```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2
                    Case No. 11-80205-CR-MARRA
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
         GOVERNMENT,               )
 5                                 )
         -v-                       )
 6                                 )
    MITCHELL J. STEIN,             )
 7                                 )
         DEFENDANT.                )    West Palm Beach, Florida
 8                                 )    May 10, 2013
    _____)
 9


10             TRANSCRIPT OF TESTIMONY OF AJAY ANAND

11            TAKEN AT THE JURY TRIAL PROCEEDINGS

12           BEFORE THE HONORABLE KENNETH A. MARRA

13                UNITED STATES DISTRICT JUDGE

14   Appearances:

15   FOR THE GOVERNMENT          Albert Stieglitz, ESQ., AND
                                 Kevin B. Muhlendorf, ESQ.
16                               U.S. Department of Justice
                                 Criminal Division
17                               1400 New York Avenue, Northwest
                                 Washington, DC 20530
18
     FOR THE DEFENDANT           Mitchell J. Stein, Pro Se
19                               1551 North Flagler Drive, #1208
                                 West Palm Beach, FL 33401
20   -and-
                                 Charles G. White, ESQ.
21                               Charles G. White, P.A.
                                 1031 Ives Dairy Road, Suite 228
22                               Miami, FL 33179

23   Reporter                    Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768               Official Court Reporter
24                               701 Clematis Street
                                 West Palm Beach, Florida  33401
25                               E-mail:
```

```
 1   * * * * * * * * * *
 2            THE COURT:  All right.  We're going to get Mr. Anand
 3   back in here.
 4            Mr. Anand, you're still under oath, sir.  Please be
 5   seated.
 6            All right.  Mr. Stein, you may continue with your
 7   cross-examination.
 8            MR. STEIN:  I'm clear to continue?
 9            THE COURT:  Yes, you may.
10            MR. STEIN:  Thank you, Your Honor.
11       Ajay Anand, Government witness, resumed the stand.
12                  Cross-examination (Cont.d')
13   BY MR. STEIN:
14   Q   Good morning, Mr. Anand.
15   A   Good morning.
16   Q   Mr. Anand, yesterday I asked you whether you received
17   stock transfers from me personally in 2003, and you said that
18   that didn't happen; is that correct?
19   A   I said I didn't recall.
20   Q   The Government and I have stipulated that the records of a
21   company called Legends Financial Management, LLC are
22   authentic.  Do you remember an entity called Legends Financial
23   Management, LLC, Mr. Anand, at any point since you met me?
24   A   Yes.
25   Q   Legends Financial Management, LLC, in 2003 was an entity
```

```
1    owned by my children's trust.  You know that to be a fact,
2    right?
3    A   I didn't know it was owned by your children's trust.  I've
4    heard the name Legends Financial Management before.
5    Q   You knew that I had an interest in and was working with
6    it; is that correct?
7    A   I understood that they had an office in your office in
8    Studio City.
9    Q   And Legends Financial Management made a transfer of 25,000
10   shares of Signalife stock to Ashton Reed on June 16th, 2003;
11   is that correct?
12   A   I don't -- I don't know.
13   Q   I didn't hear your answer.
14   A   I don't recall that transaction.
15   Q   You don't recall one way or another whether it happened?
16   A   No.
17   Q   Legends Financial Management, LLC made another transfer of
18   25,000 shares of Signalife stock to Ashton Reed on August 14,
19   2003; isn't that correct?
20   A   I don't recall that transaction.
21   Q   You don't recall whether it happened or not?
22   A   No.
23   Q   Legends Financial Management, LLC, at my direction, made
24   another transfer to you of 40,000 shares of Signalife stock on
25   November 23rd, 2003; isn't that correct?
```

```
 1    A    I don't recall any of those transactions.  I'm not saying

 2    that they didn't happen; I just don't have access to the

 3    information that would support an answer of yes or no.

 4    Q    So is it safe to assume that you did not disclose to the

 5    Department of Justice any of those three transactions which

 6    you're today saying you don't recall; is that correct?

 7    A    No, that's not correct.  I disclosed to the SEC and to the

 8    Department of Justice all the information that I had access to

 9    in terms of my trading records, account statements, brokerage

10    statements.  2003 statements were very difficult to get access

11    to.

12    Q    You indicated yesterday that you did not begin consulting

13    for Signalife until 2006; isn't that correct?

14    A    No.

15    Q    You did not make that statement yesterday under oath?

16    A    No, I was consulting with Rajiv Singh in 2005, and even

17    prior to that, variously with you.

18    Q    And those consultings with me before 2005 and 2004 with me

19    were being paid for by the transfers of stock to you; isn't

20    that correct?

21    A    That's possible.

22    Q    You're aware of paragraph 3A of your plea agreement which

23    the Government has introduced into evidence, which says you

24    must respond truthfully and completely to all questions that

25    may be put to you in any courtroom.  Do you recall that?
```

```
 1    A    Yes.

 2    Q    Mr. Anand, did you testify before any grand jury in this

 3    case or related to Signalife?

 4    A    Yes.

 5    Q    Other than your testimony before the Securities and

 6    Exchange Commission, did you testify before any grand jury in

 7    this case?

 8    A    No.

 9    Q    Did you testify before any other judicial body in this

10    case other than the SEC and other than this courtroom?

11    A    No.

12    Q    Now, I'm going to focus on written statements.

13         Mr. Anand, did you make any written statements under

14    oath about Signalife prior to your testimony here at any time

15    in your life?

16    A    I don't know what that means.  I don't understand the

17    question.

18    Q    Written statements under penalty of perjury, declarations,

19    affidavits.

20    A    Can you be more specific in your question?

21    Q    Yes.

22         Other than your plea bargain agreement, which is

23    obviously in writing and is in evidence --

24         THE COURT:  I'm sorry, Mr. Stein.  You keep saying

25    the plea agreement's in evidence.  Was the plea agreement put
```

```
 1   into evidence?
 2            MR. MUHLENDORF:  It was, Your Honor.  It was 228.
 3            THE COURT:  All right.  Thank you.  I'm sorry.
 4            MR. STEIN:  Thank you, Your Honor.
 5   BY MR. STEIN:
 6   Q    Other than the Government's exhibit 228, the plea
 7   agreement, which contains your signature -- you did sign that,
 8   right?
 9   A    Yes.
10   Q    Did you make any other statements under oath regarding or
11   relating to Signalife at any time in writing?
12   A    I may have.  I don't recall.
13   Q    Now, with regard to these three possible transfers from
14   Legends Financial Management to you of stock in 2003, do you
15   recall the value of that stock being $260,000?
16   A    I don't recall that value, no.
17   Q    So it could have been $260,000 or it could not have been,
18   you just don't recall?
19   A    I just don't recall.  It could have been or it couldn't
20   have been, yes.
21   Q    This is the way throughout our relationship that when you
22   consulted with a company, you and I worked, as you said,
23   sometimes we'd get transfer of blocks of stock at way under
24   market.  So it wouldn't -- you wouldn't doubt that it happened
25   in 2003; is that right?
```

1    A    No, I'm not disputing that, but to answer your question

2    about producing documents and producing account statements,

3    when I ran my search for producing account statements, I

4    believe it only went back five years.

5    Q    You may have purged it.  I just wanted to know if you

6    had -- I'm just testing your recollection of it.

7           Did I ever make any gifts of stock to you, or did any

8    company that I was affiliated with ever make any gifts, as

9    opposed to a consulting transfer or a sale of stock to you at

10   any time?

11   A    Yes, possibly.

12   Q    Do you have any specific -- were any of these three

13   possible transactions, 2003 -- do you recall any gifts in 2003

14   of me to you?

15   A    Possibly.  I don't remember specifically.

16   Q    So you don't recall whether these three possible transfers

17   to you in 2003 were gifts or were consulting transfers or were

18   purchases?

19   A    I don't believe they were purchases because I don't recall

20   any stock purchase agreements or any formal agreements.  I'm

21   not disputing whether or not you sent them.

22   Q    But they were -- but they weren't gifts either.  You don't

23   recall that, right?  Those three transfers of stock?

24   A    I don't recall that, no.

25   Q    So your consultancy with Signalife may have begun through

```
 1    those transfers in 2003 as early as 2003, is that accurate?

 2    A   I was doing some work for you and for Signalife starting

 3    in 2002 or 2003, yes.

 4         MR. STEIN:  Your Honor, we've marked exhibit 359,

 5    which is a -- which is the plea agreement that's already in

 6    evidence, so I don't think there's going to be an objection.

 7         THE COURT:  Why are we going to put it in again?

 8         MR. STEIN:  I believe the Government's may have been

 9    missing a couple pages, but I'm going to show it to them and

10    find out.  If it isn't, I'll just use their's.

11         Your Honor, it is the same document.  We're going to

12    put it on the screen.

13         THE COURT:  All right.  This is Government's

14    exhibit 228; is that right?  Government's exhibit 228.

15         MR. STEIN:  Attachment A and blow up paragraph 1.

16    BY MR. STEIN:

17    Q   Mr. Anand, in your plea agreement you signed a statement

18    of facts regarding that plea agreement, right?

19    A   Yes.

20    Q   And what's on the screen right now is paragraph 1 of those

21    statements; is that correct?

22    A   Yes.

23    Q   Could you read paragraph 1, please.

24    A   "Between in or about April 2003 and April 2008, the

25    relevant period, Defendant was, at various times, an investor
```

```
 1    in and consultant for Signalife, Inc., Signalife, a
 2    corporation that purportedly manufactured and sold electronic
 3    heart monitor products.  Signalife was formerly known as Recom
 4    Managed Systems, Inc., and later known as Heart Tronics, Inc."
 5    Q   So it says there investor in and consultant for, which may
 6    create an ambiguity, and I just want to confirm we've cleared
 7    it up today.  You recall being both a consultant and investor
 8    dating back to 2003 appertaining to or relating to Signalife;
 9    is that right?
10    A   Yes.
11    Q   Thank you.
12            And naturally, if you open up the whole page that
13    you're on right now, those are your initials on the bottom of
14    page I of exhibit A; isn't that right?
15    A   Yes, they are.
16    Q   Mr. Anand, you testified yesterday that you and I had a
17    meeting at Mi Piace where you alleged that I asked you to sign
18    a false purchase order.  Do you recall that testimony?
19    A   That's not what I said.
20    Q   And you said yesterday that you told me, after I told you
21    it doesn't matter, I can have somebody by the name of Ruben,
22    who's outside do it, you said you wouldn't sign a false
23    purchase order; is that correct?
24    A   I never stated anything about signing a false purchase
25    order.
```

```
 1    Q   And your testimony today is that you never said yesterday

 2    that you refused to disseminate or be involved in or sign a

 3    false purchase order; is that your testimony today?

 4    A   Can you repeat the question?

 5    Q   Your testimony today is that you don't recall testifying

 6    less than 24 hours ago that at Mi Piaci you told me you would

 7    not be involved in either signing or disseminating a purchase

 8    order for Signalife that was shown to you by the Government.

 9    Is that your testimony today?

10    A   Yes.

11    Q   So your testimony today is that you did agree in this

12    allegation of allegedly signing an allegedly false purchase

13    order and disseminating it with me?

14            MR. MUHLENDORF:  Your Honor, objection, he's

15    restating the testimony incorrectly, and he said twice now he

16    didn't do anything about signing.

17            THE COURT:  I don't understand the question,

18    Mr.~Stein.  There's too many negatives in there.  Restate your

19    question, please.

20    BY MR. STEIN:

21    Q   Did you sign and disseminate any false press releases or

22    any false purchase orders for Signalife at Mi Piaci Restaurant

23    with me in 2007?

24    A   You asked me about a press release or purchase order?

25    Q   I'm asking you about both now.
```

```
 1    A    No.

 2    Q    You never signed the purchase order?

 3    A    No.

 4    Q    You, in fact, agreed -- you said to me, I will not sign

 5    the purchase order; is that right?

 6    A    We had a discussion about you asking me to disseminate a

 7    purchase order.

 8    Q    And you said you wouldn't do that either, right?

 9    A    Yes.

10    Q    You wouldn't disseminate the purchase order, and you

11    wouldn't sign the purchase order.  That's what you testified

12    to yesterday; is that correct?

13    A    Yes.

14              MR. STEIN:  Please put up paragraph 6 of the same

15    page.

16   BY MR. STEIN:

17    Q    Same page of your retainer agreement -- excuse me, your

18    plea bargain agreement, Mr. Anand.

19              Could you please read paragraph 6 that you signed

20    under oath.

21    A    "In or about the winter of 2007, Stein asked the Defendant

22    to assist him with the creation and dissemination of a false

23    and misleading document regarding to be a purported purchase

24    order for Signalife products.  Defendant agreed to do so."

25    Q    Defendant agreed to do so.  You just told me you didn't
```

1    agree to do so.

2    A    That's not what this document's referencing.

3    Q    You had a meeting two nights ago with the Department of

4    Justice and the Postal Inspector Service, didn't you?

5    A    Yes, I did.

6    Q    And they told you to change "agreed" to "not agreed"

7    regarding signing purchase orders, isn't that right?

8    A    No.

9         MR. MUHLENDORF:  Objection, Your Honor, calls for

10   hearsay.

11        THE COURT:  Overruled.

12   BY MR. STEIN:

13   Q    They didn't tell you that; is that right?

14   A    Can you repeat the question?

15   Q    Did the Department of Justice tell you two nights ago to

16   stat today under oath or yesterday under oath that you never

17   agreed to sign an alleged purchase order and disseminate an

18   alleged purchase order?

19   A    No.

20   Q    So the Government has never approved of you saying that

21   you agree or don't agree to the statement that allegedly there

22   was a false purchase order, there's been no discussions about

23   that?

24        MR. MUHLENDORF:  Judge, objection again.  What we

25   approved or disapproved is totally irrelevant to Mr. Anand's

```
 1    testimony.
 2              THE COURT:  I don't understand the question,
 3    Mr. Stein, can you please restate the question?
 4              MR. STEIN:  I'll restate it.
 5    BY MR. STEIN:
 6    Q    What is it, Mr. Anand?  Did you ever agree to disseminate
 7    and sign a false purchase order for Signalife ever in your
 8    life?
 9    A    No.
10    Q    Can you explain why exhibit 6 of your plea agreement says
11    "Defendant agreed to do so" in reference to a purported
12    purchase order for Signalife?
13    A    Yes, I'd be happy to explain.
14    Q    Please explain.
15    A    The document that I provided -- I shouldn't say the
16    document -- the information I provided to the Department of
17    Justice was that I put together and disseminated to you and
18    Dr.~Harmison a cancellation order, and I have agreed to that,
19    and that is in my testimony to the Department of Justice.
20    Q    But paragraph 6 says nothing about a cancellation order.
21    It says purchase order, right?
22              MR. MUHLENDORF:  Your Honor, objection.
23              THE WITNESS:  That is what it says, yes.
24              MR. MUHLENDORF:  It speaks for itself, and that's not
25    what it says.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. STEIN:
 3    Q   Paragraph 6 does not say purported purchase order; is that
 4    your testimony?
 5    A   No, it does say that.
 6    Q   It says you agreed to disseminate allegedly a false
 7    purchase order, right?
 8    A   That is what it states, but that's not what I -- that's
 9    not what I did.
10    Q   Okay.  So paragraph 6 is not what you did, correct?
11    A   No, I put together at your request a cancellation order
12    and a change of address for IT Healthcare.
13    Q   Just need a direct question (sic) to what I asked.
14    Paragraph 6, when it says "Defendant agreed to do so" is not
15    accurate; is that correct?
16    A   Yes.
17    Q   It's a part of your plea bargain agreement, right?
18    A   Yes.
19    Q   Between the time in 2012 you signed your plea agreement
20    and today, did you ever tell the Department of Justice that
21    paragraph 6 was inaccurate in any respect?
22    A   I did not, no.
23    Q   Did the Department of Justice ever tell you that
24    paragraph 6 was inaccurate in any -- at any time?
25    A   No, but I did bring up this issue with counsel
```

```
 1   approximately two weeks ago.
 2   Q    What -- you brought up this issue with counsel -- with
 3   your own counsel?
 4   A    My own counsel, yes.
 5   Q    I don't want to hear about that.
 6   A    Okay.
 7   Q    You brought up the issue of the inaccuracy of paragraph 6
 8   with your counsel?
 9   A    Yes, I did.
10   Q    But to your --
11   A    It was -- let me restate that.  It wasn't about
12   paragraph 6.
13          On the Department of Justice's website, there has a
14   paragraph about my involvement in Heart Tronics and Signalife,
15   and the way it reads is that it states similar to what this
16   states, from the standpoint of instead of discussing the
17   cancellation orders that you were requesting me to do, it does
18   state that it was a purchase order.
19   Q    Nobody that you know of called the Department of Justice
20   and told them about this inaccuracy; is that correct?
21   A    I don't know.  I don't know about that.
22   Q    Now, Mr. Anand, moving on from your plea bargain agreement
23   in paragraph 6, this Mr. Gulati who was involved in some way,
24   shape or form with the Silve Group, he's an actual real live
25   human being, right?
```

```
 1    A    Yes.

 2    Q    He actually testified before the SEC, right?

 3    A    Yes.

 4    Q    And the two of you maintained a brokerage account together

 5    at E-trade; is that correct?

 6    A    Yes.

 7    Q    And Mr. Gulati, you represented to John Woodbury of the

 8    company, was involved with a company called SES Capital that

 9    you had formed; is that correct?

10    A    No.

11    Q    You never told Mr. Woodbury that in words or substance?

12    A    Not SES Capital, no.

13    Q    You never told him he was involved in all of your

14    companies quote-unquote?

15    A    What I said was Mr. Gulati was involved in the Silve Group

16    and possibly another company, but not SES Capital.

17    Q    Okay.  So he was possibly involved in some of the other

18    companies you mentioned, not SES Capital?

19    A    Yesterday.  Some of the companies I mentioned yesterday,

20    yes.

21    Q    Mr. Anand, you said yesterday that you and I first met

22    with regard to a company called Medtech when you were at

23    Magnum Financial.  Do you recall that?

24    A    Yes.

25    Q    In fact -- and that was somewhere in the late '90s; is
```

1    that correct?

