```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
                       Case No. 11-80205-CR-MARRA
 3
     UNITED STATES OF AMERICA,     )
 4                                 )
          GOVERNMENT,              )
 5                                 )
          -v-                      )
 6                                 )
     MITCHELL J. STEIN,            )
 7                                 )
          DEFENDANT.               )    West Palm Beach, Florida
 8                                 )    May 13, 2013
     _____)
 9

10           TRANSCRIPT OF TESTIMONY OF MARTIN B. CARTER

11              TAKEN AT THE JURY TRIAL PROCEEDINGS

12            BEFORE THE HONORABLE KENNETH A. MARRA

13                 UNITED STATES DISTRICT JUDGE

14   Appearances:

15   FOR THE GOVERNMENT          Albert Stieglitz, ESQ., AND
                                 Kevin B. Muhlendorf, ESQ.
16                               U.S. Department of Justice
                                 Criminal Division
17                               1400 New York Avenue, Northwest
                                 Washington, DC 20530
18
     FOR THE DEFENDANT           Mitchell J. Stein, Pro Se
19                               1551 North Flagler Drive, #1208
                                 West Palm Beach, FL 33401
20   -and-
                                 Charles G. White, ESQ.
21                               Charles G. White, P.A.
                                 1031 Ives Dairy Road, Suite 228
22                               Miami, FL 33179

23   Reporter                    Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768               Official Court Reporter
24                               701 Clematis Street
                                 West Palm Beach, Florida  33401
25                               E-mail:  SFranklinUSDC@aol.com
```

```
 1          (Call to the order of the Court.)

 2               THE COURT:  Good morning, everyone.  Please be

 3     seated.  Welcome back.

 4               We're back on the record, and Mr.~Stein's present.

 5               We ready to continue?

 6               MR. STIEGLITZ:  The United States is ready, Your

 7     Honor.

 8               MR. STEIN:  We're ready, Your Honor.

 9               THE COURT:  All right.  So let's bring the jury in.

10          (The jury enters the courtroom, after which the following

11     proceedings were had:)

12               THE COURT:  Good morning, everyone.  Welcome back.

13     Please be seated, ladies and gentlemen.  Hope you had a

14     pleasant weekend, and those of you who are mothers, hope you

15     had a nice Mother's Day, and thank you for being back again

16     this morning.  We're ready to continue with the Government's

17     next witness.

18               Mr. Stieglitz.

19               MR. STIEGLITZ:  Thank you, Your Honor.  The

20     Government calls Martin Carter.

21               Oh, and, Your Honor on a housekeeping level, we've

22     got some exhibits we've agreed on.  I don't think that needs

23     to be done outside the presence of Mr. Carter, but I can start

24     that process.

25               THE COURT:  All right.
```

 1              Sir, would you please raise your right hand for me.

 2              Martin B. Carter, Government witness, sworn.

 3              THE COURT:  Mr. Carter, that chair doesn't move.  So

 4    if you need to adjust the microphone, it will move.  You can

 5    move it towards you, and if you could please try and speak

 6    into it.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  And tell us your name and spell your last

 9    name for us, please.

10              THE WITNESS:  Martin B. Carter, C-a-r-t-e-r.

11              THE COURT:  Thank you.

12              MR. STIEGLITZ:  And, Your Honor, I apologize.  I'm

13    doing this somewhat out of order, but, again, the parties have

14    agreed to the admissibility of several exhibits which we'll be

15    handing out to the members of the jury, and I'll just go down

16    that list, and Mr. Sweeney, if y'all would hand those out as I

17    do so.

18              225.  And with respect to 225, that's the plea

19    agreement, Your Honor, and I just want to make clear, my

20    understanding from Mr. Stein is there's definitely no

21    objection to admitting that on direct.

22              MR. STEIN:  That's correct, Your Honor.

23              THE COURT:  225's admitted without objection.

24         (Government Exhibit No. 225 entered into evidence.)

25              MR. STIEGLITZ:  245, 29, 32, 85, 83, 300, Defense

```
 1   exhibit 82, Defense exhibit 241.
 2          Back to Government exhibits, Government exhibit 86,
 3   Government exhibit 88, Government exhibit 91.  I'll apologize
 4   to the members of the jury that this is going to be such a
 5   pile.  I believe I left off with 91.  Government's exhibit 90,
 6   Government's exhibit 89, Defense exhibit 244.  This is all
 7   recycled paper.  Government's exhibit 95, Government's
 8   exhibit 97.  I'm going to give my colleagues a minute to just
 9   catch up, Your Honor, if that's all right.
10          THE COURT:  If you wouldn't mind, can you just run
11   through all those numbers for me just one more time?
12          MR. STIEGLITZ:  I apologize, Your Honor.  The ones
13   that we've gotten to this point?
14          THE COURT:  Yes, start from the beginning, if you
15   wouldn't mind.
16          MR. STIEGLITZ:  Your Honor, to this point we've got
17   Government's exhibit 225, Government's exhibit 245,
18   Government's exhibit 29, Government's exhibit 32, Government's
19   exhibit 85, although I believe that's already in evidence, but
20   if it's not, the parties have agreed that it is admissible.
21   Government's exhibit 83, Government's exhibit 300, Defense
22   exhibit 82, Defense exhibit 241, Government's exhibit 86,
23   Government's exhibit 88, Government's exhibit 91, Government's
24   exhibit 90, Government's exhibit 89, Defense exhibit 244,
25   Government's exhibit 95, Government's exhibit 97, and
```

```
 1    Government's exhibit 100, and Government's exhibit 31.

 2           And I think in the interest of not being completely

 3    buried in paper I'll stop there for now.  I'll stop there for

 4    now, and then we can add to that when we get there.

 5           THE COURT:  All right.  Mr.~Stein, are those all

 6    admitted without objection?

 7           MR. STEIN:  Yes, Your Honor.

 8           THE COURT:  All right.  They'll all be admitted

 9    without objection.  Thank you.

10      (Government Exhibit Nos. 29, 31, 32, 83, 86, 88, 89, 90,

11    91, 95, 97, 100, 225, 245, and 300  entered into evidence.)

12      (Defense Exhibit Nos. 82, 241, and 244 entered into

13    evidence.)

14           MR. STIEGLITZ:  Thank you, Your Honor.

15           And I should clarify I guess for the Court, there

16    will be certain exhibits that we didn't hand out again because

17    they are already in evidence, but these are the new exhibits.

18           And, of course, these will all be displayed on the

19    screen, as well, and we'll do our best to blow those up.

20           All right.  May I inquire, Your Honor?

21           THE COURT:  Yes.

22                           Direct Examination

23    BY MR. STIEGLITZ:

24    Q   Good morning, Mr. Carter.  Mr. Carter, in what city and

25    state do you live?
```

```
1    A    Boca Raton, Florida.

2    Q    And just make sure, Mr. Carter, that you're speaking

3    loudly into that microphone so that we can hear you.

4    A    Okay.

5    Q    We've got an air conditioning vent that at least for me

6    makes it sometimes hard to hear.

7              Sir, how are you employed?  What line of work are you

8    in?

9    A    Basically, I'm a handyman.  I do certain odd jobs for

10   people's homes.

11   Q    Are we talking big jobs, small jobs?  If you could just

12   give the jury an idea what sort of jobs you do.

13   A    Mostly small jobs like replace dimmers, do landscape

14   lighting, I put up ceiling fans, just odds and end type of

15   jobs, small jobs.

16   Q    Mr. Carter, what is the highest level of education that

17   you've completed?

18   A    Twelfth grade.

19   Q    Mr. Carter, do you have a bank account?

20   A    Yes, I do.

21   Q    Can you give the jury an idea how much is in your bank

22   account?

23   A    Roughly, about $215.

24   Q    Can you give the jurors an estimate of your current net

25   worth, Mr. Carter?
```

1    A    Around $20,000.

2    Q    Mr. Carter, do you know the Defendant, Mitchell Stein?

3    A    Yes, I do.

4    Q    And when did you first meet Mr.~Stein?

5    A    I met him in October of 2005.

6    Q    Mr. Carter, at some point after you met Mr.~Stein, did you

7    help him create fake documents?

8    A    Yes, I did.

9    Q    Did you help him send fake documents to a company called

10   Signalife?

11   A    Yes, I did.

12   Q    And when I talk about Signalife, did you understand that

13   company to also go by the name Recom and Heart Tronics at

14   various times?

15   A    Yes, I did.

16   Q    Is it okay with you if, when we're talking this morning,

17   we just refer to everything as Signalife?

18   A    That will be fine.

19   Q    Those things you said you did, creating fake documents and

20   sending them to Signalife, why did you do that?

21   A    Because I was directed by Mr.~Stein to do so.

22   Q    Did you have any motivation of your own?

23   A    No, I did not.

24   Q    Mr. Carter, did you want to make money?

25   A    Yes, I did.

1   Q    Who told you that you'd make money?

2   A    Mitchell Stein.

3   Q    Did you, in fact, make money from helping Mr.~Stein?

4   A    Yes, I did.

5   Q    Did any of that money come from Mr. Stein himself?

6   A    Yes, it did.

7   Q    Did any of that money come from Signalife?

8   A    Yes, it did.

9   Q    The money that you got from Signalife, did you keep most

10  of it yourself?

11  A    No, I did not.

12  Q    What did you do with it?

13  A    I gave it back to Mitchell J. Stein.

14  Q    Now, Mr. Carter, you've pled guilty to a federal crime; is

15  that right?

16  A    That's correct.

17  Q    Let's bring up Government's exhibit 225, which has been

18  admitted into evidence.

19  A    Excuse me, can they put this screen up?

20       MR. STIEGLITZ:  May I approach, Your Honor?

21       THE COURT:  The only problem is, it sometimes blocks

22  the jurors' views of the witness.  So if you could look at

23  the -- in the binder, it should be in the binder, Mr. Carter.

24       THE WITNESS:  Okay.  Thank you.

25       THE COURT:  And if that's a problem, then we'll try

```
 1    and -- if you could tilt it up just slightly.  I'm talking
 2    about the monitor.
 3              All right, go ahead.
 4              MR. STIEGLITZ:  Thank you, Your Honor.
 5    BY MR. STIEGLITZ:
 6    Q   Mr. Carter, what is Government's exhibit 225?
 7    A   That is a court document.
 8    Q   Is that your plea agreement, Mr. Carter?
 9    A   Yes, it is.
10    Q   Tell the members of the jury, and again, if it's easier to
11    look at it in the binder, feel free to do that.
12              Mr. Carter, what did you plead guilty to?
13    A   I pled guilty to conspiracy to commit wire fraud, mail
14    fraud, and obstruction of justice.
15    Q   Mr. Carter, as part of your plea agreement, did anyone
16    promise you anything about what your exact sentence would be?
17    A   No, sir.
18    Q   Do I decide what your exact sentence is going to be?
19    A   No, sir, you do not.
20    Q   What about Mr. Muhlendorf or any other government
21    attorney?  Do they decide what your exact sentence is going to
22    be?
23    A   No, sir.
24    Q   Who's going to decide what your sentence is going to be,
25    Mr. Carter?
```

```
1    A    The judge in Washington, D.C.

2    Q    And that's Washington, D.C. because that's where you pled

3    guilty; is that right?

4    A    That's correct.

5    Q    Now, Mr. Carter, there's -- is it fair to say there's a

6    lot of detail in that plea agreement?

7    A    Yes, there is.

8    Q    Would you just tell the members of the jury what's the one

9    fundamental promise you've made under that plea agreement?

10   A    To tell the truth, nothing but the truth.

11   Q    If you do that, if you tell the truth, what is it that you

12   hope will happen?

13   A    A lesser sentence.

14   Q    Are there any other agreements that you have with anyone

15   about your plea, like verbal agreements, any side agreements,

16   or is this plea agreement the entirety of your agreement with

17   the Government?

18   A    The plea agreement is my entire agreement.

19   Q    What's your understanding of what happens to that

20   agreement if you intentionally lie to this jury today?

21   A    That agreement gets thrown out and other charges will be

22   brought against me.

23   Q    I don't think I could hear the second part of that so I'm

24   not sure if the members of the jury could.

25   A    That this agreement would be thrown out, and other
```

1    charges, I believe, would be brought against me.

2    Q    Does that agreement, that plea agreement, give you any

3    sort of bonus if Mr.~Stein gets convicted?

4    A    No, it has no bearing at all.

5    Q    Mr. Carter, you said that you pled guilty to -- well, what

6    did you plead guilty to again?

7    A    To conspiracy for mail fraud, wire fraud, and obstruction

8    of justice.

9    Q    Who did you conspire with in that conspiracy?

10   A    Mitchell Stein.

11   Q    Who was the leader of that conspiracy?

12   A    Mitchell Stein.

13   Q    Now, Mr. Carter, you've also been sued by the Securities

14   and Exchange Commission; is that right?

15   A    That's correct.

16   Q    Did the SEC accuse you of committing fraud in connection

17   with Signalife?

18   A    Yes, they did.

19   Q    Did you admit to the SEC that you had committed fraud?

20   A    Could you rephrase that?

21   Q    Did you admit, after the SEC sued you, did you admit that

22   you had committed fraud?

23   A    Yes, I did.

24         MR. STIEGLITZ:  Okay.  We can take down Government's

25   exhibit 225.

```
 1    BY MR. STIEGLITZ:
 2    Q   I want to ask you some questions not related to any
 3    specific documents there.
 4            Mr. Carter, let's go through some background.  When
 5    did you first meet Mr.~Stein?
 6    A   It was in October of 2005.
 7    Q   And can you just explain to the members of the jury the
 8    circumstances?  How was it that you met Mr.~Stein?
 9    A   I met him by putting a generator up right before Hurricane
10    Wilma; I installed a generator.
11    Q   And just to be clear, you installed it where?
12    A   At his house, I'm sorry, in Boca Raton, Florida.
13    Q   And at that time, what were you doing for a living,
14    Mr. Carter?
15    A   Basically handyman type of stuff.  You know, putting up
16    for people's homes odds and ends, switches, Casablanca fans,
17    those type of things.
18    Q   And Mr. Carter, if you could just make sure to speak up.
19    A   Okay.  I'm sorry.
20    Q   Again, I'm having trouble hearing you.
21            Were you a licensed electrician, Mr. Carter?
22    A   No, I was not.
23    Q   Approximately how much were you making at that time?
24    A   Roughly between 35, 40,000, maybe.
25    Q   Per year?
```

```
 1    A    Per year, yes.

 2    Q    Did there come a time after you installed that generator

 3    at Mr.~Stein's house that you and he had lunch together?

 4    A    That's correct.

 5    Q    Where did you have lunch?

 6    A    In Boca Raton.  I forget the name of the restaurant,

 7    though.

 8    Q    Was anyone else there, or was it just you and Mr.~Stein?

 9    A    Just me and Mr.~Stein.

10    Q    And Mr. Carter, if you're having trouble at any point,

11    there's some water there if you'd like.

12    A    Thank you.

13    Q    What did Mr.~Stein, if anything, what did he tell you at

14    that lunch?

15    A    He told me that he had a heart monitor company and they

16    were having problems with a cable issue and wanted to know if

17    I was interested in helping.

18    Q    Did he promise you anything if you agreed to help him?

19    A    He promised I was going to make a lot of money.

20    Q    Now, Mr. Carter, you're an electrician, a handyman.  Had

21    you ever done any work on heart monitors?

22    A    No, sir, I did not.

23    Q    Had you ever done at that time any work of any kind on

24    healthcare devices?

25    A    No, I did not.
```

```
1    Q    Were you an electrical engineer of some kind?

2    A    No, sir, I was not.

3    Q    At any point during your conversation at that lunch with

4    Mr.~Stein, did he even ask you if you had any background in

5    heart monitors?

6    A    No, he did not.

7    Q    Despite all that, did you agree to help him with those

8    cables, help him with Signalife?

9    A    Yes, I did.

10   Q    Why?

11   A    Again, it was because he told me I was going to make more

12   money than I've made before.

13   Q    So after that lunch, what happened next?

14   A    After the lunch, it was like a week later, I believe, he

15   flew me to Greenville, South Carolina.

16   Q    And, again, Mr. Carter, I'm sounding like a broken record.

17   If you could just make sure to speak up, please.

18   A    Okay.

19   Q    Mr. Carter, did you -- when you flew to Greenville, South

20   Carolina, did you fly commercial?

21   A    No, I did not.

22   Q    How did you get there?

23   A    We flew on a private jet.

24   Q    Who was on the jet?

25   A    Myself, Mr.~Stein, and the crew.
```

1    Q    What did you wear to Greenville, South Carolina?

2    A    He told me to wear a business suit.

3    Q    Who's "he"?

4    A    Mitchell Stein, sorry.

5    Q    Did Mr.~Stein give you any instructions about what you

6    should or should not say once you were in South Carolina?

7    A    He basically told me just to keep my mouth shut and follow

8    what he says.

9    Q    So you flew to Greenville.  Where in Greenville did you

10   go?

11   A    At the corporate headquarters of Signalife.

12   Q    When you got there, was anyone there to meet you?

13   A    Yes, there was a Pamela Bunes, I believe is her name.

14   Q    Okay.  Had you ever met Ms. Bunes before?

15   A    No, I did not.

16   Q    Had you ever met or spoken with anyone from Signalife

17   before?

18   A    No, I did not.

19   Q    Who made the introductions at that meeting?  Who

20   introduced you?  Who introduced everybody to one another?

21   A    Mr.~Stein.

22   Q    And based on what you saw at that meeting, who was in

23   charge of it?

24   A    Mr.~Stein was.

25   Q    Did you say anything at that meeting other than

```
 1   introductions?

 2   A    No, basically not.

 3   Q    Why not?

 4   A    Because I was told not to.

 5   Q    By whom?

 6   A    By Mr.~Stein.

 7   Q    When the meeting in Greenville was over, where did you go?

 8   A    Well, we went to lunch, and then after lunch he told me he

 9   had to go to New York, and he wanted me to go back to Florida,

10   and he bought me a ticket to go commercially back to Florida.

11   Q    And the "he" that you're referring to is who?

12   A    Mr.~Stein, I'm sorry.

13   Q    Did there come a time after you returned to Florida when

14   you heard from Mr.~Stein again?

15   A    That's correct, yes.

16   Q    Can you just give the members of the jury an idea about

17   how long after you got back to Florida that was, just roughly?

18   A    I believe it was like a week, but I don't remember the

19   exact time.

20   Q    Are we still talking about late 2005, though?

21   A    Yes, that's correct.

22   Q    When Mr.~Stein contacted you, did he ask you to do

23   anything?

24   A    Well, he asked, you know, for me to drive for him, which I

25   did.
```

```
 1    Q    And let's just talk a little bit about that.  Describe
 2    what -- what car were you driving when you drove for
 3    Mr.~Stein?
 4    A    We drove his S600 sedan Mercedes.
 5    Q    And would you pick him up at his house?
 6    A    Yes, I would.
 7    Q    And that was his -- I'm sorry, to be clear, was that his
 8    house in Boca Raton?
 9    A    Yes, it was.
10    Q    And when you would pick him up, would he sit in the front
11    with you, or would he sit in the back?
12    A    He would sit in the back on the right-hand side, passenger
13    side.
14    Q    Where would you drive him, Mr. Carter?  What types of
15    places or things would you drive him to?
16    A    I drove him various places.  I'd drive him to maybe a
17    restaurant, clubs.  I would take him, you know, around the
18    tri-county area, wherever he needed to go.
19    Q    Did Mr.~Stein pay you for driving him?
20    A    Yes, he did.
21    Q    How much did he pay you approximately?
22    A    Roughly around $300 a day.
23    Q    A day?
24    A    Yes, every time I drove him.
25    Q    And was he writing you checks?  Was he direct depositing
```

```
 1    into your bank account?  Tell the members of the jury how he
 2    was paying you.
 3    A    He would pay me by cash.
 4    Q    Now, in or around that same time, late 2005, early 2006,
 5    did Mr.~Stein ask you to travel to California?
 6    A    Yes, he did.
 7    Q    Did he say why?
 8    A    He told me he wanted me to look at the manufacturing
 9    facility for Heart Tronics.
10    Q    Did you agree to go to California?
11    A    Yes, I did.
12    Q    Before you went to California, did you talk to anyone at
13    Signalife about the fact that you were going to California?
14    A    No, I did not.
15    Q    Who made your travel arrangements?
16    A    Mr.~Stein did.
17    Q    Who paid for your trip?
18    A    Mr.~Stein.
19    Q    Do you remember the name of the company that you visited
20    out in California?
21    A    Yes, I do.
22    Q    What was it?
23    A    I'm sorry, Ventrex.
24    Q    Was anyone with you from Signalife when you visited this
25    Ventrex?
```

```
 1    A    Yes, there was a Bill Matthews.
 2    Q    And I'm sorry, Ventrex is V-e-n-t-r-e-x.  Is that the best
 3    of your recollection, Mr. Carter?
 4    A    Yes.
 5    Q    Now, Mr. Carter, Ventrex was the manufacturing facility
 6    for the Signalife heart monitor; is that right?
 7    A    That's correct.
 8    Q    You didn't have any background in medical device
 9    technology, did you?
10    A    No, sir, I did not.
11    Q    When you're touring Ventrex, did you have any idea really
12    what you were looking at?
13    A    No, sir, I did not.
14    Q    Now, after you did your tour of Ventrex, did you go
15    anywhere else while you were out in California?
16    A    Yes, I did.  I went to their other corporate office, I
17    believe in California.  I forget the exact -- I think it was
18    Studio City, but I don't --
19    Q    And whose office was that?  I'm sorry.
20    A    That was Signalife's, I'm sorry.
21    Q    While you were at Signalife's offices in California, did
22    anyone give you anything?
23    A    Yes, they gave me a set of cables and a disc with software
24    information on it.
25    Q    Now, again, you didn't have any background in medical
```

 1   device technology.  Did you have any idea what those cables

 2   were about, what that software was about?

 3   A    No, sir, I did not.

 4   Q    Did you take those cables back to Florida with you?

 5   A    Yes, I did.

 6   Q    What did you do with them when you got back to Florida,

 7   anything?

 8   A    I gave them back to Mitchell J. Stein.

 9   Q    Was that the last you saw of those cables or was there

10   something else that you did with them?

11   A    No, I saw them another time when they wanted me to go to a

12   cable manufacturer.

13   Q    And just to be clear, whose -- did someone tell you to

14   take them to a cable manufacturer?

15   A    Yes, they did.

16   Q    Who told you that?

17   A    Mitchell Stein and a Bill Matthews.

18   Q    All right.  Did you, in fact, take those cables to a cable

19   manufacturer?

20   A    Yes, I did.

21   Q    And what was the name of that cable manufacturer?

22   A    Advantage Medical.

23   Q    Where is Advantage Medical?

24   A    They are in Coral Springs, Florida.

25   Q    Other than taking those cables to Advantage Medical,

```
 1    Mr. Carter, did you do anything with those cables?
 2    A    No, sir, I did not.
 3    Q    Did you help Advantage Medical, you know, redesign the
 4    cables in some way?
 5    A    No, I did not.
 6    Q    Did you consult with Advantage Medical or anybody else
 7    about those cables?
 8    A    No, I did not.
 9    Q    And after getting the cables to Advantage Medical, did you
10    ever have anything to do with cables after that?
11    A    Could you rephrase?
12    Q    After you took those cables to Advantage Medical, did you
13    at any point have anything else to do with Signalife heart
14    monitor cables?
15    A    No, not really.
16    Q    Now, in late 2005, early 2006, when you're going to
17    California and coming back, when you get back, are you still
18    driving for Mr.~Stein?
19    A    Yes, I am.
20    Q    Did you ever drive Mr.~Stein to the airport?
21    A    Yes, I did.
22    Q    Mr. Carter, to your knowledge, did Mr.~Stein have his own
23    plane?
24    A    Yes, he did.
25    Q    And have you seen that plane before?
```

```
 1    A    Yes, I have.

 2    Q    Let's pull up what's been admitted into evidence as

 3    Government's exhibit 245, and let's look at the -- let's just

 4    look at that first page, Mr. Carter, of 245, which again, is

 5    in your binder, as well.

 6              Mr. Carter, does that picture fairly and accurately

 7    show Mr.~Stein's plane?

 8    A    Yes, it does.

 9    Q    Let's look at the next page of the exhibit, please.  Does

10    that picture fairly and accurately describe Mr.~Stein's plane?

11    A    Yes, it does.

12    Q    And let's just look at the last page, please.  Mr. Carter,

13    is that another picture of Mr.~Stein's plane?

14    A    Yes, it is.

15    Q    And if we can just -- we'll zoom in, Mr. Carter, on that

16    spot by the door, those logos.  Do you see those two symbols

17    by the door, Mr. Carter?

18    A    Yes, I do.

19    Q    What are they?

20    A    It's a picture of a doberman, or a drawing of a doberman,

21    and a cat.

22    Q    Does that doberman symbol have any significance for you?

23    A    Yes, it does.

24    Q    Can you just explain that to the jury, please?

25    A    That's what Mr.~Stein called himself, The Doberman.
```

```
 1              MR. STIEGLITZ:  Okay.  We can take that exhibit down.
 2  BY MR. STIEGLITZ:
 3  Q   Mr. Carter, so at this time you're driving Mr.~Stein; is
 4  that right?
 5  A   That's correct.
 6  Q   Are you doing other tasks for him?
 7  A   Yes, I am.
 8  Q   Can you give the jury some examples of the kinds of tasks
 9  you're doing for Mr.~Stein?
10  A   I would go get him like carpet, I would go get him
11  vitamins, I'd get him medicine if he needed, I would go get
12  him drinks if he wanted.
13  Q   Mr. Carter, to your knowledge, was any of that work, any
14  of those tasks, was that related to Signalife in any way?
15  A   No, it was not.
16  Q   And, Mr. Carter, in addition to those tasks that you're
17  doing for Mr.~Stein, did there come a point in time where he
18  asked you for your personal information?
19  A   Yes, he did.
20  Q   And just tell the jury a little bit about that, please.
21  A   He asked for my driver's license, my passport, my mother's
22  maiden name, my Social Security number.  I don't remember all
23  the other information offhand.
24  Q   Mr. Carter, did he ask you for a copy of your signature?
25  A   Yes, he did.
```

```
1    Q    Did he tell you why he wanted any of those things?

2    A    He just said he needed that, so I gave it to him.

3    Q    Why?

4    A    Because I trusted him.

5    Q    Mr. Carter, did you ever give any of that information to

6    Lowell Harmison or anybody else at Signalife?

7    A    No, I did not.

8    Q    Okay.  Mr. Carter, in 2005, did you get any money from

9    Signalife?

10   A    In 2005, no, I did not.

11   Q    Did there come a point in 2006 where you tried to get

12   money for Signalife?

13   A    Yes.

14   Q    From Signalife?

15   A    Yes, I did.

16   Q    We'll pull up, Mr. Carter, and again, it's also in your

17   binder there, Government's exhibit 29, which has already been

18   admitted into evidence.

19   A    Is it okay if I hold the binder like this?

20   Q    Mr. Carter, you can move that binder around wherever you'd

21   like it.  Just make sure that you're speaking into the

22   microphone, please.

23   A    Okay.  No problem.

24   Q    And Mr. Carter, can you just explain to the members of the

25   jury what we're looking at here?
```

```
1    A   We're looking at an invoice to Signalife for $200,000.

2    Q   Who created this invoice, Mr. Carter?

3    A   I created it.

4    Q   And the date on it is what?

5    A   May 22nd, 2006.

6    Q   And, Mr. Carter, what is it that you're telling Signalife

7    you are owed that $200,000 for?

8    A   For design and development of cables.

9    Q   Is this document true or is this a lie, Mr. Carter?

10   A   This is a lie.

11   Q   Why?

12   A   Because I never did any design and development of the

13   cables.

14   Q   Now, to be clear, Mr. Carter, did anyone tell you to send

15   this invoice anyplace?

16   A   No, they did not.

17   Q   Not Mr.~Stein, right?

18   A   That's correct.

19   Q   Did this invoice get sent to the company?

20   A   Yes, it did.

21   Q   Did Signalife pay you on this invoice?

22   A   No, they did not.

23   Q   Why not?

24   A   As a matter of fact, Mr.~Stein told me to retract the

25   invoice.
```

```
 1    Q   Let's pull up what's been admitted into evidence as
 2   Government's exhibit 32, please.
 3            And, again, Mr. Carter this is in your binder, and
 4   we'll blow it up on the screen, as well.
 5            And if you just tell the members of the jury what
 6   we're looking at here.
 7   A   Okay.  It's a letter.
 8   Q   Is that your signature, Mr. Carter?
 9   A   Yes, that's my signature.
10   Q   Did you create this letter?
11   A   No, I did not.
12   Q   Who asked you to sign this letter, Mr. Carter?
13   A   Mr.~Stein.
14   Q   Now, Mr. Carter, I'm going to ask you to read some
15   portions of this document, but I just want you to tell us,
16   tell us, first, do you have trouble reading, Mr. Carter?
17   A   Yes, I do.  I am dyslexic.
18   Q   So Mr. Carter, I want you to let me know if you have
19   trouble reading anything that I ask you to read, but let's try
20   reading the first sentence of that letter, please.
21   A   Okay.  "This confirms that I, Martin B. Carter, am owed no
22   money by Signalife, Inc. for any work I have performed.  In
23   fact, I did not even know that an invoice was sent, as it was
24   sent by my wife, I believe out of frustration."
25   Q   Mr. Carter, focusing on that first sentence where you say
```

1   you're owed no money by Signalife, was that true?

2   A   Yes, that's correct.

3   Q   If you can just read that second paragraph, please.

4   A   "Frustrations were as a result of all the work I have done

5   trying to help your company in good faith and a result of

6   dozens of conflicting instructions I have received regarding

7   the cables I developed with Advantage Medical.  Advantage can

8   also attest to their frustrations about numerous conflicting

9   instructions during the last six months."

10   Q   Mr. Carter, in that paragraph you talk about all the work

11   you've done trying to help the company in good faith regarding

12   the cables you developed.  Is that true or is that a lie?

13   A   No, that's a lie.

14   Q   Had you done any work other than dropping the cables off

15   with respect to those cables?

16   A   No, I did not.

17   Q   Below that, Mr. Carter, there's a reference to dunning

18   calls.  Do you see that?

19   A   Yes, I do.

20   Q   Do you have any idea what dunning calls are, Mr. Carter?

21   A   No, I do not.

22   Q   What did you do with this letter once you signed it,

23   Mr. Carter?

24   A   It was Mitchell J. Stein.  I gave it back to him.

25   Q   Now, even though in this letter you're saying you're not

```
 1   owed any money by Signalife, was Mr.~Stein still promising to
 2   get you money from Signalife?
 3   A   Yes, he was.
 4   Q   Okay.  We'll take down that document, and let me just ask
 5   you, Mr. Carter, that invoice that we just looked at in
 6   May 2006, moving forward into the summer of 2006, did you
 7   drive Mr.~Stein during the summer of 2006?
 8   A   No, he went back to California in 2006.
 9   Q   Did he come back to Florida at some point?
10   A   Yes, in the late fall, like October, November.  I don't
11   remember the exact date.
12   Q   Is that generally how Mr.~Stein structured his living,
13   sort of summer in LA and spring and fall in Florida?
14   A   That's correct.
15   Q   When Mr.~Stein got back to Florida later in 2006, did you
16   have any contact with him?
17   A   Yes, I did.
18   Q   What sorts of things were you doing for him?
19   A   Again, I was driving him to different places he wanted to
20   go.
21   Q   Were you doing any work related to Signalife or just sort
22   of those personal tasks for Mr.~Stein?
23   A   From what I can remember, the personals for him, for
24   Mr.~Stein.  Excuse me.
25   Q   Was Mr.~Stein paying you?
```

```
 1   A    Yes, he was.

 2   Q    Since we're in late 2006, I want to ask you, did there

 3   come a time when Mr.~Stein told you about something called the

 4   Five Investments Partnership?

 5   A    Yes, he did.

 6   Q    Mr. Carter, what is your understanding of what the Five

 7   Investments Partnership was?

 8   A    My understanding was it was a company that was dealing

 9   with stock, I believe.  He just said I was going to make money

10   with it.

11   Q    So to be clear, did Mr.~Stein ask you to join this

12   partnership with him?

13   A    Yes, he did.

14   Q    Were there any other partners besides the two of you?

15   A    No, there was not.

16   Q    Did Mr.~Stein tell you who would handle the business of

17   the partnership?

18   A    Yes, he was.

19   Q    Mr. Carter, do you recognize the name Mark Nevdahl?

20   A    Yes, I do.

21   Q    Did Mr.~Stein tell you anything about Mr. Nevdahl?

22   A    All I knew he was a stockbroker for him.

23   Q    Do you know Mr. Nevdahl?

24   A    No, I do not.

25   Q    Did you ever talk to Mr. Nevdahl that you can recall?
```

```
 1   A    One time from what I can recall.

 2   Q    Was that on the phone or in person?

 3   A    That was on the phone.

 4   Q    Were you on the phone alone with Mr. Nevdahl, or was

 5   someone else on the phone with you?

 6   A    I believe I was on the phone with Mr.~Stein.

 7   Q    As between you and Mr.~Stein, who was doing the talking?

 8   A    Mr.~Stein was.

 9   Q    Mr. Carter, did you contribute any money to start up the

10   Five Investments Partnership?

11   A    No, I did not.

12   Q    Did you have any role in determining what investments the

13   Five Investments Partnership would make?

14   A    No, I did not.

15   Q    Did Mr.~Stein ever ask you to do anything with regard to

16   the business of the Five Investments Partnership?

17   A    No, he did not.

18   Q    Mr. Carter, I'll ask you to look either on the screen or

19   in your binder at Government's exhibit 85, which is already in

20   evidence.

21          And that's a multi-page document; is that right,

22   Mr. Carter?

23   A    That's correct.

24   Q    If you can just go to the fifth page of the exhibit,

25   Mr. Carter.  Looking at the bottom right, the numbers end in
```

1    1632.

2    A    Okay.

3    Q    What's the title of that page, Mr. Carter?

4    A    It says "Corporate Resolution Certification."

5    Q    For what entity?

6    A    For Five Investment Partnerships.

7    Q    Mr. Carter, skipping down to the bottom left, is that your

8    signature there?

9    A    Yes, that is my signature.

10   Q    Who gave you this document to sign, Mr. Carter?

11   A    Mitchell Stein.

12   Q    Did you write the title "President" under your name?

13   A    No, I did not.

14   Q    When Mr.~Stein gave this document to you, did he explain

15   what it was?

16   A    Not really.  He just said that he needed this signed.

17   Q    Did he tell you maybe you should talk to an attorney to

18   figure out what this was all about?

19   A    No, he did not.

20   Q    In the middle of the document there, Mr. Carter, who does

21   it say is going to have check writing and debit card

22   privileges for the Five Investments Partnership?

23   A    Mitchell Stein only.

24   Q    Not you?

25   A    Not me.

```
 1   Q   And just looking down from there, Mr. Carter, who is it

 2   that has the authority to give orders for the purchase, sale

 3   or other disposition of stocks and bonds and other securities

 4   from that account?

 5   A   Mitchell Stein.

 6   Q   Mr. Carter, let's look at page 7 of the document, which

 7   ends in 1634 there at the bottom right.  Do you have that

 8   document in front of you, Mr. Carter?

 9   A   Yes, I do.

10   Q   Mr. Carter, there are two signatures on that document; is

11   that right?

12   A   That's correct.

13   Q   Whose signatures are those?

14   A   Those are my signatures.

15   Q   Let's look first at that typewritten language at the very

16   top, please.

17   A   Yes, I see it.

18   Q   And if you're comfortable doing so, Mr. Carter, please go

19   ahead and read that to the jury.

20   A   "With respect to Five Investments Partnership, this shall

21   clarify and confirm that any decisions about the brokerage

22   account or the writing of funds from such brokerage accounts

23   of Five Investments Partnership shall be made exclusively by

24   the managing partner of Five Investments Partnership."

25   Q   Who was the managing partner of Five Investments
```

```
 1   Partnership, Mr. Carter?

 2   A   Mitchell J. Stein.

 3   Q   Let's look at that handwriting below there.  Can you read

 4   that to the jury?

 5           Well, let's back up.  Whose handwriting is that,

 6   Mr. Carter?

 7   A   That's my handwriting.

 8   Q   Can you just read that to the jury, please?

 9   A   "Mr.~Stein is in control of money and stock wires.  Here

10   are my FDL and Justice Department badge."

11   Q   Mr. Carter -- well, did you make up any of that language,

12   either the handwritten language or the typewritten language?

13   A   No, I did not.

14   Q   Where did you get that language from?

15   A   Mr.~Stein.

16   Q   And can you just tell -- you refer there to your FDL.

17   What is that on the left there, that sort of square looking

18   thing?

19   A   I believe that's my driver's license.

20   Q   And that badge that you describe as your Justice

21   Department badge, Mr. Carter, you're not an employee of the

22   Justice Department, are you?

23   A   No, I am not.

24   Q   You've not ever been an employee of the Justice

25   Department, right?
```

1    A    No, I have not.

2    Q    What is that badge?

3    A    Concealed weapons permit badge.

4    Q    Mr. Carter, did Mr.~Stein ever ask you to carry a gun

5    while you were with him?

6    A    Yes, he did.

7    Q    Did he ever ask you to act as his bodyguard?

8    A    Yes, he did.

9    Q    Why did you put those things on there, that badge and your

10   driver's license?

11   A    Because that's what Mr.~Stein wanted.

12   Q    Mr. Carter, these documents that we've looked at here that

13   you've signed, did you have any idea why you were signing

14   them?

15   A    No, I did not.

16   Q    What did you do with them once you'd signed them?

17   A    I signed them at his house, at Mitchell Stein's house in

18   Boca Raton, Florida.

19   Q    And did you then give them to him?

20   A    Yes.

21   Q    Let's look at the tenth page of the exhibit, Mr. Carter,

22   which ends in 1637 on the bottom of it, bottom right of it.

23   A    Okay.

24   Q    And we'll blow it up a little bit on the screen so that

25   you can -- so that you can take a look.

```
1              What's the title of this document, Mr. Carter?

2    A    "General Partnership Agreement."

3    Q    Mr. Carter, prior to the Government showing you this

4    document at a meeting, had you ever seen this document before,

5    that you can recall?  And feel free to take a look at it in

6    your binder if you need to refresh yourself.

7    A    Okay.  No, I do not.

8    Q    Just looking under the title there, what's the date of

9    this document, Mr. Carter?

10   A    The 11th day of December, 2006.

11   Q    Who is this general partnership agreement between?

12   A    Mitchell J. Stein and Martin Carter, myself.

13   Q    And Mitchell J. Stein is described in those parentheses as

14   what?

15   A    The first partner and individual residing in Boca Raton,

16   Florida, and California.

17   Q    And what are you described as in the parentheses?

18   A    The second partner.

19   Q    Let's flip back to the signature page, which is the 14th

20   page of that exhibit.  It ends in 1641.  Do you have that in

21   front of you, Mr. Carter?

22   A    Yes, I do.

23   Q    We'll blow up on the screen those signatures, as well, if

24   you'd like to look at it there.

25   A    Okay.
```

```
 1    Q    Who appears to sign under the first partner?

 2    A    Mitchell J. Stein.

 3    Q    What about under the second partner?  Whose signature is

 4    that, do you know?

 5    A    I have no idea.

 6    Q    That's not your signature?

 7    A    No, it is not.

 8    Q    What about that address under the second partner?  Whose

 9    address is that?

10    A    It's Mitchell J. Stein's address in Boca Raton, Florida.

11    Q    And it's care of that address and care of a phone number.

12    Do you recognize that phone number, Mr. Carter?

13    A    Yes, I do.

14    Q    Whose phone number is that?

15    A    Mitchell J. Stein's.

16    Q    Did Mr.~Stein ever show you this document, Mr. Carter?

17    A    No, he did not.

18    Q    Did he ever ask you if he could fill out this document and

19    sign it for you?

20    A    No, he did not.

21    Q    We'll take that document down, and we'll pull up what's

22    already been admitted into evidence as Government's 296.  And

23    we'll blow it up a little bit on the screen there, Mr. Carter,

24    so that you can see it if you'd like to look at it on the

25    screen.
```

1    A    Okay.

2    Q    Mr. Carter, prior to the Government showing you this

3    document in a meeting, had you ever seen this document before?

4    A    No, I have not.

5    Q    Just looking at the first page of it, the address under

6    Five Investments Partnership, whose address is that?

7    A    Mitchell Stein's address in Boca Raton, Florida.

8    Q    And let's look at what I believe is the fourth page of the

9    document, Mr. Carter.  I apologize.  I think it's the last

10   page.  I don't have a page number there.

11   A    Okay.

12   Q    Let's look at who's listed in the middle there as the

13   partners in the Five Investments Partnership.

14   A    Mitchell Stein and Marten Carter.

15   Q    Did you write your name on that form, Mr. Carter?

16   A    No, I did not.

17   Q    Is that even how you spell your name?

18   A    No, it is not.

19   Q    Is that your signature on that form, Mr. Carter?

20   A    No, it is not.

21   Q    Did Mr.~Stein ever ask you if he could fill this document

22   out for you?

23   A    No, he did not.

24   Q    Did he ever ask you if he could sign this document for

25   you?

1    A    No, he did not.

2    Q    Bottom line, Mr. Carter, did you ever control anything

3    about what went on with the Five Investments Partnership?

4    A    No, I did not.

5    Q    To your knowledge, who did?

6    A    Mitchell Stein.

7    Q    Why would you enter a partnership, Mr. Carter, if you had

8    no idea what was going on and had no control over what was

9    going on?

10   A    Because I trusted Mitchell Stein.  He told me I was going

11   to make money and just follow his lead.

12   Q    Let's talk about making money.  Let's move forward into

13   2007.  Are you still driving for Mr.~Stein in 2007?

14   A    Yes, I am.

15   Q    Are you doing anything else for him at that time, any

16   other tasks for him?

17   A    Just like doing menial things like pick him up stuff, make

18   him food, things like that.

19   Q    Are you doing any work for Signalife at that time?

20   A    No, I am not.

21   Q    That stuff we talked about with Advantage Medical and the

22   cables, is that all, as of 2007, long in the past?

23   A    Yes.

24   Q    Let's look at what's been admitted into evidence as

25   Government's exhibit 83, please, Mr. Carter.

1    A    Okay.

2    Q    Should be the next document in your binder.

3    A    Yes.

4    Q    And Mr. Carter, is it -- well, why don't you look at the

5    top of it there, which we'll blow out on the screen for you,

6    and just tell the members of the jury what we're looking at

7    here.

8    A    It's an e-mail from Mitch Stein to myself.

9    Q    And if you could just -- if you could just explain the

10   e-mail addresses, mikofood@aol.com, is that your e-mail

11   address?

12   A    Yes, that's my e-mail address.

13   Q    All right.  Can you just read that e-mail to the jury,

14   please?

15   A    "Marty, you will get a wire regarding Lowell in the amount

16   $105,300.  You keep a thousand for yourself, and then you wire

17   transfer $104,300 to Mark Nevdahl at the coordinates attached

18   to this e-mail.  Then you write me a confirming e-mail that

19   was done.  You give me a wire confirmation number.  This is

20   urgent.  Please do not screw it up, and do it carefully.  Go

21   to the bank yourself and wires (sic) carefully.  Thank you,

22   Mitch."

23   Q    Mr. Carter, who is Lowell?

24   A    Lowell Harmison, that's from Signalife.

25   Q    At the time of this e-mail~-- the date on this e-mail,

```
 1   Mr. Carter, is November 12th of 2007; is that right?

 2   A   That's correct.

 3   Q   At that time had you asked Signalife for $105,300?

 4   A   No, I did not.

 5   Q   I mean, setting aside that invoice that we talked about

 6   earlier that you had pulled back?

 7   A   Correct.  No, I did not.

 8   Q   At this time in November of 2007, were you owed $105,300

 9   from Signalife?

10   A   No, I was not.

11   Q   What about Dr. Harmison, Lowell Harmison?  Did he owe you

12   any money?

13   A   No, he did not.

14   Q   Did you ever talk to Dr.~Harmison about this wire?

15   A   No, I did not.

16   Q   Bottom line, did you have any idea what this was about,

17   why you were getting $105,300?

18   A   No, I did not.

19   Q   Who was the only person you talked to this wire -- talked

20   about this wire with?

21   A   Mitchell Stein.

22   Q   Did you follow the instructions on this e-mail?

23   A   Yes, I did.

24   Q   Okay.  Let's shift gears a little bit.  We'll take that

25   document down, Mr. Carter, and let's look at what's been
```

```
 1   admitted into evidence as Government's exhibit 300, please,
 2   which should be the next document in your binder.
 3          Mr. Carter, do you recognize this document as being a
 4   purchase order for Signalife products?
 5   A   Yes, I did.
 6   Q   Who's the customer for this order?
 7   A   Cardiac Hospital Management.
 8   Q   Can you just tell the members of the jury how it is that
 9   you -- well, have you seen this document before, Mr. Carter?
10   A   Yes, I have.
11   Q   And explain how it was that you saw this document.
12   A   I believe Mitchell Stein showed it to me in his car, but
13   I'm not a hundred percent sure about that.
14   Q   A hundred percent sure of what?
15   A   Where I saw it, whether it was in the car or at his house.
16   Q   Did Mr.~Stein ask you to do anything with respect to this
17   document?
18   A   Well, he kept asking me to see if I could get somebody
19   involved in Asia, like my wife's family.
20   Q   To do what, Mr. Carter?
21   A   To try and get involved and see if they wanted to be a
22   customer of the company.
23   Q   Now, to be clear, was this form already filled out when
24   Mr.~Stein showed it to you, to the best of your recollection?
25   A   Yes, it was.
```

```
 1   Q    Those words, "Cardiac Hospital Management," and all the
 2   stuff about the price and the number of units, that was all in
 3   there already?
 4   A    Yes, it was.
 5   Q    But on the bottom there, Mr. Carter, there's some
 6   handwriting; is that correct?
 7   A    That's correct.
 8   Q    It says Antonio Mijares; is that correct?
 9   A    That's correct.
10   Q    Whose handwriting is that?
11   A    That is my handwriting.
12   Q    Was that on the form when Mr.~Stein gave it to you?
13   A    No, it was not.
14   Q    Who's Antonio M. Mijares?
15   A    That was my wife's uncle.
16   Q    Why did you write his name on this document that Mr.~Stein
17   gave you?
18   A    Because that's the only one that we knew that was in Asia.
19   Q    That who knew?
20   A    That myself and my wife.
21   Q    Is Mr. Mijares in the medical business?
22   A    No, he is not.
23   Q    Is Mr. Mijares in any way associated with a company called
24   Cardiac Hospital Management?
25   A    No, he was not.
```

```
 1   Q   To your knowledge, did Mr. Mijares ever have any contact
 2   with Signalife?
 3   A   No, he did not.
 4   Q   Now, Mr. Carter, just to be clear, did you try to find
 5   someone in Asia to take Signalife products?
 6   A   I tried.
 7   Q   I want to show you what's been marked as Defense
 8   exhibit 82, please -- this is A -- which has been admitted
 9   into evidence.  And we'll blow it up there on the screen for
10   you, Mr. Carter.
11   A   Okay.  Thank you.
12   Q   Mr. Carter, is it fair to say this is an e-mail from you
13   to Mr.~Stein in January of 2008?
14   A   That's correct.
15   Q   And why don't you just read that e-mail to the jury,
16   please.
17   A   "Mitch, I got in touch with Christina's father in the
18   Philippines.  We are flying him here.  He will be here
19   tomorrow at 5:00 p.m. tomorrow night.  He is a doctor in the
20   Philippines and has lots of contacts in Asia, so we can set up
21   a meeting with him.  I am working very hard on these contracts
22   for us, Mitch."
23        And then "your boychick."
24   Q   And what's "your boychick" mean?
25   A   Your friend.  It's a Yiddish term.
```

```
 1    Q    Let's now look at what I believe is the next document in

 2    your binder, Mr. Carter, Defense exhibit 241, already admitted

 3    into evidence.  And we'll blow this up on the screen, as well,

 4    Mr. Carter.

 5    A    Okay.

 6    Q    Is it fair to say this is an e-mail from you to Mr.~Stein

 7    on January 26th of 2008?

 8    A    Yes, that's correct.

 9    Q    Can you just read this one to the jury, please?

10    A    "Hey, Mitch, what time today to meet my father-in-law from

11    the Philippines so we can go over everything with him?"

12    Q    We'll take that down, Mr. Carter, and let's just talk

13    generally.

14           We saw Mr. Mijares there.  Who was that again?

15    A    My wife's uncle.

16    Q    And now in those e-mails you're talking about your

17    father-in-law; is that right?

18    A    That's correct.

19    Q    Did your father-in-law, to your knowledge, have lots of

20    contacts to sell the Signalife products in Asia?

21    A    Well, he was a retired doctor in the Philippines, you

22    know, so he told me he had contacts.

23    Q    Was he looking to sell products in Asia, to the best of

24    your knowledge?

25    A    I believe so, but I'm not a hundred percent sure.
```

```
 1    Q    Were you -- I mean -- well, let's back up.
 2              Is your father-in-law in any way associated with a
 3    company called Cardiac Hospital Management?
 4    A    No, he is not.
 5    Q    And had he filled out that purchase order that we saw in
 6    Government's exhibit 300?
 7    A    No, he did not.
 8    Q    Mr. Carter, were you trying to impress Mr.~Stein by
 9    telling him you had some guy who had contacts in Asia?
10    A    Yes, I was.
11    Q    Did your father-in-law ever become a Signalife customer?
12    A    No, he did not.
13    Q    Did he meet with anyone associated with Signalife?
14    A    He met with Mitchell Stein.
15    Q    Anyone else?
16    A    No.
17    Q    Did anything come of that meeting he had with Mr.~Stein?
18    A    Not to my knowledge.
19    Q    Now, Mr. Carter, did there come a time when Mr.~Stein
20    asked you to travel to Israel?
21    A    Yes, he did.
22    Q    And approximately when was that, if you remember?
23    A    It was the end of December 2007.
24    Q    Did Mr.~Stein tell you why he wanted you to go to Israel?
25    A    He just wanted me to go over there and see if I could get
```

```
 1   people in Israel.

 2   Q    People to do what?

 3   A    For the heart monitors for Signalife.

 4   Q    Mr. Carter, do you have family in Israel?

 5   A    Yes, I do.

 6   Q    Did you have any business contacts in Israel, Mr. Carter?

 7   A    Not really.

 8   Q    Mr. Carter, had you ever sold heart monitors to anybody?

 9   A    No, I did not.

10   Q    So if you're going to go to Israel as a sales

11   representative from Signalife, did you talk to anyone at

12   Signalife about this sales trip you were taking to Israel?

13   A    No, I did not.

14   Q    Did you get like a prototype monitor to take with you to

15   show people?

16   A    No, I did not.

17   Q    Did you call Signalife and have someone make travel

18   arrangements for you?

19   A    No, I did not.

20   Q    Who made your travel arrangements, Mr. Carter?

21   A    Mitchell Stein.

22   Q    Who paid for your ticket?

23   A    Mitchell Stein.

24   Q    Well, let's just look briefly, Mr. Carter, at what's been

25   admitted into evidence as Government's exhibit 86, which
```

```
 1    should be the next document in your binder.  And we'll blow up
 2    on the screen that part that says "flight information."
 3              Mr. Carter, is this the flight itinerary that
 4    Mr.~Stein purchased for you?
 5    A   That's correct.
 6    Q   Leaving on December 30th; is that right?
 7    A   That's correct.
 8    Q   Now, did you get some materials from Mr.~Stein before you
 9    left?
10    A   He was sending me -- I don't --
11    Q   Did you get some materials from him?
12    A   Yes, yes.
13    Q   Let's look at Government's exhibit 88, please.  And we'll
14    blow up this -- this has been admitted into evidence.  Let's
15    blow up the exchange between the two -- is it fair to say this
16    is an exchange between you and Mr.~Stein?
17    A   That's correct.
18    Q   And starting at the bottom there, is it fair to say that's
19    an e-mail from you to Mr.~Stein?
20    A   That's correct.
21    Q   And what are you asking him?
22    A   "Okay.  What else do you think I need?"
23    Q   And December 27th of 2007, is it fair to say, Mr. Carter,
24    that's before you leave for Israel?
25    A   That's correct.
```

```
 1    Q    Let's go back up to the top, and let's look at what
 2    Mr.~Stein says to you, Mr. Carter.  Will you read that,
 3    please, to the jury.
 4    A    Sure.
 5              "The rest of what you need we can do over the phone.
 6    I have explained everything to you.  It is now time for you to
 7    make your power known and felt throughout the world and to
 8    bring home a different life for you, your family, and to make
 9    your friends proud.  And to all the enemies and jealousies,
10    let them suffer."
11    Q    Mr. Carter, you asked Mr.~Stein what he thought you needed
12    for your trip; is that right?
13    A    That's correct.
14    Q    Did you ask anyone else at Signalife what they thought you
15    needed for your trip?
16    A    No, I did not.
17    Q    Let's pull up Government exhibit 91, Mr. Carter, which
18    should be the next document in your binder.  And just looking
19    at the address information at the top, Mr. Carter, is it fair
20    to say this is an e-mail from Mr.~Stein to you on
21    December 28th of 2007?
22    A    Yes, it is.
23    Q    So is this something that you received before you left for
24    Israel?
25    A    Yes, it is.
```

```
 1    Q    And staying on the address information, Mr. Carter, is
 2    anyone copied on this e-mail?
 3    A    No, they're not.
 4    Q    Not Dr. Lowell Harmison from Signalife?
 5    A    No, sir.
 6    Q    And while we're talking about Dr.~Harmison, did you get
 7    any e-mails of any kind from Dr.~Harmison before you left for
 8    Israel?
 9    A    No, I did not.
10    Q    Mr. Carter, just looking at the document as a whole, is it
11    fair to say this is a template for entering into a power of
12    attorney with people?
13    A    Yes, it is.
14    Q    Did Dr.~Harmison ever send you any templates like this to
15    enter into contracts with people?
16    A    No, he did not.
17    Q    Did Mr.~Stein, when he sent this to you, tell you that he
18    had gotten it from Dr.~Harmison?
19    A    No, he did not.
20    Q    Did you talk to Lowell Harmison before you left?
21    A    No, I did not.
22    Q    All right.  Let's look at Government's exhibit 90.  It's
23    the next document in your binder, Mr. Carter.  This has been
24    admitted into evidence, as well.
25              Now, Mr. Carter, is it fair to say this is an e-mail
```

1    there -- well, actually, you're forwarding this e-mail to

2    yourself, but you're forwarding an e-mail from Mr.~Stein to

3    you; is that right?

4    A    That's correct.

5    Q    December 28th, 2007.  Is that before you left for Israel?

6    A    Yes, it is.

7    Q    Mr. Carter, this appears to be a letter from a Sam Levy of

8    the ODR Heart Institute; is that right?

9    A    Yes.

10   Q    Who is Sam Levy of the ODR Heart Institute?

11   A    I have no idea.

12   Q    Ever met him?

13   A    No.

14   Q    Ever talked to him?

15   A    No.

16   Q    And just looking at who this is addressed to, who does

17   Mr. Levy of the ODR Heart Institute address his letter there

18   to?

19   A    To Dr. Lowell Harmison.

20   Q    But again here, Mr. Carter, is Dr. Harmison copied on that

21   e-mail from Mr.~Stein to you?

22   A    No, he is not.

23   Q    Now, let's look at Government's exhibit 89.

24        Oh, excuse me.

25        I'm sorry.  We're going to take a moment, Mr. Carter,

```
 1   because I've fallen behind on drowning the jury in paper.

 2   A    Okay.

 3             THE WITNESS:  Could I be excused to go to the

 4   bathroom, Your Honor?

 5             THE COURT:  If you need to, sure.  We'll take a

 6   break.

 7             Ladies and gentlemen, let's take a 15-minute recess.

 8   Don't discuss the case or form any opinions.  Leave your notes

 9   and exhibits at your seats.  Thank you.

10    (The jury exits the courtroom.)

11             THE COURT:  All right.  Sir, during the break don't

12   discuss your testimony with anyone.  All right?

13             THE WITNESS:  Yes, yes.

14             THE COURT:  We'll see you in 15 minutes.

15    (A recess was taken from 10:17 a.m. to 10:31 a.m., after

16   which the following proceedings were had:)

17             THE COURT:  Please be seated, everyone.  We're back

18   on the record.  Mr.~Stein's present.

19             Just so there's full disclosure, I don't know if you

20   recall, but juror number 14 during voir dire, she mentioned

21   that I had done the adoption for her child.  So she brought in

22   a picture of the day that I did the -- approved the adoption

23   for her child.

24             MR. STIEGLITZ:  How long ago?

25             THE COURT:  It's got to be 12 to 13 years ago; in
```

```
 1    that time frame.  So if anybody wants to see it . . .

 2              All right.  Let's go, Mr. Carter.

 3              We ready to bring the jury back in?

 4              MR. STIEGLITZ:  Yes, Your Honor, the United States is

 5    ready.

 6              THE COURT:  Mr.~Stein, you ready?

 7              MR. STEIN:  Yes, Your Honor.

 8              THE COURT:  Bring the jurors in, please.

 9       (The jury enters the courtroom, after which the following

10    proceedings were had:)

11              THE COURT:  Welcome back, everyone.  Please be

12    seated.

13              Mr. Stieglitz, you may continue.

14              MR. STIEGLITZ:  Thank you, Your Honor.

15    BY MR. STIEGLITZ:

16    Q   Mr. Carter, when we broke, we were talking about some

17    e-mails you had received from Mr.~Stein prior to leaving for

18    Israel.  Do you remember that?

19    A   Yes, I do.

20    Q   Okay.  Let's pull up Government's exhibit 89, which is

21    already in evidence.  And just focusing on the address portion

22    up at the top, Mr. Carter -- and, again, we'll blow that up on

23    the screen for you.  It's also in that binder in front of you.

24    This an e-mail from Mr.~Stein to you on December 28th, 2007?

25    A   That's correct.
```

1  Q   So, again, is this something you got before you left for

2  Israel?

3  A   Yes, that's correct.

4  Q   Now, Mr. Carter, just looking at the whole document, is it

5  fair to say these are templates for letters, Mr. Carter?

6  A   Yes, that's correct.

7  Q   Can you please just read that first letter at the top

8  there for us?

9  A   "Dear Dr.~Harmison, with regard to invoice number, blank,

10 we hereby instruct you to change our address for delivery of

11 Fidelity 100s to Israel Group.  We have moved our distribution

12 operations and thus require the items to be shipped

13 accordingly.  Thank you."

14 Q   And Mr. Carter, looking at the bottom half of the page, I

15 won't ask you to reread it, but is it fair to say that's the

16 same language, but just instead of "Israel group" it says

17 Japan or Hong Kong Group?

18 A   That's correct.

19 Q   Now, Mr. Carter, who are both of those templates drafted

20 to go to?

21 A   Dr.~Harmison.

22 Q   Looking at the top of that e-mail, the address

23 information, does Mr.~Stein copy Dr.~Harmison on that e-mail?

24 A   No, he did not.

25 Q   Does he copy anybody on that e-mail?

```
 1   A    Just what he sent to me, but he didn't copy to anybody
 2   else, no.
 3   Q    Did you get any e-mails like this talking about changes of
 4   address from Lowell Harmison before you left for Israel?
 5   A    No, I did not.
 6   Q    Before you left for Israel, Mr. Carter, did Mr.~Stein tell
 7   you anything about a Signalife customer who had moved its
 8   distribution operations to Israel?
 9   A    No, he did not.
10   Q    What about Hong Kong or Japan?  Did he tell you anything
11   about a Signalife customer who had moved its distribution
12   operations to Japan or Hong Kong?
13   A    No, he did not.
14   Q    Now, let's look at what's been admitted into evidence as
15   Defense exhibit 244, please.
16          And Mr. Carter, is it fair to say this is an e-mail
17   from you to Mr.~Stein on December 26th of 2007?
18   A    Yes.
19   Q    So before you left for Israel; is that right?
20   A    Correct.
21   Q    And just read that e-mail to the jury, please.
22   A    "I already spoke to them in Israel, Japan, and the
23   Philippines and (sic) ready to shoot the moon."
24   Q    Mr. Carter, who had you spoken to in Israel before you
25   left for your trip?
```

```
 1   A    I think I spoke to a cousin.  That's all I can remember.

 2   Q    Were you going to sell products to that cousin?

 3   A    No.

 4   Q    What about Japan?  Had you spoken to anybody in Japan?

 5   A    No.

 6   Q    And the Philippines.  Who did you speak to in the

 7   Philippines?

 8   A    That would have been, I believe, my wife's uncle.

 9   Q    Were you going to sell products to him?

10   A    No.

11   Q    So Mr. Carter, bottom line on this e-mail, are you trying

12   to impress Mr.~Stein by sending this e-mail?

13   A    Yes, I am.

14   Q    Now, since we've talked about the things that you got

15   before you left for Israel, let's take that down and just talk

16   about your trip to Israel.

17            Who did you stay with when you went to Israel?

18   A    I stayed at my brother's place, a cousin's place, and then

19   I came back.

20   Q    And where city-wise?

21   A    Oh, I'm sorry.  Netanya, Israel, and I don't remember,

22   it's called a moshav.  It's like a kibbutz, but it's not.  I

23   don't remember where it was, though.

24   Q    And Mr. Carter, we're going to do our best, you and I are,

25   not to talk over one another so that Mr. Franklin doesn't
```

1    throw anything at me.

2    A    I'm sorry.

3    Q    Mr. Carter, when you were in Israel, will you just

4    describe for the members of the jury what you spent your time

5    doing?

6    A    Basically I just went sightseeing, ate.  That's about it.

7    Q    Did you have any meetings?

8    A    I had a meeting with one guy.

9    Q    And where -- what type of establishment were you in when

10   you had that meeting?

11   A    A restaurant.

12   Q    And sort of how long was that meeting?

13   A    Maybe a half hour.

14   Q    Did you convince this guy to buy heart monitors?

15   A    No, I did not.

16   Q    When you came back to the United States, did you tell

17   anyone at Signalife that you had sold a bunch of products in

18   Israel?

19   A    No, I did not.

20   Q    Did you tell Mr.~Stein that?

21   A    No, I did not.

22   Q    Mr. Carter, let's look at Government's exhibit 94, which

23   is already in evidence.

24          Now, just to be clear, Mr. Carter, this is an e-mail

25   from Mr.~Stein to Dr.~Harmison; is that right?

```
 1    A    That's correct.

 2    Q    You're not on this e-mail?

 3    A    No, I am not.

 4    Q    Now, let's look at the attachments to this e-mail,

 5    Mr. Carter.  That second page, which, again, is in your binder

 6    but will also be up on the screen.  You recognize that

 7    document, Mr. Carter?

 8    A    Yes, I do.

 9    Q    Who created that document, Mr. Carter?

10    A    I created the document.

11    Q    Why?

12    A    Because I was told to by Mitchell Stein.

13    Q    That letter says:  "Dear, Dr.~Harmison, here is the change

14    of address for Cardiac Hospital Management, "and gives an

15    address in Tokyo, Japan; is that right?

16    A    That's correct.

17    Q    Mr. Carter, did you talk to anyone from Cardiac Hospital

18    Management before you created that letter?

19    A    No, I did not.

20    Q    Have you ever talked to anyone from Cardiac Hospital

21    Management?

22    A    No, I did not.

23    Q    Do you even know if Cardiac Hospital Management exists?

24    A    No, I do not.

25    Q    At the bottom there, who signs that, or who purports to
```

```
1    sign that?

2    A    Toni Nonoy.

3    Q    Did you ever talk to a Tony Nonoy that you can remember?

4    A    No, I did not.

5    Q    Do you know if Tony Nonoy even exists?

6    A    No, I do not.

7    Q    Mr. Carter, if you created this document, did you come up

8    with the content of it, or did someone give that to you?

9    A    That was given to me.

10   Q    By whom?

11   A    Mitchell Stein.

12   Q    What did you do with this letter once you finished it?

13   A    I gave it to him, to Mitchell Stein.

14   Q    Let's look at the third page of this exhibit, please, the

15   next page in your binder, Mr. Carter.  Do you recognize this

16   letter, Mr. Carter?

17   A    Yes, I do.

18   Q    Who created that letter?

19   A    I created it.

20   Q    Why?

21   A    Again, Mitchell Stein told me to create it.

22   Q    And then this one says:  "Dear, Dr.~Harmison, please make

23   notice of our change of address for IT Healthcare and product

24   delivery," and then it gives an address in Natanya, Israel; is

25   that right, Mr. Carter?
```

```
 1   A    That's correct.

 2   Q    Is that address familiar to you, Mr. Carter?

 3   A    It's a made up address.

 4   Q    Can you just explain what -- explain that to the jury,

 5   please?

 6   A    The street name is correct, but it was just a made up

 7   address.  I put 10 Smllansky Street.

 8   Q    Is that the address of IT Healthcare, Mr. Carter?

 9   A    No, it is not.

10   Q    This letter says it's from IT Healthcare.  Did you talk to

11   anyone from IT Healthcare about this letter?

12   A    No, I did not.

13   Q    Have you ever talked to anyone from IT Healthcare?

14   A    No, I did not.

15   Q    Do you have any idea if IT Healthcare even exists?

16   A    No, I do not.

17   Q    Who purports to sign this letter at the bottom,

18   Mr. Carter?

19   A    Yossi Keret.

20   Q    Did you talk to a Yossi Keret that you can remember?

21   A    No, I did not.

22   Q    Have you ever met a Yossi Keret?

23   A    No, I did not.

24   Q    Do you have any idea if Yossi Keret exists?

25   A    No, I do not.
```

```
1    Q   And this letter, what did you do with this once you had
2    finished creating it?
3    A   Gave it to Mitchell Stein.
4    Q   Now, Mr. Carter, Mr. Stein is asking you to create these
5    letters, do you have any idea why he couldn't just create them
6    himself?
7    A   No, I do not know.
8    Q   You're creating letters from companies in Israel and Japan
9    that you know nothing about, right?
10   A   Yes.
11   Q   Did anything about that seem suspicious to you?
12   A   Yes, it did.
13   Q   So why'd you do it?
14   A   Because I followed whatever Mitchell Stein told me to do.
15   Q   Before we leave this exhibit, let's just look back at the
16   first page, the e-mail, please.
17           Now, in this e-mail, Mr.~Stein says, "Lowell, this is
18   what you faxed, and I am e-mailing it back as you instructed
19   for your records."  Is that right?
20   A   Yes, it does.
21   Q   Who created these attachments, Mr. Carter?
22   A   Could you rephrase -- you mean it --
23   Q   Who created those documents we just looked at?
24   A   Oh, I created the documents.
25   Q   And just to be clear, once you created them, who'd you
```

```
 1   give them to?

 2   A   Mitchell Stein.

 3   Q   Let's talk about -- let's move forward.  Again, you're

 4   back from Israel in early 2008; is that right?

 5   A   That's correct.

 6           MR. STIEGLITZ:  We can take this document down.

 7   BY MR. STIEGLITZ:

 8   Q   Let's look at Government's exhibit 96, please.  And this

 9   is already in evidence.  And, Mr. Carter, this is in your

10   binder, a multi-page document.  Take a moment and look at it,

11   and just, if you'd tell the members of the jury, tell us

12   what -- tell the members of the jury what this is.

13   A   It's a consulting agreement.

14   Q   Whose consulting agreement?

15   A   My consulting agreement.

16   Q   Let's look at the eighth page of the exhibit.  And

17   Mr. Carter, you have some page numbers on the bottom right of

18   that exhibit.  It ends in 5830.  It's the signature page.

19   A   Yes, I got it.

20   Q   Do you see where it says Electrical Connections there?

21   A   Yes, I do.

22   Q   Whose signature is that?

23   A   That is my signature.

24   Q   And just above the two signatures, what's the date this

25   says it's executed and deemed executed?
```

```
 1    A    January 20th, 2008.

 2    Q    And Electrical Connections, will you just tell us, what is

 3    that?

 4    A    That was a company that Mitch Stein wanted me to open up,

 5    a name.

 6    Q    Let's look at the next page, Mr. Carter.  This is titled

 7    "Exhibit A," is that right, Mr. Carter?

 8    A    That's correct.

 9    Q    Do you see there, there's a section described as

10    "Consideration;" is that right?

11    A    Yes.

12    Q    How much are you going to get paid under this contract,

13    Mr. Carter?

14    A    Was that the 700,000, or it was down lower?

15    Q    Mr. Carter, under the section that's titled

16    "Consideration," how much does it say the consultant is going

17    to get paid?

18    A    Oh, I'm sorry, $700,000.

19    Q    Is it fair to say, Mr. Carter, that was the part of this

20    agreement that interested you the most?

21    A    Yes, it is.

22    Q    But what was your understanding, Mr. Carter, of how you

23    were supposed to hold your payment?

24    A    I was told in this agreement I'm supposed to hold it under

25    trust.
```

1    Q    Let's move down to the services that you're agreeing to

2    provide in this consulting agreement, Mr. Carter, which start

3    at the bottom half of that page.  Do you see that, Mr. Carter?

4    A    Yes, I do.

5    Q    Now, it says there that you're -- well, why don't you go

6    ahead and just read that first paragraph.

7    A    "Consultant shall consult regarding the continual

8    development of cables and attachments regarding the products

9    of the party of the first part application (sic) to its heart

10   monitoring technologies."

11   Q    Mr. Carter, did you ever consult with Signalife regarding

12   its -- regarding the continual development of cables and

13   attachments?

14   A    No, I did not.

15   Q    To your knowledge, based on your experience, your skill

16   set, are you even capable of doing that?

17   A    No, I am not.

18   Q    Now, in the next two paragraphs, the one that's on the

19   bottom there, and then we're going to go to the next page

20   because it carries over, it says you're going to consult and

21   develop on the Fidelity 1000; is that right?

22   A    That's correct.

23   Q    Did you do that?

24   A    No, I did not.

25   Q    Are you even capable of doing that, to your knowledge?

```
 1    A    No, I am not.

 2    Q    The next paragraph down under services that you're going

 3    to provide, Mr. Carter, fair to say it says you're going to

 4    consult on software, microchip, and connectivity development

 5    for the Fidelity 1000?

 6    A    Yes.

 7    Q    Is that something that you ever did?

 8    A    No.

 9    Q    Again, based on your background, your knowledge, your

10    experience, were you able to consult on software, microchip

11    and connectivity development on a heart monitor?

12    A    No, I was not.

13    Q    And let's just look at one more paragraph of what you're

14    going to be consulting on.  The next paragraph there,

15    Mr. Carter, says you're going to consult regarding the

16    manufacturing facility of Signalife and the efficiencies and

17    economies of device production.  Is that right?  Is that what

18    that says?

19    A    Yes, that's what it says.

20    Q    Same question, Mr. Carter.  Did you know anything about

21    the manufacturing and efficiencies and economies of heart

22    monitor production?

23    A    No, I did not.

24    Q    Did you review this contract at all before you signed it,

25    Mr. Carter?
```

```
 1   A    A little bit, but not -- you know, I didn't understand
 2   some of it.  I just knew that I was going to make money.
 3   Q    Was there any sort of negotiation with anybody about the
 4   contract before you signed it?
 5   A    No.
 6   Q    Did you have any meetings to discuss it before you signed
 7   it?
 8   A    Only Mitchell Stein.  That's the only one.
 9   Q    So Lowell Harmison, who signs for Signalife, did you ever
10   meet with him about this contract?
11   A    No, I did not.
12   Q    Did Mr.~Stein suggest that you should have a lawyer or
13   anyone look at this document on your behalf?
14   A    No, he did not.
15   Q    Where were you when you signed this document?
16   A    At his house in Boca Raton, Florida.
17   Q    Was Lowell Harmison there?
18   A    No, he was not.
19   Q    Anyone else from Signalife there?
20   A    No.
21   Q    Okay.  We'll take that down, Mr. Carter.
22            After you signed that contract in January of 2008,
23   did you suddenly start doing a bunch of work for Signalife?
24   A    No, I did not.
25   Q    What about Mr.~Stein?  Were you still doing work for him
```

1    in early 2008?

2    A   Yes, I was.

3    Q   Let's look at what's been admitted into evidence as

4    Government's exhibit 95, please.

5         Mr. Carter, is it fair to say that -- well, let's

6    start at the bottom of that document.  Who is that e-mail from

7    and to?

8    A   It's an e-mail from myself to Mitch Stein.

9    Q   And if you'd just take a crack at reading that to the

10   jury, please.

11   A   "Hey, Mitch, I put the other band on the Rolex but need to

12   measure for the right size on your wrist.  So I need to check

13   and see how many links we need to cut off on the band because

14   no more screws to be taken out but needs to be cut.  So that

15   is why I need to measure your wrist for the precise size.

16   Call me.  Your boychick."

17   Q   Mr. Carter, is this to reflect -- indicative of the kind

18   of things Mr.~Stein was having you do for him?

19   A   Yes, it does.

20   Q   Let's look at what's been admitted into evidence as

21   Government's exhibit 97, please.  And that e-mail at the top

22   there, we can't see the "from" and the "to," but who is that

23   from, Mr. Carter?

24   A   From Mitch Stein to myself.

25   Q   And just read that to the jury, please.

1   A   "Marty, please go get me a small four by four dark brown

2   rug, matches our picture frames, for me to wipe my boots on.

3   Then come over to size my watch.  Please come before 7:00.  I

4   am not mad at you.  We will then meet until 8:00.  I am very

5   busy trying to make this all work, Mitch."

6   Q   Again, Mr. Carter, indicative of the sorts of things that

7   Mr.~Stein's having you do for him during this time?

8   A   Yes, it is.

9   Q   Let's look at -- and I think we may be a few short on

10  this -- what's been admitted into evidence as Government's

11  exhibit 100.

12          And Mr. Carter, again, here, we don't see the "from"

13  and the "to" in the e-mail caption there, but who's this

14  e-mail, to the best of your recollection, from and to?

15  A   From Mitch Stein to myself.

16  Q   And I'm not going to have you go through every line of

17  this e-mail, but is it accurate to say Mr.~Stein's asking you

18  to do three things in this e-mail?

19  A   Yes, it is.

20  Q   And very generally, what's the first thing he's telling

21  you to do?

22  A   To fix the rear view mirror on the Mercedes.

23  Q   What about the second item that he's asking you about

24  there?  What's he asking you to do in that number two?

25  A   He tells me to go please gas up the car and have it

```
 1   washed.

 2   Q    What about the third item that he's asking you to take

 3   care of?

 4   A    He wants me to go to GNC and get him about a hundred

 5   protein bars.

 6   Q    Now, let's just look at the bottom of that e-mail, and we

 7   can leave it as it is on the screen, but you've got it there

 8   in front of you.

 9        Will you just read that section that starts with

10   "when you are done with," there at the bottom.  Do you see

11   that?

12   A    One second.  Yes.

13        "When you are done with the foregoing, I will explain

14   what we are doing on the trading side, and we can get our

15   contracts properly set up.  Thanks, Mitch."

16   Q    What kind of trading did you understand Mr.~Stein to be

17   referring to there?

18   A    Trading Signalife stock.

19   Q    Did there come a time, Mr. Carter, when Mr.~Stein asked

20   you to open a stock -- a brokerage account?

21   A    Yes, he did.

22   Q    Did he tell you why he wanted you to do that?

23   A    He said I was getting stock certificates from Signalife.

24   Q    All right.  We're going to talk more about your stock

25   trading in a minute, but just as a general matter, why would
```

```
 1    you suddenly -- why would you be getting stock certificates
 2    from the company?  Were you suddenly doing work for the
 3    company?
 4    A   No, I was not.
 5    Q   All right.  Let's look at Government's exhibit 31,
 6    Mr. Carter, which is the next document in your binder.  And
 7    this is already in evidence.
 8             MR. STEIN:  What exhibit?
 9             MR. STIEGLITZ:  Thirty-one.
10             MR. STEIN:  Thank you.
11    BY MR. STEIN:
12    Q   Mr. Carter, is this a multi-page document here, or
13    exhibit?
14    A   Yes, it is.
15    Q   Okay.  Can you just describe to the members of the jury
16    what those exhibits -- or, excuse me, what those documents
17    are?
18    A   Yes, they're invoices.
19    Q   From whom?
20    A   From Electrical Connections to Signalife.
21    Q   Again, just to remind us, Electrical Connections is what?
22    A   Is a company that he told me to open up, Mitch Stein told
23    me to open up.
24    Q   So it's your company?
25    A   It's my company, yes.
```

```
 1    Q    Now, these invoices to Signalife, Mr. Carter, were you
 2    actually doing any work for Signalife when you start creating
 3    these invoices?
 4    A    No, I did not.
 5    Q    So why are you creating invoices telling Signalife that
 6    you are doing work for them?
 7    A    Because Mitch Stein told me to do it.
 8    Q    Let's just look at a few examples in Government's
 9    exhibit 31 here.  Let's look at that very first one,
10    Mr. Carter.  What are you telling Signalife on January 5th of
11    2008 that Signalife owes you?  How much?
12    A    $25,000.
13    Q    For what?
14    A    Consulting on contractual agreement.
15    Q    And just to be clear, had you been consulting on your
16    contractual agreement, Mr. Carter?
17    A    No, I have not.
18    Q    Let's look at the next page, Mr. Carter.  January 11th of
19    2008, how much are you telling Signalife that you owe -- they
20    owe you?
21    A    $25,000.
22    Q    For what?
23    A    Design and development of cables.
24    Q    Had you actually been designing and developing cables for
25    Signalife, Mr. Carter?
```

```
 1    A    No, I have not.

 2    Q    Just one more.  The next page, Mr. Carter.  January 21st

 3    of 2008, how much are you telling Signalife it owes you?

 4    A    $12,000.

 5    Q    For what?

 6    A    For electrical, architectural services, and joint venture.

 7    Q    Is that -- had you been doing electrical architectural

 8    services in a joint venture with Signalife?

 9    A    No, I was not.

10    Q    Now, we won't go through the rest of these, Mr. Carter,

11    but have you had an opportunity to look through all of these

12    invoices prior to coming to court today?

13    A    Yes.

14    Q    And the dollar amounts that you're asking for and the

15    things that you're telling Signalife you did, are those true

16    or are those lies?

17    A    Those are lies.

18    Q    The dollar amounts that are in those invoices, did you

19    just make those up, or where did you get those dollar amounts?

20    A    Those are from Mitchell Stein told me what to put in.

21    Q    Told you how much to put in them?

22    A    That's correct.

23    Q    Now, to be clear, did anyone else at the company at

24    Signalife ever tell you to submit an invoice, like Lowell

25    Harmison or anybody like that?
```

```
1    A    No.

2    Q    What did you do with these invoices once you had created

3    them?

4    A    I gave them to Mitchell Stein.

5    Q    Who is the only person associated with Signalife that

6    you've talked with these -- talked about these invoices with?

7    A    Mitchell Stein.

8         MR. STIEGLITZ:  Okay.  Since I'm sure everyone is

9    clamoring for more paper, I'm going to take this opportunity,

10   Your Honor, to hand out the next chunk of exhibits, which

11   are -- and I'll read them off for the Court.  These have been

12   agreed by the parties as -- to be admitted.

13        This is Government's exhibit 126, Government's

14   exhibit 153, Government's exhibit 169, Government's

15   exhibit 277, Government's exhibit 114, Government's

16   exhibit 102 and Government's exhibit 173.  And, let's see,

17   that may -- why don't we stop with that.

18        Well, no, we'll do a couple more.  Government's

19   exhibit 185, Government's exhibit 189, Government's

20   exhibit 194 and Government's exhibit 171.

21        We would move those into evidence.

22        THE COURT:  Any objection, Mr.~Stein?

23        MR. STEIN:  No, Your Honor.

24        THE COURT:  They'll all be admitted without

25   objection.
```

```
 1        (Government Exhibit No. 102, 114, 126, 153, 169, 171, 173,
 2   185, 189, 194, and 277 entered into evidence.)
 3   BY MR. STIEGLITZ:
 4   Q   All right.  Mr. Carter, after you started sending out
 5   these invoices in Government's 31, did you start to receive
 6   payment from Signalife?
 7   A   Yes, I did.
 8   Q   In what form?  Was it cash?  Was it stock?  Was it gold
 9   bars?
10   A   It was cash and stocks.
11   Q   I want to focus on the stock for a second.
12   A   Okay.
13   Q   How did you get stock from the company?
14   A   They came in from DHL to my house in Boca Raton, Florida.
15   Q   And when you say they, what was the actual thing that came
16   DHL to you in Boca?
17   A   The actual stock certificates.
18   Q   Okay.  Once you got those stock certificates, what did you
19   do with them?
20   A   I deposited them in my brokerage account.
21   Q   Mr. Carter, prior to Mr.~Stein telling you to open a
22   brokerage account, had you ever had a brokerage account
23   before?
24   A   No.
25   Q   Did you know anything about buying and selling stock?
```

```
 1   A    Well, I know a little bit, but nothing of significance.

 2   Q    Well, let me -- had you ever traded stock online?

 3   A    Oh, no, I have not.

 4   Q    Initially, after Mr.~Stein told you to open an account,

 5   where -- what institution did you open the account with?

 6   A    The first account was Scottrade.

 7   Q    You say the first account.  Did you transfer that account

 8   someplace else?

 9   A    Yes, to Ameritrade.

10   Q    And just as a general proposition, Mr. Carter, did you

11   just get one stock certificate from Signalife, or did you get

12   a number of stock certificates from Signalife?

13   A    A number, multiples.

14   Q    Let's look at what's been marked -- excuse me, what's been

15   admitted into evidence as Government's exhibit 126.  And,

16   again, that's in your binder, Mr. Carter.

17            Just very generally what is this, Mr. Carter?

18   A    It's a stock certificate from Signalife to myself.

19   Q    I'm so, I was just going to ask you.  I think we're doing

20   the same thing, but we're -- how many shares is it for?

21   A    Sorry, 300,000 shares.

22   Q    And the date there at the bottom left of it, Mr. Carter,

23   what is that?

24   A    March 19th, 2008.

25   Q    And, again, is this something you remember getting at your
```

```
 1    house in Boca from DHL on or around that date?

 2    A   Yes, that's correct.

 3    Q   Let's look at Government's exhibit 153, also admitted into

 4    evidence, please.

 5             Mr. Carter, is this another share certificate?

 6    A   Yes, it is.

 7    Q   For how many shares?

 8    A   For 390,000 shares.

 9    Q   What's the date at the bottom left of it there?

10    A   June 12th, 2008.

11    Q   And, again, is this something you got via DHL at your home

12    in Boca on or around that date?

13    A   Yes, that's correct.

14    Q   Let's just look at one more, Mr. Carter, what's been

15    admitted into evidence as Government's exhibit 169.

16             What is this, Mr. Carter?

17    A   A stock certificate.

18    Q   How many shares?

19    A   400,000.

20    Q   And, Mr. Carter, what's the date at the bottom left?

21    A   August 22nd, 2008.

22    Q   And, again, is this something you remember receiving at

23    your house in Boca on or around that date?

24    A   Yes, I do.

25    Q   Via DHL?
```

```
 1    A    That's correct.

 2    Q    Okay.  Now, I want to just ask you about this one,

 3    Mr. Carter, because unlike those last two, right, this one has

 4    a stamp on it that says what?

 5    A    Canceled.

 6    Q    Now, just to be clear, that stamp, was that on there when

 7    you got it from DHL?

 8    A    No, it was not.

 9    Q    So we can take that down, Mr. Carter, and kind of

10    switching subjects here, but we talked a little bit earlier

11    about Lowell Harmison.  Do you remember that?

12    A    Yes.

13    Q    Have you ever met in person Lowell Harmison?

14    A    I have met him, yes.

15    Q    Can you tell the members of the jury how many times in

16    total in your life have you been in the same room as Lowell

17    Harmison?

18    A    Three, maybe four times.

19    Q    Have you ever talked to Lowell Harmison on the phone?

20    A    No.

21    Q    Did Lowell Harmison, to your knowledge, ever come to

22    Florida?

23    A    Yes, he did.

24    Q    To your knowledge, did he come to Florida to meet with

25    you?
```

```
 1   A    No, he did not.

 2   Q    Why did he come to Florida, if you know?

 3   A    To meet Mitch Stein, that's all I know.

 4   Q    Now, when Dr.~Harmison was in Florida, did you. on

 5   occasion, meet with him?

 6   A    Yes, I did.

 7   Q    But when that would happen, was it ever just you and

 8   Dr.~Harmison, or was someone else there?

 9   A    No, Mitchell Stein was with us, as well.

10   Q    Okay.  So just to be absolutely clear, have you ever met

11   with Dr.~Harmison outside the presence of Mitch Stein?

12   A    No, I have not.

13   Q    But just to flip that around, to your knowledge, have

14   Dr. Stein -- Mr. Stein and Dr.~Harmison -- got to keep my

15   names straight -- ever met outside of your presence?

16   A    I believe so, yes.

17   Q    Okay.  Let's look at Government's exhibit 277, please,

18   admitted into evidence.

19        In fact, Mr. Carter, the date of this e-mail, is it

20   fair to say this is an e-mail from Mr.~Stein to you?

21   A    Yes, it is.

22   Q    February 13 of 2008?

23   A    That's correct.

24   Q    Just read those first two lines if you would.

25   A    "Marty, don't come over today, as I am meeting with
```

```
 1    Dr.~Harmison.  Just await my telephone calls.  Stay at your

 2    station at home."

 3    Q   Was that unusual for Mr. Stein to ask you to stay away

 4    while he met with certain people, or was that something that

 5    happened regularly?

 6    A   It happened regularly.

 7    Q   He says "stay at your station at home;" is that right?

 8    A   That's correct.

 9    Q   Let's look at Government's exhibit 114, please, also

10    admitted into evidence.

11          Mr. Carter, here again at the very top we can't see

12    the "from" and the "to" e-mail addresses; is that right?

13    A   That's correct.

14    Q   But who is this an e-mail exchange between?

15    A   Myself and Mitchell Stein.

16    Q   Let's start at the bottom.  Is that an e-mail from you to

17    Mr.~Stein?

18    A   That's correct.

19    Q   Would you just read that to the jury, please.

20    A   "Mitch, are you going to tell me what to say to

21    Dr.~Harmison before I meet you at the Tempura House?"

22    Q   Tempura House, where is that?

23    A   It's a restaurant in Boca Raton, sorry.

24    Q   Had Dr.~Harmison called you to tell you about a meeting at

25    the Tempura House?
```

```
1    A    No, he did not.

2    Q    Who told you about a meeting with Dr.~Harmison at the

3    Tempura House?

4    A    Mitchell Stein.

5    Q    Why does Mr.~Stein have to tell you what to say to

6    Dr.~Harmison?

7    A    Because he always told me, you just do what I tell you to

8    do.

9    Q    Let's look up at the top of the e-mail, Mr.~Stein's

10   response to you.  Can you just read that part that starts with

11   "I will call you?"

12   A    "Yes, I will call you early a.m. do (sic) we can go over

13   everything.  Important that you be by your station tomorrow at

14   home.  Big day."

15   Q    So, now, is it fair to say this is the second e-mail we've

16   now looked at where he's talking to you about being by your

17   station; is that right?

18   A    That's correct.

19   Q    What did you understand him to be referring to when he

20   said be by your station?

21   A    Stay by my computer.

22   Q    To do what?

23   A    Stock trading.

24   Q    Let's look at what's the next document in your binder

25   there, Mr. Carter, what's been admitted as Government's
```

```
 1    exhibit 102, please.
 2            And again, Mr. Carter, is this -- even though we
 3    can't see the "from" and the "to," is this an e-mail exchange
 4    between you and Mr.~Stein?
 5    A   Yes, it is.
 6    Q   And just read Mr.~Stein's -- what he says to you there.
 7    A   "I am developing plan for the shares.  I will call you
 8    later.  I am still sleeping, getting better."
 9    Q   What's the date of that e-mail, Mr. Carter?
10    A   February 3rd, 2008.
11    Q   Now, when you were at your station, at your computer, did
12    Mr.~Stein ever give you any instructions?
13    A   Yes, he did.
14    Q   And what were those -- what was the general nature of
15    those instructions?
16    A   He would always tell me to buy Signalife stock to keep the
17    price up.
18    Q   Did anyone else ever call you from Signalife and tell you
19    to do that?
20    A   No.
21    Q   And we'll talk more about this in a few minutes, but did
22    Mr.~Stein ever also give you instructions to sell stock?
23    A   Yes, he did.
24    Q   Now, I asked you a few minutes ago if you had ever traded
25    stocks before online, right?  And what was . . .
```

```
 1   A    No, I never have.

 2   Q    So how did you learn how to trade stocks online?

 3   A    From Mitchell Stein.

 4   Q    Can you just describe that to the jury?

 5   A    Yes, he had me come over to his house, and he'd show me on

 6   his computer how to trade stocks.

 7   Q    Mr. Carter, did you ever buy or sell shares of Signalife

 8   stock other than when Mr.~Stein told you to?

 9   A    No, I did not.

10   Q    Let's look at what's been admitted into evidence as

11   Government's exhibit 173, please.

12            Is this an e-mail from Mr.~Stein to you, Mr. Carter?

13   A    That's correct.

14   Q    What's the date of it?

15   A    September 2nd, 2008.

16   Q    Let's just -- well, if you can just read that to the

17   members of the jury, please.

18   A    "Marty, you are not answering your telephone again during

19   the trading day, and it pisses me off, because I am always at

20   work.  Figure out a way to get in touch with me."

21   Q    Let's just look at one more on this issue, what's been

22   admitted into evidence as Government's exhibit 185, please.

23            Mr. Carter, is this an e-mail from Mr.~Stein to you?

24   A    Yes, it is.

25   Q    Again, even later in the year, November of 2008; is that
```

```
 1   right?

 2   A   That's correct.

 3   Q   Can you just read that line starting with -- well, read

 4   starting with "You could do me a favor."  Read those first two

 5   lines.

 6   A   "I am very sick and have to go away on the 4th.  I am

 7   getting big trading lined up, but I am sick."

 8   Q   And without reading all the rest of that e-mail, he's

 9   asking you to pick up some beverages for him, right?

10   A   That's correct.

11   Q   Is that the sort of thing, running errands, picking things

12   that up you're still doing for Mr.~Stein at that time?

13   A   Yes, I am.

14   Q   Now, while we're talking about the things you're doing for

15   Mr.~Stein, let's look at Government's exhibit 189, please.

16            Mr. Carter, who's this e-mail from and to?

17   A   From Mitch Stein to myself.

18   Q   What's the date?

19   A   November 29th, 2008.

20   Q   And just very generally, what's he telling you?

21   A   He's telling me that there are problems with the Mercedes.

22   Q   And so just looking at the -- let's look at those last two

23   paragraphs.  Just read those to the jury, if you would.

24   A   The one that starts "get the car?"

25   Q   Yes, please.
```

```
 1    A    Okay.  "Get the car to somebody good and fix it -- and get
 2    it fixed.  This car has a mere 70,000 miles on it, and I have
 3    been unable to enjoy it for two years.  Suddenly, all these
 4    things are going wrong and the car has not even been driven.
 5    Somebody fucked with it.  People will lie to you about the
 6    car.  They will create transmission problems when none are
 7    there.  You must get the car to somebody good and honest.
 8    Dishonesty will cause mountains of problems and will piss me
 9    off to no end.  This must be fixed now, please."
10    Q    Mr. Carter, is this indicative of the types of things
11    Mr.~Stein would send you and tell you to do?
12    A    Yes, it was.
13    Q    Let's turn, Mr. Carter, to -- let's look at what's
14    admitted into evidence as Government's exhibit 194, while
15    we're still talking about sorts of things Mr.~Stein is having
16    you do.
17              What's the date on this e-mail, Mr. Carter?
18    A    January 21st, 2009.
19    Q    And who's it from and to?
20    A    From Mitchell Stein to myself.
21    Q    And we won't spend a bunch of time on this, but just,
22    what's he asking you to do?
23    A    He was asking me to go to Starbucks, go get him
24    cappuccinos like I got them in Florida; to get rid of his
25    Daytona gold watch.
```

```
 1    Q    And, again, is this indicative of the types of things
 2    you're doing for Mr.~Stein, running errands, picking up
 3    cappuccinos for him?
 4    A    Yes, it is.
 5    Q    Okay.  Let's get back to, Mr. Carter, the shares of stock
 6    that we talked about a few minutes ago.  We can take that
 7    exhibit down.
 8            Just to remind us, when you got those share
 9    certificates via DHL, what did you do with them?
10    A    I took them to Ameritrade to deposit them into my
11    brokerage account.
12    Q    Now, just to be clear, according to your consulting
13    agreement with Signalife, what were you supposed to be doing
14    with those share certificates?
15    A    Supposed to hold them in trust.
16    Q    But, again, did you do that?
17    A    No, I did not.
18    Q    Once those shares were in your brokerage account, as a
19    general matter what did you do with them?
20    A    He told me just, you know, to sell them.  Once I had, just
21    sell so much a day of my shares.
22    Q    Who's he?
23    A    Mitchell Stein, I'm sorry.
24    Q    And to be clear, those sales, those are out of your TD
25    Ameritrade account?
```

```
 1   A    That's correct.

 2   Q    The cash that you're generating from selling that stock,

 3   do you keep any of it?

 4   A    Very little.  Most of it I gave to Mitchell Stein.

 5   Q    Why?

 6   A    Because that's what I was instructed to do.

 7   Q    All right.  Let's look at what's been admitted as

 8   Government's exhibit 171, which has been admitted into

 9   evidence.

10        Mr. Carter, is it fair to say this is an e-mail

11   exchange between you and Mr.~Stein?

12   A    Yes, it is.

13   Q    And what's the date of this e-mail exchange?

14   A    August 22nd, 2008.

15   Q    There at the bottom, that very first line that starts with

16   "please have," can you just read that?

17   A    "Please have full predictability Monday."

18   Q    And this e-mail's kind of -- the way this printed out is a

19   little goofy.  So who's saying that?  Is that you saying that,

20   or is Mitch Stein saying that?

21   A    Mitch Stein is saying that.

22   Q    Then above that, is that your response that starts with

23   "no problem?"

24   A    Yes, it is.

25   Q    And just read that to the jury, please.
```

1    A    "No problem.  I will take care of it on Monday.  They

2    release all the stocks to me at 4:00 p.m.  Consider it done."

3    Q    Can you just describe to the members of the jury very

4    generally like, what are y'all -- what are you talking about

5    here?

6    A    About getting it -- because this was around August, that

7    they were giving me the stock certificates back from

8    Ameritrade.

9    Q    So basically getting access to the shares that you had

10   been issued?

11   A    That's correct.

12   Q    Okay.  Let's go up to the top there and see what Mr.~Stein

13   tells you in response to your e-mail.  Just read that to the

14   jury, would you?

15   A    "We need to talk.  4:00 p.m. is not good enough.  We must

16   be on the ball.  I am playing for keeps.  What about you?  We

17   need to go over this very carefully.  This is no joke and no

18   cigar room shit.  This requires hard work.  What do you think

19   I've been doing for the past six years?"

20   Q    Mr. Carter, to your knowledge, why did Mr.~Stein want you

21   to have those shares available to you?

22   A    I believe because, number one, he wanted me to be able to

23   sell them and get the money from it.

24   Q    Here again, Mr. Carter, I'm going to ask you, you're

25   getting -- you're selling these shares and sending money to

```
 1    Mr.~Stein.  Did anything about that seem suspicious to you?

 2    A    Well, of course.

 3    Q    So why'd you do it?

 4    A    Because I followed -- whatever he would tell me to do, I

 5    followed him.

 6    Q    You're sending Mr.~Stein money that you're generating from

 7    these shares.  Did you owe Mr.~Stein any money, to your

 8    knowledge?

 9    A    No, I did not.

10    Q    Had he told you that you owed him legal fees or something

11    like that?

12    A    No, he did not.

13    Q    Had he sent you a bill, an invoice or anything like that?

14    A    No, he did not.

15    Q    Now, let's be clear, Mr. Carter, though.  Mr.~Stein did

16    offer to do some legal work for you; is that right?

17    A    Yes.

18    Q    Can you just very generally explain to the jury what the

19    nature of that legal work he offered to do for you was?

20    A    Yes, he offered to do on our family estate money.

21    Q    But, again, just to be clear, the money that you're

22    sending him, did that have anything to do with some legal work

23    that he either had offered to do or was doing?

24    A    No, it did not.

25    Q    And, I'm sorry, you may have already said this, but did he
```

```
1    ever say that it did?
2    A   No, he did not.
3    Q   Mr. Carter, did you ever tell anyone at Signalife what you
4    were doing with respect to all this stock you were getting
5    issued, that you were selling it and sending money to
6    Mr.~Stein?
7    A   No, I did not.
8    Q   Why not?
9    A   Because Mitch Stein told me not to say anything to
10   anybody.
11   Q   Okay.  Now, we talked about this a few minutes ago.  Your
12   contract said you were supposed to do what with the shares
13   that you were getting from Signalife?
14   A   I was supposed to hold them in trust.
15          MR. STIEGLITZ:  Well, Your Honor, we've got a number
16   of exhibits that are already admitted, but maybe we'll just go
17   ahead and finish this out at this time to add to the pile of
18   paper before lunch here.  These are already in evidence, I
19   believe, but I'll read them off just in case I've got that
20   wrong.  149, 237, 167, and 161.
21          THE COURT:  Did you say 239?
22          MR. STIEGLITZ:  237, Your Honor.
23          THE COURT:  Those are all in evidence.
24          MR. STIEGLITZ:  Thank you, Your Honor.
25          So for the jury's convenience, we're handing out
```

```
 1    extra copies just so that they've got it handy.  I'm sure
 2    that's what folks are clamoring for.
 3              I'm also handing out -- I'm going to move
 4    Government's exhibit 119, which the parties have agreed to,
 5    I'll move that into evidence, Your Honor.
 6              MR. STEIN:  No objection.
 7              THE COURT:  What was the number?
 8              MR. STIEGLITZ:  Sorry, 119, Your Honor.
 9              THE COURT:  No objection, Mr.~Stein?
10              MR. STEIN:  No objection.
11              THE COURT:  Admitted without objection.
12         (Government Exhibit No. 119 entered into evidence.)
13              MR. STIEGLITZ:  We're handing out additional copies
14    of 129, 130, and 151, all of which are already in evidence.
15              And if it's any solace to the Court or members of the
16    jury, we're only going to hand out six more documents after
17    that, so . . .
18    BY MR. STIEGLITZ:
19    Q    Now, Mr. Carter, we were talking about your contract.  And
20    just to remind us, the way you were supposed to hold the
21    shares that you got from Signalife was what?  How were you
22    supposed to hold those?
23    A    To be held in trust.
24              MR. STIEGLITZ:  And if we're missing any copies, to
25    the members of the jury, just let us know and we can address
```

```
 1    that.
 2            Your Honor, what we'll do at the lunch break is we'll
 3    make any exhibits that are not -- that the jurors are missing
 4    a few copies of, we'll make additional copies and we'll have
 5    those available after the lunch break.  I apologize for the
 6    confusion.  We will put these up on the screen, as well, and
 7    some of these have been handed out previously.
 8    BY MR. STIEGLITZ:
 9    Q   Mr. Carter, you were supposed to be holding these shares
10    in trust.  Were you holding them in trust?
11    A   No, I was not.
12    Q   Okay.  Let's look at what's already in evidence as
13    Government's exhibit 149, please.
14            Mr. Carter, have you seen this letter before?
15    A   Yes, I have.
16    Q   Who created this letter?
17    A   I created the letter.
18    Q   Why?
19    A   Because I was told to by Mitchell Stein.
20    Q   This Mark Silverman that signs it at the bottom, did he
21    have anything to do with creating this document?
22    A   No, he did not.
23    Q   Is that his signature?
24    A   No, it is not.
25    Q   Is he a real person?
```

```
1    A    Yes, he is.

2    Q    Just tell the members of the jury who Mark Silverman is.

3    A    He's an insurance salesman and also a stock brokerage

4    firm.

5    Q    Okay.  The language in this letter that you created, did

6    you make up this language, or did someone give you this

7    language to put in there?

8    A    Mitchell Stein gave me the language to put in there.

9    Q    What about sort of the letterhead, the way it looks there?

10   Who created that?

11   A    I did that off the Internet.

12   Q    Will you just read the letter, please.

13   A    "To whom this may concern, this confirms that we are

14   acting as financial consultants and trustee with regards to

15   that certain consulting agreement executed as of January 20th,

16   2008, by and between Signalife, Inc. and Electrical

17   Connections.  Pursuant to exhibit A of that agreement, this

18   confirms that Electrical Connections owner Martin Carter holds

19   all consideration received directly by him from Signalife in

20   trust.

21          "Electrical Connections is due to provide its first

22   quarterly update on May 31st, 2008.  We shall not dispense any

23   consideration of Signalife to anybody absent the express

24   written approval of Signalife."

25   Q    Is that true, Mr. Carter?  Is NPC Financial, Mark
```

 1   Silverman, holding anything in trust for you?

 2   A   No, that's not true.

 3   Q   Who did you give this letter to once you created it?

 4   A   Mitchell Stein.

 5   Q   Do you have any idea why he couldn't just create this

 6   letter himself?

 7   A   No, I do not know.

 8   Q   Let's look at what's already in evidence as Government's

 9   exhibit 237, please, which should be the next document in your

10   binder, Mr. Carter.

11            Mr. Carter, did you write this letter?

12   A   Yes, I did.

13   Q   Why?

14   A   Because Mitchell Stein told me to.

15   Q   Is it true?

16   A   No, it is not true.

17   Q   Why not?

18   A   Because --

19   Q   Were you holding anything in trust, Mr. Carter?

20   A   No, I was not holding anything in trust.

21   Q   What about payments made to subcontractors?  Mr. Carter,

22   did you -- well, did you make any payments to subcontractors?

23   A   No, I did not.

24   Q   Did you have any subcontractors?

25   A   No, I did not.

```
 1    Q    Who told you what to put in this letter, Mr. Carter?

 2    A    Mitchell Stein.

 3    Q    What did you do with this letter once you created it?

 4    A    I believe I gave it to Mitchell Stein.

 5    Q    Let's look at one more document on this topic, what's been

 6    admitted into evidence as Government's exhibit 167.

 7              Do you recognize this, Mr. Carter?

 8    A    Yes, I do.

 9    Q    Did you write this?

10    A    Yes, I did.

11    Q    Why?

12    A    Because Mitchell Stein told me to.

13    Q    Same question as before.  With respect to the language in

14    this letter, did you make that up or did someone tell you what

15    to write?

16    A    No, Mitchell Stein told me what to write.

17    Q    Is what you say in this letter true?  Are the stocks that

18    were issued to you under control of a trustee?

19    A    No, they are not.

20    Q    What did you do with this letter when you were done?

21    A    He had me fax it.

22    Q    Do you remember where you faxed it, or . . .

23    A    I believe that number that I wrote on the top.

24    Q    Okay.  Now, that last letter, Government's 237, talked

25    about subcontractors, right, Mr. Carter?
```

```
1    A    That's correct.

2    Q    Let's look at Government's exhibit 161, please.  That's

3    already in evidence.

4              Now, Mr. Carter, it's a multi-page exhibit; is that

5    right?  It's an e-mail with some attachments?

6    A    Yes, that's correct.

7    Q    Prior to the Government showing you this e-mail and its

8    attachments in a meeting, had you ever seen it before?

9    A    No, I have not.

10   Q    And, in fact, you're not copied on this e-mail, are you?

11   A    That's correct.

12   Q    This is an e-mail from Mitch Stein, right?

13   A    Yes, it is.

14   Q    Can you just read it to the jury, please?

15   A    "John, you asked for the relationship between these two

16   people and EC, Carter.  They sent me this by e-mail late last

17   night.  He says he has worked with these people for years and

18   does not keep any other documents in the (sic) records, but

19   these are pretty clear.  They are income to EC and the work

20   was already done, according to EC.  Mitch."

21   Q    Let's look at attachments to this e-mail.  We'll start

22   with the very first page, Mr. Carter.

23             Mr. Carter, do you recognize that signature at all?

24   A    No, I do not.

25   Q    Whoever this person is is saying, I am providing
```

```
 1    consulting services to EC as mutually agreed; is that right?

 2    A   No, that is not right.

 3    Q   I'm sorry, I asked that in a bad way.  Is that what the

 4    document actually says?

 5    A   Yes, that's what the document says.

 6    Q   Was anyone providing consulting services to EC, Electrical

 7    Connections?

 8    A   No, they were not.

 9    Q   Let's look at the next page.

10        Same language here; is that right, Mr. Carter?

11    A   That's correct.

12    Q   And do you know whose signature that is?

13    A   No, I do not.

14    Q   Whoever that person is says he or she is providing

15    consulting services to EC as mutually agreed.  Could that

16    person have been providing consulting services to Electrical

17    Connections?

18    A   No, they did not.

19    Q   And let's go to the last page.

20        Same language here again, right, Mr. Carter?

21    A   Hold on one second.  I got to open it.

22        Yes.

23    Q   You recognize that signature?

24    A   No, I do not.

25    Q   Is that person -- could that person have been providing
```

```
 1    consulting services to Electrical Connections?
 2    A    No.
 3    Q    And let me ask you, while we're talking about this issue
 4    of subcontractors, have you ever heard the name, Jamie Yafa
 5    that you can recall?
 6    A    I think I heard the name, but I'm not a hundred percent
 7    sure.
 8    Q    Was Jamie Yafa providing any consulting services to
 9    Electrical Connections?
10    A    No.
11    Q    So let's just look at Mr.~Stein's cover e-mail, the very
12    first page of this exhibit.  Let's look at what Mr.~Stein says
13    about this.  He says that:  "He says he has worked with these
14    people for years."
15          Had you worked with any consultants, anyone who's
16    providing consulting services to Electrical Connections for
17    years?
18    A    No, never have.
19    Q    Okay.  We'll take that down and go pivot away from how you
20    were holding your money and the subcontractor issue and let's
21    get back to just what you were getting from Signalife.
22          We talked about you getting stock from Signalife,
23    right?
24    A    Correct.
25    Q    Did you also get cash from Signalife?
```

```
 1   A    That's correct.

 2   Q    And, again, had you done anything for Signalife that

 3   explained why you were getting cash from Signalife?

 4   A    No.

 5   Q    The cash that you got from Signalife, did you keep all of

 6   that or did you send it someplace else?

 7   A    No, I was told to send it somewhere else.

 8   Q    Where?

 9   A    To Mitchell Stein, wherever he directed me to send it to.

10   Q    Who told you to do that?

11   A    Mitchell Stein.

12   Q    But you got to keep some of that money, right?

13   A    Yes, very little.

14   Q    That money that you kept, did you ever spend any of that

15   on Mr.~Stein?

16   A    Yes, I did.

17   Q    Can you give some examples to the members of the jury of

18   the sorts of things that you'd spend that money on?

19   A    Yeah, he had me get things like for a computer, he'd have

20   me get cables for like stereo systems, food, or he'd have me

21   get vitamins.

22   Q    Did he ever offer to reimburse you?

23   A    No.

24   Q    Let's just look at Government's exhibit 119, please,

25   already in evidence.
```

```
 1              Mr. Carter, is it fair to say this is a -- an e-mail
 2   exchange between you and Mr.~Stein?
 3   A   Yes.
 4   Q   Let's just look up at the top there, what he's asking you
 5   to do.
 6   A   Okay.
 7   Q   Read that to the jury, please.
 8   A   "I need another large piece of cooked fish at about
 9   8:30 a.m. tomorrow, like the other day, but deboned.  My (sic)
10   chef, electronics expert, friend, securities expert in
11   training, bodyguard, et cetera, et cetera see you at
12   8:30 a.m."
13   Q   Mr. Carter, does this pretty well encapsulate the sort of
14   things you're doing for Mr.~Stein at this time March of 2008?
15   A   Yes, it does.
16   Q   He calls you securities expert in training.  Who's
17   training you what to do with securities?
18   A   Mitchell Stein.
19   Q   While we're talking about things that Mr.~Stein asked you
20   to do, we can take that exhibit down, and did there come a
21   point in time, Mr. Carter, when Mr.~Stein asked you to
22   register phone numbers for him?
23   A   Yes, he did.
24   Q   Did ask you him why he wanted you to do that?
25   A   Not that I can recall.
```

```
 1    Q    Did you do it?

 2    A    Yes, I did.

 3    Q    Why?

 4    A    Because that's what Mitch Stein told me he wanted me to

 5    do.

 6    Q    And when we say register phone numbers, can you just

 7    explain what that means?

 8    A    For -- be able to fax things with different numbers.

 9    Q    Well, they --

10    A    I'm sorry.

11    Q    I'm sorry.  It's my fault for talking over you, but

12    mechanically, did you contact somebody to get a phone number?

13    A    There's called The Phone People.

14    Q    Okay.  Those phone numbers that you registered, what did

15    you do with them once you had registered them?

16    A    I gave them to Mitch Stein, as well.  Besides myself.

17    Q    Do you recall approximately when that was that he asked

18    you to do that?

19    A    I'd have to look.  I don't remember the date offhand.

20    Q    Is there anything I could show you that would refresh your

21    recollection as to approximately when you registered those

22    phone numbers?

23    A    Yes.

24              MR. STIEGLITZ:  Your Honor, may I approach

25    Mr. Carter?
```

```
 1            THE COURT:  Yes.
 2    BY MR. STEIN:
 3    Q   Mr. Carter, take a moment, look at those documents.  Let
 4    me know when you've finished looking at those documents.  I
 5    don't want you to read off them.
 6    A   Okay.
 7    Q   Mr. Carter, now that you've read those documents, do you
 8    remember approximately when you registered those phone numbers
 9    for Mr.~Stein?
10    A   Yeah, like in February up to, I think, May.
11    Q   Okay.  So first half of 2008?
12    A   Yes.
13    Q   Okay.  You said you gave those -- well, I'm sorry.  Who
14    did you give those phone numbers to once you registered them?
15    A   To Mitchell Stein.
16    Q   Did you ever give those phone numbers to anyone else at
17    Signalife, like Dr.~Harmison or anybody else at Signalife?
18    A   No, I did not.
19    Q   Did there come a point in time, Mr. Carter, where
20    Mr.~Stein asked you to fax some documents for him?
21    A   Yes, he did.
22    Q   Let's take a look at Government's exhibit 129, which is
23    already in evidence.  And let's start at the second page of
24    it, please.  And we'll just sort of -- this is 129.  Why don't
25    we just blow -- we'll blow out sort of the top half of that
```

```
 1    document, Mr. Carter, so you can get a better look on the

 2    screen there.

 3            Have you seen this document before, Mr. Carter?

 4    A    Yes.

 5    Q    What is it?

 6    A    It is a facsimile letter.

 7    Q    Okay.  Where'd you get this letter?

 8    A    I got this letter from Mitchell Stein.

 9    Q    Okay.  Did he tell you to do anything with it?

10    A    He told me to fax it.

11    Q    Let's look at the number via facsimile above the name

12    Mr. Tony Nony.  What's that number?

13    A    An 866 number.  I believe that's my fax number.

14    Q    Mr. Carter, I'm sorry, is that 866 number your fax number?

15    A    No, that's from that -- I believe The Phone People.  I'm

16    not a hundred percent sure.

17    Q    Is there anything I could show you -- well, we'll move on

18    from that.  We'll come back to that.

19            As far as you know, is that number a number for

20    Cardiac Hospital Management?

21    A    No.

22    Q    Or for Tony Nony?

23    A    No.

24    Q    Let's look at the first page of the exhibit, Mr. Carter.

25    A    Okay.
```

1   Q    You see that number there, where it says "you have

2   received a new fax from?"

3   A    Yes, I do.

4   Q    Do you recognize that number?

5   A    Yes, I do.

6   Q    What is it?

7   A    That's my fax number at my house.

8   Q    In Boca?

9   A    That's correct.

10  Q    The date that this was faxed, March 25th, '08, do you

11  remember faxing that document on or around that date?

12  A    Yes, I do.

13  Q    And again, why'd you do that?

14  A    Because I was told to by Mitchell Stein.

15  Q    Let's look at Government's exhibit 130, please.  This is

16  also already in evidence.

17          Mr. Carter, we'll start on the second page of this,

18  as well.  And, Mr. Carter, this letter, have you seen this

19  before?

20  A    Yes, I have.

21  Q    Where'd you get this letter, Mr. Carter?

22  A    From Mitchell Stein.

23  Q    Did he give you any instructions as to what to do with it?

24  A    He told me he wanted me to fax it.

25  Q    Looking at the number there, where it says via facsimile

```
 1   to, and then there's a 513 number above Mr. Yossi H. Keret, do
 2   you recognize that number?
 3   A   Yes, I do.
 4   Q   Whose number is that?
 5   A   It's a friend of mine, Tim Cutter's, in Cincinnati.
 6   Q   And we'll come back to this in a second, but just -- well,
 7   prior to getting this letter from Mr.~Stein, had you given
 8   Mr.~Stein Tim Cutter's contact information, his phone number?
 9   A   Yes, I did.
10   Q   Did you ever give Tim Cutter's phone number to anyone else
11   associated with Signalife?
12   A   No, I did not.
13   Q   To your knowledge, is Tim Cutter's phone number also the
14   number for a company called IT Healthcare?
15   A   No, it is not.
16   Q   Is it the number for Yossi H. Keret?
17   A   No.
18   Q   Mr. Carter, to your knowledge, does Tim Cutter have
19   anything to do with IT Healthcare?
20   A   No, he does not.
21   Q   What is Tim Cutter's business?
22   A   He is a landscaper.
23   Q   Why had you given his phone number, his contact
24   information to Mr.~Stein?
25   A   Because Mr.~Stein wanted to have the number of somebody I
```

1    knew in Cincinnati.

2    Q    We'll come back to Tim Cutter in just a second.  Let's

3    look at the first page of that exhibit, please.

4          You see that number where it says "you have received

5    a new fax from?"

6    A    Yes, I do.

7    Q    Is that your fax number again, Mr. Carter?

8    A    Yes, it is.

9    Q    And, again, just to be clear, that's where,

10   geographically?

11   A    Boca Raton, Florida.

12   Q    Okay.  Looking at the date, March 25th of '08, do you

13   recall faxing this document on or around that date?

14   A    Yes, I do.

15   Q    And, again, why did you do that?

16   A    Because I followed whatever Mitchell Stein told me to do.

17          MR. STIEGLITZ:  Okay.  Your Honor, I think I can get

18   through just a little bit more before we break.

19   BY MR. STIEGLITZ:

20   Q    Okay.  Let's talk about Tim Cutter.  We can take down that

21   exhibit, Mr. Carter.

22          Tim Cutter was a friend of yours in Cincinnati; is

23   that right?

24   A    That's correct.

25   Q    Did there come a point in time when Signalife, to your

```
 1   knowledge, shipped boxes to Tim Cutter?

 2   A   Yes.

 3   Q   Well, you had given Tim Cutter's contact information to

 4   Mitch Stein prior to that happening?

 5   A   That's correct.

 6   Q   Is Tim Cutter in the medical device business?

 7   A   No, he is not.

 8   Q   To your knowledge, was Tim Cutter wanting to buy or

 9   distribute Signalife heart monitors?

10   A   No, he did not.

11   Q   Did you ever tell Mr.~Stein otherwise, that Tim Cutter did

12   want to do any of that stuff?

13   A   No, I did not.

14   Q   To your knowledge, did Tim Cutter have contact with

15   anybody from Signalife other than you?

16   A   I don't know.

17   Q   Okay.  Do you know what Tim Cutter did with the boxes once

18   he got them?

19   A   He stored them in his basement for me.

20   Q   Did there come a point in time when you went to that

21   Cincinnati area and picked up those boxes?

22   A   Yes, I did.

23   Q   Why?

24   A   Because Mitch Stein told me he wanted me to pick them up

25   and take them to North Carolina, to ship them back to the
```

```
 1   company.
 2   Q    Did Mr.~Stein tell you to do anything to the boxes before
 3   you shipped them back?
 4   A    Yes, he did.  He told me to open up a couple boxes, take
 5   out some cables and just put it back the wrong way.
 6   Q    Put it back the wrong way?
 7   A    Yeah, back in the box.  Meaning like, take out some cables
 8   or some literature and then ship them back.
 9   Q    Did you follow those instructions, Mr. Carter?
10   A    Yes, I did.
11   Q    Do you remember approximately when it was that you went to
12   Cincinnati and picked up those boxes?
13   A    Yes, it was in June, I believe it was 2008, but I'm pretty
14   sure that was the date, June 5th, because it was my birthday.
15   Q    That's why you remember that date specifically?
16   A    Yes.
17   Q    Let's pull up Government's exhibit 151, Mr. Carter, which
18   hopefully is that next document in your binder.  And, again,
19   we're going to start on the second page here.  This is already
20   in evidence.
21        Mr. Carter, have you seen this letter before?
22   A    Yes.
23   Q    Who created this letter?
24   A    I created the letter.
25   Q    Why?
```

```
1    A    Because Mitchell Stein told me to.

2    Q    The content of this letter, did you make it up or did

3    Mr.~Stein tell you to put it in there?

4    A    Mr.~Stein told me to put it in there.

5    Q    Looking at the letterhead, who does this letter say that

6    it's from?

7    A    IT Healthcare, Netanya, Israel.

8    Q    Who's it purportedly signed by?

9    A    Yossi Keret.

10   Q    And what did you do with this letter once you created it?

11   A    I gave it to Mitchell Stein.

12   Q    Well, actually, Mr. Carter, why don't you take a look at

13   the first page of the exhibit and see if that refreshes your

14   recollection as to what you did with this.

15   A    Well, he had me fax it.  I did fax it.

16   Q    Okay.  And, again, who told you to do that?

17   A    Mitchell Stein.

18          MR. STIEGLITZ:  Let's play some audio.  Let's play

19   some audio about Mr.~Stein testifying about IT Healthcare

20   December 18th of 2009, starting at transcript page 366,

21   line 23, ending on page 367, line 1.

22          We'll then play immediately after that a clip from

23   the same day, December 18th, 2009, starting on page 368,

24   line 23, ending on page 369, line 6.

25          So we'll just play clip number 21 and then clip
```

```
 1    number 22.

 2              (Audio played.)

 3              MR. STIEGLITZ:  And clip number 22, please.

 4              (Audio played.)

 5    BY MR. STIEGLITZ:

 6    Q    Mr. Carter, is Mr.~Stein telling the truth when he says

 7    that to the SEC?

 8    A    No, he's lying.

 9    Q    Let's look at the first page of that exhibit.  That's

10    Government's exhibit --

11              Well, before I do that, why do you say that?

12    A    Because he's the one who made up all those -- the name of

13    the companies and everything.

14    Q    Okay.  Mr. Carter, let's look back at the first page of

15    Government's exhibit 151.  And do you see in the middle of the

16    page there, it says "you have received a new fax from?"

17              What's that number?

18    A    That's my fax number in Boca Raton, Florida.

19    Q    And the date that this was faxed, June 11th of '08, do you

20    remember faxing that letter from Yossi Keret, at IT

21    Healthcare, on or around that date?

22    A    Yes, I do.

23    Q    And, again, why'd you do it?

24    A    Because I was told to by Mitchell Stein.

25    Q    And here again, Mr. Carter, I'm going to ask you, you're
```

1    sending these letters from companies you don't know anything

2    about.  Did anything about that seem suspicious to you?

3    A   Well, it did, yes.

4    Q   So why'd you do it?

5    A   Because I followed -- it was greed.  I wanted to make

6    money, and Mitch Stein told me what to do, and I followed his

7    direction.

8         MR. STIEGLITZ:  Your Honor, it probably makes sense

9    to break now.

10        THE COURT:  Let's break now.

11        All right.  Ladies and gentlemen, we'll take our

12   lunch recess.  Please don't discuss the case or form any

13   opinions.  Leave your notes and all the exhibits, and we'll

14   see you at 1:15.  Thank you.

15        And, by the way, we're going to break at 4:30 today,

16   for your planning purpose.

17        (The jury exits the courtroom.)

18        THE COURT:  All right.  We'll see you at 1:15.  We're

19   going to break at 4:30.  I have another matter that's at 4:30,

20   if that's a problem.

21        MR. STIEGLITZ:  Not at all.

22        Your Honor, Mr. Franklin informed us you have

23   something at 1:00.  Is it okay if we leave stuff?

24        THE COURT:  It's telephonic.

25        MR. STIEGLITZ:  Okay.  Great, great.

```
 1                THE COURT:  See you at 1:15.

 2                MR. STIEGLITZ:  Thank you, Your Honor.

 3                MR. STEIN:  Thank you, Your Honor.

 4                MR. STIEGLITZ:  Your Honor, I'm sorry, do you mind

 5      admonishing Mr. Carter?

 6                THE COURT:  Yes.

 7                Mr. Carter, don't discuss your testimony during the

 8      recess.  All right?

 9                MR. STIEGLITZ:  Thank you.

10                MR. STEIN:  Thank you, Your Honor.

11           (A recess was taken from 11:59 a.m. to 1:19 p.m., after

12      which the following proceedings were had:)

13                THE COURT:  Please be seated, everyone.

14                We're back on the record.  Mr.~Stein's present.  We

15      ready?

16                MR. STIEGLITZ:  United States is ready, Your Honor.

17                MR. STEIN:  Defense is ready, Your Honor.

18                THE COURT:  Bring the jurors in.  Let's have

19      Mr. Carter back.

20                Mr. Carter, you're still under oath.

21                THE WITNESS:  Yes.

22           (The jury enters the courtroom, after which the following

23      proceedings were had:)

24                THE COURT:  Welcome back, everyone.  Please be

25      seated, ladies and gentlemen.
```

```
 1              Mr. Stieglitz, you may continue.

 2              MR. STIEGLITZ:  Thank you, Your Honor.

 3   BY MR. STIEGLITZ:

 4   Q   Mr. Carter, when we -- prior to breaking for lunch, we had

 5   looked at Government's exhibit 94, and I'd like to put that

 6   back up on the screen, please.  And just looking at the second

 7   page first, if you could just -- remember, Mr. Carter, this is

 8   a letter that you had created; is that right?

 9   A   That's correct, sir.

10   Q   And the address for Cardiac Hospital Management is in

11   where?

12   A   Tokyo, Japan.

13   Q   I'm going to ask you more about Japan in a minute, but

14   just the third page of this document, also a letter you

15   created, Mr. Carter?

16   A   Yes, I did.

17   Q   And what's the company that you're talking about in this

18   letter?

19   A   IT Healthcare.

20   Q   And who told you to create these documents?

21   A   Mitchell Stein.

22              MR. STIEGLITZ:  Let's go ahead and listen to what

23   Mr.~Stein tells the SEC about IT Healthcare and Cardiac.  And

24   this will be a clip that begins at -- from Mr.~Stein's

25   December 18th, 2009, testimony, beginning at page 410, line 9,
```

```
 1    and ending at page 410, line 22.

 2            And, Your Honor, the parties have agreed there's a

 3    reference in this clip to SEC exhibit 46, and the parties have

 4    agreed that that is, in fact, the same document as what's been

 5    marked and admitted as Government's exhibit 141.

 6            THE COURT:  Is that correct?

 7            MR. STEIN:  That's correct, Your Honor.

 8            THE COURT:  Thank you.

 9            MR. STIEGLITZ:  If we could pull that up,

10    Mr. Sweeney.

11    BY MR. STIEGLITZ:

12    Q    And we'll just blow out the top of that, Mr. Carter, so

13    you can be looking at that while this is playing.

14            MR. STIEGLITZ:  Okay.  And if we could play clip

15    number 25, please, Mr. Sweeney.

16            (Audio played.)

17    BY MR. STIEGLITZ:

18    Q    Mr. Carter, when Mr.~Stein says he doesn't know anything

19    about Yossi Keret and where IT Healthcare and Cardiac Hospital

20    Management are located, is he telling the truth to the SEC?

21    A    No, he's not.

22    Q    Why not?

23    A    Because he's the one who made up all these names.

24    Q    Okay.

25    A    Of the companies, the IT Healthcare, and Cardiac
```

```
 1   Management.
 2            MR. STIEGLITZ:  Okay.  Let's -- with respect to
 3   Cardiac Hospital Management, let's just listen to a little
 4   more of what Mr.~Stein says about Cardiac Hospital Management.
 5   In particular, we're going to play two clips here.  The first,
 6   again from Mr.~Stein's December 18th, 2009, testimony before
 7   the SEC.  This is clip -- I'm sorry.  It begins at page 325,
 8   line 10, ends at 325, line 11.
 9            We will then play a second clip from Mr.~Stein's
10   December 18th, 2009, testimony, beginning at page 325,
11   line 24, ending at page 326, line 9.
12            Clip eight, please.
13            (Audio played.)
14            MR. STIEGLITZ:  Clip nine, please.
15            (Audio played.)
16   BY MR. STIEGLITZ:
17   Q   Just looking back at Government's exhibit 94, Mr. Carter,
18   the second page, please.  Again, this letter that Mr.~Stein
19   had you create says that Cardiac Hospital Management is in
20   Japan; is that correct?
21   A   That's correct.
22   Q   Did there come a time when Mr.~Stein asked you to travel
23   to Japan?
24   A   Yes, he did.
25   Q   And do you remember approximately when that was?
```

```
 1    A    I believe it was in the summer, I don't remember was it
 2    2008 or '9.  I don't remember.
 3    Q    Did he tell you anything about why you needed to go to
 4    Japan?
 5    A    He told me I needed to mail a letter back for him.
 6    Q    Did you go to Mr.~Stein's house before you left for Japan?
 7    A    Yes, I did.
 8    Q    And just explain what happened, sort of step by step, when
 9    you got to Mr.~Stein's house before your trip to Japan.
10    A    Okay.  Mr.~Stein came out with a clear Ziploc, and he had
11    a pair of gloves on, on one hand, and he told me that he
12    wanted me to take this to Japan, mail it, for me to have a
13    glove so I can, when I hand it in, so I left no fingerprints.
14    He had it in a Ziploc.  It was already in a sealed envelope,
15    so I don't know who it was made out to.
16    Q    Did he tell you anything about why he wanted you to do
17    that?
18    A    No, he just told me he wanted me to go to Japan and mail
19    this back.
20    Q    Again, I'll ask, Mr. Carter, did anything about that seem
21    suspicious to you?
22    A    Absolutely.
23    Q    So why'd you do it?
24    A    Again, I did whatever Mr.~Stein told me to do because I
25    trusted him.  He was a lawyer, and I trusted everything he
```

 1   said.

 2   Q    All right.  So you flew to Japan?

 3   A    That's correct.

 4   Q    Who paid for your ticket?

 5   A    Mr.~Stein.

 6   Q    What did you do when you landed in Japan?

 7   A    I went to the hotel.  Then the next day I went to a post

 8   office and mailed it back.

 9   Q    And did you do what Mr.~Stein had told you?  Did you put

10   on a glove and hand the letter in?

11   A    Yes, I did.

12   Q    And when you got done mailing the letter at the post

13   office in Japan, what did you do?

14   A    I came back.  I went to the airport and came back.

15   Q    So you're in Japan total for how long?

16   A    A day, day and a half with travel, I guess.

17   Q    Now, to be clear -- to be clear, Mr. Carter, you don't

18   have any idea what was in that envelope, do you?

19   A    No, I do not.

20   Q    Okay.  Let's switch gears a little bit.  Let's move

21   into -- moving forward chronologically --

22        MR. STIEGLITZ:  Actually, Your Honor, from a

23   housekeeping perspective, before I do this, I said we had six

24   more documents.  We actually over the lunch break pared it

25   down a little bit to four documents that I believe there's no

```
 1    dispute over, that we move into evidence.  Government's

 2    exhibit 197, 196, 238, and 221.  We'd move those into evidence

 3    at this time.

 4              THE COURT:  Any objection?

 5              MR. STEIN:  One moment.

 6              No objection, Your Honor.

 7              THE COURT:  They'll all be admitted without

 8    objection.

 9        (Government Exhibits Nos. 197, 196, 238, and 221 entered

10    into evidence.)

11    BY MR. STIEGLITZ:

12    Q   And Mr. Carter, we'll give the members of the jury just a

13    moment to get those documents passed around.

14              MR. STIEGLITZ:  And, Your Honor, I'd also like to

15    mention that over the -- prior to the lunch break, we had

16    understood that some members of the jury were missing

17    exhibits 151 and 129.  Those will obviously be in the exhibits

18    that will go back to the jury, as they are in evidence.  I

19    don't intend to ask Mr. Carter additional questions about

20    them, however, we do have extra copies if any members of the

21    jury would like them.

22    BY MR. STIEGLITZ:

23    Q   All right.  So Mr. Carter, again, we're sort of switching

24    topics here, and we're -- when it came to 2009, did you file

25    taxes for the year 2008?
```

```
 1   A    Yes, I did.

 2   Q    And -- but you filed those in 2009; is that right?

 3   A    Correct.

 4   Q    Did anyone help you prepare your taxes in 2009?

 5   A    Yes, Mitchell Stein.

 6   Q    Was that a new thing, or had Mr.~Stein helped you prepare

 7   your taxes in previous years?

 8   A    That was a new thing.

 9   Q    I want to show you what's been admitted into evidence as

10   Government's exhibit 197, which is going to be on the screen

11   there, and we'll blow it up, but it should also be in your

12   binder, Mr. Carter.

13   A    Yes.

14   Q    And Mr. Carter, what's the -- well, who is this e-mail

15   from and to?

16   A    From Mitchell Stein to myself.

17   Q    And what's the date and the time of this e-mail?

18   A    Wednesday, April 15th, 1:39 a.m.

19   Q    1:39 in the morning?

20   A    In the morning, I'm sorry.

21   Q    Just read this e-mail to the jury, please.

22   A    "Marty, let's hit this tomorrow, not at 7:30 a.m.  I'll

23   call you, but please get a few IRS forms with instructions.

24   Then we will meet in the early afternoon and see what is up.

25   Get some rest, Mitch."
```

1   Q   Okay.  So what's your understanding of what Mr.~Stein was

2   talking about, "let's hit this"?  What's he talking about?

3   A   Meaning he wanted to do the tax return.

4   Q   Okay.  Let's pull up Government's exhibit 196, please.

5           You know what this document is?  This is already in

6   evidence, but what is this document, Mr. Carter?

7   A   Tax return.

8   Q   Whose?

9   A   Mine.

10  Q   For what year?

11  A   2008.

12  Q   Is this the return that Mr.~Stein helped you prepare?

13  A   Yes.

14  Q   Let's look at the second page of this exhibit, and about

15  two thirds of the way down, do you see the section that says

16  "refund" there?

17  A   Yes.

18  Q   What does it say you're due in the way of a refund there

19  in line 72 and 73?

20  A   $284,947.

21  Q   Do you recall putting that number in that tax return,

22  Mr. Carter?

23  A   Yes, I do.

24  Q   Are you a tax expert, Mr. Carter?

25  A   No, I am not.

```
 1   Q    But based on as far as you knew, were you entitled to a

 2   tax refund in the amount of almost $285,000?

 3   A    No, I was not.

 4   Q    Was it your idea to put that number in there, or did

 5   someone tell you to put it in there?

 6   A    Somebody told me to put it in there.

 7   Q    Who?

 8   A    Mitchell Stein.

 9   Q    Did you, in fact, get a tax refund in that amount from the

10   IRS?

11   A    Yes, I did.

12   Q    What'd you do with the money when you got it?

13   A    I gave most of it to Mitchell J. Stein.

14   Q    Why?

15   A    Because he told me that's what you're going to have to do.

16   Q    You said you sent most of it.  The amount that you kept,

17   did you buy things with the stuff that you kept?

18   A    Yes, I did.

19   Q    Did you buy things for Mr.~Stein with the stuff that you

20   kept?

21   A    Yes, I did.

22   Q    Can you give the jury some examples of what you bought for

23   him?

24   A    I bought stereo equipment.  I also bought a Mercedes, a

25   2000 -- no, not 2000, a 1992 600SL Mercedes.
```

```
 1    Q    And, Mr. Carter, the portion of that money that you sent

 2    to Mr.~Stein, did he give you any instructions on, you know,

 3    the size or the amount that you should send him at any given

 4    time?

 5    A    Yeah, sometimes he wanted me to always keep it under

 6    $10,000.  In money orders.

 7    Q    Okay.  We'll take that exhibit down.

 8         Mr. Carter, let's fast-forward to 2010.

 9    A    Okay.

10    Q    Did there come a time in 2010 when you were contacted by

11    the Securities and Exchange Commission, the SEC?

12    A    Yes, I was.

13    Q    And just describe for the members of the jury how it was

14    that that happened.

15    A    They came to the door with a subpoena.

16    Q    Okay.  What did you do when you got that subpoena?

17    A    I immediately called Mitchell Stein.

18    Q    Why Mitchell Stein?

19    A    Because he was a lawyer, and he was the one that

20    controlled everything.

21    Q    Did you call anyone else at Signalife?

22    A    No, I did not.

23    Q    Did Mr.~Stein tell you to come meet with him?

24    A    Yes.

25    Q    And did you do that?
```

```
 1    A    Yes, I did.

 2    Q    Can you just describe that meeting?  Let's start with

 3    where it took place.

 4    A    We went to a restaurant in Boca Raton, a bagel restaurant

 5    in Boca.

 6    Q    And what -- was anyone else at that meeting between you

 7    and Mr.~Stein?

 8    A    No, just the two of us.

 9    Q    And what, if anything, did he tell you during that

10    meeting?

11    A    He had me write down on a napkin, a placemat, detail lines

12    of how to go from 2005 all the way to, I don't remember the

13    date, but this is what he wanted me to tell the SEC.

14    Q    I want to show you what's been admitted into evidence as

15    Government's exhibit 238, please.  And that should be in your

16    binder, as well, Mr. Carter.

17    A    That's correct.

18    Q    I have no explanation for you as to why our exhibit

19    sticker is upside down.

20          But tell the jury what this is, what we're looking at

21    here.

22    A    We're looking at a timeline of what he wanted me to say to

23    the SEC.

24    Q    You just referred to notes on a placemat.  Is that a

25    copy -- is this a copy of what that was?
```

```
1    A    Well, this -- he would tell me what to write, and I wrote

2    it down.

3    Q    Okay.  Now, you said that Mr.~Stein was telling you what

4    to say to the SEC.  Were the things that he was telling you to

5    say to the SEC, were those true or were those false?

6    A    They were false.

7    Q    Let's look at a couple of items here in particular,

8    Mr. Carter.  Near the bottom of that first page that we're

9    looking at right there on the screen, do you see in that

10   middle column the section where it says:  "Harmison called me

11   immediately and told me he is new CEO and wants to meet with

12   me."  Do you see that, Mr. Carter?

13   A    Yes, I do.

14   Q    Is that true?

15   A    No, it's not true.

16   Q    That never happened?

17   A    Never happened.

18   Q    Let's look at the top of the next column, Mr. Carter,

19   where it says -- do you see where it says:  "Harmison called

20   several times in October regarding blue tooth problem and told

21   me not to mention this to anyone, especially not to Mitch

22   Stein?"

23        Is that true, Mr. Carter?

24   A    No, it is not.

25   Q    Did that happen?
```

```
 1   A   No, it did not.

 2   Q   Let's look a little lower in that column.  You see where

 3   it says there:  "He wanted me to start opening a manufacturing

 4   facility in Ohio."

 5           Do you see that, Mr. Carter?

 6   A   Oh, up here.  Yes, I do.

 7   Q   Is that true?  Did Dr.~Harmison want you to open a

 8   manufacturing facility in Ohio?

 9   A   No, that's not true.

10   Q   And, again, who's telling you to write all this down?

11   A   Mitchell Stein.

12   Q   Okay.  Let's look at just a couple more examples.  Let's

13   look at the second page there of this exhibit, the bottom

14   right there.  You see where it says:  "Harmison came to Ohio

15   to meet with me and would send units, said would call me in

16   two week -- two weeks."

17           Is that true?  Did Dr.~Harmison come to Ohio and meet

18   with you and tell you those things?

19   A   No, he did not.

20   Q   Let's look at one other example.  Let's look at the last

21   page.  I believe it's the fourth page of the exhibit.

22   Mr. Carter, let's just look at another statement about

23   Dr.~Harmison, the middle there, you see where it says:

24   "Harmison told me so many names of companies and purchasers, I

25   can't remember than (sic) all."
```

```
 1              Did that ever happen, Mr. Carter?
 2    A    No, it did not.
 3    Q    So, is that true?
 4    A    No, it is not true.
 5    Q    So if you know that this stuff isn't true that you're
 6    writing down in these -- on this placemat, why are you writing
 7    it down?
 8    A    Because Mitchell Stein told me to write it down and study
 9    it, and that's what he wanted me to say.
10    Q    Just to go back to the second page of the exhibit, up at
11    the top there, whose handwriting is that?
12    A    That is my wife.
13    Q    What's it say?
14    A    It says:  "Marty, study notes per Mitch for jury to say."
15    Q    So did Mr. -- did you study these notes, Mr. Carter?
16    A    Yes, I did.
17    Q    Now, when you were talking with Mr.~Stein about testifying
18    before the SEC, did Mr.~Stein ever tell you that he had
19    already testified before the SEC himself?
20    A    No, he did not.
21    Q    Did he ever offer to try to figure out a way that you
22    wouldn't have to testify, like take the Fifth, do something
23    like that?
24    A    No, he never told me anything.
25    Q    Okay.  So did you go testify before the SEC?
```

1    A    Yes, I did.

2    Q    And geographically, where did that happen?

3    A    In Washington, D.C.

4    Q    How did you get there?

5    A    I went by train.

6    Q    Who paid for your trip?

7    A    Mr.~Stein.

8    Q    Did you stay at a hotel?

9    A    Yes, I did.

10   Q    Who paid for that?

11   A    Well, it was either Mr.~Stein or Mr. Scharf.  That, I

12   don't know.

13   Q    And for purposes of clarity, who's Mr. Scharf?

14   A    He was the attorney, I believe, for Signalife, another

15   attorney.

16   Q    Did you have your own room in the hotel?

17   A    No, I did not.

18   Q    Who did you share a room with?

19   A    Mr.~Stein.

20   Q    Did you get there the day before you testified?  Two days

21   before?  Do you remember?

22   A    I believe it was the day before, but I'm not sure of the

23   exact.

24   Q    So the free time that you had before you testified, did

25   you get out, see the sights in Washington, or what did you do?

```
 1   A    No, I did not.  I stayed in the room and studied the

 2   notes.

 3   Q    Why?

 4   A    Because that's what Mr.~Stein wanted me to do.

 5   Q    When you went to the SEC to testify, who went with you?

 6   A    Mr. Stein and Mr. Scharf.

 7   Q    Where was Mr. Stein sitting during your SEC testimony?

 8   A    He was sitting to the left of me.

 9   Q    While you testified, did you stick to the story that you

10   and Mr.~Stein had talked about?

11   A    Yes.

12   Q    How'd you feel about doing that?

13   A    I was very scared.

14   Q    Why?

15   A    Because I've never done anything like this before in my

16   life.

17   Q    Bottom line, Mr. Carter, did you lie in front of the SEC?

18   A    Yes, I did.

19   Q    About just a few things, or pretty much across the board?

20   A    Across the board.

21   Q    Was Mr.~Stein there the whole time?

22   A    Yes, he was.

23   Q    If you knew those were lies, Mr. Carter, when you were

24   telling them, why did you do it?

25   A    Because he was sitting right next to me and I didn't know
```

```
 1   what to do, because I had Mr. Stein on the left and Mr. Scharf

 2   on the right.

 3   Q   We'll take down that exhibit and -- Mr. Carter, you were

 4   under oath when you lied at the SEC, weren't you?

 5   A   Yes, I was.

 6   Q   Let's pull up Government's exhibit 221.  And that's in

 7   your binder, as well, Mr. Carter.

 8           What type of document is this?

 9   A   Looks like a court document, I believe.

10           MR. STIEGLITZ:  Your Honor -- well, I'm sorry, this

11   is already in evidence, Government's 221.

12   BY MR. STIEGLITZ:

13   Q   On the first page of the exhibit, let's just look at that

14   part that says:  "Martin B. Carter, under penalty of perjury."

15   see that, Mr. Carter?

16   A   Yes, I do.

17   Q   "Martin B. Carter, under penalty of perjury, states as

18   follows;" is that right?

19   A   Yes.

20   Q   And we'll get back to what you state on penalty of perjury

21   in just a second, but let's just turn to the last page of the

22   exhibit, which is page -- I will tell you in a second --

23   page 4 of the exhibit, the signature page there, Mr. Carter.

24   Do you have that in front of you?

25   A   Yes, I do.
```

1    Q    And here again, Mr. Carter, you say "I" -- well, whose

2    signature is that?

3    A    That is my signature.

4    Q    Here again you say:  "I declare under penalty of perjury

5    that the foregoing is true and correct;" is that right?

6    A    Yes.

7    Q    So let's look at what you say under penalty of perjury.

8    Let's go back to the first page.  See in the middle there,

9    Mr. Carter, with the sentence starting with "I was hired

10   initially."  Why don't you just read that to the jury, please.

11   A    "I was hired initially by Pam Bunes when she was chief

12   executive officer of Signalife, and after her departure in

13   2007, I was kept on as an engineer and assistant chief

14   technology officer by the new CEO, Lowell Harmison."

15   Q    Why don't you just read that next sentence, please.

16   A    "After Mr. Harmison's departure in 2008, I was kept on as

17   an engineer and technology advisor by Signalife's new CEOs,

18   Rowland Perkins, Willie Gault.  I have been" --

19   Q    That's fine for the moment, Mr. Carter.

20        Mr. Carter, you talk about being hired initially by

21   Pam Bunes, you talk about Lowell Harmison, you talk about

22   Rowland Perkins and Willie Gault.

23        Who introduced you to Signalife, Mr. Carter?

24   A    Mr.~Stein.

25   Q    Who was your point of contact at Signalife?

1    A    Mr.~Stein.

2    Q    Mr. Carter, let's look at the next page up there at the

3    top.  You say:  "I'm extremely adept at micro-technology and

4    engineering.  I am fully familiar with the technology of the

5    Fidelity 100 heart monitoring device."

6              Is that true or is that a lie?

7    A    That's a lie.

8    Q    Let's move on.  Paragraph 2.  Why don't you read that

9    first sentence.

10   A    "In 2007 and 2008, I was in frequent contact with Lowell

11   Harmison.  Among other duties, Dr.~Harmison asked me to test

12   Signalife's products, including its Fidelity 100 heart

13   monitoring device."

14   Q    Mr. Carter, is that true?  Were you in frequent contact

15   with Lowell Harmison, and was he asking you to test

16   Signalife's products?

17   A    No, that was not true.

18   Q    Mr. Carter, I'm not going to go through the rest of this

19   document, but is it fair to say that there are other lies in

20   here that you told?

21   A    Yes, that's correct.

22   Q    Now, we just looked a minute ago at lots of names that

23   were in here, Pam Bunes, Lowell Harmison, Rowland Perkins, and

24   Willie Gault.  Just looking at this document, Mr. Carter, is

25   Mr.~Stein's name anywhere in this document?

```
 1   A    No, it is not.

 2   Q    Who gave you this document to sign?

 3   A    Mitchell Stein.

 4   Q    Did he ask you to look at it and correct anything that

 5   wasn't true?

 6   A    No, he did not.

 7   Q    Why did you do it?  Why did you sign this document?

 8   A    Again, I trusted him, and I'm pretty naive on

 9   understanding this stuff, but I signed it.

10         MR. STIEGLITZ:  Court's indulgence.

11   BY MR. STIEGLITZ:

12    Q   Mr. Carter --

13         MR. STIEGLITZ:  You can take down that exhibit.

14   BY MR. STIEGLITZ:

15    Q   I just want to step back for a second.

16         When you first met Mr. Stein, did you look up to him?

17   A    Yes, I did.

18   Q    Did you admire him?

19   A    Yes, I did.

20   Q    Sitting here today, do you believe that Mr.~Stein lied to

21   you?

22   A    Yes, I do.

23   Q    Do you believe that he misled you?

24   A    Yes, I do.

25   Q    If that's the case, Mr. Carter, if you think Mr.~Stein
```

```
1    lied and misled you, why'd you plead guilty to a federal

2    crime?

3    A    Because I wanted to tell the truth.

4    Q    That crime, that conspiracy that you pled guilty to, who

5    was the leader of that conspiracy?

6    A    Mitchell Stein.

7    Q    Mr. Carter, you got a lot of money from Signalife, didn't

8    you?

9    A    Yes, I did.

10   Q    Did you keep most of it, or did you send it someplace

11   else?

12   A    I sent most of it to Mitchell Stein.

13   Q    Did you ever send money to Lowell Harmison?

14   A    No, I did not.

15   Q    Did you ever send money to John Woodbury?

16   A    No, I did not.

17   Q    Did you ever send money to anybody else at the company?

18   A    No, I did not.

19   Q    Only to Mitch Stein; is that right?

20   A    That's correct.

21   Q    And why'd you do that?

22   A    Because that's what he told me to send.

23        MR. STIEGLITZ:  Mr. Carter, please answer any

24   questions Mr.~Stein has for you.

25        THE WITNESS:  Okay.  Thank you.
```

```
 1                  THE COURT:  All right.  Cross-examination.

 2                  MR. STEIN:  Thank you, Your Honor.

 3                          Cross-examination

 4     BY MR. STEIN:

 5     Q   Good afternoon, Mr. Carter.

 6     A   Good afternoon.

 7                  MR. STEIN:  I ask the indulgence, since you've got --

 8     can you put up defense 82?

 9                  You can take it down for now.  I just want to have it

10     ready.

11     BY MR. STEIN:

12     Q   Mr. Carter, you understand that by having pled guilty,

13     you're a convicted felon; is that right?

14     A   Yes.

15     Q   Let's jump forward for a minute to May 2nd of this year.

16     A   Okay.

17     Q   You met with the Department of Justice on May 2nd; isn't

18     that right?

19     A   I believe so, yes.

20     Q   Here in South Florida, right?

21     A   Yes, I believe so.

22     Q   West Palm Beach, right?

23     A   Yes, I believe so.

24                  THE COURT:  Mr.~Stein, can you pull that microphone a

25     little closer to you, please?
```

```
 1                 MR. STEIN:  I'm sorry, Your Honor.

 2                 Is that better?

 3                 THE COURT:  Yes, thank you.

 4                 MR. STEIN:  And can you put up 82, please?

 5    BY MR. STEIN:

 6    Q    You remember testifying about that exhibit earlier today,

 7    right?

 8    A    Yes.

 9    Q    When you met with the Department of Justice, they asked

10    you why you told me about all of these contacts in Asia.

11    A    Yes.

12    Q    They did ask you on May 2nd, right?

13    A    I don't remember for sure because I was shown so many

14    documents.

15    Q    Do you recall them asking and you saying you don't recall

16    why you sent that memo because it's not true?  Do you recall

17    saying that to them, to Mr. George Clark and to Mr. Stieglitz?

18    A    Could you repeat the question, please?

19    Q    Do you recall telling the Department of Justice on May 2nd

20    that you don't know why you sent this exhibit because it's not

21    true?

22    A    I don't remember what I said to them.

23    Q    So you may have said that on May 2nd?

24    A    I'm not sure.

25    Q    You may or may not have, you just don't remember?
```

1    A    I don't remember, correct.

2    Q    But today your memory regarding that exhibit was really

3    clear.  You said you sent that e-mail to me because you were

4    trying to impress me.  It was in this courtroom about three

5    hours ago.  Remember?

6    A    Correct, yes.

7    Q    So it's a clear memory today, but you don't remember what

8    it was on May 2nd; is that your testimony?

9    A    Yes, I don't remember.

10    Q    Is there anything that happened between May 2nd and today

11    to cause you to have a recollection about an e-mail that was

12    sent to me in 2008?

13    A    No.

14    Q    So nobody from the Department of Justice, sitting at that

15    table, told you to have that memory; is that correct?

16    A    No.

17    Q    No, it's not correct?  Yes, it's not correct?

18    A    No, they did not tell me to remember this.

19    Q    Is there anything else that happened that caused you to

20    remember today that you sent that e-mail to me allegedly to

21    impress me?

22    A    It's just whatever is showed to me.

23    Q    And you don't remember telling the DOJ on May 2nd that

24    that memorandum was untrue, correct?

25    A    I don't remember.

1    Q    Do you remember talking about that memo on May 2nd?

2    A    I don't know about May 2nd, but I remember talking about

3    the memo.

4    Q    To the Department of Justice?

5    A    Yes.

6    Q    When's the last time you talked about this memo -- it's a

7    pretty important memo -- to the Department of Justice, if you

8    can recall?

9    A    Honestly, I can't remember.

10   Q    Was it before or after you testified before the SEC?

11   A    It was after, I believe.

12   Q    Was it within the last 18 months?

13   A    Yes.

14   Q    How many times did you talk to them about this exhibit?

15   A    I don't remember.

16   Q    More or less than five?

17   A    I don't remember.  I don't recall.

18   Q    More or less than one?

19   A    I just don't remember.

20   Q    So you don't remember talking to them?  Because I just

21   asked you if it was one.

22   A    I didn't say I didn't remember talking to them, I just

23   don't remember how many times.

24   Q    And you don't remember if it was more than one?  So it

25   could have been just one time?

```
 1    A    It could have, yes.

 2    Q    But you're positive today you sent me this memo to impress

 3    me; is that correct?

 4    A    Yes.

 5    Q    Have you read your plea bargain agreement with the

 6    Department of Justice carefully?

 7    A    As best as I can, yes.

 8    Q    It is your hope, isn't it, that your cooperation here

 9    today will lead to a sentence of probation for the felony you

10    pled guilty to; is that accurate?

11    A    Yes.

12    Q    And you only pled guilty to one felony; is that right?

13    A    To one count, yes.

14    Q    To one count?

15    A    Yes.

16    Q    You've testified today that you allegedly created more

17    than one document that was false; is that right?

18    A    Correct.

19    Q    More than 10 documents that were false; is that correct?

20    A    I believe so.

21    Q    At any time in your life, have you ever made any

22    statements to a grand jury?

23    A    I never stood in front of a grand jury.

24    Q    So certainly in this case you never told the story you

25    told today to a grand jury; is that right?
```

```
 1    A    I've never been in front of a grand jury; that's correct.
 2    Q    In this case you've never been in front of a grand jury;
 3    that's right?  Just to be clear.
 4    A    I assume it's a grand jury.  I'm not familiar with the
 5    grand jury.  I've never been to one.
 6    Q    You've never been in another courtroom testifying in this
 7    case; is that right?
 8    A    No, I just said I've never been in front of a grand jury.
 9    Q    Okay.  What about other courtrooms?  Have you been in any
10    other courtroom in connection with Signalife?
11    A    Yes.
12    Q    And where was that courtroom?
13    A    In Washington, D.C.
14    Q    Wasn't that a room with a stenographer, a deposition room,
15    not a courtroom?
16    A    No, that was a courtroom, I believe.
17    Q    Was there a judge there?
18    A    Yes, there was.
19    Q    Do you remember if the judge was male or female?
20    A    The judge was a female.
21    Q    And what was the judge's name, do you remember?
22    A    I don't remember her name offhand, no.
23    Q    Rachel Nonaka ring a bell?
24    A    Oh, that's the SEC, yes.
25    Q    That was the judge?
```

```
 1    A    No, no, that's the SEC that you're talking about, Rachel

 2    Nonaka.

 3    Q    Okay.  I'm sorry.  You said you testified before the SEC,

 4    and there was a judge there.

 5    A    No, let me rephrase it.  I apologize.  I was in front of

 6    the SEC.  There were attorneys there.

 7    Q    Okay.  That's -- we have that statement.  We'll be talking

 8    about that.

 9    A    Okay.

10    Q    Were you ever in any courtroom besides here and besides

11    the SEC with regard to Signalife at any time?

12    A    Well, for my plea of guilty when I was in Washington.

13    Q    Okay.  And at the plea of guilty, when you were in

14    Washington you were represented by counsel, right?

15    A    That's correct.

16    Q    You told Signalife's lawyer, Mr. Scharf, to come down to

17    Washington, didn't you?

18    A    No, I did not.

19    Q    You did not tell Mr. Scharf to come to Washington?

20    A    No, I did not.

21    Q    When you pled guilty, did you make a statement to that

22    judge in Washington, D.C., other than, I'm pleading guilty?  I

23    mean, did you make a statement about any of these documents?

24    A    Not to my knowledge.  I don't remember.

25    Q    Have you ever made any other -- we've now covered the
```

```
 1    gambit -- any recorded statements regarding Signalife to the
 2    Department of Justice other than what you've already testified
 3    to, to the best of your recollection?
 4    A    Could you rephrase that again, please, so I understand it?
 5    Q    I just want to know if you made any other statements to
 6    any other agency regarding Signalife other than what you've
 7    already testified?  I understand it's a long period of time.
 8    Nobody's going to hold you to the answer, I just want to know
 9    if you remember making any other statements.
10    A    All I remember is to the SEC and to the Court in
11    Washington.
12    Q    Thank you.
13          You know the name Budimir Drakulic; isn't that right?
14    A    Yes, I do.
15    Q    From and after the time that you got involved with me, you
16    understood or were told that Budimir Drakulic was the person
17    who invented the technology of Signalife, is that --
18          MR. STIEGLITZ:  Your Honor, I would object on the
19    "you were told" portion of that.
20          THE COURT:  Sustained.  Rephrase your question.
21    BY MR. STEIN:
22    Q    Was it your understanding prior to today that Budimir
23    Drakulic claimed to be the person who developed the Signalife
24    technologies?
25    A    Yes, that's correct.
```

```
 1    Q    You've met Budimir Drakulic, right?

 2    A    Yes, I did.

 3    Q    Did you ever sign any false documents for him or anything

 4    like that?

 5    A    Not that I know of.

 6    Q    Did you ever sign any documents for him?

 7    A    Not that I know of.

 8    Q    How many times have you met Budimir Drakulic?

 9    A    Twice.

10    Q    You met him here once, right?  Here in Florida?

11    A    I met him here once, that's correct.

12    Q    At Advantage Medical, the cable --

13    A    That's correct.

14    Q    And you met him, I guess, in California on the other time,

15    right?

16    A    One time, yes.

17    Q    The time you met him in California I wasn't there; is that

18    right?

19    A    That's correct.

20    Q    What did you talk about the time in California when I

21    wasn't there with him?

22    A    I didn't talk to him.  I was just told to pick up the

23    cables and the CD, which I did.

24    Q    So you didn't say anything to him?

25    A    No, I just said hello.  That's it.
```

```
 1    Q   Mr. Carter, I'm going to show you a rather lengthy

 2    document which has already been marked as exhibit 278.  And

 3    provide it to the Government.

 4          Mr. Carter, as you sit here today, are you aware of

 5    whether or not Dr. Drakulic is a director of a company that

 6    makes medical devices regarding the heart other than

 7    Signalife?  Are you aware of that?

 8    A   No, I am not.

 9    Q   Are you aware of whether or not Pam Bunes today consults

10    with a company that makes medical devices regarding the heart?

11    A   No, I am not.

12          MR. STEIN:  May I approach, Your Honor?

13          THE COURT:  Yes.

14  BY MR. STEIN:

15    Q   I'm going to show you what has been marked as exhibit 278

16    and ask you to look at it carefully.

17    A   (Perusing exhibit.)

18          MR. STIEGLITZ:  Your Honor, while Mr. Carter's

19    looking at this document, may we have a brief sidebar?

20          THE COURT:  Yes.

21      (The following proceedings were held at sidebar:)

22          MR. STIEGLITZ:  I note that one of the jurors is sort

23    of playing with his cellphone.  I'd prefer not to sort of be

24    the one ratting her out, for obvious reasons.

25          THE COURT:  Which juror?
```

```
 1              MR. STIEGLITZ:  The one who handed you a picture
 2     earlier.
 3              THE COURT:  Okay.
 4              MR. STIEGLITZ:  I don't know when it would be
 5     appropriate, I just want to raise it since I noticed it.
 6              MR. STEIN:  I couldn't hear it complete.
 7              MR. STIEGLITZ:  One of the jurors has her cellphone
 8     out to play with it, so I just wanted to raise it.  Maybe at
 9     the break or something, just maybe some sort of instruction.
10              Now the one next to her now does, too.
11              MR. STEIN:  The break is fine with me.
12              THE COURT:  Well, it's a little early for the break.
13              MR. STEIN:  I'm saying when the break happens.
14              THE COURT:  Okay.
15         (Sidebar conference concluded.)
16     BY MR. STEIN:
17     Q    Did you have a chance to review exhibit 278, Mr. Carter?
18     A    Yes, I did.
19     Q    Are you aware of a company called Biosig Technologies?
20     A    No, I am not.
21     Q    Did you or any member of your family invest in Biosig
22     Technologies?
23     A    No, I did not.
24     Q    Did you or any member of your family invest in any company
25     holding Signalife's technologies?
```

1    A    No, not that I know of.

2    Q    You see any names on that exhibit that you recognize?

3    A    Only one, Budimir Drakulic.

4         MR. STIEGLITZ:  Your Honor, I'd object to asking

5    about the content of documents that aren't in evidence.

6         THE COURT:  Well, at this point all he asked was if

7    he saw something that he recognized.  So I'll overrule that

8    objection, but we'll see where it leads.

9         MR. STEIN:  I'm not going . . .

10   BY MR. STEIN:

11   Q    You haven't invested in that company.  You recognized

12   Budimir Drakulic's name?

13   A    That's the only name I recognize.

14   Q    Do you recall whether or not you ever knew that Pam Bunes'

15   background was she worked for a company called Biosense

16   Webster?  Do you recall knowing that?

17   A    No, I did not.

18   Q    Do you recall ever knowing that she worked for Johnson &

19   Johnson?

20   A    Yes, because you told me.

21   Q    You see on that document the name Budimir Drakulic?

22   A    Yes.

23   Q    Now, you indicated that you've met Pam Bunes, right?

24   A    Correct.

25   Q    Multiple times, right?

```
 1   A    Twice that I know of.

 2              MR. STEIN:  May I approach, Your Honor, just to get

 3   the document?

 4              THE COURT:  Yes.

 5   BY MR. STEIN:

 6   Q    Thank you, Mr. Carter.

 7   A    You're welcome.

 8   Q    You met her down here at that place you called the Tempura

 9   House; isn't that right?

10   A    Yes.

11   Q    You were expecting to get a contract from her and you

12   didn't get it, right?

13   A    Correct.

14   Q    It was kind of irritating, wasn't it?

15   A    Yes.

16   Q    This was after the trip to Greenville that we made that

17   you testified about, right?

18   A    Greenville I testified?  You mean when I went --

19   Q    With me.

20   A    When I went to Greenville, yes.

21   Q    This was after that?

22   A    Yes.

23   Q    The Tempura House meeting?

24   A    That's correct.

25   Q    She promised she would bring a contract for you, didn't
```

```
 1    she?

 2    A    Well, that's what you told me.

 3    Q    And she came, and you didn't get any contract?

 4    A    That's correct.

 5    Q    During this time, 2005-2006, do you recall Pam Bunes or

 6    anybody working for her, like Rajiv Singh or Matthews being

 7    concerned about Budimir Drakulic's integrity or honesty?  Do

 8    you recall that?

 9              MR. STIEGLITZ:  Objection as to him testifying to

10    other people's states of minds.

11              THE COURT:  Overruled.  If they said something to you

12    that gave you the indication.

13              THE WITNESS:  Could you repeat the question, please?

14    BY MR. STEIN:

15    Q    Do you recall a concern about Dr. Drakulic's honesty at

16    that beginning phase by the officers of the company?

17    A    No.

18    Q    Mr. Carter, I'm going to show you a document which is, as

19    you can see, Bates stamped 4032, and I'd like you to just

20    concentrate on the first page.  If you could just quietly

21    review that.  Don't repeat any of it.  It's pretty short.

22    A    (Perusing document.)

23    Q    You don't need to read on, Mr. Carter.  Unless it is

24    refreshing your recollection, you don't need to read on.

25    A    Okay.
```

```
 1    Q    Now, these people you've mentioned, Pam Bunes and the rest
 2    of them, you understand that they might testify here.  It's
 3    very important that you tell the truth.  You understand that.
 4    You've already told us about that, right?
 5    A    Yes.
 6    Q    Does this document refresh your recollection about a
 7    concern that any officer of the company had about Budimir
 8    Drakulic and his honesty going back to 2006?
 9    A    Not really, because I never got one of these documents.
10    Q    Do you have any recollection, as you sit here today, with
11    me showing you that document, of any concern by any officer of
12    the company or by me regarding Budimir Drakulic's honesty
13    dating back to 2006?
14         MR. STIEGLITZ:  Objection, asked and answered, and
15    Mr. Carter's not competent to testify as to other people's
16    concerns.
17         THE COURT:  Sustained as to asked and answered.
18    BY MR. STEIN:
19    Q    So as you sit here today, you're not aware of any concern
20    regarding Dr. Drakulic.
21         Have you ever talked to the Department of Justice
22    about any issue having to do with theft of technologies?  Have
23    you ever spoken with the Department of Justice about any issue
24    regarding that?
25    A    Not to my knowledge, no.
```

1   Q    Have you ever talked to the Department of Justice about

2   the Economic Espionage Act of 1996?

3   A    No, I did not.

4   Q    From your background in the electrical business, are you

5   aware that it's wrong to take without permission inventory

6   from one company and use it in another company, without

7   permission?

8   A    I believe so, but I'm not sure.

9   Q    But that's actually happened in one of your prior

10  businesses, right?

11  A    In one of my what, please?

12  Q    Prior businesses.  The taking of inventory of Lighthouse,

13  the business you grew up with.  You're aware of that problem?

14  A    We never took and tried to have another company make it,

15  no.

16  Q    Nobody ever did that in your family?

17  A    Not in our family, no.

18  Q    How about technology?  You also are aware generally that

19  it's wrong to take technology from one company without

20  permission, use it in another company?

21  A    Yes, I understand that.

22  Q    Okay.  When you met with the Department of Justice on

23  May 2nd, we've already spoken about that, did they mention

24  anything to you about Biosig Technologies, Inc?

25  A    Not to my knowledge.

```
1    Q    Mr. Carter, moving back to the period of time when you

2    were arrested, where were you at that time physically?

3    A    At my house.

4    Q    At the time you were arrested, were you represented by

5    counsel regarding the SEC investigation regarding Signalife?

6    A    The only one I was told that was was Jared Scharf.

7    Q    Was it your understanding at the time of your arrest that

8    the United States would not be contacting you unless it was

9    through your counsel, Mr. Scharf?  Was that your

10   understanding?

11            MR. STIEGLITZ:  Your Honor, I'm going to object on

12   relevance grounds.

13            THE COURT:  Can I see counsel, please?

14       (The following proceedings were held at sidebar:)

15            THE COURT:  What's this all about?

16            MR. STEIN:  When he was incarcerated, as the Court

17   probably knows, there were --

18            THE COURT:  I don't know anything about his

19   incarceration.

20            MR. STEIN:  There were things done to him, including

21   withholding of medication.  And it's three questions, but I

22   need to ask him about it.  It could go to -- it does go to why

23   he pled guilty, and it's probably three questions.

24            THE COURT:  I'm sorry.  There were things done to him

25   by whom?
```

```
 1              MR. STEIN:  Well, in the Jencks memo the Government
 2    sent me, they said that it wasn't by -- he said it wasn't by
 3    the DOJ, it was by the jail authorities, but I just want to
 4    ask him.
 5              THE COURT:  So you're trying to suggest that he was
 6    coerced or something was done to him to force him to plead
 7    guilty?
 8              MR. STEIN:  Yeah, there's memos regarding -- I'm not
 9    going to go into those memos, I just want to ask him.
10              THE COURT:  So what is it about not speaking to
11    counsel, or what was the question you asked him?
12              MR. STEIN:  Well, before he was arrested, he had
13    testified before the SEC, and I think he had an understanding,
14    but I don't know, that he would be contacted through counsel.
15    The postal inspectors banged on his front door, without
16    calling counsel, then he was incarcerated, then he wasn't
17    given his diabetes medication.  It's three or four questions,
18    but I have --
19              THE COURT:  So you want to try and lay a predicate
20    that he pled guilty because of coercion or deprivation of
21    medications, and he was -- you know, things were done to him
22    to kind of get him to plead guilty without his really knowing
23    what he was doing?
24              MR. STEIN:  Absolutely, Your Honor.
25              THE COURT:  All right.  Well, I mean, if he wants to
```

 1   try and establish that, I guess, you know --

 2          MR. STIEGLITZ:  Your Honor, I don't see how the -- I

 3   mean, if Mr. Carter wanted to raise that issue, I see how

 4   that's -- you know, when we were adverse to Mr. Carter, that

 5   might be one thing.  The voluntariness of Mr. Carter's plea, I

 6   don't see how that's at all relevant to the allegations in the

 7   indictment against Mr.~Stein.

 8          I'd also note that the Court's seen where Mr.~Stein

 9   has headed with this, and I'd suggest that these are going to

10   be some extraordinarily inflammatory things that Mr.~Stein's

11   about to raise of the variety that he raised in that motion,

12   the 30-plus page motion to dismiss he filed two weeks before

13   trial, where he's going to suggest that the Government was

14   torturing people, withholding medication.

15          There is no -- Mr.~Stein cannot, I would suggest,

16   have a good-faith basis for suggesting that anyone

17   deliberately withheld medication or did anything else untoward

18   toward Mr. Carter, and I think that that line of questioning

19   should be precluded.

20          THE COURT:  Well, I guess it would go to the

21   credibility of whether or not his statements in his plea

22   agreement, his statements to the Government as far as his

23   admissions of what he claims to have done improperly is true

24   or not.

25          MR. STIEGLITZ:  But they weren't signed in -- it

 1    wasn't like they were signed in prison or something like that.

 2            THE COURT:  That's for the jury to sort out.  I mean,

 3    if he wants to try and show it, I think he is entitled to ask

 4    the question, and we'll see where it leads.  But, I mean, it

 5    could, assuming he gets an answer that says, yes, I was

 6    coerced into this and I didn't know what I was doing, you

 7    know, affect the credibility of his testimony.

 8            MR. STIEGLITZ:  I'd just ask that the Court instruct

 9    Mr.~Stein that this be an extraordinarily limited line of

10    questioning, because I think the Court, again, has seen where

11    Mr.~Stein has wanted to go with this sort of line of

12    questioning, and it would be, again, just extraordinarily

13    improper in front of the jury to have those sorts of

14    allegations made, but . . .

15            THE COURT:  Well, I think I'm going to have to let

16    him ask the questions.

17            MR. STEIN:  Your Honor, there's not much here, but

18    there are memos from his wife and him, so I -- you know, I'm

19    not going to even be showing him, I just want to ask him his

20    bare recollection.

21            THE COURT:  Again, if you think that you can try and

22    establish that his plea agreement was coerced and it was

23    because of some deprivation of food and nourishment and

24    medical care, and that's the only reason he pled guilty, I

25    guess, have at it.

```
 1              But I think I have to let him go down the road if he

 2    thinks he can show it.

 3              MR. STIEGLITZ:  Understood, Your Honor.

 4         (Sidebar conference concluded.)

 5              THE COURT:  All right, go ahead, Mr.~Stein.

 6              MR. STEIN:  Thank you, Your Honor.

 7    BY MR. STEIN:

 8    Q   I'll repeat the question, Mr. Carter.

 9              At the time of your arrest, was it your understanding

10    that the United States of America would not be contacting you

11    unless it was through your counsel, Mr. Scharf?

12    A   I remember that they were -- did not have me use the

13    counsel, Mr. Scharf.

14    Q   Who's they?

15    A   That the Government rejected -- did not want me to have

16    with Mr. Scharf or you, in contact with anybody.

17    Q   Was that before the arrest of you, the Government told you

18    that?

19    A   It was at the time of the arrest, yes.

20    Q   At the time of the arrest, the Department of Justice

21    people told you, at the time of arrest, not to contact

22    Mr. Scharf, is that what you're saying?

23    A   Mr. Scharf, yourself or anybody with Signalife.

24    Q   This is extremely important, Mr. Carter.  At the time of

25    the arrest, not afterwards, at the time of the arrest at your
```

```
 1   home, someone from the Department of Justice told you that you

 2   couldn't contact Mr. Jared Scharf, is that your testimony?

 3   A   I was told I was not allowed to use Mr. Scharf.

 4   Q   At the time of your arrest?

 5   A   I don't remember exactly at the time of the arrest what

 6   was said to me.  I know the reason why I was arrested is

 7   because I didn't show up for the grand jury, which you and

 8   Mr. Scharf told me I did not need to go to.

 9   Q   And were you subpoenaed to go to a grand jury?

10   A   Yes, I was.

11   Q   And at the time that you were arrested, are you positive

12   that the Department of Justice told you at that time you could

13   not contact Mr. Scharf?

14          MR. STIEGLITZ:  Objection, mischaracterizing

15   Mr. Carter's testimony.

16          THE COURT:  Sustained.  Rephrase your question.

17   BY MR. STEIN:

18   Q   Did they or didn't they?  Did they tell you not to contact

19   Mr. Scharf or didn't they when you were arrested?

20   A   I don't remember.

21   Q   Okay.  When you got served with the grand jury subpoena --

22   and I think you just answered this.  If you did, I guess an

23   objection for asked and answered will be sustained.  Did you

24   make a telephone call to Jared Scharf, the lawyer in New York,

25   when you got served?
```

1    A    I called you first, and then you put Jared Scharf on the

2    phone with us.

3    Q    Without going into what was said, this is when you were

4    served with the grand jury subpoena; is that right?

5    A    That's correct.

6    Q    How long before your arrest was that, if you recall?

7    A    I don't even remember when they served me with the

8    subpoena.  I don't remember.

9    Q    Do you still have the subpoena somewhere?

10   A    I don't have it.

11   Q    Did the Department of Justice come to your house multiple

12   times or just that one time to arrest you?

13   A    Well, they came once, you know, for -- let me just see if

14   I can remember.  They came once and told me I wasn't allowed

15   to speak to anybody, Jared Scharf or yourself.  And then the

16   second time I was arrested.

17   Q    When they came to your house on either occasion, did you

18   witness any member of your immediate family under any sort of

19   distress?

20   A    My daughter was.

21   Q    The second time they came they arrested you; is that

22   right?

23   A    Yes, that's correct.

24   Q    They put you in a jail facility in Florida, would that be

25   accurate?

```
1    A    Yes, that's correct.

2    Q    You were in that jail facility for more than three days;

3    is that right?

4    A    Yes.

5    Q    More than six days, right?

6    A    Yes.

7    Q    During the time you were in the jail facility, Mr. Carter,

8    did you ever communicate to anyone that you required diabetes

9    medication and weren't being given it?

10   A    Yes.

11   Q    How many times did you make that inquiry to people at the

12   jail?

13   A    Quite a few times.

14   Q    You need diabetes medication in order to live; is that

15   right?

16   A    I needed my insulin, and when they came to arrest me my

17   wife did give them all my insulin.

18   Q    But you weren't getting it in the jail, right?

19   A    No, the jail was not giving me my insulin.

20   Q    Now, on the second, when you met with the Department of

21   Justice, in fairness to the Department of Justice, you told

22   them you didn't believe anybody at the Department of Justice

23   was behind this failure to give you your insulin, right?

24   A    That's correct.

25   Q    You don't think that they were behind it?
```

```
 1    A    No, I do not.

 2    Q    Neither do I.  But somebody was behind it, right?

 3    A    Yes.

 4    Q    Wasn't me, right?

 5    A    No, not that I know of.

 6    Q    So that's one of the things I didn't do, right?  Failure

 7    to give your diabetes medication to you?

 8    A    Correct.

 9    Q    It was serious, though, right, for you?

10    A    I need it, yes.

11    Q    Were you deprived of it for more than 10 days?

12    A    No.

13    Q    So eventually, your pleas to the jail officials were

14    heard, and they got you your diabetes medication; is that

15    right?

16    A    Yes, because I was in the medical section.

17    Q    Now, Mr. Carter, when you were in jail at this time, when

18    you were arrested, I notice when you walked in you had a

19    bandage on the outside of your leg.  Did anyone in the jail

20    facility by, or intentionally crash a cart into your knee?

21    A    Yes, they did.

22    Q    Was that a knee that was already a bad knee, a bum knee?

23    A    Yes, it was.

24    Q    Did you have surgery on that knee?

25    A    Yes, I did.
```

```
 1   Q   When did you have the surgery?  I don't remember you
 2   telling me that.
 3   A   I want to say I believe it was March 2010, but I don't
 4   remember the exact date.
 5   Q   So it was a recent surgery?
 6   A   Yes.
 7   Q   And did your knee still hurt when you were arrested?
 8   A   Yes.
 9   Q   Were you limping?
10   A   I wasn't limping, limping, but I had a brace on, yes.
11   Q   Oh, you had a brace on when they arrested you?
12   A   Yes.
13   Q   And then when you went to jail, they crashed a cart into
14   that very knee that you had the brace on?
15           MR. STIEGLITZ:  Objection.
16           THE COURT:  Sustained.  Rephrase the question.
17   BY MR. STEIN:
18   Q   After you were arrested and you were in jail, a cart was
19   crashed into that knee; is that right?
20           MR. STIEGLITZ:  Objection to the nature of this
21   question, this argumentative nature of this question that
22   someone intentionally crashed a cart into Mr. Carter's knee.
23   There's no basis for that.
24           THE COURT:  Sustained.  Rephrase the question.
25   BY MR. STEIN:
```

```
 1    Q    Did anybody crash a cart into your knee after you were
 2    arrested?
 3              MR. STIEGLITZ:  Same objection, Your Honor.
 4              THE COURT:  Did someone intentionally smash into your
 5    knee?
 6              MR. STEIN:  I don't know if it was intentional, but I
 7    did get hit in the knee.
 8              THE COURT:  You got hit in the knee?
 9              THE WITNESS:  Yes.
10              THE COURT:  Go ahead.
11              MR. STEIN:  I'm not going to be going into this much
12    more, but I just want to find out.
13    BY MR. STEIN:
14    Q    Did that cause your knee to get worse, or did it not have
15    any impact on your physical condition?
16    A    No, it got worse.
17    Q    Is that one of the reasons you went to the infirmary?
18    A    I was in the infirmary before that.
19    Q    So the incident with the knee happened while you were in
20    the infirmary?
21    A    Correct.
22    Q    Did you ever communicate any of the activities we've just
23    talked about to Jared Scharf?
24    A    I was -- only spoke to my wife on the phone from the jail.
25    Q    Was it your understanding that Jared Scharf was being told
```

```
 1   about these things and was trying to put a stop to them?

 2   A   Yes, I believe so.

 3   Q   And they eventually stopped?

 4   A   Yes.

 5           THE COURT:  Mr. Stein, if you're at a breaking point,

 6   I was going to suggest maybe we take a break now.  No?

 7           MR. STEIN:  I think in light of the Court's

 8   invitation, I think we should take a break now.

 9           THE COURT:  Okay.  I didn't want to interrupt if

10   you're in the middle of something.

11           MR. STEIN:  No.  Actually, I think the next part

12   should be done without a break, so I would agree.

13           THE COURT:  All right.  Ladies and gentlemen, let's

14   take a 15-minute recess.  Don't discuss the case or form any

15   opinions, leave everything in your seat.  Thank you.  And

16   we'll see you in about 15 minutes.

17       (The jury exits the courtroom.)

18           THE COURT:  I'm going to have Irene tell the

19   jurors --

20           MR. STEIN:  Are they still doing it?

21           THE COURT:  -- not to use their phones while we're in

22   session.  Does anyone have any objection to me conveying that

23   message to the jury?

24           MR. STIEGLITZ:  The fewer fingerprints we have on it

25   the better.  Yes, Your Honor.
```

 1          MR. STEIN:  No objection, Your Honor.

 2          THE COURT:  Sir, don't discuss your testimony during

 3    the break.

 4       (A recess was taken from 2:32 p.m. to 2:48 p.m., after

 5    which the following proceedings were had:)

 6          THE COURT:  All right.  Please be seated.

 7          Ready to proceed?

 8          MR. STEIN:  Not immediately, Your Honor.

 9          Given the testimony, it's incumbent upon me as I'm

10    being told and I believe to make a motion regarding this

11    interference with this man's right to counsel.  As the Court

12    may recall, Mr. Pasano multiple motions of governmental

13    misconduct, we made motions, and now we've got live testimony

14    of somebody telling him he can't talk to his lawyer, and he

15    thinks he was arrested for not going to the grand jury, and

16    that is the interference with the grand jury process, he never

17    testified.  And it's also --

18          THE COURT:  How do you know why he didn't testify in

19    front -- do you even -- was he subpoenaed before the grand

20    jury?

21          MR. STIEGLITZ:  Your Honor, he did get a grand jury

22    subpoena for documents prior to his arrest and all that, but,

23    I mean, I'll wait to respond once Mr.~Stein's . . .

24          THE COURT:  Go ahead, Mr.~Stein.  I don't understand

25    how you're going to be asserting interference with his rights

```
 1    to counsel.  So I don't quite understand how you get to assert

 2    that right, and how it inures to your benefit.

 3              MR. STEIN:  I would rather all of his testimony come

 4    in and everything I have to ask him come in.  However --

 5              THE COURT:  What have you asked him that hasn't been

 6    allowed to come in thus far?

 7              MR. STEIN:  Nothing.

 8              THE COURT:  So what are you complaining about?

 9              MR. STEIN:  Your Honor, he has testified, and it's

10    now on the record, that he was told apparently by someone from

11    the --

12              THE COURT:  What difference does that make to you?  I

13    heard what his testimony was.  What difference does it make to

14    you if his rights to counsel were interfered with?  How does

15    that affect you one iota?

16              MR. STEIN:  It creates -- it's an interference with

17    the grand jury proceeding, and it --

18              THE COURT:  What does that have to do with the grand

19    jury proceeding if he was told at the time of his arrest, if

20    you believe his testimony, that he was told he couldn't

21    contact Mr. Scharf?  How does that interfere with the grand

22    jury proceeding if he's already arrested?

23              MR. STEIN:  Because he was, according to his

24    testimony, subpoenaed before that.  Had he gone to the grand

25    jury, nobody testified here before a grand jury.  He would
```

```
 1   have testified, and they would have gotten a record of his

 2   testimony, which they didn't get.  They didn't hear from any

 3   witness.  And, in fact, I can represent --

 4            THE COURT:  You're telling me that a grand jury

 5   indictment was issued in your case without any testimony from

 6   anyone; is that what you're telling me?

 7            MR. STEIN:  Yes.  I believe there was no testimony

 8   from the two people that have pled guilty.  I believe this

 9   because Mr. Stieglitz has told me in words or substance, since

10   I wasn't there.  So those two witnesses, and I don't believe

11   anyone from the company ever testified before the grand jury.

12            THE COURT:  So?  So you're entitled to decide who

13   testifies before a grand jury?

14            MR. STEIN:  Not at all.

15            THE COURT:  You get to pick?

16            MR. STEIN:  Absolutely not.  But Mr. Carter is being

17   represented by Mr. Scharf, there is nothing that allows them

18   to interfere with his right to counsel.

19            THE COURT:  What difference does it make to you,

20   Mr.~Stein?  I don't understand what difference it makes to you

21   if Mr. Carter's rights to counsel at the time of his arrest

22   were interfered with.  How does it affect you?

23            MR. STEIN:  It affects the proceeding before the

24   Court.

25            THE COURT:  How?  How?
```

1          MR. STEIN:  Because Mr. Carter believes at that

2   moment when he's told this about Mr. Scharf and about me, he

3   believes that he's adverse to us before he's adverse to us,

4   before anything happens.  And so at a minimum, I need to -- I

5   should go into, outside the jury's presence, exactly what

6   happened at the arrest.  I may not have standing, but I'm not

7   going to do this in front of the jury.  But I don't know what

8   his testimony is, and I don't -- it could go much deeper, and

9   maybe it was one statement made to him.

10          THE COURT:  What -- he just said he didn't remember

11   what he was -- what was said to him at the time of his arrest.

12          MR. STEIN:  I don't --

13          THE COURT:  He said at some point he was told he

14   couldn't speak to Mr. Scharf.  He didn't say it was at the

15   time of his arrest.  It's my recollection he said it wasn't

16   sure if it was at the time of his arrest or some other time.

17          MR. STEIN:  No, he said he was told before he was

18   arrested he couldn't talk to Mr. Scharf.  It was actually

19   worse than that.  He was told before.  They visited him two

20   times.

21          THE COURT:  And how does it affect you?

22          MR. STEIN:  It affects me, Your Honor, in the manner

23   that I've indicated.  It's an abuse of the process, it's abuse

24   of the grand jury system, and it --

25          THE COURT:  How is it abuse of the grand jury system?

```
 1              MR. STEIN:  At a minimum, it creates bias.

 2              THE COURT:  All right.  Well, I'm not going to waste

 3    time now with the jury sitting in there on this motion, so --

 4              MR. STEIN:  I don't want to waste --

 5              THE COURT:  -- your motion, if it was a motion to

 6    dismiss --

 7              MR. STEIN:  No, no, it's a motion to strike his

 8    testimony.  I wasn't asking --

 9              THE COURT:  Well, I'm denying it because you haven't

10    laid any basis to strike his testimony.  Even if his right to

11    counsel was interfered with, it has nothing to do with his

12    testimony here and doesn't affect you one bit.

13              So if you want to lay something out for the record

14    outside the presence of the jury, we'll do it after we've

15    finished with this witness' testimony.

16              MR. STEIN:  I don't want to do, that Your Honor.  I

17    don't want to waste court time.  He's already testified

18    clearly, and the Court's been very clear in its ruling.  We

19    can go forward.

20              THE COURT:  I want to also be clear.  I don't want to

21    deprive you of making a record for appellate purposes of

22    anything you think you need to make.  So if you want to

23    examine this gentleman outside the presence of the jury to

24    make some kind of an appellate record, I want to make sure you

25    understand I'm giving you the right to do that.  If you want
```

 1    give up that right, that's fine, but it's not based upon I --

 2    I don't want it to be based upon any ruling I've made or

 3    anything I've said thus far.  I'm giving you the opportunity

 4    to make whatever record you want to make for appellate

 5    purposes outside the presence of the jury with this witness

 6    after he's finished with the rest of his testimony.  Okay?

 7        So you can decide what you want to do.  But I want to

 8    make sure you understand you have the right to do it if you

 9    wish.

10        MR. STEIN:  I think the Court's being overly fair to

11    me, and I will research it this evening, and if I'm going to

12    do it --

13        THE COURT:  We're not going to do it this evening

14    because this witness is not going to be here.  We need to do

15    this today, unless he's going to carry over until tomorrow.

16        MR. STEIN:  There's no way I'm going to finish.  I've

17    got exhibits like this thick.

18        THE COURT:  All right.  Well, then that's a different

19    issue.

20        Let's bring the jury back in.

21        MR. STEIN:  Thank you, Your Honor.

22        THE COURT:  Come on up, sir.

23        You're still under oath, Mr. Carter.

24        THE WITNESS:  Yes, Your Honor.

25     (The jury enters the courtroom, after which the following

```
 1    proceedings were had:)
 2            THE COURT:  Welcome back, everyone.  Sorry that we
 3    took a little longer to get you back in here.  We had some
 4    legal matters to talk about.  So we appreciate your patience.
 5            Everyone please be seated.
 6            You may continue, Mr.~Stein.
 7            MR. STEIN:  Thank you, Your Honor.
 8    BY MR. STEIN:
 9    Q   Mr. Carter, you testified today to a number of e-mails
10    between you and I from 2005 all the way through 2008 or '9.
11    You recall generally that testimony, right?
12    A   Yes.
13    Q   You operated mainly out of an account called
14    mikofoods@aol.com?
15    A   That's correct.
16    Q   Do you allege or believe that I ever took control over
17    your e-mail account or you ever took control over my e-mail
18    account?
19    A   No, you had my information, but I don't know if you ever
20    took control of it, but you did have my information.
21    Q   I had the pass code to your Miko Foods account?
22    A   Yes, you did.
23    Q   When was I given that?
24    A   I don't recall the time, because you also gave me to yours
25    one time.
```

```
 1    Q    But as you sit here today, you're not aware of any --

 2    either of us taking over each other's e-mail accounts and

 3    sending false e-mails, is that accurate?

 4    A    I'm not sure.  I don't know how to answer that.

 5    Q    Thank you.

 6              MR. STEIN:  Can you put up on the screen exhibit 91.

 7              I'll show the witness what's been marked as

 8    Defendant's exhibit 400.

 9              THE COURT:  Is that what's on the screen, 400?

10              MR. STEIN:  No, it is not, Your Honor.  On the screen

11    is exhibit 91 of the Government.

12              THE COURT:  Thank you.

13              MR. STEIN:  You're welcome.

14              We're going to pass these out to the jury, since

15    there's only one page.

16              THE COURT:  Is there any objection to Defense 400?

17              MR. STIEGLITZ:  No, Your Honor.

18              THE COURT:  Admitted without objection.

19        (Defense Exhibit No. 400 entered into evidence.)

20              MR. STEIN:  Can you scroll down to the bottom of that

21    page, the whole page, and blow it up a little bit?  Thank you.

22    Little bit more.

23    BY MR. STEIN:

24    Q    Mr. Carter, you earlier testified that the Government's

25    exhibit 91 was an authentic e-mail chain between you and I in
```

1   which I sent you some sort of attachment regarding purchase

2   orders or change orders or something.  You remember that?

3   A   Yes.

4           MR. STEIN:  May I approach?

5           THE COURT:  Yes.

6   BY MR. STEIN:

7   Q   Show you what's been marked as exhibit 400, Mr. Carter.

8           Mr. Carter, have you ever seen that document,

9   exhibit 400, before?

10  A   I don't recall.

11  Q   Do you have any reason to believe that exhibit 400 was not

12  sent by you to me?

13  A   It says Miko Foods, but I don't recall.

14  Q   You can look on the screen or on your screen in front of

15  you.  You see the exhibit that the Government entered earlier

16  today.  You see that?

17  A   Yes, I do.

18  Q   And you see the date and the time of the Miko food e-mail

19  is 2:16:51 p.m.

20  A   Yes.

21  Q   Do you mind if I look with you at this document?

22  A   No.

23  Q   This says 2:16 p.m.

24  A   Yes, says 2:16 p.m.

25  Q   I'm sorry.  I can't see.  I misread it.

```
 1              You see any difference between the e-mail that the

 2    Government introduced this morning and the e-mail,

 3    exhibit 400, that you're now looking at?

 4    A    The only difference is the way it shows this gmail and

 5    then AOL at the bottom.  There's the AOL.

 6    Q    You can't see any other difference between these two

 7    e-mails as you sit here today?

 8    A    Well, there's these change of address language and

 9    Rubbermaid.  That's the only thing I see.

10    Q    They're attached to your e-mail to me?

11    A    Yes.

12    Q    Let's scroll up to the top of the Government's exhibit 91,

13    and let's look at the time that that was sent, Mr. Carter.

14              What time does that say that that was sent by me to

15    you?

16    A    At 3:16 p.m. on the 28th.

17    Q    And 3:16 p.m. on the 28th is after 2:16 p.m. on the 28th,

18    right?

19    A    Yes, if that's when it was, yes.

20    Q    Do you recall sending me these three attachments and then

21    me sending them back to you?

22    A    No, I don't recall.

23    Q    But as you sit here today, that's the story that the

24    Government is telling, because you don't deny exhibit 400,

25    right?
```

1   A    What, please?  I'm sorry.

2   Q    Show it to you again, Mr. Carter.

3   A    Okay.

4   Q    You're not denying exhibit 400.

5   A    No.  That I see it?  No, I don't.

6   Q    So the Government says that exhibit 91 is the authentic

7   way this happened, but exhibit 400 of the defense shows you

8   sending me three attachments an hour prior to me sending you

9   language.  Is that what it shows?

10  A    Yes, but I would know nothing about Rubbermaid document,

11  because I had nothing to do with Rubbermaid.  I don't even

12  know what it's about.

13  Q    You know lawyers in Boca Raton, don't you?  I can start

14  going down the list.  I mean --

15  A    Yeah, I know lawyers in Boca Raton.

16  Q    We don't need to go down the list.  You introduced me to

17  many of them, right?

18  A    Not many of them.

19  Q    At least one or two of them, right?

20  A    I believe one of them, yes.

21  Q    Did that one lawyer, Mr. Carter, have anything whatsoever

22  to do with Signalife in any way, shape, or form at any time,

23  that one lawyer of yours that you knew?

24  A    It was somebody who I did a clock repair for.  His name

25  was Armpriester.  That's only thing I know.

```
 1   Q   Did this man have anything to do with your dealings with

 2   me and Signalife or with Signalife at all, to your knowledge?

 3   A   I don't know offhand.  I don't remember.

 4   Q   So he could have had something to do with either your

 5   interactions with me or with Signalife; is that your

 6   testimony?  He could have; you just don't remember?

 7   A   That's correct.

 8   Q   And his name is Armpriester?

 9   A   Correct.

10   Q   And he was someone you introduced me to?

11   A   That's correct.

12   Q   And exhibit 400 is you sending me three documents.  That's

13   what it purports to be, right?

14   A   Well, that's what it shows, yes.

15   Q   The Government didn't put up on the screen exhibit 400

16   today, did they?

17   A   Not that I know of.

18   Q   Can you explain this disparity between exhibit 400 and

19   exhibit 91?  Can you explain why it is that you would be

20   sending me language and then I would be sending you the same

21   language back, or anything like that?

22   A   First of all, I would not even know how to put language in

23   as a power of attorney.

24   Q   But your lawyers would, right?  Mr. Armpriester's a good

25   lawyer, isn't he?
```

```
 1   A   He's a good lawyer, but I didn't use him as a lawyer.  I

 2   just did a clock repair for him.

 3   Q   You never used him as a lawyer in connection with

 4   Signalife?

 5   A   No.

 6   Q   Isn't it true that Mr. Armpriester and one of his partners

 7   actually at one point attempted to buy into a large piece of

 8   Signalife and you actually attended those meetings?

 9   A   No, that's not true.

10   Q   That's not true?

11   A   No.

12   Q   So if we call Mr. Armpriester to the stand, he's going to

13   say he did not attempt to invest in --

14           MR. STIEGLITZ:  Objection.

15           THE COURT:  Sustained.

16   BY MR. STEIN:

17   Q   Do you recall Willie Gault coming to Boca Raton to meet

18   with you?

19   A   Yes.

20   Q   Do you recall Willie Gault ever meeting with

21   Mr. Armpriester?

22   A   No.

23   Q   Do you recall Willie Gault meeting with anybody that

24   Mr. Armpriester is a partner with?

25   A   No.
```

```
 1    Q    Your only recollection of Mr. Gault is with regard to
 2    Advantage Medical, right?
 3    A    And coming down to meet you.
 4    Q    Right.  Coming down to meet me, which we'll get into.  But
 5    you have no other recollection of him coming to Florida,
 6    right?
 7    A    No, I do not.
 8         MR. STEIN:  Can you pull up Government's 90, please?
 9    And scroll down to the bottom again.
10    BY MR. STEIN:
11    Q    You see Government's 90, Mr. Carter?
12    A    Yes.
13    Q    It's that same 2:16 e-mail from you to me on the
14    Government's 90 with no attachments.  You see that?
15    A    Yes.
16    Q    But we have exhibit 400 with the attachments, right?
17    A    Yes.
18    Q    Can you explain this e-mail having a disparity between
19    exhibit 400?  Do you have any way -- any recollection of it at
20    all today?
21    A    No, I do not.
22    Q    Have you ever spoken to the Department of Justice at any
23    time regarding the disparity between the look of this document
24    versus the look of that document?
25    A    They showed it to me, yes.
```

```
1    Q    They showed it to you?

2    A    Yes.

3    Q    You mean you've seen exhibit 400 before?  You told me you

4    hadn't seen exhibit 400 before.  Have you seen it?

5    A    Meaning I've seen it here where you show me.

6    Q    You've seen exhibit -- this is important.  You've seen

7    exhibit 90 before or you've seen exhibit 400 before?

8    A    I've seen this 90 before.

9    Q    Okay.  But exhibit 400, the one that the jury's holding,

10   you've never talked with the Department of Justice about that;

11   is that right?

12   A    They did show it to me, and if I made a mistake that I

13   said I didn't, I did get that, yes.

14   Q    You did get it?

15   A    Yes.

16   Q    And who gave it to you from the Department of Justice?

17   A    Well, I got it from my attorney, Mary Petras.

18   Q    Did you ever speak with the Department of Justice about

19   it?  I'm not interested in your discussions with your counsel.

20   A    They asked me about it, but I didn't know anything about

21   it.

22   Q    What did they ask you about it?

23   A    They just asked me if that, you know, is my e-mail.  And,

24   I said, yes, that is my e-mail address.  But they didn't ask

25   me anything about the documents, because I don't know about
```

```
 1   those documents.

 2   Q   You don't recall this document, exhibit 400?

 3   A   I don't recall whether I did anything with that document

 4   or not, attachments.  I do not recall any of those

 5   attachments.

 6   Q   You didn't recall it when you first interviewed with the

 7   Government back in, even at the SEC days, and you don't recall

 8   it today; is that correct?

 9   A   I recall them showing it to me just recently, but not back

10   then, no.

11   Q   Did they show it to you on May 2nd?

12   A   I believe so, yes, but I'm not a hundred percent sure.

13   Q   And on May 2nd, they actually asked you about this

14   disparity between exhibit 400 and exhibit 91 and the rest

15   of --

16   A   Yes, I believe so.

17   Q   And you told them at that meeting that you didn't know why

18   there was a disparity; is that right?

19   A   Correct.

20   Q   You never knew why there was a disparity because you never

21   remembered exhibit 400 until they showed it to you on May 2nd,

22   right?

23   A   Correct.  I don't remember any of that.

24   Q   Did anything jog your memory between May 2nd and today

25   regarding the difference between exhibit 400 and the
```

 1   Government's exhibits?

 2   A    The only thing I feel a disparity is a power of attorney,

 3   which I don't -- I wouldn't know how to do those things --

 4   document.  But any of those documents, I don't recall how they

 5   got on my e-mail.

 6   Q    You don't recall?

 7   A    I do not recall.

 8   Q    Including you don't recall that I broke into your e-mail

 9   account and sent this to myself, right?

10   A    I don't know.  I don't recall.

11   Q    You don't recall that either?

12   A    That's correct.

13   Q    So the Government brought this up to you on May 2nd, the

14   disparity between these documents.  So they got it.  They

15   understood it, right?

16   A    Yes.

17   Q    But they didn't put it into evidence on your direct exam,

18   did they?

19   A    Not that I know of.

20   Q    And you told them on the 2nd that you just don't recall

21   why this exhibit has three attachments, shows three

22   attachments, and why exhibits 91, 90, and 89 have no

23   attachments.  You just didn't talk about it; is that right?

24   A    I don't remember about it.

25   Q    So you couldn't talk about something you don't know.

```
 1   A    Can't talk about something I don't know.

 2   Q    Right.

 3             Is there anything you can think of -- and

 4   Mr. Stieglitz correctly asked you this with regard to other

 5   questions.  Is there anything you can think of, as you sit

 6   here today, and please think carefully, that would refresh

 7   your recollection of whether you sent exhibit 400 to me, why

 8   you sent exhibit 400 to me, how these attachments got on to

 9   exhibit 400, anything that would refresh your recollection?

10   A    Maybe if you show me documents.

11   Q    What type of documents?

12   A    What you say that's on there.

13   Q    You mean the attachments?

14   A    Yes.

15   Q    Oh, okay.  I'll do it.  I'll mark as exhibit 401, 402, and

16   403 the three attachments referenced in exhibit 400.  I'll

17   show it first to the Government.

18             MR. STIEGLITZ:  Your Honor, I apologize.  This is not

19   something we had ahead of time, so it's just taking us a

20   minute to look at it.

21             THE COURT:  All right.

22   BY MR. STEIN:

23   Q    Mr. Carter, I'm just going to show you the whole lot of

24   them, exhibit 400, which the jury has, and the three

25   attachments attached thereto, which we will not publish until
```

```
 1    you look at them.

 2    A   Okay.

 3            MR. STEIN:  May I approach, Your Honor?

 4            THE COURT:  Yes.

 5            THE WITNESS:  (Perusing exhibits.)

 6            Okay.

 7    BY MR. STEIN:

 8    Q   Are those the three attachments you sent me to

 9    exhibit 400?

10    A   Yes.

11            MR. STEIN:  I offer them.

12            MR. STIEGLITZ:  Your Honor, may I voir dire the

13    witness on this before it comes in?

14            THE COURT:  Yes.

15            MR. STIEGLITZ:  Excuse me, Mr. Stein.

16            MR. STEIN:  Sure.

17            MR. STIEGLITZ:  May I approach, Mr. Carter, Your

18    Honor, since we're working off one copy?

19            THE COURT:  Yes.

20                         Voir Dire Examination

21    BY MR. STIEGLITZ:

22    Q   Mr. Carter, we're going to have to share here.  I

23    apologize.

24            MR. STIEGLITZ:  Is it all right if I inquire here

25    since we're sharing?
```

```
 1                THE COURT:  Yes.
 2   BY MR. STIEGLITZ:
 3   Q   Mr. Carter, what's the date on the top of Mr.~Stein's
 4   e-mail in Government's exhibit 400 that he's introduced into
 5   evidence?  What is that date right there?
 6   A   4/16/13.
 7                THE COURT:  I'm sorry.  We couldn't hear you.
 8                THE WITNESS:  I'm sorry.  4/16/13.
 9   BY MR. STIEGLITZ:
10   Q   Now, is there a date on top of all of these other
11   e-mail -- these other documents that Mr.~Stein has said are --
12   they're separate from this, but they're attached, they're the
13   attachments to this, Mr.~Stein says?  What's the date on top
14   of there?
15   A   May 12th.
16   Q   Of what year?
17   A   Of '13.
18   Q   Okay.  And, now, the attachments -- let's start with
19   the -- let's just look at the attachment there.  What's the
20   document title?
21   A   Language to Be Included in Any Power of Attorney Document.
22   Q   Well, that's not the actual -- Mr. Carter, the attach~--
23   the title -- actually, you know what we'll do?  We'll use the
24   ELMO.  That might be more -- no, it hasn't been published yet.
25   I'm sorry.  Might have done Mr.~Stein a favor there.  Didn't
```

1      mean to do that.

2              The title of the document here is, Language to Be

3      Included in Any Power of Attorney; is that right?

4      A    That's correct.

5      Q    And then it has a file extension .docx; is that right?

6      A    That's correct.

7      Q    Is there a title up on top of this document, this power

8      attorney thing?

9      A    Yes, there is.

10     Q    And that's language to be included in any power of

11     attorney, parenthesis, one, isn't it?

12     A    That's correct.

13     Q    So that's different from what's on Government's

14     exhibit 400, isn't it?

15     A    That's correct.

16     Q    Now, Mr. Carter, there's also some language on the bottom

17     of Government's exhibit -- excuse me, Defense exhibit.  I keep

18     saying Government's exhibit.  Force of habit -- defense

19     exhibit 400.  And that looks like a Google mail web address

20     from where this was printed?

21     A    Yes.

22     Q    Does that appear on the bottom of any of these

23     attachments?

24     A    No, it does not.

25     Q    In fact, this says something, chrome extension gee

```
 1   (phonetic) -- okay.  Something doesn't have anything to do
 2   with Google mail, does it?
 3   A   Not that I know of.
 4          MR. STIEGLITZ:  Your Honor, I'd object to the
 5   admission of this as, on the grounds of lack of foundation,
 6   authenticity.
 7          THE COURT:  May I see these, please?
 8          MR. STIEGLITZ:  I'm sorry.  I should have walked them
 9   up to the Court..
10          Actually, you know what, Your Honor, in the interest
11   of time, saving everybody time, I'll withdraw the objection.
12   We'll deal with it on redirect.  So if Mr.~Stein wants to
13   introduce those, we'll withdraw our objection.
14          THE COURT:  All right.  We'll admit 401, 402, and
15   403, Defendant's exhibits, without objection.  Thank you.
16       (Defense Exhibits Nos. 401, 402, and 403 entered into
17   evidence.)
18                 Cross-examination (Cont.'d)
19   BY MR. STEIN:
20   Q   Mr. Carter, this morning, the Government did not show you
21   exhibit 400.  We've already established that.  You indicated
22   they showed you exhibit 400 on May 2nd.  You recall that,
23   right?
24   A   Yes.
25   Q   We're clear about that.
```

```
 1              On May 2nd, when they showed you the disparity
 2   between 400 and 91, 90, and 89, did they show you the three
 3   attachments in the form that you're now seeing them, that
 4   unfortunately the jury's not able to see because I haven't
 5   passed them out?
 6   A    No, I did not see those.
 7   Q    So they just showed you exhibit 400?
 8   A    That's all I saw, yes.
 9   Q    But when I showed you the three attachments, you said you
10   recalled them, and then you were voir-dired on them and then
11   we've admitted them, right?
12   A    Yes.
13   Q    Can you think of any reason why the Government on May 2nd,
14   2013, or on May 2nd, 2012, or at any time since they arrested
15   you, have not showed you the attachments to this e-mail and
16   asked you about them?
17              MR. STIEGLITZ:  Objection.
18              THE COURT:  Sustained.
19   BY MR. STEIN:
20   Q    Well, let's start with May 2nd, 2013.
21              THE COURT:  Mr.~Stein, he can't answer why the
22   Government did or did not do something.
23   BY MR. STEIN:
24   Q    When the Government showed you exhibit 400, did you ask
25   them to see the attachments like you asked me in court here?
```

```
 1   A    No, I did not ask.

 2   Q    How long of a discussion was it about exhibit 400?  Was it

 3   a minute, or two minutes or 20 minutes?

 4   A    Honestly, I don't remember the time.

 5   Q    But it occurred?

 6   A    I didn't see the attachments.  That's the only thing I

 7   saw, yes.

 8   Q    Are you -- on May 2nd, did the Government bring up any

 9   other exhibits or e-mails or letters of any kind that were

10   different than the ones they were introducing, and ask you

11   about them?  Anything?

12   A    I don't recall what other documents they showed me.

13   Q    So they may have showed you other documents that were

14   different than the ones -- you just don't remember.

15            MR. STIEGLITZ:  Objection, mischaracterization of

16   what Mr. Carter's saying.

17            THE COURT:  Sustained.

18   BY MR. STEIN:

19   Q    I just want to know, when you say you don't recall --

20   A    I don't remember.  I have no independent recollection.

21   Q    So it's possible on May 2nd that they showed you another

22   document?

23   A    Again, I don't know.

24   Q    Okay.  Mr. Carter, there's been a lot of testimony this

25   morning and into this afternoon regarding cables and the
```

```
 1    Fidelity 100 ECG monitor and other items.  You generally

 2    recall that testimony?

 3    A    Yes.

 4    Q    And you are very consistent in your statement that you had

 5    nothing to do with designing or building or thinking through

 6    the cable issues regarding the Fidelity 100 heart monitor; is

 7    that right?

 8    A    Yes.

 9    Q    You've seen the Fidelity 100 heart monitor before, right?

10    A    Yes, I have.

11    Q    Does this look like it?

12    A    Yes, it does.

13    Q    You once saw it with a Rubbermaid logo on it, right?

14    A    That I don't remember.

15    Q    But you knew that Rubbermaid at one time was involved in

16    the device, right?

17    A    Yes, because you told me so.

18    Q    And Mr. Carter --

19            MR. STEIN:  One moment, Your Honor.

20    BY MR. STEIN:

21    Q    The Government also asked you about this invoice that you

22    sent in 2005 or 2006 for $250,000.  You remember that?

23    A    It was 200,000, I believe.

24    Q    I'm sorry, 200,000.

25            You remember that testimony?
```

```
 1   A    Yes.

 2   Q    You never sent an invoice for 300,000, did you?

 3   A    I don't remember.  Whatever invoices you told me to send,

 4   that's what I sent.

 5   Q    I've got that.  We've all got that.

 6   A    Okay.

 7   Q    At the SEC, Mr. Carter, they asked you if you had sent an

 8   invoice for $300,000, and you told them you did; isn't that

 9   right?

10   A    I don't recall.

11        MR. STEIN:  Page 72 of the Carter transcript, dated

12   February 25th, 2010, lines 4 through 7.

13        MR. STIEGLITZ:  Your Honor, I'd ask before Mr.~Stein

14   starts reading testimony, I think -- I don't know if

15   Mr.~Stein's going to refresh him on this or if we're just

16   going to start reading testimony in.

17        THE COURT:  Why don't you see if it refreshes his

18   memory.  Show it to him.  See if it refreshes his memory.

19        MR. STEIN:  I think he's testified to it a number of

20   times, but . . .

21        THE COURT:  He said he didn't remember.

22   BY MR. STEIN:

23   Q    Okay.  Is it okay if I stand next to you?

24   A    That's fine.

25   Q    This is what I'm reading from.
```

```
 1              MR. STIEGLITZ:  Your Honor, to the extent that

 2    Mr.~Stein and Mr. Carter are conferring, I can't hear it.

 3              MR. STEIN:  I'm just showing him the testimony.  It's

 4    from -- and just for the record, it's page 72, lines 4 through

 5    7.

 6    BY MR. STEIN:

 7    Q    Does this refresh your recollection?

 8    A    No, I don't remember.

 9    Q    But you testified this morning that you had nothing to do

10    with the development of cables.  Remember that?

11    A    That's correct.

12    Q    And this testimony is inconsistent.  Ms. Nonaka asked:

13              "Associated with this $300,000 bill, did you include

14    an accounting of the specific charges?"

15              Your answer was:  "Well, it was for development and

16    design of the snap cable connection."

17              You remember saying that?

18    A    No, I do not.

19    Q    As you sit here today, is that a true statement, that you

20    developed and designed the snap cable connection?

21              MR. STIEGLITZ:  Your Honor, this is just completely

22    improper use of the testimony.  It's not -- he said he doesn't

23    remember saying it, so . . .

24              THE COURT:  Overruled.  He can answer the question.

25    BY MR. STEIN:
```

```
 1   Q    Do you remember developing something called a snap cable

 2   connection for the Fidelity 100 heart monitor?

 3   A    No, I do not.

 4   Q    Okay.  Thank you.

 5        MR. STEIN:  I'm also going to be referring to the

 6   same deposition transcript, which is Thursday, February 25th,

 7   2010, at page 49 also, and --

 8        THE COURT:  Mr.~Stein, can I see you over here,

 9   please?

10        (The following proceedings were held at sidebar:)

11        THE COURT:  You're starting to refer to a portion of

12   the transcript without -- what's the basis for the

13   impeachment?

14        MR. STEIN:  He testified this morning he had nothing

15   to do with it, and here again --

16        THE COURT:  Nothing to do with what?

17        MR. STEIN:  The development of the cables.  This is

18   impeachment of that testimony.  He never said, I lied

19   regarding the entire transcript, he -- I'm trying to figure

20   out what part he lied about.  This impeaches his testimony.

21        THE COURT:  So you're trying to get him to -- you're

22   trying to impeach his testimony --

23        MR. STEIN:  Today.

24        THE COURT:  -- that he never was involved in the

25   development of the cables.
```

```
1              MR. STEIN:  That's correct.

2              THE COURT:  So you want to use his testimony at the

3    SEC proceeding or deposition where he said he did do that?

4              MR. STEIN:  That's correct.

5              THE COURT:  So why don't you ask him if he ever --

6              MR. STEIN:  Said the words.

7              THE COURT:  If he ever assisted, or whatever he said

8    in the deposition.  Ask him, did you ever do this.  If he says

9    no, then I guess you can impeach him with the testimony of

10   his -- you know, deposition.  But you can't just start off

11   with the deposition testimony.  You have to ask him a question

12   that leads to an inconsistent answer.

13             MR. STEIN:  I apologize, Your Honor.  I thought that

14   this morning he made it very clear, but I understand what the

15   Court's saying.

16             THE COURT:  So ask him -- if you have a portion of

17   the deposition that you think you want to use to impeach his

18   testimony, say:  Is it true that -- boom, A, B, C, D.  If he

19   says something different from what's in the transcript, then

20   you can say:  Isn't it true that you gave this answer to this

21   question on such and such a date.

22             MR. STEIN:  Thank you, Your Honor.  I understand.

23        (Sidebar conference concluded.)

24   BY MR. STEIN:

25   Q   Mr. Carter, you don't remember ever working on the cable
```

1    design for the Fidelity 100 in any way, shape or form; is that

2    right?

3    A   I never worked on it, no, sir.

4    Q   So you never worked on problems with what is called the

5    shielding regarding the cables; is that right?

6    A   I personally never worked on it, no.

7    Q   You never worked on reducing what is called artifact

8    noise, is that your testimony?

9    A   That's correct.

10   Q   Artifact, a-r-t-i-f-a-c-t.

11          You never developed what is called a DV15 connector

12   with gold pins that snap into place; is that correct?

13   A   That's correct, I never did.

14   Q   You never did a site visit to determine whether a facility

15   was FDA compliant or not regarding cable manufacturing; is

16   that right?

17   A   No, that's not correct.  We did do a site.

18   Q   Who's we?

19   A   You had -- at one time I went with you the very first

20   time.  That's where we learned about with the different

21   shielding from Advantage Medical.  Then the other time you had

22   Bill Matthews come down and had me meet him and take him to

23   Advantage Medical.

24   Q   I thought you said you had never worked on any shielding

25   issues.

1    A    I didn't work on it.

2    Q    You just heard it mentioned?

3    A    No.  Did I personally work on it?  No, I did not

4    personally work on it.

5    Q    You heard somebody mention the shielding issue, is that

6    your testimony?

7    A    From Advantage Medical.

8    Q    And you never developed a cable that had a snap-in system

9    so that it would get good continuity of the signal; is that

10   right?

11   A    Yes, I never developed it.

12   Q    I'm reading from the deposition in front of the SEC

13   February 25th, 2010, page 49, lines 12 through 19.

14           "Question:  Do you know what the problem was?

15           "Answer:  Well, there was the shielding.  It was

16   because they were getting too much artifact noise.  So I

17   developed what -- it is called a DV15 with gold pins that snap

18   into the unit, and cables would work with that.  I used the

19   approved FDA facility.  It had to be because of the medical

20   thing.  But what I did is I developed a cable, the snap-in

21   system, so this way they would get good continuity with it."

22           And Mr. Carter, that statement, you're now telling us

23   is a lie; is that correct?

24   A    Yes, it is.

25           MR. STEIN:  May I approach, Your Honor?

```
 1              THE COURT:  Yes.
 2   BY MR. STEIN:
 3   Q   I'm bringing you the Fidelity 100 heart device and the
 4   cables.  You've seen these before; is that right?
 5   A   Yes, I have.
 6   Q   Can you grab hold of the Fidelity 100?
 7   A   Sure.
 8   Q   So the jury can see it, higher?
 9   A   Sorry.
10   Q   Can you please attach this cable.
11   A   Sure.
12   Q   Have you ever before snapped a cable into the Fidelity 100
13   like you just did?  Have you ever done this before, or was
14   that the first time you ever snapped a cable in?
15   A   I don't remember if I did a snap cable because this was
16   all -- this is all from Advantage Medical.
17   Q   So you don't remember this -- this is the first time you
18   ever snapped the cable into the device like you just did?
19              MR. STIEGLITZ:  Objection, not what he said.
20              THE COURT:  Overruled.
21   BY MR. STEIN:
22   Q   I just want to know.
23   A   Like I said, I don't remember everything that was done.
24   Advantage Medical designed it.  And I know that you had
25   Budimir design that one.
```

```
 1              THE COURT:  Who?

 2              MR. STEIN:  Budimir.

 3  BY MR. STEIN:

 4  Q    But my question was just very simple.  Is this the first

 5  time you've ever snapped in this DV15 connector into the

 6  device, today in court?

 7  A    Honestly, I don't remember.

 8  Q    You don't remember?

 9  A    I don't remember if I did it before, but I know I did it

10  right now.

11  Q    And it snapped in.  It's pretty snug, huh?

12  A    Yes, it is.

13  Q    By the way, what are all these blue and orange and dots

14  for?

15  A    Well, they snap them on the chest.

16  Q    Oh.  And they -- then from the chest, they read the

17  signal?

18  A    That's correct.

19  Q    And then how does the signal come on the screen?

20  A    You told me it was blue tooth continuity.

21  Q    Have you ever seen the signal come on the screen?

22  A    Yes, I did.

23  Q    Have you seen it come on the screen when somebody's

24  running?

25  A    Yes.
```

1   Q   Perfectly?

2   A   No.

3   Q   You've never seen it work perfectly?

4   A   When we were at Advantage Medical, they said there was a

5   problem with it.

6   Q   Who was demonstrating it at Advantage Medical?

7   A   Willie Gault, Budimir Drakulic was there, I was there, and

8   you were there.

9   Q   Did you ever testify anywhere that Budimir Drakulic

10  blocked your view of that demonstration and somehow sabotaged

11  that demonstration?  Did you ever say that to anyone at any

12  time, whether truth or not?

13  A   I remember you told me to say that.

14  Q   So you told it as a lie.  It didn't really happen?

15  A   I don't remember.  I don't recall how I said it.

16  Q   No, I'm asking you if you recall whether, when you said

17  it, it was a lie or not, not whether you recall saying it.  Do

18  you ever recall saying it as a truthful fact, that Drakulic

19  blocked your vantage point?

20  A   I don't remember how I said it, no.

21  Q   So you don't remember whether you truthfully said what I

22  just said, that he blocked your vantage point, whether that

23  was true?

24  A   I don't remember.

25  Q   Did he block your vantage point on that demonstration?

1    A    I remember he was fiddling with something with cables, but

2    I don't remember how he was blocking.  I just don't remember.

3    Advantage Medical would know that better.

4    Q    Advantage Medical would know -- were you sitting next to

5    Advantage Medical during that meeting?

6          MR. STIEGLITZ:  Your Honor, I'd just ask that for the

7    purposes of further questioning, maybe Mr. Stein not --

8          MR. STEIN:  I was going to do another --

9          MR. STIEGLITZ:  Okay.  If that's the purpose.

10         MR. STEIN:  That's fine.

11   BY MR. STEIN:

12   Q    Were you sitting next to Advantage Medical for this

13   demonstration?

14   A    No, I believe I was standing next to Willie Gault, but I

15   don't remember.

16   Q    And where was I during this meeting?

17   A    I think you were on the left of me, but I don't remember.

18   Q    And Advantage Medical was on the other side of the room at

19   their desks, near their desks, right?

20   A    They were there, I just don't remember where everybody was

21   standing.

22   Q    Budimir was in the middle of them and you, is that your

23   best recollection?

24   A    I believe so, yes.

25   Q    This happened way after the events we're talking about.

```
 1   This was in 2009-2010, right?

 2   A   I think it was 2010, but I'm not sure.

 3   Q   It certainly wasn't 2006 or '7?

 4   A   No.

 5   Q   And was there -- was Advantage Medical so turned off by

 6   the device not working that they kicked us out of the office,

 7   or, on the other hand, did we meet after the failure?  We have

 8   lunch or something?

 9   A   I believe we had lunch.

10   Q   And at that lunch, Budimir explained what the purported

11   problem was with the cable and the demonstration, right?

12           MR. STIEGLITZ:  Objection, hearsay.

13           THE COURT:  He's not asking him what he said, just

14   whether he gave an explanation.

15           So you can answer the question.  Did he give an

16   explanation of what he thought the problem was?

17           THE WITNESS:  No.

18   BY MR. STEIN:

19   Q   Was the demonstration spoken about by anyone at that lunch

20   meeting?

21   A   I think so, but I don't remember.  I don't recall what was

22   said.

23   Q   Do you remember a double blind test regarding various

24   cable systems and which was the best that was done by the

25   management of Signalife at any time?
```

```
 1   A   I remember you saying something about it, the blind

 2   taste -- not taste test, I'm sorry.  Test, I'm sorry.

 3   Q   It was like a blind taste test.  They were all submitted

 4   in bags that didn't show where they came from, right?  They

 5   were submitted to Budimir Drakulic.

 6   A   That I don't remember.

 7   Q   But you remember there was a double blind taste test?

 8   A   There was a double blind test.

 9   Q   We're calling it that just sort of as a synonym.

10   A   Okay.

11   Q   And you do recall, whether or not you worked on the

12   cables, that Advantage Medical submitted a set of cables in a

13   plastic bag in that taste test, right?

14   A   Correct.

15   Q   But it didn't say Advantage Medical on the bag, right?

16   A   Yeah, I believe it did not.

17   Q   Because Mr. Matthews and the management did not want

18   Budimir to know where the cables came from.

19           MR. STIEGLITZ:  Objection.

20   BY MR. STEIN:

21   Q   They just wanted the truth, right?

22           MR. STIEGLITZ:  Objection, he's not competent to

23   testify as to what those individuals --

24           MR. STEIN:  I'll rephrase it.

25           THE COURT:  Rephrase it.
```

```
 1                    MR. STEIN:  Thank you.

 2    BY MR. STEIN:

 3    Q    You were aware at the time these bags were submitted with

 4    cables inside of them, that the management of Signalife wanted

 5    Budimir to independently, without knowing who developed the

 6    cables, pick the right ones; is that right?

 7                    MR. STIEGLITZ:  Same objection, Your Honor.

 8                    THE COURT:  Overruled.  If he knows.

 9                    THE WITNESS:  No, I don't know.

10    BY MR. STEIN:

11    Q    And then at the end of the cable test, Budimir Drakulic,

12    in his lab in LA -- you were all the way in Florida, right?

13    He was in LA, right?

14    A    Yes.

15    Q    In his laboratory in LA, Budimir Drakulic -- and he had

16    other engineers, didn't he, working there?

17    A    I believe so.

18    Q    He ended up picking one of the cables.  You learned of

19    that, didn't you?

20    A    Yes.

21    Q    This was back when Pam Bunes was the CEO of the company,

22    right?

23    A    Yes.

24    Q    2006, right?

25    A    I believe so, yes.
```

```
 1    Q    And the demo we were just talking about was way in 2010.

 2    She was long gone by that time, right?

 3    A    I believe so, yes.

 4    Q    The Rubbermaid deal had failed, right?

 5    A    Yes.

 6    Q    And so Budimir performed the cable test, and he picked one

 7    of the cable sets as the best, and then e-mails started

 8    getting sent around the company, is that accurate?

 9    A    I think so.

10    Q    And you recall that these e-mails -- and there were many

11    of them -- said that Marty's cable -- Marty, meaning Marty

12    Carter -- is the best, and Budimir picked it.  You remember

13    that, don't you?

14              MR. STIEGLITZ:  Objection to the hearsay.

15              THE COURT:  Sustained.

16    BY MR. STEIN:

17    Q    You remember that Budimir Drakulic had picked the

18    Advantage Medical cables out of all of the ones tested; is

19    that correct?

20    A    Yes, I believe that was correct.

21    Q    And these were the cables that you had developed; is that

22    correct?

23    A    No, I did not develop them.  I'm not qualified to develop

24    them.

25    Q    And nobody in the company thought you developed them --
```

```
 1                  MR. STEIN:  Strike that, Your Honor.  I'll rephrase
 2      it.
 3      BY MR. STEIN:
 4      Q    You're not aware that anyone in the company stated to the
 5      public that you had developed those cables; is that your
 6      testimony?
 7                  MR. STIEGLITZ:  Objection to the hearsay.
 8                  THE COURT:  Can you rephrase the question?  I'm
 9      sorry, I didn't understand the question.
10                  MR. STEIN:  I'm asking if there was a public
11      statement that Mr. Carter's cables were the best made in the
12      public records anywhere.
13                  THE COURT:  Okay.  So if he knows the answer to that.
14                  THE WITNESS:  No, I don't know the answer.
15                  MR. STEIN:  I'm going to show him the document to
16      refresh.  It's 81.
17      BY MR. STEIN:
18      Q    Is there anything you could look at to refresh your
19      recollection about whether or not your cables were the ones
20      chosen?
21      A    Well, they wouldn't have been my cables.  They would have
22      been still Advantage Medical.
23      Q    Anything you could look at to refresh your recollection
24      about whether or not anything was said to the public or within
25      the company that they were your cables?
```

```
 1   A    Maybe.
 2          MR. STEIN:  I'm going to show him what is Defense
 3   exhibit 81.  We'll be authenticating it later in the trial.
 4   BY MR. STEIN:
 5   Q   Mr. Carter, does this document refresh your recollection
 6   regarding your development of the cables which you just
 7   snapped on the Fidelity 100 device in the demonstration in
 8   court here?
 9   A   Could you repeat?  I was trying to read this as you were
10   talking.
11   Q   I'm sorry.  Why don't you take a moment and read it, and
12   then I'll inquire.  Thank you.
13   A   (Perusing exhibit.)
14          Okay.  I see this.
15   Q   Does this refresh your recollection of whether or not
16   there was a Marty Carter set of cables that were evaluated in
17   this double blind taste test that we've talked about?
18   A   I believe you showed me this, yes.
19   Q   So there was a Marty Carter cable set that was evaluated,
20   is that your recollection now?
21   A   All you did is, you showed me this e-mail.  Doesn't mean
22   that I developed the cables, which I never did.
23   Q   I understand.
24   A   Advantage Medical developed them.
25   Q   I understand.  But you understood there was something
```

1    called a Marty Carter cable set inside the --

2    A    It says Marty, but, I mean, my name is Marty, yes.  That's

3    what it says on the e-mail, too.

4         MR. STEIN:  Okay.  I'm going to approach with

5    document 4034 to further refresh.

6         MR. STIEGLITZ:  Your Honor, I guess I'd just ask for

7    some clarity.  I don't object to Mr.~Stein trying to refresh

8    Mr. Carter's recollection.  I just ask for a little bit of

9    clarity as to what the actual question is that he's trying to

10   refresh Mr. Carter on.

11        THE COURT:  Yes.  What are you trying to refresh him

12   on?

13        MR. STEIN:  Now that we've established there was

14   something called a Marty cable, even though he didn't develop

15   it, I want to see if I can refresh his recollection about what

16   that cable was as distinguished from the other cables

17   technically.

18        THE COURT:  Why don't you ask him if he knows and

19   then see what -- if he remembers.

20        MR. STEIN:  I think he's already testified he doesn't

21   know.  I'll ask him again.  Thank you, Your Honor.

22   BY MR. STEIN:

23   Q    Mr. Carter, do you know what was the difference between

24   the Advantage Medical cables or the Marty cables, whatever

25   they were called, on the one hand, and the other cables that

1   were tested in the blind taste test on the other hand, what

2   was technically different?

3   A    The only thing I remember, there were a set of gray

4   cables, and it was that white cable, which I remember you guys

5   were telling me it's a Mortara cable.

6   Q    Okay.  Anything else that you can independently recall

7   about the technical specifications of the cable or artifact,

8   any of the things that you talked about in front of the SEC

9   that you said were lies?

10          MR. STIEGLITZ:  Your Honor, I'm sorry, I just object

11   to the form of that question as to, does Mr. Carter recall

12   anything about anything he said to the SEC that's a lie.  I

13   don't -- maybe I just heard it wrong.

14          MR. STEIN:  I don't think that was my question, but

15   I'll rephrase.

16          THE COURT:  All right.

17   BY MR. STEIN:

18   Q    Do you recall anything else regarding -- you've now --

19   we've now gotten that there was a set of gray cables and a set

20   of white cables and something about Mortara, which I'm going

21   to obviously ask you about because I don't know what you're

22   talking about.  But we then go into anything else technically

23   or otherwise regarding this double blind taste test with the

24   cables that you can recall, any other technical

25   specifications?

```
 1              You testified before the SEC.  We've read the

 2    testimony.  Anything else you can recall, whether it's the

 3    testimony or not, other than the color of them?  So far,

 4    you've recalled the color, gray and white.

 5    A   Yes.

 6    Q   Anything else?

 7    A   I remember when you went with me there, when they took us

 8    around, they were showing us about, with the gold pins,

 9    because they said it gets better continuity.  I remember that.

10    And then I remember there were a set of cables that kept

11    getting sent to Signalife through Bill Matthews and Rajiv

12    Singh.  That's all I can remember.

13    Q   I remember the gold pins because, as an electrician, you

14    said that made sense, that gold was a better conduit.

15              MR. STIEGLITZ:  Objection, Your Honor.

16              THE COURT:  Sustained.

17              Don't testify, Mr. Stein.  Just ask a question.

18    BY MR. STEIN:

19    Q   You indicated to us and to me that the gold pins would be

20    a better source of continuity, in general, electrically.

21              THE COURT:  Is that a statement or a question?

22              MR. STEIN:  It's a question.

23    BY MR. STEIN:

24    Q   Isn't that correct?

25    A   That gold pins are better continuity?
```

 1    Q    Yes.

 2    A    Yes, I would agree with that.

 3    Q    Do you remember something regarding skin impedence testing

 4    with these cables?  When they touch the skin, you know, there

 5    can be apparently noise or an impedence or artifact.  Do you

 6    remember anything about that in the testing?

 7    A    The only thing I remember with Advantage Medical, they did

 8    like a snap thing.  That's all I can recall.  Electrodes or

 9    whatever they call those, when they do an EKG.

10    Q    You're talking about these little snap-on things here?

11    A    No, no, it's whatever, 3M or whatever, when they do an

12    EKG, they put these things on your body, and those snap into

13    it.

14    Q    These snap into them?

15    A    Yes.

16    Q    These are -- these snap into -- they're round snaps,

17    right?

18    A    Yes, those are round snaps.

19    Q    And some other cables had a different way to connect to

20    the chest, by a hook or something, right, or a prong?

21    A    I believe so, but I don't remember offhand.

22    Q    But these were definitely the best Advantage Medical

23    thought, right?

24    A    Well, that I don't know.  Technically, I don't know that.

25    Q    Do you remember a black cable?  You've testified about a

```
 1   gray cable and a white cable.  Do you remember a black cable?
 2   A   No, I don't.
 3   Q   Let's back up from the issue of the cables for a minute
 4   into the general issue of cables.
 5           Did Advantage -- from Advantage Medical or anyone
 6   else, did you ever come to understand why the cable's
 7   connection to the chest was important, why it was so
 8   important?
 9   A   All I can remember is what they said was, it gives, you
10   know, on the -- it gives a better connection or something.
11   That's all I know.
12   Q   At the time that we were all meeting with Advantage
13   Medical, you and Bill Matthews and you mentioned some other
14   people, the Fidelity 100 you knew to be FDA cleared for sale
15   to the market, right?
16   A   That's what you told me, yes.
17   Q   And you had no reason to doubt that, right?
18   A   Yeah.
19   Q   Nobody at the company told you it wasn't FDA approved,
20   right?
21   A   No.
22   Q   Do you recall stating to anyone in an e-mail that the only
23   connection to the patient from this FDA-approved device was
24   the cables?  Do you remember stating that in an e-mail?
25   A   No, I don't remember.
```

```
 1    Q    Could you have stated that to someone in an e-mail?

 2    A    Said what, that --

 3    Q    That the only connection to the patient from this device

 4    is the cables, is the snap-on.  Do you remember saying that?

 5    A    No, I don't remember.

 6    Q    Because you don't even remember developing the cables or

 7    being involved in it, right?

 8    A    Well, I never developed them.

 9    Q    But you do remember doing a site inspection of Advantage

10    Medical, right?

11    A    Yes, I do.

12    Q    And what is a site inspection?

13    A    They just told me -- you told me to go find -- I remember

14    Bill Matthews told me to go to some other place.  Then we

15    found Advantage Medical, because the other place couldn't do

16    it.  And then you told me to call Bill Matthews, or you did, I

17    don't remember for sure, to come down here and do a site

18    inspection because he was a -- part of the FDA -- I forget

19    what his title was.

20    Q    And Bill Matthews came into town, and you and he did a

21    site inspection of Advantage Medical, right?

22    A    Yes, I took him down there; that's correct.

23    Q    Any problem with the site inspection that Bill Matthews

24    told you about?

25    A    Not that I know of.
```

```
 1    Q    Now, when you say you weren't involved in the development
 2    of the cables, were you involved in supervising Advantage
 3    Medical in any way with target dates or goal dates of when the
 4    cables were to be done?  Supervision, not development?
 5    A    I don't remember if I was or was not.  I have no
 6    recollection of that.
 7    Q    You have no recollection of supervising them?
 8    A    Correct.
 9    Q    So you don't have any recollection of knowing a date
10    certain when the cables to be tested would be done or not be
11    done?  You don't recall that as you sit here today, is that
12    your testimony?
13    A    Yes, I don't recall when.
14          MR. STEIN:  Can we have 405?  I think we're at 405,
15    Your Honor.
16          THE COURT:  I have 403 is the last exhibit.
17          MR. STEIN:  Okay.  So I'll mark as -- I think we're
18    four -- there were three attachments, 400, '1, '2, '3.  Yeah,
19    the Court's right.
20    BY MR. STEIN:
21    Q    So I'm going to mark as exhibit 404 and 405 two documents
22    from you that have been provided to the Government.  I'm just
23    going to show them to you again.
24          MR. STEIN:  May I approach?
25          THE COURT:  Yes.
```

```
 1   BY MR. STEIN:

 2   Q    I'm showing you what's been marked as Defendant's 404 and

 3   405 that purport to be two e-mails from you.  Have you ever

 4   seen those before?

 5   A    Yes.

 6   Q    Both of them?

 7   A    I'm looking at the other one.  One second.

 8   Q    I'm sorry.  I'm trying to speed things up by giving you

 9   more than one exhibit.

10   A    Yes, I recall this.

11   Q    You sent those two e-mails to me?

12   A    Yes, I did.

13         MR. STEIN:  Your Honor, I'd offer them.  I think with

14   one of them we're going to have a sidebar, I'm told.

15         MR. STIEGLITZ:  Actually, Your Honor, I may be able

16   to solve -- may I just have one quick look at them again?  We

17   may be able to expedite all this.

18         MR. STEIN:  Thank you.

19         May I approach, Your Honor, to get the other exhibit?

20         Thank you.

21         MR. STIEGLITZ:  404, there's no objection, Your

22   Honor.

23         THE COURT:  All right.  404 is admitted without

24   objection.

25       (Defense Exhibit No. 404 entered into evidence.)
```

```
 1              MR. STIEGLITZ:  405, there's a portion of it that

 2    we'd object to on hearsay grounds.

 3              THE COURT:  May I see it, please?

 4              You said there's a portion you object to.

 5              MR. STIEGLITZ:  Should we approach?

 6              THE COURT:  I guess we'll have to talk about it over

 7    here.

 8         (The following proceedings were held at sidebar:)

 9              THE COURT:  What is it that you're objecting to?

10              MR. STIEGLITZ:  I think it's everything after "Ken

11    told us," which is all about -- first of all, I don't know who

12    Ken is.  Mr. Carter may be able to tell us who Ken is.

13    Obviously, there are some issues in there that are relevant to

14    the case.  So to the extent it's a hearsay, you know, it is an

15    out-of-court statement --

16              THE COURT:  What is it that you're interested in

17    getting in here?  What is it~-- the point you're trying to

18    make with the exhibit, Mr.~Stein?

19              MR. STEIN:  All of the exhibits are cumulatively

20    going to show the entire relationship between Mr. Carter and I

21    and any -- any redaction of something is going to limit the

22    relationship, which will eventually --

23              THE COURT:  What is the point you're trying to make

24    with this?

25              MR. STEIN:  That he met with Advantage Medical, then
```

```
 1    he met with me right afterwards, who I was with, what happened
 2    at Advantage Medical, what he witnessed there.  There's
 3    nothing there hearsay, that's not just a directive statement
 4    of what he's doing and where he's going.
 5              THE COURT:  Well, to the extent that they're -- I
 6    guess Mr.~Stein's trying to show that Mr. Carter was involved
 7    in the manufacture or the development of the cables.  He's
 8    talking about somebody bought a manufacturer in China to make
 9    cables, I don't think that it's being offered for the truth of
10    whether or not, again, they really did buy this interest.  I
11    think they're trying to offer to show that he's actually
12    talking about his involvement with the cables is being offered
13    for the fact that he's making the statement to show his
14    involvement and not for the truth of what's being said here.
15              So I'm going to allow it over objection.
16              MR. STIEGLITZ:  Understood.
17              MR. STEIN:  Thank you, Your Honor.
18              MR. STIEGLITZ:  Thank you, Your Honor.
19         (Sidebar conference concluded.)
20              THE COURT:  All right.  I'm going to admit
21    exhibit 405 over objection.
22         (Defense Exhibit No. 405 entered into evidence.)
23              MR. STEIN:  Thank you, Your Honor.
24              Can we publish 404?
25    BY MR. STEIN:
```

```
 1    Q    You got it on your screen in front of you.  The only

 2    person that doesn't have it is me.

 3              Mr. Carter, can you read your January 20th, 2006,

 4    e-mail to me into the record?

 5    A    "Mitch, I spoke to Bill.  He will be here on Wednesday the

 6    25th, '06, for the inspection, and the cables will be done

 7    before the 1st of February.  Any questions, call me or e-mail

 8    me."

 9    Q    You're asking me if I had any questions about what was

10    going on to call you, right?

11    A    Yeah, but the only thing that doesn't make sense to me,

12    and maybe I'm wrong, is I don't remember writing like a 25/06.

13    I would put -- that's the only thing that I would remember, I

14    would put the month and the day.  I wouldn't do it like this.

15    Q    Are you saying that exhibit 404 is not authentic?

16    A    I'm not saying yes or no, because I don't know, but

17    usually I never wrote it like that.

18    Q    We would have liked to have heard that before we published

19    it.

20    A    I understand that.  I made a mistake that, you know.

21    Maybe I did, but I don't remember.

22    Q    Okay.  So this exhibit, 404, may not be authentic; is that

23    your testimony?

24    A    That's possible.

25    Q    So we can tomorrow just roll up through my e-mail and just
```

1    pull it up and find out if it's authentic.  Maybe that will

2    refresh your recollection.  Okay?  Is that fair?

3    A    Fair.

4    Q    So the Court has wifi so we can just do it.

5            Now, I'm going to show you what's been marked as 405.

6            MR. STEIN:  Publish it.  Thank you.

7    BY MR. STEIN:

8    Q    Now, before we publish it, is there any question in your

9    mind that 405 is authentic, is the real thing?

10   A    No, because I remember them saying about, that Ken, they

11   told me from Advantage Medical, that they bought a place in

12   China.  I remember that.  I believe you were with me.

13   Q    So that's authentic, that e-mail?  That really happened?

14   That's the real McCoy, right?  I mean, it's from you to me, so

15   . . .

16   A    Yeah, but I remember when we went to Advantage Medical,

17   you and I, we had a meeting there, and that's when they said

18   they just bought a place in China.  I remember them saying

19   that.

20   Q    I just want to know if that e-mail was sent by you to me

21   in the form we're looking at it right now before I publish it

22   to the jury.  That's all I want to know.

23   A    Honestly, I don't remember now.  Because I know I might

24   have said, you know, because I'm looking at Miko Food, but I

25   remember saying I was going to meet with you with Joe Pesci,

1    but I don't remember this part about the manufacturing in

2    China.  That I don't remember saying.

3    Q   But it's already been admitted, so we're going to publish

4    it.

5    A   I just remember that both of us was at Advantage Medical

6    when they said it.  You and I were both there.

7    Q   Okay.  Understanding that you don't completely remember

8    this entire e-mail, but that you previously authenticated,

9    it's in evidence, can you please read it into the record?

10   A   "Mitch, finished with Bill.  What time can I meet with you

11   and Joe Pesci?  All went well.  Also, Ken told us that they

12   just bought a manufactor (sic) in China, 25 percent interest

13   to make the cables for about $30 a set, and they also get us

14   accounts all over the world for the model 100."

15   Q   When you say in that memo, if you recall, you say that,

16   "finished with Bill," what time can I meet you, I wasn't with

17   you with Bill at this meeting, was that your recollection?

18   A   Yes, but they never said anything about a manufacturing

19   facility.

20   Q   I don't want to know what they said.  I just want to know,

21   was I there?

22   A   You were not there when I met with Bill, that's correct.

23   Q   I was with Joe Pesci, apparently, right?

24   A   You were playing golf at the Boca Raton Resort, yes.

25   Q   But you felt the need to get me the information regarding

```
 1   the cables quickly, didn't you?

 2   A   Well, you told me to come over and meet and have dinner

 3   with you and Joe Pesci, I remember that.

 4   Q   And did you come over to the Boca resort?

 5   A   Yes, because you had me pick you guys up.

 6   Q   You mean neither of us drove there?

 7   A   No.  I picked both of you up there and we drove to Roger

 8   King's house and had dinner.

 9   Q   We had dinner at Roger King's house?

10   A   Yes.

11   Q   Okay.  I'm more interested when you met with me, did you

12   elaborate on anything in this memo?  Please don't tell me what

13   you said, just tell me if you elaborated on what this memo

14   said, this e-mail.

15   A   I don't remember.

16   Q   Did we talk about it, about what happened at Advantage

17   Medical?

18   A   I honestly can't remember what I said or what was said.  I

19   don't remember.

20   Q   But you remember we had dinner at Roger King's house,

21   who's now deceased?

22   A   Yes.

23   Q   Thank you.

24           And you're positive.  I mean, we've gone over this

25   very important issue.  You have promised to tell the truth,
```

1    and I'm under indictment.  You positive that you didn't,

2    yourself, completely and totally develop these white cables;

3    is that correct?

4    A    I'm not going to say yes or no, because I don't know.

5    Q    You may have developed them; it may have happened.

6    A    I couldn't have developed them.  I don't have the

7    expertise to do that.

8    Q    So are you positive you didn't develop them?

9    A    Personally, no, I did not develop them.

10          MR. STEIN:  Reading from his deposition on

11   February 25th, 2010, before the SEC, page 53, lines 17 and 18.

12   It's very short.

13          Actually, I'm going to start at line 11.  It's not as

14   short.

15          "Question:  When you say you made the cables, what do

16   you mean?

17          "Well, I helped develop, like I said, the DB15

18   connector.

19          "Did you go to Home Depot and buy all the parts, or

20   did you --

21          "Absolutely not.

22          "So what do you mean?

23          "I used Advantage Medical.  I did all the work there.

24          "Mr. Scharf:  You designed it?

25          "Yes.  I designed it over there at Advantage

```
1    Medical."

2    BY MR. STEIN:

3    Q    As you sit here today, you're telling me that these

4    statements are an out and out lie that you told to the SEC; is

5    that right?

6    A    They are a lie.  I did not develop them.

7    Q    You have -- you had at the time no idea what a DB15

8    connector is; is that right?

9    A    I did because of Advantage Medical, and they kept saying

10   and you kept saying, keep saying about the DB15.  I remember

11   you saying that distinctly to me.

12   Q    So tomorrow, when we go into all those notes that you say

13   that you took at a bagel place, those notes of your testimony,

14   we're going to find DB15 all over those notes?

15   A    I don't know that.  I just remember you telling me that.

16   Q    So it may not be in the notes?

17   A    I can't recall.

18   Q    Were there any other manufacturer -- you certainly worked

19   with Advantage Medical, it sounds like, right?  We can find

20   common ground there?

21   A    No, I didn't work for them.

22   Q    No, work with them, interact with them.

23   A    Interact, but I didn't do any work.  If you're asking me

24   did I help with anything, no, I did not.

25   Q    Well, you seem to have gone there at least twice.  Did you
```

1    feel that you were entitled to be paid for going there two

2    times and interacting with them?

3    A    Well, you had me interact with them, yes, I did.

4    Q    And you felt like you should be paid, right?

5    A    Well, for what you were having me go back and forth, yes.

6    Q    We've established that I had you do everything, but you

7    thought you should be paid by somebody, the company or me?

8    A    Yes.

9    Q    Any other in this kingdom of people that should have paid

10   you, anybody else you could think of besides the company and

11   me?

12   A    No.

13   Q    Did you work with any other cable -- or interact -- in

14   fairness to what you're saying, with any other cable

15   manufacturer other than Advantage Medical?

16   A    It was the first place that Bill Matthews, that you had

17   him call me, for me to go in a place in Fort Lauderdale.  I

18   don't remember the name of them, and they're the ones who told

19   me that they are not FDA approved, go to Advantage Medical.

20   And that's what I did.

21   Q    So there was another place you went to, and they told you

22   to go to Advantage Medical?

23   A    Because they couldn't do it, correct.

24   Q    But ultimately, you didn't interact with anyone else on

25   these cables other than Advantage Medical, right?

```
 1   A    That's correct.

 2   Q    You worked with Advantage Medical because they were FDA

 3   approved.  You had done a site visit with Bill Matthews, and

 4   you felt that everything was, as they say, kosher with

 5   Advantage Medical; is that accurate?

 6   A    Yeah, I would say that's what Advantage Medical said.

 7   Q    They were actually -- after you had interacted with them,

 8   you talked about them as the gold standard in the cable

 9   business.  Do you remember that?

10   A    No, I don't remember that.

11        MR. STEIN:  Deposition before the SEC February 25th,

12   2010, page 54, lines 5 through eight.

13        "Mr. Scharf:  And they were the gold standard in

14   that" -- referring to cable design manufacturer at the

15   foregoing line.

16        And you, Mr. Carter, said:  "They were definitely the

17   gold standard in that."

18   BY MR. STEIN:

19   Q    Was that statement, the statement that they're the gold

20   standard, Advantage Medical, is that an out and out lie when

21   you said it to the SEC?

22   A    If I said it, I said it, but I don't know.  I don't know

23   if they're the gold standard.

24   Q    Did I tell you to say they were the gold standard?

25   A    I don't remember.
```

```
 1    Q   So this is an instance in your deposition where you may
 2    have said something on your own without me telling you to say
 3    it?  This is an instance of that, that possibility; is that
 4    right?
 5    A   I don't know that one way or the other.
 6    Q   So it might not be an instance.  I may have told you to
 7    say it?
 8    A   I don't know, and I don't remember.
 9    Q   Who at Advantage Medical regarding the cables did you work
10    with or did you interact with?  Do you remember the names of
11    the human beings?
12    A   Yes, Ken Kendricks and Dave Kendricks, the owners.
13    Q   You interacted with the owners?
14    A   Yes.
15    Q   Now, we're seeing a set of cables here.  And I understand
16    you said you didn't develop them, but we're seeing a set of
17    cables that I'm describing for the record, and I can't leave
18    it with the cord.  Is it like a ribbon in white?
19    A   Yes.
20    Q   Do you remember at Advantage Medical another set of cables
21    for resting EKGs that were much thicker than those cables,
22    very, very thick and had shielding on them, heavy?
23    A   They would have been gray cables, I believe.
24    Q   Right, they were gray.  Remember those?
25    A   I remember those, yes.
```

```
1    Q   And with regard to those cables -- I'm not talking about

2    these cables, the ones used for when somebody's on the golf

3    course or running.  I'm talking about what you call the gray

4    cables.  Did you have anything to do with developing those

5    cables as opposed to these cables that we've already talked

6    about?

7    A   No, I did not.

8    Q   Now, the gray cables at Advantage Medical, you did see

9    them at some point, right?

10   A   Yes, I did.

11   Q   They were gray, right?

12   A   Yes, they were.

13   Q   And they had -- they were much thicker than the cables

14   that I'm showing you in the courtroom; is that right?

15   A   Yes, they were.

16   Q   And therefore they were heavier, right?

17   A   That's correct.

18   Q   And they were so heavy that when they were connected to

19   the stick-it thing on the chest, that they could actually even

20   come off very easily because they were so heavy.  Remember

21   that problem?

22   A   Vaguely.

23   Q   Heavier cables would tug on the chest and come off;

24   lighter cables wouldn't.  Do you remember that problem coming

25   up at Advantage Medical?
```

```
 1   A    Yes, I believe so.

 2   Q    Did Advantage Medical ever -- I don't want to know what

 3   they said.  Did they ever tell you in person their opinion of

 4   which cable, the heavy cable, the one that would pull off the

 5   chest, or the light cable, the one that wouldn't, would be the

 6   preferred cable?  Did they ever tell you anything about that?

 7   Don't tell me what they said.

 8   A    I don't remember.

 9   Q    But you do remember the gray cables and you do remember

10   the white cables?

11   A    Yes, I do.

12   Q    Okay.  By the way, Ms. Bunes had some technology officer

13   working with her in the northeast, not in Los Angeles.  In the

14   east coast.  Do you remember his name?

15   A    Yes, you told me it's Rajiv Singh.

16   Q    And you met Rajiv Singh, right?

17   A    Once, yes.

18   Q    And where did you meet him?

19   A    You had me pick him up at the airport and bring him to

20   Advantage Medical.

21   Q    Was I there with you at Advantage Medical?

22   A    No, you were not.

23   Q    And what in the world was he doing at Advantage Medical?

24   We already had Bill Matthews there, the company had Bill

25   Matthews, and we had that.  You've already talked about that.
```

```
 1   We've got two exhibits.  What was Rajiv Singh doing there?

 2   A   I don't know, but I remember you told me to pick him up,

 3   and Bill Matthews came down, too, because you didn't want

 4   Rajiv to know that Bill Matthews was there.

 5   Q   And what happened at that meeting?  What did you see with

 6   your eyes at that meeting at Advantage Medical with Rajiv

 7   Singh and Bill Matthews and not me, if you recall?

 8   A   All I can remember is they were all sitting down, we all

 9   went to lunch afterwards.  But before that, I remember Rajiv

10   Singh went into one of his offices and called Pamela Bunes.

11   That's all I can remember.  I don't know what they said.

12   Q   Do you remember whether there was any -- whether you

13   witnessed any tension or bad vibrations between Bill Matthews

14   and Rajiv Singh?

15   A   Not offhand, no.

16   Q   Who was Bill Matthews to Signalife?

17   A   I thought he was the FDA person to -- I'm trying to

18   remember how to say it.  It was just, he was the FDA person to

19   be able to explain, make sure that they were FDA approved.

20   Q   And who was Rajiv Singh to Signalife, if you recall?

21   A   I thought he was in the technology, but I'm not sure.

22   Q   Do you have any reason -- do you know of any reason why

23   Budimir Drakulic, the inventor and the chief scientist who

24   we've talked about at the beginning of your testimony today,

25   wasn't there at that meeting instead of Bill Matthews and
```

```
1    Rajiv Singh?  Do you know why?

2    A    I have no idea.

3    Q    But he definitely wasn't there; is that right?

4    A    That's correct.

5    Q    The only time Budimir Drakulic was ever there was at that

6    one demonstration in 2010 that we talked about earlier, right?

7    A    Correct.

8    Q    Mr. Carter, the Government has been kind enough to put

9    back on the screen exhibit 221.  It's on your screen also.

10   A    Okay.

11   Q    And it's also, I think, in a booklet.  It's the last

12   exhibit in your binder.

13   A    Can you make it larger for me?

14   Q    The Government's saying it's the last exhibit in the

15   binder.

16   A    Oh, okay.

17        Okay.  Yes.

18   Q    Now, Mr. Carter, this -- when you signed this declaration,

19   you understood that there was a class action lawsuit filed

20   against the company in South Carolina.  You knew that, didn't

21   you?

22   A    Yes, because you told me.

23   Q    And you knew that the class action lawsuit alleged various

24   activities like false purchase orders that are being talked

25   about here that you alleged on direct?
```

```
 1              MR. STIEGLITZ:  Your Honor, may we approach on this,

 2   please?

 3              THE COURT:  Yes.

 4         (The following proceedings were held at sidebar:)

 5              MR. STIEGLITZ:  Your Honor, I just am curious, sort

 6   of.  I don't want to raise a scope objection, but I think one

 7   may be forthcoming.  I'm just curious where Mr. Stein's headed

 8   in terms of the allegations in the fraud -- of fraud in the

 9   class action lawsuit.

10              MR. STEIN:  Oh, oh.  I don't intend to go one or two

11   questions beyond this declaration.  I'm not going to go into

12   the lawsuit.

13              THE COURT:  What is it that you want to ask him

14   about?

15              MR. STEIN:  Well, he said that he lied in this

16   declaration, and he didn't lie in some of it.  So I want to go

17   over it and test his recollection, but I'm not going to go

18   into other pleadings.

19              MR. STIEGLITZ:  That's fine if he just wants to talk

20   about what's in the declaration, that's fine.  I was just

21   concerned --

22              MR. STEIN:  It was a massive lawsuit, and it was

23   settled for nothing.  I'm not going to go into that, and I'm

24   not going to say that to the jury.

25              THE COURT:  I think you may have already said that
```

```
 1    once before.

 2              MR. STEIN:  I think it's going to come into evidence

 3    through the custodian, but not here.  He wouldn't know that.

 4              THE COURT:  So you're not going to get into the

 5    specifics or the merits of the --

 6              MR. STEIN:  Absolutely not.

 7              THE COURT:  ~-- the class action, right?

 8              MR. STEIN:  No, because he wouldn't know anything

 9    about it.  Of course, I'm not going to do that.

10              MR. STIEGLITZ:  That's fine.

11              THE COURT:  Thank you.

12              MR. STEIN:  Thank you, Your Honor.

13         (Sidebar conference concluded.)

14    BY MR. STEIN:

15    Q    Mr. Carter, you have the declaration in front of you, 221,

16    Government?

17    A    Yes, I do.

18    Q    And everything in this declaration is false; is that

19    right, other than your name?

20    A    Yes, to my knowledge, but I didn't really read it

21    thoroughly.  I remember you had me come over to your house and

22    sign it, which I did.

23    Q    At my house?

24    A    At your house, yes, in Boca Raton, Florida.

25    Q    Now, if you look at the fax legend on the top of this
```

```
 1    exhibit, you see it says -- well, actually, the Government's
 2    exhibit doesn't have a fax legend, does it?
 3    A    No, I do not see one.
 4    Q    But you were at my house when you signed it, right?
 5    A    I remember you bringing me over to your house to sign it,
 6    yes.
 7    Q    Okay.  So you signed it at my house.
 8              MR. STEIN:  I am going to have to show the witness
 9    exhibit 7 of the defense, and I need the cord back.
10    Inconsistencies are flowing at a dramatic level.
11              THE WITNESS:  Can I say something, Your Honor?  I
12    might have made a mistake.  I -- you know, that is definitely
13    my signature, but I -- now, I am remembering I don't know if I
14    actually did go to his house to sign it or not.  But it is
15    definitely my signature.  I remember he had me sign something
16    at his house.
17              THE COURT:  Okay.
18              MR. STEIN:  May I approach?
19              THE COURT:  Yes.
20    BY MR. STEIN:
21    Q    I'm going to show you what is the Defense exhibit 7.
22    A    Okay.  I see it.
23    Q    Is that your signature?
24    A    Yes, that's my signature.
25    Q    You recognize the document?
```

```
 1    A    Yes.

 2              MR. STEIN:  I offer it.

 3              MR. STIEGLITZ:  No objection, Your Honor.

 4              THE COURT:  Admitted without objection.

 5         (Defense Exhibit No. 7 entered into evidence.)

 6    BY MR. STEIN:

 7    Q    Mr. Carter, there's a fax legend at the top.

 8    A    Correct.

 9    Q    Could you read the second fax legend?

10    A    000-0000?

11    Q    Yes.  From left to right.  Can you read that into the

12    record?

13    A    (000)000-0000.

14    Q    Anything else on that line you can see?

15    A    Well, page 2, it says Marty.

16    Q    And to the left of that?

17    A    October 19th, at 10:08:30 a.m., or "a".

18    Q    So you sent that from your house; is that right?

19    A    No, I did not.

20    Q    Where did you send that from?

21    A    Well, first of all, I don't know if I sent it because I

22    would never put my name Marty on my fax machine.

23    Q    So you don't know where you sent this from; is that

24    correct?

25    A    I'm not saying that I sent it or did not send it.  I do
```

1    not know.

2    Q   Well, just on a basic level, you signed a declaration in

3    that action which you said is false, and you sent it

4    somewhere; is that right?

5    A   I don't know if I sent it somewhere.  I might not have

6    sent it.  I remember you having me sign something, but I

7    honestly did not pay attention to this.

8    Q   Did any -- was I counsel of record, do you recall, in the

9    Greenville action?

10   A   I don't remember.  I think you were, but I don't remember.

11   Q   Was there a local counsel in Greenville involved, do you

12   remember?  Did you ever talk to a local counsel there?

13   A   I never spoke to anybody.

14   Q   You never spoke to Jared Scharf about that action?

15   A   Jared Scharf, but not nobody else.

16   Q   Could you have sent this declaration to Jared Scharf

17   regarding this action?

18   A   If I did, it would have my fax number on it.

19   Q   Very well.

20          Let's focus on~-- both declarations are identical.

21   Let's focus what's said in the declaration.

22          The second sentence on paragraph 1 says:  "I have

23   been employed by Signalife as an engineer and technology

24   advisor since 2005."

25          We've now gone through a lot of the things that you

```
 1    did.  Would you classify yourself as an engineer and

 2    technology advisor since 2005 or not?

 3    A    Absolutely not.

 4    Q    So that was a lie?

 5    A    Yes, I am not an engineer.

 6    Q    You're not an engineer?

 7    A    No, I am not.

 8    Q    Did you ever have an electrical contractor's license in

 9    your life?

10    A    A long time ago in Ohio.

11    Q    And in Ohio, what business did you work for?

12    A    We owned a very big electrical and lighting company.

13    Q    Who's "we"?

14    A    My family.

15    Q    It was the largest reseller of lighting equipment in the

16    Midwest, wasn't it?

17    A    Yes.

18    Q    What is a reseller?

19    A    Where we resell from manufacturers we get, and we would

20    sell -- it's a retail operation, retail and wholesale.

21    Q    So the business -- this was your parents' business?

22    A    That's correct.

23    Q    And you grew up working in this business?

24    A    Yes, I did.

25    Q    And who was, of your parents, one or the other was more
```

```
 1   hands-on in this business?

 2   A    My mother.

 3   Q    You were very close with your mother; is that right?

 4   A    Yes, I was.

 5   Q    And you learned all about the electrical and lighting

 6   business as you were growing up; isn't that right?

 7   A    Yes.

 8   Q    That business -- was the name of that business called

 9   Lighthouse?

10   A    Yes, it was.

11   Q    Lighthouse, Inc.?

12   A    Yes, it was.

13   Q    And that business didn't manufacture anything, right?

14   A    No, we did not.

15   Q    It took units in lighting in, and then sold them to

16   consumers and installed them; is that right?

17   A    Yes.

18   Q    A reseller is somebody, you knew from growing up, that

19   takes things into inventory and then, because the customer

20   doesn't know how to use them, they help them install them.  Is

21   that what a reseller does?

22   A    No, usually a reseller is where we would sell the device

23   to them, you know, whatever light fixtures, builders would

24   come in and buy from us.

25   Q    And there were many times -- I'm sorry, I didn't mean to
```

```
 1   interrupt you.  Please finish.

 2   A    No, we would have different manufacturers that would

 3   supply us, and we would sell it to builders and consumers.

 4   Q    A lot of times, though, you, yourself, had to stand on an

 5   ungodly tall ladder in order to install lighting, right?

 6   A    Yes, yes.

 7   Q    So Lighthouse knew how to install for the consumer, right?

 8   A    Yes.

 9   Q    And the manufacturers trusted you; is that right?

10   A    Yes.

11   Q    It was the closing of that business or the untimely death

12   of your mother that led to the estate problems in Ohio, right?

13   A    Yes, that's correct.

14   Q    I never provided legal services on those, right?

15   A    No, you did not.

16   Q    You never sent me any e-mails regarding providing legal

17   services, right?

18   A    I spoke to you, and then you wrote up a thing saying that

19   you were legal counsel for my estate, but you never did

20   anything.

21   Q    And your sister sent me e-mails, too, correct?

22   A    Yes, I believe my sister did, yes.

23   Q    And do you know whether I read any of these e-mails

24   regarding the estate of Lighthouse, Inc. and your family?

25   A    I think you did, but you didn't do anything.
```

1    Q    But you -- but I got many e-mails from your sister and

2    from you --

3    A    Regarding the properties and everything, yes, that my

4    parents had.

5    Q    The properties in Ohio?

6    A    That's correct.

7    Q    You felt that your estate was scammed out of those -- out

8    of those properties, that --

9    A    That's correct.

10   Q    You felt pretty strongly about that, didn't you?

11   A    Yes, I did.

12   Q    You actually delivered me a very large container of

13   documents regarding that; is that right?

14   A    Yes, that's correct.

15   Q    Because you needed legal help regarding that; isn't that

16   right?

17   A    Yes, we wanted help.

18   Q    There was actually an issue of competency regarding your

19   father.  You played me a videotape regarding that issue; is

20   that correct?

21   A    Yes.

22   Q    He was in a -- in a, like, Ben Hogan-style hat on a

23   wheelchair in that video, right?

24   A    Yes, that's correct.

25   Q    And the issue in that proceeding and in Ohio, one of the

```
 1   issues was whether or not he was competent when he got married

 2   to a younger woman and apparently gave away a lot of the

 3   estate.  That was one of the issues, right?

 4   A   Yes.

 5   Q   And you felt he was not competent at that point, and you

 6   felt that whoever he married, I'm not going to go into her

 7   name, you felt that she had duped your father, right?

 8   A   Yes.

 9   Q   And that you were damaged as a result of that, right?

10   A   Yes.

11           THE COURT:  Mr. Stein, are you finished with this

12   area?

13           MR. STEIN:  Yes.

14           THE COURT:  Okay.  We're going to recess for the

15   evening because I mentioned earlier we're going to stop at

16   4:30 today.  I have another matter I have to deal with.

17           MR. STEIN:  I'm sorry, Your Honor.

18           THE COURT:  That's all right, unless you had

19   something you wanted to finish up?

20           MR. STEIN:  No, Your Honor.  I've got a lot.

21           THE COURT:  All right.  Ladies and gentlemen, thank

22   you again for your cooperation and your patience, and I ask

23   you to be back tomorrow morning at 9:00.  Please, again, don't

24   discuss the case or form any opinions, leave everything at

25   your seat.  We'll see you tomorrow morning.  Have a pleasant
```

```
 1    evening.  Thank you.

 2         (The jury exits the courtroom.)

 3         THE COURT:  Mr. Carter, you have to come back

 4    tomorrow.  Please don't discuss your testimony during the

 5    recess.  All right?  If you can be back at 9:00, we'd

 6    appreciate it.  Thank you.  Have a nice evening.

 7         THE WITNESS:  Thank you.

 8         THE COURT:  All right.  If you could maybe try and

 9    make some room for the attorneys at the tables.  I'm not going

10    to ask you to remove your things.  If you could just kind of

11    make some space for them to be able to sit.

12         MR. STIEGLITZ:  Your Honor, I'm just curious for

13    scheduling purposes.  I don't mean to hold up this, but if

14    Mr.~Stein would be willing to give us an estimate as to how

15    much farther we've got to go, so that we can make sure to have

16    our folks lined up appropriately tomorrow.

17         MR. STEIN:  Yes, Your Honor.  It's the -- it

18    hopefully will be the morning session, but to be more

19    specific, I intend to go throughout the Government's exhibits

20    and I intend to go through 12 to 15 areas of his deposition

21    before the SEC.  So it should be done in the morning session

22    without a doubt.

23         THE COURT:  All right.  That help you?

24         MR. STIEGLITZ:  Yes, Your Honor.  Thank you very

25    much.
```

1               THE COURT:  Thank you.

2          You don't have to move everything.  You can just

3     leave some room for the attorneys.  And the interpreter's

4     going to be sitting over there at the end of the defense

5     table.

6          (The evening recess was taken at 4:34 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        * * * * *

 2                       I N D E X

 3   Testimony of Martin B. Carter

 4            Direct by Mr. Stieglitz          3

 5            Cross by Mr. Stein               132

 6            Voir Dire by Mr. Stieglitz       178

 7            Cross by Mr. Stein (Cont.'d)     181

 8                        * * * * *

 9                      E X H I B I T S

10   Government's Exhibits in Evidence:

11            Government's 225                 3

12            Government's 29, 31, 32, 83, 86, 88,

13   89, 90, 91, 95, 97, 100, 225, 245 and 300    5

14            Government's 102, 114, 126, 153,

15   169, 171, 173, 185, 189, 194 and 277     73

16            Government's 119                 89

17            Government's 197, 196, 238 and 221   116

18

19

20

21

22

23

24

25
```

```
1                           * * * * *

2                   E X H I B I T S  (Cont.'d)

3   Defendant's Exhibits in Evidence:

4           Defendant's 82, 241 and 244          5

5           Defendant's 400                      167

6           Defendant's 401-403                  181

7           Defendant's 404                      208

8           Defendant's 405                      210

9           Defendant's 7                        227

10                          * * * * *

11                         CERTIFICATE

12      I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16      Dated this 17th day of MAY, 2013.

17

18      /s/Stephen W. Franklin
        _____
19      Stephen W. Franklin, RMR, CRR

20

21

22

23

24

25
```

## $

$10,000 [1]  120/6
$104,300 [1]  39/17
$105,300 [4]  39/16 40/3 40/8 40/17
$12,000 [1]  71/4
$20,000 [1]  7/1
$200,000 [2]  25/1 25/7
$215 [1]  6/23
$25,000 [2]  70/12 70/21
$250,000 [1]  184/22
$284,947 [1]  118/20
$285,000 [1]  119/2
$30 [1]  213/13
$300 [1]  17/22
$300,000 [2]  185/8 186/13
$700,000 [1]  62/18

## '

'06 [1]  211/6
'08 [3]  102/10 104/12 108/19
'1 [1]  207/18
'13 [1]  179/17
'2 [1]  207/18
'3 [1]  207/18
'7 [1]  195/3
'9 [2]  114/2 166/10

## -

-and [1]  1/20
-v [1]  1/5

## .

.docx [1]  180/5

## /

/s/Stephen [1]  237/18

## 0

000 [1]  227/13
000-0000 [2]  227/10 227/13
0000 [2]  227/10 227/13
06 [1]  211/12

## 1

10 [4]  59/7 113/8 136/19 156/11
100 [17]  5/1 5/11 67/11 129/5 129/12 184/1
184/6 184/9 187/2 189/1 191/3 191/6 191/12
200/7 205/14 213/14 236/13
1000 [2]  63/21 64/5
100s [1]  53/11
102 [4]  72/16 73/1 80/1 236/14
1031 [1]  1/21
10:08:30 [1]  227/17
10:17 [1]  51/15
10:31 [1]  51/15
11 [2]  113/8 215/13
11-80205-CR-MARRA [1]  1/2
114 [4]  72/15 73/1 78/9 236/14
116 [1]  236/17
119 [5]  89/4 89/8 89/12 97/24 236/16
11:59 [1]  110/11
11th [3]  35/10 70/18 108/19
12 [3]  51/25 190/13 234/20
1208 [1]  1/19
126 [4]  72/13 73/1 74/15 236/14
129 [4]  89/14 100/22 100/24 116/17
12th [3]  40/1 75/10 179/15
13 [5]  1/8 51/25 77/22 179/6 179/8
130 [1]  89/14 102/15

132 [1]  236/5
14 [1]  51/20
1400 [1]  1/17
141 [1]  112/5
149 [2]  88/20 90/13
14th [1]  35/19
15 [3]  51/14 159/16 234/20
15-minute [2]  51/7 159/14
151 [4]  89/14 106/17 108/15 116/17
153 [4]  72/14 73/1 75/3 236/14
1551 [1]  1/19
15th [1]  117/18
161 [2]  88/20 94/2
1632 [1]  31/1
1634 [1]  32/7
1637 [1]  34/22
1641 [1]  35/20
167 [3]  88/20 93/6 237/5
169 [4]  72/14 73/1 75/15 236/15
17 [1]  215/11
171 [4]  72/20 73/1 85/8 236/15
173 [4]  72/16 73/1 81/11 236/15
178 [1]  236/6
17th [1]  237/16
18 [2]  135/12 215/11
181 [2]  236/7 237/6
185 [4]  72/19 73/2 81/22 236/15
189 [4]  72/19 73/2 82/15 236/15
18th [5]  107/20 107/23 111/25 113/6 113/10
19 [1]  190/13
194 [4]  72/20 73/2 83/14 236/15
196 [4]  116/2 116/9 118/4 236/15
197 [4]  116/2 116/9 117/10 236/17
1992 [1]  119/25
1996 [1]  147/2
19th [2]  74/24 227/17
1:00 [1]  109/23
1:15 [3]  109/14 109/18 110/1
1:19 [1]  110/11
1:39 [1]  117/19
1:39 a.m [1]  117/18
1st [1]  211/7

## 2

20 [1]  183/3
200,000 [2]  184/23 184/24
2000 [2]  119/25 119/25
2005 [12]  7/5 12/6 16/20 18/4 21/16 24/8
24/10 121/12 166/10 184/22 228/24 229/2
2005-2006 [1]  145/5
2006 [18]  18/4 21/16 24/11 25/5 28/6 28/6
28/7 28/8 28/15 29/2 35/10 145/5 146/8
146/13 184/22 195/3 197/24 211/3
2007 [13]  38/13 38/13 38/22 40/1 40/8 45/23
47/23 48/21 50/5 52/24 54/17 128/13 129/10
2008 [30]  43/13 44/7 61/4 62/1 65/22 66/1
70/11 70/19 71/3 74/24 75/10 75/21 77/22
80/10 81/15 81/25 82/19 85/14 91/16 91/22
98/14 100/11 106/13 114/2 116/25 118/11
128/16 129/10 134/12 166/10
2009 [9]  83/18 107/20 107/23 111/25 113/6
113/10 116/24 117/2 117/4
2009-2010 [1]  195/1
2010 [12]  120/8 120/10 157/3 185/12 187/7
190/13 195/1 195/2 198/1 215/11 218/12
223/6
2012 [1]  182/14
2013 [4]  1/8 182/14 182/20 237/16
20530 [1]  1/17
208 [1]  237/7

20th [3]  62/1 91/15 211/3
21 [1]  107/25
210 [1]  237/8
21st [2]  71/2 83/18
22 [3]  108/1 108/3 112/1
221 [7]  116/2 116/9 127/6 127/11 223/9
225/15 236/17
225 [10]  3/18 3/18 3/24 4/17 5/11 8/17 9/6
11/25 236/11 236/13
225's [1]  3/23
227 [1]  237/9
228 [1]  1/21
22nd [3]  25/5 75/21 85/14
23 [2]  107/21 107/24
237 [4]  88/20 88/22 92/9 93/24
238 [4]  116/2 116/9 121/15 236/17
239 [1]  88/21
24 [1]  113/11
241 [5]  4/1 4/22 5/12 44/2 237/4
244 [5]  4/6 4/24 5/12 54/15 237/4
245 [6]  3/25 4/17 5/11 22/3 22/4 236/13
25 [1]  112/15
25 percent [1]  213/12
25/06 [1]  211/12
25th [8]  102/10 104/12 185/12 187/6 190/13
211/6 215/11 218/11
26th [2]  44/7 54/17
277 [4]  72/15 73/2 77/17 236/15
278 [3]  141/2 141/15 142/17
27th [1]  47/23
28th [6]  48/21 50/5 52/24 169/16 169/17
169/17
29 [5]  3/25 4/18 5/10 24/17 236/12
296 [1]  36/22
29th [1]  82/19
2:16 [1]  173/13
2:16 p.m [3]  168/23 168/24 169/17
2:16:51 p.m [1]  168/19
2:32 [1]  160/4
2:48 [1]  160/4
2nd [25]  81/15 132/15 132/17 133/12 133/19
133/23 134/8 134/10 134/23 135/1 135/2
147/23 175/11 175/13 175/21 175/24 176/13
176/20 181/22 182/1 182/13 182/14 182/20
183/8 183/21

## 3

30-plus [1]  150/12
300 [6]  3/25 4/21 5/11 41/1 45/6 236/13
300,000 [2]  74/21 185/2
30th [1]  47/6
31 [6]  5/1 5/10 69/5 70/9 73/5 236/12
31st [1]  91/22
32 [5]  3/25 4/18 5/10 26/2 236/12
325 [3]  113/7 113/8 113/10
326 [1]  113/11
33179 [1]  1/22
33401 [2]  1/19 1/24
35 [1]  12/24
366 [1]  107/20
367 [1]  107/21
368 [1]  107/23
369 [1]  107/24
3768 [1]  1/23
390,000 [1]  75/8
3:16 p.m [2]  169/16 169/17
3M [1]  204/11
3rd [1]  80/10

## 4

4/16/13 [2]  179/6 179/8

**4**

40,000 [1]  12/24
400 [41]  167/8 167/9 167/16 167/19 168/7
168/9 168/11 169/3 169/24 170/4 170/7
171/12 171/15 171/18 173/16 173/19 174/3
174/4 174/7 174/9 175/2 175/14 175/21
175/25 177/7 177/8 177/9 177/16 177/24
178/9 179/4 180/14 180/19 181/21 181/22
182/2 182/7 182/24 183/2 207/18 237/5
400,000 [1]  75/19
401 [3]  177/15 181/14 181/16
401-403 [1]  237/6
402 [3]  177/15 181/14 181/16
403 [5]  177/16 181/15 181/16 207/16 237/6
4032 [1]  145/19
4034 [1]  201/5
404 [9]  207/21 208/2 208/21 208/23 208/25
210/24 211/15 211/22 237/7
405 [10]  207/14 207/14 207/21 208/3 209/1
210/21 210/22 212/5 212/9 237/8
410 [2]  111/25 112/1
46 [1]  112/3
49 [2]  187/7 190/13
4:00 p.m [2]  86/2 86/15
4:30 [4]  109/15 109/19 109/19 233/16
4:34 [1]  235/6
4th [1]  82/6

**5**

513 [1]  103/1
514-3768 [1]  13/23
53 [1]  215/11
54 [1]  218/12
561 [1]  1/23
5830 [1]  61/18
5:00 p.m [1]  43/19
5th [2]  70/10 106/14

**6**

600SL [1]  119/25

**7**

70,000 miles [1]  83/2
700,000 [1]  62/14
701 [1]  1/24
72 [3]  118/19 185/11 186/4
73 [2]  118/19 236/15
7:00 [1]  67/3
7:30 a.m [1]  117/22

**8**

81 [2]  199/16 200/3
82 [7]  4/1 4/22 5/12 43/8 132/8 133/4 237/4
83 [5]  3/25 4/21 5/10 38/25 236/12
85 [3]  3/25 4/19 30/19
86 [5]  4/2 4/22 5/10 46/25 236/12
866 [2]  101/13 101/14
88 [5]  4/3 4/23 5/10 47/13 236/12
89 [9]  4/6 4/24 5/10 50/23 52/20 176/22
182/2 236/13 236/16
8:00 [1]  67/4
8:30 a.m [2]  98/9 98/12

**9**

90 [12]  4/5 4/24 5/10 49/22 173/8 173/11
173/14 174/7 174/8 176/22 182/2 236/13
91 [15]  4/3 4/5 4/23 5/11 48/17 167/6 167/11
167/25 169/12 170/6 171/19 175/14 176/22
182/2 236/13

94 [3]  56/22 111/5 113/17
95 [5]  4/7 4/25 5/11 66/4 236/13
96 [1]  61/8
97 [5]  4/8 4/25 5/11 66/21 236/13
9:00 [2]  233/23 234/5

**A**

a-r-t-i-f-a-c-t [1]  189/10
a.m [9]  51/15 51/15 79/12 98/9 98/12 110/11
117/18 117/22 227/17
able [9]  64/10 86/22 99/8 182/4 208/15
208/17 209/12 222/19 234/11
above [5]  61/24 85/22 101/11 103/1 237/15
above-entitled [1]  237/15
absent [1]  91/23
absolutely [7]  77/10 114/22 149/24 162/16
215/21 225/6 229/3
abuse [3]  163/23 163/23 163/25
access [1]  86/9
according [3]  84/12 94/20 161/23
accordingly [1]  53/13
account [22]  6/19 6/22 18/1 32/4 32/22 68/20
73/20 73/22 73/22 74/4 74/5 74/6 74/7 74/7
84/11 84/18 84/25 166/13 166/17 166/18
166/21 176/9
accounting [1]  186/14
accounts [3]  32/22 167/2 213/14
accurate [6]  67/17 136/10 154/25 167/3
198/8 218/5
accurately [2]  22/6 22/10
accuse [1]  11/16
across [2]  126/19 126/20
act [2]  34/7 147/2
acting [1]  91/14
action [8]  223/19 223/23 224/9 225/7 228/3
228/9 228/14 228/17
activities [1]  158/22 223/24
actual [4]  73/15 73/17 179/22 201/9
actually [24]  50/1 70/2 70/24 95/4 107/12
115/22 115/24 147/9 159/11 163/18 172/7
172/8 175/13 179/23 181/10 208/15 210/11
215/13 218/7 220/19 226/1 226/14 232/12
232/18
add [2]  5/4 88/17
addition [1]  23/16
additional [3]  89/13 90/4 116/19
address [29]  36/8 36/9 36/10 36/11 37/5 37/6
37/7 39/11 39/12 48/19 49/1 50/17 52/21
53/10 53/22 54/4 57/14 57/15 58/23 58/24
59/2 59/3 59/7 59/8 89/25 111/10 169/8
174/24 180/19
addressed [1]  50/16
addresses [2]  39/10 78/12
adept [1]  129/3
adjust [1]  3/4
admire [1]  130/18
admissibility [1]  3/14
admissible [1]  4/20
admission [1]  181/5
admissions [1]  150/23
admit [5]  11/19 11/21 11/21 181/14 210/20
admitted [44]  3/23 5/6 5/8 8/18 22/2 24/18
26/1 36/22 38/24 41/1 43/8 44/2 46/25 47/14
49/24 54/14 66/3 66/20 67/10 72/12 72/24
74/15 75/3 75/15 77/18 78/10 79/25 81/10
81/22 83/14 85/7 85/8 88/16 89/11 93/6
112/5 116/7 117/9 121/14 167/18 182/11
208/23 213/3 227/4
admitting [1]  3/21
admonishing [1]  110/5

adoption [2]  51/21 51/22
Advantage [67]  20/22 20/23 20/25 21/3 21/6
21/9 21/12 27/7 27/7 38/21 140/12 173/2
189/21 189/23 190/7 191/16 191/24 193/4
193/6 194/3 194/4 194/5 194/12 194/18
195/5 196/12 196/15 198/18 199/22 200/24
201/24 204/7 204/22 205/5 205/5 205/12
206/9 206/15 206/21 207/2 209/25 210/2
212/11 212/16 213/5 214/16 215/23 215/25
216/9 216/19 217/15 217/19 217/22 217/25
218/2 218/5 218/6 218/20 219/9 219/20
220/8 220/25 221/2 221/20 221/21 221/23
222/6
adverse [3]  150/4 163/3 163/3
advisor [1]  128/17 228/24 229/2
affect [5]  151/7 161/15 162/22 163/21 164/12
affects [2]  162/23 163/22
after [41]  2/10 7/6 11/21 13/2 14/13 14/14
16/8 16/13 16/17 19/14 21/9 21/10 21/12
51/15 52/9 65/22 73/4 74/4 89/16 90/5
107/22 110/11 110/22 128/12 128/16 135/10
135/11 139/15 144/16 144/21 157/18 158/1
160/4 164/14 165/6 165/25 169/17 194/25
195/7 209/10 218/7
afternoon [4]  117/24 132/5 132/6 183/25
afterwards [3]  152/25 210/1 222/9
again [70]  2/15 3/13 5/16 9/10 11/6 12/20
14/11 14/16 16/14 19/25 22/4 24/16 26/3
28/19 44/14 50/20 52/22 53/1 57/5 58/21
61/3 64/9 67/6 67/12 69/21 74/16 74/25
75/11 75/22 78/11 80/2 81/18 81/25 84/1
84/16 86/24 87/21 95/20 97/2 102/13 104/7
104/9 104/15 106/18 107/16 108/23 108/25
113/6 113/18 114/20 114/24 116/23 123/10
128/1 128/4 130/8 139/4 151/10 151/12
151/21 170/2 173/9 183/23 187/15 201/21
207/23 208/16 210/10 233/22 233/23
against [4]  10/22 11/1 150/7 223/20
agency [1]  139/6
ago [8]  51/24 51/25 80/24 84/6 88/11 129/22
134/5 229/10
agree [4]  14/7 18/10 159/12 204/2
agreed [20]  2/22 3/14 4/20 13/18 72/12 89/4
95/1 95/15 112/2 112/4
agreeing [1]  63/1
agreement [30]  3/19 9/8 9/15 10/6 10/9
10/16 10/16 10/18 10/18 10/20 10/21 10/25
11/2 11/2 35/2 35/11 61/13 61/14 61/15
62/20 62/24 63/2 70/14 70/16 84/13 91/15
91/17 136/5 150/22 151/22
agreements [3]  10/14 10/15 10/15
ahead [9]  9/3 32/19 63/6 88/17 111/22 152/5
158/10 160/24 177/19
air [1]  6/5
airport [3]  21/20 115/14 221/19
Albert [1]  1/15
allegations [3]  150/6 151/14 224/8
allege [1]  166/16
alleged [2]  223/23 223/25
allegedly [2]  134/20 136/16
allow [1]  210/15
allowed [3]  153/3 154/14 161/6
allows [1]  162/17
almost [1]  119/2
alone [1]  30/4
already [44]  4/19 5/17 24/17 30/19 36/22
41/23 42/3 44/2 52/21 54/22 56/23 61/9 69/7
87/25 88/16 88/18 89/14 90/12 92/8 94/3
94/20 97/25 100/23 102/16 106/19 114/14
118/5 124/19 127/11 139/2 139/7 141/2

**A**

already... [12]  146/4 147/23 156/22 161/22
164/17 181/21 201/20 213/3 220/5 221/24
221/25 224/25
also [31]  7/13 11/13 24/16 27/8 52/23 57/6
75/3 78/9 80/22 89/3 91/3 96/25 102/16
103/13 111/14 116/14 117/11 119/24 147/18
150/8 160/17 164/20 166/24 180/16 184/21
187/5 187/7 213/11 213/13 223/9 223/11
although [1]  4/19
always [4]  79/7 80/16 81/19 120/5
am [35]  21/19 23/7 26/17 26/21 33/23 38/14
38/20 43/21 55/13 57/3 60/18 63/17 64/1
67/4 67/4 77/25 80/7 80/8 81/19 82/6 82/6
82/7 82/13 86/16 94/25 118/25 129/4 141/8
141/11 142/20 224/5 226/8 226/13 229/5
229/7
AMERICA [2]  1/3 152/10
Ameritrade [4]  74/9 84/10 84/25 86/8
Among [1]  129/11
amount [5]  39/15 119/2 119/9 119/16 120/3
amounts [3]  71/14 71/18 71/19
Angeles [1]  221/13
another [18]  15/20 20/11 22/13 55/25 75/5
98/8 109/19 123/22 125/14 137/6 147/6
147/14 147/20 183/21 194/8 217/21 219/20
233/16
answer [13]  131/23 139/8 151/5 167/4
182/21 186/15 186/24 188/12 188/20 190/15
195/15 199/13 199/14
answered [4]  146/14 146/17 153/22 153/23
answering [1]  81/18
Antonio [2]  42/8 42/14
any [168]
anybody [23]  21/6 24/6 46/8 52/1 53/25 54/1
55/4 65/3 71/25 88/10 91/23 100/17 105/15
131/17 145/6 152/16 152/23 154/15 155/22
158/1 172/23 217/10 228/13
anyone [45]  9/15 10/14 13/8 15/12 15/16
18/12 18/24 19/22 25/14 45/13 45/15 46/11
48/14 49/2 51/12 56/17 57/17 57/20 59/11
59/13 65/13 65/19 71/23 80/18 85/3 95/6
96/15 100/16 103/10 117/4 120/21 121/6
122/21 150/16 155/8 156/19 159/22 162/6
162/11 193/11 195/19 199/4 205/5 205/22
217/24
anyplace [1]  25/15
anything [90]
anywhere [4]  19/15 129/25 193/9 199/12
AOL [2]  169/5 169/5
aol.com [3]  1/25 39/10 166/14
apologize [9]  3/12 4/3 4/12 37/9 90/5 138/5
177/18 178/23 188/13
apparently [4]  161/10 204/5 213/23 233/2
appear [1]  180/22
Appearances [1]  1/14
appears [2]  36/1 50/7
appellate [3]  164/21 164/24 165/4
application [1]  63/9
appreciate [2]  166/4 234/6
approach [14]  8/20 99/24 141/12 144/2
168/4 178/3 178/17 190/25 201/4 207/24
208/19 209/5 224/1 226/18
appropriate [1]  142/5
appropriately [1]  234/16
approval [1]  91/24
approved [7]  51/22 190/19 205/19 205/23
217/19 218/3 222/19
approximately [8]  12/23 17/21 45/22 99/17

99/21 100/8 106/11 113/25
April [1]  117/18
April 15th [1]  117/18
architectural [2]  71/6 71/7
area [3]  17/18 105/21 233/12
areas [1]  234/20
aren't [1]  143/5
argumentative [1]  157/21
Armpriester [6]  170/25 171/8 172/6 172/12
172/21 172/24
Armpriester's [1]  171/24
around [20]  7/1 17/17 17/22 18/4 24/20 75/1
75/12 75/23 77/13 86/6 102/11 104/13
108/21 116/13 198/8 203/8
arrangements [3]  18/15 46/18 46/20
arrest [20]  148/7 152/9 152/17 152/19
152/20 152/21 152/25 152/25 153/4 153/5
154/6 154/12 155/16 160/22 161/19 162/21
163/6 163/11 163/15 163/16
arrested [17]  148/2 148/4 149/12 153/6
153/11 153/19 154/16 154/21 156/18 157/7
157/11 157/18 158/2 160/15 161/22 163/18
182/14
artifact [5]  189/7 189/10 190/16 202/7 204/5
Asia [8]  41/19 42/18 43/5 43/20 44/20 44/23
45/9 133/10
aside [1]  40/5
ask [62]  12/2 14/4 16/22 18/5 23/24 26/14
26/19 28/4 29/2 29/11 30/15 30/18 34/4 34/7
36/18 37/21 37/24 41/16 48/14 53/15 74/19
76/2 78/3 86/24 96/3 98/24 108/25 111/13
114/20 116/19 130/4 132/7 133/12 141/16
148/22 149/4 149/9 151/3 151/8 151/16
151/19 161/4 174/22 174/24 182/24 183/1
183/10 185/13 188/5 188/8 188/11 188/16
194/6 201/6 201/8 201/18 201/21 202/21
203/17 224/13 233/22 234/10
asked [34]  16/24 23/18 23/21 26/12 40/3
45/20 48/11 68/19 80/24 94/15 95/3 98/19
98/21 99/17 100/20 113/22 129/11 133/9
135/21 143/6 146/14 146/17 149/11 153/23
161/5 174/20 174/23 175/13 177/4 182/16
182/25 184/21 185/7 186/12
asking [21]  41/18 47/21 60/4 67/17 67/23
67/24 68/2 71/14 82/9 83/22 83/23 98/4
129/15 133/15 143/4 164/8 193/16 195/13
199/10 211/9 216/23
assert [1]  161/21
asserting [1]  160/25
assistant [1]  128/13
assisted [1]  188/7
associated [6]  42/23 45/2 45/13 72/5 103/11
186/13
assume [1]  137/4
assuming [1]  128/13
ate [1]  56/6
attach [2]  179/22 191/10
attached [4]  39/17 169/10 177/25 179/12
attachment [2]  168/1 179/19
attachments [30]  57/4 60/21 63/8 63/13 94/5
94/8 94/21 169/20 170/8 173/14 173/16
175/4 175/5 176/21 176/22 176/23 177/8
177/13 177/16 177/25 178/8 179/13 179/18
180/23 182/3 182/9 182/15 182/25 183/6
207/18
attempt [2]  172/13
attempted [1]  172/7
attended [1]  172/8
attention [1]  228/7
attest [1]  27/8

attorney [12]  9/21 31/17 49/12 125/14
125/15 171/23 174/17 176/2 179/21 180/3
180/8 180/11
attorneys [3]  138/6 234/9 235/3
audio [7]  107/18 107/19 108/2 108/4 112/16
113/13 113/15
August [3]  75/21 85/14 86/6
August 22nd [2]  75/21 85/14
authentic [7]  167/25 170/6 211/15 211/22
212/1 212/9 212/13
authenticated [1]  213/8
authenticating [1]  200/3
authenticity [1]  181/6
authorities [1]  149/3
authority [1]  32/2
available [2]  86/21 90/5
Avenue [1]  1/17
await [1]  78/1
aware [11]  141/4 141/7 141/9 142/19 146/19
147/5 147/13 147/18 167/1 197/3 199/4
away [4]  78/3 82/6 96/19 233/2

**B**

back [79]  2/3 2/4 2/12 2/15 4/2 8/13 16/9
16/10 16/17 17/11 17/12 20/4 20/6 20/8
21/17 21/17 27/24 28/8 28/9 28/15 33/5
35/19 40/6 45/1 48/1 51/17 52/3 52/11 55/19
56/16 60/15 60/18 61/4 84/5 86/7 96/21
101/18 103/6 104/2 105/25 106/3 106/5
106/6 106/7 106/8 108/14 110/14 110/19
110/24 111/6 113/17 114/5 114/19 115/8
115/14 115/14 116/18 124/10 127/20 128/8
130/15 146/8 146/13 148/1 165/20 166/2
166/3 169/21 171/21 175/7 175/9 197/21
205/3 217/5 223/9 226/9 233/23 234/3 234/5
143/15 147/4
background [7]  12/4 14/4 19/8 19/25 64/9
143/15 147/4
bad [3]  95/3 156/22 222/13
badge [6]  33/10 33/20 33/21 34/2 34/3 34/9
bag [2]  196/13 196/15
bagel [2]  121/4 216/13
bags [2]  196/4 197/3
ball [1]  86/16
band [2]  66/11 66/13
bandage [1]  156/19
banged [1]  149/15
bank [4]  6/19 6/21 18/1 39/21
bare [1]  161/20
bargain [1]  136/5
bars [2]  68/5 73/9
based [6]  15/22 63/15 64/9 119/1 165/1
165/2
basement [1]  105/19
basic [1]  228/2
basically [6]  6/9 12/15 15/7 16/2 56/6 86/9
basis [4]  150/16 157/23 164/10 187/12
Bates [1]  145/19
bathroom [1]  51/4
Beach [4]  1/7 1/19 1/24 132/22
bearing [1]  11/4
because [100]
become [1]  45/11
before [96]
beginning [5]  4/14 111/25 113/10 145/16
222/24
begins [2]  111/24 113/7
behalf [1]  65/13
behind [4]  51/1 155/23 155/25 156/2
being [16]  2/15 5/2 41/3 79/16 128/20 145/6
155/9 158/25 160/10 162/16 165/10 206/7

# B

being... [4] 210/9 210/12 210/14 223/24
beings [1] 219/11
believe [67] 4/5 4/19 11/1 14/14 15/13 16/18 19/17 26/24 29/9 30/6 33/19 37/8 41/12 44/1 44/25 55/8 77/16 86/22 88/19 93/4 93/23 101/13 101/15 106/13 114/1 115/25 123/21 125/14 125/22 127/9 130/20 130/23 132/19 132/21 132/23 135/11 136/20 137/16 147/8 155/22 157/3 159/2 160/10 161/20 162/7 162/8 162/10 166/16 168/11 170/20 175/12 175/16 184/23 194/14 194/24 195/9 196/16 197/17 197/25 198/3 198/20 200/18 204/21 212/12 219/23 221/1 231/22
believes [2] 163/1 163/3
bell [1] 137/23
below [2] 27/17 33/3
Ben [1] 232/22
benefit [1] 161/2
besides [5] 29/14 99/16 138/10 138/10 217/10
best [14] 5/19 19/2 41/24 44/23 55/24 67/14 136/7 139/3 194/23 195/24 198/7 198/12 199/11 204/22
better [10] 80/8 101/1 133/2 159/25 194/3 203/9 203/14 203/20 203/25 205/10
between [28] 12/24 30/7 35/11 47/15 47/16 78/14 80/4 85/11 91/16 94/15 98/2 121/6 134/10 166/10 167/25 169/1 169/6 171/18 173/18 173/23 175/14 175/24 175/25 176/14 182/2 201/23 209/20 222/13
beverages [1] 82/9
beyond [1] 224/11
bias [1] 164/1
big [4] 6/11 79/14 82/7 229/12
bill [26] 19/1 20/17 87/13 186/13 189/22 203/11 205/13 206/14 206/16 206/20 206/23 211/5 213/10 213/16 213/17 213/22 217/16 218/3 221/24 221/24 222/3 222/4 222/7 222/13 222/16 222/25
binder [30] 8/23 8/23 9/11 22/5 24/17 24/19 24/20 26/3 30/19 35/6 39/2 41/2 44/2 47/1 48/18 49/23 52/23 57/5 58/15 61/10 69/6 74/16 79/24 92/10 106/18 117/12 121/16 127/7 223/12 223/15
Biosense [1] 143/15
Biosig [3] 142/19 142/21 147/24
birthday [1] 106/14
bit [15] 17/1 23/20 34/24 36/23 40/24 65/1 74/1 76/10 104/18 115/20 115/25 164/12 167/21 167/22 201/8
black [2] 204/25 205/1
blank [1] 53/9
blind [8] 195/23 196/1 196/3 196/7 196/8 200/17 202/1 202/23
block [1] 193/25
blocked [3] 193/10 193/19 193/22
blocking [1] 194/2
blocks [1] 8/21
blow [17] 5/19 26/4 34/24 35/23 36/23 39/5 43/9 44/3 47/1 47/14 47/15 52/22 100/25 100/25 112/12 117/11 167/21
blue [3] 122/20 192/13 192/20
board [2] 126/19 126/20
Boca [26] 6/1 12/12 13/6 17/8 34/18 35/15 36/10 37/7 65/16 73/14 73/16 75/1 75/12 75/23 78/23 102/8 104/11 108/18 121/4 121/5 170/13 170/15 172/17 213/24 214/4 225/24

body [1] 204/12
bodyguard [2] 34/7 98/11
bonds [1] 32/3
bonus [1] 11/3
booklet [1] 223/11
boom [1] 188/18
boots [1] 67/2
both [6] 53/19 208/6 213/5 213/6 224/7 228/20
bottom [33] 30/25 31/7 32/7 34/22 34/22 38/2 40/16 42/5 47/18 53/14 55/11 57/25 59/17 61/17 63/3 63/19 66/6 68/6 68/10 74/22 75/9 75/20 78/16 85/15 90/20 122/8 123/13 126/17 167/20 169/5 173/9 180/16 180/22
bought [8] 16/10 119/22 119/24 119/24 210/8 212/11 212/18 213/12
box [1] 106/7
boxes [5] 105/1 105/17 105/21 106/2 106/4 106/12
boychick [3] 43/23 43/24 66/16
brace [3] 157/10 157/11 157/14
break [19] 51/6 51/11 90/2 90/5 104/18 109/9 109/10 109/15 109/19 115/24 116/15 142/9 142/11 142/12 142/13 159/6 159/8 159/12 160/3
breaking [2] 111/4 159/5
brief [1] 141/19
briefly [1] 46/24
bring [10] 2/9 8/17 48/8 52/3 52/8 110/18 144/25 165/20 183/8 221/19
bringing [2] 191/3 226/5
broke [2] 52/16 176/8
broken [1] 14/16
brokerage [9] 32/21 32/22 68/20 73/20 73/22 73/22 84/11 84/18 91/3
brother's [1] 55/18
brought [4] 10/22 11/1 51/21 176/13
brown [1] 67/1
Budimir [27] 139/13 139/16 139/22 140/1 140/8 143/3 143/12 143/21 145/7 146/7 146/12 191/25 192/2 193/7 193/9 194/22 195/10 196/5 196/18 197/5 197/11 197/15 198/6 198/12 198/17 222/23 223/5
builders [2] 230/23 231/3
building [1] 184/5
bum [1] 156/22
bunch [3] 56/17 65/23 83/21
Bunes [12] 15/13 15/14 128/11 128/21 129/23 141/9 143/23 145/5 146/1 197/21 221/12 222/10
Bunes' [1] 143/14
buried [1] 5/3
business [20] 15/2 29/16 30/16 42/21 46/6 103/21 105/16 147/4 147/13 218/9 229/11 229/21 229/21 229/23 230/1 230/6 230/8 230/8 230/13 231/11
businesses [2] 147/10 147/12
busy [1] 67/5
buy [10] 56/14 80/16 81/7 105/8 119/17 119/19 172/7 210/10 215/19 230/24
buying [1] 73/25

# C

C-a-r-t-e-r [1] 3/10
cable [44] 13/16 20/12 20/14 20/18 20/21 140/12 184/6 186/16 186/20 187/1 188/25 189/15 190/8 190/20 191/10 191/12 191/14 191/15 191/18 195/11 195/24 197/11 198/6 198/7 198/11 200/19 201/1 201/14 201/16

202/4 202/5 202/7 204/25 205/1 205/1 205/1 217/13 217/14 218/8 218/14 221/4 221/4 221/5 221/6
cable's [1] 205/6
cables [98]
California [14] 18/5 18/10 18/12 18/13 18/20 19/15 19/17 19/21 21/17 28/8 35/16 140/14 140/17 140/20
called [27] 7/9 22/25 29/3 42/23 45/3 55/22 78/24 99/13 103/14 120/17 122/10 122/19 142/19 143/15 144/8 154/1 166/13 187/1 189/4 189/7 189/11 190/17 201/1 201/14 201/25 222/10 230/8
calling [2] 149/16 196/9
calls [5] 2/20 27/18 27/20 78/1 98/16
came [20] 55/19 56/16 73/14 73/15 114/10 115/14 115/14 116/24 120/15 123/14 145/3 154/13 154/14 154/17 154/21 155/16 196/4 196/18 206/20 222/3
can't [15] 66/22 78/11 80/3 123/25 135/9 160/14 168/25 169/6 177/1 182/21 186/2 188/10 214/18 216/17 219/17
Canceled [1] 76/5
cannot [1] 150/15
capable [2] 63/16 63/25
cappuccinos [2] 83/24 84/3
caption [1] 67/13
car [10] 17/2 41/12 41/15 67/25 82/24 83/1 83/2 83/4 83/6 83/7
card [1] 31/21
Cardiac [16] 41/7 42/1 42/24 45/3 57/14 57/17 57/20 57/23 101/20 111/10 111/23 112/19 112/25 113/3 113/4 113/19
care [5] 36/11 36/11 68/3 86/1 151/24
carefully [6] 39/20 39/21 86/17 136/6 141/16 177/6
Carolina [6] 14/15 14/20 15/1 15/6 105/25 223/20
carpet [1] 23/10
carries [1] 63/20
carry [2] 34/4 165/15
cart [5] 156/20 157/13 157/18 157/22 158/1
CARTER [384]
Carter's [9] 141/18 146/15 150/5 153/15 157/22 162/21 183/16 199/11 201/8
Casablanca [1] 12/16
case [12] 1/2 51/8 88/19 109/12 130/25 136/24 137/2 137/7 159/14 162/5 209/14 233/24
cash [7] 18/3 73/8 73/10 85/2 96/25 97/3 97/5
cat [1] 22/21
catch [1] 4/9
cause [3] 83/8 134/11 158/14
caused [1] 134/19
CD [1] 140/23
ceiling [1] 6/14
cellphone [2] 141/23 142/7
CEO [3] 122/11 128/14 197/21
CEOs [1] 128/17
certain [5] 5/16 6/9 78/4 91/15 207/10
certainly [3] 136/24 195/3 216/18
certificate [5] 74/11 74/18 75/5 75/17 237/11
certificates [8] 68/23 69/1 73/17 73/18 74/12 84/9 84/14 86/7
Certification [1] 31/4
Certified [1] 237/13
certify [1] 237/13
cetera [2] 98/11 98/11
chain [1] 167/25

**C**

chair [1]  3/3
chance [1]  142/17
change [5]  53/10 57/13 58/23 168/2 169/8
changes [1]  54/3
charge [1]  15/23
charges [3]  10/21 11/1 186/14
Charles [1]  1/20 1/21
check [2]  31/21 66/12
checks [1]  17/25
chef [1]  98/10
chest [7]  192/15 192/16 204/20 205/7 220/19 220/23 221/5
chief [3]  128/11 128/13 222/23
child [2]  51/21 51/23
China [5]  210/8 212/12 212/18 213/2 213/12
chosen [1]  199/20
Christina's [1]  43/17
chrome [1]  180/25
chronologically [1]  115/21
chunk [1]  72/10
cigar [1]  86/18
Cincinnati [5]  103/5 104/1 104/22 105/21 106/12
circumstances [1]  12/8
city [3]  5/24 19/18 55/20
city-wise [1]  55/20
claimed [1]  139/23
claims [1]  150/23
clamoring [2]  72/9 89/2
clarify [2]  5/15 32/21
clarity [3]  125/13 201/7 201/9
Clark [1]  133/17
class [4]  223/19 223/23 224/9 225/7
classify [1]  229/1
clear [30]  3/19 12/11 17/7 20/13 25/14 29/11 41/23 43/4 56/24 60/25 70/15 71/23 76/6 77/10 84/12 84/24 87/15 87/21 94/19 104/9 114/10 115/17 115/17 134/3 134/7 137/3 164/18 164/20 181/25 188/14
cleared [1]  205/14
clearly [1]  164/18
Clematis [1]  1/24
clip [11]  107/22 107/25 107/25 108/3 111/24 112/3 112/14 113/7 113/9 113/12 113/14
clips [1]  113/5
clock [2]  170/24 172/2
close [1]  230/3
closer [1]  132/25
closing [1]  231/11
clubs [1]  17/17
coast [1]  221/14
code [1]  166/21
coerced [3]  149/6 151/6 151/22
coercion [1]  149/20
colleagues [1]  4/8
color [2]  203/3 203/4
column [3]  122/10 122/18 123/2
comes [1]  178/13
comfortable [1]  32/18
coming [7]  21/17 71/12 172/17 173/3 173/4 173/5 220/24
commercial [1]  14/20
commercially [1]  16/10
Commission [2]  11/14 120/11
commit [1]  9/13
committed [2]  11/19 11/22
committing [1]  11/16
common [1]  216/20

communicate [2]  155/8 158/22
companies [5]  60/8 108/13 109/1 112/25 123/24
company [49]  7/9 7/13 13/15 18/19 25/19 27/5 27/11 29/8 41/22 42/23 45/3 62/4 69/2 69/3 69/22 69/24 69/25 71/23 73/13 103/14 106/1 111/17 131/17 141/5 141/10 142/19 142/24 143/11 143/15 145/16 146/7 146/12 147/6 147/6 147/14 147/19 147/20 162/11 197/21 198/8 198/25 199/4 199/25 205/19 217/7 217/10 221/24 223/20 229/12
competency [1]  232/18
competent [4]  146/15 196/22 233/1 233/5
complaining [1]  161/8
complete [1]  142/6
completed [1]  6/17
completely [4]  5/2 186/21 213/7 215/2
compliant [1]  189/15
computer [4]  79/21 80/11 81/6 97/19
Concealed [1]  34/3
concentrate [1]  145/20
concern [5]  91/13 145/15 146/7 146/11 146/19
concerned [2]  145/7 224/21
concerns [1]  146/16
concluded [5]  142/15 152/4 188/23 210/19 225/13
condition [1]  158/15
conditioning [1]  6/5
conduit [1]  203/14
conference [5]  142/15 152/4 188/23 210/19 225/13
conferring [1]  186/2
confirm [1]  32/21
confirmation [1]  39/19
confirming [1]  39/18
confirms [3]  26/21 91/13 91/18
conflicting [2]  27/6 27/8
confusion [1]  90/6
connect [1]  204/19
connected [1]  220/18
connection [10]  11/16 137/10 172/3 186/16 186/20 187/2 205/7 205/10 205/23 206/3
Connections [12]  61/20 62/2 69/20 69/21 91/17 91/18 91/21 95/7 95/17 96/1 96/9 96/16
connectivity [2]  64/4 64/11
connector [4]  189/11 192/5 215/18 216/8
Consider [1]  86/2
consideration [4]  62/10 62/16 91/19 91/23
consistent [1]  184/4
conspiracy [6]  9/13 11/7 11/9 11/11 131/4 131/5
conspire [1]  11/9
consult [7]  21/6 63/7 63/11 63/20 64/4 64/10 64/15
consultant [2]  62/16 63/7
consultants [2]  91/14 96/15
consulting [16]  61/13 61/14 61/15 63/2 64/14 70/14 70/15 84/12 91/15 95/1 95/6 95/15 95/16 96/1 96/8 96/16
consults [1]  141/9
consumer [1]  231/7
consumers [2]  230/16 231/3
Cont.'d [3]  181/18 236/7 237/2
contact [26]  28/16 43/1 99/12 103/8 103/23 105/3 105/14 128/25 129/10 129/14 152/16 152/21 153/2 153/13 153/18 161/21
contacted [3]  16/22 120/10 149/14
contacting [2]  148/8 152/10

contacts [6]  43/20 44/20 44/22 45/9 46/6 133/10
container [1]  232/12
content [3]  58/8 107/2 143/5
continual [2]  63/7 63/12
continue [5]  2/5 2/16 52/13 111/1 166/6
continuity [6]  190/9 190/21 192/20 203/9 203/20 203/25
contract [10]  62/12 64/24 65/4 65/10 65/22 88/12 89/19 144/11 144/25 145/3
contractor's [1]  229/8
contracts [3]  43/21 49/15 68/15
contractual [2]  70/14 70/16
contribute [1]  30/9
control [7]  33/9 38/2 38/8 93/18 166/16 166/17 166/20
controlled [1]  120/20
convenience [1]  88/25
conversation [1]  14/3
conveying [1]  159/22
convicted [2]  11/3 132/13
convince [1]  56/14
cooked [1]  98/8
cooperation [2]  136/8 233/22
coordinates [1]  39/17
copied [3]  49/2 50/20 94/10
copies [6]  89/1 89/13 89/24 90/4 90/4 116/20
copy [7]  23/24 53/23 53/25 54/1 121/25 121/25 178/18
Coral [1]  20/24
cord [2]  219/18 226/9
corporate [3]  15/11 19/16 31/4
correct [148]
correctly [1]  177/4
couldn't [12]  60/5 92/5 142/6 153/2 161/20 163/14 163/18 176/25 179/7 206/15 215/6 217/23
counsel [20]  138/14 148/5 148/9 148/13 149/11 149/14 149/16 152/11 152/13 160/11 161/1 161/14 162/18 162/21 164/11 174/19 228/8 228/11 228/12 231/19
count [2]  136/13 136/14
county [1]  17/18
couple [4]  72/18 106/4 122/7 123/12
course [4]  5/18 87/2 220/3 225/9
court [22]  1/1 1/23 2/1 5/5 9/7 71/12 72/11 89/15 127/9 139/10 148/16 151/8 151/10 160/11 162/24 164/17 181/9 182/25 192/6 200/8 209/15 212/4
Court's [7]  130/10 150/8 159/7 164/18 165/10 188/15 207/19
courtroom [16]  2/10 51/10 52/9 109/17 110/22 134/4 137/6 137/10 137/12 137/15 137/16 138/10 159/17 165/25 220/14 234/2
courtrooms [1]  137/9
cousin [2]  55/1 55/2
cousin's [1]  55/18
cover [1]  96/11
covered [1]  138/25
CPE [1]  1/23
CR [1]  1/2
crack [1]  66/9
crash [2]  156/20 158/1
crashed [3]  157/13 157/19 157/22
create [9]  7/7 26/10 58/21 60/4 60/5 83/6 92/5 111/20 113/19
created [25]  25/2 25/3 57/9 57/10 57/18 58/7 58/18 58/19 60/21 60/23 60/24 60/25 72/2 90/16 90/17 91/5 91/10 92/3 93/3 106/23 106/24 107/10 111/8 111/15 136/16

# C

creates [2] 161/16 164/1
creating [6] 7/19 60/2 60/8 70/2 70/5 90/21
credibility [2] 150/21 151/7
crew [1] 14/25
crime [3] 8/14 131/2 131/4
Criminal [1] 1/16
Cross [5] 132/1 132/3 181/18 236/5 236/7
Cross-examination [2] 132/1 132/3 181/18
CRR [2] 1/23 237/19
cumulatively [1] 209/19
curious [3] 224/5 224/7 234/12
current [1] 6/24
custodian [1] 225/3
customer [6] 41/6 41/22 45/11 54/7 54/11
230/19
cut [2] 66/13 66/14
Cutter [10] 103/18 104/2 104/20 104/22
105/1 105/6 105/8 105/11 105/14 105/17
Cutter's [6] 103/5 103/8 103/10 103/13
103/21 105/3

# D

D.C [5] 10/1 10/2 125/3 137/13 138/22
Dairy [1] 1/21
damaged [1] 233/9
dark [1] 67/1
date [36] 25/4 28/11 35/8 39/25 61/24 74/22
75/1 75/9 75/12 75/20 75/23 77/19 80/9
81/14 82/18 83/17 85/13 99/19 102/10
102/11 104/12 104/13 106/14 106/15 108/19
108/21 117/17 121/13 157/4 168/18 179/3
179/5 179/10 179/13 188/21 207/9
dated [2] 185/11 237/16
dates [2] 207/3 207/3
dating [1] 146/13
daughter [1] 154/20
Dave [1] 219/12
days [5] 125/20 155/2 155/5 156/11 175/7
Daytona [1] 83/25
DB15 [4] 215/17 216/7 216/10 216/14
DC [1] 1/17
deal [3] 181/12 198/4 233/16
dealing [1] 29/8
dealings [1] 171/1
Dear [3] 53/9 57/13 58/22
death [1] 231/11
debit [1] 31/21
deboned [1] 98/9
deceased [1] 214/21
December [13] 35/10 45/23 47/6 47/23 48/21
50/5 52/24 54/17 107/20 107/23 111/25
113/6 113/10
December 18th [5] 107/20 107/23 111/25
113/6 113/10
December 2007 [1] 45/23
December 26th [1] 54/17
December 27th [1] 47/23
December 28th [3] 48/21 50/5 52/24
December 30th [1] 47/6
decide [5] 9/18 9/21 9/24 162/12 165/7
decisions [1] 32/21
declaration [9] 223/18 224/11 224/16 224/20
225/15 225/18 228/2 228/16 228/21
declarations [1] 228/20
declare [1] 128/4
deemed [1] 61/25
deeper [1] 163/8
DEFENDANT [3] 1/7 1/18 7/2

Defendant's [10] 167/8 181/15 208/2 237/3
237/4 237/5 237/6 237/7 237/8 237/9
Defendant's 404 [1] 208/2
defense [25] 3/25 4/1 4/6 4/21 4/22 4/24 5/12
43/7 44/2 54/15 110/17 132/8 167/16 167/19
170/7 180/17 180/18 181/16 200/2 208/25
210/22 226/9 226/21 227/5 235/4
definitely [6] 3/20 204/22 218/16 223/3
226/12 226/15
deliberately [1] 150/17
delivered [1] 232/12
delivery [2] 53/10 58/24
demo [1] 198/1
demonstrating [1] 193/6
demonstration [8] 193/10 193/11 193/25
194/13 195/11 195/19 200/7 223/6
deny [1] 169/24
denying [2] 164/9 170/4
Department [28] 1/16 33/10 33/21 33/22
33/25 132/17 133/9 133/19 134/14 135/4
135/7 136/6 139/2 146/21 146/23 147/1
147/22 152/20 153/1 153/12 154/11 155/20
155/21 155/22 173/22 174/10 174/16 174/18
departure [2] 128/12 128/16
deposit [1] 84/10
deposited [1] 73/20
depositing [1] 17/25
deposition [12] 137/14 187/6 188/3 188/8
188/10 188/11 188/17 190/12 215/10 218/11
219/1 234/20
Depot [1] 215/19
deprivation [2] 149/20 151/23
deprive [1] 164/21
deprived [1] 156/11
describe [9] 17/1 22/10 33/20 56/4 69/15
81/4 86/3 120/13 121/2
described [3] 35/13 35/17 62/9
describing [1] 219/17
design [7] 25/8 25/12 70/23 186/16 189/1
191/25 218/14
designed [4] 186/20 191/24 215/24 215/25
designing [2] 70/24 184/5
desks [2] 194/19 194/19
Despite [1] 14/7
detail [2] 10/6 121/11
determine [1] 189/14
determining [1] 30/12
develop [10] 63/21 198/23 198/23 201/14
215/2 215/8 215/9 215/17 216/6 219/16
developed [18] 27/7 27/12 139/23 186/20
189/11 190/8 190/11 190/17 190/20 197/5
198/21 198/25 199/5 200/22 200/24 206/8
215/5 215/6
developing [5] 70/24 80/7 187/1 206/6 220/4
development [15] 25/8 25/12 63/8 63/12 64/4
64/11 70/23 186/10 186/15 187/17 187/25
200/6 207/1 207/4 210/7
device [15] 19/8 20/1 64/17 105/6 129/5
129/13 184/16 191/3 191/18 192/6 195/6
200/7 205/23 206/3 230/22
devices [3] 13/24 141/6 141/10
DHL [7] 73/14 73/16 75/1 75/11 75/25 76/7
84/9
diabetes [5] 149/17 155/8 155/14 156/7
156/14
didn't [62] 5/16 19/8 19/25 54/1 65/1 126/25
131/7 135/22 135/22 138/17 140/22 140/24
144/12 144/25 145/3 151/6 153/7 153/18
153/19 155/22 156/6 159/9 160/18 162/2
162/2 163/10 163/14 171/15 172/1 174/13

174/20 174/24 175/6 175/17 176/17 176/23
179/25 183/6 185/21 190/1 193/14 196/4
196/15 197/16 197/19 199/9 201/14 214/1
215/1 215/8 216/21 216/23 217/24 219/16
222/3 223/20 224/16 225/20 230/13 230/25
231/25 232/10
difference [9] 161/12 161/13 162/19 162/20
169/1 169/4 169/6 175/25 201/23
different [12] 28/19 48/8 99/8 165/18 180/13
183/10 183/14 188/19 189/20 202/2 204/19
231/2
dimmers [1] 6/13
dinner [4] 214/2 214/8 214/9 214/20
dire [4] 51/20 178/12 178/20 236/6
direct [6] 3/21 5/22 17/25 176/17 223/25
236/4
directed [2] 7/21 97/9
direction [1] 109/7
directive [1] 210/3
directly [1] 91/19
director [1] 141/5
dired [1] 182/10
disc [1] 19/23
disclosure [1] 51/19
discuss [9] 51/8 51/12 65/6 109/12 110/7
159/14 160/2 233/24 234/4
discussion [1] 183/2
discussions [1] 174/19
Dishonesty [1] 83/8
dismiss [2] 150/12 164/6
disparity [9] 171/18 173/18 173/23 175/14
175/18 175/20 176/2 176/14 182/1
dispense [1] 91/22
displayed [1] 5/18
disposition [1] 32/3
dispute [1] 116/1
distinctly [1] 216/11
distinguished [1] 201/16
distress [1] 154/19
distribute [1] 105/9
distribution [3] 53/11 54/8 54/11
DISTRICT [3] 1/1 1/1 1/13
Division [1] 1/16
doberman [4] 22/20 22/20 22/22 22/25
doctor [2] 43/19 44/21
document [96]
documents [38] 7/7 7/9 7/19 12/3 34/12
60/23 60/24 69/16 89/16 94/18 100/3 100/4
100/7 100/20 111/20 115/24 115/25 116/13
133/14 136/19 138/23 140/3 140/6 143/5
146/9 160/22 171/12 174/25 175/1 176/4
176/14 177/10 177/11 179/11 183/12 183/13
207/21 232/13
does [47] 11/2 22/6 22/8 22/9 22/11 22/22
22/23 31/20 50/16 53/23 53/25 60/20 62/16
66/19 79/5 94/18 98/13 98/15 103/18 103/20
107/5 118/18 142/10 146/6 148/22 159/22
161/12 161/13 161/14 161/18 161/21 162/19
162/22 163/21 169/14 180/22 180/24 181/2
184/11 184/12 186/7 192/19 200/5 200/15
202/11 226/2 230/21
doesn't [12] 3/3 55/25 112/18 164/12 181/1
186/22 200/21 201/20 211/2 211/11 226/2
230/20
doing [39] 3/13 12/13 23/6 23/9 23/17 28/18
28/21 30/7 32/18 38/15 38/17 38/19 56/5
63/16 63/25 65/23 65/25 68/14 69/2 70/2
70/6 71/7 74/19 82/12 82/14 84/2 84/13
86/19 87/23 88/4 98/14 126/12 149/23 151/6
159/20 206/9 210/4 221/23 222/1

**D**

DOJ [2]  134/23 149/3
dollar [3]  71/14 71/18 71/19
don't [214]
done [32]  2/23 13/21 13/23 27/4 27/11 27/14
39/19 51/21 68/10 68/13 86/2 93/20 94/20
97/2 115/12 126/15 148/20 148/24 149/6
149/21 150/23 159/12 179/25 191/13 191/23
195/24 207/4 207/10 207/11 211/6 218/3
234/21
door [4]  22/16 22/17 120/15 149/15
dots [1]  192/13
double [5]  195/23 196/7 196/8 200/17 202/23
doubt [2]  205/17 234/22
down [47]  3/15 11/24 23/1 28/4 31/7 32/1
36/21 40/25 44/12 55/15 61/6 62/14 63/1
64/2 65/21 76/9 84/7 96/19 98/20 104/20
115/25 118/15 120/7 121/11 121/19 122/2
123/10 124/6 124/7 124/8 127/3 130/13
132/9 138/16 144/8 152/1 167/20 170/14
170/16 173/3 173/4 173/9 189/22 206/17
206/22 222/3 222/8
dozens [1]  27/6
Dr [25]  40/14 49/6 49/7 49/14 49/18 53/9
53/21 53/23 56/25 57/13 58/22 77/4 77/8
77/11 77/14 78/1 78/21 78/24 79/2 79/6
100/17 123/7 123/17 123/23 129/11
Dr. [8]  40/11 49/4 50/19 50/20 77/14 141/5
145/15 146/20
Dr. Drakulic [2]  141/5 146/20
Dr. Drakulic's [1]  145/15
Dr. Harmison [2]  40/11 50/20
Dr. Lowell [2]  49/4 50/19
Dr. Stein [1]  77/14
drafted [1]  53/19
Drakulic [19]  139/13 139/16 139/23 140/1
140/8 141/5 143/3 143/21 146/8 146/20
193/7 193/9 193/18 196/5 197/11 197/15
198/17 222/23 223/5
Drakulic's [4]  143/12 145/7 145/15 146/12
dramatic [1]  226/10
drawing [1]  22/20
drinks [1]  23/12
drive [7]  1/19 16/24 17/14 17/15 17/16 21/20
28/7
driven [1]  83/4
driver's [3]  23/21 33/19 34/10
driving [6]  17/2 17/19 21/18 23/3 28/19
38/13
dropping [1]  27/14
drove [6]  17/2 17/4 17/16 17/24 214/6 214/7
drowning [1]  51/1
due [2]  91/21 118/18
dunning [2]  27/17 27/20
duped [1]  233/7
during [16]  14/3 27/9 28/7 51/11 51/20 67/7
81/18 110/7 121/9 126/7 145/5 155/7 160/2
194/5 194/16 234/4
duties [1]  129/11
DV15 [3]  189/11 190/17 192/5
dyslexic [1]  26/17

**E**

e-mail [102]
e-mail's [1]  85/18
e-mailing [1]  60/18
e-mails [16]  44/16 49/7 52/17 54/3 166/9
167/3 169/7 183/9 198/7 198/10 208/3
208/11 231/16 231/21 231/23 232/1

each [1]  167/2
earlier [8]  40/6 76/10 133/6 142/3 167/24
168/15 223/6 233/15
early [7]  18/4 21/16 61/4 66/1 79/12 117/24
142/12
easier [1]  9/10
easily [1]  220/20
east [1]  221/14
EC [6]  94/16 94/19 94/20 95/1 95/6 95/15
ECG [1]  184/1
Economic [1]  147/2
economies [2]  64/17 64/21
education [1]  6/16
efficiencies [2]  64/16 64/21
eight [2]  113/12 218/12
eighth [1]  61/16
either [8]  30/18 33/12 87/23 125/11 154/17
167/2 171/4 176/11
EKG [2]  204/9 204/12
EKGs [1]  219/21
elaborate [1]  214/12
elaborated [1]  214/13
electrical [19]  14/1 61/20 62/2 69/20 69/21
71/6 71/7 91/16 91/18 91/21 95/6 95/16 96/1
96/9 96/16 147/4 229/8 229/12 230/5
electrically [1]  203/20
electrician [3]  12/21 13/20 203/13
Electrodes [1]  204/8
electronics [1]  98/10
ELMO [1]  179/24
else [38]  13/8 19/15 20/10 21/6 21/13 24/6
30/5 38/15 45/15 47/22 48/14 54/2 65/19
71/23 74/8 77/8 80/18 97/6 97/7 100/16
100/17 103/10 120/21 121/6 131/11 131/17
134/19 150/17 202/6 202/18 202/22 203/2
203/6 205/6 217/10 217/24 227/14 228/15
employed [2]  6/7 228/23
employee [2]  33/21 33/24
encapsulate [1]  98/13
end [6]  6/14 30/25 45/23 83/9 197/11 235/4
ended [1]  197/18
ending [4]  107/21 107/24 112/1 113/11
ends [6]  12/16 32/7 34/22 35/20 61/18 113/8
enemies [1]  48/9
engineer [7]  14/1 128/13 128/17 228/23
229/1 229/5 229/6
engineering [1]  129/4
engineers [1]  197/16
enjoy [1]  83/3
enough [2]  86/15 223/8
enter [2]  38/7 49/15
entered [12]  3/24 5/1 67/11 116/9
167/19 168/15 181/16 208/25 210/22 227/5
entering [1]  49/11
enters [4]  2/10 52/9 110/22 165/25
entire [4]  10/18 187/19 209/20 213/8
entirety [1]  10/16
entitled [5]  119/1 151/3 162/12 217/1 237/15
entity [1]  91/6
envelope [2]  114/14 115/18
equipment [2]  119/24 229/15
errands [2]  82/11 84/2
especially [1]  122/21
Espionage [1]  147/2
ESQ [3]  1/15 1/15 1/20
establish [2]  150/1 151/22
established [3]  181/21 201/13 217/6
establishment [1]  56/9
estate [6]  87/20 231/12 231/19 231/24 232/7
233/3

estimate [2]  6/24 234/14
et [2]  98/11 98/11
et cetera [1]  98/11
evaluated [2]  200/16 200/19
even [22]  14/4 26/23 27/25 37/17 57/23 58/5
59/15 63/16 63/25 80/2 81/25 83/4 151/19
154/7 160/19 164/10 170/11 171/22 175/7
201/14 206/6 220/19
evening [6]  165/11 165/13 233/15 234/1
234/6 235/6
events [1]  194/25
eventually [3]  156/13 159/3 209/22
ever [104]
every [2]  17/24 67/16
everybody [3]  15/20 181/11 194/20
everyone [9]  2/2 2/12 51/17 52/11 72/8
110/13 110/24 166/2 166/5
everything [17]  7/17 44/11 48/6 79/13
108/13 114/25 120/20 159/15 161/4 191/23
209/10 217/6 218/4 225/18 232/3 233/24
235/2
evidence [70]  3/24 4/19 5/11 5/13 5/17 8/18
22/2 24/18 26/1 30/20 36/22 38/24 41/1 43/9
44/3 46/25 47/14 49/24 52/21 54/14 56/23
61/9 66/3 66/20 67/10 69/7 72/21 73/2 74/15
75/4 75/15 77/18 78/10 81/10 81/22 83/14
85/9 88/18 88/23 89/5 89/12 89/14 90/12
92/8 93/6 94/3 97/25 100/23 102/16 106/20
116/1 116/2 116/10 116/18 117/9 118/6
121/14 127/11 143/5 167/19 176/17 179/5
181/17 208/25 210/22 213/9 225/2 227/5
236/10 237/3
exact [2]  9/16 9/18 9/21 16/19 19/17 28/11
125/23 157/4
exact -- I [1]  19/17
exactly [2]  153/5 163/5
exam [1]  176/17
examination [5]  5/22 132/1 132/3 178/20
181/18
examine [1]  164/23
example [1]  123/20
examples [5]  23/8 70/8 97/17 119/22 123/12
exchange [9]  11/14 47/15 47/16 78/14 80/3
85/11 85/13 98/22 120/11
exclusively [1]  32/23
excuse [7]  8/19 28/24 50/24 69/16 74/14
178/15 180/17
excused [1]  51/3
executed [3]  61/25 61/25 91/15
executive [1]  128/12
exhibit [215]
exhibit 100 [2]  5/1 67/11
exhibit 102 [2]  72/16 80/1
exhibit 114 [2]  72/15 78/9
exhibit 119 [2]  89/4 97/24
exhibit 126 [2]  72/13 74/15
exhibit 129 [1]  100/22
exhibit 130 [1]  102/15
exhibit 141 [1]  112/5
exhibit 149 [1]  90/13
exhibit 151 [2]  106/17 108/15
exhibit 153 [2]  72/14 75/3
exhibit 161 [1]  94/2
exhibit 167 [1]  93/6
exhibit 169 [2]  72/14 75/15
exhibit 171 [2]  72/20 85/8
exhibit 173 [2]  72/16 81/11
exhibit 185 [2]  72/19 81/22
exhibit 189 [2]  72/19 82/15
exhibit 194 [2]  72/20 83/14

## E

exhibit 196 [1]  118/4
exhibit 197 [2]  116/2 117/10
exhibit 221 [2]  127/6 223/9
exhibit 225 [4]  4/17 8/17 9/6 11/25
exhibit 237 [1]  92/9
exhibit 238 [1]  121/15
exhibit 241 [3]  4/1 4/22 44/2
exhibit 244 [3]  4/6 4/24 54/15
exhibit 245 [2]  4/17 22/3
exhibit 277 [2]  72/15 77/17
exhibit 278 [3]  141/2 141/15 142/17
exhibit 29 [2]  4/18 24/17
exhibit 300 [3]  4/21 41/1 45/6
exhibit 31 [3]  5/1 69/5 70/9
exhibit 32 [2]  4/18 26/2
exhibit 400 [35]  167/8 168/7 168/9 168/11
169/3 169/24 170/4 170/7 171/12 171/15
171/18 173/16 173/19 174/3 174/4 174/7
174/9 175/2 175/14 175/21 175/25 177/7
177/8 177/9 177/16 177/24 178/9 179/4
180/14 180/19 181/21 181/22 182/7 182/24
183/2
exhibit 401 [1]  177/15
exhibit 404 [2]  207/21 211/15
exhibit 405 [1]  210/21
exhibit 46 [1]  112/3
exhibit 7 [2]  226/9 226/21
exhibit 81 [1]  200/3
exhibit 82 [3]  4/1 4/22 43/8
exhibit 83 [2]  4/21 38/25
exhibit 85 [2]  4/19 30/19
exhibit 86 [3]  4/2 4/22 46/25
exhibit 88 [3]  4/3 4/23 47/13
exhibit 89 [4]  4/6 4/24 50/23 52/20
exhibit 90 [4]  4/5 4/24 49/22 174/7
exhibit 91 [10]  4/3 4/23 48/17 167/6 167/11
167/25 169/12 170/6 171/19 175/14
exhibit 94 [3]  56/22 111/5 113/17
exhibit 95 [3]  4/7 4/25 66/4
exhibit 96 [1]  61/8
exhibit 97 [3]  4/8 4/25 66/21
exhibits [26]  2/22 3/14 4/2 5/16 5/17 51/9
69/16 72/10 88/16 90/3 109/13 116/9 116/17
116/17 165/17 176/1 176/22 178/5 181/15
181/16 183/9 209/19 222/1 234/19 236/10
237/3
exhibits 151 [1]  116/17
exhibits 91 [1]  176/22
exists [4]  57/23 58/5 59/15 59/24
exits [4]  51/10 109/17 159/17 234/2
expecting [1]  144/11
expedite [1]  208/17
experience [2]  63/15 64/10
expert [4]  98/10 98/10 98/16 118/24
expertise [1]  215/7
explain [16]  12/7 22/24 24/24 31/14 39/9
41/11 59/4 59/4 68/13 87/18 99/7 114/8
171/18 171/19 173/18 222/19
explained [3]  48/6 97/3 195/10
explanation [3]  121/18 195/14 195/16
express [1]  91/23
extension [2]  180/5 180/25
extent [3]  186/1 209/14 210/5
extra [2]  89/1 116/20
extraordinarily [3]  150/10 151/9 151/12
extremely [2]  129/3 152/24
eyes [1]  222/6

## F

facility [12]  18/9 19/5 64/16 123/4 123/8
154/24 155/2 155/7 156/20 189/14 190/19
213/19
facsimile [3]  101/6 101/11 102/25
fact [13]  8/3 18/13 20/18 25/24 26/23 77/19
94/10 112/4 119/9 162/3 180/25 193/18
210/13
failed [1]  198/4
failure [3]  155/23 156/6 195/7
fair [23]  10/5 43/12 44/6 47/15 47/18 47/23
48/19 49/11 49/25 53/5 53/15 54/16 62/19
64/3 66/5 77/20 79/15 85/10 98/1 129/19
165/10 212/2 212/3
fairly [2]  22/6 22/10
fairness [2]  155/21 217/14
faith [3]  27/5 27/11 150/16
fake [3]  7/7 7/9 7/19
fall [2]  28/10 28/13
fallen [1]  51/1
false [9]  12/5 122/6 136/17 136/19 140/3
167/3 223/24 225/18 228/3
familiar [3]  59/2 129/4 137/4
family [11]  41/19 46/4 48/8 87/20 142/21
142/24 147/16 147/17 154/18 229/14 231/24
fans [2]  6/14 12/16
far [6]  101/19 119/1 150/22 161/6 165/3
203/3
farther [1]  234/15
fast [1]  120/8
fast-forward [1]  120/8
father [8]  43/17 44/10 44/17 44/19 45/2
45/11 232/19 233/7
father-in-law [5]  44/10 44/17 44/19 45/2
45/11
fault [1]  99/11
favor [2]  82/4 179/25
fax [21]  93/21 99/8 100/20 101/10 101/13
101/14 102/2 102/7 102/24 104/5 104/7
107/15 107/15 108/16 108/18 225/25 226/2
227/7 227/9 227/22 228/18
faxed [4]  60/18 93/22 102/10 108/19
faxing [3]  102/11 104/13 108/20
FDA [11]  189/15 190/19 205/14 205/19
205/23 206/18 217/19 218/2 222/17 222/18
222/19
FDA-approved [1]  205/23
FDL [2]  33/10 33/16
February [9]  77/22 80/10 100/10 185/12
187/6 190/13 211/7 215/11 218/11
February 13 [1]  77/22
February 25th [5]  185/12 187/6 190/13
215/11 218/11
February 3rd [1]  80/10
federal [2]  8/14 131/1
feel [5]  9/11 35/5 126/12 176/2 217/1
fees [1]  87/10
felon [1]  132/13
felony [2]  136/9 136/12
felt [9]  48/7 213/25 217/4 218/4 232/7 232/10
233/5 233/6 233/7
female [2]  137/19 137/20
few [10]  67/9 70/8 80/21 80/24 84/6 88/11
90/4 117/23 126/19 155/13
fewer [1]  159/24
fiddling [1]  194/1
Fidelity [15]  53/11 63/21 64/5 129/5 129/12
184/1 184/6 184/9 187/2 189/1 191/3 191/6
191/12 200/7 205/14

## F

fifth [2]  30/24 124/22
figure [4]  31/18 81/20 124/21 187/19
file [2]  116/24 180/5
filed [3]  117/2 150/12 223/19
fill [2]  36/18 37/21
filled [2]  41/23 45/5
financial [2]  91/14 91/25
find -- I [1]  206/13
fine [9]  7/18 128/19 142/11 165/1 185/24
194/10 224/19 224/20 225/10
fingerprints [2]  114/13 159/24
finish [4]  88/17 165/16 231/1 233/19
finished [8]  58/12 60/2 100/4 164/15 165/6
213/10 213/16 233/11
firm [1]  91/4
first [49]  7/4 12/5 22/4 26/16 26/20 26/25
32/15 35/15 36/1 37/5 53/7 60/16 63/6 63/9
67/20 70/9 74/6 74/7 77/24 82/4 85/15 91/21
94/22 96/12 100/11 101/24 104/3 107/13
108/9 108/14 111/7 113/5 122/8 127/13
128/8 129/9 130/16 145/20 154/1 171/22
175/6 177/17 189/19 191/14 191/17 192/4
209/11 217/16 227/21
fish [1]  98/8
five [15]  29/4 29/6 30/10 30/13 30/16 31/6
31/22 32/20 32/23 32/24 32/25 37/6 37/13
38/3 135/16
fix [2]  67/22 83/1
fixed [2]  83/2 83/9
fixtures [1]  230/23
FL [2]  1/19 1/22
Flagler [1]  1/19
flew [5]  14/15 14/19 14/23 15/9 115/2
flight [2]  47/2 47/3
flip [2]  35/19 77/13
FLORIDA [34]  1/1 1/7 1/24 6/1 12/12 16/9
16/10 16/13 16/17 20/4 20/6 20/24 28/9
28/13 28/15 34/18 35/16 36/10 37/7 65/16
73/14 76/22 76/24 77/2 77/4 83/24 104/11
108/18 132/20 140/10 154/24 173/5 197/12
225/24
flowing [1]  226/10
fly [1]  14/20
flying [1]  43/18
focus [3]  73/11 228/20 228/21
focusing [2]  26/25 52/21
folks [2]  89/2 234/16
follow [4]  15/7 38/11 40/22 106/9
followed [6]  60/14 87/4 87/5 104/16 109/5
109/6
following [12]  2/10 51/16 52/9 110/12
110/22 141/21 148/14 160/5 165/25 187/10
209/8 224/4
follows [1]  127/18
food [5]  38/18 97/20 151/23 168/18 212/24
Foods [2]  166/21 168/13
force [2]  149/6 180/18
foregoing [4]  68/13 128/5 218/15 237/13
forget [3]  13/6 19/17 206/18
form [14]  37/15 37/19 41/23 42/12 51/8 73/8
109/12 159/14 170/22 182/3 189/1 202/11
212/21 233/24
forms [1]  117/23
Fort [1]  217/17
forth [1]  217/5
forthcoming [1]  224/7
forward [7]  28/6 38/12 61/3 115/21 120/8
132/15 164/19
forwarding [2]  50/1 50/2
found [1]  206/15

**F**

foundation [1]  181/5
four [6]  67/1 67/1 76/18 115/25 149/17
207/18
fourth [2]  37/8 123/21
frame [1]  52/1
frames [1]  67/2
Franklin [6]  1/23 55/25 109/22 237/12
237/18 237/19
fraud [9]  9/13 9/14 11/7 11/7 11/16 11/9
11/22 224/8 224/8
free [3]  9/11 35/5 125/24
frequent [2]  129/10 129/14
friend [4]  43/25 98/10 103/5 104/22
friends [1]  48/9
front [21]  17/10 32/8 35/21 52/23 68/8
126/17 127/24 136/23 137/1 137/2 137/8
138/5 149/15 151/13 160/19 163/7 168/14
190/12 202/8 211/1 225/15
frustration [1]  26/24
frustrations [2]  27/4 27/8
fucked [1]  83/5
full [2]  51/19 85/17
fully [1]  129/4
fundamental [1]  10/9
funds [1]  32/22
further [2]  194/7 201/5

**G**

gambit [1]  139/1
gas [1]  67/25
Gault [9]  128/18 128/22 129/24 172/17
172/20 172/23 173/1 193/7 194/14
gave [26]  8/13 19/23 20/8 24/2 27/24 31/10
31/14 42/12 42/17 58/13 60/3 72/4 85/4 91/8
93/4 99/16 100/13 107/11 119/13 130/2
145/12 166/24 174/16 188/20 195/14 233/2
gears [2]  40/24 115/20
gee [1]  180/25
general [8]  35/2 35/11 68/25 74/10 80/14
84/19 203/20 205/4
generally [10]  28/12 44/13 67/20 74/17
82/20 86/4 87/18 147/18 166/11 184/1
generating [2]  85/2 87/6
generator [3]  12/9 12/10 13/2
gentleman [1]  164/23
gentlemen [6]  2/13 51/7 109/11 110/25
159/13 233/21
geographically [2]  104/10 125/2
George [1]  133/17
gets [4]  10/21 11/3 151/5 203/9
getting [21]  21/9 40/17 68/23 69/1 74/25
80/8 82/7 86/6 86/9 86/25 88/4 88/13 96/21
96/22 97/3 103/7 155/18 190/16 198/8
203/11 209/17
give [33]  4/8 6/12 6/21 6/24 11/2 15/5 16/16
19/22 23/8 24/5 32/2 34/19 39/19 58/8 61/1
80/12 80/22 91/6 92/3 97/17 100/14 100/16
102/23 103/10 116/12 119/22 120/2 155/17
155/23 156/7 165/1 195/15 234/14
given [9]  58/9 103/7 103/23 105/3 120/3
149/17 155/9 160/9 166/23
gives [4]  57/14 58/24 205/9 205/10
giving [5]  86/7 155/19 164/25 165/3 208/8
glove [2]  114/13 115/10
gloves [1]  114/11
gmail [1]  169/4
GNC [1]  68/4
goal [1]  207/3

going [117]
gold [15]  73/8 83/25 189/12 190/17 203/8
203/13 203/14 203/19 203/25 218/8 218/13
218/17 218/19 218/23 218/24
golf [2]  213/24 220/2
gone [5]  161/24 198/2 214/24 216/25 228/25
good [15]  2/2 2/12 5/24 27/5 27/11 83/1 83/7
86/15 132/5 132/6 150/16 171/24 172/1
190/9 190/21
good-faith [1]  150/16
goofy [1]  85/19
Google [2]  180/19 181/2
got [56]  2/22 4/16 6/5 8/9 15/12 16/17 20/6
28/15 43/17 52/25 53/1 55/14 61/19 68/7
73/18 75/11 76/7 77/14 83/24 84/8 88/15
88/19 89/1 89/21 95/21 97/5 97/12 101/8
105/18 114/9 115/12 119/12 120/16 131/7
132/7 139/15 146/9 153/21 153/25 156/14
158/8 158/16 160/13 165/17 174/17 176/5
176/14 177/8 185/5 185/5 211/1 222/1 232/1
233/1 233/20 234/15
gotten [4]  4/13 49/18 162/1 202/19
government [43]  1/4 1/15 2/20 3/2 3/24 4/2
4/2 4/3 4/3 5/10 9/20 10/17 35/3 37/2 48/17
73/1 89/12 94/7 116/9 141/3 149/1 150/13
150/22 152/15 152/17 167/11 168/15 169/2
169/24 170/6 171/15 175/7 176/13 177/17
181/20 182/13 182/22 182/24 183/8 184/21
207/22 223/8 225/16
Government's [107]
Government's 221 [1]  127/11
Government's 237 [1]  93/24
Government's 296 [1]  36/22
Government's 31 [1]  73/5
Government's 90 [2]  173/8 173/11
governmental [1]  160/12
grab [1]  191/6
grade [1]  6/18
grand [26]  136/22 136/23 136/25 137/1
137/2 137/4 137/5 137/8 153/7 153/9 153/21
154/4 160/15 160/16 160/19 160/21 161/17
161/18 161/21 161/24 161/25 162/4 162/1
162/13 163/24 163/25
gray [10]  202/3 202/19 203/4 205/1 219/23
219/24 220/3 220/8 220/11 221/9
great [2]  109/25 109/25
greed [1]  109/5
Greenville [11]  14/15 14/19 15/1 15/9 15/9
16/7 144/16 144/18 144/20 228/9 228/11
grew [2]  147/13 229/23
ground [1]  216/20
grounds [3]  148/12 181/5 209/2
group [3]  53/11 53/16 53/17
growing [2]  230/6 230/18
guess [11]  5/15 115/16 140/14 150/1 150/20
151/25 153/22 188/9 201/6 209/6 210/6
guilty [21]  8/14 9/12 9/13 10/3 11/5 11/6
131/1 131/4 132/12 136/10 136/12 138/12
138/13 138/21 138/22 148/23 149/7 149/20
149/22 151/24 162/8
gun [1]  34/4
guy [3]  45/9 56/8 56/14
guys [2]  202/4 214/5

**H**

habit [1]  180/18
hadn't [1]  174/4
half [6]  53/14 56/13 63/3 100/11 100/25
115/16
hand [12]  3/1 3/16 5/16 17/12 72/10 89/16

114/11 114/13 115/10 195/7 201/25 202/1
handed [2]  90/7 142/1
handing [4]  3/15 88/25 89/3 89/13
handle [1]  29/16
hands [1]  230/1
hands-on [1]  230/1
handwriting [7]  33/3 33/5 33/7 42/6 42/10
42/11 124/11
handwritten [1]  33/12
handy [1]  89/1
handyman [3]  6/9 12/15 13/20
happen [6]  10/12 77/7 122/25 124/1 125/2
193/14
happened [19]  14/13 78/5 78/6 114/8 120/14
122/16 122/17 134/10 134/19 147/9 158/19
163/6 170/7 194/25 210/1 212/13 214/16
215/5 222/5
happening [1]  105/4
happens [3]  10/19 142/13 163/4
hard [3]  6/6 43/21 86/18
Harmison [52]  24/6 39/24 40/11 40/11 40/14
49/4 49/6 49/7 49/14 49/18 49/20 50/19
50/20 53/9 53/21 53/23 54/4 56/25 57/13
58/22 65/9 65/17 71/25 76/11 76/13 76/17
76/19 76/21 77/4 77/8 77/11 77/14 78/1
78/21 78/24 79/2 79/6 100/17 122/10 122/19
123/7 123/14 123/17 123/23 123/24 128/14
128/21 129/11 129/11 129/15 129/23 131/13
Harmison's [1]  128/16
hasn't [2]  161/5 179/24
hat [1]  232/22
haven't [3]  143/11 164/9 182/4
having [11]  12/20 13/10 13/16 66/18 67/7
83/15 132/12 146/22 173/18 217/5 228/6
he'd [3]  81/5 97/19 97/20
he's [33]  67/20 67/23 68/2 79/16 82/8 82/21
91/3 98/4 108/8 108/12 112/21 112/23
150/13 161/22 163/2 163/3 163/3 164/17
165/6 165/15 172/1 172/12 179/4 185/19
195/13 196/22 201/9 201/20 210/4 210/4
210/7 210/11 210/13
headed [2]  150/9 224/7
headquarters [1]  15/11
healthcare [16]  13/24 58/23 59/8 59/10
59/11 59/13 59/15 103/14 103/19 107/7
107/19 108/21 111/19 111/23 112/19 112/25
hear [7]  6/3 6/6 10/23 142/6 162/2 179/7
186/2
heard [9]  16/14 96/4 96/6 156/14 161/13
190/2 190/5 202/13 211/18
hearing [1]  12/20
hearsay [6]  195/12 198/14 199/7 209/2
209/14 210/3
heart [25]  7/13 13/15 13/21 14/5 18/9 19/6
21/13 46/3 46/8 50/8 50/10 50/17 56/14 63/9
64/11 64/21 105/9 129/5 129/12 141/6
141/10 184/6 184/9 187/2 191/3
heavier [2]  220/16 220/23
heavy [4]  219/22 220/18 220/20 221/4
held [6]  89/23 141/21 148/14 187/10 209/8
224/4
hello [1]  140/25
help [14]  7/7 7/9 13/18 14/7 14/8 21/3 27/5
27/11 117/4 216/24 230/20 232/15 232/17
234/23
helped [3]  117/6 118/12 215/17
helping [2]  8/3 13/17
here [71]  24/25 26/6 33/9 34/12 39/7 43/18
43/18 50/20 57/13 67/12 69/12 70/9 76/10
78/11 86/5 86/24 88/18 95/10 95/20 106/19

**H**

here... [51]  108/25 113/5 116/24 121/21
122/7 123/6 128/1 128/4 129/20 129/23
130/20 132/20 136/8 138/10 140/10 140/10
140/11 141/4 144/8 146/2 146/10 146/19
151/17 161/25 164/12 165/14 166/3 167/1
169/7 169/23 174/5 177/6 178/22 178/24
180/2 182/25 186/19 187/8 187/15 200/8
204/10 206/17 207/11 209/7 209/17 210/14
211/5 216/3 219/15 223/25 225/3
hereby [1]  53/10
Hey [2]  44/10 66/11
higher [1]  191/8
highest [1]  6/16
himself [5]  8/5 22/25 60/6 92/6 124/19
hired [3]  128/9 128/11 128/20
hit [4]  117/22 118/2 158/7 158/8
Hogan [1]  232/22
Hogan-style [1]  232/22
hold [11]  24/19 62/23 62/24 84/15 88/14
89/20 89/22 95/21 139/8 191/6 234/13
holding [8]  90/9 90/10 92/1 92/19 92/20
96/20 142/25 174/9
holds [1]  91/18
home [7]  48/8 75/11 78/2 78/7 79/14 153/1
215/19
homes [2]  6/10 12/16
honest [1]  83/7
honestly [6]  135/9 183/4 192/7 212/23
214/18 228/7
honesty [4]  145/7 145/15 146/8 146/12
Hong [3]  53/17 54/10 54/12
Honor [108]
HONORABLE [1]  1/12
hook [1]  204/20
hope [2]  2/13 2/14 10/12 136/8
hopefully [2]  106/18 234/18
Hospital [14]  41/7 42/1 42/24 45/3 57/14
57/17 57/20 57/23 101/20 111/10 112/19
113/3 113/4 113/19
hotel [3]  115/7 125/8 125/16
hour [2]  56/13 170/8
hours [1]  134/5
house [36]  12/12 13/3 17/5 17/8 34/17 34/17
41/15 65/16 73/14 75/1 75/23 78/21 78/22
78/25 79/3 81/5 102/7 114/6 114/9 144/9
144/23 148/3 154/11 154/17 214/8 214/9
214/20 225/21 225/23 225/24 226/4 226/5
226/7 226/14 226/16 227/18
housekeeping [2]  2/21 115/23
How'd [1]  126/12
however [2]  116/20 161/4
huh [1]  192/11
human [1]  219/11
hundred [7]  41/13 41/14 44/25 68/4 96/6
101/16 175/12
Hurricane [1]  12/9
hurt [1]  157/7

**I**

I'd [16]  17/16 23/11 99/19 111/5 116/14
141/23 143/4 145/19 150/8 150/9 151/8
181/4 185/13 194/6 201/6 208/13
I'll [24]  3/15 4/3 5/3 5/3 30/18 72/11 88/19
89/5 114/20 117/22 143/7 152/8 160/23
167/7 177/15 177/15 177/16 181/11 196/24
199/1 200/12 201/21 202/15 207/17
I'm [143]
I've [16]  14/12 51/1 86/19 88/19 126/15

137/1 137/5 137/8 163/23 165/2 165/3
165/16 174/5 174/8 185/5 233/20
idea [19]  6/12 6/21 16/16 19/11 20/1 27/20
34/13 36/5 38/8 40/16 50/11 59/15 59/24
60/5 92/5 115/18 119/4 216/7 223/2
identical [1]  228/20
immediate [1]  154/18
immediately [4]  107/22 120/17 122/11 160/8
impact [1]  158/15
impeach [3]  187/22 188/9 188/17
impeaches [1]  187/20
impeachment [2]  187/13 187/18
impedence [2]  204/3 204/5
important [8]  79/13 135/7 146/3 152/24
174/6 205/7 205/8 214/25
impress [5]  45/8 55/12 134/4 134/21 136/2
improper [2]  151/13 186/22
improperly [1]  150/23
Inc [5]  26/22 91/16 147/24 230/11 231/24
incarcerated [2]  148/16 149/16
incarceration [1]  148/19
incident [1]  158/19
include [1]  186/13
included [3]  179/21 180/3 180/10
including [3]  129/12 148/20 176/8
income [1]  94/19
Inconsistencies [1]  226/10
inconsistent [2]  146/12 188/12
incumbent [1]  160/9
independent [1]  183/20
independently [2]  197/5 202/6
indicated [4]  143/23 163/23 181/21 203/19
indication [1]  145/12
indicative [4]  66/17 67/6 83/10 84/1
indictment [3]  150/7 162/5 215/1
individual [1]  35/15
individuals [1]  196/23
indulgence [2]  130/10 132/7
infirmary [3]  158/17 158/18 158/20
inflammatory [1]  150/10
information [1]  19/24 23/18 23/23 24/5
47/2 48/19 49/1 53/23 103/8 103/24 105/3
166/19 166/20 213/25
informed [1]  109/22
initially [4]  74/4 128/10 128/11 128/20
inquire [3]  5/20 178/24 200/12
inquiry [1]  155/11
inside [2]  197/4 201/1
inspection [6]  206/9 206/12 206/18 206/21
206/23 211/6
inspectors [1]  149/15
install [3]  230/20 231/5 231/7
installed [4]  12/10 12/11 13/2 230/16
instance [3]  219/1 219/3 219/6
instead [2]  13/6 222/25
Institute [3]  50/8 50/10 50/17
institution [1]  74/5
instruct [2]  53/10 151/8
instructed [2]  60/18 85/6
instruction [1]  142/9
instructions [11]  15/5 27/6 27/9 40/22 80/12
80/15 80/22 102/23 106/9 117/23 120/2
insulin [4]  155/16 155/17 155/19 155/23
insurance [1]  91/3
integrity [1]  145/7
intend [4]  116/19 224/10 234/19 234/20
intentional [1]  158/6
intentionally [4]  10/20 156/20 157/22 158/4
interact [6]  216/22 216/23 217/3 217/13
217/24 219/10

interacted [2]  218/7 219/13
interacting [1]  217/2
interactions [1]  171/5
interest [4]  5/2 181/10 210/10 213/12
interested [5]  13/17 62/20 174/19 209/16
214/11
interfere [2]  161/21 162/18
interfered [3]  161/14 162/22 164/11
interference [4]  160/11 160/16 160/25
161/16
Internet [1]  91/11
interpreter's [1]  235/3
interrupt [2]  159/9 231/1
interviewed [1]  175/6
introduce [1]  181/13
introduced [7]  15/20 15/20 128/23 169/2
170/16 171/10 179/4
introducing [1]  183/10
introductions [2]  15/19 16/1
inures [1]  161/2
invented [1]  139/17
inventor [1]  222/23
inventory [3]  147/5 147/12 230/19
invest [3]  142/21 142/24 172/13
invested [1]  143/11
investigation [1]  148/5
Investment [1]  31/6
investments [14]  29/4 29/7 30/10 30/12
30/13 30/16 31/22 32/20 32/23 32/24 32/25
37/6 37/13 38/3
invitation [1]  159/8
invoice [15]  25/1 25/2 25/15 25/19 25/21
25/25 26/23 28/5 40/5 53/9 71/24 87/13
184/21 185/2 185/8
invoices [10]  69/18 70/1 70/3 70/5 71/12
71/18 72/2 72/6 73/5 185/3
involved [10]  41/19 41/21 139/15 184/15
187/24 206/7 207/1 207/2 210/6 228/11
involvement [2]  210/12 210/14
iota [1]  161/15
Irene [1]  159/18
irritating [1]  144/14
IRS [2]  117/23 119/10
isn't [14]  124/5 132/17 136/8 139/13 144/9
171/25 172/6 180/11 180/14 185/8 188/20
203/24 230/6 232/15
Israel [31]  45/20 45/24 46/1 46/4 46/6 46/10
46/12 47/24 48/24 49/8 50/5 52/18 53/2
53/11 53/16 54/4 54/6 54/8 54/19 54/22
54/24 55/15 55/16 55/17 55/21 56/3 56/18
58/24 60/8 61/4 107/7
issue [15]  13/16 81/21 96/3 96/20 146/22
146/23 150/3 165/19 190/5 205/3 205/4
214/25 232/18 232/19 232/25
issued [4]  86/10 88/5 93/18 162/5
issues [5]  184/6 189/25 209/13 233/1 233/3
it's [91]
item [2]  67/23 68/2
items [3]  53/12 122/7 184/1
itinerary [1]  47/3
Ives [1]  1/21

**J**

jail [13]  149/3 154/24 155/2 155/7 155/12
155/18 155/19 156/13 156/17 156/19 157/13
157/18 158/24
Jamie [2]  96/4 96/8
January [10]  43/13 44/7 62/1 65/22 70/10
70/18 71/2 83/18 91/15 211/3
January 11th [1]  70/18

**J**

January 20th [3]  62/1 91/15 211/3
January 21st [2]  71/2 83/18
January 26th [1]  44/7
January 5th [1]  70/10
Japan [21]  53/17 54/10 54/12 54/22 55/4
55/4 57/15 60/8 111/12 111/13 113/20
113/23 114/4 114/6 114/9 114/12 114/18
115/2 115/6 115/13 115/15
Jared [10]  148/6 153/2 153/24 154/1 154/15
158/23 158/25 228/14 228/15 228/16
jealousies [1]  48/9
Jencks [1]  149/1
jet [2]  14/23 14/24
jobs [7]  6/9 6/11 6/12 6/13 6/15 6/15
Joe [4]  212/25 213/11 213/23 214/3
jog [1]  175/24
John [2]  94/15 131/15
Johnson [2]  143/18 143/19
join [1]  29/11
joint [2]  71/6 71/8
joke [1]  86/17
judge [8]  1/13 10/1 137/17 137/19 137/20
137/25 138/4 138/22
judge's [1]  137/21
jump [1]  132/15
June [4]  75/10 106/13 106/14 108/19
June 11th [1]  108/19
June 12th [1]  75/10
June 5th [1]  106/14
juror [2]  51/20 141/25
jurors [7]  6/24 52/8 90/3 110/18 141/22
142/7 159/19
jurors' [1]  8/22
jury [110]
jury's [4]  88/25 163/5 174/9 182/4
just [266]
justice [30]  1/16 9/14 11/8 33/10 33/20 33/22
33/24 132/17 133/9 133/19 134/14 135/4
135/7 136/6 139/2 146/21 146/23 147/1
147/22 152/20 153/1 153/12 154/11 155/21
155/21 155/22 173/22 174/10 174/16 174/18

**K**

keep [13]  8/9 15/7 39/16 77/14 80/16 85/3
94/18 97/5 97/12 120/5 131/10 180/17
216/10
keeps [1]  86/16
Ken [6]  209/10 209/12 209/12 212/10 213/11
219/12
Kendricks [2]  219/12 219/12
KENNETH [1]  1/12
kept [10]  41/18 97/14 119/16 119/17 119/20
128/13 128/16 203/10 216/9 216/10
Keret [9]  59/19 59/20 59/22 59/24 103/1
103/16 107/9 108/20 112/19
Kevin [1]  1/15
kibbutz [1]  55/22
kicked [1]  195/6
kind [13]  13/23 14/1 49/7 66/17 68/16 76/9
85/18 144/14 149/22 164/24 183/9 223/8
234/10
kinds [1]  23/8
King's [3]  214/8 214/9 214/20
kingdom [1]  217/9
knee [15]  156/20 156/22 156/22 156/22
156/24 157/7 157/14 157/19 157/22 158/1
158/5 158/7 158/8 158/14 158/19
knew [16]  29/22 42/18 42/19 65/2 104/1

119/1 126/23 143/14 170/23 175/20 184/15
205/14 223/20 223/23 230/18 231/7
know [139]
knowing [5]  143/16 143/18 149/22 197/5
207/9
knowledge [25]  21/22 23/13 38/5 43/1 44/19
44/24 45/18 63/15 63/25 64/9 76/21 76/24
77/13 86/20 87/8 103/13 103/18 105/1 105/8
105/14 138/24 146/25 147/25 171/2 225/20
known [1]  48/7
knows [4]  148/17 197/8 199/13 201/18
Kong [3]  53/17 54/10 54/12
kosher [1]  218/4

**L**

LA [4]  28/13 197/12 197/13 197/15
lab [1]  197/12
laboratory [1]  197/15
lack [1]  181/5
ladder [1]  231/5
ladies [6]  2/13 51/7 109/11 110/25 159/13
233/21
laid [1]  164/10
landed [1]  115/6
landscape [1]  6/13
landscaper [1]  103/22
language [22]  32/15 33/11 33/12 33/12 33/14
53/16 91/5 91/6 91/7 91/8 93/13 95/10 95/20
169/8 170/9 171/20 171/21 171/22 179/21
180/2 180/10 180/16
large [3]  98/8 172/7 232/12
larger [1]  223/13
largest [1]  229/15
last [17]  3/8 20/9 22/12 27/9 37/9 76/3 82/22
93/24 94/16 95/19 123/20 127/21 135/6
135/12 207/16 223/11 223/14
late [6]  16/20 18/4 21/16 28/10 29/2 94/16
later [5]  14/14 28/15 80/8 81/25 200/3
Lauderdale [1]  217/17
law [5]  44/10 44/17 44/19 45/2 45/11
lawsuit [5]  223/19 223/23 224/9 224/12
224/22
lawyer [12]  65/12 114/25 120/19 138/16
153/24 160/14 170/21 170/23 171/25 172/1
172/1 172/3
lawyers [3]  170/13 170/15 171/24
lay [2]  149/19 164/13
lead [2]  38/11 136/9
leader [2]  11/11 131/5
leads [3]  143/8 151/4 188/12
learn [1]  81/2
learned [3]  189/20 197/18 230/5
least [3]  6/5 170/19 216/25
leave [10]  47/24 51/8 60/15 68/7 109/13
109/23 159/15 219/17 233/24 235/3
leaving [2]  47/6 52/17
led [1]  232/1
left [24]  4/5 31/7 33/17 47/9 48/23 49/7
49/20 50/5 53/1 54/4 54/6 54/19 54/25 55/15
74/22 75/9 75/20 114/6 114/13 126/8 127/1
194/17 227/11 227/16
leg [1]  156/19
legal [9]  87/10 87/16 87/19 87/22 166/4
231/14 231/16 231/19 232/15
legend [4]  225/25 226/2 227/7 227/9
lengthy [1]  141/1
less [2]  135/16 135/18
lesser [1]  10/13
let [11]  26/18 28/4 48/10 74/2 89/25 96/3
100/3 138/5 151/15 152/1 154/13

let's [143]
letter [52]  26/7 26/10 26/12 26/20 27/22
27/25 50/7 50/17 53/7 57/13 57/18 58/12
58/16 58/18 59/10 59/11 59/17 60/1 90/14
90/16 90/17 91/5 91/12 92/3 92/6 92/11 93/1
93/3 93/14 93/17 93/20 93/24 101/6 101/7
101/8 102/18 102/21 103/7 106/21 106/23
106/24 107/2 107/5 107/10 108/20 111/8
111/14 111/18 113/18 114/5 115/10 115/12
letterhead [2]  91/9 107/5
letters [5]  53/5 60/5 60/8 109/1 183/9
level [4]  2/21 6/16 226/10 228/2
Levy [3]  50/7 50/10 50/17
license [4]  23/21 33/19 34/10 229/8
licensed [1]  12/21
lie [18]  10/20 25/9 25/10 27/12 27/13 83/5
126/17 129/6 129/7 190/23 193/14 193/17
202/12 216/4 216/6 218/20 224/16 229/4
lied [6]  127/4 130/20 131/1 187/18 187/20
224/15
lies [5]  71/16 71/17 126/23 129/19 202/9
life [5]  48/8 76/16 126/16 136/21 229/9
light [3]  159/7 221/5 230/23
lighter [1]  220/24
Lighthouse [5]  147/12 230/9 230/11 231/7
231/24
lighting [6]  6/14 229/12 229/15 230/5 230/15
231/5
liked [1]  211/18
limit [1]  209/21
limited [1]  151/9
limping [3]  157/9 157/10 157/10
line [25]  6/7 38/2 40/16 55/11 67/16 82/3
85/15 107/21 107/21 107/24 107/24 111/25
112/1 113/8 113/8 113/11 113/11 118/19
126/17 150/18 151/9 151/11 215/13 218/15
227/14
line 1 [1]  107/21
line 10 [1]  113/8
line 11 [2]  113/8 215/13
line 22 [1]  112/1
line 23 [2]  107/21 107/24
line 24 [1]  113/11
line 6 [1]  107/24
line 72 [1]  118/19
line 9 [2]  111/25 113/11
lined [2]  82/7 234/16
lines [8]  77/24 82/5 121/11 185/12 186/4
190/13 215/11 218/12
lines 12 [1]  190/13
lines 17 [1]  215/11
lines 4 [1]  185/12
lines 5 [1]  218/12
links [1]  66/13
list [3]  3/16 170/14 170/16
listed [1]  37/12
listen [2]  111/22 113/3
literature [1]  106/8
little [23]  17/1 23/20 34/24 36/23 40/24 65/1
74/1 76/10 85/4 85/19 97/13 104/18 113/3
115/20 115/25 123/2 132/25 142/12 166/3
167/21 167/22 201/8 204/10
live [3]  5/25 155/14 160/13
living [2]  12/13 28/12
local [2]  228/11 228/12
located [1]  112/20
logo [1]  184/13
logos [1]  213/2
long [10]  16/17 38/22 51/24 56/12 115/15
139/7 154/6 183/2 198/2 229/10

## L

longer [1] 166/3
looked [6] 28/5 34/12 60/23 79/16 111/5 129/22
looking [34] 19/12 24/25 25/1 26/6 30/25 32/1 33/17 35/8 37/5 39/6 44/23 48/18 49/10 50/16 53/4 53/14 53/22 82/22 100/4 102/25 104/12 107/5 111/6 112/13 113/17 121/20 121/22 122/9 129/24 141/19 169/3 208/7 212/21 212/24
looks [3] 91/9 127/9 180/19
Los [1] 221/13
lot [9] 10/6 13/19 131/7 177/23 183/24 228/25 231/4 233/2 233/20
lots [3] 43/20 44/19 129/22
loudly [1] 6/3
Lowell [24] 24/6 39/15 39/23 39/24 40/11 49/4 49/20 50/19 54/4 60/17 65/9 65/17 71/24 76/11 76/13 76/16 76/19 76/21 128/14 128/21 129/10 129/15 129/23 131/13
lower [2] 62/14 123/2
lunch [20] 13/3 13/5 13/14 14/3 14/13 14/14 16/8 16/8 88/18 90/2 90/5 109/12 111/4 115/24 116/15 195/8 195/9 195/10 195/19 222/9
lying [1] 108/8

## M

machine [1] 227/22
mad [1] 67/4
maiden [1] 23/22
mail [109]
mail's [1] 85/18
mailed [1] 115/8
mailing [2] 60/18 115/12
mails [16] 44/16 49/7 52/17 54/3 166/9 167/3 169/7 183/9 198/7 198/10 208/3 208/11 231/16 231/21 231/23 232/1
mainly [1] 166/13
makes [5] 6/6 109/8 141/6 141/10 162/20
making [5] 12/23 38/12 139/9 164/21 210/13
male [1] 137/19
man [1] 171/1
man's [1] 160/11
management [18] 41/7 42/1 42/24 45/3 57/14 57/18 57/21 57/23 101/20 111/10 112/20 113/1 113/3 113/4 113/19 195/25 196/17 197/4
managing [2] 32/24 32/25
manner [1] 163/22
manufactor [1] 213/12
manufacture [2] 210/7 230/13
manufacturer [8] 20/12 20/14 20/19 20/21 210/8 216/18 217/15 218/14
manufacturers [3] 229/19 231/2 231/9
manufacturing [9] 18/8 19/5 64/16 64/21 123/3 123/8 189/15 213/1 213/8
March [5] 74/24 98/14 102/10 104/12 157/3
March 19th [1] 74/24
March 2010 [1] 157/3
March 25th [2] 102/10 104/12
mark [8] 29/19 39/17 90/20 91/2 91/25 177/15 207/17 207/21
marked [9] 43/7 74/14 112/5 141/2 141/15 167/7 168/7 208/2 212/5
market [1] 205/15
MARRA [2] 1/2 1/12
married [2] 233/1 233/6
Marten [1] 37/14

MARTIN [10] 1/10 2/20 3/2 3/10 26/21 35/12 91/18 127/14 127/17 236/3
Marty [17] 39/15 67/1 77/25 81/18 117/22 124/14 198/11 198/11 200/16 200/19 201/1 201/2 201/2 201/14 201/24 227/15 227/22
Marty's [1] 198/11
Mary [1] 174/17
massive [1] 224/22
matches [1] 67/2
materials [2] 47/8 47/11
matter [6] 25/24 68/25 84/19 109/19 233/16 237/15
matters [1] 166/4
Matthews [21] 19/1 20/17 145/6 189/22 196/17 203/11 205/13 206/14 206/16 206/20 206/23 217/16 218/3 221/24 221/25 222/3 222/4 222/7 222/13 222/16 222/25
May 12th [1] 179/15
May 20th [1] 28/6
May 22nd [1] 25/5
May 2nd [23] 132/15 132/17 133/12 133/19 133/23 134/8 134/10 134/23 135/1 135/2 147/23 175/11 175/13 175/21 175/24 176/13 181/22 182/1 182/13 182/14 182/20 183/8 183/21
May 31st [1] 91/22
maybe [18] 12/24 17/16 31/17 56/13 76/18 88/14 142/8 142/9 159/6 163/9 177/10 194/7 200/1 202/13 211/12 211/21 212/1 234/8
McCoy [1] 212/14
me [257]
mean [24] 40/5 43/24 45/1 60/22 138/23 144/18 149/25 150/3 151/2 151/4 160/23 170/14 174/3 177/13 180/1 200/21 201/2 212/14 214/6 214/24 215/16 215/22 230/25 234/13
meaning [4] 106/7 118/3 174/5 198/11
means [1] 99/7
measure [2] 66/12 66/15
mechanically [1] 99/12
medical [74] 19/8 19/25 20/22 20/23 20/25 21/3 21/6 21/9 21/12 27/7 38/21 42/21 105/6 140/12 141/6 141/10 151/24 156/16 173/2 189/21 189/23 190/7 190/19 191/16 191/24 193/4 193/6 194/3 194/4 194/5 194/12 194/18 195/5 196/12 196/15 198/18 199/22 200/24 201/24 204/7 204/22 205/5 205/13 206/10 206/15 206/21 207/3 209/25 210/2 212/11 212/16 213/5 214/17 215/23 216/1 216/9 216/19 217/15 217/19 217/22 217/25 218/2 218/5 218/6 218/20 219/9 219/20 220/8 220/25 221/2 221/20 221/21 221/23 222/6
medication [8] 148/21 149/17 150/14 150/17 155/9 155/14 156/7 156/14
medications [1] 149/21
medicine [1] 23/11
meet [26] 7/4 12/5 15/12 44/10 45/13 65/10 67/4 76/24 77/3 77/5 78/21 117/24 120/23 122/11 123/15 123/17 172/17 173/3 173/4 189/22 195/7 212/25 213/10 213/16 214/2 221/18
meeting [31] 15/19 15/22 15/25 16/7 35/4 37/3 43/21 45/17 56/8 56/10 56/12 77/25 78/24 79/2 94/8 121/2 121/6 121/10 144/23 172/20 172/23 177/15 194/5 194/16 195/20 205/12 212/17 213/17 222/5 222/6 222/25
meetings [3] 56/7 65/6 172/8
member [3] 142/21 142/24 154/18
members [27] 3/15 4/4 9/10 10/8 10/24 12/7

16/16 18/1 24/24 26/5 39/6 41/8 56/4 61/11 61/12 69/15 76/15 81/17 86/3 89/15 89/25 91/2 97/17 116/12 116/16 116/20 120/13 memo [10] 133/16 135/1 135/3 135/6 135/7 136/2 149/1 213/15 214/12 214/13
memorandum [1] 134/24
memory [6] 134/2 134/7 134/15 175/24 185/18 185/18
memos [3] 149/8 149/9 151/18
menial [1] 38/17
mention [4] 116/15 122/21 147/23 190/5
mentioned [5] 51/20 146/1 190/2 205/13 233/15
Mercedes [5] 17/4 67/22 82/21 119/24 119/25
mere [1] 83/2
Merit [1] 237/12
merits [1] 225/5
message [1] 159/23
met [32] 7/5 7/6 12/8 12/9 15/14 15/16 45/14 50/12 59/22 76/13 76/14 77/10 77/15 78/4 130/16 132/17 133/9 140/1 140/8 140/10 140/11 140/14 140/17 143/23 144/8 147/22 155/20 209/25 210/1 213/22 214/11 221/16
Miami [1] 1/22
micro [1] 129/3
micro-technology [1] 129/3
microchip [2] 64/4 64/10
microphone [4] 3/4 6/3 24/22 132/24
middle [8] 31/20 37/12 108/15 122/10 123/23 128/8 159/10 194/22
Midwest [1] 229/16
might [8] 146/2 150/5 179/24 179/25 212/23 219/6 226/12 228/5
Mijares [6] 42/8 42/14 42/21 42/23 43/1 44/14
Miko [4] 166/21 168/13 168/18 212/24
mikofood [1] 39/10
mikofoods [1] 166/14
miles [1] 83/2
mind [5] 4/10 4/15 110/4 168/21 212/9
minds [1] 145/10
mine [2] 103/5 118/9
minimum [2] 163/4 164/1
minute [10] 4/8 51/7 68/25 111/13 129/22 132/15 159/14 177/20 183/3 205/3
minutes [8] 51/14 80/21 80/24 84/6 88/11 159/16 183/3 183/3
mirror [1] 67/22
mischaracterization [1] 183/15
mischaracterizing [1] 153/14
misconduct [1] 160/13
misled [1] 130/23 131/1
misread [1] 168/25
missing [3] 89/24 90/3 116/16
mistake [3] 174/12 211/20 226/12
Mitch [34] 39/8 39/22 43/17 43/22 44/10 62/4 66/8 66/11 66/24 67/5 67/15 68/15 69/22 70/7 77/3 77/11 78/20 82/17 85/20 85/21 88/9 94/12 94/20 99/4 99/16 105/4 105/24 109/6 117/25 122/21 124/14 131/19 211/5 213/10
MITCHELL [80]
model [1] 213/14
moment [9] 50/25 61/10 100/3 116/5 116/13 128/19 163/2 184/19 200/11
Monday [2] 85/17 86/1
money [40] 7/24 8/1 8/3 8/5 8/7 8/9 13/19 14/12 24/8 24/12 26/22 26/22 27/1 28/1 28/2 29/9 30/9 33/9 38/11 38/12 40/12 65/2 86/23

## M

money... [18]  86/25 87/6 87/7 87/20 87/21
88/5 96/20 97/12 97/14 97/18 109/6 119/12
120/1 120/6 131/7 131/13 131/15 131/17
monitor [11]  9/2 13/15 19/6 21/14 46/14
64/11 64/22 184/1 184/6 184/9 187/2
monitoring [3]  63/10 129/5 129/13
monitors [6]  13/21 14/5 46/3 46/8 56/14
105/9
month [1]  211/14
months [2]  27/9 135/12
moon [1]  54/23
morning [17]  2/2 2/12 2/16 5/24 7/16 117/19
117/20 169/2 181/20 183/25 186/9 187/14
188/14 233/23 233/25 234/18 234/21
Mortara [2]  202/5 202/20
moshav [1]  55/22
most [7]  8/9 62/20 85/4 119/13 119/16
131/10 131/12
Mostly [1]  6/13
mother [3]  230/2 230/3 231/12
mother's [2]  2/15 23/21
mothers [1]  2/14
motion [7]  150/11 150/12 160/10 164/3
164/5 164/5 164/7
motions [2]  160/12 160/13
motivation [1]  7/22
mountains [1]  83/8
mouth [1]  15/7
move [16]  3/3 3/4 3/5 24/20 38/12 61/3 63/1
72/21 89/3 89/5 101/17 115/20 116/1 116/2
129/8 235/2
moved [3]  53/11 54/7 54/11
moving [3]  28/6 115/21 148/1
Mr [217]
Mr. [447]
Mr. Armpriester [4]  172/6 172/12 172/21
172/24
Mr. Armpriester's [1]  171/24
Mr. Carter [366]
Mr. Carter's [9]  141/18 146/15 150/5 153/15
157/22 162/21 183/16 199/11 201/8
Mr. Franklin [2]  55/25 109/22
Mr. Gault [1]  173/1
Mr. George [1]  133/17
Mr. Harmison's [1]  128/16
Mr. Jared [1]  153/2
Mr. Levy [1]  50/17
Mr. Matthews [1]  196/17
Mr. Mijares [4]  42/21 42/23 43/1 44/14
Mr. Muhlendorf [1]  9/20
Mr. Nevdahl [4]  29/21 29/23 29/25 30/4
Mr. Pasano [1]  160/12
Mr. Scharf [23]  125/11 125/13 126/6 127/1
138/16 138/19 148/9 152/11 152/13 152/16
152/22 152/23 153/3 153/8 153/13 153/19
161/21 162/17 163/2 163/14 163/18 215/24
218/13
Mr. Stein [14]  3/20 8/5 60/4 77/14 78/3
126/6 126/7 127/1 130/16 159/5 178/15
194/7 203/17 233/11
Mr. Stein's [1]  224/7
Mr. Stieglitz [6]  118/2 52/13 111/1 133/17
162/9 177/4
Mr. Sweeney [3]  3/16 112/10 112/15
Mr. Tony [1]  101/12
Mr. Yossi [1]  103/1
Ms. [3]  15/14 186/12 221/12
Ms. Bunes [2]  15/14 221/12

Ms. Nonaka [1]  186/12
much [19]  6/21 12/23 17/21 62/12 62/16
70/11 70/19 71/3 71/21 84/21 126/19 151/17
158/11 163/8 190/16 219/21 220/13 234/15
234/25
Muhlendorf [2]  1/15 9/20
multi [4]  30/21 61/10 69/12 94/4
multi-page [4]  30/21 61/10 69/12 94/4
multiple [3]  143/25 154/11 160/12
multiples [1]  74/13
must [3]  83/7 83/9 86/15
mutually [2]  95/1 95/15
myself [14]  14/25 35/12 39/8 42/20 66/8
66/24 67/15 74/18 78/15 82/17 83/20 99/16
117/16 176/9

## N

naive [1]  130/8
name [35]  3/8 3/9 7/13 13/6 15/13 18/19
20/21 23/22 29/19 31/12 37/15 37/17 42/16
59/6 62/5 96/4 96/6 101/11 108/12 129/25
137/21 137/22 139/13 143/12 143/13 143/21
170/24 171/8 201/2 217/18 221/14 225/19
227/22 230/8 233/7
names [6]  77/15 112/23 123/24 129/22 143/2
219/10
napkin [1]  121/11
Natanya [1]  58/24
nature [4]  80/14 87/19 157/20 157/21
near [2]  122/8 194/19
need [24]  3/4 35/6 47/22 48/5 51/5 66/11
66/12 66/13 66/15 86/15 86/17 98/8 145/23
145/24 148/22 153/8 155/14 156/10 163/4
164/22 165/14 170/16 213/25 226/9
needed [10]  17/18 23/11 24/2 31/16 48/11
48/15 114/3 114/5 155/16 232/15
needs [2]  2/22 66/14
negotiation [1]  65/3
neither [2]  156/2 214/6
net [1]  6/24
Netanya [2]  51/21 107/7
Nevdahl [6]  29/19 29/21 29/23 29/25 30/4
39/17
never [45]  25/12 81/1 96/18 122/16 122/17
124/24 126/15 136/23 136/24 137/1 137/2
137/5 137/6 137/8 146/9 147/14 160/16
172/3 174/10 175/20 175/20 185/2 187/18
187/24 189/3 189/4 189/6 189/7 189/11
189/13 189/14 189/24 190/8 190/11 193/3
200/22 206/8 211/17 213/18 227/22 228/13
228/14 231/14 231/16 231/19
new [12]  1/17 5/17 16/9 102/2 104/5 108/16
117/6 117/8 122/11 128/14 128/17 153/24
next [34]  2/17 14/13 22/9 39/2 41/2 44/1 47/1
48/18 49/23 58/15 62/6 63/18 63/19 64/2
64/14 69/6 70/18 71/2 72/10 79/24 92/9 95/9
106/18 115/7 122/18 126/25 128/15 129/2
142/10 159/11 185/23 194/4 194/12 194/14
nice [2]  2/15 234/6
night [2]  43/19 94/17
nine [1]  113/14
no [355]
nobody [6]  134/14 147/16 161/25 198/25
205/19 228/15
Nobody's [1]  139/8
noise [3]  189/8 190/16 204/5
Nonaka [3]  137/23 138/2 186/12
none [1]  83/6
Nonoy [3]  58/2 58/3 58/5
Nony [2]  101/12 101/22

North [2]  1/19 105/25
northeast [1]  221/13
Northwest [1]  1/17
Nos [4]  5/10 5/12 116/9 181/16
note [2]  141/22 150/8
notes [10]  51/8 109/13 121/24 124/14 124/15
126/2 216/12 216/13 216/14 216/16
nothing [12]  10/10 60/9 74/1 161/7 162/17
164/11 170/10 170/11 184/5 186/9 187/14
187/16 210/3 224/23
notice [2]  58/23 156/18
noticed [1]  142/5
nourishment [1]  151/23
November [5]  28/10 40/1 40/8 81/25 82/19
November 12th [1]  40/1
November 29th [1]  82/19
NPC [1]  91/25
number [52]  23/22 36/11 36/12 36/14 37/10
39/19 42/2 51/20 53/9 67/24 74/12 74/13
86/22 88/15 89/7 93/23 99/12 101/11 101/12
101/13 101/13 101/14 101/14 101/19 101/19
102/1 102/4 102/7 102/25 103/1 103/2 103/4
103/8 103/10 103/13 103/14 103/16 103/23
103/25 104/4 104/7 107/25 108/1 108/3
108/17 108/18 112/15 118/21 119/4 166/9
185/19 228/18
number 14 [1]  51/20
number 21 [1]  107/25
number 22 [2]  108/1 108/3
number 25 [1]  112/15
numbers [11]  4/11 30/25 61/17 98/22 99/6
99/8 99/14 99/22 100/8 100/14 100/16
numerous [1]  27/8

## O

oath [3]  110/20 127/4 165/23
object [8]  139/18 143/4 148/11 181/4 201/7
202/10 209/2 209/4
objecting [1]  209/9
objection [46]  3/21 3/23 5/6 5/9 72/22 72/25
89/6 89/9 89/10 89/11 116/4 116/6 116/8
143/8 145/9 146/14 153/14 153/23 157/15
157/20 158/3 159/22 160/1 167/16 167/18
172/14 181/11 181/13 181/15 182/17 183/15
191/19 195/12 196/19 196/22 197/7 198/14
199/7 203/15 208/21 208/24 210/15 210/21
224/6 227/3 227/4
obstruction [2]  9/14 11/7
obvious [1]  141/24
obviously [3]  116/17 202/21 209/13
occasion [2]  77/5 154/17
occurred [1]  183/5
October [5]  7/5 12/6 28/10 122/20 227/17
October 19th [1]  227/17
odd [1]  6/9
odds [2]  6/14 12/16
ODR [3]  50/8 50/10 50/17
off [15]  4/5 27/14 66/13 72/11 81/19 83/9
88/19 91/11 100/5 178/18 188/10 195/5
220/20 220/23 221/4
offer [7]  87/16 97/22 124/21 178/11 208/13
210/11 227/2
offered [5]  87/19 87/20 87/23 210/9 210/12
offhand [6]  23/23 99/19 137/22 171/3 204/21
222/15
office [5]  19/16 19/19 115/8 115/13 195/6
officer [5]  128/12 128/14 146/7 146/11
221/12
officers [1]  145/16
offices [2]  19/21 222/10

**O**

Official [1] 1/23
officials [1] 156/13
oh [14] 2/21 50/24 55/21 60/24 62/18 74/3
123/6 137/24 157/11 177/15 192/16 223/16
224/10 224/10
Ohio [9] 123/12 123/8 123/14 123/17 229/10
229/11 231/12 232/5 232/25
okay [117]
once [24] 15/6 27/22 34/16 58/12 60/1 60/25
72/2 73/18 84/18 84/20 92/3 93/3 99/15
100/14 105/17 107/10 140/10 140/11 154/3
154/14 160/23 184/13 221/17 225/1
one [94]
ones [8] 4/12 183/10 183/14 197/6 198/18
199/19 217/18 220/2
online [3] 74/2 80/25 81/2
only [30] 8/21 31/23 40/19 42/18 65/8 65/8
72/5 89/16 131/19 136/12 143/3 143/13
148/6 151/24 158/24 167/15 169/4 169/9
170/25 173/1 176/2 183/6 202/3 204/7
205/22 206/3 211/1 211/11 211/13 223/5
open [10] 62/4 68/20 69/22 69/23 73/21 74/4
74/5 95/21 106/4 123/7
opening [1] 123/3
operated [1] 166/13
operation [1] 229/20
operations [3] 53/12 54/8 54/12
opinion [1] 221/3
opinions [4] 51/8 109/13 159/15 233/24
opportunity [3] 71/11 72/9 165/3
opposed [1] 220/5
orange [1] 192/13
order [7] 2/1 3/13 41/4 41/6 45/5 155/14
231/5
orders [5] 32/2 120/6 168/2 168/2 223/24
other's [1] 167/2
otherwise [2] 105/11 202/23
our [13] 5/19 53/10 53/11 55/24 58/23 67/2
68/14 87/20 109/11 121/18 147/17 181/13
234/16
out-of-court [1] 209/15
outside [8] 2/23 77/11 77/15 156/19 163/5
164/14 164/23 165/5
over [34] 16/7 38/8 44/11 45/25 48/5 55/25
63/20 67/3 77/25 79/12 81/5 86/17 99/11
115/24 116/1 116/15 165/15 166/16 166/17
167/2 187/8 209/6 210/15 210/21 213/14
214/2 214/4 214/24 215/25 216/14 224/17
225/21 226/5 235/4
overly [1] 165/10
overrule [1] 143/7
Overruled [4] 145/11 186/24 191/20 197/8
owe [4] 40/11 70/19 70/20 87/7
owed [6] 25/7 26/21 27/1 28/1 40/8 87/10
owes [2] 70/11 71/3
own [4] 7/22 21/22 125/16 219/2
owned [1] 229/12
owner [1] 91/18
owners [2] 219/12 219/13

**P**

P.A [1] 1/21
p.m [13] 43/19 86/2 86/15 110/11 160/4
160/4 168/19 168/23 168/24 169/16 169/17
169/17 235/6
page [80]
page -- I [1] 127/22
page 2 [1] 227/15

page 325 [2] 113/7 113/10
page 326 [1] 113/11
page 366 [1] 107/20
page 367 [1] 107/21
page 368 [1] 107/23
page 369 [1] 107/24
page 4 [1] 127/23
page 410 [2] 111/25 112/1
page 49 [2] 187/7 190/13
page 53 [1] 215/11
page 54 [1] 218/12
page 7 [1] 32/6
page 72 [2] 185/11 186/4
page first [1] 111/7
paid [11] 18/17 46/22 62/12 62/17 115/4
125/6 125/10 217/1 217/4 217/7 217/9
pair [1] 114/11
Palm [4] 1/7 1/19 1/24 132/22
Pam [9] 128/11 128/21 129/23 141/9 143/14
143/23 145/5 146/1 197/21
Pamela [2] 113/23 222/10
paper [5] 4/7 5/3 51/1 72/9 88/18
paragraph [8] 27/3 27/10 63/6 64/2 64/13
64/14 129/8 228/22
paragraph 1 [1] 228/22
Paragraph 2 [1] 129/8
paragraphs [2] 63/18 82/23
pared [1] 115/24
parentheses [2] 35/13 35/17
parenthesis [1] 180/11
parents [2] 229/25 232/4
parents' [1] 229/21
particular [2] 113/5 122/7
parties [6] 3/13 4/20 72/12 89/4 112/2 112/3
partner [8] 32/24 32/25 35/15 35/18 36/1
36/3 36/8 172/24
partners [3] 29/14 37/13 172/6
partnership [18] 29/4 29/7 29/12 29/17
30/10 30/13 30/16 31/22 32/20 32/23 32/24
33/1 35/2 35/11 37/6 37/13 38/3 38/7
Partnerships [1] 31/6
parts [1] 215/19
party [1] 63/9
Pasano [1] 160/12
pass [2] 166/21 167/14
passed [2] 116/13 182/5
passenger [1] 17/12
passport [1] 23/21
past [2] 38/22 86/19
patience [2] 166/4 233/22
patient [2] 205/23 206/3
pay [5] 17/19 17/21 18/3 25/21 228/7
paying [2] 18/2 28/25
payment [2] 62/23 73/6
payments [2] 92/21 92/22
penalty [5] 127/14 127/17 127/20 128/4
128/7
people [19] 46/1 46/2 46/15 49/12 49/15 78/4
83/5 94/16 94/17 96/14 99/13 101/15 146/1
150/14 152/21 155/11 162/8 205/14 217/9
people's [6] 6/10 12/16 145/10 146/15
per [3] 12/25 13/1 124/14
percent [7] 41/13 41/14 44/25 96/6 101/16
175/12 213/12
perfectly [2] 193/1 193/3
performed [2] 26/22 198/6
period [2] 139/7 148/1
perjury [5] 127/14 127/17 127/20 128/4
128/7
Perkins [3] 128/18 128/22 129/23

permission [3] 147/5 147/7 147/20
permit [1] 34/3
person [16] 30/2 40/19 72/5 76/13 90/25
94/25 95/14 95/16 95/25 95/25 139/16
139/23 211/2 221/3 221/7 222/18
personal [2] 23/18 28/22
personally [4] 189/6 190/3 190/4 215/9
personals [1] 28/23
perspective [1] 115/23
Perusing [4] 141/17 145/22 178/5 200/13
Pesci [4] 212/25 213/11 213/23 214/3
Petras [1] 174/17
phase [1] 145/16
Philippines [7] 43/18 43/20 44/11 44/21
54/23 55/6 55/7
phone [26] 30/2 30/3 30/4 30/5 30/6 36/11
36/12 36/14 48/5 76/19 98/22 99/6 99/12
99/13 99/14 99/22 100/8 100/14 100/16
101/15 103/8 103/10 103/13 103/23 154/2
158/24
phones [1] 159/21
phonetic [1] 181/1
physical [1] 158/15
physically [1] 148/2
pick [11] 17/5 17/10 38/17 82/9 105/24
140/22 162/15 197/6 214/5 221/19 222/12
picked [6] 105/21 106/12 198/6 198/12
198/17 214/7
picking [3] 82/11 84/2 197/18
picture [7] 22/6 22/10 22/13 22/20 51/22
67/2 142/1
piece [2] 98/8 172/7
pile [2] 4/5 88/17
pins [6] 189/12 190/17 203/8 203/13 203/19
203/25
piss [1] 83/8
pisses [1] 81/19
pivot [1] 96/19
place [13] 55/18 55/18 121/3 144/8 189/12
206/14 206/15 212/11 212/18 216/13 217/16
217/17 217/21
placemat [3] 121/11 121/24 124/6
places [3] 17/15 17/16 28/19
plan [1] 80/7
plane [5] 21/23 21/25 22/7 22/10 22/13
planning [1] 109/16
plastic [1] 196/13
play [8] 107/18 107/18 107/22 107/25 112/14
113/5 113/9 142/8
played [6] 108/2 108/4 112/16 113/13 113/15
232/19
playing [4] 86/16 112/13 141/23 213/24
plea [15] 3/18 9/8 9/15 10/6 10/9 10/15 10/16
10/18 11/2 136/5 138/12 138/13 150/5
150/21 151/22
plead [5] 9/12 11/6 131/1 149/6 149/22
pleading [1] 138/22
pleadings [1] 224/18
pleas [1] 156/13
pleasant [2] 2/14 233/25
please [106]
pled [13] 8/14 9/13 10/2 11/5 131/4 132/12
136/10 136/12 138/21 148/23 149/20 151/24
162/8
plus [1] 150/12
point [25] 4/13 4/16 7/6 13/10 14/3 21/13
23/17 24/11 28/9 98/21 100/19 104/25
105/20 128/25 143/6 159/5 163/13 172/7
193/19 193/22 193/25 209/17 209/23 220/9
233/5

# P

portion [7]  52/21 120/1 139/19 187/11
 188/16 209/1 209/4
portions [1]  26/15
positive [5]  136/2 153/11 214/24 215/1 215/8
possibility [1]  219/3
possible [2]  183/21 211/24
post [2]  115/7 115/12
postal [1]  149/15
power [8]  48/7 49/11 171/21 176/2 179/21
 180/3 180/7 180/10
precise [1]  66/15
precluded [1]  150/19
predicate [1]  149/19
predictability [1]  85/17
prefer [1]  141/23
preferred [1]  221/6
prepare [3]  117/4 117/6 118/12
presence [7]  2/23 77/11 77/15 163/5 164/14
 164/23 165/5
present [3]  2/4 51/18 110/14
President [1]  31/12
pretty [9]  94/19 98/13 106/13 126/19 130/8
 135/7 145/21 192/11 232/10
previous [1]  117/7
previously [2]  90/7 213/8
price [2]  42/2 80/17
printed [2]  85/18 180/20
prior [15]  35/3 37/2 52/17 71/12 73/21 94/7
 103/7 105/4 111/4 116/15 139/22 147/9
 147/12 160/22 170/8
prison [1]  151/1
private [1]  14/23
privileges [1]  31/22
Pro [1]  1/18
probably [3]  109/8 148/17 148/23
probation [1]  136/9
problem [15]  8/21 8/25 24/23 85/23 86/1
 109/20 122/20 147/13 190/14 193/5 195/11
 195/16 206/23 220/21 220/24
problems [6]  13/16 82/21 83/6 83/8 189/4
 231/12
proceed [1]  160/7
proceeding [6]  161/17 161/19 161/22 162/23
 188/3 232/25
proceedings [14]  1/11 2/11 51/16 52/10
 110/12 110/23 141/21 148/14 160/5 166/1
 187/10 209/8 224/4 237/14
process [3]  2/24 160/16 163/23
product [1]  58/23
production [2]  64/17 64/22
products [10]  41/4 43/5 44/20 44/23 55/2
 55/9 56/17 63/8 129/12 129/16
promise [3]  9/16 10/9 13/18
promised [3]  13/19 144/25 214/25
promising [1]  28/1
prong [1]  204/20
properly [2]  68/15
properties [3]  232/3 232/5 232/8
proposition [1]  74/10
protein [1]  68/5
prototype [1]  46/14
proud [1]  48/9
provide [4]  63/2 64/3 91/21 141/3
provided [2]  207/22 231/14
providing [8]  94/25 95/6 95/14 95/16 95/25
 96/8 96/16 231/16
public [4]  199/5 199/10 199/12 199/24
publish [6]  177/25 210/24 212/6 212/8

212/21 213/3
published [2]  179/24 211/18
pull [14]  22/2 24/16 26/1 36/21 48/17 52/20
 106/17 112/9 118/4 127/6 132/24 173/8
 212/1 221/4
pulled [1]  40/6
purchase [5]  32/2 41/4 45/5 168/1 223/24
purchased [1]  47/4
purchasers [1]  123/24
purport [1]  208/3
purported [1]  195/10
purportedly [1]  107/8
purports [3]  57/25 59/17 171/13
purpose [2]  109/16 194/9
purposes [5]  125/13 164/21 165/5 194/7
 234/13
Pursuant [1]  91/17
put [34]  6/14 8/19 34/9 59/7 66/11 71/20
 71/21 90/6 91/7 91/8 93/1 106/5 106/6 107/3
 107/4 111/5 115/9 119/4 119/5 119/6 132/8
 133/4 154/1 154/24 159/1 167/6 171/15
 171/22 176/17 204/12 211/13 211/14 223/8
 227/22
putting [3]  12/9 12/15 118/21

# Q

qualified [1]  198/23
quarterly [1]  91/22
question [29]  64/20 93/13 133/18 139/20
 145/13 149/11 151/4 152/8 153/16 157/16
 157/21 157/21 157/24 186/24 188/11 188/21
 190/14 192/4 195/15 199/8 199/9 201/9
 202/11 202/14 203/17 203/21 203/22 212/8
 215/15
questioning [4]  150/18 151/10 151/12 194/7
questions [11]  12/2 116/19 131/24 148/21
 148/23 149/17 151/16 177/5 211/7 211/9
 224/11
quick [1]  208/16
quickly [1]  214/1
quietly [1]  145/20
quite [2]  155/13 161/1

# R

Rachel [2]  137/23 138/1
raise [6]  3/1 142/5 142/8 150/3 150/11 224/6
raised [1]  150/11
Rajiv [11]  145/6 203/11 221/15 221/16 222/1
 222/4 222/6 222/9 222/14 222/20 223/1
rather [2]  141/1 161/3
Raton [19]  6/1 12/12 13/6 17/8 34/18 35/15
 36/10 37/7 65/16 73/14 78/23 104/11 108/18
 121/4 170/13 170/15 172/17 213/24 225/24
ratting [1]  141/24
read [51]  26/14 26/19 27/3 32/19 33/3 33/8
 39/13 43/15 44/9 48/2 53/7 54/21 63/6 66/25
 68/9 72/11 77/24 78/19 79/10 80/6 81/16
 82/3 82/3 82/4 82/23 85/16 85/25 86/13
 88/19 91/12 94/14 98/7 100/5 100/7 117/21
 128/10 128/15 129/8 136/5 145/23 145/24
 192/16 200/9 200/11 203/1 211/3 213/9
 225/20 227/9 227/11 231/23
reading [10]  26/16 26/19 26/20 66/9 82/8
 185/14 185/16 185/25 190/12 215/10
ready [13]  2/5 2/6 2/8 2/16 52/3 52/5 52/6
 52/15 104/15 110/16 110/17 132/10 160/7
real [3]  90/25 212/9 212/14
really [11]  19/11 21/15 31/16 46/7 134/2
 146/9 149/22 193/14 210/10 212/13 225/20
Realtime [1]  237/13

rear [1]  67/22
reason [7]  151/24 153/6 168/11 182/13
 205/17 222/22 222/22
reasons [2]  141/24 158/17
recall [72]  29/25 30/1 35/5 51/20 96/5 98/25
 99/17 104/13 118/21 133/15 133/15 133/16
 133/19 135/8 135/17 143/14 143/16 143/18
 145/5 145/8 145/15 154/6 160/12 166/11
 166/24 168/10 168/13 169/20 169/22 172/17
 172/20 172/23 175/2 175/3 175/4 175/6
 175/7 175/9 176/4 176/6 176/7 176/8 176/10
 176/11 176/20 181/22 183/12 183/19 184/2
 185/10 193/15 193/16 193/17 193/18 195/21
 196/11 198/10 202/6 202/11 202/18 202/24
 203/2 204/8 205/22 207/11 207/13 208/10
 213/15 216/17 222/7 222/20 228/8
recalled [2]  182/10 203/4
receive [1]  73/5
received [7]  27/6 48/23 52/17 91/19 102/2
 104/4 108/16
receiving [1]  75/22
recent [1]  157/5
recently [1]  175/9
recess [10]  51/7 51/15 109/12 110/8 110/11
 159/14 160/4 233/14 234/5 235/6
recognize [13]  29/19 36/12 41/3 57/6 58/15
 93/7 94/23 95/23 102/4 103/2 143/2 143/13
 226/25
recognized [2]  143/7 143/11
recollection [33]  19/3 41/24 67/14 99/21
 107/14 134/11 139/3 145/24 146/6 146/10
 151/20 163/15 173/1 173/5 173/19 177/7
 177/9 183/20 186/7 194/23 199/19 199/23
 200/5 200/15 200/20 201/8 201/15 207/6
 207/7 207/9 212/2 213/17 224/17
Recom [1]  7/13
record [17]  2/4 14/16 51/18 110/14 161/10
 162/1 164/13 164/21 164/24 165/4 186/4
 211/4 213/9 219/17 227/12 228/8 237/14
recorded [1]  139/1
records [3]  60/19 94/18 199/12
recycled [1]  4/7
redaction [1]  209/21
redesign [1]  21/3
redirect [1]  181/12
reducing [1]  189/7
refer [3]  7/17 33/16 187/11
reference [2]  27/17 112/3
referenced [1]  177/16
referred [1]  121/24
referring [5]  16/11 68/17 79/19 187/5 218/14
reflect [1]  66/17
refresh [18]  35/6 99/20 146/6 177/6 177/9
 185/15 186/7 199/16 199/18 199/23 200/5
 200/15 201/5 201/7 201/10 201/11 201/15
 212/2
refreshes [3]  107/13 185/17 185/18
refreshing [1]  145/24
refund [4]  118/16 118/18 119/2 119/9
regard [6]  30/15 53/9 138/11 173/1 177/4
 220/1
regarding [44]  27/6 27/11 39/15 63/7 63/8
 63/11 63/12 64/15 122/20 134/2 139/1 139/6
 141/6 141/10 146/12 146/20 146/24 148/5
 148/5 149/8 160/10 168/1 173/23 175/25
 183/25 184/6 187/19 189/5 189/15 195/23
 200/6 202/18 202/23 204/3 213/25 219/9
 228/17 231/16 231/24 232/3 232/13 232/15
 232/18 232/19
regards [1]  91/14

**R**

register [2] 98/22 99/6
registered [6] 99/14 99/15 99/21 100/8 100/14 237/12
regularly [2] 78/5 78/6
reimburse [1] 97/22
rejected [1] 152/15
related [3] 12/2 23/14 28/21
relationship [3] 94/15 209/20 209/22
release [1] 86/2
relevance [1] 148/12
relevant [2] 150/6 209/13
remember [180]
remembered [1] 175/21
remembering [1] 226/13
remembers [1] 201/19
remind [3] 69/21 84/8 89/20
remove [1] 234/10
repair [2] 170/24 172/2
repeat [5] 133/18 145/13 145/21 152/8 200/9
rephrase [14] 11/20 21/11 60/22 138/5 139/4 139/20 153/16 157/16 157/24 196/24 196/25 199/1 199/8 202/15
replace [1] 6/13
Reporter [4] 1/23 1/23 237/12 237/13
represent [1] 162/3
representative [1] 46/11
represented [3] 138/14 148/4 162/17
require [1] 53/12
required [1] 155/8
requires [1] 86/18
reread [1] 53/15
research [1] 165/11
resell [1] 229/19
reseller [5] 229/15 229/18 230/18 230/21 230/22
residing [1] 35/15
Resolution [1] 31/4
resort [2] 213/24 214/4
respect [7] 3/18 27/15 32/20 41/16 88/4 93/13 113/2
respond [1] 160/23
response [3] 79/10 85/22 86/13
rest [8] 48/5 71/10 82/8 117/25 129/18 146/1 165/6 175/14
restaurant [6] 13/6 17/17 56/11 78/23 121/4 121/4
resting [1] 219/21
result [3] 27/4 27/5 233/9
retail [2] 229/20 229/20
retired [1] 44/21
retract [1] 25/24
return [4] 118/3 118/7 118/12 118/21
returned [1] 16/13
review [3] 64/2 142/17 145/21
ribbon [1] 219/18
rid [1] 83/24
right [245]
right-hand [1] 17/12
rights [3] 160/25 161/14 162/21
ring [1] 137/23
RMR [2] 1/23 237/19
road [2] 1/21 152/1
Roger [3] 214/7 214/9 214/20
role [1] 30/12
Rolex [1] 66/11
roll [1] 211/25
room [10] 76/16 86/18 125/16 125/18 126/1 137/14 137/14 194/18 234/9 235/3

roughly [4] 6/23 12/24 16/17 17/22
round [2] 204/16 204/18
Rowland [3] 128/18 128/22 129/23
Rubbermaid [6] 169/9 170/10 170/11 184/13 184/15 198/4
rug [1] 67/2
ruling [2] 164/18 165/2
run [1] 4/10
running [4] 82/11 84/2 192/24 220/3

**S**

S600 [1] 17/4
sabotaged [1] 193/10
sale [2] 32/2 205/14
sales [3] 46/10 46/12 84/24
salesman [1] 91/3
Sam [2] 50/7 50/10
same [15] 18/4 53/16 64/20 74/20 76/16 93/13 95/10 95/20 107/23 112/4 158/3 171/20 173/13 187/6 197/7
saving [1] 181/11
saw [11] 15/22 20/9 20/11 41/11 41/15 44/14 45/5 143/7 182/8 183/7 184/13
say [76] 10/5 15/6 15/25 18/7 26/25 31/21 43/12 44/6 47/15 47/18 47/23 48/20 49/11 49/25 53/5 53/15 54/16 62/16 62/19 64/3 66/5 67/17 73/15 74/7 77/20 78/20 79/5 79/15 85/10 88/1 88/9 88/21 93/17 98/1 99/6 107/5 108/11 118/18 121/22 122/4 122/5 124/9 124/13 124/14 128/1 128/4 128/7 129/3 129/19 135/22 140/24 157/3 163/14 169/14 172/13 177/12 183/19 188/18 188/20 193/11 193/13 196/15 207/1 213/15 213/15 215/4 215/15 216/12 218/4 218/6 218/24 219/2 219/7 222/18 224/24 226/11
saying [33] 27/25 85/19 85/19 85/20 85/21 94/25 133/15 133/17 142/13 152/22 180/18 183/16 186/17 186/23 188/15 193/17 193/18 196/1 206/4 211/15 211/16 212/10 212/18 212/25 213/2 216/9 216/10 216/10 216/11 217/14 223/14 227/25 231/18
says [59] 15/8 31/4 42/8 47/2 48/2 53/16 57/13 58/22 59/10 60/11 61/20 61/25 63/5 63/20 64/3 64/15 64/18 64/19 76/4 78/7 80/6 94/17 95/4 95/5 95/14 96/12 96/13 96/13 102/1 102/25 104/4 108/6 108/16 112/18 113/4 113/19 118/15 122/10 122/19 122/9 123/3 123/14 123/23 124/14 127/14 151/5 168/13 168/23 168/24 170/6 179/13 180/25 188/8 188/19 201/2 201/3 226/1 227/15 228/22
scammed [1] 232/7
scared [1] 126/13
Scharf [33] 125/11 125/13 126/6 127/1 138/16 138/19 148/6 148/9 152/11 152/13 152/16 152/22 152/23 153/2 153/3 153/8 153/13 153/19 154/23 154/4 154/15 158/23 158/25 161/21 162/17 163/2 163/4 163/18 215/24 218/13 228/14 228/15 228/16
scheduling [1] 234/13
scientist [1] 222/23
scope [1] 224/6
Scottrade [1] 74/6
screen [32] 5/19 8/19 26/4 30/18 34/24 35/23 36/23 36/25 39/5 43/9 44/3 47/2 52/23 57/6 68/7 90/6 101/2 111/6 117/10 122/9 167/6 167/9 167/10 168/14 168/14 171/15 192/19 192/21 192/23 211/1 223/9 223/9
screw [1] 39/20
screws [1] 66/14

scroll [3] 167/20 169/12 173/9
Se [1] 1/18
sealed [1] 114/14
seat [2] 159/15 233/25
seated [8] 2/3 2/13 51/17 52/12 110/13 110/25 160/6 166/5
seats [1] 51/9
SEC [41] 11/16 11/19 11/21 108/7 111/23 112/3 112/20 113/7 120/11 121/13 121/23 122/4 122/5 124/18 124/19 124/25 126/5 126/7 126/17 127/4 135/10 137/24 138/1 138/3 138/6 138/11 139/10 148/5 149/13 175/7 185/7 188/3 190/12 202/8 202/12 203/1 215/11 216/4 218/11 218/21 234/21
second [31] 10/23 27/3 35/18 36/3 36/8 57/5 67/23 68/12 73/11 79/15 95/21 100/23 102/17 103/6 104/2 106/19 111/6 113/9 113/18 118/14 123/13 124/10 127/21 127/22 130/15 154/16 154/21 155/20 208/7 227/9 228/22
section [6] 62/9 62/15 68/9 118/15 122/10 156/16
securities [6] 11/13 32/3 98/10 98/16 98/17 120/11
Security [1] 23/22
sedan [1] 17/4
seeing [3] 182/3 219/15 219/16
seem [5] 60/11 87/1 109/2 114/20 216/25
seen [26] 21/25 35/4 37/3 41/9 90/14 94/8 101/3 102/18 106/21 150/8 151/10 168/8 174/3 174/4 174/4 174/5 174/6 174/6 174/7 174/8 184/9 191/4 192/21 192/23 193/3 208/4
sell [12] 44/20 44/23 55/2 55/9 80/22 81/7 84/20 84/21 86/23 229/20 230/22 231/3
selling [4] 73/25 85/2 86/25 88/5
send [17] 7/9 25/14 49/14 83/11 97/6 97/7 97/9 120/3 123/15 131/10 131/13 131/15 131/17 131/22 185/3 227/20 227/25
sending [17] 7/20 47/10 55/12 73/4 86/25 87/6 87/22 88/5 109/1 167/3 169/20 169/21 170/8 170/8 171/12 171/20 171/20
sense [3] 109/8 203/14 211/11
sent [43] 25/19 26/23 26/24 49/17 54/1 87/13 94/16 119/16 120/1 131/12 133/16 133/20 134/3 134/12 134/20 136/2 149/2 168/1 168/12 169/13 169/14 176/9 177/7 177/8 178/8 184/22 185/2 185/4 185/7 198/8 203/11 208/11 212/20 227/18 227/21 227/23 227/25 228/3 228/5 228/6 228/16 231/16 231/21
sentence [12] 9/16 9/18 9/21 9/24 10/13 26/20 26/25 128/9 128/15 129/9 136/9 228/22
separate [1] 179/12
September [1] 81/15
September 2nd [1] 81/15
serious [1] 156/9
served [4] 153/21 153/25 154/4 154/7
services [13] 63/1 64/2 71/6 71/8 95/1 95/6 95/15 95/16 96/1 96/8 96/16 231/14 231/17
session [3] 159/22 234/18 234/21
set [16] 19/23 43/20 63/16 68/15 196/12 200/16 200/19 201/1 202/3 202/19 202/19 203/10 213/13 219/15 219/16 219/20
sets [1] 198/7
setting [1] 40/5
settled [1] 224/23
several [2] 3/14 122/20
SFranklinUSDC [1] 1/25

**S**

shall [4]  32/20 32/23 63/7 91/22
shape [2]  170/22 189/1
share [5]  75/5 84/8 84/14 125/18 178/22
shares [17]  74/20 74/21 75/7 75/8 75/18 80/7
81/7 84/5 84/18 84/21 86/9 86/21 86/25 87/7
88/12 89/21 90/9
sharing [1]  178/25
shielding [6]  189/5 189/21 189/24 190/5
190/15 219/22
shift [1]  40/24
ship [2]  105/25 106/8
shipped [3]  53/12 105/1 106/3
shit [1]  86/18
shoot [1]  54/23
short [4]  67/9 145/21 215/12 215/14
should [24]  5/15 8/23 15/6 15/6 31/17 39/2
41/2 47/1 48/18 65/12 92/9 117/11 120/3
121/15 150/19 159/8 159/12 163/5 181/8
209/5 217/4 217/7 217/9 234/21
show [38]  22/7 36/16 43/7 46/15 81/5 99/20
101/17 117/9 121/14 141/1 141/15 145/18
151/3 152/2 153/7 167/7 168/7 170/2 174/5
174/12 175/11 177/10 177/17 177/23 181/20
182/2 185/18 196/4 199/15 200/2 207/23
209/20 210/6 210/11 210/13 212/5 226/8
226/21
showed [17]  41/12 41/24 134/22 173/25
174/1 175/21 181/22 182/1 182/7 182/9
182/15 182/24 183/12 183/13 183/21 200/18
200/21
showing [10]  35/3 37/2 94/7 146/11 151/19
175/9 186/3 203/8 208/2 220/14
shown [1]  133/13
shows [5]  169/4 170/7 170/9 171/14 176/21
shut [1]  15/7
sic [8]  39/21 54/23 63/9 79/12 94/18 98/9
123/25 213/12
sick [2]  82/6 82/7
side [5]  10/15 17/12 17/13 68/14 194/18
sidebar [12]  141/19 141/21 142/15 148/14
152/4 187/10 188/23 208/14 209/8 210/19
224/4 225/13
sights [1]  125/25
sightseeing [1]  56/6
sign [16]  26/12 31/10 36/1 36/19 37/24 58/1
59/17 130/2 130/7 140/3 140/6 225/22 226/5
226/14 226/15 228/6
signal [4]  190/9 192/17 192/19 192/21
Signalife [120]
Signalife's [7]  19/20 19/21 128/17 129/12
129/16 138/16 142/25
signature [23]  23/24 26/8 26/9 31/8 31/9
35/19 36/3 36/6 37/19 61/18 61/22 61/23
90/23 94/23 95/12 95/23 127/23 128/2 128/3
226/13 226/15 226/23 226/24
signatures [5]  32/10 32/13 32/14 35/23 61/24
signed [18]  27/22 31/16 34/13 34/16 34/17
64/24 65/4 65/6 65/15 65/22 107/8 130/9
150/25 151/1 223/18 226/4 226/7 228/2
significance [2]  22/22 74/1
signing [1]  34/13
signs [3]  57/25 65/9 90/20
Silverman [3]  90/20 91/2 92/1
simple [1]  192/4
since [12]  29/2 55/14 72/8 132/7 142/5 162/9
167/14 178/18 178/25 182/14 222/23 226/24
Singh [10]  145/6 203/12 221/15 221/16
222/1 222/7 222/10 222/14 222/20 223/1

sir [17]  3/1 6/7 9/17 9/19 9/23 13/22 14/2
19/10 19/13 20/3 21/2 49/5 51/11 111/9
160/2 165/22 189/3
sister [3]  231/21 231/22 232/1
sit [10]  17/10 17/11 17/12 141/4 146/10
146/19 167/1 169/7 169/23 177/5 186/19
207/11 216/3 234/11
site [8]  189/14 189/17 206/9 206/12 206/17
206/21 206/23 218/3
sitting [10]  126/7 126/8 126/25 130/20
134/14 164/3 194/4 194/12 222/8 235/4
six [5]  27/9 86/19 89/16 115/23 155/5
size [4]  66/12 66/15 67/3 120/3
skill [1]  63/15
skin [2]  204/3 204/4
skipping [1]  31/7
sleeping [1]  80/8
slightly [1]  9/1
small [4]  6/11 6/13 6/15 67/1
smash [1]  158/4
Smllansky [1]  29/7
snap [15]  186/16 186/20 187/1 189/12 190/8
190/17 190/20 191/15 192/15 204/8 204/10
204/12 204/14 204/16 206/4
snap-in [2]  190/8 190/20
snap-on [2]  204/10 206/4
snapped [6]  191/12 191/14 191/18 192/5
192/11 200/7
snaps [2]  204/16 204/18
snug [1]  192/11
Social [1]  23/22
software [4]  19/23 20/2 64/4 64/10
solace [1]  89/15
sold [3]  46/8 56/17 230/15
solve [1]  208/16
somebody [14]  41/18 83/1 83/5 83/7 99/12
103/25 119/6 156/2 160/14 170/24 190/5
210/8 217/7 230/18
somebody's [2]  192/23 220/2
somehow [1]  193/10
someone [15]  20/13 30/5 43/5 46/17 58/8
77/8 91/6 93/14 119/5 153/1 157/22 158/4
161/10 171/10 206/1
someplace [3]  74/8 97/6 131/10
something [44]  20/10 29/3 48/23 53/1 64/7
74/25 75/11 75/22 78/4 87/10 109/23 124/22
142/9 143/7 145/11 149/6 151/1 159/10
164/13 168/2 171/4 176/25 177/1 177/19
180/25 181/1 182/22 187/1 188/19 194/1
195/8 196/1 200/25 201/14 202/20 204/3
204/20 205/10 209/21 219/2 226/11 226/15
228/6 233/19
sometimes [3]  6/6 8/21 120/5
somewhat [1]  3/13
somewhere [4]  97/7 154/9 228/4 228/5
sorry [47]  12/12 12/19 15/4 16/12 17/7 18/23
19/2 19/19 19/20 50/25 55/21 56/2 62/18
74/21 78/23 84/23 87/25 89/8 95/3 99/10
99/11 100/13 101/14 110/4 113/7 117/20
127/10 133/1 138/3 148/24 166/2 168/25
170/1 179/7 179/8 179/25 181/8 184/24
191/9 196/2 196/2 199/9 200/11 202/10
208/8 230/25 233/17
sort [23]  6/12 11/3 28/13 28/21 33/17 56/12
65/3 82/11 91/9 98/13 100/24 100/25 114/8
116/23 141/22 141/23 142/9 151/2 151/11
154/18 168/1 196/9 224/5
sorts [5]  28/18 67/6 83/15 97/18 151/13
sounding [1]  14/16
sounds [1]  216/19

source [1]  203/20
South [6]  14/15 14/19 15/1 15/6 132/20
223/20
SOUTHERN [1]  1/1
space [1]  234/11
speak [7]  3/5 12/18 14/17 55/6 154/15
163/14 174/18
speaking [3]  6/2 24/21 149/10
specific [3]  12/3 186/14 234/19
specifically [1]  106/15
specifications [2]  202/7 202/25
specifics [1]  225/5
speed [1]  208/8
spell [2]  3/8 37/17
spend [3]  83/21 97/14 97/18
spent [1]  56/4
spoke [5]  54/22 55/1 158/24 211/5 228/13
228/14 231/18
spoken [7]  15/16 54/24 55/4 146/23 147/23
173/22 195/19
spot [1]  22/16
spring [1]  28/13
Springs [1]  20/24
square [1]  33/17
stamp [2]  76/4 76/6
stamped [1]  145/19
stand [3]  172/12 185/23 231/4
standard [6]  218/8 218/13 218/17 218/20
218/23 218/24
standing [3]  163/6 194/14 194/21
Starbucks [1]  83/23
start [21]  2/23 4/14 30/9 63/2 65/23 66/6
70/2 73/5 78/16 94/21 100/23 102/17 106/19
121/2 123/3 170/13 179/18 182/20 185/16
188/10 215/13
started [2]  73/4 198/7
starting [7]  47/18 82/3 82/4 107/20 107/23
128/9 187/11
starts [6]  68/9 79/10 82/24 85/15 85/22
185/14
state [2]  5/25 127/20
stated [2]  199/4 206/1
statement [15]  123/22 138/7 138/21 138/23
163/9 184/4 186/19 190/22 199/11 203/21
209/15 210/3 210/13 218/19 218/19
statements [7]  136/22 139/1 139/5 139/9
150/21 150/22 216/4
states [11]  1/1 1/3 1/13 2/6 52/4 56/16 110/16
127/17 145/10 148/8 152/10
stating [2]  205/22 205/24
station [6]  78/2 78/7 79/13 79/17 79/20 80/11
stay [6]  55/17 78/1 78/3 78/7 79/21 125/8
stayed [2]  55/18 126/1
staying [1]  49/1
STEIN [302]
Stein's [28]  2/4 13/3 22/7 22/10 22/13 34/17
36/10 36/15 37/7 51/18 67/7 67/17 79/9 80/6
96/11 110/14 111/24 113/6 113/9 114/6
114/9 129/25 150/10 160/23 179/3 185/15
210/6 224/7
stenographer [1]  137/14
step [3]  114/8 114/8 130/15
Stephen [4]  1/23 237/12 237/18 237/19
stereo [2]  97/20 119/24
stick [2]  126/9 220/19
stick-it [1]  220/19
sticker [1]  121/19
Stieglitz [9]  1/15 2/18 52/13 111/1 133/17
162/9 177/4 236/4 236/6
still [14]  16/20 21/17 28/1 38/13 65/25 80/8

**S**

still... [8]  82/12 83/15 110/20 154/9 157/7
159/20 165/23 199/22
stock [28]  29/9 33/9 68/18 68/20 68/23 68/24
69/1 73/8 73/11 73/13 73/17 73/18 73/25
74/2 74/11 74/12 74/18 75/17 79/23 80/16
80/22 81/8 84/5 85/2 86/7 88/4 91/3 96/22
stockbroker [1]  29/22
stocks [7]  32/3 73/10 80/25 81/2 81/6 86/2
93/17
stood [1]  136/23
stop [5]  5/3 5/3 72/17 159/1 233/15
stopped [1]  159/3
stored [1]  105/19
story [3]  126/9 136/24 169/23
straight [1]  77/15
street [3]  1/24 59/6 59/7
strike [3]  164/7 164/10 199/1
strongly [1]  232/10
structured [1]  28/12
studied [1]  126/1
Studio [1]  19/18
study [3]  124/8 124/14 124/15
stuff [10]  12/15 38/17 38/21 42/2 105/12
109/23 119/17 119/19 124/5 130/9
style [1]  232/22
subcontractor [1]  96/20
subcontractors [5]  92/21 92/22 92/24 93/25
96/4
subjects [1]  76/10
submit [1]  71/24
submitted [4]  196/3 196/5 196/12 197/3
subpoena [7]  120/15 120/16 153/21 154/4
154/8 154/9 160/22
subpoenaed [3]  153/9 160/19 161/24
substance [1]  162/9
such [4]  4/4 32/22 188/21 188/21
suddenly [4]  65/23 69/1 69/2 83/3
sued [2]  11/13 11/21
suffer [1]  48/10
suggest [6]  65/12 149/5 150/9 150/13 150/15
159/6
suggesting [1]  150/16
suit [1]  15/2
Suite [1]  1/21
summer [4]  28/6 28/7 28/13 114/1
supervising [2]  207/2 207/7
Supervision [1]  207/4
supply [1]  231/3
supposed [9]  62/23 62/24 84/13 84/15 88/12
88/14 89/20 89/22 90/9
sure [32]  6/2 10/24 12/18 14/17 24/21 41/13
41/14 44/25 48/4 51/5 72/8 89/1 96/7 101/16
106/14 125/22 133/13 133/24 147/8 163/16
164/24 165/8 167/4 175/12 178/16 191/7
191/11 195/2 206/17 222/19 222/21 234/15
surgery [3]  156/24 157/1 157/5
suspicious [4]  60/11 87/1 109/2 114/21
sustained [11]  139/20 146/17 153/16 153/23
157/16 157/24 172/15 182/18 183/17 198/15
203/16
Sweeney [3]  3/16 112/10 112/15
switch [1]  115/20
switches [1]  12/16
switching [2]  76/10 116/23
sworn [1]  3/2
symbol [1]  22/22
symbols [1]  22/16
synonym [1]  196/9

system [4]  163/24 163/25 190/8 190/21
systems [2]  97/20 195/24

**T**

table [2]  134/15 235/5
tables [1]  234/9
take [50]  11/24 17/17 20/4 20/14 20/18 23/1
28/4 34/25 35/5 36/21 40/24 43/5 44/12
46/14 50/25 51/5 51/7 55/15 61/6 61/10
65/21 66/9 68/2 72/9 76/9 84/6 86/1 96/19
98/20 100/3 100/22 104/20 105/25 106/4
106/7 107/12 109/11 114/12 120/7 124/22
127/3 130/13 132/9 147/5 147/19 159/6
159/8 159/14 189/22 200/11
taken [6]  1/11 51/15 66/14 110/11 160/4
235/6
takes [1]  230/19
taking [5]  20/25 46/12 147/12 167/2 177/19
talk [38]  7/12 17/1 18/12 27/10 29/25 31/17
38/12 40/14 44/12 46/11 49/20 55/15 55/25
57/17 58/3 59/10 59/20 61/3 68/24 80/21
86/15 104/20 128/20 128/21 128/21 135/14
140/20 140/22 160/14 163/18 166/4 176/23
176/25 177/1 209/6 214/16 224/19 228/12
talked [38]  31/2 40/5 40/19 40/19 50/14
55/14 57/20 59/13 72/6 76/10 76/19
84/6 88/11 93/24 96/22 126/10 135/6 146/21
147/1 158/23 174/10 200/17 202/8 218/8
220/5 221/25 222/24 223/6 223/24
talking [36]  6/11 7/16 9/1 16/20 30/7 44/16
49/6 52/16 54/3 79/16 82/14 83/15 86/4
89/19 96/3 98/19 99/11 111/17 118/2 118/2
124/17 135/1 135/2 135/20 135/22 138/1
138/7 194/25 198/1 200/10 202/22 204/10
210/8 210/12 220/1 220/3
tall [1]  231/5
target [1]  207/3
tasks [6]  23/6 23/8 23/14 23/16 28/22 38/16
taste [8]  196/2 196/2 196/3 196/7 196/13
200/17 202/1 202/23
tax [6]  118/3 118/7 118/21 118/24 119/2
119/9
taxes [3]  116/25 117/4 117/7
TD [1]  84/24
technical [2]  202/7 202/24
technically [4]  201/17 202/2 202/22 204/24
technologies [7]  63/10 139/24 142/19 142/22
142/25 146/22 147/24
technology [13]  19/9 20/1 128/14 128/17
129/3 129/4 139/17 147/18 147/19 221/12
222/21 228/23 229/2
telephone [3]  78/1 81/18 153/24
telephonic [1]  109/24
tell [73]  3/8 9/10 10/8 10/10 10/11 13/13 18/1
20/13 23/20 24/1 25/14 26/5 26/15 26/16
29/16 29/21 31/17 33/16 39/6 41/8 45/24
50/19 52/6 53/19 54/16 56/20 61/11 61/11
61/12 62/2 68/22 71/24 76/15 78/20 78/24
79/5 79/7 80/16 80/18 83/11 87/4 88/3 91/2
93/14 101/9 105/11 106/2 107/3 114/3
114/16 119/5 120/23 121/9 121/13 121/20
122/1 123/18 124/18 127/22 131/3 134/18
138/19 146/3 153/18 159/18 209/12 214/12
214/13 214/25 218/24 221/3 221/6 221/7
telling [29]  25/6 45/9 67/20 70/5 70/10 70/19
71/3 71/15 73/21 82/20 82/21 108/6 112/20
122/3 122/4 123/10 126/24 133/19 134/23
157/2 160/14 162/6 169/24 190/22
202/5 216/3 216/15 219/2
tells [3]  67/25 86/13 111/23

template [1]  49/11
templates [3]  49/14 53/5 53/19
Tempura [6]  78/21 78/22 78/25 79/3 144/8
144/23
tension [1]  222/13
tenth [1]  34/21
term [1]  43/25
terms [1]  224/8
test [15]  129/11 129/15 195/23 196/2 196/2
196/3 196/7 196/8 196/13 197/11 198/6
200/17 202/1 202/23 224/17
tested [3]  198/18 202/1 207/10
testified [26]  124/19 125/20 125/24 126/9
135/10 136/16 138/3 139/2 139/7 144/17
144/18 149/13 160/17 161/9 161/25 162/1
162/11 164/17 166/9 167/24 185/19 186/9
187/14 201/20 203/1 204/25
testifies [1]  162/13
testify [9]  124/22 124/25 126/5 146/2 146/15
160/18 193/9 196/23 203/17
testifying [5]  107/19 124/17 133/6 137/6
145/9
testimony [55]  1/10 51/12 110/7 111/25
113/6 113/10 126/7 134/8 151/7 153/2
153/15 160/2 160/9 160/13 161/3 161/13
161/20 161/24 162/2 162/5 162/7 163/8
164/8 164/10 164/12 164/15 165/6 166/11
171/6 183/24 184/2 184/25 185/14 185/16
186/3 186/12 186/22 187/18 187/20 187/22
188/2 188/9 188/11 188/18 189/8 190/6
199/6 203/2 203/3 207/12 211/23 216/13
222/24 234/4 236/3
testing [2]  204/3 204/6
thank [56]  2/15 2/19 3/7 3/11 5/9 5/14 8/24
9/4 13/12 39/21 43/11 51/9 52/14 53/13
69/10 88/24 109/14 110/2 110/3 110/9
110/10 111/2 112/8 131/25 132/2 133/3
139/12 144/6 152/6 159/15 165/21 166/7
167/5 167/12 167/21 181/15 187/4 188/22
197/1 200/2 201/21 208/18 208/20 210/17
210/18 210/23 212/6 214/23 225/11 225/12
233/21 234/1 234/6 234/7 234/24 235/1
Thanks [1]  68/15
that's [211]
theft [1]  146/22
there's [26]  3/20 10/5 10/5 13/11 27/17 42/5
51/19 62/9 99/13 103/1 112/2 115/25 149/8
151/17 157/23 165/16 167/15 169/5 169/8
180/16 183/24 208/21 209/1 209/4 210/2
227/7
therefore [1]  220/16
thereto [1]  177/25
They'll [3]  5/8 72/24 116/7
they're [12]  49/3 69/18 169/10 179/12
179/12 179/12 204/16 210/5 210/11 217/18
218/19 218/23
they've [1]  89/1
thick [2]  165/17 219/22
thicker [2]  219/21 220/13
thing [22]  33/18 67/20 73/15 74/20 82/11
117/6 117/8 150/5 169/9 170/25 176/2 180/8
183/6 190/20 202/3 204/7 204/8 211/11
211/13 212/9 220/19 231/18
things [43]  7/19 12/17 17/15 24/1 28/18 34/9
38/17 38/18 55/14 66/18 67/6 67/18 71/15
82/11 82/14 83/4 83/10 83/15 84/1 97/18
97/19 98/14 98/19 99/8 119/17 119/19 122/4
123/18 126/19 148/20 148/24 149/21 150/10
156/6 159/1 176/3 202/8 204/10 204/12
208/8 228/25 230/19 234/10

**T**

think [54]  2/22 5/2 10/23 19/17 37/9 47/22 55/1 67/9 74/19 86/18 96/6 100/10 104/17 130/25 149/13 150/18 151/3 151/10 151/15 151/21 152/1 153/22 155/25 159/7 159/8 159/11 164/22 165/10 177/3 177/5 177/6 182/13 185/14 185/19 188/17 194/17 195/2 195/21 198/9 201/20 202/14 207/14 207/17 208/13 209/10 210/9 210/11 217/10 223/11 224/6 224/25 225/2 228/10 231/25
thinking [1]  184/5
thinks [2]  152/2 160/15
third [3]  58/14 68/2 111/14
thirds [1]  118/15
Thirty [1]  69/9
Thirty-one [1]  69/9
thoroughly [1]  225/21
those [109]
though [4]  13/7 16/20 27/25 55/23 80/2 87/15 156/9 201/14 231/4
thought [10]  48/11 48/14 188/13 189/24 195/16 198/25 204/23 217/7 222/17 222/21
thousand [1]  39/16
three [18]  67/18 76/18 134/4 148/21 148/23 149/17 155/2 169/20 170/8 171/12 176/21 176/21 177/16 177/24 178/8 182/2 182/9 207/18
through [21]  4/11 12/4 67/16 71/10 71/11 104/18 129/18 148/9 149/14 152/11 166/10 184/5 185/12 186/4 190/13 203/11 211/25 218/12 225/3 228/25 234/20
throughout [2]  48/7 234/19
throw [1]  56/1
thrown [2]  10/21 10/25
Thursday [1]  187/6
thus [3]  53/12 161/6 165/3
ticket [3]  16/10 46/22 115/4
tilt [1]  9/1
Tim [16]  103/5 103/8 103/10 103/13 103/18 103/21 104/2 104/20 104/22 105/1 105/3 105/6 105/8 105/11 105/14 105/17
timeline [1]  121/22
times [16]  7/14 76/15 76/18 122/20 135/14 135/23 140/8 143/25 154/12 155/11 155/13 163/20 185/20 217/2 230/25 231/4
title [9]  31/3 31/12 35/1 35/8 179/20 179/23 180/2 180/7 206/19
titled [2]  62/6 62/15
today [38]  10/20 44/10 71/12 77/25 109/15 130/20 133/6 134/2 134/7 134/10 134/20 136/2 136/9 136/16 136/25 139/22 141/4 141/9 146/10 146/19 165/15 166/9 167/1 168/16 169/7 169/23 171/16 173/20 175/8 175/24 177/6 186/19 187/23 192/6 207/11 216/3 222/24 233/16
together [1]  13/3
Tokyo [2]  57/15 111/12
told [121]
tomorrow [12]  43/19 43/19 79/13 98/9 117/22 165/15 211/25 216/12 233/23 233/25 234/4 234/16
Toni [1]  58/2
Tony [8]  58/3 58/5 101/12 101/22
too [5]  142/10 190/16 201/3 222/3 231/21
took [12]  21/12 84/10 121/13 147/14 166/3 166/16 166/17 166/20 203/7 206/22 216/13 230/15
tooth [2]  122/20 192/20
top [25]  32/16 39/5 48/1 48/19 52/22 53/7 53/22 66/21 78/11 79/9 86/12 93/23 98/4 100/25 112/12 122/18 124/11 129/3 169/12 179/3 179/10 179/13 180/7 225/25 227/7
topic [1]  93/5
topics [1]  116/24
torturing [1]  150/14
total [2]  76/16 115/15
totally [1]  215/2
touch [3]  43/17 81/20 204/4
tour [1]  19/11
touring [1]  19/11
toward [1]  150/18
towards [1]  3/5
town [1]  206/20
trade [2]  81/2 81/6
traded [2]  74/2 80/24
trading [7]  68/14 68/16 68/18 68/25 79/23 81/19 82/7
train [1]  125/5
training [3]  98/11 98/16 98/17
transcript [8]  1/10 107/20 185/11 187/6 187/12 187/19 188/19 237/14
transfer [2]  39/17 74/7
transmission [1]  83/6
travel [7]  18/5 18/15 45/20 46/17 46/20 113/22 115/16
tri [1]  17/18
tri-county [1]  17/18
trial [3]  1/11 150/13 200/3
tried [3]  24/11 43/6 147/14
trip [9]  18/17 46/12 48/12 48/15 54/25 55/16 114/9 125/6 144/16
Tronics [2]  7/13 18/9
trouble [4]  12/20 13/10 26/16 26/19
true [34]  25/9 27/1 27/12 71/15 91/25 92/2 92/15 92/16 93/17 122/5 122/14 122/15 122/23 123/7 123/9 123/17 124/3 124/4 124/5 128/5 129/6 129/14 129/17 130/5 133/16 133/21 149/24 152/23 172/6 172/9 172/10 186/19 188/18 188/20 193/23
trust [10]  62/25 84/15 88/14 89/23 90/10 90/10 91/20 92/1 92/19 92/20
trusted [6]  24/4 38/10 114/25 114/25 130/8 231/9
trustee [2]  91/14 93/18
truth [12]  10/10 10/10 10/11 108/6 112/20 131/3 146/3 193/12 196/21 210/9 210/14 214/25
truthful [1]  193/18
truthfully [1]  193/21
try [11]  3/5 8/25 26/19 41/21 43/4 124/21 149/19 150/1 151/3 151/21 234/8
trying [7]  27/5 27/11 45/8 55/11 67/5 134/4 149/5 159/1 187/19 187/21 187/22 200/9 201/7 201/9 201/11 208/8 209/17 209/23 210/6 210/11 222/17
tug [1]  220/23
turn [2]  83/13 127/21
turned [1]  195/5
Twelfth [1]  6/18
twice [3]  140/9 144/1 216/25
two [32]  22/16 29/14 32/10 47/15 61/24 63/18 67/24 76/3 77/24 82/4 82/22 83/3 94/15 113/5 118/15 121/18 123/16 123/16 125/20 150/12 162/8 162/10 163/19 169/6 170/19 183/3 207/21 208/3 208/11 217/1 222/1 224/10
type [6]  6/14 12/15 12/17 56/9 127/8 177/11
types [3]  17/14 83/10 84/1
typewritten [2]  32/15 33/12

**U**

U.S [1]  1/16
ultimately [1]  217/24
unable [1]  83/3
uncle [3]  42/15 44/15 55/8
under [22]  10/9 31/12 35/8 36/1 36/3 36/8 37/5 62/12 62/15 62/24 64/2 93/18 110/20 120/5 127/4 127/14 127/17 128/4 128/7 154/18 165/23 215/1
understand [23]  7/12 65/1 68/16 79/19 132/12 139/4 139/7 146/2 146/3 147/21 160/24 161/1 162/20 164/25 165/8 188/14 188/22 199/9 200/23 200/25 205/6 211/20 219/15
understanding [14]  3/20 10/19 29/6 29/8 62/22 118/1 130/9 139/22 148/7 148/10 149/13 152/9 158/25 213/7
understood [7]  116/16 139/16 152/3 176/15 200/25 210/16 223/19
unfortunately [1]  182/4
ungodly [1]  231/5
unit [1]  190/18
UNITED [9]  1/1 1/3 1/13 2/6 52/4 56/16 110/16 148/8 152/10
units [3]  42/2 123/15 230/15
unless [5]  145/23 148/8 152/11 165/15 233/18
unlike [1]  76/3
until [4]  67/4 165/15 175/21 177/25
untimely [1]  231/11
untoward [1]  150/17
untrue [1]  134/24
unusual [1]  78/3
update [1]  91/22
upon [3]  160/9 165/1 165/2
upside [1]  121/19
urgent [1]  39/20
us [35]  3/8 3/9 26/15 26/16 43/22 53/8 61/11 62/2 69/21 77/9 84/8 89/20 89/25 109/22 121/8 146/4 154/2 163/3 163/3 167/2 177/19 190/22 195/6 203/7 203/8 203/19 209/11 209/12 213/5 213/11 213/13 214/6 230/24 231/3 234/14
used [4]  172/3 190/18 215/23 220/2
usually [2]  211/17 230/22

**V**

V-e-n-t-r-e-x [1]  19/2
Vaguely [1]  220/22
vantage [3]  193/19 193/22 193/25
variety [1]  150/11
various [4]  7/14 17/16 195/23 223/23
vent [1]  6/5
Ventrex [6]  18/23 18/25 19/2 19/5 19/11 19/14
venture [2]  71/6 71/8
verbal [1]  10/15
versus [1]  173/24
very [35]  32/15 43/21 67/4 67/20 70/9 74/17 78/11 82/6 82/20 85/4 85/15 86/3 86/17 87/18 94/22 96/11 97/13 126/13 146/3 157/14 164/18 184/4 188/14 189/19 192/4 214/25 215/12 219/22 219/22 220/20 228/19 229/12 230/3 232/12 234/24
via [5]  75/11 75/25 84/9 101/11 102/25
vibrations [1]  222/13
video [1]  232/23
videotape [1]  232/19
view [2]  67/22 193/10

**V**

views [1]  8/22
visit [2]  189/14 218/3
visited [3]  18/19 18/24 163/19
vitamins [2]  23/11 97/21
voir [5]  51/20 178/12 178/20 182/10 236/6
voir-dired [1]  182/10
voluntariness [1]  150/5

**W**

wait [1]  160/23
walked [2]  156/18 181/8
want [56]  3/19 7/24 12/2 26/15 26/18 29/2
43/7 73/11 76/2 86/20 100/5 105/12 117/9
121/14 123/7 130/15 132/9 139/5 139/8
142/5 149/3 149/9 149/19 151/19 152/15
157/3 158/12 159/9 164/4 164/13 164/16
164/17 164/20 164/20 164/22 164/24 164/25
165/2 165/4 165/7 165/7 183/19 188/2
188/17 191/22 196/17 201/15 212/20 212/22
213/20 213/20 221/2 222/3 224/6 224/13
224/16
wanted [38]  13/16 16/9 18/8 20/11 23/12
24/1 28/19 34/11 41/21 45/24 45/25 62/4
68/22 86/22 98/24 99/4 102/24 103/25
105/24 109/5 114/12 114/16 114/18 118/3
120/5 121/13 121/22 123/3 124/9 126/4
131/3 142/8 150/3 151/11 196/21 197/4
232/17 233/19
wanting [1]  105/8
wants [7]  52/1 68/4 122/11 149/25 151/3
181/12 224/19
washed [1]  68/1
Washington [12]  1/17 10/1 10/2 125/3
125/25 137/13 138/12 138/14 138/17 138/19
138/22 139/11
wasn't [21]  130/5 137/14 140/17 140/21
144/14 149/2 149/2 149/16 151/1 154/14
156/4 157/10 162/10 163/15 164/8 195/3
205/19 213/16 222/25 223/3 229/16
waste [3]  164/2 164/4 164/17
watch [2]  67/3 83/25
water [1]  13/11
we'd [3]  116/2 209/2 234/5
we'll [64]  3/14 5/19 8/25 22/15 24/16 26/4
28/4 34/24 35/23 36/21 36/21 36/23 39/5
40/24 43/9 44/3 44/12 47/1 47/13 51/5 51/14
52/22 65/21 72/18 80/21 88/16 90/2 90/2
90/4 90/4 94/21 96/19 100/24 100/25 101/17
101/18 102/17 103/6 104/2 107/22 107/25
109/11 109/13 109/18 112/12 116/12 117/11
120/7 127/3 127/20 138/7 143/8 151/4
159/16 164/14 173/4 179/23 179/23 181/12
181/13 181/14 200/3 209/6 233/25
we're [55]  2/4 2/8 2/16 7/16 24/25 25/1 26/6
29/2 39/6 49/6 50/25 51/17 55/24 63/19
68/24 74/19 74/20 82/14 83/15 88/25 89/13
89/16 89/24 96/3 98/19 106/19 109/15
109/18 110/14 113/5 116/23 116/24 121/20
121/22 122/8 159/21 165/13 167/14 178/18
178/22 178/25 181/25 185/15 194/25 196/9
207/14 207/17 208/14 212/21 213/3 216/14
219/15 219/16 233/14 234/15
we've [28]  2/21 2/22 4/13 4/16 6/5 34/12
55/14 79/15 88/15 138/25 147/23 158/22
160/13 164/14 181/21 182/11 185/5 200/17
201/13 202/19 203/1 214/24 217/6 220/5
222/1 222/24 228/25 234/15
weapons [1]  34/3

wear [2]  15/1 15/2
web [1]  180/19
Webster [1]  143/16
Wednesday [2]  117/18 211/5
week [3]  14/14 16/18 123/16
weekend [1]  2/14
weeks [2]  123/16 150/12
welcome [7]  2/3 2/12 52/11 110/24 144/7
166/2 167/13
well [86]
went [27]  16/8 18/12 19/16 28/8 38/3 55/17
56/6 105/20 106/11 115/7 115/7 115/14
121/4 125/5 126/5 126/5 144/18 144/20
157/13 158/17 189/19 203/7 212/16 213/11
217/21 222/9 222/10
weren't [5]  127/4 150/25 155/9 155/18 207/1
West [4]  1/7 1/19 1/24 132/22
What'd [1]  119/12
what's [67]  10/8 10/19 22/2 26/1 31/3 35/1
35/8 36/21 38/24 40/25 43/7 43/24 46/24
54/14 61/24 66/3 66/20 67/10 67/20 67/24
74/14 74/14 75/9 75/14 75/20 79/24 79/25
80/9 81/10 81/14 81/21 82/18 82/20 83/13
83/17 83/22 85/7 85/13 90/12 92/8 93/5
101/12 108/17 111/17 112/4 117/9 117/14
117/17 118/1 118/2 121/14 124/13 148/15
167/7 167/9 168/7 179/3 179/13 179/19
180/13 187/12 188/19 208/2 210/14 212/5
224/20 228/21
whatever [31]  60/14 87/4 104/16 114/24
134/22 165/4 185/3 188/7 201/24 204/9
204/11 204/11 234/21
whatsoever [1]  170/21
wheelchair [1]  232/23
When's [1]  135/6
where [62]  10/2 12/11 13/5 15/9 16/7 17/14
20/23 23/17 24/11 26/25 33/14 41/15 55/20
55/23 56/9 61/20 65/15 71/19 74/5 78/22
79/16 93/22 97/8 100/19 102/1 102/25 104/4
104/9 111/11 112/19 121/3 122/10 122/19
122/19 123/2 123/14 123/23 125/2 126/7
137/12 143/8 148/2 150/8 150/13 151/4
151/10 174/5 180/20 188/3 189/20 194/16
194/20 196/4 196/18 210/4 219/1 221/18
224/7 227/20 227/23 229/19 230/22
Where'd [2]  101/7 102/21
wherever [3]  17/18 24/20 97/9
whether [24]  41/15 141/5 141/9 143/14
150/21 175/3 177/7 189/14 193/12 193/16
193/17 193/21 193/22 195/14 196/11 199/19
199/24 200/15 203/2 210/10 222/12 222/12
231/23 233/1
while [14]  19/15 19/21 34/5 49/6 78/4 82/14
83/14 96/3 98/19 112/13 126/9 141/18
158/19 159/21
white [9]  1/20 1/21 202/4 202/20 203/4 205/1
215/2 219/18 221/10
who'd [1]  60/25
who's [19]  9/24 15/3 37/12 41/6 42/14 67/13
82/16 83/19 84/22 85/19 96/15 98/16 107/8
123/10 125/13 152/14 189/18 214/21 229/13
whoever [3]  94/25 95/14 233/6
whole [5]  49/10 53/4 126/21 167/21 177/23
wholesale [1]  229/20
whom [5]  16/5 58/10 69/19 91/13 148/25
whose [16]  19/9 20/13 32/13 33/5 36/3 36/8
36/14 37/6 42/10 61/14 61/22 95/12 103/4
118/8 124/11 128/1
why [84]
why'd [8]  60/13 87/3 102/13 108/23 109/4

114/23 131/1 131/21
wife [6]  26/24 42/20 124/12 151/18 155/17
158/24
wife's [4]  41/19 42/15 44/15 55/8
wifi [1]  21/4
Willie [8]  128/18 128/22 129/24 172/17
172/20 172/23 193/7 194/14
willing [1]  234/14
Wilma [1]  12/10
wipe [1]  67/2
wire [8]  9/13 11/7 39/15 39/16 39/19 40/14
40/19 40/20
wires [2]  33/9 39/21
wise [1]  55/20
wish [1]  165/9
withdraw [2]  181/11 181/13
withheld [1]  150/17
withholding [2]  148/21 150/14
within [2]  135/12 199/24
without [23]  3/23 5/6 5/9 72/24 82/8 89/11
116/7 147/5 147/6 147/19 149/15 149/22
154/3 159/12 162/5 167/18 181/15 187/12
197/5 208/23 219/2 227/4 234/22
witness [10]  2/17 3/2 8/22 154/18 162/3
165/5 165/14 167/7 178/13 226/8
witness' [1]  164/15
witnessed [2]  210/2 222/13
witnesses [1]  162/10
woman [1]  233/2
won't [3]  53/15 71/10 83/21
Woodbury [1]  131/15
words [3]  42/1 162/9 188/6
work [34]  6/7 13/21 13/23 23/13 26/22 27/4
27/10 27/14 28/21 38/19 65/23 65/25 67/5
69/2 70/2 70/6 81/20 86/18 87/16 87/19
87/22 94/19 190/1 190/3 190/4 190/18 193/3
215/23 216/21 216/22 216/23 217/13 219/9
229/11
worked [13]  94/17 96/13 96/15 143/15
143/18 189/3 189/4 189/6 189/7 189/24
196/11 216/18 218/2
working [8]  43/21 145/6 178/18 188/25
195/6 197/16 221/13 229/23
world [3]  48/7 213/14 221/23
worse [3]  158/14 158/16 163/19
worth [1]  6/25
wouldn't [10]  4/10 4/15 124/22 176/3 199/21
211/14 220/24 221/5 225/3 225/8
wrist [2]  66/12 66/15
writing [6]  17/25 31/21 32/22 124/6 124/6
211/12
written [1]  91/24
wrong [8]  83/4 88/20 106/5 106/6 147/5
147/19 202/13 211/12
wrote [4]  93/23 122/1 211/17 231/18

**Y**

y'all [2]  3/16 86/4
Yafa [2]  96/4 96/8
Yeah [12]  97/19 100/10 106/7 120/5 149/8
170/15 196/16 205/18 207/18 211/11 212/16
218/6
year [7]  12/25 13/1 81/25 116/25 118/10
132/15 179/16
years [7]  51/25 83/3 86/19 94/17 96/14 96/17
117/7
yes [417]
yet [1]  179/24
Yiddish [1]  43/25
York [3]  1/17 16/9 153/24

**Y**

Yossi [9]  59/19 59/20 59/22 59/24 103/1
 103/16 107/9 108/20 112/19
you'd [9]  8/1 13/11 24/20 34/16 35/24 36/24
 61/11 66/9 97/18
you're [88]
you've [34]  6/17 8/14 10/9 11/13 27/11 33/24
 34/13 68/7 72/6 100/4 100/7 132/7 136/16
 137/2 137/6 139/2 139/6 140/1 143/23 146/1
 146/4 174/3 174/6 174/6 174/7 174/10 184/9
 191/4 192/5 193/3 202/18 203/4 204/25
 221/25
younger [1]  233/2
yours [3]  104/22 166/24 170/23
yourself [10]  8/10 35/6 39/16 39/21 50/2
 152/23 154/15 215/2 229/1 231/4

**Z**

Ziploc [2]  114/10 114/14
zoom [1]  22/15