```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        Case No. 11-80205-CR-MARRA
 3
     UNITED STATES OF AMERICA,      )
 4                                  )
          GOVERNMENT,               )
 5                                  )
          -v-                       )
 6                                  )
     MITCHELL J. STEIN,             )
 7                                  )
          DEFENDANT.                )    West Palm Beach, Florida
 8                                  )    May 8, 2013
     _____)
 9

10                    VOLUME 3, PAGES 1 - 251

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12           BEFORE THE HONORABLE KENNETH A. MARRA

13                 UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT           Albert Stieglitz, ESQ., and
                                  Kevin Muhlendorf, ESQ.
17                                U.S. Department of Justice
                                  Criminal Division
18                                1400 New York Avenue, Northwest
                                  Washington, DC 20530
19
     FOR THE DEFENDANT            Mitchell J. Stein, Pro Se
20                                1551 North Flagler Drive, #1208
                                  West Palm Beach, FL 33401
21   -and-
     (Standby Counsel)            Charles G. White, ESQ.
22                                1031 Ives Dairy Road, Suite 228
                                  Miami, FL 33179
23
     Reporter                     Stephen W. Franklin, RMR, CRR, CPE
24   (561)514-3768                Official Court Reporter
                                  701 Clematis Street
25                                West Palm Beach, Florida  33401
                                  E-mail:  SFranklinUSDC@aol.com
```

```
 1        (Call to the order of the Court.)
 2            THE COURT:  Good morning, everyone.  Please be
 3   seated.
 4            All right.  Mr. Stein's present.  We ready to
 5   proceed?
 6            MR. STIEGLITZ:  The United States is ready, Your
 7   Honor.
 8            THE COURT:  Mr. Stein ready?
 9            MR. STEIN:  Defense is ready, Your Honor.
10            MR. STIEGLITZ:  May I just mention one housekeeping
11   matter, Your Honor?  We understand that some of the jurors had
12   indicated they were having trouble seeing the screen
13   yesterday.  We have hard copies of all the exhibits that we're
14   going to introduce today.  Our preference would be that only
15   if the jurors sort of indicate, obviously not to us
16   necessarily, but through you, that they're having trouble with
17   a particular exhibit, we can hand that out.  But rather than
18   dumping a bunch of paper on them, we figured it would be best
19   to sort of play it by ear.
20            THE COURT:  I'm not sure that they're going to give
21   me any indication.  It was my understanding as they were going
22   in on a break they made a comment to my courtroom deputy about
23   not being able to read some of the -- I think most of the
24   wording because it's just too small.  And I know I've been
25   having trouble reading it, at least from here.  I can see it
```

1   on this monitor better.  So I'm not sure that I'm going to be

2   able to tell you, oh, which ones, if any, they're having

3   problems with.

4        MR. STIEGLITZ:  I wasn't suggesting the Court needed

5   to -- that I was relying on the Court.  I just wanted to

6   suggest that we were going to just automatically hand on up

7   copies.  We thought we would sort of play it by ear, if that's

8   all right with the Court.

9        THE COURT:  Or you -- if you want me to make an

10  inquiry as to whether they prefer to have hard copies rather

11  than looking at the screen, I can make that inquiry if you'd

12  like.

13       MR. STIEGLITZ:  If the Court would be willing, that'd

14  be great, and we can then do that.  And I assume that then

15  they would also be instructed to leave those copies in the

16  courtroom, like their notebooks, and not take it back.

17       THE COURT:  Right.

18       Mr. Stein, do you have any problem with that?

19       MR. STEIN:  No, Your Honor.

20       THE COURT:  Okay.  I'll ask them.

21       MR. STIEGLITZ:  Thank you, Your Honor.

22       THE COURT:  Are you able to talk about the exhibits

23  in the next witness as to whether or not there were going to

24  be any objections?

25       MR. STIEGLITZ:  We were, Your Honor.  I think

```
 1    Mr. Stein was working on ones later in the day.  As to

 2    Mr. Woodbury on redirect, there would be two exhibits, and

 3    Mr. Stein indicated he would not object to either one of them.

 4            THE COURT:  What numbers are there?

 5            MR. STIEGLITZ:  123 and 63, both Government exhibits.

 6            THE COURT:  So they'll be admitted without objection;

 7    is that correct?

 8            MR. STEIN:  That's correct.

 9            And prior to any recross, which will be very short,

10    there will be -- I'll tell the Government the exhibit numbers,

11    which they already have.

12            THE COURT:  Ordinarily, I don't allow recross, so I'm

13    just letting you know.

14            MR. STEIN:  I'm just trying to prevent him from

15    coming here.

16            THE COURT:  I'm not saying I'm not going to allow it.

17            MR. STEIN:  I understand.

18            THE COURT:  Ordinarily I don't, so don't expect that

19    every witness you're going to be allowed to recross.

20            MR. STEIN:  I understand, Your Honor.

21            THE COURT:  So it was 63 and 123?

22            MR. STIEGLITZ:  Yes, Your Honor.

23            And just as a procedural matter for purposes of the

24    record, would you still like me to move them?

25            THE COURT:  As far as I'm concerned, they're in
```

 1    evidence now; 123 and 63 are admitted without objection.

 2         (Government's Exhibit No. 123 and 63 entered into

 3    evidence.)

 4         (The jury enters the courtroom, after which the following

 5    proceedings were had:)

 6              THE COURT:  Good morning, everyone.  Welcome back.

 7    Please be seated, ladies and gentlemen.  Thank you again for

 8    being here promptly this morning.  We appreciate you~-- the

 9    sacrifice you're making to be with us for this case.

10         (The jury enters the courtroom, after which the following

11    proceedings were had:)

12              THE COURT:  Ladies and gentlemen, Mr. Franklin tells

13    me he's going to need some time to fix this problem, and I

14    don't know -- sorry it happened after you came in here.  I

15    apologize.  If I could ask you to step back in and we'll try

16    and get with you as soon as possible.  I apologize.

17         (The jury exits the courtroom.)

18              THE COURT:  Please be seated.  We're back on the

19    record.  Mr. Stein's present.

20              My understanding is the machinery's working again, so

21    are we ready to bring the jury back in?

22              MR. STIEGLITZ:  Yes, Your Honor.

23              MR. STEIN:  Yes, Your Honor.

24              THE COURT:  Ready?

25              Okay.  Let's bring the jurors in.

 1                Can we get Mr. Woodbury back in here?

 2                Mr. Woodbury, you're still under oath, sir.

 3                THE WITNESS:  Yes, sir.

 4           (The jury enters the courtroom, after which the following

 5      proceedings were had:)

 6                THE COURT:  Please be seated again, everyone.

 7      Welcome back.  I'm sorry for the delay.  We think we have

 8      matters under control, and we're ready to proceed.

 9                Before we begin with the redirect examination of

10      Mr. Woodbury, Irene told me that some of you had indicated to

11      her that you were having difficulty reading some of the

12      exhibits that were being shown on the screen.  So the

13      Government is able to, if you would prefer, to hand out hard

14      copies of the exhibits so you could actually look at them, as

15      long as, again, you leave them at your seats during breaks and

16      don't take them with you.  Would you prefer to have hard

17      copies or would you want to continue to look at the screen?

18                A JUROR:  Both.

19                THE COURT:  You can do both if you'd like.  You can

20      do it however you want.  Why don't we just hand them out, and

21      if you want to use them, fine.  If you don't, you don't need

22      to use them.  Is that all right?

23                All right.  So --

24                MR. STIEGLITZ:  Thank you, Your Honor.  We'll do

25      that.  We'll start that as soon as we're done with

1    Mr. Woodbury this morning.

2              THE COURT:  All right.

3              MR. STIEGLITZ:  May I?

4              THE COURT:  Yes, you may inquire.

5              MR. STIEGLITZ:  Thank you, Your Honor.

6         John Martin Woodbury, Jr., Government's witness,

7                        resumed the stand.

8                      Redirect Examination

9    BY MR. STIEGLITZ:

10    Q    Good morning, Mr. Woodbury.

11    A    Good morning.

12    Q    Mr. Woodbury, this morning I want to ask you about a few

13    things that Mr. Stein asked you about yesterday.  Mr. Stein

14    asked you about several defense exhibits, and I want to just

15    look back at them very briefly.  And probably at my own peril,

16    I'm going to try and put them on the overhead projector here.

17    So we'll see how this works.

18              THE COURT:  You can also zoom in on that if you'd

19    like.

20              MR. STIEGLITZ:  Thank you, Your Honor.  I'm going to

21    leave it pulled out just for now.

22    BY MR. STIEGLITZ:

23    Q    Mr. Woodbury, this is defense exhibit 188.  Do you recall

24    Mr. Stein asking you about this document?

25    A    Yes, I do.

1    Q    Mr. Woodbury, can you just look and tell the members of

2    the jury what the date of that e-mail exchange is?

3    A    July 24th, 2007.

4    Q    Okay.  And I'm going to take that down and I'm going to

5    try and switch this back so we can see one of the Government's

6    exhibits.  And we'll pull up Government's exhibit 64, please,

7    which is already in evidence.  And Mr. Woodbury, this is the

8    Cardiac Hospital Management purchase order that we looked at

9    yesterday; is that right?

10   A    Yes.

11   Q    And we'll just blow out the date of it there at the upper

12   right.  And what's that date, Mr. Woodbury?

13   A    September 14th, 2007.

14   Q    Okay.  And let's pull up Government's exhibit 70, please,

15   which is the first -- well -- and Mr. Woodbury, do you recall

16   talking to Mr. -- well, do you recall looking at this document

17   yesterday, Government's exhibit 70?

18   A    Yes, I do.

19   Q    And if we can just -- we'll pull out the date there by the

20   signature line at the bottom, and if you'd just tell the

21   members of the jury what that date is.

22   A    September 24th, 2007.

23   Q    Okay.  And just one more here.  We'll look at Government's

24   exhibit 74.  Mr. Woodbury, do you recall looking at this

25   document yesterday?

```
1    A    Yes, I do.

2    Q    Third purchase order?

3    A    Yes, I do.

4    Q    And if we can just pull out the date there at the bottom,

5    what's the date of this document?

6    A    October 4th, 2007.

7    Q    So just to go back to that document that Mr. Stein showed

8    you in defense exhibit 188, we'll pull down our exhibit, that

9    was months before any of those purchase orders --

10   A    That's correct.

11   Q    -- that we looked at; is that right?

12   A    That's correct.

13   Q    And, in fact, Mr. Woodbury, this e-mail doesn't have

14   anything to do with those purchase orders, does it?

15   A    No, it's unrelated to the purchase orders.

16   Q    Okay.  Now, take down 188.  Let's put up another document

17   that Mr. Stein asked you about.  This is defense exhibit 206.

18   We'll leave it -- I tell you what, I'll zoom out and then I'll

19   zoom back in so we can see all of it, or at least attempt to

20   see all of it.  And this is defense exhibit 206, which

21   Mr. Stein asked you about.  I'll zoom in again a little bit so

22   that we can see certain parts of it.

23        Do you remember Mr. Stein asking you about this

24   document, Mr. Woodbury?

25   A    Yes, I do.
```

1    Q    And what's the date of this e-mail exchange between you

2    and Dr. Harmison and Mr. Stein?

3    A    August 13th, 2007.

4    Q    So, again, this is, if I'm doing my math right, this is

5    over a month before even the first of those purchase orders,

6    isn't it?

7    A    That's correct.

8    Q    And this e-mail talks about cash flow projections,

9    financial projections.  This doesn't have anything to do with

10   those purchase orders, does it, Mr. Woodbury?

11   A    Not at all.  Totally unrelated.

12   Q    Okay.  Let's look at one more document that Mr. Stein

13   showed you yesterday.  This is defense exhibit 216.  I think I

14   could afford to zoom in a little more on this one.

15          Mr. Woodbury, do you remember Mr. Stein asking you

16   about this document yesterday?

17   A    Yes, I do.

18   Q    And this exchange between you and Dr. Harmison, what's the

19   date of this one?

20   A    August 21st, 2007.

21   Q    And so, again, here we are weeks before any of those

22   purchase orders; isn't that right?

23   A    That's correct.

24   Q    And, again, in this e-mail, this Kevin Kading is asking

25   about your AMEX listing being secure.  This doesn't have

1   anything to do with those purchase orders, does it?

2   A   No, it's unrelated.

3   Q   Now, Mr. Stein also showed you some e-mails yesterday that

4   he suggested showed that you were talking to Dr. Harmison

5   about certain press releases.  Do you remember him asking you

6   those questions?

7   A   Yes, I do.

8   Q   And let's just look at one of those documents in

9   Government's -- excuse me, defense exhibit, I've got it here,

10  186.

11          Mr. Woodbury, looking at that document, what's the

12  date of that document?

13  A   August 24th, 2007.

14  Q   And Mr. Woodbury, August 24th, 2007, weeks before any

15  of -- even that first purchase order; isn't that right?

16  A   That's correct.

17  Q   So is it fair to say that whatever press release you and

18  Dr. Harmison are talking about, it couldn't have had anything

19  to do with those purchase orders?

20  A   It's actually a letter to AMEX, but you're right, it has

21  no relationship at all to the purchase orders.

22  Q   Now, but even so, Mr. Woodbury, what does Dr. Harmison ask

23  you to do even after he approves this, whatever this press

24  release is?  What does he ask you in that top e-mail?

25  A   He just wants to make sure that Mr. Stein has approved the

 1    letter.

 2    Q    Okay.  And just to be clear, in defense exhibit 186,

 3    Mr. Stein didn't -- that's just a single-page document.

 4    Mr. Stein didn't show you what that press release was that was

 5    attached to that, did he?

 6    A    No.

 7    Q    Mr. Stein also showed you defense exhibit 165.  Do you

 8    remember Mr. Stein asking you about this document,

 9    Mr. Woodbury?

10    A    Yes, I do.

11    Q    Now, Mr. Stein asked you some questions about those top

12    e-mails that Dr. Harmison sent.  Do you remember him asking

13    you those questions?

14    A    Yes, I do.

15    Q    And is it fair to say that in that e-mail, Dr. Harmison

16    was saying that he had made some edits to a press release;

17    isn't that right?

18    A    That's correct.

19    Q    Okay.  Now, Mr. Stein didn't show you what that press

20    release was, did he?

21    A    No, I didn't see any of the attachments.

22    Q    Okay.  And, in fact, this e-mail, this wasn't an e-mail

23    attaching a press release, to your knowledge, having anything

24    to do with those purchase orders, was it?

25    A    Well, I couldn't see the attachments.  I can't recall what

 1   went with this, so I didn't know the context.

 2   Q    Well, and let's just move down.  Mr. Stein didn't ask you

 3   about the bottom of this e-mail.  There at the bottom where it

 4   says "from MJS," who is that?

 5   A    Mr. Stein.

 6   Q    And just take a moment and read that, and from your read

 7   of that e-mail, what, in fact, do you believe this press

 8   release related to, if you know?

 9   A    I don't recall what press release.  There were a whole

10   bunch of them.

11   Q    Okay.

12   A    So I'd have to see it.

13   Q    Okay.  But defense exhibit 165 certainly didn't include

14   the press release that was attached to -- purportedly attached

15   to this?

16   A    No.

17   Q    Okay.  All right.  Mr. Woodbury, Mr. Stein asked you a

18   bunch of questions about something called naked short selling.

19   Do you remember him asking you those questions?

20   A    I recall him presenting a report from the SEC that dealt

21   with it, but I don't think he actually asked me questions

22   about it.

23   Q    Fair enough.

24        And Mr. Stein showed you an e-mail, defense

25   exhibit 326, which is a long e-mail.  I'm not going to have

```
 1   you read that to the jury.  But Mr. Stein (sic), do you
 2   remember Mr. Stein showing you this e-mail from a Ms. Crowley?
 3   A   Yes, I do.
 4   Q   At AMEX?
 5   A   And I actually refreshed my memory on the course of this
 6   particular one.
 7   Q   Very generally, Mr. Woodbury, is it fair to say that in
 8   response to some of Mr. Stein's questions yesterday, you told
 9   the jury that you were interacting with the AMEX at
10   Mr. Stein's direction on this issue; is that right?
11   A   Mr. Stein was the, yes, the lead person in terms of
12   developing strategy with the AMEX.  And actually, I refreshed
13   my memory, and I did prepare this letter at Mr. Stein's
14   request.  He wanted it done first thing in the morning, and I
15   sent it back to him.
16   Q   And just to be clear, Mr. Woodbury, in response to any
17   interaction that you had with the AMEX, the stock exchange
18   that Signalife was trading on, did the AMEX or anyone else
19   tell you that you should go out and buy stock in the open
20   market or do anything else to fight to keep the stock price
21   up?
22   A   No, there was never any suggestion to that effect.
23   Q   Did the AMEX give you advice of any kind on what you
24   should do?
25   A   No, not at all.
```

```
 1    Q   All right.  Now, speaking of the AMEX, Mr. Stein asked you

 2    some questions about whether Dr. Harmison was the one that you

 3    were communicating with about that issue; is that right?  Do

 4    you recall that?  Do you recall him asking you those

 5    questions?

 6    A   Well, he raised the question that Dr. Harmison went up to

 7    New York and met with some officials at AMEX.

 8    Q   And I apologize, I don't have Mr. Stein's copy of this.

 9         MR. STIEGLITZ:  Do you object to putting up our copy

10    of 180?

11         MR. STEIN:  Not at all.

12  BY MR. STIEGLITZ:

13    Q   Okay.  Mr. Woodbury, I'm going to show you a copy of our

14    printout of Mr. Stein's exhibit 180.  Boy, I think I'm getting

15    worse at this rather than better.

16         This is defense exhibit 180.  And Mr. Woodbury, do

17    you remember Mr. Stein asking you about this document?

18    A   Yes, I do.

19    Q   And this document appears to have some attachments

20    pertaining to the AMEX; is that right?

21    A   That's correct.

22    Q   Mr. Stein didn't show you any of those attachments, did

23    he?

24    A   No, he did not.

25    Q   Okay.  But even so, at the top there, Dr. Harmison asks
```

```
 1   you to do something, and it's actually highlighted there.
 2   What's he asking you to do?
 3   A   He's asking me to wait for inputs from Mr. Stein before I
 4   do anything.
 5   Q   All right.  Now, Mr. Woodbury, Mr. Stein also asked you --
 6   do you remember Mr. Stein asking you some questions about the
 7   role of auditors?
 8   A   Yes.
 9   Q   And whether auditors were checking up on Signalife
10   transactions?
11   A   Yes.
12   Q   Now, Mr. Woodbury, Signalife had auditors; is that right?
13   A   That's correct.
14   Q   Now, let's look at -- okay.  Mr. Woodbury, let's look at
15   what's been admitted into evidence as Government's
16   exhibit 123, which we'll pop up on the screen there in front
17   of you.  And if we can just blow out the top half of that
18   document, please.
19          Mr. Woodbury, is it fair to say this is a memo that
20   was prepared in response to the auditors' questions~-- the
21   questions the auditors were asking of you when you were
22   preparing the 10-K?
23   A   It appears to be so.
24   Q   Mr. Woodbury, what's the number one thing on that list
25   that the auditors were asking about?
```

```
 1    A    Status of purchase orders and production delays.

 2    Q    And to the best of your recollection, is that something

 3    that -- those purchase orders, were those the three that we've

 4    looked at, the Cardiac and the two IT Healthcare ones?

 5    A    Yes.

 6    Q    Well, and let's just explain.  The date of this memo is

 7    March 19th, 2008; is that right?

 8    A    That's correct.

 9    Q    And who's it addressed to?

10    A    Mike Boliek is the, I guess the partner in charge of the

11    auditors firm that's handling the account for Signalife, and

12    Keith Hendrix was a junior CPA that worked underneath

13    Mr. Boliek.

14    Q    What's Elliott Davis?

15    A    Elliott Davis is the CPA firm that they worked for that

16    was auditing the financial statements.

17    Q    Now, if we can just scroll down a bit and blow out the

18    section that says purchase orders, Mr. Woodbury, we'll look at

19    that.

20         And Mr. Woodbury, is it fair to say this is what you

21    and Signalife were telling the auditors about the purchase

22    orders?

23    A    That's correct.

24    Q    And if you'd just read the very first sentence of the

25    first paragraph, please.
```

1    A    "On September 14th, 2007, Cardiac Hospital Management

2    entered into a purchase order with Signalife for the purchase

3    of 180 Fidelity 100s, plus upgrades, at a unit price of

4    $11,000, for a total purchase price of 1.98 million."

5    Q    And now let's take a look at the first sentence of the

6    second paragraph, please.

7    A    "On September 29th, 2007, IT Healthcare entered into a

8    purchase order agreement with Signalife for the purchase of

9    300 Fidelity 100s with cables and the upgrade package at a

10   unit price of $11,000, for a total cost of 3.3 million, with a

11   deposit of $30,000 applied toward the total cost."

12   Q    And just that -- the first sentence of that last

13   paragraph, please?

14   A    "On October 4th, 2007, IT Healthcare signed another

15   purchase order for 47 Fidelity 100s with cables, upgrade, and

16   translucent cables at $12,000 per unit, for a total price of

17   $564,000."

18   Q    Mr. Woodbury, what was the source of this information that

19   Signalife was telling the auditors about these purchase

20   orders?

21   A    Well, my source was Mr. Stein.

22   Q    We'll take that exhibit down, Mr. Woodbury.

23        I want to just push your attention back to this issue

24   of press releases and look at one more document that Mr. Stein

25   showed you yesterday.  He showed you defense exhibit 272.  And

```
 1   let me just blow it out real quickly so that we can see what

 2   this was, and then we'll zoom in on the top part.

 3           Mr. Woodbury, do you remember Mr. Stein asking you

 4   questions about this document?

 5   A   Yes, I do.

 6   Q   Okay.  And he had you look at that part at the top where

 7   Dr. Harmison was -- well, the part that Dr.~Harmison wrote at

 8   the top, didn't he?

 9   A   That's correct.

10   Q   The part where Dr.~Harmison says he doesn't want you to

11   issue your redrafted press release, right?  He wants you to

12   issue his press releases.

13   A   That's correct.

14   Q   Now, I want to direct your attention to a part of the

15   exhibit that Mr. Stein didn't ask you to look at and read.

16           Mr. Woodbury, whose e-mail is that at the bottom?

17   Who is that from and to?

18   A   That is an e-mail from Mr. Stein to myself and

19   Dr.~Harmison.

20   Q   And why don't you just read it to the jury, please.

21   A   "John, this is a press release that Lowell has approved."

22           By the way, it's issued -- comes to me at

23   6:00 o'clock, 6:18 in the evening.

24           "It is" -- and this is capitalized -- "critical and

25   must hit the market before the market opens."
```

```
 1           Then it continues:  "Our whole company is involved in
 2      this product launch.  There are a dozen hospitals involved,
 3      and product launches are" -- capitalized -- "very, very
 4      critical to companies."
 5           Then it goes on:  "Please assure this is on the
 6      market wire" -- capitalized -- "before market opens."
 7           And then it ends:  "Dr.~Harmison is readily available
 8      and is copied."
 9      Q   So is it fair to say that the person who sent you whatever
10      this press release is in the first instance was Mr. Stein?
11      A   That's correct.
12      Q   And to be clear, Mr. Woodbury, this wasn't a press release
13      about any of those three purchase orders, was it?  This was
14      about a product launch; is that right?
15      A   Well, to be more accurate, this is the press release that
16      announced that Dr.~Harmison, Dr. Windom and I guess
17      Dr. Phillips were going to go start their marketing efforts,
18      and this was the lead-in about a week prior to them going to
19      Florida.  So, telling the world they're going to start out
20      there hitting hospitals.
21      Q   Okay.
22      A   Marketing the product.
23      Q   And what's the date of Mr.~Stein's e-mail to you,
24      Mr. Woodbury?
25      A   September 9th, 2007.  That's Harmison's -- oh, I'm sorry,
```

```
 1    they're both September 9th, 2007.

 2    Q   I apologize.  I'm probably blocking folks.  I'll try to

 3    keep myself out of the way here to the extent I can.

 4            And just up at the top, that part that Mr. Stein had

 5    you read?

 6    A   September 9th, 2007.

 7    Q   What time?

 8    A   10:56 in the evening, almost midnight.

 9    Q   Okay.  Defense exhibit 272, whatever press release that

10    was, that wasn't attached to defense exhibit 272?  Mr.~Stein

11    didn't show that to you, did he?

12    A   No, he did not.

13    Q   Okay.  I want to show you another document that Mr.~Stein

14    didn't show you.  Let's pull up Government's exhibit 63.

15            Now, Mr. Woodbury, let's just start at the top of

16    this e-mail with the from and the to with everything.

17    A   Okay.

18    Q   If you'd just tell this -- I'm sorry, this is already in

19    evidence.

20            Mr. Woodbury, what's -- who's this from and to?

21    A   This is from Mr.~Stein.  That's his e-mail, DOBIECO.  This

22    is to myself and to Dr. Harmison on the CC.

23    Q   And what date and time?

24    A   September 10th, 2007, at 1:45 in the morning.

25    Q   So fair to say, Mr. Woodbury, that's about two hours, 45
```

```
 1    minutes after the e-mail that Mr. Stein asked you about?

 2    A   That's correct.

 3    Q   Does this, in fact, pertain to that same issue, that same

 4    issue that was being discussed in that last e-mail?

 5    A   Yes, essentially, it tracks it.

 6    Q   Let's scroll down, and I'm going to ask you to read the

 7    very first line of that e-mail, please.

 8    A   "John, I started to revise your reworked press release,

 9    got enormously frustrated, and stopped at the first

10    paragraph."

11    Q   And now we're going to skip down to the third paragraph of

12    that e-mail.  If you can just read that first sentence,

13    please.

14    A   "If I were a shareholder, your press release would cause

15    me to vomit in my lap.  It makes it look like the strong and

16    experienced Lowell Harmison has suddenly become apologetic for

17    raising $102 million.  Notwithstanding AMEX's apparent

18    statement to you, Yorkville has over 2 billion under

19    management."

20            That's referring to a line of credit that was

21    procured.

22    Q   And Mr. Woodbury, we can just actually skip down to the --

23    well, you can read that last sentence.

24    A   Okay.

25            "I do not believe Dr.~Harmison is apologetic."
```

```
 1   Q   And now we'll skip down to the next paragraph of the
 2   e-mail.
 3   A   "You can tell the AMEX that Dr.~Harmison, paren, who I
 4   have spoken to, paren, said this, quote.  If they would like
 5   to sit down and draft" -- in all caps -- "our fucking press
 6   releases for us" -- then it continues:  "To please say so in
 7   writing so that we can take appropriate action under the First
 8   Amendment to the United States Constitution, freedom of
 9   speech, under the federal securities laws and under the RICO
10   laws."
11   Q   And let's go ahead and we'll read the next -- well, so
12   that we can see, and maybe we'll blow them out one at a time,
13   let's read the next two paragraphs.  I think we can afford to
14   blow those out.
15   A   "This one is now up to Lowell.  But for me, if we are
16   going to become apologetic and afraid about how our wording is
17   organized in a press release, I would much rather concentrate
18   on other matters.
19           "The press release you drafted sounds like a lawyer
20   drafted it, who is being careful."
21           True.
22           "That will cause a sell off.  Dr. Harmison has
23   nothing to apologize for.  Medtronics called this the finest
24   ECG in the world.  They said it in writing."
25   Q   And then let's just read the next paragraph, please,
```

```
 1    Mr. Woodbury.

 2    A    "I am frankly perplexed by the time spent revising the

 3    release.  The initial release says nothing hyperbolic,

 4    objectionable or otherwise.  And, for Christ's sake, it is a

 5    press release.  It is supposed to be upbeat and promotional

 6    about such an exciting event."

 7    Q    Mr. Woodbury, could you just tell the jury, was this

 8    indicative of the tone of e-mails that Mr. Stein would send

 9    you if you didn't do what he wanted you to do?

10    A    Yes, in many cases.

11    Q    After you received this e-mail, were you inclined to

12    second-guess Mr. Stein on press releases?

13    A    Well, anything to do with the sales and marketing press

14    release, no, I wouldn't.

15              MR. STIEGLITZ:  Court's indulgence just a moment.

16              Nothing further, Your Honor.

17              THE COURT:  Mr. Stein, did you have anything else?

18              MR. STEIN:  I did.  If the Court didn't want me to do

19    it, I would address it at sidebar.

20              THE COURT:  No, go ahead.

21              MR. STEIN:  Thank you, Your Honor.

22                        Recross-examination

23    BY MR. STEIN:

24    Q    Mr. Woodbury, I just have a couple of questions --

25              MR. STEIN:  Your Honor, the Government and I have
```

```
 1   stipulated to move in 214 and 348, and I would ask to be
 2   allowed to approach the witness.
 3              THE COURT:  Any objection to those?
 4              MR. STIEGLITZ:  No, Your Honor.
 5              THE COURT:  All right.  They'll both be admitted
 6   without objection.
 7      (Defendant's Exhibit No. 214 and 348 entered into
 8   evidence.)
 9      You may proceed.
10              MR. STEIN:  Thank you, Your Honor.
11   BY MR. STEIN:
12   Q   Mr. Woodbury, I'm showing you exhibit 214 which is in
13   evidence.  Mr. Woodbury, have you ever seen that document
14   before?
15   A   Yes, I have.
16   Q   Now it's time for me to use the ELMO, which will be a
17   disaster.
18              Mr. Woodbury, you wrote a memo on March 31, 2008, to
19   Keith Hendrix, who was mentioned as one of the auditors, and
20   it says and is on the screen, it says:
21              "Keith, attached please find the standard terms and
22   conditions used with the invoices signed by IT Health and
23   Cardiac Management."
24              Those are the purchase orders that the Government's
25   been asking you about now for two days.
```

```
 1    A    That is correct.
 2    Q    And then it says below:  "I am currently getting a copy of
 3    Lowell's signature page on the one and will remit when I get
 4    it."
 5              You see that?
 6    A    Yes, I do.
 7    Q    So not only were you communicating with the auditors, but
 8    you were going back to Lowell Harmison to get a copy of his
 9    signature on the two press releases the Government has sat
10    here and asked you if they were real or not; is that correct?
11    Is that what happened in March of 2008?
12    A    Well, the auditors noted that two of the purchase orders
13    had been signed and one had not been signed, and they wanted
14    to make sure that Dr.~Harmison's signature was on the one that
15    had not been signed.
16    Q    And dutifully, you went back to Dr.~Harmison and got his
17    signature; isn't that correct?
18    A    That's correct.
19    Q    And the Government was so worried about this exhibit, that
20    you met with them in person on May 5th, 2013, didn't you?
21              MR. STIEGLITZ:  Objection as to what the Government
22    was worried about.
23              THE COURT:  Sustained.
24    BY MR. STEIN:
25    Q    You met with the Government on May 5th, 2013, didn't you?
```

1    A    May 5th.  I met with the Government several times in

2    witness preparation.  Was it specifically about this

3    particular e-mail?  I don't recall discussing that with the

4    Government.

5    Q    According to me, May 5th was a few days ago.  Did you meet

6    with the Government a few days ago?

7    A    Yes, we did witness preparation when I arrived.

8    Q    And you told the Government, isn't it true, that you

9    talked to Dr.~Harmison about one of the purchase orders, and

10   you don't remember anything remarkable about his response to

11   you regarding the purchase order?  Is that what you said to

12   the Government?

13   A    I don't remember anything remarkable about his response?

14   Q    Yeah, you don't remember anything remarkable about the

15   response from Dr.~Harmison.  Is that what you said?

16   A    Relating to this e-mail?

17   Q    Relating to your communications with Keith Hendrix and

18   this e-mail; that's correct.

19   A    My recollection was I said, Dr.~Harmison, we don't have a

20   signature to this, can you please sign it and send it over,

21   I'll remit it to the auditors.

22   Q    Nothing -- I'm sorry to interrupt you.

23   A    Yes, nothing remarkable, as I recall.

24   Q    Finally, you also told the Government three days ago that

25   you do not recall Harmison questioning the purchase order;

```
1    isn't that correct?
2    A    No, I have no recollection of him questioning the purchase
3    order.
4    Q    You don't recall telling the Government that you do not
5    recall Harmison questioning the purchase order?
6    A    Yes, I have no recollection of him questioning the
7    purchase order.
8              MR. STEIN:  Nothing further.
9              THE COURT:  All right.  Thank you.
10             Anything else?
11             MR. STIEGLITZ:  Nothing.
12             THE COURT:  Thank you, sir.  You're excused.  Watch
13   your step.
14             THE WITNESS:  Okay.  Thank you.
15             MR. STIEGLITZ:  And just for the purposes of clarity,
16   Your Honor, we're okay to release Mr. Woodbury to go home?
17             THE COURT:  Subject to what we discussed yesterday.
18             MR. STEIN:  Absolutely, Your Honor.
19             THE COURT:  Thank you, sir.
20             Next witness.
21             MR. MUHLENDORF:  Your Honor, the Government calls
22   Tracy Jones.
23             And, Your Honor, as we discussed, we have hard copies
24   of the documents.  Should I hand them out as we go?  How would
25   you prefer to proceed?
```

```
 1              THE COURT:  If you could do it all at once it would
 2      be probably easier.  Otherwise, we're going to have to take
 3      that each time.  Are they collated or not?
 4              MR. MUHLENDORF:  They're collated by exhibit number.
 5      It's not a packet per juror.  It's per exhibit.
 6              THE COURT:  Well then, if you don't have a packet for
 7      each juror, we might as well do it one at a time.
 8              Ma'am, would you please raise your right hand for me.
 9                Tracy Jones, Government witness, sworn.
10              THE COURT:  All right.  Would you tell us your name,
11      please, and spell your first name for us.
12              THE WITNESS:  Tracy Jones, T-r-a-c-y.
13              THE COURT:  Thank you, ma'am.
14                        Direct Examination
15      BY MR. MUHLENDORF:
16      Q    Good morning, Ms. Jones.
17      A    Good morning.
18      Q    So Ms. Jones, in what city and state do you reside?
19      A    Simpsonville, South Carolina.
20      Q    What's your educational background, Ms. Jones?
21      A    A couple credits shy of my associate's degree.
22      Q    And how are you currently employed?
23      A    I'm an assistant to some shareholders at an accounting
24      firm called Elliott Davis.
25      Q    And prior to being at Elliott Davis, where did you work?
```

```
 1    A    I worked at Signalife, also known as Heart Tronics.

 2    Q    How long were you at Signalife?  When did you start?

 3    A    September 2005.

 4    Q    Okay.  And when did you leave Signalife?

 5    A    Around June 2009.

 6    Q    Could you explain to the jury how you came to be employed

 7    at Signalife?

 8    A    I moved from New York to South Carolina and just started

 9    looking for a job and saw an ad in the paper for an executive

10    assistant.

11    Q    At the time did you have an understanding of what

12    Signalife did, what kind of company it was?

13    A    Not when I applied, but when I interviewed.

14    Q    And what did you learn when you interviewed?

15    A    They were a research and development company for a product

16    called the Fidelity 100, a heart monitor.

17    Q    Were you ultimately hired by Signalife?

18    A    Yes.

19    Q    And who was it that hired you at Signalife?

20    A    Pam Bunes, Rod Hildebrandt, and Jane Greene.

21    Q    Do you recall what your starting salary was?

22    A    Around 42,000.

23    Q    Now, if you could just explain to the jury sort of --

24    we'll start with when you were first hired in 2005.  What were

25    your duties at Signalife?
```

```
 1   A   Executive assistant to the president and chief operating
 2   officer.
 3   Q   Okay.  And was that Ms. Bunes was the president?
 4   A   Yes.
 5   Q   Who was Mr. Hildebrandt?
 6   A   He was the chief operating officer.
 7   Q   Now, what sort of things did you do as executive
 8   assistant?
 9   A   Flight arrangements, telephone calls, typing of letters,
10   memos, communicating with the board of directors for setting
11   up meetings, just basically normal executive assistant duties.
12   Q   When you first started, whose instructions were you
13   following in 2005?
14   A   Pam Bunes and Rod Hildebrandt.
15   Q   Over the course of your time at Signalife, did the person
16   you responded to -- person you received instructions from
17   change?
18   A   Yes.
19   Q   As it got toward the end of your time, who did it change
20   towards?
21   A   Mitchell Stein.
22   Q   Now, did your salary change over time?
23   A   Yes.
24   Q   Okay.  And explain that to the jury.
25   A   My employment agreement stated, I believe it was after 30
```

1    days I would receive an increase.  Rod Hildebrandt gave me an

2    increase to 50,000.  I'm not exactly sure of the timeframe,

3    but then I was increased to 65 or 67,000 and promoted to

4    business office manager.  And then around August 2007,

5    Mitchell Stein gave me an increase that doubled my salary to

6    125,000.

7    Q   And in that progression from 42,000 to 125,000, did your

8    duties change?

9    A   Yes.

10   Q   Okay.  And please explain to the jury how your duties

11   changed.

12   A   I dealt with the bookkeeper and accountants more, I would

13   transfer stock for payroll and others.  It was more

14   office-wide instead of assistant.  Basically back office

15   operations.

16   Q   Did you do wire transfers?

17   A   Yes, I did.

18   Q   And did you issue -- you said you issued stock?

19   A   Yes.

20   Q   Did you pay bills?

21   A   I submitted bills to the accountant to be paid.

22   Q   Now, towards the end of your time at Signalife, how many

23   people were in the office?

24   A   Just my -- in the Greenville office?

25   Q   In the Greenville office.

```
 1    A    Just myself.
 2    Q    I apologize, I should have started, where were you located
 3    this whole time?
 4    A    Greenville, South Carolina.
 5    Q    Now, do you know the name Mark Nevdahl?
 6    A    I do.
 7    Q    Who is Mark Nevdahl?
 8    A    He is a broker.  I cannot remember the name of the firm,
 9    but he's a broker where our accounts got transferred to for
10    stock transfers, and he handled the employee pay through
11    stock.
12    Q    Who is it that suggested you open brokerage accounts or
13    work with Mark Nevdahl?
14    A    Mitchell Stein.
15    Q    Now, we've mentioned the Defendant Mitchell Stein a couple
16    times.  Did you ever meet Mr. Stein in person?
17    A    I believe it was two times.
18    Q    If you could speak up a little bit.
19    A    I believe it was two times.
20    Q    And despite only meeting him two times, did you interact
21    regularly with him throughout your time at Signalife?
22    A    More towards the end, very frequently towards the end and
23    a little bit in the beginning, if I answered the telephone.
24    Q    Did Mr. Stein tell you anything about himself when you did
25    talk to him when you first met him?
```

```
 1    A    Anything personal?

 2    Q    About his lifestyle, anything like that.

 3    A    I knew that he owned a few home,s a jet, had a daughter

 4    who was his little princess, a son he said he could give a

 5    crap about, a wife named Tracy, had a house in Hidden Hills,

 6    one in Boca Raton, and that he was majority shareholder, or

 7    his wife.

 8    Q    Did he ever tell you anything about the jets in

 9    particular?

10    A    He just called me from an air phone on the jet once, and

11    there was a time that he was looking to see if a stock

12    transfer he had requested arrived on time, and I had to track

13    it, and I heard him say on the phone, Tracy, get the fuel in

14    the jet, we've gotta go.  But that's all I've heard about it.

15    Q    Now, if you could describe for the jury your understanding

16    of the Defendant's role at Signalife.

17    A    My understanding was that he owned the company.

18    Q    Did he control the company?

19    A    Yes.

20    Q    Now, there were CEOs throughout your time there, correct?

21    A    Correct.

22    Q    And Mr. Stein was not a CEO, correct?

23    A    Correct.

24    Q    Did the CEOs have control of the company?

25    A    I believe they tried to, but didn't seem that way.
```

```
 1                MR. MUHLENDORF:  Your Honor, if I could approach the

 2     witness?

 3                THE COURT:  Yes.

 4                MR. MUHLENDORF:  I'm going to use the easel if that's

 5     okay.

 6                THE COURT:  All right.

 7     BY MR. MUHLENDORF:

 8     Q   Now, Ms. Jones, can you see that?

 9     A   That's better.  Thank you.

10     Q   Someone very usefully --

11                THE COURT:  Ms. Easley, can you see that?

12                A JUROR:  Yes, sir.

13     BY MR. MUHLENDORF:

14     Q   Someone very usefully put up a chronology of the CEOs.

15     Does this seem correct to you?  Mr. Fink, Ms. Bunes,

16     Mr. Harmison, and Mr. Perkins?  That seem about the right

17     chronology?

18     A   There was a Lee Ehrlichman before Harmison for a short

19     while, and I did not work with Marvin Fink, but that was my

20     understanding.

21     Q   So you were here at Pam Bunes down to Perkins, correct?

22     A   Correct.

23     Q   If I were to ask you to put a percentage of control that

24     Mitchell Stein had during the time period of each one of these

25     CEOs, could you do that?  So start with Pam Bunes.  How much
```

```
 1   control did he exert during the Pam Bunes timeframe?

 2   A    To my knowledge, it seemed to be about 50 percent.

 3   Q    And then during the Harmison timeframe, how much control

 4   did he exert?

 5   A    Probably more like 75 percent.

 6   Q    And then how about when Mr. Perkins was in charge?

 7   A    95 percent or greater.

 8   Q    Now, is it fair to say that Mr. Stein's control increased

 9   over time?

10   A    Yes.

11   Q    Okay.  Now, you said earlier in a question that you

12   believed he controlled the company; is that correct?

13   A    Correct.

14   Q    What led you to believe that?  Tell the jury what sort of

15   things you saw that lead you to make that statement.

16   A    I was always told what he says goes.  He would call daily

17   after closing market and report to Pam during Pam's time there

18   how much stock to transfer to who, after 4:00 o'clock each

19   day.

20   Q    Can you speak up, please, ma'am?

21   A    After 4:00 o'clock each day he would place that call to

22   the office.  Myself or the executive assistant would answer,

23   give the call to Pam.

24        He approved what cars she purchased under her

25   agreement, traveling arrangements for her.  Later on when Pam
```

 1   was gone, I received a lot of phone calls from him mostly with

 2   stock, wire transfers, who to send it to and when, where to

 3   send the tracking information, how quickly to get it done.

 4   Q   Did people at the company, the CEOs, yourself, other

 5   staffers, did they check with Mitch Stein before they did

 6   things?

 7   A   Things related to stock, absolutely.  I'm not sure -- not

 8   every little detail.  Not every little item should I say.  But

 9   things to do with stock, yes.

10   Q   So, for instance, the 50 percent control you say that

11   Mr. Stein had during the Pam Bunes era, did that relate to

12   things like stock, he was in control of the stock issuances?

13   A   Those are the things I knew he was in control of, yes.

14   Q   And then as it goes down, 75 and 95 percent, did that

15   include stock and wire transfers?

16   A   Yes.

17   Q   Did the Defendant, Mr. Stein, tell you which bills to pay?

18   A   Towards the end, each time I wanted to get some bills

19   paid, I had to have a conference call with Mitchell Stein,

20   Kevin Pickard, and Norma Provencio, and I would report

21   everything that was outstanding, and he would tell me which

22   ones to submit for payment.

23        MR. MUHLENDORF:  Your Honor, I've provided to the

24   defense a list of exhibits.  I'd like to go ahead and move

25   them into evidence, unless they have any objection.

```
 1              MR. STEIN:  This is --

 2              THE COURT:  Why don't you start with the first

 3     exhibit and let them continue to review the others.

 4              MR. STIEGLITZ:  Yes, Your Honor.

 5              MR. MUHLENDORF:  Can we have 318, please?

 6              THE COURT:  Is there any objection to 318, Mr. Stein?

 7              MR. STEIN:  No.

 8              THE COURT:  318 will be admitted without objection.

 9          (Government's Exhibit No. 318 entered into evidence.)

10              MR. MUHLENDORF:  If I could inquire through the Court

11     if the jury can see that?

12              THE COURT:  Is that -- does anyone want hard copies?

13     One of the --

14     BY MR. MUHLENDORF:

15     Q    Ms. Bunes (sic), do you recognize exhibit 318?

16     A    I do.

17     Q    If you could speak into the microphone, please, ma'am.

18     A    I do.

19     Q    What is exhibit 318?

20     A    They are check payments to Mitchell Stein in the amount of

21     $10,000.

22     Q    Do you have an understanding of -- is that your signature

23     at the bottom of the checks?

24     A    It is.

25     Q    Why did you issue these two checks from Signalife to
```

```
 1   Mr. Stein?

 2   A   Mitchell Stein telephoned me and told me he needed to be

 3   paid for legal services that he provided to the company.

 4   Q   Did Mr. Stein ever provide you an invoice or a bill for

 5   these legal services?

 6   A   I requested them but never received them.

 7   Q   Do you recall an instance involving Mr. Stein and him

 8   directing you to issue shares in amounts under a hundred

 9   shares?

10   A   Yes.

11   Q   Would you explain that to the jury?

12   A   I was told that if it was a hundred shares or less, that

13   it wouldn't show up during trade, that it wouldn't be

14   noticeable that it was being traded.

15   Q   Did he ask you to keep it quiet?

16   A   Yes.

17   Q   Now, Ms. Jones, we've talked about stock issuances,

18   correct?

19   A   Correct.

20   Q   And if you could just explain to the jury sort of the

21   mechanics of how you would issue -- how you would cause stock

22   to be issued for the company.

23   A   I would receive a phone call from Mitchell Stein.  He

24   would ask me to send it to certain individuals and get the

25   copy of the certificate and tracking information faxed to him
```

 1    immediately.  It would be for overnight delivery for the next

 2    day, even if it was Saturday.  Priority morning, typically.

 3    So I would do up like a letter that we have, kinda like a form

 4    letter, who it was to go to, number of shares, send it to the

 5    transfer agent -- fax it to the transfer agent requesting

 6    overnight delivery.

 7              They would then fax the stock certificate copy, as

 8    well as the tracking sheet back to me, and I would send it to

 9    Mitchell Stein, and the rest they would take care of.

10    Q   I want to break that down a little bit just so the jury

11    understands the mechanics.

12              So you said you would get a call from Mr. Stein about

13    stock?

14    A   This is towards the end, yes.

15    Q   Correct.

16              And to be fair, sometimes the instruction would come

17    from Ms. Bunes?

18    A   That's correct.

19    Q   But did you have an understanding about who was ultimately

20    responsible for the instruction even when it came from

21    Ms. Bunes?

22    A   Definitely.

23    Q   And what was your understanding?

24    A   That Mitchell Stein was telephoning her.  I witnessed the

25    phone calls come in many times telling her who to send the

```
 1    shares to, and then she would relay the information to me and
 2    have me send in the request.
 3    Q    So who exactly were you sending a request to?
 4    A    Initially, it was Atlas Stock Transfer, Pam Gray.  And
 5    then she left the company and they merged or were bought out,
 6    and it was Standard Register -- Registrar, typically, Amy
 7    Merrill.
 8    Q    And Standard and Atlas, what kind of companies were those?
 9    A    They were a transfer agent.
10    Q    And a transfer agent, you understand what they do?
11    A    I know that they have your pot of stock, or I think that
12    they have your pot of stock and make transfers upon your
13    request.
14    Q    Did there come a time towards the end of your tenure when
15    Signalife was, for lack of a better word, short on cash?
16    A    Yes.
17         MR. MUHLENDORF:  Your Honor, I would like to move
18    exhibit 188 into evidence.
19         THE COURT:  Is there any objection to 188?
20         MR. STEIN:  No objection.
21         THE COURT:  Admitted without objection.
22         MR. STEIN:  All of the Government's exhibits they've
23    given me, there's no objection.
24         THE COURT:  Okay.  What are the numbers?
25         MR. MUHLENDORF:  318 we already did, Your Honor.
```

```
 1   188, 46, 47, 57, 295, 125, 152, 168, 132, and 137.

 2          THE COURT:  All right.  They'll all be admitted

 3   without objection.

 4      (Government's Exhibit No. 188, 46, 47, 57, 295, 125, 152,

 5   168, 132, and 137 entered into evidence.)

 6          MR. MUHLENDORF:  All right.  So if we could have

 7   exhibit 188.

 8   BY MR. MUHLENDORF:

 9   Q   And Ms. Jones, I'm going to blow up -- well, actually,

10   Ms. Jones, what's the date of this -- what is this we're

11   looking at here?  Let's try that.

12   A   An e-mail from Mitchell Stein to myself.

13   Q   And what is the date of the e-mail?

14   A   November 25th, 2008.

15   Q   Ms. Jones, I hate to keep asking you to speak into the

16   microphone.  I'm having a hard time hearing you.

17   A   November 25th, 2008.

18   Q   Thank you.

19          Okay.  So let's start in this bottom part, which is

20   the e-mail from you to Mr. Stein, correct?  See that?

21   A   Yes.

22   Q   Okay.  What -- if you could just explain to the jury

23   what's going on in this e-mail and then we'll flip over to the

24   second page.

25   A   Mitchell had asked me to request a report from our
```

```
 1   transfer agent or from somebody, I don't recall at the time,
 2   called the DTC report.  Once in a while he would request me to
 3   get that.  And I was informed when I tried to request it that
 4   we needed to pay for a new subscription, but I couldn't use
 5   our company credit card to pay for it because due to lack of
 6   payment it had been canceled, and we didn't have any other
 7   means to pay for it, since we were out of cash, as far as I
 8   know, we were low on cash.
 9   Q    Okay.  Now, Ms. Jones, if you would look at Mr. Stein's
10   response to you and explain to the jury what Mr. Stein's
11   response to you is to your pleas for cash to operate the
12   company.
13   A    He asked me to transfer shares to Mark Nevdahl, Budimir
14   Drakulic, himself, myself, and Willie Gault.
15   Q    So -- but looking at what he asked you to do, how many
16   shares does he ask to be transferred to himself?
17   A    2000 shares.
18   Q    And then how many shares does he say you should get?
19   A    Fifty.
20   Q    And then what does he tell you?
21   A    I'll have a nice Christmas.
22   Q    Now, are you familiar with something called the Silve
23   Group?
24   A    I know the name.
25   Q    Did Mr. Stein ask you to issue stock to the Silve Group?
```

```
 1    A    Yes, he did.
 2            MR. MUHLENDORF:  Now, if we could have exhibit 46.
 3    BY MR. MUHLENDORF:
 4    Q    All right.  Do you recognize exhibit 46?
 5    A    Yes.
 6    Q    Okay.  If you could just explain to the jury what it is.
 7    And we're going to move quickly through these three because
 8    they're all the same, basically, with just different numbers.
 9    A    This is a letter that I would send to the transfer agent
10    requesting the number of shares, who to and the method for
11    delivery.
12    Q    Who were you issuing these shares to?
13    A    The Silve Group.
14    Q    And who told you to do that?
15    A    Mitchell Stein.
16    Q    How many shares were you asked to issue?
17    A    30,000.
18    Q    Okay.  And what's the date of this request?
19    A    February 2007.
20            MR. MUHLENDORF:  And if we could have 47, please.
21    BY MR. MUHLENDORF:
22    Q    So what's the date of this next request?
23    A    February 27th, 2007.
24    Q    How many days later is that?
25    A    It's just a few days.  I don't remember the first date.
```

```
 1    Q    One day?

 2    A    Yes.

 3    Q    And how many shares did you issue here?

 4    A    80,000.

 5    Q    Who asked you to send 80,000 shares the next day to the

 6    Silve Group?

 7    A    Mitchell Stein.

 8    Q    Now, just over the course of your time, did you -- were

 9    you asked by Mitchell Stein to issue a few or a lot of shares?

10    A    A lot of shares.

11    Q    More than a thousand?

12    A    More than a million.

13    Q    Did you have an understanding why you were issuing shares

14    to Silve Group?

15    A    To my knowledge, it was like an investments relation firm.

16    Q    Did Mr. Stein ever tell you whether he was receiving cash

17    back from the Silve Group?

18    A    No.

19         MR. MUHLENDORF:  Now, could I have 57, please.

20    BY MR. MUHLENDORF:

21    Q    What's the date of this one?

22    A    June 21st, 2007.

23    Q    Okay.  Is this another -- what is this document?

24    A    It's another transfer request.

25    Q    Okay.  And this one is to a different person, it looks
```

```
 1    like.  If you could tell the jury who that is?

 2    A   Sameer Gulati.  To my knowledge, he worked from the Silve

 3    Group.

 4    Q   From whom did you get the name Sameer Gulati?

 5    A   Mitchell Stein.

 6    Q   Now, after you received back the materials from the

 7    transfer agent, you said you would get back documents from

 8    them?

 9    A   Yes.

10    Q   Did you put it all in a file in the office?

11    A   Yes.

12         MR. MUHLENDORF:  If I could have exhibit 295, please.

13    BY MR. MUHLENDORF:

14    Q   And Ms. Jones, what is exhibit 295?

15    A   It is a copy of a stock certificate to Sameer Gulati at

16    the Silve Group.

17    Q   And how many shares did you issue to Mr. Gulati?

18    A   40,000.

19    Q   Now, did you keep sometimes notes related to these stock

20    issuances?

21    A   I did.

22    Q   We'll look at page 3 of the exhibit.

23         Could you tell us what this note related to this

24    issuance to Sameer Gulati says?

25    A   It related to figuring the number of shares based at the
```

1   closing price of $1.25 the day prior, the number of shares,

2   who it was to be sent to, how it was supposed to be delivered,

3   and who it was requested by, which was Mitchell Stein, on

4   September 24th, 2007.

5   Q   So is there any doubt in your mind that it was Mr.~Stein

6   who was directing you to issue shares to Silve?

7   A   No.

8   Q   Now, do you remember the name Martin Carter?

9   A   Yes, I do.

10  Q   Who was Martin Carter?

11  A   He owned an electrical company called M&C Electrical, I

12  believe, and I was told he was working on our next product,

13  which would be the Fidelity 1000.

14  Q   Who told you that?

15  A   Mitchell Stein.

16  Q   Now, did Mr. Stein have you do anything regarding

17  Mr. Carter?

18  A   He had me send him stock as well as wire transfers, I

19  believe.

20  Q   Now, was the process for sending Mr. Carter the stock the

21  same we just described with Silve Group?

22  A   Yes.

23  Q   So who gave you the instruction for each issuance?

24  A   Mitchell Stein.

25          MR. MUHLENDORF:  Now, if we could have exhibit 125,

```
 1   please.
 2   BY MR. MUHLENDORF:
 3   Q    Do you recognize exhibit 125?
 4   A    Yes.
 5   Q    Okay.  Please explain to the jury what exhibit 125 is.
 6   A    It is a letter to the transfer agent requesting 300,000
 7   shares of stock, Signalife stock, to be transferred to Martin
 8   Carter, care of Electrical Connections.
 9   Q    Thank you, Ms. Jones.
10        What's the date of the issuance?
11   A    March 19th, 2008.
12   Q    Who asked you to issue this stock to Martin Carter?
13   A    Mitchell Stein.
14   Q    Okay.  And how did you ask that it be delivered to
15   Mr. Carter?
16   A    Overnight courier for morning delivery.
17   Q    With the stock issuances to Mr. Carter, was there a -- was
18   there a temporal element to it?  Was there a hurry?
19   A    There was always a hurry.
20   Q    Who was in a hurry?
21   A    Mitchell Stein.
22   Q    Do you have an understanding of how many shares you issued
23   to Mr. Carter at Mr. Stein's direction?
24   A    It was in the millions, but I'm not really sure exactly
25   how many.
```

```
 1   Q    Just try and speak up.

 2   A    It was in the millions.  I'm not exactly sure how many.

 3        MR. MUHLENDORF:  If I could have exhibit 152, please.

 4   BY MR. MUHLENDORF:

 5   Q    While the jury's getting their copy, could you just tell

 6   the jury what the date of this exhibit is?

 7   A    June 12th, 2008.

 8   Q    And what is this exhibit?

 9   A    It is a letter to the transfer agent requesting 390,000

10   shares of stock be transferred to Martin Carter, care of his

11   other company name, M&C Electrical, or Electric.

12   Q    Who asked you to issue those shares to Martin Carter?

13   A    Mitchell Stein.

14   Q    Now, did Mr. Stein ever discuss with you or explain to you

15   why you were issuing so many shares to Martin Carter?

16   A    Yes, it was very important, because he was working on our

17   next product, the Fidelity 1000, which was crucial to the

18   company's survival.

19   Q    Other than Mr. Stein telling you that, did you see any

20   evidence of Martin Carter working on a device like that?

21   A    I did not.

22   Q    Do you recall having a discussion with Mr.~Stein related

23   to this particular share issuance and whether there'd be any

24   more after this?

25   A    I may have.  If so, I may have written some notes.
```

```
 1    Q    Is there anything that might refresh your recollection

 2    about that?

 3    A    Only if I took notes on it.

 4              MR. MUHLENDORF:  Your Honor, can I approach the

 5    witness?

 6              THE COURT:  Yes..

 7    BY MR. MUHLENDORF:

 8    Q    All right.  Ms. Jones, if you would just read that section

 9    and then put it down when you're finished.  Okay?

10    A    Out loud?

11    Q    No, to yourself.

12              Does that refresh your recollection about the

13    discussion about these shares?

14    A    Yes, it does.

15    Q    What was the discussion you had with Mr.~Stein about these

16    shares?

17    A    He asked me to transfer the shares, saying that it was

18    final payment under his contract for the Fidelity 1000 that he

19    was working on and that he would get me a copy of that

20    contract, which I never received, and that he had just

21    recently spoken with Rowland Perkins about it, and that I

22    should perform the transfer.

23    Q    Did you ever get a copy of the contract?

24    A    I did not.

25    Q    Now, was that, in fact, the last issuance of shares as
```

```
 1    Mr. Stein had told you?
 2    A    I don't believe so.
 3              MR. MUHLENDORF:   If we could have exhibit 168,
 4    please.
 5    BY MR. MUHLENDORF:
 6    Q    While the jury's getting their copy, if you could just
 7    explain to the jury the date of this exhibit.
 8    A    August 22nd, 2008.
 9    Q    And what exactly is this exhibit?
10    A    It's another letter to the transfer agent requesting
11    400,000 shares of stock be transferred to Martin Carter, care
12    of Electrical Connections.
13    Q    Now, Ms. Jones, looking back over your time at Signalife,
14    and I think you mentioned the time when there wasn't cash
15    around, they were cash short, did there come a time when you
16    were no longer paid a salary?
17    A    Yes.
18    Q    Did the stock issuances to Mr. Carter continue even though
19    you weren't getting paid your salary?
20    A    They did.
21    Q    Did the stock issuances to Mr. Carter continue even when
22    the company couldn't pay its bills?
23    A    They did.
24    Q    Now, you mentioned that you were involved in wire
25    transactions.   Do you remember that?
```

```
 1    A    Yes.

 2    Q    Now, regarding wire transactions to Mr. Carter, did you do

 3    those?

 4    A    Yes.

 5    Q    Who instructed you to make wire transactions to

 6    Mr. Carter?

 7    A    Mitchell Stein.

 8              MR. MUHLENDORF:  If we could have 132, please.

 9    BY MR. MUHLENDORF:

10    Q    Now, Ms. Jones, if you look at the exhibit 132, what

11    exactly is the -- at the top there, the from and the to and

12    the copy?

13    A    It's a request from Lowell Harmison, copy to myself -- to

14    myself, copy to Mitchell Stein, requesting that I transfer

15    $180,000 per Mitch's instructions to M&C Electrical Services.

16    Q    I just want to break that down a little bit.

17              So the e-mail is actually from whom?

18    A    Lowell Harmison.

19    Q    And is Mr. Stein copied on it?

20    A    Yes.

21    Q    And the e-mail from Mr. Harmison says that the wire

22    transfer is per whose instruction?

23    A    Mitchell Stein's.

24    Q    Did Mr. Stein ever tell you not to make this wire

25    transfer?
```

```
 1    A    He did not.

 2    Q    Did you, in fact, make the wire transfer?

 3    A    Yes.

 4    Q    And, in fact, let's look at the top of the e-mail.  Okay.

 5    If you look right here, could you just explain to the jury

 6    what you're conveying there?  Read the part that says "I will

 7    get."

 8    A    Okay.

 9    Q    If you could just read to the jury, "I will get."

10    A    "I will get the 180,000 wire to MC Electrical out this

11    morning.  After the invoices we paid, the incoming wire, the

12    outgoing wire of today and the check to David Walker, my

13    records show that we still have a cash balance of about

14    82,000.  We will have about 30,000 in payroll taxes,

15    et cetera, in the next few days, which will leave us a cash

16    balance of about . . ."

17    Q    That's fine.

18         So Ms. Jones, when you were wiring Mr. Carter

19    $180,000 at Mr. Stein's direction, is this sort of the time

20    when the cash is starting to get tight?

21    A    Yes.

22    Q    We're going to look at exhibit 137 next.

23         MR. MUHLENDORF:  And if we could have the second

24    page, please.  Actually, I'm sorry, the first page, please.

25    BY MR. MUHLENDORF:
```

```
 1    Q    So while that's getting handed out, Ms. Jones, what is the
 2    first page of this exhibit, 137?  What is this?
 3    A    It's an e-mail thread from Lowell to myself.
 4    Q    Well, if you start at the bottom.
 5    A    Oh, okay.
 6    Q    Right here.
 7    A    I'm sorry, from myself to Lowell.
 8    Q    What's the date?
 9    A    April 4th, 2008.
10    Q    And do you recall if this is in relation to the prior
11    exhibit, exhibit 132, how much longer after that that is?
12    Just a week or so?
13    A    Yeah.
14    Q    Okay.
15          MR. MUHLENDORF:  Go to the second page, please, Eric.
16    BY MR. MUHLENDORF:
17    Q    So what do you tell Dr.~Harmison in your e-mail?
18    A    I'm telling him that Kevin, our accountant, said that we
19    should have enough money to do the transfer, but that he
20    needed a copy of an invoice for support, as well as past
21    invoices for wires that were sent.
22    Q    Okay.  Did you ever get the invoices you needed?
23    A    I didn't get them from M&C Electrical.
24    Q    No?
25          What happened with the invoices from M&C Electrical?
```

```
 1   A   I was told to make one for that one wire, and that it
 2   would be replaced with one from M&C Electrical.  I never
 3   received any of other past.
 4   Q   Who told you to make an invoice for some other company?
 5   A   It was either Lowell or Mitchell.
 6   Q   And was that unusual that you would be making an invoice
 7   for another company?
 8   A   Yes.
 9           MR. MUHLENDORF:  If we could have the first page,
10   please.
11   BY MR. MUHLENDORF:
12   Q   Okay.  Now, what's -- this e-mail, as we continue the
13   chain, is from you to whom?
14   A   To Lowell and Mitchell.
15   Q   Okay.  And why is it you're copying Mitchell Stein on the
16   e-mail when you first started copying Dr. Harmison?
17   A   I wanted to make sure that he knew about all of this,
18   since I was told that he was the initial one to request it.
19   Q   Now, in fact, if you could just read the e-mail to the
20   jury.
21   A   "I did the wire for $200,000, as that is our daily limit.
22   As mentioned to Mitch when he answered your phone, I will do
23   the other 28,000 tomorrow, and they should receive it Monday.
24   I tried to do a separate 28,000, as well, but the system would
25   not allow.
```

1          "Also, I have made the M&C invoice as Mitch

2     instructed me to do, and I will submit it to Kevin.  The wire

3     is still processing but should be completed shortly."

4     Q   So who was it that told you to make that invoice for M&C

5     Electrical?

6     A   Mitchell Stein.

7     Q   And who was it that answered Dr. Harmison's phone?

8     A   Mitchell Stein.

9     Q   Are you familiar with any allegations that Mr.~Stein was

10    using Dr.~Harmison's e-mail account?

11    A   Yes, on one occasion.

12    Q   Okay.

13          MR. MUHLENDORF:  Your Honor, I've got about 10 or 15

14    minutes.  Should we take the morning break?

15          THE COURT:  If you suggest, we'll take the morning

16    break.

17          All right.  Ladies and gentlemen, let's take a

18    15-minute recess.  Please don't discuss the case or form any

19    opinions, leave your notes and those exhibits at your seats,

20    and we'll see you in about 15 minutes.  Thank you.

21       (The jury exits the courtroom.)

22          THE COURT:  Ma'am, you could step down during the

23    break, but don't discuss your testimony with anyone.  All

24    right?

25          THE WITNESS:  Okay.

```
 1              THE COURT:  Thank you.

 2              See you in about 15 minutes.  Thank you.

 3          (A recess was taken from 10:33 a.m. to 10:49 a.m., after

 4      which the following proceedings were had:)

 5              THE COURT:  Okay.  We're back on the record.

 6      Mr. Stein's present.

 7              Are we ready to proceed?

 8              MR. MUHLENDORF:  We are, Your Honor.

 9              THE COURT:  Mr. Stein, you ready?

10              MR. STEIN:  Yes, Your Honor.

11              THE COURT:  Let's get our witness back in here.  If

12      we could bring the jurors in, please.

13              Ms. Jones, you're still under oath.

14              MR. STEIN:  Your Honor, prior to the jury coming

15      in --

16              THE COURT:  I've already asked the jurors to come in.

17              MR. STIEGLITZ:  Why don't we do it after direct's

18      over.

19          (The jury enters the courtroom, after which the following

20      proceedings were had:)

21              THE COURT:  Welcome back, everyone.  Please be

22      seated, ladies and gentlemen.

23              All right.  You may continue with your direct

24      examination.

25              MR. MUHLENDORF:  Thank you, Your Honor.
```

```
 1   BY MR. MUHLENDORF:
 2   Q   Ms. Jones, when we broke we were talking about
 3   exhibit 137, I believe.  I just want to direct your attention
 4   again to what was the date of this e-mail between you and
 5   Mr.~Stein?
 6   A   April 4th, 2008.
 7   Q   Okay.  And the amount of wire you sent to Mr. Carter?
 8   A   200,000.
 9   Q   Okay.  And, again, does it indicate who talked to you
10   about the wire in the e-mail?
11   A   Mitchell Stein.
12   Q   Okay.  Now --
13           MR. MUHLENDORF:  You can take that down, please.
14   BY MR. MUHLENDORF:
15   Q   Do you know who John Woodbury is?
16   A   Yes.
17   Q   Okay.  Who is John Woodbury?
18   A   He was corporate counsel for Signalife.
19   Q   Did Mr.~Stein ever ask you to lie to Mr. Woodbury?
20   A   Yes, he did.
21   Q   Would you please explain that to the jury?
22   A   There were some stock certificates, and Mitchell Stein
23   called me and told me that he was sending some of them back,
24   and that I was to tell John Woodbury, if he called me and
25   inquired about them, that I canceled them, and the rest were
```

```
 1    being sent back to me.

 2    Q    Was that not true?

 3    A    Yes, it was not true.

 4    Q    Okay.  Did you convey the lie to Mr. Woodbury?

 5    A    Yes, I did.  Well, I didn't lie to him.  I told him what I

 6    was told to lie about.

 7    Q    Now, Ms. Jones, you were -- towards the end, you were the

 8    only person in the office in Greenville, correct?

 9    A    Correct.

10    Q    Are you familiar with the name Tony Nony?

11    A    No.

12    Q    Did anyone ever ask you to issue an invoice to Tony Nony?

13    A    No.

14    Q    Did anyone ever ask you to correspond with something

15    called Cardiac Hospital Management?

16    A    No.

17          MR. MUHLENDORF:  Exhibit 70, please.  It's already in

18    evidence.

19    BY MR. MUHLENDORF:

20    Q    And while the jury's getting their copy, Ms. Jones, if you

21    could just tell the jury the date of exhibit 70.  Can you read

22    that?

23    A    Looks like September 24th, 2007.

24    Q    Who was the CEO at that time?

25    A    That should have been Lowell Harmison.
```

1    Q    Now, on matters of wires back in 2007, who were you taking

2    instructions from?

3    A    Mitchell Stein or Mitchell Stein through Lowell.

4    Q    And on matters of share issuances, who was that at that

5    time?

6    A    Mitchell Stein.

7    Q    Did anyone at that time ever ask you to issue an invoice

8    to someone named Avi Cohen?

9    A    No, not that I can recall.

10   Q    Did you ever hear the name Avi Cohen?

11   A    No.

12   Q    Did anyone ever communicate to the Greenville office

13   that -- to you in the Greenville office that you should

14   contact something called IT Healthcare?

15   A    No.

16   Q    Never heard of it?

17   A    I -- not to be contacted.  I've heard the name.  I believe

18   that I was told that they're working on some deals with them,

19   but I don't know anything about it.

20   Q    You never saw any paperwork from IT Healthcare?

21   A    No.

22   Q    What about the name Yossi Keret?  Did that name ever come

23   up?

24   A    Don't know the name.

25   Q    Were you ever asked to issue shares to someone named Evie

```
 1    Muscillo?

 2    A    That's familiar.

 3    Q    Who asked you to issue shares to Evie Muscillo?

 4    A    Mitchell Stein.

 5    Q    Now, Ms. Jones, you appeared a little nervous when you

 6    came in here.  Was there a particular reason you were nervous?

 7    A    Just some things that were said to me in the past from

 8    Mr. Stein.

 9    Q    I'm sorry?

10    A    Some things that were said to me in the past from Mitchell

11    Stein.

12    Q    Could you please tell the jury what Mr.~Stein told you

13    that made you nervous about testifying today?

14    A    When Pam left the company and Susan Keitt, he asked me for

15    all the dirt on them I could find so he could sue them for

16    every bogus lawsuit he could think of, make sure they never

17    worked again, and make sure that they spent their entire

18    savings and then some on legal fees to fight his lawsuits, and

19    that anybody that crosses him will receive the same.

20              MR. MUHLENDORF:  Your witness.

21              THE COURT:  Was there an issue we need to talk about

22    before --

23              MR. STEIN:  Yes, may we approach?

24              THE COURT:  All right.

25         (The following proceedings were held at sidebar:)
```

```
 1              THE COURT:  What's the issue?

 2              MR. STEIN:  Your Honor, there were about 30

 3    depositions taken before the SEC.  We've stipulated that

 4    those -- that the deposition of me can be entered into

 5    evidence.  We have not stipulated to utilizing any of the

 6    other depositions.

 7              The SEC was served with a subpoena.  They've produced

 8    a certified copy.

 9              THE COURT:  Of what?

10              MR. STEIN:  Of the deposition that they took in this

11    investigation.

12              MR. MUHLENDORF:  Of Ms. Jones is what he's getting

13    at.

14              MR. STEIN:  Of Ms. Jones now, but they've taken it of

15    everyone.  I didn't ask Mr. Woodbury regarding his deposition

16    because I had enough paperwork.

17              The deposition I'm going to be impeaching her, I'm

18    going to be reading from it, and I believe that it's

19    admissible, and if the Securities and Exchange Commission has

20    to come and testify -- but I think it's admissible under past

21    recollection recorded, as well as under impeachment to the

22    extent she testifies adverse to it, and the Government's not

23    willing to stipulate to the admissibility of the deposition.

24              MR. MUHLENDORF:  Your Honor --

25              THE COURT:  The deposition can't be admitted in and
```

1    of itself.  She's here.  If she testifies inconsistently with

2    her deposition you can use her prior testimony to impeach her,

3    but why do you want to admit her entire deposition?

4           MR. STEIN:  Just out of fairness, I would give it to

5    the -- the Government's going to also -- there's things in

6    here that are consistent and there are things that are

7    inconsistent.  If the Court is saying --

8           THE COURT:  If you want to ask her questions that

9    you -- again, we're into this issue of are you presenting your

10   own case, are you cross-examining her on what her testimony

11   is.

12          Is there information that you want to extract from

13   her that you think is relevant to your defense so we don't

14   have to bring her back in your case and you want to extract

15   information, ask her the questions that relate to your defense

16   and I'll let you, you know, again, in order to avoid having to

17   bring her back, I'll let you conduct a direct examination of

18   her today, so she doesn't have to come back.

19          Ask her whatever questions you want that you think

20   relate to your defense.  If she says something different than

21   she said in her deposition, you can use it to impeach her.

22   But I don't understand just hand -- you know, wholesale

23   turning in a deposition of someone.  I don't understand the

24   concept of that.

25          MR. STEIN:  If she does -- first of all, I do intend

```
 1    to do what the Court has suggested, and that is, examine her
 2    so I don't have to re-call her because I have my own witnesses
 3    in my case.  If she testifies adversely, I intend to request
 4    the Court that I be able to read from the deposition directly
 5    her statement by page and line number.
 6            THE COURT:  Yeah, if it's an impeachment.  If it's
 7    inconsistent with her prior testimony you can ask her, do you
 8    remember on such and such a date testifying before the SEC or
 9    giving a deposition on such and such a date, do you remember
10    this question being asked and this answer being given?  That's
11    how you do it.  You can do that if she says something
12    inconsistent with what she gave in her deposition.  There's no
13    problem with that.
14            MR. STEIN:  But introducing the deposition as prior
15    recollection recorded or whatever is not allowed?
16            THE COURT:  It's hearsay.  The deposition is hearsay.
17    Your deposition was admitted because it's a statement of a
18    party opponent.
19            MR. STEIN:  I understand that.
20            THE COURT:  So it's an admission.  It's an exception.
21    She's here.  That's hearsay.  You can use it for impeachment,
22    but you can't hand it in just saying, here's her prior
23    testimony.
24            MR. STEIN:  Just to make a record, the Government had
25    an opportunity to examine her and cross-examine her.  I'm the
```

```
 1    one who didn't have the opportunity, and I'm waiving that.  So
 2    under prior recollection recorded, there's -- it seems to me
 3    an exception of the hearsay rule.
 4         THE COURT:  There's no need for a prior recollection
 5    recorded unless she's saying something that she doesn't
 6    remember what she -- the facts.  So, I mean, we're wasting
 7    time.
 8         MR. STEIN:  I will use it to impeach her.  I will
 9    read from it.  I will not admit it.
10         THE COURT:  Well, you'll use it to impeach her if she
11    says something inconsistent.  If she says something
12    consistent, there's no reason to impeach her.  So let's be
13    clear.  If she says something inconsistent, you can use it to
14    impeach her.  If she doesn't, there's no reason or need to
15    refer to the deposition testimony.  And whatever direct
16    examination you want to do of her for purposes of your defense
17    so she doesn't have to come back, I'll let do.
18         MR. STEIN:  That's my intention.
19         THE COURT:  Okay.
20         MR. STEIN:  Thank you.
21         I will then ask her if she testified and if it's --
22    and that's it.
23         THE COURT:  You don't need to ask her if she
24    testified unless --
25         MR. STEIN:  Unless it's inconsistent.
```

```
 1            THE COURT:  Yes, because there's no reason.  It
 2   doesn't make any difference whether she testified before if
 3   she's going to give you the same answer she gave in her
 4   deposition.
 5            MR. STEIN:  It's already inconsistent, so I'll do
 6   what the Court has suggested.  Thank you, Your Honor.
 7            THE COURT:  You're welcome.
 8       (Proceedings concluded.)
 9            MR. STEIN:  Your Honor, the Government and I have
10   stipulated to the admissibility of the following exhibits.
11            MR. STIEGLITZ:  Why don't you just read the list of
12   exhibits and then we'll identify which ones we've stipulated
13   to.  Fair?
14            MR. STEIN:  Right now?
15            MR. STIEGLITZ:  Yes.
16            MR. STEIN:  118.
17            THE COURT:  Is that agreed admitted?
18            MR. MUHLENDORF:  Yes, Your Honor.
19            THE COURT:  All right.  118's admitted.
20       (Defendant's Exhibit No. 118 entered into evidence.)
21            THE COURT:  Go ahead.
22            MR. STEIN:  343.
23            MR. STIEGLITZ:  I don't think you had shown us that
24   one.
25            MR. MUHLENDORF:  No objection.
```

```
 1              THE COURT:  Admitted without objection.

 2         (Defendant's Exhibit No. 343 entered into evidence.)

 3              MR. STEIN:  338.

 4              MR. MUHLENDORF:  No objection.

 5              THE COURT:  Admitted without objection.

 6         (Defendant's Exhibit No. 338 entered into evidence.)

 7              MR. STEIN:  334.

 8              MR. MUHLENDORF:  No objection.

 9              THE COURT:  Admitted without objection.

10         (Defendant's Exhibit No. 334 entered into evidence.)

11              MR. STEIN:  341.

12              MR. MUHLENDORF:  No objection.

13              THE COURT:  Admitted without objection.

14         (Defendant's Exhibit No. 341 entered into evidence.)

15              MR. STEIN:  139.

16              MR. MUHLENDORF:  No objection.

17              THE COURT:  Admitted without objection.

18         (Defendant's Exhibit No. 139 entered into evidence.)

19              MR. STEIN:  145.

20              MR. MUHLENDORF:  No objection.

21              THE COURT:  Admitted without objection.

22         (Defendant's Exhibit No. 145 entered into evidence.)

23              MR. STEIN:  335, which is in --

24              MR. MUHLENDORF:  Two pieces.

25              MR. STEIN:  337 is in two pieces.
```

```
 1            MR. MUHLENDORF:  No objection.

 2            THE COURT:  That was 345?

 3            MR. STEIN:  335.

 4            THE COURT:  335.  I'm sorry.

 5            Admitted without objection.

 6       (Defendant's Exhibit No. 335 entered into evidence.)

 7            MR. STEIN:  One hundred.

 8            MR. MUHLENDORF:  No objection.

 9            THE COURT:  Admitted without objection.

10       (Defendant's Exhibit No. 100 entered into evidence.)

11            MR. STEIN:  349.

12            MR. MUHLENDORF:  No objection.

13            THE COURT:  Admitted without objection.

14       (Defendant's Exhibit No. 349 entered into evidence.)

15            MR. STEIN:  Ninety-nine.

16            MR. MUHLENDORF:  No objection.

17            THE COURT:  Admitted without objection.

18       (Defendant's Exhibit No. 99 entered into evidence.)

19            MR. STEIN:  340.

20            MR. MUHLENDORF:  No objection.

21            THE COURT:  Admitted without objection.

22       (Defendant's Exhibit No. 340 entered into evidence.)

23            MR. STEIN:  143.

24            MR. MUHLENDORF:  No objection.

25            THE COURT:  Admitted without objection.
```

```
1            (Defendant's Exhibit No. 143 entered into evidence.)

2            MR. STEIN:  201.

3            MR. MUHLENDORF:  No objection.

4            THE COURT:  Admitted without objection.

5       (Defendant's Exhibit No. 201 entered into evidence.)

6            MR. STIEGLITZ:  We just suggest there's some personal

7   information in that that maybe should be redacted before it's

8   published, but we can deal with that later.

9            THE COURT:  Okay.

10           MR. STEIN:  144.

11           MR. MUHLENDORF:  No objection.

12           THE COURT:  Admitted without objection.

13      (Defendant's Exhibit No. 144 entered into evidence.)

14           MR. STEIN:  345.

15           MR. MUHLENDORF:  This I think we have a problem with.

16           THE COURT:  Are there any others, Mr. Stein?

17           MR. STEIN:  Yes, there are.  I'm going to go past

18  345.

19           Where did we leave off, Your Honor, before 345?

20           THE COURT:  144.

21           MR. STEIN:  Thank you.  342.

22           MR. MUHLENDORF:  No objection.

23           THE COURT:  Admitted without objection.

24      (Defendant's Exhibit No. 342 entered into evidence.)

25           THE COURT:  Mr. Stein, can I suggest that one of you
```

```
 1    go with what you've done so far, and we can talk -- I have a
 2    feeling that will take us into the lunch hour, and you can
 3    deal with the rest during the lunch hour.
 4              MR. STEIN:  I hope not, Your Honor.  Thank you.
 5              THE COURT:  If we have to get to some more, we'll get
 6    to them when we have a chance.
 7                        Cross-examination
 8    BY MR. STEIN:
 9    Q   Good morning, Ms. Jones.
10    A   Good morning.
11    Q   You worked very closely in the Greenville office with
12    Ms. Bunes from the time you were hired until she left the
13    company; is that correct?
14    A   I worked with her.  She was my boss.  She didn't really
15    have time for any close relationships.
16    Q   Physically, where was your office situated in terms of the
17    closeness to Ms. Bunes' office?  Were you right outside of her
18    office?
19    A   Yes.
20    Q   Ms. Bunes kept a bound binder of notes that she took notes
21    of everything that happened every day, and it turned into
22    several binders.  Do you remember that binder and that pattern
23    that she had?
24    A   I recall her taking notes.  I don't know about several
25    binders.  I'm not sure.
```

```
 1    Q    Do you remember it being in a binder form, though?

 2    A    I recall a book, like a bound journal book.

 3    Q    That's what I meant, I'm sorry.

 4    A    Okay.

 5    Q    It was a bound book; is that right?

 6    A    As far as I know, yes.

 7    Q    And I believe you testified, and I don't recall

 8    specifically, you recall at a certain point there was a

 9    $100 million equity line of credit that you had heard about;

10    is that right?

11              MR. MUHLENDORF:  Your Honor, I don't think she

12    testified about that.

13              THE COURT:  Sustained.

14  BY MR. STEIN:

15    Q    Do you recall the discussions inside of the company

16    regarding a $100 million line of credit with YA Global?

17    A    I recall a credit with YA Global.  I'm not sure at this

18    time of the amount.

19    Q    Do you recall YA Global advancing money to the company

20    while you were working with the company under that line of

21    credit?

22    A    Yes.

23    Q    And you recall Mr. Woodbury interacting with YA Global to

24    cause the credit line to issue money to the company; is that

25    right?
```

```
1    A    I don't know anything about that that I recall.  I
2    recalled faxing something to them.  That was the only line of
3    communication we had with them requesting, but I don't know
4    where the fax went when we requested.
5    Q    That was a fax you sent?
6    A    I may have, Susan may have, anybody that was asked to send
7    the requests, but it was a fax number.  We didn't know who it
8    was going to.
9    Q    You testified that I told you to lie to Mr. Woodbury
10   regarding shares that -- in Signalife that you sent to me.  Is
11   that accurate?
12   A    That you asked me to lie to Woodbury, yes.
13   Q    And you testified that you did lie to Mr. Woodbury; is
14   that right?
15   A    I testified that I told him about the lie you asked me to
16   tell him.  I did not lie to him.
17   Q    You did not lie to him?
18   A    I did not lie to him.
19   Q    Do you know whatever became of those shares?
20   A    No, I do not.  I never received the certificates back that
21   I know of.
22   Q    Do you know if Mr. Woodbury ever canceled those shares
23   with the transfer agent?
24   A    I do not know.
25   Q    Who was Jane Greene?
```

```
 1    A    She was there when I first started.  I believe her title
 2    was VP of marketing.
 3    Q    So would it be safe to assume that she was senior to you,
 4    being a vice president?
 5    A    Yes, but she was in marketing.  Little bit different than
 6    my department, but senior to me, sure.
 7    Q    I understand.
 8         You remember through your tenure the company made
 9    many public filings with the Securities and Exchange
10    Commission; is that right?
11    A    Can you elaborate like what type of filing?
12    Q    10-K, 10-Q after board meetings.
13    A    Yes, they had.
14    Q    And Mr. Woodbury and Mr. Pickard were the persons
15    responsible for those filings as best you can recall; is that
16    correct?
17    A    I would only -- I could only assume that they sent the
18    filings in.  I don't know who was responsible for the
19    information then.
20    Q    You don't know who was responsible?
21    A    I didn't work on any of that.
22    Q    Do you recall testifying before the Securities and
23    Exchange Commission in this matter on December 7, 2009?
24    A    Yes.
25    Q    Do you recall a question asked to you by the Securities
```

```
 1    and Exchange Commission:  "Who was responsible --"

 2              THE COURT:  Page and line.

 3              MR. STEIN:  Your Honor, this is page 174, lines 15

 4    through 25, and going on to page 175 through line 15.

 5              MR. STIEGLITZ:  Sorry, what was the second one again?

 6              MR. STEIN:  It's just 174, 15, through 175, line 12.

 7    BY MR. STEIN:

 8    Q    You recall testifying?

 9    A    Yes, I do.

10    Q    Do you recall being asked the identical question of who

11    was responsible for the filings by the SEC examiner?

12    A    Not specifically.

13    Q    Do you recall testifying that John Woodbury and Kevin

14    Pickard put the filings together and were responsible?

15    A    That's probably what I would have said.  I don't recall

16    every word that I said back then, only the truth.

17    Q    Do you recall saying the words:  "I know the two of them

18    for sure, because they would call me, and they would say that

19    they needed the spreadsheets that I did, the stock transfers

20    for the payroll, so that they can guess I work on the balance

21    sheet or something."

22              Do you recall saying those words?

23    A    It's not really making sense to me.  To do with filings?

24    Q    Yes.

25    A    I'm not sure what that would have to do with payroll.  I
```

```
 1    know that they worked on them.  I'm not sure that they were
 2    responsible for every bit of information that went into them.
 3    Q   Do you recall the examiner at the SEC then saying to you
 4    that Mr. Woodbury and Mr. Pickard, identifying those two
 5    people by name, were responsible for the filings, and you
 6    said:  Correct?  Do you remember that?
 7    A   It was a few years ago.  I probably would have said that
 8    because I know they worked with the filings.
 9    Q   And then the SEC examiner said:  Anyone else?
10             And you said:  People from Mr. Pickard's office.
11             Do you deny saying that?
12    A   No, I don't.
13             MR. MUHLENDORF:  Your Honor, I'm not sure this is
14    inconsistent or anything relevant, whether Pickard and
15    Woodbury filed things.
16             THE COURT:  Overruled at this point.
17             MR. STEIN:  Bear with me one second, Your Honor.
18    BY MR. STEIN:
19    Q   Ms. Jones, what's been admitted as exhibit 118 I'm going
20    to show you, and it's on the screen.
21             MR. STEIN:  If you could blow that up or expand it
22    into just the left side, the numbers, so the jury can see it.
23             May I approach, Your Honor?
24             THE COURT:  Yes.
25    BY MR. STEIN:
```

```
 1    Q   Ms. Greene, (sic) in 2005, do you recall preparing a list

 2    of salaries for the Greenville office?

 3    A   I prepared many lists.  I may have.

 4    Q   You don't deny that you prepared this list?

 5    A   I don't deny that I did.  I'm not sure that I did.

 6    Q   A different question.

 7            Looking back to 2005, do those sums appear accurate

 8    in terms of net salaries?

 9    A   As accurate as I can recall.  And I had only been with the

10    company for a month at this point.  I'm not even a hundred

11    percent sure that I was part of salaries at that point.

12    Q   Thank you.

13            MR. STEIN:  May I approach?

14            THE COURT:  Yes.

15  BY MR. STEIN:

16    Q   Now I'm going to talk about exhibit 343, which has been --

17    which is in evidence.

18            MR. STEIN:  May I approach, Your Honor?

19            THE COURT:  Yes.

20  BY MR. STEIN:

21    Q   Ms. Jones, this is a document now dated 2006,

22    September 19th, 2006.  It's entitled, "Salary Action, Tracy

23    Jones.  Starting salary 42,000, six-month increase 50,000,

24    one-year increase 52,500, warrant for 5000 options,

25    1250/quarter over four quarters."
```

```
 1              Did you prepare this document?

 2   A   I believe Rod Hildebrandt did, but I'm not a hundred

 3   percent sure.

 4   Q   And who was Rod Hildebrandt?

 5   A   Chief operating officer.

 6   Q   Chief operating officer of Signalife?

 7   A   Yes.

 8             THE COURT:  Mr. Stein, can you stay by the

 9   microphone?

10             MR. STEIN:  I'm sorry, Your Honor.

11   BY MR. STEIN:

12   Q   Chief operating officer of Signalife?

13   A   Chief operating officer.

14             MR. STEIN:  May I approach?

15             THE COURT:  Yes.

16   BY MR. STEIN:

17   Q   Thank you.

18   A   You're welcome.

19   Q   Is exhibit 343, to the best of your knowledge, an accurate

20   rendition of the salaries in 2006 in the Greenville office

21   that were prepared by Mr. Hildebrandt?

22   A   For the salaries or --

23   Q   The salaries that you see on the screen, salary actions,

24   starting, six-month increase, one-year increase, were they

25   accurate?
```

```
 1    A    Yes, except for the one-year increase.

 2    Q    And how is that inaccurate?

 3    A    At one point I received a promotion and a title change to

 4    business office manager.  I didn't get the one-year increase

 5    for the executive assistant role.  I got a different increase,

 6    and I'm not exactly sure when, when I got my promotion.

 7              MR. STEIN:  Exhibit 338 has been allowed in evidence.

 8    May I approach?

 9              THE COURT:  Yes.

10    BY MR. STEIN:

11    Q    Did you prepare that document, Ms. Jones?

12    A    Looks like I did.

13              MR. MUHLENDORF:  Your Honor, the jury can't see.

14              THE COURT:  I know they can't see it.

15              MR. MUHLENDORF:  Well, we don't have it either.

16              MR. STEIN:  You have it.  You've stipulated it into

17    evidence.

18              MR. MUHLENDORF:  Well, we don't have a copy.

19    BY MR. STEIN:

20    Q    What's the exhibit number?

21    A    338.

22    Q    What is exhibit 338?

23    A    It's an e-mail from John Woodbury to me asking if I can

24    let him know which signed option certificates I've received,

25    and then my e-mail to John Woodbury giving him a list of the
```

```
 1   following signed certificates.
 2   Q   And it was your understanding at the time that option
 3   certificates were options in stock in the company; is that
 4   right?
 5   A   Yes.
 6           MR. STEIN:  May I approach?
 7           THE COURT:  Yes.
 8   BY MR. STEIN:
 9   Q   Thank you, Ms. Jones.
10   A   You're welcome.
11   Q   Into evidence has been marked exhibit 334, and it's an
12   August 16, 2006, memorandum from Mr. Hildebrandt to you.
13           MR. STEIN:  May I approach, Your Honor?
14           THE COURT:  Yes.
15           You don't need to ask every time, Mr. Stein.
16   BY MR. STEIN:
17   Q   Could you read -- it's a very short e-mail.  Could you
18   read the e-mail, please?
19   A   Initial e-mail from John Woodbury.  It says:
20           "Attached, please find my bills for April through
21   June 2006.  I've calculated the S-8 shares payable, and it
22   comes out to 25,817 shares per the attached spreadsheet.  I'm
23   enclosing wire transfer instructions for the cash portion.
24   Please put the shares in my name, John M. Woodbury, and have
25   Atlas send a certificate to TD Waterhouse brokerage at the
```

 1   below address and person.  Please also have Atlas wire account

 2   number 43408928 on the front of the certificate.

 3            "TD Waterhouse, 16133 Ventura Boulevard, Suite 120,

 4   Encino, California."  Then there's phone numbers.

 5            And then there's an e-mail to Rod from myself -- I'm

 6   sorry, from Rod to myself:

 7            "Tracy, attached is John Woodbury's invoice for legal

 8   services for the second quarter of 2006.  It is approved for

 9   payment.  His payment comes in two modes:  SA stock, 25,817

10   shares, and cash $4,307.19.  Please transfer the shares to

11   John and wire him the cash per the attached wiring

12   instructions, thank you."

13   Q   Did you actually do what Mr. Hildebrandt asked you to do?

14   A   I'm sure I did.  I don't recall, but I'm sure I did.

15   Q   At the time, if I told you that the stock was trading at

16   over three dollars, would you have an inconsistent

17   recollection of that in 2006?

18   A   It was possible, but I don't recall the exact amounts.

19   Q   So if it was trading at three dollars, that's over a

20   hundred thousand dollars of consideration or close to a

21   hundred thousand dollars to Mr. Woodbury; is that right?

22   A   Three dollars, that'd be 75, 78,000.

23   Q   Thank you.  Now, you testified earlier on the chart behind

24   you, that we can all see, of the levels of control that you

25   believe I had over the company going from 50 percent to

1   95 percent.  Everything I told you to do as a custom and

2   practice you went and confirmed it with the then CEO of the

3   company; is that correct?

4   A   I tried to.  I am not sure that I did every time.  I was

5   always told you were the boss and the owner, do what you said.

6   Q   When you say you tried to, do you remember a specific

7   instance where did you not go and get approval from the CEOs

8   listed behind you, the ones, of course, that you --

9   A   The things that you asked me to do or just anything?

10  Q   No, the things that I asked you to do.

11  A   There may have been times when I knew Pam had told me that

12  you were going to call with the stock transfer that I didn't

13  go get approval because I had already known or such situations

14  like that.  I can't recall anything else off the top of my

15  head.  Or even Lowell.

16  Q   Or even Lowell?

17  A   I'm saying Pam or even Lowell.  If they had mentioned it

18  to me, I wouldn't have gone back for approval.

19  Q   And this would have also included Rowland Perkins after

20  Lowell's departure, is that right?

21  A   Or any president, yes.

22  Q   Any president?

23  A   Yes.

24  Q   You don't know what these presidents instructed me to do

25  as the outside lawyer to the company; isn't that right?

```
 1   A    Correct.

 2   Q    You weren't privy to any of those conversations; is that

 3   right?

 4   A    Not that I can recall.  Possibly, but I don't recall any.

 5   Q    Who instructed you to call the CEOs to confirm the

 6   veracity of what I was telling you to do?

 7   A    I did it myself, just to make sure that I was doing the

 8   right thing.  There was also times that Lowell Harmison told

 9   me to let him know of anything you requested.

10   Q    Did you follow that instruction?

11   A    Right after I'm sure that I did.

12   Q    I'm going to approach again and ask you to authenticate

13   exhibit 341.  It's another list of options, 341.

14        You remember that?

15   A    Um, yes.

16   Q    It's just the same thing I showed you before.  You're

17   listing out the stock options and who's getting paid what, is

18   that basically accurate?

19   A    Right.

20        And, of course, mentioning I never received mine.

21   Q    Thank you.

22        Nothing further on this exhibit.

23        I'm glad you brought up never requesting that you

24   received yours.  We've admitted into evidence exhibit 145.

25        MR. STEIN:  If you could place that on the screen,
```

```
 1   please.
 2   BY MR. STEIN:
 3   Q    I'm going to approach and show you that exhibit.
 4            You remember that exhibit?
 5   A    Yes.
 6   Q    You had just indicated in the prior exhibit where you were
 7   talking about shares, that you weren't getting your shares.
 8   A    Right, and I did not.
 9   Q    And in this e-mail you wrote to John Woodbury.  You recall
10   this e-mail, don't you?
11   A    Uh-huh, I do.
12   Q    And you said -- why don't you read the first and second
13   sentence.
14   A    On which e-mail thread?  From Jane to myself or from
15   myself to --
16   Q    From you to John.
17   A    "Below is an e-mail from Jane Greene to our accountant
18   regarding a promotion slash salary increase slash stock option
19   grant for me.  Please use this as a request to grant 25,000
20   options to me with an effective date of 10/13/06, close of
21   10/12/06.
22            "Do you have any of my other grants to send to me
23   yet?  This will be my fourth grant since my date of hire, and
24   I do not have any signed grants as of yet."
25   Q    And you made that request to John Woodbury?
```

```
 1   A   Correct.

 2   Q   The counsel.

 3           You and I never spoke about this; isn't that true?

 4   A   Not that I recall.

 5   Q   Did John Woodbury do what you asked him regarding your

 6   grants of stock?

 7   A   I never saw them.

 8   Q   Did you ever tell anyone about that?

 9   A   I may have.  Definitely him, the accountants, obviously.

10   I'm not sure if I told any presidents or not.

11   Q   I'm going to show you what has been marked as exhibit 139.

12           Can you read the e-mail from Pam Bunes to you

13   regarding Ellsworth Roston?

14   A   "Tracy:  Please let me know what happened to the shares

15   transferred that I authorized for Ellie.  He says that he

16   hasn't received anything on this yet, and I know that we took

17   care of it some time ago.

18           "Thanks, Pam."

19   Q   Ellsworth Roston was a member of the board of directors of

20   Signalife; isn't that correct?

21   A   Yes.

22   Q   He was a longtime member of the board of directors, wasn't

23   he, to your knowledge?

24   A   I believe so.

25   Q   He was also a patent lawyer, do you remember that?
```

```
 1    A    Yes, I believe so.

 2    Q    You never spoke to me about this e-mail and Ellsworth

 3    Roston's options; is that right?

 4    A    I don't recall.  I don't believe so.

 5    Q    Thank you.

 6             I'm going to show you what's been marked as

 7    exhibit 100.  Ask you to take a look at it and see if you can

 8    recall the e-mail train.  Time period of this is what, 2000 --

 9    late 2006?

10    A    Yes.

11    Q    So sort of at the end of what you allege was my 50 percent

12    control?  Sort of at the end of that period?

13    A    Yes.

14             Well, the end of that period would be the Bunes

15    period ending in 2007, wasn't it?

16    Q    I don't -- you're the one who made the --

17    A    That's when Pam Bunes had left.

18    Q    Okay.  So my level of control you don't think increased

19    under Pam Bunes, it was just 50 percent?  You're not saying it

20    was slowly increasing?

21    A    Not necessarily during Pam.

22    Q    Okay.  Now, this is regarding action by the board of

23    directors of Signalife and meetings by them; is that correct?

24    A    Correct.

25    Q    None of these e-mails were copied to me; is that correct?
```

```
 1    A    Correct.

 2    Q    You were arranging for the board meeting in late 2006; is

 3    that correct?

 4    A    I recall arranging for some.  I'm not a hundred percent

 5    sure of this timeframe.  Possibly.

 6    Q    I'd like to test your memory regarding who was on the

 7    board in 2006.

 8              Pam Bunes was on the board; is that right?

 9    A    She was an actual board member?

10    Q    I'm asking you.

11    A    I don't know.  She was president and CEO.

12    Q    Well, how about Mr. Roston, who we've already talked

13    about, the patent lawyer.  Was he on the board?

14    A    I believe he was.

15    Q    Was Dr. Harmison on the board?

16    A    I believe he was.

17    Q    Was Mr. Perkins on the board?

18    A    I believe so, as well.

19    Q    Was there any other board members that you can recall that

20    I haven't mentioned thus far?

21    A    Norma Provencio and Jennifer Black, but I'm not a hundred

22    percent sure of the timeframe; and yourself.

23    Q    You believe I was on the board?

24    A    I was told you were on the board.

25    Q    But you didn't copy me with this memo calling a board
```

1    meeting; is that right?

2    A    Calling a board meeting?  I called a board meeting?

3    Q    Or arranging a board meeting.

4    A    This isn't arranging a board meeting.  It's asking for

5    payment to Charlie who was added to the board, unless I missed

6    something.

7    Q    You were asked to e-mail the directors a package for

8    Harrison's addition to the board.

9    A    "Can you please e-mail the director's package."  It was a

10   certain package we had.

11   Q    And did you e-mail that?

12   A    Probably.

13   Q    And did you include Mr. Harrison, as well, since he was

14   being added to the board?

15   A    I'm sure I probably did.

16   Q    Was Mr. Harrison in the healthcare field, do you recall?

17   A    I don't recall.

18   Q    Nothing further on this exhibit.  Thank you.

19            I'm going to show you a two-page document which has

20   been marked as exhibit 349.  I'm going to approach and ask you

21   if you've seen this before.

22            Have you seen this before?

23   A    Yes.

24   Q    I'm going to approach.  There are more documents to this

25   exhibit that I'd like you to look at.

1    A    Okay.

2    Q    Are there parts of that you remember, or do you remember

3    all of it?

4    A    It's familiar.

5    Q    Okay.  Let's start with the first e-mail, which is from

6    you to John:  "Per Pam's request, please forward all copies of

7    board minutes from 2006 through current."

8         Do you remember sending that request?

9    A    Not specifically, but . . .

10   Q    Do you have any reason to believe Pam did not instruct you

11   to send copies of all the board minutes?

12   A    No.

13   Q    Would that be something routine that she would ask you to

14   do?

15   A    I don't know about routine, but I'm not saying she didn't

16   ever request it.

17   Q    I understand.

18         Did you actually do that?

19   A    I'm sure I did what she asked.  I don't recall.

20   Q    And as you recall, working for her, board minutes are

21   formal typewritten minutes prepared by the board of what they

22   discussed at their board meeting, is that accurate?

23   A    To my knowledge, yes.

24   Q    And the minutes also reflected who was at the board

25   meetings; is that right?

```
 1   A    I don't recall looking at them.  Typically, minutes do.

 2   Q    And they also have signature lines on the bottom of them

 3   generally, is that right, for the board members?

 4   A    I never really studied the minutes, to be honest.

 5   Q    Okay.  Let's go to the second e-mail in the chain.

 6           MR. STEIN:  If you could blow that up.

 7   BY MR. STEIN:

 8   Q    This is the memo from Pam Bunes back to you.  Could you

 9   please read it?  It's in blue dated March 1.

10   A    "These are audit committee meeting minutes, not board

11   minutes.  I thought that I had sent you some a few days ago.

12   Additionally, John Woodbury would be able to provide minutes

13   from the annual shareholders meeting and board meeting.  I

14   would like a copy of these for my files.  If you need more

15   from me, I'll try to find them."

16   Q    Do you remember also compiling audit committee meeting

17   notes for Pam Bunes?

18   A    She may have asked.  They were sent to me sometimes by the

19   audit committee.

20   Q    I wasn't on the audit committee; is that right?

21   A    I'm not sure.

22   Q    You certainly -- you didn't call me to ask me for the

23   audit committee notes, right?

24   A    I didn't call you, no.

25   Q    They were sent to you by somebody else?
```

1    A    Yes.

2    Q    And the audit committee, it was your understanding, was

3    evaluating the financial condition of the company and

4    interacting with the outside auditors; is that right?

5    A    Yes.

6    Q    Let's go to the next part of that exhibit.

7         This is just emblematic of your compliance with the

8    first part.  It says:  "Pam, attached are the electronic

9    copies of the board minutes."

10        You recall writing this back?

11   A    Vaguely.

12   Q    Okay.  Let's go to the next part.

13        Who is Allyson Hutchins, if you recall?

14   A    She was an auditor with the outside accounting firm.

15   Q    Elliott Davis?

16   A    Yes.

17   Q    They were located in the Carolinas; is that right?

18   A    Correct.

19   Q    When you took the job at the company, you understood that

20   the company had moved from Los Angeles to Greenville to

21   accommodate Ms. Bunes and her team, didn't you?

22   A    No.  I understood that they opened up a second office in

23   Greenville to accommodate Ms. Bunes, but that LA was still

24   fully functional.

25   Q    And Elliott Davis was in the Carolinas, either North or

```
 1    South Carolina?

 2    A    Correct.

 3    Q    Which one were they in?  I don't remember.

 4    A    They were in South Carolina.  They are in South Carolina.

 5    Q    Did you interact with them regularly?

 6    A    Occasionally, if they asked me for certain documents they

 7    needed during an audit or were requesting payment that they

 8    hadn't received.

 9    Q    Were you ever on a conference call with me and Elliott

10    Davis that you can recall?

11    A    Not that I recall.

12    Q    If we can go to the next document.

13         And you recall this in the stream:  "Allyson, that

14    should be all of them?  Did you receive them via e-mail?  Can

15    you forward that to me?"

16         Do you recall generally interacting with her in this

17    fashion?

18    A    I recall interacting with her, yes.

19    Q    Okay.  Nothing further on that exhibit.  Thanks.

20         You actually set up audit committee meetings as well

21    as board meetings; isn't that true?

22    A    I would send like a conference call dial-in for audit

23    committee meetings.  That's about as much as I recall doing.

24    I believe I was contacted with the date and time and then just

25    sent out some dial-in instructions.
```

1           Board meetings, I don't recall setting up much about

2  that.  Annual meetings, a couple times I was requested to set

3  up by you.

4  Q   I'm going to approach and show you what's been admitted

5  into evidence as exhibit 99.

6           Do you remember writing this e-mail or this kind of

7  e-mail?

8  A   I had written this type in the past, yes.

9  Q   Here you were setting up an audit committee meeting

10 amongst all the members of the audit committee; is that right?

11 A   Yes.  I was sending the dial-in information.

12 Q   I'm sorry, sending the dial information just like you had

13 previously sent?

14 A   Correct.

15 Q   In doing this, I was not copied on this e-mail.  I'm not

16 on here; is that correct?

17 A   You're not.  I wasn't sure that you were on the audit

18 committee.

19 Q   Thank you.

20           I'm going to show you what's been marked as

21 exhibit 340.  It's a very short e-mail.

22           Do you remember this e-mail?

23 A   I don't recall it specifically.

24 Q   You don't deny you sent this e-mail, though?

25 A   No, no, no, I don't deny that.

```
 1   Q   And do you remember the process of procuring signatures

 2   from, for example, Kevin Pickard to make a document complete?

 3   A   Well, in this case it looks like I e-mailed requests, but

 4   I don't know that there was a process.

 5   Q   You e-mail requested Kevin Pickard, the CFO, to sign the

 6   document.  Did he -- do you remember if he actually did that?

 7   A   I don't recall.

 8   Q   Did Kevin Pickard ever say to you upon signing any

 9   document as a CFO of the company, that he needed to get my

10   approval in order to sign it?  Did he ever tell you that in

11   words or substance?

12           MR. MUHLENDORF:  Your Honor, it calls for hearsay.

13           THE COURT:  Overruled.

14           THE WITNESS:  I don't recall that he did or he

15   didn't.

16   BY MR. STEIN:

17   Q   Thank you.

18           Do you recall a company called MJD Media?

19   A   I recall the name.

20   Q   Do you recall them calling into the Greenville office at

21   any time during your tenure there?

22   A   It's possible.  I don't recall specifically.

23   Q   Do you recall whether or not they had a contract, a

24   written contract, with Signalife, MJD Media?

25   A   It's possible.  I don't recall for sure.
```

```
 1    Q    There's been also a discussion about the Silve Group.  Do
 2    you recall the name of that group?
 3    A    I do.
 4    Q    Do you recall whether or not the Silve Group had a written
 5    contract with the company, Signalife?
 6    A    Again, it's possible.  I'm not sure.
 7              MR. STEIN:  Your Honor, we've stipulated to mark
 8    exhibit 149 into evidence and enter it into evidence.
 9              THE COURT:  Any objection?
10              MR. MUHLENDORF:  No objection, Your Honor.
11              THE COURT:  Admitted without objection.
12         (Defendant's Exhibit No. 149 entered into evidence.)
13              MR. STEIN:  May I approach, Your Honor?
14              THE COURT:  Yes.
15    BY MR. STEIN:
16    Q    Ms. Jones, on the screen is a document titled, "Investor
17    Relations Agreement" between MJD Media on the one hand and
18    Signalife on the other hand, and I ask you to look at only the
19    initials and the signature line of the document.  Is that Pam
20    Bunes' signature, to the best of your knowledge, at the end of
21    the document?
22    A    It looks like it, yes.
23    Q    You're familiar with her signature at this point, aren't
24    you?
25    A    Yes.
```

```
 1   Q    Is this document consistent with your recollection that
 2   there was some sort of contract with MJD Media that Pam Bunes
 3   had signed?
 4   A    I'm not sure whether or not I ever saw this or not, but,
 5   like I said, I knew the name.
 6   Q    I'm now going to show you --
 7           MR. STEIN:  Your Honor, we have stipulated into
 8   evidence exhibit 83.
 9           THE COURT:  Is that correct?
10           MR. MUHLENDORF:  No objection, Your Honor.
11           THE COURT:  Admitted without objection.
12           MR. STEIN:  Defense 83.
13           THE COURT:  Admitted without objection.
14       (Defendant's Exhibit No. 83 entered into evidence.)
15   BY MR. STEIN:
16   Q    With respect to the Silve Group contract, do you also
17   recognize Pam Bunes' signature and initials on every page
18   thereof?
19   A    I don't have a signature on my copy, only initials.
20   Q    Do you recognize her initials?
21   A    I'm not sure.  Oh, there's a signature on page 10.  It
22   looks like hers.
23   Q    It looks like her signature?
24   A    Yeah, it looks -- that looks like her signature.
25   Q    Did Ms. Bunes ever tell you that I controlled the Silve
```

```
 1   Group, in words or substance?

 2   A   Not that I recall.

 3   Q   Thank you.

 4           MR. STEIN:  Your Honor, I'm going to have to question

 5   the witness on this.  It's not going to be stipulated in.

 6           Do not put it on the screen.

 7   BY MR. STEIN:

 8   Q   I've marked as exhibit 194 a one-page document with two

 9   e-mails in it.  Ask if you've -- if you remember this

10   document.

11   A   Okay.

12   Q   You remember it?

13   A   It's familiar, yes.

14   Q   Do you recall receiving that document and responding to it

15   in the ordinary course of business?

16   A   Yes.

17   Q   It was from Dr.~Harmison to you, right?

18   A   Correct.

19   Q   He was giving you an instruction; is that right?

20   A   Yes.

21           MR. STEIN:  I move the document into evidence, Your

22   Honor.

23           MR. MUHLENDORF:  Your Honor, we object on hearsay

24   grounds.

25           THE COURT:  All right.  May I see it, please?  May I
```

```
 1    see the document?
 2            Are you objecting to the entire document, or only a
 3    portion of it?
 4            MR. MUHLENDORF:  If I could see it again, Your Honor?
 5    But the top portion for sure.
 6            THE COURT:  I'm going to allow it over objection.
 7    It's not being offered for the truth but for the fact that the
 8    statement was made.  So I'll allow it.
 9            MR. STEIN:  Thank you, Your Honor.
10            THE COURT:  So what is the number?
11            MR. STEIN:  It's 194.
12            THE COURT:  194 is admitted over objection.
13        (Defendant's Exhibit No. 194 entered into evidence.)
14    BY MR. STEIN:
15    Q   What's the date of this document?
16    A   February 11th, 2008.
17    Q   Is it your recollection at that time the company had this
18    $100 million credit line with YA Global during Harmison's
19    tenure?
20    A   I don't know about the timeframe for that.  I recall a
21    line with them.
22    Q   The company didn't have a $100 million line of credit
23    under Ms. Bunes' tenure; is that right?
24    A   I don't know.
25    Q   Okay.  Do you recall the words being said to you by
```

```
 1   Dr.~Harmison:  "Not one penny goes out without my approval,

 2   Dr. H"?

 3   A   Yes.

 4   Q   Dr.~Harmison had a rather stern strong personality, didn't

 5   he?

 6   A   He did.

 7   Q   He wanted things done his way, didn't he?

 8   A   He wanted things done right.

 9           MR. MUHLENDORF:  Your Honor, I object.

10           THE COURT:  I'm sorry?

11           MR. MUHLENDORF:  Object to what -- she knows what he

12   wanted.

13           THE COURT:  Overruled.

14   BY MR. STEIN:

15   Q   I'm sorry, you just said he wanted things done right?

16   A   To my knowledge, he just wanted things done right.

17   Q   He was very stern about that, wasn't he?

18   A   He was very sweet to me, and he was business professional.

19   Q   You talked to him often, didn't you?

20   A   For a while.  He checked in with me every day, made sure

21   everything was going well in the office.

22   Q   Ms. Bunes was terminated sometime in August of 2006; is

23   that accurate?

24   A   2007.

25   Q   2007, excuse me.
```

```
 1              Is that accurate?
 2   A   Yes.
 3   Q   Your recollection is better than mine.
 4              And prior to the termination, there was a contract
 5   with Rubbermaid and then a lawsuit.  Do you remember those two
 6   things?
 7   A   Yes.
 8   Q   And then Lowell Harmison came in as the CEO of the
 9   company, is that your recollection, August 2007?
10   A   Yes.
11   Q   Now, let's go down to the Jones portion of the e-mail.
12              Do you recall sending this to Dr.~Harmison about the
13   current cash balance of the company?
14   A   I'm sure I did.  I did on a few occasions.
15   Q   That was regularly how you interacted with him; is that
16   right?
17   A   If he asked.
18   Q   Was it your understanding that the Greenville office was
19   maintained even after Ms. Bunes was terminated because of
20   Dr.~Harmison's residence in Washington and because of his
21   working relationship with you?  Do you recall why the
22   Greenville office -- or did I just make a statement that's
23   true?
24   A   The only thing I recall about the Greenville office was
25   that Stan Gelfer beg and pleaded to you to keep me because I
```

```
 1    was a great asset to the company.  That's all I recall.

 2    That's all that was told to me.  I don't know any other reason

 3    it was kept.

 4    Q   Who told that to you?

 5    A   Sam Gelfer.

 6    Q   And after that happened, Dr.~Harmison and you had a --

 7    sounds like a very good interaction together during the tenure

 8    of Dr.~Harmison?

 9    A   Yeah, he was a nice man.

10    Q   Thank you.

11          So Dr. Harmison during your tenure never came across

12    to you as being crazy, insane, bipolar, anything like that?

13    A   I only talked to him on the phone.  He only came to the

14    office maybe two times.

15    Q   I understand.

16          Just from your interactions with him.

17    A   I've never noticed anything like that.  He was always nice

18    to me.

19    Q   And very businesslike?

20    A   He was businesslike.  He was a nice man.

21    Q   Did his directions to you make sense when he made them, or

22    did they seem out of the ordinary?

23    A   He didn't really make that much direction to me.  He would

24    call me at the end of the day sometimes and ask if I had any

25    kind of update for him.  Once in a while he would check on the
```

```
1    cash balance.  Yeah, I mean . . .

2    Q   Well, for example, this direction, not one penny goes out

3    without my approval, did you have a -- did you think that that

4    was, from what you knew about the company day to day, you had

5    been working there for a few years, did you find that to be

6    out of the ordinary?

7    A   He was the president.  I didn't find it to be odd that he

8    would ask that.

9            MR. STEIN:  Your Honor, the rest of the exhibits have

10   not been stipulated.  This might be a good time to break.

11           THE COURT:  All right.  Why don't we break for lunch,

12   and then we can deal with those issues.  All right?

13           Ladies and gentlemen, let's take our lunch recess.

14   Please don't, again, discuss the case, form any opinions.

15   Leave your notes and your exhibits, and if we can see you at

16   1:15.  Thank you very much.

17       (The jury exits the courtroom.)

18           THE COURT:  All right.  Ms. Jones, you can step down.

19   Please don't discuss your testimony during the recess.  If you

20   could be back at 1:15.

21           Thank you.

22           All right.  What do we have to deal with here?  Have

23   you seen the exhibits yet?

24           MR. STIEGLITZ:  Not yet.

25           MR. STEIN:  I don't think there's going to be a
```

 1  problem.  One of them needed to be redacted.  She's going to

 2  do it on the screen.

 3          MR. STIEGLITZ:  We just haven't had a chance --

 4          THE COURT:  Why don't we do this.  Why don't we get

 5  back about five minutes early and we can talk about them.  So,

 6  be back at 1:10.  All right?

 7          MR. STIEGLITZ:  Absolutely.

 8          THE COURT:  Okay.  Thank you, Your Honor.

 9          MR. STEIN:  Thank you, Your Honor.

10          THE COURT:  See you at 1:10.

11      (A recess was taken from 11:59 a.m. to 1:13 p.m., after

12  which the following proceedings were had:)

13          THE COURT:  Please be seated, everyone.

14          We're back on the record.  Mr.~Stein is present.

15          Have you been able to go over the exhibits?

16          MR. STIEGLITZ:  We have, Your Honor.  I don't mean to

17  speak for Mr. Muhlendorf.  We were able to agree to all the

18  exhibits Mr. Stein told us he intends to introduce this

19  afternoon.  Excuse me, through Ms. Jones.

20          THE COURT:  What numbers are they that we haven't

21  already discussed?

22          MR. STEIN:  Your Honor, they are exhibits -- correct

23  me, gentlemen, if I'm wrong -- 201, 144, 342, 344, 331, 330,

24  98, 192, 332, 200, 333, which, Your Honor, is in two pages,

25  337, 233, 346, 339, and 336.  I do not believe I will have any

1  other questions regarding the deposition or whether there's

2  impeachment there.  So this and some other general questions

3  will comprise the rest of my cross-examination.

4       THE COURT:  All right.  Is there any objection to any

5  of those additional exhibits that Mr. Stein just recited?

6       MR. MUHLENDORF:  No, Your Honor.

7       THE COURT:  All right.  They'll all be admitted

8  without objection.

9    (Defendant's Exhibit No. 201, 144, 344, 331, 330, 98, 192,

10  332, 200, 333, 337, 233, 346, and 339 entered into evidence.)

11       THE COURT:  You were going to go over each one of

12  those with the witness?

13       MR. STEIN:  I may go over some of them in groups, but

14  I am going to go over the majority of them.

15       THE COURT:  Okay.  All right.  An issue came up

16  during lunch.  One of the jurors, Ms. Leslie, she's number 13,

17  juror number 13, apparently has -- she called and left a

18  message that her employer is requiring that she come to work

19  for two hours after she finishes here.  She's not happy about

20  that and says that she can't -- she'll be too tired to pay

21  attention.

22       I believe it was something to that effect, that if

23  she has to come here and go to work, she'll be too tired to be

24  able to pay attention.

25       So my question to both of you is does anyone have any

```
 1   objection if I, on behalf of Ms. Leslie, contact her employer
 2   and impress upon her employer the need that she not be
 3   required to work after and advise her employer of the civil
 4   liability of having -- of taking any adverse action against
 5   someone who serves on a federal jury?  Does anyone have any
 6   problem if I do that independently of -- outside the presence
 7   of everyone?
 8              MR. STIEGLITZ:  No, Your Honor.
 9              MR. STEIN:  No problem, Your Honor.
10              THE COURT:  Okay.  All right.  Why don't we -- can we
11   bring Ms. Leslie in so I can let her know what's going to
12   happen?
13              MR. STIEGLITZ:  Absolutely, Your Honor.
14              MR. STEIN:  Thank you, Your Honor.
15              (Juror Leslie enters the courtroom.)
16              THE COURT:  Hi, Ms. Leslie.  How are you?
17              A JUROR:  I'm okay.
18              THE COURT:  I understand you left a message with
19   Irene saying that you're having some issues with your
20   employer; is that correct?
21              A JUROR:  Yes.  I don't want to be excused.  I've
22   never asked -- what they want me to do now, they're not
23   telling me I can't do jury duty, but they told me yesterday to
24   have my scrubs in my car and to leave here and go straight to
25   work and work until they closed.
```

```
 1              THE COURT:  Okay.  And I take it --

 2              A JUROR:  That would be 10 to 11-hour days every day,

 3   and it's kind of hard to pay really close attention when you

 4   can't keep your eyeballs open.

 5              THE COURT:  Have you -- did you request one of those

 6   letters that I signed for some of the jurors?

 7              A JUROR:  I have one.  I haven't had a chance to give

 8   it to them.  I couldn't get ahold of our big HR person today.

 9              THE COURT:  Did you fax it to them at least?

10              A JUROR:  I haven't been near a fax, but I'm going to

11   give it to them tonight.

12              THE COURT:  All right.  Well, if you would give us

13   the fax number, we'll fax it for you if you would like, and

14   also if you would like, I would call -- I will call your HR

15   person myself and advise them of the need to leave you alone

16   during the time you're on jury duty.

17              A JUROR:  That would be great.  My real HR person,

18   not my personal HR person.

19              THE COURT:  Well, you tell me who to call.

20              A JUROR:  The big boss.

21              THE COURT:  You tell me who to call.  You don't need

22   to do it now, but why don't you give Irene the fax number for

23   your employer, we'll fax the letter for you, and give her the

24   name and phone number of the person that I should call, and I

25   will follow up with a phone call.  Is that all right?
```

```
 1              A JUROR:  Perfect.  Thank you so much.

 2              THE COURT:  Okay.  You're welcome.

 3              MR. STEIN:  Your Honor, may I move that 50 percent,

 4    70 -- that chart over there closer to the jury?  Because I

 5    intend to use it, and I think it's too far away there.  I

 6    don't know if that presents any problems visually.  I don't

 7    think it does, but I can't tell.

 8              THE COURT:  I prefer if you're going to use it and if

 9    you're not going to be using the video screen at the same

10    time, you kinda put it in the middle here rather than over

11    here.

12              MR. STEIN:  Yes, Your Honor.

13              While they're here, I'll just move it myself over

14    into the middle.

15              THE COURT:  Okay.  But, again, if you're going to use

16    the screen, it's going to -- you have to move it out of the

17    way.

18              MR. STEIN:  I won't use them simultaneously.

19              I'll request a five-minute break before we start with

20    the chart.

21              THE COURT:  Okay.  Is our witness here, Ms. Jones?

22              MR. STEIN:  Your Honor, Mr. White will just move it

23    while I'm examining so that we don't delay.

24              THE COURT:  Okay.  Great.

25              Ms. Jones, you're still under oath.
```

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Have a seat, ma'am.  We're waiting for
 3    the jury to come back in.
 4         (The jury enters the courtroom, after which the following
 5    proceedings were had:)
 6              THE COURT:  Welcome back, everyone.  Please be
 7    seated, ladies and gentlemen.
 8              Okay.  All right.  Mr. Stein, you may continue with
 9    your cross-examination.
10              MR. STEIN:  Thank you, Your Honor.
11    BY MR. STEIN:
12    Q    Good afternoon, Ms. Jones.
13    A    Hello.
14    Q    Ms. Jones, do you recall during your tenure with Signalife
15    interacting with any of the CEOs regarding issuance of shares
16    to cover the tax liability of Budimir Drakulic?  Do you recall
17    that coming up?
18    A    I really don't.
19    Q    Budimir Drakulic, you recall was the person who said that
20    he had invented the Fidelity 100, this device?
21    A    I was told that he invented it.  He never actually said
22    that to me.
23    Q    This is the device you've seen, right?
24    A    Yeah, I would say that is.
25    Q    You've seen it work?
```

```
 1   A    I've seen it work.  I was told that he invented the
 2   technology.
 3   Q    Do you recall during Dr. Harmison's tenure a disagreement
 4   between Dr.~Harmison and Dr. Drakulic regarding Dr. Harmison's
 5   concern that the technology was being played with by
 6   Dr. Drakulic in any way, shape or form?
 7   A    No, I don't recall that.
 8   Q    Do you recall any disagreements of any kind between
 9   Dr. Harmison and Dr. Drakulic that you're aware of?
10   A    Not that I can recall.
11   Q    We've admitted into evidence some exhibits that I'm going
12   to ask you about.  The first is exhibit 344.
13             MR. STEIN:  May I approach, Your Honor?
14             THE COURT:  Yes.
15   BY MR. STEIN:
16   Q    Have you seen that before?
17   A    I don't recall it, but it's from me.
18   Q    So you don't deny that you sent it?
19   A    No.
20   Q    Was this one of your responsibilities, to assist in
21   tracking travel expenses for Signalife staff or personnel?
22   A    Tracking?  If I was asked to, I may have.  Some would send
23   me their expense reports to type up for them.
24   Q    Thank you.
25             This one is for Stan Gelfer and Budimir Drakulic.
```

```
1    We've mentioned who Dr. Drakulic is, the person who had

2    claimed to invent the product.

3               Who was Mr. Gelfer?

4    A    As far as I know, he was our information technology

5    person.

6    Q    So he worked in the technology division of the company?

7    A    IT.

8    Q    Did he work in Greenville or in Los Angeles during your

9    tenure?

10   A    Los Angeles.

11   Q    I'm going to show you what's been marked as exhibit 342.

12   Ask you if you've ever seen that before.

13   A    I recall e-mailing regarding Tom Foxhall, but, again, not

14   specifically.

15   Q    Who was Tom Foxhall?

16   A    He was somebody that worked for the company and flew to

17   the LA office on occasion.  I don't know exactly what he did

18   for the company, though.  He was an employee of the company.

19   Q    When you say he flew to the LA office sometimes, he flew,

20   you mean from Greenville?

21   A    No.  He lived elsewhere; I'm not sure where he lived, but

22   I know that he traveled back and forth.  Worked from home and

23   sometimes at the LA office.

24   Q    Do you recall what division of the company he worked in or

25   what department?
```

```
1    A   California was research and development, so that's all I

2    was aware of.  But I don't know exactly what he did.

3    Q   And in this e-mail you're being told to increase the net

4    pay to him, and do you recall having done that?

5    A   I don't.  I'm sure I did.  I do not recall.  Long time

6    ago.

7    Q   Well, this is a rather large net pay.  It says increase

8    the net pay amount for Tom Foxhall by $5721.24.  Then it says

9    this is his net pay for his Canadian payroll.

10            Did Mr. Fox have, to your recollection, staff in

11   Canada working for Signalife?

12   A   No, but the dollar amount differed, to my knowledge, so we

13   had to adjust the amounts accordingly.

14   Q   Oh, it was an exchange rate thing?

15   A   As far as I know, yes.

16   Q   So your recollection is he worked out of Canada?

17   A   From his home, yes, and came to LA, as well.

18   Q   I understand.  Thank you.

19            I'm going to show you now what's been admitted into

20   evidence as exhibit 144.  It also pertains to, I think,

21   Mr. Foxhall.

22            MR. STEIN:  Blow up the third line and below that.

23   BY MR. STEIN:

24   Q   Could you read the third paragraph and the fourth

25   paragraph of that letter, of that e-mail?
```

```
 1   A    "Also, any news on Foxhall?  We really need to get him

 2   straightened out.  He keeps going to Budimir because he is

 3   insistent that we pay him in cash and in the correct

 4   percentages of Canadian slash U.S. dollars.  I don't want him

 5   to come back to us at year-end and complain about his taxes."

 6   Q    Do you -- do you recall sending this e-mail?

 7   A    Not specifically.

 8   Q    Do you generally recall the issues discussed in this?

 9   A    I recall Tom having issues with his pay because of the

10   different dollar amounts between Canadian and U.S., but I

11   don't specifically remember what the problem was.

12   Q    I understand that.

13         What about complaining about his taxes?  Are you

14   talking about Tom complaining about his taxes?

15   A    It sounds that way, but I don't recall.

16   Q    Do you recall -- does this refresh any recollection you

17   have about anybody else complaining about their taxes, or is

18   it just an issue you recall with Foxhall, or you just don't

19   remember?

20   A    I don't remember, but based on what I wrote, it looks like

21   Tom wanted to make sure he got the correct pay, any

22   percentages and taxes paid, because of the difference between

23   Canadian and U.S.

24   Q    But he wasn't -- was he an employee or a 1099 contractor?

25   A    I don't remember.
```

```
 1              MR. MUHLENDORF:  Your Honor, I'm not sure how this is

 2      at all relevant to the case.

 3              THE COURT:  Sustained.

 4      BY MR. STEIN:

 5      Q   Show you a document which has been admitted into evidence

 6      as exhibit 332.

 7              MR. STEIN:  Blow that up.

 8      BY MR. STEIN:

 9      Q   You remember this short e-mail chain?

10      A   Vaguely.

11      Q   It's a request from Kevin to you to send money to Norma

12      Provencio.

13              Could you read what you wrote back to Mr. Pickard at

14      the top of the e-mail?

15      A   "Dr. H has not approved for me to do this."

16      Q   And so you didn't do it; is that right?

17      A   As of this e-mail.  I don't know if I did later on.

18      Q   Thank you.

19              Dr.~Harmison ceased working actively for the company

20      in the middle of April 2008; is that correct?

21      A   I don't know the exact timeframe, but around there.

22      Q   And is it your recollection that he ceased working because

23      of some illness that he had?

24      A   I recall a telephone call from him to me telling me that

25      he was ill, and then I asked you about him and whether or not
```

```
 1    he was working for the company anymore because I wasn't sure

 2    if I should give him any information he asked for, and you

 3    asked me what led me to believe to think that, and that was

 4    the last discussion I ever had about him.  He just kinda

 5    disappeared.

 6    Q    After he disappeared, you then began speaking with Rowland

 7    Perkins; is that correct, as the next CEO, I mean?

 8    A    Lee Ehrlichman?

 9    Q    Lee Ehrlichman was the president who worked under

10    Mr. Perkins; isn't that right?

11    A    I thought they were co-CEO.

12    Q    How long did Mr. Erlichman work in the company in any

13    capacity, if you recall?

14    A    All I can tell you is it wasn't that long, but I really

15    don't recall the dates.

16    Q    At the time that Mr. Erlichman left do you recall -- that

17    was late 2008, then, you're saying?

18    A    Mid to late.

19    Q    Mid to late 2008?

20    A    Yes.

21    Q    I have one more exhibit.  It's exhibit 200 that I'd like

22    to ask you about.

23           Do you recall this?

24    A    Yes.

25    Q    Emblematic of how you interacted with Dr.~Harmison?
```

1    A    Yes.

2              MR. STEIN:  Your witness.

3              THE COURT:  Thank you.

4              Any redirect?

5              MR. MUHLENDORF:  Just briefly, Your Honor.

6              THE COURT:  Okay.

7                        Redirect Examination

8    BY MR. MUHLENDORF:

9    Q    Ms. Jones, do you recall, I think it was at the very

10   beginning of your cross-examination, you were shown an

11   exhibit, defense exhibit 334 that involved Mr. Woodbury being

12   paid, and you were asked questions about the calculation for

13   the stock and how much he got, do you remember that?

14   A    Yes.

15   Q    And there was a calculation involving time worked in

16   hours, correct?  It was an invoice?

17   A    Like an e-mail invoice?

18   Q    Yes.

19   A    Yes.

20             MR. MUHLENDORF:  Now, if we could pull up

21   exhibit 318.

22   BY MR. MUHLENDORF:

23   Q    So, now, Mr. Woodbury was -- what was his position with

24   the company?

25   A    Corporate counsel.

```
 1    Q    And the corporate -- and the corporate counsel, as

 2    Mr. Stein pointed out to you, sent you an e-mail that talked

 3    about number of shares and cash.  You got an e-mail about

 4    that, right?

 5    A    Yes.

 6    Q    Okay.  But when Mr. Stein wanted payment, how did that

 7    happen?  When he wanted you to write those checks, what did he

 8    say?

 9    A    He called me and told me to write the checks.

10    Q    Did anyone send you an invoice for those checks?

11    A    No.

12    Q    Now, during your cross-examination, you were asked -- you

13    were shown a lot of e-mails, and a lot of them didn't involve

14    Mr. Stein, did they?

15    A    Correct.

16    Q    Did Mr. Stein show you any e-mails involving the payments

17    to Mr. Anand?

18    A    To who?

19    Q    The payments to Silve Group.

20    A    No, I don't think so.

21    Q    Did he show you any e-mails involving the shares issued to

22    Mr. Carter?

23    A    No.

24    Q    Did he show you any e-mails involving the wires to

25    Mr. Carter?
```

```
 1    A    No.
 2    Q    Who was the person at Signalife who most directly told you
 3    to do those things?
 4    A    Mitchell Stein.
 5    Q    Now, you don't have any idea what the arrangement was
 6    between Mr. Stein and Silve Group, do you?
 7    A    I do not.
 8    Q    Do you know what the arrangement was between Mr. Carter
 9    and Mr. Stein?
10    A    No, I do not.
11    Q    Now, those e-mails covered a large period of time that
12    Mr. Stein showed you, didn't they?
13    A    Yes, they did.
14    Q    Did they cover the purchase orders we had talked about on
15    direct?  Any e-mails about the purchase orders?
16    A    No.
17    Q    Did you have a term in the office for the purchase orders?
18    A    Did I have a what in the office?
19    Q    A term.  Did you have a term that you used to describe the
20    purchase orders?
21    A    We would have just called it a purchase order or a sales
22    requisition.
23    Q    Did you have a term that referenced the fact that you
24    hadn't seen any invoices for the IT and Cardiac Healthcare
25    purchase orders?
```

1    A    Well, I had a discussion with Lee Erlichman when he came

2    to visit the office that I called them phantom purchase orders

3    because I never received any backup or anything on them.

4    Q    What was that term?  It was phantom?

5    A    Phantom.  I believe that's what I said to him.

6              MR. MUHLENDORF:  Court's indulgence.

7              Nothing further, Your Honor.

8              THE COURT:  Thank you.

9              Anything else, Mr. Stein?

10             MR. STEIN:  Nothing further.  I just want to admit an

11   exhibit.

12             Do you have an objection to that?

13             THE COURT:  So you don't have any further questions

14   for Ms. Jones?

15             MR. STEIN:  No, Your Honor.

16             THE COURT:  All right.  Thank you, Ms. Jones.  You're

17   excused.  Watch your step.

18             MR. MUHLENDORF:  May she be released?  She's not

19   under subpoena from Mr. Stein.

20             THE COURT:  Yes.

21             MR. STEIN:  Yes, she may be released.

22             THE COURT:  Thank you.

23             Next witness.

24             MR. STEIN:  Your Honor, we've just stipulated to

25   admit 349 into evidence.

```
 1                THE COURT:  Any objection?

 2                MR. STIEGLITZ:  No, Your Honor.

 3                THE COURT:  Admitted without objection.

 4          (Defendant's Exhibit No. 349 entered into evidence.)

 5                THE COURT:  Who's our next witness?

 6                MR. STIEGLITZ:  Kevin Pickard, Your Honor.

 7                And, Your Honor, the parties have agreed to the

 8     admission of four exhibits.

 9                THE COURT:  All right.  What are they?

10                MR. STIEGLITZ:  Government's 134, Government's 84,

11     Government's 178, and Government's 343.  And, Your Honor, 343

12     is an addition to the Government's exhibit list.  It's

13     actually a document Mr.~Stein produced to the Government but

14     we're going to mark it as an exhibit.

15                THE COURT:  Any objection to those, Mr. Stein?

16                MR. STEIN:  No, Your Honor.

17                THE COURT:  All right.  That will be admitted without

18     objection.

19          (Government's Exhibit No. 134, 84, 178, and 343 entered

20     into evidence.)

21                Kevin Pickard, Government's witness, sworn.

22                THE COURT:  Please tell us your name, sir, and spell

23     your last name.

24                THE WITNESS:  Kevin Pickard, P-i-c-k-a-r-d.

25                THE COURT:  Thank you, sir.
```

```
 1              MR. STIEGLITZ:  May I inquire, Your Honor?

 2              THE COURT:  Yes.

 3                         Direct Examination

 4   BY MR. STIEGLITZ:

 5   Q   Good afternoon, Mr. Pickard.

 6              Would you just tell the members of the jury what

 7   city, and state you live in, please?

 8   A   Valencia, California.

 9   Q   And, sir, what is it that you do for a living?

10   A   I'm a certified public accountant.

11   Q   And where or for whom do you work?

12   A   I have a number of clients that we work for.

13   Q   I'm sorry, I asked that in a bad way.

14              Do you have a company, Mr. Pickard?

15   A   Yes, I do.

16   Q   And what's the name of that company?

17   A   Pickard & Green.

18   Q   And now, let's talk about who Pickard & Green's clients

19   are.

20   A   Pickard & Green is a small accounting firm.  We have eight

21   people.  We've got clients ranging from small companies to

22   large corporations.

23   Q   And are these public companies or private companies?

24   A   We have some of both.  We do work for both public

25   companies and private companies.
```

1    Q   And just very generally, for those of us that may not be

2    familiar with it, what's the difference between a public

3    company and private company?

4    A   A public company is a company that sells its shares to the

5    general public.

6    Q   All right.  And just very generally, what sorts of things

7    do you do for -- or does Pickard & Green do for its public

8    company clients?

9    A   We mainly prepare financial statements that are included

10   in the public filings that all public companies have to file

11   with the Securities and Exchange Commission.

12   Q   Mr. Pickard, how long have you been a certified public

13   accountant?

14   A   For 25 years now.

15   Q   Mr. Pickard, are you familiar with a company by the name

16   of Signalife?

17   A   Yes, I am.

18   Q   Who introduced you to that company?

19   A   John Woodbury.

20   Q   And just in general, how did you know John Woodbury?

21   A   John Woodbury and I have known each other probably for

22   three or four years prior to that, and we had worked on other

23   clients together.

24   Q   All right.  Was it your understanding that Mr. Woodbury

25   himself had a role at Signalife?

```
 1   A    Yes.

 2   Q    What was that role?

 3   A    He was their securities counsel.

 4   Q    And approximately when was it that Mr. Woodbury introduced

 5   you to Signalife?

 6   A    It was the fall of 2006.

 7   Q    Specifically, Mr. Pickard, did you agree to go to work for

 8   Signalife in any capacity?

 9   A    Yes, I agreed to be their interim chief financial officer.

10   Q    And in that capacity, very generally, what were your

11   duties and responsibilities?

12   A    My primary responsibility was to make sure that the

13   filings with the Securities and Exchange Commission were put

14   together and filed on time.

15   Q    All right.  And was Signalife a public company?

16   A    Yes, they were.

17   Q    And just, you mentioned the SEC filings a moment ago.

18   What were the major filings that Signalife filed with the SEC?

19   A    They would file a form 10-Q, which is a quarterly report,

20   and they also filed a 10-K, which is the annual report.

21   Q    And are those filings confidential, or are they available

22   to the public?

23   A    No, those are available to the public.

24   Q    And just very generally, what sorts of things do those

25   filings report on?
```

```
 1    A    Primarily in a 10-Q, it would be the financial statements,

 2    which include a balance sheet, an income statement, a

 3    statement of stockholders equity, and a statement of cash

 4    flows.  There would be footnotes to the financial statements

 5    and a section called the management discussion and analysis.

 6    Q    And, Mr. Pickard, for what time period approximately did

 7    you assist Signalife in preparing its filings with the SEC?

 8    A    The first one I was involved with was their

 9    September 30th, 2006, form 10-Q, and I believe the last one

10    was their September 30th, 2008, 10-Q.

11    Q    And did you work with anyone in particular at the company

12    to put those together or not?

13    A    My principal, you know, contact with the company was with

14    John Woodbury.

15    Q    All right.  Now, if you and Mr. Woodbury are working on

16    the filings together, was there a sort of division of labor?

17    Were there things that you focused on versus what Mr. Woodbury

18    focused on?

19    A    Yes.  My primary focus was the financial statements, and

20    John's was the legal aspect of what needed to be disclosed in

21    the filings.

22    Q    All right.  Was there an agreement between Signalife and

23    your company, Pickard & Green, that set forth the basics of

24    what you were to be paid and what sort of work you'd be doing

25    for Signalife?
```

```
 1    A    Yes, we had an agreement in place.

 2    Q    And how, in terms of what sort of currency, I guess, were

 3    you to be paid?

 4    A    The initial agreement was I was just being paid on an

 5    hourly basis.

 6    Q    And was that in cash?  Was that in stock?

 7    A    That was in cash.

 8    Q    All right.  And did you get paid in cash by Signalife for

 9    any period of time?

10    A    Yes, for the first year I was paid all in cash.

11    Q    Okay.  And what happened after that?

12    A    After about a year, our firm took on some more

13    responsibility, so we modified our engagement agreement with

14    the company, and it was at that point we went from an hourly

15    rate to just a flat monthly fee.  And Signalife -- also in the

16    agreement, it gave Signalife the option to pay us either in

17    cash or in stock, at their option.

18    Q    And you mentioned that you were then being paid a flat

19    monthly fee.  Was that flat monthly fee in the nature of a

20    retainer?  In other words, something that was paid upfront

21    that you would then work off, or was that something that was

22    being paid for work you had already done?

23    A    It was for work we had already done.  Generally, we would

24    work for the month and then we would send a bill at the end of

25    the month.
```

```
 1    Q   All right.  Now, Mr. Pickard, as the chief financial

 2    officer of Signalife, did you relocate?  Did you take an

 3    office in the Signalife offices?

 4    A   No, I did not.

 5    Q   Did you resign from your accounting firm or your

 6    accounting job?

 7    A   No, I did not.

 8    Q   All right.  Now, as Signalife's chief financial officer,

 9    did you have authority over the company's bank accounts for a

10    period of time?

11    A   I did after the first year.  Once the agreement was

12    modified, I became a signatory on the bank account.

13    Q   Now, Mr. Pickard, during the time you were Signalife's

14    chief financial officer, did you at any point have any

15    involvement in trying to sell the Signalife product?

16    A   No, I did not.

17    Q   Did you have any involvement in trying to put together

18    press releases for the Signalife product?

19    A   No, I did not.

20            MR. STIEGLITZ:  I'd like to look at a document that's

21    already in evidence as Government's exhibit 73, please.  And

22    that is the --

23    BY MR. STIEGLITZ:

24    Q   Mr. Woodbury (sic), is this the form 10-Q, the quarterly

25    filing for the third quarter of 2007?
```

```
 1   A    Yes, it is.

 2   Q    And is this a document, one of the documents that you

 3   helped prepare for Signalife?

 4   A    Yes, it is.

 5   Q    Let's just look at page 22 of that document, please.  And

 6   if we can blow up the section labeled, pending purchase

 7   orders.

 8        Mr. Pickard, I'm just going to ask you to take a look

 9   and read that very first sentence of the first paragraph.

10   A    It says:

11        "On September 14th, 2007, Signalife received a

12   purchase order from a hospital/medical group purchasing

13   organization for a finance lease for Fidelity 100 units.  The

14   gross proceeds to Signalife, assuming exercise of purchase

15   rights, will be $1,980,000."

16   Q    And if you can just do the same thing as to that second

17   paragraph, please.

18   A    "On September 24th, 2007, Signalife received a purchase

19   order from a hospital/medical group purchasing organization

20   for a finance lease for Fidelity 100 units.  The gross

21   proceeds to Signalife, assuming exercise of purchase rights,

22   will be $3,300,000."

23   Q    So just to be clear, this is language that's in the third

24   quarter 2007 filing with the SEC; is that right?

25   A    Yes, that is correct.
```

```
 1    Q    Let's move forward to page 45 of that document, please.

 2              MR. STIEGLITZ:  And if we can just blow out the first

 3    paragraph under that label "subsequent events," please.

 4    BY MR. STIEGLITZ:

 5    Q    And Mr. Pickard, I apologize, I'm going to ask you to read

 6    the first two sentences of that paragraph, please.

 7    A    "On October 4th, 2007, Signalife received a purchase order

 8    from a hospital/medical group purchasing organization for a

 9    finance lease for Fidelity 100 units.  The gross proceeds to

10    Signalife, assuming exercise of purchase rights, will be

11    $564,000."

12    Q    And, again, language that's in that SEC filing; is that

13    right?

14    A    That is correct.

15    Q    Mr. Pickard, do you recall any other purchase orders being

16    recorded in this third quarter 2007 filing?

17    A    No, I do not.

18    Q    All right.  We can take that exhibit down.

19              And after the third quarter 2007 filing, is the next

20    significant filing on the agenda, the full year 10-K filing?

21    A    Yes, it would be the form 10-K for the year ended

22    December 31st, 2007.

23    Q    And just very generally, what's the difference between the

24    10-K and the 10-Q other than the time periods that they cover?

25    A    The 10-K includes more information about the company, risk
```

1    factors, and the financial statements for a 10-K have to be

2    audited, where the financial statements in a 10-Q are not

3    required to be audited?

4    Q    And who was Signalife's auditor for that 2007 10-K?

5    A    It was a firm by the name of Elliott Davis.

6    Q    All right.  And can you just describe very generally --

7    well, were you one of the individuals that interacted with the

8    auditors?

9    A    Yes, I was the primary contact for the auditors.

10   Q    And just describe very generally what the nature of that

11   interaction with the auditors was in preparing the 10-K.

12   A    They would provide a list of things they needed from us in

13   order to do their audit, and it was my responsibility to put

14   all the documents and schedules together and answer any

15   questions that they had.

16   Q    Let's pull up Government's exhibit 123, which is already

17   in evidence.  And we'll just blow up the top of that document,

18   Mr. Pickard.

19          And Mr. Pickard, this appears to be a memo to Elliott

20   Davis, the auditors, from Dr. Lowell Harmison and you dated

21   March 19th, 2008; is that right?

22   A    That is correct.

23   Q    And would you just tell the jury what is the purpose of

24   this memo?

25   A    The auditors had four areas of concern that they wanted

```
 1   the company to address, and so this memo was put together to

 2   address their concerns or their questions.

 3   Q    What's the number one concern that they've got on that

 4   list?

 5   A    The status of purchase orders and production delays.

 6   Q    If we can just go to the bottom half of that page, please.

 7   And Mr. Pickard, if you could just read the first sentence of

 8   that first paragraph under "purchase orders."

 9   A    It says, "On September 14th, 2007, Cardiac Hospital

10   Management entered into a purchase order with Signalife for

11   the purchase of 180 Fidelity 100s plus upgrades at a unit

12   price of $11,000, for a total purchase price of $1,980,000."

13   Q    And does it also say that the purchase order itself is

14   attached as exhibit 1 to the document?

15   A    Yes, it does.

16   Q    Let's take a look at exhibit 1, which is page 12 of this

17   document.  And, Mr. Pickard is that, in fact, the Cardiac

18   Hospital Management purchase order that was attached and sent

19   to the auditors?

20   A    Yes, it is.

21   Q    Mr. Pickard, did you at any time meet anyone from Cardiac

22   Hospital Management?

23   A    No, I did not.

24   Q    Did you ever talk to anyone from Cardiac Hospital

25   Management?
```

```
 1   A    No, I did not.

 2   Q    Did you have any idea if Cardiac Hospital Management even

 3   exists?

 4   A    No, I do not.

 5   Q    Let's go back to the first page of this exhibit, please,

 6   and I'd just ask you to read, if we can blow out the second to

 7   last paragraph.  And Mr. Pickard, if you'll just read the

 8   first sentence of that, please.

 9   A    "On September 29th, 2007, IT Healthcare entered into a

10   purchase order agreement with Signalife for the purchase of

11   300 Fidelity 100s with cables and the upgrade package at a

12   unit price of $11,000, for a total cost of $3,300,000, with a

13   deposit of $30,000 applied against the total cost."

14   Q    And do you recall attaching a purchase order for that

15   transaction to this memo, as well?

16   A    I do not believe so.

17   Q    Can I show you something -- would there be anything you

18   could look at that would refresh your recollection as to

19   whether that was true or not?

20   A    Yes, if you'd show me the rest of the document.

21   Q    If you'd look in that binder that's in front of you,

22   Mr. Pickard, there should be Government's exhibit 123.  And if

23   you'd just look at the 16th page of that -- of the full

24   exhibit.  I apologize, I know this is difficult doing it

25   electronically.
```

 1              And Mr. Pickard, without -- have you had a chance to

 2    look at the 16th page?

 3    A    Yes, I have.

 4    Q    Okay.  Does that refresh your recollection as to whether

 5    you attached a purchase order related to this description to

 6    that memo?

 7    A    Yes, it does.

 8    Q    All right, go ahead.  You can close that binder.

 9              And did you, in fact, attach a purchase order?

10    A    Yes.

11    Q    Let's look at the 16th page of the exhibit, Mr. Pickard.

12              And Mr. Pickard, is this, in fact, the purchase order

13    for -- a purchase order for IT Healthcare that was attached to

14    this memo?

15    A    Yes, it is.

16    Q    And, Mr. Pickard, who purports to sign that purchase order

17    for IT Healthcare?

18    A    Somebody by the name of Avi Cohen.

19    Q    And I apologize.  I should have had you do this earlier.

20    We're going to bounce around within the document a little bit,

21    so I'm sorry about that.

22              Let's go back to the first page of this again, this

23    exhibit, the memo, and let's just look at that last paragraph,

24    please.

25              Without having you read it, Mr. Pickard, is it fair

1    to say that the first sentence of -- well, that paragraph

2    describes a second purchase order from IT Healthcare?

3    A   That is correct.

4    Q   And did you, in fact, attach a second IT Healthcare

5    purchase order to this memo?

6    A   Yes.

7    Q   All right.  If we can go to the 17th page of the exhibit,

8    please.

9            And Mr. Pickard, is this, in fact, the purchase order

10   that you attached to that memo?

11   A   Yes, it is.

12   Q   And who's signing this one on behalf of IT Healthcare?

13   A   The same person, Avi Cohen.

14   Q   Mr. Pickard, did you, in all your time associated with

15   Signalife, ever meet anyone associated with IT Healthcare?

16   A   No.

17   Q   Did you ever talk to anyone from IT Healthcare?

18   A   No.

19   Q   Do you have any idea if IT Healthcare even exists?

20   A   No.

21   Q   What about Avi Cohen?  Do you have any idea if he is a

22   real person or not?

23   A   No, I do not.

24   Q   So just stepping back, why is it that you're sending the

25   auditors these purchase orders?

1    A    Because they wanted evidence that we had these purchase

2    orders as part of their audit, and we just provided this to

3    them as, you know, evidence that they needed for their audit.

4    Q    Have you created any of these purchase orders that we've

5    just looked at?

6    A    No, I did not.

7    Q    Where did you get them, Mr. Pickard?

8    A    From John Woodbury.

9    Q    And do you have any idea where he got them?

10   A    No, I do not.

11   Q    And, again, if you can recall, were there any other

12   portfolios that you were discussing with the auditors besides

13   these three in preparation for the 2007 10-K?

14   A    No, there were no others.

15   Q    As the chief financial officer of Signalife, can you just

16   explain the importance of, you know, some $5 million or so of

17   sales for Signalife?

18   A    Well, Signalife had minimal revenue up to this point, so

19   getting purchase orders for $5 million-worth of product was a

20   big deal for the company.

21   Q    Now, as part of your preparation of the 10-K, besides

22   getting these purchase orders, did you do anything else, you

23   and Mr. Woodbury, to try and validate, you know, the existence

24   of these purchase orders?

25   A    Yes, we did.

```
 1   Q    And would you just describe, very generally, what it was
 2   that you did?
 3   A    Well, since it had been six months from the time the
 4   purchase orders were signed, we wanted to verify that the
 5   companies were still planning to purchase product from us.
 6   And so we sent confirmations to both companies asking them to
 7   confirm, you know, back to us that these purchase orders were
 8   still valid.
 9   Q    Okay.  Let's look at Government's exhibit 293, which is
10   already in evidence.
11        MR. STIEGLITZ:  And if we can just blow out the top
12   half of that document, please.
13   BY MR. STIEGLITZ:
14   Q    And can you just explain to the members of the jury what
15   it is that this document is?
16   A    This was just a confirmation letter that was sent to
17   Cardiac Management just asking them to respond directly to us
18   indicating the terms of the purchase order that they had
19   signed with Signalife.
20   Q    And to your knowledge, who was it that wrote the text of
21   this letter?
22   A    John Woodbury.
23   Q    And if we can just look at the -- well, who signed the
24   letter for Signalife?
25   A    I signed the letter.
```

```
 1   Q   Okay.  Who sent it out?  You?  Mr. Woodbury?  Somebody

 2   else?

 3   A   I sent out the letter.

 4   Q   And how did you send it out?

 5   A   I sent it out via facsimile.

 6       MR. STIEGLITZ:  Okay.  And if we can just blow out

 7   the sort of date through the address.

 8   BY MR. STIEGLITZ:

 9   Q   And is that number by, "via facsimile," the 866 number, is

10   that the fax number to which you sent out this letter?

11   A   Yes, it is.

12   Q   And just looking at that name, that letter was sent to

13   Mr. Tony Nony, the purchasing agent for Cardiac Management; is

14   that right?

15   A   That is correct.

16   Q   Okay.  If we can look at the second page of this exhibit,

17   please.  And looking at the counter -- well, Mr. Pickard, what

18   did you and Mr. Woodbury in this letter ask Cardiac Management

19   to do, Mr. Tony Nony, to do if, in fact, they still wanted the

20   products?

21   A   Just to sign the letter and return it back to us.

22   Q   Okay.  Let's look at who signs there on the bottom?

23   A   The signature is Tony Nony.

24   Q   Have you ever met Tony Nony?

25   A   I have not.
```

```
1    Q    Ever spoken to him?

2    A    No.

3    Q    Any idea if he's a real person or not?

4    A    No.

5    Q    All right.  Let's look at Government's exhibit 130, which

6    is also already in evidence, and we'll start at the second

7    page of that document, please.

8              And Mr. Pickard, is it fair to say this is the same

9    type of letter, a confirmation letter that you and

10   Mr. Woodbury sent to IT Healthcare?

11   A    Yes, it is.

12   Q    But just to be clear, the text of this letter was created

13   by who?

14   A    John Woodbury.

15   Q    But who sent out this letter?

16   A    I sent out the letter.

17             MR. STIEGLITZ:  And if we can blow out the top there,

18   please.

19   BY MR. STIEGLITZ:

20   Q    Who -- how did you send this letter out?

21   A    Via facsimile.

22   Q    And did you send it to that 513, looks like 497-1573

23   number?

24   A    I attempted to send it to that number, but it didn't go

25   through.
```

```
 1   Q    When it didn't go through, did you do anything?

 2   A    I called Dr.~Harmison to let him know it didn't go

 3   through.

 4   Q    Did you reach Dr.~Harmison?

 5   A    I got his voicemail and I left him a voicemail asking him

 6   to call me.

 7   Q    Did you -- did you -- well, did you hear back from anyone

 8   about this?

 9   A    I heard back almost immediately.  Mitch Stein called back.

10   He had Dr.~Harmison on the phone, and Mitch gave me a new fax

11   number to send the confirmation to.

12   Q    So just to be clear, both Mr.~Stein and Dr.~Harmison

13   called you back together?

14   A    Correct.

15   Q    But who did the talking during that call?

16   A    Mitch did.

17   Q    And did Mr.~Stein act confused at all about who or what IT

18   Healthcare was?

19   A    No, he did not.

20   Q    Did he tell you he needed more time to figure out what was

21   going on with this, didn't know what it was about?

22   A    No, he did not.

23   Q    All right.  Let's --

24          MR. STIEGLITZ:  Actually, Court's indulgence a

25   moment.
```

```
 1              Apologize, Your Honor.  I've misplaced one document

 2    I'm looking for.

 3              THE COURT:  Do you have an exhibit number?

 4              MR. STIEGLITZ:  Unfortunately it's not an exhibit,

 5    Your Honor.  I'm just trying to make sure I get the accurate

 6    transcript cite.  It's my cheat sheet of transcript cites for

 7    the audio that we're about to play.  I'm certain it's here, I

 8    just need to . . .

 9              Your Honor, if it's permissible for the Court, we

10    will come back.  I'm going to play two clips now.  We will

11    identify them by the appropriate transcript cite so that we

12    don't keep the jury waiting.

13              THE COURT:  All right.

14              MR. STIEGLITZ:  Clip number 21, please.

15              (Audio played.)

16              MR. STIEGLITZ:  And clip number 33, please.

17              (Audio played.)

18    BY MR. STIEGLITZ:

19    Q    Mr. Pickard, is Mr. Stein telling the SEC the truth when

20    he says that?

21    A    I don't believe so.

22    Q    Why not?

23    A    Because with my -- after my conversation with him, he

24    appeared to know who IT Healthcare was and that they had

25    purchased product from Signalife.
```

1    Q    Mr. Pickard, let's look at Government's exhibit 134, which

2    is already in evidence.  And if we can just -- fair to say,

3    Mr. Pickard, this is an e-mail exchange -- well, this is --

4    the lower part of this document is an e-mail from you to

5    Mr. Woodbury, Dr. Harmison, and Mr. Stein?

6    A    That is correct.

7    Q    Okay.  And if you can just read that e-mail to the jury,

8    please.

9    A    It says:  "Gentlemen, I am working with the auditors on

10   the going concern issue.  They are requesting updated

11   information about our shipments.  It is my understanding that

12   we shipped five units last week and plan to ship about 20 more

13   over the next few weeks.  Please confirm the recent shipments

14   and let me know how many units you expect to ship over the

15   next 60 days."

16   Q    Mr. Pickard, at the risk of treading into accounting

17   minutia, can you just explain to those of us who are not

18   accountants, very generally, what you're referring to when you

19   say "the going concern issue"?

20   A    We just needed to provide evidence to the auditors that

21   the company was a viable entity, that it was -- had the

22   financial stability to be in existence for the next 12 months.

23   Q    And why are you sending this e-mail to Dr.~Harmison,

24   Mr. Woodbury, and Mr.~Stein?

25   A    Because I believe that they would have had knowledge about

1    the shipments that had gone out and were going out.

2    Q   And just looking at what Dr. Harmison does with your

3    e-mail, to whom does he send your e-mail?

4    A   To Mitch Stein.

5    Q   Anybody else?

6    A   No.

7    Q   All right.  Let's look at Government's exhibit 93, please,

8    which is already in evidence.

9         And Mr. Pickard, is this the 2007 10-K for Signalife?

10   A   Yes, it is.

11   Q   Now, if we can look at page 78 of the 2007 10-K.  And

12   we'll look at that section under pending purchase orders.  I

13   know you're terribly disappointed I'm not going to ask you to

14   read that, but if you can take a look at that, is that the

15   same language that we saw in the preceding filing, the 10-Q

16   that we just saw?

17   A   Yes, it is, very similar language.

18   Q   Mr. Pickard, why was it that you were comfortable leaving

19   this sort of language in the 10-K?

20   A   Because we had reconfirmed those purchase orders with the

21   companies that had purchased or were going to purchase the

22   product.

23   Q   Okay.  Let's stay within the 2007 10-K, but let's shift

24   gears a little bit.  Let's look at page 71.  And more

25   miniscule type, I apologize.  Let's look at the section under

```
 1    prepaid sales commissions.

 2            And Mr. Pickard, again, I apologize for the small

 3    type.  Can you just read that very first sentence, please?

 4    A   It says:  "During the year ended December 31st, 2007, the

 5    company issued to the Silve Group a total of 1,736,583 common

 6    shares valued at $2,848,251.  The issuance of these shares was

 7    an advance against future commissions to be earned by the

 8    Silve Group."

 9    Q   Thank you, Mr. Pickard.

10            Do you recall the Silve Group and the shares being

11    issued to the Silve Group being an issue for you as you were

12    preparing the 10-K or preparing filings in general for

13    Signalife?

14    A   Yes, I do.

15    Q   And why?

16    A   Because it was a large amount of shares that we had

17    advanced to them, and, you know, typically companies don't

18    make that large of an advance to a vendor.

19    Q   Mr. Pickard, did you ever meet anyone from the Silve Group

20    to your knowledge?

21    A   No, I did not.

22    Q   Did you ever talk to anyone from the Silve Group?

23    A   No, I did not.

24    Q   Did you do anything to look into who or what the Silve

25    Group was?
```

```
 1    A    I obtained a copy of the company's agreement with the

 2    Silve Group.

 3    Q    And from whom did you obtain that copy?

 4    A    John Woodbury.

 5    Q    And when you received that contract, what, if anything

 6    else, did you do?

 7    A    I read it and, you know, the payments that we had made to

 8    them were in accordance with the contract.

 9    Q    Okay.  Let's get back to the IT Healthcare and the Cardiac

10    Hospital Management purchase orders and pull up Government's

11    exhibit 141, which is already in evidence.

12              MR. STIEGLITZ:  And if we can just blow out the top

13    half of that document.

14    BY MR. STIEGLITZ:

15    Q    And Mr. Pickard, is it fair to say this is an e-mail

16    exchange between you and John Woodbury?

17    A    Yes, it is.

18    Q    Who's copied on this e-mail exchange between you and John

19    Woodbury?

20    A    Mitch Stein.

21    Q    And if you'd just read starting with your e-mail to John

22    Woodbury.

23    A    It says:  "I need the address and contact person at IT

24    Healthcare so I can send the April invoice."

25    Q    And then at the top, what does Mr. Woodbury say to you?
```

1   A   It says:  "Kevin, Mitch has advised me that he believes

2   that this is IT Healthcare's and Cardiac Management's

3   respective addresses per looking at his notes taken from

4   Lowell's notes."

5   Q   And IT Healthcare is that individual, Yossi H. Keret in

6   Netanya, Israel; is that right?

7   A   Yes.

8   Q   And Cardiac Hospital Management, I guess here it's Toni

9   Nohoy, in Tokyo, Japan.  I'm not going to try to pronounce

10  that stuff above that, but Tokyo, Japan; is that right.

11          Now, you said Mr. Stein was copied on this e-mail

12  exchange?

13  A   Yes, he was.

14  Q   Did Mr. Stein ever follow up on Mr. Woodbury's e-mail and

15  say, whoa, whoa, whoa, I have no idea who these people are or

16  what you guys are even talking about?

17  A   No, he did not.

18  Q   Did he ever express any sort of confusion, ask for any

19  more detail on any of these purchasers?

20  A   No, he did not.

21  Q   Let's again shift gears a little bit, and I just want to

22  ask you briefly about some of your other duties as chief

23  financial officer at the company.

24          In that capacity, were you aware of what the

25  company's a cash position, what the company's bank balance

1    was?

2    A   Yes, I was.

3    Q   And let's look at Government's exhibit 84, which is

4    already in evidence, and we'll just blow out the top there,

5    which may make it marginally easier to read.

6            And Mr. Pickard, this is an e-mail from you to whom?

7    A   To Dr.~Harmison, Mitch Stein, Norma Provencio, and Tracy

8    Jones.

9    Q   And Norma Provencio, just to remind those of us who may

10   not have heard her name very much, who is she?

11   A   She was a former board member.

12   Q   Okay.  And the date of this e-mail, Mr. Pickard, is

13   November 14th, 2007; is that right?

14   A   Yes.

15   Q   Can you just read that first, I guess it would be three

16   sentences, the first two lines of the e-mail, please?

17   A   Says:  "I wanted to give everyone an update on our cash

18   balance.  At the end of the week, our cash balance will drop

19   below $600,000.  See below."

20   Q   And I just want to draw your attention to that -- the last

21   wire that's mentioned there, to M&C Electric.  The amount of

22   that wire is how much?

23   A   $90,000.

24   Q   And Mr. Pickard, did you know who M&C Electric was at the

25   time you were sending this e-mail?  Did you have an

1    understanding of who they were?

2    A    Yes, I did.

3    Q    And what was that understanding?

4    A    That they were just an electrical contractor for the

5    company that was testing the electrical components of our

6    product.

7    Q    Did you ever interact with M&C Electrical yourself?

8    A    No, I did not.

9    Q    All right.  Let's look at Government's exhibit 178,

10   please.  This is also already in evidence.

11          MR. STIEGLITZ:  If we can just blow out the top

12   portion of this e-mail, please.  There we go, to where it says

13   "Kevin."

14   BY MR. STIEGLITZ:

15   Q    And Mr. Pickard, this is an e-mail dated September 24th,

16   2008, from you to Rowland Perkins; is that right?

17   A    Yes.

18   Q    And Rowland Perkins at that time was who?

19   A    He was the CEO of the company.

20   Q    And can you just read your e-mail to Mr. Perkins, please?

21   A    It says:  "Rowland, after paying the payroll taxes, I

22   think we have about $5000 in the accounts.  I may be able to

23   do the $4500 but definitely cannot do the 10 to $15,000.  We

24   need more money desperately."

25   Q    Mr. Pickard, in late 2008, when this e-mail is being sent,

```
 1    can you just describe very generally the company's cash

 2    position, please?

 3    A    It basically was out of cash.

 4    Q    Now, this e-mail was September 2008.

 5         MR. STIEGLITZ:  And we can take that down.

 6    BY MR. STIEGLITZ:

 7    Q    How long approximately after that did your involvement

 8    with Signalife end?

 9    A    I resigned in February of 2009.

10    Q    All right.  And very generally, why did you do that?

11    A    Because I was not being paid.

12    Q    Now, you said earlier -- I asked you earlier whether

13    Pickard & Green, whether you were getting paid in cash or

14    stock.  At that time were you getting paid in stock, to the

15    extent you had gotten paid at all?

16    A    Yes.

17    Q    And, again, that stock that had been paid to you, was that

18    payment for work you had actually done or some upfront sort of

19    retainer?

20    A    For work that we had already done.

21    Q    In fact, Mr. Pickard, have you ever had a retainer with

22    any of your clients?

23    A    No, I have not.

24    Q    So those shares that the company would issue them, when

25    they would issue them to you, what would you -- what would you
```

```
 1    and your company do with them?
 2    A    Well, when they would give us shares to pay for our
 3    services, we would sell those immediately, turn those into
 4    cash so that we could pay the expenses of running our firm.
 5    Q    Did there come a point in time when Mr. Stein called you
 6    about doing that?
 7    A    Yes, there was.
 8    Q    Can you just describe that to the jury, please?
 9    A    In November of 2008, we had received some shares for
10    payment, and we sold some of those shares to turn them into
11    cash.
12    Q    And did Mr.~Stein contact you about that?
13    A    When Mr.~Stein found out that we had been selling shares,
14    he went ballistic.  He was yelling and screaming.  He was
15    extremely upset that we had sold shares.
16    Q    Did you have any shares left at that time?
17    A    Yes, we did.
18    Q    Did Mr.~Stein give you any instructions as to what, if
19    anything, you should do with those shares?
20    A    Yes, he did.
21    Q    What did he ask you or tell you to do?
22    A    He told us to move the shares to a brokerage firm in
23    Spokane, Washington.
24    Q    With any particular broker?
25    A    I believe his name was Mark Nevdahl was the broker.
```

```
1    Q    Did you do that?

2    A    We transferred approximately two thirds of the shares that

3    we held to that brokerage firm.

4    Q    What about the money that you had gotten from selling the

5    shares that Mr. Stein -- that had originally prompted

6    Mr. Stein's call?  Did he tell you anything about what you

7    should do with that money?

8    A    He demanded that we give that money back to the company.

9    Q    And to be clear, was it your understanding that you were

10   under any obligation to do any of that?

11   A    No, we were under no obligation to do that.

12   Q    So did you send money back to the company?

13   A    After arguing back and forth, finally, I just gave in and

14   sent the money back.

15   Q    Mr. Pickard, I apologize.  I'm going to have to go to a

16   paper copy of an exhibit which I've given to the defense.

17   This is Government's 343, which I will hand out to the members

18   of the jury, since we can't put it up on the screen.

19            MR. STIEGLITZ:  And I have a copy for the Court since

20   it's not in the Court's binder, if I may, and for

21   Mr. Franklin, as well.  And most importantly, for Mr. Pickard.

22   Thank you.

23   BY MR. STIEGLITZ:

24   Q    And Mr. Pickard, this is already in evidence, Government's

25   exhibit 343.  And while the jurors are having a chance to take
```

1  a look at that, Mr. Pickard, is this an e-mail exchange

2  between initially you and Mr. Stein and then that you forward

3  to others that relates to the matters that you just discussed?

4  A   Yes, it is.

5  Q   All right.  I'm going to ask you to take a look at the

6  portion of the e-mail exchange here that starts in the bottom

7  of the first page and carries over to the second page.  And if

8  you can just read that to the jury, please.  Who's that from?

9  A   It's from Mitch Stein.

10 Q   To you?

11 A   Yes, it is.

12 Q   Okay, go ahead and read that to the jury, would you?

13 A   It says:  "Kevin, I have your confusing e-mail and do not

14 believe you are this dumb.  The document you say you signed is

15 a fraud and a nullity.  We have the document, and Rowland is

16 going to go all the way with it if you're going to defraud

17 him.  We have the document you signed and will take it all the

18 way if your dumbness persists.  All the way means all the way.

19 You never told us you were getting paid, and, indeed, none of

20 your books reflect it.  John Woodbury so represented and it

21 was relied upon by Rowland, by Willie, and by countless others

22 who advanced money based on your honor."

23 Q   Let's skip down, since everybody's got a copy of it, let's

24 just skip down with the paragraph that starts with or the

25 section beginning with:  "You could not have taken the stock

```
 1    as a gift," paragraph beginning with "it's either one or the
 2    other."
 3    A    "It's either one or the other.  You could not have taken
 4    the stock as a gift for being a blood relative.  You should
 5    have taken the stock as payment while simultaneously taken the
 6    stock as a retainer against your underwear.  That is the best
 7    you can do, but that will not save you from the undertaker.
 8    Even with both not recommended, you are still sunk, because we
 9    have your writings.
10         "Here are your choices, and consult with Mr. I'm the
11    fraud, I'm going to jail, I'm the Am guy Green and any
12    criminal lawyer you want to consult, because either way you're
13    going to jail."
14    Q    Mr. Pickard, I won't have you read the rest of the e-mail,
15    but does the rest of the e-mail, is it similar in tone and
16    content to what you've just read?
17    A    Yes, it is.
18    Q    Mr. Pickard, was it after you had these exchanges with
19    Mr. Stein that you ultimately decided to send the money back
20    to the company?
21    A    Yes, we -- yes, we -- after discussions with him and just
22    tired of being harassed, that the money was sent back to the
23    company.
24    Q    I was going to ask you, why is it that you decided to do
25    that if you weren't obligated to do it under your contract?
```

```
 1   A   I was just tired of being harassed, and I was fearful that
 2   Mitch Stein would sue me.
 3            MR. STIEGLITZ:  Court's indulgence.
 4            Please answer Mr. Stein's questions.
 5            THE COURT:  Ladies and gentlemen, before the
 6   cross-examination, Mr. Franklin needs a break, so let's take a
 7   15-minute recess.  Please don't discuss the case or form any
 8   opinions, and we'll see you shortly.  Thank you.
 9        (The jury exits the courtroom.)
10            THE COURT:  Sir, you can step down for the break.
11   Don't discuss your testimony during the recess, please.
12            Thank you.
13            All right.  Are we going to try and see if we can
14   agree to Mr. Stein's exhibits for cross-examination?
15            MR. STIEGLITZ:  Absolutely.  We haven't seen them
16   yet, but yes.
17            MR. STEIN:  They're right here.
18            THE COURT:  Why don't you try and see if you can
19   agree during the break.  Thank you.
20            MR. STIEGLITZ:  Thank you, Your Honor.
21        (A recess was taken from 2:30 p.m. to 2:56 p.m., after
22   which the following proceedings were had:)
23            THE COURT:  All right.  Please be seated, everyone.
24            Back on the record.  Mr. Stein's present.
25            We were trying to deal with Ms. Leslie's work issue,
```

 1    so that's why we took longer than we anticipated.  So I think

 2    we've got her straightened out.

 3          MR. STIEGLITZ:  Your Honor, I can either correct or

 4    supplement the record as to those transcript cites now or I

 5    can do it in the presence of the jury, whatever the Court

 6    would prefer.  I don't know that the jury needs to be here for

 7    it.

 8          THE COURT:  No, you can just do it now.

 9          MR. STIEGLITZ:  Okay.  Your Honor, the Government,

10    during Mr. Pickard's direct examination, played two audio

11    excerpts.  The first one was from Mr. Stein's December 18th,

12    2009, testimony before the SEC starting at page 366, line 23,

13    ending at page 367, line 1.

14          The second excerpt was from Mr. Stein's April 5th,

15    2010 testimony starting at page 574, line 8, ending at

16    page 574, line 9.

17          Thank you, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Pickard, you can come on up.

20          MR. STEIN:  Your Honor, we also have stipulated to

21    most of the exhibits.  There are a few that we have not

22    stipulated to that I'm going to be trying to introduce.  I

23    don't know if the Court wants me to do that now.

24          THE COURT:  Well, it may be something we can -- so we

25    don't have to have a sidebar.

```
 1              Why don't you just tell me first what are the ones

 2    that you've agreed to.

 3              MR. STEIN:  We've agreed -- well, some of them are

 4    already in evidence.

 5              We've agreed to exhibit 25, defense exhibit 209,

 6    defense exhibit 350, defense exhibit 347, and the rest of the

 7    exhibits I'll be examining him on are already in evidence.

 8              MR. STIEGLITZ:  No objection to those new ones, Your

 9    Honor.

10              THE COURT:  All right.  Those four additional

11    exhibits will be admitted without objection.

12         (Defendant's Exhibit No. 25, 209, 350, and 347 entered

13    into evidence.)

14              THE COURT:  Which ones were there objections to?

15              MR. STEIN:  Excuse me, Your Honor.

16              Your Honor, perhaps we should exclude the witness

17    with regard to these exhibits, because I'm going to be talking

18    substantively about them, and one of them's rather important.

19              THE COURT:  What are the nature of the objections?

20              MR. STEIN:  Two of them are relevance and one of them

21    is hearsay.

22              THE COURT:  Okay.  Is that correct?

23              MR. STIEGLITZ:  Well, I think relevance is certainly

24    one of the objections that we'll have to three of the

25    documents that Mr.~Stein identified.  We'd also have a scope
```

```
 1    objection to them, as they're beyond what we talked to

 2    Mr. Pickard about, and one of them, at least one of them, if

 3    not more -- actually, all three of them we'd have hearsay

 4    objections to, as well.

 5              THE COURT:  All right.  Well, do I need to -- I can

 6    look at them and decide whether it's hearsay or not.

 7              Well, why don't you step outside, Mr. Pickard, just

 8    to avoid any issues until we resolve these evidentiary

 9    matters.  Sorry.

10              All right.  What exhibit numbers are they?

11              MR. STEIN:  Yes.  I'm trying to figure out if I

12    can -- the one that they have a hearsay objection to is --

13              THE COURT:  What number?  What's the number?

14              MR. STEIN:  That's exhibit number 158.

15              THE COURT:  May I see it?

16              MR. STEIN:  Yes.

17              THE COURT:  Is that correct?  It's hearsay?

18              MR. STIEGLITZ:  Yes, Your Honor.

19              THE COURT:  All right.  What's your argument against

20    the hearsay exception?  Why do you think it should be

21    admissible?

22              MR. STEIN:  I'm not admitting it for the truth of the

23    matter asserted, merely, that the contract with Dr.~Harmison

24    was sent in that manner to those people on that date.

25              THE COURT:  Well, you may be able to get the witness
```

 1    to acknowledge that this was done.  I'm not sure he's aware of

 2    it, but is he listed on here as -- okay.  So he's receiving --

 3         MR. STEIN:  Yes.

 4         THE COURT:  He's listed as receiving it.  I guess

 5    there is additional information in here, such as:  "I wish to

 6    note that Dr.~Harmison spent all of last week in several

 7    different east coast cities with several employees and board

 8    members launching the Fidelity 100."  I kinda guess that

 9    that's the hearsay that the Government is a little concerned

10    about.

11         MR. STEIN:  I'm not admitting it for the truth of

12    that at all.

13         THE COURT:  Well, but it's kinda hard to have this

14    admitted and just ignore that sentence in there.

15         MR. STEIN:  If it would be acceptable, we can quickly

16    redact it and only show on the screen the part about the

17    contract.

18         THE COURT:  Do you have any other objections other

19    than that one statement?

20         MR. STIEGLITZ:  Your Honor, I apologize, that's the

21    only copy I've got.  I can look.

22         I mean, I just note for the Court this is an e-mail

23    for Mr. Perkins.  Mr. Stein had a Rule 15 deposition of

24    Mr. Perkins, and to my recollection, he didn't show this to

25    him when he had the opportunity.  I'd suggest that any

```
 1    characterization of discussions that he had with board members

 2    about circumstances upon which Dr.~Harmison may be

 3    terminated -- I know the Court doesn't any longer have it in

 4    front of it.  I'm sorry.

 5              THE COURT:  Mr. Stein, I believe the objection is

 6    well taken, and I can't -- I don't think I can allow it in.  I

 7    think it's hearsay, and I'll sustain the objection.

 8              What's the next exhibit?

 9              MR. STEIN:  Next exhibit is a one-sentence e-mail

10    from Dr.~Harmison to Mr. Pickard regarding Sarbanes-Oxley.  It

11    just says:  "Dear Kevin, please call me this morning re above

12    matter, if possible.  Thanks, Lowell."  That's the exhibit,

13    and it's exhibit 202.

14              MR. STIEGLITZ:  Your Honor, the objection is I

15    believe there's three or four documents Mr. Stein appears to

16    want to introduce about Sarbanes-Oxley compliance, and that

17    whole topic is not something that came up in direct at all and

18    is not something in the Government's view is relevant to what

19    we're talking about here, so it was more sort of an objection

20    to all of those documents to the extent he's trying to get any

21    of these Sarbanes-Oxley related documents in.

22              As to that e-mail I, don't know that I have a

23    specific objection, but if then it's going to be the next

24    three documents, as well, about Sarbanes-Oxley on the same

25    basis, we would object to those.
```

```
 1              THE COURT:  What are the other documents?

 2              MR. STEIN:  That's it.

 3              THE COURT:  What do they say?

 4              MR. STEIN:  The other documents is the Sarbanes-Oxley

 5    engagement letter that Mr. Pickard got for the company with a

 6    consultant to do Sarbanes-Oxley work.  And the last one is an

 7    e-mail from Dr. Harmison to Mr. Pickard regarding that

 8    engagement agreement of about two sentences.

 9              THE COURT:  And what is the -- what is the

10    Sarbanes-Oxley engagement agreement?  I'm not sure I

11    understand what that means.

12              MR. STEIN:  SOX 404, the Sarbanes-Oxley Act is a

13    condition precedent after the Enron scandal for companies to

14    be able to file 10-Ks and 10-Qs.  They were introduced on

15    direct, and Mr. Pickard did this work, and I think it's

16    directly within the scope of what he was asked about.

17              THE COURT:  But how is it relevant to the case?

18              MR. STEIN:  Because Sarbanes-Oxley and 404 require

19    the accountant and the auditors to test virtually every

20    transaction that's being questioned in the indictment in this

21    case, and he felt the need to hire an outside consultant

22    and --

23              THE COURT:  Who's "he"?

24              MR. STEIN:  Mr. Pickard.

25              Apparently, according to these exhibits.  I wasn't a
```

```
 1   part of the -- part of it, but according to the exhibits, he

 2   hired Assurance Partners, LLP, and I just wanted to establish

 3   that he did.  I'm not going to go into everything they did,

 4   but it's relevant to all public filings.

 5          THE COURT:  And is there anything other than you

 6   don't think the subject matter is relevant, is there anything

 7   in the exhibits that you're concerned about?

 8          MR. STIEGLITZ:  As to the engagement letter -- well,

 9   I can't make my foundation objection now.  Mr. Stein said this

10   is something that Mr. Pickard got.  I don't believe it's

11   signed by anyone.

12          THE COURT:  Well, assuming he can lay a proper

13   predicate for its authenticity, et cetera, is there any

14   content to any of these exhibits other than the fact that you

15   don't think the Sarbanes-Oxley is relevant that's troublesome

16   to you, content, statements in there that you feel is

17   problematic?

18          MR. STIEGLITZ:  It's fine, Your Honor.  No.

19          THE COURT:  So assuming you can lay a predicate for

20   them, I'll overrule the objections to those three.  What are

21   those numbers?

22          MR. STEIN:  Those three that the Court has just

23   commented on are 202, 203, and 204.

24          THE COURT:  All right.  I don't know if you can -- is

25   there an authenticity problem -- objection to --
```

```
 1              MR. STIEGLITZ:  Well, two of them are e-mails, Your
 2      Honor.  So I think let's take them one at a time.
 3              202, there's no objection to, Your Honor.
 4              THE COURT:  All right.  Admitted without objection.
 5              MR. STIEGLITZ:  204, there's not an objection to,
 6      Your Honor.
 7              THE COURT:  All right.
 8              MR. STIEGLITZ:  And as to 203, again, I --
 9              MR. STEIN:  Your Honor, I wouldn't even want to
10      admit -- it's not signed, so I would like to lay a foundation,
11      because if it's not the document --
12              THE COURT:  All right.  So we'll reserve on 203.  204
13      and 202 will be admitted without objection.
14          (Defendant's Exhibit No. 202 and 204 entered into
15      evidence.)
16              THE COURT:  Let's bring the jurors back in.
17              Sir, you're still under oath.  Thank you.
18          (The jury enters the courtroom, after which the following
19      proceedings were had:)
20              THE COURT:  Please be seated, everyone.
21              Welcome back, ladies and gentlemen.  I'm sorry for
22      the extended break.  We had some matters to deal with that I
23      had to excuse you for, so I apologize for the extended delay.
24              Mr.~Stein, you may cross-examine.
25              MR. STEIN:  Thank you, Your Honor.
```

```
 1                      Cross-examination

 2   BY MR. STEIN:

 3   Q    Good afternoon.

 4          Mr. Pickard, you and I have never met before; is that

 5   correct?

 6   A    That is correct.

 7   Q    Would you please direct your attention to what's been

 8   marked as Government exhibit 343.  The e-mail that you were

 9   reading from, the one at the bottom of page 1 that starts from

10   Mitchell Stein and is to -- if you go to the page 2, to you,

11   Rowland Perkins, Willie Gault and Robert Collinic (phonetic).

12          Rowland Perkins was the CEO of the company at this

13   time; isn't that correct?

14   A    That is correct.

15   Q    Willie Gault was the co-CEO of the company at this time,

16   isn't that correct?

17   A    That is correct.

18   Q    You had many conversations with Mr. Gault regarding the

19   issues discussed in this e-mail; isn't that correct?

20   A    Define many.

21   Q    You had conversations with him?

22   A    Yes.

23   Q    He, too, was upset about something regarding this stock

24   and Mr. Green, is that your general recollection?

25   A    Yes, he was.
```

```
 1    Q    And Mr. Collinic was some sort of financier for the
 2    company during this period, was he not?
 3    A    Yes, he was.
 4    Q    He had advanced money to the company; is that right?
 5    A    Yes, he had loaned money to the company.
 6    Q    And was it your understanding at the time that you got
 7    this e-mail that Mr. Perkins, Mr. Gault, and Mr. Collinic knew
 8    about this dispute that was occurring between Pickard & Green
 9    on the one hand and Signalife on the other hand; is that
10    correct?
11    A    I don't know what Mr. Collinic knew.
12    Q    You knew he was working closely with Mr. Gault at the
13    time, didn't you?
14    A    I did not.
15    Q    You just knew he was a financier?
16    A    Correct.
17    Q    Did you ever talk to Mr. Colonic?
18    A    Yes, he called me a few times.
19    Q    Did he ever call you regarding the contents of Government
20    exhibit 343?
21    A    No, he did not.
22    Q    In response to -- you realized when you got this that I
23    was acting in a legal capacity, that's why I copied the
24    principals of the company, Mr. Perkins and Mr. Gault?  You had
25    that general understanding, right?
```

```
1    A   I'm not sure I understand your question.

2    Q   I was acting as a lawyer.

3    A   Yes.

4    Q   Then going back to the first page of that exhibit, your

5    e-mail sent back to me the next day at 9:00 in the morning,

6    can you read that short e-mail that starts with "Rowland"?

7    A   "Rowland, I do understand the purpose of Mitch's e-mail.

8    John, on behalf of the company, had discussed with me the

9    exchange of 28,859 shares for the amount owed my firm for past

10   services.  This agreement was documented in a letter that I

11   signed on February 19th, 2009.  By the end of the week, all

12   the shares will be in Byron Green's WEG brokerage account, and

13   I have authorized Mark Nevdahl to do the exchange by my

14   signature on the letter.

15        "I am still waiting to go forward with this

16   transaction.  Please let me know if the company wants to

17   proceed with this transaction."

18   Q   The shares that you're talking about were in the account

19   of your partner, Byron Green; is that right?

20   A   That is correct.

21   Q   Byron green had never, to your knowledge, sent an e-mail

22   to Rowland Perkins regarding Signalife and the work your firm

23   was doing; is that correct?

24   A   Not to my knowledge.

25   Q   He had never sent an e-mail to Willie Gault; is that
```

1    correct?

2    A    Not to my knowledge.

3    Q    You were for years doing the accounting work with your

4    staff under you, but Byron Green was not involved; is that

5    correct?

6    A    No, he was not.

7    Q    And then finishing off with Government's 343, Rowland

8    Perkins wrote you back and said:  "I assume the company does.

9    I'm trying to reach Mitch to get a final response.  I will be

10   in touch with you as soon as I can confirm this fact.

11   Rowland."

12           Did you ever have any problems or arguments with

13   Rowland besides this letter, if you consider it an argument;

14   did you ever have any other arguments?

15   A    No, I did not.

16   Q    Did you find Rowland to be competent?

17   A    Yes, I didn't work with him that much, but my interactions

18   with him were very pleasant.

19   Q    And you didn't interact with him that much because you

20   resigned at a certain point.  But during your interactions

21   with him, you found him to be competent and fair and in

22   control?

23   A    Yes, he was a very fair person to me.

24   Q    Other than this e-mail, do you recall any other arguments,

25   even little ones, that you and I ever had about anything from

1   the beginning of time of you working with the company through

2   your resignation?

3   A   There was -- I mean, prior to the e-mail, there was, you

4   know, a phone conversation regarding the sale of these shares.

5   Q   I'm excluding the sale of the shares.  I apologize.

6   A   Okay.

7   Q   Other than that, did we ever have any arguments?

8   A   No, we did not.

9   Q   And this argument was resolved satisfactorily by contract,

10  by written agreement, and you tendering some shares back and

11  some money back with you not admitting any liability

12  whatsoever, is that accurate?

13  A   Well, we negotiated a contract with -- our firm negotiated

14  a contract with the company, but it was never finalized.

15  Q   Were the -- were the oral terms that were in that

16  contract, in other words, the writing, if you were to read it

17  out loud, were those terms complied with?

18  A   Well, no, they were not.  I mean, the agreement or the

19  intent of the agreement was we had -- our firm was in

20  possession of these shares, and we were going to exchange our

21  shares for the money that was owed us for our fees, and that

22  exchange never took place.

23  Q   Did you ever hire a lawyer regarding that problem of

24  replacing your shares?

25  A   We talked to our counsel about the matter.

```
 1    Q    I'm not asking for any communications with your counsel.

 2         Did you ever file suit against the company for breach

 3    of that oral or written agreement?

 4    A    No, I did not.

 5    Q    Did you ever have another discussion with Mr. Perkins

 6    regarding any failure to perform regarding Government's

 7    exhibit 343 and the aftermath of it?

 8    A    I did not.

 9    Q    Ever have a discussion with Mr. Gault regarding that?

10    A    No, I did not.

11    Q    Ever have a discussion with me regarding it?

12    A    No, I did not.

13    Q    Thank you.

14         I'm now going to turn my attention -- and you still

15    have this in front of you, I hope -- to Government's

16    exhibit 123.  If you could turn to the second page of that,

17    it's on your screen and also on the big screen.  It's titled

18    "Production Delays and Production Costs."

19         Who drafted that section, which goes on for about a

20    page, about production delays and production costs?  Who

21    drafted that section as between you and Dr.~Harmison or

22    anybody else that was involved, to Elliott Davis, the outside

23    accountants?  Who drafted that?

24    A    I believe John Woodbury drafted most of the document.  And

25    then Dr.~Harmison and I reviewed it and added to it what we
```

1    thought was appropriate.

2    Q    How -- how long of a period of time did it take for you

3    and Dr.~Harmison to edit Mr. Woodbury's work and get a

4    document that you were satisfied with?

5    A    Probably within a few days.

6    Q    Let's go through the production delays on these shipments.

7         The first sentence says:  "Production delays in

8    manufacturing the Fidelity 100 heart monitors have resulted in

9    delays in filling the pending purchase orders."

10        Did Dr.~Harmison confirm that to you?

11   A    Yes, he did.

12   Q    Next sentence says:  "There were two reasons for the

13   manufacturing delays.  First, on or about October 2007, Dell

14   suddenly, without notice, discontinued the laptop that

15   Signalife was to use for the Fidelity 100 monitoring systems,

16   including running our proprietary signal processing operating

17   system."

18        Did Dr.~Harmison confirm to you that that had, in

19   fact, happened?

20        MR. STIEGLITZ:  Objection, hearsay.

21        THE COURT:  Sustained.

22   BY MR. STEIN:

23   Q    Did you go through any mechanisms to determine that the

24   entirety of the production delays that's laid out were true

25   besides talking to Dr.~Harmison?

```
 1   A    No, I did not.

 2   Q    For example, the head of the IT department, Dr. Drakulic,

 3   you're familiar with that name?

 4   A    Yes, I am.

 5   Q    The alleged inventor of the Fidelity 100.  Familiar with

 6   that?

 7   A    I'm familiar with who Dr. Drakulic is.

 8   Q    And you're familiar with the fact that he is the alleged

 9   inventor of the product?

10   A    That's what I've been told, but I don't know that for

11   sure.

12   Q    Did you get any of the information on this page from

13   Dr. Drakulic either directly or indirectly to your knowledge?

14   A    No.

15   Q    The second paragraph that says that:  "At approximately

16   the same time, the Athletes for Life Foundation had the

17   opportunity to be at the Super Bowl for several days to

18   perform heart tests using the Fidelity 100."

19        Were you personally familiar with who Athletes for

20   Life was?

21   A    I was told by Dr.~Harmison who they were.

22        MR. STIEGLITZ:  Objection to the hearsay.

23        THE COURT:  He just said -- he didn't say what he was

24   told, so overruled at this point.

25   BY MR. STEIN:
```

```
 1    Q    Did you ever speak with Mr. Gault regarding who Athletes

 2    for Life was and what they were doing?

 3    A    No, I did not.

 4    Q    Did you ever learn from any source, including the

 5    Internet, what Athletes for Life was doing at the Super Bowl

 6    at or after this time?

 7    A    What I know about Athletes for Life other than from

 8    Dr. Harmison?

 9    Q    And at the time of sending this, you had -- and you worked

10    with Mr. Woodbury, as well.  You had no reason to doubt

11    anything that was in this production delays paragraph; is that

12    right?

13    A    No, I did not.

14    Q    Now, if we could turn our attention to page 3 of

15    Government's exhibit 123, talks about prepaid sales

16    commissions.  And you are accounting in that paragraph for

17    common shares issued and other things.

18         Do you recall working on that yourself and doing

19    those calculations?

20    A    Yes, I do.

21    Q    And you recall that the Silve Group and Signalife had a

22    contract, right?

23    A    Correct.

24    Q    And you recall that that contract was entered into in

25    2005; is that right?
```

```
 1   A    I don't recall the date it was entered into.

 2   Q    Have you ever seen the contract before?  Did you read the

 3   contract before calculating the prepaid commissions?

 4   A    Yes, I did.

 5            MR. STEIN:  May I approach, Your Honor?

 6            THE COURT:  Yes.

 7            MR. STEIN:  It's been marked into evidence as

 8   Defendant's exhibit 83.

 9   BY MR. STEIN:

10   Q    Just take a moment and familiarize yourself with that to

11   determine whether that's the contract you were working off of.

12   A    Yes, I believe this was the contract that I received.

13   Q    So the contract you were working off was signed by Pam

14   Bunes, is that your recollection?

15   A    Yes, it is.

16   Q    Thank you.

17            From an accounting standpoint, as of the date that

18   you sent exhibit 123, which is in evidence, Government 123,

19   was it your professional judgment that Signalife was in

20   compliance with the contract with the Silve Group?

21            MR. STIEGLITZ:  Objection, calls for a legal

22   conclusion.

23            THE COURT:  Overruled.

24            THE WITNESS:  Can you repeat the question?

25   BY MR. STEIN:
```

```
 1    Q    I just want to know from an accounting standpoint, was it
 2    your -- reviewing all the invoices and the contract and
 3    everything, was it your impression that Signalife was in
 4    compliance with the Silve Group contract that you've just
 5    looked at?
 6    A    You know, I can't speak from a legal standpoint.  All I
 7    did was, you know, was account for the shares that had been
 8    advanced to them, and I believe that we accounted for those
 9    advances properly.
10    Q    Thank you.
11         If you go down to page 3 of Government's exhibit 123,
12    the fourth full paragraph on the page that was blown up, I'd
13    like to zoom in on that.  Page 3, fourth full paragraph.
14    Starts off "the Silve Group."  If you can blow that up.
15         It says:  "The Silve Group agreement acted as a sales
16    agent and was managed by Signalife's former CEO, Pam Bunes."
17         Do you remember writing that or participating in
18    writing that?
19    A    I believe John Woodbury wrote it, but I remember reviewing
20    that.
21    Q    And then it says:  "Dr.~Harmison's currently reviewing
22    Signalife's relationship with the Silve Group and will make a
23    decision about the relationship going forward."
24         Does that comport with your recollection?
25    A    Yes, it does.
```

```
 1   Q   Did Dr.~Harmison ever contact you to tell you that he had

 2   made any decision -- don't tell me what the decision is.  I

 3   just want to know if he contacted you -- regarding making any

 4   decision about the Silve Group contract going forward?

 5           MR. STIEGLITZ:  I'd object, Your Honor.  I mean, he

 6   is asking for what Dr.~Harmison told him.  So I'd object on

 7   hearsay grounds.

 8           THE COURT:  He just asked if he contacted him, so

 9   overruled.  He can ask him if he contacted him.

10           THE WITNESS:  He did not contact me.

11   BY MR. STEIN:

12   Q   The next sentence is:  "In the meantime, Signalife and the

13   Silve Group have agreed that the Silve Group will and has

14   provided Dr.~Harmison with its contact list, and Dr.~Harmison,

15   with the assistance of board members and others, has used the

16   contact list for certain sales calls and is designing a sales

17   plan around the contact list."

18           That sentence, whoever it was drafted upon, you made

19   that your own by the time this letter went out; is that

20   correct?

21   A   Yes, that is correct.

22   Q   Did Dr.~Harmison ever contact you regarding any of the

23   matters or issues discussed in the paragraph that I've just

24   read?  And that is, again, page 3, the fourth full paragraph.

25   A   No, he did not.
```

```
 1   Q   If you continue to look at Government's exhibit 123, and

 2   you go down there to -- it's a very large document, so bear

 3   with me, please.  Go to exhibit 9 of that agreement.

 4   A   Can you give me the number at the bottom?

 5   Q   I don't know if we're looking at the same.  Do you have E

 6   on the bottom?

 7   A   Yes, I do.

 8   Q   E006696.  But it's exhibit 9, and the Government and I

 9   think it came out differently.

10   A   I've got mine starting with E148, so . . .

11   Q   But in any event, it's exhibit 9.

12           The contract with Innet that is already in evidence

13   in this case, Mr. Pickard, do you recall evaluating, as an

14   accountant, how sales to the Innet group might be accounted

15   for in the financial statements and having discussions with

16   Elliott Davis regarding that?

17   A   I vaguely remember.

18   Q   It was a contract that you reviewed in the ordinary course

19   of your business; is that correct?

20   A   Yes, it was.

21   Q   During your tenure after Dr.~Harmison became the CEO, the

22   company entered into a $100 million line of credit with YA

23   Global.  Do you recall that?

24   A   Yes, I do.

25   Q   Do you recall money being advanced under that line of
```

```
 1   credit?

 2   A   I do.

 3   Q   Do you recall assisting Dr.~Harmison and Mr. Woodbury in

 4   arranging for money to be advanced under that credit line?

 5   A   I wouldn't regard my actions as assisting.  I was provided

 6   documents that~-- the legal documents that were prepared when

 7   we got the advances.

 8   Q   And that hundred million dollar line of credit was subject

 9   to an SB2 securities filing approved by the Securities and

10   Exchange Commission.  You're familiar with that, aren't you?

11   A   Yes, I am.

12   Q   And that securities filing, just from recollection, is as

13   long and comprehensive as a 10-K, isn't it?

14   A   Yes, it is.

15   Q   It sort of serves a similar purpose as a 10-K in terms of

16   disclosure, doesn't it?

17   A   Yeah, the disclosures in both documents would be fairly

18   similar.

19   Q   Do you know whether I had any relationship with YA Global,

20   as you sit here today?

21   A   I have no knowledge of that.

22   Q   Do you know of any of the conversations I had with

23   Dr.~Harmison regarding the Innet agreement you've seen on the

24   screen?

25   A   I don't have any knowledge of any conversations.
```

```
 1   Q    You don't have any knowledge of any conversations I had

 2   with Dr.~Harmison regarding any of these contracts; is that

 3   true?

 4   A    Yes.

 5   Q    And other than the one turf battle that happened regarding

 6   the shares, which is the subject of the Government exhibit,

 7   you're not aware of any of the conversations I had or

 8   instructions I was given by Rowland Perkins during the time he

 9   was CEO; is that right?

10   A    No.

11        THE COURT:  No, it's not right, or no, you didn't

12   have any -- you're not aware of the conversations?

13        THE WITNESS:  No, I'm not aware of the conversations.

14   BY MR. STEIN:

15   Q    We have introduced into evidence exhibit 25.  I'm going to

16   show it to you.  It's defense exhibit 25.

17        I see why the jury can't see it; I can't see it.

18        Mr. Pickard, you sent this e-mail to the outside

19   auditors, as you previously talked about; isn't that right?

20   A    Yes.

21   Q    This is sort of emblematic of what we talked about, that

22   you vaguely remember looking at how to book the revenues or

23   how to treat the contract for accounts purposes?

24   A    Yes.

25   Q    Thank you.
```

```
 1                Show you what's been marked and admitted as
 2    exhibit 209.  Have you seen this document before?
 3    A    Yes, I have.
 4    Q    Who is Ryan?
 5    A    I believe he was a market maker for the company.
 6    Q    And was this a routine e-mail you would send to the CEO of
 7    the company regarding cash flow if you felt there was a
 8    problem or a reason?
 9    A    If there was a problem, I would alert Dr.~Harmison.
10    Q    Did you ever have any problems with Dr.~Harmison, his
11    responsiveness to your e-mails?
12    A    No, he was always very responsive.
13    Q    Thank you.
14                I'm going to show you what's already in evidence as
15    exhibit 194.  We've already gone through this today, but not
16    with you.
17                Do you recall this e-mail?
18    A    Yes, I do.
19    Q    And do you recall having any discussions with Dr.~Harmison
20    about this e-mail?
21    A    You know, it's been so long ago, I don't recall any
22    specific discussions on this particular e-mail.
23    Q    I understand.  But you do recall the e-mail saying --
24    Dr.~Harmison saying, "What is absolutely critical over the
25    rest of February and March, not one penny goes out without my
```

1    approval, Dr. H."

2            Do you recall that?

3    A   Yes, I do.

4    Q   Do you recall that Dr.~Harmison could be very dictatorial

5    and have a strong personality when he wanted his orders

6    followed, do you recall that?

7    A   Yes, I do.

8    Q   Thank you.

9            Did -- Mr. Pickard, did I play any role whatsoever at

10   the company during your tenure in drafting SEC filings?

11   A   Not that I'm aware.

12   Q   Did I play any role during your tenure in the company in

13   drafting any regulatory filings, any FDA certifications,

14   anything like that, to your knowledge?

15   A   Not to my knowledge, but we -- but we had very little

16   interaction, so I wouldn't -- wouldn't know.

17   Q   A part of your assumption and conclusion regarding my

18   non-role in these matters was from discussions you had with

19   Dr.~Harmison; isn't that right?

20   A   I don't recall having such discussions with him.

21   Q   How about investor relations firms?  Do you have any

22   knowledge that I worked with any media consultants or

23   advertising consultants?

24   A   I have no knowledge of that.

25   Q   And you learned nothing about any interactions I had with

```
 1   any investment firm during your tenure with the company, is

 2   that your testimony?

 3   A   Yeah, I have no knowledge of what you did or didn't do.

 4   Q   Now, you worked with Mr. Woodbury with other companies,

 5   other public companies; isn't that right?

 6   A   That's correct.

 7   Q   So you talked to him more than just on this little

 8   company, Signalife, right?

 9   A   Yes.

10   Q   And during all those discussions, Mr. Woodbury never told

11   you that I played a role in the public filings; is that

12   correct?

13   A   I believe we had discussions where he would circulate the

14   public filings to every -- to management, including you, and

15   we would get comments back from yourself and various members

16   of the management team.

17   Q   Mr. Pickard, do you recall a deposition before the SEC

18   that was taken on December 2nd, 2009 of you?

19   A   Yes, I do.

20   Q   On page 60 of that deposition, the SEC asked you:

21            "Going back to the role Mr.~Stein played at the

22   company, did he have any role in drafting SEC filings?"

23            And you said:  "To my knowledge, no.  At least the

24   ones I worked on, the 10-Ks and the 10-Qs, he did not."

25            Do you wish to change that testimony today?
```

```
 1   A    No, I do not.

 2   Q    The next line says:  "Did he have any role in drafting of

 3   regulatory filings, that kind of stuff?"

 4             And you said:  "That, I have no knowledge of."

 5             Do you want to change that testimony today?

 6   A    No, I do not.

 7   Q    The entire time of your engagement, Mr. Pickard, Elliot

 8   Davis was the outside auditors for Signalife; is that correct?

 9   A    That is correct.

10   Q    Elliott Davis, I guess, of South Carolina?

11   A    Their Greenville, South Carolina, office was the one

12   responsible for the audit.

13   Q    They have more than one office?

14   A    I believe they do.

15   Q    How large are they, if you recall?  Are they small, mid or

16   large accounting firm?

17   A    They are a regional accounting firm.

18   Q    So less than 50 accountants?

19   A    I assume it's more than that.

20   Q    Okay.  The two people you interacted with there were Mike

21   Boliek and Keith Hendrix; is that right?

22   A    That is right.

23   Q    And you worked with them on the filings and any other

24   regulatory issues; is that right?

25   A    Yes, I did.
```

```
 1    Q    And you were the main liaison between Signalife and

 2    Elliott Davis; isn't that right?

 3    A    Yes, it is.

 4    Q    It wasn't John Woodbury; it was you, right?

 5    A    Yeah, I was the main contact for Elliott Davis.

 6    Q    I'm going to show you what's been marked as

 7    Defendant's 202, and it's in evidence.

 8         Have you seen this before, Mr. Pickard?

 9    A    Yes, I have.

10    Q    What matter was Dr.~Harmison asking you to call him about?

11    A    The SOX 404 work that was being performed for the company.

12    Q    Who was performing that work for the company?

13    A    Our firm did, with the assistance of an outside

14    consultant.

15    Q    Who was the outside consultant on SOX 404 work?

16    A    I don't recall his name.

17    Q    Was it Assurance Partners, LLP?

18    A    That sounds familiar, yes.

19    Q    Can you provide to the ladies and gentlemen of the jury

20    and the Court a brief description of the importance of SOX 404

21    compliance work in your auditing?

22    A    Well, the -- all publically held companies are required to

23    go through what's called SOX 404.  It's basically a

24    documentation of the company's internal controls, and then

25    those internal controls are documented and then they're
```

1    tested.

2    Q    And those internal controls grew out of the -- sort of the

3    Enron scandal of the dot com bust, is that your recollection?

4    A    Correct.  It's part of the Sarbanes-Oxley legislation.

5    Q    The term "controls" means many people checking on one

6    item.  It means redundancy.  You don't just have one person

7    check, you have three check.  That's what controls means,

8    isn't it?

9    A    That's very simplified, but it means the company's got

10   proper controls over its procedures.

11   Q    So if a company didn't have an audit committee, it

12   wouldn't have proper controls and would be violative of the

13   Sarbanes-Oxley Act.  Would you say that's accurate?

14   A    Well, having an audit committee is a requirement of SOX

15   404.

16   Q    And then having that audit committee meet and report to

17   the board is another requirement; is that right?

18   A    That is correct.

19   Q    And then having the board meet and evaluate what the audit

20   committee did is another requirement; is that correct?

21   A    Yes.

22   Q    And so these are tests and redundancies, which are called

23   controls under Sarbanes-Oxley, if we were to look at the law;

24   is that correct?

25   A    Yes, that is correct.

```
 1    Q    At the time that you were at the company, Signalife, did

 2    Signalife, in your view, have proper controls in compliance

 3    with the Sarbanes-Oxley legislation?

 4    A    Yes, they did.

 5              MR. STEIN:  Can I approach?

 6    BY MR. STEIN:

 7    Q    I'm going to show you what's marked as 204.

 8              Mr. Pickard, do you recall this document?

 9    A    Yes, I do.

10    Q    If you look down below Dr.~Harmison's e-mail, you see

11    jrosas@AssurancePartnersllp.com, was that the firm that you

12    recommended to be hired to perform the Sarbanes-Oxley work?

13    A    I don't recall how we got their name.  I don't recall

14    recommending them, but it's been so long I don't remember.

15    Q    Do you recall the company engaging that firm to do the

16    Sarbanes-Oxley compliance work?

17    A    They were -- yes, they were engaged to assist us in doing

18    that.

19    Q    Did you find their work competent?

20    A    Yes, I did.

21    Q    Did you work carefully with them on the controls

22    throughout the company, as required under Sarbanes-Oxley?

23    A    Yes.

24    Q    I'm going to show you what's been marked as exhibit 203.

25              MR. STEIN:  Do not put it on the screen.
```

```
 1   BY MR. STEIN:

 2   Q   Mr. Pickard, this is the only document I have from

 3   Assurance Partners, and I want to know if you've ever seen

 4   this before and in any iteration.

 5   A   Yes, I have.

 6   Q   Is that exhibit the Sarbanes-Oxley contract that Signalife

 7   entered into with Assurance?

 8   A   Yes, it is.

 9           MR. STEIN:  I move its introduction.

10           MR. STIEGLITZ:  No objection, Your Honor.

11           THE COURT:  Admitted without objection.

12       (Defendant's Exhibit No. 203 entered into evidence.)

13   BY MR. STEIN:

14   Q   So let me get this straight, because we're deeply into

15   securities filings and accountancy.

16           Sarbanes-Oxley compliance consult is so important to

17   filing securities filings that there are times when a 25-year

18   accountant like yourself has to go outside and hire a firm in

19   order to assist.  There's so much work that has to be done.

20   Would you say that's accurate?

21   A   I wouldn't -- doing the SOX 404 work is a specialty, and

22   our firm did not have that~-- the background to be able to,

23   you know, complete it start to finish, so we needed some

24   assistance from, you know, an outside expert who was familiar

25   with all the requirements.
```

```
 1   Q    I apologize.  Thanks for educating on this area.

 2            So you being the CFO, would know when you don't have

 3   the expertise on a particular area, you go out and you make

 4   sure that the expertise is provided for the company, is that

 5   basically accurate?

 6   A    Yes.

 7   Q    And Assurance provided this expertise?

 8   A    Yes, they did.

 9   Q    They complied with this contract that's on the screen?

10   A    Yes, they did.

11   Q    Going back, and there's no need to put it on the screen,

12   it was exhibit 204, the jury will see it at the end.  Why was

13   Dr.~Harmison not pleased with one of the letters?  Was this

14   preliminary to this contract, or do you remember?

15            MR. STIEGLITZ:  Objection as to Dr.~Harmison's state

16   of mind.

17            THE COURT:  Sustained.

18   BY MR. STEIN:

19   Q    I'm going to show you exhibit 204 again.  I apologize.

20            Were there preliminary drafts for this engagement

21   letter for Sarbanes-Oxley prior to this being signed that

22   Dr.~Harmison saw, to your knowledge?

23   A    I believe what gave rise to Dr.~Harmison's e-mail was, I

24   think we were going to go outside and have them do all of the

25   work, and the fee they proposed was extremely high, and I
```

```
 1   think that's what prompted Dr.~Harmison's e-mail address, or

 2   his e-mail.  And I think what happened is we hired this

 3   outside firm to oversee the Sarbanes-Oxley work, and we used

 4   the staff in our firm to do all the -- you know, the legwork

 5   to be overseen by Assurance Partners.

 6   Q   Approximately seven people in your firm used?

 7   A   There were probably two to three people in our firm that

 8   were involved with it.

 9   Q   This expense for small companies using Sarbanes-Oxley has

10   been the subject in the accounting field of great controversy,

11   whether small companies should comply with Sarbanes-Oxley

12   because it's so expensive.  Are you aware of that in general?

13           MR. STIEGLITZ:  Your Honor, objection.  Scope,

14   relevance.

15           THE COURT:  Rephrase the question.  I'll allow the --

16           MR. STEIN:  I only have two questions in this area.

17           THE COURT:  Rephrase the question without a

18   statement.

19   BY MR. STEIN:

20   Q   The expense of Sarbanes-Oxley has been the subject of

21   great debate among commentators for small companies.  Are you

22   aware of that?

23   A   Yes, I am.

24   Q   And there have been recommendations that small companies

25   be relieved of some of the Sarbanes-Oxley compliance rules.
```

```
 1    Are you aware of that?

 2    A   Yes, I am.

 3    Q   But in this case, Signalife did not skirt any of the

 4    Sarbanes-Oxley rules; is that correct?

 5    A   No, they complied with Sarbanes-Oxley.

 6    Q   Completely, just like IBM would?

 7    A   Yes.

 8    Q   Mr. Pickard, I'm hopefully almost through.  Famous last

 9    words.  Let's talk about, since you were the CFO, the bank

10    accounts of the company.

11         You knew where the company had bank accounts while

12    you were the CFO; is that right?

13    A   Yes.

14    Q   Were there any bank accounts of Signalife that I was

15    authorized to sign a check on, to your knowledge, during your

16    tenure?

17    A   No, there were not.

18    Q   None?

19    A   No.

20    Q   Were there any checks that required two signatures?

21    A   I don't believe so.

22    Q   Do you recall at any time any of the CEOs signing checks

23    directly?

24    A   No, I do not.

25         Let me back up.  I think Pam Bunes may have signed
```

```
 1    some checks.  That was before I was a signer on the accounts.

 2    Q    And after you began working, then it was okay for you to

 3    sign checks?

 4    A    I did not become a signer on the account until about a

 5    year after I had been engaged.

 6    Q    After that, then it was fine?

 7    A    Then I became a signer with Dr.~Harmison.

 8    Q    You indicated earlier that you're not aware of any

 9    discussions I had with any of the CEOs.  You recall that

10    testimony?

11    A    Yes.

12    Q    So if the CEOs reported things to me regarding any of the

13    purchase orders and I then called you with the CEO, I may not

14    have known that purchaser?

15              MR. STIEGLITZ:  Objection to the speculation.

16              THE COURT:  Sustained.

17              MR. STIEGLITZ:  Object to the form of the question.

18    BY MR. STEIN:

19    Q    You don't know for certain whether I lied to you or not

20    when I called you with Dr.~Harmison on the telephone, do you?

21    A    I mean, I have -- I don't know what you knew.

22    Q    So it's fair to say that "lie" may be a strong word,

23    because you don't know what I knew?

24    A    I guess I could only make assumptions based on, you know,

25    what was happening at the time.
```

```
 1   Q    Could "lie" have been too strong of a word regarding the

 2   one conversation I had with you with Dr.~Harmison regarding a

 3   purchase order, in retrospect?

 4   A    At the time, you appeared to be very familiar with what we

 5   were doing, and, you know, the reason for the confirmations.

 6   Q    I could have got that knowledge from Dr.~Harmison.

 7              MR. STIEGLITZ:  Objection, speculation.

 8              THE COURT:  Sustained.

 9   BY MR. STEIN:

10   Q    Did you presume I had gotten knowledge from Dr.~Harmison

11   with regard to purchase orders?

12   A    Yes, I did.

13              MR. STEIN:  Your witness.

14              THE COURT:  Thank you.

15              Any redirect?

16              MR. STIEGLITZ:  There will be, Your Honor.  I don't

17   know if you want to -- I'm happy to proceed.  I think it would

18   be brief.

19              THE COURT:  Well, let's finish up this witness, and

20   then we'll talk about a break.

21                         Redirect Examination

22   BY MR. STIEGLITZ:

23   Q    Mr. Pickard, just a few questions.

24              I want to get back to -- and I think you still have

25   it up there -- Government's exhibit 343 Mr.~Stein asked you
```

```
 1    some questions about.  Do you remember that?
 2    A   Yes, I do.
 3    Q   If you look -- he asked you some questions in particular
 4    about the -- his e-mail to you there at the -- on the fourth
 5    page of the -- oh, that's right, I'm sorry, we don't have it.
 6    The jury does have it in printed form.  The fourth page there
 7    at the bottom where he's e-mailing you, the one at the end
 8    with the picture of the doberman.
 9    A   Yes.
10    Q   You see that?
11    A   Uh-huh.
12    Q   Now, I want to ask you, Mr. Pickard, Mr. Stein says in
13    there in his second sentence:  "By this confirmation, the
14    attached is the final, final agreement."
15         Do you remember him going back and forth with you
16    about "this is the final agreement" versus some other version
17    of the agreement?
18    A   Yes, I do.
19    Q   And why don't you tell the jury a little bit about what
20    was going on in terms of this exchange of agreements and why
21    this was taking some amount of time.
22    A   There was some discussion over some language, I think it
23    was in the first or second page of the agreement regarding our
24    fees, whether they were for payment for past services or a
25    retainer for future services.
```

```
 1    Q    Basically that issue that then gets discussed further up

 2    in that e-mail?

 3    A    Yes, regarding the stock.

 4    Q    And did Mr.~Stein send you versions of an agreement?

 5    A    The agreement was negotiated between myself and John

 6    Woodbury, and we came up to, you know, language that, you

 7    know, would work for both sides.  I signed the agreement and

 8    sent it back to John, who was going to have Rowland Perkins

 9    execute it on behalf of the Government.

10    Q    Did you then get a different version of the document back?

11    A    Then I believe this e-mail Mitch attached a copy of the

12    agreement with my signature on it, but the language that was

13    in dispute had been changed.

14    Q    So he took your document, made some changes to it, stuck

15    your signature on it, and then sent it back and said, no, no,

16    no, this is actually the document; is that right?

17    A    That's correct.  That's correct.

18    Q    Mr. Pickard, Mr. Stein asked you several questions about

19    Sarbanes-Oxley or SOX 404.  Do you remember those questions?

20    A    Yes, I do.

21    Q    And Mr. Pickard, since Mr.~Stein brought it up, is lying

22    to auditors a problem under SOX 404?

23    A    Yes, it is.

24    Q    Causing other people to lie to auditors, is that a problem

25    under SOX 404?
```

```
1    A   Yes, it is.

2    Q   What about causing false filings to the SEC?  Is that a

3    problem under SOX 404?

4    A   Yes, it is.

5    Q   And all those questions Mr. Stein asked you about

6    complying with SOX 404 and whether you thought Signalife had

7    complied with SOX 404, you thought that because you thought

8    that the information that was in those filings was true,

9    right?

10   A   Yes, I did.

11   Q   And your source for that information by and large, that

12   was John Woodbury, right?

13   A   Yes, most of the agreements I got from him.

14   Q   In particular, those three purchase orders that we've seen

15   now many, many times over the past two days, right?

16   A   Yes.

17   Q   Finally, Mr. Pickard, Mr. Stein asked you -- I believe he

18   showed you an exhibit.  And I apologize, I don't have the

19   number in front of me.  But he showed you an exhibit about

20   asking -- where Dr.~Harmison was asking you to alert him if

21   the money -- not a penny goes out the door without him knowing

22   about it, right?

23   A   Yes.

24   Q   And he asked you about Dr.~Harmison being concerned about

25   what the cash position in the company was, right?  Do you
```

1    remember those questions?

2    A   Yes, I do.

3    Q   Now, you discussed a little bit, both on direct and cross,

4    the company's cash position, and just describe again for the

5    jury, what was the company's cash position, especially as 2008

6    wore along?

7    A   At the beginning of 2008 the cash position was going down,

8    and there was some concern that, you know, we needed more

9    money to keep the company going.

10   Q   And was there just some concern, or was the company -- I

11   mean, was the company essentially running out of money?

12   A   Yes, it was running out of money.

13   Q   Was part of the reason that the company was running out of

14   money large wires to people like M&C Electric?

15   A   Yes, there was some large wires sent to them.

16   Q   Did Mr.~Stein at any point ask you, like Dr.~Harmison did,

17   to let him know how much money the company had before any of

18   these wires, say, to M&C Electric went out?

19   A   No, he did not.

20           MR. STIEGLITZ:  Nothing further, Your Honor.

21           THE COURT:  All right.  Thank you.

22           Anything else, Mr. Stein?

23           MR. STEIN:  (Shakes head.)

24           THE COURT:  Thank you, sir.

25           MR. STIEGLITZ:  And I don't believe Mr. Pickard's

```
 1   under subpoena by Mr. Stein, but may Mr. Pickard be released

 2   permanently?

 3              THE COURT:  Yes.

 4              MR. STEIN:  Yes, he's not under subpoena.

 5              THE COURT:  Thank you, sir.

 6              All right.  Ladies and gentlemen, why don't we take a

 7   very short break, 10 minutes and no more.  Apologize, but so

 8   we can finish up the day.

 9              Please don't discuss the case or form any opinions

10   during the break, and leave everything at your seat.  Thank

11   you.

12        (The jury exits the courtroom.)

13              MR. STIEGLITZ:  Your Honor, we have -- our next three

14   witnesses are exceedingly brief.  I'm probably being naively

15   optimistic.  I genuinely think we can get through two, if not

16   all three of them if the jury's willing to stay 'til,

17   certainly 'til 5:30, but probably even just 5:15.  Obviously,

18   I can't speak to Mr. Stein's cross.  For example, the direct

19   of our next witness will take 15, 20 minutes.

20              THE COURT:  Let's wait and see where we are at

21   5:00 o'clock.  We'll try and get -- if it looks like we can

22   finish with the witness, I'll, you know, ask the jury if they

23   can stay.  If they can't, I'm going to honor their

24   commitments.

25              MR. STIEGLITZ:  Oh, absolutely.
```

```
 1              MR. STEIN:  Perhaps we can talk and maybe even limit
 2    it further.
 3              THE COURT:  All right.  We'll see you in 10 minutes.
 4              MR. STIEGLITZ:  Thank you, Your Honor.
 5         (A recess was taken from 4:06 p.m. to 4:13 p.m., after
 6    which the following proceedings were had:)
 7              THE COURT:  All right.  We ready to go?
 8              MR. STIEGLITZ:  Yes, Your Honor.  We can proceed.
 9    Mr. Muhlendorf is a bit tardy from the restroom, but he will
10    be here momentarily and we can proceed anyway.
11              THE COURT:  You ready, Mr. Stein?
12              MR. STEIN:  Yes, Your Honor.
13              THE COURT:  Let's bring the jury in.
14              Is he handling the next witness?
15              MR. STIEGLITZ:  No, he's not.  That's why I said we
16    can proceed.
17              THE COURT:  All right.  Why don't you come up here,
18    sir.
19         (The jury enters the courtroom, after which the following
20    proceedings were had:)
21              THE COURT:  Welcome back, everyone.  Please be
22    seated.
23              All right.  Your next witness?
24              MR. STIEGLITZ:  The Government calls Tim Cutter.
25              THE COURT:  Sir, would you raise your right hand,
```

```
 1   please.

 2           Timothy Alan Cutter, Government's witness, sworn.

 3           THE COURT:  Please be seated.

 4           Sir, if you could try and~-- the chair doesn't move,

 5   so you can move that microphone towards you so we can hear

 6   you; and tell us your name and spell your last name for us.

 7           THE WITNESS:  It's Timothy Alan Cutter.  Last name

 8   spelled C-u-t-t-e-r.

 9           THE COURT:  Thank you, sir.

10           You may proceed.

11                        Direct Examination

12   BY MR. STIEGLITZ:

13   Q   Good afternoon, Mr. Cutter.

14           Sir, would you just tell the members of the jury what

15   city and state you live in, please?

16   A   Loveland, Ohio.  It's a suburb of Cincinnati.

17   Q   Sir, if you could just both speak slowly and clearly into

18   that microphone so that we can all make sure to hear you.

19   A   Yes, sir.

20   Q   Sir, what is it that you do for a living?

21   A   I am a landscaper.

22   Q   Residential?  Commercial?  Tell us.

23   A   Both, residential and commercial.

24   Q   Sir, do you work for a company called IT Healthcare?

25   A   I do not.
```

1    Q    Have you ever worked for a company called IT Healthcare?

2    A    I have not.

3    Q    Have you ever worked for any medical device company?

4    A    I have not.

5    Q    Any medical device distribution company?

6    A    I have not.

7    Q    Have you ever worked in the medical device industry in any

8    capacity?

9    A    No, I haven't.

10   Q    Have you ever worked for an individual by the name of Avi

11   Cohen?

12   A    I have not.

13   Q    Have you ever met or spoken to anyone by the name Avi

14   Cohen?

15   A    I have not.

16   Q    How about Yossi Keret?  Have you ever worked for an

17   individual by that name?

18   A    I have not.

19   Q    Have you ever met or spoken to anyone by the name Yossi

20   Keret?

21   A    No, I haven't.

22   Q    Have you ever spoken to anyone from a company called IT

23   Healthcare?

24   A    Not to my knowledge, no.

25   Q    Now, Mr. Cutter, you don't know the Defendant, Mr. Stein,

1    do you?

2    A    No, I don't.

3    Q    And did you ever work for a company called Signalife?

4    A    No, I didn't.

5    Q    Well, what about an individual by the name Martin Carter?

6    Do you know who that is?

7    A    Yes, I do.

8    Q    And can you just tell the members of the jury very

9    generally how you know Mr. Carter?

10    A    Through my girlfriend.  It's my girlfriend's

11    brother-in-law.

12    Q    Can you just describe Mr. Carter very generally to the

13    jury?

14    A    Can you rephrase the question?

15    Q    I'm sorry.  That was a terribly formed question.

16          Can you just describe -- just explain who Mr. Carter

17    is to the jury.

18    A    As far as work's concerned?

19    Q    As far as you know, as far as who he is.

20    A    As far as he's a nice guy, if you ask me.  He's a friend.

21    Q    What does he do for a living?

22    A    Electrician/handyman work.

23    Q    Where does he live?

24    A    To my last recollection, was Boca Raton, Florida.

25    Q    Wealthy guy?  Not a wealthy guy?

```
 1   A   I wouldn't say wealthy.

 2   Q   To your knowledge, does he do anything for or has he ever

 3   done anything for Mitchell Stein?

 4   A   He told me he did.

 5   Q   What did he tell you he did for Mr. Stein?

 6           MR. STEIN:  Objection, hearsay.

 7           THE COURT:  Sustained.

 8           MR. STIEGLITZ:  Your Honor, as a coconspirator

 9   statement.

10           THE COURT:  All right.  I'll overrule the objection.

11           MR. STEIN:  Your Honor, there's no allegation this

12   man is a coconspirator.

13           THE COURT:  Mr. Carter is the coconspirator.

14           Overruled.  You can answer the question.

15           THE WITNESS:  I'm sorry, can you --

16   BY MR. STIEGLITZ:

17   Q   Mr. Cutter, what did Mr. Carter tell you he did for

18   Mr. Stein?

19   A   He had done work around his house, but he also said he was

20   a chauffeur.

21   Q   To your knowledge, Mr. Cutter -- it's going to get

22   confusing, Cutter and Carter.

23           To your knowledge, Mr. Cutter, is Mr. Carter a

24   computer specialist?

25   A   To my knowledge, no.
```

1   Q    Is he an electrical engineer?

2   A    No.

3   Q    Is he a medical device expert?

4   A    No.

5   Q    Did there come a time, Mr. Cutter, when you agreed to

6   accept delivery of some boxes for Mr. --

7   A    Yes, I did.

8   Q    -- for Mr. Carter?

9   A    Yes, I did.

10  Q    And approximately when was that?

11  A    The spring of '08.

12  Q    Now, Mr. Cutter, do you own any kind of a warehouse?

13  A    I wouldn't consider it a warehouse, but I do own a storage

14  facility where I keep my lawn care equipment.

15  Q    Do you store anything else there other than lawn

16  equipment?

17  A    No, I don't.

18  Q    Have you ever used that storage facility as a distribution

19  center for anything?

20  A    No, I haven't.

21  Q    Mr. Cutter, at the time you -- well, at the time you

22  agreed to take delivery of these boxes, were you intending to

23  become a medical device distributor of some kind?

24  A    No, I wasn't.

25  Q    In fact, did you even know that you were receiving medical

```
 1   devices?

 2   A   No, I didn't.

 3   Q   Do you have the knowledge or the skills to distribute

 4   medical devices?

 5   A   No, I don't.

 6   Q   So why did you agree to accept these boxes?

 7   A   As a friendly favor to Marty.

 8   Q   Did he tell you what was in them?

 9   A   To my knowledge, I can't recollect that, no.

10   Q   Did he tell you that he was trying to set up some sort of

11   distribution network for medical devices?

12   A   No, he didn't.

13   Q   All right.  So let's talk about the boxes being delivered.

14           Were they delivered to your house?

15   A   Yes, they were.

16   Q   And approximately when was that?

17   A   In the spring of '08, more probably the middle of the

18   spring, probably.

19   Q   Can you describe approximately how many there were?

20   A   To my recollection, 20 to 25.

21   Q   And can you just sort of describe what they looked like,

22   how heavy they were?  Just paint a picture of them for us.

23   A   Probably between 30, 40 pounds, like you would buy a new

24   computer, a box that size.  Maybe two by two or two by three.

25   Q   And after they were delivered, did you keep them or did
```

1   you send them on someplace else?

2   A    I stored them for Marty.

3   Q    Did you ever open them?

4   A    I did not.

5   Q    When they arrived at your house, did you call Mr. Carter

6   to let him know they were there?

7   A    Yes, I did.

8   Q    What did he say when you called him?

9   A    He asked if I could hold on to them for a little bit, and

10  he --

11  Q    I'm sorry, what happened next?  Did he come get them?

12  A    Eventually, he came to get them, yes.

13  Q    And approximately when was that?

14  A    Towards late spring, early summer of '08.

15  Q    And did he take them somewhere, to your knowledge?

16  A    Yes, he did.

17  Q    Do you know where he took them?

18  A    No, I don't.

19  Q    Did you help him move them someplace?

20  A    No, I did not.

21  Q    To your knowledge, was anyone with Mr. Carter when he came

22  to pick up those boxes from you?

23  A    No one was with Marty.

24  Q    And, again, when Mr. Carter showed up, had you at that

25  time opened any of the boxes?

```
 1    A    I had not.

 2    Q    Were any of the boxes damaged as far as you could tell?

 3    A    Not to my knowledge.

 4    Q    Mr. Cutter, I want to just show you a few documents,

 5    starting with Government's exhibit 70, which is already in

 6    evidence.  It's also in that binder in front of you.  Whatever

 7    you're more comfortable with, either the screen or the binder.

 8            And Mr. Cutter, prior to the Government showing you

 9    that document, had you ever seen it before?

10    A    No, I hadn't.

11    Q    So you didn't fill any of this document out?

12    A    I did not.

13    Q    That signature there by the name Avi Cohen, is that your

14    signature?

15    A    No, it's not.

16    Q    Now, let's look at Government exhibit 74, please.  And

17    we'll just blow out the relevant portion of the document

18    there, and we'll leave it there.

19            Mr. Cutter, prior to being shown this document by the

20    Government, had you ever seen it before?

21    A    No, I hadn't.

22    Q    Did you fill any of this document out?

23    A    I did not.

24    Q    That signature there by the name Avi Cohen, is that your

25    signature?
```

```
 1   A    No, it's not.

 2   Q    Let's look at Government's exhibit 130, which is also

 3   already in evidence.  And we'll look at the second -- second

 4   page, please.

 5            MR. STIEGLITZ:  And if we can blow out that portion

 6   of the letter.

 7   BY MR. STIEGLITZ:

 8   Q    Mr. Cutter, prior to being shown this document by the

 9   Government, had you ever seen it before?

10   A    No, I hadn't.

11   Q    Do you recall ever receiving this letter?

12   A    No, I don't.

13   Q    We'll come back to this page, but let's quickly go to the

14   second page of this letter.  Again, this is Government's

15   exhibit 130.  And we'll look at the signature there at the

16   bottom where it says Yossi Keret.

17            Is that your signature, Mr. Cutter --

18   A    No, it's not.

19   Q    -- for IT Healthcare?

20   A    No, it's not.

21   Q    Let's go back to the first page of this letter in

22   Government's exhibit 130, and we'll look at the address

23   information up there at the top.

24            That number there, via facsimile, do you recognize

25   that number, Mr. Cutter?
```

1    A    Yes, I do.

2    Q    What is it?

3    A    It's my home phone number.

4    Q    Is that the fax number for Yossi Keret, the manager of IT

5    Healthcare?

6    A    Not to my knowledge.

7    Q    Have you ever gone by the name Yossi Keret?

8    A    No, I haven't.

9    Q    Mr. Cutter, can you explain why that number appears on a

10   letter addressed to Yossi Keret at IT Healthcare?

11   A    I cannot.

12   Q    Finally, let's look at Government's exhibit 151, please,

13   which is also already in evidence, and we'll look again at the

14   second page.

15           And Mr. Cutter, I'm going to ask you a question

16   that's probably become familiar to you by now.  Prior to being

17   shown this document by the Government, had you ever seen it

18   before?

19   A    No, I hadn't.

20   Q    Did you create this document?

21   A    No, I didn't.

22   Q    Did you send this document to anybody?

23   A    No, I didn't.

24   Q    That signature by the name Yossi Keret, is that your

25   signature?

```
 1    A    No, it's not.
 2    Q    Mr. Cutter, have you ever told anyone anywhere ever in
 3    your life that you had anything to do with a company called IT
 4    Healthcare?
 5    A    No, I haven't.
 6    Q    To your knowledge, have you ever spoken with anyone at
 7    Signalife?
 8    A    To my knowledge, no.
 9    Q    Have you ever placed an order for Signalife products?
10    A    No, I haven't.
11    Q    Have you ever ordered heart monitors from anybody?
12    A    No, I haven't.
13    Q    Bottom line, Mr. Cutter, why did you agree to accept
14    delivery of those boxes that we talked about earlier?
15    A    Just a friendly gesture towards a friend.
16    Q    And aside from the Government, did you ever speak to
17    anyone other than Mr. Carter about those boxes?
18    A    No, I didn't.
19              MR. STIEGLITZ:  Please answer Mr. Stein's questions.
20              THE COURT:  Cross-examination.
21              MR. STEIN:  Brief.
22                          Cross-examination
23    BY MR. STEIN:
24    Q    Good afternoon, Mr. Cutter.
25    A    Good afternoon.
```

```
1    Q    You and I have never met before; is that correct?

2    A    That's correct.

3    Q    We've never spoke on the telephone before; is that

4    correct?

5    A    Not to my recollection, no.

6    Q    We've never been on the telephone that you can recall

7    where you heard me in the background?  Do you recognize my

8    voice at all?

9    A    No.

10   Q    Do you recognize -- do you e-mail, Mr. Carter?  Do you

11   e-mail each other?

12   A    I'm sorry, do I e-mail Mr. --

13   Q    I'm sorry, do you e-mail, you and Mr. Carter, because

14   you're friendly?

15   A    I think we have in the past, yes.

16   Q    Do you recognize an address, mikofood@aol.com?

17   A    I don't recognize that address, but I know that's

18   probably -- that's his food company, yes.

19   Q    Mr. Carter has a food company?

20   A    Correct, food distribution company.

21   Q    Food distribution.

22         You indicated that Mr. Carter had no special skills

23   in software electronics, do you recall that?

24   A    Yes, not to my knowledge.

25   Q    How long have you known Mr. Carter?
```

```
 1    A    Probably 20-plus years.

 2    Q    Are you aware that Mr. Carter has an expertise in

 3    electronic research and diagnostics?

 4    A    I'm not aware of that.

 5    Q    How about complaint handling and resolution of

 6    electronics?

 7    A    No.

 8    Q    How about customer service management?

 9    A    Not aware.

10    Q    How about customer satisfaction enhancement?

11    A    Not aware of that.

12    Q    How about front end supervision?

13    A    Not aware.

14    Q    Do you even know what front end supervision means?  Have

15    you ever heard that phrase before?

16    A    No, not offhand, I have not.

17    Q    Me neither.

18             How about sales and margin improvement?

19    A    No.

20    Q    How about team building and training?  Does he have that

21    expertise?

22    A    No.

23    Q    How about cost reduction strategies for companies?

24    A    Not to my knowledge, no.

25    Q    How about order fulfillment?
```

1   A    Not to my knowledge.

2   Q    So -- and you've known Mr. Carter for how many years?

3   A    Twenty-plus years.

4   Q    So if Mr. Carter published and circulated a resume to a

5   public company that said that his areas of expertise were each

6   of the ones I just mentioned to you, he would be lying; is

7   that true?

8           MR. STIEGLITZ:  Objection, speculation.

9           THE COURT:  Overruled.

10          You can answer the question.

11          THE WITNESS:  I don't want to call him a liar, but I

12  don't know if that would be true.

13  BY MR. STEIN:

14  Q    From your knowledge, it would not be true; is that

15  correct?

16  A    It would not be true, yes.

17          MR. STEIN:  No further questions.

18          THE COURT:  Thank you.

19          Any redirect?

20          MR. STIEGLITZ:  No, Your Honor.

21          THE COURT:  Thank you, sir.  You're excused.  Watch

22  your step.

23          MR. STIEGLITZ:  Mr. Cutter's excused permanently, I

24  trust?

25          MR. STEIN:  Yes.

```
 1                 THE COURT:  Thank you, sir.

 2                 Next witness.

 3                 MR. MUHLENDORF:  Jennifer McEwin, Your Honor.

 4                 Your Honor, can I approach with a binder?

 5                 THE COURT:  Sure.

 6                 Ma'am, would you raise your right hand for me,

 7    please.

 8                 Jennifer McEwin, Government's witness, sworn.

 9                 THE COURT:  Please be seated.

10                 If you can try and lean in forward and speak into

11    that microphone and tell us your name and spell your last name

12    for us, please.

13                 THE WITNESS:  Jennifer McEwin, J-e-n-n-i-f-e-r,

14    M-c-E-w-i-n.

15                 THE COURT:  Thank you, ma'am.  You may proceed.

16                         Direct Examination

17    BY MR. MUHLENDORF:

18    Q    Good afternoon, Ms. McEwin.

19    A    Hi.

20    Q    What city and state do you reside?

21    A    Las Vegas, Nevada.

22    Q    How are you currently employed?

23    A    Executive director of casino collections for MGM Resorts.

24    Q    How long have you had that job?

25    A    About 18 years.
```

```
 1    Q    If you could just describe for the jury what that job

 2    entails.

 3    A    I'm responsible for the recovery of the casino receivable

 4    for our properties.

 5    Q    Is that essentially debt collection?

 6    A    Yes.

 7    Q    Now, in the course of your duties with MGM did you come

 8    across the Defendant, Mitchell Stein?

 9    A    Yes.

10    Q    Was Mr. Stein a customer of the MGM?

11    A    Yes.

12    Q    And did he accrue a debt to the MGM in 2005?

13    A    Yes.

14    Q    Do you have a recollection of how large that debt was?

15    A    It was 800,000.

16    Q    Now, did you continue to deal with -- did you deal with

17    Mr.~Stein in the collection of that debt?

18    A    Yes.

19    Q    And did you continue to deal with Mr.~Stein through 2008?

20    A    Yes.

21    Q    Okay.  Did Mr.~Stein pay his debt to the MGM throughout

22    that time period?

23    A    He paid a portion of the debt.

24    Q    Now, did MGM ultimately seek a judgment against Mr.~Stein?

25    A    Yes.
```

```
1    Q    Did they obtain a judgment?

2    A    They did.

3    Q    Roughly how much was that judgment?

4    A    The judgment was for 570 in principal, 570,000 in

5    principal, and with the awards, the fees, costs, and interest,

6    it came to over a million dollars.

7    Q    Now, I just want to go back in time a little bit to the

8    accrual of that debt.

9              Was Mr.~Stein a regular customer of the MGM?

10   A    Yes.

11   Q    Does the MGM rate their gamblers based on certain factors?

12   A    Yes.

13   Q    Okay.  Could you describe the factors and explain to the

14   jury where Mr. Stein fit in?

15   A    It's basically a caliber system, and the best player being

16   a one, the nominal player being a 12, and Mr. Stein was rated

17   a one.

18   Q    Okay.  And what does a one mean in the dollars gambled,

19   that sort of thing?

20   A    He's considered a high roller.  In industry vernacular,

21   he's considered a high roller.

22   Q    Now, did Mr. Stein obtain a credit limit -- a ability with

23   MGM or marker, I think you call it?

24   A    Yes.

25   Q    Can you explain what a marker is and how someone obtains
```

1    that?

2    A    A marker is basically a window check that's issued by the

3    casino for gambling purposes.  He completes an application,

4    and once approved, he's able to go to a gaming table, draw

5    markers at that table and then ultimately he'd be required to

6    pay those back.

7    Q    And just to people who aren't gamblers, does that mean he

8    goes to the table and instead of pulling out hundred dollar

9    bills, does he sign a card?  Is that fair?

10   A    He presents his player's card that identifies him to the

11   table employees, and then he's issued a check from his marker

12   limit, he signs that check, and in place of that marker he's

13   given chips.

14   Q    And in order to obtain the marker, does someone like

15   Mr. Stein or did Mr. Stein have to fill out a credit

16   application?

17   A    He did.

18           MR. MUHLENDORF:  If we could have exhibit 3.

19   BY MR. MUHLENDORF:

20   Q    It's in your book, but it could also be up on your screen.

21           THE COURT:  Are these exhibits in evidence?

22           MR. STIEGLITZ:  Mr. Stein?

23           MR. STEIN:  No objection.

24           THE COURT:  What numbers are going into evidence so

25   we can -- looks like the jury already has seen these

```
 1    documents, so.  What numbers are we dealing with?
 2              MR. STIEGLITZ:  Your Honor, we had presented
 3    Mr. Stein with a list but I can read it off.
 4              Exhibit 3, 230, 232, 231, 233, 234, and exhibit 1.
 5              THE COURT:  Any objections to those, Mr.~Stein?
 6              MR. STEIN:  I didn't previously -- probably not.  I
 7    just want to look at them very quickly, if I could.
 8              THE COURT:  All right.
 9              MR. MUHLENDORF:  I can move on while he's doing that.
10              THE COURT:  Do you object to 3, which is the one I
11    think he offered?
12              MR. STEIN:  No objection.
13              THE COURT:  Three's admitted without objection.
14         (Government's Exhibit No. 3 entered into evidence.)
15              MR. MUHLENDORF:  Thank you, Your Honor.
16    BY MR. MUHLENDORF:
17    Q   Now, Ms. McEwin, if you could just explain to the jury
18    what exhibit 3 is.
19    A   It's the MGM signature card for Mr. Mitchell Stein.
20    Q   And when did he open this up?
21    A   That card was signed on 4/16/2004.
22    Q   And is there a signature of Mr.~Stein at the bottom?
23    A   There is.
24    Q   Now, in opening an account with MGM, you ask the customers
25    to describe something about themselves.
```

 1    A    Yes.

 2    Q    How did Mr.~Stein describe himself in 2004 when he opened

 3    the account?

 4    A    He represented himself to be an attorney, that he leases

 5    jets, and owns companies.

 6    Q    And there's a credit amount at the bottom there.  Can you

 7    explain what that is?

 8    A    That's the amount that he requested at the time the limit

 9    was established, and that was $400,000.

10    Q    Now, in addition to having them fill out -- customers fill

11    out an application such as that, does MGM do some research

12    into their -- into credit history?

13    A    We do.

14    Q    If you would turn in your binder to exhibit 230, and --

15         MR. STEIN:  No objection to these exhibits, Your

16    Honor.

17         THE COURT:  The ones that he mentioned earlier?

18         MR. STEIN:  Yes.

19         THE COURT:  All right.  So they'll all be admitted,

20    230 through '34, 237, and 1 and 3.  I believe those were all.

21         MR. STIEGLITZ:  And also 28, Your Honor.

22         THE COURT:  All right.  Twenty-eight.  All will be

23    admitted without objection.

24       (Government's Exhibit No. 230-234, 1, and 28 entered into

25    evidence.)

```
1    BY MR. MUHLENDORF:

2    Q    So looking at exhibit 230 in your binder or on the screen,

3    Ms. McEwin, did MGM do some research into Mr.~Stein's bank

4    accounts?

5    A    Yes.

6    Q    And directing your attention to the bank information on

7    the screen there, where did you get this information?

8    A    This would have come from Mr.~Stein.

9    Q    Did Mr.~Stein indicate to the bank that he had a Canadian

10   bank account?

11   A    He indicated to the MGM that he had a Canadian bank

12   account, yes.

13   Q    Thank you.

14        If you could turn to exhibit 231 in your book.  We're

15   going to work from the back of this document.

16        Now, Ms. McEwin, what is this document, 230 (sic)?

17   A    This is the balance activity information from Mr. Stein

18   from July 15th, 2005 up through September 27th, 2006.

19   Q    And can you explain to the jury what this document is

20   indicating, starting with the entry at 12:04 on July 15th,

21   2005?

22   A    It's basically a running total of markers issued and

23   redemptions made to those markers over a period of time.

24   Q    So what was happening over that period of time, starting

25   with 12:04, and then going on?
```

```
 1   A    A series of markers were issued that began at 12:04 p.m.
 2   on July 15th, and it looks like the final marker was drawn at
 3   3:41 p.m. on July 15th, for a total of $800,000.
 4   Q    So if you could just explain to the jury what that means
 5   happened in that three-hour time span that Mr.~Stein was at
 6   your casino.
 7   A    During the course of his play, he would be drawing
 8   markers, he would be given chips for those markers, he
 9   presumably wagered those chips, and at the end of his play if
10   he had won, he would buy back the marker in the pit.  If he
11   lost that money, then he would either conclude his play or
12   continue to draw markers up to the amount of his marker limit.
13   Q    So at the end of the day, how much did he owe the casino?
14   A    800,000.
15   Q    Is that the debt we were talking about, that -- some
16   portion of he owed all the way into 2008?
17   A    Yes.
18   Q    Now, if we could turn to exhibit 233 in your binder,
19   Ms. McEwin.  And explain to the jury exactly what 233 is.
20   A    This is the Receiver Master.  It's kind of a snapshot of
21   his gaming activity with the company and his habits.
22   Q    His, being Mr.~Stein's?
23   A    Mr. Stein's, yes.
24   Q    What does it tell us about his high bet on that July 15th
25   day?
```

```
1    A    His high bet on July 15th was $30,000 per hand.

2    Q    And does it tell us in particular what game Mr. Stein was

3    gambling?

4    A    Most typical game is black jack.

5    Q    What was his most typical loss with his history at MGM?

6    A    His history at MGM, most typical loss is $172,303.

7    Q    What does that mean, his typical loss?

8    A    That's the average of what he's lost over his lifetime.

9    Q    So it's not a total, it's an average of trips?

10   A    Of trips and days within those trips.

11   Q    Now, at some point did you personally become involved with

12   trying to collect Mr. Stein's debts?

13   A    Yes.

14   Q    Okay.  About when was that?

15   A    It started right away.  The minute he owed the money, it

16   was my department's responsibility to get it repaid.  We gave

17   him a period of time that he could repay it, and once that

18   time expired we started asking for payment on the balance.  He

19   made some payments.  There were many broken promises.  It

20   was -- it was definitely a slow pay.  And then ultimately when

21   the debt remained unpaid, we sought civil action.

22   Q    Now, you mentioned that he did make some payments.  If you

23   could turn to exhibit 28 in your binder.

24   A    I'm sorry, what's the section?  Is it Bates 28?

25   Q    No, on the top it should be exhibit 28.
```

```
 1    A    Oh, yes.

 2    Q    If it's not in your binder, it's on the screen.

 3         MR. MUHLENDORF:  And I apologize, ladies and

 4    gentlemen, if it's not in the binder.  It's a new exhibit.

 5         THE COURT:  All right.

 6   BY MR. MUHLENDORF:

 7    Q    What is exhibit 28?

 8    A    It's a receipt for payment on May 5th, 2006.

 9    Q    Okay.  And who's making the payment?

10    A    It's for benefit of Mitchell Stein.

11    Q    Okay.  And if we look down at the second page, what is

12    this document?

13    A    It's a receipt for a $20,000 payment on July 23rd, 2006,

14    for Mitchell Stein.

15    Q    Did someone make -- can you tell if someone made a payment

16    on his behalf?

17    A    Yes.

18    Q    Who did that?

19    A    Richard Wilk.

20    Q    Is that common in Las Vegas, to have someone else paying

21    your bills?

22    A    Yes.

23    Q    Now, in the course of trying to collect the debts for

24    Mr. Stein, did you speak to him personally?

25    A    Yes.
```

```
 1   Q   Did Mr. Stein promise to pay the debt in full?

 2   A   Yes.

 3   Q   Did he pay the debt in full?

 4   A   No.

 5   Q   Did your discussions with him continue in 2006?

 6   A   Yes.

 7   Q   Did they continue in 2007?

 8   A   Yes.

 9   Q   Did they continue in 2008?

10   A   Yes.

11   Q   So is it fair to say that in that whole time period you

12   were after Mr.~Stein to pay the money?

13   A   Yes.

14   Q   And then if you could turn to exhibit 1 in your binder.

15   What is exhibit 1?

16   A   It is the notification of judgment, "Certificate of

17   Judgment for Registration in Another District," to be exact.

18   Q   And is this the judgment, the million dollar judgment you

19   were talking about?

20   A   It is.

21           MR. MUHLENDORF:  No further questions, Your Honor.

22           THE COURT:  Thank you.

23           Any cross-examination?

24           MR. STEIN:  Yes.

25                        Cross-examination
```

```
 1   BY MR. STEIN:

 2   Q   Good afternoon, Ms. McEwin.

 3   A   Yes.

 4   Q   Have we ever met before?

 5   A   Not in person.

 6   Q   I'm going to have you look at exhibit 233.

 7           This is an internal document of the MGM; is that

 8   correct?

 9   A   That is correct.

10   Q   It's information the MGM is tracking on the customer, me,

11   Mitchell Stein, right?

12   A   Yes.

13   Q   MGM is relying on that information?

14   A   Yes.

15   Q   I was a one, which was ranked as the best player.

16   A   Yes.

17   Q   Is that what you said?

18           Which actually means I was the worse player, right?

19   A   (Laughter.)

20   Q   The relationship with the MGM started in 2001 according to

21   that exhibit; is that correct?

22   A   That's correct.

23   Q   So you were tracking information on me from 2001 through

24   the date you said you got a judgment, is that accurate?

25   A   That's accurate.
```

```
 1    Q    Does the MGM have internal records of how much money I

 2    lost from 2001 through the last visit, the 2005 visit?

 3    A    They do.

 4    Q    What's the total amount of money that I lost?

 5    A    I don't have it in front of me, but I do know that it is a

 6    little under $2.8 million.

 7    Q    So from over a period of four to five years I lost almost

 8    $3 million to the MGM?

 9    A    Correct.

10    Q    Do you know if the MGM ever flew me by private jet in

11    order for me to gamble there?

12    A    I don't have knowledge of that.

13    Q    Do you know whether the MGM ever housed me at a facility

14    called The Mansions in order for me to gamble there?

15    A    They did.

16    Q    Is The Mansions a private facility where general customers

17    are not permitted?

18    A    Yes.

19    Q    And did the MGM ever charge me for staying at the

20    Mansions?

21    A    I'm not certain if you were charged for any stay, but

22    there was definite comp stays.

23    Q    What is a comp stay?

24    A    Based on your gaming activity and your history with the

25    company, they will, as an incentive for your play, comp your
```

```
 1    stay, room, food, and beverage, show tickets, spa visits,
 2    things of that nature.
 3    Q    And the Mansions have 24-hour butler service, as well; is
 4    that correct?
 5    A    Correct.
 6    Q    And that was also comped if things were comped?
 7    A    Yes.
 8    Q    It was routine to do that?
 9    A    Yes.
10    Q    You indicated on direct examination that there was a
11    judgment that the MGM obtained regarding me and that you were
12    chasing me, and I was unable to pay the judgment, but you
13    stopped telling us what happened after 2008.  Did you stop
14    chasing me in 2008?
15    A    No.
16    Q    You continued to chase me?
17    A    Up until bankruptcy was filed.
18    Q    And who filed bankruptcy?
19    A    You did.
20    Q    The MGM didn't file bankruptcy?
21    A    No.
22    Q    And after I filed bankruptcy, did the MGM turn the matter
23    over to its attorneys?
24    A    The matter was assigned to the attorneys when the judgment
25    was obtained.  So it was already in the hands of the
```

```
 1    attorneys.

 2    Q    At the current time, the MGM is an agreed, in Florida,

 3    Chapter 11 creditor in the amount of the debt; is that

 4    correct?

 5    A    That is correct.

 6    Q    Chapter 11 is a reorganization section of the bankruptcy

 7    code.  Are you aware of that?

 8    A    Yes.

 9    Q    And the MGM did not object to the plan of reorganization

10    that was confirmed by the Honorable Judge Hyman on Flagler

11    Street, which was issued in 2011; is that right?

12    A    They filed a proof of claim in the matter, and they're

13    monitoring the bankruptcy proceedings.

14    Q    Have they filed any objection whatsoever to anything that

15    I have done as a trustee for eight years with regard to that

16    bankruptcy plan?

17         MR. MUHLENDORF:  Objection, Your Honor, she can't

18    know what other things -- other than MGM.  That's a broad

19    question.

20         THE COURT:  I think he's saying did MGM object to

21    anything, if she knows, in the bankruptcy proceeding.

22         If you know.

23         THE WITNESS:  There's been no adversarial action

24    filed by MGM Grand.

25    BY MR. STEIN:
```

```
 1    Q    You've been working at the MGM for 18 years you said, I

 2    believe; is that right?

 3    A    I've actually been working there since it was opened.  It

 4    will be 20 years in December.  But my capacity as executive

 5    director has been the last 18.

 6    Q    Some very unique events in monitoring the bankruptcy came

 7    about over the last two years.  I know your lawyer was

 8    handling it.  You may have no knowledge of them.  Are you

 9    aware of a governmental agency freezing my bank accounts?

10           MR. MUHLENDORF:  Objection, Your Honor.

11           THE COURT:  Sustained.

12    BY MR. STEIN:

13    Q    Was the MGM aware, prior to being contacted by the

14    Government, of this indictment?

15    A    I have no knowledge of that.

16    Q    Do you have any knowledge that the MGM has filed an

17    objection of any kind in the bankruptcy because of or as a

18    result of this indictment?

19           MR. MUHLENDORF:  Asked and answered already.

20           THE COURT:  Overruled, if you know.

21           THE WITNESS:  We've not filed an objection, but that

22    was an internal decision.  I have no knowledge if it was as a

23    result of the indictment.

24    BY MR. STEIN:

25    Q    But you know that there's been no objection filed?
```

```
 1    A    That is correct.
 2              MR. STEIN:  No further questions.
 3              THE COURT:  Thank you.
 4              Any redirect?
 5              MR. MUHLENDORF:  Just one briefly.
 6                       Redirect Examination
 7    BY MR. MUHLENDORF:
 8    Q    Ms. McEwin, since we were talking about your other debts,
 9    in the course of your investigating or following up
10    Mr. Stein's debts, did you also learn about debts to the Las
11    Vegas Hilton?
12    A    We did.
13    Q    And could you tell the jury about that?
14    A    At some point in time it was -- I want to say it was close
15    to a year.  I know the records exist.  We were made aware that
16    Mr. Stein had gone to what is now LVH, but at that time Las
17    Vegas Hilton, and had amassed a fairly large gaming debt
18    there.  It was well after we had given him his marker limit
19    and he had amassed the $800,000 with MGM, and we're
20    disappointed to find out that he was still actively gambling
21    and losing money at another property.
22              MR. MUHLENDORF:  No further questions.
23              THE COURT:  Any recross on~--
24              MR. STEIN:  (Shakes head.)
25              THE COURT:  No?
```

```
 1              Thank you, ma'am.  Thank you.  Watch your step.

 2              MR. STIEGLITZ:  And may she be released permanently,

 3    Your Honor?

 4              THE COURT:  Yes.

 5              MR. STEIN:  Yes.

 6              THE COURT:  Okay.  What do you think?

 7              MR. MUHLENDORF:  Your Honor, the direct on the next

 8    witness I think is 15 or 20 minutes.  That may just be too

 9    long, I'm afraid.

10              THE COURT:  I think so, yeah.

11              So we'll have to recess then.

12              All right.  Ladies and gentlemen, again, thank you

13    for your cooperation.  We appreciate your willingness to

14    serve, and I'm going to ask you to not discuss the case, form

15    any opinions, leave your notes.

16              And just for your planning purposes, let me just take

17    one second.  Remember, this Friday afternoon we're going to go

18    to 1:00 o'clock only, and the rest of the afternoon we'll be

19    out of session.  Next week, all five days, we'll be in

20    session.  The week after, assuming we're still going, Monday

21    the 20th to 1:00 o'clock only; Tuesday all day; Wednesday

22    1:00 o'clock only; Thursday the 23rd, we won't be in session

23    at all.

24              So I'm just trying to give you a heads up.  And then

25    the Monday after that, the 27th, again, hopefully, we won't be
```

```
 1   still here, but maybe we will; that's a federal holiday.  The
 2   27th is Memorial Day.  So just giving you, so you can plan
 3   ahead as best you can.  All right?
 4            Thank you.  Have a good evening.  We'll see you
 5   tomorrow, 9:00 o'clock.
 6        (The jury exits the courtroom.)
 7            THE COURT:  All right.  Anything we need to talk
 8   about?
 9            MR. STIEGLITZ:  Not from the United States, Your
10   Honor.
11            MR. STEIN:  Not from the defense, Your Honor.
12            THE COURT:  All right.  We'll see you tomorrow
13   morning at 9:00.  Have a nice evening.
14            MR. STIEGLITZ:  Thank you, Your Honor.
15            THE COURT:  Off the record.
16        (The evening recess was taken at 4:56 p.m.)
17
18
19
20
21
22
23
24
25
```

```
 1                        *  *  *  *  *

 2                        I N D E X

 3  Testimony of John Martin Woodbury, Jr. (Continued)

 4          Redirect by Mr. Stieglitz            7

 5  Testimony of Tracy Jones

 6          Direct by Mr. Muhlendorf             29

 7          Cross by Mr. Stein                   70

 8          Redirect by Mr. Muhlendorf           114

 9  Testimony of Kevin Pickard

10          Direct by Mr. Stieglitz             119

11          Cross by Mr. Stein                   159

12          Redirect by Mr. Stieglitz           187

13  Testimony of Timothy Alan Cutter

14          Direct by Mr. Stieglitz             193

15          Cross by Mr. Stein                   204

16  Testimony of Jennifer McEwin

17          Direct by Mr. Muhlendorf            207

18          Cross by Mr. Stein                   218

19          Redirect by Mr. Muhlendorf          223

20                        *  *  *  *  *

21

22

23

24

25
```

```
 1                       * * * * *

 2                    E X H I B I T S

 3   Government's Exhibits in Evidence:

 4           Government's 123 and 63              5

 5           Government's 318                     38

 6           Government's 188, 46-47, 57, 295,

 7   125, 152, 168, 132 and 137                   42

 8           Government's 134, 84, 178 and 343    119

 9           Government's 3                       212

10           Government's 230-234, 1 and 28       213

11   Defendant's Exhibits in Evidence:

12           Defendant's 214 and 348              24

13           Defendant's 118                      67

14           Defendant's 343                      67

15           Defendant's 338                      67

16           Defendant's 334                      67

17           Defendant's 341                      67

18           Defendant's 139                      67

19           Defendant's 145                      68

20           Defendant's 335                      68

21           Defendant's 100                      68

22           Defendant's 349                      68

23           Defendant's 99                       68

24           Defendant's 340                      69

25           Defendant's 143                      69
```

```
1                            * * * * *
2                     E X H I B I T S (Continued)
3    Defendant's Exhibits in Evidence:
4              Defendant's 201                          69
5              Defendant's 144                          69
6              Defendant's 342                          69
7              Defendant's 149                          94
8              Defendant's 83                           84
9              Defendant's 194                          97
10             Defendant's 201, 144, 344, 330-331,
11    98, 192, 332-333, 200, 346 and 339                103
12             Defendant's 349                         118
13             Defendant's 25, 209, 350 and 347        152
14             Defendant's 202 and 204                 159
15             Defendant's 203                         181
16                           * * * * *
17                          CERTIFICATE
18        I, Stephen W. Franklin, Registered Merit Reporter, and
19    Certified Realtime Reporter, certify that the foregoing is a
20    correct transcript from the record of proceedings in the
21    above-entitled matter.
22        Dated this 4th day of JULY, 2013.
23
24        /s/Stephen W. Franklin
          _____
25        Stephen W. Franklin, RMR, CRR
```

**$**

$1,980,000 [2]  125/15 128/12
$1.25 [1]  47/1
$10,000 [1]  38/21
$100 [5]  71/9 71/16 97/18 97/22 171/22
$100 million [5]  71/9 71/16 97/18 97/22
 171/22
$102 [1]  22/17
$102 million [1]  22/17
$11,000 [4]  18/4 18/10 128/12 129/12
$12,000 [1]  18/16
$15,000 [1]  144/23
$172,303 [1]  215/6
$180,000 [2]  52/15 53/19
$2,848,251 [1]  140/6
$2.8 [1]  219/6
$2.8 million [1]  219/6
$20,000 [1]  216/13
$200,000 [1]  55/21
$3 [1]  219/8
$3 million [1]  219/8
$3,300,000 [2]  125/22 129/12
$30,000 [3]  18/11 129/13 215/1
$4,307.19 [1]  80/10
$400,000 [1]  212/9
$4500 [1]  144/23
$5 [2]  132/16 132/19
$5 million [1]  132/16
$5 million-worth [1]  132/19
$5000 [1]  144/22
$564,000 [2]  18/17 126/11
$5721.24 [1]  110/8
$600,000 [1]  143/19
$800,000 [2]  214/3 223/19
$90,000 [1]  143/23

**'**

'08 [3]  197/11 198/17 199/14
'34 [1]  212/20
'til [2]  191/16 191/17

**-**

-and [1]  1/21
-v [1]  1/5

**/**

/s/Stephen [1]  228/24

**0**

06 [2]  83/20 83/21

**1**

1,736,583 [1]  140/5
1.98 million [1]  18/4
10 [6]  56/13 95/21 105/2 144/23 191/7 192/3
10-K [19]  16/22 73/12 121/20 126/20 126/21
 126/24 126/25 127/1 127/4 127/11 132/13
 132/21 139/9 139/11 139/19 139/23 140/12
 172/13 172/15
10-Ks [2]  156/14 176/24
10-Q [9]  73/12 121/19 122/1 122/9 122/10
 124/24 126/24 127/2 139/15
10-Qs [2]  156/14 176/24
10/12/06 [1]  83/21
10/13/06 [1]  83/20
100 [13]  30/16 68/10 85/7 107/20 125/13
 125/20 126/9 154/8 165/8 165/15 166/5
 166/18 227/21
1000 [3]  47/13 49/17 50/18

100s [5]  18/3 18/9 18/15 128/11 129/11
103 [1]  228/11
1031 [1]  1/22
1099 [1]  111/24
10:33 [1]  57/3
10:49 [1]  57/3
10:56 [1]  21/8
10th [1]  21/24
11 [2]  221/3 221/6
11-80205-CR-MARRA [1]  1/2
11-hour [1]  105/2
114 [1]  226/8
118 [5]  66/16 66/20 75/19 227/13 228/12
118's [1]  66/19
119 [2]  226/10 227/8
11:59 [1]  102/11
11th [1]  97/16
12 [4]  74/6 128/16 138/22 209/16
120 [1]  80/3
1208 [1]  1/20
123 [14]  4/5 4/21 5/1 5/2 16/16 127/16
 129/22 164/16 167/15 168/18 168/18 169/11
 171/1 227/4
125 [6]  42/1 42/4 47/25 48/3 48/5 227/7
125,000 [2]  32/6 32/7
1250/quarter [1]  76/25
12:04 [2]  213/20 213/25
12:04 p.m [1]  214/1
12th [1]  49/7
13 [2]  103/16 103/17
130 [4]  135/5 201/2 201/15 201/22
132 [6]  42/1 42/5 52/8 52/10 54/11 227/7
134 [4]  118/10 118/19 138/1 227/8
137 [6]  42/1 42/5 53/22 54/2 58/3 227/7
139 [4]  67/15 67/18 84/11 227/18
13th [1]  10/3
1400 [1]  1/18
141 [1]  141/11
143 [3]  68/23 69/1 227/25
144 [8]  69/10 69/13 69/20 102/23 103/9
 110/20 228/5 228/10
145 [4]  67/19 67/22 82/24 227/19
149 [3]  94/8 94/12 228/7
14th [5]  8/13 18/1 125/11 128/9 143/13
15 [9]  56/13 56/20 57/2 74/3 74/4 74/6
 154/23 191/19 224/8
15-minute [2]  56/18 150/7
151 [1]  202/12
152 [5]  42/1 42/4 49/3 227/7 228/13
1551 [1]  1/20
1573 [1]  135/22
158 [1]  153/14
159 [2]  226/11 228/14
15th [6]  213/18 213/20 214/2 214/3 214/24
 215/1
16 [1]  79/12
16133 [1]  80/3
165 [2]  12/7 13/13
168 [4]  42/1 42/5 51/3 227/7
16th [3]  129/23 130/2 130/11
174 [2]  74/3 74/6
175 [2]  74/4 74/6
178 [4]  118/11 118/19 144/9 227/8
17th [1]  131/7
18 [3]  207/25 222/1 222/5
180 [5]  15/10 15/14 15/16 18/3 128/11
180,000 [1]  53/10
181 [1]  228/15
186 [2]  11/10 12/2
187 [1]  226/12

188 [9]  7/23 9/8 9/16 41/18 41/19 42/1 42/4
 42/7 227/6
18th [1]  151/11
192 [3]  102/24 103/9 228/11
193 [1]  226/14
194 [6]  96/8 97/11 97/12 97/13 174/15 228/9
19th [5]  17/7 48/11 76/22 127/21 161/11
1:00 o'clock [3]  224/18 224/21 224/22
1:10 [2]  102/6 102/10
1:13 [1]  102/11
1:15 [2]  101/16 101/20
1:45 [1]  21/24

**2**

2 billion [1]  22/18
20 [5]  138/12 191/19 198/20 222/4 224/8
20-plus [1]  205/1
200 [4]  102/24 103/10 113/21 228/11
200,000 [1]  58/8
2000 [2]  43/17 85/8
2001 [3]  218/20 218/23 219/2
2004 [2]  211/21 212/2
2005 [10]  30/3 30/24 31/13 76/1 76/7 167/25
 208/12 213/18 213/21 219/2
2006 [18]  76/21 76/22 77/20 79/12 79/21
 80/8 80/17 85/9 86/2 86/7 88/7 98/22 121/6
 122/9 213/18 216/8 216/13 217/5
2007 [45]  8/3 8/13 8/22 9/6 10/3 10/20 11/13
 11/14 18/1 18/7 18/14 20/25 21/1 21/6 21/24
 32/4 44/19 44/23 45/22 47/4 59/23 60/1
 85/15 98/24 98/25 99/9 124/25 125/11
 125/18 125/24 126/7 126/16 126/19 126/22
 127/4 128/9 129/9 132/13 139/9 139/11
 139/23 140/4 143/13 165/13 217/7
2008 [27]  17/7 25/18 26/11 42/14 42/17
 48/11 49/7 51/8 54/9 58/6 97/16 112/20
 113/17 113/19 122/10 127/21 144/16 144/25
 145/4 146/9 190/5 190/7 208/19 214/16
 217/9 220/13 220/14
2009 [6]  30/5 73/23 145/9 151/12 161/11
 176/18
201 [6]  69/2 69/5 102/23 103/9 228/4 228/10
2010 [1]  151/15
2011 [1]  221/11
2013 [4]  1/8 26/20 26/25 228/22
202 [7]  155/13 157/23 158/3 158/13 158/14
 178/7 228/14
203 [6]  157/23 158/8 158/12 180/24 181/12
 228/15
204 [9]  157/23 158/5 158/12 158/14 180/7
 182/12 182/19 226/15 228/14
20530 [1]  1/18
206 [2]  9/17 9/20
207 [1]  226/17
209 [4]  152/5 152/12 174/2 228/13
20th [1]  224/21
21 [1]  137/14
212 [1]  227/9
213 [1]  227/10
214 [4]  25/1 25/7 25/12 227/12
216 [1]  10/13
218 [1]  226/18
21st [2]  10/20 45/22
22 [1]  125/5
223 [1]  226/19
228 [1]  1/22
22nd [1]  51/8
23 [1]  151/12
230 [5]  211/4 212/14 212/20 213/2 213/16
230-234 [2]  212/24 227/10

**2**

231 [2]  211/4 213/14
232 [1]  211/4
233 [6]  102/25 103/10 211/4 214/18 214/19
 218/6
234 [3]  211/4 212/24 227/10
237 [1]  212/20
23rd [2]  216/13 224/22
24 [1]  227/12
24-hour [1]  220/3
24th [8]  8/3 8/22 11/13 11/14 47/4 59/23
 125/18 144/15
25 [8]  74/4 120/14 152/5 152/12 173/15
 173/16 198/20 228/13
25,000 [1]  83/19
25,817 [2]  79/22 80/9
25-year [1]  181/17
251 [1]  1/10
25th [2]  42/14 42/17
272 [3]  18/25 21/9 21/10
27th [4]  44/23 213/18 224/25 225/2
28 [7]  212/21 212/24 215/23 215/24 215/25
 216/7 227/10
28,000 [2]  55/23 55/24
28,859 [1]  161/9
29 [1]  226/6
293 [1]  133/9
295 [5]  42/1 42/4 46/12 46/14 227/6
29th [2]  18/7 129/9
2:30 [1]  150/21
2:56 [1]  150/21
2nd [1]  176/18

**3**

3.3 million [1]  18/10
30 [3]  31/25 62/2 198/23
30,000 [2]  44/17 53/14
300 [2]  18/9 129/11
300,000 [1]  48/6
30th [2]  122/9 122/10
31 [1]  25/18
318 [9]  38/5 38/6 38/8 38/9 38/15 38/19
 41/25 114/21 227/5
31st [2]  126/22 140/4
326 [1]  13/25
33 [1]  137/16
330 [2]  102/23 103/9
330-331 [1]  228/10
331 [3]  102/23 103/9 228/10
33179 [1]  1/22
332 [3]  102/24 103/10 112/6
332-333 [1]  228/11
333 [3]  102/24 103/10 228/11
334 [5]  67/7 67/10 79/11 114/11 227/16
33401 [2]  1/20 1/25
335 [5]  67/23 68/3 68/4 68/6 227/20
336 [1]  102/25
337 [3]  67/25 102/25 103/10
338 [6]  67/3 67/6 78/7 78/21 78/22 227/15
339 [3]  102/25 103/10 228/11
340 [4]  68/19 68/22 92/21 227/24
341 [5]  67/11 67/14 82/13 82/13 227/17
342 [5]  69/21 69/24 102/23 109/11 228/6
343 [16]  66/22 67/2 76/16 77/19 118/11
 118/11 118/19 147/17 147/25 159/8 160/20
 162/7 164/7 186/25 227/8 227/14
344 [4]  102/23 103/9 108/12 228/10
345 [4]  68/2 69/14 69/18 69/19
346 [3]  102/25 103/10 228/11

347 [3]  152/6 152/12 228/13
348 [3]  25/1 25/7 227/12
349 [7]  68/11 68/14 87/20 117/25 118/4
 227/22 228/12
350 [3]  152/6 152/12 228/13
366 [1]  151/12
367 [1]  151/13
3768 [1]  1/24
38 [1]  227/5
390,000 [1]  49/9
3:41 p.m [1]  214/3

**4**

4/16/2004 [1]  211/21
40 pounds [1]  198/23
40,000 [1]  46/18
400,000 [1]  51/11
404 [14]  156/12 156/18 178/11 178/15
 178/20 178/23 179/15 181/21 188/19 188/22
 188/25 189/3 189/6 189/7
42 [1]  227/7
42,000 [3]  30/22 32/7 76/23
43408928 [1]  80/2
45 [2]  21/25 126/1
46 [4]  42/1 42/4 44/2 44/4
46-47 [1]  227/6
47 [5]  18/15 42/1 42/4 44/20 227/6
497-1573 [1]  135/22
4:00 o'clock [2]  36/18 36/21
4:06 [1]  192/5
4:13 [1]  192/5
4:56 [1]  225/16
4th [6]  9/6 18/14 54/9 58/6 126/7 228/22

**5**

50 [1]  177/18
50 percent [6]  36/2 37/10 80/25 85/11 85/19
 106/3
50,000 [2]  32/2 76/23
5000 [1]  76/24
513 [1]  135/22
514-3768 [1]  1/24
52,500 [1]  76/24
561 [1]  1/24
57 [4]  42/1 42/4 45/19 227/6
570 [1]  209/4
570,000 [1]  209/4
574 [2]  151/15 151/16
5:00 o'clock [1]  191/21
5:15 [1]  191/17
5:30 [1]  191/17
5th [6]  26/20 26/25 27/1 27/5 151/14 216/8

**6**

60 [2]  138/15 176/20
63 [6]  4/5 4/21 5/1 5/2 21/14 227/4
64 [1]  8/6
65 [1]  32/3
67 [6]  227/13 227/14 227/15 227/16 227/17
 227/18
67,000 [1]  32/3
68 [5]  227/19 227/20 227/21 227/22 227/23
69 [5]  227/24 227/25 228/4 228/5 228/6
6:00 o'clock [1]  19/23
6:18 [1]  19/23

**7**

70 [7]  8/14 8/17 59/17 59/21 106/4 200/5
 226/7
701 [1]  1/24

71 [1]  139/24
73 [1]  124/21
74 [2]  8/24 200/16
75 [2]  37/14 80/22
75 percent [1]  36/5
78 [1]  139/11
78,000 [1]  80/22

**8**

80,000 [2]  45/4 45/5
800,000 [2]  208/15 214/14
82,000 [1]  53/14
83 [5]  95/8 95/12 95/14 168/8 228/8
84 [5]  118/10 118/19 143/3 227/8 228/8
866 [1]  134/9

**9**

93 [1]  139/7
94 [1]  228/7
95 percent [3]  36/7 37/14 81/1
97 [1]  228/9
98 [3]  102/24 103/9 228/11
99 [3]  68/18 92/5 227/23
9:00 [1]  225/13
9:00 in [1]  161/5
9:00 o'clock [1]  225/5
9th [3]  20/25 21/1 21/6

**A**

a.m [3]  57/3 57/3 102/11
ability [1]  209/22
able [14]  2/23 3/2 3/22 6/13 64/4 89/12
 102/15 102/17 103/24 144/22 153/25 156/14
 181/22 210/4
above [3]  142/10 155/11 228/21
above-entitled [1]  228/21
absolutely [7]  28/18 37/7 102/7 104/13
 150/15 174/24 191/25
accept [3]  197/6 198/6 203/13
acceptable [1]  154/15
accommodate [2]  90/21 90/23
accordance [1]  141/8
according [4]  27/5 156/25 157/1 218/20
accordingly [1]  110/13
account [12]  17/11 56/10 80/1 124/12 161/12
 161/18 169/7 185/4 212/24 212/3 213/10
 213/12
accountancy [1]  181/15
accountant [8]  32/21 54/18 83/17 119/10
 120/13 156/19 171/14 181/18
accountants [5]  32/12 84/9 138/18 164/23
 177/18
accounted [2]  169/8 171/14
accounting [13]  29/23 90/14 119/20 124/5
 124/6 138/16 162/3 167/16 168/17 169/1
 177/16 177/17 183/10
accounts [11]  33/9 33/12 124/9 144/22
 173/23 184/10 184/11 184/14 185/1 213/4
 222/9
accrual [1]  209/8
accrue [1]  208/12
accurate [17]  20/15 72/11 76/7 76/9 77/19
 77/25 82/18 88/22 98/23 99/1 137/5 163/12
 179/13 181/20 182/5 218/24 218/25
acknowledge [1]  154/1
across [2]  100/11 208/8
act [3]  136/17 156/12 179/13
acted [1]  169/15
acting [2]  160/23 161/2
action [6]  23/7 76/22 85/22 104/4 215/21

**A**

action... [1]  221/23
actions [2]  77/23 172/5
actively [2]  112/19 223/20
activity [3]  213/17 214/21 219/24
actual [1]  86/9
actually [22]  6/14 11/20 13/21 14/5 14/12
16/1 22/22 42/9 52/17 53/24 80/13 88/18
91/20 93/6 107/21 118/13 136/24 145/18
153/3 188/16 218/18 222/3
ad [1]  30/9
added [3]  87/5 87/14 164/25
addition [3]  87/8 118/12 212/10
additional [3]  103/5 152/10 154/5
Additionally [1]  89/12
address [10]  24/19 80/1 128/1 128/2 134/7
141/23 183/1 201/22 204/16 204/17
addressed [2]  17/9 202/10
addresses [1]  142/3
adjust [1]  110/13
admissibility [2]  62/23 66/10
admissible [3]  62/19 62/20 153/21
admission [2]  64/20 118/8
admit [5]  63/3 65/9 117/10 117/25 158/10
admitted [48]  4/6 5/1 16/15 25/5 38/8 41/21
42/2 62/25 64/17 66/17 66/19 67/1 67/5 67/9
67/13 67/17 67/21 68/5 68/9 68/13 68/17
68/21 68/25 69/4 69/12 69/23 75/19 82/24
92/4 94/11 95/11 95/13 97/12 103/7 108/11
110/19 112/5 118/3 118/17 152/11 154/14
158/4 158/13 174/1 181/11 211/13 212/19
212/23
admitting [3]  153/22 154/11 163/11
advance [2]  140/7 140/18
advanced [6]  140/17 148/22 160/4 169/8
171/25 172/4
advances [2]  169/9 172/7
advancing [1]  71/19
adversarial [1]  221/23
adverse [2]  62/22 104/4
adversely [1]  64/3
advertising [1]  175/23
advice [1]  14/23
advise [2]  104/3 105/15
advised [1]  142/1
afford [2]  10/14 23/13
afraid [2]  23/16 224/9
after [55]  5/4 5/10 5/14 6/4 11/23 22/1 24/11
31/25 36/17 36/18 36/21 46/6 49/24 53/11
54/11 57/3 57/17 57/19 73/12 81/19 82/11
99/19 100/6 102/11 103/19 104/3 107/4
113/6 123/11 123/12 124/11 126/19 137/23
144/21 145/7 147/13 149/18 149/21 150/21
156/13 158/18 167/6 171/21 185/2 185/5
185/6 192/5 192/19 198/25 217/12 220/13
220/22 223/18 224/20 224/25
aftermath [1]  164/7
afternoon [11]  102/19 107/12 119/5 159/3
193/13 203/24 203/25 207/18 218/2 224/7
224/18
again [35]  5/7 5/20 6/6 6/15 9/21 10/4 10/21
10/24 58/4 58/9 61/17 63/9 63/16 74/5 82/12
94/6 97/4 101/14 106/15 109/13 126/12
130/22 132/11 140/2 142/21 145/17 158/8
170/24 182/19 190/4 199/24 201/14 202/13
224/12 224/25
against [7]  104/4 129/13 140/7 149/6 153/19
164/2 208/24
agency [1]  222/9

agenda [1]  126/20
agent [13]  40/5 40/5 41/9 41/10 43/1 44/9
46/7 48/6 49/9 51/10 72/23 134/13 169/16
110/6 121/17 174/21
ago [9]  27/5 27/6 27/24 75/7 84/17 89/11
110/6 121/17 174/21
agree [6]  102/17 121/7 150/14 150/19 198/6
203/13
agreed [10]  66/17 118/7 121/9 152/2 152/3
152/5 170/13 197/5 197/22 221/2
agreement [30]  18/8 31/25 36/25 94/17
122/22 123/1 123/4 123/13 123/16 124/11
129/10 141/1 156/8 156/10 161/10 163/10
163/18 163/19 164/3 169/15 171/3 172/23
187/14 187/16 187/17 187/23 188/4 188/5
188/7 188/12
agreements [2]  187/20 189/13
ahead [7]  23/11 24/20 37/24 66/21 130/8
148/12 225/3
ahold [1]  105/8
air [1]  34/10
Alan [3]  193/2 193/7 226/13
Albert [1]  1/16
alert [2]  174/9 189/20
allegation [1]  196/11
allegations [1]  56/9
allege [1]  85/11
alleged [2]  166/5 166/8
allow [7]  4/12 4/16 55/25 97/6 97/8 155/6
183/15
allowed [4]  4/19 25/2 64/15 78/7
Allyson [2]  90/13 91/13
almost [4]  21/8 136/9 184/8 219/7
alone [1]  105/15
along [1]  190/6
already [34]  4/11 8/7 21/18 41/25 57/16
59/17 66/5 81/13 86/12 102/21 123/22
123/23 124/21 127/16 133/10 135/6 138/2
139/8 141/11 143/4 144/10 145/20 147/24
152/4 152/7 171/12 174/14 174/15 200/5
201/3 202/13 210/25 220/25 222/19
also [37]  3/15 7/18 11/3 12/7 16/5 27/24 30/1
56/1 63/5 80/1 81/19 82/8 84/25 88/24 89/2
89/16 94/1 95/16 105/14 110/20 111/1
121/20 123/15 128/13 135/6 144/10 151/20
152/25 164/17 196/19 200/6 201/2 202/13
210/20 212/21 220/6 223/10
always [5]  36/16 48/19 81/5 100/17 174/12
am [13]  24/2 26/2 81/4 103/14 120/17 138/9
149/11 161/15 166/4 172/11 183/23 184/2
193/21
amassed [2]  223/17 223/19
Amendment [1]  23/8
AMERICA [1]  1/3
AMEX [12]  10/25 11/20 14/4 14/9 14/12
14/17 14/18 14/23 15/1 15/7 15/20 23/3
AMEX's [1]  22/17
among [1]  183/21
amongst [1]  92/10
amount [14]  38/20 58/7 71/18 110/8 110/12
140/16 143/21 161/9 187/21 212/6 212/8
214/12 219/4 221/3
amounts [4]  39/8 80/18 110/13 111/10
Amy [1]  41/6
analysis [1]  122/5
Anand [1]  115/17
Angeles [3]  90/20 109/8 109/10
announced [1]  20/16
annual [3]  183/21 92/2 121/20
another [13]  9/16 18/14 21/13 45/23 45/24
51/10 55/7 82/13 164/5 179/17 179/20

217/17 223/21
answer [8]  36/22 64/10 66/3 127/14 150/4
196/14 203/19 206/10
answered [4]  33/23 55/22 56/7 222/19
anticipated [1]  151/1
any [174]
anybody [7]  61/19 72/6 111/17 139/5 164/22
202/22 203/11
anymore [1]  113/1
anyone [28]  14/18 38/12 56/23 59/12 59/14
60/7 60/12 75/9 84/8 103/25 104/5 115/10
122/11 128/21 128/24 131/15 131/17 136/7
140/19 140/22 157/11 194/13 194/19 194/22
199/21 203/2 203/6 203/17
anything [51]  9/14 10/9 11/1 11/18 12/23
14/20 16/4 24/13 24/17 27/10 27/13 27/14
28/10 33/24 34/1 34/2 34/8 47/16 50/1 60/19
72/1 75/14 81/9 81/14 82/9 84/16 100/12
100/17 117/3 117/9 129/17 132/22 136/1
140/24 141/5 146/19 147/6 157/5 157/6
162/25 167/11 175/14 190/22 196/2 196/3
197/15 197/19 203/3 221/14 221/21 225/7
anyway [1]  192/10
anywhere [1]  203/2
aol.com [2]  1/25 204/16
apologetic [3]  22/16 22/25 23/16
apologize [21]  5/15 5/16 15/8 21/2 22/23
33/2 126/5 129/24 130/19 137/1 139/25
140/2 147/15 154/20 158/23 163/5 182/1
182/19 189/18 191/7 216/3
apparent [1]  22/17
apparently [2]  103/17 156/25
appear [1]  76/7
Appearances [1]  1/15
appeared [3]  61/5 137/24 186/4
appears [5]  15/19 16/23 127/19 155/15 202/9
application [3]  210/3 210/16 212/11
applied [3]  18/11 30/13 129/13
appreciate [2]  5/8 224/13
approach [21]  25/2 35/1 50/4 61/23 75/23
76/13 76/18 77/14 78/8 79/6 79/13 82/12
83/3 87/20 87/24 92/4 94/13 108/13 168/5
180/5 207/4
appropriate [3]  23/7 137/11 165/1
approval [7]  81/7 81/13 81/18 93/10 98/1
101/3 175/1
approved [7]  11/25 19/21 36/24 80/8 112/15
172/9 210/4
approves [1]  11/23
approximately [10]  121/4 122/6 145/7 147/2
166/15 183/6 197/10 198/16 198/19 199/13
April [6]  54/9 58/6 79/20 112/20 141/24
151/14
April 2008 [1]  112/20
April 4th [2]  54/9 58/6
April 5th [1]  151/14
area [3]  182/1 182/3 183/16
areas [2]  127/25 206/5
aren't [3]  94/23 172/10 210/7
arguing [1]  147/13
argument [3]  153/19 162/13 163/9
arguments [4]  162/12 162/14 162/24 163/7
around [8]  30/5 30/22 32/4 51/15 112/21
130/20 170/17 196/19
arrangement [2]  116/5 116/8
arrangements [2]  31/9 36/25
arranging [5]  86/2 86/4 87/3 87/4 172/4
arrived [3]  27/7 34/12 199/5
aside [1]  203/16
ask [57]  3/20 5/15 7/12 11/22 11/24 13/2

## A

ask... [51]  19/15 22/6 25/1 35/23 39/15 39/24
43/16 43/25 48/14 58/19 59/12 59/14 60/7
62/15 63/8 63/15 63/19 64/7 65/21 65/23
79/15 82/12 85/7 87/20 88/13 89/22 94/18
96/9 100/24 101/8 108/12 109/12 113/22
125/8 126/5 129/6 134/18 139/13 142/18
142/22 146/21 148/5 149/24 170/9 187/12
190/16 191/22 195/20 202/15 211/24 224/14
asked [59]  7/13 7/14 9/17 9/21 12/11 13/17
13/21 15/1 16/5 22/1 26/10 42/25 43/13
43/15 44/16 45/5 45/9 48/12 49/12 50/17
57/16 60/25 61/3 61/14 64/10 72/6 72/12
72/15 73/25 74/10 80/13 81/9 81/10 84/5
87/7 88/19 89/18 91/6 99/17 104/22 108/22
112/25 113/2 113/3 114/12 115/12 119/13
145/12 156/16 170/8 176/20 186/25 187/3
188/18 189/5 189/17 189/24 199/9 222/19
asking [30]  7/24 9/23 10/15 10/24 11/5 12/8
12/12 13/19 15/4 15/17 16/2 16/3 16/6 16/21
16/25 19/3 25/25 42/15 78/23 86/10 87/4
133/6 133/17 136/5 164/1 170/6 178/10
189/20 189/20 215/18
asks [1]  15/25
aspect [1]  122/20
asserted [1]  153/23
asset [1]  100/1
assigned [1]  220/24
assist [4]  108/20 122/7 180/17 181/19
assistance [3]  170/15 178/13 181/24
assistant [8]  29/23 30/10 31/1 31/8 31/11
32/14 36/22 78/5
assisting [2]  172/3 172/5
associate's [1]  29/21
associated [2]  131/14 131/15
assume [5]  3/14 73/3 73/17 162/8 177/19
assuming [6]  125/14 125/21 126/10 157/12
157/19 224/20
assumption [1]  175/17
assumptions [1]  185/24
Assurance [6]  157/2 178/17 181/3 181/7
182/7 183/5
AssurancePartnersllp.com [1]  180/11
assure [1]  20/5
Athletes [5]  166/16 166/19 167/1 167/5
167/7
Atlas [4]  41/4 41/8 79/25 80/1
attach [2]  130/9 131/4
attached [17]  12/5 13/14 13/14 21/10 25/21
79/20 79/22 80/7 80/11 90/8 128/14 128/18
130/5 130/13 131/10 187/14 188/11
attaching [2]  12/23 129/14
attachments [4]  12/21 12/25 15/19 15/22
attempt [1]  9/19
attempted [1]  135/24
attention [11]  18/23 19/14 58/3 103/21
103/24 105/3 143/20 159/7 164/14 167/14
213/6
attorney [1]  212/4
attorneys [3]  220/23 220/24 221/1
audio [4]  137/7 137/15 137/17 151/10
audit [20]  89/10 89/16 89/19 89/20 89/23
90/2 91/7 91/20 91/22 92/9 92/10 92/17
127/13 132/2 132/3 177/12 179/11 179/14
179/16 179/19
audited [2]  127/2 127/3
auditing [2]  17/16 178/21
auditor [2]  90/14 127/4
auditors [28]  16/7 16/9 16/12 16/21 16/25

17/11 17/21 18/19 25/19 26/7 26/12 27/21
90/4 127/8 127/9 127/11 127/20 127/25
128/19 131/25 132/12 138/9 138/20 156/19
173/19 177/8 188/22 188/24
auditors' [1]  16/20
August [9]  10/3 10/20 11/13 11/14 32/4 51/8
79/12 98/22 99/9
August 13th [1]  10/3
August 16 [1]  79/12
August 2007 [2]  32/4 99/9
August 21st [1]  10/20
August 22nd [1]  10/3
August 24th [2]  11/13 11/14
authenticate [1]  82/12
authenticity [2]  157/13 157/25
authority [1]  124/9
authorized [3]  84/15 161/13 184/15
automatically [1]  3/6
available [3]  20/7 121/21 121/23
Avenue [1]  1/18
average [2]  215/8 215/9
Avi [9]  60/8 60/10 130/18 131/13 131/21
194/10 194/13 200/13 200/24
avoid [2]  63/16 153/8
awards [1]  209/5
aware [21]  108/9 110/2 142/24 154/1 173/7
173/12 173/13 175/11 183/12 183/22 184/1
185/8 205/2 205/4 205/9 205/11 205/13
221/7 222/9 222/13 223/15
away [2]  106/5 215/15

## B

back [87]
background [3]  29/20 181/22 204/7
backup [1]  117/3
bad [1]  119/13
balance [11]  53/13 53/16 74/20 99/13 101/1
122/2 142/25 143/18 143/18 213/17 215/18
ballistic [1]  146/14
bank [12]  124/9 124/12 142/25 184/9 184/11
184/14 213/3 213/6 213/9 213/10 213/11
222/9
bankruptcy [11]  220/17 220/18 220/20
220/22 221/6 221/13 221/16 221/21 222/6
222/17
based [6]  46/25 111/20 148/22 185/24
209/11 219/24
basically [11]  31/11 32/14 44/8 82/18 145/3
178/23 182/5 188/1 209/15 210/2 213/22
basics [1]  122/23
basis [2]  123/5 155/25
Bates [1]  125/24
battle [1]  173/5
Beach [3]  1/7 1/20 1/25
bear [2]  75/17 171/2
became [4]  72/19 124/12 171/21 185/7
because [39]  2/24 43/5 44/7 49/16 62/16 64/2
64/17 66/1 74/18 75/8 81/13 99/19 99/20
99/25 106/4 111/2 111/9 111/22 112/22
113/1 117/3 132/1 137/23 138/25 139/20
140/16 145/11 149/8 149/12 152/17 156/18
158/11 162/19 181/14 183/12 185/23 189/7
204/13 222/17
become [6]  21/16 23/16 185/4 197/23 202/16
215/11
before [44]  1/12 6/9 9/9 10/5 10/21 11/14
16/3 19/25 20/6 25/14 35/18 37/5 61/22 62/3
64/8 66/2 69/7 69/19 73/22 82/16 87/21
87/22 106/19 108/16 109/12 150/5 151/12
159/4 168/2 168/3 174/2 176/17 178/8 181/4

185/1 190/17 200/9 200/20 201/9 202/18
204/1 204/3 205/15 218/4
beg [1]  99/25
began [3]  113/6 185/2 214/1
begin [1]  6/9
beginning [6]  33/23 114/10 148/25 149/1
163/1 190/7
behalf [5]  104/1 131/12 161/8 188/9 216/16
behind [2]  80/23 81/8
being [47]  2/23 5/8 6/12 10/25 22/4 23/20
29/25 39/14 59/1 64/10 64/10 71/1 73/4
74/10 87/14 97/7 97/25 100/12 108/5 110/3
114/11 123/4 123/18 123/22 126/15 140/10
140/11 144/25 145/11 149/4 149/22 150/1
156/20 171/25 178/11 182/2 182/21 189/24
191/14 198/13 200/19 201/8 202/16 209/15
209/16 214/22 222/13
believe [53]  13/7 22/25 31/25 33/17 33/19
34/25 36/14 47/12 47/19 51/2 58/3 60/17
62/18 71/7 73/1 77/2 80/25 84/24 85/1 85/4
86/14 86/16 86/18 86/23 88/10 91/24 102/25
103/22 113/3 117/5 122/9 129/16 137/21
138/25 146/25 148/14 155/5 155/15 157/10
164/24 168/12 169/8 169/19 174/5 176/13
177/14 182/23 184/21 188/11 189/17 190/25
212/20 222/2
believed [1]  36/12
believes [1]  142/1
below [7]  26/2 80/1 83/17 110/22 143/19
143/19 180/10
benefit [1]  216/10
besides [4]  132/12 132/21 162/13 165/25
best [9]  2/18 17/2 73/15 77/19 94/20 149/6
209/15 218/15 225/3
bet [2]  214/24 215/1
better [5]  3/1 15/15 35/9 41/15 99/3
between [21]  10/1 10/18 58/4 94/17 108/4
108/8 111/10 111/22 116/6 116/8 120/2
122/22 126/23 141/16 141/18 148/2 160/8
164/21 178/1 188/5 198/23
beverage [1]  220/1
beyond [1]  153/1
big [4]  105/8 105/20 132/20 164/17
bill [2]  39/4 123/24
billion [1]  22/18
bills [8]  32/20 32/21 37/17 37/18 51/22 79/20
210/9 216/21
binder [16]  70/20 70/22 71/1 129/21 130/8
147/20 200/6 200/7 207/4 212/14 213/2
214/18 215/23 216/2 216/4 217/14
binders [2]  70/22 70/25
bipolar [1]  100/12
bit [16]  9/21 17/17 33/18 33/23 40/10 52/16
73/5 75/2 130/20 139/24 142/21 187/19
190/3 192/9 199/9 209/7
black [2]  86/21 215/4
blocking [1]  21/2
blood [1]  149/4
blow [24]  8/11 16/17 17/17 19/1 23/12 23/14
42/9 75/21 89/6 110/22 112/7 125/6 126/2
127/17 129/6 133/11 134/6 135/17 141/12
143/4 144/11 169/14 200/17 201/5
blown [1]  169/12
blue [1]  89/9
board [41]  31/10 73/12 84/19 84/22 85/22
86/2 86/7 86/8 86/9 86/13 86/15 86/17 86/19
86/23 86/24 86/25 87/2 87/2 87/3 87/4 87/5
87/8 87/14 88/7 88/11 88/20 88/21 88/22
88/24 89/3 89/10 89/13 90/9 91/21 92/1
143/11 154/7 155/1 170/15 179/17 179/19

# B

Boca [2]  34/6 195/24
bogus [1]  61/16
Boliek [3]  17/10 17/13 177/21
book [6]  71/2 71/2 71/5 173/22 210/20
 213/14
bookkeeper [1]  32/12
books [1]  148/20
boss [3]  70/14 81/5 105/20
both [16]  4/5 6/18 6/19 21/1 25/5 103/25
 119/24 119/24 133/6 136/12 149/8 172/17
 188/7 190/3 193/17 193/23
bottom [20]  8/20 9/4 13/3 13/3 19/16 38/23
 42/19 54/4 89/2 128/6 134/22 148/6 159/9
 171/4 171/6 187/7 201/16 203/13 211/22
 212/6
bought [1]  41/5
Boulevard [1]  80/3
bounce [1]  130/20
bound [3]  70/20 71/2 71/5
Bowl [2]  166/17 167/5
box [1]  198/24
boxes [9]  197/6 197/22 198/6 198/13 199/22
 199/25 200/2 203/14 203/17
Boy [1]  55/14
breach [1]  164/2
break [16]  2/22 40/10 52/16 56/14 56/16
 56/23 101/10 101/11 106/19 150/6 150/10
 150/19 158/22 186/20 191/7 191/10
breaks [1]  6/15
brief [4]  178/20 186/18 191/14 203/21
briefly [4]  7/15 114/5 142/22 223/5
bring [8]  5/21 5/25 57/12 63/14 63/17 104/11
 158/16 192/13
broad [1]  221/18
broke [1]  58/2
broken [1]  215/19
broker [4]  33/8 33/9 146/24 146/25
brokerage [5]  33/12 79/25 146/22 147/3
 161/12
brother [1]  195/11
brother-in-law [1]  195/11
brought [2]  82/23 188/21
Budimir [5]  43/13 107/16 107/19 108/25
 111/2
building [1]  205/20
bunch [3]  2/18 13/10 13/18
Bunes [29]  30/20 31/3 31/14 35/15 35/21
 35/25 36/1 37/11 38/15 40/17 40/21 70/12
 70/20 84/12 85/14 85/17 85/19 86/8 89/8
 89/17 90/21 90/23 95/2 95/25 98/22 99/19
 168/14 169/16 184/25
Bunes' [4]  70/17 94/20 95/17 97/23
business [5]  32/4 78/4 96/15 98/18 171/19
businesslike [2]  100/19 100/20
bust [1]  179/3
butler [1]  220/3
buy [3]  14/19 198/23 214/10
Byron [4]  161/12 161/19 161/21 162/4

# C

C-u-t-t-e-r [1]  193/8
cables [4]  18/9 18/15 18/16 129/11
calculated [1]  79/21
calculating [1]  168/3
calculation [2]  114/12 114/15
calculations [1]  167/19
caliber [2]  209/15
California [3]  80/4 110/1 119/8

called [35]  13/18 23/23 29/24 30/16 34/10
 43/22 43/22 47/11 58/23 58/24 59/15 60/14
 87/2 93/18 103/17 115/9 116/21 117/2 122/5
 136/2 136/9 136/13 146/5 160/18 178/23
 179/22 185/13 185/20 193/24 194/1 194/22
 195/3 199/8 203/3 219/14
calling [3]  86/25 87/2 93/20
calls [8]  28/21 31/9 37/1 40/25 93/12 168/21
 170/16 192/24
came [17]  5/14 30/6 40/20 61/6 99/8 100/11
 100/13 103/15 110/17 117/1 155/17 171/9
 188/6 199/12 199/21 209/6 222/6
can't [20]  12/25 62/25 64/22 78/13 78/14
 81/14 103/20 104/23 105/4 106/7 147/18
 155/6 157/9 169/6 173/17 173/17 191/18
 191/23 198/9 221/17
Canada [2]  110/11 110/16
Canadian [6]  110/9 111/4 111/10 111/23
 213/9 213/11
canceled [3]  43/6 58/25 72/22
cannot [3]  33/8 144/23 202/11
capacity [7]  113/13 121/8 121/10 142/24
 160/23 194/8 222/4
capitalized [3]  19/24 20/3 20/6
caps [1]  23/5
car [1]  104/24
card [5]  43/5 210/9 210/10 211/19 211/21
Cardiac [17]  8/8 17/4 18/1 25/23 59/15
 116/24 128/9 128/17 128/21 128/24 129/2
 133/17 134/13 134/18 141/9 142/2 142/8
care [6]  40/9 48/8 49/10 51/11 84/17 197/14
careful [1]  23/20
carefully [1]  180/21
Carolina [8]  29/19 30/8 33/4 91/1 91/4 91/4
 177/10 177/11
Carolinas [2]  90/17 90/25
carries [1]  148/7
cars [1]  36/24
Carter [44]  47/8 47/10 47/17 47/20 48/8
 48/12 48/15 48/17 48/23 49/10 49/12 49/15
 49/20 51/11 51/18 51/21 52/2 52/6 53/18
 58/7 115/22 115/25 116/8 195/5 195/9
 195/12 195/16 196/13 196/17 196/22 196/23
 197/8 199/5 199/21 199/24 203/17 204/10
 204/13 204/19 204/22 204/25 205/2 206/2
 206/4
case [16]  1/2 5/9 56/18 63/10 63/14 64/3 93/3
 101/14 112/22 150/7 156/17 156/21 171/13
 184/3 191/9 224/14
cases [1]  24/10
cash [37]  10/8 41/15 43/7 43/8 43/11 45/16
 51/14 51/15 53/13 53/15 53/20 79/23 80/10
 80/11 99/13 101/1 111/3 115/3 122/3 123/6
 123/7 123/8 123/10 123/17 142/25 143/17
 143/18 145/1 145/3 145/3 146/4 146/11
 174/7 189/25 190/4 190/5 190/7
casino [5]  207/23 208/3 210/3 214/6 214/13
cause [4]  22/14 23/22 39/21 71/24
causing [2]  188/24 189/2
CC [1]  21/22
ceased [2]  112/19 112/22
center [1]  197/19
CEO [15]  34/22 59/24 81/2 86/11 99/8 113/7
 113/11 144/19 152/12 159/15 169/16 171/21
 173/9 174/6 185/13
CEOs [11]  34/20 34/24 35/14 35/25 37/4
 81/7 82/5 107/15 184/22 185/9 185/12
certain [12]  9/22 11/5 39/24 71/8 87/10 91/6
 137/7 162/20 170/16 185/19 209/11 219/21
certainly [4]  13/13 89/22 152/23 191/17

certificate [7]  39/25 40/7 46/15 79/25 80/2
 217/16 228/17
certificates [5]  58/22 72/20 78/24 79/1 79/3
certifications [1]  175/13
certified [4]  62/8 119/10 120/12 228/19
certify [1]  228/19
cetera [2]  53/15 157/13
CFO [5]  93/5 93/9 182/2 184/9 184/12
chain [3]  55/13 89/5 112/9
chair [1]  193/4
chance [5]  70/6 102/3 105/7 130/1 147/25
change [7]  31/17 31/19 31/22 32/8 78/3
 176/25 177/5
changed [2]  32/11 188/13
changes [1]  188/14
Chapter [2]  221/3 221/6
characterization [1]  155/1
charge [3]  17/10 36/6 219/19
charged [1]  219/21
Charles [1]  1/21
Charlie [1]  87/5
chart [3]  80/23 106/4 106/20
chase [1]  220/16
chasing [2]  220/12 220/14
chauffeur [1]  196/20
cheat [1]  137/6
check [10]  37/5 38/20 53/12 100/25 179/7
 179/7 184/15 210/2 210/11 210/12
checked [1]  98/20
checking [2]  16/9 179/5
checks [9]  38/23 38/25 115/7 115/9 115/10
 184/20 184/22 185/1 185/3
chief [12]  31/1 31/6 77/5 77/6 77/12 77/13
 121/9 124/1 124/8 124/14 132/15 142/22
chips [3]  210/13 214/8 214/9
choices [1]  149/10
Christ's [1]  24/4
Christmas [1]  43/21
chronology [2]  35/14 35/17
Cincinnati [1]  193/16
circulate [1]  176/13
circulated [1]  206/4
circumstances [1]  155/2
cite [2]  137/6 137/11
cites [2]  137/6 151/4
cities [1]  154/7
city [4]  29/18 119/7 193/15 207/20
civil [2]  104/3 215/21
claim [1]  221/12
claimed [1]  109/2
clarity [1]  28/15
clear [8]  12/2 14/16 20/12 65/13 125/23
 135/12 136/12 147/9
clearly [1]  193/17
Clematis [1]  1/24
clients [6]  119/12 119/18 119/21 120/8
 120/23 145/22
clip [2]  137/14 137/16
clips [1]  137/10
close [6]  70/15 80/20 83/20 105/3 130/8
 223/14
closed [1]  104/25
closely [2]  70/11 160/12
closeness [1]  70/17
closer [1]  106/4
closing [2]  36/17 47/1
co [2]  113/11 159/15
co-CEO [2]  113/11 159/15
coast [1]  154/7
coconspirator [3]  196/8 196/12 196/13

## C

code [1] 221/7
Cohen [9] 60/8 60/10 130/18 131/13 131/21 194/11 194/14 200/13 200/24
collated [2] 29/3 29/4
collect [2] 215/12 216/23
collection [2] 208/5 208/17
collections [1] 207/23
Collinic [4] 159/11 160/1 160/7 160/11
Colonic [1] 160/17
com [1] 179/3
comes [3] 19/22 79/22 80/9
comfortable [2] 139/18 200/7
coming [3] 4/15 57/14 107/17
comment [1] 2/22
commentators [1] 183/21
commented [1] 157/23
comments [1] 176/15
commercial [2] 193/22 193/23
Commission [7] 62/19 73/10 73/23 74/1 120/11 121/13 172/10
commissions [4] 140/1 140/7 167/16 168/3
commitments [1] 191/24
committee [15] 89/10 89/16 89/19 89/20 89/23 90/2 91/20 91/23 92/9 92/10 92/18 179/11 179/14 179/16 179/20
common [3] 140/5 167/17 216/20
communicate [1] 60/12
communicating [3] 15/3 26/7 31/10
communication [1] 72/3
communications [2] 27/17 164/1
comp [3] 219/22 219/23 219/25
companies [22] 20/4 41/8 119/21 119/23 119/23 119/25 119/25 120/10 133/5 133/6 139/21 140/17 156/13 176/4 176/5 178/22 183/9 183/11 183/21 183/24 205/23 212/5
company [128]
company's [10] 49/18 124/9 141/1 142/25 142/25 145/1 178/24 179/9 190/4 190/5
comped [2] 220/6 220/6
competent [3] 162/16 162/21 180/19
compiling [1] 89/16
complain [1] 111/5
complaining [3] 111/13 111/14 111/17
complaint [1] 205/5
complete [2] 93/2 181/23
completed [1] 56/3
Completely [1] 184/6
completes [1] 210/3
compliance [9] 90/7 155/16 168/20 169/4 178/21 180/2 180/16 181/16 183/25
complied [4] 163/17 182/9 184/5 189/7
comply [1] 183/11
complying [1] 189/6
components [1] 144/5
comport [1] 169/24
comprehensive [1] 172/13
comprise [1] 103/3
computer [2] 196/24 198/24
concentrate [1] 23/17
concept [1] 63/24
concern [7] 108/5 127/25 128/3 138/10 138/19 190/8 190/10
concerned [5] 4/25 154/9 157/7 189/24 195/18
concerns [1] 128/2
conclude [1] 214/11
concluded [1] 66/8
conclusion [2] 168/22 175/17

condition [2] 90/3 156/13
conditions [1] 25/22
conduct [1] 63/17
conference [2] 37/19 91/9 91/22
confidential [1] 121/21
confirm [6] 82/5 133/7 138/13 162/10 165/10 165/18
confirmation [4] 133/16 135/9 136/11 187/13
confirmations [2] 133/6 186/5
confirmed [2] 81/2 221/10
confused [1] 136/17
confusing [2] 148/13 196/22
confusion [1] 142/18
Connections [2] 48/8 51/12
consider [2] 162/13 197/13
consideration [1] 80/20
considered [2] 209/20 209/21
consistent [3] 63/6 65/12 95/1
Constitution [1] 23/8
consult [3] 149/10 149/12 181/16
consultant [4] 156/6 156/21 178/14 178/15
consultants [2] 175/22 175/23
contact [13] 60/14 104/1 122/13 127/9 141/23 146/12 170/1 170/10 170/14 170/16 170/17 170/22 178/5
contacted [6] 60/17 91/24 170/3 170/8 170/9 222/13
content [3] 149/16 157/14 157/16
contents [1] 160/19
context [1] 13/1
continue [14] 6/17 38/3 51/18 51/21 55/12 57/23 107/8 171/1 208/16 208/19 214/12 217/5 217/7 217/9
continued [3] 220/16 226/3 228/2
continues [2] 20/1 23/6
contract [35] 50/18 50/20 50/23 93/23 93/24 94/5 95/2 95/16 99/4 141/5 141/8 149/25 153/23 154/17 163/9 163/13 163/14 163/16 167/22 167/24 168/2 168/3 168/11 168/12 168/13 168/20 169/2 169/4 170/4 171/12 171/18 173/23 181/6 182/9 182/14
contractor [2] 111/24 144/4
contracts [1] 173/2
control [14] 6/8 34/18 34/24 35/23 36/1 36/3 36/8 37/10 37/12 37/13 80/24 85/12 85/18 162/22
controlled [2] 36/12 95/25
controls [10] 178/24 178/25 179/2 179/5 179/7 179/10 179/12 179/23 180/2 180/21
controversy [1] 183/10
conversation [3] 137/23 163/4 186/2
conversations [9] 82/2 159/18 159/21 172/22 172/25 173/1 173/7 173/12 173/13
convey [1] 59/4
conveying [1] 53/6
cooperation [2] 224/13
copied [7] 20/8 52/19 85/25 92/15 141/18 142/11 160/23
copies [11] 2/13 3/7 3/10 3/15 6/14 6/17 28/23 38/12 88/6 88/11 90/9
copy [29] 15/8 15/9 15/13 26/2 26/8 39/25 40/7 46/15 49/5 50/19 50/23 51/6 52/12 52/13 52/14 54/20 59/20 62/8 78/18 86/25 89/14 95/19 141/1 141/3 147/16 147/19 148/23 154/21 188/11
copying [2] 55/15 55/16
corporate [4] 58/18 114/25 115/1 115/1
corporations [1] 119/22
correct [119]

correspond [1] 59/14
cost [5] 18/10 18/11 129/12 129/13 205/23
costs [3] 164/18 164/20 209/5
couldn't [5] 11/18 12/25 43/4 51/22 105/8
counsel [8] 1/21 58/18 84/2 114/25 115/1 121/3 163/25 164/1
counter [1] 134/17
countless [1] 148/21
couple [4] 24/24 29/21 33/15 92/2
courier [1] 48/16
course [11] 14/5 31/15 45/8 81/8 82/20 96/15 171/18 208/7 214/7 216/23 223/9
COURT [21] 1/1 1/24 2/1 3/4 3/5 3/8 3/13 24/18 38/10 63/7 64/1 64/4 66/6 137/9 147/19 151/5 151/23 154/22 155/3 157/22 178/20
Court's [5] 24/15 117/6 136/24 147/20 150/3
courtroom [16] 2/22 3/16 5/4 5/10 5/17 6/4 56/21 57/19 101/17 104/15 107/4 150/9 158/18 191/12 192/19 225/6
cover [3] 107/16 116/14 126/24
covered [1] 116/11
CPA [2] 17/12 17/15
CPE [1] 1/23
CR [1] 1/2
crap [1] 34/5
crazy [1] 100/12
create [1] 202/20
created [2] 132/4 135/12
credit [17] 22/20 43/5 71/9 71/16 71/17 71/21 71/24 97/18 97/22 171/22 172/1 172/4 172/8 209/22 210/15 212/6 212/12
creditor [1] 221/3
credits [1] 29/21
criminal [2] 1/17 149/12
critical [3] 19/24 20/4 174/24
cross [21] 63/10 64/25 70/7 103/3 107/9 114/10 115/12 150/6 150/14 158/24 159/1 190/3 191/18 203/20 203/22 217/23 217/25 226/7 226/11 226/15 226/18
cross-examination [12] 70/7 103/3 107/9 114/10 115/12 150/6 150/14 159/1 203/20 203/22 217/23 217/25
cross-examine [2] 64/25 158/24
cross-examining [1] 63/10
crosses [1] 61/19
Crowley [1] 14/2
CRR [2] 1/23 228/25
crucial [1] 49/17
currency [1] 123/2
current [3] 88/7 99/13 221/2
currently [4] 26/2 29/22 169/21 207/22
custom [1] 81/1
customer [5] 205/8 205/10 208/10 209/9 218/10
customers [3] 211/24 212/10 219/16
Cutter [24] 192/24 193/2 193/7 193/13 194/25 196/17 196/21 196/22 196/23 197/5 197/12 197/21 200/4 200/8 200/19 201/8 201/17 201/25 202/9 202/15 203/2 203/13 203/24 226/13
Cutter's [1] 206/23

## D

daily [2] 36/16 55/21
Dairy [1] 1/22
damaged [1] 200/2
date [37] 8/2 8/11 8/12 8/19 8/21 9/4 9/5 10/1 10/19 11/12 17/6 20/23 21/23 42/10 42/13 44/18 44/22 44/25 45/21 48/10 49/6 51/7

**D**

date... [15]  54/8 58/4 59/21 64/8 64/9 83/20
83/23 91/24 97/15 134/7 143/12 153/24
168/1 168/17 218/24
dated [5]  76/21 89/9 127/20 144/15 228/22
dates [1]  113/15
daughter [1]  34/3
David [1]  53/12
Davis [15]  17/14 17/15 29/24 29/25 90/15
90/25 91/10 127/5 127/20 164/22 171/16
177/8 177/10 178/2 178/5
days [16]  25/25 27/5 27/6 27/24 32/1 44/24
44/25 53/15 89/11 105/2 138/15 165/5
166/17 189/15 215/10 224/19
DC [1]  1/18
deal [10]  69/8 70/3 101/12 101/22 132/20
150/25 158/22 208/16 208/16 208/19
dealing [1]  211/1
deals [1]  60/18
dealt [2]  13/20 32/12
Dear [1]  155/11
debate [1]  183/21
debt [13]  208/5 208/12 208/14 208/17 208/21
208/23 209/8 214/15 215/21 217/1 217/3
221/3 223/17
debts [5]  215/12 216/23 223/8 223/10 223/10
December [6]  73/23 126/22 140/4 151/11
176/18 222/4
December 18th [1]  151/11
December 2nd [1]  176/18
December 31st [2]  126/22 140/4
December 7 [1]  73/23
decide [1]  153/6
decided [2]  149/19 149/24
decision [5]  169/23 170/2 170/2 170/4
222/22
deeply [1]  181/14
DEFENDANT [6]  1/7 1/19 33/15 37/17
194/25 208/8
Defendant's [55]  25/7 34/16 66/20 67/2 67/6
67/10 67/14 67/18 67/22 68/6 68/10 68/14
68/18 68/22 69/1 69/5 69/13 69/24 94/12
95/14 97/13 103/9 118/4 152/12 158/14
168/8 178/7 181/12 227/11 227/12 227/13
227/14 227/15 227/16 227/17 227/18 227/19
227/20 227/21 227/22 227/23 227/24 227/25
228/3 228/4 228/5 228/6 228/7 228/8 228/9
228/10 228/12 228/13 228/14 228/15
Defendant's 202 [1]  178/7
defense [29]  2/9 7/14 7/23 9/8 9/17 9/20
10/13 11/9 12/2 12/7 13/13 13/24 15/16
18/25 21/9 21/10 37/24 63/13 63/15 63/20
65/16 95/12 114/11 147/16 152/5 152/6
152/6 173/16 225/11
Define [1]  159/20
definite [1]  219/22
definitely [4]  40/22 84/9 144/23 215/20
defraud [1]  148/16
degree [1]  29/21
delay [3]  6/7 106/23 158/23
delays [10]  17/1 128/5 164/18 164/20 165/6
165/7 165/9 165/13 165/24 167/11
delivered [5]  47/2 48/14 198/13 198/14
198/25
delivery [7]  40/1 40/6 44/11 48/16 197/6
197/22 203/14
Dell [1]  165/13
demanded [1]  147/8
deny [6]  75/11 76/4 76/5 92/24 92/25 108/18

department [4]  1/17 73/6 109/25 166/2
department's [1]  215/16
departure [1]  81/20
deposit [2]  18/11 129/13
deposition [22]  62/4 62/10 62/15 62/17 62/23
62/25 63/2 63/3 63/21 63/23 64/4 64/9 64/12
64/14 64/16 64/17 65/15 66/4 103/1 154/23
176/17 176/20
depositions [2]  62/3 62/6
deputy [1]  2/22
describe [16]  34/15 116/19 127/6 127/10
133/1 145/1 146/8 190/4 195/12 195/16
198/19 198/21 208/1 209/13 211/25 212/2
described [1]  47/21
describes [1]  131/2
description [2]  130/5 178/20
designing [1]  170/16
desperately [1]  144/24
despite [1]  33/20
detail [2]  37/8 142/19
determine [2]  165/23 168/11
developing [1]  14/12
development [2]  30/15 110/1
device [8]  49/20 107/20 107/23 194/3 194/5
194/7 197/3 197/23
devices [3]  198/1 198/4 198/11
diagnostics [1]  205/3
dial [4]  91/22 91/25 92/11 92/12
dial-in [3]  91/22 91/25 92/11
dictatorial [1]  175/4
didn't [63]  12/3 12/4 12/19 12/21 13/1 13/2
13/13 15/22 19/8 19/15 21/11 21/14 24/9
24/18 26/20 26/25 34/25 43/6 54/23 59/5
62/15 65/1 70/14 72/7 73/21 78/4 81/12
86/25 88/15 89/22 89/24 90/21 93/15 97/22
98/4 98/7 98/19 100/23 101/7 112/16 115/13
116/12 135/24 136/1 136/2 136/21 154/24
160/13 162/17 162/19 166/23 173/11 176/3
179/11 195/4 198/2 198/12 200/11 202/21
202/23 203/18 211/6 220/20
differed [1]  110/12
difference [4]  66/2 111/22 120/2 126/23
different [9]  44/8 45/25 63/20 73/5 76/6 78/5
111/10 154/7 188/10
differently [1]  171/9
difficult [1]  129/24
difficulty [1]  6/11
direct [32]  19/14 29/14 57/23 58/3 63/17
65/15 116/15 119/3 151/10 155/17 156/15
159/7 190/3 191/18 193/11 207/16 220/10
224/7 226/6 226/10 226/14 226/17
direct's [1]  57/17
directing [3]  39/8 47/6 213/6
direction [5]  14/10 48/23 53/19 100/23 101/2
directions [1]  100/21
directly [6]  64/4 116/2 133/17 156/16 166/13
184/23
director [2]  207/23 222/5
director's [1]  87/9
directors [5]  31/10 84/19 84/22 85/23 87/7
dirt [1]  61/15
disagreement [1]  108/3
disagreements [1]  108/8
disappeared [2]  113/5 113/6
disappointed [2]  139/13 223/20
disaster [1]  25/17
disclosed [1]  122/20
disclosure [1]  172/17
disclosures [1]  172/17
discontinued [1]  165/14

discuss [9]  49/14 56/18 56/23 101/14 101/19
150/7 150/11 191/9 224/14
discussed [2]  22/4 28/17 28/23 88/22
102/21 111/8 148/3 159/19 161/8 170/23
188/1 190/3
discussing [2]  27/3 132/12
discussion [11]  49/22 50/13 50/15 94/1 113/4
117/1 122/5 164/5 164/9 164/11 187/22
discussions [12]  71/15 149/21 155/1 171/15
174/19 174/22 175/18 175/20 176/10 176/13
185/9 217/5
dispute [2]  160/8 188/13
distribute [1]  198/3
distribution [5]  194/5 197/18 198/11 204/20
204/21
distributor [1]  197/23
DISTRICT [4]  1/1 1/1 1/13 217/17
division [4]  1/17 109/6 109/24 122/16
doberman [1]  187/8
DOBIECO [1]  21/21
document [84]
documentation [1]  178/24
documented [2]  161/10 178/25
documents [19]  11/8 28/24 46/7 87/24 91/6
125/2 127/14 152/25 155/15 155/20 155/21
155/24 156/1 156/4 172/6 172/6 172/17
200/4 211/1
does [46]  9/14 10/10 11/1 11/22 11/24 22/3
35/15 38/12 43/16 43/18 43/20 50/12 50/14
58/9 63/25 103/25 104/5 106/7 111/16 120/7
128/13 128/15 130/4 130/7 139/2 139/3
141/25 149/15 162/8 169/24 169/25 187/6
195/21 195/23 196/2 205/20 209/11 209/18
210/7 210/9 210/14 212/11 214/24 215/2
215/7 219/1
doesn't [12]  9/13 10/9 10/25 19/10 63/18
65/5 65/14 65/17 66/2 155/3 172/16 193/4
doing [16]  10/4 82/7 91/23 92/15 122/24
129/24 146/6 161/23 162/3 167/2 167/5
167/18 180/17 181/21 186/5 211/9
dollar [5]  110/12 111/10 172/8 210/8 217/18
dollars [8]  80/16 80/19 80/20 80/21 80/22
111/4 209/6 209/18
don't [166]
done [18]  6/25 14/14 37/3 70/1 98/7 98/8
98/15 98/16 110/4 123/22 123/23 145/18
145/20 154/1 181/19 196/3 196/19 221/15
door [1]  189/21
dot [1]  179/3
doubled [1]  32/5
doubt [2]  47/5 167/10
down [30]  8/4 9/8 9/16 13/2 17/17 18/22 22/6
22/11 22/22 23/1 23/5 35/21 37/14 40/10
50/9 52/16 56/22 58/13 99/11 101/18 126/18
145/5 148/23 148/24 150/10 169/11 171/2
180/10 190/7 216/11
dozen [1]  20/2
Dr [73]  19/7 19/10 19/19 20/7 20/16 22/25
23/3 26/14 26/16 27/9 27/15 27/19 54/17
56/10 96/17 98/1 98/4 99/12 99/20 100/6
100/8 108/4 112/15 112/19 113/25 136/2
136/4 136/10 136/12 138/23 143/7 153/23
154/6 155/2 155/10 164/21 164/25 165/3
165/10 165/18 165/25 166/21 169/21 170/1
170/6 170/14 170/14 170/22 171/21 172/3
172/23 173/2 174/9 174/10 174/19 174/24
175/4 175/19 178/10 180/10 182/13 182/15
182/22 182/23 183/1 185/7 185/20 186/2
186/6 186/10 189/20 189/24 190/16
Dr. [36]  10/2 10/18 11/4 11/18 11/22 12/12

**D**

Dr.... [30]  12/15 15/2 15/6 15/25 19/7 20/16
  20/17 21/22 23/22 55/16 56/7 86/15 98/2
  100/11 108/3 108/4 108/4 108/6 108/9 108/9
  109/1 127/20 138/5 139/2 156/7 166/2 166/7
  166/13 167/8 175/1
Dr. Drakulic [7]  108/4 108/6 108/9 109/1
  166/2 166/7 166/13
Dr. H [2]  98/2 175/1
Dr. Harmison [21]  10/2 10/18 11/4 11/18
  11/22 12/12 12/15 15/2 15/6 15/25 19/7
  21/22 23/22 55/16 86/15 100/11 108/9 138/5
  139/2 156/7 167/8
Dr. Harmison's [3]  56/7 108/3 108/4
Dr. Lowell [1]  127/20
Dr. Phillips [1]  20/17
Dr. Windom [1]  20/16
draft [1]  23/5
drafted [7]  23/19 23/20 164/19 164/21
  164/23 164/24 170/18
drafting [4]  175/10 175/13 176/22 177/2
drafts [1]  182/20
Drakulic [11]  43/14 107/16 107/19 108/4
  108/6 108/9 108/25 109/1 166/2 166/7
  166/13
draw [3]  143/20 210/4 214/12
drawing [1]  214/7
drawn [1]  214/2
Drive [1]  1/20
drop [1]  143/18
DTC [1]  43/2
due [1]  43/5
dumb [1]  148/14
dumbness [1]  148/18
dumping [1]  2/18
during [39]  6/15 35/24 36/1 36/3 36/17 37/11
  39/13 56/22 70/3 85/21 91/7 93/21 97/18
  100/7 100/11 101/19 103/16 105/16 107/14
  108/3 109/8 115/12 124/13 136/15 140/4
  150/11 150/19 151/10 160/2 162/20 171/21
  173/8 175/10 175/12 176/1 176/10 184/15
  191/10 214/7
duties [7]  30/25 31/11 32/8 32/10 121/11
  142/22 208/7
dutifully [1]  26/16
duty [2]  104/23 105/16

**E**

e-mail [136]
e-mailed [1]  93/3
e-mailing [2]  109/13 187/7
e-mails [13]  11/3 12/12 24/8 85/25 96/9
  115/13 115/16 115/21 115/24 116/11 116/15
  158/1 174/11
E006696 [1]  171/8
E148 [1]  171/10
each [11]  29/3 29/7 35/24 36/18 36/21 37/18
  47/23 103/11 120/21 204/11 206/5
ear [2]  2/19 3/7
earlier [8]  36/11 80/23 130/19 145/12 145/12
  185/8 203/14 212/17
early [2]  102/5 199/14
earned [1]  140/7
easel [1]  35/4
easier [2]  29/2 143/5
Easley [1]  35/11
east [1]  154/7
ECG [1]  23/24
edit [1]  165/3

edits [1]  12/16
educating [1]  182/1
educational [1]  29/20
effect [2]  14/22 103/22
effective [1]  83/20
efforts [1]  20/17
Ehrlichman [3]  35/18 113/8 113/9
eight [3]  119/20 212/22 221/15
either [12]  4/3 55/5 78/15 90/25 123/16
  149/1 149/3 149/12 151/3 166/13 200/7
  214/11
elaborate [1]  73/11
Electric [5]  49/11 143/21 143/24 190/14
  190/18
electrical [15]  47/11 47/11 48/8 49/11 51/12
  52/15 53/10 54/23 54/25 55/2 56/5 144/4
  144/5 144/7 197/1
Electrician [1]  195/22
Electrician/handyman [1]  195/22
electronic [2]  90/8 205/3
electronically [1]  129/25
electronics [2]  204/23 205/6
element [1]  48/18
Ellie [1]  84/15
Elliot [1]  177/7
Elliott [14]  17/14 17/15 29/24 29/25 90/15
  90/25 91/9 127/5 127/19 164/22 171/16
  177/10 178/2 178/5
Ellsworth [3]  84/13 84/19 85/2
ELMO [1]  25/16
else [18]  14/18 14/20 24/17 28/10 75/9 81/14
  89/25 111/17 117/9 132/22 134/2 139/5
  141/6 164/22 190/22 197/15 199/1 216/20
elsewhere [1]  109/21
emblematic [3]  90/7 113/25 173/21
employed [3]  29/22 30/6 207/22
employee [3]  33/10 109/18 111/24
employees [2]  154/7 210/11
employer [6]  103/18 104/1 104/2 104/3
  104/20 105/23
employment [1]  31/25
Encino [1]  80/4
enclosing [1]  79/23
end [24]  31/19 32/22 33/22 33/22 37/18
  40/14 41/14 59/7 85/11 85/12 85/14 94/20
  100/24 111/5 123/24 143/18 145/8 161/11
  182/12 187/7 205/12 205/14 214/9 214/13
ended [2]  126/21 140/4
ending [3]  85/15 151/13 151/15
ends [1]  20/7
engaged [2]  180/17 185/5
engagement [7]  123/13 156/5 156/8 156/10
  157/8 177/7 182/20
engaging [1]  180/15
engineer [1]  197/1
enhancement [1]  205/10
enormously [1]  22/9
enough [3]  13/23 54/19 62/16
Enron [2]  156/13 179/3
entails [1]  208/2
enter [1]  94/8
entered [40]  5/2 18/2 18/7 25/7 38/9 42/5
  62/4 66/20 67/2 67/6 67/10 67/14 67/18
  67/22 68/6 68/10 68/14 68/18 68/22 69/1
  69/5 69/13 69/24 94/12 95/14 97/13 103/10
  118/4 118/19 128/10 129/9 152/12 158/14
  167/24 168/1 171/22 181/7 181/12 211/14
  212/24
enters [8]  5/4 5/10 6/4 57/19 104/15 107/4
  158/18 192/19

entire [4]  61/17 63/3 97/2 177/7
entirety [1]  165/24
entitled [2]  76/22 228/21
entity [1]  138/21
entry [1]  213/20
equipment [2]  197/14 197/16
equity [2]  71/9 122/3
era [1]  37/11
Eric [1]  54/15
Erlichman [3]  113/12 113/16 117/1
especially [1]  190/5
ESQ [3]  1/16 1/16 1/21
essentially [3]  22/5 190/11 208/5
establish [1]  157/2
established [1]  212/9
et [2]  53/15 157/13
et cetera [2]  53/15 157/13
evaluate [1]  179/19
evaluating [2]  90/3 171/13
even [24]  10/5 11/15 11/22 11/23 15/25 40/2
  40/20 51/18 51/21 76/10 81/15 81/16 81/17
  99/19 129/2 131/19 142/16 149/8 158/9
  162/25 191/17 192/1 197/25 205/14
evening [5]  19/23 21/8 225/4 225/13 225/16
event [2]  24/6 171/11
events [2]  126/3 222/6
Eventually [1]  199/12
ever [85]
every [14]  4/19 37/8 37/8 61/16 70/21 74/16
  75/2 79/15 81/4 95/17 98/20 105/2 156/19
  176/14
everybody's [1]  148/23
everyone [12]  2/2 5/6 6/6 57/21 62/15 102/13
  104/7 107/6 143/17 150/23 158/20 192/21
everything [8]  21/16 37/21 70/21 81/1 98/21
  157/3 169/3 191/10
evidence [84]
evidentiary [1]  153/8
Evie [2]  60/25 61/3
exact [3]  80/18 112/21 217/17
exactly [10]  32/2 41/3 48/24 49/2 51/9 52/11
  78/6 109/17 110/2 214/19
examination [27]  6/9 7/8 24/22 29/14 57/24
  63/17 65/16 70/7 103/3 107/9 114/7 114/10
  115/12 119/3 150/6 150/14 151/10 159/1
  186/21 193/11 203/20 203/22 207/16 217/23
  217/25 220/10 223/6
examine [4]  64/1 64/25 64/25 158/24
examiner [3]  74/11 75/3 75/9
examining [3]  63/10 106/23 152/7
example [4]  93/2 101/2 166/2 191/18
exceedingly [1]  191/14
except [1]  78/1
exception [3]  64/20 65/3 153/20
excerpt [1]  151/14
excerpts [1]  151/11
exchange [23]  8/2 10/1 10/18 14/17 62/19
  73/9 73/23 74/1 110/14 120/11 121/13 138/3
  141/16 141/18 142/12 148/1 148/6 161/9
  161/13 163/20 163/22 172/10 187/20
exchanges [1]  149/18
exciting [1]  24/6
exclude [1]  152/16
excluding [1]  163/5
excuse [5]  11/9 98/25 102/19 152/15 158/23
excused [5]  28/12 104/21 117/17 206/21
  206/23
execute [1]  188/9
executive [8]  30/9 31/1 31/7 31/11 36/22 78/5
  207/23 222/4

**E**

exercise [3]  125/14 125/21 126/10
exert [2]  36/1 36/4
exhibit [205]
exhibit 1 [5]  128/14 128/16 211/4 217/14
 217/15
exhibit 100 [1]  85/7
exhibit 118 [1]  75/19
exhibit 123 [8]  16/16 127/16 129/22 164/16
 167/15 168/18 169/11 171/1
exhibit 125 [3]  47/25 48/3 48/5
exhibit 130 [4]  135/5 201/2 201/15 201/22
exhibit 132 [2]  52/10 54/11
exhibit 134 [1]  138/1
exhibit 137 [2]  53/22 58/3
exhibit 139 [1]  84/11
exhibit 141 [1]  141/11
exhibit 144 [1]  110/20
exhibit 145 [1]  82/24
exhibit 149 [1]  94/8
exhibit 151 [1]  202/12
exhibit 152 [1]  49/3
exhibit 165 [2]  12/7 13/13
exhibit 168 [1]  51/3
exhibit 178 [1]  144/9
exhibit 180 [2]  15/14 15/16
exhibit 186 [1]  12/2
exhibit 188 [4]  7/23 9/8 41/18 42/7
exhibit 194 [2]  96/8 174/15
exhibit 200 [1]  113/21
exhibit 203 [1]  180/24
exhibit 204 [2]  182/12 182/19
exhibit 206 [2]  9/17 9/20
exhibit 209 [2]  152/5 174/2
exhibit 214 [1]  25/12
exhibit 216 [1]  10/13
exhibit 230 [2]  212/14 213/2
exhibit 231 [1]  213/14
exhibit 233 [2]  214/18 218/6
exhibit 25 [3]  152/5 173/15 173/16
exhibit 272 [3]  18/25 21/9 21/10
exhibit 28 [3]  215/23 215/25 216/7
exhibit 293 [1]  133/9
exhibit 295 [2]  46/12 46/14
exhibit 3 [3]  210/18 211/4 211/18
exhibit 318 [3]  38/15 38/19 114/21
exhibit 326 [1]  13/25
exhibit 332 [1]  112/6
exhibit 333 [2]  79/11 114/11
exhibit 338 [2]  78/7 78/22
exhibit 340 [1]  92/21
exhibit 341 [1]  82/13
exhibit 342 [1]  109/11
exhibit 343 [7]  76/16 77/19 147/25 159/8
 160/20 164/7 186/25
exhibit 344 [1]  108/12
exhibit 347 [1]  152/6
exhibit 349 [1]  87/20
exhibit 350 [1]  152/6
exhibit 46 [2]  44/2 44/4
exhibit 63 [1]  21/14
exhibit 64 [1]  8/6
exhibit 70 [5]  8/14 8/17 59/17 59/21 200/5
exhibit 73 [1]  124/21
exhibit 74 [2]  8/24 200/16
exhibit 83 [2]  95/8 168/8
exhibit 84 [1]  143/3
exhibit 9 [3]  171/3 171/8 171/11
exhibit 93 [1]  139/7

exhibit 99 [1]  92/5
exhibits [36]  2/13 3/22 4/2 4/5 6/12 6/14 7/14
 8/6 37/24 41/22 56/19 66/10 66/12 101/9
 101/15 101/23 102/15 102/18 102/22 103/5
 108/11 118/8 150/14 151/21 152/7 152/11
 152/17 156/25 157/1 157/7 157/14 210/21
 212/15 227/3 227/11 228/3
exist [1]  223/15
existence [2]  132/23 138/22
exists [2]  129/3 131/19
exits [6]  5/17 56/21 101/17 150/9 191/12
 225/6
expand [1]  75/21
expect [2]  4/18 138/14
expense [3]  108/23 183/9 183/20
expenses [2]  108/21 146/4
expensive [1]  183/12
experienced [1]  22/16
expert [2]  181/24 197/3
expertise [6]  182/3 182/4 182/7 205/2 205/21
 206/5
expired [1]  215/18
explain [27]  17/6 30/6 30/23 31/24 32/10
 39/11 39/20 42/22 43/10 44/6 48/5 49/14
 51/7 53/5 58/21 132/16 133/14 138/17
 195/16 202/9 209/13 209/25 211/17 212/7
 213/19 214/4 214/19
express [1]  142/18
extended [2]  158/22 158/23
extent [4]  21/3 62/22 145/15 155/20
extract [2]  63/12 63/14
extremely [2]  146/15 182/25
eyeballs [1]  105/4

**F**

facility [4]  197/14 197/18 219/13 219/16
facsimile [4]  134/5 134/9 135/21 201/24
fact [22]  9/13 12/22 13/7 22/3 50/25 53/2
 53/4 55/19 97/7 116/23 128/17 130/9 130/12
 131/4 131/9 134/19 145/21 157/14 162/10
 165/19 166/8 197/25
factors [3]  127/1 209/11 209/13
facts [1]  65/6
failure [1]  164/6
fair [20]  11/17 12/15 13/23 14/7 16/19 17/20
 20/9 21/25 36/8 40/16 66/13 130/25 135/8
 138/2 141/15 162/21 162/23 185/22 210/9
 217/11
fairly [2]  172/17 223/17
fairness [1]  63/4
fall [1]  121/6
false [1]  189/2
familiar [19]  43/22 56/9 59/10 61/2 88/4
 94/23 96/13 120/2 120/15 166/3 166/5 166/7
 166/8 166/19 172/10 178/18 181/24 186/4
 202/16
familiarize [1]  168/10
Famous [1]  184/8
far [13]  4/25 43/7 70/1 71/6 86/20 106/5
 109/4 110/15 195/18 195/19 195/19 195/20
 200/2
fashion [1]  91/17
favor [1]  198/7
fax [14]  40/5 40/7 72/4 72/5 72/7 105/9
 105/10 105/13 105/13 105/22 105/23 134/10
 136/10 202/4
faxed [1]  39/25
faxing [1]  72/2
FDA [1]  175/13
fearful [1]  150/1

February [6]  44/19 44/23 97/16 145/9
 161/11 174/25
February 11th [1]  97/16
February 19th [1]  161/11
February 2007 [1]  44/19
February 27th [1]  44/23
federal [3]  23/9 104/5 225/1
fee [4]  123/15 123/19 123/19 182/25
feel [1]  157/16
feeling [1]  70/2
fees [4]  61/18 163/21 187/24 209/5
felt [2]  156/21 174/7
few [17]  7/12 27/5 27/6 34/3 44/25 45/9
 53/15 75/7 89/11 99/14 101/5 138/13 151/21
 160/18 165/5 186/23 200/4
Fidelity [18]  18/3 18/9 18/15 30/16 47/13
 49/17 50/18 107/20 125/13 125/20 126/9
 128/11 129/11 154/8 165/8 165/15 166/5
 166/18
field [2]  87/16 183/10
Fifty [1]  43/19
fight [2]  14/20 61/18
figure [2]  136/20 153/11
figured [1]  2/18
figuring [1]  46/25
file [6]  46/10 120/10 121/19 156/14 164/2
 220/20
filed [13]  75/15 121/14 121/18 121/20 220/17
 220/18 220/22 221/12 221/14 221/24 222/16
 222/21 222/25
files [1]  89/14
filing [12]  73/11 124/25 125/24 126/12
 126/16 126/19 126/20 126/20 139/15 172/9
 172/12 181/17
filings [30]  73/9 73/15 73/18 74/11 74/14
 74/23 75/5 75/8 120/10 121/13 121/17
 121/18 121/21 121/25 122/7 122/16 122/21
 140/12 157/4 175/10 175/13 176/11 176/14
 176/22 177/3 177/23 181/15 181/17 189/2
 189/8
fill [5]  200/11 200/22 210/15 212/10 212/10
filling [1]  165/9
final [6]  50/18 162/9 187/14 187/14 187/16
 214/2
finalized [1]  163/14
finally [4]  27/24 147/13 189/17 202/12
finance [3]  125/13 125/20 126/9
financial [17]  10/9 17/16 90/3 120/9 121/9
 122/1 122/4 122/19 124/1 124/8 124/14
 127/1 127/2 132/15 138/22 142/23 171/15
financier [2]  160/1 160/15
fine [4]  6/21 53/17 157/18 185/6
finest [1]  23/23
finish [4]  181/23 186/19 191/8 191/22
finished [1]  50/9
finishes [1]  103/19
finishing [1]  162/7
Fink [2]  35/15 35/19
firm [29]  17/11 17/15 29/24 33/8 45/15 90/14
 119/20 123/12 124/5 127/5 146/4 146/22
 147/3 161/9 161/22 163/13 163/19 176/1
 177/16 177/17 178/13 180/11 180/15 181/18
 181/22 183/3 183/4 183/6 183/7
firms [1]  175/21
first [53]  8/15 10/5 11/15 14/14 17/24 17/25
 18/5 18/12 20/10 22/7 22/9 22/12 23/7 29/11
 30/24 31/12 33/25 38/2 44/25 53/24 54/2
 55/9 55/16 63/25 73/1 83/12 88/5 90/8
 108/12 122/8 123/10 124/11 125/9 125/9
 126/2 126/6 128/7 128/8 129/5 129/8 130/22

**F**

first... [12]  131/1 140/3 143/15 143/16 148/7
  151/11 152/1 161/4 165/7 165/13 187/23
  201/21
fit [1]  209/14
five [5]  102/5 106/19 138/12 219/7 224/19
five-minute [1]  106/19
fix [1]  5/13
FL [2]  1/20 1/22
Flagler [2]  1/20 221/10
flat [3]  123/15 123/18 123/19
flew [4]  109/16 109/19 109/19 219/10
Flight [1]  31/9
flip [1]  42/23
FLORIDA [6]  1/1 1/7 1/25 20/19 195/24
  221/2
flow [2]  10/8 174/7
flows [1]  122/4
focus [1]  122/19
focused [2]  122/17 122/18
folks [1]  21/2
follow [3]  82/10 105/25 142/14
followed [1]  175/6
following [16]  5/4 5/10 6/4 31/13 57/4 57/19
  61/25 66/10 79/1 102/12 107/4 150/22
  158/18 192/6 192/19 223/9
food [5]  204/18 204/19 204/20 204/21 220/1
footnotes [1]  122/4
foregoing [1]  228/19
form [14]  40/3 56/18 71/1 101/14 108/6
  121/19 122/9 124/24 126/21 150/7 185/17
  187/6 191/9 224/14
formal [1]  88/21
formed [1]  195/15
forth [4]  109/22 122/23 147/13 187/15
forward [8]  88/6 91/15 126/1 148/2 161/15
  169/23 170/4 207/10
found [2]  146/13 162/21
foundation [3]  157/9 158/10 166/16
four [7]  76/25 118/8 120/22 127/25 152/10
  155/15 219/7
fourth [5]  83/23 110/24 169/12 169/13
  170/24 187/4 187/6
Fox [1]  110/10
Foxhall [6]  109/13 109/15 110/8 110/21
  111/1 111/18
Franklin [7]  1/23 5/12 147/21 150/6 228/18
  228/24 228/25
frankly [1]  24/2
fraud [2]  148/15 149/11
freedom [1]  23/8
freezing [1]  222/9
frequently [1]  33/22
Friday [1]  224/17
friend [2]  195/20 203/15
friendly [3]  198/7 203/15 204/14
front [10]  16/16 80/2 129/21 155/4 164/15
  189/19 200/6 205/12 205/14 219/5
frustrated [1]  22/9
fucking [1]  23/5
fuel [1]  34/13
fulfillment [1]  205/25
full [7]  126/20 129/23 169/12 169/13 170/24
  217/1 217/3
fully [1]  90/24
functional [1]  90/24
further [15]  24/16 28/8 82/22 87/18 91/19
  117/7 117/10 117/13 188/1 190/20 192/2

206/17 217/21 223/2 223/22
future [2]  140/7 187/25

**G**

gamble [2]  219/11 219/14
gambled [1]  209/18
gamblers [2]  209/11 210/7
gambling [3]  210/3 215/3 223/20
game [2]  215/2 215/4
gaming [4]  210/4 214/21 219/24 223/17
Gault [10]  43/14 159/11 159/15 159/18
  160/7 160/12 160/24 161/25 164/9 167/1
gave [10]  32/1 32/5 47/23 64/12 66/3 123/16
  136/10 147/13 182/23 215/16
gears [2]  139/24 142/21
Gelfer [4]  99/25 100/5 108/25 109/3
general [8]  103/2 120/5 120/20 140/12
  159/24 160/25 183/12 219/16
generally [18]  14/7 89/3 91/16 111/8 120/1
  120/6 121/10 121/24 123/23 126/23 127/6
  127/10 133/1 138/18 145/1 145/10 195/9
  195/12
gentlemen [14]  5/7 5/12 56/17 57/22 101/13
  102/23 107/7 138/9 150/5 158/21 178/19
  191/6 216/4 224/12
genuinely [1]  191/15
gesture [1]  203/15
gets [1]  188/1
getting [15]  15/14 26/2 49/5 51/6 51/19 54/1
  59/20 62/12 82/17 83/7 132/19 132/22
  145/13 145/14 148/19
gift [2]  149/1 149/4
girlfriend [1]  195/10
girlfriend's [1]  195/10
give [18]  2/20 14/23 34/4 36/23 63/4 66/3
  105/7 105/11 105/12 105/22 105/23 113/2
  143/17 146/2 146/18 147/8 171/4 224/24
given [7]  41/23 64/10 147/16 173/8 210/13
  214/8 223/18
giving [4]  64/9 78/25 96/19 225/2
glad [1]  82/23
Global [7]  71/16 71/17 71/19 71/23 97/18
  171/23 172/19
goes [9]  20/5 36/16 37/14 98/1 101/2 164/19
  174/25 189/21 210/8
going [120]
gone [6]  37/1 81/18 139/1 174/15 202/7
  223/16
good [19]  2/2 5/6 7/10 7/11 29/16 29/17 70/9
  70/10 100/7 101/10 107/12 119/5 159/3
  193/13 203/24 203/25 207/18 218/2 225/4
got [29]  11/9 22/9 26/16 31/19 33/9 56/13
  78/5 78/6 111/21 114/13 115/3 119/21 128/3
  132/9 136/5 148/23 151/2 154/21 156/5
  157/10 160/6 160/22 171/10 172/7 179/9
  180/13 186/6 189/13 218/24
gotta [1]  34/14
gotten [3]  145/15 147/4 186/10
GOVERNMENT [38]  1/4 1/16 4/5 4/10 6/13
  24/25 26/9 26/19 26/21 26/25 27/1 27/4 27/6
  27/8 27/12 27/24 28/4 28/21 29/9 64/24 66/9
  118/13 151/9 154/9 159/8 160/19 168/18
  171/8 173/6 188/9 192/24 200/8 200/16
  200/20 201/9 202/17 203/16 222/14
Government's [59]  5/2 7/6 8/5 8/6 8/14 8/17
  8/23 11/9 16/15 21/14 25/24 38/9 41/22 42/4
  62/22 63/5 118/10 118/10 118/11 118/11
  118/12 118/19 118/21 124/21 127/16 129/22
  133/9 135/5 138/1 139/7 141/10 143/3 144/9
  147/17 147/24 155/18 162/7 164/6 164/15

167/15 169/11 171/1 186/25 193/2 200/5
  201/2 201/14 201/22 202/12 207/8 211/14
  212/24 227/3 227/4 227/5 227/6 227/8 227/9
  227/10
Government's 134 [1]  118/10
Government's 178 [1]  118/11
Government's 343 [3]  118/11 147/17 162/7
Government's 84 [1]  118/10
governmental [1]  222/9
Grand [1]  221/24
grant [3]  83/19 83/19 83/23
grants [3]  83/22 83/24 84/6
Gray [1]  41/4
great [6]  3/14 100/1 105/17 106/24 183/10
  183/21
greater [1]  36/7
green [21]  119/17 119/20 120/7 122/23
  145/13 149/11 159/24 160/8 161/19 161/21
  162/4
Green's [1]  119/18 161/12
Greene [4]  30/20 72/25 76/1 83/17
Greenville [18]  32/24 32/25 33/4 59/8 60/12
  60/13 70/11 76/2 77/20 90/20 90/23 93/20
  99/18 99/22 99/24 109/8 109/20 177/11
grew [1]  179/2
gross [3]  125/14 125/20 126/9
grounds [2]  96/24 170/7
group [37]  43/23 43/25 44/13 45/6 45/14
  45/17 46/3 46/16 47/21 94/1 94/2 94/4 95/16
  96/1 115/19 116/6 125/12 125/19 126/8
  140/5 140/8 140/10 140/11 140/19 140/22
  140/25 141/2 167/21 168/20 169/4 169/14
  169/15 169/22 170/4 170/13 170/13 171/14
groups [1]  103/13
guess [11]  17/10 20/16 24/12 74/20 123/2
  142/8 143/15 154/4 154/8 177/10 185/24
Gulati [5]  46/2 46/4 46/15 46/17 46/24
guy [4]  149/11 195/20 195/25 195/25
guys [1]  142/16

**H**

habits [1]  214/21
hadn't [6]  91/8 116/24 200/10 200/21 201/10
  202/19
half [4]  16/17 128/6 133/12 141/13
hand [16]  2/17 3/6 6/13 6/20 28/24 29/8
  63/22 64/22 94/17 94/18 147/17 160/9 160/9
  192/25 207/6 215/1
handed [1]  54/1
handled [1]  33/10
handling [4]  17/11 192/14 205/5 222/8
hands [1]  220/25
handyman [1]  195/22
happen [2]  104/12 115/7
happened [13]  5/14 26/11 54/25 70/21 84/14
  100/6 123/11 165/19 173/5 183/2 199/11
  214/5 220/13
happening [2]  185/25 213/24
happy [2]  103/19 186/17
harassed [2]  149/22 150/1
hard [9]  2/13 3/10 6/13 6/16 28/23 38/12
  42/16 105/3 154/13
Harmison [99]
Harmison's [13]  20/25 26/14 56/7 56/10
  97/18 99/20 100/3 108/4 169/21 180/10
  182/15 182/23 183/1
Harrison [2]  87/13 87/16
Harrison's [1]  87/8
hasn't [1]  84/16
hate [1]  42/15

## H

haven't [13]  86/20 102/3 102/20 105/7
105/10 150/15 194/9 194/21 197/20 202/8
203/5 203/10 203/12
having [22]  2/12 2/16 2/25 3/2 6/11 12/23
42/16 49/22 63/16 104/4 104/19 110/4 111/9
130/25 147/25 171/15 174/19 175/20 179/14
179/16 179/19 212/10
he'd [1]  210/5
he's [22]  5/13 16/3 33/9 62/12 135/3 154/1
154/2 154/4 155/20 187/7 191/4 192/15
195/20 195/20 209/20 209/21 210/4 210/11
210/12 211/9 215/8 221/20
head [4]  81/15 166/2 190/23 223/24
heads [1]  224/24
Health [1]  25/22
healthcare [29]  17/4 18/7 18/14 60/14 60/20
87/16 116/24 129/9 130/13 130/17 131/2
131/4 131/12 131/15 131/17 131/19 135/10
136/18 137/24 141/9 141/24 142/5 193/24
194/1 194/23 201/19 202/5 202/10 203/4
Healthcare's [1]  142/2
hear [4]  60/10 136/7 193/5 193/18
heard [9]  34/13 34/14 60/16 60/17 71/9
136/9 143/10 204/7 205/15
hearing [1]  42/16
hearsay [18]  64/16 64/16 64/21 65/3 93/12
96/23 152/21 153/3 153/6 153/12 153/17
153/20 154/9 155/7 165/20 166/22 170/7
196/6
heart [5]  30/1 30/16 165/8 166/18 203/11
heavy [1]  198/22
held [3]  61/25 147/3 178/22
Hello [1]  107/13
help [1]  199/19
helped [1]  125/3
Hendrix [4]  17/12 25/19 27/17 177/21
here [44]  2/25 4/15 5/8 5/14 6/1 7/16 8/23
10/21 11/9 21/3 26/10 35/21 42/11 45/3 53/5
54/6 57/11 61/6 63/1 63/6 64/21 92/9 92/16
101/22 103/19 103/23 104/24 106/10 106/11
106/13 106/21 137/7 142/8 148/6 149/10
150/17 151/6 154/2 154/5 155/19 172/20
192/10 192/17 225/1
here's [1]  64/22
hers [1]  95/22
Hi [2]  104/16 207/19
Hidden [1]  34/5
high [5]  182/25 209/20 209/21 214/24 215/1
highlighted [1]  16/1
Hildebrandt [9]  30/20 31/5 31/14 32/1 77/2
77/4 77/21 79/12 80/13
Hills [1]  34/5
Hilton [2]  223/11 223/17
himself [6]  33/24 43/14 43/16 120/25 212/2
212/4
hire [4]  83/23 156/21 163/23 181/18
hired [7]  30/17 30/19 30/24 70/12 157/2
180/12 183/2
history [4]  212/12 215/5 215/6 219/24
hit [1]  19/25
hitting [1]  20/20
hold [1]  199/9
holiday [1]  225/1
home [4]  28/16 109/22 110/17 202/3
home,s [1]  34/3
honest [1]  89/4
honor [137]
HONORABLE [2]  1/12 221/10

hope [2]  70/4 164/15
hopefully [2]  184/8 224/25
hospital [13]  8/8 18/1 59/15 125/12 125/19
126/8 128/9 128/18 128/22 128/24 129/2
141/10 142/8
hospital/medical [3]  125/12 125/19 126/8
hospitals [2]  20/2 20/20
hour [5]  70/2 70/3 105/2 214/5 220/3
hourly [2]  123/5 123/14
hours [3]  21/25 103/19 114/16
house [4]  34/5 196/19 198/14 199/5
housed [1]  219/13
housekeeping [1]  2/10
however [1]  6/20
HR [4]  105/8 105/14 105/17 105/18
huh [2]  83/11 187/11
hundred [11]  39/8 39/12 68/7 76/10 77/2
80/20 80/21 86/4 86/21 172/8 210/8
hurry [3]  48/18 48/19 48/20
Hutchins [1]  90/13
Hyman [1]  221/10
hyperbolic [1]  24/3

## I

I'd [11]  13/12 37/24 86/6 87/25 113/21
124/20 129/6 154/25 169/12 170/5 170/6
I'll [22]  3/20 4/10 9/18 9/18 9/21 21/2 27/21
43/21 63/16 63/17 65/17 66/5 89/15 97/8
106/13 106/19 152/7 155/7 157/20 183/15
191/22 196/10
I'm [158]
I've [290]  2/24 11/9 34/14 37/23 56/13 57/16
60/17 78/24 79/21 96/8 100/17 104/21 108/1
137/1 147/16 154/21 166/10 170/23 171/10
222/3
IBM [1]  184/6
idea [7]  116/5 129/2 131/19 131/21 132/9
135/3 142/15
identical [1]  74/10
identified [1]  152/25
identifies [1]  210/10
identify [2]  66/12 137/11
identifying [1]  75/4
ignore [1]  154/14
ill [1]  112/25
illness [1]  112/25
immediately [3]  40/1 136/9 146/3
impeach [6]  63/2 63/21 65/8 65/10 65/12
65/14
impeaching [1]  62/17
impeachment [4]  62/21 64/6 64/21 103/2
importance [2]  132/16 178/20
important [3]  49/16 152/18 181/16
importantly [1]  147/21
impress [1]  104/2
impression [1]  169/3
improvement [1]  205/18
inaccurate [1]  78/2
incentive [1]  219/25
inclined [1]  24/11
include [4]  13/13 37/15 87/13 122/2
included [2]  81/19 120/9
includes [1]  126/25
including [3]  165/16 167/4 176/14
income [1]  122/2
incoming [1]  122/11
inconsistent [9]  63/7 64/7 64/12 65/11 65/13
65/25 66/5 75/14 80/16
inconsistently [1]  63/1
increase [13]  32/1 32/2 32/5 76/23 76/24

77/24 77/24 78/1 78/4 78/5 83/18 110/3
110/7
increased [2]  32/3 36/8 85/18
increasing [1]  85/20
indeed [1]  148/19
independently [1]  104/6
indicate [3]  2/15 58/9 213/9
indicated [8]  2/12 4/3 6/10 83/6 185/8
204/22 213/11 220/10
indicating [2]  133/18 213/20
indication [1]  2/21
indicative [1]  24/8
indictment [4]  156/20 222/14 222/18 222/23
indirectly [1]  166/13
individual [4]  142/5 194/10 194/17 195/5
individuals [2]  39/24 127/7
indulgence [2]  24/15 117/6 136/24 150/3
industry [2]  194/7 209/20
information [26]  18/18 37/3 39/25 41/1
63/12 63/15 69/7 73/19 75/2 92/11 92/12
109/4 113/2 126/25 138/11 154/5 166/12
189/8 189/11 201/23 213/6 213/7 213/17
218/10 218/13 218/23
informed [1]  43/3
initial [4]  24/3 55/18 79/19 123/4
initially [2]  41/4 148/2
initials [4]  94/19 95/17 95/19 95/20
Innet [3]  171/12 171/14 172/23
inputs [1]  16/3
inquire [3]  7/4 38/10 119/1
inquired [1]  58/25
inquiry [2]  3/10 3/11
insane [1]  100/12
inside [1]  71/15
insistent [1]  111/3
instance [4]  20/10 37/10 39/7 81/7
instead [2]  32/14 210/8
instruct [1]  88/10
instructed [5]  3/15 52/5 56/2 81/24 82/5
instruction [6]  40/16 40/20 47/23 52/22
82/10 96/19
instructions [9]  31/12 31/16 52/15 60/2
79/23 80/12 91/25 146/18 173/8
intend [3]  63/25 64/3 106/5
intending [1]  197/22
intends [1]  102/18
intent [1]  163/19
intention [1]  65/18
interact [4]  33/20 91/5 144/7 162/19
interacted [4]  99/15 113/25 127/7 177/20
interacting [6]  14/9 71/23 90/4 91/16 91/18
107/15
interaction [4]  14/17 100/7 127/11 175/16
interactions [4]  100/16 162/17 162/20
175/25
interest [1]  209/5
interim [1]  121/9
internal [6]  178/24 178/25 179/2 218/7 219/1
222/22
Internet [1]  167/5
interrupt [1]  27/22
interviewed [2]  30/13 30/14
introduce [2]  2/14 102/18 151/22 155/16
introduced [4]  120/18 121/4 156/14 173/15
introducing [1]  64/14
introduction [1]  181/9
invent [1]  109/2
invented [3]  107/20 107/21 108/1
inventor [2]  166/5 166/9
investigating [1]  223/9

**I**

investigation [1]  62/11
investment [1]  176/1
investments [1]  45/15
investor [2]  94/16 175/21
invoice [13]  39/4 54/20 55/4 55/6 56/1 56/4
59/12 60/7 80/7 114/16 114/17 115/10
141/24
invoices [7]  25/22 53/11 54/21 54/22 54/25
116/24 169/2
involve [1]  115/13
involved [9]  20/1 20/2 51/24 114/11 122/8
162/4 164/22 183/8 215/11
involvement [3]  124/15 124/17 145/7
involving [5]  39/7 114/15 115/16 115/21
115/24
Irene [3]  6/10 104/19 105/22
isn't [22]  10/6 10/22 11/15 12/17 26/17 27/8
28/1 81/25 84/3 84/20 87/4 91/21 113/10
159/13 159/16 159/19 172/13 173/19 175/19
176/5 178/2 179/8
Israel [1]  142/6
issuance [7]  46/24 47/23 48/10 49/23 50/25
107/15 140/6
issuances [7]  37/12 39/17 46/20 48/17 51/18
51/21 60/4
issue [36]  14/10 15/3 18/23 19/11 19/12 22/3
22/4 32/18 38/25 39/8 39/21 43/25 44/16
45/3 45/9 46/17 47/6 48/7 49/12 59/12 60/7
60/25 61/3 61/21 62/1 63/9 71/24 103/15
111/18 138/10 138/19 140/11 145/24 145/25
150/25 188/1
issued [18]  19/22 32/18 39/22 48/22 115/21
140/5 140/11 167/17 210/2 210/11 213/22
214/1 221/11
issues [8]  101/12 104/19 111/8 111/9 153/8
159/19 170/23 177/24
issuing [3]  44/12 45/13 49/15
it's [117]
item [2]  37/8 179/6
iteration [1]  181/4
itself [2]  63/1 128/13
Ives [1]  1/22

**J**

J-e-n-n-i-f-e-r [1]  207/13
jack [1]  215/4
jail [2]  149/11 149/13
Jane [4]  30/20 72/25 83/14 83/17
Japan [2]  142/9 142/10
Jennifer [5]  86/21 207/3 207/8 207/13
226/16
jet [4]  34/3 34/10 34/14 219/10
jets [2]  34/8 212/5
job [5]  30/9 90/19 124/6 207/24 208/1
John [39]  7/6 19/21 22/8 58/15 58/17 58/24
74/13 78/23 78/25 79/19 79/24 80/7 80/11
83/9 83/16 83/25 84/5 88/6 89/12 120/19
120/20 120/21 122/14 132/8 133/22 135/14
141/4 141/16 141/18 141/21 148/20 161/8
164/24 169/19 178/4 188/5 188/8 189/12
226/3
John's [1]  122/20
Jones [45]  28/2 29/9 29/12 29/16 29/18
29/20 35/8 39/17 42/9 42/10 42/15 43/9
46/14 48/9 50/8 51/13 52/10 53/18 54/1
57/13 58/2 59/7 59/20 61/5 62/12 62/14 70/9
75/19 76/21 76/23 78/11 79/9 94/16 99/11
101/18 102/19 106/21 106/25 107/12 107/14

114/9 117/14 117/16 143/8 226/5
journal [1]  71/2
Jr [2]  7/6 226/3
jrosas [1]  180/11
JUDGE [2]  1/13 221/10
judgment [13]  168/19 208/24 209/1 209/3
209/4 217/16 217/17 217/18 217/18 218/24
220/11 220/12 220/24
July [9]  8/3 213/18 213/20 214/2 214/3
214/24 215/1 216/13 228/22
July 15th [6]  213/18 213/20 214/2 214/3
214/24 215/1
July 23rd [1]  216/13
July 24th [1]  8/3
June [4]  30/5 45/22 49/7 79/21
June 12th [1]  49/7
June 2006 [1]  79/21
June 2009 [1]  30/5
June 21st [1]  45/22
junior [1]  17/12
juror [2]  29/25 97/3 103/17 104/15
jurors [9]  2/11 2/15 5/25 57/12 57/16 103/16
105/6 147/25 158/16
jury [83]
jury's [4]  49/5 51/6 59/20 191/16
just [215]
Justice [1]  1/17

**K**

Kading [1]  10/24
keep [11]  14/20 21/3 39/15 42/15 46/19
99/25 105/4 137/12 190/9 197/14 198/25
keeps [1]  111/2
Keith [5]  17/12 25/19 25/21 27/17 177/21
Keitt [1]  61/14
KENNETH [1]  1/12
kept [2]  70/20 100/3
Keret [9]  60/22 142/5 194/16 194/20 201/16
202/4 202/7 202/10 202/24
Kevin [18]  1/16 10/24 37/20 54/18 56/2
74/13 93/2 93/5 93/8 112/11 118/6 118/21
118/24 142/1 144/13 148/13 155/11 226/9
kind [12]  14/23 30/12 41/8 92/6 100/25
105/3 108/8 177/3 197/12 197/23 214/20
222/17
kinda [5]  40/3 106/10 113/4 154/8 154/13
knew [13]  34/3 37/13 55/17 81/11 95/5 101/4
160/7 160/11 160/12 160/15 184/11 185/21
185/23
know [119]
knowing [1]  189/21
knowledge [53]  12/23 36/2 45/15 46/2 77/19
84/23 88/23 94/20 98/16 110/12 133/20
138/25 140/20 161/21 161/24 162/2 166/13
172/21 172/25 173/1 175/14 175/15 175/22
175/24 176/3 176/23 177/4 182/22 184/15
186/6 186/10 194/24 196/2 196/21 196/23
196/25 198/3 198/9 199/15 199/21 200/3
202/6 203/6 203/8 204/24 205/24 206/1
206/14 219/12 222/8 222/15 222/16 222/22
known [6]  30/1 81/13 120/21 185/14 204/25
206/2
knows [2]  98/11 221/21
Ks [2]  156/14 176/24

**L**

LA [5]  90/23 109/17 109/19 109/23 110/17
label [1]  126/3
labeled [1]  125/6
labor [1]  122/16

lack [2]  41/15 43/5
ladies [12]  5/7 5/12 56/17 57/22 101/13
107/7 150/5 158/21 178/19 191/6 216/3
224/12
laid [1]  165/24
landscaper [1]  193/21
language [8]  125/23 126/12 139/15 139/17
139/19 187/22 188/6 188/12
lap [1]  22/15
laptop [1]  165/14
large [13]  110/7 116/11 119/22 140/16
140/18 171/2 177/15 177/16 189/11 190/14
190/15 208/14 223/17
Las [4]  207/21 216/20 223/10 223/16
last [21]  18/12 22/4 22/23 50/25 113/4
118/23 122/9 129/7 130/23 138/12 143/20
154/6 156/6 184/8 193/6 193/7 195/24
207/11 219/2 222/5 222/7
late [7]  85/9 86/2 113/17 113/18 113/19
144/25 199/14
later [5]  4/1 36/25 44/24 69/8 112/17
Laughter [1]  218/19
launch [2]  20/2 20/14
launches [1]  20/3
launching [1]  154/8
law [2]  179/23 195/11
lawn [2]  197/14 197/15
laws [2]  23/9 23/10
lawsuit [2]  61/16 99/5
lawsuits [1]  61/18
lawyer [8]  23/19 81/25 84/25 86/13 149/12
161/2 163/23 222/7
lay [3]  157/12 157/19 158/10
lead [3]  14/11 20/18 36/15
lead-in [1]  20/18
lean [1]  207/10
learn [3]  30/14 167/4 223/10
learned [1]  175/25
lease [3]  125/13 125/20 126/9
leases [1]  212/4
least [5]  2/25 9/19 105/9 153/2 176/23
leave [14]  3/15 6/15 7/21 9/18 30/4 53/15
56/19 69/19 101/15 104/24 105/15 191/10
200/18 224/15
leaving [1]  139/18
led [2]  36/14 113/3
Lee [4]  35/18 113/8 113/9 117/1
left [10]  41/5 61/14 70/12 75/22 85/17 103/17
104/18 113/16 136/5 146/16
legal [6]  39/3 39/5 61/18 80/7 122/20 160/23
168/21 169/6 172/6
legislation [2]  179/4 180/3
legwork [1]  183/4
Leslie [5]  103/16 104/1 104/11 104/15
104/16
Leslie's [1]  150/25
less [2]  39/12 177/18
let [17]  19/1 38/3 63/16 63/17 65/17 78/24
82/9 84/14 104/11 136/2 138/14 161/16
181/14 184/25 190/17 199/6 224/16
let's [67]  5/25 8/14 9/16 10/12 11/8 13/2
16/14 16/14 17/6 18/5 21/14 21/15 22/6
23/11 23/13 23/25 42/11 42/19 53/4 56/17
57/11 65/12 88/5 89/5 90/6 90/12 99/11
101/13 119/18 125/5 126/1 127/16 128/16
129/5 130/11 130/22 130/23 133/9 134/22
135/5 136/23 138/1 139/7 139/23 139/23
139/24 139/25 141/9 142/21 143/3 144/9
148/23 148/23 150/6 158/2 158/16 165/6
184/9 186/19 191/20 192/13 198/13 200/16

**L**

let's... [4] 201/2 201/13 201/21 202/12
letter [38] 11/20 12/1 14/13 40/3 40/4 44/9
  48/6 49/9 51/10 105/23 110/25 133/16
  133/21 133/24 133/25 134/3 134/10 134/12
  134/18 134/21 135/9 135/9 135/12 135/15
  135/16 135/20 156/5 157/8 161/10 161/14
  162/13 170/19 182/21 201/6 201/11 201/14
  201/21 202/10
letters [3] 31/9 105/6 182/13
letting [1] 4/13
level [1] 85/18
levels [1] 80/24
liability [3] 104/4 107/16 163/11
liaison [1] 178/1
liar [1] 206/11
lie [14] 58/19 59/4 59/5 59/6 72/9 72/12
  72/13 72/15 72/16 72/17 72/18 185/22 186/1
  188/24
lied [1] 185/19
life [6] 166/16 166/20 167/2 167/5 167/7
  203/3
lifestyle [1] 34/2
lifetime [1] 215/8
limit [7] 55/21 192/1 209/22 210/12 212/8
  214/12 223/18
line [27] 8/20 22/7 22/20 64/5 71/9 71/16
  71/20 71/24 72/2 74/2 74/4 74/6 94/19 97/18
  97/21 97/22 110/22 151/12 151/13 151/15
  151/16 171/22 171/25 172/4 172/8 177/2
  203/13
line 1 [1] 151/13
line 12 [1] 74/6
line 15 [1] 74/4
line 23 [1] 151/12
line 8 [1] 151/15
line 9 [1] 151/16
lines [3] 74/3 89/2 143/16
lines 15 [1] 74/3
list [14] 16/24 37/24 66/11 76/1 76/4 78/25
  82/13 118/12 127/12 128/4 170/14 170/16
  170/17 211/3
listed [3] 81/8 154/2 154/4
listing [2] 10/25 82/17
lists [1] 76/3
little [23] 9/21 10/14 33/18 33/23 34/4 37/8
  37/8 40/10 52/16 61/5 73/5 130/20 139/24
  142/21 154/9 162/25 175/15 176/7 187/19
  190/3 199/9 209/7 219/6
live [3] 119/7 193/15 195/23
lived [2] 109/21 109/21
living [3] 119/9 193/20 195/21
LLP [2] 157/2 178/17
loaned [1] 160/5
located [2] 33/2 90/17
long [15] 6/15 13/25 30/2 110/5 113/12
  113/14 120/12 145/7 165/2 172/13 174/21
  180/14 204/25 207/24 224/9
longer [4] 51/16 54/11 151/1 155/3
longtime [1] 84/22
looked [6] 8/8 9/11 17/4 132/5 169/5 198/21
looking [19] 3/11 8/16 8/24 11/11 30/9 34/11
  42/11 43/15 51/13 76/7 89/1 134/12 134/17
  137/2 139/2 142/3 171/5 173/22 213/2
looks [16] 45/25 59/23 78/12 93/3 94/22
  95/22 95/23 95/24 95/24 111/20 135/22
  191/21 210/25 214/2
Los [3] 90/20 109/8 109/10
losing [1] 223/21

loss [3] 215/5 215/6 215/7
lost [5] 214/11 215/8 219/2 219/4 219/7
lot [5] 37/1 45/9 45/10 115/13 115/13
loud [2] 50/10 163/17
Loveland [1] 193/16
low [1] 43/8
Lowell [19] 19/21 22/16 23/15 26/8 52/13
  52/18 54/3 54/7 55/5 55/14 59/25 60/3 81/15
  81/16 81/17 82/8 99/8 127/20 155/12
Lowell's [3] 26/3 81/20 142/4
lower [1] 138/4
lunch [5] 70/2 70/3 101/11 101/13 103/16
LVH [1] 223/16
lying [2] 188/21 206/6

**M**

M-c-E-w-i-n [1] 207/14
ma'am [9] 29/8 29/13 36/20 38/17 56/22
  107/2 207/6 207/15 224/1
machinery's [1] 5/20
mail [136]
mailed [1] 93/3
mailing [2] 109/13 187/7
mails [13] 11/3 12/12 24/8 85/25 96/9 115/13
  115/16 115/21 115/24 116/11 116/15 158/1
  174/11
main [2] 178/1 178/5
mainly [1] 120/9
maintained [1] 99/19
major [1] 121/18
majority [2] 34/6 103/14
maker [1] 174/5
makes [1] 22/15
making [5] 5/9 55/6 74/23 170/3 216/9
man [3] 100/9 100/20 196/12
managed [1] 169/16
management [19] 8/8 18/1 22/19 25/23
  59/15 122/5 128/10 128/18 128/22 128/25
  129/2 133/17 134/13 134/18 141/10 142/8
  176/14 176/16 205/8
Management's [1] 142/2
manager [3] 32/4 78/4 202/4
manner [1] 153/24
Mansions [4] 219/14 219/16 219/20 220/3
manufacturing [2] 165/8 165/13
March [7] 17/7 25/18 26/11 48/11 89/9
  127/21 174/25
March 1 [1] 89/9
March 19th [3] 17/7 48/11 127/21
March 31 [1] 25/18
margin [1] 205/18
marginally [1] 143/5
mark [8] 33/5 33/7 33/13 43/13 94/7 118/14
  146/25 161/13
marked [13] 79/11 84/11 85/6 87/20 92/20
  96/8 109/11 159/8 168/7 174/1 178/6 180/7
  180/24
marker [10] 209/23 209/25 210/2 210/11
  210/12 210/14 214/2 214/10 214/12 223/18
markers [7] 210/5 213/22 213/23 214/1
  214/8 214/8 214/12
market [7] 14/20 19/25 19/25 20/6 20/6
  36/17 174/5
marketing [5] 20/17 20/22 24/13 73/2 73/5
MARRA [2] 1/2 1/12
Martin [12] 7/6 47/8 47/10 48/7 48/12 49/10
  49/12 49/15 49/20 51/11 195/5 226/3
Marty [3] 198/7 199/2 199/23
Marvin [1] 35/19
Master [1] 214/20

materials [1] 46/6
math [1] 10/4
matter [12] 2/11 4/23 73/23 153/23 155/12
  157/6 163/25 178/10 220/22 220/24 221/12
  228/21
matters [9] 6/8 23/18 60/1 60/4 148/3 153/9
  158/22 170/23 175/18
May 5th [5] 26/20 26/25 27/1 27/5 216/8
maybe [6] 23/12 69/7 100/14 192/1 198/24
  225/1
MC [1] 53/10
McEwin [11] 207/3 207/8 207/13 207/18
  211/17 213/3 213/16 214/19 218/2 223/8
  226/16
me [137]
mean [14] 65/6 101/1 102/16 109/20 113/7
  154/2 163/3 163/18 170/5 185/21 190/11
  209/18 210/7 215/7
means [10] 43/7 148/18 156/11 179/5 179/6
  179/7 179/9 205/14 214/4 218/18
meant [1] 71/3
meantime [1] 170/12
mechanics [2] 39/21 40/11
mechanisms [1] 165/23
media [5] 93/18 93/24 94/17 95/2 175/22
medical [11] 125/12 125/19 126/8 194/3
  194/5 194/7 197/3 197/23 197/25 198/4
  198/11
Medtronics [1] 23/23
meet [7] 27/5 33/16 128/21 131/15 140/19
  179/16 179/19
meeting [13] 33/20 86/2 87/1 87/2 87/2 87/3
  87/4 88/22 89/10 89/13 89/13 89/16 92/9
meetings [9] 31/11 73/12 85/23 88/25 91/20
  91/21 91/23 92/1 92/2
member [4] 84/19 84/22 86/9 143/11
members [14] 8/1 8/21 86/19 89/3 92/10
  119/6 133/14 147/17 154/8 155/1 170/15
  176/15 193/14 195/8
memo [14] 16/19 17/6 25/18 86/25 89/8
  127/19 127/24 128/1 129/15 130/6 130/14
  130/23 131/5 131/10
memorandum [1] 79/12
Memorial [1] 225/2
memory [3] 14/5 14/13 86/6
memos [1] 31/10
mention [1] 2/10
mentioned [14] 25/19 33/15 51/14 51/24
  55/22 81/17 86/20 109/1 121/17 123/18
  143/21 206/6 212/17 215/22
mentioning [1] 82/20
merely [1] 153/23
merged [1] 41/5
Merit [1] 228/18
Merrill [1] 41/7
message [2] 103/18 104/18
met [11] 15/7 26/20 26/25 27/1 33/25 134/24
  159/4 194/13 194/19 204/1 218/4
method [1] 44/10
MGM [37] 207/23 208/7 208/10 208/12
  208/21 208/24 209/9 209/11 209/23 211/19
  211/24 212/11 213/3 213/11 215/5 215/6
  218/7 218/10 218/13 218/20 219/1 219/8
  219/10 219/13 219/19 220/11 220/20 220/22
  221/2 221/9 221/18 221/20 221/24 222/1
  222/13 222/16 223/19
Miami [1] 1/22
microphone [6] 38/17 42/16 77/9 193/5
  193/18 207/11
mid [3] 113/18 113/19 177/15

## M

middle [4]  106/10 106/14 112/20 198/17
midnight [1]  21/8
might [4]  29/7 50/1 101/10 171/14
Mike [2]  17/10 177/20
mikofood [1]  204/16
million [16]  18/4 18/10 22/17 45/12 71/9 71/16 97/18 97/22 132/16 132/19 171/22 172/8 209/6 217/18 219/6 219/8
millions [2]  48/24 49/2
mind [2]  47/5 182/16
mine [3]  82/20 99/3 171/10
minimal [1]  132/18
miniscule [1]  139/25
minute [4]  56/18 106/19 150/7 215/15
minutes [20]  22/1 56/14 56/20 57/2 88/7 88/11 88/20 88/21 88/24 89/1 89/4 89/10 89/11 89/12 90/9 102/5 191/7 191/19 192/3 224/8
minutia [1]  138/17
misplaced [1]  137/1
missed [1]  87/5
Mitch [14]  37/5 55/22 56/1 136/9 136/10 136/16 139/4 141/20 142/1 143/7 148/9 150/2 162/9 188/11
Mitch's [2]  52/15 161/7
MITCHELL [48]  1/6 1/19 31/21 32/5 33/14 33/15 35/24 37/19 38/20 39/2 39/23 40/9 40/24 42/12 42/25 44/15 45/7 45/9 46/5 47/3 47/15 47/24 48/13 48/21 49/13 52/7 52/14 52/23 55/5 55/14 55/15 56/6 56/8 58/11 58/22 60/3 60/3 60/6 61/4 61/10 116/4 159/10 196/3 208/8 211/19 216/10 216/14 218/11
MJD [4]  93/18 93/24 94/17 95/2
MJS [1]  13/4
modes [1]  80/9
modified [2]  123/13 124/12
moment [5]  13/6 24/15 121/17 136/25 168/10
momentarily [1]  192/10
Monday [3]  55/23 224/20 224/25
money [31]  54/19 71/9 71/24 112/11 144/24 147/4 147/7 148/8 147/12 147/14 148/22 149/19 149/22 160/4 160/5 163/21 171/25 172/4 189/21 190/9 190/11 190/12 190/14 190/17 214/11 215/15 217/12 219/1 219/4 223/21
monitor [2]  3/1 30/16
monitoring [3]  165/15 221/13 222/6
monitors [2]  165/8 203/11
month [6]  10/5 76/10 76/23 77/24 123/24 123/25
monthly [3]  123/15 123/19 123/19
months [3]  9/9 133/3 138/22
morning [21]  2/2 5/6 5/8 7/1 7/10 7/11 7/12 14/14 21/24 29/16 29/17 40/2 48/16 53/11 56/14 56/15 70/9 90/10 155/11 161/5 225/13
most [9]  2/23 116/2 147/21 151/21 164/24 189/13 215/4 215/5 215/6
mostly [1]  37/1
move [18]  4/24 13/2 25/1 37/24 41/17 44/7 96/21 106/3 106/13 106/16 106/22 126/1 146/22 181/9 193/4 193/5 199/19 211/9
moved [2]  30/8 90/20
Mr [56]  8/16 20/23 21/10 21/13 21/21 47/5 49/22 50/15 56/9 58/5 58/19 61/12 102/14 118/13 136/12 136/17 138/24 146/12 146/13 146/18 152/25 158/24 159/18 176/21 186/25

188/4 188/21 190/16 197/6 204/12 208/17 208/19 208/21 208/24 209/9 211/5 211/22 212/2 213/3 213/8 213/9 214/5 214/22 217/12 226/4 226/6 226/7 226/8 226/10 226/11 226/12 226/14 226/15 226/17 226/18 226/19
Mr. [405]
Mr. Anand [1]  115/17
Mr. Boliek [1]  17/13
Mr. Carter [33]  47/17 47/20 48/15 48/17 48/23 51/18 51/21 52/2 52/6 53/18 58/7 115/22 115/25 116/8 195/9 195/12 195/16 196/13 196/17 196/23 197/8 199/5 199/21 199/24 203/17 204/10 204/13 204/19 204/22 204/25 205/2 206/2 206/4
Mr. Collinic [3]  160/1 160/7 160/11
Mr. Colonic [1]  160/17
Mr. Cutter [19]  193/13 194/25 196/17 196/21 196/23 197/5 197/12 197/21 200/4 200/8 200/19 201/8 201/17 201/25 202/9 202/15 203/2 203/13 203/24
Mr. Cutter's [1]  206/23
Mr. Erlichman [2]  113/12 113/16
Mr. Fink [1]  35/15
Mr. Fox [1]  110/10
Mr. Foxhall [1]  110/21
Mr. Franklin [3]  5/12 147/21 150/6
Mr. Gault [5]  160/7 160/12 160/24 164/9 167/1
Mr. Gelfer [1]  109/3
Mr. Green [1]  159/24
Mr. Gulati [1]  46/17
Mr. Harmison [2]  35/16 52/21
Mr. Harrison [2]  87/13 87/16
Mr. Hildebrandt [4]  31/5 77/21 79/12 80/13
Mr. I'm [1]  149/10
Mr. Mitchell [1]  211/19
Mr. Muhlendorf [2]  102/17 192/9
Mr. Perkins [10]  35/16 36/6 86/17 113/10 144/20 154/23 154/24 160/7 160/24 164/5
Mr. Pickard [78]
Mr. Pickard's [1]  75/10 151/10 190/25
Mr. Roston [1]  86/12
Mr. Stein [119]
Mr. Stein's [24]  2/4 5/19 14/8 14/10 14/13 15/8 15/14 36/8 43/9 43/10 48/23 53/19 57/6 147/6 150/4 150/14 150/24 151/11 151/14 191/18 203/9 214/23 215/12 223/10
Mr. Tony [2]  134/13 134/19
Mr. White [1]  106/22
Mr. Woodbury [78]
Mr. Woodbury's [2]  142/14 165/3
Ms [1]  42/15
Ms. [66]  14/2 29/16 29/18 29/20 31/3 35/8 35/11 35/15 38/15 39/17 40/17 40/21 42/9 42/10 43/9 46/14 48/9 50/8 51/13 52/10 53/18 54/1 57/13 58/2 59/7 59/20 61/5 62/12 62/14 70/12 70/17 70/20 75/19 76/1 76/21 78/11 79/9 90/21 90/23 94/16 95/25 97/23 98/22 99/19 101/18 102/19 103/16 104/1 104/11 104/16 106/21 106/25 107/12 107/14 114/9 117/14 117/16 150/25 207/18 211/17 213/3 213/16 214/19 218/2 223/8
Ms. Bunes [12]  31/3 35/15 38/15 40/17 40/21 70/12 70/20 90/21 90/23 95/25 98/22 99/19
Ms. Bunes' [2]  70/17 97/23
Ms. Crowley [1]  14/2
Ms. Easley [1]  35/11
Ms. Greene [1]  76/1
Ms. Jones [37]  29/16 29/18 29/20 35/8 39/17

42/9 42/10 43/9 46/14 48/9 50/8 51/13 52/10 53/18 54/1 57/13 58/2 59/7 59/20 61/5 62/12 62/14 70/9 75/19 76/21 78/11 79/9 94/16 101/18 102/19 106/21 106/25 107/12 107/14 114/9 117/14 117/16
Ms. Leslie [4]  103/16 104/1 104/11 104/16
Ms. Leslie's [1]  150/25
Ms. McEwin [7]  207/18 211/17 213/3 213/16 214/19 218/2 223/8
much [20]  23/17 35/25 36/3 36/18 54/11 91/23 92/1 100/23 101/16 106/1 114/13 143/10 143/22 162/17 162/19 181/19 190/17 209/3 214/13 219/1
Muhlendorf [7]  1/16 102/17 192/9 226/6 226/8 226/17 226/19
Muscillo [2]  61/1 61/3
must [1]  19/25
myself [19]  19/18 21/3 21/22 33/1 36/22 42/12 43/14 52/13 52/14 54/3 54/7 80/5 80/6 82/7 83/14 83/15 105/15 106/13 188/5

## N

naively [1]  191/14
naked [1]  13/18
name [46]  29/10 29/11 33/5 33/8 43/24 46/4 47/8 49/11 59/10 60/10 60/17 60/22 60/22 60/24 75/5 79/24 93/19 94/2 95/5 105/24 118/22 118/23 119/16 120/15 127/5 130/18 134/12 143/10 146/25 166/3 178/16 180/13 193/6 193/6 193/7 194/10 194/13 194/17 194/19 195/5 200/13 200/24 202/7 202/24 207/11 207/11
named [3]  34/5 60/8 60/25
nature [4]  123/19 127/10 152/19 220/2
near [1]  105/10
necessarily [2]  2/16 85/21
need [19]  5/13 6/21 61/21 65/4 65/14 65/23 79/15 89/14 104/2 105/15 105/21 111/1 137/8 141/23 144/24 153/5 156/21 182/11 225/7
needed [16]  3/4 39/2 43/4 54/20 54/22 74/19 91/7 93/9 102/1 122/20 127/12 132/3 136/20 138/20 181/23 190/8
needs [2]  150/6 151/6
negotiated [3]  163/13 163/13 188/5
neither [1]  205/17
nervous [3]  61/5 61/6 61/13
net [5]  76/8 110/3 110/7 110/8 110/9
Netanya [1]  142/6
network [1]  198/11
Nevada [1]  207/21
Nevdahl [6]  33/5 33/7 33/13 43/13 146/25 161/13
never [29]  14/22 39/6 50/20 55/2 60/16 60/20 61/16 72/20 82/20 82/23 84/3 84/7 85/2 89/4 100/11 100/17 104/22 107/21 117/3 148/19 159/4 161/21 161/25 163/14 163/22 176/10 204/1 204/3 204/6
new [8]  1/18 15/7 30/8 43/4 136/10 152/8 198/23 216/4
news [1]  111/1
next [38]  3/23 23/1 23/11 23/13 23/25 28/20 40/1 44/22 45/5 47/12 49/17 53/15 53/22 90/6 90/12 91/12 113/7 117/23 118/5 126/19 138/13 138/15 138/22 155/8 155/9 155/23 161/5 165/12 170/12 177/2 191/13 191/19 192/14 192/23 199/11 207/2 224/7 224/19
nice [6]  43/21 100/9 100/17 100/20 195/20 225/13
nine [1]  68/15

**N**

Ninety [1] 68/15
Ninety-nine [1] 68/15
no [247]
Nohoy [1] 142/9
nominal [1] 209/16
non [1] 175/18
non-role [1] 175/18
none [3] 85/25 148/19 184/18
Nony [6] 59/10 59/12 134/13 134/19 134/23 134/24
Norma [5] 37/20 86/21 112/11 143/7 143/9
normal [1] 31/11
North [2] 1/20 90/25
Northwest [1] 1/18
note [3] 46/23 154/6 154/22
notebooks [1] 3/16
noted [1] 26/12
notes [13] 46/19 49/25 50/3 56/19 70/20 70/20 70/24 89/17 89/23 101/15 142/3 142/4 224/15
nothing [14] 23/23 24/3 24/16 27/22 27/23 28/8 28/11 82/22 87/18 91/19 117/7 117/10 175/25 190/20
notice [1] 165/14
noticeable [1] 39/14
noticed [1] 100/17
notification [1] 217/16
Notwithstanding [1] 22/17
November [4] 42/14 42/17 143/13 146/9
November 14th [1] 143/13
November 25th [1] 42/14
nullity [1] 148/15
number [38] 16/24 29/4 40/4 44/10 46/25 47/1 64/5 72/7 78/20 80/2 97/10 103/16 103/17 105/13 105/22 105/24 115/3 119/12 128/3 134/9 134/9 134/10 135/23 135/24 136/11 137/3 137/14 137/16 153/13 153/13 153/14 171/4 189/19 201/24 201/25 202/3 202/4 202/9
number 13 [2] 103/16 103/17
number 158 [1] 153/14
number 21 [1] 137/14
number 33 [1] 137/16
number 43408928 [1] 80/2
numbers [11] 4/4 4/10 41/24 44/8 75/22 80/4 102/20 153/10 157/21 210/24 211/1

**O**

o'clock [8] 19/23 36/18 36/21 191/21 224/18 224/21 224/22 225/5
oath [4] 6/2 57/13 106/25 158/17
object [12] 4/3 15/9 96/23 98/9 98/11 155/25 170/5 170/6 185/17 211/10 221/9 221/20
objecting [1] 97/2
objection [97]
objectionable [1] 24/4
objections [8] 3/24 152/14 152/19 152/24 153/4 154/18 157/20 211/5
obligated [1] 149/25
obligation [2] 147/10 147/11
obtain [4] 141/3 209/1 209/22 210/14
obtained [3] 141/1 220/11 220/25
obtains [1] 209/25
obviously [3] 2/15 84/9 191/17
occasion [2] 56/11 109/17
Occasionally [1] 91/6
occasions [1] 99/14
occurring [1] 160/8

October [4] 9/6 18/14 126/7 165/13
October 2007 [1] 165/13
October 4th [3] 9/6 18/14 126/7
odd [1] 101/7
off [10] 23/22 69/19 81/14 123/21 162/7 168/11 168/13 169/14 211/3 225/15
offered [2] 97/7 211/11
offhand [1] 205/16
office [35] 32/4 32/14 32/14 32/23 32/24 32/25 36/22 46/10 59/8 60/12 60/13 70/11 70/16 70/17 70/18 75/10 76/2 77/20 78/4 90/22 93/20 98/21 99/18 99/22 99/24 100/14 109/17 109/19 109/23 116/17 116/18 117/2 124/3 177/11 177/13
office-wide [1] 32/14
officer [12] 31/2 31/6 77/5 77/6 77/12 77/13 121/9 124/2 124/8 124/14 132/15 142/23
offices [1] 124/3
Official [1] 1/24
officials [1] 15/7
often [1] 98/19
oh [8] 3/2 20/25 54/5 95/21 110/14 187/5 191/25 216/1
Ohio [1] 193/16
okay [105]
once [7] 29/1 34/10 43/2 100/25 124/11 210/4 215/17
one [95]
one-page [1] 96/8
one-sentence [1] 155/9
one-year [4] 76/24 77/24 78/1 78/4
ones [13] 3/2 4/1 17/4 37/22 66/12 81/8 152/1 152/8 152/14 162/25 176/24 206/6 212/17
only [24] 2/14 26/7 33/20 50/3 59/8 72/2 73/17 73/17 74/16 76/9 94/18 95/19 97/2 99/24 100/13 100/13 154/16 154/21 181/2 183/16 185/24 224/18 224/21 224/22
open [5] 14/19 33/12 105/4 199/3 211/20
opened [4] 90/22 199/25 212/2 222/3
opening [1] 211/24
opens [2] 19/25 20/6
operate [1] 43/11
operating [7] 31/1 31/6 77/5 77/6 77/12 77/13 165/16
operations [1] 32/15
opinions [5] 56/19 101/14 150/8 191/9 224/15
opponent [1] 64/18
opportunity [4] 64/25 65/1 154/25 166/17
optimistic [1] 191/15
option [5] 78/24 79/2 83/18 123/16 123/17
options [6] 76/24 79/3 82/17 83/20 85/3
oral [2] 163/15 164/3
order [40] 2/1 8/8 9/2 11/15 18/2 18/8 18/15 27/11 27/25 28/3 28/5 28/7 63/6 93/10 116/21 125/12 125/19 126/7 127/13 128/10 128/13 128/18 129/10 129/14 130/5 130/9 130/12 130/13 130/16 131/2 131/5 131/9 133/18 181/19 186/3 203/9 205/25 210/14 219/11 219/14
ordered [1] 203/11
orders [45] 9/9 9/14 9/15 10/5 10/10 10/22 11/1 11/19 11/21 12/24 17/1 17/3 17/18 17/22 18/20 23/25 24/3 25/24 26/12 27/9 116/14 116/15 116/17 116/20 116/25 117/2 125/7 126/15 128/5 128/8 131/25 132/2 132/4 132/19 132/22 132/24 133/4 133/7 139/12 139/20 141/10 165/9 175/5 185/13 186/11

189/14
Ordinarily [2] 4/12 4/18
ordinary [4] 96/15 100/22 101/6 171/18
organization [3] 125/13 125/19 126/8
organized [1] 23/17
originally [1] 147/5
others [7] 32/13 38/3 69/16 132/14 148/3 148/21 170/15
otherwise [2] 24/4 29/2
our [44] 2/14 9/8 15/9 15/13 20/1 23/5 23/16 33/9 42/25 43/5 47/12 49/16 54/18 55/21 57/11 83/17 101/13 105/8 106/21 109/4 118/5 123/12 123/13 138/11 143/17 143/18 144/5 146/2 146/4 163/13 163/19 163/20 163/21 163/25 165/16 167/14 178/13 181/22 183/4 183/7 187/23 191/13 191/19 208/4
outgoing [1] 53/12
outside [16] 70/17 81/25 90/4 90/14 104/6 153/7 156/21 164/22 173/18 177/8 178/13 178/15 181/18 181/24 182/24 183/3
outstanding [1] 37/21
over [38] 10/5 22/18 27/20 31/15 31/22 36/9 42/23 45/8 51/13 57/18 76/25 80/16 80/19 80/25 97/6 97/12 102/15 103/11 103/13 103/14 106/4 106/10 106/13 124/9 138/13 138/14 148/7 174/24 179/10 187/22 189/15 209/6 213/23 213/24 215/8 219/7 220/23 222/7
overhead [1] 7/16
overnight [3] 40/1 40/6 48/16
overrule [2] 157/20 196/10
overruled [9] 75/16 93/13 98/13 166/24 168/23 170/9 196/14 206/9 222/20
oversee [1] 183/3
overseen [1] 183/5
owe [1] 214/13
owed [6] 161/9 163/21 214/16 215/15
own [6] 7/15 63/10 64/2 170/19 197/12 197/13
owned [3] 34/3 34/17 47/11
owner [1] 81/5
owns [1] 212/5
Oxley [28] 155/10 155/16 155/21 155/24 156/4 156/6 156/10 156/12 156/18 157/15 179/4 179/13 179/23 180/3 180/12 180/16 180/22 181/6 181/16 182/21 183/3 183/9 183/11 183/20 183/25 184/4 184/5 188/19

**P**

P-i-c-k-a-r-d [1] 118/24
p.m [8] 102/11 150/21 150/21 192/5 192/5 214/1 214/3 225/16
package [5] 18/9 87/7 87/9 87/10 129/11
packet [2] 29/5 29/6
page [58] 12/3 26/3 42/24 46/22 53/24 53/24 54/2 54/15 55/9 64/5 74/2 74/3 74/4 87/19 95/17 95/21 96/8 125/5 126/1 128/6 128/16 129/5 129/23 130/2 130/11 130/22 131/7 134/16 135/7 139/11 139/24 148/7 148/7 151/12 151/13 151/15 151/16 159/9 159/10 161/4 164/16 164/20 166/12 167/14 169/11 169/12 169/13 170/24 176/20 187/5 187/6 187/23 201/4 201/13 201/14 201/21 202/14 216/11
page 1 [1] 159/9
page 10 [1] 95/21
page 12 [1] 128/16
page 174 [1] 74/3
page 175 [1] 74/4
page 2 [1] 159/10

**244**

# P

page 22 [1]  125/5
page 3 [5]  46/22 167/14 169/11 169/13
  170/24
page 366 [1]  151/12
page 367 [1]  151/13
page 45 [1]  126/1
page 574 [2]  151/15 151/16
page 60 [1]  176/20
page 71 [1]  139/24
page 78 [1]  139/11
pages [2]  1/10 102/24
paid [24]  32/21 37/19 39/3 51/16 51/19
  53/11 82/17 111/22 114/12 122/24 123/3
  123/4 123/8 123/10 123/18 123/20 123/22
  145/11 145/13 145/14 145/15 145/17 148/19
  208/23
paint [1]  198/22
Palm [3]  1/7 1/20 1/25
Pam [29]  30/20 31/14 35/21 35/25 36/1
  36/17 36/23 36/25 37/11 41/4 61/14 81/11
  81/17 84/12 84/18 85/17 85/19 85/21 86/8
  88/10 89/8 89/17 90/8 94/19 95/2 95/17
  168/13 169/16 184/25
Pam's [2]  36/17 88/6
paper [3]  2/18 30/9 147/16
paperwork [2]  60/20 62/16
paragraph [26]  17/25 18/6 18/13 22/10
  22/11 23/1 23/25 110/24 110/25 125/9
  125/17 126/3 126/6 128/8 129/7 130/23
  131/1 148/24 149/1 166/15 167/11 167/16
  169/12 169/13 170/23 170/24
paragraphs [1]  23/13
paren [2]  23/3 23/4
participating [1]  169/17
particular [13]  2/17 14/6 27/3 34/9 49/23
  61/6 122/11 146/24 174/22 182/3 187/3
  189/14 215/2
parties [1]  118/7
partner [2]  17/10 161/19
Partners [4]  157/2 178/17 181/3 183/5
parts [2]  9/22 88/2
party [1]  64/18
past [11]  54/20 55/3 61/7 61/10 62/20 69/17
  92/8 161/9 187/24 189/15 204/15
patent [2]  84/25 86/13
pattern [1]  70/22
pay [27]  32/20 33/10 37/17 43/4 43/5 43/7
  51/22 103/20 103/24 105/3 110/4 110/7
  110/8 110/9 111/3 111/9 111/21 123/16
  146/2 146/4 208/21 210/6 215/20 217/1
  217/3 217/12 220/12
payable [1]  79/21
paying [2]  144/21 216/20
payment [17]  37/22 43/6 50/18 80/9 80/9
  87/5 91/7 115/6 145/18 146/10 149/5 187/24
  215/18 216/8 216/9 216/13 216/15
payments [6]  38/20 115/16 115/19 141/7
  215/19 215/22
payroll [6]  32/13 53/14 74/20 74/25 110/9
  144/21
pending [3]  125/6 139/12 165/9
penny [4]  98/1 101/2 174/25 189/21
people [14]  32/23 37/4 75/5 75/10 119/21
  142/15 153/24 177/20 179/5 183/6 183/7
  188/24 190/14 210/7
per [10]  18/16 29/5 29/5 52/15 52/22 79/22
  80/11 88/6 142/3 215/1
percent [14]  36/2 36/5 36/7 37/10 37/14

76/11 77/3 80/25 81/1 85/11 85/19 86/4
  86/22 106/3
percentage [1]  35/23
percentages [2]  111/4 111/22
Perfect [1]  106/1
perform [4]  50/22 164/6 166/18 180/12
performed [1]  178/11
performing [1]  178/12
perhaps [2]  152/16 192/1
peril [1]  7/15
period [17]  35/24 85/8 85/12 85/14 85/15
  116/11 122/6 123/9 124/10 160/2 165/2
  208/22 213/23 213/24 215/17 217/11 219/7
periods [1]  126/24
Perkins [22]  35/16 35/21 36/6 50/21 81/19
  86/17 113/7 113/10 144/16 144/18 144/20
  154/23 154/24 159/11 159/12 160/7 160/24
  161/22 162/8 164/5 173/8 188/8
permanently [3]  191/2 206/23 224/2
permissible [1]  137/9
permitted [1]  219/17
perplexed [1]  24/2
persists [1]  148/18
person [25]  14/11 20/9 26/20 31/15 31/16
  33/16 45/25 59/8 80/1 105/8 105/15 105/17
  105/18 105/24 107/19 109/1 109/5 116/2
  131/13 131/22 135/3 141/23 162/23 179/6
  218/5
personal [3]  34/1 69/6 105/18
personality [2]  98/4 175/5
personally [3]  166/19 215/11 216/24
personnel [1]  108/21
persons [1]  73/14
pertain [1]  22/3
pertaining [1]  15/20
pertains [1]  110/20
phantom [3]  117/2 117/4 117/5
Phillips [1]  20/17
phone [14]  34/10 34/13 37/1 39/23 40/25
  55/22 56/7 80/4 100/13 105/24 105/25
  136/10 163/4 203/9
phonetic [1]  159/11
phrase [1]  205/15
Physically [1]  70/16
pick [1]  199/22
Pickard [95]
Pickard's [1]  75/10 151/10 190/25
picture [2]  187/8 198/22
pieces [2]  67/24 67/25
pit [1]  214/10
place [5]  36/21 82/25 123/1 163/22 210/12
placed [1]  203/9
plan [5]  138/12 170/17 221/9 221/16 225/2
planning [2]  133/5 224/16
play [10]  2/19 3/7 137/7 137/10 175/9 175/12
  214/7 214/9 214/11 219/25
played [6]  108/5 137/15 137/17 151/10
  176/11 176/21
player [4]  209/15 209/16 218/15 218/18
player's [1]  210/10
pleaded [1]  99/25
pleas [1]  43/11
pleasant [1]  162/18
please [110]
pleased [1]  182/13
plus [4]  18/3 128/1 205/1 206/3
point [15]  71/8 75/16 76/10 76/11 78/3 94/23
  123/14 124/14 132/18 146/5 162/20 166/24
  190/16 215/11 223/14
pointed [1]  115/2

pop [1]  16/16
portfolios [1]  132/12
portion [10]  79/23 97/3 97/5 99/11 144/12
  148/6 200/17 201/5 208/23 214/16
position [7]  114/23 142/25 145/2 189/25
  190/4 190/5 190/7
possession [1]  163/20
possible [6]  5/16 80/18 93/22 93/25 94/6
  155/12
Possibly [2]  82/4 86/5
pot [2]  41/11 41/12
pounds [1]  198/23
practice [1]  81/2
precedent [1]  156/13
preceding [1]  139/15
predicate [2]  157/13 157/19
prefer [6]  3/10 6/13 6/16 28/25 106/8 151/6
preference [1]  2/14
preliminary [2]  182/14 182/20
prepaid [3]  140/1 167/15 168/3
preparation [4]  27/2 27/7 132/13 132/21
prepare [5]  14/13 77/1 78/11 120/9 125/3
prepared [6]  16/20 76/3 76/4 77/21 88/21
  172/6
preparing [6]  16/22 76/1 122/7 127/11
  140/12 140/12
presence [2]  104/6 151/5
present [5]  2/4 5/19 57/6 102/14 150/24
presented [1]  211/2
presenting [2]  13/20 63/9
presents [2]  106/6 210/10
president [8]  31/1 31/3 73/4 81/21 81/22
  86/11 101/7 113/9
presidents [2]  81/24 84/10
press [28]  11/5 11/17 11/23 12/4 12/16 12/19
  12/23 13/7 13/9 13/14 18/24 19/11 19/12
  19/21 20/10 20/12 20/15 21/9 22/8 22/14
  23/5 23/17 23/19 24/5 24/12 24/13 26/9
  124/18
presumably [1]  214/9
presume [1]  186/10
prevent [1]  4/14
previously [3]  92/13 173/19 211/6
price [9]  14/20 18/3 18/4 18/10 18/16 47/1
  128/12 128/12 129/12
Primarily [1]  122/1
primary [3]  121/12 122/19 127/9
princess [1]  34/4
principal [3]  122/13 209/4 209/5
principals [1]  160/24
printed [1]  187/6
printout [1]  15/14
prior [22]  4/9 20/18 29/25 47/1 54/10 57/14
  63/2 64/7 64/14 64/22 65/2 65/4 83/6 99/4
  120/22 163/3 182/21 200/8 200/19 201/8
  202/16 222/13
Priority [1]  40/2
private [5]  119/23 119/25 120/3 219/10
  219/16
privy [1]  82/2
Pro [1]  1/19
probably [20]  7/15 21/2 29/2 36/5 74/15 75/7
  87/12 87/15 120/21 165/5 183/7 191/14
  191/17 198/17 198/18 198/23 202/16 204/18
  205/1 211/6
problem [15]  3/18 5/13 64/13 69/15 102/1
  104/6 104/9 111/11 157/25 163/23 174/8
  174/9 188/22 188/24 189/3
problematic [1]  157/17
problems [4]  3/3 106/6 162/12 174/10

**P**

procedural [1]  4/23
procedures [1]  179/10
proceed [12]  2/5 6/8 25/9 28/25 57/7 161/17
186/17 192/8 192/10 192/16 193/10 207/15
proceeding [1]  221/21
proceedings [16]  1/11 5/5 5/11 6/5 57/4
57/20 61/25 66/8 102/12 107/5 150/22
158/19 192/6 192/20 221/13 228/20
proceeds [3]  125/14 125/21 126/9
process [3]  47/20 93/1 93/4
processing [2]  56/3 165/16
procured [1]  22/21
procuring [1]  93/1
produced [2]  62/7 118/13
product [16]  20/2 20/3 20/14 20/22 30/15
47/12 49/17 109/2 124/15 124/18 132/19
133/5 137/25 139/22 144/6 166/9
production [10]  17/1 128/5 164/18 164/18
164/20 164/20 165/6 165/7 165/24 167/11
products [2]  134/20 203/9
professional [2]  98/18 168/19
progression [1]  32/7
projections [2]  10/8 10/9
projector [1]  7/16
promise [1]  217/1
promises [1]  215/19
promoted [1]  32/3
promotion [3]  78/3 78/6 83/18
promotional [1]  24/5
prompted [2]  147/5 183/1
promptly [1]  5/8
pronounce [1]  142/9
proof [1]  221/12
proper [4]  157/12 179/10 179/12 180/2
properly [1]  169/9
properties [1]  208/4
property [1]  223/21
proposed [1]  182/25
proprietary [1]  165/16
Provencio [5]  37/20 86/21 112/12 143/7
143/9
provide [5]  39/4 89/12 127/12 138/20 178/19
provided [7]  37/23 39/3 132/2 170/14 172/5
182/4 182/7
public [19]  73/9 119/10 119/23 119/24 120/2
120/4 120/5 120/7 120/10 120/10 120/12
121/15 121/22 121/23 157/4 176/5 176/11
176/14 206/5
publically [1]  178/22
published [2]  69/8 206/4
pull [9]  8/6 8/14 8/19 9/4 9/8 21/14 114/20
127/16 141/10
pulled [1]  7/21
pulling [1]  210/8
purchase [85]
purchased [3]  36/24 137/25 139/21
purchaser [1]  185/14
purchasers [1]  142/19
purchasing [4]  125/12 125/19 126/8 134/13
purportedly [1]  13/14
purports [1]  130/16
purpose [2]  127/23 161/7 172/15
purposes [6]  4/23 28/15 65/16 173/23 210/3
224/16
push [1]  18/23
put [18]  7/16 9/16 35/14 35/23 46/10 50/9
74/14 79/24 96/6 106/10 121/13 122/12
124/17 127/13 128/1 147/18 180/25 182/11

putting [1]  15/9

**Q**

Qs [2]  156/14 176/24
quarter [6]  76/25 80/8 124/25 125/24 126/16
126/19
quarterly [2]  121/19 124/24
quarters [1]  76/25
question [19]  15/6 36/11 64/10 73/25 74/10
76/6 96/4 103/25 161/1 168/24 183/15
183/17 185/17 195/14 195/15 196/14 202/15
206/10 221/19
questioned [1]  156/20
questioning [4]  27/25 28/2 28/5 28/6
questions [37]  11/6 12/11 12/13 13/18 13/19
13/21 14/8 15/2 15/5 16/6 16/20 16/21 19/4
24/24 63/8 63/15 63/19 103/1 103/2 114/12
117/13 127/15 128/2 150/4 183/16 186/23
187/1 187/13 188/18 188/19 189/5 190/1
203/19 206/17 217/21 223/2 223/22
quickly [6]  19/1 37/3 44/7 154/15 201/13
211/7
quiet [1]  39/15
quote [1]  23/4

**R**

raise [3]  29/8 192/25 207/6
raised [1]  15/6
raising [1]  22/17
ranging [1]  119/21
ranked [1]  218/15
rate [3]  110/14 123/15 209/11
rated [1]  209/16
rather [8]  2/17 3/10 15/15 23/17 98/4 106/10
110/7 152/18
Raton [2]  34/6 195/24
re [2]  64/2 155/11
re-call [1]  64/2
reach [2]  136/4 162/9
read [52]  2/23 13/6 13/6 14/1 17/24 19/15
19/20 21/5 22/6 22/12 22/23 23/11 23/13
23/25 50/8 53/6 53/9 55/19 59/21 64/4 65/9
66/11 79/17 79/18 83/12 84/12 89/9 110/24
112/13 125/9 126/5 128/7 129/6 129/7
130/25 138/7 139/14 140/3 141/7 141/21
143/5 143/15 144/20 148/8 148/12 149/14
149/16 161/6 163/16 168/2 170/24 211/3
readily [1]  20/7
reading [4]  2/25 6/11 62/18 159/9
ready [11]  2/4 2/6 2/8 2/9 5/21 5/24 6/8 57/7
57/9 192/7 192/11
real [5]  19/1 26/10 105/17 131/22 135/3
realized [1]  160/22
really [9]  48/24 70/14 74/23 89/4 100/23
105/3 107/18 111/1 113/14
Realtime [1]  228/19
reason [6]  61/6 65/12 65/14 66/1 88/10
100/2 167/10 174/8 186/5 190/13
reasons [1]  165/12
recall [142]
recalled [1]  72/2
receipt [2]  216/8 216/13
receivable [1]  208/3
receive [5]  32/1 39/23 55/23 61/19 91/14
received [21]  24/11 31/16 37/1 39/6 46/6
50/20 55/3 72/20 78/3 78/24 82/20 82/24
84/16 91/8 117/3 125/11 125/18 126/7 141/5
146/9 168/12
Receiver [1]  214/20
receiving [6]  45/16 96/14 154/2 154/4 197/25

201/11
recent [1]  138/13
recently [1]  50/21
recess [11]  56/18 57/3 101/13 101/19 102/11
150/7 150/11 150/21 192/5 224/11 225/16
recited [1]  103/5
recognize [10]  38/15 44/4 48/3 95/17 95/20
201/24 204/7 204/10 204/16 204/17
recollect [1]  198/9
recollection [31]  17/2 27/19 28/2 28/6 50/1
50/12 62/21 64/15 65/2 65/4 80/17 95/1
97/17 99/3 99/9 110/10 110/16 111/16
112/22 129/18 130/4 154/24 159/24 168/14
169/24 172/12 179/3 195/24 198/20 204/5
208/14
recommendations [1]  183/24
recommended [2]  149/8 180/12
recommending [1]  180/14
reconfirmed [1]  139/20
record [9]  4/24 5/19 57/5 64/24 102/14
150/24 151/4 225/15 228/20
recorded [5]  62/21 64/15 65/2 65/5 126/16
records [3]  53/13 219/1 223/15
recovery [1]  208/3
recross [5]  4/9 4/12 4/19 24/22 223/23
Recross-examination [1]  24/22
redact [1]  154/16
redacted [2]  69/7 102/1
redemptions [1]  213/23
redirect [6]  4/2 6/9 7/8 114/4 114/7 186/15
186/21 206/19 223/4 223/6 226/4 226/8
226/12 226/19
redrafted [1]  19/11
reduction [1]  205/23
redundancies [1]  179/22
redundancy [1]  179/6
refer [1]  65/15
referenced [1]  116/23
referring [2]  22/20 138/18
reflect [1]  148/20
reflected [1]  88/24
refresh [5]  50/1 50/12 111/16 129/18 130/4
refreshed [2]  14/5 14/12
regard [4]  152/17 172/5 186/11 221/15
regarding [42]  27/11 47/16 52/2 62/15 71/16
72/10 83/18 84/5 84/13 85/22 86/6 103/1
107/15 108/4 109/13 155/10 156/7 159/18
159/23 160/19 161/22 163/4 163/23 164/6
164/6 164/9 164/11 167/1 170/3 170/22
171/16 172/23 173/2 173/5 174/7 175/17
185/12 186/1 186/2 187/23 188/3 220/11
regional [1]  177/17
Register [1]  41/6
Registered [1]  228/18
Registrar [1]  41/6
Registration [1]  217/17
regular [1]  209/9
regularly [3]  33/21 91/5 99/15
regulatory [3]  175/13 177/3 177/24
relate [3]  37/11 63/15 63/20
related [8]  13/8 37/7 46/19 46/23 46/25
49/22 130/5 155/21
relates [1]  148/3
Relating [2]  27/16 27/17
relation [2]  45/15 54/10
relations [2]  94/17 175/21
relationship [6]  11/21 99/21 169/22 169/23
172/19 218/20
relationships [1]  70/15
relative [1]  149/4

## R

relay [1]  41/1
release [24]  11/17 11/24 12/4 12/16 12/20
12/23 13/8 13/9 13/14 19/11 19/21 20/10
20/12 20/15 21/9 22/8 22/14 23/17 23/19
24/3 24/3 24/5 24/14 28/16
released [4]  117/18 117/21 191/1 224/2
releases [7]  11/5 18/24 19/12 23/6 24/12 26/9
124/18
relevance [3]  152/20 152/23 183/14
relevant [9]  63/13 75/14 112/2 155/18
156/17 157/4 157/6 157/15 200/17
relied [1]  148/21
relieved [1]  183/25
relocate [1]  124/2
relying [2]  3/5 218/13
remained [1]  215/21
remarkable [4]  27/10 27/13 27/14 27/23
remember [57]  9/23 10/15 11/5 12/8 12/12
13/19 14/2 15/17 16/6 19/3 27/10 27/13
27/14 33/8 44/25 47/8 51/25 64/8 64/9 65/6
70/22 71/1 73/8 75/6 81/6 82/14 83/4 84/25
88/2 88/2 88/8 89/16 91/3 92/6 92/22 93/1
93/6 96/9 96/12 99/5 111/11 111/19 111/20
111/25 112/9 114/13 169/17 169/19 171/17
173/22 180/14 182/14 187/1 187/15 188/19
190/1 224/17
remind [1]  143/9
remit [2]  26/3 27/21
rendition [1]  77/20
reorganization [2]  221/6 221/9
repaid [1]  215/16
repay [1]  215/17
repeat [1]  168/24
rephrase [3]  183/15 183/17 195/14
replaced [1]  55/2
replacing [1]  163/24
report [9]  13/20 36/17 37/20 42/25 43/2
121/19 121/20 121/25 179/16
reported [1]  185/12
Reporter [4]  1/23 1/24 228/18 228/19
reports [1]  108/23
represented [2]  148/20 212/4
request [21]  14/14 41/2 41/3 41/13 42/25
43/2 43/3 44/18 44/22 45/24 52/13 55/18
64/3 83/19 83/25 88/6 88/8 88/16 105/5
106/19 112/11
requested [8]  34/12 39/6 47/3 72/4 82/9 92/2
93/5 212/8
requesting [10]  40/5 44/10 48/6 49/9 51/10
52/14 72/3 82/23 91/7 138/10
requests [2]  72/7 93/3
require [1]  156/18
required [6]  104/3 127/3 178/22 180/22
184/20 210/5
requirement [3]  179/14 179/17 179/20
requiring [1]  103/18
requisition [1]  116/22
research [5]  30/15 110/1 205/3 212/11 213/3
reserve [1]  158/12
reside [2]  29/18 207/20
residence [1]  99/20
residential [2]  193/22 193/23
resign [1]  124/5
resignation [1]  163/2
resigned [2]  145/9 162/20
resolution [1]  205/5
resolve [1]  153/8

resolved [1]  163/9
Resorts [1]  207/23
respect [1]  95/16
respective [1]  142/3
respond [1]  133/17
responded [1]  31/16
responding [1]  96/14
response [10]  14/8 14/16 16/20 27/10 27/13
27/15 43/10 43/11 160/22 162/9
responsibilities [2]  108/20 121/11
responsibility [4]  121/12 123/13 127/13
215/16
responsible [11]  40/20 73/15 73/18 73/20
74/1 74/11 74/14 75/2 75/5 177/12 208/3
responsive [1]  174/12
responsiveness [1]  174/11
rest [11]  40/9 58/25 70/3 101/9 103/3 129/20
149/14 149/15 152/6 174/25 224/18
restroom [1]  192/9
result [2]  222/18 222/23
resulted [1]  165/8
resume [1]  206/4
resumed [1]  7/7
retainer [5]  123/20 145/19 145/21 149/6
187/25
retrospect [1]  186/3
return [1]  134/21
revenue [1]  132/18
revenues [1]  173/22
review [1]  38/3
reviewed [2]  164/25 171/18
reviewing [3]  169/2 169/19 169/21
revise [1]  22/8
revising [1]  24/2
reworked [1]  22/8
Richard [1]  216/19
RICO [1]  23/9
right [181]
rights [3]  125/15 125/21 126/10
rise [1]  182/23
risk [2]  126/25 138/16
RMR [1]  1/23 228/25
Road [1]  1/22
Robert [1]  159/11
Rod [7]  30/20 31/14 32/1 77/2 77/4 80/5 80/6
role [12]  16/7 34/16 78/5 120/25 121/2 175/9
175/12 175/18 176/11 176/21 176/22 177/2
roller [2]  209/20 209/21
room [1]  220/1
Roston [3]  84/13 84/19 86/12
Roston's [1]  85/3
Roughly [1]  209/3
routine [4]  88/13 88/15 174/6 220/8
Rowland [19]  50/21 81/19 113/6 144/16
144/18 144/21 148/15 148/21 159/11 159/12
161/6 161/7 161/22 162/7 162/11 162/13
162/16 173/8 188/8
Rubbermaid [1]  99/5
rule [2]  65/3 154/23
rules [2]  183/25 184/4
running [6]  146/4 165/16 190/11 190/12
190/13 213/22
Ryan [1]  174/4

## S

S-8 [1]  79/21
SA [1]  80/9
sacrifice [1]  5/9
safe [1]  73/3
sake [1]  24/4

salaries [6]  76/2 76/8 76/11 77/20 77/22
77/23
salary [9]  30/21 31/22 32/5 51/16 51/19
76/22 76/23 77/23 83/18
sale [2]  163/4 163/5
sales [10]  24/13 116/21 132/17 140/1 167/15
169/15 170/16 170/16 171/14 205/18
Sam [1]  100/5
same [15]  22/3 22/3 44/8 47/21 61/19 66/3
82/16 106/9 125/16 131/13 135/8 139/15
155/24 166/16 171/5
Sameer [4]  46/2 46/4 46/15 46/24
Sarbanes [28]  155/10 155/16 155/21 155/24
156/4 156/6 156/10 156/12 156/18 157/15
179/4 179/13 179/23 180/3 180/12 180/16
180/22 181/6 181/16 182/21 183/3 183/9
183/11 183/20 183/25 184/4 184/5 188/19
Sarbanes-Oxley [28]  155/10 155/16 155/21
155/24 156/4 156/6 156/10 156/12 156/18
157/15 179/4 179/13 179/23 180/3 180/12
180/16 180/22 181/6 181/16 182/21 183/3
183/9 183/11 183/20 183/25 184/4 184/5
188/19
sat [1]  26/9
satisfaction [1]  205/10
satisfactorily [1]  163/9
satisfied [1]  165/4
Saturday [1]  40/2
save [1]  149/7
savings [1]  61/18
saw [8]  30/9 36/15 60/20 84/7 95/4 139/15
139/16 182/22
say [38]  11/17 12/15 14/7 16/19 17/20 20/9
21/25 23/6 34/13 36/8 37/8 37/10 43/18
74/18 81/6 93/8 107/24 109/19 115/8 128/13
131/1 135/8 138/2 138/19 141/15 141/25
142/15 148/14 156/3 166/23 179/13 181/20
185/22 190/18 196/1 199/8 217/11 223/14
saying [18]  4/16 12/16 50/17 63/7 64/22 65/5
74/17 74/22 75/3 75/11 81/17 85/19 88/15
104/19 113/17 174/23 174/24 221/20
says [42]  13/4 17/18 19/10 24/3 25/20 25/20
26/2 36/16 46/24 52/21 53/6 63/20 64/11
65/11 65/11 65/13 79/19 84/15 90/8 103/20
110/7 110/8 125/10 128/9 137/20 138/9
140/4 141/23 142/1 143/17 144/12 144/21
148/13 155/11 165/7 165/12 166/15 169/15
169/21 177/2 187/12 201/16
SB2 [1]  172/9
scandal [2]  156/13 179/3
schedules [1]  127/14
scope [3]  152/25 156/16 183/13
screaming [1]  146/14
screen [27]  2/12 3/11 6/12 6/17 16/16 25/20
75/20 77/23 82/25 94/16 96/6 102/2 106/9
106/16 147/18 154/16 164/17 164/17 172/24
180/25 182/9 182/11 200/7 210/20 213/2
213/7 216/2
scroll [2]  17/17 22/6
scrubs [1]  104/24
Se [1]  1/19
seat [2]  107/2 191/10
seated [12]  2/3 5/7 5/18 6/6 57/22 102/13
107/7 150/23 158/20 192/22 193/3 207/9
seats [2]  6/15 56/19
SEC [19]  13/20 62/3 62/7 64/8 74/11 75/3
75/9 121/17 121/18 122/7 125/24 126/12
137/19 151/12 175/10 176/17 176/20 176/22
189/2
second [29]  18/6 24/12 42/24 53/23 54/15

**S**

second... [24]  74/5 75/17 80/8 83/12 89/5 90/22 125/16 129/6 131/2 131/4 134/16 135/6 148/7 151/14 164/16 166/15 187/13 187/23 201/3 201/3 201/14 202/14 216/11 224/17

second-guess [1]  24/12

section [11]  17/18 50/8 122/5 125/6 139/12 139/25 148/25 164/19 164/21 215/24 221/6

secure [1]  10/25

securities [13]  23/9 62/19 73/9 73/22 73/25 120/11 121/3 121/13 172/9 172/9 172/12 181/15 181/17

seeing [1]  2/12

seek [1]  208/24

seem [4]  34/25 35/15 35/16 100/22

seemed [1]  36/2

seems [1]  65/2

seen [22]  25/13 87/21 87/22 101/23 107/23 107/25 108/1 108/16 109/12 116/24 150/15 168/2 172/23 174/2 178/8 181/3 189/14 200/9 200/20 201/9 202/17 210/25

sell [3]  23/22 124/15 146/3

selling [3]  13/18 146/13 147/4

sells [1]  120/4

send [34]  24/8 27/20 37/2 37/3 39/24 40/4 40/8 40/25 41/2 44/9 45/5 47/18 72/6 79/25 83/22 88/11 91/22 108/22 112/11 115/10 123/24 134/4 135/20 135/22 135/24 136/11 139/3 141/24 147/12 149/19 174/6 188/4 199/1 202/22

sending [12]  41/3 47/20 58/23 88/8 92/11 92/12 99/12 111/6 131/24 138/23 143/25 167/9

senior [2]  73/3 73/6

sense [2]  74/23 100/21

sent [41]  12/12 14/15 20/9 47/2 54/21 58/7 59/1 72/5 72/10 73/17 89/11 89/18 89/25 91/25 92/13 92/24 108/18 115/2 128/18 133/6 133/16 134/1 134/3 134/5 134/10 134/12 135/10 135/15 135/16 144/25 147/14 149/22 153/24 161/5 161/21 161/25 168/18 173/18 188/8 188/15 190/15

sentence [18]  17/24 18/5 18/12 22/12 22/23 83/13 125/9 128/7 129/8 131/1 140/3 154/14 155/9 165/7 165/12 170/12 170/18 187/13

sentences [3]  126/6 143/16 156/8

separate [1]  55/24

September [21]  8/13 8/22 18/1 18/7 20/25 21/1 21/6 21/24 30/3 47/4 59/23 76/22 122/9 122/10 125/11 125/18 128/9 129/9 144/15 145/4 213/18

September 10th [1]  21/24

September 14th [4]  8/13 18/1 125/11 128/9

September 19th [1]  76/22

September 2005 [1]  30/3

September 2008 [1]  145/4

September 24th [5]  8/22 47/4 59/23 125/18 144/15

September 27th [1]  213/18

September 29th [2]  18/7 129/9

September 30th [2]  122/9 122/10

September 9th [3]  20/25 21/1 21/6

series [1]  214/1

serve [1]  224/14

served [1]  62/7

serves [2]  104/5 172/15

service [2]  205/8 220/3

services [8]  39/3 39/5 52/15 80/8 146/3

161/10 187/24 187/25

session [3]  224/19 224/20 224/22

set [4]  91/20 92/2 122/23 198/10

setting [3]  31/10 92/1 92/9

seven [1]  183/6

several [8]  7/14 27/1 70/22 70/24 154/6 154/7 166/17 188/18

SFranklinUSDC [1]  1/25

Shakes [2]  190/23 223/24

shape [1]  108/6

share [2]  49/23 60/4

shareholder [2]  22/14 34/6

shareholders [2]  29/23 89/13

shares [75]  39/8 39/9 39/12 40/4 41/1 43/13 43/16 43/17 43/18 44/10 44/12 44/16 45/3 45/5 45/9 45/10 45/13 46/17 46/25 47/1 47/6 48/7 48/22 49/10 49/12 49/15 50/13 50/16 50/17 50/25 51/11 60/25 61/3 72/10 72/19 72/22 79/21 79/22 79/24 80/10 80/10 83/7 83/7 84/14 107/15 115/3 115/21 120/4 140/6 140/6 140/10 140/16 145/24 146/2 146/9 146/10 146/13 146/15 146/16 146/19 146/22 147/2 147/5 161/9 161/12 161/18 163/4 163/5 163/10 163/20 163/21 163/24 167/17 169/7 173/6

she'll [2]  103/20 103/23

she's [8]  63/1 64/21 65/5 66/3 102/1 103/16 103/19 117/18

sheet [4]  40/8 74/21 122/2 137/6

shift [2]  139/23 142/21

ship [2]  138/12 138/14

shipments [4]  138/11 138/13 139/1 165/6

shipped [1]  138/12

short [10]  4/9 13/18 35/18 41/15 51/15 79/17 92/21 112/9 161/6 191/7

shortly [2]  56/3 150/8

should [26]  14/19 14/24 28/24 33/2 37/8 43/18 50/22 54/19 55/23 56/3 56/14 59/25 60/13 69/7 91/14 105/24 113/2 129/22 130/19 146/19 147/7 149/4 152/16 153/20 183/11 215/25

show [36]  12/4 12/19 15/13 15/22 21/11 21/13 21/14 39/13 53/13 75/20 83/3 84/11 85/6 87/19 92/4 92/20 95/6 109/11 110/19 112/5 115/16 115/21 115/24 129/17 129/20 154/16 154/24 173/16 174/1 174/14 178/6 180/7 180/24 182/19 200/4 220/1

showed [13]  9/7 10/13 11/3 11/4 12/7 13/24 18/25 18/25 82/16 116/12 189/18 189/19 199/24

showing [3]  14/2 25/12 200/8

shown [7]  6/12 66/23 114/10 115/13 200/19 201/8 202/17

shy [1]  29/21

sic [5]  14/1 38/15 76/1 124/24 213/16

side [1]  75/22

sidebar [3]  24/19 61/25 151/25

sides [1]  188/7

sign [8]  27/20 93/5 93/10 130/16 134/21 184/15 185/3 210/9

signal [1]  165/16

Signalife [91]

Signalife's [5]  124/8 124/13 127/4 169/16 169/22

signatory [1]  124/12

signature [30]  8/20 26/3 26/9 26/14 26/17 27/20 38/22 89/2 94/19 94/20 94/23 95/17 95/19 95/21 95/23 95/24 134/23 161/14 188/12 188/15 200/13 200/14 200/24 200/25 201/15 201/17 202/24 202/25 211/19 211/22

signatures [2]  93/1 184/20

signed [24]  18/14 25/22 26/13 26/13 26/15 78/24 79/1 83/24 95/3 105/6 133/4 133/19 133/23 133/25 148/14 148/17 157/11 158/10 161/11 168/13 182/21 184/25 188/7 211/21

signer [3]  185/1 185/4 185/7

significant [1]  126/20

signing [3]  93/8 131/12 184/22

signs [2]  134/22 210/12

Silve [33]  43/22 43/25 44/13 45/6 45/14 45/17 46/2 46/16 47/6 47/21 94/1 94/4 95/16 95/25 115/19 116/6 140/5 140/8 140/10 140/11 140/19 140/22 140/24 141/2 167/21 168/20 169/4 169/14 169/15 169/22 170/4 170/13 170/13

similar [4]  139/17 149/15 172/15 172/18

simplified [1]  179/9

Simpsonville [1]  29/19

simultaneously [2]  106/18 149/5

since [12]  43/7 55/18 83/23 87/13 133/3 147/18 147/19 148/23 184/9 188/21 222/3 223/8

single [1]  12/3

single-page [1]  12/3

sir [23]  6/2 6/3 28/12 28/19 35/12 118/22 118/25 119/9 150/10 158/17 190/24 191/5 192/18 192/25 193/4 193/9 193/14 193/17 193/19 193/20 193/24 206/21 207/1

sit [2]  23/5 172/20

situated [1]  70/16

situations [1]  81/13

six [3]  76/23 77/24 133/3

six-month [2]  76/23 77/24

size [1]  198/24

skills [2]  198/3 204/22

skip [5]  22/11 22/22 23/1 148/23 148/24

skirt [1]  184/3

slash [3]  83/18 83/18 111/4

slow [1]  215/20

slowly [2]  85/20 193/17

small [9]  2/24 119/20 119/21 140/2 177/15 183/9 183/11 183/21 183/24

snapshot [1]  214/20

software [1]  204/23

sold [2]  146/10 146/15

somebody [5]  43/17 89/25 109/16 130/18 134/1

someone [11]  35/10 35/14 60/8 60/25 63/23 104/5 209/25 210/14 216/15 216/15 216/20

someplace [2]  199/1 199/19

something [26]  13/18 16/1 17/2 43/22 59/14 60/14 63/20 64/11 65/5 65/11 65/11 65/13 72/2 74/21 87/6 88/13 103/22 123/20 123/21 129/17 151/24 155/17 155/18 157/10 159/23 211/25

sometime [1]  98/22

sometimes [6]  40/16 46/19 89/18 100/24 109/19 109/23

somewhere [1]  199/15

son [1]  34/4

soon [3]  5/16 6/25 162/10

sorry [28]  5/14 6/7 20/25 21/18 27/22 53/24 54/7 61/9 68/4 71/3 74/5 77/10 80/6 92/12 98/10 98/15 119/13 130/21 153/9 155/4 158/21 187/5 195/15 196/15 199/11 204/12 204/13 215/24

sort [26]  2/15 2/19 3/7 30/23 31/7 36/14 39/20 53/19 85/11 85/12 95/2 122/16 122/24 123/2 134/7 139/19 142/18 145/18 155/19 160/1 172/15 173/21 179/2 198/10 198/21

**S**

sort... [1] 209/19
sorts [2] 120/6 121/24
sought [1] 215/21
sounds [4] 23/19 100/7 111/15 178/18
source [4] 18/18 18/21 167/4 189/11
South [8] 29/19 30/8 33/4 91/1 91/4 91/4 177/10 177/11
SOUTHERN [1] 1/1
SOX [13] 156/12 178/11 178/15 178/20 178/23 179/14 181/21 188/19 188/22 188/25 189/3 189/6 189/7
spa [1] 220/1
span [1] 214/5
speak [13] 33/18 36/20 38/17 42/15 49/1 102/17 167/1 169/6 191/18 193/17 203/16 207/10 216/24
speaking [2] 51/1 113/6
special [1] 204/22
specialist [1] 196/24
specialty [1] 181/21
specific [3] 81/6 155/23 174/22
specifically [10] 27/2 71/8 74/12 88/9 92/23 93/22 109/14 111/7 111/11 121/7
speculation [3] 185/15 186/7 206/8
speech [1] 23/9
spell [4] 29/11 118/22 193/6 207/11
spelled [1] 193/8
spent [3] 24/2 61/17 154/6
Spokane [1] 146/23
spoke [3] 84/3 85/2 204/3
spoken [7] 23/4 50/21 135/1 194/13 194/19 194/22 203/6
spreadsheet [1] 79/22
spreadsheets [1] 74/19
spring [4] 197/11 198/17 198/18 199/14
stability [1] 138/22
staff [4] 108/21 110/10 162/4 183/4
staffers [1] 37/5
Stan [2] 94/25 108/25
stand [1] 7/7
standard [3] 25/21 41/6 41/8
Standby [1] 1/21
standpoint [3] 168/17 169/1 169/6
start [14] 6/25 20/17 20/19 21/15 30/2 30/24 35/25 38/2 42/19 54/4 88/5 106/19 135/6 181/23
started [9] 22/8 30/8 31/12 33/2 55/16 73/1 215/15 215/18 218/20
starting [11] 30/21 53/20 76/23 77/24 141/21 151/12 151/15 171/10 200/5 213/20 213/24
starts [5] 148/6 148/24 159/9 161/6 169/14
state [5] 29/18 119/7 182/15 193/15 207/20
stated [1] 31/25
statement [12] 22/18 36/15 64/5 64/17 97/8 99/22 122/2 122/3 122/3 154/19 183/18 196/9
statements [9] 17/16 120/9 122/1 122/4 122/19 127/1 127/2 157/16 171/15
STATES [6] 1/1 1/3 1/13 2/6 23/8 225/9
status [2] 17/1 128/5
stay [7] 77/8 139/23 191/16 191/23 219/21 219/23 220/1
staying [1] 219/19
stays [1] 219/22
STEIN [211]
Stein's [28] 2/4 5/19 14/8 14/10 14/13 15/8 15/14 20/23 36/8 43/9 43/10 48/23 52/23 53/19 57/6 147/6 150/4 150/14 150/24

step [9] 5/15 28/13 56/22 101/18 117/17 150/10 153/7 206/22 224/1
Stephen [4] 1/23 228/18 228/24 228/25
stepping [1] 131/24
stern [2] 98/4 98/17
Stieglitz [5] 1/16 226/4 226/10 226/12 226/14
still [18] 4/24 6/2 53/13 56/3 57/13 90/23 106/25 133/5 133/8 134/19 149/8 158/17 161/15 164/14 186/24 223/20 224/20 225/1
stipulate [1] 62/23
stipulated [13] 25/1 62/3 62/5 66/10 66/12 78/16 94/7 95/7 96/5 101/10 117/24 151/20 151/22
stock [56] 14/17 14/19 14/20 32/13 32/18 33/10 33/11 34/11 36/18 37/2 37/7 37/9 37/12 37/12 37/15 39/17 39/21 40/7 40/13 41/4 41/11 41/12 43/25 46/15 46/19 47/18 47/20 48/7 48/7 48/12 48/17 49/10 51/1 51/18 51/21 58/22 74/19 79/3 80/9 80/15 81/12 82/17 83/18 84/6 114/13 123/6 123/17 145/14 145/14 145/17 148/25 149/4 149/5 149/6 159/23 188/3
stockholders [1] 122/3
stop [1] 220/13
stopped [2] 22/9 220/13
storage [2] 197/13 197/18
store [1] 197/15
stored [1] 199/2
straight [2] 104/24 181/14
straightened [2] 111/2 151/2
strategies [1] 205/23
strategy [1] 14/12
stream [1] 91/13
Street [2] 224/11 221/11
strong [5] 22/15 98/4 175/5 185/22 186/1
stuck [1] 188/14
studied [1] 89/4
stuff [2] 142/10 177/3
subject [6] 28/17 157/6 172/8 173/6 183/10 183/20
submit [2] 37/22 56/2
submitted [1] 32/21
subpoena [4] 62/7 117/19 191/1 191/4
subscription [1] 43/4
subsequent [1] 126/3
substance [2] 93/11 96/1
substantively [1] 152/18
suburb [1] 193/16
such [9] 24/6 64/8 64/8 64/9 64/9 81/13 154/5 175/20 212/11
suddenly [2] 22/16 165/14
sue [2] 61/15 150/2
suggest [5] 3/6 56/15 69/6 69/25 154/25
suggested [4] 11/4 33/12 64/1 66/6
suggesting [1] 3/4
suggestion [1] 14/22
suit [1] 164/2
Suite [2] 1/22 80/3
summer [1] 199/14
sums [1] 76/7
sunk [1] 149/8
Super [2] 166/17 167/5
supervision [2] 205/12 205/14
supplement [1] 151/4
support [1] 54/20
supposed [2] 24/5 47/2
sure [55] 2/20 3/1 11/25 26/14 32/2 37/7

48/24 49/2 55/17 61/16 61/17 70/25 71/17 73/6 74/18 74/25 75/1 75/13 76/5 76/11 77/3 78/6 80/14 80/14 81/4 82/7 82/11 84/10 86/5 86/22 87/15 88/19 89/21 92/17 93/25 94/6 95/4 95/21 97/5 98/20 99/14 109/21 110/5 111/21 112/1 113/1 121/12 137/5 154/1 156/10 161/1 166/11 182/4 193/18 207/5
survival [1] 49/18
Susan [2] 61/14 72/6
sustain [1] 155/7
Sustained [9] 26/23 71/13 112/3 165/21 182/17 185/16 186/8 196/7 222/11
sweet [1] 98/18
switch [1] 8/5
sworn [4] 2/9 118/21 193/2 207/8
system [3] 55/24 165/17 209/15
systems [1] 165/15

**T**

T-r-a-c-y [1] 29/12
table [4] 210/4 210/5 210/8 210/11
take [36] 3/16 6/16 8/4 9/16 13/6 18/5 18/22 23/7 29/2 40/9 56/14 56/15 56/17 58/13 70/2 85/7 101/13 105/1 124/2 125/8 126/18 128/16 139/14 145/5 147/25 148/5 148/17 150/6 158/2 165/2 168/10 191/6 191/19 197/22 199/15 224/16
taken [14] 57/3 62/3 62/14 102/11 142/3 148/25 149/3 149/5 149/5 150/21 155/6 176/18 192/5 225/16
taking [4] 60/1 70/24 104/4 187/21
talk [16] 3/22 33/25 61/21 70/1 76/16 102/5 119/18 128/24 131/17 140/22 160/17 184/9 186/20 192/1 198/13 225/7
talked [14] 27/9 39/17 58/9 86/12 98/19 100/13 115/2 116/14 153/1 163/25 173/19 173/21 176/7 203/11
talking [15] 8/16 11/4 11/18 58/2 83/7 111/14 136/15 142/16 152/17 155/19 161/18 165/25 214/15 217/19 223/8
talks [2] 10/8 167/15
tardy [1] 192/9
tax [1] 107/16
taxes [7] 53/14 111/5 111/13 111/14 111/17 111/22 144/21
TD [2] 79/25 80/3
team [3] 90/21 176/16 205/20
technology [4] 108/2 108/5 109/4 109/6
telephone [6] 31/9 33/23 112/24 185/20 204/3 204/6
telephoned [1] 39/2
telephoning [1] 40/24
tell [57] 3/2 4/10 8/1 8/20 9/18 14/19 21/18 23/3 24/7 29/10 33/24 34/8 36/14 37/17 37/21 43/20 45/16 46/1 46/23 49/5 52/24 54/17 58/24 59/21 61/12 72/16 84/8 93/10 95/25 105/19 105/21 106/7 113/14 118/22 119/6 127/23 136/20 146/21 147/6 152/1 170/1 170/2 187/19 193/6 193/14 193/22 195/8 196/5 196/17 198/8 198/10 200/2 207/11 214/24 215/2 216/15 223/13
telling [12] 17/21 18/19 20/19 28/4 40/25 49/19 54/18 82/6 104/23 112/24 137/19 220/13
tells [1] 5/12
temporal [1] 48/18
tendering [1] 163/10
tenure [15] 41/14 73/8 93/21 97/19 97/23 100/7 100/11 107/14 108/3 109/9 171/21 175/10 175/12 176/1 184/16

**T**

term [6]  116/17 116/19 116/19 116/23 117/4
179/5
terminated [3]  98/22 99/19 155/3
termination [1]  99/4
terms [10]  14/11 25/21 70/16 76/8 123/2
133/18 163/15 163/17 172/15 187/20
terribly [2]  139/13 195/15
test [2]  86/6 156/19
tested [1]  179/1
testified [19]  65/21 65/24 66/2 71/7 71/12 72/9
72/13 72/15 80/23
testifies [3]  62/22 63/1 64/3
testify [1]  62/20
testifying [5]  61/13 64/8 73/22 74/8 74/13
testimony [19]  56/23 63/2 63/10 64/7 64/23
65/15 101/19 150/11 151/12 151/15 176/2
176/25 177/5 185/10 226/3 226/5 226/9
226/13 226/16
testing [1]  144/5
tests [2]  166/18 179/22
text [2]  133/20 135/12
thank [87]
Thanks [4]  84/18 91/19 155/12 182/1
that'd [2]  3/13 80/22
that's [84]
them's [1]  152/18
themselves [1]  211/25
there'd [1]  49/23
there's [24]  41/23 63/5 64/12 65/2 65/4 65/12
65/14 66/1 69/6 80/4 80/5 94/1 95/21 101/25
103/1 155/15 158/3 158/5 181/19 182/11
196/11 212/6 221/23 222/25
thereof [1]  95/18
they'll [5]  4/6 25/5 42/2 103/7 212/19
they're [15]  2/16 2/20 3/2 4/25 20/19 21/1
29/4 44/8 60/18 104/22 106/13 150/17 153/1
178/25 221/12
they've [4]  41/22 62/7 62/14 128/3
thing [8]  14/14 16/24 82/8 82/16 99/24
110/14 125/16 209/19
things [30]  7/13 31/7 39/15 37/6 37/7 37/9
37/12 37/13 61/7 61/10 63/5 63/6 75/15 81/9
81/10 98/7 98/8 98/15 98/16 99/6 116/3
120/6 121/24 122/17 127/12 167/17 185/12
220/2 220/6 221/18
think [51]  2/23 3/25 6/7 10/13 13/21 15/14
23/13 41/11 51/14 61/16 62/20 63/13 63/19
66/23 69/15 71/11 85/18 101/3 101/25 106/5
106/7 110/20 113/3 114/9 115/20 144/22
151/1 152/23 153/20 155/6 155/7 156/15
157/6 157/15 158/2 171/9 182/24 183/1
183/2 184/25 186/17 186/24 187/22 191/15
204/15 209/23 211/11 221/20 224/6 224/8
224/10
third [8]  9/2 22/11 110/22 110/24 124/25
125/23 126/16 126/19
thirds [1]  147/2
those [88]
though [4]  51/18 71/1 92/24 109/18
thought [7]  3/7 89/11 113/11 165/1 189/6
189/7 189/7
thousand [3]  45/11 80/20 80/21
thread [2]  54/3 83/14
three [23]  17/3 20/13 27/24 44/7 80/16 80/19
80/22 120/22 132/13 143/15 152/24 153/3
155/15 155/24 157/20 157/22 179/7 183/7
189/14 191/13 191/16 198/24 214/5
Three's [1]  211/13

**T** *(continued)*

three-hour [1]  214/5
through [29]  2/16 33/10 38/10 44/7 60/3
73/8 74/4 74/4 74/6 79/20 88/7 102/19 134/7
135/25 136/1 136/3 163/1 165/6 165/23
174/15 178/23 184/8 191/15 195/10 208/19
212/20 213/18 218/23 219/2
throughout [4]  33/21 34/20 180/22 208/21
Thursday [1]  224/22
thus [1]  86/20
tickets [1]  220/1
tight [1]  53/20
Tim [1]  192/24
timeframe [7]  32/2 36/1 36/3 86/5 86/22
97/20 112/21
times [13]  27/1 33/16 33/17 33/19 33/20
40/25 81/11 82/8 92/2 100/14 160/18 181/17
189/15
Timothy [3]  193/2 193/7 226/13
tired [4]  103/20 103/23 149/22 150/1
title [2]  73/1 78/3
titled [2]  94/16 164/17
today [9]  2/14 53/12 61/13 63/18 105/8
172/20 174/15 176/25 177/5
together [10]  74/14 100/7 120/23 121/14
122/12 122/16 124/17 127/14 128/1 136/13
Tokyo [2]  142/9 142/10
told [47]  6/10 14/8 27/8 27/24 36/16 39/2
39/12 44/14 47/12 47/14 51/1 55/1 55/4
55/18 56/4 58/23 59/5 59/6 60/18 61/12 72/9
72/15 80/15 81/1 81/5 81/11 82/8 84/10
86/24 100/2 100/4 102/18 104/23 107/21
108/1 110/3 115/9 116/2 146/22 148/19
166/10 166/21 166/24 170/6 176/10 196/4
203/2
Tom [6]  109/13 109/15 110/8 111/9 111/14
111/21
tomorrow [3]  55/23 225/5 225/12
tone [2]  24/8 149/15
Toni [1]  142/8
tonight [1]  105/11
Tony [6]  59/10 59/12 134/13 134/19 134/23
134/24
too [7]  2/24 103/20 103/23 106/5 159/23
186/1 224/8
took [10]  50/3 62/10 70/20 84/16 90/19
123/12 151/1 163/22 188/14 199/17
top [23]  11/24 12/11 15/25 16/17 19/2 19/6
19/8 21/4 21/15 52/11 53/4 81/14 97/5
112/14 127/17 133/11 135/17 141/12 141/25
143/4 144/11 201/23 215/25
topic [1]  155/17
total [12]  18/4 18/10 18/11 18/16 128/12
129/12 129/13 140/5 213/22 214/3 215/9
219/4
Totally [1]  10/11
touch [1]  162/10
toward [2]  18/1 131/19
towards [11]  31/20 32/22 33/22 33/22 37/18
40/14 41/14 59/7 193/5 199/14 203/15
track [1]  34/12
tracking [7]  37/3 39/25 40/8 108/21 108/22
218/10 218/23
tracks [2]  22/5
Tracy [10]  28/22 29/9 29/12 34/5 34/13
76/22 80/7 84/14 143/7 226/5
trade [1]  39/13
traded [1]  39/14
trading [3]  14/18 80/15 80/19
train [1]  85/8
training [1]  205/20

**T** *(continued)*

transaction [4]  129/15 156/20 161/16 161/17
transactions [4]  16/10 51/25 52/2 52/5
transcript [6]  1/11 137/6 137/6 137/11 151/4
228/20
transfer [27]  32/13 34/12 36/18 40/5 40/5
41/4 41/9 41/10 43/1 43/13 44/9 45/24 46/7
48/6 49/9 50/17 50/22 51/10 52/14 52/22
52/25 53/2 54/19 72/23 79/23 80/10 81/12
transferred [7]  33/9 43/16 48/7 49/10 51/11
84/15 147/2
transfers [7]  32/16 33/10 37/2 37/15 41/12
47/18 74/19
translucent [1]  18/16
travel [1]  108/21
traveled [1]  109/22
traveling [1]  36/25
treading [1]  138/16
treat [1]  173/23
tried [5]  34/25 43/3 55/24 81/4 81/6
trips [3]  215/9 215/10 215/10
Tronics [1]  30/1
trouble [3]  2/12 2/16 2/25
troublesome [1]  157/15
true [15]  23/21 27/8 59/2 59/3 84/3 91/21
99/23 129/19 165/24 173/3 189/8 206/7
206/12 206/14 206/16
trust [1]  206/24
trustee [1]  221/15
truth [5]  74/16 97/7 137/19 153/22 154/11
try [14]  5/15 7/16 8/5 21/2 42/11 49/1 89/15
132/23 142/9 150/13 150/18 191/21 193/4
207/10
trying [13]  4/14 124/15 124/17 137/5 150/25
151/22 153/11 155/20 162/9 198/10 215/12
216/23 224/24
Tuesday [1]  224/21
turf [1]  173/5
turn [11]  146/3 146/10 164/14 164/16 167/14
212/14 213/14 214/18 215/23 217/14 220/22
turned [1]  70/21
turning [1]  63/23
Twenty [2]  206/3 212/22
Twenty-eight [1]  212/22
Twenty-plus [1]  206/3
two [41]  4/2 17/4 21/25 23/13 25/25 26/9
26/12 33/17 33/19 33/20 38/25 67/24 67/25
74/17 75/4 80/9 87/19 96/8 99/5 100/14
102/24 103/19 126/6 137/10 143/16 147/2
151/10 152/20 156/8 158/1 165/12 177/20
183/7 183/16 184/20 189/15 191/15 198/24
198/24 198/24 222/7
two-page [1]  87/19
type [6]  73/11 92/8 108/23 135/9 139/25
140/3
typewritten [1]  88/21
typical [4]  215/4 215/5 215/6 215/7
typically [4]  40/2 41/6 89/1 140/17
typing [1]  31/9

**U**

U.S [4]  1/17 111/4 111/10 111/23
Uh [2]  83/11 187/11
Uh-huh [2]  83/11 187/11
ultimately [6]  30/17 40/19 149/19 208/24
210/5 215/20
Um [2]  82/15
unable [1]  220/12
under [38]  6/2 6/8 22/18 23/7 23/9 23/9
36/24 39/8 50/18 57/13 62/20 62/21 65/2

## U

under... [25]  71/20 85/19 97/23 106/25 113/9
117/19 126/3 128/8 139/12 139/25 147/10
147/11 149/25 158/17 162/4 171/25 172/4
179/23 180/22 188/22 188/25 189/3 191/1
191/4 219/6
underneath [1]  17/12
understand [17]  2/11 4/17 4/20 41/10 63/22
63/23 64/19 73/7 88/17 100/15 104/18
110/18 111/12 156/11 161/1 161/7 174/23
understanding [21]  2/21 5/20 30/11 34/15
34/17 35/20 38/22 40/19 40/23 45/13 48/22
79/2 90/2 99/18 120/24 138/11 144/1 144/3
147/9 160/6 160/25
understands [1]  40/11
understood [2]  90/19 90/22
undertaker [1]  149/7
underwear [1]  149/6
Unfortunately [1]  137/4
unique [1]  222/6
unit [5]  18/3 18/10 18/16 128/11 129/12
UNITED [6]  1/1 1/3 1/13 2/6 23/8 225/9
units [5]  125/13 125/20 126/9 138/12 138/14
unless [5]  37/25 65/5 65/24 65/25 87/5
unpaid [1]  215/21
unrelated [3]  9/15 10/11 11/2
until [5]  70/12 104/25 153/8 185/4 220/17
unusual [1]  55/6
upbeat [1]  24/5
update [2]  100/25 143/17
updated [1]  138/10
upfront [2]  123/20 145/18
upgrade [3]  18/9 18/15 129/11
upgrades [2]  18/3 128/11
upon [6]  41/12 93/8 104/2 148/21 155/2
170/18
upper [1]  8/11
upset [2]  114/25 159/23
us [36]  2/15 5/9 23/6 29/10 29/11 46/23
53/15 66/23 70/2 102/18 105/12 111/5
118/22 120/1 123/16 127/12 133/5 133/7
133/17 134/21 138/17 143/9 146/2 146/22
148/19 163/21 180/17 193/6 193/6 193/22
198/22 207/11 207/12 214/24 215/2 220/13
used [6]  25/22 116/19 170/15 183/3 183/6
197/18
usefully [2]  35/10 35/14
using [4]  56/10 106/9 166/18 183/9
utilizing [1]  62/5

## V

vaguely [4]  90/11 112/10 171/17 173/22
Valencia [1]  119/8
valid [1]  133/8
validate [1]  132/23
valued [1]  140/6
various [1]  176/15
Vegas [4]  207/21 216/20 223/11 223/17
vendor [1]  140/18
Ventura [1]  80/3
veracity [1]  82/6
verify [1]  133/4
vernacular [1]  209/20
version [2]  187/16 188/10
versions [1]  188/4
versus [2]  122/17 187/16
very [48]  4/9 7/15 14/7 17/24 20/3 20/3 22/7
33/22 35/10 35/14 49/16 70/11 79/17 92/21
98/17 98/18 100/7 100/19 101/16 114/9

120/1 120/6 121/10 121/24 125/9 126/23
127/6 127/10 133/1 138/18 139/17 140/3
143/10 145/1 145/10 162/18 162/23 171/2
174/12 175/4 175/15 179/9 186/4 191/7
195/8 195/12 211/7 222/6
via [5]  91/14 134/5 134/9 135/21 201/14
viable [1]  138/21
vice [1]  73/4
video [1]  106/9
view [2]  155/18 180/2
violative [1]  179/12
virtually [1]  156/19
visit [3]  117/2 219/2 219/2
visits [1]  220/1
visually [1]  106/6
voice [1]  204/8
voicemail [2]  136/5 136/5
VOLUME [1]  1/10
vomit [1]  22/15
VP [1]  73/2

## W

wagered [1]  214/9
wait [2]  16/3 191/20
waiting [3]  107/2 137/12 161/15
waiving [1]  65/1
Walker [1]  53/12
want [42]  3/9 6/17 6/20 6/21 7/12 7/14 18/23
19/10 19/14 21/13 24/18 38/12 40/10 52/16
58/3 63/3 63/8 63/12 63/14 63/19 65/16
104/21 104/22 111/4 117/10 142/21 143/20
149/12 155/16 158/9 169/1 170/3 177/5
181/3 186/17 186/24 187/12 200/4 206/11
209/7 211/7 223/14
wanted [21]  3/5 14/14 24/9 26/13 37/18
55/17 98/7 98/8 98/12 98/15 98/16 111/21
115/6 115/7 127/25 132/1 133/4 134/19
143/17 157/2 175/5
wants [4]  11/25 19/11 151/23 161/16
warehouse [2]  197/12 197/13
warrant [1]  76/24
Washington [3]  1/18 99/20 146/23
wasn't [16]  3/12 12/22 20/12 21/10 51/14
84/22 85/15 89/20 92/17 98/17 111/24 113/1
113/14 156/25 178/4 197/24
wasting [1]  65/6
Watch [4]  28/12 117/17 206/21 224/1
Waterhouse [2]  79/25 80/3
we'd [2]  152/25 153/3
we'll [48]  5/15 6/24 6/25 7/17 8/6 8/11 8/19
8/23 9/8 9/18 16/16 17/18 18/22 19/2 23/1
23/11 23/12 30/24 42/23 46/22 56/15 56/20
66/12 70/5 105/13 105/23 127/17 135/6
139/12 143/4 150/8 152/24 158/12 186/20
191/21 192/3 200/17 200/18 201/3 201/13
201/15 201/22 202/13 224/11 224/18 224/19
225/4 225/12
we're [25]  2/13 5/18 6/8 6/25 22/11 28/16
29/2 42/10 44/7 53/22 57/5 63/9 65/6 102/14
107/2 118/14 130/20 137/7 155/19 171/5
181/14 213/14 223/19 224/17 224/18
we've [22]  17/3 33/15 34/14 39/17 62/3 66/12
82/24 86/12 94/7 108/11 109/1 117/24
119/21 132/4 151/2 152/3 152/5 174/15
189/14 204/3 204/6 222/21
wealthy [3]  195/25 195/25 196/1
Wednesday [1]  224/21
week [8]  20/18 54/12 138/12 143/18 154/6
161/11 224/19 224/20
weeks [3]  10/21 11/14 138/13

WEG [1]  161/12
welcome [10]  5/6 6/7 57/21 66/7 77/18 79/10
106/2 107/6 158/21 192/21
well [73]  8/15 8/16 12/25 13/2 15/6 17/6
18/21 19/7 20/15 22/23 23/11 24/13 26/12
29/6 29/7 40/8 42/9 47/18 54/4 54/20 55/24
59/5 62/21 65/10 78/15 78/18 85/14 86/12
86/18 87/13 91/20 93/3 98/21 101/2 105/12
105/19 110/7 110/17 117/1 127/7 129/15
131/1 132/18 133/3 133/23 134/17 136/7
138/3 146/2 147/21 151/24 152/3 152/23
153/4 153/5 153/7 153/25 154/13 155/6
155/24 157/8 157/12 158/1 163/13 163/18
167/10 178/22 179/14 186/19 195/5 197/21
220/3 223/18
went [10]  13/1 15/6 26/16 72/4 75/2 81/2
123/14 146/14 170/19 190/18
weren't [4]  51/19 82/2 83/7 149/25
West [3]  1/7 1/20 1/25
what's [46]  8/12 9/5 10/1 10/18 11/11 16/2
16/15 16/24 17/14 20/23 21/20 29/20 42/10
42/23 44/18 44/22 45/21 48/10 54/8 55/12
62/1 75/19 78/20 85/6 92/4 92/20 97/15
104/11 109/11 110/19 119/16 120/2 126/23
128/3 153/13 153/19 155/8 159/7 174/1
174/14 178/6 178/23 180/7 180/24 215/24
219/4
whatever [10]  11/17 11/23 20/9 21/9 63/19
64/15 65/15 72/19 151/5 200/6
whatsoever [3]  163/12 175/9 221/14
where [31]  13/3 19/6 19/10 29/25 33/2 33/9
37/2 69/19 70/16 72/4 81/7 83/6 109/21
119/11 127/2 132/7 132/9 144/12 176/13
184/11 187/7 189/20 191/20 195/23 197/14
199/17 201/16 204/7 209/14 213/7 219/16
whether [25]  3/10 3/23 15/2 16/9 45/16
49/23 66/2 75/14 93/23 94/4 95/4 103/1
112/25 129/19 130/4 145/12 145/13 153/6
168/11 172/19 183/11 185/19 187/24 189/6
219/13
while [15]  35/19 43/2 49/5 51/6 54/1 59/20
71/20 98/20 100/25 106/13 106/23 147/25
149/5 184/11 211/9
White [2]  1/21 106/22
who's [9]  17/9 21/20 82/17 118/5 131/12
141/18 148/8 156/23 216/9
whoa [3]  142/15 142/15 142/15
whoever [1]  170/18
whole [5]  13/9 20/1 33/3 155/17 217/11
wholesale [1]  63/22
whom [7]  46/4 52/17 55/13 119/11 139/3
141/3 143/6
whose [3]  19/16 31/12 52/22
why [40]  6/20 19/20 38/2 38/25 45/13 49/15
55/15 57/17 63/3 66/11 83/12 99/21 101/11
102/4 102/4 104/10 105/22 131/24 137/22
138/23 139/18 140/15 145/10 149/24 150/18
151/1 152/1 153/7 153/20 160/23 173/17
182/12 187/19 187/20 191/6 192/15 192/17
198/6 202/9 203/13
wide [1]  32/14
wife [2]  34/5 34/7
Wilk [1]  216/19
Willie [5]  43/14 148/21 159/11 159/15
161/25
willing [3]  3/13 62/23 191/16
willingness [1]  224/13
Windom [1]  20/16
window [1]  210/2
wire [24]  20/6 32/16 37/2 37/15 47/18 51/24

| W | Y |
|---|---|
| wire... [18]  52/2 52/5 52/21 52/24 53/2 53/10 53/11 53/12 55/1 55/21 56/2 58/7 58/10 79/23 80/1 80/11 143/21 143/22<br>wires [6]  54/21 60/1 115/24 190/14 190/15 190/18<br>wiring [2]  53/18 80/11<br>wish [2]  154/5 176/25<br>within [5]  130/20 139/23 156/16 165/5 215/10<br>without [41]  4/6 5/1 25/6 38/8 41/21 42/3 67/1 67/5 67/9 67/13 67/17 67/21 68/5 68/9 68/13 68/17 68/21 68/25 69/4 69/12 69/23 94/11 95/11 95/13 98/1 101/3 103/8 118/3 118/17 130/1 130/25 152/11 158/4 158/13 165/14 174/25 181/11 183/17 189/21 211/13 212/23<br>witness [31]  3/23 4/19 7/6 25/2 27/2 27/7 28/20 29/9 35/2 50/5 57/11 61/20 96/5 103/12 106/21 114/2 117/23 118/5 118/21 152/16 153/25 186/13 186/19 191/19 191/22 192/14 192/23 193/2 207/2 207/8 224/8<br>witnessed [1]  40/24<br>witnesses [2]  64/2 191/14<br>won [1]  214/10<br>won't [4]  106/18 149/14 224/22 224/25<br>Woodbury [111]<br>Woodbury's [3]  80/7 142/14 165/3<br>wording [2]  2/24 23/16<br>words [8]  74/17 74/22 93/11 96/1 97/25 123/20 163/16 184/9<br>wore [1]  190/6<br>work [51]  29/25 33/13 35/19 73/21 74/20 103/18 103/23 104/3 104/25 104/25 107/25 108/1 109/8 113/12 119/11 119/12 119/24 121/7 122/11 122/24 123/21 123/22 123/23 123/24 145/18 145/20 150/25 156/6 156/15 161/22 162/3 162/17 165/3 178/11 178/12 178/15 178/21 180/12 180/16 180/19 180/21 181/19 181/21 182/25 183/3 188/7 193/24 195/3 195/22 196/19 213/15<br>work's [1]  195/18<br>worked [27]  17/12 17/15 30/1 46/2 61/17 70/11 70/14 75/1 75/8 109/6 109/16 109/22 109/24 110/16 113/9 114/15 120/22 167/9 175/22 176/4 176/24 177/23 194/1 194/3 194/7 194/10 194/16<br>working [25]  4/1 5/20 47/12 49/16 49/20 50/19 60/18 71/20 88/20 99/21 101/5 110/11 112/19 112/22 113/1 122/15 138/9 160/12 163/1 167/18 168/11 168/13 185/2 222/1 222/3<br>works [1]  7/17<br>world [2]  20/19 23/24<br>worried [2]  26/19 26/22<br>worse [2]  15/15 218/18<br>worth [1]  132/19<br>wouldn't [12]  24/14 39/13 39/13 81/18 158/9 172/5 175/16 175/16 179/12 181/21 196/1 197/13<br>writing [7]  23/7 23/24 90/10 92/6 163/16 169/17 169/18<br>writings [1]  149/9<br>written [6]  49/25 92/8 93/24 94/4 163/10 164/3<br>wrong [1]  102/23<br>wrote [8]  19/7 25/18 83/9 111/20 112/13 133/20 162/8 169/19 | YA [7]  71/16 71/17 71/19 71/23 97/18 171/22 172/19<br>yeah [11]  27/14 54/13 64/6 95/24 100/9 101/1 107/24 172/17 176/3 178/5 224/10<br>year [14]  76/24 77/24 78/1 78/4 111/5 123/10 123/12 124/11 126/20 126/21 140/4 181/17 185/5 223/15<br>year-end [1]  111/5<br>years [14]  75/7 101/5 120/14 120/22 162/3 205/1 206/2 206/3 207/25 219/7 221/15 222/1 222/4 222/7<br>yelling [1]  146/14<br>yes [312]<br>yesterday [12]  2/13 7/13 8/9 8/17 8/25 10/13 10/16 11/3 14/8 18/25 28/17 104/23<br>yet [6]  83/23 83/24 84/16 101/23 101/24 150/16<br>York [3]  1/18 15/7 30/8<br>Yorkville [1]  22/18<br>Yossi [9]  60/22 142/5 194/16 194/19 201/16 202/4 202/7 202/10 202/24<br>you'd [11]  3/11 6/19 7/18 8/20 17/24 21/18 122/24 129/20 129/21 129/23 141/21<br>you'll [2]  65/10 129/7<br>you're [45]  4/19 5/9 6/2 11/20 28/12 50/9 53/6 55/15 57/13 66/7 77/18 79/10 82/16 85/16 85/19 92/17 94/23 104/19 105/16 106/2 106/8 106/9 106/15 106/25 108/9 110/3 113/17 117/16 131/24 138/18 139/13 148/16 149/12 157/7 158/17 161/18 166/3 166/8 172/10 173/7 173/12 185/8 200/7 204/14 206/21<br>you've [14]  70/1 78/16 87/21 96/9 107/23 107/25 109/12 149/16 152/2 169/4 172/23 181/3 206/2 222/1<br>yours [1]  82/24<br>yourself [8]  37/4 50/11 86/22 144/7 167/18 168/10 176/15 181/18 |
|   | **Z** |
|   | zoom [7]  7/18 9/18 9/19 9/21 10/14 19/2 169/13 |