```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
                     Case No. 11-80205-CR-MARRA
3
UNITED STATES OF AMERICA,      )
4                              )
        GOVERNMENT,            )
5                              )
        -v-                    )
6                              )
MITCHELL J. STEIN,            )
7                              )
        DEFENDANT.             )   West Palm Beach, Florida
8                              )   May 14, 2013
_____)
9

10                   VOLUME 7, PAGES 1 - 257

11             TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12           BEFORE THE HONORABLE KENNETH A. MARRA

13                  UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT        Albert Stieglitz, ESQ., and
                               Kevin Muhlendorf, ESQ.
17                             U.S. Department of Justice
                               Criminal Division
18                             1400 New York Avenue, Northwest
                               Washington, DC 20530
19
     FOR THE DEFENDANT         Mitchell J. Stein, Pro Se
20                             1551 North Flagler Drive, #1208
                               West Palm Beach, FL 33401
21   -and-
     (Standby Counsel)         Charles G. White, ESQ.
22                             1031 Ives Dairy Road, Suite 228
                               Miami, FL 33179
23
     Reporter                  Stephen W. Franklin, RMR, CRR, CPE
24   (561)514-3768             Official Court Reporter
                               701 Clematis Street
25                             West Palm Beach, Florida  33401
                               E-mail:  SFranklinUSDC@aol.com
```

```
 1          (Call to the order of the Court.)

 2          THE COURT:  Good morning, everyone.  Please be

 3   seated.

 4          Okay.  Are we ready to proceed?

 5          MR. STIEGLITZ:  Your Honor, I just want to raise one

 6   issue very briefly.

 7          Yesterday during Mr. Stein's cross-examination of

 8   Mr. Carter, there was a moment, and ordinarily, I wouldn't

 9   even raise this but given the proximity of the jury to us,

10   where Mr. Stein sort of wheeled around, went for the cord and

11   I don't have a better way to describe it but editorializing

12   about what was going on.  I believe the line was, wow, the

13   inconsistencies are really flying in now.

14          You know, when you're two feet from the jury, I feel

15   compelled to just sort of raise that and ask the Court to

16   remind Mr. Stein that that sort of thing just has no place in

17   what's going on here.  Just opining on things in sort of a

18   sidebar with the jury.

19          So we've studiously avoided doing that for obvious

20   reasons, and I just ask that the Court remind Mr. Stein that

21   that's not appropriate.

22          MR. STEIN:  Your Honor, I wheeled around and said it

23   in a whisper to this gentleman, Mr. Stieglitz then confronted

24   me and said if you do this again, we have a problem, and I

25   apologized and I was saying it to Mr. White, and I may even
```

```
 1    have asked Mr. Carter about whether there were
 2    inconsistencies.  But I apologize if the Court heard it or the
 3    jury heard it.  I don't think they did.
 4              THE COURT:  I don't remember hearing it.  But -- oh,
 5    okay, the Court reporter says it's in the record, so . . .
 6    You need to refrain from editorializing and making, you know,
 7    offhanded comments about anything that happens in the
 8    courtroom.
 9              MR. STEIN:  I apologize, Your Honor.
10              THE COURT:  I just wanted to let everyone know again,
11    one of the jurors baked cookies and provided cookies for the
12    staff.  They didn't provide any for the lawyers, so -- and I
13    think that's appropriate.  I just want to let you know if I
14    make a comment to the jurors thanking whoever it was for the
15    cookies, that's what I'm talking about.
16              Does anybody have a problem with that?
17              MR. STIEGLITZ:  Only the fact we didn't get it.
18              MR. STEIN:  Yeah, I mean, I'm, you know, in the rush,
19    no breakfast, so . . .
20              THE COURT:  All right.  Let's bring the jury in.
21              Mr. Carter, you're still under oath.
22              MR. STEIN:  Yes, Your Honor.
23         (The jury enters the courtroom, after which the following
24    proceedings were had:)
25              THE COURT:  Good morning, everyone.  Welcome back.
```

```
 1    And thank you for the gifts, whoever it was that brought the
 2    cookies.  Who was it that provided the goodies?  Thank you
 3    very much.  Appreciate it.  The lawyers are upset that they
 4    didn't get any, but we'll keep them to ourselves.  Thank you
 5    very much, though.
 6              All right.  Everyone, please be seated.
 7              All right.  Mr.~Stein, you may continue with your
 8    cross-examination.
 9              MR. STEIN:  Thank you, Your Honor.
10        Martin B. Carter, Government witness, resumed the stand.
11                    Cross-examination (Cont.'d)
12    BY MR. STEIN:
13    Q    Good morning, Mr. Carter.
14    A    Good morning.
15    Q    Between the conclusion of your testimony yesterday and
16    right now, have you spoken with anyone at the Department of
17    Justice?
18    A    No, I have not.
19    Q    Let's go back to that first meeting in Greenville in 2005
20    that you testified to, where you flew up there with me in a
21    jet.  Remember that testimony?
22    A    Yes, I do.
23    Q    When you arrived at Signalife and met Ms. Bunes, you
24    signed a confidentiality agreement; is that correct?
25    A    That's correct.
```

```
 1    Q    That confidentiality agreement prohibited you from

 2    disclosing any of the technology of the company that you might

 3    learn; is that right?

 4    A    That's correct.

 5    Q    The DOJ didn't show us that confidentiality agreement

 6    yesterday, right?

 7    A    That's correct.

 8    Q    At that same meeting in 2005 in Greenville, on the spot,

 9    Ms. Bunes asked you to look at and take apart a little credit

10    card EKG device; isn't that true?

11              MR. STIEGLITZ:  Objection, hearsay.

12              THE COURT:  Overruled.

13              You can answer the question.

14              THE WITNESS:  Oh, I'm sorry.

15              Yes.

16    BY MR. STEIN:

17    Q    And she told you she did that because she wanted you to

18    develop a credit card-sized EKG device to be sold over the

19    counter in shelves and in drug stores and whatnot, right?

20              MR. STIEGLITZ:  Objection, hearsay.

21              THE COURT:  Sustained.

22    BY MR. STEIN:

23    Q    Did you -- when she gave you the device, did you take a

24    tool of some sort out of your hand and actually open the

25    device up, the credit card device?
```

1    A    Yes, I did open it.

2    Q    And you generally discussed in that meeting the topic of

3    Signalife developing what was called the Fidelity 200; is that

4    generally what happened?

5    A    No, it is not.

6    Q    By the Fidelity 200, I was referring to a credit card

7    over-the-counter device for consumers.  You didn't discuss

8    that with anybody?

9    A    No, all I did is open it up and look at the battery.

10   That's it.

11   Q    Was it after that confidentiality agreement was signed

12   that Ms. Bunes promised you you'd be getting a contract?

13             MR. STIEGLITZ:  Objection, hearsay.

14             THE COURT:  Sustained.

15   BY MR. STEIN:

16   Q    Was it after the confidentiality agreement that was signed

17   that you began to have an expectation you would get a contract

18   in follow up to that confidentiality agreement?

19   A    I believe so, but I'm not sure.

20   Q    And you've testified that you've never received -- that

21   Ms. Bunes never gave you such a contract; is that accurate?

22   A    That's correct.

23   Q    Let's turn to your experience as a young man at your

24   family's business, Lighthouse, Inc. and its reseller business.

25   Okay?

1    A    Okay.

2    Q    Did the Department of Justice ever ask you if

3    Dr.~Harmison's plan, business plan, was to set up a reseller

4    network that he controlled, and then to have that network

5    deliver the Fidelity 100 device to end users?  Did he ever

6    tell you that?

7    A    Not that I know.

8         MR. STIEGLITZ:  I'm sorry, Your Honor, objection.

9    Mr.~Stein kind of moved the goalpost there.  I think at the

10   end he said, did Dr.~Harmison ever tell you that.  I don't

11   object to the first part of the question, which was Mr.~Stein

12   asking what the Department of Justice asked Mr. Carter, but as

13   to what Dr.~Harmison told Mr. Carter, I do object to that.

14        MR. STEIN:  I'll rephrase, Your Honor.  I apologize.

15        THE COURT:  All right.

16   BY MR. STEIN:

17   Q    Mr. Carter, did the Department of Justice ever talk to you

18   about Signalife setting up a reseller network relating to the

19   purchase orders that they have showed you?  Did they ever

20   discuss that with you?

21   A    I'm not sure.  I don't remember.

22   Q    Did you actively work for Signalife in setting up a

23   reseller network that was similar to the one you had at

24   Lighthouse, Inc. that you grew up with?

25   A    No, I did not.

1   Q   Did you ever tell Dr.~Harmison that Thomas Tribou would be

2   one of the people who would be warehousing the unit and

3   obligated to then go in and deliver it to end users?

4   A   No, I did not.  I don't even know who that gentleman is.

5   Q   Did you ever tell him that Tony Nony was going to be an

6   obligated reseller regarding any contract, such as a contract

7   with Innet, Inc.?

8   A   No, I did not.

9   Q   Did you ever tell the Department of Justice that -- so

10   that we can just do it in one question, that Mr. Tribou,

11   Mr. Nony, Mr. Keret, these people were obligated to deliver

12   products satisfactorily to end users, like hospitals and

13   pharmacies and other end users?  Did you ever tell that to the

14   DOJ?

15   A   No, I did not.

16   Q   Did they ever ask you if that was the case?

17   A   No, they did not.

18   Q   Now, for a device like the Fidelity 100 with these things

19   having to be put on the chest that we talked about yesterday,

20   and from your experience with Lighthouse as an apprentice, was

21   it your view back then that the end user for the device would

22   have to be somebody that used the device, like a major

23   hospital or a researcher or a pharmaceutical company doing

24   clinical testing?  Did you understand that at the time between

25   2005 and 2008?

```
 1    A    Could you explain again?

 2    Q    I'm sorry.  It was a messed up question.

 3         Between this time that you worked for the company,

 4    between 2005 and 2008, or interactive with the company, your

 5    testimony, do you recall ever expressing to anyone that the

 6    Fidelity 100 would have to be installed in end users like

 7    hospitals by resellers in order to teach them how to use the

 8    device and to avoid the problems at Rubbermaid?

 9         Did you ever express that to anyone?

10    A    No, I did not.

11    Q    Did you ever express that to the Department of Justice?

12    A    Not to my knowledge.

13    Q    Did you ever express that to the Securities and Exchange

14    Commission?

15    A    I don't remember.

16    Q    So if we go through that transcript, you might have

17    disclosed it to the SEC, but never with anyone else?

18    A    Well, I know you were discussing that.

19    Q    Right.

20         Anybody else?

21    A    Not to my knowledge.

22    Q    Thank you.

23         Now, let's flip the question.

24         How many meetings have you had with the Department of

25    Justice regarding Signalife in your entire life?  Not the SEC;
```

```
 1    the Department of Justice, the postal inspectors, those

 2    people.

 3    A    Several times.

 4    Q    Less than 10?

 5    A    Probably, but I don't remember for sure.

 6    Q    But 10 is a pretty good bullet point number?  It wasn't a

 7    hundred?

 8    A    That's correct.

 9    Q    And it wasn't one?

10    A    That's correct.

11    Q    Did the Department of Justice ever ask you to explain to

12    them anything about a reseller network and whether or not

13    these purchase orders were trained middlemen who knew about

14    the medical device industry that were to deliver the devices

15    to end users?  Did they ever ask you that?

16          MR. STIEGLITZ:  Your Honor, I'd object to the form of

17    that question.  Counsel's testifying.

18          THE COURT:  Sustained.

19 BY MR. STEIN:

20    Q    Did they ever ask you -- did the Department of Justice

21    ever ask you in these approximately 10 meetings about the form

22    of any reseller agreement?

23    A    Not to my knowledge.

24    Q    Did the topic reseller arrangement, reseller network,

25    distribution network, ever come up at all with the Department
```

 1   of Justice?

 2   A   I don't remember.

 3   Q   Now, Mr. Carter, you do from your experience, understand

 4   the term "end user" as opposed to "reseller," right?

 5   A   An end user would be somebody that receives a product.

 6   Q   In 2007, after Dr.~Harmison was appointed CEO, you

 7   actually drove me to Sarasota Hospital on the other side of

 8   Florida to meet with Dr. Windham; isn't that correct?

 9   A   Not to a hospital.  I drove you to somebody's house.

10   Q   To meet with -- you met Dr. Windham; isn't that right?

11   A   No, I don't know.  You had me sit in the car.

12   Q   You never had someone come out and introduce themselves to

13   you?

14   A   Not to my knowledge.

15   Q   Did you ever hear that the company had a relationship and

16   a contract with Sarasota Hospital, who was expecting units to

17   be delivered?  Did you ever learn that from any source

18   whatsoever?

19   A   Only from you.

20   Q   And so I told you that?

21   A   That's correct.

22   Q   By the way, the driving me there, let's get back to the

23   chauffeur thing you spoke about.  Okay?

24   A   Okay.

25   Q   You do not drink alcohol; isn't that correct?

```
 1    A    That's correct.

 2    Q    Never; is that correct?

 3    A    No, I have had a drink once in a while.

 4    Q    Since you met me, you've never had a drink of alcohol in

 5    my presence; is that right?

 6    A    Only one time.

 7    Q    And we've obviously met hundreds of times, or talked; is

 8    that right?

 9    A    That's correct.

10    Q    In 2005 or '6 or that period when you drove me places, you

11    were aware that I did have a cocktail from time to time; is

12    that right?

13    A    That's correct.

14    Q    Did the DOJ ever ask you whether you drink alcohol,

15    Mr. Carter?

16    A    Not to my knowledge.

17    Q    Did the DOJ ever ask you, in the chauffeur allegation, in

18    the times you drove me, it was not because you were acting as

19    a chauffeur but because you were acting as a designated

20    driver?  Did they ever ask you that question?

21    A    No.

22    Q    Did you ever volunteer that information to them?

23    A    I don't remember.

24    Q    When we drove places, would you have been comfortable with

25    me driving if I had had even one drink?  Would you have been
```

```
 1   comfortable getting in the car with me, if you remember
 2   thinking about it?
 3   A   I mean, if you drove, yeah, but I did all the driving for
 4   you.
 5   Q   You were aware in 2005 that almost instantaneously with
 6   getting to Florida, my license was suspended due to
 7   allegations of a driving while intoxicated, right?
 8   A   That's correct.
 9   Q   You actually went to the meetings with me that is required
10   when you have a DUI alleged against you; is that right?
11   A   That's correct.
12   Q   You sat through the meetings with me?
13   A   That's correct.
14   Q   Let's go back to Sarasota Hospital.  Did you ever speak
15   with Dr.~Harmison -- don't tell me what was said -- regarding
16   Sarasota Hospital?
17   A   No, I did not.
18   Q   Did you ever speak to him about Edwards Life Sciences?
19   A   About what?
20   Q   Edwards Life Sciences.
21   A   No, I did not.
22   Q   Did you ever speak with him about Baxter Medical?
23   A   No, I did not.
24   Q   Do you remember in 2008, after he got ill, receiving a
25   lengthy document entitled "Summary Report of Lowell Harmison"
```

```
 1   in the e-mail?

 2   A    You showed that to me, yes.

 3   Q    In that he described everything that happened during his

 4   tenure?

 5              MR. STIEGLITZ:  Objection.

 6              THE COURT:  Sustained.

 7   BY MR. STEIN:

 8   Q    Did you read the document when you received it?

 9   A    No, I did not.

10   Q    Did I ask you to read the document when you received it?

11   A    You were just explaining it to me because, again, I have

12   very trouble reading a document, lengthy document.  It will

13   take me a very long time to comprehend things like that.

14   Q    Did I explain it to you in detail or just in a sentence or

15   two?

16   A    You didn't explain in detail, but you went over things.

17   Q    What type of things?

18              MR. STIEGLITZ:  Objection as to having Mr. Carter

19   recount statements of Mr.~Stein.   Hearsay.

20              THE COURT:  Sustained.

21   BY MR. STEIN:

22   Q    Did you ever learn from your possession of that summary

23   report -- by the way, do you recall approximately how many

24   pages it was?  More or less than 10?

25   A    I have no idea.
```

```
 1   Q   More or less than one page?

 2   A   No, it was more than one page.

 3   Q   Does this look about how thick it was?

 4           MR. STIEGLITZ:  Your Honor, I'd object to this

 5   repeated sort of showing of exhibits that aren't in evidence.

 6           MR. STEIN:  I'm not showing the exhibit.  I'm holding

 7   the white page up.  I just want to know how long the summary

 8   report was.

 9           THE COURT:  Overruled.  Go ahead.  You can answer.

10           THE WITNESS:  I don't remember.

11   BY MR. STEIN:

12   Q   Let's delve a little bit more into your experience.

13           Your father developed the air-compressed staple gun;

14   isn't that correct?

15   A   Yes, he did.

16   Q   Did the DOJ ever ask you about that fact, that your father

17   developed the air-compressed staple gun?

18   A   No, they did not.

19   Q   This is the staple gun that you sort of hold up, push the

20   button and the staples come out very fast on a vertical into

21   the wall.  Is that basically what it does?

22   A   No, when my father developed it he was working for Fisher

23   Body Plant, and he developed it because he had a very heavy

24   Polish accent, because my father came from Poland, he was 30

25   years old.  He used to spit chewing tobacco in a bucket where
```

```
 1    he'd put the nails in.  He developed it, but somebody else
 2    stole the patent from him.
 3    Q    Somebody else stole the patent from him?
 4    A    Yes, from Fisher Body Plant.
 5    Q    Have you ever used in your work at any time the
 6    air-compressed staple gun to do any work?
 7    A    No, I don't believe I ever did.
 8    Q    In all of the climbing up ladders, installing lights and
 9    stuff, you've never used an air-compressed staple gun?
10    A    Why would you use air-compressed staple guns to put up a
11    light fixture?
12    Q    I don't know.  I'm just asking.
13    A    I believe that's used for putting up molding.
14    Q    Okay.  What else is it used for?
15    A    Putting up paneling.
16    Q    What else is it used for?
17    A    I don't know all the uses, because there's a nail gun and
18    there's a staple gun.  There's a difference.
19    Q    Did your father develop the nail gun also?
20    A    No, he did not.
21    Q    Your family dating back into Europe was also heavily
22    involved in associations regarding grandfather clocks; is that
23    right?
24    A    That's correct.
25    Q    Remember yesterday you said that this lawyer,
```

```
 1   Mr. Armpriester, that you met him to repair his grandfather
 2   clock.  You remember that?
 3   A    That's correct, I remember.
 4   Q    These grandfather clocks are -- would you find them to be
 5   a more complicated type of device than some of the other
 6   things that you do, some of the other, like putting in a light
 7   fixture?
 8   A    Yes, you have to take a plate apart, yes.
 9   Q    Were you paid by Mr. Armpriester for the work you did
10   regarding the grandfather clocks?
11   A    Yes, I did charge him.
12   Q    In your electrical business, before you installed the
13   generator in Mrs. Stein's home, before you met her and met me,
14   you had months where you made over $50,000; isn't that right?
15   A    Month?
16   Q    Month, yes.  You had a month where you made over $50,000
17   as an example; is that right?
18   A    No, that's not correct.
19   Q    You actually during that experiential period in your
20   lighting business put up all the lighting for renovations at
21   the Smithsonian Institute; isn't that right?
22   A    Well, I didn't personally.  My father sold it.
23   Q    But you were involved in the installation; is that right?
24   A    No, I was not.
25   Q    You were not involved in the installation?
```

```
 1    A    No, I was not.

 2              MR. STEIN:  Deposition of the SEC Thursday,

 3    February 25th, 2010, page 74, lines 10 through 15.

 4              Question by Ms. Nonaka of the SEC:  "So in one month

 5    you've made more than $60,000?

 6              "Answer:  Uh-huh.

 7              "Mr. Eisner:  Verbal answer.

 8              "The witness:  Yes.  In our lighting business,

 9    absolutely.  I did all the lighting for the Smithsonian

10    Institute."

11   BY MR. STEIN:

12    Q    You're now saying that statement was a lie; is that right?

13    A    We sold the lighting fixtures to the Smithsonian

14    Institute.  My father did.  Did we install it?  Absolutely

15    not.

16    Q    But you said "I" in that testimony.

17    A    Well, if I said "I," I meant to say our family.

18    Q    Did you have any involvement in designing the architecture

19    of how that lighting was going to go in?

20    A    No, I did not.

21    Q    And then I just read where you said you made $60,000 in a

22    month during your career.  Was that a lie?

23    A    50,000?  Yeah, I've never made 50,000 in a month.

24    Q    But you were successful in all kinds of fields, lighting,

25    grandfather clocks, generators during the hurricanes.  I mean,
```

1    you were able to do those things, right?

2    A    Yes.

3    Q    Let's talk about the generator and what you did in your

4    business, your electrical business.  The way you got generator

5    business is that you walked through Home Depot and put your

6    business card and slipped it into all the generator boxes; is

7    that correct?

8    A    That's correct.

9    Q    It's a pretty creative entrepreneurial thing, don't you

10   think?  Nobody else did that.

11   A    Not that I know of.

12   Q    And from that, people would buy a generator, not know how

13   to use it, and they'd call you and you'd know how to hook

14   those up, right?

15   A    Not all the time, but sometimes.

16   Q    I actually wasn't in Florida when you installed the

17   generator for Mrs. Stein; is that right?

18   A    I believe that's correct.

19   Q    So you met Mrs. Stein first, and then you met me?

20   A    That's correct.

21   Q    The company that you formed regarding the work you did

22   when you moved to Florida -- you moved to Florida, like, 20

23   years ago; is that right?

24   A    Yeah, yes, it was like in '91.

25   Q    The name of the company that you formed that you used to

```
 1    do all these things we're talking about was called M&C
 2    Electrical; is that right?
 3    A    That's correct.
 4    Q    Company's still in business, right?
 5    A    No.
 6    Q    The company -- you've closed the company?
 7    A    Yes.
 8    Q    And in addition to that, you had a food distribution
 9    company called Miko Foods; is that correct?
10    A    That's correct.
11    Q    And Miko Foods was the manufacturer of some very good
12    tasting barbecue sauce; is that right?
13    A    Not barbecue sauce, Asian sauces.
14    Q    I'm sorry.  Asian sauces?
15    A    Yes.
16    Q    And then as the manufacturer, you then went to have those
17    distributed by retail outlets; is that right?
18    A    That's correct.
19    Q    And you successfully had that product distributed to
20    people; is that correct?
21    A    Yes, I did.
22    Q    Did you ever talk -- did you or the SEC ever talk about
23    the topic of Miko Foods and this Asian sauce?
24    A    Not that I can remember.
25    Q    Remember yesterday you mentioned -- and I don't remember
```

```
 1   what it was, I'm sorry, you mentioned Casablanca Fans on

 2   either direct or cross-examination.  Remember that?

 3   A   Yes.

 4   Q   You were at one point a reseller for Casablanca Fans in

 5   Florida; is that right?

 6   A   No, not in Florida, in Cincinnati.

 7   Q   I'm sorry.  You were a reseller for Casablanca Fans in

 8   Cincinnati at some point; is that right?

 9   A   That's correct.

10   Q   These fans are -- consumers can't put these fans up in

11   general, right?

12   A   No, that's not correct.

13   Q   You've seen consumers who do it themselves?

14   A   Yes, I have.

15   Q   But when you did it, it was a time when the consumers

16   couldn't do it, right?

17   A   At certain times, yes.

18   Q   And this required sometimes you going up 10 or 15 feet on

19   a ladder to install, right?

20   A   That's correct.

21   Q   Did the Department of Justice ever ask you about your

22   relationship, business relationship, with Casablanca Fans and

23   the reseller activities you had for that company?

24   A   Not that I can remember.

25   Q   Did you ever volunteer the information to them?
```

```
 1    A    I don't believe so.
 2    Q    Did you feel under your plea agreement that you had an
 3    obligation not only to just tell the truth in response to the
 4    DOJ questions, but to be forthcoming about your past regarding
 5    the reseller networks, the food distribution or any other
 6    item?  Did you feel under your plea agreement you had to do
 7    that?
 8    A    Not to my knowledge.
 9    Q    And so that's why you never volunteered it, you didn't
10    feel that you were obligated to; is that right?
11    A    Well, because one had nothing to do with the other.
12    Q    The reseller networks that you had worked in had nothing
13    to do with Signalife, is that what you were saying, one had
14    nothing to do with the other?
15    A    Could you rephrase that, please?
16    Q    I just want to narrow down your answer.  You said one had
17    nothing to do with the other.  And the one and the other was
18    the old reseller networks for all these different companies on
19    one hand versus Signalife on the other hand, that you didn't
20    feel they had anything to do with each other?
21    A    No, the food business had nothing to do with Heart
22    Tronics.
23    Q    And the electrical business had nothing to do with Heart
24    Tronics?  These were your feelings?
25    A    I'm not sure.
```

1    Q    The Department of Justice asked you about cappuccinos and

2    corned beef sandwiches and vitamins, but they never asked you

3    about your entrepreneurial experiences with Lighthouse, Inc.,

4    Miko Foods or Casablanca fans; is that correct?

5    A    I don't remember.

6    Q    Well, they definitely asked you about -- they put into

7    evidence the vitamins, the things that you went to get for me,

8    and you testified they never asked you and you never talked to

9    them about your reselling experience.  So is that a correct

10   statement?

11   A    I would say so.

12   Q    If they had asked you about the reseller business at

13   Casablanca Fans or anywhere, would you have told them the

14   truth?

15   A    Abso --

16          MR. STIEGLITZ:  Objection to the speculation.

17          THE COURT:  Sustained.

18   BY MR. STEIN:

19   Q    After you signed your plea agreement, you understand --

20   you understood you had to tell the DOJ the truth, right?

21   A    That's correct.

22   Q    Now, the evidence is stipulated, it's unrebutted that you

23   went out and picked up things for me and brought them to the

24   house.  Do you remember all that testimony and exhibits,

25   right?

```
 1   A   Yes, I do.

 2   Q   You never complained to me about doing that work; is that

 3   right?

 4   A   Not that I can think of.

 5   Q   Was it your impression during this time -- I'm talking

 6   2005 to 2008, before I moved back to LA -- that I was very

 7   busy trading stocks and watching the screen and didn't come

 8   out of my office?  Is that your impression?

 9   A   A lot of times, yes.

10   Q   Sometimes you would come there and wait for me and I never

11   came out.

12   A   That's correct.

13   Q   And you would maybe get a note from my ex-wife, and you

14   would -- telling you he need this, and you would go get what

15   was needed.  Did that happen sometimes?

16   A   Sometimes, yes.

17   Q   And you remember at this time with regard to this very

18   thing, that when we did have chances to talk, I told you that

19   the activities I was doing -- strike that.

20           MR. STIEGLITZ:  Objection as to Mr. --

21           THE COURT:  Sustained.

22   BY MR. STEIN:

23   Q   During this time, 2005 to 2008 that we've just referenced,

24   do you remember the phrase "naked short selling" being used by

25   anybody?
```

```
 1    A    By you, yes.
 2    Q    And what did you understand naked short selling to be at
 3    that time?
 4    A    Well, I really didn't understand it.  You just said that
 5    naked short selling.
 6    Q    And today, you don't understand it either?
 7    A    All I know is I thought that your naked short selling
 8    thing that they can sell things without actually having it,
 9    stock.  I don't know.  I'm not a stock expert.
10    Q    I didn't say you were, I just wanted to know what the
11    background was.
12          But you did understand it was selling something you
13    didn't have, in general?
14    A    Well, that's what you told me.
15    Q    And did you understand that when I told it to you?  Did
16    you understand what I was generally talking about, selling
17    things you don't have?
18    A    Sort of.
19    Q    Do you ever recall discussing with anyone the analogy of
20    someone selling a car to someone else but not owning -- but
21    not having a car?  Did you ever recall doing that in your
22    life?
23    A    No, I do not.
24    Q    Did the Department of Justice and you ever discuss the
25    topic of naked short selling at any time?
```

```
 1   A    I don't remember.

 2   Q    Did the SEC and you ever discuss the topic of naked short

 3   selling at any time?

 4   A    I don't remember.

 5   Q    Now, at this time, again we're talking about 2005 to 2008

 6   as the bracket period, you had witnessed with your own eyes

 7   the Fidelity 100 being used; is that right?

 8   A    That's correct.

 9   Q    And that goes as far as back as, like 2006 because there

10   were videos, right?

11   A    Yes.

12   Q    You remember looking at a video comparing the Fidelity 100

13   to the General Electric device?  Do you remember looking at

14   that?

15   A    Yes, it was on the Internet.

16   Q    It was on the Internet?

17   A    Yes, you told me about it.

18   Q    But before that, there was also a CD ROM of that that you

19   looked at, right?

20   A    I don't remember that.

21   Q    We're not going into the technology.

22            You remember a man by the name of Ajay Anand, don't

23   you?

24   A    Yes, I do.

25   Q    And in the timeframe of 2008, the meltdown when the
```

```
 1   economy went down, when I moved back to LA, you expressed to

 2   me your viewpoint of Mr. Anand being a very favorable

 3   trustworthy guy, didn't you?

 4   A   No, I did not.

 5   Q   We discussed Mr. Anand, didn't we?

 6   A   You just told me that he was somebody that you made him

 7   tens of millions of dollars.  That's all I know.

 8   Q   You never said anything back to me about him?

 9   A   I didn't -- I don't remember if I did.

10   Q   But you never said he was very trustworthy in your mind?

11   You know that for sure?

12   A   No, I don't know that for sure.

13   Q   So you never remember saying you didn't trust what he was

14   doing either?

15   A   No, I did not say that.

16   Q   So you may have said to me you didn't trust what Mr. Anand

17   was doing; is that right?

18   A   I'm not sure.  I don't remember.

19   Q   There was a little bit of testimony yesterday on direct

20   about, I think there was an e-mail that I was telling you to

21   stay at your station, and I was out with Dr.~Harmison in Boca

22   Raton.  Do you remember generally that?

23   A   Yes.

24   Q   You remember me spending a lot of time with Dr.~Harmison

25   during the time he was the CEO.  Do you remember that?
```

```
 1    A    Not a lot of time, but I know you spent time with him.
 2    Q    I'm talking about the time in Boca Raton, because
 3    elsewhere you wouldn't have known if I spent time with him
 4    with you not being there.  In Boca Raton, he traveled a lot of
 5    times down here to meet with me, right?
 6    A    Oh, I don't know how many times.  I just knew the times
 7    that I saw with you.
 8    Q    Well, like, for example, you saw him at the house with a
 9    lot of papers in front of him laid out on the dining room
10    table.  Do you remember that?
11    A    No, I did not.
12    Q    You're denying you saw him, or you just don't recall?
13    A    I did not see him at your house.
14    Q    At the time that you met with Ms. Bunes, we're talking
15    about before Dr.~Harmison took over the company as CEO but
16    while he was still on the board, you knew at that time that
17    Signalife was not paying me directly; isn't that correct?
18    A    No, I don't know that.
19    Q    You don't know one way or the other; is that right?
20    A    Correct.
21    Q    Did you ever talk to the Department of Justice at any time
22    before or after your arrest about whether or not Signalife was
23    paying me before you first went to Ms. Bunes in 2005?  Did you
24    ever discuss that?
25    A    No, I believe not.
```

```
 1   Q    Did you ever discuss with them whether Signalife was
 2   paying me afterwards?
 3   A    No.
 4   Q    Did they ever represent to you anything about Signalife
 5   paying me one way or the other?
 6   A    Not to my knowledge.
 7   Q    The trip to Greenville in 2005, that was on a private jet,
 8   right?
 9   A    That's correct.
10   Q    And yesterday the Government showed you a private jet with
11   a doberman on it and a cat on it.  Do you remember that?
12   A    Yes, I do.
13   Q    The trip to Greenville was not in that jet; isn't that
14   right?
15   A    That's correct.
16   Q    The Government didn't make that point yesterday, that the
17   trip was in a different jet; is that right?
18   A    Could you rephrase that again?
19   Q    You just never testified about that fact yesterday of what
20   jet you were in when you flew up there?
21   A    I believe that's correct.
22   Q    You understand eventually I had to file bankruptcy and the
23   jet was lost.  You found that out, right?
24   A    Yes.
25   Q    So the jet is no more, right, for me?
```

```
 1   A    I assume that's correct.
 2   Q    When the Government asked you to hone in on the picture of
 3   the doberman and you said that's what I call myself, you
 4   actually know that in the public records, in articles, there's
 5   reference to me as The Doberman?  You've seen that?
 6   A    You have shown me that, yes.
 7   Q    These are publications you've heard of before, right?
 8   A    I forgot which publication it was, but I remember there
 9   was something you showed me.
10   Q    Does Premier Magazine ring a bell?
11   A    I know the magazine.
12   Q    Ring a bell as to that description of me?
13   A    I don't remember.  I don't remember which one you showed
14   me.
15   Q    Did the meltdown at the end of 2008 cause any financial
16   problems for you that you recall, your family?
17   A    Well, I mean, yeah, we were having a hard time.
18   Q    Everyone you interacted with, the lawyer, everyone else,
19   everybody was having a hard time?
20   A    It was hurting everybody, yes.
21   Q    There were -- at the time of the meltdown, 2008, I wasn't
22   taking you on private jet trips; is that right?
23   A    That I don't remember.
24   Q    At one point after the meltdown, I went back to LA and
25   began suing on behalf of homeowners.  You know that to be
```

```
 1    true.

 2              MR. STIEGLITZ:  Objection, Your Honor.

 3              THE COURT:  Sustained.

 4              MR. STIEGLITZ:  Can we approach on this?

 5              THE COURT:  Okay.

 6        (The following proceedings were held at sidebar:).

 7              MR. STIEGLITZ:  Your Honor, I think what Mr.~Stein's

 8    about to go into here is, A, way beyond the scope of anything

 9    that was asked about in direct, B, is totally irrelevant to

10    this case, and, C, just a very transparent attempt to arouse

11    some sort of passions in the jury's mind about suing on behalf

12    of homeowners against the big bad banks.  I don't think that

13    has anything to do with this case.

14              MR. STEIN:  May I make an offer of proof?

15              THE COURT:  Wait a second.

16              MR. STIEGLITZ:  And I'd ask that it not be allowed.

17              THE COURT:  Where are you going with this whole

18    cross-examination?  Because I'm --

19              MR. STEIN:  Mr. Carter then became a paralegal for

20    me.  He moved to LA.  He met the next CEO of the company, and

21    it didn't stop in 2008.  I have to --

22              THE COURT:  What didn't stop in 2008?

23              MR. STEIN:  His relationship with Signalife and his

24    relationship with me.  That's number one.  But I would still

25    not go into the bank parts of~-- the bank lawsuits.  But the
```

```
 1    Government has listed as its exhibits state bar activity in
 2    California during this time, and if they're going to go into
 3    that activity, then I have to go into it.  If there's -- and
 4    we've made a motion in limine about this.  If there's a ruling
 5    that that activity's irrelevant -- if there was a ruling that
 6    it's not to be gone into or that it's irrelevant, I would not
 7    ask him about that but only ask him about what he did with
 8    Signalife.
 9          THE COURT:  Okay.  At this point, I don't see why we
10    need to do anything other than talk about his involvement with
11    Signalife.  I don't know what your bringing lawsuits against
12    banks in California has to do with the case.  So if for some
13    reason I allow the Government to talk about something that you
14    think you need to bring this witness back in your case, he's
15    local, so we can get him back here, if I'm going to allow them
16    to go into something that you think you need him to rebut in
17    your case.  But at this point, I don't see any reason to go
18    into anything further.
19          MR. STEIN:  How am I going to do that if they do it
20    in their rebuttal case?
21          THE COURT:  They're not going to do it in their
22    rebuttal case.  They're not going to be allowed to do
23    something like that in rebuttal.  I'm talking about in their
24    case in chief.
25          MR. STEIN:  So if they talk about issues other than
```

```
 1    Signalife in their case in chief, then we can talk about maybe
 2    bringing Mr. Carter back; is that correct?
 3         THE COURT:  You mentioned something about issues
 4    relating to California bar grievance proceedings, that you
 5    don't want me to allow them to get into.
 6         MR. STEIN:  Actually, I do want them.  I just don't
 7    know whether the Court's going to allow it.  And so that's why
 8    I'm asking him.
 9         THE COURT:  Okay.  Well, again, I don't -- again, at
10    this point it doesn't seem like it has any relevance.  If
11    something happens during the course of the trial that makes
12    this line of testimony that you want to go into now relevant,
13    you can bring him back.  He's local, in your case in chief or
14    in your case, and cover it, but I don't see any reason to do
15    it now.
16         MR. STEIN:  Your Honor, that's extremely fair.  I
17    will narrow the questions to Signalife.
18         THE COURT:  Okay.
19         MR. STEIN:  And I will exclude all of the questions
20    about his work with me in the other areas.
21         THE COURT:  Well, I don't have any problem with you,
22    you know, bringing out that he came out and worked with you in
23    California.
24         MR. STEIN:  Just don't tell what it's about.
25         THE COURT:  But I just don't want to get into what
```

```
 1   you were doing, what kind of legal cases you were handling in
 2   California that he may have been helping you on.  I don't
 3   think is relevant.  We need to focus on what he was doing for
 4   Signalife.
 5        I think -- I mean, my impression is that your whole
 6   line of cross-examination this morning has been to try and
 7   show that this man has some kind of expertise in business
 8   relations or he's an entrepreneur, and he's -- was more
 9   involved with Signalife than the Government has led the jury
10   to believe.  So, do you want to show that he was involved in
11   Signalife in California?  I guess that's fair and tries to
12   rebut their arguments that they're going to make to the jury.
13        But anything else, I just don't see why it's
14   relevant.  Okay?  Just focus on what he did for Signalife.
15        MR. STEIN:  Just so we don't have another sidebar,
16   there's -- when he came back, he has knowledge of -- when he
17   was working with Signalife and when he was in LA, there's
18   knowledge of this Mercedes-Benz they talk about, and there's
19   also knowledge about the financial condition which they've
20   brought into evidence.
21        THE COURT:  Financial condition of what?
22        MR. STEIN:  Of me, the wealth, the plane, et cetera.
23        THE COURT:  If it's something that they've gone into
24   on their direct, you can, you know, deal with it on cross.
25        MR. STEIN:  I will stay away from the bank issue.
```

```
 1              THE COURT:  Okay.

 2              MR. STEIN:  Thank you.

 3        (Sidebar conference concluded.)

 4   BY MR. STEIN:

 5   Q   Mr. Carter, in 2009, I began to spend more time in

 6   California, to your knowledge; is that correct?

 7   A   That's correct.

 8   Q   And in 2009, the Greenville operation of Signalife was

 9   closed because Pam Bunes was no longer the CEO.  Remember

10   that?

11   A   Yes.

12   Q   The CEO of the company was Rowland Perkins, who resided in

13   LA, right?

14   A   That's correct.

15   Q   You've met Mr. Perkins?

16   A   Yes, I have.

17   Q   You've stayed at his house; is that correct?

18   A   Never stayed at his house.

19   Q   You've managed his house or stayed there to fix things at

20   his house; is that right?

21   A   I did work over there, but I stayed at your house.

22   Q   Let's talk about staying at my house.  When you were

23   staying at my house, you began to do work for me that I was

24   doing in LA, to assist me in that, right?

25   A   Correct.
```

```
 1   Q    And that was both legal work and work for Signalife,
 2   right?
 3   A    Not for Signalife, but legal work, yes.
 4   Q    Had you ever done legal work before?
 5   A    No.
 6   Q    You ultimately became very proficient at paralegal work,
 7   is that what you recall?
 8   A    Because of what you wanted me to do, to make documents for
 9   you.
10   Q    Print and collate documents?
11   A    Correct.
12   Q    Things that these paralegals do?
13   A    I assume that that's what they do, yes.
14   Q    Ultimately, you actually worked with other lawyers in LA
15   that I asked you to work for; is that right?
16   A    Yes.
17   Q    That's how you -- with one of those people, that's how you
18   hurt your knee.  It was in LA, right?
19   A    Well, Orange County.
20   Q    Orange County being, like, 40 miles south of LA, right?
21   A    By San Diego, I guess.  I don't remember how far that was.
22   Q    And when you went down to Orange County, you drove this
23   red Mercedes-Benz you talked about, right?
24   A    That's correct.
25   Q    When you were staying with me at the house in LA, it was a
```

```
 1    large house; is that right?
 2    A    Yes, it was.
 3    Q    Very large?
 4    A    Yes.
 5    Q    Right?
 6              Like 16,000 feet, right?
 7    A    I believe so.
 8    Q    And would it be -- would it be accurate and fair to say
 9    that we were both working extremely hard when we were in LA?
10    A    We were working, yes.
11    Q    Do you recall multiple times where I didn't sleep at night
12    and you would bring me food?
13    A    Yes.
14    Q    Like multiple nights in a row, I mean.
15    A    Yes.
16    Q    Where I didn't sleep for three or four nights?
17    A    Yes, that is correct.
18    Q    It was kind of ugly, the things that we were having to do.
19    We remarked about that, didn't we?
20    A    Yes, I believe so.
21    Q    At one point the water bill was so high because such a big
22    house, that the water got shut off at the house; is that
23    right?
24    A    That's correct.
25    Q    And I told you I couldn't pay the water bill; is that
```

```
 1   correct?
 2   A    That's correct.
 3   Q    And the big problem at that point, because we were just
 4   working, was -- the first problem was flushing the toilets.
 5   Do you remember that problem?
 6   A    Yes, I do.
 7   Q    And you remember I had no idea how toilets worked, so we
 8   actually went down the street to take a shower because the
 9   water didn't work, right?
10   A    I remember taking a shower down the street.
11   Q    Do you remember us bailing water from the pool and pouring
12   it into the toilets in order to make the toilets work at the
13   house?
14   A    Yes, I do.
15   Q    Do you recall explaining to me that if I left buckets
16   outside when it was raining, they would be filled the next
17   morning, and we could use the rainwater to make the toilets
18   work?
19   A    That's correct.
20   Q    These were hard financial times, weren't they?
21   A    Well, because you didn't want to pay for the water heater
22   that got broke down.
23   Q    Right.  You don't -- you don't know why it wasn't paid
24   for.  You're just -- you're classifying it as I didn't want
25   to, which is fine.
```

```
 1    A    I'm not saying, maybe it was you, but I remember your

 2    ex-wife Tracey had me go pay a water bill to the Las Virgenes,

 3    or whatever the name of the water company was.

 4    Q    She gave you the money for that, right?

 5    A    She did not.  I paid for it.

 6    Q    You paid for it?

 7    A    I paid for it.

 8    Q    You knew -- by this time, you had known us for over four

 9    years by 2009, right?

10    A    Yes.

11    Q    You knew at this time that Tracey controlled all the money

12    in the family, that she came from a very wealthy family?

13    A    But I always thought that you also came from a very

14    wealthy family.

15    Q    That's correct, but I'm just asking you about Tracey now.

16    The Government will go into me, or maybe I will.

17              She came from a very wealthy family, right?

18    A    I guess so.  I know her father was famous.

19    Q    And what was the fame of her father?

20    A    That you told me that he did -- wrote the music for the --

21    not Donna Summers (sic).  What's her name?  You know the one

22    black singer.  I can't remember her name.

23    Q    Diana Ross.

24    A    Diana Ross, yes, and the Supremes.

25    Q    He wrote the song Love Child, right?
```

```
 1   A    Yes, I believe so.

 2   Q    And then he became a minister.  Is that your recollection?

 3   A    Yes.

 4   Q    Did you meet him?

 5   A    Yes, I did.

 6   Q    With regard to -- let's move our attention now -- by the

 7   way, you weren't just in LA for one week.  You were there for

 8   a long time, starting at the beginning of 2009 off and on; is

 9   that right?

10   A    Yes.

11   Q    You talked about a refund, and we'll put it on the board

12   and talk about it, but you talked about a tax refund.  You

13   remember that?

14   A    Yes.

15   Q    And on that tax return, you recall there was a partnership

16   named Five Knights Partners, don't you?

17   A    I don't recall without seeing it in front of me again.

18   Q    Do you recall there was a partnership of some kind on the

19   tax return?

20   A    I remember a partnership agreement.  I don't remember if I

21   saw it on the return.  I have to see it again.

22   Q    Do you recall that the partnership that you and I formed

23   lost a lot of money in the meltdown?

24   A    Yes, that's what you put.

25   Q    And you didn't put any money into that partnership
```

1    agreement, right?

2    A    No, I did not.

3    Q    But I -- you knew that I put in over a million dollars,

4    right?

5    A    I don't know how much you put in, but I remember you --

6    you know, that you filled out and had me fill out the return.

7    Q    And you understood at the time, from all your business

8    experience, that when a business, a partnership, loses a lot

9    of money, there are tax consequences in general, just like

10   when you make money, right?

11   A    Yes.

12   Q    Losing a million dollars in the meltdown was a lot of

13   money for us, right?

14   A    That would be a lot of money, yes.

15   Q    I mean, we were bailing water for the toilets.  So a

16   million dollars could have paid the water bill, right?

17   A    Well, yes.

18   Q    Could have paid all the water bills, right?

19   A    I would hope so.

20   Q    I'm just saying while we were there.  They're expensive in

21   California.

22   A    Yes.

23   Q    At this time, you said you got a refund check from the IRS

24   in the amount of 200-some thousand dollars, is that what you

25   said?

1    A   Yes.

2    Q   And then you said you bought me a red Mercedes, a 1991 red

3    Mercedes.  Remember that?

4    A   '92, I believe.

5    Q   I'm sorry.  '92 red Mercedes.

6    A   Yes.

7    Q   Where did you buy that vehicle?

8    A   You had me -- I was on vacation with my wife up in

9    Orlando.  You called me and you told me to fly to Chicago,

10    bought me a ticket to Chicago, and I went to Chicago.  You

11    told me to buy the car and bring it to you out in California,

12    and you would give me the money back.

13    Q   I would give you what money back?

14    A   What I paid for the car.

15    Q   We weren't paying the water bills.  Where would I get the

16    money to pay for the car?

17    A   You told me, that was your direct words, that you would

18    pay me back.  Okay?  So I bought the car, I drove out to

19    California, and then, of course, you had no intention of

20    paying me back.  And then you turned around and you said,

21    well, that's not the car for me, that's your car.

22         First of all, I've never bought a car like that

23    before.  I'm not a flamboyant type of person.  I don't buy

24    expensive cars usually.

25    Q   Do you recall driving that car back to Florida at any

1    point?

2    A    Yes, I do.

3    Q    The pink slip of that car was not in my name, right?

4    A    No, it was not.

5    Q    It was in your name?

6    A    Correct.

7    Q    And you sold that car, correct?

8    A    I didn't sell it.

9    Q    You still have it?

10   A    No, I do not.

11   Q    Was it repossessed?

12   A    Yes, it was.

13   Q    But when you bought it you paid cash for it.  In other

14   words, you didn't take a lien out on it, right?

15   A    That's correct, I paid cash.

16   Q    So then later you took a lien on it, right?

17   A    A lien?

18   Q    You took a loan against the car later, right?

19   A    Not that I can remember.

20   Q    I'm trying to figure out how it got repossessed.  If you

21   paid cash for it and owned it outright, how did it get

22   repossessed?

23   A    The Government picked it up, seized the car.

24   Q    The Government seized the car?

25   A    Yes.

1    Q    Did the Government seize anything else from you?

2    A    No.

3    Q    Have you -- prior to your arrest, which -- when was your

4    arrest?

5    A    On my birthday, when was it, '11, or right by my birthday

6    in '11, June of '11, I think it was.

7    Q    June of 2011?

8    A    Yes.

9    Q    You're certain of that?

10   A    No, I'm not 100 -- I don't remember.  It was '11.  I don't

11   think it was '12.  I think it was in '11.

12   Q    It was definitely in 2011, and your birthday is in, you're

13   saying, June?

14   A    June, yes.

15   Q    Okay.  Prior to your arrest, did anyone ever send you a

16   writing from the Internal Revenue Service questioning your

17   refund that you say you got of 200-some thousand dollars,

18   prior to your arrest?

19   A    No.

20   Q    Never heard from the IRS?

21   A    No.

22   Q    IRS never disputed that the partnership lost a million

23   dollars during the meltdown, right, during that time?

24   A    I would guess so.

25   Q    So even though there was a lot of money lost, when you

```
 1    lose money, the result is you can get a refund from the
 2    Internal Revenue Service, or at least, that was your
 3    understanding of what I told you?
 4    A    Yes, of what you told me.
 5    Q    When was the red Mercedes that had a pink slip to you,
 6    when was it repossessed?  Or, excuse me, I'm sorry, seized.
 7    A    I think it was like two months ago.
 8    Q    But the Government arrested you two years ago.  So they
 9    never seized it in 2011?
10    A    No.
11    Q    And you never sold it?
12    A    No.
13    Q    And you never got a loan against it?
14    A    No.
15    Q    And it was in Florida?
16    A    Yes, it was.
17    Q    And it never went back to California?
18    A    Not after I brought it from there, no.
19    Q    And the Government never seized it in 2012, the red
20    Mercedes that you said you bought for me; is that right?
21    A    Yes.
22    Q    They just seized it; is that right?
23    A    Yeah, roughly about two months ago.
24    Q    So it wasn't a surprise to you.  You cooperated with them
25    in turning it over to them, would that be accurate?
```

```
1    A    Yes, that would be accurate.

2    Q    Were the wheels on that car owned by Tracey Hampton-Stein,

3    on that Mercedes?

4    A    I don't know if the wheels were owned by her.

5    Q    When you bought the car, were the wheels that were on the

6    car when the DOJ seized it, were those the same wheels that

7    were on the car as were on the car when you bought it?

8    A    No, they were not.

9    Q    Those wheels were in the garage of this big house that we

10   were bailing water in; is that right?

11   A    Well, like an overhang, not in the garage.

12   Q    Yeah, it's an -- I'm sorry.  In an overhang?

13   A    Yes.

14   Q    They were very high performance wheels that were on the

15   location of the property in California, right?

16   A    Yes.

17   Q    And they were better than the regular wheels on the car,

18   right?

19   A    Well, I don't know.  I guess so.  I mean, the wheel that

20   it sat on, the hub, you know, that was much nicer.  It was a

21   shiny -- I mean, they were nice wheels, no question.

22   Q    Expensive wheels.  They weren't just stock wheels?

23   A    Right.

24   Q    When you cooperated with the Government with them seizing

25   the Mercedes, did you tell them that the wheels on the car
```

1    were not yours, they were not bought by you?  Did you tell

2    them that?

3    A    No, I did not.

4    Q    Did they ask you anything about those wheels?

5    A    Not to my knowledge.

6    Q    Did you think -- did you ever tell anybody at the

7    Department of Justice, before they seized the car, that the

8    wheels on the car were taken from a property in California and

9    put on the car?

10   A    No, I did not.

11   Q    So if those wheels were acquired in 2005 having nothing to

12   do with Signalife money and they're now gone, then the

13   Government just got wheels on a car that were not --

14        MR. STIEGLITZ:  Objection, lot of "ifs."

15        THE COURT:  Sustained.

16   BY MR. STEIN:

17   Q    These wheels, you're aware, would cost thousands of

18   dollars to purchase; is that right?

19   A    Yeah, I would say thousands of dollars, couple thousand.

20   Q    And the Government now has the car and the wheels, right?

21   A    That's correct.

22   Q    When you -- by the way, how did you hurt your knee in

23   Orange County?

24   A    I went motorcycle riding with that attorney that you

25   wanted me to go work with, George Beau (phonetic), and when we

```
 1    were making a turn at like not even 10 miles an hour, I hit
 2    the curb, fell down, threw my knee out.
 3    Q    After that happened, you developed, something to do with
 4    your diabetes, you developed some very severe foot problems,
 5    as well, didn't you?
 6    A    That was before that accident.
 7    Q    You had to have surgery on that, right?
 8    A    I had surgery on my right foot and my left foot, knee.
 9    Q    At that time?
10    A    No.
11    Q    Which foot was it at that time?
12    A    The foot was when I left from your house in California,
13    when there was no water and everything, and I came back and I
14    was admitted to the hospital that night.
15    Q    Let's go back to Signalife and talk about the activities
16    in Los Angeles.
17              Prior to that, Pam Bunes you knew, right?
18    A    Yes, I met her.
19    Q    Lowell Harmison you knew, right?
20    A    Yes.
21    Q    And you have -- you have no idea of all the communications
22    that those two people had with the rest of the people at the
23    company; is that right?
24    A    That's correct.
25    Q    You have no idea of the communications those people had
```

1   with me; is that correct?

2   A   I know they had communication with you, but I don't -- I

3   have no idea what it was about.

4   Q   That's fair.

5           When you flew to Ventrex, that was prior to the time

6   that I moved back to California and the water bailing and all

7   that.  That was prior to that, right?

8   A   That's correct.

9   Q   Years prior, right?

10  A   Yes.

11  Q   And you flew to Ventrex not on a private plane but

12  commercially, right?

13  A   Commercially, correct.

14  Q   And Signalife paid for that, right?

15  A   Well, you paid for it.  I don't know if Signalife paid for

16  it, but you paid for it.

17  Q   You don't know if Signalife reimbursed me or --

18  A   No, that I do not know.

19  Q   But you didn't pay for that, right?

20  A   I did not pay for it.

21  Q   Your memory may be faulty.  I wasn't at Ventrex with you

22  on that trip; is that right?

23  A   No, you were not.

24  Q   I was not at Ventrex on that trip, right?

25  A   No, you were not.

1    Q    You testified yesterday I was at Ventrex on that trip.  Do

2    you recall that?

3    A    No, I don't.

4    Q    And you met Bill Matthews there, I think you testified

5    yesterday, right?

6    A    That's correct.

7    Q    He didn't fly with you.  He was coming from somewhere

8    else, right?

9    A    Yes, he lived in Ventura County.  I forgot the name of the

10   case, Cucamonga something, California.

11   Q    When Pam Bunes was terminated, did you understand that to

12   be because of the failure of her transaction with Rubbermaid?

13   Did you have that understanding in general?

14   A    Yeah, I believe that's what you told me, that's the whole

15   reason.

16   Q    Is it fair to say you felt more comfortable with

17   Dr.~Harmison, the former principal deputy of the FDA, as CEO

18   than you did with Pam Bunes as CEO; is that a fair statement?

19   A    Because you introduced me to him, yes.

20   Q    Based upon your meetings with him and his credentials, did

21   you feel more comfortable with him?

22   A    I didn't like Pam Bunes, so I would say yes.

23   Q    Because she didn't give you the contract.

24   A    Right.

25   Q    When you signed the contract with Dr.~Harmison, you

 1   actually met him at Villa Blanca Restaurant on Clint Moore;

 2   isn't that right?

 3   A   Villa Blanca?  No.

 4   Q   An Italian restaurant on Clint Moore in a mall.  Do you

 5   remember going there a lot with me?

 6   A   Yes, I do.

 7   Q   What's the name of that restaurant?

 8   A   Villa de Rosa, I think, not Villa --

 9   Q   I'm sorry.

10        So Villa de Rosa, you met with Dr.~Harmison there to

11   talk about this agreement with him taking notes, like he

12   always did in his notebook?  You remember that, don't you?

13   A   No, I do not.

14        MR. STEIN:  One moment, Your Honor.

15        Your Honor, I'm going to show the witness what has

16   already been marked as exhibit 9.

17      (Brief pause in proceedings.)

18        MR. STEIN:  Your Honor, I think we've stipulated to

19   exhibit 9 coming into evidence.

20        MR. STIEGLITZ:  No objection, Your Honor.

21        THE COURT:  Admitted without objection,

22   Defendant's 9.

23      (Defense Exhibit No. 9 entered into evidence.)

24        MR. STEIN:  May I approach, Your Honor?

25        THE COURT:  Yes.

```
 1   BY MR. STEIN:

 2   Q    Mr. Carter, this has already been marked as exhibit 9.

 3   You've already seen this before.

 4   A    Yes.

 5   Q    Or something like it from the Government's exhibits.

 6              You've seen that before, right?

 7   A    Yes, I have.

 8   Q    It's the contract between you and Signalife, right?

 9   A    That's correct.

10   Q    Mr. Carter --

11              MR. STEIN:  Can you go to the bottom of the document?

12   Thank you.

13   BY MR. STEIN:

14   Q    Mr. Carter, do you notice any difference between exhibit 9

15   and the contract that you talked about yesterday that the

16   Government showed you?  Do you notice, off the top of your

17   head, any difference?

18   A    Well, I'm not sure.  I know there's like a signature or

19   initials, but I thought that was on the other one, too.  What

20   difference am I supposed to see?

21   Q    I don't know.  I just want to know if you see any

22   difference that you can recall.

23   A    Is it okay if I open the binder?

24              THE COURT:  Yes.

25              MR. STEIN:  For the Court, it's exhibit 96 of the
```

```
 1    Government.

 2             THE WITNESS:  I realize this one's in bigger type, I

 3    guess.  Is that . . .

 4             One shows a fax header.  The other one does not.  Is

 5    that what you're talking about?

 6             MR. STEIN:  No, I'm just showing you two exhibits.

 7             If everyone has 96 in front of them and the Court has

 8    it.

 9    BY MR. STEIN:

10    Q   Mr. Carter, on exhibit 96, you see the -- on the bottom,

11    the production, what the Government produced, what you talked

12    about yesterday, do you see the production saying JW on the

13    bottom with a Bates stamp number on every page?

14    A   Yes, I see that.

15    Q   Would it be fair to say that you know that JW means John

16    Woodbury?

17             MR. STIEGLITZ:  Objection.  Mr. Carter's not

18    competent to testify to the Government's Bates numbering.

19             THE COURT:  Sustained.

20    BY MR. STEIN:

21    Q   Could you read the Bates numbering of any page of the

22    Government's exhibit 96, just the Bates numbering.

23    A   JW00005823.

24    Q   And when you look on the top of that, there's a fax legend

25    on the top of it, right?
```

```
 1   A    Yes.

 2   Q    On Defense exhibit 9, is there a fax legend on the top of

 3   that, Defense exhibit 9 that I just showed you?  It's on the

 4   screen.

 5   A    Oh, I'm sorry.  I can't see it.

 6         MR. STEIN:  Go to the top, please.

 7   BY MR. STEIN:

 8   Q    Do you see a fax legend on the top of Defendant's

 9   exhibit 9?

10   A    No, I do not.

11   Q    Now go to the bottom page, of any page of Defendant's

12   exhibit 9.  We're going to scroll down there for you.

13         It says DOJ-CARTER-000660.  Says that.  Do you see

14   the reference to DOJ-CARTER on the bottom?

15   A    Yes, I do.

16   Q    Do you recall producing this consulting agreement to the

17   Government yourself?

18   A    I turned over everything that I had.

19   Q    And this was something that you had?  You recall having a

20   copy of this agreement?

21   A    Yes.

22   Q    So you recall having a copy of the agreement with no fax

23   legend on the top of it; is that right?

24   A    I don't remember if it had anything on it, but I remember

25   giving everything that I had in my possession.
```

1    Q   Do you recall ever whiting out the fax legend on the top

2    of exhibit 9?

3    A   I don't recall, no.

4    Q   Would that be something you would do in general?  Is that

5    a habit or a custom or something that you would do as a custom

6    and practice?

7    A   No.

8    Q   Now, look at page 1 at the bottom of exhibit 9, on the

9    bottom right.  You see above DOJ-CARTER there's initials

10   there?

11   A   Correct.

12   Q   Those are your initials there, right?

13   A   At the top, yes.

14   Q   You mean at the top of the bottom?

15   A   Yeah, the MC, that's my initials.

16   Q   And you see a line going through it, and then there's

17   another sets of initials, right?

18   A   Yes.

19   Q   You testified yesterday on direct and cross that you were

20   not in person with Lowell Harmison when you signed this

21   consulting agreement.  Do you recall that testimony?

22   A   Yes, I do.

23   Q   Does this document cause you to doubt that recollection?

24   Could that recollection have been faulty?

25   A   No, I came to your house to sign it.  I remember it.

1    Q    I'm not asking that.  I'm asking whether you and

2    Dr.~Harmison were present together when it was signed and put

3    a slash between your initials and his.

4    A    No.

5    Q    You're still saying that's not the way it happened?

6    A    That's correct.

7    Q    That is your signature on the bottom of page 8 of

8    exhibit 9 on the screen, right?

9    A    That is my signature, yes.

10    Q    It's the identical signature that's on the Government's

11    exhibit 96, right?  Identical meaning there's no difference.

12    It's the same --

13    A    Yes, that's my signature.

14    Q    Okay.  Do you have any explanation or can you think of any

15    reason why the document you produced to the DOJ has no fax

16    legend on the top?  You may not have any idea or you may know.

17    A    I don't know.

18    Q    Thank you.

19          In any event, after Dr.~Harmison came aboard and then

20    after everything we've testified to regarding Dr.~Harmison,

21    the meltdown happened at the end of 2008, sort of a line of

22    demarcation.  You remember that distinctly, right?

23    A    That the meltdown what?  I'm sorry.

24    Q    Happened, that it happened.

25    A    Yes.

1    Q    Late 2008, right?

2    A    Yes.

3    Q    And do you recall ever making any other trips before that

4    meltdown?  So we're talking, let's say October of 2008, is

5    that fair?

6    A    Yeah, I guess so.

7    Q    Okay.  Before October of '8, 2008, do you recall any other

8    trips that you were sent on by me, by Signalife or whatever,

9    to the western part of the United States regarding Signalife?

10   You've testified to a meeting at Ventrex and then I think in

11   the same meeting, that you drove down to the corporate

12   headquarters --

13   A    Yes.

14   Q    -- and got something from Budimir.  And then you testified

15   after the meltdown you came to LA, which we're going to go

16   into.  But prior to the meltdown, do you recall any other

17   meeting west of the Mississippi regarding Signalife that you

18   personally attended?

19   A    There was one in Las Vegas, but I don't remember the date.

20   Q    To the best of your recollection, was that before the

21   meltdown?

22   A    I don't remember.

23   Q    Who was at that meeting?

24   A    There was a Stan Gelfen, and there were two other people.

25   I forgot their names.

```
 1    Q    Was one of the two other people Michael Phillips?

 2    A    That might have been.  I don't remember his name.

 3    Q    Do you remember he was the son of a board member,

 4   Dr. Steven Phillips?

 5    A    Yeah, I think you did say that, that's correct.

 6    Q    And the other person that was there was Brian Harmison; is

 7   that correct?

 8    A    If that was his name, I think that's what it was, yes.

 9    Q    And either Signalife or me paid for that trip to Las

10   Vegas.  You didn't come out of pocket for that trip; is that

11   correct?

12    A    Yes, I didn't pay for it.

13    Q    During that trip to Las Vegas, you had a dinner meeting

14   with these gentlemen, didn't you?

15    A    Yes, that's correct.

16    Q    And at the dinner meeting, you discussed, you know, sort

17   of all matters relating to Signalife.  It was a Signalife

18   meeting, right?

19    A    Well, they discussed it, yes.  I pretty much listened.

20    Q    Well, when you say you pretty much listened, you didn't

21   say anything to them at that meeting in response to anything

22   that they said.  Don't tell me what you said or they said,

23   just tell me if you said anything.

24    A    No.

25    Q    How long was the meeting?
```

```
 1    A    Well, it was dinner, so, you know, say maybe an hour.
 2    Q    Did you understand -- today, do you understand why you
 3    were sent to that meeting?  Do you have a recollection of
 4    that?
 5    A    Because you wanted me to try on how to put on the device
 6    on the chest.
 7    Q    And during that meeting, did that -- or otherwise in Las
 8    Vegas, did that demonstration occur by those people?
 9    A    Yes, it did.
10    Q    And you also spoke to those people about the reseller
11    network; is that right?
12    A    That I don't remember.
13    Q    Rather than me asking and you saying "I don't remember,"
14    is there anything else you do remember, any topic you do
15    remember discussing with Dr. Phillips' son, the board member's
16    son, Michael; Brian Harmison -- and I can't remember it --
17    and --
18    A    Stan Gelfen.
19    Q    And Stan Gelfen.
20         Do you recall anything else you discussed the topic
21    of it?
22    A    I remember they were discussing about their expense
23    report.
24    Q    They were discussing with you present their expense
25    report?
```

```
 1   A    Yes.  That they wanted to fill out -- I came back -- I
 2   think I told you on the telephone that they ordered like an
 3   $800 bottle of wine, they were drinking and everything, and I
 4   don't drink at all.
 5   Q    You've already said that today.
 6   A    Yes.
 7   Q    They ordered an $800 bottle of wine?
 8   A    Yeah, I believe it was $800, yes.
 9   Q    How does that relate to their -- did they say how that
10   related to their expense reports?
11   A    No.
12   Q    Yes or no?
13          MR. STIEGLITZ:  Objection to the hearsay, and
14   frankly, the relevance and scope of this.
15          THE COURT:  Sustained.
16 BY MR. STEIN:
17   Q    Anything else talked about other than expense reports and
18   putting on the device, and possibly, the reseller network?
19   Anything else talked about?
20   A    Not that I can recall.
21   Q    And you just said you reported back to the company what
22   your thoughts were about the meeting in Las Vegas; is that
23   right?
24   A    I reported back to you.
25   Q    And what did you tell me?
```

```
 1    A   I told you that they were talking about the expense report
 2    and that they bought wine and everything.  I explained that to
 3    you.
 4    Q   You told me you were -- you didn't think that was
 5    appropriate; isn't that correct?
 6    A   Yes.
 7    Q   You were somewhat critical of Messrs. Gelfen and Phillips
 8    and Harmison, the son Harmison, right?
 9    A   Just the way they were spending money, I guess, yes.
10    Q   Now, to just to try to jog your memory, and I know
11    everything jumbled together, but this meeting would have been
12    in the latter part of 2007, before the -- after -- Harmison
13    was the CEO during this meeting, right?
14          MR. STIEGLITZ:  Your Honor, I'm going to object.  I
15    think we've had several minutes of questions talking about a
16    meeting in late '08, so maybe I'm just mishearing what
17    Mr.~Stein's asking Mr. Carter.
18          THE COURT:  I thought he said he didn't remember when
19    the meeting was.  I think he's trying to focus him on when it
20    took place.
21          MR. STIEGLITZ:  Okay.
22    BY MR. STEIN:
23    Q   Harmison was the CEO when you attended that meeting.  You
24    remember that, right?
25    A   Yes, I believe so.
```

```
 1    Q    So it would have to have been after August of 2007, then,
 2    right?
 3    A    I would think so, yes.
 4    Q    And after the meltdown, you said we moved -- we went to
 5    LA, so it would have been prior to October of 2008, right?
 6    A    I just don't remember the date.
 7    Q    So after Harmison is the best you can remember; is that
 8    right?
 9    A    Yes.
10    Q    Okay.  That's fair.
11              At this time after the meeting, Dr.~Harmison told you
12    and identified the names of several national --
13              MR. STIEGLITZ:  Objection.
14              THE COURT:  Rephrase the question.
15    BY MR. STEIN:
16    Q    After the meeting with these gentlemen in Las Vegas, you
17    were made aware and you knew of independently several
18    hospitals, domestically and internationally, that were end
19    users and waiting for products; is that right?
20              MR. STIEGLITZ:  Objection, lack of foundation.
21              THE COURT:  Overruled, if you know the answer.
22              THE WITNESS:  No, I don't.
23    BY MR. STEIN:
24    Q    You don't remember one way or the other?
25    A    That's correct.
```

```
 1    Q   Not even Sarasota, the one you drove me to?
 2    A   I did not drive you to a hospital; I drove you to
 3    somebody's house.
 4    Q   Right.  But I'm saying not even Sarasota, even if --
 5    whatever the drive was for.  You don't remember them either?
 6    A   No, I don't remember driving to a hospital there, at all.
 7    Q   I'm not -- I don't care where you drove me, I just want to
 8    know if you remember one of the end users being Sarasota
 9    Hospital, one way or the other.
10    A   I think that's what you told me, yes.
11    Q   Do you have a recollection that after Dr.~Harmison got
12    sick, that Dr. Windham resigned because of some technological
13    issue with Budimir and Sarasota Hospital?  Do you recall that
14    happening?
15    A   No, I do not.
16    Q   Now, you've indicated what you felt about Pam Bunes.  You
17    felt more comfortable with Dr.~Harmison.  From your
18    interactions with him, did he ever tell you something --
19              MR. STIEGLITZ:  Objection.
20              THE COURT:  Sustained.  Don't ask him what
21    Dr.~Harmison told him.
22    BY MR. STEIN:
23    Q   Did anything you expected to happen under Dr.~Harmison's
24    tenure not come true?
25    A   That -- repeat it again.  I'm sorry.
```

```
 1    Q    Did anything during Dr. Harmison's tenure, which I guess
 2    started in August of 2007, and ended when he got sick, did
 3    anything he -- during that time that you had an expectation of
 4    not happen?
 5    A    I'm not sure.
 6    Q    Have you ever read the indictment against me in this case?
 7    A    Not fully, no.
 8    Q    You've partially read it?
 9    A    Very little, yes.
10    Q    Have you ever spoken with the Government about the
11    indictment?  Nothing else, just I'm talking about that
12    indictment.
13    A    I don't remember.
14    Q    Did the Government ever tell you that in paragraph 4 of
15    the indictment they characterized you as a chauffeur for me?
16    Did they ever tell you that?
17    A    I remember they were talking about it, but I don't
18    remember the exact words that was said.
19    Q    Did you ever respond to them and tell them that that was
20    an incorrect characterization of what you did?
21    A    I went and did services, whatever you wanted me to do.
22    Q    No, I understand.  But did you ever tell the DO~--- the
23    Department of Justice that the characterization of a chauffeur
24    was not fair, a fair characterization?  Did you ever utter
25    that to them with your words?
```

```
 1   A   I don't remember that, if I did.
 2            THE COURT:  Mr.~Stein, if you're going to bring up a
 3   document, why don't we take a recess.  All right?
 4            MR. STEIN:  Yes, Your Honor.
 5            THE COURT:  Ladies and gentlemen, let's take a
 6   15-minute break.  Don't discuss the case or form any opinions.
 7   Thank you.  We'll see you in 15 minutes.
 8        (The jury exits the courtroom.)
 9            MR. STEIN:  I'm presuming that the next question is
10   scheduling.
11            THE COURT:  How are we doing?
12            MR. STEIN:  We're doing good.
13            I have three more pages on this line.  Then I'm going
14   to pull up some of the Government's exhibits with their help
15   and ask him about those, and then I'm going to ask him about
16   approximately six pages of his deposition before the SEC, and
17   then I'm done with Mr. Carter.
18            THE COURT:  Okay.  That sounds like quite a bit.
19            MR. STEIN:  No, it -- well, just to -- emblematic of
20   that, just to give you what we've already gone through, it's
21   15 pages.  So this is -- we're on the downhill slope
22   significantly.
23            THE COURT:  All right.  Sir, don't discuss your
24   testimony during the recess, please.
25            All right.  We'll see you in 15 minutes.  Thank you.
```

```
 1              (A recess was taken from 10:32 a.m. to 10:48 a.m., after
 2    which the following proceedings were had:)
 3              THE COURT:  Please be seated.
 4              We're back on the record.
 5              We ready to proceed, Mr.~Stein?
 6              MR. STEIN:  Yes, Your Honor.
 7              MR. STIEGLITZ:  The United States is ready.
 8              THE COURT:  Come on back up, Mr. Carter.  You're
 9    still under oath.
10              THE WITNESS:  Yes, Your Honor.
11              THE COURT:  And if you could bring the jurors in,
12    please.
13              And we're going to also finish at 4:30 today, for
14    everybody's planning, and I believe tomorrow, as well.  I
15    think the rest of the week, other than Friday.
16              MR. WHITE:  Your Honor, regarding scheduling, when
17    you said the next week, I think we have a couple of days, we
18    only work mornings, are you saying that we're going to work
19    'til 1:30 on those days?
20              THE COURT:  1:00.  That's my plan.  Except for
21    Thursday.  Thursday, we're not going to be in session at all,
22    the 23rd.
23         (The jury enters the courtroom, after which the following
24    proceedings were had:)
25              THE COURT:  Welcome back, everyone.  Please be
```

```
 1    seated, ladies and gentlemen.

 2              All right.  Mr.~Stein, you may proceed.

 3              MR. STEIN:  Thank you, Your Honor.

 4    BY MR. STEIN:

 5    Q   Mr. Carter, I'm going to show you what's already been

 6    marked and introduced into evidence as Defendant's

 7    exhibit 150.  It will be on the screen in front of you.

 8    A   Okay.

 9              MR. STIEGLITZ:  I don't know that this is in, Your

10    Honor.

11              Fifty-seven is in.  I thought you said 150.

12              MR. STEIN:  I may have.  I apologize.

13              Okay.  You can publish it.

14    BY MR. STEIN:

15    Q   Mr. Carter, could you take a moment to review this

16    agreement.  And I'm mainly interested in the first page and

17    the second page; the second page, leading up to the first page

18    of the contract after the table of contents.

19              THE COURT:  This is Defendant's exhibit 57, correct?

20              MR. STEIN:  That's correct, Your Honor.

21              THE COURT:  Okay.  Thank you.

22    BY MR. STEIN:

23    Q   And we're going to blow that up so you can read the pages.

24              So let's just concentrate on the page that says

25    "Capital Venture Equity Agreement," and says "Recitals," and
```

```
 1    then goes through exhibit A, just that right now.

 2    A    (Perusing exhibit.)

 3    Q    Have you had a chance to look at just that little bit?

 4    It's a long agreement.

 5    A    Yes.

 6    Q    Now, March of 2008 was a time when Dr.~Harmison was the

 7    CEO of Signalife; is that correct?

 8    A    Yes, I believe so.

 9    Q    And you recall in March of 2008 the company entering into

10    a very large $40 million contract with a Korean-based public

11    company; is that right?

12    A    No, I don't remember that.

13    Q    You remember nothing about it?

14    A    No.

15    Q    So you don't remember the name Innet, I-n-n-e-t?

16    A    Doesn't ring a bell, no, sir.

17    Q    And you don't remember that your trips to Asia were

18    related to this contract with Innet?

19    A    No, I do not know.

20    Q    Dr.~Harmison and you never spoke about that; is that

21    correct?

22    A    That's correct.

23    Q    Did you ever speak to me about that?

24    A    Not that I can recall.

25    Q    So you may have, you just don't recall?
```

```
 1    A    I just don't -- I have no recollection.

 2    Q    But with Harmison, you know you didn't speak with him?

 3    A    That's correct.

 4    Q    But certainly, Dr.~Harmison spoke with you about your trip

 5    overseas; isn't that correct?

 6    A    No, it is not.

 7    Q    Mr. Carter, you knew, at the time in 2007-2008,

 8    December 2007, when you made this trip, and then into the

 9    middle of 2008 --

10         MR. STIEGLITZ:  I'm sorry, I just want to clarify

11    what trip we're talking about, Your Honor.

12    BY MR. STEIN:

13    Q    The trips you testified on direct examination to, I

14    believe Israel and Tokyo, I think you testified.

15         MR. STIEGLITZ:  Yeah, I just . . .

16    BY MR. STEIN:

17    Q    You remember that testimony generally, right?

18    A    Yes.

19    Q    And you knew at that time that Dr.~Harmison and I were

20    interfacing on a regular basis, right?  You already

21    testified --

22    A    I guess so.  I don't know a hundred percent.

23    Q    But you know he was coming to Boca Raton, and that's where

24    I was at that time, and we were meeting, right?

25    A    Yes, you lived in Boca, and he came here.
```

```
 1    Q    And you knew at that time that I had explained to him or

 2    we had discussed --

 3              MR. STIEGLITZ:  Objection as to --

 4              THE COURT:  Rephrase the question.

 5    BY MR. STEIN:

 6    Q    You knew at the time that Dr.~Harmison and I had discussed

 7    your trip overseas; is that correct?

 8              MR. STIEGLITZ:  Still an objection.

 9              THE COURT:  Overruled.

10              You can answer.

11              THE WITNESS:  No, I do not.

12    BY MR. STEIN:

13    Q    I'd like to show you what's been marked as exhibit 150 and

14    is not in evidence, so please don't read anything from it.

15    And I'd ask you to look at it and tell me if it refreshes your

16    recollection of whether or not your trip was discussed with

17    anyone at the company.

18              MR. STIEGLITZ:  Your Honor, can we just approach

19    really quickly on this?  I'm sorry to interrupt, but . . .

20              THE COURT:  Yes.

21              MR. STIEGLITZ:  Thank you.

22         (The following proceedings were held at sidebar:)

23              MR. STIEGLITZ:  So as I understand what Mr.~Stein's

24    trying to do, he's asked Mr. Carter a question, do you recall

25    something happening.  Mr. Carter says -- he doesn't even say,
```

1    do you recall.  He says, did somebody discuss this.

2    Mr. Carter says no.  And then Mr.~Stein goes up and attempts

3    to, even though there's not been any claim of a -- you know,

4    "I'm confused," "I don't remember," anything like that, he

5    goes up, he shows him a document that is entirely hearsay and

6    then suggests that somehow this is going to remind Mr. Carter

7    that this hearsay occurred.

8            So I don't see what the end goal of this is, how

9    anything admissible comes of whatever this exercise is that

10   Mr.~Stein's going through.

11           THE COURT:  I guess it's possible that if he looks at

12   this document, he might recall something differently than he

13   just answered.  He said no, and maybe this will trigger his

14   memory, and maybe his answer was, oh, now I do remember.  But

15   that's the only thing that can come of it.  That doesn't mean

16   that he's going to be able to get this admitted into evidence.

17           MR. STIEGLITZ:  And I guess my --

18           THE COURT:  I don't know what the next question would

19   be if he does remember, but . . .

20           MR. STIEGLITZ:  I guess my only concern, Your Honor,

21   is just maybe I've missed sort of what I was expecting to hear

22   in terms of setup.  If someone says I don't remember, I have

23   no objection to Mr.~Stein trying to prompt him.  But

24   Mr. Carter's answering these things unequivocally, he says,

25   did this discussion occur?  No, I'm not aware of any

 1   discussion.  Then Mr.~Stein's trying to go up and show him a

 2   bunch of documents otherwise.

 3            THE COURT:  I don't think the fact the witness says

 4   something unequivocally means that he couldn't be wrong or

 5   that his memory couldn't necessarily be refreshed and he may

 6   conclude after looking at something, that that answer was

 7   incorrect.  So a mere fact that he said no definitively, I

 8   don't think prevents him from trying to see if something might

 9   change his mind.

10            MR. STIEGLITZ:  Okay.  I understand.

11            THE COURT:  So if this will change his recollection,

12   then I think he's able to see if it will or not.

13            MR. STIEGLITZ:  Understood, Your Honor.  Thank you.

14            MR. STEIN:  Thank you, Your Honor.

15        (Sidebar conference concluded.)

16   BY MR. STIEGLITZ:

17   Q   Mr. Carter, I'm now going to show you what's been marked

18   as exhibit 150.  Please do not read it aloud.

19   A   Okay.

20   Q   Ask you to review it.

21   A   Okay.  I got a chance to review it.

22   Q   And Mr. Carter, you previously testified that you knew

23   that Dr.~Harmison and I were speaking, but you didn't know

24   what we talked about, is that right, generally?

25   A   Yes.

1    Q    And you previously testified that you and Dr.~Harmison

2    directly never talked about your trip overseas; is that

3    accurate?

4    A    That's correct.  I never spoke with him about it.

5    Q    Does this document change your recollection about whether

6    or not I talked to Dr.~Harmison about your trip overseas in

7    any way?

8    A    No, it does not.

9    Q    Does this document refresh your recollection about whether

10   Dr.~Harmison and you talked about your trip overseas?

11   A    No, it does not.

12   Q    Does this document refresh your recollection about whether

13   Dr.~Harmison and you talked about any of your trips overseas?

14   A    Never spoke to him.

15   Q    And it doesn't refresh your recollection in that regard?

16   A    As far as I can remember, I never spoke to him about any

17   trips.

18   Q    As far as you can remember, you never spoke to him?

19   A    (No response.)

20           THE COURT:  I'm sorry.  What was the answer?

21           THE WITNESS:  I never spoke to him, as far as I can

22   remember.  I never spoke to Dr.~Harmison about any trips.

23   BY MR. STEIN:

24   Q    Thank you.

25           Mr. Carter, you've also testified that you received

```
 1   wire transfers from the company, on direct examination from
 2   the Department of Justice.  Do you recall that testimony?
 3   A   Yes, I do.
 4   Q   And you testified that you had no knowledge that the
 5   company approved of such wire transfers.  Is that what you
 6   testified to?
 7   A   Yes.
 8   Q   But you don't know whether or not Dr.~Harmison and I spoke
 9   about those wire transfers, right?
10   A   I have no idea.
11   Q   Mr. Carter, I'm going to show you what's marked as
12   exhibit 132 and ask you to review it.
13   A   Okay.
14   Q   Does this document refresh your recollection at all about
15   whether or not I told Dr.~Harmison or the company Signalife
16   knew about the wire transfers to you?
17   A   No, you were the only one that told me I was getting in a
18   wire transfer.
19           MR. STEIN:  Can you please publish the exhibit.
20           THE COURT:  Which exhibit is this?  I'm sorry.
21           MR. STEIN:  I'm sorry.  It's Government exhibit 132.
22           THE COURT:  Thank you.
23   BY MR. STEIN:
24   Q   Mr. Carter, you have it on the screen in front of you.
25   It's already in evidence.  Could you read the "to" line, who
```

```
 1   it's from (sic)?
 2   A    From -- it says to Lowell Harmison.  It doesn't say from
 3   who -- Tracy Jones, I'm sorry.
 4   Q    From Tracy Jones to Lowell Harmison?
 5   A    Yes.
 6   Q    Can you please read the e-mail?
 7   A    "The wire is in the amount of 100" --
 8   Q    Can you please read the e-mail, just start a couple
 9   sentences up, there's two letters.
10   A    "Hi?"
11   Q    Yeah.  Go ahead.
12   A    "Hi.  The wire is in.  The amount is $175,250.  I will get
13   the 180,000 wired to MC Electrical out this morning."
14   Q    Let's stop there.
15            MC Electrical is your company, right?
16   A    That's correct.
17   Q    You got a wire in or about March of 2008; isn't that
18   correct?
19   A    I got a wire.  I don't remember the amounts, though.
20   Q    Continue reading, please.
21   A    Okay.  "After the invoices we paid, the incoming wire, the
22   outgoing wire of today, and the check to David Walker, my
23   records show that we will have a cash balance of about
24   $82,000.  We will have about 30,000 in payroll taxes,
25   et cetera, in a few days, which will leave us a cash balance
```

```
 1    of about 50,000 to $52,000.
 2              "I will also have to make another credit card payment
 3    shortly once you approve to keep some credit open for your
 4    travel needs and on top of that.  I will need to do another
 5    check run for payables next week, if approved.  I will check
 6    with Kevin to verify that my totals are accurate and that he
 7    did not send out anything I am not aware of.
 8              "Working on the stock certificates.  Will overnight
 9    to you as requested, along with David's check."
10    Q   Do you remember anybody by the name of David Walker?
11    A   No, I do not.
12    Q   Do you remember any of the issues about Dr.~Harmison's
13    trip in 2008 that are sort of vaguely referred to in here?
14    A   No, I do not.
15    Q   Do you remember receiving stock certificates in 2008 after
16    you signed your contract?
17    A   Yes, I do.
18    Q   Do you remember whether Dr.~Harmison was -- when he came
19    to Boca Raton, do you remember where he stayed, generally?
20    A   One time you had the -- the two of us had to pick him up
21    at a place called the Bridges Hotel.
22    Q   Which is right next to the Boca Resort and Spa?
23    A   It's down the street from it, yes.
24    Q   And you remember times he was at the Boca Resort and Spa,
25    as well, right?
```

```
 1   A    That I don't remember.

 2   Q    In this period after your contract was signed and before

 3   Dr.~Harmison got sick -- so we're talking about January to

 4   April -- you recall Dr.~Harmison coming to Boca Raton more

 5   frequently than in 2007; is that accurate?  Would that be

 6   fair?

 7   A    I'm not for sure on that.

 8   Q    So it might have happened, might not have happened, you

 9   don't recall?

10   A    I don't recall; that's correct.

11   Q    Thank you.

12          MR. STEIN:  Can you pull up the plea agreement?

13          MR. STIEGLITZ:  225, I think.

14          MR. STEIN:  Can you just blow up the first page?

15   BY MR. STEIN:

16   Q    Mr. Carter, is it safe to assume that you are, in view of

17   the importance of this agreement, very familiar with it?

18   A    Yes, I am.

19   Q    It requires you to tell the truth; is that right?

20   A    That's correct.

21   Q    It requires you to disclose everything to the DOJ that

22   they ask you or that is material, right?

23   A    Yes.

24   Q    And you pled guilty to one count of perjury; is that

25   correct?
```

```
 1    A    Well, it was one count of conspiracy to commit mail fraud,
 2    wire fraud and obstruction of justice.
 3    Q    One count?
 4    A    That's correct.
 5    Q    And you understood when you signed it that under one
 6    count, you could get a maximum of five years in prison; is
 7    that correct?
 8    A    Yes, I do.
 9    Q    And you indicated earlier you were hoping for probation;
10    is that right?
11    A    Yes.
12    Q    But you've already testified, and we'll be going into more
13    of it now, that you told many lies both to the SEC and to me
14    and to others as you sit here today, not just one lie, right?
15    A    Before, yes.
16    Q    And you understand that each lie is a separate crime?  Do
17    you understand that?
18           MR. STIEGLITZ:  Objection, Your Honor, that's a false
19    statement of the law.
20           THE COURT:  Sustained.
21    BY MR. STEIN:
22    Q    You understand that for perjury, you could be charged with
23    a count of perjury for perjury one time?  Do you understand
24    that?
25    A    Not fully, but I see what you're saying, yes.
```

```
1    Q    You also understood at the time that you signed this plea
2    agreement that committing a fraud against the Internal Revenue
3    Service was also a crime, didn't you?
4    A    Yes, that's a crime.
5    Q    And you were never charged with such a crime by the
6    Department of Justice; is that correct?
7    A    Yes; that's correct.
8    Q    Mr. Carter, it is true that during the year 2008, your
9    family purchased any interest that I had in Five Knights
10   Partnership; is that true?
11   A    My family?  No.
12   Q    Or you or your wife, some entity you controlled purchased
13   that interest, right?
14   A    That's what you had me sign, yes.
15   Q    And you purchased that interest, right?
16   A    Not with any money, no.
17   Q    You paid me a lot of money during that year, right?
18   A    Whatever the stock certificates, yes, whatever the wire
19   money I got.
20   Q    So was it your understanding that you were purchasing Five
21   Knights Partnership for free, or that you were purchasing it
22   with money that you paid to me?
23   A    You didn't say that.
24   Q    But you knew I had put a million dollars into Five Knights
25   Partnership.  We've already talked about that, right?
```

```
 1    A   Well, that's what you're saying.  I don't ever saw that
 2    you put the money in.
 3    Q   But you said that it wasn't inconsistent with your
 4    recollection, right?
 5    A   I don't remember what I said.
 6    Q   It was just like an hour ago.
 7    A   Well, if it can be repeated.  I don't remember what I
 8    said.
 9    Q   Well, we'll just let the record say it.  I don't want to
10    keep asking.
11          Mr. Carter, after the purchase, whether you paid zero
12    dollars for the partnership or paid something, at that point
13    you understood you had a right to use the name, right, Five
14    Knights Partnership?
15    A   Well, I never used it, but you told me, you know, you had
16    me sign these papers to buy into the company.
17    Q   You never used the name, Five Knights Partnership, right?
18    A   Only whatever you would have me do.
19    Q   Okay.
20          MR. STEIN:  May I approach, Your Honor?
21          THE COURT:  Yes.
22    BY MR. STEIN:
23    Q   Mr. Carter, this is exhibit 47, and I would just ask if
24    that's your signature or if you recall signing that document.
25    A   Yes, that's my signature.
```

```
 1                MR. STEIN:  Offer it.

 2                MR. STIEGLITZ:  No objection.

 3                THE COURT:  Admitted without objection.

 4           (Defense Exhibit No. 47 entered into evidence.)

 5   BY MR. STEIN:

 6   Q    You had testified on direct that this -- that you had

 7   brokerage accounts, and that one of the places you opened

 8   those accounts was at Ameritrade, you remember that?

 9   A    Yes.

10   Q    And this document is somewhat later.  It's after all the

11   transactions the Government showed you.  You see the stamp

12   date on that?

13   A    Yes, I do.

14   Q    What's the date of that?

15   A    September 3rd, 2008.

16   Q    Do you recall ever sending me any money after

17   September 3rd, 2008?  I'm not talking about paying the water

18   bill, after we were bailing the water.  I'm talking about the

19   transactions that the Government was referring to.  Do you

20   recall ever sending me any money after September 3rd, 2008?

21   A    Yes.

22   Q    And were those transactions, were they all encompassed in

23   your direct testimony here yesterday?

24   A    What do you mean by compass?

25   Q    Encompassed.  Did you cover those in your direct
```

1    testimony, or did you not cover them?

2    A    Well, I don't know about all of them, no.

3    Q    But you think you covered some of the transactions that

4    occurred after September 3rd, 2008?

5    A    I think so, but I don't remember.

6    Q    And you're sure that -- well, let me ask you.  These

7    transactions after September 3rd, 2008, were they wire

8    transfers to me?

9    A    Not all of them.

10   Q    Some of them?

11   A    Some were.

12   Q    They were wire transfers after September 3rd, 2008, is

13   that your testimony?

14   A    I think so.  I don't know the dates for sure.  I'd have to

15   see something in front of me.

16   Q    And do you recall yesterday seeing anything -- I

17   understand there's a lot of documents.  I wouldn't expect you

18   to recall.  But do you recall seeing yesterday a wire transfer

19   after September 3rd, 2008, to me?

20   A    I don't remember the date.  I remember seeing a wire

21   transfer, I just don't remember the date, though.

22   Q    Now, you opened this account at Ameritrade; is that right?

23   A    Yes, I believe so.

24   Q    And this was after, as you said, I told you to buy Five

25   Knights Partnership; is that correct?

1    A    I think so.

2    Q    And when you opened this account at Ameritrade, was I

3    there with you?

4    A    No.

5    Q    And what is -- can you read on number 2, and can we blow

6    up number 2 -- excuse me, number 3.   Number 3.   Is that your

7    handwriting on number 3 in terms of the name of the brokerage

8    account?

9    A    To the left, yes, but not to the right.

10   Q    Okay.   So to the left, meaning Five Knights Partnership,

11   that's your handwriting?

12   A    That is my writing, yes.

13   Q    So you were using the name Five Knights Partnership in

14   September of 2008; is that right?

15   A    I guess so.

16   Q    You don't recognize the handwriting on the right, says

17   revocable living trust?

18   A    No, I definitely do not.

19   Q    You don't maintain that's my handwriting, though, right?

20   A    I can't tell you one way or the other.

21   Q    Okay.   Is the rest of the handwriting on this yours?

22   A    Not all of it.

23   Q    Do you maintain that any of the other handwriting on this

24   is mine?

25   A    I'm not sure.   I definitely wouldn't have -- that's not my

 1    writing on Miko Food, and that's not my writing with the phone

 2    number.

 3    Q    And you were in person at Ameritrade when you filled that

 4    out; is that correct?

 5    A    I don't remember.  I don't recall.

 6    Q    But if -- but you definitely recall that you and I never

 7    went to Ameritrade together; is that right?

 8    A    I don't remember one way or the other.

 9    Q    So you opened an account called Five Knights Partnership

10    on September 3rd, 2008, with Ameritrade.

11    A    That's what it says here, yes.

12    Q    And that's not inconsistent with anything you remember; is

13    that right?

14    A    Yes.

15            THE WITNESS:  Am I allowed to say something, Your

16    Honor?

17            THE COURT:  Wait for a question.

18            THE WITNESS:  Oh, okay.

19            MR. STEIN:  Your Honor, this is still on exhibit 47.

20    I'm now going to show Mr. Carter the rest of it, and we've

21    stipulated that the entire exhibit 47 is in evidence, I

22    believe.

23            MR. STIEGLITZ:  That's correct, Your Honor.

24            THE COURT:  All right.  Are you just -- whatever

25    you're adding to what's shown to Mr. Carter?

```
 1              MR. STEIN:  That's correct.

 2              MR. STIEGLITZ:  Mr.~Stein, if you'd just read maybe

 3    the beginning Bates number and ending Bates number.

 4              MR. STEIN:  Your Honor, for identification purposes,

 5    it's Bates number -- Defendant's Bates number 0047 through --

 6    I'm sorry, it's Bates number 1957 through 1966.

 7              THE COURT:  Thank you.

 8    BY MR. STEIN:

 9    Q   Mr. Carter, I'm now going to show you the second part of

10    exhibit 47, ask if you've ever seen that before.

11    A   Yes, I believe so.

12    Q   Did you provide that agreement to Ameritrade when you

13    opened the account with them, as you've previously testified

14    to, for Five Knights Partnership?

15    A   I don't remember because this was one that you filled out

16    for me to do, like if I go to Ameritrade, to fill out

17    information like this.  It's a trust, and I remember you

18    giving me this.

19    Q   How many different -- you said you opened a lot of

20    brokerage accounts.  You remember that yesterday?

21    A   Not a lot.  I tried to.

22    Q   How many different entity names did you utilize just by

23    number, if you recall, more or less than five in opening these

24    brokerage accounts?

25    A   One under my personal name, one under -- I remember one
```

 1   was under my personal name.  I don't remember if I opened them

 2   up under any other names.  I can't remember what I did.

 3   Q   Okay.  Do you remember opening a brokerage account in 2008

 4   as a trust for the benefit of your daughter?

 5   A   Yes, I believe so.

 6   Q   So that would be another one, right?

 7   A   Yes.

 8   Q   And your testimony is that I told you to do all of those?

 9   A   Yes, that's correct.

10   Q   Including the one to your daughter?

11   A   Yes.

12   Q   Thank you.

13         I'm going to show you what's been marked as

14   Government exhibit 186.

15         MR. STEIN:  And I'd offer 186 into evidence by

16   stipulation at this time, Your Honor.

17         MR. STIEGLITZ:  No objection, Your Honor.

18         THE COURT:  You said Government's 186.

19         MR. STEIN:  Government exhibit 186.

20         THE COURT:  Is it already in evidence?

21         MR. STEIN:  No, it is not.

22         THE COURT:  Okay.  It's admitted without objection.

23     (Government Exhibit No. 186 entered into evidence.)

24         MR. STEIN:  For identification, it's a one-page

25   document.

```
 1   BY MR. STEIN:
 2   Q    Mr. Carter, you're looking at the screen.  I'm going to
 3   show you maybe a better copy.
 4             And if you can go to the bottom of that document.
 5   A    Okay.
 6   Q    You can see there's a Government exhibit and there's a
 7   Bates stamp under it.
 8   A    Yes.
 9   Q    JW00005833.
10   A    Yes.
11   Q    You see that?
12   A    Yes.
13   Q    Did you sign this document?
14   A    That is my signature.  I don't remember signing it.
15   Q    Could you please read that document into -- what's the
16   date of that document?
17   A    November 5th, 2008.
18   Q    And at November 5th, 2008, you were in communication with
19   Willie Gault; is that right?
20   A    I met him the one time down here, I believe with you, and
21   then the only other communication was, you know, when you had
22   me live out in California with you.
23   Q    So you knew who Willie Gault was?
24   A    Yes, I knew who Willie Gault was.
25   Q    You knew he was the co-chief executive officer at this
```

```
 1    time of the company, right?

 2    A    That's correct.

 3    Q    Could you please read the document starting with, Dear

 4    Mr. Carter.

 5    A    "Dear Mr. Carter, this letter confirms the understanding

 6    of the parties pursuant to which the parties agree that

 7    Electrical Connections has fully performed its duties and

 8    projects, the projects, under its consulting and research and

 9    development agreements with Signalife; two, that the common

10    stocks (sic) previously tendered by Signalife to Martin Carter

11    and/or Electrical Connections, the shares, constitute full

12    payment for the provisions of the aforesaid services and any

13    other amounts due to Martin Carter and/or Electrical

14    Connections, and that no further amounts are due, and this

15    letter shall constitute written instructions to (sic)

16    notification to NPC Financial pursuant to which such firm is

17    instructed and authorized, effective immediately, to release

18    the shares to Martin Carter and/or Electrical Connections.

19          "Notwithstanding the foregoing, Signalife shall be

20    entitled to receipt of all work product related to the

21    projects.  If the foregoing accurately reflects the aforesaid

22    matters, please indicate your agreement by signing and

23    returning the attached copy of this letter."

24    Q    And if we can scroll to the top of the page, you see the

25    document bears the Signalife name and logo.  It's on Signalife
```

```
 1    letterhead.  You see that?

 2    A    Yes.

 3    Q    And if we can now go to the bottom of the document, very

 4    bottom, you see the address, 4705 Laurel Canyon Boulevard,

 5    Suite 203, Studio City, California.  You see that?

 6    A    Yes, I do.

 7    Q    You previously testified you recall the company moving

 8    back from Greenville to LA.  This document's consistent with

 9    that, right?

10    A    Well, they closed the office in Greenville, yes.

11    Q    Because Pam Bunes was gone?

12    A    Yes.

13    Q    And do you know who prepared this document?

14    A    No.  I remember you had a document that you sent to me a

15    while ago, but I definitely did not prepare this document.  I

16    don't know who did.

17    Q    Do you have any recollection of whether or not Mr. Gault

18    and you spoke about this agreement at or before the time you

19    signed it?

20    A    No.

21    Q    Do you know whether you and Mr. John Woodbury spoke about

22    this agreement at or before the time you signed it?

23    A    No.

24    Q    And you don't recall whether you and I spoke about this

25    particular agreement at or before you signed it, right?
```

```
 1    A    Yes, but that -- that is my signature, but I didn't sign
 2    it there.  It looks like that somebody moved it into there.
 3    Because you had my signature on a PDF.
 4    Q    So you're saying that I put your signature on there?
 5    A    You have my signature on a PDF.
 6    Q    Are you saying that I put your signature --
 7    A    I did not personally sign that document.  That is my
 8    signature.
 9    Q    Did you understand at this time to be in a dispute with
10    Signalife?
11    A    No.
12    Q    You still had a relationship with Rowland Perkins and me
13    at this time, right?
14    A    Yes.
15    Q    And so there's nothing in this document, in the content of
16    this document, that is inconsistent with your recollection of
17    what happened in November of 2008; is that right?
18    A    Well, I don't know, and I don't remember.
19    Q    Now, Mr. Carter, after this document was signed, whoever
20    signed it, you understood that the other co-chief executive
21    officer was Rowland Perkins.  Did you understand that?
22    A    Yes, I do.
23    Q    So there was a Willie Gault and Rowland Perkins, right?
24    A    That's correct.
25    Q    Rowland Perkins at this time was somewhat infirmed
```

```
 1   somewhat.  He's an older gentleman, right?
 2   A   Yes, he is.
 3   Q   Did you find Rowland Perkins to be a trustworthy
 4   individual?
 5   A   I believe so, yes.
 6   Q   Did you find Willie Gault to be a trustworthy individual?
 7   A   I had no doubts.  I didn't really interact with them in
 8   the company.
 9   Q   But at this time, you testified that I was doing things
10   that you felt very uncomfortable about and you felt were
11   wrong, right?
12   A   Yes.
13   Q   Now, after this agreement was signed and all prior
14   obligations under the other agreement were released, the
15   company and you began discussing the next phase of your
16   relationship in a new agreement; isn't that correct?
17   A   Could you rephrase that so I understand?
18   Q   After this document --
19           MR. STEIN:  You can scroll back up to the top of the
20   Government's exhibit.
21   BY MR. STEIN:
22   Q   It's November 5th.  After that, you began speaking with
23   the company regarding a new agreement for you; is that right?
24   A   Not that I remember.
25   Q   So you don't remember you and the company having any
```

```
 1    contractual discussions after November of 2008.  Is that your
 2    testimony right now?
 3    A   Not that I can remember.
 4    Q   I'm going to show you three documents separately Bates
 5    stamped 4516, 4517, and 4518, and ask you to look at them.
 6    Don't repeat what's in them, please.
 7    A   Okay.  I see all this.
 8    Q   Mr. Carter, does this document refresh your recollection
 9    of whether, after November 6th, 2008, you and the company or
10    you and me, if it was me, began discussing a new contract
11    under new management between your electrical businesses on the
12    one hand and Signalife on the other hand?
13    A   Not to my knowledge.
14    Q   Does not refresh your recollection?
15    A   No, this does not.
16    Q   So your recollection is that you don't recall speaking to
17    anyone, me, John Woodbury, Willie Gault, anybody regarding a
18    new contract after November 5th, 2008; is that correct?
19    A   That's correct.
20    Q   Okay.  Thank you.
21        And then right after November 2008, quickly after
22    that, you learned that the Securities and Exchange Commission
23    had begun doing an inquiry on Signalife, didn't you?
24    A   From you, yes.
25    Q   And in your mind, everything sort of changed at that
```

1    moment.  The SEC was doing an inquiry, right?

2    A    From what you told me.

3    Q    You didn't find anything -- it was a private inquiry.  You

4    didn't find anything about what I said to you to be untrue at

5    the time, did you?

6    A    I don't know.

7    Q    And at that time you recall just generally -- I don't want

8    to talk about it.  I don't want to get an objection -- that

9    there was a class action lawsuit filed against the company in

10   Greenville, South Carolina.  Do you recall that happening

11   after this?

12   A    I don't remember when it happened, but I know it did

13   happen because you told me so.

14   Q    And we've already talked about a declaration that you say

15   has lies in it regarding that case.  So you generally remember

16   the case, right?

17   A    Well, I don't really remember much of the case because I

18   never went there.

19   Q    But you remember a case?

20   A    Yes, I remember you telling me about a case, class action

21   lawsuit.

22   Q    And at the beginning of 2009, you remember that as I was

23   moving back to California, I filed for Chapter 11 bankruptcy

24   here in Florida.  You remember that, too, right?

25   A    Yes, I do.

1    Q   So at this time, the meltdown time, after the meltdown,

2    late 2008, there was an SEC inquiry, as you recall, there was

3    a class action lawsuit, as you recall, and I filed personal

4    bankruptcy under Chapter 11 to reorganize, as you recall.  Is

5    that an accurate summation?

6    A   I remember that you first tried Chapter 7, I think, and

7    then an 11.  I don't remember exactly.

8    Q   You think I first tried Chapter 7 and then went into an

9    11?

10   A   I'm not 100 percent sure.

11   Q   Well, but Chapter 7 just came off the tip of your tongue.

12          MR. STIEGLITZ:  Your Honor, objection.  If Mr.~Stein

13   wants to testify about a bankruptcy, he can't do it through

14   Mr. Carter.

15          THE COURT:  Sustained.

16   BY MR. STEIN:

17   Q   At that time, do you recall any communications with anyone

18   at Signalife -- at that time meaning those three events that

19   you just mentioned, meaning class action lawsuit, SEC inquiry,

20   bankruptcy.  Do you recall Signalife adopting plans that were

21   different than before those three events happening?

22   A   No, I don't recall.

23   Q   Do you recall Signalife saying that it had to turn inward

24   because of the meltdown and had to begin to investigate these

25   activities?  Do you recall that?

```
 1    A    Not offhand, no.

 2    Q    Do you know a guy named Jim Feidler?

 3    A    Yes, I do.

 4    Q    Do you remember Jim Feidler as being a former senior

 5    executive of the Sony Corporation?

 6    A    From what you told me, yes.

 7    Q    Do you remember me telling you that Jim Feidler was a

 8    former --

 9              MR. STIEGLITZ:  Objection.

10              THE COURT:  Sustained.

11    BY MR. STEIN:

12    Q    You remember Jim Feidler having also had a history at MCA

13    Universal?

14    A    I don't recall that.  I remember Sony Pictures.

15    Q    You've interacted with Mr. Feidler on a number of

16    occasions; is that right?

17    A    Yes, with you along, yes.

18    Q    And did you find Mr. Feidler to act in a way that was

19    distrustful?

20    A    Distrustful?

21    Q    Distrustful to you.  Did you consider him doing things

22    that were distrustful?

23    A    I had no way, one way or the other.

24    Q    And at about this time, did Mr. Feidler -- about this

25    time, meaning after these three events and before today.  Do
```

1   you remember Mr. Feidler becoming a senior official of

2   Signalife?

3   A    I remember you were trying to do something about it, but I

4   don't know.

5   Q    Do you remember what I was trying to do about it?  I don't

6   understand.

7   A    I don't remember exactly what you were doing.

8   Q    But you remember that that was happening, Mr. Feidler was

9   becoming a senior executive of Signalife after the meltdown

10  and these three events, correct?

11  A    I think so, but I don't remember.

12  Q    But certainly, you remember Rowland Perkins after this

13  event?

14  A    Yes, I believe also he was the attorney for Rowland

15  Perkins, if I remember.

16        MR. STEIN:  Your Honor, the next exhibit I'm going to

17  be passing out to the jury and starts the final line of

18  questioning.  I don't know if the Court wants me to do that.

19  It might be cut off.  I don't know if this is the time or you

20  want me to go for another 15 minutes.

21        THE COURT:  I'd prefer it if you continue.

22        MR. STEIN:  Okay.  I will.

23  BY MR. STEIN:

24  Q    Now, Mr. Carter, you moved and began doing work in

25  California, living in the house, bailing water into the

1    toilet, the things we talked about, after 2009, right?

2    A    Yeah, it was -- the first time was in -- yeah, it was

3    January 1st.  We were there for New Year's, I think in 2009 or

4    2010.  I don't remember the date now.

5    Q    Yeah.  You were spending a lot of time there, and then you

6    drove this red Mercedes-Benz that was later seized by the

7    Government, you drove it to California at some point.

8    A    Not originally.  Yes, at some point.  I drove you first.

9    To California.

10   Q    I'm just talking about the red Mercedes.  You drove that

11   from --

12   A    From Chicago to California, that's correct.

13   Q    I wasn't in the car with you when you drove it from

14   Chicago to California?

15   A    No, you were not.  You were in California.

16   Q    And then you continued to do work in good faith from 2009

17   through 2010 as the investigation of the SEC was happening and

18   everything else; you continued to work in good faith, right?

19   A    For you, yes.

20   Q    And you expected to be paid for that work, right?

21   A    For whatever I did for you, yes.

22   Q    Now, you previously testified that when you were working

23   for me before, in whatever capacity, whether it's a chauffeur

24   or a vitamin-getter, or whatever it is that you were doing,

25   that you were being paid by me in cash?

```
 1    A    Yes, you would pay me, that's correct.

 2    Q    That's what you testified to, right?  That's your story?

 3    A    Correct, that you were paying me.

 4    Q    How about after the meltdown, the bankruptcy, et cetera?

 5   Was I still paying you?

 6    A    You paid me a little bit.

 7    Q    Things were very tight then, right?

 8    A    Things were getting tighter, yes.

 9    Q    You paid the water bill for the house in California,

10   right?

11    A    Because you and your ex-wife told me to.

12    Q    Right.

13         So that by May of 2011, which I think is a month

14   before you were arrested --

15    A    Okay.

16    Q    -- I think you told me, you were interacting with

17   Mr. Perkins, Mr. Gault, and me and other people at my law firm

18   regarding -- still regarding this new contractual arrangement,

19   right?

20    A    What contractual arrangement?

21    Q    Some sort of new contractual arrangement.  And I'm talking

22   about early 2011.

23    A    You talking about like to work in your law firm and stuff

24   like that?  Is that what you're talking about?

25    Q    To work in my law firm, if that's what you want to
```

```
 1    characterize it as.  Some contract regarding me or Signalife.

 2    A   I'm not sure.  I don't remember seeing a contract, but I

 3    don't remember.

 4    Q   I'm going to show you what's been marked as exhibit 152.

 5           Mr. Carter --

 6           MR. STEIN:  Your Honor, we've stipulated to the

 7    admission of defense exhibit 152, a one-page document.

 8           MR. STIEGLITZ:  There's no objection, Your Honor.

 9           THE COURT:  Admitted without objection.

10      (Defense Exhibit No. 152 entered into evidence.)

11   BY MR. STEIN:

12    Q   Now, Mr. Carter, your only recollection about this time

13    and a potential new contract is, it would have been for me and

14    the law firm, right?

15    A   As far as I can remember.

16    Q   Okay.  I show you 152.

17           MR. STEIN:  And you may publish it on the screen.

18           THE WITNESS:  Okay.  Yes.

19   BY MR. STEIN:

20    Q   Do you recall communicating with anyone at mriley8@aol.com

21    in May of 2011?

22    A   Yes, he was an attorney with you, yes.

23    Q   And do you recall sending this e-mail?

24    A   I don't recall offhand.

25    Q   But you have no reason to doubt that you sent the e-mail,
```

```
 1    right?
 2    A    Not sure one way or the other, but, I mean, that's
 3    definitely my e-mail account.
 4    Q    Please read the e-mail aloud.
 5    A    "This confirms to the budget for the past three months of
 6    work.  Please have check ready for me in the amount of 5500
 7    for now.  The rest in within five to 10 days of balance.  This
 8    will cover until you get back.  This is for the law firm and
 9    Batelle's Heart Tronics' upcoming trip.  Please forward the
10    budget to Mitch, as well.  I will see him on Tuesday as per
11    your conversation.  Looking forward to working relationship
12    venture.  Thank you, Marty."
13    Q    The reference in the letter to Batelle Heart Tronics'
14    upcoming trip, you know who Batelle is, right?
15    A    Yes, that's who you had me meet in California.  There was
16    some guy that came, I remember.  I don't remember his name.
17    Q    Actually, and Batelle's actually located in Ohio; isn't
18    that right?
19    A    Batelle is located in Columbus, Ohio, yes.
20    Q    You knew that before just from life, right?  They're a big
21    company?
22    A    No, I didn't really know.  You told me.
23    Q    And you recall that Batelle is an electronics, among other
24    things, an electronics company?
25    A    Yes.
```

 1    Q    You recall they worked on the Fidelity 100, right?

 2    A    Yes, that's what you told me.

 3    Q    You recall meeting with Batelle -- a Batelle

 4    representative, along with Mr. Feidler and Mr. Perkins, prior

 5    to this e-mail at the Bel-Air Country Club; is that right?

 6    A    And yourself, that's correct.

 7    Q    And myself.

 8    A    Yes.

 9    Q    And you recall at that meeting being represented as the

10    CO-CTO of the company?

11    A    I remember that, yes.

12    Q    And you didn't blurt out that you objected to such a

13    title; is that right?

14    A    No, I did not.

15    Q    Did you understand the things that the person from Batelle

16    was telling you?  Don't discuss them, just did you understand

17    what was being talked about?

18    A    No, I remember that you guys were going to have me go

19    there to see this site at Batelle.

20    Q    You were going to do a site inspection of Batelle?

21    A    You guys were going to send me; that's correct.

22    Q    Did you recall Batelle to be a 5 billion-dollar a year

23    company?

24    A    I didn't know what they were worth.  I knew they were a

25    big company.

```
 1   Q    You knew they were a big company?

 2   A    Yes.

 3   Q    And your recollection of that meeting is, we wanted you to

 4   do a site inspection of a big company?

 5   A    Right.

 6   Q    Did you learn at that meeting -- strike that.

 7          Did you ever learn that Batelle has had a 50-year

 8   contract with the United States Department of Energy?  Did you

 9   ever learn that?

10   A    I think so, but I don't remember.  I don't recall.

11   Q    Could be true, might not be true?

12   A    Yes.  I can't recall.

13   Q    Do you recall knowing that Batelle had developed parts of

14   the Fidelity 100 heart monitor?

15   A    I remember from you telling me that they did help develop

16   the Fidelity 100.

17   Q    Do you recall after -- at or after the meeting with

18   Batelle, believing that the Fidelity 100 device may have been

19   sabotaged by a Signalife employee prior to that meeting?  Do

20   you recall learning of that?

21   A    I remember you were telling me something about that.

22   Q    That would be pretty serious -- a pretty serious problem,

23   right?

24   A    Uh-huh.

25          THE COURT:  Is that a "yes"?
```

```
 1              THE WITNESS:  Yes, I'm sorry.

 2   BY MR. STEIN:

 3   Q   Are you familiar with the Economic Espionage Act of 1996?

 4              MR. STIEGLITZ:  Your Honor, I'll object on relevance

 5   and scope.

 6              THE COURT:  Sustained.

 7   BY MR. STEIN:

 8   Q   In any event, you do recall the issue, right?

 9   A   What issue?

10   Q   The sabotage issue.

11   A   No.

12   Q   You don't recall the sabotage issue?

13   A   Of what you're saying?  No.  You're talking about

14   sabotaging the unit?

15   Q   Yes.

16   A   Oh, I understand that, yes.

17   Q   You remember that thought?

18   A   You saying that, yes.

19   Q   Do you recall if I mentioned the name Davie Jones, David

20   Jones?  Was that the person at Batelle that was at the

21   meeting?

22   A   I believe that was his name.

23   Q   And you knew from the public filings and from everything I

24   told you that Batelle had been involved with Signalife since

25   2004, that they were a longterm involved --
```

```
 1    A    Yes, I remember you telling me that.
 2    Q    And you recall that, after that meeting, that the
 3    knowledge that Budimir Drakulic was the inventor of the
 4    Fidelity 100 changed in your mind; is that correct?
 5    A    Meaning that what he developed, or what?
 6    Q    Meaning that he may have not developed all of the Fidelity
 7    100, that Batelle may have developed it.  Do you recall having
 8    that understanding after the meeting?
 9    A    I think so, but I don't remember for sure.
10    Q    Do you recall it being like sort of a shocking revelation
11    at the meeting?  Did people's jaws drop?
12    A    No, I don't remember any jaws dropping.
13    Q    You don't remember any sort of shock in any way, shape or
14    form?
15    A    I just remember they were going to help to redevelop.
16    That's what I remember you doing at the meeting.
17    Q    And you were going to go there -- at the meeting, you
18    intended to go there and visit them in Ohio?
19    A    Right.
20    Q    Because Ohio's where you grew up, and you knew how to get
21    around, and they were in Ohio, right?
22    A    Yes, that's correct.
23    Q    And you were the CO-CTO at that meeting, as you
24    represented, right?
25    A    As you made it, yes.
```

```
1    Q    I'm going to show you a three-page document.

2         Mr. Carter, what's been marked as Defendant's 157,

3    and particularly page 3 of it, can you indicate, without

4    talking about the content of it, whether you've ever seen this

5    document before?

6         MR. STEIN:  And if it please the Court, I'm going to

7    leave exhibit 152 with him.  It may assist him.

8    BY MR. STEIN:

9    Q    152 has an attachment on it which has been demonstrated?

10   A    Okay.

11   Q    Mr. Carter, is this the attachment you sent to Mr. Riley,

12   as referenced in the exhibit that's on your screen?

13   A    I believe so, because that's what you told me to do, send

14   a budget.

15        MR. STEIN:  Offer it.

16        MR. STIEGLITZ:  As to the Excel sheet, there's no

17   objection.  I think there's some other materials that may be

18   included with that that Mr. Carter's looking at.

19        THE WITNESS:  Right.  Only the Excel spreadsheet is

20   all I know.

21        MR. STIEGLITZ:  So as to the part that he remembers,

22   I have no objection.

23        MR. STEIN:  Your Honor, we will truncate that exhibit

24   to only include the spreadsheet.

25        THE COURT:  So what's the Bates stamp number on it?
```

```
 1              MR. STEIN:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3              MR. STEIN:  Thank you.

 4         The Bates number of exhibit 157 that I'm offering now

 5    is Bates number 3038.

 6              THE COURT:  All right.  157, as modified, will be

 7    admitted without objection.

 8         (Defense Exhibit No. 157 entered into evidence.)

 9              THE COURT:  All right.  Why don't we take our lunch

10    break now, Mr. Stein.  All right?

11              MR. STEIN:  Okay, Your Honor.  Thank you.

12              THE COURT:  Ladies and gentlemen, let's take our

13    lunch recess.  Please don't discuss the case, form any

14    opinions.  Leave all your exhibits and notes, and we'll see

15    you at 1:15.  Thank you.  And we're going to be leaving at

16    4:30 again today, ladies and gentlemen.  Thank you.

17         (The jury exits the courtroom.)

18              All right.  Sir, you'll have to be back again at

19    1:15.  Don't discuss your testimony during the recess.

20              Where are we?

21              MR. STEIN:  I'm about to now go into about five clips

22    of his deposition and a couple of Government exhibits.  I'm

23    almost done.

24              THE COURT:  All right.  Very good.  We'll see you at

25    1:15.  Thank you.
```

```
 1              MR. STIEGLITZ:  Thank you, Your Honor.

 2              MR. MUHLENDORF:  Thank you, Your Honor.

 3          (A recess was taken from 12:01 p.m. to 1:18 p.m., after

 4      which the following proceedings were had:)

 5              THE COURT:  Please be seated, everyone.

 6              MR. STEIN:  Your Honor, may we have a very quick

 7      sidebar?

 8              THE COURT:  We don't need a sidebar since the jury's

 9      not here.

10              MR. STEIN:  The gentleman's not in the room, so

11      you're correct.  The other postal inspector's not in the room.

12      But there's been a gentleman in a blue striped shirt with

13      Mr. Carter who's been making comments that can be heard at

14      least back there during my questioning.  Like, when I said I

15      would have a cocktail, you wouldn't, he said many cocktails.

16      He said, I'm in the twilight zone.  He's making comments.  The

17      postal inspector told him even to be quiet.  He's not in the

18      room, so there's no need for a sidebar.  I would ask that if

19      he does come in the room -- I haven't looked behind me -- but

20      they can tell you what --

21              THE COURT:  I know who you're talking about.

22              MR. STEIN:  Oh, you do.

23              THE COURT:  I've seen him in here.

24              MR. STEIN:  I would ask somehow that, without the

25      jury hearing it, that the Court admonish him, if there's no
```

```
 1    objection from the Government.

 2              THE COURT:  Is he out there now?

 3              MR. STIEGLITZ:  I think he's out there.  He's somehow

 4    related to Mr. Carter, I believe.

 5              THE COURT:  Bring him in here now.

 6              MR. STEIN:  I apologize, Your Honor, but they just

 7    told me about it.

 8              THE COURT:  No, that's fine.

 9              MR. STIEGLITZ:  Obviously, Your Honor, we have no

10    objection to that.

11              THE COURT:  Sir, can you just step up here for a

12    second, please?

13              UNIDENTIFIED PERSON:  Yes, sir.

14              THE COURT:  I've noticed that you've been in the

15    courtroom the last couple of days, and it's been observed that

16    during the course of the trial you've been making comments

17    that can be heard by people in the courtroom.  I'm going to

18    ask you to please refrain from saying anything during the

19    course of the trial.

20              UNIDENTIFIED PERSON:  Yes, Your Honor.

21              THE COURT:  Don't make any comments.  Don't make any

22    gestures.  Don't make any signals or body motions that might

23    in any way give your opinion as to what the testimony is or

24    what the -- what's happening in the courtroom.

25              You understand, sir?
```

```
 1              UNIDENTIFIED PERSON:  Yes, Your Honor.  Sorry about
 2   that.  I do apologize.
 3              THE COURT:  All right.  Because it's a problem if
 4   your opinions about what's being said is heard by the jury.
 5   Do you understand?
 6              UNIDENTIFIED PERSON:  Yes, sir.
 7              THE COURT:  Thank you for your cooperation.
 8              UNIDENTIFIED PERSON:  Thank you, Your Honor.
 9              THE COURT:  All right.  Have a good day.
10              UNIDENTIFIED PERSON:  You, too, sir.
11              MR. STEIN:  Your Honor, I apologize for doing what
12   may appear like a delay.  It's not.  We were talking about
13   scheduling at the break, given my evaluation of everything, my
14   remaining examination of Mr. Carter will be truncated to
15   probably 20 minutes.  The Government had indicated they're
16   also evaluating their situation.  So given that it's going to
17   be truncated and I've previously said it might be longer, I
18   want to disclose that now to the Government.
19              MR. STIEGLITZ:  And we appreciate that.  And just to
20   round it out for the Court's purposes, what we had indicated
21   to Mr.~Stein, we indicated this morning we may have four more
22   witnesses.  I think at this point we may only have three.  I
23   still think it's optimistic that we'd rest today, but I can
24   say with a fair amount of certainty that we'd rest hopefully
25   before lunch tomorrow, which is, hopefully, relatively
```

```
 1    consistent with what Mr.~Stein is expecting.

 2            And obviously, we're not going to object if Mr.~Stein

 3    needs a little extra time to get somebody here, something like

 4    that.

 5            MR. STEIN:  Your Honor, the Government has honorably

 6    on Saturday, as I already may have told you, sent an e-mail

 7    saying they were going to rest Tuesday, so I won't have to

 8    delay.  I have witnesses I expected.  So I think we're on a

 9    good schedule.

10            THE COURT:  Okay.  Great.

11            MR. STEIN:  Thank you, Your Honor.

12            THE COURT:  Can we bring the jury in?

13            MR. STEIN:  Yes, Your Honor.

14            THE COURT:  Let's get Mr. Carter back in here, and

15    let's bring the jurors in, please.

16            THE COURTROOM SECURITY OFFICER:  Yes, Your Honor.

17            THE COURT:  Mr. Carter, you're still under oath, sir.

18            THE WITNESS:  Yes, Your Honor.

19       (The jury enters the courtroom, after which the following

20    proceedings were had:)

21            THE COURT:  Welcome back, everyone.  Please be

22    seated, ladies and gentlemen.

23            And the cookies were delicious, so thank you very

24    much.

25            All right.  Mr.~Stein, you may continue.
```

```
 1              MR. STEIN:  Thank you, Your Honor.  Thank you.
 2   BY MR. STEIN:
 3   Q   Mr. Carter, you recall before lunch we were talking about
 4   Five Knights Partners?
 5   A   Yes.
 6   Q   Do you recall an agreement with me to -- and you, in
 7   writing, to purchase tranches or interest in Five Knights
 8   Partners?
 9   A   I remember an agreement, yes, sir.
10   Q   Do you remember an agreement that allowed you to purchase
11   up to 70 percent of Five Knights Partners or a majority
12   interest?
13   A   Yes, I remember you putting that down.
14   Q   And do you recall that those tranches were -- there were
15   contemplated to be as much as 10 of them or as little as one
16   of them?  You recall that?
17   A   I don't recall how many, no, sir.
18   Q   And you recall that those tranches were in amounts ranging
19   from $150,000 to $300,000?
20   A   What's a tranche, by the way?
21   Q   Just a payment to purchase an interest.  In other words,
22   that you can make those payments over time when you were
23   purchasing Five Knights Partners.  Do you recall that?
24   A   I don't recall about making any payments, no, sir.
25   Q   But you recall the agreement?
```

1   A    The agreement Five Knights Partners that you put together,

2   yes.

3   Q    And ultimately, you recall as of September you, as we

4   talked about earlier, owned the Five Knights Partners name and

5   everything that went with it, right?

6   A    From what you wrote down, yes, I guess.

7   Q    Thank you.

8          Mr. Carter, we had left, I think, with exhibit 157,

9   the truncated version of it admitted into evidence.

10          MR. STEIN:  If you could publish that, I'd appreciate

11  it.  Just blow up what you have on the screen if you can.

12  BY MR. STEIN:

13  Q    Mr. Carter, we had previously showed you an e-mail to this

14  Mike Riley attaching your budget.  Is this the budget you

15  attached and sent in?

16  A    Yes, I believe so.

17  Q    $13,000 a month in income, and then you were listing your

18  expenses, and you were doing that for February, March, and

19  April of 2011.  Is that accurate?  Is that what you sent him?

20  A    I believe so.

21  Q    On the top left-hand corner of the document it says

22  4/22/2011, and then it says 11:28 a.m.  Do you think that's

23  when you prepared this budget from the best of your

24  recollection?

25  A    I can't remember offhand.

```
 1    Q    Thank you.

 2         Mr. Carter, after you prepared the budget, you

 3    received from Rowland Perkins a request that you submit to him

 4    your updated resume because the company was about to make

 5    filings again with the Securities and Exchange Commission.  Do

 6    you recall that?

 7    A    I remember you asked me to submit a resume to him, I

 8    believe, yes.

 9    Q    Do you recall Mr. Perkins asking you to submit a resume?

10    A    Not offhand, no, sir.

11    Q    I'm going to show you what's been marked as exhibit 153.

12    Please don't talk about it.

13    A    Okay.

14    Q    Have you seen this before?

15    A    Yes, I believe so.

16         MR. STEIN:  I offer it.

17         MR. STIEGLITZ:  Objection, hearsay.

18         THE COURT:  May I see it, please?

19         Let me see you over here, please.

20    (The following proceedings were held at sidebar:)

21         THE COURT:  Why is it not hearsay?

22         MR. STEIN:  It's just the direction that was made,

23    and there's two other e-mails that are also a sentence long of

24    how the resume went through the system of the company.  It's

25    just the fact the direction was made.  I'm not offering it for
```

```
 1   the truth of the matter asserted.  If he wants to say that

 2   these aren't accurate, he can say it.

 3           THE COURT:  Well, it seems to me you are offering it

 4   for the truth of the matter that Mr. Rowland wanted him to get

 5   a resume because you needed or the company needed it for its

 6   filings.  So, I mean, it seems like you are offering it for

 7   the truth of that matter.

 8           MR. STEIN:  So that we don't --

 9           THE COURT:  If you want to show it to him and ask him

10   if it refreshes his recollection as to whether he was asked to

11   submit a resume for filings, that's one thing.  But, again, I

12   think it seems to me that it is being offered for the truth of

13   the matter asserted, so I would have to sustain the objection.

14           MR. STEIN:  Your Honor, to avoid two more sidebars,

15   the next two exhibits, one of them is from Mr. Carter to

16   Mr. Perkins saying here it is.

17           THE COURT:  That's different.

18           MR. STEIN:  But the problem is that they're short

19   e-mails, and attached to that is an e-mail back from

20   Mr. Perkins to Mr. Woodbury saying here it is, and they're

21   going to object to that on hearsay.  So I don't want to have

22   another sidebar.

23           THE COURT:  Okay.  Well, again, if Mr. Carter is the

24   one who's sending something, then it's his statement, and you

25   could get him to admit that he made the statement and what his
```

```
 1    statement was.  But as far as other people's statements --
 2              MR. STEIN:  I understand.
 3              THE COURT:  -- I would probably have to sustain it,
 4    although I haven't seen it.
 5              MR. STEIN:  I think the Court's ruling is clear.
 6    I'll get it in through words.  Thank you.
 7              THE COURT:  Thank you.
 8         (Sidebar conference concluded.)
 9    BY MR. STEIN:
10    Q   Mr. Carter, I show you again what was marked as
11    exhibit 153.  Did Rowland Perkins ask you, after you submitted
12    the budget, for your resume?
13    A   That had nothing to do with the budget.
14    Q   I understand.
15    A   He asked for a resume from me, yes.
16    Q   Thank you.
17              That was on May 25th at 8:14.
18              And then on the next afternoon you sent him your
19    resume; is that right?
20    A   I believe I did.  I don't remember, but I believe I did.
21    Q   And then you have knowledge that he sent the resume to
22    John Woodbury, right?
23    A   No, I did not know that.
24              MR. STEIN:  May I approach?
25              THE COURT:  Yes.
```

```
 1              THE WITNESS:  Okay.
 2    BY MR. STEIN:
 3    Q   Mr. Carter, after looking at this document, do you have a
 4    recollection that you sent your resume to Mr. Perkins, as he
 5    asked?
 6    A   That I remember to Mr. Perkins, yes.
 7    Q   And is it your recollection that you knew that Mr. Perkins
 8    then sent it to John Woodbury?
 9    A   I don't remember.
10    Q   Mr. Carter, I'm going to show you what's been marked as
11    exhibit 154, Defense 154.  Is that the resume you submitted to
12    Mr. Perkins in late May 2011?
13    A   I wouldn't have put all this information in.
14    Q   Is that the resume --
15    A   I'm not an electronic circuitry specialist.  I'm not
16    authorized Casablanca Fan for the United States.  That's
17    incorrect.
18    Q   I'm not asking you if it's true.  I'm asking you if that's
19    the resume you sent Mr. Perkins.
20    A   I don't remember.
21    Q   You don't recall?
22    A   I don't recall.
23    Q   But you recall that by e-mail you sent him a resume; is
24    that right?
25    A   I believe so, yes.
```

1    Q    You don't recall that what you're looking at is not the

2    resume, you just don't recall what you sent him; is that your

3    testimony?

4    A    This just doesn't have things that I would have put on

5    here.

6    Q    I just want to know if you --

7    A    I sent the resume, but I don't recall that I sent it.  But

8    I know it wouldn't have had all these things on here.

9    Q    So you don't believe that's the resume you sent

10   Mr. Perkins; is that correct?

11   A    I don't know one way or the other, that's correct.

12   Q    Would it be correct at the time you sent your resume that

13   you resided at 8103 Meisner Lane?

14   A    Yes.

15   Q    Would it be correct to have said you were a dedicated

16   customer service manager with 20-years plus of experience,

17   would that have been correct?

18   A    In our lighting business, yes.

19   Q    Respected builder and leader of customer-focused teams,

20   would that have been correct?

21   A    Not sure.

22   Q    M&C Electrical electrical contractor, would that have been

23   correct?

24   A    M&C Electric, yes.

25            MR. STEIN:  Your Honor, I move exhibit 154 into

```
 1    evidence.

 2              MR. STIEGLITZ:  No objection, Your Honor.

 3              THE COURT:  Admitted without objection.

 4         (Defense Exhibit No. 154 entered into evidence.)

 5    BY MR. STEIN:

 6    Q   A few more things, Mr. Carter.

 7              Mr. Carter, in 2008, did Dr.~Harmison promise you a

 8    $2 million bonus for doing things for Signalife?

 9              MR. STIEGLITZ:  Objection, hearsay.

10              THE COURT:  Sustained.

11    BY MR. STEIN:

12    Q   In 2008, did you get an understanding in any way, shape or

13    form, contractual or otherwise, that you would be paid a

14    $2 million bonus?

15    A   No, I did not.

16    Q   You're positive about that?

17    A   I never heard that.

18              MR. STEIN:  Deposition transcript, Thursday,

19    February 25th, 2010, page 122, lines 4 through 17:

20              "Question:  Do you recall when in 2008 you were paid?

21              "Answer:  It was right after I got my contract.  I

22    had a contract with them.

23              "Question:  So approximately the end of January?

24              "Answer:  Probably.

25              "Question:  Okay.  And then in January how much were
```

```
 1    you paid?

 2              "Answer:  Well, my contract was $750,000 plus more.

 3              "Question:  And how much did you get paid?

 4              "Answer:  I was being paid through -- they were

 5    paying me through stocks and money.  I had more than 700, and

 6    then he told me I was going to even get a bonus of two million

 7    dollars for doing other things in the company.  I was directed

 8    by him to develop what he wanted me to do."

 9    BY MR. STEIN:

10    Q    Was that statement a lie that you made to the SEC?

11    A    Yes, it was.

12    Q    Isn't it true that Dr.~Harmison is the person who told you

13    where to ship the units in terms of the resellers network?

14              MR. STIEGLITZ:  Objection, hearsay.

15              THE COURT:  Overruled.

16    BY MR. STEIN:

17    Q    Did you have an understanding --

18              THE COURT:  It's not being offered for the truth.

19              THE WITNESS:  Could you repeat the question, please?

20    BY MR. STEIN:

21    Q    Isn't it true that it was Dr.~Harmison who, on the

22    reseller network, directed you as to where to have the units

23    shipped?

24    A    That is incorrect.

25              MR. STEIN:  Deposition before the SEC, Thursday,
```

```
1    February 25th, 2010, lines 4 through 20.
2            "And who would tell you where these units would be
3    shipped?
4            "Answer:  Lowell Harmison.
5            "Question:  So Signalife was going to sell the units
6    to an end user, and then you would ship those products from --
7            "Answer:  That's correct.
8    "Oh, okay.
9            "Question:  Let me finish the question.
10           "Answer:  I'm sorry.
11           "Question:  I know you understand, but Signalife was
12   going to tell where you to ship the units, and you would take
13   the unit from Ohio and ship it to the end user?
14           "Answer:  That's correct."
15   BY MR. STEIN:
16   Q   Were those statements lies to the SEC?
17   A   Yes, they were.
18   Q   But it is true that you grew up in this reseller business
19   with your family in Ohio, right?
20   A   Lighting business, yes.
21   Q   And it is true that you and Dr.~Harmison talked about the
22   reseller network for the company because of the complex nature
23   of the technology; isn't that right?
24   A   No, it is not.
25   Q   And it is true that Harmison told you he wanted you to set
```

```
 1    up that reseller network --

 2              MR. STIEGLITZ:  Objection, hearsay.

 3              THE COURT:  Sustained.

 4    BY MR. STEIN:

 5    Q   It is true that you were in the process in 2008 of setting

 6    up that reseller network before the SEC inquiry started; is

 7    that correct?

 8    A   No, it is not.

 9              MR. STEIN:  Deposition before the SEC, February 25th,

10    2010, page 129, and then again on page 145.  On 129, it's

11    lines 21 through 25, and then on page 145, it is on lines 13

12    through the next page, 15.

13              "Question:  What happened in 2008?

14              "Answer:  Okay.  In 2008, he wanted me to start to

15    set up a network for distribution facilities, manufacturing

16    facilities, distribution center, because we were going to have

17    a lot of units being done.  He told me anywhere between 50 and

18    a hundred thousand units."

19    BY MR. STEIN:

20    Q   Do you recall saying those words to the SEC?

21    A   Yes, I do.

22    Q   And those words are actually true, aren't they?

23    A   No, they are not.

24    Q   And, lastly, let's read from the deposition of the SEC,

25    your testimony, same date, page 45, starting at line 13, and
```

```
1    we'll be moving onto the next page.
2              "Question.  And product for distribution, okay, and
3    were you asked to do that?
4              "Answer:  Yes, I was.
5              "And who asked you?
6              "Answer:  Lowell Harmison.
7              "Question:  What did he ask you to do?
8              "Answer:  Again, he wanted me to start getting people
9    that I knew for a reseller network, the distribution
10   facilities.  I knew a couple of companies, like I said.  There
11   was TZ Medical, there was Sarasota Hospital, there was for
12   Baylor University, Davis Medical.  But I was very excited
13   because there were going to be 50 to a hundred thousand units
14   sold.
15             "Question:  I don't know what a reseller --"
16             And then the question was cut off and you said:
17             "Okay.  Let me explain to you what a reseller does.
18   A reseller gets the product.  They sit there.  Either they
19   repackage it or they go to the end supplier who is going to be
20   receiving it.  They are going to make sure that they know how
21   to set up everything for customer service -- and for customer
22   service.  That is what a reseller is.
23             "And you had those contacts?
24             "Answer:  Yes, that was for my family business,
25   absolutely.
```

```
 1              "Question:  You had it as it pertains to medical

 2    devices?

 3              "I had it as it pertained to anything.  I had the

 4    network.  That is what I had, was the network.

 5              "Question:  So a company that distributes electrical

 6    devices can equally distribute medical devices?

 7              "Answer:  Well, it has to be medically approved, and

 8    that was all Harmison handling that.

 9              "Question:  So how would your contacts -- were they

10    medically approved?

11              "Well, it's -- no, my contacts were just able to send

12    out the devices where they needed to be.

13              "Question:  I'm sorry.  Maybe I'm missing.  Can you

14    explain what that means?  You knew people who could -- is it

15    shipping, are you talking about?

16              "Answer:  Yeah, it is shipping and reselling and

17    going out and shipping distribution."

18              Do you recall that lengthy colloquy with the SEC?

19    A    Vaguely.

20    Q    When you explained to them what a reseller does, you were

21    accurately explaining what a reseller does, right?

22    A    No, that's a lie.

23    Q    That's not what a reseller does?

24    A    No, a reseller doesn't repackage, they just send out the

25    stuff that they get.
```

```
 1    Q    So the part where you said they send to the supplier is

 2    accurate, but the repackaging part is a lie?

 3    A    Not what we send to the supplier.  What we get from the

 4    supplier, the manufacturers.

 5    Q    Right.

 6    A    Then we send it out to our customers.

 7    Q    Okay.  And were you trying to explain that to the SEC when

 8    they examined you, what you just testified to?

 9    A    Not like that.  I was doing what you told me to do, and

10    you kept for me to remember all this stuff.

11    Q    Mr. Carter, we've gone over Miko Foods, and we've gone

12    over M&C Electrical, Electrical Connections.  We've gone over

13    other companies.  We've gone over the purchase of Five Knights

14    Partnership.  In the end, you really are an entrepreneur,

15    aren't you?

16    A    I tried to be, yes, sir.

17    Q    And you really did do your very best in good faith for

18    Signalife to the best of your abilities, didn't you?

19    A    I did what you told me to do.

20         MR. STEIN:  Your witness.

21                        Redirect Examination

22    BY MR. STIEGLITZ:

23    Q    Good afternoon, Mr. Carter.

24         MR. STIEGLITZ:  I should ask permission.  May I

25    inquire of the witness, Your Honor?
```

```
 1              THE COURT:  Yes.

 2              MR. STIEGLITZ:  Thank you.

 3              Ms. Rikert (phonetic), if you wouldn't mind pulling

 4   up what's been admitted as Defense exhibit 154.

 5   BY MR. STIEGLITZ:

 6   Q    Mr. Carter, do you see that document on the screen in

 7   front of you there?

 8   A    Yes, sir, I do.

 9   Q    What's the title?  See that neon sort of teal-colored bar

10   up there, the title of this file, what's the title of this

11   file?

12   A    Where it says e-mail?

13   Q    Where it says, right up here on the top, can you see that?

14   A    Oh, yeah.

15   Q    Does that say Adriana Giorgi?

16   A    Yes, I see that.

17   Q    Adriana Giorgi.

18              MR. STIEGLITZ:  Ms. Rikert, do you have Internet

19   access in here?  Would you mind just going on to Google for

20   me, and would you just type in that name, please, Adriana

21   Giorgi, and type in resume, as well, if you would.  And why

22   don't we pull up this second link, if you would, please,

23   Ms. Rikert.

24              I apologize, Your Honor.  Is it okay if I walk back

25   and forth to the screen?
```

```
 1            THE COURT:  Yes.

 2            MR. STIEGLITZ:  And if you'll just scroll down a bit,

 3   Ms. Rikert, please.  And can you go ahead and click on this

 4   document here?  And I think it will open it for you.  And I

 5   don't know if you have the ability to blow that up in your

 6   Internet browser or not.

 7            Thanks.  That's great.

 8   BY MR. STIEGLITZ:

 9   Q   Mr. Carter, I'm going to hand you, because I don't know

10   that you still --

11            MR. STIEGLITZ:  May I approach, Your Honor?

12            THE COURT:  Yes.

13   BY MR. STIEGLITZ:

14   Q   I'm going to hand you Defense exhibit 154.  Actually, you

15   know what I'll do instead of -- no, I can't do that.  Can't do

16   two things on the same screen, actually.

17            Why don't you just take a moment and look at Adriana

18   Giorgi's resume and compare it to the one that Mr. Stein just

19   introduced as Defense exhibit 154.  Take a look in particular

20   at those first two categories where it says, dedicated

21   customer service manager, respected builder and leader and

22   those areas of expertise.  Would you just tell the jury if

23   there's any similarity?

24   A   Yes, there is.

25   Q   In fact, is it more or less exactly the same?
```

```
 1    A    Pretty much, yes.

 2    Q    Mr. Carter, who was it who asked you to put a resume

 3    together to send to the company in, I believe Mr.~Stein asked

 4    you whether it was 2010, 2011, something like that?

 5    A    I believe it was Mr. Perkins.

 6    Q    And so did you have any conversations with Mr.~Stein about

 7    that, about putting a resume together?

 8    A    I don't remember 100 percent.

 9    Q    Okay.  Is it fair to say you may have gone on the Internet

10    to look for a template for a resume?

11    A    Yes.

12    Q    Okay.  And Mr.~Stein asked you about some of the items on

13    here, and I think -- well, fair to say some of the items on

14    Defense exhibit 154 are accurate.  And now actually, I think I

15    can use this document here, this thing.  I haven't done this

16    in a in a few days, so I may be even worse than I was before.

17            Mr. Carter, if you'd take a look, it's going to be on

18    the screen there in front of you.

19    A    Yes, I see.

20    Q    Bottom line, Mr. Carter, did you create this off the

21    Internet?

22    A    I believe I did.

23    Q    Okay.  And you had known Mr.~Stein for at least four or

24    five years by that time, right?

25    A    That's correct.
```

```
1    Q    So based on -- to your knowledge, would Mr.~Stein have

2    known if you were a dedicated customer service manager with

3    20-plus years of experience?

4    A    Would he have known?  No.

5    Q    He wouldn't have known one way or the other?

6    A    As far as I know, I wouldn't have said that, I don't

7    think.

8    Q    Would he have known if you had experience in front end

9    supervision or customer satisfaction enhancement?

10   A    Yes, he should know that.

11   Q    He would have known that?  And he would have known that

12   you didn't have that experience, wouldn't he?

13   A    Yes.

14   Q    Mr.~Stein knew you pretty well by that time, didn't he?

15   A    Yes, he did.

16   Q    Now, Mr. Carter, Mr.~Stein asked you a number of questions

17   yesterday about your arrest.

18   A    Uh-huh.

19   Q    Right?  Remember those questions?

20   A    Yes, sir.

21   Q    Now, let's, just for the purposes of clarification, back

22   in 2010, you were contacted by law enforcement trying to serve

23   you with a subpoena; is that right?

24   A    That's correct.

25   Q    And Mr.~Stein kept saying yesterday that you were
```

```
 1   contacted by the DOJ, right?

 2   A   Yes.

 3   Q   But that's not -- that wasn't what happened.  That was law

 4   enforcement that contacted you, right?

 5   A   That's correct.

 6   Q   I didn't contact you, right?

 7   A   No, you did not.

 8   Q   Mr. Muhlendorf didn't contact you?

 9   A   No, he did not.

10   Q   Now, when those law enforcement agents contacted you, you

11   told them you had an attorney, didn't you?

12   A   Yes, I did.

13   Q   And they didn't try to ask you any more questions, did

14   they?

15   A   That's correct.

16   Q   Now, a month or so after that you were arrested, right?

17   A   Yes.

18   Q   And, again, Mr.~Stein said a number of times yesterday, in

19   asking you questions, that the DOJ arrested you.  The DOJ

20   didn't arrest you, did they?

21   A   No, they did not.

22   Q   That was federal law enforcement, right?

23   A   Yes, it was.

24   Q   I didn't arrest you?  Mr. Muhlendorf didn't arrest you?

25   A   No, you did not.
```

1    Q    Okay.  And when you were arrested, in fact, the law

2    enforcement agents told you not to say anything, right?

3    A    That's correct.

4    Q    Okay.  And no one ever told you you couldn't talk to an

5    attorney, right?

6    A    No, that's correct.

7    Q    No one ever tried to ask you any questions outside the

8    presence of an attorney, right?

9    A    That's correct.

10   Q    No one ever tried to prevent an attorney from reaching

11   you, right?

12   A    That's correct.

13   Q    Mr. Carter, you were arrested for lying to the Securities

14   and Exchange Commission; isn't that right?

15   A    Yes, I was.

16   Q    Who were your attorneys when you lied to the SEC?

17   A    Jared Scharf and Mitchell J. Stein was an attorney.

18   Q    And, in fact, it was only when you went to court, right,

19   that the judge explained to you that you weren't to have

20   contact with Mr. Scharf and Mr.~Stein; isn't that right?

21   A    Yes, it is.

22   Q    But even so, even despite what the judge told you, when

23   you got to Washington, D.C. for your first hearing up there,

24   you had an opportunity to pick your attorney, right?  You had

25   the opportunity.  You could choose between Mr. Scharf, who was

```
 1   there in the SEC with you, and Mary Petras, the federal public
 2   defender up in DC, right?
 3   A   Yes, that's correct.
 4   Q   And who'd you choose, Jared Scharf or not Jared Scharf?
 5   A   Not Jared Scharf.
 6   Q   And I don't want to know what you've talked about with
 7   Ms. Petras.  She's your current attorney as well, right?
 8   A   Yes, she is.
 9   Q   I don't want to ask you what you talked about with her,
10   but did you talk to her before you decided to plead guilty?
11   A   Yes, I did.
12   Q   Did you plead guilty voluntarily, Mr. Carter?
13   A   Yes, I did.
14   Q   Did anyone coerce you into pleading guilty?
15   A   No, they did not.
16   Q   All right.  Now, Mr. Stein asked you a number of questions
17   yesterday afternoon, and -- well, a number of questions
18   yesterday afternoon, asking you questions about Advantage
19   Medical and the cables, the black cables, the gray cables, the
20   white cables.  Do you remember those questions?
21   A   Vaguely, yes, I remember them.
22   Q   Now, just as a very basic matter of timing, chronology,
23   Mr. Carter.
24   A   Okay.
25   Q   Whatever contact you had with Advantage Medical, that was
```

 1   long done by, let's start with 2007.  That was long done by

 2   2007; isn't that right?

 3   A   That's correct.

 4   Q   So certainly long done by 2008, when you start sending in

 5   those invoices and getting all those shares from the company?

 6   A   That's correct.

 7   Q   And whatever you did in connection with Advantage Medical,

 8   if you went to their building, if you dropped off some cables,

 9   in your judgment, did you do $2 million-worth of work for the

10   company with regard to Advantage Medical and these cables?

11   A   No, I did not.

12   Q   All right.  Now -- and I apologize, Mr. Carter, I'm kind

13   of jumping around here between topic areas, but Mr.~Stein also

14   asked you about -- he asked you some questions about that tax

15   return that we talked about on direct; is that right?

16   A   Yes, that's correct.

17   Q   That's your 2008 tax return?

18   A   Yes, it was.

19   Q   Now, I want to make sure I understand, make sure the jury

20   understands, I guess.  That tax return had something to do

21   with Five Knights Partnership, right?

22   A   Yes, I believe so.

23   Q   Is that what Mr.~Stein told you?

24   A   Yes.

25   Q   That's a totally different thing from Five Investments

1    Partnership, isn't it?

2    A   Yes, it is.

3    Q   Now, did Mr.~Stein ever tell you that he was claiming some

4    sort of tax writeoff for Five Knights Partnership on his tax

5    return?

6    A   I think so, but I don't remember.

7    Q   But he definitely said you had to, as well; is that right?

8    A   Yes.

9    Q   And he asked you whether -- Mr.~Stein asked you whether

10   you knew at the time it was a crime to defraud the IRS in

11   connection with a tax return.  Do you remember him asking you

12   that?

13   A   I don't remember him asking me that.

14   Q   Okay.  Well, then I'll withdraw that question.

15          Mr. Carter, Mr.~Stein also asked you several

16   questions about this red Mercedes with the wheels and

17   everything.  You remember that?

18   A   Yes, I do.

19   Q   Let's just talk about that for a minute.  Why don't you --

20   if you just explain to the jury when -- you said Mr.~Stein --

21   well, Mr.~Stein asked you how it was that you came to go pick

22   up a red Mercedes for him, and if you'd just remind us how it

23   was.  Did you get a call from Mr.~Stein?

24   A   Yes, I did.

25   Q   Where were you when you got that call?

```
 1   A    I was up in Orlando.

 2   Q    What were you doing in Orlando?

 3   A    With my wife, my daughter, and some relatives to spend a

 4   holiday there.

 5   Q    Were you at Disney World?

 6   A    Yes, we were at Disney World.

 7   Q    So fair to say you're on vacation?

 8   A    That's correct.

 9   Q    So you're on vacation.  You get a call from Mr.~Stein, and

10   Mr.~Stein tells you to do what?

11   A    He told me that he found a Mercedes, he wanted me to fly

12   to Chicago and buy it and bring it to California.

13   Q    Did you blow him off, say, come on, guy, I'm on vacation

14   with my family?

15   A    No, I did not.

16   Q    What'd you do?

17   A    He got me a plane ticket, I flew to Chicago, I went to the

18   dealership, bought the car, and he says I will pay you when

19   you get to California.  I drove it to California.

20   Q    By yourself?

21   A    By myself.

22   Q    And what happened when you got to California?  Did you

23   meet up with Mr.~Stein?

24   A    Yes, I drove to his house in Hidden Hills.

25   Q    And what, if any -- well -- and, now, Mr.~Stein suggested
```

 1   that that -- well, what did he -- did he offer to pay you when

 2   you got there?

 3   A   No, he did not.

 4   Q   Did Mr.~Stein have any -- did he use the car, though,

 5   while it was out there in California?

 6   A   When I left to come back to Florida, yes, he did use the

 7   car.

 8            MR. STIEGLITZ:  In fact, before I show this, before I

 9   publish this, I'll show it to defense counsel, what's been

10   marked for identification as Government's exhibit 214.

11            All right.  Your Honor, I'd go ahead and move 214,

12   then, Government's 214.

13            THE COURT:  Admitted without objection.

14       (Government Exhibit No. 214 entered into evidence.)

15   BY MR. STIEGLITZ:

16   Q   Mr. Carter, this will pop up on the screen, but I'll give

17   you -- actually, I'll go ahead and give you a copy.

18   A   Thank you.

19   Q   See if I can read it off the screen here.  And I'll

20   apologize to the jury that I didn't -- this was last-minute

21   addition.

22   BY MR. STIEGLITZ:

23   Q   In fact, Mr. Carter, is this an e-mail from Mr.~Stein to

24   you?

25   A   Yes, it is.

```
 1   Q   And the date of it is what, September 15th of '09; is that
 2   correct?
 3   A   Of '09, correct.
 4   Q   And what's he say in that first little section there?
 5   A   Said:  "Please get the front lights working and get us the
 6   red Mercedes back.  Front lights should be all bulbs working
 7   on timer.  Nobody else but you can do it.  Everybody else is a
 8   taker."
 9   Q   And then below that, he asks you to do some -- he asks you
10   to get him some sort of coffee drink.  I mean, is it fair to
11   say in September of '09 that's still the nature of your
12   relationship with him?
13   A   Yes, that's correct.
14   Q   You can keep that, Mr. Carter.
15           Now, at some point did Mr.~Stein tell you to bring
16   the car back to Florida?
17   A   He did not tell me, no.
18   Q   How did it come to be that the car got back to Florida?
19   A   Because I drove it because he says, that's your car, not
20   my car.
21   Q   And to that point, it being your car, not his car, the
22   reason you don't have that car today, right, is that you
23   voluntarily turned that over to the United States Government,
24   didn't you?
25   A   That's correct.
```

1   Q    And you did that because that car was the -- you believed

2   was the proceeds, was bought with the proceeds of what?

3   A    Of the money from Signalife, and tax return, yes.

4   Q    All right.  We'll take that exhibit down.

5         Mr.~Stein also asked you several questions about you

6   being out in Los Angeles and doing work for him out there.  Do

7   you remember those questions, Mr. Carter?

8   A    Yes.

9   Q    And Mr.~Stein asked you about doing legal work for him.

10  Do you remember him asking you that?

11  A    Yes.

12  Q    Now, when you were out in California with Mr.~Stein, you

13  weren't just doing legal work for Mr.~Stein, were you?

14  A    No.

15  Q    In fact, Mr. Carter -- well, and I think Mr.~Stein --

16  before I move on from that, Mr.~Stein, I believe asked you if

17  you had created some documents as part of that legal work that

18  you were doing for him; is that right?

19  A    Yes.

20  Q    And did you create some documents while you were out

21  there?

22  A    What he told me to, yes.

23  Q    Okay.  Let's -- I want to talk about one thing you were

24  doing while you were out in California, and I'll start out

25  with -- well, before we get there, I'm sorry.  The thing that

```
 1    you were doing -- one of the things you were doing for him,

 2    right, involved sending out some mailings to people, right?

 3    A    That's correct.

 4    Q    Trying to get people to send you and Mr.~Stein money,

 5    right?

 6    A    Correct.

 7    Q    And, in fact, Mr. Carter, wasn't the nature -- that was

 8    going to be basically a direct mail operation, right?

 9    A    That's correct.

10    Q    And Mr. Carter --

11          MR. STEIN:  Objection.  It's beyond the scope, and

12    I'd like to have a sidebar on it.

13          THE COURT:  All right.

14      (The following proceedings were held at sidebar:)

15          MR. STEIN:  This is the reason why I was going to

16    more detailed inquire of what happened in California with

17    regard to the legal work, and had they asked him this on

18    direct, I would have crossed.  They're now going to bring in

19    evidence of another entrepreneurial failed business venture,

20    and it's going to cause me to have to redirect him.  It hasn't

21    been talked about up to now.  It was -- it was -- I mean, I

22    think they can tell you what it is and agree with me.  It was

23    a mail order thing that was an idea that had two or three

24    e-mails involving it that never got off the ground.

25          THE COURT:  Okay.  Why are we going into it?
```

```
1              MR. STIEGLITZ:  Mr.~Stein elicited on

2    cross-examination that Mr. Carter was on all the -- with the

3    basis of it being I want the jury to understand the

4    relationship between me, Mr.~Stein, and Mr. Carter, elicited

5    this testimony about what was going on in LA and suggested

6    that it was going to be -- that it was this legal work.  And

7    what we had objected to was that he was going to then go down

8    the road of, oh, I was suing the banks.

9              This is going to be testimony about exactly what was

10   going on out there, which was, in fact, a direct mail scheme,

11   which we -- frankly, bordered or mail fraud if not was mail

12   fraud using fake documents with fake people.  It's plainly

13   404(b).  It was disclosed to Mr.~Stein well in advance of

14   trial, that we might introduce evidence of this.  And given

15   that he's put in issue what was going on out in California

16   when Mr. Carter was out there --

17             THE COURT:  Let's just stay away from it.  It's just

18   going to open up a whole other line of questioning and require

19   more redirect examination -- I mean recross examination, and

20   it's a different fraud, and I don't think we need to go there.

21             MR. STIEGLITZ:  Understood, Your Honor.

22        (Sidebar conference concluded.)

23   BY MR. STIEGLITZ:

24   Q   Mr. Carter, now, Mr.~Stein showed you Government's

25   exhibit 132, which is in evidence.  If we can take a look at
```

1   that, please.  And Mr.~Stein showed you the top half of this

2   document.

3   A    Could you blow that up for me, please?

4   Q    Absolutely, Mr. Carter.

5          And Mr.~Stein asked you a number of questions about

6   this $180,000 wire to M&C Electrical, didn't he?

7   A    Yes.

8   Q    And you remember getting that $180,000 wire from

9   Signalife?

10   A    I believe so, but I'd have to look at the records.

11   Q    Okay.  Now, let's look at the part of the e-mail that

12   Mr.~Stein didn't ask you about, which is the second half of

13   the e-mail.  Who's that e-mail from?

14   A    From Lowell Harmison to Tracy Jones and Mitchell Stein.

15   Carbon copy Mitchell Stein.

16   Q    And Mr. Carter, is it fair to say this is Dr.~Harmison

17   giving instructions to send that wire; is that right?

18   A    Yes.

19   Q    And what's he say at the bottom?

20   A    "Per Mitch's instructions."

21   Q    Now, Mr. Carter, did you -- once you got this wire, do you

22   remember what you did with this $180,000?

23   A    Yeah, I wired it to Mitchell Stein or to wherever he told

24   me to wire it to.

25   Q    Do you remember wiring that amount and more to the Five

1   Investments Partnership?

2   A   Yes.

3   Q   And just to be clear, who controlled what happened to the

4   money in the Five Investments Partnership?

5   A   Mitchell J. Stein.

6   Q   Now, just looking at that e-mail, does it say anywhere in

7   there that this $180,000 to M&C Electrical is going to go to

8   the -- ultimately go to the Five Investments Partnership

9   account?

10   A   No, it does not.

11   Q   Does it say anything in there about, oh, by the way, this

12   money is actually going to an account that Mitchell Stein

13   controls?

14   A   Does it say it on there?

15   Q   Does it say it on there, Mr. Carter?

16   A   Not that I can see.

17   Q   Now, Mr.~Stein also --

18          MR. STIEGLITZ:  Thank you.  We can take that down.

19   BY MR. STIEGLITZ:

20   Q   And Mr.~Stein also asked you several questions about a TD

21   Ameritrade account application.  Do you remember those

22   questions?

23   A   Yes, I do.

24   Q   And that was for the Five Knights Revocable Living Trust,

25   or something like that?

```
 1    A    That's correct.

 2    Q    In September of 2008?

 3    A    Yes.

 4    Q    Now, let's just be absolutely clear, Mr. Carter.  That

 5    account, that wasn't the account that you were talking about

 6    earlier that you got those Signalife shares into, sold them,

 7    sent the money to Mr.~Stein back in early 2008, right?

 8    A    That's correct.

 9    Q    Totally different account that Mr.~Stein was asking you

10    about, right?

11    A    That's correct.

12    Q    That money, that $180,000 and the rest of the money that

13    you were invoicing Signalife for, who told you to send those

14    invoices to ask Signalife for that money?

15    A    Mitchell J. Stein.

16    Q    And once you got that money, where'd you send it, most of

17    it?

18    A    To wherever he told me to send it.

19    Q    Did you ever tell Signalife you were doing that?

20    A    No, I did not.

21    Q    Why not?

22    A    Because I was told not to.

23    Q    By whom?

24    A    Mitchell J. Stein.

25    Q    Now, I just have two other things I want to ask you about.
```

1    And the first is your SEC testimony.  Now, Mr.~Stein read you

2    a number of selections from your SEC testimony; is that right?

3    A    Yes, he did.

4    Q    And just to remind us, did you tell the truth or did you

5    lie in the SEC?

6    A    I lied.

7    Q    And who told you to lie in the SEC?

8    A    Mitchell Stein.

9    Q    And Mr.~Stein read you -- well, let's take a look.

10         Mr.~Stein read you -- I'm going to just pull a couple

11   of these that he read to you.  Mr.~Stein read you a section

12   talking about DB15 gold pins.  Do you remember that?

13   A    Yes.

14   Q    And he asked if you that was anywhere in that placemat of

15   notes.  Do you remember him asking you that?

16   A    I think so, yes.

17         MR. STIEGLITZ:  If we can just pull up Government's

18   exhibit 238, please.

19   BY MR. STIEGLITZ:

20   Q    Again, would you just remind the jury what this is?

21   A    The DB15?

22   Q    Exhibit 238, Mr. Carter.

23   A    This is a document that I wrote on a placemat at a

24   restaurant.

25   Q    And what you're writing down, is that things you're making

```
 1   up or those things that somebody is telling you?
 2   A   Those are dictated to me by Mitchell J. Stein.
 3   Q   Let's just look at the second page there, and let's
 4   look --
 5           MR. STIEGLITZ:  May I approach the screen, Your
 6   Honor?
 7   BY MR. STIEGLITZ:
 8   Q   Let's just look up at the top left, Mr. Carter.  Do you
 9   see there talking about cables in bags with no labels and
10   DB15?
11   A   Yes, I see it.
12   Q   Is that something -- Mr.~Stein did tell you to talk about
13   the DB15, didn't he?
14   A   Yes, he did.
15   Q   Now, Mr.~Stein also asked you several questions, or,
16   excuse me, about several passages of your SEC testimony where
17   you talk about Lowell Harmison giving you directions about a
18   reseller network; is that right?
19   A   Yes.
20   Q   And, again, those statements, when you made them to the
21   SEC, were they true or were they lies?
22   A   They were a lie.
23   Q   In fact, let's just look at the first page of the exhibit.
24   About two thirds of the way down, you see a section in that
25   right column -- we may have looked at it yesterday -- where it
```

```
 1   says "he wanted me to start opening a manufacturing facility

 2   in Ohio," talking about Lowell Harmison.  You see that,

 3   Mr. Carter?

 4   A   I can't see it yet.

 5   Q   See that, Mr. Carter?

 6   A   Yes, I do.

 7   Q   And on the next page, Mr. Carter, just below the section

 8   we just talked about:  "Then March or April, took him to

 9   offices.  He told me, quote, that he was" -- what's that word,

10   Mr. Carter?  He was what?

11   A   Ecstatic, I guess.

12   Q   "Ecstatic, and told the company has sales of a hundred

13   thousand units."

14            Is that approximately what that says, Mr. Carter?

15   A   Yes, it does.

16   Q   So when Mr.~Stein read your SEC deposition where you're

17   saying "I was very excited because there were going to be

18   50,000 to a hundred thousand units sold," why were you saying,

19   that, Mr. Carter?

20   A   Because I was told to by Mitchell Stein.

21            MR. STIEGLITZ:  Court's indulgence just a moment.

22   BY MR. STIEGLITZ:

23   Q   Now, Mr. Carter, Mr.~Stein asked you about several

24   documents, including some e-mails from 2011.  Do you remember

25   that?
```

```
 1    A    Yes.

 2    Q    I want to pull up a couple Government exhibits Mr.~Stein

 3    didn't ask you any questions about.  Well, you can tell the

 4    jury if he asked you any questions about them.

 5    A    Okay.

 6    Q    Let's pull up Government's exhibit 64 already in evidence.

 7    Did Mr.~Stein ask you a single question about this?

 8    A    No.

 9    Q    How about Government's exhibit 70, please.  Did he ask you

10    a single question about this document?

11    A    No, he did not.

12    Q    How about Government's exhibit 74?  Did Mr.~Stein ask you

13    a single question about this document?

14    A    No, he did not.

15    Q    Now, you and I on your direct examination yesterday

16    morning, I guess, talked about Government's exhibit 129,

17    right?

18    A    Yes.

19         MR. STIEGLITZ:  Can we pull that up, please?

20    BY MR. STIEGLITZ:

21    Q    And just looking back at that document and the second page

22    it, please.  Do you remember talking about this document,

23    Mr. Carter?

24    A    Yes, I do.

25    Q    And that's a fax that Mr.~Stein told you to send?
```

```
 1   A    Yes.

 2   Q    Did he ask you a single question about it?

 3   A    No.

 4   Q    What about any of the other faxes that Mr.~Stein asked you

 5   to send?  Did he ask you a single question about that?

 6   A    No, not that I know.

 7   Q    What about the picking up of the boxes in Ohio?  Did you

 8   talk about that at all on your cross-examination with

 9   Mr.~Stein?

10   A    No, I did not.

11   Q    What about the cancellation letter that you put together?

12   Did you talk about that at all on your cross-examination?

13   A    No, I did not.

14   Q    What about those letters talking about you having stock

15   held in trust?  You remember those letters?

16   A    Yes.

17   Q    Did you talk about that at all on your cross-examination?

18   A    Not that I can remember.

19   Q    And just one last document, exhibit 161.  Do you remember

20   talking about this document on direct, Mr. Carter?

21   A    Yes.

22   Q    And if we can just take a look at the fourth page of that

23   exhibit.  You remember looking at those attachments to that

24   document?

25   A    Yes, I do.
```

```
 1    Q    Mr.~Stein didn't ask you anything about this -- these

 2    documents, did he?

 3    A    No, he did not.

 4              MR. STIEGLITZ:  Nothing further, Your Honor.

 5              THE COURT:  Thank you.

 6              MR. STEIN:  Your Honor, I've got, in view of one area

 7    he opened, I've got to ask one question.

 8              THE COURT:  All right.

 9              MR. STEIN:  I apologize.

10                        Recross-examination

11    BY MR. STEIN:

12    Q    Mr. Carter, Mr. Stieglitz just asked you if Five

13    Investments Partnership and Five Knights Partnership had

14    anything to do with one another.  Do you remember that?

15    A    Yes.

16    Q    You said no, right?

17    A    Yes.

18              MR. STEIN:  I'm going to offer into evidence

19    exhibit 19, Defendant's exhibit 19.

20              May I approach, Your Honor?

21              THE COURT:  Yes.

22              MR. STEIN:  Thank you, Your Honor.

23    BY MR. STEIN:

24    Q    We just want to know if that's your signature and initials

25    on the bottom of the pages.
```

```
1   A    Yes, those are my signatures.

2              MR. STEIN:  Offer it.

3              MR. STIEGLITZ:  No objection.

4              THE COURT:  Admitted, Defendant's 19, without

5   objection.

6         (Defense Exhibit No. 19 entered into evidence.)

7              MR. STIEGLITZ:  Mr.~Stein, do you mind reading the

8   Bates numbers out, the last four of them?

9              MR. STEIN:  Yes, it's Bates 1228 through 1234.

10             MR. STIEGLITZ:  Thank you.

11  BY MR. STEIN:

12  Q   Mr. Carter, just very quickly, I'm not going to publish

13  this because it's just one sentence, can you read the first

14  sentence of paragraph 1?

15  A    "Name and docile.  The name of the partnership shall be

16  Five Knights Partners."

17  Q    Thank you.

18             Can you please read, as the penultimate question, the

19  last page that you signed?

20  A    Where do you want me to read?

21  Q    Just the typewritten.

22  A    "With respect to Five Investment Partners, this shall

23  clarify and confirm that any decisions about the brokerage

24  account or the writing of funds for such brokerage accounts of

25  Five Investment Partnership shall be made exclusively by the
```

 1   managing partner of Five Investment Partnership."

 2   Q   So this document talks about Five Knights Partners and

 3   Five Investment Partnership, right?

 4   A   Yeah, I guess it does.

 5   Q   Does this refresh your recollection that they were the

 6   same partnership or not?

 7   A   Can I look at them one more time, please?

 8   Q   Absolutely.

 9   A   Yes, I believe they would be.

10         MR. STEIN:  No further questions, Your Honor.

11         THE COURT:  Thank you.

12         MR. STIEGLITZ:  May I just ask one follow-up on that?

13         THE COURT:  Yes.

14         MR. STIEGLITZ:  We don't have it electronically.  Do

15   you have it electronically?

16         Oh, I can just use the overhead.

17                     Redirect Examination

18   BY MR. STIEGLITZ:

19   Q   Mr. Carter, I'm going to put up the last page of Defense

20   exhibit 19 that you were just reading from.  Actually, I

21   apologize.  This has not been redacted.  We'll fix it before

22   it gets back.

23         Mr. Carter, just read the handwritten portion,

24   please.

25   A   "Mr.~Stein is in control of money and stocks wired.  Here

1   are my FDL and Justice Department badge."

2   Q    And Mr. Carter, that's the last page of the document that

3   Mr.~Stein just handed you, right?

4   A    That's correct.

5            MR. STIEGLITZ:  Nothing further, Your Honor.

6            MR. STEIN:  Nothing further.

7            THE COURT:  Thank you, sir.  You're excused.  Watch

8   your step.

9            MR. STIEGLITZ:  May Mr. Carter be released

10  permanently?

11           THE COURT:  Yes?

12           MR. STEIN:  No objection.

13           THE COURT:  All right.  Yes.

14           MR. STIEGLITZ:  Thank you, Your Honor.

15           THE WITNESS:  So I'm excused?

16           THE COURT:  Yes.

17           Next witness.

18           MR. MUHLENDORF:  Your Honor, the Government calls

19  Jamie Yafa.

20           THE COURT:  Sir, would you raise your right hand,

21  please.

22            Jamie Yafa, Government's witness, sworn.

23           THE COURT:  Please be seated.

24           MR. MUHLENDORF:  Your Honor, if I could approach and

25  switch out the binders?

```
 1                    THE COURT:  Yes.

 2              Sir, if you could tell us your name, please, and

 3     spell your first and last names for us.

 4                    THE WITNESS:  My name is Jamie Yafa.  First name is

 5     J-a-m-i-e, last name Yafa, Y-a-f-a.

 6                    MR. MUHLENDORF:  And, Your Honor, if I could go ahead

 7     and move in a few exhibits we've already agreed to.

 8                    THE COURT:  All right.

 9                    MR. MUHLENDORF:  104, 108, and 110 the Government

10     would move into evidence.

11                    THE COURT:  Any objections, Mr.~Stein?

12                    MR. STEIN:  No objections, Your Honor.

13                    THE COURT:  They'll be admitted without objection.

14          (Government's Exhibit No. 104, 108, and 110 entered into

15     evidence.)

16                    MR. MUHLENDORF:  May I proceed?

17                    THE COURT:  Yes.

18                              Direct Examination

19     BY MR. MUHLENDORF:

20     Q   Good afternoon, Mr. Yafa.

21              In what city and state do you reside?

22     A   St. Cloud, Florida.

23     Q   And if you would speak into the microphone and slowly so

24     we don't --

25                    THE COURT:  You can move it towards you, sir.
```

```
 1              THE WITNESS:  Okay.
 2   BY MR. MUHLENDORF:
 3   Q    How old are you, Mr. Yafa?
 4   A    I am 34.
 5   Q    Okay.  And if you could give the jury a little bit about
 6   your educational background.
 7   A    I got my GED.
 8   Q    Okay.  Do you have any training as an electrical engineer?
 9   A    Absolutely not.
10   Q    Okay.  Do you ever do any work on~-- as an electrical
11   contractor?
12   A    Absolutely not.
13   Q    Did you ever work on anything like a heart monitor?
14   A    Absolutely not.
15   Q    Now, since you don't do all those things, what do you do
16   for a living?
17   A    I raise investor awareness for publicly traded companies.
18   Q    And the members of the jury might not be familiar with
19   what that means.  Can you just give a brief description of how
20   you go about doing that?
21   A    I raise awareness for these companies.  I add new
22   investors, you know, to their roster, help companies raise
23   investor awareness, bring up the stock price, things like
24   that.
25   Q    Okay.  You said bring up the stock price?
```

```
 1    A    Yes.

 2    Q    Now, do you organize publications?

 3    A    Yes.

 4    Q    Are you familiar with a company known as Signalife?

 5    A    I am.

 6    Q    And how did you come into contact with Signalife?

 7    A    I met Signalife through a few of my associates by the name

 8    of David Vandervort and Frank Pena.

 9    Q    Now, were you ultimately hired to do some work for

10    Signalife?

11    A    Yes, I was.

12    Q    Who hired you to do the work?

13    A    Mitch Stein.

14    Q    So you're familiar with the Defendant, Mr.~Stein?

15    A    I am.

16    Q    Let me finish before you answer.  Okay?  It causes

17    problems with the court reporter.

18            Now, how did you get in contact with Mr.~Stein with

19    regard to Signalife?

20    A    I first got in contact with Mitch through David Vandervort

21    and Frank Pena.  We had set up an initial conference call.

22    Q    And when about was this?

23    A    Late 2007, early 2008.

24    Q    You said you had a call, right?

25    A    Yes.
```

1    Q    Did Mr.~Stein ask you anything about yourself or to do

2    anything on the call, either of those things?

3    A    Yeah, we talked about our backgrounds, got to know each

4    other a little bit, and what they were trying to do with

5    Signalife, where the company was going and what their future

6    was going to be.

7    Q    Did they talk about what they wanted -- did they want you

8    to do something?

9    A    Yes.

10   Q    And what did Mr.~Stein say he wanted you to do?

11   A    He wanted me to raise awareness for the company.

12   Q    Okay.  And, again, is that involved in getting a stock

13   price up?

14   A    It is.

15   Q    Now, what did you understand Mr.~Stein's role to be, or

16   did you have an understanding of Mr.~Stein's role when you

17   talked to him on that phone call?

18   A    I understand his role was counsel for the company.

19   Q    Now, after that initial call, was there a subsequent call?

20   A    Yeah, we had set up another couple calls over the next few

21   days.

22   Q    Okay.  And what'd you talk about on those calls?

23   A    More getting to know each other, more about Signalife and,

24   you know, what the company was all about, and, again, what

25   their future ideas were and where they wanted to be.

1    Q    At any time during these conference calls did Mr.~Stein

2    ask you to do any sort of work of an electrical nature?

3    A    Not in a million years.

4    Q    Did he ever ask you to work for someone named Martin

5    Carter?

6    A    Not in a million years.

7    Q    Did he ever mention Martin Carter?

8    A    No.

9    Q    Now, did you on one of these calls come to an agreement

10   with Mr.~Stein about working for Signalife?

11   A    Yes.

12   Q    Okay.  Tell the jury about that, what the terms were, what

13   you were going to be paid, that sort of thing.

14   A    I explained to him that it would be in free-trading

15   shares.  That's my compensation.  Stressed that it has to be

16   free trading, and I came upon what the budget was going to be.

17   I told him it was going to be around 247,000 shares.

18   Q    And just to explain to the jury what the term

19   "free-trading" means?

20   A    Free-trading shares.  That's not restricted.  It can be

21   sold in the open market, and that's free-trading shares.

22   Q    So did you explain to -- did Mr.~Stein understand that you

23   were going to sell the shares?

24   A    Absolutely.

25   Q    Did Mr.~Stein agree to your terms of 247,000 free-trading

```
 1   shares?
 2   A    Yes.
 3   Q    Did he have to ask anyone?
 4   A    No.
 5   Q    Did he check with anyone that you know of?
 6   A    No.
 7   Q    In your dealings with Mr.~Stein at that point and going
 8   forward, did he indicate to you the level of control he had in
 9   the company?
10   A    He didn't really indicate it, but it was -- you know, it
11   was (sic) aware that he was counsel.
12   Q    Did he say he needed anyone's approval to negotiate
13   contracts with you?
14   A    No.
15   Q    Now, in doing your work, did you come to an agreement?
16   A    Yes.
17   Q    Okay.  And did you hire anyone to help you?
18   A    Yes, I did.
19   Q    Okay.  And who were they?
20   A    I hired Bob Lurea, which was an associate of mine, and
21   also David Ryan, which is an online newsletter, which is
22   Stocks That Rock.
23   Q    Stocks That Rock?
24   A    That Rock.
25   Q    And were Lurea or Ryan going to do anything related to
```

```
 1    electrical work?

 2    A    Not in a million years.

 3    Q    Were they going to do anything related to Martin Carter?

 4    A    No.

 5    Q    Did the two names, Lurea and Ryan and Martin Carter ever

 6    come up in a conversation you had with Mr.~Stein?

 7    A    Never.

 8    Q    Now, in your book there's an exhibit 110, which has

 9    already been admitted into evidence.  And what is exhibit 110,

10    Mr. Yafa?

11    A    It was a cert.

12    Q    110, if you go a little further in your book.

13    A    Sorry.

14    Q    That's okay.

15    A    This is a consulting agreement.

16    Q    Now, the consulting agreement's dated what?

17    A    It is February 13th, 2008.

18    Q    Okay.  Actually, I think, does it say Februarty?  Is that

19    what that says?

20    A    Yes, it does.

21    Q    And who is it between?  If you could read the parties

22    there.

23    A    It is between Evie Muscillo and Signalife.

24    Q    Okay.  Who is Evie Muscillo?

25    A    That is my fiance'.
```

```
 1    Q    Is this the contract we were just talking about that you

 2    were going to get paid the 247,000 shares for?

 3    A    Yes, it is.

 4    Q    Why is Evie Muscillo on the contract and not you or your

 5    company or something like that?

 6    A    She takes care of all the administrative for the business.

 7    Q    Now, if we look at the second paragraph of the agreement,

 8    the second whereas, do you see that?  Whereas -- do you see

 9    that where it says the whereas there?

10    A    Yes.

11    Q    And consultant provides various mergers and

12    acquisition-related services?

13    A    Yes, I see it.

14    Q    Okay.  Is that correct?

15    A    That's not correct.

16    Q    Why is that in this document?

17    A    This was a template that was given to me from Bob Lurea,

18    and there was a basic template.  The only thing we really

19    plugged in was Evie put in her name and the actual date and

20    Signalife.

21    Q    Did you review this before you had it -- well, who asked

22    you to send it to them?

23    A    Mitch.

24    Q    Did you review it before you sent it to Mitch?

25    A    Not really, no.
```

1    Q    If we look at the fourth page of the exhibit, whose

2    signature is that on the right?

3    A    Evie Muscillo's.

4    Q    And, again why is her signature on the document?

5    A    Because she handles all the administrative end of the

6    business.

7    Q    And do you know whose signature that is on the left?

8    A    I believe that was Mitch's.

9    Q    Okay.  Well, when -- did you send the document to

10   Mr.~Stein with Ms. Muscillo's on it?

11   A    Yes.

12   Q    Did you get it back like that with the signature?

13   A    I did, yes.

14   Q    Did you ever talk to anyone else about this contract other

15   than Mitch Stein?

16   A    I did not.

17   Q    Now, you mentioned the number 247,000 shares.  Did you

18   receive 247,000 shares?

19   A    I did.

20   Q    If we could look at exhibit 104 in your binder.  Do you

21   recognize 104?

22   A    I do.

23   Q    So just explain to the jury what we're looking at here in

24   104.

25   A    This is a cert for Signalife for 247,000 shares that I was

1    sent from Mitch.

2    Q    And, again, this came from Mr.~Stein?

3    A    Yes, it did.

4    Q    And the name, Evie Muscillo, that was on there when you

5    got the stock certificate?

6    A    Yes, it was.

7    Q    Had you talked to anyone else at Signalife about Evie

8    Muscillo?

9    A    No.

10   Q    Only Mr.~Stein?

11   A    Only Mitch.

12   Q    Now, you notice the date on this one is slightly before

13   that contract, correct?

14   A    Correct.

15   Q    Did you and Ms. Muscillo try and deposit this stock

16   certificate?

17   A    Yes, we did.

18   Q    And what happened?

19   A    She tried to deposit, and it was rejected.

20   Q    Well, when it was rejected, did you make some attempt to

21   try and get paid?

22   A    Yes.

23   Q    And who did you contact?

24   A    I contacted Mitch Stein.

25   Q    And what happened when you told him this stock certificate

1    wouldn't work?

2    A    I explained to him that they weren't taking the cert, it

3    was something to do with the signatories.  They said something

4    like they couldn't have two signatories on there or something.

5    I explained that to him.  It made more sense to him, and he

6    said he would take care of it and overnight me another cert.

7    Q    Okay.  Let's look at exhibit 108.  Do you recognize 108?

8    A    I do.

9    Q    What is 108?

10   A    That is also a cert for Signalife in the amount of 247,000

11   shares.

12   Q    Is this the cert you received after talking with

13   Mr.~Stein?

14   A    Yes.

15   Q    Did you talk to anyone else at Signalife about the

16   problems you were having with the initial certificate?

17   A    I did not.

18   Q    What did you and Ms. Muscillo do with this stock

19   certificate once you received it?

20   A    Once we received it, we sent it to the brokerage and

21   deposited it.

22   Q    Now, did you have any conversations with Mr.~Stein after

23   depositing this stock about the progress of your work?

24   A    Yes.

25   Q    And did he tell you anything about the progress of your

1    work?

2    A    We talked back and forth about the progress, and we spoke

3    fluidly throughout the week.

4    Q    Was he -- this is -- and, again, this is back in,

5    according to that stock certificate, February-March of 2008;

6    is that right?

7    A    Yes.

8    Q    Now, was he pleased with your work?

9    A    He was pleased.

10   Q    Again, you mentioned earlier the stock price going up.

11   Was that happening?

12   A    It was happening.

13   Q    And did Mr.~Stein express an opinion on what he thought

14   about that?

15   A    He did.

16   Q    And what was his opinion of the stock price moving up?

17   A    He was happy the stock price was moving up.  I don't

18   remember the exact price.  I think it was something like maybe

19   90 cents and it moved up like five, six, seven, eight cents

20   and kind of fluctuated back and forth, but the volume, there

21   was a lot of volume in there.

22   Q    And volume is what?

23   A    Meaning shares are traded.

24   Q    Now, after this initial bit of work with the 247,000

25   shares, did you have any other meetings with Mr.~Stein?

```
 1   A    Yeah, we had set up a meeting for the second tranche for

 2   the investor -- second tranche for the second awareness

 3   campaign with him in Boca Raton and also to talk about other

 4   future endeavors they wanted to get listed on the Frankfurt

 5   exchange.

 6   Q    Did Mr.~Stein make any statements to you about -- well,

 7   did he ask you to set up a meeting?

 8   A    Yes.

 9   Q    Did he make any statements to you about how he was going

10   to arrive at this meeting?

11   A    That meeting -- this meeting was in Boca Raton, so that's

12   the next one that we actually met in Boca.

13   Q    Did he tell you about -- asking about an airfield?

14   A    Yeah, the airfield was when he was coming actual into

15   Orlando.  He asked me to set up -- well, actually to find the

16   local airfield for his jet that could receive a private jet,

17   and I did.

18   Q    Did that second meeting ever happen?

19   A    That meeting did not take place in Orlando, but the

20   meeting did happen in Boca Raton.

21   Q    Now, I'm going to show you what's been marked as

22   exhibit 161.  It's already in evidence.

23        Now, if we could go to the fourth page of the

24   exhibit.  Do you recognize the fourth page of 161?

25   A    I do.
```

```
 1    Q    Okay.  And what is the fourth page there?  What are we
 2    looking at?
 3    A    This was a basic -- well, I took it as a consulting
 4    agreement, but basic acknowledgment that I received shares of
 5    Signalife from Mitch Stein.
 6    Q    So you thought this was from Mitch Stein?
 7    A    Yeah, he sent it to me.
 8    Q    And who signs it there?
 9    A    Evie Muscillo.
10    Q    Now, it says on the document:  "I am providing consulting
11    services to EC as mutually agreed."
12              Do you know who EC is?
13    A    I do not.
14    Q    Did the name Electrical Connections ever come up in your
15    conversations with Mr.~Stein?
16    A    It never did.
17    Q    Did the name Martin Carter ever come up in your
18    conversations with Mr.~Stein?
19    A    Never in a million years.
20    Q    Now, if we look at the third page of the exhibit, there's
21    a very similar document.  Do you see that?
22    A    Yes.
23    Q    Did you also receive that from Mr.~Stein?
24    A    Yes.
25    Q    Okay.  And what did you do with it?
```

```
 1    A    This one I believe I -- we put it into our files.

 2    Q    Did you send it to -- is there a name on the bottom there?

 3    A    David Ryan, yes.

 4    Q    Is that one of the people we talked about earlier?

 5    A    It is.

 6    Q    Did you send this document to Mr. Ryan?

 7    A    I believe I did, yes.

 8    Q    And did you -- did he sign it and send it back?

 9    A    Yes.

10    Q    Okay.  And then, what did you do with it?

11    A    Just kept it in the file.

12    Q    Did you send it back to Mr.~Stein?

13    A    Yes.

14    Q    And then on the second page of the exhibit, we won't go

15    through it in detail, but was it the same scenario, you

16    received it from Mr.~Stein, you sent it off to be signed and

17    it came back?

18    A    Yes, I did.

19    Q    What did you do with this one?

20    A    Just kept it in the file.

21    Q    Did you send it back --

22    A    Yes, I sent it back to Mr.~Stein.

23    Q    So, now, let's look at the first page of exhibit 161.

24              Now, before coming to testify today, did you have a

25    chance to look at this exhibit?
```

```
 1   A    Yes.

 2   Q    So the e-mail there, MJS, do you know who that is from?

 3   A    I do not.

 4   Q    Is that Mr.~Stein's e-mail, MJS, Mitchell J. Stein?

 5   A    It looks like it, yes.

 6   Q    And do you see John Woodbury there?  Do you know who that

 7   is?

 8   A    I do not.

 9   Q    Now, you see at the bottom it says Mitch.  See the last

10   line there?

11   A    Yes.

12   Q    Okay.

13   A    I see it.

14   Q    Okay.  Now, Mr.~Stein writes to someone named

15   Mr. Woodbury:

16        "You asked me for the relationship between these two

17   people and EC, paren, Carter.  They sent me this by e-mail

18   late last night.  He says he has worked with these people for

19   years and does not keep any other documents in their records,

20   but these are pretty clear.  They are income to EC and the

21   work was already done, paren, according to EC, closed paren.

22   Mitch."

23        Now, Mr. Yafa, where he says "these two people"-- a

24   relationship between these two people and EC or Carter, any of

25   the people we just looked at, Ryan, Muscillo or the other one,
```

```
 1   which was, I think hard to read, did that have any -- did you
 2   have anything to do with EC or Martin Carter?
 3   A    Absolutely not.
 4   Q    Did you ever give Mr.~Stein any reason to think you had
 5   anything to do with someone named Martin Carter?
 6   A    Absolutely not.
 7   Q    Did you ever tell Mr.~Stein any -- that you or any of your
 8   subcontractors would be working on heart monitors?
 9   A    Absolutely not.
10   Q    Would you even know how to do that?
11   A    Never in a million years.
12        MR. MUHLENDORF:  Okay.  Now, I want to play a couple
13   clips, clip 52, which is July 8th, 2010, page 931:19, to 933,
14   line 21.
15        (Audio played.)
16        MR. MUHLENDORF:  And if we could play briefly clip
17   53, which is the same date, July 8th, 2010, page 935, line 3,
18   to 935, line 23 of Mr.~Stein's testimony.
19        (Audio played.)
20   BY MR. MUHLENDORF:
21   Q    Now, Mr. Yafa, you've just heard a couple clips from
22   Mr.~Stein testifying under oath to the Securities and Exchange
23   Commission.
24        Who had the most knowledge about why the shares were
25   issued to Evie Muscillo?
```

```
 1   A    Mitch Stein.

 2   Q    And to your knowledge, did Dr.~Harmison or anyone else

 3   have more knowledge than Mitch Stein about what was going on

 4   with you and your project?

 5   A    Absolutely not.

 6   Q    Did Mr. Carter have anything to do with the shares issued

 7   to Evie Muscillo?

 8   A    Absolutely not.

 9   Q    Who knew the nature of the work that was the reason for

10   the issuance of those shares to Evie Muscillo?

11   A    Mitch Stein.

12   Q    And was Mr.~Stein's testimony that you just listened to,

13   was that accurate?

14   A    That was accurate.

15   Q    It was --

16   A    Well, he's saying that he didn't know it was not accurate.

17   I mean I had never heard that in a million years.  It makes no

18   sense to me.

19   Q    Was what Mr.~Stein telling the SEC true?

20   A    Not in a million years, no.

21            MR. MUHLENDORF:  Answer any questions Mr.~Stein might

22   have.

23            THE COURT:  We'll take a recess before the

24   cross-examination.

25            Ladies and gentlemen, we'll take our 15-minute
```

```
 1    recess, please don't discuss the case, and we'll see you in 15

 2    minutes.  Thank you.

 3              And as I mentioned, we'll be leaving at 4:30 today.

 4       (The jury exits the courtroom.)

 5              THE COURT:  Sir, if you would not discuss your

 6    testimony during the recess, please.  If you would be back in

 7    15 minutes.  Thank you.

 8              THE WITNESS:  Absolutely.

 9        (A recess was taken from 2:50 p.m. to 3:05 p.m., after

10    which the following proceedings were had:)

11              THE COURT:  All right.  We ready to go?

12              MR. STIEGLITZ:  Yes, Your Honor.

13              THE COURT:  Mr.~Stein?

14              MR. STEIN:  Yes.

15              THE COURT:  Let's bring the jurors in.  If we could

16    have our witness back, please.

17              Sir, you're still under oath.

18        (The jury enters the courtroom, after which the following

19    proceedings were had:)

20              THE COURT:  Welcome back, everyone.  Please be

21    seated, ladies and gentlemen.

22              All right.  Mr.~Stein, you may cross-examine.

23              MR. STEIN:  Thank you, Your Honor.

24                           Cross-examination

25    BY MR. STEIN:
```

```
1    Q    Good afternoon, Mr. Yafa.

2    A    Good afternoon.

3    Q    You and I have met in person one time; is that correct?

4    A    That is correct.

5    Q    Was anybody else at that meeting?

6    A    Yes, myself and Vincent Ramatar.

7    Q    Who is Vincent Ramatar?

8    A    He's a gentleman from Canada.

9    Q    On your direct examination you mentioned two other people

10   who worked with you and then you mentioned your fiance'.  Do

11   you recall that generally?

12   A    Yes.

13   Q    What are the names of those people again?

14   A    David Ryan and Bob Lurea.

15   Q    And your fiance's name is?

16   A    Evie Muscillo.

17   Q    To the best of your knowledge, I've never met any of these

18   people in person; is that correct?

19   A    Except for Vincent Ramatar.

20   Q    At that one meeting?

21   A    Yeah.

22   Q    You, Mr. Yafa, said on direct that you never talked to

23   anyone about this consulting agreement from Signalife other

24   than me, that I was the main point of contact; is that right?

25   A    Yes.
```

```
 1              MR. MUHLENDORF:  Objection, Your Honor, that's not

 2   what he said.

 3              THE COURT:  Overruled.

 4              You can answer whether it's true or not.  Is that

 5   correct?

 6              THE WITNESS:  Can you ask me one more time?

 7   BY MR. STEIN:

 8   Q   You said on direct that you never talked to anyone about

 9   this contract from Signalife other than me.  I was your point

10   of contact; isn't that correct?

11   A   Yes.

12   Q   And as you sit -- as you sit here today, you're not aware

13   of anybody at Signalife having any understanding of the

14   contractual relationship other than me; is that right?

15   A   That's right.

16              MR. STEIN:  Deposition testimony before the United

17   States Securities and Exchange Commission, dated October 8th,

18   2010, page 58, lines 22 through 25.

19              Question by the Securities and Exchange Commission:

20              "Do you know whether Lowell Harmison was aware of the

21   consulting agreement that you had?

22              "Answer:  I knew that.  Not the exact agreement, but

23   he was aware of us structuring the deal, yes."

24   BY MR. STEIN:

25   Q   You didn't lie to the SEC, did you?
```

```
 1    A    No.  You asked me if Lowell Harmison was aware of it.

 2    Q    And just to be clear further, you had conversations not

 3    just with me, but you had conversations with Dr.~Harmison in

 4    2008, correct?

 5    A    Absolutely.

 6    Q    About the contract, correct?

 7    A    Not about the contract, but working with Signalife and

 8    you.

 9    Q    Which had to do with the contract, right?

10    A    You said specifically the contract.  I did not speak to

11    him about the specific of a contract.

12    Q    I just read you something where you said he knew about the

13    structuring of the deal.  That is accurate, right?

14    A    Well, structuring in the case of raising investor

15    awareness for the company.

16    Q    Which is what the contract says.

17    A    Well, you're asking me two different things.

18    Q    Was that your understanding of what the contract the

19    Government showed you 25 minutes ago, was that your

20    understanding of what it talked about?

21    A    I can't answer that.

22    Q    Did you have a discussion with Dr.~Harmison in which you

23    told him that you were willing to work with him under the

24    contract and come onboard and work to (sic) him to help the

25    company, and last, you really had a conversation with him
```

```
 1    about meeting?

 2            MR. MUHLENDORF:  Objection, Your Honor.  Is he just

 3    reading from the transcript?

 4            MR. STEIN:  No, I'm not.

 5            THE COURT:  Can you rephrase the question, please?

 6            MR. STEIN:  Sure.

 7    BY MR. STEIN:

 8    Q   In your conversations with Dr.~Harmison, did you have

 9    detailed discussions about your duties under the contract and

10    what you were doing?

11    A   I didn't speak in detail.  I don't know what you mean how

12    detailed.

13    Q   But you spoke to him?

14    A   I spoke to him.

15    Q   More than one occasion?

16    A   Yes.

17    Q   And he knew of the arrangement?

18    A   Arrangement?

19    Q   The contractual arrangement that was put up on the screen.

20    A   Well, you're asking me again, I don't know how detailed he

21    knew of a contract agreement.  That was between you and him.

22    That wasn't between me and him.  I was dealing with you.

23    Q   Did you tell Dr.~Harmison the truth during these many

24    conversations you had with him?

25    A   What do you mean?
```

```
 1    Q    Did you tell him the truth about your relationship with

 2    his company when you spoke with him?

 3    A    I never lied to him.

 4    Q    Okay.  That's all I wanted to know.

 5              You have not spoken to me since 2008; is that

 6    correct?

 7    A    That's correct.

 8    Q    And you've not spoken to Dr.~Harmison since 2008; is that

 9    correct?

10    A    That's correct.

11    Q    Did you know that Dr.~Harmison passed away?

12    A    I heard that recently.

13    Q    Who told you that?

14    A    I believe the SE -- the Government or my attorney.  But I

15    did hear that.

16    Q    Indeed, during 2008, Dr.~Harmison and I both had a couple

17    of conference calls with you; is that correct?

18    A    That's correct.

19    Q    In those conference calls we discussed Signalife and you

20    and these three other people, correct?

21    A    Three other people who?

22    Q    Evie Muscillo, your fiance'; and these other people that

23    you've mentioned.

24    A    I didn't speak of them specifically, no.

25    Q    So we spoke of Signalife in those conversations?
```

 1    A    Yes.

 2    Q    You don't have any idea whether or not Martin Carter and

 3    Lowell Harmison spoke about you or your contract; is that

 4    correct?

 5    A    I do not.

 6    Q    You have no idea, if they did speak, what Mr. Carter and

 7    Mr. Harmison spoke about; is that correct?

 8    A    I have no idea.

 9              MR. STEIN:  Your witness.

10              MR. MUHLENDORF:  Briefly, Your Honor.

11                        Redirect Examination

12    BY MR. MUHLENDORF:

13    Q    Mr. Yafa.

14    A    Yes.

15    Q    In any of those conversations with Dr.~Harmison and

16    Mr.~Stein, did anyone ask you to work on a heart monitor?

17    A    Did anyone ask me?  Never in a million years.

18    Q    Did the name Martin Carter ever come up in connection with

19    the work you were doing?

20    A    Absolutely not.

21    Q    If Mr.~Stein told the lawyer for Signalife that you were

22    working with Mr. Carter, would that be a true or false

23    statement?

24    A    That would be false.

25              MR. MUHLENDORF:  If we could pull up exhibit 161,

```
 1    please.  Blow up the to and from.
 2              THE COURT:  Mr. Yafa, you could look in that monitor
 3    in front of you.
 4              THE WITNESS:  Perfect.
 5    BY MR. MUHLENDORF:
 6    Q    The e-mail that we were discussing earlier, is
 7    Dr.~Harmison copied on the e-mail from Mr.~Stein to
 8    Mr. Woodbury?
 9    A    He is not.
10              MR. MUHLENDORF:  No further questions, Your Honor.
11              THE COURT:  All right.
12              MR. STEIN:  Nothing further, Your Honor.
13              THE COURT:  Thank you, sir.  You're excused,
14    Mr. Yafa.  Thank you.
15              MR. MUHLENDORF:  Can Mr. Yafa be excused?
16              MR. STEIN:  No objection, Your Honor.
17              THE COURT:  Yes.
18              Next witness.
19              MR. MUHLENDORF:  Your Honor, the Government calls
20    Peter Melley.
21              THE COURT:  Sir, would you raise your right hand,
22    please.
23         Peter Joseph Melley, Government's witness, sworn.
24              THE COURT:  Please be seated.
25              All right.  Sir, if you could tell us your name,
```

```
 1    please, and spell your last name for us.

 2              THE WITNESS:  Peter Joseph Melley, M-e-l-l-e-y.

 3              THE COURT:  Thank you, sir.

 4              MR. MUHLENDORF:  May I approach, Your Honor?

 5              THE COURT:  Yes.

 6              Mr. Melley, the chair doesn't move, so you may need

 7    to adjust that microphone.  It moves.  So you can move it

 8    closer to you if you need to.  Thank you.  Try and speak into

 9    it, please.

10              THE WITNESS:  Thank you.

11              THE COURT:  You're welcome.

12                          Direct Examination

13    BY MR. MUHLENDORF:

14    Q    Good afternoon, Mr. Melley.

15    A    Good afternoon.

16    Q    Could you please introduce yourself to the jury by way of

17    background, what you do, where you're from?

18    A    I'm the director of FINRA's criminal prosecution

19    assistance group, located in Washington, D.C.

20    Q    And what is FINRA?

21    A    FINRA is the Financial Industry Regulatory Authority.  It

22    is a private not-for-profit self-regulatory organization of

23    the securities industry.  It creates rules that govern the

24    conduct of its members, who are brokerage firms, and the

25    registered individuals who work at those firms.  FINRA is
```

1    also -- has the mission of regulating trading on the various

2    securities markets, like the New York Stock Exchange, the

3    AMEX, the NASDAQ stock market, over-the-counter securities

4    markets.  And it is under the jurisdiction of the U.S.

5    Securities and Exchange Commission.

6    Q   Okay.  Now, you said something called about criminal

7    prosecution assistance group.  Could you explain to the jury

8    what that is.

9    A   Yes, I'm the director of that group, which is a unit

10   within FINRA that only works on providing assistance in

11   criminal investigations and prosecutions involving securities

12   fraud.

13   Q   And how long have you been with -- can I call it CPAG?

14   A   Sure.

15   Q   How long have you been with CPAG?

16   A   Approximately 15 years.

17   Q   Now, in the course of your duties at CPAG when you're

18   assisting prosecutions, what sort of materials do you review?

19   A   We will often review brokerage industry records, like

20   account statements and other firm documents.  We'll also look

21   at SEC filings that are submitted by public companies.  FINRA

22   also has its own databases, which include large voluminous

23   data trading information.  And we can also use publicly

24   available resources or things like Bloomberg, which is a

25   financial software news service and data company.

```
 1   Q   Among some of the things we were just discussing, do some

 2   of those include stock trading information?

 3   A   Correct.

 4   Q   Explain which ones are the stock trading information.

 5   A   Stock trading information could be found in some of those

 6   brokerage firm documents, like account statements for

 7   individuals listing purchases and sales of certain companies.

 8   Q   Now, Mr. Melley, did you assist the United States

 9   Department of Justice regarding an investigation into what

10   we've been calling Signalife?

11   A   Yes.

12   Q   And what did you do as part of that assistance generally?

13   A   That assistance included looking at SEC filings made by

14   Signalife, looking at certain news and press releases that the

15   company had submitted, looking at publicly available price and

16   volume information on the Bloomberg data service, and also

17   looking at transfer agent records and brokerage firm records

18   for particular accounts.

19   Q   And did you in the course of that prepare some summary

20   charts?

21   A   I did.

22   Q   We'll get to those in a second.

23       You mentioned the Securities and Exchange Commission.

24   Did you review SEC filings?

25   A   Yes.
```

```
 1              MR. MUHLENDORF:  If we could pull up exhibit 93,

 2    please, the first page.

 3    BY MR. MUHLENDORF:

 4    Q   It's in your binder, Mr. Melley.

 5              MR. MUHLENDORF:  And, Your Honor, we're doing a

 6    foundation for the summary exhibits, we're going to do them

 7    one by one, if that's okay.

 8              THE COURT:  That's fine.

 9              Is this in evidence already?

10              MR. MUHLENDORF:  This is in evidence, 93, yes.

11    BY MR. MUHLENDORF:

12    Q   Mr. Melley, while the jury's getting that, is this one of

13    the SEC filings you reviewed?

14    A   Yes.

15    Q   And for which company?

16    A   For Signalife.

17    Q   And what filing is this?

18    A   This is a 10-K.  Companies are required to file with the

19    SEC certain periodic reports under SEC rules, whether it be

20    quarterly reports or in this case an annual report, which is

21    commonly called a 10-K.  It provides a snapshot of the

22    company's financial condition as of that time.

23    Q   Does this 10-K, just on its face, indicate whether

24    Signalife had a class of securities registered under Section

25    12 of the Securities and Exchange act of 1934?
```

1   A   Yes, it's discussed on the bottom portion of the left-hand

2   side.

3   Q   And did you have the occasion to look at other SEC filings

4   made by Signalife and determine whether that was the case

5   through May of 2008?

6   A   Correct, Signalife did have registered shares.

7   Q   Now, Mr. Melley, you mentioned preparing some summary

8   charts.  If you would turn in your binder to 262.  Do you

9   recognize exhibit 262?

10          MR. MUHLENDORF:  Your Honor, may I approach and

11   assist the witness?

12          THE COURT:  Yes.

13          THE WITNESS:  Yes.  All set.  Sorry.

14   BY MR. MUHLENDORF:

15   Q   Do you recognize exhibit 262?

16   A   Yes, I do.

17   Q   Just generally, what is exhibit 262?

18   A   This is a chart that I had created based on closing price

19   and volume information of Signalife, as well as press releases

20   for Signalife between the dates of August 27th and

21   October 12th of 2007.

22   Q   And is it a fair and accurate representation of the data

23   that you've compiled to make this chart?

24   A   Correct.

25          MR. MUHLENDORF:  Your Honor, we'd offer 262 into

```
1    evidence.

2              MR. STEIN:  No objection.

3              THE COURT:  Admitted without objection.

4         (Government's Exhibit No. 262 entered into evidence.)

5    BY MR. MUHLENDORF:

6    Q    While my assistant's handing that out, if you could just

7    briefly explain to the jury, moving from left to right, sort

8    of what we're looking, what you've put into this chart.

9    A    Sure.  Moving from left to right, on the left side there's

10   a scale for share volume, and shares is indicative of the

11   amount of stock that is traded or purchased and sold on a

12   daily basis.  And they're indicated by the blue bars on a

13   daily basis between August 27th and October 12th.  The

14   right-hand scale from zero to $2.30, that's to reflect the

15   closing prices over the period of time, which are also

16   indicated by the ebb and flow of the red line that goes across

17   the chart.

18             On particular days I included text boxes to indicate

19   certain Signalife press releases.  Primarily, one on

20   September 20th, another on the 25th and then a third one on

21   October 10th.

22             And then finally, there's a yellow box up at the top

23   to indicate that the share price of Signalife increased

24   177 percent from the first date of that period, where it

25   closed at 78 cents, to when it reached a high of $2.16 on
```

 1   October 4th.

 2   Q   And Mr. Melley, why did you pick this period, August 27th

 3   to October 12th of 2007?

 4   A   I wanted to show what was happening to the stock for a few

 5   weeks prior to that first press release during the period.  I

 6   could have carried it out further even back to June, and the

 7   price would have been consistent with that opening price at

 8   the end of August.

 9   Q   And you've got in your binder three exhibits, 69, 72, and

10   76.  Could you please take a brief look at those.

11            MR. MUHLENDORF:  These are already in evidence, Your

12   Honor.

13            THE COURT:  Okay.

14            THE WITNESS:  Okay.

15            MR. MUHLENDORF:  Mr. Sweeney, if you'd put up 69 next

16   to the chart.

17            THE COURT:  Sir, you can look at the screen right in

18   front of you instead of having to turn around.

19   BY MR. MUHLENDORF:

20   Q   So exhibit 69, which is already in evidence, is a press

21   release announcing 1.98 million sales orders thus so far, and

22   you can see it's dated September 20th.  Is that one of the

23   ones reflected on your chart?

24   A   Correct.  That is the first one.

25   Q   Okay.  And what's the price approximately when that press

1    release goes out?

2    A    As of that date, it is at approximately $1.35.

3    Q    And then -- thank you, Mr. Melley.

4          MR. MUHLENDORF:  If we could have on the right side

5    72, Mr. Sweeney.

6    BY MR. MUHLENDORF:

7    Q    Is exhibit 72, which is another press release already in

8    evidence talking about $3.3 million in sales, is that

9    reflected on your chart?

10   A    Yes, it is.  With the arrow pointing to the closing price

11   of approximately $1.70.

12   Q    And then if we could also have exhibit --

13          MR. MUHLENDORF:  Mr. Sweeney, if you can bring up 76.

14   BY MR. MUHLENDORF:

15   Q    And Mr. Melley, the last one is exhibit 76, which, again,

16   is already in evidence, and it's a press release talking

17   about -- continues to purchase -- procure purchase orders at

18   $551,000.  Do you see that?

19   A    Yes.

20   Q    Is that also reflected on your chart?

21   A    Yes, by the text box for 10/10/07, again, showing closing

22   price for that date.  It was approximately $1.90 where it

23   closed.

24   Q    Okay.  Now, did you also compile a chart that -- having to

25   do with shares issued to Martin Carter?

1    A    Yes, I did.

2    Q    If you look in your notebook at 263.

3    A    Okay.

4    Q    Do you recognize Government's exhibit 263?

5    A    Yes, I do.  This was a spreadsheet that I put together

6    based on stock issuances to Martin Carter between January and

7    September 2008.

8    Q    Is it a fair and accurate representation of the data you

9    compiled to place into the chart?

10   A    It is.

11           MR. MUHLENDORF:  Your Honor, we'd move 263 into

12   evidence.

13           MR. STEIN:  No objection.

14           THE COURT:  Admitted without objection.

15       (Government's Exhibit No. 263 entered into evidence.)

16   BY MR. MUHLENDORF:

17   Q    All right.  Mr. Melley, while the jury's getting their

18   copy, if you could just briefly explain the columns in your

19   chart, exhibit 263.

20   A    This chart reflects the 19 issuances of Signalife stock to

21   Mr. Carter between January 11th and September 16th, 2008.  For

22   each of those issuances I included the number of shares as

23   well as the closing price that day and then calculated the

24   value, which was simply the number of shares times that

25   closing price on the date they were issued to Mr. Carter, and

```
 1   that value is reflected in the final column.
 2            For those 19 issuances, it shows that Mr. Carter
 3   received over 6 million shares of Signalife stock.
 4   Q   And what was the value on the day of issuance for all
 5   those shares?
 6   A   The total value of all the 19 issuances was $1,473,900.
 7   Q   Now, that's the -- is that the value on~-- as the price
 8   they were sold for or the price on the day they were issued?
 9   A   That is the closing price for Signalife on the date that
10   those shares were actually issued to Mr. Carter.
11            MR. MUHLENDORF:  Your Honor, may I approach?
12            THE COURT:  Yes.
13   BY MR. MUHLENDORF:
14   Q   Mr. Melley, before coming to testify today, did you review
15   Government's exhibit 31, which is already in evidence?
16   A   Yes, I did.
17            MR. MUHLENDORF:  And if we could put up Government's
18   exhibit 31, Mr. Sweeney.
19   BY MR. MUHLENDORF:
20   Q   Now, Mr. Melley, did you have a chance to flip through the
21   various pieces of exhibit 31?
22   A   Yes.
23   Q   And generally, what does it appear to be?
24   A   These represent invoices in the name of Signalife with a
25   description of consulting for contractual agreements with a
```

```
 1    dollar price.  The first one is on January 5th, 2008.
 2    Q    How does the date of the first invoice in that packet
 3    relate to the date of the first share issuance you saw in the
 4    materials you were given?
 5    A    The first invoice occurs six days before the first
 6    issuance to Mr. Carter on January 11th.
 7    Q    Now, Mr. Melley, I want to dig a little bit down on some
 8    of the entries on your chart 263.  Did you do any further
 9    analysis to see what happened to some of those shares that you
10    cataloged as being issued in your chart 263?
11    A    Yes, I looked more closely at three different issuances.
12         MR. MUHLENDORF:  Okay.  Let's -- if we could pull up
13    exhibit 125 and 126.
14    BY MR. MUHLENDORF:
15    Q    If you look at those in your binder, Mr. Melley.
16         MR. MUHLENDORF:  And these are already in evidence,
17    Your Honor.
18    BY MR. MUHLENDORF:
19    Q    What is exhibit 125, Mr. Melley?
20    A    This is a letter from Signalife, Ms. Tracy Jones, to
21    Signalife's transfer agent, which is Standard Registrar &
22    Transfer, discussing the issuance of 300,000 shares to
23    Mr. Carter.  It is dated March 19th, 2008.
24    Q    Did you examine a share certificate that went along with
25    that?
```

```
 1    A    I did.

 2    Q    And I think the jury's going to be getting exhibit 126.

 3    Pull up 126 in your binder.

 4              Mr. Melley, is that the share certificate that went

 5    with 125?

 6    A    Yes, it is.

 7    Q    Okay.

 8    A    Again, it indicates to Mr. Carter 300,000 shares on the

 9    date of March 19, 2008.

10    Q    Okay.  Now, did you do any analysis or look at any

11    documents that would indicate whether those shares were

12    actually deposited into a brokerage account?

13    A    I did.  I examined Mr. Carter's trading account at TD

14    Ameritrade.

15    Q    Okay.  And if you would look at your binder at

16    exhibit 135.

17              MR. MUHLENDORF:  Your Honor, we'd move 135 into

18    evidence.

19              MR. STEIN:  No objection.

20              THE COURT:  Admitted without objection.

21         (Government's Exhibit No. 135 entered into evidence.)

22    BY MR. MUHLENDORF:

23    Q    What is exhibit 135, Mr. Melley?

24    A    This is a TD Ameritrade brokerage account statement for

25    the month of March, 2008, in the name of Martin Bert Carter,
```

```
 1    and it basically shows over the course of that month the

 2    trading history for Mr. Carter in various securities,

 3    including Signalife.

 4    Q   Now, do you have a -- in your binder page 22 of 40 for

 5    that account statement?

 6    A   Yes.

 7             MR. MUHLENDORF:  If we could pull that up.

 8    BY MR. MUHLENDORF:

 9    Q   Mr. Melley, do you see an entry reflecting -- well,

10    there's an entry there for March 24th, 2008.  What does that

11    reflect?

12    A   It says that 300,000 shares of Signalife were received

13    into the account, basically deposited into the account on that

14    day.

15    Q   Okay.  To the best of your knowledge, is that the 300,000

16    shares that we saw were issued to Mr. Carter on March 19th,

17    2008?

18    A   Correct.

19    Q   Now, did you at some point try to figure out what happened

20    with those shares once they were deposited?

21    A   Yes.

22    Q   Okay.  And did the issuance of those shares, March 19th,

23    2008, are you aware whether that relates in some way to a

24    count in the indictment?

25    A   Yes, count 2 of the indictment.
```

```
 1    Q    Now, did you create a summary chart that showed -- will

 2    explain to the jury the buying and selling in the account

 3    around that time period?

 4    A    I did.

 5    Q    If you would turn in your binder to exhibit 264.  Do you

 6    recognize 264?

 7    A    Yes, I do.

 8    Q    Okay.  And what is 264?

 9    A    This is a flowchart that I created based on my review of

10    the Martin Carter TD Ameritrade account and the transfer agent

11    documents describing the issuance of 300,000 shares on

12    March 19th, 2008.

13              MR. MUHLENDORF:  Your Honor, we'd offer 264 into

14    evidence.

15              MR. STEIN:  No objection.

16              THE COURT:  Admitted without objection.

17         (Government's Exhibit No. 364 entered into evidence.)

18    BY MR. MUHLENDORF:

19    Q    Now, Mr. Melley, if you would just explain to the jury

20    exactly what we're looking at here, starting on the left and

21    moving to the right, and explain your various boxes.

22    A    Sure.

23              And, again, this covers the period of March 19th

24    through June 12th, 2008.

25              Beginning on the left side up at the top, the white
```

```
 1    box indicating the 300,000 shares of Signalife that were
 2    issued to Mr. Carter on the 19th.  Those were subsequently
 3    deposited or received into his TD Ameritrade account on
 4    March 24th.  Subsequent to that, Mr. Carter, from my review of
 5    his account statement, he purchased an additional 239,550
 6    shares of Signalife from the investing public on the open
 7    market.
 8              Simultaneously, he also sold 803,450 shares between
 9    March 24th and June 12th.  From those sales, he generated net
10    proceeds in the amount of $461,332.30.
11    Q   And Mr. Melley, of that $461,000 net proceeds, did you do
12    any further analysis about where the money went after that?
13    A   No, I did not.
14    Q   Now, Mr. Melley, you ran your chart from March 19th, 2008,
15    to June 12th, 2008.  Why did you stop at June 12th, 2008?
16    A   Because on June 12th, 2008 represents the next issuance of
17    shares that I was reviewing.
18    Q   Okay.  So if we could look at Exhibits 152 and 153, which
19    I believe are already in evidence.  Government's exhibits 152
20    and 153.
21              What is 152, Government exhibit 152, Mr. Melley?
22    A   Government exhibit 152 is a letter from Signalife to
23    Signalife's transfer agent, Standard Registrar & Transfer,
24    discussing the issuance of 390,000 shares to Martin Carter on
25    June 12th, 2008.
```

1    Q    Okay.  And then exhibit 153?

2    A    That is the actual stock certificate for those 390,000

3    shares issued to Mr. Carter.

4    Q    What's the date of the stock certificate?

5    A    June 12th, 2008.

6    Q    As we did with the earlier issuance, did you then look to

7    see what happened to that stock certificate?  Did you examine

8    his trading records?

9    A    I did.  I looked at his TD Ameritrade account.

10   Q    Do you have exhibit 286 in your binder?

11   A    I do.

12   Q    And what is exhibit 286?

13   A    This is a June 2008 account statement for Mr. Carter from

14   TD Ameritrade.

15              MR. MUHLENDORF:  Your Honor, we would move 286 into

16   evidence.

17              MR. STEIN:  No objection.

18              THE COURT:  Admitted without objection.

19       (Government's Exhibit No. 286 entered into evidence.)

20   BY MR. MUHLENDORF:

21   Q    Now, did you look through these records to see what

22   happened with that 390,000 shares?

23   A    Yes, I did.  I saw that on June 16th, 2008, 390,000 shares

24   of Signalife were received or deposited into the account.

25   Q    Okay.  Is that what we're looking at there on the screen?

```
 1    A    Correct.

 2    Q    Okay.  That's the 390,000 shares we were just looking at

 3    in the prior two exhibits?

 4    A    Yes.

 5    Q    Now, again, did you incorporate all of that information

 6    into a summary chart to present to the jury what happened with

 7    the buying and the selling of the account subsequent to that

 8    deposit?

 9    A    I did.

10    Q    If you look at 265 in your binder, please.

11    A    Okay.

12    Q    Is 265 the chart you were just referring to?

13    A    Yes.

14         MR. MUHLENDORF:  Your Honor, we would move 265 into

15    evidence.

16         MR. STEIN:  No objection.

17         THE COURT:  Admitted without objection.

18    (Government's Exhibit No. 265 entered into evidence.)

19    BY MR. MUHLENDORF:

20    Q    Now, Mr. Melley, 265, the deposit of the shares that

21    Mr. Carter was issued on June 12th, 2008, did that relate to a

22    particular count in the indictment?

23    A    Yes, count 3.

24    Q    Would you explain to the jury what happened with the

25    buying and the selling of the shares in the account after
```

```
 1    those were deposited.

 2    A    Sure.

 3              They were deposited on June 16th, and between that

 4    date and August 22nd, 2008, Mr. Carter's account purchased an

 5    additional 13,150 shares of Signalife.  Simultaneously during

 6    that time, he also sold 1,073,300 shares of the stock,

 7    generating net proceeds in the amount of $261,260.74.

 8    Q    Okay.  And, Mr. Melley, you mentioned that he sold a

 9    million shares.  The issuance is 390, and he only bought

10    13,000.  So what's the difference?  Where's he getting the

11    other shares?

12    A    The TD Ameritrade account still had a position of shares

13    in the account during that time.  So there were shares of

14    Signalife in that account at the start of that period of

15    June 12th.

16    Q    And did he receive any other shares in between June 12th

17    and August 22nd?

18    A    Yes.

19    Q    Now, again, you stopped on August 22nd, 2008.  Why did you

20    stop there?

21    A    Because on that date, August 22nd, was the date of the

22    next focus of another issuance that I looked at.

23    Q    And, again, did you do anything to examine what happened

24    to the money after it accumulated in the TD Ameritrade account

25    for Mr. Carter?
```

1    A    No, I did not.

2    Q    All right.  If we could look at Exhibits 168 and 169 in

3    your binder.  They're already in evidence.

4         What is exhibit 168, Mr. Melley?

5    A    This is a letter from Signalife to the transfer agent,

6    Standard Registrar & Transfer, discussing an issuance of

7    400,000 shares to Martin Carter on August 22nd, 2008.

8    Q    Okay.  And does this issuance relate to a particular count

9    in the indictment?

10   A    Yes, Count 4.

11   Q    Okay.  Now, if we could have 169 in your binder, please.

12        Now, what is 169?

13   A    This is the actual stock certificate pertaining to that

14   issuance of 400,000 shares to Mr. Carter, again, dated

15   August 22nd, 2008.

16   Q    Mr. Melley, I want to draw your attention to a stamp that

17   appears on there dated September 2nd.  You see that stamp?

18   A    Yes, canceled September 2nd, 2008.

19   Q    Now, were you able to determine whether these shares were

20   actually deposited and sold in Mr. Carter's account?

21   A    Yes, they were.  I looked at the TD Ameritrade account,

22   and they were deposited into the account.

23   Q    Okay.  Can you explain to the jury how it is that this

24   share certificate might have a canceled stamp on it when your

25   analysis determined that they were actually sold?

```
 1    A    Well, the transfer agent could subsequently cancel shares

 2    for a number of reasons.  The amount of shares could be

 3    reissued to another party, or series of parties, and therefore

 4    they could break up the issuance into smaller groups.  You

 5    know, the stock certificate could also be lost.  There could

 6    be a number of different reasons why one is then given the

 7    legend of canceled.

 8          But, again, as of a couple days after the issuance,

 9    those shares were, indeed, deposited into Mr. Carter's

10    account.

11    Q    And then do you have an exhibit 288 in your binder, the TD

12    Ameritrade statement that goes with this?

13    A    Yes, I do.

14          MR. MUHLENDORF:  Your Honor, we'd move 288 into

15    evidence.

16          MR. STEIN:  No objection.

17          THE COURT:  Admitted without objection.

18      (Government's Exhibit No. 288 entered into evidence.)

19    BY MR. MUHLENDORF:

20    Q    And Mr. Melley, if you would just look at 288.  What is

21    that?

22    A    This is the August 2008 TD Ameritrade account statement

23    for Mr. Carter, again, showing his trading history involving

24    securities, including Signalife.

25    Q    If you'd look at page 5 of that account statement.  Do you
```

```
 1    see the deposit of the shares we were just discussing?

 2    A    Yes.  On August 26th, 2008, as it states, that 400,000

 3    shares were received into the account.

 4    Q    Okay.  And as you did with the other -- the buying and

 5    selling in the previous 2 -- ones we looked at, did you

 6    examine what happened with these shares once they were

 7    deposited?

 8    A    I did.

 9    Q    Did you prepare a summary chart?

10    A    Yes.

11    Q    Would you look in your binder at Government's exhibit 266.

12    Do you have that?

13    A    Yes.

14    Q    Is 266 your summary chart that we've been discussing?

15    A    Correct.

16           MR. MUHLENDORF:  Your Honor, we'd move

17    Government's 266 into evidence.

18           MR. STEIN:  No objection.

19           THE COURT:  Admitted without objection.

20        (Government's Exhibit No. 266 entered into evidence.)

21    BY MR. MUHLENDORF:

22    Q    Could you please explain to the jury what happened on

23    August 22nd, 2008, with the deposit of the shares received on

24    August 22nd, 2008?

25    A    Those shares were subsequently deposited into the TD
```

 1    Ameritrade account on August 26th.  Between that day and the

 2    18th of September, Mr. Carter, in this particular account,

 3    purchased an additional 501,205 shares of Signalife.  During

 4    this same period, he also sold 3,085,586 shares of SGN,

 5    generating net proceeds in the amount of $98,531.34.

 6    Q    Again, what was the net sales in that period?

 7    A    Net sales were over 3 million shares.

 8    Q    And what was the time period there?  How many days, weeks,

 9    roughly.

10    A    A little less than a month.  Three and a half weeks, or

11    so.

12    Q    Why did you stop on September 18th, 2008?

13    A    Because at that -- well, that was -- the next activity in

14    the account was subsequent to an actual reverse stock split

15    involving the company.  It was a one for 4500 reverse stock

16    split.

17    Q    Can you just basically explain to the jury what that

18    means, the term "reverse stock split?"

19    A    Sure.

20         A reverse stock split is a corporate event when a

21    company decides to decrease the number of shares yet increase

22    the share price.  It does not change the value.  So, for

23    instance, if you have 10 million shares, with each share worth

24    ten dollars, and you do a one for 10 reverse stock split,

25    you're now saying that for every 10 shares it becomes one

1    share.  So instead of 10 million you now have 1 million

2    shares.  But the inverse of that is the stock price is going

3    to go up.  So instead of every share being worth ten dollars,

4    you now have every share worth a hundred dollars.

5            The thing is the value of the investment doesn't

6    change.  Before the split, you had a hundred million dollar

7    investment, and after the split you still have a hundred

8    million dollar investment.

9    Q   Now, as with the other two summary charts, did you do any

10   further analysis to see what happened with the money once it

11   accumulated from the sales in the TD Ameritrade account?

12   A   I did not.

13   Q   And as to the TD Ameritrade account itself, the one you

14   were looking at, who was the owner of that account?

15   A   Martin Bert Carter.

16   Q   Was it in the name of any entities or anything like that?

17   A   I believe it was in his own name.

18           MR. MUHLENDORF:  Court's indulgence, Your Honor.

19           Please answer any questions Mr.~Stein has.

20           MR. STEIN:  Your Honor, may we take a five-minute

21   break?

22           THE COURT:  Are you going to be able to finish this

23   witness today?  Is five minutes going to make a difference?

24           MR. STEIN:  Yes, I think we'll finish the witness

25   today.

```
 1            THE COURT:  Ladies and gentlemen, let's take a
 2   five-minute recess.  Please don't discuss the case or form any
 3   opinions.  Leave your notes, and we'll see you very shortly.
 4   Thank you.
 5       (The jury exits the courtroom.)
 6            THE COURT:  Sir, if you would not discuss your
 7   testimony during the break.
 8            THE WITNESS:  Sure.
 9            THE COURT:  Thank you.
10            We'll see you in about five minutes.
11       (A recess was taken from 3:52 p.m. to 4:00 p.m., after
12   which the following proceedings were had:)
13            THE COURT:  You ready, Mr. Stein?
14            MR. STEIN:  Yes, Your Honor.
15            THE COURT:  Thank you.
16            Let's bring the jurors in.
17            You're still under oath, sir.
18       (The jury enters the courtroom, after which the following
19   proceedings were had:)
20            THE COURT:  Welcome back, everyone.  Please be
21   seated, ladies and gentlemen.  Thank you for your cooperation.
22            Mr.~Stein, you may cross-examine.
23            MR. STEIN:  Thank you, Your Honor.
24                        Cross-examination
25   BY MR. STEIN:
```

```
1    Q    Good afternoon, Mr. Melley.

2    A    Good afternoon.

3    Q    Am I pronouncing that right?

4    A    Melley.

5    Q    Melley, I'm sorry.  Good afternoon, Mr. Melley.

6              You indicated you were director of FINRA's criminal

7    investigation prosecution group at the SEC; is that right?

8    A    No, FINRA's criminal prosecution assistance group.  Not at

9    the SEC.

10   Q    Assisting the SEC.

11   A    No, I do not assist the SEC.  We assist criminal law

12   enforcement agencies.  SEC is a civil agency.

13   Q    Okay.  FINRA is affiliated with the SEC.  Is that correct

14   or incorrect?

15   A    FINRA falls under the jurisdiction of the SEC in that it

16   needs to get its rules approved.  FINRA itself is a

17   self-regulatory organization.  Our unit is separate from the

18   rest of the organization in that our group only works on

19   criminal cases.

20   Q    With regard to your group at FINRA, could you describe in

21   a very short nutshell the types of things you investigate?

22   Obviously, you investigate stock issuances, sales, and stock

23   manipulation.  Anything else?

24   A    Basically what we do, we don't -- just to clarify, we

25   don't do the investigation.  We just respond to requests from
```

1   various criminal law enforcement agencies and provide help

2   when we can.  The types of cases could include accounting

3   fraud, insider trading, market manipulation, Ponzi schemes,

4   you know, computer intrusion cases, whole host of different

5   cases that have securities fraud as an element.

6   Q   Thank you.  I understand.

7         And one of your -- one of your responsibilities --

8   and please correct me if I'm wrong, because I -- you and I

9   have never met before, right?

10  A   No.

11  Q   One of the responsibilities of FINRA is it regulates the

12  American Stock Exchange; is that correct?

13  A   What FINRA does is it provides surveillance and regulation

14  of the trading on various exchanges.  It does not have

15  jurisdiction over companies that are listed on the AMEX.  It's

16  just the trading of securities that are on those various

17  exchanges.

18        As I said earlier, FINRA only has jurisdiction over

19  its members who are brokerage firms and the individuals who

20  work at those firms.  Does not have jurisdiction over

21  companies.

22  Q   I understand.  I'm just trying to figure out the scope of

23  what you do before I ask you specifically.

24        If a company on the American Stock Exchange made a

25  complaint to the American Stock Exchange about trading, it's

1    possible that that complaint could be referred to FINRA; is

2    that right?

3    A    If there's a complaint involving the trading as it relates

4    to brokerage firm trading, it may at some point.

5    Q    So it wouldn't surprise you in any case if the American

6    Stock Exchange received a complaint and said we've got to

7    refer this to FINRA?  That's something that happens, right?

8    A    It's something that happens, like it happens for various

9    exchanges and markets.

10   Q    Does FINRA regulate any other exchanges besides the

11   American Stock Exchange?

12   A    It regulates trading on various exchanges, NASDAQ stock

13   market, over-the-counter securities markets.  It does

14   surveillance on the New York Stock Exchange, NYSE, a number of

15   different markets.

16   Q    And your title is director of criminal prosecution, right?

17   A    Director of the criminal prosecution assistance group.

18   Q    In connection with Signalife, which you've been discussing

19   today, you evaluated Signalife's trading activity, as you've

20   done in these very nice charts, through those periods at the

21   request of criminal prosecutors; is that correct?

22   A    Correct.

23   Q    Did you receive any direct calls from the American Stock

24   Exchange regarding potential criminal activity or illegal

25   activity regarding Signalife while it was trading on the

```
 1   American Stock Exchange during the periods you've testified
 2   about?
 3   A   No.  Again, my role is I only work with criminal law
 4   enforcement agencies.  So the AMEX not being criminal law
 5   enforcement agency, would not be contacting our group.
 6   Q   I apologize.
 7        So the question would be better phrased, did any
 8   criminal enforcement person of any kind ever contact you and
 9   say that there was an issue regarding Signalife during the
10   periods you've mentioned other than what you've testified to
11   today?
12   A   I'm only aware of what I've testified to today.
13   Q   Thank you.
14        I'm sorry for bumbling up the other question.  This
15   is somewhat complex.
16        You're not here as an expert witness, right?
17   A   No.
18   Q   You're just compiling data that is in evidence in this
19   case; is that right?
20   A   Analyzing it and providing it in chart form.
21   Q   You're unaware of the details of any contract that
22   Mr. Carter, the person you referenced, had with or didn't have
23   with Signalife; is that right?
24   A   I'm not aware of that, the details regarding that.
25   Q   Has any law enforcement official ever showed you any
```

```
1    contract or a copy of it between Mr. Carter and Signalife?

2    A    No.

3    Q    Has any governmental prosecutor ever showed you any

4    contract between Signalife, on the one hand, and anybody on

5    the other hand?

6    A    No.

7    Q    You're just compiling the information that the prosecutor

8    gives you, right?

9    A    No, not necessarily.

10         The prosecutor didn't give me all the information.  I

11   was able to gather -- for instance, on the price volume chart,

12   I gathered the Bloomberg data from my ability to get that

13   information.  The SEC filings, I was able to get that online,

14   as is the general public.  What was provided to me were

15   Mr. Carter's account statements and some of the transfer agent

16   records.

17   Q    And then you're able to evaluate the market with respect

18   and how it relates to those trades as you've done in your

19   charts; is that right?

20   A    Sure.

21   Q    Okay.  And the charts reflected that during certain press

22   releases the stock went up and then it went down.  That's what

23   I generally saw from the charts, is that basically right?

24   A    Yes, it's an accurate depiction of what happened to the

25   stock during that period of time.
```

```
 1   Q   Are you familiar with a resource in the public records
 2   called buyins.net?
 3   A   It has been made aware to me, but I was not aware of it
 4   before providing assistance on this case.
 5   Q   Really?
 6         Are you aware, one way or the other, of whether or
 7   not buyins.net is owned by the former chief of the Securities
 8   and Exchange Commission?  Do you know that to be true or
 9   false?
10   A   I had never heard of it.
11   Q   Did you pop it up and look at it on the Internet after you
12   were made aware of it?
13   A   I think I looked at it very briefly for a couple seconds
14   in relation to some other documents I had reviewed.
15   Q   Is it safe to say that buyins.net is an electronic service
16   where you can punch in the stock symbol of any company and get
17   a spreadsheet of the trading of that company?
18   A   That's what their website says.  I can't validate what the
19   company's about or its accuracy.
20   Q   Do you recall when you looked on buyins.net, I understand
21   you can't vouch for anything other than what you looked at, do
22   you recall seeing on the first page of buyins.net or when you
23   looked through it the phrase "squeeze trigger price?"
24   A   I think I saw that.  I'm not sure if I saw it on the
25   website, but I think I saw it in some of the defense exhibits.
```

1    Q    Some press releases that were issued by buyins.net, right?

2    A    Correct.

3    Q    And buyins.net, from your understanding, tracks the

4    activity of naked short selling or short selling in stocks,

5    right?

6    A    Based on what I saw, again, just briefly looking at it.

7    Q    You didn't do any detailed analysis of the buyins.net

8    website?

9    A    No, that was not my focus.

10   Q    Your focus was determined by the prosecutors who hire --

11   who called you, contacted you, right?

12   A    They contacted me and asked for assistance regarding this

13   particular matter and asked me to analyze trading in various

14   accounts, as well as the market as a whole.

15   Q    And when was the first contact you got from a criminal

16   prosecutor regarding Signalife?

17   A    Well, a colleague of mine had provided assistance prior to

18   me taking over since he left the group.  I started working on

19   it I would say back in September of last year.

20   Q    September of last year?

21   A    Uh-huh.

22   Q    At the time that you were asked to evaluate the trading of

23   Signalife last year, were you told to go back and look at any

24   information regarding naked short selling during the period

25   that you've referenced, that short period of, I guess,

```
 1   February 2008 to September?
 2   A    I don't have the ability through our systems to determine
 3   naked short selling.
 4   Q    Why is that?  Why don't you have the ability to do that?
 5   Is it a technological inability, or is it just you're not --
 6   it's not what you're asked to do?
 7   A    There may be other individuals at FINRA that are able to
 8   do that, but in terms of what I have access to, that's not
 9   something that we do or that I have access to a certain
10   program like that, so . . .
11   Q    Right.
12   A    I couldn't speak for other members of the organization.
13   Q    But you do have access to the entire market trading
14   activity, and you can actually tie it to brokerage firms and
15   individuals and the rest of it, right?
16   A    I cannot tie it to individuals.  That information has to
17   come from the firm itself, but I can see which of the market
18   participants for each trade, whether they're buying it for
19   their own account or on behalf of a customer.  We look
20   basically as it buys and sells, but to determine to a level of
21   a naked short, that's not something I have the capability to
22   determine.
23   Q    If a prosecutor had come to you and said I want you to
24   develop that ability, is that --
25   A    To look at naked shots?
```

```
1    Q    Yes.  Is that information available in the market, to see
2    who is not covering their trades, their sells in the security?
3    A    It may be.  Again, it's not -- I can only speak for what I
4    have access to on my desktop.
5    Q    That's all I want.
6    A    And that's -- yeah, I'm sorry I can't help you.  I'm just
7    telling you what I have access to.  So that may be accessible
8    in other forms for other organizations, but not in my office.
9    Q    You speak to other people at FINRA, other departments
10   inside of FINRA, right?
11   A    Not about case details, no.
12   Q    No, I'm just talking about in general day to day.  There's
13   other departments at FINRA, right?
14   A    No, we're usually walled off from the rest of the
15   organization, so we normally don't interact too often with
16   other departments.
17   Q    Where are you located?
18   A    Washington, D.C.
19   Q    So no prosecutor in this case ever showed you any letter
20   from Signalife to the American Stock Exchange that was
21   forwarded to FINRA?  You've never seen any document like that;
22   is that right?
23   A    No.
24   Q    You're completely unaware of any complaints that Signalife
25   as a company made to the American Stock Exchange regarding
```

```
1    anything; is that right?
2    A    Yeah, I haven't seen any documentation with the American
3    Stock Exchange.
4    Q    And these are, I think, pretty obvious questions at this
5    point, I just have to ask them.
6    A    Sure.
7    Q    Are you aware of whether or not Lowell Harmison -- you
8    know who Lowell Harmison is?  You read the name, right?
9    A    No.
10   Q    Don't know who he is.
11        If I -- is there anything that could give you a
12   recollection of what he is if I showed you something?
13   A    I have no idea who that is.
14   Q    Are you familiar with the Food Drug Administration and who
15   runs that, or you just don't work with that area?
16   A    That's -- we work with securities.
17   Q    Okay.  I'm going to show you what's been marked as
18   exhibit 224, and it is not in evidence, so I'd ask you not to
19   talk about it.
20            THE COURT:  This is a defense exhibit?
21            MR. STEIN:  Yes, I'm sorry, Your Honor.  224.
22            THE COURT:  Okay.
23   BY MR. STEIN:
24   Q    This should probably be rather quick from what you said.
25        Have you ever seen that before?
```

```
 1    A    No.

 2    Q    Do you know who James Mullin is?

 3    A    James Mullin?  Well, it says here he's the managing

 4    director, listing qualifications of the American Stock

 5    Exchange as of 2007.

 6    Q    But what I wanted to know is whether you independently

 7    know who James Mullin is, not what you read on the letter.

 8    A    No.

 9    Q    Does FINRA ever interface directly with anyone at the

10    American Stock Exchange?

11    A    I'm sure it has.

12    Q    But you don't?

13    A    No.  Again, as I said earlier, we're separate from the

14    rest of the organization which provides regulatory services.

15    Our unit only works with criminal law enforcement agencies on

16    criminal matters.  So I would not be privy to complaints that

17    are made by an exchange to FINRA.  That's not my role at

18    FINRA, to work on FINRA complaints or FINRA matters.

19    Q    Even if that complaint involved a crime, unless you're

20    contacted by a prosecutor or a law enforcement, whatever you

21    call them, you're not going to be working on anything; is that

22    right?

23    A    Correct.  The only time I would be privy to something like

24    that, if that was shown to me by a criminal law enforcement

25    investigator or prosecutor.
```

1   Q   Now, Mr. Melley, are you aware of what the phrase -- and

2   I'm talking about in looking at stock trading, like the charts

3   you just did -- are you aware of what the phrase "failures to

4   deliver" is?

5   A   Sure.  In relation to short selling, basically a failure

6   to deliver is the failure to, once you sell shares, a failure

7   to deliver is the failure to go and identify and borrow or buy

8   back those shares to cover what you had sold.

9   Q   And you had very articulately explained the reverse stock

10  split and the effect that that would -- supposed to have on a

11  market, that it would reduce the shares, increase the price

12  and I guess decrease the ability of failures to deliver,

13  because you'd have less stock, right?

14  A   I guess that's possible, yes.

15  Q   Now, during the period of the charts that you made --

16  strike that.

17          MR. STEIN:  I apologize, Your Honor.

18  BY MR. STEIN:

19  Q   Would failures to deliver securities have an impact on

20  stock price if there were lots of them?  In your experience?

21  A   Say that again?  Would failures to deliver affect?

22  Q   I actually -- that was actually a terrible question.  Let

23  me rephrase it and try to clean it up.

24          From your experience only, would significant failures

25  to deliver stock, selling stock you don't have, have an impact

 1    on the stock price of a company?

 2    A    Well, asking for my experience only, I don't think there

 3    is a case that I worked on where short selling was a vital

 4    element of that fraud.  So I couldn't say from my personal

 5    experience that, you know, I'm used to seeing that term and

 6    investigating that term, so . . .

 7    Q    That's what -- I wanted to get your personal experience.

 8              Now, let's go outside of your personal experience and

 9    just from your knowledge in business and everything you've

10    learned at FINRA.  Would failures to deliver have an impact on

11    stock price in the market of a stock?

12    A    It possibly could, depending on, again, the amount of

13    shares that are available to identify to, again, borrow in

14    that type of transaction.

15    Q    Has any --

16    A    But I couldn't say for certain how often, when, to what

17    degree.

18    Q    I'm sorry for interrupting you.

19    A    Uh-huh.

20    Q    Have you ever been called by a prosecutor in any case to

21    evaluate whether or not there's stock manipulation and whether

22    or not it was caused by naked short selling?  Has that ever

23    happened before?

24    A    No, usually stock manipulation due to people connected

25    with the company orchestrating the fraud.

1  Q   Did you ever in any investigation find that you needed

2  information about naked short selling based upon your review

3  it wasn't enough or something?  Did that ever happen?  Did you

4  ever tell a prosecutor I need this information?

5  A   No.  I've worked on hundreds of matters, and that's never

6  been an issue in any case I've worked on.

7  Q   Mr. Melley, I'm going to show you what's been Bates

8  stamped 5822 and ask you to just briefly look at it.

9  A   Okay.

10 Q   You see that the first page is a chart, and then the

11 second page is a bunch of numbers, and all the rest of it is a

12 bunch of numbers.

13 A   Correct.

14 Q   You see that?

15        Have you ever -- the period you're referring to,

16 which is the 2008 period, I'm going to turn to where this

17 document talks about that period.

18 A   And that was just one of the periods I was referring to in

19 my charts?  Is that what you're talking about?

20 Q   That's correct.

21 A   Because I also looked at 2007, as well.

22 Q   Well, let's go back to 2007.  I'm sorry.

23        So we have all of this trading in 2007, or purported

24 trading.  And you can see that 2007 takes up one, two, three

25 pages of this document.  We don't know what it is.

A Right.

Which, again, I cannot vouch for what this document is in terms of the numbers on it, where they come from, what they stand for.

Q I don't wish you to do that. I just wanted to identify that there's a lot of numbers on this document.

A Okay. A lot of numbers.

Q And you see that next to the dates it says what?

A SGN, which was the signal for Signalife.

Q Okay. And next to that there seems to be just numbers, right? 121,000 --

MR. MUHLENDORF: Your Honor, I object. The document's not in evidence.

THE COURT: Sustained.

BY MR. STEIN:

Q Mr. Melley, you see at the end stock prices are on the page, as well, right?

A I don't know. Is that what that is? I don't know.

Q Like $1.60. That seems like a stock price.

MR. MUHLENDORF: Your Honor, again.

THE COURT: Sustained.

Mr.~Stein, he said he's not familiar with the information on the document, so . . .

MR. STEIN: I understand.

BY MR. STEIN:

1    Q   Sir, have you ever seen a chart like the first page of

2    document 5822 before in your life?

3    A   No, I have not.

4    Q   You have no idea what document 5822, what that chart is or

5    purports to be?

6    A   I have no idea what they're trying to show in that chart.

7    Q   Okay.  And you see there's red on the left, black on the

8    right.  You don't know anything about that, right?

9    A   No, sir.

10   Q   Okay.  Now, widening the scope of that, when you went to

11   the buyins.net website, did you see any charts regarding

12   Signalife for the period you were examining it at all?  Not

13   this chart that I showed you, but any charts.

14   A   No, I spent about five seconds on the buyin website, if at

15   all.

16   Q   You spent five seconds on the buyins website?

17   A   Yeah.

18   Q   To the best of your knowledge, during the exact period

19   which you have evaluated, are you aware that there were

20   7 million shares -- and this is a yes or no.  I'm not saying

21   it happened -- there was 7 million shares sold into the

22   market, but the person selling them didn't have the stock,

23   there was a failure to deliver of 7 million shares.  Are you

24   aware of that?

25   A   I am not.

 1    Q    Are you aware of any failures to deliver during the

 2    period?

 3    A    No.  Again, that wasn't the focus of my review.

 4    Q    From the volume that you saw on the screen that you

 5    prepared in the charts, and the price and everything you

 6    examined, if there were 7 million failures to deliver during

 7    the period of March 2008 through August of 2008, would that

 8    have had an impact on the stock price of Signalife?

 9    A    Again, I could only speak to whatever viewed, which was

10    the purchases and sales of Signalife in particular accounts,

11    as well as the market for particular periods of time.  My

12    focus wasn't on failures to deliver, and I don't feel

13    comfortable giving a hypothetical.  You said yourself you're

14    not sure if it happened or not, so I don't know what kind of

15    answer you're looking for.

16    Q    No, I said don't assume it didn't happen.  I'm sure what

17    happened.

18         But you understand that buyins.net is supposed to be

19    tracking that data?

20    A    I have no idea what buyins.net really does.

21    Q    Okay.

22    A    You know, like I said, I glanced at the website, I glanced

23    at some of the defense exhibits that mentioned it, which is

24    why I then went to the website, because I had never heard of

25    it.  I couldn't really tell you in any great detail what

1    buyins.net is.  I'm sorry.

2    Q    That's extremely fair.  I just wanted to know.  We need to

3    know the basis for your analysis.

4              With regard to evaluating the Signalife stock, did

5    you ever have an understanding that Signalife, whether it was

6    a previous name or not, became a trading public company

7    actively in 2002?

8    A    Yes, from my review in Bloomberg, I believe that's when it

9    became publicly traded when it was Recom Managed Systems.

10   Q    Right.  So you did evaluate the company very specifically.

11   You've just volunteered the previous name.

12   A    Yeah.  I mean, in terms of specific -- that's the extent

13   of the history I know about it.

14   Q    Did any prosecutor ever ask you to review the period 2005

15   regarding Signalife trading?  Anybody ever ask you to do that?

16   A    No, I believe I started gathering Bloomberg data in 2006.

17   The data I reviewed was 2006 through 2008.

18   Q    The data you've prepared charts about is 2007 to 2008; is

19   that right?

20   A    Correct.

21   Q    You never were asked to evaluate any other periods other

22   than 2006-2008; is that right?

23   A    Right.  That is the scope of the timeframe the trading in

24   Signalife that I was asked to focus on for my charts.

25   Q    Now, you testified that during 2008, you had evaluated --

 1   saw and evaluated a reverse stock split of 4500 to one.

 2   Remember that?

 3   A   Yeah.  I didn't evaluate it.  It occurred in

 4   September 2008.

 5   Q   You were able to determine that it occurred?

 6   A   Yes.

 7   Q   Do you remember what the stock price of Signalife was the

 8   moment after the reverse stock split?  Do you have a

 9   recollection of that?

10   A   Well, I know it was a one for 4500.  I know within a day

11   it was~-- the day before the stock split it was trading for a

12   penny, and I think the day after the stock split it was

13   trading for a dollar.  So that's what I recall.  Within a day

14   or two it was trading at a dollar.

15   Q   I want to know --

16   A   That's what I recall.

17   Q   I understand.  That's all I'm asking you.

18        I want to know the moment after the stock split.  I

19   don't want to know the next day, because obviously things

20   happen in the market.  I want to know a moment after the stock

21   split, do you recall as you sit here today, what the stock

22   price of Signalife is?

23   A   Well, I guess theoretically in a one for 4500, I guess

24   theoretically it would be for a brief second in time $45, but

25   that's not what it was trading at the following trading day.

```
 1    Q    Did you find --

 2    A    At least that's not what I recall from the Bloomberg data.

 3    Q    Do you know what Signalife is trading at today?

 4    A    I do not.  I don't even know if it's still trading.  I

 5    believe it subsequently became Heart Tronics, so it's not

 6    trading as Signalife.

 7    Q    Yeah, we've agreed here for -- just to try to shorten the

 8    trial, we're going to try to refer to it as Signalife.

 9    A    Sure.

10    Q    I'm sorry.

11    A    But, yeah, I don't know.  I can't recall.  I'm sure at

12    some point in my review I looked at what it currently is

13    trading, but I can't recall if it's trading below a dollar,

14    above a dollar.  I'm not sure.

15    Q    Now, let's go back to the period that you did review.  The

16    4500 to one reverse stock split, the price for, let's just say

17    a nano second, because I'm trying to repeat your language, was

18    $45.  Is that accurate of what it would have to be from a

19    penny?

20    A    Correct.  Keeping in mind that somebody who had -- the

21    shares may be worth $45 a share, but, again, the value of

22    someone's investment is no different from when it was trading

23    at a penny, the nano second before the one for 4500 split.

24    Q    Right.

25              And I think it's very important for the Court and the
```

```
 1   jury to understand that.  And so if you could explain when a
 2   stock goes from a penny to $45, how it is that someone's value
 3   stays the same.  Why hasn't their stock gone to 45-dollars?
 4   The answer is because it's been heavily reduced, the amount of
 5   stock, right?  By 4500 to one?
 6   A   Correct, the number of shares has been reduced.
 7   Q   Right.
 8          So it's the same pie, it's just cut up a different
 9   way.?
10   A   Correct.
11   Q   So someone holding 19 million shares, that was the largest
12   shareholder in the company, after that happened they'd be
13   holding a couple thousand shares, right?
14   A   Correct, as well as everybody else who is a shareholder at
15   that time.
16   Q   In fact, reverse stock splits create fractional, so-called
17   fractional share ownership, right?
18   A   It can.
19   Q   Meaning people own a divisible number of shares, it's so
20   low?
21   A   It's possible, based on the circumstances of that company.
22   Q   Now, you just testified that after the nano second $45,
23   that the next time you remember looking it was a dollar very
24   quickly.
25   A   I recall the next trading day's closing price was at a
```

```
 1    dollar.
 2    Q    Did you report -- did you find that suspicious in any way?
 3    A    No, I don't think I was focused -- I wasn't as focused on
 4    anything that happened after the stock split.  That wasn't,
 5    again, the focus of my review.  Focus of my review as you can
 6    see from the charts, was Mr. Carter's activity, certain stock
 7    issuances and the fall 2007 timeframe with the press releases.
 8    So I didn't really focus two far in the late fall winter 2008
 9    period.
10    Q    You didn't focus on the drastic drop from $45 to a dollar
11    because that wasn't your charge.  Nobody asked you to do that,
12    right?
13    A    Right.  And, again, it was after the split.  That wasn't
14    something that I was really looking into.  It's not like on
15    its face it's suspicious.  So I'm not sure where you're going
16    with it.
17    Q    Nobody asked you to review it.  I mean, you could have
18    easily reviewed it at that point because there was no trading.
19    There was no stock.  You could have reviewed it, right?
20    A    Yeah.  I'm just not sure what you're asking what I should
21    have reviewed.
22    Q    I'm not saying you should have reviewed.  I just want to
23    know if anyone asked you to review it.
24    A    No, that was the date, that was the stock price.
25    Q    That's fair.
```

```
 1              You have no idea whether Mr. Carter is guilty of a

 2   felony under the law.  You're not a lawyer, right?

 3   A    I am a lawyer.

 4   Q    Do you know whether he's guilty of a fraud under the law

 5   as you sit here today?

 6   A    I don't know specifics about Mr. Carter's history.

 7   Q    Are you aware of an individual by the name of Mark Taylor?

 8   A    No.

 9              MR. MUHLENDORF:  Your Honor, scope.  Objection.

10              THE COURT:  Sustained.

11              MR. STEIN:  I'm not going to be calling him back.  I

12   have three more questions.

13              THE COURT:  Well, let's get through them.

14   BY MR. STEIN:

15   Q    Are you aware of trading activity in the stock during the

16   period in time which you referenced by any brokerage firms

17   other than those involving Mr. Carter, like Merrill Lynch, you

18   know, some other brokerage house?  Are you aware of the

19   trading of any other brokerage firms?

20   A    Yeah, well, I looked at the trading in the market.  I

21   didn't look at specific accounts, I looked at trading in the

22   market over that time.

23              Are you saying did I focus on other accounts?

24   Q    No, I was just asking if you looked at other brokerage

25   firms' trading, not behind that, and you're saying you did.
```

```
 1   A   Well, in terms of the marketability.  I looked at what's
 2   called blue sheet data, which is trading, you know, throughout
 3   the market in Signalife during that period of time.
 4   Q   Last question.  If you know.
 5   A   Uh-huh.
 6   Q   What is the highest percentage of selling versus the
 7   entire trading in one day that came out of Martin Carter's
 8   account versus the entire market for any day?  And this is a
 9   best estimate I'm asking for.  I'm not going to go through
10   your charts.
11   A   Yeah, I can't give one day.  I know during those last two
12   flowcharts I talked about, he sold over 4 million shares
13   between June and September of 2008, but I couldn't say on one
14   particular day how much he sold.  And that's one account.
15   Q   So you just don't know whether it was 10 percent,
16   40 percent?  You didn't do that?
17   A   I can't give a percentage, no.
18           MR. STEIN:  No further questions.
19           THE COURT:  Thank you.
20           Any redirect?
21           MR. MUHLENDORF:  One question, Your Honor.
22                        Redirect Examination
23   BY MR. MUHLENDORF:
24   Q   Mr. Melley, Mr.~Stein asked you a lot of questions about
25   short selling and naked shorts and things like that.
```

```
 1              MR. MUHLENDORF:  If we could put 266 back up.

 2   BY MR. MUHLENDORF:

 3   Q    And in your exhibit 266, you show in that few week period

 4   3 million shares sold out of Mr. Carter's account.  You see

 5   that?

 6   A    Yes.

 7   Q    Now, does selling of a large amount of shares have a

 8   negative effect on a stock price?

 9   A    It can drive the stock price down, yes.

10   Q    And you do know if, in fact, the stock price was declining

11   this period that Mr. Carter was selling?

12   A    Yes, I believe by late August 2008, it was trading under

13   ten cents, or around ten cents.

14              MR. MUHLENDORF:  No further questions, Your Honor.

15              THE COURT:  All right.

16              MR. STEIN:  Nothing further, Your Honor.

17              THE COURT:  Thank you, sir.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  Watch your step.

20              All right.  Ladies and gentlemen, we're going to

21   recess for the evening.  Again, don't discuss the case, form

22   any opinions.  Leave everything at your seats, and we'll see

23   you tomorrow at 9:00.  Thank you very much.  Have a nice

24   evening.

25         (The jury exits the courtroom.)
```

```
 1              THE COURT:  Anything we need to talk about?

 2              MR. STIEGLITZ:  Your Honor, just for purposes, again,

 3    of scheduling, and I guess I'll mention for the Court's

 4    information, as well, we had originally anticipated calling

 5    someone by the name of Jennifer Black.  As we've informed

 6    Mr.~Stein already, we don't intend to do that.  So we expect

 7    to have one witness tomorrow and then rest.  That witness will

 8    probably take two-thirds of the morning maybe.

 9              THE COURT:  For you?

10              MR. STIEGLITZ:  No, no.  For us, it will be maybe an

11    hour at the most.  I'm trying to incorporate some cross.

12              I just request through the Court, I renew my request

13    of the defense.  We have not yet received exhibits marked any

14    higher than 321.  So, I mean, from 321 to about 404 it's going

15    to be increasingly difficult as Mr.~Stein puts on a case to

16    sort of engage on that front.  So I just renew that request,

17    and the parties hopefully will be able to talk about

18    Mr.~Stein's witness order should that begin tomorrow.

19              THE COURT:  Do you have exhibits that you need to

20    provide them?

21              MR. WHITE:  We're now compiling that, Your Honor.

22              THE COURT:  When do you expect to have that for them?

23              MR. WHITE:  I'm going to -- I have most of them here.

24    I've been compiling them.  But we have some of them that I

25    can't find, so I'm looking for those.
```

```
 1              THE COURT:  Maybe you can speak, you know, after we
 2    recess and see if you can --
 3              MR. STEIN:  Your Honor, I think the next expert is --
 4    excuse me, not expert, the next witness is a summary witness
 5    who's going to go from what this gentleman did, to me, and the
 6    cross-examination of him is going to be a more lengthy, but it
 7    will certainly conclude, if they're going to finish in one
 8    hour, it will conclude in a couple hours.
 9              After that, I may need a two-hour break to get our
10    first witness here.
11              THE COURT:  You told me yesterday you had your
12    witnesses lined up.
13              MR. STEIN:  I do, and I have to talk -- my standby
14    counsel's been arranging that.  We do have witnesses here, but
15    I haven't had time to speak with them.  But we will be
16    prepared to have a witness.
17              THE COURT:  All right.  I mean, it doesn't sound like
18    it's going to be -- I wouldn't expect you to have someone here
19    in the morning.  Okay.  So at the earliest, after lunch.  That
20    would be the earliest I would expect you to have someone here.
21              MR. STEIN:  I --
22              THE COURT:  Assuming we finish with the Government's
23    case in the morning.
24              So if we finish with the Government's case sometime
25    in the morning, I'm not going to say where's your witness.
```

```
 1   We'll wait until after the lunch break as the earliest that I
 2   would expect you to have a witness here.
 3            MR. STIEGLITZ:  And, Your Honor, given that we don't
 4   intend to call Ms. Black, she is under subpoena by Mr.~Stein.
 5   I don't know if we can go ahead --
 6            MR. STEIN:  I'm sorry, what?
 7            MR. STIEGLITZ:  Ms. Jennifer Black is under subpoena
 8   by Mr.~Stein.  We're happy to keep her here if Mr.~Stein
 9   intends to call her tomorrow, something like that, but
10   otherwise we were inclined to put her on a plane.
11            MR. STEIN:  To put her on the plane and she wouldn't
12   be called in the rebuttal case?
13            MR. STIEGLITZ:  Well, it's hard for to us project
14   what we need to do in a rebuttal case until we hear the
15   defense case.
16            THE COURT:  Do you intend to call her in your case?
17            MR. STEIN:  I did intend to call her in my case.
18            THE COURT:  So you might as well call her when she's
19   here.
20            MR. STEIN:  But she's coming all the way from Oregon.
21            THE COURT:  But she's here.
22            MR. STEIN:  Yes.
23            THE COURT:  So you might as well call her tomorrow or
24   soon thereafter so she doesn't have to go home and come back.
25            MR. STEIN:  I will evaluate the matter and tell
```

```
 1    Mr. Stieglitz within an hour, since he's now in control of the
 2    witness.  I'd like to do some evaluation of that.
 3              THE COURT:  Okay.  I'm just saying let's not send her
 4    back to Oregon and then have to bring her back again, if she's
 5    already here if you intend to call her in your case.
 6              MR. STEIN:  Can I ask whether there's any other,
 7    other than this one witness, part of the Government's case
 8    that's going to occur tomorrow?  Because I'm going to be -- I
 9    have a duty to make a Rule 29 motion, which I'm going to do,
10    which will probably take five minutes, and then I just want to
11    know if there's any other witnesses or evidence that's going
12    to be offered that we're going to be arguing about.
13              THE COURT:  They just told you they're going to have
14    one more summary witness.
15              Who is the witness?
16              MR. STIEGLITZ:  His name is George Clark, and we'll
17    be reading some stipulations in before and after him.  But
18    other than that, the Government anticipates resting.  And if
19    that changes, obviously, we'll let Mr.~Stein know.  I don't
20    foresee it changes.
21              MR. STEIN:  So summary exhibits and stipulations
22    meaning that we signed?
23              MR. STIEGLITZ:  Yes.
24              MR. STEIN:  And no other evidence, other than those
25    summary exhibits and the stipulation?
```

```
 1              MR. STIEGLITZ:  Just to clarify, there will be

 2    exhibits introduced through the summary witness in the nature

 3    of summary charts, and off the top of my head, there may be a

 4    handful of other exhibits that are e-mails from Mr.~Stein, for

 5    example.  But there will be evidence admitted through a

 6    summary witness, some stipulations will be read into the

 7    record, and I anticipate that we will rest when that's

 8    concluded.

 9              MR. STEIN:  I just wanted to know if there are any

10    new exhibits, not summary exhibits, but exhibits that we

11    haven't yet seen that were going to be introduced.

12              MR. STIEGLITZ:  The exhibits that -- the Government

13    has not introduced a single exhibit that wasn't provided to

14    Mr.~Stein well in advance of trial.

15              MR. STEIN:  I'm talking about exhibits that have

16    already been introduced.

17              THE COURT:  He says there's going to be some other

18    exhibits coming into evidence.  Presumably, you know what they

19    are.  If you don't know what they are, ask Mr. Stieglitz,

20    because I don't think it's going to be a big surprise that

21    he's going to spring on you tomorrow on the last day of their

22    case, wow, here's the smoking gun that we never told you

23    about, Mr.~Stein, and here it is, and we're going to spring it

24    on you at the last minute.

25              I don't think that's going to happen.  So just talk
```

```
1   about it and figure out what you're going to present and talk
2   about what exhibits you need to show the Government so that
3   they are not surprised and we don't have to waste a lot of
4   time looking at exhibits in the middle of your case and
5   keeping this jury here longer than necessary.  That's all I'm
6   asking.
7           Yes, Mr. White.
8           MR. WHITE:  Your Honor, there is -- I just wanted to
9   know if it'd be possible for me to see what -- record of what
10  the Court has introduced into evidence.
11          THE COURT:  If you will stick around for a few
12  minutes after I take this change of plea, I'll be happy to let
13  you know every exhibit that I have marked down in evidence
14  both from the Government and the defense, if you wouldn't mind
15  waiting a few minutes.
16          MR. WHITE:  Thank you, Your Honor.
17          MR. STEIN:  Thank you, Your Honor.
18          MR. STIEGLITZ:  Thank you, Your Honor.
19          THE COURT:  All right.  If you could just, again,
20  clear some space for the parties.  You don't need to move
21  everything, just so they can sit down.
22      (The evening recess was taken at 4:43 p.m.)
23                          * * * * *
24
25
```

```
 1                         * * * * *

 2                      I N D E X

 3   Testimony of Martin B. Carter (Continued)

 4           Cross by Mr. Stein (Cont.'d)          4

 5           Redirect by Mr. Stieglitz           124

 6           Recross by Mr. Stein                148

 7           Redirect by Mr. Stieglitz           150

 8   Testimony of Jamie Yafa

 9           Direct by Mr. Muhlendorf            152

10           Cross by Mr. Stein                  170

11           Redirect by Mr. Muhlendorf          176

12   Testimony of Peter Joseph Melley

13           Direct by Mr. Muhlendorf            178

14           Cross by Mr. Stein                  201

15           Redirect by Mr. Muhlendorf          225

16                         * * * * *

17                    E X H I B I T S

18   Government's Exhibits in Evidence:

19           Government's 186                     86

20           Government's 214                    135

21           Government's 104, 108 and 110       152

22           Government's 262                    183

23           Government's 263                    186

24           Government's 135                    189

25           Government's 364                    191
```

```
 1                          *  *  *  *  *

 2                E X H I B I T S  (Cont.'d)

 3  Government's Exhibits in Evidence:

 4          Government's 286                    193

 5          Government's 265                    194

 6          Government's 288                    197

 7          Government's 266                    198

 8  Defendant's Exhibits in Evidence:

 9          Defendant's 9                        51

10          Defendant's 47                       81

11          Defendant's 152                      99

12          Defendant's 157                     106

13          Defendant's 154                     118

14          Defendant's 19                      149

15                          *  *  *  *  *

16                        CERTIFICATE

17      I, Stephen W. Franklin, Registered Merit Reporter, and

18  Certified Realtime Reporter, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above-entitled matter.

21      Dated this 8th day of JULY, 2013.

22

23      /s/Stephen W. Franklin
        _____
24      Stephen W. Franklin, RMR, CRR

25
```

**$**

$1,473,900 [1]  187/6
$1.35 [1]  185/2
$1.60 [1]  216/19
$1.70 [1]  185/11
$1.90 [1]  185/22
$13,000 [1]  112/17
$150,000 [1]  111/19
$175,250 [1]  75/12
$180,000 [5]  140/6 140/8 140/22 141/7
 142/12
$2 [3]  118/8 118/14 132/9
$2 million [2]  118/8 118/14
$2 million-worth [1]  132/9
$2.16 [1]  183/25
$2.30 [1]  183/14
$261,260.74 [1]  195/7
$3.3 [1]  185/8
$3.3 million [1]  185/8
$300,000 [1]  111/19
$40 [1]  68/10
$40 million [1]  68/10
$45 [6]  220/24 221/18 221/21 222/2 222/22
 223/10
$461,000 [1]  192/11
$461,332.30 [1]  192/10
$50,000 [2]  17/14 17/16
$52,000 [1]  76/1
$551,000 [1]  185/18
$60,000 [2]  18/5 18/21
$750,000 [1]  119/2
$800 [3]  60/3 60/7 60/8
$82,000 [1]  75/24
$98,531.34 [1]  199/5

**'**

'08 [1]  61/16
'09 [3]  136/1 136/3 136/11
'11 [5]  44/5 44/6 44/6 44/10 44/11
'12 [1]  44/11
'6 [1]  12/10
'8 [1]  57/7
'91 [1]  19/24
'92 [2]  42/4 42/5
'til [1]  66/19

**-**

-and [1]  1/21
-v [1]  1/5

**/**

/s/Stephen [1]  234/23

**0**

000660 [1]  54/13
0047 [1]  85/5
07 [1]  185/21

**1**

1 million [1]  200/1
1,073,300 [1]  195/6
1.98 million [1]  184/21
10 [10]  10/4 10/6 10/21 14/24 18/3 21/18
 100/7 111/15 199/24 199/25
10 miles [1]  48/1
10 million [2]  199/23 200/1
10 percent [1]  225/15
10-K [3]  181/18 181/21 181/23
10/10/07 [1]  185/21

100 [13]  7/5 8/18 9/6 26/7 26/12 44/10 75/7
 101/1 102/14 102/16 102/18 104/4 104/7
100 percent [2]  94/10 127/8
1031 [1]  1/22
104 [6]  152/9 152/14 160/20 160/21 160/24
 233/21
106 [1]  234/12
108 [6]  152/9 152/14 162/7 162/7 162/9
 233/21
10:32 [1]  66/1
10:48 [1]  66/1
10th [1]  183/21
11 [4]  93/23 94/4 94/7 94/9
11-80205-CR-MARRA [1]  1/2
110 [6]  152/9 152/14 158/8 158/9 158/12
 233/21
118 [1]  234/13
11:28 a.m [1]  112/22
11th [2]  186/21 188/6
12 [1]  181/25
1208 [1]  1/20
121,000 [1]  216/11
122 [1]  118/19
1228 [1]  149/9
1234 [1]  149/9
124 [1]  233/5
125 [3]  188/13 188/19 189/5
126 [3]  188/13 189/2 189/3
129 [3]  121/10 121/10 146/16
12:01 [1]  107/3
12th [13]  182/21 183/13 184/3 191/24 192/9
 192/15 192/15 192/16 192/25 193/5 194/21
 195/15 195/16
13 [2]  121/11 121/25
13,000 [1]  195/10
13,150 [1]  195/5
132 [3]  74/12 74/21 139/25
135 [6]  189/16 189/17 189/21 189/23 233/20
 233/24
13th [1]  158/17
14 [1]  1/8
1400 [1]  1/18
145 [2]  121/10 121/11
148 [1]  233/6
149 [1]  234/14
15 [9]  18/3 65/7 65/21 65/25 96/20 121/12
 170/1 170/7 179/16
15 feet [1]  21/18
15-minute [2]  65/6 169/25
150 [5]  67/7 67/11 70/13 72/18 233/7
152 [14]  99/4 99/7 99/10 99/16 105/7 105/9
 192/18 192/19 192/21 192/21 192/22 233/9
 233/21 234/11
153 [5]  113/11 115/11 192/18 192/20 193/1
154 [9]  116/11 116/11 117/25 118/4 125/4
 126/14 126/19 127/14 234/13
1551 [1]  1/20
157 [6]  105/2 106/4 106/6 106/8 112/8
 234/12
15th [1]  136/1
16,000 feet [1]  37/6
161 [5]  147/19 164/22 164/24 166/23 176/25
168 [2]  196/2 196/4
169 [3]  196/2 196/11 196/12
16th [3]  186/21 193/23 195/3
17 [1]  118/9
170 [1]  233/10
176 [1]  233/11
177 percent [1]  183/24
178 [1]  233/13

180,000 [1]  75/13
183 [1]  233/22
186 [7]  86/14 86/15 86/18 86/19 86/23
 233/19 233/23
189 [1]  233/24
18th [2]  199/2 199/12
19 [10]  148/19 148/19 149/4 149/6 150/20
 186/20 187/2 187/6 189/9 234/14
19 million [1]  222/11
191 [1]  233/25
193 [1]  234/4
1934 [1]  181/25
194 [1]  234/5
1957 [1]  85/6
1966 [1]  85/6
197 [1]  234/6
198 [1]  234/7
1991 [1]  42/2
1996 [1]  103/3
19th [7]  188/23 190/16 190/22 191/12 191/23
 192/2 192/14
1:00 [1]  66/20
1:15 [3]  106/15 106/19 106/25
1:18 [1]  107/3
1:30 [1]  66/19
1st [1]  97/3

**2**

20 [3]  19/22 109/15 120/1
20-plus [1]  128/3
20-years [1]  117/16
200 [2]  6/3 6/6
200-some [2]  41/24 44/17
2002 [1]  219/7
2004 [1]  103/25
2005 [13]  4/19 5/8 8/25 9/4 12/10 13/5 24/6
 24/23 26/5 28/23 29/7 47/11 219/14
2006 [3]  26/9 219/16 219/17
2006-2008 [1]  219/22
2007 [18]  11/6 61/12 62/1 64/2 69/8 77/5
 132/1 132/2 154/23 182/21 184/3 212/5
 215/21 215/22 215/23 215/24 219/18 223/7
2007-2008 [1]  69/7
2008 [102]
2009 [8]  35/5 35/8 39/9 40/8 93/22 97/1 97/3
 97/16
201 [1]  233/14
2010 [11]  18/3 97/4 97/17 118/19 120/1
 121/10 127/4 128/22 168/13 168/17 172/18
2011 [11]  44/7 44/12 45/9 98/13 98/22 99/21
 112/19 112/22 116/12 127/4 145/24
2012 [1]  45/19
2013 [2]  1/8 234/21
203 [1]  89/5
20530 [1]  1/18
20th [2]  183/20 184/22
21 [2]  121/11 168/14
214 [5]  135/10 135/11 135/12 135/14 233/20
22 [2]  172/18 190/4
224 [2]  211/18 211/21
225 [2]  77/13 233/15
228 [1]  1/22
22nd [8]  195/4 195/17 195/19 195/21 196/7
 196/15 198/23 198/24
23 [1]  168/18
238 [2]  143/18 143/22
239,550 [1]  192/5
23rd [1]  66/22
247,000 [8]  156/17 156/25 159/2 160/17
 160/18 160/25 162/10 163/24

**2**

24th [3] 190/10 192/4 192/9
25 [3] 121/11 172/18 173/19
257 [1] 1/19
25th [6] 18/3 115/17 118/19 120/1 121/9 183/20
262 [7] 182/8 182/9 182/15 182/17 182/25 183/4 233/22
263 [8] 186/2 186/4 186/11 186/15 186/19 188/8 188/10 233/23
264 [4] 191/5 191/6 191/8 191/13
265 [6] 194/10 194/12 194/14 194/18 194/20 234/5
266 [7] 198/11 198/14 198/17 198/20 226/1 226/3 234/7
26th [2] 198/2 199/1
27th [3] 182/20 183/13 184/2
286 [5] 193/10 193/12 193/15 193/19 234/4
288 [5] 197/11 197/14 197/18 197/20 234/6
29 [1] 230/9
2:50 [1] 170/9
2nd [2] 196/17 196/18

**3**

3 million [2] 199/7 226/4
3,085,586 [1] 199/4
30 [1] 15/24
30,000 [1] 75/24
300,000 [6] 188/22 189/8 190/12 190/15 191/11 192/1
3038 [1] 106/5
31 [3] 187/15 187/18 187/21
321 [2] 227/14 227/14
33179 [1] 1/22
33401 [2] 1/20 1/25
34 [1] 153/4
364 [2] 191/17 233/25
3768 [1] 1/24
390 [1] 195/9
390,000 [5] 192/24 193/2 193/22 193/23 194/2
3:05 [1] 170/9
3:52 [1] 201/11
3rd [8] 81/15 81/17 81/20 82/4 82/7 82/12 82/19 84/10

**4**

4 million [1] 225/12
4/22/2011 [1] 112/22
40 [1] 190/4
40 miles [1] 36/20
40 percent [1] 225/16
400,000 [3] 196/7 196/14 198/2
404 [2] 139/13 227/14
45 [1] 121/25
45-dollars [1] 222/3
4500 [7] 199/15 220/1 220/10 220/23 221/16 221/23 222/5
4516 [1] 92/5
4517 [1] 92/5
4518 [1] 92/5
47 [6] 80/23 81/4 84/19 84/21 85/10 234/10
4705 [1] 89/4
4:00 [1] 201/11
4:30 [3] 66/13 106/16 170/3
4:43 [1] 232/22
4th [1] 184/1

**5**

5 billion-dollar [1] 101/22

**50** [2] 121/17 122/13
50,000 [4] 18/23 18/23 76/1 145/18
50-year [1] 102/7
501,205 [1] 199/3
51 [1] 234/9
514-3768 [1] 1/24
52 [1] 168/13
53 [1] 168/17
5500 [1] 100/6
561 [1] 1/24
57 [1] 67/19
58 [1] 172/18
5822 [3] 215/8 217/2 217/4
5th [5] 87/17 87/18 91/22 92/18 188/1

**6**

6 million [1] 187/3
64 [1] 146/6
69 [3] 184/9 184/15 184/20
6th [1] 92/9

**7**

7 million [4] 217/20 217/21 217/23 218/6
70 [1] 146/9
70 percent [1] 111/11
700 [1] 119/5
701 [1] 1/24
72 [3] 184/9 185/5 185/7
74 [2] 18/3 146/12
76 [3] 184/10 185/13 185/15
78 [1] 183/25

**8**

803,450 [1] 192/8
81 [1] 234/10
8103 [1] 117/13
86 [1] 233/19
8:14 [1] 115/17
8th [4] 168/13 168/17 172/17 234/21

**9**

90 [1] 163/19
93 [2] 181/1 181/10
931:19 [1] 168/13
933 [1] 168/13
935 [2] 168/17 168/18
96 [5] 52/25 53/7 53/10 53/22 56/11
99 [1] 234/11
9:00 [1] 226/23

**A**

a.m [3] 66/1 66/1 112/22
abilities [1] 124/18
ability [6] 126/5 206/12 209/2 209/4 209/24 213/12
able [12] 19/1 71/16 72/12 123/11 196/19 200/22 206/11 206/13 206/17 209/7 220/5 227/17
aboard [1] 56/19
above [3] 55/9 221/14 234/20
above-entitled [1] 234/20
Abso [1] 23/15
absolutely [18] 18/9 18/14 122/25 140/4 142/4 150/8 153/9 153/12 153/14 156/24 168/3 168/6 168/9 169/5 169/8 170/8 173/5 176/20
accent [1] 15/24
access [6] 125/19 209/8 209/9 209/13 210/4 210/7
accessible [1] 210/7

accident [1] 48/6
according [2] 163/5 167/21
account [54] 82/22 83/2 83/8 84/9 85/13 86/3 100/3 141/9 141/12 141/21 142/5 142/5 142/9 149/24 179/20 180/6 189/12 189/13 189/24 190/5 190/13 190/13 191/2 191/10 192/3 192/5 193/9 193/13 193/24 194/7 194/25 195/4 195/12 195/13 195/14 195/24 196/20 196/21 196/22 197/10 197/22 197/25 198/3 199/1 199/2 199/14 200/11 200/13 200/14 206/15 209/19 225/8 225/14 226/4
accounting [1] 203/2
accounts [10] 81/7 81/8 85/20 85/24 149/24 180/18 208/14 218/10 224/21 224/23
accumulated [2] 195/24 200/11
accuracy [1] 207/19
accurate [20] 6/21 37/8 45/25 46/1 73/3 76/6 77/5 94/5 112/19 114/2 124/2 127/14 169/13 169/14 169/16 173/13 182/22 186/8 206/24 221/18
accurately [2] 88/21 123/21
acknowledgment [1] 165/4
acquired [1] 47/11
acquisition [1] 159/12
acquisition-related [1] 159/12
across [1] 183/16
act [3] 95/18 103/3 181/25
acting [2] 12/18 12/19
action [4] 93/9 93/20 94/3 94/19
actively [2] 7/22 219/7
activities [4] 21/23 24/19 48/15 94/25
activity [10] 32/1 32/3 199/13 204/19 204/24 204/25 208/4 209/14 223/6 224/15
activity's [1] 32/5
activity's irrelevant [1] 32/5
actual [5] 159/19 164/14 193/2 196/13 199/14
actually [30] 5/24 11/7 13/9 17/19 19/16 25/8 30/4 33/6 36/14 38/8 51/1 100/17 100/17 121/22 126/14 126/16 127/14 135/17 141/12 150/20 158/18 164/12 164/15 187/10 189/12 196/20 196/25 209/14 213/22 213/22
add [1] 153/21
adding [1] 84/25
addition [2] 20/8 135/21
additional [3] 192/5 195/5 199/3
address [1] 89/4
adjust [1] 178/7
Administration [1] 211/14
administrative [2] 159/6 160/5
admissible [1] 71/9
admission [1] 99/7
admit [1] 114/25
admitted [23] 48/14 51/21 71/16 81/3 86/22 99/9 106/7 112/9 118/3 125/4 135/13 149/4 152/13 158/9 183/3 186/14 189/20 191/16 193/18 194/17 197/17 198/19 231/5
admonish [1] 107/25
adopting [1] 94/20
Adriana [4] 125/15 125/17 125/20 126/17
advance [2] 139/13 231/14
Advantage [4] 131/18 131/25 132/7 132/10
affect [1] 213/21
affiliated [1] 202/13
aforesaid [2] 88/12 88/21
after [92]
afternoon [12] 115/18 124/23 131/17 131/18 152/20 171/1 171/2 178/14 178/15 202/1 202/2 202/5
afterwards [1] 29/2

# A

again [59]  2/4 3/10 9/1 14/11 26/5 29/18
33/9 33/9 40/17 40/21 63/25 106/16 106/18
113/5 114/11 114/23 115/10 121/10 122/8
129/18 143/20 144/20 155/12 155/24 160/4
161/2 163/4 163/10 171/13 174/20 185/15
185/21 189/8 191/23 194/5 195/19 195/23
196/14 197/8 197/23 199/6 205/3 208/6
210/3 212/13 212/21 214/12 214/13 216/2
216/20 218/3 218/9 221/21 223/5 223/13
226/21 227/2 230/4 232/19
against [8]  13/10 31/12 32/11 43/18 45/13
64/6 79/2 93/9
agencies [4]  202/12 203/1 205/4 212/15
agency [2]  202/12 205/5
agent [7]  180/17 188/21 191/10 192/23 196/5
197/1 206/15
agents [2]  129/10 130/2
ago [7]  19/23 45/7 45/8 45/23 80/6 89/15
173/19
agree [3]  88/6 138/22 156/25
agreed [3]  152/7 165/11 221/7
agreement [46]  4/24 5/1 5/5 6/11 6/16 6/18
10/22 22/2 22/6 23/19 40/20 41/1 51/11
54/16 54/20 54/22 55/21 67/16 67/25 68/4
77/12 77/17 79/2 85/12 88/22 89/18 89/22
89/25 91/13 91/14 91/16 91/23 111/6 111/9
111/10 111/25 112/1 156/9 157/15 158/15
159/7 165/4 171/23 172/21 172/22 174/21
agreement's [1]  158/16
agreements [2]  88/9 187/25
ahead [7]  15/9 75/11 126/3 135/11 135/17
152/6 229/5
air [6]  15/13 15/17 16/6 16/9 16/10 101/5
air-compressed [5]  15/13 15/17 16/6 16/9
16/10
airfield [3]  164/13 164/14 164/16
Ajay [1]  26/22
Albert [1]  1/16
alcohol [3]  11/25 12/4 12/14
allegation [1]  12/17
allegations [1]  13/7
alleged [1]  13/10
allow [4]  32/13 32/15 33/5 33/7
allowed [4]  31/16 32/22 84/15 111/10
almost [2]  13/5 106/23
along [4]  76/9 95/17 101/4 188/24
aloud [2]  72/18 100/4
already [30]  51/16 52/2 52/3 60/5 65/20 67/5
69/20 74/25 78/12 79/25 86/20 93/14 110/6
146/6 152/7 158/9 164/22 167/21 181/9
184/11 184/20 185/7 185/16 187/15 188/16
192/19 196/3 227/6 230/5 231/16
also [39]  16/19 16/21 26/18 34/19 39/13
59/10 66/13 73/25 76/2 79/1 79/3 95/12
96/14 109/16 113/23 132/13 133/15 137/5
141/17 141/20 144/15 157/21 162/10 164/3
165/23 179/1 179/20 179/22 179/23 180/16
183/15 185/12 185/20 185/24 192/8 195/6
197/5 199/4 215/21
although [1]  115/4
always [2]  39/13 51/12
am [12]  32/19 52/20 76/7 77/18 84/15 153/4
154/5 154/15 165/10 202/3 217/25 224/3
AMERICA [1]  1/3
American [12]  203/12 203/24 203/25 204/5
204/11 204/23 205/1 210/20 210/25 211/2
212/4 212/10
Ameritrade [23]  81/8 82/22 83/2 84/3 84/7

84/10 85/12 85/16 141/21 189/14 189/24
191/10 192/3 193/9 193/14 195/12 195/24
196/21 197/12 197/22 199/1 200/11 200/13
AMEX [3]  179/3 203/15 205/4
among [2]  100/23 180/1
amount [15]  41/24 75/7 75/12 100/6 109/24
140/25 162/10 183/11 192/10 195/7 197/2
199/5 214/22 224/2 226/7
amounts [4]  75/19 88/13 88/14 111/18
analogy [1]  25/19
analysis [7]  188/9 189/10 192/12 196/25
200/10 208/7 219/3
analyze [1]  208/13
Analyzing [1]  205/20
Anand [4]  26/22 27/2 27/5 27/16
and/or [3]  88/11 88/13 88/18
Angeles [2]  48/16 137/6
announcing [1]  184/21
annual [1]  181/20
another [15]  34/15 55/17 76/2 76/4 86/6
96/20 114/22 138/19 148/14 155/20 162/6
183/20 185/7 195/22 197/3
answer [33]  5/13 15/9 18/6 18/7 22/16 62/21
70/10 71/14 72/6 73/20 118/21 118/24 119/2
119/4 120/4 120/7 120/10 120/14 121/14
122/4 122/6 122/8 122/24 123/7 123/16
154/16 169/21 172/4 172/22 173/21 200/19
218/15 222/4
answered [1]  71/13
answering [1]  71/24
anticipate [1]  231/7
anticipated [1]  227/4
anticipates [1]  230/18
any [138]
anybody [11]  3/16 6/8 9/20 24/25 47/6 76/10
92/17 171/5 172/13 206/4 219/15
anyone [24]  4/16 9/5 9/9 9/17 25/19 44/15
70/17 92/17 94/17 99/20 131/14 157/3 157/5
157/17 160/14 161/7 162/15 169/2 171/23
172/8 176/16 176/17 212/9 223/23
anyone's [1]  157/12
anything [56]  3/7 10/12 22/20 27/8 29/4 31/8
31/13 32/10 32/18 34/13 44/1 47/4 54/24
58/21 58/21 58/23 59/14 59/20 60/17 60/19
63/23 64/1 64/3 70/14 71/4 71/9 76/7 82/16
84/12 93/3 93/4 108/18 123/3 130/2 141/11
148/1 148/14 153/13 155/1 155/2 157/25
158/3 162/25 168/2 168/5 169/6 195/23
200/16 202/23 207/21 211/1 211/11 212/21
217/8 223/4 227/1
anywhere [4]  23/13 121/17 141/6 143/14
aol.com [2]  1/25 99/20
apart [2]  5/9 17/8
apologize [14]  3/2 3/9 7/14 67/12 108/6
109/2 109/11 125/24 132/12 135/20 148/9
150/21 205/6 213/17
apologized [1]  2/25
appear [2]  109/12 187/23
Appearances [1]  1/15
appears [1]  196/17
application [1]  141/21
appointed [1]  11/6
appreciate [3]  4/3 109/19 112/10
apprentice [1]  8/20
approach [3]  31/4 51/24 70/18 80/20 106/1
115/24 126/11 144/5 148/20 151/24 178/4
182/10 187/11
appropriate [2]  2/21 3/13 61/5
approval [1]  157/12
approve [1]  76/3

approved [5]  74/5 76/5 123/7 123/10 202/16
approximately [10]  10/21 14/23 65/16
118/23 145/14 179/16 184/25 185/2 185/11
185/22
April [3]  77/4 112/19 145/8
architecture [1]  18/18
area [2]  148/6 211/15
areas [3]  33/20 126/22 132/13
aren't [4]  15/5 114/2 121/22 124/15
arguing [1]  230/12
arguments [1]  34/12
Armpriester [2]  17/1 17/9
around [10]  2/10 2/22 42/20 104/21 132/13
156/17 184/18 191/3 226/13 232/11
arouse [1]  31/10
arrangement [7]  10/24 98/18 98/20 98/21
174/17 174/18 174/19
arranging [1]  228/14
arrest [9]  223/22 44/3 44/4 44/15 44/18
128/17 129/20 129/24 129/24
arrested [6]  45/8 98/14 129/16 129/19 130/1
130/13
arrive [1]  164/10
arrived [1]  4/23
arrow [1]  185/10
articles [1]  30/4
articulately [1]  213/9
Asia [1]  68/17
ask [67]  2/15 2/20 7/2 8/16 10/11 10/15
10/20 10/21 12/14 12/17 12/20 14/10 15/16
21/21 31/16 32/7 32/7 47/4 63/20 65/15
65/15 70/15 72/20 74/12 77/22 80/23 82/6
85/10 92/5 107/18 107/24 108/18 114/9
115/11 122/7 124/24 129/13 130/7 131/9
140/12 142/14 142/25 146/3 146/7 146/9
146/12 147/2 147/5 148/1 148/7 150/12
155/1 156/2 156/4 157/3 164/7 172/6 176/16
176/17 203/23 211/5 211/18 215/8 219/14
219/15 230/6 231/19
asked [55]  3/1 5/9 7/12 23/1 23/2 23/6 23/8
23/12 30/2 31/9 36/15 70/24 113/7 114/10
115/15 116/5 122/3 122/5 127/2 127/3
127/12 128/16 131/16 132/14 132/14 133/9
133/9 133/15 133/21 137/5 137/9 137/16
138/17 140/5 141/20 143/14 144/15 145/23
146/4 147/4 148/12 159/21 164/15 167/16
173/1 208/12 208/13 208/22 209/6 219/21
219/24 223/11 223/17 223/23 225/24
asking [28]  7/12 16/12 33/8 39/15 56/1 56/1
59/13 61/17 80/10 113/9 116/18 116/18
129/19 131/18 133/11 133/13 137/10 142/9
143/15 164/13 173/17 174/20 214/2 220/17
223/20 224/24 225/9 232/6
asks [2]  136/9 136/9
asserted [2]  114/1 114/13
assist [6]  35/24 105/7 180/8 182/11 202/11
202/11
assistance [10]  178/19 179/7 179/10 180/12
180/13 202/8 204/17 207/4 208/12 208/17
assistant's [1]  183/6
assisting [2]  179/18 202/10
associate [1]  157/20
associates [1]  154/7
associations [1]  16/22
assume [4]  30/1 36/13 77/16 218/16
Assuming [1]  228/22
attached [3]  88/23 112/15 114/19
attaching [1]  112/14
attachment [2]  105/9 105/11

**A**

attachments [1] 147/23
attempt [2] 31/10 161/20
attempts [1] 71/2
attended [2] 57/18 61/23
attention [2] 40/6 196/16
attorney [11] 47/24 96/14 99/22 129/11
130/5 130/8 130/10 130/17 130/24 131/7
175/14
attorneys [1] 130/16
Audio [2] 168/15 168/19
August [19] 62/1 64/2 182/20 183/13 184/2
184/8 195/4 195/17 195/19 195/21 196/7
196/15 197/22 198/2 198/23 198/24 199/1
218/7 226/12
August 2008 [2] 197/22 226/12
August 22nd [8] 195/4 195/17 195/19 195/21
196/7 196/15 198/23 198/24
August 26th [2] 198/2 199/1
August 27th [3] 182/20 183/13 184/2
Authority [1] 178/21
authorized [2] 88/17 116/16
available [4] 179/24 180/15 210/1 214/13
Avenue [1] 1/18
avoid [2] 9/8 114/14
avoided [1] 2/19
aware [27] 12/11 13/5 47/17 62/17 71/25
76/7 157/11 172/12 172/20 172/23 173/1
190/23 205/12 205/24 207/3 207/3 207/6
207/12 211/7 213/1 213/3 217/19 217/24
218/1 224/7 224/15 224/18
awareness [6] 153/17 153/21 153/23 155/11
164/2 173/15
away [3] 34/25 139/17 175/11

**B**

back [73] 3/25 4/19 8/21 11/22 13/14 16/21
24/6 26/9 27/1 27/8 30/24 32/14 32/15 33/2
33/13 34/16 42/12 42/13 42/18 42/20 42/25
45/17 48/13 48/15 49/6 60/1 60/21 60/24
66/4 66/8 66/25 89/8 91/19 93/23 100/8
106/18 107/14 110/14 110/21 114/19 125/24
128/21 135/6 136/6 136/16 136/18 142/7
146/21 150/22 160/12 163/2 163/4 163/20
166/8 166/12 166/17 166/21 166/22 170/6
170/16 170/20 184/6 201/20 208/19 208/23
213/8 215/22 221/15 224/11 226/1 229/24
230/4 230/4
back -- I [1] 60/1
background [3] 25/11 153/6 178/17
backgrounds [1] 155/3
bad [1] 31/12
badge [1] 151/1
bags [1] 144/9
bailing [6] 38/11 41/15 46/10 49/6 81/18
96/25
baked [1] 3/11
balance [3] 75/23 75/25 100/7
bank [3] 31/25 31/25 34/25
bankruptcy [6] 29/22 93/23 94/4 94/13
94/20 98/4
banks [3] 31/12 32/12 139/8
bar [3] 32/1 33/4 125/9
barbecue [2] 20/12 20/13
bars [1] 183/12
based [9] 50/20 68/10 128/1 182/18 186/6
191/9 208/6 215/2 222/21
basic [4] 131/22 159/18 165/3 165/4
basically [9] 15/21 138/8 190/1 190/13

199/17 202/24 206/23 209/20 213/5
basis [5] 69/20 139/3 183/12 183/13 219/3
Batelle [16] 100/3 100/14 100/19 100/23
101/3 101/3 101/15 101/19 101/20 101/22
102/7 102/13 102/18 103/20 103/24 104/7
Batelle's [2] 100/9 100/17
Bates [17] 53/13 53/18 53/21 53/22 85/3 85/3
85/5 85/5 85/6 87/7 92/4 105/25 106/4 106/5
149/8 149/9 215/7
battery [1] 6/9
Baxter [1] 13/22
Baylor [1] 122/12
Beach [3] 1/7 1/20 1/25
bears [1] 88/25
Beau [1] 47/25
became [6] 31/19 36/6 40/2 219/6 219/9
221/5
because [60] 5/17 12/18 12/19 14/11 15/23
15/24 16/17 22/11 26/9 28/2 31/18 35/9 36/8
37/21 38/3 38/8 38/21 50/12 50/19 50/23
59/5 63/12 85/15 89/11 90/3 93/13 93/17
94/24 98/11 104/20 105/13 109/3 113/4
114/5 120/22 121/16 122/13 126/9 136/19
136/19 137/1 142/22 145/17 145/20 149/13
160/5 192/16 195/21 199/13 203/8 213/13
215/21 218/24 220/19 221/17 222/4 223/11
223/18 230/8 231/20
becomes [1] 199/25
becoming [2] 96/1 96/9
beef [1] 37/2
before [64] 1/12 17/12 17/13 24/6 26/18
28/15 28/22 28/23 30/7 36/4 42/23 47/7 48/6
52/3 52/6 57/3 57/7 57/20 61/12 65/16 77/2
78/15 85/10 89/18 89/22 89/25 94/21 95/25
97/23 98/14 100/20 105/5 109/25 111/3
113/14 119/25 121/6 121/9 127/16 131/10
135/8 135/8 137/16 137/25 150/21 154/16
159/21 159/24 161/12 166/24 169/23 172/16
187/14 188/5 200/6 203/9 203/23 207/4
211/25 214/23 217/2 220/11 221/23 230/17
began [8] 6/17 30/25 35/5 35/23 91/15 91/22
92/10 96/24
begin [2] 94/24 227/18
beginning [4] 40/8 85/3 93/22 191/25
begun [1] 92/23
behalf [3] 30/25 31/11 209/19
behind [2] 107/19 224/25
being [22] 24/24 26/7 27/2 28/4 36/20 63/8
95/4 97/25 101/9 101/17 104/10 109/4
114/12 119/4 119/18 121/17 136/21 137/6
139/3 188/10 200/3 205/4
Bel [1] 101/5
Bel-Air [1] 101/5
believe [54] 2/12 6/19 16/7 16/13 19/18 22/1
28/25 29/21 34/10 37/7 37/20 40/1 42/4
50/14 60/8 61/25 66/14 68/8 69/14 82/23
84/22 85/11 86/5 87/20 91/5 96/14 103/22
105/13 108/4 112/16 112/20 113/8 113/15
115/20 115/20 116/25 117/9 127/3 127/5
127/22 132/22 137/16 140/10 150/9 160/8
166/1 166/7 175/14 192/19 200/17 219/8
219/16 221/5 226/12
believed [1] 137/1
believing [1] 102/18
bell [3] 30/10 30/12 68/16
below [3] 136/9 145/7 221/13
benefit [1] 86/4
Benz [3] 34/18 36/23 97/6
Bert [2] 189/25 200/15
besides [1] 204/10

best [9] 57/20 62/7 112/23 124/17 124/18
171/17 190/15 217/18 225/9
better [4] 2/11 46/17 87/3 205/7
between [29] 4/15 8/24 9/3 9/4 52/8 52/14
56/3 92/11 121/17 130/25 132/13 139/4
158/21 158/23 167/16 167/24 174/21 174/22
182/20 183/13 186/6 186/21 192/8 195/3
195/16 199/1 206/1 206/4 225/13
beyond [2] 31/8 138/11
big [9] 31/12 37/21 38/3 46/9 100/20 101/25
102/1 102/4 231/20
bigger [1] 53/2
bill [7] 37/21 37/25 39/2 41/16 50/4 81/18
98/9
billion [1] 101/22
bills [2] 41/18 42/15
binder [6] 52/23 160/20 181/4 182/8 184/9
188/15 189/3 189/15 190/4 191/5 193/10
194/10 196/3 196/11 197/11 198/11
binders [1] 151/25
birthday [3] 44/5 44/5 44/12
bit [10] 15/12 27/19 65/18 68/3 98/6 126/2
153/5 155/4 163/24 188/7
black [6] 39/22 131/19 217/7 227/5 229/4
229/7
Blanca [2] 51/1 51/3
Bloomberg [6] 179/24 180/16 206/12 219/8
219/16 221/2
blow [8] 67/23 77/14 83/5 112/11 126/5
134/13 140/3 177/1
blue [3] 107/12 183/12 225/2
blurt [1] 101/12
board [4] 28/16 40/11 58/3 59/15
Bob [3] 157/20 159/17 171/14
Boca [13] 27/21 28/2 28/4 69/23 69/25 76/19
76/22 76/24 77/4 164/3 164/11 164/12
164/20
body [3] 15/23 16/4 108/22
bonus [3] 118/8 118/14 119/6
book [2] 158/8 158/12
bordered [1] 139/11
borrow [2] 213/7 214/13
both [5] 36/1 37/9 78/13 175/16 232/14
bottle [2] 60/3 60/7
bottom [18] 52/11 53/10 53/13 54/11 54/14
55/8 55/9 55/14 56/7 87/4 89/3 89/4 127/20
140/19 148/25 166/2 167/9 182/1
bought [12] 42/24 42/10 42/18 42/22 43/13
45/20 46/5 46/7 47/1 61/2 134/18 137/2
195/9
Boulevard [1] 89/4
box [3] 183/22 185/21 192/1
boxes [4] 19/6 147/7 183/18 191/21
bracket [1] 26/6
break [8] 65/6 106/10 109/13 197/4 200/21
201/7 228/9 229/1
breakfast [1] 3/19
Brian [2] 58/6 59/16
Bridges [1] 76/21
brief [4] 51/17 153/19 184/10 220/24
briefly [8] 2/6 168/16 176/10 183/7 186/18
207/13 208/6 215/8
bring [19] 3/20 32/14 33/13 37/12 42/11 65/2
66/11 108/5 110/12 110/15 134/12 136/15
138/18 153/23 153/25 170/15 185/13 201/16
230/4
bringing [3] 32/11 33/2 33/22
broke [1] 38/22
brokerage [21] 81/7 83/7 85/20 85/24 86/3
149/23 149/24 162/20 178/24 179/19 180/6

**B**

brokerage... [10]  180/17 189/12 189/24
203/19 204/4 209/14 224/16 224/18 224/19
224/24
brought [4]  4/1 23/23 34/20 45/18
browser [1]  126/6
bucket [1]  15/25
buckets [1]  38/15
budget [10]  100/5 100/10 105/14 112/14
112/14 112/23 113/2 115/12 115/13 156/16
Budimir [3]  57/14 63/13 104/3
builder [2]  117/19 126/21
building [1]  132/8
bulbs [1]  136/6
bullet [1]  10/6
bumbling [1]  205/14
bunch [3]  72/2 215/11 215/12
Bunes [13]  4/23 5/9 6/12 6/21 28/14 28/23
35/9 48/17 50/11 50/18 50/22 63/16 89/11
business [26]  6/24 6/24 7/3 17/12 17/20 18/8
19/4 19/4 19/5 19/6 20/4 21/22 22/21 22/23
23/12 34/7 41/7 41/8 117/18 120/18 120/20
122/24 138/19 159/6 160/6 214/9
businesses [1]  92/11
busy [1]  24/7
button [1]  15/20
buy [8]  19/12 42/7 42/11 42/23 80/16 82/24
134/12 213/7
buyin [1]  217/14
buying [5]  191/2 194/7 194/25 198/4 209/18
buyins [1]  217/16
buyins.net [12]  207/2 207/7 207/15 207/20
207/22 208/1 208/3 208/7 217/11 218/18
218/20 219/1
buys [1]  209/20

**C**

cables [7]  131/19 131/19 131/19 131/20
132/8 132/10 144/9
calculated [1]  186/23
California [36]  32/2 32/12 33/4 33/23 34/2
34/11 35/6 41/21 42/11 42/19 45/17 46/15
47/8 48/12 49/6 50/10 87/22 89/5 93/23
96/25 97/7 97/9 97/12 97/14 97/15 98/9
100/15 134/12 134/19 134/19 134/22 135/5
137/12 137/24 138/16 139/15
called [14]  6/3 20/1 20/9 42/9 76/21 84/9
179/6 181/21 207/2 208/11 214/20 222/16
225/2 229/12
calling [3]  180/10 224/11 227/4
calls [9]  151/18 155/20 155/22 156/1 156/9
175/17 175/19 177/19 204/23
came [21]  15/24 24/11 33/22 34/16 39/12
39/13 39/17 48/13 55/25 56/19 57/15 60/1
69/25 76/18 94/11 100/16 133/21 156/16
161/2 166/17 225/7
campaign [1]  164/3
can't [21]  21/10 39/22 54/5 59/16 83/20 86/2
94/13 102/12 112/25 126/15 126/15 145/4
173/21 207/18 207/21 210/6 221/11 221/13
225/11 225/17 227/25
Canada [1]  171/8
cancel [1]  197/1
canceled [3]  196/18 196/24 197/7
cancellation [1]  147/11
cannot [2]  209/16 216/2
Canyon [1]  89/4
capability [1]  209/21
capacity [1]  97/23

Capital [1]  67/25
cappuccinos [1]  23/1
car [41]  11/11 13/1 25/20 25/21 42/11 42/14
42/16 42/18 42/21 42/21 42/22 42/25 43/3
43/7 43/18 43/23 43/24 46/2 46/5 46/6 46/7
46/7 46/17 46/25 47/7 47/8 47/9 47/13 47/20
97/13 134/18 135/4 135/7 136/16 136/18
136/19 136/20 136/21 136/21 136/22 137/1
Carbon [1]  140/15
card [6]  5/10 5/18 5/25 6/6 19/6 76/2
card-sized [1]  5/18
care [3]  63/7 159/6 162/6
career [1]  18/22
Carolina [1]  93/10
carried [1]  184/6
cars [1]  42/24
Carter [164]
Carter's [12]  53/17 71/24 105/18 189/13
195/4 196/20 197/9 206/15 223/6 224/6
225/7 226/4
Casablanca [7]  21/1 21/4 21/7 21/22 23/4
23/13 116/16
case [48]  1/2 8/16 31/10 31/13 32/12 32/14
32/17 32/20 32/22 32/24 33/1 33/13 33/14
50/10 64/6 65/6 93/15 93/16 93/17 93/19
93/20 106/13 170/1 173/14 181/20 182/4
201/2 204/5 205/19 207/4 210/11 210/19
214/3 214/20 215/6 226/21 227/15 228/23
228/24 229/12 229/14 229/15 229/16 229/17
230/5 230/7 231/22 232/4
cases [5]  34/1 202/19 203/2 203/4 203/5
cash [6]  43/13 43/15 43/21 75/23 75/25 97/25
cat [1]  29/11
cataloged [1]  188/10
categories [1]  126/20
cause [3]  30/15 55/23 138/20
caused [1]  214/22
causes [1]  154/16
CD [1]  26/18
center [1]  121/16
cents [5]  116/19 163/19 183/25 226/13
226/13
CEO [11]  11/6 27/25 28/15 31/20 35/9 35/12
50/17 50/18 61/13 61/23 68/7
cert [6]  158/11 160/25 162/2 162/6 162/10
162/12
certain [10]  21/17 44/9 180/7 180/14 181/19
183/19 206/21 209/9 214/16 223/6
certainly [4]  69/4 96/12 132/4 228/7
certainty [1]  109/24
certificate [15]  161/5 161/16 161/25 162/16
162/19 163/5 188/24 189/4 193/2 193/4
193/7 196/13 196/24 197/5 234/16
certificates [3]  76/8 76/15 79/18
Certified [1]  234/18
certify [1]  234/18
cetera [3]  34/22 75/25 98/4
chair [1]  178/6
chance [4]  68/3 72/21 166/25 187/20
chances [1]  24/18
change [6]  72/9 72/11 73/5 199/22 200/6
232/12
changed [2]  92/25 104/4
changes [2]  230/19 230/20
Chapter [5]  93/23 94/4 94/6 94/8 94/11
Chapter 7 [3]  94/6 94/8 94/11
characterization [3]  64/20 64/23 64/24
characterize [1]  64/15
characterized [1]  64/15
charge [2]  17/11 223/11

charged [2]  78/22 79/5
Charles [1]  1/21
chart [27]  182/18 182/23 183/8 183/17
184/16 184/23 185/9 185/20 185/24 186/9
186/19 186/20 188/8 188/10 191/1 192/14
194/6 194/12 198/9 198/14 205/20 206/11
215/10 217/1 217/4 217/6 217/13
charts [18]  180/20 182/8 200/9 204/20
206/19 206/21 206/23 213/2 213/15 215/19
217/11 217/13 218/5 219/18 219/24 223/6
225/10 231/3
chauffeur [6]  11/23 12/17 12/19 64/15 64/23
97/23
check [7]  41/23 75/22 76/5 76/5 76/9 100/6
157/5
chest [2]  8/19 59/6
chewing [1]  15/25
Chicago [7]  42/9 42/10 42/10 97/12 97/14
134/12 134/17
chief [6]  32/24 33/1 33/13 87/25 90/20 207/7
Child [1]  39/25
choose [2]  130/25 131/4
chronology [1]  131/22
Cincinnati [2]  21/6 21/8
circuitry [1]  116/15
circumstances [1]  222/21
city [2]  89/5 152/21
civil [1]  202/12
claim [1]  71/3
claiming [1]  133/3
clarification [1]  128/21
clarify [4]  69/10 149/23 202/24 231/1
Clark [1]  230/16
class [5]  93/9 93/20 94/3 94/19 181/24
classifying [1]  38/24
clean [1]  213/23
clear [6]  115/5 141/3 142/4 167/20 173/2
232/20
Clematis [1]  1/24
click [1]  126/3
climbing [1]  16/8
clinical [1]  8/24
Clint [2]  51/1 51/4
clip [2]  168/13 168/16
clips [3]  106/21 168/13 168/21
clock [1]  17/2
clocks [4]  16/22 17/4 17/10 18/25
closed [6]  20/6 35/9 89/10 167/21 183/25
185/23
closely [1]  188/11
closer [1]  178/8
closing [8]  182/18 183/15 185/10 185/21
186/23 186/25 187/9 222/25
Cloud [1]  152/22
Club [1]  101/5
co [4]  87/25 90/20 101/10 104/23
co-chief [2]  87/25 90/20
CO-CTO [2]  101/10 104/23
cocktail [2]  12/11 107/15
cocktails [1]  107/15
coerce [1]  131/14
coffee [1]  136/10
collate [1]  36/10
colleague [1]  208/17
colloquy [1]  123/18
colored [1]  125/9
Columbus [1]  100/19
column [2]  144/25 187/1
columns [1]  186/18
comes [1]  71/9

# C

comfortable [6]   12/24 13/1 50/16 50/21
63/17 218/13
coming [9]   50/7 51/19 69/23 77/4 164/14
166/24 187/14 229/20 231/18
comment [1]   3/14
comments [5]   3/17 107/13 107/16 108/16
108/21
commercially [2]   49/12 49/13
Commission [10]   9/14 92/22 113/5 130/14
168/23 172/17 172/19 179/5 180/23 207/8
commit [1]   78/1
committing [1]   79/2
common [1]   88/9
commonly [1]   181/21
communicating [1]   99/20
communication [3]   49/2 87/18 87/21
communications [3]   48/21 48/25 94/17
companies [11]   22/18 122/10 124/13 153/17
153/21 153/22 179/21 180/7 181/18 203/15
203/21
company [75]   5/2 8/23 9/3 9/4 11/15 19/21
19/25 20/6 20/6 20/9 21/23 28/15 31/20
35/12 39/3 48/23 60/21 68/9 68/11 70/17
74/1 74/5 74/15 75/15 80/16 88/1 89/7 91/8
91/15 91/23 91/25 92/9 93/9 100/21 100/24
101/10 101/23 101/25 102/1 102/4 113/4
113/24 114/5 119/7 120/22 123/5 127/3
132/5 132/10 145/12 154/4 155/5 155/11
155/18 155/24 157/9 159/5 173/15 173/25
175/2 179/25 180/15 181/15 199/15 199/21
203/24 207/16 207/17 210/25 214/1 214/25
219/6 219/10 222/12 222/21
company's [3]   20/4 181/22 207/19
compare [1]   126/18
comparing [1]   26/12
compass [1]   81/24
compelled [1]   2/15
compensation [1]   156/15
competent [1]   53/18
compile [1]   185/24
compiled [2]   182/23 186/9
compiling [4]   205/18 206/7 227/21 227/24
complained [1]   24/2
complaint [5]   203/25 204/1 204/3 204/6
212/19
complaints [3]   210/24 212/16 212/18
completely [1]   210/24
complex [2]   120/22 205/15
complicated [1]   17/5
comprehend [1]   14/13
compressed [5]   15/13 15/17 16/6 16/9 16/10
computer [1]   203/4
concentrate [1]   67/24
concern [1]   71/20
conclude [3]   72/6 228/7 228/8
concluded [5]   35/3 72/15 115/8 139/22 231/8
conclusion [1]   4/15
condition [3]   34/19 34/21 181/22
conduct [1]   178/24
conference [8]   35/3 72/15 115/8 139/22
154/21 156/1 175/17 175/19
confidentiality [6]   4/24 5/1 5/5 6/11 6/16
6/18
confirm [1]   149/23
confirms [2]   88/5 100/5
confronted [1]   2/23
confused [1]   71/4
connected [1]   214/24

connection [4]   132/7 133/11 176/18 204/18
Connections [6]   88/7 88/11 88/14 88/18
124/12 165/14
consequences [1]   41/9
consider [1]   95/21
consistent [2]   89/8 110/1 184/7
conspiracy [1]   78/1
constitute [2]   88/11 88/15
consultant [1]   159/11
consulting [10]   54/16 55/21 88/8 158/15
158/16 165/3 165/10 171/23 172/21 187/25
consumers [4]   6/7 21/10 21/13 21/15
Cont.'d [3]   4/11 233/4 234/2
contact [12]   129/6 129/8 130/20 131/25
154/6 154/18 154/20 161/23 171/24 172/10
205/8 208/15
contacted [8]   128/22 129/1 129/4 129/10
161/24 208/11 208/12 212/20
contacting [1]   205/5
contacts [3]   122/23 123/9 123/11
contemplated [1]   111/15
content [2]   90/15 105/4
contents [1]   67/18
continue [4]   4/7 75/20 96/21 110/25
continued [3]   97/16 97/18 233/3
continues [1]   185/17
contract [43]   6/12 6/17 6/21 8/6 8/6 11/16
50/23 50/25 52/8 52/15 67/18 68/10 68/18
76/16 77/2 92/10 92/18 99/1 99/2 99/13
102/8 118/21 118/22 119/2 159/1 159/4
160/14 161/13 172/9 173/6 173/7 173/9
173/10 173/11 173/16 173/18 173/24 174/9
174/21 176/3 205/21 206/1 206/4
contractor [2]   117/22 153/11
contracts [1]   157/13
contractual [8]   92/1 98/18 98/20 98/21
118/13 172/14 174/19 187/25
control [3]   150/25 157/8 230/1
controlled [4]   7/4 39/11 79/12 141/3
controls [1]   141/13
conversation [3]   100/11 158/6 173/25
conversations [10]   127/6 162/22 165/15
165/18 173/2 173/3 174/8 174/24 175/25
176/15
cookies [5]   3/11 3/11 3/15 4/2 110/23
cooperated [2]   45/24 46/24
cooperation [2]   109/7 201/21
copied [1]   177/7
copy [8]   54/20 54/22 87/3 88/23 135/17
140/15 186/18 206/1
cord [1]   2/10
corned [1]   23/2
corner [1]   112/21
corporate [2]   57/11 199/20
Corporation [1]   95/5
correct [189]
cost [1]   47/7
couldn't [11]   21/16 37/25 72/4 72/5 130/4
162/4 209/12 214/4 214/16 218/25 225/13
counsel [4]   1/21 135/9 155/18 157/11
counsel's [2]   10/17 228/14
count [11]   77/24 78/1 78/3 78/6 78/23 190/24
190/25 194/22 194/23 196/8 196/10
count [2]   190/25
count 3 [1]   194/23
Count 4 [1]   196/10
counter [4]   5/19 6/7 179/3 204/13
Country [1]   101/5
County [5]   36/19 36/20 36/22 47/23 50/9
couple [16]   47/19 66/17 75/8 106/22 108/15

122/10 143/10 146/2 155/20 168/12 168/21
175/16 197/8 207/13 222/13 228/8
course [7]   33/11 42/19 108/16 108/19 179/17
180/19 190/1
court [17]   1/1 1/24 2/1 2/15 2/20 3/2 3/5
52/25 53/7 96/18 105/6 107/25 130/18
154/17 221/25 227/12 232/10
Court's [6]   33/7 109/20 115/5 145/21 200/18
227/3
courtroom [14]   3/8 3/23 65/8 66/23 106/17
108/15 108/17 108/24 110/19 170/4 170/18
201/5 201/18 226/25
cover [5]   33/14 81/25 82/1 100/8 213/8
covered [1]   82/3
covering [1]   210/2
covers [1]   191/23
CPAG [3]   179/13 179/15 179/17
CPE [1]   1/23
CR [1]   1/2
create [4]   127/20 137/20 191/1 222/16
created [3]   137/17 182/18 191/9
creates [1]   178/23
creative [1]   19/9
credentials [1]   50/20
credit [6]   5/9 5/18 5/25 6/6 76/2 76/3
crime [6]   78/16 79/3 79/4 79/5 133/10
212/19
criminal [20]   1/17 178/18 179/6 179/11
202/6 202/8 202/11 202/19 203/1 204/16
204/17 204/21 204/24 205/3 205/4 205/8
208/15 212/15 212/16 212/24
critical [1]   61/7
cross [22]   2/7 4/8 4/11 21/2 31/18 34/6 34/24
55/19 139/2 147/8 147/12 147/17 169/24
170/22 170/24 201/22 201/24 227/11 228/6
233/4 233/10 233/14
cross-examination [14]   2/7 4/8 4/11 21/2
31/18 34/6 139/2 147/8 147/12 147/17
169/24 170/24 201/24 228/6
cross-examine [2]   170/22 201/22
crossed [1]   138/18
CRR [2]   1/23 234/24
CTO [2]   101/10 104/23
Cucamonga [1]   50/10
curb [1]   48/2
current [1]   131/7
currently [1]   221/12
custom [2]   55/5 55/5
customer [8]   117/16 117/19 122/21 122/21
126/21 128/2 128/9 209/19
customer-focused [1]   117/19
customers [1]   124/6
cut [3]   96/19 122/16 222/8

# D

D.C [3]   130/23 178/19 210/18
daily [2]   183/12 183/13
Dairy [1]   1/22
data [13]   179/23 179/25 180/16 182/22 186/8
205/18 206/12 218/19 219/16 219/17 219/18
221/2 225/2
databases [1]   179/22
date [26]   57/19 62/6 81/12 81/14 82/20 82/21
87/16 97/4 121/25 136/1 159/19 161/12
168/17 183/24 185/2 185/22 186/25 187/9
188/2 188/3 189/9 193/4 195/4 195/21
195/21 223/24
dated [7]   158/16 172/17 184/22 188/23
196/14 196/17 234/21
dates [3]   82/14 182/20 216/8

**D**

dating [1]  16/21
daughter [3]  86/4 86/10 134/3
David [8]  75/22 76/10 103/19 154/8 154/20 157/21 166/3 171/14
David's [1]  76/9
Davie [1]  103/19
Davis [1]  122/12
day's [1]  222/25
days [11]  66/17 66/19 75/25 100/7 108/15 127/16 155/21 183/18 188/5 197/8 199/8
DB15 [4]  143/12 143/21 144/10 144/13
DC [2]  1/18 131/2
de [2]  51/8 51/10
deal [3]  34/24 172/23 173/13
dealership [1]  134/18
dealing [1]  174/22
dealings [1]  157/7
Dear [2]  88/3 88/5
December [1]  69/8
December 2007 [1]  69/8
decided [1]  131/10
decides [1]  199/21
decisions [1]  149/23
declaration [1]  93/14
declining [1]  226/10
decrease [2]  199/21 213/12
dedicated [3]  117/15 126/20 128/2
DEFENDANT [3]  1/7 1/19 154/14
Defendant's [16]  51/22 54/8 54/11 67/6 67/19 85/5 105/2 148/19 149/4 234/8 234/9 234/10 234/11 234/12 234/13 234/14
Defendant's 157 [1]  105/2
Defendant's 19 [1]  149/4
Defendant's 9 [1]  51/22
defender [1]  131/2
defense [22]  51/23 54/2 54/3 81/4 99/7 99/10 106/8 116/11 118/4 125/4 126/14 126/19 127/14 135/9 149/6 150/19 207/25 211/20 218/23 227/13 229/15 232/14
definitely [8]  23/6 44/12 83/18 83/25 84/6 89/15 100/3 133/7
definitively [1]  72/7
defraud [1]  133/10
degree [1]  214/17
delay [2]  109/12 110/8
delicious [1]  110/23
deliver [16]  7/5 8/3 8/11 10/14 213/4 213/6 213/7 213/12 213/19 213/21 213/25 214/10 217/23 218/1 218/6 218/12
delivered [1]  11/17
delve [1]  15/12
demarcation [1]  56/22
demonstrated [1]  105/9
demonstration [1]  59/8
denying [1]  28/12
Department [23]  1/17 4/16 7/2 7/12 7/17 8/9 9/11 9/24 10/1 10/11 10/20 10/25 21/21 23/1 25/24 28/21 47/7 64/23 74/2 79/6 102/8 151/1 180/9
departments [3]  210/9 210/13 210/16
depending [1]  214/12
depiction [1]  206/24
deposit [6]  161/15 161/19 194/8 194/20 198/1 198/23
deposited [13]  162/21 189/12 190/13 190/20 192/3 193/24 195/1 195/3 196/20 196/22 197/9 198/7 198/25
depositing [1]  162/23

deposition [9]  18/2 65/16 106/22 118/18 119/25 121/9 121/24 145/16 172/16
Depot [1]  19/5
deputy [1]  50/17
describe [2]  2/11 202/20
described [1]  14/3
describing [1]  191/11
description [3]  30/12 153/19 187/25
designated [1]  12/19
designing [1]  18/18
desktop [1]  210/4
despite [1]  130/22
detail [5]  14/14 14/16 166/15 174/11 218/25
detailed [5]  138/16 174/9 174/12 174/20 208/7
details [3]  205/21 205/24 210/11
determine [6]  182/4 196/19 209/2 209/20 209/22 220/5
determined [2]  196/25 208/10
develop [5]  5/18 16/19 102/15 119/8 209/24
developed [11]  15/13 15/17 15/22 15/23 16/1 48/3 48/4 102/13 104/5 104/6 104/7
developing [1]  6/3
development [1]  88/9
device [17]  5/10 5/18 5/23 5/25 5/25 6/7 7/5 8/18 8/21 8/22 9/8 10/14 17/5 26/13 59/5 60/18 102/18
devices [5]  10/14 123/2 123/6 123/6 123/12
diabetes [1]  48/4
Diana [2]  39/23 39/24
didn't [85]
Diego [1]  36/21
difference [8]  16/18 52/14 52/17 52/20 52/22 56/11 195/10 200/23
different [16]  22/18 29/17 85/19 85/22 94/21 114/17 132/25 139/20 142/9 173/17 188/11 197/6 203/4 204/15 221/22 222/8
differently [1]  71/12
difficult [1]  227/15
dig [1]  188/7
dining [1]  28/9
dinner [3]  58/13 58/16 59/1
direct [25]  21/2 27/19 31/9 34/24 42/17 55/19 69/13 74/1 81/6 81/23 81/25 132/15 138/8 138/18 139/10 146/15 147/20 152/18 171/9 171/22 172/8 178/12 204/23 233/9 233/13
directed [2]  119/7 119/22
direction [2]  113/22 113/25
directions [1]  144/17
directly [3]  28/17 73/2 212/9
director [6]  178/18 179/9 202/6 204/16 204/17 212/4
disclose [2]  77/21 109/18
disclosed [2]  9/17 139/13
disclosing [1]  5/2
discuss [17]  6/7 7/20 25/24 26/2 28/24 29/1 65/6 65/23 71/1 101/16 106/13 106/19 170/1 170/5 201/2 201/6 226/21
discussed [10]  6/2 27/5 58/16 58/19 59/20 70/2 70/6 70/16 175/19 182/1
discussing [15]  9/18 25/19 59/15 59/22 59/24 91/15 92/10 177/6 180/1 188/22 192/24 196/6 198/1 198/14 204/18
discussion [3]  71/25 72/1 173/22
discussions [2]  92/1 174/9
Disney [2]  134/5 134/6
dispute [1]  90/9
disputed [1]  44/22

distinctly [1]  56/22
distribute [1]  123/6
distributed [2]  20/17 20/19
distributes [1]  123/5
distribution [8]  101/22 20/8 22/5 121/15 121/16 122/2 122/9 123/17
DISTRICT [3]  1/1 1/1 1/13
distrustful [4]  95/19 95/20 95/21 95/22
divisible [1]  222/19
Division [1]  1/17
doberman [3]  29/11 30/3 30/5
docile [1]  149/15
document [67]  13/25 14/8 14/10 14/12 14/12 52/11 55/23 56/15 65/3 71/5 71/12 73/5 73/9 73/12 74/14 80/24 81/10 86/25 87/4 87/13 87/15 87/16 88/3 88/25 89/3 89/13 89/14 89/15 90/7 90/15 90/16 90/19 91/18 92/8 99/7 105/1 105/5 112/21 116/3 125/6 126/4 127/15 140/2 143/23 146/10 146/13 146/21 146/22 147/19 147/20 147/24 150/2 151/2 159/16 160/4 160/9 165/10 165/21 166/6 210/21 215/17 215/25 216/2 216/6 216/23 217/2 217/4
document's [2]  89/8 216/13
documentation [1]  211/2
documents [16]  36/8 36/10 72/2 82/17 92/4 137/17 137/20 139/12 145/24 148/2 167/19 179/20 180/6 189/11 191/11 207/14
does [48]  3/16 15/3 15/21 30/10 53/4 55/23 60/9 71/19 73/5 73/8 73/9 73/11 73/12 74/14 92/8 92/14 92/15 107/19 122/17 123/20 123/21 123/23 125/15 141/6 141/10 141/11 141/14 141/15 145/15 150/4 150/5 158/18 158/20 167/19 181/23 187/23 188/2 190/10 196/8 199/22 203/13 203/14 203/20 204/10 204/13 212/9 218/20 226/7
doesn't [12]  33/10 68/16 70/25 71/15 73/15 75/2 117/4 123/24 178/6 200/5 228/17 229/24
doing [39]  2/19 8/23 24/2 24/19 25/21 27/14 27/17 34/1 34/3 35/24 65/11 65/12 91/9 92/23 93/1 95/21 96/7 96/24 97/24 104/16 109/11 112/18 118/8 119/7 124/9 134/2 137/6 137/9 137/13 137/18 137/24 138/1 138/1 142/19 153/20 157/15 174/10 176/19 181/5
DOJ [16]  5/5 8/14 12/14 12/17 15/16 22/4 23/20 46/6 54/13 54/14 55/9 56/15 77/21 129/1 129/19 129/19
DOJ-CARTER [2]  54/14 55/9
DOJ-CARTER-000660 [1]  54/13
dollar [11]  101/22 188/1 200/6 200/8 220/13 220/14 221/13 221/14 222/23 223/1 223/10
dollars [16]  27/7 41/3 41/12 41/16 41/24 44/17 44/23 47/18 47/19 79/24 80/12 119/7 199/24 200/3 200/4 222/3
domestically [1]  62/18
don't [240]
done [25]  22/16 27/1 28/5 36/22 38/8 38/10 38/22 48/2 54/12 57/11 76/23 87/20 111/13 112/6 126/2 137/4 139/7 141/18 143/25 144/24 188/7 206/22 226/9 232/13 232/21
Donna [1]  39/21
doubt [2]  55/23 99/25
doubts [1]  91/7
down [25]  22/16 27/1 28/5 36/22 38/8 38/10 38/22 48/2 54/12 57/11 76/23 87/20 111/13 112/6 126/2 137/4 139/7 141/18 143/25 144/24 188/7 206/22 226/9 232/13 232/21
downhill [1]  65/21
Dr [53]  7/3 7/10 7/13 8/1 11/6 13/15 27/21 27/24 28/15 50/17 50/25 51/10 56/2 56/19

**D**

Dr... [39] 56/20 62/11 63/11 63/17 63/21
 63/23 64/1 68/6 68/20 69/4 69/19 70/6 72/23
 73/1 73/6 73/10 73/13 73/22 74/8 74/15
 76/12 76/18 77/3 77/4 118/7 119/12 119/21
 120/21 140/16 169/2 173/3 173/22 174/8
 174/23 175/8 175/11 175/16 176/15 177/7
Dr. [5] 11/8 11/10 58/4 59/15 63/12
Dr. Phillips' [1] 59/15
Dr. Steven [1] 58/4
Dr. Windham [3] 11/8 11/10 63/12
Drakulic [1] 104/3
drastic [1] 223/10
draw [1] 196/16
drink [7] 11/25 12/3 12/4 12/14 12/25 60/4
 136/10
drinking [1] 60/3
drive [4] 1/20 63/2 63/5 226/9
driver [1] 12/20
driving [6] 11/22 12/25 13/3 13/7 42/25 63/6
drop [2] 104/11 223/10
dropped [1] 132/8
dropping [1] 104/12
drove [20] 11/7 11/9 12/10 12/18 12/24 13/3
 36/22 42/18 57/11 63/1 63/2 63/7 97/6 97/7
 97/8 97/10 97/13 134/19 134/24 136/19
drug [2] 5/19 211/14
due [4] 13/6 88/13 88/14 214/24
DUI [1] 13/10
during [46] 2/7 14/3 17/19 18/22 18/25 24/5
 24/23 27/25 32/2 33/11 44/23 44/23 58/13
 59/7 61/13 64/1 64/3 65/24 79/8 79/17
 106/19 107/14 108/16 108/18 156/1 170/6
 174/23 175/16 184/5 195/5 195/13 199/3
 201/7 205/1 205/9 206/21 206/25 208/24
 213/15 217/18 218/1 218/6 219/25 224/15
 225/3 225/11
duties [3] 88/7 174/9 179/17
duty [1] 230/9

**E**

e-mail [25] 1/25 14/1 27/20 75/6 75/8 99/23
 99/25 100/3 100/4 101/5 110/6 112/13
 114/19 116/23 125/12 135/23 140/11 140/13
 140/13 141/6 167/2 167/4 167/17 177/6
 177/7
e-mails [5] 113/23 114/19 138/24 145/24
 231/4
each [7] 22/20 78/16 155/3 155/23 186/22
 199/23 209/18
earlier [9] 78/9 112/4 142/6 163/10 166/4
 177/6 193/6 203/18 212/13
earliest [3] 228/19 228/20 229/1
early [3] 98/22 142/7 154/23
easily [1] 223/18
ebb [1] 183/16
EC [7] 165/11 165/12 167/17 167/20 167/21
 167/24 168/2
Economic [1] 103/3
economy [1] 27/1
Ecstatic [2] 145/11 145/12
editorializing [2] 2/11 3/6
educational [1] 153/6
Edwards [2] 13/18 13/20
effect [2] 213/10 226/8
effective [1] 88/17
eight [1] 163/19
Eisner [1] 18/7
either [7] 21/2 25/6 27/14 58/9 63/5 122/18

155/2
EKG [2] 5/10 5/18
Electric [2] 26/13 117/24
electrical [23] 17/12 19/4 20/2 22/23 75/13
 75/15 88/7 88/11 88/13 88/18 92/11 117/22
 117/22 123/5 124/12 124/12 140/6 141/7
 153/8 153/10 156/2 158/1 165/14
electronic [2] 116/15 207/15
electronically [2] 150/14 150/15
electronics [2] 100/23 100/24
element [2] 203/5 214/4
elicited [2] 139/1 139/4
else [27] 9/17 9/20 16/1 16/3 16/14 16/16
 19/10 25/20 30/18 34/13 44/1 50/8 59/14
 59/20 60/17 60/19 64/11 97/18 136/7 136/7
 160/14 161/7 162/15 169/2 171/5 202/23
 222/14
elsewhere [1] 28/3
emblematic [1] 165/19
employee [1] 102/19
encompassed [2] 81/22 81/25
end [24] 7/5 7/10 8/3 8/12 8/13 8/21 9/6
 10/15 11/4 11/5 30/15 56/21 62/18 63/8 71/8
 118/23 120/6 120/13 122/19 124/14 128/8
 160/5 184/8 216/16
endeavors [1] 164/4
ended [1] 64/2
ending [1] 85/3
Energy [1] 102/8
enforcement [14] 128/22 129/4 129/10
 129/22 130/2 202/12 203/1 205/4 205/5
 205/8 205/25 212/15 212/20 212/24
engage [1] 227/16
engineer [1] 153/8
enhancement [1] 128/9
enough [1] 215/3
entered [3] 51/23 81/4 86/23 99/10 106/8
 118/4 135/14 149/6 152/14 183/4 186/15
 189/21 191/17 193/19 194/18 197/18 198/20
entering [1] 68/9
enters [5] 3/23 66/23 110/19 170/18 201/18
entire [5] 9/25 84/21 209/13 225/7 225/8
entirely [1] 71/5
entities [1] 200/16
entitled [3] 13/25 88/20 234/20
entity [2] 79/12 85/22
entrepreneur [2] 34/8 124/14
entrepreneurial [1] 19/9 23/3 138/19
entries [1] 188/8
entry [2] 190/9 190/10
equally [1] 123/6
Equity [1] 67/25
Espionage [1] 103/3
ESQ [3] 1/16 1/16 1/21
estimate [1] 225/9
et [3] 34/22 75/25 98/4
et cetera [2] 75/25 98/4
Europe [1] 16/21
evaluate [7] 206/17 208/22 214/21 219/10
 219/21 220/3 229/25
evaluated [4] 204/19 217/19 219/25 220/1
evaluating [2] 109/16 219/4
evaluation [2] 109/13 230/2
even [20] 2/9 2/25 8/4 12/25 44/25 48/1 63/1
 63/4 63/4 70/25 71/3 107/17 119/6 127/16
 130/22 130/22 168/10 184/6 212/19 221/4
evening [3] 226/21 226/24 232/22
event [4] 56/19 96/13 103/8 199/20
events [4] 94/18 94/21 95/25 96/10
eventually [1] 29/22

ever [98]
every [5] 53/13 199/25 200/3 200/4 232/13
everybody [4] 30/19 30/20 136/7 222/14
everybody's [1] 66/14
everyone [12] 2/2 3/10 3/25 4/6 30/18 30/18
 53/7 66/25 107/5 110/21 170/20 201/20
everything [20] 14/3 48/13 54/18 54/25
 56/20 60/3 61/2 61/11 77/21 92/25 97/18
 103/23 109/13 112/5 122/21 133/17 214/9
 218/5 226/22 232/21
evidence [69] 15/5 23/7 23/22 34/20 51/19
 51/23 67/6 70/14 71/16 74/25 81/4 84/21
 86/15 86/20 86/23 99/10 106/8 112/9 118/1
 118/4 135/14 138/19 139/14 139/25 146/6
 148/18 149/6 152/10 152/15 158/9 164/22
 181/9 181/10 183/1 183/4 184/11 184/20
 185/8 185/16 186/12 186/15 187/15 188/16
 189/18 189/21 191/14 191/17 192/19 193/16
 193/19 194/15 194/18 196/3 197/15 197/18
 198/17 198/20 205/18 211/18 216/13 230/11
 230/24 231/5 231/18 232/10 232/13 233/18
 234/3 234/8
Evie [13] 158/23 158/24 159/4 159/19 160/3
 161/4 161/7 165/9 168/25 169/7 169/10
 171/16 175/22
ex [3] 24/13 39/2 98/11
ex-wife [3] 24/13 39/2 98/11
exact [4] 64/18 163/18 172/22 217/18
exactly [5] 94/7 96/7 126/25 139/9 191/20
examination [28] 2/7 4/8 4/11 21/2 31/18
 34/6 69/13 74/1 109/14 124/21 139/2 139/19
 139/19 146/15 147/8 147/12 147/17 148/10
 150/17 152/18 169/24 170/24 171/9 176/11
 178/12 201/24 225/22 228/6
examine [6] 170/22 188/24 193/7 195/23
 198/6 201/22
examined [3] 124/8 189/13 218/6
examining [1] 217/12
example [3] 17/17 28/8 231/5
Excel [2] 105/16 105/19
Except [2] 66/20 171/19
exchange [27] 9/13 92/22 113/5 130/14
 164/5 168/22 172/17 172/19 179/2 179/5
 180/23 181/25 203/12 203/24 203/25 204/6
 204/11 204/14 204/24 205/1 207/8 210/20
 210/25 211/3 212/5 212/10 212/17
exchanges [5] 203/14 203/17 204/9 204/10
 204/12
excited [2] 122/12 145/17
exclude [1] 33/19
exclusively [1] 149/25
excuse [4] 45/6 83/6 144/16 228/4
excused [4] 151/7 151/15 177/13 177/15
executive [4] 87/25 90/20 95/5 96/9
exercise [1] 71/9
exhibit [126]
exhibit 104 [1] 160/20
exhibit 108 [1] 162/7
exhibit 110 [2] 158/8 158/9
exhibit 125 [2] 188/13 188/19
exhibit 126 [1] 189/2
exhibit 129 [1] 146/16
exhibit 132 [3] 74/12 74/21 139/25
exhibit 135 [2] 189/16 189/23
exhibit 150 [3] 67/7 70/13 72/18
exhibit 152 [5] 99/4 99/7 105/7 192/21
 192/22
exhibit 153 [3] 113/11 115/11 193/1
exhibit 154 [6] 116/11 117/25 125/4 126/14
 126/19 127/14

**E**

exhibit 157 [2]  106/4 112/8
exhibit 161 [4]  147/19 164/22 166/23 176/25
exhibit 168 [1]  196/4
exhibit 186 [2]  86/14 86/19
exhibit 19 [3]  148/19 148/19 150/20
exhibit 214 [1]  135/10
exhibit 224 [1]  211/18
exhibit 238 [2]  143/18 143/22
exhibit 262 [3]  182/9 182/15 182/17
exhibit 263 [2]  186/4 186/19
exhibit 264 [1]  191/5
exhibit 266 [2]  198/11 226/3
exhibit 286 [2]  193/10 193/12
exhibit 288 [1]  197/11
exhibit 31 [3]  187/15 187/18 187/21
exhibit 47 [4]  80/23 84/19 84/21 85/10
exhibit 57 [1]  67/19
exhibit 64 [1]  146/6
exhibit 69 [1]  184/20
exhibit 70 [1]  146/9
exhibit 72 [1]  185/7
exhibit 74 [1]  146/12
exhibit 76 [1]  185/15
exhibit 9 [11]  51/16 51/19 52/2 52/14 54/2
 54/3 54/9 54/12 55/2 55/8 56/8
exhibit 93 [1]  181/1
exhibit 96 [4]  52/25 53/10 53/22 56/11
exhibits [36]  15/5 23/24 32/1 52/5 53/6 65/14
 106/14 106/22 114/15 146/2 152/7 181/6
 184/9 192/18 192/19 194/3 196/2 207/25
 218/23 227/13 227/19 230/21 230/25 231/2
 231/4 231/10 231/10 231/10 231/12 231/15
 231/18 232/2 232/4 233/18 234/3 234/8
exhibits 152 [2]  192/18 192/19
Exhibits 168 [1]  196/2
exits [5]  65/8 106/17 170/4 201/5 226/25
expect [6]  82/17 227/6 227/22 228/18 228/20
 229/2
expectation [2]  6/17 64/3
expected [3]  63/23 97/20 110/8
expecting [3]  11/16 71/21 110/1
expense [5]  59/22 59/24 60/10 60/17 61/1
expenses [1]  112/18
expensive [3]  41/20 42/24 46/22
experience [16]  6/23 8/20 11/3 15/12 23/9
 41/8 117/16 128/3 128/8 128/12 213/20
 213/24 214/2 214/5 214/7 214/8
experiences [1]  23/3
experiential [1]  17/19
expert [4]  25/9 205/16 228/3 228/4
expertise [2]  34/7 126/22
explain [23]  9/1 10/11 14/14 14/16 122/17
 123/14 124/7 133/20 156/18 156/22 160/23
 179/7 180/4 183/7 186/18 191/2 191/19
 191/21 194/24 196/23 198/22 199/17 222/1
explained [8]  61/2 70/1 123/20 130/19
 156/14 162/2 162/5 213/9
explaining [3]  14/11 38/15 123/21
explanation [1]  56/14
express [4]  9/9 9/11 9/13 163/13
expressed [1]  27/1
expressing [1]  9/5
extent [1]  219/12
extra [1]  110/3
extremely [3]  33/16 37/9 219/2
eyes [1]  26/6

**F**

face [2]  181/23 223/15

facilities [3]  121/15 121/16 122/10
facility [1]  145/1
fact [17]  3/17 15/16 29/19 72/3 72/7 113/25
 126/25 130/1 130/18 135/8 135/23 137/15
 138/7 139/10 144/23 222/16 226/10
failed [1]  138/19
failure [6]  50/12 213/5 213/6 213/6 213/7
 217/23
failures [9]  213/3 213/12 213/19 213/21
 213/24 214/10 218/1 218/6 218/12
fair [22]  33/16 34/11 37/8 49/4 50/16 50/18
 53/15 57/5 62/10 64/24 64/24 77/6 109/24
 127/9 127/13 134/17 136/10 140/16 182/22
 186/8 219/2 223/25
faith [3]  97/16 97/18 124/17
fake [2]  139/12 139/12
fall [2]  223/7 223/8
falls [1]  202/15
false [4]  78/18 176/22 176/24 207/9
fame [1]  39/19
familiar [8]  71/17 103/3 153/18 154/4
 154/14 207/1 211/14 216/22
family [12]  16/21 18/17 30/16 39/12 39/12
 39/14 39/17 79/9 79/11 120/19 122/24
 134/14
family's [1]  6/24
famous [1]  39/18
Fan [1]  116/16
fans [8]  21/1 21/4 21/7 21/10 21/10 21/22
 23/4 23/13
far [10]  26/9 36/21 73/16 73/18 73/21 99/15
 115/1 128/6 184/21 223/8
fast [1]  15/20
father [9]  15/13 15/16 15/22 15/24 16/19
 17/22 18/14 39/18 39/19
faulty [2]  49/21 55/24
favorable [1]  27/2
fax [8]  53/4 53/24 54/2 54/8 54/22 55/1 56/15
 146/25
faxes [1]  147/4
FDA [1]  50/17
FDL [1]  151/1
February [1]  158/18
February [8]  18/3 112/18 118/19 120/1
 121/9 158/17 163/5 209/1
February 13th [1]  158/17
February 2008 [1]  209/1
February 25th [4]  18/3 118/19 120/1 121/9
February-March [1]  163/5
federal [2]  129/22 131/1
feel [7]  2/14 22/2 22/6 22/10 22/20 50/21
 218/12
feelings [1]  22/24
feet [3]  2/14 21/18 37/6
Feidler [10]  95/2 95/4 95/7 95/12 95/15
 95/18 95/24 96/1 96/8 101/4
fell [1]  48/2
felony [1]  224/2
felt [5]  50/16 63/16 63/17 91/10 91/10
few [10]  75/25 118/6 127/16 152/7 154/7
 155/20 184/4 226/3 232/11 232/15
fiance' [3]  158/25 171/10 175/22
fiance's [1]  171/15
Fidelity [13]  46/3 6/6 7/5 8/18 9/6 26/7 26/12
 101/1 102/14 102/16 102/18 104/4 104/6
fields [1]  18/24
Fifty [1]  67/11
Fifty-seven [1]  67/11
figure [4]  43/20 190/19 203/22 232/1
file [6]  29/22 125/10 125/11 166/11 166/20

181/18
filed [3]  93/9 93/23 94/3
files [1]  166/1
filing [1]  181/17
filings [10]  103/23 113/5 114/6 114/11
 179/21 180/13 180/24 181/13 182/3 206/13
fill [3]  41/6 60/1 85/16
filled [4]  38/16 41/6 84/3 85/15
final [2]  96/17 187/1
finally [1]  183/22
financial [8]  30/15 34/19 34/21 38/20 88/16
 178/21 179/25 181/22
fine [3]  38/25 108/8 181/8
finish [6]  66/13 120/9 154/16 200/22 200/24
 228/7 228/22 228/24
FINRA [26]  178/20 178/21 178/25 179/10
 179/21 202/13 202/15 202/16 202/20 203/11
 203/13 203/18 204/1 204/7 204/10 209/7
 210/9 210/10 210/13 210/21 212/9 212/17
 212/18 212/18 212/18 214/10
FINRA's [3]  178/18 202/6 202/8
firm [11]  88/16 98/17 98/23 98/25 99/14
 100/8 179/20 180/6 180/17 204/4 209/17
firms [7]  178/24 178/25 203/19 203/20
 209/14 224/16 224/19
firms' [1]  224/25
first [37]  4/19 7/11 19/19 28/23 38/4 42/22
 67/16 67/17 77/14 94/6 94/8 97/2 97/8
 126/20 130/23 136/4 143/1 144/23 149/13
 152/3 152/4 154/20 166/23 181/2 183/24
 184/5 184/24 188/1 188/2 188/3 188/5 188/5
 207/22 208/15 215/10 217/1 228/10
Fisher [2]  15/22 16/4
five [46]  40/16 78/6 79/9 79/20 79/24 80/13
 80/17 82/24 83/10 83/13 84/9 85/14 85/23
 100/7 106/21 111/4 111/7 111/11 111/23
 112/1 112/4 124/13 127/24 132/21 132/25
 133/4 140/25 141/4 141/8 141/24 148/12
 148/13 149/16 149/22 149/25 150/1 150/2
 150/3 163/19 200/20 200/23 201/2 201/10
 217/14 217/16 230/10
five-minute [2]  200/20 201/2
fix [2]  35/19 150/21
fixture [2]  16/11 17/7
fixtures [1]  18/13
FL [2]  1/20 1/22
Flagler [1]  1/20
flamboyant [1]  42/23
flew [5]  4/20 29/20 49/5 49/11 134/17
flip [2]  9/23 187/20
FLORIDA [17]  1/1 1/7 1/25 11/8 13/6 19/16
 19/22 19/22 21/5 21/6 42/25 45/15 93/24
 135/6 136/16 136/18 152/22
flow [1]  183/16
flowchart [1]  191/9
flowcharts [1]  225/12
fluctuated [1]  163/20
fluidly [1]  163/3
flushing [1]  38/4
fly [3]  42/9 50/7 134/11
flying [1]  2/13
focus [14]  34/3 34/14 61/19 195/22 208/9
 208/10 218/3 218/12 219/24 223/5 223/5
 223/8 223/10 224/23
focused [3]  117/19 223/3 223/3
follow [2]  6/18 150/12
follow-up [1]  150/12
following [14]  3/23 31/6 66/2 66/23 70/22
 107/4 110/19 113/20 138/14 170/10 170/18
 201/12 201/18 220/25

## F

food [6]  20/8 22/5 22/21 37/12 84/1 211/14
Foods [5]  20/9 20/11 20/23 23/4 124/11
foot [5]  48/4 48/8 48/8 48/11 48/12
foregoing [3]  88/19 88/21 234/18
foresee [1]  230/20
forgot [3]  30/8 50/9 57/25
form [9]  10/16 10/21 65/6 104/14 106/13
 118/13 201/2 205/20 226/21
formed [3]  19/21 19/25 40/22
former [4]  50/17 95/4 95/8 207/7
forms [1]  210/8
forth [3]  125/25 163/2 163/20
forthcoming [1]  22/4
forward [3]  100/9 100/11 157/8
forwarded [1]  210/21
found [3]  29/23 134/11 180/5
foundation [2]  62/20 181/6
four [5]  37/16 39/8 109/21 127/23 149/8
fourth [5]  147/22 160/1 164/23 164/24 165/1
fractional [2]  222/16 222/17
Frank [2]  154/8 154/21
Frankfurt [1]  164/4
Franklin [4]  1/23 234/17 234/23 234/24
frankly [2]  60/14 139/11
fraud [12]  78/1 78/2 79/2 139/11 139/12
 139/20 179/12 203/3 203/5 214/4 214/25
 224/4
free [7]  79/21 156/14 156/16 156/19 156/20
 156/21 156/25
free-trading [5]  156/14 156/19 156/20
 156/21 156/25
frequently [1]  77/5
Friday [1]  66/15
front [14]  28/9 40/17 53/7 67/7 74/24 82/15
 125/7 127/18 128/8 136/5 136/6 177/3
 184/18 227/16
full [1]  88/11
fully [3]  64/7 78/25 88/7
funds [1]  149/24
further [17]  32/18 88/14 148/4 150/10 151/5
 151/6 158/12 173/2 177/10 177/12 184/6
 188/8 192/12 200/10 225/18 226/14 226/16
future [3]  155/5 155/25 164/4

## G

garage [2]  46/9 46/11
gather [1]  206/11
gathered [1]  206/12
gathering [1]  219/16
Gault [8]  87/19 87/23 87/24 89/17 90/23
 91/6 92/17 98/17
gave [3]  5/23 6/21 39/4
GED [1]  153/7
Gelfen [4]  57/24 59/18 59/19 61/7
general [8]  21/11 25/13 26/13 41/9 50/13
 55/4 206/14 210/12
generally [14]  6/2 6/4 25/16 27/22 69/17
 72/24 76/19 93/7 93/15 171/11 180/12
 182/17 187/23 206/23
generated [1]  192/9
generating [2]  195/7 199/5
generator [6]  17/13 19/3 19/4 19/6 19/12
 19/17
generators [1]  18/25
gentleman [6]  2/23 8/4 91/1 107/12 171/8
 228/5
gentleman's [1]  107/10
gentlemen [12]  58/14 62/16 65/5 67/1 106/12

106/16 110/22 169/25 170/21 201/1 201/21
 226/20
George [2]  47/25 230/16
gestures [1]  108/22
gets [2]  122/18 150/22
getter [1]  97/24
getting [14]  6/12 13/1 13/6 74/17 98/8 122/8
 132/5 140/8 155/12 155/23 181/12 186/17
 189/2 195/10
gifts [1]  4/1
Giorgi [3]  125/15 125/17 125/21
Giorgi's [1]  126/18
give [14]  42/12 42/13 50/23 65/20 108/23
 135/16 135/17 153/5 153/19 168/4 206/10
 211/11 225/11 225/17
given [8]  2/9 109/13 109/16 139/14 159/17
 188/4 197/6 229/3
gives [1]  206/8
giving [5]  54/25 85/18 140/17 144/17 218/13
glanced [2]  218/22 218/22
goal [1]  71/8
goalpost [1]  7/9
goes [8]  26/9 68/1 71/2 71/5 183/16 185/1
 197/12 222/2
going [135]
gold [1]  143/12
gone [11]  32/6 34/23 47/12 65/20 89/11
 124/11 124/11 124/12 124/13 127/9 222/3
good [22]  2/3 3/25 4/13 4/14 10/6 20/11
 65/12 97/16 97/18 106/24 109/9 110/9
 124/17 124/23 152/20 171/1 171/2 178/14
 178/15 202/1 202/2 202/5
goodies [1]  4/2
Google [1]  125/19
got [37]  13/24 19/4 37/22 38/22 41/23 43/20
 44/17 45/13 47/13 57/14 63/11 64/2 72/21
 75/17 75/19 77/3 79/19 118/21 130/23
 133/25 134/17 134/22 135/2 136/18 138/24
 140/21 142/6 142/16 148/6 148/7 153/7
 154/20 155/3 161/5 184/9 204/6 208/15
govern [1]  178/23
GOVERNMENT [51]  1/4 1/16 4/10 29/10
 29/16 30/2 32/1 32/13 34/9 39/16 43/23
 43/24 44/1 45/8 45/19 46/24 47/13 47/20
 52/16 53/1 53/11 54/17 64/10 64/14 74/21
 81/11 81/19 86/14 86/19 86/23 87/6 97/7
 106/22 108/1 109/15 109/18 110/5 135/14
 136/23 146/2 151/18 152/9 173/19 175/14
 177/19 192/21 192/22 230/18 231/12 232/2
 232/14
Government's [48]  52/5 53/18 53/22 56/10
 65/14 86/18 109/20 135/10 135/12 139/24
 143/17 146/6 146/9 146/12 146/16 151/22
 152/14 177/23 183/4 186/4 186/15 187/15
 187/17 189/21 191/17 192/19 193/19 194/18
 197/18 198/11 198/17 198/20 228/22 228/24
 230/7 233/18 233/19 233/20 233/21 233/22
 233/23 233/24 233/25 234/3 234/4 234/5
 234/6 234/7
Government's 186 [1]  86/18
Government's 214 [1]  135/12
Government's 266 [1]  198/17
governmental [1]  206/3
grandfather [5]  16/22 17/1 17/4 17/10 18/25
gray [1]  131/19
great [3]  110/10 126/7 218/5
Greenville [8]  4/19 5/8 29/7 29/13 35/8 89/8
 89/10 93/10
grew [1]  7/24 104/20 120/18
grievance [1]  33/4

ground [1]  138/24
group [10]  178/19 179/7 179/9 202/7 202/8
 202/18 202/20 204/17 205/5 208/18
groups [1]  197/4
guess [25]  34/11 36/21 39/18 44/24 46/19
 53/3 57/6 61/9 64/1 69/22 71/1 71/17 71/20
 83/15 112/6 132/20 145/11 146/16 150/4
 208/25 213/12 213/14 220/23 220/23 227/3
guilty [6]  77/24 131/10 131/12 131/14 224/1
 224/4
gun [9]  15/13 15/17 15/19 16/6 16/9 16/17
 16/18 16/19 231/22
guns [1]  16/10
guy [4]  27/3 95/2 100/16 134/13
guys [2]  101/18 101/21

## H

habit [1]  55/5
half [3]  140/1 140/12 199/10
Hampton [1]  46/2
Hampton-Stein [1]  46/2
hand [14]  5/24 22/19 22/19 92/12 92/12
 112/21 126/9 126/14 151/20 177/21 182/1
 183/14 206/4 206/5
handed [1]  151/3
handful [1]  231/4
handing [1]  183/6
handles [1]  160/5
handling [2]  34/1 123/8
handwriting [6]  83/7 83/11 83/16 83/19
 83/21 83/23
handwritten [1]  150/23
happen [10]  24/15 63/23 64/4 93/13 164/18
 164/20 215/3 218/16 220/20 231/25
happened [35]  6/4 14/3 48/3 56/5 56/7
 56/24 56/24 77/8 77/8 90/17 93/12 121/13
 129/3 134/22 138/16 141/3 161/18 161/25
 188/9 190/19 193/7 193/22 194/6 194/24
 195/23 198/6 198/22 200/10 206/24 214/23
 217/21 218/14 218/17 222/12 223/4
happening [10]  63/14 70/25 93/10 94/21
 96/8 97/17 108/24 163/11 163/12 184/4
happens [5]  3/7 33/11 204/7 204/8 204/8
happy [3]  163/17 229/8 232/12
hard [6]  30/17 30/19 37/9 38/20 168/1
 229/13
Harmison [75]  7/10 7/13 8/1 11/6 13/15
 13/25 27/21 27/24 28/15 48/19 50/17 50/25
 51/10 55/20 56/2 56/19 56/20 58/6 59/16
 61/8 61/8 61/12 61/23 62/7 62/11 63/11
 63/17 63/21 68/6 68/20 69/2 69/4 69/19 70/6
 72/23 73/1 73/6 73/10 73/13 73/22 74/8
 74/15 75/2 75/4 76/18 77/3 77/4 118/7
 119/12 119/21 120/4 120/21 120/25 122/6
 123/8 140/14 140/16 144/17 145/2 169/2
 172/20 173/1 173/3 173/22 174/8 174/23
 175/8 175/11 175/16 176/3 176/7 176/15
 177/7 211/7 211/8
Harmison -- you [1]  211/7
Harmison's [4]  7/3 63/23 64/1 76/12
hasn't [2]  138/20 222/3
haven't [6]  107/19 115/4 127/15 211/2
 228/15 231/11
having [18]  8/19 14/18 25/8 25/21 30/17
 30/19 37/18 47/11 54/19 54/22 91/25 95/12
 104/7 147/14 162/16 172/13 184/18 185/24
he'd [1]  16/1
he's [21]  32/14 33/13 34/8 34/8 61/19 70/24
 71/16 72/12 91/1 107/16 107/17 108/3 108/3
 139/15 169/16 171/8 212/3 216/22 224/4

**H**

he's... [2] 230/1 231/21
head [2] 52/17 231/3
header [1] 53/4
headquarters [1] 57/12
hear [4] 11/15 71/21 175/15 229/14
heard [13] 3/2 3/3 30/7 44/20 107/13 108/17
109/4 118/17 168/21 169/17 175/12 207/10
218/24
hearing [3] 3/4 107/25 130/23
hearsay [13] 5/11 5/20 6/13 14/19 60/13 71/5
71/7 113/17 113/21 114/21 118/9 119/14
121/2
heart [9] 22/21 22/23 100/9 100/13 102/14
153/13 168/8 176/16 221/5
heater [1] 38/21
heavily [2] 16/21 222/4
heavy [1] 15/23
held [5] 31/6 70/22 113/20 138/14 147/15
help [6] 65/14 102/15 104/15 153/22 157/17
173/24 203/1 210/6
helping [1] 34/2
here [50] 2/17 28/5 31/8 32/15 69/25 76/13
78/14 81/23 84/11 87/20 93/24 107/9 107/23
108/5 108/11 110/3 110/14 113/19 114/16
114/20 117/5 117/8 125/13 125/19 126/4
127/13 127/15 132/13 135/19 150/25 160/23
172/12 191/20 205/16 212/3 220/21 221/7
224/5 227/23 228/10 228/14 228/18 228/20
229/2 229/8 229/19 229/21 230/5 231/23
232/5
here's [1] 231/22
Hi [2] 75/10 75/12
Hidden [1] 134/24
high [3] 37/21 46/14 183/25
higher [1] 227/14
highest [1] 225/6
Hills [1] 134/24
hire [2] 157/17 208/10
hired [3] 154/9 154/12 157/20
history [5] 95/12 190/2 197/23 219/13 224/6
hit [1] 48/1
hold [1] 15/19
holding [3] 15/6 222/11 222/13
holiday [1] 134/4
home [3] 17/13 19/5 229/24
homeowners [2] 30/25 31/12
hone [1] 30/2
Honor [125]
HONORABLE [1] 1/12
honorably [1] 110/5
hook [1] 19/13
hope [1] 41/19
hopefully [3] 109/24 109/25 227/17
hoping [1] 78/9
hospital [12] 8/23 11/7 11/9 11/16 13/14
13/16 48/14 63/2 63/6 63/9 63/13 122/11
hospitals [3] 8/12 9/7 62/18
host [1] 203/4
Hotel [1] 76/21
hour [7] 48/1 59/1 80/6 227/11 228/8 228/9
230/1
hours [1] 228/8
house [24] 11/9 23/24 28/8 28/13 35/17
35/18 35/19 35/20 35/21 35/22 35/23 36/25
37/1 37/22 37/22 38/13 46/9 48/12 55/25
63/3 96/25 98/9 134/24 224/18
hub [1] 46/20
huh [6] 18/6 102/24 128/18 208/21 214/19

**I**

225/5
hundred [9] 10/7 69/22 121/18 122/13
145/12 145/18 200/4 200/6 200/7
hundreds [2] 12/7 215/5
hurricanes [1] 18/25
hurt [2] 36/18 47/22
hurting [1] 30/20
hypothetical [1] 218/13

**I**

I'd [14] 10/16 15/4 31/16 70/13 70/15 82/14
86/15 96/21 112/10 135/11 138/12 140/10
211/18 230/2
I'll [12] 7/14 103/4 115/6 126/15 133/14
135/9 135/16 135/17 135/19 137/24 227/3
232/12
I'm [153]
I've [13] 18/23 42/22 71/21 107/23 108/14
109/17 148/6 148/7 171/17 205/12 215/5
215/6 227/24
I-n-n-e-t [1] 68/15
idea [16] 14/25 38/7 48/21 48/25 49/3 56/16
74/10 138/23 176/2 176/6 176/8 211/13
217/4 217/6 218/20 224/1
ideas [1] 155/25
identical [2] 56/10 56/11
identification [3] 85/4 86/24 135/10
identified [1] 62/12
identify [3] 213/7 214/13 216/5
ifs [1] 47/14
ill [1] 13/24
illegal [1] 204/24
immediately [1] 88/17
impact [4] 213/19 213/25 214/10 218/8
importance [1] 77/17
important [1] 221/25
impression [3] 24/5 24/8 34/5
inability [1] 209/5
Inc [4] 6/24 7/24 8/7 23/3
inclined [1] 229/10
include [4] 105/24 179/22 180/2 203/2
included [4] 105/18 180/13 183/18 186/22
including [4] 86/10 145/24 190/3 197/24
income [2] 112/17 167/20
incoming [1] 75/21
inconsistencies [2] 2/13 3/2
inconsistent [3] 80/3 84/12 90/16
incorporate [2] 194/5 227/11
incorrect [5] 64/20 72/7 116/17 119/24
202/14
increase [2] 199/21 213/11
increased [1] 183/23
increasingly [1] 227/15
indeed [2] 175/16 197/9
independently [2] 62/17 212/6
indicate [8] 88/22 105/3 157/8 157/10 181/23
183/18 183/23 189/11
indicated [8] 63/16 78/9 109/15 109/20
109/21 183/12 183/16 202/6
indicates [1] 189/8
indicating [1] 192/1
indicative [1] 183/10
indictment [8] 64/6 64/11 64/12 64/15
190/24 190/25 194/22 196/9
individual [3] 91/4 91/6 224/7
individuals [6] 178/25 180/7 203/19 209/7
209/15 209/16
indulgence [2] 145/21 200/18
industry [4] 10/14 178/21 178/23 179/19
infirmed [1] 90/25

information [21] 12/22 21/25 85/17 116/13
179/23 180/2 180/4 180/5 180/16 182/19
194/5 206/7 206/10 206/13 208/24 209/16
210/1 215/2 215/4 216/23 227/4
informed [1] 212/6
initial [4] 154/21 155/19 162/16 163/24
initials [7] 52/19 55/9 55/12 55/15 55/17 56/3
148/24
Innet [3] 8/7 68/15 68/18
inquire [2] 124/25 138/16
inquiry [6] 92/23 93/1 93/3 94/2 94/19 121/6
inside [1] 210/10
insider [1] 203/3
inspection [2] 101/20 102/4
inspector [1] 107/17
inspector's [1] 107/11
inspectors [1] 10/1
install [2] 18/14 21/19
installation [2] 17/23 17/25
installed [3] 9/6 17/12 19/16
installing [1] 16/8
instance [2] 199/23 206/11
instantaneously [1] 13/5
instead [4] 126/15 184/18 200/1 200/3
Institute [3] 17/21 18/10 18/14
instructed [1] 88/17
instructions [3] 88/15 140/17 140/20
intend [5] 227/6 229/4 229/16 229/17 230/5
intended [1] 104/18
intends [1] 229/9
intention [2] 42/19
interact [2] 91/7 210/15
interacted [2] 30/18 95/15
interacting [1] 98/16
interactions [1] 63/18
interactive [1] 9/4
interest [6] 79/9 79/13 79/15 111/7 111/12
111/21
interested [1] 67/16
interface [1] 212/9
interfacing [1] 69/20
Internal [3] 44/16 45/2 79/2
internationally [1] 62/18
Internet [7] 26/15 26/16 125/18 126/6 127/9
127/21 207/11
interrupt [1] 70/19
interrupting [1] 214/18
intoxicated [1] 13/7
introduce [3] 11/12 139/14 178/16
introduced [8] 50/19 67/6 126/19 231/2
231/11 231/13 231/16 232/10
intrusion [1] 203/4
inventor [1] 104/3
inverse [1] 200/2
investigate [3] 94/24 202/21 202/22
investigating [1] 214/6
investigation [5] 97/17 180/9 202/7 202/25
215/1
investigations [1] 179/11
investigator [1] 212/25
investing [1] 192/6
investment [8] 149/22 149/25 150/1 150/3
200/5 200/7 200/8 221/22
Investments [5] 132/25 141/1 141/4 141/8
148/13
investor [4] 153/17 153/23 164/2 173/14
investors [1] 153/22
invoice [2] 188/2 188/5
invoices [4] 75/21 132/5 142/14 187/24
invoicing [1] 142/13

**I**

involved [10]  16/22 17/23 17/25 34/9 34/10
 103/24 103/25 138/2 155/12 212/19
involvement [2]  18/18 32/10
involving [6]  138/24 179/11 197/23 199/15
 204/3 224/17
inward [1]  94/23
irrelevant [3]  31/9 32/5 32/6
IRS [4]  41/23 44/20 44/22 133/10
isn't [23]  5/10 11/8 11/10 11/25 15/14 17/14
 17/21 28/17 29/13 51/2 61/5 69/5 75/17
 91/16 100/17 119/12 119/21 120/23 130/14
 130/20 132/2 133/1 172/10
Israel [1]  69/14
issuance [17]  169/10 187/4 188/3 188/6
 188/22 190/22 191/11 192/16 192/24 193/6
 195/9 195/22 196/6 196/8 196/14 197/4
 197/8
issuances [8]  186/6 186/20 186/22 187/2
 187/6 188/11 202/22 223/7
issue [10]  2/6 34/25 63/13 103/8 103/9
 103/10 103/12 139/15 205/9 215/6
issued [12]  168/25 169/6 185/25 186/25
 187/8 187/10 188/10 190/16 192/2 193/3
 194/21 208/1
issues [3]  32/25 33/3 76/12
it'd [1]  232/9
it's [77]  3/5 19/9 23/22 32/6 32/6 33/24 34/13
 34/23 46/12 52/8 52/25 54/3 56/10 56/12
 65/20 68/4 71/1 74/21 74/25 75/1 76/23
 81/10 85/5 85/6 85/17 86/22 86/24 88/25
 91/22 97/23 108/15 109/3 109/12 109/16
 109/23 113/22 113/24 114/24 116/18 119/18
 121/10 123/11 127/17 138/11 138/20 139/12
 139/17 139/20 149/9 149/13 164/22 172/4
 181/4 182/1 184/22 185/16 203/15 203/25
 204/8 206/24 209/6 210/3 221/4 221/5
 221/13 221/25 222/4 222/8 222/19 222/19
 222/21 223/14 223/15 227/14 228/18 229/13
 231/20
Italian [1]  51/4
item [1]  22/6
items [2]  127/12 127/13
itself [3]  200/13 202/16 209/17
Ives [1]  1/22

**J**

J-a-m-i-e [1]  152/5
James [3]  212/2 212/3 212/7
Jamie [4]  151/19 151/22 152/4 233/8
January [8]  77/3 97/3 118/23 118/25 186/6
 186/21 188/1 188/6
January 11th [2]  186/21 188/6
January 1st [1]  97/3
January 5th [1]  188/1
Jared [4]  130/17 131/4 131/4 131/5
jaws [2]  104/11 104/12
Jennifer [2]  227/5 229/7
jet [11]  4/21 29/7 29/10 29/13 29/17 29/20
 29/23 29/25 30/22 164/16 164/16
Jim [4]  95/2 95/4 95/7 95/12
jog [1]  61/10
John [6]  53/15 89/21 92/17 115/22 116/8
 167/6
Jones [6]  75/3 75/4 103/19 103/20 140/14
 188/20
Joseph [3]  177/23 178/2 233/12
judge [3]  1/13 130/19 130/22
judgment [1]  132/9

July [3]  168/13 168/17 234/21
July 8th [2]  168/13 168/17
jumbled [1]  61/11
jumping [1]  132/13
June [19]  44/6 44/7 44/13 44/14 184/6
 191/24 192/9 192/15 192/15 192/16 192/25
 193/5 193/13 193/23 194/21 195/3 195/15
 195/16 225/13
June 12th [10]  191/24 192/9 192/15 192/15
 192/16 192/25 193/5 194/21 195/15 195/16
June 16th [2]  193/23 195/3
June 2008 [1]  193/13
jurisdiction [5]  179/4 202/15 203/15 203/18
 203/20
jurors [6]  3/11 3/14 66/11 110/15 170/15
 201/16
jury [46]  1/11 2/9 2/14 2/18 3/3 3/20 3/23
 34/9 34/12 65/8 66/23 96/17 106/17 107/25
 109/4 110/12 110/19 126/22 132/19 133/20
 135/20 139/3 143/20 146/4 153/5 153/18
 156/12 156/18 160/23 170/4 170/18 178/16
 179/7 183/7 191/2 191/19 194/6 194/24
 196/23 198/22 199/17 201/5 201/18 222/1
 226/25 232/5
jury's [5]  31/11 107/8 181/12 186/17 189/2
just [197]
justice [23]  1/17 4/17 7/2 7/12 7/17 8/9 9/11
 9/25 10/1 10/11 10/20 11/1 21/21 23/1 25/24
 28/21 47/7 64/23 74/2 78/2 79/6 151/1 180/9
JW [2]  53/12 53/15
JW00005823 [1]  53/23
JW00005833 [1]  87/9

**K**

keep [6]  4/4 76/3 80/10 136/14 167/19 229/8
keeping [2]  221/20 232/5
KENNETH [1]  1/12
kept [4]  124/10 128/25 166/11 166/20
Keret [1]  8/11
Kevin [2]  1/16 76/6
kind [9]  7/9 34/1 34/7 37/18 40/18 132/12
 163/20 205/8 218/14
kinds [1]  18/24
knee [4]  36/18 47/22 48/2 48/8
knew [35]  10/13 28/6 28/16 39/8 39/11 41/3
 48/17 48/19 62/17 69/7 69/19 70/1 70/6
 72/22 74/16 79/24 87/23 87/24 87/25 100/20
 101/24 102/1 103/23 104/20 116/7 122/9
 122/10 123/14 128/14 133/10 169/9 172/22
 173/12 174/17 174/21
Knights [24]  40/16 79/9 79/21 79/24 80/14
 80/17 82/25 83/10 83/13 84/9 85/14 111/4
 111/7 111/11 111/23 112/1 112/4 124/13
 132/21 133/4 141/24 148/13 149/16 150/2
know [160]
knowing [1]  102/13
knowledge [24]  9/12 9/21 10/23 11/14 12/16
 22/8 29/6 34/16 34/18 34/19 35/6 47/5 74/4
 92/13 104/3 115/21 128/1 168/24 169/2
 169/3 171/17 190/15 214/9 217/18
known [10]  28/3 39/8 127/23 128/2 128/4
 128/5 128/8 128/11 128/11 154/4
Korean [1]  68/10
Korean-based [1]  68/10

**L**

LA [17]  24/6 27/1 30/24 31/20 34/17 35/13
 35/24 36/14 36/18 36/20 36/25 37/9 40/7
 57/15 62/5 89/8 139/5
labels [1]  144/9

lack [1]  62/20
ladder [1]  21/19
ladders [1]  16/8
ladies [10]  65/5 67/1 106/12 106/16 110/22
 169/25 170/21 201/1 201/21 226/20
laid [1]  28/9
Lane [1]  117/13
language [1]  221/17
large [5]  37/1 37/3 68/10 179/22 226/7
largest [1]  222/11
Las [7]  39/2 57/19 58/9 58/13 59/7 60/22
 62/16
last [21]  108/15 135/20 147/19 149/8 149/19
 150/19 151/2 152/3 152/5 167/9 167/18
 173/25 178/1 185/15 208/19 208/20 208/23
 225/4 225/11 231/21 231/24
last-minute [1]  135/20
lastly [1]  121/24
late [8]  57/1 61/16 94/2 116/12 154/23
 167/18 223/8 226/12
later [4]  43/16 43/18 81/10 97/6
latter [1]  61/12
Laurel [1]  89/4
law [21]  78/19 98/17 98/23 98/25 99/14
 100/8 128/22 129/3 129/10 129/22 130/1
 202/11 203/1 205/3 205/4 205/25 212/15
 212/20 212/24 224/2 224/4
lawsuit [4]  93/9 93/21 94/3 94/19
lawsuits [2]  31/25 32/11
lawyer [5]  16/25 30/18 176/21 224/2 224/3
lawyers [3]  3/12 4/3 36/14
leader [2]  117/19 126/21
leading [1]  67/17
learn [6]  5/3 11/7 14/22 102/6 102/7 102/9
learned [2]  92/22 214/10
learning [1]  102/20
least [4]  45/2 107/14 127/23 221/2
leave [5]  75/25 105/7 106/14 201/3 226/22
leaving [2]  106/15 170/3
led [1]  34/9
left [18]  38/15 48/8 48/12 83/9 83/10 112/8
 112/21 135/6 144/8 160/7 182/1 183/7 183/9
 183/9 191/20 191/25 208/18 217/7
left-hand [2]  112/21 182/1
legal [9]  34/1 36/1 36/3 36/4 137/9 137/13
 137/17 138/17 139/6
legend [7]  53/24 54/2 54/8 54/23 55/1 56/16
 197/7
lengthy [4]  13/25 14/12 123/18 228/6
less [7]  10/4 14/24 15/1 85/23 126/25 199/10
 213/13
let [11]  3/10 3/13 80/9 82/6 113/19 120/9
 122/17 154/16 213/22 230/19 232/12
let's [44]  3/20 4/19 6/23 9/23 11/22 13/14
 15/12 19/3 35/22 40/6 48/15 57/4 65/5 67/24
 75/14 106/12 110/14 110/15 121/24 128/21
 132/1 133/19 137/23 139/17 140/11 142/4
 143/9 144/3 144/3 144/8 144/23 146/6 162/7
 166/23 170/15 188/12 201/1 201/16 214/8
 215/22 221/15 221/16 224/13 230/3
letter [10]  88/5 88/15 88/23 100/13 147/11
 188/20 192/22 196/5 210/19 212/7
letterhead [1]  89/1
letters [3]  75/9 147/14 147/15
level [2]  157/8 209/20
license [1]  13/6
lie [11]  18/12 18/22 78/14 78/16 119/10
 123/22 124/2 143/5 143/7 144/22 172/25
lied [3]  130/16 143/6 175/3
lien [3]  43/14 43/16 43/17

# L

lies [4]  78/13 93/15 120/16 144/21
life [6]  9/25 13/18 13/20 25/22 100/20 217/2
light [2]  16/11 17/6
Lighthouse [4]  6/24 7/24 8/20 23/3
lighting [9]  17/20 17/20 18/8 18/9 18/13 18/19 18/24 117/18 120/20
lights [3]  16/8 136/5 136/6
limine [1]  32/4
line [16]  2/12 33/12 34/6 55/16 56/21 65/13 74/25 96/17 121/25 127/20 139/18 167/10 168/14 168/17 168/18 183/16
line 13 [1]  121/25
line 21 [1]  168/14
line 23 [1]  168/18
line 3 [1]  168/17
lined [1]  228/12
lines [6]  18/3 118/19 120/1 121/11 121/11 172/18
lines 10 [1]  18/3
lines 21 [1]  121/11
lines 22 [1]  172/18
lines 4 [2]  118/19 120/1
link [1]  125/22
listed [3]  32/1 164/4 203/15
listened [3]  58/19 58/20 169/12
listing [3]  112/17 180/7 212/4
little [14]  5/9 15/12 27/19 64/9 68/3 98/6 110/3 111/15 136/4 153/5 155/4 158/12 188/7 199/10
live [1]  87/22
lived [2]  50/9 69/25
living [4]  83/17 96/25 141/24 153/16
loan [2]  43/18 45/13
local [3]  32/15 33/13 164/16
located [4]  100/17 100/19 178/19 210/17
location [1]  46/15
logo [1]  180/5
long [11]  14/13 15/7 40/8 58/25 68/4 113/23 132/1 132/1 132/4 179/13 179/15
longer [3]  35/9 109/17 232/5
longterm [1]  103/25
looked [19]  26/19 107/19 144/25 167/25 188/11 193/9 195/22 196/21 198/5 207/13 207/20 207/21 207/23 215/21 221/12 224/20 224/21 224/24 225/1
looking [29]  26/12 26/13 72/6 87/2 100/11 105/18 116/3 117/1 141/6 146/21 147/23 160/23 165/2 180/13 180/14 180/15 180/17 183/8 191/20 193/25 194/2 200/14 208/6 213/2 218/15 222/23 223/14 227/25 232/4
looks [3]  71/11 90/2 167/5
Los [2]  48/16 137/6
lose [1]  45/1
loses [1]  41/8
Losing [1]  41/12
lost [5]  29/23 40/23 44/22 44/25 197/5
lot [23]  24/9 27/24 28/1 28/4 28/9 40/23 41/8 41/12 41/14 44/25 47/14 51/5 79/17 82/17 85/19 85/21 97/5 121/17 163/21 216/6 216/7 225/24 232/3
lots [1]  213/20
Love [1]  39/25
low [1]  222/20
Lowell [15]  13/25 48/19 55/20 75/2 75/4 120/4 122/6 140/14 144/17 145/2 172/20 173/1 176/3 211/7 211/8
lunch [6]  106/9 106/13 109/25 111/3 228/19 229/1

Lurea [5]  157/20 157/25 158/5 159/17 171/14
lying [1]  130/13
Lynch [1]  224/17

# M

M-e-l-l-e-y [1]  178/2
magazine [2]  30/10 30/11
mail [31]  1/25 14/1 27/20 75/6 75/8 78/1 99/23 99/25 100/3 100/4 101/5 110/6 112/13 114/19 116/23 125/12 135/23 138/8 138/23 139/10 139/11 139/11 140/11 140/13 140/13 141/6 167/2 167/4 167/17 177/6 177/7
mailings [1]  138/7
mails [5]  113/23 114/19 138/24 145/24 231/4
main [1]  171/24
mainly [1]  67/16
maintain [2]  83/19 83/23
major [1]  8/22
majority [1]  111/11
makes [2]  33/11 169/17
making [8]  3/6 48/1 57/3 107/13 107/16 108/16 111/24 143/25
mall [1]  51/4
man [3]  6/23 26/22 34/7
managed [2]  35/19 219/9
management [1]  92/11
manager [3]  117/16 126/21 128/2
managing [2]  150/1 212/3
manipulation [4]  202/23 203/3 214/21 214/24
manufacturer [2]  20/11 20/16
manufacturers [1]  124/4
manufacturing [2]  121/15 145/1
March [18]  68/6 68/9 75/17 112/18 145/8 163/5 188/23 189/9 189/25 190/10 190/16 190/22 191/12 191/23 192/4 192/9 192/14 218/7
March 19 [1]  189/9
March 19th [6]  188/23 190/16 190/22 191/12 191/23 192/14
March 2008 [1]  218/7
March 24th [3]  190/10 192/4 192/9
Mark [1]  224/7
marked [17]  51/16 52/2 67/6 70/13 72/17 74/11 86/13 99/4 105/2 113/11 115/10 116/10 135/10 164/21 211/17 227/13 232/13
market [19]  156/21 179/3 192/7 203/3 204/13 206/17 208/14 209/13 209/17 210/1 213/11 214/11 217/22 218/11 220/20 224/20 224/22 225/3 225/8
marketability [1]  225/1
markets [5]  179/2 179/4 204/9 204/13 204/15
MARRA [2]  1/2 1/12
Martin [22]  4/10 88/10 88/13 88/18 156/4 156/7 158/3 158/5 165/17 168/2 168/5 176/2 176/18 185/25 186/6 189/25 191/10 192/24 196/7 200/15 225/7 233/3
Marty [1]  100/12
Mary [1]  131/1
material [1]  77/22
materials [3]  105/17 179/18 188/4
matter [8]  114/1 114/4 114/7 114/13 131/22 208/13 229/25 234/20
matters [5]  58/17 88/22 212/16 212/18 215/5
Matthews [1]  50/4
maximum [1]  78/6
May 25th [1]  115/17
maybe [16]  24/13 33/1 39/1 39/16 59/1 61/16

71/13 71/14 71/21 85/2 87/3 123/13 163/18 227/8 227/10 228/1
MC [3]  55/15 75/13 75/15
MCA [1]  95/12
me [212]
mean [24]  3/18 13/3 18/25 30/17 34/5 37/14 41/15 46/19 46/21 55/14 71/15 81/24 100/2 114/6 136/10 138/21 139/19 169/17 174/11 174/25 219/12 223/17 227/14 228/17
meaning [10]  56/11 83/10 94/18 94/19 95/25 104/5 104/6 163/23 222/19 230/22
means [6]  53/15 72/4 123/14 153/19 156/19 199/18
meant [1]  18/17
medical [10]  10/14 13/22 122/11 122/12 123/1 123/6 131/19 131/25 132/7 132/10
medically [2]  123/7 123/10
meet [6]  11/8 11/10 28/5 40/4 100/15 134/23
meeting [47]  4/19 5/8 6/2 57/10 57/11 57/17 57/23 58/13 58/16 58/18 58/21 58/25 59/3 59/7 60/22 61/11 61/13 61/16 61/19 61/23 62/11 62/16 69/24 101/3 101/9 102/3 102/6 102/17 102/19 103/21 104/2 104/8 104/11 104/16 104/17 104/23 164/1 164/7 164/10 164/11 164/11 164/18 164/19 164/20 171/5 171/20 174/1
meetings [6]  9/24 10/21 13/9 13/12 50/20 163/25
Meisner [1]  117/13
Melley [39]  177/20 177/23 178/2 178/6 178/14 180/8 181/4 181/12 182/7 184/2 185/3 185/15 186/17 187/14 187/20 188/7 188/15 188/19 189/4 189/23 190/9 191/19 192/11 192/14 192/21 194/20 195/8 196/4 196/16 197/20 202/1 202/4 202/5 202/5 213/1 215/7 216/16 225/24 233/12
meltdown [19]  26/25 30/15 30/21 30/24 40/23 41/12 44/23 56/21 56/23 57/4 57/15 57/16 57/21 62/4 94/1 94/1 94/24 96/9 98/4
member [1]  58/3
member's [1]  59/15
members [4]  153/18 178/24 203/19 209/12
memory [4]  49/21 61/10 71/14 72/5
mention [2]  156/7 227/3
mentioned [16]  20/25 21/1 33/3 94/19 103/19 160/17 163/10 170/3 171/9 171/10 175/23 180/23 182/7 195/8 205/10 218/23
Mercedes [15]  34/18 36/23 42/2 42/3 42/5 45/5 45/20 46/3 46/25 97/6 97/10 133/16 133/22 134/11 136/6
Mercedes-Benz [3]  34/18 36/23 97/6
mere [1]  72/7
mergers [1]  159/11
Merit [1]  234/17
Merrill [1]  224/17
messed [1]  9/2
Messrs. [1]  61/7
Messrs. Gelfen [1]  61/7
met [22]  4/23 11/10 12/4 12/7 17/1 17/13 17/13 19/19 19/19 28/14 31/20 35/15 48/18 50/4 51/1 51/10 87/20 154/7 164/12 171/3 171/17 203/9
Miami [1]  1/22
Michael [2]  58/1 59/16
microphone [2]  152/23 178/7
middle [2]  69/9 232/4
middlemen [1]  10/13
might [17]  5/2 9/16 58/2 71/12 72/8 77/8 77/8 96/19 102/11 108/22 109/17 139/14 153/18 169/21 196/24 229/18 229/23

## M

Mike [1]  112/14
Miko [6]  20/9 20/11 20/23 23/4 84/1 124/11
miles [2]  36/20 48/1
million [35]  41/3 41/12 41/16 44/22 68/10
79/24 118/8 118/14 119/6 132/9 156/3 156/6
158/2 165/19 168/11 169/17 169/20 176/17
184/21 185/8 187/3 195/9 199/7 199/23
200/1 200/1 200/6 200/8 217/20 217/21
217/23 218/6 222/11 225/12 226/4
millions [1]  27/7
mind [10]  27/10 31/11 72/9 92/25 104/4
125/3 125/19 149/7 221/20 232/14
mine [3]  83/24 157/20 208/17
minister [1]  40/2
minute [7]  65/6 133/19 135/20 169/25
200/20 201/2 231/24
minutes [13]  61/15 65/7 65/25 96/20 109/15
170/2 170/7 173/19 200/23 201/10 230/10
232/12 232/15
mishearing [1]  61/16
missed [1]  71/21
missing [1]  123/13
mission [1]  179/1
Mississippi [1]  57/17
Mitch [16]  100/10 154/13 154/20 159/23
159/24 160/15 161/1 161/11 161/24 165/5
165/6 167/9 167/22 169/1 169/3 169/11
Mitch's [2]  140/20 160/8
MITCHELL [14]  1/6 1/19 130/17 140/14
140/15 140/23 141/5 141/12 142/15 142/24
143/8 144/2 145/20 167/4
MJS [2]  167/2 167/4
modified [1]  106/6
molding [1]  16/13
moment [9]  2/8 51/14 67/15 93/1 126/17
145/21 220/8 220/18 220/20
money [36]  39/4 39/11 40/23 40/25 41/9
41/10 41/13 41/14 42/12 42/13 42/16 44/25
45/1 47/12 61/9 79/16 79/17 79/19 79/22
80/2 81/16 81/20 119/5 137/3 138/4 141/4
141/12 142/7 142/12 142/12 142/14 142/16
150/25 192/12 195/24 200/10
monitor [4]  102/14 153/13 176/16 177/2
monitors [1]  168/8
month [12]  17/15 17/16 17/16 18/4 18/22
18/23 98/13 112/17 129/16 189/25 190/1
199/10
months [4]  17/14 45/7 45/23 100/5
Moore [2]  51/1 51/4
morning [13]  2/2 3/25 4/13 4/14 34/6 38/17
75/13 109/21 146/16 227/8 228/19 228/23
228/25
mornings [1]  66/18
most [4]  142/16 168/24 227/11 227/23
motion [2]  32/4 230/9
motions [1]  108/22
motorcycle [1]  47/24
move [16]  40/6 117/25 135/11 137/16 152/7
152/10 152/25 178/6 178/7 186/11 189/17
193/15 194/14 197/14 198/16 232/20
moved [11]  7/9 19/22 19/22 24/6 27/1 31/20
49/6 62/4 90/2 96/24 163/19
moves [1]  178/7
moving [8]  89/7 93/23 122/1 163/16 163/17
183/7 183/9 191/21
Mr [149]
Mr. [251]
Mr. Anand [3]  27/2 27/5 27/16

Mr. Armpriester [2]  17/1 17/9
Mr. Carter [136]
Mr. Carter's [11]  53/7 71/24 105/18 189/13
195/4 196/20 197/9 206/15 223/6 224/6
226/4
Mr. Eisner [1]  18/7
Mr. Feidler [6]  95/15 95/18 95/24 96/1 96/8
101/4
Mr. Gault [2]  89/17 98/17
Mr. Harmison [1]  176/7
Mr. John [1]  89/21
Mr. Keret [1]  8/11
Mr. Melley [33]  178/6 178/14 180/8 181/4
181/12 182/7 184/2 185/3 185/15 186/17
187/14 187/20 188/7 188/15 188/19 189/4
189/23 190/9 191/19 192/11 192/14 192/21
194/20 195/8 196/4 196/16 197/20 202/1
202/5 213/1 215/7 216/16 225/24
Mr. Muhlendorf [2]  129/8 129/24
Mr. Nony [1]  8/11
Mr. Perkins [13]  35/15 98/17 101/4 113/9
114/16 114/20 116/4 116/6 116/7 116/12
116/19 117/10 127/5
Mr. Riley [1]  105/11
Mr. Rowland [1]  114/4
Mr. Ryan [1]  166/6
Mr. Scharf [2]  130/20 130/25
Mr. Stein [7]  2/10 2/16 2/20 106/10 126/18
131/16 201/13
Mr. Stein's [1]  2/7
Mr. Stieglitz [4]  2/23 148/12 230/1 231/19
Mr. Sweeney [4]  184/15 185/5 185/13
187/18
Mr. Tribou [1]  226/8
Mr. White [2]  2/25 232/7
Mr. Woodbury [3]  114/20 167/15 177/8
Mr. Yafa [11]  152/20 153/3 158/10 167/23
168/21 171/1 172/12 176/13 177/2 177/14
177/15
mriley8 [1]  99/20
Mrs. [3]  17/13 19/17 19/19
Mrs. Stein [2]  19/17 19/19
Mrs. Stein's [1]  17/13
Ms. [18]  4/23 5/9 6/12 6/21 18/4 28/14 28/23
125/3 125/18 125/23 126/3 131/7 160/10
161/15 162/18 188/20 229/4 229/7
Ms. Black [1]  229/4
Ms. Bunes [6]  4/23 5/9 6/12 6/21 28/14
28/23
Ms. Jennifer [1]  229/7
Ms. Muscillo [2]  161/15 162/18
Ms. Muscillo's [1]  160/10
Ms. Nonaka [1]  18/4
Ms. Petras [1]  131/7
Ms. Rikert [1]  125/3 125/18 125/23 126/3
Ms. Tracy [1]  188/20
much [14]  4/3 4/5 41/5 46/20 58/19 58/20
93/17 110/24 111/15 118/25 119/3 127/1
225/14 226/23
Muhlendorf [7]  1/16 129/8 129/24 239/9
233/11 233/13 233/15
Mullin [3]  212/2 212/3 212/7
multiple [2]  37/11 37/14
Muscillo [14]  158/23 158/24 159/4 161/4
161/8 161/15 162/18 165/9 167/25 168/25
169/7 169/10 171/16 175/22
Muscillo's [2]  160/3 160/10
music [1]  39/20
mutually [1]  165/11
myself [4]  30/3 101/7 134/21 171/6

## N

nail [2]  16/17 16/19
nails [1]  16/1
naked [14]  24/24 25/2 25/5 25/7 25/25 26/2
208/4 208/24 209/3 209/21 209/25 214/22
215/2 225/25
name [51]  19/25 26/22 39/3 39/21 39/22 43/3
43/5 50/9 51/7 58/2 58/8 68/15 76/10 80/13
80/17 83/7 83/13 85/25 86/1 88/25 100/16
103/19 103/22 112/4 125/20 149/15 149/15
152/2 152/4 152/5 154/7 159/19 161/4
165/14 165/17 166/2 171/15 176/18 177/25
178/1 187/24 189/20 206/16 200/17 211/8
219/6 219/11 224/7 227/5 230/16
named [5]  40/16 95/2 156/4 167/14 168/5
names [7]  57/25 62/12 85/22 86/2 152/3
158/5 171/13
nano [3]  221/17 221/23 222/22
narrow [2]  22/16 33/17
NASDAQ [2]  179/3 204/12
national [1]  62/12
nature [6]  120/22 136/11 138/7 156/2 169/9
231/2
necessarily [2]  72/5 206/9
necessary [1]  232/5
need [20]  3/6 24/14 32/10 32/14 32/16 34/3
76/4 107/8 107/18 139/20 178/6 178/8 215/4
219/2 227/1 227/19 228/9 229/14 232/2
232/20
needed [6]  24/15 114/5 114/5 123/12 157/12
215/1
needs [3]  76/4 110/3 202/16
negative [1]  226/8
negotiate [1]  157/12
neon [1]  125/9
net [6]  192/9 192/11 195/7 199/5 199/6 199/7
network [19]  7/4 7/4 7/18 7/23 10/12 10/24
10/25 59/11 60/18 119/13 119/22 120/22
121/1 121/6 121/15 122/9 123/4 123/4
144/18
networks [3]  22/5 22/12 22/18
never [59]  6/20 6/21 9/17 11/12 12/2 12/4
16/9 18/23 22/9 23/2 23/8 23/8 24/2 24/10
27/8 27/10 27/13 29/19 35/18 42/22 44/20
44/22 45/9 45/11 45/13 45/17 45/19 68/20
73/2 73/4 73/14 73/16 73/18 73/21 73/22
79/5 80/15 80/17 84/6 93/18 118/17 138/24
158/7 165/16 165/19 168/11 169/17 171/17
171/22 172/8 175/3 176/17 203/9 207/10
210/21 215/5 218/24 219/21 231/22
new [14]  1/18 91/16 91/23 92/10 92/11 92/18
97/3 98/18 98/21 99/13 153/21 179/2 204/14
231/10
news [2]  179/25 180/14
newsletter [1]  157/21
next [29]  31/20 38/16 65/9 66/17 71/18 76/5
76/22 91/15 96/16 114/15 115/18 121/12
122/1 145/7 151/17 155/20 164/12 177/18
184/15 192/16 195/22 199/13 216/8 216/10
220/19 222/23 222/25 228/3 228/4
nice [3]  46/21 204/20 226/23
nicer [1]  46/20
night [3]  37/11 48/14 167/18
nights [2]  37/14 37/16
no [276]
Nobody [4]  19/10 136/7 223/11 223/17
Nonaka [1]  18/4
Nony [2]  8/5 8/11
normally [1]  210/15

**N**

North [1]  1/20
Northwest [1]  1/18
not-for-profit [1]  178/22
note [1]  24/13
notebook [2]  51/12 186/2
notes [4]  51/11 106/14 143/15 201/3
nothing [16]  22/11 22/12 22/14 22/17 22/21
22/23 47/11 64/11 68/13 90/15 115/13 148/4
151/5 151/6 177/12 226/16
notice [3]  52/14 52/16 161/12
noticed [1]  108/14
notification [1]  88/16
Notwithstanding [1]  88/19
November [8]  87/17 87/18 90/17 91/22 92/1
92/9 92/18 92/21
November 2008 [1]  92/21
November 5th [4]  87/17 87/18 91/22 92/18
November 6th [1]  92/9
NPC [8]  88/16
number [34]  10/6 31/24 53/13 83/5 83/6 83/6
83/6 83/7 84/2 85/3 85/3 85/5 85/5 85/6
85/23 95/15 105/25 106/4 106/5 128/16
129/18 131/16 131/17 140/5 143/2 160/17
186/22 186/24 197/2 197/6 199/21 204/14
222/6 222/19
number 2 [2]  83/5 83/6
number 247,000 [1]  160/17
number 3 [3]  83/6 83/6 83/7
numbering [3]  53/18 53/21 53/22
numbers [7]  149/8 215/11 215/12 216/3
216/6 216/7 216/10
nutshell [1]  202/21
NYSE [1]  204/14

**O**

oath [6]  3/21 66/9 110/17 168/22 170/17
201/17
object [9]  7/11 7/13 10/16 15/4 61/14 103/4
110/2 114/21 216/12
objected [2]  101/12 139/7
objection [68]  5/11 5/20 6/13 7/8 14/5 14/18
23/16 24/20 31/2 47/14 51/20 51/21 53/17
60/13 62/13 62/20 63/19 70/3 70/8 71/23
78/18 81/2 81/3 86/17 86/22 93/8 94/12 95/9
99/8 99/9 105/17 105/22 106/7 108/1 108/10
113/17 114/13 118/2 118/3 118/9 119/14
121/2 135/13 138/11 149/3 149/5 151/12
152/13 172/1 172/4 177/16 183/2 183/3
186/13 186/14 189/19 189/20 191/15 191/16
193/17 193/18 194/16 194/17 197/16 197/17
198/18 198/19 224/9
objections [2]  152/11 152/12
obligated [4]  8/3 8/6 8/11 22/10
obligation [1]  22/3
obligations [1]  91/14
observed [1]  108/15
obstruction [1]  78/2
obvious [2]  2/19 211/4
obviously [6]  12/7 108/9 110/2 202/22
220/19 230/19
occasion [2]  174/15 182/3
occasions [1]  95/16
occur [3]  59/8 71/25 230/8
occurred [4]  71/7 82/4 220/3 220/5
occurs [1]  188/5
October [9]  57/4 57/7 62/5 172/17 182/21
183/13 183/21 184/1 184/3
October 10th [1]  183/21
October 12th [3]  182/21 183/13 184/3
October 4th [1]  184/1
October 8th [1]  172/17
off [14]  37/22 40/8 52/16 94/11 96/19 122/16
127/20 132/8 134/13 135/19 138/24 166/16
210/14 231/3
offer [10]  31/14 81/1 86/15 105/15 113/16
135/1 148/18 149/2 182/25 191/13
offered [3]  114/12 119/18 230/12
offering [4]  106/4 113/25 114/3 114/6
offhand [4]  95/1 99/24 112/25 113/10
offhanded [1]  3/7
office [3]  24/8 89/10 210/8
officer [2]  87/25 90/21
offices [1]  145/9
official [3]  1/24 96/1 205/25
often [3]  179/19 210/15 214/16
oh [13]  3/4 5/14 28/6 54/5 71/14 84/18
103/16 107/22 120/8 125/14 139/8 141/11
150/16
Ohio [8]  100/17 100/19 104/18 104/21
120/13 120/19 145/2 147/7
Ohio's [1]  104/20
okay [126]
old [3]  15/25 22/18 153/3
older [1]  91/1
onboard [1]  173/24
once [10]  12/3 76/3 140/21 142/16 162/19
162/20 190/20 198/6 200/10 213/6
one [125]
one's [1]  53/2
one-page [2]  86/24 99/7
ones [3]  180/4 184/23 198/5
online [2]  157/21 206/13
only [31]  3/17 11/19 12/6 22/3 32/7 66/18
71/15 71/20 74/17 80/18 87/21 99/12 105/19
105/24 109/22 130/18 159/18 161/10 161/11
179/10 195/9 202/18 203/18 205/3 205/12
210/3 212/15 212/23 213/24 214/2 218/9
open [9]  5/24 6/1 6/9 52/23 76/3 126/4
139/18 156/21 192/6
opened [8]  81/7 82/22 83/2 84/9 85/13 85/19
86/1 148/7
opening [4]  85/23 86/3 145/1 184/7
operation [2]  35/8 138/8
opining [1]  2/17
opinion [3]  108/23 163/13 163/16
opinions [5]  65/6 106/14 109/4 201/3 226/22
opportunity [2]  130/24 130/25
opposed [1]  11/4
optimistic [1]  109/23
Orange [4]  36/19 36/20 36/22 47/23
orchestrating [1]  214/25
order [5]  2/1 9/7 38/12 138/23 227/18
ordered [2]  60/2 60/7
orders [4]  7/19 10/13 184/21 185/17
ordinarily [1]  2/8
Oregon [2]  229/20 230/4
organization [6]  178/22 202/17 202/18
209/12 210/15 212/14
organizations [1]  210/8
organize [1]  154/2
originally [2]  97/8 227/4
Orlando [5]  42/9 134/1 134/2 164/15 164/19
others [1]  78/14
otherwise [4]  79/7 72/2 118/13 229/10
our [17]  18/8 18/17 40/6 106/9 106/12
117/18 124/6 155/3 166/1 169/25 170/16
202/17 202/18 205/5 209/2 212/15 228/9
ourselves [1]  4/4
outgoing [1]  75/22
outlets [1]  20/17
outright [1]  43/21
outside [3]  38/16 130/7 214/8
over [31]  55/8 67/7 14/16 17/14 17/16 28/15
35/21 39/8 41/3 45/25 54/18 111/22 113/19
124/11 124/12 124/12 124/13 136/23 155/20
179/3 183/15 187/3 190/1 199/7 203/15
203/18 203/20 204/13 208/18 224/22 225/12
over-the-counter [3]  6/7 179/3 204/13
overhang [2]  46/11 46/12
overhead [1]  150/16
overnight [2]  76/8 162/6
Overruled [6]  5/12 15/9 62/21 70/9 119/15
172/3
overseas [6]  69/5 70/7 73/2 73/6 73/10 73/13
own [5]  26/6 179/22 200/17 209/19 222/19
owned [5]  43/21 46/2 46/4 112/4 207/7
owner [1]  200/14
ownership [1]  222/17
owning [1]  25/20

**P**

p.m [7]  107/3 107/3 170/9 170/9 201/11
201/11 232/22
packet [1]  188/2
page [54]  15/1 15/2 15/7 18/3 53/13 53/21
54/11 54/11 55/8 56/7 67/16 67/17 67/17
67/17 67/24 77/14 86/24 88/24 99/7 105/1
105/3 118/19 121/10 121/10 121/11 121/12
121/25 122/1 144/3 144/23 145/7 146/21
147/22 149/19 150/19 151/2 160/1 164/23
164/24 165/1 165/20 166/14 166/23 168/13
168/17 172/18 181/2 190/4 197/25 207/22
215/10 215/11 216/17 217/1
page 1 [1]  55/8
page 122 [1]  118/19
page 129 [1]  121/10
page 145 [2]  121/10 121/11
page 22 [1]  190/4
page 3 [1]  105/3
page 45 [1]  121/25
page 5 [1]  197/25
page 58 [1]  172/18
page 74 [1]  18/3
page 931:19 [1]  168/13
pages [8]  1/10 14/24 65/13 65/16 65/21 67/23
148/25 215/25
paid [33]  17/9 38/23 39/5 39/6 39/7 41/16
41/18 42/14 43/13 43/15 43/21 49/14 49/15
49/15 49/16 58/9 75/21 79/17 79/22 80/11
80/12 97/20 97/25 98/6 98/9 118/13 118/20
119/1 119/3 119/4 156/13 159/2 161/21
Palm [3]  1/7 1/20 1/25
Pam [7]  35/9 48/17 50/11 50/18 50/22 63/16
89/11
paneling [1]  16/15
papers [2]  28/9 80/16
paragraph [3]  64/14 149/14 159/7
paragraph 1 [1]  149/14
paragraph 4 [1]  64/14
paralegal [2]  31/19 36/6
paralegals [1]  36/12
paren [3]  167/17 167/21 167/21
partially [1]  64/8
participants [1]  209/18
particular [11]  89/25 126/19 180/18 183/18
194/22 196/8 199/2 208/13 218/10 218/11
225/14
particularly [1]  105/3

# P

parties [6]  88/6 88/6 158/21 197/3 227/17
  232/20
partner [1]  150/1
Partners [10]  40/16 111/4 111/8 111/11
  111/23 112/1 112/4 149/16 149/22 150/2
partnership [32]  40/15 40/18 40/20 40/22
  40/25 41/8 44/22 79/10 79/21 79/25 80/12
  80/14 80/17 82/25 83/10 83/13 84/9 85/14
  124/14 132/21 133/1 133/4 141/1 141/4
  141/8 148/13 148/13 149/15 149/25 150/1
  150/3 150/6
parts [2]  31/25 102/13
party [1]  197/3
passages [1]  144/16
passed [1]  175/11
passing [1]  96/17
passions [1]  31/11
past [2]  22/4 100/5
patent [2]  16/2 16/3
pause [1]  51/17
pay [11]  37/25 38/21 39/2 42/16 42/18 49/19
  49/20 58/12 98/1 134/18 135/1
payables [1]  76/5
paying [10]  28/17 28/23 29/2 29/5 42/15
  42/20 81/17 98/3 98/5 119/5
payment [3]  76/2 88/12 111/21
payments [2]  111/22 111/24
payroll [1]  75/24
PDF [2]  90/3 90/5
Pena [2]  154/8 154/21
penny [4]  220/12 221/19 221/23 222/2
penultimate [1]  149/18
people [35]  8/2 8/11 10/2 19/12 20/20 36/17
  48/22 48/22 48/25 57/24 58/1 59/8 59/10
  98/17 108/17 122/8 123/14 138/2 138/4
  139/12 166/4 167/17 167/18 167/23 167/24
  167/25 171/9 171/13 171/18 175/20 175/21
  175/22 210/9 214/24 222/19
people's [2]  104/11 115/1
per [2]  100/10 140/20
percent [7]  69/22 94/10 111/11 127/8 183/24
  225/15 225/16
percentage [2]  225/6 225/17
Perfect [1]  177/4
performance [1]  46/14
performed [1]  88/7
period [32]  12/10 17/19 26/6 77/2 183/15
  183/24 184/2 184/5 191/3 191/23 195/14
  199/4 199/6 199/8 206/25 208/24 208/25
  213/15 215/15 215/16 215/17 217/12 217/18
  218/2 218/7 219/14 221/15 223/9 224/16
  225/3 226/3 226/11
periodic [1]  181/19
periods [6]  204/20 205/1 205/10 215/18
  218/11 219/21
perjury [4]  77/24 78/22 78/23 78/23
Perkins [23]  35/12 35/15 90/12 90/21 90/23
  90/25 91/3 96/12 96/15 98/17 101/4 113/3
  113/9 114/16 114/20 115/11 116/4 116/6
  116/7 116/12 116/19 117/10 127/5
permanently [1]  151/10
permission [1]  124/24
person [12]  42/23 55/20 58/6 84/3 101/15
  103/20 119/12 171/3 171/18 205/8 205/22
  217/22
personal [6]  85/25 86/1 94/3 214/4 214/7
  214/8
personally [3]  17/22 57/18 90/7

pertained [1]  123/3
pertaining [1]  196/13
pertains [1]  123/1
Perusing [1]  68/2
Peter [4]  177/20 177/23 178/2 233/12
Petras [2]  131/1 131/7
pharmaceutical [1]  8/23
pharmacies [1]  8/13
phase [1]  91/15
Phillips [3]  58/4 58/4 61/7
Phillips' [1]  59/15
phone [2]  84/1 155/17
phonetic [2]  47/25 125/3
phrase [4]  24/24 207/23 213/1 213/3
phrased [1]  205/7
pick [4]  76/20 130/24 133/21 184/2
picked [2]  23/23 43/23
picking [1]  147/7
picture [1]  30/2
Pictures [1]  95/14
pie [1]  222/8
pieces [1]  187/21
pink [2]  43/3 45/5
pins [1]  143/12
place [5]  2/16 61/20 76/21 164/19 186/9
placemat [2]  143/14 143/23
places [3]  12/10 12/24 81/7
plainly [1]  139/12
plan [3]  7/3 7/3 66/20
plane [5]  34/22 49/11 134/17 229/10 229/11
planning [1]  66/14
plans [1]  94/20
Plant [2]  15/23 16/4
plate [1]  17/8
play [2]  168/12 168/16
played [2]  168/15 168/19
plea [6]  22/2 22/6 23/19 77/12 79/1 232/12
plead [2]  131/10 131/12
pleading [1]  131/14
please [68]  2/2 4/6 22/15 54/6 65/24 66/3
  66/12 66/25 70/14 72/18 74/19 75/6 75/8
  75/20 87/15 88/3 88/22 92/6 100/4 100/6
  100/9 105/6 106/13 107/5 108/12 108/18
  110/15 110/21 113/12 113/18 113/19 119/19
  125/20 125/22 126/3 136/5 140/1 140/3
  143/18 146/9 146/19 146/22 149/18 150/7
  150/24 151/21 151/23 152/2 170/1 170/6
  170/16 170/20 174/5 177/1 177/22 177/24
  178/1 178/9 178/16 181/2 184/10 194/10
  196/11 198/22 200/19 201/2 201/20 203/8
pleased [2]  163/8 163/9
pled [1]  77/24
plugged [1]  159/19
plus [3]  117/16 119/2 128/3
pocket [1]  58/10
point [25]  10/6 21/4 21/8 29/16 30/24 32/9
  32/17 33/10 37/21 38/3 43/1 80/12 97/7 97/8
  109/22 136/15 136/21 157/7 171/24 172/9
  190/19 204/4 211/5 221/12 223/18
pointing [1]  185/10
Poland [1]  15/24
Polish [1]  15/24
Ponzi [1]  203/3
pool [1]  38/11
pop [2]  135/16 207/11
portion [2]  150/23 182/1
position [1]  195/12
positive [1]  118/16
possession [2]  14/22 54/25
possible [5]  71/11 204/1 213/14 222/21 232/9

possibly [2]  60/18 214/12
postal [3]  10/1 107/11 107/17
potential [2]  99/13 204/24
pouring [1]  38/11
practice [1]  55/6
prefer [1]  96/21
Premier [1]  30/10
prepare [3]  89/15 180/19 198/9
prepared [6]  89/13 112/23 113/2 218/5
  219/18 228/16
preparing [1]  182/7
presence [2]  12/5 130/8
present [4]  56/2 59/24 194/6 232/1
press [11]  180/14 182/19 183/19 184/5
  184/20 184/25 185/7 185/16 206/21 208/1
  223/7
Presumably [1]  231/18
presuming [1]  65/9
pretty [10]  10/6 19/9 58/19 58/20 102/22
  102/22 127/1 128/14 167/20 211/4
prevent [1]  130/10
prevents [1]  72/8
previous [3]  198/5 219/6 219/11
previously [8]  72/22 73/1 85/13 88/10 89/7
  97/22 109/17 112/13
price [40]  153/23 153/25 155/13 163/10
  163/16 163/17 163/18 180/15 182/18 183/23
  184/7 184/7 184/25 185/10 185/22 186/23
  186/25 187/7 187/8 187/9 188/1 199/22
  200/2 206/11 207/23 213/11 213/20 214/1
  214/11 216/19 218/5 218/8 220/7 220/22
  221/16 222/25 223/24 226/8 226/9 226/10
prices [2]  183/15 216/16
Primarily [1]  183/19
principal [1]  50/17
Print [1]  36/10
prior [15]  44/3 44/15 44/18 48/17 49/5 49/7
  49/9 57/16 62/5 91/13 101/4 102/19 184/5
  194/3 208/17
prison [1]  78/6
private [7]  29/7 29/10 30/22 49/11 93/3
  164/16 178/22
privy [2]  212/16 212/23
Pro [1]  1/19
probably [7]  10/5 109/15 115/3 118/24
  211/24 227/8 230/10
probation [1]  78/9
problem [9]  2/24 3/16 33/21 38/3 38/4 38/5
  102/22 109/3 114/18
problems [5]  9/8 30/16 48/4 154/17 162/16
proceed [4]  2/4 66/5 67/2 152/16
proceedings [17]  1/11 3/24 31/6 33/4 51/17
  66/2 66/24 70/22 107/4 110/20 113/20
  138/14 170/10 170/19 201/12 201/19 234/19
proceeds [6]  137/2 137/2 192/10 192/11
  195/7 199/5
process [1]  121/5
procure [1]  185/17
produced [2]  53/11 56/15
producing [1]  54/16
product [5]  11/5 20/19 88/20 122/2 122/18
production [2]  53/11 53/12
products [3]  8/12 62/19 120/6
proficient [1]  36/6
profit [1]  178/22
program [1]  209/10
progress [3]  162/23 162/25 163/2
prohibited [1]  5/1
project [2]  169/4 229/13
projects [3]  88/8 88/8 88/21

**P**

promise [1]  118/7
promised [1]  6/12
prompt [1]  71/23
pronouncing [1]  202/3
proof [1]  31/14
property [2]  46/15 47/8
prosecution [6]  178/18 179/7 202/7 202/8 204/16 204/17
prosecutions [2]  179/11 179/18
prosecutor [11]  206/3 206/7 206/10 208/16 209/23 210/19 212/20 212/25 214/20 215/4 219/14
prosecutors [2]  204/21 208/10
provide [4]  3/12 85/12 203/1 227/20
provided [5]  3/11 4/2 206/14 208/17 231/13
provides [4]  159/11 181/21 203/13 212/14
providing [4]  165/10 179/10 205/20 207/4
provisions [1]  88/12
proximity [1]  2/9
public [9]  30/4 68/10 103/23 131/1 179/21 192/6 206/14 207/1 219/6
publication [1]  30/8
publications [2]  30/7 154/2
publicly [4]  153/17 179/23 180/15 219/9
publish [6]  67/13 74/19 99/17 112/10 135/9 149/12
pull [13]  65/14 77/12 125/22 143/10 143/17 146/2 146/6 146/19 176/25 181/1 188/12 189/3 190/7
pulling [1]  125/3
punch [1]  207/16
purchase [10]  7/19 10/13 47/18 80/11 111/7 111/10 111/21 124/13 185/17 185/17
purchased [7]  79/9 79/12 79/15 183/11 192/5 195/4 199/3
purchases [2]  180/7 218/10
purchasing [3]  79/20 79/21 111/23
purported [1]  215/23
purports [1]  217/5
purposes [4]  85/4 109/20 128/21 227/2
pursuant [2]  88/6 88/16
push [1]  15/19
put [36]  8/19 16/1 16/10 17/20 19/5 21/10 23/6 40/11 40/24 40/25 41/3 41/5 47/9 56/2 59/5 79/24 80/2 90/4 90/6 112/1 116/13 117/4 127/2 139/15 147/11 150/19 159/19 166/1 174/19 183/8 184/15 186/5 187/17 226/1 229/10 229/11
puts [1]  227/15
putting [6]  16/13 16/15 17/6 60/18 111/13 127/7

**Q**

qualifications [1]  212/4
quarterly [1]  181/20
question [48]  5/13 7/11 8/10 9/2 9/23 10/17 12/20 18/4 46/21 62/14 65/9 70/4 70/24 71/18 84/17 118/20 118/23 118/25 119/3 119/19 120/5 120/9 120/9 120/11 121/13 122/2 122/7 122/15 122/16 123/1 123/5 123/9 123/13 133/14 146/7 146/10 146/13 147/2 147/5 148/7 149/18 172/19 174/5 205/7 205/14 213/22 225/4 225/21
questioning [4]  44/16 96/18 107/14 139/18
questions [32]  22/4 33/17 33/19 61/15 128/16 128/19 129/13 129/19 130/7 131/16 131/17 131/18 131/20 132/14 133/16 137/5 137/7 140/5 141/20 141/22 144/15 146/3

146/4 150/10 169/21 177/10 200/19 211/4 224/12 225/18 225/24 226/14
quick [2]  107/6 211/24
quickly [4]  70/19 92/21 149/12 222/24
quiet [1]  107/17
quite [1]  65/18
quote [1]  145/9

**R**

raining [1]  38/16
rainwater [1]  38/17
raise [9]  2/5 2/9 2/15 151/20 153/17 153/21 153/22 155/11 177/21
raising [1]  173/14
Ramatar [3]  171/6 171/7 171/19
ran [1]  192/14
ranging [1]  111/18
rather [2]  59/13 211/24
Raton [9]  27/22 28/2 28/4 69/23 76/19 77/4 164/3 164/11 164/20
reached [1]  183/25
reaching [1]  130/10
read [35]  14/8 14/10 18/21 53/21 64/6 64/8 67/23 70/14 72/18 74/25 75/6 75/8 83/5 85/2 87/15 88/3 100/4 121/24 135/19 143/1 143/9 143/10 143/11 143/11 145/16 149/13 149/18 149/20 150/23 158/21 168/1 173/12 211/8 212/7 231/6
reading [6]  14/12 75/20 149/7 150/20 174/3 230/17
ready [6]  2/4 66/5 66/7 100/6 170/11 201/13
realize [1]  53/2
really [17]  2/13 25/4 70/19 91/7 93/17 100/22 124/14 124/17 157/10 159/18 159/25 173/25 207/5 218/20 218/25 223/8 223/14
Realtime [1]  234/18
reason [10]  32/13 32/17 33/14 50/15 56/15 99/25 136/22 138/15 168/4 169/9
reasons [3]  2/20 197/2 197/6
rebut [2]  32/16 34/12
rebuttal [5]  32/20 32/22 32/23 229/12 229/14
recall [111]
receipt [1]  88/20
receive [5]  160/18 164/16 165/23 195/16 204/23
received [18]  6/20 14/8 14/10 73/25 113/3 162/12 162/19 162/20 165/4 166/16 187/3 190/12 192/3 193/24 198/3 198/23 204/6 227/13
receives [1]  11/5
receiving [3]  13/24 76/15 122/20
recently [1]  175/12
recess [15]  65/3 65/24 66/1 106/13 106/19 107/3 169/23 170/1 170/6 170/9 201/2 201/11 226/21 228/2 232/22
Recitals [1]  67/25
recognize [8]  83/16 160/21 162/7 164/24 182/9 182/15 186/4 191/6
recollection [29]  40/2 55/23 55/24 57/20 59/3 63/11 69/1 70/16 72/11 73/5 73/9 73/12 73/15 74/14 80/4 89/17 90/16 92/8 92/14 92/16 99/12 102/3 112/24 114/10 116/4 116/7 150/5 211/12 220/9
Recom [1]  219/9
record [9]  3/5 66/4 80/9 231/7 232/9 234/19
records [11]  30/4 75/23 140/10 167/19 179/19 180/17 180/17 193/8 193/21 206/16 207/1
recount [1]  14/19

recross [3]  139/19 148/10 233/6
Recross-examination [1]  148/10
red [13]  36/23 42/2 42/2 42/5 45/5 45/19 97/6 97/10 133/16 133/22 136/6 183/16 217/7
redacted [1]  150/21
redevelop [1]  104/15
redirect [11]  124/21 138/20 139/19 150/17 176/11 225/20 225/22 233/5 233/7 233/11 233/15
reduce [1]  213/11
reduced [2]  222/4 222/6
refer [2]  204/7 221/8
reference [3]  30/5 54/14 100/13
referenced [5]  24/23 105/12 205/22 208/25 224/16
referred [2]  76/13 204/1
referring [5]  6/6 81/19 194/12 215/15 215/18
reflect [2]  183/14 190/11
reflected [5]  184/23 185/9 185/20 187/1 206/21
reflecting [1]  190/9
reflects [2]  181/22 186/20
refrain [2]  3/6 108/18
refresh [7]  73/9 73/12 73/15 74/14 92/8 92/14 150/5
refreshed [1]  72/5
refreshes [2]  70/15 114/10
refund [5]  40/11 40/12 41/23 44/17 45/1
regard [8]  24/17 40/6 73/15 132/10 138/17 154/19 202/20 219/4
regarding [28]  8/6 9/25 13/15 16/22 17/10 19/21 22/4 56/20 57/9 57/17 66/16 91/23 92/17 93/15 98/18 98/18 99/1 180/9 204/24 204/25 205/9 205/24 208/12 208/16 208/24 210/25 217/11 219/15
registered [4]  178/25 181/24 182/6 234/17
Registrar [3]  188/21 192/23 196/6
regular [2]  46/17 69/20
regulate [1]  204/10
regulates [2]  203/11 204/12
regulating [1]  179/1
regulation [1]  203/13
regulatory [4]  178/21 178/22 202/17 212/14
reimbursed [1]  49/17
reissued [1]  197/3
rejected [2]  161/19 161/20
relate [4]  60/9 188/3 194/21 196/8
related [7]  60/10 68/18 88/20 108/4 157/25 158/3 159/12
relates [3]  190/23 204/3 206/18
relating [3]  7/18 33/4 58/17
relation [2]  207/14 213/5
relations [1]  34/8
relationship [14]  11/15 21/22 21/22 31/23 31/24 90/12 91/16 100/11 136/12 139/4 167/16 167/24 172/14 175/1
relatively [1]  109/25
relatives [1]  134/3
release [6]  88/17 184/5 184/21 185/1 185/7 185/16
released [2]  91/14 151/9
releases [6]  180/14 182/19 183/19 206/22 208/1 223/7
relevance [3]  33/10 60/14 103/4
relevant [3]  33/12 34/3 34/14
remaining [1]  109/14
remarked [1]  37/19
remember [202]
remembers [1]  105/21

**R**

remind [6]  2/16 2/20 71/6 133/22 143/4 143/20
renew [2]  227/12 227/16
renovations [1]  17/20
reorganize [1]  94/4
repackage [2]  122/19 123/24
repackaging [1]  124/2
repair [1]  17/4
repeat [4]  63/25 92/6 119/19 221/17
repeated [2]  15/5 80/7
rephrase [8]  7/14 22/15 29/18 62/14 70/4 91/17 174/5 213/23
report [8]  13/25 14/23 15/8 59/23 59/25 61/1 181/20 223/2
reported [2]  60/21 60/24
reporter [6]  1/23 1/24 3/5 154/17 234/17 234/18
reports [4]  60/10 60/17 181/19 181/20
repossessed [4]  43/11 43/20 43/22 45/6
represent [2]  29/4 187/24
representation [2]  182/22 186/8
representative [1]  101/4
represented [2]  101/9 104/24
represents [1]  192/16
request [5]  113/3 204/21 227/12 227/12 227/16
requested [1]  76/9
requests [1]  202/25
require [1]  139/18
required [1]  13/9 21/18 181/18
requires [2]  77/19 77/21
research [1]  88/8
researcher [1]  8/23
reseller [34]  6/24 7/3 7/18 7/23 8/6 10/12 10/22 10/24 10/24 11/4 21/4 21/7 21/23 22/5 22/12 22/18 23/12 59/10 60/18 119/22 120/18 120/22 121/1 121/6 122/9 122/15 122/17 122/18 122/22 123/20 123/21 123/23 123/24 144/18
resellers [2]  9/7 119/13
reselling [2]  23/9 123/16
reside [1]  152/21
resided [2]  35/12 117/13
resigned [1]  63/12
Resort [2]  76/22 76/24
resource [1]  207/1
resources [1]  179/24
respect [2]  149/22 206/17
respected [2]  117/19 126/21
respond [2]  64/19 202/25
response [3]  22/3 58/21 73/19
responsibilities [2]  203/7 203/11
rest [16]  48/22 66/15 83/21 84/20 100/7 109/23 109/24 110/7 142/12 202/18 209/15 210/14 212/14 215/11 227/7 231/7
restaurant [4]  51/1 51/4 51/7 143/24
resting [2]  230/18
restricted [1]  156/20
result [1]  45/1
resume [24]  113/4 113/7 113/9 113/24 114/5 114/11 115/12 115/15 115/19 115/21 116/4 116/11 116/14 116/19 116/23 117/2 117/7 117/9 117/12 125/21 126/18 127/2 127/7 127/10
resumed [1]  4/10
retail [1]  20/17
return [40]  40/15 40/19 40/21 41/6 132/15 132/17 132/20 133/5 133/11 137/3

returning [1]  88/23
revelation [1]  104/10
Revenue [3]  44/16 45/2 79/2
reverse [10]  199/14 199/15 199/18 199/20 199/24 213/9 220/1 220/8 221/16 222/16
review [22]  67/15 72/20 72/21 74/12 159/21 159/24 179/18 179/19 180/24 187/14 191/9 192/4 215/12 218/3 219/8 219/14 221/12 221/15 223/5 223/5 223/17 223/23
reviewed [7]  181/13 207/14 219/17 223/18 223/19 223/21 223/22
reviewing [1]  192/17
revocable [2]  83/17 141/24
riding [1]  47/24
right [335]
right-hand [1]  183/14
Rikert [2]  125/3 125/18 125/23 126/3
Riley [2]  105/11 112/14
ring [3]  30/10 30/12 68/16
RMR [2]  1/23 234/24
road [2]  1/22 139/8
Rock [3]  157/22 157/23 157/24
role [5]  155/15 155/16 155/18 205/3 212/17
ROM [1]  26/18
room [5]  28/9 107/10 107/11 107/18 107/19
Rosa [2]  51/8 51/10
Ross [2]  39/23 39/24
roster [1]  153/22
roughly [2]  45/23 199/9
round [1]  109/20
row [1]  37/14
Rowland [11]  35/12 90/12 90/21 90/23 90/25 91/3 96/12 96/14 113/3 114/4 115/11
Rubbermaid [2]  9/8 50/12
Rule [1]  230/9
rules [3]  178/23 181/19 202/16
ruling [3]  32/4 32/5 115/5
run [1]  76/5
runs [1]  211/15
rush [1]  3/18
Ryan [7]  157/21 157/25 158/5 166/3 166/6 167/25 171/14

**S**

sabotage [2]  103/10 103/12
sabotaged [1]  102/19
sabotaging [1]  103/14
safe [2]  77/16 207/15
sales [10]  145/12 180/7 184/21 185/8 192/9 199/6 199/7 200/11 202/22 218/10
same [13]  5/8 46/6 56/12 57/11 121/25 126/16 126/25 150/6 166/15 168/17 199/4 222/3 222/8
San [1]  36/21
sandwiches [1]  23/2
Sarasota [9]  11/7 11/16 13/14 13/16 63/1 63/4 63/8 63/13 122/11
sat [2]  13/12 46/20
satisfaction [1]  128/9
satisfactorily [1]  8/12
Saturday [1]  110/6
sauce [3]  20/12 20/13 20/23
sauces [2]  20/13 20/14
saw [15]  28/7 28/8 28/12 40/21 80/1 188/3 190/16 193/23 206/23 207/24 207/24 207/25 208/6 218/4 220/1
say [51]  18/17 23/11 25/10 27/15 37/8 44/17 47/19 50/16 54/23 57/4 58/5 58/20 58/21 59/1 60/9 70/25 75/2 79/23 80/9 84/15 93/14 109/24 114/1 114/2 125/15 127/9

127/13 130/2 134/7 134/13 136/4 136/11 140/16 140/19 141/6 141/11 141/14 141/15 155/10 157/12 158/18 205/9 207/15 208/19 213/21 214/4 214/16 221/16 225/13 228/25
saying [34]  2/25 18/12 22/13 27/13 39/1 41/20 44/13 53/12 56/5 59/13 63/4 66/18 78/25 80/1 90/4 90/6 94/23 103/13 103/18 108/18 110/7 114/16 114/20 121/20 128/25 145/17 145/18 169/16 199/25 217/20 223/22 224/23 224/25 230/3
says [35]  3/5 54/13 54/13 67/24 67/25 70/25 71/1 71/2 71/22 71/24 72/3 75/2 83/16 84/11 112/21 112/22 125/12 125/13 126/20 134/18 136/19 145/1 145/14 158/19 159/9 165/10 167/9 167/18 167/23 173/16 190/12 207/18 212/3 216/8 231/17
scale [2]  183/10 183/14
scenario [1]  166/15
Scharf [6]  130/17 130/20 130/25 131/4 131/4 131/5
schedule [1]  110/9
scheduling [4]  65/10 66/16 109/13 227/3
scheme [1]  139/10
schemes [1]  203/3
Sciences [2]  13/18 13/20
scope [8]  31/8 60/14 103/5 138/11 203/22 217/10 219/23 224/9
screen [20]  24/7 54/4 56/8 67/7 74/24 87/2 99/17 105/12 112/11 125/6 125/25 126/16 127/18 135/16 135/19 144/5 174/19 184/17 193/25 218/4
scroll [4]  54/12 88/24 91/19 126/2
Se [2]  1/19 175/14
seated [10]  2/3 4/6 66/3 67/1 107/5 110/22 151/23 170/21 177/24 201/21
seats [1]  226/22
SEC [34]  9/17 9/25 18/2 18/4 20/22 26/2 65/16 78/13 93/1 94/2 94/19 97/17 119/10 119/25 120/16 121/6 121/9 121/20 121/24 123/18 124/7 130/16 131/1 143/1 143/2 143/5 143/7 144/16 144/21 145/16 169/19 172/25 179/21 180/13 180/24 181/13 181/19 181/19 182/3 202/7 202/9 202/10 202/11 202/12 202/13 202/15 206/13
second [22]  31/15 67/17 67/17 85/9 108/12 125/22 140/12 144/3 146/21 159/7 159/8 164/1 164/2 164/2 164/18 166/14 180/22 215/11 220/24 221/17 221/23 222/22
seconds [3]  207/13 217/14 217/16
section [5]  136/4 143/11 144/24 145/7 181/24
securities [23]  9/13 92/22 113/5 130/13 168/22 172/17 172/19 178/23 179/2 179/3 179/5 179/11 180/23 181/24 181/25 190/2 197/24 203/5 203/16 204/13 207/7 211/16 213/19
security [1]  210/2
seeing [7]  40/17 82/16 82/18 82/20 99/2 207/22 214/5
seem [1]  33/10
seems [5]  114/3 114/6 114/12 216/10 216/19
seen [14]  21/13 30/5 52/3 52/6 85/10 105/4 107/23 113/14 115/4 210/21 211/2 211/25 217/1 231/11
seize [1]  44/1
seized [9]  43/23 43/24 45/6 45/9 45/19 45/22 46/6 47/7 97/6
seizing [1]  46/24
selections [1]  143/2
self [2]  178/22 202/17

**S**

self-regulatory [2] 178/22 202/17
sell [5] 25/8 43/8 120/5 156/23 213/6
selling [27] 24/24 25/2 25/5 25/7 25/12 25/16
25/20 25/25 26/3 191/2 194/7 194/25 198/5
208/4 208/4 208/24 209/3 213/5 213/25
214/3 214/22 215/2 217/22 225/6 225/25
226/7 226/11
sells [2] 209/20 210/2
send [25] 44/15 76/7 101/21 105/13 123/11
123/24 124/1 124/3 124/6 127/3 138/4
140/17 142/13 142/16 142/18 146/25 147/5
159/22 160/9 166/2 166/6 166/8 166/12
166/21 230/3
sending [8] 81/16 81/20 99/23 114/24 132/4
138/2
senior [3] 95/4 96/1 96/9
sense [2] 162/5 169/18
sent [27] 57/8 59/3 89/14 99/25 105/11 110/6
112/15 112/19 115/18 115/21 116/4 116/8
116/19 116/23 117/2 117/7 117/7 117/9
117/12 142/7 159/24 161/1 162/20 165/7
166/16 166/22 167/17
sentence [4] 14/14 113/23 149/13 149/14
sentences [1] 75/9
separate [3] 78/16 202/17 212/13
separately [1] 92/4
September [26] 81/15 81/17 81/20 82/4 82/7
82/12 82/19 83/14 84/10 112/3 136/1 136/11
142/2 183/20 184/22 186/7 186/21 196/17
196/18 199/2 199/12 208/19 208/20 209/1
220/4 225/13
September 15th [1] 136/1
September 16th [1] 186/21
September 18th [1] 199/12
September 2008 [2] 186/7 220/4
September 20th [2] 183/20 184/22
September 2nd [2] 196/17 196/18
September 3rd [8] 81/15 81/17 81/20 82/4
82/7 82/12 82/19 84/10
series [1] 197/3
serious [2] 102/22 102/22
serve [1] 128/22
service [11] 44/16 45/2 79/3 117/16 122/21
122/22 126/21 128/2 179/25 180/16 207/15
services [5] 64/21 88/12 159/12 165/11
212/14
session [1] 66/21
set [10] 7/3 120/25 121/15 122/21 154/21
155/20 164/1 164/7 164/15 182/13
sets [1] 55/17
setting [3] 7/18 7/22 121/5
setup [1] 71/22
seven [2] 67/11 163/19
several [10] 10/3 61/15 62/12 62/17 133/15
137/5 141/20 144/15 144/16 145/23
severe [1] 48/4
SFranklinUSDC [1] 1/25
SGN [2] 199/4 216/9
shall [5] 88/15 88/19 149/15 149/22 149/25
shape [2] 104/13 118/12
share [13] 183/10 183/23 188/3 188/24 189/4
196/24 199/22 199/23 200/1 200/3 200/4
221/21 222/17
shareholder [2] 222/12 222/14
shares [89]
she's [5] 131/7 229/18 229/20 229/21 230/4
sheet [2] 105/16 225/2
shelves [1] 5/19

shiny [1] 46/21
ship [4] 119/13 120/6 120/12 120/13
shipped [2] 119/23 120/3
shipping [3] 123/15 123/16 123/17
shirt [1] 107/12
shock [1] 104/13
shocking [1] 104/10
short [19] 24/24 25/2 25/5 25/7 25/25 26/2
114/18 202/21 208/4 208/4 208/24 208/25
209/3 209/21 213/5 214/3 214/22 215/2
225/25
shorten [1] 221/7
shortly [2] 76/3 201/3
shorts [1] 225/25
shots [1] 209/25
should [7] 124/24 128/10 136/6 211/24
223/20 223/22 227/18
show [31] 5/5 34/7 34/10 51/15 67/5 70/13
72/1 72/17 74/11 75/23 84/20 85/9 86/13
87/3 92/4 99/4 99/16 105/1 113/11 114/9
115/10 116/10 135/8 135/9 164/21 184/4
211/17 215/7 217/6 226/3 232/2
showed [18] 7/19 14/2 29/10 30/9 30/13
52/16 54/3 81/11 112/13 139/24 140/1
173/19 191/1 205/25 206/3 210/19 211/12
217/13
shower [2] 38/8 38/10
showing [5] 15/5 15/6 53/6 185/21 197/23
shown [3] 30/6 84/25 212/24
shows [4] 53/4 71/5 187/2 190/1
shut [1] 37/22
sic [6] 39/21 75/1 88/10 88/15 157/11 173/24
sick [3] 63/12 64/2 77/3
side [5] 11/7 182/2 183/9 185/4 191/25
sidebar [5] 2/18 31/6 34/15 35/3 70/22
72/15 107/7 107/8 107/18 113/20 114/22
115/8 138/12 138/14 139/22
sidebars [1] 114/14
sign [7] 55/25 79/14 80/16 87/13 90/1 90/7
166/8
signal [1] 216/9
Signalife [136]
Signalife's [3] 188/21 192/23 204/19
signals [1] 108/22
signatories [2] 162/3 162/4
signature [19] 52/18 56/7 56/9 56/10 56/13
80/24 80/25 87/14 90/1 90/3 90/4 90/5 90/6
90/8 148/24 160/2 160/4 160/7 160/12
signatures [1] 149/1
signed [20] 4/24 6/11 6/16 23/19 50/25 55/20
56/2 76/16 77/2 78/5 79/1 89/19 89/22 89/25
90/19 90/20 91/13 149/19 166/16 230/22
significant [1] 213/24
significantly [1] 65/22
signing [3] 80/24 87/14 88/22
signs [1] 165/8
similar [2] 7/23 165/21
similarity [1] 126/23
simply [1] 186/24
Simultaneously [2] 192/8 195/5
since [8] 12/4 103/24 107/8 153/15 175/5
175/8 208/18 230/1
singer [1] 39/22
single [6] 146/7 146/10 146/13 147/2 147/5
231/13
sir [32] 65/23 68/16 106/18 108/11 108/13
108/25 109/6 109/10 110/17 111/9 111/17
111/24 113/10 114/22 124/16 125/8 128/20 151/7
151/20 152/2 152/25 170/5 170/17 177/13
177/21 177/25 178/3 184/17 201/6 201/17

217/1 217/9 226/17
sit [8] 11/11 78/14 122/18 172/12 172/12
220/21 224/5 232/21
site [3] 101/19 101/20 102/4
situation [1] 109/16
six [3] 65/16 163/19 188/5
sized [1] 5/18
slash [1] 56/3
sleep [2] 37/11 37/16
slightly [1] 161/12
slip [2] 43/3 45/5
slipped [1] 19/6
slope [1] 65/21
slowly [1] 152/23
smaller [1] 197/4
Smithsonian [3] 17/21 18/9 18/13
smoking [1] 231/22
snapshot [1] 181/21
so-called [1] 222/16
software [1] 179/25
sold [22] 5/18 17/22 18/13 43/7 45/11 122/14
142/6 145/18 156/21 183/11 187/8 192/8
195/6 195/8 196/20 196/25 199/4 213/8
217/21 225/12 225/14 226/4
somebody [10] 8/22 11/5 16/1 16/3 27/6 71/1
90/2 110/3 144/1 221/20
somebody's [2] 11/9 63/3
somehow [3] 71/6 107/24 108/3
someone [11] 11/12 25/20 25/20 71/22 156/4
167/14 168/5 222/11 227/5 228/18 228/20
someone's [2] 221/22 222/2
something [29] 25/12 30/9 32/13 32/16 32/23
33/3 33/11 34/23 48/3 50/10 52/5 54/19 55/4
55/5 57/14 63/18 70/25 71/12 72/4 72/6 72/8
80/12 82/15 84/15 96/3 102/21 110/3 114/24
127/4 132/20 141/25 144/12 155/8 159/5
162/3 162/3 162/4 163/18 173/12 179/6
204/7 204/8 209/9 209/21 211/12 212/23
215/3 223/14 229/9
sometime [1] 228/24
sometimes [19] 19/15 21/18 24/10 24/15 24/16
somewhat [5] 61/7 81/10 90/25 91/1 205/15
somewhere [1] 50/7
son [4] 58/3 59/15 59/16 61/8
song [1] 39/25
Sony [2] 95/5 95/14
soon [1] 229/24
sorry [36] 5/14 7/8 9/2 20/14 21/1 21/7 42/5
45/6 46/12 51/9 54/5 56/23 63/25 69/10
70/19 73/20 74/20 74/21 75/3 85/6 103/1
109/1 120/10 123/13 137/25 158/13 182/13
202/5 205/14 210/6 211/21 214/18 215/22
219/1 221/10 229/6
sort [25] 2/10 2/15 2/16 2/17 5/24 15/5 15/19
25/18 31/11 56/21 58/16 71/21 76/13 92/25
98/21 104/10 104/13 125/9 133/4 136/10
156/2 156/13 179/18 183/7 227/16
sound [1] 228/17
sounds [1] 65/18
source [1] 11/17
south [2] 36/20 93/10
SOUTHERN [1] 1/1
Spa [2] 76/22 76/24
space [1] 232/20
speak [17] 13/14 13/18 13/22 68/23 69/2
152/23 173/10 174/11 175/24 176/6 178/8
209/12 210/3 210/9 218/9 228/1 228/15
speaking [2] 72/23 91/22 92/16
specialist [1] 116/15
specific [3] 173/11 219/12 224/21

## S

**specifically** [4]  173/10 175/24 203/23 219/10
**specifics** [1]  224/6
**speculation** [1]  23/16
**spell** [2]  152/3 178/1
**spend** [2]  35/5 134/3
**spending** [3]  27/24 61/9 97/5
**spent** [4]  28/1 28/3 217/14 217/16
**spit** [1]  15/25
**split** [18]  199/14 199/16 199/18 199/20
199/24 200/6 200/7 213/10 220/1 220/8
220/11 220/12 220/18 220/21 221/16 221/23
223/4 223/13
**splits** [1]  222/16
**spoke** [21]  11/23 59/10 68/20 69/4 73/4
73/14 73/16 73/18 73/21 73/22 74/8 89/18
89/21 89/24 163/2 174/13 174/14 175/2
175/25 176/3 176/7
**spoken** [4]  4/16 64/10 175/5 175/8
**spot** [1]  5/8
**spreadsheet** [4]  105/19 105/24 186/5 207/17
**spring** [2]  231/21 231/23
**squeeze** [1]  207/23
**St.** [1]  152/22
**St. Cloud** [1]  152/22
**staff** [1]  3/12
**stamp** [7]  53/13 81/11 87/7 105/25 196/16
196/17 196/24
**stamped** [2]  92/5 215/8
**Stan** [3]  57/24 59/18 59/19
**stand** [2]  4/10 216/4
**Standard** [3]  188/21 192/23 196/6
**standby** [1]  1/21 228/13
**staple** [7]  15/13 15/17 15/19 16/6 16/9 16/10
16/18
**staples** [1]  15/20
**start** [8]  75/8 121/14 122/8 132/1 132/4
137/24 145/1 195/14
**started** [4]  64/2 121/6 208/18 219/16
**starting** [4]  40/8 88/3 121/25 191/20
**starts** [1]  96/17
**state** [2]  32/1 152/21
**statement** [16]  18/12 23/10 50/18 78/19
114/24 114/25 115/1 119/10 176/23 189/24
190/5 192/5 193/13 197/12 197/22 197/25
**statements** [9]  14/19 115/1 120/16 144/20
164/6 164/9 179/20 180/6 206/15
**states** [11]  1/1 1/3 1/13 57/9 66/7 102/8
116/16 136/23 172/17 180/8 198/2
**station** [1]  27/21
**stay** [3]  27/21 34/25 139/17
**stayed** [5]  35/17 35/18 35/19 35/21 76/19
**staying** [3]  35/22 35/23 36/25
**stays** [1]  222/3
**STEIN** [161]
**Stein's** [13]  2/7 17/13 31/7 61/17 70/23 71/10
72/1 155/15 155/16 167/4 168/18 169/12
227/18
**step** [3]  108/11 151/8 226/19
**Stephen** [1]  1/23 234/17 234/23 234/24
**Steven** [1]  58/4
**stick** [1]  232/11
**Stieglitz** [7]  1/16 2/23 148/12 230/1 231/19
233/5 233/7
**still** [21]  3/21 20/4 28/16 31/24 43/9 56/5
66/9 70/8 84/19 90/12 98/5 98/18 109/23
110/17 120/16 136/11 170/17 195/12 200/7
201/17 221/4
**stipulated** [4]  23/22 51/18 84/21 99/6

**stipulation** [2]  86/16 230/25
**stipulations** [3]  230/17 230/21 231/6
**stock** [97]
**stocks** [7]  24/7 88/10 119/5 150/25 157/22
157/23 208/4
**stole** [2]  16/2 16/3
**stop** [6]  31/21 31/22 75/14 192/15 195/20
199/12
**stopped** [1]  195/19
**stores** [1]  5/19
**story** [1]  98/2
**street** [4]  1/24 38/8 38/10 76/23
**Stressed** [1]  156/15
**strike** [3]  24/19 102/6 213/16
**striped** [1]  107/12
**structuring** [3]  172/23 173/13 173/14
**Studio** [1]  89/5
**studiously** [1]  2/19
**stuff** [4]  16/9 98/23 123/25 124/10
**subcontractors** [1]  168/8
**submit** [4]  113/3 113/7 113/9 114/11
**submitted** [4]  115/11 116/11 179/21 180/15
**subpoena** [3]  128/23 229/4 229/7
**subsequent** [4]  155/19 192/4 194/7 199/14
**subsequently** [4]  192/2 197/1 198/25 221/5
**successful** [1]  18/24
**successfully** [1]  20/19
**such** [6]  6/21 8/6 37/21 74/5 79/5 88/16
101/12 149/24
**suggested** [2]  134/25 139/5
**suggests** [1]  71/6
**suing** [3]  30/25 31/11 139/8
**Suite** [1]  1/22 89/5
**summary** [19]  13/25 14/22 15/7 180/19
181/6 182/7 191/1 194/6 198/9 198/14 200/9
228/4 230/14 230/21 230/25 231/2 231/3
231/6 231/10
**summation** [1]  94/5
**Summers** [1]  39/21
**supervision** [1]  128/9
**supplier** [4]  122/19 124/1 124/3 124/4
**supposed** [3]  52/20 213/10 218/18
**Supremes** [1]  39/24
**sure** [40]  6/19 7/21 10/5 22/25 27/11 27/12
27/18 52/18 64/5 77/7 82/6 82/14 83/25
94/10 99/2 100/2 104/9 117/21 122/20
132/19 132/19 174/6 179/14 183/9 191/22
195/2 199/19 201/8 206/20 207/24 211/6
212/11 213/5 218/14 218/16 221/9 221/11
221/14 223/15 223/20
**surgery** [2]  48/7 48/8
**surprise** [3]  45/24 204/5 231/20
**surprised** [1]  232/3
**surveillance** [2]  203/13 204/14
**suspended** [1]  13/6
**suspicious** [2]  223/2 223/15
**sustain** [2]  114/13 115/3
**Sustained** [21]  5/21 6/14 10/18 14/6 14/20
23/17 24/21 31/3 47/15 53/19 60/15 63/20
78/20 94/15 95/10 103/6 118/10 121/3
216/14 216/21 224/10
**Sweeney** [4]  184/15 185/5 185/13 187/18
**switch** [1]  151/25
**sworn** [2]  151/22 177/23
**symbol** [1]  207/16
**system** [1]  113/24
**systems** [2]  209/2 219/9

## T

**table** [2]  28/10 67/18

**take** [30]  5/9 5/23 14/13 17/8 38/8 43/14 65/3
65/5 67/15 106/9 106/12 120/12 126/17
126/19 127/17 137/4 139/25 141/18 143/9
147/22 162/6 164/19 169/23 169/25 184/10
200/20 201/1 227/8 230/10 232/12
**taken** [6]  47/8 66/1 107/3 170/9 201/11
232/22
**taker** [1]  136/8
**takes** [2]  159/6 215/24
**taking** [5]  30/22 38/10 51/11 162/2 208/18
**talk** [37]  7/17 19/3 20/22 20/22 24/18 28/21
32/10 32/13 32/25 33/1 34/18 35/22 40/12
48/15 51/11 93/8 113/12 130/4 131/10
133/19 137/23 144/12 144/17 147/8 147/12
147/17 155/7 155/22 160/14 162/15 164/3
211/19 227/1 227/17 228/13 231/25 232/1
**talked** [36]  8/19 12/7 23/8 36/23 40/11 40/12
52/15 53/11 60/17 60/19 72/24 73/2 73/6
73/10 73/13 79/23 93/14 97/1 101/17 112/4
120/21 131/6 131/9 132/15 138/21 145/8
146/16 155/3 155/17 161/7 163/2 166/4
171/22 172/8 173/20 225/12
**talking** [43]  3/15 20/1 24/5 25/16 26/5 28/2
28/14 32/23 53/5 57/4 61/1 61/15 64/11
64/17 69/11 77/3 81/17 81/18 97/10 98/21
98/23 98/24 103/13 105/4 107/21 109/12
111/3 123/15 142/5 143/12 144/9 145/2
146/22 147/14 147/20 159/1 162/12 185/8
185/16 210/12 213/2 215/19 231/15
**talks** [2]  150/2 215/17
**tasting** [1]  20/12
**tax** [11]  40/12 40/15 40/19 41/9 132/14
132/17 132/20 133/4 133/4 133/11 137/3
**taxes** [1]  75/24
**Taylor** [1]  224/7
**TD** [15]  141/20 189/13 189/24 191/10 192/3
193/9 193/14 195/12 195/24 196/21 197/11
197/22 198/25 200/11 200/13
**teach** [1]  9/7
**teal** [1]  125/9
**teal-colored** [1]  125/9
**teams** [1]  117/19
**technological** [2]  63/12 209/5
**technology** [3]  5/2 26/21 120/23
**telephone** [1]  60/2
**tell** [47]  7/6 7/10 8/1 8/5 8/9 8/13 13/15 22/3
23/20 33/24 46/25 47/1 47/6 58/22 58/23
60/25 63/18 64/14 64/16 64/19 64/22 70/15
77/19 83/20 107/20 120/2 120/12 126/22
133/3 136/15 136/17 138/22 142/19 143/4
144/12 146/3 152/2 156/12 162/25 164/13
168/7 174/23 175/1 177/25 215/4 218/25
229/25
**telling** [11]  24/14 27/20 93/20 95/7 101/16
102/15 102/21 104/1 144/1 169/19 210/7
**tells** [1]  134/10
**template** [3]  127/10 159/17 159/18
**ten** [4]  199/24 200/3 226/13 226/13
**tendered** [1]  88/10
**tens** [1]  27/7
**tenure** [3]  14/4 63/24 64/1
**term** [5]  11/4 156/18 199/18 214/5 214/6
**terminated** [1]  50/11
**terms** [9]  71/22 83/7 119/13 156/12 156/25
209/8 216/3 219/12 225/1
**terrible** [1]  213/22
**testified** [31]  4/20 6/20 23/8 29/19 50/1 50/4
55/19 56/20 57/10 57/14 69/13 69/14 69/21
72/22 73/1 73/25 74/4 74/6 78/12 81/6 85/13
89/7 91/9 97/22 98/2 124/8 205/1 205/10

**T**

testified... [3]  205/12 219/25 222/22
testify [4]  53/18 94/13 166/24 187/14
testifying [2]  10/17 168/22
testimony [33]  4/15 4/21 9/5 18/16 23/24
 27/19 33/12 55/21 65/24 69/17 74/2 81/23
 82/1 82/13 86/8 92/2 106/19 108/23 117/3
 121/25 139/5 139/9 143/1 143/2 144/16
 168/18 169/12 170/6 172/16 201/7 233/3
 233/8 233/12
testing [1]  8/24
text [2]  183/18 185/21
thank [73]  4/1 4/2 4/4 4/9 9/22 35/2 52/12
 56/18 65/7 65/25 67/3 67/21 70/21 72/13
 72/14 73/24 74/22 77/11 85/7 86/12 92/20
 100/12 106/3 106/11 106/15 106/16 106/25
 107/1 107/2 109/7 109/8 110/11 110/23
 111/1 111/1 112/7 113/1 115/6 115/7 115/16
 125/2 135/18 141/18 148/5 148/22 149/10
 149/17 150/11 151/7 151/14 170/2 170/7
 170/23 177/13 177/14 178/3 178/8 178/10
 185/3 201/4 201/9 201/15 201/21 201/23
 203/6 205/13 225/19 226/17 226/18 226/23
 232/16 232/17 232/18
thanking [1]  3/14
Thanks [1]  126/7
that's [209]
themselves [2]  11/12 21/13
theoretically [2]  220/23 220/24
there's [41]  16/17 16/18 16/18 30/4 32/3 32/4
 34/16 34/17 34/18 52/18 53/24 55/9 55/16
 56/11 71/3 75/9 82/17 87/6 87/6 90/15 99/8
 105/16 105/17 107/12 107/18 107/25 113/23
 126/23 158/8 165/20 183/9 183/22 190/10
 204/3 210/12 214/21 216/6 217/7 230/6
 230/11 231/17
thereafter [1]  229/24
therefore [1]  197/3
they'd [2]  19/13 222/12
They'll [1]  152/13
they're [17]  32/2 32/21 32/22 34/12 41/20
 47/12 100/20 109/15 114/18 114/20 138/18
 183/12 196/3 209/18 217/6 228/7 230/13
they've [2]  34/19 34/23
thick [1]  15/3
thing [15]  2/16 11/23 19/9 24/18 25/8 71/15
 114/11 127/15 132/25 137/23 137/25 138/23
 156/13 159/18 200/5
things [42]  2/17 8/18 14/13 14/16 14/17 17/6
 19/1 20/1 23/7 23/23 25/8 25/17 35/19 36/12
 37/18 71/24 91/9 95/21 97/1 98/7 98/8
 100/24 101/15 117/4 117/8 118/6 118/8
 119/7 126/16 138/1 142/25 143/25 144/1
 153/15 153/23 155/2 173/17 179/24 180/1
 202/21 220/19 225/25
think [84]
think -- I [1]  34/5
thinking [1]  13/2
third [2]  165/20 183/20
thirds [2]  144/24 227/8
Thomas [1]  8/1
those [86]
though [7]  4/5 44/25 71/3 75/19 82/21 83/19
 135/4
thought [8]  25/7 39/13 52/19 61/18 67/11
 103/17 163/13 165/6
thoughts [1]  60/22
thousand [8]  41/24 44/17 47/19 121/18
 122/13 145/13 145/18 222/13

thousands [2]  47/17 47/19
three [18]  37/16 65/13 92/4 94/18 94/21
 95/25 96/10 100/5 105/1 109/22 138/23
 175/20 175/21 184/9 188/11 199/10 215/24
 224/12
three-page [1]  105/1
threw [1]  48/2
through [39]  9/16 13/12 18/3 19/5 55/16
 65/20 68/1 71/10 85/5 85/6 94/13 97/17
 113/24 115/6 118/19 119/4 119/5 120/1
 121/11 121/12 149/9 154/7 154/20 166/15
 172/18 182/5 187/20 191/24 193/21 204/20
 207/23 209/2 218/7 219/17 224/13 225/9
 227/12 231/2 231/5
throughout [2]  163/3 225/2
Thursday [5]  18/2 66/21 66/21 118/18
 119/25
thus [1]  184/21
ticket [2]  42/10 134/17
tie [2]  209/14 209/16
tight [1]  98/7
tighter [1]  98/8
timeframe [3]  26/25 219/23 223/7
timer [1]  136/7
times [13]  10/3 12/7 12/18 21/17 24/9 28/5
 28/6 28/6 37/11 38/20 76/24 129/18 186/24
timing [1]  131/22
tip [1]  94/11
title [5]  101/13 125/9 125/10 125/10 204/16
tobacco [1]  15/25
today [22]  25/6 59/2 60/5 66/13 75/22 78/14
 95/25 106/16 109/23 136/22 166/24 170/3
 172/12 187/14 200/23 200/25 204/19 205/11
 205/12 220/21 221/3 224/5
together [8]  56/2 61/11 84/7 112/1 127/3
 127/7 147/11 186/5
toilet [1]  97/1
toilets [6]  38/4 38/7 38/12 38/12 38/17 41/15
Tokyo [1]  69/14
told [72]  5/17 7/13 11/20 23/13 24/18 25/14
 25/15 26/17 27/6 37/25 39/20 42/9 42/11
 42/17 45/3 45/4 50/14 60/2 61/1 61/4 62/11
 63/10 63/21 74/15 74/17 78/13 80/15 82/24
 86/8 93/2 93/13 95/6 98/11 98/16 100/22
 101/2 103/24 105/13 107/17 108/7 110/6
 119/6 119/12 120/25 121/17 124/9 124/19
 129/11 130/2 130/4 130/22 132/23 134/11
 137/22 140/23 142/13 142/18 142/22 143/7
 145/9 145/12 145/20 146/25 156/17 161/25
 173/23 175/13 176/21 208/23 228/11 230/13
 231/22
tomorrow [9]  66/14 109/25 226/23 227/7
 227/18 229/9 229/23 230/8 231/21
tongue [1]  94/11
Tony [1]  8/5
too [4]  52/19 93/24 109/10 210/15
took [6]  28/15 43/16 43/18 61/20 145/8 165/3
tool [1]  5/24
top [21]  52/16 53/24 53/25 54/2 54/6 54/8
 54/23 55/1 55/13 55/14 56/16 76/4 88/24
 91/19 112/21 125/13 140/1 144/8 183/22
 191/25 231/3
topic [8]  6/2 10/24 20/23 25/25 26/2 59/14
 59/20 132/13
total [1]  187/6
totally [3]  31/9 132/25 142/9
totals [1]  76/6
towards [1]  152/25
Tracey [4]  39/2 39/11 39/15 46/2
tracking [1]  218/19

tracks [1]  208/3
Tracy [4]  75/3 75/4 140/14 188/20
trade [1]  209/18
traded [4]  153/17 163/23 183/11 219/9
trades [2]  206/18 210/2
trading [56]  24/7 156/14 156/16 156/19
 156/20 156/21 156/25 179/1 179/23 180/2
 180/4 180/5 189/13 190/2 193/8 197/23
 203/3 203/14 203/16 203/25 204/3 204/4
 204/12 204/19 204/25 207/17 208/13 208/22
 209/13 213/2 215/23 215/24 219/6 219/15
 219/23 220/11 220/13 220/14 220/25 220/25
 221/3 221/4 221/6 221/13 221/13 221/22
 222/25 223/18 224/15 224/19 224/20 224/21
 224/25 225/2 225/7 226/12
trained [1]  10/13
training [1]  153/8
tranche [3]  111/20 164/1 164/2
tranches [3]  111/7 111/14 111/18
transaction [2]  50/12 214/14
transactions [5]  81/11 81/19 81/22 82/3 82/7
transcript [5]  1/11 9/16 118/18 174/3 234/19
transfer [13]  74/18 82/18 82/21 180/17
 188/21 188/22 191/10 192/23 192/23 196/5
 196/6 197/1 206/15
transfers [6]  74/1 74/5 74/9 74/16 82/8 82/12
transparent [1]  31/10
travel [1]  76/4
traveled [1]  28/4
trial [7]  1/11 33/11 108/16 108/19 139/14
 221/8 231/14
Tribou [2]  8/1 8/10
tried [7]  85/21 94/6 94/8 124/16 130/7
 130/10 161/19
tries [1]  34/11
trigger [2]  71/13 207/23
trip [20]  29/7 29/13 29/17 49/22 49/24 50/1
 58/9 58/10 58/13 69/4 69/8 69/11 70/7 70/16
 73/2 73/6 73/10 76/13 100/9 100/14
trips [8]  30/22 57/3 57/8 68/17 69/13 73/13
 73/17 73/22
Tronics [3]  22/22 22/24 221/5
Tronics' [2]  100/9 100/13
trouble [1]  14/12
true [20]  5/10 31/1 63/24 79/8 79/10 102/11
 102/11 116/18 119/12 119/21 120/18 120/21
 120/25 121/5 121/22 144/21 169/19 172/4
 176/22 207/8
truncate [1]  105/23
truncated [3]  109/14 109/17 112/9
trust [7]  27/13 27/16 83/17 85/17 86/4
 141/24 147/15
trustworthy [4]  27/3 27/10 91/3 91/6
truth [12]  22/3 23/14 23/20 77/19 114/1
 114/4 114/7 114/12 119/18 143/4 174/23
 175/1
try [11]  34/6 59/5 61/10 129/13 161/15
 161/21 178/8 190/19 213/23 221/7 221/8
trying [16]  43/20 61/19 70/24 71/23 72/1
 72/8 96/3 96/5 124/7 128/22 138/4 155/4
 203/22 217/6 221/17 227/11
Tuesday [2]  100/10 110/7
turn [7]  6/23 48/1 94/23 182/8 184/18 191/5
 215/16
turned [3]  42/20 54/18 136/23
turning [1]  45/25
twilight [1]  107/16
two [36]  2/14 14/15 45/7 45/8 45/23 48/22
 53/6 57/24 58/1 75/9 76/20 88/9 113/23
 114/14 114/15 119/6 126/16 126/20 138/23

**T**

two... [17]  142/25 144/24 158/5 162/4 167/16
167/23 167/24 171/9 173/17 194/3 200/9
215/24 220/14 223/8 225/11 227/8 228/9
two-hour [1]  228/9
two-thirds [1]  227/8
type [7]  14/17 17/5 42/23 53/2 125/20 125/21
214/14
types [2]  202/21 203/2
typewritten [1]  149/21
TZ [1]  122/11

**U**

U.S [2]  1/17 179/4
ugly [1]  37/18
Uh [6]  18/6 102/24 128/18 208/21 214/19
225/5
Uh-huh [6]  18/6 102/24 128/18 208/21
214/19 225/5
ultimately [5]  36/6 36/14 112/3 141/8 154/9
unaware [2]  205/21 210/24
uncomfortable [1]  91/10
under [30]  3/21 22/2 22/6 63/23 66/9 78/5
85/25 85/25 86/1 86/2 87/7 88/8 91/14 92/11
94/4 110/17 168/22 170/17 173/23 174/9
179/4 181/19 181/24 201/17 202/15 224/2
224/4 226/12 229/4 229/7
understand [45]  8/24 11/3 23/19 25/2 25/4
25/6 25/12 25/15 25/16 29/22 50/11 59/2
59/2 64/22 70/23 72/10 78/16 78/17 78/22
78/23 82/17 90/9 90/21 91/17 96/6 101/15
101/16 103/16 108/25 109/5 115/2 115/14
120/11 132/19 139/3 155/15 155/18 156/22
203/6 203/22 207/20 216/24 218/18 220/17
222/1
understanding [13]  45/3 50/13 79/20 88/5
104/8 118/12 119/17 155/16 172/13 173/18
173/20 208/3 219/5
understands [1]  132/20
understood [8]  23/20 41/7 72/13 78/5 79/1
80/13 90/20 139/21
unequivocally [2]  71/24 72/4
unit [6]  8/2 103/14 120/13 179/9 202/17
212/15
UNITED [10]  1/1 1/3 1/13 57/9 66/7 102/8
116/16 136/23 172/16 180/8
units [11]  11/16 119/13 119/22 120/2 120/5
120/12 121/17 121/18 122/13 145/13 145/18
Universal [1]  95/13
University [1]  122/12
unless [1]  212/19
unrebutted [1]  23/22
until [3]  100/8 229/1 229/14
untrue [1]  93/4
upcoming [2]  100/9 100/14
updated [1]  113/4
upon [3]  50/20 156/16 215/2
upset [1]  4/3
us [17]  2/9 5/5 38/11 39/8 41/13 75/25 76/20
133/22 136/5 143/4 152/2 152/3 172/23
177/25 178/1 227/10 229/13
used [13]  8/22 15/25 16/5 16/9 16/13 16/14
16/16 19/25 24/24 26/7 80/15 80/17 214/5
user [5]  8/21 11/4 11/5 120/6 120/13
users [8]  7/5 8/3 8/12 8/13 9/6 10/15 62/19
63/8
uses [1]  16/17
using [2]  83/13 139/12
usually [3]  42/24 210/14 214/24

utilize [1]  85/22
utter [1]  64/24

**V**

vacation [4]  42/8 134/7 134/9 134/13
vaguely [3]  76/13 123/19 131/21
validate [1]  207/18
value [9]  186/24 187/1 187/4 187/6 187/7
199/22 200/5 221/21 222/2
Vandervort [2]  154/8 154/20
various [1]  159/11 179/1 187/21 190/2
191/21 203/1 203/14 203/16 204/8 204/12
208/13
Vegas [6]  57/19 58/10 58/13 59/8 60/22
62/16
vehicle [1]  42/7
Ventrex [6]  49/5 49/11 49/21 49/24 50/1
57/10
Ventura [1]  50/9
venture [3]  67/25 100/12 138/19
Verbal [1]  18/7
verify [1]  76/6
version [1]  112/9
versus [3]  22/19 225/6 225/8
vertical [1]  15/20
very [44]  2/6 4/3 4/5 14/12 14/13 15/20 15/23
20/11 24/6 24/17 27/2 27/10 31/10 36/6 37/3
39/12 39/13 39/17 46/14 48/4 64/9 68/10
77/17 89/3 91/10 98/7 106/24 107/6 110/23
122/12 124/17 131/22 145/17 149/12 165/21
201/3 202/21 204/20 207/13 213/9 219/10
221/25 222/23 226/23
video [1]  26/12
videos [1]  26/10
view [3]  8/21 77/16 148/6
viewed [1]  218/9
viewpoint [1]  27/2
Villa [5]  51/1 51/3 51/8 51/8 51/10
Vincent [2]  171/6 171/7 171/19
Virgenes [1]  39/2
visit [1]  104/18
vital [1]  214/3
vitamin [1]  97/24
vitamin-getter [1]  97/24
vitamins [2]  23/2 23/7
volume [9]  1/10 163/20 163/21 163/22
180/16 182/19 183/10 206/11 218/4
voluminous [1]  179/22
voluntarily [2]  131/12 136/23
volunteer [1]  12/22 21/25
volunteered [2]  22/9 219/11
vouch [2]  207/21 216/2

**W**

wait [4]  24/10 31/15 84/17 229/1
waiting [2]  62/19 232/15
walk [1]  25/24
walked [1]  19/5
Walker [2]  75/22 76/10
wall [1]  15/21
walled [1]  210/14
want [44]  2/5 3/13 15/7 22/16 33/5 33/6
33/12 33/25 34/10 38/21 38/24 52/21 63/7
69/10 80/9 93/7 93/8 96/20 98/8 114/9
114/9 114/21 117/6 131/6 131/9 132/19
137/23 139/3 142/25 146/2 148/24 149/20
155/7 168/12 188/7 196/16 209/23 210/5
220/15 220/18 220/19 220/20 223/22 230/10
wanted [29]  3/10 5/17 25/10 36/8 47/25 59/5
60/1 64/21 102/3 114/4 119/8 120/25 121/14

122/8 134/11 145/1 155/7 155/10 155/11
155/25 164/4 175/4 184/4 212/6 214/7 216/5
219/2 231/9 232/8
wants [3]  94/13 96/18 114/1
warehousing [1]  8/2
was -- I [1]  138/21
Washington [4]  1/18 130/23 178/19 210/18
wasn't [21]  10/6 10/9 19/16 30/21 38/23
45/24 49/21 80/3 97/13 129/3 138/7 142/5
174/22 215/3 218/3 218/12 223/3 223/4
223/11 223/13 231/13
waste [1]  232/3
Watch [2]  151/7 226/19
watching [1]  24/7
water [19]  37/21 37/22 37/25 38/9 38/11
38/21 39/2 39/3 41/15 41/16 41/18 42/15
46/10 48/13 49/6 81/17 81/18 96/25 98/9
we'd [8]  109/23 109/24 182/25 186/11
189/17 191/13 197/14 198/16
we'll [24]  4/4 40/11 65/7 65/25 78/12 80/9
106/14 106/24 122/1 137/4 150/21 169/23
169/25 170/1 170/3 179/20 180/22 200/24
201/3 201/10 226/22 229/1 230/16 230/19
we're [33]  20/1 26/5 26/21 28/14 54/12 57/4
57/15 65/12 65/21 66/4 66/13 66/18 66/21
67/23 69/11 77/3 106/15 110/2 110/8 160/23
181/5 181/6 183/8 191/20 193/25 210/14
212/13 221/8 226/20 227/21 229/8 230/12
231/23
we've [22]  2/19 12/7 24/23 32/4 51/18 56/20
61/15 65/20 79/25 84/20 93/14 99/6 124/11
124/11 124/12 124/13 152/7 180/10 198/14
204/6 221/7 227/5
wealth [1]  34/22
wealthy [3]  39/12 39/14 39/17
website [8]  207/18 207/25 208/8 217/11
217/14 217/16 218/22 218/24
week [6]  40/7 66/15 66/17 76/5 163/3 226/3
weeks [3]  184/5 199/8 199/10
welcome [6]  3/25 66/25 110/21 170/20
178/11 201/20
well [92]
went [31]  2/10 13/9 14/16 20/16 23/7 23/23
27/1 28/23 30/24 36/22 38/8 42/10 45/17
47/24 62/4 64/21 84/7 93/18 94/8 112/5
113/24 130/18 132/8 134/17 188/24 189/4
192/12 206/22 206/22 217/10 218/24
weren't [7]  38/20 40/7 42/15 46/22 130/19
137/13 162/2
west [4]  1/7 1/20 1/25 57/17
western [1]  57/9
what'd [2]  134/16 155/22
what's [34]  2/17 39/21 51/7 67/5 70/13 72/17
74/11 81/14 84/25 86/13 87/15 92/6 99/4
105/2 105/25 108/24 109/4 111/20 113/11
116/10 125/4 125/9 125/10 135/9 136/4
140/19 145/9 164/21 184/25 193/4 195/10
211/17 215/7 225/1
whatever [16]  39/3 57/8 63/5 64/21 71/9
79/18 79/18 80/18 84/24 97/21 97/23 97/24
131/25 132/7 212/20 218/9
whatnot [1]  5/19
whatsoever [1]  11/18
wheel [1]  46/19
wheeled [2]  2/10 2/22
wheels [18]  46/2 46/4 46/5 46/6 46/9 46/14
46/17 46/21 46/22 46/22 46/25 47/4 47/8
47/11 47/13 47/17 47/20 133/16
where [45]  2/10 4/20 15/25 17/14 17/16
18/21 31/17 37/11 37/16 42/7 42/15 63/7

**W**

where... [33]  69/23 76/19 104/20 106/20
119/13 119/22 120/2 120/12 123/12 124/1
125/12 125/13 126/20 133/25 144/16 144/25
145/16 149/20 155/5 155/25 159/9 167/23
173/12 178/17 183/24 185/22 192/12 207/16
210/17 214/3 215/16 216/3 223/15
where'd [1]  142/16
where's [2]  195/10 228/25
whereas [3]  159/8 159/8 159/9
wherever [2]  140/23 142/18
whether [45]  3/1 10/12 12/14 28/22 29/1
33/7 56/1 70/16 73/5 73/9 73/12 74/8 74/15
76/18 80/11 89/17 89/21 89/24 92/9 97/23
105/4 114/10 127/4 133/9 133/9 172/4
172/20 176/2 181/19 181/23 182/4 189/11
190/23 196/19 207/6 209/18 211/7 212/6
214/21 214/21 219/5 224/1 224/4 225/15
230/6
while [12]  12/3 13/7 28/16 41/20 89/15 135/5
137/20 137/24 181/12 183/6 186/17 204/25
whisper [1]  2/23
white [6]  1/21 2/25 15/7 131/20 191/25 232/7
whiting [1]  55/1
who'd [1]  131/4
who's [4]  107/13 114/24 140/13 228/5
whoever [3]  3/14 4/1 90/19
whole [6]  31/17 34/5 50/14 139/18 203/4
208/14
whom [1]  142/23
whose [2]  160/1 160/7
why [31]  16/10 22/9 32/9 33/7 34/13 38/23
56/15 59/2 65/3 106/9 113/21 125/21 126/17
133/19 138/15 138/25 142/21 145/18 159/4
159/16 160/4 168/24 184/2 192/15 195/19
197/6 199/12 209/4 209/4 218/24 222/3
widening [1]  217/10
wife [6]  24/13 39/2 42/8 79/12 98/11 134/3
Willie [6]  87/19 87/23 87/24 90/23 91/6
92/17
willing [1]  173/23
Windham [3]  11/8 11/10 63/12
wine [3]  60/3 60/7 61/2
winter [1]  223/8
wire [22]  74/1 74/5 74/9 74/16 74/18 75/7
75/12 75/17 75/19 75/21 75/22 78/2 79/18
82/7 82/12 82/18 82/20 140/6 140/8 140/17
140/21 140/24
wired [3]  75/13 140/23 150/25
wiring [1]  140/25
wish [1]  216/5
withdraw [1]  133/14
within [5]  100/7 179/10 220/10 220/13 230/1
without [21]  25/8 40/17 51/21 81/3 86/22
99/9 105/3 106/7 107/24 118/3 135/13 149/4
152/13 183/3 186/14 189/20 191/16 193/18
194/17 197/17 198/19
witness [32]  4/10 18/8 32/14 51/15 72/3
124/20 124/25 151/17 151/22 170/16 176/9
177/18 177/23 182/11 200/23 200/24 205/16
227/7 227/7 227/18 228/4 228/4 228/10
228/16 228/25 229/2 230/2 230/7 230/14
230/15 231/2 231/6
witnessed [1]  26/6
witnesses [5]  109/22 110/8 228/12 228/14
230/11
won't [2]  110/7 166/14
Woodbury [9]  53/16 89/21 92/17 114/20
115/22 116/8 167/6 167/15 177/8

words [8]  42/17 43/14 64/18 64/25 111/21
115/6 121/20 121/22
work [61]  7/22 16/5 16/6 17/9 19/21 24/2
33/20 35/21 35/23 36/1 36/1 36/3 36/4 36/6
36/15 38/9 38/12 38/18 47/25 66/18 66/18
88/20 96/24 97/16 97/18 97/20 98/23 98/25
100/6 132/9 137/6 137/9 137/13 137/17
138/17 139/6 153/10 153/13 154/9 154/12
156/2 156/4 157/15 158/1 162/1 162/23
163/1 163/8 163/24 167/21 169/9 173/23
173/24 176/16 176/19 178/25 203/20 205/3
211/15 211/16 212/18
worked [11]  9/3 22/12 33/22 36/14 38/7
101/1 167/18 171/10 214/3 215/5 215/6
working [16]  15/22 34/17 37/9 37/10 38/4
76/8 97/22 100/11 136/5 136/6 156/10 168/8
173/7 176/22 208/18 212/21
works [3]  179/10 202/18 212/15
World [2]  134/5 134/6
worse [1]  127/16
worth [6]  101/24 132/9 199/23 200/3 200/4
221/21
wouldn't [16]  2/8 28/3 82/17 83/25 107/15
116/13 117/8 125/3 128/5 128/6 128/12
162/1 204/5 228/18 229/11 232/14
wow [2]  2/12 231/22
writeoff [1]  133/4
writes [1]  167/14
writing [7]  44/16 83/12 84/1 84/1 111/7
143/25 149/24
written [1]  88/15
wrong [3]  72/4 91/11 203/8
wrote [4]  39/20 39/25 112/6 143/23

**Y**

Y-a-f-a [1]  152/5
Yafa [16]  151/19 151/22 152/4 152/5 152/20
153/3 158/10 167/23 168/21 171/1 171/22
176/13 177/2 177/14 177/15 233/8
yeah [38]  3/18 13/3 18/23 19/24 30/17 45/23
46/12 47/19 50/14 55/15 57/6 58/5 60/8
69/15 75/11 97/2 97/2 97/5 123/16 125/14
140/23 150/4 155/3 155/20 164/1 164/14
165/7 171/21 210/6 211/2 217/17 219/12
220/3 221/7 221/11 223/20 224/20 225/11
year [7]  79/8 79/17 101/22 102/7 208/19
208/20 208/23
Year's [1]  97/3
years [19]  15/25 19/23 39/9 45/8 49/9 78/6
117/16 127/24 128/3 156/3 156/6 158/2
165/19 167/19 168/11 169/17 169/20 176/17
179/16
yellow [1]  183/22
yes [396]
yesterday [27]  2/7 4/15 5/6 8/19 16/25 20/25
27/19 29/10 29/16 29/19 50/1 50/5 52/15
53/12 55/19 81/23 82/16 82/18 85/20 128/17
128/25 129/18 131/17 131/18 144/25 146/15
228/11
yet [4]  145/4 199/21 227/13 231/11
York [3]  1/18 179/2 204/14
you'd [8]  6/12 19/13 85/2 127/17 133/22
184/15 197/25 213/13
you'll [2]  106/18 126/2
you're [63]  2/14 3/21 18/12 28/12 38/24
38/24 44/9 44/12 47/17 53/5 56/5 65/2 66/8
78/25 80/1 82/6 84/25 87/2 90/4 98/24
103/13 103/13 107/11 107/21 110/17 117/1
118/16 134/7 134/9 143/25 143/25 145/16
151/7 154/14 170/17 172/12 173/17 174/20

177/13 178/11 178/17 179/17 199/25 201/17
205/16 205/18 205/21 206/7 206/17 209/5
209/6 210/24 212/19 212/21 215/15 215/19
218/13 218/15 223/15 223/20 224/2 224/25
232/1
you've [44]  6/20 6/20 12/4 16/9 18/5 20/6
21/13 30/5 30/7 35/15 35/17 35/19 52/3 52/6
57/10 60/5 63/16 64/8 73/25 78/12 85/10
85/13 95/15 105/4 108/14 108/16 131/6
168/21 175/8 175/23 182/23 183/8 184/9
204/18 204/19 205/1 205/10 205/10 206/18
208/25 210/21 214/9 219/11 219/18
young [1]  6/23
yours [2]  47/1 83/21
yourself [6]  54/17 101/6 134/20 155/1
178/16 218/13

**Z**

zero [2]  80/11 183/14
zone [1]  107/16