1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2
             Case No. 11-80205-CR-MARRA
3
UNITED STATES OF AMERICA,      )
4                              )
      GOVERNMENT,              )
5                              )
      -v-                      )
6                              )
MITCHELL J. STEIN,             )
7                              )
      DEFENDANT.               )    West Palm Beach, Florida
8                              )    May 15, 2013
_____)
9

10              VOLUME 8, PAGES 1 - 302

11          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12        BEFORE THE HONORABLE KENNETH A. MARRA

13              UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT        Albert Stieglitz, ESQ., and
                               Kevin Muhlendorf, ESQ.
17                             U.S. Department of Justice
                               Criminal Division
18                             1400 New York Avenue, Northwest
                               Washington, DC 20530
19
     FOR THE DEFENDANT         Mitchell J. Stein, Pro Se
20                             1551 North Flagler Drive, #1208
                               West Palm Beach, FL 33401
21   -and-
     (Standby Counsel)         Charles G. White, ESQ.
22                             1031 Ives Dairy Road, Suite 228
                               Miami, FL 33179
23
     Reporter                  Stephen W. Franklin, RMR, CRR, CPE
24   (561)514-3768             Official Court Reporter
                               701 Clematis Street
25                             West Palm Beach, Florida  33401
                               E-mail:  SFranklinUSDC@aol.com

```
 1            (Call to the order of the Court.)

 2            THE COURT:  Good morning, everyone.  Please be

 3    seated.

 4            Okay.  We're back on the record.  Mr. Stein is

 5    present.

 6            Are we ready to proceed?

 7            MR. STEIN:  Yes, Your Honor.

 8            MR. STIEGLITZ:  The United States is ready, Your

 9    Honor.

10            THE COURT:  Okay.  Let's bring the jury in.

11        (The jury enters the courtroom, after which the following

12    proceedings were had:)

13            THE COURT:  Welcome back, ladies and gentlemen.  Good

14    morning, everyone.  Please be seated.

15            Thank you again for being back here promptly this

16    morning.  We appreciate it, and we're ready to proceed with

17    the Government's next witness.

18            MR. STIEGLITZ:  Thank you, Your Honor.  The

19    Government --

20            Actually, before the Government calls its next

21    witness, may I read some stipulations into the record, Your

22    Honor?

23            THE COURT:  Yes.

24            MR. STIEGLITZ:  Thank you.

25            Your Honor, these stipulations pertain to the
```

```
 1    documents and the summaries the next witness will be
 2    testifying about.  So I'll just go ahead and go through them.
 3              This is a stipulation that has been signed by the
 4    parties, Mr.~Stein and the United States, and it says the
 5    following:
 6              "The United States of America, by and through its
 7    respected undersigned attorneys, and Defendant, Mitchell J.
 8    Stein, hereby stipulate and agree to the following:
 9              "As to the authenticity and admissibility of certain
10    documents and recordings, records of the following entities,
11    as identified in an attached chart, are records of a regularly
12    conducted activity for the purposes of Federal Rule of
13    Evidence 803(6), self-authenticating -- and are
14    self-authenticating pursuant to Federal Rule of Evidence
15    902(11) and/or 902(12).
16              "FedEx Corporation, also known as FedEx, Suntrust
17    Bank, Citibank, Bank of America, JPMorgan Chase, Manufacturers
18    Bank, Wells Fargo and/or Wachovia, Charles Schwab, E*trade,
19    Fidelity Investments, JP Turner & Company, Legends Financial
20    Management, Morgan Stanley, National Securities, Olympia Asset
21    Management, Oppenheimer, Pacific West, Park Avenue Securities,
22    Regal Securities, Scottrade, TD Ameritrade, UBS, West Rock
23    Advisors, World Equity Group, Standard Registrar & Transfer
24    Company, and MGM Resorts International.
25              "Furthermore, documents produced by Defendant
```

1    Mitchell J. Stein and/or Tracey Hampton-Stein to the

2    Securities and Exchange Commission, also identified in an

3    attached chart, are authentic pursuant to Federal Rule of

4    Evidence 901.

5           "Furthermore, audio recordings of testimony given by

6    Defendant Mitchell J. Stein before the SEC on December 17th

7    and 18th, 2009, April 15th, 2010, and July 8th, 2010, and

8    transcripts thereof, are authentic pursuant to Federal Rules

9    of Evidence 901(7) and 902(4) and are statements of Defendant

10   Mitchell J. Stein for the purposes of Federal Rule of Evidence

11   801(d)(2)."

12          Three more.

13          "Documents filed with the SEC by or on behalf of

14   Heart Tronics, Incorporated, formerly doing business as

15   Signalife, Inc. and Recom Managed Systems, Inc., including but

16   not limited to quarterly reports or forms 10-Q and annual

17   reports, or forms 10-K are authentic pursuant to Federal Rules

18   of Evidence 901(7) and 902(4).

19          "Records obtained by the Department of Justice from

20   the SEC, which the SEC obtained via its blue sheeting system

21   are authentic pursuant to Federal Rules of Evidence 901(7) and

22   902(4)."

23          Finally, "Records pertaining to the price and volume

24   of trading in securities issued by Heart Tronics, Inc.,

25   formerly doing business as Signalife, Inc. and Recom Managed

```
 1    Systems, Inc., which were maintained by Bloomberg, Inc., are

 2    authentic pursuant to Federal Rule of Evidence 901 and are

 3    market reports and similar commercial publications for the

 4    purposes of Federal Rule of Evidence 803(17)."

 5              Your Honor, there are a few more that we'll read

 6    after the summary witness' testimony, but for now that's all

 7    we have on the stipulations, so we can -- we have some

 8    exhibits we'll preadmit, but we can go ahead and call the

 9    witness.  That witness is Postal Inspector George Clark.

10              THE COURT:  You agree to that stipulation, Mr.~Stein?

11              MR. STEIN:  I signed the stipulation.

12              Can we have a sidebar for one second, Your Honor,

13    regarding that stipulation and that exhibit?

14              THE COURT:  All right.

15              MR. STEIN:  Thank you.

16              MR. STIEGLITZ:  Your Honor, I'm sorry.  We may be

17    able to obviate the need for a sidebar.

18         (Brief pause in proceedings.)

19              MR. STIEGLITZ:  Your Honor, I think we solved the

20    question.

21              THE COURT:  Is that correct, Mr.~Stein?

22              MR. STEIN:  Your Honor, that is correct, there's no

23    need for a sidebar.

24              THE COURT:  All right.  Great.

25              All right.  Let's call the witness.
```

```
 1              MR. STIEGLITZ:  The United States calls Postal
 2    Inspector George Clark.
 3              THE COURT:  Sir, would you raise your right hand,
 4    please.
 5               George Clark, Government's witness, sworn.
 6              THE COURT:  Please be seated.
 7              All right.  Sir, if you could please try and pull
 8    that microphone toward you so we can hear you, and tell us
 9    your name and spell your last name, please.
10              THE WITNESS:  George Clark, C-l-a-r-k.
11              THE COURT:  Thank you.
12              You may proceed.
13              MR. STIEGLITZ:  Thank you, Your Honor.
14              The parties have agreed to admit the following
15    Government exhibits, which we'll hand out to the jury as they
16    come up.  Actually, I should clarify.  Not all of them will we
17    hand out to the jury.  Some of them are financial records that
18    we won't be displaying on the screen but Inspector Clark will
19    be testifying to.
20              101, 135, 146, 339, 115, 120, 131, 132, 145, 340,
21    341, 259, 255, 256, 254, 258, 257, and 260.
22              The Government would move all those into evidence.
23              MR. STEIN:  No objection, Your Honor.
24              THE COURT:  They'll all be admitted without
25    objection.
```

```
 1        (Government's Exhibit Nos. 101, 135, 146, 339, 115, 120,

 2   131, 132, 145, 340, 341, 259, 255, 256, 254, 258, 257, and 260

 3   entered into evidence.)

 4        MR. STIEGLITZ:  Thank you, Your Honor.

 5                     Direct Examination

 6   BY MR. STIEGLITZ:

 7   Q    Good morning, Inspector Clark.

 8   A    Good morning.

 9   Q    Will you please explain to the members of the jury how it

10   is that you're employed.

11   A    I'm a United States postal inspector.  I work for the

12   Postal Inspection Service.  It is a law enforcement agency

13   under the post office.  We investigate a wide range of crimes

14   that use or affect the mail system, and among those we

15   investigate mail fraud, securities fraud, wire fraud, bank

16   fraud, things like that.

17   Q    And Inspector Clark, in the course of your duties as a

18   postal inspector, have you been involved in the investigation

19   of the Defendant, Mitchell J. Stein?

20   A    I have been.

21   Q    Since approximately -- well, I should back up.  How long

22   have you been a postal inspector?

23   A    I've been a postal inspector for almost six years now.

24   Q    When -- approximately when did you begin -- did you become

25   involved with an investigation of the Defendant, Mr.~Stein?
```

1    A    In January 2011.

2    Q    And would you just explain for the members of the jury

3    what sorts of documents, what sorts of materials you've

4    reviewed in the course of your investigation.

5    A    I've reviewed thousands of documents, including bank

6    records, brokerage records, testimony transcripts,

7    correspondence, e-mail, mail.

8    Q    And Inspector Clark, you mentioned bank and brokerage

9    accounts.  In your investigation, did you focus on any

10   specific bank and brokerage accounts?

11   A    Eventually, we were focused on accounts held by Martin

12   Carter and Mitchell Stein.

13   Q    Now, bank and brokerage accounts.  Can you just very

14   generally explain the difference between those two types of

15   accounts?

16   A    A brokerage account is a account which individuals or

17   entities can hold securities, and you buy and sell securities

18   out of the brokerage account.  A bank account, I'm sure most

19   of us are familiar with.  You hold U.S. currency or cash.

20   Q    And what time period, as a general matter, did you focus

21   on in looking at the bank and brokerage and other records that

22   you looked at?

23   A    We reviewed records, I reviewed records from 2005 to 2010.

24   Q    Now, in your review of those records, did you see money,

25   just as a general matter, coming into Mr.~Stein's accounts?

```
 1    A    I did.  I saw a lot of money coming into Mr.~Stein's
 2    accounts.
 3    Q    Was any of that money related, again, as a general matter,
 4    to Signalife?
 5    A    Much of that money was related to Signalife.
 6    Q    And can you just explain very generally when we say
 7    related to Signalife what sorts of things you mean by that?
 8    A    He received money directly from Signalife in the form of
 9    checks and wire transfers, and he received millions of dollars
10    in proceeds of security sales, Signalife security sales.
11    Q    Now, I'd like to direct your attention --
12         And if I could ask my colleague's indulgence to hand
13    out Government's exhibit 259, which should be in your binder
14    there, Inspector Clark.
15    A    Yes, it is.
16    Q    And Inspector Clark, while the members of the jury are
17    receiving their copies, can you just tell us generally what
18    this is?
19    A    This is a chart summarizing the money we traced to
20    Mitchell Stein bank accounts.  You have money coming from
21    Martin Carter, you have money coming from Ajay Anand, you have
22    direct cash transfers in the form of checks and wire transfers
23    coming from Signalife, and you have money coming into a bank
24    account for THS Blind Trust.
25    Q    And we'll talk about that more in just a minute, Inspector
```

 1   Clark.  But just to be clear, is the information on this
 2   chart, this is accurate based on your review of the financial
 3   documents in the case?
 4   A   It is.
 5   Q   To be clear, Inspector Clark, does this chart show all the
 6   money that Mr.~Stein got into his accounts between 2005 and
 7   2010?
 8   A   No, no, it does not.
 9   Q   Just the money coming from those certain entities; is that
10   right?
11   A   Just the money coming from those identified entities, yes.
12   Q   Now, that chart indicates, Inspector Clark, that Mr.~Stein
13   received over $1.8 million from Martin Carter between 2005 and
14   2010; is that right?
15   A   That's correct.
16   Q   Based on your review of the records very generally, what
17   was the source of that money that he received from Mr. Carter?
18   A   Very generally, the source was either Martin Carter either
19   received cash directly from Signalife that was then forwarded
20   on to Mitchell Stein, and Martin Carter received millions of
21   shares of Signalife which he then sold in his brokerage
22   account, turned into cash, and forwarded that on to Mr.~Stein.
23   Q   And to be clear, when we're talking about funds to
24   Mitchell Stein, is it fair to say that covers accounts both in
25   Mr.~Stein's name, as well as accounts that Mr.~Stein had

```
 1   control over; is that right?

 2   A    That's correct.

 3   Q    All right.  We'll come back to Mr. Carter, but let's just

 4   move through the rest of the chart.

 5            How much does Mr. Anand and his associated companies

 6   send to Mr.~Stein?

 7   A    $478,600.

 8   Q    And just to remind us, the company, one of the companies

 9   associated with Mr. Anand is what?

10   A    The Silve Group.

11   Q    Now, the money that Mr. Anand or the Silve Group sent to

12   Mr.~Stein, what was the source of that money?

13   A    Well, the Silve Group received millions of shares, as

14   well, which Mr. Anand sold, converted into cash, and the

15   $478,600 was proceeds from some of those sales.

16   Q    And to be clear, Mr. Anand also received some shares

17   through -- from Mr.~Stein directly; is that right?  From one

18   of those blind trust accounts; is that right?

19   A    He did receive some shares from one of the blind trust

20   accounts.  Yes, he did.

21   Q    But is it fair to say, bottom line, that $478,600 was

22   money derived from the sale of Signalife shares; is that

23   right?

24   A    Yes, that's correct.

25   Q    Now, the money directly from Signalife is fairly
```

```
 1    self-explanatory.  We'll skip over that and go to the THS
 2    Blind Trust.  And Inspector Clark, if you would just take a
 3    moment and explain why it is that you include the THS Blind
 4    Trust on this chart.
 5    A   Mitchell Stein was the sole beneficiary of the THS Blind
 6    Trust.  There was a THS Blind Trust brokerage account
 7    administered by Mark Nevdahl that sold only Signalife shares,
 8    and the money, the proceeds of those sales were then
 9    transferred to a THS Blind Trust bank account which Mr.~Stein
10    was the sole beneficiary again of, and the proceeds, the money
11    in that bank account was spent on Mr.~Stein's behalf.
12    Q   And just to refresh us, who was it that was the -- who
13    were the trustees of that THS Blind Trust bank account?
14    A   Mark Nevdahl was the THS Blind Trustee who had authority
15    over the brokerage account, and Richard Wilk was the THS Blind
16    Trust trustee who had authority over the bank account.
17    Q   And from your review of the records as a general matter,
18    what was Mr. Wilk spending much of the money from the THS
19    Blind Trust bank account on?
20    A   The bulk of the money was spent on casino debts that
21    Mr.~Stein had accumulated in Las Vegas.
22            MR. STIEGLITZ:  Court's indulgence, please.
23    BY MR. STIEGLITZ:
24    Q   Now, again, self-explanatory, the last line of that chart
25    is just the total of those amounts above it, right?
```

```
 1    A    That's correct.
 2    Q    Okay.  So let's return to Mr. Carter there at the top of
 3    the -- top of the chart.  Have you reviewed Mr. Carter's bank
 4    and brokerage accounts?
 5    A    I have.
 6    Q    And in those records, did you see him receiving the
 7    Signalife shares that you mentioned?
 8    A    Saw him receiving millions of Signalife shares, yes.
 9    Q    And as a general matter just mechanically, where did
10    those -- geographically, where did those share comes from?
11    A    They came from the transfer agent in Utah.
12    Q    Okay.
13    A    They were mailed to Mr. Carter.
14    Q    Is that standard registrar and transfer in Draper Utah?
15    A    That's standard registrar and register company in Draper,
16    Utah, yes.
17    Q    In your review of the records, did you also see Mr. Carter
18    selling those shares?
19    A    I did.
20    Q    Were you able to trace what happened to that money that
21    he -- the proceeds of those sales?
22    A    So Mr. Carter would deposit the shares into his own
23    brokerage account, he would sell the shares and generate cash,
24    obviously from those sales, and would transfer that cash, the
25    bulk of that cash, to Mr.~Stein.
```

1    Q    Okay.  I want to talk about a few specific examples of

2    Mr. Carter selling shares and talk about what happened to that

3    money.  In your review of the documents, did you see a sale of

4    shares by Mr. Carter on March 5th, on or around March 5th of

5    2008?

6    A    I did.

7    Q    And before we get to that sale, March of 2008, that's

8    almost, what, six months after the press releases and purchase

9    orders that have been talked about in this case; is that

10   right?

11   A    That's correct.  They were issued in late September.

12   Q    But as of March 5th, 2008, what was the most recent SEC

13   filing that was on file?

14   A    The third quarter 10-Q, which was filed in the winter of

15   2000 -- the late winter of 2007.

16   Q    So let's just quickly look at what the existing SEC filing

17   at the time, March 5th, was.  That's Government's exhibit 73,

18   which is already in evidence.

19          Inspector Clark, I'm going to studiously avoid

20   referring to Mr. Muhlendorf as my assistant this morning.  But

21   while the jury is receiving their copies of Government's

22   exhibit 73, is this, in fact, that filing, the third quarter

23   10-Q?

24   A    This is the third quarter 10-Q.

25   Q    Okay.  And let's just look at page 22 of that document,

1    please, which should be in your binder.

2    A   Yes, it is.

3    Q   And we'll look specifically at that section which is

4    "Pending Purchase Orders."

5              And Inspector Clark, I won't have you read that, but

6    can you just explain what's being disclosed in that filing

7    that is the Signalife, most recent Signalife filing, as of the

8    time of the stock sale we're going to talk about in a moment?

9    A   Well, in this 10-Q, which was publicly and still is

10   publicly available on the SEC website, there were pending

11   purchase orders announced on September 14th and

12   September 24th.

13   Q   And, in fact, Inspector Clark, those are those first two

14   paragraphs there on 22?

15   A   Yeah, that's correct; those are the first two paragraphs.

16   Q   If we can now fast-forward to page 45, please, and we'll

17   look at that first paragraph under Subsequent Events.  And if

18   you'd just remind us, Inspector Clark, what this refers to.

19   A   Yet another purchase order announced on October 4th.

20   Q   Okay.  So this is what's out there in the public at the

21   time of this March 5th, 2008, stock sale; is that fair to say?

22   A   That's fair to say.

23   Q   Okay.  Let's get back to that stock sale.  What's been

24   marked for identification -- well, what's been admitted into

25   evidence, actually, as Government's exhibit 255.  And

1    Inspector Clark, that should be in your binder, as well.

2    A    It is.

3    Q    And while the members of the jury are receiving their

4    copies, will you just tell us very generally what this chart

5    is, please, what it depicts.

6    A    This is a flowchart depicting the sale of shares and the

7    subsequent transfer of funds to Mitchell Stein.

8    Q    And just to be clear, is this information accurate based

9    on your review of the financial documents in the case?

10   A    This information is accurate, yes.

11   Q    Now, in the interest of time, we're not going to look at

12   each of those financial documents, but is it fair to say those

13   are the account records and wire forms that had been admitted

14   as Government exhibits 135, 120, and 131?

15   A    It is.

16   Q    So if you'd just walk through this chart for the jury and

17   explain what it is that we're looking at here.

18   A    Martin Carter, as you can see in the box down on the left,

19   sold 52,550 shares on March 5th out of his TD Ameritrade

20   account, account number ending in 5251, sold the shares in the

21   general market.  The sale of those shares generated

22   $36,387.55.  Mr. Carter then transferred from his TD

23   Ameritrade account $34,000 to Mitchell Stein in his

24   Manufacturers Bank account, bank account number ending in

25   2154.

1    Q    Now, Inspector Clark, have you reviewed the indictment in

2    this case?

3    A    I have.

4    Q    And these two transactions, the sale of shares and the

5    transfer of money, do those pertain to any of the counts in

6    the indictment?

7    A    They pertain to counts 9 and 12, a securities fraud count

8    and a money laundering count.

9    Q    Now, we'll take that exhibit down, Inspector Clark.

10          Turning to the time period of April 18th through 22nd

11   of 2008.  In your review of records, did you see sales of

12   Signalife shares by Mr. Carter during that period?

13   A    Yes.

14   Q    And just to ask you questions like the ones I asked a

15   moment ago, in April of 2008, when that sale of shares is

16   happening, again, that's almost seven months, I guess, after

17   the press releases and purchase orders that we saw earlier in

18   the case?

19   A    Yes, it was.

20   Q    Had the company, Signalife's, 10-K annual filing been

21   filed by that time?

22   A    The 10-K was filed at the end of March, or April 1st.

23   Yeah, it had been filed by that time.

24   Q    Okay.  And let's just, before we get to the sale itself,

25   let's just look at that filing, Government's exhibit 93, which

 1    is already in evidence.

 2            And Inspector Clark, is this, in fact, the 10-K that

 3    you were just referring to?

 4    A    This is the 10-K.

 5    Q    Let's look at page 78 of that document, and we'll look at

 6    the section labeled "Pending Purchase Orders."

 7            And if you could just take a look, Inspector Clark,

 8    at the bottom of page 78, there, over onto the top of page 79,

 9    and tell the members of the jury, remind us what's disclosed

10    in that filing.

11    A    This publicly available document, the 10-K, again

12    discloses the series of purchase orders announced in

13    September, late September and early October of 2007.

14    Q    So that's what's out in the public about Signalife in late

15    April of 2008?

16    A    That is still out in the public in late -- or early 2008.

17    Q    Let's go to Government's exhibit already admitted 256,

18    please.  And Inspector Clark, while the members of the jury

19    are receiving their copies, will you just tell us very

20    generally what this chart depicts.

21    A    Much like the previous one, it depicts a sale of shares

22    and the subsequent flow of proceeds to Mitchell Stein.

23    Q    And is the information in this chart accurate based on

24    your review of financial records in this case?

25    A    This is accurate, yes.

```
 1   Q   And, again, we won't put up each one of those financial

 2   documents, but is it fair to say that the transactions in

 3   here, the financial documents reflecting these transactions

 4   are -- have been admitted as Government's exhibits 146, 132,

 5   145, 340, and 341?

 6   A   That's correct.

 7   Q   Now, if you'd just explain to the members of the jury what

 8   it is that this chart shows.

 9   A   Martin Carter again, out of his TD Ameritrade account,

10   account number ending in 5251, sells 118,100 shares over the

11   course of those four days.  Those sales generate $115,819.98.

12           Mr. Carter then wires $105,000 to his Wachovia Bank

13   account, account number ending in 5541, and he does that

14   because the only account that one is supposed to wire proceeds

15   from a brokerage sale to is one's own bank account.  So

16   Mr. Carter wires $105,000 to his own bank account, and then on

17   the same day wires $105,000 to Mitchell Stein's Manufacturers

18   Bank account, account number ending in 2154.

19   Q   Now, Inspector Clark, do the -- does that sale of shares

20   and that ultimate transfer of money to Mr.~Stein pertain to

21   any of the counts in the indictment?

22   A   They pertain to counts 10 and 13, a securities fraud count

23   and a money laundering count.

24   Q   Now, Inspector Clark, in addition to the other records

25   that you indicated you had reviewed, did you review records of
```

1    the Five Investments Partnership?

2    A   I did.

3    Q   And just to be clear, we've had -- there's been some talk

4    about Five Knights Partnership.  We're talking now about the

5    Five Investments Partnership; is that right?

6    A   We're talking about an account in the name of Five

7    Investments Partnership, yes.

8    Q   And just to remind us, who is -- who are the partners of

9    the Five Investments Partnership?

10   A   Martin Carter and Mitchell Stein.

11   Q   And just to take a look at what's in evidence as

12   Government's exhibit 85, we'll look at the fifth page of it,

13   which, Inspector Clark, I believe is marked as Government's --

14   excuse me, on the bottom there has a number ending in 1632.

15          Who is the person that gets check writing and debit

16   card privileges for the Five Investments Partnership?

17   A   Mitchell Stein.

18   Q   Who is it that gets to open an account for the Five

19   Investments Partnership?

20   A   Mitchell Stein.

21   Q   And who is the only person authorized to give orders about

22   disposition of stocks, bonds, and other securities with regard

23   to that account?

24   A   Again, Mitchell Stein.

25   Q   Now from your review of the records, Inspector Clark, did

1    Mr.~Stein sell stocks, Signalife shares, out of the Five

2    Investments Partnership brokerage account?

3    A    He did, yes.

4    Q    And more specifically, did you see him selling shares on

5    or around January 28th of 2008?

6    A    I did, yes.

7    Q    And again, without looking at it again, at the time,

8    January 28th of 2008, what disclosures are out there in the

9    public about Signalife?

10   A    As discussed a couple minutes ago, the only disclosure was

11   the 10-Q, the public disclosure, and --

12   Q    And when you say the -- I'm sorry.  Go ahead.

13   A    The 10-Q was disclosing the series of purchase orders

14   announced in late September and early October of 2007.

15   Q    And when you say the only disclosure, just to be clear,

16   you mean as between the 10-K and the 10-Q?

17   A    Well, referencing SEC documents, there were press

18   releases.  There was certainly information available on the

19   Internet.

20   Q    So back to the sale, let's look at what's been admitted

21   into evidence as Government's exhibit 254, please.  And while

22   the members of the jury are receiving their copies, Inspector

23   Clark, would you just explain very generally what this chart

24   shows?

25   A    This chart shows the sale of Signalife shares out of the

1   Five Investment Partnership brokerage account, Pacific West,

2   account number ending in 1470, an account that only Mitchell

3   Stein had control over.  The account sold 50,148 shares into

4   the market, and those sales generated $19,755.10.

5           The proceeds were then wired to Mitchell Stein's

6   Manufacturers Bank account, and the proceeds were $19,717.84.

7   And, again, the Mitchell Stein Manufacturers Bank account

8   ending in 2154.

9   Q   And Inspector Clark, the information in this chart, is it

10   accurate based on your review of the financial documents in

11   this case?

12   A   It is accurate, yes.

13   Q   And, in fact, are those financial documents, do those

14   include what have been admitted as Government's exhibit 101,

15   339, and 115?

16   A   That's correct, yes.

17   Q   And Inspector Clark, those two transactions, the sale of

18   the shares and the transfer of the money, do those pertain to

19   any counts in the indictment?

20   A   They pertain to Counts 8 and 11, a securities fraud count

21   and a money laundering count.

22   Q   And, now, Inspector Clark, you've mentioned a number of

23   wire transfers -- excuse me, money transfers.

24           When Mr. Carter is sending money to Mr. Stein, these

25   transactions you've described, are those transactions all

```
 1   occurring in the United States?

 2   A   Those transactions are all occurring in the United States,

 3   yes.

 4   Q   Now, let's get back to Mr. Carter.

 5          From your review of the records in this case, have

 6   you been able to determine how much in total Mr. Carter got

 7   from Signalife, both in terms of shares and in terms of cash?

 8   A   We have added it up, yes.

 9   Q   And let's look at Government's exhibit 258.

10          And Inspector Clark, while the members of the jury

11   are receiving their chart or their copy of the chart, will you

12   just explain very generally what this chart shows?

13   A   This chart shows the amount of money Martin Carter

14   received from November 2007 to September 2008 either --

15   Q   I'm sorry.  Why are you focusing on that time period in

16   particular?

17   A   I'm focusing on that time period because that's when the

18   bulk of the money that he received occurred, and I'm focusing

19   on that time period also because that's when the false

20   disclosures were in the marketplace.

21   Q   And Inspector Clark, is the information in this chart, is

22   that accurate based on your review of the financial documents

23   in this case?

24   A   It is accurate, yes.

25   Q   All right.  Now, between November 2007 and September 2008,
```

```
 1   Mr. Carter gets how many shares from Signalife?
 2   A   He got 6,035,000 shares.
 3   Q   And below that, can you just explain what that value
 4   number is?
 5   A   That's the value of the shares when they were issued to
 6   him.
 7   Q   All right.
 8   A   That's $1,473,900.
 9   Q   And the cash is fairly self-explanatory, right?
10   A   The cash is self-explanatory.  That's direct cash
11   transfers in the form of wires or checks in the amount of
12   $682,100.  And that's direct cash transfers from the company,
13   Signalife.
14   Q   And will you just explain what the rest of the chart
15   shows, please.
16   A   Well, we have a total there that's adding up the
17   1.4 million and the 682,000, for a grand total $2,156,000.
18   Conservatively, we have Carter sending to Mitchell Stein
19   85 percent of that money, and that's $1,823,283.  And I stress
20   conservatively, because that's what we could determine
21   conclusively.  It could have been higher.
22   Q   All right.  Now, Inspector Clark, in your review of
23   Mr. Carter's account records, did you see him transferring
24   money to anyone else associated with Signalife other than
25   Mr.~Stein?
```

```
 1   A    I did not.
 2          I take that back.  He transferred a very small amount
 3   of money to Mitchell Stein's wife, Tracey Hampton-Stein.
 4   Q    How about Lowell Harmison?  Did he transfer any money to
 5   Lowell Harmison?
 6   A    He did not.
 7   Q    John Woodbury?
 8   A    No.
 9   Q    Rowland Perkins?
10   A    No.
11   Q    Pam Bunes?
12   A    No.
13   Q    Now, Inspector Clark, did you hear Mr. Carter's and
14   Mr. Anand's testimony about Mr.~Stein asking them to keep
15   certain withdrawals or transfers below $10,000?
16   A    I did hear that from Mr. Carter, yes.
17   Q    To your knowledge, is there anything that -- anything
18   significant that happens when transactions are in excess of
19   $10,000?
20   A    The bank secrecy laws require banks to report to the
21   Department of the Treasury cash transactions over $10,000.  So
22   they're reportable and trackable.
23   Q    Now, let's look back at Government's exhibit 259, which
24   is, again, already in evidence.  That's the chart of what
25   Mr.~Stein got from certain people and entities.  And let's
```

1    focus in on the cash, the wire transfers from Signalife,

2    directly from Signalife.  How much is that, Inspector Clark?

3    A    $160,680.

4    Q    Now, Inspector Clark, have you reviewed the records of

5    Signalife's bank account?

6    A    I have.

7    Q    Did Signalife have just one account, or did Signalife have

8    a number of accounts during that period?

9    A    It had two accounts, one at Wachovia Bank and one at

10   Carolina First.

11   Q    And, now, to be clear, Mr.~Stein wasn't a signatory on

12   those bank accounts, was he?

13   A    No, he was not.

14   Q    Okay.  Now, you recall Mr.~Stein asking several

15   individuals about August 2007, kind of pegging that as the

16   time when Lowell Harmison became CEO; is that right?

17   A    That's correct.

18   Q    So let's focus on August 2007, and we'll look at the year

19   after August 2007.  So August 2007 through July of 2008.

20            In that one-year period alone, how much does

21   Signalife wire Mr.~Stein?

22   A    I think it was about $120,000.

23   Q    And are you aware of any funds that Mr.~Stein got from

24   other Signalife accounts other than that sort of main account

25   at Wachovia during that time?

```
1    A    He got a couple of checks from the Carolina First account,

2    yes.

3    Q    And we'll just pull up briefly Government's exhibit 318,

4    which is already in evidence, and we'll just look at those

5    bottom two checks.  Are those the checks you're referring to,

6    Inspector Clark?

7    A    Those are the checks, yes, from Carolina First Signalife

8    bank account to Mitchell Stein, signed by Tracy Jones.

9    Q    Now, let's look at what was going on in the company while

10   Mr.~Stein was going this money.

11         MR. STIEGLITZ:  Government's exhibit 84, please.

12   This is already in evidence.

13   BY MR. STIEGLITZ:

14   Q    And hopefully it's in your binder, as well, Inspector

15   Clark.

16   A    It is in my binder, yes, and it's on the screen.

17   Q    Now, this is an e-mail dated November 14th of '07; is that

18   right, Inspector Clark?

19   A    That's correct.

20   Q    From Kevin Pickard to some folks at Signalife, including

21   Mr.~Stein, right?

22   A    Including Mitchell Stein, yes.

23   Q    And just very generally, what is Mr. Pickard advising

24   those people, including Mr.~Stein, is going to happen?

25   A    That the company is running low on cash, and that they
```

1   have several outstanding payments to make.

2   Q    And in particular, what's that last wire that Mr. Pickard

3   flags?

4   A    That's a wire to M&C Electric, that's Martin Carter's

5   company, for $90,000.

6   Q    Now, have you had an opportunity to look at what -- other

7   than the wires that are mentioned here, what other wire

8   requests or wires Signalife was sending out at or around the

9   time of this e-mail?

10  A    I have, yes.

11  Q    And more specifically, did you see any wires at or around

12  this time to Mr.~Stein himself?

13  A    Around this time there were wires to Mr.~Stein, yes.

14  Q    Okay.  In fact, nine days before this e-mail, Mr.~Stein

15  received a wire for $20,000 from Signalife; isn't that

16  correct?

17  A    That's correct.

18  Q    And, in fact, just the day before this e-mail, did

19  Signalife wire money to Mr. Carter?

20  A    Signalife wired money to Mr. Carter, yes.

21  Q    Do you recall what that amount is?

22  A    Can I check my --

23  Q    Absolutely.

24        MR. STIEGLITZ:  And just for clarity purposes of the

25  record, Inspector Clark is referring to account spreadsheets

```
 1   prepared during the course of the investigation.
 2   BY MR. STIEGLITZ:
 3   Q   That's correct, Inspector Clark?
 4   A   That's correct, yes.
 5         MR. STIEGLITZ:  That were provided to Mr.~Stein
 6   several weeks ago.  I don't have the exact timeframe.
 7   BY MR. STIEGLITZ:
 8   Q   So, again, Inspector Clark, the day before this e-mail,
 9   November 13th of '07, did Signalife wire additional money to
10   Mr. Carter?
11   A   It did.  Yes, it did.
12   Q   How much?
13   A   Make sure I am accurate in this.  It was $105,300.
14   Q   So in addition to that $105,300 that goes to Mr. Carter on
15   November 13th, then does Mr. Carter also get this wire of
16   $90,000 at or around the time of this e-mail?
17   A   On 11/15 he actually got a wire for $90,800 from
18   Signalife.
19   Q   And I hesitate to ask to do the math, but -- well,
20   roughly, the total between November 13 and 15, is that
21   approximately $196,100?
22   A   I'll trust your math on this, but that sounds about right.
23   Q   It's a perilous thing to do.
24         Have you determined what happened to any of that
25   money that Mr. Carter got?
```

```
 1   A   It got forwarded on to Mitchell Stein.

 2   Q   Now, let's just look at Government's exhibit 257, please,

 3   already in evidence.

 4        And while the members of the jury are receiving their

 5   copies, Inspector Clark, can you just take a look -- can you

 6   just tell me whether the information in this chart is accurate

 7   based on your review of the financial records in this case?

 8   A   It is accurate, yes.

 9   Q   And would you just describe for the members of the jury

10   what we see in this chart.

11   A   We see Signalife wiring -- no security sales here --

12   wiring cash from its bank account to Martin Carter's Wachovia

13   Bank account ending in 5541, a series of three cash transfers

14   between November 13th and November 15th, 2007.

15        On November 16th, 2007, Mr. Carter wires $194,800 to

16   Five Investments Partnership at Regal Securities, account

17   number ending in 1013.  Again, an account controlled by

18   Mitchell Stein.

19   Q   And on one of the earlier slides, we saw a reference to a

20   Five Investments Partnership at Pacific West.  Do you remember

21   that?

22   A   I do, yes.

23   Q   Can you just explain to the members of the jury why we're

24   seeing on this chart Regal Securities?

25   A   Because Mark Nevdahl, the broker managing the account, his
```

 1    employer changed, but the account stayed with him.

 2    Q   So let's look back at Government's exhibit 84.

 3            Inspector Clark, does it say anything in that e-mail

 4    about that wire to M&C Electric actually being money for Five

 5    Investments Partnership?

 6    A   No, it does not.

 7    Q   Or for an account controlled by Mitchell Stein?

 8    A   No, it does not.

 9    Q   Let's move forward in time now, and I want to pull up an

10    exhibit that I believe Mr.~Stein entered as defense

11    exhibit 194.  And we'll look at actually the whole e-mail.

12    Why don't we -- in an effort to read it, why don't we make it

13    right above the Signalife logo.

14            Inspector Clark, while the members of the jury are

15    getting their copy, do you remember this document?

16    A   I do remember this document, yes.

17    Q   And this is an e-mail exchange February 11th of 2008; is

18    that right?

19    A   Yes, it is.

20    Q   And let's start at the bottom there and just remind us

21    who's e-mailing whom and what's being said.

22    A   On February 11th, 2008, Tracey Jones is e-mailing Lowell

23    Harmison, then the CEO of Signalife, a note on the cash

24    balance for the company.

25            "Hi, Dr. H.  Our current cash balance is $185,000."

```
 1   Q    And then above that, Dr.~Harmison responds; is that right?

 2   A    Above that Dr.~Harmison responds on the same day, yes.

 3   Q    What's he say?

 4   A    He says:  "Tracey, what is absolutely critical over the

 5   rest of February and March, not one penny goes out with my

 6   approval."  I take it to mean without my approval.  "Dr. H."

 7   Q    Okay.  Let's look at what actually happens around the time

 8   before and after this e-mail.

 9        Again, have you had an opportunity to look at what

10   sorts of transactions occurred sort of before and after this

11   e-mail?

12   A    I have, yes.

13   Q    Again, starting in August of 2007 to the time of this

14   e-mail, February of '08, approximately how much money had

15   Signalife sent to Mr.~Stein?

16   A    Approximately $140,000.

17   Q    So approximately a hundred thousand, Inspector Clark?

18   A    I'm sorry, yes, I'm getting myself -- almost a hundred.

19   It was 99, a little over $99,000.

20   Q    So that's the month before this e-mail.  In the months

21   after this e-mail, did Mr.~Stein stop getting wires from the

22   company for a while?

23   A    He did.

24   Q    And approximately how long?

25   A    Approximately five months.  At the end of July of 2008 he
```

1    got a wire transfer.

2    Q    Okay.  So Signalife wasn't wiring money to Mr.~Stein

3    directly during those months.  Did that mean that Mr.~Stein

4    stopped getting money from the company?

5    A    No, it doesn't.  No, it did not.

6    Q    Explain what you mean by that.

7    A    He was continuing to get money from Martin Carter, who

8    continued to get money from Signalife and from the shares of

9    Signalife stock.

10   Q    In fact, over just the next two months after this e-mail,

11   Signalife sent Mr. Carter $486,000, didn't they?

12   A    That's correct, yes.

13   Q    And was that in one wire or in multiple wires?

14   A    Several wires, yeah.

15   Q    And let's pull up what's already in evidence as

16   Government's exhibit 132, please.  And let's just look at the

17   bottom e-mail, Inspector Clark, which I hope is in your binder

18   there.

19   A    It is.

20   Q    This is an e-mail from Dr.~Harmison to Tracy Jones on

21   March 26th of 2008; is that right?

22   A    That's correct, CC'ing Mitchell Stein.

23   Q    And just very generally, what's Dr.~Harmison telling

24   Ms. Jones to do?

25   A    Dr.~Harmison is telling Tracey Jones and CC'ing Mitchell

```
 1   Stein, "Tracy, please make a wire transfer ASAP."
 2   Q   And on whose instruction is that wire happening?
 3   A   "Per Mitch's instruction, Dr. H," $180,000 wire transfer
 4   to M&C Electrical Services, with the account number and
 5   routing number.
 6   Q   And then let's look at the top e-mail.
 7            And is it fair to say this is Ms. Jones' response to
 8   Dr.~Harmison?
 9   A   On March 26th, Ms. Jones responds to Dr.~Harmison and
10   says:  "The wire is in," and --
11   Q   And Inspector Clark, I won't ask you to read the entirety
12   of this e-mail, but just very generally, after that wire, that
13   $180,000 wire and the rest of the things that Ms. Jones talks
14   about, what's she saying to Dr.~Harmison that the cash balance
15   the company is going to have, is going to be?
16   A   After the wire, it's going to be 82,000, and with others
17   in expenses it will be down to about $50,000.
18   Q   In your review of the records, did you see Signalife, in
19   fact, send that $180,000 wire to Mr. Carter?
20   A   I did.
21   Q   And what, if anything, did Mr. Carter do with that money
22   once he received it?
23   A   He forwarded it on to Mitchell Stein.
24   Q   And when you say Mitchell Stein, again, are you
25   short-handing for Five Investments Partnership?
```

```
 1    A    I apologize.  It's the Five Investments Partnership
 2    account controlled by Mitchell Stein.
 3    Q    Let's look back at the bottom of this e-mail, and I'll ask
 4    you, Inspector Clark, anywhere in that e-mail that Mr.~Stein's
 5    copied on, does it indicate that that money, that wire is
 6    destined for Five Investments Partnership?
 7    A    No, it does not.
 8    Q    Or for an account controlled by Mr.~Stein?
 9    A    No, it does not.
10    Q    Now, that wire was on March 26th of 2008; is that right?
11    A    That's correct.
12    Q    For $180,000?
13    A    That's correct.
14    Q    So at the end of the month, the end of March 2008 is just
15    a few days later, right?
16    A    That's correct.
17    Q    Would you tell the members of the jury what Signalife's
18    bank balance at the end of the month, after this wire and some
19    of those other things, was?
20    A    Can I consult my chart here?
21    Q    Absolutely.
22    A    The end of March, on March 31st, the balance was
23    $182,806.77.
24    Q    So about half of what was there before this wire?
25    A    Approximately about half, yes.
```

1  Q   Let's look at another wire to Mr. Carter, Government's

2  exhibit 137, please, already in evidence.  And let's look at

3  the middle e-mail on that page.  And this is already in

4  evidence, and I won't have you read the whole thing, but will

5  you just remind the members of the jury what generally is

6  going on in this e-mail?

7  A   Tracy Jones is e-mailing Lowell Harmison and Mitchell

8  Stein alerting them that she wired out money to Martin Carter.

9  Q   And actually, I did this the wrong way.  If we can look at

10 the beginning of the e-mail exchange, which is at the bottom

11 of that first page and carries over to the second page.  So

12 let's look at the second page.

13        So just fair to say that this is Tracy Jones

14 indicating that she's sending out a -- or been asked to send

15 out a $228,000 wire to M&C Electrical?

16 A   The beginning of this e-mail chain is an April 4th e-mail

17 from Tracy Jones to Lowell Harmison alerting her that (sic)

18 they have enough money to make this wire transfer.

19 Q   So now let's go back to that other e-mail.  I apologize.

20 The middle of the first page.

21 A   So, again, later in the day Tracy's e-mailing Lowell and

22 Mitch now, Mitchell Stein, that she did the wire for $228,000,

23 but she had to break it up over two, because the daily wire

24 limit for the company was only $200,000, so she had to send

25 the second wire of $28,000 the next day.

```
 1    Q    And --
 2    A    And that was a wire to M&C Electric, which, again, is an
 3    account for Martin Carter, a bank account for Martin Carter.
 4    Q    And Inspector Clark, in your review of the records did you
 5    see that happening?
 6    A    I did.
 7    Q    And what, if anything, did Mr. Carter do with that money
 8    once he got it?
 9    A    He forwarded it on to Mitchell Stein.
10    Q    And, again, are we talking about the Five Investments
11    Partnership account?
12    A    Again, we are, yes.
13    Q    All right.  Anywhere in that e-mail exchange does
14    Mr.~Stein indicate or does anyone else indicate, for that
15    matter, that that's money destined for Five Investments
16    Partnership?
17    A    No, nowhere in that e-mail exchange, no.
18    Q    Or for an account controlled by Mr.~Stein?
19    A    Nowhere does it mention Five Investment Partnerships or
20    for the benefit of Mitchell Stein.
21    Q    And just staying in April 2008.  We'll stay there for just
22    another minute.  Does Signalife wire any more money to
23    Mr. Carter in April of 2008?
24    A    Let me just doublecheck my chart here.
25    Q    Please.
```

1    A    April 11th, Signalife wires $78,000 to Martin Carter.

2    Q    And I'll ask you a question that's by now become familiar

3    to you, Inspector Clark.  What does Mr. Carter do with that

4    money once he gets it?

5    A    He forwards it on to Mitchell Stein.

6    Q    All right.  We can take down that exhibit.

7            Up to now, Inspector Clark, we've been talking about

8    what Mr.~Stein was getting.  From your review of the records,

9    were you also able to determine what sorts of things Mr.~Stein

10   was spending money on between 2005 and 2010?

11   A    We were.

12   Q    Let's look at Government's exhibit 260 already admitted

13   into evidence.

14           And while the members of the jury are getting this --

15   their copies of this chart, Inspector Clark, is the

16   information in this chart accurate based on your review of the

17   financial documents in this case?

18   A    It is accurate, yes.

19   Q    Inspector Clark, let's just -- well, and just to be clear,

20   this isn't all the money that Mr.~Stein spent between 2005 and

21   2010, is it?

22   A    No, this is just several selective large categories.

23   Q    Okay.  So will you just walk through the chart?  And let's

24   start with that first line, please.

25   A    He spent $264,563 largely at Executive Car Leasing.

```
 1    Q    And what is Executive Car Leasing?

 2    A    Executive Car Leasing is pretty much exactly as it sounds.

 3    It's a leasing company in Los Angeles that leases cars,

 4    specializing in luxury cars.

 5    Q    Have you reviewed documents from Executive Car Leasing?

 6    A    I have.

 7    Q    And from your review of those documents, do you know what

 8    kind of cars Mr.~Stein was leasing from them during that time

 9    period?

10    A    He was leasing a couple of Mercedes, a VW Phaeton, and a

11    BMW.

12    Q    All right.  So in total, Mr.~Stein paid Executive Car

13    Leasing $264,563 during that time period; is that right?

14    A    That's correct.

15    Q    Let's just walk through the rest of the chart, please.

16    A    There were over $500,000 in credit card payments, there

17    was $101,000 in cash withdrawals, there was $1,553,560 spent

18    paying back debts at casinos, and there was $125,200 paid to

19    Trayton Aviation.

20    Q    And based on your review of the records, what is Trayton

21    Aviation?

22    A    It's a private aircraft leasing company.

23    Q    Pulling up what's been admitted into evidence as

24    Government's exhibit 245, please.  Inspector Clark, is that a

25    plane, based on your review of the record, that was operated
```

1    at any point between '05 to 2010 by Trayton Aviation?

2    A    That is, yes.

3    Q    We can take that down.

4            And just to be clear, Inspector Clark, with respect

5    to Government's exhibit 260, if we could pull that up for a

6    moment, you mentioned earlier that your numbers were

7    conservative numbers; is that right?

8    A    That's correct.

9    Q    So, for example, if Mr.~Stein made a cash withdrawal, no

10   matter how large from his bank accounts, like went to the ATM,

11   for example, you don't have visibility on what that money was

12   spent on, right?

13   A    I have no idea.

14   Q    Did you see cash withdrawals from his accounts during that

15   time period?

16   A    Yeah, over a hundred thousand dollars worth of cash

17   withdrawals.

18   Q    We'll take that down, Mr. Clark, and I want to shift gears

19   and focus a little bit on SEC testimony.

20           Inspector Clark, how many times did Mr.~Stein testify

21   before the SEC?

22   A    Four times.

23   Q    Each time, was he under oath?

24   A    He was under oath.

25   Q    Is it your understanding from your investigation that he

```
 1    also accompanied other people to their testimony before the
 2    SEC?
 3    A    He accompanied several people to their testimony, yes.
 4    Q    Do you remember who any of those individuals newspaper?
 5    A    He accompanied his wife, Tracey Hampton-Stein; he
 6    accompanied Jennifer Black; he accompanied Willie Gault; he
 7    accompanied Martin Carter; he accompanied Rowland Perkins.
 8    Q    And as to Jennifer Black, is she a board member of
 9    Signalife, former board member?
10    A    Jennifer Black is a former board member of Signalife;
11    that's correct.
12    Q    Rowland Perkins is who?
13    A    The former CEO of Signalife.
14    Q    And Willie Gault served in some executive capacity, as
15    well, for Signalife?
16    A    Willie Gault was co-CEO of Signalife with Mr. Perkins.
17    Q    Now, you said Mr.~Stein testified four times.  Just
18    describe for the members of the jury how the timing of his
19    testimony related to the testimony of those individuals that
20    he accompanied to the SEC.
21    A    He testified twice before all those individuals testified.
22    He then -- his last two days of testimony occurred after he
23    had sat in on all of those individuals' testimony.
24    Q    So, for example, he heard what Mr. Carter said to the SEC
25    and then got to testify again; is that right?
```

```
 1    A    That's correct.

 2    Q    When he testified again, did he correct any of what

 3    Mr. Carter said?

 4    A    He did not.

 5    Q    Did he tell the SEC that Mr. Carter had lied?

 6    A    He did not.

 7    Q    Now, just turning back to Mr.~Stein's own SEC testimony,

 8    setting aside Mr. Carter's, let's pull up, again, Government's

 9    exhibit 259.  Again, that shows what Mr.~Stein got from -- for

10    example, from Signalife directly and from Martin Carter; is

11    that right?

12    A    That's correct.

13    Q    So let's listen to what Mr.~Stein told the SEC under oath

14    about what he was getting from the company.

15    A    Okay.

16          MR. STIEGLITZ:  We're going to start with clip

17    number 3, which is a portion of Mr.~Stein's December 17th,

18    2009, testimony, beginning at page 106, line 25, ending at

19    page 107, line 4.  Clip number 3, please.

20          (Audio played.)

21    BY MR. STIEGLITZ:

22    Q    Was that the only time Mr.~Stein claimed he didn't get any

23    money from the company?

24    A    That was not the only time, no.

25          MR. STIEGLITZ:  Let's play clip -- well, this will be
```

```
 1    a portion of that same day's testimony, beginning at page 119,

 2    line 8, ending at page 119, line 14.  Clip number 4, please.

 3              (Audio played.)

 4              MR. STIEGLITZ:  Let's listen to one more clip from

 5    Mr.~Stein's testimony that same day, December 17th, 2009,

 6    beginning at page 191, line 21, ending at page 192, line 1.

 7    Clip five, please.

 8              (Audio played.)

 9    BY MR. STIEGLITZ:

10    Q    Inspector Clark, based on your review of the bank and

11    brokerage records, is Mr.~Stein telling the truth when he

12    denies getting money from Signalife?

13    A    He was lying.

14    Q    Why not -- why was he lying?  Why do you say that?

15    A    Because the records clearly~-- the bank records and the

16    brokerage records clearly indicate that he was receiving

17    millions of dollars from either Signalife directly or from

18    Martin Carter, who had received money from Signalife directly

19    and had -- and was also receiving shares of Signalife that he

20    was selling and forwarding on to Mr.~Stein, as well as Ajay

21    Anand, who forwarded on some money to Mr.~Stein that he

22    generated from Signalife shares.

23    Q    So let's just look back again at Government's exhibit 259,

24    please.

25              Inspector Clark, focusing your attention on the line
```

```
 1   relating to Mr. Anand where he sends $478,600 to Mr.~Stein
 2   between 2005 and 2010, in your review of the records, you
 3   reviewed records, I think you may have said, but remind us
 4   again, did you review Mr. Anand and the Silve Group's records,
 5   as well?
 6   A   Yes, we did.  Yes, I did.  Yes, we did.  Yes, I did.
 7   Q   Did you ever see Mr. Anand sending money to Lowell
 8   Harmison?
 9   A   No, I did not.
10   Q   To Rowland Perkins?
11   A   No, I did not.
12   Q   Pam Bunes?
13   A   No.
14   Q   John Woodbury?
15   A   No money was sent by Mr. Anand to John Woodbury.
16   Q   How about anyone else at Signalife?
17   A   I did not see Mr. Anand send money to anybody else
18   connected to Signalife.
19   Q   What about Martin Carter?  Did he send money to any of
20   those people?
21   A   He did not send money to any of those individuals, no.
22   Q   Setting aside the small amount of money you referred to
23   earlier that Mr. Carter sent to Mr.~Stein's wife, who's the
24   only person associated with Signalife that Martin Carter sent
25   money to?
```

```
 1    A    The Defendant, Mitchell Stein.
 2              MR. STIEGLITZ:  Please answer Mr. Stein --
 3              Well, I'll read them after Mr.~Stein asks you any
 4    questions he has.
 5              THE COURT:  Are you ready to proceed, Mr.~Stein, or
 6    would you like a break?
 7              MR. STEIN:  I can proceed.
 8              THE COURT:  Okay.  Cross-examination.
 9              MR. STEIN:  Thank you.
10                        Cross-examination
11    BY MR. STEIN:
12    Q    Good morning, Mr. Clark.
13    A    Good morning.
14    Q    You are the individual who arrested me at the LA airport
15    in late 2011; is that right?
16    A    That's correct.
17    Q    Mr. Clark, focusing on your area of testimony regarding
18    shares transferred from the company or to Mr. Carter,
19    Mr. Anand, others, focusing on that area of testimony.
20    A    Okay.
21    Q    You're aware that all of those shares were approved and
22    registered under form S-8 with the SEC.  Are you aware of
23    that?
24    A    I am.
25    Q    And you're aware that in order for those shares to be
```

1    sent, a detailed registration statement must be filed and

2    approved by the SEC under form S-8.  Are you aware of that?

3    A   Generally speaking, yes.

4    Q   Generally speaking.  They're all going to be given to the

5    jury, but I'm just generally talking now.

6    A   Yes.

7    Q   And you're aware that the SEC reviews S-8 share plans

8    filed by the company very carefully because of the exact

9    dangers that are being inferred by the Government and stated

10   by the Government; isn't that right?  They review those

11   carefully.

12   A   Mr.~Stein, I have no idea what the SEC does.  I don't work

13   for them.  I've never worked with them.  I have no idea.  I'm

14   guessing with the millions of filings they get, I doubt they

15   review every single one of them carefully.

16   Q   So they might not review S-8 share plans care -- just

17   wouldn't know?

18   A   I have no idea.

19   Q   That's fair.

20          But you do know what S-8 stock plans are, and all of

21   these shares transferred to Mr. Carter, Mr. Anand, were S-8

22   approved shares by the SEC.  Is that what you found?

23   A   They were all legally traded shares, yes.

24   Q   Now, we've been focusing on the area of 2005 through 2010

25   basically; is that right?

 1    A    That's correct.

 2    Q    And then more particularly, and I'll go into this in

 3    detail with you, 2007 and 2008 is something you very closely

 4    looked at; is that right?

 5    A    That's correct.

 6    Q    During this same time, the company was making detailed S-8

 7    filings with the SEC.  Are you aware of that?

 8    A    Generally speaking, yes.

 9    Q    Have you reviewed each one of those S-8 filings and what

10    was disclosed to the SEC with regard to each one of those

11    filings?

12    A    Not in too much detail, no.

13    Q    But this is an important matter.  I mean, you've looked at

14    disclosures on the board regarding the company, and you have a

15    broad investigatory power, it appears.  Why didn't you go and

16    carefully review form S-8s filed by the company and available

17    to the public just as if you would a 10-Q or a 10-K?  Is there

18    a reason?

19    A    It didn't do -- it wasn't relevant to my investigation.

20    Q    Let me -- I'm going to go beyond the 2005-2010 area, but

21    I'm also focused on that area.

22    A    Okay.

23    Q    In the end.

24         Are you aware and have you reviewed a March 2003 S-8

25    registration filing with the SEC that will be shown to the

```
 1    jury and will be admitted, stipulated admitted, for 500,000

 2    shares registered by the company with the SEC?  Have you

 3    reviewed that one?

 4    A   I couldn't tell you off the top of my head.

 5    Q   Are you familiar with any of the disclosures or language

 6    in those S-8 filings, in that 2003 filing?

 7    A   In that 2003 filing?

 8    Q   Yes.

 9    A   I'm not familiar at all.

10        I mean, that was 2003.

11    Q   I understand.

12    A   That was long before the investigation, the focus of the

13    investigation.

14    Q   And I'll be getting into -- I appreciate that.

15    A   Okay.

16    Q   I'm just trying to go chronologically.

17        Did you review the September 2006 S-8 filing by the

18    company for 480,547 S-8 shares to be approved for issuance to

19    consultants by the SEC?

20    A   Again, I probably did, but it wasn't something that was of

21    all that import to me, so I can't tell you right now what was

22    there and whether I reviewed it.

23    Q   Did you generally become aware -- since you're saying you

24    don't -- haven't reviewed these --

25    A   That's not what I'm saying.  I'm saying I probably did.  I
```

```
 1    reviewed thousands and thousands of pieces of paper, many of
 2    which were of not too much investigatory interest, including
 3    the documents that you're suggesting.
 4    Q   So the disclosures in the --
 5    A   Talking about.
 6    Q   I'm sorry.  I didn't mean to interrupt you.
 7    A   The documents you're talking about, not suggesting.  I
 8    apologize.
 9    Q   Thank you.
10          So the disclosures made to the public and then
11    approved by the SEC in the S-8 filings, you didn't feel had a
12    lot of investigatory power as compared to a 10-Q or 10-K is
13    that generally --
14    A   I'll say this.  And I'm pretty confident in this.  No
15    security -- no filing with the SEC revealed the transfer of
16    funds from Martin Carter or Ajay Anand to you.
17    Q   And are you aware under the securities laws of whether or
18    not, under form S-8, any such transactions after the shares go
19    to the consultant, must be disclosed to the SEC under form
20    S-8?  Are you aware of the law in that arena?
21    A   That's -- there's a lot in that question.  Am I aware of
22    the law generally?  Yes.
23    Q   Are you aware that the law provides for no restriction
24    after the shareholder gets the shares for his services on what
25    he can do with the money in order to be approved by the SEC?
```

1    Are you aware that that's the case?

2    A    So once a shareholder gets his shares and converts it into

3    money, he has no -- just so I'm clear on your question, he has

4    no obligation to the SEC?

5    Q    No.  I'm saying that in order for the shares to be

6    approved under S-8 for issuance by the board of directors to

7    employees and consultants, there's no requirement that the

8    people that might be getting the shares predict to the SEC who

9    they're going to spend the money on that they're paid, right?

10   A    That's correct, yes.

11   Q    Okay.  All right.  So going through -- but there are --

12   these S-8 filings are not two pages.  They're lengthy, right?

13   A    They're not as long as a 10-K, but, yeah, they're lengthy.

14   Q    10-Ks are very long, and registration statements are very

15   long like this, right (indicating)?

16   A    That's a thick document.

17   Q    Yeah.  And this is -- I'll just represent to you this is

18   Defendant's 323, the SB2 registration statement -- we'll be

19   talking about this in detail -- filed with the SEC and

20   approved by the SEC.

21        Did you review this document, by the way, in

22   connection with your investigation, exhibit 323?

23   A    Again, what S-8 is that?

24        MR. STEIN:  I'm sorry.  Can I approach, Your Honor?

25        THE COURT:  Yes.

```
 1              THE WITNESS:  The SB2, no, I did not review that.
 2   BY MR. STEIN:
 3   Q   Well, I was going to continue on with the S-8, but given
 4   that this is already in evidence and you indicated you didn't
 5   review it --
 6              THE COURT:  What exhibit is that?  323?
 7              MR. STEIN:  I'm sorry, Your Honor, it's 323, which
 8   is --
 9              THE COURT:  It's in evidence, yes.
10              MR. STEIN:  Thank you.
11              Can you please publish 323?
12   BY MR. STEIN:
13   Q   Mr. Clark, can you -- this SB2, which is in evidence, just
14   review the section entitled "Selling Shareholders," which --
15   and then stop at the chart.
16              THE COURT:  What page is that, for the record, in the
17   exhibit?
18              MR. STEIN:  When Mr. Woodbury filed it, all these
19   pages had number marks on the bottom, but it's -- but it's on
20   file with the SEC.  He just forgot to paginate it, I guess.
21              THE COURT:  All right.
22   BY MR. STEIN:
23   Q   But it's the section entitled, selling shareholders.  Can
24   you just read that aloud?
25   A   "The following tables set forth the total number of common
```

1    shares beneficially owned or acquired by each of the selling

2    shareholders as of June 13th, 2005.  The total number of

3    common shares they may sell under this prospectus and the

4    number of common shares they will own thereafter, assuming the

5    sale of all shares offered under this prospectus" -- moving on

6    to page 2 -- "and further assuming no other acquisitions or

7    dispositions of common shares.

8         "The number and percentage of shares beneficially

9    owned is determined in accordance with Rule 13d-3 and 13d-5 of

10   the Exchange Act, which calculates ownership based solely upon

11   the sole or shared voting power or investment power, and the

12   information is not necessarily indicative of beneficial

13   ownership or any other purpose, including the determination of

14   direct or indirect pecuniary ownership.  See footnote 1 to

15   this table.

16        "We believe that each individual or entity named has

17   sole investment and voting power with respect to the

18   securities indicated as beneficially owned by them, subject to

19   community property laws, where applicable, except where

20   otherwise noted.

21        "The selling shareholders are in no obligation to

22   sell all or any portion of the common shares offered for sale

23   under this prospectus.  The total number of common shares sold

24   under this prospectus may be adjusted to reflect adjustments

25   due to stock dividends, stock distributions, splits,

```
 1    combinations, recapitalizations or the triggering of standard

 2    weighted-average and other anti-dilution protective

 3    provisions.

 4          "Unless otherwise stated below, to our knowledge, no

 5    selling shareholder nor any of affiliate of such shareholder

 6    has held position or office with, been employed by or

 7    otherwise has had any material relationship with us or our

 8    affiliates during the three years prior to the date of this

 9    prospectus.  To our knowledge, none of the selling

10    shareholders are a broker-dealer or an affiliate of a

11    broker-dealer within the meaning of SEC Rule 405."

12    Q    Okay.  Who are the selling shareholders in the table below

13    under this exhibit 323, the SB2 approved by the SEC?

14    A    In 2005, the selling shareholders were ARC Finance Group,

15    LLC.

16    Q    How much were they authorized to sell?

17    A    They were authorized to sell 3,000,500 shares.

18    Q    Did they ever sell any more than that, to your knowledge?

19    A    Toy my knowledge, I don't think so.

20    Q    And that includes your analysis of the ARC Blind Trust,

21    the various blind trusts you're referencing, right?

22          THE COURT:  Mr.~Stein, can you get near the

23    microphone, please?

24          MR. STEIN:  I'm sorry, Your Honor.

25    BY MR. STEIN:
```

1   Q   When you say your investigation reveals that ARC didn't

2   sell more than they're entitled to under this plan, that

3   includes your analysis of all these blind trusts that were

4   formed by ARC; is that right?

5   A   That's correct, yes.

6   Q   Who else was entitled to sell shares under this SB2?

7   A   Trellus Partners.

8   Q   Did you investigate who Trellus Partners was at any point

9   in your investigation?

10  A   No, not really.  This was 2005, this was sort of pre our

11  investigation.

12  Q   When you were going through the filings --

13  A   Well, I told you -- I actually told you I didn't look at

14  this filing, but in any event.

15  Q   Okay.

16  A   So this is the very first time that I looked at this

17  filing.  But I'll continue.

18  Q   You were making an inference, and we'll go into it

19  specifically in your charts, that the sale of shares by ARC

20  Finance Group or the blind trust was somehow not disclosed to

21  the market or wrongful.  Do you remember that testimony?

22  A   Yeah, I do remember vaguely that testimony.  I'm not

23  exactly -- we'll have to go back and look at it, but I don't

24  think it was exactly that.  But I think what I was testifying

25  to was that you were the beneficiary of the THS Blind Trust.

```
 1   Q   Right.

 2           And the THS Blind Trust, the owner and settlor of

 3   that trust, meaning the person who formed it, was ARC Finance

 4   Group; is that right?

 5   A   That's correct.

 6   Q   And out of the blind trust that you've evaluated, no more

 7   than three and a half million shares was sold ever in the

 8   history of the company; is that correct?

 9   A   I'm not going to say ever, but I don't recall there being

10   more shares sold.

11   Q   I understand, and I apologize.  You did say you didn't

12   review this document.

13           Do you remember reviewing any documents suggesting

14   that Trellus Partners invested $7 million into Signalife prior

15   to this registration statement?

16   A   Do I remember it?  I remember that being a fact in the

17   investigation.  I don't remember exactly where that came from,

18   because it, again, was not of much import to me.

19   Q   Did you ever speak to anyone at Trellus Partners regarding

20   that investment?

21   A   No, I did not.

22   Q   Did you ever speak to a man named Adam Usdan?

23   A   No, I did not.

24   Q   Did you ever learn that Trellus Partners invested money

25   into Signalife because they had previously invested money in
```

```
 1   other of my companies successfully?

 2   A   No.  Again, I didn't speak to Adam Usdan, so I don't know

 3   why he invested in Signalife.

 4   Q   But you know they did invest $7 million?

 5   A   It was something that was -- tangentially, it came up in

 6   the investigation.  It wasn't of much import, so I can't get

 7   into too much detail with you because I don't know.

 8   Q   And I don't want you to say anything you don't know.

 9   A   Sure.

10   Q   The plane, the jet that was put on the board, during your

11   investigation you evaluated expenses paid relating to that

12   jet, right?  You've gone over some of them this morning.

13   A   There was a line of expenses, yeah.

14   Q   Do you know whether or not the company, Signalife, used

15   that jet to fly to New York to meet with Trellus Partners to

16   close the $7 million financing?

17   A   I couldn't tell you which jet, but I do know from my

18   investigation that you went to New York to meet with people to

19   get financing.  I don't know who you met with exactly, I don't

20   know what you did, and I don't know what plane you flew on.

21   So if you're saying you flew on that plane, okay.

22   Q   Did that plane stop -- from your investigation, I didn't

23   know you had that much information.  Did that plane stop in

24   South Carolina to pick up officers of Signalife to come with

25   me to the investor?  Do you know that?
```

```
1    A    I didn't review flight records.  I knew you went to New

2    York, as I said.  So I don't know what plane you flew on.  I

3    didn't review flight records.  I knew you went to New York to

4    meet with people to get financing for the company.  It was

5    something that came up in the investigation, but it wasn't

6    something that required me to go and review flight records for

7    specific planes.  So I don't know if you stopped in South

8    Carolina or not.

9    Q    Do you know whether any of the money that you've shown

10   that was paid back to either me or Trayton Aviation was a

11   reimbursement for the plane flight to Greenville or to New

12   York?  Did you review any records pertaining to that?

13   A    I have no idea.

14   Q    The next person selling shareholder is Laguntas Partners.

15   Did that name come up in your investigation?

16   A    No, actually, that name I'm not familiar with.

17   Q    Neither am I.

18        The next investor's name is Gruber and McBaine

19   Investment.  You remember that name, right?

20   A    I've seen the name before, yes.

21   Q    They're a large investment firm on the west coast; is that

22   right?

23   A    They're in San Francisco, yeah.

24   Q    Yeah.  And they also invested at the same time millions of

25   dollars into Signalife, which is what caused this SB2 to be
```

```
 1    filed.  They wanted their shares registered for sale, right?
 2    A    Okay.
 3    Q    Is that accurate?
 4    A    I have no idea.  I didn't review this document.  I didn't
 5    talk to Gruber McBaine.  I don't know, but that's what it
 6    says.
 7    Q    With regard to the shares that you're showing on the
 8    board, which we're going to go into each exhibit in detail,
 9    did you track whether or not the company continued to update
10    this SB2, as required, into the period of your investigation?
11    This is 2005.  Do you know whether the company ever filed
12    another SB2?
13    A    I don't know.
14    Q    Do you know whether the company filed three more SB2s?
15    A    Probably did.
16    Q    And do you remember that they were all approved by the
17    SEC?
18    A    Again, I don't know what the SEC does.  I'm going to opine
19    and say that the SEC probably does not review every single
20    document that gets filed with them.  They're there for the
21    public.  The public has an opportunity, if they're interested,
22    to download those documents and review the information in
23    them.  The SEC doesn't, I don't believe, but I don't know,
24    review every single document.  The volume would be too large,
25    is too large.  I'm guessing.  I don't work there.
```

```
 1    Q    I understand.
 2         Have you ever heard of the phrase with regard -- you
 3    do know what an SB2 is, though?
 4    A    Generally speaking.  I mean, it's not something that I pay
 5    too much attention.
 6    Q    It's a registration for selling shares.
 7    A    Okay.
 8    Q    Are you familiar with the phrase "going effective?"
 9    A    No.
10    Q    Is there anything that I could give you that would refresh
11    your recollection about the phrase "going effective" in
12    relation to an SB2?
13    A    Probably not.
14    Q    Are you aware of a document that the SEC files post the
15    SB2 that says the registration statement is effective?  Are
16    you aware of just that process?  You either are or you aren't.
17    A    I'm not.
18    Q    Let's go down to the next person on the selling
19    shareholder list, J. Patterson McBaine.  Do you remember that
20    name coming up in your investigation as to any shares they
21    bought or sold in any way, shape or form during your
22    investigation?
23    A    No.
24    Q    And the last one at the bottom says John D. Gruber.  You
25    can read it.  If it didn't come up in your investigation --
```

```
 1    A    The name John D. Gruber and Linda W. Gruber did not come

 2    up in my investigation.

 3    Q    Are you aware during your investigation of any of the

 4    trading by anybody other than ARC Finance Group, when we've

 5    already discussed in detail both on direct and cross, but

 6    anybody else, are you aware of their trading patterns with

 7    regard to Signalife?  Did you investigate any of that?

 8    A    No, not in any real detail, no.

 9              I investigated Martin Carter and Ajay Anand's trading

10    patterns, but I've testified to that.

11              THE COURT:  Why don't we take a recess for 15

12    minutes.

13              Ladies and gentlemen, let's take a morning recess.

14    Please don't discuss the case, form any opinions, leave

15    everything, and we'll see you in about 15 minutes.  Thank you.

16        (The jury exits the courtroom.)

17              THE COURT:  If you could step down, sir, and don't

18    discuss your testimony during the break.

19              THE WITNESS:  Sure.

20              THE COURT:  We'll see you in about 15 minutes.  Thank

21    you.

22              Do you want ask me something?  You looked like you

23    had something.

24              MR. STEIN:  No, I didn't.

25              Thank you, Your Honor.
```

```
 1          (A recess was taken from 10:31 a.m. to 10:48 a.m., after
 2     which the following proceedings were had:)
 3               THE COURT:  All right.  Welcome back.  We're back on
 4     the record.
 5               You ready, Mr.~Stein?
 6               MR. STEIN:  Yes, Your Honor.
 7               THE COURT:  Let's bring the witness back.
 8               You're still under oath.
 9               THE WITNESS:  Yes.
10               THE COURT:  Let's bring the jurors.
11          (The jury enters the courtroom, after which the following
12     proceedings were had:)
13               THE COURT:  Welcome back, everyone.  Please be
14     seated.
15               Mr.~Stein, you may continue.
16               MR. STEIN:  Thank you, Your Honor.
17     BY MR. STEIN:
18     Q   I'm going to place back on the screen Exhibit 323, the
19     2005 SB2.  Go to the next page entitled, plan of distribution.
20               Mr. Clark, at the time of conducting your
21     investigation into me, were you aware that SB2s not only
22     contain disclosures about what shareholders could sell what,
23     but also regarding how they could sell it?  Are you aware
24     generally that that's what an SB2 is?
25     A   I'm not comfortable saying that, because I really have
```

```
 1   never really paid attention to SB2s.
 2   Q   Did any -- is it the policy of your department at the
 3   postal inspectors to not pay attention to SB2s, or is it just
 4   something that you individually feel is not relevant to an
 5   investigation like this one?  I understand every
 6   investigation's different.
 7   A   The Postal Inspection Service has no policy on what we
 8   review, in particular no policy on SB2s.
 9         When I was investigating you, I didn't feel it was
10   relevant because it was before the date of our investigation,
11   and the evidence that I collected regarding your misconduct
12   had nothing to do with what's in this SB2, period.
13   Q   Well, some of the misconduct you testified about was
14   regarding ARC Finance Group and the blind trust's sale into
15   the market; is that right?
16   A   I don't think I testified about ARC Finance Group.  I
17   testified about THS Blind Trust.  I understand THS Blind Trust
18   got its shares from the ARC Finance Group, but I testified
19   about THS Blind Trust, which you were the beneficiary of.
20   Q   I understand that.
21         And in connection with that investigation, a trust
22   that was formed by ARC Finance Group, you did not feel at any
23   time that it was necessary to review the SB2 regarding those
24   exact shares that were put into that blind trust, is that an
25   accurate portrayal of what happened?
```

1    A   Well, I had seen other SEC filings that had falsehoods in

2    them, so I wasn't really relying upon what was filed with the

3    SEC.

4    Q   On the next page under plan of distribution it says in the

5    SB2, exhibit 323, plan of distribution on the board -- and I

6    apologize for not having copies for the jury, but I'm only one

7    person.

8            "Each selling shareholder and each of their

9    respective donees, transferees, pledgees or other

10   successors-in-interest, to the extent permitted under this

11   plan of distribution as described below, may from time to time

12   sell any or all of their common shares offered for sale under

13   this prospectus on AMEX or any other exchange, market or

14   trading facility on which the shares are traded or in private

15   transactions."

16           Did you understand this language, did you understand

17   that to be an approval -- back in 2005 -- and I grant it's

18   before the time of your investigation.  Did you understand

19   this to be an approval of the SEC as I've just read it back in

20   2005, or did you not investigate --

21   A   Mr.~Stein, I think we've said many times, I've said many

22   times I have no idea, none.  And I am happy to offer an

23   opinion, if you want, what the SEC does with these filings --

24   I've also told you many times I have not read this document.

25   This is the first time I'm reading this, so I -- "did" is not

```
 1   the right word to use.  Do I understand that?  I don't know.
 2   I didn't understand anything about this document ever, because
 3   I didn't review it.
 4   Q   But as you read it today do you understand it?
 5   A   The language is fairly self-explanatory, sure.
 6   Q   The language says the shareholders can sell in various
 7   different ways, through transferees, pledgees.  We just read
 8   it, right?
 9   A   Yeah, you just read it, yes.
10   Q   Then it goes on.  It says:  "These sales may be at fixed
11   or negotiated prices.  A selling shareholder may use any one
12   or more of the following methods when selling shares:
13           "Ordinary brokerage transactions and transactions in
14   which the broker solicits purchasers."
15           You're aware that Mark Nevdahl is a broker, right?
16   A   Yes, I am.
17   Q   "One or more block trades in which the broker or dealer so
18   engaged will attempt to sell the shares as agent but may
19   position and resell a portion of the block as principal to
20   facilitate the transaction."
21           You're familiar with brokers and block trades; is
22   that right?
23   A   I'm familiar with brokers.  I'm not familiar with block
24   trades.
25   Q   So a block trade of 50,000 or a hundred thousand shares to
```

1    Ajay Anand, you don't know whether or not that was being

2    approved in this SB2?

3    A    I have -- okay.  Again, I didn't review this SB2, so I

4    don't know.

5    Q    I'm talking about approved by the SEC in this SB2.

6    A    And, again, I have no idea what the SEC approves or

7    doesn't approve.  And, again, I'm willing to apine (sic) if

8    you want.

9    Q    Have you ever worked at the SEC?

10   A    I think I have answered that.  No, I have not.  Never.  I

11   have never worked at the SEC.

12   Q    I apologize for cutting you off.

13        The next method of distribution is "purchases by a

14   broker or dealer as principal and resale by the broker or

15   dealer for its account."

16        The next says "in privately negotiated transaction."

17        The next says "an exchange of distribution in

18   accordance with the rules of an exchange."

19        The next is "through the writing of options on the

20   shares."

21        The next is "through underwriters, brokers or dealers

22   who may act as agents or principals to one or more

23   purchasers."

24        And I'd like you to focus that one.  I'm going to

25   read it again.  "Through underwriters, brokers or dealers who

1    may act as agents or principals or directly to one or more

2    purchasers."

3           Mr. Nevdahl was, as we discussed, a broker, right?

4    A    Yes.

5    Q    And with regard to the trusts that were set up, he was on

6    paper, on the trusts you reviewed and spoke about, I think the

7    THS trust, is that what it was called?

8    A    That's what we talked about, yeah.

9    Q    He was acting as the trustee on paper, right?

10   A    On paper, yeah.

11   Q    So he would be considered on paper a principal or an

12   affiliate, right?

13   A    Sure.

14   Q    The next authorized method of sale is through agents.

15          And then the last one is any combination of these

16   methods.

17          And we're clear that you did not review any SB2s in

18   connection with your investigation; is that right?

19   A    I may or may not have.  Again, I don't remember reviewing

20   this one.  In fact, I'm pretty sure I didn't, because this was

21   predating my investigation.  And, well, I guess it was right

22   at the beginning of my investigation, but it was predating a

23   lot of conduct that I was interested in.

24          Moreover, I wasn't relying upon SEC~-- the truths in

25   these SEC documents, because I had seen falsehoods in others.

```
 1   Q   Let's finish up with this SB2 with that point you just
 2   made, which I think is very -- is truthful and a salient
 3   point.
 4           The three and a half million shares that are approved
 5   in this SB2 were approved before anybody filed any press
 6   release that you're complaining about here; isn't that right?
 7   A   I'm not complaining about anything.  I didn't invest in
 8   Signalife.  I'm just invest -- I just investigated what
 9   happened.
10   Q   The three and a half million shares were, isn't it true,
11   approved for sale before any of the press releases which you
12   have spoken about today; is that right?
13   A   That's correct, yeah.
14   Q   And so would it be safe to assume that at the time those
15   press releases were not moving the market in any way because
16   they hadn't been issued until two years later, at the time of
17   this SB2?
18   A   Those press releases that were issued in 2007 --
19   Q   Could not move the market in 2005, right?
20   A   -- I'm going to venture a guess had nothing to do with the
21   market in 2005.
22   Q   Okay.  So these shares were approved, and they were
23   approved before any press release that you have testified
24   about in this courtroom; is that right?
25   A   That's correct.
```

1    Q   And the approval of these shares for sale under what we

2    just read in 2005 was at a stock price over three dollars; is

3    that right?

4    A   I have no idea.

5    Q   Do you believe in 2005 -- did you ever evaluate the stock

6    price from 2005 to 2010, or was it just in 2007 and 2008?

7    A   I didn't evaluate the stock price in all that much

8    significance at any point.

9    Q   Okay.  That's fair.

10        But you're aware now -- I understand you didn't

11   review this before -- that any of these selling shareholders

12   that were mentioned, could have sold all of their shares under

13   this registration statement in 2005?

14   A   Mr.~Stein, there were falsehoods in these SEC filings.  I

15   don't know if there's falsehoods in this SEC filing.  I'm not

16   aware of anything that you just said.

17   Q   Well, I just -- I'm not going to read it again.  So you're

18   not aware that any of these shareholders could sell some or

19   all of their shares in -- back in 2005?

20   A   A lot of this is words on paper that I didn't create, I

21   didn't really review in detail, and I didn't investigate.

22   I've seen falsehoods in other SEC filings related to

23   Signalife.  I put little stock in what's publicly available on

24   the SEC website regarding your company.

25        So I'm not going to say I'm aware of anything like

```
 1    you just suggested today.
 2    Q    And you put little stock in these filings, as well,
 3    because you indicated you don't even know if the SEC has time
 4    to review all these filings, right?
 5    A    I put little stock in these filings because there are
 6    falsehoods in other filings which gives me pause about who's
 7    behind them and the company that they're talking about.
 8    Q    We're going to get into those alleged falsehoods in 2007.
 9    A    Good.  I'm looking forward to it.
10    Q    But you never looked into the 2005 disclosures to
11    determine whether they were false or not; is that right?
12    A    I have no idea if they were false or not.
13    Q    Okay.  But you know that the 2007 disclosures were false;
14    is that right?
15    A    The evidence that I gathered would lead me to believe that
16    they were, but I'm not sitting in judgment of you or of those
17    filings.
18    Q    Well, I don't want to generally go into them, because
19    we're going to go specifically into them.
20    A    Okay.
21    Q    I don't want to take up too much time going over
22    generalities.
23          Before I made the mistake of picking up this
24    document, starting to ask you questions about it, exhibit 323,
25    we were talking about S-8 shares issued by the company to
```

```
 1   consultants and employees.  Do you remember that generally?

 2   A   Generally, yes.

 3   Q   In your investigation, did you become aware that in 2006,

 4   the Securities and Exchange Commission approved for the

 5   issuance by the board of the company in its discretion of, in

 6   September of 2006, of 480,547 shares?  Did you become aware of

 7   that at any time?

 8   A   I may or may not have.  It wasn't a significant event in

 9   my investigation, if it's true.

10   Q   It wasn't significant because it was prior to the time

11   that you were focusing on?

12   A   I mean, that was part of the time we were focusing on, but

13   it wasn't significant because it didn't really matter to me

14   what was in these S-8 filings.

15   Q   But they've all been stipulated into, and you've been in

16   the courtroom for the entire trial, they've all been

17   stipulated into evidence in this matter, all of the public

18   filings; is that right?

19   A   I didn't stipulate to them.  I've been in the courtroom.

20   I think many of them were stipulated into.  I don't know what

21   all was stipulated into.  That's . . .

22   Q   So some of the filings that you didn't review in your

23   investigation the jury's going to be asked to review possibly

24   in their deliberations; is that possible?

25            MR. STIEGLITZ:  Your Honor --
```

```
 1            THE COURT:  Sustained.
 2   BY MR. STEIN:
 3   Q   You didn't review the SB2, and if the jury reviews it,
 4   they're reviewing something --
 5            MR. STIEGLITZ:  Same objection as to if the jury's
 6   reviewing things.
 7            THE COURT:  Mr.~Stein, what's the question?  I don't
 8   understand the question.
 9            MR. STEIN:  There's no question, Your Honor.  I'll
10   withdraw the question.
11   BY MR. STEIN:
12   Q   Are you aware that in November of 2006, the SEC approved
13   the issuance of 2,528,792 consulting and employee shares, S-8
14   shares, for distribution?  Are you aware of that?
15   A   Again, I'm going to have to say the same thing I said
16   before.  I may or may not be.  I don't know.  If you want to
17   show me a document.
18   Q   Are you aware that in 2006, as well, the Securities and
19   Exchange Commission approved the distribution under S-8 of
20   9,682,706 shares?
21   A   I don't think the SEC approved or disapproved of anything.
22   I think that's probably what the filing suggested, but I don't
23   think the SEC approved, and I am not aware, again, of what the
24   SEC approves of or disapproves of.
25   Q   I understand.
```

```
 1   A    Other than falsehoods in the filings, but that's usually
 2   after the fact.
 3           Anyway, sorry.
 4   Q    You're saying the SEC approves or disapproves of
 5   falsehoods after the -- I don't understand.
 6   A    I think they approve of falsehoods in the filings.
 7   Q    Okay.
 8           Are you aware that in May of 2008, now we're in
 9   directly in the period of your investigation, right?  May of
10   2008 is the core period?
11   A    Sure, it's right there, yeah.
12   Q    That an S-8 plan was approved by the SEC for the issuance
13   of 5,667,334 shares of S-8 stock?  Are you aware of that as
14   you sit here today?
15   A    Maybe.  I don't -- I can't answer that conclusively.
16   Q    This is May of 2008, the core of your investigation.
17   Let's move forward now to August of 2008.  Would it be safe to
18   assume that's also a core period of the investigation?
19   A    It's a core period of the investigation.
20   Q    Are you aware that in August of 2008, the Securities and
21   Exchange Commission reviewed and approved an S-8 plan for
22   9,479,074 shares to be paid to consultants and employees of
23   the company?  Are you aware of that as you sit here today?
24   A    I am not aware of what the SEC approved or reviewed.
25   Q    How about in November of 2008?  Are you aware that even as
```

1   of that date, the SEC approved of the issuance of an

2   additional 1,002,181 shares issuable to consultants and

3   employees at the direction of the board of the company?  Are

4   you aware of that?

5   A   I'm unaware of what the SEC approved of in November 2008.

6   Q   This is all the ones that I'm aware of that I just pulled

7   up.

8            Are you aware that from the period -- periods that we

9   mentioned, 2006 through 2008, that the SEC approved S-8 plans

10  for the issuance of 29,340,634 shares by the board of the

11  company to its consultants and to its employees?  Are you

12  aware of that total number?

13  A   I'm not aware of that total number..

14  Q   Did you ever do a comparison between -- you did know that

15  all the shares that you were reviewing were S-8 shares, right?

16  A   Freely trading shares?

17  Q   Right, S-8 freely trading shares.

18  A   Freely trading shares, the ones that Martin Carter and

19  Ajay Anand were selling?

20  Q   Yes.

21  A   Yes.

22  Q   You were generally aware --

23  A   I was aware they were freely trading, yes.

24  Q   Freely trading just means the restriction has been lifted.

25  A   The restriction has been lifted.

```
 1   Q    The restriction has been lifted through something, and in
 2   this case S-8, right?
 3   A    Yes.
 4   Q    Did you ever do an evaluation during your investigation of
 5   me of the comparison of the number of shares the company was
 6   authorized to pay its consultants and employees versus the
 7   number of shares it actually paid its consultants and
 8   employees?  Did you ever do that analysis?
 9   A    No, I did not.
10   Q    You were aware from your investigation, I think you've
11   already testified that in 2005, the date of the SB2 we looked
12   at, exhibit 323, the company raised a lot of money.
13   A    I didn't -- what I said was that you went to New York to
14   raise money, and I was generally aware that there might have
15   been something that happened, but it's not something that I
16   can sit here and conclusively testify to and how much was
17   raised.
18   Q    But you knew that money was invested at some point in
19   2005.  You generally knew that?
20   A    Generally, yeah.
21   Q    And you knew from your investigation that the main
22   operations of the company were in Greenville at that time.
23   They had moved to Greenville, South Carolina.  You knew that,
24   right?
25   A    The headquarters had moved to Greenville when the company
```

1    hired Pam Bunes.  I'm not sure -- through my investigation,

2    I'm not sure really where the main operations were, but there

3    were people in Greenville, South Carolina, and it was

4    nominally listed as a headquarters, sure.

5    Q    Did you ever interview during your investigation any -- a

6    woman by the name of Jane Greene?

7    A    I have interviewed Ms. Greene.

8    Q    And you interviewed Ms. Greene after I served her with a

9    subpoena to appear in this trial; is that right?

10   A    I interviewed her after she was listed as a potential

11   Defense witness, yes.

12   Q    You never talked to her before that during your

13   investigation, you just talked to her after you saw her on the

14   witness list, right?

15   A    That's correct.

16   Q    Are you aware from your investigation one way or the other

17   whether the company raised any other money after 2005, any

18   other financings?  Are you aware of that?

19   A    I know the company had money to pay some of its bills and

20   to pass on to Mr. Carter and you.  I don't know exactly where

21   the money came from.  I don't know if it raised money or if it

22   was money that had already been raised.

23   Q    Well, you were aware that there was a lot of stock being

24   issued.  I mean, that's --

25   A    Yeah, there was a lot of stock being issued.

```
1    Q    And you're aware it was free trading stock.

2         Did you ever during your investigation evaluate why

3    the company was issuing free trading stock as opposed to cash

4    to pay its consultants?

5    A    Did I ever -- can you repeat the question?

6    Q    I'm sorry.

7    A    I'm sorry.  It was probably clear.  I might have gotten

8    lost in it.  Go ahead.

9    Q    It was probably my fault.

10        Did you ever evaluate during the investigation period

11   2006 through 2009 why the company was paying consultants and

12   employees in stock as opposed to in cash?

13   A    I didn't evaluate.  I was told in the course of my

14   investigation by different witnesses that the company was

15   running out of money and didn't have enough cash to pay

16   people, so it was starting to pay people in shares.

17   Q    Did you evaluate the operations in Greenville, South

18   Carolina and who was in control of those operations and the

19   money that was spent in connection with those operations?  I'm

20   only talking about Greenville, which would be the period of

21   2005 through I believe, you agree with me, the middle to end

22   of 2007?

23   A    There was no independent evaluation of Greenville, South

24   Carolina.

25   Q    And the money that they were spending in Greenville.  You
```

```
 1    did no evaluation of that?

 2    A    Separated out from the rest of the company?  No.

 3    Q    Yes.

 4              Neither did I.

 5              But at some point we both agree that we had heard

 6    that the company had run out of money or was running out of

 7    money?

 8    A    Yes.

 9    Q    Okay.  And way back in 2003, and then in 2006 and 2008,

10    I've told you that the company planned for that by --

11              MR. STIEGLITZ:  Objection.

12              THE COURT:  Sustained.  You can't tell us what --

13    you're not testifying now, Mr.~Stein.

14              MR. STEIN:  I apologize, Your Honor.

15    BY MR. STEIN:

16    Q    You understood the company had S-8 stock, free trading

17    stock available for issuance from years prior to the issuance

18    of these press releases, right?

19    A    It's not something that was consciously evaluated, so I'm

20    guessing the answer is yes.  I don't know.

21              MR. STEIN:  May I approach, Your Honor?

22              THE COURT:  Yes.

23              MR. STEIN:  Thank you.

24    BY MR. STEIN:

25    Q    Sir, have you seen exhibit 86 before?  And I'm just
```

1   focusing on the first couple of pages.

2   A   Yeah, this is familiar to me.

3   Q   This is at the core of your investigatory period, May of

4   2008.  We've already talked about that, right?

5   A   Yeah, it was -- I mean, that's certainly in the time

6   period that . . .

7   Q   And you have no reason to doubt the authenticity of this

8   exhibit; is that right?

9   A   I have no reason to doubt it at this time.

10  Q   It's in evidence.

11          Can you turn to page 2 of it.

12          This is already in evidence and is a communication

13  from Mr. Nevdahl to Mr. Woodbury of ARC and its affiliates and

14  what they held as of May of 2008.  You see the number 19057000

15  shares on the second paragraph?

16  A   Yes, I do.

17  Q   Was that statement accurate from your investigation?

18  A   You know what, I don't remember at this time whether it

19  was accurate.  It might have been.  I remember there was some

20  discussion with Mr. Nevdahl about this, so I honestly -- I'd

21  have to review the interview.

22  Q   Was this in the ballpark of the amount of shares?

23  A   Well, it's not~-- the shares, I have no idea what the

24  number of shares is right now.  I'm more focused on whether --

25  or having voting power -- yeah, ARC Finance Group had voting

```
 1    power.  It was the controlling -- held the largest number of
 2    shares of Signalife.
 3    Q    It could revoke those blind trusts at any time, right?
 4    A    I don't know.  I don't know.
 5    Q    Have you reviewed the blind trust agreements --
 6    A    I have not reviewed the blind trust agreement, and if you
 7    want to give it to me, I'll review it.
 8    Q    I will be giving it to you.  I just want to know if you
 9    remember whether --
10    A    I don't have it memorized.
11    Q    -- these are irrevocable instruments.
12    A    I don't have it memorized.
13            THE COURT:  Mr. Clark, could you wait until he
14    finishes the question before you answer, please?  Thank you.
15    BY MR. STEIN:
16    Q    I think you've answered.
17            And you're aware that on September 22, 2008, the
18    company effectuated -- it's not in those papers.  The company
19    effectuated a 4500 to one reverse split of the stock.  You're
20    aware of that event, right?
21    A    I'm aware of that event.
22            MR. STEIN:  May I approach, Your Honor?
23            THE COURT:  Yes.
24            MR. STEIN:  Just to get the paper.
25    BY MR. STEIN:
```

```
 1   Q   So that directly after that reverse split of the stock --
 2   and you were in the courtroom when the FINRA person testified,
 3   weren't you?
 4   A   I was here, yeah.
 5   Q   After the reverse split of the stock, the stock price was
 6   $45 per share on September 22nd, 2008.  Do you remember that?
 7           MR. STIEGLITZ:  Objection, mischaracterization of the
 8   prior testimony.
 9           THE COURT:  Sustained.
10  BY MR. STEIN:
11   Q   Forgetting what anyone has testified to, do you remember
12   the stock price opening at $45 a share on September 22nd,
13   2008?
14   A   No, I don't remember that.  I don't think that's what was
15   said, but . . .
16   Q   I want to know if you independently recall that.
17   A   The stock split meant very little to the investigation.  I
18   didn't pay much attention to it in the investigation.  I
19   certainly wasn't paying attention to the stock price in
20   September 2008, you know, in September 2008 I wasn't paying
21   attention.
22   Q   But you were paying attention to at least one of the blind
23   trusts that ARC Finance Group had set up, right?
24   A   I had -- through the investigation, I had paid attention
25   to it, yes.
```

```
 1   Q    Okay.  So ARC Finance Group was in the ambit of your

 2   investigation, right?

 3   A    ARC Finance group was -- yeah, it was in the ambit of the

 4   investigation.

 5           MR. STEIN:  I'm going to show him what's been marked

 6   as 294, which I don't believe's in evidence.

 7   BY MR. STEIN:

 8   Q    I'm going to show you what's exhibit 294, but please don't

 9   read it because it's not in evidence.

10           Does this document refresh your recollection of the

11   stock price of Signalife trading shares immediately following

12   the reverse stock split?

13   A    No, I have no recollection of that.  So this doesn't

14   refresh it.  I've never reviewed that.  I have no recollection

15   of the stock price immediately after the split.

16   Q    Are you aware that after the split -- in other words, a

17   day later -- that the stock price precipitously dropped?  Are

18   you aware of that in any way, shape or form from your

19   investigation?

20   A    I've been in the courtroom.  I've heard the testimony,

21   yes.

22   Q    It did precipitously drop?

23   A    Apparently it did, yes.

24   Q    Do you know why the stock price -- did you ever

25   investigate why it precipitously dropped, the stock price of
```

```
 1    Signalife, during the period of your investigation?  Did you
 2    ever investigate why?
 3    A   Well, in the spring and summer of 2008, there had been
 4    these releases, these phony press releases and filings in the
 5    SEC --
 6         MR. STIEGLITZ:  Your Honor, I'm going to object on
 7    the grounds of competency.  This witness is not competent --
 8         THE COURT:  Can I see counsel and Mr.~Stein?
 9    (The following proceedings were held at sidebar:)
10         THE COURT:  Mr.~Stein, you're doing pretty much the
11    same thing with this witness as you did with Mr. Melley.
12    You're trying to use this witness to extract information about
13    which the witness has no knowledge.  You went through the
14    whole thing with Mr. Melley in the same way, asking him about
15    things he didn't investigate, he doesn't know.  You're doing
16    the same thing with this witness, asking him about
17    information.  He says, I don't know, I don't know what the
18    stock price was.  You show him a document.  He doesn't know --
19         MR. STEIN:  It's a publicly available document.
20         THE COURT:  It doesn't make any difference whether
21    it's a publicly available document.  He doesn't know what that
22    document is.  It's your representation as to what it is.  He
23    says it doesn't refresh his recollection.  Then you go even
24    further.
25         This man, all he did was look at documents, analyze
```

```
 1    them, collated them, information, and put them in charts.

 2    That's what you should be cross-examining --

 3              MR. STEIN:  But he's not --

 4              THE COURT:  Excuse me.

 5              MR. STEIN:  I'm sorry.

 6              THE COURT:  You should be cross-examining him on what

 7    he testified to, which was information that was in the charts,

 8    whether that's true, untrue, accurate, inaccurate, false,

 9    misleading, whether he left out information that should have

10    been included that he didn't put in.  That's what you should

11    be cross-examining him on.  You shouldn't be using this

12    witness to make your case which you need to do in your case

13    with your witnesses.  You're wasting everybody's time with

14    this cross-examination, just like you basically wasted it with

15    Mr. Melley.

16              Please cross-examine him on what he testified to.  Do

17    not spend your time trying to make your defense with a witness

18    who didn't -- who only testified about numbers.  Numbers.  Are

19    the numbers right or are the numbers wrong?  Should there be

20    other information in these numbers that he left out?  That

21    should be the extent of it.

22              All this stuff about SEC filings and whether the

23    stocks were authorized to be sold, I mean, I don't know what

24    that has to do with whether or not there were false statements

25    made in SEC filings about prospective sales.  I don't know
```

1      what that has -- I mean, but what -- he didn't testify to

2      anything about -- about the number of shares that were

3      authorized.

4              He's not -- no one in this case has even suggested

5      that any of the sales of the shares were illegal, or there

6      were shares of -- unregistered shares or restricted shares.

7      No one's even suggested that, so I don't know why we're

8      wasting time on it.

9              MR. STEIN:  I -- the core of the cross-examination is

10     I'm going to pull up all the Government's exhibits and go over

11     them.  However, he did indicate he -- a broad sort of

12     investigative power, and if I covered too much of it I

13     apologize, but I wanted to cover things that are directly

14     related to what he said he was investigating.  I don't expect

15     to spend more than two other questions on this area before I

16     go to the Government's exhibits.

17             THE COURT:  I don't think you've spent any time on

18     what he testified to.

19             MR. STEIN:  No, I haven't.  I'm doing this ahead.

20             THE COURT:  So why don't you focus on what he

21     testified to and not on things he didn't testify to?

22             MR. STEIN:  Because the only reason, and I'm just

23     saying this, I understand what the Court says, and I will

24     refocus the cross-examination, but he indicated that he was --

25     not like Mr. Melley, he had broad investigative authority and

1    was doing a broader investigation, and I just~-- the fact that

2    he did not look at SEC records or did not trust them or

3    whatever is probative regarding the competency of that

4    investigation.  And I appreciate the Court letting me go into

5    it.  I don't have many more questions about that.

6         THE COURT:  All right.  So let's try and zero in on

7    cross-examining his testimony.

8         MR. STEIN:  But I don't want to have another sidebar

9    and have -- and have you yell at me or sanction me or

10   something.

11        THE COURT:  I'm not going to yell at you or sanction

12   you.  I'm just explaining to you my view of what's going on.

13        MR. STEIN:  And I -- and I understand completely what

14   you're saying, and I -- I'm just trying to establish on

15   cross-examination so that I don't have to call these people in

16   my case, the things they did and didn't do.  I don't want --

17   I'm not trying to go that far afield.

18        But with this witness, because he was directly

19   investigating ARC, I want to know if he knew what happened,

20   investigated after the stock split, because there is -- there

21   is an allegation of wrongful misconduct, and I just want to

22   know if he investigated it.  If he didn't investigate it,

23   that's fine.  And then I'll go into the -- and that's my last

24   question and the last thing I'm going to show him, because

25   it's pretty dramatic what happened in two days.

```
 1          THE COURT:  But he said he didn't know.  He doesn't

 2   know what happened.  He doesn't know what -- and so if he

 3   doesn't know -- I mean, if you want to ask him whether he

 4   investigated anything about why the stock price dropped at any

 5   point during his investigation and see what his answer to that

 6   is, that's fine.

 7          MR. STEIN:  Yeah, that -- well --

 8          THE COURT:  But whether -- you know, when it happened

 9   and whether it was after the stock split or not, I don't -- it

10   seems to me that I don't -- again, I don't know what the --

11   exactly what the Government's theory is, but it would seem to

12   me that the Government is trying to say that your alleged

13   false publications of information drove the stock price up,

14   and that's when you sold your shares so you can make money,

15   not that you did anything to drive the price down, but I don't

16   know, maybe I'm wrong, maybe I'm missing something.  But go

17   ahead.

18          MR. STEIN:  I just want to know if he looked at that

19   issue, and I have a couple more questions about it, and then

20   I'm going into the exhibit.  But I don't -- I will not ask

21   those questions if that's the direction the Court wants me to

22   go in.

23          THE COURT:  I'm not sure the question you want to

24   ask.

25          MR. STEIN:  I can be very specific, see we don't have
```

```
 1   another sidebar.
 2          MR. STIEGLITZ:  Can I clarify one thing, Your Honor?
 3   There's not a single allegation in the indictment anything
 4   about the reverse stock split was improper, that that was part
 5   of the scheme to defraud, that that was -- so just to echo
 6   what Your Honor just said, that's not really part of this case
 7   at all.
 8          MR. STEIN:  Your Honor, that's my point.  There is an
 9   allegation in the indictment, and I'll go get it.  It's a
10   specific allegation that the holding of shares and manner of
11   sale of the shares through ARC was wrongful and done to
12   deceive, and I just want to know -- that allegation in the
13   indictment is very serious, and it's -- he claims that I --
14   the claim is that I was behind it, and I want to ask him if he
15   investigated it because of the claim.
16          THE COURT:  Well, I don't remember him testifying
17   about it, so I'm not sure why it would be appropriate
18   cross-examination since he didn't testify to anything about
19   that.
20          MR. STEIN:  No, I agree with that.  The Court has
21   given me latitude in that regard.
22          THE COURT:  So let's just wrap it up and get to what
23   he actually testified to.  Okay?
24          MR. STEIN:  Okay.  So we're --
25          THE COURT:  Just ask your next question, and we'll
```

 1   see what it is and whether I'm going to sustain it.

 2          MR. STEIN:  Thank you, Your Honor.

 3       (Sidebar conference concluded.)

 4   BY MR. STEIN:

 5   Q   Mr. Clark, is it safe to say that you did not investigate

 6   things that happened post-split with regard to the stock price

 7   in general?

 8   A   There were no allegations of wrongdoing.  So, no, I didn't

 9   investigate that.

10   Q   Thank you.  The Government played clip five, pages 191 and

11   192 for you, and it's a statement of me in front of the SEC

12   that I had spent seven years of my time, and before that I was

13   making millions of dollars a year, and I was now in Chapter 11

14   bankruptcy and hadn't been paid, and you felt that statement

15   was false.  Do you generally remember that?

16   A   What I felt was false was that you said you didn't receive

17   any money from Signalife.  Whether you filed for Chapter 11

18   bankruptcy or made millions of dollars in the years prior to

19   Signalife from 2002 or 2003, I'm not in a position to say was

20   true or false.

21   Q   With regard to that clip, did you investigate how much --

22   how much in legal fees was billed to Signalife by me for work

23   performed through those years?  Did you investigate that?

24   A   I investigated -- as part of my investigation, I reviewed

25   files from Signalife, and I don't remember seeing any detailed

```
 1   or un-detailed bills from you for legal fees.  And, in fact, I
 2   do remember Martin Carter and other witnesses and other
 3   individuals telling me that you asked them to put legal fees
 4   on checks but that you, in fact, provided no legal fees, at
 5   least to them, for the money that you were remitting or that
 6   they were remitting to you.
 7   Q   Okay.  Well, let's go through the -- a few items in the
 8   period of your investigation and whether or not you examined
 9   them.
10           Are you aware one way or another of whether or not I
11   provided legal services in connection with a 75-page contract
12   between New Rubbermaid, a Fortune 500 company, and Signalife?
13   Are you aware whether or not I did?
14   A   I understood from other individuals I interviewed that you
15   participated in that negotiation, yes.
16   Q   And that I drafted a part of that document, along with
17   John Woodbury.  Is that what you learned?
18   A   That is generally what I learned, yeah.
19   Q   And how about litigation regarding a person by the name of
20   Steven Sparks?  Are you aware of litigation regarding him?
21   A   I am aware of some of litigation regarding Steven Sparks,
22   yes.
23   Q   So that was covered in your investigation.
24           You spoke with Steven Sparks, didn't you?
25   A   Being aware of litigation and investigating the litigation
```

 1   are different things.  I believe I spoke to Steven Sparks.  I

 2   would have to -- I don't specifically remember, but I think I

 3   did.

 4   Q   Are you aware of whether I provided legal services to

 5   Signalife for the litigation with Steven Sparks one way or the

 6   other?

 7   A   I am unaware as to what you did for Signalife vis-a-vis

 8   Steven Sparks.

 9   Q   How about the litigation with Rubbermaid after the company

10   failed under the contract, there was litigation.  Are you

11   aware of whether I spent time in that litigation?

12   A   I have no idea.  Again, there were no bills in the

13   Signalife files that were turned over to the Government for

14   any work that you did on these litigations or other

15   litigations.

16   Q   How about simply the e-mails we're seeing on the screen

17   that I'm copied on and asked to review things.  Have you

18   evaluated of any of -- whether or not there were any legal

19   services that were billed to the company and had to be paid

20   for in connection with that?

21         MR. STIEGLITZ:  I'm going to object as to asking

22   Inspector Clark to testify whether his opinion of something

23   was a legal service or not.

24         THE COURT:  Overruled, if he did an evaluation and

25   has come to some conclusion based upon his review of the

```
 1    evidence.
 2              THE WITNESS:  Mr. Stein, there were many e-mails in
 3    which you referenced lawsuits, and suing this person and that
 4    person or this company or that company or being involved in
 5    this.  I have no idea what you did, and none of the -- well, I
 6    don't recall any e-mails in which you specifically billed the
 7    company or demanded payment, but certainly there were
 8    references to litigation and you suing people.
 9    BY MR. STEIN:
10    Q    And the company getting sued?
11    A    The company getting sued.
12    Q    And on this area, last question.  Are you aware of the
13    total amount of legal fees, one way or the other, from 2002
14    through today that I expended for Recom Managed Systems,
15    Signalife, Heart Tronics?
16    A    So in the course of my investigation, I was unable to
17    determine from anyone that I interviewed at Signalife what the
18    total amount of your legal fees were, because I don't think
19    anyone at Signalife knew what the total amount of your legal
20    fees were, because you never billed them.
21    Q    Now, you said you were aware of the Chapter 11 bankruptcy
22    in Florida of which I'm the trustee of.  You were generally
23    aware of that from your investigation, right?
24    A    Generally aware, yeah.
25    Q    And you're aware in that investigation that Signalife
```

```
 1    testified under oath in the United States bankruptcy court

 2    that --

 3              MR. STIEGLITZ:  Objection.

 4              THE COURT:  Sustained.

 5    BY MR. STEIN:

 6    Q    Are you aware of any testimony by Signalife in the

 7    bankruptcy regarding legal fees between me and Signalife?

 8    A    I am not aware of any testimony in that trial.

 9    Q    Did you examine any bankruptcy records regarding legal

10    fees from me to Signalife, that narrow issue, at any time in

11    your investigation?

12    A    I have reviewed some filings that you've made briefly.

13    Q    In your investigation from what you've reviewed, do you

14    recall an amount owed by Signalife to me one way or the other?

15    Just from what you reviewed.

16    A    I don't.

17    Q    Now, maybe we can pull up Government's exhibit 137.

18              Do you remember testifying about this?

19    A    I do, yes.

20    Q    And you testified about some treasury regulation that I

21    may have been trying to avoid by having wires to me in the

22    amount of less than $10,000?

23              MR. STIEGLITZ:  Objection, mischaracterizing the

24    testimony.

25              THE COURT:  Rephrase the question, please.
```

```
 1   BY MR. STEIN:
 2   Q    Do you recall your testimony regarding that $10,000
 3   figure?
 4   A    I do recall my testimony, and I recall exactly what I
 5   said, which was there's a treasury regulation, a federal law
 6   that dictates any cash transactions, which these aren't
 7   referencing -- these -- this e-mail's not referencing cash
 8   transactions.  This e-mail's referencing wire transfers -- any
 9   cash transactions at or above $10,000, meaning if someone
10   walks into a bank and other financial institutions, or walks
11   out of a bank with $10,000, the bank -- or above, the bank, or
12   other financial institutions, has to report it to Treasury.
13   There's no such law dictating wire transfers.
14   Q    So there were a lot of wire transfers to me or Five
15   Investments Partnership you've referenced in the amounts well
16   over $10,000; is that your recollection?
17   A    Well over $10,000, yes.
18   Q    And Five Investments Partnership was never an affiliate of
19   Signalife, is that your recollection?
20            MR. STIEGLITZ:  Objection.
21            THE COURT:  Overruled if he knows.
22            THE WITNESS:  Five Investments Partnership, as it was
23   explained to me by Martin Carter, who was not in control of
24   it, and Mark Nevdahl, who managed the brokerage account, their
25   understanding was it was a investment partnership between --
```

```
 1   with two general partners, you and Martin Carter.  I have no
 2   understanding that it had any connection to the company
 3   Signalife, though it did hold, buy, and sell Signalife shares.
 4   BY MR. STEIN:
 5   Q   And you're aware that it bought over a million dollars of
 6   Signalife shares; isn't that correct?
 7   A   It bought many Signalife shares, yes.  With money
 8   forwarded to it by Martin Carter, whose money was derived from
 9   Signalife or the sale of Signalife shares.
10   Q   Were you sitting in the courtroom when it was testified
11   that a million dollars came in at the beginning of Five
12   Investments Partnership?  Do you remember any such testimony
13   regarding that?
14   A   I think you said that.  I don't know if it was testified
15   to.  I do remember you saying that.
16   Q   I haven't taken the witness stand yet.
17           Do you remember any evidence of that?  It could be --
18   A   I don't.
19   Q   Now, are you independently aware, forgetting any testimony
20   here, that upon the formation of Five Investments Partnership,
21   I caused a million dollars to be placed into that partnership?
22   A   If you show me the records, I might be able to refresh
23   myself on that.
24   Q   Let's put up Government's 260, please.
25           Mr. Clark, who owned this jet?
```

```
 1    A    My understanding is it was leased by Trayton Aviation.  So
 2    I'm guessing the ownership was Trayton Aviation, leased to you
 3    and your wife.
 4    Q    Who owned Trayton Aviation?
 5    A    I couldn't tell you right now.  I don't know.
 6    Q    So you don't know whether or not I had any ownership
 7    interest or not in Trayton Aviation; is that right?
 8    A    I don't know at this time.
 9    Q    How much jet travel did this jet -- was this jet used for
10    with regard to Signalife officers and directors?
11    A    I have no idea how much this specific jet was used by
12    Signalife officers, or for you, for that matter.  I don't.
13    Q    Are you aware of the relative expense of a private jet
14    versus flying commercially, in general?
15    A    Mr.~Stein, I'm a government employee, so I really have
16    little knowledge of flying in a private jet.
17    Q    So you have no idea how much it would cost to go from
18    Greenville to New York?
19    A    My understanding is it's expensive.
20    Q    Okay.  Did you ever interview anybody regarding -- at
21    Signalife regarding their use of this jet that you're looking
22    at on the screen?
23    A    No, it was not a question that I asked people at
24    Signalife.  I understand Martin Carter flew in it a couple
25    times with you, maybe without you, but I don't recall asking
```

```
 1   other individuals at Signalife how many times they flew on
 2   your private jet.
 3   Q   But you recall that Martin Carter flew on this jet a
 4   couple times; is that right?
 5   A   I think he testified to that, yes.
 6   Q   You think he did.
 7           Okay.
 8           This jet, you are aware of from your investigation,
 9   was repossessed by Aviation Finance Group, AFG, right?
10   A   I have heard that.  I don't know.  It wasn't really
11   something that was of any import to me.
12   Q   Well, it's one of the Government's exhibits, so I just
13   want to ask you about what you looked at regarding the jet
14   other than just the fact that it existed, and my next question
15   is regarding the jet.  Are you aware of whether or not, one
16   way or the other, anyone has made a claim against me in my
17   bankruptcy that I'm reorganizing --
18           MR. STIEGLITZ:  Objection, relevance.
19           THE COURT:  Sustained.
20           MR. STIEGLITZ:  Scope.
21   BY MR. STEIN:
22   Q   Mr. Clark, you've testified extensively about the blind
23   trust and about my -- Mrs. Tracey Hampton-Stein, my ex-wife,
24   right?
25           MR. STIEGLITZ:  Objection.  Mischaracterizing the
```

```
 1   testimony.
 2           THE COURT:  Sustained.
 3   BY MR. STEIN:
 4   Q   You investigated Mrs. Stein and I both because of the
 5   existence of ARC, would that be accurate?
 6   A   We looked into ARC Finance Group, yes.
 7   Q   Did you also look into, in connection with ARC or in
 8   connection with Mrs. Stein, the money owed by either me to her
 9   or her to me --
10           MR. STIEGLITZ:  Objection to Mr.~Stein testifying.
11           THE COURT:  Overruled.
12           THE WITNESS:  Mr. Stein, there were payments from you
13   to your wife, significant payments.  I have no idea what they
14   were for.  You never sat down with me to explain that.  But
15   there were payments out of your account to your wife.
16   BY MR. STEIN:
17   Q   There were significant payments; is that right?
18   A   There were significant payments.
19   Q   And when you say I never sat down with you, the first time
20   we ever met was at the airport when I was arrested, right?
21   A   And you invoked your right to counsel, and we didn't talk
22   about any of this.
23   Q   You were very cordial to me.  I'm not suggesting you
24   weren't.
25   A   I appreciate that.
```

```
 1              MR. STEIN:  Can you please pull up defense
 2   exhibit 194.
 3   BY MR. STEIN:
 4   Q    You recall this exhibit?
 5   A    I do, yes.
 6   Q    "Not one penny goes out without my approval, Dr. H."
 7              In your investigation, did you determine that this
 8   exhibit was authentic?
 9   A    In my investigation, did I determine -- I wasn't making
10   determinations of authenticity, but, I mean, I saw this
11   exhibit and I included it in my investigative file, yes.
12   Q    Did you ever interview in person -- or in person Lowell
13   Harmison?
14   A    Unfortunately by the time our investigation started,
15   Mr. Harmison passed away.
16   Q    Dr.~Harmison.
17   A    Dr.~Harmison passed away.
18   Q    So your investigation started after Dr.~Harmison passed
19   away?
20   A    Well, our investigation started in January of 2012.  I was
21   personally unaware of him being sick, and he passed away --
22   not '12, I'm sorry.  December 2011.  Not December.
23   January 2011, our investigation started, my investigation
24   started.  I was unaware how ill he was, and he passed away
25   before I had a chance to talk to him.
```

```
 1   Q    So you never talked to Dr.~Harmison regarding any of the

 2   things you've testified about here today; is that right?

 3   A    I've never talked to Dr.~Harmison about anything.

 4            MR. STEIN:  One moment, Your Honor.

 5            Can we pull up exhibit Government's 258?

 6   BY MR. STEIN:

 7   Q    To be clear about exhibit 258, you're just compiling

 8   shares of Signalife he received and not opining as to the

 9   legality of him receiving them; is that right?

10   A    This exhibit is just compiling the number of shares

11   Mr. Carter received, that's correct.

12   Q    And all those shares were free trading S-8 shares, right?

13   He didn't get any restricted shares?

14   A    No, he did not.

15            MR. STEIN:  Please pull up 255 Government's.

16   BY MR. STEIN:

17   Q    In this exhibit, again, you're depicting shares from TD

18   Ameritrade, and you're compiling those numbers, correct?  And

19   then you're tracing them to my Manufacturers Bank account; is

20   that right?

21   A    Tracing the proceeds of the sale of those shares to your

22   Manufacturers Bank account, that's correct.

23   Q    You're not opining as to whether or not the company,

24   Dr.~Harmison, approved of this transaction, right?

25   A    About whether Dr.~Harmison approved of the transfer to
```

```
 1   you?  I'm not opining on that, no.  I have no idea what
 2   Dr.~Harmison -- I didn't talk to him.
 3   Q    During the investigation, did you ever come to know, one
 4   way or the other, whether the Manufacturers Bank account was
 5   the account of my law firm?  Did you ever know, one way or the
 6   other?
 7   A    Well, I reviewed the account, and I don't remember -- I
 8   mean, there were various expenses out of that account.  Some
 9   of them may or may not have been law related, but a lot of
10   them looked like it wasn't, so . . .
11   Q    During the investigation, did you ever review any tax
12   records of my law firm at any time?
13   A    No, I did not.
14   Q    So as you sit here today, you have no idea whether the
15   Manufacturers Bank account was my law firm's account or my
16   personal account; is that right?
17   A    Well, can I -- do you mind if I look at my chart here?
18   Q    No, no.  Spend time, please.
19   A    Your Manufacturers Bank account ending in 2154 is in your
20   name, not your law firm's name.  So, you know, I took it to be
21   your bank account.
22   Q    Did you ever come to know the manner in which my law firm
23   was in existence, whether it was a corporation --
24            MR. STIEGLITZ:  Objection, scope and relevance.
25            THE COURT:  Overruled if he knows.
```

```
 1                THE WITNESS:  I have no idea.
 2    BY MR. STEIN:
 3    Q    Did you ever evaluate during your investigation with
 4    regard to the Manufacturers Bank account what human being was
 5    sending instructions into that account to wire money out of
 6    that account?  Did you ever know human being who was doing
 7    that?
 8    A    That's sort of an odd question.  It was your bank account.
 9    I believe you were probably the only one authorized to do
10    that.
11    Q    Okay.
12    A    So I don't know if you had other people doing that, no.
13    Q    That's fair.  I just want to know if you evaluated whether
14    or not it was me or somebody working for me or Tracey
15    Hampton-Stein.  You never evaluated that?
16    A    No.
17    Q    Thank you.
18             MR. STEIN:  Can we pull up 259?
19    BY MR. STEIN:
20    Q    Now, you had indicated earlier that the SB2, which is
21    exhibit 323, being from 2005, was before the area you were
22    concerned with and you hadn't reviewed it.  Do you remember
23    that?
24    A    I remember that.  The SB2 was of no interest to me, or
25    little interest to me.
```

1    Q    But this chart that you created and you compiled numbers

2    on is in the period 2005 to 2010, which is directly covered by

3    this SB2, right?

4    A    Right, but the SB2 doesn't have any consequence on what's

5    in this chart.

6    Q    I understand.

7         So you were compiling numbers from 2005 to 2010?

8    A    That's correct.

9    Q    Have you ever reviewed in your investigation any

10   agreements by the Carter family to purchase the interest in

11   Five Investments Partnership or Five Knights Partnership?  Did

12   you ever review any of those?

13   A    No, I have not.

14   Q    Did you ever review the tax return that was testified to

15   in court by someone that Mr. Carter says I caused him to file

16   with the IRS?  Did you ever review that tax return?

17   A    I have reviewed it.

18   Q    And who signed that tax return?

19   A    Mr. Carter.

20   Q    Did I sign it anywhere?

21   A    I don't believe you did.

22   Q    Are you aware whether the Internal Revenue Service ever

23   audited me regarding that tax return?

24   A    I have no idea what the Internal Revenue Service did or

25   did not do.

1   Q   With regard to Mr. Anand, I think in fairness to the

2   Government, they indicated in their questioning that there was

3   some transfers to Mr. Anand of shares by me, do you recall

4   that?

5   A   Yes, I do.

6   Q   And do you have any reason to believe that the amounts

7   paid to me were not the type of block trades described in the

8   SB2 in 2005?  Do you have any reason to disbelieve that?

9   A   I mean, I wasn't -- I'm not really sure what the block

10   trades were, and I don't have any idea what the block trades

11   were for 2002 and 2005, so I have no idea whether they were or

12   not.

13   Q   But you do know Mr. Anand got shares of this blind trust

14   of which I was the beneficiary, this one blind trust?

15   A   Mr. Anand got shares on your direction -- Mr. Anand got

16   shares on your direction from the THS Blind Trust, which Mark

17   Nevdahl was the trustee of?

18   Q   And I was the beneficiary of?

19   A   You were the beneficiary of, not the trustee of.  But on

20   your direction to Mr. Nevdahl, Mr. Anand got shares from the

21   THS Blind Trust.

22   Q   And are you opining that those transfers of shares and

23   payment for them were unlawful?

24   A   The blind trust is ostensibly set up to keep you as the

25   beneficiary uninvolved with the business of the trust.  In

```
 1    talking to Mr. Nevdahl and in this instance, in my
 2    investigation it became clear that not only were you the
 3    beneficiary of the blind trust, you were controlling what the
 4    trust was doing.
 5    Q    So I was controlling the trading that the trust did.
 6    Forgetting about Mr. Anand, your investigation revealed that I
 7    was controlling the trading of the THS Blind Trust?  Is that
 8    your testimony?
 9    A    Mr. Nevdahl felt that you were.  He made the trades, but
10    he felt that he was under pressure and direction from you as
11    to what to do.  And you did direct him to transfer shares out
12    of there at his -- even though he told you that would be
13    economically bad for the trust, to Mr. Anand.
14    Q    Again, it would be economically against my interest to
15    transfer those shares.
16    A    That's correct.
17    Q    And I told him to do it anyway.  That's your
18    understanding, right?
19    A    That's my understanding.
20    Q    Do you know what Mr. Anand did after he got those shares?
21    Do you know what he did with the shares?  Did you investigate
22    that?
23    A    Yeah, I believe he sold them.  This is why Mr. Nevdahl
24    told you this would be a bad idea because it would devalue the
25    trust.
```

```
 1    Q    And do you believe that Mr. Anand represented to

 2    Mr. Nevdahl that he wasn't going to sell the shares?

 3    A    I don't think he did.  I don't know.

 4    Q    Do you believe that Mr. Anand said to Mr. Nevdahl that he

 5    was going to immediately sell all the shares into the market?

 6              MR. STIEGLITZ:  Objection to the hearsay.

 7              THE COURT:  Sustained.

 8    BY MR. STEIN:

 9    Q    Did you learn from any source any knowledge by Mr. Nevdahl

10    or I of what Mr. Anand was going to do with the shares after

11    he got them, from any source?

12    A    I've learned from Mr. Anand he was going to sell them.

13    Q    And that he did sell them?

14    A    And that he did sell them, yes.

15    Q    The Signalife direct cash transfers is next on the list.

16    You've compiled these numbers from the bank records; is that

17    right?

18    A    That's correct.

19    Q    Is it safe to assume that the majority of this money went

20    into the Manufacturers Bank account that you looked at

21    earlier?

22    A    It's safe to assume that, yes.

23    Q    And this is the account we spoke of earlier which you said

24    you didn't recall who owned that account?

25    A    No, I think I said the name on the account was yours.
```

1    Q    Right.  You didn't know whether it was --

2    A    In fact, you opened up the account, and the name on the

3    account was Mitchell Stein.

4    Q    And that's a very good point.

5            When you say I opened up the account, when did I open

6    up the account?

7    A    I don't have those records in front of me.  They're in

8    evidence, but I don't have them in front of me.

9    Q    It was opened up, in your recollection, at or about the

10   time, 2005, when money started coming in, or before that time?

11   A    Mr.~Stein, I really don't know.  I know you had a couple

12   of accounts, and I just don't know when this one was opened

13   up.  I mean, it was open for a time period.  I don't know when

14   it was opened up.

15   Q    So you don't know whether it was open for a week or 10

16   years?

17   A    Well, I'm comfortable -- I'm sorry.

18   Q    Please.

19   A    I'm comfortable to say it was open for more than a week,

20   certainly.

21   Q    I'm not going to start going down the ladder with you, but

22   does the 10 years' thing, is that a possibility?  Could it

23   have been opened for over 10 years?

24   A    Until I see the account-opening documents, again, which I

25   didn't commit to memory, I don't know when it was opened.

```
 1   Q    Perhaps you'll do that on redirect if it's relevant.

 2             THS Blind Trust brokerage account selling Signalife

 3   shares.   That was the blind trust that I was the beneficiary

 4   of, right?

 5   A    That was the blind trust that you were the beneficiary of

 6   and that Mark Nevdahl told me that he felt you were, in fact,

 7   directing him on what to do.

 8   Q    I understand.   We've heard from Mr. Nevdahl.

 9             But that was all of the transactions with the THS

10   Blind Trust, right?

11   A    That was the -- the brokerage transactions, yes, that's

12   correct.

13   Q    And those were all the proceeds of shares that ARC Finance

14   Group was approved to sell back in 2005, is that your

15   understanding?   They were registered shares.

16   A    Those were shares that were registered by ARC Finance

17   Group and transferred to THS Blind Trust.   I hesitate to say

18   approved.

19   Q    They were not restricted shares is all I'm saying, right?

20   A    They weren't restricted shares.

21   Q    Did you ever compile an exhibit of the amount of money

22   expended by me or Five Investments Partnership in the purchase

23   of Signalife securities privately or in the market?

24   A    No, I didn't create that exhibit.

25   Q    Could you -- do you have the material to create that
```

1    exhibit if you had been asked to?

2    A   We have the Five Investment brokerage account.  I'm not

3    sure that -- I don't recall a brokerage account for you.  So

4    we could look at Five Investments and see how many shares they

5    bought and when they bought them.

6    Q   Were you in the courtroom when Mr. Nevdahl authenticated

7    the National Securities brokerage accounts of me individually?

8    Do you remember that?

9    A   I don't.  I mean, I don't have memory of that.  I might

10   not have been in the courtroom at that time.

11   Q   I understand.

12          So the only transactions you would be able to compile

13   a chart of buying Signalife securities would be Five

14   Investments Partnership?

15   A   Well, if there are records of an account that you have

16   individually, we could certainly do that, as well.  I just

17   don't remember that being something that was of much interest

18   in my investigation, so I don't remember.  But if it's records

19   that are there, we could do that, yes.

20   Q   So you don't know whether at the end I spent more money

21   buying the stock than is reflected here or not?  You didn't

22   prepare any charts regarding that, did you?

23   A   No.

24          THE COURT:  Mr.~Stein, are you finished with this

25   area?

```
 1              MR. STEIN:  Yes, I'm finished with this.

 2              THE COURT:  Okay.  Why don't we take our lunch break

 3    then.  All right?

 4              MR. STEIN:  Yes, Your Honor.

 5              THE COURT:  Ladies and gentlemen, let's recess for

 6    lunch.  If we could see you back at 1:15.  Please don't

 7    discuss the case or form any opinions.  Thank you.

 8         (The jury exits the courtroom.)

 9              THE COURT:  All right.  Sir, if you would not discuss

10    your testimony during the recess, and we'll see you at 1:15.

11              MR. STIEGLITZ:  Your Honor, for scheduling purposes,

12    I'm just curious as to sort of who's next, how much longer

13    we've got here.

14              MR. STEIN:  I have a witness ready, Your Honor, who's

15    been here since 11:00 o'clock.

16              MR. STIEGLITZ:  Who?

17              MR. STEIN:  It's Ms. Jane Greene.  I hope to complete

18    my examination of Mr. Clark within a half hour, and then I

19    would like, for the record, to make certain motions, and then

20    I'd like to call Ms. Greene if the Government's resting.  I

21    don't know if they're resting or not after this.

22              MR. STIEGLITZ:  And just out of curiosity, is there

23    anybody after Ms. Greene?

24              MR. STEIN:  Yes, after Ms. Greene it would be Jim

25    Feidler, and he's also ready and prepared to testify.
```

```
 1              THE COURT:  All right.  Thank you.  We'll see you at
 2    1:15.
 3              And I have something at 1:00 o'clock which I'm hoping
 4    will be over by 1:15.
 5              MR. STIEGLITZ:  Telephonic, Your Honor?
 6              THE COURT:  No, it's going to be -- I ask you to
 7    maybe clear your desks.
 8              MR. STEIN:  Thank you, Your Honor.
 9              THE COURT:  Thank you.
10         (A recess was taken from 12:05 p.m. to 1:19 p.m., after
11    which the following proceedings were had:)
12              THE COURT:  All right.  Please be seated, everyone.
13              We're ready to go, Mr.~Stein?
14         MR. STEIN:  Yes, Your Honor.
15              THE COURT:  All right.  Let's get our witness back up
16    here.
17              Mr. Clark, you're still under oath.
18              MR. STEIN:  Yes, Your Honor.
19              THE COURT:  Let's bring the jurors in.
20         (The jury enters the courtroom, after which the following
21    proceedings were had:)
22              THE COURT:  Welcome back, everyone.  Please be
23    seated, ladies and gentlemen.
24              Mr.~Stein, you may continue with your
25    cross-examination.
```

```
 1                MR. STEIN:  Thank you, Your Honor.

 2                Can you pull up 255?  I'm sorry, 258.

 3   BY MR. STEIN:

 4   Q    Good afternoon, Mr. Clark.

 5   A    Good afternoon.

 6   Q    In the data that you have, that you compiled to prepare

 7   this chart and the other charts, is there any data regarding

 8   sale of an interest in Five Knights Partnership or Five

 9   Investments Partnership one way or the other?

10   A    There's no data regarding a sale of an interest in Five

11   Knights Partnership.

12   Q    Did you ever investigate whether or not that partnership

13   interest was ever sold by anyone?

14   A    I spoke to your other partner, Martin Carter, and at no

15   point did he tell me in any of our interviews that he was

16   under the impression from you that he had to buy an interest

17   in Five Knights Partnership.  In fact, he didn't really

18   understand what it was and said that he was following your

19   direction.

20   Q    And you believed him?

21   A    He had -- yeah, I did believe him -- and the documents

22   supported it, because I didn't see anything to suggest

23   otherwise.

24   Q    And in those documents that wouldn't suggest otherwise,

25   you're including the tax return that was signed by him, right?
```

```
 1   A    I -- I haven't really thought about the association

 2   between the two, so I'm unprepared to answer that question.

 3   Q    But you're aware that he signed the tax return?

 4   A    Yes.

 5          MR. STEIN:  Nothing further.

 6          THE COURT:  All right.  Thank you.

 7          Any redirect?

 8          MR. STIEGLITZ:  Yes, Your Honor.thank you.

 9                    Redirect Examination

10   BY MR. STIEGLITZ:

11   Q    Inspector Clark, Mr.~Stein asked you a number of questions

12   about what the SEC approved and what it didn't.  Do you

13   remember him asking you those questions?

14   A    I remember many of them, yes.

15   Q    And Mr. Carter -- Inspector Clark, excuse me, are you

16   testifying today as a securities expert?

17   A    I am not a securities expert.

18   Q    Just to be clear, what you testified about this morning is

19   essentially addition and subtraction, right?  Numbers on

20   charts, right?

21   A    That's correct.

22   Q    Okay.  Now, I just want to clarify something.  Mr.~Stein

23   asked you some questions about his Manufacturers Bank account,

24   right.  Do you remember that?

25   A    I do.
```

1    Q    And to the extent you may have suggested that certain

2    account-opening documents were in evidence, you don't know

3    that to be the case, do you?

4    A    I don't.

5    Q    Okay.  So just getting back to your role, that addition

6    and subtraction that you talked about of various dollar

7    amounts and numbers of shares, that's what's reflected in

8    those charts that we looked at this morning; is that right?

9    A    That's correct.

10   Q    Now, Mr.~Stein asked you if the shares that Mr. Carter

11   sold you in the open market were legally sold shares.  Do you

12   remember him asking you that?

13   A    I do remember, yes.

14   Q    And to the extent you suggested they were, is it fair to

15   say you mean because they were freely trading shares?

16   A    That's all I meant by that, that answer, yes.  They

17   weren't restricted as far as I understood.

18   Q    So you weren't opining at all on the -- on what happened

19   after Mr. Carter sold those shares, or frankly, how Mr. Carter

20   got those shares, right?

21   A    No, absolutely not.

22   Q    And to the extent that you suggested the SEC was okay with

23   misrepresentations in filings, is that something you meant to

24   say, or is that --

25   A    Well, I was being facetious.  I'm sure the SEC's not okay

```
 1   with any false information in any of its filings.
 2   Q   Okay.
 3   A   I apologize.  I realize a record might have a hard time
 4   picking up facetiousness.
 5   Q   Now, one other clarification.  Mr. Stein asked you some
 6   questions about certain SEC filings you had read.  Do you
 7   recall him asking you those questions?
 8   A   Yes.
 9   Q   And to the extent you suggested you don't put much stock
10   in what SEC filings say, were you referring to all SEC
11   filings, or just to certain SEC filings?  Why don't you
12   clarify that for the jury.
13   A   The crux of the allegations that we received was that
14   there was false information in several SEC filings vis-a-vis
15   or with regards to Signalife or that Signalife filed.
16   Q   So to be clear, Inspector Clark, is it fair to say that
17   your skepticism about those certain filings is based on
18   information that you obtained in your investigation; is that
19   right?
20   A   That's correct.
21   Q   You're not suggesting the public shouldn't rely on SEC
22   filings, right?
23   A   I'm not suggesting the public should not rely on SEC
24   filings.
25   Q   All right.  Now, Mr.~Stein asked you several questions
```

```
 1   about legal fees; is that right?

 2   A   He did.

 3   Q   Now -- and Mr.~Stein also showed you that SB2 filing,

 4   which I think is defense exhibit 323.  Do you remember Mr.

 5   Stein showing you that document?

 6   A   I do.

 7   Q   Now, in the course of your investigation in that document

 8   or elsewhere, do you ever recall reviewing an SEC filing in

 9   which the company disclosed that it was paying Mr.~Stein by

10   issuing shares to Mr. Carter or Mr. Anand?

11   A   Do I recall an SEC filing that -- could you repeat the

12   question?

13   Q   Do you recall ever reviewing an SEC filing that said

14   Mitchell Stein was being paid by Signalife issuing shares to

15   Martin Carter or Ajay Anand?

16   A   I do not.

17   Q   And, in fact, Mr.~Stein, in that language that he had you

18   read from Government's exhibit -- excuse me, defense

19   exhibit 323 -- well, I think you had said previously -- had

20   you ever seen that document before or reviewed that document,

21   defense exhibit 323, that you can recall?

22   A   That I can recall, no.

23   Q   Okay.  But in that language that Mr.~Stein spent some time

24   on with you, did you see anything about the company issuing

25   stock to Martin Carter or Ajay Anand, period?
```

```
 1   A    In that filing, no.  In that language, no.
 2   Q    Did it say anything in there that you recall that you went
 3   over with Mr.~Stein about Ajay Anand or the Silve Group
 4   getting stock and then giving packages or taking care of
 5   Mr.~Stein?
 6   A    It said nothing like that, no.
 7   Q    Okay.  Now, speaking about the stock that people were
 8   getting, Mr.~Stein also asked you about S-8 stock.  Do you
 9   remember those questions?
10   A    He did.
11   Q    What is your understanding of what -- just big picture --
12   what the purpose of S-8 stock is?
13   A    It's to identify stock and the holders of the stock, the
14   freely trading stock that can be traded free on the market.
15   Q    And is S-8 stock something that's used to compensate
16   people who are doing work for the company that's issuing that
17   stock?
18   A    Yes.
19   Q    So to the extent that Mr. Carter and Mr. Anand are being
20   issued S-8 stock, is it fair to say that was for work that
21   they were purportedly doing for the company?
22   A    Purportedly, yes.
23   Q    Do you recall in your investigation, Inspector Clark,
24   seeing any documents where the company disclosed that it was
25   paying Mr. Carter or Mr. Anand so that they could then pay
```

1   Mr.~Stein?

2   A   I don't remember seeing any records like that, no.

3   Q   And in the course of your investigation, do you recall

4   seeing any invoices that Mr.~Stein sent to the company for

5   whatever -- whatever legal fees or whatever legal work he

6   claimed to be doing for the company?

7   A   I have not seen any invoices issued by Mr.~Stein for legal

8   work he did for the company.

9   Q   Any documents itemizing things, like I spent this much

10  time on a call, I spent this much time going to a meeting?

11  Anything like that?

12  A   No documents like that, no.

13  Q   Do you recall seeing any documents in the course of your

14  investigation where Mr.~Stein asked for his legal fees to be

15  paid to M&C Electrical or Martin Carter?

16  A   No, I did not.

17  Q   To your knowledge, did Mr.~Stein ever tell the company

18  that that's how he wanted to be paid?

19  A   I have not heard that from anybody or in any document in

20  this investigation, no.  In my investigation.

21  Q   And do you know anything in that SB2 document, defense

22  exhibit 323 that Mr.~Stein asked you about, do you know if

23  anything in there disclosed that that's what was happening,

24  that some sort of -- there was some sort of pay arrangement

25  between Mr.~Stein, where he'd get money from the company via

```
 1    Martin Carter?

 2    A    In the document that he showed me?

 3    Q    Yes.

 4    A    I have not reviewed the entire document, so in what he

 5    showed me there was nothing.  I didn't read anything along

 6    those lines.

 7    Q    And have you ever seen anything in any other SEC filing

 8    that disclosed that?

 9    A    I have not seen anything that disclosed that.

10              MR. STIEGLITZ:  Nothing further, Your Honor.

11              MR. STEIN:  Nothing further, Your Honor.

12              THE COURT:  Thank you, sir.

13              MR. STIEGLITZ:  Your Honor, just as a housekeeping

14    matter, may I read the remainder of our stipulation into the

15    record at this time?

16              THE COURT:  Yes.

17              MR. STIEGLITZ:  Thank you.

18              These are, again, stipulations that are on file,

19    agreed to between the parties, the United States and

20    Mr.~Stein.

21              Stipulation number 7, beginning there:

22              "At all times relevant to the indictment, DHL

23    Corporation was a private or commercial interstate carrier

24    engaged in the business of transporting, carrying, and

25    delivering items from one state to another."
```

1    Number 8:  "The facsimiles referenced in Counts five,

2    six, and seven of the indictment were transmitted by means of

3    wire communication in interstate and foreign commerce from the

4    Southern District of Florida."

5    Number 9:  "The wire transfers referenced in

6    counts 11, 12, and 13 of the indictment were monetary

7    transactions; that is, transfers of funds or monetary

8    instruments by, through, and to financial institutions in a

9    way that affects interstate commerce."

10   Number 10:  "The wire transfers referenced in counts

11   11, 12, and 13 of the indictment were transmitted through the

12   Southern District of Florida."

13   And number 11:  "At all times relevant to the

14   indictment, the Securities and Exchange Commission was an

15   agency of the United States."

16   And, Your Honor, at this time the United States would

17   rest.

18   THE COURT:  All right.  Thank you.

19   Ladies and gentlemen, the Government's just rested

20   its case, and we didn't expect this to happen so quickly this

21   afternoon.  So I'm going to ask you to step in the jury room

22   just for a few minutes while we take up some legal matters

23   before we go forward with the rest of the case.

24   Again, don't discuss the case or form any opinions.

25   We should be back with you within 10 minutes, and we'll try

```
 1    and make it as short as possible.  Thank you.
 2         (The jury exits the courtroom.)
 3              THE COURT:  You can be seated.
 4              Mr.~Stein.
 5              MR. STEIN:  Yes, Your Honor.
 6              THE COURT:  Do you have any motions you wanted to
 7    make at this time?
 8              MR. STEIN:  Yes, Your Honor.  I'd like to make a
 9    motion under Rule 29 for judgment of acquittal on, at a
10    minimum, certain of the counts by the Government, if I could.
11              THE COURT:  Yes.
12              MR. STEIN:  As the Court is aware, under Rule 29 of
13    the Federal Rules of Criminal Procedure, before submission to
14    the jury after the Government closes its evidence or after the
15    close of all evidence, the Court, on Defendant's motion, must
16    enter judgment of acquittal of any offense for which the
17    evidence is insufficient to sustain a conviction.  The Court
18    may on its own consider whether the evidence is insufficient
19    to sustain a conviction.
20              If the Court denies a motion for judgment of
21    acquittal at the close of the Government's evidence, the
22    Defendant may then offer evidence without having reserved the
23    right to do so.  I'm obviously reserving the right to put on a
24    case in the event this motion is denied.
25              Your Honor, the indictment which I have in front of
```

 1   me relies on a conspiracy which the Government, for some

 2   reason, ties back to 2005, and this is emblematic throughout

 3   the indictment.  I turn my attention specifically to

 4   paragraph 6, which is count 1:  "As explained more fully

 5   below, from in or about July 2005 through in or about

 6   July 2010, Stein and others perpetrated a scheme to defraud

 7   Signalife investors."

 8           The Government is the master of their indictment.

 9   They're the ones who drafted this.  I obviously didn't draft

10   it, and I didn't have a grand jury issue it.  There is no

11   evidence, in fact, the evidence is to the contrary, that in

12   July of 2005, as opposed to July of 2007, when there might be

13   some evidence that, I would argue, does not satisfy the

14   standard beyond a reasonable doubt.  But from July 2005, in

15   that timeframe, there is simply no evidence at all that I was

16   involved in any conspiracy with anyone to do any of the things

17   mentioned in here.

18           For example, they said -- and, remember, we're dating

19   back to 2005, and the Government drafted it.  They had a

20   burden to put on evidence regarding 2005.  And then they said

21   false purchase orders, false change of address notices.  Those

22   pieces of evidence that were testified to by government

23   cooperators are all indisputably dated 2007 and 2008.  They're

24   not dated 2005.

25           The Government, furthermore, has failed to call to

```
 1    the stand any former officer or director of the company to
 2    testify that any of these transactions were not approved by
 3    the company.  The Government has undisputably (sic) -- I
 4    understand there's a difference between the SEC and the DOJ,
 5    but has undisputably (sic), and they won't dispute it, has
 6    been investigating this matter since 2008.  They have had
 7    access with a waiver of attorney/client privilege to all
 8    documents of the company, and they filed this indictment after
 9    Lowell Harmison dies.  They don't interview him.
10         He is the man who was in charge during the
11    allegations in question, and they literally call no other
12    officer or director to state that anything in the filings was
13    untrue or that, more importantly, there's anything in 2005 or
14    '6 that is in any way, shape or form accurate.
15         I'm not going to go through the complaint and cherry
16    pick various allegations, because I'm not going to use the
17    Court's time to do that.  But this is emblematic of the
18    complaint.
19         Paragraph 4 -- and I'm not going to go through
20    anything after that:  "Coconspirator one was a handyman and
21    Stein's chauffeur who resided in Boca Raton, Florida."
22         We know who coconspirator one is now.  It's Martin
23    Carter.  Testimony was elicited that the Government doesn't
24    dispute that he was not the chauffeur and handyman.  This is
25    emblematic of the type of misleading and wrongful allegations
```

1    that are in this indictment.  Does this mean that the

2    indictment, that they haven't proven the case beyond a

3    reasonable doubt?  Well, certainly if they had alleged that

4    between 2005 and 2007 that I did these various things, they

5    would be incorrect, because they haven't proven it.  There's

6    just no evidence in the record about it.

7          Mr. Pickard testified, Mr. Woodbury testified, and

8    none of them talked about any acts in 2005 or 2006 or any

9    conspiracy in 2005 or 2006.  Mr. Carter did not testify about

10   any false purchase orders in 2005 or 2006.

11         So with regard to count number 1, the paragraphs 10,

12   11, and 12, they are simply not things that relate to 2005 or

13   2006, and there's no evidence in the record that proves beyond

14   a reasonable doubt that these allegations are true.  The

15   allegations are continued throughout the complaint.

16         And, Your Honor, paragraph 14 is the actual last

17   poster child for why the Government has not proven their case.

18   It says:  "It was a purpose of the conspiracy that Stein and

19   his coconspirators" -- and remember this is all dating back to

20   2005 -- "would enrich themselves by artificially inflating the

21   share price of Signalife through the dissemination of false

22   information, then selling their shares of Signalife stock at

23   those inflated prices.  In addition, Stein and his

24   coconspirators misappropriated Signalife assets through sham

25   agreements which diverted approximately 1.5 million in

```
 1    corporate assets to Stein."

 2            Your Honor, I followed the Court's direction and did

 3    not ask Mr. Clark the penultimate question regarding what

 4    happened to ARC shares, but the Government has clearly alleged

 5    that I have some control over ARC Finance Group.  It is in the

 6    record undisputed, and to the extent the Court has any doubt

 7    about this, I would respectfully request the Court to read the

 8    stipulation which the parties have signed, which is docket

 9    number 113, in which all of the prices are stipulated to be

10    authentic and true from, I believe it's Bloomberg.  Is it

11    Bloomberg?

12            MR. STIEGLITZ:  (Nods head.)

13            MR. STEIN:  From Bloomberg.

14            And if the Court looks at those prices, it is

15    undisputed that ARC Finance Group, from the exhibit that

16    Mr. Clark was responding to, that ARC Finance Group had

17    19.5 million shares, that it was no more shares than they were

18    entitled to sell under the SB2, and that the stock was then

19    reverse split.  And then if the Court looks at the screen, the

20    Court -- of what's been stipulated to, the Court will see that

21    the stock dropped from $45 to one dollar the next day after

22    the sale.

23            This is something that I don't believe this Court, on

24    that fact, has ever seen before, a stock dropping from $45 to

25    one dollar in 24 hours.
```

```
 1            So the Government has proven a case in which it says
 2    that I and my coconspirators, the only one of which they've
 3    mentioned is Martin Carter.  They don't allege Dr.~Harmison
 4    was a coconspirator.  If they're going to, they'll say so when
 5    they come up here.  It's not in the complaint.  They're
 6    suggesting that they've proven beyond a reasonable doubt that
 7    for a gain of a million and a half dollars or $2 million, that
 8    the Stein family would give up $50 million, because the stock
 9    went in one day to zero, and it's not disputed.  It's been
10    stipulated into evidence.
11            That stipulation of that stock drop is what defeats
12    the Government's case at this stage, at the close of their
13    case, because it is not only not beyond a reasonable doubt,
14    but it's not even believable that I would or my wife would or
15    my ex-wife would go and enrich themselves for $3 million and
16    give up what was worth $40 million.  And the Court has in
17    evidence all of the price quotations.
18            Earlier in the case, the Government was suggesting
19    that more than 3 million shares was sold by ARC.  That would
20    be a completely different situation.  But the Court has in
21    evidence an SB2 that ARC didn't sell any more of, and the
22    Court has in evidence nothing regarding 2005 and 2006, and
23    we're left with this idea that I was enriching myself in the
24    amount of $3 million, $4 million, and concurrently destroying
25    the company, of which my family held 19 million shares, which
```

 1    were worth $50 million, and those -- it's undisputed that

 2    those shares are now worthless for my family.

 3          If I have to put on my case in chief, the Court will

 4    see who now owns the shares.  It's the people now working with

 5    the company.  But that's not -- the Government hasn't put any

 6    evidence on regarding that either.

 7          So, Your Honor, for all of those reasons, and most

 8    particularly the fact that the Government has things in the

 9    indictment which we know are untrue and some other things in

10    the indictment that stretch back to 2005, which there's no

11    evidence to support, I would request that the Court dismiss

12    the indictment, or at a minimum dismiss counts 2 through 4,

13    which are the mail fraud counts, given that those counts

14    incorporate a conspiracy from 2005, which the Government

15    hasn't proven at all.

16          There's not a shred of evidence.  And they talk about

17    three overt acts in each of those counts, which in and of

18    themselves they have not established any evidentiary basis

19    beyond a reasonable doubt that I was responsible for.

20          And on that, Your Honor, I will conclude the motion

21    and thank the Court for its time in considering it.

22          THE COURT:  All right.  Thank you.

23          MR. WHITE:  Your Honor, could I just have a moment

24    with Mr.~Stein?

25          THE COURT:  Sure.

```
 1              MR. STEIN:  Your Honor, I'll just supplement the

 2    motion with two additional points.

 3              There is direct testimony that -- by the Government's

 4    witness that none of the stock sales were illegal.  They have

 5    no knowledge of it being illegal.  The stock was all

 6    registered stock, undisputed.

 7              The Court has in evidence under the stipulation

 8    approximately 50 SEC filings, all of which say the exact same

 9    thing, which I questioned the witness about and the Court

10    correctly cut me off when I was done, but I was able to get

11    through all of the S-8 and all of the SB2 transfers.

12              And because the stock sales were not illegal, perhaps

13    they were in violation of a regulation that I'm unaware of,

14    the counts of mail fraud cannot be sustained, and that's why

15    I've asked that the Rule 29 motion on those be granted.

16              And that also, obviously, Your Honor, applies to the

17    money laundering counts.  The transactions themselves were not

18    illegal, because the stock was registered and the transactions

19    from the company to whoever got the stock were not illegal.

20    There's no evidence that they were illegal.  Whatever happened

21    after that, if I defrauded Mr. Carter, Mr. Carter defrauded me

22    and we're going to sue each other, that's a different story.

23              But from company to Carter, from company to Anand,

24    from company to ARC, ARC formed this company.  The Government

25    has put on that evidence.  The shares were issued.  ARC sold
```

 1    only those shares which it -- which were registered, and

 2    there's simply no evidence of an illegality between company on

 3    the one hand and the issuees of the stock on the other hand,

 4    which, without that illegality, there is no money laundering

 5    ability, and all of the counts of the indictment fail because

 6    of that connection between company and transferee.

 7              And I would submit the motion on that, Your Honor.

 8              THE COURT:  Thank you.

 9              Well, at this point of the proceedings I have to take

10    the evidence in the light most favorable to the Government,

11    and the mere fact that the indictment may encompass a period

12    of time that the conspiracy alleged to have taken place

13    within, and the Government, assuming you're correct,

14    Mr.~Stein, didn't prove a conspiracy in 2005, so long as they

15    presented sufficient evidence to make out a prima facie case

16    of a conspiracy within the timeframe alleged in the indictment

17    at some point, whether it was for the entire period of time or

18    not, that's sufficient.

19              The fact that the stock may have dropped

20    precipitously after the reverse split, I don't see how that

21    affects the Government's case or would entitle you to a

22    judgment as a matter of law, or acquittal, judgment of

23    acquittal, since the allegations of the complaint have nothing

24    to do with the stock split.  And there's no evidence in the

25    record as to why the stock split took place, or the reverse

1    split took place.  So, again, I don't see how that would

2    require a judgment of acquittal.

3           And the fact that the shares that were sold were

4    registered shares, this case is not a case alleging illegal

5    share of unregistered stock.  It's a case about fraudulent --

6    alleged fraudulent misrepresentations and public filings that

7    allegedly were made at your direction for the purpose of

8    profiting by sales of the shares, the registered shares that

9    were legally sold in the open market so that you can profit

10   from them.

11          So I think there's sufficient evidence in the record

12   that makes out a prima facie case for the jury to consider.

13   So I'm going to deny the motion.

14          MR. STEIN:  Thank you, Your Honor.

15          Your Honor, may I make sure that the witness is

16   available?

17          THE COURT:  Well, you want to take a couple minutes

18   to get set up.

19          MR. STIEGLITZ:  And may I just ask an administrative

20   question?  And I have a suggestion about all the stacks of

21   paper that the jury has at this point from the Government's

22   case.  I remember -- you know, I appreciate what the Court had

23   said earlier about they may be taking notes on them.

24          Might it work for to us to suggest that we're happy

25   to take back whatever they don't want to keep at this time and

```
 1    dispose of it, just so -- I mean, I don't want Mr.~Stein's

 2    case to be in any way impeded by, if he's handing stuff out

 3    by, you know, piles of paper in the jury box.

 4         THE COURT:  Do you object if we ask the jurors if

 5    they want to -- let them know that they're going to get copies

 6    of all this at the end of the case, and if they want to turn

 7    back their copies of exhibits --

 8         MR. STEIN:  I have no objection to that, Your Honor.

 9         As an additional housekeeping matter, given the

10    reading of the stipulations in the record, and under the

11    stipulations, are all of the securities filings of Signalife

12    now in evidence?

13         THE COURT:  I don't know what exhibits are in -- I

14    mean, I don't know what a lot of these numbers are that I've

15    admitted into the record.  So you have to tell me what these

16    are.

17         MR. STEIN:  Your Honor, given the stipulation which

18    is on the Court's docket, and given that all of these filings

19    are public record and publicly available on~-- on the SEC

20    website, I would ask the Court to judicially notice the

21    filings at this time.  They've been stipulated as being

22    authentic, and they're available on the screen of any judge or

23    human being that wants to find them.  So the filings of

24    Signalife, we've stipulated they're authentic, and they're

25    available, and I would ask that the Court judicially notice
```

```
 1    them under the Rules of Evidence.
 2              THE COURT:  Judicially notice them for what fact?
 3              MR. STEIN:  Judicially notice the fact that they were
 4    filed.
 5              THE COURT:  But what good does that do?  I mean, the
 6    jury can't make a decision based upon judicially noticed
 7    information that is on a website, an SEC website.  They're not
 8    going to be able to get on an SEC website during their
 9    deliberations to look at SEC filings if they want to.
10    Whatever evidence is being presented to them needs to be
11    presented in a form that they can review, either hard copy,
12    some kind of computer disc, something that's admitted into
13    evidence that they can look at and review during their
14    deliberations.  They can't get on a computer and get on the
15    Internet and start looking at SEC filings.
16              MR. STEIN:  I understand that, Your Honor.  That's --
17    the Government has admitted very few filings, although they've
18    stipulated --
19              THE COURT:  Well, that's why you have a chance to put
20    on your case and choose in your case what you would like to
21    put on, and they have a chance to object and if they believe
22    it's not relevant, the fact, again, that something is
23    authentic and stipulated as being authentic doesn't
24    necessarily make it admissible or relevant.
25              So you're now in your case.  You can choose what you
```

```
 1    wish to offer in your case as evidence, and we'll go from

 2    there.

 3           MR. STEIN:  Your Honor, I'm just talking about the

 4    filings during the 2005 to 2010 period.  They're obviously all

 5    relevant because the Government has alleged there's a

 6    conspiracy during that period.  I'm not talking about any

 7    earlier filings or later filings.

 8           THE COURT:  Mr.~Stein, you're going to be able to

 9    start your case in five minutes, 10 minutes, however much time

10    you'd like before we start, and during the course of your case

11    you can offer whatever evidence you want into the record and

12    I'll deal with it.  I don't know how else to tell you.

13           MR. STEIN:  I understand.  I understand what the

14    Court's saying.  The bottom line is, it's going to be, given

15    the dearth of securities filings put in, there's going to be a

16    lot of securities filings offered, but I will do it.

17           THE COURT:  Okay.  And we'll deal with it as it

18    comes.

19           MR. STEIN:  I understand.  May I go make sure the

20    witness is available?

21           THE COURT:  Are you ready to start?

22           MR. STEIN:  Yes.

23           THE COURT:  Okay.  I think the court reporter would

24    like a short break, so let's wait 10 minutes, and then we'll

25    get ready to go.  Okay?
```

```
 1              MR. STIEGLITZ:  And just to bring it back around, I
 2    think where we were, Mr. Stein, I don't think has an objection
 3    to dealing with the exhibits the way we suggested?
 4              MR. STEIN:  No objection whatsoever.
 5              THE COURT:  All right.  I'll let them know when they
 6    come in.
 7              MR. STIEGLITZ:  Thank you, Your Honor.
 8              THE COURT:  Thank you.
 9        (A recess was taken from 1:57 p.m. to 2:08 p.m., after
10    which the following proceedings were had:)
11              THE COURT:  Please be seated.
12              We're back on the record.
13              We ready, Mr.~Stein, to proceed?
14              MR. STEIN:  Yes, Your Honor.
15              THE COURT:  Let's bring the jurors out.
16              Is that box there for the jurors to discard their
17    exhibits?
18              MR. STIEGLITZ:  Well, the CSO kindly suggested that
19    maybe that would be a good way to go about it.  So if they
20    want to.  I'm in no way suggesting they should.
21        (The jury enters the courtroom, after which the following
22    proceedings were had:)
23              THE COURT:  Welcome back, everyone.  Please be
24    seated, ladies and gentlemen.
25              All right.  The reason for the box is now that the
```

```
 1   Government has finished with presenting its case, so you won't

 2   have papers cluttered around you for the remainder of the

 3   trial, if you wish -- you're not obligated to.  If you want to

 4   get rid of those papers, stick them in the box and we'll

 5   remove them.  All of the exhibits that have been admitted into

 6   evidence will be presented to you at the end of the case

 7   when -- during your deliberations, so they'll be copied for

 8   you to look at during your deliberations if you choose to.

 9          So if you want to get rid of your documents, just

10   pass them down, stick them in the box.  If you want to hold on

11   to them, hold on to them.  It's up to you.  If you'd like to

12   do it now, just so you don't have to keep them there.

13          MR. STEIN:  Your Honor, for anything the jury

14   discards, may the defense have copies, since we weren't given

15   any?

16          THE COURT:  We'll just hold on to everything.

17          MR. MUHLENDORF:  Your Honor, they have copies there.

18          THE COURT:  They're in the binders.

19          MR. STEIN:  I know.  Additional copies.

20          THE COURT:  We'll just hold on to them.

21          MR. STEIN:  Thank you.

22          MR. STIEGLITZ:  May I, Your Honor?

23          THE COURT:  Sure.

24          All right.  We'll just -- thank you, ladies and

25   gentlemen.  Let's just stick those under the table there.
```

```
 1              All right.  Thank you, ladies and gentlemen.  And now
 2    we're ready to proceed.  Government's rested its case, and now
 3    Mr.~Stein is going to present whatever evidence he would like
 4    to present in his defense.
 5              Mr.~Stein.
 6              MR. STEIN:  Thank you, Your Honor.
 7              Defense calls Ms. Jane Greene to the stand.
 8              THE COURT:  All right.  Ma'am, would you please raise
 9    your right hand for me.
10               Jane Greene, Defendant's witness, sworn.
11              THE COURT:  Please be seated.  Watch your step.
12              The chair doesn't move, ma'am.  The best way to do it
13    is move that microphone toward you as best you can.  You can
14    just stay right where you are.
15              If you could tell us your name, please, and spell
16    your last name for us.
17              THE WITNESS:  Jane Greene, G-r-e-e-n-e.
18              THE COURT:  Thank you, ma'am.
19              You may proceed, Mr.~Stein.
20              MR. STEIN:  Thank you, Your Honor.
21                          Direct Examination
22    BY MR. STEIN:
23    Q   Good afternoon.
24              Ms. Greene, are you a prior employee of Signalife?
25    A   Yes, I am.
```

```
1    Q    For purposes of this courtroom, we're referring to

2    Signalife as the company previously known as Recom Managed

3    Systems.

4    A    All right.

5    Q    When you were hired, was the company known as Recom

6    Managed Systems or Signalife?

7    A    Recom Managed Systems.

8    Q    Ms. Greene, prior to yesterday, how many times have you

9    and I spoken?

10   A    I had spoken to you once.  I have met you twice, but we

11   really didn't talk.

12   Q    When did you meet me in person?

13   A    When we went to New York to put Signalife on the New York

14   Stock Exchange and we rang the bell.  I met you then.  And

15   then when we had the opening, grand opening in Greenville, you

16   flew in for that grand opening, and I met you then.

17   Q    Any other times you can recall?

18   A    No.

19   Q    In either of the times you met me, did you get the

20   impression I was in control of Recom Managed

21   Systems/Signalife?

22   A    No.

23   Q    How is it that you occasioned to call me in 2013?  You

24   called me a couple weeks ago.

25   A    Yes.  I was subpoenaed by the Deputy U.S. Marshal.  He
```

```
 1   brought a subpoena to my house, and it was on the bottom that

 2   it was a court case for Mitchell Stein, and there was a

 3   telephone number, as well as an e-mail address.  So I tried to

 4   get in touch with you by both of those.

 5            I've never had a subpoena.  I didn't know what I was

 6   supposed to do.

 7   Q   Eventually you and I got in touch --

 8   A   Yes.

 9   Q   -- with each other.

10            And you're here today to comply with that subpoena --

11   A   Correct.

12   Q   -- is that accurate?

13            Did you and I meet last night?

14   A   Yes.

15   Q   Where did we meet last night?

16   A   In the restaurant at the hotel.

17   Q   Last night in the restaurant at the hotel, did I show you

18   any documents relating in any way to the business of Signalife

19   when you were there?

20   A   No.

21   Q   Did we talk about Signalife last night?

22   A   Yes.

23   Q   But with no documents?

24   A   No, the only document I saw was the pixel something from

25   the federal marshal, federal guy, George.
```

```
 1    Q    Okay.  No other documents last night?

 2    A    No.

 3    Q    So we were just talking from your bare memory about your

 4    time at Signalife?

 5    A    Correct.

 6    Q    From any time since you were served with the subpoena, did

 7    I ever tell you to lie about anything?

 8              MR. MUHLENDORF:  Objection, Your Honor.

 9              THE COURT:  Overruled.

10              THE WITNESS:  Does that mean I answer?

11              THE COURT:  You can answer, yes.

12              THE WITNESS:  Okay.  No, you didn't.

13    BY MR. STEIN:

14    Q    Have I ever told you in the times we talked to lie?

15    A    No.

16    Q    Ms. Greene, after you were served with a subpoena, did you

17    receive a telephone call from the postal inspectors?

18    A    One, George.

19    Q    And is that the only call you've ever had in your life

20    with anyone from the Government regarding Signalife?

21    A    Regarding anything from the Government.  Yes, regarding --

22    yes, that's the only time.

23    Q    And in your conversation with George, was it a pleasant

24    conversation?

25    A    It was very nice.
```

```
1   Q   But it was the only conversation you've ever had with
2   anyone from the Government, you're positive, regarding this --
3   Signalife, this company?
4   A   Yes.
5   Q   Ms. Greene, can you tell the Court a little bit about your
6   work background starting after you graduated high school?
7   A   Yes.  Graduated from high school, got married, went to
8   work for Upjohn, went to work for Greenville Hospital System.
9   I never went to college.  Single mother with two children, and
10  I was working for Greenville Hospital System, and there was a
11  new therapy that could save babies' lives.
12          I had lost a baby myself at five months -- and could
13  save babies' lives.  And the hospital wouldn't do the therapy.
14  It was a home therapy, and they wouldn't do it because they
15  said it took away from patient days.
16          And so I said, well, then I'm going to start my own
17  company, and I did.  And I had $3000, and I started my own
18  company in the living room of my house, and --
19  Q   What was the name of that company?
20  A   Medical Resource Management.  And we took all mothers,
21  whether they had insurance or not.  And that was a success at
22  that company.  And then I sold it three years later.
23  Q   When was that company, just in a year timeframe?
24  A   August of 1988, and I sold it in August of 1991 for
25  $15 million.
```

1    Q    And you were the founder of that company?

2    A    Only in America.

3    Q    What did you do after you sold your interest in that

4    company?

5    A    I got married again.

6    Q    Okay.

7    A    But then I started another company.

8    Q    While you were married?

9    A    Yeah, yeah, cardiac monitoring company.

10   Q    And what was the name of that company?

11   A    Monitor Medics.

12   Q    Did you start that company also from the bottom up?

13   A    Yeah.  Had a little bit more resources this time than I

14   did the first time.  I didn't have to sell my car and take my

15   money out of savings this time.

16   Q    I understand.

17        Could you just briefly explain to the Court and the

18   jury what the business of Monitor Medics was?

19   A    Well, it was a monitoring company, too, and we monitored

20   cardiac patients.  My father had a pacemaker and a

21   defibrillator, and so I got really interested in monitoring

22   cardiac patients because it really is not that much different

23   than monitoring pregnant women that are in danger of losing

24   their babies.  They require good constant monitoring by

25   skilled technicians, whether it be an OB nurse or whether it

```
 1    be a cardiac technician.
 2            We had halter monitors, event monitors, we did blood
 3    pressure monitoring, and we did pacemaker follow-up.  Did that
 4    in 15 states.  I'm sorry, 14 states.  Had about 150 employees,
 5    and it just kept getting bigger and bigger, and then I sold
 6    it.
 7    Q   What timeframe is this?
 8    A   This was from 1994 until the end of '97, and sold it to a
 9    private company this time.  The first one was sold to a public
10    company, so we got our money immediately.  This one was sold
11    to a private company, and we didn't get our money immediately,
12    but they took all these little small companies like mine and
13    rolled them all up and Matria, the large healthcare company,
14    bought them all for 498 million.
15    Q   You didn't get 498 million?
16    A   No, no.  My investors and I didn't get that much.
17    Q   But you made a profit on the investment?
18    A   Well, we made -- we got 17 million, but not 498.
19    Q   After Monitor Medics, which I think you said was '97, what
20    did you do next?
21    A   I volunteered to take the animal emergency clinic we had
22    in Greenville to the next level and raise the funds to get a
23    new building for them, because they were in an old Hardee's
24    that had kinda been redone.  And so I raised the money, and we
25    built a new building for the animals with a courtyard.
```

```
 1              Anyway, it was -- and then I went to work for Clemson
 2    University.  I worked for the university, raising money for
 3    them for a couple of years, and then retired again.
 4    Q   And when did you retire again?
 5    A   About 2003.
 6    Q   It doesn't sound like you stay in retirement very long.
 7    Did you ultimately come out of retirement again?
 8    A   Well, I did when I heard about the new monitoring company
 9    that was coming to Greenville.
10    Q   Was that company at the time Recom Managed Systems?
11    A   Yes, it was, Signalife.
12    Q   Okay.  Actually, was the name changed to Signalife after
13    you came to --
14    A   After I came.  After I came.  It was originally Recom, and
15    then it was changed.  But I looked into it, I did some
16    research online, and I contacted Pam Bunes, and she had really
17    just started herself, but I overnighted my -- she was on the
18    west coast at that time, and I overnighted my resume to her
19    because of my experience with running a company and also, the
20    monitoring companies that I had, you know.  That's what we
21    did, in cardiac.
22    Q   As you sit here today, are you aware of any other name
23    that the company has ever used other than Recom or Signalife?
24    A   No.
25    Q   You then said you sent your resume to Ms. Bunes.  Who was
```

```
 1    Pamela Bunes?
 2    A    Well, I didn't know, but at that time she was -- I mean, I
 3    didn't know her, but she was the president of Signalife, of
 4    Recom.
 5    Q    Did she respond to your resume?
 6    A    She did.
 7    Q    Did you have on your resume these other companies that you
 8    had founded and sold?
 9    A    Yes, I did.
10    Q    Did you ultimately negotiate with her for a position in
11    the company?
12    A    I did.
13    Q    Was I involved in those negotiations at all?
14    A    No.
15    Q    You never talked to me during this period?
16    A    No.
17    Q    Did the company and you ultimately reach an agreement and
18    you were hired?
19    A    Yes.
20    Q    When was that?
21    A    May or June of 2005.
22    Q    And what was your position at the company under that
23    original arrangement in May of 2005?
24    A    Vice president of market development.
25    Q    At the time you were hired and you took on the title vice
```

```
 1   president of development, were there any other vice presidents
 2   in Recom/Signalife?
 3   A    There were no other vice presidents the entire time I was
 4   there.
 5   Q    So in the chain of command while you were there, who was
 6   above you, if anybody, at Signalife?
 7   A    Pam was.  She was the president, and Rod was the chief
 8   operating officer, and I was the vice president.  So I guess
 9   that was sort of the chain of command, or I thought that was
10   going to be the chain of command.
11   Q    You mentioned the name Rod.  Can you just elaborate on his
12   name?
13   A    Yeah, Rod Hildebrandt.  Rod had worked at Johnson &
14   Johnson with Pam before, and I think he had worked with her
15   at, oh, one other company.  The name escapes me right now.
16   Don't think it was Indecon, I think it was the one before
17   that.
18   Q    Was Rodney Hildebrandt older than Pam Bunes?
19   A    Yes, he was closer to my age.  He was probably younger
20   than I was.
21   Q    So at the time, you -- they were a team?
22   A    Yes, yes.
23   Q    Did you have an understanding they were hired at the same
24   time or at different times?
25   A    I didn't really know.  I knew they knew each other, but I
```

```
 1   didn't -- they were already onboard when I came onboard.

 2   Q    And this is, again, in May of 2005, right?

 3   A    Yeah, either May or June.

 4   Q    Okay.  Now, to bracket the end of your tenure, and then

 5   we'll go through it, when did you cease being the vice

 6   president of marketing for Signalife?

 7   A    I was the vice president -- you mean when did my title

 8   cease?  My title never ceased.

 9   Q    No, when did you resign?

10   A    Oh, when did I resign?  Oh, December of 2006.

11   Q    So you were at the company from May of 2005 through

12   December of 2006?

13   A    Yes.

14   Q    During that time, let's talk for a moment about the

15   day-to-day operations of the Greenville office.  Did you have

16   an understanding from what you witnessed as to who was in

17   control of the day-to-day operations of Signalife while you

18   were there?

19   A    Well, Pam was in control, what there was of it.  We just

20   sort of figured that somebody else had to be in control,

21   because she really didn't know what she was doing.

22             THE COURT:  Ms. Greene, can you kinda lean a little

23   closer to the microphone, please?

24             THE WITNESS:  Yes, sir.  Maybe I can pull it a little

25   bit.
```

```
 1            THE COURT:  Can you give that answer again?
 2            THE WITNESS:  Yes.  I said we -- that meant my
 3   team -- all assumed somebody was running the business, because
 4   she didn't know how to run the business.
 5   BY MR. STEIN:
 6   Q   Was this something that you noticed soon after you were
 7   hired or later?
 8   A   It was later.  In the beginning it's all excitement and
 9   thrills, and we're a team, and we're all going to work
10   together, and we each appreciate each other, and we're going
11   to do something for the greater good.
12   Q   Let's talk about the beginning of your tenure.  At the
13   beginning of your tenure, let's say the first quarter of your
14   tenure, the first few months, did you notice anything or
15   witness anything that appeared to you to be unique about the
16   way Pam Bunes was running the office and what she was doing?
17   A   Yeah, yeah.  I've never seen anybody that wrote everything
18   that was said down.  She had these journals, and if we would
19   sit down at a staff meeting, she -- my daughter is a
20   journalist.  Some people journal.  I don't journal.  I stick
21   little notes here and there, but I mean she opened up the
22   books, and she writes everything out in long hand that we
23   said, and she must have gone through two to three books a
24   month, filled them up with everything.
25            So I thought to myself, why would she be doing that
```

1   and operating always under the beer truck theory?  I don't

2   know if y'all -- maybe I shouldn't say about the beer truck

3   theory, but that's -- you want me to hush?

4   Q   No, I don't -- I want you to just testify to what

5   happened.

6           This beer truck theory --

7           THE COURT:  We're all curious now.  We need to know

8   what the beer truck theory is.

9           THE WITNESS:  Well, it has been my experience in

10  leading a company if you did not have your whole team knowing

11  everything that was going on, then if you went outside and the

12  beer truck ran over you, then the company would not continue.

13  So I just assumed she was writing all this down so when she

14  went outside and the beer truck ran over her, then we would

15  know what to do.  But I never knew exactly what it all was,

16  because it was never shared with all of the rest of us.

17          She took notes at all of our staff meetings, and took

18  notes at board meetings, and took notes at her desk, and took

19  notes at my desk, at Claire's desk, at Susan's desk.  I've

20  never seen anything like that.

21          So then I thought, well, maybe she's going to write a

22  book, How I Got To Be Famous.

23  Q   You said maybe she's going to write a book?

24  A   Yeah.  I mean, you know, kings and queens used to take

25  notes about everything, and the president -- never mind.

```
 1    Q    At the time you were hired in this first quarter, did you
 2    know at that time that Recom/Signalife had just moved its
 3    operations across country?
 4    A    Uh-huh, yes, yes.
 5    Q    That was made crystal clear to you when you were hired?
 6    A    Yes, the company relocated to Greenville because Pam had
 7    said she would not run the company unless it was from
 8    Greenville because she had two younger children.
 9    Q    And do you recall if you had an impression of -- why would
10    you come out of retirement to come to work for a startup
11    company?  Did you have an impression back then of why am I
12    doing this, why am I coming out of retirement?  I mean, you
13    had made a lot of money over the past 15 years.
14    A    I was going to make a lot more.  I was going to make a lot
15    more money, help a lot of people.  I mean, when you're
16    presented with an opportunity that is not only -- my theory is
17    you do well by doing good, and it's always served me all my
18    life, and I've done well by doing good.
19             This product would do good.  It would have helped so
20    many people, and that's what was so frustrating about it.  I
21    knew what it could do.
22    Q    From the date you sent your resume, you felt you knew what
23    it could do?
24    A    No, I didn't know from the day I sent my resume, but I
25    knew it was worth looking into, and when I saw the product and
```

```
 1    saw where we could take it and understood the technology

 2    behind it, the Air Force technology, how it all -- how the

 3    brain works like the heart does, and . . .

 4    Q    When did you learn all of these things that you're talking

 5    about, how the brain works?

 6    A    When I went to the west coast.  And sat down and talked to

 7    Budimir, and he told me about how he developed this

 8    technology.

 9              MR. MUHLENDORF:  Your Honor, objection.

10              THE WITNESS:  I'm sorry.

11              MR. MUHLENDORF:  She's talking about what

12    Mr. Drakulic said.

13              THE COURT:  Well, it's not being offered for the

14    truth of anything.  She's just giving some background.

15              THE WITNESS:  Well, he developed this technology for

16    the Air Force.  The F16 fighter jets would get up to a certain

17    height and it would short-circuit their brains, and we were

18    losing a lot of our good fighter pilots because of that, and

19    so the Air Force hired Budimir to develop an

20    electroencephalogram helmet that the F16 pilots wore, and at

21    the point they hit that magic point that the pilots blacked

22    out, the helmet picked it up.

23              And so consequently, they went in and they could redo

24    the pilot's helmets so that it could block out that whatever

25    was causing the trigger in the brain.
```

```
 1              Well, then the Air Force didn't need the technology

 2    anymore, and they gave it to Budimir.  And so he worked with

 3    it to be cardiac technology, to do the same thing for the

 4    heart, and this was the latest and greatest.

 5    BY MR. STEIN:

 6    Q   So the technology that you're talking about, you traveled

 7    from Greenville after you were hired, to the west coast to

 8    look at?

 9    A   (Nods head.)

10              THE COURT:  Was that a "yes"?

11              THE WITNESS:  That was a yes.  I'm sorry, yes, sir.

12    BY MR. STEIN:

13    Q   You have to answer audibly with all these people.

14    A   I'm sorry.  Yes, sir.

15    Q   Thank you.

16              When you traveled to the west coast from Greenville,

17    approximately, if you can recall, I know this is your bare

18    memory, when was that?

19    A   Probably about three weeks after I was hired.

20    Q   Who did you meet with on the west coast?

21    A   I met with Budimir and Stan, and I can't remember Stan's

22    last name.

23    Q   And what was the purpose of your meeting with them?

24    A   For them to show me exactly how he had transferred this

25    technology from a helmet to a heart device.
```

1   Q    Did you see, when you were in the west coast -- was that

2   in Los Angeles?

3   A    Yeah, but it was called -- it's a little outskirt.

4   Q    Studio City?

5   A    Studio City, yes.

6   Q    Did you see with your eyes evidence of this -- these Air

7   Force studies with the helmet?

8   A    Yes.

9   Q    Did you see letters from the Air Force regarding the

10  technology?

11  A    Yes, because I specifically wanted to know if the Air

12  Force released the technology and we could use it,

13  because . . .

14  Q    And you understood that the company owned the technology?

15  A    Yes, yes.

16  Q    And to this day, you don't have any knowledge that anyone

17  else owns the technology; is that right?

18  A    No.

19  Q    What else happened at this meeting in Los Angeles with you

20  and Budimir Drakulic and someone named Stan?

21  A    Well, we waited on Budimir a long time to come in, because

22  he was playing tennis, and we sat around, and he told about

23  how the technology had come about, and then Stan -- we went to

24  dinner, and that was kinda it.

25  Q    From what you saw at this time in 2005, did it equal your

1    excitement that you had when you initially sent your resume

2    in?

3    A    Yes, yes.

4    Q    And what was the most exciting thing about the technology

5    that you can now recall here in 2013?

6    A    I felt like that technology was international, it had

7    international ramifications.

8    Q    Why did you feel that way?

9    A    Because you didn't have to know English to decipher it,

10   and so it could be used internationally.  A lot of

11   American-made products at the time -- we were using at the

12   time I did my companies were totally translated into English,

13   or, you know, they weren't built for an international stage.

14   But this had that ability, and I -- we could take it there.

15   Q    Anything else about the technology that you found unique

16   at this meeting in Los Angeles?

17   A    It was wireless.  Not wire -- there were wires, but it

18   transmitted to its informational database wirelessly, and that

19   wasn't the way things were in the past.  They had cassettes.

20   The event recorder had a cassette in it, and you had to press

21   for these markers, the halter monitor.  If you did some

22   activity -- you had to wear the event monitor for a month and

23   the halter monitor for 24 hours, and if you climbed some steps

24   you had to press a marker, and this technology didn't have all

25   of that.  It just picked up everything.

1    Q    When you say it picked up everything, you mean it picked

2    up everything and transferred it to a screen realtime?

3    A    Yes.

4    Q    At the time that you were in Los Angeles in 2005, did you

5    learn of whether or not the technology was capable of being

6    read over the Internet from coast to coast?  Did you learn

7    about that at that time or not?

8    A    I don't think at that time, no.  That was later.

9    Q    So how long was the meeting in Los Angeles?  How many

10   days?

11   A    Just a couple of days.

12   Q    And you at that point felt satisfied, and you went back to

13   Greenville?

14   A    I did.

15   Q    Now, you indicated that at the company there were two

16   people above you, Pamela Bunes and Rodney Hildebrandt?

17   A    Yes.

18   Q    Did Mr. Rodney Hildebrandt live in Greenville?

19   A    No, he lived out west somewhere.

20   Q    Did -- during your tenure, which ended, I think you said

21   December 2006, did Mr. Hildebrandt ever move to Greenville,

22   South Carolina?

23   A    No.

24   Q    In all fairness, at the time did you ever know that

25   Mr. Hildebrandt was or wasn't supposed to move to Greenville?

1    A    No, I didn't know if he was or he wasn't supposed to.

2    Q    Now you're back from seeing the technology.  You're in

3    Greenville.  What was your next move as the vice president of

4    marketing?

5    A    Well, I felt like we needed to get a team together,

6    someone that understood how to put a cardiac monitoring center

7    together, someone who understood cardiac rhythms.  And I had

8    both that worked for me in my cardiac monitoring company, and

9    so I talked to Pam about bringing Susan Keitt onboard and

10   Elaine Sosbe.  And Elaine was a cardiac technician, and Susan

11   was a master at putting together monitoring centers, and so

12   forth and so on.  She had done that twice before for me.

13        So we get the team together and we rollout our plan.

14   This is what we'd like to do.  We'd like to start putting it

15   in hospitals, and I had worked for Greenville Hospital System.

16   It was 1200 beds, and it was a system of hospitals there in

17   the Greenville, Greer, Simpsonville, that whole area there.

18   And I guess that was the first really big disappointment.  Pam

19   said, no, she wanted to use her contacts from Biosense

20   Webster.  That was the company I couldn't remember, Biosense

21   Webster, that Pam and Rod had worked for.

22   Q    You've just given us a lot of information.  Can you tell

23   us again the names of the two people that you hired?

24   A    Susan and Elaine, Susan Keitt and Elaine Sosbe.

25   Q    Could you spell their names?

```
 1    A    Sosbe, S-o-s-b-e, Keitt, K-e-i-t-t.

 2    Q    And you said you had worked with them in the past.  Was

 3    that at this Monitor Medics Company?

 4    A    Both of them worked at Monitor Medics, and Susan worked in

 5    my first company, which was the Perinatal Monitoring Company.

 6    Q    And were you successful in causing the company to hire

 7    these two people, Elaine and Susan I think you said?

 8    A    Yes, yes.  It was time for the company to grow, and if we

 9    were going to grow, we had to grow by marketing.

10    Q    Now, what is the point where these two people were hired

11    and your team began to expand in Greenville?  Approximately

12    when in 2005?

13    A    Probably after I had been there about five months.

14    Q    So we're talking about October.

15    A    November -- yeah, yeah.

16    Q    2005?

17    A    Yeah.

18    Q    So let's take the period of when you were hired through

19    the end of 2005.

20    A    Uh-huh.

21    Q    Did you and I talk day to day?

22    A    I never talked with you on the telephone until after I got

23    my subpoena.

24    Q    Do you have a recollection of why we never talked on the

25    phone while you were with the company?
```

```
1    A    Well, it was pretty much understood that we couldn't call
2    you direct.  We couldn't call Budimir direct, we couldn't call
3    you direct.  All that had to go through Pam or Clair.
4    Q    And who is Clair?
5    A    Well, she was direct --
6    Q    What's her name I'm saying?
7    A    I'm sorry, Clair LaFrance.  She's now Pappas.  She's
8    gotten married again.
9              Anyway, either Clair or Pam.  Rod wouldn't talk to
10   Budimir.  I don't think Rod talked to you.  I think it was
11   just Pam and Clair.  None of the rest of us, they felt like
12   they could handle things better.
13   Q    Budimir Drakulic, in your mind at this time, 2005 'til the
14   end of 2005, he was, in your mind, the inventor of the
15   technology, from what you've described.  Is that accurate?
16   A    Yes.
17   Q    Did it cause you any concern that, as you say, you
18   couldn't talk to him without going through Pam at that time?
19   A    Yes, it did.
20   Q    What were the concerns, if you can recall them?
21   A    Well, we would want to go to the hospital and talk to the
22   head of cardiology, and it would have been really nice for
23   Budimir to go to and talk -- even though he wasn't a
24   cardiologist, he was an engineer, and he developed the
25   product, and he knew the ins and outs of it better than the
```

```
 1   marketing people knew the ins and outs.  So we wanted him to
 2   go with us into the hospital and sit down and talk to the head
 3   of cardiology and what this would do.  And we couldn't do
 4   that.
 5   Q   Could you please tell the Court and the jury why you
 6   couldn't do that, if you recall?
 7   A   I was told that Budimir would lose his temper, and Pam
 8   said she was the only one that could really control him.
 9   So . . .
10   Q   So your team, the marketing team, the three people in 2005
11   that you've testified about, you were unable to get ahold of
12   Budimir directly unless you went through Pam?
13   A   Correct, correct.
14   Q   Was anybody else hired -- at this time, at the end of
15   2005, could you just identify the employees in the Greenville
16   office?
17   A   Well, by this time they had hired Rajiv Singh.  We were so
18   excited, because Rajiv was an engineer.  He worked for L3,
19   which was the federal government, a contractor for the federal
20   government.  He knew how things worked, and he was excited
21   about it, we were excited and enthusiastic about it.  He was
22   hired as director of product development, and we thought,
23   well, Rajiv can talk to Budimir, because here you're talking
24   engineering brain to engineering brain.  And then it worked
25   out he couldn't talk to Budimir either.
```

```
 1    Q    But Rajiv Singh, you could talk to him?

 2    A    Oh, yeah, yeah.  He's a really smart, smart -- a team

 3    player, wanting things to be successful, just like we were.

 4    Q    And did you ever come to realize that Mr. Singh was having

 5    trouble interacting with Budimir Drakulic?

 6    A    Yes, yes.

 7    Q    Was that over a short period of time, a long period of

 8    time?  How long did it take to find that out?

 9    A    Rajiv would not say a lot about it in the beginning, but

10    towards the time before they fired him he had a lot to say

11    about not being able -- especially after the Rubbermaid

12    debacle.  He had a lot to say about not being able to.  We

13    would get it right there, we would get the product.  We knew

14    that we could put it in the market, and Budimir would say, no,

15    I need to work with this chip, or that chip, or -- and

16    something about an ASIG (phonetic) chip or an Acer chip or

17    something.

18              And was it my understanding that the technology was

19    there, but it just wasn't released.  And then when it was

20    released to Rubbermaid, then it didn't work.

21    Q    When the technology -- when you were there, did you have

22    an understanding of whether the FDA had cleared the technology

23    for sale?

24    A    Oh, yes, yes.

25    Q    So it was an FDA cleared?
```

```
1    A    It was an FDA approved device.

2    Q    Again, in the 2005 timeframe, did you have an

3    understanding of the company's cash position or liquidity at

4    any time between the time you were hired and December of 2005?

5    A    Well, when I was hired it was my understanding that some

6    money had been raised and that the company had eight or

7    $10 million.

8    Q    And --

9    A    And then by six months, Pam was talking about she needed

10   to raise more money.  I started to say if she'd sell some of

11   those expensive paintings she had on the wall or we had a

12   lower rent office or her salary wasn't $300,000 a year, maybe

13   we all would, you know . . .

14        Because we had all invested in it.  We had 401k money

15   taken out to buy Signalife stock, we had put money in the

16   company.  We wanted to see it successful.

17   Q    Could you describe in 2005 the Greenville Signalife

18   offices?

19   A    Oh, man, I had never seen anything like that except when I

20   went with my little brother and I were in the first company

21   together, and we went down to see Pete Petit's office,

22   Healthdyne, and he had all this -- it was kind of like your

23   office.  It was really nice.  Looked a whole lot better than

24   my living room did.

25        But, yeah, when I walked in, there were exposed brick
```

```
 1    walls and thick carpet on the floor and big beautiful plants
 2    that other people came and fixed and looked after, and
 3    gorgeous paintings.  And they were real.  They weren't any of
 4    these lithograph things, you know, and they weren't copies.
 5    They're real paintings that -- her brother had an art gallery,
 6    and so she got the paintings from her brother.
 7    Q    Whose brother?
 8    A    Pam's.  She got them from her brother, and the desks were
 9    really -- and it was the highest rent district in Greenville,
10    because it was overlooking -- this is Greenville, South
11    Carolina.  It was overlooking the Reedy River, and the falls
12    came down like that, and the Liberty Bridge -- Greenville's
13    not very big, but it's bigger than where I live in Abbeville,
14    but it was -- they were really nice, and I was proud to be
15    there, because I had never been in offices like that.
16    Q    Did you, at the end of 2005, have full confidence that
17    when the product was delivered to you, you would be able to
18    market it to hospitals and internationally?
19    A    I can sell, I can plan a marketing campaign, we could sell
20    it.
21    Q    Notwithstanding your plans in 2005, did you have an
22    occasion to go back to Los Angeles again in 2005?
23    A    I think I've been twice.  I went that first time, and I
24    think I went another time.  And that seems like -- it seems
25    like to me a plastic surgeon bought some of these devices to
```

```
 1   monitor his patients with after he had already worked on them,

 2   and I think you -- you might have brokered that deal, I think.

 3   Q   Your recollection is all we want.

 4   A   Yeah, I don't know, but I think we went out there for

 5   that.

 6   Q   Do you recall when you were -- when you went out the

 7   second time, do you recall actually going to that doctor's

 8   office?

 9   A   No, I didn't go.

10   Q   Do you recall anybody going that you were with?

11   A   Pam.

12   Q   Do you recall Pam -- you're talking about Pamela Bunes?

13   A   Yeah, yes.

14   Q   Do you recall Pamela Bunes videotaping the activities in

15   that doctor's office?

16   A   No, I don't recall that.

17   Q   You do recall her going there?

18   A   Yes.

19   Q   But you weren't -- were in LA, but you didn't go with her

20   to the doctor's office?

21   A   No, I did not.  I think Clair went.

22   Q   Clair LaFrance?

23   A   No.

24   Q   I wasn't there, right?

25   A   Not that I know of, but I didn't go.
```

```
1   Q    When you went back to LA, were you personally for your
2   marketing duties in the company looking for any other
3   assurances regarding the product and delivery?  Was there any
4   other reason why you went back there that you can recall
5   today?
6   A    No, I can't recall.
7   Q    Did you go to the Signalife offices on the second visit?
8   A    Yes, yes.
9   Q    Did you see the technology again?
10  A    Saw the technology again, saw Budimir again, saw Stan
11  again, and another engineer that had a different name.  It
12  sounded Russian to me.  I don't know.
13  Q    Okay.  And then you went back to Greenville.
14  A    Back to Greenville.
15  Q    At that time, what was the next thing you did as vice
16  president of marketing for Signalife?
17  A    I went to India and the Ukraine.
18  Q    Now, why would you do that?
19  A    Because a lot of monitoring for large companies is done
20  out of India, and some is now being done out of Ukraine.  I
21  had already been to the Ukraine.  The Secretary of State for
22  South Carolina had some people that were representing
23  hospitals, pharmaceutical companies, home care companies.
24  When Russia broke apart, it was a humanitarian effort to see
25  if the State of South Carolina could provide the Ukraine with
```

```
 1    a product that they could sell in the Ukraine that would

 2    benefit both South Carolina and the Ukrainian people.

 3            But when we got there, we realized that the break

 4    with Russia, I mean, they were like -- their medical schools,

 5    they had placards like these over here that had all of the

 6    information, and the students stood down there and read the

 7    placards, and when they were finished, it would -- it was like

 8    1930s and '40s in the United States.  So they weren't ready.

 9            So we went on to India.  And Rajiv and his wife, who

10    have family there, were there for whatever Indian holiday

11    comes in November.  We went to see the head -- flew into

12    Delhi, New Delhi, and stayed at a hotel, and Rajiv and Neland

13    came and got me, and we went to meet with her father, who was

14    the ambassador to Angola and also had the third largest

15    pharmaceutical company in India.  And they took me to meet the

16    head of cardiology at one of the hospitals there.

17            And then we flew the next day to Mumbai and saw the

18    head of cardiology there, because I was looking not just at

19    monitoring from India, but also putting some of our monitors

20    in the hospitals there.

21            But there's a certain amount of technology that

22    you've got to have in order to be able to even operate not

23    just these monitors, but India had it.  And India had the

24    fiberoptic cables under the ocean that we could have used for

25    the monitoring.  So when we got back to New Delhi, we went to
```

1    some of the big monitoring sites that monitored like for

2    American Express and some of the larger insurance companies

3    and all -- you know, hello, my name is Susan.

4    Q    Could you please explain to the Court and the jury what a

5    monitoring center is.

6    A    It's just --

7              MR. MUHLENDORF:  Your Honor, may we have a sidebar?

8              THE COURT:  Yes.

9         (The following proceedings were held at sidebar:)

10             MR. MUHLENDORF:  Your Honor, we've been going for

11   about 30 minutes now.  I haven't heard anything relevant to

12   anything in the case.

13             THE COURT:  Okay.  Mr. Stein, I assume when you

14   called this witness and you started out with her testimony,

15   you were using her to establish that you didn't have any

16   control over what was going on, she never saw you, she never

17   heard from you, she never had any dealings with you, she was

18   the vice president, third in control, therefore she never

19   heard of you.  Everything was running without your

20   involvement, so therefore the Government's portrayal of you as

21   running the company is all wet, so to speak.

22             I thought that was where you were going.  Maybe I'm

23   wrong.  Maybe there's something more to it.

24             And she's very entertaining, and she's got a very

25   interesting background, and she's very charming, but what does

```
 1    all this have to do with the case?

 2              MR. STEIN:  The Government is the one, which we

 3    talked about in the motion, that alleged the conspiracy dating

 4    back to 2005.  This woman will -- and this woman's experiences

 5    during the time will -- is very probative to exactly what the

 6    company was doing, and then she -- then when she left, I mean

 7    . . .

 8              THE COURT:  Well, what the company was doing isn't

 9    really the issue here.  It's what the Government claims you

10    were doing, and if you want to use her to prove the

11    Government's wrong about what you were doing, I think that's

12    perfectly legitimate.  And as I said, starting out, it seemed

13    like you were using her to establish that you were not in

14    control, and that other people were in control, and you were

15    not involved in the day-to-day operations, as the Government's

16    tried to portray it, and I think that's perfectly legitimate.

17              But all of this about going to Mumbai and all of her

18    cute stories about the offices, I mean, those are all, as I

19    said, very entertaining and charming, but we're wasting

20    everyone's time, including the jurors'.

21              So I'm going to suggest that focus on the

22    Government's allegations and what she may have to offer to

23    refute the Government's allegations, rather than trying to

24    prove that this was the greatest invention since sliced bread

25    and was going to be a success, which isn't really the issue in
```

```
 1    the case, whether this was a good product or a bad product,

 2    whether the company was going to be successful if Pam Bunes

 3    had spent more time marketing instead of writing notes in her

 4    journals.

 5              I mean, the case is about what the Government claims

 6    you orchestrated in terms of fraudulent representations to the

 7    public and how that benefited you personally.  That's what the

 8    case is about.

 9              MR. STEIN:  But her experiences at the company are --

10    I mean, I'm not -- I make to the Court an offer of proof.  She

11    has -- she will testify on cross-examination there's --

12              THE COURT:  This is direct examination.

13              MR. STEIN:  No, I understand.  But she was under an

14    impression that I was under some sort of control.  So I need

15    to elicit everything that happened during her stewardship as

16    quickly as possible.

17              THE COURT:  You don't need to elicit everything that

18    happened during her stewardship.

19              MR. STEIN:  No, the major things, Rubbermaid and then

20    her resignation.

21              THE COURT:  I mean, I don't understand what her

22    resignation has to do with anything.  I don't know why she

23    resigned.  The Government didn't call her in their case, so I

24    don't know what you're refuting as far as her resignation.

25              MR. STEIN:  The Government has made an allegation
```

1    about 2005 and 2006, and she is testifying directly about

2    those periods of time.

3         THE COURT:  But she's testifying about things that

4    have nothing to do with the case.  The fact that it happened

5    in 2005 or 2006 doesn't make it relevant to the case.  Let's

6    focus on the Government's allegations against you and what she

7    might know about them or can -- what she knows to refute them.

8    That's what we need to focus on.

9         MR. STEIN:  I will tie all of her events to whether I

10   was involved then.

11        THE COURT:  Well, fine.  Try and focus on~--

12        MR. STEIN:  Okay.  Thank you.

13     (Sidebar conference concluded.)

14        THE COURT:  I'm sorry.  I'm advised that the witness

15   needs a break, so we're going to take a short recess.  All

16   right?

17        THE WITNESS:  Thank you.

18        THE COURT:  You're welcome.

19        Ladies and gentlemen, let's give the witness an

20   opportunity to use the restroom, please.  Don't discuss the

21   case or form any opinions.  Thank you.

22        Don't discuss your testimony during the break, but,

23   yes, go ahead.

24     (The jury exits the courtroom.)

25        THE COURT:  All right.  Let's take a short recess for

```
 1    the witness.

 2        (A recess was taken from 3:05 p.m. to 3:15 p.m., after

 3    which the following proceedings were had:)

 4            THE COURT:  All right.  Let's bring the jury back in.

 5            Ma'am, you're still under oath.

 6            THE WITNESS:  Yes.

 7            THE COURT:  Thank you.

 8        (The jury enters the courtroom, after which the following

 9    proceedings were had:)

10            THE COURT:  Welcome back, everyone.  And please be

11    seated, ladies and gentlemen.  Thank you, ladies and

12    gentlemen, for your cooperation with our witness, and we're

13    ready to proceed.

14            Mr.~Stein.

15            MR. STEIN:  Thank you, Your Honor.

16    BY MR. STEIN:

17    Q    Good afternoon, Ms. Greene.

18    A    Hi.

19    Q    When we broke, you were talking about the trip to India.

20    You returned to Greenville after that trip; isn't that

21    correct?

22    A    Yes.

23    Q    Your trip was approved by the company?

24    A    Yes.

25    Q    Who at the company approved the trip?
```

```
 1   A    Pam.

 2   Q    Turning your attention to 2006, did the company engage in

 3   any significant new transactions in 2006?

 4   A    Yes, a big one with Rubbermaid.

 5   Q    When was that?

 6   A    I think it was March, maybe March.

 7   Q    Of 2006?

 8   A    Of 2006.  It was -- yeah.

 9   Q    And what type of transaction was that, if you recall?

10   A    It was -- Rubbermaid was going to pay Signalife $2 million

11   to -- for the rights to sell the Signalife recorder.  So once

12   the contract was all worked out, and it was my understanding

13   that you came down to sign the contract, but you didn't come

14   to Greenville, you went to Charlotte.

15         After the contract was signed, then we -- Susan,

16   Elaine, and myself -- well, Rubbermaid hired new salespeople,

17   and so we went to train.  We went to Charlotte to train the

18   new Rubbermaid employees.  They had hired six new people, and

19   we spent a week up there training them, training them in how

20   the monitor worked and where we felt would be a good market.

21         Rubbermaid is a very familiar household name, but the

22   company wanted to get a bigger healthcare presence.  And so

23   Pam knew a guy at Rubbermaid, and he came down to Greenville.

24   Doug, maybe.  I don't remember.  But he came to Greenville,

25   saw the technology, and sat and spent some time talking to me,
```

```
 1    talking to Susan, talking to Elaine, talking to Rajiv, and
 2    brought his boss in who was marketing for Rubbermaid, and they
 3    decided this would be a big healthcare venture for Rubbermaid.
 4    Q    To your knowledge, did Rubbermaid eventually sign an
 5    agreement with Signalife?
 6    A    Yeah.
 7              MR. MUHLENDORF:  Your Honor, I'm going to object on
 8    the relevancy again.
 9              THE COURT:  Overruled.
10    BY MR. STEIN:
11    Q    Did Rubbermaid pay Signalife $2 million?
12    A    Yep.  That was my understanding that they did.
13    Q    For the rights to distribute this technology?
14    A    Correct.
15    Q    You said that I went to Charlotte, to your knowledge.  Do
16    you remember that?
17    A    Yes.
18    Q    Did you have an understanding of what I was doing in
19    Charlotte?  Was I acting as a lawyer?  Was I acting as a
20    principal?  Do you have any remembrance?
21    A    I thought that you just went to sign the contract.
22    Q    And who gave you that impression?
23    A    Pam.
24    Q    Did you ever see the contract with Rubbermaid?
25    A    No.
```

```
 1   Q    Did Pam go to Charlotte regarding the Rubbermaid contract?

 2   A    Yes.

 3   Q    At the same time you thought I was there?

 4   A    Yes.

 5   Q    At about this time, I guess you said it was March of 2006,

 6   were you aware inside of the Greenville office that myself or

 7   my wife at the time or anybody affiliated with us was selling

 8   stock into the marketplace?

 9   A    It was brought to our attention that -- we didn't know it,

10   but the person that was the shareholder relations person said,

11   look at this, the stock will go up, Mitch and Tracey will

12   sell, the stock will go down.  And she showed us several

13   instances that that happened.  We didn't think that was right.

14          We felt like it was very foolish to do that, because

15   we were all holding on to ours because we were going to make

16   something out of our stock.

17   Q    Who is -- when you say she told us, who is the "she" that

18   showed you that?

19   A    Clair, Clair LaFrance.  She was head -- our director of

20   investor relations.

21   Q    Did that fact of what she told you cause you to have any

22   desire to stop the marketing efforts you were doing with

23   regard to the technology?

24   A    No, nothing had -- I'm a, put it in the top, hold it out

25   here and put it in the bottom type person.  I don't get
```

1    involved in all the little day to day stuff.  But it did -- it

2    did make us wonder what was going on.

3           And by that time, we were being paid in stock that

4    was being sold.  I can't remember the attorney's name, but

5    Tracy would call and say you gotta sell so many shares of

6    stock to pay the people.  I wondered where all the money went.

7    Q   So you're saying during the time of the Rubbermaid

8    contract you stopped being paid in cash by the company and

9    started being paid in stock, is that what you're saying?

10   A   I don't know if it was the time of the Rubbermaid

11   contract, because shortly after we trained the people, the

12   Rubbermaid contract just kind of came unglued.  They said they

13   wanted their money back.  We'd already trained their people.

14   They said the product wouldn't work.  We knew the product

15   would.

16          Budimir had the product back.  And so we wanted -- I

17   particularly wanted to go and sit down and talk to them from a

18   marketing standpoint, because we had a lot of hospitals in

19   North Carolina and South Carolina and Georgia, Alabama, and

20   Virginia and around that we had worked with, and we could have

21   helped them get into those hospitals.  But Pam said let her

22   handle it, so . . .

23   Q   At this time in the middle of 2006 when you learned about

24   stock sales, did you feel that I was taking advantage of the

25   company or cheating the company in any way?

```
 1    A    Yes.

 2    Q    And what made you feel that?

 3    A    Because you were selling the stock.

 4    Q    And did someone tell you that was wrong, without

 5    mentioning a name?

 6    A    She didn't come right out and say that it was wrong, but

 7    it was inferred that it was wrong.

 8    Q    And did you ever call me at that time to discuss this?

 9    You were vice president of marketing.

10    A    I was not allowed to call you.

11    Q    I understand you weren't allowed to call me.

12    A    We were all told that if there were calls that went to

13    Mitch or to Budimir, that they were to go through Pam.

14    Q    And so you never called me during this period?

15    A    No, no.

16             I didn't call Budimir either.

17    Q    Did Budimir -- when you say the Rubbermaid contract became

18    unglued, did Budimir rush to the east coast?

19    A    No.

20    Q    Did Budimir come to the east coast?

21    A    He did not.  He did not.

22    Q    Do you have any impression --

23    A    Pam went sailing, and we were all floundering around

24    trying to pull the thing together.

25    Q    This is after Rubbermaid paid the company $2 million,
```

```
 1    right?

 2    A    I guess they had paid both of them.  I think they paid one

 3    and were going to pay another.  I don't remember that exactly,

 4    exactly.  But they wanted their money back.

 5    Q    Do you know whether Rubbermaid ever got their money back?

 6    A    No, I don't know.

 7    Q    Do you know whether I ever handled litigation work with

 8    Rubbermaid regarding that?

 9    A    No.

10    Q    Do you know whether there ever was litigation with

11    Rubbermaid regarding this issue?

12    A    No, I don't.  We were just kept out of that.

13    Q    This -- did this increase the frustration you had talked

14    about in 2005?

15    A    Extremely.

16    Q    Could you explain in a concise way to the Court and the

17    jury what the frustration was in the middle of 2006 in your

18    mind, if you recall?

19    A    We couldn't get -- we had a good product that would save

20    lives.  There was even a program called Athletes for Life that

21    we would have taken into high schools, taken this product into

22    high schools and put it on young athletes to check to see if

23    they had a heart arrhythmia.  That's what we wanted to do.

24          Elaine's son was the coach at Greenville High School.

25    I had all the tie-ins to Clemson University, and the director
```

```
 1    of athletics was a good friend of mine.  So we wanted to do it

 2    slowly step by step, Athletes for Life, protecting young

 3    people; and Pam didn't want to do that way.  She wanted to go

 4    straight to the big leagues, straight to the Willie Gault,

 5    straight to the professional teams.  And you gotta kind of

 6    take some baby steps here before you can -- and that never

 7    came off.

 8            And I'm sorry, I lost the question.

 9    Q   You've answered the question.

10            Did you and I ever speak in 2006 regarding your

11    frustration and your thoughts that I was taking advantage of

12    the company?

13    A   I never talked to you ever on the telephone until after

14    this thing; and, no, we didn't.  No, we did not.

15            Oh, what were some of my frustrations.  That's what

16    you had asked me.

17            One was we had a good product that would have saved

18    lives.  Two was -- and I honestly thought you were running the

19    company because Pam was not smart enough.  She did not have

20    the ability to run the company.  So I thought, well, Mitch

21    must be running it, or somebody else is running it, and it's

22    just -- and they're not turning this product -- Budimir

23    wouldn't turn the product loose.  He kept tinkering with it

24    and tinkering with it, and all it needed was this, or was

25    that.  And it was made up stuff.
```

```
 1              And then they fired Rajiv.  And then we're getting
 2    paid in stock.  And I'm thinking, and I have gotten my friends
 3    that I made money for, my children, my parents were invested
 4    in this company.  And the town I lived in was 7000 people, and
 5    I grew up in that town, and the people there know me, and I
 6    could not in all honesty look at them and say I don't believe
 7    in this company anymore, because they would say, well, why are
 8    you still there.
 9    Q    Who fired Rajiv Singh?
10    A    Pam.
11    Q    You said you didn't feel Pam was competent.
12    A    No.
13    Q    Were Pam and Rodney Hildebrandt together, in your view,
14    competent as a team?
15    A    Rod was competent.
16    Q    But he wasn't in South Carolina, right?
17    A    No, no.  He didn't -- he would come a couple days out of
18    the week.
19    Q    Did you ever form an impression that I was involved in a
20    conspiracy with Budimir Drakulic to withhold the technology
21    from the Greenville office?
22    A    No, no.  Budimir had his own something going, I guess.  I
23    don't know, because he just, he would keep saying it's not
24    ready, it's not ready, it's not ready.  It was ready.
25              Excuse me.  I'm sorry.  It was very frustrating.
```

1    Q    The FDA said it was ready in your mind, correct?

2    A    The FDA said it was ready, we said it was ready, Rajiv

3    said it was ready.  Not Budimir.

4    Q    When is the last time you've spoken with Pamela Bunes?

5    A    I got a Linkedin -- I left in 2006, and probably in 2008

6    that Linkedin website that somebody asks you to link in and be

7    their friend, it's kind of like a professional Facebook; and I

8    got a thing from her.

9    Q    I'm sorry.  I asked that question ahead of time.

10         You ultimately resigned from the company.

11   A    Yes.

12   Q    When was that?

13   A    December of '06.

14   Q    From and after that point, other than this Linkedin thing

15   with Pamela Bunes, have you spoken to Ms. Bunes?

16   A    No.

17   Q    Are you familiar with a man named Kenneth Londoner?

18   A    Yes, I can't remember exactly why, but the name is very

19   familiar.  He had something to do with maybe Biosense Webster.

20   Q    Have you spoken with Mr. Londoner since you resigned?

21   A    No, no.

22   Q    Prior to getting subpoenaed, did you speak to me after you

23   resigned?

24   A    Nor while I was -- no, I did not.

25   Q    Have you spoken with Clair LaFrance since your

```
 1    resignation?

 2    A    She did a Linkedin thing, too, but, no.

 3    Q    Have you spoken with Budimir Drakulic?

 4    A    No.

 5    Q    Have you ever heard of the name Ajay Anand?

 6    A    Is that a company?  Well, no, I haven't ever heard of it.

 7    Q    Have you ever heard of the name Martin Carter?

 8    A    No.

 9    Q    Did you ever read any of the securities filings -- you're

10    familiar with securities filings?

11    A    Yes, I am.

12    Q    Did you ever read any of the securities filings regarding

13    the company?

14    A    No.

15    Q    You were just interested in getting the product in and

16    marketing it?

17    A    That wasn't my area of expertise, securities filings.

18    Q    What was your area of expertise?

19    A    Marketing.  Market development, building a team, taking a

20    product to market.

21    Q    Do you, as you sit here today or at any time before today,

22    do you feel that -- or did you feel that I was blocking this

23    product from coming into the marketplace?

24    A    No.

25    Q    And we're clear that the product I'm holding up is the
```

 1   product that you are in your mind thinking of?

 2   A   Yes.

 3           MR. STEIN:   Your witness.

 4                     Cross-examination

 5   BY MR. MUHLENDORF:

 6   Q   Good afternoon, Ms. Greene.

 7   A   Hi.

 8   Q   I just want to go over -- it's going to be very brief, I

 9   think, just a few of the things you testified about.

10           Now, I think you said that you talked about, that you

11   had talked to Mr. Stein last night, correct?

12   A   Uh-huh.

13   Q   You had dinner with him at the hotel?

14   A   Yes, yes.

15   Q   And you said that you did that because you got a subpoena

16   from him to be a witness for him in his case, right?

17   A   Correct.

18   Q   Okay.  And I just want to make sure I understood some of

19   the stuff we were just talking about when you were testifying

20   for Mr.~Stein.

21           It was your impression that you honestly thought he

22   was running the company back in 2005 and 2006?

23   A   I felt like he had to be, because Pam wasn't smart enough.

24   Q   Okay.  Again, appearing here for Mr.~Stein, it was your

25   testimony that -- and I think it was either 2005 or 2006 --

```
 1    that you felt like he was cheating the company from his sales;

 2    isn't that what you said?

 3    A   Well, I don't know, but if -- when the stock goes up and

 4    you sell some stock, and then it goes down and you don't sell

 5    it, to me, that's not right.

 6    Q   And that's what your understanding of what Mr.~Stein was

 7    doing?

 8    A   Yes.

 9    Q   You have a really fascinating history, the companies

10    you've started.  That is very impressive.

11        When you were talking about the first company you

12    started, you mentioned something about having to sell your

13    car.  You remember that testimony?

14    A   (Nods head.)

15    Q   So you would agree with me, I think, that for a startup

16    company, conserving cash and spending cash wisely is

17    important, right?

18    A   Yes.

19    Q   And if you were trying to run one of your companies, and

20    you found out that an employee or someone associated with the

21    company had created fake contracts to funnel money to

22    themselves, would that be a problem for you?

23    A   Yes.

24    Q   Would that -- you would -- you think you'd -- would that

25    hinder the ability to develop the company?
```

```
 1   A   Yes.

 2   Q   Okay.  And you think that would be improper?

 3   A   Yes.

 4   Q   And I think you mentioned.  It may have been before the

 5   break.  You were talking about -- I think you mentioned one of

 6   your companies became a -- was sold to a public company?

 7   A   Uh-huh.

 8           THE COURT:  Was that a "yes," ma'am?

 9           THE WITNESS:  Yes, I'm sorry.  Yes.

10           THE COURT:  Thank you.

11   BY MR. MUHLENDORF:

12   Q   And when we were -- do you -- you said you didn't read the

13   securities filings for Signalife, right?

14   A   Correct.

15   Q   Okay.  But you understand, don't you, that the securities

16   filings have to be truthful?

17   A   Yes, because we had to do that.  I raised money with both

18   of my companies, and so we had to get a securities attorney to

19   do the private placement, and he had to -- I mean, I had never

20   done my own business or anything.

21   Q   Okay.

22   A   And so he had to teach me what you could say and what you

23   couldn't say.  And so -- but, I mean, I don't know all about

24   securities filings.

25   Q   Sure.  Sure.  No, I understand.
```

1           But the securities lawyer that was helping you

2     through the process and was speaking to the market, right, he

3     was the one putting together the papers?

4     A    Yes.

5     Q    You told him the truth, didn't you?

6     A    I always tell the truth.

7     Q    And I think you'd agree with me that it's important that

8     someone like you, or anyone speaking to a lawyer for the

9     company, would tell the truth about what goes out into the

10    market, right?

11    A    Sure.

12    Q    Would it be a problem for you as someone who has an

13    experience as an executive, someone associated with a company

14    was not telling the truth?

15    A    Yes.

16    Q    Big problem, wouldn't it?

17    A    Yes.

18    Q    Okay.

19    A    Whether they were associated with the company or we were

20    just talking, not telling the truth is a big problem.

21    Q    And as someone who has run companies, and very

22    successfully, I think you'd agree with me that creating fake

23    invoices is a big problem, isn't it?

24    A    Uh-huh.

25           THE COURT:  Was that a "yes"?

```
 1                  THE WITNESS:  Yes, I'm sorry.

 2                  THE COURT:  Thank you.

 3                  THE WITNESS:  Maybe I ought to look at you and you

 4      can just shake your head and I'll say yes, sir.

 5      BY MR. MUHLENDORF:

 6      Q   Now, Ms. Greene, just a couple more questions.  We're

 7      going to be finished up here.

 8                  You mentioned you invested in Signalife, correct?

 9      A   Yes.

10      Q   And you said something about a 401k plan, a retirement

11      plan?

12      A   Yes.

13      Q   You understand, right, that investors need to be able to

14      rely on the truthfulness and accuracy of SEC filings, right?

15      A   Yes.

16      Q   And you would never buy a security if you thought the

17      filings were false, would you?

18      A   No.

19                  Would you?

20      Q   I don't have to answer the questions, unfortunately.

21      A   Why would you do that?

22      Q   It's an excellent question, Ms. Greene.  Excellent

23      question.  Why would you do that?

24                  MR. MUHLENDORF:  I think we're going to rest, Your

25      Honor.
```

```
 1                    Your witness.

 2              THE COURT:  Any redirect, Mr.~Stein?

 3              MR. STEIN:  Two questions.

 4                        Redirect Examination

 5   BY MR. STEIN:

 6   Q    With regard to the cross-examination and the opulent

 7   spending, to your knowledge, was I a signer on any bank

 8   account for the company during the time you were there?

 9   A    No, you didn't sign the checks.  Pam signed them, and I

10   think Clair had signing authority.

11   Q    Was I ever involved in any way in the day to day

12   activities of the company during your tenure?

13   A    No.

14   Q    When things started to get problematic with Rubbermaid,

15   you indicated you wanted to talk to me?

16   A    Yeah, because I hoped you'd come in and save the day.

17   Q    And why did you think I could come in and save the day?

18              MR. MUHLENDORF:  Your Honor, I'm going to object to

19   outside the scope of the cross.

20              THE COURT:  Overruled.  You can recross if you want

21   on this area.  You can answer the question.

22              THE WITNESS:  I can answer?

23              THE COURT:  Yes.

24              THE WITNESS:  Because you were a businessman.  During

25   this period of time we had been reading about you, and what
```

```
 1   you had done, and the successes that you had had and all of

 2   that, and so I just assumed that a smart man or woman had to

 3   be running it because the one we had sure wasn't.  So I just

 4   hoped you would come in and get us all together and we would

 5   go in there and, yeah, team for God and country and save the

 6   contract.

 7   BY MR. STEIN:

 8   Q   You were never able to get ahold of me because of the

 9   unspoken rule?

10   A   I couldn't call you.

11          MR. STEIN:  Nothing further.

12          THE COURT:  Thank you.

13          Anything else?

14          MR. MUHLENDORF:  No, Your Honor.

15          THE COURT:  Thank you, ma'am.  Thank you.  You're

16   excused.

17          Next witness.

18          MR. STEIN:  Your Honor, defense calls James Feidler

19   to the stand.

20          THE COURT:  Sir, would you raise your right hand,

21   please, for me.

22          James N. Fiedler, Defendant's witness, sworn.

23          THE COURT:  Please be seated.

24          Sir, the chair doesn't move, so you'll have to try

25   and adjust that microphone and move it towards you.  If you
```

```
 1    could speak into it and tell us your name and spell your last

 2    name for us.

 3              THE WITNESS:  James N. Feidler, spelled

 4    F-i-e-d-l-e-r.

 5              THE COURT:  Thank you, sir.

 6              You may proceed, Mr.~Stein.

 7              MR. STEIN:  Thank you, Your Honor.

 8                        Direct Examination

 9    BY MR. STEIN:

10    Q   Mr. Feidler, are you currently an officer of a company

11    that was known as Signalife?

12    A   Yes.

13    Q   What is your position with that company today?

14    A   I'm the president and chief operating officer.  I'm also

15    the general counsel, internal general counsel.

16    Q   What is the name of the company today?

17    A   Heart Tronics, Inc.

18    Q   For purposes of the courtroom, we're going to use the name

19    Signalife, is that okay?

20    A   Yes.

21    Q   Does Heart Tronics, Inc. own the rights to the Fidelity

22    100 technologies which we've talked about in court here?

23    A   Yes.

24    Q   As of today, Heart Tronics, Inc. owns the right to the

25    Fidelity 100 technologies?
```

```
 1    A    Yes.

 2    Q    As of today, what is my interest in Heart Tronics?

 3    A    You own some stock.

 4    Q    Is it more or less than 5 percent of the company, if you

 5    know?

 6    A    It's approximately 5 percent.

 7    Q    Anybody else from my family own any stock?

 8    A    There's some trusts that I believe your wife has.

 9    Q    And what percentage of the company do they hold right now?

10    A    It's very small.  I don't know the exact number.

11    Q    Less than 5 percent?

12    A    Yes.

13    Q    Way less than 5 percent?

14    A    Yes.

15    Q    Mr. Feidler, are you the custodian of records, of all of

16    the business records of Heart Tronics, formerly known as

17    Signalife, formerly known as Recom Managed Systems?

18    A    Yes.

19    Q    Mr. Feidler, what is your understanding concisely of your

20    duties as a custodian of records?

21    A    To maintain the normal business corporate records that

22    would occur from anything that we're doing currently and to

23    maintain the security on the business records that have

24    existed in the past history of the company.

25    Q    The business records of the company known as Heart
```

```
1    Tronics, formerly known as Signalife, formerly known as Recom
2    Managed Systems, how far under your custodianship now do they
3    date back into?
4    A   Some records go back into the 1990s, but the bulk of the
5    corporate records start in the early 2000s.
6    Q   And are these records maintained on a computer system
7    anywhere?
8    A   Yes, they are.
9    Q   Are those all of the records or a part of the records?
10   A   Part of the records.
11   Q   What part of the records is maintained on a computer
12   database?
13   A   From 2009 backwards.
14   Q   Why is that line of demarcation, 2009 backwards, how did
15   that come about?
16   A   Because I became the custodian of records in very late
17   2000 -- 2000 -- excuse me -- some of the records are from 2010
18   backwards.  I became the custodian in 2010, and I'm
19   maintaining the database myself from 2010 forward.
20   Q   So from 2010 forward, you maintain the database.  From
21   2010 backwards they're on a computer?
22   A   That's correct.
23   Q   That computer database, Mr. Feidler, to your knowledge, as
24   the custodian, when was that computer database formed?
25   A   2009.
```

```
 1    Q    Why was the computer database formed, from your knowledge?

 2    A    It happened because of the shareholder -- shareholder

 3    lawsuit and the commencement of an SEC investigation of the

 4    company.

 5    Q    Do you have control today over that database, Mr. Feidler?

 6    A    Yes.

 7    Q    Has any other person in the world that you're aware of

 8    ever had control over that database that you've described,

 9    computer database?

10    A    Yes.

11    Q    Who else had access to that database that you're aware of

12    from your custodianship?

13    A    Our counsel and the Securities and Exchange Commission.

14    Q    Does this database include attorney/client privilege

15    information that would otherwise be secret?

16    A    Yes.

17    Q    To your knowledge, did the company waive the

18    attorney/client privilege and provide the SEC with all

19    documents?

20         MR. MUHLENDORF:  Your Honor, could we have another

21    sidebar?  I'm going to object on relevance.  I don't see the

22    relevance of this.

23         THE COURT:  Let's talk about it.

24    (The following proceedings were held at sidebar:)

25         THE COURT:  What's this all about?
```

```
1              MR. STEIN:  There's -- we've already looked at

2    thousands of business records, and this man, when I go through

3    his background, he'll establish he's custodian of the records,

4    and the records are relevant to each act and event the

5    Government claims I did, and these records will be offered

6    into evidence, and they've been produced to the Government.

7              THE COURT:  What records?

8              MR. STEIN:  Records of acts, conditions, events,

9    e-mails, letters, reports through this exact timeframe that

10   the Government is alleging about me, and on these direct

11   issues.  The Government has all of these exhibits.

12             THE COURT:  But I'm trying to understand what is the

13   point of this line of questioning about whether you waived the

14   attorney/client privilege or not?

15             MR. STEIN:  Oh, that's just -- that was just a

16   preliminary question regarding what was in the database.  I'm

17   not --

18             THE COURT:  Okay.  So are you trying to establish the

19   business record exception for every document that's in his

20   database?  Is that what you're trying to do?  I'm trying to

21   understand what's the point of this.

22             MR. STEIN:  For certain of the documents, they are

23   definitely admissible under an exception of the hearsay rule,

24   and I will lay the foundation and establish that.

25             THE COURT:  Is this witness here to talk about
```

 1    anything other than establishing authenticity or business

 2    record exceptions to the hearsay rule?  Is he here for any

 3    other reason?

 4            MR. STEIN:  Yes.

 5            THE COURT:  Okay.  So right now you're focusing on

 6    business record exceptions or --

 7            MR. STEIN:  Right now I'm focusing on his

 8    relationship to the company, then his background, then the

 9    records, then the database, and then I will begin to introduce

10    records which the Government has and some of which we've

11    already seen.

12            THE COURT:  All right.  So you're going to ask him

13    information or try and extract testimony from him that --

14    other than, other than for the purpose of establishing that

15    certain documents are business records?

16            MR. STEIN:  I will also be doing that, yes.

17            THE COURT:  But you're going to do something in

18    addition to that?

19            MR. STEIN:  Yes.

20            THE COURT:  Okay.  So you intend to at some point

21    show him a document and try and establish that a particular

22    document falls within the business record exception?

23            MR. STEIN:  That is my intention.

24            THE COURT:  So how many documents are you going to

25    try and do that with?

```
 1              MR. STEIN:  All these documents have been produced to

 2     the Government.  I would say there are -- I would say the

 3     amount of documents that would be introduced would be in the

 4     hundred category of pages, maybe 150 pages.

 5              THE COURT:  I'm talking about documents, not pages.

 6     How many documents?

 7              MR. STEIN:  Maybe 10 to 15 documents.

 8              THE COURT:  Do you know what documents he's going to

 9     try and --

10              MR. MUHLENDORF:  I have a suspicion about a couple,

11     but maybe the faster way to do it would be we can excuse the

12     jury and do it out of their presence, if we're going to argue

13     about all 15, it would seem to be a waste of time to do it one

14     by one in the jury's presence if he's -- if we're going to

15     fight over it.  We don't know what they're.

16              THE COURT:  I guess I'm -- at this point I'm not sure

17     what we should do.  So I'll overrule the objection to the

18     question about whether or not the Government -- I mean the

19     Signalife waived its attorney/client privilege to these

20     documents, and then we'll go from there and see where it will

21     lead.

22              MR. STEIN:  I'm going to be doing exactly what I

23     said.

24              THE COURT:  How much time do you have with this

25     witness?  Is it going to take us through the rest of the day
```

```
 1   in terms of -- other than document production stuff.

 2            MR. STEIN:  Yes, other than document production, it

 3   would take us to the end of the day.  Tomorrow, he would -- we

 4   would move for the admissibility of documents and ask him

 5   about certain events that he witnessed with his own eyes.

 6            THE COURT:  Well, maybe you should, towards the end,

 7   like maybe about 4:30 or so, maybe we should excuse the jury

 8   and we can try and lay foundations for the documents'

 9   admission so we don't have to waste the jury's time.

10            MR. STEIN:  Oh, sure.

11            THE COURT:  If you can kind of maybe talk about other

12   things.

13            MR. STEIN:  Well, I wanted to first establish who he

14   was.

15            THE COURT:  That's fine.

16            MR. STEIN:  And I have to go through his background

17   to show his experiential base.

18       (Sidebar conference concluded.)

19            THE COURT:  All right.  I'll overrule the objection

20   to the last question.

21   BY MR. STEIN:

22   Q   Did you answer the last question?  I don't remember.

23            The database contains attorney/client privilege

24   information that's been waived?

25   A   Yes.
```

```
 1   Q   Mr. Feidler, let's go into your background post-high
 2   school.  Where did you go after high school?
 3   A   I started at Pomona College, and then I went to UCLA.
 4   Q   Did you receive an undergraduate degree there?
 5   A   Yes.
 6   Q   Did you go on to additional studies?
 7   A   Yes.
 8   Q   What college was that at?
 9   A   UCLA School of Law.
10   Q   Did you receive a law degree from the UCLA School of Law?
11   A   Yes.
12   Q   When did that occur?
13   A   1964.
14   Q   Have you been a continuously active member of the
15   California bar since then?
16   A   Correct.
17   Q   After -- after 1964 and your law degree, what did you do
18   next?
19   A   I was in the Army, and then when I left active duty I
20   maintained my status in the Reserves, I entered the private
21   practice of law for a couple of years, and then I left to join
22   legal staffs in some of the entertainment companies in
23   Hollywood.
24   Q   Jumping forward -- it's a long time, 1964.  Jumping
25   forward, did you ever go back to school for any other
```

```
 1    post-graduate work?

 2    A    Yes.

 3    Q    And what was that you went back to school for?

 4    A    I was pursuing a master of arts at UCLA in photography.  I

 5    did not complete that course of study, but then I attended

 6    Pepperdine University and received an MBA degree in 1985.

 7    Q    And so you have your JD, juris doctor, with a law degree

 8    and an MBA?

 9    A    That's correct.

10    Q    After receiving that MBA degree, what company did you work

11    for, or companies?

12    A    After receiving the MBA degree?

13    Q    Yes.

14    A    I was the president of a joint venture between MCA, which

15    is more commonly known as Universal Studios, and IBM.

16    Q    And approximately what year was that, or years?

17    A    I had two tenures.  I was first president in 1979 to about

18    1980, and then I recommenced my services in 1982, and that

19    went 'til middle part of 1989.

20    Q    After MCA-Universal, did you work at anywhere else in the

21    corporate world?

22    A    Sony Corporation of America.

23    Q    And what was your position at Sony Corporation of America?

24    A    I was the senior vice president, and I was responsible for

25    all intellectual property activities of Sony in North and
```

1   South America.

2   Q   With regard to the intellectual property at Sony, were you

3   the custodian of those records?

4   A   Yes.

5   Q   Going back to the IBM-MCA joint venture that you were

6   president of, were you the custodian of records?

7   A   Yes.

8   Q   Jumping forward, when did you leave Sony Corporation?

9   A   August 1st, 1999.

10  Q   Thereafter, what have you been doing?

11  A   I've had my own technology company, that I've been dealing

12  with licensing of technology; I've been consulting with other

13  companies.  I eventually came to Heart Tronics.

14  Q   Did you ever retire in this period?

15  A   No.

16  Q   The -- you said you then came to work for Heart Tronics.

17  Was that in your current role as the president or some other

18  role?

19  A   No, when I first joined Heart Tronics, I joined as a

20  consultant.

21  Q   And when was this?

22  A   March of 2009.

23  Q   March of 2009 you became a consultant to Signalife?

24  A   Correct.

25  Q   And did you eventually go from consultant to

1    president-CEO?  When did that happen?

2    A    Effective January 1, 2010.

3    Q    And you've continuously been in that position from then

4    until now?

5    A    Correct.

6    Q    The business records that you're the custodian of with

7    regard to Signalife, are they business records, in your

8    experience, of acts, events, conditions, opinions that have

9    taken place in the past with regard to the company?

10   A    Yes.

11   Q    From your experience from reviewing these records and

12   maintaining them, were they made at or near the time or from

13   information transmitted by someone with knowledge of events

14   therein?

15   A    Yes.

16   Q    Were the records that you were the custodian of kept in

17   the regular and ordinary course of the activity of the

18   business now known as Heart Tronics and Signalife in this

19   courtroom?

20   A    Yes.

21   Q    Was it a regular practice of the company, if you were

22   aware from your review of the records, to make these business

23   records in the regular ordinary course of business?

24   A    Yes.

25   Q    Is there anything about the records that you are the

1   custodian over that makes you believe that any of those

2   records are not -- are kept in a manner that is not

3   trustworthy?

4   A   No.

5   Q   Does the fact that joint access to the records was had by

6   an agency of the Government give you further assurances in

7   that regard or not?

8   A   I presume that the Government was looking at the records,

9   and if they saw something askance, they would certainly raise

10  it with us.

11  Q   Are the records, these computerized records, going back

12  from before your tenure, are they maintained by a direct

13  employee of the company or by an outside vendor?

14  A   Outside vendor.

15  Q   What is the name of the outside vendor?

16  A   Renew Data.

17  Q   Does the company pay Renew Data to maintain the database?

18  A   The company has a directors and officers insurance policy,

19  and the insurance carrier is paying for the maintenance of

20  that database.

21  Q   To your knowledge as the custodian, has the insurance

22  company been continuously paying for that since 2008?

23  A   Yes.

24  Q   Have you, prior to today, at any time inquired as to

25  whether these records, the content of them, has changed at all

```
 1   from 2008 backwards in the last three or four years?
 2   A   Yes.
 3   Q   And have you reached a conclusion whether the records have
 4   changed?
 5   A   My conclusion is there has been no change since the
 6   database was initially established.
 7   Q   You personally met some of the individuals that
 8   established this database?
 9   A   Yes.
10   Q   Could you name some of those individuals who established
11   the database, if you personally met them?
12        MR. MUHLENDORF:  Your Honor, I'm going to object to
13   the relevancy of this.
14        THE COURT:  What's the relevance, Mr.~Stein?
15        MR. STEIN:  If Your Honor will give me one question,
16   it will become apparent.
17        THE COURT:  Okay.  Go ahead.
18        MR. STEIN:  Thank you.
19   BY MR. STEIN:
20   Q   You're aware of some of the people?
21   A   Yes.
22   Q   Without mentioning names, did you speak with these people
23   regarding the database at the time it was formed?
24   A   Yes.
25   Q   And are these people currently counsel for the company or
```

```
1    consultants to the company, the people you spoke with?

2    A    Yes.

3    Q    And is there anybody that was involved in the formation of

4    the database now that's not counsel for the company or not a

5    consultant for the company?

6    A    Yes.

7    Q    Is that person who formed the database currently ever been

8    adverse to the company in legal proceedings?

9              MR. MUHLENDORF:  Your Honor, I'm going to object

10   again.  That's six questions, and I still don't see the

11   relevance.

12             THE COURT:  Can I see counsel, please?

13             MR. STEIN:  I'll move on, Your Honor.

14             THE COURT:  All right.

15   BY MR. STEIN:

16   Q    Mr. Feidler, are you familiar in your stewardship as

17   consultant and then now president of the company, with an

18   entity known as Batelle Memorial Institute?

19   A    Yes.

20   Q    Who is Batelle Memorial Institute?

21   A    It's a trust that was established in Columbus, Ohio for

22   research in various areas of technology.  They've been in

23   existence for I think about 75 years at this point in time.

24   They do basic research not only for the United States

25   Government, but for many Fortune 100 companies and small
```

```
 1   companies alike, depending upon the technology that's

 2   involved.

 3   Q   Does Batelle Memorial Institute have a relationship,

 4   contractual or otherwise, with the company, Signalife?

 5   A   Yes.

 6   Q   When did that relationship begin?

 7           MR. MUHLENDORF:  Your Honor, again, the relevance of

 8   Batelle.

 9           THE COURT:  Can I see you, please?

10       (The following proceedings were held at sidebar:)

11           THE COURT:  Mr.~Stein, I have no idea what you're

12   trying to establish.  What is this all about?

13           MR. STEIN:  I have to -- I mean, I have to be able to

14   have some latitude to try the case.  I'm going to lay the

15   foundation for events, acts that this witness actually

16   perceived regarding Martin Carter and during the timeframe

17   that the Government has made allegations about and then --

18           THE COURT:  What is this company?  What does it have

19   to do with the case?

20           MR. STEIN:  They -- I mean, the offer of proof is

21   they developed the technology.  They're still involved with

22   the technology.  They work with Martin Carter, and I'm

23   entitled to delve into the relationship in the records

24   regarding that.

25           THE COURT:  You completely lost me.
```

```
 1              They developed what technology?

 2              MR. STEIN:  Well, that's what I'd like to show.

 3              THE COURT:  Well, I would assume you know -- I assume

 4    you would know the information that you're trying to extract

 5    from the witness.  So tell me what it is that this company

 6    supposedly did relevant to this case.

 7              MR. STEIN:  Yes.

 8              This company developed half of the Fidelity 100.  The

 9    company didn't learn that 'til 2010 because it was kept from

10    them.

11              The additional offer of proof is that Martin Carter

12    met with this company as the CTO, and they're in Ohio, and

13    it's directly relevant.

14              THE COURT:  How does this gentleman know that

15    Mr. Carter met with these people in wherever it is, in Ohio,

16    Columbus, Ohio.  How does he know?

17              MR. STEIN:  I didn't say he met with them -- he met

18    with them in Los Angeles.  They're based in Columbus.  He was

19    there.  That's how he knows.  He was present.

20              THE COURT:  He knows that Mr. Carter was at a meeting

21    with this company in Los Angeles?

22              MR. STEIN:  No, the company's in Ohio.  They're a

23    national company.

24              THE COURT:  You said they met in California.

25              MR. STEIN:  That's correct.  They came to California
```

1    to meet.  There was -- and at that meeting Mr. Carter was

2    there during the period the Government is alleging things,

3    like he was a chauffeur, and this is directly -- this is the

4    company, the technology.  Mr. Carter is directly relevant and

5    Dr.~Harmison and the approval of every act.

6           THE COURT:  So this gentleman was present at a

7    meeting where Mr. Carter was acting as some kind of an expert

8    in technology for Signalife?

9           MR. STEIN:  That's correct.

10          THE COURT:  Okay.  All right.

11          MR. STEIN:  But I can't just ask him straight out.  I

12    have to go through the --

13          THE COURT:  Now I understand where it's supposedly

14    going, assuming that he can establish that it seems relevant

15    to me.

16          Okay.  Let's go.

17          MR. STEIN:  Thank you, Your Honor.

18       (Sidebar conference concluded.)

19    BY MR. STEIN:

20    Q   Mr. Feidler, we were talking about Batelle Memorial

21    Institute.

22          From the books and records of the company, when did

23    the company and Batelle Memorial Institute begin working with

24    each other?

25    A   I believe early 2003.

1    Q    Do you know whether or not Batelle Memorial Institute

2    developed any of the technology that is found in this device?

3    A    Yes.

4    Q    Is that information contained within the documents in the

5    database that is maintained by you?

6    A    Part of it is.

7    Q    Are you saying that there's information regarding Batelle

8    Memorial Institute's development of a part of this device

9    that's not in the database?

10   A    Some of the results are not in the database.

11   Q    What exactly did Batelle Memorial Institute develop

12   regarding this technology?

13   A    What was developed in the end result from Batelle is a

14   subject of trade secret, but what Batelle did was take a

15   device that had been developed as far as could be done

16   internally and made it a product and made it work.

17   Q    You say the word "trade secret."  That's sort of a legal

18   word.  What do you mean by that?

19   A    Trade secret is an intellectual property concept where you

20   don't disclose how you do something, and you keep it secret.

21   You don't tell people how you do things.

22   Q    Would an example of that be the formula for Coca Cola?

23   A    A very good example of it.

24   Q    Would an example of that be computer software source code?

25   A    Yes.

```
 1    Q    Is there a computer software source code connected with

 2    this product that Batelle developed?

 3    A    Yes.

 4    Q    Where is that computer software today?

 5    A    At Batelle.

 6    Q    Is it under lock and key at Batelle?

 7    A    Yes.

 8    Q    Is it kept in accordance with the Uniform Trade Secrets

 9    Act at Batelle?

10    A    Yes.

11    Q    To this day, are you still in contact with Batelle, who's

12    holding apparently the software to this device?

13    A    Yes.

14    Q    Mr. Feidler, at any time since you were personally

15    involved in the company, did Batelle ever have an opportunity

16    to come to Los Angeles to meet with the company?

17    A    Yes.

18    Q    Where did they come from?

19    A    Columbus, Ohio.

20    Q    That's their location?

21    A    Yes.

22    Q    And from the campus at Columbus, Ohio, where did they come

23    at various places and meet in Los Angeles if you remember that

24    you were at?

25    A    We normally would meet at a restaurant for lunch or for
```

```
 1    dinner.

 2    Q    Was I at any of those meetings?

 3    A    I know of one you were at.

 4    Q    This is your own sense impressions, not what's in the

 5    records of the company.

 6    A    My own impressions.

 7    Q    How many meetings were there that you attended?

 8    A    Approximately 10.

 9    Q    Throughout the period of your consultancy-ship and now

10    presidency of the company?

11    A    Correct.

12    Q    And I was at one of those meetings?

13    A    Yes.

14    Q    Which one of those meetings was I at?  Where was that

15    meeting?

16    A    A lunch meeting at the Bel-Air Country Club.

17    Q    When was that lunch meeting at the Bel-Air Country Club

18    where I was at with Batelle Memorial Institute?

19    A    I believe it was 2009.  It could have been 2010, but I

20    think 2009.

21    Q    Could you -- do you believe, looking at the business

22    records of the company, you could refresh your recollection of

23    the approximate date of the meeting?

24    A    Yes.

25    Q    Was that meeting indoors or outdoors at Bel-Air Country
```

```
 1    Club in Los Angeles?
 2    A    Outdoors.
 3    Q    It was under a patio area, right?
 4    A    Yes.
 5    Q    Who else was at that meeting -- who was there from Batelle
 6    Memorial Institute?
 7    A    David Jones.
 8    Q    From your knowledge, has Mr. Jones had a longterm
 9    involvement with this device or a short-term involvement?
10    A    He's been involved with the device since the beginning in
11    2003.
12    Q    Was he at this meeting at Bel-Air Country Club?
13    A    Yes.
14    Q    Who else was at the meeting at Bel-Air Country Club?
15    A    Besides yourself and myself, it was Rowland Perkins, who
16    was the CEO of the company.
17    Q    Was he the CEO of the company at the time of the meeting?
18    A    Yes.
19    Q    Is he still the CEO of the company?
20    A    Yes.
21    Q    Is he currently infirmed, ill?
22    A    Yes.
23    Q    How old of a man is he?
24    A    Eighty -- 78.
25    Q    Was anyone else at this meeting at the Bel-Air Country
```

```
 1    Club with Batelle Memorial Institute that you've referenced?

 2    A    Marty Carter.

 3    Q    Was Marty Carter at this meeting as my chauffeur?

 4    A    I really don't know what capacity he thought he was at the

 5    meeting at.

 6    Q    What capacity did he represent to Mr. Jones he was there

 7    at?

 8              MR. MUHLENDORF:  Objection, Your Honor, hearsay.

 9              THE COURT:  Overruled.  It's being offered for what

10    was said.

11              THE WITNESS:  I'm sorry, could you repeat the

12    question, please?

13    BY MR. STEIN:

14    Q    What capacity did Mr. Carter say that he was there at the

15    meeting as?  In what division of the company?

16    A    To be honest, I don't remember Marty Carter saying

17    anything at the meeting, but he was nominally called a co-CTO.

18    Q    At that meeting, was -- did Batelle disclose something to

19    the people at that meeting that you had never heard before?

20    A    Yes.

21    Q    What was that disclosure at the meeting at Bel-Air Country

22    Club --

23              MR. STIEGLITZ:  Your Honor, relevancy and hearsay.

24              THE COURT:  Again, I need to hear sidebar what this

25    is, so . . .
```

```
 1              (The following proceedings were held at sidebar:)

 2              THE COURT:  This is the -- this is a representative

 3    from the company from Columbus?

 4              MR. STEIN:  Yes.

 5              THE COURT:  And what is this person going to say?

 6    What is he going to say the person said?

 7              MR. STEIN:  It's -- he -- the disclosure at the

 8    meeting was for the first time was that the device, the

 9    software to the device was sitting in Ohio at Batelle, which

10    is a government contractor, and that a meeting was then

11    arranged with -- and the offer of proof is a meeting was then

12    arranged for Mr. Carter to go back there, and Mr. Carter even

13    testified to it in court here, Your Honor.

14              THE COURT:  Well, you can say, did they make a

15    disclosure?  He can say yes.  And then you can say as a result

16    of that disclosure, what happened.

17              MR. STEIN:  Right.

18              THE COURT:  But don't tell him what the disclosure

19    was.  You can just say after the disclosure, what happened,

20    and if you want to say that -- if he has knowledge that Carter

21    went to Colombia, he can talk about it.

22              MR. STEIN:  I understand.

23              THE COURT:  Okay.  But don't tell us what was said.

24              MR. STEIN:  I understand.

25         (Sidebar conference concluded.)
```

BY MR. STEIN:

Q    Mr. Feidler, without telling us the disclosure that was

made, was the disclosure surprising to you?

A    Yes.

Q    Did the rest of the people at the table appear to you to

be surprised?

A    Yes.

Q    After the disclosure was made, were there discussions

about Signalife or any of the people at the table coming back

to Ohio in follow-up to the meeting?

A    I don't have a specific recollection of that.

Q    Are there documents in the database that could refresh

your recollection if you looked at them, do you believe?

A    There should be.

Q    The -- after the meeting occurred with Batelle, did

Mr. Jones then go back to Ohio, or was there another meeting?

A    There was not another meeting with us.  I don't know.  He

went back to Ohio, but I don't know where he went after the

meeting.

Q    Right.  You weren't tracking him.

        But you didn't have any other meetings during that

visit with him; is that right?

A    No, no.

Q    To your knowledge, Mr. Carter didn't have any other

meetings at that trip with him; is that right?

```
 1   A   That's correct.

 2   Q   I didn't have any other meetings with him; is that right?

 3   A   That's correct.

 4   Q   Nor did Mr. Perkins, right?

 5   A   That's correct.

 6   Q   After that meeting, did Batelle Memorial Institute

 7   continue to be actively involved in the company?

 8   A   Yes.

 9   Q   After that meeting at the Bel-Air Country Club, did

10   Mr. Carter continue to interface with Rowland Perkins

11   directly, to your knowledge?

12   A   Yes.

13   Q   Did he continue to interface with me, to your knowledge?

14   A   Yes.

15   Q   Did he continue to interface with you, to your knowledge?

16   A   Not directly, no.

17   Q   Did you continue to interface after that meeting with

18   Mr. Perkins?

19   A   Yes.

20   Q   Is that almost daily?

21   A   Always daily.

22   Q   Always daily.

23         And how about you and I?  Did we continue after that

24   meeting to interface regarding Signalife daily or less often?

25   A   Less often.
```

1    Q    Did Martin Carter, to your knowledge, go back to Florida

2    right after the meeting with Mr. Jones?

3    A    I don't know.

4    Q    Did Martin Carter have a long stay in Los Angeles that

5    you're aware of?

6    A    When he came to Los Angeles he would be there for a couple

7    of weeks or possibly longer.  I didn't really keep track of

8    what Marty Carter did.

9    Q    But he had direct access to Rowland Perkins, right?

10   A    On occasion he did, yes.

11   Q    And you knew that he was working with me; is that correct?

12   A    Yes.

13   Q    You knew that he was working with me in connection with

14   Signalife; is that correct?

15   A    Yes.

16   Q    And with me in connection with my law practice; is that

17   correct?

18   A    Yes.

19   Q    After witnessing all of these events, there came a time

20   when you actually became a partner of mine in my law practice;

21   is that correct?

22   A    That's correct.

23   Q    And for fairness sake, when did that occur that we became

24   partners in my law practice?

25   A    Late December 2011.

```
 1    Q    And this was how long after, if you recall, how long after
 2    the meeting at Bel-Air country club when the disclosure was
 3    made by Batelle?  Years?  Months?
 4    A    At least 18 months.
 5    Q    In between the -- in between the meeting where Batelle
 6    made this disclosure and the time you became my law partner,
 7    in between those two times you became the president and COO of
 8    Signalife; is that right?
 9    A    That's correct.
10    Q    And in doing that, you, from your experience, did you do
11    any due diligence regarding the company before you took that
12    position?
13    A    The due diligence I did was based on the technology and
14    what the promise of the technology was and what the
15    marketplace was and what Batelle could add to it on a current
16    basis.
17    Q    And when you became the custodian of business records, did
18    you do due diligence regarding how those records were
19    maintained?
20    A    Yes.
21    Q    When you became the president, there was an active SEC
22    investigation; is that correct?
23    A    That is correct.
24    Q    You became the president anyway?
25    A    Yes.
```

```
 1    Q    The records of the company that are maintained include

 2    records that are trade secret privileged; is that right?

 3    A    They contain records that are privileged.  I do not

 4    believe the trade secrets are included in the records.

 5              MR. STEIN:  About to show him a document, Your Honor.

 6    BY MR. STEIN:

 7    Q    Mr. Feidler, from the -- since you've been the president

 8    and COO of Heart Tronics, have you had occasion to look at and

 9    examine any securities filings that the company made at any

10    time?

11    A    Yes.

12    Q    You've also had occasion to look at the business records

13    in the database as they're maintained; is that right?

14    A    Yes.

15    Q    Are you familiar with the name Lowell Harmison?

16    A    Yes.

17    Q    Who in your knowledge was or is Lowell Harmison?

18    A    Lowell Harmison was the CEO of Heart Tronics prior to the

19    current CEO.

20    Q    During what period was Lowell Harmison the CEO, if you

21    have a recollection?

22    A    I don't know when he started.  I believe he was CEO until

23    March of 2008, somewhere in 2008.

24    Q    Does the database contain records of -- authored by

25    Dr.~Harmison, to your recollection, without looking at the
```

```
 1    database?

 2    A    Yes.

 3          MR. STEIN:  Your Honor, just a moment.  I'm now going

 4    to begin offering an exhibit.

 5          THE COURT:  Okay.

 6  BY MR. STEIN:

 7    Q    Mr. Feidler, is it the habit and custom of departing CEOs

 8    that voluntarily depart from the company to deliver to the

 9    company a report of their tenure?  Is that a habit of yours

10    and of the company?

11          MR. MUHLENDORF:  Your Honor, objection.  He doesn't

12    have competence to answer this.

13          THE COURT:  I don't know if he knows or not, so

14    overruled if you know the answer.

15          THE WITNESS:  Yes, it is.  Yes, Your Honor.

16  BY MR. STEIN:

17    Q    Is that, in your experience for technology companies, the

18    general custom and practice of the technology companies you've

19    worked for over the years?

20    A    Absolutely mandatory.  Yes, it's a custom and practice.

21    Q    Why do you say it's absolutely mandatory?

22    A    Because you have to know where you are.  There's a summary

23    of what you're doing with the technology, where you're trying

24    to go with it so that the successor CEOs, or whoever, can pick

25    up and not be blind.
```

```
 1    Q    And from your knowledge of the database, did Dr.~Harmison
 2    deliver to the company a report after his tenure concluded?
 3    A    Yes.
 4              MR. STEIN:  May I approach?
 5              THE COURT:  Yes.
 6    BY MR. STEIN:
 7    Q    I'm going to show you what's been marked as Defendant's
 8    exhibit 14 and ask you to take a look at it.
 9              Mr. Feidler, from your knowledge, was this document
10    delivered by Lowell Harmison to Signalife following his tenure
11    on the board, as was the custom and practice of the company?
12    A    That's my understanding.
13    Q    Has this document continuously been in the computerized
14    database from 2008 until today?
15    A    Yes.
16    Q    Is there any doubt in your mind of that?
17    A    None.
18              MR. STEIN:  I offer the document into evidence.
19              MR. MUHLENDORF:  Your Honor, we object on hearsay
20    grounds.
21              THE COURT:  May I see it, please?
22              Ladies and gentlemen, why don't you step in the jury
23    room for a few minutes, please, because it's going to take us
24    a while to resolve this issue.
25              Please don't discuss the case or form any opinions.
```

```
 1        (The jury exits the courtroom.)

 2             THE COURT:  You can have a seat, sir.

 3             What is this?

 4             MR. STEIN:  This is the report that was delivered by

 5   Lowell Harmison of what he did during his tenure to the

 6   company in 2008.  Its authenticity is undisputed, or maybe it

 7   is disputed.  The Government can tell you whether it's

 8   disputed or not.  It's been --

 9             THE COURT:  What's the point of it?

10             MR. STEIN:  There are -- the offer of proof is there

11   are that and additional documents that go to the direct issue

12   of corporate approval over transactions that the Government

13   claims were false or fraudulent.

14             THE COURT:  Show me.

15             MR. STEIN:  Well --

16             THE COURT:  Show me in here where there's an

17   indication of something that the Government contends is false

18   or fraudulent that you think shows that were authorized and

19   approved.  Show me.

20             MR. STEIN:  May I approach?

21             THE COURT:  Yeah.

22             MR. STEIN:  There's additional documents about this,

23   Your Honor.  These are the end users that Dr.~Harmison --

24             THE COURT:  The court reporter can't hear you, and

25   neither can the other parties.  So tell me what you're --
```

```
 1              MR. STEIN:  These are the end users, without

 2    mentioning them, who Dr.~Harmison was working with regarding

 3    his reseller network.  The evidence will be undisputed from

 4    the database regarding this, from his e-mails, his

 5    communications, and it's also in press releases tied directly

 6    to them.

 7              And then there are --

 8              THE COURT:  I don't understand what you're saying,

 9    Mr.~Stein.  What does this -- you're pointing to something on

10    page number 001065 of this document.  What are you trying to

11    tell me that this shows?

12              MR. STEIN:  The end users of the products that

13    Dr.~Harmison was setting up the reseller network for are

14    Edwards Life Sciences, Davis Medical Electronics, and all the

15    other companies.

16              THE COURT:  What does that have to do with this case?

17              MR. STEIN:  Because it will then tie into the

18    reseller network that the Government claims is false and

19    fraudulent.

20              THE COURT:  I don't remember the Government saying

21    anything about reseller network.  I remember you saying many

22    things about a reseller network.  I don't remember the

23    Government even mentioning the word "reseller network."  You

24    were the one who brought it up.

25              The Government says that you created phony invoices
```

```
 1   for -- three invoices, phony invoices, and that you were
 2   responsible for having published in SEC filings false press
 3   releases about the phony invoices.  What does that document
 4   show that any of those were actually valid, authorized, and
 5   true?  What does that document have to do with those
 6   allegations?
 7            MR. STEIN:  This document, and I will represent an
 8   additional three to five documents directly tie to those
 9   purchase orders and demonstrate their authenticity.
10            THE COURT:  Show me in this document what ties to
11   those purchase orders and press releases.
12            MR. STEIN:  There's a document that the Government
13   introduced which the Government can say off the top of their
14   head what it is, it's between TV Ventures and the company,
15   signed by Thomas Tribou.  Thomas Tribou was a longtime
16   associate of Dr.~Harmison.  He was the signatory on one of the
17   false purchase orders.  That's how direct this evidence is.
18   And Dr.~Harmison worked with him, developed an FDA-approved
19   device.
20            He was the signatory, and they're claiming that his
21   signature on that particular bogus press release that they're
22   saying is bogus was somehow not his signature.  This is --
23   they haven't called him to the stand.  He's still alive.
24            THE COURT:  Who is this person?
25            MR. STEIN:  Thomas Tribou.
```

```
 1              MR. STIEGLITZ:  He's on the Government's witness
 2    list, Your Honor.
 3              THE COURT:  He's not on your witness list.
 4              All right.  I'm completely lost.  So I'm trying to
 5    understand what this document shows regarding the allegations
 6    of falsity regarding the press releases and the purchase
 7    orders.  Point to me the page.
 8              MR. STEIN:  This document contains the people that
 9    Dr.~Harmison represented to the board of the company with
10    Mr. Tribou were the end users of the products.  Mr. Tribou was
11    one of the re-purchasers which the Government claims -- he
12    signed one of the purchase orders which the Government claims
13    is false and fraudulent and that I had something to do with.
14              This document, he was obligated to deliver the
15    product to the people in this document, and the exhibits I'm
16    going to put in will demonstrate that.  They've already put in
17    exhibits with his signature on it.
18              THE COURT:  I don't understand what you're saying.  I
19    have no idea what you're saying.
20              MR. STEIN:  Dr.~Harmison direct --
21              THE COURT:  If you have a witness who signed the
22    purchase order and can say it's a valid purchase order, why
23    don't you bring that witness in and have him testify?  I mean,
24    that would seem to me to be the best way of proving that it's
25    a valid purchase order, to get the person in here who signed
```

```
 1     it and who can say, yes this is a valid purchase order, I

 2     signed it.

 3             I don't understand this showing that some other

 4     company that's not even mentioned in the purchase order is

 5     supposed to be an end user of products that your company was

 6     going to sell.  What does that have to do with the purchase

 7     order is a valid or invalid purchase order?

 8             MR. COHEN:  If the Court would be more inclined, I'll

 9     introduce 20 exhibits at once which will connect the whole

10     thing together.

11             THE COURT:  Show me the 20 exhibits.  I want to see

12     the connection.

13             MR. STEIN:  Could the Government please bring its

14     exhibits, the TV Ventures agreements all that I admitted

15     without objection?

16             MR. STIEGLITZ:  You want exhibit 78, right?

17             Your Honor, should we excuse the witness?

18             THE COURT:  I don't think this witness is going to be

19     influenced one way or another by what he hears.

20             MR. STEIN:  The TV Ventures agreement, the purchase

21     order with one of these hospitals.  It was signed by

22     Mr. Tribou.

23             THE COURT:  I guess maybe we're doing unnecessary --

24     how is this a business record under Rule 803(6)?  How is it a

25     business record?
```

```
 1              MR. STEIN:  It's a record of an act, condition or

 2   event made at or about the time of the event recorded.  It

 3   is --

 4              THE COURT:  How is that made at or about the time of

 5   the event recorded when you tell me it's a summary of what

 6   this man did for three years?

 7              MR. STEIN:  No, it's a summary of what he did for six

 8   months.

 9              THE COURT:  Well, how is that a record of what was

10   done at the time when it's a summary of what was done for six

11   months?

12              MR. STEIN:  It's a record of what Dr.~Harmison

13   reported that he did, and it is under the hearsay rule.

14              THE COURT:  Here's what the hearsay rule requires.

15   Okay?

16              One, it has to be a record of an act.  I don't think

17   that's a record of an act.  An event.  I don't think that's a

18   record of an event.  A condition.  I don't think it's a record

19   of a condition.  I don't think it's an opinion or a diagnosis.

20   That's what it has to be first.

21              Then it has to be made at or near the time.  I don't

22   know when this was made.  I don't even know if it was made by

23   Dr.~Harmison.  The fact that it is in their records doesn't

24   necessarily mean that it was made by Dr.~Harmison.  It says it

25   was, but let's assume it was.  Has to be made at or near the
```

1    time.  I don't know when this was made.

2           Apparently, it was made after he left the company,

3    and it's about a period of time before he left the company.

4           But this is more critical.  The record was kept in

5    the ordinary course of a regularly conducted activity of a

6    business.  What is the regular -- regularly conducted activity

7    of a business that this document was prepared for?

8           MR. STEIN:  The business of manufacturing, producing,

9    and selling the Fidelity 100 EKG machine and other technology

10   of the company.

11          THE COURT:  The record was kept in the course of a

12   regularly conducted activity of a business.

13          MR. STEIN:  The business is Signalife, and it's

14   existed undisputedly since -- in other names since 2002 at a

15   minimum.

16          THE COURT:  A record that is kept in the course of a

17   regularly conducted activity of business is one that is done

18   routinely, over and over.  This is what they do every time

19   this thing happens.  They get an invoice and they stamp

20   "received," and they give it to the payment department, and

21   then the payment department puts a check with it, and then

22   they put it in -- those are regularly conducted business

23   activities that happened over and over repeatedly.

24          The fact that somebody leaves a company and decides

25   that he's going to give a summary of what he did for the last

```
1    six months is not a regularly conducted business activity.

2         MR. STEIN:  In this business, Mr. Feidler testified

3    that it is, in technology businesses it is, and in -- as the

4    Court will look at in the hearsay rule exception, even

5    diagnosis of medical physicians are admissible under the

6    hearsay rule.  This falls far short of a medical diagnosis.

7    This is merely his report which was mandatory upon him leaving

8    and which he delivered.

9         And I add lastly, Your Honor, that the one that we

10   produced on the bottom, if the Court could just look at the

11   bottom of the exhibit --

12        THE COURT:  Yes.

13        MR. STEIN:  DOJ Carter, Mr. Carter produced this to

14   the DOJ.  So I will be -- there are versions of this document

15   that are in the company's files that are identical to this.

16   Mr. Carter had the document.  They claim he was a chauffeur,

17   and they've already introduced evidence regarding Mr. Tribou.

18        THE COURT:  And the next requirement under the rule

19   is making the record was a regular practice of that activity.

20   So the activity that is being recorded has to be regular, and

21   the making of the record was a regular practice of that

22   activity.

23        I mean, you're trying to say that the regular

24   business activity was a CEO leaving the business and writing a

25   summary of his activities?  That's the regularly conducted
```

1    activity?  And making a record was a regular practice of that

2    activity?  The regular practice of leaving the business was

3    making a record?

4             MR. STEIN:  That's what Mr. Feidler testified, Your

5    Honor.  But this is -- this is merely one record.  There are

6    records of contemporaneous e-mail exchanges between

7    Dr.~Harmison and the people in this case.  Dr.~Harmison and

8    Mr. Tribou, that are contemporaneous, that don't even have the

9    indicia of talking about the past that the Court is concerned

10   about.

11            THE COURT:  I mentioned this previously in one other

12   sidebar that we had.  Correspondence, that just because a

13   business keeps its correspondence doesn't mean it's a

14   regularly conducted business activity.  Everybody keeps their

15   correspondence.  The fact that you keep correspondence doesn't

16   make the fact that you sent correspondence a regularly

17   conducted business activity.  The hearsay rule is there to

18   create an exception for things that are done routinely that

19   you can rely upon the information in there as a routine

20   business practice done repeatedly over and over again.

21            You don't create an exception to have hearsay

22   statements in documents and say, oh, here's an e-mail that was

23   sent, and we keep our -- all our e-mails, and we keep them in

24   a database, and we keep them forever.  Well, it's a regularly

25   conducted business activity because we send e-mails to each

```
 1   other.  And it doesn't matter what's said in there, but we can

 2   admit it in front of a jury and for the truth of the matter

 3   asserted because we send e-mails to each other and we keep our

 4   e-mails.  And that's what you're telling me.

 5            MR. STEIN:  No, I'm telling you that Dr.~Harmison was

 6   the CEO of the company and was able to give directions to

 7   people, and these e-mails are not for the truth of the matter

 8   asserted, they're for the fact that he said the words, and

 9   these e-mails will come into evidence.  This is laying the

10   foundation, which the Court already knows he was the CEO, he's

11   now deceased, and these documents that are going to come into

12   evidence are -- that I'm going to introduce, are

13   contemporaneous e-mails of directions that he gave directly

14   relating to the Government's alleged case against me.

15            I will grant the Court this is a summary report.

16   It's the beginning.

17            THE COURT:  Here is part of this exhibit:  Summary of

18   National Sales Marketing Plan.  What is that?  That's a

19   regularly conducted business activity, summary of national

20   sales marketing plan?

21            MR. STEIN:  This is the report he delivered.  The

22   Government can cross-examine Mr. Feidler on the report.

23            THE COURT:  How is he going to cross-examine

24   Mr. Feidler?  All he knows is it's in his records.  What's he

25   going to cross-examine him about?
```

1              MR. STEIN:  Mr. Feidler had -- may have done other

2    things personally regarding these purchase orders, and I need

3    to examine him on those things.  And when I'm -- when the

4    examination's complete, it will tie directly to the purchase

5    orders and directly to what the company did.

6              THE COURT:  I'm sustaining the objection.  I don't

7    believe it's a business record that meets the hearsay

8    exception.

9              MR. STEIN:  Your Honor, I'd like an opportunity to

10   deliver to the Court two pages of case law from the Eleventh

11   Circuit regarding this issue.

12             THE COURT:  Sure.  I'll be happy to look at it.

13             MR. STEIN:  I mean --

14             THE COURT:  I assume this gentleman's going to be

15   here tomorrow, so you'll have time to show it to me tomorrow.

16             MR. STEIN:  Can we do that 10 minutes before?

17             THE COURT:  We can do it tonight if you've got it.

18             MR. STEIN:  Okay.  I will -- should I use an e-mail

19   address and send it to counsel?

20             THE COURT:  No, I thought maybe you had it handy.

21   No?

22             MR. STEIN:  No, I don't have it.  I mean, I could

23   find it.

24             THE COURT:  Just get it to me by 8:30 tomorrow

25   morning.  I'll be here, and I'll look at it 8:30.

```
 1              MR. STEIN:  And would it also be appropriate to set

 2    forth all of the documents that I intend to use?

 3              THE COURT:  Might as well.  Let's do that tonight.

 4              MR. STEIN:  Well, they've already been provided to

 5    the Government.  I'll just pull them out and make a --

 6              THE COURT:  I'd like to look at them.  Maybe we can

 7    spend the time with this witness for the rest of the evening,

 8    excuse the jury and go through all the exhibits that you want

 9    to use as a business record and see if you can lay a

10    foundation for it.  Can we do that now?  Do you have all the

11    exhibits?

12              MR. STEIN:  Yes, we have it on the computer.

13              THE COURT:  All right.  We can show it on the

14    computer screen.  Let's excuse the jurors for the evening and

15    tell them to be back at 9:00.  Have Irene tell them to come

16    back at 9:00 tomorrow, and then we will continue here.

17              MR. STIEGLITZ:  Your Honor, there's some personal

18    items, glasses and things like that.

19              THE COURT:  Okay.  Why don't you take a few minutes

20    to get your documents together.

21              MR. STEIN:  I want to approach in the interest of

22    time and in the interest of getting a final ruling on these

23    matters and just show the Court what's already been admitted

24    as an exhibit, already been admitted by the Government in this

25    action without objection from a witness who wasn't here, and I
```

```
 1    think this will make the Court aware of what I'm about to do.

 2              THE COURT:  Okay.  I'm not sure what that means.

 3              MR. STEIN:  Government's exhibit 78.

 4              THE COURT:  Yes.

 5              MR. STEIN:  It's an e-mail from me with attached

 6    agreements, and it's already in evidence.

 7              THE COURT:  Okay.  And . . .

 8              MR. STEIN:  There are additional exhibits that the

 9    Government -- additional documents pertaining to this from

10    real live human beings that the Government has not introduced

11    as an exhibit that are in the business records that directly,

12    directly relate and tie to that exhibit.  I've let that

13    exhibit in without objection.

14              Mr. Tribou is not here.  Dr.~Harmison is dead.  The

15    Government never interviewed him.

16              THE COURT:  I thought you had testimony from

17    Dr.~Harmison you wanted to present.

18              MR. STEIN:  No.

19              THE COURT:  Who's the witness?

20              MR. MUHLENDORF:  SEC testimony.

21              MR. STIEGLITZ:  That's Rowland Perkins, Your Honor.

22              THE COURT:  I'm sorry.

23              MR. STEIN:  Rowland Perkins is the CEO of the

24    company.  Dr.~Harmison died.

25              THE COURT:  Okay.  I was wrong.
```

```
 1              MR. STEIN:  I apologize, Your Honor, for fisty the
 2    feistiness, but this is a matter of importance.
 3              THE COURT:  I understand.
 4              MR. STEIN:  This document that the Government
 5    introduced opens the door, Your Honor, to exactly what
 6    happened.  They have Mr. Tribou on their witness list.
 7              THE COURT:  Mr.~Stein, the fact that you agreed to
 8    allow an exhibit into evidence doesn't waive the Government's
 9    ability to object to an exhibit that you offer in your case.
10    You can't say, oh, they -- I agreed to let this in, so
11    therefore they can't object to my objectionable exhibit.
12    That's not a valid argument.
13              MR. STEIN:  I'm not saying, that Your Honor.  They
14    have had -- they have put in testimony regarding these
15    exhibits, regarding these purchase orders, and the company's
16    books and records regularly conducted contain additional
17    documentation regarding these purchase orders.
18              THE COURT:  Mr.~Stein, if you have an exhibit that
19    meets the exception to the hearsay rule, I'll let it in.  I
20    don't think the last one met the exception.  If you offer an
21    exhibit that they don't object to, it will come into evidence.
22    But if you offer an exhibit that you think is a business
23    record and if they object and I believe it's not a business
24    record, the fact that there was testimony that came in about
25    it, the fact that they didn't call someone that may know
```

 1     something about it has no bearing on whether it comes into

 2     evidence.

 3              MR. STEIN:  I understand that.

 4              THE COURT:  Okay.  So showing me this doesn't cure

 5     any issue regarding the last document.  Let's go to the

 6     next~-- the other documents that you have and see if they meet

 7     the exception or not.

 8              MR. STEIN:  I simply wanted the Court to be aware of

 9     this document as I begin to show the Court the documents that

10     are in the records of the company.

11              THE COURT:  Relevancy is not the issue.

12              MR. STEIN:  No, I understand.  I understand

13     relevancy's not the issue, but these documents are

14     extraordinarily material, the witness is unavailable, and

15     they're kept in the regular course of business, and I believe

16     the Eleventh Circuit case law is clear that directions by CEOs

17     of companies are business records that are excepted from the

18     hearsay rule.

19              THE COURT:  If you give me the case law that says

20     that and you're correct and the documents that you want to

21     offer fit within that parameter, then I'll admit it.  We need

22     to take them one at a time.

23              MR. STEIN:  It appears it's better to take them one

24     at a time outside the presence of the jury the Court is

25     saying?

```
 1              THE COURT:  Why waste the jury's time.  Let's try and
 2    accomplish it now.
 3              MR. STEIN:  Okay.  Thank you.
 4              THE COURT:  If you don't have the exhibits because
 5    you're not prepared to show them to me this evening, then
 6    we'll deal do it at another time, but I'd rather do it now if
 7    you can.  I assume that you had the witness here and you were
 8    going to try and introduce them, that you would have them
 9    available.
10              MR. STEIN:  Yes, Your Honor.
11              THE COURT:  Do you need some time to gather them?
12              MR. STEIN:  I'm sorry, Your Honor?
13              THE COURT:  Do you need some time to gather them
14    together?
15              MR. STEIN:  Yeah, 10 minutes to make a collation of
16    them so they're not coming one at a time.
17              THE COURT:  I think we're going to have to take them
18    one at a time unless they all fit into the exact same
19    category.
20              MR. COHEN:  It seems the Court is saying that it will
21    be better outside the presence of the jury if the Court could
22    see the litany of them instead of one at a time, it'd be
23    faster.
24              THE COURT:  I want to do it when the jury's not
25    sitting around waiting.  I want to save the jurors the time of
```

```
1   sitting around getting frustrated being in the jury room while
2   we're doing this.  So let's do it now, if possible, or
3   tomorrow morning before the jury gets here.  I'd like to do it
4   now since everybody's here.
5           MR. STEIN:  Okay.  We'll spend 10 minutes and do it
6   now.
7           THE COURT:  Let's take -- tell me when you're ready.
8       (A recess was taken from 4:47 p.m. to 5:07 p.m., after
9   which the following proceedings were had:)
10          THE COURT:  Please be seated.  We're back on the
11  record.
12          Are you ready, Mr.~Stein, or you need more time?
13          MR. STEIN:  Your Honor, this process is somewhat
14  disadvantageous.  Some of these record -- first of all, I
15  would like to have an opportunity to provide the Court a
16  brief, which I had no clue -- some of these documents are
17  checks, so they're clearly admissible under the hearsay rule.
18  They're checks from the people that the Government claims
19  don't exist, and they're checks that negotiated successfully
20  through the bank.
21          THE COURT:  Do you know if they're objecting to the
22  checks?
23          MR. STEIN:  I have -- I could tell them what exhibit
24  it is.  We've given to this to them.
25          Okay.  Well, I can show the Court and them the check
```

1    right now, and they can --

2         THE COURT:  Have you shown the Government these

3    exhibits yet?

4         MR. STEIN:  We've shown them most of the exhibits,

5    but we have subpoenas out.  We have 21 subpoenas, and

6    documents continue to come in.  Some of them were admitted

7    through Mr. Nevdahl.  The brokerage statements were produced

8    by National Securities.

9         This check from Mr. Tribou, who signed one of these

10   purchase orders, made out to Signalife for $50,000 dated

11   September 27, 2007, I can't imagine how the check is not

12   admissible under --

13        THE COURT:  Did you ask them if they're going to

14   object to it yet?

15        MR. STEIN:  Not as to this check.  And they've

16   objected to the things I have.  There are probably 20 to 30

17   exhibits, e-mails, checks, reports, and I'd more than happy to

18   meet with them all night regarding it, but the check right now

19   is emblematic of something that I can't imagine why they would

20   object, and if they do, I can't imagine --

21        THE COURT:  Have you shown it to them and asked them

22   whether they object?

23        MR. STEIN:  Do you object to that?

24        THE COURT:  You've talked for five minutes about the

25   same thing.  I just said show it to them and see if they

```
 1    object.

 2              MR. STEIN:  They're looking at it right now.

 3              MR. STIEGLITZ:  Your Honor, here's the position we

 4    find ourselves in is I don't want to hold up this process.  I

 5    don't know that we're going to have an objection to a check.

 6    I don't think we would.  It's just difficult sort of on an ad

 7    hoc basis on a computer.  If Mr.~Stein's getting productions

 8    from banks, we're happy to look at them, go through them and

 9    if he wants to identify exhibits to us he wants to put in,

10    we've been doing that on a daily basis and saying, here are

11    the exhibits we'd like to put in, do you have an objection.

12              We're willing and able to do that.  I don't

13    anticipate we'd have an objection to a check, but, again, I'm

14    somewhat hesitant to do that based on an electronic

15    representation of something that Mr.~Stein's going to print

16    out and it's not Bates stamped.

17              Again, if this is all that's holding us up we can

18    probably get past that, but if it's one of many things that

19    Mr.~Stein is suggesting are going to be a problem, my

20    suggestion would be for him to get us those exhibits, let us

21    have a chance to look at them and we can probably get through

22    some of this, if not all of it.

23              THE COURT:  What else do you have besides this check?

24              MR. STEIN:  There are -- the check came with a cover

25    letter from Mr. Tribou saying, enclosed is a check.  There are
```

```
 1   e-mails --

 2           THE COURT:  What else do you have besides the check

 3   was my question.

 4           MR. STEIN:  Directive e-mails by Dr.~Harmison, as the

 5   CEO, in the period 2007 and 2008 that I've already provided to

 6   them.

 7           THE COURT:  Have you seen them?

 8           MR. STIEGLITZ:  Your Honor, I think this is where --

 9   off the top of my head, I don't know based on the generalized

10   description.

11           Mr.~Stein, about two weeks, before trial gave us

12   something like 7000 documents.  So he identified a subset of

13   those as exhibits.  I can say with some confidence I've seen

14   most, if not all of those.

15           As to miscellaneous Harmison exhibits, I don't know.

16   If Mr.~Stein wants to identify them, it looks like he's

17   prepared to do that, I can look at them and let you know if we

18   object.

19           MR. STEIN:  Exhibits 26 --

20           MR. STIEGLITZ:  And, Your Honor, I don't want to

21   waste the Court's time.  We can try and do this this evening.

22           THE COURT:  Well, I just want to know if there's

23   going to be a need to examine the witness for business

24   purpose -- business record purposes so we can do that without

25   wasting the jury's time.  So that's what this was supposed to
```

```
 1    be, an opportunity to examine the witness outside the presence

 2    of the jury so we don't waste the jury's time for him to try

 3    and lay a predicate as to whether these would be admissible as

 4    business records.

 5          MR. STIEGLITZ:  I can speak -- 26, I believe is

 6    already in evidence as a Government exhibit.  It's a

 7    multi-page document.  We'd want a chance to just confirm that

 8    it's the same thing, but assuming that it is, I don't foresee

 9    that we'd have an objection to that.

10          MR. STEIN:  Sixty-five, 67, 76.

11          MR. STIEGLITZ:  Hang on.

12          MR. MUHLENDORF:  I'm keeping track.

13          MR. STEIN:  Eighty-four, 88, 97, 155, 156, 167, 168,

14    170, 174, 179, 185, 214, 224.

15          MR. STIEGLITZ:  Okay.  So 65 and 67 are both e-mails,

16    Your Honor, which we object to on hearsay grounds.  They're

17    not business records either.  I don't know how to --

18          THE COURT:  Well, all right, so we'll have to have

19    the witness try and lay a predicate for those.  All right.

20    Those two, put those aside for now.

21          What else?

22          MR. MUHLENDORF:  Eighty-four, 88 -- oh, 76, sorry.

23          MR. STIEGLITZ:  Your Honor, I believe Mr.~Stein has

24    moved 76 already and it's not come in.  We'd have the same

25    objection on hearsay grounds, and frankly, business records --
```

```
 1    not being a business record.

 2            Eighty-four, we'd object to on hearsay grounds.

 3            MR. STEIN:  Sixty-seven is a letter from Signalife to

 4    the American Stock Exchange.

 5            THE COURT:  Mr.~Stein, can we wait until they're

 6    finished?

 7            MR. STEIN:  Absolutely.

 8            THE COURT:  Then once they let us know what they

 9    object to, you can attempt to lay a predicate.

10            MR. STIEGLITZ:  Eighty-eight is a letter we'd object

11    to on hearsay grounds.  Ninety-seven -- 97 is hearsay, but

12    we're not going to object to it.  So 97 we don't have an

13    objection to.

14            THE COURT:  All right.  We'll admit 97 without

15    objection.

16        (Defendant's Exhibit No. 97 entered into evidence.)

17            MR. STIEGLITZ:  Your Honor, 155 appears to be the

18    same document as 76, and therefore, we'd have the same hearsay

19    objection.

20            156 we'd object to on hearsay grounds, Your Honor.

21            Your Honor, 167 we don't have an objection to.

22            THE COURT:  I'm sorry, what was that?

23            MR. STIEGLITZ:  I'm sorry, that was defense 167.

24            THE COURT:  All right.  167's admitted without

25    objection.
```

```
 1              (Defendant's Exhibit No. 167 entered into evidence.)

 2              MR. STIEGLITZ:  168, Your Honor, is -- 168, Your

 3    Honor, we'll waive any objection to, as well.

 4              THE COURT:  168's admitted without objection.

 5              (Defendant's Exhibit No. 168 entered into evidence.)

 6              MR. STIEGLITZ:  Your Honor, 170, our objection would

 7    be both hearsay and relevance.

 8              Your Honor, we're skipping over 174 and 179 because I

 9    think I'm going to need to look at them on their computer.

10              185, our objection would, again, be hearsay and

11    relevance.

12              Your Honor, it appears 224 is the same document as

13    76, and I've lost track.  Anyway, our objection would be

14    hearsay, but it's the third copy of a letter that Mr.~Stein

15    has suggested as numbered as other exhibits, too.

16              MR. MUHLENDORF:  So we need to see 174, 179, and 214.

17              MR. STIEGLITZ:  174, Your Honor, we would object to

18    on hearsay grounds.

19              Your Honor, we'd object to this on~-- I'm sorry, to

20    179 on hearsay grounds, as well.

21              What's the other one?

22              MR. MUHLENDORF:  214.

23              MR. STIEGLITZ:  214 is already in.

24              THE COURT:  All right.  So how do you want to proceed

25    with those exhibits to which they're objecting?  You want to
```

```
 1   show me them?  You want the witness to try and lay a predicate
 2   for them being business records?
 3             MR. STEIN:  I don't want to do that if the Court's of
 4   the viewpoint, from looking at the exhibits, that they're not
 5   admissible under the hearsay rule.  I'd rather give the Court
 6   the case law.
 7             THE COURT:  I haven't looked at them yet.  I've only
 8   looked at one of the documents.
 9             MR. STEIN:  These exhibits obviously being kept in
10   the ordinary course of business, they range from directives to
11   actual communications the Court may view as hearsay.
12             MR. WHITE:  Can I have a moment, Your Honor?
13             THE COURT:  Yes.
14        (Brief pause in proceedings.)
15             MR. STEIN:  Your Honor, respectfully, I make the
16   following suggestion.  The Government is correct that 14 days
17   before trial I produced a subset of the 200 million document
18   database that was relevant that was in the books and records.
19             Of those documents, I would like to pull out tonight
20   the documents that we definitely want to put into evidence,
21   given the Court's already annunciated viewpoints about the
22   hearsay exception.  We will truncate our -- what we wish to
23   put into evidence, and then I will send it to the Government
24   tonight, and if they don't stipulate to it, I would offer to
25   either put the witness on at 8:00 in the morning or outside
```

```
 1    the presence of the jury or whatever other procedure the Court

 2    wishes to follow.

 3          But I -- to chop this up into today and then

 4    tomorrow, whereas if I'm given two hours, I can go through it

 5    all at one time.

 6          I mean, for example, the check, Your Honor, I mean I

 7    can lay a foundation right now.  I don't know if the

 8    Government's objecting or not.  The check just came to us, and

 9    we literally have to print it out.  These were subpoenas that

10    were issued 14 days ago or 20 days ago.  So I don't have an

11    ability right now to pull out the documents which I think are

12    directive which the Court seems more interested in, as opposed

13    to e-mail chatting communications.  They're all -- they've all

14    been produced to the Government.  I'd like to pull out the

15    ones that are -- that I think are -- that they're not

16    objecting to.  For example --

17          THE COURT:  Mr.~Stein, they've not objected to 97,

18    167, and 168.  They've listed some of them that you've given

19    to them and you've offered, they've said, we object.  Let's

20    deal with those now.  You've got your witness here.  Let's

21    deal with them now.  If you have more in the morning that you

22    want to present, we'll deal with those in the morning.  But

23    why can't we deal with the ones that you've already dealt with

24    now?

25          MR. STEIN:  We can deal with the ones that the
```

 1   Government's objected to now.

 2          THE COURT:  All right.  So do you consider these --

 3   is your response to their hearsay objection that they're

 4   business records and you agree it's hearsay but they come

 5   under the business exception, or is there some other response

 6   that you have to their hearsay objection?

 7          MR. STEIN:  No, the response -- and that's why I'd

 8   like -- there's a few of them they've objected to.  I'd like

 9   the Court to see them, because if the Court's going to sustain

10   the objection, the foundation is useless.

11          THE COURT:  I don't know if the foundation is useless

12   until you present a foundation for it.  Obviously, I may look

13   at them and conclude there's no way that this can be a

14   business record, just like I did with the report that you gave

15   me, that just because it's kept by the business in its records

16   doesn't make it a business record for hearsay exception

17   purposes.  So I don't know what you're proposing as to these

18   documents.

19          Can I see them?  Let me just take a quick look at

20   them.

21          MR. STIEGLITZ:  Yes, Your Honor.  I apologize.  One

22   of the copies has some handwriting, because I believe

23   Mr.~Stein offered them previously, offered it previously.  So

24   it has some highlighting in my notes, but other than that,

25   they should be --

1          Oh, I'm sorry.  Those were the ones that you listed

2     minus the three that we agreed to.

3          MR. STEIN:  Okay.

4          MR. STIEGLITZ:  And the handful that are on your

5     computer that we don't have copies of with us, at least.

6          THE COURT:  All right.  I've looked at -- I'm

7     assuming the numbers in the bottom right-hand corner are the

8     exhibit numbers; is that correct?

9          MR. STEIN:  Yes, Your Honor.

10         THE COURT:  So I think I'm looking at Defendant's

11    Exhibits 185, 65, 67, 84, 88, 156, 170, 224, 76, and 155.

12    They appear to me to all be in the general category I would

13    categorize as general correspondence, either correspondence to

14    individuals outside of the company or internal e-mail

15    correspondence back and forth.  I don't see, unless you can

16    try and lay a predicate, I don't see how any of this qualifies

17    as a business record under the hearsay exception.

18         I understand that the business keeps its

19    correspondence in the ordinary course of business and takes a

20    letter that it sends to someone and sticks a copy in its file

21    in the ordinary course of business and keeps that as a record

22    in the ordinary course of business.  That doesn't make it a

23    business record.  It has to be a record of a regularly

24    conducted business activity.

25         I understand businesses regularly exchange

```
 1    correspondence.  I understand that businesses regularly
 2    communicate internally by e-mail.  That's not what the hearsay
 3    rule is designed to encapsulate.  General correspondence is
 4    not a business record.  So that's what this seems to me to
 5    fall under, just general correspondence and communications
 6    back and forth within the company, outside the company.  I
 7    don't see it as a business record.
 8          Now, again, if you want to try and lay a predicate
 9    for these -- the admission, make it a business record with
10    your records custodian here, I want you to have the
11    opportunity to do it.  But my inclination is that you're not
12    going to be able to establish them as business records.
13          Let me just give you an example, okay, Mr. Stein.  An
14    example of why this does not fall under hearsay exception.
15          Let's assume that Dr.~Harmison wrote an e-mail to
16    John Woodbury.  That's what you have here.  For example, you
17    have e-mails between Woodbury and Harmison, and Mr. Harmison
18    wrote an e-mail and said, you know, John, I think Mr.~Stein is
19    ripping off the company.  I think he stole a million dollars
20    from the company.
21          It's in the business records, it's in this database
22    that your witness has, and the Government tried to offer that
23    as evidence that you stole a million dollars from the company.
24    I think you would have a problem with that being offered for
25    the truth of the matter that you stole a million dollars from
```

 1   the company.  It doesn't make it a business record because one

 2   person communicates with another person about something

 3   related to the company and you keep a copy of it in your files

 4   and you have it in the database and no one's touched it for

 5   five years and it's authentic.  It doesn't make it a business

 6   record, even though John Woodbury and Dr.~Harmison

 7   communicated regularly about the business.

 8        It's hearsay.  To say that you stole a million

 9   dollars from the company and encapsulate that in an e-mail

10   doesn't make it admissible.

11        Certainly, I don't think you would want that

12   admissible against you if there was such a document.  I'm just

13   trying to give an example of why this doesn't make it as a

14   business record.

15        MR. STEIN:  I respect what the Court says.  I think

16   the issue is one that as a matter of law one way or the other,

17   and I would like to present the Court with Eleventh Circuit

18   case law on this issue.

19        THE COURT:  I'd be happy to look at it, but I'm just

20   saying you have a witness here.  I want to give you the

21   opportunity, if you want to take advantage of it, to try and

22   lay a better foundation for this stuff being admissible under

23   the hearsay exception, business record exception.  I don't --

24   I'm not sure you're going to be able to do it, but he's here,

25   and if you want to provide a better foundation than you

```
1    already did for the other exhibit, I want to give you the
2    chance to do it.
3            MR. STEIN:  This witness has already testified that
4    items preceding when he became the custodian, that as to those
5    items, they're in the business records he's maintained and he
6    has no personal knowledge.  So, Your Honor, I would just like
7    to identify for the record what the Court has just said.  I
8    think the Court has identified them.
9            THE COURT:  Yes, I did.
10           MR. STEIN:  But there's no -- this witness has
11   already laid the foundation of the business records that we're
12   talking about.  There are more of them, which I don't -- right
13   now don't have an opportunity to go through because they
14   are -- they've been Bates stamp numbered and provided to the
15   Government, but I intended to show them to the witness.  These
16   are the ones I've come up with right now.
17           But this is an issue as a matter of law.  If the case
18   law I show the Court is in agreement with everything the Court
19   is saying, then this witness can be -- can testify about the
20   remainder of his personal sense impressions of what happened
21   with Mr. Carter and otherwise and leave.  To the extent the
22   case law causes the Court to reconsider its opinions, then we
23   can proceed to introduce this evidence as a custodian.
24           But I have to, given the oral discussions in court
25   today, I've got to have an opportunity to make the legal
```

```
 1    record and provide the Court with that case law, which I'll do

 2    this evening.

 3              THE COURT:  I certainly don't want to deprive you of

 4    that.  Again, since the witness is here and the jury's not,

 5    and I prefer not wasting the jury's time with going through

 6    this tomorrow, if you have any additional questions you want

 7    to ask the witness about these documents for purposes of

 8    laying a foundation for them being business records under the

 9    hearsay exception, I want you to do it now rather than with

10    the jury here tomorrow.  That's all I'm saying.

11              So if you've got anything else, let's do it now.  If

12    you don't and you're just going to stand on what you've

13    already presented and provide me with some case law tomorrow

14    and have us decide or have me decide it based upon the

15    additional case law you provide and no additional testimony,

16    that's fine, as well.

17              But I just don't want to waste the jury's time

18    tomorrow going through predicates with this witness when the

19    jury's here.  I'd rather do it now.  That's all I'm saying.

20              MR. STEIN:  For a half a minute may I consult with

21    standby counsel?

22              THE COURT:  Yes, sure.

23        (Brief pause in proceedings.)

24              MR. STEIN:  Your Honor, after consulting with standby

25    counsel, given the additional proof that the Court's asking
```

1    for, I would like to have five minutes with the custodian of

2    the company to determine exactly what the reality is regarding

3    some of these exhibits that precede his stewardship.

4            THE COURT:  Okay.  Can you come on up, Mr. Feidler?

5            MR. WHITE:  I think he wanted to talk with the

6    witness first to make sure that the witness would be able to

7    answer these questions before he --

8            THE COURT:  Well, I mean, he's already in the middle

9    of his testimony, so that's kind of unusual to, after he's

10   already testified, the rule's been invoked, for him now to be

11   able to confer with him separately.  So if you want to ask him

12   the questions, you can ask him now.  There's no jury here.

13   You can find out what he knows or what he doesn't know, but I

14   don't think it would be appropriate, since the rule's been

15   invoked, that you can confer with him separately to find out

16   what he might say, since he's already started his testimony.

17           MR. STEIN:  While the Court and standby counsel have

18   had this discussion, Mr. Feidler has taken it upon himself to

19   retake the witness stand.

20           THE COURT:  Well, I assume that's what you were

21   talking about when you said you wanted to talk to him.  I

22   thought you meant on the witness stand.  I didn't know you

23   meant separately.

24           THE WITNESS:  I am sorry, Your Honor, I presumed you

25   had called me up.

 1          THE COURT:  I did, because I thought that he wanted

 2   to examine you on the witness stand.

 3          THE WITNESS:  I was very happy back there.

 4          THE COURT:  Did you want to talk to him on the

 5   witness stand?

 6          MR. STEIN:  No, I'll continue the examination.

 7          THE COURT:  Okay.

 8                    Proffer Examination

 9   BY MR. STEIN:

10   Q   Mr. Feidler, when we left off you had indicated that the

11   reports of voluntarily outgoing CEOs were mandatory in a

12   technology company.  You remember that?  That's where we left

13   off.

14   A   Yes.

15   Q   And that from your personal evaluation of Signalife, that

16   custom and practice existed at Signalife?

17   A   Yes.

18   Q   In the prior technology companies you were with, did they

19   have the same custom and practice?

20   A   Yes.

21   Q   Why, in your experience, was it mandatory customary for

22   the outgoing CEO to prepare a report of his tenure?

23   A   Because the CEO is the residuum of the total knowledge of

24   the company.  They are able to put all elements together.  You

25   may have a lot of senior people, but they can't see

1    everything.  So someone has to say this is why the company's

2    doing something or should do something, and here are the

3    elements of why that must happen.  And that's what the

4    Harmison report was to me when I read it.

5    Q    You don't know whether or not the Harmison report is true

6    or untrue, right?

7    A    No, I do not know that.

8    Q    It's just the mere fact that he delivered the report to

9    the company that, in your experience, is important to the

10   indicia of what's happened at the company, not the reality of

11   the truth of what statements are made therein?

12   A    It's the reality of what he thought was happening at the

13   company.

14   Q    And the fact that he delivered the report in and of itself

15   is also important in terms of the continuity of the company,

16   is that your understanding?

17   A    Yes.

18   Q    When a president or a CEO leaves and sues the company and

19   doesn't deliver a report, that can do far more damage to the

20   company?

21   A    Of course.

22   Q    I'm asking leading questions.  I'm trying to shorten this.

23   But is that where you were going when you were saying this is

24   mandatory for outgoing CEOs?

25   A    Yes.

```
1    Q    Have you personally delivered such reports to companies

2    upon your departure?

3    A    Always.

4    Q    A hundred percent of the time?

5    A    100 percent of the time.

6    Q    You were the president of the joint venture of MCA and

7    IBM?

8    A    Yes.

9    Q    And you were the general counsel of Sony Corporation?

10   A    For intellectual property, yes.

11   Q    And you were the custodian at both of those companies?

12   A    Yes.

13   Q    And in your experience in the technology industry over 45

14   years, this is a custom and practice industry-wide, not just

15   in Signalife?

16   A    Not just in Signalife.  It's been the custom and practice

17   of every company that I'm particularly aware of.  I can't

18   speak for all companies in existence.

19            MR. STEIN:  Your Honor, with that foundation, we can

20   redact the entire document.  The fact that the report was made

21   is of independent significance, and it's -- the continuity of

22   that report is extremely important to my defense, and we can

23   just -- we can do this in any way, but I would strongly urge

24   the Court to consider the importance of the fact that these

25   documents were sent as opposed to what is in the documents.
```

 1            And I'm willing to stipulate and remove Mr. Feidler

 2    from the stand if we just have a listing of the e-mail

 3    communications that Harmison had.

 4            Without that, Mr. Harmison is dead.  Signalife is in

 5    existence as a corporation.  The fact that these

 6    communications were made, not what they're about, not what is

 7    said, is of critical importance to me.  Because right now a

 8    juror may have an opinion that Dr.~Harmison was asleep at the

 9    switch, and if he delivered a hundred communications during

10    this period of time, he, in that juror's mind, may not have

11    been asleep at the switch.

12            THE COURT:  Can I interrupt for a second?

13            The only thing I heard him talk about just now and

14    actually previously was this report, this summary report.  Now

15    it seems like you're going beyond that and talking about other

16    communications that Dr.~Harmison may have sent.  I didn't hear

17    him talk about any of that.  So are you -- I'm not sure what

18    you're arguing as far as the other communications and what --

19            MR. STEIN:  Well, with each one the Government's

20    objected to --

21            THE COURT:  I guess I'm trying to understand what

22    you're saying.  You don't want the content of the -- those

23    various e-mails and letters admitted, you just want the fact

24    that Dr.~Harmison on such and such a date sent an e-mail to

25    John Woodbury or on such and such a date he sent a letter to

1    the American Stock Exchange?  You don't care whether or not --

2    what -- you don't want the content of the communications

3    admitted?

4         MR. STEIN:  Well, Your Honor, obviously I would want

5    the content admitted, but in the interest of having the jury

6    go out on this case and begin deliberations, I would reduce

7    that need to just the fact that the communication was sent on

8    the dates indicated in the exhibits that we've referenced that

9    the Government's objected to.

10        I would, with respect to the summary report, at a

11   minimum, request that the organizational chart that

12   Dr.~Harmison delivered of what -- of the company that he left

13   be admitted.  That's the last page of the summary report.  The

14   rest of it can be redacted or eliminated.  But the fact that

15   these communications were made and the fact that this man was

16   the former head of the FDA are critical to my defense, and

17   they are critical to my freedom, and I can't imagine that the

18   Court would find them to be irrelevant --

19        THE COURT:  Could I interrupt you for a second?

20        MR. STEIN:  Of course.

21        THE COURT:  Did you have any more questions for this

22   witness regarding laying any kind of a foundation for the

23   admissibility of any of those documents?

24        MR. STEIN:  Yes.

25        THE COURT:  Then ask the questions.  Let's get

```
 1   through the testimony before we talk about the argument.

 2            MR. STEIN:  Okay.  Your Honor, we'll put them up one

 3   by one on the screen.

 4   BY MR. STEIN:

 5   Q   Mr. Feidler, from your -- other than the summary report --

 6            MR. STEIN:  Your Honor, I would again re-offer the

 7   summary report all redacted except for the organizational

 8   chart at the end.  So it would be the first page and the last

 9   page.

10            MR. MUHLENDORF:  Objection, Your Honor.

11            THE COURT:  I want the testimony first, and then

12   we'll talk about what's going to be admitted and what's not.

13   Okay?  Let's get through the testimony.

14   BY MR. STEIN:

15   Q   Mr. Feidler, have you completed your testimony regarding

16   the summary report of Lowell Harmison that is contained and

17   has been offered into evidence?

18   A   I think I've answered all the questions you've asked me.

19   I have other views about it, but that's my view.

20   Q   I'm just asking you -- I'm just laying the foundation for

21   the admission of the summary report.

22            And you are certain from your experience over 45

23   years and from the database that has been in the possession of

24   the company and the SEC for five years, that that summary

25   report was sent by Dr.~Harmison to the board of directors of
```

```
 1    Signalife in 2008 after he left the company?

 2    A    Yes.

 3    Q    You're 100 percent certain?

 4    A    Yes.

 5    Q    I will now go on to additional exhibits.

 6              THE COURT:  Mr. Feidler, you can tilt that up so you

 7    can look at the documents when they show them.

 8    BY MR. STEIN:

 9    Q    Okay.

10              THE COURT:  Which exhibit number is this?

11              MR. STEIN:  This is exhibit number 185.  It is a --

12    an e-mail from -- it says from Dr. Lowell Harmison to John

13    Woodbury dated October 25, 2007.  Subject is regarding fatal

14    flaw, and it is a direction.  He says:  "John, yes, send final

15    copy.  Thanks, Lowell."  There's an e-mail chain below it.

16    BY MR. STEIN:

17    Q    Mr. Feidler, is this document -- and please carefully

18    examine it.  Is this a document that you are the custodian

19    over as you've previously testified to regarding Signalife?

20    A    It appears to be, yes.

21    Q    Is this chain of e-mails, from your experience and from

22    your interaction in creating the database, a chain of e-mails

23    that was likely to be made at or about the time of the events

24    stated therein?

25    A    Yes.
```

```
 1    Q    Was it highly likely, given the shortness of this e-mail,
 2    to be made in the ordinary course of business?
 3    A    Yeah, it's something that was created obviously in the
 4    midst of negotiation.
 5    Q    It was a direction of Dr.~Harmison, in your experience; is
 6    that right?
 7    A    That's what I'm reading.  That's from my experience, what
 8    I'm reading off the e-mail, yes.
 9    Q    And this document was contained in a database set up in
10    2009 that you've testified to earlier?
11    A    Correct.
12            MR. STEIN:  I would offer this document not for the
13    truth of the matter asserted --
14            THE COURT:  Just go through all the documents.
15            MR. STEIN:  Okay.
16            THE COURT:  We'll get to the admission issue after.
17    I'd like this witness to be able to go home --
18            MR. STEIN:  Sixty-five.  Thank you, Your Honor.
19            THE COURT:  -- for the night.
20    BY MR. STEIN:
21    Q    Mr. Feidler, would you please review this document
22    carefully and determine whether the markings on it reflect
23    that it was contained in the database.  This is an e-mail from
24    Dr. Lowell Harmison to Mitchell@dobieco.org dated Thursday,
25    December 27th, 2007, which says:  "Mitch, two thoughts.
```

```
 1   Given --"
 2            THE COURT:  Don't read the document, Mr.~Stein.
 3   Okay?
 4            MR. STEIN:  Can I read the re line to identify it?
 5            THE COURT:  You've already identified it.  It's part
 6   of the record.  We know what it is.  The court reporter
 7   doesn't have to type the entire document.
 8            THE WITNESS:  I need to see the rest of the document.
 9            Is there any way I can control the view of the
10   document?
11   BY MR. STEIN:
12   Q   No.
13            MR. STEIN:  Just keep scrolling down.
14   BY MR. STEIN:
15   Q   Mr. Feidler, is this document, exhibit 65, a document
16   contained in the database which you've testified about?
17   A   Yes.
18   Q   And you're positive about that?
19   A   Yes.
20   Q   Why are you positive about that?
21   A   Because of the notation on the bottom of the pages of the
22   document of the SEC.
23   Q   Mr. Feidler, are you aware of Dr. Steven Phillips, the
24   name Steven Phillips?
25   A   Vaguely.
```

```
 1    Q    You never met Steven Phillips?

 2    A    No.

 3    Q    But Steven Phillips was on the board of the company at one

 4    point with Dr.~Harmison, right?

 5    A    That's correct.

 6    Q    And his son apparently -- you never met him either, right?

 7    A    Correct.

 8    Q    But this document was in the database, and you're positive

 9    of it because of the markings on it?

10    A    That's correct.

11    Q    And this is a chain of e-mails between Dr.~Harmison; me;

12    Michael Phillips, Steven Phillips' son, involving various

13    topics?

14            THE COURT:  Mr.~Stein, you don't have to have written

15    in the record what it is.  It's obvious what it is.  Okay.  We

16    just need testimony as to the foundation.

17    BY MR. STEIN:

18    Q    Okay.  So the foundation on this document you're positive

19    came from the database?

20    A    Yes.

21    Q    Next one is 67.

22            Mr. Feidler, I'm asking you the same question about

23    exhibit 67, which is an e-mail from Lowell Harmison to

24    Mitchell@dobieco.org and is an e-mail communication?

25    A    Okay.
```

```
1    Q    Mr. Feidler, is exhibit 67, from your experience with

2    Signalife, a document maintained in the database of the

3    company?

4    A    Yes.

5    Q    And are you positive of that?

6    A    Yes.

7    Q    And that database was the database that was made in 2009

8    that you've testified about?

9    A    Yes.

10   Q    Why are you positive that exhibit 67 is in that database?

11   A    Because of the markings on the bottom of the page.

12   Q    With regard to exhibits in general, are there other things

13   you would look at besides Bates stamp numbers to determine

14   whether they come from the database?

15   A    I have some knowledge of history before I joined the

16   company, and sometimes the document will shed light on

17   something that I'm familiar with.

18   Q    But the database is accessible on a laptop computer that

19   we could give you right now, and you can pull up any document,

20   right?

21   A    Right.

22        THE COURT:  Mr.~Stein, I don't think the issue is

23   whether or not these documents actually come from the

24   database.  That's not the problem.

25        MR. STEIN:  I understand.
```

```
 1              THE COURT:  But you're spending all the time having

 2      the witness verify that they come from the database.  I think

 3      everyone understands and doesn't dispute that they come from

 4      the database.  That's not the difficulty that I have with the

 5      documents.  I don't have to -- I don't doubt for a minute that

 6      these are part of this gentleman's database of correspondence

 7      of the company.  That's not the problem.

 8              MR. STEIN:  Where I'm leading, Your Honor, is the --

 9      simply the fact that these communications were sent and the

10      solution being a redaction or elimination of the e-mail and

11      perhaps an instruction that communications were sent on these

12      dates.  That's where I'm leading, and that's why I'm asking

13      him these questions.

14              THE COURT:  Okay.  Well, I don't think it's an issue

15      that these are in the database.

16              MR. STEIN:  Well, the jury's not going to know

17      they're in the database unless someone testifies or someone

18      tells them.

19              THE COURT:  I understand, but we don't have the jury

20      here now.  We're trying to lay the foundation for their

21      admissibility under the hearsay exception.

22              MR. STEIN:  I apologize, Your Honor.

23              Let's go to exhibit 84.

24              MR. STIEGLITZ:  Your Honor, may I make a suggestion

25      that just based on what Mr.~Stein has suggested about this
```

1    issue, the issue being that he wants to establish the

2    existence of communications, I don't think the Government --

3    I'd have to think about it, I don't know that we would have an

4    objection, that there would be one, but I certainly don't know

5    that we'd make one if tomorrow in the presence of the jury

6    Mr.~Stein wants to ask Mr. Feidler, hey, looking at, you know,

7    the database or whatever, were there a certain number of

8    communications, without getting into the content of them,

9    between Lowell Harmison and somebody else, or between these

10   two people.

11        I don't know that we'd have an objection to that, but

12   I just raise that as maybe a way to get through this more

13   quickly.

14        MR. STEIN:  And, Your Honor, that would be -- I'm a

15   man in possession of all my faculties.  That would be a good

16   middle ground solution that I would stipulate to.

17        THE COURT:  So can you then come up with a

18   stipulation that on such and such a date, Lowell Harmison sent

19   an e-mail to so-and-so regarding this topic, and lay them all

20   out?

21        MR. STIEGLITZ:  Well, just to walk it back, Your

22   Honor, I think what I'm suggesting is I understood Mr.~Stein

23   to be concerned about the issue of the existence of

24   communication as a general matter, and frankly, the number of

25   those communications.  That, I think we could easily agree on.

```
 1    Going beyond that into content, including the subject of them,
 2    I think we would have -- there'd be still be a gap between us
 3    that might not be able to be bridged.
 4              But again, I'm just trying to help move it quicker.
 5              THE COURT:  But with the date?  You'd have a problem
 6    with the date?
 7              MR. STIEGLITZ:  No, not with the date.  I'm sorry,
 8    Your Honor, not with the date.
 9              MR. STEIN:  He didn't say the date, Your Honor; he
10    said the subject matter being --
11              THE COURT:  So do you have a problem with if you come
12    to a stipulation of all the dates and the communications
13    between Harmison and so-and-so on such and such a date?  It's
14    stipulated on such and such a date he communicated with
15    so-and-so, on such and such a date he communicated with
16    so-and-so, or he received a communication from so-and-so.
17              You said you'd agree to that?
18              MR. STIEGLITZ:  I think we can agree to that.
19              MR. STEIN:  Your Honor, in the event that's the
20    stipulation and in the event the organizational chart, the
21    last page of the summary report were -- came into evidence for
22    the fact that he delivered it, I would be able to do that
23    stipulation with the Government in an hour, right now.
24              MR. STIEGLITZ:  We'd still oppose any part of that
25    summary report.
```

```
1              THE COURT:  Could I see that summary report, that
2    organizational chart again?
3              MR. STEIN:  We could put it on the screen.
4              Your Honor, it's on the screen in color.
5              MR. STIEGLITZ:  Your Honor, if Mr.~Stein -- well,
6    I'll defer to what Mr.~Stein wants to offer, but I think if it
7    were just, I want to offer this page in, without
8    characterizing it as a statement of someone one way or the
9    other, you know, I don't think we'd have an objection to that.
10             MR. STEIN:  Merely that it was delivered, the first
11   page of the title of the document and the last page, it was
12   delivered to the company by Dr.~Harmison, and the Court would
13   obviously instruct the jury it's not being admitted for the
14   truth of anything in it, that stipulation would be fine.  And
15   with all other exhibits, just the date that they were sent, as
16   the Court has indicated, I would stipulate to that.
17             MR. STIEGLITZ:  May I make yet another suggestion,
18   Your Honor, as a way to get through it?
19             THE COURT:  Yes.
20             MR. STIEGLITZ:  Perhaps Mr.~Stein would want to
21   disassemble that, take that document, show it to Mr. Feidler,
22   ask him if that's the organization as he understands it, and
23   maybe that's the way we get past this, and then Mr.~Stein
24   could admit that as Mr. Feidler's understanding of the
25   structure of Signalife or Heart Tronics, I guess as the case
```

 1  may be during Mr. Feidler's time.

 2          THE COURT:  I don't know how -- the witness said that

 3  he believed that this was, in fact, delivered by Dr.~Harmison.

 4  What is the basis for your belief that it was actually

 5  delivered by him as opposed to you just found it in your

 6  records?

 7          THE WITNESS:  I've read it, and I -- Mr. Perkins and

 8  I had discussed it, because we built some strategy around it.

 9          THE COURT:  But you don't have any personal knowledge

10  that it was actually delivered by Dr.~Harmison?

11          THE WITNESS:  I have no personal knowledge it was

12  actually delivered, just what people have said to me.

13          MR. STEIN:  May I lay a foundation on that one issue?

14          THE COURT:  Hold on.

15          So -- but it's in your records as a document that was

16  delivered by Dr.~Harmison.  That's how --

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  So would you have a problem with him just

19  testifying that this first page and this last page were

20  records, according to their records, that were delivered by

21  Dr.~Harmison to the company?

22          MR. STIEGLITZ:  Your Honor, I have much more of a

23  problem with the first page in terms of the summary report

24  simply because I don't -- I fear that that, then, is the basis

25  for argument as to what's in the report.

```
 1              THE COURT:  Well, the report's not going to go in, so
 2    how can he argue about what's in it?
 3              MR. STIEGLITZ:  Understood.
 4              I think if that's the case, it would just be that
 5    cover page and then the sort of org chart thing that we're
 6    looking at here, we would agree to that.
 7              MR. STEIN:  So stipulated.
 8              THE COURT:  And you're going to then get the dates of
 9    the communications.
10              MR. STEIN:  Absolutely.
11              THE COURT:  All right.
12              MR. STIEGLITZ:  So just --
13              THE COURT:  So what will be admitted is the first
14    page and the organizational chart, with the witness being
15    allowed to testify that this is -- this was in the records of
16    the company as having been delivered by Dr.~Harmison.
17              MR. STIEGLITZ:  Yes, no objection to that, Your
18    Honor.
19              MR. STEIN:  Would that testimony be in the presence
20    of the jury?
21              THE COURT:  Yeah, of course.
22              MR. STEIN:  Okay.
23              THE COURT:  It's not going to do any good to have him
24    testify to me.
25              MR. STIEGLITZ:  I just want to clarify, Your Honor,
```

```
 1    that obviously that will be the extent of it, as opposed to

 2    any, oh, was there more to this report, is there any other

 3    aspect to it.  I just think it's important to clarify that for

 4    purposes of tomorrow.

 5           MR. STEIN:  I will ask him if it was -- if the

 6    document was sent, he'll answer truthfully, and then I'll say,

 7    were these two pages a part of the document, he'll answer, and

 8    I'll be done.  I mean, I think the jury knows that it wasn't a

 9    two-page document with an org chart in it, but I'm not going

10    to be arguing what was in the document.

11           THE COURT:  You can't get into the content of

12    anything other than what's on those two pages.

13           MR. STEIN:  Absolutely.

14           THE COURT:  All right.

15           MR. STIEGLITZ:  And I'd just request, Your Honor,

16    that as to any itemization of other e-mails that Mr.~Stein

17    gives us, that he identify them somehow so that we can go

18    through and determine what it is as opposed to just rattling

19    off a series of numbers that we may or may not have been

20    received.

21           THE COURT:  Just give them the exhibit numbers.

22           MR. STEIN:  I will give them all of the exhibit

23    numbers or Bates stamp numbers, Your Honor, before -- before

24    midnight tonight, and tomorrow morning Mr. Feidler will

25    testify, I presume, regarding the first and last page of
```

```
 1   exhibit 14 and regarding anything else that the Government has
 2   stipulated to regarding those exhibits being in the records,
 3   and then lastly, regarding the things he actually perceived
 4   when he was at the company.
 5              THE COURT:  That's separate.
 6              MR. STEIN:  That's separate, right.
 7              THE COURT:  Okay.
 8              MR. STEIN:  And if that's the way this is moving
 9   forward, then I believe that is an extremely fair compromise
10   for my rights, Your Honor.
11              THE COURT:  All right.  Anything else we need to talk
12   about, then?
13              MR. STIEGLITZ:  Just on a housekeeping perspective, I
14   guess I'd renew or make again our request for, pursuant to
15   Rule 16, for any of this additional discovery that Mr.~Stein's
16   alluded to.  I'm not suggesting he's been withholding it, I'm
17   just saying we'd like to see it if it's coming in.
18              MR. STEIN:  The only new thing we've located,
19   found -- got is the check from Mr. Tribou, which everything
20   else I think they have.  But nonetheless, I'll meet with them
21   right now and we can go through everything.
22              MR. STIEGLITZ:  And just the witness order for
23   tomorrow, Your Honor, if we could so that we can prepare.
24              MR. STEIN:  The witness order for tomorrow is
25   Mr. Feidler and Mr. Jones, from Batelle Memorial Institute,
```

1    and I don't think there will be any more time for witnesses

2    after that, but it will be Mr. Feidler and Mr. Jones from

3    Batelle.

4         THE COURT:  You think Mr. Jones is going to take all

5    day tomorrow?

6         MR. STEIN:  Well, the meeting with Mr. Carter that

7    Mr. Jones attended, he has his own -- I don't know what his

8    recollections are about the meeting.  I haven't spoken with

9    him.  So he could take five minutes or he could take all day.

10        THE COURT:  How can he take all day on the meeting

11   with Mr. Carter?

12        MR. STEIN:  There are -- then following the meeting,

13   what happened in the ordinary course of his business with

14   regard to this device, and Mr. Carter and Signalife obviously

15   is going to be important and admissible, critical.

16        THE COURT:  What his interaction with Mr. Carter was,

17   to the extent that Mr. Carter was an electrical expert or was

18   involved in developing the cords for the item, if he has any

19   knowledge about that, I certainly see how that would be

20   relevant, but I don't know why beyond that what they did with

21   the company and how they helped develop the product, what does

22   that have to do with this case?

23        MR. STEIN:  Nothing.  It's what the Court has

24   referred to.

25        THE COURT:  How can that take all day?

```
 1              MR. STEIN:  I will have witnesses in addition to

 2   Mr. Jones should it not take all day.

 3              THE COURT:  All right.  So then who are they?  The

 4   Government wants to know.

 5              MR. STEIN:  There are 18 witnesses under subpoena.

 6   Adam Usdan, who is the principal of Trellus.

 7              THE COURT:  I don't need to explain who they are.

 8   Just give him the names.

 9              MR. STIEGLITZ:  And he'll be here tomorrow?

10              MR. STEIN:  Adam Usdan, and then we have under

11   subpoena additional people who the Marshal's office and

12   standby counsel are working with who may be here.

13              Ms. Greene arrived here without my knowledge, and we

14   were fortunate enough to call her today.  There are other

15   witnesses who are supposed to be here, and I -- Mr. --

16              THE COURT:  So you don't know who's going to be here

17   tomorrow, is that what you're telling me?

18              MR. STEIN:  I presume the witnesses I've listed are

19   going to be here, but Mr. White knows for sure.  He's been

20   interacting with the Marshal Service.

21              THE COURT:  Okay.  Well, Mr. White, do you know who's

22   going to be here tomorrow from what you've learned?

23              MR. WHITE:  I'll have to check and confer with

24   Mr.~Stein on that, Your Honor.

25              MR. STIEGLITZ:  And I raise this, Your Honor, just
```

1   because it's come to our attention that either Mr. White or

2   Mr.~Stein has notified Dr. Drakulic and at least one other

3   witness that they should expect to be here sometime early next

4   week.  I'm just trying to figure out how we kind of fill that

5   gap, prepare, and it's -- a list of 18 people is difficult to

6   do that with.

7            THE COURT:  Are you going to have people to fill up

8   tomorrow and Friday?

9            MR. STEIN:  Yes, Your Honor.  And Mr. Stieglitz is

10  correct, those witness --

11           THE COURT:  I just want to know if you're going to

12  have people here tomorrow and Friday.

13           MR. STEIN:  Yes.

14           THE COURT:  Besides the three that you named, do you

15  know who they're going to be?

16           MR. STEIN:  I have to look with Mr. White on the list

17  of the subpoena and what the marshals have -- what information

18  they've delivered.  They're coming on his Apple.

19           THE COURT:  Well, I'd ask you to try and confer with

20  counsel for the Government after we recess so you can give

21  them some better idea of who's coming when so they can have

22  a -- be prepared.

23           All right.  Anything else?

24           MR. STIEGLITZ:  Nothing.

25           MR. STEIN:  Nothing else, Your Honor.

```
 1              MR. STIEGLITZ:  Thank you, Your Honor.

 2              THE COURT:  Thank you, Mr. Feidler.  I'm sorry to

 3   have to keep you so late.

 4              THE WITNESS:  That's all right.

 5              THE COURT:  And we'll see you tomorrow at 9:00,

 6   please.

 7              THE WITNESS:  Look forward to it.

 8              THE COURT:  Thank you.

 9              MR. STIEGLITZ:  And, Your Honor, I'd just ask that

10   you admonish the witness, if you would.

11              THE COURT:  Yes, don't discuss your testimony,

12   Mr. Feidler, during the recess.  Okay, sir?  Don't discuss

13   your testimony with anyone.

14              THE WITNESS:  Of course not, Your Honor.

15              THE COURT:  Thank you.

16         (The evening recess was taken at 6:16 p.m.)

17                            *  *  *  *  *

18

19

20

21

22

23

24

25
```

```
 1                       * * * * *

 2                     I N D E X

 3   Testimony of George Clark

 4          Direct by Mr. Stieglitz              7

 5          Cross by Mr. Stein                  45

 6          Redirect by Mr. Stieglitz         112

 7   Government Rests                         119

 8   Rule 29 Motion                           120

 9   Testimony of Jane Greene

10          Direct by Mr. Stein               135

11          Cross by Mr. Muhlendorf           179

12          Redirect by Mr. Stein             184

13   Testimony of James N. Fiedler

14          Direct by Mr. Stein               186

15          Proffer by Mr. Stein              249

16                     * * * * *

17

18

19

20

21

22

23

24

25
```

```
1                              *  *  *  *  *

2                          E X H I B I T S

3    Government's Exhibits in Evidence:

4            Government's 101, 135, 146, 339, 115,

5    120, 131, 132, 145, 340, 341, 259, 255, 256,

6    254, 258, 257 and 260                          7

7    Defendant's Exhibits in Evidence:

8            Defendant's 97                        238

9            Defendant's 167                       239

10           Defendant's 168                       239

11                              *  *  *  *  *

12                          CERTIFICATE

13       I, Stephen W. Franklin, Registered Merit Reporter, and

14    Certified Realtime Reporter, certify that the foregoing is a

15    correct transcript from the record of proceedings in the

16    above-entitled matter.

17       Dated this 9th day of JULY, 2013.

18

19       /s/Stephen W. Franklin

20       _____
         Stephen W. Franklin, RMR, CRR

21

22

23

24

25
```

**$**

$1,473,900 [1]  24/8
$1,553,560 [1]  39/17
$1,823,283 [1]  24/19
$1.8 [1]  10/13
$1.8 million [1]  10/13
$10 [1]  159/7
$10 million [1]  159/7
$10,000 [9]  25/15 25/19 25/21 92/22 93/2
  93/9 93/11 93/16 93/17
$101,000 [1]  39/17
$105,000 [3]  19/12 19/16 19/17
$105,300 [2]  29/13 29/14
$115,819.98 [1]  19/11
$120,000 [1]  26/22
$125,200 [1]  39/18
$140,000 [1]  32/16
$15 [1]  139/25
$15 million [1]  139/25
$160,680 [1]  26/3
$180,000 [4]  34/3 34/13 34/19 35/12
$182,806.77 [1]  35/23
$185,000 [1]  31/25
$19,717.84 [1]  22/6
$19,755.10 [1]  22/4
$194,800 [1]  30/15
$196,100 [1]  29/21
$2 [4]  125/7 169/10 170/11 173/25
$2 million [4]  125/7 169/10 170/11 173/25
$2,156,000 [1]  24/17
$20,000 [1]  28/15
$200,000 [1]  36/24
$228,000 [2]  36/15 36/22
$264,563 [2]  38/25 39/13
$28,000 [1]  36/25
$3 [2]  125/15 125/24
$3 million [2]  125/15 125/24
$300,000 [1]  159/12
$3000 [1]  139/17
$34,000 [1]  16/23
$36,387.55 [1]  16/22
$4 [1]  125/24
$4 million [1]  125/24
$40 [1]  125/16
$40 million [1]  125/16
$45 [4]  80/6 80/12 124/21 124/24
$478,600 [4]  11/7 11/15 11/21 44/1
$486,000 [1]  33/11
$50 [2]  125/8 126/1
$50 million [2]  125/8 126/1
$50,000 [2]  34/17 234/10
$500,000 [1]  39/16
$682,100 [1]  24/12
$7 [3]  55/14 56/4 56/16
$7 million [3]  55/14 56/4 56/16
$78,000 [1]  38/1
$90,000 [2]  28/5 29/16
$90,800 [1]  29/17
$99,000 [1]  32/19

**'**

'05 [1]  40/1
'06 [1]  177/13
'07 [2]  27/17 29/9
'08 [1]  32/14
'12 [1]  98/22
'40s [1]  163/8
'6 [1]  122/14
'97 [2]  141/8 141/19

**'til [3]  156/13 195/19 202/9**

**-**

-and [1]  1/21
-v [1]  1/5

**/**

/s/Stephen [1]  273/19

**0**

001065 [1]  218/10

**1**

1,002,181 [1]  73/2
1.4 million [1]  24/17
1.5 million [1]  123/25
10 [14]  19/22 106/15 106/22 106/23 119/10
  119/25 123/11 132/9 132/24 192/7 206/8
  227/16 232/15 233/5
10-K [10]  4/17 17/20 17/22 18/2 18/4 18/11
  21/16 47/17 49/12 50/13
10-Ks [1]  50/14
10-Q [10]  4/16 14/14 14/23 14/24 15/9 21/11
  21/13 21/16 47/17 49/12
100 [5]  186/22 186/25 200/25 202/8 223/9
100 percent [2]  251/5 255/3
101 [4]  6/20 7/1 22/14 273/4
1013 [1]  30/17
1031 [1]  1/22
106 [1]  42/18
107 [1]  42/19
10:31 [1]  61/1
10:48 [1]  61/1
11 [9]  3/15 22/20 88/13 88/17 91/21 119/6
  119/11 119/13 123/12
11-80205-CR-MARRA [1]  1/2
11/15 [1]  29/17
112 [1]  272/6
113 [1]  124/9
115 [4]  6/20 7/1 22/15 273/4
118,100 [1]  19/10
119 [3]  43/1 43/2 272/7
11:00 o'clock [1]  109/15
11th [3]  31/17 31/22 38/1
12 [5]  3/15 17/7 119/6 119/11 123/12
120 [5]  6/20 7/1 16/14 272/8 273/5
1200 [1]  154/16
1208 [1]  1/20
12:05 [1]  110/10
13 [4]  19/22 29/20 119/6 119/11
131 [4]  6/20 7/2 16/14 273/5
132 [5]  6/20 7/2 19/4 33/16 273/5
135 [5]  6/20 7/1 16/14 272/10 273/4
137 [2]  36/2 92/17
13d-3 [1]  52/9
13d-5 [1]  52/9
13th [4]  29/9 29/15 30/14 52/2
14 [7]  43/2 123/16 141/4 216/8 240/16
  241/10 267/1
1400 [1]  1/18
145 [4]  6/20 7/2 19/5 273/5
146 [4]  6/20 7/1 19/4 273/4
1470 [1]  22/2
14th [2]  15/11 27/17
15 [10]  1/8 29/17 29/20 60/11 60/15 60/20
  141/4 148/13 192/7 192/13
150 [2]  141/4 192/4
155 [3]  237/13 238/17 243/11
1551 [1]  1/20
156 [3]  237/13 238/20 243/11

15th [2]  4/7 30/14
16 [1]  267/15
1632 [1]  20/14
167 [6]  237/13 238/21 238/23 239/1 241/18
  273/9
167's [1]  238/24
168 [6]  237/13 239/2 239/2 239/5 241/18
  273/10
168's [1]  239/4
16th [1]  30/15
17 [1]  5/4
17 million [1]  141/18
170 [3]  237/14 239/6 243/11
174 [4]  237/14 239/8 239/16 239/17
179 [5]  237/14 239/8 239/16 239/20 272/11
17th [3]  4/6 42/17 43/5
18 [3]  213/4 269/5 270/5
184 [1]  272/12
185 [4]  237/14 239/10 243/11 255/11
186 [1]  272/14
18th [2]  4/7 17/10
19 million [1]  125/25
19.5 million [1]  124/17
19057000 [1]  78/14
191 [2]  43/6 88/10
192 [2]  43/6 88/11
1930s [1]  163/8
194 [2]  31/11 98/2
1964 [3]  194/13 194/17 194/24
1979 [1]  195/17
1980 [1]  195/18
1982 [1]  195/18
1985 [1]  195/6
1988 [1]  139/24
1989 [1]  195/19
1990s [1]  188/4
1991 [1]  139/24
1994 [1]  141/8
1999 [1]  196/9
1:00 o'clock [1]  110/3
1:15 [4]  109/6 109/10 110/2 110/4
1:19 [1]  110/10
1:57 [1]  133/9
1st [2]  17/22 196/9

**2**

2,528,792 [1]  71/13
20 [4]  221/9 221/11 234/16 241/10
200 million [1]  240/17
2000 [3]  14/15 188/17 188/17
2000s [1]  188/5
2002 [4]  88/19 91/13 103/11 223/14
2003 [9]  47/24 48/6 48/7 48/10 77/9 88/19
  142/5 203/25 207/11
2005 [77]  8/23 10/6 10/13 38/10 38/20 44/2
  46/24 52/2 53/14 54/10 58/11 61/19 63/17
  63/20 67/19 67/21 68/2 68/5 68/6 68/13
  68/19 69/10 74/11 74/19 75/17 76/21 101/21
  102/2 102/7 103/8 103/11 106/10 107/14
  121/2 121/5 121/12 121/14 121/19 121/20
  121/24 122/13 123/4 123/8 123/9 123/10
  123/12 123/20 125/22 126/10 126/14 128/14
  132/4 143/21 143/23 145/2 145/11 151/25
  153/4 155/12 155/16 155/19 156/13 156/14
  157/10 157/15 159/2 159/4 159/17 160/16
  160/21 160/22 165/4 167/1 167/5 174/14
  179/22 179/25
2005-2010 [1]  47/20
2006 [29]  48/17 70/3 70/6 71/12 71/18 73/9
  76/11 77/9 123/8 123/9 123/10 123/13

**2**

2006... [17]  125/22 145/10 145/12 153/21
167/1 167/5 169/2 169/3 169/7 169/8 171/5
172/23 174/17 175/10 177/5 179/22 179/25
2007 [25]  14/15 18/13 21/14 23/14 23/25
26/15 26/18 26/19 26/19 30/14 30/15 32/13
47/3 67/18 68/6 69/8 69/13 76/22 121/12
121/23 123/4 234/11 236/5 255/13 256/25
2008 [51]  14/5 14/7 14/12 15/21 17/11 17/15
18/15 18/16 21/5 21/8 23/14 23/25 26/19
31/17 31/22 32/25 33/21 35/10 35/14 37/21
37/23 47/3 68/6 72/8 72/10 72/16 72/17
72/20 72/25 73/5 73/9 77/9 78/4 78/14 79/17
80/6 80/13 80/20 80/20 82/3 121/23 122/6
177/5 198/22 199/1 214/23 214/23 216/14
217/6 236/5 255/1
2009 [13]  4/7 42/18 43/5 76/11 188/13
188/14 188/25 196/22 196/23 206/19 206/20
256/10 259/7
2010 [24]  4/7 4/7 8/23 10/7 10/14 38/10
38/21 40/1 44/2 46/24 47/20 68/6 102/2
102/7 121/6 132/4 188/17 188/18 188/19
188/20 188/21 197/2 202/9 206/19
2011 [5]  8/1 45/15 98/22 98/23 212/25
2012 [1]  98/20
2013 [4]  1/8 136/23 152/5 273/17
20530 [1]  1/18
21 [2]  43/6 234/5
214 [4]  237/14 239/16 239/22 239/23
2154 [4]  16/25 19/18 22/8 100/19
22 [3]  14/25 15/14 79/17
224 [3]  237/14 239/12 243/11
228 [1]  1/22
22nd [3]  17/10 80/6 80/12
238 [1]  273/8
239 [2]  273/9 273/10
24 [2]  124/25 152/23
245 [1]  39/24
249 [1]  272/15
24th [1]  15/12
25 [2]  42/18 255/13
254 [4]  6/21 7/2 21/21 273/6
255 [6]  6/21 7/2 15/25 99/15 111/2 273/5
256 [4]  6/21 7/2 18/17 273/5
257 [4]  6/21 7/2 30/2 273/6
258 [7]  6/21 7/2 23/9 99/5 99/7 111/2 273/6
259 [8]  6/21 7/2 9/13 25/23 42/9 43/23
101/18 273/5
26 [2]  236/19 237/5
260 [6]  6/21 7/2 38/12 40/5 94/24 273/6
26th [3]  33/21 34/9 35/10
27 [1]  234/11
27th [1]  256/25
28th [2]  21/5 21/8
29 [4]  120/9 120/12 127/15 272/8
29,340,634 [1]  73/10
294 [2]  81/6 81/8
2:08 [1]  133/9

**3**

3 million [1]  125/19
3,000,500 [1]  53/17
30 [2]  164/11 234/16
302 [1]  1/10
318 [1]  2/3
31st [1]  35/22
323 [15]  50/18 50/22 51/6 51/7 51/11 53/13
61/18 63/5 69/24 74/12 101/21 115/4 115/19
115/21 117/22

**33179** [1]  1/22
33401 [2]  1/20 1/25
339 [4]  6/20 7/1 22/15 273/4
340 [4]  6/20 7/2 19/5 273/5
341 [4]  6/20 7/2 19/5 273/5
3768 [1]  1/24
3:05 [1]  168/2
3:15 [1]  168/2

**4**

401k [2]  159/14 183/10
405 [1]  53/11
45 [4]  15/16 251/13 254/22 272/5
4500 [1]  79/19
480,547 [2]  48/18 70/6
498 [1]  141/18
498 million [2]  141/14 141/15
4:30 [1]  193/7
4:47 [1]  233/8
4th [2]  15/19 36/16

**5**

5 percent [4]  187/4 187/6 187/11 187/13
5,667,334 [1]  72/13
50 [1]  127/8
50,000 [1]  64/25
50,148 [1]  22/3
500 [1]  89/12
500,000 [1]  48/1
514-3768 [1]  1/14
52,550 [1]  16/19
5251 [2]  16/20 19/10
5541 [2]  19/13 30/13
561 [1]  1/24
5:07 [1]  233/8
5th [6]  14/4 14/4 14/12 14/17 15/21 16/19

**6**

6,035,000 [1]  24/2
65 [3]  237/15 243/11 257/15
67 [7]  237/10 237/15 243/11 258/21 258/23
259/1 259/10
682,000 [1]  24/17
6:16 [1]  271/16

**7**

7000 [2]  176/4 236/12
701 [1]  1/24
73 [2]  14/17 14/22
75 [1]  200/23
75-page [1]  89/11
76 [6]  237/10 237/22 237/24 238/18 239/13
243/11
78 [5]  18/5 18/8 207/24 221/16 229/3
79 [1]  18/8

**8**

801 [1]  4/11
803 [3]  3/13 5/4 221/24
82,000 [1]  34/16
84 [4]  27/11 31/2 243/11 260/23
85 [1]  20/12
85 percent [1]  24/19
86 [1]  77/25
88 [3]  237/13 237/22 243/11
8:00 in [1]  240/25
8:30 [2]  227/24 227/25
8s [1]  47/16
8th [1]  4/7

**9**

9,479,074 [1]  72/22
9,682,706 [1]  71/20
901 [5]  4/4 4/9 4/18 4/21 5/2
902 [5]  3/15 3/15 4/9 4/18 4/22
93 [1]  17/25
97 [7]  237/13 238/11 238/12 238/14 238/16
241/17 273/8
99 [1]  32/19
9:00 [2]  228/15 271/5
9:00 tomorrow [1]  228/16
9th [1]  273/17

**A**

a.m [2]  61/1 61/1
Abbeville [1]  160/13
ability [6]  128/5 152/14 175/20 180/25 230/9
241/11
able [26]  5/17 13/20 23/6 38/9 94/22 108/12
127/10 131/8 132/8 158/11 158/12 160/17
163/22 183/13 185/8 201/13 226/6 235/12
244/12 245/24 248/6 248/11 249/24 256/17
262/3 262/22
above [9]  12/25 31/13 32/1 32/2 93/9 93/11
144/6 153/16 273/16
above-entitled [1]  273/16
absolutely [9]  28/23 32/4 35/21 113/21
215/20 215/21 238/7 265/10 266/13
access [4]  122/7 189/11 198/5 212/9
accessible [1]  259/18
accompanied [8]  41/1 41/3 41/5 41/6 41/6
41/7 41/7 41/20
accomplish [1]  232/2
accordance [3]  52/9 65/18 205/8
according [1]  264/20
account [94]
account-opening [2]  106/24 113/2
accounts [22]  8/9 8/10 8/11 8/13 8/15 8/25
9/2 9/20 10/6 10/24 10/25 11/18 11/20 13/4
26/8 26/9 26/12 26/24 40/10 40/14 106/12
108/7
accumulated [1]  12/21
accuracy [1]  183/14
accurate [23]  10/2 16/8 16/10 18/23 18/25
22/10 22/12 23/22 23/24 29/13 30/6 30/8
38/16 38/18 58/3 62/25 78/17 78/19 80/8
97/5 122/14 137/12 156/15
Acer [1]  158/16
acquired [1]  52/1
acquisitions [1]  52/6
acquittal [6]  120/9 120/16 120/21 128/22
128/23 129/2
across [1]  148/3
act [9]  52/10 65/22 66/1 190/4 203/5 205/9
222/1 222/16 222/17
acting [4]  66/9 170/19 170/19 203/7
action [1]  228/25
active [3]  194/14 194/19 213/21
actively [1]  211/7
activities [5]  161/14 184/12 195/25 223/23
224/25
activity [19]  3/12 152/22 197/17 223/5 223/6
223/12 223/17 224/1 224/19 224/20 224/22
224/24 225/1 225/2 225/14 225/17 225/25
226/19 243/24
acts [5]  123/8 126/17 190/8 197/8 201/15
actual [2]  123/16 240/11
actually [23]  2/20 6/16 15/25 29/17 31/4
31/11 32/7 36/9 54/13 57/16 74/7 87/23

276

**A**

actually... [11] 142/12 161/7 201/15 212/20 219/4 252/14 259/23 264/4 264/10 264/12 267/3
ad [1] 235/6
Adam [4] 55/22 56/2 269/6 269/10
add [2] 213/15 224/9
added [1] 23/8
adding [1] 24/16
addition [7] 19/24 29/14 112/19 113/5 123/23 191/18 269/1
additional [20] 29/9 73/2 127/2 130/9 134/19 194/6 202/11 217/11 217/22 219/8 229/8 229/9 230/16 247/6 247/15 247/15 247/25 255/5 267/15 269/11
address [3] 121/21 137/3 227/19
adjust [1] 185/25
adjusted [1] 52/24
adjustments [1] 52/24
administered [1] 12/7
administrative [1] 129/19
admissibility [4] 3/9 193/4 253/23 260/21
admissible [11] 131/24 190/23 224/5 233/17 234/12 237/3 240/5 245/10 245/12 245/22 268/15
admission [4] 193/9 244/9 254/21 256/16
admit [5] 6/14 226/2 231/21 238/14 263/24
admitted [28] 6/24 15/24 16/13 18/17 19/4 21/20 22/14 38/12 39/23 48/1 48/1 130/15 131/12 131/17 134/5 221/14 228/23 228/24 234/6 238/24 239/4 252/23 253/3 253/5 253/13 254/12 263/13 265/13
admonish [1] 271/10
advantage [3] 172/24 175/11 245/21
adverse [1] 200/8
advised [1] 167/14
advising [1] 27/23
Advisors [1] 3/23
affect [1] 7/14
affects [2] 119/9 128/21
affiliate [4] 53/5 53/10 66/12 93/18
affiliated [1] 171/7
affiliates [2] 53/8 78/13
AFG [1] 96/9
afield [1] 85/17
after [100]
afternoon [6] 111/4 111/5 119/21 135/23 168/17 179/6
again [79] 2/15 9/3 12/10 12/24 17/16 18/11 19/1 19/9 20/24 21/7 21/7 22/7 25/24 29/8 30/17 32/9 32/13 34/24 36/21 37/2 37/10 37/12 41/25 42/2 42/8 42/9 43/23 44/4 48/20 50/23 55/18 56/2 58/18 65/3 65/6 65/7 65/25 66/19 68/17 71/15 71/23 86/10 90/12 99/17 104/14 106/24 118/18 119/24 129/1 131/22 140/5 142/3 142/4 142/7 145/2 146/1 154/23 156/8 159/2 160/22 162/9 162/10 162/10 162/11 170/8 179/24 200/10 201/7 208/24 225/20 235/13 235/17 239/10 244/8 247/4 254/6 262/4 263/2 267/14
against [5] 96/16 104/14 167/6 226/14 245/12
age [1] 144/19
agency [3] 7/12 119/15 198/6
agent [2] 13/11 64/18
agents [3] 65/22 66/1 66/14
ago [6] 17/15 21/10 29/6 136/24 241/10 241/10
agree [13] 3/8 5/10 76/21 77/5 87/20 180/15

182/7 182/22 242/4 261/25 262/17 262/18 265/6
agreed [5] 6/14 118/19 230/7 230/10 243/2
agreement [5] 79/6 143/17 170/5 221/20 246/18
agreements [5] 79/5 102/10 123/25 221/14 229/6
ahead [9] 3/2 5/8 21/12 76/8 84/19 86/17 167/23 177/9 199/17
ahold [2] 157/11 185/8
Air [16] 149/2 149/16 149/19 150/1 151/6 151/9 151/11 206/16 206/17 206/25 207/12 207/14 207/25 208/21 211/9 213/2
aircraft [1] 39/22
airport [2] 45/14 97/20
Ajay [10] 9/21 43/20 49/16 60/9 65/1 73/19 115/15 115/25 116/3 178/5
Alabama [1] 172/19
Albert [1] 1/16
alerting [2] 36/8 36/17
alike [1] 201/1
alive [1] 219/23
allegation [6] 85/21 87/3 87/9 87/10 87/12 166/25
allegations [14] 88/8 114/13 122/11 122/16 122/25 123/14 123/15 128/23 165/22 165/23 167/6 201/17 219/6 220/5
allege [1] 125/3
alleged [10] 69/8 86/12 123/3 124/4 128/12 128/16 129/6 132/5 165/3 226/14
allegedly [1] 129/7
alleging [3] 129/4 190/10 203/2
allow [1] 230/8
allowed [3] 173/10 173/11 265/15
alluded [1] 267/16
almost [5] 7/23 14/8 17/16 32/18 211/20
alone [1] 26/20
along [2] 89/16 118/5
aloud [1] 51/24
already [44] 14/18 18/1 18/17 25/24 27/4 27/12 30/3 33/15 36/2 36/3 38/12 51/4 60/5 74/11 75/22 78/4 78/12 145/1 161/1 162/21 172/13 190/1 191/11 220/16 224/17 226/10 228/4 228/23 228/24 229/6 236/5 237/6 237/24 239/23 240/21 241/23 246/1 246/3 246/11 247/13 248/8 248/10 248/16 257/5
also [29] 3/16 4/2 11/16 13/17 23/19 29/15 38/9 41/1 43/19 47/21 57/24 61/23 63/24 72/18 97/7 109/25 115/3 116/8 127/16 140/12 142/19 163/14 163/19 186/14 191/16 214/12 218/5 228/1 250/15
although [1] 131/17
always [46] 147/1 148/17 182/6 211/21 211/22 251/3
am [17] 29/13 45/24 49/21 57/17 63/22 64/16 71/23 72/24 89/21 90/7 92/8 112/17 135/25 148/11 148/12 178/11 248/24
ambassador [1] 163/14
ambit [2] 81/1 81/3
AMERICA [7] 1/3 3/6 3/17 140/2 195/22 195/23 196/1
American [4] 152/11 164/2 238/4 253/1
American-made [1] 152/11
Ameritrade [5] 3/22 16/19 16/23 19/9 99/18
AMEX [1] 63/13
among [1] 7/14
amount [15] 23/13 24/11 25/2 28/21 44/22 78/22 91/13 91/18 91/19 92/14 92/22 107/21 125/24 163/21 192/3
amounts [4] 12/25 93/15 103/6 113/7

analysis [3] 53/20 54/3 74/8
analyze [1] 82/25
Anand [38] 9/21 11/5 11/9 11/11 11/14 11/16 43/21 44/1 44/4 44/7 44/15 44/17 45/19 46/21 49/16 65/1 73/19 103/1 103/3 103/13 103/15 103/15 103/20 104/6 104/13 104/20 105/1 105/4 105/10 105/12 115/10 115/15 115/25 116/3 116/19 116/25 127/23 178/5
Anand's [2] 25/14 60/9
and 11 [1] 22/20
and/or [3] 3/15 3/18 4/1
Angeles [14] 39/3 151/2 151/19 152/16 153/4 153/9 160/22 202/18 202/21 205/16 205/23 207/1 212/4 212/6
Angola [1] 163/14
animal [1] 141/21
animals [1] 141/25
announced [4] 15/11 15/19 18/12 21/14
annual [2] 4/16 17/20
annunciated [1] 240/21
another [19] 15/19 36/1 37/22 58/12 85/8 87/1 89/10 118/25 140/7 160/24 162/11 174/3 189/20 210/16 210/17 221/19 232/6 245/2 263/17
answer [20] 45/2 72/15 77/20 79/14 86/5 112/2 113/16 138/10 138/11 146/1 150/13 183/20 184/21 184/22 193/22 215/12 215/14 248/7 266/6 266/7
answered [4] 65/10 79/16 175/9 254/18
anti [1] 53/2
anti-dilution [1] 53/2
anticipate [1] 235/13
any [190]
anybody [14] 44/17 60/4 60/6 67/5 95/20 109/23 117/19 144/6 146/17 157/14 161/10 171/7 187/7 200/3
anymore [2] 150/2 176/7
anyone [14] 24/24 37/14 44/16 55/19 80/11 91/17 91/19 96/16 111/13 121/16 138/20 139/2 151/16 182/8 207/25 271/13
anything [55] 25/17 25/17 31/3 34/21 37/7 56/8 59/10 64/22 67/7 68/16 68/25 71/21 84/2 86/4 86/15 87/3 87/18 99/3 111/22 115/24 116/2 117/11 117/21 117/23 118/5 118/7 118/9 122/12 122/13 122/20 134/13 138/7 138/21 146/14 146/15 147/20 149/14 152/15 159/19 164/11 164/12 166/22 181/20 185/13 187/22 191/1 197/25 208/17 218/21 247/11 263/14 266/12 267/1 267/11 270/23
anyway [6] 72/3 104/17 142/1 156/9 213/24 239/13
anywhere [5] 35/4 37/13 102/20 188/7 195/20
aol.com [1] 1/25
apart [1] 162/24
apine [1] 65/7
apologize [12] 35/1 36/19 49/8 55/11 63/6 65/12 77/14 84/13 114/3 230/1 242/21 260/22
apparent [1] 199/16
apparently [4] 81/23 205/12 223/2 258/6
appear [3] 75/9 210/5 243/12
Appearances [1] 1/15
appeared [1] 146/15
appearing [1] 179/24
appears [5] 47/15 231/23 238/17 239/12 255/20
Apple [1] 270/18
applicable [1] 52/19

**A**

applies [1]  127/16
appreciate [6]  2/16 48/14 85/4 97/25 129/22
146/10
approach [6]  50/24 77/21 79/22 216/4
217/20 228/21
appropriate [3]  87/17 228/1 248/14
approval [8]  32/6 32/6 63/17 63/19 68/1 98/6
203/5 217/12
approve [2]  65/7 72/6
approved [39]  45/21 46/2 46/22 48/18 49/11
49/25 50/6 50/20 53/13 58/16 65/2 65/5 67/4
67/5 67/11 67/22 67/23 70/4 71/12 71/19
71/21 71/23 72/12 72/21 72/24 73/1 73/5
73/9 99/24 99/25 107/14 107/18 112/12
122/2 159/1 168/23 168/25 217/19 219/18
approves [3]  65/6 71/24 72/4
approximate [1]  206/23
approximately [16]  7/21 7/24 29/21 32/14
32/16 32/17 32/24 32/25 35/25 123/25 127/8
150/17 155/11 187/6 195/16 206/8
April [9]  4/7 17/10 17/15 17/22 18/15 36/16
37/21 37/23 38/1
April 11th [1]  38/1
April 15th [1]  4/7
April 18th [1]  17/10
April 1st [1]  17/22
April 2008 [1]  37/21
April 4th [1]  36/16
ARC [32]  53/14 53/20 54/1 54/4 54/19 55/3
60/4 62/14 62/16 62/18 62/22 78/13 78/25
80/23 81/1 81/3 85/19 87/11 97/5 97/6 97/7
107/13 107/16 124/4 124/5 124/15 124/16
125/19 125/21 127/24 127/24 127/25
area [14]  45/17 45/19 46/24 47/20 47/21
84/15 91/12 101/21 108/25 154/17 178/17
178/18 184/21 207/3
areas [1]  200/22
aren't [2]  59/16 93/6
arena [1]  49/20
argue [3]  121/13 192/12 265/2
arguing [2]  252/18 266/10
argument [3]  230/12 254/1 264/25
Army [1]  194/19
around [15]  14/4 21/5 28/8 28/11 28/13
29/16 32/7 133/1 134/2 151/22 172/20
173/23 232/25 233/1 264/8
arranged [2]  209/11 209/12
arrangement [2]  117/24 143/23
arrested [2]  45/14 97/20
arrhythmia [1]  174/23
arrived [1]  269/13
art [1]  160/5
artificially [1]  123/20
arts [1]  195/4
ASAP [1]  34/1
aside [3]  42/8 44/22 237/20
ASIG [1]  158/16
ask [35]  9/12 17/14 29/19 34/11 35/3 38/2
60/22 69/24 86/3 86/20 86/24 87/14 87/25
96/13 110/6 119/21 124/3 129/19 130/4
130/20 130/25 191/12 193/4 203/11 216/8
234/13 247/7 248/11 248/12 253/25 261/6
263/22 266/5 270/19 271/9
askance [1]  198/9
asked [20]  17/14 36/14 70/23 89/3 90/17
95/23 108/1 112/11 112/23 113/10 114/5
114/25 116/8 117/14 117/22 127/15 175/16
177/9 234/21 254/18

asking [14]  25/14 26/14 82/14 82/16 90/21
95/25 112/13 113/12 114/7 247/25 250/22
254/20 258/22 260/12
asks [2]  45/3 177/6
asleep [2]  252/8 252/11
aspect [1]  266/3
asserted [3]  226/3 226/8 256/13
Asset [1]  3/20
assets [2]  123/24 124/1
assistant [1]  14/20
associate [1]  219/16
associated [7]  11/5 11/9 24/24 44/24 180/20
182/13 182/19
association [1]  112/1
assume [12]  67/14 72/18 105/19 105/22
164/13 202/3 202/3 222/25 227/14 232/7
244/15 248/20
assumed [3]  146/3 147/13 185/2
assuming [6]  52/4 52/6 128/13 203/14 237/8
243/7
assurances [2]  162/3 198/6
athletes [3]  174/20 174/22 175/2
athletics [1]  175/1
ATM [1]  40/10
attached [3]  3/11 4/3 229/5
attempt [2]  64/18 238/9
attended [3]  195/5 206/7 268/7
attention [14]  9/11 43/25 59/5 62/1 62/3
80/18 80/19 80/21 80/22 80/24 121/3 169/2
171/9 270/1
attorney [17]  122/7 181/18 189/14 189/18
190/14 192/19 193/23
attorney's [1]  172/4
attorney/client [6]  122/7 189/14 189/18
190/14 192/19 193/23
attorneys [1]  3/7
audibly [1]  150/13
audio [4]  4/5 42/20 43/3 43/8
audited [1]  102/23
August [10]  26/15 26/18 26/19 26/19 32/13
72/17 72/20 139/24 139/24 196/9
August 1st [1]  196/9
August 2007 [4]  26/15 26/18 26/19 26/19
authentic [12]  4/3 4/8 4/17 4/21 5/2 98/8
124/10 130/22 130/24 131/23 131/23 245/5
authenticated [1]  108/6
authenticating [2]  3/13 3/14
authenticity [6]  3/9 78/7 98/10 191/1 217/6
219/9
authored [1]  214/24
authority [4]  12/14 12/16 84/25 184/10
authorized [10]  20/21 53/16 53/17 66/14
74/6 83/23 84/3 101/9 217/18 219/4
available [14]  15/10 18/11 21/18 47/16 68/23
77/17 82/19 82/21 129/16 130/19 130/22
130/25 132/20 232/9
Avenue [2]  1/18 3/21
average [1]  53/2
Aviation [9]  39/19 39/21 40/1 57/10 95/1
95/2 95/4 95/7 96/9
avoid [2]  14/19 92/21
aware [88]  26/23 45/21 45/22 45/25 46/2
46/7 47/7 47/24 48/23 49/17 49/20 49/21
49/23 50/1 59/14 59/16 60/3 60/6 61/21
61/23 64/15 68/10 68/16 68/18 68/25 70/3
70/6 71/12 71/14 71/18 71/23 72/8 72/13
72/20 72/23 72/24 72/25 73/4 73/6 73/8
73/12 73/13 73/22 73/23 74/10 74/14 74/16
75/18 75/23 76/1 79/17 79/20 79/21 81/16
81/18 89/10 89/13 89/20 89/21 89/25 90/4

90/11 91/12 91/21 91/23 91/24 91/25 92/6
92/8 94/5 94/19 95/13 96/8 96/15 102/22
112/3 120/12 122/12 171/6 189/7 189/11
197/22 199/20 212/5 229/1 231/8 251/17
257/23
away [6]  98/15 98/17 98/19 98/21 98/24
139/15

**B**

babies [1]  140/24
babies' [2]  139/11 139/13
baby [2]  139/12 175/6
back [77]  2/4 2/13 2/15 7/21 11/3 15/23
21/20 23/4 25/2 25/23 31/2 35/3 36/19 39/18
42/7 43/23 54/23 57/10 61/3 61/3 61/7 61/13
61/18 63/17 63/19 68/19 77/9 107/14 109/6
110/15 110/22 113/5 119/25 121/2 121/19
123/19 126/10 129/25 130/7 133/1 133/12
133/23 148/11 153/12 154/2 160/22 162/1
162/4 162/13 162/14 163/25 165/4 168/4
168/10 172/13 172/16 174/4 174/5 179/22
188/3 188/4 194/25 195/3 196/5 198/11
209/12 210/9 210/16 210/18 212/1 228/15
228/16 233/10 243/15 244/6 249/3 261/21
background [7]  139/6 149/14 164/25 190/3
191/8 193/16 194/1
backwards [5]  188/13 188/14 188/18 188/21
199/1
bad [3]  104/13 104/24 166/1
balance [5]  31/24 31/25 34/14 35/18 35/22
ballpark [1]  78/22
bank [55]  3/17 3/17 3/18 7/15 8/5 8/8 8/10
8/13 8/18 8/21 9/20 9/23 12/9 12/11 12/13
12/16 12/19 13/3 16/24 16/24 19/12 19/15
19/16 19/18 22/6 22/7 25/20 26/5 26/9 26/12
27/8 30/12 30/13 35/18 37/3 40/10 43/10
43/15 93/10 93/11 93/11 93/11 99/19 99/22
100/4 100/15 100/19 100/21 101/4 101/8
105/16 105/20 112/23 184/7 233/20
bankruptcy [7]  88/14 88/18 91/21 92/1 92/7
92/9 96/17
banks [2]  25/20 235/8
bar [1]  194/15
bare [2]  138/3 150/17
base [1]  193/17
based [21]  10/2 10/16 16/8 18/23 22/10
23/22 30/7 38/16 39/20 39/25 43/10 52/10
90/25 114/17 131/6 202/18 213/13 235/14
236/9 247/14 260/25
basic [1]  200/24
basically [2]  46/25 83/14
basis [6]  126/18 213/16 235/7 235/10 264/4
264/24
Batelle [29]  200/18 200/20 201/3 201/8
203/20 203/23 204/1 204/7 204/11 204/13
204/14 205/2 205/5 205/6 205/9 205/11
205/15 206/18 207/5 208/1 208/18 209/9
210/15 211/6 213/3 213/5 213/15 267/25
268/3
Bates [4]  235/16 246/14 259/13 266/23
Beach [3]  1/7 1/20 1/25
bearing [1]  231/1
beautiful [1]  160/1
became [6]  26/16 104/2 173/17 181/6
188/16 188/18 196/23 212/20 212/23 213/6
213/7 213/17 213/21 213/24 246/4
because [103]
become [6]  7/24 38/2 48/23 70/3 70/6 199/16
beds [1]  154/16
beer [6]  147/1 147/2 147/6 147/8 147/12

**B**

beer... [1] 147/14
before [58]  1/12 2/20 4/6 14/7 17/24 28/14
28/18 29/8 32/8 32/10 32/20 35/24 40/21
41/1 41/21 48/12 57/20 62/10 63/18 67/5
67/11 67/23 68/11 69/23 71/16 75/12 77/25
79/14 84/15 88/12 98/7 100/21 106/10
115/20 119/23 120/13 124/24 132/10 144/14
144/16 154/12 158/10 175/6 178/21 181/4
198/12 208/19 213/11 223/3 227/16 233/3
236/11 240/17 248/7 254/1 259/15 266/23
266/23
began [1]  155/11
begin [7]  7/24 191/9 201/6 203/23 215/4
231/9 253/6
beginning [14]  36/10 36/16 42/18 43/1 43/6
66/22 94/11 118/21 146/8 146/12 146/13
158/9 207/10 226/16
behalf [2]  4/13 12/11
behind [3]  69/7 87/14 149/2
being [50]  2/15 15/6 31/4 31/21 46/9 55/9
55/16 65/1 75/23 75/25 89/25 91/4 98/21
101/4 101/6 101/21 108/17 113/25 115/14
116/19 127/5 130/21 130/23 131/10 131/23
145/5 149/13 153/5 158/11 158/12 162/20
172/3 172/4 172/8 172/9 208/9 224/20 233/1
238/1 240/2 240/9 244/24 245/22 247/8
260/10 261/1 262/10 263/13 265/14 267/2
beings [1]  229/10
Bel [9]  206/16 206/17 206/25 207/12 207/14
207/25 208/21 211/9 213/2
Bel-Air [9]  206/16 206/17 206/25 207/12
207/14 207/25 208/21 211/9 213/2
belief [1]  264/4
believable [1]  125/14
believe [34]  20/13 31/10 52/16 58/23 68/5
69/15 76/21 90/1 101/9 102/21 103/6 104/23
105/1 105/4 111/21 124/10 124/23 131/21
176/6 187/8 198/1 203/25 206/19 206/21
210/13 214/4 214/22 227/7 230/23 231/15
237/5 237/23 242/22 267/9
believe's [1]  81/6
believed [2]  111/20 264/3
bell [1]  136/14
below [7]  24/3 25/15 53/4 53/12 63/11 121/5
255/15
beneficial [1]  52/12
beneficially [3]  52/1 52/8 52/18
beneficiary [11]  12/5 12/10 54/25 62/19
103/14 103/18 103/19 103/25 104/3 107/3
107/5
benefit [2]  37/20 163/2
benefited [1]  166/7
besides [5]  207/15 235/23 236/2 259/13
270/14
best [3]  135/12 135/13 220/24
better [8]  156/12 156/25 159/23 231/23
232/21 245/22 245/25 270/21
between [35]  8/14 10/6 10/13 21/16 23/25
29/20 30/14 38/10 38/20 40/1 44/2 73/14
89/12 92/7 93/25 112/2 117/25 118/19 122/4
123/4 128/2 128/6 159/4 195/14 213/5 213/5
213/7 219/14 225/6 244/17 258/11 261/9
261/9 262/2 262/13
beyond [10]  47/20 121/14 123/2 123/13
125/6 125/13 126/19 252/15 262/1 268/20
big [11]  116/11 154/18 160/1 160/13 164/1
169/4 170/3 175/4 182/16 182/20 182/23
bigger [4]  141/5 141/5 160/13 169/22

billed [4]  88/22 90/19 91/6 91/20
bills [3]  75/19 89/1 90/12
binder [6]  9/13 15/1 16/1 27/14 27/16 33/17
binders [1]  134/18
Biosense [3]  154/19 154/20 177/19
bit [4]  40/19 139/5 140/13 145/25
Black [3]  41/6 41/8 41/10
blacked [1]  149/21
blind [42]  9/24 11/18 11/19 12/2 12/3 12/5
12/6 12/9 12/13 12/14 12/15 12/19 53/20
53/21 54/3 54/20 54/25 55/2 55/6 62/14
62/17 62/17 62/19 62/24 79/3 79/5 79/6
80/22 96/22 103/13 103/14 103/16 103/21
103/24 104/3 104/7 107/2 107/3 107/5
107/10 107/17 215/25
block [9]  64/17 64/19 64/21 64/23 64/25
103/7 103/9 103/10 149/24
blocking [1]  178/22
blood [1]  141/2
Bloomberg [4]  5/1 124/10 124/11 124/13
blue [1]  4/20
BMW [1]  39/11
board [16]  41/8 41/9 41/10 47/14 50/6 56/10
58/8 63/5 70/5 73/3 73/10 147/18 216/11
220/9 254/25 258/3
Boca [1]  122/21
bogus [2]  219/21 219/22
bonds [1]  20/22
book [2]  147/22 147/23
books [5]  146/22 146/23 203/22 230/16
240/18
boss [1]  170/2
both [14]  10/24 23/7 60/5 77/5 97/4 137/4
154/8 155/4 163/2 174/2 181/17 237/15
239/7 251/11
bottom [19]  11/21 18/8 20/14 27/5 31/20
33/17 35/3 36/10 51/19 59/24 132/14 137/1
140/12 171/25 224/10 224/11 243/7 257/21
259/11
bought [7]  59/21 94/5 94/7 108/5 108/5
141/14 160/25
box [6]  16/18 130/3 133/16 133/25 134/4
134/10
bracket [1]  145/4
brain [5]  149/3 149/5 149/25 157/24 157/24
brains [1]  149/17
bread [1]  165/24
break [9]  36/23 45/6 60/18 109/2 132/24
163/3 167/15 167/22 181/5
brick [1]  159/25
Bridge [1]  160/12
bridged [1]  262/3
brief [5]  5/18 179/8 233/16 240/14 247/23
briefly [3]  27/3 92/12 140/17
bring [9]  2/10 61/7 61/10 110/19 133/1
133/15 168/4 220/23 221/13
bringing [1]  154/9
broad [3]  47/15 84/11 84/25
broader [1]  85/1
broke [2]  162/24 168/19
broker [9]  30/25 53/10 53/11 64/14 64/15
64/17 65/14 65/14 66/3
broker-dealer [2]  53/10 53/11
brokerage [25]  8/6 8/8 8/10 8/13 8/16 8/18
8/21 10/21 12/6 12/15 13/4 13/23 19/15 21/2
22/1 43/11 43/16 64/13 93/24 107/2 107/11
108/2 108/3 108/7 234/7
brokered [1]  161/2
brokers [4]  64/21 64/23 65/21 65/25
brother [5]  159/20 160/5 160/6 160/7 160/8

brought [4]  137/1 170/2 171/9 218/24
Budimir [28]  149/7 149/19 150/2 150/21
151/20 151/21 156/2 156/10 156/13 156/23
157/7 157/12 157/23 157/25 158/5 158/14
162/10 172/16 173/13 173/16 173/17 173/18
173/20 175/22 176/20 176/22 177/3 178/3
building [3]  141/23 141/25 178/19
built [3]  141/25 152/13 264/8
bulk [4]  12/20 13/25 23/18 188/4
Bunes [15]  25/11 44/12 75/1 142/16 142/25
143/1 144/18 146/16 153/16 161/12 161/14
166/2 177/14 177/15 177/15
burden [1]  121/20
business [89]  4/14 4/25 103/25 118/24
137/18 140/18 146/3 146/4 181/20 187/16
187/21 187/23 187/25 190/2 190/19 191/1
191/6 191/15 191/22 197/6 197/7 197/18
197/22 197/23 206/21 213/17 214/12 221/24
221/25 223/6 223/7 223/8 223/12 223/13
223/17 223/22 224/1 224/2 224/24 224/24
225/2 225/13 225/14 225/17 225/20 225/25
226/19 227/7 228/9 229/11 230/22 230/23
231/15 231/17 234/26 234/7 237/17
237/25 238/1 240/2 240/10 242/4 242/5
242/14 242/15 242/16 243/17 243/18 243/19
243/21 243/22 243/23 243/24 244/4 244/7
244/9 244/12 244/21 245/1 245/5 245/7
245/14 245/23 246/5 246/11 247/8 256/2
268/13
businesses [3]  224/3 243/25 244/1
businessman [1]  184/24
buy [5]  8/17 94/3 111/16 159/15 183/16
buying [2]  108/13 108/21

**C**

C-l-a-r-k [1]  6/10
cables [1]  163/24
calculates [1]  52/10
California [3]  194/15 202/24 202/25
called [9]  66/7 136/24 151/3 164/14 173/14
174/20 208/17 219/23 248/25
calls [5]  2/20 6/1 135/7 173/12 185/18
came [28]  13/11 55/17 56/5 57/5 75/21 94/11
142/13 142/14 142/14 145/1 160/2 160/12
163/13 169/13 169/23 169/24 172/12 175/7
196/13 196/16 202/25 212/6 212/19 230/24
235/24 241/8 258/19 262/21
campaign [1]  160/19
campus [1]  205/22
can't [22]  48/21 56/6 72/15 77/12 131/6
131/14 150/21 162/6 172/4 177/18 203/11
217/24 230/10 230/11 234/11 234/19 234/20
241/23 249/25 251/17 253/17 266/11
cannot [1]  127/14
capable [1]  153/5
capacity [4]  41/14 208/4 208/6 208/14
car [7]  38/25 39/1 39/2 39/5 39/12 140/14
180/13
card [2]  20/16 39/16
cardiac [10]  140/9 140/20 140/22 141/1
142/21 150/3 154/6 154/7 154/8 154/10
cardiologist [1]  156/24
cardiology [4]  156/2 157/3 163/16 163/18
care [4]  46/16 116/4 162/23 253/1
carefully [6]  46/8 46/11 46/15 47/16 255/17
256/22
Carolina [17]  26/10 27/1 27/7 56/24 57/8
74/23 75/3 76/18 76/24 153/22 160/11
162/22 162/25 163/2 172/19 172/19 176/16
carpet [1]  160/1

# C

carrier [2]  118/23 198/19
carries [1]  36/11
carrying [1]  118/24
cars [3]  39/3 39/4 39/8
Carter [119]
Carter's [6]  13/3 24/23 25/13 28/4 30/12
42/8
case [84]  1/2 10/3 14/9 16/9 17/2 17/18 18/24
22/11 23/5 23/23 30/7 38/17 50/1 60/14 74/2
83/12 83/12 84/4 85/16 87/6 109/7 113/3
119/20 119/23 119/24 120/24 123/2 123/17
125/1 125/12 125/13 125/18 126/3 128/15
128/21 129/4 129/4 129/5 129/12 129/22
130/2 130/6 131/20 131/20 131/25 132/1
132/9 132/10 134/1 134/6 135/2 164/1
164/12 165/1 166/1 166/5 166/8 166/23
167/4 167/5 167/21 179/16 201/14 201/19
202/6 216/25 218/16 225/7 226/14 227/10
230/9 231/16 231/19 240/6 245/18 246/17
246/22 247/1 247/13 247/15 253/6 263/25
265/4 268/22
cash [36]  8/19 9/22 10/19 10/22 11/14 13/23
13/24 13/25 23/7 24/9 24/10 24/10 24/12
25/21 26/1 27/25 30/12 30/13 31/23 31/25
34/14 39/17 40/9 40/14 40/16 76/3 76/12
76/15 93/6 93/7 93/9 105/15 159/3 172/8
180/16 180/16
casino [1]  12/20
casinos [1]  39/18
cassette [1]  152/20
cassettes [1]  152/19
categories [1]  38/22
categorize [1]  243/13
category [3]  192/4 232/19 243/12
cause [2]  156/17 171/21
caused [3]  57/25 94/21 102/15
causes [1]  246/22
causing [2]  149/25 155/6
CC'ing [2]  33/22 33/25
cease [2]  145/5 145/8
ceased [1]  145/8
center [2]  154/6 164/5
centers [1]  154/11
CEO [20]  26/16 31/23 41/13 41/16 197/1
207/16 207/17 207/19 214/18 214/19 214/20
214/22 224/24 226/6 226/10 229/23 236/5
249/22 249/23 250/18
CEOs [5]  215/7 215/24 231/16 249/11
250/24
certain [18]  3/9 10/9 25/15 25/25 109/19
113/1 114/6 114/11 114/17 120/10 149/16
163/21 190/22 191/15 193/5 254/22 255/3
261/7
certainly [12]  21/18 78/5 80/19 91/7 106/20
108/16 123/3 198/9 245/11 247/3 261/4
268/19
CERTIFICATE [1]  273/12
Certified [1]  273/14
certify [1]  273/14
chain [8]  36/16 144/5 144/9 144/10 255/15
255/21 255/22 258/11
chair [2]  135/12 185/24
chance [6]  98/25 131/19 131/21 235/21
237/7 246/2
change [2]  121/21 199/5
changed [5]  31/1 142/12 142/15 198/25
199/4
Chapter [3]  88/13 88/17 91/21

characterizing [1]  263/8
charge [1]  122/10
Charles [2]  1/21 3/18
Charlotte [5]  169/14 169/17 170/15 170/19
171/1
charming [2]  164/25 165/19
chart [47]  3/11 4/3 9/19 10/2 10/5 10/12 11/4
12/4 12/24 13/3 16/4 16/16 18/20 18/23 19/8
21/23 21/25 22/9 23/11 23/11 23/12 23/13
23/21 24/14 25/24 30/6 30/10 30/24 35/20
37/24 38/15 38/16 38/23 39/15 51/15 100/17
102/1 102/5 108/13 111/7 253/11 254/8
262/20 263/2 265/5 265/14 266/9
charts [7]  54/19 83/1 83/7 108/22 111/7
112/20 113/8
Chase [1]  3/17
chatting [1]  241/13
chauffeur [5]  122/21 122/24 203/3 208/3
224/16
cheating [2]  172/25 180/1
check [19]  20/15 28/22 174/22 223/21
233/25 234/9 234/11 234/15 234/18 235/5
235/13 235/23 235/24 235/25 236/2 241/6
241/8 267/19 269/23
checks [14]  9/9 9/22 24/11 27/1 27/5 27/5
27/7 89/4 184/9 233/17 233/18 233/19
233/22 234/17
cherry [1]  92/15
chief [3]  126/3 144/7 186/14
child [1]  117/23
children [3]  139/9 148/8 176/3
chip [4]  158/15 158/15 158/16 158/16
choose [3]  131/20 131/25 134/8
chop [1]  241/3
chronologically [1]  48/16
circuit [4]  149/17 227/11 231/16 245/17
Citibank [1]  3/17
City [2]  151/4 151/5
claim [4]  87/14 87/15 96/16 224/16
claimed [2]  42/22 117/6
claiming [1]  219/20
claims [9]  87/13 165/9 166/5 190/5 217/13
218/18 220/11 220/12 233/18
Clair [11]  156/3 156/4 156/7 156/9 156/11
161/21 161/22 171/19 171/19 177/25 184/10
Claire's [1]  147/19
clarification [1]  114/5
clarify [6]  6/16 87/2 112/22 114/12 265/25
266/3
clarity [1]  28/24
Clark [81]  5/9 6/2 6/5 6/10 6/18 7/7 7/17 8/8
9/14 9/16 10/1 10/5 10/12 12/2 14/19 15/5
15/13 15/18 16/1 17/1 17/9 18/2 18/7 18/18
19/19 19/24 20/13 20/25 21/23 22/9 22/17
22/22 23/10 23/21 24/22 25/13 26/2 26/4
27/6 27/15 27/18 28/25 29/3 29/8 30/5 31/3
31/14 32/17 33/17 34/11 35/4 37/4 38/3 38/7
38/15 38/19 39/24 40/4 40/18 40/20 43/10
43/25 45/12 45/17 51/13 61/20 79/13 88/5
90/22 94/25 96/22 109/18 110/17 111/4
112/11 112/15 114/16 116/23 124/3 124/16
272/3
clear [21]  10/1 10/5 10/23 11/16 16/8 20/3
21/15 26/11 38/19 40/4 50/3 66/17 76/7 99/7
104/2 110/7 112/18 114/16 148/5 178/25
231/16
cleared [2]  158/22 158/25
clearly [4]  43/15 43/16 124/4 233/17
Clematis [1]  1/24
Clemson [2]  142/1 174/25

client [6]  122/7 189/14 189/18 190/14 192/19
193/23
climbed [1]  152/23
clinic [1]  141/21
clip [8]  42/16 42/19 42/25 43/2 43/4 43/7
88/10 88/21
close [4]  56/16 120/15 120/21 125/12
closely [1]  47/3
closer [2]  144/19 145/23
closes [1]  120/14
club [9]  206/16 206/17 207/1 207/12 207/14
208/1 208/22 211/9 213/2
clue [1]  233/16
cluttered [1]  134/2
co [2]  41/16 208/17
co-CEO [1]  41/16
co-CTO [1]  208/17
coach [1]  174/24
coast [11]  57/21 142/18 149/6 150/7 150/16
150/20 151/1 153/6 153/6 173/18 173/20
Coca [1]  204/22
coconspirator [3]  122/20 122/22 125/4
coconspirators [3]  123/19 123/24 125/2
code [2]  204/24 205/1
Cola [1]  204/22
collated [1]  83/1
collation [1]  232/15
colleague's [1]  9/12
collected [1]  62/11
college [3]  139/9 194/3 194/8
Colombia [1]  209/21
color [1]  263/4
Columbus [6]  200/21 202/16 202/18 205/19
205/22 209/3
combination [1]  66/15
combinations [1]  53/1
comes [4]  13/10 132/18 163/11 231/1
comfortable [3]  61/25 106/17 106/19
coming [8]  8/25 9/1 9/20 9/21 9/23 9/23
10/9 10/11 59/20 106/10 142/9 148/12
178/23 210/9 232/16 267/17 270/18 270/21
command [3]  144/5 144/9 144/10
commencement [1]  189/3
commerce [2]  119/3 119/9
commercial [2]  5/3 118/23
commercially [1]  95/14
Commission [6]  4/2 70/4 71/19 72/21 119/14
189/13
commit [1]  106/25
common [7]  51/25 52/3 52/4 52/7 52/22
52/23 63/12
commonly [1]  195/15
communicate [1]  244/2
communicated [3]  245/7 262/14 262/15
communicates [1]  245/2
communication [6]  78/12 119/3 253/7
258/24 261/24 262/16
communications [18]  218/5 240/11 241/13
244/5 252/3 252/6 252/9 252/16 252/18
253/2 253/15 260/9 260/11 261/2 261/8
261/25 262/12 265/9
community [1]  52/19
companies [29]  11/5 11/8 56/1 141/12
142/20 143/7 152/12 162/19 162/23 162/23
164/2 180/9 180/19 181/6 181/18 182/21
194/22 195/11 196/13 200/25 201/1 215/17
215/18 218/15 231/17 249/18 251/1 251/11
251/18
company [264]
company's [5]  159/3 202/22 224/15 230/15

# C

company's... [1] 250/1
compared [1] 49/12
comparison [2] 73/14 74/5
compensate [1] 116/15
competence [1] 215/12
competency [2] 82/7 85/3
competent [4] 82/7 176/11 176/14 176/15
compile [2] 107/21 108/12
compiled [3] 102/1 105/16 111/6
compiling [4] 99/7 99/10 99/18 102/7
complaining [2] 67/6 67/7
complaint [5] 122/15 122/18 123/15 125/5 128/23
complete [3] 109/17 195/5 227/4
completed [1] 254/15
completely [4] 85/13 125/20 201/25 220/4
comply [1] 137/10
compromise [1] 267/9
computer [18] 131/12 131/14 188/6 188/11 188/21 188/23 188/24 189/1 189/9 204/24 205/1 205/4 228/12 228/14 235/7 239/9 243/5 259/18
computerized [2] 198/11 216/13
concept [1] 204/19
concern [1] 156/17
concerned [3] 101/22 225/9 261/23
concerns [1] 156/20
concise [1] 174/16
concisely [1] 187/19
conclude [2] 126/20 242/13
concluded [6] 88/3 167/13 193/18 203/18 209/25 216/2
conclusion [3] 90/25 199/3 199/5
conclusively [3] 24/21 72/15 74/16
concurrently [1] 125/24
condition [3] 222/1 222/18 222/19
conditions [2] 190/8 197/8
conduct [1] 66/23
conducted [14] 3/12 223/5 223/6 223/12 223/17 223/22 224/1 224/25 225/14 225/17 225/25 226/19 230/16 243/24
conducting [1] 61/20
confer [4] 248/11 248/15 269/23 270/19
conference [5] 88/3 167/13 193/18 203/18 209/25
confidence [2] 160/16 236/13
confident [1] 49/14
confirm [1] 237/7
connect [1] 221/9
connected [2] 44/18 205/1
connection [13] 50/22 62/21 66/18 76/19 89/11 90/20 94/2 97/7 97/8 128/6 212/13 212/16 221/12
consciously [1] 77/19
consequence [1] 102/4
consequently [1] 149/23
conservative [1] 40/7
conservatively [2] 24/18 24/20
conserving [1] 180/16
consider [4] 120/18 129/12 242/2 251/24
considered [1] 66/11
considering [1] 126/21
conspiracy [11] 121/1 121/16 123/9 123/18 126/14 128/12 128/14 128/16 132/6 165/3 176/20
constant [1] 140/24
consult [2] 35/20 247/20
consultancy [1] 206/9

consultancy-ship [1] 206/9
consultant [6] 49/19 196/20 196/23 196/25 200/5 200/17
consultants [11] 48/19 50/7 70/1 72/22 73/2 73/11 74/6 74/7 76/4 76/11 200/1
consulting [3] 71/13 196/12 247/24
contact [1] 205/11
contacted [1] 142/16
contacts [1] 154/19
contain [4] 61/22 214/3 214/24 230/16
contained [5] 204/4 254/16 256/9 256/23 257/16
contains [2] 193/23 220/8
contemporaneous [3] 225/6 225/8 226/13
contends [1] 217/17
content [7] 198/25 252/22 253/2 253/5 261/8 262/1 266/11
continue [14] 51/3 54/17 61/15 110/24 147/12 211/7 211/10 211/13 211/15 211/17 211/23 228/16 234/6 249/6
continued [3] 33/8 58/9 123/15
continuing [1] 33/7
continuity [2] 250/15 251/21
continuously [4] 194/14 197/3 198/22 216/13
contract [13] 89/11 90/10 169/12 169/13 169/15 170/21 170/24 171/1 172/8 172/11 172/12 173/17 185/6
contractor [2] 117/19 209/10
contracts [1] 180/21
contractual [1] 201/4
contrary [1] 121/11
control [18] 11/1 22/3 76/18 93/23 124/5 136/20 145/17 145/19 145/20 157/8 164/16 164/18 165/14 165/14 166/14 189/5 189/8 257/9
controlled [5] 30/17 31/7 35/2 35/8 37/18
controlling [4] 79/1 104/3 104/5 104/7
conversation [3] 138/23 138/24 139/1
converted [1] 11/14
converts [1] 50/2
conviction [2] 120/17 120/19
COO [2] 213/7 214/8
cooperation [1] 168/12
cooperators [1] 121/23
copied [3] 35/5 90/17 134/7
copies [16] 9/17 14/21 16/4 18/19 21/22 30/5 38/15 63/6 130/5 130/7 134/14 134/17 134/19 160/4 242/22 243/5
copy [7] 23/11 31/15 131/11 239/14 243/20 245/3 255/15
cordial [1] 97/23
cords [1] 268/18
core [6] 72/10 72/16 72/18 72/19 78/3 84/9
corner [1] 243/7
corporate [5] 124/1 187/21 188/5 195/21 217/12
corporation [8] 3/16 100/23 118/23 195/22 195/23 196/8 251/9 252/5
correct [88] 5/21 5/22 10/15 11/2 11/24 13/1 14/11 15/15 19/6 22/16 26/17 27/19 28/16 28/17 29/3 29/4 33/12 33/22 35/11 35/13 35/16 39/14 40/8 41/11 42/1 42/2 42/12 45/16 47/1 47/5 50/10 54/5 55/5 55/8 67/13 67/25 75/15 94/6 99/11 99/18 99/22 102/8 104/16 105/18 107/12 112/21 113/9 114/20 123/14 137/11 138/5 157/13 157/13 168/21 170/14 177/1 179/11 179/17 181/14 183/8 188/22 194/16 195/9 196/24 197/5 202/25 203/9 206/11 211/1 211/3 211/5 212/11 212/14 212/17 212/21 212/22 213/9 213/22

213/23 231/20 240/16 243/8 256/11 258/5 258/7 258/10 270/10 273/15
correctly [1] 127/10
correspondence [14] 8/7 225/12 225/13 225/15 225/15 225/16 243/13 243/13 243/15 243/19 244/1 244/3 244/5 260/6
cost [1] 95/17
couldn't [14] 48/4 56/17 95/5 154/20 156/1 156/2 156/2 156/18 157/3 157/6 157/25 174/19 181/23 185/10
counsel [16] 1/21 82/8 97/21 186/15 186/15 189/13 199/25 200/4 200/12 227/19 247/21 247/25 248/17 251/9 269/12 270/20
count [8] 17/7 17/8 19/22 19/23 22/20 22/21 121/4 123/11
count 1 [1] 121/4
country [11] 148/3 185/5 206/16 206/17 206/25 207/12 207/14 207/25 208/21 211/9 213/2
counts [17] 17/5 17/7 19/21 19/22 22/19 22/20 119/1 119/6 119/10 120/10 126/12 126/13 126/13 126/17 127/14 127/17 128/5
counts 10 [1] 19/22
counts 11 [1] 119/6
counts 2 [1] 126/12
Counts five [1] 119/1
couple [17] 21/10 27/1 39/10 78/1 86/19 95/24 96/4 106/11 117/24 136/24 142/3 153/11 176/17 183/6 192/10 194/21 212/6
course [27] 7/17 8/4 19/1 29/1 76/13 91/16 115/7 117/3 117/13 132/10 195/5 197/17 197/23 223/5 223/11 223/16 231/15 240/10 243/19 243/21 243/22 250/21 253/20 256/2 265/21 268/13 271/14
court [79] 1/1 1/24 2/1 84/23 85/4 86/21 87/20 92/1 102/15 120/12 120/15 120/17 120/20 124/6 124/7 124/14 124/19 124/20 124/24 124/23 125/16 125/20 125/22 126/3 126/11 126/21 127/7 127/9 129/22 130/20 130/25 132/23 137/2 139/5 140/17 157/5 164/4 166/10 174/6 186/22 209/13 217/24 221/8 224/4 224/10 225/9 226/10 226/15 227/10 228/23 229/1 231/8 231/9 231/24 232/20 232/21 233/15 233/25 240/5 240/11 241/1 241/12 242/9 245/15 245/17 246/7 246/8 246/18 246/18 246/22 246/24 247/1 248/17 251/24 253/18 257/6 263/12 263/16 268/23
Court's [10] 12/22 122/17 124/2 130/18 132/14 236/21 240/3 240/21 242/9 247/25
courtroom [21] 2/11 60/16 61/11 67/24 70/16 70/19 80/2 81/20 94/10 108/6 108/10 109/8 110/20 120/2 133/21 136/1 167/24 168/8 186/18 197/19 217/1
courtyard [1] 141/25
cover [3] 84/13 235/24 265/5
covered [3] 84/12 89/23 102/2
covers [1] 10/24
CPE [1] 1/23
CR [1] 1/2
create [5] 68/20 107/24 107/25 225/18 225/21
created [4] 102/1 180/21 218/25 256/3
creating [2] 182/22 255/22
credit [1] 39/16
crimes [1] 7/13
Criminal [2] 1/17 120/13
critical [6] 32/4 223/4 252/7 253/16 253/17 268/15
cross [23] 45/8 45/10 60/5 83/2 83/6 83/11

**C**

cross... [17]  83/14 83/16 84/9 84/24 85/7
85/15 87/18 110/25 166/11 179/4 184/6
184/19 226/22 226/23 226/25 272/5 272/11
cross-examination [11]  45/8 45/10 83/14
84/9 84/24 85/15 87/18 110/25 166/11 179/4
184/6
cross-examine [4]  83/16 226/22 226/23
226/25
cross-examining [4]  83/2 83/6 83/11 85/7
CRR [2]  1/23 273/20
crux [1]  114/13
crystal [1]  148/5
CSO [1]  133/18
CTO [2]  202/12 208/17
cure [1]  231/4
curiosity [1]  109/22
curious [2]  109/12 147/7
currency [1]  8/19
current [4]  31/25 196/17 213/15 214/19
currently [5]  186/10 187/22 199/25 200/7
207/21
custodian [19]  187/15 187/20 188/16 188/18
188/24 190/3 196/3 196/6 197/6 197/16
198/1 198/21 213/17 244/10 246/4 246/23
248/1 251/11 255/18
custodianship [2]  188/2 189/12
custom [8]  215/7 215/18 215/20 216/11
249/16 249/19 251/14 251/16
customary [1]  249/21
cut [1]  127/10
cute [1]  165/18
cutting [1]  65/12

**D**

daily [6]  36/23 211/20 211/21 211/22 211/24
235/10
Dairy [1]  1/22
damage [1]  250/19
danger [1]  140/23
dangers [1]  46/9
data [5]  111/6 111/7 111/10 198/16 198/17
database [58]  152/18 188/12 188/19 188/20
188/23 188/24 189/1 189/5 189/8 189/9
189/11 189/14 190/16 190/20 191/9 193/23
198/17 198/20 199/6 199/8 199/11 199/23
200/4 200/7 204/5 204/9 204/10 210/12
214/13 214/24 215/1 216/1 216/14 218/4
225/24 240/18 244/21 245/3 254/23 255/22
256/9 256/23 257/16 258/8 258/19 259/2
259/7 259/7 259/10 259/14 259/18 259/24
260/2 260/4 260/6 260/15 260/17 261/7
date [19]  53/8 62/10 73/1 74/11 148/22 188/3
206/23 252/24 252/25 261/18 262/5 262/6
262/7 262/8 262/9 262/13 262/14 262/15
263/15
dated [7]  27/17 121/23 121/24 234/10 255/13
256/24 273/17
dates [4]  253/8 260/12 262/12 265/8
dating [3]  121/18 123/19 165/3
daughter [1]  146/19
David [1]  207/7
Davis [1]  218/14
day's [1]  43/1
day-to-day [3]  145/15 145/17 165/15
days [12]  19/11 28/14 35/15 41/22 85/25
139/15 153/10 153/11 176/17 240/16 241/10
241/10
DC [1]  1/18

dead [2]  229/14 252/4
deal [9]  132/12 132/17 161/2 232/6 241/20
241/21 241/22 241/23 241/25
dealer [5]  53/10 53/11 64/17 65/14 65/15
dealers [2]  65/21 65/25
dealing [2]  133/3 196/11
dealings [1]  164/17
dealt [1]  241/23
dearth [1]  132/15
debacle [1]  158/12
debit [1]  20/15
debts [2]  12/20 39/18
deceased [1]  226/11
deceive [1]  87/12
December [12]  4/6 42/17 43/5 98/22 98/22
145/10 145/12 153/21 159/4 177/13 212/25
256/25
December 17th [3]  4/6 42/17 43/5
December 2006 [1]  153/21
December 2011 [2]  98/22 212/25
December 27th [1]  256/25
decide [2]  247/14 247/14
decided [1]  170/3
decides [1]  223/24
decipher [1]  152/9
decision [1]  131/6
defeats [1]  125/11
DEFENDANT [10]  1/7 1/19 3/7 3/25 4/6 4/9
7/19 7/25 45/1 120/22
Defendant's [13]  50/18 120/15 135/10
185/22 216/7 238/16 239/1 239/5 243/10
273/7 273/8 273/9 273/10
Defendant's 323 [1]  50/18
defense [15]  31/10 75/11 83/17 98/1 115/4
115/18 115/21 117/21 134/14 135/4 135/7
185/18 238/23 251/22 253/16
defer [1]  263/6
defibrillator [1]  140/21
definitely [2]  190/23 240/20
defraud [2]  87/5 121/6
defrauded [2]  127/21 127/21
degree [7]  194/4 194/10 194/17 195/6 195/7
195/10 195/12
Delhi [3]  163/12 163/12 163/25
deliberations [6]  70/24 131/9 131/14 134/7
134/8 253/6
deliver [5]  215/8 216/2 220/14 227/10 250/19
delivered [21]  160/17 216/10 217/4 224/8
226/21 250/8 250/14 251/1 252/9 253/12
262/22 263/10 263/12 264/3 264/5 264/10
264/12 264/16 264/20 265/16 270/18
delivering [1]  118/25
delivery [1]  162/3
delve [1]  201/23
demanded [1]  91/7
demarcation [1]  188/14
demonstrate [2]  219/9 220/16
denied [1]  120/24
denies [2]  43/12 120/20
deny [1]  129/13
depart [1]  215/8
departing [1]  215/7
department [6]  1/17 4/19 25/21 62/2 223/20
223/21
departure [1]  251/2
depending [1]  201/1
depicting [2]  16/6 99/17
depicts [3]  16/5 18/20 18/21
deposit [1]  13/22
deprive [1]  247/3

Deputy [1]  136/25
derived [2]  11/22 94/8
describe [3]  30/9 41/18 159/17
described [5]  22/25 63/11 103/7 156/15
189/8
description [1]  236/10
designed [1]  244/3
desire [1]  171/22
desk [4]  147/18 147/19 147/19 147/19
desks [2]  110/7 160/8
destined [2]  35/6 37/15
destroying [1]  125/24
detail [8]  47/3 47/12 50/19 56/7 58/8 60/5
60/8 68/21
detailed [4]  46/1 47/6 88/25 89/1
determination [1]  52/13
determinations [1]  98/10
determine [11]  23/6 24/20 38/9 69/11 91/17
98/7 98/9 248/2 256/22 259/13 266/18
determined [2]  29/24 52/9
devalue [1]  104/24
develop [4]  149/19 180/25 204/11 268/21
developed [11]  149/7 149/15 156/24 201/21
202/1 202/8 204/2 204/13 204/15 205/2
219/18
developing [1]  268/18
development [5]  143/24 144/1 157/22 178/19
204/8
device [12]  150/25 159/1 204/2 204/8 204/15
205/12 207/9 207/10 209/8 209/9 219/19
268/14
devices [1]  160/25
DHL [1]  118/22
diagnosis [3]  222/19 224/5 224/6
dictates [1]  93/6
dictating [1]  93/13
didn't [112]
died [1]  229/24
dies [1]  122/9
difference [3]  8/14 82/20 122/4
different [9]  62/6 64/7 76/14 90/1 125/20
127/22 140/22 144/24 162/11
difficult [2]  235/6 270/5
difficulty [1]  260/4
diligence [3]  213/11 213/13 213/18
dilution [1]  53/2
dinner [3]  151/24 179/13 206/1
direct [26]  7/5 9/11 9/22 24/10 24/12 52/14
60/5 104/11 105/15 127/3 135/21 156/2
156/2 156/3 156/5 166/12 186/8 190/10
198/12 212/9 217/11 219/17 220/20 272/4
272/10 272/14
directing [1]  107/7
direction [11]  73/3 86/21 103/15 103/16
103/20 104/10 111/19 124/2 129/7 255/14
256/5
directions [3]  226/6 226/13 231/16
directive [2]  236/4 241/12
directives [1]  240/10
directly [29]  9/8 10/19 11/17 11/25 26/2 33/3
42/10 43/17 43/18 66/1 72/9 80/1 84/13
85/18 102/2 157/12 167/1 202/13 203/3
203/4 211/11 211/16 218/5 219/8 226/13
227/4 227/5 229/11 229/12
director [5]  122/1 122/12 157/22 171/19
174/25
directors [4]  50/6 95/10 198/18 254/25
disadvantageous [1]  233/14
disappointment [1]  154/18
disapproved [1]  71/21

## D

disapproves [2]  71/24 72/4
disassemble [1]  263/21
disbelieve [1]  103/8
disc [1]  131/12
discard [1]  133/16
discards [1]  134/14
disclose [2]  204/20 208/18
disclosed [10]  15/6 18/9 47/10 49/19 54/20
115/9 116/24 117/23 118/8 118/9
discloses [1]  18/12
disclosing [1]  21/13
disclosure [14]  21/10 21/11 21/15 208/21
209/7 209/15 209/16 209/18 209/19 210/2
210/3 210/8 213/2 213/6
disclosures [9]  21/8 23/20 47/14 48/5 49/4
49/10 61/22 69/10 69/13
discovery [1]  267/15
discretion [1]  70/5
discuss [11]  60/14 60/18 109/7 109/9 119/24
167/20 167/22 173/8 216/25 271/11 271/12
discussed [4]  21/10 60/5 66/3 264/8
discussion [2]  78/20 248/18
discussions [2]  210/8 246/24
dismiss [2]  126/11 126/12
displaying [1]  6/18
dispose [1]  130/1
disposition [1]  20/22
dispositions [1]  52/7
dispute [3]  122/5 122/24 260/3
disputed [3]  125/9 217/7 217/8
dissemination [1]  123/21
distribute [1]  170/13
distribution [8]  61/19 63/4 63/5 63/11 65/13
65/17 71/14 71/19
distributions [1]  52/25
district [6]  1/1 1/1 1/13 119/4 119/12 160/9
diverted [1]  123/25
dividends [1]  52/25
division [2]  1/17 208/15
dobieco.org [2]  256/24 258/24
docket [2]  124/8 130/18
doctor [1]  195/7
doctor's [3]  161/7 161/15 161/20
document [86]  14/25 18/5 18/11 31/15 31/16
50/16 50/21 55/12 58/4 58/20 58/24 59/14
63/24 64/2 69/24 71/17 81/10 82/18 82/19
82/21 82/22 89/16 115/5 115/7 115/20
115/20 117/19 117/21 118/2 118/4 137/24
190/19 191/21 191/22 193/1 193/2 214/5
216/9 216/13 216/18 218/10 219/3 219/5
219/7 219/10 219/12 220/5 220/8 220/14
220/15 223/7 224/14 224/16 230/4 231/5
231/9 237/7 238/18 239/12 240/17 245/12
251/20 255/17 255/18 256/9 256/12 256/21
257/2 257/7 257/8 257/10 257/15 257/15
257/22 258/8 258/18 259/2 259/16 259/19
263/11 263/21 264/15 266/6 266/7 266/9
266/10
documentation [1]  230/17
documents [80]  3/1 3/10 3/25 4/13 8/3 8/5
10/3 14/3 16/9 16/12 19/2 19/3 21/17 22/10
22/13 23/22 38/17 39/5 39/7 49/3 49/7 55/13
58/22 66/25 82/25 106/24 111/21 111/24
113/2 116/24 117/9 117/12 117/13 122/8
134/9 137/18 137/23 138/1 189/19 190/22
191/15 191/24 192/1 192/3 192/5 192/6
192/7 192/8 192/20 193/4 204/4 210/12
217/11 217/22 219/8 225/22 226/11 228/2

228/20 229/9 231/6 231/9 231/13 231/20
233/16 234/6 236/12 240/8 240/19 240/20
241/11 242/18 247/7 251/25 251/25 253/23
255/7 256/14 259/23 260/5
documents' [1]  193/8
does [46]  10/5 10/8 11/5 19/13 19/19 26/20
29/15 31/3 31/6 31/8 35/5 35/7 35/9 37/13
37/14 37/19 37/22 38/3 46/12 58/18 58/19
63/23 81/10 106/22 121/13 123/1 131/5
138/10 149/3 164/25 186/21 189/14 198/5
198/17 201/3 201/18 202/14 202/16 214/24
218/9 218/16 219/3 219/5 221/6 244/14
268/21
doesn't [36]  33/5 58/23 65/7 81/13 82/15
82/18 82/20 82/21 82/23 86/1 86/2 86/3
102/4 122/23 131/23 135/12 142/6 167/5
185/24 215/11 222/23 225/13 225/15 226/1
230/8 231/4 242/16 243/22 245/1 245/5
245/10 245/13 248/13 259/10 259/17 260/3
doing [35]  4/14 4/25 82/10 82/15 84/19 85/1
101/6 101/12 104/4 116/16 116/21 117/6
145/21 146/16 146/25 148/12 148/17 148/18
165/6 165/8 165/10 165/11 170/18 171/22
180/7 187/22 191/16 192/22 196/10 213/10
215/23 221/23 233/2 235/10 250/2
DOJ [3]  122/4 224/13 224/14
dollar [3]  113/6 124/21 124/25
dollars [15]  9/9 40/16 43/17 57/25 68/2
88/13 88/18 94/5 94/11 94/21 125/7 244/19
244/23 244/25 245/9
don't [256]
done [16]  87/11 127/10 148/18 154/12
162/19 162/20 181/20 185/1 204/15 222/10
222/10 223/17 225/18 225/20 227/1 266/8
donees [1]  63/9
door [1]  230/5
doublecheck [1]  37/24
doubt [12]  46/14 78/7 78/9 121/14 123/3
123/14 124/6 125/6 125/13 126/19 216/16
260/5
Doug [1]  169/24
down [27]  16/18 17/9 34/17 38/6 40/3 40/18
59/18 60/17 86/15 97/14 97/19 106/21
134/10 146/18 146/19 147/13 149/6 157/2
159/21 160/12 163/6 169/13 169/23 171/12
172/17 180/4 257/13
download [1]  58/22
Dr [53]  32/1 32/2 33/20 33/23 33/25 34/8
34/9 34/14 98/16 98/17 98/18 99/1 99/3
99/24 99/25 100/2 125/3 203/5 214/25 216/1
217/23 218/2 218/13 219/16 219/18 220/9
220/20 222/12 222/23 222/24 225/7 225/7
226/5 229/14 229/17 229/24 236/4 244/15
245/6 252/8 252/16 252/24 253/12 254/25
256/5 258/4 258/11 263/12 264/3 264/10
264/16 264/21 265/16
Dr. [8]  31/25 32/6 34/3 98/6 255/12 256/24
257/23 270/2
Dr. Drakulic [1]  270/2
Dr. H [4]  31/25 32/6 34/3 98/6
Dr. Lowell [2]  255/12 256/24
Dr. Steven [1]  257/23
draft [1]  121/9
drafted [3]  89/16 121/9 121/19
Drakulic [7]  149/12 151/20 156/13 158/5
176/20 178/3 270/2
dramatic [1]  85/25
Draper [2]  13/14 13/15
drive [1]  1/20 86/15
drop [2]  81/22 125/11

dropped [5]  81/17 81/25 86/4 124/21 128/19
dropping [1]  124/24
drove [1]  86/13
due [4]  52/25 213/11 213/13 213/18
during [5]  17/12 26/8 26/25 29/1 33/3 39/8
39/13 40/14 47/6 53/8 56/10 59/21 60/3
60/18 74/4 75/5 75/12 76/2 76/10 82/1 86/5
100/3 100/11 101/3 109/10 122/10 131/8
131/13 132/4 132/6 132/10 134/7 134/8
143/15 145/14 153/20 165/5 166/15 166/18
167/22 172/7 173/14 184/8 184/12 184/24
201/16 203/2 210/21 214/20 217/5 252/9
264/1 271/12
duties [3]  7/17 162/2 187/20
duty [1]  194/19

## E

e-mail [53]  1/25 8/7 27/17 28/9 28/14 28/18
29/8 29/16 31/3 31/11 31/17 32/8 32/11
32/14 32/20 32/21 33/10 33/17 33/20 34/6
34/12 35/3 35/4 36/3 36/6 36/10 36/16 36/16
36/19 37/13 37/17 137/3 225/6 225/22
227/18 229/5 241/13 243/14 244/2 244/15
244/18 245/9 252/2 252/24 255/12 255/15
256/1 256/8 256/23 258/23 258/24 260/10
261/19
e-mail's [2]  93/7 93/8
e-mailing [4]  31/21 31/22 36/7 36/21
e-mails [22]  90/16 91/2 91/6 190/9 218/4
225/23 225/25 226/3 226/4 226/7 226/9
226/13 234/17 236/1 236/4 237/15 244/17
252/23 255/21 255/22 258/11 266/16
each [21]  16/12 19/1 40/23 47/9 47/10 52/1
52/16 58/8 63/8 63/8 126/17 127/22 137/9
144/25 146/10 146/10 190/4 203/24 225/25
226/3 252/19
earlier [11]  17/17 30/19 40/6 44/23 101/20
105/21 105/23 125/18 129/23 132/7 256/10
early [6]  18/13 18/16 21/14 188/5 203/25
270/3
easily [1]  261/25
east [2]  173/18 173/20
echo [1]  87/5
economically [2]  104/13 104/14
Edwards [1]  218/14
effective [4]  59/8 59/11 59/15 197/2
effectuated [2]  79/18 79/19
effort [2]  31/12 162/24
efforts [1]  171/22
eight [2]  159/6 238/10
Eighty [5]  207/24 237/13 237/22 238/2
238/10
Eighty-eight [1]  238/10
Eighty-four [3]  237/13 237/22 238/2
either [20]  10/18 10/18 23/14 43/17 57/10
59/16 97/8 126/6 131/11 136/19 145/3 156/9
157/25 173/16 179/25 237/17 240/25 243/13
258/6 270/1
EKG [1]  223/9
elaborate [1]  144/11
Elaine [7]  154/10 154/10 154/24 154/24
155/7 169/16 170/1
Elaine's [1]  174/24
Electric [3]  28/4 31/4 37/2
electrical [4]  34/4 36/15 117/15 268/17
electroencephalogram [1]  149/20
electronic [1]  235/14
Electronics [1]  218/14
elements [2]  249/24 250/3
Eleventh [3]  227/10 231/16 245/17

**E**

elicit [2]  166/15 166/17
elicited [1]  122/23
eliminated [1]  253/14
elimination [1]  260/10
else [30]  24/24 37/14 44/16 44/17 54/6 60/6
132/12 145/20 151/17 151/19 152/15 157/14
175/21 185/13 187/7 189/11 195/20 207/5
207/14 207/25 235/23 236/2 237/21 247/11
261/9 267/1 267/11 267/20 270/23 270/25
elsewhere [1]  115/8
emblematic [4]  121/2 122/17 122/25 234/19
emergency [1]  141/21
employed [2]  7/10 53/6
employee [5]  71/13 95/15 135/24 180/20
198/13
employees [11]  50/7 70/1 72/22 73/3 73/11
74/6 74/8 76/12 141/4 157/15 169/18
employer [1]  31/1
encapsulate [2]  244/3 245/9
enclosed [1]  235/25
encompass [1]  128/11
end [26]  17/22 32/25 35/14 35/14 35/18
35/22 47/23 76/21 108/20 130/6 134/6 141/8
145/4 155/19 156/14 157/14 160/16 193/3
193/6 204/13 217/23 218/1 218/12 220/10
221/5 254/8
ended [1]  153/20
ending [14]  16/20 16/24 19/10 19/13 19/18
20/14 22/2 22/8 30/13 30/17 42/18 43/2 43/6
100/19
enforcement [1]  7/12
engage [1]  169/2
engaged [2]  64/18 118/24
engineer [3]  156/24 157/18 162/11
engineering [2]  157/24 157/24
English [2]  152/9 152/12
enough [5]  36/18 76/15 175/19 179/23
269/14
enrich [2]  123/20 125/15
enriching [1]  125/23
enter [1]  120/16
entered [6]  7/3 31/10 194/20 238/16 239/1
239/5
enters [5]  2/11 61/11 110/20 133/21 168/8
entertaining [1]  164/24 165/19
entertainment [1]  194/22
enthusiastic [1]  157/21
entire [6]  70/16 118/4 128/17 144/3 251/20
257/7
entirety [1]  34/11
entities [5]  3/10 8/17 10/9 10/11 25/25
entitle [1]  128/21
entitled [8]  51/14 51/23 54/2 54/6 61/19
124/18 201/23 273/16
entity [2]  52/16 200/18
equal [1]  151/25
Equity [1]  3/23
escapes [1]  144/15
especially [1]  158/11
ESQ [3]  1/16 1/16 1/21
essentially [1]  112/19
establish [12]  85/14 164/15 165/13 190/3
190/18 190/24 191/21 193/13 201/12 203/14
244/12 261/1
established [5]  126/18 199/6 199/8 199/10
200/21
establishing [2]  191/1 191/14
evaluate [7]  68/5 68/7 76/2 76/10 76/13

76/17 101/3
evaluated [6]  55/6 56/11 77/19 90/18 101/13
101/15
evaluation [5]  74/4 76/23 77/1 90/24 249/15
even [71]  69/3 72/25 82/23 84/4 84/7 104/12
125/14 156/23 163/22 174/20 209/12 218/23
221/4 222/22 224/4 225/8 245/6
evening [6]  228/7 228/14 232/5 236/21 247/2
271/16
event [16]  54/14 70/8 79/20 79/21 120/24
141/2 152/20 152/22 190/4 222/2 222/2
222/5 222/17 222/18 262/19 262/20
events [9]  15/17 167/9 190/8 193/5 197/8
197/13 201/15 212/19 255/23
eventually [5]  8/11 137/7 170/4 196/13
196/25
ever [71]  44/7 53/18 55/7 55/9 55/19 55/22
55/24 58/11 59/2 64/2 65/9 68/5 73/14 74/4
74/8 75/5 76/6 76/10 81/24 82/2 95/20
97/20 98/12 100/3 100/5 100/11 100/22
101/3 101/6 102/9 102/12 102/14 102/16
102/22 107/21 111/12 111/13 115/8 115/13
115/20 117/17 118/7 124/24 138/7 138/14
138/19 139/1 142/23 153/21 153/24 158/4
170/24 173/8 174/5 174/7 174/10 175/10
175/13 176/19 178/5 178/6 178/7 178/9
178/12 184/11 189/8 194/25 196/14 200/7
205/15
every [8]  46/15 58/19 58/24 62/5 190/19
203/5 223/18 251/17
Everybody [1]  225/14
everybody's [2]  83/13 233/4
everyone [8]  2/2 2/14 61/13 110/12 110/22
133/23 168/10 260/3
everyone's [1]  165/20
everything [17]  60/15 134/16 146/17 146/22
146/24 147/11 147/25 152/25 153/1 153/2
164/19 166/15 166/17 246/18 250/1 267/19
267/21
evidence [100]
evidentiary [1]  126/18
ex [2]  96/23 125/15
ex-wife [2]  96/23 125/15
exact [7]  29/6 46/8 62/24 127/8 187/10 190/9
232/18
exactly [18]  39/2 54/23 54/24 55/17 56/19
75/20 86/11 93/4 147/15 150/24 165/5 174/3
174/4 177/18 192/22 204/11 230/5 248/2
examination [20]  7/5 45/8 45/10 83/14 84/9
84/24 85/15 87/18 109/18 110/25 112/9
135/21 166/11 166/12 179/4 184/4 184/6
186/8 249/6 249/8
examination's [1]  227/4
examine [11]  83/16 92/9 214/9 226/22
226/23 226/25 227/3 236/23 237/1 249/2
255/18
examined [1]  89/8
examining [4]  83/2 83/6 83/11 85/7
example [14]  40/9 40/11 41/24 42/10 121/18
204/22 204/23 204/24 241/6 241/16 244/13
244/14 244/16 245/13
examples [1]  14/1
excellent [2]  183/22 183/22
except [3]  52/19 159/19 254/7
excepted [1]  231/17
exception [19]  190/19 190/23 191/22 224/4
225/18 225/21 227/8 230/19 230/20 231/7
240/22 242/5 242/16 243/17 244/14 245/23
245/23 247/9 260/21
exceptions [2]  191/2 191/6

excess [1]  25/18
exchange [18]  4/2 31/17 36/10 37/13 37/17
52/10 63/13 65/17 65/18 70/4 71/19 72/21
119/14 136/14 189/13 238/4 243/25 253/1
exchanges [1]  225/6
excited [3]  157/18 157/20 157/21
excitement [2]  146/8 152/1
exciting [1]  154/4
excuse [12]  20/14 22/23 83/4 112/15 115/18
176/25 188/17 192/11 193/7 221/17 228/8
228/14
excused [1]  185/16
executive [7]  38/25 39/1 39/2 39/5 39/12
41/14 182/13
exhibit [93]
exhibit 101 [1]  22/14
exhibit 132 [1]  33/16
exhibit 137 [2]  36/2 92/17
exhibit 14 [2]  216/8 267/1
exhibit 194 [2]  31/11 98/2
exhibit 245 [1]  39/24
exhibit 254 [1]  21/21
exhibit 255 [1]  15/25
exhibit 257 [1]  30/2
exhibit 258 [2]  23/9 99/7
exhibit 259 [4]  9/13 25/23 42/9 43/23
exhibit 260 [2]  38/12 40/5
exhibit 294 [1]  81/8
exhibit 318 [1]  27/3
exhibit 323 [10]  50/22 53/13 63/5 69/24
74/12 101/21 115/4 115/19 115/21 117/22
exhibit 65 [1]  257/15
exhibit 67 [3]  258/23 259/1 259/10
exhibit 73 [2]  14/17 14/22
exhibit 78 [1]  229/3
exhibit 84 [3]  27/11 31/2 260/23
exhibit 85 [1]  22/24
exhibit 86 [1]  77/25
exhibit 93 [1]  17/25
exhibits [45]  5/8 6/15 16/14 19/4 84/10 84/16
96/12 130/7 130/13 133/3 133/17 134/5
190/11 220/15 220/17 221/9 221/11 221/14
228/8 228/11 229/8 230/15 232/4 234/3
234/4 234/17 235/9 235/11 235/20 236/13
236/15 236/19 239/15 239/25 240/4 240/9
243/11 248/3 253/8 255/5 259/12 263/15
267/2 273/3 273/7
exhibits 135 [1]  16/14
exhibits 146 [1]  19/4
Exhibits 185 [1]  243/11
Exhibits 26 [1]  236/19
exist [1]  233/19
existed [4]  96/14 187/24 223/14 249/16
existence [7]  97/5 100/23 200/23 251/18
252/5 261/2 261/23
existing [1]  14/16
exits [5]  60/16 109/8 120/2 167/24 217/1
expand [1]  155/11
expect [3]  84/14 119/20 270/3
expended [2]  91/14 107/22
expense [1]  95/13
expenses [4]  34/17 56/11 56/13 100/8
expensive [2]  95/19 159/11
experience [15]  142/19 147/9 182/13 197/8
197/11 213/10 215/17 249/21 250/9 251/13
254/22 255/21 256/5 256/7 259/1
experiences [2]  165/4 166/9
experiential [1]  193/17
expert [4]  112/16 112/17 203/7 268/17
expertise [2]  178/17 178/18

**E**

explain [19]  7/9 8/2 8/14 9/6 12/3 15/6 16/17
19/7 21/23 23/12 24/3 24/14 30/23 33/6
97/14 140/17 164/4 174/16 269/7
explained [2]  93/23 121/4
explaining [1]  85/12
explanatory [5]  12/1 12/24 24/9 24/10 64/5
exposed [1]  159/25
Express [1]  164/2
extensively [1]  96/22
extent [11]  63/10 83/21 113/1 113/14 113/22
114/9 116/19 124/6 246/21 266/1 268/17
extract [3]  82/12 191/13 202/4
extraordinarily [1]  231/14
extremely [3]  174/15 251/22 267/9
eyes [2]  151/6 193/5

**F**

F-i-e-d-l-e-r [1]  186/4
F16 [2]  149/16 149/20
Facebook [1]  177/7
facetious [1]  113/25
facetiousness [1]  114/4
facie [2]  128/15 129/12
facilitate [1]  64/20
facility [1]  63/14
facsimiles [1]  119/1
fact [51]  14/22 15/13 18/2 22/13 28/14 28/18
33/10 34/19 55/16 66/20 72/2 85/1 89/1 89/4
96/14 106/2 107/6 111/17 115/17 121/11
124/24 126/8 128/11 128/19 129/3 131/2
131/3 131/22 167/4 171/21 198/5 222/23
223/24 225/15 226/16 226/8 230/7 230/24
230/25 250/8 250/14 251/20 251/24 252/5
252/23 253/7 253/14 253/15 260/9 262/22
264/3
faculties [1]  261/15
fail [1]  128/5
failed [2]  90/10 121/25
fair [15]  10/24 11/21 15/21 15/22 16/12 19/2
34/7 36/13 46/19 68/9 101/13 113/14 114/16
116/20 267/9
fairly [3]  11/25 24/9 64/5
fairness [1]  103/1 153/24 212/23
fake [2]  180/21 182/22
fall [2]  244/5 244/14
falls [3]  160/11 191/22 224/6
false [23]  23/19 69/11 69/12 69/13 83/8
83/24 86/13 88/15 88/16 88/20 114/1 114/14
121/21 121/21 123/10 123/21 183/17 217/13
217/17 218/18 219/2 219/17 220/13
falsehoods [10]  63/1 66/25 68/14 68/15
68/22 69/6 69/8 72/1 72/5 72/6
falsity [1]  220/6
familiar [17]  8/19 38/2 48/5 48/9 57/16 59/8
64/21 64/23 64/23 78/2 169/21 177/17
177/19 178/10 200/16 214/15 259/17
family [6]  102/10 125/8 125/25 126/2 163/10
187/7
Famous [1]  147/22
far [8]  85/17 113/17 166/24 188/2 204/15
224/6 250/19 252/18
Fargo [1]  3/18
fascinating [1]  180/9
fast [1]  15/16
fast-forward [1]  15/16
faster [2]  192/11 232/23
fatal [1]  255/13
father [2]  140/20 163/13

fault [1]  76/9
favorable [1]  128/10
FDA [7]  158/22 158/25 159/1 177/1 177/2
219/18 253/16
FDA-approved [1]  219/18
fear [1]  264/24
February [4]  31/17 31/22 32/5 32/14
February 11th [2]  31/17 31/22
federal [15]  3/12 3/14 4/3 4/8 4/10 4/17 4/21
5/2 5/4 93/5 120/13 137/25 137/25 157/19
157/19
FedEx [2]  3/16 3/16
feel [10]  49/11 62/4 62/9 62/22 152/8 172/24
173/2 176/11 178/22 178/22
fees [12]  88/22 89/1 89/3 89/4 91/13 91/18
91/20 92/7 92/10 115/1 117/5 117/14
Feidler [41]  109/25 185/18 186/3 186/10
187/15 187/19 188/23 189/5 194/1 200/16
203/20 205/14 210/2 214/7 215/7 216/9
224/2 225/4 226/22 226/24 227/1 248/4
248/18 249/10 252/1 254/5 254/15 255/6
255/17 256/21 257/15 257/23 258/22 259/1
261/6 263/21 266/24 267/25 268/2 271/2
271/12
Feidler's [2]  263/24 264/1
feistiness [1]  230/2
felt [14]  88/14 88/16 104/9 104/10 107/6
148/22 152/6 153/12 154/5 156/11 169/20
171/14 179/23 180/1
few [15]  5/4 14/1 35/15 89/7 119/22 131/17
146/14 179/9 216/23 228/19 242/8
fiberoptic [1]  163/24
Fidelity [5]  3/19 186/21 186/25 202/8 223/9
Fiedler [2]  185/22 272/13
fifth [1]  20/12
fight [1]  192/15
fighter [2]  149/16 149/18
figure [2]  93/3 270/4
figured [1]  145/20
file [6]  14/13 51/20 98/11 102/15 118/18
243/20
filed [20]  4/13 14/14 17/21 17/22 17/23 46/1
46/8 47/16 50/19 51/18 58/1 58/11 58/14
58/20 63/2 67/5 88/17 114/15 122/8 131/4
files [5]  59/14 88/25 90/13 224/15 245/3
filing [23]  14/13 14/16 14/22 15/6 15/7 17/20
17/25 18/10 47/25 48/6 48/7 48/17 49/15
54/14 54/17 68/15 71/22 115/3 115/8 115/11
115/13 116/1 118/7
filings [62]  44/17 47/7 47/9 47/11 48/6 49/11
50/12 54/12 63/1 63/23 68/14 68/22 69/2
69/4 69/5 69/6 69/17 70/14 70/18 70/22 72/1
72/6 82/4 83/22 83/25 92/12 113/23 114/1
114/6 114/10 114/11 114/11 114/14 114/17
114/22 114/24 122/12 127/8 129/6 130/11
130/18 130/21 130/23 131/9 131/15 131/17
132/4 132/7 132/7 132/15 132/16 178/9
178/10 178/12 178/17 181/13 181/16 181/24
183/14 183/17 214/9 219/2
fill [2]  270/4 270/7
filled [1]  146/24
final [2]  228/22 255/14
Finally [1]  4/23
Finance [19]  53/14 54/20 55/3 60/4 62/14
62/16 62/18 62/22 78/25 80/23 81/1 81/3
96/9 97/6 107/13 107/16 124/5 124/15
124/16
financial [3]  3/19 6/17 10/2 16/9 16/12
18/24 19/1 19/3 22/10 22/13 23/22 30/7
38/17 93/10 93/12 119/8

financing [3]  56/16 56/19 57/4
financings [1]  75/18
fine [6]  85/23 86/6 167/11 193/15 247/16
263/14
finish [1]  67/1
finished [6]  108/24 109/1 134/1 163/7 183/7
238/6
finishes [1]  79/14
FINRA [1]  80/2
fired [3]  158/10 176/1 176/9
firm [4]  57/21 100/5 100/12 100/22
firm's [2]  100/15 100/20
first [37]  15/13 15/15 15/17 26/10 27/1 27/7
36/11 36/20 38/24 54/16 63/25 78/1 97/19
140/14 141/9 146/13 146/14 148/1 154/18
155/5 159/20 160/23 180/11 193/13 195/17
196/19 209/8 222/20 233/14 248/6 254/8
254/11 263/10 264/19 264/23 265/13 266/25
fisty [1]  230/1
fit [2]  231/21 232/18
five [48]  20/1 20/4 20/5 20/6 20/9 20/16
20/18 21/1 22/1 30/16 30/20 31/4 32/25
34/25 35/1 35/6 37/10 37/15 37/19 43/7
88/10 93/14 93/18 93/22 94/11 94/20 102/11
102/11 107/22 108/2 108/4 108/13 111/8
111/8 111/10 111/17 119/1 132/9 139/12
155/13 219/8 234/24 237/10 245/5 248/1
254/24 256/18 268/9
fixed [2]  64/10 160/2
FL [2]  1/20 1/22
Flagler [1]  1/20
flags [1]  28/3
flaw [1]  255/14
flew [9]  56/20 56/21 57/2 95/24 96/1 96/3
136/16 163/11 163/17
flight [4]  57/1 57/3 57/6 57/11
floor [1]  160/1
FLORIDA [8]  1/1 1/7 1/25 91/22 119/4
119/12 122/21 212/1
floundering [1]  173/23
flow [1]  18/22
flowchart [1]  16/6
fly [1]  56/15
flying [2]  95/14 95/16
focus [12]  8/9 8/20 26/1 26/18 40/19 48/12
65/24 84/20 165/21 167/6 167/8 167/11
focused [3]  8/11 47/21 78/24
focusing [12]  23/15 23/17 23/18 43/25 45/17
45/19 46/24 70/11 70/12 78/1 191/5 191/7
folks [1]  27/20
follow [3]  141/3 210/10 241/2
follow-up [2]  141/3 210/10
followed [1]  124/2
following [26]  2/11 3/5 3/8 3/10 6/14 51/25
61/2 61/11 64/12 81/11 82/9 110/11 110/20
111/18 133/10 133/21 164/9 168/3 168/8
189/24 201/10 209/1 216/10 233/9 240/16
268/12
foolish [1]  171/14
footnote [1]  52/14
footnote 1 [1]  52/14
Force [7]  149/2 149/16 149/19 150/1 151/7
151/9 151/12
foregoing [1]  273/14
foreign [1]  119/3
foresee [1]  237/8
forever [1]  225/24
forgetting [3]  80/11 94/19 104/6
forgot [1]  51/20
form [18]  9/8 9/22 24/11 45/22 46/2 47/16

## F

form... [12]  49/18 49/19 59/21 60/14 81/18 109/7 119/24 122/14 131/11 167/21 176/19 216/25
formation [2]  94/20 200/3
formed [8]  54/4 55/3 62/22 127/24 188/24 189/1 199/23 200/7
former [5]  41/9 41/10 41/13 122/1 253/16
formerly [6]  4/14 4/25 187/16 187/17 188/1 188/1
forms [3]  4/16 4/17 16/13
formula [1]  204/22
forth [5]  51/25 154/12 228/2 243/15 244/6
fortunate [1]  269/14
Fortune [2]  89/12 200/25
forward [12]  15/16 31/9 69/9 72/17 119/23 188/19 188/20 194/24 194/25 196/8 267/9 271/7
forwarded [7]  10/19 10/22 30/1 34/23 37/9 43/21 94/8
forwarding [1]  43/20
forwards [1]  38/5
found [6]  46/22 152/15 180/20 204/2 264/5 267/19
foundation [19]  190/24 201/15 226/10 228/10 241/7 242/10 242/11 242/12 245/22 245/25 246/11 247/8 251/19 253/22 254/20 258/16 258/18 260/20 264/13
foundations [1]  193/8
founded [1]  143/8
founder [1]  140/1
four [7]  19/11 40/22 41/17 199/1 237/13 237/22 238/2
Francisco [1]  57/23
Franklin [4]  1/23 273/13 273/19 273/20
frankly [3]  113/19 237/25 261/24
fraud [9]  7/15 7/15 7/15 7/16 17/7 19/22 22/20 126/13 127/14
fraudulent [7]  129/5 129/6 166/6 217/13 217/18 218/19 220/13
free [5]  76/1 76/3 77/16 99/12 116/14
freedom [1]  253/17
freely [7]  73/16 73/17 73/18 73/23 73/24 113/15 116/14
Friday [2]  270/8 270/12
friend [2]  175/1 177/7
friends [1]  176/2
front [5]  88/11 106/7 106/8 120/25 226/2
frustrated [1]  233/1
frustrating [2]  148/20 176/25
frustration [3]  174/13 174/17 175/11
frustrations [1]  175/15
full [1]  160/16
fully [1]  121/4
funds [6]  10/23 16/7 26/23 49/16 119/7 141/22
funnel [1]  180/21
further [7]  52/6 82/24 112/5 118/10 118/11 185/11 198/6
furthermore [3]  3/25 4/5 121/25

## G

G-r-e-e-n-e [1]  135/17
gain [1]  125/7
gallery [1]  160/5
gap [2]  262/2 270/5
gather [2]  232/11 232/13
gathered [1]  69/15
Gault [4]  41/6 41/14 41/16 175/4

gave [5]  150/2 170/22 226/13 236/11 242/14
gears [1]  40/18
general [19]  8/20 8/25 9/3 12/17 13/9 16/21 88/7 94/1 95/14 186/15 186/15 215/18 243/12 243/13 244/3 244/5 251/9 259/12 261/24
generalities [1]  69/22
generalized [1]  236/9
generally [33]  8/14 9/6 9/17 10/16 10/18 16/4 18/20 21/23 27/23 33/23 34/12 36/5 46/3 46/4 46/5 47/8 48/23 49/13 49/22 59/4 61/24 69/18 70/1 70/2 73/22 74/14 74/19 74/20 88/15 89/18 91/22 91/24
generate [2]  13/23 19/11
generated [3]  16/21 22/4 43/22
gentleman [2]  202/14 203/6
gentleman's [2]  227/14 260/6
gentlemen [12]  2/13 60/13 109/5 110/23 119/19 133/24 134/25 135/1 167/19 168/11 168/12 216/22
geographically [1]  13/10
George [8]  5/9 6/2 6/5 6/10 137/25 138/18 138/23 272/3
Georgia [1]  172/19
gets [8]  20/15 20/18 24/1 38/4 49/24 50/2 58/20 233/3
getting [23]  31/15 32/18 32/21 33/4 38/8 38/14 42/14 43/12 48/14 50/8 91/10 91/11 113/5 116/4 116/8 141/5 176/1 177/22 178/15 228/12 233/1 235/7 261/8
give [23]  20/21 59/10 79/7 125/8 125/16 146/1 167/19 198/6 199/15 223/20 223/25 226/6 231/19 240/5 244/13 245/13 245/20 246/1 259/19 266/21 266/22 269/8 270/20
given [19]  4/5 46/4 51/3 87/21 126/13 130/9 130/17 130/18 132/14 134/14 154/22 233/24 240/21 241/4 241/18 246/24 247/25 256/1 257/1
gives [2]  69/6 266/17
giving [3]  79/8 116/4 149/14
glasses [1]  228/18
God [1]  185/5
goes [7]  29/14 32/5 64/10 98/6 180/3 180/4 182/9
going [157]
gone [2]  56/12 146/23
good [29]  2/2 2/13 7/7 7/8 45/12 45/13 69/9 106/4 111/4 111/5 131/5 133/19 135/23 140/24 146/11 148/17 148/18 148/19 149/18 166/1 168/17 169/20 174/19 175/1 175/17 179/6 204/23 261/15 265/23
gorgeous [1]  160/3
got [47]  10/6 23/6 24/2 25/25 26/23 27/1 29/17 29/25 30/1 33/1 37/8 41/25 42/9 62/18 103/13 103/15 103/15 103/20 104/20 105/11 109/13 113/20 127/19 137/7 139/7 140/5 140/21 141/10 141/18 147/22 155/22 160/6 160/8 163/3 163/13 163/22 163/25 164/24 174/5 177/5 177/8 179/15 227/17 241/20 246/25 247/11 267/19
gotta [2]  172/5 175/5
gotten [3]  76/7 156/8 176/2
government [92]
Government's [60]  2/17 6/5 7/1 9/13 14/17 14/21 15/25 17/25 18/17 19/4 20/12 20/13 21/21 22/14 23/9 25/23 27/3 27/11 30/2 31/2 33/16 36/1 38/12 39/24 40/5 42/8 43/23 84/10 84/16 86/11 92/17 94/24 96/12 99/5 99/15 109/20 115/18 119/19 120/21 125/12 127/3 128/21 129/21 135/2 164/20 165/11

165/15 165/22 165/23 167/6 220/1 226/14 229/3 230/8 241/8 242/1 252/19 253/9 273/3 273/4
Government's 258 [1]  99/5
Government's 260 [1]  94/24
graduate [1]  195/1
graduated [2]  139/6 139/7
grand [4]  24/17 121/10 136/15 136/16
grant [2]  63/17 226/15
granted [1]  127/15
Great [1]  5/24
greater [1]  146/11
greatest [2]  150/4 165/24
Greene [21]  75/6 75/7 75/8 109/17 109/20 109/23 109/24 135/7 135/10 135/17 135/24 136/8 138/16 139/5 145/22 168/17 179/6 183/6 183/22 269/13 272/9
Greenville [41]  57/11 74/22 74/23 74/25 75/3 76/17 76/20 76/23 76/25 95/18 136/15 139/8 139/10 141/22 142/9 145/15 148/6 148/8 150/7 150/16 153/13 153/18 153/21 153/25 154/3 154/15 154/17 155/11 157/15 159/17 160/9 160/10 162/13 162/14 168/20 169/14 169/23 169/24 171/6 174/24 176/21
Greenville's [1]  160/12
Greer [1]  154/17
grew [1]  176/5
ground [1]  261/16
grounds [9]  82/7 216/20 237/16 237/25 238/2 238/11 238/20 239/18 239/20
group [24]  3/23 11/10 11/11 11/13 53/14 54/20 55/4 60/4 62/14 62/16 62/18 62/22 78/25 80/23 81/1 81/3 96/9 97/6 107/14 107/17 116/3 124/5 124/15 124/16
Group's [1]  44/4
grow [3]  155/8 155/9 155/9
Gruber [5]  57/18 58/5 59/24 60/1 60/1
guess [14]  17/16 51/20 66/21 67/20 144/8 154/18 171/5 174/2 176/22 192/16 221/23 252/21 263/25 267/14
guessing [4]  46/14 58/25 77/20 95/2
guy [2]  137/25 169/23

## H

habit [2]  215/7 215/9
hadn't [3]  67/16 88/14 101/22
half [9]  35/24 35/25 55/7 67/4 67/10 109/18 125/7 202/8 247/20
halter [3]  141/2 152/21 152/23
Hampton [5]  4/1 25/3 41/5 96/23 101/15
Hampton-Stein [5]  4/1 25/3 41/5 96/23 101/15
hand [10]  6/3 6/15 6/17 9/12 128/3 128/3 135/9 146/22 185/20 243/7
handful [1]  243/4
handing [1]  34/25 130/2
handle [2]  156/12 172/22
handled [1]  174/7
handwriting [1]  242/22
handy [1]  227/20
handyman [2]  122/20 122/24
Hang [1]  237/11
happen [4]  27/24 119/20 197/1 250/3
happened [28]  13/20 14/2 29/24 62/25 67/9 74/15 85/19 85/25 86/2 86/8 88/6 113/18 124/4 127/20 147/5 151/19 166/15 166/18 167/4 171/13 189/2 209/16 209/19 223/23 230/6 246/20 250/10 268/13
happening [5]  17/16 34/2 37/5 117/23 250/12

**H**

happens [3]  25/18 32/7 223/19
happy [7]  63/22 129/24 227/12 234/17 235/8 245/19 249/3
hard [2]  114/3 131/11
Hardee's [1]  141/23
Harmison [83]  25/4 25/5 26/16 31/23 32/1 32/2 33/20 33/23 33/25 34/8 34/9 34/14 36/7 36/17 44/8 98/13 98/15 98/16 98/17 98/18 99/1 99/3 99/24 99/25 100/2 122/9 125/3 203/5 214/15 214/17 214/18 214/20 214/25 216/1 216/10 217/5 217/23 218/2 218/13 219/16 219/18 220/9 220/20 222/12 222/23 222/24 225/7 225/7 226/5 229/14 229/17 229/24 236/4 236/15 244/15 244/17 244/17 245/6 250/4 250/5 252/3 252/4 252/8 252/16 252/24 253/12 254/16 254/25 255/12 256/5 256/24 258/4 258/11 258/23 261/9 261/18 262/13 263/12 264/3 264/10 264/16 264/21 265/16
hasn't [2]  126/5 126/15
haven't [11]  48/24 84/19 94/16 112/1 123/2 123/5 164/11 178/6 219/23 240/7 268/8
having [10]  63/6 78/25 92/21 120/22 158/4 180/12 219/2 253/5 260/1 265/16
he'd [1]  117/25
he'll [4]  190/3 266/6 266/7 269/9
he's [22]  83/3 84/4 109/25 130/2 158/2 190/3 192/8 192/14 207/10 219/23 220/1 220/3 223/25 226/10 236/16 245/24 246/5 248/8 248/9 248/16 267/16 269/19
head [14]  48/4 124/12 150/9 156/22 157/2 163/11 163/16 163/18 171/19 180/14 183/4 219/14 236/9 253/16
headquarters [2]  74/25 75/4
healthcare [3]  141/13 169/22 170/3
Healthdyne [1]  159/22
hear [6]  6/8 25/13 25/16 208/24 217/24 252/16
heard [16]  41/24 59/2 77/5 81/20 96/10 107/8 117/19 142/8 164/11 164/17 164/19 178/5 178/6 178/7 208/19 252/13
hears [1]  221/19
hearsay [42]  105/6 190/23 191/2 208/8 208/23 216/19 222/13 222/14 224/4 224/6 225/17 225/21 227/7 230/19 231/18 233/17 237/16 237/25 238/2 238/11 238/11 238/18 238/20 239/7 239/10 239/14 239/18 239/20 240/5 240/11 240/22 242/3 242/4 242/6 242/16 243/17 244/2 244/14 245/8 245/23 247/9 260/21
heart [20]  4/14 4/24 91/15 149/3 150/4 150/25 174/23 186/17 186/21 186/24 187/2 187/16 187/25 196/13 196/16 196/19 197/18 214/8 214/18 263/25
height [1]  149/17
held [10]  8/11 53/6 78/14 79/1 82/9 125/25 164/9 189/24 201/10 209/1
hello [1]  164/3
helmet [4]  149/20 149/22 150/25 151/7
helmets [1]  149/24
help [2]  148/15 262/4
helped [3]  148/19 172/21 268/21
helping [1]  182/1
here [71]  2/15 16/17 19/3 28/7 30/11 35/20 37/24 67/6 72/14 72/23 74/16 80/4 94/20 99/2 100/14 100/17 108/21 109/13 109/15 110/16 121/17 125/5 137/10 142/22 146/21 152/5 157/23 163/5 165/9 171/25 175/6

178/21 179/24 183/7 186/22 190/25 191/2 209/13 217/16 220/25 226/17 227/15 227/25 228/16 228/25 229/14 232/7 233/3 233/4 235/10 241/20 244/10 244/16 245/20 245/24 247/4 247/10 247/19 248/12 250/2 260/20 265/6 269/9 269/12 269/13 269/15 269/16 269/19 269/22 270/3 270/12
here's [2]  222/14 225/22 235/3
hereby [1]  3/8
herself [1]  142/17
hesitant [1]  235/14
hesitate [2]  29/19 107/17
hey [1]  261/6
Hi [3]  31/25 168/18 179/7
high [7]  139/6 139/7 174/21 174/22 174/24 194/1 194/2
higher [1]  24/21
highest [1]  160/9
highlighting [1]  242/24
highly [1]  256/1
Hildebrandt [7]  144/13 144/18 153/16 153/18 153/21 153/25 176/13
himself [2]  28/12 248/18
hinder [1]  180/25
hire [1]  155/6
hired [21]  75/1 136/5 143/18 143/25 144/23 146/7 148/1 148/5 149/19 150/7 150/19 154/23 155/10 155/18 157/14 157/17 157/22 159/4 159/5 169/16 169/18
history [4]  55/8 180/9 187/24 259/15
hit [1]  149/21
hoc [1]  235/7
hold [11]  8/17 8/19 94/3 134/10 134/11 134/16 134/20 171/24 187/9 235/4 264/14
holders [1]  116/13
holding [5]  87/10 171/15 178/25 205/12 235/17
holiday [1]  163/10
Hollywood [1]  194/23
home [3]  139/14 162/23 256/17
honest [1]  208/16
honestly [3]  78/20 175/18 179/21
honesty [1]  176/6
Honor [161]
Honor.thank [1]  112/8
HONORABLE [1]  1/12
hope [2]  33/17 109/17
hoped [2]  184/16 185/4
hopefully [1]  27/14
hoping [1]  110/3
hospital [6]  139/8 139/10 139/13 154/15 156/21 157/2
hospitals [9]  154/15 154/16 160/18 162/23 163/16 163/20 172/18 172/21 221/21
hotel [4]  137/16 137/17 163/12 179/13
hour [2]  109/18 262/23
hours [3]  124/25 152/23 241/4
house [2]  137/1 139/18
household [1]  169/21
housekeeping [3]  118/13 130/9 267/13
however [2]  84/11 132/9
huh [5]  148/4 155/20 179/12 181/7 182/24
human [4]  101/4 101/6 130/23 229/10
humanitarian [1]  162/24
hundred [7]  32/17 32/18 40/16 64/25 192/4 251/4 252/9
hush [1]  147/3

**I**

I'd [23]  9/11 65/24 78/20 109/20 120/8 202/2

227/9 228/6 232/6 233/3 234/17 240/5 241/14 242/7 242/8 245/19 247/19 256/17 261/3 266/15 267/14 270/19 271/9
I'll [35]  3/2 29/22 35/3 38/2 45/3 47/2 48/14 49/14 50/17 54/17 71/9 79/7 85/23 87/9 127/1 132/12 133/5 183/4 192/17 193/19 200/13 221/8 227/12 227/25 227/25 228/5 230/19 231/21 247/1 249/6 263/6 266/6 266/8 267/20 269/23
I'm [207]
I've [37]  7/23 8/5 46/13 57/20 60/10 63/19 63/21 63/24 68/22 70/19 77/10 81/14 81/20 81/20 99/3 105/12 127/15 130/14 137/5 146/17 147/19 148/18 160/23 196/11 196/11 196/12 229/12 236/5 236/13 239/13 240/7 243/6 246/16 246/25 254/18 264/7 269/18
IBM [3]  195/15 196/5 251/7
IBM-MCA [1]  196/5
idea [27]  40/13 46/12 46/13 46/18 57/13 58/4 63/22 65/6 68/4 69/12 78/23 90/12 91/5 95/11 95/17 97/13 100/1 100/14 101/1 102/24 103/10 103/11 104/24 125/23 201/11 220/19 270/21
identical [1]  224/15
identification [1]  15/24
identified [6]  3/11 4/2 10/11 236/12 246/8 257/5
identify [7]  116/13 157/15 235/9 236/16 246/7 257/4 266/17
ill [2]  98/24 207/21
illegal [8]  84/5 127/4 127/5 127/12 127/18 127/19 127/20 129/4
illegality [2]  128/2 128/4
imagine [4]  234/11 234/19 234/20 253/17
immediately [5]  81/11 81/15 105/5 141/10 141/11
impeded [1]  130/2
import [4]  48/21 55/18 56/6 96/11
importance [3]  230/2 251/24 252/7
important [8]  47/13 180/17 182/7 250/9 250/15 251/22 266/3 268/15
importantly [1]  122/13
impression [9]  111/16 136/20 148/9 148/11 166/14 170/22 173/22 176/19 179/21
impressions [3]  206/4 206/6 246/20
impressive [1]  180/10
improper [2]  87/4 181/2
inaccurate [1]  83/8
Inc [9]  4/15 4/15 4/24 4/25 5/1 5/1 186/17 186/21 186/24
inclination [1]  244/11
inclined [1]  221/8
include [4]  12/3 22/14 189/14 214/1
included [3]  83/10 98/11 214/4
includes [2]  53/20 54/3
including [10]  4/15 8/5 27/20 27/22 27/24 49/2 52/13 111/25 165/20 262/1
incorporate [1]  126/14
Incorporated [1]  4/14
incorrect [1]  123/5
increase [1]  174/13
Indecon [1]  144/16
independent [2]  76/23 251/21
independently [2]  80/16 94/19
India [8]  162/17 162/20 163/9 163/15 163/19 163/23 163/23 168/19
Indian [1]  163/10
indicate [5]  35/5 37/14 37/14 43/16 84/11
indicated [12]  19/25 51/4 52/18 69/3 84/24 101/20 103/2 153/15 184/15 249/10 253/8

**I**

indicated... [1] 263/16
indicates [1] 10/12
indicating [2] 36/14 50/15
indication [1] 217/17
indicative [1] 52/12
indicia [2] 225/9 250/10
indictment [24] 17/1 17/6 19/21 22/19 87/3
87/9 87/13 118/22 119/2 119/6 119/11
119/14 120/25 121/3 121/8 122/8 123/1
123/2 126/9 126/10 126/12 128/5 128/11
128/16
indirect [1] 52/14
indisputably [1] 121/23
individual [2] 45/14 52/16
individually [3] 62/4 108/7 108/16
individuals [12] 8/16 26/15 41/4 41/19 41/21
44/21 89/3 89/14 96/1 199/7 199/10 243/14
individuals' [1] 41/23
indoors [1] 206/25
indulgence [2] 9/12 12/22
industry [2] 251/13 251/14
industry-wide [1] 251/14
inference [1] 54/18
inferred [2] 46/9 173/7
infirmed [1] 207/21
inflated [1] 123/23
inflating [1] 123/20
influenced [1] 221/19
information [35] 10/1 16/8 16/10 18/23
21/18 22/9 23/21 30/6 38/16 52/12 56/23
58/22 82/12 82/17 83/1 83/7 83/9 83/20
86/13 114/1 114/14 114/18 123/22 131/7
154/22 163/6 189/15 191/13 193/24 197/13
202/4 204/4 204/7 225/19 270/17
informational [1] 152/18
initially [2] 152/1 199/6
inquired [1] 198/24
ins [3] 156/25 157/1 174/25
inside [1] 171/6
Inspection [2] 7/12 62/7
inspector [68] 5/9 6/2 6/18 7/7 7/11 7/17
7/18 7/22 7/23 8/8 9/14 9/16 9/25 10/5 10/12
12/2 14/19 15/5 15/13 15/18 16/1 17/1 17/9
18/2 18/7 18/18 19/19 19/24 20/13 20/25
21/22 22/9 22/17 22/22 23/10 23/21 24/22
25/13 26/2 26/4 27/6 27/14 27/18 28/25 29/3
29/8 30/5 31/3 31/14 32/17 33/17 34/11 35/4
37/4 38/3 38/7 38/15 38/19 39/24 40/4 40/20
43/10 43/25 90/22 112/11 112/15 114/16
116/23
inspectors [2] 62/3 138/17
instance [1] 104/1
instances [1] 171/13
instead [2] 166/3 232/22
Institute [12] 200/18 200/20 201/3 203/21
203/23 204/1 204/11 206/18 207/6 208/1
211/6 267/25
Institute's [1] 204/8
institutions [3] 93/10 93/12 119/8
instruct [1] 263/13
instruction [3] 34/2 34/3 260/11
instructions [1] 101/5
instruments [2] 79/11 119/8
insufficient [2] 120/17 120/18
insurance [5] 139/21 164/2 198/18 198/19
198/21
intellectual [4] 195/25 196/2 204/19 251/10
intend [2] 191/20 228/2

intended [1] 246/15
intention [1] 191/23
interacting [2] 158/5 269/20
interaction [2] 255/22 268/16
interest [18] 16/11 49/2 63/10 95/7 101/24
101/25 102/10 104/14 108/17 111/8 111/10
111/13 111/16 140/3 187/2 228/21 228/22
253/5
interested [5] 58/21 66/23 140/21 178/15
241/12
interesting [1] 164/25
interface [5] 211/10 211/13 211/15 211/17
211/24
internal [4] 102/22 102/24 186/15 243/14
internally [2] 204/16 244/2
international [4] 3/24 152/6 152/7 152/13
internationally [2] 152/10 160/18
Internet [3] 21/19 131/15 153/6
interrupt [3] 49/6 252/12 253/19
interstate [3] 118/23 119/3 119/9
interview [5] 75/5 78/21 95/20 98/12 122/9
interviewed [6] 75/7 75/8 75/10 89/14 91/17
229/15
interviews [1] 111/15
introduce [5] 191/9 221/9 226/12 232/8
246/23
introduced [5] 192/3 219/13 224/17 229/10
230/5
invalid [1] 221/7
invention [1] 165/24
inventor [1] 156/14
invest [3] 56/4 67/7 67/8
invested [9] 55/14 55/24 55/25 56/3 57/24
74/18 159/14 176/3 183/8
investigate [16] 7/13 7/15 54/8 60/7 63/20
68/21 81/25 82/2 82/15 85/22 88/5 88/9
88/21 88/23 104/21 111/12
investigated [8] 60/9 67/8 85/20 85/22 86/4
87/15 88/24 97/4
investigating [5] 62/9 84/14 85/19 89/25
122/6
investigation [94]
investigation's [1] 62/6
investigative [3] 84/12 84/25 98/11
investigatory [4] 47/15 49/2 49/12 78/3
investment [10] 22/1 37/19 52/11 52/17
55/20 57/19 57/21 93/25 108/2 141/17
Investments [26] 3/19 20/1 20/5 20/7 20/9
20/16 20/19 21/2 30/16 30/20 31/5 34/25
35/1 35/6 37/10 37/15 93/18 93/22
94/12 94/20 102/11 107/22 108/4 108/14
111/9
investor [2] 56/25 171/20
investor's [1] 57/18
investors [3] 121/7 141/16 183/13
invoice [1] 223/19
invoices [15] 117/4 117/7 182/23 218/25 219/1
219/1 219/3
invoked [3] 97/21 248/10 248/15
involved [17] 7/18 7/25 91/4 121/16 143/13
165/15 167/10 172/1 176/19 184/11 200/3
201/2 201/21 205/15 207/10 211/7 268/18
involvement [3] 164/20 207/9 207/9
involving [1] 258/12
Irene [1] 228/15
irrelevant [1] 253/18
irrevocable [1] 79/11
IRS [1] 102/16
isn't [11] 28/15 38/20 46/10 67/6 67/10 94/6
165/8 165/25 168/20 180/2 182/23

issuable [1] 73/2
issuance [9] 48/18 50/6 70/5 71/13 72/12
73/1 73/10 77/17 77/17
issue [22] 86/19 92/10 121/10 165/9 165/25
174/11 216/24 217/11 227/11 231/5 231/11
231/13 245/16 245/18 246/17 256/16 259/22
260/14 261/1 261/1 261/23 264/13
issued [12] 4/24 14/11 24/5 67/16 67/18
69/25 75/24 75/25 116/20 117/7 127/25
241/10
issuees [1] 128/3
issues [1] 190/11
issuing [5] 76/3 115/10 115/14 115/24
116/16
it'd [1] 232/22
it's [132]
item [1] 268/18
itemization [1] 266/16
itemizing [1] 117/9
items [5] 89/7 118/25 228/18 246/4 246/5
itself [2] 17/24 250/14
Ives [1] 1/22

**J**

James [4] 185/18 185/22 186/3 272/13
Jane [6] 75/6 109/17 135/7 135/10 135/17
272/9
January [6] 8/1 21/5 21/8 98/20 98/23 197/2
January 1 [1] 197/2
January 2011 [2] 8/1 98/23
January 28th [2] 21/5 21/8
JD [1] 195/7
Jennifer [3] 41/6 41/8 41/10
jet [17] 56/10 56/12 56/15 56/17 94/25 95/9
95/9 95/9 95/11 95/13 95/16 95/21 96/2 96/3
96/8 96/13 96/15
jets [1] 149/16
Jim [1] 109/24
John [12] 25/7 44/14 44/15 59/24 60/1 89/17
244/16 244/18 245/6 252/25 255/12 255/14
Johnson [2] 144/13 144/14
join [1] 194/21
joined [3] 196/19 196/19 259/15
joint [4] 195/14 196/5 198/5 251/6
Jones [20] 27/8 31/22 33/20 33/24 33/25 34/9
34/13 36/7 36/13 36/17 207/7 207/8 208/6
210/16 212/2 267/25 268/2 268/4 268/7
269/2
Jones' [1] 34/7
journal [2] 146/20 146/20
journalist [1] 146/20
journals [2] 146/18 166/4
JP [1] 3/19
JPMorgan [1] 3/17
judge [2] 1/13 130/22
judgment [7] 69/16 120/9 120/16 120/20
128/22 128/22 129/2
judicially [5] 130/20 130/25 131/2 131/3
131/6
July [9] 4/7 26/19 32/25 121/5 121/6 121/12
121/12 121/14 273/17
July 2005 [2] 121/5 121/14
July 2010 [1] 121/6
July 8th [1] 4/7
Jumping [3] 194/24 194/24 196/8
June [3] 52/2 143/21 145/3
June 13th [1] 52/2
juris [1] 195/7
juror [1] 252/8
juror's [1] 252/10

**J**

jurors [7] 61/10 110/19 130/4 133/15 133/16
228/14 232/25
jurors' [1] 165/20
jury [70] 1/11 2/10 2/11 6/15 6/17 7/9 8/2
9/16 14/21 16/3 16/16 18/9 18/18 19/7 21/22
23/10 30/4 30/9 30/23 31/14 35/17 36/5
38/14 41/18 46/5 48/1 60/16 61/11 63/6 71/3
109/8 110/20 114/12 119/21 120/2 120/14
121/10 129/12 129/21 130/3 131/6 133/21
134/13 140/18 157/5 164/4 167/24 168/4
168/8 174/17 192/12 193/7 216/22 217/1
226/2 228/8 231/24 232/21 233/1 233/3
237/2 241/1 247/10 248/12 253/5 260/19
261/5 263/13 265/20 266/8
jury's [13] 70/23 71/5 192/14 193/9 232/1
232/24 236/25 237/2 247/4 247/5 247/17
247/19 260/16
just [240]
Justice [2] 1/17 4/19

**K**

K-e-i-t-t [1] 155/1
keep [15] 25/14 103/24 129/25 134/12
176/23 204/20 212/7 225/15 225/23 225/23
225/24 226/3 245/3 257/13 271/3
keeping [1] 237/12
keeps [4] 225/13 225/14 243/18 243/21
Keitt [3] 154/9 154/24 155/1
KENNETH [2] 1/12 177/17
kept [13] 141/5 174/12 175/23 197/16 198/2
202/9 205/8 223/4 223/11 223/16 231/15
240/9 242/15
Kevin [2] 1/16 27/20
key [1] 205/6
kind [12] 26/15 39/8 131/12 159/22 172/12
175/5 177/7 193/11 203/7 248/9 253/22
270/4
kinda [3] 141/24 145/22 151/24
kindly [1] 133/18
kings [1] 147/24
knew [22] 57/1 57/3 74/18 74/19 74/21 74/23
85/19 91/19 144/25 144/25 147/15 148/21
148/22 148/25 156/25 157/1 157/20 158/13
169/23 172/14 212/11 212/13
Knights [5] 20/4 102/11 111/8 111/11 111/17
know [192]
knowing [1] 147/10
knowledge [36] 25/17 53/4 53/9 53/18 53/19
82/13 95/16 105/9 117/17 127/5 151/16
170/4 170/15 184/7 188/23 189/1 189/17
197/13 198/21 207/8 209/20 210/24 211/11
211/13 211/15 212/1 214/17 216/1 216/9
246/6 249/23 259/15 264/9 264/11 268/19
269/13
known [12] 3/16 136/2 136/5 186/17 187/16
187/17 187/25 188/1 188/1 195/15 197/18
200/18
knows [11] 93/21 100/25 167/7 202/19
202/20 215/13 226/10 226/24 248/13 266/8
269/19
Ks [1] 50/14

**L**

L3 [1] 157/18
LA [3] 45/14 161/19 162/1
labeled [1] 18/6
ladder [1] 106/21
ladies [12] 2/13 60/13 109/5 110/23 119/19
133/24 134/24 135/1 167/19 168/11 168/11
216/22
LaFrance [4] 156/7 161/22 171/19 177/25
Laguntas [1] 57/14
laid [1] 246/11
language [7] 48/5 63/16 64/5 64/6 115/17
115/23 116/1
laptop [1] 259/18
large [7] 38/22 40/10 57/21 58/24 58/25
141/13 162/19
largely [1] 38/25
larger [1] 164/2
largest [2] 79/1 163/14
Las [1] 12/21
last [32] 6/9 12/24 28/2 41/22 59/24 66/15
85/23 85/24 91/12 123/16 135/16 137/13
137/15 137/17 137/21 138/1 150/22 177/4
179/11 186/1 193/20 193/22 199/1 223/25
230/20 231/5 253/13 254/8 262/21 263/11
264/19 266/25
lastly [2] 224/9 267/3
late [10] 14/11 14/15 18/13 18/14 18/16
21/14 45/15 188/16 212/25 271/3
later [9] 35/15 36/21 67/16 81/17 132/7
139/22 146/7 146/8 153/8
latest [1] 150/4
latitude [2] 87/21 201/14
laundering [5] 17/8 19/23 22/21 127/17
128/4
law [35] 7/12 49/20 49/22 49/23 93/5 93/13
100/5 100/9 100/12 100/15 100/20 100/22
128/22 194/9 194/10 194/10 194/17 194/21
195/7 212/16 212/20 212/24 213/6 227/10
231/16 231/19 240/6 245/16 245/18 246/17
246/18 246/22 247/1 247/13 247/15
laws [3] 25/20 49/17 52/19
lawsuit [1] 189/3
lawsuits [1] 91/3
lawyer [3] 170/19 182/1 182/8
lay [15] 190/24 193/8 201/14 228/9 237/3
237/19 238/9 240/1 241/7 243/16 244/8
245/22 260/20 261/19 264/13
laying [4] 226/9 247/8 253/22 254/20
lead [2] 69/15 192/21
leading [4] 147/10 250/22 260/8 260/12
leagues [1] 175/4
lean [1] 145/22
learn [6] 55/24 105/9 149/4 153/5 153/6
202/9
learned [5] 89/17 89/18 105/12 172/23
269/22
leased [2] 95/1 95/2
leases [1] 39/3
leasing [9] 38/25 39/1 39/2 39/3 39/5 39/8
39/10 39/13 39/22
least [5] 80/22 89/5 213/4 243/5 270/2
leave [3] 60/14 196/8 246/21
leaves [2] 223/24 250/18
leaving [3] 224/7 224/24 225/2
left [14] 16/18 83/9 83/20 125/23 165/6 177/5
194/19 194/21 223/2 223/3 249/10 249/12
253/12 255/1
legal [23] 88/22 89/1 89/3 89/4 89/11 90/4
90/18 90/23 91/13 91/18 91/19 92/7 92/9
115/1 117/5 117/5 117/7 117/14 119/22
194/22 200/8 204/17 246/25
legality [1] 99/9
legally [6] 46/23 113/11 129/9
Legends [1] 3/19
legitimate [2] 165/12 165/16
lengthy [2] 50/12 50/13
less [6] 92/22 187/4 187/11 187/13 211/24
211/25
let [13] 37/24 47/20 130/5 133/5 172/21
229/12 230/10 230/19 235/20 236/17 238/8
242/19 244/13
let's [81] 2/10 5/25 11/3 13/2 14/16 14/25
15/23 17/24 17/25 18/5 18/17 21/20 23/4
23/9 25/23 25/25 26/18 27/9 30/2 31/2 31/9
31/20 32/7 33/15 33/16 34/6 35/3 36/1 36/2
36/12 36/19 38/12 38/19 38/23 39/15 42/8
42/13 42/25 43/4 43/23 59/18 60/13 61/7
61/10 67/1 72/17 85/6 87/22 89/7 94/24
109/5 110/15 110/19 132/24 133/15 134/25
145/14 146/12 146/13 155/18 167/5 167/19
167/25 168/4 189/23 194/1 203/16 222/25
228/3 228/14 231/5 232/1 233/2 233/7
241/19 241/20 244/15 247/11 253/25 254/13
260/23
letter [6] 235/25 238/3 238/10 239/14 243/20
252/25
letters [3] 151/9 190/9 252/23
letting [1] 85/4
level [1] 141/22
Liberty [1] 160/12
licensing [1] 196/12
lie [2] 138/7 138/14
lied [1] 42/5
life [5] 138/19 148/18 174/20 175/2 218/14
lifted [3] 73/24 73/25 74/1
light [2] 128/10 259/16
likely [2] 255/23 256/1
limit [1] 36/24
limited [1] 4/16
Linda [1] 60/1
line [15] 11/21 12/24 38/24 42/18 42/19 43/2
43/2 43/6 43/6 43/25 56/13 132/14 188/14
190/13 257/4
line 1 [1] 43/6
line 14 [1] 43/2
line 21 [1] 43/6
line 25 [1] 42/18
line 4 [1] 42/19
line 8 [1] 43/2
lines [1] 118/6
link [1] 177/6
Linkedin [4] 177/5 177/6 177/14 178/2
Linkedin website [1] 177/6
liquidity [1] 159/3
list [8] 59/19 75/14 105/15 220/2 220/3 230/6
270/5 270/16
listed [5] 75/4 75/10 241/18 243/1 269/18
listen [2] 42/13 43/4
listing [1] 252/2
litany [1] 232/22
literally [2] 122/11 241/9
lithograph [1] 160/4
litigation [12] 89/19 89/20 89/21 89/25 89/25
90/5 90/9 90/10 90/11 91/8 174/7 174/10
litigations [2] 90/14 90/15
little [17] 32/19 40/19 68/23 69/2 69/5 80/17
95/16 101/25 139/5 140/13 141/12 145/22
145/24 146/21 151/3 159/20 172/1
live [3] 153/18 160/13 229/10
lived [2] 153/19 176/4
lives [4] 139/11 139/13 174/20 175/18
living [2] 139/18 159/24
LLC [1] 53/15
located [1] 267/18
location [1] 205/20

# L

lock [1]  205/6
logo [1]  31/13
Londoner [2]  177/17 177/20
long [17]  7/21 32/24 48/12 50/13 50/14 50/15
 128/14 142/6 146/22 151/21 153/9 158/7
 158/8 194/24 212/4 213/1 213/1
longer [2]  109/12 212/7
longterm [1]  207/8
longtime [1]  219/15
looked [21]  8/22 47/4 47/13 54/16 60/22
 69/10 74/11 86/18 96/13 97/6 100/10 105/20
 113/8 142/15 159/23 160/2 190/1 210/13
 240/7 240/8 243/6
looking [17]  8/21 16/17 21/7 69/9 95/21
 131/15 148/25 162/2 163/18 198/8 206/21
 214/25 235/2 240/4 243/10 261/6 265/6
looks [3]  124/14 124/19 236/16
loose [1]  175/23
Los [14]  39/3 151/2 151/19 152/16 153/4
 153/9 160/22 202/18 202/21 205/16 205/23
 207/1 212/4 213/1
lose [1]  157/7
losing [2]  140/23 149/18
lost [6]  76/8 139/12 175/8 201/25 220/4
 239/13
lot [26]  9/1 49/12 49/21 66/23 68/20 74/12
 75/23 75/25 93/14 100/9 130/14 132/16
 148/13 148/14 148/14 148/15 149/18 152/10
 154/22 158/9 158/10 158/12 159/23 162/19
 172/18 249/25
low [1]  27/25
Lowell [23]  25/4 25/5 26/16 31/22 36/7 36/17
 36/21 44/7 98/12 122/9 214/15 214/17
 214/18 214/20 216/10 217/5 254/16 255/12
 255/15 256/24 258/23 261/9 261/18
lower [1]  159/12
lunch [5]  109/2 109/6 205/25 206/16 206/17
luxury [1]  39/4
lying [2]  43/13 43/14

# M

ma'am [6]  135/8 135/12 135/18 168/5 181/8
 185/15
machine [1]  223/9
magic [1]  149/21
mail [58]  1/25 7/14 7/15 8/7 8/7 27/17 28/9
 28/14 28/18 29/8 29/16 31/3 31/11 31/17
 32/8 32/11 32/14 32/20 32/21 33/10 33/17
 33/20 34/6 34/12 35/3 35/4 36/3 36/6 36/10
 36/16 36/16 36/19 37/13 37/17 126/13
 127/14 137/3 225/6 225/22 227/18 229/5
 241/13 243/14 244/2 244/15 244/18 245/9
 252/2 252/24 255/12 255/15 256/1 256/8
 256/23 258/23 258/24 260/10 261/19
mail's [2]  93/7 93/8
mailed [1]  13/13
mailing [4]  31/21 31/22 36/7 36/21
mails [22]  90/16 91/2 91/6 190/9 218/4
 225/23 225/25 226/3 226/4 226/7 226/9
 226/13 234/17 236/1 236/4 237/15 244/17
 252/23 255/21 255/22 258/11 266/16
main [3]  26/24 74/21 75/2
maintain [4]  187/21 187/23 188/20 198/17
maintained [11]  5/1 188/6 188/11 194/20
 198/12 204/5 213/19 214/1 214/13 246/5
 259/2
maintaining [2]  188/19 197/12
maintenance [1]  198/19

major [1]  166/19
majority [1]  105/19
makes [2]  129/12 198/1
making [8]  47/6 54/18 88/13 98/9 224/19
 224/21 225/1 225/3
man [11]  55/22 82/25 122/10 159/19 177/17
 185/2 190/2 207/23 222/6 253/15 261/15
managed [11]  4/15 4/25 91/14 93/24 136/2
 136/6 136/7 136/20 142/10 187/17 188/2
Management [3]  3/20 3/21 139/20
managing [1]  30/25
mandatory [6]  215/20 215/21 224/7 249/11
 249/21 250/24
manner [3]  87/10 100/22 198/2
Manufacturers [13]  3/17 16/24 19/17 22/6
 22/7 99/19 99/22 100/4 100/15 100/19 101/4
 105/20 112/23
manufacturing [1]  223/8
March [22]  14/4 14/4 14/7 14/12 14/17 15/21
 16/19 17/22 32/5 33/21 34/9 35/10 35/14
 35/22 35/22 47/24 169/6 169/6 171/5 196/22
 196/23 214/23
March 2003 [1]  47/24
March 2008 [1]  35/14
March 26th [3]  33/21 34/9 35/10
March 31st [1]  35/22
March 5th [6]  14/4 14/4 14/12 14/17 15/21
 16/19
Mark [7]  12/7 12/14 30/25 64/15 93/24
 103/16 107/6
marked [4]  15/24 20/13 81/5 216/7
marker [1]  152/24
markers [1]  152/21
market [22]  5/3 16/21 22/4 54/21 62/15
 63/13 67/15 67/19 67/21 105/5 107/23
 113/11 116/14 129/9 143/24 158/14 160/18
 169/20 178/19 178/20 182/2 182/10
marketing [17]  145/6 154/4 155/9 157/1
 157/10 160/19 162/2 162/16 166/3 170/2
 171/22 172/18 173/9 178/16 178/19 226/18
 226/20
marketplace [4]  23/20 171/8 178/23 213/15
markings [3]  256/22 258/9 259/11
marks [1]  51/19
MARRA [2]  1/2 1/12
married [4]  139/7 140/5 140/8 156/8
marshal [3]  136/25 137/25 269/20
Marshal's [1]  269/11
marshals [1]  270/17
Martin [43]  8/11 9/21 10/13 10/18 10/20
 16/18 19/9 20/10 23/13 28/4 30/12 33/7 36/8
 37/3 37/3 38/1 41/7 42/10 43/18 44/19 44/24
 49/16 60/9 73/18 89/2 93/23 94/1 94/8 95/24
 96/3 111/14 115/15 115/25 117/15 118/1
 122/22 125/3 178/7 201/16 201/22 202/11
 212/1 212/4
Marty [4]  208/2 208/3 208/16 212/8
master [3]  121/8 154/11 195/4
material [3]  53/7 107/25 231/14
materials [1]  8/3
math [2]  29/19 29/22
Matria [1]  141/13
matter [26]  8/20 8/25 9/3 12/17 13/9 37/15
 40/10 47/13 70/13 70/17 95/12 114/18 122/6
 128/22 130/9 226/1 226/2 226/7 230/2
 244/25 245/16 246/17 256/13 261/24 262/10
 273/16
matters [2]  119/22 228/23
maybe [31]  72/15 86/16 86/16 92/17 95/25
 110/7 133/19 145/24 147/2 147/21 147/23

159/12 164/22 164/23 169/6 169/24 177/19
 183/3 192/4 192/7 192/11 193/6 193/7 193/7
 193/11 217/6 221/23 227/20 228/6 261/12
 263/23
MBA [4]  195/6 195/8 195/10 195/12
MCA [4]  195/14 195/20 196/5 251/6
MCA-Universal [1]  195/20
McBaine [3]  57/18 58/5 59/19
me [144]
mean [55]  9/7 21/16 32/6 33/3 33/6 47/13
 48/10 49/6 59/4 70/12 75/24 78/5 83/23 84/1
 86/3 98/10 100/8 103/9 106/13 108/9 113/15
 123/1 130/1 130/14 131/5 138/10 143/2
 145/7 146/21 147/24 148/12 148/15 153/1
 163/4 165/6 165/18 166/5 166/10 166/21
 181/19 181/23 192/18 201/13 201/20 204/18
 220/23 222/24 224/23 225/13 227/13 227/22
 241/6 241/6 248/8 266/8
meaning [3]  53/11 55/3 93/9
means [3]  73/24 119/2 229/2
meant [6]  80/17 113/16 113/23 146/2 248/22
 248/23
mechanically [1]  13/9
medical [5]  139/20 163/4 218/14 224/5 224/6
Medics [5]  140/11 140/18 141/19 155/3
 155/4
meet [16]  56/15 56/18 57/4 136/12 137/13
 137/15 150/20 163/13 163/15 203/1 205/16
 205/23 205/25 231/6 234/18 267/20
meeting [45]  117/10 146/19 150/23 151/19
 152/16 153/9 202/20 203/1 203/7 206/15
 206/16 206/17 206/23 206/25 207/5 207/12
 207/14 207/17 207/25 208/3 208/5 208/15
 208/17 208/18 208/19 208/21 209/8 209/10
 209/11 210/10 210/15 210/16 210/17 210/19
 211/6 211/9 211/17 211/24 212/2 213/2
 213/5 268/6 268/8 268/10 268/12
meetings [9]  147/17 147/18 206/2 206/7
 206/12 206/14 210/21 210/25 211/2
meets [2]  227/7 230/19
Melley [4]  82/11 82/14 83/15 84/25
member [4]  41/8 41/9 41/10 194/14
members [17]  7/9 8/2 9/16 16/3 18/9 18/18
 19/7 21/22 23/10 30/4 30/9 30/23 31/14
 35/17 36/5 38/14 41/18
Memorial [13]  200/18 200/20 201/3 203/20
 203/23 204/1 204/8 204/11 206/18 207/6
 208/1 211/6 267/25
memorized [2]  79/10 79/12
memory [4]  106/25 108/9 138/3 150/18
mention [1]  37/19
mentioned [16]  8/8 13/7 22/22 28/7 40/6
 68/12 73/9 121/17 125/3 144/11 180/12
 184/4 181/5 183/8 221/4 225/11
mentioning [4]  173/5 199/22 218/2 218/23
Mercedes [1]  39/10
mere [2]  128/11 250/8
merely [3]  224/7 225/5 263/10
Merit [1]  273/13
met [17]  56/19 97/20 136/10 136/14 136/16
 136/19 150/21 199/7 199/11 202/12 202/15
 202/17 202/17 202/24 230/20 258/1 258/6
method [2]  65/13 66/14
methods [2]  64/12 66/16
MGM [1]  3/24
Miami [1]  1/22
Michael [1]  258/12
microphone [5]  6/8 53/23 135/13 145/23
 185/25
middle [8]  36/3 36/20 76/21 172/23 174/17

**M**

middle... [3]  195/19 248/8 261/16
midnight [1]  266/24
midst [1]  256/4
might [15]  46/16 50/8 74/14 76/7 78/19
94/22 108/9 114/3 121/12 129/24 161/2
167/7 228/3 248/16 262/3
million [36]  10/13 24/17 55/7 55/14 56/4
56/16 67/4 67/10 94/5 94/11 94/21 123/25
124/17 125/7 125/7 125/8 125/15 125/16
125/19 125/24 125/24 125/25 126/1 139/25
141/14 141/15 141/18 159/7 169/10 170/11
173/25 240/17 244/19 244/23 244/25 245/8
millions [9]  9/9 10/20 11/13 13/8 43/17 46/14
57/24 88/13 88/18
mind [9]  100/17 147/25 156/13 156/14
174/18 177/1 179/1 216/16 252/10
mine [3]  141/12 175/1 212/20
minimum [4]  120/10 126/12 223/15 253/11
minus [1]  243/2
minute [4]  9/25 37/22 247/20 260/5
minutes [19]  21/10 60/12 60/15 60/20 119/22
119/25 129/17 132/9 132/9 132/24 164/11
216/23 227/16 228/19 232/15 233/5 234/24
248/1 268/9
misappropriated [1]  123/24
miscellaneous [1]  236/15
mischaracterization [1]  80/7
mischaracterizing [2]  92/23 96/25
misconduct [3]  62/11 62/13 85/21
misleading [2]  83/9 122/25
misrepresentations [2]  113/23 129/6
missing [1]  86/16
mistake [1]  69/23
Mitch [5]  36/22 171/11 173/13 175/20
256/25
Mitch's [1]  34/3
MITCHELL [46]  1/6 1/19 3/7 4/1 4/6 4/10
7/19 8/12 9/20 10/20 10/24 12/5 16/7 16/23
18/22 19/17 20/10 20/17 20/20 20/24 22/2
22/5 22/7 24/18 25/3 27/8 27/22 30/1 30/18
31/7 33/22 33/25 34/23 34/24 35/2 36/7
36/22 37/9 37/20 38/5 45/1 106/3 115/14
137/2 256/24 258/24
moment [9]  12/3 15/8 17/15 40/6 99/4
126/23 145/14 215/3 240/12
monetary [2]  119/6 119/7
money [121]
monitor [10]  140/11 140/18 141/19 152/21
152/22 152/23 155/3 155/4 161/1 169/20
monitored [2]  140/19 164/1
monitoring [17]  140/9 140/19 140/21 140/23
140/24 141/3 142/8 142/20 154/6 154/8
154/11 155/5 162/19 163/19 163/25 164/1
164/5
monitors [4]  141/2 141/2 163/19 163/23
month [5]  32/20 35/14 35/18 146/24 152/22
months [15]  14/8 17/16 32/20 32/25 33/3
33/10 139/12 146/14 155/13 159/9 213/3
213/4 222/8 222/11 224/1
Moreover [1]  66/24
Morgan [1]  3/20
morning [18]  2/2 2/14 2/16 7/7 7/8 14/20
45/12 45/13 56/12 60/13 112/18 113/8
227/25 233/3 240/25 241/21 241/22 266/24
most [8]  8/18 14/12 15/7 126/7 128/10 152/4
234/4 236/14
mother [1]  139/9
mothers [1]  139/20

motion [11]  120/9 120/15 120/20 120/24
126/20 127/2 127/15 128/7 129/13 165/3
272/8
motions [2]  109/19 120/6
move [15]  6/22 11/4 31/9 67/19 72/17 135/12
135/13 153/21 153/25 154/3 185/24 185/25
193/4 200/13 262/4
moved [4]  74/23 74/25 148/2 237/24
moving [3]  52/5 67/15 267/8
Mr [159]
Mr. [224]
Mr. Anand [28]  11/5 11/9 11/11 11/14 11/16
44/1 44/4 44/7 44/15 44/17 45/19 46/21
103/1 103/3 103/13 103/15 103/15 103/20
104/6 104/13 104/20 105/1 105/4 105/10
105/12 115/10 116/19 116/25
Mr. Anand's [1]  25/14
Mr. Carter [68]  10/17 11/3 13/2 13/13 13/17
13/22 14/2 14/4 16/22 17/12 19/12 19/16
22/24 23/4 23/6 24/1 25/16 28/19 28/20
29/10 29/14 29/15 29/25 30/15 33/11 34/21
36/1 37/7 37/23 38/3 41/24 42/3 42/5 44/23
45/18 46/21 75/20 99/11 102/15 102/19
112/15 113/10 113/19 113/19 115/10 116/19
116/25 123/9 127/21 127/21 202/15 202/20
203/1 203/4 203/7 208/14 209/12 209/12
210/24 211/10 224/13 224/16 246/21 268/6
268/11 268/14 268/16 268/17
Mr. Carter's [4]  13/3 24/23 25/13 42/8
Mr. Clark [13]  40/18 45/12 45/17 51/13
61/20 88/5 94/25 96/22 109/18 110/17 111/4
124/3 124/16
Mr. Drakulic [1]  149/12
Mr. Feidler [38]  186/10 187/15 187/19
188/23 189/5 194/1 200/16 203/20 205/14
210/2 214/7 215/7 216/9 224/2 225/4 226/22
226/24 227/1 248/4 248/18 249/10 252/1
254/5 254/15 255/6 255/17 256/21 257/15
257/23 258/22 259/1 261/6 263/21 266/24
267/25 268/2 271/2 271/12
Mr. Feidler's [2]  263/24 264/1
Mr. Harrison [3]  98/15 244/17 252/4
Mr. Hildebrandt [2]  153/21 153/25
Mr. Jones [9]  207/8 208/6 210/16 212/2
267/25 268/2 268/4 268/7 269/2
Mr. Londoner [1]  177/20
Mr. Melley [4]  82/11 82/14 83/15 84/25
Mr. Muhlendorf [1]  14/20
Mr. Nevdahl [13]  66/3 78/13 78/20 103/20
104/1 104/9 104/23 105/2 105/4 105/9 107/8
108/6 234/7
Mr. Perkins [4]  41/16 211/4 211/18 264/7
Mr. Pickard [3]  27/23 28/2 123/7
Mr. Rodney [1]  153/18
Mr. Singh [1]  158/4
Mr. Stein [8]  22/24 45/2 91/2 114/5 133/2
164/13 179/11 244/13
Mr. Stieglitz [1]  270/9
Mr. Tribou [10]  220/10 220/10 221/22
224/17 225/8 229/14 230/6 234/9 235/25
267/19
Mr. White [4]  269/19 269/21 270/1 270/16
Mr. Wilk [1]  12/18
Mr. Woodbury [3]  51/18 78/13 123/7
Mrs. [3]  96/23 97/4 97/8
Mrs. Stein [2]  97/4 97/8
Mrs. Tracey [1]  96/23
Ms [1]  109/24
Ms. [22]  33/24 34/7 34/9 34/13 75/7 75/8
109/17 109/20 109/23 135/7 135/24 136/8

138/16 139/5 142/25 145/22 168/17 177/15
179/6 183/6 183/22 269/13
Ms. Bunes [2]  142/25 177/15
Ms. Greene [14]  75/7 75/8 109/20 109/23
135/24 136/8 138/16 139/5 145/22 168/17
179/6 183/6 183/22 269/13
Ms. Jane [2]  109/17 135/7
Ms. Jones [3]  33/24 34/9 34/13
Ms. Jones' [1]  34/7
much [40]  9/5 11/5 12/18 18/21 23/6 26/2
26/20 29/12 32/14 39/2 47/12 49/2 53/16
55/18 56/6 56/7 56/23 59/5 68/7 69/21 74/16
80/18 82/10 84/12 88/21 88/22 95/9 95/11
95/17 108/17 109/12 114/9 117/9 117/10
132/9 140/22 141/16 156/1 192/24 264/22
Muhlendorf [3]  1/16 14/20 272/11
multi [1]  237/7
multi-page [1]  237/7
multiple [1]  33/13
Mumbai [2]  163/17 165/17
must [6]  46/1 49/19 120/15 146/23 175/21
250/3
myself [9]  32/18 94/23 125/23 139/12 146/25
169/16 171/6 188/19 207/15

**N**

name [44]  6/9 6/9 10/25 20/6 57/15 57/16
57/18 57/19 57/20 59/20 60/1 75/6 89/19
100/20 100/20 105/25 106/2 135/15 135/16
139/19 140/10 142/12 142/22 144/11 144/12
144/15 150/22 156/6 162/11 164/3 169/21
172/4 173/5 177/18 178/5 178/7 186/1 186/2
186/16 186/18 198/15 199/10 214/15 257/24
named [5]  52/16 55/22 151/20 177/17 270/14
names [5]  154/23 154/25 199/22 223/14
269/8
narrow [1]  92/10
national [6]  3/20 108/7 202/23 226/18
226/19 234/8
near [4]  53/22 197/12 222/21 222/25
necessarily [3]  52/12 131/24 222/24
necessary [1]  62/23
need [24]  5/17 5/23 83/12 147/7 150/1
158/15 166/14 166/17 167/8 183/13 208/24
227/2 231/21 232/11 232/13 233/12 236/23
239/9 239/16 253/7 257/8 258/16 267/11
269/7
needed [3]  154/5 159/9 175/24
needs [2]  131/10 167/15
negotiate [1]  143/10
negotiated [3]  64/11 65/16 233/19
negotiation [2]  89/15 256/4
negotiations [1]  143/13
neither [3]  57/17 77/4 217/25
Neland [1]  163/12
network [6]  218/3 218/13 218/18 218/21
218/22 218/23
Nevdahl [20]  12/7 12/14 30/25 64/15 66/3
78/13 78/20 93/24 103/17 103/20 104/1
104/9 104/23 105/2 105/4 105/9 107/6 107/8
108/6 234/7
never [41]  46/13 62/1 65/10 65/11 69/10
75/12 81/14 91/20 93/18 97/14 97/19 99/1
99/3 101/15 137/5 139/9 143/15 145/8
146/17 147/15 147/16 147/20 147/25 155/22
155/24 159/19 160/15 164/16 164/16 164/17
164/18 173/14 175/6 175/13 181/19 183/16
185/8 208/19 229/15 258/1 258/6
new [22]  1/18 56/15 56/18 57/1 57/3 57/11
74/13 89/12 95/18 136/13 136/13 139/11

**N**

new... [10]  141/23 141/25 142/8 163/12
  163/25 169/3 169/16 169/18 169/18 267/18
newspaper [1]  41/4
next [32]  2/17 2/20 3/1 33/10 36/25 57/14
  57/18 59/18 61/19 63/4 65/13 65/16 65/17
  65/19 65/21 66/14 87/25 96/14 105/15
  109/12 124/21 141/20 141/22 154/3 162/15
  163/17 185/17 194/18 224/18 231/6 258/21
  270/3
nice [4]  138/25 156/22 159/23 160/14
night [8]  137/13 137/15 137/17 137/21 138/1
  179/11 234/18 256/19
nine [1]  28/14
Ninety [1]  238/11
Ninety-seven [1]  238/11
no [234]
Nods [3]  124/12 150/9 180/14
nominally [2]  75/4 208/17
none [7]  53/9 63/22 91/5 123/8 127/4 156/11
  216/17
nonetheless [1]  267/20
normal [1]  187/21
normally [1]  205/25
North [3]  1/20 172/19 195/25
Northwest [1]  1/18
Nos [1]  7/1
notation [1]  257/21
note [1]  31/23
noted [1]  52/20
notes [9]  129/23 146/21 147/17 147/18
  147/18 147/19 147/25 166/3 242/24
nothing [15]  62/12 67/20 112/5 116/6 118/5
  118/10 118/11 125/22 128/23 167/4 171/24
  185/11 268/23 270/24 270/25
notice [5]  130/20 130/25 131/2 131/3 146/14
noticed [2]  131/6 146/6
notices [1]  121/21
notified [1]  270/2
Notwithstanding [1]  160/21
November [14]  23/14 23/25 27/17 29/9 29/15
  29/20 30/14 30/14 30/15 71/12 72/25 73/5
  155/15 163/11
November 13 [1]  29/20
November 13th [3]  29/9 29/15 30/14
November 14th [1]  27/17
November 15th [1]  30/14
November 16th [1]  30/15
November 2007 [2]  23/14 23/25
November 2008 [1]  73/5
nowhere [2]  37/17 37/19
number [46]  16/20 16/24 19/10 19/13 19/18
  20/14 22/2 22/22 24/4 26/8 30/17 34/4 34/5
  42/17 42/19 43/2 51/19 51/25 52/2 52/4 52/8
  52/23 73/12 73/13 74/5 74/7 78/14 78/24
  79/1 84/2 99/10 112/11 118/21 119/1 119/5
  119/10 119/13 123/11 124/9 137/3 187/10
  218/10 255/10 255/11 261/7 261/24
number 001065 [1]  218/10
number 1 [1]  123/11
Number 10 [1]  119/10
number 11 [1]  119/13
number 113 [1]  124/9
number 185 [1]  255/11
number 19057000 [1]  78/14
number 3 [2]  42/17 42/19
number 4 [1]  43/2
number 7 [1]  118/21
Number 8 [1]  119/1

Number 9 [1]  119/5
numbered [2]  239/15 246/14
numbers [21]  40/6 40/7 83/18 83/18 83/19
  83/19 83/20 99/18 102/1 102/7 105/16
  112/19 113/7 130/14 243/7 243/8 259/13
  266/19 266/21 266/23 266/23
nurse [1]  140/25

**O**

o'clock [2]  109/15 110/3
oath [7]  40/23 40/24 42/13 61/8 92/1 110/17
  168/5
OB [1]  140/25
object [29]  82/6 90/21 130/4 131/21 170/7
  184/18 189/21 199/12 200/9 216/19 230/9
  230/11 230/21 230/23 234/14 234/20 234/22
  234/23 235/1 236/18 237/16 238/2 238/9
  238/10 238/12 238/20 239/17 239/19 241/19
objected [6]  234/16 241/17 242/1 242/8
  252/20 253/9
objecting [4]  233/21 239/25 241/8 241/16
objection [49]  6/23 6/25 71/5 77/11 80/7
  92/3 92/23 93/20 96/18 96/25 97/10 100/24
  105/6 130/8 133/2 133/4 138/8 149/9 192/17
  193/19 208/8 215/11 221/15 227/6 228/25
  229/13 235/5 235/11 235/13 237/9 237/25
  238/13 238/15 238/19 238/21 238/25 239/3
  239/4 239/6 239/10 239/13 242/3 242/6
  242/10 254/10 261/4 261/11 263/9 265/17
objectionable [1]  230/11
obligated [2]  134/3 220/14
obligation [2]  50/4 52/21
obtained [3]  4/19 4/20 114/18
obviate [1]  5/17
obvious [1]  258/15
obviously [12]  13/24 120/23 121/9 127/16
  132/4 240/9 242/12 253/4 256/3 263/13
  266/1 268/14
occasion [4]  160/22 212/10 214/8 214/12
occasioned [1]  136/23
occur [3]  187/22 194/12 212/23
occurred [4]  23/18 32/10 41/22 210/15
occurring [2]  23/1 23/2
ocean [1]  163/24
October [5]  15/19 18/13 21/14 155/14
  255/13
October 25 [1]  255/13
October 4th [1]  15/19
odd [1]  101/8
off [11]  48/4 65/12 127/10 175/7 219/13
  236/9 244/19 249/10 249/13 256/8 266/19
offense [1]  120/16
offer [21]  63/22 120/22 132/1 132/11 165/22
  166/10 201/20 202/11 209/11 216/18 217/10
  230/9 230/20 230/22 231/21 240/24 244/22
  254/6 256/12 263/6 263/7
offered [12]  52/5 52/22 63/12 132/16 149/13
  190/5 208/9 241/19 242/23 242/23 244/24
  254/17
offering [1]  215/4
office [14]  7/13 53/6 145/15 146/16 157/16
  159/12 159/21 159/23 161/8 161/15 161/20
  171/6 176/21 269/11
officer [5]  122/1 122/12 144/8 186/10 186/14
officers [4]  56/24 95/10 95/12 198/18
offices [4]  159/18 160/15 162/7 165/18
Official [1]  1/24
often [2]  211/24 211/25
oh [14]  144/15 145/10 145/10 158/2 158/24
  159/19 175/15 190/15 193/10 225/22 230/10

237/22 243/1 266/2
Ohio [11]  200/21 202/12 202/15 202/16
  202/22 205/19 205/22 209/9 210/10 210/16
  210/18
okay [101]
old [2]  141/23 207/23
older [1]  144/18
Olympia [1]  3/20
onboard [3]  145/1 145/1 154/9
once [8]  34/22 37/8 38/4 50/2 136/10 169/11
  221/9 238/8
one [114]
one's [1]  19/15 84/7 245/4
one-year [1]  26/20
ones [9]  17/14 73/6 73/18 121/9 241/15
  241/23 241/25 243/1 246/16
online [1]  142/16
only [32]  12/7 19/14 20/21 21/10 21/15 22/2
  36/24 42/22 42/24 44/24 61/21 63/6 76/20
  83/18 84/22 101/9 104/2 108/12 125/2
  125/13 128/1 137/24 138/19 138/22 139/1
  140/2 148/16 157/8 200/24 240/7 252/13
  267/18
open [7]  20/18 106/5 106/13 106/15 106/19
  113/11 129/9
opened [8]  106/2 106/5 106/9 106/12 106/14
  106/23 106/25 146/21
opening [6]  80/12 106/24 113/2 136/15
  136/15 136/16
opens [1]  230/5
operate [1]  163/22
operated [1]  39/25
operating [3]  144/8 147/1 186/14
operations [9]  74/22 75/2 76/17 76/18 76/19
  145/15 145/17 148/3 165/15
opine [1]  58/18
opining [5]  99/8 99/23 100/1 103/22 113/18
opinion [4]  63/23 90/22 222/19 252/8
opinions [7]  60/14 109/7 119/24 167/21
  197/8 216/25 246/22
Oppenheimer [1]  3/21
opportunity [13]  28/6 32/9 58/21 148/16
  167/20 205/15 227/9 233/15 237/1 244/11
  245/21 246/13 246/25
oppose [1]  262/24
opposed [8]  76/3 76/12 121/12 241/12
  251/25 264/5 266/1 266/18
options [1]  65/19
opulent [1]  184/6
oral [1]  249/4
orchestrated [1]  166/6
order [16]  2/1 15/19 45/25 49/25 50/5 163/22
  220/22 220/22 220/25 221/1 221/4 221/7
  221/7 221/21 267/22 267/24
orders [20]  14/9 15/4 15/11 17/17 18/6 18/12
  20/21 21/13 121/21 123/10 219/9 219/11
  219/17 220/7 220/12 227/2 227/5 230/15
  230/17 234/10
ordinary [10]  64/13 197/17 197/23 223/5
  240/10 243/19 243/21 243/22 256/2 268/13
org [2]  265/5 266/9
organization [1]  263/22
organizational [5]  253/11 254/7 262/20
  263/2 265/14
original [1]  143/23
originally [1]  142/14
ostensibly [1]  103/24
others [4]  34/16 45/19 66/25 121/6
otherwise [8]  52/20 53/4 53/7 111/23 111/24
  189/15 201/4 246/21

**O**

ought [1] 183/3
our [33] 31/25 53/4 53/7 53/9 54/10 62/10
  98/14 98/20 98/23 109/2 110/15 111/15
  118/14 141/10 141/11 147/17 149/18 154/13
  163/19 168/12 171/9 171/16 171/19 189/13
  225/23 225/23 226/3 239/6 239/10 239/13
  240/22 267/14 270/1
ours [1] 171/15
ourselves [1] 235/4
outdoors [2] 206/25 207/2
outgoing [3] 249/11 249/22 250/24
outs [2] 156/25 157/1
outside [12] 147/11 147/14 184/19 198/13
  198/14 198/15 231/24 232/21 237/1 240/25
  243/14 244/6
outskirt [1] 151/3
outstanding [1] 28/1
over [52] 10/13 11/1 12/1 12/15 12/16 18/8
  19/10 22/3 25/21 32/4 32/19 33/10 36/11
  36/23 39/16 40/16 56/12 68/2 69/21 84/10
  90/13 93/16 93/17 94/5 106/23 110/4 116/3
  124/5 147/12 147/14 148/13 153/6 158/7
  163/5 164/16 179/8 189/5 189/8 192/15
  198/1 215/19 217/12 223/18 223/18 223/23
  223/23 225/20 225/20 239/8 251/13 254/22
  255/19
overlooking [2] 160/10 160/11
overnighted [2] 142/17 142/18
overrule [2] 192/17 193/19
overruled [9] 90/24 93/21 97/11 100/25
  138/9 170/9 184/20 208/9 215/14
overt [1] 126/17
owed [2] 92/14 97/8
own [18] 13/22 19/15 19/16 42/7 52/4 120/18
  139/16 139/17 176/22 181/20 186/21 187/3
  187/7 193/5 196/11 206/4 206/6 268/7
owned [7] 52/1 52/9 52/18 94/25 95/4 105/24
  151/14
owner [1] 55/2
ownership [5] 52/10 52/13 52/14 95/2 95/6
owns [3] 126/4 151/17 186/24

**P**

p.m [9] 110/10 110/10 133/9 133/9 168/2
  168/2 233/8 233/8 271/16
pacemaker [2] 140/20 141/3
Pacific [3] 3/21 22/1 30/20
packages [1] 116/4
page [41] 14/25 15/16 18/5 18/8 18/8 20/12
  36/3 36/11 36/11 36/12 36/20 42/18 42/19
  43/1 43/2 43/6 43/6 51/16 52/6 61/19 63/4
  78/11 89/11 218/10 220/7 237/7 253/13
  254/8 254/9 259/11 262/21 263/7 263/11
  263/11 264/19 264/19 264/23 265/5 265/14
  266/9 266/25
page 106 [1] 42/18
page 107 [1] 42/19
page 119 [1] 43/2
page 191 [1] 43/6
page 192 [1] 43/6
page 2 [2] 52/6 78/11
page 22 [1] 14/25
page 45 [1] 15/16
page 78 [2] 18/5 18/8
page 79 [1] 18/8
pages [12] 1/10 50/12 51/19 78/1 88/10 192/4
  192/4 192/5 227/10 257/21 266/7 266/12
pages 191 [1] 88/10

paginate [1] 51/20
paid [22] 39/12 39/18 50/9 56/11 57/10 62/1
  72/22 74/7 80/24 88/14 90/19 103/7 115/14
  117/15 117/18 172/3 172/8 172/9 173/25
  174/2 174/2 176/2
paintings [4] 159/11 160/3 160/5 160/6
Palm [3] 1/7 1/20 1/25
Pam [37] 25/11 44/12 75/1 142/16 144/7
  144/14 144/18 145/19 146/16 148/6 154/9
  154/18 154/21 156/3 156/9 156/11 156/18
  157/7 157/12 159/9 161/11 161/12 166/2
  169/1 169/23 170/23 171/1 172/21 173/13
  173/23 175/3 175/19 176/10 176/11 176/13
  179/23 184/9
Pam's [1] 160/8
Pamela [6] 143/1 153/16 161/12 161/14
  177/4 177/15
paper [9] 49/1 66/6 66/9 66/10 66/11 68/20
  79/24 129/21 156/7
papers [4] 79/18 134/2 134/4 182/3
Pappas [1] 156/7
paragraph [5] 15/17 78/15 121/4 122/19
  123/16
paragraph 14 [1] 123/16
Paragraph 4 [1] 122/19
paragraph 6 [1] 121/4
paragraphs [3] 15/14 15/15 123/11
paragraphs 10 [1] 123/11
parameter [1] 231/21
parents [1] 176/3
Park [1] 3/21
participated [1] 89/15
particular [5] 23/16 28/2 62/8 191/21 219/21
particularly [4] 47/2 126/8 172/17 251/17
parties [5] 3/4 6/14 118/19 124/8 217/25
partner [3] 111/14 212/20 213/6
partners [10] 20/8 54/7 54/8 55/14 55/19
  55/24 56/15 57/14 94/1 212/24
partnership [3] 20/1 20/4 20/5 20/7 20/9
  20/16 20/19 21/2 22/1 30/16 30/20 31/5
  34/25 35/1 35/6 37/11 37/16 93/15 93/18
  93/22 93/25 94/12 94/20 94/21 102/11
  102/11 107/22 108/14 111/8 111/9 111/11
  111/12 111/17
Partnerships [1] 37/19
pass [2] 75/20 134/10
passed [5] 98/15 98/17 98/18 98/21 98/24
past [8] 148/13 152/19 155/2 187/24 197/9
  225/9 235/18 263/23
patient [1] 139/15
patients [3] 140/20 140/22 161/1
patio [1] 207/3
patterns [2] 60/6 60/10
Patterson [1] 59/19
pause [4] 18 69/6 240/14 247/23
pay [15] 59/4 62/3 74/6 75/19 76/4 76/15
  76/16 80/18 116/25 117/24 169/10 170/11
  172/6 174/3 198/17
paying [9] 39/18 76/11 80/19 80/20 80/22
  115/9 116/25 198/19 198/22
payment [4] 91/7 103/23 223/20 223/21
payments [7] 28/1 39/16 97/12 97/13 97/15
  97/17 97/18
pecuniary [1] 92/2
pegging [1] 26/15
pending [3] 18/4 15/10 18/6
penny [2] 32/5 98/6
penultimate [1] 124/3
people [60] 25/25 27/24 41/1 41/3 44/20 50/8
  56/18 57/4 75/3 76/16 76/16 85/15 91/8

95/23 101/12 116/7 116/16 126/4 146/20
  148/15 148/20 150/13 153/16 154/23 155/7
  155/10 157/1 157/10 160/2 162/22 163/2
  165/14 169/18 172/6 172/11 172/13 175/3
  176/4 176/5 199/20 199/22 199/25 200/1
  202/15 204/21 208/19 210/5 210/9 220/8
  220/15 225/7 226/7 233/18 249/25 261/10
  264/12 269/11 270/5 270/7 270/12
Pepperdine [1] 195/6
per [2] 34/3 80/6
perceived [2] 201/16 267/3
percent [8] 24/19 187/4 187/6 187/11 187/13
  251/4 251/5 255/3
percentage [2] 52/8 187/9
perfectly [2] 165/12 165/16
performed [1] 88/23
perhaps [4] 107/1 127/12 260/11 263/20
perilous [1] 29/23
Perinatal [1] 155/5
period [44] 8/20 17/10 17/12 23/15 23/17
  23/19 26/8 26/20 39/9 39/13 40/15 58/10
  62/12 72/9 72/10 72/18 72/19 73/8 76/10
  76/20 78/3 78/6 82/1 89/8 102/2 106/13
  115/25 128/11 128/17 132/4 132/6 143/15
  155/18 158/7 158/7 173/14 184/25 196/14
  203/2 206/9 214/20 223/3 236/5 252/10
periods [2] 73/8 167/2
Perkins [15] 25/9 41/7 41/12 41/16 44/10
  207/15 211/4 211/10 211/18 212/9 229/21
  229/23 264/7
permitted [1] 63/10
perpetrated [1] 121/6
person [25] 20/15 20/21 44/24 55/3 57/14
  59/18 63/7 80/2 89/19 91/3 91/4 98/12 98/12
  136/12 171/10 171/10 171/25 189/7 200/7
  209/5 209/6 219/24 220/25 245/2 245/2
personal [7] 100/16 228/17 246/6 246/20
  249/15 264/9 264/11
personally [8] 98/21 162/1 166/7 199/7
  199/11 205/14 227/2 251/1
perspective [1] 267/13
pertain [7] 2/25 17/5 17/7 19/20 19/22 22/18
  22/20
pertaining [3] 4/23 57/12 229/9
Pete [1] 159/21
Petit's [1] 159/21
Phaeton [1] 39/10
pharmaceutical [2] 162/23 163/15
Phillips [5] 257/23 257/24 258/1 258/3
  258/12
Phillips' [1] 258/12
phone [1] 155/25
phonetic [1] 158/16
phony [4] 82/4 218/25 219/1 219/3
photography [1] 195/4
phrase [3] 59/2 59/8 59/11
physicians [1] 224/5
pick [3] 56/24 122/16 215/24
Pickard [4] 27/20 27/23 28/2 123/7
picked [4] 149/22 152/25 153/1 153/1
picking [2] 69/23 114/4
picture [1] 116/11
pieces [2] 49/1 121/22
piles [1] 130/3
pilot's [1] 149/24
pilots [3] 149/18 149/20 149/21
pixel [1] 137/24
placards [2] 163/5 163/7
place [5] 61/18 128/12 128/25 129/1 197/9
placed [1] 94/21

**P**

placement [1]  181/19
places [1]  205/23
plan [13]  54/2 61/19 63/4 63/5 63/11 72/12
72/21 154/13 160/19 183/10 183/11 226/18
226/20
plane [8]  39/25 56/10 56/20 56/21 56/22
56/23 57/2 57/11
planes [1]  57/7
planned [1]  77/10
plans [5]  46/7 46/16 46/20 73/9 160/21
plants [1]  160/1
plastic [1]  160/25
play [1]  42/25
played [4]  42/20 43/3 43/8 88/10
player [1]  158/3
playing [1]  151/22
pleasant [1]  138/23
please [67]  2/2 2/14 6/4 6/6 6/7 6/9 7/9 12/22
15/1 15/16 16/5 18/18 21/21 24/15 27/11
30/2 33/16 34/1 36/2 37/25 38/24 39/15
39/24 42/19 43/2 43/7 43/24 45/2 51/11
53/23 60/14 61/13 79/14 81/8 83/16 92/25
94/24 98/1 99/15 100/18 106/18 109/6
110/12 110/22 133/11 133/23 135/8 135/11
135/15 145/23 157/5 164/4 167/20 168/10
185/21 185/23 200/12 201/9 208/12 216/21
216/23 216/25 221/13 233/10 255/17 256/21
271/6
pledgees [2]  63/9 64/7
point [27]  40/1 54/8 67/1 67/3 68/8 74/18
77/5 86/5 87/8 106/4 111/15 128/9 128/17
129/21 149/21 149/21 153/12 155/10 177/14
190/13 190/21 191/20 192/16 200/23 217/9
220/7 258/4
pointing [1]  218/9
points [1]  127/2
policy [4]  62/2 62/7 62/8 198/18
Pomona [1]  194/3
portion [4]  42/17 43/1 52/22 64/19
portray [1]  165/16
portrayal [2]  62/25 164/20
position [11]  53/6 64/19 88/19 143/10 143/22
159/3 186/13 195/23 197/3 213/12 235/3
positive [7]  139/2 257/18 257/20 258/8
258/18 259/5 259/10
possession [2]  254/23 261/15
possibility [1]  106/22
possible [4]  70/24 120/1 166/16 233/2
possibly [2]  70/23 212/7
post [5]  7/13 59/14 88/6 194/1 195/1
post-graduate [1]  195/1
post-high [1]  194/1
post-split [1]  88/6
postal [10]  5/9 6/1 7/11 7/12 7/18 7/22 7/23
62/3 62/7 138/17
poster [1]  123/17
potential [1]  75/10
power [8]  47/15 49/12 52/11 52/11 52/17
78/25 79/1 84/12
practice [17]  194/21 197/21 212/16 212/20
212/24 215/18 215/20 216/11 224/19 224/21
225/1 225/2 225/20 249/16 249/19 251/14
251/16
pre [1]  54/10
preadmit [1]  5/8
precede [1]  248/3
preceding [1]  246/4
precipitously [4]  81/17 81/22 81/25 128/20

predating [2]  66/21 66/22
predicate [6]  237/3 237/19 238/9 240/1
243/16 244/8
predicates [1]  247/18
predict [1]  50/8
prefer [1]  247/5
pregnant [1]  140/23
preliminary [1]  190/16
prepare [5]  108/22 111/6 249/22 267/23
270/5
prepared [6]  29/1 109/25 223/7 232/5
236/17 270/22
presence [9]  169/22 192/12 192/14 231/24
232/21 237/1 241/1 261/5 265/19
present [9]  2/5 135/3 135/4 202/19 203/6
229/17 241/22 242/12 245/17
presented [6]  128/15 131/10 131/11 134/6
148/16 247/13
presenting [1]  147/2
presidency [1]  206/10
president [26]  143/3 143/24 144/1 144/7
144/8 145/6 145/7 147/25 154/3 162/16
164/18 173/9 186/14 195/14 195/17 195/24
196/6 196/17 197/1 200/17 213/7 213/21
213/24 214/7 250/18 251/6
president-CEO [1]  197/1
presidents [2]  144/1 144/3
press [17]  14/8 17/17 21/17 67/5 67/11 67/15
67/18 67/23 77/18 82/4 152/20 152/24 218/5
219/2 219/11 219/21 220/6
pressure [2]  104/10 141/3
presume [3]  198/8 266/25 269/18
presumed [1]  248/24
pretty [6]  39/2 49/14 66/20 82/10 85/25
156/1
previous [1]  18/21
previously [8]  55/25 115/19 136/2 225/11
242/23 242/23 252/14 255/19
price [9]  4/23 68/2 68/6 68/7 80/5 80/12
80/19 81/11 81/15 81/17 81/24 81/25 82/18
86/4 86/13 86/15 88/6 123/21 125/17
prices [4]  64/11 123/23 124/9 124/14
prima [2]  128/15 129/12
principal [5]  64/19 65/14 66/11 170/20 269/6
principals [2]  65/22 66/1
print [2]  235/15 241/9
prior [12]  53/8 55/14 70/10 77/17 80/8 88/18
135/24 136/8 177/22 198/24 214/18 249/18
private [10]  39/22 63/14 95/13 95/16 96/2
118/23 141/9 141/11 181/19 194/20
privately [1]  65/16 107/23
privilege [6]  122/7 189/14 189/18 190/14
192/19 193/23
privileged [2]  214/2 214/3
privileges [1]  20/16
Pro [1]  1/19
probably [16]  48/20 48/25 58/15 58/19 59/13
71/22 76/7 76/9 101/9 144/19 150/19 155/13
177/5 234/16 235/18 235/21
probative [2]  85/3 165/5
problem [13]  180/22 182/12 182/16 182/20
182/23 235/19 244/24 259/24 260/7 262/5
262/11 264/18 264/23
problematic [1]  184/14
procedure [2]  120/13 241/1
proceed [12]  2/6 2/16 6/12 45/5 45/7 133/13
135/2 135/19 168/13 186/6 239/24 246/23
proceedings [22]  1/11 2/12 5/18 61/2 61/12
82/9 110/11 110/21 128/9 133/10 133/22
164/9 168/3 168/9 189/24 200/8 201/10

209/1 233/9 240/14 247/23 273/15
proceeds [11]  9/10 11/15 12/8 12/10 13/21
18/22 19/14 22/5 22/6 99/21 107/13
process [4]  59/16 182/2 233/13 235/4
produced [8]  3/25 190/6 192/1 224/10
224/13 234/7 240/17 241/14
producing [1]  223/8
product [27]  148/19 148/25 156/25 157/22
158/13 160/17 162/3 163/1 166/1 166/1
172/14 172/14 172/16 174/19 174/21 175/17
175/22 175/23 178/15 178/20 178/23 178/25
179/1 204/16 205/2 220/15 268/21
production [2]  193/1 193/2
productions [1]  235/7
products [4]  152/11 218/12 220/10 221/5
professional [2]  175/5 177/7
Proffer [2]  249/8 272/15
profit [2]  129/9 141/17
profiting [1]  129/8
program [1]  174/20
promise [1]  213/14
promptly [1]  2/15
proof [6]  166/10 201/20 202/11 209/11
217/10 247/25
property [5]  52/19 195/25 196/2 204/19
251/10
proposing [1]  242/17
prospective [1]  83/25
prospectus [6]  52/3 52/5 52/23 52/24 53/9
63/13
protecting [1]  175/2
protective [1]  53/2
proud [1]  160/14
prove [3]  128/14 165/10 165/24
proven [6]  123/2 123/5 123/17 125/1 125/6
126/15
proves [1]  123/13
provide [7]  162/25 189/18 233/15 245/25
247/1 247/13 247/15
provided [7]  29/5 89/4 89/11 90/4 228/4
236/5 246/14
provides [1]  49/23
proving [1]  220/24
provisions [1]  53/3
public [17]  15/20 18/14 18/16 21/9 21/11
47/17 49/10 58/21 58/21 70/17 114/21
114/23 129/6 130/19 141/9 166/7 181/6
publications [2]  5/3 86/13
publicly [7]  15/9 15/10 18/11 68/23 82/19
82/21 130/19
publish [1]  51/11
published [1]  219/2
pull [20]  6/7 27/3 31/9 33/15 40/5 42/8 84/10
92/17 98/1 99/5 99/15 101/18 111/2 145/24
173/24 228/5 240/19 241/11 241/14 259/19
pulled [1]  73/6
Pulling [1]  39/23
purchase [30]  14/8 15/4 15/11 15/19 17/17
18/6 18/12 21/13 102/10 107/22 121/21
123/10 219/9 219/11 219/17 220/6 220/12
220/22 220/22 220/25 221/1 221/4 221/6
221/7 221/20 227/2 227/4 230/15 230/17
234/10
purchasers [4]  64/14 65/23 66/2 220/11
purchases [1]  65/13
purportedly [2]  116/21 116/22
purpose [7]  52/13 116/12 123/18 129/7
150/23 191/14 236/24
purposes [11]  3/12 4/10 5/4 28/24 109/11
136/1 186/18 236/24 242/17 247/7 266/4

**P**

pursuant [7]  3/14 4/3 4/8 4/17 4/21 5/2
267/14
pursuing [1]  195/4
put [39]  19/1 56/10 62/24 68/23 69/2 69/5
83/1 83/10 89/3 94/24 114/9 120/23 121/20
126/3 126/5 127/25 131/19 131/21 132/15
136/13 154/6 158/14 159/15 171/24 171/25
174/22 220/16 223/22 230/14 235/9
235/11 237/20 240/20 240/23 240/25 249/24
254/2 263/3
puts [1]  223/21
putting [4]  154/11 154/14 163/19 182/3

**Q**

qualifies [1]  243/16
quarter [5]  14/14 14/22 14/24 146/13 148/1
quarterly [1]  4/16
queens [1]  147/24
question [37]  5/20 38/2 49/21 50/3 71/7 71/8
71/9 71/10 76/5 79/14 85/24 86/23 87/25
91/12 92/25 95/23 96/14 101/8 112/2 115/12
122/11 124/3 129/20 175/8 175/9 177/9
183/22 183/23 184/21 190/16 192/18 193/20
193/22 199/15 208/12 236/3 258/22
questioned [1]  127/9
questioning [2]  103/2 190/13
questions [26]  17/14 45/4 69/24 84/15 85/5
86/19 86/21 112/11 112/13 112/23 114/6
114/7 114/25 116/9 183/6 183/20 184/3
200/10 247/6 248/7 248/12 250/22 253/21
253/25 254/18 260/13
quick [1]  242/19
quicker [1]  262/4
quickly [4]  14/16 119/20 166/16 261/13
quotations [1]  125/17

**R**

raise [9]  6/3 74/14 135/8 141/22 159/10
185/20 198/9 261/12 269/25
raised [8]  74/12 74/17 75/17 75/21 75/22
141/24 159/6 181/17
raising [1]  142/2
Rajiv [11]  157/17 157/18 157/23 158/1 158/9
163/9 163/12 170/1 176/1 176/9 177/2
ramifications [1]  152/7
ran [2]  147/12 147/14
rang [1]  136/14
range [2]  7/13 240/10
rather [5]  165/23 232/6 240/5 247/9 247/19
Raton [1]  122/21
rattling [1]  266/18
re [3]  220/11 254/6 257/4
re-offer [1]  254/6
re-purchasers [1]  220/11
reach [1]  143/17
reached [1]  199/3
read [32]  2/21 5/5 15/5 31/12 34/11 36/4
45/3 51/24 59/25 63/19 63/24 64/4 64/7 64/9
65/25 68/2 68/17 81/9 114/6 115/18 118/5
118/14 124/7 153/6 163/6 178/9 178/12
181/12 250/4 257/2 257/4 264/7
reading [5]  63/25 130/10 184/25 256/7 256/8
ready [24]  2/6 2/8 2/16 45/5 61/5 109/14
109/25 110/13 132/21 132/25 133/13 135/2
163/8 168/13 176/24 176/24 176/24 176/24
177/1 177/2 177/2 177/3 233/7 233/12
real [4]  60/8 160/3 160/5 229/10
reality [3]  248/2 250/10 250/12

realize [2]  114/3 158/4
realized [1]  163/3
really [32]  54/10 61/25 62/1 63/2 68/21
70/13 75/2 87/6 95/15 96/10 103/9 106/11
111/17 112/1 136/11 140/21 140/22 142/16
144/25 145/21 154/18 156/22 157/8 158/2
159/23 160/9 160/14 165/9 165/25 180/9
208/4 212/7
realtime [2]  153/2 273/14
reason [10]  47/18 78/7 78/9 84/22 103/6
103/8 121/2 133/25 162/4 191/3
reasonable [6]  121/14 123/3 123/14 125/6
125/13 126/19
reasons [1]  126/7
recall [43]  26/14 28/21 55/9 80/16 91/6 92/14
93/2 93/4 93/4 95/25 96/3 98/4 103/3 105/24
108/3 114/7 115/8 115/11 115/13 115/21
115/22 116/2 116/23 117/3 117/13 136/17
148/9 150/17 152/5 156/20 157/6 161/6
161/7 161/10 161/12 161/14 161/16 161/17
162/4 162/6 169/9 174/18 213/1
recapitalizations [1]  53/1
receive [5]  11/19 88/16 138/17 194/4 194/10
received [20]  9/8 9/9 10/13 10/17 10/19
10/20 11/13 11/16 23/14 23/18 28/15 34/22
43/18 99/8 99/11 114/13 195/6 223/20
262/16 266/20
receiving [14]  9/17 13/6 13/8 14/21 16/3
18/19 21/22 23/11 30/4 43/16 43/19 99/9
195/10 195/12
recent [2]  14/12 15/7
recess [16]  60/11 60/13 61/1 109/5 109/10
110/10 133/9 167/15 167/25 168/2 233/8
270/20 271/12 271/16
recollection [15]  59/11 81/10 81/13 81/14
82/23 93/16 93/19 106/9 155/24 161/3
206/22 210/11 210/13 214/21 214/25
recollections [1]  268/8
Recom [15]  4/15 4/25 91/14 136/2 136/5
136/7 136/20 142/10 142/14 142/23 143/4
144/2 148/2 187/17 188/1
Recom/Signalife [2]  144/2 148/2
recommenced [1]  195/18
reconsider [1]  246/22
record [66]  2/4 2/21 28/25 39/25 51/16 61/4
109/19 114/3 118/15 123/6 123/13 124/6
128/25 129/11 130/10 130/15 130/19 132/11
133/12 190/19 191/2 191/6 191/22 221/24
221/25 222/1 222/9 222/12 222/16 222/17
222/18 222/18 223/4 223/11 223/16 224/19
224/21 225/1 225/3 225/5 227/7 228/9
230/23 230/24 233/11 233/14 236/24 238/1
242/14 242/16 243/17 243/21 243/23 243/23
244/4 244/7 244/9 245/1 245/6 245/14
245/23 246/7 247/1 257/6 258/15 273/15
recorded [3]  222/2 222/5 224/20
recorder [2]  152/20 169/11
recordings [2]  3/10 4/5
records [127]
recross [1]  184/20
redact [1]  251/20
redacted [2]  253/14 254/7
redaction [1]  260/10
redirect [7]  107/1 112/7 112/9 184/2 184/4
272/6 272/12
redo [1]  149/23
redone [1]  141/24
reduce [1]  253/6
Reedy [1]  160/11
reference [1]  30/19

referenced [7]  91/3 93/15 119/1 119/5
119/10 208/1 253/8
references [1]  91/8
referencing [5]  21/17 53/21 93/7 93/7 93/8
referred [2]  44/22 268/24
referring [6]  14/20 18/3 27/5 28/25 114/10
136/1
refers [1]  15/18
reflect [2]  52/24 256/22
reflected [2]  108/21 113/7
reflecting [1]  19/3
refocus [1]  84/24
refresh [8]  12/12 59/10 81/10 81/14 82/23
94/22 206/22 210/12
refute [2]  165/23 167/7
refuting [1]  166/24
Regal [3]  3/22 30/16 30/24
regard [21]  20/22 47/10 58/7 59/2 60/7 66/5
87/21 88/6 88/21 95/10 101/4 103/1 123/11
171/23 184/6 196/2 197/7 197/9 198/7
259/12 268/14
regarding [72]  5/13 45/17 47/14 55/19 61/23
62/11 62/14 62/23 68/24 85/3 89/19 89/20
89/21 92/7 92/9 93/2 94/13 95/20 95/21
96/13 96/15 99/1 102/23 108/22 111/7
111/10 121/20 124/3 125/22 126/6 138/20
138/21 138/21 139/2 151/9 162/3 171/1
174/8 174/11 175/10 178/12 190/16 199/23
201/16 201/24 204/7 204/12 211/24 213/11
213/18 218/2 218/4 220/5 220/6 224/17
227/2 227/11 230/14 230/15 230/17 231/5
234/18 248/2 253/22 254/15 255/13 255/19
261/19 266/25 267/1 267/2 267/3
regards [1]  114/15
register [1]  13/15
registered [11]  45/22 48/2 58/1 107/15
107/16 127/6 127/18 128/1 129/4 129/8
273/13
registrar [3]  3/23 13/14 13/15
registration [8]  46/1 47/25 50/14 50/18
55/15 59/6 59/15 68/13
regular [1]  197/17 197/21 197/23 223/6
224/19 224/20 224/21 224/23 225/1 225/2
231/15
regularly [17]  3/11 223/5 223/6 223/12
223/17 223/22 224/1 224/25 225/14 225/16
225/24 226/19 230/16 243/23 243/25 244/1
245/7
regulation [3]  92/20 93/5 127/13
reimbursement [1]  57/11
relate [2]  123/12 229/12
related [8]  9/3 9/5 9/7 41/19 68/22 84/14
100/9 245/3
relating [4]  44/1 56/11 137/18 226/14
relation [1]  59/12
relations [2]  171/10 171/20
relationship [5]  53/7 191/8 201/3 201/6
201/23
relative [1]  95/13
release [3]  67/6 67/23 219/21
released [3]  151/12 158/19 158/20
releases [13]  14/8 17/17 21/18 67/11 67/15
67/18 77/18 82/4 82/4 218/5 219/3 219/11
220/6
relevance [9]  96/18 100/24 189/21 189/22
199/14 200/11 201/7 239/7 239/11
relevancy [4]  170/8 199/13 208/23 231/11
relevancy's [1]  231/13
relevant [18]  47/19 62/4 62/10 107/1 118/22
119/13 131/22 131/24 132/5 164/11 167/5

## R

relevant... [7] 190/4 202/6 202/13 203/4 203/14 240/18 268/20
relies [1] 121/1
relocated [1] 148/6
rely [4] 114/21 114/23 183/14 225/19
relying [2] 63/2 66/24
remainder [3] 118/14 134/2 246/20
remember [62] 30/20 31/15 31/16 41/4 54/21 54/22 55/13 55/16 55/16 55/17 57/19 58/16 59/19 66/19 70/1 78/18 78/19 79/9 80/6 80/11 80/14 87/16 88/15 88/25 89/2 90/2 92/18 94/12 94/15 94/17 100/7 101/22 101/24 108/8 108/17 108/18 112/13 112/14 112/24 113/12 113/13 115/4 116/9 117/2 121/18 123/19 129/22 150/21 154/20 169/24 170/16 172/4 174/3 177/18 180/13 193/22 205/23 208/16 218/20 218/21 218/22 249/12
remembrance [1] 170/20
remind [7] 11/8 15/18 18/9 20/8 31/20 36/5 44/3
remitting [2] 89/5 89/6
remove [2] 134/5 252/1
renew [3] 198/16 198/17 267/14
rent [2] 159/12 160/9
reorganizing [1] 96/17
repeat [3] 76/5 115/11 208/11
repeatedly [2] 223/23 225/20
Rephrase [1] 92/25
report [33] 25/20 93/12 215/9 216/2 217/4 224/7 226/15 226/21 226/22 242/14 249/22 250/4 250/5 250/8 250/14 250/19 251/20 251/22 252/14 252/15 253/10 253/13 254/5 254/7 254/16 254/21 254/25 262/21 262/25 263/1 264/23 264/25 266/2
report's [1] 265/1
reportable [1] 25/22
reported [1] 222/13
reporter [7] 1/23 1/24 132/23 217/24 257/6 273/13 273/14
reports [7] 4/16 4/17 5/3 190/9 234/17 249/11 251/1
repossessed [1] 96/9
represent [3] 50/17 208/6 219/7
representation [2] 82/22 235/15
representations [1] 166/6
representative [1] 209/2
represented [2] 105/1 220/9
representing [1] 148/12
request [5] 124/7 126/11 253/11 266/15 267/14
requests [1] 28/8
require [3] 25/20 129/2 140/24
required [2] 57/6 58/10
requirement [2] 50/7 224/18
requires [1] 222/14
resale [1] 65/14
research [3] 142/16 200/22 200/24
resell [1] 64/19
reseller [6] 218/3 218/13 218/18 218/21 218/22 218/23
reserved [1] 120/22
Reserves [1] 194/20
reserving [1] 120/23
resided [1] 122/21
residuum [1] 249/23
resign [2] 145/9 145/10
resignation [4] 166/20 166/22 166/24 178/1
resigned [4] 166/23 177/10 177/20 177/23

resolve [1] 216/24
Resorts [1] 3/24
Resource [1] 139/20
resources [1] 140/13
respect [4] 40/4 52/17 245/15 253/10
respected [1] 3/7
respectfully [2] 124/7 240/15
respective [1] 63/9
respond [1] 143/5
responding [1] 142/16
responds [3] 32/1 32/2 34/9
response [4] 34/7 242/3 242/5 242/7
responsible [3] 126/19 195/24 219/2
rest [16] 11/4 24/14 32/5 34/13 39/15 77/2 119/17 119/23 147/16 156/11 183/24 192/25 210/5 228/7 253/14 257/8
restaurant [3] 137/16 137/17 205/25
rested [2] 119/19 135/2
resting [2] 109/20 109/21
restricted [5] 84/6 99/13 107/19 107/20 113/17
restriction [1] 49/23 73/24 73/25 74/1
restroom [1] 167/20
Rests [1] 272/7
result [2] 204/13 209/15
results [1] 204/10
resume [7] 142/18 142/25 143/5 143/7 148/22 148/24 152/1
retake [1] 248/19
retire [2] 142/4 196/14
retired [1] 142/3
retirement [5] 142/6 142/7 148/10 148/12 183/10
return [7] 13/2 102/14 102/16 102/18 102/23 111/25 112/3
returned [1] 168/20
revealed [2] 49/15 104/6
reveals [1] 54/1
Revenue [2] 102/22 102/24
reverse [8] 79/19 80/1 80/5 81/12 87/4 124/19 128/20 128/25
review [67] 8/24 10/2 10/16 12/17 13/17 14/3 16/9 17/11 18/24 19/25 20/25 22/10 23/5 23/22 24/22 30/7 34/18 37/4 38/8 38/16 39/7 39/20 39/25 43/10 44/2 44/4 46/10 46/15 46/16 47/16 48/17 50/7 51/1 51/5 51/14 55/12 57/1 57/3 57/6 57/12 58/4 58/19 58/22 58/24 62/8 62/23 64/3 65/3 66/17 68/11 68/21 69/4 70/22 70/23 71/3 78/21 79/7 90/17 90/25 100/11 102/12 102/14 102/16 131/11 131/13 197/22 256/21
reviewed [32] 8/4 8/5 8/23 8/23 13/17 19/25 26/4 39/5 44/3 47/9 47/24 48/3 48/22 48/24 49/1 66/6 72/21 72/24 79/5 79/6 81/14 88/24 92/12 92/13 92/15 100/7 101/22 102/9 102/17 115/20 118/4
reviewing [8] 55/13 66/19 71/4 71/6 73/15 115/8 115/13 197/11
reviews [2] 46/7 71/3
revoke [1] 79/3
rhythms [1] 154/7
Richard [1] 12/15
rid [2] 134/4 134/9
right [220]
right-hand [1] 243/7
rights [4] 169/11 170/13 186/21 267/10
ripping [1] 244/19
River [1] 160/11
RMR [2] 1/23 273/20
Road [1] 1/22

Rock [1] 3/22
Rod [8] 144/7 144/11 144/13 144/13 154/21 156/9 156/10 176/15
Rodney [4] 144/18 153/16 153/18 176/13
role [3] 113/5 196/17 196/18
rolled [1] 141/13
rollout [1] 154/13
room [5] 119/21 139/18 159/24 216/23 233/1
roughly [1] 29/20
routine [1] 225/19
routinely [2] 223/18 225/18
routing [1] 34/5
Rowland [9] 25/9 41/7 41/12 44/10 207/15 211/10 212/9 229/21 229/23
Rubbermaid [26] 89/12 90/9 158/11 158/20 166/19 169/4 169/10 169/16 169/18 169/21 169/23 170/2 170/3 170/4 170/11 170/24 171/1 172/7 172/10 172/12 173/17 173/25 174/5 174/8 174/11 184/14
rule [28] 3/12 3/14 4/3 4/10 5/2 5/4 52/9 53/11 120/9 120/12 127/15 185/9 190/23 191/2 221/24 222/13 222/14 224/4 224/6 224/18 225/17 230/19 231/18 233/17 240/5 244/3 267/15 272/8
rule's [2] 248/10 248/14
rules [6] 4/8 4/17 4/21 65/18 120/13 131/1
ruling [1] 228/22
run [6] 77/6 146/4 148/7 175/20 180/19 182/21
running [13] 27/25 76/15 77/6 142/19 146/3 146/16 164/19 164/21 175/18 175/21 175/21 179/22 185/3
rush [1] 173/18
Russia [2] 162/24 163/4
Russian [1] 162/12

## S

S-8 [37] 45/22 46/2 46/7 46/16 46/20 46/21 47/6 47/9 47/24 48/6 48/17 48/18 49/11 49/18 49/20 50/6 50/12 50/23 51/3 69/25 70/14 71/13 71/19 72/12 72/13 72/21 73/9 73/15 73/17 74/2 77/16 99/12 116/8 116/12 116/15 116/20 127/11
S-8s [1] 47/16
S-o-s-b-e [1] 155/1
safe [5] 67/14 72/17 88/5 105/19 105/22
sailing [1] 173/23
sake [1] 212/23
salary [1] 159/12
sale [33] 11/22 14/3 14/7 15/8 15/21 15/23 16/6 16/21 17/4 17/15 17/24 18/21 19/15 19/19 21/20 21/25 22/17 52/5 52/22 54/19 58/1 62/14 63/12 66/14 67/11 68/1 87/11 94/9 99/21 111/8 111/10 124/22 158/23
sales [20] 9/10 9/10 11/15 12/8 13/21 13/24 17/11 19/11 22/4 30/11 64/10 83/25 84/5 127/4 127/12 129/8 172/24 180/1 226/18 226/20
salespeople [1] 169/16
salient [1] 67/2
same [24] 19/17 32/2 43/1 43/5 47/6 57/24 71/5 71/15 82/11 82/14 82/16 127/8 144/23 150/3 171/3 232/18 234/25 237/8 237/24 238/18 238/18 239/12 249/19 258/22
San [1] 57/23
sanction [2] 85/9 85/11
sat [6] 41/23 97/14 97/19 149/6 151/22 169/25
satisfied [1] 153/12
satisfy [1] 121/13

**296**

**S**

save [7]  139/11 139/13 174/19 184/16 184/17
185/5 232/25
saved [1]  175/17
savings [1]  140/15
saw [17]  9/1 13/8 17/17 30/19 75/13 98/10
137/24 148/25 149/1 151/25 162/10 162/10
162/10 163/17 164/16 169/25 198/9
say [81]  9/6 10/24 11/21 15/21 15/22 16/12
19/2 21/12 21/15 31/3 32/3 34/7 34/24 36/13
43/14 49/14 54/1 55/9 55/11 56/8 58/19
68/25 71/15 86/12 88/5 88/19 97/19 106/5
106/19 107/17 113/15 113/24 114/10 114/16
116/2 116/20 125/4 127/8 146/13 147/2
153/1 156/17 158/9 158/10 158/12 158/14
159/10 171/17 172/5 173/6 173/17 176/6
176/7 181/22 181/23 183/4 192/2 192/2
202/17 204/17 208/14 209/5 209/6 209/14
209/15 209/15 209/19 209/20 215/21 219/13
220/22 221/1 224/23 225/22 230/10 236/13
245/8 248/16 250/1 262/9 266/6
saying [37]  34/14 48/23 48/25 48/25 50/5
56/21 61/25 72/4 84/23 85/14 94/15 107/19
132/14 156/6 172/7 172/9 176/23 204/7
208/16 218/8 218/20 218/21 219/22 220/18
220/19 230/13 231/25 232/20 235/10 235/25
245/20 246/19 247/10 247/19 250/23 252/22
267/17
says [24]  3/4 32/4 34/10 58/6 59/15 59/24
63/4 64/6 64/10 65/16 65/17 82/17 82/23
84/23 102/15 123/18 125/1 218/25 222/24
231/19 245/15 255/12 255/14 256/25
SB2 [34]  50/18 51/1 51/13 53/13 54/6 57/25
58/10 58/12 59/3 59/12 59/15 61/19 61/24
62/12 62/23 63/5 65/2 65/3 65/5 67/1 67/5
67/17 71/3 74/11 101/20 101/24 102/3 102/4
103/8 115/3 117/21 124/18 125/21 127/11
SB2s [6]  58/14 61/21 62/1 62/3 62/8 66/17
scheduling [1]  109/11
scheme [2]  87/5 121/6
school [9]  139/6 139/7 174/24 194/2 194/2
194/9 194/10 194/25 195/3
schools [3]  163/4 174/21 174/22
Schwab [1]  3/18
Sciences [1]  218/14
scope [3]  96/20 100/24 184/19
Scottrade [1]  3/22
screen [12]  6/18 27/16 61/18 90/16 95/22
124/19 130/22 153/2 228/14 254/3 263/3
263/4
scrolling [1]  257/13
Se [1]  1/19
seat [1]  217/2
seated [13]  2/3 2/14 6/6 61/14 110/12 110/23
120/3 133/11 133/24 135/11 168/11 185/23
233/10
SEC [100]
SEC's [1]  113/25
second [9]  5/12 36/11 36/12 36/25 78/15
161/7 162/7 252/12 253/19
secrecy [1]  25/20
secret [6]  189/15 204/14 204/17 204/19
204/20 214/2
Secretary [1]  162/21
secrets [2]  205/8 214/4
section [4]  15/3 18/6 51/14 51/23
securities [40]  3/20 3/21 3/22 4/2 4/24 7/15
8/17 8/17 17/7 19/22 20/22 22/20 30/16
30/24 49/17 52/18 70/4 71/18 72/20 107/23

108/7 108/13 112/16 112/17 119/14 130/11
132/15 132/16 178/9 178/10 178/12 178/17
181/13 181/15 181/18 181/24 182/1 189/13
214/9 234/8
security [6]  9/10 9/10 30/11 49/15 183/16
187/23
seeing [8]  30/24 88/25 90/16 116/24 117/2
117/4 117/13 154/2
seem [3]  86/11 192/13 220/24
seemed [1]  165/12
seems [8]  86/10 160/24 160/24 203/14
232/20 241/12 244/4 252/15
seen [16]  57/20 63/1 66/25 68/22 77/25
115/20 117/7 118/7 118/9 124/24 146/17
147/20 159/19 191/11 236/7 236/13
selective [1]  38/22
self [7]  3/13 3/14 12/1 12/24 24/9 24/10 64/5
self-authenticating [2]  3/13 3/14
self-explanatory [5]  12/1 12/24 24/9 24/10
64/5
sell [37]  8/17 13/23 21/1 52/3 52/22 53/16
53/17 53/18 54/2 54/6 61/22 61/23 63/12
64/6 64/18 68/18 94/3 105/2 105/5 105/12
105/13 105/14 107/14 124/18 125/21 140/14
159/10 160/19 160/19 163/1 169/11 171/12
172/5 180/4 180/4 180/12 221/6
selling [25]  13/18 14/2 21/4 43/20 51/14
51/23 52/1 52/21 53/5 53/9 53/12 53/14
57/14 59/6 59/18 63/8 64/11 64/12 68/11
73/19 107/2 123/22 171/7 173/3 223/9
sells [1]  19/10
send [12]  11/6 34/19 36/14 36/24 44/17
44/19 44/21 225/25 226/3 227/19 240/23
255/14
sending [6]  22/24 24/18 28/8 36/14 44/7
101/5
sends [2]  44/1 243/20
senior [2]  195/24 249/25
sense [2]  206/4 246/20
sent [25]  11/11 32/15 33/11 44/15 44/23
44/24 46/1 117/4 142/25 148/22 148/24
152/1 152/16 225/23 251/25 252/16 252/24
252/25 253/7 254/25 260/9 260/11 261/18
263/15 266/6
separate [2]  267/5 267/6
Separated [1]  77/2
separately [3]  248/11 248/15 248/23
September [16]  14/11 15/11 15/12 18/13
18/13 21/14 23/14 23/25 48/17 70/6 79/17
80/6 80/12 80/20 80/20 234/11
September 14th [1]  15/11
September 2006 [1]  48/17
September 2008 [4]  23/14 23/25 80/20 80/20
September 22 [1]  79/17
September 22nd [2]  80/6 80/12
September 24th [1]  15/12
September 27 [1]  234/11
series [4]  18/12 21/13 30/13 266/19
serious [1]  87/13
served [5]  41/14 75/8 138/6 138/16 148/17
service [6]  7/12 62/7 90/23 102/22 102/24
269/20
services [6]  34/4 49/24 89/11 90/4 90/19
195/18
set [7]  51/25 66/5 80/23 103/24 129/18 228/1
256/9
setting [3]  42/8 44/22 218/13
settlor [1]  55/2
seven [5]  17/16 88/12 119/2 238/3 238/11
several [9]  26/14 28/1 29/6 33/14 38/22 41/3

114/14 114/25 171/12
SFranklinUSDC [1]  1/25
shake [1]  183/4
sham [1]  123/24
shape [3]  59/21 81/18 122/14
share [7]  13/10 46/7 46/16 80/6 80/12 123/21
129/5
shared [2]  52/11 147/16
shareholder [11]  49/24 50/2 53/5 53/5 57/14
59/19 63/8 64/11 171/10 189/2 189/2
shareholders [11]  51/14 51/23 52/2 52/21
53/10 53/12 53/14 61/22 64/6 68/11 68/18
shares [164]
she'd [1]  159/10
she's [11]  36/14 147/21 147/23 149/11
149/14 156/7 156/7 164/24 164/24 164/25
167/3
shed [1]  259/16
sheeting [1]  4/20
shift [1]  40/18
ship [1]  206/9
short [9]  34/25 120/1 132/24 149/17 158/7
167/15 167/25 207/9 224/6
short-circuit [1]  149/17
short-handing [1]  34/25
short-term [1]  207/9
shorten [1]  250/22
shortly [1]  172/11
shortness [1]  256/1
should [24]  6/16 7/21 9/13 15/1 16/1 83/2
83/6 83/9 83/10 83/19 83/21 114/23 119/25
133/20 192/17 193/6 193/7 210/14 221/17
227/18 242/25 250/2 269/2 270/3
shouldn't [3]  83/11 114/21 147/2
show [32]  10/5 71/17 81/5 81/8 82/18 85/24
94/22 137/17 150/24 191/21 193/17 202/2
214/5 216/7 217/14 217/16 217/19 219/4
219/10 221/11 227/15 228/13 228/23 231/9
232/5 233/25 234/25 240/1 246/15 246/18
255/7 263/21
showed [5]  115/3 118/2 118/5 171/12 171/18
showing [4]  58/7 115/5 221/3 231/4
shown [5]  47/25 57/9 234/2 234/4 234/21
shows [10]  19/8 21/24 21/25 23/12 23/13
24/15 42/9 217/18 218/11 220/5
shred [1]  126/16
sic [4]  36/17 65/7 122/3 122/5
sick [1]  98/21
sidebar [19]  5/12 5/17 5/23 82/9 85/8 87/1
88/3 164/7 164/9 167/13 189/21 189/24
193/18 201/10 203/18 208/24 209/1 209/25
225/12
sign [5]  102/20 169/13 170/4 170/21 184/9
Signalife [176]
Signalife's [3]  17/20 26/5 35/17
signatory [3]  26/11 219/16 219/20
signature [3]  219/21 219/22 220/17
signed [16]  3/3 5/11 27/8 102/18 111/25
112/3 124/8 169/15 184/9 219/15 220/12
220/21 220/25 221/2 221/21 234/9
signer [1]  184/7
significance [2]  68/8 251/21
significant [8]  25/18 70/8 70/10 70/13 97/13
97/17 97/18 169/3
signing [1]  184/10
Silve [5]  11/10 11/11 11/13 44/4 116/3
similar [1]  5/3
simply [7]  90/16 121/15 123/12 128/2 231/8
260/9 264/24
Simpsonville [1]  154/17

**S**

since [23]  7/21 48/23 87/18 109/15 122/6
128/23 134/14 138/6 165/24 177/20 177/25
194/15 198/22 199/5 205/14 207/10 214/7
223/14 223/14 233/4 247/4 248/14 248/16
Singh [4]  157/17 158/1 158/4 176/9
single [5]  46/15 58/19 58/24 87/3 139/9
sir [15]  6/3 6/7 60/17 77/25 109/9 118/12
145/24 150/11 154/24 183/4 185/20 185/24
186/5 217/2 271/12
sit [9]  72/14 72/23 74/16 100/14 142/22
146/19 157/2 172/17 178/21
sites [1]  164/1
sitting [5]  69/16 94/10 209/9 232/25 233/1
situation [1]  125/20
six [9]  7/23 14/8 119/2 159/9 169/18 200/10
222/7 222/10 224/1
Sixty [3]  237/10 238/3 256/18
Sixty-five [2]  237/10 256/18
Sixty-seven [1]  238/3
skepticism [1]  114/17
skilled [1]  140/25
skip [1]  12/1
skipping [1]  239/8
sliced [1]  165/24
slides [1]  30/19
slowly [1]  175/2
small [5]  25/2 44/22 141/12 187/10 200/25
smart [5]  158/2 158/2 175/19 179/23 185/2
so-and-so [5]  261/19 262/13 262/15 262/16
262/16
software [5]  204/24 205/1 205/4 205/12
209/9
sold [32]  10/21 11/14 12/7 16/19 16/20 22/3
52/23 55/7 55/10 59/21 68/12 83/23 86/14
104/23 111/13 113/11 113/11 113/19 125/19
127/25 129/3 129/9 139/22 139/24 140/3
141/5 141/8 141/9 141/10 143/8 172/4 181/6
sole [4]  12/5 12/10 52/11 52/17
solely [1]  52/11
solicits [1]  64/14
solution [2]  260/10 261/16
solved [1]  5/19
somebody [7]  101/14 145/20 146/3 175/21
177/6 223/24 261/9
somehow [3]  54/20 219/22 266/17
someone [18]  93/9 102/15 151/20 154/6
154/7 173/4 180/20 182/8 182/12 182/13
182/21 197/13 230/25 243/20 250/1 260/17
260/17 263/8
something [53]  47/3 48/20 56/5 57/5 57/6
59/4 60/22 60/23 62/4 71/4 74/1 74/15 74/15
77/19 85/10 86/16 90/22 96/11 108/17 110/3
112/22 113/23 116/15 124/23 131/12 131/22
137/24 146/6 146/11 158/16 158/17 164/23
171/16 176/22 177/19 180/12 183/10 191/17
198/9 204/20 208/18 217/17 218/9 220/13
231/1 234/19 235/15 236/12 245/2 250/2
250/2 256/3 259/17
sometime [1]  270/3
sometimes [1]  259/16
somewhat [2]  233/13 235/14
somewhere [2]  153/19 214/23
son [3]  174/24 258/6 258/12
Sony [6]  195/22 195/23 195/25 196/2 196/8
251/9
soon [1]  146/6
sorry [37]  5/16 21/12 23/15 32/18 49/6 50/24
51/7 53/24 72/3 76/6 76/7 83/5 98/2 106/17

111/2 141/4 149/10 150/11 150/14 156/7
167/14 175/8 176/25 177/9 181/9 183/1
208/11 229/22 232/12 237/22 238/22 238/23
239/19 243/1 248/24 262/7 271/2
sort [24]  26/24 32/10 54/10 84/11 101/8
109/12 117/24 117/24 144/9 145/20 166/14
204/17 235/6 265/5
sorts [5]  8/3 8/3 9/7 32/10 38/9
Sosbe [3]  154/10 154/24 155/1
sound [1]  142/6
sounded [1]  162/12
sounds [2]  29/22 39/2
source [7]  10/17 10/18 11/12 105/9 105/11
204/24 205/1
South [14]  56/24 57/7 74/23 75/3 76/17
76/23 153/22 160/10 162/22 162/25 163/2
172/19 176/16 196/1
SOUTHERN [3]  1/1 119/4 119/12
Sparks [6]  89/20 89/21 89/24 90/1 90/5 90/8
speak [10]  55/19 55/22 56/2 164/21 175/10
177/22 186/1 199/22 237/5 251/18
speaking [7]  46/3 46/4 47/8 59/4 116/7 182/2
182/8
specializing [1]  39/4
specific [7]  8/10 14/1 57/7 86/25 87/10 95/11
210/11
specifically [9]  15/3 21/4 28/11 54/19 69/19
90/2 91/6 121/3 151/11
spell [4]  6/9 135/15 154/25 186/1
spelled [1]  186/3
spend [6]  50/9 83/17 84/15 100/18 228/7
233/5
spending [6]  12/18 38/10 76/25 180/16 184/7
260/1
spent [17]  12/11 12/20 38/20 38/25 39/17
40/12 76/19 84/17 88/12 90/11 108/20
115/23 117/9 117/10 166/3 169/19 169/25
split [16]  79/19 80/1 80/5 80/17 81/12 81/15
81/16 85/20 86/9 87/4 88/6 124/19 128/20
128/24 128/25 129/1
splits [1]  52/25
spoke [6]  66/6 89/24 90/1 105/23 111/14
200/1
spoken [9]  67/12 136/9 136/10 177/4 177/15
177/20 177/25 178/3 268/8
spreadsheets [1]  28/25
spring [1]  82/3
stacks [1]  129/20
staff [2]  146/19 147/17
staffs [1]  194/22
stage [2]  125/12 152/13
stamp [3]  223/19 246/14 259/13 266/23
stamped [1]  235/16
Stan [4]  150/21 151/20 151/23 162/10
Stan's [1]  150/21
stand [11]  94/16 122/1 135/7 185/19 219/23
247/12 248/19 248/22 249/2 249/5 252/2
standard [5]  3/23 13/14 13/15 53/1 121/14
standby [5]  1/21 247/21 247/24 248/17
269/12
standpoint [1]  172/18
Stanley [1]  3/20
start [12]  31/20 38/24 42/16 106/21 131/15
132/9 132/10 132/21 139/16 140/12 154/14
188/5
started [18]  98/14 98/18 98/20 98/23 98/24
106/10 139/17 140/7 142/17 159/10 164/14
172/9 180/10 180/12 184/14 194/3 214/22
248/16
starting [5]  32/13 69/24 76/16 139/6 165/12

startup [2]  148/10 180/15
state [4]  118/25 122/12 162/21 162/25
stated [3]  46/9 53/4 255/24
statement [9]  46/1 50/18 55/15 59/15 68/13
78/17 88/11 88/14 263/8
statements [4]  4/9 50/14 83/24 225/22 234/7
250/11
states [18]  1/1 1/3 1/13 2/8 3/4 3/6 6/1 7/11
23/1 23/2 92/1 118/19 119/15 119/16 141/4
141/4 163/8 200/24
status [1]  194/20
stay [4]  37/21 135/14 142/6 212/4
stayed [2]  31/1 163/12
staying [1]  37/21
STEIN [201]
Stein's [17]  8/25 9/1 10/25 12/11 19/17 22/5
25/3 35/4 42/7 42/17 43/5 44/23 122/21
130/1 235/7 235/15 267/15
step [6]  60/17 119/21 135/11 175/2 175/2
216/22
Stephen [4]  1/23 273/13 273/19 273/20
steps [2]  152/23 175/6
Steven [11]  89/20 89/21 89/24 90/1 90/5 90/8
257/23 257/24 258/1 258/3 258/12
stewardship [4]  166/15 166/18 200/16 248/3
stick [4]  134/4 134/10 134/25 146/20
sticks [1]  243/20
Stieglitz [4]  1/16 270/9 272/4 272/6
still [13]  15/9 18/16 61/8 110/17 168/5 176/8
200/10 201/21 205/11 207/19 219/23 262/2
262/24
stipulate [6]  3/8 70/19 240/24 252/1 261/16
263/16
stipulated [15]  48/1 70/15 70/17 70/20 70/21
124/9 124/20 125/10 130/21 130/24 131/18
131/23 262/14 265/7 267/2
stipulation [15]  3/3 5/10 5/11 5/13 118/14
118/21 124/8 125/11 127/7 130/17 261/18
262/12 262/20 262/23 263/14
stipulations [6]  2/21 2/25 5/7 118/18 130/10
130/11
stock [89]  15/8 15/21 15/23 33/9 46/20 52/25
52/25 68/2 68/5 68/7 68/23 69/2 69/5 72/13
75/23 75/25 76/1 76/3 76/12 77/16 77/17
79/19 80/1 80/5 80/5 80/12 80/17 80/19
81/11 81/12 81/15 81/17 81/24 81/25 82/18
85/20 86/4 86/9 86/13 87/4 88/6 108/21
114/9 115/25 116/4 116/7 116/8 116/12
116/13 116/13 116/14 116/15 116/17 116/20
123/22 124/18 124/21 124/24 125/8 125/11
127/4 127/5 127/6 127/12 127/18 127/19
128/3 128/19 128/24 128/25 129/5 136/14
159/15 171/8 171/11 171/12 171/16 172/3
172/6 172/9 172/24 173/3 176/2 180/3 180/4
187/3 187/7 238/4 253/1
stocks [3]  20/22 21/1 83/23
stole [4]  244/19 244/23 244/25 245/8
stood [1]  163/6
stop [5]  32/21 51/15 56/22 56/23 171/22
stopped [3]  33/4 57/7 172/8
stories [1]  165/18
story [1]  127/22
straight [4]  175/4 175/4 175/5 203/11
strategy [1]  264/8
Street [1]  1/24
stress [1]  24/19
stretch [1]  126/10
strongly [1]  251/23
structure [1]  263/25
students [1]  163/6

**S**

studies [2] 151/7 194/6
Studio [2] 151/4 151/5
Studios [1] 195/15
studiously [1] 14/19
study [1] 195/5
stuff [7] 83/22 130/2 172/1 175/25 179/19
193/1 245/22
subject [5] 52/18 204/14 255/13 262/1
262/10
submission [1] 120/13
submit [1] 128/7
subpoena [11] 75/9 137/1 137/5 137/10
138/6 138/16 155/23 179/15 269/5 269/11
270/17
subpoenaed [2] 136/25 177/22
subpoenas [3] 234/5 234/5 241/9
subsequent [3] 15/17 16/7 18/22
subset [2] 236/12 240/17
subtraction [2] 112/19 113/6
success [2] 139/21 165/25
successes [1] 185/1
successful [4] 155/6 158/3 159/16 166/2
successfully [3] 56/1 182/22 233/19
successor [2] 215/24
successors [1] 63/10
successors-in-interest [1] 63/10
such [18] 49/18 53/5 93/13 94/12 245/12
251/1 252/24 252/24 252/25 252/25 261/18
261/18 262/13 262/13 262/14 262/14 262/15
262/15
sue [1] 127/22
sued [2] 91/10 91/11
sues [1] 250/18
sufficient [3] 128/15 128/18 129/11
suggest [4] 111/22 111/24 129/24 165/21
suggested [12] 69/1 71/22 84/4 84/7 113/1
113/14 113/22 114/9 133/3 133/18 239/15
260/25
suggesting [12] 49/3 49/7 55/13 97/23
114/21 114/23 125/6 125/18 133/20 235/19
261/22 267/16
suggestion [5] 129/20 235/20 240/16 260/24
263/17
suing [2] 91/3 91/8
Suite [1] 1/22
summaries [1] 3/1
summarizing [1] 9/19
summary [22] 5/6 215/22 222/5 222/7
222/10 223/25 224/25 226/15 226/17 226/19
252/14 253/10 253/13 254/5 254/7 254/16
254/21 254/24 262/21 262/25 263/1 264/23
summer [2] 82/3
Suntrust [1] 3/16
supplement [1] 127/1
support [1] 126/11
supported [1] 111/22
supposed [7] 19/14 137/6 153/25 154/1
221/5 236/25 269/15
supposedly [2] 202/6 203/13
sure [34] 8/18 29/13 56/9 60/19 64/5 66/13
66/20 72/11 75/1 75/2 75/4 86/23 87/17
103/9 108/3 113/25 126/25 129/15 132/19
134/23 179/18 181/25 181/25 182/11 185/3
192/16 193/10 227/12 229/2 245/24 247/22
248/6 252/17 269/19
surgeon [1] 160/25
surprised [1] 210/6
surprising [1] 210/3

Susan [9] 154/9 154/10 154/24 154/24 155/4
155/7 164/3 169/15 170/1
Susan's [1] 147/19
suspicion [1] 192/10
sustain [4] 88/1 120/17 120/19 242/9
sustained [8] 71/1 77/12 80/9 92/4 96/19
97/2 105/7 127/14
sustaining [1] 227/6
switch [2] 252/9 252/11
sworn [3] 6/5 135/10 185/22
system [7] 4/20 7/14 139/8 139/10 154/15
154/16 188/6
Systems [10] 4/15 5/1 91/4 136/3 136/6
136/7 136/21 142/10 187/17 188/2
Systems/Signalife [1] 136/21

**T**

table [5] 52/15 53/12 134/25 210/5 210/9
tables [1] 51/25
take [47] 12/2 17/9 18/7 20/11 25/2 30/5 32/6
38/6 40/3 40/18 60/11 60/13 69/21 109/2
119/22 128/9 129/17 129/25 140/14 141/21
147/24 149/1 152/14 155/18 158/8 167/15
167/25 175/6 192/25 193/3 204/14 216/8
216/23 228/19 231/22 231/23 232/17 233/7
242/19 245/21 263/21 268/4 268/9 268/9
268/10 268/25 269/2
taken [13] 61/1 94/16 110/10 128/12 133/9
159/15 168/2 174/21 174/21 197/9 233/8
248/18 271/16
takes [1] 243/19
taking [5] 116/4 129/23 172/24 175/11
178/19
talk [37] 9/25 14/1 14/2 15/8 20/3 58/5 97/21
98/25 100/2 126/16 136/11 137/21 145/14
146/12 155/21 156/9 156/18 156/21 156/23
157/2 157/23 157/25 158/1 172/17 184/15
189/23 190/25 193/11 209/21 248/5 248/21
249/4 252/13 252/17 254/1 254/12 267/11
talked [13] 14/9 66/8 75/12 75/13 78/4 99/1
99/3 113/6 123/8 138/14 143/15 149/6 154/9
155/22 155/24 156/10 165/3 174/13 175/13
179/10 179/11 186/22 234/24
talking [39] 10/23 20/4 20/6 37/10 38/7 46/5
49/5 49/7 50/19 65/5 69/7 69/25 76/20 104/1
132/3 132/6 138/3 149/4 149/11 150/6
155/14 157/23 159/9 161/12 168/19 169/25
170/1 170/1 170/1 179/19 180/11 181/5
182/20 192/5 203/20 225/9 246/12 248/21
252/15
talks [1] 34/13
tangentially [1] 56/5
tax [7] 100/11 102/14 102/16 102/18 102/23
111/25 112/3
TD [5] 3/22 16/19 16/22 19/9 99/17
teach [1] 181/22
team [13] 144/21 146/3 146/9 147/10 154/5
154/13 155/11 157/10 157/10 158/2 176/14
178/19 185/5
teams [1] 175/5
technician [2] 141/1 154/10
technicians [1] 140/25
technologies [2] 186/22 186/25
technology [51] 149/1 149/2 149/8 149/15
150/1 150/3 150/6 150/25 151/10 151/12
151/14 151/17 151/23 152/4 152/6 152/15
152/24 153/5 154/2 156/15 158/18 158/21
158/22 162/9 162/10 163/21 169/25 170/13
171/23 176/20 196/11 196/12 200/22 201/1
201/21 201/22 202/1 203/4 203/8 204/2

204/12 213/13 213/14 215/17 215/18 215/23
223/9 224/3 249/12 249/18 251/13
telephone [4] 137/3 138/17 155/22 175/13
Telephonic [1] 110/5
tell [38] 6/8 9/17 16/4 18/9 18/19 30/6 35/17
42/5 48/4 48/21 56/17 77/12 95/5 111/15
117/17 130/15 132/12 135/15 138/7 139/5
154/22 157/5 173/4 182/6 182/9 186/1 202/5
204/21 209/18 209/23 217/7 217/25 218/11
222/5 228/15 233/18 233/25 233/7 233/23
telling [10] 33/23 33/25 43/11 89/3 182/14
182/20 210/2 226/4 226/5 269/17
tells [1] 260/18
temper [1] 157/7
tennis [1] 151/22
tenure [12] 145/4 146/12 146/13 146/14
153/20 184/12 198/12 215/9 216/2 216/10
217/5 249/22
tenures [1] 51/25
term [1] 207/9
terms [6] 23/7 23/7 166/6 193/1 250/15
264/23
testified [42] 41/17 41/21 41/21 42/2 60/10
62/13 62/16 62/17 62/18 67/23 74/11 80/2
80/11 83/7 83/16 83/18 84/18 84/21 87/23
92/1 92/20 94/10 94/14 96/5 96/22 99/2
102/14 112/18 121/22 123/7 123/7 157/11
179/9 209/13 224/2 225/4 246/3 248/10
255/19 256/10 257/16 259/8
testifies [1] 260/17
testify [17] 40/20 41/25 74/16 84/1 84/21
87/18 90/22 109/25 122/2 123/9 147/4
166/11 220/23 246/19 265/15 265/24 266/25
testifying [12] 3/2 6/19 54/24 77/13 87/16
92/18 97/10 112/16 167/1 167/3 179/19
264/19
testimony [58] 4/5 5/6 8/6 25/14 40/19 41/1
41/3 41/19 41/19 41/22 41/23 42/7 42/18
43/1 43/5 45/17 45/19 54/21 54/22 60/18
80/8 81/20 85/7 92/6 92/8 92/24 93/2 93/4
94/12 94/19 97/1 104/8 109/10 122/23 127/3
164/14 167/22 179/25 180/13 191/13 229/16
229/20 230/14 230/24 247/15 248/9 248/16
254/1 254/11 254/13 254/15 258/16 265/19
271/11 271/13 272/3 272/9 272/13
thank [63]  2/15 2/18 2/24 5/15 6/11 6/13 7/4
45/9 49/9 51/10 60/15 60/20 60/25 61/16
77/23 79/14 88/2 88/10 101/17 109/7 110/1
110/8 110/9 111/1 112/6 118/12 118/17
119/18 120/1 126/21 126/22 128/8 129/14
137/ 133/8 134/21 134/24 135/1 135/6
135/18 135/20 150/15 167/12 167/17 167/21
168/7 168/11 168/15 181/10 183/2 185/12
185/15 185/15 186/5 186/7 199/18 203/17
232/3 256/18 271/1 271/2 271/8 271/15
Thanks [1]  255/15
that's [185]
themselves [5]  123/20 125/15 126/18 127/17
180/22
theory [6]  86/11 147/1 147/3 147/6 147/8
148/16
therapy [3]  139/11 139/13 139/14
there'd [1]  262/2
there's [39]  5/22 20/3 49/21 50/7 68/15 71/9
87/3 93/5 93/13 111/10 122/4 122/13 123/5
123/13 126/10 126/16 127/20 128/2 128/24
129/11 132/5 132/15 163/21 164/23 166/11
187/8 190/1 204/7 215/22 217/16 217/22
219/12 228/17 236/22 242/8 242/13 246/10
248/12 255/15

**T**

thereafter [2]  52/4 196/10
therefore [4]  164/18 164/20 230/11 238/18
therein [3]  197/14 250/11 255/24
thereof [1]  4/8
they'll [3]  6/24 125/4 134/7
they're [59]  25/22 46/4 50/9 50/9 50/12
50/13 50/13 54/2 57/21 57/23 58/20 58/21
69/7 71/4 106/7 109/21 121/9 121/23 125/4
125/5 130/5 130/22 130/24 130/24 131/7
132/4 134/18 160/5 175/22 188/21 192/15
201/21 202/12 202/18 202/22 214/13 219/20
219/21 226/8 231/15 232/16 233/17 233/18
233/19 233/21 234/13 235/2 237/16 238/5
239/25 240/4 241/13 241/15 242/3 246/5
252/6 260/17 270/15 270/18
they've [19]  70/15 70/16 125/2 125/6 130/21
131/17 190/6 200/22 220/16 224/17 228/4
234/15 241/13 241/17 241/18 241/19 242/8
246/14 270/18
thick [2]  50/16 160/1
thing [25]  29/23 36/4 71/15 82/11 82/14
82/16 85/24 87/2 106/22 127/9 150/3 152/4
162/15 173/24 175/14 177/8 177/14 178/2
221/10 223/19 234/25 237/8 252/13 265/5
267/18
things [42]  7/16 9/7 34/13 35/19 38/9 71/6
82/15 84/13 84/21 85/16 88/6 90/1 90/17
99/2 117/9 121/16 123/4 123/12 126/8 126/9
149/4 152/19 156/12 157/20 158/3 160/4
166/19 167/3 179/9 184/14 193/12 203/2
204/21 218/22 225/18 227/2 227/3 228/18
234/16 235/18 259/12 267/3
think [111]
thinking [2]  176/2 179/1
third [6]  14/14 14/22 14/24 163/14 164/18
239/14
Thomas [3]  219/15 219/15 219/25
those [136]
though [5]  59/3 94/3 104/12 156/23 245/6
thought [18]  112/1 144/9 146/25 147/21
157/22 164/22 170/21 171/3 175/18 175/20
179/21 183/16 208/4 227/20 229/16 248/22
249/1 250/12
thoughts [2]  175/11 256/25
thousand [3]  32/17 40/16 64/25
thousands [4]  8/5 49/1 49/1 190/2
three [19]  4/12 30/13 53/8 55/7 58/14 67/4
67/10 68/2 126/17 139/22 146/23 150/19
157/10 199/1 219/1 219/8 222/6 243/2
270/14
thrills [1]  146/9
through [67]  3/2 3/6 11/4 11/17 16/16 17/10
26/19 38/23 39/15 46/24 50/11 54/12 64/7
65/19 65/21 65/25 66/14 73/9 74/1 75/1
76/11 76/21 80/24 82/13 87/11 88/23 89/7
91/14 119/8 119/11 121/5 122/15 122/19
123/21 123/24 126/12 127/11 145/5 145/11
146/23 155/18 156/3 156/18 157/12 173/13
182/2 190/2 190/9 192/25 193/16 203/12
228/8 233/20 234/7 235/8 235/21 241/4
246/13 247/5 247/18 254/1 254/13 256/14
261/12 263/18 266/18 267/21
throughout [3]  121/2 123/15 206/9
THS [12]  9/24 12/1 12/3 12/5 12/6 12/9
12/13 12/14 12/15 12/18 54/25 55/2 62/17
62/17 62/19 66/7 103/16 103/21 104/7 107/2
107/9 107/17
Thursday [1]  256/24

tie [6]  167/9 174/25 218/17 219/8 227/4
229/12
tie-ins [1]  174/25
tied [1]  218/5
ties [2]  121/2 219/10
tilt [1]  255/6
timeframe [8]  29/6 121/15 128/16 139/23
141/7 159/2 199/6 201/16
times [17]  40/20 40/22 41/7 63/21 63/22
63/24 95/25 96/1 96/4 118/22 119/13 136/8
136/17 136/19 138/14 144/24 213/7
timing [1]  41/18
tinkering [2]  175/23 175/24
title [4]  143/25 145/7 145/8 263/11
today [25]  64/4 67/12 69/1 72/14 72/23
91/14 99/2 100/14 112/16 137/10 142/22
162/5 178/21 178/21 186/13 186/16 186/24
187/2 189/5 198/24 205/4 216/14 241/3
246/25 269/14
together [14]  146/10 154/5 154/7 154/11
154/13 159/21 173/24 176/13 182/3 185/4
221/10 228/20 232/14 249/24
told [18]  42/13 54/13 54/13 63/24 76/13
77/10 104/12 104/17 104/24 107/6 138/14
149/7 151/22 157/7 171/17 171/21 173/12
182/5
tomorrow [23]  193/3 227/15 227/15 227/24
228/16 233/3 241/4 247/6 247/10 247/13
247/18 261/5 266/4 266/24 267/23 267/24
268/5 269/9 269/17 269/22 270/8 270/12
271/5
tonight [5]  227/17 228/3 240/19 240/24
266/24
too [11]  47/12 49/2 56/7 58/24 58/25 59/5
69/21 84/12 140/19 178/2 239/15
took [13]  100/20 128/25 129/1 139/15 139/20
141/12 143/25 147/17 147/17 147/18 147/18
163/15 213/11
top [8]  13/2 13/3 18/8 34/6 48/4 171/24
219/13 236/9
topic [1]  261/19
topics [1]  258/13
total [15]  12/25 23/6 24/16 24/17 29/20
39/12 51/25 52/2 52/23 73/12 73/13 91/13
91/18 91/19 249/23
totally [1]  152/12
touch [2]  137/4 137/7
touched [1]  245/4
toward [2]  6/8 135/13
towards [3]  158/10 185/25 193/6
town [2]  176/4 176/5
Toy [1]  53/19
trace [1]  13/20
traced [1]  9/19
Tracey [9]  4/1 25/3 31/22 32/4 33/25 41/5
96/23 101/14 171/11
tracing [2]  99/19 99/21
track [4]  58/9 212/7 237/12 239/13
trackable [1]  25/2
tracking [1]  210/20
Tracy [7]  27/8 33/20 34/1 36/7 36/13 36/17
172/5
Tracy's [1]  36/21
trade [8]  3/18 64/25 204/14 204/17 204/19
205/8 214/2 214/4
traded [3]  46/23 63/14 116/14
trades [7]  64/17 64/21 64/24 103/7 103/10
103/10 104/9
trading [19]  4/24 60/4 60/6 60/9 63/14 73/16
73/17 73/18 73/23 73/24 76/1 76/3 77/16

81/11 99/12 104/5 104/7 113/15 116/14
train [2]  169/17 169/17
trained [2]  172/11 172/13
training [2]  169/19 169/19
transaction [4]  64/20 65/16 99/24 169/9
transactions [26]  17/4 19/2 19/3 22/17 22/25
22/25 23/2 25/18 25/21 32/10 49/18 63/15
64/13 64/13 93/6 93/8 93/9 107/9 107/11
108/12 119/7 122/2 127/17 127/18 169/3
217/12
transcript [2]  1/11 273/15
transcripts [2]  4/8 8/6
transfer [17]  3/23 13/11 13/14 13/24 16/7
17/5 19/20 22/18 25/4 33/1 34/1 34/3 36/18
49/15 99/25 104/11 104/15
transferee [1]  128/6
transferees [2]  63/9 64/7
transferred [8]  12/9 16/22 25/2 45/18 46/21
107/17 150/24 153/2
transferring [1]  24/23
transfers [20]  9/9 9/22 9/22 22/23 22/23
24/11 24/12 25/15 26/1 30/13 93/8 93/13
93/14 103/3 103/22 105/15 119/5 119/7
119/10 127/11
translated [1]  152/12
transmitted [4]  119/2 119/11 152/18 197/13
transporting [1]  118/24
travel [1]  95/9
traveled [2]  150/6 150/16
Trayton [8]  39/19 39/20 40/1 57/10 95/1
95/2 95/4 95/7
treasury [4]  25/21 92/20 93/5 93/12
Trellus [7]  54/7 54/8 55/14 55/19 55/24
56/15 269/6
trial [7]  1/11 70/16 75/9 92/8 134/3 236/11
240/17
Tribou [13]  219/15 219/15 219/25 220/10
220/10 221/22 224/17 225/8 229/14 230/6
234/9 235/25 267/19
tried [3]  137/3 165/16 244/22
trigger [1]  149/25
triggering [1]  53/1
trip [5]  168/19 168/20 168/23 168/25 210/25
Tronics [16]  4/14 4/24 91/15 186/17 186/21
186/24 187/2 187/16 188/1 196/13 196/16
196/19 197/18 214/8 214/18 263/25
trouble [1]  158/5
truck [6]  147/1 147/2 147/6 147/8 147/12
147/14
true [8]  67/10 70/9 83/8 88/20 123/14 124/10
219/5 250/5
truncate [1]  240/22
trust [46]  9/24 11/18 11/19 12/2 12/4 12/6
12/6 12/9 12/13 12/16 12/19 29/22 53/20
54/20 54/25 55/3 55/5 55/6 62/17 62/17
62/19 62/21 62/24 66/7 79/5 79/6 85/2 96/23
103/13 103/14 103/16 103/21 103/24 103/25
104/3 104/4 104/5 104/7 104/13 104/25
107/2 107/5 107/10 107/17 200/21
trust's [1]  62/14
trustee [6]  12/14 12/16 66/9 91/22 103/17
103/19
trustees [1]  12/13
trusts [7]  53/21 54/3 66/5 66/6 79/3 80/23
187/8
trustworthy [1]  198/3
truth [13]  43/11 149/11 182/5 182/6 182/9
182/14 182/20 226/2 226/7 244/25 250/11
256/13 263/14
truthful [2]  67/2 181/16

**T**

truthfully [1] 266/6
truthfulness [1] 183/14
truths [1] 66/24
try [21] 6/7 85/6 119/25 167/11 185/24
 191/13 191/21 191/25 192/9 193/8 201/14
 232/1 232/8 236/21 237/2 237/19 240/1
 243/16 244/8 245/21 270/19
trying [24] 48/16 82/12 83/17 85/14 85/17
 86/12 92/21 165/23 173/24 180/19 190/12
 190/18 190/20 190/20 201/12 202/4 215/23
 218/10 220/4 224/23 245/13 250/22 252/21
 260/20 262/4 270/4
turn [4] 78/11 121/3 130/6 175/23
turned [2] 10/22 90/13
Turner [1] 3/19
turning [4] 17/10 42/7 169/2 175/22
TV [3] 219/14 221/14 221/20
twice [4] 41/21 136/10 154/12 160/23
two [37] 8/14 15/13 15/15 17/4 22/17 26/9
 27/5 33/10 36/23 41/22 50/12 67/16 84/15
 85/25 94/1 112/2 127/2 139/9 146/23 148/8
 153/15 154/23 155/7 155/10 175/18 184/3
 195/17 213/7 227/10 236/11 237/20 241/4
 256/25 261/10 266/7 266/9 266/12
two-page [1] 266/9
type [5] 103/7 122/25 169/9 171/25 257/7
types [1] 8/14

**U**

U.S [3] 1/17 8/19 136/25
UBS [1] 3/22
UCLA [4] 194/3 194/9 194/10 195/4
Uh [5] 148/4 155/20 179/12 181/7 182/24
Uh-huh [5] 148/4 155/20 179/12 181/7
 182/24
Ukraine [5] 162/17 162/20 162/21 162/25
 163/1
Ukrainian [1] 163/2
ultimate [1] 19/20
ultimately [4] 142/7 143/10 143/17 177/10
un [1] 89/1
un-detailed [1] 89/1
unable [2] 91/16 157/11
unavailable [1] 231/14
unaware [5] 73/5 90/7 98/21 98/24 127/13
under [63] 7/13 15/17 40/23 40/24 42/13
 45/22 46/2 49/17 49/18 49/19 50/6 52/3 52/5
 52/23 52/24 53/13 54/2 54/6 61/8 63/4 63/10
 63/12 68/1 68/12 71/19 90/10 92/1 104/10
 110/17 111/16 120/9 120/12 124/18 127/7
 130/10 131/1 134/25 143/22 147/1 163/24
 166/13 166/14 168/5 188/2 190/23 205/6
 207/3 221/24 222/13 224/5 224/18 233/17
 234/12 240/5 242/5 243/17 244/5 244/14
 245/22 247/8 260/21 269/5 269/10
undergraduate [1] 194/4
undersigned [1] 3/7
understand [54] 48/11 55/11 59/1 62/5 62/17
 62/20 63/16 63/16 63/18 64/1 64/2 64/4
 68/10 71/8 71/25 72/5 84/23 85/13 95/24
 102/6 107/8 108/11 111/18 122/4 131/16
 132/13 132/13 132/19 140/16 166/13 166/21
 173/11 181/15 181/25 183/13 190/12 190/21
 203/13 209/22 209/24 218/8 220/5 220/18
 221/3 230/3 231/3 231/12 231/12 243/18
 243/25 244/1 252/21 259/25 269/10
understanding [23] 40/25 93/25 94/2 95/1
 95/19 104/18 104/19 107/15 116/11 144/23

145/16 158/18 158/22 159/3 159/5 169/12
 170/12 170/18 180/6 187/19 216/12 250/16
 263/24
understands [2] 260/3 263/22
understood [11] 77/16 89/14 113/17 149/1
 151/14 154/6 154/7 156/1 179/18 261/22
 265/3
underwriters [2] 65/21 65/25
undisputably [2] 122/3 122/5
undisputed [6] 124/6 124/15 126/1 127/6
 217/6 218/3
undisputedly [1] 223/14
unfortunately [2] 98/14 183/20
unglued [1] 172/12 173/18
Uniform [1] 205/8
uninvolved [1] 103/25
unique [2] 146/15 152/15
UNITED [16] 1/1 1/3 1/13 2/8 3/4 3/6 6/1
 7/11 23/1 23/22 92/1 118/19 119/15 119/16
 163/8 200/24
Universal [2] 195/15 195/20
university [4] 142/2 142/2 174/25 195/6
unlawful [1] 103/23
unless [6] 53/4 148/7 157/12 232/18 243/15
 260/17
unnecessary [1] 221/23
unprepared [1] 112/2
unregistered [2] 84/6 129/5
unspoken [1] 185/9
until [11] 67/16 79/13 106/24 141/8 155/22
 175/13 197/4 214/22 216/14 238/5 242/12
untrue [4] 83/8 122/13 126/9 250/6
unusual [1] 248/9
update [1] 58/9
Upjohn [1] 139/8
upon [12] 52/10 63/2 66/24 90/25 94/20
 131/6 201/1 224/7 225/19 247/14 248/18
 251/2
urge [1] 251/23
us [47] 6/8 8/19 9/17 11/8 12/12 15/18 16/4
 18/9 18/19 20/8 31/20 44/3 53/7 77/12
 129/24 135/15 135/16 147/16 154/22 154/23
 156/11 157/2 171/7 171/12 171/17 172/2
 185/4 186/1 186/2 192/25 193/3 198/10
 209/23 210/2 210/17 216/23 235/9 235/17
 235/20 235/20 236/11 238/8 241/8 243/5
 247/14 262/2 266/17
Usdan [4] 55/22 56/2 269/6 269/10
used [8] 56/14 95/9 95/11 116/15 142/23
 147/24 152/10 163/24
useless [2] 242/10 242/11
user [1] 221/5
users [4] 217/23 218/1 218/12 220/10
using [4] 83/11 152/11 164/15 165/13
usually [1] 72/1
Utah [3] 13/11 13/14 13/16

**V**

vaguely [2] 54/22 257/25
valid [6] 219/4 220/22 220/25 221/1 221/7
 230/12
value [2] 24/3 24/5
various [10] 53/21 64/6 100/8 113/6 122/16
 123/4 200/22 205/23 252/23 258/12
Vegas [1] 12/21
vendor [3] 198/13 198/14 198/15
venture [5] 67/20 170/3 195/14 196/5 251/6
Ventures [3] 219/14 221/14 221/20
verify [1] 260/2
versions [1] 224/14

versus [2] 74/6 95/14
very [43] 8/13 9/6 10/16 10/18 16/4 18/19
 21/23 23/12 25/2 27/23 33/23 34/12 46/8
 47/3 50/14 50/14 54/16 67/2 80/17 86/25
 87/13 97/23 106/4 131/17 138/25 142/6
 160/13 164/24 164/24 164/25 165/5 165/19
 169/21 171/14 176/25 177/18 179/8 180/10
 182/21 187/10 188/16 204/23 249/3
via [2] 4/20 117/25
vice [12] 143/24 143/25 144/1 144/3 144/8
 145/5 145/7 154/3 162/15 164/18 173/9
 195/24
videotaping [1] 161/14
view [12] 85/12 176/13 240/11 254/19 257/9
viewpoint [1] 240/4
viewpoints [1] 240/21
views [1] 254/19
violation [1] 127/13
Virginia [1] 172/20
vis [4] 90/7 90/7 114/14 114/14
vis-a-vis [2] 90/7 114/14
visibility [1] 40/11
visit [2] 162/7 210/22
volume [3] 1/10 4/23 58/24
voluntarily [2] 215/8 249/11
volunteered [1] 141/21
voting [4] 52/11 52/17 78/25 78/25
VW [1] 39/10

**W**

Wachovia [5] 3/18 19/12 26/9 26/25 30/12
wait [3] 79/13 132/24 238/5
waited [1] 151/21
waiting [1] 232/25
waive [3] 189/17 230/8 239/3
waived [3] 190/13 192/19 193/24
waiver [1] 122/7
walk [4] 16/16 38/23 39/15 261/21
walked [1] 159/25
walks [2] 93/10 93/10
wall [1] 159/11
walls [1] 160/1
want [85] 14/1 31/9 40/18 56/8 60/22 63/23
 65/8 69/18 69/21 71/16 79/7 79/8 80/16 85/8
 85/16 85/19 85/21 86/3 86/18 86/23 87/12
 87/14 96/13 101/13 112/22 129/17 129/25
 130/1 130/5 130/6 131/9 132/11 133/20
 134/3 134/9 134/10 147/3 147/4 156/21
 161/3 165/10 175/3 179/8 179/18 184/20
 209/20 221/11 221/16 228/8 228/21 231/20
 232/24 232/25 235/4 236/20 236/22 237/7
 239/24 239/25 240/1 240/3 240/20 241/22
 244/8 244/10 245/11 245/20 245/21 245/25
 246/1 247/3 247/6 247/9 247/17 248/11
 249/4 252/22 252/23 253/2 253/4 254/11
 263/7 263/20 265/25 270/11
wanted [23] 58/1 84/13 117/18 120/6 151/11
 154/19 157/1 159/16 169/22 172/13 172/16
 172/17 174/4 174/23 175/1 175/3 184/15
 193/13 229/17 231/8 248/5 248/21 249/1
wanting [1] 158/3
wants [9] 86/21 130/23 235/9 235/9 236/16
 261/1 261/6 263/6 269/4
Washington [1] 1/18
wasn't [31] 26/11 33/2 47/19 48/20 56/6 57/5
 63/2 66/24 70/8 70/10 70/13 80/19 80/20
 96/10 98/9 100/10 103/9 105/2 152/19
 153/25 154/1 156/23 158/19 159/12 161/24
 176/16 178/17 179/23 185/3 228/25 266/8
waste [6] 192/13 193/9 232/1 236/21 237/2

## W

waste... [1] 247/17
wasted [1] 83/14
wasting [5] 83/13 84/8 165/19 236/25 247/5
Watch [1] 135/11
ways [1] 64/7
we'd [18] 154/14 154/14 172/13 235/11
235/13 237/7 237/9 237/24 238/2 238/10
238/18 238/20 239/19 261/5 261/11 262/24
263/9 267/17
we'll [45] 5/5 5/8 6/15 9/25 11/3 12/1 15/3
15/16 17/9 18/5 20/12 26/18 27/3 27/4 31/11
37/21 40/18 50/18 54/18 54/23 60/15 60/20
87/25 109/10 110/1 119/25 132/1 132/17
132/24 134/4 134/16 134/20 134/24 145/5
192/20 232/6 233/5 237/18 238/14 239/3
241/22 254/2 254/12 256/16 271/5
we're [55]  2/4 2/16 10/23 15/8 16/11 16/17
20/4 20/6 30/23 42/16 58/8 61/3 66/17 69/8
69/19 72/8 84/7 87/24 90/16 110/13 121/18
125/23 127/22 129/24 133/12 135/2 136/1
146/9 146/9 146/10 147/7 155/14 165/19
167/15 168/12 176/1 178/25 183/6 183/24
186/18 187/22 192/12 192/14 221/23 232/17
233/2 233/10 235/5 235/8 235/12 238/12
239/8 246/11 260/20 265/5
we've [18]  20/3 38/7 46/24 60/4 63/21 78/4
107/8 109/13 130/24 164/10 186/22 190/1
191/10 233/24 234/4 235/10 253/8 267/18
wear [1] 152/22
website [7] 15/10 68/24 130/20 131/7 131/7
131/8 177/6
Webster [3] 154/20 154/21 177/19
week [5] 106/15 106/19 169/19 176/18 270/4
weeks [5] 29/6 136/24 150/19 212/7 236/11
weighted [1] 53/2
weighted-average [1] 53/2
welcome [7] 2/13 61/3 61/13 110/22 133/23
167/18 168/10
well [106]
Wells [1] 3/18
went [50] 40/10 56/18 57/1 57/3 74/13 82/13
105/19 116/2 125/9 136/13 139/7 139/8
139/9 142/1 147/11 147/14 149/6 149/23
151/23 153/12 157/12 159/20 159/21 160/23
160/24 161/4 161/6 161/21 162/1 162/4
162/13 162/17 163/9 163/11 163/13 163/25
169/14 169/17 169/17 170/15 170/21 172/6
173/12 173/23 194/3 195/3 195/19 209/21
210/18 210/18
weren't [13] 80/3 97/24 107/20 113/17
113/18 134/14 152/13 160/3 160/4 161/19
163/8 173/11 210/20
west [15]  1/7 1/20 1/25 3/21 3/22 22/1 30/20
57/21 142/18 149/6 150/7 150/16 150/20
151/1 153/19
wet [1] 164/21
what's [41]  15/6 15/20 15/23 15/24 18/9
18/14 20/11 21/20 28/2 31/21 32/3 33/15
33/23 34/14 39/23 62/12 68/23 71/7 81/5
81/8 85/12 102/4 113/7 124/20 156/6 189/25
190/21 199/14 206/4 216/7 217/9 226/1
226/24 228/23 239/21 250/10 254/12 254/12
264/25 265/2 266/12
whatever [13]  85/3 117/5 117/5 117/5
127/20 129/25 131/10 132/11 135/3 149/24
163/10 241/1 261/7
whatsoever [1] 133/4
where [40]  13/9 13/10 44/1 52/19 52/19

55/17 75/2 75/20 116/24 117/14 117/25
133/2 135/14 137/15 149/1 155/10 160/13
164/22 169/20 172/6 192/20 194/2 203/7
203/13 204/19 205/4 205/18 205/22 206/14
206/18 210/18 213/5 215/22 215/23 217/16
236/8 249/12 250/23 260/8 260/12
whereas [1] 241/4
wherever [1] 202/15
whether [73]  30/6 48/22 49/17 56/14 57/9
58/9 58/11 58/14 65/1 69/11 75/17 78/18
78/24 79/9 82/20 83/8 83/9 83/22 83/24 86/3
86/8 86/9 88/1 88/17 89/8 89/10 89/13 90/4
90/11 90/18 90/22 95/6 96/15 99/23 99/25
100/4 100/14 100/23 101/13 102/22 103/11
106/1 106/15 108/20 111/12 120/18 128/17
139/21 140/25 140/25 153/5 158/22 166/1
166/2 167/9 174/5 174/7 174/10 182/19
190/13 192/18 198/25 199/3 204/1 217/7
231/1 234/22 237/3 250/5 253/1 256/22
259/14 259/23
while [20]  9/16 14/21 16/3 18/18 21/21 23/10
27/9 30/4 31/14 32/22 38/14 119/22 140/8
144/5 145/17 155/25 177/24 216/24 233/1
248/17
White [5]  1/21 269/19 269/21 270/1 270/16
who's [10]  31/21 44/23 69/6 109/12 109/14
205/11 229/19 269/16 269/21 270/21
whoever [2]  127/19 215/24
whole [7]  31/11 36/4 82/14 147/10 154/17
159/23 221/9
whom [1] 31/21
whose [3]  34/2 94/8 160/7
why [61]  12/3 23/15 30/23 31/12 31/12 43/14
43/14 43/14 47/15 56/3 60/11 76/2 76/11
81/24 81/25 82/2 84/7 84/20 86/4 87/17
104/23 109/2 114/11 123/17 127/14 128/25
131/19 146/25 148/9 148/11 148/12 152/8
155/24 157/5 162/4 162/18 166/22 176/7
177/18 183/21 183/23 184/17 188/14 189/1
215/21 216/22 220/22 228/19 232/1 234/19
241/23 242/7 244/14 245/13 249/21 250/1
250/3 257/20 259/10 260/12 268/20
wide [2]  7/13 251/14
wife [12]  25/3 41/5 44/23 95/3 96/23 97/13
97/15 125/14 125/15 163/9 171/7 187/8
Wilk [2] 12/15 12/18
Willie [4]  41/6 41/14 41/16 175/4
willing [3]  65/7 235/12 252/1
winter [2]  14/14 14/15
wire [47]  7/15 9/9 9/22 16/13 19/14 22/23
26/1 26/21 28/2 28/4 28/7 28/15 28/19 29/9
29/15 29/17 31/4 33/1 33/13 34/1 34/2 34/3
34/10 34/12 34/13 34/16 34/19 35/5 35/10
35/18 35/24 36/1 36/15 36/18 36/22 36/23
36/25 37/2 37/22 93/8 93/13 93/14 101/5
119/3 119/5 119/10 152/17
wired [3]  22/5 28/20 36/8
wireless [1] 152/17
wirelessly [1] 152/18
wires [15]  19/12 19/16 19/17 24/11 28/7 28/8
28/11 28/13 30/15 32/21 33/13 33/14 38/1
92/21 152/17
wiring [3]  30/11 30/12 33/2
wisely [1] 180/16
wish [3]  132/1 134/3 240/22
wishes [1] 241/2
withdraw [1] 71/10
withdrawal [1] 40/9
withdrawals [4]  25/15 39/17 40/14 40/17
withhold [1] 176/20

withholding [1] 267/16
within [9]  53/11 109/18 119/25 128/13
128/16 191/22 204/4 231/21 244/6
without [25]  6/24 21/7 32/6 95/25 98/6
120/22 128/4 156/18 164/19 173/4 199/22
210/2 214/25 218/1 221/15 228/25 229/13
236/24 238/14 238/24 239/4 252/4 261/8
263/7 269/13
witness [84]  2/17 2/21 3/1 5/9 5/9 5/25 6/5
61/7 75/11 75/14 82/7 82/11 82/12 82/13
82/16 83/12 83/17 85/18 94/16 109/14
110/15 127/4 127/9 129/15 132/20 135/10
146/15 164/14 167/14 167/19 168/1 168/12
179/3 179/16 184/1 185/17 185/22 190/25
192/25 201/15 202/5 220/1 220/3 220/21
220/23 221/17 221/18 228/7 228/25 229/19
230/6 231/14 232/7 236/23 237/1 237/19
240/1 240/25 241/20 244/22 245/20 246/3
246/10 246/15 246/19 247/4 247/7 247/18
248/6 248/6 248/19 248/22 249/2 249/5
253/22 256/17 260/2 264/2 265/14 267/22
267/24 270/3 270/10 271/10
witness' [1] 5/6
witnessed [2]  145/16 193/5
witnesses [8]  76/14 83/13 89/2 268/1 269/1
269/5 269/15 269/18
witnessing [1] 212/19
woman [3]  75/6 165/4 185/2
woman's [1] 165/4
women [1] 140/23
won't [7]  6/18 15/5 19/1 34/11 36/4 122/5
134/1
wonder [1] 172/2
wondered [1] 172/6
Woodbury [12]  25/7 44/14 44/15 51/18
78/13 89/17 123/7 244/16 244/17 245/6
252/25 255/13
words [3]  68/20 81/16 226/8
wore [1] 149/20
work [26]  7/11 46/12 58/25 88/22 90/14
116/16 116/20 117/5 117/8 129/24 139/6
139/8 139/8 142/1 146/9 148/10 158/15
158/20 172/14 174/7 195/1 195/10 195/20
196/16 201/22 204/16
worked [22]  46/13 65/9 65/11 142/2 144/13
144/14 150/2 154/8 154/15 154/21 155/2
155/4 155/4 157/18 157/20 157/24 161/1
169/12 169/20 172/20 215/19 219/18
working [8]  101/14 126/4 139/10 203/23
212/11 212/13 218/2 269/12
works [2]  149/3 149/5
world [3]  3/23 189/7 195/21
worth [4]  40/16 125/16 126/1 148/25
worthless [1] 126/2
wouldn't [8]  46/17 111/24 139/13 139/14
156/9 172/14 175/23 182/16
wrap [1] 87/22
writes [1] 146/22
writing [5]  20/15 65/19 147/13 166/3 224/24
written [1] 258/14
wrong [9]  36/9 83/19 86/16 164/23 165/11
173/4 173/6 173/7 229/25
wrongdoing [1] 88/8
wrongful [4]  54/21 85/21 87/11 122/25
wrote [3]  146/17 244/15 244/18

## Y

y'all [1] 147/2
yeah [52]  15/15 17/23 33/14 40/16 50/13
50/17 54/22 56/13 57/23 57/24 64/9 66/8

**Y**

yeah... [40]  66/10 67/13 72/11 74/20 75/25
78/2 78/5 78/25 80/4 81/3 86/7 89/18 91/24
104/23 111/21 140/9 140/13 144/13
145/3 146/17 146/17 147/24 151/3 155/15
155/15 155/17 158/2 158/2 159/25 161/4
161/13 169/8 170/6 184/16 185/5 217/21
232/15 256/3 265/21
year [6]  26/18 26/20 88/13 139/23 159/12
195/16
years [23]  7/23 53/8 67/16 77/17 88/12 88/18
88/23 106/16 106/23 139/22 142/3 148/13
194/21 195/16 199/1 200/23 213/3 215/19
222/6 245/5 251/14 254/23 254/24
years' [1]  106/22
yell [2]  85/9 85/11
Yep [1]  170/12
yes [309]
yesterday [1]  136/8
yet [6]  15/19 94/16 234/3 234/14 240/7
263/17
York [10]  1/18 56/15 56/18 57/2 57/3 57/12
74/13 95/18 136/13 136/13
you -- I [1]  54/13
you'd [11]  15/18 16/16 19/7 132/10 134/11
180/24 182/7 182/22 184/16 262/5 262/17
you'll [3]  107/1 185/24 227/15
you're [97]
you've [47]  8/3 22/22 22/25 47/13 55/6 56/12
57/9 70/15 74/10 79/16 84/17 92/12 92/13
93/15 96/22 99/2 105/16 138/19 139/1
154/22 156/15 157/11 163/22 175/9 177/4
180/10 189/8 197/3 208/1 214/7 214/12
215/18 227/17 234/24 241/18 241/19 241/20
241/23 247/11 247/12 254/18 255/19 256/10
257/5 257/16 259/8 269/22
young [2]  174/22 175/2
younger [2]  144/19 148/8
yours [2]  105/25 215/9
yourself [1]  207/15

**Z**

zero [2]  85/6 125/9