UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.: 11-80205-CR-MARRA

UNITED STATES OF AMERICA,

vs.

MITCHELL J. STEIN,
　　　　　Defendant.
_____/

<u>DEFENDANT MITCHELL J. STEIN'S MOTION FOR NEW TRIAL IN THE INTEREST OF
JUSTICE AND BASED UPON NEWLY DISCOVERED EVIDENCE,
REQUEST FOR EVIDENTIARY HEARING</u>

The Defendant, MITCHELL J. STEIN, hereinafter ("Stein" or "Defendant"), by and

through the undersigned attorney, pursuant to Federal Rule of Criminal Procedure 33 and the

additional authorities cited below, hereby moves this Honorable Court for an order granting the

defendant's application for a new trial. Defendant respectfully requests leave to file this Motion

in excess of the page limit as directed by Local Rule 7.1(c)(2). Defendant submits a separate

Motion for Evidentiary Hearing concurrently herewith pursuant to Local Rule 7.1(b)(2).

Newly discovered evidence undeniably establishes that Defendant's conviction was

based on the perjured testimony of key Government witnesses and exclusion of crucial

exculpatory and impeachment evidence as a result of prosecutorial misconduct. Defendant

further believes that the Government has failed to comply with *Brady* and *Giglio* obligations as

well as court orders, resulting in the suppression of relevant exculpatory material, preventing

Defendant from having a fair trial for causes not due to the Defendant's own fault, which

necessitates a new trial. This Motion is further based on newly discovered evidence as set forth

below. This motion is based upon the following grounds:

I.     **PRELIMINARY STATEMENT**

As the Court is aware, on May 20, 2013, Mr. Stein was convicted by a jury of mail and wire fraud, securities fraud, money laundering, and obstruction of justice. See DE 212. This Court remanded him into custody immediately following trial. See DE 209.

Because of a culmination of events that led to an unfair trial for Mr. Stein, he requests a new trial. At this stage in the proceedings, the Court has broad discretion to decide whether a new trial is now warranted. Rule 33 of the Federal Rules of Criminal Procedure provides that, upon a defendant's motion, the Court "may grant a new trial to that defendant *if required in the interest of justice*" (emphasis added). At least when the decision to grant a new trial is not based on the insufficiency of the evidence, where a more stringent standard applies, "[t]he decision to grant or deny the new trial motion is within [the] sound discretion of the trial court and will be not overturned on appeal unless the ruling is so clearly erroneous as to constitute an abuse of discretion." *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) (citation omitted) (emphasis added); *United States v. Pedrick,* 181 F.3d 1264, 1266 (11th Cir. 1999), ("[W]e review for clear abuse of discretion the trial court's decision to grant a new trial . . . .") (emphasis added). As expressly stated in the language in Rule 33, the basis for granting a new trial under the Rule "is whether it is required 'in the interest of justice'. That is a broad standard. It is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous." *Vicaria,* 12 F.3d at 198 (emphasis added).

Indeed, in *Vicaria*, in which the Court of Appeals affirmed the district court's decision to grant a new trial based on a reconsideration of its ruling on a jury instruction issue, the district court did not hold that it had committed legal error in refusing the defense instruction. It "concluded only that it 'should have instructed the jury' on the defense theory, not that its failure

to do so was legal error." *Id.* at 198 (emphasis added).

Here, a "perfect storm" of events left Mr. Stein unrepresented, facing pressure from the Court to resolve his matter, and unprepared to properly defend himself. The suppression of exculpatory evidence in conjunction with Defendant's inability to retain the counsel of his choice and his subsequent decision to represent himself denied him a fair trial and allowed the Prosecution to take advantage of the situation. Consequently, the Court should give Mr. Stein a "do over" to ensure the integrity of any convictions Mr. Stein may or may not eventually face.

II.    **INTRODUCTION**

Defendant has now discovered new evidence which the Government had a duty to disclose, and which either directly contravenes or tends to contravene the allegations against Defendant as described herein. All of this evidence contradicts trial testimony of the Government's key witnesses. In one instance involving not a "fake" but a real, live person on a Purchase Order change of address notice – the uncle of Martin Carter's wife – the Government ripped this change of address notice off of its trial exhibit and adduced testimony that the uncle of Martin Cater's wife was not involved in the company Cardiac Hospital Management it pertained to. (Transc. Vol. 6 at 42).

As to IT Healthcare and its change of address notice, newly discovered evidence establishes that Yossi Keret is a real person and the address at 10 Smilanksy Street (the address on the change of address notice) is a legitimate address. This is contrary to the testimony of Martin Carter and the repeated representations in open court by the government.

As the United States Supreme Court stated in *Kyles v. Whitley*, 515 U.S. 419 (1995), the Courts do not tolerate "slovenly investigations" in criminal cases particularly when they are

coupled with prosecutorial misconduct.  *Id*. at n. 15. Here, the government's misconduct (a) involved a violation of this Court's September 26 2012 *Brady* order, (b) pivoted around the universe of documents containing over 200 million pages of evidence the Government had access to, yet fought to prevent the Defense from gaining access to, and (c) in any event failed to identify *Brady* material of obvious exculpatory value contained within it. Instead, the Prosecution provided what it finally admitted was a "very small subset of documents" from the universe of documents the Prosecution deemed important to bolster its case, <u>and which curiously excluded pertinent material that would impeach key Government witnesses</u>. The Defense has already uncovered extensive exonerating and impeachment evidence out of a database containing documents possessed, but never turned over, by the Government. Given time, the Defense expects to uncover significant additional exonerating evidence, considering what has been found to date. In the event this Motion for New Trial is not granted, the Defense will almost certainly be compelled to file Motions for New Trial s*eriatum.*[1] This is the consequence of Government misconduct in withholding Defense access to large databases and exonerating documents contained within them.

### III.   <u>NEWLY DISCOVERED EVIDENCE; THE "SMOKING GUN"; PERJURY BY GOVERNMENT WITNESSES</u>

(i) <u>Perjury Committed by Government Witness Martin Carter</u>

<u>Perjury regarding Carter relatives' involvement with Cardiac Hospital Management; the Government secretly detaches critical page bates stamped "DOJ-Carter_000008" from Exhibit 300.</u>

After the trial, the Defense has uncovered new and powerful impeachment evidence

---

[1] Defendant plans to do so every time new evidence is discovered.

calling into question the incredible story of Martin Carter, alleged co-conspirator and key Government witness, who was allegedly advised by Mr. Stein to fabricate fake names and fake change of address notices. The Prosecution suppressed this evidence and then presented false testimony of Martin Carter to the Court and the Jury. The Defense could not impeach Carter, because it did not know about a key page of an actual DOJ document named "DOJ-Carter_000001", to wit: page stamped DOJ-Carter_000008 [2], which the Prosecution detached from the trial exhibit (Govt. Ex. 300) and thus concealed from the Court and the Jury. If the Court has any inclination to deny the Defendant a new trial, the defendant would submit that document experts must be called at an evidentiary hearing regarding Government Exhibit 300. The Court is respectfully requested to examine the Government trial exhibit 300 (attached hereto as Exhibit "A") with the DOJ exhibit as kept in the DOJ files (attached hereto as Exhibit "B"). Given that this document was tampered with by the Prosecution prior to its presentation to the Court (by detaching page DOJ-Carter_000008), it is appropriate to determine why the location of the bates stamp shifted from the bottom right hand corner to the bottom left hand corner of the page just as Government Exhibit 300 was presented to Mr. Carter on the witness stand. It is submitted that the Government cannot have an innocent explanation for bate stamped numbers that appear in different places on the same document.

     The first page of Government Exhibit 300 contains what Carter admitted is his hand-writing of the name and address of the uncle of Carter's wife, Antonio M. Mijares. On direct examination, the Prosecution adduced Carter's testimony that his wife's uncle Mr. Mijares was in no way associated with a company called Cardiac Hospital Management. (Transc. Vol. 6 at 42). The Prosecution's presentation of the document in the possession of the DOJ was

_____

[2] Attached hereto for the Court's convenience.

5

misleading at best. The real Government Exhibit 300 (DOJ document named "DOJ-Carter_000001") contains bates pages DOJ-Carter_000001 through DOJ-Carter_000008, however the Prosecution's Exhibit 300 presented at trial omits the last page and ends in DOJ-Carter_000006. Page bates numbered DOJ-Carter_000008 is a smoking gun. The original document, containing page DOJ-Carter_000008, is so crucial that the defense has attached it hereto as Exhibit "B" as well as to the Decl. of Reichardt in support of this Motion as Ex. "H" for the Court's convenience. The missing DOJ_Carter_000008 page is certainly problematic. The suppressed page clearly shows that Carter listed a live, existing person – his wife's uncle Mr. Mijares – as the new contact for Cardiac Hospital Management.[3]

On cross-examination regarding his claim that he fabricated fake people and addresses in Israel and Japan, Carter was asked whether he had relatives there.[4] He admitted he did. (Transc. Vol. 6 at 41-42). Just as we now have additional evidence that the purchase orders were real (see *infra*), the Defense at trial was attempting to impeach Carter with proof that his relatives may have been involved in the Israel and Japan change of address notices. Because Carter's story has no corroborating witnesses or documents, such impeachment – if it existed – was absolutely critical to a fair defense. And, low and behold, we now find that the very change of address

---

[3] Curiously, the Government questioned Mr. Carter regarding his handwriting on the first page of Exhibit 300, Bates stamp numbered DOJ-Carter_000001 when the database contained the identical exhibit as it existed in Carter's files kept in the ordinary course of business as turned over to the DOJ. That Carter document contained the change of address notice for Cardiac Hospital Management, c/o Mr. Mijares, contradicting Carter's testimony at trial that Mr. Mijares was in no way affiliated with Cardiac Hospital Management. In other words, the Government adduced testimony from Carter that his wife's uncle had nothing to do with Cardiac Hospital Management, although the document before him during that testimony originally contained a page directly contradicting that testimony. Somehow, that page – produced to the DOJ by Carter (bates stamped DOJ-Carter_00008) – did not make it into Government Exhibit 300 and did not make it to the attention of the Court or the Jury in this criminal case where the Government is now seeking a multi-decade prison sentence. A clear violation of Brady – the needle in the haystack (200 million plus pages of data text) run amok – is unimaginable.

