UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Case No 11-80205-CR-MARRA/HOPKINS |
| | § | |
| MITCHELL J. STEIN, | § | |
| | § | |
| Defendant. | § | |

_____/

## UNITED STATES' POSITION ON SENTENCING

The United States respectfully asks this Court to sentence the defendant to imprisonment for a term of years that both would assure that the defendant remains in prison for at least 25 years and that would forcefully promote general deterrence. The defendant's advisory Sentencing Guidelines Adjusted Offense Level is 49 – six levels off the Sentencing Table – and his recommended Guideline sentence is 235 years of imprisonment. The United States acknowledges that a sentence of 235 years for a white-collar defendant may, on its face, appear greater than necessary, which is why the United States proposes that this Court impose a sentence of at least 25 years, which would be nearly a 90% downward variance from the advisory Guidelines in this case. Such a sentence, while being less than the effective life sentence called for by the advisory Guidelines, nevertheless would appropriately account for the extent and magnitude of the defendant's criminal activity, be comparable to sentences received by other similar defendants, protect the public from further wrongdoing by a habitual fraudster, and send a powerful deterrent message to anyone contemplating similar criminal activity.

## BACKGROUND

On May 20, 2013, following a ten-day jury trial, the defendant was convicted of fourteen felony offenses – each and every offense with which he was charged – based on his design and

orchestration of a multi-year, multi-million-dollar fraud scheme.  In his capacity as a licensed

attorney, counsel to medical device company Signalife, and husband of Signalife's majority

shareholder, the defendant not only repeatedly deceived the investing public, but positioned his

family to profit secretly from the liquidation of their Signalife ownership stake through a series

of purportedly (but not actually) blind trusts.  Moreover, while he was deceiving the market

about the successes of and bright future for Signalife, he was at the same time secretly looting

millions of dollars from Signalife through sham agreements with parties under his control.  Even

more disturbing, given his position as a member of the bar, is the fact that when his web of

deception began to collapse, the defendant repeatedly lied in sworn testimony to the United

States Securities and Exchange Commission ("SEC") and caused a co-conspirator he purported

to represent as counsel to not only lie to the SEC, but also to submit a false declaration to another

federal court.  This is to say nothing of the tax fraud and other frauds the defendant undertook in

yet more attempts to fund his lavish lifestyle.  Simply put, the defendant is a serial, unrepentant

fraudster who abused the trust placed in him as a member of the bar to manipulate and prey upon

those around him and who will not be deterred from his habitual predations absent a sentence of

at least 25 years.

<u>**ARGUMENT**</u>

In imposing a sentence after *United States v. Booker*, 543 U.S. 220 (2005), courts in the

Eleventh Circuit must engage in a two-step process:

> First, the district court must consult the Guidelines and correctly calculate the
> range provided by the Guidelines.  Second, the district court must consider several
> factors to determine a reasonable sentence: (1) the nature and circumstances of the
> offense and the history and characteristics of the defendant; (2) the need to reflect
> the seriousness of the offense, to promote respect for the law, and to provide just
> punishment for the offense; (3) the need for deterrence; (4) the need to protect the
> public; (5) the need to provide the defendant with needed educational or
> vocational training or medical care; (6) the kinds of sentences available; (7) the

2

Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims.

*United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) (internal citations omitted).

## I.      The Applicable Guideline Range

The Presentence Investigation Report ("PSR") calculates the defendant's adjusted offense as 49.  (PSR ¶ 62.)  This calculation includes (a) a base offense level of 7; (b) a 24-level enhancement for more than $50 million of victim losses; (c) a 6-level enhancement for more than 250 victims; (d) a 2-level enhancement for the use of sophisticated means; (e) a 4-level enhancement for endangering the solvency or financial security of an organization that, at any time during the offense, was a public traded company; (f) a 2-level reduction based on the cap imposed by U.S.S.G. § 2B1(b)(15(C); (g) a 4-level upward adjustment for the defendant's role in the offense; (h) a 2-level upward adjustment for the defendant's abuse of trust or use of a special skill; and (i) a 2-level upward adjustment for the defendant's obstruction of justice.  (PSR ¶¶ 49–58.)  Pursuant to U.S.S.G. § 5 cmt. n. 2 (2014), the defendant's offense level is capped at 43 because his Guidelines are literally off the charts by six levels.  Based on the Guidelines Sentencing Table, the recommended sentence for the defendant is life imprisonment.  (PSR ¶ 109.)  However, none of the fourteen felony counts on which the defendant was convicted has a statutory maximum sentence of life imprisonment, and thus the advisory Guideline sentence for the defendant is calculated by running each count's statutory maximum sentence consecutively, which results in a recommended sentence of 235 years of imprisonment. U.S.S.G. § 5G1.2(d).

The defendant has challenged several of the factual bases of his sentence as set forth in the PSR, and therefore the United States bears the burden of establishing those factual bases by a preponderance of the evidence.  *United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009).

In making factual findings as the basis for its Guidelines calculation, the Court may consider "among other things, evidence heard during trial" and "evidence presented during the sentencing hearing," *United States v. Mackey*, 573 F. App'x. 863, 875 (11th Cir. 2014) (internal quotation marks omitted), and "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that that information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

### A.      Loss Amount

The primary driver of the defendant's total offense level is the 24-level enhancement applied pursuant to U.S.S.G. Section 2B1.1(b)(1)(M), and thus it is unsurprising that much if not most of the defendant's objections to the PSR are directed at that enhancement. Yet, as explained below, even the most narrow and conservative loss calculation one can apply to this case, when combined with the other clearly applicable enhancements set forth in the PSR, would still result in a total offense level of at least 43, leaving the defendant no differently situated than he is according to the PSR. To put it another way, unless the Court accepts the defendant's argument that there is no loss in this case, something which is factually and legally incorrect for the reasons that follow, the parties' disagreement regarding loss has absolutely no impact on the defendant's advisory Guideline range, given the readily apparent applicability of the other enhancements identified in the PSR.

### i.      *Legal Standard for Calculating Loss*

The Guidelines make clear that "loss is the greater of actual loss or intended loss," and that "actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A) (2014). "Reasonably foreseeable pecuniary harm" is

further defined as "pecuniary harm the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*

Importantly, in calculating the applicable advisory Guideline range, "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n. 3(C) (2014). The Eleventh Circuit repeatedly has recognized this principle. *See, e.g., United States v. Campbell*, 765 F.3d 1291, 1301 (11th Cir. 2014) ("Given the nature of [economic] crimes, the financial damage may often be difficult to calculate with precision; accordingly, the Sentencing Guidelines only require district courts to make a reasonable estimate of the loss") (internal citations and quotation marks omitted); *United States v. Rafferty*, 296 F. App'x. 788, 797–98 (11th Cir. 2008) (upholding this Court's sentence in a securities fraud case, and noting that "[a] reasonable estimate of the loss amount is appropriate because often the amount of loss caused by fraud is difficult to determine accurately") (internal citations and quotation marks omitted); *United States v. Snyder*, 291 F.3d 1291, 1296 (11th Cir. 2002) ("Just because each individual's precise loss cannot be ascertained does not mean that the district court should abandon a loss calculation altogether").

The defendant proposes a different legal standard for calculating loss from that set forth in the Sentencing Guidelines and by the Eleventh Circuit. He argues that "there is no proof any purported victim in fact relied on" any of the fraudulent information the defendant disseminated," and, citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005), claims that this alleged lack of proof should preclude the Court from assigning any loss to the defendant. Letter from Mark H. Allenbaugh to Sheila A. Parsons, Senior U.S. Probation Officer 8 (Sept. 12, 2014) (hereinafter "Defense PSR Objections"). His argument completely ignores the dictates of Eleventh Circuit precedent, as well as the facts as presented at trial.

