UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.: 11-80205-CR-MARRA

UNITED STATES OF AMERICA,
      Plaintiff,
vs.

MITCHELL J. STEIN,
      Defendant.
_____/

**MOTION TO DISMISS INDICTMENT OR, ALTERNATIVELY,
FOR DISCLOSURE OF GRAND JURY MATERIALS,
FOR AN EVIDENTIARY HEARING AND FOR A NEW TRIAL**

COMES NOW, defendant Mitchell J. Stein ("Stein"), by and through the undersigned counsel, and hereby respectfully moves the Court for an order dismissing the indictment or, in the alternative, for disclosure of grand jury materials, for an evidentiary hearing and for a new trial, and as grounds therefore states:

## I.      PRELIMINARY STATEMENT

Rule 33(b)(1), Federal Rules of Criminal Procedure, states:

> "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case."

*See also, United States v. Brown*, 438 Fed. Appx. 871, 872 (11th Cir. 2011) (addressing divestiture of trial court's jurisdiction during pendency of appeal); *United States v. Fuentes-Lozano*, 580 F.2d 724, 726 (5th Cir. 1978) (defendant may present motion for new trial "directly to the district court while the appeal is pending," but district court may not grant the motion until after remand).

Stein brings this motion to preserve the record regarding new developments in the case,

1

outlined below, that reveal additional evidence of prosecutorial misconduct and related violations of law amounting to reversible error in the structure of this prosecution.[1]

## II.      INTRODUCTION

On September 28, 2015, the Government made certain admissions in its respondent's brief in the pending criminal appeal which wholly contradict some of its prior positions and prove its knowledge of the falsity of the evidence it presented at trial, both of which – the falsity and knowledge of that falsity – the Government has consistently disputed in prior proceedings. This is significant with respect to evaluating these admissions in connection with the grand jury proceedings in this case. While "[f]or *Giglio* violations, the defendant is entitled to a new trial 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'" (*Guzman v. Sec'y, Dep't of Corr.,* 663 F.3d 1336, 1348 (11th Cir. 2011) (citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976)), an error in grand jury proceedings which is prejudicial to the defendant leads to dismissal of the indictment.  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S. Ct. 2369, 2373 (1988).

Further, an April 11, 2016 submission by the United States Securities and Exchange Commission ("SEC") in a related lawsuit reveals specific evidence that the prosecutors made false statements to this Court when they represented that their investigation was "truly separate" from the SEC's investigation and that the SEC was not part of the prosecution team.  (DE46:8.) This newly discovered evidence confirms that the two agencies ("prosecution team") worked closely together in both the investigation and prosecution of Stein, and that, accordingly – just as Stein has always alleged – the SEC was an important part of the prosecution team.

---

[1] On April 12, 2016, the Eleventh Circuit Court of Appeals determined that oral argument will be necessary in deciding Stein's appeal of his conviction and sentence, which is currently set for July 12, 2016 in Miami, Florida.

Case 9:11-cr-80205-KAM   Document 479   Entered on FLSD Docket 05/20/2016   Page 3 of 26

These findings, taken together, have significant ramifications and include the reality that the prosecutors' violations of law in this case were structural in nature and that this Court should seriously consider invoking the unusual remedy of dismissing the indictment. Notwithstanding their obligation to search for the truth,[2] the prosecutors knowingly suppressed approximately 99% of the prosecution team's files in filing a case they knew was untrue and in then conducting this litigation by making false representations to the Court while egregiously violating Stein's discovery rights under Rule 16, *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972).

Stein thus formally moves this Court to dismiss the indictment or alternatively to order a new trial and disclosure of all grand jury materials, as well as an evidentiary hearing.

## III.    STATEMENT OF FACTS

A.   In the three motions for a new trial following his conviction, Stein maintained that the SEC was a part of the investigative and prosecution team in this case and that, accordingly, the prosecutors' conduct in not producing files from the universe of documents held by the SEC mandates reversal under Rule 16, *Brady* and *Giglio*.   (*See, e.g.,* DE279:21-30; DE308:11-15; DE355:6-11 .) Stein also asserted that the prosecutors knowingly presented false evidence to the jury, did not correct the falsity and instead capitalized on it in closing argument. (*See, e.g.,* DE279:47-50; DE312:17-23; DE355:11-12.)

B.   Based in part upon the prosecutors' judicial representations that no *Giglio* violations had occurred because the prosecution did not concede to any such violations (DE318:4-6), as well as the prosecutors' judicial representations that the SEC's and DOJ's investigations were "truly separate" and that the SEC was not part of the prosecution team (DE46:8), the Court ruled that the motions for

---

[2] *Strickler v. Greene*, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999).

3

new trial were "baseless" and "offensive" and that documents in the SEC database were never in "possession of the prosecution team in this case."  (DE340:1; DE388:1.)

C.  On September 28, 2015, the Government filed its respondent's brief in the criminal appeal, Eleventh Circuit Court of Appeals Case No. 14-15621. (*See*, Exhibit C; highlighted for the Court's convenience.)

 D. April 11, 2016, the SEC admitted that its files contain "Emails between SEC staff and staff from the Department of Justice ("DOJ") *sharing information and analysis* about parallel SEC and DOJ investigations," as well as at least four letters from the SEC to the DOJ regarding the SEC records accessed by the DOJ for use in the Stein prosecution.  (*See*, Exhibits A and B, SEC's recent filing in FOIA litigation styled *Mitchell J. Stein v. United States Securities and Exchange Commission*, District of Columbia Case No. 1:15-cv-01560-JDB ("FOIA case submission") (D.C. DE10-2:5-6; D.C. DE10-4:20,21,22); emphasis added.) Notably, the SEC has so far refused to list individually on its *Vaughn* index what it estimated to be "thousands" of communications, including inter-agency email communications, relating to its investigations and has thereby withheld the authors and recipients of these communications although FOIA requires such details to be disclosed to allow the reviewing court to test the claimed exemptions.[3]  (Exhibits A and B (D.C. DE10-4D.C. DE10-2).)

