**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 11-80205-CR-MARRA**

UNITED STATES OF AMERICA,

vs.

MITCHELL J. STEIN,

Defendant.

**DEFENDANT'S SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND .......................................................................................................3

    A.    The Alleged Scheme ...............................................................................3

    B.    Signalife's Stock Drops Throughout the Alleged Fraud Period, Behavior Inconsistent with a Pump-and-Dump Scheme To Deceive the Market ...................................................................................5

    C.    The (Non-)Revelation of the Fraud.........................................................6

    D.    Defendant's Trading During the Fraud Period ...........................................8

    E.    The Prior Sentencing Proceeding.............................................................9

    F.    The Government's Disclosures of Its Loss Estimates in This Proceeding............................................................................................10

ARGUMENT .........................................................................................................11

I.    Legal Standards.................................................................................................11

    A.    The Government's Burden........................................................................11

    B.    The Legal Framework for Calculation of the Loss Amount.....................11

        1.    Defendant's Offense Must Be the Factual ("But For") and Legal ("Proximate") Cause of Any Losses Included in the Loss Amount. ..............................................................................12

        2.    To Prove Factual Causation, the Government Must Prove that Any Alleged Victim Actually Relied Upon the Specific Misrepresentations. ..................................................................12

        3.    To Prove Proximate Causation, the Government Must Prove that Defendant's Offense Conduct, and Not Other Causes, Caused Any Pecuniary Loses That Victims Suffered. ........................................13

        4.    In Securities Fraud Cases, Courts Calculate Investor Losses by Assessing the Impact on the Stock Price When the Fraud Is Revealed.....................................................................................15

II.    The Government Cannot Prove Losses to Investors..............................................17

    A.    The Government Has Failed To Prove Reliance ......................................18

    B.    The Government Has Failed To Prove Proximate Causation....................19

        1.    Because the Government Failed to Prove Market Efficiency, It Cannot Show that Price Movements Resulted from Any Particular Cause......................................................................................19

        2.    Alternatively, Only the August 15, 2008 10-Q, and Not the April 14, 2008 Webcast, Contained a Corrective Disclosure. .......20

|   | 3. | Intervening Causes Contributed to the Stock Price Decline Both on August 15, 2008, and Earlier in the Alleged Fraud Periods. .........21 |

|   | 4. | Conclusion on Loss Causation........................................................23 |

III. Defendant's Alleged Gain Should Not Be Used As an Alternative Measure of Loss, But in Any Event It Was Zero....................................24

IV. The Enhancement for 250 or More Victims Does Not Apply .............................24

V. A Finding of a Substantially Reduced Loss Amount Should Result in a Substantially Reduced Sentence ...................................................................25

CONCLUSION...................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)......................................................13

*Boatmen's Nat'l Co. v. M.W. Elkins & Co.*, 63 F.2d 214 (8th Cir. 1933) ........................13

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)...............................................16

*Eagletech Commc'ns Inc. v. Citigroup, Inc.*, No. 07-60668-CIV, 2008 WL
    3166533 (S.D. Fla. June 27, 2008) ..............................................................23

*Gall v. United States*, 552 U.S. 38 (2007) .........................................................25

*Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014)..............................19

*Honeycutt v. United States*, 137 S. Ct. 1626 (2017) ...............................................1

*In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616 (N.D. Ala. 2009)...............13, 18, 19

*In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009) ....................20

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562
    (2016)..................................................................................................22

*Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013)................................................15, 16, 20

*Paroline v. United States*, 134 S. Ct. 1710 (2014)................................................13

*Peugh v. United States*, 133 S. Ct. 2072 (2013) ...................................................17

*Rita v. United States*, 551 U.S. 338 (2007).......................................................25

*Robers v. United States*, 134 S. Ct. 1854 (2014) ................................................13

*Stanaford v. Genovese*, No. 13-CV-80923-RYSKAMP/HOPKINS, 2016
    WL 4198146 (S.D. Fla. Mar. 14, 2016)....................................................13, 18

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...........................15

*United States v. Barona-Bravo*, 685 F. App'x 761 (11th Cir. 2017)...............................14

*United States v. Evans*, 744 F.3d 1192 (10th Cir. 2014) ......................................12, 17, 21

*United States v. Evbuomwan*, 992 F.2d 70 (5th Cir. 1993) ...................................15, 23

*United States v. Giovenco*, 773 F.3d 866 (7th Cir. 2014).........................................24

*United States v. Hatfield*, No. 06-CR-0550, 2014 WL 7271616 (E.D.N.Y. Dec. 18, 2014)........................................................................................16

*United States v. Huff*, 609 F.3d 1240 (11th Cir. 2010) .....................................11

*United States v. Hunter*, 323 F.3d 1314 (11th Cir. 2003)....................14, 15, 23

*United States v. Martin*, 803 F.3d 581 (11th Cir. 2015) ...............................11, 14

*United States v. Munoz*, 430 F.3d 1357 (11th Cir. 2005) ...................................24

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005)..............................16, 21, 22

*United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013) .......................................15

*United States v. Peppel*, No. 3:06-CR-196, 2011 WL 3608139 (S.D. Ohio Aug. 16, 2011) ...................................................................................15

*United States v. Rand*, 835 F.3d 451 (4th Cir. 2016)..........................................15

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .........................................17

*United States v. Robertson*, 493 F.3d 1322 (11th Cir. 2007)..................13, 14, 23

*United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007)....................................16

*United States v. Snyder*, 291 F.3d 1291 (11th Cir. 2002) ...................................24

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) ............................. passim

*United States v. Studley*, 47 F.3d 569 (2d Cir. 1995)........................................14

*United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999) ..................................14

**Statutes & Rules**

18 U.S.C. § 3663A(a)(1)-(2) .............................................................................11

18 U.S.C. § 3742(g)(1) ......................................................................................10

U.S.S.G. App. C, Vol. II at 178, Amend. 617 (Nov. 1, 2001)...........................12

U.S.S.G. § 1B1.3.................................................................................................14

U.S.S.G. § 2B1.1.................................................................................................12

U.S.S.G. § 2B1.1(b)(1) ........................................................................................9

U.S.S.G. § 2B1.1(b)(2)(A) (2014) .....................................................................10

U.S.S.G. § 2B1.1(b)(2)(C) (2014) ........................................................................10, 24, 25

U.S.S.G. § 2B1.1(b)(15)(B)(ii) (2014) .................................................................10

U.S.S.G. § 2B1.1 n.3(A)(i) .................................................................................11, 23

U.S.S.G. § 2B1.1 n.3(B) ......................................................................................24

U.S.S.G. § 2B1.1 n.3(F)(ix) ...............................................................................15, 17

U.S.S.G. § 5.A (2014).........................................................................................10

**Other Authorities**

"Naked" Short Selling Antifraud Rule, SEC Release No. 34-58774, 73
    Fed. Reg. 61667 (2008) ...............................................................................23

Restatement (2d) of Torts § 548A cmt. b ...........................................................17

## INDEX OF EXHIBITS

| Exhibit No. | Short Citation (if applicable) | Description |
|---|---|---|
| 1 | O'Neal Rpt. | Expert Report of Edward S. O'Neal, Ph.D., dated April 6, 2018 |
| 2 | Christian Rpt. | Expert Report of James Wesley Christian dated April 6, 2018 |
| 3 | Becker Rpt. | Expert Report of Chyhe K. Becker, Ph.D., dated April 6, 2018 |
| 4 | Hayter Rpt. | Rebuttal Report of Dr. Anthony Hayter, dated May 10, 2018 |
| 5 | O'Neal Rebuttal Rpt. | Rebuttal Report of Edward S. O'Neal, Ph.D., dated May 10, 2018 |
| 6 | Christian Rebuttal Rpt. | Rebuttal Report of James W. Christian, dated May 10, 2018 |
| 7 | | Signalife Inc., Form 10-Q, August 15, 2008 |
| 8 | | Brochure titled "Athletes for Life Foundation" dated Apr. 16, 2008, DOJ-LBE0026145 |
| 9 | | Nov. 12-13, 2008 emails between M. Stein and officials at the National Institutes of Health, SEC-MS_0005798 |
| 10 | | Signalife Press Release, "AFL receives overwhelming demand for Signalife Heart Screening," SEC-LBE 028511 |
| 11 | | Feb. 28, 2007 emails between M. Stein and Michael Menzies, SEC-MS_0014764 |
| 12 | | Jan. 8-9, 2007 emails between M. Stein and Pam Bunes, SEC-MS_0016484 |
| 13 | | Signalife Stock Price Data, USA-MS-0000005833 |
| 14 | | Transcript of April 14, 2008 Signalife Webcast, HT-SEC 0005615 |
| 15 | | Letter from Michelle Pascucci to Benjamin Gruenstein, dated April 18, 2018 |
| 16 | | Excerpt from Signalife trading data (Bryan Harris trades) |

Defendant Mitchell J. Stein respectfully submits this sentencing memorandum pursuant to the Court's January 24, 2018 scheduling order (DE 523).[1]

## PRELIMINARY STATEMENT

In 2014, this Court sentenced Defendant, Mitchell J. Stein, to 204 months in prison. As of June of this year, Stein, who is fifty-nine years old, will have served sixty-one months of that sentence. Nearly half of Defendant's total offense level for Guidelines purposes included a 20-point loss enhancement, based on the Court's finding that over two thousand investor victims who purchased stock in Signalife Inc. lost nearly $13.2 million from the offenses. The Eleventh Circuit vacated the sentence and remanded for reconsideration of the loss amount (if any). For the reasons that follow, applying the Eleventh Circuit's decision, this Court should find a substantially smaller loss amount than $13.2 million, and accordingly should impose a substantially reduced sentence and restitution amount.

