UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No 11-80205-CR-MARRA |
| | § | |
| MITCHELL J. STEIN, | § | |
| | § | |
| Defendant. | § | |

_____

## UNITED STATES' SENTENCING MEMORANDUM

The government hereby submits this Sentencing Memorandum as to Defendant Mitchell Stein. As this Court is well aware, the Defendant orchestrated a massive scheme to defraud investors of Signalife, Inc. ("Signalife"), causing investor losses in the millions. In May 2013, the Defendant was found guilty of one count of conspiracy to commit mail fraud and wire fraud, three counts of mail fraud, three counts of wire fraud, three counts of securities fraud, three counts of money laundering, and one count of conspiracy to obstruct justice. This Court sentenced the Defendant to a term of imprisonment of 204 months, followed by two years of supervised release, and ordered restitution of $13,186,025.85 and forfeiture of $5,378,581.61 (D.E. 407, 461). On appeal, the Eleventh Circuit affirmed the Defendant's convictions and remanded the matter for resentencing for the limited purpose of calculating loss and restitution. *United States v. Stein*, 846 F.3d 1135, 1156 (11th Cir. 2017). For the reasons set forth below, the government respectfully requests that this Court re-impose a sentence of 204 months and order restitution of $8,773,369, based on a loss to investors of $2,027,890 and a loss to Signalife of $6,745,479, for a total loss of $8,773,369. The government also respectfully requests that this Court find that the Defendant's gain of over $5.3 million is an alternative measure of loss, and even under this more conservative

1

estimate, a sentence of 204 months is still below the applicable Guidelines range and appropriate given the Defendant's egregious conduct.

## FACTUAL BACKGROUND

The evidence presented at trial established that the Defendant, a licensed attorney and husband to Signalife's majority shareholder, was the mastermind of a massive fraud scheme wherein he pumped fake sales information to investors and looted Signalife. As part of the scheme, the Defendant fabricated purchase orders to inflate the price of Signalife stock and directed the issuance of press releases touting nonexistent sales to the investing public. The Defendant's convictions were affirmed on appeal. The factual record below is taken from both the trial record and the recitation of facts by the Eleventh Circuit.

### I.    The Defendant directed the issuance of fake press releases to mislead investors.

In the fall of 2007, "[i]n an effort to inflate artificially the value of Signalife stock, the Defendant drafted three press releases and three corresponding purchase orders touting more than $5 million in bogus Signalife sales." *Stein*, 846 F.3d at 1140. First, on September 20, 2007, the Defendant emailed Signalife securities counsel John Woodbury a draft press release announcing $1.98 million in sales. *See* Trial Ex. 68 (attached hereto as Ex. A); Trial Tr. II (D.E. 240) at 59. In the email, the Defendant wrote, "The attached release is backed up by [a] purchase order and we are beginning to ship the units. It is anything but 'promotional.' It is a fact. Please make sure it is released before the market opens." The Defendant asked that the press release issue in the morning so investors could "immediately respond and hopefully that price increase [would] be reflected throughout the whole market." Trial Tr. II (D.E. 240) at 60. The press release issued that day. *Stein*, 846 F.3d at 1140-41; *see also* Trial Ex. 69 (attached hereto as Ex. B).

Second, on September 24, 2007, the Defendant sent Woodbury another draft press release announcing $3.3 million in sales. *See* Trial Ex. 71 (attached hereto as Ex. C); Trial Tr. II (D.E.

2

240) at 64-65.  The next day, on September 25, 2007, the press release issued.  *See* Trial Ex. 72 (attached hereto as Ex. D); *Stein*, 846 F.3d at 1141.  The press release included language that Signalife had "$5.28 million" in sales and expected "additional sales . . . shortly."  Ex. D.

Third, on October 9, 2007, the Defendant emailed Woodbury a draft press release announcing $551,500 in sales.  *See* Trial Ex. 75 (attached hereto as Ex. E); Trial Tr. II (D.E. 240) at 68-69.  The Defendant's email instructed Woodbury that the press release "[m]ust be out before market opens."  The press release issued the next day, on October 10, 2007.  Trial Ex. 76 (attached hereto as Ex. F); *Stein*, 846 F.3d at 1141.  The press release stated that "[t]hese purchase orders are currently resulting in revenues to the company such that the company anticipates achieving break-even status by the end of January, 2008, or at the very latest the end of 2008 first quarter."

The sales were fake, and the Defendant orchestrated an intricate scheme to make them appear valid.  He directed coconspirators to submit false documentation regarding these orders purporting to be from "Toni Nonoy" of "Cardiac Hospital Management," or "CHM," and "Yossie Keret" of "IT Healthcare."  *Stein*, 846 F.3d at 1141-42; *see* Trial Tr. IV (D.E. 242) at 213-15 (IT Healthcare); Trial Tr. VI (D.E. 244) at 57-60 (CHM; IT Healthcare).  These names and entities were fabricated, yet another component of the Defendant's attempt to bolster the fake purchase orders.  *Stein*, 846 F.3d at 1141 (describing co-conspirator Martin Carter's belief that that the Defendant "had fabricated these names."); *see* Trial Tr. VI (D.E. 244) at 57-58.  The Defendant also directed Carter to travel to Japan, where CHM purportedly requested that the products be delivered, solely to send a letter, presumably associated with the fake sales, back to the United States, and to use gloves "so [he] left no fingerprints."  Trial Tr. VI (D.E. 244) at 113-15.

