UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Case No 11-80205-CR-MARRA |
| | § |
| MITCHELL J. STEIN, | § |
| | § |
| Defendant. | § |

## UNITED STATES' OPPOSITION TO THE DEFENDANT'S SENTENCING MEMORANDUM

The government hereby submits its opposition to the Defendant's Sentencing Memorandum (D.E. 532) (the "Memorandum") and respectfully urges this Court to re-impose the appropriate sentence of 204 months for the reasons set forth below.

To this day, the Defendant remains utterly remorseless for his conduct and the extensive damage he caused through his fraudulent scheme. The Defendant, an attorney and counsel to Signalife, took advantage of the trust bestowed upon him in that role to orchestrate a massive fraud scheme and line his own pockets by looting Signalife. The Defendant's deceit, as evidenced at trial, was seemingly boundless — creating sham consulting agreements, Trial Tr. IV (D.E. 242) at 182-83; Trial Tr. VI (D.E. 244) at 63-64, sending a coconspirator overseas to mail a letter and directing him not to leave any fingerprints on the envelope, Trial Tr. VI (D.E. 244) at 113-15, and funneling Signalife shares through elaborate blind trusts, Trial Tr. IV (D.E. 242) at 46-57, all to conceal his scheme from victims while he continued to profit. Employees testified at trial that they trusted and feared the Defendant, their boss and superior, and acted at his direction. Trial Tr. II (D.E. 240) at 65 (John Woodbury: "All my interactions were through Mr. Stein, who was, indeed, my superior."); Trial Tr. III (D.E. 241) at 61 (Employee Tracy Jones testifying that, when

1

employees left the Company, the Defendant "asked [her] for all the dirt on them [she] could find so he could sue them for every bogus lawsuit he could think of, . . . and make sure they spent their entire savings and then some on legal fees to fight his lawsuits.").

As the Defendant's scheme began to unravel, his deceit and flagrant disregard for the law only grew. Rather than acknowledge his role orchestrating the fraud, the Defendant lied before the Securities and Exchange Commission ("SEC") and encouraged co-conspirator Martin Carter to do the same. Trial Tr. VI (D.E. 244) at 121-27. The Defendant had Carter take detailed notes on what to say before the SEC and sat immediately beside Carter — amazingly, posing *as his attorney* — as Carter perjured himself. *Id.* at 126. Based on the Defendant's appalling conduct and the overwhelming evidence at trial, the jury took less than half an hour to convict him on all charges, including wire fraud, securities fraud, money laundering, and conspiring to obstruct justice. Trial Tr. X (D.E. 248) at 161. This Court applied several enhancements which the Defendant has not (and cannot credibly) dispute. For abusing a position of public trust, acting as a leader of the conspiracy, endangering the solvency of a public company, using sophisticated means to carry out and hide the scheme, and obstructing justice, the Court applied an additional fourteen offense levels.[1] This Court then appropriately imposed a sentence of 204 months. Sentencing Tr. II (D.E. 429) at 72. Yet, even after his conviction and sentence, the Defendant has shown no regret for his conduct, much less accepted any responsibility. The Defendant has consistently mischaracterized the record and this Court's rulings, and his recent filings evince the Defendant's deceit, greed, and utter disregard for the truth.

---

[1] The obstruction of justice enhancement was based the Defendant's lies under oath before the SEC and encouraging Carter to testify falsely before the SEC. Trial Tr. VI (D.E. 244) at 121-27.

