1        UNITED STATES DISTRICT COURT
         SOUTHERN DISTRICT OF FLORIDA
2
              Case No. 11-80205-CR-KAM
3
UNITED STATES OF AMERICA,      )
4                              )
     GOVERNMENT,               )
5                              )
     -v-                       )
6                              )
MITCHELL J. STEIN,             )
7                              )
     DEFENDANT.                )   West Palm Beach, Florida
8                              )   July 19, 2018
_____)
9

10            VOLUME 1 - PAGES 1 - 287

11      TRANSCRIPT OF RESENTENCING PROCEEDINGS

12    BEFORE THE HONORABLE KENNETH A. MARRA

13         UNITED STATES DISTRICT JUDGE

14

15  Appearances:

16  (On Page 2.)

17

18  Reporter              Stephen W. Franklin, RMR, CRR, CPE
    (561)514-3768         Official Court Reporter
19                        701 Clematis Street
                          West Palm Beach, Florida  33401
20                        E-mail:  SFranklinUSDC@aol.com

21

22

23

24

25

```
 1   Appearances:

 2   FOR THE GOVERNMENT            Michelle Pascucci, ESQ.
                                   Securities and Financial Fraud
 3                                 Unit, Fraud Section
                                   Criminal Division
 4                                 U.S. Department of Justice
                                   1400 New York Avenue, Northwest
 5                                 Washington, DC 20530
     -and-
 6                                 Caitlin R. Cottingham, ESQ.
                                   Securities and Financial Fraud
 7                                 Unit, Fraud Section
                                   Criminal Division
 8                                 U.S. Department of Justice
                                   1400 New York Avenue, Northwest
 9                                 Washington, DC 20530

10   FOR THE DEFENDANT             Benjamin Gruenstein, ESQ.
                                   Cravath, Swaine & Moore, LLP
11                                 Worldwide Plaza
                                   825 Eighth Avenue
12                                 New York, NY 10019
     -and-
13                                 Alex Delnido, ESQ.
                                   Cravath, Swaine & Moore, LLP
14                                 Worldwide Plaza
                                   825 Eighth Avenue
15                                 New York, NY 10019
     -and-
16                                 Richard C. Klugh, Jr., ESQ.
                                   25 Southeast 2nd Avenue
17                                 Suite 1100
                                   Miami, FL 33131
18   -and-
                                   David S. Harris, ESQ.
19                                 6431 Southwest 39th Street
                                   Miami, FL 33155
20
                                   *  *  *  *  *
21

22

23

24

25
```

```
 1          (Call to the order of the Court.)

 2          THE COURT:  Good morning, everyone.  Please be

 3   seated.

 4          All right.  We are back here in the case of the

 5   United States of America versus Mitchell Stein, case

 6   number 11-80205-CR-MARRA.

 7          May I have counsel state their appearances, please.

 8          MS. PASCUCCI:  Michelle Pascucci and Caitlyn

 9   Cottingham for the United States of America.  Good morning,

10   Your Honor.

11          THE COURT:  Good morning.

12          MR. GRUENSTEIN:  Good morning, Your Honor.  Benjamin

13   Gruenstein of Cravath, Swaine & Moore for the defendant.  With

14   me is my colleague, Alex Delnido.

15          THE COURT:  Good morning.

16          MR. KLUGH:  Richard Klugh also for Mr. Stein.

17          THE COURT:  Good morning.

18          MR. HARRIS:  Good morning, Your Honor.  David Harris

19   for Mr. Stein.

20          MR. KLUGH:  Also with us is Rasica Reichardt, the

21   paralegal.

22          THE COURT:  Good morning.

23          MR. KLUGH:  Thank you.

24          THE COURT:  We are here upon the remand from the

25   Eleventh Circuit for me to resentence Mr. Stein based upon a
```

1   recalculation of his Sentencing Guidelines for loss amount and

2   the restitution.  So we ready to proceed?

3              MS. PASCUCCI:  Yes, Your Honor.  Thank you.

4              THE COURT:  Defense ready?

5              MR. GRUENSTEIN:  Yes, Your Honor.  Thank you.

6              THE COURT:  Okay.  All right.  I presume the

7   Government has some witnesses that they want -- or at least a

8   witness?

9              MS. COTTINGHAM:  We do, Your Honor.

10             I wanted to just briefly address two housekeeping

11  matters.

12             In the papers Your Honor may have seen, there's a

13  debate about whether the 2014 versus the 2016 Sentencing

14  Guidelines apply.  We think by statute the 2014 guidelines

15  apply, but given that the 2016 guidelines would give the

16  defendant potentially some benefit, we think that's

17  appropriate here.  I've conferred with defense counsel about

18  that, and he agrees with that.

19             THE COURT:  All right.

20             MS. COTTINGHAM:  And the second point, Your Honor,

21  was just with respect to the Government's exhibits -- and I'll

22  apologize for the records in advance -- we have numbered these

23  for the sentencing proceeding and will proceed that way.  A

24  number of them are trial exhibits.  So just so the record is

25  clear, we will be also saying they were -- that were admitted

```
 1    at trial and given that number.  So apologies for any

 2    confusion that may have caused.

 3              THE COURT:  All right.  Thank you.

 4              We ready?  I don't know if you want to make opening

 5    statements or you just wanted to go into the testimony.  I

 6    read the papers.  I think I understand all the issues, and I'm

 7    not sure I need opening statements, but if you want to make

 8    one, I'm not going to prevent you from making one.

 9              MS. PASCUCCI:  Thank you, Your Honor.

10              The Government is ready to call the first witness

11    without opening statements.

12              THE COURT:  All right.  How about the defense?

13              MR. GRUENSTEIN:  That's fine, Your Honor.

14              THE COURT:  Okay.  Let's do it, then.

15              MS. PASCUCCI:  The United States calls Mark Taylor.

16              THE COURTROOM DEPUTY:  Please raise your right hand.

17               Mark Taylor, Government's witness, sworn.

18              THE COURTROOM DEPUTY:  Please take a seat.

19              State your full name and spell your name.

20              THE WITNESS:  Mark W. Taylor.

21              THE COURT:  You may proceed.

22              MS. PASCUCCI:  Your Honor, could we have the screens

23    put on for presentation of exhibits.

24                          Direct Examination

25    BY MS. PASCUCCI:
```

```
 1    Q     Good morning good morning, Mr. Taylor.

 2    A     Good morning.

 3    Q     Where are you from?

 4    A     Spokane, Washington.

 5    Q     What is your educational background?

 6    A     I have a bachelor's degree in economics and accounting

 7    from Washington State University.

 8              THE COURT:  Mr. Taylor, can you pull that microphone

 9    just a little closer to you, please.  The whole thing moves.

10    There you go.

11              THE WITNESS:  Okay.

12              THE COURT:  Thank you, sir.

13    BY MS. PASCUCCI:

14    Q     What is your current employment position?

15    A     I work as an investment advisor with a firm by the name

16    of Ten Capital in Spokane.

17    Q     How long have you been so employed?

18    A     Since about 2013.

19    Q     And how were you employed in 2007 and 2008?

20    A     I was a registered representative with an investment firm

21    by the name of Partners Investment Group, out of Spokane.

22    Q     And in that role, did you advise others how to invest?

23    A     I do.

24    Q     And before you make these advisement decisions, do you

25    perform diligence on companies to invest in?
```

1    A    I do.

2    Q    And what is your pattern and practice when making an

3    investment decision?  What are the first steps you take?

4    A    I would ordinarily go to financial statements filed with

5    the SEC, look for analyst comments, background that way.  In

6    lieu of no analyst following it, I would rely exclusively on

7    the SEC filings that I would find.

8    Q    And would you also look at company press releases?

9    A    Yes.

10           THE COURT:  Ms. Pascucci, can you move the

11   microphone closer to you, please.

12           MS. PASCUCCI:  Sure.

13           THE COURT:  Thank you.

14   BY MS. PASCUCCI:

15   Q    When did you learn about SignaLife?

16   A    It was probably December -- November-December of '07.

17   Very late in '07.

18   Q    And how did you learn about SignaLife?

19   A    I was contacted by a individual who was an analyst, an

20   independent analyst I guess how you would phrase him, who it

21   turned out was working for SignaLife as a investment

22   representative, let's say, or a representative to the

23   investment community.

24   Q    Who was that individual?

25   A    Fella's name was Ryan Rauch.

```
1    Q     And did you eventually invest in SignaLife?

2    A     I did.

3    Q     When did you first invest in SignaLife stock?

4    A     I made a small investment in my own name only, I think it

5    was probably December of '07, and I wasn't necessarily

6    convinced of -- I didn't have -- hadn't done an awful lot of

7    background at that point, and I sold the stock at a small

8    profit probably in January of '08.

9          About that time, Ryan Rauch contacted me again and

10   started to give me more information and expressed an

11   enthusiasm for the company.  And so I got deeper into the

12   filings, my own personal research, due diligence on the

13   company.

14   Q     What types of materials were available to investors to

15   learn about SignaLife?

16   A     From my standpoint, it was exclusively the SEC filings

17   that the company would make.

18   Q     Was there any analyst coverage?

19   A     No.

20   Q     And would you have reviewed any SignaLife press releases?

21   A     Oh, yeah, yeah.  And those -- if I understand it

22   correctly, those press releases are filed with the SEC also

23   for -- for a -- as I say, a filing, yeah.

24   Q     And, Mr. Taylor, how much did you invest in SignaLife in

25   total?
```

```
1   A    Personally in my own individual name, I think probably in

2   the range of 135, $150,000.  But I had some peripheral

3   accounts, let's say, children's accounts, accounts that were

4   in my children's name, and there was a business account that

5   my two brothers and I had together.  So those three

6   probably -- those three sources probably totaled about

7   $200,000.

8        I know the one brother individually probably had 40

9   to $50,000 in it.

10  Q    Did you advise any of your clients to invest in

11  SignaLife?

12  A    Yeah, we did then.  As I got deeper into the filings and

13  the information that was coming to me from Rauch, probably

14  ended up with a total of a million dollars invested in the

15  company.

16  Q    And, Mr. Taylor, you'll notice a binder in front of you

17  that has some of the Government's exhibits in there.  I'd like

18  you to review what's been marked as sentencing exhibits 1, 2

19  and 3.

20        MS. PASCUCCI:  And, Your Honor, these came in at

21  trial at trial exhibits 69, 72 and 76.

22        THE WITNESS:  Okay.  Where it says down here in the

23  bottom Government exhibit number 1 is what you're referring

24  to?

25  BY MS. PASCUCCI:
```

```
 1   Q    Yes.  So if you could review the first three exhibits

 2   there.

 3   A    Okay.

 4        THE COURT:  Before you -- I assume there is no

 5   objection to these exhibits because they were trial exhibits,

 6   I assume?

 7        MR. GRUENSTEIN:  That's correct, Your Honor.

 8        THE COURT:  So they're admitted for this hearing

 9   without objection, 1, 2 and 3.

10        (Government's Exhibit Nos. 1-3 entered into evidence.)

11   BY MS. PASCUCCI:

12   Q    Have you reviewed these documents in preparation for your

13   testimony here today?

14   A    I have.

15   Q    And what did these announce?

16   A    They announced sales orders.  So this was -- this was

17   evidence to me that there was actual operations going and

18   tangible product that was being bought by or ordered by

19   hospitals, medical equipment companies, and it was the -- I

20   don't know if I'd say the beginning, but it was tangible

21   evidence that there was real revenue to be recognized, and the

22   company was going forth with a business plan.

23   Q    And to clarify, these are the press releases issued on

24   September 20th, September 25th and October 10th of '07,

25   announcing new sales orders?
```

1    A    Correct.  And, you know, I just wanted to emphasize that

2    these press releases were available as filings with the

3    Securities and Exchange Commission.

4    Q    Is this the type of info you would have reviewed when

5    deciding whether to invest?

6    A    Exactly the type of evidence.

7    Q    And do you recall reviewing these three press releases

8    from over a decade ago at the time of your investment?

9    A    You know, ten years ago, to be specific on this, I'm

10   certain that I did, but ten years ago is a long time to

11   recall, you know, exactly what you did.

12   Q    But this is the type of information that you would have

13   reviewed?

14   A    Exactly, yeah, yeah.  I'm sure I saw these and reviewed

15   them at the time.

16   Q    And you mentioned this a little bit.  Why would these

17   announcements have been important to your decision to invest?

18   A    Well, without announcements like this, I would have -- I

19   can't imagine that I would have been investing in a company

20   that was with no viable, you know, tangible activity, you

21   know, to produce economic results.

22   Q    If you had known that the information in these press

23   releases was completely made up, would you have decided to

24   invest in SignaLife?

25   A    Of course not, no.

1    Q    And why is that?

2    A    Well, it would have been a -- it would have been a fraud.

3    I mean, I wouldn't have been involved with it, you know.  I

4    have always had a reputable business practice, probably 25 to

5    30 years in the business.  It just would have been totally

6    inconsistent with anything I would have done before.

7    Q    Are you familiar with an investor call in April of 2008?

8    A    Very familiar with it.

9    Q    How did you learn about this call?

10   A    The call was announced I believe on the Friday before

11   with a press release.  But as I recall in the immediate days

12   before that, perhaps two days before that, would have been

13   told by Ryan Rauch that a press conference detailing, you

14   know, the next stage of the company was in the planning stage

15   and would be occurring shortly.

16   Q    Did you listen to the investor call?

17   A    I did.

18   Q    How it you listen to it?

19   A    That morning before it started, I went to the office and

20   I logged into whatever the procedures would have been to hear

21   it over the telephone and listened to it, put it on a speaker

22   phone and listened to it right then.

23   Q    What were you expecting to hear during this call?

24   A    I was expecting to hear a call, the way it was titled,

25   detailing, you know, future orders, the immediate plans of the

 1   company for both orders being procured and a business plan or

 2   a timetable of deliveries and revenue recognition.

 3   Q    And why were you expecting to hear this information?

 4   A    Well, I believe that's -- was the general title of the

 5   press release on Friday, but specifically, as I say, the

 6   investor contact, Ryan Rauch, would have laid out that that's

 7   what the purpose of the call was.

 8   Q    And I want to show you what's been marked as exhibit 4 in

 9   your binder.

10   A    Okay.

11   Q    Is this a transcript of the investor call from April 14th

12   of 2008?

13   A    Yes, it is.

14           MS. PASCUCCI:  Your Honor, the Government moves to

15   admit exhibit 4.

16           THE COURT:  Any objection?

17           MR. GRUENSTEIN:  No objection, Your Honor.

18           THE COURT:  Admitted without objection.

19       (Government's Exhibit No. 4 entered into evidence.)

20   BY MS. PASCUCCI:

21   Q    What happened during this investor call?  What was

22   announced?

23   A    From a standpoint of what I was looking for, virtually

24   nothing.

25           The call lasted somewhere in the range of 30

```
 1   minutes, and it was just a generalized conversation one-sided
 2   from Dr. Harmison about the heart and how it functions.  There
 3   was virtually no reference to the company and the business
 4   plan at all.  There was one comment in the call probably
 5   two-thirds of the way in it -- I'm just, you know, recalling
 6   -- where Dr. Harmison referenced $40 million in future orders
 7   was their plan, I guess, you know, but nothing specific,
 8   nowhere -- nothing on the base of what I was looking for and
 9   what I had been led to believe.
10           Anyway, the stock just cratered in the first few
11   minutes of that call.
12   Q    What was your reaction to this investor call?
13   A    Probably can't quite say it here in court, but it was,
14   you know, what the hell is going on.
15   Q    Did you have any questions regarding the status of orders
16   after this webcast?
17   A    Oh, absolutely, absolutely.
18   Q    And I want to show you what is marked in your binder as
19   sentencing exhibit 10.
20   A    Okay.  I got it.
21   Q    And do you recognize this document?
22   A    It's an e-mail that I sent to Mitch Stein.
23           MS. PASCUCCI:  Your Honor, the Government moves to
24   admit sentencing exhibit 10.
25           MR. GRUENSTEIN:  No objection.
```

```
 1              THE COURT:  Any objection?

 2              MR. GRUENSTEIN:  No objection.

 3              THE COURT:  Admitted without objection.

 4         (Government's Exhibit No. 10 entered into evidence.)

 5              MS. PASCUCCI:  Thank you, Your Honor.

 6   BY MS. PASCUCCI:

 7   Q    When did you send this e-mail to Mr. Stein?

 8   A    The same afternoon of the call.  It says here on the

 9   e-mail that it's 3:44 p.m. on April 14th, which is the Monday

10   of the call.

11   Q    And what were you asking him, or what were you saying to

12   him in this e-mail?

13   A    Well, I told him that I had been -- I'll just summarize

14   the e-mail here.  I have been accumulating --

15              THE COURT REPORTER:  I'm sorry.  Start over, please.

16              THE WITNESS:  Oh, I'm sorry.

17              THE COURT REPORTER:  Slow down, please.

18              THE WITNESS:  Okay.

19              THE COURT REPORTER:  "I have been accumulating."

20              THE WITNESS:  I have been, I have been accumulating

21   SignaLife stock for approximately two months.

22   BY MS. PASCUCCI:

23   Q    And, Mr. Taylor, I'll just stop you there.

24   A    Okay.

25   Q    Rather than reading the e-mail, can you offer a general
```

```
 1   summary of what you were asking in that e-mail?
 2   A    Yeah, I said -- one line here, I was disappointed in the
 3   presentation during today's webcast, and I said that I wanted
 4   to hear the specifics of this assumed -- you know, their
 5   business -- I wanted to hear specifics of the business plan
 6   and the execution of it, and that's what I had been led to
 7   being that would be presented in the call.
 8   Q    And specifically were you requesting more information
 9   regarding orders and sales?
10   A    Absolutely, yes.  That's what I was looking for is a
11   business plan.
12   Q    Why did you send this e-mail?
13   A    Because what had been presented in that call covered none
14   of these things.
15   Q    Had you ever sent an e-mail like this to a company you
16   had invested in before?
17   A    No, no.
18   Q    And had you ever contacted Mr. Stein previously?
19   A    No.
20   Q    So what motivated you to do this for essentially the
21   first time ever?
22   A    Well, the -- I had never had an occasion where what was
23   told to me or what was announced in a press release by a
24   company was so -- and then the subsequent presentation was so
25   unconnected to what they had said they intended to present to
```

1    us.

2    Q    Mr. Taylor, when did you begin to suspect fraud at

3    SignaLife?

4    A    At this -- at the time this call occurred.

5    Q    And what was it about this call that made you suspect

6    fraud?

7    A    As I've been saying, that there were none of the

8    follow-up, the specifics that had been relayed that -- to me

9    that this call would be covering.

10   Q    Did you ever sell your holdings in SignaLife?

11   A    Eventually.  But when I sold them, it was -- there was no

12   market for the stock.  I think I sold it at maybe a nickel a

13   share with a cost basis of close to a dollar.

14   Q    And when did you try to sell your investments in

15   SignaLife?

16   A    Well, personally I never sold them until all of my

17   clients had been liquidated.  That just wouldn't be --

18   wouldn't be allowed.  I had some clients that just said, well,

19   let's get out of this thing, salvage what we can, and they

20   probably got somewhere in the 30-cent range.

21          A couple of clients had positions -- well, one

22   client, one client had a position much larger than my -- my

23   own, and he was tied up in the thing, and, you know, there's

24   just that hope that there's been a misunderstanding or some --

25   that the thing can be resurrected, that there actually is a

```
 1   viable product here that's not a total fraud.
 2           And so we held on~-- he held onto his position, and
 3   I wouldn't have disagreed with him, 'til probably the July
 4   period, July-August.  And when he decided to liquidate, and
 5   others liquidated -- in fact, actually when I recall it now, I
 6   think an awful lot of clients simply signed what's called a
 7   worthless securities letter.  There was no market for the
 8   stock.  And I can't recall specifically if I sold it and
 9   received any revenue in it.  If I did, it was pennies per
10   share.  Or in some cases I might have just signed a worthless
11   securities letter, too.  There was no market for the stock.
12   Q    And what you're describing when your clients were seeking
13   to liquidate, this was after the call occurred?
14   A    Yeah, yeah.
15   Q    Okay.  How much did you lose of your investment in
16   SignaLife stock?
17   A    I couldn't give you an exact figure, but like I say, I
18   probably had $200,000 invested, including the peripheral
19   accounts that I mentioned.  I would say I lost 198,000 of it,
20   if not the whole 200,000.
21   Q    How much did your clients lose?
22   A    Concurrent with the -- with my own loss, this is a
23   percentage.  You know, there were clients that had 5, 7,
24   $10,000 in there.  And while it was material to them, and it
25   caused quite a bit of consternation, it didn't destroy their
```

 1   portfolios in whole.  But the client that had the large

 2   position, his name was Bryan Harris, he lost -- I think he had

 3   investments outside of my own, I think he lost at least

 4   $600,000, which, you know, when you're in your fifties, it's

 5   quite a bit of your portfolio, your net worth.

 6   Q    How did this impact your business?

 7   A    Oh, it was -- it was quite devastating.  And then this

 8   immediately preceded the 2008-2009.  This was just kind of at

 9   the beginning of the -- you know, the stock market correction,

10   depression, if you will.  So it was quite a challenging time.

11          MS. PASCUCCI:  Your Honor, could I have a moment of

12   the Court's indulgence?

13          THE COURT:  Yes.

14          MS. PASCUCCI:  No further questions from the

15   Government, Your Honor.

16          THE COURT:  Thank you.

17          Cross-examination.

18                     Cross-Examination

19   BY MR. GRUENSTEIN:

20   Q    Good morning, Mr. Taylor.

21   A    Good morning.

22   Q    Would it be fair to say that you understood when you

23   first invested -- would it be fair to say when you first

24   invested in SignaLife that you recognized that it was a risky

25   stock?

```
 1  A     I would agree to that, yeah.

 2  Q     You only invested for clients who you believed were able

 3  to weather a loss?

 4  A     Correct.  There were no little old ladies and widows in

 5  this stock.

 6  Q     Okay.  These were for sophisticated investors and wealthy

 7  clients who could absorb the loss associated with a risky

 8  stock, correct?

 9  A     I would -- I think that's a good characterization.  As I

10  said, I had, you know, investors that had 5, 7, $10,000 in the

11  stock, and that wouldn't have been anything but a few

12  percentage points of their total portfolio.

13  Q     You said that when you make an investment decision,

14  you'll look at all SEC filings, is that correct, for that

15  stock?

16  A     In the case of a stock like this, where there was very

17  little, if any, other information, I would look at SEC filings

18  as the only credible source of information.  If I was

19  investing in an S&P 500 stock, I wouldn't feel the need to

20  rely on SEC filings, and there would be plenty of analyst

21  coverage and plenty of information out in the, you know, the

22  general universe that you could rely on.

23  Q     Right.

24        And you testified that among the materials you

25  looked at were the press releases that would have been filed
```

```
1    on a Form 8-K with the SEC, correct?

2    A    Correct.

3    Q    But also, you had access to the financial statements

4    associated with the company that were also filed, correct?

5    A    Those would be at the same location that I would go to,

6    sure.

7    Q    And would you give both of those things, the financial

8    statements and the press releases, equal weight?

9    A    Depends on the individual, on each situation.  I'll admit

10   that in a case like SignaLife, the financial statements, the

11   balance sheets, you know, weren't on par with Chase Bank, you

12   know, a AAA -- a blue chip stock.  So I would probably give

13   more weight to the announcements of orders which would lead to

14   a stronger balance sheet.

15   Q    But, still, among the universe of materials you would

16   rely on would be the financial statements of the company?

17   A    That's -- yeah.

18   Q    And other information in the SEC filings beyond simply

19   the press releases?

20   A    Maybe be more explicit what you're referring to there.

21   Q    Well, the SEC filings could be hundreds of pages long,

22   right, and includes more information than just press releases?

23   A    You're right.  So I would look at -- you know, going to

24   that point, let's say a 10-Q for the quarter, because at the

25   end of the 10-Q -- or I wouldn't necessarily say at the end of
```

1    the 10-Q, but a large part of the body of the 10-Q would be

2    forward-looking statements, expectations for the company, and

3    those are written by the company management.

4    Q    I want to talk to you a little bit about this April

5    webcast that you testified about.

6    A    Okay.

7    Q    Going into the webcast, you had testified that you had

8    certain expectations of what would come out on the webcast,

9    correct?

10   A    Correct.

11   Q    And you had expectations based on the press release that

12   the company put out a few days before, correct?

13   A    That's correct.

14   Q    And you also had expectations based on a conversation, or

15   conversations, that you had with Ryan Rauch, correct?

16   A    That's I would say correct.

17   Q    And Ryan Rauch was not publicly providing expectations to

18   the market; he was providing expectations to you, correct?

19   A    To myself and other, let's say, people of influence

20   within the investment community.

21   Q    Okay.  But you would agree that the market as a whole,

22   all investors would not have access to what Ryan Rauch was

23   necessarily telling you?

24   A    I think that's -- yeah, that's reasonable.  Ryan Rauch

25   wasn't going to call and explain the story to, you know, a

1   client of mine that had $10,000 invested in the stock.  I was

2   the conduit to --

3   Q    Right.  And he wouldn't reach out to the thousands of

4   investors who owned the stock?

5   A    No.

6   Q    And the morning of the webcast, actually before the

7   webcast started, isn't it true that you saw a nose dive in the

8   stock?

9   A    I don't know.  I saw a nose dive in the stock.  As to the

10  exact timing of it, whether it happened a moment before the

11  stock -- before Harmison started speaking, I couldn't say.

12  But certainly the nose dive occurred coinciding with the

13  beginning of the conference -- the conference call.

14  Q    Well, do you recall writing in your victim impact

15  questionnaire -- first of all, do you recall providing a

16  victim impact questionnaire to the Court?

17  A    Now that you bring it up, I do, yeah.

18  Q    And do you recall saying the following, quote, the

19  morning of the webcast, the stock was trading heavy volume,

20  and literally a moment before Harmison started speaking,

21  suddenly a huge block of stock hit the tape on the sell side,

22  dropping the stock from $1.40 to 85 cents to 90 cents before

23  recovering to over a dollar on much lighter volume at the

24  close?  Do you recall writing that?

25  A    That -- I do.

1  Q    And was that accurate when you wrote it?

2  A    It was.

3  Q    So the drop in the stock price on April 14th from $1.40

4  to 85 cents was before Dr. Harmison ever said anything,

5  correct?

6  A    Correct.

7        I will interject that it appeared to me to be a

8  coordinated sale associated with the call.

9  Q    What do you mean by a coordinated sale?

10  A    That someplace out there, there were large blocks of

11  stock that wanted to hit the tape at exactly the same time.

12  And I don't know if you have a time in tape, what we refer to

13  saying when the sale occurred or when the sale started.  But

14  as I say, maybe I wrote in there, and I'm sure that that's

15  accurate, that the drop occurred moments before Dr. Harmison

16  started speaking.

17        But I think of it as a coordinated sale, because I

18  think his conference call, I'm not sure the exact time, maybe

19  it was supposed to start at 11:00 o'clock Eastern, and by the

20  time he actually came on, maybe it was 11:03, 11:04, 11:05,

21  and the sales occurred, as I say, without a time in tape,

22  10:58, 10:59, maybe 11:01, but they certainly appeared to be

23  coordinated to me.

24  Q    And when you say coordinated, you're suggesting that some

25  person or group of people were looking to tank the stock?

```
1    A    I wouldn't put it that way.  I would say that those

2    people were looking to sell into the -- into the strongest bid

3    or market that they could find, which they, it seems, decided

4    that it was before Dr. Harmison started into information and

5    didn't -- and there was actually no revealing coordination of

6    how the business plan would -- would be executed.

7    Q    Okay.

8    A    So those sellers wanted out of there before it became

9    apparent that there wasn't -- that this was just BS.

10   Q    And, of course, this is all speculation on your part,

11   correct?

12   A    I -- yeah, yeah.  But it's just a intuitive, logical

13   conclusion, having seen 25, 30 years of financial markets

14   operating.

15   Q    Okay.  But the fact that you know to be true is that this

16   coordinated sale happened before the Harmison webcast,

17   correct?

18   A    By a moment or two.

19   Q    Yeah.  And you were disappointed by the information on

20   the webcast, because it did not include things like the

21   business plan, correct?

22   A    Disappointed is a nice way of phrasing it.

23   Q    And when we're talking about the business plan, we're

24   talking about future sales, correct?

25   A    Not just future sales, but an execution of production,
```

1    delivery, revenue recognition of the sales that had already

2    been announced.  And I might add that while it wasn't in this

3    exhibit, there was a larger sale that was announced sometime

4    in the late March period, right before the -- the announcement

5    of, okay, now we're going to do a conference call and tell you

6    how this -- how this will be carried out in the next nine

7    months, 12 months.

8    Q    And you were disappointed that you didn't hear more

9    information about that March press release and the purchase

10   order that was described there, correct?

11   A    That was part of what I expected to hear, that's correct.

12   Q    Okay.  And the Government showed you three press releases

13   from the trial that were in September and October of 2007, but

14   the March one occurred several months later, correct?

15   A    The March one occurred several months later, but during

16   the time period that I was accumulating stock.

17   Q    And you were acutely interested in what was going on with

18   those March sales, correct?

19   A    Among other, among other sales.  That, as I recall, was

20   the largest sale announced to date.

21   Q    And you were also interested in hearing what was the

22   company's plan for the future, correct?

23   A    That's correct; to execute on these orders, produce --

24   actually, to produce revenue.

25   Q    To produce revenue not only on what had been announced,

1   but on future sales, as well?

2   A    Yeah.  And with regards to the future, I know that that

3   would be speculating, but for a company to start to be

4   specific and, you know, give the investment community guidance

5   that you can reasonably expect orders or these are our

6   expectations of orders of I believe the figure was $40 million

7   forthcoming, and then to not make any reference to it at all

8   was so out of the ordinary for anything I had ever experienced

9   before.

10  Q    And did you believe that the prior announcements of sales

11  were false after hearing the webcast?

12  A    That really -- no.  I would say at that point I did not

13  come to that conclusion at that time.

14  Q    And you remained invested in the stock after the webcast,

15  correct?

16  A    That's correct.  As I explained, I felt there was no way

17  out of it at that point, and I couldn't sell until all these

18  clients had been liquidated first.  The amount of stock that I

19  owned in my -- what we call your book of clients was probably

20  equal to the amount of stock that had been sold -- maybe --

21  maybe it was even more, or maybe there was more stock sold

22  that morning, but they dropped the stock, you know, as I say,

23  60 cents in three minutes.  How could I possibly sell a

24  million shares, you know, after that and have any expectation

25  of having a reasonable bid?

```
 1    Q    And the three minutes you're referring to is before the

 2    webcast, correct?

 3    A    Before or simultaneous with the beginning of the webcast,

 4    or the announced beginning of the webcast.

 5    Q    After the webcast, you tried to learn more about the

 6    company, correct?

 7    A    That's right.

 8    Q    You visited with a Dr. Drakulich at the research center?

 9    A    No, no.

10    Q    Did you ask to visit with Dr. Drakulich at the research

11    center?

12    A    I did.  And that was actually -- I would suggest that was

13    a late February, sometime early March request, and I didn't

14    receive any response.

15    Q    You don't recall making the same requests to

16    Dr. Harmison, at SignaLife?

17    A    I made the request to Dr. Harmison.

18    Q    But you don't recall making that after the webcast?

19    A    I don't recall another attempt after the webcast.

20              MR. GRUENSTEIN:  Okay.  Why don't -- if we could put

21    up -- Your Honor, we're not able to connect, so if I could

22    just use paper copies?

23              THE COURT:  Sure.

24              Sir, Mr. Taylor, I don't know if you can see that

25    clearly.
```

```
 1                THE WITNESS:  I can here on the screen.
 2                THE COURT:  Because you can lift that up a little,
 3      straighten it out if it's not clear.
 4                MR. GRUENSTEIN:  Your Honor, we'll mark this for
 5      identification as DX69.
 6      BY MR. GRUENSTEIN:
 7      Q    Do you see that this is an e-mail?  At the top, it's from
 8      Dr. Harmison to M Stein administration?
 9      A    I did not recall this, but I evidently did make another
10      request after the webcast.
11                MR. GRUENSTEIN:  Your Honor, the defense offers
12      DX69.
13                THE COURT:  Any objection?
14                MS. PASCUCCI:  No, Your Honor.
15                THE COURT:  Admitted without objection.
16           (Defendant's Exhibit No. 69 entered into evidence.)
17      BY MR. GRUENSTEIN:
18      Q    You testified about certain losses that you suffered.
19      Are you aware that the Government has made its own
20      calculations of losses in this case?
21      A    I'm aware that they made --
22                MS. PASCUCCI:  Objection, Your Honor.
23                THE COURT:  Overruled.
24                THE WITNESS:  Okay.  I'm aware that they made
25      calculations.  I have no -- no information on how the
```

```
 1    calculations were made.
 2    BY MR. GRUENSTEIN:
 3    Q    Okay.  Are you aware that under one of their calculations
 4    they've calculated that you had zero loss?
 5    A    I was not aware of that.
 6    Q    And are you aware that under that same calculation they
 7    calculated that Dr. Harris had zero loss?
 8    A    I was not aware of that.  And I don't know the basis of
 9    that calculation, because I do know the actual dollar amounts
10    that were lost.
11              MS. PASCUCCI:  Court's indulgence, Your Honor.
12              MR. GRUENSTEIN:  I'm sorry.  Your Honor, if I could
13    just have one moment with my client?
14              THE COURT:  Sure, sure.
15    BY MR. GRUENSTEIN:
16    Q    Mr. Taylor, just briefly, have you seen your trading
17    records in this case relating to SignaLife?
18    A    I haven't seen those.  If I saw them ten years ago, I
19    don't have any recollection specifically of them now.
20    Q    We're going to show them to you so we can put them in the
21    record.  And this will be marked for identification as DX70.
22    This is an excerpt of the Government's exhibit, the blue sheet
23    trading data.
24              Do you see it says Mark W. Taylor?
25    A    I do see that, yeah.
```

```
 1              MR. GRUENSTEIN:  Your Honor, the Government offers
 2    DX70 into evidence.
 3              THE COURT:  You mean the defendant.
 4              MR. GRUENSTEIN:  I'm sorry, Your Honor.  Old habits.
 5    I apologize.  I knew I would do that at least once during this
 6    hearing.
 7              THE COURT:  Any objection?
 8         (Defendant's Exhibit No. 70 entered into evidence.)
 9              MS. PASCUCCI:  No, Your Honor.
10              THE COURT:  Can I make a suggestion?  Are there
11    going to be any objection to any of these exhibits that are --
12    I assume you've each exchanged your exhibits, you know what
13    the -- what are contained in these binders.
14              MR. GRUENSTEIN:  I won't have any objection to any
15    of the Government's exhibits.
16              THE COURT:  Does the Government have any objection
17    to the defense exhibits?
18              MS. COTTINGHAM:  Your Honor, we may have some
19    objections on relevance to frankly some of the cases, to the
20    extent they want case law admitted as exhibits for one of
21    their witnesses to discuss or legal conclusions on those.  But
22    other than that, we anticipate having no objections at all to
23    anything we've seen from the defense.
24              THE COURT:  All right.  So can we just say what are
25    the numbers of the exhibits so we can get them in the record,
```

```
 1    and then we don't have to go through the foundation-laying?

 2            What are the exhibit numbers that the Government

 3    wants to introduce for the hearing?

 4            MS. COTTINGHAM:  For the hearing?  Your Honor, if we

 5    could -- could we potentially give that to the Court in just

 6    ten minutes or so?  I'm going to run through the list right

 7    now, and I think we can get a list to you and put them on

 8    before we put on the next witness, Your Honor.

 9            THE COURT:  All right.  What about the defense?  Do

10    we know how many -- because I notice that the last two

11    exhibits were not on your list, so do you have a complete

12    list, or do you have --

13            MR. GRUENSTEIN:  That's right, Your Honor.  Those

14    were cross exhibits, so we -- I think we can put together a

15    list and give them to Your Honor.

16            THE COURT:  All right.  Thank you.  Sorry to

17    interrupt there.

18    BY MR. GRUENSTEIN:

19    Q    Mr. Taylor, were you familiar with sales relating to a

20    company called CHM, Cardiac Health Management?

21    A    After the -- as the case came out and individual

22    purchasers or buyers were identified I would have heard that

23    name.  I never heard the name during the relevant time period.

24    Q    And you didn't yourself draw any conclusions as to

25    whether that was a true or false purchase order, did you?
```

```
1    A      No, I -- no.

2    Q      And how about involving a company called Innet,

3    I-n-n-e-t?  Do you remember hearing about that?

4    A      That name doesn't ring a bell at all.

5    Q      And how about AR Pacific?

6    A      Again, no, no.

7    Q      And to state the obvious, if you don't remember them, you

8    don't remember drawing any conclusions --

9    A      Correct.

10            THE COURT REPORTER:  Excuse me.

11            THE COURT:  Sir, wait until he's finished.

12   BY MR. GRUENSTEIN:

13   Q      To state the obvious, given that you haven't heard of

14   these, you would -- or at least you don't remember hearing

15   about them, you don't remember drawing any conclusions about

16   whether those were true or false purchase orders, correct?

17   A      Correct.

18            MR. GRUENSTEIN:  No further questions, Your Honor.

19            THE COURT:  Thank you.

20            Any redirect?

21            MS. PASCUCCI:  Court's indulgence, Your Honor.

22            THE COURT:  Sure.

23            MS. PASCUCCI:  A limited redirect, Your Honor.

24   Thank you.

25            THE COURT:  All right.
```

```
 1                    Redirect Examination
 2   BY MS. PASCUCCI:
 3   Q    Mr. Taylor, would you ever invest in a company that
 4   issued false press releases to investors?
 5   A    No.
 6   Q    And, Mr. Taylor, you were asked about the Government's
 7   calculation of losses.  How would you calculate your losses in
 8   this case?
 9   A    I know what I lost, and I lost -- without being able to
10   give you the, you know, to-the-penny exact amount, probably
11   $185,000, I would calculate my number at.
12   Q    And was this a substantial financial harm for you?
13   A    Of course, yes.
14            MS. PASCUCCI:  Thank you, Your Honor.  No further
15   questions from the Government.
16            THE COURT:  Okay.  Thank you, sir.  You can step
17   down.
18            THE WITNESS:  Okay.
19            THE COURT:  Thank you.
20            MS. PASCUCCI:  Your Honor, could Mr. Taylor be
21   excused?
22            THE COURT:  Unless he's under subpoena by the
23   defense.
24            MS. PASCUCCI:  Or at least for the day.
25            THE COURT:  Unless the defense --
```

```
 1              MR. GRUENSTEIN:  He wasn't, and we don't have an

 2    objection.

 3              THE COURT:  Okay.  Yes, of course.

 4              MS. PASCUCCI:  Your Honor, the next witness that the

 5    Government would like to call is Dr. Chyhe Becker.

 6              THE COURTROOM DEPUTY:  Please raise your right hand.

 7              Chyhe Becker, Government's witness, sworn.

 8              THE COURTROOM DEPUTY:  Please take a seat.

 9              State your name and spell your name.

10              THE WITNESS:  Chyhe Becker.  It's spelled C-h-y-h-e,

11    and my last name is Becker, B-e-c-k-e-r.

12                            Direct Examination

13    BY MS. PASCUCCI:

14    Q    Dr. Becker, what is your educational background?

15              THE COURT:  Again, if you can pull that microphone

16    down so we can hear you.

17              And Dr. Becker, if you would maybe put that

18    microphone a little more directly in front of you, please, so

19    we can make sure we hear you clearly.  The whole thing will

20    move so you can adjust it.  There you go.  Thank you.

21              THE WITNESS:  Okay.  Is that better?

22              THE COURT:  That is, thank you.

23              THE WITNESS:  My educational background includes a

24    Ph.d. in finance from the University of Chicago graduate

25    school of business, an MBA from the same school also in
```

```
 1    finance, and a bachelor's degree from Yale University.
 2    BY MS. PASCUCCI:
 3    Q    What is your current position?
 4    A    I'm the acting division director and acting chief
 5    economist of the Division of Economic and Risk Analysis at the
 6    Securities and Exchange Commission.
 7    Q    What are your duties in that position?
 8    A    I oversee a division of about 150 different people,
 9    mostly economists, who perform work like conducting economic
10    analysis in the context of SEC rule-making and also economic
11    analysis in the context of SEC enforcement actions, as well as
12    risk analysis and structured data issues.
13    Q    How long have you been employed at the SEC?
14    A    For ten years.
15    Q    Have you testified as an expert previously?
16    A    Yes.
17    Q    What topic matters, generally speaking, have you
18    testified to as an expert?
19    A    Fraud cases and insider trading cases.
20    Q    And did you prepare an expert report, an expert rebuttal
21    report for the sentencing today?
22    A    I did.
23          MS. PASCUCCI:  And, Your Honor, these are
24    exhibits 30 and 31.  They've already -- assuming no objection
25    from the defense.
```

```
 1              THE COURT:  All right.  They're admitted without
 2   objection.
 3        (Government's Exhibit Nos. 30-31 entered into evidence.)
 4   BY MS. PASCUCCI:
 5   Q    And I want to show you exhibit 101.  And if -- you have a
 6   binder right there in front of you, and that should include
 7   all of the Government's exhibits.  It should be tab 101.
 8              And is this the sentencing PowerPoint that you
 9   prepared for purposes of today's hearing?
10   A    Yes, it is.
11   Q    What type of work did you perform for this case?
12   A    I did two categories of work.  I did an event study on
13   specific dates, and I also looked at whether or not
14   intervening events and other factors caused SignaLife's stock
15   price decline during what I call the relevant period.
16   Q    So let's begin with the event study.  I want you to look
17   in your binder at exhibits 1, 2 and 3.  They should be at the
18   very beginning of the binder.
19              Are these the press releases that SignaLife issued
20   on September 20th, September 25th and October 10th of 2007?
21   A    Yes, they are.
22   Q    And let's turn to page 2 of exhibit 101.
23              What did the September 20th press release announce?
24   A    It announced that SignaLife had received orders for the
25   sale of $2 million worth of product.
```

```
 1   Q    What did the September 25th press release -- my
 2   apologies.  Let's turn to page 3 of exhibit 101.
 3             What did the September 25th press release announce?
 4   A    It announced that SignaLife had received orders for 3.3
 5   additional -- $3.3 million worth of additional product.
 6   Q    And turning ahead to page 4 of exhibit 101.  What did the
 7   October 10th press release announce?
 8   A    This announced that SignaLife had received additional
 9   purchase orders for over $500,000, and it also stated that
10   these purchase orders are currently resulting in revenue to
11   the company such that the company anticipated achieving a
12   break-even status by the end of January 2008, or at the very
13   latest, the end of the 2008 first quarter.
14   Q    Did you analyze these three press releases and their
15   impact on SignaLife stock for purposes of the event study you
16   performed?
17   A    I did.
18   Q    And I want you to turn to exhibit 4.  Is this a
19   transcript of the webcast that was -- occurred on April 14th,
20   2008?
21   A    Yes.
22   Q    And I want to show you what's been marked as exhibit 5.
23             MS. PASCUCCI:  Your Honor, this came in as trial
24   exhibit 159.
25   BY MS. PASCUCCI:
```

```
 1   Q     Is this a 10-Q that was released on August 15th, 2008,
 2   for SignaLife?
 3   A     Yes.
 4   Q     And turning ahead to page 5 of exhibit 101, what did the
 5   10-Q announce regarding the purchase orders?
 6   A     The 10-Q announced that the September -- the purchase
 7   order received on September 14th was not going -- it said that
 8   before shipping under that order, SignaLife is requiring
 9   confirmation of the ability and intention of the lessee to pay
10   and that SignaLife had not recognized any revenues from that
11   purchase order to date.
12   Q     And did you analyze these two events and their impact on
13   SignaLife stock for the event study today?
14   A     I analyzed that -- that one right there is the
15   September 20th, 2007, press release.  It's associated with the
16   September 20th, 2007, press release.  And, yes, I analyzed
17   that one.
18         And I analyzed -- sorry.  When you said the two
19   ones, I think you meant the August 15th, 2008 10-Q and the
20   webcast that happened on April 14th, 2008, and I did analyze
21   them.
22   Q     Stepping back for a moment, Dr. Becker, what is an event
23   study?
24   A     An event study is a standard methodology for studying how
25   stock prices react to events or news.
```

1    Q    What is your first step in conducting an event study?

2    A    My first step in conducting an event study is to

3    calculate the expected return of the stock on the date of the

4    news to see what the stock price -- to estimate what the stock

5    price would have been absent the news.

6    Q    And what does "expected return" mean generally?

7    A    It means what the return of the stock would have been, so

8    the difference between the closing price the day before and

9    the closing price on that day would have been in the ordinary

10   course of events.  So sort of what it would have been -- what

11   I would have forecast it to be.

12   Q    What is your next step in the event study once you

13   calculate the expected return?

14   A    I calculate the abnormal return.

15   Q    And what is abnormal return?

16   A    Abnormal return is the difference between the actual

17   return of this stock on that date, which does include the

18   influence of the news, and the expected return, which doesn't

19   include the effects of that news.

20   Q    Once you've calculated the abnormal return, what will you

21   then do?

22   A    The next thing I would do is to check news sources and

23   also in this case I also looked at investor chat rooms to see

24   what else was going on for the stock to see whether or not

25   other news on that date might have contributed to the stock

```
 1  price reaction.
 2  Q     And once you've looked for other news, what will you then
 3  do?
 4  A     So my fourth step would be to conduct a statistical test.
 5  I used here a T test to determine whether or not the abnormal
 6  return is different from the day-to-day random -- from the --
 7  from whether or not it was due to the normal day-to-day random
 8  variation in the stock price.
 9  Q     So did you test whether it was statistically significant?
10  A     Yes.
11  Q     And how do you measure statistical significance?
12  A     I measure statistical significance as a way to determine
13  whether the abnormal return is distinguishable from the
14  typical variation in the volatility in the stock returns on a
15  daily basis.
16  Q     What confidence level did you use?
17  A     I used a 95 percent confidence level.
18  Q     Dr. Becker, did you review the expert rebuttal report
19  produced by Dr. Hayter in this case?
20  A     I did.
21  Q     And how do you respond to his criticism that you should
22  have used a 99 percent confidence level?
23  A     I disagree with Dr. Hayter's conclusion in this.
24  Q     And why do you disagree?
25  A     There are a couple of different reasons.  Making a
```

1    multiple testing adjustment in the context of an event study

2    is not standard for financial economists conducting event

3    studies.  I determined this by looking at ten different

4    authoritative textbooks and articles on the use of event

5    studies.  I also determined it by looking at the use of event

6    studies in peer-reviewed journals, and I found -- in both

7    sources, I found no suggestion -- in the authoritative texts,

8    I found no instruction to do a multiple testing adjustment.

9    In the publications that are in peer-reviewed journals using

10   event studies, I found nobody who had done this.  And then I

11   also looked at the expert report of Dr. O'Neal that was filed

12   in this case.  And when he conducted an event study on

13   multiple dates, he did not adjust from using a 95 percent

14   confidence level.

15   Q    And did you consider market and industry indexes in

16   conducting your event study?

17   A    I did.

18   Q    And how would -- how did you incorporate those in the

19   event study?

20   A    So I actually didn't use them in my event study.

21   Q    And why is that?

22   A    It's because I found that this -- that SignaLife's stock

23   returns were not correlated with industry and market returns.

24   So they didn't actually improve the quality of my -- or the

25   accuracy of my forecast, so I didn't use them.

```
1   Q    What is the relevant period that you looked at for this

2   event study?

3   A    The relevant period that I was looking at that I was

4   studying was from September 20th, 2007, 'til August 15th,

5   2008.

6   Q    And were these dates provided to you by the Government?

7   A    Yes.

8   Q    And what types of materials did you rely on in conducting

9   your event study?

10  A    I relied on the press releases, the webcast transcript,

11  the 10-Q itself.  I also relied on data from the Center for

12  Research and Securities prices and from Bloomberg to get data

13  for the SignaLife stock and for the market and industry

14  indices.  And I also looked at chat rooms and a new source

15  called Factiva that pulls news from lots and lots of different

16  sources to search for whether or not there was other news on

17  these dates.

18  Q    So I want us to turn ahead to page 7 of exhibit 101.

19       What does this chart show?

20  A    This chart shows SignaLife's stock price over -- as it

21  occurred during what I call the relevant period.  Actually, it

22  starts from the beginning of September 2007 and ends a little

23  bit later in September of 2008.  And it has red dots on the

24  dates of the three purchase orders and blue dots on the dates

25  of the corrective disclosures.
```

1    Q    Can you summarize your findings with respect to the three

2    press releases?

3    A    Yes.

4         So what I found was that on September 25th, 2007,

5    SignaLife -- that's the date that SignaLife had disclosed its

6    $3.3 million purchase order -- the company experienced an

7    abnormal return of 18 percent, which was statistical

8    significant at the 95 percent confidence level.

9    Q    Which red dot correlates to this press release of

10   September 25th?

11   A    That's the one in the middle with the arrow pointing to

12   it.

13   Q    And what information on this graph indicates that that

14   abnormal return is statistically significant?

15   A    The T statistic value shows that it's statistically

16   significant.

17   Q    Can you explain that a little?

18   A    Yes.  The critical value for a T statistic is either plus

19   or minus 1.96.  So I compare the T statistic that I calculate

20   here in absolute value to 1.96.  Since 2.8 exceeds 1.96, I

21   conclude that this result is statistically significant.

22   Q    What, in your opinion, caused the increase of SignaLife

23   stock on September 25th of '07?

24   A    In my opinion, the increase in the abnormal return was

25   caused by the purchase order.

1    Q      And how did you come to this determination?

2    A      I came to this determination by conducting the event

3    study, including looking at all the other news and looking at

4    investor chat rooms to see what the discussions were about

5    SignaLife on that day.  And what I found was that I was unable

6    to find any mention of any other news on this date.  The

7    purchase order and the press release describing the purchase

8    order seemed to be by far the most relevant information.

9    Q      And when you say purchase order, you're referring to the

10   press release that was issued on September 25th?

11   A      Yes, it's the press release describing that purchase

12   order.

13   Q      And let's turn ahead to page 8 of exhibit 101.

14          Can you summarize your findings with respect to the

15   events in April and August of 2008?

16   A      Yes.

17          So on April 14th, 2008 -- that's the date of the

18   SignaLife webcast -- I calculated an abnormal return of a

19   negative 12.7 percent.  So that's a decline in the stock

20   price.  And the T statistic, which is a negative 2.003, again,

21   the absolute value of that, which would be 2.003, exceeds the

22   1.96 threshold.  So I concluded that the abnormal return on

23   that date is statistically significant.

24   Q      And what were your findings with respect to the

25   August 15th, 2008, disclosure?

```
1  A     On August 15th, 2008, I found -- that's the date when
2  SignaLife filed its 10-Q -- I found an abnormal return of a
3  negative 9 percent, and I found that the T statistic was less
4  than 1.96 in absolute value.  So therefore I concluded that it
5  was not statistically significant.
6  Q     What, in your opinion, caused the decrease of SignaLife
7  stock on April 14th of 2008?
8  A     In my opinion, that abnormal return of negative
9  12.7 percent was caused by the SignaLife webcast.
10 Q     How did you come to this determination?
11 A     I came to this determination, again, by looking for other
12 news and by looking at discussion in the chat rooms, and the
13 focus was entirely on the webcast.
14 Q     Do investors find information about sales important?
15 A     Yes, they do.
16 Q     Why are sales important to investors?
17 A     Sales are important to investors because investors
18 typically have invested in a business, a company that's
19 producing products.  So the company can't make money without
20 selling its product.
21 Q     How can sales impact company revenues?
22 A     Sales can impact company revenues -- for many companies,
23 including for SignaLife, sales and revenues would sort of be
24 the two words for the same exact thing.  For some kinds of
25 bigger companies in different situations, you can have
```

1    revenues that are different from sales, because they can make

2    money in other ways, like by selling a line of business, and

3    there are other ways to generate money.  But for SignaLife, it

4    was all about selling its product.

5    Q    And how can sales impact company earnings?

6    A    Sales impact company earnings because it's the -- what we

7    call the top line.  It's the starting point for calculating

8    earnings and profits.  If you don't sell product, you won't

9    make a profit.

10   Q    So let's turn to page 6 of exhibit 101.

11         Did you review revenue information for SignaLife

12   prior to 2007?

13   A    Yes, I did.

14   Q    What did you review?

15   A    I reviewed the company's 10-K and 10-Q filings during

16   this time period.

17   Q    What did this information show regarding SignaLife's

18   revenues prior to 2007?

19   A    It showed that SignaLife had generated no revenues for

20   the years 2001 through 2005, and that in 2006 it had generated

21   $190,170 worth of revenue.

22   Q    And in light of this background, how important would

23   information regarding SignaLife sales in 2007 have been to

24   investors?

25   A    In my opinion, SignaLife's revenues in 2007 would have

1   been very important to investors, because investors would have

2   been wondering about overall market demand for SignaLife's

3   product.

4   Q    And based on your event study, did you create a

5   spreadsheet reflecting the inflationary value of SignaLife

6   stock during the relevant period?

7   A    Yes.  I and staff at my direction created that

8   spreadsheet.

9   Q    I want to show you what's been marked as sentencing

10  exhibit 32.

11          Is this the spreadsheet that you prepared?

12  A    Yes, it is.

13          MS. PASCUCCI:  And, Your Honor, the Government moves

14  to admit exhibit 32.

15          MR. GRUENSTEIN:  No objection.

16          THE COURT:  Admitted without objection.

17          (Government's Exhibit No. 32 entered into evidence.)

18  BY MS. PASCUCCI:

19  Q    And what is represented in this spreadsheet?

20  A    This spreadsheet gives the dates, it gives, under the

21  column marked "actual price," it gives SignaLife's closing

22  price on a daily basis, and then it also gives an amount for

23  the inflation in SignaLife's stock price on those dates based

24  on my calculations.

25  Q    What does inflation mean in this context?

1  A    Inflation means -- remember we were talking about that

2  18 percent abnormal return that occurred when SignaLife issued

3  a press release on September 25th, 2007.  My calculation of

4  inflation just says -- it's based on the idea that 18 percent

5  of the stock price going -- starting on September 25th and

6  going forward was inflation; that that press release caused

7  inflation in the stock price of 18 percent.

8  Q    And what does that final column, "intrinsic price," refer

9  to?

10 A    So the column marked "intrinsic price" -- I just realized

11 that we have a typographical error in the word "intrinsic." I

12 apologize for that.

13       The column marked "intrinsic price" is equal to the

14 difference between the actual price and the inflation amount.

15 So it's literally a subtraction of the inflation from the

16 actual price to say this is what the price of SignaLife would

17 have been had they not issued the September 25th, 2007, press

18 release.

19 Q    Given this chart, simply put, how would you calculate the

20 inflation due to fraud?

21 A    I calculate the inflation due to fraud based on the

22 18 percent and the actual price.

23 Q    So let's turn to page 9 of exhibit 101.

24       Did you review Dr. Hayter's analysis that the

25 abnormal returns on September 25th of 2007 and April 14th of

1    2008 were not out of the ordinary?

2    A      I did.

3    Q      Do you agree with that analysis?

4    A      I do not.

5    Q      And why not?

6    A      The reason -- so this chart summarizes the distribution

7    of SignaLife's stock returns.  And based on this analysis,

8    which I'll explain in a little bit more detail, I find that

9    only 3 percent of the days during this period -- on only -- on

10   only 3 percent of the days during this period did SignaLife

11   have a return that was greater than the 18 percent that

12   occurred on September 25th, 2007.  And on only 4 percent of

13   the days during this period did SignaLife have a negative

14   return that was less than 12.7 percent.

15            So I deem those findings of an 18-percent return and

16   a negative of a 12.7 return to be unusual in light of the

17   distribution of just the daily stock returns.  This is another

18   way to -- these results are consistent with my event study

19   results, which also showed, based on a statistical test, that

20   the returns on those dates were unusual.

21   Q      How did you choose a time period for this chart?

22   A      This time period is based on the relevant period plus the

23   prior year.  The prior year is the time period that I used as

24   an estimation period for calculating the abnormal -- the

25   expected return, which is an input to the abnormal return.

```
1    Q    And are you familiar with the concept of market
2    efficiency?
3    A    I am familiar with that concept.
4    Q    What is market efficiency?
5    A    Markets are efficient when stock prices quickly and
6    correctly move to reflect all available information.
7    Q    Is market efficiency measured on a zero sum basis?
8    A    It's not measured on a zero or one basis.  So it's not an
9    absolute.  In my view, markets are never completely perfectly
10   efficient, because if they were, they would, as a practical
11   matter, they would reflect not only all publicly available
12   information but all nonpublic information.  This is what's
13   called the strong version of a hypothesis of market
14   efficiency.  But that would be sort of the perfect ideal
15   version of market efficiency.
16              And also there's like sort of perfect inefficiency.
17   I don't think we observe things in that range.  I think where
18   we live is sort of in between those two extremes.
19   Q    Did you test for market efficiency prior to performing
20   this event study?
21   A    I did not.
22   Q    Do you need to conduct a test of market efficiency before
23   performing an event study?
24   A    No, in my opinion I do not.
25   Q    And did you also conduct an analysis to determine whether
```

```
 1    certain intervening events caused a decline in SignaLife stock
 2    during the relevant period?
 3    A    I did.
 4    Q    I want to turn to page 10 of exhibit 101.  Is this the
 5    list of intervening events that you analyzed for today?
 6    A    Yes, it is.
 7    Q    And what were your conclusions?
 8    A    I concluded that none of these events caused the decline
 9    in SignaLife stock price during the relevant period.
10    Q    So let's begin with the financial crisis and market
11    downturn.  What historical event, just generally speaking,
12    were you referring to when you reference a financial crisis
13    and market downturn?
14    A    When I say financial crisis, I mean what's sometimes
15    referred to as the 2007-2008 financial crisis.  Sometimes it's
16    also referred to as the subprime crisis.
17    Q    Did you find any evidence that the financial crisis and
18    market downturn caused a decline in SignaLife's stock during
19    the relevant period?
20    A    I did not.
21    Q    So let's turn ahead to page 11 of exhibit 101.  What does
22    this chart show?
23    A    So this chart shows SignaLife's stock price actually
24    starting now in January 2007, going forward until it was
25    delisted from the American Stock Exchange.  It also shows a
```

```
 1   black line, which is the market index over this same time
 2   period and a green line, which is the medical equipment
 3   industry, which is SignaLife's industry, over the same time
 4   period.  And it has red lines to show you where the relevant
 5   period is.
 6   Q    And what stocks are included in the market index?
 7   A    The market index consists of evaluated index of all
 8   exchange-listed stocks in the United States.
 9   Q    What's included -- what stocks are included in the
10   industry index?
11   A    Those are stocks that operate in the medical equipment
12   industry.
13   Q    Do you see a correlation between these indexes in
14   SignaLife stock?
15   A    I do not.  And if you look at the green and the black
16   lines together, so there I do see the two lines moving
17   together.  So if you look closely, you can sort of see that
18   when the green line moves up, oftentimes the black line is
19   also moving up.  And when the green line is moving down, the
20   black line is also moving down.  So the market and the
21   industry are correlated with each other, positively correlated
22   with each other in terms of their returns.
23        But if you look at SignaLife's returns over this
24   same time period, you don't -- I don't see, just visually, the
25   green line and the black line moving up when SignaLife's stock
```

1    price is typically going up and conversely for the downward

2    movement.

3    Q    And what does your finding regarding causation --

4    correlation lead you to conclude about causation?

5    A    So since I don't observe correlation here between

6    SignaLife's returns and the market and the industry returns, I

7    defined no evidence that the market in the industry caused

8    SignaLife's returns to decline during the same time period.

9    Q    Turning ahead to page 12 of exhibit 101.

10            Did you also conduct a regression analysis here?

11   A    Yes, I did.  This was the basis for my opinion.

12   Q    And what is a regression analysis?

13   A    A regression analysis is a statistical technique for

14   measuring the statistical significance of an observed

15   correlation.

16   Q    What factors did you consider in this regression

17   analysis?

18   A    I considered both the market index and the industry

19   index.

20   Q    And what does this chart show?

21   A    So this chart shows that -- like if you start out -- so

22   you read this in a column.  The first column is the regression

23   results where I'm regressing -- I'm explaining SignaLife's

24   returns as a function of the market index.  And the market

25   index is labeled here evaluated portfolio of U.S. equities.

1          That negative 0.717 is -- that means that if

2     SignaLife's stock price went down, the market index typically

3     went up.  So the negative sign on that coefficient means that

4     the SignaLife and the market were typically moving opposite

5     each other.

6          When you look below that, you see a number in

7     parenthesis.  That's the T statistic that's in parenthesis.

8     So since the absolute value of that T statistic is not greater

9     than two, this -- I find that the relationship, the

10    correlation between the market index and SignaLife's returns

11    is not statistically significant.

12         And at the very bottom, you can see a figure for the

13    adjusted R square.  This tells you what percent of the

14    variation in SignaLife's stock price or stock returns is

15    attributable to the market returns.  And this shows that less

16    than 1 percent of the variation in SignaLife's returns can be

17    attributed to correlation with the market index.

18    Q    And what is represented in column 2?

19    A    Column 2 shows the regression results between SignaLife's

20    return and the industry index, the medical equipment index.

21    Q    And what were your findings there?

22    A    Again, I found that the correlation was negative.  In

23    other words, SignaLife tended to move, if anything, opposite

24    the industry.

25         But, again, the T statistic value of 0.53 is really

```
 1   small, so it's -- the correlation is not statistically
 2   significant.  It's not greater than zero.  And my value for
 3   the adjusted R squared is, again, less than 1 percent.  So the
 4   percent of variation in SignaLife's returns that can be
 5   explained by the industry index is less than 1 percent.
 6   Q    And what is represented in column 3?
 7   A    Column 3 is a multiple regression analysis, where I
 8   considered both the market index and the medical equipment
 9   index together, and I said when we combine these, do I find a
10   result that is statistically significant.  And I found the
11   answer to that question was no.  If you look at the numbers in
12   parenthesis, neither one of them is greater than two in
13   absolute value.  So, again, the results are not statistically
14   significant.
15   Q    Dr. Becker, what is a robustness check?
16   A    A robustness check is when you, or in this case when I
17   change -- I test to see whether or not a change in the
18   approach would cause my results to change.
19   Q    Did you conduct robustness checks here?
20   A    I did.
21   Q    And did you consider time lags?
22   A    Yes.
23   Q    What time lags did you consider?
24   A    I considered time lags of up to five days of delay for
25   the market reaction.
```

```
1    Q    Did your robustness checks confirm your regression

2    analysis?

3    A    They did.

4    Q    I want to turn to the topic of short selling.

5              Before we get into this, generally speaking what is

6    short selling?

7    A    Short selling is when you sell a stock that you actually

8    don't own.  So typically when people sell something or when

9    you think about somebody selling something, you think about

10   somebody selling something that they own.  So if you hold IBM

11   and you sell a share of IBM, then that's sometimes referred to

12   as a long sale to distinguish it from a short sell, or just

13   sort of regular selling.

14             Short selling would be if you sell a share of IBM,

15   or in this case SignaLife, and you don't actually own the

16   stock at the time you sell it.  That's called short selling.

17   Q    Do you have experience in short selling?

18   A    I have experience with analyzing short selling, although

19   I have to admit I have never sold a stock in my life.

20   Q    Did you study short selling in graduate school?

21   A    I did.

22   Q    Have you led short selling-related investigations at the

23   SEC?

24   A    Yes, I have.

25   Q    And have you done work relayed to Reg. SHO?
```

```
 1    A     Yes, I have.

 2    Q     And just generally speaking, what is Reg. SHO?

 3    A     So Reg. SHO is a regulation that puts rules around short

 4    selling and around what's called naked short selling, or

 5    failures to deliver.  Yeah.

 6    Q     Turning ahead to page 13 of exhibit 101.  Can you just

 7    walk me through the hypothetical that's presented on this

 8    page?

 9    A     Sure.

10          THE COURT:  Can I interrupt for a second?  Because

11    this is something that I still need some education on.

12          MS. PASCUCCI:  Okay.

13          THE COURT:  How do you sell a stock that you don't

14    own?  How is that possible?  I don't -- I'm not a trader, so I

15    don't -- I don't understand how you accomplish it.  Can you

16    explain this to me, please?

17          THE WITNESS:  Sure, no problem.

18          What you do is you borrow the stock from somebody

19    else, and then you sell it.  So I think of an example of

20    somebody who is going into business in the home appliance

21    industry.  Your -- that person might be selling dishwashers,

22    right?  And if somebody walks into your store, you're just

23    starting up, they might want a particular dishwasher that you

24    don't actually have in inventory, right?  But you think you

25    can get it, because, you know, it's a Maytag, and you know
```

```
 1    you've got a relationship with Maytag.  You can get it, but

 2    you don't have it right now.

 3            So I would, if I were the business owner, I might

 4    sell you the dishwasher, even though I don't own it today.  I

 5    take your money, I go get -- place an order for the dishwasher

 6    from Maytag, and then I'm gonna send you the dishwasher

 7    when -- after I get it from Maytag.

 8            THE COURT:  Okay.

 9    BY MS. PASCUCCI:

10    Q    Dr. Becker, can you explain the hypothetical on this page

11    about how -- kind of more detail on how short selling works?

12    A    Sure.

13            So in my example, a short seller places an order to

14    short sell 10,000 shares of SignaLife when it was trading at

15    one dollar per share.  So when that person does that, so

16    somebody buys the shares that I am -- or that the short seller

17    is short selling.  When that person buys, the short seller is

18    going to get $10,000 because I've just sold you 10,000 shares

19    at a dollar a share.

20            Then you have to look ahead to the future to say,

21    well, what's going to happen here, because sooner or later,

22    I'm going to have to go buy those shares.  I borrowed them in

23    order to be able to sell it to you, but sooner or later, I'm

24    going to have to go buy those shares in the open market so

25    that I can repay them to the person from whom I borrowed them.
```

1    I'm going to have to -- there is going to be -- I'm going to

2    have to do that sooner or later.

3            So if during that time period the stock price has

4    fallen -- in my example it falls to 10 cents a share, then the

5    short seller has to go out and buy 10,000 shares at 10 cents a

6    share, which is going to be $1000 of expenditure, in order to

7    provide the stock to the person from whom they borrowed the

8    stock.

9            So in this instance, the short seller is going to

10   make $9000, because I had to spend a thousand dollars to get

11   the stock in the end, and I got $10,000 when I short sold the

12   stock.

13           Conversely speaking, if the stock price has risen

14   during this time period -- and it can rise indefinitely -- I

15   made an example where the stock price rises to $10 a share.

16   Now, the short seller has to go out and buy 10,000 shares of

17   SignaLife at $10 a share.  So the short seller is going to

18   have to spend $100,000 to get those 10,000 shares, and the

19   short seller will experience a net loss of $90,000.

20   Q    And what is referenced by "trade date" and "settlement

21   date" at the top of this page?

22   A    The trade date is the date on which the short seller

23   undertakes the short sale itself.  So that's the date of the

24   transaction.  And the settlement date is three days later.

25   That's why we label it T plus three.  That's the date on which

 1    either the short seller or its brokerage firm -- it's really

 2    its brokerage firm has to deliver the stock to the entity that

 3    bought the stock.

 4    Q    Turning ahead to page 14 --

 5              THE COURT:  Can I interrupt again?  I'm sorry.  I

 6    want to make sure.

 7              When you use the term "borrow," when I use the term

 8    "borrow," I actually physically get something from someone and

 9    I'm using somebody else's property.

10              In this context when you say borrow, the person

11    who's selling the borrowed shares doesn't really actually have

12    the shares.  They don't really have anything from the seller.

13    They're hoping to buy the shares at a later date to replace

14    the shares.  Am I correct or am I missing something?

15              THE WITNESS:  You're -- you're right.  I think,

16    generally speaking, in the world of investing, when you buy

17    stock, you typically don't get anything, and when you sell --

18    like it's all now in computers, and it's all -- like, you

19    know, it's like a numbers going up and down in your brokerage

20    account like numbers go up and down in your bank account.  So

21    it's all sort of in a virtual world.

22              But when the person borrows the stock, they have an

23    entity from which they have borrowed the stock.  Now, multiple

24    people may have borrowed the stock from the same entity, so

25    that makes it a little complicated, right?  That's like I lent

1   my saw to two different people at the same time.  That, you

2   know, wouldn't work if we were talking about physical objects.

3   But based on the rules that people use -- have set up for

4   short selling, multiple people can borrow at the same time.

5          I can't totally explain that, but it's sorta how it

6   works.

7          THE COURT:  The other thing I didn't understand when

8   I was reading the reports is that at the end of the day,

9   there's some reporting of how many short sales have taken

10  place.  How does one know that -- do you have to report that

11  you're doing a short sale when you engage in one?  Is that a

12  requirement, that you report it?

13         THE WITNESS:  Yeah, it actually is.  So you have to

14  go through -- the brokerage firm will actually make you go

15  through special -- fill in special forms and do extra stuff in

16  order to be allowed to short sell, and you're going to have

17  to -- like I made these two little bullet points about like

18  there's something called a margin requirement.  Basically, you

19  have to have an account with at least -- at the starting

20  point, it has to be at least 50 percent -- no, up to

21  50 percent of the amount that you are short selling.  It's

22  sort of like putting -- it's like making a deposit somewhere,

23  because it's sort of -- it's a way of making sure you're good

24  for the money.  And you may probably have to -- and you would

25  have to pay a fee to borrow the stock, as well.

```
 1                THE COURT:  Okay.  Thank you.
 2                MS. PASCUCCI:  Thank you, Your Honor.
 3                THE COURT:  Sorry for the interruption.
 4                MS. PASCUCCI:  Thank you, Your Honor.
 5     BY MS. PASCUCCI:
 6     Q    Turning ahead to page 14 of exhibit 101.
 7                Did you find any evidence that short selling caused
 8     decline in SignaLife stock during the relevant period?
 9     A    Overall I did not find any evidence that short selling
10     caused the decline in SignaLife stock during the relevant
11     period.
12     Q    What does this chart show?
13     A    So this chart shows my attempt to do a, quote-unquote,
14     zoom-out on the stock -- on short selling and the stock
15     returns.  What I did is I looked at stock returns over longer
16     periods than just a one-day period to see how much short
17     selling was associated with these longer time periods during
18     which SignaLife's stock price was generally going up and
19     generally declining.
20     Q    So how did you define these periods?  How did you
21     determine them?
22     A    I looked at the SignaLife stock price chart, which is
23     that blue line, and I just looked to see sort of when did it
24     seem to reach a peak and when did it seem to reach a trough,
25     and I identified -- I just drew a line where I saw those peaks
```

```
 1   and troughs.

 2   Q    And what did this analysis show about the correlation

 3   between short selling and SignaLife market returns?

 4   A    This analysis shows that during time periods where

 5   SignaLife's stock price was rising, there was typically more

 6   short selling than there was during time periods where

 7   SignaLife's stock price was falling.

 8   Q    What would you have expected to see if there were a

 9   relationship between short selling and SignaLife stock

10   returns?

11   A    If there was a relationship, I'd expect to see that there

12   was more short selling when SignaLife's stock price was

13   falling than when it was rising.  And these gains and losses

14   are very large relative to most stocks.

15            You know, a 84 percent decline followed by a

16   185 percent gain over these relatively short time periods,

17   these are very extreme changes in SignaLife's price.

18   Q    So turning ahead to page 15 of exhibit 101.

19            What were you analyzing here?

20   A    Here, I was looking at the question of was there a lot of

21   short selling in SignaLife's stock relative to other

22   companies.

23   Q    And why were you looking in particular at the first eight

24   months of 2008?

25   A    I looked at the first eight months of 2008 because I
```

```
 1   found a published paper cited in this footnote there that
 2   showed -- that provided a calculation based on average short
 3   selling volume for a random sample of 350 stocks listed on the
 4   New York Stock Exchange.  So what the paper showed is
 5   identified in that sort of second bullet point there, which
 6   says that the New York Stock Exchange stock's average short
 7   selling volume was 39.2 percent of total trading volume during
 8   this time period.
 9   Q    And where was this paper published?  What journal?
10   A    It was published in the Journal of Financial Economics.
11   Q    And how did SignaLife's short selling percent volume
12   compare during the same period?
13   A    So short -- SignaLife's short selling volume during the
14   same time period was actually less than the average short
15   selling volume for this sample of New York Stock Exchange
16   stocks.
17   Q    And what about its percent volume during the relevant
18   period?
19   A    Looking over the entire relevant period, so the first
20   eight months of 2008 is -- most of that is included in the
21   relevant period.  When I look over the entire relevant period,
22   SignaLife's short selling volume was a similar percent of
23   total trading volume and also less than the average for those
24   New York Stock Exchange stocks.
25   Q    And I want to -- I want to ask, did SignaLife have an
```

1  excessive amount of short selling during the relevant period?

2  A    I conclude based on this comparison that the short

3  selling in SignaLife's stock was not excessive during the

4  relevant period.

5  Q    So I want to pull up defense exhibit 34.  This is

6  Dr. Hayter's expert rebuttal report, page 45.  And here he

7  states that SignaLife had a higher short selling volume than

8  the 350 randomly selected stocks listed on the New York Stock

9  Exchange.

10        Do you agree with his conclusions that are offered

11  on this page?

12  A    No.

13  Q    And why not?

14  A    There -- so there's actually a couple of different things

15  here, but the most important thing is that Dr. Hayter is

16  pointing out that on that on six out of 16 days during the

17  January 1st, 2008, to August 31st, 2008, time period,

18  SignaLife's short interest was more than that percent of its

19  trading volume.  And what he's saying is that in some

20  instances -- what he -- is that on some -- during some time

21  periods, SignaLife had short interest that was higher than the

22  average that I calculated, and then what he doesn't say is

23  that on other days it was lower.  And that's sort of the

24  nature of the average is that it's in the middle.

25        So I am unsurprised that on some of the days he

 1   would have a number that's in excess.

 2         I should note, however, he's actually talking about

 3   short interest here as opposed to short volume.  So in my

 4   calculation, I was comparing short volume to -- as a percent

 5   of trading volume to short volume as a percent of trading

 6   volume, which is apples to apples with a figure -- with the

 7   calculation performed in that study.

 8         Short interest is actually a different -- it sounds

 9   very similar, but it's a different thing than short volume.

10   Short volume is typically available, or it can be found on a

11   day-to-day basis.  You know, that's how much short selling

12   there is on a day divided by total trading volume.  Short

13   interest is a different measure that says how much, if we add

14   up everybody, how much of a total aggregate short position

15   does everybody in the market have for SignaLife.

16         So it's also a different metric in that regard.

17   Q    Turning ahead to page 16, back to exhibit 101.  What does

18   this chart show?

19   A    This chart shows what I would describe as a lack of

20   correlation between SignaLife's daily stock returns and its

21   daily short volume.

22   Q    And what did you find in your analysis here?

23   A    So I found that there was no -- like visually, I don't

24   see a sign of a correlation between SignaLife's daily stock

25   returns and its daily short volume.  Each dot on this chart is

1    a different day.  And if I had found this pattern of

2    correlation, I would have expected to observe that stock

3    returns would be higher when daily short volume was lower.  So

4    I'd expect to see more dots on the top left, and I'd expect to

5    see more dots on the bottom right, because I'd expect returns

6    to be lower when daily short volume was really high.  But

7    since I don't observe that sort of pattern of a negative slope

8    in the data, this is a chart that shows the lack of

9    correlation.

10   Q    And turning ahead to page 17 of exhibit 101, did you

11   conduct a regression analysis to determine the correlation

12   between SignaLife's stock returns and short selling?

13   A    Yes, I did.

14   Q    And what factors did you consider?

15   A    I considered the short selling volume in SignaLife's

16   stock on a day-to-day basis.

17   Q    What was the result of your regression analysis?

18   A    So my regression analysis shows that the coefficient,

19   which shows the correlation between SignaLife's returns and

20   short selling volume, is positive.  So, in other words,

21   SignaLife's returns tended to be higher when there was more

22   short selling.  This is the opposite direction.  This would go

23   in the opposite direction of the theory that SignaLife -- that

24   short selling was driving down SignaLife's stock price.

25              In addition, I find that that result is not

```
 1   statistically significant, because that .94 in parenthesis in
 2   absolute value is not greater than 1.96, and I find that a
 3   very small percent of -- less than -- about 1 percent of the
 4   variation in SignaLife's returns are explained by SignaLife's
 5   short selling volume.
 6   Q    And that's the R squared value?
 7   A    Yes, exactly.  That's the adjusted R squared.
 8   Q    And did you conduct any robustness checks?
 9   A    Yes, I did.
10   Q    Turning ahead to page 18 of exhibit 101.
11        Briefly, what other factors did you look at in these
12   robustness checks?
13   A    I looked at short selling volume as a percentage of daily
14   trading volume, and I looked at short selling volume as a
15   percentage of shares outstanding.  And I looked at that for
16   same-day short sales, short sales that occur on the same day
17   as the return, and for short sales that occurred the day
18   before the observed return.
19   Q    Did these robustness checks confirm your regression
20   analysis?
21   A    Yes, they did.
22   Q    I want to turn to page 19 of exhibit 101.
23        Are there different types of short selling?
24        THE COURT:  Why don't we take a break before we get
25   into this next area.  All right?
```

```
 1                MS. PASCUCCI:  Thank you, Your Honor.

 2                THE COURT:  Doctor, you can step down for a few

 3    minutes.

 4                We're going to take a 15-minute recess.  All right?

 5    Thank you.

 6         (A recess was taken from 10:35 a.m. to 10:53 p.m., after

 7    which the following proceedings were had:)

 8                THE COURT:  Please be seated, everyone.

 9                Back on the record.  Mr. Stein's present with

10    counsel.

11                You may continue your examination.

12                MS. PASCUCCI:  Thank you, Your Honor.

13    BY MS. PASCUCCI:

14    Q    So let's pull up page 19 of exhibit 101.

15                Are there different types of short selling?

16    A    Yes, there are.

17    Q    And is all short selling manipulative?

18    A    No, it isn't.

19    Q    What are the types of nonmanipulative short selling?

20    A    So short selling is not manipulative if it's just trading

21    by investors through broker dealers who are -- who are trading

22    by broker dealers who are providing liquidity to the market.

23                So this is the example like the dishwasher example

24    where you're just selling the stock to somebody who wants to

25    buy it.  I might be short selling simply because somebody
```

1   wants to buy, I don't have it in inventory, that leads me to

2   short sell.  But there's no manipulative intent there.  And,

3   in fact, it tends to be associated with upward movement in the

4   stock price, because the trade was sort of buyer initiated is

5   how we would describe that.

6          A different kind of nonmanipulative short selling

7   would be informational trading by investors who suspect that a

8   stock price is going to decline in the future.  So one reason

9   that they might suspect this is because of ongoing fraud.

10   They might suspect that there is ongoing fraud, and therefore

11   they expect the stock price to decline, or for other reasons

12   they expect the stock price to decline.  They're not

13   manipulating the stock price downwards; there's just trading

14   on the expectation that the stock price will decline in the

15   future.

16   Q    And you mention the link between short selling and fraud,

17   and I want to go ahead to page 20.

18          Can you explain that correlation a little more?

19   A    Sure.

20          So I'm going to actually read this, starting with

21   the middle sentence that says:  Short selling is associated

22   with a faster time to discovery for fraud cases, and it

23   actually dampens the share price inflation that occurs when

24   firms misstate their earnings.

25          So this is an abstract an article published in the

1    Journal of Finance, which is a well-regarded journal in my

2    field.

3             I'm going to read the next sentence now.  It says:

4    These results indicate that short sellers anticipate the

5    eventual discovery and severity of financial misconduct, and

6    they also convey external benefits helping to uncover

7    misconduct and keeping prices closer to fundamental values.

8    Q    I want to turn to naked short selling.

9             First, what is naked short selling?

10   A    Naked short selling is a short sale when the short seller

11   does not actually deliver the stock on the settlement date.

12   Q    Is all naked short selling manipulative?

13   A    No, it is not.

14   Q    Turning to page 21 of exhibit 101.

15            What is represented on this chart?

16   A    So I'm going to start out with the timeline, which

17   compares the trade date.  That's the date of the short sale.

18   And I labeled it naked short sale, but actually on the trade

19   date, you can't know whether or not the person is or is not

20   going to deliver the stock three days later.  So it -- really,

21   what you observe on the trade date is a short sale.

22            And then three days later, which is the settlement

23   date, if the short seller does not deliver the stock or the

24   brokerage firm does not deliver the stock on day T plus three,

25   then there's a fail to deliver.

1    Q    And I believe the Judge was asking you about this a

2    little before.  When would you know that a naked short sale

3    had happened?

4    A    You know that the naked short sale has happened on the

5    delivery date when the short seller does not actually deliver

6    the stock on date T plus three.

7    Q    So, and this is referred to as the settlement day on the

8    chart?

9    A    Yes.

10   Q    And this chart also refers to FTDs, or fails to deliver.

11   Can you explain the significance of that?

12   A    Sure.  Maybe I'll just walk through that chart at the

13   bottom?

14   Q    Yes, sure.

15   A    So in this example, somebody who actually -- in my

16   example, the person anticipates they already know that they're

17   going to be a naked short seller.  So they short a hundred

18   shares on Monday, and they short a hundred shares on Tuesday,

19   and then we don't know whether or not they're going to fail to

20   deliver until Thursday, which is the date that they're

21   supposed to deliver.  And on Thursday, we find out that we see

22   that there's a hundred fails to deliver, and so there was

23   naked short selling as of Thursday.  And then on Friday, the

24   number of fails to deliver would double to 200, because fails

25   to deliver are recorded on a cumulative basis.

```
 1              So in my hypothetical here, the number doubles when
 2    the next naked short sales -- when the next short sales are
 3    also not delivered.
 4    Q    So piecing that apart a little bit, first off, how are
 5    fails to deliver related to naked short selling?
 6    A    Fails to deliver are the -- are the report of whether or
 7    not there was a delivery failure.  And when there is a
 8    delivery failure, we know that the short selling -- the short
 9    selling that occurred actually three days ago is now -- can be
10    described as, quote-unquote, naked short selling.
11    Q    And --
12    A    I don't know who exactly came up with that term, but,
13    yeah.
14    Q    Can fails to deliver, are they always associated with
15    naked short selling?
16    A    No, they are not.
17              So you can have fails to deliver from a regular long
18    sale, as well.  You can think you're selling stock that you
19    have in inventory, but you might not be able to deliver it.
20    If you don't deliver a stock, whether it's a long sale or a
21    short sale, you have a failure to deliver.
22    Q    And you represent that they're counted as cumulative, and
23    can you explain what you mean by that?
24    A    I mean that the number of fails to deliver on each day
25    reflects the number of fails to deliver on that day plus the
```

1    fails to deliver on prior days that have not been closed out.

2    Q    And is that why there's a difference in the number of

3    fails to deliver in the second column and the third column?

4    A    Yes.  So the third column reflects the change in the

5    fails to deliver, which shows that you got a hundred new fails

6    on Thursday and a hundred new fails on Friday, but the fails

7    to deliver measure goes up to 200 on Friday, because it's

8    reported on a cumulative basis.

9    Q    And I want to show you exhibit -- sentencing exhibit 21.

10   And what is this chart?

11   A    This is a printout of the fails to deliver data for

12   SignaLife starting on that first date is January -- sorry,

13   September 20th, 2007, and the far right column gives you the

14   number of fails on that date.

15   Q    And is this reporting from the Securities and Exchange

16   Commission?

17   A    Yes, it is.

18   Q    Did you rely on this document in your analysis of

19   SignaLife naked short selling?

20   A    I relied on the data that is captured in this document,

21   yes.

22   Q    And how does the SEC report fails to delivers?

23   A    It reports fails to deliver on a cumulative basis, and

24   that during this time period it reported as zero if the number

25   of fail to deliver was less than 10,000 shares on a given day.

```
 1   Q     And going back to your chart, that's the second column of

 2   the chart that is cumulative?

 3   A     Exactly.

 4   Q     So turning ahead to page 22 of exhibit 101.  Is there any

 5   correlation between naked short selling and fraud?

 6   A     Yes.

 7         So we say that naked short selling is sometimes

 8   viewed as a scapegoat in instances of fraud.  So this quote

 9   here comes from educational material that the SEC has

10   developed and put on its website to answer questions about

11   short selling and naked short selling.  We say, there may also

12   be instances where a company insider or paid promotor provides

13   false and misleading excuses for why a company's stock price

14   has recently decreased.  For instance, these individuals may

15   claim that the price decrease is a temporary condition

16   resulting from the activities of, quote-unquote, naked short

17   sellers.  Often the price decrease is a result of the

18   company's poor financial situation rather than the reasons

19   provided by the insiders or promotors.

20         So the folks at the SEC have observed this phenomena

21   so often, that we felt that it was important to disseminate as

22   investor education to let investors know that if you hear that

23   a company's stock price has declined because of naked short

24   selling, there is reason to be cautious about investing in

25   that stock.
```

1   Q    Dr. Becker, given your experience, are you aware of

2   pervasive underreporting or hidden short selling?

3   A    Up until when I read the expert reports in this case, I

4   had never heard of the term of hidden short selling.

5   Q    Is this something --

6   A    Or hidden fails to deliver.

7   Q    Is this something that the SEC would be interested in if

8   this was a rampant problem in the market?

9   A    I would think so.  I mean, we're very much concerned

10  about market function, and we take that responsibility very

11  seriously.  It's the mission of the Commission.

12  Q    Turning ahead to page 23 of exhibit 101.  What does this

13  chart show?

14  A    This chart shows holding period returns for SignaLife and

15  fails to deliver.  So the fails to deliver, just like on the

16  previous chart, are marked as red lines on the bottom, and

17  they're red on the right-hand indexes.

18  Q    And what does your analysis bear out here regarding the

19  return of SignaLife stock and fails to deliver?

20  A    So my analysis shows that fails to deliver were often

21  higher when SignaLife's stock price was rising dramatically

22  than they were when during time periods when SignaLife's stock

23  price was declining.

24  Q    And, again, what would you expect to see if there were a

25  correlation between naked short selling and SignaLife stock

1    returns?

2    A    So if there were a correlation between short selling and

3    SignaLife's stock returns, I would expect to see overall

4    declines in SignaLife's stock during time periods where there

5    was high levels of fails to deliver, and I would expect to see

6    that the stock price would rise when fails to deliver were

7    lower.

8    Q    And turning ahead to page 24 of exhibit 101.

9             Do you agree with Dr. Hayter's criticism that a

10   subset during this period, from March 5th of 2008 to

11   April 29th of 2008, was a fact associated with a very large

12   number of fails to deliver?

13   A    So in point of calculation, I don't disagree with

14   Dr. Hayter's number of the finding of a negative 34 percent

15   return over these dates and the calculation of the average

16   fails to deliver of 331,000 during those dates.  But what I

17   found was that if I looked closer at the data, the results

18   don't bear up the conclusion.

19            So I show here one split of the stock which goes

20   between March 5th, 2008, and April 11th, 2008.  During that

21   time period, SignaLife's stock price rose by 91.4 percent, and

22   the average fails to deliver during that time period was

23   374,000.  So it's even higher than the number calculated by

24   Dr. Hayter.

25            And then if I look at the next time period in that

1    next subset of the time during that -- from April 12th to

2    April 29th, 2008, I find that the stock price drops by

3    65 percent, and the average fails to deliver are lower.

4    Q    Turning ahead to page 25 of exhibit 101, what does this

5    chart show?

6    A    So this chart shows that if I look on a daily basis -- so

7    in this chart each dot is a different day, and, again, the

8    vertical axis is the stock returns for SignaLife, and here the

9    X axis is the number of fails to deliver -- once again, I do

10   not observe that fails to deliver are generally higher.  When

11   fails to deliver are lower, I don't observe that the stock

12   returns are typically higher.

13         So like in the first part of this chart like toward

14   the left, I see that this is when fails to deliver are pretty

15   low, I see dots both above and below the zero percent line.

16   And as I look visually to the right, I see, again, sort of

17   relatively equal distributions of dots both above and below

18   the line.

19   Q    In other words, you do not see a correlation between

20   stock returns and fails to deliver?

21   A    Exactly.  I don't see evidence of that correlation.

22   Q    What would you expect to see on this chart if there were

23   such a correlation?

24   A    I would expect to see dots on the top left and on the

25   bottom right and generally speaking a picture showing a

```
 1    downward slope.
 2    Q     Turning ahead to page 26 of exhibit 101.  Did you also
 3    conduct a regression analysis here?
 4    A     I did.
 5    Q     What factors did you analyze?
 6    A     I analyzed the volume of fails to deliver and how that
 7    correlated with SignaLife's day-to-day stock returns.
 8    Q     What was the result of this regression analysis?
 9    A     So I found a negative relationship between SignaLife's
10    returns and the fails to deliver, that negative .0173 shows
11    that the relationship was relatively small, and the number of
12    parentheses underneath that, the 0.61, since in absolute value
13    that is not greater than 1.6, I concluded that the
14    relationship between the volumes of fails to deliver and
15    SignaLife's returns is not statistically significant.
16    Q     And turning ahead to page 27 of exhibit 101, did you
17    review the expert report of Dr. Shapiro in this matter?
18    A     I did.
19    Q     What measure did Dr. Shapiro use in his regression
20    analysis?
21    A     He used the percentage change in fails to deliver.
22    Q     Did you use that metric?
23    A     I did not.
24    Q     And why not?
25    A     I didn't use that metric because to me it didn't make
```

```
 1   sense.

 2   Q    Why didn't it make sense?

 3   A    Because that measure -- if I use that measure, then an

 4   increase in the number of fails to deliver from one to two

 5   counts as a 100 percent increase in the fails to deliver.  So,

 6   in other words, one more failure to deliver, failure to

 7   deliver a single stock, can -- would be associated with a

 8   100 percent increase in the fails to deliver.

 9          And I come up with that same 100 percent increase if

10   the level of fails to deliver increases from 1 million shares

11   to 2 million shares.  So that's a very large increase in the

12   number of fails to deliver, but it would count as the same

13   100 percent increase using Dr. Shapiro's measure.  So as an

14   economist, I felt that that measure does not make sense.

15   Q    Turning ahead to page 28 of exhibit 101.

16          What is represented on this slide?

17   A    So this slide provides that same timeline from before of

18   the trade date to the settlement date, but it shows that the

19   trade date is the date on which I would expect to see a

20   trading effect of naked short selling.  So if naked short

21   selling caused the stock price to decline because of trading

22   volume or the effect of additional selling or short selling,

23   then I would count that as the trading effect, and I would

24   expect to see that effect on the stock price on date T.

25   That's when the trade occurs.
```

```
 1              The information effect of naked short selling occurs
 2   on the date when we know whether or not there is a fail to
 3   deliver, on date T plus three, the settlement date.  And
 4   that's when the world learns, oh, this short seller is not
 5   delivering their stock.  So to the extent that that affects
 6   investors' views of the value of the stock, that might have an
 7   effect on that date.
 8   Q    In other words, you wouldn't know that there had been a
 9   naked short sale from the trade date alone?
10   A    That's right.
11   Q    Did you perform robustness checks in this analysis?
12   A    I did.
13   Q    And let's turn to page 29 of exhibit 101.
14              What factors did you consider in those robustness
15   checks?
16   A    So in addition to looking at the measure of fails to
17   deliver, which I abbreviated FTDs, and that parenthesis MM
18   means in millions, I also looked at fails to deliver divided
19   by daily trading volume and fails to deliver divided by shares
20   outstanding for the company.
21              I also looked at the change in the fails to deliver
22   relative to the previous date, the change in the fails to
23   deliver divided by trading volume and the change in fails to
24   deliver divided by shares outstanding.  And I looked at
25   those -- I looked -- I did a regression on the trading effect,
```

1    looking at both the same-day naked short sale and the previous

2    day's naked short sale.  And I also did a regression looking

3    for the information effect looking at the day of the fail to

4    deliver and the fail to deliver on the previous day.

5    Q    So looking at the information effect, you're looking at

6    when one would have learned that there was -- a short sale

7    was, in fact, a naked short sale?

8    A    That's right.

9    Q    Did you also look into month or several-month-long lags

10   when conducting these robustness checks?

11   A    I did not.

12   Q    Why didn't you look at that metric?

13   A    Because it did not make sense to me.

14   Q    Why wouldn't that make sense?

15   A    So if I looked to see whether or not the stock price

16   responds one month later to the fact that somebody failed to

17   deliver the stock today, what I would have to believe is

18   that -- so, remember, the public learns on the settlement date

19   as to whether or not there is a failure to deliver.  So now

20   this information is publicly available, and investors -- not

21   just one investor, but the whole collective market of

22   investors would have to sort of decide to not react to that

23   information today or tomorrow or the next day, but to hang on

24   to that information and then react to it, like, three months

25   later.  So to hold back from trading on the information, but

```
 1   then to react to the information three months later, and that
 2   just -- it doesn't make sense from my perspective of common
 3   sense, and it also is inconsistent with any model or empirical
 4   analysis that I am familiar with in the field of finance.
 5   Q    Did your robustness checks conducted here confirm your
 6   regression analysis?
 7   A    They did.
 8   Q    I want to turn to the chart on page 30 of exhibit 101.
 9            Did you study what effect, if any, the Uncle Mills
10   trade had on SignaLife stock during the relevant period?
11   A    Yes, I did.
12   Q    What is the Uncle Mills trade?
13   A    The Uncle Mills trade is a purchase by this small private
14   fund.  They purchased over-the-counter 10,000 shares of
15   SignaLife at a dollar per share.  So they expended a total
16   amount of $10,315 on September 20th, 2008.
17   Q    And this is after the relevant period?
18   A    Yes.
19   Q    And what effect, if any, did you determine that the Uncle
20   Mills trade had on SignaLife stock returns during the relevant
21   period?
22   A    It had none.
23   Q    And why didn't the Uncle Mills trade have an effect?
24   A    Because it occurred after the end of the relevant period.
25   Q    Turning ahead to page 31 of exhibit 101, did you study
```

1    what effect, if any, the termination of the Rubbermaid

2    contract had on SignaLife's stock during the relevant period?

3    A    I did.

4    Q    And when did SignaLife enter into a contract with

5    Rubbermaid?

6    A    SignaLife entered into a contract with Rubbermaid to

7    distribute its products on March 30th, 2006.

8    Q    When was the contract terminated?

9    A    It was terminated -- or the termination was announced on

10   January 30th, 2007.

11   Q    Both these dates occurred before the relevant period?

12   A    Both of these dates occurred well before the relevant

13   period, which doesn't start until September 20th, 2007.

14   Q    Did the termination -- did you determine that the

15   termination of the Rubbermaid contract had any effect on

16   SignaLife's stock returns during the relevant period?

17   A    I determined that it had no effect on SignaLife stock

18   returns during the relevant period.

19   Q    How did you come to that conclusion?

20   A    I did two things.

21            First, just as I was talking about with these

22   multiple months of delay between learning about -- between the

23   public learning about information and then thinking that there

24   would be a stock price reaction with many months of delay, so

25   as a matter of common sense, it makes no sense to think that

1    the termination of the contract on January 30th would be

2    affecting returns between September 20th and August 15th.

3            Second of all, I looked to see whether or not the

4    initiation of the contract or the termination of the contract

5    was associated with an abnormal return, because if I wanted to

6    think that the Rubbermaid contract was so important to

7    SignaLife that it had this incredible lasting effect causing

8    declines in the stock price like a year later, then I would

9    think that when the world first learned that SignaLife entered

10   into the contract and when SignaLife terminated the contract,

11   that it would be associated with statistically significant

12   abnormal return for SignaLife's stock price, because it would

13   have mattered to investors at that level.

14   Q    Turning ahead to page 32 of exhibit 101.

15   A    Can I just say, and I found that those returns were not

16   statistically significant.

17   Q    Did you study what effect, if any, the selling of shares

18   by YA Global had on the value of SignaLife stock during the

19   relevant period?

20   A    Yes, I did study that.

21   Q    First off, what is YA Global?

22   A    YA Global was essentially an underwriter.  So YA Global

23   is an entity that was unable to sell SignaLife stock into the

24   market.

25   Q    Did you find that the selling of shares by YA Global

1   caused the decline in SignaLife stock during the relevant

2   period?

3   A    I found that it did not cause the decline in SignaLife

4   stock during the relevant period.

5   Q    And how did you come to that determination?

6   A    I looked at the days when YA Global sold SignaLife stock.

7   So I found that they sold SignaLife stock on 92 different days

8   out of the 229-day relevant period.  They sold almost

9   13 million shares for $9 million.  And I calculated whether or

10  not YA Global was a net buyer or a net seller on each of those

11  days.  I found that YA Global was a net seller on 72 of those

12  days.  And then I calculated how the stock price changed on

13  those days on average, and I found on average that the stock

14  price actually rose on the days when YA Global was selling

15  SignaLife stock.

16          So I concluded that the selling of shares by YA

17  Global did not cause the decline in SignaLife stock during

18  this period.

19  Q    Turning ahead to page 33 of exhibit 101.

20          Did you determine whether the liquidity of

21  SignaLife's stock caused the decline during the relevant

22  period?

23  A    Yes, I did.

24  Q    And could you describe the various measures of liquidity

25  that are reflected on this chart?

```
 1   A    Sure.
 2          The first measure is daily trading volume, which is
 3   sort of a basic measure of like how much is the stock trading.
 4   If it's liquid, you expect daily trading volume to be higher.
 5          Economists more commonly look at a measure called
 6   turnover, which is just that daily trading volume number
 7   divided by the total shares outstanding.  Just because if you
 8   have a company with a lot of shares outstanding, that's
 9   relevant when you think about the daily trading volume.  You
10   would want to normalize by how many shares outstanding there
11   were when you look at the daily trading volume, in other
12   words.
13          So the second column is really one measure of
14   liquidity, the first measure of liquidity.
15          The second measure of liquidity is the bid-ask
16   spread.  Here I have the bid-ask spread measured in dollars.
17          And the third measure of liquidity is the number of
18   I called it nontrading days.  This is the number of days in
19   which there were no trades in SignaLife stock.
20   Q    And what is represented in the bottom part of this chart?
21   A    The bottom part of the chart shows the -- these liquidity
22   measures for comparable firms during the relevant period.
23   Q    And what did you determine regarding the liquidity of
24   SignaLife stock during the relevant period as compared to
25   those comparable firms?
```

```
 1   A    I found that SignaLife was at least as liquid and

 2   generally more liquid than these comparable firms during the

 3   relevant period.

 4   Q    So did you determine that the decline in SignaLife stock

 5   during the relevant period was attributable to the illiquidity

 6   of SignaLife stock during this period?

 7   A    No, I concluded that the decline in SignaLife stock was

 8   not due to the illiquidity of SignaLife stock during this

 9   period.

10   Q    And how did you come to that conclusion?

11   A    I came to that conclusion based on my observation that

12   SignaLife's stock was essentially not particularly illiquid

13   when compared to comparable firms.

14   Q    Turning ahead to page 34 of exhibit 101.

15        Did you determine what effect, if any, the class

16   action lawsuit had on SignaLife stock during the relevant

17   period?

18   A    I concluded that the class action lawsuit did not have an

19   effect on SignaLife stock during the relevant period.

20   Q    And how did you come to that conclusion?

21   A    I came to that conclusion because the class action

22   lawsuit was filed after the end of the relevant period.

23   Q    Dr. Becker, did any of the events you analyzed today

24   cause a decline in SignaLife stock, in your opinion, during

25   the relevant period?
```

```
 1   A     No, they did not.

 2   Q     And, Dr. Becker, how much were you paid for your work in

 3   this case?

 4   A     I was not paid any additional pay.  I just get my regular

 5   salary at the SEC.

 6            MS. PASCUCCI:  The Court's indulgence, Your Honor.

 7            THE COURT:  If I may while you're checking, I have

 8   another question about the short selling failure to deliver,

 9   just for my own edification.

10            What happens when there's a failure to deliver

11   between the parties that -- the short seller and the entity

12   from whom the stock was borrowed?  How does that get resolved?

13            THE WITNESS:  It gets captured as a failure to

14   deliver.  So the company that's supposed to deliver is sort of

15   on the hook.  You know, we have documents that say you're

16   supposed to deliver.

17            If the failure to deliver continues, then the

18   broker-dealer that executed the, quote-unquote, naked short

19   sale will have different abilities taken away from it.  Like

20   it will after a period of time no longer be allowed to engage

21   in more short selling, that kind of thing.

22            THE COURT:  So there are regulatory . . .

23            THE WITNESS:  Exactly.  We do our best to kick in as

24   regulators to make sure that this doesn't persist.

25            However, I will say that it happens -- fails to
```

1    deliver happen relatively often, and the economic impact isn't

2    colossal, in my view, of a failure to deliver.  It's -- it's

3    just that the stock didn't get delivered.

4         You know, the people who short sold the stock still

5    actually have to deliver the dividend.  So if the stock pays

6    dividends at all, they have to give those dividends to the

7    person who bought the stock, even if the person who bought the

8    stock doesn't actually, quote-unquote, have it in their

9    possession.  They -- they're on record as having bought the

10   stock.  They would have the voting rights, and the short

11   seller has to pay the dividends over.  So it's sort of like as

12   if they held the stock.

13        And the failure -- the regulators and the industry

14   put considerable pressure to make sure that the fails get

15   closed out.

16             THE COURT:  Okay.  Thank you.

17             MS. PASCUCCI:  Thank you, Your Honor.  No further

18   questions.

19             THE COURT:  Thank you.

20             Cross-examination.

21             MR. GRUENSTEIN:  Thank you, Your Honor.

22                       Cross-Examination

23   BY MR. GRUENSTEIN:

24   Q    Good morning, Dr. Becker.

25   A    Good morning.

```
 1   Q    As part of your event study analysis, you studied the
 2   impact of five events on SignaLife's stock price during the
 3   relevant period, correct?
 4   A    That's correct.
 5   Q    Those were the three press releases on September 20th,
 6   25th and August 10th, correct?
 7   A    October 10th, yes.
 8   Q    October 10th, correct?
 9   A    Yes.
10   Q    As well as the April 14th webcast and the August 15th
11   10-Q; is that correct?
12   A    That's correct.
13   Q    You did not conduct any analysis to determine how much
14   investors lost during the relevant period; is that correct?
15   A    That's correct.
16   Q    And that's true whether we look at investors individually
17   or as a group; you did not express any opinion on the loss
18   amount, correct?
19   A    Correct.
20   Q    And you also express no opinion on what the proper method
21   of calculating that loss would be in this case, correct?
22   A    That's correct.
23   Q    Have you ever worked with Mr. Melley before?
24   A    Our paths have crossed before, I think, but I am not sure
25   exactly when.
```

1    Q    Did they --

2    A    I recognize his name.

3    Q    Okay.  Did you work with him at all in this case?

4    A    Oh, no.

5    Q    Okay.

6    A    Oh, I think I remember; sorry.

7          It's because on a previous case I worked with one of

8    his colleagues.  So I actually -- and it would have been him,

9    but he was out on vacation.  So I had a sort of a near miss

10   with Peter Melley on a different case.

11   Q    Okay.  But you did not work at all with him in this case,

12   correct?

13   A    Absolutely right, yes.

14   Q    Did you even know that he was working on this case?

15   A    Yes, I did.

16   Q    And you understand that he was the one that calculated

17   the alleged loss to investors in this case?

18   A    Yes.  So I actually did talk with him about his

19   calculation, and I provided him the inputs that he used in his

20   calculation.

21   Q    Okay.  So you provided him, for example, the 18 percent

22   inflation amount?  I think that was GX32, perhaps.

23   A    Yes.  I don't remember the exhibit number, but, yes,

24   absolutely I provided him with that.

25   Q    Okay.  But did you give him any instruction on how he

1   should calculate loss in this case?

2   A    I told him how I would calculate loss in this case.

3   Q    And how would you calculate loss in this case?

4   A    I would look at -- so there is a bunch of different ways

5   you could calculate loss.  But if you're interested in

6   calculating loss based on the event study results, I would use

7   the event study results to look at how much inflation was

8   there in the stock price on the date an individual purchased

9   the stock.  So that would be sort of how much did the person

10  overpay because of the inflation in the stock price.  And then

11  I would look to see whether or not they sold the stock price

12  when there was still inflation in the stock, and I would

13  subtract any inflation that was in the stock on the date that

14  they sold.

15  Q    Okay.  And is it your understanding that that is the

16  method that he ended up following?

17  A    I think it's one of the methods.  I think he does more

18  than one thing.  I'm not -- I've actually not seen his

19  results.  I haven't talked to him about it.

20  Q    And you believed, based on your expertise, that that was

21  an appropriate method for calculating the loss in this case?

22  A    Yeah.  That's a very standard method.  It's very widely

23  used.

24  Q    Okay.  But you did not explain this method at all in your

25  expert report, because you were not actually conducting this

```
 1   analysis, correct?
 2   A    That's right.
 3   Q    And are you aware of whether Mr. Melley explained in his
 4   analysis how he -- you know, that he had relied on you for
 5   this method?
 6   A    Yeah, I don't know.  I haven't seen anything that he did.
 7   Q    Okay.  Have you testified before to calculate losses in a
 8   securities fraud case using the method you just described?
 9   A    Sorry for the pause.  I'm trying to remember.
10        Do you mean courtroom testimony or expert report?
11   Q    I mean courtroom testimony.
12   A    Okay.  I don't think so.
13   Q    And would you consider that expert analysis to do that
14   sort of work?
15            MS. PASCUCCI:  Objection, Your Honor.
16            THE COURT:  Overruled.
17            You can answer.
18            THE WITNESS:  You know, I'm not sure.
19   BY MR. GRUENSTEIN:
20   Q    But you believe that there is support in the literature
21   for that approach?
22   A    Absolutely, yeah.
23   Q    And in your report, you didn't provide support in the
24   literature, correct?
25   A    Yeah.  It's not just even in the literature.  There's
```

1    something called like the handbook of litigation something.

2    Anyway, it's in there, too.

3    Q    Okay.  But you don't -- you didn't describe that in your

4    report, and you're not aware whether Mr. Melley provided that

5    information to the defense, are you?

6    A    That's right.  I didn't provide it, and I'm not aware if

7    he provided it.

8    Q    Okay.  You testified about your event study that there

9    are three steps, correct?

10    A    Four, actually.

11    Q    Four.

12         Well, the first one I have is that you estimate what

13    the predicted return would be?

14    A    Yes.

15    Q    You then compare the -- and just to be clear, that first

16    step, that would be based on market and industry performance?

17    A    Well, it wasn't in my case, because the market and

18    industry were uncorrelated with SignaLife stock returns.

19    Q    But typically that is what you would look at, correct?

20    A    It's often what one would look at, yeah.

21    Q    And then you compare the actual return to the predicted

22    return to find what you've been calling the abnormal return?

23    A    Yes.

24    Q    And then the third step that I have is that you would do

25    a statistical test to determine whether that return is

1   abnorm -- is statistically significant; is that correct?

2   A    Yes.  I would call that my fourth step.

3   Q    Okay.  So what step did I miss?

4   A    It's the one of checking to see whether or not there was

5   any other news on that date that would explain the observed

6   return.

7   Q    Okay.  And if there was other news, then it could be that

8   one piece of news or the other caused the return or a

9   combination of the two pieces of news, correct?

10  A    Right.  It would depend on what the news was and when it

11  came out relative to the observed decline in the stock price.

12  Q    Okay.  And you would call that other piece of news a

13  confounding factor, perhaps?

14  A    I would call it potentially confounding news, absolutely.

15  Q    Okay.  When you look at the abnormal return, it's

16  possible that some amount of that return is attributable to

17  the news and some other part of the return is attributable,

18  say, to a confounding piece of news, correct?

19  A    Are you sort of speaking in general?

20  Q    In general, yes.

21  A    Yes.

22  Q    And it's also possible that part of that abnormal return

23  is due to random variation in the stock price, correct?

24  A    Sorry, can you say that again?

25  Q    It's also possible that part of the abnormal return is

1   due to random variation in the stock price?

2   A    Yes.

3   Q    So when you, for example, said that there was an abnormal

4   return of 18 percent, part of that you attribute to the

5   webcast, but it could be that part of that relates to random

6   noise occurring on that day, correct?

7   A    Well, that's why I calculate -- I do the statistical test

8   to see whether or not it's attributable to the day-to-day

9   noise in the stock price.

10  Q    Right.  But when you are -- you made a determination that

11  18 percent would be an abnormal return, correct?

12  A    Yes.

13  Q    You did not make a determination that the webcast caused

14  all 18 percent of that increase, correct?

15  A    I did actually make a determination that the expected

16  value of the effect of the webcast is the 18 percent.  Because

17  remember, random noise can be both positive and negative.  It

18  would go -- I would expect it to go both ways.  That's the

19  whole thing about it being random.

20          So 18 percent is my best estimate of the

21  inflation -- well, actually, the 18 percent is not the

22  webcast; the 18 percent is --

23  Q    I'm sorry.

24  A    -- purchaser order press release.

25  Q    I apologize.

```
1    A    Right.  Yeah, I'm sorry.

2    Q    Okay.  But while the 18 percent may be your best

3    estimate, there could also be a margin of error there,

4    correct?

5    A    Yeah.  That's why I do the statistical hypothesis test.

6    Q    Right.  But the statistical hypothesis test tells you

7    that the abnormal return was caused by the event.  It doesn't

8    tell you specifically that the right number, the right effect

9    is 18 percent.  It could be somewhere less than 18 percent; it

10   could be somewhere more than 18 percent, correct?

11   A    That's right.

12   Q    And do you have any sense of what the margin of error is?

13   A    I do because I calculated it, but I cannot tell it to you

14   off of the top of my head.

15   Q    Okay.  So could the actual error have been -- I mean, the

16   actual return due to the purchase orders have been something

17   closer to 16 percent?

18   A    I can't remember what the standard deviation was, but I

19   would imagine, yes.

20   Q    Okay.  You did say with respect to the 10-Q announcement

21   in August that there was a -- if I -- if I recall, that there

22   was a 9 percent abnormal return, correct?

23   A    Yes.

24   Q    Or a negative 9 percent.

25        And you found that that was not statistically
```

1   significant?

2   A    That's correct.

3   Q    So that 9 percent could have been noise, random variation

4   in the stock price?

5   A    That's right.

6   Q    Is it possible that on the day that the stock price went

7   up 18 percent, that half of that 9 percent was random noise or

8   variation, and the other 9 percent was the impact of the press

9   release?

10  A    I could give you a better calculation.  I think you're

11  looking for the confidence interval on the 18 percent, and

12  that is a knowable thing, but I just don't know it off of the

13  top of my head.

14  Q    You also --

15       MR. GRUENSTEIN:  Why don't we put up the Government

16  exhibit, I believe it's 32, that has the list of inflation.

17  BY MR. GRUENSTEIN:

18  Q    Sorry.  While we're putting it up, essentially you

19  created a list showing what the inflation was on each day in

20  the stock price during the relevant period, correct?

21  A    Yes.

22  Q    And you were able to determine that there was an

23  18 percent inflation on the second press release, correct?

24  A    Yes.

25  Q    But that really is plus or minus whatever the confidence

1    interval is.  It could have been less than 18 percent?

2    A    No.  Well, my best estimate is 18 percent, just to be

3    clear.

4    Q    Okay.  Your best estimate, but in reality, the number

5    could have been less than that or more than that?

6    A    Uh, yes.

7    Q    Did you do any analysis to support a finding that the

8    inflation was 18 percent in every day subsequent to the

9    issuance of the press release?

10   A    No, I did not.

11   Q    Okay.  So as far as you know, Mr. Melley relied on a

12   conclusion that there was an 18 percent inflation on every

13   subsequent day, despite the fact that you did not do any

14   analysis to support that; is that correct?

15   A    Yeah.  My analysis in support of that comes from checking

16   the return on October 10th and checking the return on

17   April 14th, and the 18 percent declines on April 14th, when

18   the press -- when the webcast happens.  So, yeah.

19   Q    Right.  But the stock did not decline 18 percent on

20   April 14th.

21   A    Right, it declined by 12.7 percent.  So my inflation

22   measure declines by 12.7 percent on that date.  So it goes

23   down to like whatever that difference is, 5.3 percent, on

24   April 14th.

25   Q    Is it possible that the inflation amount was somewhere in

```
 1    between 12 and 18 during the period between the press release

 2    and the webcast?

 3    A    You're talking about some kind of -- are you talking

 4    about the possibility that there were additional corrective

 5    disclosures in between or something?

 6    Q    Well, I'm really asking what analysis you did to assure

 7    yourself that the inflation did not decrease from 18 to 12

 8    before the webcast, whether you did any analysis of that.

 9    A    I did not.

10         MR. GRUENSTEIN:  Okay.  If we could blow that up a

11    little bit if that's possible.  And this is GX32?

12    BY MR. GRUENSTEIN:

13    Q    When you looked at the inflation, you looked at the --

14    when you say actual price, that is not the actual price that

15    any purchase -- any one purchaser paid or received for the

16    stock, is it?

17    A    It's the closing price on that day.

18    Q    Okay.  So for a particular person, they may have had a

19    higher or lower price on that day, correct?

20    A    That's right.

21    Q    And if you were going to say for a given person how much

22    inflation did they have in their stock, if you're using these

23    numbers, it could actually be skewed, because their purchase

24    price may have been different?

25    A    I wouldn't call it skewed, because skewed implies that
```

1    there's like a directional bias in it.  I would call this an

2    approximation.

3    Q    Okay.  But for any particular person -- I'm not asking

4    over the course of the whole population, because that goes to

5    your bias point.  For any particular person, their inflation

6    may actually be higher or less than 18 percent based on the

7    price at which they bought the stock.

8    A    It might.

9    Q    Okay.

10   A    But how we typically calculate investor losses is not

11   necessarily based on calculating a different inflation amount

12   for each individual purchaser or seller.

13   Q    Okay.  And that -- in your expert opinion, that is an

14   acceptable way of conducting such analysis, correct?

15   A    This is an acceptable way, yes.

16   Q    Right.  Which you didn't explain in your expert report,

17   correct?

18   A    That's correct.

19   Q    And Mr. Melley is not testifying here as an expert, so he

20   won't be explaining it as an expert either, correct?

21   A    Presumably, yeah.

22   Q    You did not explain in your report anything with respect

23   to market efficiency; is that correct?

24   A    That's correct.

25   Q    And you are now expressing the opinion that you can do an

1   event study without having determined market efficiency?

2   A    Yes.

3   Q    And this is the first time in this case that you have

4   explained that; is that correct?

5   A    I -- yeah, I think so.  How else would I have done it?

6   Just my expert report -- I wrote an expert report; I wrote a

7   rebuttal report.  It wasn't in there, and now I'm here talking

8   about it.  So, yeah.

9   Q    Are you familiar with academic literature that says that

10   market efficiency is actually a precursor for doing an event

11   study?

12   A    Yes.

13   Q    Are you -- well, in fact, you cite to one of those, and

14   this was in your report at paragraph 12, note 3, you cite to a

15   Campbell and MacKinlay chapter called "Event Study Analysis"

16   in the Econometrics of Financial Markets.

17           Do you recall that piece of literature?

18   A    This may be Campbell, Lo and MacKinlay?

19   Q    It may be.

20   A    Yeah, I think so.

21   Q    That's correct.

22           So on page 140, the authors say:  The usefulness of

23   such a study -- meaning an event study -- comes from the fact

24   that given rationality in the marketplace, the effect of an

25   event will be reflected immediately in asset prices.  Thus,

 1    the event's economic impact can be measured using asset prices

 2    observed over a relatively short time period.  I put that up.

 3    We can introduce it as defense exhibit 71.  We've highlighted

 4    that.

 5              Are you familiar with that piece of literature?

 6    A    I'm certainly familiar with this chapter in this

 7    textbook.

 8    Q    Okay.  And are you familiar with any academic literature

 9    that says that you do not need market efficiency for a

10    particular stock in order to do an event study?

11    A    Yes.

12    Q    And can you tell us what that literature is?

13    A    Not off the top of my head, but I think I can explain it.

14    Q    In order to conclude that an event on a particular date

15    caused a price reaction on that date, you would need to assume

16    that the information makes its way to the market quickly and

17    the market is able to incorporate that information into the

18    stock price, correct?

19    A    No.

20    Q    And why is that?

21    A    It's because what I'm doing with my event study is

22    checking to see whether or not the information is making its

23    way into the stock price.  So if I -- if you look at scholarly

24    texts on how to study market efficiency, they say that one

25    thing you should do is test to see -- you should conduct an

```
 1    event study to test to see whether or not the stock price is
 2    moving in response to news.
 3             So you sort of have to do an event study in order to
 4    test for market efficiency.  So I can't have to test for
 5    market efficiency in order to do an event study, because that
 6    would lead me into an infinite circle.
 7    Q    But you would agree that there are also other factors
 8    that should be looked at, or at least that courts look at, to
 9    determine market efficiency, correct?
10    A    There are other factors that courts look at to study
11    market efficiency, yes.
12    Q    Like the number of analysts who follow a company,
13    correct?
14    A    That is a measure I am aware I think has been looked at
15    by courts, yes.
16    Q    Okay.  And are you aware that there are -- without going
17    into all of the factors, that there are other factors that
18    courts look into to determine market efficiency?
19    A    Yes.
20    Q    But in your situation, the only thing you looked at is
21    whether the event study led to conclusions that news was being
22    incorporated into the stock price, correct?
23    A    Well, I wasn't studying market efficiency; I was looking
24    to see whether or not the news went into the stock price.
25    Q    Okay.  Without doing a market efficiency analysis?
```

```
 1    A     Correct.

 2    Q     You say that it did, but it didn't in every instance,

 3    correct?  With all pieces of news?

 4    A     I'm not sure what you're referring to, sir.

 5    Q     Well, why don't we put up the Government exhibit that

 6    showed the stock price with the five events, the three in red

 7    and two in blue I believe that you looked at, which is your

 8    slide -- sorry I don't have the specific page number.

 9              MR. GRUENSTEIN:  And for the record, is that

10    slide 8?  Yes.

11    BY MR. GRUENSTEIN:

12    Q     So you see on the left there are three red dots.  Those

13    are three press releases, correct?

14    A     Yes, they are.

15    Q     You found no abnormal return on the first and the third,

16    correct?

17    A     That's right.

18    Q     So that news was not incorporated into the market in any

19    way that affected the stock price, correct?

20    A     It may very well have been incorporated into the market

21    in a way that affected the stock price, but -- like, for

22    instance, the third date had a smaller purchase order amount.

23    So perhaps the return was just smaller.  The announcement

24    effect of that news, the inflationary effect of that news was

25    just smaller.
```

```
 1   Q    Well, you found a 0.00 percent abnormal return for both
 2   of the first and the third press release, correct?
 3   A    That's correct.
 4   Q    So it doesn't get much smaller than that, does it?
 5   A    It could be negative.
 6   Q    Okay.  The first -- is it possible that the second press
 7   release, where there was an inflation you found of 18 percent,
 8   that that could have somehow incorporated both the news from
 9   the first and the second, and the cumulative effect was the
10   18 percent when -- and let me rephrase it.
11             So that when investors saw, well, not only was there
12   one press release, but there was a second press release, now
13   they say, okay, the stock should go up 18 percent?
14   A    That's not inconceivable to me, no.
15   Q    Now, if it were the case that the first press release
16   were not even fraudulent, then you would -- if that happened,
17   you would say the 18 percent was resulting both from a
18   nonfraudulent first press release and a fraudulent second
19   press release; would that be correct?
20   A    Yeah, I don't think I needed to know, like, the fraud
21   part.  I guess I -- anyway, but, yes, that could have
22   happened.
23   Q    To be clear, when we're talking about the 18 percent
24   increase, you said earlier you did not opine on the amount
25   that SignaLife investors lost, correct?
```

```
1    A    Correct.

2    Q    So this 18 percent does not reflect the amount that

3    SignaLife investors lost during the period, correct?

4    A    It in -- yeah, it would reflect the amount by which they

5    overpaid between those dates, between the September 25th and

6    the April -- 2007 date and the April 14th, 2008, date as a

7    percent.

8    Q    Okay.  In fact, the 18 percent would be a cap on what

9    SignaLife investors lost, using Mr. Melley's method, correct?

10   A    Sorry, I don't know why that would be a cap.

11   Q    Well, then we don't need to -- we don't need get into --

12   or how familiar are you with the method that Mr. Melley

13   ultimately performed?

14   A    Not very familiar.

15   Q    Okay.  Then I'll save that question for him.

16              You're familiar generally with how damages are

17   calculated in securities fraud cases, correct?

18   A    Yes.

19   Q    And you've seen securities fraud cases where the amount

20   of the loss is equal to the number of shares times the number

21   of shares outstanding on the day of the disclosure of the

22   fraud times the stock drop on that day, correct?

23   A    I'm sorry, I just didn't completely follow your question.

24   Q    Let me start again.

25              In securities fraud cases, have you seen a measure
```

1    of damages where the loss is calculated based on the loss on

2    the day of the disclosure of the fraud?

3    A    I -- yes.

4    Q    And in those situations, the rationale is that when the

5    fraud is disclosed, that -- and you look at the stock price,

6    you can see how much the market built into the fraud based on

7    how much the stock went down on that day; is that correct?

8    A    Yes.

9    Q    And then you take the stock price and you multiply it by

10   the number of outstanding shares, correct, and that is the

11   loss?

12   A    You mean you take -- not the stock price, but the --

13   Q    The delta.

14   A    The change on the stock price.

15        And you multiply it by what, did you say?

16   Q    The number of shares, the number of investor shares,

17   outstanding on the day of that stock drop, correct?

18   A    I've heard of this method.  I don't know that I've ever

19   seen it in practice.

20   Q    Okay.  You're not aware that this is the moment common

21   method that is used in securities fraud cases?

22   A    The thing that you're describing, multiplying by the

23   total market cap, maybe it's because -- I would -- I did

24   not -- I was not aware that that was the most common method

25   used.

```
 1   Q     Okay.

 2   A     I'm still not aware of it, but I take your word.

 3   Q     Okay.  Do you ever work in civil securities fraud cases?

 4   A     I have worked in civil securities fraud cases.

 5   Q     Okay.  And you've never seen this method performed?

 6   A     I don't think so, no.

 7   Q     You're familiar with the Dura case?

 8   A     Yes.

 9   Q     And in your view, when the stock price was inflated

10   18 percent on the date of the second press release, do you

11   believe that investors suffered a loss at that point?

12   A     If investors purchased a stock that was overpriced by

13   18 percent, then they overpaid by the amount of the inflation

14   in the stock price at the time, but their losses would be

15   determined based on how much inflation there was when they

16   sold the stock price.  So you sort of need both ends of their

17   transaction in order to determine what their losses were.

18   Q     Okay.  So if the stock price went up and they sold, then

19   you would agree they didn't lose any money?

20   A     Well, if the amount of inflation increased --

21   Q     No, I'm talking about whether if the stock price goes

22   up --

23   A     Okay.

24   Q     -- and the inflation stays constant, they would make

25   money off of the sale, correct?
```

```
 1   A     If the stock price goes up and the inflation remains

 2   constant as a dollar amount or as a percent, either one, they

 3   would make money.

 4   Q     Okay.  If the stock price goes down under this inflation

 5   focus theory, then you would say that the person lost money,

 6   correct?

 7   A     Well, this -- that's not based on the inflation.  Now

 8   you're -- I'm sorry, I'm confused.  I think you're just

 9   talking about did -- how did their purchase price compare with

10   their selling price.

11   Q     Right.  And they lost money in that situation.

12   A     Yes.

13   Q     And they didn't lose money as a result of having paid an

14   inflated amount; they lost money because the stock price went

15   down, correct?

16   A     Yes.

17   Q     In fact, they don't lose money as a result of the fraud

18   until the date that the fraud is revealed, correct?

19   A     Until at least some portion of the news about the fraud

20   is revealed.

21   Q     Which, in your analysis, was on April 14th, the day of

22   the webcast, correct?

23   A     That was the first date, yes.

24   Q     And the reason I asked you about Dura is there is a line

25   in Dura at 342, 544 U.S. at 342, that says, as a matter of
```

1    pure logic, at the moment the transaction takes place, the

2    plaintiff has suffered no loss.  The inflated purchase payment

3    is offset by ownership of a share that, at that instant,

4    possesses equivalent value.

5              And you agree with that point, correct?

6    A    Yes, it's consistent with the calculation I've described,

7    or that I recommended.

8    Q    So in your view -- I think you've said it, but just to be

9    clear -- people did not suffer a loss -- investors in

10   SignaLife did not suffer a loss until April 14th?

11   A    You mean did not suffer a loss due to the fraud?

12   Q    That's correct.

13   A    So based on a constant dollar approach, which I don't

14   know if that's what Peter Melley did, but I think it is, yes,

15   that would be right.

16             Wait.  It depends on the date on which they sold.

17   So it's actually not -- it's not that they didn't suffer a

18   loss until April 14th; it's actually -- it depends on the date

19   on which they sold it if the date on which they sold it was

20   after April 14th, then they may have suffered a loss due to

21   the fraud.

22   Q    And if the date they sold was before April 14th, they

23   would not have suffered a loss due to the fraud?

24   A    Yes.

25   Q    Just while we have that slide up, you spoke about all of

```
 1    the things that did not cause the stock price to drop.  That
 2    was your -- the last half of your testimony, the seven things
 3    that did not cause the stock price to drop.  But the stock
 4    price did drop; you saw that?
 5    A    Absolutely.  The stock price drops a lot.
 6    Q    Yeah.  And do you know why the stock price dropped
 7    between the time of the press release, the last one was
 8    October 10th, and just before the webcast?
 9    A    I've thought about it, but I did not write about this in
10    my expert report.
11    Q    Okay.  During this time period, in January of 2008, for
12    example, SignaLife received a deficiency notice from the AMEX
13    stock exchange, which was then put out in a press release.  Is
14    it possible that something like that sort of news could have
15    led to a decrease in the stock price?
16    A    It is possible.
17    Q    And to figure that out, you would just do an event study?
18    A    Yes.
19    Q    Similarly, after the webcast, on August 8th, there was a
20    press release that SignaLife announced its intent to withdraw
21    from AMEX and trade on the OTCBB, and there was a press
22    release about that.  That also could have resulted in a
23    decrease in the stock price, and you could determine that by
24    doing an event study, correct?
25    A    Yes, I could.
```

1    Q    Okay.

2    A    It's not obvious that that decline would be unrelated to

3    the fraud or even the earlier one about the deficiency notice

4    from AMEX, that that would be unrelated to the fraud.

5    Q    But you've not expressed an opinion on the relationship

6    between these press releases and the fraud?

7    A    That's right.

8    Q    Let's talk for a moment about naked short selling.

9         You opined that you did a correlation analysis to

10   determine over the entire period overall whether naked short

11   selling had an impact on the stock price, correct?

12   A    Are you talking about my regression analysis?

13   Q    Yes.

14   A    Yes.

15   Q    Now, a regression analysis draws a conclusion about the

16   overall period.  It does not say, for example, on no specific

17   date in that period could naked short selling have caused a

18   drop in the stock price, correct?

19   A    That's right.

20        MR. GRUENSTEIN:  So maybe we could pull up one of

21   the charts or graphs that shows the FTDs and the returns.

22   Yeah, that.

23   BY MR. GRUENSTEIN:

24   Q    Okay.  So if you look at this, this page is 23, you

25   notice that there's certainly some peaks in the -- in the FTDs

1  throughout the period, correct?

2  A    Yes.

3  Q    And you have not drawn a conclusion that none of those

4  peaks had an impact on the stock price, because you did a

5  regression analysis, not an event study analysis.

6  A    Sorry; thinking about it.

7        Yeah, my regression analysis looks at the overall

8  correlation, and I find none.  And that's the basis for my

9  conclusion that fails to deliver did not cause a decline in

10  the stock price overall, yeah.

11  Q    But it still remains possible that some particularly

12  large FTDs could have, perhaps once or twice during the fraud

13  period, have caused a decline in the stock price.  That's not

14  an analysis that you did, though, correct?

15  A    That's right.

16        It's also possible that there were additional

17  fraudulent statements made that could have increased the

18  amount of inflation during this time period, and I didn't

19  study those either.

20  Q    Okay.  And you have not been pointed to other fraudulent

21  statements found by the jury or anyone else to do an event

22  study on those statements, have you?

23  A    I have not.

24  Q    Just talking about the impact of naked short selling on

25  the stock price, when the excess selling due to naked short

```
 1    selling exceeds the buying, would that trend in general to
 2    cause a depressive effect on the stock price?
 3    A    Okay.  So there are problems with your question.  Can you
 4    clarify for me, please?
 5    Q    Sure.
 6          Well, when you have naked short selling, you can
 7    have a lot of sales into the market, and the sales could
 8    exceed the buys, couldn't they?
 9    A    No.  Every time you have a transaction, you have a buyer
10    and a seller.
11    Q    Uh-huh.
12    A    You can't have a transaction without both a buyer and a
13    seller.  So you can't have selling exceeding buying.
14    Q    Right.  But if you -- in the case of FTDs, you're
15    having -- these are kind of sales of stock that don't even
16    exist, correct?
17    A    They're not sales of stock that don't exist; they're
18    sales of stock.
19    Q    Okay.  Could they be sale -- could the short selling
20    exceed the outstanding float of the stock?
21    A    I certainly wouldn't expect it to, and I'm not sure
22    whether it technically could.
23    Q    You did a comparison between New York Stock Exchange
24    listed companies and SignaLife looking at short volume,
25    correct?
```

```
 1    A     Yes.

 2    Q     Did you not do a comparison of naked short selling

 3    between -- NYSE stocks and SignaLife, correct?

 4    A     Yeah, because I couldn't find the data.

 5    Q     And SignaLife was not a NYSE-listed stock, correct?

 6    A     That's right.  It was listed on the American Stock

 7    Exchange.

 8    Q     And it certainly would not be comparable to the average

 9    NYSE listed stock, right?  It's a nano cap stock?

10    A     I think you're saying you would expect that it would be

11    smaller than the average New York Stock Exchange stock, and I

12    would agree with that statement.

13    Q     Okay.  Let's talk about the April 14th webcast.

14          In your report, you stated:  I understand from

15    counsel that during the webcast there were disclosures

16    suggesting potential problems at SignaLife.

17          Do you recall writing that?

18    A     Yes.

19    Q     For the report, did you do any independent analysis as to

20    whether there was a corrective disclosure in that webcast?

21    A     Yes.

22    Q     But you did not put that in the report?

23    A     I did not.

24    Q     You would agree that there was no mention in the webcast

25    of the September 20th, 25th or October 10th, 2007, press
```

1    releases, correct?

2    A    I would, but you don't have to say something specific

3    about those press releases in order for it to be a corrective

4    disclosure.

5    Q    Okay.  But you have not expressed an opinion in this case

6    that there was a corrective disclosure.  Rather, you assumed

7    it based on counsel's instruction, correct?

8    A    That's right.

9    Q    Were -- let me ask you a question.  Do you know how many

10   people watched the webcast, how many investors watched the

11   webcast?

12   A    I do not.

13   Q    Do you know whether anyone wrote anything about the

14   webcast, like analysts, after the fact?

15   A    People did write about it in chat rooms after the fact.

16   Q    Okay.  And you've reviewed those?

17   A    Yes.

18   Q    You've included that in your expert report?

19   A    I did not include the -- I included the reference to the

20   chat room source, but I did not quote chat rooms in my expert

21   report.

22   Q    And you didn't rely on those chat rooms for a conclusion

23   about whether this was a corrective disclosure in your report?

24   A    I did not.

25   Q    Do you know what time of day the webcast was?

```
 1   A     I don't remember, but it's -- I have that information.

 2   Q     Okay.

 3   A     I think it might actually be written on the transcript.

 4   Q     Okay.  If -- I think we had a witness in here earlier who

 5   testified he thought it was 11:00 o'clock.  But let's go with

 6   that for assumption purposes.

 7             If there was something that happened that was market

 8   moving before the webcast, then would that impact your

 9   conclusion as to whether the webcast is what caused the stock

10   to drop?

11   A     Yeah.  So I checked the intraday data, and I found that

12   SignaLife's stock price moved when the webcast -- started to

13   move when the webcast started.  So it actually coincides in

14   time.

15   Q     Okay.  Well, we had a -- are you aware that it was

16   actually moments before the webcast started that there was

17   significant intraday -- there was significant trading?

18   A     Yes.

19   Q     And, again, the testimony before was that the stock

20   dropped into the 80- and 90-cent range because of a major sell

21   just before the webcast.  Were you aware of that?

22   A     I -- I can't be sure at this time.

23   Q     Okay.  You say that you looked at the intraday trading.

24   Is that something that you cited in your report?

25   A     I did not cite it in my report.
```

```
1    Q    Is it something that you relied on?

2    A    I used it as a confirmation, as a check.  So I would not

3    say that I relied on it, no.

4    Q    Okay.  If there was, in fact, significant sales leading

5    the stock price to drop before the webcast, does that affect

6    your conclusion that it was the webcast that caused the stock

7    to drop?

8    A    No, it doesn't.

9    Q    So your view is the stock price could have dropped before

10   the webcast, and the webcast that occurred after retroactively

11   caused the stock to drop?

12   A    It could be that that large sale of stock was actually

13   due to the information that was forthcoming in the webcast.

14   So -- because people might have known about certain

15   information, and they might have traded on the basis of it.

16   Q    Okay.

17   A    So as a result, I can't conclude that it was

18   disconnected.

19   Q    Okay.  So --

20   A    I wouldn't conclude that it was disconnected.

21   Q    It may be that some people had information that led

22   them -- maybe even related to the webcast, that led them to

23   sell beforehand, correct?  That's your view?  It could be?

24   A    Yeah.

25   Q    But there was no public information to that effect,
```

```
 1   correct?

 2   A    Yes.

 3   Q    So that's not information that the entire market would

 4   have had, correct?

 5   A    That's right.  At that time.  It's the -- it may very

 6   well have been information that was completely available to

 7   the market with the webcast.

 8   Q    Okay.  Now, once the webcast began, the -- do you know of

 9   anything that happened in the first few minutes of the webcast

10   that would have led to a corrective disclosure?

11          Let me say that another way.  Have you expressed an

12   opinion that there's something that happened in the first few

13   minutes of the webcast that led to a reduction in the stock

14   price?

15   A    I have not expressed that opinion in my expert report or

16   my rebuttal report.

17          MR. GRUENSTEIN:  Okay.  Why don't we look at tab 17,

18   which will be defense exhibit 72.

19   BY MR. GRUENSTEIN:

20   Q    Let me -- before we get into this, let me ask a question

21   that I meant to ask earlier.

22          Does your analysis change if you learned that during

23   the fraud period there were other purchase orders for

24   SignaLife product that were much larger than those first three

25   purchase orders and were legitimate?  Does that change your
```

1    analysis in any way?

2    A    My analysis actually wasn't about the legitimacy or lack

3    thereof of the purchase orders.  I was aware that there was

4    another press release about purchase orders during the

5    relevant period, so . . .

6    Q    And you didn't do an event study to look at the impact of

7    that purchase order on the stock, correct?

8    A    That's correct.

9    Q    So let's look at this chart, and maybe we could zoom in a

10   little bit, if possible.  And what this is meant to show is

11   the stock price for SignaLife surrounding this webcast.  Do

12   you see that?

13   A    Yes.

14   Q    And do you see the -- I think the drop that you focused

15   on was on 4/14, between 4/11 and 4/14, I believe, the date of

16   the webcast?

17   A    Yes.

18   Q    Do you see that the day before, so I guess from Thursday

19   on Friday, which was the trading day before, there was

20   actually a significant increase in the stock price?

21   A    Yes.

22   Q    And so it ends up after the webcast that day, the day of

23   the webcast, the stock actually ended higher than it had been

24   a day before the webcast, correct?

25   A    I'm sorry, can you -- I just wasn't sure what you were

1   saying.  Can you repeat that one for me?

2   Q    Sure.

3         The day after the web -- or the day of the webcast,

4   the closing price was $1.17, right?

5   A    Yes.

6   Q    The end of the prior week, closing price was $1.03.  Do

7   you see that?

8   A    Sorry, I think the price was $1.34 maybe at the end of

9   the prior week.

10  Q    Okay.  So I think that was the Friday.  So let's say the

11  Thursday, it was $1.03.

12  A    Yes.

13  Q    And it had been in that neighborhood of between 94 and

14  $1.03 for the prior ten days?

15  A    Right, more or less, excluding the April 1st date.

16  Q    Right.  So 94 to $1.05.

17  A    Yes.

18  Q    Okay.  And then there was an immediate peak to $1.34,

19  correct?

20  A    Yes.

21  Q    And then after this supposed corrective disclosure, there

22  was a drop to $1.17, correct?

23  A    Yes.

24  Q    And that $1.34 seems to be an abnormality, correct, that

25  it rose 31 cents on that date.  Looking at the ten days

1    before, that is an abnormal return, correct?

2    A    Oh, sir, you know how I calculate abnormal returns, and

3    it is not, just by looking at the closing stock price.

4    Q    Okay.  But you do recognize that the $1.34, at least for

5    the week and a half before, was a peak, a significant peak?

6    A    It is a peak.

7    Q    Then when the -- well, just to be clear, it was a one-day

8    peak, correct?

9    A    Yes.

10   Q    And this supposed corrective disclosure of the fraud

11   dropped the stock price to $1.17, correct?

12   A    That's right.

13   Q    And which was still over 10 percent higher than where the

14   stock had been trading over the last previous ten days,

15   correct?

16   A    Yes.

17   Q    Let's talk for a minute about the August 10-Q.

18            You saw Dr. O'Neal's report relating to that,

19   correct?

20   A    Yes.

21   Q    And he saw a statistically significant drop in the two

22   days surrounding that, and you did not see a statistically

23   significant drop in the one day after the 10-Q, correct?

24   A    That's correct.

25   Q    You recognized -- well, let me ask you this.  You drew

```
 1   the conclusion that there was a corrective disclosure as part

 2   of the 10-Q, correct?

 3   A    Um . . . yes.

 4   Q    Okay.

 5   A    Because information was released that was relevant to

 6   investors, and it was about the fraud in this case.

 7   Q    Okay.  It was about the purchase orders?

 8   A    Yes.

 9   Q    And there was also, of course, other information released

10   in the 10-Q, correct?

11   A    That's right.

12   Q    And in your report, you said at paragraph 16, note 10,

13   other information in SignaLife's 10-Q filing was also released

14   to the market on 8/15/08, which may have a confounding effect

15   on the event study results.  Do you recall saying that?

16   A    Yes.

17   Q    So there's other information that could have affected the

18   stock price on the day the 10-Q was released, correct?

19   A    Right.

20   Q    And you saw Dr. O'Neal's report, where he talks about

21   that there was information about negative shareholders equity,

22   as well as the loss amount that the company suffered over the

23   prior quarter, correct?

24   A    I did see that that's in his report.

25   Q    Okay.  And you raised an issue in your rebuttal report as
```

1   to kind of which is more important, earnings or revenue, if I

2   recall correctly.

3   A    I don't think I said that.

4   Q    Well, Dr. O'Neal, you recall, had a conclusion that, if

5   anything, information about earnings would be more important

6   to a shareholder than about sales, about these purchase

7   orders.  Do you recall him saying that?

8   A    Vaguely, yes.

9   Q    Okay.  And then you cited a study on~-- in paragraph 6 of

10  your rebuttal report -- let me just pull it so that I don't

11  misstate it -- I think in which you said after -- it was a

12  study about whether financial executives were surveyed, and

13  the result was that after earnings, the financial executives

14  identified revenues as the second most important company

15  performance measure reported to outsiders.  Do you recall

16  saying that?

17  A    I recall citing it.

18  Q    Citing it?

19  A    Yes.

20  Q    So at least according to this study, earnings would be

21  first most important to shareholders, revenues would be

22  second, according to that study?

23  A    In general.  I think the study is, yeah, obviously not

24  specific to SignaLife.

25  Q    Okay.  And speaking of things not specific to SignaLife,

1    when you quoted the SEC talking about short selling could be a

2    way of indicating fraud or detecting fraud, you are not --

3    that is a general statement by the SEC, and you have not drawn

4    an opinion that the short selling or the naked short selling

5    here was a -- an indication that the company was engaged in

6    fraud or was a red flag that people were raising that there

7    was fraud going on at the company, correct?

8    A    Yes.  I'm just trying to follow you exactly, what you

9    said.  So I think I agree with it, but --

10   Q    I can say it again.

11   A    Yeah, thank you.

12   Q    You cited to a chart.

13              MR. GRUENSTEIN:  Maybe we could just pull up the

14   slide.

15   BY MR. GRUENSTEIN:

16   Q    This was from your presentation.

17              You said -- and this is slide 22.  I don't need to

18   read it, but to be clear, this is a general statement by the

19   SEC.  Of course, it doesn't apply in all instances, correct?

20   A    It's a general warning by the SEC, yes.

21   Q    And you have not drawn any conclusion that this is what

22   was going on at SignaLife.  That was not part of your mandate

23   or opinion, correct?

24   A    Correct.

25              MR. GRUENSTEIN:  If I may have one moment, Your

1    Honor?

2            THE COURT:  Yes.

3    BY MR. GRUENSTEIN:

4    Q    Just two further questions.

5            On my question earlier about whether excess selling

6    could lead to a depreciation in the stock price, if numerous

7    people go to their brokers and say we want to sell, but there

8    are no buyers indicating an agreement to buy, wouldn't that

9    depress the stock price?

10   A    So you're talking about unfulfilled orders?

11   Q    Right.

12   A    Selling order pressure.  Then, yes, that can cause the

13   stock price to go down.

14   Q    As you're aware, there are three press releases at issue

15   in this case, 9/20, 9/25 and 10/10, correct?

16   A    Those are the three that I was asked to look at, yes.

17   Q    Exactly.

18           And, ultimately, if the -- if there were to be a

19   finding by the Court that the first press release was actually

20   not fraudulent at all, would that affect your analysis in any

21   way?

22   A    No, I don't think so.

23   Q    Except insofar as the 18 percent inflation was the result

24   of the first two press releases, correct?

25   A    Yeah, I did not come to the conclusion that the stock

```
 1    price reaction on September 25th was caused by the press
 2    release on September 20th.  I did not draw that conclusion.
 3    Q    Okay.  But the -- as we discussed earlier, the
 4    September 25th press release could have had an impact because
 5    it was confirming an earlier press release, correct?
 6    A    It certainly was consistent with an earlier press
 7    release.
 8    Q    And if the first one were not fraudulent and the second
 9    one were fraudulent, and you were to ask the question, what
10    impact did the fraud have, then you would have two confounding
11    events, correct?
12    A    I'm sorry, I'm not following your question.
13    Q    If the two press releases had an impact on the stock
14    price, the 18 percent inflation, you can't determine -- or you
15    haven't determined what the impact was of the first press
16    release versus the second press release, correct?
17    A    Sir, I determined that the second press release, standing
18    on its own, had a statistically significant impact on the
19    stock price on September 25th, 2007.  So I think the answer to
20    your question -- well, so your question's a little bit
21    complicated, but that was -- that was my conclusion.
22              MR. GRUENSTEIN:  I'll leave it at that.  Thank you.
23              THE COURT:  Thank you.
24              Any redirect?
25              MS. PASCUCCI:  Your Honor, the Government does
```

```
 1   expect a redirect of up to 45 minutes.

 2              THE COURT:  Okay.  Then we're going to take a lunch

 3   break.

 4              MS. PASCUCCI:  Thank you, Your Honor.

 5              THE COURT:  All right, Doctor.  We're going to have

 6   to ask you to step down 'til we get back from lunch.  So we'll

 7   get back, let's make it 1:40, 1:40.  All right?

 8              So we'll see you then.  Thank you.

 9       (A recess was taken from 12:26 p.m. to 1:47 p.m., after

10   which the following proceedings were had:)

11              THE COURT:  Please be seated, everyone.

12              Doctor, you can have a seat, and we're ready for

13   redirect.

14              MS. PASCUCCI:  Thank you, Your Honor.

15                          Redirect Examination

16   BY MS. PASCUCCI:

17   Q    Dr. Becker, you were asked about your years -- about

18   random variations in the stock on days that you calculated

19   inflation.  You used a 95 percent confidence level in your

20   event study?

21   A    Yes, I did.

22   Q    And can you explain what exactly that means?

23   A    Sure.  The 95 percent confidence level is a measure of my

24   sureness or my certainty that the -- my conclusion is correct.

25   So it's a measure of how certain -- in this case, it's a
```

1    measure of how sure I am that the abnormal return is not due

2    to the normal day-to-day random variation in SignaLife's stock

3    price.

4    Q    Can you explain that a little more, how the 95 percent

5    confidence level is connected to this random variation

6    concept?

7    A    Sure.  I can go into the whole description of how the T

8    statistic is actually calculated.  The T statistic is

9    calculated as the difference in returns divided by a measure

10   of the volatility or a measure of the random variation in the

11   stock returns.  And based on the observed statistical

12   distribution of stock returns, the -- there is an implied

13   statistical distribution of my T statistic.

14          So the 95 percent confidence level reflects the fact

15   that it is highly unlikely that the observed abnormal return

16   is just caused by random chance.  There's less than a

17   5 percent likelihood that the observed return is actually due

18   to random chance, as opposed to being caused by the, in this

19   case like if we're talking about the 18 percent abnormal

20   return, it would be caused by the press release on that date.

21   Q    Why did you use a 95 percent confidence level?

22   A    Because the 95 percent confidence level is widely used --

23   is by far the most widely used by financial economists and

24   economists in the work that we do.

25   Q    In fact, did another expert in this case use a 95 percent

     1    confidence level?

     2    A    Yes.  When Dr. O'Neal tested -- did an event study, he

     3    also used a 95 percent confidence level.

     4    Q    You were also asked about the relationship between fails

     5    to deliver and SignaLife stock.  Did you do an event study to

     6    task whether spikes in fails to deliver were related to

     7    movements in SignaLife stock?

     8    A    I'm sorry, can you ask me the question again?

     9    Q    Did you perform an event study with regard to -- with

    10    respect to spikes in fails to deliver?

    11    A    No, I did not.

    12    Q    But did you do a number of other inquiries looking at the

    13    relationship between fails to deliver and SignaLife stock?

    14    A    Yes, I did.

    15    Q    And I want to pull up exhibit 101, page 29.

    16         Are these some of the measures you used in your

    17    robustness analysis -- in your robustness checks when

    18    confirming whether there was not a relationship between fails

    19    to deliver and returns in SignaLife stock?

    20    A    Yes, these are the robustness checks that I performed.

    21    Q    Did you also conduct a regression analysis?

    22    A    These -- each of those checkmarks represents a separate

    23    regression analysis.

    24    Q    Did any of these analyses suggest that there was a

    25    relationship between fails to deliver and the decline in the

```
 1   SignaLife stock during the relevant period?
 2   A     None of them suggested that there was a relationship
 3   between the fails to deliver and the decline in SignaLife
 4   stock during the relevant period.
 5   Q     Did you see any evidence of manipulative short selling in
 6   your analysis?
 7   A     I saw no evidence of manipulative short selling during
 8   the relevant period.
 9   Q     I also want to ask you about the April 14th webcast.  You
10   were asked about whether this was a corrective disclosure.
11           Now, I want to pull up what's been marked as
12   sentencing exhibit 7.  What is the date -- this is a press
13   release issued on April 11th from SignaLife; isn't that
14   correct?
15   A     Yes.
16   Q     And can you just read the first line of that press
17   release.
18   A     SignaLife announces a webcast.  SignaLife has confirmed
19   that it has filed its Form 10-KSB, and the company's chairman
20   and chief executive officer, Dr. Lowell T. Harmison, has
21   scheduled a webcast on April 14th, 2008, at 10:00 a.m. Eastern
22   Daylight Time.
23   Q     You were asked about a spike in SignaLife stock on
24   April 11th, 2008; is that correct?
25   A     That's correct.
```

1    Q     If you look to the second paragraph, what else do they

2    say about what is going to be in the content of the broadcast

3    -- the webcast, excuse me?

4    A     So Dr. Harmison stated:  I am pleased to provide

5    direction on new contracts, pending orders and production,

6    various product initiatives, from the Fidelity 100 to the

7    prospective industry-wide application of the Fidelity 1000

8    module, and the Athletes for Life partnership, as well as such

9    issues as the company's immediate positive financial

10   prospects, as well as several other initiatives that have now

11   been completed.

12   Q     Dr. Becker, are you familiar with the concept of a

13   partial corrective disclosure?

14   A     I am.

15   Q     What is a partial corrective disclosure?

16   A     A partial corrective disclosure is when people learn some

17   information about the fraud but not all of the information

18   about the fraud.

19   Q     And how often is it that a particular disclosure will

20   explicitly announce that there was a fraud?

21   A     It's more often that corrective disclosures do not -- in

22   particular, the first corrective disclosure typically does not

23   announce that there is a fraud.

24   Q     And can an event where there is a lack of information

25   constitute a corrective disclosure where investors were

1    expecting to hear information?

2              MR. GRUENSTEIN:  Objection, outside the scope of the

3    expert report.

4              THE COURT:  Overruled.

5              THE WITNESS:  Sorry, can you ask the question again?

6    BY MS. PASCUCCI:

7    Q    Can an event that has a lack of information, a disclosure

8    with a lack of information, constitute a corrective disclosure

9    wherein investors were not expecting that or were expecting

10   that information?

11   A    Yes.  So if investors were expecting a certain kind of

12   information, like in this webcast, investors were led to

13   expect certain information.  If that information was not

14   revealed, that can absolutely be a corrective disclosure.

15   There's actually a lot of research in finance about how the

16   absence of information constitutes information to market

17   participants.

18   Q    And turning back to this exhibit, exhibit 7, at what time

19   was the webcast scheduled to begin?

20   A    It was scheduled to begin at 10:00 a.m. Eastern Daylight

21   Time.

22   Q    And the Government -- I want to show you what has been

23   marked as Government exhibit 122.  This is a stock price chart

24   for April 14th, 2008, prepared by the SEC based on SignaLife

25   intraday trading data.

```
 1              MS. PASCUCCI:  Your Honor, this was not in our

 2   original exhibit list, but we have copies for defense counsel

 3   and the Court.

 4              MR. GRUENSTEIN:  Your Honor, we object, as this is

 5   outside the scope of the expert report.  And in addition, the

 6   defendant was never provided with the underlying data.  To

 7   this day, I've never seen the underlying data.  It was not --

 8   I understand that this sort of data may be publicly available

 9   from paid databases, but it was never made available to us.

10              THE COURT:  What is this again?

11              MS. PASCUCCI:  Your Honor, this is a price chart

12   showing the SignaLife intraday trading data on April 14th,

13   2008, prepared by the SEC.  This is based on Bloomberg trading

14   information.

15              THE COURT:  Who prepared this?

16              MS. PASCUCCI:  It was prepared by the Securities and

17   Exchange Commission.

18              THE COURT:  So not this witness?

19              MS. PASCUCCI:  Not this witness, no.

20              THE COURT:  So who's going to lay the foundation for

21   this being accurate?

22              MS. PASCUCCI:  Your Honor, the Government could

23   certainly call a witness to admit this separately.

24              THE COURT:  Has this doctor seen this before?

25   BY MS. PASCUCCI:
```

```
1    Q    Have you seen this chart before, Dr. Becker?

2    A    I have not seen this chart before, but I've seen actually

3    the same data in a similar chart before.

4         THE COURT:  Did you use -- I thought you said in

5    your earlier testimony that you had done a intraday trade

6    checking of some kind.

7         THE WITNESS:  Exactly.  So I did that.  I looked at

8    the same data in a chart that was made earlier.

9         THE COURT:  All right.  Well, you can tell me what

10   you recall about what you did yourself without referring to

11   this chart.

12        I mean, the issue about whether the drop in the

13   price took place before or after the webcast started is an

14   issue that's come up, so I would like to find out.  Because

15   Mr. Taylor I think said it happened before; and if you have

16   data that shows that it actually occurred after the webcast

17   started, I'd like to know the answer to that.

18        So I'm going to sustain the objection to this chart,

19   but you can ask her what she remembers from her own

20   examination of the data.

21        MS. PASCUCCI:  Sure.

22   BY MS. PASCUCCI:

23   Q    Dr. Becker, based on your examination of the data in

24   preparing your expert report, did SignaLife stock decline in

25   advance of the webcast?
```

```
 1   A     SignaLife's stock price declined for the most part after

 2   the webcast.  So there is some variation in the stock price

 3   prior to the webcast, but it really started to decline after

 4   the webcast started.

 5   Q     And is what you saw consistent with your findings about

 6   the impact of the webcast on SignaLife stock price?

 7   A     Yes, absolutely, because since the timing of the drop in

 8   the stock price coincides with the timing of the webcast, that

 9   supports my conclusion that the webcast was the cause of the

10   decline in the stock price on that day.

11             MS. PASCUCCI:  Court's indulgence, Your Honor.

12             THE COURT:  Okay.

13             MS. PASCUCCI:  No further questions, Your Honor.

14   Thank you.

15             THE COURT:  That was a quick 45 minutes.

16             Thank you, Doctor.

17             Next witness.

18             MS. COTTINGHAM:  Yes, Your Honor.

19             Apologies, Your Honor.  Just one moment.

20             THE COURT:  That's all right.

21             MS. COTTINGHAM:  Your Honor, the United States would

22   call Erin Smith, from the Securities and Exchange Commission

23   regarding the chart we were just discussing.

24             THE COURT:  Okay.

25             MR. GRUENSTEIN:  Your Honor, first of all, I was
```

 1    just told the next witness is Peter Melley.  This is a witness

 2    I've never heard of to talk about data that was never provided

 3    to us.  I'm not sure what the basis is for the Government to

 4    add this in their case in chief.

 5           THE COURT:  I guess it's because the issue of when

 6    the stock price actually started to drop on the day the

 7    webcast took place, whether it was before or immediately

 8    after.  I guess that's the reason.

 9           MR. GRUENSTEIN:  I guess, Your Honor.  But the

10    expert witness said that she did the analysis.  She said she

11    didn't rely on it; therefore we never received the analysis.

12    It was never disclosed to us.  Now, if the Government's going

13    to put on a witness to explain a chart, I know hearsay is

14    allowed, but there has to be a foundation, and we haven't even

15    seen the underlying data.

16           MS. COTTINGHAM:  Your Honor, I just --

17           THE COURT:  Well, let's find out what she has to

18    say, and then we'll deal with it, any objections.  All right?

19           MS. COTTINGHAM:  Your Honor, I just wanted to make

20    clear one thing for the record.  This chart is based on

21    Bloomberg data that actually several -- at least one of the

22    defense's own experts relied on.  It's publicly available

23    intraday trading data.

24           So, no, we have not disclosed absolutely everything

25    on Bloomberg that relates to SignaLife.  But the idea that the

1    defense doesn't have this, especially given that they've now

2    made an issue of the timing of these trades, I think is not

3    quite right.

4            THE COURT:  Well, but they should at least have fair

5    notice that you're intending to rely on the data so they can

6    check it, can cross-examine.

7            So let's go, and we'll see where we wind up.

8            MS. COTTINGHAM:  Thank you, Your Honor.

9            THE COURTROOM DEPUTY:  Please raise your right hand.

10            Erin Smith, Government's witness, sworn.

11            THE COURTROOM DEPUTY:  Please take a seat.

12            State your name and spell your name.

13            THE WITNESS:  Erin Smith, E-r-i-n S-m-i-t-h.

14                       Direct Examination

15   BY MS. COTTINGHAM:

16   Q    Ms. Smith, where do you work?

17   A    I work at the Securities and Exchange Commission.

18   Q    What is your role at Securities and Exchange Commission?

19   A    I'm a financial economist.

20   Q    In your role as a financial economist, have you helped in

21   the analysis, the event study that Dr. Becker performed here

22   today?

23   A    At her direction, yes.

24   Q    And in connection with your work in the event study --

25            MS. COTTINGHAM:  Can we pull up exhibit 122, please?

```
 1   BY MS. COTTINGHAM:

 2   Q    Were you asked to prepare a chart showing intraday

 3   trading information in SignaLife stock on April 14th, 2008?

 4   A    Uh, I --

 5   Q    Were you asked to prepare the chart?

 6   A    Yes.

 7   Q    What is the information in this chart based on?

 8   A    The information in this chart is based on intraday

 9   trading data for SignaLife stock.  Yeah.

10   Q    And what does this red line on this chart represent?

11   A    The red line corresponds to 10 a.m., which we understand

12   is the time that the webcast started.

13   Q    And how does this chart relate to the analysis that you

14   did at Dr. Becker's direction in connection with the event

15   study?

16   A    This chart shows that the decline in SignaLife stock

17   price that occurred on April 14th largely occurred after the

18   start of the webcast.

19              MS. COTTINGHAM:  Your Honor, at this time, we would

20   move the chart into evidence.

21              THE COURT:  Well, let me allow the defense to voir

22   dire the witness.  And I'm probably going -- before I admit

23   it, I'm probably going to give the defense an opportunity to

24   verify the correctness, since we're probably going to be here

25   tomorrow.  They'll have some time to check on it and see if
```

     1    they have any challenge to it.

     2            Is Ms. Smith going to be here tomorrow?

     3            THE WITNESS:  Yes.

     4            THE COURT:  Yes.

     5            MS. COTTINGHAM:  Thank you, Your Honor.

     6            THE COURT:  So she'll be able to be cross-examined

     7    tomorrow if the defense wants to.

     8            Anyway, if you want to -- you can either reserve now

     9    and wait until you've had a chance to check on this

    10    information, or you can do some examination now.  I'm going to

    11    reserve ruling on admitting it until you've had an opportunity

    12    to at least try and verify the data.

    13            MR. GRUENSTEIN:  Okay.  I appreciate that, Your

    14    Honor.  Maybe just very briefly.

    15            THE COURT:  Okay.

    16                       Voir Dire Examination

    17    BY MR. GRUENSTEIN:

    18    Q    Ms. Smith, just so that I understand, your role was

    19    essentially as an assistant to Dr. Becker?

    20    A    That's right.

    21    Q    You did a lot of her kind of the detailed analysis that

    22    she then relied on?

    23    A    She did the analysis that she relied on.  We also

    24    verified that analysis.

    25    Q    You helped prepare her for her report?

```
 1   A    Yes.

 2   Q    You had e-mails back and forth with her discussing the

 3   analysis that you were doing?

 4   A    We typically spoken (sic) on the phone.

 5   Q    Okay.  But did you also have e-mails?

 6   A    No.

 7        MS. COTTINGHAM:  Your Honor, I'd object that this is

 8   sort of outside of the scope of the limited voir dire.

 9        THE COURT:  Sustained.

10        MR. GRUENSTEIN:  Your Honor, I'll explain the

11   reason, which is if she's a witness, there are certain

12   disclosure obligations, which is all of her prior statements

13   about her testimony.  We've received not a single disclosure.

14   We received disclosure from other government witnesses.  So to

15   spring a witness on us without any disclosure of the work that

16   she's done -- she's not the testifying expert.  That's

17   shielded by attorney-client work product.  She's a consultant.

18        THE COURT:  Well, but she's only here to testify

19   about this chart.

20        MR. GRUENSTEIN:  Okay.

21        THE COURT:  I don't know -- I mean, if she was going

22   to testify beyond what this chart is, I would say, yeah, you

23   can examine her about her complete role in assisting

24   Dr. Becker, but --

25        MR. GRUENSTEIN:  That's fine, Your Honor.
```

```
 1              Maybe I'll just ask two more brief questions, which

 2    are:

 3    BY MR. GRUENSTEIN:

 4    Q    Did you also do analysis beyond looking at the press

 5    release to determine whether the webcast actually did take

 6    place at 10:00 o'clock that day or simply whether it was

 7    scheduled to take place?

 8    A    I don't recall.

 9    Q    And you were in the courtroom for Mr. Taylor's testimony?

10    A    Yes.

11    Q    And do you recall him saying that the press -- the

12    webcast was at 11:00?

13    A    Yes.

14    Q    And do you also recall him saying that the stock dropped

15    around 80 to 90 cents just before the webcast?

16    A    I recall him saying that, yes.

17    Q    And do you see that the stock actually dropped to around

18    85 cents just before 11:00 o'clock?

19    A    I do see that, yes.

20              MR. GRUENSTEIN:  Okay.  Thank you, Your Honor.

21              THE COURT:  All right.  Thank you.

22              Thank you.

23              MS. COTTINGHAM:  Your Honor, the United States now

24    calls Peter Melley.

25              THE COURTROOM DEPUTY:  Please raise your right hand.
```

```
 1                  Peter Melley, Government's witness, sworn.

 2                  THE COURTROOM DEPUTY:  Please take a seat.

 3                  THE WITNESS:  Thank you.

 4                  THE COURT:  State your name for the record and spell

 5      your last name.

 6                  THE WITNESS:  Peter Melley, M-e-l-l-e-y.

 7                             Direct Examination

 8      BY MS. COTTINGHAM:

 9      Q    Good afternoon, Mr. Melley.

10      A    Good afternoon.

11      Q    Mr. Melley, where do you work?

12      A    I work in Washington, DC, for FINRA, which is the

13      Financial Industry Regulatory Authority.

14      Q    How long have you worked for FINRA?

15      A    Approximately 22 years; and 20 years with my current

16      group, which is the criminal prosecution assistance group.

17      Q    In your role at the criminal prosecution assistance

18      group, what type of work do you do?

19      A    As the director of that group, we're separated from the

20      regulatory function of the organization.  Our sole focus is to

21      provide assistance to criminal investigations and prosecution

22      involving securities fraud.

23      Q    And when you say your role is to provide assistance, what

24      kind of assistance?

25      A    When requested for help, we'll analyze trading
```

```
1   information, we will summarize that analysis of the trading
2   data into exhibits, and if necessary, testify at a hearing or
3   at a trial.
4   Q    Mr. Melley, have you testified in this case before?
5   A    I have, yes.
6   Q    You testified at the last sentencing in this case?
7   A    Correct.
8   Q    Mr. Melley, were you asked to perform calculations
9   related to stock in SignaLife?
10  A    Yes.
11  Q    Very generally, what information did you rely on for
12  those calculations?
13  A    I relied on SEC blue sheet data for trading in SignaLife,
14  which is a list of all the purchases and sales by investors in
15  the stock.  I also looked at closing prices that were provided
16  to me that I think the SEC had generated.  And in addition, I
17  was asked to look at some transfer agent records and also some
18  press releases and a filing made by SignaLife to the SEC.
19  Q    And were you asked to calculate losses using a variety of
20  different methodologies?
21  A    Yes.
22  Q    What were those methodologies?
23  A    The two main methodologies; one was the modified
24  rescissory method, and the other, for lack of a better phrase,
25  was the buyers-only methodology.
```

1  Q    And are both of those methodologies substantially similar

2  to the methodologies you performed in connection with the

3  first sentencing in this matter?

4  A    Correct.

5  Q    And what was your role with respect to doing the

6  calculations?

7  A    Analyzing the trading data.  For the buyers-only

8  methodology was focused on the universe of investors who

9  purchased stock during a period of time and trying to figure

10 out who made money or who lost money.

11          For the modified rescissory method, it was focused

12 more on the number of outstanding shares at the time and

13 averaging the closing price of SignaLife stock.

14          So two different types of methodologies to arrive at

15 different numbers.

16 Q    Were you also asked to summarize losses to SignaLife in

17 this case?

18 A    Yes, I was.

19 Q    And were you asked to summarize or calculate funds the

20 defendant received throughout this case?

21 A    Yes.

22 Q    And did you perform any economic analysis of SignaLife

23 stock price?

24 A    No, I did not.

25 Q    Did you do any statistical analysis of SignaLife stock

1   price?

2   A     No.

3   Q     And were you asked to offer any opinions as to the use of

4   particular methodologies?

5   A     No, I was not.

6         MS. COTTINGHAM:  Your Honor, with respect to the

7   modified rescissory method, the Government is aware of, of

8   course, this Court's findings with respect to the modified

9   rescissory method in the first sentencing, and we would submit

10  on the papers we believe that's still an appropriate method,

11  it's still advocated by the guidelines, but would not put on

12  testimony here today unless the Court would like to hear more

13  on it.

14        THE COURT:  Are the numbers any different?

15        MS. COTTINGHAM:  Your Honor, the numbers that we've

16  proposed in our sentencing paper for the modified rescissory

17  method are identical to the narrow period modified rescissory

18  method for the numbers that were used at the last sentencing.

19        THE COURT:  If you're not going to change anything

20  from the last time, I don't think we need to hear any more

21  testimony, unless the defense wants to cross-examine on them,

22  but I'll let them decide.

23        MR. GRUENSTEIN:  No, that's fine, Your Honor.  I

24  mean, we may have to have an argument on it, because I didn't

25  realize this, but that's fine.

```
1              THE COURT:  All right.

2              MS. COTTINGHAM:  Thank you, Your Honor.

3    BY MS. COTTINGHAM:

4    Q    Mr. Melley, turning first to calculations, were you asked

5    to perform calculations as to loss due to inflation in

6    SignaLife's stock?

7    A    Yes, I was.

8    Q    Okay.  And what information did you use in those

9    calculations?

10   A    I relied on the SEC blue sheet data that I listed

11   earlier, as well as an SEC spreadsheet of provided closing

12   prices based on the intrinsic value of the stock, as well as

13   the actual closing prices of the stock for the same period of

14   time.

15             MS. COTTINGHAM:  Can we pull up sentencing

16   exhibit 32, please.

17   BY MS. COTTINGHAM:

18   Q    Mr. Melley, is this the spreadsheet you just referred to?

19   A    Correct, it is.

20   Q    Okay.  And what does this spreadsheet show?

21   A    It shows on a daily basis between September of 2007 and

22   2008 the trading in SignaLife with a focus on the actual price

23   that the stock closed at each day, as well as, if necessary,

24   an inflationary value or percentage, and in the last column

25   what the intrinsic price should have been in the stock.  And
```

1  the intrinsic price was found by taking the actual price and

2  subtracting the inflationary value.

3  Q    And when you say intrinsic value, what does that mean to

4  you?

5  A    That would represent the closing price of the stock on

6  each particular day absent the fraud.

7         MS. COTTINGHAM:  Can we pull up sentencing

8  exhibit 102, please.

9  BY MS. COTTINGHAM:

10  Q    Mr. Melley, is this a PowerPoint that you prepared to

11  explain your calculations for SignaLife?

12  A    Yes.

13  Q    Excuse me, your loss calculations for SignaLife

14  investors?

15  A    Correct, yes.

16  Q    Walking through this, this says "relevant period."  What

17  is that?

18  A    That is the period of time, September 20th, 2007, through

19  August 15th of 2008, that was the main focus of my analysis.

20  Q    And what happened on September 20th, 2007?

21  A    There was a press release by SignaLife discussing

22  equipment orders.

23  Q    Okay.  And what happened on August 15th, 2008?

24  A    On that day, there was a SEC filing made by SignaLife

25  regarding, I believe, a problem with orders to the company.

1   Q    Mr. Melley, you're not testifying about these two dates.

2   Were you asked to use these dates in your calculations?

3   A    Yes, I was just asked to use the dates.  Yes.

4   Q    Turning to slide two, Mr. Melley, just in very general

5   terms, can you explain how you did these calculations of the

6   loss due to the fraudulent inflation in SignaLife stock?

7   A    I basically did the same analysis for the same group of

8   investors just using two different sets of numbers.  In one

9   bucket, or as we see in step one, I basically took what each

10  customer, what their actual loss was based on the purchase and

11  sales during the relevant period to determine who actually

12  lost money.

13          And then for the step two, the same group of people,

14  I subtracted their actual prices for each transaction with

15  what the intrinsic value price was that we just saw in the SEC

16  spreadsheet and then did the same analysis just using that

17  intrinsic price for each transaction, determining whether

18  those same individuals either made money or lost money.

19          And then the final step would be, as it's described

20  there, is subtracting the intrinsic loss value from the actual

21  loss value to get what's referred to as a final loss due to

22  the inflation of the stock.

23  Q    Okay.  So you did two sets of calculations for all of the

24  investors in the pool?

25  A    Correct.

1   Q    And just so I understand, in step one, the actual losses,

2   is that consistent with the methodology you used to explain

3   the first sentencing in this case?

4   A    Yes.

5   Q    And that is based just on actual purchases and sales of

6   SignaLife stock during the relevant period?

7   A    Correct.

8   Q    And for step two, the loss based on the intrinsic price,

9   what is different in that step, as opposed to step one?

10  A    In step two, what I did was I substituted the actual

11  prices that were in step one with the intrinsic prices

12  provided in the SEC spreadsheet.  So whatever the closing

13  price was on a particular date, I took that intrinsic closing

14  price and put that into the actual transaction of that date in

15  taking out the actual price.

16           So it's the same methodology.  The only different --

17  same number of shares.  The only difference is I substituted

18  the intrinsic price in place of the actual price, and then

19  therefore that would change the cost to the investment or the

20  proceeds of the investment for that particular transaction.

21  Q    Okay.  And what was the total that you determined was the

22  loss due to the fraudulent inflation in SignaLife stock?

23  A    The total loss, after going through a number of steps,

24  was $2,026,652.

25           MS. COTTINGHAM:  If we could turn to slide three,

1    please.

2    BY MS. COTTINGHAM:

3    Q    So breaking down these steps a little bit more, first,

4    what universe of investors did you use at the outset of your

5    calculations?

6    A    At the outset, the focus was on any investor who

7    purchased between September 20th, 2007, and August 15th, 2008.

8    So that was the universe of individuals from the blue sheet

9    data.

10        What I then looked to do was for any -- my focus was

11   on retail (sic) customers, so I removed certain institutional

12   investors, for instance, large hedge funds or brokerage firm

13   trading accounts.  I also removed if any profit accounts

14   happened to still be in there, I would remove those.  Again,

15   the focus is only on those who lost.

16        And then the final thing that I did in this analysis

17   was if any investor lost less than a hundred dollars in their

18   investment of SignaLife, I would remove them.  There were I

19   think in total about $400,000 or so of folks that were removed

20   I think at this point, but regardless, I would lop off those

21   folks less than a hundred dollars, and that left me with just

22   over 2000 victim accounts.

23   Q    Did you also remove any additional -- in addition to

24   institutional investors, did you remove any other groups of

25   investors?

1  A    Yes, there were also certain individuals that I was asked

2  to removed.  Mr. Stein, other individuals connected with

3  Mr. Stein.

4        And one other thing I just wanted to highlight as

5  seen here with the 2029 victim accounts.  Those aren't

6  necessarily 2029 victims; that's actually individuals who may

7  have had multiple accounts themselves, or if possible, I would

8  combine an account that an individual had with another account

9  they may have with their spouse or child.  I did that by

10  sorting by name and also by address.

11        I did that to try to come up with the most

12  conservative number for that investor account.  So if they

13  lost money in one account but they happened to make a profit

14  in another account, I would combine those two in an effort to

15  come up with the most conservative number possible.  And if

16  they lost money in one and made more money in another, I would

17  remove that individual, even if they had purchased stock

18  during that time.

19  Q    And, Mr. Melley, did you calculate -- what were the

20  actual losses based on this culled down set of victims?

21  A    As of this point, the actual losses accounted for

22  $14.4 million.

23  Q    And how did you get that $14 million figure -- 14.4,

24  excuse me?

25  A    Again, that's just based on if an individual purchased

1    shares at one price, sold at a lower price, whatever that loss

2    amount is, and that would be -- I would just add all those

3    people together.  Simple arithmetic.  So that's where we are

4    just based on their actual transactions.

5              MS. COTTINGHAM:  And can we go to slide four,

6    please.

7    BY MS. COTTINGHAM:

8    Q    Mr. Melley, we spoke just a minute ago about how

9    August 15th, 2008, is the end of this relevant period.  In

10   your calculations, how do you treat investors who still held

11   SignaLife stock as of August 15th, 2008?

12   A    While there were a few hundred investors who everything

13   they bought they sold in excess of $300,000 in losses, the

14   majority of the victim accounts included accounts where, as of

15   8/15/2008, they were still holding shares of SGN stock.

16             So what I did was while we were using August 15th as

17   a sharp ending date, I wanted to theoretically give credit to

18   those folks if they sold somewhere down the road.  I didn't

19   have trading data for years after August 15th, 2008, to track

20   whether they eventually sold the shares.  So what I did was

21   anybody who held shares as of that date, I took the closing

22   price of that date, which was 10 cents, and I theoretically

23   did a calculation that all those shares that they held would

24   be sold at that price.  That would generate a proceed amount,

25   which would then be credited back to their loss amount,

1    bringing the loss amount lower.

2         Again, not everybody could, in reality, have sold

3    those shares on that date and the price remained 10 cents a

4    share, but I did that conservative calculation, which in

5    essence brought the loss number down.

6    Q    Okay.  So, effectively, did you give everyone that was

7    still holding as of that date, you treated them for purposes

8    of your calculations as though they hypothetically had sold

9    all of their shares at 10 cents a share?

10   A    Correct.

11   Q    And if that resulted -- and were all of the investor

12   accounts credited with whatever their remaining shares were,

13   given the 10-cent hypothetical share price?

14   A    Yes.

15   Q    Once you had applied this 10-cent credit, did you do any

16   additional work to identify -- did you do any additional work

17   with respect to which investors were in the pool at that

18   point?

19   A    As of that point, basically what I did was for a number

20   of people, the shares that remained as of 8/15, if they were

21   sold at 10 cents, that proceed amount would have exceeded

22   their loss amount, because maybe they didn't buy them at 10

23   cents, maybe they bought them at eight cents.

24        So therefore a number of people, their loss was

25   completely wiped out, and so therefore the theoretical proceed

 1    amount was higher than their actual loss amount.  And if so, I

 2    would remove those individuals.

 3              And, again, I also looked for anybody who, as of

 4    this point after the credit, had less than a hundred dollars

 5    in losses, I would remove them from the analysis.

 6    Q    And, Mr. Melley, why did you apply this 10-cent credit to

 7    investors who were still holding shares?

 8    A    Just to make an effort to kinda determine, since they

 9    still held shares and could have sold them at some point, but

10    having been unable to track whether they could or not, I felt

11    since that was the -- that was the last day of the review

12    period, to do that, that theoretical sale.  And that is also

13    what we did at the last sentencing, as well.

14    Q    And based on your review of the blue sheet data, I mean,

15    were a number of investors still holding shares after this

16    date?

17    A    Correct.  This brings us down below 2000, about 1980

18    victim accounts, attributing in actual losses about 14 -- a

19    little less than 14.4 million.

20    Q    And in your review of the blue sheet data, were those

21    investors all able to sell their shares?

22    A    They were not.

23    Q    Why not?

24    A    Because the market would not be able to -- if everybody

25    sold their shares at that price, there would be the demand to

```
 1   meet all the sales at 10 cents.
 2           MR. GRUENSTEIN:  Your Honor, I'm going to move to
 3   strike --
 4           THE COURT:  Sustained.
 5           MR. GRUENSTEIN:  -- as that's expert opinion.
 6           THE COURT:  Sustained.
 7           MS. COTTINGHAM:  And we'll go to slide five now.
 8   BY MS. COTTINGHAM:
 9   Q    Mr. Melley, we've talked about actual losses and how you
10   calculated the actual loss figure.  I want to talk about the
11   second part of your calculations, the intrinsic account value
12   losses.  How did you perform those calculations?
13   A    So, again, taking all of the same transactions from the
14   actual loss analysis but substituting out the actual prices
15   for each transaction and replacing it with the intrinsic
16   closing price on the day of the actual transaction, I then did
17   the same simple arithmetic of what the cost was, subtracting
18   the sale.  If the sale amount exceeded the loss amount, then
19   that individual would be removed.  If the loss amount was
20   higher, they would stay in, and then I would do the same
21   analysis that I stated earlier.  For the remaining shares,
22   they were also sold hypothetically at 10 cents a share.
23   Again, if the resulting credit amount was higher than the loss
24   amount, they were taken out.
25           The -- what I also removed was in those instances
```

```
 1   where the intrinsic loss value was higher than the actual loss
 2   value, then I would remove that individual.
 3   Q     So Mr. --
 4   A     So there were a number of additional steps.
 5   Q     All right.  So let's take them one at a time just to get
 6   purely the intrinsic account losses.
 7   A     Uh-huh.
 8   Q     What information did you use to make that calculation?
 9   A     Just the intrinsic closing prices provided in the SEC
10   spreadsheet.
11   Q     And once you calculated those intrinsic losses, what was
12   your next step after that?  I think you mentioned you had
13   excluded additional investors.
14   A     Right.  So the next step would be for any of those that
15   still were holding remaining shares as of 8/15/2008, again,
16   the closing price -- intrinsic closing price was also 10
17   cents, so I used that closing price multiplied by the number
18   of remaining shares to give a credit, which was then backed
19   into the loss number to again determine either a new loss
20   number or if that individual account should even still be
21   included in the analysis.
22   Q     And I think you also mentioned investors who had a
23   greater intrinsic loss than actual loss.  How could that
24   happen?
25   A     Because, again, the intrinsic loss value is based on~--
```

```
 1    it's a closing price.  However, throughout the day, the market
 2    price can change for the stock, and therefore you may have had
 3    individuals who in actuality bought at a different price.  And
 4    it could go both ways.  It could have bought below what the
 5    intrinsic value price was or above it.  And that would
 6    determine whether, under the intrinsic analysis, you would
 7    have received a profit or your loss would have even been
 8    greater than the actual loss.  And then, therefore, under
 9    either of those circumstances, I would remove that account.
10    Q    Okay.  So did you also include -- excuse me.  Did you
11    also exclude individuals where the difference between their
12    actual loss and their intrinsic loss was minimal?
13    A    Yes.  In keeping consistent with the less than a hundred
14    dollars methodology, if there was a less than a hundred
15    dollars' difference between one's actual loss and their
16    intrinsic loss, I would remove that account.  There was
17    approximately $385,000 worth of those types of losses.  So
18    those individuals were then removed.
19    Q    Okay.  And, Mr. Melley, once you'd removed these
20    additional individuals or victims, how many victims were left
21    in the pool?
22    A    1082.
23    Q    And are these the individuals that are represented in the
24    final loss calculations?
25    A    Correct.
```

1   Q    And when you started your calculations, how many victims

2   were in the potential pool?

3   A    Over 2400.  So less than half at this point.

4         MS. COTTINGHAM:  And can we pull up exhibit 40,

5   please.

6   BY MS. COTTINGHAM:

7   Q    Mr. Melley, are these the calculations you have just

8   described?

9   A    Yes.

10  Q    And can you just walk us through left to right what these

11  columns are?

12  A    Sure.  The first identifier is the account name for each

13  investor account.  Their original actual trade account value,

14  meaning what their true loss was based only on their purchases

15  and sales.  Then when they did have remaining shares, I

16  indicated how many.  The closing price on 8/15/08 was 10

17  cents.  That, multiplied by the remaining shares, would give

18  you a proceed amount, which was then backed into the original

19  loss value to give you a final actual account loss value for

20  each individual.

21        And then I did the same analysis, as you can see,

22  moving left to right, starting with the intrinsic account

23  value.  So that's the original loss value under the intrinsic

24  prices, also using the remaining shares.  By 8/15/08, the

25  actual closing price and the intrinsic price were both 10

 1    cents a share.  Handle the same credit back under remaining

 2    share proceeds.  And then basically the last column in yellow,

 3    again, just a simple math of subtracting the final intrinsic

 4    account value from the final actual account loss value, and

 5    what you got is the difference between the two would be the

 6    final inflationary value.

 7               MS. COTTINGHAM:  Your Honor, I should have done -- I

 8    apologize.

 9               The Government would move to admit exhibit 40.

10               MR. GRUENSTEIN:  No objection.

11               THE COURT:  Admitted without objection.

12          (Government's Exhibit No. 40 entered into evidence.)

13               MS. COTTINGHAM:  And can we pull exhibit 102 back

14    up, please.  And we'll go to the last page here.

15    BY MS. COTTINGHAM:

16    Q    So, Mr. Melley, does this, like, summarize the

17    calculations you've just described?

18    A    Yes, it does.

19    Q    Can you just walk us through?  What's the first line

20    represent?

21    A    So there were 1082 victim loss accounts.  And, again,

22    that is combining multiple individuals if, by chance, they

23    had -- there were multiple accounts for one individual or

24    related individuals.

25    Q    And that second line, the actual account loss value, what

```
 1   does that represent?

 2   A    That's just based on the purchases and sales that they

 3   made, not taking into account whether they held shares at the

 4   end of 8/15/2008.  And that's $13.1 million.

 5            Then we have when you do take into account the

 6   remaining shares being sold at 10 cents a share, the final

 7   account loss value is approximately $11.6 million.

 8            Those same individuals had a final intrinsic account

 9   loss value of approximately $9.6 million, again using that

10   theoretical sell of shares.

11            And then basically subtracting the final intrinsic

12   account loss value from the final actual account loss value,

13   you get the loss due to fraudulent inflation of SGN stock at

14   $2,026,652.

15   Q    And, Mr. Melley, just a few follow-up questions just to

16   make sure I understand who's represented in this pool of

17   investors.

18            So if an investor purchased before September 20th,

19   2007, and they didn't buy anything during that relevant

20   period, are they included in this loss calculation?

21   A    They are not.

22   Q    If an investor bought both before and during -- so they

23   bought before September 20th, 2007, and after September 20th,

24   2007, but before August 15th of 2008, are they included in

25   this loss calculation?
```

```
1    A    Yes.

2    Q    How are they represented in this loss calculation, given

3    that they bought during two different periods?

4    A    For those individuals, if, for instance, they bought a

5    hundred shares before 9/20/07, then bought a hundred shares

6    during the review period, but sold 200 shares during the

7    review period, under my analysis, I attributed the full 200

8    sale but did not account for that first 100 shares, the cost

9    of that before the review period.

10        So, in essence, it's a more conservative loss

11   number.  Due to the volume of the information, I was not able

12   to go individual by individual to trace their individual

13   shares prior to 9/20/07, so I gave -- I basically gave them

14   credit by any of those shares that were purchased before, I

15   did not include the cost of that purchase in the relevant

16   period analysis.

17        So, in essence, if you sold more shares than you

18   purchased during the relevant period, you got credit for that.

19   Q    Mr. Melley, did you also perform this same analysis we've

20   been discussing, the same calculations, for a more limited

21   period of time?

22   A    I did.

23        MS. COTTINGHAM:  Can we pull up exhibit 41, please.

24   BY MS. COTTINGHAM:

25   Q    Mr. Melley, are these the calculations you performed for
```

1    this narrow period of time?

2    A    Yes.

3    Q    And what was that period of time?

4    A    This covered a smaller timeframe of September 25th, 2007,

5    through April 14th of 2008.

6    Q    And aside from the dates, does the methodology for these

7    calculations vary at all from what we just walked through?

8    A    The only difference in this, the narrow period, I believe

9    I included those accounts that had lost less than a hundred

10   dollars.  So they may be included in this narrow period

11   analysis.

12   Q    And what were the results of your calculations of the

13   loss during just the narrow period, this period from September

14   to April?

15   A    It was approximately $396,000 in loss.

16        MS. COTTINGHAM:  And the Government would move to

17   admit exhibit 41.  I apologize, Your Honor.

18        MR. GRUENSTEIN:  No objection.

19        THE COURT:  Admitted without objection.

20        (Government's Exhibit No. 41 entered into evidence.)

21   BY MS. COTTINGHAM:

22   Q    Mr. Melley, in addition to loss to investors based on the

23   SEC's event study, were you asked to calculate losses suffered

24   by specific individual investors?

25   A    Yes, I was.

```
 1              MS. COTTINGHAM:  And I'm going to pull up

 2    exhibit 103, please.

 3    BY MS. COTTINGHAM:

 4    Q    Mr. Melley, is this a chart totaling the losses to

 5    individual investors that you were asked to calculate?

 6    A    Yes.

 7              MS. COTTINGHAM:  Your Honor, the Government moves to

 8    admit 103.

 9              MR. GRUENSTEIN:  As long as he'll explain the basis

10    and lay a foundation, we have no objection.

11              THE COURT:  All right.  I'll admit it without

12    objection.

13         (Government's Exhibit No. 103 entered into evidence.)

14    BY MS. COTTINGHAM:

15    Q    Mr. Melley, what does this chart show?

16    A    This shows for each of the investors listed, their actual

17    loss, again, just based on their actual purchases and sales of

18    SignaLife stock during the -- starting with the relevant time

19    period of 9/20/07 through 8/15/08.

20              I indicated for each of those their actual trading

21    range, which would begin with their first purchase and end

22    with their final purchase or final sale.  And if they held any

23    remaining shares as of 8/15/08, that would be listed there.

24    Q    Mr. Melley, who identified the individuals on this list?

25    A    I was provided with these individuals from the
```

1    Government.

2    Q    And what information did you use to calculate this

3    information?

4    A    The SEC blue sheet data.

5    Q    And so this is based purely on what these investors

6    actually bought and sold?

7    A    Correct.

8    Q    And what was the total loss to these specific investors?

9    A    $953,902.

10   Q    Mr. Melley, did you -- were you also asked to summarize

11   losses to SignaLife, the company?

12   A    Yes.

13   Q    Did those calculations involve valuation of shares and

14   funds transferred from SignaLife?

15   A    Yes, it did.

16   Q    And were you asked to calculate the value of certain

17   groups of shares issued by SignaLife to certain individuals?

18   A    Yes, I was.

19   Q    And how did you value those shares?

20   A    I would review transfer agent records, specifically share

21   certificates, looking at the dates of issuance and then

22   looking at the closing price, and I would multiply the closing

23   price on the date of issuance to value those shares.

24   Q    For these groups of shares, did you have a role in

25   identifying the individuals in this group?

```
 1    A    I was simply provided with the list of names.

 2              MS. COTTINGHAM:  Pull up exhibit 114, please.

 3    BY MS. COTTINGHAM:

 4    Q    Mr. Melley, is this chart that was prepared summarizing

 5    your summary of the losses to SignaLife?

 6    A    Yes.

 7    Q    We'll walk through these individually, but what's the

 8    overall total here?

 9    A    $6,691,229.76.

10              MS. COTTINGHAM:  And can we pull up exhibit 109,

11    please.

12              And, Your Honor, this was admitted at trial without

13    objection as Government exhibit 258 as a summary exhibit.

14              THE COURT:  All right.

15              MS. COTTINGHAM:  We'd move to admit it for these

16    purposes, as well.

17              THE COURT:  Admitted without objection.

18         (Government's Exhibit No. 258 entered into evidence.)

19    BY MS. COTTINGHAM:

20    Q    Mr. Melley, did you prepare this exhibit?

21    A    I did not.

22    Q    Did you review it in connection with your testimony here

23    today?

24    A    Yes, I did.

25    Q    And does this chart show the number of shares that Martin
```

```
 1   Carter -- shares in cash, excuse me, that Martin Carter
 2   received from SignaLife?
 3   A    Yes.
 4   Q    And what were the total -- what was the value of the
 5   shares transferred to Mr. Carter?
 6   A    Of the over 6 million shares transferred or issued to
 7   Mr. Carter, the value of those shares was $1,473,900.
 8   Q    And what was the value of the cash that was transferred
 9   to Mr. Carter?
10   A    $682,100.
11   Q    And, Mr. Melley, have you had the opportunity to review
12   the summary chart we were just looking at a moment ago,
13   exhibit 114, and confirm that that exhibit is accurate with
14   respect to the assets Mr. Carter received from SignaLife
15   represented on this exhibit?
16   A    Yes.
17   Q    Does exhibit 114 accurately depict the information in
18   exhibit 258?
19   A    It does.
20         MS. COTTINGHAM:  And if we can pull up exhibit 110,
21   please.
22         Your Honor, this, again, was admitted at trial as
23   Government exhibit 259 without objection.
24         THE COURT:  All right.
25      (Government's Exhibit No. 259 entered into evidence.)
```

```
 1   BY MS. COTTINGHAM:

 2   Q    Mr. Melley, did you prepare this exhibit?

 3   A    No, I did not.

 4   Q    Did you review it in connection with your testimony here

 5   today?

 6   A    Yes, I did review it.

 7   Q    And does this chart show the funds that Mr. Stein

 8   received from SignaLife?

 9   A    Yes.

10   Q    And have you had the opportunity to compare the summary

11   chart and exhibit 114 and confirm that it is accurate with

12   respect to the funds transferred directly to Mr. Stein?

13   A    Yes, I have.

14        MR. GRUENSTEIN:  Your Honor, I'm going to object.

15   It seems like the witness is not testifying as to accuracy,

16   but rather whether he took numbers from exhibits he knows

17   nothing about and put them into another exhibit.

18        THE COURT:  Well, if that's what he did, then that's

19   what he did.  So that's not an expert opinion; he's just

20   transferring numbers.

21        Admitted over objection.

22   (Government's Exhibit No. 114 entered into evidence.)

23   BY MS. COTTINGHAM:

24   Q    Mr. Melley, let me pull up exhibit -- let me actually

25   make sure I confirm that.  Have you confirmed that the funds
```

1    transferred to Mr. Stein as reflected in exhibit 259, which

2    was admitted at trial, are accurately depicted in exhibit 114?

3    A    Yes.

4         MS. COTTINGHAM:  And if we can pull up sentencing

5    exhibit 69, please.

6    BY MS. COTTINGHAM:

7    Q    Mr. Melley, what is this document?

8    A    This is a share certificate for SignaLife made out to

9    Evie Muscillo in the amount of 247,000 shares of SignaLife.

10        MS. COTTINGHAM:  Your Honor, again, this was

11   admitted at trial as exhibit 108 without objection.  We'd move

12   to admit it now.

13        MR. GRUENSTEIN:  No objection.

14        THE COURT:  Admitted without objection.

15   (Government's Exhibit No. 108 entered into evidence.)

16   BY MS. COTTINGHAM:

17   Q    Now, Mr. Melley, can you -- what is the date on this

18   share certificate?

19   A    February 12th, 2008.

20   Q    And how many shares does this indicate are being

21   transferred in SignaLife?  Excuse me, how many shares does

22   this represent?

23   A    247,000.

24   Q    And are there any restrictions on the ability to sell or

25   transfer these 247,000 shares of SignaLife?

```
 1  A     No, there's not.  If there was, it would be in a legend
 2  across the front of this certificate.  So there was no
 3  restriction.
 4            MS. COTTINGHAM:  Can we pull up exhibit 114 again.
 5  BY MS. COTTINGHAM:
 6  Q    Mr. Melley, on February 12th, 2008, the day the shares we
 7  were just looking at were issued, what was the closing price
 8  of SignaLife stock on that date?
 9  A     Approximately 74 cents.
10  Q    So what was the value of the shares, of the 247,000
11  shares, that were issued to Evie Muscillo on that date?
12            MR. GRUENSTEIN:  Objection.  That would require
13  expert testimony.
14            THE COURT:  Overruled.  You can answer.
15            THE WITNESS:  $182,780.
16            MS. COTTINGHAM:  Thank you.
17            Can we pull up exhibit 115, please.
18            And for the record, this was previously admitted at
19  the prior sentencing as exhibit 346 without objection.
20            THE COURT:  Any objection to this?
21            MR. GRUENSTEIN:  No, Your Honor.
22            THE COURT:  Admitted without objection.
23       (Government's Exhibit No. 115 entered into evidence.)
24  BY MS. COTTINGHAM:
25  Q    Mr. Melley, what is this document?
```

1   A      This is a document that I created at the last sentencing.

2   It just lists a number of stock issuances of SignaLife and the

3   valuation of those all attributed to the Silve Group or Sameer

4   Gulati.

5   Q      Mr. Melley, did you identify the Silve Group or

6   Mr. Gulati?

7   A      No, the names were provided to me, and I was asked to

8   review the transfer agent records and issuances to those

9   names.

10  Q      So what information did you rely on in creating this

11  chart?

12  A      Transfer agent records, like a stockholder list, as well

13  as I believe stock certificates.

14  Q      Now, if we can scroll down to the bottom there.

15         In total, how many shares were issued to the Silve

16  Group?

17  A      1 thousand 845,512 (sic).

18         THE COURT:  You said 1,000.

19         THE WITNESS:  I'm sorry, 1,845,512.

20  BY MS. COTTINGHAM:

21  Q      And, Mr. Melley, how did you value -- there's a number of

22  entries here.  How did you value each of these particular

23  share issuances?

24  A      I determined the closing price based on the date of

25  issuance listed in the transfer agent records and multiplied

1   the number of shares by the closing price to get a dollar

2   valuation for that issuance.

3   Q   And what was the total value of all of the shares issued

4   to the Silve Group?

5   A   Approximately $3 million.

6   Q   And, Mr. Melley, have you compared the funds listed here,

7   the total value of the stock transferred to the Silve Group,

8   with the chart in exhibit 114 and confirmed that 114 is

9   accurate?

10   A   Yes.

11   Q   And is the entry with respect to the Silve Group on

12   exhibit 114 accurate?

13   A   Yes.

14   Q   Mr. Melley, were you also asked to review some trial

15   exhibits with respect to shares issued to two trust accounts?

16   A   Yes, I was.

17         MS. COTTINGHAM:  Can we pull up exhibit 73, please,

18   previously marked as Government's exhibit 343 for the first

19   sentencing.  We would move to admit this, Your Honor.

20         MR. GRUENSTEIN:  No objection.

21         THE COURT:  Admitted without objection.

22      (Government's Exhibit No. 73 entered into evidence.)

23   BY MS. COTTINGHAM:

24   Q   Mr. Melley, what is this document?

25   A   This is a stock certificate for SignaLife in the name of

```
 1   C. Roberto Trust.

 2   Q    How many shares this for?

 3   A    600,000 shares of SignaLife.

 4   Q    Are there any restrictions on the transfer of these

 5   shares?

 6   A    No, there are not.

 7   Q    What was the date on this share certificate?

 8   A    April 4th, 2008.

 9        MS. COTTINGHAM:  Pull up exhibit 72, please, which

10   is previously admitted as exhibit 344 at the prior sentencing.

11   BY MS. COTTINGHAM:

12   Q    Mr. Melley, is this another share certificate that was

13   issued to SignaLife?

14   A    Correct.  This one in the name of D. Clemens Trust.

15   Q    How many shares are represented?

16   A    Also 600,000.

17   Q    Any restriction in the transfer of these shares?

18   A    No; they were freely tradeable.

19   Q    What is the date of this share certificate?

20   A    Like the last certificate, this is all April 4th, 2008.

21   Q    So these two certificates have the same date and same

22   number of shares?

23   A    They do.

24        MS. COTTINGHAM:  We would move to admit exhibit 72,

25   Your Honor.
```

```
 1              MR. GRUENSTEIN:  No objection.

 2              THE COURT:  Admitted without objection.

 3         (Government's Exhibit No. 72 entered into evidence.)

 4    BY MS. COTTINGHAM:

 5    Q    Mr. Melley, I'm going to pull up Government exhibit 71.

 6              MS. COTTINGHAM:  Your Honor, this is a very

 7    voluminous exhibit.  It's two binders of bank records.  We

 8    have it up on the screen.  I can bring the binders up to you,

 9    or we could put it up on the screen.  How would the Court

10    prefer?

11              THE COURT:  Is that what's on this disc?

12              MS. COTTINGHAM:  Yes, Your Honor.

13              THE COURT:  I'll take the disc.

14    BY MS. COTTINGHAM:

15    Q    Mr. Melley, what is exhibit 71?

16    A    It is a number of documents pertaining to brokerage and

17    bank records.  I believe it was part of an MLAT request.

18    Q    Have you had the opportunity to review these documents?

19    A    I have.

20              MS. COTTINGHAM:  And can we turn to page 3 of this?

21    BY MS. COTTINGHAM:

22    Q    What company is listed on the account-opening application

23    perform?

24    A    Beckring Investments.

25    Q    If we scroll down there, what individual is listed on
```

 1    these bank account documents?

 2    A    I believe -- I think maybe it's on the next page.

 3    Q    It's the next page.  I apologize.

 4    A    It's okay.  Mitchell Jay Stein.

 5    Q    All right.  And if we scroll down a little more.

 6         All right.  And if -- in your review, Mr. Melley,

 7    are there any other individuals listed on this account-opening

 8    paperwork?

 9    A    No, Mr. Stein is the only individual listed.

10    Q    And if we turn to the next page, page 5, and we take a

11    look there at the bottom, whose signature is on the bottom of

12    page 5?

13    A    Mitchell J. Stein.

14    Q    Who's listed as the beneficial owner of the account?

15    A    Mr. Stein.

16    Q    Is anyone else listed as a beneficial owner of this

17    account?

18    A    No.

19    Q    And if we turn to page 113 of this document.

20         Mr. Melley, what is this document?

21    A    This document is a confirmation statement discussing the

22    1.2 million shares that are being deposited.  Those are

23    1.2 million shares of SignaLife stock being deposited into an

24    account for Beckring Investments.

25    Q    What is the date of the deposit?

```
 1   A     April 18th, 2008.

 2   Q     How long after the share certificates we were just

 3   looking at is April 18th, 2008?

 4   A     About two weeks.

 5   Q     And turning to the next page.

 6         MS. COTTINGHAM:  The page after that, sorry.

 7   BY MS. COTTINGHAM:

 8   Q     Mr. Melley, what is this document?

 9   A     This is a stock certificate for D. Clemens Trust in the

10   amount of 600,000 shares.

11   Q     Mr. Melley, have you had the opportunity to compare this

12   document from the bank accounts of Mr. Stein to Government's

13   exhibit 72?

14   A     Yes, I have.

15   Q     And are they the same?

16   A     They are.  Everything is the same.

17   Q     And did you compare the CUSIPs on these two share

18   certificates?

19   A     The CUSIPs are the same, same numbers.

20         MS. COTTINGHAM:  If we can go two additional pages,

21   please.

22   BY MS. COTTINGHAM:

23   Q     Mr. Melley, what is this document?

24   A     Similar to the stock certificate we saw earlier for C.

25   Roberto Trust, this is another copy of that stock certificate.
```

```
 1   Q    And did you have the opportunity to compare this to

 2   sentencing exhibit 73 that we were just talking about?

 3   A    Yes, I did.

 4   Q    And does this share certificate in Mr. Stein's bank

 5   accounts reflect the same securities that we were just

 6   discussing?

 7   A    It does.  I verified it by the CUSIP number.

 8   Q    So Mr. Melley, in your review of the bank records, did

 9   this show that the share certificates issued to D. Clemens and

10   C. Roberto Trust that they were placed into an account in the

11   defendant's name?

12   A    Yes.

13        MS. COTTINGHAM:  Your Honor, we would move to admit

14   exhibit 71.

15        MR. GRUENSTEIN:  No objection.

16        THE COURT:  Admitted without objection.

17   (Government's Exhibit No. 71 entered into evidence.)

18        MS. COTTINGHAM:  And if we could pull exhibit 114

19   back up, please.

20   BY MS. COTTINGHAM:

21   Q    Mr. Melley, putting this all together, what was the

22   SignaLife closing price on April 4th, 2008, the date of the C.

23   Roberto and D. Clemens share certificates that we just looked

24   at?

25   A    Approximately 99 cents per share.
```

```
 1   Q    And based on that closing price, what was the value of

 2   the $600,000 (sic) shares issued to the C. Roberto Trust on

 3   April 4th, 2008?

 4   A    The 600 shares -- 600,000 shares were valued for each

 5   trust at $594,000.

 6   Q    And, Mr. Melley, taking a look at exhibit 114, what was

 7   the total that you summarized of the loss to SignaLife?

 8   A    Approximately $6.7 million.

 9        MS. COTTINGHAM:  And, Your Honor, I just wanted to

10   note one point for the record, which is on the Government

11   submitted this figure, the loss to SignaLife, on pages 15 to

12   16 of its sentencing memorandum.  The number in the sentencing

13   memorandum is slightly higher by about $55,000, and I was just

14   going to ask Mr. Melley about that slight discrepancy now.

15        THE COURT:  Okay.

16   BY MS. COTTINGHAM:

17   Q    Mr. Melley, in the course of preparing for your testimony

18   today, did you do additional review of all of the funds

19   reflected in this chart that you've just testified about,

20   exhibit 114?

21   A    Yes.

22   Q    And the value of the shares issued to Ajay Anand, if you

23   take a look at that third item right there.

24   A    Um-hum.

25   Q    Is the number on the chart consistent with the number
```

```
 1    that you testified at the first sentencing hearing --

 2             THE COURT REPORTER:  I'm sorry.  Could you repeat --

 3             MS. COTTINGHAM:  I will start again.

 4    BY MS. COTTINGHAM:

 5    Q    Mr. Melley, taking a look at line 3 of the value of the

 6    shares issued to a Mr. Anand, have you had the opportunity to

 7    compare that to the calculations you did in connection with

 8    the shares transferred to Mr. Anand?

 9    A    Yes.

10    Q    And have you confirmed that this is accurate as

11    represented in exhibit 114?

12    A    Yes.

13    Q    In addition to loss, Mr. Melley, were you asked to

14    summarize gain to the defendant?

15    A    I was.

16    Q    And, again, what was the information you used in these

17    calculations?

18    A    Again, I believe it was transfer agent records, as well

19    as bank statements.

20             MS. COTTINGHAM:  Can we pull up exhibit 113, please.

21    BY MS. COTTINGHAM:

22    Q    Mr. Melley, does this chart summarize the funds that the

23    defendant received based on your calculations?

24    A    Yes, it does.

25             MS. COTTINGHAM:  Your Honor, we'd move to admit 113.
```

```
 1              MR. GRUENSTEIN:  No objection.

 2              THE COURT:  Admitted without objection.

 3         (Government's Exhibit No. 113 entered into evidence.)

 4    BY MS. COTTINGHAM:

 5    Q    Mr. Melley, a number of the figures in chart 113 are

 6    substantially -- are identical, actually, to those in

 7    exhibit 114.

 8              Let me rephrase that.  Have you had the opportunity

 9    to compare exhibits 113 and 114?

10              MS. COTTINGHAM:  And I think we can actually -- can

11    we split screen them?

12    BY MS. COTTINGHAM:

13    Q    So rather than go through all of them again, Mr. Melley,

14    I think can we first ask with respect to the -- on

15    exhibit 113, have you had the opportunity, for the first line

16    to compare, is the first line money Stein received directly

17    from SignaLife identical to what's on exhibit 114?

18    A    Yes, it is.

19    Q    And the second line, the $682,100, is that identical to

20    exhibit 114?

21    A    Yes.

22    Q    And with respect to Mr. Anand, we will -- excuse me.

23    With respect to Mr. Anand --

24              MS. COTTINGHAM:  Can we pull up Government

25    exhibit -- apologies, Your Honor.  Let me go to the next line,
```

```
 1   excuse me.

 2   BY MS. COTTINGHAM:

 3   Q    With respect to the funds received to Carter, is that

 4   identical?

 5   A    It is.

 6   Q    And the trusts that we were just talking about, are those

 7   two lines, the entries for the C. Roberto and D. Clemens

 8   trusts, are those identical?

 9   A    They are.

10            MS. COTTINGHAM:  And with respect to the Anand and

11   the THS Blind Trust entries, can we pull up Government

12   exhibit 115.  I apologize, Your Honor.  Court's indulgence

13   very briefly.

14            I apologize.  Can we pull up 110, please.

15   BY MS. COTTINGHAM:

16   Q    And, Mr. Melley, with respect to the money transferred to

17   Mr. Anand, is this figure of $478,600 the same as the figure

18   represented in chart 113?

19   A    It is.

20   Q    And with respect to the money that Mr. Stein received

21   from the THS Blind Trust, is this the same figure that's

22   represented in Government exhibit 113?

23   A    Yes, it is.

24            MS. COTTINGHAM:  Your Honor, we would move to admit

25   Government exhibit 104, which reflects our modified rescissory
```

1    calculations, just so they are in the record, but at this time

2    wouldn't offer any additional testimony about that

3    methodology.

4             THE COURT:  Any objection?

5             MR. GRUENSTEIN:  If we could see it.

6             MS. COTTINGHAM:  Of course.

7             Pull up 104, please.

8             And, Your Honor, this is I believe also in our

9    sentencing paper.

10            The final, I should say, the final bottom figure is

11   in our sentencing paper, and that's the figure we've put

12   forward for the modified rescissory method.

13            THE COURT:  Okay.  Is there any objection to that?

14            MR. GRUENSTEIN:  One second, Your Honor.

15            Your Honor, I don't think that we have enough

16   information to vouch that there's foundation here, so unless

17   there's going to be a foundation.  It could be done through

18   argument or through a witness.

19            THE COURT:  Didn't you say this was based upon what

20   was presented during the initial sentencing?

21            MS. COTTINGHAM:  Yes, Your Honor.  This 24,974

22   (sic), yes, it's using the same exact methodology that was

23   used at the first sentencing.  I think you will remember there

24   were a number of broad periods, narrow periods.  This was the

25   narrow period methodology.

```
 1              MR. GRUENSTEIN:  Your Honor, I don't think all of
 2    these calculations were done at the last sentencing.
 3              THE COURT:  All right.  Do you know if they were or
 4    not, or is he doing new calculations based upon that
 5    information that was presented previously?
 6              MS. COTTINGHAM:  Your Honor, Mr. Melley has not done
 7    any new calculations with respect to the modified recissory
 8    method in connection with the resentencing.
 9              THE COURT:  So all are these are numbers that were
10    presented at the last sentencing?
11              MS. COTTINGHAM:  Yes.
12              THE COURT:  And the data was presented at the last
13    sentencing?
14              MS. COTTINGHAM:  Yes, Your Honor.
15              THE COURT:  You're disagreeing with that?
16              MR. GRUENSTEIN:  Well, Your Honor, I do note for the
17    bottom one, the 24 million, it was.  I don't -- I simply don't
18    know and I don't believe that that's true for the top two
19    calculations.  I mean, I think ultimately the Government's
20    only relying on the bottom.  I hear a representation there was
21    no new work done.  So, you know, maybe we could go back and
22    look, but we'll withdraw our objection.
23              MS. COTTINGHAM:  Yeah, Your Honor, just so the
24    record is clear on this, the bottom figure -- counsel's
25    exactly right, the bottom figure is what we are advancing as
```

```
 1    the modified rescissory method that we would put forward.  The
 2    all outstanding shares, I think you can see from the header,
 3    the excluding only ARC Finance, the figure that we are putting
 4    forward, which, again, was at the first sentencing as the
 5    modified rescissory method, excluding all shares that we
 6    believe to be affiliated with the defendant and related
 7    entities.  So it is just that 24,000.
 8              I am also happy, Your Honor, to revise the slide so
 9    it's just that box.
10              THE COURT:  I don't think we need to do that.  I'll
11    admit the last box, the third one at the bottom, without
12    objection.
13          (Government's Exhibit No. 104 entered into evidence.)
14              MS. COTTINGHAM:  Thank you.
15              Your Honor, brief indulgence.
16              Thank you, Your Honor.  Nothing further from
17    Mr. Melley right now.
18              THE COURT:  Thank you.
19              Do you want to take a break before we begin
20    cross-examination?
21              How long do you think you're going to be?
22              MR. GRUENSTEIN:  I would say at least an hour.
23              THE COURT:  All right.  Then why don't we take a
24    10-minute recess.  All right?
25              MR. GRUENSTEIN:  Sure.  Thank you.
```

```
 1              (A recess was taken from 3:04 p.m. to 3:17 p.m., after

 2    which the following proceedings were had:)

 3              THE COURT:  Please be seated, everyone.

 4              We're back on the record.  Mr. Stein's present with

 5    counsel.

 6              You may cross-examine.

 7              MR. GRUENSTEIN:  Thank you, Your Honor.

 8                          Cross-Examination

 9    BY MR. GRUENSTEIN:

10    Q    Good afternoon, Mr. Melley.

11    A    Good afternoon.

12    Q    What relationship, if any, is there between FINRA and the

13    Department of Justice?

14    A    There is no relationship in the sense that FINRA is a

15    self-regulatory organization.  It's not a government entity.

16    But FINRA has this unit, criminal prosecution assistance

17    group, that's walled off from the rest of the organization,

18    and CPAC, criminal assistance unit, provides assistance to the

19    Department of Justice upon request.

20    Q    Okay.  And there's no payment to FINRA for this work?

21    A    No; just to cover travel to be here today.  My salary is

22    drawn by FINRA.

23    Q    We're going to talk a little bit about the broad and

24    narrow period calculation you did for this sentencing.

25              Approximately how long do you think it took you to
```

1    do?

2    A      All of it together?

3    Q      Yeah.

4    A      You know, I was juggling other cases at the time, so it's

5    kinda hard to say.  You know, it would be a few days.  At one

6    instance, I mean, overall it took to do the analysis, you

7    know, probably a couple weeks all together start to finish.

8    It's tough to judge.

9    Q      I mean, you had to calculate, do your analysis for each

10   investor individually, correct?

11   A      Well, I took the timeframe and then ran a query for

12   everybody who bought during the period of time.  So as I said

13   earlier, I wasn't tracing individual shares for each customer.

14   It's just running a query of all those who purchased or those

15   who were active during the timeframe, and then from there,

16   doing the analysis.

17   Q      So you didn't do it manually; you had a program that did

18   it for you?

19   A      It's not a program.  It's just running a query like in an

20   Excel spreadsheet, just to kinda sort the data a certain way.

21   Q      Did you keep an Excel spreadsheet that had all of your

22   calculations?

23   A      Well, the spreadsheet kept evolving as you would kinda

24   start with the overall blue sheet data and then run the data,

25   and then, you know, it was from there kinda whittling down

 1   like through the steps that we discussed.

 2   Q    Let me ask you, for the -- let's say for the narrow

 3   period, if I wanted to confirm that your numbers were

 4   accurate, would I have to do the analysis over again, or is

 5   there something that you could provide me that I could review

 6   to confirm it?

 7   A    I mean, I think it's very simple to do the analysis, as

 8   I've kinda laid out.  I mean, you start with that narrow

 9   period.  I basically took a subset of the blue sheet data.  So

10   it's a spreadsheet for 9/25/07 to 4/14/08.  And then it's just

11   kinda putting in a query, give me everybody who bought during

12   that period of time, and then it just would list all the --

13   all the accounts for those people who bought during that time.

14         And then you do those subsequent steps, like we

15   said.  With the intrinsic value, it's doing the same thing;

16   you're just substituting the transaction prices.

17   Q    But then you have to do that for each individual victim,

18   correct?

19   A    But it's all listed in a spreadsheet like the spreadsheet

20   that you have; that's the final spreadsheet.  It's just like a

21   list of individuals with their actual loss or the remaining

22   shares.

23         I mean, in terms of the remaining share field, all I

24   did was you just put an equation into Excel, you know, field

25   A2 times field A3 equals field A4.

1    Q    And you have that Excel that shows exactly how it was

2    done; is that correct?

3    A    Well, yeah.  It's just an Excel -- an Excel spreadsheet

4    that kinda does that.  But, I mean, it's just like you just

5    take the data, and you can easily just run it.

6    Q    Are you aware that the defense has made a request for

7    your work papers?

8    A    I believe so.

9    Q    Would -- is there any way -- is there any reason you

10   can't provide that Excel spreadsheet easily?

11   A    You know, in terms of -- for the narrow period or the

12   broad period?

13   Q    Right.

14   A    I mean, I don't have that on me.  I don't have such a --

15   Q    But it does exist?

16   A    It's like an evolving document over -- I mean, I could

17   try to see.  I mean, it's like an evolving document over time

18   of the Excel.  It's like very straightforward in terms of

19   determining it.

20   Q    We'll get back to that in a minute.

21          I want to put the broad and narrow period analysis

22   aside and talk about the last half of your testimony, which

23   was about things like loss to SignaLife, gain to Mr. Stein.

24   A    Okay.

25   Q    And what I want to get a better understanding is of the

 1   work that you actually did versus work that you relied on from

 2   others.

 3              MR. GRUENSTEIN:  So maybe if we could go through the

 4   exhibits that we discussed.  Let's start with GX114.

 5   BY MR. GRUENSTEIN:

 6   Q    This is a document you testified about?

 7   A    Correct.

 8   Q    Do you have personal information about any of this

 9   information?

10   A    The valuing of shares for the two trusts, I recall doing

11   that at the first sentencing.  And the value of shares issued

12   to Mr. Carter, to Evie Muscillo, I recall doing that at

13   sentencing, as well as I think the value of shares for, like,

14   Silve Group, which I guess is Mr. Anand.

15              The bottom two, the money sent directly to Stein or

16   to Mr. Carter, I did not calculate those numbers originally.

17   Q    So for the top five, which you did calculate, you don't

18   have any information that, for example, any of these shares

19   were issued improperly?

20   A    I do not, no.

21   Q    You were just adding, adding numbers up, correct?

22   A    Yeah, I was just provided those individuals with their

23   stock certificates or stockholder list and just asked to

24   identify those issuances, multiply it to value, those shares.

25   Q    And, for example, the $3 million to Mr. Anand, you don't

```
 1   have any information that any of that was ever given to
 2   Mr. Stein, do you?
 3   A    Not directly, no.
 4            MR. GRUENSTEIN:  Okay.  Why don't we move to the
 5   next exhibit that was discussed earlier.  Ah, Government
 6   exhibit 113.
 7   BY MR. GRUENSTEIN:
 8   Q    I have the same question.  Can you just tell us which
 9   work -- which calculation you did and which you're just
10   relying on others for?
11   A    The valuation of the shares for Mr. Carter, the two
12   trusts, the top four money received, I did not calculate those
13   monies.
14   Q    Okay.  So the top four you did not do; the bottom three
15   you did, correct?
16   A    Correct.
17   Q    Government exhibit 109.  Is this information you
18   prepared?
19   A    I did not prepare this exhibit here.  What I valued was
20   the top line, the shares of SGN, with that amount of 6 million
21   shares for Mr. Carter, and I did the valuation of that
22   1.4 million number.
23   Q    Government exhibit 110.  These are funds to Mitchell
24   Stein.  Did you do this calculation?
25   A    This one, no.  I mean, I did not create this document.
```

1  And then in terms of the dollar figures, no, I did not create

2  this one.

3  Q    Okay.  So to be clear, when you were asked questions to

4  confirm the accuracy of numbers, you were just simply

5  confirming that the numbers on, let's say, Government

6  exhibit 110 were accurately copied onto the document you did

7  prepare for today; is that correct?

8  A    I -- yeah, I reviewed other documents, like, for

9  instance, the THS Blind Trust, I reviewed a spreadsheet that

10  showed how it added up to $1,395,302.  So I verified each of

11  those numbers based on those supporting documents.

12  Q    Okay.  But you didn't prepare the spreadsheet, for

13  example?

14  A    Correct.

15  Q    Government exhibit 115.  Did you prepare this?

16  A    I did.  I believe I prepared this for the previous

17  sentencing based on my review of the transfer agent records

18  provided.

19  Q    Okay.  And, again, you didn't draw any conclusions about

20  whether these were improper transfers, did you?

21  A    No, I did not.  That wasn't my role.

22  Q    Okay.  You spoke about the method that you used for the

23  broad and the narrow period.

24  A    Correct.

25  Q    Correct?

```
 1              I know you went through a PowerPoint.  I thought --
 2    I would like to drill in a little bit, and I thought maybe we
 3    could show you an e-mail that you wrote to the Government on
 4    April 30th, 2018, which we'll introduce as -- or offer as
 5    DX73.
 6              THE COURT:  Any objection?
 7              MS. COTTINGHAM:  No, Your Honor.
 8              THE COURT:  Admitted without objection.
 9         (Defendant's Exhibit No. 73 entered into evidence.)
10    BY MR. GRUENSTEIN:
11    Q    Does this e-mail accurately describe the approach that
12    you took?
13    A    Let me see.  I think, yes, generally.  I believe so.  We
14    were trying to put together the process.
15    Q    So this was -- this was before you did the analysis or
16    after?
17    A    I think this was -- was during -- I think this was
18    during, as I was doing this.  I can't remember for the broad
19    period.  Maybe I had finished that but was doing the narrow
20    period.  It was around that time.
21    Q    Okay.  And who told you the analysis that you should do?
22    A    The Government.
23    Q    They told you to do these steps?
24    A    Yeah, in terms of laying out to get to these final
25    numbers.  So, and then it was us just trying to discuss
```

 1    together what steps I took to get to those numbers.

 2    Q    Okay.  But just so that I'm clear, this is an e-mail

 3    you're sending to them?

 4    A    Right.

 5    Q    But you're saying that the Government told you how to do

 6    the calculations?

 7    A    Right, in terms of here's the review period, here's what

 8    we're looking for, and this is where we want to go.

 9          And so then what I'm putting in here is kinda

10    describing how I got there.

11    Q    Okay.

12    A    So they gave me the general parameters to get there.

13    Q    The general parameters were here are the broad and narrow

14    review periods?  Presumably they told you the review periods?

15    A    They gave me the dates, yes.

16    Q    And then said, we want to know the loss?

17    A    Well, it was, we want to know the actual loss.  And then

18    because I had also gotten the SEC spreadsheet of the intrinsic

19    value, it was we want to know what that loss is, and then we

20    want to know what the inflationary value loss would be, which

21    is one subtracted from the other.

22    Q    So in order to figure out the inflationary amount, you

23    needed the information from the SEC, correct?

24    A    Correct.

25    Q    And what the information was was the closing price --

```
 1    well, why don't you explain.

 2              MR. GRUENSTEIN:  Maybe we should put up GX32.

 3    BY MR. GRUENSTEIN:

 4    Q    So in this document, this has actual price minus

 5    inflation, and that's the intrinsic price, correct?

 6    A    Correct.

 7    Q    And actual price is the closing price on a particular

 8    day, correct?

 9    A    Right, the actual publicly available closing price,

10    right.

11    Q    So it's not necessarily the price that the investors

12    we're looking at paid; it is the closing price, the last sell

13    of the day?

14    A    Correct.

15    Q    And then what the SEC did was they came up with an

16    inflation amount.  And do you know who came up with that

17    inflation amount?

18    A    Not specifically, no.

19    Q    Do you know how the inflation amount was derived?

20    A    I do not.

21    Q    Do you know what the inflation amount was?

22    A    Well, just based on what this spreadsheet is here.

23    Q    But as a -- is the inflation a particular percentage of

24    the price?

25    A    Well, I took the inflation amount that's listed here.  I
```

```
 1   mean, I just realize that they take what the difference is
 2   between the actual price and the intrinsic price, and that
 3   difference is the inflationary amount.
 4   Q    Do you understand that the inflation is constant as a
 5   percentage of the actual price?
 6   A    Again, I don't know the specifics, and it wasn't the
 7   focus of my analysis.
 8   Q    Okay.  So you don't understand that the inflation is
 9   roughly 18 percent?
10   A    I did know at one point there was, like -- that number
11   sounds familiar, but I couldn't tie that to a certain
12   timeframe.
13   Q    Okay.  And do you know that the inflation was
14   consistently 18 percent throughout the narrow period?
15   A    I believe so.
16   Q    Okay.  And you're not testifying as an expert here,
17   correct?
18   A    No, not with regards to this.  No.
19   Q    Not with regards to anything, correct?
20   A    Correct.
21   Q    So you don't have an explanation as to why the inflation
22   amount is 18 percent, correct?
23   A    I do not.
24   Q    So if we could go back to number 5 -- I'm sorry, DX73,
25   you go through certain steps.  And if we could start at
```

```
 1   paragraph 3, I'm going to walk through the steps, and you tell
 2   me if I describe it accurately.
 3            The first step is for you to see which accounts
 4   purchased shares during the time periods, correct?
 5   A    Okay.  So we're looking at number 3 here?
 6   Q    Right.  This is the first step in your analysis.
 7   A    Correct.
 8   Q    Why don't we just talk about the narrow period for
 9   simplicity during my questions.
10            So the first question that you look into is which
11   investors purchased during the narrow period, correct?
12   A    Correct.
13   Q    And then you subtract their purchases from their sales,
14   correct?
15   A    If they have -- you would subtract their sales from their
16   original purchases.
17   Q    Okay.
18   A    Correct.
19   Q    And to see if they had a loss?
20   A    Correct.
21   Q    If the people did not show a loss, then you remove them?
22   A    Right.  If they showed a profit amount, they were
23   removed, correct.
24   Q    And you also said that you took out people whose loss was
25   less than a hundred dollars from the broad period but not the
```

```
 1  narrow period?

 2  A    Correct.  And that --

 3  Q    Yeah, go ahead.

 4  A    No, and that was just because of just the sheer volume of

 5  individuals in the broader period.  It was a much larger

 6  universe of people.  So it was just a decision in order to

 7  kinda save some time.

 8  Q    A decision made by you or by the Government?

 9  A    I actually made that decision because it was a voluminous

10  task.

11  Q    Okay.  So then we go to paragraph 4.  And for the people

12  who did not sell all their shares, you essentially imputed a

13  final share price during that period, correct?

14  A    Right; the closing price on the last date of the period.

15  Q    Okay.  So then -- and that, if you totaled that up, that

16  would be, for any given investor, that was their -- I call it

17  their position during that period, correct?

18  A    In terms of the number of shares?

19  Q    The number -- well, the amount of money they lost during

20  the period.

21  A    Yeah.  I mean, their position would be how many shares

22  they had at the end of the time period, and then you could say

23  their value at the end of that period would be either, right,

24  based on that sale, now a profit amount or a new loss amount.

25  Q    And that's how you define the actual loss during the
```

```
1   period for those people?

2   A    The final actual loss.

3   Q    Correct.

4   A    Again, not their actual loss, because we're giving that

5   theoretical credit of 10 cents a share.

6   Q    Okay.  But the -- you're not making -- you're not drawing

7   a conclusion that that loss actually resulted from the fraud,

8   are you?

9   A    My focus is just on the trading itself.

10  Q    Okay.

11  A    Not what is a result of anything.  Just based on the

12  dates I was given.

13  Q    So you -- first you do the actual loss.

14  A    Uh-huh.

15  Q    Then you have this notion of the intrinsic loss, correct?

16  A    You say this notion.  I mean, I was asked to do this

17  other types of analysis.

18  Q    Right.

19        And just so that I'm clear, this is not a

20  calculation you came up with; it's a type of calculation the

21  Government asked you to do.

22  A    Correct.

23  Q    And what the intrinsic value of the share is is

24  essentially the value of the -- the price of the share at

25  closing minus the inflation amount.
```

```
 1   A     Correct.
 2   Q     And if I bought a share for $1.10, let's say, but the
 3   closing price was $1.20, you would actually calculate the
 4   inflation based on the closing price, not based on the actual
 5   price that I paid.
 6   A     Correct.  The close -- I mean, I did not calculate the
 7   closing price; it was just I used the price listed.  That
 8   intrinsic price would be, yes, the actual price minus the
 9   inflationary value amount gives you the intrinsic closing
10   price.
11   Q     Right.  But I want to be clear when I say the actual
12   price, I'm not saying --
13   A     The market price.
14   Q     I think you got it, but let me just finish so the record
15   is clear.
16   A     Okay.  Sure.
17   Q     When I say actual price, I don't mean the actual price
18   that me, an investor, I, an investor, paid.  I mean the
19   closing price on that day.
20   A     Correct, the actual closing price.  Correct.
21   Q     Got it.
22         And then what we do is we subtract the intrinsic
23   loss from the actual loss, and that gets the total
24   inflationary value, correct?
25   A     Right.
```

```
 1              And, again, with the intrinsic methodology, we're
 2   also handling those remaining shares.
 3   Q    Right.
 4   A    Yeah.
 5   Q    So for any given person during the narrow period, the
 6   inflationary amount is 18 percent, correct?
 7   A    During one particular period, yes.
 8   Q    Yes.  During the narrow period.
 9   A    Yeah, right.  And I can't recall if the whole narrow
10   period is 18 percent, but I -- okay.
11   Q    And what that essentially means is that the inflationary
12   value should not be higher than 18 percent of the actual loss,
13   correct?
14   A    Correct.
15   Q    So if someone lost a hundred thousand dollars during the
16   period, their final inflationary value should not be more than
17   18,000, correct?
18   A    Correct.
19   Q    And if the stock -- let's say the stock drops down to
20   zero.  Then the inflationary value would be the full 18,000,
21   correct?
22   A    Correct.
23   Q    If the stock only drops 50 percent --
24   A    Then it -- go ahead.
25   Q    Well, you're going -- It will be 9000.
```

```
 1   A     Right.

 2   Q     It will be 9000.

 3          So basically the inflationary value, which I think

 4   is meant to be the loss that the Government is arguing for, is

 5   going to depend on how much the stock fell during the period,

 6   correct?

 7   A     Based on the analysis, I believe so.

 8   Q     Yeah.

 9          Just so that we're clear on the broad period and the

10   narrow period and how it's changed from the first sentencing

11   to the second sentencing, am I correct that the current broad

12   period was actually the narrow period in the first sentencing?

13   A     Correct.

14   Q     And the current narrow period didn't exist in the first

15   sentencing?

16   A     Correct.

17   Q     Because the current narrow period ends off at the webcast

18   on April 14th, correct?

19   A     Yes.

20   Q     The broad period, as the narrow period previously at the

21   last sentencing, ends off at the 10-Q?

22   A     Correct.

23   Q     Okay.  And that was a decision that the Government made,

24   not you, correct?

25   A     Yes.
```

1    Q    Why don't we look at Government exhibit 41.

2              MR. GRUENSTEIN:  And if we could blow that up.

3    BY MR. GRUENSTEIN:

4    Q    So maybe we could take the first line, Abdollah

5    Parsapour.  Okay?  He lost $15,892 during this narrow period,

6    correct?

7    A    Correct.

8    Q    That's how much the stock went down, and he lost in

9    total, correct?

10   A    Based on his actual trade-in.

11   Q    He has zero remaining shares on the day of the webcast,

12   correct?

13   A    Correct.

14   Q    He sold all of his shares before April 14th?

15   A    Correct.  That's why his final actual account value is

16   the same as the actual trade account value earlier.

17   Q    The -- his intrinsic account value by taking the

18   inflation out is 11,600, ending him up with 4,292, correct?

19   A    Correct.

20   Q    Is it a fair assumption to -- we said earlier that the

21   final inflationary value should not be greater than 18 percent

22   of the actual trade account value.  Do you recall saying that?

23   A    Yes.  I guess the only difference would be, again, if

24   we're looking at their prices -- you know, the 18 percent I

25   guess is based on comparison of the actual closing price and

```
 1   the intrinsic price, but, again, we have to look at the actual
 2   prices they purchased and sold at, which could be different
 3   than the actual.  So I guess that's why that number could
 4   change.  It's individuals.
 5   Q    Right.  By not using an individual actual price, instead
 6   using the closing price, that could skew things one way or the
 7   other, correct?
 8   A    Right.  Using the individual price methodology would be
 9   different than just using across-the-board actual price or an
10   inflationary amount --
11   Q    Correct.
12   A    -- of 18 percent.
13   Q    So if we look at the next line, for example, this person,
14   Mr. Al-Sai, his inflationary value was 1320, and his final --
15   I'm sorry.  Yeah.
16   A    That's his final inflationary.
17   Q    That's his final inflationary, and his final account
18   value is 1770.  Do you see that?
19   A    Yes.
20   Q    And so in that situation, his inflationary amount is far
21   higher than 18 percent, correct?
22   A    Correct.
23        And I guess that is because it's, again, that final
24   actual account value is based on what his actual cost and
25   proceeds were.
```

1    Q    And it's because the discrepancy between what he -- the

2    price he bought and sold at and the closing price on those

3    particular days, correct?

4    A    Correct.

5    Q    And you were not involved in the decision whether to use

6    people's actual prices that they paid, as opposed to the

7    closing price, which was the last price of the day.

8    A    No.

9    Q    But you do recognize, in looking at some of these

10   examples, that it could -- by doing that, you could overstate

11   the inflationary amount, correct?

12   A    It would be different if you just did a across-the-board

13   18 percent methodology.

14   Q    For a lot of these -- the people on this list -- well,

15   let me first go to the bottom.

16         The total of the final inflationary value is

17   396,372.  What does that mean?

18   A    That is if you add up all the final inflationary values

19   for each of those investor accounts, it would amount to just

20   under $400,000.  Again, for investor accounts during that

21   narrow period.

22   Q    And that would be the loss associated with the narrow

23   period?

24   A    Exactly.  And, again, that loss is the difference between

25   the intrinsic and the actual just for the narrow period.

1  Q    So there are a fair number of people who have zero

2  remaining shares in column 3.  Do you see that?

3  A    Yes.

4  Q    I don't know if you want to skim through it, but it looks

5  like approximately half or maybe more are zero.

6  A    Okay.

7  Q    And what that means is that those people sold all of

8  their shares before the webcast, correct?

9  A    Correct.

10  Q    And you understand, or maybe you were not told this, but

11  the webcast is supposed to be the first corrective disclosure

12  in this case.  Were you told that?

13  A    I just know that that was a important date.

14  Q    And you were not here, I don't believe, in the courtroom,

15  when Dr. Becker testified that anyone who sold their shares

16  before the corrective disclosure did not suffer a loss.  Were

17  you here for that?

18  A    I was not.

19  Q    If that is true, that the people who sold all of their

20  shares before the webcast did not suffer a loss, how would you

21  correct this chart?

22  A    In terms of -- maybe I'm not following you.  If all of

23  these people that are listed here did not suffer a loss?

24  Q    If the people who had zero remaining shares at the end of

25  the period.

```
 1   A    Right.

 2   Q    They sold off everything before the corrective

 3   disclosure.  In order to --

 4   A    Right.

 5   Q    Let me ask the question.

 6        In order to calculate the loss for the entire narrow

 7   period, you would simply remove those people from the chart,

 8   correct?

 9   A    Right.  And, I guess, again, you know, we're also dealing

10   with for those people who, under their actual methodology,

11   they did lose.  So they could have bought at a price different

12   than, for instance, the $1.11 that's listed on 4/14.  If

13   they're buying at a different price, that would affect whether

14   there was indeed a loss or not.

15   Q    Okay.  But there could be people who had an actual loss,

16   but because they sold before the corrective disclosure, we're

17   gonna say they suffered no loss, you could just remove those

18   simply from this chart, correct?  I'm not asking you to agree

19   with it, I'm just saying --

20   A    Yeah.

21   Q    -- you could just take out all the lines that have zero?

22   A    I guess you -- I guess you could under -- for purposes of

23   the intrinsic methodology.

24   Q    Then for the other people -- let's say -- let's look at

25   Adam Weissman who's a little bit down further on the page, he
```

1   had a loss of 55,000 and change, and he had 27,000 remaining

2   shares.  If you wanted to calculate -- if you wanted to ignore

3   all of his sales, all of the shares that he sold off before

4   the corrective disclosure and only focus on the loss on the

5   day of the corrective disclosure, would the correct way to do

6   that be to take his remaining shares, 27,135, and multiply it

7   by the amount of the stock drop on the date of the corrective

8   disclosure?

9   A    Meaning the $1.11?

10  Q    No, the drop, the delta, between whatever the closing

11  price was on~--

12  A    The actual closing price on 4/14 was --

13  Q    You take the -- I'm sorry, why don't I start again.

14  A    Uh-huh.

15  Q    4/11 was a Friday.

16  A    Correct.

17  Q    The stock closed at 1.34.

18  A    Right.

19  Q    4/14 is a Monday, the stock closed at 1.17.

20  A    Right.

21  Q    If you wanted to find out just how much people lost who

22  are holding shares on that day, you would take their remaining

23  shares --

24  A    Uh-huh.

25  Q    -- and just multiply it by the stock drop, which is $1.34

1    minus $1.17.

2    A    The difference.

3    Q    And that would be 17 cents times the number of

4    shareholders.

5    A    Correct.

6    Q    So I don't expect you to have done the calculation, but

7    if I added up all of the remaining shares, that's something

8    that I could do, I'll represent it was 687,410, and if I

9    multiplied that by 17 cents, that would be the amount that

10   those people lost on the day of the corrective disclosure,

11   correct?

12   A    Correct.

13   Q    And just for the record, what I came up with was

14   $116,859.70.

15   A    In total proceeds?

16   Q    Yeah.

17        So -- and that's something that you could do also

18   for the broad period, correct?

19   A    You could.

20   Q    You would just do the same thing, look at the stock drop

21   on the last day, times the remaining shares, and come up with

22   a number.

23   A    On the last day, though, the broad period, the intrinsic

24   price was the same as the actual price, 10 cents.  So there's

25   no difference.  So it would be zero.

```
1    Q    Well, I'm not talking about the difference in the

2    intrinsic price versus the regular price.  I'm talking about

3    how much money people lost on that day, and what you have to

4    look at is the stock drop, not the inflation.  So I think on

5    that day, the stock dropped one cent.

6              So what you would do, if I understand it correctly,

7    on August 15th, 2008, there were 15 million remaining shares,

8    roughly.  Multiply that by --

9    A    Ten cents.

10   Q    A penny, a penny, because that's the delta --

11   A    Oh, the difference.

12   Q    The difference.

13             And you get roughly $150,000.

14   A    Which would still leave you with millions of dollars.

15   Q    Millions of dollars in what?

16   A    In a difference.

17             If you're like -- you're multiplying that number --

18   so that's just a -- that proceed amount, that's a proceed

19   amount that you would then back in, say, to the original loss,

20   you're still left with an overall loss.

21   Q    Oh, you are?  You're left with a loss on the day of the

22   corrective disclosure.

23   A    Right.

24   Q    That's all we're looking at, on that day --

25   A    Just on that day.
```

```
 1   Q    -- $150,000.

 2   A    I gotcha.

 3           THE COURT:  You need to wait until he finishes the

 4   question, please.

 5           Can you ask the question again?

 6           MR. GRUENSTEIN:  Sure.

 7   BY MR. GRUENSTEIN:

 8   Q    Just to be clear, if we're only focused on the loss on

 9   the day of the corrective disclosure, the way to do it is to

10   take your amount of remaining shares.  That's all the buyers,

11   how many shares they have remaining.  That was around

12   15 million at the end of the broad period.  Multiply it by the

13   stock drop on that one day, and that's roughly $152,000, that

14   would be the loss suffered by people in that class on the day

15   of the corrective disclosure.

16           Did I -- I know you can't -- you can trust me on the

17   math, but did I state the calculation correctly?

18   A    The way you stated it, that sounds correct if you're

19   using that methodology.

20   Q    Now, to be clear, you did a lot of calculations with

21   respect to these people, but you did not make a finding that

22   any of these people relied on any false press releases,

23   correct?

24   A    That, I don't know.

25   Q    And you didn't make a finding on whether this stock
```

```
 1    traded in an efficient market, correct?

 2    A    It wasn't the purpose of my analysis, no.

 3    Q    In fact, there are people who were included in your list

 4    who -- well, let me withdraw that.

 5              Let's look at -- we're still on the narrow period,

 6    but I want to compare it to the chart you did of individual

 7    investors and their losses.

 8              THE COURT:  Which exhibit is this you're showing him

 9    now?

10              MR. GRUENSTEIN:  We're just going to pull it up.

11    103, thank you.

12    BY MR. GRUENSTEIN:

13    Q    So for -- we have Government exhibit 103.  You listed

14    several people.  These people showed actual losses, which,

15    you're not testifying that those are losses caused by the

16    fraud, correct?

17    A    Just -- it's just losses just based on their actual

18    transactions.

19    Q    And some of these people might not even show up in your,

20    in your calculations as having lost at all, correct?

21    A    Going through the subsequent steps beyond the actual

22    loss, yes.

23    Q    So, like, Jamie Carpenter, for example, she doesn't show

24    up in your narrow period calculation, Government exhibit 41.

25    A    Correct.
```

1    Q    Bryan Harris, does he?

2    A    I don't recall about Mr. Harris.  I think in large part

3    that would be because of if the shares were sold at that

4    closing price, that would exceed the loss as of that day.

5    Q    Okay.  Klinek and Pack, they had no shares as of 8/15, so

6    they wouldn't have lost any money on the date of that

7    disclosure, correct?

8    A    Klinek and Pack I listed as zero, but they actually I

9    believe sold more than they purchased.  They were short about

10   200-plus thousand shares.

11   Q    Okay.  But if I look at the narrow period, I came up with

12   something like 700 -- 7,674 as a loss for them, as compared to

13   their actual loss.

14        What explains why their inflationary, final

15   inflationary value, is so much less than their actual loss?

16   A    I think in part because of -- and I'm not sure on the

17   narrow period if I have Robert Klinek and Susan Pack always

18   together, because there were a number of accounts for Klinek,

19   separate ones for Pack, and it's possible in the narrow period

20   that I don't have them all lumped together in one.

21   Q    Okay.  But the --

22   A    Like I did for the broad period.

23   Q    Right.  But the basic reason is, as we said, the

24   inflationary value should not -- in the narrow period, should

25   not exceed 18 percent of the actual losses, correct?

```
 1   A     Correct.

 2   Q     And Mark Taylor, he's also -- you don't include him in

 3   your losses in the narrow period either, even though he's

 4   listed here as losing $140,000, correct?

 5   A     And, again, that's because I think using that closing

 6   price of $1.11 as of 4/14, that would then, multiplied by the

 7   168,000 shares he has, that would give him a theoretical

 8   profit amount.

 9   Q     Okay.  So before the corrective disclosure on~-- or

10   allegedly corrective disclosure on April 15th, it's possible

11   that Mark Taylor actually made money, correct?

12   A     Well, he did make money, because he didn't sell other

13   shares.  So in actuality he lost money.

14   Q     But he is ultimately -- you didn't include him as having

15   lost any money in the narrow period?

16   A     For purposes of the inflationary type analysis.  I'm not

17   here to say that he didn't not lose money in actuality.  But

18   for purposes of the inflationary analysis, he would come out

19   because of the theoretical sale, which, again, was just purely

20   theoretical.

21         I believe actually after 8/15, I saw Mr. Harris

22   maybe sell nine shares, we're told, of $330.  So he still held

23   a number of those shares.

24   Q     And maybe to state the obvious, but you did not -- you

25   did not choose to include these people on the individual
```

```
 1   losses chart, correct?

 2   A    No, I was just given these names.

 3   Q    And of all the people who were potential -- or who were

 4   investors in SignaLife, you don't know why these four or five

 5   people were included and others weren't, correct?

 6   A    I do not.

 7            MR. GRUENSTEIN:  Your Honor, I'm just wrapping up.

 8   If I could have one minute to consult?

 9            THE COURT:  Sure.

10   BY MR. GRUENSTEIN:

11   Q    Just on the topic of Taylor, you testified that he was at

12   zero for the narrow period, and do you recall that he was at

13   roughly 14,000 for the broad period?

14   A    I don't recall offhand for either one, no.

15            MR. GRUENSTEIN:  Why don't we just pull up

16   Government exhibit 40.

17   BY MR. GRUENSTEIN:

18   Q    Roughly 17,000, I believe, but we'll get there.

19            So you see there's just under 17,000 for Mr. Taylor

20   in the broad period?

21   A    For the final inflationary value, yes.

22            MR. GRUENSTEIN:  I have nothing further, Your Honor.

23   Thank you.

24            THE COURT:  Thank you.

25            Any redirect?
```

```
 1              MS. COTTINGHAM:  Briefly, Your Honor.
 2                      Redirect Examination
 3   BY MS. COTTINGHAM:
 4   Q    Mr. Melley, you were asked a number of questions.
 5              MS. COTTINGHAM:  And if we can pull up Government
 6   exhibit 41, please.
 7   BY MS. COTTINGHAM:
 8   Q    You were asked a number of questions on cross-examination
 9   about Government exhibit 41 and about individuals and a
10   comparison of their inflationary value and their final account
11   value.  Do you remember that?
12   A    I do.
13   Q    And, Mr. Melley, as part of your calculations, do you
14   recall testifying on direct examination that when you used --
15   when you calculated the intrinsic value, what share price did
16   you use on the purchase and sale dates?
17   A    I was using the closing intrinsic value price that was
18   provided in the spreadsheet.
19   Q    And as a result of using those closing prices, I think --
20   did you -- do you recall testifying on direct exam about how
21   that calculation actually yielded some investors who had a --
22   essentially a benefit from using the intrinsic value?
23   A    Absolutely.
24   Q    Do you recall about how many investors that involved?
25   A    That benefited from having what, more . . .
```

1    Q    Let me rephrase that.

2    A    Yeah.

3    Q    About how many investors did you remove from your final

4    calculations because they essentially did better under the

5    intrinsic loss methodology?

6    A    I know there was, in terms of folks who were less than a

7    hundred dollars difference, there were a few hundred that

8    amount to about $375,000 in loss, they were wiped out.  In

9    terms of the number of folks who derived a benefit in terms of

10   like a proceed amount, I don't have that actual number.

11   Q    And I --

12   A    But I know there was a substantial amount, because it --

13   again, it went from, under our step-by-step process, we went

14   from about 19 -- 1,980 victim accounts, and then those last

15   three steps of removing people who made more under the

16   intrinsic valuation, people who lost more under the intrinsic

17   valuation than actual, or people who lost less than a hundred

18   dollars between, we took out almost 900 more people.

19   Q    And why did you remove those 900 investors?

20   A    To come up with the most conservative loss number that I

21   could calculate based on that analysis.

22   Q    And on cross-examination, Mr. Melley -- and I think we

23   may be having technical issues, so I'll just ask you to flip

24   to 41 in your --

25              MS. COTTINGHAM:  May I approach the witness, Your

1    Honor?

2            THE COURT:  Yes.

3    BY MS. COTTINGHAM:

4    Q    And I believe on cross-examination you were asked some

5    questions to point to specific individuals where the final

6    inflationary value was -- looking at it on ballpark -- looked

7    like more than 18 percent of the actual losses.

8            And if you take a look at page 3, Mr. Melley, just

9    skimming through, that's certainly not true of all of the

10   investors in Government's 41, is it?

11   A    Not at all.

12   Q    Okay.  For example, if you take a look at Shawna Kaufman

13   down here, it looks like actual losses of $1300 and

14   inflationary value of 149?

15   A    Correct.

16   Q    If you look on that same page, Charles Dobson, just a few

17   down.

18   A    $486.

19   Q    And do both of those look like the inflationary value

20   looks to be less than 18 percent?

21   A    It does.

22   Q    So, Mr. Melley, as a general matter, you were asked a

23   number of questions about, you know, individuals who may have

24   been included.  In performing your calculations, at each step

25   did you remove individual investors from the potential victim

```
 1   pool?

 2   A    I did.  And, again, those are investors who, in

 3   actuality, were victims.

 4   Q    So your calculations here today, do they reflect every

 5   individual victim who lost money in SignaLife stock even

 6   during the relevant period?

 7   A    Not at all.

 8   Q    Do they reflect everybody who lost stock even during this

 9   narrow period?

10   A    No.

11        MS. COTTINGHAM:  Court's indulgence briefly.

12        THE COURT:  Yes.

13        MS. PASCUCCI:  Nothing further, Your Honor.

14        THE COURT:  Thank you.

15        Thank you, sir.

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  Next?

18        MS. COTTINGHAM:  Your Honor, the Government does not

19   have any additional witnesses.

20        THE COURT:  All right.  So are you ready to present

21   any evidence, or you want to wait until tomorrow?  I don't

22   know if you're ready.

23        MR. GRUENSTEIN:  Yeah, we're ready.

24        THE COURT:  You're ready?  Okay.

25        MR. GRUENSTEIN:  Sure.
```

```
 1              THE COURT:  Can you call someone that we can finish,
 2   you know, around 5:00 o'clock?
 3              MR. GRUENSTEIN:  Oh, no, we won't finish.  We may
 4   finish the direct.  I doubt it, but we certainly won't finish
 5   the cross.
 6              THE COURT:  Okay.
 7              MR. GRUENSTEIN:  So the defense calls Dr. Edward
 8   O'Neal.
 9              THE COURT:  Sir, if you would raise your right hand,
10   please.
11         Edward Shannon O'Neal, Defendant's witness, sworn.
12              THE COURT:  If you would try and pull that
13   microphone towards you, please.
14              THE WITNESS:  Okay.
15              THE COURT:  The whole thing moves.
16              THE WITNESS:  Okay.  All right.
17              THE COURT:  Tell us your name, and spell your last
18   name, please.
19              THE WITNESS:  Edward Shannon O'Neal, and O'Neal is
20   spelled O'N-e-a-l.
21              THE COURT:  And Shannon is?
22              THE WITNESS:  S-h-a-n-n-o-n.
23              THE COURT:  Thank you.
24              THE WITNESS:  You're welcome.
25              THE COURT:  You may proceed.
```

```
 1                    Direct Examination

 2   BY MR. GRUENSTEIN:

 3   Q    Dr. O'Neal, where do you work?

 4           MS. COTTINGHAM:  Your Honor, I'm not sure that we

 5   actually have a copy of this.  We're checking right now, but I

 6   don't know that we have a copy of this presentation, Your

 7   Honor.

 8           MR. GRUENSTEIN:  This is a demonstrative which is --

 9   reflects only things that are in his report.  We're happy to

10   e-mail a copy, but I don't think there's going to be anything

11   surprising to the Government.

12           THE COURT:  Do you have something you can at least

13   show them so they can see it before you start?  You don't have

14   a hard copy?

15           MR. GRUENSTEIN:  Your Honor, I'm happy to, with the

16   Court's indulgence, take a five-minute break.  They can review

17   it on our computer before we go through it.

18           THE COURT:  Why don't we do that.

19           Sorry, Doctor.

20           THE WITNESS:  No problem.

21      (A recess was taken from 4:07 p.m. to 4:14 p.m., after

22   which the following proceedings were had:)

23           THE COURT:  Please be seated, everyone.

24           You all right with the exhibit?

25           MS. COTTINGHAM:  Yes, Your Honor.
```

```
 1                MR. GRUENSTEIN:  Thank you.

 2   BY MR. GRUENSTEIN:

 3   Q    Dr. O'Neal, where do you work?

 4   A    I work for a company called Securities Litigation and

 5   Consulting Group.  It is located in -- right outside of

 6   Washington, DC.

 7   Q    And what sort of work does that company do?

 8   A    We do two things.  One, we provide litigation consulting

 9   and expert witness testimony in cases like this, and we also

10   write and publish research on various complex investment

11   products.

12   Q    Can you give us some of your professional background

13   before going to SLCG?

14   A    Yes.  I have a bachelor's degree in electrical

15   engineering, I've got an MBA, and I have a Ph.d. in finance.

16   Graduated from University of Florida, with Ph.d. in finance in

17   the early '90s.  After that, I took faculty positions at three

18   different universities, most recently, Wake Forest University,

19   in Winston-Salem, North Carolina.

20                I also spent during those 14 years or so I spent a

21   year and a half working for the SEC in Washington, DC.

22   Q    What was your position at the SEC in Washington?

23   A    I was a senior economist at the SEC, worked for the chief

24   economist and provided the Commission with analysis when they

25   were considering various policy and regulatory issues.
```

```
 1   Q     Did you prepare slides, which are defense exhibit 68, to

 2   assist you in your testimony today?

 3   A     Yes.

 4              MR. GRUENSTEIN:  If we could go to the second slide,

 5   the first slide after the cover.

 6   BY MR. GRUENSTEIN:

 7   Q     This goes through some of your background.

 8              Have you testified before as an expert?

 9   A     Yes, I've testified approximately 80 or 85 times.

10   Q     And what sort of cases?

11   A     Various types of cases ranging from insider trading

12   cases, to accounting fraud cases, to investor -- individual

13   investor cases against brokerage firms.

14   Q     Have you ever testified as an expert in a case involving

15   securities fraud?

16   A     Yes.

17   Q     How many times?

18   A     Three times.

19   Q     And on which side?

20   A     Twice on the side of the DOJ and once on the side of the

21   SEC.

22   Q     Can you -- have you -- in the cases you've worked on,

23   have you worked on any case that's similar in any way to the

24   case that's before the Court now?

25   A     Yes.  The two cases listed here on the bottom two bullet
```

1   points are fairly similar to the current case.

2   Q    Can you explain how they're similar?

3   A    Yes.  Both of those cases involved accounting fraud,

4   ongoing accounting fraud, and I was asked to provide testimony

5   as to the amount of losses that the accounting fraud caused

6   for investors.

7   Q    And how did -- and, again, there you were testifying on

8   behalf of DOJ?

9   A    Correct.

10  Q    And how did the method that you applied there compare to

11  the method that you applied in this case?

12  A    It's exactly the same.

13  Q    When you say exactly the same, what do you mean?

14  A    For both of those cases and for this current case, I

15  applied an event study methodology to determine what the

16  investor losses were due to the fraud.

17  Q    Was it -- was there a dispute in that case whether that

18  was the appropriate methodology to apply?

19  A    No.  In both of those cases, event study methodologies

20  were applied, yes.

21  Q    What were you asked to do in this case?

22  A    I was asked to look at two things.  One, I was asked to

23  calculate investor losses due to fraud, and, second, I was

24  asked to look at the losses that Mr. Stein incurred on his

25  SignaLife holdings.

1  Q    Okay.  Did you also in the course of your work review the

2  expert reports provided by the Government in this case?

3  A    Yes.  I reviewed the report of Dr. Becker.

4  Q    As well as the rebuttal report?

5  A    Yes.

6  Q    And you've been sitting here all day today?

7  A    Yes.

8  Q    So you've observed the testimony of Dr. Becker and

9  Mr. Melley?

10  A    Yes.

11  Q    You've heard testimony and you reviewed the report of

12  Dr. Becker about the event study that she did to study five

13  SignaLife events.  What was your opinion of Dr. Becker's event

14  study methodology?

15  A    Of the methodology, I think she applied the economic

16  methodology correctly.  We looked at different dates, but in

17  terms of her analysis of the dates she looked at, it looked

18  correct to me.

19  Q    In your opinion, did Dr. Becker -- did her analysis

20  establish what investors in SignaLife might have lost?

21  A    No.

22  Q    And why is that?

23  A    Well, Dr. Becker's report and I think her testimony

24  corroborated today, she was looking at what the amount of

25  inflation was in the stock price due to the fraud, but she did

```
 1   not, then, take the next step to calculate what the losses
 2   were to investors.  That was not part of her assignment, as I
 3   understand it.
 4   Q    And hearing Mr. Melley's testimony, did you reach any
 5   opinions about the reliability of his methodology to measure
 6   investor loss due to fraud?
 7   A    Yes.
 8   Q    And what are those opinions?
 9   A    I don't think that they apply the methodology correctly
10   or that the methodology itself does not accurately identify
11   what the investor losses are due to the fraud.
12   Q    And why is that?
13   A    In the cases that I've testified in before, and certainly
14   other cases in civil law, the losses that investors incur are
15   the losses that they incur when the fraud is disclosed to the
16   market.  It appears to me from looking at Mr. Melley's
17   calculations that that is not how he calculated the losses.
18   Q    And why do you say that?
19   A    Because the way that I've done it, and, again, consistent
20   with how I've done this before, is to look at the stock price
21   drop on the date of disclosure, or the date of disclosures if
22   there are more than one, and then multiply the stock price
23   drop by the number of shares to get the investor loss.
24        As I understand Mr. Melley's calculations, what he
25   did was look at each individual investor who bought shares
```

1    during the fraud period and calculated a loss due to inflation

2    for all investors even if they weren't holding it over the

3    time period where the disclosure was made to the market.

4              So, in other words, if someone purchased the stock

5    shortly after September of 2007 and then sold it in, say,

6    January of 2008, before there was any fraud disclosure, the

7    price both when that stock is bought and when it was sold both

8    sort of include the inflation amount.

9              So that investor hasn't lost anything due to

10   inflation.  He may have lost because stocks move up and down

11   for a variety of reasons.  But if the fraud has not been

12   disclosed, then that investor has not lost any money due to

13   the fraud.

14   Q    And do you -- did you agree with Dr. Becker's testimony

15   that people who sell all of their stock before their

16   corrective disclosure do not lose any money due to the fraud?

17   A    Yes, I agree with that.

18   Q    Let's talk about your event study methodology.

19   A    Okay.

20   Q    Dr. Becker already testified about the event study

21   methodology and how it's done generally, so we won't get into

22   too much detail there.

23   A    Okay.

24   Q    Can you just explain why economists use event studies?

25   A    Yes.  Economists use event studies, and I think

1    Dr. Becker probably touched on this, to determine the effect

2    of various news events on stock prices to try to figure out

3    what investors really think is important with respect to

4    valuing a stock.  So it's done -- obviously the event study

5    methodology was developed in academic studies but is applied

6    both in academic studies and also in litigation cases.

7    Q    And you focused on the date -- to see if there was a

8    loss, you focused on the date of the 10-Q.  Why did you focus

9    on that date?

10   A    That's correct.

11        In my opinion, the 10-Q was the first date where the

12   fraud was disclosed to the market.  I did not see any other

13   news announcements going back to September 20th, 2007, that

14   indicated that there was any potential fraud going on.  So in

15   my opinion, the 10-Q was the first and really only

16   announcement that I looked at that had information about --

17   that referred to the press releases that could be considered a

18   disclosure of fraud.

19   Q    In your experience, how common is it to look at the -- to

20   do an event study and look at the loss amount on the date of

21   the correction of the fraud?

22   A    In my experience, I think that's the only way you would

23   do it is to look at the date of the corrective disclosure.

24   Q    Have you ever seen it done that there was a focus on the

25   inflation due to the initial fraud?

1   A    Not that I can recall, no.

2   Q    Are you familiar with any academic literature that

3   provides for that sort of analysis?

4   A    No.  But I will say most of the academic literature

5   doesn't necessarily revolve around securities fraud cases.

6   So, no, I'm not aware of any studies like that.

7   Q    What is the key assumption that you need to make in order

8   to conduct a meaningful event study?

9   A    The event study methodology is an accurate way to look at

10  the impact of a particular news event if the market for that

11  stock is efficient.  Again, I think Dr. Becker did a fine job

12  of talking about what an efficient market is.  But basically

13  what you need to be able to determine is, is it the case that

14  investors rapidly and completely impound information and a

15  news event into the stock price.

16          You need to be convinced that the market is

17  efficient for the stock with respect to a securities fraud

18  case, because you need to be able to sort of make the

19  assumption that, okay, if the fraud is disclosed, then the

20  market presumably will push the stock price down to reflect

21  that fraud disclosure, but you need to be somewhat convinced

22  that the market for a particular stock does indeed fully and

23  completely impound any news event into the stock price.

24  Q    And are there standard ways of determining market

25  efficiency?

```
 1   A    There are various factors that have been looked at in
 2   previous securities fraud cases.  I'm not here to offer a
 3   legal opinion, but there are various factors, characteristics
 4   of the company or characteristics of the stock itself that are
 5   often looked at to prove market efficiency.
 6   Q    And do those factors go beyond doing the event study
 7   itself and seeing what the results are?
 8   A    Yes.  I mean, there are factors such as what is the
 9   volume that is traded on a daily basis for a stock relative to
10   its outstanding volume, the size of the company.  I mean, a
11   company like Apple, for instance, there's so much information
12   about Apple and so many people looking at Apple, that we would
13   imagine that its stock adjusts rapidly to any new information
14   that comes to the market.  The number of analysts that cover
15   the stock, the bid-ask spread of the stock.  There are a
16   number of factors that have been looked at in previous cases.
17   Q    If a market for a stock is not efficient, what can an
18   event study tell you?
19   A    If it's not efficient, then you can't draw any conclusion
20   that the movement of the stock on the day of the disclosure is
21   due to the disclosure.
22   Q    And why is that?
23   A    Because you can't be certain that the movement on any
24   given day is simply the result of white noise or other random
25   information about the stock.
```

```
1   Q    What was the time period that you were asked to consider

2   for your analysis?

3   A    September 20th, 2007, to August 15th, 2008.

4   Q    Can you please describe how the stock performed during

5   this period.

6   A    Yes.  Well, we've seen a graph obviously similar to this

7   already, but it was around $1.50 towards the beginning of that

8   period, and basically it declined significantly over the

9   period in the -- in August of 2008.

10  Q    Was there a second peak around the time of the webcast?

11  A    Yes, there was.

12  Q    And where do we see that in this slide?

13  A    We see that approximately the middle of April of 2008.

14       MR. GRUENSTEIN:  Can -- why don't we zoom in or go

15  to slide four, which I think zooms in on the press releases.

16  BY MR. GRUENSTEIN:

17  Q    What did you determine -- what did you conclude was going

18  on around the press releases?

19  A    Again, I think we've looked at this period also in

20  Dr. Becker's testimony.

21       So there were three press releases.  The first was

22  on September 20th.  There was no stock price reaction on that

23  day.  The second was on September the 25th; there was an

24  increase of approximately 18 percent on that day.  And then

25  there was a third press release on October the 10th, and there
```

```
 1    was no reaction on that day.

 2            Over this period the stock price was rising, but it

 3    peaked sort of in between the second press release and the

 4    third press release and then began to decline after that.

 5            MR. GRUENSTEIN:  Why don't we go to the next slide.

 6    BY MR. GRUENSTEIN:

 7    Q    In Dr. Becker's report, she did an event study of the

 8    effects of this webcast on the stock price.  Do you recall

 9    that?

10    A    Yes.

11    Q    And what was your opinion of her analysis?

12    A    In my opinion, she conducted the event study methodology,

13    the calculations, correctly, but in my opinion, the webcast

14    itself was not a corrective disclosure.  It did not mention

15    the press releases or the purchase orders that were the

16    subject of those press releases.  Therefore, I didn't consider

17    it a corrective disclosure.

18            The way I understand the testimony today is that the

19    absence of a discussion of the purchase orders was information

20    that was revealed to the market.  In my opinion, there's -- if

21    a company doesn't make an announcement on any given day,

22    there's an absence of information.

23            So I think it's not reliable to rely on that press

24    release as an absence of information that somehow discloses to

25    the market that there is -- there's a fraud or something wrong
```

1    with those purchase orders.

2            And then, finally, the SignaLife stock activity, the

3    price activity around the webcast, in my opinion, yields

4    conclusions drawn about the information content of that

5    webcast to be unreliable.

6    Q    In your experience, have you ever seen an analysis of an

7    omission as considered a corrective disclosure?

8    A    Not that I can recall as I sit here, no.

9    Q    If an omission were a corrective disclosure, when in

10   relation to the webcast would you expect that the price impact

11   would occur?

12   A    At the end of the webcast, once it, I guess, became

13   finally apparent that the information was not going to be

14   disclosed or that the information was ultimately omitted.

15   Q    If you -- did you analyze the intraday trading on

16   April 14th?

17   A    No.

18   Q    Why not?

19   A    We did not have access to that.  Our Bloomberg terminal

20   would not give us access to the intraday trading data in

21   2007 -- I'm sorry, 2008.

22   Q    And what impact would there be on an event study if there

23   was a significant amount of selling prior to the webcast?

24   A    Well, I don't think it's necessarily the selling prior to

25   the webcast, but it's the price pattern prior to the webcast.

```
 1   If the price of the stock fell significantly before the
 2   webcast, then the content of the webcast or any omissions in
 3   the webcast could not be the reason for the price decline of
 4   the stock.
 5   Q    Let's look at slide seven.
 6             What are we looking at here?
 7   A    Just for the record, this is slide six.
 8   Q    I apologize.
 9   A    That's okay.  That's okay.
10             This is the stock price around the webcast date.
11             So the webcast occurred on April the 14th, 2008.
12   April the 14th was a Monday.  We can see here that if you look
13   two trading days - so obviously there's a week in between
14   there, but you've got Thursday, Friday and Monday as three
15   consecutive trading days.  So on Thursday the stock price is
16   $1.03.  On Friday, it jumps up to $1.34.  So that's an
17   increase of 31 cents, or approximately 30 percent.
18             Then on the day of the webcast itself, the price
19   then declines from 134, $1.34, to $1.17.  So that's a decline
20   of 17 cents from the closing price the day before the webcast,
21   but still represents an increase of about 14 cents from the
22   day -- trading day two days prior to the webcast.
23   Q    And what do you conclude based on this?
24   A    I just think it's -- there's obviously a temporary peak
25   on this stock price on the Friday before the webcast.  And so
```

1   in my opinion, drawing a conclusion about investors' sort of

2   revaluation of the stock due to any sort of disclosure is not

3   reliable.  In fact, the stock price at that point is still 14

4   cents higher than it was just two trading days prior.

5           So, again, just this sort of one-day significant

6   increase in stock price just causes me to question the

7   attribution of the drop on this -- the second day to any sort

8   of information in the press release or any specific piece of

9   information that was omitted from the press release -- I'm

10  sorry, from the webcast.

11  Q    Do you think it's appropriate to conclude that there must

12  have been a corrective disclosure simply because the price

13  dropped around the time of the webcast?

14  A    No.

15  Q    Why not?

16  A    Well, we don't simply look at the stock price drop and

17  then find a stock price drop and then try to attribute that as

18  some sort of corrective disclosure.  Again, my opinion is that

19  the price, although it dropped on that day, it was from a very

20  fleeting high price one day prior and brought it down still

21  significantly higher, in fact, than it was two days prior.

22  Q    You heard Dr. Becker testify that she did a calculation

23  to find that the inflation was 18 percent throughout the fraud

24  period until the webcast.  Do you recall that?

25  A    Yes.

1  Q    And what is your reaction to a finding that the inflation

2  was 18 percent on each one of those days?

3  A    This case, like other cases that I've been involved in,

4  there's sort of an ongoing assumption of sort of an ongoing

5  fraud.  So to say that the inflation is exactly 18 percent on

6  every day throughout the fraud period until the first

7  disclosure, I don't necessarily think that that's accurate.

8  Q    When an abnormal return is considered statistically

9  significant, what does that mean about the abnormal return?

10 A    That means that the abnormal return is statistically

11 different from zero.  So when you're -- and, again this goes

12 back to the academic literature.

13       The event study classically was meant to see

14 whether, on average, over a number of different stocks,

15 whether a certain type of information's important to

16 investors.

17       So the way that the academic studies evolved was to

18 look at whether on average that stock price movement was

19 different from zero.  So, in other words, if, on average, the

20 stock price is significantly higher than zero, then that would

21 mean that investors take that information into account and

22 take that piece of information or that type of information as

23 good news for the stock price.

24       But, again, the statistical significance is whether

25 it is statistically different from zero, so whether it is

1   positive or not.

2           Another way to think about that is the confidence

3   interval that I think you asked Dr. Becker about, if the

4   confidence interval is so wide that it includes zero, then it

5   is not a statistically significant movement in the stock

6   price.

7           So when we say that, for example, at the second

8   press release that the stock price increased by 18 percent,

9   that is, as Dr. Becker said, the correct point estimate for

10  that increase in the stock price, but -- and we know that

11  18 percent is different from zero, but we can't necessarily

12  say that that stock price increase, the 18 percent, is

13  different than, say, 12 percent or than 10 percent.  That

14  would require sort of the estimation of the confidence

15  interval.

16          So that's probably a longer answer than you were

17  requesting.

18  Q    That's fine.

19          So when the stock price went up 18 percent, the fact

20  that that was statistically significant, that it was a

21  positive number, does that tell you that the right answer, the

22  right amount of increase was 18 percent, with 95 percent

23  certainty?

24  A    No.  With 95 percent certainty, you can say that it was

25  different than zero, but you can't say that 18 percent is

```
 1    correct with any sort of degree of certainty.  It's best to
 2    estimate it by 18 percent, but it could be higher, it could be
 3    lower.
 4    Q    And do you have a sense how big that confidence interval
 5    would be?
 6    A    In this particular case, I think that the T statistic in
 7    Dr. Becker's analysis was close to three, so it would suggest
 8    to me that the confidence interval is probably between about
 9    it's 18 plus or minus maybe 10 or 12 percent.
10    Q    So it could be as low as -- the actual impact of the
11    alleged fraud on the stock price could be as low as 6 or
12    8 percent?
13    A    Yes.
14    Q    So what would that mean as far as what else caused the
15    stock to go up on that day, if only 6 or 8 percent was
16    actually -- potentially actually due to the fraud?
17    A    There was really no other information released about the
18    stock that day, so you would likely just attribute that to
19    random noise.
20    Q    And how would that compare to there was a finding by
21    Dr. Becker that there was a 9 percent drop on the date of the
22    10-Q?  Was that her finding that even that 9 percent abnormal
23    return was noise, right?
24    A    That's correct.
25    Q    The fact that the -- let's talk about the day of the
```

```
 1   webcast, where the stock dropped roughly 12 percent?

 2   A    Yes, that's correct.

 3   Q    Given that there was an inflation of 18 percent after the

 4   second press release, a drop of 12 percent on the day of the

 5   webcast, if that was, in fact, a corrective disclosure, can

 6   you draw any conclusion from that that it was only a partial

 7   corrective disclosure as opposed to a full corrective

 8   disclosure?

 9   A    I don't believe so, no.

10   Q    The fact that 12 percent of the drop is less than 18

11   percent, does that mean that there was more fraud to be

12   revealed?

13   A    It's -- it could be; it may not be.  I mean, it's either

14   one.  The fact that you've already said that the 18 percent

15   increase could be 18 percent, it could be 17, 16, I think even

16   12 percent is within the confident interval.  So it could be

17   that only 12 percent of that increase is due to the press

18   release, and then it's fully corrected when the 12 percent

19   decline occurs at the webcast.

20   Q    And of the 12 percent decline in the webcast, there would

21   similarly be a confidence interval there, correct?

22   A    Correct.

23   Q    So that could actually be 15, 16, 17 percent, right?

24   A    It could, yes.

25   Q    So is it fair to say that you can't draw any conclusion
```

```
 1    by the difference between the inflation on the press release
 2    and the decrease at the webcast as to whether it was a full or
 3    a partial corrective disclosure?
 4    A    No, I don't believe you can just by looking at the
 5    magnitudes of the disclosures.
 6    Q    What is the best way to determine whether something was a
 7    corrective disclosure?
 8    A    Well, obviously the analysis first looks at the
 9    information content of whatever news event you're looking at.
10    So you have to look and see whether the news constitutes some
11    sort of corrective disclosure.  It doesn't necessarily have to
12    mention fraud, but it has to somehow correct the aspect of
13    fraud.
14          And then once you have identified announcements,
15    news announcements that you think fit that description, then
16    you would run the event study methodology on that day to
17    determine whether the stock price did, in fact, increase or
18    decrease on that day due to the news event.
19    Q    And what was your basis for finding that the webcast was
20    not a corrective disclosure?
21    A    Simply the fact that it did not mention the press
22    releases, did not mention the three purchase orders, and
23    therefore did not give any information about those three press
24    releases.
25    Q    By contrast, did you find that the 10-Q did provide a
```

1    corrective disclosure?

2    A     Yes.

3    Q     Why did you find that?

4    A     The 10-Q is obviously a long document, but there were a

5    couple paragraphs in the 10-Q that talked about the purchase

6    orders and the fact that they either were not going to be

7    fulfilled or the items had been sent back, something that gave

8    some information about the fact that those purchase orders

9    were, for whatever reason, no longer viable.

10   Q     During the course of the work that you did, did you reach

11   your own estimate of what the investor losses would be?

12   A     Yes.

13   Q     And how did you do that?

14   A     In my analysis, I determined that the 10-Q was the only

15   disclosure of the fraud.  And so what I did was look at the

16   price change of SignaLife on the day of the 10-K -- I'm sorry,

17   the 10-Q disclosure.  In fact, SignaLife stock only dropped by

18   a penny on that day from 11 cents to 10 cents.  I believe that

19   that was a Friday.  By the next Monday, though, the price had

20   dropped another three cents to seven cents.

21          So in my analysis, what I did was look at the

22   two-day decline in SignaLife, which is a fairly common way to

23   look at these things.  I mean, often when a -- especially with

24   a 10-Q, if it comes out late in the afternoon, it's not

25   necessarily the case that people can fully get through it and

```
 1    figure out what information's important to them.  So it's
 2    possible that the reaction of the market might spill over into
 3    the following trading day.
 4            So in any case, I looked at the two days, the 15th
 5    of August and the 18th of August.  The stock price declined by
 6    four cents.  That's close to a 40-percent decline.  That was
 7    statistically significant.
 8    Q    By expanding your review to two days after the 10-Q and
 9    not just one, did you think you were being more conservative?
10    A    Yes, yes.
11    Q    And why is that?
12    A    Well, simply because it was a larger price drop than it
13    would have been had I simply looked at the single day that the
14    10-Q was released.
15    Q    And if you had only looked at the day after the 10-Q,
16    what would your finding have been?
17    A    That the price decline was insignificant from a
18    statistical perspective.
19    Q    If you -- again, how is the market efficiency a premise
20    of all the work that you're doing here?
21    A    This analysis really depends on two assumptions.  One is
22    that the investors are relying on this information in the
23    10-Q, and the second is that the market is efficient, and
24    therefore the change in stock price is an accurate
25    representation of the investors' revaluation of the stock
```

1    after they've seen the information that came out in the 10-Q.

2    Q    Okay.  So you saw a four-cent decline over two days.

3    What did you do with that number?

4    A    I then looked at all of the shares of SignaLife that were

5    outstanding and not part of the holdings of Mr. Stein, and

6    there were approximately 40 million shares I believe

7    outstanding at that point that were not in Mr. Stein's

8    accounts.  So I took the four-cent decline and multiplied by

9    the number of shares outstanding.  That turned out to be

10   approximately $1.58 million.

11   Q    You heard me earlier when I crossed Mr. Melley, we were

12   using a number of 15 million shares.  Why would your number of

13   shares be significantly higher than Mr. Melley?

14   A    My shares include investors that not only bought after

15   the onset of the fraud in September of 2007 but also anybody

16   else who had purchased the SignaLife shares before that fraud

17   date.

18   Q    So no matter when they bought, if they held shares on the

19   day of the corrective disclosure, you included them, correct?

20   A    That's right.  So I included, as I said, 40 million

21   shares.  According to Mr. Melley's calculations, I think only

22   15 million or so of those 40 million had been purchased after

23   September of 2007.

24   Q    So as part of your analysis as to what the loss amount

25   was, assuming market efficiency, did you also review the 10-Q

1   for information other than about the press releases?

2   A    Yes, I did.

3   Q    And why did you do that?

4   A    When you're looking at news information that's coming to

5   the market, it's sort of easy sometimes to look at a press

6   release and figure out what -- you know, quickly what

7   information is relevant to investors in a short press release.

8   But a 10-Q has got 40 or 50 pages of information, a lot of

9   financial data.

10        And so when you're looking at a news event or a news

11   release, you always want to see if there is other information

12   besides the information about the fraud that could have been

13   important to investors, because you don't want to attribute

14   the entire movement of the stock to fraud if there's other

15   information that also might have been important to investors

16   at that time.

17        So the other information that may have been

18   important or may be important is often called confounding

19   information.  So what I did was to look at the 10-Q to see if

20   there were other pieces of information that would have been

21   important to investors, and then because they were also

22   important, might sort of confound the ability to attribute the

23   entire movement of SignaLife stock to just the new information

24   on the press releases or on the purchase orders.

25   Q    And in reviewing the 10-Q, what did you find?

1    A    I found there were at least two other disclosures or

2    pieces of information that I felt was important to investors

3    or would have been important to investors.  And those two

4    important financial disclosures were that SignaLife in that

5    quarter -- so the press releases in August has information

6    about the second quarter of 2008.  So in the second quarter of

7    2008, SignaLife realized a very large quarterly loss, largest

8    loss they've had in at least the last two years, and they also

9    reported negative stockholders' equity in the company for the

10   first time.  And stockholders' equity is an accounting term

11   that basically is calculated by taking the book value of all

12   the assets of the firm and subtracting off all of the

13   liabilities.  And because of the capital structure of the

14   firm, anything that's left over after that is, by definition,

15   owned by the stockholders.

16            So for the first time, for SignaLife, the

17   liabilities of the company outweighed the assets of the

18   company.  So we had a negative stockholders' equity.

19            So I thought both the very large quarterly loss,

20   which is an earnings loss, earnings were very negative, and

21   the negative stockholders' equity would have also been

22   important to investors in addition to the purchase order

23   information.

24   Q    So the negative stockholders' equity, does that

25   essentially mean that the company was worth less than zero?

```
 1    A    On the books, yes.

 2    Q    Why don't we -- and let me just elaborate a little bit on

 3    this largest quarterly loss in two years.  What do you mean by

 4    loss?

 5    A    That's basically what the earnings were of the company.

 6    So if you take all of the -- all the revenues and subtract out

 7    all the costs, that's what the earnings were to the company.

 8    So it's also called an operating loss.  And this is just the

 9    operating loss in various quarters leading up to the second

10    quarter of 2008.

11    Q    Okay.  So what you've done here is you've gone back ten

12    quarters; is that correct?

13    A    Yes.

14    Q    And what does this show as far as the operating loss,

15    or -- is operating loss the same as negative earnings?

16    A    Yes.

17    Q    And what does this show as far as negative earnings?

18    A    About negative five and a half million.

19    Q    Okay.  And how does it compare to prior quarters?

20    A    Certainly to the prior four quarters, it was

21    significantly larger.  There were two other large -- fairly

22    large losses in December of '06 and March of '07.  But when

23    you measure it out, this was the largest in the last ten

24    quarters.

25    Q    And given that the earnings had been negative for at
```

1    least ten quarters, why was it important -- or why did you

2    think it would be important to investors that it was even more

3    negative in June of -- or at the end of this quarter?

4    A    I think, you know, eventually investors in companies like

5    this are going to want to see positive earnings.  It hadn't

6    occurred in the previous nine quarters leading up to 2000' --

7    I'm sorry, leading up to June of 2008.  Then not only is it

8    negative, but it's about twice as negative as it was just the

9    previous quarter.  So in my opinion, it was a big -- it was a

10   big drop from the previous quarter and therefore would have

11   probably been important to investors.

12   Q    Let's go to the next slide.

13         How does this slide help us understand the second

14   factor that you saw that would be significant, the negative

15   shareholders equity?

16   A    Right.  The red line here is simply the stock price, so

17   we've seen that graph.  The blue line is the stockholders'

18   equity.  And as you can see -- and this is as of the reporting

19   date.  So the reporting date for the 10-Q was August of '08,

20   even though it referred to the stockholders' equity in the

21   second quarter of 2008.  And you can see that there is a

22   significant drop from May of '08 to August of '08.  But as I

23   said earlier, this is the first time that that number actually

24   dropped negative, which means that on the books, the equity

25   value on the books was negative.

```
 1   Q     And how did you use these two other numbers -- or these
 2   two other revealed facts about the company to help you
 3   consider what was the loss due to the alleged fraud?
 4   A     In my opinion, these two pieces of financial information
 5   would have been at least as important to investors as the new
 6   information on the purchase orders.  So basically what we have
 7   is we have information on the purchase orders, we have
 8   information on earnings or operating losses, and we have
 9   information on stockholders' equity.  So three pieces of new
10   or important information potentially to investors that came
11   out in the 10-Q.
12            So what I did was take the total loss that all
13   stockholders in SignaLife incurred on the date that the 10-Q
14   was released and attributed one-third of that loss to each of
15   these three pieces of information.
16   Q     And what were the number -- what was the number you came
17   up with?
18   A     The number that I came up with was $525,000 worth of loss
19   to attribute to the fraud -- to the fraud.
20   Q     And could you have done it in a way that wasn't
21   one-third, one-third, one-third?
22   A     Yes, I could, but I felt like these three pieces of
23   information were important.  As I said, in my opinion, the
24   information on earnings and stockholders' equity were probably
25   more important than the information on the purchase orders,
```

```
 1   but, again, to be conservative, I just attributed one-third to
 2   each of those three pieces of information.
 3   Q    And, again, what were the assumptions of this relating to
 4   whether there was marketwide reliance?
 5   A    So what this analysis assumes is that all investors that
 6   were holding SignaLife stock as of the date of the 10-Q were
 7   relying upon the information that the company put out in the
 8   10-Q.
 9   Q    And in order to reach that conclusion, would there have
10   to be a finding on market efficiency?
11   A    Yes.  That -- again, I've assumed market efficiency
12   running this analysis.  So, yeah, if the market was efficient,
13   then you could assume that the investors were relying upon the
14   information in the 10-Q.
15   Q    And to your information, has the Government presented any
16   evidence or has presented a conclusion that the market was
17   efficient?
18   A    Not that I'm aware.
19           MR. GRUENSTEIN:  Your Honor, I think this may be a
20   good time to break for the evening.
21           THE COURT:  Are you finished with your direct?
22           MR. GRUENSTEIN:  I'm not.  I probably have another
23   half an hour, 20 minutes.
24           THE COURT:  What is the schedule going to be
25   tomorrow?  Are we going to finish tomorrow with all of your
```

```
 1   witnesses?
 2          MR. GRUENSTEIN:  I think so.  That's what we're
 3   anticipating.
 4          THE COURT:  How much?  I'm trying to figure out
 5   whether we should try and finish the direct.
 6          MR. GRUENSTEIN:  I think we'll have -- we have two
 7   more witnesses, so I think we should be done by early
 8   afternoon, late morning.
 9          THE COURT:  Okay.  All right.
10          MR. GRUENSTEIN:  Thank you, Your Honor.
11          THE COURT:  All right.  I'll take your
12   recommendation.
13          All right.  So we'll get back tomorrow at 9:00.
14          Thank you, sir.  We'll see you tomorrow morning.
15          MR. KLUGH:  Your Honor, there's one thing.  We had
16   some -- we were going to, rather than try to introduce them in
17   today or in the morning, there was some additional discovery
18   that the Government had provided since the sentencing
19   memorandum.  We were going to file that electronically
20   tonight, and that would give the Government an opportunity to
21   decide whether they have any problems in consideration of
22   those documents.  They're all from Government discovery
23   documents.  We just wanted to put them in the record.
24          THE COURT:  Is this for purposes of the --
25          MR. KLUGH:  Mostly for purposes --
```

```
 1              THE COURT:  Recalculation?

 2              MR. KLUGH:  Our argument about the -- I think it's

 3    basically stock data that the Government had, and I think it's

 4    mostly just for the purpose of argument.  We may not argue it,

 5    but just to have it in the record.

 6              THE COURT:  All right.  Well, file it and see if the

 7    Government has any objections to it.

 8              MR. KLUGH:  Thank you, Your Honor.

 9              THE COURT:  If you also can see if you can come up

10    with exhibit lists that -- of all the exhibits that you're

11    agreeing to go into evidence so that we don't -- have a clear

12    record on that.  Okay?

13              MS. COTTINGHAM:  Yes, Your Honor.

14              THE COURT:  All right.  Thank you.  We'll see you

15    tomorrow at 9:00.  Have a nice evening.

16         (The evening recess was taken at 5:00 p.m.)

17                          *  *  *  *  *

18

19

20

21

22

23

24

25
```

```
 1                         * * * * *

 2                        I N D E X

 3    Testimony of Mark W. Taylor

 4          Direct by Ms. Pascucci                    5

 5          Cross by Mr. Gruenstein                  19

 6          Redirect by Ms. Pascucci                 34

 7    Testimony of Chyhe Becker

 8          Direct by Ms. Pascucci                   35

 9          Cross by Mr. Gruenstein                  91

10          Redirect by Ms. Pascucci                131

11    Testimony of Erin Smith

12          Direct by Ms. Cottingham                141

13          Voir Dire by Mr. Gruenstein             143

14    Testimony of Peter Melley

15          Direct by Ms. Cottingham                146

16          Cross by Mr. Gruenstein                 188

17          Redirect by Ms. Cottingham              218

18    Testimony of Edward Shannon O'Neal

19          Direct by Mr. Gruenstein                223

20                         * * * * *

21

22

23

24

25
```

```
 1                        * * * * *

 2                     E X H I B I T S

 3    Government's Exhibits in Evidence:

 4        Exhibit Nos. 1-3                        10

 5        Exhibit No. 4                           13

 6        Exhibit No. 10                          15

 7        Exhibit Nos. 30 & 31                    37

 8        Exhibit No. 32                          48

 9        Exhibit No. 40                         163

10        Exhibit No. 41                         166

11        Exhibit No. 103                        167

12        Exhibit No. 258                        169

13        Exhibit No. 259                        170

14        Exhibit No. 114                        171

15        Exhibit No. 108                        172

16        Exhibit No. 115                        173

17        Exhibit No. 73                         175

18        Exhibit No. 72                         177

19        Exhibit No. 71                         180

20        Exhibit 113                            183

21        Exhibit 104                            187

22                        * * * * *

23

24

25
```

```
 1                          * * * * *

 2                  E X H I B I T S  (Cont.'d)

 3   Defendant's Exhibits Received in Evidence:

 4        Exhibit No. 69                          29

 5        Exhibit No. 70                          31

 6        Exhibit No. 73                         195

 7                          * * * * *

 8                        CERTIFICATE

 9        I, Stephen W. Franklin, Registered Merit Reporter, and

10   Certified Realtime Reporter, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13        Dated this 30th day of JULY, 2018.

14

15        /s/Stephen W. Franklin
         _____
16        Stephen W. Franklin, RMR, CRR

17

18

19

20

21

22

23

24

25
```

**BY MR. GRUENSTEIN: [33]** 19/18 29/5 29/16 30/1 30/14 32/17 33/11 91/22 95/18 100/16 102/11 107/10 115/22 122/18 128/14 129/2 143/16 145/2 188/8 192/4 193/6 195/9 197/2 205/2 213/6 214/11 217/9 217/16 223/1 224/1 225/5 233/15 234/5

**BY MS. COTTINGHAM: [42]** 141/14 141/25 146/7 150/2 150/16 151/8 154/1 156/6 159/7 162/5 163/14 165/23 166/20 167/2 167/13 169/2 169/18 170/25 171/22 172/5 172/15 173/4 173/23 174/19 175/22 176/10 177/3 177/13 177/20 179/6 179/21 180/19 181/15 182/3 182/20 183/3 183/11 184/1 184/14 218/2 218/6 220/2

**BY MS. PASCUCCI: [21]** 5/24 6/12 7/13 9/24 10/10 13/19 15/5 15/21 34/1 35/12 36/1 37/3 38/24 48/17 59/8 63/4 70/12 131/15 136/5 137/24 138/21

**MR. GRUENSTEIN: [81]** 3/11 4/4 5/12 10/6 13/16 14/24 15/1 28/19 29/3 29/10 30/11 30/25 31/3 31/13 32/12 33/17 34/25 48/14 91/20 100/14 102/9 107/8 115/19 122/16 128/12 128/24 130/21 136/1 137/3 139/24 140/8 143/12 144/9 144/19 144/24 145/19 149/22 159/1 159/4 163/9 166/17 167/8 171/13 172/12 173/11 173/20 175/19 176/25 180/14 182/25 185/4 185/13 185/25 186/15 187/21 187/24 188/6 192/2 193/3 197/1 205/1 213/5 214/9 217/6 217/14 217/21 221/22 221/24 222/2 222/6 223/7 223/14 223/25 225/3 233/13 234/4 251/18 251/21 252/1 252/5 252/9

**MR. HARRIS: [1]** 3/17

**MR. KLUGH: [7]** 3/15 3/19 3/22 252/14 252/24

253/1 253/7

**MS. COTTINGHAM: [71]** 4/8 4/19 31/17 32/3 139/17 139/20 140/15 140/18 141/7 141/24 142/18 143/4 144/6 145/22 149/5 149/14 150/1 150/14 151/6 153/24 156/4 159/6 162/3 163/6 163/12 165/22 166/15 166/25 167/6 169/1 169/9 169/14 170/19 172/3 172/9 173/3 173/15 175/16 176/8 176/23 177/5 177/11 177/19 179/5 179/19 180/12 180/17 181/8 182/2 182/19 182/24 183/9 183/23 184/9 184/23 185/5 185/20 186/5 186/10 186/13 186/22 187/13 195/6 217/25 218/4 219/24 221/10 221/17 223/3 223/24 253/12

**MS. PASCUCCI: [45]** 3/7 4/2 5/8 5/14 5/21 7/11 9/19 13/13 14/22 15/4 19/10 19/13 29/13 29/21 30/10 31/8 33/20 33/22 34/13 34/19 34/23 35/3 36/22 38/22 48/12 58/11 63/1 63/3 69/25 70/11 90/5 91/16 95/14 130/24 131/3 131/13 136/25 137/10 137/15 137/18 137/21 138/20 139/10 139/12 221/12

**THE COURT REPORTER: [5]** 15/14 15/16 15/18 33/9 182/1

**THE COURT: [164]** 3/1 3/10 3/14 3/16 3/21 3/23 4/3 4/5 4/18 5/2 5/11 5/13 5/20 6/7 6/11 7/9 7/12 10/3 10/7 13/15 13/17 14/25 15/2 19/12 19/15 28/22 29/1 29/12 29/14 29/22 30/13 31/2 31/6 31/9 31/15 31/23 32/8 32/15 33/10 33/18 33/21 33/24 34/15 34/18 34/21 34/24 35/2 35/14 35/21 36/25 48/15 58/9 58/12 59/7 61/4 62/6 62/25 63/2 69/23 70/1 70/7 90/6 90/21 91/5 91/18 95/15 129/1 130/22 131/1 131/4 131/10 136/3 137/9 137/14 137/17 137/19 137/23 138/3 138/8 139/11 139/14 139/19 139/23 140/4 140/16 141/3 142/20 143/3

143/5 144/14 144/8 144/17 144/20 145/20 146/3 149/13 149/18 149/25 159/3 159/5 163/10 166/18 167/10 169/13 169/16 170/23 171/17 172/13 173/13 173/19 173/21 174/17 175/20 177/1 177/10 177/12 180/15 181/14 183/1 185/3 185/12 185/18 186/2 186/8 186/11 186/14 187/9 187/17 187/22 188/2 195/5 195/7 213/2 214/7 217/8 217/23 220/1 221/11 221/13 221/16 221/19 221/23 221/25 222/5 222/8 222/11 222/14 222/16 222/20 222/22 222/24 223/11 223/17 223/22 251/20 251/23 252/3 252/25 252/8 252/10 252/22 252/25 253/5 253/8 253/13

**THE COURTROOM DEPUTY: [8]** 5/15 5/17 35/5 35/7 141/8 141/10 145/24 146/1

**THE WITNESS: [33]** 5/19 6/10 9/21 15/15 15/17 15/19 28/25 29/23 34/17 35/9 35/20 35/22 58/16 61/14 62/12 90/12 90/22 95/17 136/4 138/6 141/12 143/2 146/2 146/5 173/14 174/18 221/15 222/13 222/15 222/18 222/21 222/23 223/19

**$**

**$1,395,302 [1]** 194/10
**$1,473,900 [1]** 170/7
**1.03 [4]** 124/6 124/11 124/14 236/16
**1.05 [1]** 124/16
**1.10 [1]** 202/2
**1.11 [3]** 209/12 210/9 216/6
**1.17 [5]** 124/4 124/22 125/11 211/1 236/19
**1.20 [1]** 202/3
**1.34 [7]** 124/8 124/18 124/24 125/4 210/25 236/16 236/19
**1.40 [2]** 23/22 24/3
**1.50 [1]** 233/7
**1.58 [1]** 245/10
**$1.58 million [1]** 245/10
**$10 [2]** 60/15 60/17
**$10,000 [5]** 18/24 20/10 23/1 59/18 60/11
**$10,315 [1]** 84/16
**$100,000 [1]** 60/18
**$1000 [1]** 60/6

**$11.6 [1]** 164/7
**$11.6 million [1]** 164/7
**$116,859.70 [1]** 211/14
**$13.1 [1]** 164/4
**$13.1 million [1]** 164/4
**$1300 [1]** 220/13
**$14 [1]** 155/23
**$14 million [1]** 155/23
**$14.4 [1]** 155/22
**$14.4 million [1]** 155/22
**$140,000 [1]** 216/4
**$15,892 [1]** 205/5
**$150,000 [3]** 9/2 212/13 213/1
**$152,000 [1]** 213/13
**$182,780 [1]** 173/15
**$185,000 [1]** 34/11
**$190,170 [1]** 47/21
**$2 [1]** 37/25
**$2 million [1]** 37/25
**$2,026,652 [2]** 153/24 164/14
**$200,000 [2]** 9/7 18/18
**$3 [2]** 175/5 192/25
**$3 million [2]** 175/5 192/25
**$3.3 [2]** 38/5 44/6
**$3.3 million [2]** 38/5 44/6
**$300,000 [1]** 156/13
**$330 [1]** 216/22
**$375,000 [1]** 219/8
**$385,000 [1]** 161/17
**$396,000 [1]** 166/15
**$40 [2]** 14/6 27/6
**$40 million [2]** 14/6 27/6
**$400,000 [2]** 154/19 207/20
**$478,600 [1]** 184/17
**$486 [1]** 220/18
**$50,000 [1]** 9/9
**$500,000 [1]** 38/9
**$525,000 [1]** 250/18
**$55,000 [1]** 181/13
**$594,000 [1]** 181/5
**$6,691,229.76 [1]** 169/9
**$6.7 [1]** 181/8
**$6.7 million [1]** 181/8
**$600,000 [2]** 19/4 181/2
**$682,100 [2]** 170/10 183/19
**$9 [1]** 87/9
**$9 million [1]** 87/9
**$9.6 [1]** 164/9
**$9.6 million [1]** 164/9
**$90,000 [1]** 60/19
**$9000 [1]** 60/10
**$953,902 [1]** 168/9

**'06 [1]** 248/22
**'07 [6]** 7/16 7/17 8/5 10/24 44/23 248/22
**'08 [4]** 8/8 249/19 249/22 249/22
**'90s [1]** 224/17

**'til [3]** 18/3 43/4 131/6

**-and [4]** 2/5 2/12 2/15 2/18
**-v [1]** 1/5

**.**

**.0173 [1]** 80/10
**.94 [1]** 69/1

**/**

**/s/Stephen [1]** 256/15

**0**

**0.00 percent [1]** 108/1
**0.53 [1]** 55/25
**0.61 [1]** 80/12
**0.717 [1]** 55/1
**07 [4]** 165/5 165/13 167/19 190/10
**08 [6]** 126/14 162/16 162/24 167/19 167/23 190/10

**1**

**1 million [1]** 81/10
**1 percent [4]** 55/16 56/3 56/5 69/3
**1,000 [1]** 174/18
**1,845,512 [1]** 174/19
**1,980 [1]** 219/14
**1-3 [2]** 10/10 255/14
**1.17 [1]** 210/19
**1.2 million [2]** 178/22 178/23
**1.34 [1]** 210/17
**1.4 million [1]** 193/22
**1.6 [1]** 80/13
**1.96 [6]** 44/19 44/20 44/20 45/22 46/4 69/2
**10 [26]** 4/19 14/24 15/4 52/4 60/4 60/5 126/12 129/15 142/11 156/22 157/3 157/9 157/21 157/22 159/1 159/22 160/16 162/16 162/25 164/6 201/5 211/24 240/9 243/18 255/4 255/6
**10 percent [2]** 125/13 239/13
**10,000 [7]** 59/14 59/18 60/5 60/16 60/18 75/25 84/14
**10-cent [3]** 157/13 157/15 158/6
**10-K [2]** 47/15 243/16
**10-KSB [1]** 134/19
**10-minute [1]** 187/24
**10-Q [45]** 21/24 21/25 22/1 22/1 39/1 39/5 39/6 39/19 43/11 46/2 47/15 92/11 99/20 125/17 125/23 126/2 126/10 126/13 126/18 204/21 230/8 230/11 230/15

**1**

**10-Q... [22]** 240/22
242/25 243/4 243/5
243/14 243/17 243/24
244/8 244/14 244/15
244/23 245/1 245/25
246/8 246/19 246/25
249/19 250/11 250/13
251/6 251/8 251/14
**10/10 [1]** 129/15
**100 [2]** 135/6 165/8
**100 percent [4]** 81/5
81/8 81/9 81/13
**1000 [1]** 135/7
**10019 [2]** 2/12 2/15
**101 [36]** 37/5 37/7 37/22
38/2 38/6 39/4 43/18
45/13 47/10 49/23 52/4
52/21 54/9 58/6 63/6
64/18 67/17 68/10 69/10
69/22 70/14 72/14 76/4
77/12 78/8 79/4 80/2
80/16 81/15 82/13 84/8
84/25 86/14 87/19 89/14
133/15
**102 [2]** 151/8 163/13
**103 [6]** 167/2 167/8
167/13 214/11 214/13
255/11
**104 [4]** 184/25 185/7
187/13 255/21
**108 [3]** 172/11 172/15
255/15
**1082 [2]** 161/22 163/21
**109 [2]** 169/10 193/17
**10:00 a.m [2]** 134/21
136/20
**10:00 o'clock [1]** 145/6
**10:35 [1]** 70/6
**10:53 [1]** 70/6
**10:58 [1]** 24/22
**10:59 [1]** 24/22
**10th [10]** 10/24 37/20
38/7 92/6 92/7 92/8
101/16 114/8 118/25
233/25
**11 [4]** 52/21 123/15
210/15 243/18
**11,600 [1]** 205/18
**11-80205-CR-KAM [1]**
1/2
**110 [4]** 170/20 184/14
193/23 194/6
**1100 [1]** 2/17
**113 [11]** 178/19 182/20
182/25 183/3 183/5
183/9 183/15 184/18
184/22 193/6 255/20
**114 [19]** 169/2 170/13
170/17 171/11 171/22
172/2 173/4 175/8 175/8
175/12 180/18 181/6
181/20 182/11 183/7
183/9 183/17 183/20
255/14
**115 [5]** 173/17 173/23

184/12 194/15 255/16
**11:00 [1]** 145/12
**11:00 o'clock [3]** 24/19
120/5 145/18
**11:01 [1]** 24/22
**11:03 [1]** 24/20
**11:04 [1]** 24/20
**11:05 [1]** 24/20
**11th [3]** 78/20 134/13
134/24
**12 [5]** 26/7 54/9 102/1
102/7 104/14
**12 percent [9]** 239/13
240/9 241/1 241/4
241/10 241/16 241/17
241/18 241/20
**12.7 [1]** 50/16
**12.7 percent [5]** 45/19
46/9 50/14 101/21
101/22
**122 [2]** 136/23 141/25
**12:26 [1]** 131/9
**12th [3]** 79/1 172/19
173/6
**13 [2]** 58/6 255/5
**13 million [1]** 87/9
**131 [1]** 254/10
**1320 [1]** 206/14
**134 [1]** 236/19
**135 [1]** 9/2
**14 [12]** 61/4 63/6 123/15
123/15 158/18 209/12
210/12 210/19 216/6
224/20 236/21 237/3
**14,000 [1]** 217/13
**14.4 [1]** 155/23
**14.4 million [1]** 158/19
**140 [1]** 104/22
**1400 [2]** 2/4 2/8
**141 [1]** 254/12
**143 [1]** 254/13
**146 [1]** 254/15
**149 [1]** 220/14
**14th [33]** 13/11 15/9
24/3 38/19 39/7 39/20
45/17 46/7 49/25 92/10
101/17 101/17 101/20
101/24 109/6 112/21
113/10 113/18 113/20
113/22 118/13 134/9
134/21 136/24 137/12
142/3 142/17 166/5
204/18 205/14 235/16
236/11 236/12
**15 [7]** 64/18 157/20
181/11 215/5 216/21
241/23 255/6
**15 million [4]** 212/7
213/12 245/12 245/22
**15-minute [1]** 70/4
**150 [1]** 36/8
**159 [1]** 38/24
**15th [19]** 39/1 39/19
43/4 45/25 46/1 86/2
92/10 151/19 151/23
154/7 156/9 156/11

156/16 156/19 164/24
212/7 216/10 233/3
244/4
**16 [6]** 66/16 67/17
126/12 181/12 241/15
241/23
**16 percent [1]** 99/17
**163 [1]** 255/9
**166 [1]** 255/10
**167 [1]** 255/11
**168,000 [1]** 216/7
**169 [1]** 255/12
**17 [6]** 68/10 122/17
211/3 211/9 236/20
241/15
**17 percent [1]** 241/23
**17,000 [2]** 217/18
217/19
**170 [1]** 255/13
**171 [1]** 255/14
**172 [1]** 255/15
**173 [1]** 255/16
**175 [1]** 255/17
**177 [1]** 255/18
**1770 [1]** 206/18
**18 [5]** 69/10 102/1 102/7
240/9 241/10
**18 percent [68]** 44/7
49/2 49/4 49/7 49/22
50/11 93/21 98/4 98/11
98/14 98/16 98/20 98/21
98/22 99/2 99/9 99/9
99/10 100/7 100/11
100/23 101/1 101/2
101/8 101/12 101/17
101/19 103/6 108/7
108/10 108/13 108/17
108/23 109/2 109/8
111/10 111/13 129/23
130/14 132/19 198/9
198/14 198/22 203/6
203/10 203/12 205/21
205/24 206/12 206/21
207/13 215/25 220/7
220/20 233/24 237/23
238/2 238/5 239/8
239/11 239/12 239/19
239/22 239/25 240/2
241/3 241/14 241/15
**18,000 [2]** 203/17
203/20
**18-percent [1]** 50/15
**180 [1]** 255/19
**183 [1]** 255/20
**185 percent [1]** 64/16
**187 [1]** 255/21
**188 [1]** 254/16
**18th [3]** 179/1 179/3
244/5
**19 [5]** 1/8 69/22 70/14
219/14 254/5
**195 [1]** 256/6
**198,000 [1]** 18/19
**1980 [1]** 158/17
**1:40 [2]** 131/7 131/7
**1:47 [1]** 131/9

**1st [2]** 66/17 124/15

**2**

**2 million [1]** 81/11
**2.003 [2]** 45/20 45/21
**2.8 [1]** 44/20
**20 [4]** 71/17 129/15
146/15 251/23
**200 [4]** 73/24 75/7 165/6
165/7
**200,000 [1]** 18/20
**200-plus [1]** 215/10
**2000 [2]** 154/22 158/17
**2000' [1]** 249/6
**2001 [1]** 47/20
**2005 [1]** 47/20
**2006 [2]** 47/20 85/7
**2007 [37]** 6/19 26/13
37/20 39/15 39/16 43/4
43/22 44/4 47/12 47/18
47/23 47/25 49/3 49/17
49/25 50/12 52/24 75/13
85/10 85/13 109/6
118/25 130/19 150/21
151/18 151/20 154/7
164/19 164/23 164/24
166/4 229/5 230/13
233/3 235/21 245/15
245/23
**2007-2008 [1]** 52/15
**2008 [68]** 6/19 12/7
13/12 38/12 38/13 38/20
39/1 39/19 39/20 43/5
43/23 45/15 45/17 45/25
46/1 46/7 50/1 52/15
64/24 64/25 65/20 66/17
66/17 78/10 78/11 78/20
78/20 79/2 84/16 109/6
114/11 134/21 134/24
136/24 137/13 142/3
150/22 151/19 151/23
154/7 156/9 156/11
156/15 156/19 160/15
164/4 164/24 166/5
172/19 173/6 176/8
176/20 179/1 179/3
180/22 181/3 212/7
229/6 233/3 233/9
233/13 235/21 236/11
247/6 247/7 248/10
249/7 249/21
**2008-2009 [1]** 19/8
**2009 [1]** 19/8
**2013 [1]** 6/18
**2014 [2]** 4/13 4/14
**2016 [2]** 4/13 4/15
**2018 [3]** 1/8 195/4
256/13
**2029 [2]** 155/5 155/6
**20530 [2]** 2/5 2/9
**20th [22]** 10/24 37/20
37/23 39/15 39/16 43/4
75/13 84/16 85/13 86/2
92/5 118/25 130/2
151/18 151/20 154/7
164/18 164/23 164/23

230/13 233/3 233/22
**21 [2]** 72/14 75/9
**218 [1]** 254/17
**22 [3]** 76/4 128/17
146/15
**223 [1]** 254/19
**229-day [1]** 87/8
**23 [2]** 77/12 115/24
**24 [1]** 78/8
**24 million [1]** 186/17
**24,000 [1]** 187/7
**24,974 [1]** 185/21
**2400 [1]** 162/3
**247,000 [4]** 172/9
172/23 172/25 173/10
**25 [5]** 2/16 12/4 25/13
79/4 129/15
**258 [4]** 169/13 169/18
170/18 255/12
**259 [4]** 170/23 170/25
172/1 255/13
**25th [21]** 10/24 37/20
38/1 38/3 44/4 44/10
44/23 45/10 49/3 49/5
49/17 49/25 50/12 92/6
109/5 118/25 130/1
130/4 130/19 166/4
233/23
**26 [1]** 80/2
**27 [1]** 80/16
**27,000 [1]** 210/1
**27,135 [1]** 210/6
**28 [1]** 81/15
**287 [1]** 1/10
**29 [3]** 82/13 133/15
256/4
**29th [2]** 78/11 79/2
**2nd [1]** 2/16

**3**

**3 percent [2]** 50/9 50/10
**3.3 [1]** 38/4
**30 [6]** 12/5 13/25 25/13
36/24 84/8 255/7
**30 percent [1]** 236/17
**30-31 [1]** 37/3
**30-cent [1]** 17/20
**30th [5]** 85/7 85/10 86/1
195/4 256/13
**31 [7]** 36/24 37/3 84/25
124/25 236/17 255/7
256/5
**31st [1]** 66/17
**32 [7]** 48/10 48/14 48/17
86/14 100/16 150/16
255/8
**33 [1]** 87/19
**331,000 [1]** 78/16
**33131 [1]** 2/17
**33155 [1]** 2/19
**33401 [1]** 1/19
**34 [3]** 66/5 89/14 254/6
**34 percent [1]** 78/14
**342 [2]** 112/25 112/25
**343 [1]** 175/18
**344 [1]** 176/10

**3**
**346 [1]** 173/19
**35 [1]** 254/8
**350 [2]** 65/3 66/8
**37 [1]** 255/7
**374,000 [1]** 78/23
**3768 [1]** 1/18
**39.2 percent [1]** 65/7
**396,372 [1]** 207/17
**39th [1]** 2/13
**3:04 [1]** 188/1
**3:17 [1]** 188/1
**3:44 p.m [1]** 15/9

**4**
**4 percent [1]** 50/12
**4,292 [1]** 205/18
**4/11 [2]** 123/15 210/15
**4/14 [6]** 123/15 123/15 209/12 210/12 210/19 216/6
**4/14/08 [1]** 190/10
**40 [7]** 9/8 162/4 163/9 163/12 217/16 246/8 255/9
**40 million [3]** 245/6 245/20 245/22
**40-percent [1]** 244/6
**41 [10]** 165/23 166/17 166/20 205/1 214/24 218/6 218/9 219/24 220/10 255/10
**45 [3]** 66/6 131/1 139/15
**48 [1]** 255/8
**4:07 [1]** 223/21
**4:14 [1]** 223/21
**4th [4]** 176/8 176/20 180/22 181/3

**5**
**5 percent [1]** 132/17
**5.3 percent [1]** 101/23
**50 [1]** 246/8
**50 percent [3]** 62/20 62/21 203/23
**500 [1]** 20/19
**514-3768 [1]** 1/18
**544 [1]** 112/25
**55,000 [1]** 210/1
**561 [1]** 1/18
**5:00 [1]** 253/16
**5:00 o'clock [1]** 222/2
**5th [2]** 78/10 78/20

**6**
**6 million [2]** 170/6 193/20
**60 [1]** 27/23
**600 [1]** 181/4
**600,000 [4]** 176/3 176/16 179/10 181/4
**6431 [1]** 2/19
**65 percent [1]** 79/3
**68 [1]** 225/1
**687,410 [1]** 211/8
**69 [4]** 9/21 29/16 172/5

256/4

**7**
**7,674 [1]** 215/12
**70 [2]** 31/8 256/5
**700 [1]** 215/12
**701 [1]** 1/19
**71 [6]** 105/3 177/5 177/15 180/14 180/17 255/19
**72 [8]** 9/21 87/11 122/18 176/9 176/24 177/3 179/13 255/18
**73 [6]** 175/17 175/22 180/2 195/9 255/17 256/6
**74 [1]** 173/9
**76 [1]** 9/21

**8**
**8 percent [2]** 240/12 240/15
**8-K [1]** 21/1
**8/15 [3]** 157/20 215/5 216/21
**8/15/08 [5]** 126/14 162/16 162/24 167/19 167/23
**8/15/2008 [3]** 156/15 160/15 164/4
**80 [3]** 120/20 145/15 225/9
**825 [2]** 2/11 2/14
**84 percent [1]** 64/15
**845,512 [1]** 174/17
**85 [4]** 23/22 24/4 145/18 225/9
**8th [1]** 114/19

**9**
**9 percent [8]** 46/3 99/22 99/24 100/3 100/7 100/8 240/21 240/22
**9/20 [1]** 129/15
**9/20/07 [3]** 165/5 165/13 167/19
**9/25 [1]** 129/15
**9/25/07 [1]** 190/10
**90 [2]** 23/22 145/15
**90-cent [1]** 120/20
**900 [2]** 219/18 219/19
**9000 [2]** 203/25 204/2
**91 [1]** 254/9
**91.4 percent [1]** 78/21
**92 [1]** 87/7
**94 [2]** 124/13 124/16
**95 percent [13]** 41/17 42/13 44/8 131/19 131/23 132/4 132/14 132/21 132/22 132/25 133/3 239/22 239/24
**99 [1]** 180/25
**99 percent [1]** 41/22
**9:00 [2]** 252/13 253/15

**A**
**a.m [4]** 70/6 134/21 136/24 142/11
**A2 [1]** 190/25
**A3 [1]** 190/25
**A4 [1]** 190/25
**AAA [1]** 21/12
**abbreviated [1]** 82/17
**Abdollah [1]** 205/4
**abilities [1]** 90/19
**ability [3]** 39/9 172/24 246/22
**able [13]** 20/2 28/21 34/9 59/23 74/19 100/22 105/17 143/6 158/21 158/24 165/11 231/13 231/18
**abnorm [1]** 97/1
**abnormal [38]** 40/14 40/15 40/16 40/20 41/5 41/13 44/7 44/14 44/24 45/18 45/22 46/2 46/8 49/2 49/25 50/24 50/25 86/5 86/12 96/22 97/15 97/22 97/25 98/3 98/11 99/7 99/22 107/15 108/1 125/1 125/2 132/1 132/15 132/19 238/8 238/9 238/10 240/22
**abnormality [1]** 124/24
**above [4]** 79/15 79/17 161/5 256/12
**above-entitled [1]** 256/12
**absence [4]** 136/16 234/19 234/22 234/24
**absent [2]** 40/5 151/6
**absolute [8]** 44/20 45/21 46/4 51/9 55/8 56/13 69/2 80/12
**absolutely [12]** 14/17 14/17 16/10 93/13 93/24 95/22 97/14 114/5 136/14 139/7 140/24 218/23
**absorb [1]** 20/7
**abstract [1]** 71/25
**academic [8]** 104/9 105/8 230/5 230/6 231/2 231/4 238/12 238/17
**acceptable [2]** 103/14 103/15
**access [2]** 21/3 22/22 235/19 235/20
**accomplish [1]** 58/15
**according [3]** 127/20 127/22 245/21
**account [44]** 9/4 61/20 61/20 62/19 155/8 155/8 155/12 155/13 155/14 159/11 160/6 160/20 161/9 161/16 162/12 162/13 162/13 162/19 162/22 163/4 163/4 163/25 164/3 164/5 164/7 164/8 164/12 164/12 165/8 177/22 178/1 178/7 178/14 178/17 178/24 180/10 205/15 205/16 205/17 205/22 206/17 206/24 218/10 238/21
**account-opening [2]** 177/22 178/7
**accounted [1]** 155/21
**accounting [6]** 6/6 225/12 226/3 226/4 226/5 247/10
**accounts [26]** 9/3 9/3 9/3 18/19 154/13 154/13 154/22 155/5 155/7 156/14 156/14 157/12 158/18 163/21 163/23 166/9 175/15 179/12 180/5 190/13 199/3 207/19 207/20 215/18 219/14 245/8
**accumulating [4]** 15/14 15/19 15/20 26/16
**accuracy [3]** 42/25 171/15 194/4
**accurate [12]** 24/1 24/15 137/21 170/13 171/11 175/9 175/12 182/10 190/4 231/9 238/7 244/24
**accurately [6]** 170/17 172/2 194/6 195/11 199/2 228/10
**achieving [1]** 38/11
**across [3]** 173/2 206/9 207/12
**across-the-board [2]** 206/9 207/12
**acting [2]** 36/4 36/4
**action [3]** 89/16 89/18 89/21
**actions [1]** 36/11
**active [1]** 189/15
**activities [1]** 76/16
**activity [3]** 11/20 235/2 235/3
**actual [95]** 10/17 30/9 40/16 48/21 49/14 49/16 49/22 96/21 99/15 99/16 102/14 102/14 150/13 150/22 151/1 152/10 152/14 152/20 153/1 153/5 153/10 153/14 153/15 153/18 155/20 155/21 156/4 158/1 158/18 159/9 159/10 159/14 159/14 159/16 160/1 160/23 161/8 161/12 161/15 162/13 162/19 162/25 163/4 163/25 164/12 167/16 167/17 167/20 190/21 196/17 197/4 197/7 197/9 198/2 198/5 200/25 201/2 201/4 201/13 202/4 202/8 202/11 202/17 202/17 202/20 202/23 203/12 205/10 205/15 205/16 205/22 205/25 206/1 206/3 206/5 206/9 206/24 206/24 207/6 207/25 209/10 209/15 210/12 211/24 214/14 214/17 214/21 215/13 215/15 215/25 219/10 219/17 220/7 220/13 240/10
**actuality [4]** 161/3 216/13 216/17 221/3
**actually [81]** 17/25 18/5 23/6 24/20 25/5 26/24 28/12 42/20 42/24 43/21 52/23 57/7 57/15 58/24 61/8 61/11 62/13 62/14 65/14 66/14 67/2 67/8 71/20 71/23 72/11 72/18 73/5 73/15 74/9 87/14 91/5 91/8 93/8 93/18 94/18 94/25 96/10 98/15 98/21 102/23 103/6 104/10 113/17 113/18 120/3 120/13 120/16 121/12 123/2 123/20 123/23 129/19 132/8 132/17 136/15 138/2 138/16 140/6 140/21 145/5 145/17 152/11 155/6 168/6 171/24 183/6 183/10 192/1 200/9 201/7 202/3 204/12 215/8 216/11 216/21 218/21 223/5 240/16 240/16 241/23 249/23
**acutely [1]** 26/17
**Adam [1]** 209/25
**add [5]** 26/2 67/13 140/4 156/2 207/18
**added [2]** 194/10 211/7
**adding [2]** 192/21 192/21
**addition [8]** 68/25 82/16 137/5 147/16 154/23 166/22 182/13 247/22
**additional [18]** 38/5 38/5 38/8 81/22 90/4 102/4 116/16 154/23 157/16 157/16 160/4 160/13 161/20 179/20 181/18 185/2 221/19 252/17
**address [2]** 4/10 155/10
**adjust [2]** 35/20 42/13
**adjusted [3]** 55/13 56/3 69/7
**adjustment [2]** 42/1 42/8
**adjusts [1]** 232/13
**administration [1]** 29/8
**admit [19]** 13/15 14/24 21/9 48/14 57/19 137/23 142/22 163/9 166/17 167/8 167/11 169/15

**A**

**admit...** [7] 172/12
175/19 176/24 180/13
182/25 184/24 187/11
**admitted** [25] 4/25 10/8
13/18 15/3 29/15 31/20
37/1 48/16 163/11
166/19 169/12 169/17
170/22 171/21 172/2
172/11 172/14 173/18
173/22 175/21 176/10
177/2 180/16 183/2
195/8
**admitting** [1] 143/11
**advance** [2] 4/22 138/25
**advancing** [1] 186/25
**advise** [2] 6/22 9/10
**advisement** [1] 6/24
**advisor** [1] 6/15
**advocated** [1] 149/11
**affect** [3] 121/5 129/20
209/13
**affected** [3] 107/19
107/21 126/17
**affecting** [1] 86/2
**affects** [1] 82/5
**affiliated** [1] 187/6
**after** [57] 14/16 18/13
27/11 27/14 27/24 28/5
28/18 28/19 29/10 32/21
59/7 70/6 84/17 84/24
89/22 90/20 113/20
114/19 119/14 119/15
121/10 123/22 124/3
124/21 125/23 127/11
127/13 131/9 138/13
138/16 139/1 139/3
140/8 142/17 153/23
156/19 158/4 158/15
160/12 164/23 179/2
179/6 188/1 195/16
216/21 223/21 224/17
225/5 229/5 234/4 241/3
244/8 244/15 245/1
245/14 245/22 247/14
**afternoon** [7] 15/8 146/9
146/10 188/10 188/11
243/24 252/8
**again** [71] 8/9 33/6
35/15 45/20 46/11 55/22
55/25 56/3 56/13 61/5
77/24 79/7 79/9 79/16
97/24 109/24 120/19
128/10 133/8 136/5
137/10 154/14 155/25
157/2 158/3 159/13
159/23 160/15 160/19
160/25 163/3 163/21
164/9 167/17 170/22
172/10 173/4 182/3
182/16 182/18 183/13
187/4 190/4 194/19
198/6 201/4 203/1
205/23 206/1 206/23
207/20 207/24 209/9
210/13 213/5 216/5

216/19 219/13 221/2
226/7 228/19 231/11
233/19 237/5 237/18
238/11 238/24 244/19
251/1 251/3 251/11
**against** [1] 225/13
**agent** [7] 147/17 168/20
174/8 174/12 174/25
182/18 194/17
**aggregate** [1] 67/14
**ago** [7] 11/8 11/9 11/10
30/18 74/9 156/8 170/12
**agree** [14] 20/1 22/21
50/3 66/10 78/9 106/7
111/19 113/5 118/12
118/24 128/9 209/18
229/14 229/17
**agreeing** [1] 253/11
**agreement** [1] 129/8
**agrees** [1] 4/18
**Ah** [1] 193/5
**ahead** [28] 38/6 39/4
43/18 45/13 52/21 54/9
58/6 59/20 61/4 63/6
64/18 67/17 68/10 69/10
71/17 76/4 77/12 78/8
79/4 80/2 80/16 81/15
84/25 86/14 87/19 89/14
200/3 203/24
**Ajay** [1] 181/22
**Al** [1] 206/14
**Alex** [2] 2/13 3/14
**alleged** [3] 93/17 240/11
250/3
**allegedly** [1] 216/10
**allow** [1] 142/21
**allowed** [4] 17/18 62/16
90/20 140/14
**almost** [2] 87/8 219/18
**alone** [1] 82/9
**already** [6] 26/1 36/24
73/16 229/20 233/7
241/14
**also** [99] 3/16 3/20 4/25
7/8 8/22 21/3 21/4 22/14
26/21 35/25 36/10 37/13
38/9 40/23 40/23 42/5
42/11 43/11 43/14 48/22
50/19 51/16 51/25 52/16
52/25 53/19 53/20 54/10
65/23 67/16 72/6 73/10
74/3 76/11 80/2 82/18
82/21 83/2 83/9 84/3
92/20 97/22 97/25 99/3
100/14 106/7 114/22
116/16 126/9 126/13
133/3 133/4 133/21
134/9 143/23 144/5
145/4 145/14 147/15
147/17 148/16 154/13
154/23 155/1 155/10
158/3 158/12 159/22
159/25 160/16 160/22
161/10 161/11 162/24
165/19 168/10 175/14
176/16 185/8 187/8

196/19 196/24 203/2
209/9 211/17 216/2
224/9 224/20 227/1
230/6 233/19 245/15
245/25 246/15 246/21
247/8 247/21 248/8
253/9
**although** [2] 57/18
237/19
**always** [4] 12/4 74/14
215/17 246/11
**am** [13] 51/3 59/16
61/14 61/14 66/25 84/4
92/24 106/14 132/1
135/4 135/14 187/8
204/11
**AMERICA** [3] 1/3 3/5
3/9
**American** [2] 52/25
118/6
**AMEX** [3] 114/12
114/21 115/4
**among** [4] 20/24 21/15
26/19 26/19
**amount** [77] 4/1 27/18
27/20 34/10 48/22 49/14
62/21 66/1 84/16 92/18
93/22 97/16 101/25
103/11 107/22 108/24
109/2 109/4 109/19
111/13 111/20 112/2
112/14 116/18 126/22
156/2 156/24 156/25
157/1 157/21 157/22
158/1 158/1 159/18
159/18 159/19 159/23
159/24 162/18 172/9
179/10 193/20 196/22
197/16 197/17 197/19
197/21 197/25 198/3
198/22 199/22 200/19
200/24 200/24 201/25
202/9 203/6 206/10
206/20 207/11 207/19
210/7 211/9 212/18
212/19 213/10 216/8
219/8 219/10 219/12
226/5 227/24 229/8
230/20 235/23 239/22
245/24
**amounts** [1] 30/9
**analyses** [1] 133/24
**analysis** [117] 36/5
36/10 36/11 36/12 49/24
50/3 50/7 51/25 54/10
54/12 54/13 54/17 56/7
57/2 64/2 64/4 67/22
68/11 68/17 68/18 69/20
75/18 77/18 77/20 80/3
80/8 80/20 82/11 84/4
84/6 92/1 92/13 95/1
95/4 95/13 101/7 101/14
101/15 102/6 102/8
103/14 104/15 106/25
112/21 115/9 115/12
115/15 116/5 116/5

116/7 116/14 118/19
122/22 123/1 123/2
129/20 133/17 133/21
133/23 134/6 140/10
140/11 141/21 142/13
143/21 143/23 143/24
144/3 145/4 147/1
148/22 148/25 151/19
152/7 152/16 154/16
158/5 159/14 159/21
160/21 161/6 162/21
165/7 165/16 165/19
166/11 189/6 189/9
189/16 190/4 190/7
191/21 195/15 195/21
198/7 199/6 201/17
204/7 214/2 216/16
216/18 219/21 224/24
227/17 227/19 231/3
233/2 234/11 235/6
240/7 242/8 243/14
243/21 244/21 245/24
251/5 251/12
**analyst** [6] 7/5 7/6 7/19
7/20 8/18 20/20
**analysts** [3] 106/12
119/14 232/14
**analyze** [6] 38/14 39/12
39/20 80/5 146/25
235/15
**analyzed** [6] 39/14
39/16 39/18 52/5 80/6
89/23
**analyzing** [3] 57/18
64/19 148/7
**Anand** [9] 181/22 182/6
182/8 183/22 183/23
184/10 184/17 192/14
192/25
**and 3** [2] 10/9 37/17
**announce** [7] 10/15
37/23 38/3 38/7 39/5
135/20 135/23
**announced** [15] 10/16
12/10 13/22 16/23 26/2
26/3 26/20 26/25 28/4
37/24 38/4 38/8 39/6
85/9 114/20
**announcement** [5] 26/4
99/20 107/23 230/16
234/21
**announcements** [7]
11/17 11/18 21/13 27/10
230/13 242/14 242/15
**announces** [1] 134/18
**announcing** [1] 10/25
**another** [16] 28/19 29/9
50/17 90/8 122/11 123/4
132/25 155/8 155/14
155/16 171/17 176/12
179/25 239/2 243/20
251/22
**answer** [8] 56/11 76/10
95/17 130/19 138/17
173/14 239/16 239/21
**anticipate** [2] 31/22 72/4

**anticipated** [1] 38/11
**anticipates** [1] 73/16
**anticipating** [1] 252/3
**any** [138] 5/1 8/18 8/20
9/10 13/16 14/15 15/1
18/9 20/17 27/7 27/24
28/14 29/13 30/19 31/7
31/11 31/11 31/14 31/14
31/16 32/24 33/8 33/15
33/20 39/10 45/6 45/6
52/17 63/7 63/9 69/8
76/4 84/3 84/9 84/19
85/1 85/15 86/17 89/15
89/23 90/4 92/13 92/17
93/25 94/13 97/5 99/12
101/7 101/13 102/8
102/15 102/15 103/3
103/5 105/8 107/18
111/19 118/19 123/1
128/21 129/20 130/24
133/24 134/5 140/18
143/1 144/15 148/22
148/25 149/3 149/14
149/20 154/6 154/10
154/13 154/17 154/23
154/24 157/15 157/16
160/14 165/14 167/22
172/24 173/20 176/4
176/17 178/7 185/2
185/4 185/13 186/7
188/12 191/9 191/9
192/8 192/18 192/18
193/1 193/1 194/19
195/6 200/16 203/5
213/22 213/22 215/6
216/15 217/25 221/19
221/21 225/23 225/23
228/4 229/6 229/12
229/16 230/12 230/14
231/2 231/6 231/23
232/13 232/19 232/23
234/21 236/2 237/2
237/7 237/8 240/1 241/6
241/25 242/23 244/4
251/15 252/21 253/7
**anybody** [3] 156/21
158/3 245/15
**anyone** [4] 116/21
119/13 178/16 208/15
**anything** [20] 12/6
20/11 24/4 27/8 31/23
55/23 61/12 61/17 95/6
103/22 119/13 122/9
127/5 149/19 164/19
198/19 201/11 223/10
229/9 247/14
**anyway** [4] 14/10 96/2
108/21 143/8
**aol.com** [1] 1/20
**apart** [1] 74/4
**apologies** [4] 5/1 38/2
139/19 183/25
**apologize** [10] 4/22 31/5
49/12 98/25 163/8
166/17 178/3 184/12
184/14 236/8

**A**

apparent [2] 25/9 235/13
appearances [3] 1/15 2/1 3/7
appeared [2] 24/7 24/22
appears [1] 228/16
Apple [3] 232/11 232/12 232/12
apples [2] 67/6 67/6
appliance [1] 58/20
application [2] 135/7 177/22
applied [7] 157/15 226/10 226/11 226/15 226/20 227/15 230/5
apply [6] 4/14 4/15 128/19 158/6 226/18 228/9
appreciate [1] 143/13
approach [5] 56/18 95/21 113/13 195/11 219/25
appropriate [5] 4/17 94/21 149/10 226/18 237/11
approximately [18] 15/21 146/15 161/17 164/7 164/9 166/15 173/9 175/5 180/25 181/8 188/25 208/5 225/9 233/13 233/24 236/17 245/6 245/10
approximation [1] 103/2
April [53] 12/7 13/11 15/9 22/4 24/3 38/19 39/20 45/15 45/17 46/7 49/25 78/11 78/20 79/1 79/2 92/10 101/17 101/17 101/20 101/24 109/6 109/6 112/21 113/10 113/18 113/20 113/22 118/13 124/15 134/9 134/13 134/21 134/24 136/24 137/12 142/3 142/17 166/5 166/14 176/8 176/20 179/1 179/3 180/22 181/3 195/4 204/18 205/14 216/10 233/13 235/16 236/11 236/12
April 11th [3] 78/20 134/13 134/24
April 12th [1] 79/1
April 14th [29] 13/11 15/9 24/3 38/19 39/20 45/17 46/7 49/25 92/10 101/17 101/17 101/20 101/24 109/6 112/21 113/10 113/18 113/20 113/22 118/13 134/9 134/21 137/12 142/3 142/17 166/5 204/18 205/14 235/16
April 15th [1] 216/10

April 18th [2] 179/1 179/3
April 1st [1] 124/15
April 29th [2] 78/11 79/2
April 30th [1] 195/4
April 4th [4] 176/8 176/20 180/22 181/3
AR [1] 33/5
ARC [1] 187/3
area [1] 69/25
aren't [1] 155/5
argue [1] 253/4
arguing [1] 204/4
argument [4] 124/24 185/18 253/2 253/4
arithmetic [2] 156/3 159/17
around [14] 58/3 58/4 145/15 145/17 195/20 213/11 222/2 231/5 233/7 233/10 233/18 235/3 236/10 237/13
arrive [1] 148/14
arrow [1] 44/11
articles [1] 71/25
articles [1] 42/4
aside [2] 166/6 191/22
ask [22] 28/10 65/25 88/15 88/16 119/9 122/20 122/21 125/25 130/9 131/6 133/8 134/9 136/5 138/19 145/1 181/14 183/14 190/2 209/5 213/5 219/23 232/15
asked [41] 34/6 112/24 129/16 131/17 133/4 134/10 134/23 142/2 142/5 147/8 147/17 147/19 148/16 148/19 149/3 150/4 152/2 152/3 155/1 166/23 167/5 168/10 168/16 174/7 175/14 182/13 192/23 194/3 201/16 201/21 218/4 218/8 220/4 220/22 226/4 226/21 226/22 226/22 226/24 233/1 239/3
asking [6] 15/11 16/1 73/1 102/6 103/3 209/18
aspect [1] 242/12
asset [2] 104/25 105/1
assets [3] 170/14 247/12 247/17
assignment [1] 228/2
assist [1] 225/2
assistance [8] 146/16 146/17 146/21 146/23 146/24 188/16 188/18 188/18
assistant [1] 143/19
assisting [1] 144/23
associated [13] 20/7 21/4 24/8 39/15 63/17

71/21 71/23 74/14 78/11 81/7 86/5 86/11 207/22
assume [5] 10/4 10/6 31/12 105/15 251/13
assumed [3] 16/4 119/6 251/11
assumed -- you [1] 16/4
assumes [1] 251/5
assuming [2] 36/24 245/25
assumption [5] 120/6 205/20 231/7 231/19 238/4
assumptions [2] 244/21 251/3
assure [1] 102/6
Athletes [1] 135/8
attempt [2] 28/19 63/13
attorney [1] 144/17
attorney-client [1] 144/17
attributable [5] 55/15 89/5 97/16 97/17 98/8
attribute [6] 98/4 237/17 240/18 246/13 246/22 250/19
attributed [5] 55/17 165/7 174/3 250/14 251/1
attributing [1] 158/18
attribution [1] 237/7
August [30] 18/4 39/1 39/19 43/4 45/15 45/25 46/1 66/17 86/2 92/6 92/10 99/21 114/19 125/17 151/19 151/23 154/7 156/9 156/11 156/16 156/19 164/24 212/7 233/3 233/9 244/5 244/5 247/5 249/19 249/22
August 10th [1] 92/6
August 15th [17] 39/1 39/19 43/4 45/25 46/1 86/2 92/10 151/19 151/23 154/7 156/9 156/11 156/16 156/19 164/24 212/7 233/3
August 31st [1] 66/17
August 8th [1] 114/19
authoritative [2] 42/4 42/7
Authority [1] 146/13
authors [1] 104/22
available [11] 8/14 11/2 51/6 51/11 67/10 83/20 122/6 137/8 137/9 140/22 197/9
Avenue [5] 2/4 2/8 2/11 2/14 2/16
average [16] 65/2 65/6 65/14 65/23 66/22 66/24 78/15 78/22 79/3 87/13 87/13 118/8 118/11 238/14 238/18 238/19
averaging [1] 148/13

aware [24] 29/19 29/21 29/24 30/3 30/5 30/6 30/8 77/1 95/3 96/4 96/6 106/14 106/16 110/20 110/24 111/2 120/15 120/21 123/3 129/14 149/7 191/6 231/6 251/18
away [1] 90/19
awful [2] 8/6 18/6
axis [2] 79/8 79/9

**B**

B-e-c-k-e-r [1] 35/11
bachelor's [3] 6/6 36/1 224/14
back [24] 3/4 39/22 67/17 70/9 76/1 83/25 131/6 131/7 136/18 144/2 156/25 163/1 163/13 180/19 186/21 188/4 191/20 198/24 212/19 230/13 238/12 243/7 248/11 252/13
backed [2] 160/18 162/18
background [8] 6/5 7/5 8/7 35/14 35/23 47/22 224/12 225/7
balance [2] 21/11 21/14
ballpark [1] 220/6
bank [9] 21/11 61/20 177/7 177/17 178/1 179/12 180/4 180/8 182/19
base [1] 14/8
based [65] 3/25 22/11 22/14 48/4 48/23 49/4 49/21 50/7 50/19 50/22 62/3 65/2 66/2 89/11 94/6 94/20 96/16 103/6 103/11 110/1 110/6 111/15 112/7 113/13 119/7 132/11 136/24 137/13 138/23 140/20 142/7 142/8 150/12 152/10 153/5 153/8 155/20 155/25 156/4 158/14 160/25 162/14 164/2 166/22 167/17 168/5 174/24 181/1 182/23 185/19 186/4 194/11 194/17 197/22 200/24 201/11 202/4 202/4 204/7 205/10 205/25 206/24 214/17 219/21 236/23
basic [2] 88/3 215/23
basically [15] 62/18 152/7 152/9 157/19 163/2 164/11 165/13 190/9 204/3 231/12 233/8 247/11 248/5 250/6 253/3
basis [20] 17/13 30/8 41/15 48/22 51/7 51/8

54/11 67/11 68/16 73/25 75/8 75/23 79/6 116/8 121/15 140/3 150/21 167/9 232/9 242/19
Beach [2] 1/7 1/19
bear [2] 77/18 78/18
became [2] 25/8 235/12
because [91] 10/5 16/13 21/24 24/17 25/20 29/2 30/9 32/10 42/22 46/17 47/1 47/6 48/1 51/10 58/10 58/25 59/18 59/21 60/10 62/23 64/25 68/5 69/1 70/25 71/4 71/9 73/24 75/7 76/23 80/25 81/3 81/21 83/13 84/24 86/5 86/12 88/7 89/21 93/7 94/10 94/25 96/7 98/16 99/13 102/23 102/25 103/4 105/21 106/5 110/23 112/14 116/4 118/4 120/20 121/14 126/5 130/4 132/22 138/14 139/7 140/5 149/24 157/22 158/24 160/25 196/18 200/4 200/9 201/4 204/17 206/23 207/1 209/16 212/10 215/3 215/16 215/18 216/5 216/12 216/19 219/4 219/12 228/19 229/10 231/18 232/23 237/12 244/12 246/13 246/21 247/13
because of [1] 215/16
Becker [34] 35/5 35/7 35/10 35/11 35/14 35/17 39/22 41/18 56/15 59/10 77/1 89/23 90/2 91/24 131/17 135/12 138/1 138/23 141/21 143/19 144/24 208/15 227/3 227/8 227/12 227/19 229/20 230/1 231/11 237/22 239/3 239/9 240/21 254/7
Becker's [7] 142/14 227/13 227/23 229/14 233/20 234/7 240/7
Beckring [2] 177/24 178/24
before [94] 1/12 6/24 10/4 12/6 12/10 12/12 12/12 12/19 16/16 22/12 23/6 23/10 23/11 23/20 23/22 24/4 24/15 25/4 25/8 25/16 26/4 27/9 28/1 28/3 32/8 39/8 40/8 51/22 57/5 69/18 69/24 73/2 81/17 85/11 85/12 92/23 92/24 95/7 102/8 113/22 114/8 120/8 120/16 120/19 120/21 121/5 121/9 122/20 123/18 123/19 123/24

**B**

**before... [43]** 125/1
125/5 137/24 138/1
138/2 138/3 138/13
138/15 140/7 142/22
145/15 145/18 147/4
164/18 164/22 164/23
164/24 165/5 165/9
165/14 187/19 195/15
205/14 208/8 208/16
208/20 209/2 209/16
210/3 216/9 223/13
223/17 224/13 225/8
225/24 228/13 228/20
229/6 229/15 236/1
236/20 236/25 245/16
**beforehand [1]** 121/23
**began [2]** 122/8 234/4
**begin [7]** 17/2 37/16
52/10 136/19 136/20
167/21 187/19
**beginning [8]** 10/20 19/9
23/13 28/3 28/4 37/18
43/22 233/7
**behalf [1]** 226/8
**being [13]** 10/18 13/1
16/7 34/9 98/19 106/21
132/18 137/21 164/6
172/20 178/22 178/23
244/9
**believe [36]** 12/10 13/4
14/9 27/6 27/10 73/1
83/17 95/20 100/16
107/7 111/11 123/15
149/10 151/25 166/8
174/13 177/17 178/2
182/18 185/8 186/18
187/6 191/8 194/16
195/13 198/15 204/7
208/14 215/9 216/21
217/18 220/4 241/9
242/4 243/18 245/6
**believed [2]** 20/2 94/20
**bell [1]** 33/4
**below [5]** 55/6 79/15
79/17 158/17 161/4
**beneficial [2]** 178/14
178/16
**benefit [3]** 4/16 218/22
219/9
**benefited [1]** 218/25
**benefits [1]** 72/6
**Benjamin [2]** 2/10 3/12
**besides [1]** 246/12
**best [7]** 90/23 98/20
99/2 101/2 101/4 240/1
242/6
**better [5]** 35/21 100/10
147/24 191/25 219/4
**between [57]** 40/8 40/16
49/14 51/18 53/13 54/5
55/10 55/19 64/3 64/9
67/20 67/24 68/12 68/19
71/16 76/5 77/25 78/2
78/20 79/19 80/9 80/14
82/25 85/22 86/2 90/11

102/1 102/1 102/5 109/5
109/5 114/7 115/6
117/23 118/3 123/15
124/13 133/4 133/13
133/18 133/25 134/3
150/21 154/7 161/11
161/15 163/5 188/12
198/2 207/1 207/24
210/10 219/18 234/3
236/13 240/8 242/1
**beyond [5]** 21/18 144/22
145/4 214/21 232/6
**bias [2]** 103/1 103/5
**bid [5]** 25/2 27/25 88/15
88/16 232/15
**bid-ask [3]** 88/15 88/16
232/15
**big [3]** 240/4 249/9
249/10
**bigger [1]** 46/25
**binder [6]** 9/16 13/9
14/18 37/6 37/17 37/18
**binders [3]** 31/13 177/7
177/8
**bit [15]** 11/16 18/25 19/5
22/4 43/23 50/8 74/4
102/11 123/10 130/20
154/3 188/23 195/2
209/25 248/2
**black [5]** 53/1 53/15
53/18 53/20 53/25
**Blind [3]** 184/11 184/21
194/9
**block [1]** 23/21
**blocks [1]** 24/10
**Bloomberg [5]** 43/12
137/13 140/21 140/25
235/19
**blow [2]** 102/10 205/2
**blue [14]** 21/12 30/22
43/24 63/23 107/7
147/13 150/10 154/8
158/14 158/20 168/4
189/24 190/9 249/17
**board [2]** 206/9 207/12
**body [1]** 22/1
**book [2]** 27/19 247/11
**books [3]** 248/1 249/24
249/25
**borrow [6]** 58/18 61/7
61/8 61/10 62/4 62/25
**borrowed [7]** 59/22
59/25 60/7 61/11 61/23
61/24 90/12
**borrows [1]** 61/22
**both [29]** 13/1 21/7 42/6
54/18 56/8 79/15 79/17
83/1 85/11 85/12 98/17
98/18 108/1 108/8
108/17 111/16 117/12
148/1 161/4 162/25
164/22 220/19 226/3
226/14 226/19 229/7
229/7 230/6 247/19
**bottom [21]** 9/23 55/12
68/5 73/13 77/16 79/25

88/24 88/21 174/14
178/11 178/11 185/10
186/17 186/20 186/24
186/25 187/11 192/15
193/14 207/15 225/25
**bought [26]** 10/18 61/3
91/7 91/7 91/9 103/7
156/13 157/23 161/3
161/4 164/22 164/23
165/3 165/4 165/5 168/6
189/12 190/11 190/13
202/2 207/2 209/11
228/25 229/7 245/14
245/18
**box [2]** 187/9 187/11
**break [6]** 38/12 69/24
131/3 187/19 223/16
251/20
**break-even [1]** 38/12
**breaking [1]** 154/3
**brief [2]** 145/1 187/15
**briefly [7]** 4/10 30/16
69/11 143/14 184/13
218/1 221/11
**bring [2]** 23/17 177/8
**bringing [1]** 157/1
**brings [1]** 158/17
**broad [17]** 185/24
188/23 191/12 191/21
194/23 195/18 196/13
199/25 204/9 204/11
204/20 211/18 211/23
213/12 215/22 217/13
217/20
**broadcast [1]** 135/2
**broader [1]** 200/5
**broker [3]** 70/21 70/22
90/18
**broker-dealer [1]** 90/18
**brokerage [8]** 61/1 61/2
61/19 62/14 72/24
154/12 177/16 225/13
**brokers [1]** 129/7
**brother [1]** 9/8
**brothers [1]** 9/5
**brought [2]** 157/5
237/20
**Bryan [2]** 19/2 215/1
**BS [1]** 25/9
**bucket [1]** 152/9
**built [1]** 110/6
**bullet [3]** 62/17 65/5
225/25
**bunch [1]** 94/4
**business [18]** 9/4 10/22
12/4 12/5 13/1 14/3 16/5
16/5 16/11 19/6 25/6
25/21 25/23 35/25 46/18
47/2 58/20 59/3
**buy [11]** 59/22 59/24
60/5 60/16 61/3 61/16
70/25 71/1 129/8 157/22
164/19
**buyer [4]** 71/4 87/10
117/9 117/12
**buyers [5]** 32/22 129/8

147/25 148/7 213/10
**buyers-only [2]** 147/25
148/7
**buying [3]** 117/1 117/13
209/13
**buys [3]** 59/16 59/17
117/8

**C**

**C-h-y-h-e [1]** 35/10
**Caitlin [1]** 2/6
**Caitlyn [1]** 3/8
**calculate [34]** 34/7
34/11 40/3 40/13 40/14
44/19 49/19 49/21 94/1
94/2 94/3 94/5 95/7 98/7
103/10 125/2 147/19
148/19 155/19 166/23
167/5 168/2 168/16
189/9 192/16 192/17
193/12 202/3 202/6
209/6 210/2 219/21
226/23 228/1
**calculated [21]** 30/4
30/7 40/20 45/18 66/22
78/23 87/9 87/12 93/16
99/13 109/17 110/1
131/18 132/8 132/9
159/10 160/11 218/15
228/17 229/1 247/11
**calculating [6]** 47/7
50/24 92/21 94/6 94/21
103/11
**calculation [29]** 30/6
30/9 34/7 49/3 65/2 67/4
67/7 78/13 78/15 93/19
93/20 100/10 113/6
156/23 157/4 160/8
164/20 164/25 165/2
188/24 193/9 193/24
201/20 201/20 211/6
213/17 214/24 218/21
237/22
**calculations [50]** 29/20
29/25 30/1 30/3 48/24
147/8 147/12 148/6
150/4 150/5 150/9
151/11 151/13 152/2
152/5 152/23 154/5
156/10 157/8 159/11
159/12 161/24 162/1
162/7 163/17 165/20
165/25 166/7 166/12
168/13 182/7 182/17
182/23 185/1 186/2
186/4 186/7 186/19
189/22 196/6 213/20
214/20 218/13 219/4
220/24 221/4 228/17
228/24 234/13 245/21
**called [15]** 18/6 32/20
33/2 43/15 51/13 57/16
58/4 62/18 88/5 88/18
96/1 104/15 224/4
246/18 248/8
**calling [1]** 96/22

**calls [3]** 5/15 145/24
222/7
**came [19]** 9/20 24/20
32/21 38/23 45/2 46/11
74/12 89/11 89/21 97/11
197/15 197/16 201/20
211/13 215/11 245/1
250/10 250/16 250/18
**Campbell [2]** 104/15
104/18
**can't [22]** 11/19 14/13
18/8 46/19 62/5 72/19
99/18 106/4 117/12
117/13 120/22 121/17
130/14 191/10 195/18
203/9 213/16 232/19
232/23 239/11 239/25
241/25
**cannot [1]** 99/13
**cap [4]** 109/8 109/10
110/23 118/9
**capital [2]** 6/16 247/13
**captured [2]** 75/20
90/13
**Cardiac [1]** 32/20
**Carolina [1]** 224/19
**Carpenter [1]** 214/23
**carried [1]** 26/6
**Carter [15]** 170/1 170/1
170/5 170/7 170/9
170/14 184/3 192/12
192/16 193/11 193/21
**case [63]** 1/2 3/4 3/5
20/16 21/10 29/20 30/17
31/20 32/21 34/8 37/11
40/23 41/19 42/12 56/16
57/15 77/3 90/3 92/21
93/3 93/7 93/10 93/11
93/14 93/17 94/1 94/2
94/3 94/21 95/8 96/17
104/3 108/15 111/7
117/14 119/5 126/6
129/15 131/25 132/19
132/25 140/4 147/4
147/6 148/17 148/20
153/3 208/12 225/14
225/23 225/24 226/1
226/11 226/14 226/17
226/21 227/2 231/13
231/18 238/3 240/6
243/25 244/4
**cases [30]** 18/10 31/19
36/19 36/19 71/22
109/17 109/19 109/25
110/21 111/3 111/4
189/4 224/9 225/10
225/11 225/12 225/13
225/13 225/22 225/25
226/3 226/14 226/19
228/13 228/14 230/6
231/5 232/2 232/16
238/3
**cash [2]** 170/1 170/8
**categories [1]** 37/12
**causation [2]** 54/3 54/4
**cause [10]** 56/18 87/3

# C

**cause... [8]** 87/17 89/24 114/1 114/3 116/9 117/2 129/12 139/9
**caused [33]** 5/2 18/25 37/14 44/22 44/25 46/6 46/9 49/6 52/1 52/8 52/18 54/7 63/7 63/10 81/21 87/1 87/21 97/8 98/13 99/7 105/15 115/17 116/13 120/9 121/6 121/11 130/1 132/16 132/18 132/20 214/15 226/5 240/14
**causes [1]** 237/6
**causing [1]** 86/7
**cautious [1]** 76/24
**cent [8]** 17/20 120/20 157/13 157/15 158/6 212/5 245/2 245/8
**center [3]** 28/8 28/11 43/11
**cents [37]** 23/22 23/22 24/4 27/23 60/4 60/5 124/25 145/15 145/18 156/22 157/3 157/9 157/21 157/23 157/23 159/1 159/22 160/17 162/17 163/1 164/6 173/9 180/25 201/5 211/3 211/9 211/24 212/9 236/17 236/20 236/21 237/4 243/18 243/18 243/20 243/20 244/6
**certain [18]** 11/10 22/8 29/18 52/1 121/14 131/25 136/11 136/13 144/11 154/11 155/1 168/16 168/17 189/20 198/11 198/25 232/23 238/15
**certainly [12]** 23/12 24/22 105/6 115/25 117/21 118/8 130/6 137/23 220/9 222/4 228/13 248/20
**certainty [4]** 131/24 239/23 239/24 240/1
**certificate [13]** 172/8 172/18 173/2 175/25 176/7 176/12 176/19 176/20 179/9 179/24 179/25 180/4 256/8
**certificates [8]** 168/21 174/13 176/21 179/2 179/18 180/9 180/23 192/23
**Certified [1]** 256/10
**certify [1]** 256/10
**chairman [1]** 134/19
**challenge [1]** 143/1
**challenging [1]** 19/10
**chance [4]** 132/16 132/18 143/9 163/22
**change [18]** 56/17 56/17

56/18 75/4 80/21 82/21 82/22 82/23 110/14 122/22 122/25 149/19 153/19 161/2 206/4 210/1 243/16 244/24
**changed [2]** 87/12 204/10
**changes [1]** 64/17
**chapter [2]** 104/15 105/6
**characteristics [2]** 232/3 232/4
**characterization [1]** 20/9
**Charles [1]** 220/16
**chart [77]** 43/19 43/20 49/19 50/6 50/21 52/22 52/23 54/20 54/21 63/12 63/13 63/22 67/18 67/19 67/25 68/8 72/15 73/8 73/10 73/12 75/10 76/1 76/2 77/13 77/14 77/16 79/5 79/6 79/7 79/13 79/22 84/8 87/25 88/20 88/21 123/9 128/12 136/23 137/11 138/1 138/2 138/3 138/8 138/11 138/18 139/23 140/13 140/20 142/2 142/5 142/7 142/8 142/10 142/13 142/16 142/20 144/19 144/22 167/4 167/15 169/4 169/25 170/12 171/7 171/11 174/11 175/8 181/19 181/25 182/22 183/5 184/18 208/21 209/7 209/18 214/6 217/1
**charts [1]** 115/21
**Chase [1]** 21/11
**chat [8]** 40/23 43/14 45/4 46/12 119/15 119/20 119/20 119/22
**check [7]** 40/22 56/15 56/16 121/2 141/6 142/25 143/9
**checked [1]** 120/11
**checking [7]** 90/7 97/4 101/15 101/16 105/22 138/6 223/5
**checkmarks [1]** 133/22
**checks [11]** 56/19 57/11 69/8 69/12 69/19 82/11 82/15 83/10 84/5 133/17 133/20
**Chicago [1]** 35/24
**chief [4]** 36/4 134/20 140/4 224/23
**child [1]** 155/9
**children's [2]** 9/3 9/4
**chip [1]** 21/12
**CHM [1]** 32/20
**choose [2]** 50/21 216/25
**Chyhe [4]** 35/5 35/7 35/10 254/7

**circle [1]** 106/6
**Circuit [1]** 3/25
**circumstances [1]** 161/9
**cite [3]** 104/13 104/14 120/25
**cited [4]** 65/1 120/24 127/9 128/12
**citing [2]** 127/17 127/18
**civil [3]** 111/3 111/4 228/14
**claim [1]** 76/15
**clarify [2]** 10/23 117/4
**class [4]** 89/15 89/18 89/21 213/14
**classically [1]** 238/13
**clear [19]** 4/25 29/3 96/15 101/3 108/23 113/9 125/7 128/18 140/20 186/24 194/3 196/2 201/19 202/11 202/15 204/9 213/8 213/20 253/11
**clearly [2]** 28/25 35/19
**Clematis [1]** 1/19
**Clemens [5]** 176/14 179/9 180/9 180/23 184/7
**client [6]** 17/22 17/22 19/1 23/1 30/13 144/17
**clients [12]** 9/10 17/17 17/18 17/21 18/6 18/12 18/13 18/23 20/2 20/7 27/18 27/19
**close [5]** 17/13 23/24 202/6 240/7 244/6
**closed [5]** 75/1 91/15 150/23 210/17 210/19
**closely [1]** 53/17
**closer [5]** 6/9 7/11 72/7 78/17 99/17
**closing [53]** 40/8 40/9 48/21 102/17 124/4 124/6 125/3 147/15 148/13 150/11 150/13 151/5 153/12 153/13 156/21 159/16 160/9 160/16 160/16 160/17 161/1 162/16 162/25 168/22 168/22 173/7 174/24 175/1 180/22 181/1 196/25 197/7 197/9 197/12 200/14 201/25 202/3 202/4 202/7 202/9 202/19 202/20 205/25 206/6 207/2 207/7 210/10 210/12 215/4 216/5 218/17 218/19 236/20
**coefficient [2]** 55/3 68/18
**coincides [2]** 120/13 139/8
**coinciding [1]** 23/12
**colleague [1]** 3/14
**colleagues [1]** 93/8
**collective [1]** 83/21

**colossal [1]** 91/2
**column [19]** 48/21 49/8 49/10 49/13 54/22 54/22 55/18 55/19 56/6 56/7 75/3 75/3 75/4 75/13 76/1 88/13 150/24 163/2 208/2
**column 3 [3]** 56/6 56/7 208/2
**columns [1]** 162/11
**combination [1]** 97/9
**combine [3]** 56/9 155/8 155/14
**combining [1]** 163/22
**comes [5]** 76/9 101/15 104/23 232/14 243/24
**coming [2]** 9/13 246/4
**comment [1]** 14/4
**comments [1]** 7/5
**Commission [9]** 11/3 36/6 75/16 77/11 137/17 139/22 141/17 141/18 224/24
**common [6]** 84/2 85/25 110/20 110/24 230/19 243/22
**commonly [1]** 88/5
**community [3]** 7/23 22/20 27/4
**companies [7]** 6/25 10/19 46/22 46/25 64/22 117/24 249/4
**company [57]** 7/8 8/11 8/13 8/17 9/15 10/22 11/19 12/14 13/1 14/3 16/15 16/24 21/4 21/16 22/2 22/3 22/12 27/3 28/6 32/20 33/2 34/3 38/11 38/11 44/6 46/18 46/19 46/21 46/22 47/5 47/6 76/12 82/20 88/8 90/14 106/12 126/22 127/14 128/5 128/7 151/25 168/11 177/22 224/4 224/7 232/4 232/10 232/11 234/21 247/9 247/17 247/18 247/25 248/5 248/7 250/2 251/7
**company's [7]** 26/22 47/15 76/13 76/18 76/23 134/19 135/9
**comparable [5]** 88/22 88/25 89/2 89/13 118/8
**compare [16]** 44/19 65/12 96/15 96/21 112/9 171/10 179/11 179/17 180/1 182/7 183/9 183/16 214/6 226/10 240/20 248/19
**compared [4]** 88/24 89/13 175/6 215/12
**compares [1]** 72/17
**comparing [1]** 67/4
**comparison [5]** 66/2 117/23 118/2 205/25

**colossal [1]** 218/10
**complete [2]** 32/11 144/23
**completed [1]** 135/11
**completely [7]** 11/23 51/9 109/23 122/6 157/25 231/14 231/23
**complex [1]** 224/10
**complicated [2]** 61/25 130/21
**computer [1]** 223/17
**computers [1]** 61/18
**concept [4]** 51/1 51/3 132/6 135/12
**concerned [1]** 77/9
**conclude [9]** 44/21 54/4 66/2 105/14 121/17 121/20 233/17 236/23 237/11
**concluded [7]** 45/22 46/4 52/8 80/13 87/16 89/7 89/18
**conclusion [31]** 25/13 27/13 41/23 78/18 85/19 89/10 89/11 89/20 89/21 101/12 115/15 116/3 116/9 119/22 120/9 121/6 126/1 127/4 128/21 129/25 130/2 130/21 131/24 139/9 201/7 232/19 237/1 241/6 241/25 251/9 251/16
**conclusions [9]** 31/21 32/24 33/8 33/15 52/7 66/10 106/21 194/19 235/4
**Concurrent [1]** 18/22
**condition [1]** 76/15
**conduct [12]** 41/4 51/22 51/25 54/10 56/19 68/11 69/8 80/3 92/13 105/25 133/21 231/8
**conducted [3]** 42/12 84/5 234/12
**conducting [10]** 36/9 40/1 40/2 42/2 42/16 43/8 45/2 83/10 94/25 103/14
**conduit [1]** 23/2
**conference [5]** 12/13 23/13 23/13 24/18 26/5
**conferred [1]** 4/17
**confidence [21]** 41/16 41/17 41/22 42/14 44/8 100/11 100/25 131/19 131/23 132/5 132/14 132/21 132/22 133/1 133/3 239/2 239/4 239/14 240/4 240/8 241/21
**confident [1]** 241/16
**confirm [9]** 57/1 69/19 84/5 170/13 171/11 171/25 190/3 190/6 194/4

**C**

**confirmation [3]** 39/9 121/2 178/21
**confirmed [4]** 134/18 171/25 175/8 182/10
**confirming [3]** 130/5 133/18 194/5
**confound [1]** 246/22
**confounding [6]** 97/13 97/14 97/18 126/14 130/10 246/18
**confused [1]** 112/8
**confusion [1]** 5/2
**connect [1]** 28/21
**connected [2]** 132/5 155/2
**connection [7]** 141/24 142/14 148/2 169/22 171/4 182/7 186/8
**consecutive [1]** 236/15
**conservative [7]** 155/12 155/15 157/4 165/10 219/20 244/9 251/1
**consider [10]** 42/15 54/16 56/21 56/23 68/14 82/14 95/13 233/1 234/16 250/3
**considerable [1]** 91/4
**consideration [1]** 252/21
**considered [7]** 54/18 56/8 56/24 68/15 230/17 235/7 238/8
**considering [1]** 224/25
**consistent [8]** 50/18 113/6 130/6 139/5 153/2 161/13 181/25 228/19
**consistently [1]** 198/14
**consists [1]** 53/7
**constant [4]** 111/24 112/2 113/13 198/4
**consternation [1]** 18/25
**constitute [2]** 135/25 136/8
**constitutes [2]** 136/16 242/10
**consult [1]** 217/8
**consultant [1]** 144/17
**consulting [2]** 224/5 224/8
**Cont.'d [1]** 256/2
**contact [1]** 13/6
**contacted [3]** 7/19 8/9 16/18
**contained [1]** 31/13
**content [4]** 135/2 235/4 236/2 242/9
**context [5]** 36/10 36/11 42/1 48/25 61/10
**continue [1]** 70/11
**continues [1]** 90/17
**contract [11]** 85/2 85/4 85/6 85/8 85/15 86/1 86/4 86/4 86/6 86/10 86/10
**contracts [1]** 135/5
**contrast [1]** 242/25

**contributed [1]** 40/25
**conversation [2]** 14/1 22/14
**conversations [1]** 22/15
**conversely [2]** 54/1 60/13
**convey [1]** 72/6
**convinced [3]** 8/6 231/16 231/21
**coordinated [6]** 24/8 24/9 24/17 24/23 24/24 25/16
**coordination [1]** 25/5
**copied [1]** 194/6
**copies [2]** 28/22 137/2
**copy [5]** 179/25 223/5 223/6 223/10 223/14
**correct [265]**
**corrected [1]** 241/18
**correction [2]** 19/9 230/21
**corrective [49]** 43/25 102/4 118/20 119/3 119/6 119/23 122/10 124/21 125/10 126/1 134/10 135/13 135/15 135/16 135/21 135/22 135/25 136/8 136/14 208/11 208/16 209/2 209/16 210/4 210/5 210/7 211/10 212/22 213/9 213/15 216/9 216/10 229/16 230/23 234/14 234/17 235/7 235/9 237/12 237/18 241/5 241/7 241/7 242/3 242/7 242/11 242/20 243/1 245/19
**correctly [8]** 8/22 51/6 127/2 212/6 213/17 227/16 228/9 234/13
**correctness [1]** 142/24
**correlated [4]** 42/23 53/21 53/21 80/7
**correlates [1]** 44/9
**correlation [24]** 53/13 54/4 54/5 54/15 55/10 55/17 55/22 56/1 64/2 67/20 67/24 68/2 68/9 68/11 68/19 71/18 76/5 77/25 78/2 79/19 79/21 79/23 115/9 116/8
**corresponds [1]** 142/11
**corroborated [1]** 227/24
**cost [6]** 17/13 153/19 159/17 165/8 165/15 206/24
**costs [1]** 248/7
**Cottingham [5]** 2/6 3/9 254/12 254/15 254/17
**couldn't [6]** 18/17 23/11 27/17 117/8 118/4 198/11
**counsel [6]** 3/7 4/17 70/10 118/15 137/2 188/5

**counsel's [2]** 119/7 186/24
**count [2]** 81/12 81/23
**counted [1]** 74/22
**counter [1]** 84/14
**counts [1]** 81/5
**couple [5]** 17/21 41/25 66/14 189/7 243/5
**course [13]** 11/25 25/10 34/13 35/3 40/10 103/4 126/9 128/19 149/8 181/17 185/6 227/1 243/10
**court [11]** 1/1 1/18 3/1 14/13 23/16 32/5 129/19 137/3 149/12 177/9 225/24
**Court's [9]** 19/12 30/11 33/21 90/6 139/11 149/8 184/12 221/11 223/16
**courtroom [4]** 95/10 95/11 145/9 208/14
**courts [4]** 106/8 106/10 106/15 106/18
**cover [3]** 188/21 225/5 232/14
**coverage [2]** 8/18 20/21
**covered [2]** 16/13 164/4
**covering [1]** 17/9
**CPAC [1]** 188/18
**CPE [1]** 1/18
**CR [2]** 1/2 3/6
**cratered [1]** 14/10
**Cravath [3]** 2/10 2/13 3/13
**create [3]** 48/4 193/25 194/1
**created [3]** 48/7 100/19 174/1
**creating [1]** 174/10
**credible [1]** 20/18
**credit [10]** 156/17 157/15 158/4 158/6 159/23 160/18 163/1 165/14 165/19 201/5
**credited [2]** 156/25 157/12
**criminal [7]** 2/3 2/7 146/16 146/17 146/21 188/16 188/18
**crisis [6]** 52/10 52/12 52/14 52/15 52/16 52/17
**critical [1]** 44/18
**criticism [2]** 41/21 78/9
**cross [18]** 19/17 19/18 32/14 91/20 91/22 141/6 143/6 149/21 187/20 188/6 188/8 218/8 219/22 220/4 222/5 254/5 254/9 254/16
**cross-examination [9]** 19/17 19/18 91/20 91/22 187/20 188/8 218/8 219/22 220/4
**cross-examine [3]** 141/6 149/21 188/6

**cross-examined [1]** 143/6
**crossed [2]** 92/24 245/11
**CRR [2]** 1/18 256/16
**culled [1]** 155/20
**cumulative [6]** 73/25 74/22 75/8 75/23 76/2 108/9
**current [8]** 6/14 36/3 146/15 204/11 204/14 204/17 226/1 226/14
**currently [1]** 38/10
**CUSIP [1]** 180/7
**CUSIPs [2]** 179/17 179/19
**customer [2]** 152/10 189/13
**customers [1]** 154/11

**D**

**daily [19]** 41/15 48/22 50/17 67/20 67/21 67/24 67/25 68/3 68/6 69/13 79/6 82/19 88/2 88/4 88/6 88/9 88/11 150/21 232/9
**damages [2]** 109/16 110/1
**dampens [1]** 71/23
**data [45]** 30/23 36/12 43/11 43/12 68/8 75/11 75/20 78/17 118/4 120/11 136/25 137/6 137/7 137/8 137/12 138/3 138/8 138/16 138/20 138/23 140/2 140/15 140/21 140/23 141/5 142/9 143/12 147/2 147/13 148/7 150/10 154/9 156/19 158/14 158/20 168/4 186/12 189/20 189/24 189/24 190/9 191/5 235/20 246/9 253/3
**databases [1]** 137/9
**date [100]** 26/20 39/11 40/3 40/17 40/25 44/5 45/6 45/17 45/23 46/1 60/20 60/21 60/22 60/22 60/23 60/24 60/25 61/13 72/11 72/17 72/17 72/19 72/21 72/23 73/5 73/6 73/20 75/12 75/14 81/18 81/18 81/19 81/19 81/24 82/2 82/3 82/3 82/7 82/9 82/22 83/18 94/8 94/13 97/5 101/22 105/14 105/15 107/22 109/6 109/6 111/10 112/18 112/23 113/16 113/18 113/19 113/22 115/17 123/15 124/15 124/25 132/20 134/12 153/13 153/14 156/17 156/21 156/22 157/3 157/7 158/16 168/23 172/17

**173/8** 173/11 174/24 176/7 176/19 176/21 178/25 180/22 200/14 208/13 210/7 215/6 228/21 228/21 230/7 230/8 230/9 230/11 230/20 230/23 236/10 240/21 245/17 249/19 249/19 250/13 251/6
**Dated [1]** 256/13
**dates [24]** 37/13 42/13 43/6 43/17 43/24 43/24 48/20 48/23 50/20 78/15 78/16 85/11 85/12 109/5 152/1 152/2 152/3 166/6 168/21 196/15 201/12 216/21 216/21 227/17
**David [2]** 2/18 3/18
**day's [1]** 83/2
**day-to-day [7]** 41/6 41/7 67/11 68/16 80/7 98/8 132/2
**Daylight [2]** 134/22 136/20
**days [39]** 12/11 12/12 22/12 50/9 50/10 50/13 56/24 60/24 66/16 66/23 66/25 72/20 72/22 74/9 75/1 87/6 87/7 87/11 87/12 87/13 87/14 88/18 88/18 124/14 124/25 125/14 125/22 131/18 189/5 207/3 236/13 236/15 236/22 237/4 237/21 238/2 244/4 244/8 245/2
**DC [5]** 2/5 2/9 146/12 224/6 224/21
**deal [1]** 140/18
**dealer [1]** 90/18
**dealers [2]** 70/21 70/22
**dealing [1]** 209/9
**debate [1]** 4/13
**decade [1]** 11/8
**December [4]** 7/16 7/16 8/5 248/22
**decide [3]** 83/22 149/22 252/21
**decided [3]** 11/23 18/4 25/3
**deciding [1]** 11/5
**decision [8]** 7/3 11/17 20/13 200/6 200/8 200/9 204/23 207/5
**decisions [1]** 6/24
**decline [42]** 37/15 45/19 52/1 52/8 52/18 54/8 63/8 63/10 64/15 71/8 71/11 71/12 71/14 81/21 87/1 87/3 87/17 87/21 89/4 89/7 89/24 97/11 101/19 115/2 116/9 116/13 133/25 134/3 138/24 139/3 139/10 142/16 234/4 236/3 236/19 241/19 241/20

**D**

**decline... [5]** 243/22
244/6 244/17 245/2
245/8
**declined [5]** 76/23
101/21 139/1 233/8
244/5
**declines [5]** 78/4 86/8
101/17 101/22 236/19
**declining [2]** 63/19
77/23
**decrease [8]** 46/6 76/15
76/17 102/7 114/15
114/23 242/2 242/18
**decreased [1]** 76/14
**deem [1]** 50/15
**deeper [2]** 8/11 9/12
**defendant [10]** 1/7 2/10
3/13 4/16 31/3 137/6
148/20 182/14 182/23
187/6
**defendant's [6]** 29/16
31/8 180/11 195/9
222/11 256/3
**defense [23]** 4/4 4/17
5/12 29/11 31/17 31/23
32/9 34/23 34/25 36/25
66/5 96/5 105/3 122/18
137/2 141/1 142/21
142/23 143/7 149/21
191/6 222/7 225/1
**defense's [1]** 140/22
**deficiency [2]** 114/12
115/3
**define [2]** 63/20 200/25
**defined [1]** 54/7
**definition [1]** 247/14
**degree [4]** 6/6 36/1
224/14 240/1
**delay [3]** 56/24 85/22
85/24
**delisted [1]** 52/25
**deliver [85]** 58/5 61/2
72/11 72/20 72/23 72/24
72/25 73/5 73/10 73/20
73/21 73/22 73/24 73/25
74/5 74/6 74/14 74/17
74/19 74/20 74/21 74/24
74/25 75/1 75/3 75/5
75/7 75/11 75/23 75/25
77/6 77/15 77/15 77/19
77/20 78/5 78/6 78/12
78/16 78/22 79/3 79/9
79/10 79/11 79/14 79/20
80/6 80/10 80/14 80/21
81/4 81/5 81/6 81/7 81/8
81/10 81/12 82/3 82/17
82/18 82/19 82/21 82/23
82/24 83/4 83/4 83/4 83/17
83/19 90/8 90/10 90/14
90/14 90/16 90/17 91/1
91/2 91/5 116/9 133/5
133/6 133/10 133/13
133/19 133/25 134/3
**delivered [2]** 74/3 91/3
**deliveries [1]** 13/2

**delivering [1]** 82/5
**delivers [1]** 75/22
**delivery [4]** 26/1 73/5
74/7 74/8
**Delnido [2]** 2/13 3/14
**delta [3]** 110/13 210/10
212/10
**demand [2]** 48/2 158/25
**demonstrative [1]** 223/8
**Department [2]** 2/4 2/8
188/13 188/19
**depend [2]** 97/10 204/15
**depends [4]** 21/9 113/16
113/18 244/21
**depict [1]** 170/17
**depicted [1]** 172/2
**deposit [2]** 62/22 178/25
**deposited [2]** 178/22
178/23
**depreciation [1]** 129/6
**depress [1]** 129/9
**depression [1]** 19/10
**depressive [1]** 117/2
**derived [2]** 197/19 219/9
**describe [23]** 67/19 71/5
87/24 96/3 195/11 199/2
233/4
**described [7]** 26/10
74/10 95/8 113/6 152/19
162/8 163/17
**describing [5]** 18/12
45/7 45/11 110/22
196/10
**description [2]** 132/7
242/15
**despite [1]** 101/13
**destroy [1]** 18/25
**detail [3]** 50/8 59/11
229/22
**detailed [1]** 143/21
**detailing [2]** 12/13 12/25
**detecting [1]** 128/2
**determination [8]** 45/1
45/2 46/10 46/11 87/5
98/10 98/13 98/15
**determine [31]** 41/5
41/12 51/25 63/21 68/11
84/19 85/14 87/20 88/23
89/4 89/15 92/13 96/25
100/22 106/9 106/18
111/17 114/23 115/10
130/14 145/5 152/11
158/8 160/19 161/6
226/15 230/1 231/13
233/17 242/6 242/17
**determined [10]** 42/3
42/5 85/17 104/1 111/15
130/15 130/17 153/21
174/24 243/14
**determining [3]** 152/17
191/19 231/24
**devastating [1]** 19/7
**developed [2]** 76/10
230/5
**deviation [1]** 99/18
**didn't [43]** 8/6 18/25

25/5 28/3 28/13 32/24
42/20 42/24 42/25 62/7
80/25 80/25 81/2 83/12
84/23 91/3 95/23 96/3
96/6 103/16 107/2
109/23 111/19 112/13
113/17 116/18 119/22
123/6 140/11 149/24
156/18 157/22 164/19
185/19 189/17 194/12
194/19 204/14 213/25
216/12 216/14 216/17
234/16
**difference [23]** 40/8
40/16 49/14 75/2 101/23
132/9 153/17 161/11
161/15 163/5 166/8
198/1 198/3 205/23
207/24 211/2 211/25
212/1 212/11 212/12
212/16 219/7 242/1
**different [47]** 36/8 41/6
41/25 42/3 43/15 46/25
47/1 62/1 66/14 67/8
67/9 67/13 67/16 68/1
69/23 70/15 71/6 79/7
87/7 90/19 93/10 94/4
102/24 103/11 147/20
148/14 148/15 149/14
152/8 153/9 153/16
161/3 165/3 206/2 206/9
207/12 209/11 209/13
224/18 227/16 238/11
238/14 238/19 238/25
239/11 239/13 239/25
**diligence [2]** 6/25 8/12
**dire [4]** 142/22 143/16
144/8 254/13
**direct [15]** 5/24 35/12
141/14 146/7 218/14
218/20 222/4 223/1
251/21 252/5 254/4
254/8 254/12 254/15
254/19
**direction [6]** 48/7 68/22
68/23 135/5 141/23
142/14
**directional [1]** 103/1
**directly [5]** 35/18
171/12 183/16 192/15
193/3
**director [2]** 36/4 146/19
**disagree [3]** 41/23 41/24
78/13
**disagreed [1]** 18/3
**disagreeing [1]** 186/15
**disappointed [4]** 16/2
25/19 25/22 26/8
**disc [2]** 177/11 177/13
**disclosed [9]** 44/5 110/5
140/12 140/24 228/15
229/12 230/12 231/19
235/14
**discloses [1]** 234/24
**disclosure [67]** 45/25
109/21 110/2 118/20

119/1 119/6 119/23
122/10 124/21 125/10
135/15 135/16 135/19
135/22 135/25 136/7
136/8 136/14 144/12
144/13 144/14 144/15
208/11 208/16 209/3
209/16 210/4 210/5
210/8 211/10 212/22
213/9 213/15 215/7
216/9 216/10 228/21
229/3 229/6 229/16
230/18 230/23 231/21
232/20 232/21 234/14
234/17 235/7 235/9
237/2 237/12 237/18
238/7 241/5 241/7 241/8
242/3 242/7 242/11
242/20 243/1 243/15
243/17 245/19
**disclosures [8]** 43/25
102/5 118/15 135/21
228/21 242/5 247/1
247/4
**disconnected [2]** 121/18
121/20
**discovery [4]** 71/22 72/5
252/17 252/22
**discrepancy [2]** 181/14
207/1
**discuss [2]** 31/21 195/25
**discussed [4]** 130/3
190/1 192/4 193/5
**discussing [6]** 139/23
144/2 151/21 165/20
178/21 180/6
**discussion [2]** 46/12
234/19
**discussions [1]** 45/4
**dishwasher [5]** 58/23
59/4 59/5 59/6 70/23
**dishwashers [1]** 58/21
**dispute [1]** 226/17
**disseminate [1]** 76/21
**distinguish [1]** 57/12
**distinguishable [1]**
41/13
**distribute [1]** 85/7
**distribution [4]** 50/6
50/17 132/12 132/13
**distributions [1]** 79/17
**DISTRICT [3]** 1/1 1/1
1/13
**dive [3]** 23/7 23/9 23/12
**divided [7]** 67/12 82/18
82/19 82/23 82/24 88/7
132/9
**dividend [1]** 91/5
**dividends [3]** 91/6 91/6
91/11
**division [5]** 2/3 2/7 36/4
36/5 36/8
**Dobson [1]** 220/16
**doctor [6]** 70/2 131/5
131/12 137/24 139/16

223/19
**document [20]** 14/21
75/18 75/20 172/7
173/25 174/1 175/24
178/19 178/20 178/21
179/8 179/12 179/23
191/16 191/17 192/6
193/25 194/6 197/4
243/4
**documents [9]** 10/12
90/15 177/16 177/18
178/1 194/8 194/11
252/22 252/23
**does [70]** 31/16 40/6
40/17 43/19 48/25 49/8
52/21 54/3 54/20 59/15
62/10 63/12 67/15 67/17
72/11 72/23 72/24 73/5
75/22 77/12 77/18 79/4
81/14 90/12 94/17 108/4
109/2 115/16 121/5
122/22 122/25 130/25
135/22 142/10 142/13
150/20 151/3 163/16
163/18 164/1 166/6
167/15 169/25 170/17
170/19 171/7 172/20
172/21 180/4 180/7
182/22 182/24 191/4
191/15 195/11 207/17
215/1 220/21 221/18
224/7 228/10 231/22
238/9 239/21 241/11
247/24 248/14 248/17
248/19 249/13
**doesn't [17]** 33/4 40/18
61/11 66/22 84/2 85/13
90/24 91/8 99/7 108/4
121/8 128/19 141/1
214/23 231/5 234/21
242/11
**doing [17]** 62/11 104/10
105/21 106/25 114/24
144/3 148/5 186/4
189/16 190/15 192/10
192/12 195/18 195/19
207/10 232/6 244/20
**DOJ [2]** 225/20 226/8
**dollar [10]** 17/13 23/23
30/9 59/15 59/19 84/15
112/2 113/13 175/1
194/1
**dollars [14]** 9/14 60/10
88/16 154/17 154/21
158/4 161/14 166/10
199/25 203/15 212/14
212/15 219/7 219/18
**dollars' [1]** 161/15
**don't [119]** 5/4 10/20
23/9 24/12 28/15 28/18
28/19 28/20 28/24 30/8
30/19 32/1 33/7 33/8
33/14 33/15 35/1 47/8
51/17 53/24 53/24 54/5
57/8 57/15 58/13 58/14
58/15 58/15 58/24 59/2

**D**

**don't...** [89] 59/4 61/12
61/17 67/23 68/7 69/24
71/1 73/19 74/12 74/20
78/13 78/18 79/11 79/21
93/23 95/6 95/12 96/3
100/12 100/15 107/5
107/8 108/20 109/10
109/11 109/11 110/18
111/6 112/17 113/13
117/15 117/17 119/2
120/1 122/17 127/3
127/10 128/17 129/22
144/21 145/8 149/20
185/15 186/1 186/17
186/15 186/1 187/10
187/23 191/14 191/14
192/17 192/25 193/4
197/1 198/6 198/8
198/21 199/8 202/17
205/1 208/4 208/14
210/13 211/6 213/24
215/2 215/20 216/2
217/4 217/14 217/15
219/10 221/21 223/6
223/10 223/13 223/18
228/9 233/14 234/5
235/24 237/16 238/7
241/9 242/4 246/13
248/2 253/11
**done** [22] 8/6 12/6 42/10
57/25 104/5 138/5
144/16 163/7 185/17
186/2 186/6 186/21
191/2 211/6 228/19
228/20 229/21 230/4
230/24 248/11 250/20
252/7
**dot** [1] 44/9 67/25 79/7
**dots** [8] 43/23 43/24
68/4 68/5 79/15 79/17
79/24 107/12
**double** [1] 73/24
**doubles** [1] 74/1
**doubt** [1] 222/4
**down** [34] 9/22 15/17
34/17 35/16 53/19 53/20
55/2 61/19 61/20 68/24
70/2 101/23 110/7 112/4
112/15 129/13 131/6
154/3 155/20 156/18
157/5 158/17 174/14
177/25 178/5 189/25
203/19 205/8 209/25
220/13 220/17 229/10
231/20 237/20
**downturn** [3] 52/11
52/13 52/18
**downward** [2] 54/1 80/1
**downwards** [1] 71/13
**Dr.** [69] 14/2 14/6 24/4
24/15 25/4 28/8 28/10
28/16 28/17 29/8 30/7
35/5 35/14 35/17 39/22
41/18 41/19 41/23 42/11
49/24 56/15 59/10 66/6

66/15 77/1 78/9 78/14
78/24 80/17 80/19 81/13
89/23 90/2 91/24 125/18
126/20 127/4 131/17
133/2 134/20 135/4
135/12 138/1 138/23
141/21 142/14 143/19
144/24 208/15 222/7
223/3 224/3 227/3 227/8
227/12 227/13 227/19
227/23 229/14 229/20
230/1 231/11 233/20
234/7 237/22 239/3
239/9 240/7 240/21
**dropping** [1] 23/22
**drops** [4] 79/2 114/5
203/19 203/23
**due** [37] 8/12 41/7 49/20
49/21 89/8 97/23 98/1
99/16 113/11 113/20
113/23 116/25 121/13
132/1 132/17 150/5
152/6 152/21 153/22
164/13 165/11 226/16
226/23 227/25 228/6
228/11 229/1 229/9
229/12 229/16 232/3
232/21 237/2 240/16
241/17 242/18 250/3
**Dura** [3] 111/7 112/24
112/25
**during** [112] 12/23
13/21 16/3 26/15 31/5
32/23 37/15 43/21 47/15
48/6 50/9 50/10 50/13
52/2 52/9 52/18 54/8
60/3 60/14 63/8 63/10
63/17 64/4 64/6 65/7
65/12 65/13 65/17 66/1
66/3 66/16 66/20 75/24
77/22 78/14 78/18 78/16
78/20 78/22 79/1 84/10
84/20 85/2 85/16 85/18
86/18 87/1 87/4 87/17
87/21 88/22 88/24 89/2
89/5 89/6 89/8 89/16
89/19 89/24 92/2 92/14
100/20 102/1 109/3
114/11 116/12 116/18
118/15 122/22 123/4
134/1 134/14 134/7 148/9
152/11 153/6 155/18
164/19 164/22 165/3
165/6 165/6 165/18
166/13 167/18 185/20
189/12 189/15 190/11
190/13 195/17 195/18
199/4 199/9 199/11
200/13 200/17 200/19
200/25 203/5 203/7
203/8 203/15 204/5
205/5 207/20 221/6
221/8 224/20 229/1
233/4 243/10
**duties** [1] 36/7
**DX69** [2] 29/5 29/12

125/23 125/23 138/12
139/7 140/6 210/7
210/10 210/25 211/20
212/4 213/13 228/21
228/23 237/7 237/16
237/17 240/21 241/4
241/10 244/12 249/10
249/22
**dropped** [14] 27/22
114/6 120/20 121/9
125/11 145/14 145/17
212/5 237/13 237/19
241/1 243/17 243/20
249/24
**dropping** [1] 23/22
**Dr. Becker** [29] 35/14
35/17 39/22 41/18 56/15
59/10 77/1 89/23 90/2
91/24 131/17 135/12
138/1 138/23 141/21
143/19 144/24 208/15
227/3 227/8 227/12
227/19 229/20 230/1
231/11 237/22 239/3
239/9 240/21
**Dr. Becker's** [7] 142/14
227/13 227/23 229/14
233/20 234/7 240/7
**Dr. Chyhe** [1] 35/5
**Dr. Drakulich** [2] 28/8
28/10
**Dr. Edward** [1] 222/7
**Dr. Harmison** [9] 14/2
14/6 24/4 24/15 25/4
28/16 28/17 29/8 135/4
**Dr. Harris** [1] 30/7
**Dr. Hayter** [3] 41/19
66/15 78/24
**Dr. Hayter's** [5] 41/23
49/24 66/6 78/9 78/14
**Dr. Lowell** [1] 134/20
**Dr. O'Neal** [5] 42/11
127/4 133/2 223/3 224/3
**Dr. O'Neal's** [2] 125/18
126/20
**Dr. Shapiro** [2] 80/17
80/19
**Dr. Shapiro's** [1] 81/13
**Drakulich** [2] 28/8
28/10
**dramatically** [1] 77/21
**draw** [6] 32/24 130/2
194/19 232/19 241/6
241/25
**drawing** [4] 33/8 33/15
201/6 237/1
**drawn** [5] 116/3 128/3
128/21 188/22 235/4
**draws** [1] 115/15
**drew** [2] 63/25 125/25
**drill** [1] 195/2
**driving** [1] 68/24
**drop** [36] 24/3 24/15
109/22 110/17 114/1
114/3 114/4 115/18
120/10 121/5 121/7
121/11 123/14 124/22

**DX70** [2] 30/21 31/2
**DX73** [2] 195/5 198/24

**E**

**e-mail** [15] 1/20 14/22
15/7 15/9 15/12 15/14
15/25 16/1 16/12 16/15
29/7 195/3 195/11 196/2
223/10
**e-mails** [2] 144/2 144/5
**E-r-i-n** [1] 141/13
**each** [34] 21/9 31/12
53/21 53/22 55/5 67/25
74/24 79/7 87/10 100/19
103/12 133/22 150/23
151/6 152/9 152/14
152/17 159/15 162/12
162/20 167/16 167/20
174/22 181/4 189/9
189/13 190/17 194/10
207/19 220/24 228/25
238/2 250/14 251/2
**earlier** [19] 108/24
115/3 120/4 122/21
129/5 130/3 130/5 130/6
138/5 138/8 150/11
159/21 179/24 189/13
193/5 205/16 205/20
245/11 249/23
**early** [3] 28/13 224/17
252/7
**earnings** [18] 47/5 47/6
47/8 71/24 127/1 127/5
127/13 127/20 247/20
247/20 248/5 248/7
248/15 248/17 248/25
249/5 250/8 250/24
**easily** [2] 191/5 191/10
**Eastern** [3] 24/19
134/21 136/20
**easy** [1] 246/5
**Econometrics** [1]
104/16
**economic** [8] 11/21 36/5
36/9 36/10 91/1 105/1
148/22 227/15
**economics** [2] 6/6 65/10
**economist** [6] 36/5
81/14 141/19 141/20
224/23 224/24
**economists** [7] 36/9 42/2
88/5 132/23 132/24
229/24 229/25
**edification** [1] 90/9
**education** [2] 58/11
76/22
**educational** [4] 6/5
35/14 35/23 76/9
**Edward** [4] 222/7
222/1 222/19 254/18
**effect** [29] 81/20 81/22
81/23 81/24 82/1 82/7
82/25 83/3 83/5 84/9
84/19 84/23 85/1 85/15
85/17 86/7 86/17 89/15
89/19 98/16 99/8 104/24

107/24 107/24 108/9
117/2 121/25 126/14
230/1
**effectively** [1] 157/6
**effects** [2] 40/19 234/8
**efficiency** [25] 51/2 51/4
51/7 51/14 51/15 51/19
51/22 103/23 104/1
104/10 105/9 105/24
106/4 106/5 106/9
106/11 106/18 106/23
106/25 231/25 232/5
244/19 245/25 251/10
251/11
**efficient** [11] 51/5 51/10
214/1 231/11 231/12
231/17 232/17 232/19
244/23 251/12 251/17
**effort** [2] 155/14 158/8
**eight** [4] 64/23 64/25
65/20 157/23
**Eighth** [2] 2/11 2/14
**either** [14] 44/18 61/1
103/20 112/2 116/19
143/8 152/18 160/19
161/9 200/23 216/3
217/14 241/13 243/6
**elaborate** [1] 248/2
**electrical** [1] 224/14
**electronically** [1] 252/19
**Eleventh** [1] 3/25
**else** [8] 40/24 58/19
104/5 116/21 135/1
178/16 240/14 245/16
**else's** [1] 61/9
**emphasize** [1] 11/1
**empirical** [1] 84/3
**employed** [3] 6/17 6/19
36/13
**employment** [1] 6/14
**end** [19] 21/25 21/25
38/12 38/13 60/11 62/8
84/24 89/22 124/6 124/8
156/9 164/4 167/21
200/22 200/23 208/24
213/12 235/12 249/25
**ended** [3] 9/14 94/16
123/23
**ending** [2] 156/17
205/18
**ends** [5] 43/22 111/16
123/22 204/17 204/21
**enforcement** [1] 36/11
**engage** [2] 62/11 90/20
**engaged** [1] 128/5
**engineering** [1] 224/15
**enough** [1] 185/15
**enter** [1] 85/4
**entered** [23] 10/10 13/19
15/4 29/16 31/8 37/3
48/17 85/6 86/9 163/12
166/20 167/13 169/18
170/25 171/22 172/15
173/23 175/22 177/3
180/17 183/3 187/13
195/9

{WITNESSNAME}                                                                                        Index: enthusiasm..exist

**E**

**enthusiasm [1]** 8/11
**entire [7]** 65/19 65/21
115/10 122/3 209/6
246/14 246/23
**entirely [1]** 46/13
**entities [1]** 187/7
**entitled [1]** 256/12
**entity [6]** 61/2 61/23
61/24 86/23 90/11
188/15
**entries [3]** 174/22 184/7
184/11
**entry [1]** 175/11
**equal [5]** 21/8 27/20
49/13 79/17 109/20
**equals [1]** 190/25
**equation [1]** 190/24
**equipment [6]** 10/19
53/2 53/11 55/20 56/8
151/22
**equities [1]** 54/25
**equity [12]** 126/21 247/9
247/10 247/18 247/21
247/24 249/15 249/18
249/20 249/24 250/9
250/24
**equivalent [1]** 113/4
**Erin [4]** 139/22 141/10
141/13 254/11
**error [4]** 49/11 99/3
99/12 99/15
**especially [2]** 141/1
243/23
**ESQ [6]** 2/2 2/6 2/10
2/13 2/16 2/18
**essence [3]** 157/5 165/10
165/17
**essentially [11]** 16/20
86/22 89/12 100/18
143/19 200/12 201/24
203/11 218/22 219/4
247/25
**establish [1]** 227/20
**estimate [9]** 40/4 96/12
98/20 99/3 101/2 101/4
239/9 240/2 243/11
**estimation [2]** 50/24
239/14
**evaluated [2]** 53/7 54/25
**even [24]** 27/21 38/12
59/4 78/23 91/7 93/14
95/25 108/16 115/3
117/15 121/22 140/14
155/17 160/20 161/7
214/19 216/3 221/5
221/8 229/2 240/22
241/15 249/2 249/20
**evening [3]** 251/20
253/15 253/16
**event [84]** 37/12 37/16
38/15 39/13 39/22 39/24
40/1 40/2 40/12 42/1
42/2 42/4 42/5 42/10
42/12 42/16 42/19 42/20
43/2 43/9 45/2 48/4

50/18 51/20 51/23 52/11
92/1 94/6 94/7 96/8 99/7
104/1 104/10 104/15
104/23 104/25 105/10
105/14 105/21 106/1
106/3 106/5 106/21
114/17 114/24 116/5
116/21 123/6 126/15
131/20 133/2 133/5
133/9 135/24 136/7
141/21 141/24 142/14
166/23 226/15 226/19
227/12 227/13 229/18
229/20 229/24 229/25
230/4 230/20 231/8
231/9 231/10 231/15
231/23 232/6 232/18
234/7 234/12 235/22
238/13 242/9 242/16
242/18 246/10
**event's [1]** 105/1
**events [14]** 37/14 39/12
39/25 40/10 45/15 52/1
52/5 52/8 89/23 92/2
107/6 130/11 227/13
230/2
**eventual [1]** 72/5
**eventually [4]** 8/1 17/11
156/20 249/4
**ever [14]** 16/15 16/18
16/21 17/10 24/4 27/8
34/3 92/23 110/18 111/3
193/1 225/14 230/24
235/6
**every [6]** 101/8 101/12
107/2 117/9 221/4 238/6
**everybody [7]** 67/14
67/15 157/2 158/24
189/12 190/11 221/8
**everyone [6]** 3/2 70/8
131/11 157/6 188/3
223/23
**everything [4]** 140/24
156/12 179/16 209/2
**evidence [38]** 10/10
10/17 10/21 11/6 13/19
15/4 29/16 31/2 31/8
37/3 48/17 52/17 54/7
63/7 63/9 79/21 134/5
134/7 142/20 163/12
166/20 167/13 169/18
170/25 171/22 172/15
173/23 175/22 177/3
180/17 183/3 187/13
195/9 221/21 251/16
253/11 255/3 256/3
**evidently [1]** 29/9
**Evie [3]** 172/9 173/11
192/12
**evolved [1]** 238/17
**evolving [3]** 189/23
191/16 191/17
**exact [6]** 18/17 23/10
24/18 34/10 46/24
185/22
**exactly [20]** 11/6 11/11

11/11 69/7 74/12
76/3 79/21 90/23 92/25
128/8 129/17 131/22
138/7 186/25 191/1
207/24 226/12 226/13
238/5
**exam [1]** 218/20
**examination [23]** 5/24
19/17 19/18 34/1 35/12
70/11 91/20 91/22
131/15 138/20 138/23
141/14 143/10 143/16
146/7 187/20 188/8
218/2 218/8 218/14
219/22 220/24 223/1
**examine [4]** 141/6
144/23 149/21 188/6
**examined [1]** 143/6
**example [19]** 58/19
59/13 60/4 60/15 70/23
70/23 73/15 73/16 93/21
98/3 114/12 115/16
192/18 192/25 194/13
206/13 214/23 220/12
239/7
**examples [1]** 207/10
**exceed [4]** 117/8 117/20
215/4 215/25
**exceeded [2]** 157/21
159/18
**exceeding [1]** 117/13
**exceeds [3]** 44/20 45/21
117/1
**Excel [8]** 189/20 189/21
190/24 191/1 191/3
191/3 191/10 191/18
**Except [1]** 129/23
**excerpt [1]** 30/22
**excess [4]** 67/1 116/25
129/5 156/13
**excessive [2]** 66/1 66/3
**exchange [18]** 11/3 36/6
52/25 53/8 65/4 65/6
65/15 65/24 66/9 75/15
114/13 117/23 118/7
118/11 137/17 139/22
141/17 141/18
**exchange-listed [1]** 53/8
**exchanged [1]** 31/12
**exclude [1]** 161/11
**excluded [1]** 160/13
**excluding [3]** 124/15
187/3 187/5
**exclusively [2]** 7/6 8/16
**excuse [9]** 33/10 135/3
151/13 155/24 161/10
170/1 172/21 183/22
184/1
**excused [1]** 34/21
**excuses [1]** 76/13
**execute [1]** 26/23
**executed [2]** 25/6 90/18
**execution [2]** 16/6 25/25
**executive [1]** 134/20
**executives [2]** 127/12
127/13

**exhibit [178]** 9/23 10/10
13/8 13/15 13/19 14/19
14/24 15/4 26/3 29/16
30/22 31/8 32/2 37/3
37/5 37/22 38/2 38/6
38/18 38/22 38/24 39/4
43/18 45/13 47/10 48/10
48/14 48/17 49/23 52/4
52/21 54/9 58/6 63/6
64/18 66/5 67/17 68/10
69/10 69/22 70/14 72/14
75/9 75/9 76/4 77/12
78/8 79/4 80/2 80/16
81/15 82/13 84/8 84/25
86/14 87/19 89/14 93/23
100/16 105/3 107/5
122/18 133/15 134/12
136/18 136/18 136/23
137/2 141/25 150/16
151/8 162/4 163/9
163/12 163/13 165/23
166/17 166/20 167/2
167/13 169/2 169/10
169/13 169/13 169/18
169/20 170/13 170/13
170/15 170/17 170/18
170/20 170/23 170/25
171/2 171/11 171/17
171/22 171/24 172/4
172/2 172/5 172/11
172/15 173/4 173/17
173/19 173/23 175/8
175/12 175/17 175/18
175/22 176/9 176/10
176/24 177/3 177/5
177/7 177/15 179/13
180/2 180/14 180/17
180/18 181/6 181/20
182/11 182/20 183/3
183/7 183/15 183/17
183/20 183/25 184/12
184/22 184/25 187/13
193/5 193/6 193/17
193/19 193/23 194/6
194/15 195/9 205/1
214/8 214/13 214/24
217/16 218/6 218/9
223/24 225/1 253/10
255/4 255/5 255/6 255/7
255/8 255/9 255/10
255/11 255/12 255/13
255/14 255/15 255/16
255/17 255/18 255/19
255/20 255/21 256/4
256/5 256/6
**exhibit 10 [2]** 14/19
14/24
**exhibit 101 [35]** 37/5
37/22 38/2 38/6 39/4
43/18 45/13 47/10 49/23
52/4 52/21 54/9 58/6
63/6 64/18 67/17 68/10
69/10 69/22 70/14 72/14
76/4 77/12 78/8 79/4
80/2 80/16 81/15 82/13
84/8 84/25 86/14 87/19

89/14 133/15
**exhibit 102 [2]** 151/8
163/13
**exhibit 103 [2]** 167/2
214/13
**exhibit 104 [1]** 184/25
**exhibit 108 [1]** 172/11
**exhibit 109 [2]** 169/10
193/17
**exhibit 110 [3]** 170/20
193/23 194/6
**exhibit 113 [4]** 182/20
183/15 184/22 193/6
**exhibit 114 [15]** 169/2
170/13 170/17 171/11
172/2 173/4 175/8
175/12 180/18 181/6
181/20 182/11 183/7
183/17 183/20
**exhibit 115 [3]** 173/17
184/12 194/15
**exhibit 122 [2]** 133/23
141/25
**exhibit 159 [1]** 38/24
**exhibit 21 [1]** 75/9
**exhibit 258 [2]** 169/13
170/18
**exhibit 259 [2]** 170/23
172/1
**exhibit 32 [3]** 48/10
48/14 150/16
**exhibit 34 [1]** 66/5
**exhibit 343 [1]** 175/18
**exhibit 344 [1]** 176/10
**exhibit 346 [1]** 173/19
**exhibit 4 [3]** 13/8 13/15
38/18
**exhibit 40 [3]** 162/4
163/9 217/16
**exhibit 41 [6]** 165/23
166/17 205/1 214/24
218/6 218/9
**exhibit 5 [1]** 38/22
**exhibit 68 [1]** 225/1
**exhibit 69 [1]** 172/5
**exhibit 7 [2]** 134/12
136/18
**exhibit 71 [4]** 105/3
177/5 177/15 180/14
**exhibit 72 [4]** 122/18
176/9 176/24 179/13
**exhibit 73 [2]** 175/17
180/2
**exhibits [28]** 4/21 4/24
5/23 9/17 9/18 9/21 10/1
10/5 10/5 31/11 31/12
31/15 31/17 31/20 31/25
32/11 32/14 36/24 37/7
37/17 147/2 171/16
175/15 183/9 192/4
253/10 255/3 256/5
**exhibits 1, 2 [1]** 37/17
**exhibits 113 [1]** 183/9
**exhibits 30 [1]** 36/24
**exhibits 69 [1]** 9/21
**exist [4]** 117/16 117/17

**E**

**exist... [2]** 191/15 204/14
**expanding [1]** 244/8
**expect [22]** 27/5 64/11
68/4 68/4 68/5 71/11
71/12 77/24 78/3 78/5
79/22 79/24 81/19 81/24
88/4 98/18 117/21
118/10 131/1 136/13
211/6 235/10
**expectation [2]** 27/24
71/14
**expectations [7]** 22/2
22/8 22/11 22/14 22/17
22/18 27/6
**expected [9]** 26/11 40/3
40/6 40/13 40/18 50/25
64/8 68/2 98/15
**expecting [7]** 12/23
12/24 13/3 136/1 136/9
136/9 136/11
**expended [1]** 84/15
**expenditure [1]** 60/6
**experience [7]** 57/17
57/18 60/19 77/1 230/19
230/22 235/6
**experienced [2]** 27/8
44/6
**expert [36]** 36/15 36/18
36/20 36/20 41/18 42/11
66/6 77/3 80/17 94/25
95/10 95/13 103/13
103/16 103/19 103/20
104/6 104/6 114/10
119/18 119/20 122/15
132/25 136/3 137/5
138/24 140/10 144/16
159/5 171/19 173/13
198/16 224/9 225/8
225/14 227/2
**expertise [1]** 94/20
**experts [1]** 140/22
**explain [25]** 22/25 44/17
50/8 58/16 59/10 62/5
71/18 73/11 74/23 94/24
97/5 103/16 103/22
105/13 131/22 132/4
140/13 144/10 151/11
152/5 153/2 167/9 197/1
226/2 229/24
**explained [5]** 27/16 56/5
69/4 95/3 104/4
**explaining [2]** 54/23
103/20
**explains [1]** 215/14
**explanation [1]** 198/21
**explicit [1]** 21/20
**explicitly [1]** 135/20
**express [2]** 92/17 92/20
**expressed [5]** 8/10 115/5
119/5 122/11 122/15
**expressing [1]** 103/25
**extent [2]** 31/20 82/5
**external [1]** 72/6
**extra [1]** 62/15
**extreme [1]** 64/17

**extremes [1]** 51/18

**F**

**fact [29]** 18/5 25/15 71/3
78/11 83/7 83/16 101/13
104/13 104/23 109/8
112/17 119/14 119/15
121/4 132/14 132/25
239/19 240/25 241/5
241/10 241/14 242/17
242/21 243/6 243/8
243/17
**Factiva [1]** 43/15
**factor [2]** 97/13 249/14
**factors [15]** 37/14 54/16
68/14 69/11 80/5 82/14
106/7 106/10 106/17
106/17 232/1 232/3
232/6 232/8 232/16
**facts [1]** 250/2
**faculty [1]** 224/17
**fail [6]** 72/25 73/19
75/25 82/2 83/3 83/4
**failed [1]** 83/16
**fails [61]** 73/10 73/22
73/24 73/24 74/5 74/6
74/14 74/17 74/24 74/25
75/1 75/3 75/5 75/5 75/6
75/6 75/11 75/14 75/22
75/23 77/6 77/15 77/15
77/19 77/20 78/5 78/6
78/12 78/16 78/22 79/3
79/9 79/10 79/11 79/14
79/20 80/6 80/10 80/14
80/21 81/4 81/5 81/8
81/10 81/12 82/16 82/18
82/19 82/21 82/22 82/23
90/25 91/14 116/9 133/4
133/6 133/10 133/13
133/18 133/25 134/3
**failure [12]** 74/7 74/8
74/21 81/6 81/6 83/19
90/8 90/10 90/13 90/17
91/2 91/13
**failures [1]** 58/5
**fair [6]** 19/22 19/23
141/4 205/20 208/1
241/25
**fairly [3]** 226/1 243/22
248/21
**fallen [1]** 60/4
**falling [2]** 64/7 64/13
**falls [1]** 60/4
**false [6]** 27/11 32/25
33/16 34/4 76/13 213/22
**familiar [17]** 12/7 12/8
32/19 51/1 51/3 84/4
104/9 105/5 105/6 105/8
109/12 109/14 109/16
111/7 135/12 198/11
231/2
**far [8]** 45/8 75/13
101/11 132/23 206/20
240/14 248/14 248/17
**faster [1]** 71/22

**February [3]** 28/13
172/19 173/6
**February 12th [2]**
172/19 173/6
**fee [1]** 62/25
**feel [1]** 20/19
**fell [2]** 204/5 236/1
**Fella's [1]** 7/25
**felt [6]** 27/16 76/21
81/14 158/10 247/2
250/22
**few [11]** 14/10 20/11
22/12 70/2 122/9 122/12
156/12 164/15 189/5
219/7 220/16
**Fidelity [2]** 135/6 135/7
**field [6]** 72/2 84/4
190/23 190/24 190/25
190/25
**fifties [1]** 19/4
**figure [22]** 18/17 27/6
55/12 67/6 114/17 148/9
155/23 159/10 181/11
184/17 184/17 184/21
185/10 185/11 186/24
186/25 187/3 196/22
230/2 244/1 246/6 252/4
**figures [2]** 183/5 194/1
**file [2]** 252/19 253/6
**filed [8]** 7/4 8/22 20/25
21/4 42/11 46/2 89/22
134/19
**filing [4]** 8/23 126/13
147/18 151/24
**filings [11]** 7/7 8/12 8/16
9/12 11/2 20/14 20/17
20/20 21/18 21/21 47/15
**fill [1]** 62/15
**final [36]** 49/8 152/19
152/21 154/16 161/24
162/19 163/3 163/4
163/6 164/6 164/8
164/11 164/12 167/22
167/22 185/10 185/10
190/20 195/24 200/13
201/2 203/16 205/15
205/21 206/14 206/16
206/17 206/17 206/23
207/16 207/18 215/14
217/21 218/10 219/3
220/5
**finally [2]** 235/2 235/13
**finance [8]** 35/24 36/1
72/1 84/4 136/15 187/3
224/15 224/16
**financial [29]** 2/2 2/6
7/4 21/3 21/7 21/10
21/16 25/13 34/12 42/2
52/10 52/12 52/14 52/15
52/17 65/10 72/5 76/18
104/16 127/12 127/13
132/23 135/9 141/19
141/20 146/13 246/9
247/4 250/4
**finding [12]** 54/3 78/14
101/7 129/19 213/21

**213/25** 238/1 240/20
240/22 242/19 244/16
251/10
**findings [7]** 44/1 45/14
45/24 50/15 55/21 139/5
149/8
**fine [6]** 5/13 144/25
149/23 149/25 231/11
239/18
**finish [8]** 189/7 202/14
222/1 222/3 222/4 222/4
251/25 252/5
**finished [3]** 33/11
195/19 251/21
**finishes [1]** 213/3
**FINRA [7]** 146/12
146/14 188/12 188/14
188/16 188/20 188/22
**firm [9]** 6/15 6/20 61/1
61/2 62/14 72/24 154/12
247/12 247/14
**firms [6]** 71/24 88/22
88/25 89/2 89/13 225/13
**first [83]** 5/10 7/3 8/3
10/1 14/10 16/21 19/23
19/23 23/15 27/18 38/13
40/1 40/2 54/22 64/23
64/25 65/19 72/9 74/4
75/12 79/13 85/21 86/9
86/21 88/2 88/14 96/12
96/15 104/3 107/15
108/2 108/6 108/9
108/15 108/18 112/23
122/9 122/12 122/24
127/21 129/19 129/24
130/8 130/15 134/16
135/22 139/25 148/3
149/9 150/4 153/3 154/3
162/12 163/19 165/8
167/21 175/18 182/1
183/14 183/15 183/16
185/23 187/4 192/11
199/3 199/6 199/10
201/13 204/10 204/12
204/14 205/4 207/15
208/11 225/5 230/11
230/15 233/21 238/6
242/8 247/10 247/16
249/23
**fit [1]** 242/15
**five [9]** 56/24 92/2 107/6
159/7 192/17 217/4
223/16 227/12 248/18
**five-minute [1]** 223/16
**FL [2]** 2/17 2/19
**flag [1]** 128/6
**fleeting [1]** 237/20
**flip [1]** 219/23
**float [1]** 117/20
**FLORIDA [4]** 1/1 1/7
1/19 224/16
**focus [13]** 46/13 112/5
146/20 150/22 151/19
154/6 154/10 154/15
198/7 201/9 210/4 230/8
230/24

**focused [6]** 123/14 148/8
148/11 213/8 230/7
230/8
**folks [6]** 76/20 154/19
154/21 156/18 219/6
219/9
**follow [5]** 17/8 106/12
109/23 128/8 164/15
**follow-up [2]** 17/8
164/15
**followed [1]** 64/15
**following [10]** 7/6 23/18
70/7 94/16 130/12
131/10 188/2 208/22
223/22 244/3
**footnote [1]** 65/1
**forecast [2]** 40/11 42/25
**foregoing [1]** 256/10
**Forest [1]** 224/18
**Form [2]** 21/1 134/19
**forms [1]** 62/15
**forth [2]** 10/22 144/2
**forthcoming [2]** 27/7
121/13
**forward [6]** 22/2 49/6
52/24 185/12 187/1
187/4
**forward-looking [1]**
22/2
**found [32]** 42/6 42/7
42/8 42/10 42/22 44/4
45/5 46/1 46/2 46/3
55/22 56/10 65/1 67/10
67/23 68/1 78/17 80/9
86/15 87/3 87/7 87/11
87/13 89/1 99/25 107/15
108/1 108/7 116/21
120/11 151/1 247/1
**foundation [6]** 32/1
137/20 140/14 167/10
185/16 185/17
**foundation-laying [1]**
32/1
**four [11]** 96/10 96/11
156/5 193/12 193/14
217/4 233/15 244/6
245/2 245/8 248/20
**four-cent [2]** 245/2
245/8
**fourth [2]** 41/4 97/2
**Franklin [4]** 1/18 256/9
256/15 256/16
**frankly [1]** 31/19
**fraud [98]** 2/2 2/3 2/6
2/7 12/2 17/2 17/6 18/1
36/19 49/20 49/21 71/9
71/10 71/16 71/22 76/5
76/8 95/8 108/20 109/17
109/19 109/22 109/25
110/2 110/5 110/6
110/21 111/3 111/4
112/17 112/18 112/19
113/11 113/21 113/23
115/3 115/4 115/6
116/12 122/23 125/10
126/6 128/2 128/2 128/6

**F**

**fraud... [53]** 128/7 130/10 135/17 135/18 135/20 135/23 146/22 151/6 201/7 214/16 225/12 225/15 226/3 226/4 226/5 226/16 226/23 227/25 228/6 228/11 228/15 229/1 229/6 229/11 229/13 229/16 230/12 230/14 230/18 230/21 230/25 231/5 231/17 231/19 231/21 232/2 234/25 237/23 238/5 238/6 240/11 240/16 241/11 242/12 242/13 243/15 245/15 245/16 246/12 246/14 250/3 250/19 250/19

**fraudulent [10]** 108/16 108/18 116/17 116/20 129/20 130/8 130/9 152/6 153/22 164/13

**freely [1]** 176/18

**Friday [12]** 12/10 13/5 73/23 75/6 75/7 123/19 124/10 210/15 236/14 236/16 236/25 243/19

**front [4]** 9/16 35/18 37/6 173/2

**FTDs [6]** 73/10 82/17 115/21 115/25 116/12 117/14

**fulfilled [1]** 243/7

**full [5]** 5/19 165/7 203/20 241/7 242/2

**fully [3]** 231/22 241/18 243/25

**function [3]** 54/24 77/10 146/20

**functions [1]** 14/2

**fund [1]** 84/14

**fundamental [1]** 72/7

**funds [11]** 148/19 154/12 168/14 171/7 171/12 171/25 175/6 181/18 182/22 184/3 193/23

**further [10]** 19/14 33/18 34/14 91/17 129/4 139/13 187/16 209/25 217/22 221/13

**future [10]** 12/25 14/6 25/24 25/25 26/22 27/1 27/2 59/20 71/8 71/15

**G**

**gain [3]** 64/16 182/14 191/23

**gains [1]** 64/13

**gave [5]** 165/13 165/13 196/12 196/15 243/7

**general [14]** 13/4 14/25 20/22 97/19 97/20 117/1 127/23 128/3 128/18

**128/20 152/4 196/12** 196/13 220/22

**generalized [1]** 14/1

**generally [15]** 36/17 40/6 52/11 57/5 58/2 61/16 63/18 63/19 79/10 79/25 89/2 109/16 147/11 195/13 229/21

**generate [2]** 47/3 156/24

**generated [3]** 47/19 47/20 147/16

**gets [2]** 90/13 202/23

**give [24]** 4/15 8/10 18/17 21/7 21/12 27/4 32/5 32/15 34/10 91/6 93/25 100/10 142/23 156/17 157/6 160/18 162/17 162/19 190/11 216/7 224/12 235/20 242/23 252/20

**given [20]** 4/15 5/1 33/13 49/19 75/25 77/1 102/21 104/24 141/1 157/13 165/2 193/1 200/16 201/12 203/5 217/2 232/24 234/21 241/3 248/25

**gives [6]** 48/20 48/20 48/21 48/22 75/13 202/9

**giving [1]** 201/4

**Global [10]** 86/18 86/21 86/22 86/22 86/25 87/6 87/10 87/11 87/14 87/17

**goes [9]** 75/7 78/19 101/22 103/4 111/21 112/1 112/4 225/7 238/11

**going [84]** 5/8 10/17 10/22 14/14 21/23 22/7 22/25 26/5 26/17 30/20 31/11 32/6 39/7 40/24 49/5 49/6 52/24 54/1 58/20 59/18 59/21 59/22 59/24 60/1 60/1 60/1 60/6 60/9 60/17 61/19 62/16 63/18 70/4 71/8 71/20 72/3 72/16 72/20 73/17 73/19 76/1 102/21 106/16 128/7 128/22 131/2 131/5 135/2 137/20 138/18 140/12 142/22 142/23 142/24 143/2 143/10 144/21 149/19 153/23 159/2 167/1 171/14 177/5 181/14 185/17 187/21 188/23 199/1 203/25 204/5 214/10 214/21 223/10 224/13 230/13 230/14 233/17 235/13 243/6 249/5 251/24 251/25 252/16 252/19

**gone [1]** 248/11

**gonna [2]** 59/6 209/17

**good [23]** 3/2 3/9 3/11 3/12 3/15 3/17 3/18 3/22

**6/1 6/4 7/2 19/20 19/21** 20/9 62/23 91/24 91/25 146/9 146/10 188/10 188/11 238/23 251/20

**got [15]** 8/11 9/12 14/20 17/20 59/1 60/11 75/5 163/5 165/18 196/10 202/14 202/21 224/15 236/14 246/8

**gotcha [1]** 213/2

**gotten [1]** 196/18

**government [66]** 14/2 4/7 5/10 9/23 13/14 14/23 19/15 26/12 29/19 31/1 31/16 32/2 34/25 35/5 43/6 48/13 100/15 107/5 130/25 136/22 136/23 137/22 140/3 144/14 149/7 163/9 166/16 167/7 168/1 169/13 170/23 177/5 181/10 183/24 184/11 184/22 184/25 188/15 193/5 193/17 193/23 194/5 194/15 195/3 195/22 196/5 200/8 201/21 204/4 204/23 205/1 214/13 214/24 217/16 218/5 218/9 221/18 223/11 227/2 251/15 252/18 252/20 252/22 253/3 253/7

**Government's [34]** 4/21 5/17 9/17 10/10 13/19 15/4 30/22 31/15 34/6 35/7 37/3 37/7 48/17 140/12 141/10 146/1 163/12 166/20 167/13 169/18 170/25 171/22 172/15 173/23 175/18 175/22 177/3 179/12 180/17 183/3 186/19 187/13 220/10 255/3

**Government's 41 [1]** 220/10

**graduate [2]** 35/24 57/20

**Graduated [1]** 224/16

**graph [3]** 44/13 233/6 249/17

**graphs [1]** 115/21

**greater [9]** 50/11 55/8 56/2 56/12 69/2 80/13 160/23 161/8 205/21

**green [5]** 53/2 53/15 53/18 53/19 53/25

**group [19]** 6/21 24/25 92/17 146/16 146/16 146/18 146/19 152/7 152/13 168/25 174/3 174/5 174/16 175/4 175/7 175/11 188/17 192/14 224/5

**groups [3]** 154/24 168/17 168/24

**Gruenstein [7]** 2/10

**3/13 254/5 254/9 254/13** 254/16 254/19

**guess [16]** 7/20 14/7 108/21 123/18 140/5 140/8 140/9 192/14 205/23 205/25 206/3 206/23 209/9 209/22 209/22 235/12

**guidance [1]** 27/4

**guidelines [5]** 4/1 4/14 4/14 4/15 149/11

**Gulati [2]** 174/4 174/6

**GX114 [1]** 194/4

**GX32 [1]** 93/22 102/11 197/2

**H**

**habits [1]** 31/4

**had 5, 7 [2]** 18/23 20/10

**hadn't [2]** 8/6 249/5

**half [9]** 100/7 114/2 125/5 162/3 191/22 208/5 224/21 248/18 251/23

**hand [6]** 5/16 35/6 77/17 141/9 145/25 222/9

**handbook [1]** 96/1

**Handle [1]** 163/1

**handling [1]** 203/2

**hang [1]** 83/23

**happen [1]** 59/21 91/1 160/24

**happened [16]** 13/21 23/10 25/16 39/20 73/3 73/4 108/16 108/22 120/7 122/9 122/12 138/15 151/20 151/23 154/14 155/13

**happens [3]** 90/10 90/25 101/18

**happy [3]** 187/8 223/9 223/15

**hard [2]** 189/5 223/14

**harm [1]** 34/12

**Harmison [13]** 14/2 14/6 23/11 23/20 24/4 24/15 25/4 25/16 28/16 28/17 29/8 134/20 135/4

**Harris [7]** 2/18 3/18 19/2 30/7 215/1 215/2 216/21

**hasn't [1]** 229/9

**haven't [6]** 30/18 33/13 94/19 95/6 130/15 140/14

**having [12]** 25/13 27/25 31/22 91/9 104/1 112/13 117/15 158/10 214/20 216/14 218/25 219/23

**Hayter [3]** 41/19 66/15 78/24

**Hayter's [5]** 41/23 49/24 66/6 78/9 78/14

**he'll [1]** 167/9

**he's [7]** 33/11 34/22 66/19 67/2 171/19 216/2

**216/3**

**head [3]** 99/14 100/13 105/13

**header [1]** 187/2

**Health [1]** 32/3

**hear [15]** 12/20 12/23 12/24 13/3 16/4 16/5 26/8 26/11 35/16 35/19 76/22 136/1 149/12 149/20 186/20

**heard [9]** 32/22 32/23 33/13 77/4 110/18 140/2 227/11 237/22 245/11

**hearing [12]** 10/8 26/21 27/11 31/6 32/3 32/4 33/3 33/14 37/9 147/2 182/1 228/4

**hearsay [1]** 140/13

**heart [1]** 14/2

**heavy [1]** 23/19

**hedge [1]** 154/12

**held [11]** 18/2 18/2 91/12 156/10 156/21 156/23 158/9 164/3 167/22 216/22 245/18

**hell [1]** 14/14

**help [3]** 146/25 249/13 250/2

**helped [2]** 141/20 143/25

**helping [1]** 72/6

**here [73]** 3/4 3/24 4/17 9/22 10/13 14/13 15/8 15/14 16/2 18/1 29/1 41/5 44/20 54/5 54/10 54/25 56/19 59/21 64/19 64/20 66/6 66/15 67/3 67/22 74/1 76/9 77/18 78/19 79/8 80/3 84/5 88/16 103/19 104/7 120/4 128/5 141/21 142/24 143/2 144/18 149/12 155/5 163/14 169/8 169/22 171/4 174/22 175/6 185/16 188/21 193/19 196/9 196/13 197/22 197/25 198/16 199/5 208/14 208/17 208/23 216/4 216/17 220/13 221/4 225/25 226/7 226/12 235/8 236/6 236/12 244/20 248/11 249/16

**here's [2]** 196/7 196/7

**hidden [3]** 77/2 77/4 77/6

**high [3]** 68/6 78/5 237/20

**higher [25]** 66/7 66/21 68/3 68/21 77/21 78/23 79/10 79/12 88/4 102/19 103/6 123/23 125/13 158/1 159/20 159/23 160/1 181/13 203/12 206/21 237/4 237/21 238/20 240/2 245/13

**H**

**highlight** [1] 155/4
**highlighted** [1] 105/3
**highly** [1] 132/15
**historical** [1] 52/11
**hit** [2] 23/21 24/11
**hold** [2] 57/10 83/25
**holding** [9] 77/14 156/15
157/7 158/7 158/15
160/15 210/22 229/2
251/6
**holdings** [3] 17/10
226/25 245/5
**home** [1] 58/20
**Honor** [130] 3/10 3/12
3/18 4/3 4/5 4/9 4/12
4/20 5/9 5/13 5/22 9/20
10/7 13/14 13/17 14/23
15/5 19/11 19/15 28/21
29/4 29/11 29/14 29/22
30/11 30/12 31/1 31/4
31/9 31/18 32/4 32/8
32/13 32/15 33/18 33/21
33/23 34/14 34/20 35/4
36/23 38/23 48/13 63/2
63/4 70/1 70/12 90/6
91/17 91/21 95/15 129/1
130/25 131/4 131/14
137/1 137/4 137/11
137/22 139/11 139/13
139/18 139/19 139/21
139/25 140/9 140/16
140/19 141/8 142/19
143/5 143/14 144/7
144/10 144/25 145/20
145/23 149/6 149/15
149/23 150/2 159/2
163/7 166/17 167/7
169/12 170/22 171/14
172/10 173/21 175/19
176/25 177/6 177/12
180/13 181/9 183/22
183/25 184/12 184/24
185/8 185/14 185/15
185/21 186/1 186/6
186/14 186/16 186/23
187/8 187/15 187/16
188/7 195/7 217/7
217/22 218/1 220/1
221/13 221/16 221/18
223/4 223/7 223/15
223/25 251/19 252/10
252/15 253/8 253/13
**HONORABLE** [1] 1/12
**hook** [1] 90/15
**hope** [1] 17/24
**hoping** [1] 61/13
**hospitals** [1] 10/19
**hour** [2] 187/22 251/23
**housekeeping** [1] 4/10
**however** [3] 67/2 90/25
161/1
**huge** [1] 23/21
**huh** [5] 117/11 160/7
201/14 210/14 210/24
**hum** [1] 181/24

**I**

**I'd** [8] 9/17 10/20 64/11
68/4 68/4 68/5 138/17
144/7
**I'll** [17] 4/21 15/13
15/23 21/9 50/8 73/12
109/15 130/22 144/10
145/1 149/22 167/11
177/13 187/10 211/8
219/23 252/11
**I'm** [90] 5/6 5/8 11/9
11/14 14/5 15/15 15/16
24/14 24/18 29/21 29/24
30/12 31/4 32/6 36/4
54/23 54/23 58/14 59/6
59/22 59/23 60/1 60/1
61/5 61/9 71/20 72/3
72/16 94/18 95/9 95/18
96/6 98/23 99/1 102/6
103/3 104/7 105/6
105/21 107/4 109/23
111/2 111/21 112/8
112/8 117/21 123/25
128/8 130/12 130/12
133/8 138/18 140/3
141/19 142/22 142/23
143/10 159/2 167/1
171/14 174/19 177/5
182/2 196/2 196/9
198/24 199/1 201/19
202/12 206/15 208/22
209/18 209/19 210/13
212/1 212/2 215/16
216/16 217/7 223/4
223/15 231/6 232/2
235/21 237/9 243/16
249/7 251/18 251/22
252/4
**I've** [19] 4/17 17/7 59/18
94/18 110/18 110/18
113/6 114/9 137/7 138/2
140/2 190/8 224/15
225/9 228/13 228/19
228/20 238/3 251/11
**I-n-n-e-t** [1] 33/3
**IBM** [3] 57/10 57/11
57/14
**idea** [2] 49/4 140/25
**ideal** [1] 51/14
**identical** [6] 149/17
183/6 183/17 183/19

184/24 184/8
**identification** [2] 29/5
30/21
**identified** [6] 32/22
63/25 65/5 127/14
167/24 242/14
**identifier** [1] 162/12
**identify** [4] 157/16
174/5 192/24 228/10
**identifying** [1] 168/25
**ignore** [1] 210/2
**illiquid** [1] 89/12
**illiquidity** [2] 89/5 89/8
**imagine** [3] 11/19 99/19
232/13
**immediate** [4] 12/11
12/25 124/18 135/9
**immediately** [3] 19/8
104/25 140/7
**impact** [28] 19/6 23/14
23/16 38/15 39/12 46/21
46/22 47/5 47/6 91/1
92/2 100/8 105/1 115/11
116/4 116/24 120/8
123/6 130/4 130/10
130/13 130/15 130/18
139/6 231/10 235/10
235/22 240/10
**implied** [1] 132/12
**implies** [1] 102/25
**important** [34] 11/17
44/16 46/16 46/17 47/22
48/1 66/15 76/21 86/6
127/1 127/5 127/14
127/21 208/13 230/3
238/15 244/1 246/13
246/15 246/18 246/18
246/21 246/22 247/2
247/3 247/4 247/22
249/1 249/2 249/11
250/5 250/10 250/23
250/25
**impound** [2] 231/14
231/23
**improper** [1] 194/20
**improperly** [1] 192/19
**improve** [1] 42/24
**imputed** [1] 200/12
**include** [12] 25/20 37/6
40/17 40/19 119/19
161/10 165/15 216/2
216/14 216/25 229/8
245/14
**included** [17] 53/6 53/9
53/9 65/20 119/18
119/19 156/14 160/21
164/20 164/24 166/9
166/10 214/3 217/5
220/24 245/19 245/20
**includes** [3] 21/22 35/23
239/4
**including** [3] 18/18 45/3
46/23
**inconceivable** [1]
108/14
**inconsistent** [1] 12/6

84/3
**incorporate** [2] 42/18
105/17
**incorporated** [4] 106/22
107/18 107/20 108/8
**increase** [21] 44/22
44/24 81/4 81/5 81/8
81/9 81/11 81/13 98/14
108/24 123/20 233/24
236/17 236/21 237/6
239/10 239/12 239/22
241/15 241/17 242/17
**increased** [3] 111/20
116/17 239/8
**increases** [1] 81/10
**incredible** [1] 86/7
**incur** [2] 228/14 228/15
**incurred** [2] 226/24
250/13
**indeed** [2] 209/14
231/22
**indefinitely** [1] 60/14
**independent** [2] 7/20
118/19
**index** [17] 53/1 53/6
53/7 53/7 53/10 54/18
54/19 54/24 54/25 55/2
55/10 55/17 55/20 55/20
56/5 56/8 56/9
**indexes** [3] 42/15 53/13
77/17
**indicate** [2] 72/4 172/20
**indicated** [3] 162/16
167/20 230/14
**indicates** [1] 44/13
**indicating** [2] 128/2
129/8
**indication** [1] 128/5
**indices** [1] 43/14
**individual** [32] 7/19
7/24 9/1 21/9 32/21 94/8
103/12 155/8 155/17
155/25 159/19 160/2
160/20 162/20 163/23
165/12 165/12 165/12
166/24 167/5 177/25
178/9 189/13 190/17
206/5 206/8 214/6
216/25 220/25 221/5
225/12 228/25
**individually** [4] 9/8
92/16 169/7 189/10
**individuals** [28] 76/14
152/18 154/8 155/1
155/2 155/6 158/2 161/3
161/11 161/18 161/20
161/23 163/22 163/24
164/8 165/4 167/24
167/25 168/17 168/25
178/7 190/21 192/22
200/5 206/4 218/9 220/5
220/23
**indulgence** [9] 19/12
30/11 33/21 90/6 139/11
184/12 187/15 221/11
223/16

industry [20] 42/15
42/23 43/13 53/3 53/3
53/10 53/12 53/21 54/6
54/7 54/18 55/20 55/24
56/5 58/21 91/13 96/16
96/18 135/7 146/13
**industry-wide** [1] 135/7
**inefficiency** [1] 51/16
**infinite** [1] 106/6
**inflated** [3] 111/9
112/14 113/2
**inflation** [71] 48/23
48/25 49/1 49/4 49/6
49/7 49/14 49/15 49/20
49/21 73/23 93/22 94/7
94/10 94/12 94/13 98/21
100/16 100/19 100/23
101/8 101/12 101/21
101/25 102/7 102/13
102/22 103/5 103/11
108/7 111/13 111/15
111/20 111/24 112/1
112/4 112/7 116/18
129/23 130/14 131/19
150/5 152/6 152/22
153/22 164/13 197/5
197/16 197/17 197/19
197/21 197/23 197/25
198/4 198/8 198/13
198/21 201/25 202/4
205/18 212/4 227/25
229/1 229/8 229/10
230/25 237/23 238/1
238/5 241/3 242/1
**inflationary** [34] 48/5
107/24 150/24 151/2
163/6 196/20 196/22
198/3 202/9 202/24
203/6 203/11 203/16
203/20 204/3 205/21
206/10 206/14 206/16
206/17 206/20 207/11
207/16 207/18 215/14
215/15 215/24 216/16
216/18 217/21 218/10
220/6 220/14 220/19
**influence** [2] 22/19
40/18
**info** [1] 11/4
**information** [136] 8/10
9/13 11/12 11/22 13/3
16/8 20/17 20/18 20/21
21/18 21/22 25/4 25/19
26/9 29/25 44/13 45/8
46/14 47/11 47/17 47/23
51/6 51/12 51/12 82/1
83/3 83/5 83/20 83/23
83/24 83/25 84/1 85/23
96/5 105/16 105/17
105/22 120/1 121/13
121/15 121/21 121/25
122/3 122/6 126/5 126/9
126/13 126/17 126/21
127/5 135/17 135/17
135/24 136/1 136/7
136/8 136/10 136/12

## I

**information... [78]**
136/13 136/13 136/16
136/16 137/14 142/3
142/7 142/8 143/10
147/1 147/11 150/8
160/8 165/11 168/2
168/3 170/17 174/10
182/16 185/16 186/5
192/8 192/9 192/18
193/1 193/17 196/23
196/25 230/16 231/14
232/11 232/13 232/25
234/19 234/22 234/24
235/4 235/13 235/14
237/8 237/9 238/21
238/22 238/22 240/17
242/9 242/23 243/8
244/22 245/1 246/1
246/4 246/7 246/8
246/11 246/12 246/15
246/17 246/19 246/20
246/23 247/2 247/5
247/23 250/4 250/6
250/7 250/8 250/9
250/10 250/15 250/23
250/24 250/25 251/2
251/7 251/14 251/15
**information's [2]** 238/15
244/1
**informational [1]** 71/7
**initial [2]** 185/20 230/25
**initiated [1]** 71/4
**initiation [1]** 86/4
**initiatives [2]** 135/6
135/10
**Innet [1]** 33/2
**input [1]** 50/25
**inputs [1]** 93/19
**inquiries [1]** 133/12
**insider [3]** 36/19 76/12
225/11
**insiders [1]** 76/19
**insignificant [1]** 244/17
**insofar [1]** 129/23
**instance [10]** 60/9 76/14
107/2 107/22 154/12
165/4 189/6 194/9
209/12 232/11
**instances [5]** 66/20 76/8
76/12 128/19 159/25
**instant [1]** 113/3
**instead [1]** 206/5
**institutional [2]** 154/11
154/24
**instruction [3]** 42/8
93/25 119/7
**intended [1]** 16/25
**intending [1]** 141/5
**intent [2]** 71/2 114/20
**intention [1]** 39/9
**interest [5]** 66/18 66/21
67/3 67/8 67/13
**interested [4]** 26/17
26/21 77/7 94/5
**interject [1]** 24/7

**interrupt [3]** 32/17
58/10 61/5
**interruption [1]** 63/3
**interval [9]** 100/11
101/1 239/3 239/4
239/15 240/4 240/8
241/16 241/21
**intervening [3]** 37/14
52/1 52/5
**intraday [11]** 120/11
120/17 120/23 136/25
137/12 138/5 140/23
142/2 142/8 235/15
235/20
**intrinsic [56]** 49/8 49/10
49/11 49/13 150/12
150/25 151/1 151/3
152/15 152/17 152/20
153/8 153/11 153/13
153/18 159/11 159/15
160/1 160/6 160/9
160/11 160/16 160/23
160/25 161/5 161/6
161/12 161/16 162/22
162/23 162/25 163/3
164/8 164/11 190/16
196/18 197/5 198/2
201/15 201/23 202/8
202/9 202/22 203/1
205/17 206/1 207/25
209/23 211/23 212/2
215/15 218/17 218/22
219/5 219/16 219/16
**introduce [4]** 32/3 105/3
195/4 252/16
**intuitive [1]** 25/12
**inventory [3]** 58/24 71/1
74/19
**invest [10]** 6/22 6/25 8/1
8/3 8/24 9/10 11/5 11/17
11/24 34/3
**invested [9]** 9/14 16/16
18/18 19/23 19/24 20/2
23/1 27/14 46/18
**investigations [2]** 57/22
146/21
**investing [4]** 11/19
20/19 61/16 76/24
**investment [16]** 6/15
6/20 6/21 7/3 7/21 7/23
8/4 11/8 18/15 20/13
22/20 27/4 153/19
153/20 154/18 224/10
**investments [4]** 17/14
19/3 177/24 178/24
**investor [36]** 12/7 12/16
13/6 13/11 13/21 14/12
40/23 45/4 76/22 83/21
103/10 110/16 154/6
154/17 155/12 157/11
162/13 164/18 164/22
189/10 200/16 202/18
202/18 207/19 207/20
225/12 225/13 226/16
226/23 228/6 228/11
228/23 228/25 229/9

229/17 243/11
**investors [95]** 8/14 20/6
20/10 22/22 23/4 34/4
46/14 46/16 46/17 46/17
47/24 48/1 48/1 70/21
71/7 76/22 83/20 83/22
86/13 92/14 92/16 93/17
108/11 108/25 109/3
109/9 111/11 111/12
113/9 119/10 126/6
135/25 136/9 136/11
137/12 147/14 148/8
151/14 152/8 152/24
154/4 154/12 154/24
154/25 156/10 156/12
157/17 158/7 158/15
158/21 160/13 160/22
164/17 166/22 166/24
167/5 167/16 168/5
168/8 197/11 199/11
214/7 217/4 218/21
219/8 219/3 219/19
220/10 220/25 221/2
226/6 227/20 228/2
228/14 229/2 230/3
231/14 238/16 238/21
244/22 245/14 246/7
246/13 246/15 246/21
247/2 247/3 247/22
249/2 249/4 249/11
250/5 250/10 251/5
251/13
**investors' [3]** 82/6 237/1
244/25
**involve [1]** 168/13
**involved [5]** 12/3 207/5
218/24 226/3 238/3
**involving [3]** 33/2
146/22 225/14
**isn't [4]** 23/7 70/18 91/1
134/13
**issuance [5]** 101/9
168/21 168/23 174/25
175/2
**issuances [4]** 174/2
174/8 174/23 192/24
**issue [6]** 126/25 129/14
138/12 138/14 140/5
141/2
**issued [21]** 10/23 34/4
37/19 45/10 49/2 49/17
134/13 168/17 170/6
173/7 173/11 174/15
175/3 175/15 176/13
180/9 181/2 181/22
182/6 192/11 192/19
**issues [5]** 5/6 36/12
135/9 219/23 224/25
**it's [131]** 14/22 15/9
19/4 25/12 29/3 29/7
35/10 39/15 42/22 44/15
45/11 47/6 47/7 49/4
49/15 51/8 51/8 52/15
56/1 56/2 58/25 61/1
61/18 61/18 61/19 61/21
62/5 62/21 62/22 62/23

62/23 66/24 67/9 67/16
70/20 74/20 75/7 77/11
78/23 88/4 91/2 91/2
91/1 93/7 94/17 94/22
95/25 96/2 96/20 97/4
97/15 97/22 97/25 98/8
100/16 102/17 105/21
110/23 113/6 113/17
113/17 113/18 115/2
116/16 118/9 120/1
122/5 128/20 131/25
131/25 135/21 140/5
140/22 149/11 152/19
153/16 161/1 165/10
177/7 178/2 178/3 178/4
185/22 187/9 188/15
189/4 189/8 189/14
189/19 189/19 190/7
190/10 190/10 190/15
190/19 190/20 191/3
191/4 191/16 191/17
191/18 197/11 201/20
204/10 206/4 206/23
207/1 214/17 215/19
216/10 226/12 229/21
230/4 232/19 234/23
235/24 235/25 236/24
237/11 240/1 240/9
241/13 241/13 241/18
243/24 244/1 246/5
248/8 249/8 253/2 253/3
**item [1]** 181/23
**items [1]** 243/7
**itself [8]** 43/11 60/23
201/9 228/10 232/4
232/7 234/14 236/18

## J

**Jamie [1]** 214/23
**January [9]** 8/8 38/12
52/24 66/17 75/12 85/10
86/1 114/11 229/6
**January 1st [1]** 66/17
**January 2007 [1]** 52/24
**January 2008 [1]** 38/12
**January 30th [2]** 85/10
86/1
**Jay [1]** 178/4
**job [1]** 231/11
**journal [4]** 65/9 65/10
72/1 72/1
**journals [2]** 42/6 42/9
**Jr [1]** 2/16
**judge [3]** 1/13 73/1
189/8
**juggling [1]** 189/4
**July [4]** 1/8 18/3 18/4
256/13
**July-August [1]** 18/4
**jumps [1]** 236/16
**June [2]** 249/3 249/7
**jury [1]** 116/21
**just [210]** 4/10 4/21 4/24
5/5 6/9 11/1 12/5 14/1
14/5 14/10 15/13 15/23
17/17 17/18 17/24 18/10

19/8 21/22 25/9 25/12
25/25 28/22 30/13 30/16
31/24 32/5 49/4 49/10
50/17 52/11 53/24 57/12
58/2 58/6 58/22 59/18
63/16 63/23 63/25 70/20
70/24 71/13 73/12 77/15
83/21 84/2 85/21 86/15
88/6 88/7 90/4 90/9 91/3
95/8 95/25 96/15 100/12
101/2 104/6 107/23
107/25 109/23 112/8
113/8 113/25 114/8
114/17 116/24 120/21
123/25 125/3 125/7
127/10 128/8 128/13
129/4 132/16 134/16
139/19 139/23 140/1
140/16 140/19 143/14
143/18 145/1 145/15
145/18 150/18 152/3
152/4 152/8 152/15
152/16 153/1 153/5
154/21 155/4 155/25
156/2 156/4 156/8 158/8
160/5 160/9 162/7
162/10 163/3 163/17
163/19 164/2 164/15
164/15 166/7 166/13
167/17 170/12 171/19
173/7 174/2 179/2 180/2
180/5 180/23 181/9
181/13 181/19 184/6
185/1 186/23 187/7
187/9 188/21 189/14
189/19 189/20 190/10
190/12 190/16 190/20
190/24 191/3 191/4
191/4 191/5 192/21
192/22 192/23 193/8
193/9 194/4 195/25
196/2 197/22 198/1
199/8 200/4 200/4 200/6
201/9 201/11 201/19
202/7 202/14 204/9
206/9 207/12 207/19
207/25 208/13 209/17
209/19 209/21 210/21
210/25 211/13 211/20
212/18 212/25 213/8
214/10 214/17 214/17
214/17 216/19 217/2
217/7 217/11 217/15
217/19 219/23 220/8
220/16 229/24 236/7
236/24 237/4 237/5
237/6 240/18 242/4
244/9 246/23 248/2
248/8 249/8 251/1
252/23 253/4 253/5
**Justice [4]** 2/4 2/8
188/13 188/19

## K

**KAM [1]** 1/2
**Kaufman [1]** 220/12

**K**

keep [1] 189/21
keeping [2] 72/7 161/13
KENNETH [1] 1/12
kept [1] 189/23
key [1] 231/7
kick [1] 90/23
kind [11] 19/8 59/11
 71/6 90/21 102/3 117/15
 127/1 136/11 138/6
 143/21 146/24
kinda [10] 158/8 189/5
 189/20 189/23 189/25
 190/8 190/11 191/4
 196/9 200/7
kinds [1] 46/24
Klinek [4] 215/5 215/8
 215/17 215/18
Klugh [2] 2/16 3/16
knew [1] 31/5
know [113] 5/4 9/8
 10/20 11/1 11/9 11/11
 11/20 11/21 12/3 12/14
 12/25 14/5 14/7 14/14
 16/4 17/23 18/23 19/4
 19/9 20/10 20/21 21/11
 21/12 21/23 22/25 23/9
 24/12 25/15 27/2 27/4
 27/22 27/24 28/24 30/8
 30/9 31/12 32/10 34/9
 34/10 58/25 58/25 61/19
 62/2 62/10 64/15 67/11
 72/19 73/2 73/4 73/16
 73/19 74/8 74/12 76/22
 82/2 82/8 90/15 91/4
 93/14 95/4 95/6 95/18
 100/12 101/11 108/20
 109/10 110/18 113/14
 114/6 119/9 119/13
 119/25 122/8 125/2
 138/17 140/13 144/21
 186/3 186/18 186/21
 189/4 189/5 189/7
 189/25 190/24 191/11
 195/1 196/16 196/17
 196/19 196/20 197/16
 197/19 197/21 198/6
 198/10 198/13 205/24
 208/4 208/13 209/9
 213/16 213/24 217/4
 219/6 219/12 220/23
 221/22 222/2 222/16
 239/10 246/6 249/4
knowable [1] 100/12
known [2] 11/22 121/14
knows [1] 171/16
KSB [1] 134/19

**L**

label [1] 60/25
labeled [2] 54/25 72/18
lack [7] 67/19 68/8
 123/2 135/24 136/7
 136/8 147/24
ladies [1] 20/4
lags [4] 56/21 56/23

56/24 83/9
laid [2] 13/6 190/8
large [14] 19/1 22/1
 24/10 64/14 78/11 81/11
 116/12 121/12 154/12
 215/2 247/7 247/19
 248/21 248/22
largely [1] 142/17
larger [6] 17/22 26/3
 122/24 200/5 244/12
 248/21
largest [4] 26/20 247/7
 248/3 248/23
last [31] 32/10 35/11
 114/2 114/7 125/14
 146/5 147/6 149/18
 149/20 150/24 158/11
 158/13 163/2 163/14
 174/1 176/20 186/2
 186/10 186/12 187/11
 191/22 197/12 200/14
 204/21 207/7 211/21
 211/23 219/14 222/17
 247/8 248/23
lasted [1] 13/25
lasting [1] 86/7
late [5] 7/17 26/4 28/13
 243/24 252/8
later [14] 26/14 26/15
 43/23 59/21 59/23 60/2
 60/24 61/13 72/20 72/22
 83/16 83/25 84/1 86/8
latest [1] 38/13
law [2] 31/20 228/14
lawsuit [3] 88/16 89/18
 89/22
lay [2] 137/20 167/10
lead [4] 21/13 54/4
 106/6 129/6
leading [4] 121/4 248/9
 249/6 249/7
leads [1] 71/1
learn [6] 7/15 7/18 8/15
 12/9 28/5 135/16
learned [3] 83/6 86/9
 122/22
learning [2] 85/22 85/23
learns [2] 82/4 83/18
least [21] 4/7 19/3 31/5
 33/14 34/24 62/19 62/20
 89/1 106/8 112/19 125/4
 127/20 140/21 141/4
 143/12 187/22 223/12
 247/1 247/8 249/1 250/5
leave [2] 130/22 212/14
led [10] 14/9 16/6 57/22
 106/21 114/15 121/21
 121/22 122/10 122/13
 136/12
left [11] 68/4 79/14
 79/24 107/12 154/21
 161/20 162/10 162/22
 212/20 212/21 247/14
legal [2] 31/21 232/3
legend [1] 173/1

legitimacy [1] 123/2
legitimate [1] 122/25
lent [1] 61/25
less [30] 46/3 50/14
 55/15 56/3 56/5 65/14
 65/23 69/3 75/25 99/9
 101/1 101/5 103/6
 124/15 132/16 154/17
 154/21 158/4 158/19
 161/13 161/14 162/3
 166/9 199/25 215/15
 219/6 219/17 220/20
 241/10 247/25
lessee [1] 39/9
let [23] 76/22 108/10
 109/24 119/9 122/11
 122/20 122/20 125/25
 127/10 142/21 149/22
 171/24 171/24 183/8
 183/25 190/2 195/13
 202/14 207/15 209/5
 214/4 219/1 248/1
let's [38] 5/14 7/22 9/3
 17/19 21/24 22/19 37/16
 37/22 38/2 45/13 47/10
 49/23 52/10 52/21 70/14
 82/13 115/8 118/13
 120/5 123/9 124/10
 125/17 131/7 140/17
 141/7 160/5 190/2 192/4
 194/5 202/2 203/19
 209/24 209/24 214/5
 229/18 236/5 240/25
 249/12
letter [2] 18/7 18/11
level [15] 41/16 41/17
 41/22 42/14 44/8 81/10
 86/13 131/19 131/23
 132/5 132/14 132/21
 132/22 133/1 133/3
levels [1] 78/5
liabilities [2] 247/13
 247/17
lieu [1] 7/6
life [2] 57/19 135/8
lift [1] 29/2
light [2] 47/22 50/16
lighter [1] 23/23
likelihood [1] 132/17
likely [1] 240/18
limited [3] 33/23 144/8
 165/20
line [31] 16/2 47/2 47/7
 53/1 53/2 53/18 53/18
 53/19 53/20 53/25 53/25
 63/23 63/25 79/15 79/18
 112/24 134/16 142/10
 142/11 163/19 163/25
 182/5 183/15 183/16
 183/19 183/25 193/20
 205/4 206/13 249/16
 249/17
line 3 [1] 182/5
lines [6] 53/4 53/16
 53/16 77/16 184/7
 209/21

link [1] 71/16
liquid [3] 88/4 89/1 89/2
liquidate [2] 18/4 18/13
liquidated [3] 17/17
 18/5 27/18
liquidity [9] 70/22 87/20
 87/24 88/14 88/14 88/15
 88/17 88/21 88/23
list [18] 32/6 32/7 32/11
 32/12 32/15 52/5 100/16
 100/19 137/2 147/14
 167/24 169/1 174/12
 190/12 190/21 192/23
 207/14 214/3
listed [57] 53/8 65/3
 66/8 117/24 118/5 118/6
 118/9 150/10 167/16
 167/23 174/25 175/6
 177/22 177/25 178/7
 178/9 178/14 178/16
 190/19 197/25 202/7
 208/3 209/12 214/13
 215/8 216/4 225/25
listen [2] 12/16 12/18
listened [2] 12/21 12/22
lists [2] 174/2 253/10
literally [2] 23/20 49/15
literature [11] 95/20
 95/24 95/25 104/9
 104/17 105/5 105/8
 105/12 231/2 231/4
 238/12
litigation [4] 96/1 224/4
 224/8 230/6
little [26] 6/9 11/16 20/4
 20/17 22/4 29/2 35/18
 43/22 44/17 50/8 61/25
 62/17 71/18 73/2 74/4
 102/11 123/10 130/20
 132/4 154/3 158/19
 178/5 188/23 195/2
 209/25 248/2
live [1] 51/18
LLP [2] 2/10 2/13
Lo [1] 104/18
located [1] 224/5
location [1] 21/5
logged [1] 12/20
logic [1] 113/1
logical [1] 25/12
long [14] 6/17 11/10
 21/21 36/13 57/12 74/17
 74/20 83/9 146/14 167/9
 179/2 187/21 188/25
 243/4
longer [5] 63/15 63/17
 90/20 239/16 243/9
looked [47] 20/25 37/13
 40/23 41/2 42/11 43/1
 43/14 63/15 63/22 63/23
 64/25 69/13 69/14 69/15
 78/17 82/18 82/21 82/24
 82/25 83/15 86/3 87/6
 102/13 102/13 106/8
 106/14 106/20 107/7
 120/23 138/7 147/15

154/10 158/3 180/23
 220/6 227/16 227/17
 227/17 230/16 232/1
 232/5 232/16 233/19
 244/4 244/13 244/15
 245/4
looking [49] 13/23 14/8
 16/10 22/2 24/25 25/2
 42/3 42/5 43/3 45/3 45/3
 46/11 46/12 64/20 64/23
 65/19 82/16 83/1 83/2
 83/3 83/5 83/5 100/11
 106/23 117/24 124/25
 125/3 133/12 145/4
 168/21 168/22 170/12
 173/7 179/3 196/8
 197/12 199/5 205/24
 207/9 212/24 220/6
 227/24 228/16 232/12
 236/6 242/4 242/9 246/4
 246/10
looks [5] 116/7 208/4
 220/13 220/20 242/8
lop [1] 154/20
lose [8] 18/15 18/21
 111/19 112/13 112/17
 209/11 216/17 229/16
losing [1] 216/4
loss [153] 4/1 18/22 20/3
 20/7 30/4 30/7 60/19
 92/17 92/21 93/17 94/1
 94/2 94/3 94/5 94/6
 94/21 109/20 110/1
 110/1 110/11 111/11
 113/2 113/9 113/10
 113/11 113/18 113/20
 113/23 126/22 150/5
 151/13 152/6 152/10
 152/20 152/21 152/21
 153/8 153/22 153/23
 156/1 156/25 157/1
 157/5 157/22 157/24
 158/1 159/10 159/14
 159/18 159/19 159/23
 160/1 160/1 160/19
 160/19 160/23 160/23
 160/25 161/7 161/8
 161/12 161/12 161/15
 161/16 161/24 162/14
 162/19 162/19 162/23
 163/4 163/21 163/25
 164/7 164/9 164/12
 164/12 164/13 164/20
 164/25 165/2 165/10
 166/13 166/15 166/22
 167/17 168/8 181/7
 181/11 182/13 190/21
 191/23 196/16 196/17
 196/19 196/20 199/19
 199/21 199/24 200/24
 200/25 201/2 201/4
 201/7 201/13 201/15
 202/23 202/23 203/12
 204/4 207/22 207/24
 208/16 208/20 208/23
 209/6 209/14 209/15

{WITNESSNAME} - Index - more - misleading

**L**

**loss... [36]** 209/17 210/1
210/4 212/19 212/20
212/21 213/8 213/14
214/22 215/4 215/12
215/13 215/15 219/5
219/8 219/20 228/6
228/23 229/1 230/8
230/20 245/24 247/7
247/8 247/19 247/20
248/3 248/4 248/8 248/9
248/14 248/15 250/3
250/12 250/14 250/18
**losses [47]** 29/18 29/20
34/7 34/7 64/13 95/7
103/10 111/14 111/17
147/19 148/16 153/1
155/20 155/21 156/13
158/5 158/18 159/9
159/12 160/6 160/11
161/17 166/23 167/4
168/11 169/5 214/7
214/14 214/15 214/17
215/25 216/3 217/1
220/7 220/13 226/5
226/16 226/23 226/24
228/1 228/11 228/14
228/15 228/17 243/11
248/22 250/8
**lost [40]** 18/19 19/2 19/3
30/10 34/9 34/9 92/14
108/25 109/3 109/9
112/5 112/11 112/14
148/10 152/12 152/18
154/15 154/17 155/13
155/16 166/9 200/19
203/15 205/5 205/8
210/21 211/10 212/3
214/20 215/6 216/13
216/15 219/16 219/17
221/5 221/8 227/20
229/9 229/10 229/12
**lot [11]** 8/6 18/6 64/20
88/8 114/5 117/7 136/15
143/21 207/14 213/20
246/8
**lots [2]** 43/15 43/15
**low [3]** 79/15 240/10
240/11
**Lowell [1]** 134/20
**lower [10]** 66/23 68/3
68/6 78/7 79/3 79/11
102/19 156/1 157/1
240/3
**lumped [1]** 215/20
**lunch [2]** 131/2 131/6

**M**

**M-e-l-l-e-y [1]** 146/6
**MacKinlay [2]** 104/15
104/18
**magnitudes [1]** 242/5
**mail [15]** 1/20 14/22
15/7 15/9 15/12 15/14
15/25 16/1 16/12 16/15
29/7 195/3 195/11 196/2

223/10
**mails [2]** 144/2 144/5
**main [2]** 147/23 151/19
**major [1]** 120/20
**majority [1]** 156/14
**makes [3]** 61/25 85/25
105/16
**making [10]** 5/8 7/2
28/15 28/18 36/10 41/25
62/22 62/23 105/22
201/6
**management [2]** 22/3
32/20
**mandate [1]** 128/22
**manipulating [1]** 71/13
**manipulative [6]** 70/17
70/20 71/2 72/12 134/5
134/7
**manually [1]** 189/17
**March [10]** 26/4 26/9
26/14 26/15 26/18 28/13
78/10 78/20 85/7 248/22
**March 30th [1]** 85/7
**March 5th [2]** 78/10
78/20
**margin [3]** 62/18 99/3
99/12
**mark [8]** 5/15 5/17 5/20
29/4 30/24 216/2 216/11
254/3
**marked [13]** 9/18 13/8
14/18 30/21 38/22 48/9
48/21 49/10 49/13 77/16
134/11 136/23 175/18
**market [98]** 17/12 18/7
18/11 19/9 22/18 22/21
25/3 42/15 42/23 43/13
48/2 51/1 51/4 51/7
51/13 51/15 51/19 51/22
52/10 52/13 52/18 53/1
53/6 53/7 53/20 54/6
54/7 54/18 54/24 54/24
55/2 55/4 55/10 55/15
55/17 56/8 56/25 59/24
64/3 67/15 70/22 77/8
77/10 83/21 86/24 96/16
96/17 103/23 104/1
104/10 105/9 105/16
105/17 105/24 106/4
106/5 106/9 106/11
106/18 106/23 106/25
107/18 107/20 110/6
110/23 117/7 120/7
122/3 122/7 126/14
136/16 158/24 161/1
202/13 214/1 228/16
229/3 230/12 231/10
231/12 231/16 231/20
231/22 231/24 232/5
232/14 232/17 234/20
234/25 244/2 244/19
244/23 245/25 246/5
251/10 251/11 251/12
251/16
**marketplace [1]** 104/24
**markets [4]** 25/13 51/5

51/19 51/23 51/25 51/25
248/16
**marketwide [1]** 251/4
**MARRA [2]** 1/12 3/6
**Martin [2]** 169/25 170/1
**material [2]** 18/24 76/9
**materials [4]** 8/14 20/24
21/15 43/8
**math [2]** 163/3 213/17
**matter [8]** 51/11 80/17
85/25 112/25 148/3
220/22 245/18 256/12
**mattered [1]** 86/13
**matters [2]** 4/11 36/17
**maybe [34]** 17/12 21/20
24/14 24/18 24/20 24/22
27/20 27/21 27/21 35/17
73/12 110/23 115/20
121/22 123/9 124/8
128/13 143/14 145/1
157/22 157/23 178/2
186/21 192/3 195/2
195/19 197/2 205/4
208/5 208/10 208/22
216/22 216/24 240/9
**Maytag [4]** 58/25 59/1
59/6 59/7
**MBA [2]** 35/25 224/15
**me [67]** 3/14 3/25 8/9
8/10 9/13 10/17 16/23
17/8 24/7 24/23 33/10
58/7 58/16 71/1 80/25
83/13 106/6 108/10
108/14 109/24 117/4
119/9 122/11 122/20
122/20 124/1 125/25
127/10 133/8 135/3
138/9 142/21 147/16
151/13 154/21 155/24
161/10 170/1 171/24
171/24 172/21 174/7
183/8 183/22 183/25
184/1 190/2 190/5
190/11 191/14 195/13
196/12 196/15 199/2
202/14 202/18 207/15
209/5 213/16 214/4
219/1 227/18 228/16
237/6 240/8 245/11
248/2
**mean [48]** 12/3 24/9
31/3 40/6 48/25 52/14
74/23 74/24 77/9 95/10
95/11 99/15 110/12
113/11 138/12 144/21
149/24 151/3 158/14
186/19 189/6 189/9
190/7 190/8 190/23
191/4 191/14 191/16
191/17 193/25 198/1
200/21 201/16 202/6
202/17 202/18 207/17
226/13 232/8 232/10
238/9 238/21 240/14
241/11 241/13 243/23
247/25 248/3
**meaning [3]** 104/23

162/14 210/9
**meaningful [1]** 231/8
**means [10]** 40/7 49/1
55/1 55/3 82/18 131/22
203/11 208/7 238/10
249/24
**meant [5]** 39/19 122/21
123/10 204/4 238/13
**measure [28]** 41/11
41/12 67/13 75/7 80/19
81/3 81/3 81/13 81/14
82/16 88/2 88/3 88/5
88/13 88/14 88/15 88/17
101/22 106/14 109/25
127/15 131/23 131/25
132/1 132/9 132/10
228/5 248/23
**measured [4]** 51/7 51/8
88/16 105/1
**measures [3]** 87/24
88/22 133/16
**measuring [1]** 54/14
**medical [5]** 10/19 53/2
53/11 55/20 56/8
**meet [1]** 159/1
**Melley [81]** 92/23 93/10
95/3 96/4 101/11 103/19
109/12 113/14 140/1
145/24 146/1 146/6
146/9 146/11 147/4
147/8 150/4 150/18
151/10 152/1 152/4
155/19 156/8 158/6
159/9 161/19 162/7
163/16 164/15 165/19
165/25 166/22 167/4
167/15 167/24 168/10
169/4 169/20 170/11
171/2 171/24 172/7
172/17 173/6 173/25
174/5 174/21 175/6
175/14 175/24 176/12
177/5 177/15 178/6
178/20 179/8 179/11
179/23 180/8 180/21
181/6 181/14 181/17
182/5 182/13 182/22
183/5 183/13 184/16
186/6 187/17 188/10
218/4 218/13 219/22
220/8 220/22 227/9
245/11 245/13 254/14
**Melley's [5]** 109/9 228/4
228/16 228/24 245/21
**memorandum [3]**
181/12 181/13 252/19
**mention [7]** 45/6 71/16
118/24 234/14 242/12
242/21 242/22
**mentioned [4]** 11/16
18/19 160/12 160/22
**Merit [1]** 256/9
**method [27]** 92/20 94/16
94/21 94/22 94/24 95/5
95/8 109/9 109/12
110/18 110/21 110/24

111/5 147/24 148/11
149/7 149/9 149/10
149/17 149/18 185/12
186/8 187/1 187/5
194/22 226/10 226/11
**methodologies [8]**
147/20 147/22 147/23
148/1 148/2 148/14
149/4 226/19
**methodology [31]** 39/24
147/25 148/8 153/2
153/16 161/14 166/6
185/3 185/22 185/25
203/1 206/8 207/13
209/10 209/23 213/19
219/5 226/15 226/18
227/14 227/15 227/16
228/5 228/9 228/10
229/18 229/21 230/5
231/9 234/12 242/16
**methods [1]** 94/17
**metric [4]** 67/16 80/22
80/25 83/12
**Miami [2]** 2/17 2/19
**Michelle [2]** 2/3 3/8
**microphone [5]** 6/8 7/11
35/15 35/18 222/13
**middle [4]** 44/11 66/24
71/21 233/13
**might [20]** 18/10 26/2
40/25 58/21 58/23 59/3
70/25 71/9 71/10 74/19
82/6 103/8 120/3 121/14
121/15 214/19 227/20
244/2 246/15 246/22
**million [35]** 9/14 14/6
27/6 27/24 37/25 38/5
44/6 81/10 81/11 87/9
87/9 155/22 155/23
158/19 164/4 164/7
164/9 170/6 175/5
178/22 178/23 181/8
186/17 192/25 193/20
193/22 212/7 213/12
245/6 245/10 245/12
245/20 245/22 245/22
248/18
**millions [3]** 82/18
212/14 212/15
**Mills [5]** 84/9 84/12
84/13 84/20 84/23
**mine [1]** 23/1
**minimal [1]** 161/12
**minus [7]** 44/19 100/25
197/4 201/25 202/8
211/1 240/9
**minute [7]** 70/4 125/17
156/8 187/24 191/20
217/8 223/16
**minutes [11]** 14/1 14/11
27/23 28/1 32/6 70/3
122/9 122/13 131/1
139/15 251/23
**misconduct [2]** 72/5
72/7
**misleading [1]** 76/13

**M**

**miss [2]** 93/9 97/3
**missing [1]** 61/14
**mission [1]** 77/11
**misstate [2]** 71/24
127/11
**misunderstanding [1]**
17/24
**Mitch [1]** 14/22
**MITCHELL [5]** 1/6 3/5
178/4 178/13 193/23
**MLAT [1]** 177/17
**MM [1]** 82/17
**model [1]** 84/3
**modified [11]** 147/23
148/11 149/7 149/8
149/16 149/17 184/25
185/12 186/7 187/1
187/5
**module [1]** 135/8
**moment [12]** 19/11
23/10 23/20 25/18 30/13
39/22 110/20 113/1
115/8 128/25 139/19
170/12
**moments [2]** 24/15
120/16
**Monday [6]** 15/9 73/18
210/19 236/12 236/14
243/19
**money [37]** 46/19 47/2
47/3 59/5 62/24 111/19
111/25 112/3 112/5
112/11 112/13 112/14
112/17 148/10 148/10
152/12 152/18 152/18
155/13 155/16 155/16
183/16 184/16 184/20
192/15 193/12 200/19
212/3 215/6 216/11
216/12 216/13 216/15
216/17 221/5 229/12
229/16
**monies [1]** 193/13
**month [3]** 83/9 83/9
83/16
**months [12]** 15/21 26/7
26/7 26/14 26/15 64/24
64/25 65/20 83/24 84/1
85/22 85/24
**Moore [3]** 2/10 2/13
3/13
**morning [22]** 3/2 3/9
3/11 3/12 3/15 3/17 3/18
3/22 6/1 6/1 6/2 12/19
19/20 19/21 23/6 23/19
27/22 91/24 91/25 252/8
252/14 252/17
**most [14]** 45/8 64/14
65/20 66/15 110/24
127/14 127/21 132/23
139/1 155/11 155/15
219/20 224/18 231/4
**mostly [1]** 36/9 252/25
253/4
**motivated [1]** 16/20

**move [18]** 7/10 35/20
51/6 55/23 120/13
142/20 159/2 163/9
166/16 169/15 172/11
175/19 176/24 180/13
182/25 184/24 193/4
229/10
**moved [1]** 120/12
**movement [8]** 54/2 71/3
232/20 232/23 238/18
239/5 246/14 246/23
**movements [1]** 133/7
**moves [7]** 6/9 13/14
14/23 48/13 53/18 167/7
222/15
**moving [9]** 53/16 53/19
53/19 53/20 53/25 55/4
106/2 120/8 162/22
**Mr [6]** 160/3 254/5
254/9 254/13 254/16
254/19
**Mr. [136]** 3/16 3/19 3/25
6/1 6/8 8/24 9/16 15/7
15/23 16/18 17/2 19/20
28/24 30/16 32/19 34/3
34/6 34/20 70/9 92/23
95/3 96/4 101/11 103/19
109/9 109/12 138/15
145/9 146/9 146/11
147/4 147/8 150/4
150/18 151/10 152/1
152/4 155/2 155/3
155/19 156/8 158/6
159/9 161/19 162/7
163/16 164/15 165/19
165/25 166/22 167/4
167/15 167/24 168/10
169/4 169/20 170/5
170/7 170/9 170/11
170/14 171/2 171/7
171/12 171/24 172/1
172/7 172/17 173/6
173/25 174/5 174/6
174/21 175/6 175/14
175/24 176/12 177/5
177/15 178/6 178/9
178/15 178/20 179/8
179/11 179/12 179/23
180/4 180/8 180/21
181/6 181/14 181/17
182/5 182/6 182/8
182/13 182/22 183/5
183/13 183/22 183/23
184/16 184/17 184/20
186/6 187/17 188/4
188/10 191/23 192/12
192/14 192/16 192/25
193/2 193/11 193/21
206/14 215/2 216/21
217/19 218/4 218/13
219/22 220/8 220/22
226/24 227/9 228/4
228/16 228/24 245/5
245/7 245/11 245/13
245/21
**Mr. Al-Sai [1]** 206/14

**Mr. Anand [7]** 182/6
182/8 183/22 183/23
184/17 192/14 192/25
**Mr. Carter [8]** 170/5
170/7 170/9 170/14
192/12 192/16 193/11
193/21
**Mr. Gulati [1]** 174/6
**Mr. Harris [2]** 215/2
216/21
**Mr. Melley [74]** 92/23
95/3 96/4 101/11 103/19
109/12 146/9 146/11
147/4 147/8 150/4
150/18 151/10 152/1
152/4 155/19 156/8
158/6 159/9 161/19
162/7 163/16 164/15
165/19 165/25 166/22
167/4 167/15 167/24
168/10 169/4 169/20
170/11 171/12 171/24
172/7 172/17 173/6
173/25 174/5 174/21
175/6 175/24 176/12
177/15 177/17 177/15
178/6 178/20 179/8
180/21 181/6 181/14
181/17 182/5 182/13
184/16 186/6 187/17
188/10 218/4 218/13
219/22 220/8 220/22
227/9 245/11 245/13
**Mr. Melley's [5]** 109/9
228/4 228/16 228/24
245/21
**Mr. Stein [18]** 3/16 3/19
3/25 15/7 16/18 155/2
155/3 171/7 171/12
172/1 178/9 178/15
179/12 184/20 191/23
193/2 226/24 245/5
**Mr. Stein's [4]** 70/9
180/4 188/4 245/7
**Mr. Taylor [15]** 6/1 6/8
8/24 9/16 15/23 17/2
19/20 28/24 30/16 32/19
34/3 34/6 34/20 138/15
217/19
**Mr. Taylor's [1]** 145/9
**Ms [7]** 254/4 254/6
254/8 254/10 254/12
254/15 254/17
**Ms. [4]** 7/10 141/16
143/2 143/18
**Ms. Pascucci [1]** 7/10
**Ms. Smith [3]** 141/16
143/2 143/18
**much [30]** 8/24 17/22
18/15 18/21 23/23 63/16
67/11 67/13 67/14 77/9
88/3 90/2 92/13 94/7
94/9 102/21 108/4 110/6
110/7 111/15 122/24

200/5 204/5 205/8
210/21 212/3 215/15
229/22 232/11 252/4
**multiple [10]** 42/1 42/8
42/13 56/7 61/23 62/4
85/22 155/7 163/22
163/23
**multiplied [6]** 160/17
162/17 174/25 211/9
216/6 245/8
**multiply [9]** 110/9
110/15 168/22 192/24
210/6 210/25 212/8
213/12 228/22
**multiplying [2]** 110/22
212/17
**Muscillo [3]** 172/9
173/11 192/12
**must [1]** 237/11
**myself [1]** 22/19

**N**

**naked [37]** 58/4 72/8
72/9 72/10 72/12 72/18
73/2 73/4 73/17 73/23
74/2 74/5 74/10 74/15
75/19 76/5 76/7 76/11
76/16 76/23 77/25 81/20
81/20 82/1 82/9 83/1
83/2 83/7 90/18 115/8
115/10 115/17 116/24
116/25 117/6 118/2
128/4
**name [27]** 5/19 5/19
6/15 6/21 7/25 8/4 9/1
9/4 19/2 32/23 32/23
33/4 35/9 35/9 35/11
93/2 141/12 141/12
146/4 146/5 155/10
162/12 175/25 176/14
180/11 222/17 222/18
**names [4]** 169/1 174/7
174/9 217/2
**nano [1]** 118/9
**narrow [42]** 149/17
166/1 166/8 166/10
166/13 185/24 185/25
188/24 190/2 190/8
191/11 191/21 194/23
195/19 196/13 198/14
198/8 199/11 200/1
203/5 203/8 203/9
204/10 204/12 204/14
204/17 204/20 205/5
207/21 207/22 207/25
209/6 214/5 214/24
215/11 215/17 215/19
215/24 216/3 216/15
217/12 221/9
**nature [1]** 66/24
**near [1]** 93/9
**necessarily [12]** 8/5
21/25 22/23 103/11
155/6 197/11 231/5
235/24 238/7 239/11
242/11 243/25

**necessary [2]** 147/2
150/23
**need [18]** 5/7 20/19
51/22 58/11 105/9
105/15 109/11 109/11
111/16 128/17 149/20
187/10 213/3 231/7
231/13 231/16 231/18
231/21
**needed [2]** 108/20
196/23
**negative [32]** 45/19
45/20 46/3 46/8 50/13
50/16 55/1 55/3 55/22
68/7 78/14 80/9 80/10
98/17 99/24 108/5
126/21 247/9 247/18
247/20 247/21 247/24
248/15 248/17 248/18
248/25 249/3 249/8
249/8 249/14 249/24
249/25
**neighborhood [1]**
124/13
**neither [1]** 56/12
**net [5]** 19/5 60/19 87/10
87/10 87/11
**never [14]** 16/22 17/16
32/23 51/9 57/19 77/4
111/5 137/6 137/7 137/9
140/2 140/2 140/11
140/12
**new [25]** 2/4 2/8 2/12
2/15 10/25 43/14 65/4
65/6 65/15 65/24 66/8
75/5 75/6 117/23 118/11
135/5 160/19 186/4
186/7 186/21 200/24
232/13 246/23 250/5
250/9
**news [45]** 39/25 40/4
40/5 40/18 40/19 40/22
40/25 41/2 43/15 43/16
45/3 45/6 46/12 97/5
97/7 97/8 97/9 97/10
97/12 97/14 97/17 97/18
106/2 106/21 106/24
107/3 107/18 107/24
107/24 108/8 112/19
114/14 230/2 230/13
231/10 231/15 231/23
238/23 242/9 242/10
242/15 242/18 246/4
246/10 246/10
**next [29]** 12/14 26/6
32/8 35/4 40/12 40/22
69/25 72/3 74/2 74/2
78/25 79/1 83/23 139/17
140/1 160/12 160/14
178/2 178/3 178/10
179/5 183/25 193/5
206/13 221/17 228/1
234/5 243/19 249/12
**nice [2]** 25/22 253/15
**nickel [1]** 17/12
**nine [3]** 26/6 216/22

**N**

**nine... [1]** 249/6
**no [181]** 1/2 7/6 8/19
10/4 11/20 11/25 13/17
13/19 14/3 14/25 15/2
15/4 16/17 16/17 16/19
17/11 18/7 18/11 19/14
20/4 23/5 25/5 27/12
27/16 28/9 28/9 29/14
29/16 29/25 29/25 31/8
31/9 31/22 33/1 33/1
33/6 33/6 33/18 34/5
34/14 36/24 42/7 42/8
47/19 48/15 48/17 51/24
54/7 56/11 58/17 62/20
66/12 67/23 70/18 71/2
72/13 74/16 85/17 85/25
88/19 89/7 90/1 90/20
91/17 92/20 93/4 101/2
101/10 105/19 107/15
108/14 111/6 111/21
113/2 115/16 117/9
118/24 121/3 121/8
121/25 129/8 129/22
133/11 134/7 137/19
139/13 140/24 144/6
148/24 149/2 149/5
149/23 163/10 163/12
166/18 166/20 167/10
167/13 169/18 170/25
171/3 171/22 172/13
172/15 173/1 173/2
173/21 173/23 174/7
175/20 175/22 176/6
176/18 177/1 177/3
178/9 178/18 180/15
180/17 183/1 183/3
186/21 187/13 188/14
188/20 188/21 192/20
193/3 193/25 194/1
194/21 195/7 195/9
197/18 198/18 198/18
200/4 207/8 209/17
210/10 211/25 214/2
215/5 217/2 217/14
221/10 222/3 223/20
226/19 227/21 231/1
231/4 231/6 233/22
234/1 235/8 235/17
237/14 239/24 240/17
241/9 242/4 243/9
245/18 255/5 255/6
255/8 255/9 255/10
255/11 255/12 255/13
255/14 255/15 255/16
255/17 255/18 255/19
256/4 256/5 256/6
**nobody [1]** 42/10
**noise [8]** 98/6 98/9 98/17
100/3 100/7 232/24
240/19 240/23
**none [7]** 16/13 17/7 52/8
84/22 116/3 116/8 134/2
**nonfraudulent [1]**
108/10
**nonmanipulative [2]**

70/19 71/6
**nonpublic [1]** 51/12
**nontrading [1]** 88/18
**normal [2]** 41/7 132/2
**normalize [1]** 88/10
**North [1]** 224/19
**Northwest [2]** 2/4 2/8
**Nos [4]** 10/10 37/3 255/4
255/7
**nose [3]** 23/7 23/9 23/12
**note [5]** 67/2 104/14
126/12 181/10 186/16
**note 3 [1]** 104/14
**nothing [7]** 13/24 14/7
14/8 171/17 187/16
217/22 221/13
**notice [6]** 9/16 32/10
114/12 115/3 115/25
141/5
**notion [2]** 201/15 201/16
**November [1]** 7/16
**November-December**
**[1]** 7/16
**nowhere [1]** 14/8
**number [93]** 3/6 4/24
5/1 9/23 34/11 55/6 67/1
73/24 74/1 74/24 74/25
75/2 75/14 75/24 78/12
78/14 78/23 79/9 80/11
81/4 81/12 88/6 88/17
88/18 93/23 99/8 101/4
106/12 107/8 109/20
109/20 110/10 110/16
110/16 133/12 148/12
153/17 153/23 155/12
155/15 157/5 157/19
157/24 158/15 160/4
160/17 160/19 160/20
165/11 169/25 174/2
174/21 175/1 176/22
177/16 180/7 181/12
181/25 181/25 183/5
185/24 193/22 198/10
198/24 199/5 200/18
200/19 206/3 208/1
211/3 211/22 212/17
215/18 216/23 218/4
218/8 219/9 219/10
219/20 220/23 228/23
232/14 232/16 238/14
239/21 245/3 245/9
245/12 245/12 249/23
250/16 250/16 250/18
**number 1 [1]** 9/23
**number**
**11-80205-CR-MARRA**
**[1]** 3/6
**number 3 [1]** 199/5
**number 5 [1]** 198/24
**numbered [1]** 4/22
**numbers [24]** 31/25 32/2
56/11 61/19 61/20
102/23 148/15 149/14
149/15 149/18 152/8
171/16 171/20 179/19
186/9 190/3 192/16

192/20 194/4 194/5
194/11 195/25 196/1
250/1
**numerous [1]** 129/6
**NY [2]** 2/12 2/15
**NYSE [3]** 118/3 118/5
118/9
**NYSE-listed [1]** 118/5

**O**

**o'clock [5]** 24/19 120/5
145/6 145/18 222/2
**O'N [1]** 222/20
**O'N-e-a-l [1]** 222/20
**O'Neal [10]** 42/11 127/4
133/2 222/8 222/11
222/19 222/19 223/3
224/3 254/18
**O'Neal's [2]** 125/18
126/20
**object [3]** 137/4 144/7
171/14
**objection [54]** 10/5
13/16 13/17 13/18 14/25
15/1 15/2 15/3 29/13
29/15 29/22 31/7 31/11
31/14 31/16 35/24 36/24
37/2 48/15 48/16 95/15
136/2 138/18 163/10
163/11 166/18 166/19
167/10 167/12 169/13
169/17 170/23 171/21
172/11 172/13 172/14
173/12 173/19 173/20
173/22 175/20 175/21
177/1 177/12 180/15
180/16 183/1 183/2
185/4 185/13 186/22
187/12 195/6 195/8
**objection, [1]** 10/9
**objection, 1, 2 [1]** 10/9
**objections [4]** 31/19
31/22 140/18 253/7
**objects [1]** 62/2
**obligations [1]** 144/12
**observation [1]** 89/11
**observe [7]** 51/17 54/5
68/2 68/7 72/21 79/10
79/11
**observed [10]** 54/14
69/18 76/20 97/5 97/11
105/2 132/11 132/15
132/17 227/8
**obvious [4]** 33/7 33/13
115/2 216/24
**obviously [7]** 127/23
230/4 233/6 236/13
236/24 242/8 243/4
**occasion [1]** 16/22
**occur [2]** 69/16 235/11
**occurred [5]** 17/4
18/13 23/12 24/13 24/15
24/21 26/14 26/15 38/19
43/21 49/2 50/12 69/17
74/9 84/24 85/11 85/12
121/10 138/16 142/17

142/17 236/11 249/6
**occurring [2]** 12/15 98/6
**occurs [4]** 71/23 81/25
82/1 241/19
**October [10]** 10/24
26/13 37/20 38/7 92/7
92/8 101/16 114/8
118/25 233/25
**October 10th [8]** 10/24
37/20 38/7 92/7 92/8
101/16 114/8 118/25
**off [13]** 74/4 86/21 99/14
100/12 105/13 111/25
154/20 188/17 204/17
204/21 209/2 210/3
247/12
**offer [5]** 15/25 149/3
185/2 195/4 232/2
**offered [1]** 66/10
**offers [2]** 29/11 31/1
**offhand [1]** 217/14
**office [1]** 12/19
**officer [1]** 134/20
**Official [1]** 1/18
**offset [1]** 113/3
**often [10]** 76/17 76/21
77/20 91/1 96/20 135/19
135/21 232/5 243/23
246/18
**oftentimes [1]** 53/18
**oh [11]** 8/21 14/17 15/16
19/7 82/4 93/4 93/6
125/2 212/11 212/21
222/3
**okay [159]** 4/6 5/14 6/11
9/22 10/3 13/10 14/20
15/18 15/24 18/15 20/6
22/6 22/21 25/7 25/15
26/5 26/12 28/20 29/24
30/3 34/16 34/18 35/3
35/21 58/12 59/8 63/1
91/16 93/3 93/5 93/11
93/21 93/25 94/15 94/24
95/7 95/12 96/3 96/8
97/3 97/7 97/12 97/15
99/2 99/15 99/20 101/4
101/11 102/10 102/18
103/3 103/9 103/13
105/8 106/16 106/25
108/6 108/13 109/8
109/15 110/20 111/1
111/3 111/5 111/18
111/23 112/4 114/11
115/1 115/24 116/20
117/3 117/19 118/13
119/5 119/16 120/2
120/4 120/15 120/23
121/4 121/16 121/19
122/8 122/17 124/10
124/18 125/4 126/4
126/7 126/25 130/3 131/2
130/12 139/24 143/13
143/15 144/5 144/20
145/20 150/8 150/20
151/23 152/23 153/21

157/6 161/10 161/19
178/4 181/15 185/13
188/20 191/24 193/4
193/14 194/3 194/12
194/19 194/22 195/21
196/2 196/11 198/8
198/13 198/16 199/5
199/17 200/11 200/15
201/6 201/10 202/16
203/10 204/23 205/5
208/6 209/15 215/5
215/11 215/21 216/9
220/12 221/24 222/6
222/14 222/16 227/1
229/19 229/23 231/19
236/9 236/9 245/2
248/11 248/19 252/9
253/12
**old [2]** 20/4 31/4
**omission [2]** 235/7 235/9
**omissions [1]** 236/2
**omitted [2]** 235/14
237/9
**once [13]** 31/5 40/12
40/20 41/2 79/9 116/12
122/8 157/15 160/11
161/19 225/20 235/12
242/14
**one [99]** 5/8 5/8 9/8 14/1
14/4 16/2 17/21 17/22
26/14 26/15 30/3 30/13
31/20 39/14 39/17 44/11
51/8 56/12 59/15 62/10
62/11 63/16 71/8 78/19
81/4 81/6 83/6 83/16
83/21 88/13 93/7 93/16
94/17 94/18 96/12 96/20
97/4 97/8 102/15 104/13
105/24 108/12 112/2
114/7 115/3 115/20
124/1 125/7 125/23
128/25 130/8 130/9
139/19 140/20 140/21
147/23 152/8 152/9
153/1 153/9 153/11
155/4 155/13 155/16
156/1 160/5 163/23
176/14 181/10 185/14
186/17 187/11 189/5
193/25 194/2 196/21
198/10 203/7 206/6
212/5 213/13 215/20
217/8 217/14 224/8
226/22 228/22 237/5
237/20 238/2 241/14
244/9 244/21 250/14
250/21 250/21 250/21
251/1 252/15
**one's [1]** 161/15
**one-day [3]** 63/16 125/7
237/5
**one-sided [1]** 14/1
**one-third [5]** 250/14
250/21 250/21 250/21
251/1
**ones [2]** 39/19 215/19

## O

**ongoing [5]** 71/9 71/10 226/4 238/4 238/4
**only [38]** 8/4 20/2 20/18 26/25 50/9 50/9 50/10 50/12 51/11 106/20 108/11 144/18 147/25 148/7 153/16 153/17 154/15 162/14 166/8 178/9 186/20 187/3 203/23 205/23 210/4 213/8 223/9 230/15 230/22 240/15 241/6 241/17 243/14 243/17 244/15 245/14 245/21 249/7
**onset [1]** 245/15
**open [1]** 59/24
**opening [5]** 5/4 5/7 5/11 177/22 178/7
**operate [1]** 53/11
**operating [6]** 25/14 248/8 248/9 248/14 248/15 250/8
**operations [1]** 10/17
**opine [1]** 108/24
**opined [1]** 115/9
**opinion [35]** 44/22 44/24 46/6 46/8 47/25 51/24 54/11 89/24 92/17 92/20 103/13 103/25 115/5 119/5 122/12 122/15 128/4 128/23 159/5 171/19 227/13 227/19 230/11 230/15 232/3 234/11 234/12 234/13 234/20 235/3 237/1 237/18 249/9 250/4 250/23
**opinions [3]** 149/3 228/5 228/8
**opportunity [11]** 142/23 143/11 170/11 171/10 177/18 179/11 180/1 182/6 183/8 183/15 252/20
**opposed [5]** 67/3 132/18 153/9 207/6 241/7
**opposite [4]** 55/4 55/23 68/22 68/23
**order [34]** 3/1 26/10 32/25 39/7 39/8 39/11 44/6 44/25 45/7 45/8 45/9 45/12 59/5 59/13 59/23 60/6 62/16 98/24 105/10 105/14 106/3 106/5 107/22 111/17 119/3 123/7 129/12 196/22 200/6 209/3 209/6 231/7 247/22 251/9
**ordered [1]** 10/18
**orders [39]** 10/16 10/25 12/25 13/1 14/6 14/15 16/9 21/13 26/23 27/5 27/6 33/16 37/24 38/4

38/9 38/10 39/5 43/24 99/16 122/23 122/25 123/3 123/4 126/7 127/7 129/10 135/5 151/22 151/25 234/15 234/19 235/1 242/22 243/6 243/8 246/24 250/6 250/7 250/25
**ordinarily [1]** 7/4
**ordinary [3]** 27/8 40/9 50/1
**organization [3]** 146/20 188/15 188/17
**original [6]** 137/2 162/13 162/18 162/23 199/16 212/19
**originally [1]** 192/16
**OTCBB [1]** 114/21
**others [5]** 6/22 18/5 192/2 193/10 217/5
**our [14]** 27/5 90/23 92/24 137/1 146/20 149/16 184/25 185/8 185/11 186/22 219/13 223/17 235/19 253/2
**outset [2]** 154/4 154/6
**outside [5]** 19/3 136/2 137/5 144/8 224/5
**outsiders [1]** 127/15
**outstanding [16]** 69/15 82/20 82/24 88/7 88/8 88/10 109/21 110/10 110/17 117/20 148/12 187/2 232/10 245/5 245/7 245/9
**outweighed [1]** 247/17
**over [36]** 11/8 12/21 15/15 23/23 38/9 43/20 53/1 53/3 53/23 63/15 64/16 65/19 65/21 78/15 84/14 91/11 103/4 105/2 115/10 125/13 125/14 126/22 154/22 162/3 170/6 171/21 190/4 191/16 191/17 229/2 233/8 234/2 238/14 244/2 245/2 247/14
**over-the-counter [1]** 84/14
**overall [11]** 48/2 63/9 78/3 115/10 115/16 116/7 116/10 169/8 189/6 189/24 212/20
**overpaid [2]** 109/5 111/13
**overpay [1]** 94/10
**overpriced [1]** 111/12
**Overruled [4]** 29/23 95/16 136/4 173/14
**oversee [1]** 36/8
**overstate [1]** 207/10
**own [17]** 8/4 8/12 9/1 17/23 18/22 19/3 29/19 57/8 57/10 57/15 58/14 59/4 90/9 130/18 138/19 140/22 243/11

**owned [3]** 23/4 27/19 247/15
**owner [3]** 59/3 178/14 178/16
**ownership [1]** 113/3

## P

**p.m [9]** 15/9 70/6 131/9 131/9 188/1 188/1 223/21 223/21 253/16
**Pacific [1]** 33/5
**Pack [4]** 215/5 215/8 215/17 215/19
**page [58]** 1/16 37/22 38/2 38/6 39/4 43/18 45/13 47/10 49/23 52/4 52/21 54/9 58/6 58/8 59/10 60/21 61/4 63/6 64/18 66/6 66/11 67/17 68/10 69/10 69/22 70/14 71/17 72/14 76/4 77/12 78/8 79/4 80/2 80/16 81/15 82/13 84/8 84/25 86/14 87/19 89/14 104/22 107/8 115/24 133/15 163/14 177/20 178/2 178/3 178/10 178/10 178/12 178/19 179/5 179/6 209/25 220/8 220/16
**page 10 [1]** 52/4
**page 11 [1]** 52/21
**page 113 [1]** 178/19
**page 12 [1]** 54/9
**page 13 [1]** 58/6
**page 14 [2]** 61/4 63/6
**page 140 [1]** 104/22
**page 15 [1]** 64/18
**page 16 [1]** 67/17
**page 17 [1]** 68/10
**page 18 [1]** 69/10
**page 19 [2]** 69/22 70/14
**page 2 [1]** 37/22
**page 20 [1]** 71/17
**page 21 [1]** 72/14
**page 22 [1]** 76/4
**page 23 [1]** 77/12
**page 24 [1]** 78/8
**page 25 [1]** 79/4
**page 26 [1]** 80/2
**page 27 [1]** 80/16
**page 28 [1]** 81/15
**page 29 [2]** 82/13 133/15
**page 3 [3]** 38/2 177/20 220/8
**page 30 [1]** 84/8
**page 31 [1]** 84/25
**page 32 [1]** 86/14
**page 33 [1]** 87/19
**page 34 [1]** 89/14
**page 4 [1]** 38/6
**page 45 [1]** 66/6
**page 5 [3]** 39/4 178/10 178/12
**page 6 [1]** 47/10

**page 7 [1]** 43/18
**page 8 [1]** 45/13
**page 9 [1]** 49/23
**pages [5]** 1/10 21/21 179/20 181/11 246/8
**pages 15 [1]** 181/11
**paid [10]** 76/12 90/2 90/4 102/15 112/13 137/9 197/12 202/5 202/18 207/6
**Palm [2]** 1/7 1/19
**paper [7]** 28/22 65/1 65/4 65/9 149/16 185/9 185/11
**papers [4]** 4/12 5/6 149/10 191/7
**paperwork [1]** 178/8
**par [2]** 21/11
**paragraph [6]** 104/14 126/12 127/9 135/1 199/1 200/11
**paragraph 12 [1]** 104/14
**paragraph 16 [1]** 126/12
**paragraph 3 [1]** 199/1
**paragraph 4 [1]** 200/11
**paragraph 6 [1]** 127/9
**paragraphs [1]** 243/5
**paralegal [1]** 3/21
**parameters [2]** 196/12 196/13
**parentheses [1]** 80/12
**parenthesis [5]** 55/7 55/7 56/12 69/1 82/17
**Parsapour [1]** 205/5
**partial [5]** 135/13 135/15 135/16 241/6 242/3
**participants [1]** 136/17
**particular [21]** 58/23 64/23 102/18 103/3 103/5 105/10 105/14 135/19 135/22 149/4 151/6 153/13 153/20 174/22 197/7 197/23 203/7 207/3 231/10 231/22 240/6
**particularly [2]** 89/12 116/11
**parties [1]** 90/11
**Partners [1]** 6/21
**partnership [1]** 135/8
**Pascucci [7]** 2/2 3/8 7/10 254/4 254/6 254/8 254/10
**paths [1]** 92/24
**pattern [4]** 7/2 68/1 68/7 235/25
**pause [1]** 95/9
**pay [4]** 39/9 62/25 90/4 91/11
**payment [2]** 113/2 188/20
**pays [1]** 91/5
**peak [8]** 63/24 124/18

125/5 125/5 125/6 125/8 233/10 236/24
**peaked [1]** 234/3
**peaks [3]** 63/25 115/25 116/4
**peer [2]** 42/6 42/9
**peer-reviewed [2]** 42/6 42/9
**pending [1]** 135/5
**pennies [1]** 18/9
**penny [4]** 34/10 212/10 212/10 243/18
**people [58]** 22/19 24/25 25/2 36/8 57/8 61/24 62/1 62/3 62/4 91/4 113/9 119/10 119/15 121/14 121/21 128/6 129/7 135/16 152/13 156/3 157/20 157/24 190/13 199/21 199/24 200/6 200/11 201/1 207/14 208/1 208/7 208/19 208/23 208/24 209/7 209/10 209/15 209/24 210/21 211/10 212/3 213/14 213/21 213/22 214/3 214/14 214/14 214/19 216/25 217/3 217/5 219/15 219/16 219/17 219/18 229/15 232/12 243/25
**people's [1]** 207/6
**per [4]** 18/9 59/15 84/15 180/25
**percent [149]** 41/17 41/22 42/13 44/7 44/8 45/19 46/3 46/9 49/2 49/4 49/7 49/22 50/9 50/10 50/11 50/12 50/14 50/15 55/13 55/16 56/3 56/4 56/5 62/20 62/21 64/15 64/16 65/7 65/11 65/17 65/22 66/18 67/4 67/5 69/3 69/3 78/14 78/21 79/3 79/15 81/5 81/8 81/9 81/13 93/21 98/4 98/11 98/14 98/16 98/20 98/21 98/22 99/2 99/9 99/9 99/10 99/17 99/22 99/24 100/3 100/7 100/7 100/8 100/11 100/23 101/1 101/2 101/8 101/12 101/17 101/19 101/21 101/22 101/23 103/6 108/1 108/7 108/10 108/23 109/2 109/7 109/8 111/10 111/13 112/12 125/13 129/23 130/14 131/19 131/23 132/4 132/14 132/17 132/19 132/21 132/22 132/25 133/3 198/9 198/14 198/22 203/6 203/10 203/12 203/23 205/21 205/24

**P**

**percent... [40]** 206/12
206/21 207/13 215/25
220/7 220/20 233/24
236/17 237/23 238/2
238/5 239/8 239/11
239/12 239/13 239/13
239/19 239/22 239/22
239/24 239/25 240/2
240/9 240/12 240/15
240/21 240/22 241/1
241/3 241/4 241/10
241/11 241/14 241/15
241/16 241/17 241/18
241/20 241/23 244/6
**percentage [8]** 18/23
20/12 69/13 69/15 80/21
150/24 197/23 198/5
**perfect [2]** 51/14 51/16
**perfectly [1]** 51/9
**perform [11]** 6/25 36/9
37/11 82/11 133/9 147/8
148/22 150/5 159/12
165/19 177/23
**performance [2]** 96/16
127/15
**performed [9]** 38/16
67/7 109/13 111/5
133/20 141/21 148/2
165/25 233/4
**performing [3]** 51/19
51/23 220/24
**perhaps [5]** 12/12 93/22
97/13 107/23 116/12
**period [187]** 18/4 26/4
26/16 32/23 37/15 43/1
43/3 43/21 47/16 48/6
50/9 50/10 50/13 50/21
50/22 50/22 50/23 50/24
52/2 52/9 52/19 53/2
53/4 53/5 53/24 54/8
60/3 60/14 63/8 63/11
63/16 65/8 65/12 65/14
65/18 65/19 65/21 65/21
66/1 66/4 66/17 75/24
77/14 78/10 78/21 78/22
78/25 84/10 84/17 84/21
84/24 85/2 85/11 85/13
85/16 85/18 86/19 87/2
87/4 87/8 87/18 87/22
88/22 88/24 89/3 89/5
89/6 89/9 89/17 89/19
89/22 89/25 90/20 92/3
92/14 100/20 102/1
105/2 109/3 114/11
115/10 115/16 115/17
116/1 116/13 116/18
122/23 123/5 134/1
134/4 134/8 148/9
149/17 150/13 151/16
151/18 152/11 153/6
156/9 158/12 164/20
165/6 165/7 165/9
165/16 165/18 165/21
166/1 166/3 166/8
166/10 166/13 166/13

167/19 185/25 188/24
189/12 190/3 190/9
190/12 191/11 191/12
191/21 194/23 195/19
195/20 196/7 198/14
199/8 199/11 199/25
200/1 200/5 200/13
200/14 200/17 200/20
200/22 200/23 201/1
203/5 203/7 203/8
203/10 203/16 204/5
204/9 204/10 204/12
204/12 204/14 204/17
204/20 204/20 205/5
207/21 207/23 207/25
208/25 209/7 211/18
211/23 213/12 214/5
214/24 215/11 215/17
215/19 215/22 215/24
216/3 216/15 217/12
217/13 217/20 221/6
221/9 229/1 229/3 233/1
233/5 233/8 233/9
233/19 234/2 237/24
238/6
**periods [15]** 63/16 63/17
63/20 64/4 64/6 64/16
66/21 77/22 78/4 165/3
185/24 185/24 196/14
196/14 199/4
**peripheral [2]** 9/2 18/18
**persist [1]** 90/24
**person [20]** 24/25 58/21
59/15 59/17 59/25 60/7
61/10 61/22 72/19 73/16
91/7 91/7 94/9 102/18
102/21 103/3 103/5
112/5 203/5 206/13
**personal [2]** 8/12 192/8
**personally [2]** 9/1 17/16
**perspective [2]** 84/2
244/18
**pertaining [1]** 177/16
**pervasive [1]** 77/2
**Peter [7]** 93/10 113/14
140/1 145/24 146/1
146/6 254/14
**Ph.d [3]** 35/24 224/15
224/16
**phenomena [1]** 76/20
**phone [2]** 12/22 144/4
**phrase [2]** 7/20 147/24
**phrasing [1]** 25/22
**physical [1]** 62/2
**physically [1]** 61/8
**picture [1]** 79/25
**piece [7]** 97/8 97/12
97/18 104/17 105/5
237/8 238/22
**pieces [9]** 97/9 107/3
246/20 247/2 250/4
250/9 250/15 250/22
251/2
**piecing [1]** 74/4
**place [8]** 59/5 62/10
113/1 138/13 140/7

145/4 145/7 153/18
**placed [1]** 180/10
**places [1]** 59/13
**plaintiff [1]** 113/2
**plan [10]** 10/22 13/1
14/4 14/7 16/5 16/11
25/6 25/21 25/23 26/22
**planning [1]** 12/14
**plans [1]** 12/25
**Plaza [2]** 2/11 2/14
**please [48]** 3/2 3/7 5/16
5/18 6/9 7/11 15/15
15/17 35/6 35/8 35/18
58/16 70/8 117/4 131/11
141/9 141/11 141/25
145/25 146/2 150/16
151/8 154/1 156/6 162/5
163/14 165/23 167/2
169/2 169/11 170/21
172/5 173/17 175/17
176/9 179/21 180/19
182/20 184/14 185/7
188/3 213/4 218/6
222/10 222/13 222/18
223/23 233/4
**pleased [1]** 135/4
**plenty [2]** 20/20 20/21
**plus [10]** 44/18 50/22
60/25 72/24 73/6 74/25
82/3 100/25 215/10
240/9
**point [25]** 4/20 8/7
21/24 27/12 27/17 47/7
62/20 65/5 78/13 103/5
111/11 113/5 154/20
155/21 157/18 157/19
158/4 158/9 162/3
181/10 198/10 220/5
237/3 239/9 245/7
**pointed [1]** 116/20
**pointing [2]** 44/11 66/16
**points [3]** 20/12 62/17
226/1
**policy [1]** 224/25
**pool [6]** 152/24 157/17
161/21 162/2 164/16
221/1
**poor [1]** 76/18
**population [1]** 103/4
**portfolio [3]** 19/5 20/12
54/25
**portfolios [1]** 19/1
**portion [1]** 112/19
**position [10]** 6/14 17/22
18/2 19/2 36/3 36/7
67/14 200/17 200/21
224/22
**positions [2]** 17/21
224/17
**positive [6]** 68/20 98/17
135/9 239/1 239/21
249/5
**positively [1]** 53/21
**possesses [1]** 113/4
**possession [1]** 91/9
**possibility [1]** 102/4

**possible [18]** 58/14
97/16 97/22 97/25 100/6
101/25 102/11 108/6
114/14 114/16 116/11
116/16 123/10 155/7
155/15 215/19 216/10
244/2
**possibly [1]** 27/23
**potential [5]** 118/16
162/2 217/3 220/25
230/14
**potentially [5]** 4/16 32/5
97/14 240/16 250/10
**PowerPoint [3]** 37/8
151/10 195/1
**practical [1]** 51/10
**practice [3]** 7/2 12/4
110/19
**preceded [1]** 19/8
**precursor [1]** 104/10
**predicted [2]** 96/13
96/21
**prefer [1]** 177/10
**premise [1]** 244/19
**preparation [1]** 10/12
**prepare [11]** 36/20
142/2 142/5 143/25
169/20 171/2 193/19
194/7 194/12 194/15
225/1
**prepared [10]** 37/9
48/11 136/24 137/13
137/15 137/16 151/10
169/4 193/18 194/16
**preparing [2]** 138/24
181/17
**present [4]** 16/25 70/9
188/4 221/20
**presentation [5]** 5/23
16/3 16/24 128/16 223/6
**presented [9]** 16/7 16/13
58/7 185/20 186/5
186/10 186/12 251/15
251/16
**press [102]** 7/8 8/20
8/22 10/23 11/2 11/7
11/22 12/11 12/13 13/5
16/23 20/25 21/8 21/19
21/22 22/11 26/9 26/12
34/4 37/19 37/23 38/1
38/3 38/7 38/14 39/15
39/16 43/10 44/2 44/9
45/7 45/10 45/11 49/3
49/6 49/17 92/5 98/24
100/8 100/23 101/9
101/18 102/1 107/13
108/2 108/6 108/12
108/12 108/15 108/18
108/19 111/10 114/7
114/13 114/20 114/21
115/6 118/25 119/3
123/4 129/14 129/19
129/24 130/1 130/4
130/5 130/6 130/13
130/15 130/16 130/17
130/20 134/12 134/16

145/4 145/11 147/18
151/21 213/22 230/17
233/15 233/18 233/21
233/25 234/3 234/4
234/15 234/16 234/23
237/8 237/9 239/8 241/4
241/17 242/1 242/21
242/23 246/1 246/5
246/7 246/24 247/5
**pressure [2]** 91/14
129/12
**presumably [3]** 103/21
196/14 231/20
**presume [1]** 4/6
**pretty [1]** 79/14
**prevent [1]** 5/8
**previous [2]** 177/16
82/22 83/1 83/4 93/7
125/14 194/16 232/2
232/16 249/6 249/9
249/10
**previously [7]** 16/18
36/15 173/18 175/18
176/10 186/5 204/20
**price [280]**
**prices [21]** 39/25 43/12
51/5 72/7 104/25 105/1
147/15 150/12 150/13
152/14 153/11 153/11
159/14 160/9 162/24
190/16 205/24 206/2
207/6 218/19 230/2
**printout [1]** 75/11
**prior [25]** 27/10 47/12
47/18 50/23 50/23 51/19
75/1 124/6 124/9 124/14
126/23 139/3 144/12
165/13 173/19 176/10
235/23 235/24 235/25
236/22 237/4 237/20
237/21 248/19 248/20
**private [1]** 84/13
**probably [28]** 7/16 8/5
8/8 9/1 9/6 9/6 9/8 9/13
12/4 14/4 14/13 17/20
18/3 18/18 21/12 27/19
34/10 62/24 142/22
142/23 142/24 189/7
230/1 239/16 240/8
249/11 250/24 251/22
**problem [4]** 58/17 77/8
151/25 223/20
**problems [3]** 117/3
118/16 252/21
**procedures [1]** 12/20
**proceed [11]** 4/2 4/23
5/21 156/24 157/21
157/25 162/18 212/18
212/18 219/10 222/25
**proceeding [1]** 4/23
**proceedings [6]** 1/11
70/7 131/10 188/2
223/22 256/11
**proceeds [4]** 153/20
163/2 206/25 211/15
**process [2]** 195/14

**P**

process... [1] 219/13
procured [1] 13/1
produce [4] 11/21 26/23
26/24 26/25
produced [1] 41/19
producing [1] 46/19
product [11] 10/18 18/1
37/25 38/5 46/20 47/4
47/8 48/3 122/24 135/6
144/17
production [2] 25/25
135/5
products [3] 46/19 85/7
224/11
professional [1] 224/12
profit [8] 8/8 47/9
154/13 155/13 161/7
199/22 200/24 216/8
profits [1] 47/8
program [2] 189/17
189/19
promotor [1] 76/12
promotors [1] 76/19
proper [1] 92/20
property [1] 61/9
proposed [1] 149/16
prosecution [4] 146/16
146/17 146/21 188/16
prospective [1] 135/7
prospects [1] 135/10
prove [1] 232/5
provide [11] 60/7 95/23
96/6 135/4 146/21
146/23 190/5 191/10
224/8 226/4 242/25
provided [23] 43/6 65/2
76/19 93/19 93/21 93/24
96/4 96/7 137/6 140/2
147/15 150/11 153/12
160/9 167/25 169/1
174/7 192/22 194/18
218/18 224/24 227/2
252/18
provides [4] 76/12 81/17
188/18 231/3
providing [4] 22/17
22/18 23/15 70/22
public [3] 83/18 85/23
121/25
publications [1] 42/9
publicly [6] 22/17 51/11
83/20 137/8 140/22
197/9
publish [1] 224/10
published [4] 65/1 65/9
65/10 71/25
pull [36] 6/8 35/15 66/5
70/14 115/20 127/10
128/13 133/15 134/11
141/25 150/15 151/7
162/4 163/13 165/23
167/1 169/2 169/10
170/20 171/24 172/4
173/4 173/17 175/17
176/9 177/5 180/18

182/20 183/24 184/11
184/14 185/7 214/10
217/15 218/5 222/12
pulls [1] 43/15
purchase [45] 26/9
32/25 33/16 38/9 38/10
39/5 39/6 39/11 43/24
44/6 44/25 45/7 45/7
45/9 45/11 84/13 99/16
102/15 102/23 107/22
112/9 113/2 122/23
122/25 123/3 123/4
123/7 126/7 127/6
152/10 165/15 167/21
167/22 218/16 234/15
234/19 235/1 242/22
243/5 243/8 246/24
247/22 250/6 250/7
250/25
purchased [18] 84/14
94/8 111/12 148/9 154/7
155/17 155/25 164/18
165/14 165/18 189/14
199/4 199/11 206/2
215/9 229/4 245/16
245/22
purchaser [3] 98/24
102/15 103/12
purchasers [1] 32/22
purchases [7] 147/14
153/5 162/14 164/2
167/17 199/13 199/16
pure [1] 113/1
purely [3] 160/6 168/5
216/19
purpose [3] 13/7 214/2
253/4
purposes [10] 37/9
38/15 120/6 157/7
169/16 209/22 216/16
216/18 252/24 252/25
push [1] 231/20
put [31] 5/23 12/21
22/12 25/1 28/20 30/20
32/7 32/8 32/14 35/17
49/19 76/10 91/14
100/15 105/2 107/5
114/13 118/22 140/13
149/11 153/14 171/17
177/9 185/11 187/1
190/24 191/21 195/14
197/2 251/7 252/23
puts [1] 58/3
putting [6] 62/22 100/18
180/21 187/3 190/11
196/9

**Q**

quality [1] 42/24
quarter [11] 21/24
38/13 126/23 247/5
247/6 247/6 248/10
249/3 249/9 249/10
249/21
quarterly [3] 247/7
247/19 248/3

quarter [7] 248/9
248/12 248/19 248/20
248/24 249/1 249/6
query [4] 189/11 189/14
189/19 190/11
question [20] 56/11
64/20 90/8 109/15
109/23 117/3 119/9
122/20 129/5 130/9
130/12 130/20 133/8
136/5 193/8 199/10
209/5 213/4 213/5 237/6
question's [1] 130/20
questionnaire [2] 23/15
23/16
questions [16] 14/15
19/14 33/18 34/15 76/10
91/18 129/4 139/13
145/1 164/15 194/3
199/9 218/4 218/8 220/5
220/23
quick [1] 139/15
quickly [3] 51/5 105/16
246/6
quite [6] 14/13 18/25
19/5 19/7 19/10 141/3
quote [8] 23/18 63/13
74/10 76/8 76/16 90/18
91/8 119/20
quote-unquote [5] 63/13
74/10 76/16 90/18 91/8
quoted [1] 128/1

**R**

raise [5] 5/16 35/6 141/9
145/25 222/9
raised [1] 126/25
raising [1] 128/6
rampant [1] 77/8
ran [1] 189/11
random [18] 41/6 41/7
65/3 97/23 98/1 98/5
98/17 98/19 100/3 100/7
131/18 132/2 132/5
132/10 132/16 132/18
232/24 240/19
randomly [1] 66/8
range [6] 9/2 13/25
17/20 51/17 120/20
167/21
ranging [1] 225/11
rapidly [2] 231/14
232/13
Rasica [1] 3/20
rather [6] 15/25 76/18
119/6 171/16 183/13
252/16
rationale [1] 110/4
rationality [1] 104/24
Rauch [9] 7/25 8/9 9/13
12/13 13/6 22/15 22/17
22/22 22/24
reach [6] 23/3 63/24
63/24 228/4 243/10
251/9
react [4] 39/25 43/22

83/24 84/1
reaction [10] 14/12 41/1
56/25 85/24 105/15
130/1 233/22 234/1
238/1 244/2
read [7] 5/6 54/22 71/20
72/3 77/3 128/18 134/16
reading [2] 15/25 62/8
ready [9] 4/2 4/4 5/4
5/10 131/12 221/20
221/22 221/23 221/24
real [1] 10/21
reality [2] 101/4 157/2
realize [2] 149/25 198/1
realized [2] 49/10 247/7
really [15] 27/12 55/25
61/1 61/11 61/12 68/6
72/20 88/13 100/25
102/6 139/3 230/3
230/15 240/17 244/21
Realtime [1] 256/10
reason [10] 50/6 71/8
76/24 112/24 140/8
144/11 191/9 215/23
236/3 243/9
reasonable [2] 22/24
27/25
reasonably [1] 27/5
reasons [4] 41/25 71/11
76/18 229/11
rebuttal [8] 36/20 41/18
66/6 104/7 122/16
126/25 127/10 227/4
recalculation [2] 4/1
253/1
recall [42] 11/7 11/11
12/11 18/5 18/8 23/14
23/15 23/18 23/24 26/19
28/15 28/18 28/19 29/9
99/21 104/17 118/17
126/15 127/2 127/4
127/7 127/15 127/17
138/10 145/8 145/11
145/14 145/16 192/10
192/12 203/9 205/22
215/2 217/12 217/14
218/14 218/20 218/24
231/1 234/8 235/8
237/24
recalling [1] 14/5
receive [1] 28/14
received [21] 18/9 37/24
38/4 38/8 39/7 102/15
114/12 140/11 144/13
144/14 148/20 161/7
170/2 170/14 171/8
182/23 183/16 184/3
184/20 193/12 256/3
recently [2] 76/14
224/18
recess [7] 70/4 70/6
131/9 187/24 188/1
223/21 253/16
recissory [1] 186/7
recognition [2] 13/2
26/1

recognize [4] 14/21 93/2
125/4 207/9
recognized [4] 10/21
19/24 39/10 125/25
recollection [1] 30/19
recommendation [1]
252/12
recommended [1] 113/7
record [20] 4/24 30/21
31/25 70/9 91/9 107/9
140/20 146/4 173/18
181/10 185/1 186/24
188/4 202/14 211/13
236/7 252/23 253/5
253/12 256/11
recorded [1] 73/25
records [12] 4/22 30/17
147/17 168/20 174/8
174/12 174/25 177/7
177/17 180/8 182/18
194/17
recovering [1] 23/23
red [11] 43/23 44/9 53/4
77/16 77/17 107/6
107/12 128/6 142/10
142/11 249/16
redirect [12] 33/20
33/23 34/1 130/24 131/1
131/13 131/15 217/25
218/2 254/6 254/10
254/17
reduction [1] 122/13
refer [2] 24/12 49/8
reference [4] 14/3 27/7
52/12 119/19
referenced [2] 14/6
60/20
referred [8] 52/15 52/16
57/11 73/7 150/18
152/21 230/17 249/20
referring [7] 9/23 21/20
28/1 45/9 52/12 107/4
138/10
refers [1] 73/10
reflect [8] 51/6 51/11
109/2 109/4 180/5 221/4
221/8 231/20
reflected [4] 87/25
104/25 172/1 181/19
reflecting [1] 48/5
reflects [5] 74/25 75/4
132/14 184/25 223/9
Reg [3] 57/25 58/2 58/3
regard [2] 67/16 133/9
regarded [1] 72/1
regarding [10] 14/15
16/9 39/5 47/17 47/23
54/3 77/18 88/23 139/23
151/25
regardless [1] 154/20
regards [3] 27/2 198/18
198/19
registered [2] 6/20
256/9
regressing [1] 54/23
regression [24] 54/10

# R

**regression...** [23] 54/12
54/13 54/16 54/22 55/19
56/7 57/1 68/11 68/17
68/18 69/19 80/3 80/8
80/19 82/25 83/2 84/6
115/12 115/15 116/5
116/7 133/21 133/23
**regular** [4] 57/13 74/17
90/4 212/2
**regulation** [1] 58/3
**regulators** [2] 90/24
91/13
**regulatory** [5] 90/22
146/13 146/20 188/15
224/25
**Reichardt** [1] 3/20
**relate** [1] 142/13
**related** [7] 57/22 74/5
121/22 133/6 147/9
163/24 187/6
**relates** [2] 98/5 140/25
**relating** [4] 30/17 32/19
125/18 251/3
**relation** [1] 235/10
**relationship** [15] 55/9
59/1 64/9 64/11 80/9
80/11 80/14 115/5 133/4
133/13 133/18 133/25
134/2 188/12 188/14
**relative** [5] 64/14 64/21
82/22 97/11 232/9
**relatively** [5] 64/16
79/17 80/11 91/1 105/2
**relayed** [2] 17/8 57/25
**release** [62] 12/11 13/5
16/23 22/11 26/9 37/23
38/1 38/3 38/7 39/15
39/16 44/9 45/7 45/10
45/11 49/3 49/6 49/18
98/24 100/9 100/23
101/9 102/1 108/2 108/7
108/12 108/12 108/15
108/18 108/19 111/10
114/7 114/13 114/20
114/22 123/4 129/19
130/2 130/4 130/5 130/7
130/16 130/16 130/17
132/20 134/13 134/17
145/5 151/21 233/25
234/3 234/4 234/24
237/8 237/9 239/8 241/4
241/18 242/1 246/6
246/7 246/11
**released** [8] 39/1 126/5
126/9 126/13 126/18
240/17 244/14 250/14
**releases** [38] 7/8 8/20
8/22 10/23 11/2 11/7
11/23 20/25 21/8 21/19
21/22 26/12 34/4 37/19
38/14 43/10 44/2 92/5
107/13 115/6 119/1
119/3 129/14 129/24
130/13 147/18 213/22
230/17 233/15 233/18

233/21 234/15 234/16
242/22 242/24 246/1
246/24 247/5
**relevance** [1] 31/19
**relevant** [61] 32/23
37/15 43/1 43/3 43/21
45/8 48/6 50/22 52/2
52/9 52/19 53/4 63/8
63/10 65/17 65/19 65/21
65/21 66/1 66/4 84/10
84/17 84/20 84/24 85/2
85/11 85/12 85/16 85/18
86/19 87/1 87/4 87/8
87/21 88/9 88/22 88/24
89/3 89/5 89/16 89/19
89/22 89/25 92/3 92/14
100/20 123/5 126/5
134/1 134/4 134/8
151/16 152/11 153/6
156/9 164/19 165/15
165/18 167/18 221/6
246/7
**reliability** [1] 228/5
**reliable** [2] 234/23 237/3
**reliance** [1] 251/4
**relied** [14] 43/10 43/11
75/20 95/4 101/11 121/1
121/3 140/22 143/22
143/23 147/13 150/10
192/1 213/22
**rely** [12] 7/6 20/20 20/22
21/16 43/8 75/18 119/22
140/11 141/5 147/11
174/10 234/23
**relying** [5] 186/20
193/10 244/22 251/7
251/13
**remained** [3] 27/14
157/3 157/20
**remaining** [24] 157/12
159/21 160/15 160/18
162/15 162/17 162/24
163/1 164/6 167/23
190/21 190/23 203/2
205/11 208/2 208/24
210/1 210/6 210/22
211/7 211/21 212/7
213/10 213/11
**remains** [2] 112/1
116/11
**remand** [1] 3/24
**remember** [16] 33/3
33/7 33/8 33/14 33/15
49/1 83/18 93/6 93/23
95/9 98/17 99/18 120/1
185/23 195/18 218/11
**remembers** [1] 138/19
**remove** [16] 154/14
154/18 154/23 154/24
155/17 158/2 158/5
160/2 161/9 161/16
199/21 209/7 209/17
219/3 219/19 220/25
**removed** [9] 154/11
154/13 154/19 155/2
159/19 159/25 161/18

161/20 199/23
**removing** [1] 219/15
**repay** [1] 59/25
**repeat** [2] 124/1 182/2
**rephrase** [3] 108/10
183/8 219/1
**replace** [1] 61/13
**replacing** [1] 159/15
**report** [47] 36/20 36/21
41/18 42/11 62/10 62/12
66/16 74/6 75/22 80/17
94/25 95/10 95/23 96/4
103/16 103/22 104/6
104/6 104/7 104/14
114/10 118/14 118/19
118/22 119/18 119/21
119/23 120/24 120/25
122/15 122/16 125/18
126/12 126/20 126/24
126/25 127/10 136/3
137/5 138/24 143/25
223/9 227/3 227/4
227/11 227/23 234/7
**reported** [4] 75/8 75/24
127/15 247/9
**Reporter** [4] 1/18 1/18
256/9 256/10
**reporting** [4] 62/9 75/15
249/18 249/19
**reports** [4] 62/8 75/23
77/3 227/2
**represent** [7] 74/22
142/10 151/5 163/20
164/1 172/22 211/8
**representation** [2]
186/20 244/25
**representative** [3] 6/20
7/22 7/22
**represented** [14] 48/19
55/18 56/6 72/15 81/16
88/20 161/23 164/16
165/2 170/15 176/15
182/11 184/18 184/22
**represents** [2] 133/22
236/21
**reputable** [1] 12/4
**request** [6] 28/13 28/17
29/10 177/17 188/19
191/6
**requested** [1] 146/25
**requesting** [2] 16/8
239/17
**requests** [1] 28/15
**require** [2] 173/12
239/14
**requirement** [2] 62/12
62/18
**requiring** [1] 39/8
**rescissory** [10] 147/24
148/11 149/7 149/9
149/16 149/17 184/25
185/12 187/1 187/5
**research** [6] 8/12 28/8
28/10 43/12 136/15
224/10
**resentence** [1] 3/25

**resentencing** [2] 1/11
186/8
**reserve** [2] 143/8 143/11
**resolved** [1] 90/12
**respect** [26] 4/21 44/1
45/14 45/24 99/20
103/22 133/10 148/5
149/6 149/8 157/17
170/14 171/12 175/11
175/15 183/14 183/22
183/23 184/3 184/10
184/16 184/20 186/7
213/21 230/3 231/17
**respond** [1] 41/21
**responds** [1] 83/16
**response** [2] 28/14 106/2
**responsibility** [1] 77/10
**rest** [1] 188/17
**restitution** [1] 4/2
**restriction** [2] 173/3
176/17
**restrictions** [2] 172/24
176/4
**result** [14] 44/21 56/10
68/17 68/25 76/17 80/8
112/13 112/17 121/17
127/13 129/23 201/11
218/19 232/24
**resulted** [3] 114/22
157/11 201/7
**resulting** [4] 38/10
76/16 108/17 159/23
**results** [15] 11/21 50/18
50/19 54/23 55/19 56/13
56/18 72/4 78/17 94/6
94/7 94/19 126/15
166/12 232/7
**resurrected** [1] 17/25
**retail** [1] 154/11
**retroactively** [1] 121/10
**return** [64] 40/3 40/6
40/7 40/13 40/14 40/15
40/16 40/17 40/18 40/20
41/6 41/13 44/7 44/14
44/24 45/18 45/22 46/2
46/8 49/2 50/11 50/14
50/15 50/16 50/25 50/25
55/20 69/17 69/18 77/19
78/15 86/5 86/12 96/13
96/21 96/22 96/22 96/25
97/6 97/8 97/15 97/16
97/17 97/22 97/25 98/4
98/11 99/7 99/16 99/22
101/16 101/16 107/15
107/23 108/1 125/1
132/1 132/15 132/17
132/20 238/8 238/9
238/10 240/23
**returns** [51] 41/14 42/23
42/23 49/25 50/7 50/17
50/20 53/22 53/23 54/6
54/6 54/8 54/24 55/10
55/14 55/15 55/16 56/4
63/15 63/15 64/3 64/10
67/20 67/25 68/3 68/5
68/12 68/19 68/21 69/4

77/14 78/1 78/3 79/8
79/12 79/20 80/7 80/10
80/15 84/20 85/16 85/18
86/2 86/15 96/18 115/21
125/2 132/9 132/11
132/12 133/19
**revaluation** [2] 237/2
244/25
**revealed** [6] 112/18
112/20 136/14 234/20
241/12 250/2
**revealing** [1] 25/5
**revenue** [10] 10/21 13/2
18/9 26/1 26/24 26/25
38/10 47/11 47/21 127/1
**revenues** [11] 39/10
46/21 46/22 46/23 47/1
47/18 47/19 47/25
127/14 127/21 248/6
**review** [33] 9/18 10/1
41/18 47/11 47/14 49/24
80/17 158/11 158/14
158/20 165/6 165/7
165/9 168/20 169/22
170/11 171/4 171/6
174/8 175/14 177/18
178/6 180/8 181/18
190/5 194/17 196/7
196/14 196/14 223/16
227/1 244/8 245/25
**reviewed** [13] 8/20
10/12 11/4 11/13 11/14
42/6 42/9 47/15 119/16
194/8 194/9 227/3
227/11
**reviewing** [2] 11/7
246/25
**revise** [1] 187/8
**revolve** [1] 231/5
**Richard** [2] 2/16 3/16
**right** [137] 3/4 4/6 4/19
5/3 5/12 5/16 12/22
20/23 21/22 21/23 23/3
26/4 28/7 31/24 32/6
32/9 32/13 32/16 33/25
35/6 37/1 37/6 39/14
58/22 58/24 59/2 61/15
61/25 68/5 69/25 70/4
75/13 77/17 79/16 79/25
82/10 83/8 93/13 95/2
96/6 97/10 98/10 99/1
99/6 99/8 99/8 99/11
100/5 101/19 101/21
102/20 103/16 107/17
112/11 113/15 115/7
115/19 116/15 117/14
118/6 118/9 119/8 122/5
124/4 124/15 124/16
125/12 126/11 126/19
129/11 131/5 131/7
138/9 139/20 140/18
141/3 141/9 143/20
145/21 145/25 150/1
160/5 160/14 162/10
162/22 167/11 169/14
170/24 178/5 178/6

## R

**right... [47]** 181/23
186/3 186/25 187/17
187/23 187/24 191/13
196/4 196/7 197/9
197/10 199/6 199/22
200/14 200/23 201/18
202/11 202/25 203/3
203/9 204/1 206/5 206/8
209/1 209/4 209/9
210/18 210/20 212/23
215/23 221/20 222/9
222/16 223/5 223/24
224/5 239/21 239/22
240/23 241/23 245/20
249/16 252/9 252/11
252/13 253/6 253/14
**right-hand [1]** 77/17
**rights [1]** 91/10
**ring [1]** 33/4
**rise [2]** 60/14 78/6
**risen [1]** 60/13
**rises [1]** 60/15
**rising [4]** 64/5 64/13
77/21 234/2
**risk [2]** 36/5 36/12
**risky [2]** 19/24 20/7
**RMR [1]** 1/18 256/16
**road [1]** 156/18
**Robert [1]** 215/17
**Roberto [6]** 176/1
179/25 180/10 180/23
181/2 184/7
**robustness [14]** 56/15
56/16 56/19 57/1 69/8
69/12 69/19 82/11 82/14
83/10 84/5 133/17
133/17 133/20
**role [10]** 6/22 141/18
141/20 143/18 144/23
146/17 146/23 148/5
168/24 194/21
**room [1]** 119/20
**rooms [7]** 40/23 43/14
45/4 46/12 119/15
119/20 119/22
**rose [3]** 78/21 87/14
124/25
**roughly [7]** 198/9 212/8
212/13 213/13 217/13
217/18 241/1
**Rubbermaid [5]** 85/1
85/5 85/6 85/15 86/6
**rule [1]** 36/10
**rule-making [1]** 36/10
**rules [2]** 58/3 62/3
**ruling [1]** 143/11
**run [4]** 32/6 189/24
191/5 242/16
**running [3]** 189/14
189/19 251/12
**Ryan [8]** 7/25 8/9 12/13
13/6 22/15 22/17 22/22
22/24

## S

**S-h-a-n-n-o-n [1]** 222/22
**S-m-i-t-h [1]** 141/13
**Sai [1]** 206/14
**salary [2]** 90/5 188/21
**sale [38]** 24/8 24/9 24/23
24/13 24/17 25/16 26/3
26/20 37/5 57/6 60/23
62/11 72/10 72/17 72/18
72/21 73/2 73/4 74/18
74/20 74/21 82/9 83/1
83/2 83/6 83/7 90/19
111/25 117/19 121/12
158/12 159/18 159/18
165/8 167/22 200/24
216/19 218/16
**Salem [1]** 224/19
**sales [45]** 10/16 10/25
16/9 24/21 25/24 25/25
26/1 26/18 26/19 27/1
27/10 32/19 46/14 46/16
46/17 46/21 46/22 46/23
47/1 47/5 47/6 47/23
62/9 69/16 69/16 69/17
74/2 74/2 117/7 117/7
117/15 117/17 117/18
121/4 127/6 147/14
152/11 153/5 159/1
162/15 164/2 167/17
199/13 199/15 210/3
**salvage [1]** 17/19
**same [59]** 15/8 21/5
24/11 28/15 30/6 35/25
46/24 53/1 53/3 53/24
54/8 61/24 62/1 62/4
65/12 65/14 69/16 69/16
81/9 81/12 81/17 83/1
138/3 138/8 150/13
152/7 152/7 152/13
152/16 152/18 153/16
153/17 159/13 159/17
159/20 162/21 163/1
164/8 165/19 165/20
176/21 176/21 179/15
179/16 179/19 179/19
180/5 184/17 184/21
185/22 190/15 193/8
205/16 211/20 211/24
220/16 226/12 226/13
248/15
**same-day [2]** 69/16 83/1
**Sameer [1]** 174/3
**sample [2]** 65/3 65/15
**save [2]** 109/15 200/7
**saw [18]** 11/14 23/7 23/9
30/18 62/1 63/25 108/11
114/4 125/18 125/21
126/20 134/7 139/5
152/15 179/24 216/21
245/2 249/14
**say [85]** 7/22 8/23 9/3
10/20 13/5 14/13 18/17
18/19 19/22 19/23 21/24
21/25 22/16 22/19 23/11
24/14 24/21 24/24 25/1
27/12 27/22 31/24 45/9
49/14 59/20 61/10
66/22 76/7 76/11 86/15
90/15 90/25 97/18 97/24
99/20 102/14 102/21
104/22 105/24 107/2
108/13 108/17 110/15
112/5 115/16 119/2
120/23 121/3 122/11
124/10 128/10 129/7
135/2 140/18 144/22
146/23 151/3 185/10
185/19 187/22 189/5
190/2 194/5 200/22
201/16 202/2 202/11
202/17 203/19 209/17
209/24 212/19 216/17
226/13 228/18 229/5
231/4 238/5 239/7
239/12 239/13 239/24
239/25 241/25
**saying [18]** 4/25 15/11
17/7 23/18 24/13 66/19
118/10 124/1 126/15
127/7 127/16 145/11
145/14 145/16 196/5
202/12 205/22 209/19
**says [12]** 9/22 15/8
30/24 49/4 65/6 67/13
71/21 72/3 104/9 105/9
112/25 151/16
**scapegoat [1]** 76/8
**schedule [1]** 251/24
**scheduled [4]** 134/21
136/19 136/20 145/7
**scholarly [1]** 105/23
**school [3]** 35/25 35/25
57/20
**scope [3]** 136/2 137/5
144/8
**screen [4]** 29/1 177/8
177/9 183/11
**screens [1]** 5/22
**scroll [3]** 174/14 177/25
178/5
**search [1]** 43/16
**seat [5]** 5/18 35/8 131/12
141/11 146/2
**seated [5]** 3/3 70/8
131/11 188/3 223/23
**SEC [42]** 7/5 7/7 8/16
8/22 20/14 20/17 20/20
21/1 21/18 21/21 36/10
36/11 36/13 57/23 75/22
76/9 76/20 77/7 90/5
128/20 136/24 137/13
147/13 147/16 147/18
150/10 150/11 151/24
152/15 153/12 160/9
168/4 196/18 196/23
197/15 224/21 224/22
224/23 225/21
**SEC's [1]** 166/23
**second [39]** 4/20 58/10
65/5 75/3 76/1 86/3
88/13 88/15 100/23

108/6 108/9 108/12
108/18 111/10 127/14
127/22 130/8 130/16
130/17 135/1 159/11
163/25 183/19 185/14
204/11 225/4 226/23
233/10 233/23 234/3
237/7 239/7 241/4
244/23 247/6 247/6
248/9 249/13 249/21
**Section [2]** 2/3 2/7
**securities [26]** 2/2 2/6
11/3 18/7 18/11 36/6
43/12 75/15 95/8 109/17
109/19 109/25 110/21
111/3 111/4 137/16
139/22 141/17 141/18
146/22 180/5 224/4
225/15 231/5 231/17
232/2
**seeing [1]** 232/7
**seeking [1]** 18/12
**seem [2]** 63/24 63/24
**seemed [1]** 45/8
**seems [3]** 25/3 124/24
171/15
**seen [23]** 4/12 25/13
30/16 30/18 31/23 94/18
95/6 109/19 109/25
110/19 111/5 137/7
137/24 138/1 138/2
138/2 140/15 155/5
230/24 233/6 235/6
245/1 249/17
**selected [1]** 66/8
**self [1]** 188/15
**self-regulatory [1]**
188/15
**sell [33]** 17/10 17/14
23/21 25/2 27/17 27/23
47/8 57/7 57/8 57/11
57/12 57/14 57/16 58/13
58/19 59/4 59/14 59/23
61/17 62/16 71/2 86/23
120/20 121/23 129/7
158/21 164/10 172/24
197/12 200/12 216/12
216/22 229/15
**seller [23]** 59/13 59/16
59/17 60/5 60/9 60/16
60/17 60/19 60/22 61/1
61/12 72/10 72/23 73/5
73/17 82/4 87/10 87/11
90/11 91/11 103/12
117/10 117/13
**sellers [3]** 25/8 72/4
76/17
**selling [112]** 46/20 47/2
47/4 57/4 57/6 57/7 57/9
57/10 57/13 57/14 57/16
57/17 57/18 57/20 57/22
58/4 58/4 58/21 59/11
59/17 61/11 62/4 62/21
63/7 63/9 63/14 63/17
64/3 64/6 64/9 64/12
64/21 65/3 65/7 65/11

65/13 65/15 65/22 66/1
66/3 66/7 67/11 68/12
68/15 68/20 68/22 68/24
69/5 69/13 69/14 69/23
70/15 70/17 70/19 70/20
70/24 70/25 71/6 71/16
71/21 72/8 72/9 72/10
72/12 73/2 73/4 74/8
74/9 74/10 74/15 74/18
75/19 76/5 76/7 76/11
76/11 76/24 77/2 77/4
77/25 78/2 81/20 81/21
81/22 81/22 82/1 86/17
86/25 87/14 87/16 90/8
90/21 112/10 115/8
115/11 115/17 116/24
116/25 117/1 117/6
117/13 117/19 118/2
128/1 128/4 128/4 129/5
129/12 134/5 134/7
235/23 235/24
**selling-related [1]** 57/22
**send [3]** 15/7 16/12 59/6
**sending [1]** 196/3
**senior [1]** 224/23
**sense [12]** 81/1 81/2
81/14 83/13 83/14 84/2
84/3 85/25 85/25 99/12
188/14 240/4
**sent [4]** 14/22 16/15
192/15 243/7
**sentence [2]** 71/21 72/3
**sentencing [47]** 4/1 4/13
14/19 14/19 14/24
36/21 37/8 48/9 75/9
134/12 147/6 148/3
149/9 149/16 149/18
150/15 151/7 153/3
158/13 172/4 173/19
174/1 175/19 176/10
180/2 181/12 181/12
182/1 185/9 185/11
185/20 185/23 186/2
186/10 186/13 187/4
188/24 192/11 192/13
194/17 204/10 204/11
204/12 204/15 204/21
252/18
**separate [2]** 133/22
215/19
**separated [1]** 146/19
**separately [1]** 137/23
**September [51]** 10/24
10/24 26/13 37/20 37/20
37/23 38/1 38/3 39/6
39/7 39/15 39/16 43/4
43/22 43/23 44/4 44/10
44/23 45/10 49/3 49/5
49/17 49/25 50/12 75/13
84/16 85/13 86/2 92/5
109/5 118/25 130/1
130/2 130/4 130/19
150/21 151/18 151/20
154/7 164/18 164/23
164/23 166/4 166/13
229/5 230/13 233/3

**S**

**September...** [4] 233/22
233/23 245/15 245/23
**September 14th** [1] 39/7
**September 2007** [1]
43/22
**September 20th** [22]
10/24 37/20 37/23 39/15
39/16 43/4 75/13 84/16
85/13 86/2 92/5 118/25
130/2 151/18 151/20
154/7 164/18 164/23
164/23 230/13 233/3
233/22
**September 25th** [18]
10/24 37/20 38/1 38/3
44/4 44/10 44/23 45/10
49/3 49/5 49/17 49/25
50/12 109/5 130/1 130/4
130/19 166/4
**seriously** [1] 77/11
**set** [2] 62/3 155/20
**sets** [2] 152/8 152/23
**settlement** [8] 60/20
60/24 72/11 72/22 73/7
81/18 82/3 83/18
**seven** [3] 114/2 236/5
243/20
**several** [6] 26/14 26/15
83/9 135/10 140/21
214/14
**several-month-long** [1]
83/9
**severity** [1] 72/5
**SFranklinUSDC** [1]
1/20
**SGN** [3] 156/15 164/13
193/20
**Shannon** [4] 222/11
222/19 222/21 254/18
**Shapiro** [2] 80/17 80/19
**Shapiro's** [1] 81/13
**share** [40] 17/13 18/10
57/11 57/14 59/15 59/19
60/4 60/6 60/15 60/17
71/23 84/15 113/3 157/4
157/9 157/13 159/22
163/1 163/2 164/6
168/20 172/8 172/18
174/23 176/7 176/12
176/19 179/2 179/17
180/4 180/9 180/23
180/25 190/23 200/13
201/5 201/23 201/24
202/2 218/15
**shareholder** [1] 127/6
**shareholders** [4] 126/21
127/21 211/4 249/15
**shares** [155] 27/24 59/14
59/16 59/18 59/22 59/24
60/5 60/16 60/18 61/11
61/12 61/13 61/14 69/15
73/18 73/18 75/25 81/10
81/11 82/19 82/24 84/14
86/17 86/25 87/9 87/16
88/7 88/8 88/10 109/20

109/21 110/10 110/16
110/16 148/12 153/17
156/1 156/15 156/20
156/21 156/23 157/3
157/9 157/12 157/20
158/7 158/9 158/15
158/21 158/25 159/21
160/15 160/18 162/15
162/17 162/24 164/3
164/6 164/10 165/5
165/5 165/6 165/8
165/13 165/14 165/17
167/23 168/13 168/17
168/19 168/23 168/24
169/25 170/1 170/5
170/6 170/7 172/9
172/20 172/21 172/25
173/6 173/10 173/11
174/15 175/1 175/3
175/15 176/2 176/3
176/5 176/15 176/17
176/22 178/22 178/23
179/10 181/2 181/4
181/4 181/22 182/6
182/8 187/2 187/5
189/13 190/22 192/10
192/11 192/13 192/18
192/24 193/11 193/20
193/21 199/4 200/12
200/18 200/21 203/2
205/11 205/14 208/2
208/8 208/15 208/20
208/24 210/2 210/3
210/6 210/22 210/23
211/7 211/21 212/7
213/10 213/11 215/3
215/5 215/10 216/7
216/13 216/22 216/23
228/23 228/25 245/4
245/6 245/9 245/12
245/13 245/14 245/16
245/18 245/21
**sharp** [1] 156/17
**Shawna** [1] 220/12
**she'll** [1] 143/6
**she's** [5] 144/11 144/16
144/16 144/17 144/18
**sheer** [1] 200/4
**sheet** [10] 21/14 30/22
147/13 150/10 154/8
158/14 158/20 168/4
189/24 190/9
**sheets** [1] 21/11
**shielded** [1] 144/17
**shipping** [1] 39/8
**SHO** [3] 57/25 58/2 58/3
**short** [159] 57/4 57/6
57/7 57/12 57/14 57/16
57/17 57/18 57/20 57/22
58/3 58/4 59/11 59/13
59/14 59/16 59/17 59/17
60/5 60/9 60/11 60/16
60/17 60/19 60/22 60/23
61/1 62/4 62/9 62/11
62/16 62/21 63/7 63/9
63/14 63/16 64/3 64/6

64/9 64/12 64/16 64/21
65/2 65/6 65/11 65/13
65/13 65/14 65/22 66/1
66/2 66/7 66/18 66/21
67/3 67/3 67/4 67/5 67/8
67/9 67/10 67/11 67/12
67/14 67/21 67/25 68/3
68/6 68/12 68/15 68/20
68/22 68/24 69/5 69/13
69/14 69/16 69/16 69/17
69/23 70/15 70/17 70/19
70/20 70/25 71/2 71/6
71/16 71/21 72/4 72/8
72/9 72/10 72/10 72/10
72/12 72/17 72/18 72/21
72/23 73/2 73/4 73/5
73/17 73/17 73/18 73/23
74/2 74/2 74/5 74/8 74/8
74/10 74/15 74/21 75/19
76/5 76/7 76/11 76/11
76/16 76/23 77/2 77/4
77/25 78/2 81/20 81/20
81/22 82/1 82/4 82/9
83/1 83/2 83/6 83/7 90/8
90/11 90/18 90/21 91/4
91/10 105/2 115/8
115/10 115/17 116/24
116/25 117/6 117/19
117/24 118/2 128/1
128/4 128/4 134/5 134/7
215/9 246/7
**shortly** [2] 12/15 229/5
**should** [24] 37/6 37/7
37/17 41/21 67/2 94/1
105/25 105/25 106/8
108/13 141/4 150/25
160/20 163/7 185/10
195/21 197/2 203/12
203/16 205/21 215/24
215/24 252/5 252/7
**show** [32] 13/8 14/18
30/20 37/5 38/22 43/19
47/17 48/9 52/22 53/4
54/20 63/12 64/2 67/18
75/9 77/13 78/19 79/5
123/10 136/22 150/20
167/15 169/25 171/7
180/9 195/3 199/21
214/19 214/23 223/13
248/14 248/17
**showed** [9] 26/12 47/19
50/19 65/2 65/4 107/6
194/10 199/22 214/14
**showing** [5] 79/25
100/19 137/12 142/2
214/8
**shows** [26] 43/20 44/15
52/23 52/25 54/21 55/15
55/19 63/13 64/4 67/19
68/8 68/18 68/19 75/5
77/14 77/20 79/6 80/10
81/18 88/21 115/21
138/16 142/16 150/21
167/16 191/1
**sic** [5] 144/4 154/11
174/17 181/2 185/22

**side** [4] 23/21 225/19
225/20 225/20
**sided** [1] 14/1
**sign** [2] 55/3 67/24
**SignaLife** [189] 7/15
7/18 7/21 8/1 8/3 8/15
8/20 8/24 9/11 11/24
15/21 17/3 17/10 17/15
18/16 19/24 21/10 28/16
30/17 37/19 37/24 38/4
38/8 38/15 39/2 39/8
39/10 39/13 43/13 44/5
44/5 44/22 45/5 45/18
46/2 46/6 46/9 46/23
47/3 47/11 47/19 47/23
48/5 49/2 49/16 50/10
50/13 52/1 52/9 53/14
55/4 55/23 57/15 59/14
60/17 63/8 63/10 63/22
64/3 64/9 65/25 66/7
66/21 67/15 68/23 75/12
75/19 77/14 77/19 77/25
79/8 84/10 84/15 84/20
85/4 85/6 85/17 86/7
86/9 86/10 86/18 86/23
87/1 87/3 87/6 87/7
87/15 87/17 88/19 88/24
89/1 89/4 89/6 89/7 89/8
89/16 89/19 89/24 96/18
108/25 109/3 109/9
113/10 114/12 114/20
117/24 118/3 118/5
118/16 122/24 123/11
127/24 127/25 128/22
133/5 133/7 133/13
133/19 134/1 134/3
134/13 134/18 134/18
134/23 136/24 137/12
138/24 139/6 140/25
142/3 142/9 142/16
147/9 147/13 147/18
148/13 148/16 148/22
148/25 150/22 151/11
151/13 151/21 151/24
152/6 153/6 153/22
154/18 156/11 167/18
168/11 168/14 168/17
169/5 170/2 170/14
171/8 172/8 172/9
172/21 172/25 173/8
174/2 175/25 176/3
176/13 178/23 180/22
181/7 181/11 183/17
191/23 217/4 221/5
226/25 227/13 227/20
235/2 243/16 243/17
243/22 245/4 245/16
246/23 247/4 247/7
247/16 250/13 251/6
**SignaLife's** [62] 37/14
42/22 43/20 47/17 47/25
48/2 48/21 48/23 50/7
52/18 52/23 53/3 53/23
53/25 54/6 54/8 54/23
55/2 55/10 55/14 55/16
55/19 56/4 63/18 64/5

64/7 64/12 64/17 64/21
65/11 65/13 65/22 66/3
66/18 67/20 67/24 68/12
68/15 68/19 68/21 68/24
69/4 69/4 77/21 77/22
78/3 78/4 78/21 80/7
80/9 80/15 85/2 85/16
86/12 87/21 89/12 92/2
120/12 126/13 132/2
139/1 150/6
**signature** [1] 178/11
**signed** [2] 18/6 18/10
**significance** [5] 41/11
41/12 54/14 73/11
282/24
**significant** [33] 41/9
44/8 44/14 44/16 44/21
45/23 46/5 55/11 56/2
56/10 56/14 69/1 80/15
86/11 86/16 97/1 100/1
120/17 120/17 121/4
123/20 125/5 125/21
125/23 130/18 235/23
237/5 238/9 239/5
239/20 244/7 249/14
249/22
**significantly** [6] 233/8
236/1 237/21 238/20
245/13 248/21
**Silve** [7] 174/3 174/5
174/15 175/4 175/7
175/11 192/14
**similar** [9] 65/22 67/9
138/3 148/1 179/24
225/23 226/1 226/2
233/6
**similarly** [2] 114/19
241/21
**simple** [4] 156/3 159/17
163/3 190/7
**simplicity** [1] 199/9
**simply** [17] 18/6 21/18
49/19 70/25 145/6 169/1
186/17 194/4 209/7
209/18 232/24 237/12
237/16 242/21 244/12
244/13 249/16
**simultaneous** [1] 28/3
**since** [11] 6/18 44/20
54/5 55/8 68/7 80/12
139/7 142/24 158/8
158/11 252/18
**single** [3] 81/7 144/13
244/13
**sir** [10] 6/12 28/24 33/11
34/16 107/4 125/2
130/17 221/15 222/9
252/14
**sit** [1] 235/8
**sitting** [1] 227/6
**situation** [5] 21/9 76/18
106/20 112/11 206/20
**situations** [2] 46/25
110/4
**six** [2] 66/16 236/7
**size** [1] 232/10

**S**

**skew** [1] 206/6
**skewed** [3] 102/23 102/25 102/25
**skim** [1] 208/4
**skimming** [1] 220/9
**SLCG** [1] 224/13
**slide** [21] 81/16 81/17 107/8 107/10 113/25 128/14 128/17 152/4 153/25 156/5 159/7 187/8 225/4 225/5 233/12 233/15 234/5 236/5 236/7 249/12 249/13
**slide 8** [1] 107/10
**slides** [1] 225/1
**slight** [1] 181/14
**slightly** [1] 181/13
**slope** [2] 68/7 80/1
**Slow** [1] 15/17
**small** [6] 8/4 8/7 56/1 69/3 80/11 84/13
**smaller** [6] 107/22 107/23 107/25 108/4 118/11 166/4
**Smith** [7] 139/22 141/10 141/13 141/16 143/2 143/18 254/11
**sold** [50] 8/7 17/11 17/12 17/16 18/8 27/20 27/21 57/19 59/18 60/11 87/6 87/7 87/8 91/4 94/11 94/14 111/16 111/18 113/16 113/19 113/19 113/22 156/1 156/13 156/18 156/20 156/24 157/2 157/8 157/21 158/9 158/25 159/22 164/6 165/6 165/17 168/6 205/14 206/2 207/2 208/7 208/15 208/19 209/2 209/16 210/3 215/3 215/9 229/5 229/7
**sole** [1] 146/20
**somebody** [11] 57/9 57/10 58/18 58/20 58/22 59/16 61/9 70/24 70/25 73/15 83/16
**somehow** [3] 108/8 234/24 242/12
**someone** [4] 61/8 203/15 222/1 229/4
**someplace** [1] 24/10
**something** [27] 57/8 57/9 57/10 58/11 61/8 61/14 62/18 77/5 77/7 96/1 96/1 99/16 102/5 114/14 119/2 120/7 120/24 121/1 122/12 190/5 211/7 211/17 215/12 223/12 234/25 242/6 243/7
**sometime** [2] 26/3 28/13
**sometimes** [5] 52/14

52/15 57/11 76/7 246/5
**somewhat** [1] 231/21
**somewhere** [7] 13/25 17/20 62/22 99/9 99/10 101/25 156/18
**sooner** [3] 59/21 59/23 60/2
**sophisticated** [1] 20/6
**sorry** [36] 15/15 15/16 30/12 31/4 32/16 39/18 61/5 63/3 75/12 93/6 95/9 97/24 98/23 99/1 100/18 107/8 109/10 109/23 112/8 116/6 123/25 124/8 130/12 133/8 136/5 174/19 179/6 182/7 198/24 206/15 210/13 223/19 235/21 237/10 243/16 249/7
**sort** [48] 40/10 46/23 51/14 51/16 51/18 53/17 57/13 61/21 62/22 62/23 63/23 65/5 66/23 68/7 71/4 79/16 83/22 88/3 90/14 91/11 93/9 94/9 95/14 97/19 106/3 111/16 114/14 137/8 144/8 189/20 224/7 225/10 229/8 231/3 231/18 234/3 237/1 237/2 237/5 237/7 237/18 238/4 238/4 239/14 240/1 242/11 246/5 246/22
**sorta** [1] 62/5
**sorting** [1] 155/10
**sounds** [3] 67/8 198/11 213/18
**source** [3] 20/18 43/14 119/20
**sources** [4] 9/6 40/22 42/7 43/16
**Southeast** [1] 2/16
**SOUTHERN** [1] 1/1
**Southwest** [1] 2/19
**speaker** [1] 12/21
**speaking** [12] 23/11 23/20 24/16 36/17 52/11 57/5 58/2 60/13 61/16 79/25 97/19 127/25
**special** [2] 62/15 62/15
**specific** [13] 11/9 14/17 27/4 37/13 107/8 115/16 119/2 127/24 127/25 166/24 168/8 220/5 237/8
**specifically** [7] 13/5 16/8 18/8 30/19 99/8 168/20 197/18
**specifics** [4] 16/4 16/5 17/8 198/6
**speculating** [1] 27/3
**speculation** [1] 25/10
**spell** [5] 5/19 35/9 141/12 146/4 222/17

**spelled** [2] 35/10 222/20
**spend** [2] 60/10 60/18
**spent** [2] 224/20 224/20
**spike** [1] 134/23
**spikes** [2] 133/6 133/10
**spill** [1] 244/2
**split** [2] 78/19 183/11
**Spokane** [3] 6/4 6/16 6/21
**spoke** [3] 113/25 156/8 194/22
**spoken** [1] 144/4
**spouse** [1] 155/9
**spread** [3] 88/16 88/16 232/15
**spreadsheet** [25] 48/5 48/8 48/11 48/19 48/20 150/11 150/18 150/20 152/16 153/12 160/10 189/20 189/21 189/23 190/10 190/19 190/19 190/20 191/3 191/10 194/9 194/12 196/18 197/22 218/18
**spring** [1] 144/15
**square** [1] 55/13
**squared** [2] 56/3 69/6 69/7
**staff** [1] 48/7
**stage** [2] 12/14 12/14
**standard** [5] 39/24 42/2 94/22 99/18 231/24
**standing** [1] 130/17
**standpoint** [2] 8/16 13/23
**start** [16] 15/15 24/19 27/3 54/21 72/16 85/13 109/24 142/18 182/3 189/7 189/24 190/8 192/4 198/25 210/13 223/13
**started** [18] 8/10 12/19 23/7 23/11 23/20 24/13 24/16 25/4 120/12 120/13 120/16 138/13 138/17 139/3 139/4 140/6 142/12 162/1
**starting** [9] 47/7 49/5 52/24 58/23 62/19 71/20 75/12 162/22 167/18
**starts** [1] 43/22
**state** [10] 3/7 5/19 6/7 33/7 33/13 35/9 141/12 146/4 213/17 216/24
**stated** [5] 38/9 118/14 135/4 159/21 213/18
**statement** [1] 118/12 128/3 128/18 178/21
**statements** [14] 5/5 5/7 5/11 7/4 21/3 21/8 21/10 21/16 22/2 116/17 116/21 116/22 144/12 182/19
**states** [10] 1/1 1/3 1/13 3/5 3/9 5/15 53/8 66/7 139/21 145/23

**statistic** [12] 44/15 44/18 44/19 45/20 46/3 55/7 55/8 55/25 132/8 132/8 132/13 240/6
**statistical** [16] 41/4 41/11 41/12 44/7 50/19 54/13 54/14 96/25 98/7 99/5 99/6 132/11 132/13 148/25 238/24 244/18
**statistically** [25] 41/9 44/14 44/15 44/21 45/23 46/5 55/11 56/1 56/10 56/13 69/1 80/15 86/11 86/16 97/1 99/25 125/21 125/22 130/18 238/8 238/10 238/25 239/5 239/20 244/7
**status** [2] 14/15 38/12
**statute** [1] 4/14
**stay** [1] 159/20
**stays** [1] 111/24
**STEIN** [27] 1/6 3/5 3/16 3/19 3/25 14/22 15/7 16/18 29/8 155/2 155/3 171/7 171/12 172/1 178/4 178/9 178/13 178/15 179/12 183/16 184/20 191/23 192/15 193/2 193/24 226/24 245/5
**Stein's** [4] 70/9 180/4 188/4 245/7
**step** [28] 34/16 40/1 40/2 40/12 41/4 70/2 96/16 96/24 97/2 97/3 131/6 152/9 152/13 152/19 153/1 153/8 153/9 153/9 153/10 153/11 160/12 160/14 199/3 199/6 219/13 219/13 220/24 228/1
**step-by-step** [1] 219/13
**Stephen** [4] 1/18 256/9 256/15 256/16
**Stepping** [1] 39/22
**steps** [13] 7/3 96/9 153/23 154/3 160/4 190/1 190/14 195/23 196/1 198/25 199/1 214/21 219/15
**still** [25] 21/15 58/11 91/4 94/12 111/2 116/11 125/13 149/10 149/11 154/14 156/10 156/15 157/7 158/7 158/9 158/15 160/15 160/20 212/14 212/20 214/5 216/22 236/21 237/3 237/20
**stock [414]**
**stock's** [1] 65/6
**stockholder** [2] 174/12 192/23
**stockholders** [2] 247/15 250/13
**stockholders'** [9] 247/9

247/10 247/18 247/21 247/24 249/17 249/20 250/9 250/24
**stocks** [12] 53/6 53/8 53/9 53/11 64/14 65/3 65/16 65/24 66/8 118/3 229/10 238/14
**stop** [1] 15/23
**store** [1] 58/22
**story** [1] 22/25
**straighten** [1] 29/3
**straightforward** [1] 191/18
**Street** [2] 1/19 2/19
**strike** [1] 159/3
**strong** [1] 51/13
**stronger** [1] 21/14
**strongest** [1] 25/2
**structure** [1] 247/13
**structured** [1] 36/12
**studied** [1] 92/1
**studies** [10] 42/3 42/5 42/6 42/10 229/24 229/25 230/5 230/6 231/6 238/17
**study** [82] 37/12 37/16 38/15 39/13 39/23 39/24 40/1 40/2 40/12 42/1 42/12 42/16 42/19 42/20 43/2 43/9 45/3 48/4 50/18 51/20 51/23 57/20 67/7 84/9 84/25 86/17 86/20 92/1 94/6 94/7 96/8 104/1 104/11 104/15 104/23 104/23 105/10 105/21 105/24 106/1 106/3 106/5 106/10 106/21 114/17 114/24 116/5 116/19 116/22 123/6 126/15 127/9 127/12 127/20 127/22 127/23 131/20 132/3 133/5 133/9 141/21 141/24 142/15 166/23 226/15 226/19 227/12 227/12 227/14 229/18 229/20 230/4 230/20 231/8 231/9 232/6 232/18 234/7 234/12 235/22 238/13 242/16
**studying** [3] 39/24 43/4 106/23
**stuff** [1] 62/15
**subject** [1] 234/16
**submit** [1] 149/9
**submitted** [1] 181/11
**subpoena** [1] 34/22
**subprime** [1] 52/16
**subsequent** [5] 16/24 101/8 101/13 190/14 214/21
**subset** [3] 78/10 79/1 190/9
**substantial** [2] 34/12 219/12

**S**

**substantially [2]** 148/1 183/6
**substituted [2]** 153/10 153/17
**substituting [2]** 159/14 190/16
**subtract [5]** 94/13 199/13 199/15 202/22 248/6
**subtracted [2]** 152/14 196/21
**subtracting [6]** 151/2 152/20 159/17 163/3 164/11 247/12
**subtraction [1]** 49/15
**such [7]** 38/11 79/23 103/14 104/23 135/8 191/14 232/8
**suddenly [1]** 23/21
**suffer [7]** 113/9 113/10 113/11 113/17 208/16 208/20 208/23
**suffered [9]** 29/18 111/11 113/2 113/20 113/23 126/22 166/23 209/17 213/14
**suggest [3]** 28/12 133/24 240/7
**suggested [1]** 134/2
**suggesting [2]** 24/24 118/16
**suggestion [2]** 31/10 42/7
**Suite [1]** 2/17
**sum [1]** 51/7
**summarize [10]** 15/13 44/1 45/14 147/1 148/16 148/19 163/16 168/10 182/14 182/22
**summarized [1]** 181/7
**summarizes [1]** 50/6
**summarizing [1]** 169/4
**summary [5]** 16/1 169/5 169/13 170/12 171/10
**support [5]** 95/20 95/23 101/7 101/14 101/15
**supporting [1]** 194/11
**supports [1]** 139/9
**supposed [7]** 24/19 73/21 90/14 90/16 124/21 125/10 208/11
**sure [45]** 5/7 7/12 11/14 21/6 24/14 24/18 28/23 30/14 30/14 33/22 35/19 58/9 58/17 59/12 61/6 62/23 71/19 73/12 73/14 88/1 90/24 91/14 92/24 95/18 107/4 117/5 117/21 120/22 123/25 124/2 131/23 132/1 132/7 138/21 140/3 162/12 164/16 171/25 187/25 202/16 213/6 215/16 217/9 221/25 223/4

**sureness [1]** 131/24
**surprising [1]** 223/11
**surrounding [2]** 123/11 125/22
**surveyed [1]** 127/12
**Susan [1]** 215/17
**suspect [5]** 17/2 17/5 71/7 71/9 71/10
**sustain [1]** 138/18
**Sustained [3]** 144/9 159/4 159/6
**Swaine [3]** 2/10 2/13 3/13
**sworn [5]** 5/17 35/7 141/10 146/1 222/11

**T**

**tab [2]** 37/7 122/17
**tab 101 [1]** 37/7
**tab 17 [1]** 122/17
**take [39]** 5/18 7/3 35/8 59/5 69/24 70/4 77/10 110/9 110/12 111/2 131/2 141/11 145/5 145/7 146/2 160/5 164/5 177/13 178/10 181/23 187/19 187/23 191/5 198/1 205/4 209/21 210/6 210/13 210/22 213/10 220/8 220/12 223/16 228/1 238/21 238/22 248/6 250/12 252/11
**taken [8]** 62/9 70/6 90/19 131/9 159/24 188/1 223/21 253/16
**takes [1]** 113/1
**taking [8]** 151/1 153/15 159/13 164/3 181/6 182/5 205/17 247/11
**talk [12]** 22/4 93/18 115/8 118/13 125/17 140/2 159/10 188/23 191/22 199/8 229/18 240/25
**talked [3]** 94/19 159/9 243/5
**talking [22]** 25/23 25/24 49/1 62/2 67/2 85/21 102/3 102/3 104/7 108/23 111/21 112/9 115/12 116/24 128/1 129/10 132/19 180/2 184/6 212/1 212/2 231/12
**talks [1]** 126/20
**tangible [3]** 10/18 10/20 11/20
**tank [1]** 24/25
**tape [4]** 23/21 24/11 24/12 24/21
**task [2]** 133/6 200/10
**Taylor [23]** 5/15 5/17 5/20 6/1 6/8 8/24 9/16 15/23 17/2 19/20 28/24 30/16 30/24 32/19 34/3

34/16 109/20 138/15 216/2 216/11 217/11 217/19 254/3
**Taylor's [1]** 145/9
**technical [1]** 219/23
**technically [1]** 117/22
**technique [1]** 54/13
**telephone [1]** 12/21
**tell [10]** 26/5 99/8 99/13 105/12 138/9 193/8 199/1 222/17 232/18 239/21
**telling [1]** 22/23
**tells [2]** 55/13 99/6
**temporary [2]** 76/15 236/24
**ten [14]** 6/16 11/9 11/10 30/18 32/6 36/14 42/3 124/14 124/25 125/14 212/9 248/11 248/23 249/1
**tended [2]** 55/23 68/21
**tends [1]** 71/3
**term [5]** 61/7 61/7 74/12 77/4 247/10
**terminal [1]** 235/19
**terminated [3]** 85/8 85/9 86/10
**termination [6]** 85/1 85/9 85/14 85/15 86/1 86/4
**terms [14]** 53/22 152/5 190/23 191/11 191/18 194/1 195/24 196/7 200/18 208/22 219/6 219/9 219/9 227/17
**test [15]** 41/4 41/5 41/9 50/19 51/19 51/22 56/17 96/25 98/7 99/5 99/6 105/25 106/1 106/4 106/4
**tested [1]** 133/2
**testified [21]** 20/24 22/5 22/7 29/18 36/15 36/18 95/7 96/8 120/5 147/4 147/6 181/19 182/1 192/6 208/15 217/11 225/8 225/9 225/14 228/13 229/20
**testify [4]** 144/18 144/22 147/2 237/22
**testifying [9]** 103/19 144/16 152/1 171/15 198/16 214/15 218/14 218/20 226/7
**testimony [32]** 5/5 10/13 95/10 95/11 114/2 120/19 138/5 144/13 145/9 149/12 149/21 169/22 171/4 173/13 181/17 185/2 191/22 224/9 225/2 226/4 227/8 227/11 227/23 228/4 229/14 233/20 234/18 254/3 254/7 254/11 254/14 254/18

**testing [2]** 42/1 42/8
**textbook [1]** 105/7
**textbooks [1]** 42/4
**texts [2]** 42/7 105/24
**thank [60]** 3/23 4/3 4/5 5/3 5/9 6/12 7/13 15/5 19/16 32/16 33/19 33/24 34/14 34/16 34/19 35/20 35/22 63/1 63/2 63/4 70/1 70/5 70/12 91/16 91/17 91/19 91/21 128/11 130/22 130/23 131/4 131/8 131/14 139/14 139/16 141/8 143/5 145/20 145/21 145/22 146/3 150/2 173/16 187/14 187/16 187/18 187/25 188/7 214/11 217/23 217/24 221/14 221/15 221/16 222/23 224/1 252/10 252/14 253/8 253/14
**that's [153]** 4/16 5/13 10/7 13/4 13/6 16/6 16/10 18/1 20/9 21/17 22/13 22/16 22/24 22/24 24/14 26/11 26/23 27/16 28/7 32/13 44/5 44/11 45/17 45/19 46/1 46/18 55/7 55/7 57/11 57/16 58/7 60/23 60/25 60/25 61/25 66/23 67/1 67/11 69/6 69/7 72/17 76/1 81/11 81/25 82/4 82/10 83/8 88/8 90/14 92/4 92/12 92/15 94/2 94/24 94/22 95/2 96/6 98/7 98/18 99/5 99/11 100/2 100/5 102/11 102/20 103/18 103/24 104/21 107/17 108/3 108/14 112/7 113/12 113/14 115/7 115/19 116/8 116/13 116/15 118/6 119/8 121/23 122/3 122/5 123/8 125/12 125/24 126/11 126/24 134/25 138/14 139/20 140/8 143/20 144/16 144/25 149/10 149/23 149/25 155/6 155/25 156/3 159/5 162/23 164/2 164/4 171/18 171/19 184/21 185/11 186/18 188/17 190/20 197/5 197/25 200/25 205/8 205/15 206/3 206/16 206/17 209/12 211/7 211/17 212/10 212/18 212/18 214/25 215/6 220/9 225/23 225/24 230/10 230/22 236/9 236/9 236/16 236/19 238/7 239/16 239/18 240/24 241/2

244/6 245/20 246/4 247/14 248/5 248/7 252/2
**the 10th [1]** 233/25
**the 14th [2]** 236/11 236/12
**the 25th [1]** 233/23
**themselves [1]** 155/7
**theoretical [7]** 157/25 158/12 164/10 201/5 216/7 216/19 216/20
**theoretically [2]** 156/17 156/22
**theory [2]** 68/23 112/5
**there's [37]** 4/12 17/23 17/24 51/16 62/9 62/18 66/14 71/2 71/3 72/25 73/22 75/2 90/10 95/25 103/1 115/25 122/12 126/17 132/16 136/15 173/1 174/21 185/16 185/17 188/20 211/24 217/19 223/10 232/11 234/20 234/22 234/25 236/13 236/24 238/4 246/14 252/15
**therefore [12]** 46/4 71/10 140/11 153/19 157/24 157/25 161/2 161/8 234/16 242/23 244/24 249/10
**thereof [1]** 123/3
**They'll [1]** 142/25
**they're [15]** 10/8 37/1 61/13 71/12 73/16 73/19 73/20 74/22 77/17 91/9 117/17 117/17 209/13 226/2 252/22
**they've [5]** 30/4 36/24 141/1 245/1 247/8
**thing [24]** 6/9 17/19 17/23 17/25 35/19 40/22 46/24 62/7 66/15 67/9 90/21 94/18 98/19 100/12 105/25 106/20 110/22 140/20 154/16 155/4 190/15 211/20 222/15 252/15
**things [15]** 16/14 21/7 25/20 51/17 66/14 85/20 114/1 114/2 127/25 191/23 206/6 223/9 224/8 226/22 243/25
**think [119]** 4/14 4/16 5/6 8/4 9/1 17/12 18/6 19/2 19/3 20/9 22/24 24/17 24/18 32/7 32/14 39/19 51/17 51/17 57/9 57/9 58/19 58/24 61/15 74/18 77/9 85/25 86/6 86/9 88/9 92/24 93/6 93/22 94/17 94/17 95/12 100/10 104/5 104/20 105/13 106/14 108/20 111/6 112/8 113/8 113/14 118/10 120/3

**T**

**think... [72]** 120/4
123/14 124/8 124/10
127/3 127/11 127/23
128/9 129/22 130/19
138/15 141/2 147/16
149/20 154/19 154/20
160/12 160/22 178/2
183/10 183/14 185/15
185/23 186/1 186/19
187/2 187/10 187/21
188/25 190/7 192/13
195/13 195/17 195/17
202/14 204/3 212/4
215/2 215/16 216/5
218/19 219/22 223/10
227/15 227/23 228/9
229/25 230/3 230/22
231/11 233/15 233/19
234/23 235/24 236/24
237/11 238/7 239/2
239/3 240/6 241/15
242/15 244/9 245/21
249/2 249/4 251/19
252/2 252/6 252/7 253/2
253/3

**thinking [2]** 85/23 116/6

**third [16]** 75/3 75/4
88/17 96/24 107/15
107/22 108/2 181/23
187/11 233/25 234/4
250/14 250/21 250/21
250/21 251/1

**thirds [1]** 14/5

**those [129]** 8/21 8/22
9/5 9/6 21/5 21/7 22/3
25/1 25/8 26/18 30/18
31/21 32/13 33/16 42/18
48/23 50/15 50/20 51/18
53/11 59/22 59/24 60/18
63/25 65/23 78/16 82/14
82/25 86/15 87/5 87/11
87/13 88/25 91/6 92/5
104/13 107/12 109/5
110/4 116/3 116/19
116/22 119/3 119/16
119/22 122/24 129/16
133/22 147/12 147/22
148/1 150/8 152/18
154/14 154/15 154/20
155/5 155/14 156/2
156/18 156/23 157/3
158/2 158/20 159/12
159/25 160/11 160/14
161/9 161/17 161/18
164/8 165/4 165/14
166/9 167/20 168/13
168/19 168/23 170/7
174/3 174/8 178/22
183/6 184/6 184/8
189/14 189/14 190/13
190/14 192/16 192/22
192/24 192/24 193/12
194/11 194/11 196/1
201/1 203/2 207/2
207/19 208/7 209/7

209/10 209/17 211/10
214/15 216/23 218/19
219/14 219/19 220/19
221/2 224/20 226/3
226/14 226/19 228/8
232/6 234/16 235/1
238/2 242/23 243/8
245/22 247/3 251/2
252/22

**though [7]** 59/4 116/14
157/8 211/23 216/3
243/19 249/20

**thought [6]** 114/9 120/5
138/4 195/1 195/2
247/19

**thousand [4]** 60/10
174/17 203/15 215/10

**thousands [1]** 23/3

**three [43]** 9/5 9/6 10/1
11/7 26/12 27/23 28/1
38/14 43/24 44/1 60/24
60/25 72/20 72/22 72/24
73/6 74/9 82/3 83/24
84/1 92/5 96/9 107/6
107/12 107/13 122/24
129/14 129/16 153/25
193/14 219/15 224/17
225/18 233/21 236/14
240/7 242/22 242/23
243/20 250/9 250/15
250/22 251/2

**threshold [1]** 45/22

**through [31]** 32/1 32/6
47/20 58/7 62/14 62/15
70/21 73/12 151/16
151/18 153/23 162/10
163/19 166/5 166/7
167/19 169/7 183/13
185/17 185/18 190/1
192/3 195/1 198/25
199/1 208/4 214/21
220/9 223/17 225/7
243/25

**throughout [6]** 116/1
148/20 161/1 198/14
237/23 238/6

**THS [3]** 184/11 184/21
194/9

**Thursday [8]** 73/20
73/21 73/23 75/6 123/18
124/11 236/14 236/15

**Thus [1]** 104/25

**tie [1]** 198/11

**tied [1]** 17/23

**timeframe [4]** 166/4
189/11 189/15 198/12

**timeline [2]** 72/16 81/17

**times [8]** 109/20 109/22
190/25 211/3 211/21
225/9 225/17 225/18

**timetable [1]** 13/2

**timing [4]** 23/10 139/7
139/8 141/2

**title [1]** 13/4

**titled [1]** 12/24

**to-the-penny [1]** 34/10

**today [37]** 10/13 36/21
39/13 52/5 59/4 83/17
82/23 89/23 141/22
149/12 169/23 171/5
181/18 188/21 194/7
221/4 225/2 227/6
227/24 234/18 252/17

**today's [2]** 16/3 37/9

**together [13]** 9/5 32/14
53/16 53/17 56/9 156/3
180/21 189/2 189/7
195/14 196/1 215/18
215/20

**told [12]** 12/13 15/13
16/23 94/2 140/1 195/21
195/23 196/5 196/14
208/10 208/12 216/22

**tomorrow [10]** 83/23
142/25 143/2 143/7
221/21 251/25 251/25
252/13 252/14 253/15

**tonight [1]** 252/20

**too [3]** 18/11 96/2
229/22

**took [17]** 138/13 140/7
152/9 153/13 156/21
171/16 188/25 189/6
189/11 190/9 195/12
196/1 197/25 199/24
219/18 224/17 245/8

**top [13]** 29/7 47/7 60/21
68/4 79/24 99/14 100/13
105/13 186/18 192/17
193/12 193/14 193/20

**topic [3]** 36/17 57/4
217/11

**total [26]** 8/25 9/14 18/1
20/12 65/7 65/23 67/12
67/14 84/15 88/7 110/23
153/21 153/23 154/19
168/8 169/8 170/4
174/15 175/3 175/7
181/7 202/23 205/9
207/16 211/15 250/12

**totaled [2]** 9/6 200/15

**totaling [1]** 167/4

**totally [2]** 12/5 62/5

**touched [1]** 230/1

**tough [1]** 189/8

**toward [1]** 79/13

**towards [2]** 222/13
233/7

**trace [1]** 165/12

**tracing [1]** 189/13

**track [2]** 156/19 158/10

**trade [21]** 60/20 60/22
71/4 72/17 72/18 72/21
81/18 81/19 81/25 82/9
84/10 84/12 84/13 84/20
84/23 114/21 138/5
162/13 205/10 205/16
205/22

**trade-in [1]** 205/10

**tradeable [1]** 176/18

**traded [3]** 121/15 214/1
232/9

**trader [1]** 58/14

**trades [2]** 88/19 141/2

**trading [56]** 23/19 30/16
30/23 36/19 59/14 65/7
65/23 66/19 67/5 67/5
67/12 69/14 70/20 70/21
71/7 71/13 81/20 81/21
81/23 82/19 82/23 82/25
83/25 88/2 88/3 88/4
88/6 88/9 88/11 120/17
120/23 123/19 125/14
136/25 137/12 137/13
140/23 142/3 142/9
146/25 147/1 147/13
148/7 150/22 154/13
156/19 167/20 201/9
225/11 235/15 235/20
236/13 236/15 236/22
237/4 244/3

**transaction [12]** 60/24
111/17 113/1 117/9
117/12 152/14 152/17
153/14 153/20 159/15
159/16 190/16

**transactions [3]** 156/4
159/13 214/18

**transcript [6]** 1/11
13/11 38/19 43/10 120/3
256/11

**transfer [10]** 147/17
168/20 172/25 174/8
174/12 174/25 176/4
176/17 182/18 194/17

**transferred [10]** 168/14
170/5 170/6 170/8
171/12 172/1 172/21
175/7 182/8 184/16

**transferring [1]** 171/20

**transfers [1]** 194/20

**travel [1]** 188/21

**treat [1]** 156/10

**treated [1]** 157/7

**trend [1]** 117/1

**trial [13]** 4/24 5/1 9/21
9/21 10/5 26/13 38/23
147/3 169/12 170/22
172/2 172/11 175/14

**tried [1]** 28/5

**trough [1]** 63/24

**troughs [1]** 64/1

**true [9]** 23/7 25/15
32/25 33/16 92/16
162/14 186/18 208/19
220/9

**trust [12]** 175/15 176/1
176/14 179/9 179/25
180/10 181/2 181/5
184/11 184/21 194/9
213/16

**trusts [4]** 184/6 184/8
192/10 193/12

**try [9]** 17/14 143/12
155/11 191/17 222/12
230/2 237/17 252/5
252/16

**trying [6]** 95/9 128/8

148/9 195/14 195/25
252/4

**Tuesday [1]** 73/18

**turn [18]** 37/22 38/2
38/18 43/18 45/13 47/10
49/23 52/4 52/21 57/4
69/22 72/8 82/13 84/8
153/25 177/20 178/10
178/19

**turned [2]** 7/21 245/9

**turning [26]** 38/6 39/4
54/9 58/6 61/4 63/6
64/18 67/17 68/10 69/10
72/14 76/4 77/12 78/8
79/4 80/2 80/16 81/15
84/25 86/14 87/19 89/14
136/18 150/4 152/4
179/5

**turnover [1]** 88/6

**twice [2]** 116/12 225/20
249/8

**two [72]** 4/10 9/5 12/12
14/5 15/21 25/18 32/10
37/12 39/12 39/18 46/24
51/18 53/16 55/9 56/12
62/1 62/17 81/4 85/20
97/9 107/7 125/21 129/4
129/24 130/10 130/13
145/1 147/23 148/14
152/1 152/4 152/8
152/13 152/23 153/8
153/10 155/14 163/5
165/3 175/15 176/21
177/7 179/4 179/17
179/20 184/7 186/18
192/10 192/15 193/11
224/8 225/25 225/25
226/22 236/13 236/22
237/4 237/21 243/22
244/4 244/8 244/21
245/2 247/1 247/3 247/8
248/3 248/21 250/1
250/2 250/4 252/6

**two-day [1]** 243/22

**two-thirds [1]** 14/5

**type [9]** 11/4 11/6 11/12
37/11 146/18 201/20
216/16 238/15 238/22

**types [9]** 8/14 43/8
69/23 70/15 70/19
148/14 161/17 201/17
225/11

**typical [1]** 41/14

**typically [13]** 46/18 54/1
55/2 55/4 57/8 61/17
64/5 67/10 79/12 96/19
103/10 135/22 144/4

**typographical [1]** 49/11

---

**U**

**U.S [4]** 2/4 2/8 54/25
112/25

**Uh [7]** 101/6 117/11
142/4 160/7 201/14
210/14 210/24

**Uh-huh [5]** 117/11

## U

**Uh-huh... [4]** 160/7
201/14 210/14 210/24
**ultimately [5]** 109/13
129/18 186/19 216/14
235/14
**Um [2]** 126/3 181/24
**Um-hum [1]** 181/24
**unable [3]** 45/5 86/23
158/10
**Uncle [5]** 84/9 84/12
84/13 84/19 84/23
**unconnected [1]** 16/25
**uncorrelated [1]** 96/18
**uncover [1]** 72/6
**under [19]** 30/3 30/6
34/22 39/8 48/20 112/4
161/6 161/8 162/23
163/1 165/7 207/20
209/10 209/22 217/19
219/4 219/13 219/15
219/16
**underlying [3]** 137/6
137/7 140/15
**underneath [1]** 80/12
**underreporting [1]** 77/2
**understand [19]** 5/6
8/21 58/15 62/7 93/16
118/14 137/8 142/11
143/18 153/1 164/16
198/4 198/8 208/10
212/6 228/3 228/24
234/18 249/13
**understanding [2]** 94/15
191/25
**understood [1]** 19/22
**undertakes [1]** 60/23
**underwriter [1]** 86/22
**unfulfilled [1]** 129/10
**unit [4]** 2/3 2/7 188/16
188/18
**UNITED [9]** 1/1 1/3
1/13 3/5 3/9 5/15 53/8
139/21 145/23
**universe [6]** 20/22 21/15
148/8 154/4 154/8 200/6
**universities [1]** 224/18
**University [5]** 6/7 35/24
36/1 224/16 224/18
**unless [5]** 34/22 34/25
149/12 149/21 185/16
**unlikely [1]** 132/15
**unquote [5]** 63/13 74/10
76/16 90/18 91/8
**unrelated [2]** 115/2
115/4
**unreliable [1]** 235/5
**unsurprised [1]** 66/25
**until [17]** 17/16 27/17
33/11 52/24 73/20 77/3
85/13 112/18 112/19
113/10 113/18 143/9
143/11 213/3 221/21
237/24 238/6
**unusual [2]** 50/16 50/20
**upon [7]** 3/24 3/25

185/19 186/4 188/19
251/7 251/13
**upward [1]** 71/3
**us [17]** 3/20 17/1 43/18
105/12 137/9 140/3
140/12 144/15 158/17
162/10 163/19 193/8
195/25 222/17 224/12
235/20 249/13
**used [23]** 41/5 41/17
41/22 50/23 80/21 93/19
94/23 110/21 110/25
121/2 131/19 132/22
132/23 133/3 133/16
149/18 153/2 160/17
182/16 185/23 194/22
202/7 218/14
**usefulness [1]** 104/22
**using [25]** 42/9 42/13
61/9 81/13 95/8 102/22
105/1 109/9 147/19
152/8 152/16 156/16
162/24 164/9 185/22
206/5 206/6 206/8 206/9
213/19 216/5 218/17
218/19 218/22 245/12

## V

**vacation [1]** 93/9
**Vaguely [1]** 127/8
**valuation [7]** 168/13
174/3 175/2 193/11
193/21 219/16 219/17
**value [93]** 44/15 44/18
44/20 45/21 46/4 48/5
55/8 55/25 56/2 56/13
69/2 69/6 80/12 82/6
86/18 98/16 113/4
150/12 150/24 151/2
151/3 152/15 152/20
152/21 159/11 160/1
160/2 160/25 161/5
162/13 162/19 162/19
162/23 162/23 163/4
163/4 163/6 163/25
164/7 164/9 164/12
164/12 168/16 168/19
168/23 170/4 170/7
170/8 173/10 174/21
174/22 175/3 175/7
181/1 181/22 182/5
190/15 192/11 192/13
192/24 196/19 196/20
200/23 201/23 201/24
202/9 202/24 203/12
203/16 203/20 204/3
205/15 205/16 205/17
205/21 205/22 206/14
206/18 206/24 207/16
215/15 215/24 217/21
218/10 218/11 218/15
218/17 218/22 220/6
220/14 220/19 247/11
249/25
**valued [2]** 181/4 193/19
**values [2]** 72/7 207/18

**valuing [2]** 192/10 230/4
**variation [14]** 41/8
41/14 55/14 55/16 56/4
69/4 97/23 98/1 100/3
100/8 132/2 132/5
132/10 139/2
**variations [1]** 131/18
**variety [1]** 147/19
229/11
**various [9]** 87/24 135/6
224/10 224/25 225/11
230/2 232/1 232/3 248/9
**vary [1]** 166/7
**verified [3]** 143/24
180/7 194/10
**verify [2]** 142/24 143/12
**version [2]** 51/13 51/15
**versus [5]** 3/5 4/13
130/16 192/1 212/2
**vertical [1]** 79/8
**very [31]** 7/17 12/8
20/16 37/18 38/12 48/1
55/12 64/14 64/17 67/9
69/3 77/9 77/10 78/11
81/11 94/22 94/22
107/20 109/14 122/5
143/14 147/11 152/4
177/6 184/13 190/7
191/18 237/19 247/7
247/19 247/20
**viable [3]** 11/20 18/1
243/9
**victim [11]** 23/14 23/16
154/22 155/5 156/14
158/18 163/21 190/17
219/14 220/25 221/5
**victims [6]** 155/6 155/20
161/20 161/20 162/1
221/3
**view [6]** 51/9 91/2 111/9
113/8 121/9 121/23
**viewed [1]** 76/8
**views [1]** 82/6
**virtual [1]** 61/21
**virtually [2]** 13/23 14/3
**visit [1]** 28/10
**visited [1]** 28/8
**visually [3]** 53/24 67/23
79/16
**voir [4]** 142/21 143/16
144/8 254/13
**volatility [2]** 41/14
132/10
**volume [46]** 1/10 23/19
23/23 65/3 65/7 65/7
65/11 65/13 65/15 65/17
65/22 65/23 66/7 66/19
67/3 67/4 67/5 67/5 67/6
67/9 67/10 67/12 67/21
67/25 68/3 68/6 68/15
68/20 69/5 69/13 69/14
69/14 80/6 81/22 82/19
82/23 88/2 88/4 88/6
88/9 88/11 117/24
165/11 200/4 232/9
232/10

**volumes [1]** 80/14
**voluminous [2]** 177/7
200/9
**voting [1]** 91/10
**vouch [1]** 185/16

## W

**wait [5]** 33/11 113/16
143/9 213/3 221/21
**Wake [1]** 224/18
**walk [6]** 58/7 73/12
162/10 163/19 169/7
199/1
**walked [1]** 166/7
**Walking [1]** 151/16
**walks [1]** 58/22
**walled [1]** 188/17
**want [48]** 4/7 5/4 5/7
13/8 14/18 22/4 31/20
37/5 37/16 38/18 38/22
43/18 48/9 52/4 57/4
58/23 61/6 65/25 65/25
66/5 69/22 71/17 72/8
75/9 84/8 88/10 129/7
133/15 134/9 134/11
136/22 143/8 159/10
187/19 191/21 191/25
196/8 196/16 196/17
196/19 196/20 202/11
208/4 214/6 221/21
246/11 246/13 249/15
**wanted [17]** 4/10 5/5
11/1 16/3 16/5 24/11
25/8 86/5 140/19 155/4
156/17 181/9 190/3
210/2 210/2 210/21
252/23
**wants [5]** 32/3 70/24
71/1 143/7 149/21
**warning [1]** 128/20
**Washington [8]** 2/5 2/9
6/4 6/7 146/12 224/6
224/21 224/22
**wasn't [15]** 8/5 22/25
25/9 26/2 35/1 96/17
104/7 106/23 123/2
123/25 189/13 194/21
198/6 214/2 250/20
**watched [2]** 119/10
119/10
**ways [6]** 47/2 47/3 94/4
98/18 161/4 231/24
**we'd [3]** 169/15 172/11
182/25
**we'll [17]** 29/4 131/6
131/8 140/18 141/7
146/25 159/7 163/14
169/7 186/22 191/20
195/4 217/18 252/6
252/13 252/14 253/14
**we're [35]** 25/23 25/23
26/5 28/21 30/20 70/4
77/9 100/18 108/23
131/2 131/5 131/12
132/19 142/24 146/19
188/4 188/23 196/8

197/12 199/5 201/4
203/1 204/9 205/24
209/9 209/16 212/24
213/8 214/5 214/10
216/22 221/23 223/5
223/9 252/2
**we've [10]** 31/23 105/3
144/13 149/15 159/9
165/19 185/11 233/6
233/19 249/17
**wealthy [1]** 20/6
**weather [1]** 20/3
**web [1]** 124/3
**webcast [120]** 14/16
16/3 22/5 22/7 22/8 23/6
23/7 23/19 25/16 25/20
27/11 27/14 28/2 28/3
28/4 28/5 28/18 28/19
29/10 38/19 39/20 43/10
45/18 46/9 46/13 92/10
98/5 98/13 98/16 98/22
101/18 102/2 102/8
112/22 114/8 114/19
118/13 118/15 118/20
118/24 119/10 119/11
119/14 119/25 120/8
120/9 120/12 120/13
120/16 120/21 121/5
121/6 121/10 121/10
121/13 121/22 122/7
122/8 122/9 122/13
123/11 123/16 123/22
123/23 123/24 124/3
134/9 134/18 134/21
135/3 136/12 136/19
138/13 138/16 138/25
139/2 139/3 139/4 139/6
139/8 139/9 140/7
142/12 142/18 145/5
145/12 145/15 204/17
205/11 208/8 208/11
208/20 233/10 234/8
234/13 235/3 235/5
235/10 235/12 235/23
235/25 235/25 236/2
236/2 236/3 236/10
236/11 236/18 236/20
236/22 236/25 237/10
237/13 237/24 241/1
241/5 241/19 241/20
242/2 242/19
**website [1]** 76/10
**week [4]** 124/6 124/9
125/5 236/13
**weeks [2]** 179/4 189/7
**weight [2]** 21/8 21/13
**Weissman [1]** 209/25
**welcome [1]** 3/23
**well [79]** 11/18 12/2
13/4 15/13 16/22 17/16
17/18 17/21 21/21 23/14
27/1 36/11 59/21 62/25
72/1 74/18 85/12 92/10
96/12 96/17 98/7 98/21
101/2 102/6 104/13
106/23 107/5 107/20

# W

**well... [51]** 108/1 108/11 109/11 111/20 112/7 117/6 120/15 122/6 125/7 125/25 126/22 127/4 130/20 135/8 135/10 138/9 140/17 141/4 142/21 144/18 150/11 150/12 150/23 158/13 169/16 171/18 174/12 182/18 186/16 189/11 189/23 191/3 192/13 196/17 197/1 197/22 197/25 200/19 203/25 207/14 212/1 214/4 216/12 227/4 227/23 233/6 235/24 237/16 242/8 244/12 253/6

**well-regarded [1]** 72/1

**went [13]** 12/19 55/2 55/3 100/6 106/24 110/7 111/18 112/14 195/1 205/8 219/13 219/13 239/19

**weren't [3]** 21/11 217/5 229/2

**West [2]** 1/7 1/19

**what's [16]** 9/18 13/8 18/6 38/22 48/9 51/12 52/14 53/9 58/4 59/21 134/11 152/21 163/19 169/7 177/11 183/17

**whatever [9]** 12/20 100/25 101/23 153/12 156/1 157/12 210/10 242/9 243/9

**where [39]** 6/3 9/22 14/6 16/22 20/16 51/17 53/4 54/23 56/7 60/15 63/25 64/4 64/6 65/9 70/24 76/12 78/4 108/7 109/19 110/1 125/13 126/20 135/24 135/25 141/7 141/16 146/11 156/3 156/14 160/1 161/11 196/8 220/5 223/3 224/3 229/3 230/11 233/12 241/1

**wherein [1]** 136/9

**whether [75]** 4/13 11/5 23/10 32/25 33/16 37/13 40/24 41/5 41/7 41/9 41/13 43/16 51/25 56/17 72/19 73/19 74/6 74/20 82/2 83/15 83/19 86/3 87/9 87/20 92/16 94/11 95/3 96/4 96/25 97/4 98/8 102/8 105/22 106/1 106/21 106/24 111/21 115/10 117/22 118/20 119/13 119/23 120/9 127/12 129/5 133/6 133/18 134/10 138/12 140/7 145/5 145/6 152/17 156/20 158/10

**W**

161/6 164/3 171/16 194/20 207/5 209/13 213/25 226/17 238/14 238/15 238/18 238/24 238/25 242/2 242/6 242/10 242/17 251/4 252/5 252/21

**while [8]** 18/24 26/2 90/7 99/2 100/18 113/25 156/12 156/16

**white [1]** 232/24

**whittling [1]** 189/25

**who's [5]** 61/11 137/20 164/16 178/14 209/25

**whole [11]** 6/19 18/20 19/1 22/21 35/19 83/21 98/19 103/4 132/7 203/9 222/15

**whom [3]** 59/25 60/7 90/12

**whose [2]** 178/11 199/24

**why [62]** 11/16 12/1 13/3 16/12 28/20 41/24 42/21 46/16 50/5 60/25 64/23 66/13 69/24 75/2 76/13 80/24 81/2 83/12 83/14 84/23 98/7 99/5 100/15 105/20 107/5 109/10 114/6 122/17 132/21 158/6 158/23 187/23 193/4 197/1 198/21 199/8 205/1 205/15 206/3 210/13 215/14 217/4 217/15 219/19 223/18 227/22 228/12 228/18 229/24 230/8 232/22 233/14 234/5 235/18 237/15 243/3 244/11 245/12 246/3 248/2 249/1 249/1

**wide [2]** 135/7 239/4

**widely [3]** 94/22 132/22 132/23

**widows [1]** 20/4

**wind [1]** 141/7

**Winston [1]** 224/19

**Winston-Salem [1]** 224/19

**wiped [2]** 157/25 219/8

**withdraw [3]** 114/20 186/22 214/4

**within [2]** 22/20 241/16

**without [33]** 5/11 10/9 11/18 13/18 15/3 24/21 29/15 34/9 37/1 46/19 48/16 104/1 106/16 106/25 117/12 138/10 144/15 163/11 166/19 167/11 169/12 169/17 170/23 172/11 172/14 173/19 173/22 175/21 177/2 180/16 183/2 187/11 195/8

**witness [25]** 4/8 5/10 5/17 32/8 35/4 35/7 120/4 137/18 137/19

137/23 139/17 140/1 140/1 140/10 140/13 141/10 142/22 144/11 144/15 146/1 171/15 185/18 219/25 222/11 224/9

**witnesses [6]** 4/7 31/21 144/14 221/19 252/1 252/7

**won't [6]** 31/14 47/8 103/20 222/3 222/4 229/21

**wondering [1]** 48/2

**words [9]** 46/24 55/23 68/20 79/19 81/6 82/8 88/12 229/4 238/19

**work [35]** 6/15 36/9 37/11 37/12 57/25 62/2 90/2 93/3 93/11 95/14 111/3 132/24 141/16 141/17 141/24 144/15 144/17 146/11 146/12 146/18 157/16 157/16 186/21 188/20 191/7 192/1 192/1 193/9 223/3 224/3 224/4 224/7 227/1 243/10 244/20

**worked [7]** 92/23 93/7 111/4 146/14 224/23 225/22 225/23

**working [3]** 7/21 93/14 224/21

**works [2]** 59/11 62/6

**world [4]** 61/16 61/21 82/4 86/9

**Worldwide [2]** 2/11 2/14

**worth [7]** 19/5 37/25 38/5 47/21 161/17 247/25 250/18

**worthless [2]** 18/7 18/10

**wouldn't [18]** 12/3 17/17 17/18 18/3 20/11 20/19 21/25 23/3 25/1 62/2 82/8 83/14 102/25 117/21 121/20 129/8 185/2 215/6

**wrapping [1]** 217/7

**writing [3]** 23/14 23/24 118/17

**written [2]** 22/3 120/3

**wrong [1]** 234/25

**wrote [6]** 24/1 24/14 104/6 104/6 119/13 195/3

# Y

**YA [10]** 86/18 86/21 86/22 86/22 86/25 87/6 87/10 87/11 87/14 87/16

**Yale [1]** 36/1

**yeah [65]** 8/21 8/21 8/23 9/2 12/11 14/11 14/16 18/14 18/14 20/1 21/17 22/24 23/17 25/12 25/12 25/19 27/2 30/25 58/5

62/13 74/13 94/22 95/6 95/22 95/25 96/20 99/1 99/5 101/15 101/18 103/21 104/5 104/8 104/20 108/20 109/4 114/6 115/22 116/7 116/10 118/4 120/11 121/24 127/23 128/11 129/25 142/9 144/22 186/23 189/3 191/3 192/22 194/8 195/24 200/3 200/21 203/4 203/9 204/8 206/15 209/20 211/16 219/2 221/23 251/12

**year [4]** 50/23 50/23 86/8 224/21

**years [14]** 11/9 11/10 12/5 25/13 30/18 36/14 47/20 131/17 146/15 146/15 156/19 224/20 247/8 248/3

**yellow [1]** 163/2

**yes [230]** 4/3 4/5 7/9 10/1 13/13 16/10 19/13 34/13 35/3 36/16 37/10 37/21 38/21 39/3 39/16 41/10 43/7 44/3 44/18 45/11 45/16 46/15 47/13 48/7 48/12 52/6 54/11 56/22 57/24 58/1 68/13 69/7 69/9 69/21 70/16 73/9 73/14 75/4 75/17 75/21 76/6 84/11 84/18 86/20 87/23 92/7 92/9 93/13 93/15 93/18 93/23 93/23 96/14 96/23 97/2 97/20 97/21 98/2 98/12 99/19 99/23 100/21 100/24 101/6 103/15 104/2 104/12 105/11 106/11 106/15 106/19 107/10 107/14 108/21 109/18 110/3 110/8 111/8 112/12 112/16 112/23 113/6 113/14 113/24 114/18 114/25 115/13 115/14 116/2 118/1 118/18 118/21 119/17 120/18 122/2 123/13 123/17 123/21 124/5 124/12 124/17 124/20 124/23 125/9 125/16 125/20 126/3 126/8 126/16 127/8 127/19 128/8 128/20 129/2 129/12 129/16 131/21 133/2 133/4 133/20 134/15 136/11 139/7 139/18 141/23 142/6 143/3 143/4 144/1 145/10 145/13 145/16 145/19 147/5 147/10 147/21 148/18 148/21 150/7 151/12 151/15 152/3 152/3 153/4 155/1

157/14 161/13 162/9 163/18 165/1 166/2 166/25 167/6 168/12 168/15 168/18 169/6 169/24 170/3 170/16 171/6 171/9 171/13 172/3 175/10 175/13 175/16 177/12 179/14 180/3 180/12 181/21 182/9 182/12 182/24 183/18 183/21 184/23 185/21 185/22 186/11 186/14 195/13 196/15 202/8 203/7 203/8 204/19 204/25 205/23 206/19 208/3 214/22 217/21 220/2 221/12 223/25 224/14 225/3 225/9 225/16 225/25 226/3 226/20 227/3 227/5 227/7 227/10 228/7 229/17 229/25 232/8 233/6 233/11 234/10 237/25 240/13 241/2 241/24 243/2 243/12 244/10 244/10 246/2 248/1 248/13 248/16 250/22 251/11 253/13

**yielded [1]** 218/21

**yields [1]** 235/3

**York [11]** 2/4 2/8 2/12 2/15 65/4 65/6 65/15 65/24 66/8 117/23 118/11

**you'd [1]** 161/19

**you'll [2]** 9/16 20/14

**you're [64]** 9/23 18/12 19/4 21/20 21/23 24/24 28/1 45/9 58/22 61/15 61/15 62/11 62/16 62/23 70/24 74/18 83/5 90/7 90/15 94/5 96/4 100/10 102/3 102/22 107/4 109/16 110/20 110/22 111/7 112/8 112/8 117/14 118/10 129/10 129/14 141/5 149/19 152/1 186/15 187/21 190/16 193/9 196/3 196/5 198/16 201/6 201/6 203/25 212/17 212/17 212/20 212/21 213/18 214/8 214/15 221/22 221/24 222/24 238/11 242/9 244/20 246/4 246/10 253/10

**you've [23]** 31/12 40/20 41/2 59/1 96/22 109/19 111/5 113/8 115/5 119/16 119/18 143/9 143/11 163/17 181/19 225/22 227/6 227/8 227/11 236/14 241/14 248/11 248/11

**yourself [3]** 32/24 102/7

{WITNESS NAME}   Index: yourself...~zooms

**Y**

**yourself... [1]** 138/10

**Z**

**zero [24]** 30/4 30/7 51/7
51/8 56/2 75/24 79/15
203/20 205/11 208/1
208/5 208/24 209/21
211/25 215/8 217/12
238/11 238/19 238/20
238/25 239/4 239/11
239/25 247/25
**zero percent [1]** 79/15
**zoom [3]** 63/14 123/9
233/14
**zoom-out [1]** 63/14
**zooms [1]** 233/15