2    A    That was 1999, yes.

3    Q    And you have no trouble remembering 1999 and that fact as

4    opposed to some of the other questions where you don't recall.

5    You remember clearly 1999 we met regarding a company called

6    Medtech at that time; is that right?

7    A    That was my first meeting with you, yes.

8    Q    In fact, we met before that with regard to a company

9    called Litack (phonetic) when you invested in a proxy contest

10   in order to bring this product to market; isn't that right?

11   A    No, that's not true.

12   Q    Not true?

13   A    Not true at all.

14        MR. STEIN:   Marked as exhibit 379, a document I've

15   given the Government before.

16        May I approach?

17        THE COURT:   Yes.

18        MR. STEIN:   Thank you, Your Honor.

19   BY MR. STEIN:

20   Q    Show you what's been marked as exhibit 379, Mr. Anand.

21   Just take a minute.  It's a public filing from Avanir

22   (phonetic), formerly known as Abrev ---excuse me, as Litack,

23   the makers of this product.  It's a public filing.

24        You're familiar with public filings, right?

25   A    Yes, I am.

```
 1    Q    What type of public filing is that?

 2    A    It's a 14-A.

 3    Q    A 14-A is a filing made to initiate a proxy contest for

 4    control of a public company; is that right?

 5    A    I believe so, yes.

 6    Q    And your testimony remains that you were not involved in

 7    1998 with Health Med and me in investing in a proxy contest to

 8    place people on the board of that company so that it could be

 9    on its way to getting FDA approval, is that your testimony?

10    A    Mr. Stein, I did not meet you until 1999.  I did not meet

11    you until 1999.  I started consulting with Magnum in 1999.  I

12    did not meet you in 1998.

13    Q    You were unemployed in 1998?

14    A    No, I was consulting.

15    Q    Were you unemployed in 1997?

16    A    I don't believe so.  I was doing some consulting.

17    Q    And in 1999 you claim you were working for Magnum.

18    A    I was working with a company called Magnum Financial, and

19    you were -- your company, Medtech, was a client of their's,

20    and I met you in their office in 19 -- early January or

21    February of 1999.

22    Q    With regard to the form 14-A that I just showed you, you

23    took some time to review it, right?

24    A    I looked it over, yes.

25    Q    And you noticed on there that the person paying for
```

```
 1   appointing people to the board was Mitchell Stein of Health

 2   Med, Inc.?

 3            MR. MUHLENDORF:  Objection, Your Honor.  It's not in

 4   evidence.

 5            THE COURT:  Sustained.

 6   BY MR. STEIN:

 7   Q   Do you recall in 1998 a company called Health Med, Inc.?

 8   A   No.

 9   Q   Was Health Med, Inc. involved in the company that you do

10   admit to being involved in, Medtech?

11   A   I don't know what Health Med is.

12   Q   You don't know what Health Med is?

13   A   No.

14   Q   So your testimony with regard to my narrow question is,

15   therefore, you have no recollection of Health Med being

16   involved in the company you do remember, Medtech, in 1999; is

17   that right?

18   A   I don't know what Health Med is.  I don't know what Health

19   Med is.

20   Q   So you could have been involved with Health Med regarding

21   Medtech, you just right today don't remember what it is; is

22   that your testimony?

23   A   Yes.  The company I knew was Medtech, then it was

24   E-Medsoft and then it was Med Diversified.  Health Med,

25   whether it was a predecessor company to that, I don't know.
```

 1   Q   Do you recall a company by the name of Sanga

 2   International?

 3   A   Yes.

 4   Q   Do you recall Sanga International was a shareholder of

 5   Medtech; is that right?

 6   A   Yes.

 7   Q   And Health Med was the owner of Sanga International; isn't

 8   that right?

 9   A   I did not know that.

10         MR. STEIN:  One moment, Your Honor.

11   BY MR. STEIN:

12   Q   So your testimony is you didn't meet me until 1999 with

13   regard to Medtech, right?

14   A   That's correct.

15   Q   And you weren't unemployed in 1997, 1998 or 1999, right?

16   A   That's correct.

17   Q   You do recall testifying before the Securities and

18   Exchange Commission on July 22, 2010, right?

19   A   Yes, I do.

20   Q   At page 30 of that deposition, you say at line 10 that

21   after you left Smith Barney in 1997, you say:  "I believe I

22   was unemployed."

23         Was that true when you said it to the SEC?

24   A   I wasn't employed by a company, I was doing some

25   consulting.  That's true.  I wasn't employed by a company

```
 1   where I was getting a monthly paycheck.  I was consulting with
 2   a company in Irvine, as a matter of fact.
 3   Q   You didn't tell that to the SEC; is that correct?
 4   A   I wasn't employed by them.  They would give me jobs to
 5   work on and pay me for my consultancy.
 6   Q   I just want to know if you told that to the SEC, that fact
 7   that you just mentioned.
 8   A   I told them I wasn't employed, yes, but I wasn't employed
 9   by a company, I was doing consulting.
10   Q   So you did tell the SEC you were unemployed for that
11   period 1998?
12   A   Yes.
13   Q   Okay.  That wasn't a lie, one of the things that you lied
14   about to them, the unemployment in 1998?
15   A   Mr. Stein, as I've said a number of times, I wasn't
16   employed by a company.  I was doing some consultancy work.
17   Q   And that consulting work did not include anything having
18   to do with me when you were unemployed and doing consulting
19   work in 1998?  Had nothing to do with me; is that right?
20   A   Nineteen -- I met you in 1999.  I did not do any work for
21   you in 1998.
22   Q   You're positive of that, or you just don't recall?
23   A   I'm positive.  I met you in 1999.
24   Q   Mr. Anand, as a -- you did work at Smith Barney; is that
25   right?
```

1    A    Yes.

2    Q    That was in, like, 1997, right?

3    A    I believe it was from 1995 to 1997.

4    Q    And then when you met me you were at Magnum Financial.

5    That was also an investment relations company for public

6    companies, right?

7    A    Yeah, they did consulting for various public companies,

8    yes.

9    Q    So you were very familiar with the public filings like

10   10-Ks and 10-Qs that we've already looked at; is that right?

11   A    Somewhat familiar, yes.

12   Q    Yesterday, Mr. Anand, you said that I asked you to sign on

13   to shipping items to a Texas warehouse.  Do you remember that?

14   A    Yes.

15   Q    And --

16   A    Well, no, no, that's not -- that's not accurate.

17   Q    Which is it?  Yes or no.

18   A    Can you repeat the question?

19   Q    Yesterday you testified that you -- that I asked you to be

20   involved with purchase orders and shipping units to a Texas

21   warehouse facility.

22   A    That's not what I stated.  What I stated was you asked me

23   if I knew anybody with a warehouse, and then you asked me to

24   go to Texas or send somebody to Texas to send in a purchase

25   order.

```
1    Q   And you testified yesterday you didn't agree to do that,
2    right?
3    A   Yes.
4    Q   We went through that this morning.
5           And yesterday you indicated to the jury that
6    allegedly I told you and asked you to do this, the false
7    purchase orders, so that Signalife could recognize revenue if
8    it shipped items to a warehouse.  You remember that, right?
9    A   Yes.
10   Q   And that statement is false, because you knew at the time
11   and you know today that Signalife always announced that it
12   would never recognize revenue from merely shipping an item to
13   a warehouse; isn't that correct?
14   A   That's not -- that's not accurate.
15   Q   I'm going to have put on the screen what's already been
16   marked and shown and admitted into evidence.  It's
17   exhibit 391, which is a page from one of the 10-Ks in 2007 for
18   Signalife.
19          THE COURT:  Is it 391 or 392?
20          MR. STEIN:  391 is page 11, I believe, of the 10-K.
21          THE COURT:  Okay.  I thought it was 392, but maybe
22   I'm wrong.
23          MR. STEIN:  Your Honor's correct.  It's listed here
24   as 391, but it's 392.
25          THE COURT:  This is what you admitted earlier today.
```

```
 1              MR. STEIN:  That's correct.

 2              THE COURT:  I have it as 392.  If I've got the wrong

 3    number, you need to let me know so I can clear it up.

 4              MR. STEIN:  This one is 391, I'm being told.

 5              THE COURT:  Is this the document you showed to

 6    Dr. Harris?

 7              MR. STEIN:  Yes, it, is Your Honor.

 8              THE COURT:  Okay.  Well, we have it as 392.

 9              MR. STEIN:  Then we're going to have it as 392 if

10    that's what you have there, and the entire public filing will

11    be 391.

12              THE COURT:  I thought the public filing was already

13    in evidence.

14              MR. STEIN:  What's that?

15              THE COURT:  I thought the entire public filing was

16    already in evidence.

17              MR. STEIN:  Yes, it was.

18              THE COURT:  As a Government's exhibit, and you were

19    taking one page out.

20              MR. STEIN:  It's one of our exhibits, too, Your

21    Honor.

22              THE COURT:  Okay.  So this is 392 now, yes?

23              MR. STEIN:  Yes, Your Honor.

24              THE COURT:  Okay.

25    BY MR. STEIN:
```

1    Q    Mr. Anand, could you please read the highlighted portion,

2    the second paragraph under "revenue recognition" for the

3    public filing of Signalife, the second paragraph.

4    A    The second paragraph starting with "we generally?"

5    Q    Yes.

6    A    "We generally recognize product sales revenue upon

7    delivery of product unless there are significant post-delivery

8    obligations or collection is not considered probable at the

9    time of sale.  When significant post-delivery obligations

10   exist, revenue is deferred until such obligations are

11   fulfilled."

12   Q    You were familiar at all times during the Silve Group of

13   Norma Provencio, correct?  You know her?

14   A    No, I don't know her.

15   Q    You're familiar with Pam Bunes, correct?

16   A    Yes.

17   Q    You knew that the company had an audit committee, correct?

18   A    Yes.

19   Q    And you had been paid a lot of stock, and you were

20   reviewing the company's filings regularly; is that right?

21   A    No, I wasn't reviewing the filings regularly.  I was paid

22   a lot of stock, yes.

23   Q    You knew in 2007 that the company did not recognize

24   revenue on any sale when there were post-delivery payment

25   obligations; isn't that right?

1    A    No, I did not know that.

2    Q    So you didn't read this statement of the public filing?

3    A    I just read it now.  I didn't read it at the time.

4    Q    So you didn't know that at the time?

5    A    No.

6    Q    You do know that the company never, in fact, recognized

7    any revenue from any of the sales that you testified to

8    yesterday that were attributed to the Silve Group; isn't that

9    right?

10   A    Could you repeat the question?

11   Q    You know that the company, Signalife, never recognized on

12   its balance sheet and its 10-Ks any revenue from any sales

13   with regard to these allegedly false purchase orders; isn't

14   that right?

15   A    I don't understand the question.

16   Q    No revenue was ever placed in the 10-K.  You understand

17   what revenue is?

18   A    Yes, I do.

19   Q    Revenue is the company bringing in money, right?

20   A    Yes.

21   Q    The company never recognized any revenue from any of these

22   allegedly false purchase orders; isn't that right?

23   A    I don't know that.

24   Q    So you didn't look at the revenue line of the company's

25   10-Ks during this period; is that your testimony?

```
1    A    Yes, I did not.

2    Q    Did you look at the company's -- at any portion of the

3    balance sheet of the company as reported in the 10-Ks during

4    2006, '7 and '8?

5    A    No.

6    Q    So you have no idea whether the company was recognizing

7    revenues as it related to the Silve Group or anyone else; is

8    that right?

9    A    No, I did not.  I wasn't reviewing the filings.

10   Q    And you had no idea whether the company was recognizing

11   accounts receivable as opposed to cash, accounts receivable

12   with regard to any of these allegedly false purchase orders;

13   isn't that right?

14   A    No, I didn't know that.

15   Q    You don't know whether they did or they didn't?

16   A    I didn't review the documents.  I didn't review the

17   filings.

18   Q    Did you ever review the public filings of Signalife at any

19   time?  We were first talking about 2006, '7, and '8, and now

20   I'm talking about at any time.

21   A    At some point in time I did, yes.

22   Q    But never the 2006, '7, and '8?  You reviewed other public

23   filings, is that your testimony?

24   A    Yeah, prior to that, I think in 2005 I may have looked at

25   some of the filings, but not 2007 or '8.
```

1  Q   Are you familiar with any startup company -- and you've

2  dealt with a lot of startup companies through the years,

3  right?

4  A   Yes.

5  Q   Are you aware of any startup company that recognizes

6  revenue, in other words, reports that it has received money,

7  or the right to money, before the money is received?  Are you

8  aware of any company that's ever done that?

9  A   I'm not aware of that.

10 Q   So in the interest of time, I don't need to show you the

11 10-K for 2000 -- and waste the jury's time and the Court's

12 time, I don't need to show you the 10-Ks for 2006, '7, and '8

13 and the same revenue recognition policy of the company because

14 you didn't read those three 10-Ks, so you have no recollection

15 one way or the other regarding them; is that right?

16 A   Yeah, I didn't read them.

17 Q   You also testified yesterday, Mr. Anand, that I never -- I

18 or my law firm never provided you or any of your companies

19 with legal services.  Do you remember that?

20 A   Yes.

21 Q   There was a legal fees notation on the bottom left-hand

22 corner of a check that was admitted by the Government in

23 evidence.  Do you remember that?

24 A   Yes, I do.

25 Q   In fact, you hired my firm with regard to a lawsuit

```
1    entitled Anand versus Trabeti (phonetic), and the firm
2    assisted you with regard to that lawsuit which was filed; is
3    that correct?
4    A    You and another attorney by the name of Paul Taylor in
5    2004 helped me with an issue regarding Ms. Trabeti, yes.
6    Q    We provided legal services to you, right?
7    A    And in addition to that, in 2007, when I was going through
8    a period of time with my now ex-wife, you did assist me a
9    little bit.  You didn't provide any documents, but you did
10   verbally assist me with something, yes.
11   Q    So I did provide legal services to you from 2004 to 2007
12   on those two matters, at least, right?
13   A    In 2004, Paul Taylor assisted me with that matter.
14   Q    I thought you said Paul Taylor and I.
15   A    You referred me to Paul Taylor, and, yes, Paul Taylor did
16   help me with that.  You and Paul Taylor did help me with that,
17   yes.
18   Q    So, again, I did provide legal services to you between the
19   period of 2004 and 2007; is that right?  By assisting you as a
20   lawyer, I would be providing legal services, right?
21   A    Yes.
22   Q    We actually filed suit in Orange County superior court,
23   right?
24   A    2004, yes.
25   Q    That suit -- in that suit you were the Plaintiff; isn't
```

1    that right?

2    A    Yes.

3    Q    And you were suing Ms. Trabeti for slander and defamation;

4    isn't that right?

5    A    Yes.

6    Q    She was vigorously harassing you almost in an unfair way;

7    isn't that right?

8    A    Yes.

9    Q    And you had a tumult.  You were upset with that, right?

10   A    Yes.

11   Q    And that's why you filed suit, correct?

12   A    Yes.

13   Q    And she stopped harassing you after we were done with that

14   lawsuit; is that right?

15   A    Yes.

16            I didn't get an invoice for the services, either.

17   Q    Did you get an invoice from Mr. Taylor?

18   A    No.

19   Q    Were you told the services were being provided pro bono by

20   Mr. Taylor?

21   A    This is nine years ago.  I don't recall.

22   Q    It's nine and six.  The 2007 thing I helped you with your

23   marriage.  Did either Paul Taylor or I tell you we were

24   providing the services for free as a gift to you?