[4]. Exhibit "C" attached hereto is a computer printout of an 8-K SEC filing the Defense has newly discovered showing that the unique name of Yossi Keret <u>is in fact attached to a real person and that real person was the CFO of Pluristem Life Systems Inc.nna Pluristem Therapeutics Inc.</u>, a large Israeli biotech company which develops and commercializes products for the treatment of severe blood and cardiovascular disorders.

document produced by Carter to the DOJ contains a real person, who was a real relative of Carter (his wife's uncle) with a real address. And we now know to be very suspicious of the Prosecution's conduct in (a) adducing testimony that his wife's uncle was in no way whatsoever associated to a company called Cardiac Hospital Management, and (b) detaching page DOJ-Carter_000008 from Government Exhibit 300 so that the Jury would never have the opportunity to conclude that Mr. Mijares on Exhibit 300 was or may have been the contact person for Cardiac Hospital Management.

What was the Government's reason for confronting Carter with a version of the Purchase Order Govt. Ex. 300 – containing his handwriting of his wife's uncle's name, as opposed to confronting him with a complete version contained in the Government's database named DOJ-Carter_000001 as produced by Carter? What was Carter's initial reason for preparing page bates DOJ-Carter_00008 listing his uncle as the contact person for Cardiac Hospital Management? Why did the Government knowingly fail to offer into evidence the Mijares change of address letter produced by Carter at trial? Why did the Prosecution fail to question Carter about the Mijares change of address letter? Given that Mr. Mijares is a relative of Carter, what is Carter's new explanation regarding whether the change of address notices contained real people and real address? The jury will never have a chance to adjudicate these questions in the light of the striking exhibit bates stamped DOJ-Carter_000008, because the Prosecution eliminated that opportunity. However, the Court is empowered to do justice and vacate the conviction. It is submitted that Defendant's Motion for new Trial should be grated.[5]

---

[5] The DOJ is expected to respond to the missing page bates stamped DOJ-Carter_00008 phenomenon, by contending either that the page is not a part of Exhibit 300 containing Carter's handwriting, and/or the page DOJ-Carter_00008 was elsewhere in the database. These arguments would be without merit, based upon an examination of database exhibit DOJ-Carter_000001, a true and correct copy is attached hereto. The existence of these databases, as discussed in detail herein, is the most compelling reason to vacate the conviction here and is of no help to the

<u>Yossi Keret really exists, the address on the change of Address Notice really exists</u>

Martin Carter and Prosecutors Albert Stieglitz and Kevin Muhlendorf continuously

misled the Jury throughout the trial regarding the so called "fake person" Yossi Keret and the

"made up" address on the change of address notice. For example, Carter and Stieglitz had the

following exchange under oath at trial:

> Q  And then this one says: "Dear, Dr. Harmison, please make notice of our
> change of address for IT Healthcare and product delivery," and then it gives an
> address in Natanya, Israel; is that right, Mr. Carter?
> A That's correct.
> Q Is that address familiar to you, Mr. Carter?
> A It's a made up address.

Transcript of Jury Trial Proceedings, Vol. 6 at 58-59.

However, Carter – who also testified that he owned a company called Electrical Connections[6]

-- committed perjury when he testified that the address "10 Smilansky Street, Netanya,

Israel" on the IT Healthcare change of address notice (Govt. Ex. 94) was made up, because,

as the Defense recently discovered, 10 Smilansky Street is a real address for a company

called *Electrical Products Import & Marketing LTD*. (Ex. "K" to the Decl. of Reichardt).

Even if the Court concludes that Carter did not commit perjury while stating he made up the

address, the newly discovered evidence could have been used to impeach the witness. If

Carter was telling the truth that he "made up" the address 10 Smilansky, how could it be that

10 Smilansky Street is a real address in Israel of a company bearing eerily similar name to

Carter's company: Compare "Electrical Connections" with "Electrical Products Import &

Marketing".

---

Government. If the missing Carter DOJ-Carter_000001 to DOJ-Carter_000008 were unimportant or benign, why
didn't the Government confront Carter with them at trial before the Court and Jury? No answer by the Government
to this question could justify the failure to specifically identify and produce the Carter change of address notice
bearing a real person's name and address.

[6] Transc. Vol. 6 at 61-62; see also Govt. Ex. 96.

To make matters worse, the government told the jury numerous times that the name Yossi Keret (as well as all of the change of address names) was fabricated.  For instance, in closing arguments, the Prosecution stated, that the "[c]onfirmation letters faxed by Martin Carter, at Mr. Stein's direction, <u>with names Mr. Stein made up, Tony Nony, Yossi Keret.  There's no evidence that those people exist. Mr. Stein made them up</u>" (Vol. 10 at 28), and that "[t]here's <u>not one shred of credible evidence that these people existed or these contracts actually happened</u>.". *Id.* at 39. (Emphasis added.)

In perhaps the most brazen example of the government's handling of this case, <u>the Government's own SEC website</u> contains a publicly traded health care company (that also is in the cardiovascular industry) <u>has Mr. Yossi Keret as its Chief Financial Officer</u>. (Ex. "J" to the Decl. of Reichardt). At long last, after a 5 year SEC-DOJ investigation into the Purchase Orders, do we really believe that these two Governmental agencies chose to indict a Defendant without checking their own public records to assure the veracity of their statements in Court?

All of the foregoing evidence regarding Yossi Keret and 10 Smilansky Street was discovered by Mr. Stein's paralegal Rasika Reichardt as explained in her declaration.

Defendant submits it is not in the interest of justice – and violative of *Brady, Kyles* and *Moon* – to shift the burden to investigate these basic elements of the allegations from the Prosecution to the Defendant, whose assets have been frozen, whose right to counsel has been denied on the eve of trial and who was denied access to significant exculpatory and impeachment evidence, as further discussed below.

Even presuming a spectacular explanation of innocence, the statements by the Prosecution and their key witness were still false, Carter's testimony was still perjurious, the newly found information regarding Mr. Keret, the newly found information regarding "Electrical

Products Import & Marketing LTD" and "10 Smilansky Street", and the balance of newly

discovered information about Carter merits immediate relief in the form of a court ordered new

trial.[7]

<u>Other Newly Discovered Evidence Pertaining to Carter</u>

New evidence also reveals Dr. Harmison's involvement with Martin Carter and the

Purchase Orders. Additional new evidence shows that Dr. Harmison was involved with Martin

Carter's brother, David Carter, a fact which was not once raised by the Prosecution or Carter.

(Ex. "G" at 7, Decl. of Reichardt.) Finally, new evidence indicates that it was Dr. Harmison who

took or may have taken the Purchase Orders (Ex. "G" at 12, Decl. of Reichardt) and shows that

the IT Healthcare Purchase Order names Dr. Harmison as the sales person (Ex. "G" at 14, 15,

Decl. of Reichardt), that is was Dr. Harmison who sent shipment instructions directing Stan

Gelfer to ship Signalife product to Tim Cutter at IT Healthcare (Ex. "G" at 1, Decl. of Reichardt)

and Orita Marina at Cardiac Hospital Management. (Ex. "G", Decl. of Reichardt at 2.)[8]

---

[7] Newly discovered evidence pertaining to the existence of persons and addresses alleged to be made up by Mr.
Stein, e.g. the existence of Yossi Keret in Israel, would also have affected how the Jury would have viewed the
Obstruction of Justice claims in the Indictment – the "lies" Mr. Stein allegedly told to the SEC, the deposition for
which should be read as a whole. There is a reasonable probability the Jury would have concluded that because
certain individuals and addresses were real but known by others such as Martin Carter and Dr. Harmison, Mr.
Stein's SEC testimony that he did not know certain individuals, e.g. Yossi Keret and Tony Nony, and the respective
companies was not a lie. On the other hand, we now know that Martin Carter committed perjury multiple times
during trial, and therefore must have told the truth before the SEC. Defendant submits that had the Defense had an
opportunity to impeach Carter with the suppressed and newly found evidence, there is a reasonable probability the
Jury would have concluded that Carter was, in fact, lying during trial, while Stein's SEC testimony is consistent with
his Defense. Had the Jury known that Carter was lying at trial, thus telling the truth to the SEC, there is a reasonable
probability that the Obstruction of Justice claim fails as a matter of law.

[8] Some of the suppressed evidence, e.g. emails, list Mr. Stein as a "cc". The Prosecution is expected to argue that
Mr. Stein had access to all documents he was listed as a recipient on. This, of course, prejudices Mr. Stein from
representing himself *pro se* at trial, because nobody would argue with a straight face that Michael Pasano (prior
Defense counsel) was not entitled to all Brady documents irrespective of whose name is listed as a recipient on each
document. Further, given the enormous quantity of files and documentary evidence in this matter, the Defense
cannot be expected to recall and discover each and every exculpatory communication which may have occurred
years ago, and it is, of course, contrary to the Rule of Brady v Maryland in which "...the prosecution's responsibility
[as set forth above] is inescapable.... "*Kyles v. Whitley*, 515 U.S. 437, 438 (1995). See also *Moon v. Head* (Affirming

A failure on the part of the Government to disclose favorable evidence requires a new trial, if disclosure of the evidence creates a reasonable probability of a different result. As the Supreme Court explained in *Kyles*, "the adjective is important," and "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

Defendant submits that there is a reasonable probability that the Jury may have concluded that the other persons alleged to be "fake" throughout the trial (e.g. Transc. Vol. 2 at 22, 28, 103, 109) could have, in fact, been real, had the Jury known of the change of address letter by the uncle of Carter's wife in the Philippines – a real person. Defendant further argues that there is a reasonable probability that the Jury may have concluded that it was primarily Dr. Harmison who was involved with the Purchase Order transactions and was collaborating with Carter on various transactions, had Carter been confronted with newly discovered evidence during trial.