In citing to *Dura Pharmaceuticals*, the defendant invites this Court to make new law in the Eleventh Circuit by importing to the criminal context a concept from civil securities fraud that neither the Supreme Court nor the Eleventh Circuit has made applicable to criminal cases. *See, e.g., United States v. Berger*, 587 F.3d 1038, 1042 (9th Cir. 2009) ("The Supreme Court has not applied its *Dura Pharmaceuticals* loss causation principle to sentencing enhancements in criminal securities fraud cases"); *United States v. Poulsen*, 655 F.3d 492, 514 (6th Cir. 2011) ("*Dura* was a civil case where the plaintiff had the burden of establishing proximate cause as a necessary element in a claim under the Private Securities Litigation Reform Act and so does not inform our discussion [of sentencing in a criminal securities fraud case]") (internal citation omitted).  While other courts admittedly have seen fit to import *Dura*'s approach into the criminal context, *see United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) and *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007), the Eleventh Circuit has not done so, and this Court should decline to do so here.  Indeed, in upholding this Court's sentencing approach in *Rafferty*, not only did the Eleventh Circuit make no mention of the *Dura Pharmaceuticals* loss causation standard, it instead emphasized the legal standard set forth in the Guidelines.  296 F. App'x. at 797 ("[t]he court need only make a reasonable estimate of the loss . . . . [a] reasonable estimate of the loss amount is appropriate because often the amount of loss caused by fraud is difficult to determine accurately") (internal citations and quotation marks omitted).  Moreover, just recently, the Eleventh Circuit again spoke to this point:

> [A] sentencing court is not generally required to make detailed findings of individualized losses to each victim in every case.  There are cases where it would be unduly cumbersome, potentially requiring large expenditures of time and resources to determine large amounts of detailed information.  Such a rigid rule is not required by the Guidelines.  All that is required is that the court "make a reasonable estimate of the loss, *given the available information*."

*Campbell*, 765 F.3d at 1304 n.13 (emphasis in original; internal citations omitted).  The Eleventh Circuit has made clear what is required for proving loss in the context of criminal sentencings, and this Court should decline the defendant's invitation to import a new loss calculation methodology into the Eleventh Circuit.[1]

As it arrives at a loss figure upon which to base its sentence, the Court also should not lose sight of the two different types of loss caused by the defendant in this case: loss to Signalife's shareholders, who were left with shares that cratered in value after the defendant deceived them regarding Signalife's success, and loss to Signalife itself by virtue of the defendant looting Signalife of its assets.  Notably, the defendant's objections to the PSR's loss calculation focus on that first category of loss, *i.e.*, the loss caused by his dissemination of false information regarding Signalife, and fail largely if not entirely to address his outright theft of approximately $6.7 million from Signalife.  For this and other reasons explained below, the defendant's assertion that "the loss amount is less [*sic*] zero" (Defense PSR Objections at 12), is completely at odds with the facts, and insults the thousands of Signalife shareholders victimized by the defendant's lies and looting of their company's assets.

### ii.   *Loss Due to Decline in Share Price*

The PSR's loss calculation is factually sound, mathematically accurate, and faithful to the Guidelines' commentary on calculating losses in securities fraud cases such as this.  It provides an appropriate basis for calculating the defendant's advisory Guideline range.  Nevertheless, in

---

[1] Aside from its legal infirmity, the defendant's assertion that there is no proof of reliance suffers from a factual infirmity as well.  To assert that there is "no proof any purported victim in fact relied on any of the press releases or other publicly disseminated materials" is to ignore (among other victim statements) the trial testimony of Dr. Bryan Harris, who explained quite clearly that in deciding to invest, he read and relied upon the public filings and press releases in which the defendant had caused false information to appear.  (Trial Tr. Vol. 5 (attached as Exhibit 6) at 6–11).

an effort to provide the Court with additional ways to conceive of and calculate the loss in this

case, the United States has calculated the loss attributable to the defendant's conduct using

additional inputs and alternative methodologies, as described below.  But again, regardless of

which methodology the Court elects to use, the defendant's resulting advisory Guideline range is

the same once the other clearly applicable enhancements and adjustments are applied.

a.      <u>Methodology #1: The Modified Rescissory Method</u>

Much of the defendant's objection to the PSR's loss calculation is based on his insistence

that the loss calculation methodology referred to as the "Modified Rescissory Method" ("MRM")

is not an appropriate way to measure the loss in this case.  The MRM is set forth in the

commentary to Section 2B1.1, as follows:

> <u>Fraudulent Inflation or Deflation in Value of Securities or Commodities.</u>—In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, there shall be a rebuttable presumption that the actual loss attributable to the change in value of the security or commodity is the amount determined by–
>
> (I)     calculating the difference between the average price of the security of commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II)    multiplying the difference in average price by the number of shares outstanding.

U.S.S.G. § 2B1.1, cmt. n. 3(F)(ix) (2014).  Curiously, the defendant characterizes the MRM as

"an untested, uncorroborated methodology" that "should be quickly rejected," (Defense PSR

Objections at 6–7),[2] despite the fact that the MRM has not only been adopted by the United

States Sentencing Commission, but has also been applied by courts around the country, as even a

cursory review of publicly available information reveals.  One need look no further than the

---

[2] This characterization of the MRM appears to have biased the work of the defendant's retained expert from the outset; she reports that counsel informed her that no cases have employed the MRM for criminal sentencing purposes.  Expert Report of Dr. Susan Mangiero (attached to Defense PSR Objections) at 12 n.10.

"Loss Primer" available on the Sentencing Commission's website to find an explanation of the

MRM that completely refutes the defendant's characterization:

> Prior to November 2012, the guidelines did not expressly provide for any particular method of loss calculation in the context of securities or commodities cases. Courts employed a number of varying methods of loss calculation when sentencing securities fraud offenders, *including . . . the modified rescissory method*[.]

Office of General Counsel, *Loss Primer (§ 2B1.1(b)(1))* UNITED STATES SENTENCING COMM'N.

17 (May 2014) http://www.ussc.gov/sites/default/files/pdf/training/primers/2014_Primer_Loss

.pdf (last visited Nov. 24, 2014) (emphasis added).  In a footnote to the passage above, the

Sentencing Commission cites no fewer than three cases, including one from the Eleventh Circuit,

as examples of courts using the modified rescissory method.  *Id.* n. 131 (citing *United States v.*

*Snyder*, 291 F.3d 1291, 1296 n.6 (11th Cir. 2002); *United States v. Brown*, 595 F.3d 498, 523–27

(3d Cir. 2010); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1240–42 (C.D. Cal. 2002)).  Thus,

far from being the "untested, uncorroborated methodology" the defendant claims it to be, the

MRM in fact has been applied for many years by several courts in various jurisdictions including

the Eleventh Circuit.

b.   Methodology #2:  "Buyers Only"

While the MRM is an entirely appropriate way to calculate loss in this case, there is

another way one might do so.  One could consider only those investors who *purchased* Signalife

shares during the period of the fraud, and subtract from the value of those shares at the time they

were purchased the value of those shares at the end of the period of the fraud.  While this

approach almost certainly would understate investors' losses by ignoring anyone who held shares

during the "fraud period" but did not buy additional shares, it would narrow the universe of

potential victims to those who acted in the market while the defendant was disseminating

fraudulent information about Signalife.  In an effort to provide options to the Court in arriving at

a loss figure, the United States has calculated loss figures using this alternate methodology as well.

c.      Applying the Methodologies to Arrive at Loss Figures

A key consideration under either the MRM or the "Buyers Only" methodology is the definition of the "fraud period."  To provide further options for the Court in calculating loss, the United States calculated loss using both methodologies during two different periods: a "broad" period from the beginning of available comprehensive trading data (June 1, 2006)[3] to the last trading day before Signalife underwent a 4,500-to-1 reverse stock split (September 19, 2008),[4] and a "narrow" period from the announcement of the first fake purchase order about which the jury heard (September 20, 2007)[5] to the first time Signalife publicly disclosed anything that could have signaled to investors that anything was amiss regarding that purchase order or any of the others it had touted over the prior months (August 15, 2008).[6]  The results of each methodology applied to each period are as follows:

---

[3] The defendant was convicted of a conspiracy lasting from July 1, 2005 through July 31, 2010. However, the United States has only been able to obtain comprehensive Signalife stock trading data for the period June 1, 2006, through December 31, 2008.