E.  Evidence contained within the SEC's recent FOIA case submission further reveals that the prosecution team in this matter conducted "settlement discussions" regarding key government

---

[3] *See, e.g., Vento v. I.R.S.*, 714 F. Supp. 2d 137, 156 (D.D.C. 2010) (agency failed to "indicate why sender and receiver information was not disclosed for all withheld e-mails"); *Wilderness Soc. v. U.S. Dept. of Interior,* 344 F. Supp. 2d 1, 15-18 (D.D.C. 2004) ("the relation between the author and recipients" must be disclosed); *Tipograph v. DOJ*, 83 F. Supp. 3d 234, 239 (D.D.C. 2015) (agency "must conduct a document-by-document review in order to assign documents to the proper category").

witness Martin Carter on August 11, 2009,[4] which – astonishingly – was six months before Carter even testified before the SEC and more than two years before the indictment against Stein was filed. (Exhibit A (D.C. DE10-4:5 [*Vaughn* index Doc.# 25]); DE3.) Thus, the government engaged in settlement discussions involving Carter *before* Carter even committed the criminal act – alleged to have been false SEC testimony – which he ultimately pled guilty to in the criminal action against him.  (*See, id.*; *see also*, Carter plea letter agreement GX225 [DE453-34]; *see also*, Ex. D at 9-13.) Also remarkable is the fact that these settlement discussion plans were crafted four months *before* Stein testified for the first time before the government in this investigation, regarding which Carter testified four years later at the criminal trial in this Court that Stein lied during his SEC deposition, leading to Stein's conviction and a 17-year sentence now on appeal.[5] (DE435-30; DE244:112; DE461.)

### IV.    MEMORANDUM OF LAW

#### A.  Fundamental Legal Standards

##### 1.   Dismissal of the Indictment

"It is well established that federal courts have the inherent power to dismiss an indictment if a sufficiently egregious case of [prosecutorial] misconduct is shown."  *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987); *see also, United States v. Holloway*, 778 F.2d 653, 655 (11th Cir. 1985) (same).   Outrageous prosecutorial misconduct merits dismissal of an indictment when it violates "fundamental fairness" or is "shocking to the universal sense of justice."  *United States v. Russell*, 411 U.S. 423, 432 (1973).

---

[4] Specifically, the document is described as "Draft for settlment [sic] discussions only of final judgement as to defendant Martin B. Carter" (Exhibit A, *Vaughn* index Doc.# 25).

[5] Notably, during this byzantine conduct involving Carter, prosecutor Kevin Muhlendorf was also Senior Counsel at the SEC's Division of Enforcement. (*See*, Exhibits L and M.)

2.   Motion for New Trial

"Rule 33 allows a defendant to file a motion for a new trial within three years after the verdict if the motion is based on 'newly discovered evidence.' Fed.R.Crim.P. 33(b)(1). The court may grant the motion 'if the interest of justice so requires.' Fed.R.Crim.P. 33(a)."

*United States v. Valdes*, 580 F. App'x 852, 853 (11th Cir. 2014).

The newly-discovered evidence standard is not required in cases involving constitutional errors such as discovery violations arising under *Brady v. Maryland* or *Giglio v. United States*. *See*, *United States v. Caro*, No. 08-20044-CR, 2011 WL 4625383, at *5 (S.D. Fla. Oct. 2, 2011), aff'd, 589 F. App'x 449 (11th Cir. 2014) ("A court evaluating a motion for new trial involving *Brady* or *Giglio* violations does not use the Rule 33 standard based on newly discovered evidence.") (citing *United States v. Vallejo,* 297 F.3d 1154, 1164 (11th Cir.2002); *United States v. Cook,* 170 Fed. Appx. 639, 640 (11th Cir.2006) ("district court erred because it evaluated [defendant's] motion for a new trial using the standard for a Rule 33 motion based on newly discovered evidence instead of a Rule 33 motion based on *Brady* evidence"); *Ventura v. Att'y Gen. Fla.f,* 419 F.3d 1269, 1276 (11th Cir.2005)); *see also*, *United States v. Rivera Pedin*, 861 F.2d 1522, 1526 (11th Cir. 1988) (newly-discovered evidence standard "is not applicable, however, where the Government's case included false testimony and the prosecution knew or should have known of the falsehood.") (citation and internal quotation marks omitted).

3.   Discovery Errors

Substantively, any suppression of exculpatory evidence requires a new trial if there is a reasonable likelihood it would have changed the outcome of the case. *Kyles v. Whitley*, 514 U.S. 419, 422 (1995). Similarly, violations of Rule 16 are grounds for new trial, particularly if they violate a defendant's fundamental rights. *See*, *United States v. Rivera,* 944 F.2d 1563, 1566 (11th Cir.1991); *United States v. Barragan,* 793 F.2d 1255, 1259 (11th Cir.1986); *United States v. Noe*, 821 F.2d 604,

607 (11th Cir. 1987); *see also, United States v. Camargo-Vergara*, 57 F.3d 993, 998 (11th Cir. 1995).