The Eleventh Circuit found the government's proof of loss to be deficient in two respects: *first*, the government failed to prove, as it must, that the alleged investor victims had actually relied on the fraudulent statements in purchasing Signalife shares; and *second*, the government failed to prove loss causation—that the offense conduct, as opposed to other factors, caused the pecuniary losses that those investors suffered. *See United States v. Stein*, 846 F.3d 1135, 1151-57 (11th Cir. 2017). Now, the evidence will show that, far from $13.2 million in losses to Signalife investors (let alone the even higher sums the government also put forward in the previous proceeding, and which this Court rejected), assuming *any* investor relied upon the alleged misrepresentations here, the losses actually caused by the Defendant's offenses amounted to close to zero. The government has not put forward any evidence establishing what was missing from its previous calculations—that the marketplace of investors collectively relied upon the alleged misrepresentations in purchasing Signalife stock. Moreover, Defendant's experts at the upcoming sentencing hearing will explain how, at most, investors collectively lost approximately $525,000, and likely much less, as a result of the offenses. By the time any facts relating to the alleged fraud ever reached the market, Signalife's stock price had already fallen

---

[1] This memorandum addresses only issues concerning sentencing and restitution. Defendant has filed a separate motion to vacate the Court's forfeiture judgment against him based on the Supreme Court's recent decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). (DE 524.) That motion is fully briefed. Defendant has two additional motions pending (DE 479 and 510).

over 90% from the date on which the first allegedly false press release was issued.  Under well-established principles for calculating investor losses, because the market never learned of the fraud before the stock price dropped, that price drop cannot be attributed to the fraud.  Factors other than the alleged purchase order fraud, including the overall market conditions, company-specific information unrelated to the fraud, and manipulative trading (so-called "naked short selling"), were among the causes of this price drop.

Importantly, it is not Defendant's burden to prove affirmatively the lack of losses resulting from his offenses.  Although Defendant does not know what specific loss estimates the government will put forward, as the government's expert did not disclose a loss amount in her reports, at the very least the government will likely be unable to show that alleged investor victims relied upon the fraud in making their decisions to purchase Signalife stock.  And, even if some investors did so rely, the government will not be able to prove that the fraud, as opposed to other factors, caused the pecuniary losses that those investors may have suffered.  Perhaps recognizing the sea change resulting from the Eleventh Circuit's decision, based on the disclosures the government has made to Defendant to date it appears that it now believes that losses to investors were well below the $13.2 million this Court previously found.

Although Defendant does not dispute the jury's verdict, that investors suffered far smaller losses than the Government originally contended is cause for reconsidering how the alleged scheme actually worked, how (if at all) investors were harmed, and how (if at all) Defendant profited.  The government's central narrative about the alleged scheme has been that it was a "pump-and-dump" scheme, in which a defendant inflates stock through fraud while secretly selling his shares at the inflated price.  Here, however, that did not happen, as Signalife's stock price began to *decline* shortly after the second of the three allegedly false press releases was issued, rather than remaining inflated throughout the alleged fraud period.  In addition, Defendant was a net *purchaser* of the stock throughout the alleged fraud period, and himself suffered large losses as a result of the stock price decline.  It is with this understanding of how the alleged scheme worked that the extent of any loss enhancement must be considered.

Because this Court should find that the loss amount is dramatically smaller than what it found previously, it should impose a substantially reduced sentence.

2

**BACKGROUND**

As explained below (*see infra* sec. F), Defendant does not know precisely what the government will present as an estimate of the loss in its sentencing memorandum. From what the government has disclosed, however, it appears that it will focus on alleged losses to certain holders of Signalife stock, as well as alleged gains to Defendant as an alternative measure of loss. This memorandum therefore focuses on those two measures of loss.

A.      **The Alleged Scheme**

On September 20 and 25, 2007, and October 10, 2007, Signalife issued three press releases reporting on purchase orders for the company's products that the government alleged were fabricated by Defendant and his co-conspirators. The company's subsequent quarterly and annual SEC filings stated that these purchase orders remained pending, until August 15, 2008. In the company's 10-Q issued on that date, Signalife reported that one of the three purchase orders had been canceled by the entity that purportedly leased the products, and that Signalife had never recognized revenue from any of the purchase orders. (O'Neal Rpt. (Ex. 1) ¶¶ 41-42; Signalife Form 10-Q (Aug. 15, 2008) (Ex. 7), at 21-22.)[2] According to the government's pre-trial disclosures, it intends to argue for a loss amount based on investor losses during two potential "fraud periods": September 20, 2007 through August 15, 2008 (the "broad" period), and September 25, 2007 through April 14, 2008 (the "narrow" period). (*See* Ltr. from M. Pascucci to B. Gruenstein (May 4, 2008) (DE 527-1) ("Pascucci May 4 Ltr.").) The end of the narrow period is the date on which Signalife's CEO held a public webcast (described below).

Accurately assessing the amount investors in Signalife stock may have lost as a result of these events requires putting them into proper context. In the early 2000s, Defendant's ex-wife, Tracey Hampton-Stein, acquired patented "signal" technology that had been developed for the U.S. Air Force. Through an entity called ARC Finance Group, Hampton-Stein sold this

---

[2] As well as this purchase order fraud, the Indictment also alleged that Stein concealed his trading of Signalife stock by selling shares through blind trusts. (Indictment (DE 3) ¶ 9.) As explained below, the blind trust sales to which the Indictment refers stopped months before the first allegedly false press release was issued. The press releases and subsequent SEC filings are the only statements to the market that the government has ever alleged to have been fraudulent. Therefore, the blind trust sales, which stopped before those statements were ever made, should not be seen as part of a scheme to deceive investors. Moreover, the government has never alleged, including in the first sentencing proceeding, that the blind trust sales resulted in losses to any victims, and Defendant does not understand the government to be alleging that now either.

3

technology to a company that came to be called Signalife, with ARC Finance owning a large majority of the company's stock.  The technology was incorporated into Signalife's main product, the Fidelity 100 heart monitor.  (Signalife, Inc., Form 10-KSB (Dec. 31, 2005) ("Signalife 2005 10-K"), DX 78 (DE 452-10), at 1-2, 4, 8.)  Despite not being a formal officer of the company, Defendant was a passionate, even obsessive, believer in the value of the company's technology and the potential for the company's products to save lives.  (*See, e.g.*, Ex. 9 (Nov. 12-13, 2008 emails between Defendant and NIH officials).)  As well as his involvement with the company's management and sales efforts, he also co-founded a charity, Athletes for Life, aimed at "promoting early diagnosis and treatment" of heart problems with the company's products.  (*See* Exs. 8, 10.)

Beginning in 2003, Defendant and his ex-wife began taking Signalife public by issuing and then selling certain quantities of shares into the public market.  (Signalife 2005 10-K, DX 78 (DE 452-10) at 1-2.)  However, throughout the company's history, Defendant remained a substantial shareholder.  As of September 19, 2007, the day before the first press release was issued, Defendant held over 19.5 million shares of Signalife through ARC Finance Group and other personal accounts.  (O'Neal Rpt. (Ex. 1) ¶¶ 77-78.)