In reality, Signalife did not have a market-ready product, and the press releases gave investors the false impression that Signalife was positioned to earn revenue.  Trial Tr. II (D.E. 240)

at 97 (Woodbury: "[I]t was a huge deal.  This was a development stage company.  They had a brand new technology.  Other than, I guess a hundred thousand dollars, they never sold any product.  All of a sudden they had over $5 million in sales.  This goes out to the public.  This company goes from an R and D company to all of a sudden a big revenue generating company."); Trial Tr. V (D.E. 243) at 8 (Investor Bryan Harris: "Signalife, to me, represented a company that was transitioning from a . . . research and development company into a company that had revenues and generating sales; and as an investor, you want to look at a company that has a good base, the stock price is trading along at a certain level, and when they transition from a company that's research and development into a viable company that has product and sales.").

## II.      The Defendant's scheme unravels as Signalife investors begin to learn the truth.

Eventually, the Defendant's scheme unraveled.  An investor call led by Signalife CEO Lowell Harmison was scheduled for April 14, 2008.  In advance of the call, investors were promised updates regarding the status of Signalife sales.  *See* Press Releases, Signalife, Inc., Signalife Announces Webcast (April 7 and 11, 2008) (attached as Ex. G).  The press releases announcing the call provided that Dr. Harmison would speak "on new contracts, pending orders and production, . . . as well as such issues as the Company's immediate, positive financial prospects."   During the call, Dr. Harmison did not deliver any news on the purported sales announced in the three press releases in September and October of 2007, nor did he offer any information regarding new sales.  *See* April 14, 2008 Investor Call Tr. (attached as Ex. H).  Instead he offered vague projections of future revenues.  On April 11, 2018, the last trading day before the investor call, Signalife's stock closed at $1.34 per share.  On April 15, 2018, the first trading day after the call, Signalife's stock closed at $1.00 per share.

On August 15, 2008, Signalife released a 10-Q stating that Signalife "ha[d] not recognized any revenues to date" from the purchase orders announced in the press releases.  Trial Ex. 159 at

21-22 (attached as Ex. I); *see* Trial Tr. II (D.E. 240) at 124-27 (testimony of Woodbury).  The 10-Q also announced that, for the purchase orders announced in the September 25, 2007 press release, the products "were returned by the lessee on the basis that too much time had passed since the purchase order was given."  Ex. I at 22.  This was a lie:  there were no purchase orders, and the Defendant spread this information in an attempt to conceal that the sales never existed.  Nevertheless, information regarding problems with the purported purchase orders alerted investors that Signalife was not, in fact, positioned to generate revenues, contrary to Signalife's earlier announcements.  *See Stein*, 846 F.3d at 1142 ("[The 10-Q] was the first public disclosure arguably signaling to stock market participants that Signalife's stock was overvalued . . . and thus, as the district court found, marked the end of the fraudulent period.").

The value of Signalife shares plummeted in the months following the April 2008 investor call.  The stock, which was trading at $1.34 immediately prior to the call, steadily declined and, on August 15, 2008, the day the 10-Q was released, Signalife's stock closed at $0.10 per share.  Shortly thereafter, a securities class action lawsuit was filed against Signalife and the company was de-listed from the American Express Stock Exchange.  In September 2008, there was a 4,500-to-1 reverse stock split greatly impacting the number and value of Signalife shares.  As the value of Signalife shares fell, investors lost most, if not all, of their investments in the company.  *See* Trial Tr. V (D.E. 243) at 10-11 (testimony of investor Dr. Bryan Harris that he suffered "almost a total loss").  Many of Signalife's investors lost thousands of dollars and were left with essentially worthless holdings in Signalife as a result of the Defendant's fraudulent scheme.

The Defendant's deceit, however, was not limited to shareholders:  the Defendant profited by funneling his Signalife shares to blind trusts and liquidating his ownership interests in the company.  Trial Tr. IV (D.E. 242) at 46-57 (testimony of Mark Nevdahl, the Defendant's former

securities broker, regarding the "blind" trusts). The Defendant also looted Signalife by orchestrating sham consulting agreements with coconspirators Ajay Anand and Martin Carter who, at the Defendant's request, remitted cash and Signalife shares they received to the Defendant.

## PROCEDURAL HISTORY

The Defendant was indicted in December 13, 2011. Following a ten-day trial, the Defendant was convicted on all charges. This Court sentenced the Defendant to a term of imprisonment of 204 months. The Court determined that a Guidelines range of life imprisonment was appropriate based on investor loss of $13,186,025, which, along with enhancements for sophisticated means endangering the solvency or financial security of a publicly traded company; the Defendant's role as a leader or organizer of the criminal activity; abuse of trust or use of a special skill; 250 or more victims; and obstruction of justice, resulted in an offense level of 45. Sentencing Tr. II (D.E. 429) at 31, 38-41; *see* U.S.S.G. § 2B1.1 (2014). The Defendant appealed. The Eleventh Circuit affirmed his convictions, but remanded for the limited purpose of "calculat[ing] anew the amount of loss for purposes of U.S.S.G § 2B1.1(b)(1) and restitution under the [Mandatory Victim Restitution Act (MVRA)]." *Stein*, 846 F.3d at 1156.

## ARGUMENT

A term of 204 months is appropriate in light of the egregious and flagrant nature of the Defendant's conduct, which caused massive loss to victims and involved disseminating false information to investors, outright theft of Signalife assets, and lying before the SEC. As described herein, a sentence of 204 months, identical to the sentence this Court imposed based on the same egregious conduct, is sufficient but not greater than necessary in light of the relevant factors under

18 U.S.C. § 3553(a), and would be well below the advisory Guidelines range under even the most conservative loss estimates proposed by the government.