As the Defendant's Memorandum and other recent filings show, when the truth does not suit the Defendant's purposes, he simply changes the facts: he lied to investors about the financial health of Signalife; he lied to the SEC and counseled others to do the same; and he has filed numerous baseless pleadings that disregard the evidence in the record. For example, the Defendant's claim in his Memorandum that he "does not dispute the jury's verdict" (D.E. 532 at 2) could not be further from the truth, as he then spends the next fifteen pages doing precisely that. Incredibly, the Defendant has the audacity to suggest in his Memorandum that no one was harmed as a result of his scheme (and, even more incredibly, that *he* was a victim). D.E. 532 at 31. The Defendant asks in his Memorandum that the Court "reconsider[] how the alleged scheme actually worked, how (*if at all*) investors were harmed, and how (*if at all*) Defendant profited." *Id* at 2. (emphasis added). Of course investors were harmed. Of course the Defendant profited. Yet instead of taking responsibility for his acts, the Defendant queries whether *anyone* suffered due to his conduct, claiming "that the loss is at or close to zero." *Id.* at 24. The Defendant refers to the "alleged scheme" (despite his convictions) and describes himself as a "passionate . . . believer" in Signalife (despite proof that he robbed the Company of funds). *Id.* at 3-4. These statements are alarming and, if nothing else, evince the Defendant's complete and persistent lack of accountability. While there is a dispute as to *how much* investors lost and *how much* the Defendant profited, there is absolutely no question that investors lost and the Defendant gained. To suggest otherwise defies logic, ignores mountains of evidence, and, yet again, highlights the Defendant's remorselessness.

Since his conviction, the Defendant has continued to file groundless and deceptive motions. This Court has denied these arguments repeatedly, calling them "baseless" and "offensive." D.E. 340, 388. The Eleventh Circuit has similarly rejected these arguments, remanding this case solely

to calculate loss and restitution. *United States v. Stein*, 846 F.3d 1135, 1156 (11th Cir. 2017). Yet, the Defendant's litany has continued, including a filing earlier this week in which the Defendant claims that he "has now proven that the prosecutor made at least six false statements to this Court during the trial." D.E. 534 at 3. The Defendant's unfounded claims of misconduct are without support in the facts or the law.

The Defendant's actions, taken as a whole, guided this Court's original sentence of 204 months. The Defendant's positions taken since that date, including his recently filed motion, confirm the Defendant has not changed. A sentence of 204 months is both appropriate and necessary. Anything less will not reflect the seriousness of the Defendant's crime or adequately deter the Defendant, who continues to assert he has done nothing wrong.

## ARGUMENT

On remand, the Eleventh Circuit explained that the government must show that "investors relied on Mr. Stein's fraudulent information to satisfy the 'but for' causation requirement" under the Guidelines. *Stein*, 846 F.3d at 1153. Nothing in the Eleventh Circuit's opinion requires testimony from all investors to show reliance. To the contrary, the Eleventh Circuit directed that "the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence," and further instructed that "in cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *Id.* at 1153-54.

In this case, the government intends to offer testimony from investors who relied on fraudulent statements regarding Signalife's financial health in making investment decisions and Dr. Chyhe Becker's expert opinion that investors relied on the Defendant's misstatements (and the

4

decline in Signalife's stock price was caused by the Defendant's scheme and not unrelated market events) to show reliance, consistent with the Eleventh Circuit's opinion. In addition, the government intends to offer evidence that the Defendant's scheme caused losses of over $8.7 million: $2,027,890 in investor losses and $6,745,479 in losses to Signalife. Finally, while loss is the most appropriate measure here, the Defendant's gain of over $5 million would provide an alternative measure of harm under the Guidelines, should the Court determine that there are losses, but they cannot reasonably be determined. Regardless, under either measure, a sentence of 204 months falls well below the appropriate Guidelines range.[2]

## I. Dr. Becker's analysis establishes that the drop in Signalife stock during the relevant period was caused by the Defendant's scheme and not other unrelated market factors.

As the Defendant's own expert avows, an event study is a well-accepted measure of investor loss. Dr. Becker's event study establishes that certain Signalife stock declines were attributable to the Defendant's fraud and therefore provides evidence of investor reliance. The Defendant's criticisms of Dr. Becker's careful and robust analyses are without merit.