25   A    Actually, yeah, I think you did tell me that.

```
 1   Q    I told you it was --

 2   A    You told me that based on all the work that I've helped

 3   you with, that you would help me with this.  Yeah, I do

 4   remember that.

 5   Q    Now, with regard to the Silve Group, which took up the

 6   majority of your testimony on direct, the Silve Group had

 7   indicated to Signalife that it hoped to become a middleman to

 8   distribute the Fidelity 100 to end users like pharmaceutical

 9   companies and the other things that we talked about yesterday

10   in your e-mail to Mr. Singh.  Is that generally accurate?

11   A    The e-mail wasn't to Mr. Singh, it was to you.  It

12   referenced Mr. Singh.  But that is fairly accurate, yes.

13   Q    Actually, that document was, you indicated yesterday, sent

14   to Ms. Bunes also, right?

15   A    I believe it was sent to you and Harmison and Ms. Bunes, I

16   believe.  I could be wrong.

17   Q    And you wanted to be a middleman, and then you thought

18   there was a great opportunity in delivering the product to

19   certain end users like pharmaceutical companies and other end

20   users; is that right?

21   A    The middleman part I don't -- that's not accurate, but you

22   engaged us to try and sell the product.  Middleman isn't an

23   accurate reflection of what we were asked to do.

24   Q    Well, the Silve Group itself wasn't going to be using the

25   Fidelity 100, right?
```

```
1    A    No.  We were trying to sell the product.

2    Q    And you did engage in, you said, one small sale in Mexico;

3    is that right?

4    A    Yes, I -- you referred me to Demetrio Sodi in Miami.  I

5    hired him in January 2007.  He embarked on marketing the

6    product in Mexico, and he did sell one unit in Mexico to a

7    doctor there.

8    Q    And the company delivered on that one product.  They

9    shipped the product; is that right?

10   A    I don't know if they shipped it or not.

11   Q    Did you ever hear whether that end user of the product

12   complained about the product in any way?

13   A    I don't recall that.

14        MR. STEIN:  May I approach?

15   BY MR. STEIN:

16   Q    I'm going to show you what's been marked as exhibit

17   number 14.

18        MR. MUHLENDORF:  Mr. Stein, what are you showing him?

19   It's not in evidence, right?

20        MR. STEIN:  It's not in evidence.

21   BY MR. STEIN:

22   Q    It's a rather lengthy document.  Could you review it and

23   see if you're familiar with it?

24   A    I've never seen this document.

25   Q    Have you ever seen any portion of this document?
```

```
 1    A    No, I have not.

 2    Q    You're positive?  It's a lengthy document.

 3    A    I'm fairly positive I have not seen this document.

 4    Q    There are various companies mentioned in there.  Are you

 5    familiar with any of those companies -- I'm not going to

 6    mention them -- as it relates to Signalife?

 7    A    This is probably a hundred pages, Mr. Stein.  I haven't

 8    reviewed all of if.

 9    Q    I wanted you to carefully review it.  It's important.

10    A    It's a hundred pages.

11    Q    There's a list of -- would you like me to show you the

12    page that I -- I'd like you to review?

13    A    If possible, yes.

14         MR. STEIN:  Can I approach again, Your Honor?

15         THE COURT:  Yes.

16 BY MR. STEIN:

17    Q    Don't mention the companies, just tell me whether you

18    remember whether or not either the Silve Group or Signalife

19    was involved with any of them.

20    A    I can't attest to Signalife being involved in any of them,

21    but I don't believe Silve Group was involved in any of these.

22    Q    But you don't know whether Signalife was involved with any

23    of them?

24    A    No, I don't know.

25    Q    Thank you.
```

```
 1              Now, you've admitted that I stopped calling you at a
 2   certain point in 2007 or '8; is that correct?
 3   A   I don't believe it was 2007 or '8.  It might have been
 4   late 2008 or 2009.  I don't recall the dates.
 5   Q   I never called you prior -- I never called you after the
 6   SEC inquiry started; is that right?
 7   A   No.
 8   Q   Never called you after the investigation which followed
 9   that started; is that right?
10   A   No, you did not.
11   Q   And during that time, you also refunded shares to the
12   company; is that right?
13   A   In 2007, I got a call from you and from Woodbury,
14   Mr. Woodbury, stating that you guys were unhappy with the
15   performance of Silve Group and asked me to remit some of the
16   shares that we didn't deposit, and I did so.
17   Q   In that --
18   A   Remit or cancel, I'm sorry.  Remit or cancel.
19   Q   And that was approximately 300,000 shares; is that right?
20   A   I believe it was more than that.
21   Q   Okay.  Somewhere around 500,000?
22   A   I don't recall the exact number, but it was a significant
23   amount of shares, yes.
24   Q   And Mr. Woodbury and I explained to you that the reason
25   for our call was that neither of us believed the --
```

```
 1              MR. MUHLENDORF:  Objection, Your Honor, hearsay.
 2              THE COURT:  Sustained.
 3              Rephrase the question.  Don't tell us what you said.
 4    BY MR. STEIN:
 5    Q   Your understanding was that the reason for the call was
 6    that the company and me and Mr. Woodbury were unhappy with the
 7    Silve Group's performance; is that correct?
 8    A   I believe the way I understood it that was the undertone,
 9    correct.
10    Q   This was the first unhappiness I had ever -- or dispute,
11    or whatever, that I had ever had with you throughout all the
12    years that we had been doing business, is that your general
13    recollection?
14    A   No, I never stated that.
15    Q   I want to know.  I'm asking you now to tell me whether
16    that's true or not.
17    A   No, no.
18              As a matter of fact, after our ARC transaction in
19    2006, you were -- I was reaching out to you a lot and you
20    weren't returning my calls for a long period of time.  I
21    believe it was maybe summer of 2006 or even late summer of
22    2006, all the way up until 2007.
23    Q   So you and I didn't talk.
24    A   Right.
25    Q   So I never expressed to you that I was irritated with you
```

1    during those times when we didn't talk?

2    A    You never expressed that, but after repeated phone calls

3    and you never returned them, I did assume that you were

4    unhappy with something.

5    Q    Other than that period and other than the period where you

6    do recall the company and certain of its principals

7    unhappiness with the Silve Group, there were never any other

8    disputes between us over the years; is that right?

9    A    I can't say never.  I wouldn't say never.

10   Q    You don't recall any right now as you sit here, right?

11   A    Not that I recall, but naturally when you speak to someone

12   seven or eight times a day and have known someone for 14

13   years, naturally there's going to be tension between two

14   people.  I don't know exactly how many times.  I'm sure there

15   were a number of times where we were unhappy with one another,

16   but to the best of my knowledge, I believe there was a few

17   periods of time that I recollect.

18   Q    And you've testified fully to those as best you can recall

19   today?

20   A    To the best of my recollection, yeah.

21   Q    Now, at one point, the Silve Group became upset because

22   nobody at the company was returning their calls regarding the

23   Silve Group's responsibilities; is that correct?

24   A    I don't understand your question.

25   Q    At some point, the Silve Group felt it was hamstrung and

```
 1    couldn't do its job because the company wasn't returning its
 2    calls under the contract; is that correct?
 3    A    I never -- I didn't -- I don't believe that's what I said.
 4    I don't believe that's what I presented.  What I said was
 5    there were times where phone calls weren't returned to us, to
 6    me.  I was the Silve Group.
 7    Q    Demetrio Sodi lived in Mexico, right?
 8    A    Yes.
 9    Q    He was a part of the Silve Group, as you've indicated,
10    right?
11    A    He was working for the Silve Group, yes.
12    Q    And, so, there were times where you were -- you felt
13    hamstrung that calls weren't being returned?
14    A    What does hamstrung mean?  I don't know what that term
15    means.
16    Q    Unable to perform for lack of communication by the company
17    and you.
18    A    I don't believe that's accurate.  I spoke to you three,
19    four, five times a day.
20    Q    Except during the period of 2006, for a year or so you
21    indicated we didn't speak?
22    A    I never said it was a year.  What I said was after the
23    transaction with ARC, which concluded I believe in October the
24    last payment was made, from October to January I don't believe
25    we spoke.  I felt that you were upset with me for some reason.
```

```
 1    I reached out to you a number of times, and you never returned

 2    my calls.

 3              MR. STEIN:  One second, Your Honor.

 4    BY MR. STEIN:

 5    Q    How much was the Silve Group paying Mr. Sodi while he was

 6    working for the Silve Group, the Mexican individual?

 7    A    We agreed upon -- when I met with you and Mr. Sodi in

 8    Florida, I asked Mr. Sodi what he would require on a monthly

 9    basis to maintain an office and a staff, and he stated he

10    would require $6500 a month cash, plus being reimbursed for

11    any of his expenses, and he asked me to purchase a laptop for

12    him, which I did.

13    Q    And did you dutifully pay him as he wished to be paid for

14    any period of time?

15    A    Yes, I did.

16    Q    How long a period of time?

17    A    I believe we started in January, and I continued paying

18    him to through September or October of 2007, to the best of my

19    recollection.

20    Q    With regard yesterday -- and I apologize for jumping

21    around, but this is based on your testimony yesterday.  You

22    indicated that the entity, I believe it was called Resource,

23    had set up a -- Resource Networks had set up a call center in

24    India with IT support.  Remember that testimony?

25    A    I don't know if that was true or not.  I said that you
```

```
 1    asked me to do that and you paid me to do that, but I don't
 2    know if that was done.
 3    Q    You set up the company, though, in India, right?
 4    A    I didn't set up any company in India, no.
 5    Q    You didn't set up any call center in India?  You didn't
 6    testify to that yesterday?
 7    A    No, that's not what I said.  You asked me to set up call
 8    centers and people who could do remote IT or phone support for
 9    Signalife, but looking back on it, I think that was just a
10    bogus situation.  I believe I gave you some names of people,
11    but I don't think anything ever occurred regarding that.
12    Q    Nothing recurred (sic) in regarding setting up call
13    centers or IT support centers by you for the benefit of
14    Signalife or any of its affiliates --
15    A    No.
16    Q    -- is that your testimony?
17    A    No, it never occurred.
18    Q    Your testimony before the SEC on July 22nd, 2010, on
19    page 69, line 21, you said:
20         "One thing we did set up is the company asked us for
21    IT support and remote call center support, and that was done
22    under an entity called -- it was originally called Resource
23    Networks, and Mr. Baker and I worked on that and sent them the
24    list that we put together for that, and that was essentially
25    that.  They wanted remote IT support and wanted some call
```

```
 1   centers to pick up the calls when the patients were alerted,

 2   and they wanted that all done in India.

 3          "Mr. Baker and I worked on that, sent it to the

 4   company, and we were paid for that."

 5          Remember that testimony?

 6   A   That testimony was false, which I have pled guilty to.

 7   Q   But Resource Networks was a company you did set up?

 8   A   It was not a company, it was a DBA under Sameer Gulati's

 9   name, which you asked me to set up, yes.

10   Q   And Sam Baker, you claimed that you were working with a

11   man named Sam Baker; is that correct?

12   A   Yes.

13   Q   Does Sam Baker exist?

14   A   No, he doesn't.

15   Q   There is no Sam Baker?

16   A   Again, you asked me to create a person named Sam Baker,

17   and I did.

18          MR. STEIN:  Can you please put back on the screen his

19   plea agreement.

20          It's Government's exhibit 228, Your Honor.

21   BY MR. STEIN:

22   Q   Mr. Anand, attachment A is the statement that you made to

23   the Government to disclose your wrongdoing.

24   A   Yeah.  I can't read it.  It's too small.

25   Q   He's very good at this from history, so he'll blow it up.
```

```
 1              MR. MUHLENDORF:  Your Honor, I think it's in his
 2    binder, if there's a hard copy.
 3              MR. STEIN:  Thank you.
 4              THE WITNESS:  What's the number?
 5              MR. MUHLENDORF:  228.
 6              THE WITNESS:  Okay.  What page?
 7    BY MR. STEIN:
 8    Q    Attachment A.  It's on the screen so you can compare it.
 9    A    Okay.
10    Q    Now this name, Sam Baker, this person didn't exist,
11    correct?
12    A    Yes, did not exist.
13    Q    Sameer Gulati did exist, correct?
14    A    Yes.
15    Q    Demetrio Sodi did exist, correct?
16    A    Yes.
17    Q    So this Sam Baker not existing, me telling you his name,
18    this allegation, this is a big deal, right?  You mentioned it
19    before the SEC, a person that didn't exist.  Government was
20    upset about that, weren't they?
21    A    I don't know if they were upset about it.  I did tell the
22    Government that there are (sic) no Sam Baker exists.
23    Q    But in your statement of facts on your plea agreement,
24    Mr. Baker, Mr. Sam Baker, the person who doesn't exist, is not
25    mentioned one time; isn't that correct?
```

```
 1    A    I don't believe so, no.

 2    Q    Notwithstanding the irritation that was expressed toward

 3    you when the shares were returned, you continued on to attempt

 4    to establish a relationship with the company, correct?

 5    A    I had a relationship with you, yes.

 6    Q    And at that time, you -- you personally were invited to

 7    lunch by the CEO of the company, Rowland Perkins, at the

 8    Bel-Air Country Club; is that correct?

 9    A    Yes -- no, you set up the lunch.

10    Q    Right, but --

11    A    You called me and said, could you meet Mr. Perkins at the

12    Bel-Air Country Club.  That's true.

13    Q    And did you and Mr. Perkins ever directly communicate on

14    any transactions that you thought you could do for the

15    company?

16    A    Yes.

17    Q    And what type of transactions did you communicate with

18    Mr. Perkins about?

19    A    I believe at that time, to the best --

20    Q    What time?  What time?

21    A    The time that I met with Mr. Perkins.

22    Q    What year, if you remember?

23    A    I don't remember the year.

24    Q    Well, it was after Dr.~Harmison got sick, right?  It was

25    after that.
```

```
 1    A    I don't remember the year.  It could have been 2007, 2008.

 2    Q    Okay.  Continue.  I'm sorry.

 3    A    Prior to my meeting with Mr. Perkins, I think you had

 4    asked me to reach out and see if I could raise some money for

 5    the company, and I said possibly I could, and you suggested I

 6    meet with Mr. Perkins at the Bel-Air Country Club, and which I

 7    did.

 8    Q    Did you, in fact, attend that meeting?

 9    A    Yes.

10    Q    And did Mr. Perkins know your name was Ajay Anand?

11    A    Yes.  Although that was the first time I met with him or

12    spoke with to him, yes.

13    Q    But I never told you to hide your name to him or to

14    anyone, right?

15              MR. MUHLENDORF:  Objection, Your Honor, hearsay.

16              THE COURT:  Overruled.

17              THE WITNESS:  Can you repeat the question?

18    BY MR. STEIN:

19    Q    I never asked you to hide your name or pretend like you

20    were someone in this person-to-person meeting with

21    Mr. Perkins, right?

22    A    Not at the meeting, no.  But you did ask me to set up an

23    entity to facilitate this money raise.

24    Q    So I was the one who was, with Mr. Perkins --

25    A    I didn't state that.  I didn't say that.
```

```
 1   Q   Who was working on this next attempted transaction that
 2   you're referring to with Mr. Perkins regarding raising money?
 3   What human beings?
 4   A   You and me.
 5   Q   Nobody else?
 6   A   Not that I recall.
 7            THE COURT:  Mr. Stein, why don't we take a break.
 8            MR. STEIN:  Oh, I'm sorry.  Of course.
 9            THE COURT:  Ladies and gentlemen, let's take a
10   15-minute recess.  Please don't discuss the case, form any
11   opinions.  Leave everything in your seat, and we'll see you in
12   about 15 minutes.  Thank you.
13       (The jury exits the courtroom.)
14            THE COURT:  All right.  Sir, you may step down.
15   Watch your step.  Don't discuss your testimony during the
16   recess.
17            Mr.~Stein, just any idea how much more?
18            MR. STEIN:  Your Honor, in view of the speed and the
19   lack of objections, it could -- I could -- I thought before
20   today I wasn't going to finish.  I think I may be able to
21   finish.
22            THE COURT:  Okay.
23            MR. STEIN:  Before 1:00.  So my estimate would be --
24   it can now be revised.  There's been virtually no objections.
25   A half hour, 45 minutes, an hour, tops.
```

```
 1              THE COURT:  All right.  Very good.  Thank you.

 2         (A recess was taken from 10:39 a.m. to 10:53 a.m., after

 3    which the following proceedings were had:)

 4              THE COURT:  All right.  We're back on the record.

 5              We ready to proceed, Mr.~Stein?

 6              MR. STEIN:  Yes.

 7              THE COURT:  Government ready?

 8              MR. MUHLENDORF:  Yes, Your Honor.

 9              THE COURT:  Bring the jurors in.  Let's bring the

10    witness back in.

11              You're still under oath, sir.

12         (The jury enters the courtroom, after which the following

13    proceedings were had:)

14              THE COURT:  Welcome back, everyone.  Please be

15    seated, ladies and gentlemen.

16              Mr.~Stein, you may continue.

17    BY MR. STEIN:

18    Q   Mr. Anand, when we broke we were talking about the

19    transactions you were discussing -- you had discussed with

20    Rowland Perkins, the then CEO of Heart Tronics.  Do you

21    remember that?

22    A   Yes.

23    Q   And what was -- did you ever know what Mr. Perkins'

24    background was?

25    A   Yes, I looked him up before I met him.
```

```
 1   Q    What was his background?
 2   A    Mr. Perkins had a very accomplished background.  He was,
 3   if I remember correctly, the founder of Creative Artist
 4   Agency, one of the biggest talent agencies in Hollywood.  He
 5   had been involved in a number of public companies, as well.
 6   That's what I remember from his background.
 7   Q    You recall him also being a high level executive at the
 8   William Morris agency?
 9   A    I believe I did read that somewhere.
10   Q    And then you testified with regard to the transaction, it
11   was a financing transaction that was requested?  Is that what
12   you testified to?
13   A    To the best of my recollection, you approached me and
14   asked me if I knew anybody or any institutions that could
15   possibly put some money into Signalife at the time.  I said
16   possibly I do, and you asked me to meet with Mr. Perkins at
17   the golf course.
18   Q    And you met there as Ajay Anand?
19   A    Yes, I did.
20   Q    And that Bel-Air Country Club is the -- is one of the most
21   posh or exclusive country clubs in Los Angeles, is that your
22   understanding?
23   A    It's a very nice club.
24   Q    Very hard to get into.
25   A    I don't know if it's hard to get into or not.
```

```
 1    Q   After you met with Mr. Perkins, you then testified that it
 2    was me and you that were interacting regarding the financing.
 3    Do you recall that?  It was just before the break.
 4    A   I believe you and I were interacting regarding some
 5    financing, yes.
 6    Q   Just you and I.
 7         And that financing never happened; is that right?
 8    A   I don't believe so.  You may have put me on the phone with
 9    Mr. Gault, Willie Gault also.
10    Q   But anything else?
11    A   Not that I recall, nobody else.
12    Q   You don't recall talking to anyone but Rowland Perkins one
13    time at the lunch, Willie Gault and me regarding the
14    financing, is that the scope of it?
15    A   To the best of my recollection, yes.
16         MR. STEIN:  Your Honor, there's one that we've
17    stipulated to, two we haven't.  Exhibit 393.
18         THE COURT:  That's the one agreed to?
19         MR. MUHLENDORF:  Yes, Your Honor.
20         THE COURT:  All right.  393's admitted without
21    objection.
22      (Defense Exhibit No. 393 entered into evidence.)
23         MR. STEIN:  And on 394 and '5 I'll lay the
24    foundation, et cetera.
25         THE COURT:  All right.
```

```
 1   BY MR. STEIN:
 2   Q   So with regard to 393 --
 3          MR. STEIN:  You can publish it.
 4   BY MR. STEIN:
 5   Q   So Gault, Perkins, and me, but in the end, you and me
 6   regarding this last potential transaction of financing?
 7   A   Never said the word "last."
 8   Q   I'm sorry.  With regard to this transaction of potential
 9   financing, right?
10   A   To the best of my recollection, yes.
11   Q   I'm going to show you what's been admitted into evidence
12   as exhibit 393.
13          Mr. Anand, have you ever seen that document before?
14   A   I don't recall seeing this, but if looks like I drafted
15   it.
16   Q   And your communication here is with John Woodbury, not
17   with Willie Gault, Rowland Perkins or me; is that correct?
18   A   This is relating to SES Capital.  Nothing to do with --
19   Q   I understand.
20   A   ~-- the Mr. Perkins meeting.
21          MR. STEIN:  Scroll down.
22   BY MR. STEIN:
23   Q   And here you're communicating with Mr. Woodbury regarding
24   the relevant documents to SES Capital; is that correct?
25   A   Yes.
```

1    Q   I'm going to now show you what's been marked as

2    exhibit 394 but is not in evidence.  Ask you if you've ever

3    seen it before, any part of it?