(ii) <u>Perjury Committed by Government Witness John Woodbury:</u>

During Trial, Government witness John Woodbury, former securities counsel for Signalife, stated that he received all his information regarding the Purchase Orders from Defendant while preparing Signalife's 10-Q for the period ending September 30, 2007.

Transcript of Jury Trial Proceedings, Vol. 2 at 96:

```
19  Q And again, at the time you prepared and filed this
20  quarterly filing, this 10-Q, with the SEC, did you have any
21  additional independent information about these purchase orders
22  other than what we've seen?
23  A No, I did not. I did not speak to Dr. Harmison. I got
```

---

*Kyles v. Brady* in 11th Circ.). See also *United States v. Spagnoulo* stating that in some cases, even though the defendant should have known of the existence of the information, this will not relieve the government of the burden of producing the information. *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992).

24  all my information from Mr. Stein.

The evidence Defendant has uncovered towards the end of trial of Norma Provencio e-mailing to Woodbury the Tribou payment (Defense Ex.410, not admitted but stipulated to) and which references the 9-14 Cardiac Management Purchase by Purchase Order number (Ex. "B" to the Decl. of Reichardt) is in direct contradiction to Woodbury's testimony during trial. The email showed that the Signalife audit committee (not Mr. Stein)[9] sent Tom Tribou's $50,000.00 check made payable to the Cardiac Hospital Management purchase order to John Woodbury for processing on October 24, 2007 in preparation for the 10-Q the Government refers to, which was completed and executed on November 14, 2007. (Ex. "D" to the Decl. of Reichardt.) Thus, Woodbury committed perjury when he stated that he obtained all his information about the purchase orders from Mr. Stein as of November 14, 2007.[10]

On redirect, the Government asked Woodbury eight (8) times if evidence the Defense showed Mr. Woodbury on cross-examination had anything to do with the Purchase Orders (Transc. Vol. 3 at 9-12) , creating the illusion that no such impeachment evidence existed, knowing that Defendant had no knowledge of the now uncovered evidence at the time. Defendant was not a party to the e-mails referred to above and could not have known of their existence. (Decl. of Reichardt) It was not the duty of the Defense to find that of which he has no knowledge, but it is the Prosecution's duty to disclose impeachment evidence.

The Government's examination of Woodbury was scripted, misleading and contained lies. Defendant submits that there is a reasonable probability the Jury would have disbelieved

---

[9] Apparently in full compliance with all Sarbanes-Oxley requirements.
[10] Even if the Court concludes that Woodbury did not commit perjury, the inconsistencies could have been used to impeach him.

Woodbury's tailored testimony if the Defense had the chance to impeach Woodbury with evidence it did not have at the time of cross-examination and which the Government had a duty to disclose.

(iii)Perjury Committed by Government Witness Tracy Jones:

During trial Government witness Tracy Jones, former secretary for Dr. Harmison, testified under oath that she called the allegedly false Purchase Orders "phantom purchase orders" because she never received anything on them. Transc. Vol. 3 at 117:

1 Jones: "Well, I had a discussion with Lee Erlichman when he came
2 to visit the office that I called them phantom purchase orders
3 because I never received any backup or anything on them."

The evidence discovered towards the end of trial (October 24, 2007 e-mail to Woodbury, Ex. "B" to Decl. of Reichardt) and well after Tracy Jones testified indicates in the e-mail chain that Ms. Jones forwarded the $50,000 Tribou check referencing the Cardiac Hospital Management Purchase Order by Purchase Order number (H-2003-0001) to Norma Provencio. (Ex. "C" to the Decl. of Reichardt). Again, this evidence is in direct contradiction to Ms. Jones' testimony at trial, but since Defendant had not known of this impeachment evidence in a timely manner, he was deprived of the ability to effectively prepare for his cross-examination. Even if this Court concludes that Ms. Jones did not commit perjury when stating that she never received anything on the Purchase Orders, Defendant submits that had he known of suppressed impeachment evidence, he would have been in a better position to cross-examine this witness.

**IV.    NEWLY FOUND EVIDENCE INCOVERED TO DATE, ALONE IS MATERIAL AND ITS SUPRESSION AND VIOLATES BRADY**

The perjury committed by these key Government witnesses contain the identical lie – a lie which is undoubtedly relevant and material to the Government's allegations – and proves a

13

pattern of the intentional suppression of the truth which the Government could not or should not have been unaware of had it not conducted a slovenly investigation, requiring the conviction to be set aside.

Again, Defendant submits that there is a reasonable probability the Jury may have disbelieved Ms. Jones' testimony had Defendant impeached this witness with evidence which he had no knowledge of at the time, and which the government failed to disclose.

In *Bagley*, the Court established a uniform test for materiality, choosing the most stringent requirement that evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. This materiality standard, found in contexts outside of *Brady* inquiries, is applied not only to exculpatory material, but also to material which would be relevant to the impeachment of witnesses. *United States v. Bagley* 473 U.S. at 676-77.

See also *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991). Cf. id. ("Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (internal quotes omitted)).  However, even if the Government claimed it did not know the perjury committed by its witnesses, the Government still had a duty pursuant to *Kyles* to learn of and disclose favorable evidence. In *Kyles*, the Court determines that a *Brady* claim might arise "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way. The Court found a duty on the part of the Government even in this last situation, though admittedly only when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id*., at 108.

Defendant submits that the holding in *Kyles* is consistent with Defendant's conclusion, that it

would have been impossible for the Defense to dig through millions of files weeks before trial, some of which are not searchable, others may not be found even if they were searchable (Decl. of Reichardt), in hopes to find the exculpatory documents, while limping to trial indigent and *pro se*.

Nevertheless, if the defense would have had access to the universe of documents from a four year investigation <u>in a meaningful manner</u> prior to trial, the defense would submit that there is a reasonably probability that the verdict would have been different. The Government's suppression of that universe, admitted by the government for the first time at the *Faretta* hearing (Transcript of April 3, 2013 Faretta Hearing Proceedings at 41) is contrary to meaningful access. It is no access. The small "subset" hard drive which is unsearchable in the manner as discussed herein is the proverbial haystack which gives no ability to find the documents in a few months or a year. Indeed, the Government's investigation stands four (4) years. The DOJ was so confident of the comprehensiveness of that investigation that it was comfortable to indict on some carefully worded "access request" to an agency it controlled – the SEC. Brady and Kyles constitute an access request as a matter of law, that the Government search all its databanks and both find and turn over all exculpatory evidence including all which it does not know. The Government failed to do so and indeed the Government introduced documents and testimony at trial that were incomplete and false. These violations go to the heart of the line of cases ending in this Circuit – *Brady, Kyles* and *Moon*—they merit an order vacating the conviction and new trial.

Defendant states that he will continue to uncover new evidence which will contradict the Government's allegations and prove that most if not all Government witnesses committed perjury during what appeared to be carefully scripted testimonies and tailored parroting of "Mitch-Stein-made-me-do-it" and "Mitch-Stein-controlled-everything" infused phraseology

throughout the trial.

## V.   VIOLATIONS OF BRADY AND GIGLIO OBLIGATIONS

Most importantly, despite discovery requests and Brady orders (as described in detail below), the Government never turned over to Defendant any material whatsoever pertaining to the down payment by Thomas Tribou towards the Cardiac Hospital Management Purchase Order – government's key Exhibit No. 64, one of the three (3) allegedly false Purchase Orders at the heart of the Indictment, such as the Tracy Jones sub-folder, the John Woodbury sub-folder, the Norma Provencio sub-folder (Decl. of Reichardt). The importance of the $50,000 check and Tracy Jones/audit committee transmission of it became compelling in closing argument when the government ran from the truth and misled the Jury stating that the check had no connection to Cardiac Hospital Management. (Transc. Vol. 10 at 114-119). Whether or not the check itself was admissible, the Defense should have been given an opportunity to impeach Government witnesses with it and to call to the stand auditors who handled the payment.

Regarding other newly discovered evidence that may have been buried within millions of pages of files the Government provided on its hard drive, Defendant respectfully submits that the Government still failed to meet its *Brady* obligations, and refers to *United States v. Salyer*, Cr. No. S-10-0061 LKK (GGH), 2010 WL 3036444 (E.D. Cal., Aug. 2, 2010) where the Court concluded that "the government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack." *Id*. at *6 (quoting *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998), rvs'd in part on other grounds, 176 F.3d 517 (D.C. Cir. 1999)).

This case involves a considerably larger volume of documents and files. As the Court in

*United States* v. *Skilling* finds, "the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it. These scenarios would indicate that the government was acting in bad faith in performing its obligations under Brady." *United States v. Skilling,* 554 F.3d 529, 577 [5th Cir. 2009). Further, Government and Defense <u>did not have equal access</u> to the universe of documents in this matter as further discussed below, preventing the Defense from uncovering exculpatory evidence the Government has access to. Only when evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility of failing to conduct a diligent investigation. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002). Notwithstanding this unassailable advantage over Defendant, the Government knew of the existence of this crucial material and nevertheless suppressed it. In addition, Defendant is unaware of all categories the Government could have turned over, such as the evidence pertaining to Mr. Mijares.

## VI.   <u>GOVERNMENT'S "CHERRY PICKING" OF ITS COMPREHENSIVE DATABASE</u>

(i)   <u>Background</u>

Since 2008, the SEC conducted an investigation on the same matters subject to the underlying Indictment. In fact, the SEC sued Mr. Stein in a parallel civil proceeding, *SEC v. HeartTronics, Inc. et al.,* Case No. 8:11-cv-01962- JVS (C.D. Cal.) on December 20, 2011 – one day after the Indictment was unsealed and Mr. Stein was arrested. In 2008, during its investigation, the SEC was provided with over 200 million pages of documents from various sources, including numerous subpoenas pertaining to about thirty-three (33) SEC depositions, enriching the SEC database with a mass of relevant material which is excluded from the database Signalife has access to.