[4] On September 22, 2008, Signalife underwent a 4,500-to-1 reverse stock split that by definition affected the number of shares outstanding as well as the stock price.  Had the United States not excluded post-September-22-2008 events from its calculations, the loss amounts in this case would have been higher, as Signalife's share price, accounting for the reverse split, continued to fall even after that date.  Thus, by stopping its analysis the last trading day before the reverse stock split, the United States is being conservative and helpful to the defendant.

[5] *See* Government Exhibit (hereinafter "GX") 69 (Exhibit 10 at 3).  For the Court's convenience, the United States has attached to this pleading as Exhibit 10 all Government Exhibits to which it cites.  All references to Government Exhibits will include a reference to the page of Exhibit 10 at which the Government Exhibit cited can be found.

[6] On August 15, 2008, Signalife filed its Form 10-Q for the second quarter of 2008, in which it described the cancellation of an "IT Healthcare" purchase order.  (GX 159 at 22; Exhibit 10 at 16–18.)  Of course, as the jury saw, this "cancellation" was something orchestrated by the defendant to cover his tracks regarding the *ab initio* falsity of the "IT Healthcare" purchase

1)      *Broad Period: MRM*

Loss for the period June 1, 2006 through September 19, 2008 calculated using the MRM

is:

| Description | Amount |
|---|---|
| Average price of Signalife stock June 1, 2006 through September 19, 2008 | $1.23 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.0059 |
| Number of shares outstanding June 1, 2006 through September 19, 2008 | 64,258,927 |
| **LOSS =** | **$78,395,890** |

Given the relationship of certain individuals and entities to the defendant and the offenses

in this case, the Court may wish to exclude from its loss calculation shares issued to them, and

thus not penalize the defendant for any loss in value those shares experienced.  For example,

Signalife issued shares to ARC Finance, the defendant's wife's company.  His co-conspirators

Martin Carter and Ajay Anand also received shares from Signalife, and so did Evie Muscillo (for

the benefit of Jamie Yafa, who as the jury heard was secretly being compensated to hype

Signalife stock) (PSR ¶ 19).

Excluding only those shares issued to ARC Finance provides the following result:

| Description | Amount |
|---|---|
| Average price of Signalife stock June 1, 2006 through September 19, 2008 | $1.23 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.0059 |
| Number of shares outstanding June 1, 2006 through September 19, 2008 (excluding shares held by ARC Finance as of 8/15/08) | 42,839,285 |
| **LOSS =** | **$52,263,927** |

---

order.  (Trial Tr. Vol. 6 (attached as Exhibit 7) at 106–09) (Martin Carter describing GX 151
(Exhibit 10 at 14–15), the fake "IT Healthcare" cancellation).

Excluding shares issued to ARC Finance, Carter, Anand, and Muscillo yields the following result:

| Description | Amount |
|---|---|
| Average price of Signalife stock June 1, 2006 through September 19, 2008 | $1.23 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.0059 |
| Number of shares outstanding June 1, 2006 through September 19, 2008 (excluding shares held by ARC Finance as of 8/15/08 and shares issued to Carter, Anand, and Muscillo) | 34,686,773 |
| **LOSS =** | **$42,317,863** |

2)      *Broad Period: "Buyers Only" Method*

During the period June 1, 2006, through September 19, 2008, 4,576 unique individuals or entities purchased shares of Signalife stock.[7]  Comparing what those individuals and entities paid for the shares of Signalife they purchased during that period with what those shares were worth at the end of the period yields a loss amount of **$27,435,459.67**.  As noted above, this number likely understates those investors' actual losses, because any shares purchased during that period that were not sold by the end of that period are valued at the closing price ($0.01) on September 19, 2008, even though the share price (accounting for the reverse split) continued to decline thereafter, and investors may have lost even more of the value of their investments as a result.

Therefore, for the "broad" period, the loss due to the diminished value of investors' Signalife shares ranges from over $27 million to over $78 million.

---

[7] This total does not include the defendant and individuals and entities associated with him, such as Martin Carter and the ARC and THS blind trusts.

    *3)  Narrow Period: MRM*

  Loss for the period September 20, 2007, through August 15, 2008, calculated using the

MRM is:

| Description | Amount |
|---|---|
| Average price of Signalife stock September 20, 2007 through August 15, 2008 | $0.75 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.03 |
| Number of shares outstanding September 20, 2007 through August 15, 2008 | 64,258,927 |
| **LOSS =** | **$46,266,427** |

  Excluding shares issued to ARC Finance yields the following result:

| Description | Amount |
|---|---|
| Average price of Signalife stock September 20, 2007 through August 15, 2008 | $0.75 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.03 |
| Number of shares outstanding September 20, 2007 through August 15, 2008 (excluding shares held by ARC Finance as of 8/15/08) | 42,839,285 |
| **LOSS =** | **$30,844,285** |

  Excluding shares issued to ARC Finance, Carter, Anand, and Muscillo yields the

following result:

| Description | Amount |
|---|---|
| Average price of Signalife stock September 20, 2007 through August 15, 2008 | $0.75 |
| Average price of Signalife stock over the subsequent 90 day period (accounting for the reverse split) | $0.03 |
| Number of shares outstanding September 20, 2007 through August 15, 2008 (excluding shares held by ARC Finance as of 8/15/08 and shares issued to Carter, Anand, and Muscillo) | 34,686,773 |
| **LOSS =** | **$24,974,476** |

    *4)  Narrow Period:  "Buyers Only" Method*

  During the period September 20, 2007, through August 15, 2008, 2,415 unique

individuals or entities purchased shares of Signalife stock.[8]  Comparing what those individuals

---

[8] Here again, this total does not include the defendant and individuals and entities associated with him, such as Martin Carter and the ARC and THS blind trusts.

and entities paid for the shares of Signalife they purchased during that period with what those shares were worth at the end of the period yields a loss amount of **$13,186,025.85**, but as above, this number likely understates those investors' actual losses, because any shares purchased during that period that were not sold by the end of that period are valued at the closing price ($0.10) on August 15, 2008, even though the share price continued to decline thereafter, and investors may have lost even more of the value of their investments as a result.

Therefore, for the "narrow" period, the loss due to the diminished value of investors' Signalife shares ranges from over $13 million to over $46 million.

### iii. *Loss Due to Theft of Company Assets*

Thus, the "stock loss" in this case alone calls for an enhancement of at least 20 levels. Yet added to any amount of loss the Court finds the defendant caused shareholders through artificially disseminating false information about Signalife must be the amount of loss the defendant caused by stealing directly from Signalife. As the jury and the Court heard at trial, the defendant caused Signalife to send him and others shares of stock and money, and though it likely is not an exhaustive list, the value of the stock and money the defendant stole from Signalife includes the following:

| Description | Amount |
|---|---|
| Money sent directly to Stein[9] | $160,679.61 |
| Money sent directly to Martin Carter[10] | $682,100.00 |
| Dollar value of shares issued to Evie Muscillo (for Jamie Yafa)[11] | $182,780.00 |
| Dollar value of shares issued to Martin Carter[12] | $1,473,900.00 |
| Dollar value of shares issued to Ajay Anand[13] | $3,058,020.15 |
| Dollar value of shares issued to C Roberto Trust (deposited by Stein into his Luxembourg account)[14] | $594,000.00 |
| Dollar value of shares issued to D Clemens Trust (deposited by Stein into his Luxembourg account) | $594,000.00 |
| **TOTAL =** | **$6,745,479.76** |

As was explained at trial and by Postal Inspector George Clark in his Declaration filed as part of the United States' Motion for Preliminary Order of Forfeiture (Dkt. No. 252-1), and as will be addressed more extensively below in the context of the "abuse of trust" enhancement below, the money and assets the defendant secretly looted from Signalife were much needed by the company, which was starved for cash and struggling to pay bills and otherwise meet obligations.