### B.   The New Evidence

1.   The Prosecution's Admissions on Appeal

Stein respectfully incorporates into this motion as newly revealed evidence the Government's remarkable admissions on appeal in the Eleventh Circuit Court of Appeals, Case No. 14-15621. Certain of the Government's admissions on appeal are crucial to this Court's evaluation because they are a complete departure from its position previously presented to this Court in a rather aggressive manner, in opposition to Stein's post-trial motions, calling his claims at the time "outlandish," "breathless," "salacious but entirely conclusory and unfounded allegations" and maintained that the "could have" standard could only be applied if the prosecutors conceded the evidence was indeed false and that the prosecutors knew it was false at trial. (*See, e.g*., DE; DE318:1,19; DE318:4-6; DE362:15.) These counter-attacks were followed by this Court's finding that Stein's motions were "baseless" and "offensive." (DE340:1.)

Some two years later, the Government's positions on important issues Stein raised in this Court and on appeal have changed completely and, indeed, constitute new admissions which render some of its theories, at a minimum, illogical.

Among other things, the Government conceded for the first time on appeal that the Cardiac Hospital Management ("CHM") purchase order, which constitutes the beginning of the alleged fraud period (DE428:211), was not "all made up" after all, but was indeed entered into by a *bona fide* customer, Thomas Tribou, who made a down-payment on it. (Ex. C at 59 (RB at 43).) Its new theory on appeal is that it was only "when Signalife could not ship any product to Tribou, Stein 'orchestrated an elaborate scheme.'" (*Id*.) This new theory renders Carter's trial testimony that the

Case 9:11-cr-80205-KAM   Document 479   Entered on FLSD Docket 05/20/2016   Page 8 of 26

purchase order was all made up by Stein because Stein made up all these names (e.g., "Cardiac Hospital Management" (*see*, DE244:112-13)) wholly incredible, because Tribou is a real person who signed the purchase order as "G.P." of "Cardiac Hospital Management" long before the Government now says Carter got involved in the "elaborate scheme." (DE312-1:59-61.) If it is true that there was a real purchase order but that "Signalife could not ship any product to Tribou" (Ex. C at 59 (RB at 43)), then, clearly, Signalife and its approximately seven executives who ran Signalife (DE241:176-177,74-75; DX412:257-258 [DE46419:257-58]; GX93:100 [DE453-16:100]) (none of which the Government called at the trial) must have been very much aware of its manufacturing problems in connection with the purchase orders Woodbury testified were a "huge deal" for Signalife. (DE240:97.) And if "Signalife could not ship any product" during this time, Signalife could not have shipped any product to IT Healthcare either.[6] What is clear is that the Government used Carter's oblique testimony about Stein making up "all these names" (*id.*; *see also*, DE244:108) to argue to the jury in closing argument what it now admits was false – that the CHM purchase order "*never happened.*" (DE248:46-47 (emphasis added).)

An additional admission on appeal is its argument that "the jury was aware that some back-up had been received for one of the purchase orders," citing to a page in GX73:22 – a lengthy public filing that mentions a down-payment on the CHM purchase order. (Exhibit C at 69 (RB at 53).) This admission is harmful to the Government's case and critical to Stein's post-trial arguments, because the Government now concedes it knowingly adduced testimony from its witness, John Woodbury, informing the jury of the exact opposite of what it now argues on appeal, *to wit*, that Woodbury *never received* "any additional independent information about these purchase orders" but that "[he] got all [his] information from Mr. Stein." (DE240:96; *see also*, DE240:9 ("… I had no independent

---

[6] The two IT Healthcare purchase orders were dated around the same time the CHM purchase order was dated. (GX70; GX74; GX64.)

understanding at all").) Similarly, it knowingly adduced testimony from its witness Tracy Jones specifically telling the jury that she "never received any backup or anything" on the purchase orders which is why she fashioned them "phantom purchase orders." (DE241:117.) Thus, the Government now concedes for the first time that, at trial, it knew that these two witnesses were not telling the jury the truth about the back-up they did receive in form of a $50,000 check by a *bona fide* customer (which it identified in its respondent's brief as "one piece of information" (Ex. C at 68 (RB at 52)), yet they did not correct the false testimony but instead capitalized on it in closing argument. (DE248:40 ("Remember Tracy Jones mentioned the phantom purchase orders."); DE248:46-47.) Again, in this Court, the Government did not apply the "could have" standard once in the post-trial briefing on the basis that the prosecutors must first concede that they knew of the falsity. (*See, e.g.*, DE318:4-5.) Stein respectfully submits that had this Court known of these recent admissions of knowledge, it could not have reasonably summarily denied Stein's post-trial motions on the grounds that they were "baseless" and "offensive."

2. <u>Grand Jury Errors Justify Dismissal</u>

The Government's admissions on appeal establish that the grand jury proceedings were tainted.  One of only two alternative scenarios is possible: Either (a) the grand jury issued the indictment based on false evidence, or (b) if the grand jury issued the indictment based upon the wholly different theory the Government now adopts, Stein was tried on a theory that was never submitted to the grand jury or approved by the grand jury.  Under each scenario, dismissal of the indictment is justified. In other words, Stein submits that whatever the disclosure of grand jury materials may reveal, the Government's admissions about the material variance in its core theories on the CHM purchase order constitutes a fatal error mandating dismissal of the indictment.

More specifically, if the grand jury issued an indictment based on evidence that the CHM

purchase order was entered into by a *bona fide* customer and that the alleged scheme was the creation

of false change of address notices "when Signalife could not ship any product to Tribou" (Ex. C at 59

(RB at 43)) – a theory that significantly varies from the Government's case before the petit jury

although the Government is now adopting this theory as the truth on appeal – then, undoubtedly,

Stein was "convicted on a charge the grand jury never made against him. This [would be] fatal

error." *Stirone v. United States,* 361 U.S. 212, 219, 80 S. Ct. 270, 274 (1960) (dismissing

indictment). Further, the indictment would have deprived Stein of proper notice of the specific

allegations, because it falsely alleges that

> "STEIN and his co-conspirators inflated artificially the price and demand
> for Signalife stock by misrepresenting Signalife's operations and
> finances, including information regarding the sale of Signalife products.
> Among other things[,] …STEIN and his co-conspirators created false
> purchase orders…."