By early 2007, Defendant believed that a group of investors in the company, including a former employee, were attempting to manipulate the company's stock price by engaging in so-called naked short selling.  (*See, e.g.*, Ex. 11 (Feb. 28, 2007 email from Defendant to Michael Menzies describing naked short selling of Signalife shares).)  Defendant was not alone in this belief; other company officers, including then-CEO Pam Bunes, also thought that the company was the target of naked short sellers.  (*See, e.g.*, Ex. 12, at SEC-MS_0016485 (Jan. 8, 2007 email from Pam Bunes to Defendant, asking for advice on website discussing naked short selling).)  Naked short selling is a trading practice whereby speculators attempt to manipulate the price of a company's stock away from its fundamental value by selling shares without owning or arranging to borrow them, as in a normal short sale.  (*See* Christian Rpt. (Ex. 2) ¶ 16; Becker Rpt. (Ex. 3) ¶ 25 n.20.)  Both sides' experts in this case agree that naked short selling "would be expected to have a negative effect on the stock price."  (Becker Rpt. (Ex. 3) ¶ 25 n.20; *see also* Christian Rpt. (Ex. 2) ¶ 16.)  Defendant believed that the only way to combat the naked short sellers was for the company to post positive earnings, which would cause the stock's price to rise and prevent the naked short sellers from profiting.  (*See, e.g.*, Ex. 12, at SEC-MS_0016484-485 (Jan. 8, 2007

4

emails from Defendant to Pam Bunes) ("the end of the short-sellers happens when you post earnings. . . . only real way to 'break' a naked short is with real revenues and real earnings, coupled with a stock buyback."); Ex. 11 (Feb. 28, 2007 email from Defendant to Michael Menzies, noting that the AMEX, Depository Trust Co., and shareholders had confirmed the manipulative trading and that "the company must simply win from a business standpoint").)

### B.     Signalife's Stock Drops Throughout the Alleged Fraud Period, Behavior Inconsistent with a Pump-and-Dump Scheme To Deceive the Market

The government's theory of the alleged scheme was that it was a traditional so-called "pump-and-dump" scheme; it argued to the jury that Stein perpetuated the fraud in order to inflate Signalife's stock price while he enriched himself by selling stock issued to him and his co-conspirators at the inflated value.  (*See* Tr. vol. 10 (DE 248) at 34-35 (government's closing) ("It was almost as if this Defendant was placing an order with Signalife for shares he could steal and sell. . . . The purpose of the scheme, the lies about the purchase orders, was to support the stock price so they could manipulate the market and get more for their shares. . . .").)

The actual behavior of the stock during the alleged fraud periods, however, belies this theory, and shows that investors in Signalife stock lost money (if they did) for reasons other than the fraud.  Signalife's stock traded at $1.37 on September 19, 2007, the day before the first press release was issued.  (O'Neal Rpt. (Ex. 1) ¶ 37.)  The government's expert found that there was no statistically significant price movement on September 20, 2007, the date of the first press release.  (Becker Rpt. (Ex. 3) ¶ 14.)  On September 25, 2007, the date of the second press release, the price rose less than thirty cents, from $1.44 to $1.70.  (*See* Signalife stock price data, Ex. 13.) The price then fluctuated, reaching a high of $2.16 on October 4, 2007.  This was the highest the stock would reach during the entire alleged fraud period.  (O'Neal Rpt. (Ex. 1) ¶ 37.)  After October 4, the price began a gradual decline through February 2008.  Like the first press release, the third, issued October 10, 2007, did not move the stock price, which continued to fall. (Becker Rpt. (Ex. 3) ¶ 14.)

The stock price recovered somewhat between February and April 2008, but then began to decline again, reaching $0.10 on August 15, 2008, the last day of the government's "broad" fraud period.  (O'Neal Rpt. (Ex. 1) ¶ 37.)  Until that date, no additional information concerning the purchase orders that the press releases reported on reached the market, other than statements in the company's SEC filings that simply repeated the same information that had been in the original press releases.  (*Id.* ¶¶ 38-39.)  During the same period, from September 20, 2007

through August 14, 2008, the stock lost over 90% of its value.  Meanwhile, price movements during that period were associated with company news unrelated to the purchase orders.  For example, Signalife's stock fell 12.75% on January 15, 2008, when the AMEX stock exchange issued a deficiency letter to the company indicating that the company was in danger of being de-listed from the exchange.  (*Id.* ¶ 74.)  The stock fell nearly 40% on July 11, 2008, when Signalife reported that its board had approved a merger.  (*Id.*)  And just a few trading days before the government's "broad" fraud period ended, on August 11, 2008, the stock fell by nearly 16%, following news that the company would de-list from the AMEX.  (*Id.*)

In addition, throughout this time period, Signalife experienced high and increasing levels of naked short selling, as evidenced by high levels of "fails-to-deliver" ("FTDs") reported by the SEC—trades in which naked short sellers, who had sold the stock without owning or borrowing it, failed to deliver the securities to the buyers.  (Christian Rpt. (Ex. 2) ¶¶ 16, 27-28.)  During some portions of the alleged fraud periods, the naked short sales represented substantial portions of the company's overall trading volume.  (*Id.* ¶¶ 27-28.)  The true level of naked short selling was likely larger than the public data suggests, due to underreporting.  (*Id.* ¶¶ 27, 30.)  The high levels of FTDs were associated with declines in the company's stock price; Defendant's experts have concluded that the relationship between FTDs and share price declines was statistically significant.  (*See id.*; Hayter Rpt. (Ex. 4) at 13-39.)

C.    **The (Non-)Revelation of the Fraud**

As mentioned above, at no point during the alleged fraud periods did any information reach the market suggesting that the purchase orders described in the three press releases were not real.  At the same time, during a period in which one would expect the stock would be artificially inflated by the alleged fraud, the stock had fallen from $1.37 on September 19, 2007, to $0.11 on August 14, 2008.[3]  On August 15, 2008, the company issued its second quarter 10-Q, in which it disclosed that (a) the lessee for one of the three purchase orders had returned the products, suggesting the order was canceled; (b) the company was requiring the lessee on a

---

[3] As one of the panel judges on appeal at oral argument stated, "this is just one of those backwards kinds of cases where when the fraud, which is what usually causes prices to rise was taking place, the prices were falling . . . and you had the short . . . sales that were taking place . . . . And typically when we're looking at losses in securities cases, we're required to take into account other factors that may come into play . . . ."  (Recording on file with the Court of Appeals.)

6

second purchase order to confirm its ability to pay; and (c) with respect to all three purchase orders, the company had not recognized revenues to date.  (O'Neal Rpt. (Ex. 1) ¶¶ 41-42; Signalife Form 10-Q (Aug. 15, 2008) (Ex. 7), at 21-22.)  In the previous sentencing proceeding, the government argued that these disclosures were "the *first time* Signalife publicly disclosed anything that *could have* signaled to investors that *anything* was amiss regarding" the purchase orders.  (U.S.'s Position on Sentencing ("Gov't Sent. Mem.") (DE 386) at 10 (emphasis added).)

The stock price declined one cent on August 15, 2008, a return that the government's expert concluded was not statistically significant.  (Becker Rpt. (Ex. 3) ¶ 16.)  The price dropped another three cents on August 18, the next trading day.  (O'Neal Rpt. (Ex. 1) ¶ 44.)  These declines cannot be attributed solely or even mostly to the purchase order disclosures in the 10-Q, as the 10-Q also disclosed additional information that would have been highly important to investors: (1) a quarterly operating loss of $5.7 million, the company's largest loss in at least ten quarters, and (2) an announcement that the company had negative shareholders' equity (meaning its liabilities exceeded the book value of its assets) for the first time.  (*Id.* ¶¶ 49-57.)  Assessing these facts, Defendant's expert Dr. O'Neal has estimated that *assuming* all investors holding shares on August 15, 2008 are counted as victims of the fraud (i.e., they relied upon the fraud in making their decisions to purchase and hold the shares and suffered a loss) and *assuming* the stock traded in an efficient market (a fact the government has not produced evidence to support), investor losses attributable to the purchase order disclosures in the 10-Q are no more than $525,422.[4]  (*Id.* ¶ 58.)  And, this did not even take into account the impact of the naked short selling going on in the background, which, as noted above, produced continuous downward pressure on the stock price.  (Christian Rpt. (Ex. 2) ¶¶ 27-28.)  Indeed, after the fraud period, the company engaged in a reverse stock split that resulted in enormous numbers of FTDs well above the trading volume of the company's shares; this indicates that substantial naked short selling had been taking place prior to the stock split.  (*Id.* ¶ 30; Hayter Rpt. (Ex. 4) at 54-56.)

---

[4] This figure represents the four-cent price drop on August 15 and 18 multiplied by all outstanding non-insider shares (i.e., shares held by investors other than Defendant and Signalife's directors and officers).  Conservatively, Dr. O'Neal looked at the two-trading-day price impact of the 10-Q, rather than the single-day return on August 15.  Dr. O'Neal divided the result, approximately $1.5 million, by three, representing the reasonable estimate that one third of the price decline could be attributed to the purchase order disclosures, while the other two thirds could be attributed to the disclosures of the quarterly loss and negative stockholders' equity respectively.  (O'Neal Rpt. (Ex. 1) ¶ 58.)