First, with respect to loss, the Defendant's scheme caused a total loss of at least **$8,773,369** ($2,027,890 to investors and $6,745,479 to Signalife). As set forth below, the $2,027,890 loss figure is based on the inflationary value of Signalife stock due to the Defendant's fraud. To determine this $2,027,890 loss figure, Dr. Chyhe Becker, of the Office of Litigation Economics in the Division of Economic and Risk Analysis at the SEC, conducted an event study in which she concluded that certain declines in Signalife stock were due to the Defendant's fraud, rather than to other unrelated and irrelevant events. As part of her analysis, Dr. Becker determined the "abnormal returns" of Signalife stock on certain dates — that is, the portion of the stock price fluctuation on particular days attributable to company-specific news, such as misleading or corrective disclosures (*i.e.*, fraudulent press releases, the investor call, and the 10-Q). The abnormal returns reflect changes in the stock price attributable to these company-specific events and thus due to the Defendant's fraudulent scheme. Based on this analysis, the government submits that Signalife's shareholders lost at least $2,027,890 due to the fraudulent inflation in Signalife's stock caused by the Defendant's scheme. In addition to the losses to Signalife's investors, the Company lost at least $6,745,479 as a result of the Defendant's outright theft of cash and Signalife stock. Taking losses to the company together with the losses to investors, the appropriate measure of loss here is **$8,773,369**.

Second, while the $8.7 million figure is the most appropriate measure of loss, the government also provides alternative loss calculations, including the Defendant's gain, loss calculated under the Modified Recissory Method ("MRM"), and loss attributable to specific investors. With respect to gain, the Defendant gained over $5.3 million by stealing and

misappropriating cash and stock from Signalife.  Under the MRM, a methodology endorsed by the Guidelines, the loss caused by the Defendant's scheme exceeds $24 million even under the most conservative approach.  Under any of the measures described above, the loss (or gain) caused by the Defendant results in a minimum 18-level increase under U.S.S.G. § 2B1.1(b)(1).

Finally, and as this Court has previously concluded, the Defendant's egregious conduct warrants application of enhancements for sophisticated means (§ 2B1.1(b)(10)(C)); endangering the solvency or financial security of a publicly traded company (§ 2B1.1(b)(16)(B)); the Defendant's role as a leader or organizer of the criminal activity (§ 3B1.1); abuse of trust or use of a special skill (§ 3B1.3); number of victims (§ 2B1.1(b)(2)(A)); and obstruction of justice. (§ 3C1.1).[1]  These enhancements are appropriate given the facts here.  Notably, aside from the victim enhancement, the Defendant did not challenge any enhancements on appeal and thus cannot do so now.  *See United States v. Copeland*, 604 F. App'x 834, 837 (11th Cir. 2015).

In sum, the Defendant's total offense level is 41, which yields a sentencing range of 324 to 405 months.  In light of the Defendant's serious conduct in this case and his significant total offense level, the Court should resentence the Defendant to his original term of 204 months imprisonment, which falls far below the appropriate Guidelines range.

---

[1]   The Defendant's original sentence was calculated pursuant to the 2014 Guidelines.  For resentencing, the 2016 Guidelines apply.  U.S.S.G. § 1B1.11(a).  In addition, the 2014 Guidelines called for a six-level enhancement for a crime involving 250 or more victims under then-U.S.S.G. § 2B1.1(b)(2)(C), while the 2016 Guidelines call for a two-level enhancement for a crime involving ten or more victims under U.S.S.G. § 2B1.1(b)(2)(A).  Thus, even though the victim enhancement still applies, the Defendant is only subject to a two-level, rather than a six-level, increase in offense level under the 2016 Guidelines.

III.    **The Defendant's scheme caused at least $2 million in investor losses (§ 2B1.1(b)(1)).**

   A.    *Calculating Loss Under § 2B1.1(b)(1)*

Under the Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A) (2016).   Actual loss, the relevant measure here, is the "reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i).  In arriving at a loss figure, the Court "need only make a reasonable estimate of the loss" based on "available information." *Id.* cmt. n.3(C).  "[T]he government [bears] the burden at sentencing of proving this loss amount by a preponderance." *United States v. Brunot*, 294 F. App'x 546, 547 (11th Cir. 2008).  "The loss determination does not need to 'be made with precision.'"  *Id.* (quoting *United States v. Dominguez*, 109 F.3d 675, 676 (11th Cir. 1997)).

The Eleventh Circuit remanded with guidance that "the government must show that the investors relied on [the defendant's] fraudulent information to satisfy the 'but for' causation requirement under U.S.S.G. § 2B1.1." *Stein*, 846 F.3d at 1153.  However, as the Eleventh Circuit recognized, "requiring individualized proof of reliance for each investor is often infeasible or impossible," and "in cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *Id.*  The Eleventh Circuit described the evidence the government presented during the first sentencing as:

> (1) trial testimony from one investor that he relied on one of Mr. Stein's false press releases; (2) a victim impact statement from another investor to the same effect; (3) a number of victim impact statements suggesting that the investors relied on press releases and other publicly available information generally, but not specifically the fraudulent information Mr. Stein disseminated; and (4) testimony that, because the only place to get information about Signalife stock was from press releases and public filings, at least some investors likely relied on this type of information.

*Id.* at 1154.  On remand, the government intends to produce additional evidence to demonstrate that investors relied on the Defendant's fraudulent misrepresentations, including testimony from

9

additional investor victims and from Dr. Chyhe Becker, consistent with her expert reports.  *See* Expert Report of Dr. Chyhe K. Becker (attached as Ex. J); Rebuttal Report of Dr. Chyhe K. Becker (attached as Ex. K).  Specifically, Dr. Becker will explain her conclusions that, based on her event study analysis, declines in Signalife's share price during certain time periods were a result of company-specific events related to the Defendant's fraud and not attributable to other events or general market factors.  *See* Ex. J.  In addition, we anticipate that Dr. Becker may testify regarding her conclusions that news regarding Signalife sales — such as the information in the fraudulent press releases — would have been important to investors because sales are an important metric in determining a company's value and therefore are material to investors.  *See* Ex. K.  Dr. Becker's testimony, in conjunction with additional investor testimony (and investor testimony already in the record), provides substantial direct and circumstantial evidence for this Court to conclude that the Defendant caused a loss to investors of **$2,027,890** (*see* Sections B and C, *supra*).  Further, the Defendant caused Signalife losses of **$6,745,479** (*see* Section IV, *supra*), for a combined loss of **$8,773,369**.  The government has also provided several alternative measures of loss, even the most conservative of which support a sentence of 204 months.