### A. *Dr. Becker's analysis establishes investor reliance.*

The Defendant contends that "it is not possible simply by looking at the movements of the company's stock price, which is all Dr. Becker did, to conclude that investors suffered losses due to the fraud as opposed to other causes." D.E. 532 at 20. Of course, Dr. Becker did far more than "simply look" at stock movements. Dr. Becker conducted a robust event study, using widely-accepted methodologies. D.E. 533-10 at 5-6. Indeed, even the Defendant's own expert agrees that event studies are an appropriate and established method for measuring investor losses. D.E. 532-

---

[2] The government anticipates that Peter Melley of FINRA will testify as a lay witness regarding these loss figures. The government disclosed this approach to the Defendant in April. As this Court will recall, Mr. Melley testified at trial and the first sentencing hearing, both times as a lay witness. *See* Trial Tr. VIII (D.E. 246) at 178-226; Sentencing Tr. I (D.E. 428) at 22-82.

5

1 at 5-6. Dr. Becker's analysis provides a quantitative representation of investor reliance. Based on this thorough event study, she determined that certain movements in Signalife stock were attributable to the Defendant's fraud. She concluded that the statistically significant increase in Signalife stock value on September 25, 2007, the date of the second press release, "was mainly driven by the false press release regarding new purchase orders." D.E. 533-10 at 7. Dr. Becker also concluded that Signalife stock experienced declines on April 14, 2008 and August 15, 2008, and that the statistically significant decline in April "was mainly driven by the webcast." *Id.* at 9.

The Defendant attacks Dr. Becker for not presenting evidence regarding market efficiency. These attacks are without merit. Citing to the *Stein* concurrence, the Defendant appears to suggest that the government is required to prove that Signalife stock traded in an efficient market in the absence of presenting testimony from each individual investor. The concurrence in *Stein*, however, imposed no such requirement, nor did the majority opinion so much as mention market efficiency, nor is that Dr. Becker's opinion.

### B. Dr. Becker's analysis excludes unrelated market events and trends as potential intervening events causing the decline in Signalife's stock price.

In addition to her event study, Dr. Becker also conducted independent regression analyses that exclude other events, including the financial crisis of 2008 and short-selling, as having had a negative impact of Signalife stock during the relevant period. Not only does Dr. Becker's analysis show that certain price fluctuations in Signalife stock were attributable to the Defendant's conduct, she also found that declines in Signalife stock during the relevant period were not attributable to these unrelated events. Expert testimony on the impact of the Defendant's fraud on Signalife share value and the effect (or lack thereof) of intervening events, taken with investor testimony on the importance of sales and the subject press releases, clearly establishes investor reliance on the Defendant's misstatements. Dr. Becker's expert report that Signalife's stock price moved in

6

response to certain company-specific events (while excluding others) is precisely the type of "circumstantial evidence" contemplated by the Eleventh Circuit.

Nor do any of the defense experts undermine Dr. Becker's findings. Defense Expert James Christian assumes that all naked short selling is indicative of manipulative trading activity. D.E. 532 at 4. Yet this assumption is untrue, because, as Dr. Becker indicated in her report, not all short selling activity is manipulative. D.E. 533-10 at 13 & n.20. Further, Dr. Becker did not find any evidence that short selling, to include naked short selling, led to the decline in Signalife's stock price during the relevant period. *Id.* at 12, 15. Further, the Defendant's analysis of short selling has multiple flaws. Whereas Dr. Becker reviewed multiple factors in analyzing the effect of short selling on the price of Signalife stock, *see* D.E. 533-11 at 4, defense expert Dr. Robert Shapiro conducted a single regression analysis based on percentage changes in Signalife's Fails-to-Deliver ("FTDs").[3] Dr. Shapiro's measure of FTDS would be the same if Signalife experienced a fluctuation from 1 to 2 FTDs or a fluctuation of 1 million to 2 million FTDs. *Id.* at 4.