4    A   I don't recall seeing this item, but it does look like I

5    drafted it, yes.

6    Q   You don't deny that you drafted it and sent it; is that

7    right?

8    A   No, I do not.

9            MR. STEIN:  I move it into evidence, Your Honor.

10           MR. MUHLENDORF:  Your Honor, object on hearsay

11   grounds.

12           THE COURT:  May I see it, please?

13           Are we just talking about the one now?

14           MR. STEIN:  There's one more, but that's --

15           THE COURT:  394?

16           MR. STEIN:  There's one more, but that's the

17   important one.  That's the one that's most admissible.

18           THE COURT:  Okay.  I need to look at it.

19           Can I see everyone over here, please?

20       (The following proceedings were held at sidebar:)

21           THE COURT:  What is it that you want into evidence?

22   Because there's a lot here.  I'm not sure.  What is it that

23   you're focusing on that's important to you?

24           MR. STEIN:  He's communicating with Mr. Perkins

25   regarding the topic of the meeting.

```
 1            THE COURT:  What is it from this document that you

 2   want into evidence?  What is it that you're focusing on?

 3            MR. STEIN:  Just the direction that Mr. Perkins made

 4   to contact John Woodbury.  That's it.  I'm not going to be

 5   asking much about it.

 6            THE COURT:  This article and the comments about the

 7   article you're not interest in that?

 8            MR. STEIN:  I would rather them put it into evidence,

 9   but that's really not the purpose.

10            THE COURT:  You're focusing on Mr. Rowland's response

11   to this gentleman's --

12            MR. STEIN:  Yes, Your Honor.

13            THE COURT:  All right.  So they're objecting on

14   hearsay grounds.  So why is it not hearsay, Mr. Rowland's

15   statement to this witness?  Why is it not hearsay?

16            MR. STEIN:  He's just directing him to call

17   Mr. Woodbury.  It's not for the truth of the matter asserted.

18            THE COURT:  Well, I assume that you want to emphasize

19   the truth of the matter that Mr. Rowland is saying to this

20   witness "we can really use your efforts and you are making a

21   bridge investment, as we need the cash." I would assume that

22   you want that statement and the truth of that statement to be

23   presented to the jury.

24            MR. STEIN:  No, I don't want that statement.  I don't

25   want the truth of that statement.  I just want the fact that
```

```
 1    he asked him to call Mr. Woodbury.  I can redact that
 2    statement.
 3         THE COURT:  Well, then why don't you ask him if he,
 4    Mr. Rowland, asked you to call Mr. Woodbury.  That I would
 5    agree is not being offered for the truth of anything other
 6    than that he asked him to make a call.  So if you want to ask
 7    him that question, I'll let you ask him.  But to put this
 8    statement in, I think I would sustain the objection to this
 9    going into evidence.  But if you want to establish that
10    Rowland asked him to call Woodbury --
11         MR. STEIN:  If he denies it, may I redact the exhibit
12    and just put in the part where he asked him to call him?
13         THE COURT:  Well, if he denies it, you can show this
14    and ask him to refresh his recollection and see what he says
15    after that, and we'll deal with it.
16         MR. STEIN:  That's very fair.  Thank you, Your Honor.
17         THE COURT:  Thank you.
18         MR. STIEGLITZ:  Just in the interest of time,
19    Mr. Stein, do you want to deal with 395 now or are you going
20    to be offering it?
21         MR. STEIN:  Given the Judge's impressions of this
22    exhibit, he's going to have worse impressions about 395.
23         THE COURT:  Okay.
24      (Sidebar conference concluded.)
25         MR. STEIN:  Thank you, Your Honor.
```

```
 1              THE COURT:  You're welcome.
 2   BY MR. STEIN:
 3   Q    Mr. Anand, we were talking about the potential investment
 4   that you met with Mr. Perkins and I with at the Bel-Air
 5   Country Club.  Do you remember talking about that before we
 6   had the sidebar?
 7   A    Yes.
 8   Q    Isn't it true that shortly after that, not Mr. Gault, not
 9   me, but Mr. Perkins asked you to contact Mr. Woodbury
10   regarding that financing?  Isn't that true?
11   A    I don't have the exhibit in front of me.  I looked at it
12   briefly.  If you can reshow me the exhibit again.
13   Q    But is it true?  I mean, is it true or untrue that
14   Mr. Perkins asked you to call Mr. Woodbury, not me?  Is that
15   true or false?
16   A    If I could see the exhibit again, I could answer it.
17   Q    Okay.  Would the exhibit refresh your recollection, you
18   think?
19   A    Yes.
20   Q    Thank you.
21   A    Would you like me to read this?
22              THE COURT:  No.
23   BY MR. STEIN:
24   Q    No, we don't want you to read it.  I just want to know if
25   it refreshes your recollection that Mr. Woodbury -- you were
```

1  told by Mr. Perkins to call Mr. Woodbury regarding the

2  financing.

3  A    Yes, that's what it states on the e-mail.

4  Q    Not Mr. Gault and not me?

5  A    Yes.  Mr. Perkins.

6  Q    Thank you.

7        Mr. Anand, you have not been sentenced yet under your

8  plea agreement with the United States of America; is that

9  correct?

10  A    That's correct.

11  Q    What is your expectation about the sentence reduction from

12  this cooperation that you have given the United States of

13  America?

14  A    My expectation is to get the cooperation credits I need to

15  minimize my sentence.

16  Q    What is your expectation regarding the minimal sentence

17  that would satisfy you?

18  A    It's up to the judge.

19  Q    Is your expectation that the judge may issue probation to

20  you?

21  A    That's a possibility.

22  Q    Are you hoping for that?

23  A    I am hoping for that, yes.

24  Q    Has anyone from the Department of Justice or the United

25  States of America told you that there was a chance for

```
 1    probation for this cooperation you've given?
 2    A    No.
 3    Q    You understand, Mr. Anand, that any sentence reduction
 4    that you get has to be done at the request of the United
 5    States of America, not your lawyer.  You understand that from
 6    your plea bargain agreement?
 7    A    Yes.
 8    Q    I put on the screen the penultimate question I have for
 9    you, and that is, with regard to paragraph D, to read it to
10    yourself and then read it out loud.  Tell me if you carefully
11    reviewed it when you signed the agreement.
12    A    Paragraph D:  "If the fraud section determines in its
13    exclusive judgment that Defendant has both complied with
14    Defendant's obligations under paragraphs 2 through four above
15    and provided substantial assistance to law enforcement in the
16    prosecution or investigation of another, substantial
17    assistance, to move the Court pursuant to USSG 5K1.1 to fix an
18    offense level and corresponding guideline range below that
19    otherwise dictated by the Sentencing Guidelines, and to
20    recommend a term of imprisonment within this reduced range;
21    and".
22    Q    And your hope under this agreement is that the judge will
23    sentence you to probation; is that correct?
24    A    I am hoping for that, but the judge ultimately decides my
25    fate.  Not the Government, not my attorney.
```

```
 1              MR. STEIN:  Nothing further.
 2              THE COURT:  All right.  Thank you.
 3              Redirect.
 4              MR. MUHLENDORF:  Yes, Your Honor.
 5                         Redirect Examination
 6   BY MR. MUHLENDORF:
 7   Q    Still good morning, Mr. Anand.
 8   A    Good morning again.
 9   Q    Mr. Stein asked you about the legal fees issue.  Do you
10   remember that?
11   A    Yes.
12   Q    And we talked about -- he talked about the check for
13   $28,500 that we looked at yesterday?
14   A    Yes.
15   Q    Did that check -- who asked you to write "legal fees" on
16   that check?
17   A    Mr.~Stein.
18   Q    Was it at all related to any legal services you (sic) had
19   performed?
20   A    No.
21   Q    What was it related to?
22   A    Kickback.
23   Q    A kickback for what?
24   A    For the sweet deal I got from Mr.~Stein.
25   Q    For the Silve Group deal?
```

```
 1    A    Yes.

 2    Q    Do you need some water?  Are you okay?

 3    A    Yeah, I need some water.

 4    Q    Now, Mr. Anand, you testified yesterday and Mr.~Stein

 5    cross-examined you on the fact that you lied to the SEC,

 6    correct?

 7    A    Yes.

 8    Q    You lied a lot to the SEC, didn't you?

 9    A    Yes, I did.

10    Q    And, in fact, as Mr.~Stein pointed out, you've pled guilty

11    to lying to the SEC, correct?

12    A    Yes.

13    Q    Well, I want to take a look at some of the paragraphs

14    Mr.~Stein didn't read you in the plea agreement.  Okay?

15              MR. MUHLENDORF:  If we could have exhibit 228,

16    page 2.

17    BY MR. MUHLENDORF:

18    Q    Do you remember in your plea agreement the obligations you

19    have vis-a-vis your testimony?

20    A    Yes.

21    Q    Mr.~Stein didn't read you the obligation in section F, did

22    he?  If you could just read that.

23    A    Section F:  "Be truthful at all times with Pretrial

24    Services, the United States Probation Office, and the Court."

25    Q    And if we go down to what you agreed to do, what does that
```

1    say?

2    A    "Defendant further agrees to cooperate fully with the

3    fraud section, the United States Postal Inspection Service,

4    and any other federal, state, local or foreign prosecuting,

5    enforcement, administrative or regulatory authority.  The

6    cooperation requires defendant to".

7                And then it goes A, B, C, and D.

8    Q    Well, let's look at what you're required to do that

9    Mr.~Stein did not show you when he was discussing this

10   document.

11   A    All right.

12   Q    What are you required to do?

13   A    "Respond truthfully and completely to all questions,

14   attend all meetings, grand jury sessions, produce voluntarily

15   all documents, records, other tangible evidence, to provide

16   full and complete listing of all assets."

17   Q    What happens if you don't do that?  What happens to this

18   plea agreement?

19   A    Gets torn up.

20   Q    If you lie in court, what happens to you?

21   A    Additional charges could be filed.

22   Q    Mr.~Stein spent a considerable amount of time on the

23   statement of facts.  If we could turn to -- it's page -- I

24   think it's the last two pages.

25                Now, just before we go through it in detail,

```
 1    Mr. Anand, your relationship with Signalife covered a whole
 2    lot of time, didn't it?
 3    A    Yes, it did.
 4    Q    Many years?
 5    A    Yes.
 6    Q    Is everything that happened with Signalife and your
 7    relationship with Signalife encapsulated in this one and a
 8    quarter pages?
 9    A    Not completely, but most of it.
10    Q    Okay.  Is this an exhaustive factual statement about
11    everything that happened?
12    A    No.
13    Q    And, in fact, Mr.~Stein didn't read --
14         MR. MUHLENDORF:  If we could have the next page.
15    BY MR. MUHLENDORF:
16    Q    -- paragraph 8 of this agreement, did he?
17    A    No, he did not.
18    Q    And what does that say?
19    A    It says:  "Defendant acknowledges and admits that this
20    statement of facts does not represent and is not intended to
21    represent an exhaustive factual recitation of all of the facts
22    about which he has knowledge relating to the matters described
23    herein."
24    Q    So you recall when Mr.~Stein was asking you about the lie
25    about Sam Baker, right?
```

1    A    Yes.

2    Q    You don't deny you lied about Sam Baker, do you?

3    A    No.

4    Q    But let's go up.  Let's go up one paragraph, paragraph 9.

5    And one of the things that's mentioned in the statement of

6    facts is "Defendant's prior knowledge about Stein's

7    activities."  Do you see that?  Same page, same paragraph.  Go

8    up one paragraph.

9    A    Okay.

10   Q    See that, "Defendant's prior knowledge about Stein's

11   activities?"

12   A    Yes.

13   Q    Who told you to use the name Sam Baker?

14   A    Mr.~Stein.

15   Q    Did you tell the Government about Sam Baker and the lie?

16   A    Yes, I did.

17   Q    If we could go up one page, first page of attachment A.

18        When Mr.~Stein was paraphrasing this document, he

19   left out some of the words, didn't he?

20   A    Yes, he did.

21   Q    Okay.  If you'd read paragraph 5 to the jury.

22   A    "In or about the summer of 2007, Stein raised the idea of

23   artificially inflating Signalife's reported revenue with

24   Defendant."

25   Q    Mr. Anand, if you could slow down.  I know the court

reporter's having a hard time.
A I'm sorry.
"In or about the summer of 2007, Stein raised the idea of artificially inflating Signalife's reported revenues with Defendant. At or around that same time, Stein requested that Defendant send Signalife a false and misleading document purporting to be a purchase order for Signalife's products. Defendant refused to send the document."
Q Mr. Anand, do you remember yesterday we looked at exhibit 70, a purchase order that had the name IT Healthcare on the top?
A Yes, I do.
Q Is that the document that's referred to in paragraph 5?
A I can't attest that that's the actual document. I remember specific facts about the document I saw.
Q It's the document that said IT Healthcare on the top?
A With the Texas designation, yes.
Q Exactly.
Now, did you refuse to send that document?
A Yes.
Q Let's look at paragraph 6.
Now, in paragraph 6, when Mr.~Stein was paraphrasing this document, this section, he left out the portion about dissemination of "a false and misleading document regarding a purported purchase order," didn't he?

```
1    A    Yes, he did.

2    Q    What document is this referring to?

3    A    This is regarding referencing two documents, a change of

4    address and a cancellation of that order.

5    Q    Is that paragraph accurate the way it's written?

6    A    Yes.

7    Q    Did Mr.~Stein confuse you when he had you on cross?

8    A    Yes, he did.

9    Q    Is the factual statement as written in attachment A

10   correct and true and accurate?

11   A    Yes.

12   Q    Let's talk a little bit about that meeting.  Where was

13   that meeting, again, the first meeting with the IT Healthcare

14   order?

15   A    It was at a restaurant called Mi Piaci, in Calabasas,

16   California.

17   Q    And you remember the document, right?

18   A    I remember parts of the document, yes.

19   Q    Now, throughout your time at Signalife, who directed you

20   to do things relating to Signalife?

21   A    Mr.~Stein.

22   Q    Who told you to wire him money from the Silve Group sales?

23   A    Mr.~Stein.

24   Q    Who told you to give him cash packages from the Silve

25   Group sales?
```

```
 1    A    Mr.~Stein.

 2    Q    Who asked you to create fake documents?

 3    A    Mr.~Stein.

 4    Q    As Mr.~Stein asked you on cross, it was just you and him,

 5    wasn't it?

 6    A    Yes.

 7    Q    That exhibit 70, the IT Healthcare purchase order, did

 8    Silve Group have anything to do with that?

 9    A    No.

10            MR. MUHLENDORF:  If we could play clip 23 again,

11    December 18th, 2009, page 370, line 12, to 371, line 1.

12            (Audio played.)

13    BY MR. MUHLENDORF:

14    Q    Mr. Anand, was Mr.~Stein telling the truth to the SEC that

15    day?

16    A    No.

17    Q    Crystal clear on that?

18    A    Yes.

19            MR. MUHLENDORF:  No further questions.

20            MR. STEIN:  Nothing further.

21            THE COURT:  Thank you, sir.

22            Can I see counsel, please?

23            MR. STIEGLITZ:  Yes.

24            You can go off the record.

25            (Sidebar conference held off the record.)
```

```
 1              THE COURT:  All right.  Ladies and gentlemen, the
 2    parties underestimated the amount of time that it was going to
 3    take to finish that witness, and because we were going to only
 4    go 'til 1:00 o'clock today and the parties thought that they
 5    were going to take the entire day up with this last witness,
 6    the Government doesn't have another witness because they
 7    didn't want someone waiting here and have to be here over the
 8    whole weekend.  So we are finished for the day.  I didn't
 9    think you would be too upset by that.
10              So I'm going to remind you to not discuss the case,
11    don't form any opinions, don't do any research, leave
12    everything at your seats, and if you could be back on Monday
13    at 9:00 o'clock.  And we are going to go through the whole
14    week next week.
15              So thank you again for your cooperation.  Have a
16    pleasant weekend.  Thank you.
17         (The jury exits the courtroom.)
18              THE COURT:  All right.  Please be seated.
19              Is there anything we can do or accomplish with the
20    time we have?
21              MR. STIEGLITZ:  Your Honor, the only thing I'd flag,
22    and I don't know what stage it's at, is the Perkins
23    deposition, given again that we're not going to -- I don't
24    know if Mr.~Stein has resubmitted that to the Court.  This is
25    something that I understand Mr.~Stein may want to play in his
```

```
 1    case.  And given that his case, we may be ready to begin his

 2    case as early as next week, I don't -- I was going to raise

 3    that whether the Court had asked the question can we do it

 4    today or not, I was just going to raise that as something that

 5    needs to be addressed.

 6          THE COURT:  I haven't actually seen it with the

 7    objections.  I thought someone was going to flag the

 8    objections for me.

 9          MR. STEIN:  That's correct.  Today, Your Honor, he's

10    not going to be -- I'm not going to be playing the clip first,

11    it would be last.  So it wouldn't be for two weeks.  And I am

12    flagging the objections and preparing a condensed version of

13    them.

14          THE COURT:  All right.  So I'm not able to do that

15    today until I get the transcript with the objections.

16          MR. STIEGLITZ:  Right.  No, I understand.  I was

17    flagging that more just as a general issue.  But for today I

18    don't think there are any issues outstanding that we need to

19    address, I mean, other --

20          MR. STEIN:  There's no issues that we can't talk

21    about.  They're just stipulations.  The Court can't help with

22    us that.

23          THE COURT:  Just a general inquiry about jury

24    instructions.  I know you've both submitted proposed jury

25    instructions.  I haven't looked at them yet, but are there any
```

 1    significant differences, or are there going to be major

 2    issues?