17

The Government initially produced to former counsel of record a database and CDs of documents that the Government regarded as important. On March 6, 2012 and April 24, 2012, defendant sent twelve (12) discovery letters to the Government requesting specific items and categories of material. (See DE 41, Ex. A – Cover Letter and Discovery Letters #1-9 and DE 41, Ex. C – Discovery Correspondence #10-12). The Government's failure to respond to certain of these discovery requests caused defendant's former counsel, Michael Pasano, to file a Motion to Compel *Brady*. (See DE 41.) The Government opposed the Motion by (i) withholding the fact that it had unfettered access to over 200 million pages of files relating to Signalife (hereinafter "universe of documents") in conjunction with (ii) intentionally mis-citing case law, thus, committing intrinsic fraud on the Court.

(ii)     <u>Government finally discloses its universe of documents at the Faretta hearing</u>

The Government maintains that "United States' discovery obligations do not extend to materials in the possession of the SEC" (DE 46 at 6), and that the "Department of Justice prosecutors do not as a general matter have […] access to SEC materials" (DE 46 at 5), yet the Department of Justice obtained its files in this matter from the SEC pursuant to an "access request". See Transc. Of Faretta Hearing at 41. (Mr. Stieglitz: "That's this sort of 200-plus million pages or documents, I've lost track of which one it is. That's that universe of documents. […] A very small subset of those documents were provided by the SEC to the Department of Justice pursuant to an <u>access request</u>. Those documents, for document management purposes, were then, admittedly, put into a database by my office." (Emphasis added)). The fact the DOJ had access to the universe of documents in possession of the SEC was withheld by the Prosecution in June 2012 when former defense counsel Michael Pasano moved this Court to Compel *Brady* (DE 41) in response to non-compliance by the government with its *Brady* obligations as described above. Despite the DOJ's

assertion that the DOJ and SEC investigations were "truly separate investigations" (DE 46 at 8) and that it had no obligation to turn over requested material, the DOJ announces on its website that "[t]his matter [CASE No.: 11-80205-CR-MARRA] was referred to the Department by the SEC, which conducted a parallel investigation and in December 2011 announced the filing of a civil enforcement action against Stein and others.  The Department thanks the SEC for its substantial assistance in this matter." (http://www.justice.gov/opa/pr/2013/May/13-crm-586.html)(Emphasis added).

Interestingly, the DOJ's "access request" resulted in a compilation of "a very small subset of documents" which excludes critical material in favor of the Defense. For example, the Government called what it believed to be one of its key witnesses, Tracy Jones, former Secretary to Dr. Harmison, however, both the Government hard drive of files the Government regarded as important, as well as the Signalife subset database exclude an abundance of material pertaining to Tracy Jones, more precisely, all material for which the "master source" would be Ms. Jones, (as further described in the Declaration of Reichardt), is unavailable to the Defense. This resulted in, for instance, the exclusion of the critical e-mail from Tracy Jones sending to Norma Provencio the $50,000 Tribou payment which references the Cardiac Management purchase order and all relating communications regarding that payment by Tracy Jones and others. Defendant only knows of this communication by chance, because the e-mail trail reflected in newly discovered evidence (Ex. "B" to the Decl. of Reichardt) reveals that Ms. Jones indeed had knowledge of the Tribou payment as a down payment towards the 9-14 Purchase Order and thus committed perjury during trial as further evidenced below. The e-mail of Provencio forwarding the copy of the check which Defendant attempted to admit at trial were obtained from the Signalife subset database, not the Government hard drive, which somehow now does not contain

this very critical evidence.

This example is critical to Defendant's assertions of intentional cherry picking of files by the Government since Michael Pasano raised these concerns in early 2012.  (DE 47 at 8).

In addressing the issue of cross-jurisdiction constructive knowledge, most courts of appeals consider: (1) whether one agency acts on behalf of or under the control of another; (2) the extent to which the two agencies are working as a team and are sharing resources; and (3) whether the agency charged with possession of evidence in the other agency's files had ready access to it. *United States v. Risha*, 445 F.3d 298, 304 (3d Cir.2006)

At the April 3, 2013 *Faretta* Hearing, the government mislead the Court when it stated that Defendant had access to the universe of documents in the SEC's possession, when neither Mr. Stein nor this Court even knew of that "universe" as of the date of the universe.[11] ("All of that is sort of background to my concern, which is, if I'm hearing Mr. Stein correctly, I fear that he may be asking the Court for license to at some date or, in fact, during trial say, well, I want to introduce any one of these 200 million documents, which, again, he does have access to.") Transc. of *Faretta* Hearing Proceedings at 42. However, the Government never turned over or provided access to the universe of documents the DOJ had access to. Instead, the DOJ merely provided the very small subset database referred to at the *Faretta* Hearing (hereinafter "DOJ subset database") containing about 282,000 files (DE 46 at 3). Defendant gained access to Signalife's subset database in late 2012 (hereinafter "Signalife subset database"), after Signalife – not the Government – provided access to the Signalife subset database, containing about 92,871 files and which is also a very small subset of the universe of documents. (Decl. of

---

[11] In fact, the Defense at the time mistakenly believed that it had access to the "200 million page database" at the time.

Reichardt). In fact, when the SEC returned to the Company the Signalife subset database, James N. Fiedler, the custodian of records, concluded that it was missing thousands of files pertinent to the underlying Indictment, including hand-written notes from Dr. Harmison[12] about pending purchase transactions. See Decl. of Fiedler.

Further, the Signalife subset database is compiled <u>exclusively</u> by files and e-mails to which the following individuals were parties to: former securities counsel John Woodbury, former CFO Kevin Pickard, current CEO Rowland Perkins and former Co-CEO Willie Gault, however, does it not contain files and e-mails between other individuals, of which Woodbury, Pickard, Perkins and/or Gault are not recipients. (Ex. "A" to the Decl. of Reichardt). Similarly, the Government hard drive also excludes pertinent sub-categories, such as Tracy Jones. As a result, Defendant never could have gained access to certain crucial exculpatory evidence, e.g. the Tracy Jones e-mail regarding the down payment on the purchase order referenced above.

Defendant argues that, had the DOJ conducted a fair and impartial investigation, their "access request" allowing the DOJ to obtain their documents from the SEC could not have been formulated in a way that would exclude obvious impeachment evidence as well as certain clearly favorable evidence Defendant has newly discovered, and which was never turned over by the Government. In other words, Defendant concludes that either the Government was aware of the favorable evidence and chose to suppress it, or the "access request" had to be designed to exclude certain favorable evidence.

Indeed, in *Kyles v. Whitley, supra*, 514 U.S. 419 at 437, 438;

> "A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense

---

[12] Dr. Harmison was Signalife's CEO during the time the allegedly false purchase orders in question were placed.

21

charged or which would tend to reduce the punishment of the accused.  ABA
Model rule of professional conduct 3.8 b (1984)...[T]he prosecution, which alone
can know what is undisclosed, must be assigned a the consequent responsibility to
gauge the likely net effect of all such evidence and make disclosure when the
point of "reasonable probability" is reached.  This in turn means that the
individual prosecutor has a duty to learn of any favorable evidence known to the
others acting on the governments behalf of the case including...[T]he
prosecution's responsibility [as set forth above] is inescapable....to accommodate
[the government with its argument that it is not responsible in this manner] would,
however, amount to a serious change of course from the Brady line of cases.  In
the state's favor it may be said that no one doubts that police investigators
sometimes fail to inform a prosecutor of all they know.  But neither is there any
serious doubt that "procedures and regulations can be established to carry [the
prosecutor's] burden and to ensure communication of all relevant information on
each case to every lawyer who deals with it."

*Giglio v. USA*, 405 U.S. 150, 154, 92 S.  763,766, 31 L.ed 104 (1972)"

Michael Pasano explicitly suspected the potential for "cherry picking"[13] of documents by

the Government unfavorable to the Defense. (DE 47 at 8).

## VII.   INTENTIONAL SUPPRESSION OF MILLIONS OF DOCUMENTS

In addition to the Government's failure to reveal to the Court that it had unfettered access

to the universe of documents in the possession of the SEC, the Government mis-cites in its

Opposition to Pasano's Motion to Compel *Brady* pertinent parts of *Gupta* in furtherance of their

gambits and stated as follows:

"Factors the court took into consideration were that the SEC and USAO
conducted "no fewer than 44 joint interviews," during which attorneys for both
the USAO and SEC asked questions, and that the "SEC interviewed *only two*

---

[13] "If the Government is not required to produce such Brady materials [in the possession of the SEC], it would
allow the DOJ to simply "cherry pick" from evidence that the SEC had gathered, while leaving exculpatory material
in the SEC's immediate possession, insulated from production. The Government should not be permitted to obtain
the benefit of the SEC's investigation while avoiding Constitutional obligations; Brady does not contemplate such a
compartmentalization of Government knowledge. See, e.g., *Martinez v. Wainwright*, 621 F.2d 184, 186 (5th Cir.
1980); *Casey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)".(DE 47 at 8).

*witnesses* outside the presence of the USAO or FBI." Id. (emphasis added)."
Finding that the agencies had "engaged in joint fact-gathering, even if they
are making separate investigatory or charging decisions," the court determined
that the USAO should have to review the SEC's memoranda of the joint
interviews as part of its discovery obligations. *Id*."

DE 46 at 7.

The true and very different language in the March 27, 2012 *Gupta Brady Ruling*,

however, reads as follows:

"For Brady purposes, <u>it is enough</u> that the agencies are engaged
in joint fact-gathering, <u>even if</u> they are making separate investigatory
or charging decisions, because the purpose of Brady is to apprise
the defendant of exculpatory evidence obtained during the fact-gathering."
(Emphasis added.)