When combined with this approximately $6.7 million in looted assets, the stock-loss figures described above yield total loss figures ranging from approximately $19.9 million to approximately $85 million. While this range is a wide one, the important point is that no matter where within it the Court determines the loss to be, the resulting enhancement applicable to the

---

[9] *See* GX 259 (Exhibit 10 at 25); Trial Tr. Vol. 8 (attached as Exhibit 9) at 9–12.

[10] *See* PSR ¶ 16; GX 258 (Exhibit 10 at 24); Trial Tr. Vol. 8 (attached as Exhibit 9) at 23–24.

[11] *See* GX 108 (Exhibit 10 at 7); Trial Tr. Vol. 7 (attached as Exhibit 8) at 156–57, 160–62.

[12] *See* GX 263 (Exhibit 10 at 26); Trial Tr. Vol. 7 (attached as Exhibit 8) at 185–87.

[13] *See* GX 49 (Exhibit 10 at 2); Trial Tr. Vol. 4 (attached as Exhibit 5) at 187–89.

[14] This share transfer, as well as the next one on the chart, are explained by Postal Inspector George Clark in his Declaration filed as part of the United States' Motion for Preliminary Order of Forfeiture (Dkt. No. 252-1), as well as in Paragraph 33 of the PSR.

defendant's base offense level would be no less than 20 levels, which when combined with the other enhancements and adjustments applicable to the defendant, take the defendant's offense level over the cap of 43.

### iv.     No "Credit against Loss" is Appropriate

The Sentencing Guidelines instruct that "[l]oss shall be reduced" by "the money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (2014); *see also, e.g., United States v. Lee*, 427 F.3d 881, 893 n.8 (11th Cir. 2005).  The Guidelines go on to explain that "[t]he time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency."  U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (2014).

The defendant suggests that because in 2011 a group of Signalife shareholders agreed to settle a civil class action lawsuit they brought against the defendant and others in the District of South Carolina, "there is in fact no actual loss to any purported victim," because the victims "have been fully compensated."  Defense PSR Objections at 8–9, 13.[15]  This assertion is wrong on the facts and the law.  First, a settlement entered into after one is sued by one's victims cannot possibly be characterized as a return of money to victims before "the time the offense was discovered" or "the time the defendant knew or reasonably should have known that the offense was detected or about to be detected."  After all, it was the victims' discovery and allegations of the offense(s) that *led* to the payment.  Second, the record of the case itself makes clear that

---

[15] The settlement to which the defendant refers was that of *Roth v. Matthews*, No. 6:08-cv-03183 (D.S.C. July 13, 2011).  The Court will recall mention of this case at the defendant's trial; it is the one in which the defendant instructed Martin Carter to perjure himself.  (Trial Tr. Vol. 6 (attached as Exhibit 7) at 127–30) (Martin Carter describing GX 221 (Exhibit 10 at 19–22)).

victims certainly were not "made whole" by the settlement of civil claims in the class action, and that like most settlements, the amount paid was something less than the damages experienced by victims. Indeed, the expert retained to address the suitability of the settlement found that $4 million (not $2 million as the defendant suggests), amounted to "9% of total estimated damages of $46,694,280." Decl. of Candice L. Preston, CFA, *In re Signalife, Inc. Securities Litigation*, No.6:08-cv-3183 5 (D.S.C. June 29, 2011) (attached hereto as Exhibit 2).[16]

The defendant made no effort to return money or property to any of his victims prior to or after discovery of his fraud. His argument that any of the loss amount for which he is found responsible should be offset by the settlement in *Roth v. Matthews* is completely without merit.

c.      The Defendant Ignores His Gain from His Crimes

The defendant's retained expert makes a number of claims regarding loss in this case, many of which, as shown above and as will be shown at sentencing, are questionable at best. But even at her most expansive, the defendant's retained expert does not suggest that the loss in this case was zero (or provide any other loss calculation as an alternative), but simply concludes that she "cannot verify the validity of the position . . . that Mr. Stein's criminal conduct caused $85 million in loss." Expert Report of Dr. Susan Mangiero at ¶ 44 (attached to Defense PSR Objections as Exhibit 1). That is, she is not suggesting that enhancement pursuant to Section 2B1.1(b)(1) is *inapplicable*, but simply that she cannot calculate what that enhancement should be. And as the Guidelines make clear, simply because a loss "reasonably cannot be determined," does not mean a Section 2B1.1(b)(1) enhancement should not apply. Instead, "[t]he court shall

---

[16] The civil plaintiffs' expert's damages calculation differs from the loss calculation in this case because, among other things, she was considering Signalife's share price over a different period of time, February 10, 2004, through April 14, 2008. Nevertheless, the Court may take comfort in the reasonableness of the government's loss calculations, given that in a separate case considering the same conduct, the shareholder loss over a similar, but not identical period was found by an expert to be over $46,000,000. (Exhibit 2 at 5.)

use the gain that resulted from the offense as an alternative measure of loss." U.S.S.G. § 2B1.1 cmt. n. 3(B) (2014).

Here, a "reasonable estimate" of the "gain that resulted from the offense" is readily ascertainable and thus would provide a basis for a Section 2B1.1 enhancement if the Court were to determine that loss was not ascertainable. To be clear, however, the United States is *not* suggesting this gain amount should be the basis for such an enhancement, given that a "reasonable estimate of the loss" is readily ascertainable as well. *See, e.g., Snyder*, 291 F.3d at 1295 ("substitution of defendants' gain is not the preferred method because it ordinarily underestimates the loss") (internal citations omitted). Solely as a reference point, the United States notes that evidence at trial and in Postal Inspector Clark's Declaration showed that the amount the defendant gained over the duration of his conspiracy is as follows:

| Description | Amount |
| --- | --- |
| Money Stein received directly from Signalife | $160,679.61 |
| Money Martin Carter received directly from Signalife | $682,100.00 |
| Money Stein received from Ajay Anand[17] | $478,600.00 |
| Money Stein received from the THS Blind Trust (proceeds of sales of Signalife stock)[18] | $1,395,302.00 |
| Dollar value of shares issued to Martin Carter | $1,473,900.00 |
| Dollar value of shares issued to C Roberto Trust (deposited by Stein into his Luxembourg account) | $594,000.00 |
| Dollar value of shares issued to D Clemens Trust (deposited by Stein into his Luxembourg account) | $594,000.00 |
| **TOTAL =** | **$5,378,581.61** |

Accordingly, even if the Court rejects every one of the eight proposed approaches to calculating loss suggested above and finds that loss cannot reasonably be determined in this case, there is yet another factual basis upon which it can and should base an enhancement under

---

[17] *See* GX 259 (Exhibit 10 at 25); Trial Tr. Vol. 8 (attached as Exhibit 9) at 11–12.

[18] *See* GX 259 (Exhibit 10 at 25); Trial Tr. Vol. 8 (attached as Exhibit 9) at 12.

Section 2B1.1(b)(1): the defendant's gain of over $5 million, which would call for an 18-level increase of the defendant's base offense level.

Taking any reasonable view of the financial impact of the defendant's crimes, be it loss-focused or gain-focused, an enhancement pursuant to Section 2B1.1(b)(1) of at least 18 levels is appropriate.  In combination with the other plainly applicable enhancements identified in the PSR and explained below, even that 18-level enhancement would leave the defendant at a total offense level of 43, that is, no differently positioned than he is in the PSR.

### B.    Number of Victims

The PSR correctly applies a six-level enhancement to the defendant's base offense level pursuant to U.S.S.G. § 2B1.1(b)(2)(C), given that the defendant's crimes "involved 250 or more victims."  (PSR ¶ 51.)  As the preceding section explains, under any calculation of the financial impact of the defendant's crimes, thousands of unique individuals or entities purchased Signalife stock during the period of the defendant's fraud scheme, which vaults him well over the threshold amount for the applicability of this enhancement.