(DE3:3.) This allegation would be entirely false as to the CHM purchase order, according to the

Government's appellate admissions, and would constitute a "variation [which] destroyed the

defendant's substantial right to be tried only on charges presented in an indictment returned by a

grand jury. Deprivation of such a basic right is far too serious to be treated as nothing more than a

variance and then dismissed as harmless error." *Stirone*, 361 U.S. at 217, 80 S. Ct. at 273.

Alternatively and perhaps more likely in light of the language in the indictment, if the jury

issued an indictment based on purported evidence which the Government now admits on appeal is

false – that the CHM purchase order was "all made up," "never happened," and was "fake" because

the customers don't exist and these names were all made up by Stein – the indictment should be

dismissed because false evidence was intentionally placed before the grand jury, just as the

prosecution knowingly placed false evidence before the petit jury. *United States v. DiBernardo*, 775

F.2d 1470, 1475 (11th Cir. 1985) (dismissal of indictment warranted if "prosecutor intentionally

placed false testimony before the grand jury").

The appellate admissions by the Government prove for the first time what this Court previously found to be baseless allegations that the Government knew of the falsities presented. These admissions are substantial and include the following statements on appeal:

The Government tries to persuade the Eleventh Circuit that "the jury was aware that some back-up had been received for one of the purchase orders." (Exhibit C at 69 (RB at 53).) Not only is this statement a misconstruction of the record, as Stein pointed out in his reply brief with specific record citations and as this Court knows, it reflects the *opposite* of what the Government endeavored to prove at the trial. Specifically, with respect to GX73:22 cited by the Government in support of this argument, the prosecutors adduced the false testimony from Woodbury that he never received any independent information that would back up the statements on this page of the public filing he submitted as the Company's securities counsel, including the "back up" on one of the purchase orders. (DE240:96.) Similarly, the Government adduced the false testimony from Jones that she called the purchase orders "phantom" because she "never received any back up or anything on them." (DE241:117.) The Government admits now, however, that it always knew that both Woodbury and Jones "received one piece of information" relating to the CHM purchase order (Ex. C at 68 (RB at 52)); *see also, id*. ("in truth, Provencio forwarded Tribou's check to Woodbury")). The Government did not stop there but even argued on appeal that the jury somehow therefore knew its witnesses were not telling the truth about never having received one piece of information or back-up of any kind. (Ex. C at 69 (RB at 53).) But in reality, the Government endeavored to prove at the trial the opposite of what it now argues on appeal, *to wit*, that Tribou was not a *bona fide* customer under the CHM purchase order (DE248:114 ("… where's Thomas Tribou's name?  Does it say sold to Thomas Tribou?  It doesn't, ladies and gentlemen")) and that the CHM purchase was Stein's scheme

to create "fake sales that were helping to get the stock price up" (DE248:46) and that Tribou's purchase order "never happened" (DE248:46-47). Consequently, the Government deliberately and repeatedly adduced testimony of what it knew to be false so that it could exploit these falsities in closing argument.

The Government also argued on appeal that Jones and Woodbury may have had memory problems about having received a copy of the $50,000 down-payment check. (Ex. C at 68 (RB at 52) (Jones and Woodbury may have "simply forg[otten] that they received one piece of information" on one of the purchase orders).) This, again, proves the Government always knew about the fact that these witnesses indeed received a copy of Tribou's $50,000 check as a down-payment on the purchase order, whereas in this Court it both denied the allegation and perplexingly claimed that no *Giglio* violation could possibly occur unless and until the prosecutors admitted the wrongdoing. (DE318:4-6.)

Consequently, irrespective of whether the grand jury was told that the CHM purchase order never happened or that it happened but that the customer never received his product, the error is fatal

in either scenario and requires dismissal of the indictment.[7]

### 3.  The Mounting Evidence of Prosecution Team

#### a.  *The Spirit of Collaboration*

The newly disclosed evidence goes beyond the existence of a number of letters between the agencies and thousands of inter-agency and intra-agency emails the SEC seeks to withhold. Inconsistent with the spirit of FOIA, the SEC has refused to disclose even how many emails exist between the SEC and the DOJ, and only vaguely estimated that it is withholding "thousands of email messages" and "more than 5,000" files. (Exhibit E, at pages 4 of 7, 7 of 7.)

The SEC purports to have conducted a search exercise within thousands of emails included in the "more than 5,000" withheld files using a limited number of search terms it selected for this search ("Stein, Heart Tronics, Inc., Martin Carter, Willie Gault, J. Rowland Perkins, Mark Nevdahl, Ryan Rauch, Yossi Keret, Tony Nony/Nonoy, Avi Cohen, Ari Cohen, or Marina Orita" (Exhibit B at ¶ 8)) among certain of the SEC attorneys ("Adam Eisner, Rachel Nonaka, Charles Cain, Stephen Cohen,