7

For the first time in this proceeding, the government has put forward an alternative theory that a webcast given by the company's then-CEO, Lowell Harmison, on April 14, 2008, was a "partial" disclosure of the fraud,[5] and will argue that investor losses should be measured based on the stock's decline on that date, seventeen cents. (*See* Becker Rpt. (Ex. 2) ¶¶ 15-16;[6] Pascucci May 4 Ltr. (DE 527-1) (describing a "narrow" fraud period from September 25, 2007, to April 14, 2008); O'Neal Rebuttal Rpt. (Ex. 5) ¶ 6.) This theory is inconsistent with the position the government took in the first sentencing, where it said that the company did not disclose anything negative about the purchase orders until August 15, 2008. (*See* Gov't Sent. Mem. (DE 386) at 10.) And, in fact, as the webcast transcript reveals, Dr. Harmison did not even mention the purchase orders or press releases that Defendant is accused of fabricating. (*See* Tr. of 4/14/18 Webcast (Ex. 14); O'Neal Rebuttal Rpt. (Ex. 5) ¶ 3.) Indeed, he provided almost no specific information about the company's financial performance or sales; what he did say, while vague, was entirely positive. (*See* Tr. of 4/14/18 Webcast (Ex. 14) at 8:22-9:5 (describing projections of $40 million in gross revenue over the subsequent quarters).)[7] The stock price's behavior surrounding the webcast was a blip: The stock was trading at $1.03 on April 10, then spiked 30% to $1.34 on April 11, the trading day prior to April 14, possibly as a result of investor speculation about the webcast. (O'Neal Rebuttal Rpt. (Ex. 5) ¶ 6.) The drop on April 14, therefore, represented the fall from a temporary high. After the drop, the stock still traded higher than beforehand, at $1.17. (*Id.*)

### D.    Defendant's Trading During the Fraud Period

As noted above, the sales from Defendant's THS Blind Trust stopped before the first press release. (*See* Excerpt from Signalife trading data (DE 524-1) (showing last sale by THS Blind Trust on February 26, 2007).) The government has not alleged that these sales either were part of any scheme to deceive the market or harmed any victims. The total proceeds of these

---

[5] The government presented *no* evidence about this webcast at the trial, and did not mention it at all in its submissions for the first sentencing proceeding.

[6] The government's expert assumed that the webcast contained a partial disclosure based on counsel's instructions. (*See* Becker Rpt. (Ex. 3) ¶ 15.)

[7] The webcast took place about ten days after the company issued its 10-K on April 3, 2008, in which it made positive statements about the pending purchase orders, including that product units had begun to be shipped and that the company anticipated completing the orders by the first quarter of 2009. (Signalife, Inc. Form 10-K (Apr. 3, 2008), GX 93 (DE 453-16) at 78-79.)

sales, according to the government, amounted to under $1.4 million. (*See* Declaration, DE 252-1.) When the government's "broad" fraud period began on September 20, 2007, Defendant still held over 19.5 million shares through ARC Finance and other accounts. (O'Neal Rpt. (Ex. 1) ¶ 77.) Defendant was a net *purchaser* of Signalife stock during the alleged fraud period, and his holdings *increased* to 21.6 million shares at the end of the second quarter of 2008. (*Id.* ¶ 78.) Including losses on stock trades as well as the decline in value of his holdings, Defendant lost over $26 million during the "broad" fraud period. (*Id.* ¶ 80.)

      **E.**    **The Prior Sentencing Proceeding**

      In the first sentencing, the government alleged that investor losses could range from $13.2 million, using a "buyers-only" calculation (taking the total losses of all investors who purchased stock during the fraud period), to as high as $78 million, using the "modified rescissory method" (taking the average stock price during the fraud period and subtracting the average price over a period of time after it, multiplied across all outstanding shares). (*See* Gov't Sent. Mem. (DE 386) at 7-14.) The Court adopted the "buyers only" method using the government's proposed fraud period, September 20, 2007 to August 15, 2008, for a loss amount of $13,186,025.85, which the court ordered Defendant to pay in restitution. (*Id.*; Sent. Tr. II (DE 429) at 31; Amended Judgment (DE 461) at 5.) The government argued that it did not have to prove either reliance by any investor or that Defendant's conduct caused an investor's loss to include it in the loss amount. (*See* Sent. Tr. I (DE 428) at 206-207; Sent. Tr. II (DE 429) at 34-35.)

      The Defendant's total offense level of 45 included a 20-point enhancement for the loss amount under U.S.S.G. § 2B1.1(b)(1). (Sent. Tr. II (DE 429) at 40-41.) The Court also imposed an enhancement for the offenses having involved 250 or more victims. (*Id.* at 39-41.) The evidence the government put forward supporting this enhancement was that over 250 investors purchased Signalife shares during the fraud period. (DE 386, at 19.) The government did not argue or show that 250 or more investors relied upon the fraud. Without these enhancements, the Defendant's total offense level using the 2014 Guidelines would have been 23,[8] which would

---

[8] This Court imposed enhancements both for the offense involving 250 or more victims pursuant to U.S.S.G. § 2B1.1(b)(2)(C) (2014) and for the offense substantially endangering the solvency or financial security of a publicly traded company pursuant to § 2B1.1(b)(15)(B)(ii) (2014). (PSR (DE 251) at 14; Sent. Tr. II (DE 429) at 40-41.) The Court then decreased the total offense level by two to keep the cumulative adjustments for these two enhancements below eight levels.

have corresponded to a 46-57 month Guideline range.  *See* U.S.S.G. § 5.A (2014).  Defendant began serving his sentence in May 2013 and has already served sixty months.

F.     **The Government's Disclosures of Its Loss Estimates in This Proceeding**

Because the government is submitting its sentencing memorandum simultaneously, Defendant does not know the precise loss estimates that the government will put forward. Although expert reports were exchanged in April and May of this year, the government's only disclosed expert, Dr. Becker, did not opine on any specific amount that she estimated investors lost as a result of the offenses; instead, she provided general opinions on the impact of certain events on Signalife's stock price.  (Becker Rpt. (Ex. 3) ¶ 1.)  The government apparently will call at the hearing Mr. Peter Melley, of FINRA, to "perform[] calculations based on Dr. Becker's expert report" and Signalife trading data and "quantify the impact of the events on Signalife's stock price."  (Ltr. from M. Pascucci to B. Gruenstein (Apr. 18, 2018) (Ex. 15).)  Because, it contends, Mr. Melley is not "testifying as an expert," the government did not disclose in an expert report what those calculations will be.  (*Id.*)  At Defendant's request, the government did disclose certain "anticipate[d]" results of its calculations; although those disclosures are unexplained and not completely clear, it appears the government will estimate that investor losses totaled approximately $2 million using the "broad" fraud period or $500,000 using the "narrow" fraud period.  (Pascucci May 4 Ltr. (DE 527-1).)  The government also disclosed that it will argue, as "alternative measures of loss," that the modified rescissory method could be applied, as well as the "loss attributable to testifying investor victims" and the "gain to the Defendant."  (*Id.*)[9]

---

(*See id.*)  If the Court were to vacate the 250 victim enhancement, the total offense level would therefore decrease by a net four levels, but in lieu of the 250-victims enhancement, Defendant would be subject to a two-level enhancement for use of mass marketing.  *See* U.S.S.G. § 2B1.1(b)(2)(A) (2014).  This Court should apply the 2014 Guidelines in this re-sentencing proceeding, as it did in the original sentencing.  *See* 18 U.S.C. § 3742(g)(1).

[9] These are the only "alternative measures" of loss to the Melley calculations that the government has disclosed to Defendant.  Defendant reserves the right to object if the government advances in its sentencing memorandum any measures of loss other than those it has previously disclosed, either in its expert reports or otherwise.  As the government bears the burden of proof, it is not fair to withhold the government's theories of loss before Defendant submits his opening sentencing memorandum; the Court's scheduling order contemplates that such disclosure would occur, as it required exchanges of expert reports prior to sentencing memoranda.  Defendant

**ARGUMENT**

I.     **LEGAL STANDARDS**

    A.     **The Government's Burden**

       The government bears the burden, both for Sentencing Guidelines purposes and restitution, to establish by a preponderance the amount of "actual loss" (if any) "attributable to the defendant's conduct." *Stein*, 846 F.3d at 1152.[10]   For restitution, the government also bears the burden of establishing that any particular person or entity was a victim of the offense, *see, e.g.*, *United States v. Martin*, 803 F.3d 581, 593 (11th Cir. 2015), as well as the extent of the victim's loss, if any, *see, e.g.*, *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010). Although this Court may "estimate the amount of loss," to carry its burden the government may not rely on "speculat[ion]" to support a loss amount, and the Court "must base its estimate on reliable and specific evidence."  *Stein*, 846 F.3d at 1152 (quotation marks omitted).