### B.    Dr. Becker's Event Study

The government expects to present testimony from Dr. Becker, who determined that certain declines in Signalife stock during the relevant period was due to the Defendant's fraud and not to unrelated events, such as short selling and the 2008 market crisis.  Dr. Becker conducted an event study, a methodology used to measure the impact of certain company-specific events on the price of a company's stock.  *See United States v. Hatfield*, 2014 WL 7271616, at *3 (E.D.N.Y. Dec. 18, 2014) (explaining an event study as a statistical analysis that "demonstrat[es] shareholder losses" by "measuring the share price decline attributable to the announcement of [a loss-inducing]

event"); *United States v. Ferguson*, 584 F. Supp. 2d 447, 449-50 (D. Conn. 2008) (describing the use of event studies). Based on the "predicted return" of a stock, that is, the expected return for a stock on a particular day based on the stock's historical performance, Dr. Becker determined the difference between the actual return and the predicted return, known as the "abnormal return," on days on which company-specific news (such as a fraudulent press release) was released. The abnormal return reflects the portion of the stock's price fluctuation on a particular day that can be attributed to the company-specific news. Dr. Becker then analyzed whether the abnormal returns were statistically significant.

Dr. Becker analyzed the impact that two types of events had on Signalife stock price: (i) misleading disclosures — the three fraudulent press releases; and (ii) two corrective disclosures — Dr. Harmison's April 14, 2008 investor call and Signalife's 10-Q filed August 15, 2008.[2] For purposes of an event study, a corrective disclosure corrects one or more of a company's previous statements. Thus, while the investor call and 10-Q were not fully "corrective" in the way that, for example, a restatement might be, these events were nevertheless corrective disclosures. *See Hatfield*, 2014 WL 7271616, at *8 ("The flexibility of the corrective disclosure inquiry reflects the reality that the market does not always learn of a fraudulent scheme in one complete *mea culpa* . . . ."); *id.* at *10 ("Even absent a corrective disclosure, a decline in share price may be attributable to a defendant's fraud where the fraud concealed some foreseeable risk that materialized and caused the share price decline."). The Defendant went to great lengths to conceal

---

[2]     At the 2014 sentencing, the government presented loss calculations based on a "broad" period from June 1, 2006 (the beginning of available comprehensive trading data) to September 19, 2008 (the last day before the 4,500-to-1 reverse stock split) and a "narrow" period of September 20, 2007 (the first press release) to August 15, 2008 (the 10-Q). Here, the government has narrowed the relevant time period for purposes of the event study to include certain misleading and corrective disclosures as described above.

his fraudulent activities from investors, and, as a result, many investors did not learn the full extent of the Defendant's fraud until the Defendant was convicted. The Defendant's persistent deception of investors does not preclude this Court from recognizing these events as corrective disclosures.

Dr. Becker concluded that Signalife stock experienced a statistically significant abnormal return of 18.0% on September 25, 2007, the date of the second press release announcing $3.3 million in sales, and this increase "was mainly driven by the false press release regarding new purchase orders." *See* Ex. J at 7. As for the corrective disclosures, Dr. Becker concluded that Signalife stock experienced abnormal returns of -12.7% on April 14, 2008 and -9.0% on August 15, 2008, and that the abnormal return on April 14, 2008 was statistically significant. Dr. Becker analyzed other information released on April 14, 2008 and determined that the decline "was mainly driven by the webcast." *Id.* at 9. The inflationary value of Signalife's stock due to the Defendant's fraudulent scheme based on Dr. Becker's analysis is summarized below:

| Table 1: Inflationary Value of Signalife Stock | | |
|---|---|---|
| **Dates** | **Abnormal Return Associated with Disclosure** | **Inflation in Signalife Stock Due to Fraud** |
| 9/20/07 to 9/24/07 | 0% | 0% |
| 9/25/07 to 4/13/08 | 18.02% | 18.02% |
| 4/14/08 to 8/14/08 | 12.72% | 5.30% |
| 8/15/08 onward | 0% | 0% |

The right-hand column reflects the percent of the stock price attributable to the Defendant's fraud. There are two distinct inflationary periods: (i) September 25, 2007 to April 13, 2008 (Signalife's stock was inflated by 18.0%); and (ii) April 14, 2008 to August 14, 2008 (Signalife's stock was inflated by 5.3%). Dr. Becker then calculated Signalife's daily "inflationary price" by multiplying the percent inflation by the closing price of the stock for each day during the relevant period.

Dr. Becker also analyzed whether certain other events had a negative impact on the price of Signalife stock. These events included the financial crisis of 2008; short-selling activity,

Signalife's termination of a distribution contract with Rubbermaid, Inc.; the selling of securities by Yorkville Advisors LLC; the alleged illiquidity of Signalife's stock; the filing of the class action lawsuit *Latham v. Matthews et al* (6:08-cv-02995-RBH); and trading attributed to Uncle Mill's Partners, LLC.  Ex. J at 9.  Based on regression analyses, Dr. Becker determined that these events did not contribute to the decline in Signalife stock during the relevant period.

      **C.**     ***Calculations applying Dr. Becker's event study***

      The government anticipates presenting testimony from Mr. Peter Melley of the Financial Industry Regulatory Authority that loss based on the inflationary value of the Signalife stock was **$2,027,890.17** for the period between September 20, 2007 (the first fraudulent press release) and August 15, 2008 (the 10-Q).  The government utilized a "Buyers Only" approach, which only considers investors who bought after the Defendant disseminated fraudulent information about Signalife and either (i) held shares as of corrective disclosures and did not sell their stock; or (ii) sold their shares after the corrective disclosures.  This "Buyers Only" method is a conservative estimate of loss, as it does not take into account investors who held shares during the "fraud period" but did not buy additional shares.