    C.    *The August 15, 2008 Disclosure: 10-Q*

The 10-Q released on August 15, 2008 stated that Signalife "ha[d] not recognized any revenues to date" from the purchase orders announced in the press releases, and that, for the purchase orders announced in the September 25, 2007 press release, the products "were returned by the lessee on the basis that too much time had passed." D.E. 533-9 at 22. The Defendant disputes that the fall in value of Signalife shares on August 15, 2008 can be attributed to this news because the 10-Q also reported quarterly losses and negative shareholders equity. *Id.* at 7. To the extent a decrease in the value of Signalife stock was attributable to these events, they were

---

[3] In a regular short sale, the short seller has three days to locate and deliver shares to the buyer. In a "naked" short sale, the shares are never delivered. Thus, the number of "fails to deliver" can provide a measure of naked short selling volume. D.E. 533-10 at 15 n.27.

7

reasonably foreseeable to the Defendant. *See Stein*, 846 F.3d at 1156 (instructing the court to "take into account intervening accounts contributing to the loss" and determining whether "those events also were reasonably foreseeable to the defendant").

As Signalife securities counsel John Woodbury and investor Bryan Harris testified at trial, the press releases in September and October 2007 announcing millions of dollars in sales signaled to investors that Signalife was transitioning from an early stage development company to a company posed to earn revenues. *See* Trial Tr. II (D.E. 240) at 97; Trial Tr. V (D.E. 243) at 8. In reality, Signalife did not have significant sales, and the press releases concealed the company's lack of revenues. Signalife's sales (or lack thereof) are inextricably woven with Signalife's financial health. As Dr. Becker explained in her rebuttal report, "without revenues, companies cannot generate earnings, as earnings equals revenues minus costs." D.E. 533-11 at 3.

The press releases gave investors an inaccurate portrait of Signalife's prospects, and any losses they incurred as the true state of Signalife's financial wellbeing came to light were reasonably foreseeable to the Defendant. *See United States v. Stedman*, 69 F.3d 737, 741 (5th Cir. 1995) ("[The defendants] exposed the bank to the possibility of loss for the entire loan amount when they chose to impede regulators from considering information that could have led them to intercede to protect the bank."); *cf. United States v. Morris*, 80 F.3d 1151, 1174 (7th Cir. 1996) ("Even if intervening forces ultimately contributed to [the bank's] demise, the thing actually taken from defrauded investors was still the face amount of the [bonds], and that amount is thus directly charged to defendants under [the Guidelines].").

### D. *The April 14, 2008 Disclosure: The Investor Call*

The Defendant also contests the government's characterization of the investor call of April 14, 2008 as a corrective disclosure, noting that this call did not arise at trial or at the first sentencing. Of course, as the Defendant is well aware, the government need not prove either loss

8

or a corrective disclosure at trial. Further, while the August 15, 2008 10-Q contained some of the first explicit news regarding problems with the purchase orders, the investor call of April 14, 2008 was a red flag alerting investors to potential issues.

The Defendant is correct that the investor call did not mention the purchase orders or press releases, but the absence of this information is exactly why this call was so troubling to investors. Prior to the investor call, Signalife released two press releases on April 7, 2008 and April 11, 2008. D.E. 533-7. In both press releases, the Company announced the April 14 call, stating, "Now that Signalife has closed filing the company's form 10-KSB and the Company is manufacturing and shipping product, I am pleased to provide direction on new contracts, pending orders and production," and "the Company's immediate, positive financial prospects." *Id.* As the Defendant acknowledges, Signalife stock spiked 30% on the day of the second press release, likely because of "investor speculation about the webcast."[4] D.E. 532 at 8. Information regarding purchase orders, production, and financial prospects was vital to investors because it greatly impacted the value of their investments. Yet despite press releases announcing that investors would receive these details, Dr. Harmison did not offer any specific news on these topics.