 3            MR. STIEGLITZ:  There are, Your Honor.  And what the

 4    Government tried to do in its submission is sort of chart

 5    those out for the Court's convenience, where we differ and

 6    where we agree.  There are a number of what the Court would

 7    suspect, sort of preliminary pattern instructions that there

 8    doesn't appear to be any disagreement on, but then there are

 9    some additional ones that the Government proposed, and the

10    Government also flagged its disagreement with certain ones

11    that Mr.~Stein proposed.

12            I hope the chart that the Government submitted is

13    helpful.  If it's not, we would be happy to submit something

14    in addition.

15            MR. STEIN:  And, Your Honor, we will -- we will also

16    be submitting something.  There are going to be not lengthy,

17    but there are going to be some disputes regarding jury

18    instructions, particularly in the instruction regarding some

19    of the applicable laws.  I can't imagine there's not going to

20    be a dispute.

21            THE COURT:  Okay.  I'm just trying to get an idea of

22    how much time we're going to need.

23            MR. STEIN:  That's a small dispute because the

24    statutes say what they say.

25            THE COURT:  Again, I'm just trying to figure out if

```
 1    we're going to need to spend a lot of time on a charging
 2    conference or not.  I'll try and get up to speed on it next
 3    week so that we maybe can set aside some time to deal with it.
 4            MR. STEIN:  Am I to presume that we're estimating
 5    late next week for my first witness?
 6            THE COURT:  I was hoping it was going to be early
 7    next week from what I heard a few days ago, but . . .
 8            MR. STIEGLITZ:  Your Honor, I can proffer to the
 9    Court, and I guess Mr. Stein, as well --
10            THE COURT:  Do we need to say anything more on the
11    record?
12            MR. STIEGLITZ:  (Shakes head.)
13            THE COURT:  Let's go off the record, then.
14         (A evening recess was taken at 11:30 a.m.)
15                        * * * * *
16
17
18
19
20
21
22
23
24
25
```

```
1                        * * * * *

2                      I N D E X

3    Testimony of Ajay Anand

4           Cross by Mr. Stein (Continued)        2

5           Redirect by Mr. Muhlendorf           55

6                      * * * * *

7                   E X H I B I T S

8    Defendant's Exhibits in Evidence:

9           Defendant's 393                      47

10                     * * * * *

11                    CERTIFICATE

12       I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16       Dated this 17th day of MAY, 2013.

17

18       /s/Stephen W. Franklin
         _____
19       Stephen W. Franklin, RMR, CRR

20

21

22

23

24

25
```

**$**

$260,000 [2]  6/15 6/17
$28,500 [1]  55/13
$6500 [1]  38/10

**'**

'5 [1]  47/23
'7 [4]  27/4 27/19 27/22 28/12
'8 [7]  27/4 27/19 27/22 27/25 28/12 34/2 34/3
'90s [1]  16/25
'til [1]  63/4

**-**

-and [1]  1/20
-v [1]  1/5

**/**

/s/Stephen [1]  67/18

**1**

10 [2]  1/8 20/20
10-K [3]  23/20 26/16 28/11
10-Ks [7]  22/10 23/17 26/12 26/25 27/3
 28/12 28/14
10-Qs [1]  22/10
100 [2]  31/8 31/25
1031 [1]  1/21
10:39 [1]  45/2
10:53 [1]  45/2
11 [1]  23/20
11-80205-CR-MARRA [1]  1/2
11:30 [1]  66/14
12 [1]  62/11
1208 [1]  1/19
14 [3]  3/18 32/17 36/12
14-A [3]  18/2 18/3 18/22
1400 [1]  1/17
15 [1]  44/12
15-minute [1]  44/10
1551 [1]  1/19
16th [1]  3/10
17th [1]  67/16
18th [1]  62/11
19 [1]  18/20
1995 [1]  22/3
1997 [5]  18/15 20/15 20/21 22/2 22/3
1998 [9]  18/7 18/12 18/13 19/7 20/15 21/11
 21/14 21/19 21/21
1999 [13]  17/2 17/3 17/5 18/10 18/11 18/11
 18/17 18/21 19/16 20/12 20/15 21/20 21/23
1:00 [1]  44/23
1:00 o'clock [1]  63/4

**2**

2000 [1]  28/11
2002 [1]  8/3
2003 [16]  2/17 2/25 3/10 3/19 3/25 4/10 6/14
 6/25 7/13 7/13 7/17 8/1 8/1 8/3 8/24 9/8
2004 [6]  4/18 29/5 29/11 29/13 29/19 29/24
2005 [3]  4/16 4/18 27/24
2006 [9]  4/13 27/4 27/19 27/22 28/12 35/19
 35/21 35/22 37/20
2007 [18]  10/23 11/21 23/17 25/23 27/25
 29/7 29/11 29/19 30/22 32/5 34/2 34/3 34/13
 35/22 38/18 43/1 59/22 60/3
2008 [3]  8/24 34/4 43/1
2009 [2]  34/4 62/11
2010 [2]  20/18 39/18
2012 [1]  14/19

2013 [2]  1/8 67/16
20530 [1]  1/17
21 [1]  39/19
22 [1]  20/18
228 [8]  1/21 6/2 6/6 8/14 8/14 40/20 41/5
 56/15
22nd [1]  39/18
23 [1]  62/10
23rd [1]  3/25
24 [1]  10/6
25,000 [2]  3/9 3/18

**3**

30 [1]  20/20
300,000 [1]  34/19
33179 [1]  1/22
33401 [2]  1/19 1/24
359 [1]  8/4
370 [1]  62/11
371 [1]  62/11
3768 [1]  1/23
379 [2]  17/14 17/20
391 [6]  23/17 23/19 23/20 23/24 24/4 24/11
392 [7]  23/19 23/21 23/24 24/2 24/8 24/9
 24/22
393 [5]  47/17 47/22 48/2 48/12 67/9
393's [1]  47/20
394 [3]  47/23 49/2 49/15
395 [2]  51/19 51/22
3A [1]  4/22

**4**

40,000 [1]  3/24
45 [1]  44/25
47 [1]  67/9

**5**

500,000 [1]  34/21
514-3768 [1]  1/23
55 [1]  67/5
561 [1]  1/23
5K1.1 [1]  54/17

**6**

69 [1]  39/19

**7**

70 [2]  60/10 62/7
701 [1]  1/24

**9**

9:00 o'clock [1]  63/13

**A**

a.m [3]  45/2 45/2 66/14
able [2]  44/20 64/14
above [2]  54/14 67/15
above-entitled [1]  67/15
Abrev [1]  17/22
Abrev ---excuse [1]  17/22
access [3]  4/2 4/8 4/10
accomplish [1]  63/19
accomplished [1]  46/2
account [4]  4/9 7/2 7/3 16/4
accounts [2]  27/11 27/11
accurate [8]  8/1 14/15 22/16 23/14 31/10
 31/12 31/21 31/23 37/18 61/5 61/10
acknowledges [1]  58/7
activities [2]  59/7 59/11
actual [2]  15/24 60/14

actually [5]  16/2 29/22 30/25 31/13 64/6
addition [2]  29/7 65/14
additional [2]  57/21 65/9
address [3]  14/12 61/4 64/19
addressed [1]  64/5
administrative [1]  57/5
admissible [1]  49/17
admit [1]  19/10
admits [1]  58/19
admitted [6]  23/16 23/25 28/22 34/1 47/20
 48/11
affidavits [1]  5/19
affiliated [1]  7/8
affiliates [1]  39/14
after [15]  9/20 20/21 30/13 34/5 34/8 35/18
 36/2 37/22 42/24 42/25 45/2 45/12 47/1
 51/15 52/8
again [13]  8/7 12/24 29/18 33/14 40/16 52/12
 52/16 55/8 61/13 62/10 63/15 63/23 65/25
agencies [1]  46/4
agency [2]  46/4 46/8
ago [6]  10/6 12/3 12/15 15/1 30/21 66/7
agree [8]  10/11 12/1 12/21 12/21 13/6 23/1
 51/5 65/6
agreed [13]  11/4 11/24 11/25 12/6 12/6 12/17
 13/11 13/18 14/6 14/14 38/7 47/18 56/25
agreement [23]
agreement's [1]  5/25
agreements [2]  7/20 7/20
agrees [1]  57/2
Air [5]  42/8 42/12 43/6 46/20 52/4
AJAY [5]  1/10 2/11 43/10 46/18 67/3
Albert [1]  1/15
alerted [1]  40/1
allegation [2]  10/12 41/18
alleged [3]  9/17 12/17 12/18
allegedly [8]  10/12 10/12 12/21 14/6 23/6
 26/13 26/22 27/12
almost [1]  30/6
already [5]  8/5 22/10 23/15 24/12 24/16
also [8]  22/5 28/17 31/14 34/11 46/7 47/9
 65/10 65/15
Although [1]  43/11
always [1]  23/11
am [5]  17/25 53/23 54/24 64/11 66/4
ambiguity [1]  9/6
AMERICA [5]  1/3 53/8 53/13 53/25 54/5
amount [3]  34/23 57/22 63/2
ANAND [36]
Anand's [1]  12/25
Angeles [1]  46/21
announced [1]  23/11
another [8]  3/15 3/17 3/24 16/16 29/4 36/15
 54/16 63/6
answer [4]  3/13 4/3 7/1 52/16
any [69]
anybody [2]  22/23 46/14
anyone [4]  27/7 43/14 47/12 53/24
anything [9]  9/24 10/16 21/17 39/11 47/10
 51/5 62/8 63/19 66/10
apologize [1]  38/20
appear [1]  65/8
Appearances [1]  1/14
appertaining [1]  9/8
applicable [1]  65/19
appointing [1]  19/1
approach [3]  17/16 32/14 33/14
approached [1]  46/13
approval [1]  18/9
approved [2]  12/20 12/25

**A**

approximately [2]  15/1 34/19
April [2]  8/24 8/24
April 2003 [1]  8/24
April 2008 [1]  8/24
ARC [2]  35/18 37/23
around [3]  34/21 38/21 60/5
article [2]  50/6 50/7
artificially [2]  59/23 60/4
Artist [1]  46/3
Ashton [2]  3/10 3/18
aside [1]  66/3
ask [3]  43/22 49/2 51/3 51/6 51/7 51/14
asked [35]
asking [5]  10/25 11/6 35/15 50/5 58/24
asserted [1]  50/17
assets [1]  57/16
assist [3]  11/22 29/8 29/10
assistance [2]  54/15 54/17
assisted [2]  29/2 29/13
assisting [1]  29/19
assume [4]  4/4 36/3 50/18 50/21
attachment [5]  8/15 40/22 41/8 59/17 61/9
attempt [1]  42/3
attempted [1]  44/1
attend [2]  43/8 57/14
attest [2]  33/20 60/14
attorney [2]  29/4 54/25
attributed [1]  26/8
Audio [1]  62/12
audit [1]  25/17
August [1]  3/18
August 14 [1]  3/18
authentic [1]  2/22
authority [1]  57/5
Avanir [1]  17/21
Avenue [1]  1/17
aware [4]  4/22 28/5 28/8 28/9

**B**

back [9]  2/3 7/4 9/8 39/9 40/18 45/4 45/10
 45/14 63/12
background [4]  45/24 46/1 46/2 46/6
Baker [16]  39/23 40/3 40/10 40/11 40/13
 40/15 40/16 41/10 41/17 41/22 41/24 41/24
 58/25 59/2 59/13 59/15
balance [2]  26/12 27/3
bargain [5]  5/22 11/18 14/17 15/22 54/6
Barney [2]  20/21 21/24
based [2]  31/2 38/21
basis [1]  38/9
Beach [3]  1/7 1/19 1/24
became [1]  36/21
because [9]  7/19 23/10 28/13 36/21 37/1
 49/22 63/3 63/6 65/23
become [1]  31/7
before [22]  1/12 3/4 4/18 5/2 5/5 5/6 5/9 16/2
 17/8 17/15 20/17 28/7 39/18 41/19 44/19
 44/23 45/25 47/3 48/13 49/3 52/5 57/25
begin [2]  4/12 64/1
begun [1]  7/25
being [13]  4/19 6/15 9/7 15/25 19/10 19/15
 24/4 30/19 33/20 37/13 38/10 46/7 51/5
beings [1]  44/3
Bel [5]  42/8 42/12 43/6 46/20 52/4
Bel-Air [5]  42/8 42/12 43/6 46/20 52/4
believe [29]
believed [1]  34/25
below [1]  54/18

benefit [1]  39/13
best [8]  36/16 36/18 36/20 38/18 42/19 46/13
 47/15 48/10
between [5]  8/24 14/19 29/18 36/8 36/13
big [1]  41/18
biggest [1]  46/4
binder [1]  41/2
bit [2]  29/9 61/12
blocks [1]  6/23
blow [2]  8/15 40/25
board [2]  18/8 19/1
body [1]  5/9
bogus [1]  39/10
bono [1]  30/19
both [4]  9/7 10/25 54/13 64/24
bottom [2]  9/13 28/21
break [2]  44/7 47/3
bridge [1]  50/21
briefly [1]  52/12
bring [4]  14/25 17/10 45/9 45/9
bringing [1]  26/19
broke [1]  45/18
brokerage [2]  4/9 16/4
brought [2]  15/2 15/7
Bunes [3]  25/15 31/14 31/15
business [1]  35/12

**C**

Calabasas [1]  61/15
California [1]  61/16
called [17]  2/21 2/22 15/19 16/8 16/22 17/5
 17/9 18/18 19/7 34/5 34/5 34/8 38/22 39/22
 39/22 42/11 61/15
calling [1]  34/1
calls [9]  12/9 35/20 36/2 36/22 37/2 37/5
 37/13 38/2 40/1
can't [7]  33/20 36/9 40/24 60/14 64/20 64/21
 65/19
cancel [2]  34/18 34/18
cancellation [5]  13/18 13/20 14/11 15/17
 61/4
Capital [6]  16/8 16/12 16/16 16/18 48/18
 48/24
carefully [2]  33/9 54/10
case [9]  1/2 5/3 5/7 5/10 44/10 63/10 64/1
 64/1 64/2
cash [4]  27/11 38/10 50/21 61/24
center [3]  38/23 39/5 39/21
centers [4]  39/8 39/13 39/13 40/1
CEO [2]  42/7 45/20
certain [4]  31/19 34/2 36/6 65/10
CERTIFICATE [1]  67/11
Certified [1]  67/13
certify [1]  67/13
cetera [1]  47/24
chance [1]  53/25
change [3]  12/6 14/12 61/3
charges [1]  57/21
charging [1]  66/1
Charles [2]  1/20 1/21
chart [2]  65/4 65/12
check [4]  28/22 55/12 55/15 55/16
children's [2]  3/1 3/3
City [1]  3/8
claim [1]  18/17
claimed [1]  40/10
clear [3]  2/8 24/3 62/17
cleared [1]  9/6
clearly [1]  17/5
Clematis [1]  1/24

client [1]  18/19
clip [2]  62/10 64/10
club [6]  42/8 42/12 43/6 46/20 46/23 52/5
clubs [1]  46/21
collection [1]  25/8
comments [1]  50/6
Commission [2]  5/6 20/18
committee [1]  25/17
communicate [2]  42/13 42/17
communicating [2]  48/23 49/24
communication [2]  37/16 48/16
companies [13]  16/14 16/18 16/19 22/6 22/7
 28/2 28/18 31/9 31/19 33/4 33/5 33/17 46/5
company [55]
company's [3]  25/20 26/24 27/2
compare [1]  41/8
complained [1]  32/12
complete [1]  57/16
completely [3]  4/24 57/13 58/9
complied [1]  54/13
concluded [2]  37/23 51/24
condensed [1]  64/12
conference [3]  51/24 62/25 66/2
confirm [1]  9/6
confuse [1]  61/7
considerable [1]  57/22
considered [1]  25/8
consultancy [3]  7/25 21/5 21/16
consultant [3]  9/1 9/5 9/7
consulted [1]  6/22
consulting [13]  4/12 4/16 7/9 7/17 18/11
 18/14 18/16 20/25 21/1 21/9 21/17 21/18
 22/7
consultings [1]  4/18
Cont.d' [1]  2/12
contact [2]  50/4 52/9
contains [1]  6/7
contest [3]  17/9 18/3 18/7
continue [4]  2/6 2/8 43/2 45/16
continued [3]  38/17 42/3 67/4
contract [1]  37/2
control [1]  18/4
convenience [1]  65/5
cooperate [1]  57/2
cooperation [5]  53/12 53/14 54/1 57/6 63/15
copy [1]  41/2
corner [1]  28/22
corporation [1]  9/2
correct [51]
correctly [1]  46/3
corresponding [1]  54/18
couldn't [2]  6/19 37/1
counsel [6]  14/25 15/2 15/3 15/4 15/8 62/22
country [6]  42/8 42/12 43/6 46/20 46/21 52/5
County [1]  29/22
couple [1]  8/9
course [2]  44/8 46/17
court [12]  1/1 1/23 29/22 54/17 56/24 57/20
 59/25 63/24 64/3 64/21 65/6 66/9
Court's [2]  28/11 65/5
courtroom [5]  4/25 5/10 44/13 45/12 63/17
covered [1]  58/1
CPE [1]  1/23
CR [1]  1/2
create [3]  9/6 40/16 62/2
creation [1]  11/22
Creative [1]  46/3
credits [1]  53/14
Criminal [1]  1/16
cross [6]  2/7 2/12 56/5 61/7 62/4 67/4