See *United States v. Gupta*, No. 11-CR-907 and No. 11 Civ. 7566, 2012 WL

990830 (S.D.N.Y. March 26, 2012), hereinafter "*Gupta Brady* Ruling". The judge in *Gupta*, in

fact, concluded that the 44 joint interviews and the two witnesses the SEC interviewed held that

"[a]t oral argument, at the Court's urging, the SEC agreed to turn over the memorandum
and notes from these two interview to the USAO, which in turn agreed to review them for
Brady material and furnish such material to the defense. See Transcript of Oral Argument
dated Feb. 16, 2012 at 12. Accordingly, the Court need not address whether these notes
and memorandum fall within the scope of any "joint investigation" conducted by the
Government and the SEC."

See *Gupta Brady* Ruling.

Additionally, certain "concerns" raised by Mr. Stieglizt at the April 3, 2013 Faretta

Hearing strongly suggest that the DOJ knew of certain exculpatory evidence and feared it would

be discovered by Defendant and introduced at trial, even though the Government maintains that

it simply requested "advance notice of documents" by Defendant from the Signalife subset

23

database (mistakenly referred to by Mr. Stieglitz as the 200 million pages of documents, which,

again, the Defense never had access to):

> "STIEGLITZ: All of that is sort of background to my concern, which is, if I'm hearing
> Mr. Stein correctly, I fear that he may be asking the Court for license to at some date or,
> in fact, during trial say, well, I want to introduce any one of these 200 million documents,
> which, again, he does have access to. […] And so I am, as the Court can understand,
> concerned about that notion, that out of anything Mr. Stein or the company has ever
> produced to the SEC or anyone else associated with the Government, he should be able to
> pull documents from it, introduce them as exhibits with no advance notice of the
> Government. […] But what I don't want is 14 -- what I would be hesitant to be excited
> about, I guess, is Mr. Stein days before trial saying here are the relevant documents -- are
> these 200 million pages. They're unquestionably relevant to the case, Your Honor,
> because they were produced by the company in the course of the SEC investigation.
> That's our exhibit list or that's the universe from which we intend to pull documents, good
> luck, Government.
> THE COURT: I don't think that's what Mr. Stein's suggesting."

Transc. of April 3, 2013 Faretta Hearing Proceedings, at 41 – 43.

As substantiated by case law extensively cited by Mr. Pasano in his Brady Motion[14] (DE

41) as well as the conclusions within the landmark *Gupta Brady* Ruling misconstrued by the

Government, the Prosecutors in this case had an obligation to timely turn over the universe of

documents, further, the Government had a duty to learn of and disclose anything in that universe

that would tend to prove Defendant's innocence pursuant to *Kyles* and its progeny.

Defendant also argues that even if the Government had turned over the universe of

documents in 2011, the Government would not have complied with their discovery obligations in

a timely manner. Since the Government hard drive, "which is a very small subset" of the

---

[14] "The Brady requirement that the material be in the possession of the Government is satisfied when the material sought is in the possession of the prosecutor or anyone over whom the prosecutor has authority. See, e.g., *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992). "[T]here is no suggestion in Brady that different 'arms' of the government are severable entities." *Martinez v. Wainwright*, 621 F.2d 184, 186 (5th Cir. 1980).

universe of documents (Transc. Of *Faretta* Hearing at 41-42), contains approximately 282,000 documents (DE 46 at 3), while Signalife's subset database contains approximately 92,871 files (Decl. of Reichardt), Defendant estimates that the universe of documents containing over 200 million pages of documents is compiled by several million documents. Even if the universe of documents consisted of only 1 million documents, to review all documents would take approximately 5,555 hours – about two and a half (2.5) years .[15] See Decl. of Reichardt.

Defendant submits that the evidence of prosecutorial misconduct warrants an order for new trial, however, irrespective of this Motion, Defendant respectfully submits that the Court should issue an order compelling the Government to produce to Defendant the universe of documents that has always been in its possession. In any event, at the rate the defense is now uncovering suppressed *Brady* and *Giglio* material, it is respectfully submitted that the Defense will ultimately have to file dozens of motions for new trial in the upcoming days and months, as evidence is uncovered.

## VIII.   VIOLATION OF COURT ORDER

On September 26, 2012, this Court disagreed with the Government's assertion that "[t]he materials Stein seeks in his motion [to Compel *Brady*], however, go far beyond that to which he is entitled, and in many cases are not within the United States' power to provide", and that "the United States has not only complied with the Court's discovery schedule, but exceeded it." DE 46 AT 2. Magistrate James Hopkins <u>granted</u> the Motion with respect to "other *Brady* Material" and ordered the United States to provide to defendant "other categories of material, which the government asserts it has turned over, intends to turn over, is not within its custody or control, or is not *Brady* material." DE 63 at 2. Defendant respectfully submits that the United States is in

---

[15] Calculation based on a 40-hour work week.

25

violation of this Court's order. Crucial documents that fall under the discovery obligations the Government was ordered to comply with in September 2012 have never been produced by the Government. Discovery letters to former Defense counsel Eric Wittenberg describe what has been produced by the Government to both Michael Pasano and Eric Wittenberg, and reveal that many of Defendant's discovery requests have not been complied with after the September 26, 2012 Court order. See Ex. "L" to the Decl. of Reichardt. It appears the Government was more concerned with producing materials pursuant to the non-disclosure agreement that the parties entered into on April 4, 2012 and the stipulation for admissibility at trial than fully complying with the Court order.

       For instance, the Government indicated that it is in possession of Martin Carter's cell phone, and that it had not yet been able to access the phone, but expected to, and would comply with its discovery obligations when it did. (DE 47, at 9, 10) Also, Defendant requested transcripts of SEC phone interviews with potential Government witnesses (DE 41-3 at 9). Third, Mr. Pasano requested information and additional details regarding an audio recording the Government provided, purported to be the voice of Defendant Mitchell Stein, however, not only is the voice clearly not that of Mr. Stein, it is also dated December 20, 2011, seven (7) days after Mr. Stein was indicted. (DE 41-3 at 2.)

       Defendant asserts upon information and belief that the requested information was never turned over after the September 2012 Court order to comply with *Brady* and *Giglio*. Around that time, Defendant was no longer able to continue to retain Michael Pasano and was forced to engage in a tedious search for new counsel, leaving Defendant little time to stay abreast of the many potential discovery violations by the Government. Defendant proposes an evidentiary hearing to further discuss specific Brady and Court order violations as well as appropriate

remedies

### IX.     LOST OR DESTROYED FILES

It has been previously established by Michal Pasano, and not been disputed by the Government, that documents have been lost or destroyed since Signalife produced documents to the SEC without retaining originals or copies. (DE. 52, at 5). See also Exhibit B to DE 52, Government Discovery Letter dated April 3, 2012 at 6. The Government explains that while loading the documents into the SEC database, only the text of certain messages was maintained, not the native files, while "other emails were extracted such that the data appeared to combine multiple underlying documents, relating in a file that "is unusable." *Id.* at 6. See also Decl. of Fiedler, declaring that thousands of files were missing in the subset database the SEC returned to Signalife, including hand-written notes by Dr. Harmison about pending purchase transactions.[16] Discovery requests pertaining to lost or destroyed data were included in Michael Pasano's Brady Motion, e.g. a request for identification of every file which has been lost, destroyed, or rendered. unusable as well as the Government's efforts to obtain those documents. Defendant again submits that the Court's September 2012 Brady order has not been complied with.

In order for destruction of evidence to rise to the level of a constitutional violation, a party must make two showings. First, that the government acted in bad faith, the presence or absence of which "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir.1993) (citing *Arizona v. Youngblood*, 488 U.S. 51, 56-57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)). Second, that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v.*

---

[16] Dr. Harmison was Signalife's CEO during the time the allegedly false purchase orders in question were placed.

*Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); Cooper, 983 F.2d at 931.

Another configuration of this test requires the showing of bad faith where the evidence is only

potentially useful and not materially exculpatory. *Del Toro-Barboza*, 673 F.3d at 1149. For

evidence to be materially exculpatory, its exculpatory nature must be apparent. *Id*.

   The DOJ indeed admitted that the SEC "harvested (extracted) all the available data from

the files, namely, the e-mail messages, <u>but did not retain the native files</u> of the e-mails

themselves; only the natives from e-mail attachments were retained." (DE 41-2 at)(Internal

quotation marks omitted)(Emphasis added). Additionally, the Government admits that a file

called "Emails.DCB" was not properly processed and loaded. "There are no underlying images

or natives for the Emails.DCB file. Additionally, the data for this file was extracted entirely to

the "subject" field in Concordance [Government hard drive]. That data appears to be segmented

of the file's contents that derive from multiple underlying documents but we are unable to

determine the demarcation between different underlying documents, whether those documents

are complete, and other information regarding the document. Therefore, the file is unusable. […]

Because the file is unusable, the Government excluded it from its February 6, 2012 production."

*Id.*

   In *U.S. v. Loud Hawk*, 628 F.2d 1139 (9th Cir.1979) Judge Kennedy concurs that

"[o]ur principal concern is to provide the accused an opportunity to produce and examine all

relevant evidence, to insure a fair trial." Id. at 1151 (Kennedy, J., concurring), and that in

evaluating the quality of the government's conduct:

> "the court should inquire whether the evidence was lost or destroyed while in its custody,
> whether the Government acted in disregard for the interests of the accused, whether it
> was negligent in failing to adhere to established and reasonable standards of care for
> police and prosecutorial functions, and, if the acts were deliberate, whether they were

taken in good faith or with reasonable justification.... It is relevant also to inquire whether the government attorneys prosecuting the case have participated in the events leading to loss or destruction of the evidence, for prosecutorial action may bear upon existence of a motive to harm the accused."

*Id.*

Defendant asserts that the Court should determine whether the evidence was lost or destroyed while in the custody of the Government and whether the Government failed to adhere to established and reasonable standards of care for police and prosecutorial functions.