The defendant concedes that a role enhancement is appropriate, but asserts that he should only receive a two-level enhancement for committing an offense through mass-marketing.  He provides no explanation of why he believes "mass-marketing" to be an appropriate factual basis for the enhancement instead of the actual number of people that purchased shares, as set forth above.  The "masses" to whom the defendant's lies were peddled in public filings and press releases are the purchasers of Signalife stock during the time when those lies were being disseminated; they total well in excess of 250 under any view of the facts, and the six-level enhancement is entirely appropriate.

C.      **Sophisticated Means**

The PSR correctly applies a two-level enhancement to the defendant's offense level

pursuant to U.S.S.G. § 2B1.1(b)(10)(C), based on the defendant's use of "sophisticated means"

to perpetrate his crimes.  (PSR ¶ 52.)  The Guidelines explain that this enhancement applies

where there is "especially complex or especially intricate offense conduct pertaining to the

execution or concealment of an offense," and further note that "[c]onduct such as hiding assets or

transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial

accounts also ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1 cmt. n. 9(B) (2014).

1.      The Defendant's Conduct is Exactly What the Sentencing Guidelines and
the Eleventh Circuit Say Merit This Enhancement

The defendant argues that this enhancement is inapplicable, given that his conduct

involved "nothing more complex or intricate that [*sic*] the dissemination of press releases and

creation of false invoices."  Defense PSR Objections at 14.  This argument ignores two key

points.  First is the fact that each of the individual actions the defendant undertook in

perpetrating his crimes need not be "sophisticated" in and of themselves to merit the

enhancement, as "[t]here is no requirement that each of a defendant's individual actions be

sophisticated in order to impose the enhancement.  Rather, it is sufficient if the totality of the

scheme was sophisticated."  *United States v. Ghertler*, 605 F.3d 1256, 1267 (11th Cir. 2010); s*ee*

*also, e.g., United States v. Barrington*, 648 F.3d 1178, 1199 (11th Cir. 2011).

Second the fact that many of the types of activity in which the defendant was engaged in

carrying out his scheme, and indeed one of the types of activity mentioned by the defendant in

objecting to this enhancement, are explicitly cited by the Guidelines commentary and the

Eleventh Circuit as examples of things that make the Section 2B1.1(b)(10(C) enhancement

appropriate.  *See* U.S.S.G. § 2B1.1 cmt. n. 9(B) (2014) (citing "the use of fictitious entities" as

something that "ordinarily indicates sophisticated means"); *United States v. Shepard*, 154 F. App'x. 849, 852 (11th Cir. 2005) (citing "the use of duplicate, altered, and fictitious invoices to defraud" as a basis for applying the enhancement).  Moreover, in situations involving similar conduct to that undertaken by the defendant, courts across the country have applied (and been upheld in doing so) the Section 2B1.1(b)(10)(C) enhancement.  *See, e.g., United States v. Green*, 648 F.3d 569, 577 (7th Cir. 2011) (upholding application of the enhancement where "the defendants' overall scheme lasted three years and involved," among other things "the creation of fake documents"); *United States. v. Jenkins*, 578 F.3d 745, 751 (8th Cir. 2009) (upholding application of the enhancement where the defendant, among other things, lied about meetings, forged signatures, and provided false personal identifying information); *United States v. Ding*, 282 F. App'x. 511, 515 (9th Cir. 2008) (upholding application of the enhancement where a defendant's scheme, among other things, involved "false contracts"); *Abreu v. United States*, 2010 WL 2483993, at *7 (S.D.N.Y. June 15, 2010) (describing a crime as eligible for the enhancement where "[i]t involved false contracts, falsifying . . . records, false invoices and the cooperation of outside parties").

The Court will recall testimonial and documentary evidence regarding the defendant's recruitment of Martin Carter, his use of fake documents, fake people, fake companies/customers, and the many other ways in which the defendant utilized sophisticated means to perpetrate his crimes.  On those facts, application of the Section 2B1.1(b)(10)(C) enhancement is entirely appropriate.

      2.    <u>The Sophisticated Means Enhancement Does Not Impermissibly Overlap With Any Other Enhancements Applied to the Defendant</u>

The defendant's fallback argument against application of this enhancement is that if the Court applies it in combination with other enhancements the defendant declines to identify with

any specificity, then he should receive a downward departure based on a substantial overlap between this "sophisticated means" enhancement and those unspecified other enhancements. Defense PSR Objections at 14–15. This argument finds no support in Eleventh Circuit case law, and is otherwise unavailing for several reasons.

First, the defendant leaves the Court to guess as to which enhancements the defendant believes overlap with the "sophisticated means" enhancement, making it difficult if not impossible to consider what enhancements and adjustments he believes overlap with one another.

Second, the Sentencing Guidelines only prohibit cumulative application of the "sophisticated means" enhancement in circumstances not applicable here. *See* U.S.S.G. § 2B1.1 cmt. n. 9(B) (2014) (prohibiting application in combination with an adjustment under Section 3C1.1 "if the conduct that forms the basis for [the "sophisticated means" enhancement] is the only conduct that forms the basis for" that adjustment). That is, the Sentencing Commission clearly considered the circumstances in which it *would* be inappropriate to apply the "sophisticated means" enhancement in combination with other provisions in the Guidelines, but just as clearly declined to deem it inappropriate in combination with any of the enhancements the PSR applies to the defendant.

*United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004), the only case cited by the defendant in support of his argument, does not dictate a contrary result. The "overlap" between Guideline provisions addressed by the Second Circuit in that case was between enhancements other than those present here, and more importantly, *Lauersen's* suggestion that a downward departure could be appropriate due to "substantially overlapping enhancements" does not appear to have been cited, much less adopted, outside the Second Circuit. Indeed, when confronted with

an argument virtually identical to that made by the defendant here, Judge Antoon of the Middle

District of Florida noted that the defendant making it "cite[d] no appellate authority outside the

Second Circuit supporting the rationale of *Lauersen*," noted that "[w]hen the Fourth Circuit was

confronted with the same argument, it was not receptive," and observed that he "f[ou]nd no case

law from other circuit courts squarely addressing this issue."  *United States v. LaMonda*, 2008

WL 68744, *19 (M.D. Fla. Jan. 2, 2008) (citing *United States v. Allen*, 491 F.3d 178, 195 (4th

Cir. 2007)).  Accordingly, "[i]n the absence of evidence to the contrary," Judge Antoon

concluded "that the Commission contemplated the kind of result produced" by cumulative

application of the enhancements challenged by the defendant.  *Id*. at *20.

> This Court should reach the same conclusion for the same reasons.  As the Guidelines
themselves and the cases applying them make clear, the sort of conduct in which the defendant
engaged is precisely that to which the "sophisticated means" enhancement, in combination with
all the other enhancements and adjustments identified in the PSR, is intended to apply.

### D.  Substantially Endangering the Solvency or Financial Security of a Publicly Traded Company

> By looting millions of dollars from Signalife, the defendant unquestionably endangered
Signalife's financial security to a substantial degree, making the enhancement set forth at
U.S.S.G. Section 2B1.1(b)(16)(B)(ii)(I) entirely appropriate.  (*See* PSR ¶ 53.)  The Court will
recall testimony and exhibits at trial showing the millions of dollars in cash and shares that the
defendant stole from Signalife, as well as the contemporaneous cash shortages experienced by
the company.  Postal Inspector Clark testified at trial to the fact that the defendant received over
$160,000 from Signalife and another $478,600 from Ajay Anand (who testified he was kicking
back funds he obtained from selling Signalife stock), (Trial Tr. Vol. 4 (attached as Exhibit 5) at
189–96), to say nothing of the over two million dollars in cash and stock Signalife sent Martin

Carter, over $1.8 million of which made its way to the defendant. (Trial Tr. Vol. 8 (attached as Exhibit 9) at 9–11) (Postal Inspector George Clark explaining GX 259 (Exhibit 10 at 25)).