---

[7] While Stein argues that dismissal is warranted at this point even without disclosure of grand jury materials, disclosure of these materials could still prove to be beneficial to this Court's evaluation. Carter never testified before the grand jury (DE244:136-37), and it remains questionable that any hearsay testimony could have possibly established any scheme regarding the purchase orders. While the government is not required to "present *all* available evidence at [the grand jury] proceeding" (*United States v. Brown*, 574 F.2d 1274, 1275 (5th Cir. 1978) (emphasis added)) and, even if disfavored, may base its evidence before the grand jury on hearsay testimony (*id.*, at 1276), a showing that the "integrity of grand jury proceedings has been impaired" could justify dismissal of the indictment (*id.*). Notably, the Second Circuit dismissed an indictment in *United States v. Estepa*, 471 F.2d 1132 (2d Cir. 1972), because the witness that testified before the grand jury had no first-hand knowledge of the events. The Second Circuit explained:

> "We have been willing to allow ample, many doubtless think too ample, latitude in the needless use of hearsay, subject to only two provisos-that the prosecutor does not deceive grand jurors as to 'the shoddy merchandise they are getting so they can seek something better if they wish,' … or that the case does not involve 'a high probability that with eyewitness rather than hearsay testimony the grand jury would not have indicted.' …"

*Id.* at 1137 (citations omitted). It is doubtful the grand jury was aware of the shoddy merchandise they were likely getting with regard to the purchase orders.

Mark Lanpher, and Paul Gunson"[8] (*id.*)) and other government agencies ("U.S. Department of Justice, the U.S. Attorney's Office, the Federal Bureau of Investigations, the U.S. Treasury, FINRA, the U.S. Postal Inspection Service, Commission de Surveillance du Secteur Financier of Luxembourg, the California AG's Office, and/or the Internal Revenue Service" (Exhibit B at ¶ 7)). By executing this search, the SEC declared it located 2,715 files. (Exhibit B at ¶ 9.) Despite the requirement to provide the district court in a FOIA action with sufficient detail to conduct a meaningful evaluation of the claimed exemptions,[9] the SEC refused to even identify senders, recipients and dates for those 2,715 files, and has thus refused to disclose how many of those emails it located are "between SEC staff and staff from the Department of Justice ('DOJ') sharing information and analysis about parallel SEC and DOJ investigations" (Exhibit B at ¶ 11); it could be as many as 1,800 emails. Further, this excludes the remainder of those "more than 5,000" withheld files from which it extracted the 2,715 files based on the criteria the SEC selected. (Exhibit E, at pages 4 of 7, 7 of 7; Ex. B, ¶¶ 7-8.)

The SEC also made clear that it intends to withhold these files in perpetuity, meaning that, while it originally invoked Exemption 7(A) in response to Stein's FOIA request, because Exemption 7(A) is temporal in nature,[10] "[c]onsistent with the temporal nature of Exemption 7(A), at the administrative appeal level the OGC advised Stein that it reserved the right to assert any other applicable exemptions when 7(A) no longer applied to the requested investigatory records" (Exhibit

---

[8] The SEC did not include all of the names of the attorneys involved in the investigation in this search (*see, e.g.*, Ex. K at bates-page 000008) and did not analyze all of the withheld files (Ex. B.)

[9] Under FOIA, the agency must meet its burden of proof on any and all of the exemptions "in a way that facilitates litigant challenges and court review of the agency's withholdings." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 148 (D.C. Cir. 2006) (citation omitted).

[10] *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) (citing *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 230-32, 98 S. Ct. 2311 (1978).

F, at 10 (D.C. DE10-1:10, fn. 3)) and later also invoked Exemption 5 in its admitted effort to assure that secrecy prevails with regard to thousands of unidentified emails. (D.C.DE10-1; D.C.DE10-4; D.C.DE10-2 (Exhibits A, B, F).) This transparent strategy to effectuate the wholesale withholding of thousands of unlisted and unidentified files is inconsistent with "FOIA [which] strongly favors openness, as Congress recognized in enacting it that an informed citizenry is 'vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'" *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S. Ct. 2311, 2327 (1978)). The SEC is even withholding the DOJ's "access request" (Ex. A at 20 (D.C. DE 10-4:20, *Vaughn* Doc. # 185 ("Letter from U.S. Department of Justice to SEC requesting access to certain SEC records"); DE146:41) and related communications on the basis that disclosure could somehow interfere with its civil case now on appeal[11] after the C.D. Cal. entered summary judgment based on the alleged collateral estoppel effect of the criminal conviction. (C.D. Cal. DE277.) The SEC also asserts the DOJ's access request is protected under the work-product privilege (Ex. A at 20), but "compilations of documents that support the factual allegations of a complaint reveals no more than that already revealed by the filing of the complaint" and are not protected by work-product doctrine. *SEC v. Collins & Aikman Corp*., 256 F.R.D. 403, 410–11 (S.D.N.Y.2009). The SEC also maintains that these thousands of files do not contain a single segregable portion of factual information. (D.C.DE10-2:¶19 (Ex. B); D.C.DE10-1:27 (Ex. F).)

Consequently, the government's recent efforts to keep these files secret to avoid the incommodious disclosure of the "strengths and weaknesses" of its case and investigation (Ex. F (D.C.DE10-1:14,16)) contribute to the already established evidence that the SEC played a pivotal

---

[11] The civil appeal, Ninth Circuit Case No. 15-55506 was stayed at the SEC's request pending resolution of the criminal appeal.

role in the prosecution of Stein.  In the event the Court is not inclined to grant relief, logic suggests it may wish to ask the prosecutors at an evidentiary hearing a simple question:  "How many written communications were there between the DOJ and SEC regarding the Signalife/Heart Tronics investigation?"