    B.     **The Legal Framework for Calculation of the Loss Amount**

       As set forth in more detail in the Eleventh Circuit's opinion and below, the Court should apply the following principles in calculating the amount of investor losses, if any, that "resulted from the offense."  U.S.S.G. § 2B1.1 n.3(A)(i); *see also* 18 U.S.C. § 3663A(a)(1)-(2).  *First*, an investor must have relied upon the specific fraudulent information promulgated by Defendant in purchasing his shares for his losses potentially to be included.  *Second*, the actual loss on his investment that that investor suffered must have been caused by Defendant's conduct, and not other causes; losses caused by intervening factors that themselves are unrelated to Defendant's actions must be excluded.  *Third*, the investor's loss must also have been "reasonably foreseeable" and not too attenuated from Defendant's conduct.  One well-accepted method of calculating an investor's loss that is consistent with these principles is to determine the amount the stock price dropped when the fraud was revealed to the market, adjusting for the impact of other information that reached the market at the same time and other phenomena that might account for a portion of such a price drop.

---

further reserves the right to object to Mr. Melley's testimony if it becomes clear that he is not simply "performing calculations" but rather testifying as an undisclosed expert.

[10] Because the legal standards and authorities are similar for both the imposition of a loss enhancement and restitution, this memorandum will generally discuss the two issues interchangeably.  *See Stein*, 846 F.3d at 1153.

11

1.      Defendant's Offense Must Be the Factual ("But For") and Legal
("Proximate") Cause of Any Losses Included in the Loss Amount.

"Actual loss" under U.S.S.G. § 2B1.1 is "defined as the reasonably foreseeable pecuniary harm that resulted from the offense." *Stein*, 846 F.3d at 1152 (quotation marks omitted). This definition "incorporates and requires both factual or 'but for' causation and legal or foreseeable causation." *Id.* (quoting *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014), and citing U.S.S.G. App. C, Vol. II at 178, Amend. 617 (Nov. 1, 2001)). Similarly, to "prove a victim suffered an actual loss under the MVRA, the government must establish both factual and legal causation in essentially the same manner as it must show causation under the guidelines—by proving but for and proximate causation." *Id.* at 1153.

2.      To Prove Factual Causation, the Government Must Prove that Any
Alleged Victim Actually Relied Upon the Specific Misrepresentations.

To satisfy the "but for" causation portion of § 2B1.1 and the MVRA, the government must prove that alleged victims "relied on Mr. Stein's fraudulent information." *Stein*, 846 F.3d at 1153. The government may show reliance either by "direct evidence that each individual investor read the false information and relied on it when deciding to purchase stock" or "specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *Id.* at 1153-54.

The $13.2 million loss calculation in the first sentencing assumed that all 2,415 investors who purchased Signalife stock during the fraud period relied on the fraud. *Id.* at 1154. The Eleventh Circuit found that this market-wide reliance assumption was unsupported. *Id.* The evidence the government put forward in this Court to support it consisted of (1) trial testimony of a single investor, Dr. Bryan Harris, (2) an impact statement from an investor stating that he relied on one of the press releases, (3) other investor impact statements stating generally that they relied on publicly available information, and (4) testimony that "at least some" investors likely relied on the misrepresentations because information on the company was only available to the public in press releases and public filings. *Id.* The Eleventh Circuit concluded that this evidence, even taken together, was insufficient to establish that all 2,415 investors—the entire market—relied on the fraudulent information in deciding to purchase Signalife stock. *Id.*

Drawing on civil securities fraud cases, the concurrence suggested that the government could satisfy the reliance requirement by establishing a "presumption" of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). *See Stein*, 846 F.3d at 1157 (J. Pryor, J., concurring).

12

Establishing this presumption would require a "fact-intensive" "analysis of the structure of the market and the speed with which all publicly available information is impounded," including the extent to which the market for Signalife stock was characterized by "high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information." *Id.* at 1158 (quotation marks omitted); *see also In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 630-41 (N.D. Ala. 2009) (analyzing nine factors in determining whether civil plaintiffs had established *Basic* presumption). Typically, establishing the *Basic* presumption requires expert testimony. *See, e.g.*, *id.*; *Stanaford v. Genovese*, No. 13-CV-80923-RYSKAMP/HOPKINS, 2016 WL 4198146, at *4-8 (S.D. Fla. Mar. 14, 2016) (analyzing expert's analysis of several factors in determining whether *Basic* presumption was appropriate). In this case, the government's expert Dr. Becker did not conduct this "fact-intensive analysis" or opine on any of the factors that are typically required to establish the presumption.

3.  To Prove Proximate Causation, the Government Must Prove that Defendant's Offense Conduct, and Not Other Causes, Caused Any Pecuniary Loses That Victims Suffered.

As noted above, only the "reasonably foreseeable pecuniary harm that resulted from the offense" may be included in a loss calculation. *Stein*, 846 F.3d at 1154-55. The Supreme Court has explained in the restitution context that a proximate cause requirement like this one "refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged," and "serves . . . to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (quotation marks omitted); *see also Robers v. United States*, 134 S. Ct. 1854, 1859 (2014) ("The basic question that a proximate cause requirement presents is whether the harm alleged has a sufficiently close connection to the conduct at issue." (quotation marks omitted)); *United States v. Robertson*, 493 F.3d 1322, 1334 (11th Cir. 2007) (to prove proximate causation under the MVRA, the government must show "that the causal connection between the [offense] conduct and the loss is not too attenuated.").

The Eleventh Circuit held that, if Defendant puts forward evidence showing that "intervening events affected [the] stock price during the fraudulent period," this Court must make findings on "the effects of these intervening events" on the stock price and "whether these events were reasonably foreseeable to Mr. Stein." *Stein*, 846 F.3d at 1156. Intervening causes of

13

a loss are only chargeable to the defendant if his own conduct is directly related to them.  *See Robertson*, 493 F.3d at 1334 ("Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct." (quotation marks omitted)).  The requirement of "reasonable foreseeability" ensures that only those harms directly caused by the defendant's conduct that have a close enough connection to it are included in the loss amount.  *See Stein*, 846 F.3d at 1155 (comparing *United States v. Martin*, 803 F.3d 581 (11th Cir. 2015) with *Robertson*, 493 F.3d 1322).  Thus, for example, a defendant cannot be held liable for losses that result from intervening acts of third parties when those intervening acts themselves are not closely and directly connected to the defendant's own criminal conduct.  *See, e.g.*, *Robertson*, 493 F.3d at 1334.[11]  In the analogous context of assessing the base offense level of individual defendants in conspiracy cases pursuant to U.S.S.G. § 1B1.3, courts separately determine whether conduct of another was within the scope of what the particular defendant agreed to undertake, and then whether such conduct was foreseeable.  *See, e.g.*, *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003) ("[T]o determine a defendant's liability for the acts of others" for purposes of calculating loss, "the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant. . . . . Only after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability." (quotation marks omitted)); *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995).  Thus a defendant is not responsible for losses resulting from his co-conspirators' acts, even if foreseeable, if those acts were not within the scope of what he agreed to do.  *See, e.g.*, *United States v. Barona-Bravo*, 685 F. App'x 761, 781 (11th Cir. 2017); *Hunter*, 323 F.3d at 1319; *United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir. 1993).  *A fortiori*, Defendant here cannot be held liable for losses caused by intervening acts of others unrelated to his conduct.

---

[11] *See also, e.g.*, *United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999) (defendant not responsible for losses Medicare incurred from kickback scheme where defendant selected lab to perform tests but doctors independently determined tests were necessary and ordered them).

4.      In Securities Fraud Cases, Courts Calculate Investor Losses by Assessing
the Impact on the Stock Price When the Fraud Is Revealed.

Although courts have taken varying approaches to calculating investors' losses resulting
from securities fraud, one widely used approach is to use the amount by which the stock price
declines in the short time period after a "corrective disclosure"—a disclosure to the market that
reveals that previous misrepresentations were false.  *See, e.g.*, *United States v. Rand*, 835 F.3d
451, 467 (4th Cir. 2016) (affirming loss calculation based on stock price's decline on days
following two corrective disclosures); *United States v. Peppel*, 707 F.3d 627, 644 (6th Cir.
2013), *aff'g* 2011 WL 3608139, at *11 (S.D. Ohio Aug. 16, 2011) (affirming loss amount
calculated based on price decline over single trading day following announcement of SEC
investigation of company); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006)
("[T]he ordinary measure of loss in a criminal securities fraud case is the decline in the price of
stock when the fraud is revealed.").  (O'Neal Rpt. (Ex. 1) ¶¶ 22-28.)  A "corrective disclosure" is
one that "reveal[s] to the market the falsity of a prior misstatement."  *Meyer v. Greene*, 710 F.3d
1189, 1200 (11th Cir. 2013) (alteration and quotation marks omitted).