      The first step in these calculations is to assess *actual* losses based on the value at the time of purchase and the "final value" of the shares.  The "final value" of an investor's shares was one of two numbers:  (i) for investors who never sold those Signalife stock, the value of their shares on the date of the disclosures (based on the closing price); or (ii) for investors who later sold their shares, the actual value of the shares when sold.  Using this methodology, the "actual losses" to Signalife shareholders between September 20, 2007 and August 15, 2008 were $11,346,374.11.

      The second step in calculating loss due to inflation caused by the fraudulent scheme is to subtract the inflationary value of shares (at either the time of sale or as of the corrective disclosures)

from the actual losses.   As set forth above, Dr. Becker determined the inflationary value in Signalife's stock during certain date ranges (*see* Table 1, *supra*).   Based on this analysis, loss due to the inflationary value of Signalife stock caused by the Defendant's scheme between September 20, 2007 and August 15, 2008 was **$2,027,890.17** and includes losses to **1,079** victims.[3]

The estimated $2,027,890 figure is certainly appropriate and in fact represents a conservative estimate of loss in many respects.   This loss figure likely underestimates loss as it fails to capture Signalife stock's precipitous decline from August 15, 2008 to September 22, 2008, the date of the 4,500-to-1 stock split.   Indeed, even in the more limited time period between the second press release and the April 2008 investor call, loss due to the inflationary value caused by the Defendant's scheme was $454,310.95 spread over 634 victims.   While this figure is excessively conservative, it would still support a sentence of 204 months.   Of course, this narrower period excludes investor losses incurred after this first corrective disclosure.   While investors may have suspected fraud when they failed to receive updates on the purchase orders during the April 2008 investor call, news of the fraud continued to trickle into the market in the months to come.[4]

---

[3]      This figure excludes losses incurred by entities and individuals associated with the Defendant and his scheme, including ARC Finance (the Defendant's wife's company), coconspirators Carter and Anand, and Evie Muscillo.   Carter served as the Defendant's right-hand man throughout the fraud, and, at the Defendant's instruction, submitted invoices to Signalife for work he never completed and helped create fake supporting documents for the false purchase orders.   Trial Tr. VI (D.E. 244) at 63-64, 70-73, 106-08; *see also* Stein, 846 F.3d at 1141-42.   Carter remitted most of the money he received from Signalife to the Defendant.   *Stein*, 846 F.3d at 1142 ("Mr. Stein funneled money and Signalife stock from Signalife through Mr. Carter himself."); *see* Trial Tr. VI (D.E. 244) at 84-85.   Anand was similarly instrumental to the Defendant's scheme and, like Carter, helped create fake documentation supporting the fabricated purchase orders.   *See* *Stein*, 846 F.3d at 1142; *see* Trial Tr. IV (D.E. 242) at 186-216.   Anand remitted $478,600 of proceeds he received from Signalife to the Defendant.   See Trial Tr. VIII (D.E. 246) at 11.   Carter and Anand are thus not factored in the loss calculations as "victims," but funds they received and remitted to the Defendant are included as components of alternative measures of loss, including loss to Signalife and gain to the Defendant.

[4]      Limiting the loss to the inflationary value further narrows the loss amount because the Defendant's fraud did not "cause shareholders to lose money by decreasing the value of [a

**IV.     The Defendant's scheme caused losses to the company of over $6 million.**

The financial harm to investors, however, is only one component of the substantial loss in this case.  The Eleventh Circuit instructed that actual loss also may be proven "through direct losses to the company resulting from, for example, theft of Signalife stock."  *Stein*, 853 F.3d at 1154.  As established at trial, the Defendant stole assets from Signalife by causing the company to send him and various coconspirators shares and money.  Signalife itself is therefore a victim that suffered loss independent from the financial harm to investors.  Accordingly, it is appropriate to aggregate loss suffered by Signalife with the loss to investors.  *See United States v. Lundstrom*, 2016 WL 1048890, at *8 n.9 (D. Neb. Mar. 14, 2016), *aff'd* 880 F.3d 423 (8th Cir. 2018) (rejecting argument "that the FDIC's losses, if proved at sentencing to have resulted from the defendant's fraud, cannot be aggregated with shareholder losses for purposes of loss calculation."); *cf. United States v. De La Torre*, 621 F. App'x 564, 568 (11th Cir. 2015) (upholding application of 18-level loss enhancement where "combined conduct for Speed Pharmacy and Atlantis Pharmacy resulted in a loss exceeding $2,500,000.").  Based on Signalife's loss of $6,745,479.76, detailed in the table below, the total loss, including loss to investors and Signalife, is $8,773,369.

---

company's] shares; it caused them to lose money by inducing them to purchase or retain shares based on information that grossly overestimated the value of those shares."  *See Lundstrom*, 2016 WL 1048890, at *6.

| Table 2: Loss to Signalife | |
| --- | --- |
| **Description** | **Amount** |
| Money sent directly to Stein | $160,679.61 |
| Money sent directly to Martin Carter | $682,100.00 |
| Dollar value of shares issued to Evie Muscillo (for Jamie Yafa) | $182,780.00 |
| Dollar value of shares issued to Martin Carter | $1,473,900.00 |
| Dollar value of shares issued to Ajay Anand | $3,058,020.15 |
| Dollar value of shares issued to C Roberto Trust (deposited by Stein into his Luxembourg account) | $594,000.00 |
| Dollar value of shares issued to D Clemens Trust (deposited by Stein into his Luxembourg account) | $594,000.00 |
| TOTAL = | $6,745,479.76 |

As explained above, Anand and Carter conspired with the Defendant and funneled money and shares back to the Defendant as a result of elaborate sham consulting agreements. *See* Section C *infra*. In addition, Yafa was secretly compensated to hype Signalife stock through shares issued to Muscillo, who received the shares on his behalf. Trial Testimony VII (D.E. 245) at 155-69.