Nor is the government's inclusion of purchases of Signalife stock following the April 14, 2008 investor call inconsistent with its theory of loss. Due to the Defendant's own efforts to hide the truth from investors, the truth leaked out gradually over time. *See United States v. Hatfield*, 2014 WL 7271616, at *8 (E.D.N.Y. Dec. 18, 2014). In any event, investor loss limited to the

---

[4] In his Memorandum, the Defendant notes that the price of Signalife stock "rose less than thirty cents" on the date of the second press release. D.E. 532 at 5. Signalife was a penny stock that rarely traded over two dollars after January 2007 onwards. For a stock such as Signalife, otherwise "small" fluctuations in value were significant in that they nevertheless represented substantial percentages of the stock's overall value.

inflationary value of the stock between September 25, 2007 (the date of the second press release) and April 14, 2008 is at least $450,000. This figure, which excludes losses from purchases after the investor call, independently supports a Guidelines sentence of 204 months. Similarly, the government's recommended investor loss figure of $2,027,890 for the period between September 20, 2007 (the date of the second press release) and August 15, 2008 (10-Q) excludes loss from any purchases following dissemination of the 10-Q.

**II.    Loss to Signalife and the Defendant's gain each independently support the government's recommended sentence.**

Despite the millions of dollars in loss suffered by both investors and Signalife, the Defendant claims that the loss caused by his scheme is "at or close to zero." D.E. 532 at 24. And because the Court can determine loss, the Defendant argues, it cannot look to the Defendant's gain of over $5 million in this case. The Defendant is wrong on both counts. For one, the Defendant has never offered any legitimate criticism of the substantial hardship endured by Signalife, which independently supports a loss figure of $6.7 million. Further, this Court may look to the Defendant's gain as an alternative measure of loss given the complex factual and legal issues in this matter, and the loss to investors was substantial.

   *A. The loss to Signalife was substantial.*

The Defendant has not tried to explain or account for the substantial loss incurred by Signalife based on the Defendant's outright theft from the Company. Ample evidence from trial and the first sentencing hearing showed that the Defendant stole millions from Signalife. This loss includes proceeds from Signalife shares that the Defendant funneled through purportedly "blind" trusts, Trial Tr. IV (D.E. 242) at 46-57, and proceeds received from coconspirators and others. The Defendant had Ajay Anand, through an entity known as the Silve Group, enter a sham consulting agreement with Signalife so that Anand could "take care of him." *Id.* at 189. Despite

only ever selling one Signalife product, Anand received approximately one million shares of Signalife through the sham consulting agreement facilitated by the Defendant. *Id.* at 189. At the Defendant's direction, Anand remitted nearly $500,000 of these proceeds to the Defendant. *Id.* at 189-90. Similarly, under the Defendant's direction, Carter entered a fake consulting agreement with Signalife to "perform work" related to Signalife's heart monitor products — work Carter admitted he was unqualified to perform. Despite never doing this work, Carter received substantial funds from Signalife and, like Anand, remitted the majority of those funds to the Defendant. Trial Tr. VI (D.E. 244) at 63-64, 70-73, 84-85. Evidence of Signalife's loss is also supported by testimony from Jamie Yafa regarding shares he received from the Defendant, Trial Tr. VII (D.E. 245) at 155-69, and a thorough tracing analysis performed by Postal Inspector George Clark, Trial Tr. VIII (D.E. 248) at 19-24. Despite the Defendant's continued insistence that he did not cause shareholder loss, he has yet to raise any legitimate question regarding the quality of the evidence supporting his outright theft of funds from Signalife. This substantial loss, standing alone, is at least $6.7 million and independently supports a sentence of 204 months.

The Defendant seems to wrongly suggest in his Memorandum that the Scheduling Order jointly proposed by the government and the Defendant (D.E. 523), and which governed expert disclosures in this case, somehow also required the government to disclose any and all loss calculations regardless of whether they were supported by expert opinion. D.E. 533 at 10. The Defendant's suggestion is ridiculous and belied by the plain language of the Scheduling Order. Indeed, the Scheduling Order explicitly contemplates that each party will file a response to the other's sentencing memorandum, thus providing each party the opportunity to respond to and rebut the other's arguments. Moreover, the government has, at the Defendant's request, provided additional non-expert disclosures, including loss estimates not required under the Scheduling

Order. Thus the Defendant's argument that it is "not fair" for the government to disclose its non-expert loss calculations in its Sentencing Memorandum (but still more than six weeks before the sentencing) makes no sense.