**C**

cross-examination [2]  2/7 2/12
cross-examined [1]  56/5
CRR [2]  1/23 67/19
Crystal [1]  62/17

**D**

Dairy [1]  1/21
Dated [1]  67/16
dates [1]  34/4
dating [1]  9/8
days [1]  66/7
DBA [1]  40/8
DC [1]  1/17
deal [6]  41/18 51/15 51/19 55/24 55/25 66/3
dealt [1]  28/2
December [1]  62/11
December 18th [1]  62/11
decides [1]  54/24
declarations [1]  5/18
defamation [1]  30/3
defendant [16]  1/7 1/18 8/25 11/21 11/24
 11/25 13/11 14/14 54/13 57/2 57/6 58/19
 59/24 60/5 60/6 60/8
Defendant's [5]  54/14 59/6 59/10 67/8 67/9
Defense [1]  47/22
deferred [1]  25/10
delivered [1]  32/8
delivering [1]  31/18
delivery [4]  25/7 25/7 25/9 25/24
Demetrio [3]  32/4 37/7 41/15
denies [2]  51/11 51/13
deny [2]  49/6 59/2
Department [12]  1/16 4/5 4/8 12/3 12/15
 13/16 13/19 14/20 14/23 15/13 15/19 53/24
deposit [1]  34/16
deposition [2]  20/20 63/23
described [1]  58/22
designation [1]  60/17
detail [1]  57/25
determines [1]  54/12
dictated [1]  54/19
didn't [45]
differ [1]  65/5
differences [1]  65/1
difficult [1]  4/10
direct [2]  14/13 31/6
directed [1]  61/19
directing [1]  50/16
direction [2]  3/23 50/3
directly [1]  42/13
disagreement [2]  65/8 65/10
disclose [2]  4/4 40/23
disclosed [1]  4/7
discuss [3]  44/10 44/15 63/10
discussed [1]  45/19
discussing [3]  15/16 45/19 57/9
discussion [1]  11/6
discussions [1]  12/22
dispute [3]  35/10 65/20 65/23
disputes [2]  36/8 65/17
disputing [2]  7/1 7/21
disseminate [7]  10/2 10/21 11/6 11/10 12/17
 13/6 14/6
disseminated [1]  13/17
disseminating [2]  10/7 10/13
dissemination [2]  11/22 60/24
distribute [1]  31/8

DISTRICT [3]  1/1 1/1 1/13
Diversified [1]  19/24
Division [1]  1/16
doctor [1]  32/7
document [28]
document's [1]  12/2
documents [7]  7/2 27/16 29/9 48/24 57/15
 61/3 62/2
does [9]  14/3 14/5 15/17 37/14 40/13 49/4
 56/25 58/18 58/20
doesn't [5]  9/21 40/14 41/24 63/6 65/8
doing [7]  8/2 18/16 20/24 21/9 21/16 21/18
 35/12
don't [93]
done [6]  28/8 30/13 39/2 39/21 40/2 54/4
doubt [1]  6/24
down [4]  44/14 48/21 56/25 59/25
Dr [2]  13/18 42/24
Dr. [1]  24/6
Dr. Harris [1]  24/6
drafted [3]  48/14 49/5 49/6
Drive [1]  1/19
during [7]  25/12 26/25 27/3 34/11 36/1 37/20
 44/15
dutifully [1]  38/13

**E**

e-mail [4]  1/25 31/10 31/11 53/3
E-Medsoft [1]  19/24
E-trade [1]  16/5
earlier [1]  23/25
early [4]  8/1 18/20 64/2 66/6
efforts [1]  50/20
eight [1]  36/12
either [6]  7/22 10/7 11/8 30/16 30/23 33/18
electronic [1]  9/2
else [4]  27/7 44/5 47/10 47/11
embarked [1]  32/5
emphasize [1]  50/18
employed [6]  20/24 20/25 21/4 21/8 21/8
 21/16
encapsulated [1]  58/7
end [5]  31/8 31/19 31/19 32/11 48/5
enforcement [2]  54/15 57/5
engage [1]  32/2
engaged [1]  31/22
entered [1]  47/22
enters [1]  45/12
entire [3]  24/10 24/15 63/5
entitled [2]  29/1 67/15
entity [5]  2/22 2/25 38/22 39/22 43/23
ESQ [3]  1/15 1/15 1/20
essentially [1]  39/24
establish [2]  42/4 51/9
estimate [1]  44/23
estimating [1]  66/4
et [1]  47/24
et cetera [1]  47/24
even [2]  4/16 35/21
evening [1]  66/14
ever [18]  7/7 7/8 13/6 13/7 14/20 14/23 26/16
 27/18 28/8 32/11 32/25 35/10 35/11 39/11
 42/13 45/23 48/13 49/2
everyone [1]  45/14 49/19
everything [4]  44/11 58/6 58/11 63/12
evidence [22]  4/23 5/23 5/25 6/1 8/6 19/4
 23/16 24/13 24/16 28/23 32/19 32/20 47/22
 48/11 49/2 49/9 49/21 50/2 50/8 51/9 57/15
 67/8
ex [1]  29/8

ex-wife [1]  29/8
exact [1]  34/22
exactly [2]  36/14 60/18
examination [3]  2/7 2/12 55/5
examined [1]  56/5
Except [1]  37/20
Exchange [2]  5/6 20/18
exclusive [2]  46/21 54/13
excuse [2]  11/17 17/22
executive [1]  46/7
exhaustive [2]  58/10 58/21
exhibit [25]
exhibit 228 [5]  6/6 8/14 8/14 40/20 56/15
exhibit 359 [1]  8/4
exhibit 379 [2]  17/14 17/20
exhibit 391 [1]  23/17
exhibit 393 [2]  47/17 48/12
exhibit 394 [1]  49/2
exhibit 6 [1]  13/10
exhibit 70 [2]  60/10 62/7
exhibits [2]  24/20 67/8
exist [8]  25/10 40/13 41/10 41/12 41/13
 41/15 41/19 41/24
existing [1]  41/17
exists [1]  41/22
exits [2]  44/13 63/17
expectation [4]  53/11 53/14 53/16 53/19
expenses [1]  38/11
explain [3]  13/10 13/13 13/14
explained [1]  34/24
expressed [3]  35/25 36/2 42/2

**F**

facilitate [1]  43/23
facility [1]  22/21
fact [15]  3/1 11/4 16/25 17/3 17/8 21/2 21/6
 26/6 28/25 35/18 43/8 50/25 56/5 56/10
 58/13
facts [7]  8/18 41/23 57/23 58/20 58/21 59/6
 60/15
factual [3]  58/10 58/21 61/9
fair [1]  51/16
fairly [2]  31/12 33/3
fake [1]  62/2
false [20]  9/18 9/22 9/24 10/3 10/12 10/21
 10/22 11/22 12/22 13/7 14/6 23/6 23/10
 26/13 26/22 27/12 40/6 52/15 60/6 60/24
familiar [8]  17/24 22/9 22/11 25/12 25/15
 28/1 32/23 33/5
fate [1]  54/25
FDA [1]  18/9
February [1]  18/21
federal [1]  57/4
fees [3]  28/21 55/9 55/15
felt [3]  36/25 37/12 37/25
few [2]  36/16 66/7
Fidelity [2]  31/8 31/25
figure [1]  65/25
filed [4]  29/2 29/22 30/11 57/21
filing [9]  17/21 17/23 18/1 18/3 24/10 24/12
 24/15 25/3 26/2
filings [9]  17/24 22/9 25/20 25/21 27/9 27/17
 27/18 27/23 27/25
Financial [11]  2/21 2/22 2/25 3/4 3/9 3/17
 3/23 6/14 16/23 18/18 22/4
financing [9]  46/11 47/2 47/5 47/7 47/14
 48/6 48/9 52/10 53/2
finish [2]  44/20 44/21 63/3
finished [1]  63/8
firm [3]  28/18 28/25 29/1

## F

first [9]  16/21 17/7 27/19 35/10 43/11 59/17
 61/13 64/10 66/5
five [2]  7/4 37/19
fix [1]  54/17
FL [2]  1/19 1/22
flag [2]  63/21 64/7
flagged [1]  65/10
flagging [2]  64/12 64/17
Flagler [1]  1/19
FLORIDA [4]  1/1 1/7 1/24 38/8
focus [1]  5/12
focusing [3]  49/23 50/2 50/10
followed [1]  34/8
following [3]  45/3 45/12 49/20
foregoing [1]  67/13
foreign [1]  57/4
form [4]  15/24 18/22 44/10 63/11
formal [1]  7/20
formed [1]  16/9
formerly [2]  9/3 17/22
foundation [1]  47/24
founder [1]  46/3
four [2]  37/19 54/14
Franklin [4]  1/23 67/12 67/18 67/19
fraud [2]  54/12 57/3
free [1]  30/24
front [1]  52/11
fulfilled [1]  25/11
full [1]  57/16
fully [2]  36/18 57/2
further [4]  55/1 57/2 62/19 62/20

## G

Gault [7]  47/9 47/9 47/13 48/5 48/17 52/8
 53/4
gave [1]  39/10
general [3]  35/12 64/17 64/23
generally [3]  25/4 25/6 31/10
gentleman's [1]  50/11
gentlemen [3]  44/9 45/15 63/1
Gets [1]  57/19
getting [2]  18/9 21/1
gift [1]  30/24
gifts [5]  7/7 7/8 7/13 7/17 7/22
give [2]  21/4 61/24
given [6]  17/15 51/21 53/12 54/1 63/23 64/1
goes [1]  57/7
going [38]
golf [1]  46/17
good [6]  2/14 2/15 40/25 45/1 55/7 55/8
got [4]  24/2 34/13 42/24 55/24
GOVERNMENT [20]  1/4 1/15 2/11 2/20
 4/23 10/8 12/20 17/15 28/22 40/23 41/19
 41/22 45/7 54/25 59/15 63/6 65/4 65/9 65/10
 65/12
Government's [6]  6/6 8/8 8/13 8/14 24/18
 40/20
grand [3]  5/2 5/6 57/14
great [1]  31/18
grounds [2]  49/11 50/14
Group [23]
Group's [2]  35/7 36/23
guess [1]  66/9
guideline [1]  54/18
Guidelines [1]  54/19
guilty [2]  40/6 56/10
Gulati [4]  15/23 16/7 16/15 41/13
Gulati's [1]  40/8

guys [1]  34/14

## H

half [1]  44/25
hamstrung [3]  36/25 37/13 37/14
hand [1]  28/21
happen [2]  2/18 4/2
happened [6]  3/15 3/21 6/24 47/7 58/6 58/11
happens [3]  57/17 57/17 57/20
happy [2]  13/13 65/13
harassing [2]  30/6 30/13
hard [4]  41/2 46/24 46/25 60/1
Harmison [2]  13/18 31/15 42/24
Harris [1]  24/6
haven't [4]  33/7 47/17 64/6 64/25
having [2]  21/17 60/1
he'll [1]  40/25
he's [7]  10/14 15/24 40/25 49/24 50/16 51/22
 64/9
head [1]  66/12
Health [12]  18/7 19/1 19/7 19/9 19/11 19/12
 19/15 19/18 19/18 19/20 19/24 20/7
Healthcare [5]  14/12 60/10 60/16 61/13 62/7
hear [3]  3/13 15/5 32/11
heard [2]  3/4 66/7
hearsay [7]  12/10 35/1 43/15 49/10 50/14
 50/14 50/15
heart [4]  9/3 9/4 15/14 45/20
held [2]  49/20 62/25
help [4]  29/16 29/16 31/3 64/21
helped [3]  29/5 30/22 31/2
helpful [1]  65/13
here [10]  2/3 5/14 23/23 36/10 48/16 48/23
 49/19 49/22 63/7 63/7
herein [1]  58/23
hide [2]  43/13 43/19
high [1]  46/7
highlighted [1]  25/1
hired [2]  28/25 32/5
history [1]  40/25
Hollywood [1]  46/4
Honor [35]
Honor's [1]  23/23
HONORABLE [1]  1/12
hope [2]  54/22 65/12
hoped [1]  31/7
hoping [4]  53/22 53/23 54/24 66/6
hour [2]  44/25 44/25
hours [1]  10/6
human [2]  45/3 54/3
hundred [2]  33/7 33/10

## I

I'd [3]  13/13 33/12 63/21
I'll [5]  8/10 13/4 47/23 51/7 66/2
I'm [35]
I've [6]  3/3 17/14 21/15 24/2 31/2 32/24
idea [6]  27/6 27/10 44/17 59/22 60/4 65/21
imagine [1]  65/19
important [3]  33/9 49/17 49/23
impressions [2]  51/21 51/22
imprisonment [1]  54/20
inaccuracy [1]  15/7 15/20
inaccurate [2]  14/21 14/24
Inc [6]  9/1 9/4 9/4 19/2 19/7 19/9
include [1]  21/17
incorrectly [1]  10/15
India [5]  38/24 39/3 39/4 39/5 40/2
indicated [7]  4/12 23/5 31/7 31/13 37/9
 37/21 38/22

individual [1]  38/6
inflating [2]  59/23 60/4
information [3]  4/3 4/8 13/16
initials [1]  9/13
initiate [1]  18/3
inquiry [2]  34/6 64/23
Inspection [1]  57/3
Inspector [1]  12/4
instead [1]  15/16
institutions [1]  46/14
instruction [1]  65/18
instructions [4]  64/24 64/25 65/7 65/18
intended [1]  58/20
interacting [2]  47/2 47/4
interest [4]  3/5 28/10 50/7 51/18
International [3]  20/2 20/4 20/7
introduced [1]  4/23
invested [1]  17/9
investigation [2]  34/8 54/16
investing [1]  18/7
investment [3]  22/5 50/21 52/3
investor [3]  8/25 9/5 9/7
invited [1]  42/6
invoice [2]  30/16 30/17
involved [18]  10/2 10/7 15/23 16/8 16/13
 16/15 16/17 18/6 19/9 19/10 19/16 19/20
 22/20 33/19 33/20 33/21 33/22 46/5
involvement [1]  15/14
irrelevant [1]  12/25
irritated [1]  35/25
irritation [1]  42/2
Irvine [1]  21/2
isn't [22]  3/19 3/25 4/13 4/19 8/10 9/14 12/7
 17/10 20/7 23/13 25/25 26/8 26/13 26/22
 27/13 29/25 30/4 30/7 31/22 41/25 52/8
 52/10
issue [7]  14/25 15/2 15/7 29/5 53/19 55/9
 64/17
issues [3]  64/18 64/20 65/2
it's [30]
item [2]  23/12 49/4
items [2]  22/13 23/8
itself [2]  13/24 31/24
Ives [1]  1/21

## J

January [4]  18/20 32/5 37/24 38/17
January 2007 [1]  32/5
job [1]  37/1
jobs [1]  21/4
John [3]  16/7 48/16 50/4
judge [6]  1/13 12/24 53/18 53/19 54/22 54/24
Judge's [1]  51/21
judgment [1]  54/13
judicial [1]  5/9
July [2]  20/18 39/18
July 22 [1]  20/18
July 22nd [1]  39/18
jumping [1]  38/20
June [1]  3/10
June 16th [1]  3/10
jurors [1]  45/9
jury [13]  1/11 5/2 5/6 23/5 44/13 45/12 50/23
 57/14 59/21 63/17 64/23 64/24 65/17
jury's [1]  28/11
just [37]
Justice [11]  1/16 4/5 4/8 12/4 12/15 13/17
 13/19 14/20 14/23 15/19 53/24
Justice's [1]  15/13

**K**

KENNETH [1]  1/12
Kevin [1]  1/15
kickback [2]  55/22 55/23
knew [7]  3/5 19/23 22/23 23/10 25/17 25/23
46/14
know [43]
knowledge [4]  36/16 58/22 59/6 59/10
known [4]  9/3 9/4 17/22 36/12
Ks [7]  22/10 23/17 26/12 26/25 27/3 28/12
28/14