Upon inquiry by former defense counsel, the Government merely states that these "requests exceed the scope of the Government's discovery obligations" (DE 41-2 at 6) and seek materials that include "privileged information protected by Department of Justice attorney work product". *Id.*

Further, the *Loud Hawk* balancing test states that

"[i]n analyzing prejudice, the court must consider a wide number of factors including, without limitation, the centrality of the evidence to the case and its importance in establishing the elements of the crime or the motive or intent of the defendant; the probative value and reliability of the secondary or substitute evidence; the nature and probable weight of factual inferences or other demonstrations and kinds of proof allegedly lost to the accused; the probable effect on the jury from absence of the evidence, including dangers of unfounded speculation and bias that might result to the defendant if adequate presentation of the case requires explanation about the missing evidence.

*Id.*

In applying the second component of the *Loud Hawk* test, Defendant argues that the prejudice to Defendant is substantial, because the exculpatory value of documents pertaining to purchase order transactions by Dr. Lowell T. Harmison and other individuals is obvious.

It is certain that the defense was substantially hampered and prejudiced by the destruction

of exculpatory evidence and an abundance of potentially exculpatory evidence forever lost to Defendant.

### X.      CERTAIN CONTENTS OF GOVERNMENT HARD DRIVE CAMOUFLAGED

The Government provided Defendant with a hard drive ("Government hard drive") containing the majority of discovery by the DOJ, encrypted by a software called TrueCrypt (DE 46-1 at 2, see also Decl. of Reichardt), and maintains that "the United States provided those contents in a format that allows Stein to search across them by letter (or other character), word, or combination of words." (DE 46 at 3.) However, the hard drive provided to Defendant by the DOJ is not entirely in a searchable format as described by the Government, in addition to containing corrupted and unusable files. Many files are not searchable because they are camouflaged as image files, each page of a document being broken down into a separate image file, without a searchable backup version of the file. (Decl. of Reichardt)

Federal Rule of Civil Procedure 34(b)(2)(E)(ii) requires the Government to produce electronically stored information in a "reasonably usable form or forms". Rule 34(a) requires that, if necessary, a responding party "translate" information it produces into a "reasonably usable" form. See Committee Notes. The Government has produced files which have been partially corrupted, and files which are no longer searchable.

If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, the information should not be produced in a form that removes or significantly degrades this feature. See Committee Notes. See also *United States v. Briggs*, 2011 WL 4017886 (W.D.N.Y. Sept. 8, 2011).  In *Briggs*, the Magistrate Judge

determined that "as between the Government and defense, the Government is in the better position to organize this mass of information and re-present it in a manner that is <u>searchable</u> by the defense," and that the government must choose "a reasonably usable form." (Emphasis added). Additionally, folders inside of the drive to which hard drive content is mounted is not searchable, instead, a second step is required to be able to search contents of the Government hard drive. The hundreds of thousands of files provided by the Government are not searchable unless all content has first been copied to a different location.

Defendant alleges again, that the Government's tactics to camouflage many files and make them unsearchable tie into the suppression evidence, as do the "concerns" raised by the Government during the *Faretta* Hearing about Defendant having access to and introducing evidence that would destroy the Government's false allegations.

## XI.   <u>UNLAWFUL ASSET FREEZE PREVENTED DEFENDANT FROM RETAINING COUNSEL OF HIS CHOICE</u>

Defendant has previously raised the unauthorized asset freeze of all of Defendant's assets prior to trial, however, Defendant reiterates the issue in light of newly discovered evidence and the inability to retain counsel of choice, preventing Mr. Stein from properly preparing for trial.

Almost immediately after initiating grand jury proceedings in this case, the Government caused all of Mr. Stein's personal bank accounts to be frozen, as explained in Docket No. 150 in further detail, which undeniably interfered with his ability to transact any business, and interfered with his ability to retain counsel of his choice.

The defendant had been working with governmental agencies in the foreclosure crisis since late 2008. As a result of the California's Attorney General's conduct seizing thousands of attorney client documents from Mr. Stein's firm, the California Attorney General is now

defendant in the federal case styled as *Copper v. Harris*. (Case No. CV 12-00987 CRB, United

States District Court, Northern District of California ) In *Copper*, U.S. District Court Judge

Charles Breyer denied a motion to dismiss filed by the State of California. The matter in which

the defendant's bank accounts were frozen is so inter-related to this criminal proceeding that,

post-conviction, the Los Angeles Superior Court continued the civil trial of an unlawful

competition action until <u>after</u> the scheduled sentencing of Mr. Stein.[17] Further, "Government

Investigator" Thomas Layton appeared at Mr. Stein's December 19, 2011 Bail Hearing to testify

about matter in which the defendant's bank accounts were frozen, and, in fact, admitted that he

lacks proof of any misconduct on the part of Mr. Stein, thus revealing that the allegations around

the mass joinder suits may have been concocted. From the Bail Hearing:

> 20  HASN'T
> 21 THE STATE BAR INFORMED THE JUDGE IN THAT MATTER THEY CANNOT
> 22 TIE ANY MONEY COMING TO MR. STEIN'S ACCOUNTS IN CONNECTION
> 23 WITH EITHER PHILIP KRAMER OR ANY OTHER SOURCE?
> 24  I'M UNAWARE OF THAT.
> 25  Q YOU HAD THE CASHIER'S CHECKS?
>
> 1 A NO, I DO NOT.
> 2 Q DO YOU KNOW HOW MANY THERE ARE?
> 3 A NO, I DO NOT.
> 4 Q DO YOU KNOW WHAT AMOUNT THEY ARE?
> 5 A NO, I DO NOT.
> 6 Q DO YOU HAVE ANY EVIDENCE, AS YOU SIT HERE TODAY, THAT
> 7 THERE WAS, IN FACT, ANY MONEY THAT CAME FROM PHILIP KRAMER'S
> 8 ACCOUNTS TO MITCHELL J. STEIN IN ANY FORM?
> 9 A I'M NOT DONE WITH THE INVESTIGATION YET. SO, NO, I DO
> 10 NOT.
> 11 Q SO THE ANSWER IS, NO, YOU DON'T HAVE ANY EVIDENCE; IS
> 12 THAT CORRECT?
> 13 A NO, I DO NOT.
> 14 MR. SAUNDERS: NO OTHER QUESTIONS, YOUR HONOR.

---

[17] The defendant represented thousands of homeowners pro bono, which apparently raised the ire of the Attorney General.  Court appointed receiver Thomas McNamara testified under oath that the defendant's involvement ended two months after it began.  Mr. Stein's law firm is the only law firm still intact notwithstanding the State's allegations.

See Ex. "M" to the Decl. of Reichardt at 13-14.

Although the DOJ lawyers in the instant case continued to maintain in open court that the evidence against the defendant in the California case is "overwhelming" (Transc. Vol. 10 at 175), the actual evidence is the two declarations of people who claim to have met the defendant one time. On the contrary, U.S. District Judge Breyer has still withheld judgment on the propriety of the behavior of the DOJ by dismissing the DOJ's motion to dismiss.  Irrespective of the extent to which Defendant can prove that prosecutors here were involved in the freezing of Mr. Stein's bank accounts, Defendant asserts it was the government's obligation, not his, to advise this court of the dual DOJ investigations of the defendant so as to explain why the defendant's assets were being frozen for two separate cases three thousand miles apart on opposite ends of the country. (See *United States v. Monsanto*, 491 U.S. 612, 615 (1989)). *Monsanto* discusses the District Court's role in the pre-trial freezing of assets where Defendant seeks to use those assets to pay for an attorney. ("Judge Winter read the permissive quality of [21 U.S.C. § 853(e)(1)] (i.e., "may enter") to authorize a district court to employ "traditional principles of equity" before restraining a defendant's use of forfeitable assets; a balancing of hardships, he concluded, generally weighed against restraining a defendant's use of forfeitable assets to pay for an attorney. 852 F.2d at 1406. Judge Winter further concluded that assets not subjected to pretrial restraint under § 853(e), if used to pay an attorney, may not be subsequently seized for forfeiture to the Government [..]." *Id.* at 612. Since *Monsanto* refers to pretrial restraint on forfeitable assets, the Court may find the case law to be inapplicable. However, given the unprecedented strategies applied by the Government in this case to freeze Defendant's assets and current and prospective bank accounts before trial and thus the absence of applicable case law, Defendant still wishes to bring these guidelines and authorities to the Court's attention.

The freeze of all of Defendant's accounts also unconstitutionally <u>prevented Defendant from opening new accounts</u>. As the Government eliminated the defendant's ability to defend this case as his assets were frozen, his ability to continue to retain Mr. Pasano, Esq., of the law firm of Carlton Fields was hamstrung. The defendant then sought to hire a former DOJ prosecutor named Jared Scharf as Mr. Scharf agreed to handle this case for free. When the Court disqualified Mr. Scharf from representing Mr. Stein, Mr. Stein limped to trial indigent and *pro se*.

## XII.   <u>LOSS OF LIVE TESTIMONY BY KEY WITNESS</u>

Defendant previously raised the issue of the loss of key witness Dr. Lowell T. Harmison, however, in light of new facts and discoveries consistent with the Government's scheme described herein, Defendant reiterates this issue, and adds crucial new facts.

In the words of Postal Inspector George Clark, the DOJ never talked to Dr. Lowell Harmison prior to Dr. Harrison's death. Dr. Harrison was the Signalife CEO who signed the approximately three (3) purchase orders at the heart of the Government's allegations. See Transc. Vol. 8, Pages 98, 99. Dr. Harmison at all times had the fiduciary responsibility to Signalife as its CEO. Dr. Harmison developed cancer in 2008 which is a fact known to the government from the depositions that Harmison was subjected to by SEC attorneys.

The Company's CEO signed the purchase orders in question, he interacted with the company's board and audit committee regarding these orders and he interacted with outside auditors on these matters.