All the while, Signalife was starved for cash, struggling to pay its employees their salaries and pay its bills. (PSR ¶ 17.) For example, on November 14, 2007, the company's Chief Financial Officer advised the defendant and others that the company's cash balance was dropping below $600,000. Yet over a three day period that included the date of that email, the defendant caused the company to send over $196,000 to Martin Carter, over 99% of which Mr. Carter in turn sent to an account controlled by the defendant. (Trial Tr. Vol. 8 (attached as Exhibit 9) at 27–31) (Postal Inspector Clark explaining with reference to GXs 84 and 257 (Exhibit 10 at 4 and 23, respectively). Had that $196,000 been left in company accounts, it would have more than doubled the cash Signalife reported having on hand as of December 31, 2007. *See* GX 93 at 63 (Exhibit 10 at 5–6) (showing Signalife reporting a mere $154,290 in cash as of December 31, 2007).

Approximately three months later, Signalife's Chief Executive Officer notified the defendant and others that the company's cash balance was going to drop below $185,000. But over just the next two months, the defendant caused Signalife to wire $486,000 to Mr. Carter, all of which (and more) Mr. Carter in turn sent to the defendant. (Trial Tr. Vol. 8 (attached as Exhibit 9) at 31–38) (Postal Inspector Clark explaining with reference to Defense Exhibit 194 and GXs 132 and 137 (Exhibit 10 at 27, 8–9, and 12–13, respectively)). Had that $486,000 been left in Signalife's accounts, it would have more than tripled the amount of cash Signalife reported having on hand at the end of the quarter. *See* GX 136 at 7 (Exhibit 10 at 10–11) (showing Signalife reporting a mere $134,759 in cash as of March 31, 2008).

The defendant's looting of cash-strapped Signalife cannot accurately be described as anything other than having endangered Signalife's financial security.  Indeed, the defendant implicitly concedes as much in pointing out that at the time he was looting the company of its assets, the company was already bankrupt.  Defense PSR Objections at 15–16.  The defendant's argument appears to be that Signalife was in such dire financial condition that his looting of its assets irrelevant.  This preposterous suggestion, that if things are sufficiently bad at a company, one should be permitted to steal from it without penalty, cannot defeat the applicability of this enhancement, which is clearly appropriate in light of the facts recited above.[19]

### E.  Leader/Organizer

The PSR correctly applies an upward adjustment of four levels to the defendant's offense level, given that "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  (PSR ¶ 56) (citing U.S.S.G. §3B1.1).  The defendant does not contest that he was an organizer or leader of the criminal activity for which he was convicted, but suggests simply that his offense level should only be increased by two levels given that "there were not 'five or more' participants involved."  Defense PSR Objections at 16.

The defendant's objection ignores the fact that irrespective of whether the criminal activity of which the defendant was an organizer or leader "involved five or more participants," the four-level adjustment at Section 3B1.1(a) is still called for where the criminal activity of which the defendant was an organizer or leader "was otherwise extensive."  In explaining this prong of the analysis, the Guidelines note that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be

---

[19] The defendant correctly concedes that should the Court find this enhancement inapplicable, the two-point reduction pursuant to U.S.S.G. Section 2B1.1(b)(16)(C) from which he currently benefits in the PSR would no longer be applicable, either.  Defense PSR Objections at 16.

considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  U.S.S.G. § 3B1.1 cmt. n. 3 (2014).  Echoing this idea, the Eleventh Circuit has made clear that the absence of "five or more participants" does not preclude application of this enhancement.  *See, e.g., United States v. Holland*, 22 F.3d 1040, 1045 (11th Cir. 1994) ("even where the activity involves less than five participants, a section 3B1.1(a) adjustment nonetheless will apply where the defendant plays a leadership role and the operation is 'otherwise extensive'"); *United States v. Hall*, 996 F.2d 284, 287 (11th Cir. 1993) ("[t]he district court's finding that the criminal activity was otherwise extensive is sufficient to support the enhancement whether or not there were five participants").

Throughout the defendant's trial, the Court heard evidence of the extensiveness of the defendant's criminal activity, from the defendant's dissemination of false information via press releases and SEC filings about Signalife's sales and operations to the defendant's placement of Signalife shares held by his wife's company into purportedly blind trusts so that sales from those trusts would not readily appear to be sales by the defendant or his family, his causing Signalife to enter into contracts with and pay various third parties who were secretly kicking money back to him, and his repeatedly providing and having others provide false testimony before the SEC.  As the Court and the jury saw, the defendant unquestionably orchestrated a complex, multifaceted, and wide-ranging fraud scheme over several years, making the Section 3B1.1(a) adjustment entirely appropriate.

### F.      Abuse of Trust/Use of Special Skill

Section 3B1.3 of the Sentencing Guidelines instructs the Court to increase the defendant's offense level if he "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of concealment of the offense."

The two-point upward adjustment applied in Paragraph 57 of the PSR is entirely appropriate both because the defendant abused his position as Signalife's attorney to facilitate the commission and concealment of his crimes, and because his special skills as an attorney enabled him to commit and conceal his crimes.

The defendant does not contest the applicability of this adjustment; he argues only that application of this adjustment in combination with the enhancement pursuant to U.S.S.G. § 2B1.1(b)(16)(B)(ii) for endangering the financial security of a publicly traded company would be improper, as "either an abuse of trust or use of a special skill is necessarily present in offense conduct that substantially endangers the solvency of a publicly traded company."  Defense PSR Objections at 16–17.  He cites no case law in support of this proposition, and points to nothing in the Guidelines commentary on the application of the Section 2B1.1(b)(16)(B)(ii) enhancement that explicitly or implicitly prohibits the application of that enhancement in combination with the Section 3B1.3 adjustment.  This is undoubtedly because neither case law nor the text of the Guidelines supports the defendant's position; indeed, both dictate precisely the opposite of that for which the defendant argues, for similar reasons to those which defeat the defendant's "overlap" argument regarding the "sophisticated means" enhancement above.

While the Guidelines explicitly instruct that the abuse-of-trust adjustment should not be applied in combination with certain enhancements, no such prohibition is set forth regarding the Section 2B1.1(b)(16)(B)(ii) enhancement.  *Compare, e.g,*. U.S.S.G. § 2B1.1 cmt. n. 8(E), 15(C) (2014), *with* U.S.S.G. § 2B1.1 cmt. n. 13(B) (2014).  From this, the Court can readily conclude that the Sentencing Commission did not intend the result for which the defendant argues, and the Court should not hesitate to apply both the Section 2B1.1(b)(16)(B)(ii) enhancement and the Section 3B1.3 adjustment.  *See* U.S.S.G. § 1B1.1 cmt. n. 4(B) ("Absent an instruction to the

27

contrary, enhancements under Chapter Two [and] adjustments under Chapter Three . . . are to be applied cumulatively.  In some cases, such enhancements [and] adjustments . . . may be triggered by the same conduct").  The Eleventh Circuit has adopted this approach as well.  *See, e.g., United States v. Stevenson*, 68 F.3d 1292, 1294 (11th Cir. 1995) (applying two Guideline provisions cumulatively given that "nothing in the text or commentary of either [one] suggests an intent not to apply those sections cumulatively," and explaining that "[w]e presume that the Commission intended to apply separate guideline sections cumulatively unless specifically directed otherwise").

The defendant's "double-counting" argument is completely without support in the Guidelines or in case law.  This Court should apply both the Section 3B1.3 adjustment and the Section 2B1.1(b)(16)(B)(ii) enhancement, as both are clearly called for by the record.

## III.   The Sentencing Factors of Section 3553(a)

The sentencing factors set for in Title 18, United States Code, Section 3553(a), fully support a sentence of at least 25 years, which would be nearly a 90% variance downward from the sentence recommended by the Guidelines.