### b.  The Carter Settlement Discussions

The Government is also expected to argue that the evidence of the withheld file described as "[d]raft for settlment [sic] discussions only of final judgement as to defendant Martin B. Carter" (Ex. B, D.C.DE10-4:5 (*Vaughn* index Doc.# 25)) is pure speculation because (a) the contents have not been disclosed, (b) the context has not been disclosed, and (c) "as a general matter," the SEC makes "wholly separate … decisions" (DE46:5,8). Even irrespective of the contents of this curious settlement-related document, it is clear that the SEC was crafting a settlement plan at a time prosecutor Kevin Muhlendorf was its Senior Counsel, and that settlement plan was crafted prior to the government's multi-year investigation and before anyone allegedly committed perjury before any government agency in this matter, and crafted these plans as to one individual only –the prosecution's star witness and government cooperator Martin Carter. (Ex. B; D.C.DE10-4:5 (*Vaughn* index Doc.#26); GX216; DE312-1:25.) Even if it were believable that the settlement discussions pertained only to the SEC's parallel civil case and not in any way to the criminal action, the SEC's own admission that its "plan all along was to move for collateral estoppel" if Stein were convicted[12] (Ex. G at 15 (C.D. Cal. DE326:15)) is important in considering the prosecution team's pre-investigation motives and goals in connection with an early settlement with Carter. In other words,

---

[12] Notably, the DOJ intervened in the civil action on April 3, 2012 to further assure discovery was stayed in the civil action and also revealed its knowledge of the SEC's intention to move for summary judgment (Ex. H; C.D. Cal. DE36:18 ("conviction will operate as an estoppel")). After the trial, the SEC produced a nearly identical set of documents to Stein, in addition to approximately 45,000 pages of files marked "SEC-Investigative" which contained, among other things, the thousands of pages of the trial transcripts of the criminal trial and Exhibit X. (*See*, DE355-2; Ex. J.)

given that the SEC never intended to litigate its case against Stein at a trial but relied entirely on the criminal trial for which Carter had agreed to testify that Stein committed perjury with respect to making up "all these names" on the purchase order documents Carter created, what benefit could flow to the SEC from an early settlement with Carter if not the agreed-upon cooperation in the criminal case? And if no witness had yet testified at the time the SEC began developing this stratagem, how could the SEC have even known what precisely the allegations against Carter were which he would consent to with respect to the purchase order documents at the heart of the investigations the government would pursue for years following the 2009 settlement discussions? It arguably shows that the government's intention to prosecute someone could very well precede any alleged proof of wrongdoing by that person. In any event, it is simply not believable that the SEC could have developed anything even close to the Consent Carter signed[13] at a time it had not deposed a single witness and had not yet even obtained authorization to conduct an investigation of "*potential* violations…" in this matter (Ex. B; D.C.DE10-4:5 (*Vaughn* index Doc.#26); emphasis added). These revelations are critical, because they buttress the clear evidence that the SEC and DOJ prosecuted this case based on inconsistent theories and proof. (Compare: DE428:34,46-47 (CHM purchase order was "all made up" and "never happened") with Ex. C at 59 (RB at 43) (purchase order happened and was a legitimate contract).) Based on this due process violation alone, the conviction should be set aside. *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (finding that prosecutor's use of "totally inconsistent ... theories ... was inherently unfair"); *Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2003) (due process rights may be implicated by government's use of factually inconsistent and irreconcilable testimony in two proceedings against the same person).

---

[13] *See*, Exhibit D; Carter Consent in the civil action laying out admissions about specific wrongdoing about purchase order documents and Exhibit A thereto, laying out admissions of committing perjury and frustrating the SEC's investigation.

4.   Cumulative Analysis

The newly disclosed evidence should be viewed cumulatively with the evidence previously presented, because "[w]hat may have been a reasonable decision on the [earlier district court] record may no longer be reasonable in light of the new evidence." *Cullen v. Pinholster*, 563 U.S. 170, 215, 131 S. Ct. 1388, 1418 (2011); *see also, United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978) ("cumulative effect of the errors . . . convinces us … that the defendant did not receive the fair trial he is entitled to under the law").

Stein submits that the now even clearer picture of the spirit of collaboration between the DOJ and SEC and mounting evidence of misrepresentations to this Court and the petit jury, when viewed cumulatively, clearly show that Stein was deprived of a fair trial and that the interests of justice justify ordering a new one.  Stein also claims that the errors in this case are structural in nature and prejudicial and warrant dismissal of the indictment. (*See*, section IV.B.2, *supra*.)

As explained in section IV.B.3a, *supra*, the cumulative effect of the piecemeal leakage of information about the extent the SEC and DOJ collaborated clearly establishes that the SEC was part of the prosecution team far earlier than anticipated and possibly at the start of the prosecutorial investigation. It also confirms that the extension of the DOJ's discovery obligations to the universe of documents in the custody of the SEC from which the DOJ essentially acquired its case and its files is anything but "illogical." " (Ex. C at 73 (RB at 57).) This Court could now not reasonably come to the same conclusion that it came to on or around September 26, 2012, when it ruled that "[i]t … cannot fairly be said that the investigation was joint, that [the DOJ and SEC] collaborated extensively, or that the SEC was part of the prosecution team." (DE63:2.)

As to the two wholly different theories on Tribou's purchase order, the new evidence of Government admissions could only be viewed collectively with the prior record. The Government

18

never presented its acceptance of a wholly different theory in this Court, but instead insisted that Stein's claims were "completely without merit" and even "outlandish." (DE298-1:1; DE318:18.) Finding Stein's claim's baseless, this Court could not evaluate the reality of the Government's alternative theory of a real purchase order entered into by a real customer, which impacts the credibility of Martin Carter's testimony, impacts the Court's assessment of the prosecutors' representations about the $50,000 check after their off-the-record telephone call with Tribou (DE247:54-57), impacts Stein's discovery claims, impacts the loss enhancement calculations, and even necessarily impacts the propriety of the grand jury proceedings as set forth herein.