This method is consistent both with the Sentencing Guidelines, *see Rand*, 835 F.3d at 467
("[L]oss should be calculated based on how the price of a security changed 'after the fraud was
disclosed to the market.'" (quoting U.S.S.G. § 2B1.1 n.3(F)(ix)), as well as logic and economic
theory.  As Dr. O'Neal will testify, where a stock trades in an efficient market,[12] in which stock
prices fully reflect all known material information about a company, the revelation of a material
fraud will cause the market to react, and that reaction quantifies the amount (if any) by which the
value of the company was inflated by the fraud.  (O'Neal Rpt. (Ex. 1) ¶¶ 22, 25-26.)  Prior to the
revelation of the fraud, the stock price continues to reflect the value of the company with the
fraudulent information impounded into the price.  (*Id.* ¶ 30.)  It follows that investors who sell
before the fraud is revealed do not suffer a loss *due to the fraud*, even if they sell at a loss,
because the sale price reflects the inflation in the stock's value from the fraudulent information.
(*Id.* ¶¶ 31-32.)  Any decline in price before a fraud revelation must be attributed to causes other

_____

[12] Neither Dr. O'Neal nor the government's expert Dr. Becker has opined on whether the market
for Signalife stock was efficient at any point in time during the alleged fraud periods, though
Defendant's expert in the first proceeding Dr. Susan Mangiero opined that it was not.  *See infra*
note 17.  As explained below, if the market was inefficient, a price change cannot necessarily be
attributed to any particular piece of information.

than the fraud, because only when a fraud is revealed does the value of the stock adjust to reflect the "true" value of the company absent the fraudulent information.  (*Id.* ¶ 32.)  And, finally, even when a fraud is revealed, the impact of *other* information that reaches the market at the same time, or market-wide effects, also has to be taken into account in determining how much loss can be attributed to the fraud specifically versus other factors.  (*Id.* ¶ 27.)  These principles inform both criminal cases and civil securities fraud cases involving the standards for proving loss causation.  *See, e.g.*, *United States v. Rutkoske*, 506 F.3d 170, 179-80 (2d Cir. 2007) ("Many factors may cause a decline in share price between the time of the fraud and the revelation of the fraud.  In such cases, losses from causes other than the fraud must be excluded from the loss calculation."); *United States v. Hatfield*, No. 06-CR-0550, 2014 WL 7271616, at *3 (E.D.N.Y. Dec. 18, 2014) ("[D]emonstrating shareholder losses involves measuring the share price decline attributable to the announcement of" a fraud, and "one must disentangle the price changes associated with those events from other, 'ordinary' price movements."); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005) (investors do not necessarily suffer actual loss from an initially inflated price if they sell before fraud is revealed or value of shares falls for reasons other than the fraud); *Meyer*, 710 F.3d at 1196-97.[13]

    For these reasons, the amount by which a stock reacts on a corrective disclosure of fraud, adjusting for the portion of that price reaction attributable to other information, is a reasonable estimate of the loss to an investor resulting from that fraud.  This method is particularly appropriate in this case given that the stock price dropped dramatically *prior* to any potential disclosure of the fraud.  (*See* Background sec. B.)  Focusing on the price impact on that disclosure avoids charging Defendant with declines in share value that could not possibly be attributed to his conduct, because the market was not aware until afterward that anything about

---

[13] Some circuits have expressly applied *Dura* in the criminal context.  *See Rutkoske*, 506 F.3d at 179-80; *United States v. Olis*, 429 F.3d 540, 546-47 (5th Cir. 2005).  Here, although the Eleventh Circuit accepted one of *Dura*'s main premises, that the government must prove proximate causation to show a loss resulting from the offense, the Eleventh Circuit declined to apply *Dura* fully because it felt that the "reasonable foreseeability test" was appropriate for calculating loss. *Stein*, 846 F.3d at 1156 n.20.  Although Defendant believes *Dura* should apply fully here, as it relied on principles that have equal application in the civil and criminal contexts, this Court need not consider *Dura* controlling or even directly on point to apply the principles set forth above.

the alleged misstatements was untrue.[14]  This method is also consistent with the Eleventh Circuit's reasonable foreseeability test:  While the foreseeable result of a fraud on a stock's price is a negative reaction when the fraud is revealed, *see, e.g.*, *United States v. Reifler*, 446 F.3d 65, 109 (2d Cir. 2006), price movements caused by other factors, including the overall market and events unrelated to the fraud, are not foreseeable.  *See, e.g.*, *Evans*, 744 F.3d at 1197-98 (vacating loss calculation that failed to assess the "effect and foreseeability of non-fraud factors" including the economy and housing market); *see also Boatmen's Nat'l Co. v. M.W. Elkins & Co.*, 63 F.2d 214, 216-17 (8th Cir. 1933); Restatement (2d) of Torts § 548A cmt. b ("[T]here is no liability when the value of the stock goes down after the [fraudulent] sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition.").  Moreover, the Guidelines contemplate that price changes caused by "external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events" are not losses—defined as "reasonably foreseeable pecuniary harms"— "resulting from the offense."  U.S.S.G. § 2B1.1 n. 3(F)(ix).[15]

## II.  THE GOVERNMENT CANNOT PROVE LOSSES TO INVESTORS

Applying these standards, the government will not be able to establish investor losses resulting from the fraud above negligible levels.  The government has not even attempted to prove market-wide reliance on the part of investors, nor has it proven individualized reliance. With respect to proximate cause, because the government has not proven that Signalife stock traded in an efficient market, it cannot prove that any particular event, including the fraud's

---

[14] For similar reasons, this Court should adhere to its view at the first sentencing and reject the application of the "modified rescissory method," which subtracts the average price during the fraud period with the average price during a period after the fraud is disclosed.  (*See* Sent. Tr. II (DE 429) at 30.)  And, as Defendant argued at the previous sentencing, the MRM was referenced in the 2014 Guidelines as a possible method of loss measurement but was not included in the Guidelines applicable when the offense was committed.  (*See* DE 387, at 7-8.)  Therefore, using the more punitive MRM here would violate the ex post facto clause—another reason not to do so.  *See Peugh v. United States*, 133 S. Ct. 2072, 2088 (2013).

[15] Application note 3(F)(ix) sets forth the modified rescissory method as "[o]ne . . . method the court may consider" in measuring loss, but instructs that to determine whether the result is "a reasonable estimate of the actual loss attributable to the change in value of the security," the court may consider whether the amount "includes significant changes in value *not resulting from the offense*," including the factors listed above.  U.S.S.G. § 2B1.1 n.3(F)(ix) (emphasis added).

revelation, caused any particular price movement.  Alternatively, if the Signalife 10-Q issued on August 15, 2008 constituted a "corrective disclosure," investor losses are limited to the decline in value, immediately after the 10-Q issued, of the shares held by those investors who both relied on the fraud in purchasing their shares and continued to hold them through the date of the 10-Q. Those losses are reduced even further when other factors that contributed to that decline, including unrelated negative information released to the market on August 15, 2008 and naked short selling of the company's stock, are taken into account.  Because the alleged fraud was not revealed to the market prior to August 15, 2008, any price declines before that date (whatever their actual cause) cannot be attributed to Defendant's offenses.  And in fact, the evidence shows that unrelated company news, broader market movements, and naked short selling were substantial factors in the price movements prior to August 15, 2008.

> ### A.      The Government Has Failed To Prove Reliance

The government has disclosed five Signalife investors it intends to call at the hearing. Even if these witnesses were to testify that they relied on fraudulent information in purchasing Signalife shares,[16] that would not establish what the government claimed in the last proceeding: that the entire marketplace of Signalife investors relied on the fraud.  The government has not argued, and its expert has not opined, that these investors are representative of the wider class of Signalife shareholders, or that they are a sample that can be extrapolated to the larger population. *See Stein*, 846 F.3d at 1154 (evidence in previous proceeding was "far too limited" to support finding that all investors who purchased shares during "broad" fraud period relied on fraudulent information); *id.* at 1157 (J. Pryor, J., concurring) (the government "presented little specific evidence that would permit the district court to extrapolate from that tiny two-person sample").