The Defendant also received money and shares from Signalife directly, transferring shares he received to purportedly blind trusts and liquidating them soon after, even as Signalife struggled for cash. Trial Tr. IV (D.E. 242) at 46-57 (testimony of Nevdahl); Trial Tr. VIII (D.E. 246) at 27-28 (testimony of Postal Inspector George Clark on Signalife's cash flow problems). At trial, Postal Inspector Clark offered a tracing analysis reflecting the value of funds and shares received by the Defendant and his coconspirators from Signalife. Trial Tr. VIII (D.E. 246) at 9-24; Trial Exs. 258-59 (attached hereto as Exs. L and M).

At the first sentencing hearing, Postal Inspector Clark detailed funds sent to the C Roberto and D Clemens Trusts in a declaration (attached hereto as Ex. N; submitted with the government's forfeiture motion (D.E. 252)) that, on April 9, 2008, the Defendant opened an account at Credit Suisse Luxembourg. The Defendant completed the account opening paperwork and listed himself as the beneficial owner and signatory. The next day, on April 10, 2008, 1.2 million shares of Signalife were deposited into this account in the form of two share certificates for 600,000 shares

16

each, one made out to the C Roberto Trust and the other to the D Clemens Trust.  The share certificates were issued and sent at the Defendant's instruction.  *See* Ex. N.  The stock certificates bore no restrictive legends and at the time of issuance were valued at $594,000 each.  Sentencing Tr. I (D.E. 428) at 50-51.

Most of the funds stolen from Signalife were misappropriated at the Defendant's direction and were ultimately funneled back to the Defendant.  Thus, much of the loss to Signalife also represents gain to the Defendant.  Further, as detailed in Postal Inspector Clark's tracing analysis and the testimony of Carter and Anand, a portion of the funds received by Anand and Carter also make up the Defendant's gain in this matter.  *See*, *e.g.*, Trial Tr. VIII (D.E. 246) at 11 (Anand sent $478,600 to the Defendant); *id.* at 24 (Carter sent the Defendant "85 percent of the money [Carter received], and that's $1,823,283").  In sum, Signalife investors suffered at least $2,027,890 in losses and the Company was robbed of at least $6,745,479 as a result of the Defendant's conduct. Combined, these two figures result in total losses of **$8,773,369**.

V.      **The Defendant gained over $5 million from the scheme.**

As set forth herein, Signalife and its investors lost millions as a result of the Defendant's fraudulent scheme.  However, under the Guidelines, the Defendant's gain may be used as an alternative measure where there is loss but it "reasonably cannot be determined."  U.S.S.G. § 2B1.1 cmt. n.3(B); *Stein*, 846 F.3d at 1154.  The parties disagree as to the *amount* of loss but this is unquestionably a case where the alternative measure of gain could apply because, even under the most conservative estimates, both investors and Signalife suffered losses.[5]      Therefore,

_____

[5] For example, the testimony of investors who lost money as a result of their investments in Signalife would, standing alone, be a sufficient to establish loss.  Similarly, even under the most conservative loss figures using the inflationary methodology, which covers only the limited time period between the second press release and the April 2008 investor call, investors suffered losses of $454,310.  Accordingly, either of these conservative metrics would be a sufficient basis on

the government respectfully requests that this Court find in the alternative that the Defendant's gain from the scheme would result in the Court imposing the same sentence. Under the Defendant's gain, a sentence of 204 months falls below the relevant Guidelines range. Again, this figure is supported by testimony from Anand and Carter regarding funds they remitted to the Defendant; Clark's trial testimony regarding his tracing analysis, which included a detailed accounting of funds received by the Defendant; and Clark's declaration submitted in the original sentencing hearing. *See* Section IV *infra*.

| Table 3: Gain to the Defendant | |
|---|---|
| **Description** | **Amount** |
| Money Stein received directly from Signalife | $160,679.61 |
| Money Martin Carter received directly from Signalife | $682,100.00 |
| Money Stein received from Ajay Anand | $478,600.00 |
| Money Stein received from the THS Blind Trust (proceeds of sales of Signalife stock) | $1,395,302.00 |
| Dollar value of shares issued to Martin Carter | $1,473,900.00 |
| Dollar value of shares issued to C Roberto Trust | $594,000.00 |
| Dollar value of shares issued to D Clemens Trust | $594,000.00 |
| TOTAL = | $5,378,581.61 |

## VI. The modified recissory method provides an alternative measure of loss.

The modified rescissory method, or "MRM," provides an alternative method of calculating loss. The Guidelines provide that in securities fraud cases, a Court may calculate loss under

> a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
> (I)     calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II)     multiplying the difference in average price by the number of shares outstanding.

---

which this Court could conclude that there were "losses" in order to look to the Defendant's substantial gains as an alternative measure under the Guidelines.

U.S.S.G. § 2B1.1, cmt. n.3(F)(ix).  In addition, courts have recognized the MRM as "a reasonable estimate of the shareholder loss."  *Lundstrom*, 2016 WL 1048890, at *6; *see United States v. Brown*, 595 F.3d 498, 524-26 (3d Cir. 2010); *Snyder*, 291 F.3d at 1296 n.6; *United States v. Grabske*, 260 F. Supp. 2d 866, 873-74 (N.D. Cal. 2002).