> **B.    The Court should find the Defendant's gain of over $5 million is an alternative measure of harm under the Guidelines.**

The government asks that, regardless of the Court's finding as to loss, it find in the alternative that the Defendant's gain independently supports a sentence of 204 months. There is no question that there was some loss to investors; the only question is how much. Looking to gain is particularly apt here because the Defendant's gain corresponds to Signalife's loss. As noted in *Section B*, *infra*, these funds include proceeds the Defendant received from his coconspirators due to the fake consulting agreements and proceeds the Defendant funneled through his blind trusts.

Where "there is a loss but it reasonably cannot be determined" the Court may look to the defendant's gain "as an alternative measure of loss." U.S.S.G. § 2B1.1. As the Eleventh Circuit acknowledged, "fraudulent schemes come in many forms and, thus, courts 'must consider the nature of the scheme in determining what method is to be used to calculate the harm caused or intended.'" *United States v. Munoz*, 430 F.3d 1357 (11th Cir. 2005) (quoting *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996)). The loss here — a question now involving testimony from factual witnesses and multiple experts (including four experts from the Defendant alone) — presents exactly the type of situation where gain may provide a useful alternative to loss. *See United States v. Yeager*, 331 F.3d 1216, 1225 (11th Cir. 2003) (affirming use of gain "based upon conflicting and confusing accounts at trial by experts"). The very nature of the Defendant's scheme, whereby he pumped false information into the market and used every means available to conceal that fraud, renders the loss amount all the more difficult to determine. Yet the Defendant's efforts to conceal his fraudulent scheme from investors should not prevent the Court from using

his gain as an alternative measure of loss. *See United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) (affirming use of gain where the loss "cannot be determined with certainty, and it would be even more anomalous to give the defendant a sentencing break when there is no interruption by some outside force but instead the very nature of the scheme precludes a certain determination of loss"). Indeed, as the Eleventh Circuit acknowledged, obtaining testimony from all investor victims is challenging, if not impossible, in securities fraud cases. *Stein*, 846 F.3d at 1153. This case is no exception, as more than a decade has passed since the 2007 press releases issued and much of the relevant conduct took place. Given these logistical difficulties, gain can provide a proxy for loss. *United States v. Zafar*, 291 F. App'x 425, 429 (2d Cir. 2008) (gain appropriate where testifying victim "injuries failed accurately to reflect the true loss caused by defendant").

The Defendant contends that, should this Court look to gain, it must look to the Defendant's "net profits" based on the depreciation of the value of Signalife shares during the fraud. As this Court explained at the first sentencing hearing, "[a] fraudulent scheme produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and places them under the control of perpetrators." Sentencing Tr. II (D.E. 429) at 36-38 (quoting *United States v. Allen*, 76 F.3d 1348, 1361 (5th Cir. 1996)). Further, this argument does not account for the direct cash that the Defendant received through Signalife.

### III. 204 months falls below the applicable sentencing range.

In his memorandum, the Defendant asked this Court to apply the 2014 Sentencing Guidelines. Section 1B1.11 of the Guidelines directs courts to use the Guidelines "in effect on the date that the defendant is sentenced," whereas 18 U.S.C. § 3742(g)(1) provides that courts should apply Guidelines "in effect on the date of the previous sentencing." These provisions are in direct conflict. The government has conducted further research since submitting its Sentencing Memorandum and believes that the Defendant is correct that the 2014 Guidelines apply here. *See*