**L**

lack [2]  37/16 44/19
ladies [3]  44/9 45/15 63/1
laptop [1]  38/11
last [6]  37/24 48/6 48/7 57/24 63/5 64/11
late [4]  16/25 34/4 35/21 66/5
later [1]  9/4
law [2]  28/18 54/15
laws [1]  65/19
lawsuit [3]  28/25 29/2 30/14
lawyer [2]  29/20 54/5
lay [1]  47/23
least [1]  29/12
leave [2]  44/11 63/11
left [4]  20/21 28/21 59/19 60/23
left-hand [1]  28/21
legal [9]  28/19 28/21 29/6 29/11 29/18 29/20
55/9 55/15 55/18
Legends [8]  2/21 2/22 2/25 3/4 3/9 3/17 3/23
6/14
lengthy [3]  32/22 33/2 65/16
less [1]  10/6
let [3]  15/11 24/3 51/7
let's [8]  44/9 45/9 57/8 59/4 59/4 60/21 61/12
66/13
level [2]  46/7 54/18
lie [4]  21/13 57/20 58/24 59/15
lied [4]  21/13 56/5 56/8 59/2
life [2]  5/15 13/8
line [5]  20/20 26/24 39/19 62/11 62/11
line 1 [1]  62/11
line 10 [1]  20/20
line 12 [1]  62/11
line 21 [1]  39/19
list [2]  33/11 39/24
listed [1]  23/23
listing [1]  57/16
Litack [2]  17/9 17/22
little [2]  29/9 61/12
live [1]  15/24
lived [1]  37/7
LLC [5]  2/21 2/23 2/25 3/17 3/23
local [1]  57/4
long [2]  35/20 38/16
looked [8]  18/24 22/10 27/24 45/25 52/11
55/13 60/9 64/25
looking [1]  39/9
looks [1]  48/14
Los [1]  46/21
lot [8]  25/19 25/22 28/2 35/19 49/22 56/8
58/2 66/1
loud [1]  54/10
lunch [3]  42/7 42/9 47/13
lying [1]  56/11

**M**

Magnum [5]  16/23 18/11 18/17 18/18 22/4

mail [4]  1/25 31/10 31/11 53/3
maintain [1]  38/9
maintained [1]  16/4
major [1]  65/1
majority [1]  31/6
makers [1]  17/23
making [1]  50/20
man [1]  40/11
Managed [1]  9/4
Management [8]  2/21 2/23 2/25 3/4 3/9 3/17
3/23 6/14
manufactured [1]  9/2
marked [6]  8/4 17/14 17/20 23/16 32/16 49/1
market [2]  6/24 17/10
marketing [1]  32/5
MARRA [2]  1/2 1/12
marriage [1]  30/23
matter [7]  9/21 21/2 29/13 35/18 50/17 50/19
67/15
matters [2]  29/12 58/22
maybe [3]  23/21 35/21 66/3
me [73]
mean [3]  37/14 52/13 64/19
means [2]  5/16 37/15
Med [13]  18/7 19/2 19/7 19/9 19/11 19/12
19/15 19/18 19/19 19/20 19/24 19/24 20/7
Medsoft [1]  19/24
Medtech [9]  16/22 17/6 18/19 19/10 19/16
19/21 19/23 20/5 20/13
meet [7]  18/10 18/10 18/12 20/12 42/11 43/6
46/16
meeting [12]  9/17 12/3 17/7 43/3 43/8 43/20
43/22 48/20 49/25 61/12 61/13 61/13
meetings [1]  57/14
mention [2]  33/6 33/17
mentioned [7]  16/18 16/19 21/7 33/4 41/18
41/25 59/5
merely [1]  23/12
Merit [1]  67/12
met [15]  2/23 16/21 17/5 17/8 18/20 21/20
21/23 22/4 38/7 42/21 43/11 45/25 46/18
47/1 52/4
Mexican [1]  38/6
Mexico [4]  32/2 32/6 32/6 37/7
Mi [4]  9/17 10/6 10/22 61/15
Miami [2]  1/22 32/4
middleman [4]  31/7 31/17 31/21 31/22
might [1]  34/3
minimal [1]  53/16
minimize [1]  53/15
minute [2]  17/21 44/10
minutes [2]  44/12 44/25
misleading [3]  11/23 60/6 60/24
missing [1]  8/9
MITCHELL [3]  1/6 1/18 19/1
moment [1]  20/10
Monday [1]  63/12
money [9]  26/19 28/6 28/7 28/7 43/4 43/23
44/2 46/15 61/22
monitor [1]  9/3
month [1]  38/10
monthly [2]  21/1 38/8
morning [5]  2/14 2/15 23/4 55/7 55/8
Morris [1]  46/8
most [3]  46/20 49/17 58/9
move [2]  49/9 54/17
moving [1]  15/22
Mr [29]
Mr. [98]
Mr. Anand [30]

Mr. Anand's [1]  12/25
Mr. Baker [3]  39/23 40/3 41/24
Mr. Gault [3]  47/9 52/8 53/4
Mr. Gulati [3]  15/23 16/7 16/15
Mr. Perkins [21]  42/11 42/13 42/18 42/21
43/3 43/6 43/10 43/21 43/24 44/2 46/2 46/16
47/1 48/20 49/24 50/3 52/4 52/9 52/14 53/1
53/5
Mr. Perkins' [1]  45/23
Mr. Rowland [2]  50/19 51/4
Mr. Rowland's [2]  50/10 50/14
Mr. Sam [1]  41/24
Mr. Singh [3]  31/10 31/11 31/12
Mr. Sodi [3]  38/5 38/7 38/8
Mr. Stein [11]  2/6 5/24 13/3 18/10 21/15
32/18 33/7 44/7 51/19 55/9 66/9
Mr. Taylor [2]  30/17 30/20
Mr. Woodbury [12]  16/11 34/14 34/24 35/6
48/23 50/17 51/1 51/4 52/9 52/14 52/25 53/1
Ms. [4]  29/5 30/3 31/14 31/15
Ms. Bunes [2]  31/14 31/15
Ms. Trabeti [2]  29/5 30/3
much [4]  38/5 44/17 50/5 65/22
Muhlendorf [2]  1/15 67/5
must [1]  4/24

**N**

name [12]  3/4 9/21 20/1 29/4 40/9 41/10
41/17 43/10 43/13 43/19 59/13 60/10
named [2]  40/11 40/16
names [1]  39/10
narrow [1]  19/14
naturally [3]  9/12 36/11 36/13
need [13]  14/13 24/3 28/10 28/12 49/18
50/21 53/14 56/2 56/3 64/18 65/22 66/1
66/10
needs [1]  64/5
negatives [1]  10/18
neither [1]  34/25
Networks [3]  38/23 39/23 40/7
never [33]
New [1]  1/17
next [7]  44/1 58/14 63/14 64/2 66/2 66/5 66/7
nice [1]  46/23
nights [2]  12/3 12/15
nine [2]  30/21 30/22
Nineteen [1]  21/20
Nineteen -- I [1]  21/20
no [79]
nobody [4]  15/19 36/22 44/5 47/11
Norma [1]  25/13
North [1]  1/19
Northwest [1]  1/17
notation [1]  28/21
nothing [6]  13/20 21/19 39/12 48/18 55/1
62/20
noticed [1]  18/25
Notwithstanding [1]  42/2
November [1]  3/25
November 23rd [1]  3/25
number [9]  21/15 24/3 32/17 34/22 36/15
38/1 41/4 46/5 65/6
number 14 [1]  32/17

**O**

o'clock [2]  63/4 63/13
oath [8]  2/4 4/15 5/14 6/10 11/20 12/16
12/16 45/11
object [1]  49/10
objecting [1]  50/13

## O

objection [10]  8/6 10/14 12/9 12/24 13/22
  19/3 35/1 43/15 47/21 51/8
objections [6]  44/19 44/24 64/7 64/8 64/12
  64/15
obligation [1]  56/21
obligations [6]  25/8 25/9 25/10 25/25 54/14
  56/18
obviously [1]  5/23
occurred [2]  39/11 39/17
October [3]  37/23 37/24 38/18
off [3]  62/24 62/25 66/13
offense [1]  54/18
offered [1]  51/5
offering [1]  51/20
office [5]  3/7 3/7 18/20 38/9 56/24
Official [1]  1/23
Oh [1]  44/8
okay [22]  14/10 15/6 16/17 21/13 23/21 24/8
  24/22 24/24 34/21 41/6 41/9 43/2 44/22
  49/18 51/23 52/17 56/2 56/14 58/10 59/9
  59/21 65/21
one [32]
ones [2]  65/9 65/10
only [3]  7/4 63/3 63/21
open [1]  9/12
opinions [2]  44/11 63/11
opportunity [1]  31/18
opposed [3]  7/9 17/4 27/11
Orange [1]  29/22
order [33]
orders [8]  10/22 12/7 15/17 22/20 23/7 26/13
  26/22 27/12
originally [1]  39/22
otherwise [1]  54/19
our [4]  6/21 24/20 34/25 35/18
outside [1]  9/22
outstanding [1]  64/18
over [4]  18/24 36/8 49/19 63/7
Overruled [2]  12/11 43/16
own [2]  15/3 15/4
owned [2]  3/1 3/3
owner [1]  20/7

## P

P.A [1]  1/21
packages [1]  61/24
page [18]  9/12 9/14 11/15 11/17 20/20 23/17
  23/20 24/19 33/12 39/19 41/6 56/16 57/23
  58/14 59/7 59/17 59/17 62/11
page -- I [1]  57/23
page 11 [1]  23/20
page 2 [1]  56/16
page 30 [1]  20/20
page 370 [1]  62/11
page 69 [1]  39/19
pages [5]  8/9 33/7 33/10 57/24 58/8
paid [6]  4/19 25/19 25/21 38/13 39/1 40/4
Palm [3]  1/7 1/19 1/24
Pam [1]  25/15
paragraph [31]
paragraph 1 [8]  8/15 8/20 8/23
paragraph 3A [1]  4/22
paragraph 5 [2]  59/21 60/13
paragraph 6 [13]  11/14 11/19 13/20 14/3
  14/10 14/14 14/21 14/24 15/7 15/12 15/23
  60/21 60/22
paragraph 8 [1]  58/16
paragraph 9 [1]  59/4

paragraphs [2]  54/14 56/13
paragraphs 2 [1]  54/14
paraphrasing [2]  59/18 60/22
particularly [1]  65/18
parties [2]  63/2 63/4
parts [1]  61/18
patients [1]  40/1
pattern [1]  65/7
Paul [7]  29/4 29/13 29/14 29/15 29/15 29/16
  30/23
pay [2]  21/5 38/13
paycheck [1]  21/1
paying [3]  18/25 38/5 38/17
payment [2]  25/24 37/24
penalty [1]  5/18
penultimate [1]  54/8
people [5]  18/8 19/1 36/14 39/8 39/10
perform [1]  37/16
performance [2]  34/15 35/7
performed [1]  55/19
period [11]  8/25 21/11 26/25 29/8 29/19
  35/20 36/5 36/5 37/20 38/14 38/16
periods [1]  36/17
perjury [1]  5/18
Perkins [27]
Perkins' [1]  45/23
person [7]  18/25 40/16 41/10 41/19 41/24
  43/20 43/20
person-to-person [1]  43/20
personally [2]  2/17 42/6
pharmaceutical [2]  31/8 31/19
phone [4]  36/2 37/5 39/8 47/8
phonetic [3]  17/9 17/22 29/1
Piace [1]  9/17
Piaci [3]  10/6 10/22 61/15
pick [1]  40/1
place [1]  18/8
placed [1]  26/16
Plaintiff [1]  29/25
play [2]  62/10 63/25
played [1]  62/12
playing [1]  64/10
plea [20]  4/22 5/22 5/25 5/25 6/6 8/5 8/17
  8/18 11/18 13/10 14/17 14/19 15/22 40/19
  41/23 53/8 54/6 56/14 56/18 57/18
pleasant [1]  63/16
please [15]  2/4 8/23 10/19 11/14 11/19 13/3
  13/14 25/1 40/18 44/10 45/14 49/12 49/19
  62/22 63/18
pled [2]  40/6 56/10
plus [1]  38/10
point [5]  2/23 27/21 34/2 36/21 36/25
pointed [1]  56/10
policy [1]  28/13
portion [4]  25/1 27/2 32/25 60/23
posh [1]  46/21
positive [4]  21/22 21/23 33/2 33/3
possibility [1]  53/21
possible [5]  4/21 6/13 7/13 7/16 33/13
possibly [7]  7/11 7/15 16/16 16/17 43/5
  46/15 46/16
post [3]  25/7 25/9 25/24
post-delivery [3]  25/7 25/9 25/24
Postal [2]  12/4 57/3
potential [3]  48/6 48/8 52/3
predecessor [1]  19/25
preliminary [1]  65/7
preparing [1]  64/12
presented [2]  37/4 50/23
press [2]  10/21 10/24

presume [1]  66/4
pretend [1]  43/19
Pretrial [1]  56/23
principals [1]  36/6
prior [7]  4/17 5/14 27/24 34/5 43/3 59/6
  59/10
pro [2]  1/18 30/19
probable [1]  25/8
probably [1]  33/7
probation [4]  53/19 54/1 54/23 56/24
proceed [1]  45/5
proceedings [5]  1/11 45/3 45/13 49/20 67/14
produce [1]  57/14
producing [3]  7/2 7/2 7/3
product [12]  17/10 17/23 25/6 25/7 31/18
  31/22 32/1 32/6 32/8 32/9 32/11 32/12
products [3]  9/3 11/24 60/7
proffer [1]  66/8
proposed [3]  64/24 65/9 65/11
prosecuting [1]  57/4
prosecution [1]  51/8
Provencio [1]  25/13
provide [4]  29/9 29/11 29/18 57/15
provided [6]  13/15 13/16 28/18 29/6 30/19
  54/15
providing [2]  29/20 30/24
proxy [3]  17/9 18/3 18/7
public [16]  17/21 17/23 17/24 18/1 18/4 22/5
  22/7 22/9 24/10 24/12 24/15 25/3 26/2 27/18
  27/22 46/5
publish [1]  48/3
purchase [36]
purchases [2]  7/18 7/19
purged [1]  7/5
purported [4]  11/23 13/11 14/3 60/25
purportedly [1]  9/2
purporting [1]  60/7
purpose [1]  50/9
pursuant [1]  54/17
put [16]  4/25 5/25 8/7 8/12 11/14 13/17
  14/11 23/15 39/24 40/18 46/15 47/8 50/8
  51/7 51/12 54/8

## Q

Qs [1]  22/10
quarter [1]  58/8
question [20]  5/17 5/20 7/1 10/4 10/17 10/19
  12/14 13/2 13/3 14/13 19/14 22/18 26/10
  26/15 35/3 36/24 43/17 51/7 54/8 64/3
questions [4]  4/24 17/4 57/13 62/19
quote [1]  16/14
quote-unquote [1]  16/14

## R

raise [4]  43/4 43/23 64/2 64/4
raised [2]  59/22 60/3
raising [1]  44/2
Rajiv [1]  4/16
ran [1]  7/3
range [2]  54/18 54/20
rather [2]  32/22 50/8
reach [1]  43/4
reached [1]  38/1
reaching [1]  35/19
read [19]  8/23 11/19 25/1 26/2 26/3 26/3
  28/14 28/16 40/24 46/9 52/21 52/24 54/9
  54/10 56/14 56/21 56/22 58/13 59/21
reads [1]  15/15
ready [3]  45/5 45/7 64/1
real [1]  15/24

**R**

really [2]  50/9 50/20
Realtime [1]  67/13
reason [3]  34/24 35/5 37/25
recall [44]
receivable [2]  27/11 27/11
received [3]  2/16 28/6 28/7
recess [4]  44/10 44/16 45/2 66/14
recitation [1]  58/21
recognition [2]  25/2 28/13
recognize [4]  23/7 23/12 25/6 25/23
recognized [3]  26/6 26/11 26/21
recognizes [1]  28/5
recognizing [2]  27/6 27/10
recollect [1]  36/17
recollection [12]  7/6 19/15 28/14 35/13 36/20
38/19 46/13 47/15 48/10 51/14 52/17 52/25
Recom [1]  9/3
recommend [1]  54/20
record [6]  45/4 62/24 62/25 66/11 66/13
67/14
records [2]  2/20 4/9 57/15
recurred [1]  39/12
redact [2]  51/1 51/11
Redirect [3]  55/3 55/5 67/5
reduced [1]  54/20
reduction [2]  53/11 54/3
Reed [2]  3/10 3/18
reference [1]  13/11
referenced [1]  31/12
referencing [2]  12/2 61/3
referred [3]  29/15 32/4 60/13
referring [2]  44/2 61/2
reflection [1]  31/23
refresh [2]  51/14 52/17
refreshes [1]  52/25
refunded [1]  34/11
refuse [1]  60/19
refused [2]  10/2 60/8
regard [16]  6/13 16/2 17/8 18/22 19/14
20/13 26/13 27/12 28/25 29/2 31/5 38/20
46/10 48/2 48/8 54/9
regarding [25]
Registered [1]  67/12
regularly [2]  25/20 25/21
regulatory [1]  57/5
reimbursed [1]  38/10
related [4]  5/3 27/7 55/18 55/21
relates [1]  33/6
relating [5]  6/11 9/8 48/18 58/22 61/20
relations [1]  22/5
relationship [5]  6/21 42/4 42/5 58/1 58/7
release [1]  10/24
releases [1]  10/2
relevant [2]  8/25 48/24
remains [1]  18/6
remember [26]
remembering [1]  17/3
remind [1]  63/10
remit [3]  34/15 34/18 34/18
remote [3]  39/8 39/21 39/25
repeat [5]  10/4 12/14 22/18 26/10 43/17
repeated [1]  36/2
Rephrase [1]  35/3
reported [3]  27/3 59/23 60/4
Reporter [4]  1/23 1/23 67/12 67/13
reporter's [1]  60/1
reports [1]  28/6
represent [2]  58/20 58/21

represented [1]  16/7
request [2]  14/11 54/4
requested [2]  46/11 60/5
requesting [1]  15/17
require [2]  38/8 38/10
required [2]  57/8 57/12
requires [1]  57/6
research [1]  17/6
reshow [1]  52/12
Resource [4]  38/22 38/23 39/22 40/7
respect [1]  14/21
respond [2]  4/24 57/13
response [1]  50/10
responsibilities [1]  36/23
restate [4]  10/18 13/3 13/4 15/11
restating [1]  10/15
restaurant [2]  10/22 61/15
resubmitted [1]  63/24
resumed [1]  2/11
retainer [1]  11/17
returned [3]  36/3 37/5 37/13 38/1 42/3
returning [3]  35/20 36/22 37/1
revenue [16]  23/7 23/12 25/2 25/6 25/10
25/24 26/7 26/12 26/16 26/17 26/19 26/21
26/24 28/6 28/13 59/23
revenues [2]  27/7 60/4
review [7]  18/23 27/16 27/16 27/18 32/22
33/9 33/12
reviewed [3]  27/22 33/8 54/11
reviewing [3]  25/20 25/21 27/9
revised [1]  44/24
right [102]
RMR [1]  1/23 67/19
Road [1]  1/21
Rowland [7]  42/7 45/20 47/12 48/17 50/19
51/4 51/10
Rowland's [2]  50/10 50/14
Ruben [1]  9/21