Newly discovered evidence shows that it was Dr. Harmison, not Defendant, who was <u>in control</u> of the purchase order transactions. New evidence shows, for example, that Dr. Harmison had a close relationship with Tom Tribou (Ex. "G" at 5, Decl. of Reichardt), that it was known

within Signalife that Tribou was connected to Cardiac Management (Ex. "G" at 3, Decl. of Reichardt), that it was Dr. Harmison who directed Stan Gelfer at Signalife to ship units to Tim Cutter at IT Healthcare and to Cardiac Management (Ex. "G" at 1, 2 Decl of Reichardt), and that apparently Dr. Harmison was previously in business with the purchasing agent of IT Healthcare (Ex. "G" at 3, Decl. of Reichardt). New evidence also shows that Dr. Harmison communicated with David Carter, Martin Carter's brother, about the sale of Signalife product. (Ex. "G"at 7, Decl. of Reichardt)

However, Dr. Harmison is deceased and unable to testify to this crucial evidence. There is a reasonable probability that the Jury would have found Mr. Stein to be innocent upon learning of Dr. Harmison's intimate involvement in these transactions. Notwithstanding the loss of live testimony of this key witness Defendant could have received a fair trial if the foregoing evidence had not been suppressed by the Government as set forth above.

### XIII.   RELEVANCE AND MATERIALITY OF EVIDENCE PERTAINING TO PURCHASE ORDERS

The underlying Indictment reveals that it is the three (3) purchase orders (Cardiac Management and IT Healthcare Purchase orders) around which the web of allegations against Defendant is spun. The Indictment alleges the Purchase Orders to be false (Indictment at 3), however, if the Purchase Orders turn out not to be false– and newly discovered documents as well as perjured testimony demonstrate that the Purchase Orders were not a scheme orchestrated by Defendant after all –  the allegations surrounding the Purchase Order transactions are no longer believable. If the Purchase Orders were not fake, the relating press releases are called into question (Indictment at 3, 7), the related SEC filings were not fake (Indictment at 3), Carter's testimony regarding Purchase Order confirmations is called into question (Indictment at 8, 11),

Carter's testimony regarding the change of address letters is called into question (Indictment at 3, 8), the shipment of products is viewed in a different light (Indictment at 4, 7), testimony regarding letters regarding the Purchase Orders is called into question (Indictment at 8), and the Purchase Order cancellations may also not have been fake (Indictment at 11).

In *United States v. Agurs* the District Court recognized that, there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. Id., 427 U.S., at 110-111, 96 S.Ct., at 2401. Even if the defense did not make a request at all, or simply asked for "all Brady material" or for "anything exculpatory," a duty resides in the prosecution to reveal to the defense obviously exculpatory evidence; if the prosecutor does not reveal it, reversal of a conviction may be required, but only if the undisclosed evidence creates a reasonable doubt as to the defendant's guilt. *Id.* at 106-14.

Upon proving the falsity of the Government's claim that the Cardiac Hospital Management purchase orders were false, the government's entire case is called into doubt. Indeed, upon proving that the Defendant did not control the purchase process at all, but rather Lowell Harmison, John Woodbury, and the audit committee, the "conflicting evidence" referred to by Judge Marra at the close of the government's case (Transc., Vol. 9 at 102) would become considerably less conflicted.

The Purchase Orders are so instrumental to the alleged scheme that they were mentioned more than three hundred (300) times during trial. The Government states, for instance, during closing arguments: "Most importantly, ladies and gentlemen, they lied to investors like Bryan Harris, who invested his retirement fund, believing the lies were true, underline through the false purchase orders, false press releases and fake SEC filings Stein caused the company to file." Transc. Vol.

10 at 42. "Now, the wire fraud, part of the scheme that involves the wire fraud is about getting the – it's about the false purchase orders and the fake sales that were helping to get the stock price up, helping him sell the shares that he had stolen from Signalife." *Id.*

However , curiously, the Government did not mention the payment towards the Cardiac Management Purchase Order once during their case in chief. The Government was hoping Defendant would be unable to dig out this unquestionably relevant material buried within the millions of files. Had the Prosecution complied with its *Brady* obligations to disclose such obviously exonerating documents, Defendant would not have been forced to find such material while incarcerated, and even alleges that if the Prosecution had thoroughly investigated and complied with its Brady obligations, no such Indictment should have been filed against Defendant

## XIV.   DEFENDANT'S 6TH AMENDMENT RIGHT TO COUNSEL VIOLATED

The Constitutional guarantee of counsel under the Sixth Amendment has been construed to include four rights:  the right to counsel, the right to effective assistance of counsel, the right to a preparation period sufficient to ensure a minimal level of quality of counsel, and the right to be represented by counsel of one's own choice.  *United States v. McCutcheon*, 86 F.3d 187 (11th Cir. 1996).

The importance of having the assistance of counsel of choice can hardly be overstated. It is "fundamental" to due process in every individual case, *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932), as well as a structural component of the adversary system, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150, 126 S. Ct. 2557, 2564 (2006).  As the Supreme Court articulated in Powell:

The right to be heard would be, in many cases, of little avail if it did not

> comprehend the right to be heard by counsel. Even the intelligent and educated
> layman has small and sometimes no skill in the science of law. If charged with
> crime, he is incapable, generally, of determining for himself whether the
> indictment is good or bad. He is unfamiliar with the rules of evidence. Left
> without the aid of counsel he may be put on trial without a proper charge, and
> convicted upon incompetent evidence, or evidence irrelevant to the issue or
> otherwise inadmissible. He lacks both the skill and knowledge adequately to
> prepare his defense, even though he had a perfect one. He requires the guiding
> hand of counsel at every step in the proceedings against him.

*Powell,* 287 U.S. at 68–69, 53 S. Ct. at 64-65 (quoted in *Gideon v. Wainwright*, 372 U.S. 335,

344–45, 83 S. Ct. 792, 797 (1963).

At trial, counsel works to ensure that the Defendant's case is informed by independent,

professional judgment about what to say, when to say it, and how to say it. The Sixth

Amendment deprives a trial court of any discretion to preclude defense counsel from making a

closing summation, even at an "open and shut" bench trial. *Herring v. New York*, 422 U.S. 853,

862–63, 95 S. Ct. 2550, 2555 (1975). It guarantees that a defendant can confer with his counsel

during an overnight trial recess. *Geders v. United States*, 425 U.S. 80, 88, 96 S. Ct. 1330, 1335

(1976).  It reserves to a defendant and his lawyer the choices of whether and when to present the

defendant's testimony. *Brooks v. Tennessee*, 406 U.S. 605, 612–13, 92 S. Ct. 1891, 1895 (1972).

The Sixth Amendment recognizes that a lay defendant is, most likely, no match for the power of

the state.

That is the import of the fact that the right to counsel is a structural right. *Gonzalez-Lopez,*

548 U.S. at 150, 126 S. Ct. at 2564. [The Sixth Amendment] embodies a realistic recognition of

the obvious truth that the average defendant does not have the professional legal skill to protect

himself when brought before a tribunal with power to take his life or liberty, wherein the

prosecution is presented by experienced and learned counsel." *Johnson v. Zerbst*, 304 U.S. 458,

402–03 (1938). This symmetry is indispensable to our faith that the system reliably yields just

outcomes, whether they are the product of trial or plea.

The right to the effective assistance to counsel is in some respects the most valuable right enshrined in the Bill of Rights, because it facilitates the security of other valuable rights, through the effective and unfettered advocacy of one's counsel.  However, Mr. Stein acknowledges that the right is not absolute.  The fact that a defendant can waive his right to counsel is well recognized. *Faretta v. California,* 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975).  Nevertheless, prior to the execution of a valid waiver, the record must establish that a knowing and voluntary waiver was made.  Abandonment of a right as important as the right to the effective assistance of counsel cannot be glibly accepted nor condoned:

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'

*Faretta,* 422 U.S. 806, 835 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 242 (1942)).

When alerted to a potential conflict the court "must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat v. United States*, 486 U.S. 153, 160 (1988) (citing *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978)).  Because the Court was unaware of the suppression of documents at the time, as well as all facts pertaining to Government witnesses and their conflict waivers, both the Court and the Defense were duped into violating Defendant's 6th Amendment right to counsel. Defendant respectfully submits that an evidentiary hearing would have allowed the Court to further examine the potential conflict and sanitize certain representations by the Government to the Court.

If the right to counsel of choice is violated—39 that is, if the trial court improperly prevents a

defendant from being represented by his counsel of choice—this qualifies as "structural error" and is not subject to harmless error analysis. *United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006).

<u>The Faretta Issue</u>

This improper denial of counsel started a chain of events that, under the totality of the circumstances, led to an unfair trial for Mr. Stein.  The *Faretta* hearing in this matter was held on April 3, 2013.  The Court scheduled the trial for the end of August 2013 to allow time for Mr. Stein to obtain counsel and prepare, but then *sua sponte* moved the trial to May 5, 2013.  See DE 85. Calendar call was canceled on April 26, 2013.  DE 155.

Here, the pressure of the weight of the charges, his lack of counsel, and the impending and imminent trial left Mr. Stein with the impression that he had no choice but to represent himself. Therefore, the undersigned argued, that Defendant's waiver of his right to counsel was not knowing and voluntary.  In addition, Mr. Stein felt that appointed counsel would not have time to properly prepare for a trial with the impending and imminent trial date because of the volume of the potentially relevant documents and the complexity of the issues.  Mr. Stein was presented with the Catch 22 choice of either representing himself or allowing an appointed attorney who would not possibly have time to get up to speed representing him.  As a result, Mr. Stein refused appointed counsel.

Mr. Stein believed that it would be better to at least have a familiarity with the background of the matter even if trial advocacy would suffer.  Moreover, Mr. Stein could not have properly prepared for trial in light of the large volume of suppressed evidence, Government exhibits which have been tampered with, databases which are difficult to search, his lack of knowledge of allegedly inexistent persons, e.g. Yossi Keret, and in particular in light of Defendant being

indigent. The Court should have allowed Mr. Stein to retain the counsel of his choice or, in the alternative, inform Mr. Stein that if he were to choose appointed counsel that counsel would have sufficient time to prepare for this complex case--the potentially relevant documents in this matter is extremely voluminous, involving over 200 million pages of documents. This problem was exacerbated when the Court *sua sponte* moved the trial date up 3 months.   See DE 85.