### A.   Nature and Circumstances of the Offense

After the defendant's trial and the extensive briefing that preceded and followed it, the Court undoubtedly is well aware of the evidence presented in support of the defendant's convictions; accordingly, the United States will not repeat all of that evidence here.  In summary, the evidence proved that the defendant, whose family stood to benefit from an inflated Signalife share price, and who acted as the outside counsel to Signalife, (1) exerted control over Signalife's affairs, (2) was personally responsible for repeated lies to the investing public about Signalife's business, (3) stole Signalife's assets by having Signalife send shares and cash to third

parties that in turn kicked back money to him, (4) looted Signalife at the same time that Signalife was desperately in need of cash, (5) personally received over $5 million as a result of his offenses and caused Signalife shareholders a loss far in excess of that amount, (6) caused Martin Carter to repeatedly perjure himself before both the SEC and another federal court, and (7) himself repeatedly provided false testimony to the SEC.

The offenses for which the defendant was convicted involved a pattern of lies and deceit over many years toward many people, including regulatory and judicial authorities. At trial and in his pleadings, the defendant has suggested his actions were simply those of a fervent believer in the potential of a life-saving healthcare product. But the facts show that instead of using his position as counsel to the company and the husband of the company's majority shareholder to help the company, the defendant exploited those positions to help himself, looting Signalife, ensuring its shareholders were deceived about what was really happening at the company, and obstructing those investigating his wrongdoing. The creativity, complexity, duration, thoroughness, and extensiveness of the defendant's criminal activities amply merit a 25-year sentence.

**B.      History and Characteristics of the Defendant**

Unlike many defendants who come before this Court, this defendant was raised in a stable environment (PSR ¶ 70) and afforded the opportunity of an undergraduate and graduate education (PSR ¶¶ 84–85). Yet the defendant's criminal activities paint a compelling picture of a man willing to say anything, do anything, and bully anyone, irrespective of the consequences to others, when he believes it is in his best interest to do so.

Moreover, this is not the only time the defendant has been accused of fraud, and it is not the only example of the defendant lying to people in an effort to deprive them of their money.

As the PSR explains, the Attorney General of California has sued the defendant, alleging that he and others were engaged in a scheme to defraud desperate homeowners into paying up-front legal fees to join lawsuits against various large financial institutions, in exchange for which the defendant and others simply pocketed the money and did little or no work.  (PSR ¶ 30.) Additionally, in email correspondence attached hereto as Exhibit 4, the Court will see the defendant, motivated by nothing but greed, giving detailed instructions to Martin Carter about how to start a direct-mail fraud scheme seemingly designed to rip off unsuspecting individuals by lying about their identity and intentions. (PSR ¶ 28.)  Moreover, documents from an individual identified herein as D.C. show that the defendant solicited an "investment" from her, only to steal the money.  *See* Exhibit 3 (showing promissory note from the defendant to D.C., followed by a series of emails from D.C. pleading for information and to get her money back). The Court also heard testimony about the defendant's instructions to Carter to file a false tax return and give the proceeds to the defendant.  (PSR ¶ 29; Trial Tr. Vol. 6 (attached as Exhibit 7) at 118–20.)

The defendant's pathological deceptions extended to lies to various regulatory and judicial authorities as well.  During trial the Court heard the defendant's repeated lies before the SEC, and also heard Martin Carter explain how the defendant instructed him to lie to the SEC. (Trial Tr. Vol. 6 (attached as Exhibit 7) at 120–27.)  Carter further explained how the defendant instructed him to sign a false declaration for a federal court in South Carolina.  (PSR ¶ 31; Trial Tr. Vol. 6 (attached as Exhibit 7) at 127–30.)  This Court also has seen in the defendant's pleadings throughout this case the defendant's repeated and eager factual mischaracterizations. (*See* Dkt. No. 340 (describing several of the defendant's post-trial allegations as "not only

baseless, but also offensive").)[20]  Andrew Ceresney, Director of the SEC's Division of

Enforcement, further described the defendant's abuse of and lies to judicial tribunals:

> Another way that Mr. Stein has flouted the justice system was by filing a series of
> frivolous lawsuits against the [SEC] staff members who conducted the investigation that
> revealed his wrongdoing . . . . baselessly alleging that three SEC attorneys "committed at
> least manslaughter against one million (1,000,000) Americans," and seeking damages
> from the [SEC] staff, personally, "in excess of $1 trillion."

Letter from Andrew Ceresney, Dir., Div. of Enforcement, U.S. Sec. & Exch. Comm'n, to Hon.

Kenneth A. Marra, U.S. Dist. Judge, S.D. Fla., at 2 (Sept. 30, 2014) (internal citations omitted)

(Filed as Dkt. No. 377).  As the PSR explains, the defendant also appears to have lied to the

bankruptcy court and the United States Trustee's Office regarding his assets.  (PSR ¶ 33.)

The Court should have particular concern about the fact that the defendant repeatedly

used his role as an attorney to facilitate his crimes.  For example, as SEC Enforcement Division

---

[20] Many of the defendant's objections to the PSR are exceedingly granular and, even if the Court
were to accept them, they would in no way undermine the factual bases for the Guideline range
calculated in the PSR.  Yet certain of them are so preposterously counterfactual, and thus
demonstrative of the defendant's cavalier disregard for the truth, as to require comment.  For
example, the defendant argues that he "did not refer to himself as 'the Doberman.'"  Defense PSR
Objections at 3.  This ignores, as the PSR points out, the fact that *on his own website*
(www.dobielaw.com), the defendant "touted himself as 'The Doberman.'"  (PSR ¶ 91.)  It also
ignores GXs 185, 188, 189, 194, and 343, all of which were admitted at trial, to say nothing of
GXs 182, 183, 190, 191, 192, and 223, which were not offered into evidence.  All of these
exhibits, which show the defendant using not just the description "the Doberman," but also an
image of a Doberman Pinscher, in his email signature block and even his checks, are attached
hereto as Exhibit 1.
      The defendant also repeatedly claims that "there was no evidence" of various items in the
PSR, either ignoring or deliberately mischaracterizing the evidence admitted at his trial.  To note
but two examples, the defendant argues that "there was no evidence presented that Mr. Stein
caused monies to be wired to himself," and that "[t]here was no evidence that Mr. Stein arranged
for Signalife to enter into an agreement with Anand."  Defense PSR Objections at 4.  The first
contention is flatly contradicted by, among others things, the testimony of Martin Carter and
Postal Inspector Clark (*see, e.g.,* Trial Tr. Vol. 8 (attached as Exhibit 9) at 27–38; Trial Tr. Vol. 6
(attached as Exhibit 7) at 39, 70–72, 96–97, 131 (Carter)), as well as GXs 84, 132, and 137
(Exhibit 10 at 4, 8–9, and 12–13, respectively).  The second contention is flatly contradicted by
Anand's testimony directly to the contrary.  (Trial Tr. Vol. 4 (attached as Exhibit 5) at 181–87;
Trial Tr. Vol. 5 (attached as Exhibit 6) at 77.)  Again, these examples are but a few of the many
occasions on which the defendant has demonstrated his propensity for repeatedly and
unabashedly alleging easily disprovable falsehoods.

Director Ceresney explained, the defendant "appeared as counsel for five witnesses during the [SEC's] Heart Tronics investigation and secretly conspired with at least one of his clients to obstruct the [SEC's] investigation." (Dkt. No. 377 at 1–2.) Having been vested with the knowledge and responsibility of an attorney, the defendant used that knowledge and his position of responsibility to threaten, bully, and harm those around him. His history and characteristics amply merit a sentence of at least 25 years.

### C.     Seriousness of the Offense

While the defendant's crimes were not violent in nature, their impact is nevertheless enormous. As explained above, thousands of investors lost much if not all of the value of their investments in Signalife. SEC Enforcement Division Director Ceresney noted that "most of those who suffered from Mr. Stein's conduct will never be made whole financially." (Dkt. No. 377 at 2.) For example, as the Court heard at trial, Dr. Bryan Harris experienced "almost a total loss" of the $650,000 he invested in Signalife. (Trial Tr. Vol. 5 (attached as Exhibit 6) at 10–11.) Dr. Harris explained that the funds he invested were "predominantly in [his] pension fund," and that they were intended for his and his employees' retirement. (*Id.* at 5–6.) Other victims have said similar things, for example:

- Investor/victim M.T., who claims to have lost nearly $190,000 on Signalife stock, reports feeling a "tremendous shame & guilt for making such a huge error in judgement [*sic*] . . . . this destroyed my business . . . . almost my entire 401-K & IRA savings balances were wiped out. I don't see how I will have much beyond S[ocial] S[ecurity] to retire on. Won't retire . . . . Have nothing left to pass on to my children."