This Court could now not reasonably come to the same conclusion it came to on or around June 9, 2014, when it ruled that Stein's post-trial motions were "not only baseless, but also offensive" (DE340:1) and on or around November 25, 2014, when it ruled that "there has been no showing that the prosecutors knowingly made false representations or presented perjured testimony to the jury in this case." (DE388:2.) It is respectfully submitted that there could be no stronger showing of knowledge by the prosecution than the prosecution's own admissions. (*See*, sections IV.B.1 and 2, *supra*.)

5.   The Evidentiary Suppression Justifies Relief

The evidence that the SEC was a part of the prosecution team merits serious consideration by this Court in fashioning an appropriate remedy.   The conduct by the Government now includes knowing representations to the Court in order to effect nearly a wholesale suppression of the universe of documents held by the prosecution team.   (*See, e.g*., DE46:5,8 ("Department of Justice prosecutors do not as a general matter have any authority over SEC investigative staff or access to SEC materials.... Here, [the DOJ's and SEC's investigations] were *truly separate* investigations, which led to *separate and wholly different* charging decisions" (emphasis added)).) That this type of

19

conduct is unlawful is long-ago settled law in this circuit.  *See, e.g., United States v. Trevino*, 556 F.2d 1265, 1272 (5th Cir. 1977) ("Certainly the prosecutor would not be allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial; such evidence is plainly within his Rule 16 'control.'").[14]

At the outset of the case in response to Stein's discovery requests, the prosecutors responded that they were only obligated to produce those "documents and materials the SEC sent the United States" (DE46:6,7, fn. 4) and that the two agencies conducted "truly separate" investigations in which the SEC was not a part of the prosecution team.  (DE46:5,8.)

On September 23, 2015, Stein sued the SEC after it refused to comply with FOIA after Stein submitted a FOIA request for "all documents and information in the possession of the Securities and Exchange Commission appertaining or relating to its investigation into any persons named Yossi Keret, Tony Nony/Nonoy, Avi Cohen, Ari Cohen and Marina Orita during its investigation [in *United States v. Mitchell J. Stein*; S.D. Fla. Case No. 11-80205 and *SEC v. Heart Tronics, Inc., et al.*, C.D. Cal. Case No. SACV11-1962]" and all documents reflected on the privilege log the SEC produced in the civil action. (Exhibit I.) On April 11, 2016, Stein and the SEC filed cross motions for summary judgment (as commonly done in a FOIA action). This caused the SEC to have to submit an explanation for its withholding of the thousands of files responsive to the FOIA request. While the SEC still refused to submit the requisite details, more evidence of the spirit of the inter-agency collaboration was revealed. (*See*, section IV.B.3a, *supra*.) As set forth above, the investigations were not "truly" separate at all.  Rather, the investigations were combined and the two agencies shared their analyses directly with one another; indeed, the DOJ obtained most of its files in this case from

---

[14] Pursuant to *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir. 1981), all decisions of the Fifth Circuit Court of Appeals rendered prior to 1981 are binding precedent in the Eleventh Circuit.

the fruits of the SEC investigation conducted at a time when prosecutor Kevin Muhlendorf was SEC Senior Counsel.

Considering the SEC's recent admission that it has located emails "between SEC staff and staff from the Department of Justice ('DOJ') sharing information and analysis about parallel SEC and DOJ investigations" in this matter (at least in connection with the search terms delineated at Ex. B, ¶8 (D.C.DE10-2:¶8)), and its refusal to identify how many of the "thousands of [withheld] emails" are such emails between the DOJ and the SEC (Ex. E, at p. 4 of 7; Ex. B.), Stein's claim that it would not be "illogical" (Ex. C at 73 (RB at 57)) to expect the DOJ to produce documents from the universe of documents held by the SEC is perfectly logical. *See, United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) (disclosure obligation when agencies significantly "pooled their investigative energies") (citation omitted); *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) (discovery obligations extend to "materials in the hands of a governmental investigatory agency closely connected to the prosecutor"); *United States v. Risha*, 445 F.3d 298, 305 (3d Cir. 2006) ("close working relationship" between agencies sufficient to find prosecution team); *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (finding suppression of "available information," because the prosecutor chose not to seek the information although he knew how to acquire it); *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (relevant factors include the "spirit of cooperation" between the agencies); *United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978) ("government [not] excused from its [discovery] obligation by the fact that the documents were in the possession of the FBI prior to trial"); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973) overruled on other grounds by *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984) ("there is no suggestion in *Brady* that different 'arms' of the government … are severable entities"); *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2001) ("knowledge of evidence is imputed to the prosecutors only if it lies within

21

an agency that is 'part of the team that investigated [the] case or participated in its prosecution'")

(citing *United States v. Morris*, 80 F.3d 1151, 1169–70 (7th Cir.1996)); *United States v. Bryan*, 868

F.2d 1032, 1036 (9th Cir. 1989) ("prosecutor  …  deemed to have knowledge of and access to

anything in the possession, custody or control of any federal agency participating in the …

investigation"); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) ("[i]nformation

possessed by other branches of the federal government, including investigating officers, is typically

imputed to the prosecutors of the case").

Having already pointed to significant evidence in the record that establishes that the SEC was

part of the prosecution team, which includes the DOJ's admitted "access" to the SEC's database

(DE146:41) as well as its admission that most of the files it produced to the defense came from the

SEC (DE46-1:2), in light of the SEC's recent admissions, the evidence of the spirit of collaboration

is now overwhelming and cannot be reasonably ignored.