Typically, to establish class-wide reliance in securities fraud cases, civil plaintiffs do what the concurrence suggested here: seek to establish the *Basic* presumption of reliance.  But that requires a detailed analysis of a number of factors that bear on "whether the stock price, at

---

[16] If these witnesses are like Dr. Harris, who testified at trial, the government will have difficulty establishing even individual reliance through their testimony.  Trading records show that Dr. Harris purchased 200,000 shares on the date of the April 14, 2008 webcast, which the government apparently claims partly revealed the fraud, and 420,000 shares after the webcast, including 350,000 shares after the August 15, 2008 10-Q.  (*See* Excerpts of Signalife trading data (Ex. 16).)  Assuming the alleged fraud had been disclosed by these dates, as the government argues, such activity is inconsistent with reliance on the fraud to make purchase decisions.

the time plaintiff effected [the] trade, reflected [the] misinformation" and whether the stock traded in an "open and efficient" market. *Stanaford*, 2016 WL 4198146, at *5; *see also HealthSouth*, 261 F.R.D. at 632. These factors include, among others, the security's "weekly trading volume," the extent to which "securities analysts followed and reported on the company's stock" during the relevant period, the existence and extent of "market makers" for the stock, "whether the company was entitled to file an S-3 Registration Statement in connection with public offerings," and whether the security "experienced an historical showing of immediate price response to unexpected corporate events or financial releases." *HealthSouth*, 261 F.R.D. at 632.[17]

The government's expert analyzed none of these factors. Instead, her opinions are limited to the fact that the stock price increased in an abnormal way on the date that one (and only one) of the three press releases was issued, September 25, 2007. (Becker Rpt. (Ex. 3) ¶ 14.) But, that is not sufficient to establish that the market for Signalife stock was efficient at the time, and thus that the price increase on September 25, 2007 necessarily resulted from the press release. And, therefore, it is insufficient to establish a presumption that all investors who purchased following that date relied on the information in the press release. Moreover, the *Basic* presumption *could not* apply to the first and third press releases, on September 20 and October 10, 2007, respectively, because Dr. Becker found *no* price impact resulting from either of them. (*Id.*) The *lack* of a price impact on a particular event *rebuts* the *Basic* presumption of reliance. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014).

**B.      The Government Has Failed To Prove Proximate Causation**

1.    <u>Because the Government Failed to Prove Market Efficiency, It Cannot Show that Price Movements Resulted from Any Particular Cause.</u>

As Dr. O'Neal will explain, in an inefficient market the share price at any point in time does not necessarily reflect any particular information available to the market. Therefore, it is not possible to determine the causes of changes in share price by reference to particular news.

---

[17] For the first sentencing hearing, Defendant's expert Dr. Susan Mangiero analyzed these factors and concluded that Signalife likely traded in an informationally *inefficient* market. (*See* Mangiero Rpt. (DE 469-1) ¶ 87.) And, Defendant's expert James W. Christian has opined that due to the extent of naked short selling the company experienced during the fraud periods (described in more detail below), changes in the stock's price would *not* necessarily reflect or incorporate material news about the company quickly or completely. (*See* Christian Rpt. (Ex. 2) ¶ 35; *see also* O'Neal Rpt. (Ex. 1) ¶¶ 22-23 (defining market efficiency and inefficiency).)

(O'Neal Rpt. (Ex. 1) ¶¶ 33-34.)  Accordingly, it is not possible simply by looking at the movements of the company's stock price, which is all Dr. Becker did, to conclude that investors suffered losses due to the fraud as opposed to other causes.  (*Id.* ¶ 61.)  The government bears the burden of proof, and therefore will not be able to show causation or investor losses.

        2.      <u>Alternatively, Only the August 15, 2008 10-Q, and Not the April 14, 2008 Webcast, Contained a Corrective Disclosure.</u>

The August 15, 2008 10-Q was the only disclosure to the market that even arguably constitutes a corrective disclosure of the fraud that took place during the alleged fraud periods. The April 14, 2008 webcast, on which the government newly relies, did not mention the relevant purchase orders or press releases at all, and what disclosures there were about the company's sales were positive, and certainly not inconsistent with the company's prior statements concerning the relevant purchase orders.  (*See* Background sec. C.)[18]  *See Meyer*, 710 F.3d at 1200; *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009) ("[I]t would be difficult to characterize an announcement that contained no negative information . . . as revelatory of the truth . . . .").

To the extent investors may have *expected* greater information about the company's performance than the webcast disclosed and their expectations were disappointed, that indicates only that the price drop following the webcast resulted from diminished short-term investor speculation, not the revelation of any fraud.  *See Meyer*, 710 F.3d at 1199 (noting that "changed investor expectations" can be "confounding information" that "do not qualify as [a] corrective disclosure[] for purposes of loss causation.").  As Dr. O'Neal opines, the stock price on the trading day prior to the webcast spiked higher than the stock had been trading previously, possibly as a result of investors bidding up the price in speculation of what would be announced. (*See* O'Neal Rebuttal Rpt. (Ex. 5) ¶ 6.)  And, even after the webcast, the stock traded higher than it had beforehand.  (*Id.*)  Thus the price behavior around the webcast should be seen as a temporary blip, and is not an accurate measure of investors' losses resulting from the offenses.

---

[18] Notably, if the April 14, 2008 webcast *did* disclose the fraud, even partially, it would not be possible for the government to argue that investors who purchased shares after that date relied upon the fraud.  The government appears to recognize this as it has disclosed it will propose both a "narrow" fraud period, beginning on Sept. 25, 2007 and ending April 14, 2008, and a "broad" period running from Sept. 20, 2007, through August 15, 2008.  (*See* Background sec. F.)

3.     Intervening Causes Contributed to the Stock Price Decline Both on August 15, 2008, and Earlier in the Alleged Fraud Periods.

a.     *Confounding Disclosures in the 10-Q*

As the Eleventh Circuit held, this Court must disentangle investor losses resulting from the Defendant's offense conduct from losses resulting from other causes. *Stein*, 846 F.3d at 1155-56. With respect to the price decline following the August 15, 2008 10-Q specifically, this means that the measure of loss must adjust for the information unrelated to the purchase orders that was disclosed in the 10-Q—specifically the announcements of the company's largest quarterly loss in ten quarters and the company's shareholders' equity entering negative territory for the first time. (*See* Background sec. C.) The market's reaction to these disclosures neither resulted from Defendant's conduct nor were foreseeable to him. *See Evans*, 744 F.3d at 1197-98. As Dr. O'Neal will testify, while investors may have seen the purchase order disclosures as important, the disclosures concerning the broader financial performance of the company would likely also have been seen as highly significant. (O'Neal Rpt. (Ex. 1) ¶ 58.) A reasonable estimate of the price decline specifically attributable to the purchase order disclosures, adjusting for the effects of the other two disclosures, is one third the total price decline over the two-trading-day period of August 15-18, or $525,422. (*Id.*)[19]

b.     *Market Movements and Unrelated Company News Before August 15, 2008*

As explained above, Signalife's share price declined over 90% from the beginning of the "broad" fraud period to August 15, 2008. This decline cannot be attributed to the alleged fraud, which would have resulted in a positive uptick, or revelation of the fraud, which had not yet occurred. Necessarily, other factors must have driven these price movements. *See, e.g.*, *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines. Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a 'loss' attributable to the misrepresentation.").

---

[19] Note that this figure is a *ceiling* for the loss amount, not the final answer, because it assumes that *all* non-insider investors who held shares on August 15, 2008 suffered a loss resulting from the fraud. (*See* O'Neal Rpt. (Ex. 1) ¶ 62.) Under the Eleventh Circuit's standard, only investors who *relied* on the fraud in purchasing shares count as victims whose losses are included. Moreover, this figure does not take into account the further effects of naked short selling, which, as explained below, placed significant downward pressure on the stock.

While the alleged fraud could not have caused Signalife's dramatic price decline during the fraud periods, other unrelated factors likely did. *First*, certain company news unrelated to the relevant purchase orders was associated with large price movements during both the "broad" and "narrow" fraud periods. (*See* Background sec. B.)  The market's reactions to news events cannot be attributed to Defendant's offense conduct, and there is no evidence that the events or the reactions were somehow foreseeable to him. *Second*, an index of comparable companies declined by approximately 15% during the "broad" fraud period. (O'Neal Rpt. (Ex. 1) ¶¶ 70-72) Although both parties' experts found that Signalife's stock's movements were not, on a day-to-day basis, statistically correlated with the broader market, it nevertheless can be expected that over time, Signalife's share price would be impacted by it. (*Id.*) Both these facts underscore that looking at the price decline on the August 15, 2008 corrective disclosure and not earlier in the fraud periods is the correct measure of loss in this case.

c.    *Naked Short Selling of Signalife Stock*

Finally, as Defendant's experts have concluded, the naked short selling of Signalife's stock throughout the fraud periods put "significant downward pressure" and was a "substantial cause of the drop" in the stock's value during those periods. (Christian Rpt. (Ex. 2) at p. 1, ¶ 26; *see also id.* Ex. C (Shapiro Rpt.) at 14 (concluding that "FTDs of Signalife had a material adverse effect on its share price"); *see generally* Background sec. B.)  Defendant's expert Dr. Anthony Hayter confirmed statistically significant correlations between the levels of FTDs reported by the SEC (indicative of naked short sales) and declines in the company's stock price. (Hayter Rpt. (Ex. 4) at 13-39.)  Although Dr. Becker disputes the statistical significance of this relationship, she does not dispute other metrics that demonstrate the extent of the naked short selling and its effects.  For example, Signalife's stock price was more likely to decline on a day after the company experienced greater than 10,000 FTDs (shares sold short that were not delivered to their buyers) than when the company saw fewer FTDs. (*Id.* at 34-39.)  Defendant's expert James W. Christian notes that among other data points Signalife averaged 679,563 FTDs per day in the first two weeks of August 2008, around the end of the "broad" fraud period. (Christian Rpt. (Ex. 2) ¶ 28.)  Over the entire "broad" fraud period, FTDs accounted for large percentages of the company's average trading volume and at times exceeded the company's reported short interest, indicating that the levels of naked short selling could have been even higher than the reported FTDs suggest. (*Id.* at ¶¶ 27-31.)  Dr. Becker ignored all of these points.