Under the MRM, the average price of Signalife stock from September 20, 2007 to August 15, 2008 is compared to the average price of Signalife stock in the 90 day period after the August 15, 2008 disclosure.

| Table 4: Loss Calculations Under the MRM | |
|---|---|
| **Description** | **Amount** |
| Average price of Signalife stock September 20, 2007 through August 15, 2008 | $0.75 |
| Average price of Signalife stock over the subsequent 90 day period | $0.03 |
| Number of shares outstanding September 20, 2007 through August 15, 2008 (excluding shares held by ARC Finance as of 8/15/08 and shares issued to Carter, Anand, and Muscillo) | 34,686,773 |
| **LOSS =** | **$24,974,476** |

This calculation yields a total of **2,415** victims.  Again, in an effort to provide a conservative estimate, this figure does not include trading days after the 4,500-to-1 stock split on September 22, 2008, which would have resulted in a much higher loss figure under the MRM.  Moreover, the government excluded shares held by entities and individuals associated with the Defendant, again, ARC Finance, Carter, Anand, and Muscillo.  By excluding these entities, the Defendant receives a credit of millions of dollars from the loss amount.[6]

## VII.   Based on investor testimony alone, the Defendant caused over $900,000 in losses.

In addition to the individuals who testified during trial, the government anticipates calling additional investor victim witnesses who suffered losses as a result of the scheme.  The government

---

[6]   During the first sentencing, the government offered MRM calculations ranging from $24 million to in excess of $46 million (D.E. 386).  By excluding these entities and limiting the time period, the government has offered the most conservative of the three MRM methods.

expects that these investor victims will testify as to their reliance on the false statements regarding Signalife and explain why information regarding sales was important to their decisions to invest in Signalife. The government anticipates that this testimony alone will demonstrate that, at a minimum, the Defendant caused investor losses of $250,000. Combined with Dr. Bryan Harris's trial testimony that he invested $650,000 in Signalife and experienced "almost a total loss," Trial Tr. V (D.E. 243) at 5, 10-11, the government anticipates that investor testimony from trial and the resentencing hearing will demonstrate that the Defendant caused over $900,000 in investor losses.

**VIII.   As the Court has previously concluded, the Defendant's conduct warrants application of additional enhancements.**

As this Court previously concluded, given the Defendant's role as an attorney and the nature of his conduct, there are several enhancements that are warranted in this case:

- **10 or More Victims (§ 2B1.1(b)(2)(A)):** At minimum, the Defendant's scheme caused a loss to 634 victims. As such, a two-level enhancement for "10 or more victims" should apply.[7]

- **Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)):** A two-level enhancement for sophisticated means is appropriate in light of the Defendant's creation of fake documents, fake people, and fake companies to further his scheme. Sentencing Tr. II (D.E. 429) at 38 ("[S]ophisticated means were used in the commission of the offense"); *see Stein,* 846 F.3d at 1141-42 (describing fake documentation).

- **Abuse of Position of Authority (U.S.S.G. § 3B1.3):** Due to the Defendant's role as Signalife's attorney, a two-level enhancement should apply. *See* Sentencing Tr. II (D.E. 429) at 38 ("[T]he Defendant did abuse a position of trust as counsel . . . in a manner that significantly facilitated the offense").

- **Organizer or Leader (U.S.S.G. § 3B1.1):** The Defendant's complete orchestration of the scheme — including his direction of Anand and Carter — support a four-level enhancement for the Defendant's role. Sentencing Tr. II (D.E. 429) at 38 ("[T]he Defendant was a leader or organizer of the criminal activity that was otherwise extensive"); *see Stein,* 846 F.3d at 1141-42 (describing instructions to Woodbury to issue press releases

---

[7]     In the event that the Court includes only the financial harm incurred by Signalife in the loss calculation under U.S.S.G. § 2B1.1, the enhancement for ten or more victims should no longer apply. *See United States v. Leach,* 417 F.3d 1099, 1107 (10th Cir. 2005).

and directing coconspirators to "make the fake purchase orders appear legitimate").

- **Endangering Solvency of Public Company (U.S.S.G. § 2B1.1(b)(16)(B)):** By looting millions of dollars from Signalife, the Defendant endangered Signalife's financial security, and a four-level enhancement is warranted. Sentencing Tr. II (D.E. 429) at 38 (finding "that the offense substantially endangered the financial security of [Signalife], which was a publicly traded company").

- **Obstruction of Justice (U.S.S.G. § 3C1.1):** The evidence underlying the Defendant's conviction for conspiracy to obstruct justice support the two-level enhancement for obstruction of justice.

The Eleventh Circuit's remand in this matter was limited to issues of loss and restitution. As such, under the law of the case doctrine, the Court may only address restitution and loss amount on remand. *See United States v. Irey*, 458 F. App'x 854, 855-56 (11th Cir. 2012) ("A district court acting on remand cannot vary or examine our mandate 'for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.'" (quoting *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996))). With the exception of the loss enhancement, the Defendant did not contest his sentence on appeal, and, as a result, the Eleventh Circuit did not address these issues. In fact, the Eleventh Circuit unequivocally affirmed the Defendant's convictions. As such, there has been nothing to undercut the substantial evidence of the Defendant's criminal conduct supporting application of the enhancements found by this Court at the 2014 sentencing. Unchallenged on appeal, these enhancements cannot be challenged anew at resentencing. *See Copeland*, 604 F. App'x at 837.