13

*United States v. Borden*, 421 F.3d 1202, 1207 (11th Cir. 2005); *see United States v. Walker*, 818 F.3d 416, 424 (8th Cir. 2016). While the Defendant's loss of $8.7 million correlates to a total offense level of 41 and range of 324 to 405 months under the 2016 Guidelines, the 2014 Guidelines call for a total offense level of 45 and a corresponding range of life, as set forth in the table below:

| **Application of the 2014 United States Sentencing Guidelines** | | | | | |
|---|---|---|---|---|---|
| | **Investor Loss** | **Loss to Signalife** | **Gain** | **Total Loss** | **MRM** |
| Loss | $2,027,890 | $6,745,479 | $5,378,581 | $8,773,369 | $24,974,476[5] |
| Base Offense Level | 7 | 7 | 7 | 7 | 7 |
| Loss Enhancements | +16 | +18 | +18 | +20 | +22 |
| Enhancement for 250+ Victims (§ 2B1.1(b)(2)(C)) | +6 | -- | -- | +6 | +6 |
| Abuse of a Position of Trust (§ 3B1.3) | +2 | +2 | +2 | +2 | +2 |
| Role as an Organizer or Leader (§ 3B1.1) | +4 | +4 | +4 | +4 | +4 |
| Solvency of Public Company (§ 2B1.1(b)(16)(B)) | +4 | +4 | +4 | +4 | +4 |
| Sophisticated Means (§ 2B1.1(b)(10)(C)) | +2 | +2 | +2 | +2 | +2 |
| Obstruction (§ 3C1.1) | +2 | +2 | +2 | +2 | +2 |
| Cap under (§ 2B1.1(b)(16)(C))[6] | -2 | 0 | 0 | -2 | -2 |
| **Total Offense level** | **41** | **39** | **39** | **45** | **47** |
| **Guidelines Range** | **324 to 405** | **262 to 327** | **262 to 327** | **Life** | **Life** |

## CONCLUSION

The Defendant's expansive criminal conduct decimated a company and robbed investors. The Court's original sentence of 204 months was based not only on loss but "all of the other

---

[5] Table 5 of the government's Sentencing Memorandum (D.E. 533 at 22) inadvertently provided one of higher the MRM loss figures from the first sentencing, rather than the more conservative figure provided in the latest Sentencing Memorandum, *id.* at 19.

[6] Under the 2014 Guidelines, § 2B1.1(b)(16)(C) provides that "[t]he cumulative adjustments from application of both subsections (b)(2) and (b)(16)(B) shall not exceed 8 levels."

14

involvements that this defendant had with the offense and causing the harm to the entity itself, to the victims, to the obstruction, all of those things." Sentencing Tr. (D.E. 429) at 71-72. Since that time, the Defendant has shown no remorse and, to the contrary, has offered this Court lies and excuses in an effort to muddy the record and reduce his sentence. The government's loss figure of $8.7 million leads to a Guidelines range well above a sentence of 204 months, and the nature and circumstances of the Defendant's offense supporting this sentence in 2014 support that same sentence today. For the reasons stated herein, the government asks that the Court impose a term of imprisonment of 204 months and a term of supervised release of two years, and order restitution in the amount of $8,773,369.

        Respectfully submitted,

        SANDRA L. MOSER
        Acting Chief, Fraud Section

BY:       _____/s/_____
        MICHELLE PASCUCCI

        Henry Van Dyck
        Assistant Chief

        Caitlin Cottingham
        Michelle Pascucci
        Trial Attorneys
        Criminal Division, Fraud Section
        United States Department of Justice
        1400 New York Avenue, Northwest
        Washington, DC 20005
        Tel: (202) 307-2208 (Pascucci)
        Fax: (202) 514-0152
        Michelle.Pascucci@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification to counsel of record.

                                        Respectfully submitted,

                                        SANDRA L. MOSER
                                        Acting Chief, Fraud Section

BY:         _____/s/_____
                                        MICHELLE PASCUCCI
                                        Trial Attorney
                                        Criminal Division, Fraud Section
                                        United States Department of Justice