**S**

safe [1]  4/4
sale [4]  7/9 25/9 25/24 32/2
sales [5]  25/6 26/7 26/12 61/22 61/25
Sam [13]  40/10 40/11 40/13 40/15 40/16
41/10 41/17 41/22 41/24 58/25 59/2 59/13
59/15
same [7]  8/11 11/14 11/17 28/13 59/7 59/7
60/5
Sameer [2]  40/8 41/13
Sanga [3]  20/1 20/4 20/7
satisfy [1]  53/17
saw [1]  60/15
say [13]  13/15 14/3 14/5 20/20 20/21 36/9
36/9 43/25 57/1 58/18 65/24 65/24 66/10
saying [5]  4/1 4/6 5/24 12/20 50/19
says [11]  4/23 9/5 13/10 13/20 13/21 13/23
13/25 14/6 14/14 51/14 58/19
scope [1]  47/14
screen [6]  8/12 8/20 23/15 40/18 41/8 54/8
Scroll [1]  48/21
Se [1]  1/18
search [1]  7/3
seat [1]  44/11
seated [3]  2/5 45/15 63/18
seats [1]  63/12
SEC [14]  4/7 5/10 16/2 20/23 21/3 21/6
21/10 34/6 39/18 41/19 56/5 56/8 56/11
62/14
second [4]  25/2 25/3 25/4 38/3
section [5]  54/12 56/21 56/23 57/3 60/23

Securities [2]  5/5 20/17
seeing [2]  48/14 49/4
seen [6]  32/24 32/25 33/3 48/13 49/3 64/6
sell [3]  31/22 32/1 32/6
send [5]  22/24 22/24 60/6 60/8 60/19
sent [6]  7/21 31/13 31/15 39/23 40/3 49/6
sentence [5]  53/11 53/15 53/16 54/3 54/23
sentenced [1]  53/7
Sentencing [1]  54/19
September [1]  38/18
Service [2]  12/4 57/3
services [10]  28/19 29/6 29/11 29/18 29/20
30/16 30/19 30/24 55/18 56/24
SES [6]  16/8 16/12 16/16 16/18 48/18 48/24
sessions [1]  57/14
set [12]  38/23 38/23 39/3 39/4 39/5 39/7
39/20 40/7 40/9 42/9 43/22 66/3
setting [1]  39/12
seven [1]  36/12
Shakes [1]  66/12
shape [1]  15/24
shareholder [1]  20/4
shares [8]  3/10 3/18 3/24 34/11 34/16 34/19
34/23 42/3
sheet [2]  26/12 27/3
shipped [3]  23/8 32/9 32/10
shipping [3]  22/13 22/20 23/12
shortly [1]  52/8
shouldn't [1]  13/15
show [10]  8/9 17/20 28/10 28/12 32/16 33/11
48/11 49/1 51/13 57/9
showed [2]  18/22 24/5
showing [1]  32/18
shown [2]  10/8 23/16
sic [4]  14/13 39/12 41/22 55/18
sick [1]  42/24
sidebar [4]  49/20 51/24 52/6 62/25
sign [10]  6/7 9/17 9/22 10/2 10/21 11/4 11/11
12/17 13/17 22/12
Signalife [39]
Signalife's [3]  59/23 60/4 60/7
signature [1]  6/7
signed [5]  8/17 11/2 11/19 14/19 54/11
significant [4]  25/7 25/9 34/22 65/1
signing [5]  9/24 10/7 10/12 10/16 12/7
Silve [25]
similar [1]  15/15
since [1]  2/23
Singh [4]  4/16 31/10 31/11 31/12
sir [4]  2/4 44/14 45/11 62/21
sit [1]  36/10
situation [1]  39/10
six [1]  30/22
slander [1]  30/3
slow [1]  59/25
small [3]  32/2 40/24 65/23
Smith [2]  20/21 21/24
Sodi [6]  32/4 37/7 38/5 38/7 38/8 41/15
sold [1]  9/2
somebody [2]  9/21 22/24
someone [5]  36/11 36/12 43/20 63/7 64/7
something [6]  29/10 36/4 63/25 64/4 65/13
65/16
sometimes [1]  6/23
Somewhat [1]  22/11
somewhere [3]  16/25 34/21 46/9
sorry [7]  5/24 6/3 34/18 43/2 44/8 48/8 60/2
sort [2]  65/4 65/7
SOUTHERN [1]  1/1
speak [2]  36/11 37/21

**S**

speaks [1]  13/24
specific [3]  5/20 7/12 60/15
specifically [1]  7/15
speed [2]  44/18 66/2
spend [1]  66/1
spent [1]  57/22
spoke [3]  37/18 37/25 43/12
staff [1]  38/9
stage [1]  63/22
stand [1]  2/11
standpoint [1]  15/16
started [4]  18/11 34/6 34/9 38/17
starting [2]  8/2 25/4
startup [3]  28/1 28/2 28/5
stat [1]  12/16
state [3]  15/18 43/25 57/4
stated [5]  9/24 22/22 22/22 35/14 38/9
statement [19]  4/15 8/17 12/21 23/10 26/2
 40/22 41/23 50/15 50/22 50/22 50/24 50/25
 51/2 51/8 57/23 58/10 58/20 59/5 61/9
statements [10]  4/9 4/10 4/10 5/12 5/13 5/18
 6/10 7/2 7/3 8/21
states [13]  1/1 1/3 1/13 14/8 15/15 15/16 53/3
 53/8 53/12 53/25 54/5 56/24 57/3
stating [1]  34/14
statutes [1]  65/24
STEIN [46]
Stein's [2]  59/6 59/10
step [2]  44/14 44/15
Stephen [4]  1/23 67/12 67/18 67/19
Stieglitz [1]  1/15
still [3]  2/4 45/11 55/7
stipulated [2]  2/20 47/17
stipulations [1]  64/21
stock [14]  2/17 3/10 3/18 3/24 4/19 6/14 6/15
 6/23 7/7 7/9 7/20 7/23 25/19 25/22
stopped [2]  37/13 34/1
Street [1]  1/24
Studio [1]  3/8
submission [1]  65/4
submit [1]  65/13
submitted [2]  64/24 65/12
submitting [1]  65/16
substance [1]  16/11
substantial [2]  54/15 54/16
such [1]  25/10
suggested [1]  43/5
suing [1]  30/3
suit [4]  29/22 29/25 29/25 30/11
Suite [1]  1/12
summer [4]  35/21 35/21 59/22 60/3
superior [1]  29/22
support [7]  4/3 38/24 39/8 39/13 39/21 39/21
 39/25
sure [2]  36/14 49/22
suspect [1]  65/7
sustain [1]  51/8
Sustained [3]  14/1 19/5 35/2
sweet [1]  55/24
Systems [1]  9/4

**T**

take [6]  17/21 44/7 44/9 56/13 63/3 63/5
taken [3]  1/11 45/2 66/14
taking [1]  24/19
talent [1]  46/4
talk [4]  35/23 36/1 61/12 64/20
talked [3]  31/9 55/12 55/12

talking [7]  27/19 27/20 45/18 47/12 49/13
 52/3 52/5
tangible [1]  57/15
Taylor [9]  29/4 29/13 29/14 29/15 29/15
 29/16 30/17 30/20 30/23
tell [14]  12/13 12/15 14/20 14/23 21/3 21/10
 30/23 30/25 33/17 35/3 35/15 41/21 54/10
 59/15
telling [2]  41/17 62/14
tension [1]  36/13
term [2]  37/14 54/20
terms [1]  4/19
testified [12]  9/16 11/11 16/2 22/19 23/1 26/7
 28/17 36/16 46/10 46/12 47/1 56/4
testify [4]  5/2 5/6 5/9 39/6
testifying [2]  10/5 20/17
testimony [30]
testing [1]  7/6
Texas [5]  22/13 22/20 22/24 22/24 60/17
thank [18]  2/10 6/3 6/4 9/11 17/18 33/25
 41/3 44/12 45/1 51/16 51/17 51/25 52/20
 53/6 55/2 62/21 63/15 63/16
that's [17]
their's [2]  8/10 18/19
there's [13]  8/6 10/18 12/22 33/11 36/13 41/2
 44/24 47/16 49/14 49/16 49/22 64/20 65/19
therefore [1]  19/15
they're [2]  50/13 64/21
thing [3]  30/22 39/20 63/21
things [4]  21/13 31/9 59/5 61/20
think [13]  8/6 27/24 30/25 39/9 39/11 41/1
 43/3 44/20 51/8 52/18 57/24 63/9 64/18
those [13]  4/1 4/5 4/18 7/23 8/1 8/20 9/13
 28/14 29/12 33/5 36/1 36/18 65/5
though [1]  39/3
thought [9]  23/21 24/12 24/15 29/14 31/17
 42/14 44/19 63/4 64/7
three [4]  4/5 6/13 7/12 7/16 7/23 28/14 37/18
through [8]  7/25 23/4 28/2 29/7 38/18 54/14
 57/25 63/13
throughout [3]  6/21 35/11 61/19
times [12]  8/25 21/15 25/12 36/1 36/12 36/14
 36/15 37/5 37/12 37/19 38/1 56/23
today [19]  4/6 9/7 10/1 10/3 10/5 10/9 10/11
 12/16 14/20 19/21 23/11 23/25 36/19 44/20
 63/4 64/4 64/9 64/15 64/17
together [4]  13/17 14/11 16/4 39/24
told [21]  9/20 9/20 10/6 11/25 12/6 15/20
 16/11 16/13 21/6 21/8 23/6 24/4 30/19 31/1
 31/2 43/13 53/1 53/25 59/13 61/22 61/24
too [4]  10/18 24/20 40/24 63/9
took [2]  18/23 31/5
top [2]  60/11 60/16
topic [1]  49/25
tops [1]  44/25
torn [1]  57/19
totally [1]  12/25
toward [1]  42/2
Trabeti [3]  29/1 29/5 30/3
trade [1]  16/5
trading [1]  4/9
transaction [9]  3/14 3/20 35/18 37/23 44/1
 46/10 46/11 48/6 48/8
transactions [6]  4/1 4/5 7/13 42/14 42/17
 45/19
transcript [1]  1/10 64/15 67/14
transfer [5]  3/9 3/17 3/24 6/23 7/9
transfers [7]  2/17 4/19 6/13 7/16 7/17 7/23
 8/1
TRIAL [1]  1/11

tried [1]  65/4
Tronics [3]  9/4 15/14 45/20
trouble [1]  17/3
true [14]  17/11 17/12 17/13 20/23 20/25
 35/16 38/25 42/12 52/8 52/10 52/13 52/13
 52/15 61/10
trust [2]  3/1 3/3
truth [6]  50/17 50/19 50/22 50/25 51/5 62/14
truthful [1]  56/23
truthfully [2]  4/24 57/13
try [2]  31/22 66/2
trying [3]  32/1 65/21 65/25
tumult [1]  30/9
turn [1]  57/23
twice [1]  10/15
two [10]  12/3 12/15 15/1 16/4 29/12 36/13
 47/17 57/24 61/3 64/11
type [2]  18/1 42/17

**U**

U.S [1]  1/16
ultimately [1]  54/24
Unable [1]  37/16
under [17]  2/4 4/15 5/13 5/18 6/10 6/23
 11/20 12/16 12/16 25/2 37/2 39/22 40/8
 45/11 53/7 54/14 54/22
underestimated [1]  63/2
understand [11]  5/16 10/17 13/2 26/15 26/16
 36/24 48/19 54/3 54/5 63/25 64/16
understanding [2]  35/5 46/22
understood [2]  3/7 35/8
undertone [1]  35/8
unemployed [6]  18/13 18/15 20/15 20/22
 21/10 21/18
unemployment [1]  21/14
unfair [1]  30/6
unhappiness [2]  35/10 36/7
unhappy [4]  34/14 35/6 36/4 36/15
unit [1]  32/6
UNITED [9]  1/1 1/3 1/13 53/8 53/12 53/24
 54/4 56/24 57/3
units [1]  22/20
unless [1]  25/7
unquote [1]  16/14
until [7]  4/13 18/10 18/11 20/12 25/10 35/22
 64/15
untrue [1]  52/13
upon [2]  25/6 38/7
upset [6]  30/9 36/21 37/25 41/20 41/21 63/9
us [7]  31/22 34/25 35/3 36/8 37/5 39/20
 64/22
user [1]  32/11
users [3]  31/8 31/19 31/20
using [1]  31/24
USSG [1]  54/17

**V**

value [2]  6/15 6/16
various [3]  8/25 22/7 33/4
variously [1]  4/17
verbally [1]  29/10
version [1]  64/12
versus [1]  29/1
very [8]  4/10 22/9 40/25 45/1 46/2 46/23
 46/24 51/16
view [1]  44/18
vigorously [1]  30/6
virtually [1]  44/24
vis [2]  56/19 56/19
vis-a-vis [1]  56/19

## V

**voluntarily [1]** 57/14

## W

**waiting [1]** 63/7
**want [19]** 9/6 15/5 21/6 35/15 49/21 50/2
50/18 50/22 50/24 50/25 50/25 51/6 51/9
51/19 52/24 52/24 56/13 63/7 63/25
**wanted [6]** 7/5 31/17 33/9 39/25 39/25 40/2
**warehouse [5]** 22/13 22/21 22/23 23/8 23/13
**Washington [1]** 1/17
**wasn't [15]** 15/11 20/24 20/25 21/4 21/8 21/8
21/13 21/15 25/21 27/9 31/11 31/24 37/1
44/20 62/5
**waste [1]** 28/11
**Watch [1]** 44/15
**water [2]** 56/2 56/3
**we'd [1]** 6/23
**we'll [2]** 44/11 51/15
**we're [8]** 2/2 8/11 24/9 45/4 63/23 65/22 66/1
66/4
**we've [4]** 8/4 9/6 22/10 47/16
**website [1]** 15/13
**week [6]** 63/14 63/14 64/2 66/3 66/5 66/7
**weekend [2]** 63/8 63/16
**weeks [2]** 15/1 64/11
**welcome [2]** 45/14 52/1
**well [11]** 22/16 24/8 31/24 42/24 46/5 50/18
51/3 51/13 56/13 57/8 66/9
**went [2]** 7/4 23/4
**weren't [6]** 7/22 20/15 35/20 37/5 37/13
41/20
**West [3]** 1/7 1/19 1/24
**what's [8]** 8/20 17/20 23/15 24/14 32/16 41/4
48/11 49/1
**whatever [1]** 35/11
**where [11]** 9/17 17/4 21/1 36/5 36/15 37/5
37/12 51/12 61/12 65/5 65/6
**whether [15]** 2/16 3/15 3/21 7/16 7/21 19/25
27/6 27/10 27/15 32/11 33/17 33/18 33/22
35/15 64/3
**while [1]** 38/5
**White [2]** 1/20 1/21
**who's [1]** 9/22
**whole [4]** 9/12 58/1 63/8 63/13
**why [7]** 8/7 13/10 30/11 44/7 50/14 50/15
51/3
**wife [1]** 29/8
**William [1]** 46/8
**Willie [3]** 47/9 47/13 48/17
**winter [1]** 11/21
**wire [1]** 61/22
**wished [1]** 38/13
**within [1]** 54/20
**without [1]** 47/20
**witness [8]** 2/11 45/10 50/15 50/20 63/3 63/5
63/6 66/5
**Woodbury [17]** 16/7 16/11 34/13 34/14
34/24 35/6 48/16 48/23 50/4 50/17 51/1 51/4
51/10 52/9 52/14 52/25 53/1
**words [3]** 16/11 28/6 59/19
**work [8]** 8/2 21/5 21/16 21/17 21/19 21/20
21/24 31/2
**worked [3]** 6/22 39/23 40/3
**working [7]** 3/5 18/17 18/18 37/11 38/6
40/10 44/1
**worse [1]** 51/22
**wouldn't [8]** 6/24 6/24 9/22 11/8 11/10 11/11
36/9 64/11

**writing [2]** 5/23 6/11
**written [5]** 5/12 5/13 5/18 61/5 61/9
**wrong [3]** 23/22 24/2 31/16
**wrongdoing [1]** 40/23

## Y

**yeah [8]** 22/7 27/24 28/16 30/25 31/3 36/20
40/24 56/3
**year [5]** 37/20 37/22 42/22 42/23 43/1
**years [7]** 7/4 28/2 30/21 35/12 36/8 36/13
58/4
**yes [137]**
**yesterday [25]**
**yet [2]** 53/7 64/25
**York [1]** 1/17
**you'd [1]** 59/21
**you're [18]** 2/4 4/6 4/22 9/13 17/24 21/22
25/15 32/23 33/2 44/2 45/11 48/23 49/23
50/2 50/7 50/10 52/1 57/8
**you've [8]** 28/1 34/1 36/18 37/9 49/2 54/1
56/10 64/24
**yourself [1]** 54/10