"A mere routine inquiry – the asking of a standard written waiver of counsel – may leave a judge entirely unaware of the facts essential to an informed decision that an accused has executed a valid waiver of his right to counsel."  *Von Moltke v. Gillies*, 332 U.S. 708 (1948)(plurality opinion).  A Faretta hearing should involve "a more extensive colloquy" than is required to plead guilty.  *Stano v. Dugger*, 921 F.2d 1125, 1148 (11th Cir. 1991)(*en banc*).  "The closer such a waiver hearing is to trial, the more rigorous, searching, and formal the questioning of the trial judge should be."  *Strozier v. Newsome*, 926 F.2d 1100, 1105 (11th Cir. 1991)(citing *Patterson v. Illinois*, 487 U.S. 285, 298-99 & n.13 (1988)).  "The ultimate test is not the trial court's express advice, but rather the defendant's understanding."  *Fitzpatrick v. Wainwright*, 800 F.2d 1057, 1065 (11th Cir. 1986).

## XV.   IMPROPER EXCLUSION OF EVIDENCE

As indicated, Defendant gained access to the Signalife subset database a few months before trial through Signalife and Defendant did not uncover exonerating material buried within the millions of pages contained therein until towards the end of trial. (See Decl. of Reichardt). Among the exculpatory evidence Defendant newly discovered is the e-mail from CPO Norma Provencio to John Woodbury, which referenced a $50,000.00 check associated with Thomas Tribou and the September 14 Cardiac Management purchase order, (Government's key Exhibit –

Exhibit No. 300), as well as a copy of the check itself.

Signalife's president and custodian of records, Mr. James Fiedler, was scheduled to testify as he was flying in from California, the defendant sought to introduce the newly found exhibits as business records of the financial transactions represented by the September 14 purchase orders. Judge Marra sustained the Government's objections. Transc. Vol 9 at 34.  The check should have been admissible pursuant to Federal Rule of Evidence 803(6) and case law cited below through James N. Fiedler. Defendant recognizes that the Court was as surprised by the sudden appearance of the check, just as the Defense was, which is why the Government should have complied with the Court's *Brady* order and the Government's obligations flowing from *Brady, Giglio, Kyles* and *Moon*.

The Defendant sought to recall witness Woodbury, and that request was denied. Tribou apparently stated to the Government in a phone call behind closed doors during trial that without looking at a copy of the check, he was skeptical it was his handwriting on the check, when in fact his wife wrote out the check. Transc.Vol. 9 at 54.  Finally, a stipulation was reached by the parties during trial inconclusively stating that "Tribou paid $50,000.00 for goods he expected to receive". See Defense Ex. 418.

Normally, bank records and checks are admissible under the business records exception to the hearsay rule, Federal Rule of Evidence 803(6).  *United States v. Naranjo*, 634 F.3d 1198, 1213 (11th Cir. 2011).18[1]. Defendant respectfully submits that he should have been allowed to subpoena different witnesses to attempt to lay the foundation to admit the check, which was discovered towards the end of trial, in consideration of the importance of the evidence and the circumstances which led to the late discovery. The vague stipulation the Defense was pressured

42

into entering and subsequent misrepresentations to the Jury by the Prosecution significantly

prejudiced Defendant, which could only be cured by an order for new trial.

## XVI.   PROSECUTORIAL MISCONDUCT – CLOSING ARGUMENT

In evaluating whether improper statements by a prosecutor at trial merit reversing a

conviction some of the factors considered by the court are:  (1) the degree to which the

challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether

they are isolated or extensive; (3) whether they were deliberately or accidentally placed before

the jury; (4) the strength of the competent proof to establish the guilt of the accused.  *Davis v.*

*Zant,* 36 F.3d 1538 (11th Cir. 1994); Walker v. Davis, 840 F.2d 834 (11th Cir. 1988).  This

applies both to improper statements made during closing argument and other improper remarks

made by a prosecutor during the course of trial.  *Id*.; *United States v. Wilson*, 249, F.3d 1298

(11th Cir. 1998); *Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985); vacated on other grounds, 478

U.S. 1016 (1986); *United States v. Herring*, 944 F.2d 703 (11th Cir. 1992).

A prosecutor may not intentionally paint for the jury a distorted picture of the realities of

a case in order to secure a conviction.  *Davis v. Zant*, 36 F.3d 1538 (11 Cir. 1994), is strikingly

similar.  In *Davis*, the defense contended that another person was the actual perpetrator of the

murder and the defense had a taped confession of that person.  At trial, however, the person

refused to testify and the trial court would not permit the defendant to introduce the tape.  While

the defendant was testifying, he made an improper reference to the taped confession of the other

person.  The prosecutor properly objected, but improperly stated, "that is not true, and it's not

evidence."  While the taped statement was not admissible evidence, it was, nevertheless "true"

and the prosecutor compounded the prejudicial mistake by arguing to the jury that this "theory"

about another perpetrator was a recent fabrication of the defense.  This argument was a blatant

lie and led the court to set aside the conviction.

Here, the Prosecutor's statements are even worse because the excluded evidence was in

fact, according to Mr. Stein, admissible.  In addition, the prosecutor argued what it knew was

false, highlighting the excluded evidence.

The Government, in closing argument, made the Tom Tribou $50,000.00 check a focal

point of its summation.  In closing, they referred to the "fake", "false" or "phantom" purchase

orders about thirty eight (38) times; a few examples are as follows:

> "[The evidence] has demonstrated that Mr. Stein lied to the investing public
> and stole from Signalife, that he faked purchase orders, and that he used fake consulting
> contracts, and that he did all this to enrich Mitchell J. Stein."
>
> Transcript of Jury Trial Proceedings, Vol. 10 at 17
>
> "Now, all those lies Mitchell Stein told the people about the fake consulting contracts and
> the fake -- and the fake purchase orders, they were all part of a scheme that he had
> developed." *Id* at 23 "So how did Martin Carter and Mitchell Stein go about creating
> these fake sales? Fake purchase orders. You saw those throughout the trial." *Id.* at 34
> "Well, now you've got your fake purchase orders, you've got your fake press releases;
> might need to create more fake documents." *Id*. at 38 He put the whole scheme in motion.
> Fake press releases and false purchase orders, fake consulting contracts."
>
> *Id.* at 51.

Armed with the advantage of excluded exonerating evidence and tailored testimony, the

Prosecution represented to the Court before trial that the $50,000.00 check from Tribou, marked

with the purchase order number in the legend portion of the check, did not necessarily flow from

the Cardiac Hospital Management agreement. Prosecutor, for instance, states: "He wants you to believe that because there's a stipulation in the record to the effect that an individual named Thomas Tribou paid Signalife $50,000, that that means that Government's exhibit 64[19] -- if we can pull that up -- is not a fake document. That number, he says, because that number that appears in this section right there, that there's -- because Mr. Tribou, according to this, paid Signalife $50,000, that that gets Mr. Stein off the hook on that purchase order. [...] Where's Tom Tribou's name, Thomas Tribou's name? Does it say sold to Thomas Tribou?" Transc. Vol. 10 at 113-114.

However, evidence shows, the $50,000.00 check from the Tribous was indeed earmarked for the Cardiac Hospital Management contract that in fact Mr. Tribou signed. New evidence shows that it was well known within the Company that the Tribou payment was a down payment towards the Purchase Order, and that Tribou was known to be the principal of Cardiac Management Hospital. Ex. "E" to Decl. of Reichardt.).[20] Thus, the vague stipulation that was reached by the parties during trial that "Tribou paid $50,000.00 for goods he expected to receive" does not cure the misrepresentations made during closing by the Government. If the Government had no "concerns" that this evidence could destroy their allegations, why would it fight so aggressively to keep this evidence out? Perhaps, Defendant speculates, the Government was concerned that Defendant would find and try to introduce additional material relating to the authenticity of the purchase orders, the change of address letters, the shipment of products, the

---

[19] Govt. Ex. 64 is a version of the Cardiac Management Purchase Order which does not show Carter's hand-writing. Govt. Ex. 300 shows Carter's hand-writing on the Cardiac Hospital Purchase Order. Stieglitz knew he was misleading the Jury there, and if the Defense had known of this evidence, it would have pointed this out to the Jury, which caused an unfair trial not due to Defendant's own fault.

[20] Further, the Defense recently discovered that Tom Tribou had produced to the DOJ his copy of the Cardiac Management Purchase Order, which proves that he had knowledge of the Cardiac Hospital Management Purchase Order which he signed and for which he paid a deposit.

purchase order confirmations, the press releases, the SEC filings and the purchase order cancellations.

And even if the United States claimed it acted in good faith at all times, exceeded their Brady obligations, did not fail to correct perjured testimony, and did not withhold crucial evidence, it is still certain that the trial was fundamentally unfair to the Defense.

In *United States v. Martinez*, the Eleventh Circuit has not been "willing to say that there can never be a case where, even without wrongdoing, circumstances are such that the trial was, nevertheless, fundamentally unfair. *United States v. Martinez,* 763 F.2d 1297, 1315 (11th  Cir. 1985) *United States v. Hatcher*, No. 10-13544, 2011 WL 4425314, at *7 (11th Cir. Sept. 23, 2011)(alteration in original).

## <u>CONCLUSION</u>

WHEREFORE, the Defendant respectfully requests that this Honorable Court grant this Motion for new trial for the aforementioned reasons as significant governmental violations led to the conviction of the defendant in the instant matter, or, in the alternative, grant Defendant's Motion for Evidentiary Hearing.

Respectfully submitted,

JONATHAN KASEN, P.A.
Co-Counsel for Defendant Stein
633 SE 3RD Ave, Suite #: 203
Fort Lauderdale, FL 33301
Phone:     (954) 761-3404
Facsimile:   (954) 767-6406

s/Jonathan Kasen
JONATHAN B. KASEN
Florida bar No.: 0164951
E-mail: attykasen@jonathankasenpa.com

46

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 22, 2013, I electronically filed the foregoing document with the Clerk of the Court and to all counsel of record.

s/Jonathan Kasen
JONATHAN B. KASEN