- Investor/victim L.L., who claims to have lost over $1.4 million on Signalife stock, reports that "[t]his loss has had horrific consequences for me and my family. I was

> obliged to liquidate many other assets in order to pay off the money spent on this series
> of transactions, and have had grave financial hardships as a result.  The mental and
> physical stress has likewise had a devastating effect on my life, well being and family
> relationships.  At this time, I am deeply in debt, largely as a result of this criminal
> action."

In addition, Stein's extensive obstruction of the SEC's investigation considerably impaired the
SEC's ability to protect investors from the defendant and those like him.  (PSR ¶¶ 25–27.)  As
SEC Enforcement Division Director Ceresney explained:

> Unlawful conduct such as Mr. Stein's has a substantial and detrimental effect on the
> integrity of the securities markets and the ability of the [SEC] to effectively police the
> nation's capital markets . . . . Mr. Stein [also] undermined the integrity of the [SEC's]
> investigative process and caused substantial delay and needless consumption of [SEC]
> resources to reveal the truth behind his lies.

(Dkt. No. 377 at 1–2.)  The impact of the defendant's crimes upon individual investor-victims as
well as on the "integrity of the nation's capital markets" clearly call for a sentence of at least 25
years.

### D.      The Need to Provide Adequate Deterrence and to Protect the Public

The need to provide adequate deterrence and protect the public via a lengthy term of
incarceration is particularly acute in this case.  As detailed above, the defendant has spent much
of the past decade attempting to enrich himself and his family by victimizing Signalife
shareholders, Signalife itself, and any others from whom he believed he could extract money.
He did this not out of desperation, but rather while a potentially lucrative form of entirely
legitimate employment as a law-abiding attorney was available to him.  He is an intelligent,
sophisticated fraudster who has proven facile at identifying and exploiting not only the legal
system but also those he finds useful and susceptible to manipulation.

Of concern now that the defendant has been convicted is that the landscape on which the defendant is operating is significantly different.  He is an indigent convicted felon who has been stripped of his bar license and thus his means of making a living.  If anything, his predilection for fraud will only be exacerbated by the absence of his ability to make money practicing law, and his likelihood of recidivism will be significant.  Further troubling is the defendant's complete lack of remorse for his crimes.  *See generally United States v. Delgado*, 551 F. App'x. 508, 510 (11th Cir. 2014) ("In determining a proper sentence, the district court 'is permitted to consider lack of remorse in its § 3553(a) analysis as to several factors, such as the characteristics of a defendant, the need to promote respect for the law, and the need to protect society") (quoting *United States v. McNair*, 605 F.3d 1152, 1231 (11th Cir. 2010)).

Moreover, deterrence under Section 3553(a) is not limited to the necessary sentence to deter the defendant himself from engaging in further criminal conduct, but also includes consideration of deterring other potential criminals from engaging in similar conduct.  As the Eleventh Circuit has explained:

> [b]ecause economic and fraud-based crime are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment . . . . Our assessment is consistent with the views of the drafters of § 3553.  As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as particularly important in the area of white collar crime.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal citations and quotation marks omitted).  *See also, e.g., United States v. Hayes*, 762 F.3d 1300, 1311 (11th Cir. 2014) (vacating sentences and remanding for resentencing where, among other things, the district court's sentence failed to "provide for general deterrence").  SEC Enforcement Division Director Ceresney spoke to this very point in his letter to the Court:

> I encourage you to impose a sentence that sends a strong message to other potential violators that . . . efforts to impede the administration of justice, especially by attorneys, will be punished . . . .   A substantial sentence would assist the SEC's mission of protecting investors by sending a strong deterrent message to potential violators and making Mr. Stein into an example for other lawyers and gatekeepers who might abuse their positions for unfair advantage or to obstruct [SEC] proceedings . . . . [The defendant's victims as well as] other investors [] will be well-served by the Court sending a strong message that illegal schemes to victimize public investors may be the subject of a criminal prosecution and the imposition of a significant sentence.

(Dkt. No. 377 at 2–3.)  Considerations of both specific and general deterrence call for a sentence of no less than 25 years, to ensure the public is protected from further offenses by the defendant himself and to strongly discourage others contemplating similar crimes from engaging in them.

### E.      The Need to Avoid Unwarranted Sentencing Disparities

A sentence of 25 years would be well within the mainstream of sentences for an offense the defendant describes as "a rather straight-forward 'pump and dump' scheme."  Defense PSR Objections at 14.  To note but two examples, both from the Eleventh Circuit:

- *Rufus Harris*, No. 1:09-cr-406 (N.D. Ga. 2012) (Defendant convicted at trial for $44 million securities fraud involving fake press releases and financial information issued so as to inflate stock price; sentenced to 23 years of imprisonment);

- *Jonathan Curshen*, No. 1:11-cr-20131 (S.D. Fla. 2012) (Defendant convicted at trial for $7 million "pump and dump" scheme using fake press releases; sentenced to 20 years of imprisonment)

The courts imposing these sentences recognized the significant harm of "pump and dump" cases and ensured that the punishment was commensurate.  In addition, these cases did not involve obstruction of the type the defendant committed.  That conduct distinguishes the defendant's case from "a rather straight-forward 'pump and dump' scheme," and weighs heavily in favor of a significant period of incarceration.  That is, the Court should look to other financial fraud cases,

many of which have resulted in sentences of a duration similar to that requested here, and should increase the defendant's sentence relative to such cases, so as to account for the serial obstruction in which the defendant engaged.

  **F. The Need to Provide Restitution to Victims**

  As noted above, the defendant's crimes resulted in millions of dollars of losses, both to Signalife in the form of looted assets, and to its shareholders in the form of a decline in the value of their investment.  As its title suggests, the Mandatory Victim Restitution Act makes restitution mandatory in cases such as this one.  18 U.S.C. § 3663A(c)(1)(a)(ii).  Accordingly, once the Court arrives at a reasonable estimate of loss, that loss would be the same amount in which a restitution order should be entered, as the amount of loss in this case is loss actually suffered by investors and by Signalife itself.

## IV. <u>Forfeiture</u>

  Currently pending before the Court is the United States' Motion for a Preliminary Order of Forfeiture, in which the United States requested that the Court enter a preliminary forfeiture order in the form of a money judgment for roughly $5.3 million.  (Dkt. No. 252.)  That sum represents the amount the defendant received in cash and Signalife shares as a result of his crimes, as explained in the Declaration submitted in support of the motion.  (Dkt. No. 252-1.) Forfeiture in this case is mandatory, and for the reasons articulated in its currently pending motion, the United States requests that the Court include in its judgment against the defendant a forfeiture order in the amount of $5,378,581.61.

**VI.**     <u>**Conclusion**</u>

For the reasons stated above, the United States respectfully asks this Court to sentence the defendant to a term of imprisonment of no less than 25 years, to order restitution in the amount of loss for which the defendant is deemed responsible, and to enter an order of forfeiture in the amount of $5,378,581.61.

Respectfully submitted,

WILLIAM J. STELLMACH
Acting Chief
Criminal Division, Fraud Section

By:     _____/s/_____

ALBERT B. STIEGLITZ, JR.
KEVIN B. MUHLENDORF
Assistant Chiefs
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Avenue, N.W.
Washington, D.C.  20005
Phone:   (202) 514-4313 (Stieglitz)
Fax:      (202) 514-0152
Email:  Albert.Stieglitz@usdoj.gov
            Kevin.Muhlendorf@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 24, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.


_____/s/_____
Albert B. Stieglitz, Jr.