6.  This Case is Akin to Structural Error

Although the doctrine of structural error applies to only a limited class of cases,[15] the impact

of the unique and far-reaching attempts to suppress the truth in this case raise a similar if not

identical kind of error.  Suppressing nearly 200 million documents is clearly akin to structural error

when considered alongside what the government now admits were, at a minimum, inaccuracies in its

prosecutors' case against Stein.  As the Supreme Court has instructed, "the touchstone of structural

error is fundamental unfairness and unreliability." *United States v. Gonzalez-Lopez*, 548 U.S. 140,

159, 126 S. Ct. 2557, 2570 (2006).

The Government's admissions on appeal remove any doubt that Stein was prejudiced by the

---

[15] *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827 (1999); *Johnson v. United States*, 520
U.S. 461, 468-69, 117 S. Ct. 1544, 1549-50 (1997) (listing limited class of cases involving structural
error).

foregoing misconduct.  For example, the government now admits that key prosecution witnesses Tracy Jones and John Woodbury may have "simply forg[otten] that they received" back up on the purchase orders when they falsely testified that the purchase orders were "phantom" because they never received back-up information regarding them.  The truth is that they both received the $50,000 down payment on the CHM purchase order which was forwarded to "chairman of the audit committee of [Signalife's] board of directors," Norma Provencio, who performed audit functions relating to the purchase orders. (Ex. C at 68 (RB at 52); DE241:117; DE264-3:2; DE264-4; DE264-1:2;  DE266:11;  GX73:39 [DE453-11:39];  GX93:93 [DE453-16:93];  DX412:11[DE452-117:11].) Whether or not their false testimony is reversable error under *Giglio* and *Davis v. Zant*[16] will soon be decided by the Eleventh Circuit, but what is not before the Eleventh Circuit is whether it was fundamentally unfair for the prosecutors to consistently dupe this Court into believing the SEC was not a part of the prosecution team as a method to avoid producing the relevant files from the SEC database.  We now know that the SEC was not only a key member of the prosecution team, but that it actually assisted in analyzing the issues in the criminal case.  The fact that the government now admits that two of its key witnesses may have had memory problems is critical to the analysis and is the hallmark of unreliability.  Indeed, the fact that those purported memory problems pertained to the core issue in the case -- whether Stein fabricated the three purchase orders -- is dispositive.  Could any one of the millions of suppressed files have refreshed their allegedly faulty recollections?  Do any of the millions of files of information reflect that there was indeed additional back-up for the three purchase orders, thus completely exonerating Stein?  It is important to remember that Tracy Jones was the executive secretary for three Chief Executives of Signalife, yet the prosecutors only

---

[16] *Davis v. Zant,* 36 F.3d 1538, 1548 (11th Cir. 1994) ("Little time and no discussion is necessary to conclude that it is improper for a prosecutor to use misstatements and falsehoods.").

produced 43 pages of her records. (DE298-1:66; DE241:30-31,35,98,100; DE277:4,5,9.) This is to be compared with 200 million files relating to this investigation into Signalife.   What is contained within Tracy Jones' files?  Do they contain additional back-up for the three purchase orders that she also forgot about?

It can hardly be disputed that these circumstances may have "undermine[d] the fairness of the criminal proceeding as a whole." *United States v. Davila*, 133 S. Ct. 2139, 2149 (2013).   In addition to the foregoing admissions on appeal, the government now further admits that the CHM purchase order was indeed a binding contract.  (Ex. C at 59 (RB at 43).)  In the words of the Supreme Court, the government's case is unreliable and that unreliability has been brought about by what we now know were intentional misrepresentations to this Court.  Therefore, in this case, we have not "simply an error in the trial process itself" but a defect that "def[ies] analysis by harmless-error standards" in that it "affec[ted] the framework within which the trial proceeded" and created a situation in which neither the Court nor Stein nor even the prosecutors had any chance of ever learning the truth behind the government's allegations. *Gonzales-Lopez*, 548 U.S. at 148.

Again, whether the misstatements constitute reversible error is something the Eleventh Circuit will soon rule on; however, the questions for review in this motion are the impact of the Government's admissions on the grand jury proceedings and whether the "search of truth" in the criminal case against Stein can lawfully withstand what the government now admits were inaccuracies in its case in combination with its prosecutors' intentional suppression of millions of relevant files.  Particularly considering the fact that the start-date for measuring loss for Stein's sentence was that authentic CHM purchase order (DE428:211), Stein now submits that fundamental fairness cannot withstand the result reached in this case.

## V.        CONCLUSION

For all these reasons, Stein respectfully requests that the indictment be dismissed.  In the alternative, Stein seeks disclosure of grand jury materials as well as an order granting either a new trial or an evidentiary hearing regarding the serious issues of misconduct presented by this case. Lastly, Stein respectfully requests the Court issue a reasoned decision.[17]

Date: May 20, 2016                              Respectfully Submitted,

                                                /s/ Jonathan B. Kasen
                                                JONATHAN B. KASEN, ESQ.
                                                633 SE 3rd Avenue,
                                                Suite # 203
                                                Fort Lauderdale, Florida 33301
                                                Phone: (954) 761-3404
                                                Facsimile: (954) 337-2822
                                                attykasen@jonathankasenpa.com
                                                Florida Bar No. 0164951

---

[17] *Danley v. Allen*, 480 F.3d 1090, 1091 (11th Cir. 2007); *Bailey v. United States*, 307 F. App'x 401, 402 (11th Cir. 2009); *United States v. Valencia-Trujillo*, 462 Fed. Appx. 894, 896-97 (11th Cir. 2012).

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 20, 2016 I electronically filed the foregoing documents with the Clerk of the Court and all counsel of record using CM/ECF.


<u>/s/ *Jonathan B. Kasen*</u>
Jonathan B. Kasen, Esq.