Mr. Christian concluded that these observations are consistent with high levels of naked short selling that can result in the downward manipulation of a company's stock price.  (*Id.*)  The Supreme Court and SEC have stated that high levels of naked short selling can result in market manipulation and the artificial depression of stock prices.  *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 136 S. Ct. 1562, 1566 (2016) ("[naked short selling] can serve 'as a tool to drive down a company's stock price'—which, of course, injures shareholders" (quoting "Naked" Short Selling Antifraud Rule, SEC Release No. 34-58774, 73 Fed. Reg. 61667 (2008))); *see also Eagletech Commc'ns Inc. v. Citigroup, Inc.*, No. 07-60668-CIV, 2008 WL 3166533, at * 6, 11 (S.D. Fla. June 27, 2008) (describing "naked shorting/failures to deliver securities" as a "form[] of stock manipulation" and "securities fraud").

That naked short selling was at least a substantial factor in the stock's decline during the fraud periods prior to any corrective disclosure (*see* Christian Rpt. (Ex. 2) at 1-2; Christian Rebuttal Rpt. (Ex. 6) ¶ 13) underscores the correctness of the approach to look only to the price impact on the fraud's revelation, and not earlier, to measure the loss attributable to the offenses. And, in addition, given the levels of naked short selling through the fraud periods, it likely also contributed to the modest price decline on August 15, 2008 itself.  Finally, there is no evidence that the naked short selling was either related to Defendant's conduct or foreseeable to him.  (*See* Christian Rpt. (Ex. 2) ¶¶ 32-34 (opining that various aspects of the naked short selling Signalife experienced mean that it could not have been foreseeable to Defendant).)  There is no evidence that Defendant's offense conduct caused or was related to the naked short selling, and certainly not that it was within the scope of criminal conduct that he agreed to undertake.  As such, any losses resulting from it cannot be included in the loss amount.  *See, e.g.*, *Robertson*, 493 F.3d at 1334; *Hunter*, 323 F.3d at 1319; *Evbuomwan*, 992 F.2d at 74.

### 4.    Conclusion on Loss Causation

Because the government has not proven that Signalife stock traded in an efficient market, it is not possible to conclude from price movements (which is all its expert analyzed) that any investors suffered "pecuniary harm *that resulted from the offense*."  U.S.S.G. § 2B1.1 n.3(A)(i). Alternatively, only those investors who the government proves relied on the specific misrepresentations in purchasing Signalife shares, and held the shares through August 15, 2008 and experienced a decline in their value on that date could even potentially be considered victims.  And then, to allocate the portion of the value those investors' shares lost on August 15,

2008 to the alleged fraud, the Court must deduct (1) the impact of the other, unrelated disclosures in the 10-Q, and (2) the impact of the naked short selling, which Defendant's experts conclude was a substantial driver of the overall price decline during the fraud periods.  The end result is a finding that the losses resulting from the offenses here were negligible.

## III.   DEFENDANT'S ALLEGED GAIN SHOULD NOT BE USED AS AN ALTERNATIVE MEASURE OF LOSS, BUT IN ANY EVENT IT WAS ZERO

The government has disclosed that it intends to argue that the alleged gain to Defendant from the offenses is an "alternative measure" of the loss here.  Gain can only be used as a loss measure, however, "if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1 n.3(B); *United States v. Snyder*, 291 F.3d 1291, 1295-96 (11th Cir. 2002).  Here, using the methods set forth above, the Court can reach a "reasonable estimate of the loss" to victims—and that loss is at or close to zero.

Even if the court were to look to Defendant's gain as a measure of loss, the result would be consistent with the loss finding; Defendant's gains from the alleged scheme were minimal at best.  The relevant inquiry is Defendant's *net* gain.  *See, e.g.*, *United States v. Giovenco*, 773 F.3d 866, 871 (7th Cir. 2014) (measuring gain for sentencing purposes in terms of "net profits"); *see also United States v. Munoz*, 430 F.3d 1357, 1370 (11th Cir. 2005).  And here, Defendant suffered net *losses* as a result of his trades that resulted in a net *increase* in his holdings of Signalife stock during the "broad" fraud period, conduct completely inconsistent with a "pump-and-dump" scheme to unload shares at inflated prices while fooling the market.  From trading losses and the decline in value of his holdings, Defendant lost approximately $26 million during the "broad" fraud period, a figure which dwarfs the government's allegations as to his alleged gains.  (*See* Background sec. D.)

## IV.   THE ENHANCEMENT FOR 250 OR MORE VICTIMS DOES NOT APPLY

The Eleventh Circuit noted that the enhancement this Court imposed pursuant to U.S.S.G. § 2B1.1(b)(2)(C) (2014) for 250 or more victims was "intertwined" with the loss enhancements, and did not "address it separately."  *Stein* 846 F.3d at 1151 n.16.  As noted above, the only basis for the enhancement was this Court's conclusion, implicit in the government's "buyers only" calculation, that all 2,415 purchasers of Signalife stock during the fraud period relied on the fraudulent information.  (*See* Background sec. E.)  Because the Eleventh Circuit vacated the loss calculation after finding that very assumption unsupported, *see id.* at 1154, this Court should not apply this enhancement to Defendant's offense level.  Because the government has failed to

prove market-wide reliance (as explained *supra* sec. II.A), there is no basis for a conclusion that 250 or more investors relied on fraudulent information, let alone that those investors suffered a pecuniary loss because of the offense and not other causes.[20]

## V.    A FINDING OF A SUBSTANTIALLY REDUCED LOSS AMOUNT SHOULD RESULT IN A SUBSTANTIALLY REDUCED SENTENCE

As the Eleventh Circuit noted in Defendant's appeal, the loss amount "serves as a proxy for the seriousness of the offense and the defendant's relative culpability." *Stein*, 846 F.3d at 1152 (citations and quotation marks omitted). In financial fraud cases such as this, "the loss calculation often drives the sentence." *Id.* This Court found it important, in imposing the previous sentence, that "there was a significant amount of loss." (Sent. Tr. II (DE 429) at 71.) As set forth above, the Court should now find the loss to be, not $13.2 million as before but at most on the government's theories $2 million, and substantially less than that as shown by Defendant. Therefore, even if, due to the thresholds in the loss table, Defendant's Guideline calculation does not dramatically change (though it would on a zero-loss finding), the Court should recognize the substantial difference between these loss amounts and its previous finding and adjust the sentence downward accordingly.

### CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court recalculate his offense level reflecting the actual loss that resulted from his offense and without the enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(C) (2014) for 250 or more victims. Based on what the government has disclosed about its loss calculations and the evidence it has put forward to date, Defendant requests a substantially reduced sentence based on a far lower loss amount. Defendant reserves the right to make additional arguments once he learns the government's specific loss estimates, including with respect to any individuals who testify at the hearing. Defendant anticipates that after reviewing the submissions of the parties and hearing the testimony of the parties' witnesses, the Court will be in a position to impose a fair and appropriate sentence. At that time, Defendant intends to make a request for a specific sentence, consistent with all of the evidence that the Court will have before it.

---

[20] To the extent the Court does impose either an enhancement for loss or number of victims, such a sentence would be inconsistent with the Sixth Amendment, because it would be based on facts found only by this Court and not the jury. *See Gall v. United States*, 552 U.S. 38, 60 (2007) (Scalia, J., concurring); *Rita v. United States*, 551 U.S. 338, 375 (2007) (Scalia, J., concurring).

Dated: June 1, 2018                Respectfully Submitted,

BENJAMIN GRUENSTEIN
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019-7475
Phone: (212) 474-1080
Fax: (212) 474-3700
Email: bgruenstein@cravath.com


By: _____/s/_____
    Benjamin Gruenstein, Esq.
    (Admitted *Pro Hac Vice*)


RICHARD C. KLUGH
Richard C. Klugh, P.A.
25 SE 2nd Avenue, Suite 1100
Miami, FL 33131-1674
Phone: 305-536-1191
Fax: 305-536-2170
Email: rklugh@klughlaw.com

By: _____/s/_____
    Richard C. Klugh, Esq.
    Florida Bar No. 305294

26

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 1, 2018, I electronically filed the foregoing

documents with the Clerk of the Court and all counsel of record using CM/ECF.

By: _____/s/_____
             Richard C. Klugh, Esq.