As the table below demonstrates, regardless of the loss adopted employed by the Court, the Defendant's original sentence of 204 months is supported under the Guidelines. Indeed, under any of the calculations offered by the government, a term of imprisonment of 204 months falls well below the applicable range.

| Table 5: Application of the United States Sentencing Guidelines | | | | | |
|---|---|---|---|---|---|
| | Investor Loss | Loss to Signalife | Gain | Total Loss | MRM |
| Loss | $2,027,890 | $6,745,479 | $5,378,581 | $8,773,369 | $46,266,427 |
| Base Offense Level | 7 | 7 | 7 | 7 | 7 |
| Loss Enhancements | +16 | +18 | +18 | +18 | +22 |
| Enhancement for 10+ Victims | +2 | -- | -- | +2 | +2 |
| Abuse of a Position of Trust | +2 | +2 | +2 | +2 | +2 |
| Role as an Organizer or Leader | +4 | +4 | +4 | +4 | +4 |
| Solvency of Public Company | +4 | +4 | +4 | +4 | +4 |
| Sophisticated Means | +2 | +2 | +2 | +2 | +2 |
| Obstruction | +2 | +2 | +2 | +2 | +2 |
| Total Offense level | **39** | **39** | **39** | **41** | **45** |
| **Guidelines Range** | **262 to 327** | **262 to 327** | **262 to 327** | **324 to 405** | **Life** |

IX.    **Under the § 3553(a) factors, a sentence of 204 months is appropriate.**

As before, the factors under 18 U.S.C. § 3553(a) support a sentence of imprisonment of 204 months.  Again, the Eleventh Circuit affirmed the Defendant's convictions on appeal, and the considerations supporting the imposition of a sentence of 204 months at the first sentencing, which include the severity of his criminal conduct, apply with equal force here.

The "nature and circumstances of the offense" support imposition of a lengthy sentence. 18 U.S.C. § 3553(a)(1).  The evidence showed that the Defendant caused lies to be issued to the investing public regarding Signalife; stole Signalife's assets by having Signalife issue shares and funds to third parties who, at the Defendant's direction, remitted funds to the Defendant; looted Signalife when it was desperate for funds; caused Carter to repeatedly perjure himself; and provided false testimony before the SEC.  Similarly, the "history and characteristics of the defendant" support a sentence of 204 months.  *Id.*  As counsel to Signalife, the Defendant engaged in a consistent pattern of lies and deceit over many years.  In addition, as described in the original PSR, the Defendant had a stable childhood and was afforded both an undergraduate and graduate

education.  2014 PSR (D.E. 282) ¶¶ 70, 83-85.  Yet instead of using his resources for lawful ends, the Defendant operated a sophisticated fraud which he went to great lengths to conceal from investors, for example, repeatedly lying under oath about the scheme.  Similarly, the seriousness of the offense supports a lengthy sentence.  As Dr. Harris testified at trial and the government expects investors to testify at the sentencing, Signalife shareholders relied on the false information that the Defendant disseminated and suffered substantial financial harm as a result.

Principles of deterrence also underscore the importance of a sentence of 204 months.  The Defendant did not commit this crime out of desperation — he had lawful avenues of employment available to him — but rather to fund his lush lifestyle.  When the Defendant is released from prison, he will no longer have a bar license and lack the financial resources once available to him.  These changed circumstances will only increase his motive to seek financial gain through any means possible.  General deterrence is also an important consideration under § 3553(a), and such principles are especially important in white collar cases.  *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." (internal citations and quotation marks omitted)).  As such, the sentencing factors under § 3553(a) support resentencing the Defendant to a term of imprisonment of 204 months.

## X.    Restitution & Forfeiture

The MVRA requires a court to "award restitution to identifiable victims of certain crimes, including crimes of fraud, without regard to the defendant's ability to pay."  *United States v. Martin*, 803 F.3d 581, 593 (11th Cir. 2015) (citing 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii)).  Under the MVRA, a victim is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(2).  "The method for calculating actual loss . . . under the Sentencing Guidelines is 'largely the same' as the method for

23

establishing actual loss to identifiable victims under the MVRA," *Stein*, 846 F.3d at 1153 (quoting *United States v. Cavallo*, 790 F.3d 1202, 1239 (11th Cir. 2015)). "[T]he government need not calculate the victim's actual loss with laser-like precision, but may instead provide a 'reasonable estimate' of that amount." *Martin*, 803 F.3d at 595 (quoting *United States v. Futrell*, 209 F.3d 1286, 1290 (11th Cir. 2000)). Here, the amount offered by the government reflects the loss to victims, and the Court should order restitution in the same amount as loss, here, $8,773,369.[8]

As argued in the government's opposition to the Defendant's motion to reopen forfeiture (D.E. 525), the Court's 2014 Forfeiture Orders (D.E. 400, 478) remain in effect and, as forfeiture was not appealed, the issue of forfeiture is not presently before this Court. Should the Court address the issue anew, however, it should order forfeiture in the original amount of $5,378,581.61, which reflects the shares and cash received through the Defendant's scheme to defraud.

<u>CONCLUSION</u>

For the reasons stated herein, the government ask that the Court impose a term of imprisonment of 204 months and a term of supervised release of two years, and order restitution in the amount of $8,773,369 and, in the event the Court revisits forfeiture, forfeiture in the amount of $5,378,581.61.

Respectfully submitted,

SANDRA L. MOSER
Acting Chief, Fraud Section

---

[8]     Should the Court accept the Defendant's gain as a measure of loss, it may only use the gain as a basis for restitution where "the defendant's gain can act as a measure of . . . the victim's loss." *United States v. Kilpatrick*, 798 F.3d 365, 390 (6th Cir. 2015). Here, the Defendant's gain largely mirrors the funds he received from Signalife and, as such, may be used as a basis for restitution to Signalife as a victim. Nevertheless, the Court may forego restitution if it finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B).

BY:            /s/
           MICHELLE PASCUCCI

           Henry Van Dyck
           Assistant Chief

           Caitlin Cottingham
           Michelle Pascucci
           Trial Attorneys
           Criminal Division, Fraud Section
           United States Department of Justice
           1400 New York Avenue, Northwest
           Washington, DC 20005
           Tel: (202) 307-2208 (Pascucci)
           Fax: (202) 514-0152
           Michelle.Pascucci@usdoj.gov

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 1, 2018, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF, which will send notification to counsel of record.

Respectfully submitted,

SANDRA L. MOSER
Acting Chief, Fraud Section

BY: _____/s/_____
MICHELLE PASCUCCI
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice