```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2
                     Case No. 11-80205-CR-KAM
 3
   UNITED STATES OF AMERICA,      )
 4                                )
        GOVERNMENT,               )
 5                                )
        -v-                       )
 6                                )
   MITCHELL J. STEIN,             )
 7                                )
        DEFENDANT.                )    West Palm Beach, Florida
 8                                )    July 20, 2018
   _____)
 9

10               VOLUME 2 - PAGES 1 - 141

11          TRANSCRIPT OF RESENTENCING PROCEEDINGS

12        BEFORE THE HONORABLE KENNETH A. MARRA

13             UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   (On Page 2.)

17

18   Reporter                Stephen W. Franklin, RMR, CRR, CPE
     (561)514-3768           Official Court Reporter
19                           701 Clematis Street
                             West Palm Beach, Florida  33401
20                           E-mail:  SFranklinUSDC@aol.com

21

22

23

24

25
```

```
 1   Appearances:

 2   FOR THE GOVERNMENT          Michelle Pascucci, ESQ.
                                 Securities and Financial Fraud
 3                               Unit, Fraud Section
                                 Criminal Division
 4                               U.S. Department of Justice
                                 1400 New York Avenue, Northwest
 5                               Washington, DC 20530
     -and-
 6                               Caitlin R. Cottingham, ESQ.
                                 Securities and Financial Fraud
 7                               Unit, Fraud Section
                                 Criminal Division
 8                               U.S. Department of Justice
                                 1400 New York Avenue, Northwest
 9                               Washington, DC 20530

10   FOR THE DEFENDANT           Benjamin Gruenstein, ESQ.
                                 Cravath, Swaine & Moore, LLP
11                               Worldwide Plaza
                                 825 Eighth Avenue
12                               New York, NY 10019
     -and-
13                               Alex Delnido, ESQ.
                                 Cravath, Swaine & Moore, LLP
14                               Worldwide Plaza
                                 825 Eighth Avenue
15                               New York, NY 10019
     -and-
16                               Richard C. Klugh, Jr., ESQ.
                                 25 Southeast 2nd Avenue
17                               Suite 1100
                                 Miami, FL 33131
18   -and-
                                 David S. Harris, ESQ.
19                               6431 Southwest 39th Street
                                 Miami, FL 33155
20
                                  *  *  *  *  *
21

22

23

24

25
```

```
 1          (Call to the order of the Court.)
 2              THE COURT:  Good morning, everyone.  Please be
 3   seated.
 4              MR. GRUENSTEIN:  Good morning.
 5              May I continue, Your Honor?
 6              THE COURT:  Yes, you may.
 7              Good morning, Doctor.
 8              THE WITNESS:  Good morning.
 9   Edward Shannon O'Neal, Defendant's witness, resumed the stand.
10                  Direct Examination (Cont.'d)
11   BY MR. GRUENSTEIN:
12   Q    Good morning, Dr. O'Neal.  When we finished yesterday,
13   you spoke about your calculation of market-wide loss of
14   525,000.  Quickly, can you just remind us of what the
15   assumptions were?
16   A    Yeah, there were really two main assumptions.  One is
17   that the market for SignaLife stock is efficient, and the
18   second is that investors, as the market as a whole, relied on
19   the information in the press releases about the purchase
20   orders and the information in the 10-Q.
21   Q    Dr. O'Neal, have you now had a chance to consider the
22   analysis performed by Mr. Melley?
23   A    Yes.
24   Q    Were you able to do that before you submitted either of
25   your expert reports?
```

```
 1    A      No.

 2    Q      And why not?

 3    A      To my knowledge, that -- those calculations were not

 4    given to the defendant or the defendant's counsel before the

 5    due dates of either of the reports.

 6    Q      So let's look at GX40.  Do you recognize this as

 7    Mr. Melley's calculation for the broad period?

 8    A      Yes.

 9    Q      Is it your understanding -- or what understanding do you

10    have as to whether these calculations include people who sold

11    off all of their shares before the corrective disclosure on

12    August 15th?

13    A      It does include those investors, to my knowledge.

14    Q      And how do you know that?

15    A      Because for a number of these investors, it shows zero

16    remaining shares as of the August 15th, 2008, 10-Q date.  So

17    therefore those investors must have sold all of their shares

18    before that day.

19    Q      So is that the third column that you're looking at where

20    we see three zeros on this chart?

21    A      Yes.

22    Q      Does it also include losses incurred by those people and

23    others before the disclosure date?

24    A      Yes.

25    Q      And as we discussed yesterday, could that -- could those
```

1    losses have resulted from the fraud?

2    A    Not in my opinion.  The losses due to the fraud occur

3    once the market is made aware of the fraud.

4    Q    I want to read you a portion of what's docket as document

5    533 in this case.  It's the U.S. sentencing memorandum.  And

6    maybe we can put it up on the screen, as well.  It's section

7    C.

8         It says:  The Government anticipates presenting

9    testimony from Mr. Peter Melley, of the Financial Industry

10   Regulatory Authority, that loss based on the inflationary

11   value of the SignaLife stock was $2,027,890.17 for the period

12   between September 20th, 2007, the first fraudulent press

13   release, and August 15th, 2008, the 10-Q.

14        Do you believe that what this is a -- that this is a

15   reference to the calculations we just saw?

16   A    I believe so, yes.  That 2,027,000 number is what that

17   document showed.

18   Q    Okay.  The next sentence says, the Government utilized a

19   buyers-only approach, which only considers investors who

20   bought after the defendant disseminated fraudulent information

21   about SignaLife and either, one, held shares as of corrective

22   disclosures and did not sell their stock, or, two, sold their

23   shares after the corrective disclosures.

24        Do you see that?

25   A    Yes.

```
 1   Q    Did Mr. Melley follow this instruction in his

 2   calculations?

 3   A    It doesn't appear to me that he did, no.

 4   Q    And maybe you can explain what this means to you and what

 5   Mr. Melley did.

 6   A    What this means to me is that what the instruction says

 7   is that in order to have a loss, the defendant needed to hold

 8   the shares as of the corrective disclosure, so still be a

 9   shareholder as of the date of the 10-Q, or sell their shares

10   after that date, but not before.

11   Q    Okay.  You said the defendant, but you mean the investor?

12   A    I'm sorry, the investors that were holding the shares,

13   yes.

14   Q    Okay.  And as you discussed earlier, during the broad

15   period there was another category of people in that

16   calculation, which are people who sold all of their shares

17   before the corrective disclosure.

18   A    Right.

19   Q    Is there a -- well, let's go to GX41.  This is a -- this

20   is Mr. Melley's second chart.  Is it correct this is the

21   narrow period chart?

22   A    Yes, it is.

23   Q    And does this chart follow the instructions in the

24   Government's sentencing memorandum?

25   A    I don't believe so, no.
```

1    Q    And in what ways?

2    A    I guess in two ways.  First, there are obviously a number

3    of shareholders here, the first three, in fact, are three that

4    did not hold any shares as of the corrective disclosure date

5    of April 14th.  So those shareholders must have sold their

6    shares before the corrective disclosure and therefore not

7    holding it as of the corrective disclosure.

8              So that seems to be -- that's obviously counter to

9    the passage you read from the sentencing memorandum, but it's

10   also the case that the shareholders are showing losses that

11   occurred not necessarily on the corrective disclosure date,

12   but losses that were incurred throughout the fraud period

13   before the corrective disclosure was made.  So those two items

14   seem to be counter to the instructions that you read from the

15   sentencing memorandum.

16   Q    How would you correct Mr. Melley's charts so as to only

17   look at the individuals who actually had shares on the date of

18   the corrective disclosure and to include the losses that they

19   suffered on that day only?

20   A    Well, it's pretty easy actually.  If you just look at the

21   remaining shares column and sum that column up, that will give

22   you the number of shares that investors who had bought after

23   the beginning of the fraud period and still held shares, what

24   that total number of shares was.  And then you can take that

25   total number of shares that were being held as of the

```
 1    corrective disclosure date and multiply it by the change in
 2    the stock price on the corrective disclosure date.  So that's
 3    how you could do it with just the data in the spreadsheet.
 4    Q    Okay.  And did you do that calculation?
 5    A    Yes.
 6    Q    Let's put up DX75.
 7              And what is this spreadsheet?
 8    A    So this is the narrow period.  Are we focusing now on the
 9    narrow period or the broad period?
10    Q    Well, let's start with the narrow period.
11    A    Okay.  This is the narrow period, so this is basically a
12    spreadsheet that shows all of the investors that Mr. Melley
13    included.  So this is the spreadsheet from which you could
14    calculate the losses on the disclosure date.
15    Q    Is all of the information we're looking at identical to
16    what Mr. Melley had?
17    A    Yes, I believe it is.
18    Q    Okay.
19    A    I mean, this is a spreadsheet that was made available to
20    us by the Government, I believe.
21              MR. GRUENSTEIN:  The defense offers DX75.
22              THE COURT:  Any objection?
23              MS. PASCUCCI:  No objection, Your Honor.
24              THE COURT:  Admitted without objection.
25         (Defendant's Exhibit No. 75 entered into evidence.)
```

```
 1   BY MR. GRUENSTEIN:

 2   Q    Why don't we go to the bottom of that spreadsheet.  And

 3   what do we see at the bottom?

 4   A    What we see at the bottom is a totals column that I added

 5   into this that shows simply what the total remaining shares

 6   was as of the April 14th webcast date; that was 687,000

 7   shares, 687,410 remaining shares.  And then I took that number

 8   of shares that were still being held by these investors as of

 9   that date and multiplied by the 17-cent decline in the stock

10   price that occurred at the disclosure date.  So when you

11   multiply 17 cents by the 687 (sic) shares, you come up with a

12   number of $116,859.

13   Q    And if Mr. Melley had done the calculation as the

14   Government in their sentencing memorandum said that he did, is

15   this the number he would have come up with for the narrow

16   period?

17   A    I believe so, yes.

18   Q    Let's look at DX74 for identification.

19            And what are we looking at here?

20   A    This is basically a spreadsheet very similar to the one

21   that we just looked at, except for this goes through the date

22   of the 10-Q.  The last one we looked at went through the date

23   of the webcast.

24   Q    Okay.  And did you include a line in here to correct the

25   analysis as you saw fit?
```

1   A    Yes.

2           MR. GRUENSTEIN:  Defense offers DX74.

3           MS. PASCUCCI:  No objection.

4           THE COURT:  Admitted without objection.

5       (Defendant's Exhibit No. 74 entered into evidence.)

6   BY MR. GRUENSTEIN:

7   Q    Let's go to the bottom.  If you can explain what you did

8   and why.

9   A    Yes.  So, again, I simply added the final row from this

10  spreadsheet and summed all of the remaining shares in the

11  third column.  That yielded a total remaining shares of

12  15,220 -- I'm sorry, 15,223,705.  I then took those remaining

13  shares and multiplied them by the one cent per share decline

14  that occurred on the date of the 10-Q, and the resulting total

15  is $152,237.

16  Q    And what explains the discrepancy between that number and

17  the roughly 2 million that Mr. Melley came up with?

18  A    Well, primarily the fact that there were -- that

19  Mr. Melley's analysis calculated losses throughout the fraud

20  period.  So if an investor bought during the fraud period and

21  sold before the corrective disclosure, any loss that he might

22  have incurred is included in his calculation.  This is simply

23  how much the investors lost on the date of the disclosure, of

24  the 10-Q in this case.

25  Q    With Mr. Melley's calculation as corrected by you, how

```
 1   different is the analysis here than the analysis that you did?
 2   A    It's actually quite similar.  I looked at the stock price
 3   change on the date of the 10-Q.  The -- there are two primary
 4   differences.  One is that I used a four-cent per share drop
 5   that occurred not only in the date of the 10-Q, but the
 6   date -- the trading date immediately following it.  So that's
 7   one difference.
 8            The other difference is that I used every
 9   shareholder that was holding the shares as of the corrective
10   disclosure date.  In Mr. Melley's calculation, they used what
11   they've termed the buyers-only method.  So they were looking
12   at only the shares that investors were holding as of the
13   disclosure date that had been purchased after the beginning of
14   the fraud period, so after September the 20th or maybe
15   September the 25th.
16   Q    Dr. O'Neal, the Government called a witness yesterday,
17   Mr. Taylor, to testify about his reliance on the original
18   press releases.  Do you recall that?
19   A    Yes.
20   Q    If you had to calculate his loss using the method that we
21   just discussed from Mr. Melley, as corrected by you, how would
22   you calculate his loss first during the narrow period and then
23   during the broad period?
24   A    I guess what I would do for him is to look at the
25   exhibits that were provided by the Government, figure out how
```

1    many remaining shares he had as of each of those two dates --

2    well, for the narrow period, that April 14th date; for the

3    broad period, the August the 15th date.  So take the remaining

4    shares that he held on each of those dates and multiply by the

5    price change due to the fraud revelation.

6    Q    And did Mr. Taylor -- did he even show up in the narrow

7    period as having suffered a loss?

8    A    I was not able to find his name in the narrow period.

9    Q    Okay.  Did he show up in the broad period?

10   A    Yes.

11   Q    So why don't we go to where he showed up in the broad

12   period.

13          Okay.  We see him there, Mark W. Taylor.  How many

14   remaining shares did he have?

15   A    168,500 shares.

16   Q    And what would you do with that number to get his total

17   loss due to the fraud if he, in fact, relied on the original

18   press releases?

19   A    I take the number of remaining shares and multiply it by

20   the decline that occurred in the stock price on the date of

21   the 10-Q, which was one cent.

22   Q    And using your more conservative method, would you use

23   one cent or four cents?

24   A    I would use four cents.  But then in my method, I also

25   divided that total four-cent drop into thirds and attributed a

1    third of it each to the negative stockholder's equity in the

2    large negative earnings in that quarter.

3    Q    So the record is clear, you take 168,500 times four cents

4    and divide that by three?

5    A    Correct.

6    Q    And you did that calculation?

7    A    I did, yes.

8    Q    And was the result 2246 and 67 cents?

9    A    I believe so, yes.

10   Q    There's another witness who testified at trial about his

11   reliance on the press releases, a fella by the name of Harris,

12   last name Harris.  Did you do the same calculation for him?

13   A    Yes.

14   Q    If we could pull up his.

15        Well, let me ask you first, did he show up on the

16   narrow period chart?

17   A    I don't believe he showed up on the narrow period chart

18   either.

19   Q    So you did the calculation only for him on the broad

20   period, correct?

21   A    Yes.

22   Q    And that's consistent with your approach also that there

23   was really only one corrective disclosure in this case,

24   correct?

25   A    Yes.

```
 1   Q    So for Mr. Harris or Dr. Harris, how many remaining

 2   shares did he have?

 3   A    570,000.

 4   Q    And what was the calculation that you did to come up with

 5   his loss due to the fraud?

 6   A    It'd be 570,000 times one cent.

 7   Q    Or your more conservative estimate?

 8   A    570,000 times four cents, divided by three.

 9   Q    And when you did that calculation, did you get $7600?

10   A    Yes.

11   Q    So the total for these two witnesses who testified about

12   their reliance would be just under $10,000, correct?

13   A    That was right.

14   Q    Let's go back to the PowerPoint so we can ask some more

15   questions about your opinion.

16        MR. GRUENSTEIN:  Go to the next page.

17   BY MR. GRUENSTEIN:

18   Q    Did you also issue an opinion concerning Mr. Stein's

19   holdings and trading in SignaLife during the relevant period?

20   A    Yes.

21   Q    And what was your opinion?

22   A    My opinion was that over the course of the fraud period

23   that Mr. Stein lost $26.3 million in SignaLife stock, and that

24   his trading did not, in my opinion, resemble a pump-and-dump

25   scheme.
```

```
 1   Q    And how did you determine what his trading was during
 2   this period?
 3   A    I had access to the blue sheet data, which has all of the
 4   trading in SignaLife stock.  I was instructed to look at the
 5   stock trading in four or five different accounts that I was
 6   told were controlled by Mr. Stein.  And so I looked at the
 7   trading in all of those accounts and figured out how much he
 8   purchased and sold over the fraud period.
 9   Q    And what are we looking at here in this bar chart?
10   A    This is the number of shares that Mr. Stein controlled in
11   those accounts and also the number of shares outside of his
12   control.  These numbers were drawn from -- again, from
13   understanding what Mr. Stein's holdings were at the beginning
14   of the fraud period and then taking the blue sheet data and
15   sort of, over time, calculating how much he would have held at
16   the end of each quarter, from the third quarter of 2007 to the
17   second quarter of 2008.  I did it on those four quarters
18   because we also had information on total shares outstanding of
19   SignaLife on a quarterly basis from the 10-Qs.
20   Q    And do these R's give us a sense of what percentage of or
21   how much of the overall SignaLife stock Mr. Stein owned?
22   A    Yes.  At any given time, it was between I think
23   36 percent and 40 percent.
24   Q    And you mentioned just before that this did not look
25   consistent with a pump and dump scheme.  Why did you draw that
```

 1   conclusion?

 2   A    Well, you can't see it by looking at that particular

 3   chart, but if you look at the time period leading up to the

 4   fraud, Mr. Stein was a net seller of SignaLife, meaning that

 5   he sold more shares than he purchased.  He was then, after the

 6   press release -- press releases, he was a net buyer, meaning

 7   that he was buying more shares than he sold.

 8            If, in fact -- well, in a typical scheme where

 9   you're trying to pump and dump the shares, you will buy before

10   the announcement that would raise the stock price, and then

11   you would sell afterwards to capitalize on that fraudulently

12   high stock price.  So it simply looked to me like his trading

13   didn't indicate that -- it just was not consistent with that

14   classic pump-and-dump scheme trading activity.

15   Q    And why did you conclude that he incurred $26.3 million

16   in losses over the alleged fraud period?

17   A    We just simply did a profit and loss of all of his

18   shares.  He was holding a certain number of shares at the

19   beginning of the fraud period and lost money on those.  And

20   then on his trading that occurred throughout the fraud period,

21   on net he lost money on those trades, as well.  So the total

22   loss was 26.3 million.

23            MR. GRUENSTEIN:  Okay.  No further questions.

24            THE COURT:  Thank you.

25            Cross-examination.

```
  1                        Cross-Examination
  2   BY MS. PASCUCCI:
  3   Q     Good morning, Dr. O'Neal.
  4   A     Good morning.
  5   Q     So to begin, did you meet with counsel yesterday evening
  6   to discuss your testimony today?
  7   A     Yes.
  8   Q     Now, I want to pull up defense exhibit 68.  That's the
  9   slide show from -- or the --
 10             MS. PASCUCCI:  We have it over here.  Thank you very
 11   much, though.
 12   BY MS. PASCUCCI:
 13   Q     And let's go to slide number 5.
 14             So, Dr. O'Neal, is it your opinion that an omission
 15   cannot constitute a corrective disclosure?
 16   A     My opinion is that it's much more difficult to attribute
 17   a corrective disclosure to an omission.  Could it possible --
 18   possibly be?  Yes.
 19   Q     So your opinion is in fact that it can be a corrective
 20   disclosure?
 21   A     I would say that it could, but it's much more difficult
 22   to attribute it to an omission for the reasons I stated
 23   yesterday.
 24   Q     You testified yesterday that you had not seen support in
 25   academic literature supporting the use of omissions as
```

1   corrective disclosure?

2   A     Yes, I testified to that.  I could not recall.

3   Q     Dr. O'Neal, have you reviewed the article "Does Silence

4   Speak," an empirical analysis of disclosure choices during

5   conference calls that's forthcoming in the *Journal of*

6   *Accounting Research*?

7   A     No.

8   Q     I'm going to show you what's been marked as Government

9   exhibit 206.

10           MS. PASCUCCI:  Your Honor, I have copies for the

11   Court and defense counsel, as well.

12           May I approach the witness?

13           THE COURT:  Yes.

14           MS. PASCUCCI:  My apologies, Your Honor.

15           THE COURT:  All right.

16           MS. PASCUCCI:  Your Honor, my apologies.  I don't

17   have an additional copy, but we can make some after the break.

18           THE COURT:  All right.

19   BY MS. PASCUCCI:

20   Q     Is this a copy of the article that I just asked you

21   about?

22   A     I believe so.  It's the first time I've ever seen it.

23   Q     And if you turn ahead to what's marked on here as page 34

24   and look at that center paragraph, do you see the sentence:

25   Our evidence suggests that managers regularly leave call

 1  participants in the dark by not answering their questions.

 2  That's the second sentence in that paragraph.

 3  A    Which page are you looking at?

 4  Q    It's page 34.

 5  A    Okay.  And, I'm sorry, the second full paragraph?

 6  Q    The second full paragraph on the page.

 7  A    Okay.

 8  Q    And the second sentence, it reads:  Our evidence suggests

 9  that managers regularly leave call participants in the dark by

10  not answering their questions.

11  A    That's what it says, yes.

12  Q    And do you see -- the final sentence:  We document strong

13  support for the assumption maintained in the literature that

14  investors interpret silence negatively, that is, they seem to

15  equate no news with bad news?

16  A    I see that.

17  Q    Thank you.

18        And, Dr. O'Neal, have you reviewed the article "No

19  News is News, Do Markets Underreact to Nothing," by Stephanie

20  (sic) Giglio and Kelly Shue, both of the University of Chicago

21  Booth School of Business?

22  A    No.

23  Q    And I'm going to show you what has --

24        MS. PASCUCCI:  Your Honor, my apologies.  The

25  Government moves to admit sentencing exhibit 206.

```
 1                THE COURT:  Any objection?

 2                MR. GRUENSTEIN:  No objection.

 3                THE COURT:  Admitted without objection.

 4           (Government's Exhibit No. 206 entered into evidence.)

 5                MS. PASCUCCI:  May I approach the witness, Your

 6      Honor?

 7                THE COURT:  Yes, you may.

 8      BY MS. PASCUCCI:

 9      Q    And is this a copy of the article that I just asked you

10      about?

11      A    I believe so.  Again, I've not seen the article before.

12      Q    And, again, this article was published in the Review of

13      Financial Studies, is that as indicated here?

14      A    I don't see that.  I was actually looking for where it

15      was published; but if you say that that's the case, I have no

16      reason to doubt you.  I just don't see that on the first page.

17      Q    And if you look at the first sentence, do you read:  The

18      absence of news reports and the passage of time often contain

19      important information?

20      A    Yes.

21      Q    And, Dr. O'Neal, you've testified as an expert multiple

22      times in federal court; isn't that correct?

23      A    Yes.

24      Q    Has a court ever found that your analyses were flawed for

25      a number of reasons?
```

```
 1  A    I think there was a case in California that there was --
 2  I don't remember the exact language, but something like that,
 3  yes.
 4  Q    Thank you.
 5            So let's turn back to the question of corrective
 6  disclosures.  Having seen this limited literature that I've
 7  showed you this morning, has your opinion changed at all on
 8  whether an omission can be perceived as a corrective
 9  disclosure?
10  A    No, I think I answered earlier that it's certainly much
11  more common practice to look at actual information, but that I
12  could foresee instances where an omission could potentially be
13  a disclosure.
14  Q    So an omission can be a corrective disclosure, then?
15  A    That's what I said, yes.
16  Q    Thank you.
17            And I want us to turn to slide number 6 in defense
18  exhibit 68.
19            Now, yesterday you testified that there was a
20  fleeting high price on April 11th of 2008; isn't that correct?
21  A    In this short period, yes.
22  Q    And I want to pull up sentencing exhibit 7.  Did you
23  review this press release before testifying here yesterday?
24  A    I believe I've seen it, yes.
25  Q    And this was released on April 11th; isn't that right?
```

```
 1   A     Yes.

 2   Q     And that was the same day as that fleeting high price?

 3   A     That's correct.

 4   Q     And if you -- and do you see on here where CEO Harmison

 5   announces that SignaLife will provide direction on new

 6   contracts, pending orders and production?

 7   A     I don't see it right as I'm looking at it, but if you

 8   blow it up or point me to where you're saying that.  I, again,

 9   don't have reason to doubt what you're saying; I just don't

10   see it as you're reading it.

11   Q     Sure, of course.  It's in the second paragraph.

12   A     Yes, I see that.

13   Q     Based on this press release, SignaLife signaled to

14   investors that they'd have news regarding pending orders;

15   isn't that correct?

16   A     Yes.

17   Q     And you acknowledge that SignaLife's stock price spiked

18   the day that this press release was issued?

19   A     That's correct, it did.

20   Q     So let's pull up sentencing exhibit 4.

21         Have you reviewed this transcript before your

22   testimony here?

23   A     Yes.

24   Q     And is it fair to say that the webcast does not give any

25   guidance regarding pending orders and contracts?
```

1   A    I believe that's the case, yes.

2   Q    And in your review of what constitutes a corrective

3   disclosure in this case, did you review chat room discussions

4   following the April 14th call, as Dr. Becker did?

5   A    No, I didn't.

6   Q    Did you read the entire trial transcript in this case?

7   A    No.

8   Q    Did you read all of the exhibits that were admitted at

9   trial?

10  A    No, I did not.

11  Q    Did you ask investors about what information was

12  important to them?

13  A    No.

14  Q    Did you speak to a single investor in this case?

15  A    I'm sorry, no.

16  Q    And yesterday -- I want to change ships a little bit

17  here.

18  A    Okay.

19  Q    You were asked about the statistical analysis that was

20  performed.  And on direct, you were asked about the confidence

21  interval and how that relates to the inflation of 18 percent

22  that Dr. Becker found.

23  A    Yes, I was.

24  Q    And you testified that with a 95 percent confidence

25  level, the 18 percent inflation could be, give or take,

```
1    10 percent.
2    A    I think that's what I said, yes.  I mean, I'm sorry, just
3    to be clear, 18 percent is the point estimate for what the
4    estimate is for the price change on that date.  It's estimated
5    with some error, so it could be higher or lower than
6    18 percent.
7    Q    So -- and you testified it could be as low as 6 or
8    8 percent.
9    A    Correct.
10   Q    But the way statistics works, you just said it could be
11   higher, too.
12   A    That's correct.
13   Q    So it could be as high as 20 or 30 percent?
14   A    Um, yes.
15   Q    And I next want to turn to the question of the 10-Q.
16   A    Okay.
17   Q    And you were asked about the 10-Q yesterday, correct?
18   A    Yes.
19   Q    And you found in the two trading days following the
20   call -- the 10-Q, the stock fell from 11 to 7 percent?
21   A    Eleven to seven cents.
22   Q    Thank you.
23   A    Yes, you're welcome.
24   Q    And based on this, you calculated a loss of about
25   1.58 million?
```

```
 1    A     That's correct.

 2    Q     And you testified that the 10-Q also contained

 3    information regarding a large quarterly loss and negative

 4    shareholder equity.

 5    A     Yes.

 6    Q     So to estimate that loss, you divided 1.58 million by

 7    three?

 8    A     Well, to -- just to be clear, to estimate -- again, it's

 9    an estimation of what portion of that price decline would be

10    attributable to those three pieces of information, I divided

11    by three, yes.

12    Q     So for purposes of your analysis, you gave equal credit

13    to each?

14    A     That's correct.

15    Q     Dr. O'Neal, aren't all three of those topics related?

16    A     They could be, yes.

17    Q     And I want to turn to pages 15 and 16 of the 10-Q, which

18    is sentencing exhibit 5.  And the --

19              MS. PASCUCCI:  One moment.

20    BY MS. PASCUCCI:

21    Q     So doesn't the 10-Q state that SignaLife had not

22    recognized revenues of over 5 million from various purchase

23    orders?

24    A     Can you point me to that language, or -- I can't remember

25    what the exact number is that they gave.
```

```
 1   Q    Sure.  We'll take a moment to pull that up.  My

 2   apologies.

 3            So looking at this, the 10-Q, you can see in these

 4   two paragraphs it's discussing the purchase orders for which

 5   they had not recognized revenues.

 6   A    That's correct.

 7   Q    And if you look at all of this, it's about a little over

 8   5 million of revenues that had not been recognized?

 9   A    I think that's correct.  So I think you're adding the

10   1.9 million in the first paragraph and the 3.3 million and

11   564,000 in the second paragraph?

12   Q    Yes.

13   A    Yes, correct.

14   Q    So if investors are expecting SignaLife to book sales of

15   over 5 million, and the sales aren't, in fact, realized,

16   revenues of 5 million are missing from the company, correct?

17   A    I wouldn't say they're missing, but they have failed to

18   materialize, and it looks like they're not going to

19   materialize.

20   Q    And wouldn't it be fair to say if these purchase orders

21   had been genuine and had they in fact materialized, at least

22   some revenues would have been recognized during this quarter?

23   A    Yes.

24   Q    And if SignaLife had booked revenues --

25   A    Actually, let me -- hold that.  It's not clear to me that
```

 1    they would have been recognized in that quarter, but they

 2    would have at some point been recognized.  I don't know what

 3    the timing would have been.

 4    Q    But it's possible that they would have been recognized in

 5    this quarter, correct?

 6    A    Yes.

 7    Q    And if SignaLife had booked revenues, wouldn't that have

 8    caused earnings to go up?

 9    A    It would have.

10    Q    So, Dr. O'Neal, your testimony is that sales can be

11    connected to earnings?

12    A    Yes.

13    Q    And isn't that the same situation with shareholder

14    equity; that had SignaLife's loss not been as low, the

15    shareholder equity would not have gone down as much?

16    A    Yes.

17    Q    Now, Dr. O'Neal, let's turn back to your calculation of

18    loss.

19    A    Okay.

20    Q    You testified that you divided the loss of 1.58 million

21    by three.

22    A    Yes.

23    Q    And you acknowledge that dividing by three is kind of

24    arbitrary here, correct?

25    A    Uh, yeah.  I wouldn't say arbitrary, but I don't have a

1  more sort of scientific or statistical way that I think would

2  be better.

3  Q    But in your opinion, there certainly is some loss in this

4  case to investors?

5  A    Yes.

6  Q    You simply can't calculate exactly what that loss is.

7  A    You ask estimate it, but you probably won't get it

8  exactly right; that's correct.

9  Q    So, in other words, your testimony is there is a loss,

10  but it's difficult to determine.

11  A    Yes.  I would say it's -- you can estimate it, but, you

12  know, you're never going to get it exactly right.

13  Q    Thank you.

14          And, Dr. O'Neal, I want to turn next to market

15  efficiency.  And you testified that you need to test for

16  market efficiency before conducting an event study, correct?

17  A    I think I said that you -- in order to draw the strongest

18  conclusions from an event study, you need to know if the

19  market was efficient.

20  Q    Are you family with a case SEC v. Drucker?

21  A    Yes.

22  Q    This case was in the Southern District of New York in or

23  around 2006?

24  A    Yes.

25  Q    And you prepared an expert report in this case?

```
 1   A     Yes, I did.

 2   Q     For purposes of this report, you analyzed a stock known

 3   as NBTY?

 4   A     I think that's right.  It's been awhile.  I don't

 5   remember the details of the case, but that sounds correct.

 6   Q     And I'll show you what's been marked as Government

 7   exhibit 200.

 8   A     Okay.

 9              MS. PASCUCCI:  May I approach, Your Honor?

10              THE COURT:  I thought the last article was 200.  Did

11   I get that wrong?

12              MS. PASCUCCI:  Your Honor, I believe the last

13   article was 208.

14              THE COURT:  Oh, okay.

15              THE WITNESS:  207.

16              MS. PASCUCCI:  207.

17              THE COURT:  All right.  I guess I --

18              MS. PASCUCCI:  My apologies.

19              THE COURT:  No, I guess I got it wrong, sorry.

20   BY MS. PASCUCCI:

21   Q     Is this a copy of the report that you prepared in SEC v.

22   Drucker?

23   A     I'm sorry, let me just take a quick look at it.

24   Q     Sure.

25   A     It appears to be.  It's been 10 or 12 years since I wrote
```

1   this, but this looks like the report to me.

2          MS. PASCUCCI:  Your Honor, the Government moves to

3   admit Government exhibit 200.

4          MR. GRUENSTEIN:  No objection.

5          THE COURT:  Admitted without objection.

6      (Government's Exhibit No. 200 entered into evidence.)

7   BY MS. PASCUCCI:

8   Q    And you concluded in this report that based on NBTY

9   market movements, that certain news regarding that stock was

10  material?

11  A    Yes, I did.

12  Q    Dr. O'Neal, this report never discusses whether the

13  market for NBTY stock was, in fact, efficient; isn't that

14  correct?

15  A    Well, I have not looked back at it, but it may not.  I

16  mean, I just haven't -- I haven't read it, but I'm not

17  questioning your -- you've read it more recently than I have.

18  Q    And turning ahead to SEC v. Symbol Technologies, you also

19  performed an event study in that case, as well; isn't that

20  correct?

21  A    Yes.

22  Q    This matter was in the Eastern District of New York

23  around 2010?

24  A    That sounds correct.

25  Q    And for this report, you performed an analysis of the

1   reaction of Symbol's stock to certain public announcements?

2   A    That's correct.

3   Q    And you calculated the inflation of Symbol stock based on

4   these events?

5   A    I believe that's correct.

6   Q    And I'm going to show you what's been marked as

7   Government exhibit 205.

8   A    Okay.

9        MS. PASCUCCI:  May I approach, Your Honor?

10       THE COURT:  Yes.

11       THE WITNESS:  Thank you.

12  BY MS. PASCUCCI:

13  Q    Is this a copy of the report that you prepared in that

14  case?

15  A    It appears to be, yes.

16  Q    You explain that there are three elements common to all

17  event studies in this case.

18  A    I may.  Can you show me the paragraph?  I mean, again, I

19  have not looked at this in eight years.

20  Q    It's on page 3 of the exhibit.

21  A    Okay.  You know what paragraph?

22  Q    It would be in the second paragraph after "event study."

23  So, in fact, the page immediately after that.

24  A    Okay.  So which page number are we talking about; 6?

25  Q    It's actually pulled up in front of you right now.

1    A    Thank you very much, I'm sorry.

2    Q    So you discuss the three elements that are common to all

3    event studies?

4    A    Right.

5    Q    But in those three elements, you don't list testing for

6    market efficiency as a prerequisite.

7    A    No.  These are just the steps similar to what Dr. Becker

8    said yesterday.  I think she had four steps, but I sort of

9    condensed them to three.  But I don't talk about market

10   efficiency in this paragraph.

11   Q    Dr. O'Neal, you don't talk about market efficiency in

12   this report at all; isn't that correct?

13   A    That may be correct.

14   Q    And, lastly, I want to change ships once more and talk

15   about your testimony regarding what Stein -- what the

16   defendant's buying practices during this case.

17   A    Okay.

18   Q    When you were looking at what the defendant SignaLife's

19   holdings were, did you subtract out the shares that he stole

20   from SignaLife?

21   A    I was not instructed to do that, so I just looked at the

22   documents that showed the number of shares.  I didn't look at

23   how they were acquired by Mr. Stein except if they were bought

24   in the blue sheet data.

25   Q    Did you look at how -- and I want us to pull up defense

```
 1   exhibit 68, the last slide.  And did you look at how much
 2   Mr. Stein paid for all these shares?
 3   A    Um, for the shares that he had as of the beginning of the
 4   fraud period, no, I did not.  For any shares that he purchased
 5   during the fraud period, we took that dollar amount into
 6   account.  So the calculation of the losses for Mr. Stein are
 7   over the fraud period, not any period before that.
 8   Q    So you did not consider the substantial holdings in
 9   SignaLife that he had going back way before 2007?
10   A    No; I was looking just at the fraud period.
11   Q    And if you had known that he had paid less than 80,000
12   for all these shares, would that change your analysis of
13   Mr. Stein's loss in this case?
14   A    Not the loss that he incurred over the fraud period.
15   Q    But it would change your analysis for -- Dr. O'Neal, are
16   you aware that there's a conspiracy in this case that's
17   charged going back to 2005?
18   A    No, I'm not aware of that.
19   Q    And if you had known that, that it goes back to 2005,
20   would that change your analysis of his losses from the
21   beginning of the conspiracy?
22   A    Well, I never calculated his losses from the beginning of
23   the conspiracy.  But if I had been given a previous date, I
24   could have done the same analysis, as long as I had the
25   trading data going back to that date.  I did not conduct that,
```

```
 1  but it could have been done.

 2  Q    Dr. O'Neal, if you had personally known that the press

 3  releases that were issued in September and October of 2007

 4  contained fraudulent information, would you have invested in

 5  SignaLife?

 6  A    No.

 7          MS. PASCUCCI:  That's all, Your Honor.  Thank you.

 8          MR. GRUENSTEIN:  A brief redirect?

 9          THE COURT:  Yes.

10                    Redirect Examination

11  BY MR. GRUENSTEIN:

12  Q    Dr. O'Neal, the Government showed you Government

13  exhibits 206 and 207, which are those two academic articles.

14  A    Yes.

15  Q    From the brief -- your brief time of skimming them, do

16  those change your conclusion about whether an omission could

17  constitute a corrective disclosure?

18  A    No.

19  Q    And, first of all, what is your conclusion about whether

20  an omission can constitute a corrective disclosure?

21  A    I think that it's possible that it could.  As I testified

22  before, the vast majority of research is looking at an actual

23  news announcement, not a lack of news announcement.  It

24  becomes difficult, because any day that there's not a press

25  release or any news about a company, that's no information
```

1    released to the market.  So, again, is it possible?  Yes, I

2    guess it's possible.

3    Q    Okay.  In 206 --

4            MR. GRUENSTEIN:  Why don't we pull that up if we

5    can.

6    BY MR. GRUENSTEIN:

7    Q    Do you know -- I believe you have the article in front of

8    you if you need to look at it.

9    A    Yes, I do.

10   Q    Do you know if this article relates to whether omissions

11   can be corrective disclosures?

12   A    I don't know.  I haven't looked at the article.

13   Q    Let's look at page 4, the paragraph that starts, "we

14   manually reviewed."

15   A    Yes, I see that.

16   Q    The second sentence says:  More specifically, we

17   determine whether or not each request for information made

18   during the call is granted.  If at least one request is not

19   granted, we mark this call as containing incomplete

20   disclosure.

21           So do you -- do you understand kind of how they

22   defined an omission?

23   A    Um, yes.  Frequently in conference calls about earnings,

24   which I think is what this was, this was an earnings-related

25   call.  So clearly, as I said earlier in my testimony, earnings

1   is probably the most important piece of information investors

2   look at.  And so companies will often have conference calls

3   where they give a -- sort of a -- an assessment of what the

4   earnings have been in a recent quarter, recent year.

5           So those conference calls, you can call in and ask

6   questions frequently in these conference calls.  And it looks

7   to me as though what they're saying here is that if someone

8   calls to try to ask a question, but that request for a

9   question is not granted, then they say that that's an

10  incomplete disclosure.

11          So that's my understanding of the -- simply from

12  this paragraph what was done in this study.

13  Q    You were asked certain questions about previous expert

14  reports that you performed or that you provided and whether

15  you looked at market efficiency.  Do you recall those

16  questions?

17  A    Yes.

18  Q    And just to be clear, in those -- those instances, who

19  were you retained by?

20  A    The SEC.

21  Q    And have you been retained more recently by the DOJ?

22  A    Yes.

23  Q    When have you been retained by the DOJ to testify as an

24  expert witness?

25  A    Once in 2015 in a case called U.S. versus Rand, and then

 1    again earlier this year in a case called U.S. versus Kipp and

 2    Viard.

 3    Q    And that's in 2018?

 4    A    Yes.

 5    Q    Did the expert reports that you were shown change your

 6    opinion as to whether market efficiency is a precursor

 7    requirement to doing an event study?

 8    A    Again, it's not a precursor to doing it, but it would be

 9    a necessary step to understand whether the market seemed to be

10    efficient for a stock to draw conclusions about the event

11    study.

12    Q    And in a case where the stock at issue is a large cap

13    stock, for example, would you have to actually go through the

14    market efficiency analysis?

15    A    No.  I mean, obviously we tend to think that larger cap

16    stocks are more -- the market for those stocks is more

17    efficient than small caps.  And those two stocks, NBTY and

18    Symbol Technologies, as well as Swisher Hygiene and Beezer

19    Homes, which were the -- those are the four stocks that were

20    at issue in the two SEC cases and the two DOJ cases, all of

21    those stocks were significantly larger than SignaLife.  And I

22    can't recall specifics about NBTY or Symbol in terms of how

23    large those companies were, but certainly the companies in the

24    two recent DOJ cases were 10 to 20 times larger than

25    SignaLife.

1    Q    And are there instances where some companies are more

2    obviously efficient -- efficiently traded than others?

3    A    Yeah.  I mean, as I think I may have mentioned -- I can't

4    remember yesterday or not -- but there are other indicators of

5    market efficiency, such as the number of analysts that cover

6    the stock, the amount of volume that's traded in stock on a

7    given sort of average volume is traded during the day and

8    bid-ask spreads.  I mean, there are a number of different

9    things to look at to determine market efficiency.

10   Q    Does anything that you were shown this morning by the

11   Government change your opinion as to whether a precursor

12   requirement to calculating loss based on an event study in

13   this case would require a finding of market efficiency?

14   A    No.

15   Q    You were also asked questions about the potential

16   relationships between the three factors or the three pieces of

17   news that came out of the 10-Q in August -- on August 15th,

18   correct?

19   A    Yes.

20   Q    Just to be clear, had the company ever booked revenues

21   related to the purchase orders from September and October of

22   2017?

23   A    No, they had not.

24   Q    Does the fact that there is potentially a connection

25   between revenue earnings and sales, does that change your

1   conclusion as to what -- if this were an efficient market,

2   what the loss would have been?

3   A    No.

4   Q    And why not?

5   A    Well, we know what the loss was.  So the sort of

6   relationship between the three pieces of information that

7   caused that loss doesn't change what the loss was.

8   Q    But how about the loss that you pinpoint to the fraud?

9   A    No, it doesn't change my opinion on that.

10  Q    And just to be clear, what we're talking about -- or you

11  said earlier that there was a loss, does that assume market

12  efficiency and reliance?

13  A    The loss itself does not, but attributing the loss to the

14  10-Q does, to the press releases and the 10-Q.

15  Q    So as far as whether you can conclude that there was a

16  loss due to the fraud, all of these event studies that you and

17  Dr. Becker did, you would still need to have a -- you would

18  need to determine market efficiency or reliance, market-wide

19  reliance, correct?

20  A    Yes.

21           MR. GRUENSTEIN:  Nothing further, Your Honor.  Thank

22  you.

23           THE COURT:  Thank you.

24           Is there any objection if I ask a few questions?

25           MR. GRUENSTEIN:  Not at all.

1          MS. PASCUCCI:  No objection, Your Honor.

2                        Examination

3     BY THE COURT:

4     Q    All right, Doctor, let me try and ask you a few

5     questions, and excuse my ignorance in this area.

6     A    Okay.

7     Q    Do you -- is it reasonable to conclude that the press

8     release that preceded the webcast, I think it was March --

9     April 11th they announced that they were going to have this

10    webcast on April 14th, and they discussed what was going to be

11    discussed during this webcast, that the spike in the price

12    between April 11th and April 14th was attributable to an

13    expectation that there was going to be good news and positive

14    information disclosed in that webcast, and people were kinda

15    getting in before the news actually hit and trying to capture

16    a rise after the webcast?  Does that make sense?

17    A     Yeah, that makes complete sense.

18          It appears as though obviously the stock price

19    jumped by 30 percent on the day of the announcement of the

20    webcast, or what was going to be discussed in the webcast.  So

21    one way to think about that is that sort of the market was

22    expecting very good news and maybe overreacted to what it was

23    expecting, and then the news that it got at the webcast didn't

24    match their expectations, so it declined.  It didn't decline

25    all the way back down on that next day, but the actual news

1   that came out in the press release didn't match the

2   expectation that investors sort of collectively got from

3   reading the press release about the upcoming webcast.

4   Q    So then why wouldn't -- and I understand your belief that

5   no information or omission in and of itself is not a

6   corrective notice, but in the context of this situation where

7   there is a publicly disclosed announcement of what's to come,

8   and then there's a market reaction to that, and then there

9   is -- it doesn't happen, and then there's other -- an opposite

10  market reaction, doesn't that create a situation where the

11  omission might, in fact, be a corrective notice here?

12  A    Not in my opinion, because the way I would view it is

13  that the market felt like the correct price of the stock after

14  the press release was $1.14, and that was on Monday.  On

15  Thursday, they thought the correct price for the stock was

16  $1.01.

17       So it appears to me that the combination of the

18  announcement that said we are going to give information about

19  upcoming purchase orders or earnings or whatever it was, can

20  kinda be seen as a combination of that announcement and then

21  the actual webcast.  Those two things together caused the

22  market, as of the day after the webcast, to value the stock

23  higher than it was simply two days before the webcast.

24       So if you combine the effects of the announcement of

25  what's going to be in the webcast with the actual content of

```
 1    the webcast, the market overall revalued the stock upwards.
 2            If there was sort of an irrational expectation about
 3    what the -- what was going to be in the webcast and it jumped
 4    the stock price up 30 percent, once the information came out
 5    in the webcast, there was a decline that sort of corrected
 6    part of that sort of excess increase in the stock that
 7    occurred on the announcement of what's going to be in the
 8    webcast.  That's the way I would look at those two dates
 9    together.
10    Q    All right.  Did you do an analysis -- I mean, I know you
11    did a loss analysis after the 10-Q, but did you do a loss
12    analysis on the assumption that the webcast was a corrective
13    notice to the market?  Did you try and do a loss analysis on
14    that assumption?
15    A    No, I did not.
16            Again, as I said -- and you've already stated my
17    opinion about the omission, but to do that event study, in my
18    opinion, those two announcements came back to back on two
19    days.  So I would have looked at it, I think if I was going to
20    look at that information in the webcast, I would have looked
21    at -- I would have sort of combined the information in the
22    press release about generally what we're going to talk about
23    in the webcast with the actual content of the webcast and
24    looked at the market movement from the day before the
25    announcement of the webcast to the day of the webcast.
```

```
 1              So it would be more of a two-day period over which I
 2   would look to do the event study.  And, of course, over that
 3   period, the market increased by 14 cents, but I haven't done
 4   the analysis to even know if that was a statistically
 5   significant -- would have been a statistically significant
 6   movement over that two-day period.
 7   Q    Okay.  But that's something that could be done?
 8   A    It could be done; but because it was an increase over
 9   that period, there would be no losses due to the fraud.
10   Q    Okay.  Let me just check my notes.
11   A    Sure.
12   Q    Oh, on Mr. Taylor, your opinion as to his damage loss, if
13   his testimony is to be believed that he, in fact, purchased
14   based upon the press releases --
15   A    Yes.
16   Q    -- and he holds the stock throughout the fraud period and
17   then holds it after, then why wouldn't his loss be the
18   difference between what he purchased it at and what it wound
19   up being worth at the end, as opposed to you just had that one
20   cent, I think, difference?  Why wouldn't you measure it from
21   what he bought it at?
22   A    His loss on his investment would be calculated like you
23   just said.  But what I'm trying to do in this case is to tease
24   out what portion of that loss is due to the fraud versus what
25   portion of that loss is just due to other company-specific
```

 1    sort of performance of SignaLife or what's due to the market.

 2    We're trying to look at just what is it that he lost because

 3    of the fraud.

 4            So just as Dr. Becker conducted an event study, I

 5    did, as well.  And the point is that the loss due to the fraud

 6    occurs in the price of the shares when the fraud is revealed.

 7    He may have lost money for a myriad of other reasons in

 8    SignaLife.  I mean, the company's performance we've seen, it

 9    was not very good.  It was declining over time.  But those

10    losses can't be attributable to the fraud.

11            So that's why, when I look at Mr. Taylor's holdings,

12    I'm looking at what his losses were on the day of the fraud to

13    attribute that particular loss to the fraud.

14    Q    And when you conduct an event study, is there an

15    assumption that the market reaction is due to the fraud or

16    that's the underlying assumption for --

17    A    Yes.

18    Q    -- conducting the event study; is that correct?

19    A    That's correct.

20    Q    So would you need to -- if you have the event study,

21    which presumes that the change in the market is a result of

22    the fraud, would you then need to have all of the investors

23    come in and tell you that they, in fact, relied upon the

24    fraudulent information?

25    A    No.  And that goes back to the market efficiency.  If --

```
 1    generally what we assume is if the market is efficient, then

 2    that means that the market as a whole is impounding

 3    information in press releases or 10-Qs immediately into the

 4    stock price.  So if you have market efficiency, then you can

 5    assume that the markets are relying on that information to

 6    sort of revalue the stock at that point.

 7               So the answer would be no to your question.

 8    Q    Okay.  Again, let me just check.

 9    A    Sure.

10    Q    And then on the three separate disclosures and the 10-Q

11    that you're trying to apportion one-third of the loss to each

12    disclosure, aren't they all interconnected in terms of the

13    fact that there's -- there's a drop in revenue.  I understand

14    they didn't have any positive revenue in any of the quarters,

15    but there's a significant drop.  There's a drop in -- or a

16    negative shareholder equity.  I mean, aren't those as a result

17    of not having the revenue from the purchase orders?

18    A    Well, as a result of all company operations.  So if --

19    when you look at a 10-Q, a 10-Q has a lot of information in

20    it, but two of the most important pieces of information are

21    the balance sheet and the income statement, and it sort of

22    shows the financial performance of the company.

23               So the loss number never included any information

24    from the press releases or from the purchase orders, because

25    it was never actually put into any of the financial
```

```
 1   statements.  So the earnings -- the big decline in earnings

 2   from the previous quarter doesn't really have anything to do

 3   with the purchase orders.  It may have had something to do

 4   with future earnings for the company, or if the purchase

 5   orders had been fulfilled, maybe revenues and earnings in the

 6   second quarter would have been higher, and I think that's what

 7   I testified to.

 8   Q    Uh-huh.

 9   A    But the fact that you had a big decline in earnings and

10   you had negative stockholders' equity, that's based on

11   accounting statements that had never included anything about

12   the press releases.  Is it possible that -- I'm sorry, it

13   never included anything about the purchase orders that were

14   the subject of the press releases.

15            Is it possible that those purchase orders, again,

16   had they been fulfilled, would have changed those numbers?

17   Yes, it's possible.  But in my opinion, the accounting

18   information was sort of separate and apart from the

19   information about the purchase orders, and therefore my best

20   estimate was just to give one-third weight to each of those

21   pieces of information.

22            THE COURT:  All right.  Thank you.

23            Any questions based on my questions?

24            MR. GRUENSTEIN:  No, Your Honor.

25            MS. PASCUCCI:  No, Your Honor.
```

```
 1              THE COURT:  All right.  Thank you, Doctor.

 2              THE WITNESS:  Thank you.

 3              THE COURT:  Let's take a short recess before we call

 4      the next witness.  All right?  Let's take 10 minutes.

 5        (A recess was taken from 10:11 a.m. to 10:43 a.m., after

 6      which the following proceedings were had:)

 7              THE COURT:  Please be seated, everyone.

 8              Welcome back.  We're back on the record.

 9              MR. GRUENSTEIN:  Your Honor, there were two

10      additional experts we were going to call, but in light of the

11      testimony to date, we're going to rest at this point and not

12      call any further witnesses.

13              THE COURT:  All right.  Thank you.

14              MS. COTTINGHAM:  Your Honor, on that point, I would

15      just -- I would ask that the expert reports of those two

16      witnesses, since we're not going to have any testimony from

17      them, I'd ask that it be stricken from the record here,

18      because we're not able to cross-examine them or anything like

19      that.

20              THE COURT:  Do you have any objection to that?

21              MR. GRUENSTEIN:  Well, Your Honor, the --

22              THE COURT:  I mean, if you want to rely on the

23      reports, then they should be allowed to cross-examine them.

24      If you want to just submit -- what we could do is if you want

25      to save time, is you could have their report stand as the
```

```
 1    direct testimony and just submit them for cross-examination.

 2               MR. GRUENSTEIN:  If I could have one moment, Your

 3    Honor?

 4               THE COURT:  Sure.

 5               Do you want a couple minutes to talk about it?

 6               MR. GRUENSTEIN:  I'm not sure we . . .

 7               Your Honor, I do think that as far as, you know, the

 8    rules at sentencing are obviously different than rules at

 9    trial.  Your Honor can certainly determine what weight these

10    reports get, and I think, you know, certainly you can reduce

11    the weight because the witnesses haven't testified.  But as

12    far as the completeness of the record, I think the SEC expert

13    has already testified about them.  I think they should stay

14    in.  And also the SEC expert has had a chance to rebut the

15    portions of the reports that she's wanted to rebut.

16               MS. COTTINGHAM:  Your Honor, I would say --

17               THE COURT:  I don't think it's fair to submit a

18    report and not give the opposing party an opportunity to

19    cross-examine the testimony.

20               MR. GRUENSTEIN:  If we could have two minutes, Your

21    Honor?

22               THE COURT:  Sure.

23               Again, I think letting the report stand as the

24    direct testimony and allowing cross-examination seems fair to

25    me.  I don't know how the Government feels about that.
```

```
 1              MS. COTTINGHAM:  Your Honor, we would actually even,
 2    given that some of the reports are in the record, we obviously
 3    anticipated cross, but I think we would actually frankly
 4    submit that we can submit two exhibits that go directly to the
 5    credibility of one of these witnesses, and with the admission
 6    of those two exhibits, if they want the reports in, as well,
 7    that would be fine with us.
 8              THE COURT:  All right.
 9              MR. GRUENSTEIN:  That's fine, Your Honor.  Thank
10    you.
11              THE COURT:  Okay.  So what exhibits do you want to
12    submit as I guess attacking the credibility of the witness, or
13    witnesses?
14              MS. COTTINGHAM:  Yes, Your Honor.  I recognize this
15    is a little unorthodox.
16              This is Government exhibit 210 and Government
17    exhibit 212.  I'll give a copy to defense counsel now.
18              And, Your Honor, Government exhibit 210, which is up
19    on the screen, is a 2008 decision from the Southern District
20    of New York sanctioning defense expert Mr. Christian for
21    filing a third amended complaint the Court found had no
22    reasonable factual basis relevant to the proceedings here.
23    This complaint alleged market manipulation essentially on a
24    theory that the defendant in that complaint knew or should
25    have known that there was manipulation in a given market.
```

```
 1   Judge Kaplan sanctioned the defendant.  I believe the sanction
 2   was all of -- all of costs, so $64,000.  That's Government
 3   exhibit 210.
 4          The Second Circuit affirmed the imposition of those
 5   sanctions, again, finding that there was no basis for making
 6   allegations in a complaint that are substantially similar to
 7   the allegations that have been made by Mr. Christian about
 8   this pervasive market-wide short selling manipulation in a
 9   market.
10          So we would submit that these go to the credibility
11   of Mr. Christian as an expert witness.
12          THE COURT:  All right.  Was that 210 and 212?
13          MS. COTTINGHAM:  Yes, Your Honor.
14          THE COURT:  The 212 was the Second Circuit
15   affirming?
16          MS. COTTINGHAM:  Yes, Your Honor.
17          And to be clear, the Second Circuit affirmed the
18   imposition, sent it back to recalculate the amount.  But those
19   are the two exhibits.
20          THE COURT:  All right.  Assuming there's no
21   objection to those exhibits?
22          MR. GRUENSTEIN:  No, Your Honor.  If I may just have
23   one more moment?
24          THE COURT:  Uh-huh.
25          MR. HARRIS:  Your Honor, David Harris for the
```

 1   defense.

 2          Your Honor, if I may, I would like to just ask

 3   Mr. Christian questions about what the Government just

 4   presented specifically as to the sanctions.  I think he would

 5   like to inform the Court more specifically as to what happened

 6   in that, and I think it's important if you're going to give it

 7   weight and consideration.  Thank you, Your Honor.

 8          THE COURT:  We might as well just have him

 9   cross-examined on the report if we're going to go through all

10   of that.

11          MR. HARRIS:  Just on the sanction.  I didn't want

12   the Court left with the idea that somehow he misled another

13   court, when the specifics of the allegations do not quite

14   match the description of the Government's explanation.  So

15   it's up to you, Your Honor.  I'll leave it.

16          THE COURT:  Well, I mean, I'll look at the orders,

17   and he's gonna tell me that the judge got it wrong and the

18   Second Circuit got it wrong?  If that's what he's going to

19   tell me . . .

20          MR. HARRIS:  No, it's actually more just the

21   underlying facts.  It's more a jurisdictional question and not

22   really anything improper that warranted the sanction in his

23   view.

24          THE COURT:  I'll let the orders speak for

25   themselves.  Okay?

```
 1              MR. HARRIS:  Thank you, Your Honor.

 2              THE COURT:  You're welcome.

 3              MS. COTTINGHAM:  Your Honor, may I just ask as a

 4   process point, if we're not going to have any additional

 5   witnesses, the Government would ask if we could take an hour

 6   or two or even come back after lunch, collect our notes and

 7   then have argument, if there's not going to be any additional

 8   evidence.  We probably only have 20 minutes or so of argument

 9   with whatever questions the Court has.

10              THE COURT:  I understood that the defense was

11   resting and not presenting any additional evidence; is that

12   correct?

13              MR. GRUENSTEIN:  I'm sorry, one moment, Your Honor.

14              Okay, Your Honor.  I'm just confirming those expert

15   reports are in, subject to the cross that was just for the --

16   those are the exhibits that were just introduced by the

17   Government, those are in, as well.  And subject to that, we

18   have no further evidence at this time.

19              THE COURT:  Yes, the reports are part of the record

20   for resentencing.

21              All right.  So the defense has rested.

22              Does the Government have any rebuttal?

23              MS. COTTINGHAM:  No, Your Honor.

24              THE COURT:  So your suggestion is rather than go

25   directly into a closing argument or argument now, you want to
```

1  take a break and get your thoughts together and come back,

2  since we've got all this time that we didn't think we had.  I

3  know there are people from out of town.  I don't know what

4  your schedules are for the rest of the day.  Do you have

5  flights that you have to catch?

6          MS. COTTINGHAM:  Not today, Your Honor.  And, again,

7  I think we'll be very brief after lunch.  We were just

8  anticipating two additional witnesses.

9          THE COURT:  Sure, I understand.

10          What about do you have any objection to that

11  suggestion?

12          MR. GRUENSTEIN:  We have flights, although we're

13  happy to stay here all day.

14          THE COURT:  What are your flights?

15          MR. GRUENSTEIN:  Not 'til the evening.

16          THE COURT:  Oh, okay.

17          MR. GRUENSTEIN:  Although I did look at the weather

18  report, and like every day it seems in West Palm Beach, there

19  are thunderstorms throughout the afternoon.  But that's fine.

20          Should we say maybe we could take an earlier lunch

21  and be back let's say by 12:30?  That would give us an hour

22  and a half.

23          MS. COTTINGHAM:  That's fine with the Government,

24  Your Honor.

25          THE COURT:  Okay.  That's fine.

```
 1              So 12:30 we'll see everybody back here.

 2              MR. GRUENSTEIN:  Thank you, Your Honor.

 3              THE COURT:  Thank you.

 4         (A recess was taken from 10:53 a.m. to 12:32 p.m., after

 5    which the following proceedings were had:)

 6              THE COURT:  Please be seated, everyone.  Welcome

 7    back.  We're back on the record.  Mr. Stein's present with

 8    counsel.

 9              Are we ready to argue this?

10              MS. COTTINGHAM:  Yes, Your Honor.

11              THE COURT:  Thank you.

12              MR. GRUENSTEIN:  Just one issue, Your Honor, a

13    housekeeping issue.

14              Over the last two years or so, as I think Your

15    Honor's aware, Mr. Stein has filed various motions.  I don't

16    think we need to interrupt the flow of the sentencing now, but

17    perhaps after we argue those, we can address those other

18    pending motions, as well, for housekeeping.

19              THE COURT:  Okay.

20              MR. GRUENSTEIN:  Thank you.

21              MS. COTTINGHAM:  Thank you, Your Honor.

22              Your Honor, we would just note that the Government

23    is aware of there's one victim who is here who would like to

24    allocute after the guidelines portion.  She's sitting in the

25    back.  Ms. Jamie Carpenter.
```

1            THE COURT:  Okay.

2            MS. COTTINGHAM:  Your Honor, there's no question

3    here, you sat through the entire trial.  You're more familiar

4    with this case than I believe anybody in this room.  There's

5    just no question that there was loss to investors, that there

6    was loss to the company, and that Mr. Stein, that he gained

7    from this scheme.  There's been a lot of discussion about

8    alleged fraud here, but we're here for resentencing.  The

9    fraud has been established.  His convictions have been

10   affirmed.  And so I'll try and keep what I'm going to say

11   narrowly focused on that issue of loss, which is really what

12   we're here to discuss.

13            There are three real measures of loss that we've

14   presented to you.  First is the amount of money Mr. Stein

15   stole.  That's in Government exhibit 114, the $6.691 million

16   figure.  It's all based on overwhelming trial evidence that

17   was summarized by Mr. Melley.

18            The amount of money investors lost, you heard

19   Mr. Melley's calculations.  It's Government's exhibit 102.

20   And that's the $2,026,000 figure.

21            And we'll pull up on the screen Government

22   exhibit 121, which summarizes all of these methodologies.  But

23   basically, Your Honor, there's the amount of money Mr. Stein

24   stole, there's the amount of money investors lost, and the

25   Government submits it's appropriate for the Court to combine

 1   those two figures here.  But even if the Court --

 2           THE COURT:  Combine them?

 3           MS. COTTINGHAM:  Yes, Your Honor.

 4           THE COURT:  Okay.  You're talking about considering

 5   the investors and the corporation as victims, correct?

 6           MS. COTTINGHAM:  Yes, Your Honor.

 7           THE COURT:  Okay.

 8           MS. COTTINGHAM:  We think that's appropriate here

 9   for several reasons.  First, as the overwhelming evidence at

10   trial showed, Mr. Stein's scheme, it had many components, but

11   the first of which was to lie to investors, to fraudulently

12   boost the share price.  And the second was he used SignaLife,

13   he used the company as his personal piggy bank.

14           So not only did he lie to investors, an entirely

15   separate part of the scheme, he also got shares transferred to

16   himself, he got funds transferred to himself directly through

17   trusts and through other coconspirators, and we think those

18   are separate components of the loss that he caused in this

19   case.

20           So the Government would submit that those are two --

21   it's not double counting to include these two pieces.  It's

22   appropriate, actually, to aggregate these losses.  And I would

23   also note that, of course, the losses to the company as a

24   calculations matter, reflects shares that were transferred to

25   coconspirators, Mr. Stein himself.  They're obviously not

1  included in the Government's very conservative $2 million

2  figure.

3          So there's not a question of double counting, it's

4  really these are two parts of the scheme, and it's appropriate

5  for Mr. Stein to be held accountable for both of those parts.

6          But if the Court is not inclined to aggregate, we

7  think the higher of the two, frankly, is appropriate here, the

8  loss to the company.

9          The Eleventh Circuit, in sending back this case,

10  explicitly said that loss to the company was a measure that

11  may be appropriate here, and we would submit that the higher

12  of the two would be appropriate.

13          Your Honor, the third bucket, in addition to loss to

14  investors, losses to the company, even if the Court doesn't go

15  with either of these metrics, the defendant gained in this

16  scheme.  The defendant gained $5.37 million.  And, again,

17  that's shown on Government's exhibit 121 and based on

18  substantial trial evidence.

19          Your Honor, under any of these metrics, there's no

20  question that the same sentence is appropriate here.  Under

21  any of these figures, the loss -- any of these loss

22  calculations, the appropriate guidelines, frankly the

23  204-month sentence you imposed will still be below the actual

24  calculable guidelines range.

25          And in response to these renewed calculations, the

```
 1   defense has put up frankly more of the same arguments this

 2   Court has seen throughout trial, throughout the prior

 3   sentencing.  There is more blaming of the victim, blaming of

 4   other factors in the market.  And we have, through

 5   Dr. Becker's event study, not only shown that it was actually

 6   the defendant's fraud that caused these losses.  We have

 7   excluded all of those additional extraneous items, all of the

 8   things the defendant is trying to blame.  He's trying to claim

 9   that he's a victim of the scheme.  Dr. Becker's analysis

10   clearly shows that that's not the case.

11           So walking through each of these briefly, Your

12   Honor -- and I know you've read the briefs, so I will keep it

13   at a high level -- but first with respect to loss to the

14   company, again, Mr. Stein, he used the company as his personal

15   piggy bank.  He -- as Mr. Carter, Mr. Anand, they testified.

16   They basically received payments for services they were in no

17   way qualified to get.  They took these shares from the company

18   in exchange for services they often didn't provide or for

19   services they were in no way qualified to perform.

20           The appropriate measure for that loss to the company

21   is when those shares were transferred to those individuals.

22   The company issued these shares to these individuals.  These

23   shares had value to the company, and we valued them exactly at

24   the time of the transfer at what the shares were trading at.

25           The same is true, Your Honor, of Evie Muscillo.
```

1    She's also included in this loss to the company figure.

2    Remember, she was the individual who she entered -- her

3    significant other, excuse me, entered into a stock promotion

4    contract.  He was helping pump up, inflate the price of

5    SignaLife stock.  He got shares in exchange for doing this.

6    So, again, the company loses.  Their company loses these

7    shares, shares that are valuable to the company.

8         And there's been an argument that these shares

9    somehow didn't have an inherent value to the company, but of

10   course they did.  That's why the company is issuing these

11   shares to these individuals.  They're using these shares to

12   pay these individuals for goods and services provided.  The

13   fact that these coconspirators weren't actually qualified or

14   didn't provide these goods and services, that doesn't

15   undermine that the shares had actual value to the company at

16   the time they were transferred.

17        Your Honor, if you take the defense argument that

18   the company didn't suffer to its logical extension, they're

19   basically saying that even though the defendant -- the

20   evidence at trial showed that he took all of this money from

21   the company, they're saying that he could never be the

22   victim -- they're saying the company could never be the

23   victim, regardless of how many proceeds were taken from the

24   company.  And that's simply not the case.  This company was

25   run into the ground.  The shares are virtually worthless.  And

1    that was as a result of the defendant's scheme.

2         So we think loss to the company is completely

3    appropriate here.

4         The second figure, Your Honor, is investor losses.

5    And I recognize that most of the testimony over the last two

6    days has been focused on that, so I just want to make a few

7    high level points there.  But, frankly, Dr. Becker -- the

8    defense expert, Dr. O'Neal, and Dr. Becker really agree on a

9    number of components about this event study.  And, frankly,

10   Dr. O'Neal, the defendant's expert, agrees there was an

11   investor loss here.  And that loss we have quantified as

12   $2 million.

13        Just walking through Dr. Becker's analysis and her

14   event study methodology, importantly, the way Dr. Becker

15   started her analysis is based on these three starting points,

16   these three false press releases.  Your Honor asked a question

17   this morning about market expectations.  And I think that's

18   really important, because those three press releases, in

19   particular the second press release, which had a statistically

20   significant impact, but those three press releases generally

21   -- remember, the defendant's entire scheme is to lie to

22   investors and pump up the stock price.  Investors are

23   expecting there are -- and you heard Dr. Becker testify about

24   this.  They're saying, okay, these are real products.  There's

25   a real demand for this.  Of course investors relied on that.

1    You've heard Mr. Taylor testify to that, and you've seen the

2    statistical, the economic impact that those press releases

3    actually had.

4           And it's that market expectation, that fall 2007,

5    these three press releases, they're setting up investors to

6    have the expectation that SignaLife is going to be making

7    money, that it's going to be a real company.  And when they

8    see these purchase orders, when they see these press releases,

9    they come to expect there's going to be revenue recognized at

10   some point.

11          You heard Mark Taylor.  You've heard the witness

12   testify about that.  And it doesn't matter when the revenue

13   was going to be recognized.  The important thing is these

14   press releases made investors think this company was real and

15   there was a demand.

16          So moving ahead to the April 2008 webcast.  This was

17   a partially corrective disclosure precisely because of the

18   question Your Honor asked this morning, because investors in

19   the market expected information.  They expected particular

20   information was going to come out about these purchase orders,

21   about the financial health of the company, and they didn't get

22   that during the webcast.

23          The case law and the literature supports both the

24   idea of a partially corrective disclosure, Your Honor, and it

25   supports the idea that the absence of information,

1    particularly given these explicit expectations by investors,

2    is an appropriate corrective disclosure.

3            Then moving on from the April webcast to the August

4    10-Q.  I think frankly, again, both experts agree this was an

5    additional corrective disclosure here, Your Honor.  This

6    revealed the falsity of the press releases.  I think really

7    the only disagreement here is about these additional -- about

8    the additional information in the 10-Q.  And I want to be

9    clear about what was in the 10-Q.

10           The 10-Q contained, by the defendant's own experts,

11   three interrelated pieces of negative financial information

12   about the company.  And I think it's important to note that

13   those pieces of news all were negative, and as the Court asked

14   this morning, they were interrelated.  They all went directly

15   to the idea of the financial health of the company.  Again,

16   this is roughly a year after you've had these press releases

17   setting up investors with the expectation that there's going

18   to be financial health, that this company has demand for its

19   products, that this company is viable.  And the 10-Q, all of

20   the information in that 10-Q, including about the press

21   releases, it further reveals the fraud to the market.

22           And, Your Honor, the defendant's experts (sic) has

23   testified that he would quantify the loss after the 10-Q

24   slightly differently than we would.  But even, frankly, under

25   his figure, it's $1.5 million in loss.  It's substantially

1    similar to -- it's $500,000 less than the loss figure we've

2    attributed to investors.  So, again, I just think it goes back

3    to the point that there's no question of investor loss in this

4    case.  There's simply not.  And there's no question that it's

5    over $1.5 million.

6            And just briefly on the partial corrective

7    disclosure point, Your Honor, assuming -- the Government has

8    taken a very conservative position, frankly, in assessing

9    these corrective disclosures.  The April 2008 webcast, for

10   purposes of our calculations, essentially between September

11   and April there's 18 percent inflation in the stock.  After

12   that webcast, by Dr. Becker's analysis, 12 percent of the

13   inflation comes out of the stock.

14           So as the ultimate purpose of these calculations,

15   Mr. Melley's calculations based on Dr. Becker's analysis, it

16   was to do exactly what both the defense expert and Dr. Becker

17   agreed; isolate the portion of investor loss that is

18   attributable to inflation.  And so I just want to highlight

19   that bringing out that additional 12 percent of inflation in

20   that second part of the period is -- again, it results in a

21   lower loss number.

22           But I want to be clear that investors who purchased

23   during this period in reliance on the scheme, they -- they

24   lost by purchasing at an inflated price, regardless of when

25   they sold throughout this period.  And, again, taking out that

1    12 percent in the second half is just a more conservative

2    method of doing this.

3              THE COURT:  Say that again.  Repeat that last thing.

4              MS. COTTINGHAM:  Yes, Your Honor.

5              My point is just that essentially there are two time

6    periods during the relevant period.

7              THE COURT:  Uh-huh.

8              MS. COTTINGHAM:  And during the first half of that

9    time period, between the second press release and the webcast,

10   based on Dr. Becker's analysis, we've assumed that there is

11   18 percent inflation in the stock.  And because the webcast

12   was a partially corrective disclosure, some of the inflation

13   comes out of that stock.  So rather than having 18 percent

14   inflation throughout the entire period, there is a smaller

15   percentage of inflation, so therefore a smaller figure of loss

16   attributed to inflation in that later period.  That's just --

17   that's my point there.

18             THE COURT:  Well, but my -- my clarification, my

19   request for clarification related to your statement it didn't

20   matter when during the period the investor sold the stock, and

21   what about the position that you don't -- you don't measure

22   the sale or the loss until after there's the disclosure?  So

23   what if someone sold before the disclosure, how does that

24   person suffer a loss?

25             MS. COTTINGHAM:  Yes.

```
 1              THE COURT:  And did Mr. Melley's analysis include
 2   people who sold before the disclosure of the fraud?
 3              MS. COTTINGHAM:  Yes, Your Honor.
 4              So Mr. Melley -- what Mr. Melley did is he took the
 5   event study, calculated losses, and he -- the limiting
 6   principle of his calculations was he limited his calculations
 7   to those who purchased during the relevant period.  And I
 8   think there's been some mischaracterization of what Dr. Becker
 9   actually said about individuals who sold during the relevant
10   period.  What Dr. Becker said was individuals who purchased
11   during the relevant period would be harmed because they
12   overpaid for the stock.  The stock is inflated as a result of
13   the fraud.  And that was what Dr. Becker said.
14              And we have included individuals who sold before the
15   corrective disclosure because those individuals purchased in
16   reliance on the fraud and suffered actual losses.
17              THE COURT:  But if they sold before the disclosure
18   of the fraud, wouldn't the -- their inflated value still exist
19   in the stock when they sold it?
20              MS. COTTINGHAM:  It would, Your Honor.  And so I
21   want to be clear about who falls into that bucket.  So only
22   investors who actual -- if they purchased during the fraud and
23   sold during the fraud.  Only if they, one, actually suffered
24   losses, and, two, given changes in the stock price, their
25   inflationary loss, they also had inflationary losses, are they
```

1    included.

2         So --

3         THE COURT:  Well, if they suffered a loss during the

4    period before the fraud is disclosed, aren't those losses

5    attributable to something other than the fraud?

6         MS. COTTINGHAM:  No, Your Honor, I don't think they

7    are.  I think those losses are attributable to the fact that

8    they -- they have overpaid for the stock because it's

9    inflated.  They still get -- they're still credited in

10   Mr. Melley's calculations for whatever -- let me back up.

11        What is due to the fraud, what -- the inflationary

12   component of the stock is caused by the fraud.  So the

13   18 percent inflation in that period is the result of fraud.

14   And if they purchase, for example, at the early part of -- in

15   the early September 2007 period, and they then sell at a

16   depressed price before the April webcast, they've still

17   purchased in reliance on the fraud, and there's inflation in

18   the price during both time periods, which is caused by the

19   scheme.  So their actual losses minus that intrinsic value is

20   still an appropriate measure to include.

21        THE COURT:  All right.  So let's assume someone buys

22   a share at $118, and it's inflated at 18 percent, so it really

23   should be a hundred dollars, but it's inflated 18 percent, so

24   he pays $118 for the stock, after the purchase orders are

25   fraudulently disclosed to the market.

```
 1              MS. COTTINGHAM:  So, Your Honor.

 2              THE COURT:  But before the April webcast --

 3              MS. COTTINGHAM:  Uh-huh.

 4              THE COURT:  -- he sells it for a hundred.  He

 5    lost -- he lost $18 on the sale.  How is that attributable to

 6    the fraud if no one knows about the fraud at that point?

 7              MS. COTTINGHAM:  Your Honor, it's attributable to

 8    the fraud in that he's lost $18 on the sale, but what we would

 9    do in those -- we would say he overpaid by 18 -- he overpaid

10    by the inflationary component.  So his losses just aren't

11    reduced by the $18 he actually loses.  So it would be the

12    hundred dollars minus 18 percent would be what would be

13    calculated as his actual proceeds on the sale.

14              So because the inflationary component is not a

15    constant dollar amount throughout the entire scheme, rather

16    it's a percentage amount, what we are doing is still isolating

17    the inflationary component.  So it would be inflated by

18    18 percent -- by $18, excuse me, when he purchases, and it's

19    inflated by a hundred, minus 18 percent when he sells.  So his

20    losses would be limited to that change in the inflationary

21    value, but he's still lost in that he has suffered from

22    overpaying for the stock.

23              THE COURT:  Okay.  And you're saying Dr. Becker said

24    that's a loss?  She didn't calculate loss, but her opinion was

25    that was loss?
```

1          MS. COTTINGHAM:  Dr. Becker's statement I believe

2    was that investors who -- investors are harmed by overpaying

3    while the fraud -- while the stock is inflated, and --

4          THE COURT:  But how do you quantify it if they sell

5    before the fraud is disclosed?

6          MS. COTTINGHAM:  And, Your Honor, my position is

7    that you quantify it the same way we were just discussing with

8    that change due to inflation.  And, again, I think that's

9    because we've measured inflation here as a constant percent

10   rather than a constant dollar amount.

11         So, frankly, because of the fluctuations in the

12   stock, the 18 percent inflation represents as a general matter

13   a smaller and smaller dollar or cent amount over the period,

14   but it still represents an overpayment, which is a harm to an

15   investor.

16         THE COURT:  So for that reason, that's why you've

17   included people who sold their shares before the disclosure as

18   part of the loss calculation?

19         MS. COTTINGHAM:  Yes, Your Honor.

20         THE COURT:  Okay.

21         MS. COTTINGHAM:  And, Your Honor, just to briefly

22   walk through a few of Mr. Melley's other -- few of the other

23   components of Mr. Melley's methodology, I think if you look

24   at, for example, there's been a lot of discussion about the

25   Mark Taylor example, but I think it really just highlights how

1   conservative Mr. Melley's methodologies are in a number of

2   respects.

3        Mr. Taylor testified that he, himself, lost money.

4   In Government's exhibit 103, he lost $140,000 in addition to

5   all of the individuals that he also -- I think family members,

6   other accounts that he also put in the stock.  So the $140,000

7   is frankly a conservative estimate just for him to begin with.

8        But under Mr. Melley's methodology, that number is

9   reduced to under 17,000.  I think with -- again, just

10  emphasizes that individual investors lost millions of dollars

11  in this scheme.  And what the Government has done is tried to

12  give the most conservative estimate possible of what those

13  losses are when they're isolated just to the inflationary

14  component.

15       I think that's also true for Bryan Harris, who was

16  the investor who testified at trial, the dentist.  I believe

17  he had losses of $640,000, which, under Mr. Melley's

18  methodology, are reduced to around $114,000.

19       So, again, those are just two examples from

20  individuals you've actually heard from who did rely on this

21  information and did suffer and how conservatively we have

22  tried to calculate losses here.

23       Again, Mr. Melley's pool of final investors, it gets

24  him from $14 million in actual losses at the beginning of his

25  calculation, to $2 million.  That pool of investors is frankly

1    less than half of the pool he even started with.  We submit

2    it's a conservative and appropriate method of calculating loss

3    here, but do want to emphasize it in no way captures everyone

4    who suffered as a result of the defendant's scheme.

5           I also just want to be clear about one other way in

6    which the methodology was particularly conservative, which is

7    everyone in Mr. Melley's calculations received that

8    theoretical credit as though they sold on August 15th of 2008,

9    the 10-cent credit.  In reality, Your Honor, the stock price

10   plummeted.  There are plenty of those investors who still hold

11   those shares today.  They're virtually worthless.  So that

12   alone again benefited by hundreds of thousands of dollars the

13   loss calculation, skewing it downward.

14          And, Your Honor, even if you don't use either of the

15   loss figures, there's certainly enough here.  I think you've

16   heard individual investor testimony.  All of the experts agree

17   there was loss in this case.  But if you decide it's not

18   quantifiable, it cannot reasonably been determined, then we

19   would urge the Court to make an alternative ruling that gain

20   is appropriate here.

21          Again this is all based on trial evidence.  We put

22   it in through Mr. Melley and through summary exhibits this

23   Court is familiar with.  But it's appropriate to measure gain

24   to the defendant.  And, importantly, the gains to the

25   defendant, we've got $5.3 million here.  It's very similar to

1    the loss to SignaLife figure.  It's similar to -- virtually

2    identical to what was found in the first sentencing.  But I

3    just want to raise a couple of points briefly about gains.

4          First, there's not any support in the case law for

5    the idea that somehow the defendant gets to offset his gains.

6    There's no support in the guidelines for it, and there's also

7    no support, frankly, in the evidence that the defendant ever

8    paid anyone back or made restitution, which is frankly the

9    only cases we've seen that the defense has even cited, that's

10   what they're dealing with.

11         We saw a chart this morning I think in the defense

12   exhibit 63 about the defendant's losses trading in SignaLife,

13   but I think it's important to take a couple of points into

14   consideration there.

15         First, if I understand it, then, the defense's

16   position is that the defendant lost $26 million, but all of

17   the other victims combined in this case lost 1.5, which I

18   think is on its face a ridiculous position.

19         But, second, the analysis -- and Dr. O'Neal was

20   asked about this -- it doesn't take anything into account

21   about how the defendant got these shares.  Substantial

22   evidence at trial about the myriad ways in which he got shares

23   of SignaLife.

24         And, Your Honor, I'd also point out that the -- and

25   this was admitted at trial, but trial exhibit 93 is a 10-K.

```
 1    All of the 10-Ks for SignaLife show that the defendant
 2    actually received a number of these shares effectively in
 3    exchange for certain technology.  So I think he received -- I
 4    think on the slide we saw earlier, as of 2008, the defendant
 5    held 21 million shares, but as the 10-K shows, the defendant
 6    actually received I think it's 78,000 -- or, excuse me.  Yeah,
 7    the defendant actually received 78 million of these shares
 8    well before any of this conduct started.
 9              So, again, this $26 million offset that they've
10    presented, it's not accurate, it's incredibly misleading, and
11    it doesn't take into account any of the actual evidence of the
12    defendant's conduct here.
13              So, Your Honor, with that, we think gain is an
14    appropriate method.  We think any of these loss calculations
15    are an appropriate method.
16              Frankly, even if the Court were just to take the
17    testimony of investor victims alone, there's no question that
18    there's been loss established here, and that it would be
19    appropriate for this Court to make a finding on any of these.
20              THE COURT:  What's the restitution amount you're --
21    do you think I should award, or did you cover that already
22    with the gain?
23              MS. COTTINGHAM:  So, Your Honor, the restitution
24    amount I believe would be the $2 million figure.  Your Honor,
25    if you go with the gain to the defendant, it would not be
```

```
1    restitution.  But it would be the $2 million to the loss to
2    investors or the $6 million loss to SignaLife, or combined.
3    Restitution to the company would be appropriate here.  There
4    are still shareholders.  It's a shell, but that would be
5    appropriate here.
6              THE COURT:  One more time on the inflation and the
7    sale before the disclosure.
8              MS. COTTINGHAM:  Yes, Your Honor.
9              THE COURT:  So, again, I want to -- using the
10   example I gave you, a person pays $118 for a share that's
11   value is inflated by 18 percent because of the fraud.  Sells
12   the share at a hundred dollars before there's any disclosure
13   of the fraud.  And your position is that the person overpaid
14   18 percent because of the fraud and that person was harmed.
15   But when the person sold before the disclosure of the fraud,
16   didn't that person get back the inflated value that he
17   overpaid because -- I mean, so didn't he come out even if he
18   sold before the fraud was disclosed?
19             MS. COTTINGHAM:  So he didn't.  And, Your Honor,
20   I'll use slightly -- I'm not -- I'll use slightly different
21   numbers to help me with the math.
22             THE COURT:  Okay.
23             MS. COTTINGHAM:  So if he buys at 118, or say he
24   buys at -- yeah, say he buys at $118.  The intrinsic value of
25   the stock there is just a hundred dollars.  And then say he
```

1   sells at half of that.  So he sells at $59.  The inflationary

2   component there is $9.  We would say the difference, that $9

3   difference is the component that is the appropriate measure of

4   loss here, because he's overpaid because of the inflation.

5   He's overpaid in both instances -- excuse me.  He's overpaid

6   when he purchases it, and, yes, you're entirely right that he

7   recoups some of that.  But because we're using a percentage

8   and not a consistent dollar value, we offset it by whatever he

9   does recoup.

10          So in that example, it's just the $9, but the $9 is

11  still the loss due to the inflationary component.

12          THE COURT:  Okay.  See if I can make sure I

13  understand that.

14          All right.  Thank you.

15          MS. COTTINGHAM:  Thank you, Your Honor.

16          Your Honor, may I just . . . Court's indulgence?

17          THE COURT:  Sure.

18          MS. COTTINGHAM:  Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. GRUENSTEIN:  Your Honor, we're here today

21  because the Eleventh Circuit gave specific requirements for

22  how to find losses to investors that result from fraud for

23  guidelines and restitution purposes.  What we've seen over the

24  past two days respectfully should change how Your Honor thinks

25  about the crime in certain respects.

 1          We'll get to the numbers in a minute, and I'd be

 2     happy to talk about your hypothetical about the $118 share.

 3     But fundamentally I think what came out in the last two days

 4     is despite everything that the Court heard during the trial --

 5     and we're not challenging any of it here.  All of the facts

 6     that were found are true for these purposes.

 7          But what has come out during this two-day hearing is

 8     that contrary to what the Government said in the second

 9     sentence of its sentencing memo, this was not a, quote,

10     massive scheme to defraud investors of SignaLife that, quote,

11     caused investors losses in the millions.

12          As we discussed with the various experts and

13     witnesses, there are calculations here that show that the

14     actual loss due to the fraud -- not the losses that people

15     suffered and that people's bank accounts went down -- but the

16     loss due to the fraud was in the low hundreds of thousands,

17     and perhaps less, depending on whether the Court makes a

18     finding of market-wide reliance, which we'll talk about.

19          Since the last sentencing, the numbers for the loss

20     have come down dramatically.  Although I wasn't here, I

21     understand that in the first proceeding the Government was

22     talking numbers in the range of 78 million in the modified

23     rescissory method, as well as ultimately the Court found

24     $13.2 million in investor losses.  Now, as the Government just

25     put up, their calculation of investor loss is $2 million.

```
 1   That's a significant drop.
 2            Another point that came out, again, while we're not
 3   disputing the facts, I think the gloss on the scheme is
 4   different now than it was previously.  As Dr. O'Neal
 5   testified, this scheme did not have the hallmark of a
 6   pump-and-dump scheme; that Mr. Stein did not buy stock before
 7   the fraudulent press releases, pump the stock price up and
 8   then sell it before the fraud was revealed.  He actually did
 9   quite the opposite.  He sold before the fraud period, the
10   stock went up, and he bought during the high watermark of the
11   stock, and that is why he ended up losing so much money,
12   because he held the stock as it went down.
13            THE COURT:  Does it make a difference for my
14   purposes of whether it was a pump-and-dump or not?
15            MR. GRUENSTEIN:  Well, for purposes of finding out
16   what the loss amount was, it doesn't make a difference.  But
17   the reason I bring it up is as we all try to get our heads
18   around how did this go from a $13 million scheme to what's a
19   $2 million scheme, according to the Government.  And when we
20   say investors probably didn't lose more than tens of thousands
21   of dollars, I think kind of understanding what Mr. Stein was
22   actually doing is helpful to painting that picture.
23            The fraud -- also what came out during this hearing
24   is that the fraud did not affect the entire market.  The
25   Government has not proven market reliance, as I'll talk about
```

 1    in a minute.  And that is another key fact.

 2              In addition, contrary to the last sentencing, where

 3    the total count of victims was 2415, over 2000 victims, now

 4    the number of victims is far less.  As we discussed with

 5    Mr. Melley, if you take out all the people who sold before the

 6    disclosure, before the first disclosure, the number of victims

 7    is down to a few hundred.  It is a very different scheme.

 8              The Government has given you several options for how

 9    to calculate the loss, and Your Honor had some questions about

10    why it makes sense to look at the difference between the

11    inflationary values.  Unfortunately, the reason that Your

12    Honor has those questions is that there was no expert who

13    actually testified as to those calculations.  Dr. Becker

14    testified about what the inflationary value was and also said

15    that the person who paid an inflationary amount did not suffer

16    a loss until the disclosure, and Mr. Melley did the

17    calculations but did not explain why that reduction in

18    inflationary amount is actually a loss.  And I'll address in a

19    minute why it wasn't.

20              So how should, in our view, the Court calculate the

21    loss in this case?

22              First, as I mentioned, there's no proof of

23    market-wide reliance.  The Court can't assume that the

24    aggregate numbers that Mr. Melley put forward about investors

25    across the entire class, or frankly that Mr. O'Neal put

1    forward, are the appropriate loss amount.  Those are ceilings.

2    Those are if you assume the entire market relied, those would

3    be the loss amount.

4            THE COURT:  But didn't Dr. O'Neal say that his event

5    study was premised on the assumption that the entire market

6    relied?  And I understand he said you also have to show that

7    it was -- worked in an efficient market.  But didn't he say

8    that when you do the event study, that's what you're doing;

9    you're assuming that there's reliance upon the entire market?

10           MR. GRUENSTEIN:  Absolutely.  But he was assuming it

11   arguendo.  He was assuming if the Government can prove that

12   this is an efficient stock -- and the Government never put

13   that forward -- then this event study would show what the loss

14   is.  But if you can't prove that it was an efficient stock,

15   then you can't use the market -- the event study.  The --

16           THE COURT:  So if I conclude that an efficient

17   market's not a prerequisite to the event study, then there is

18   market -- full market reliance if I --

19           MR. GRUENSTEIN:  That's right.  If Your Honor

20   find -- yes, absolutely.  If Your Honor finds that market

21   efficiency is not a requirement of an event study, then we

22   could go either with Dr. Becker's event study or Mr. Melley's

23   calculation as adjusted.  The problem is that the law doesn't

24   support that.

25           There is, in civil securities fraud cases -- and

 1    there's a case that came out of this district.  It was the

 2    Stanaford case which we cited, by the late Judge Ryskamp, we

 3    cited it in our papers, explains how you determine market

 4    efficiency.  And as a matter of logic, if a market is not

 5    efficient, there's no basis to draw any conclusions from an

 6    event study, because what it means for a market to be

 7    efficient is that the news that's out there gets, in the words

 8    of Dr. O'Neal, gets impounded into the stock price.  And this

 9    is a market where the news doesn't get --I think about the

10    real estate market.  The real estate market I don't think is

11    efficient.  There may be news out there about certain houses.

12    It doesn't get impounded into the stock price.  If someone

13    drops the price of their house from $2 million to 1.3, you

14    don't know why they did it.  You can't infer that there was a

15    reason, because it's not an efficient market.

16             And this is actually one of the three legal issues

17    I'm going to be talking about today that I think are the key

18    legal issues that are in this case.

19             One is the question of can you find market-wide

20    reliance without a finding of market efficiency?  There's no

21    support from the Government that you can.  And if we look at

22    the Eleventh Circuit opinion, the Eleventh Circuit opinion

23    actually laid out three different ways to find market-wide

24    reliance.

25             In the majority opinion, the opinion of the full

 1    panel, they said you could do it either through direct

 2    evidence, calling all the investors to see did you rely, or

 3    you could do it through circumstantial evidence.  So that

 4    could be calling enough investors that you can draw an

 5    inference that all investors relied.

 6             In the separate concurring opinion of Judge Pryor,

 7    she gave a third possibility, which was applying the basic

 8    test, which is applying the market efficiency reliance test.

 9             So it has to be done in one in three ways.  You

10    can't just go to the event study.  There has to be either

11    direct evidence, all the investors -- we've only heard from

12    one; circumstantial evidence, we haven't heard any

13    circumstantial evidence of market-wide reliance, or doing it

14    the way that Judge Pryor suggested in her concurrence.

15             So that is the first legal issue I think in this

16    case of how do you actually prove market-wide reliance and do

17    you need a preliminary finding, which we submit that you

18    certainly do.  The case law is clear, the Eleventh Circuit was

19    clear, and the Government has offered nothing to the contrary.

20             THE COURT:  Is the only case that you have on that

21    point a requirement of efficient market Judge Ryskamp's

22    decision?  There are no other cases that support that or say

23    it's a prerequisite?

24             MR. GRUENSTEIN:  My understanding is that the Basic

25    case is the Supreme Court case that establishes that

1    requirement in all securities fraud cases.

2         THE COURT:  Which case is that?

3         MR. GRUENSTEIN:  It's Basic v. Levinson.  I don't

4    know if I can get the cite.  Halliburton is another Supreme

5    Court case.  I can hand up the cite.  So the Basic case is 485

6    U.S. 224.  The Halliburton case is 134 Supreme Court 2398.

7         And this is the standard way in every civil

8    securities fraud case when their loss has to be proven; first

9    we find the market efficiency.

10        Now, in the cases that were handed up to Dr. O'Neal,

11   one of them was about Symbol Technologies.  Symbol

12   Technologies, he didn't do the market efficiency analysis.

13   Symbol Technologies was a $4 billion company.  It was sold to

14   Motorola for $4 billion.  That was, of course, a -- that was a

15   stock like Apple or IBM.  Of course that was efficient.

16        This is a very different beast.  This is a stock for

17   which there were no analyst reports.  There's no news about

18   it.  The only thing, the only news there is in the securities

19   filings.

20        So let me talk a little bit about this question

21   about has the Government established market-wide reliance.

22   The Eleventh Circuit said that they did not when they did four

23   things.  The four things they did previously was they put

24   forward a single investor, Dr. Harris.  They put forward a

25   single victim impact statement that indicated reliance.  They

1    put together other victim impact statements.  They put forward

2    that stated that investors relied on public statements but not

3    specifically the fraudulent information that Mr. Stein

4    disseminated.  And then the fourth thing they did was

5    testimony generally that the only information about SignaLife

6    came from the company.

7          So what has the Government done now to supplement

8    the record?  Instead of testimony from one investor,

9    Dr. Harris, they now have two investors, Harris and Taylor.

10   Taylor was, in fact, the one victim impact statement that the

11   Eleventh Circuit referred to.  So now he's not just a victim

12   impact statement, he is a witness.  And there is no additional

13   evidence of market-wide reliance.

14         Dr. Becker can't tell you whether any individual

15   investor relied upon the specific misrepresentations at issue.

16   Neither can the Government's other witness, Mr. Melley.  So

17   what does this ultimately mean for the loss amount?  It means

18   that the Government can't prove reliance across the market.

19   They're left with only two individual investors.

20         As I said, Mr. Melley's numbers assume that all

21   investors who purchased during the period relied on the fraud,

22   but it's just an assumption.  He has no opinion or proof.

23         Dr. Becker gives you an estimate of how much the

24   stock moved on particular events but no opinion on how the

25   loss should be calculated generally.

1          And as I mentioned, in the Eleventh Circuit, Judge

2    Pryor's decision, she said that the fraud on the market

3    presumption requires a showing of market efficiency, which she

4    describes, she quoted another case, she described it as a

5    fact-intensive inquiry.

6          The Government has offered an alternative

7    explanation or an alternative loss, and that's based on the

8    loss to individual investors.

9          And if we could put up Government exhibit 103.

10          That is not one of the investors.  (Laughter.)

11          Let me start talking about them while they're going

12    up.

13          The first one was Ms. Carpenter, who I understand is

14    in the courtroom.  We understood that she was going to be a

15    witness, but she was not a witness at the hearing.  Our

16    understanding is that she suffered a small loss.  In fact, in

17    the Melley calculations, the broad and the narrow period,

18    she's not identified as a -- someone who lost anything during

19    the fraud period.

20          The trading records that we looked at, which are in

21    evidence, showed that she was essentially a day trader.  She

22    bought and sold blocks of stock very frequently.  And there's

23    no indication that after the press releases that she had any

24    sort of unusual purchases.  In fact, right after the press

25    releases, she didn't buy any stock, even though over the year

```
 1    of the fraud period, she would buy and sell numerous times a

 2    day.

 3            And to be clear, while I do say that about

 4    Ms. Carpenter, and the Government suggested that the

 5    defendant, and perhaps myself by extension, were trying to

 6    blame the victim.  We're not at all.  People certainly who

 7    invested in SignaLife lost a lot of money.  But the question

 8    that we're trying to address is did they lose the money as a

 9    result of the fraud or simply as a result of the company's

10    poor performance and the stock dropping.

11            The second individual investors that GX103 showed

12    were investors names Klinek and Pack, K-l-i-n-e-k, and Pack,

13    P-a-c-k.  These are investors that actually sold before the

14    webcast.  They didn't suffer any loss.  And in Melley's model,

15    they lost under $8000.

16            We spoke about Harris and Taylor.  Harris, as we

17    discussed, he lost over $600,000, but that was not due to the

18    fraud.  As far as the amount that he lost on the day of the

19    final corrective disclosure, as Dr. O'Neal said, he lost

20    $7600.  And Mr. Taylor, as Dr. O'Neal testified, on the day of

21    the fraud lost I believe the amount was $2200 roughly.

22            While Mr. Taylor talked about that he did review the

23    press releases, he also spoke about reviewing many materials.

24    The extent to which he relied on the press releases is a

25    little unclear, given it sounds like he relied on all
```

information together.

I do want to say on that point actually is the point
that the Government made and that Your Honor picked up on in
the questioning of Dr. O'Neal, which was that the three causes
of the stock drop on the date of the disclosure were to some
extent related.  There were the press releases, the losses,
the net operating losses, as well as the negative shareholder
equity.  And Your Honor correctly questioned are they related,
and absolutely, they all relate to performance.  They all
relate to revenue earnings, financial information.

But what's important is that it doesn't mean that
those are all relating to the fraud.  The only one of those
that related to the fraud was actually a segment of that, a
smaller part, which was the press releases.  That was part of
a much larger body of information.  So while they are related,
that doesn't mean that you can't think that it's -- that the
1.5 million is the ceiling and it has to be divided among the
three pieces of news.

And Dr. O'Neal said that, yeah, it's somewhat
arbitrary.  I had no reason to pick a different number, but
each one of them, you know, presumably had roughly equal
amount of impact.

Briefly -- and the Eleventh Circuit did mention
victim impact statements.  There -- we certainly did receive
additional victim impact statements from the Government.  We

1    have moved them all into evidence.  We did not see any

2    additional victim impact statements or memoranda of interviews

3    that sway us in any -- or suggest to us that any additional

4    investors relied on the press releases.  So I think the state

5    of the evidence there is the same as it was before the

6    Eleventh Circuit.

7              Very briefly, just on the topic of individual

8    investors, when we first received the Government's witness

9    list, there were five witnesses that we were going to hear

10   from.  Ultimately we only heard from one.  We don't think it

11   was an accident.  We think that those witnesses would not have

12   had helpful testimony.

13             Ronald McMahan, we asked the Government whether --

14   because we couldn't find any trading data for him in the blue

15   sheet data, and we asked whether he -- whether they could

16   identify his trades.  And this was an individual who there was

17   evidence perhaps at the trial, certainly in the record here,

18   that he looked to take over the company at some point.  We

19   asked the Government to identify the trades.  They said if we

20   can't identify the trades, we won't call him as a witness.

21   They told us soon after they were not going to be calling him

22   as a witness.

23             Jamie Carpenter, she's in the courtroom today.  She

24   was interviewed the day before the hearing started.  We know

25   this from the interview memo that we got.  She actually said

1    the webcast on April 14th was really positive news.  She

2    didn't see it as a corrective disclosure.  She thought it was

3    good.  She remembered watching it and thought it was actually

4    good news about the stock.  She was not called as a witness.

5           Richard Faust was going to be a witness, but in his

6    memorandum of interview, he said he didn't remember the press

7    releases and he thought he bought the stock on the

8    recommendation of a friend of his at the gym.

9           And the final witness was Justin Benscoter, who had

10   no specific information that led him to invest.

11          I do want to get to the question that Your Honor

12   raised as to why an investor who lost money during the fraud

13   period but before the corrective disclosure should be

14   included, and this is -- when I said there are three legal

15   issues, this is the second important legal issue.  Does an

16   individual investor lose money before the fraud is disclosed?

17          And this was the Dura case, and I cited that in

18   talking to one of the witnesses.  And I can give Your Honor

19   the cite.  It's 544 U.S. 336.  And in that case the Supreme

20   Court said that an investor does not lose money due to fraud

21   until the fraud is revealed.  And it's precisely -- they said,

22   quote, as a matter of logic, and it's precisely for the logic

23   that Your Honor raised, which is you buy something at an

24   inflated price, and it continues to be inflated.  When the

25   fraud is revealed, that's when the inflation is lost.  But

1    until that point, you bought a stock for $118, and that's what

2    you own is a stock worth $118.

3         Now, there could be fluctuations.  The stock could

4    go up during that period to 130.  You gain money.  The stock

5    could go down to a hundred, you lose money.  But you don't

6    lose as a result of the fraud until the fraud is disclosed.

7    It's only at that point that the harm is actually felt by the

8    investor.

9         And, again, the Government has no legal authority to

10   say that the investor lost money during the fraud period.  Our

11   expert said as a matter of economics the investor didn't lose.

12   The Government's expert said that the investor is harmed, that

13   they bought something at an inflated price, and if they hold

14   on to it when the fraud is disclosed, yes, they will lose in

15   the future.  They're holding an asset that could crumble.  But

16   they don't actually suffer the loss until the stock is sold.

17        And then I pointed out that the Government, in their

18   sentencing memo, 13, at least the way they described to the

19   Court what they were doing, they said that they were only

20   including investors who held shares at the time of the

21   disclosure or sold after the disclosure.  So it seemed, at

22   least as they believed they were presenting it, that it would

23   not include losses suffered during the period.

24        I think ultimately I agree with the Government that

25   there's not a lot of disagreement between the experts.  And

1    the reason is if you take out all of the -- you know, from the

2    Melley calculations, all of the fraud -- all of the loss

3    derived during the fraud period, if you take that all out,

4    your only loss -- you're left with a loss on one day, and

5    that's the date of disclosure.  And if that's all you look at,

6    then, of course, Dr. Becker and Mr. Melley are going to agree.

7    And they roughly agree, because as we said, it's roughly a

8    hundred thousand dollars on Mr. Melley's, even in his broad or

9    his narrow period.

10            Dr. O'Neal had 500,000.  The reason his is more

11   is -- actually there are two reasons.  One, he took a more

12   conservative approach, which is he looked at two days of the

13   drop and not just one.  He also did not do a buyer's only

14   method.  He was not able to do a buyer's only method, because

15   we didn't Mr. Melley's spreadsheets until after his reports.

16   But the Government's buyer's only method makes sense.  It's

17   the people who buy after the fraud are the ones who are able

18   to rely on it.

19            Had Dr. O'Neal done his calculations on a buyer's

20   only method and just with one day, he would have gotten

21   exactly the same numbers, we believe, as Mr. Melley as

22   adjusted down by taking out the people who lost during the

23   fraud period.

24            I do want to make one point about the discussion of

25   why -- so to go with the question of the person who buys at

1   118 and then the stock drops for whatever reason.  That

2   happened to a lot of people here, because the stock did drop

3   during the fraud period.  And as the Court knows, we were

4   considering calling witnesses to discuss why the stock

5   dropped, and that it was because of naked short selling.

6        But ultimately, given that there was agreement we

7   thought -- and we know there's legal support that there's no

8   basis to look at that drop during the fraud period; that

9   really the focus has to be on the date of disclosure.

10  Ultimately we did not call those witnesses, because we thought

11  that given there was no disagreement, and the Court really

12  should only be looking at the date of disclosure, ultimately

13  the question of why the stock dropped is not important.  What

14  is important is why -- is the fact that the stock did not drop

15  as a result of the fraud.

16       The way we know that the stock did not drop as a

17  result of the fraud is because even on Dr. Becker's approach,

18  which he assumes from the Government doesn't prove it, the

19  first potential corrective disclosure was on April 14th.

20       And you also know that the stock did not drop at all

21  because of the fraud because she says there is a constant

22  18 percent inflation on every single day of the relevant

23  period.  So that inflation, that's the inflation due to the

24  fraud, and that did not go down at all during the relevant

25  period.  So there may be other reasons.  We could have shown

1    it with naked short selling, but the important point is it was

2    unrelated to the fraud.

3              To close the loop on Mr. Melley, and so the Court

4    has the numbers, we said if you take out the loss during the

5    fraud period, if you look at the broad period, the loss amount

6    is $152,000.  If you look at the narrow period, it's $116,000.

7    And, of course, those rely on a finding of market-wide

8    reliance, which has not been found here.

9              Let me move to the next part of the potential loss

10   that the Government raised, which is loss to the company.  And

11   this is the third legal issue that I think is prominent in

12   this case, which is can you have loss both to the company,

13   which is essentially just shareholders, and to the

14   shareholders, and is that separate.  The Government cited one

15   case in their brief which was not on point, and we explained

16   in our brief why it was not on point.

17             There are a few points.  When thinking about loss to

18   the company --

19             GX114.  Thank you.

20             So this is the Government exhibit, and I can walk

21   through it.

22             I think it's important when we're talking about what

23   the loss to the company is, the first point is that Mr. Stein,

24   as we saw on Dr. O'Neal's graph, he owned up to 40 percent of

25   the company.  So when we're talking about what is the loss to

1    the company, he is 40 percent of the company.  So certainly

2    any numbers that the Government say were losses to the company

3    would have to be offset by 60 percent -- or at least

4    40 percent would have to be reduced, because he is the

5    company.  If he embezzled, he embezzled from himself.

6         The -- again, while I was not here for the trial,

7    I've read the trial transcript, and most of the trial

8    transcript relates to the fraud of the press releases.  So

9    because of that, the facts are -- certainly the Court has some

10   facts, but the facts are more limited than they are with

11   respect to the press releases, and we don't know quite as

12   much.

13        There were facts found by the Court on gain last

14   time.  The Court would have to find facts on -- or gain or

15   loss to the company, the Court would have to find those facts

16   now.

17        On the question of share issuances, as we explained

18   in our brief, those -- share issuances do not result in a loss

19   of the company.  They result in a loss to other investors.  So

20   if I have a public company with a million shares and I issue

21   another million shares, every current investor, their stock

22   will be diluted 50 percent, but the company won't lose

23   anything.  And that's an important point, because the question

24   then is, well, when do those investors lose?  They don't lose

25   immediately, because no one knows that the shares have been

1   issued.  They only lose when there's the next SEC filing that

2   says that there's been a loss -- or that there's been

3   additional shares issued.

4         So that's the reason in our mind why looking at

5   shares being issued would not be a basis to say that there was

6   a loss to SignaLife.  It would be a loss to other investors,

7   but then we're talking about the losses to other investors.

8         Mr. Melley, when he testified, he correctly

9   testified that he really didn't have additional information as

10  to the facts underlying these matters.  He had done some

11  document review.  But if we look at the various recipients of

12  these shares, I think there's at least some uncertainty in the

13  record that would require clarification before findings could

14  be made.

15        So, for example, Evie Muscillo for Yafa, Yafa

16  testified at trial that he was hired to raise awareness for

17  the company as a stock promotor, and he did that, and he was

18  paid in shares.  Evidently, Dr. Harmison knew about that

19  arrangement, as well.  That's not clearly loss to the company.

20        Carter testified.  Of course, he was a cooperating

21  witness.  But there was some testimony that indicated that he

22  felt that he should be paid at least some amount -- not the

23  whole amount, but at least some amount.  Findings would need

24  to be made.

25        Anand, nearly all of the payments of shares to Anand

1    were before the press releases at issue in this case and were

2    not part of the scheme.

3         The Government said earlier, well, the scheme goes

4    from 2005 to 2010.  Well, that's what was alleged; but as far

5    as what the facts were, the focus at the trial, was the press

6    releases, 2007, 2008.

7         The Luxembourg Trusts which are referenced here in

8    lines 4 and 5, there was no testimony at trial about what

9    these were, whether the shares were authorized to be issued to

10   Stein, whether Dr. Harmison was involved in it, whether shares

11   were sold.  There was just simply no information, and findings

12   cannot be made on that record.

13        And, finally, as far as money to Stein, there was

14   testimony that he did some legal work for the company, so the

15   question would be, well, how do you value that.  Findings

16   would need to be made.

17        Let's talk a minute about the alternative theory.

18   And this is where the Government ended, and I'm about to sit

19   down.  But this relates to the alternative theory of gains to

20   Mr. Stein.

21        In this case, it's our view and the Government's

22   view that a loss can be estimated; and therefore under the

23   guidelines, there's no basis to look to gain.  To the extent

24   that the Court does look to gain, we would ask the Court to

25   look to net gain.  And in our brief, the opening brief at 24

1    and our opposition brief at 12, we cited cases from the

2    Eleventh Circuit for the proposition that you do look to the

3    net gain, and the Government did not contest those cases.

4           What they do contest is, well, how far back should

5    you look.  We've -- of course, Dr. O'Neal focused on the

6    2007-2008 period, because that was the heart of the fraud for

7    which there were factual findings, and Dr. O'Neal found that

8    Mr. Stein lost $26 million during the fraud, and the reason he

9    lost is because he bought a lot of stock and he didn't dump

10   it; he held onto it.

11          In addition, the gain must be resulting from the

12   offense.

13          If we could look at GX113, if you don't mind.

14          These are very similar to the loss, but if we look

15   at all of these, the gain has to result from the offense.  And

16   for all of these for similar reasons why I just discussed,

17   these gains do not result from what was the clear offense

18   charged, ultimately proved at trial, were the lies in the

19   press releases.  These do not relate to them at all.

20          In addition to what I said earlier, the THS Blind

21   Trust shares, those issuances were actually before the first

22   press release was even issued.  We see the Anand shares again.

23   Mr. Anand also testified, or Mr. Nevdhal did, the investor --

24   the broker testified that Mr. Stein sold Anand some stock at

25   below-market prices.  We don't know how much of that 478,000

1     is for stock, for legal services or anything else.

2              I do want to spend a moment just talking about the

3     guidelines in this case, and then I will sit down.

4              There are several guidelines enhancements that we're

5     not contesting.  Obviously the base offense level is seven.

6     There's a sophisticated means enhancement that we're not

7     contesting.  That's two.  That Mr. Stein was a leader of this

8     criminal activity, that's four.  That there was a substantial

9     endangerment of the solvency or financial security of the

10    publicly traded company.  We have not contested that

11    enhancement, although I do note and hope the Court will

12    appreciate from this hearing that given the significant stock

13    drop that resulted during the fraud period before any fraud

14    was revealed, this was a company that was highly endangered to

15    begin with and that was highly insecure.  But we are not -- we

16    are not contesting the four points, but we just ask the Court

17    to consider that in light of the facts, that the four points

18    does overstate the issue in this case.

19             There was an abuse of trust, given that Mr. Stein

20    was outside counsel for SignaLife.  That's an enhancement of

21    two.  There's an obstruction -- there's obstruction of justice

22    because of the allegation which was proven at trial that

23    Mr. Stein obstructed justice.

24             The issues -- the two remaining guidelines that are

25    subject to dispute are what is the loss amount and what -- and

 1  does the offense involve more than 10 or more than 250

 2  victims.  As the Court is aware, we've presented certain

 3  numbers, the Government has presented certain numbers.

 4        As far as loss amount, the position -- the

 5  defendant's position is that the only loss that has been

 6  proven, because there's been no market-wide reliance, are the

 7  two investors that have testified, and those investors lost

 8  roughly $10,000 together.  That would be an enhancement of two

 9  for loss amount and zero for the number of victims.

10        And that would be a total guidelines of 23.

11        To the extent the Court found that Mr. Melley's

12  approach was appropriate, that would require a finding of

13  market reliance, and which we don't think is appropriate in

14  this case or that there's any factual basis.  However, if

15  there was -- if the Court did take the Melley approach, we

16  think it is appropriate, we respectfully submit it's

17  appropriate to discount his calculation by taking out all

18  people who sold before the disclosure period.  And if that's

19  done, there are essentially three different ways to calculate

20  the loss.  I'm happy to provide it to the Court.

21        One is to say that the loss was in the broad period

22  was $152,000.  That would be an enhancement of 10.  But there

23  still would only be more than 10 victims.  So that would be a

24  level of -- that would be a level 33, if I'm doing my math

25  correctly.

1              In addition, it could be determined that that loss

2      amount in the broad period should actually be divided by three

3      for the reasons Dr. O'Neal said, because there are three

4      different pieces of news, in which case the loss amount would

5      be roughly 50,000.  The offense level for the loss amount

6      would be six.

7              Finally, for Melley's narrow calculation, the loss

8      amount would be $116,000.  That would be an offense level of

9      eight on the loss, and it would -- the resulting total offense

10     level would be 31.

11             Again, to state the obvious for an abundance of

12     caution, it is the defendant's position, my position, that the

13     Government has not proven market-wide reliance.  There's no

14     basis to find it.  The Government, for reasons known to them,

15     they've relied on two witnesses.  They've done nothing more

16     than they did in the first case before the Eleventh Circuit.

17             The only loss that can be found in this case is the

18     $10,000 to Harris and Taylor, and that would be the only

19     legally supportable loss that could be found in this case.

20             Thank you, Your Honor.

21             THE COURT:  Thank you.

22             Any rebuttal?

23             MS. COTTINGHAM:  Briefly, Your Honor.

24             Your Honor, there were a number of points made that

25     I just want to -- I just want to briefly correct four of them.

1           The first is where defense counsel just ended, and I

2    think there was some discussion about the Eleventh Circuit

3    case, but the Government has proven reliance, and we have

4    proven that the fraud caused the decline in SignaLife's stock

5    price.  Dr. Becker's analysis established that the fraud

6    caused the decline in SignaLife's stock price.

7           And with respect to the cases, the civil cases, all

8    civil cases that the defendant has been citing to you in the

9    context of the Eleventh Circuit's concurrence, the Eleventh

10   Circuit, the last paragraph of the concurrence, what Judge

11   Pryor said is:  I do not mean to suggest that the Government

12   may never establish reliance by offering other types of

13   specific circumstantial evidence, perhaps expert testimony.

14          So the suggestion that somehow the Eleventh Circuit

15   directed in a concurrence, not a majority opinion, that this

16   Court had to find market-wide reliance and had to use the

17   basic presumption, Your Honor, it's not what it says on the

18   face of the opinion, and we don't think it's appropriate here.

19          With respect to the Court has heard substantial

20   evidence about the market efficiency point, and what I will

21   say is the parties disagree about that.  Dr. Becker, who is --

22   you heard her credentials, you heard her testify, and she

23   didn't just do this event study; she looked at not only what

24   SignaLife's -- what these particular disclosures did in the

25   stock market for SignaLife's -- excuse me, did to the

1    SignaLife stock price.  She also then went on to exclude a

2    number of additional factors.

3            Dr. Becker's analysis establishes that the

4    defendant's fraud, these press releases, the April disclosure,

5    the August disclosure, they caused the declines in SignaLife's

6    stock.

7            And with respect to that second part of Dr. Becker's

8    analysis, defense counsel made passing reference to these

9    other factors, naked shorts.  Of course, we didn't have the

10   opportunity to hear from those -- we didn't have the

11   opportunity, frankly, to hear any actual evidence of that.

12   The only evidence we actually heard about that was, frankly,

13   from Dr. Becker, who excluded naked shorts, some sort of

14   hidden fails to deliver conspiracy and all of these other, the

15   recession, the Uncle Mills Partners trading.  She did

16   additional testing and excluded all of those.

17           Your Honor, our position is that we've submitted

18   direct evidence both through victim testimony; there was

19   victim testimony at trial, there are victim impact statements;

20   but, more importantly, that the circumstantial evidence we

21   presented through Dr. Becker's analysis is exactly what the

22   Eleventh Circuit has asked for, and that's what we've proven

23   up today and yesterday.

24           Just finally, Your Honor, on the gain and loss

25   point, I just want to make two points, the first of which is

```
 1    we are not here to relitigate what happened at trial.  All of

 2    the evidence that was relied on at trial that led to the

 3    defendant being convicted of multiple counts of securities

 4    fraud, wire fraud, it's already in the record.  That

 5    conviction has been affirmed.  So the idea that we have to

 6    prove anew the defendant's fraud scheme is ridiculous, and

 7    it's completely unsupported by case law.  We have relied

 8    generally on those charts, and those are exhibits 113 and 114,

 9    on evidence the Court is well familiar with and on evidence

10    that the jury used as the basis for its verdict in convicting

11    the defendant.

12            And the final point I want to make there is this

13    idea of net gain.  Net gain is not appropriate here.  The only

14    cases the defendants have cited about this are cases involving

15    where there were return payments to victims.  I'm certainly

16    not aware of any such return payments in this case, and it

17    would be completely inappropriate to offset the defendant's

18    gains in any way.

19            The final point on the legal analysis is that

20    defense has repeatedly -- he asked that we -- I believe

21    Dr. Becker was questioned about the Dura case, and there's

22    been repeated reliance on it here.  But what I want to remind

23    the Court is that the final footnote of the Eleventh Circuit's

24    opinion says, Mr. Stein also, of course, urged the Eleventh

25    Circuit to follow the lead and to actually apply Dura.  And
```

1    what the Eleventh Circuit said is, we decline his invitation,

2    because we believe our reasonable foreseeability test strikes

3    the right balance for calculating actual loss under the

4    Sentencing Guidelines.

5            It's already asked the court of appeals to apply the

6    civil standard.  They've rejected that.  We have provided the

7    evidence that was asked for by the Eleventh Circuit to support

8    these loss figures, and yet again the defense is asking again

9    for this Court to go to a civil standard that's already been

10   rejected and that isn't appropriate here.  Thank you.

11           THE COURT:  Thank you.

12           MR. GRUENSTEIN:  Can I just briefly, Your Honor?

13           THE COURT:  Yes.

14           MR. GRUENSTEIN:  Does Your Honor intend to tell us

15   what the guidelines calculation would be and then hear

16   argument on 3553, or should I finish the argument here?

17           THE COURT:  Well, I've got a lot of material to

18   digest.

19           MR. GRUENSTEIN:  Okay.

20           THE COURT:  And I don't think I'm going to be

21   prepared today to make that decision.

22           MR. GRUENSTEIN:  Okay.  I just really wanted to make

23   one final point to the extent you make the guidelines

24   calculation.

25           What is clear is that the offense level, the loss

```
 1   amount has come down significantly.  One thing I didn't
 2   address was what the Government said was, okay, yes, even if
 3   you get it all the way down to $500,000, or whatever it is,
 4   the final guidelines would still include 17 years.  We think
 5   that that would be remarkably unfair.  If the loss amount does
 6   come down from 13 million to wherever it is, even if it does
 7   result in a higher guidelines, we would ask the Court to
 8   consider the fairness of essentially reducing the loss by over
 9   90 percent but keeping the same sentence.  This is a very
10   different case if that is true.
11           THE COURT:  Well, I think what makes sense is --
12   again, I want to think about this, so I note we've got people
13   from out of town, and I feel bad about that, and I don't -- I
14   hate to have to bring people back from out of town, but I
15   don't feel comfortable just ruling today without going back,
16   after having heard the testimony and the argument, reviewing
17   the reports and going back and looking at some of the
18   testimony to get my thoughts aligned.
19           So what I think makes the most sense is for me to
20   bring you back.  I will hopefully, before you come back, tell
21   you what my guideline conclusions are, and then you can argue
22   3553 factors from there once you know what my guideline
23   calculations are going to be.  Is that a problem for anyone?
24           MS. COTTINGHAM:  No, Your Honor.  We would just ask,
25   we do have a victim who's traveled here.  Can she allocute
```

```
 1   today?

 2            THE COURT:  Absolutely.

 3            I mean, if anyone who's here now and wants to talk

 4   to me, I'd be happy to listen to so they don't have to come

 5   back.

 6            MS. COTTINGHAM:  Thank you, Your Honor.

 7            THE COURT:  But I don't think I'm ready to make a

 8   ruling on the guidelines today.

 9            MS. COTTINGHAM:  Okay.

10            THE COURT:  All right.  So Ms. Carpenter, was it?

11            Good afternoon.  Right there, ma'am.

12            THE WITNESS:  Good afternoon, Your Honor.

13            THE COURT:  Your name for the record, please.

14            THE WITNESS:  My name is Jamie Carpenter.

15            THE COURT:  And is it J-a-m-i-e?

16            THE WITNESS:  Yes.

17            THE COURT:  Yes, ma'am?

18            THE WITNESS:  As you have heard, I was originally

19   subpoenaed here as a witness, and circumstances changed, so I

20   was not called.

21            The reason I felt it important to address the Court

22   in addition to my rights as a victim, my two brothers were

23   impacted by this as well as I, and just barely sent an impact

24   statement yesterday with their information.

25            In 2007, I read Taipan financial journal.  It's a
```

1    subscription-based journal that tells you what would be good

2    investments to make, and it was touting SignaLife.  I had

3    never traded before.  I pulled all my retirement account out

4    of my 401k.  I had worked for 12 years for the City.  I

5    decided I was going to learn how to do my own investing.  I

6    read two different books that taught me how to do investing.

7            Your Honor, I discovered SignaLife.  I went and I

8    read the SEC filings.  I decided that its debt-to-income ratio

9    looked good.  I personally have a grandmother who has been in

10   a wheelchair for 15 years and had a heart problem.  I believed

11   that this technology was amazing.  It was going to change the

12   way that heart conditions could be discovered.

13           Your Honor, two years later, there's not even a

14   product that this guy has made.  I mean, everything he said,

15   everything he concocted was a complete lie.  Not only the

16   Fidelity 100, the Fidelity 200, the Fidelity, all of the

17   products, all of the contracts that they had made with

18   companies all over the world.

19           And I'm sorry I'm upset, but I can't imagine that --

20   and I hope today that Mr. Stein can hear me and let him know

21   that I'm willing to forgive him for what he did, and I hope

22   that when he spends time that he does think about what he has

23   done.  There are people who read that information and there

24   are people who rely on it and make decisions about it.

25           And this is not a game.  This is not a game.  And

1   since 2008, after the web broadcast -- and, yes, I did believe

2   it was not bad information -- I continued to purchase 20,000

3   additional shares.  My brothers still hold the shares that

4   they purchased.  One of my brothers lost $8000, the other one

5   lost around $4000.  My losses were around $27,000.  And, you

6   know, that's just economic losses.

7            I haven't traded in the stock market since the stock

8   did -- after the stock did a reverse split, I was notified

9   that there was a class action.  That's the first time I

10  realized this was a complete fraud.  I was served with a class

11  action.  And I had actually quit my job and enrolled in law

12  school.  It was my first year.  My professor had worked for a

13  company in California doing class actions, and in civil

14  procedure we learned about class actions.  And he read that

15  complete with me and believed this is a situation where we can

16  opt out of the class.

17           There's two situations you can opt out of a class

18  action.  That's where the plaintiffs will not represent the

19  class adequately or your losses are different in kind than the

20  losses that you believe have been represented by the rest of

21  the class.

22           Your Honor, the lead plaintiffs are institutional

23  investors.  This is the second time that Mr. Stein has had a

24  company where he has done this.  The first one was e-MedSoft.

25  And I did, I took my professor's advice and I opted out of the

```
 1    class action and filed my own lawsuit for fraud in South

 2    Carolina.  And I filed causes of action for -- five different

 3    causes of action.  I did not recover near the losses.

 4            In my action, I sued for $127,000.  That was for

 5    punitive damages, which I believe were appropriate.  Your

 6    Honor, I have not invested since I learned of the class action

 7    in any stock, because frankly I'm terrified of the falsity

 8    that these reports -- you know, in the SEC filings.

 9            In 2007, my law professor, in contracts, came into

10    class and said, folks, today -- I'm sorry.  It would be August

11    of 2008 is when my first semester of law school started.  He

12    said, folks, today the stock market is a place where you could

13    buy a cup of Starbucks coffee for the same price that you

14    could buy a share of Starbucks.  If any of you had any common

15    sense, you would invest in the stock market today.

16            Starbucks is trading at $51 a share.  I looked

17    yesterday just to see what it was at.  If I would have had my

18    money invested, I wouldn't have lost my trust in the stock

19    market.  I could have made over three to $400,000 on the

20    amount of money that I had.

21            I'm disappointed to hear that this Court has not

22    included me personally or my brothers as victims, because the

23    loss cannot even be attributed to what this man is directly

24    responsible for and the lies that he fabricated.

25            Yes, I had a lot of trading in my account.  The
```

```
 1   books that I read show that you trade by having a base amount
 2   in the account, and if there's a certain percentage of loss,
 3   you have a stop loss.  And that's triggered and automatically
 4   sells your stock.  And then when you have a certain percent
 5   increase, there's an automatic sell, and half of your stock
 6   investment sells.  Those are automatic trades, t.hose are not
 7   day trading.  Those are not gambling.  That's what those books
 8   investment teaches you how to invest wisely when you have a
 9   company.
10           I probably traded 417,000 shares in a period of 2007
11   to 2009, and that's because of the trading platform's stop
12   losses and sells when there's certain amount of gains.
13           And Mr. Stein owned -- not only did he own the
14   majority of the company in shares through blind trusts and AMC
15   Financial that his wife was a part of, he controlled the stock
16   movement.  He controlled the ups; he controlled the downs.
17   It's called hedging.  I didn't learn about that until probably
18   the second year I was investing.
19           How is this possible?  How is this possible that the
20   stock dropped, all this -- 30 percent when there was good
21   news?  What's going on?  If a certain person owns a certain
22   amount of shares in a company, they can cause that stock to
23   drop by triggering a loss, and they know that there's stop
24   losses that will trigger other people's shares to sell.  That
25   means the amount of gain that they get on a put option or a
```

 1   sell is greater than the amount that they've —- that they're

 2   holding, that they lose on.  So it's called hedging.  I never

 3   got into it, but, Your Honor, when I read about stocks that I

 4   invested in, the SEC filings, they tell you when there's an

 5   insider that owns shares, that buy shares or that sell shares.

 6   And you watch that, because if that person is buying shares,

 7   you know that that's an insider and he probably has good

 8   information.  There's a reason he's buying into that company.

 9   If he's selling shares, you probably want to take a closer

10   look at that and wonder why is that insider selling shares.

11         Mr. Stein owned pretty much the entire majority of

12   shares in the company, or his wife or through his trusts.  He

13   didn't disclose not one time to me or other investors that he

14   owned all of those shares.  He was buying shares; he was

15   selling shares.  He was selling shares to people or paying

16   compensation to people through the sale of shares.  He did not

17   disclose any of that, let alone all of the reports in the SEC

18   telling us that they had contracts around the world, five

19   different products that they were producing.

20         Dr. Harmison's patent, which I actually looked into

21   and thought this is amazing, it's a patent, it's gonna do

22   well, this company is going to be successful.

23         Your Honor, I would ask that today that if you can,

24   if you have the ability to make sure that my two brothers and

25   my victim statement is accepted by the Court or by Mr. Clark

```
 1    and just considered.  I was told that if there was
 2    restitution, it would be very unlikely that there would be
 3    enough collected that victims would be compensated.  So I feel
 4    like that's unfortunate, considering Mr. Stein has a house
 5    that I read was 48,000 square foot in California.  This man
 6    has millions of dollars.
 7             I also read in the paper he was involved in a
 8    mortgage fraud in 2014, so I think he's going to have a lot of
 9    time to think about what he did.  And I would greatly
10    appreciate if Mr. Stein ever feels the need to write me and my
11    brothers an apology, let alone all the people at work that I
12    convinced to purchase.  It's not just a couple of people,
13    victims that are not included in those results.  There are
14    hundreds of shareholders like me, and I've just named three of
15    them that I personally know.
16             THE COURT:  Thank you, ma'am.
17             Anyone else that's here that needs to speak to me
18    before -- that won't be back next time?
19             MS. COTTINGHAM:  Not that I'm aware of, Your Honor.
20             THE COURT:  Okay.
21             MR. GRUENSTEIN:  Your Honor, just with respect to
22    the forfeiture issue, we're comfortable submitting on the
23    papers.
24             THE COURT:  Yes.
25             MR. GRUENSTEIN:  And I know Mr. Klugh wanted to
```

1     address the other pending motions.

2          MR. KLUGH:  Your Honor, I don't know -- make two

3     motions briefly.  The two motions that -- I guess really three

4     motions, but it -- that are pending haven't been ruled on yet,

5     and I didn't know whether the Court wanted to hear any

6     argument on them or -- we feel that the Court probably should

7     rule on them before -- at least before imposing sentence, that

8     that would be appropriate.

9          One of them is a Brady motion, and that relates

10    mostly to the trading data and specific inquiries we've asked

11    the Government to make with regard to very voluminous records

12    that they have on trading data.  The Government's response is

13    that we had some kind of equivalent access to it is just not

14    supported.  We don't think that their response really, even if

15    there were a technical argument where you could balance it out

16    and say maybe they're right or maybe we're right on the

17    technical argument, it doesn't seem to us to make sense why

18    they shouldn't go ahead and produce the Brady material.

19         THE COURT:  Why are we talking about Brady material

20    at this point?

21         MR. KLUGH:  Just because before the sentence

22    concludes, again, we're talking about investor information

23    with regard to Brady, and it may affect -- certainly may

24    affect the 3553 factors substantially.  And simply a matter

25    of -- just for record purposes alone, it might be good if the

 1    Court were to resolve it before.

 2            THE COURT:  Well, I understand that I should resolve

 3    these matters, but I'm trying to understand why are Brady

 4    issues being raised on a resentencing status of the case?

 5            MR. KLUGH:  Well, as everyone reminds me every time

 6    I talk about the issue, Brady itself was a sentencing case.

 7    That's what -- I've been getting a barrage of that from

 8    everybody that talks to me.  So it is important in that

 9    regard.

10            And these decisions -- and it can happen both ways

11    in terms of explaining why an investor feels one way about it,

12    and then we find the investor came in this way and saw things

13    this way, or why an investor -- why the Government sees an

14    investor as having relied on something, and we can see from

15    the data that that's not the case.

16            Again, there were four witnesses that the Government

17    was going to call as of two days ago that weren't called.  And

18    that's sort of Brady information.  We don't know why they

19    weren't called exactly.  Again, obviously, for example, the

20    last witness didn't testify as a witness, we didn't have any

21    Brady material there.  That's -- I don't want to focus there.

22            I'm just talking in general, it was a reasonable

23    Brady request.  The Government was saying if you put 20 times

24    the resources that we would have to put into it, you might be

25    able to find the same thing.  We're saying that doesn't make

```
1    any sense.  You have the material.  You have the databases, so
2    you can just plug the queries in and get the answer.
3              THE COURT:  But are you suggesting that there was
4    material that wasn't disclosed that would have exculpated
5    Mr. Stein and wasn't produced and you're wanting them to
6    produce it now?  I'm trying to understand how it relates to
7    the -- as I understand Brady, it relates to information that
8    would be exculpatory that should have been disclosed to you.
9    So how does -- are you saying you're trying to get information
10   to file a motion for new trial if it would show that it should
11   have been disclosed previously and wasn't?
12             MR. KLUGH:  This particular demand, to the extent
13   we've raised it right now, would be in the mitigational part
14   of Brady only, the mitigational part of Brady, to show
15   information about the investors.  In other words, to the
16   extent that there's an image, particular image -- the
17   Government, for example, is still proceeding on, as I
18   understand it, on some theory of market reliance on certain
19   information.  And, again, some of these simple database
20   inquiries that we've asked for would relate to those things
21   and would serve a mitigation purpose.
22             THE COURT:  So you think that there may be
23   information that the Government has in its possession that
24   shows that the investors did not rely upon the fraudulent
25   information, and you want to use that for sentencing purposes?
```

```
1              MR. KLUGH:  Yes, Your Honor.  The document that I --
2    I actually filed it myself, is 510 in the file.  And the
3    records that we've sought is we've asked that search the files
4    in their possession for information regarding these
5    particular -- the trades and trading data.  And it's -- we
6    don't see it as a burdensome request.  We don't think the
7    Government has said that -- has established either legally or
8    factually that it's so burdensome that they couldn't provide
9    it to us.  And we feel there has been, at least on the record
10   that we related in the motion and certainly at sentencing,
11   enough of a basis to show that it is likely to have
12   mitigational impact.
13              THE COURT:  Okay.
14              MR. KLUGH:  And the other motion, Your Honor, or the
15   set of motions has to do with the motion to dismiss.  This
16   relates to -- I think this is particularly appropriate today,
17   since -- is the -- because the Government in their sentencing
18   argument for example today referred to, again, three
19   fraudulent press releases.  So this is not something that's
20   gone away.  The Government is persisting on the
21   September 20th, 2007, as a fraudulent press release.
22              The Eleventh Circuit found that the Government
23   presented perjured testimony to obtain a jury finding in any
24   way relating to this September 20th, 2007, event.  The
25   Government -- the court of appeals did not reverse, and
```

1    there's a circuit conflict on it.  We took certiorari, and

2    these are -- documents are available online in Westlaw.  The

3    circuit conflict remains.  One of the reasons why we believe

4    cert was not granted was because the case is not final.

5           Since that time, we have supplemented the motion to

6    dismiss on that point with the new discovery that it goes

7    beyond just having known that the testimony was perjured, that

8    there were some additional facts that the Government knew that

9    we didn't have any ability to find out, which were that the

10   representations made by the Government to the Court with

11   regard to the person who actually puts this -- makes this

12   purchase order, who confirmed it in an affidavit filed in a

13   supplement that we -- the docket at -- it's document 530.  The

14   individual who signed the check, made the purchase order, so

15   they're not -- at a minimum, given that part of the record,

16   and particularly without resolution of that motion, I just

17   don't think the Government can use the number 3 with regard to

18   fraudulent press releases anymore, even from a relying --

19   giving the greatest possible reliance on the jury verdict.

20          But more than that, the point we made in our reply

21   on that motion, again, is that what we discovered with the new

22   evidence with the affidavit that's filed is with the

23   explanation that the Court received from the Government at

24   trial with regard to why the Court could rely on the document

25   at all relating to a fraudulent purchase -- fraudulent

```
 1   document supporting a purchase order, and that undercut our
 2   ability to show that there was confirmation of this purchase
 3   order.  Multiple witnesses then present false testimony about
 4   it.  That the witness who actually signed the check said, no,
 5   the representation made by the Government regarding a
 6   conversation that I represented X or Y, that never happened at
 7   all.  It's not just that I didn't -- they were confused about
 8   what I said or I didn't say that.  Say, no, they never called
 9   me.
10           And what we said in our reply, we thought was
11   important, is having made this -- having gone out on a limb,
12   wasn't something I personally I do and I don't think many
13   lawyers like to do is go out and attack other lawyers,
14   although it's done, the lawyer involved, the AUSA or DOJ
15   lawyer involved filed nothing in response.  Didn't deny it.
16           And that, again, really creates an important cloud
17   on that matter.  And certainly as the Government continues to
18   rely on that press release in this proceeding, we think that's
19   a fundamental issue that should be addressed by the court, and
20   we requested a hearing on that, as well.
21           Those are the two matters or three matters.  Thank
22   you.
23           THE COURT:  All right.  Thank you.
24           Who wants to respond?
25           MS. COTTINGHAM:  I will, Your Honor.
```

```
1              Your Honor, I'll take up the second.  I think it's a

2    category of motions.  I think there's three or four pending on

3    this motion.

4              The most recent motion about Mr. Tribou contains

5    some ridiculous and false accusations about Mr. Stiglitz, who,

6    as you know was trial counsel.  As we very clearly stated in

7    our reply, the Government of course disputes those

8    allegations, disputes the account of what happened.

9              But I think the most important thing about our

10   response there, Your Honor, is these are the same arguments

11   the Court has heard, the same arguments the Eleventh Circuit

12   has heard.  They have been rejected up and down.  There's no

13   merit whatsoever to this motion.  Nothing in it is material.

14   And as we set out clearly in our papers, it's time barred.

15             So if the Court has any questions, we're happy to

16   answer them, but we'd also submit on the papers on that.

17             And I don't -- I will say on the first issue on the

18   Brady question, I frankly don't entirely understand the

19   request that's being made, but I believe that it's more than

20   anything an attempt to relitigate the attempt to get at the

21   SEC's files, which, again, is something this Court has

22   rejected roundly.  It's been affirmed by the Eleventh Circuit

23   on that.

24             The defense has all of the trading data.  They have

25   interview memoranda that we have produced describing
```

1    conversations with victim witnesses.  They have victim impact

2    statements.  You've heard excerpts from all of those today.

3    Those witness interviews have been pushed into evidence.

4           So I think Mr. Klugh just said something to the

5    effect that he wants -- he believes there's information that

6    is Brady about why the Government chose not to call certain

7    witnesses at sentencing.  And I guess first and foremost, I

8    would say that's not why a prosecutor may have elected to call

9    or not call a witness.  That decision, that strategy call, is

10   certainly not Brady information.  But, moreover, the

11   Government has fully complied with all of its discovery

12   obligations here.

13          As this Court's already found, the SEC is an

14   entirely separate entity for purposes of discovery in this

15   case.

16          So unless the Court has any questions.

17          THE COURT:  I wasn't prepared to deal with these

18   motions today, and I understand Mr. Klugh wants me to deal

19   with them before I complete the sentencing.

20          So I will look at them in conjunction with doing my

21   guideline decisions, and then I'll decide whether -- I'll

22   either rule on them or decide to have further argument on

23   them.

24          MS. COTTINGHAM:  Thank you, Your Honor.

25          MR. KLUGH:  Twenty-five seconds for a quick point?

```
 1              THE COURT:  Yes, sir.
 2              MR. KLUGH:  First, certainly the Tribou motion,
 3    T-r-i-b-o-u, Thomas Tribou motion, the supplement clearly has
 4    not been decided by the Eleventh Circuit.  It was not even
 5    filed until several -- a few months ago.  Neither has the
 6    Brady motion at this point been decided, and there have been a
 7    substantial new record.
 8              Secondly, just in general, the allegations, to our
 9    knowledge, are not false.  The allegations are sworn by
10    somebody who is a substantial person, somebody who's got a lot
11    to lose by knowingly filing an affidavit in federal court.
12    He's not --
13              And, secondly, more importantly, they have not been
14    rebutted by any other affidavit.  And that is very important.
15              Finally, jurisdiction exists on both motions.  The
16    Court has complete jurisdiction over this case under Eleventh
17    Circuit precedent with regard to these matters, which are
18    particularly matters that have arisen since the sentencing.
19              The Court has jurisdiction over dismissal and
20    certainly has jurisdiction over discovery, and even if they
21    were not Brady, they would at least fall under Rule 16.
22              Thank you, Your Honor.
23              THE COURT:  As I said, I wasn't prepared to address
24    those today or yesterday.  So I will look at them, and I'll
25    either rule on them before we get back together, or I'll ask
```

```
 1   for argument on them.

 2           So what are your schedules like in the next couple

 3   weeks?  Are you able to tell me, or should I have my courtroom

 4   deputy contact you, and maybe between now and next week you

 5   can look at your schedules and tell me what your availability

 6   is in the next few weeks?  Would that make more sense to give

 7   you a chance to go back and look at your calendars?

 8           MR. GRUENSTEIN:  Yeah, that would work for us.

 9           MS. COTTINGHAM:  Yes, Your Honor, that would work.

10           THE COURT:  All right.  So why don't I have my

11   courtroom deputy contact you next week, and you can give me

12   your availability over the next couple weeks, and hopefully

13   we'll be able to make some final decisions at that point.

14           Of course, now I have new -- I have not only the

15   guideline issues to deal with, now I have all these other

16   issues I have to deal with.  So I'm not sure how long that's

17   going to take me to delve into.  I may have to put this off

18   further until I deal with these other matters.

19           But let me get your availability, and we'll go from

20   there.  All right?

21           MS. COTTINGHAM:  Your Honor, one other final

22   housekeeping matter.  The Court I believe reserved on

23   admitting Government's 122 yesterday.

24           THE COURT:  Oh, yes.

25           MS. COTTINGHAM:  This morning we provided defense
```

 1    with underlying -- the underlying trading data, and we'd move

 2    to admit it at this time.

 3              THE COURT:  Any objection to the chart?

 4              MR. GRUENSTEIN:  That's both the chart and the

 5    underlying data I understand you're going to put in?

 6              MS. COTTINGHAM:  Yes.  And we will also put in the

 7    underlying data, yes.

 8              MR. GRUENSTEIN:  We don't object.

 9              THE COURT:  All right.  I'll admit that without

10    action.

11        (Government's Exhibit No. 118 entered into evidence.)

12              MS. COTTINGHAM:  Thank you, Your Honor.

13              THE COURT:  Was there something else?

14              MR. GRUENSTEIN:  No, Your Honor.  Thank you.

15              THE COURT:  No?

16              All right.  Thank you all for your presentations.

17    They were very enlightening.  And we'll see you hopefully in

18    the next couple weeks.

19              Thank you all.

20              MR. GRUENSTEIN:  Thanks, Judge.

21              MS. COTTINGHAM:  Your Honor, I apologize.  There was

22    one final housekeeping matter I forgot to raise, which is just

23    that there are some victim impact statements and also exhibits

24    that contain that personal sensitive information and true PII.

25    So would it be okay if we filed the exhibits containing that

```
 1   information under seal?

 2           THE COURT:  Can you redact the information?  I

 3   prefer if you could -- if it's not going to be too burdensome,

 4   to redact the personal information rather than putting things

 5   under seal.  If it's going to be too much, then I'll

 6   reconsider.  But is it something you can redact?

 7           MS. COTTINGHAM:  We should be able to redact it,

 8   Your Honor.

 9           THE COURT:  You can submit the complete document to

10   me in camera, and -- but file the redacted portion.  All

11   right?

12           MS. COTTINGHAM:  Okay.  Thank you, Your Honor.

13           THE COURT:  All right.

14           MR. GRUENSTEIN:  Thank you.

15       (Proceedings concluded.)

16                       *  *  *  *  *

17

18

19

20

21

22

23

24

25
```

```
 1                    *  *  *  *  *

 2                    I N D E X

 3   Testimony of Edward Shannon O'Neal (Resumed)

 4        Direct by Mr. Gruenstein (Cont.'d)          2

 5        Cross by Ms. Pascucci                       17

 6        Redirect by Mr. Gruenstein                  34

 7        Examination by The Court                    40

 8   Argument by Ms. Cottingham                       55

 9   Argument by Mr. Gruenstein                       74

10   Rebuttal Argument by Ms. Cottingham              98

11   Surrebuttal by Mr. Gruenstein                    102

12   Brady Motion and Motion to Dismiss by Mr. Klugh  111

13                    *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            * * * * *

 2                         E X H I B I T S

 3   Government's Exhibits Received in Evidence:

 4        Exhibit No. 206                           20

 5        Exhibit 200                               30

 6        Exhibit 122                              118

 7   Defendant's Exhibits Received in Evidence:

 8        Exhibit 75                                 8

 9        Exhibit 74                                10

10                            * * * * *

11                         CERTIFICATE

12        I, Stephen W. Franklin, Registered Merit Reporter, and

13   Certified Realtime Reporter, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16        Dated this 30th day of JULY, 2018.

17

18        /s/Stephen W. Franklin
          _____
19        Stephen W. Franklin, RMR, CRR

20

21

22

23

24

25
```

**BY MR. GRUENSTEIN: [6]** 3/10 8/25 10/5 14/16 34/10 35/5

**BY MS. PASCUCCI: [8]** 17/1 17/11 18/18 20/7 25/19 29/19 30/6 31/11

**BY THE COURT: [1]** 40/2

**MR. GRUENSTEIN: [44]** 3/3 8/20 10/1 14/15 16/22 20/1 30/3 34/7 35/3 39/20 39/24 46/23 47/8 47/20 48/1 48/5 48/19 49/8 50/21 52/12 53/11 53/14 53/16 54/1 54/11 54/19 74/19 76/14 78/9 78/18 80/23 81/2 102/11 102/13 102/18 102/21 110/20 110/24 120/7 121/3 121/7 121/13 121/19 122/13

**MR. HARRIS: [4]** 50/24 51/10 51/19 51/25

**MR. KLUGH: [8]** 111/1 111/20 112/4 113/11 113/25 114/13 118/24 119/1

**MS. COTTINGHAM: [50]** 47/13 48/15 48/25 49/13 50/12 50/15 52/2 52/22 53/5 53/22 54/9 54/20 55/1 56/2 56/5 56/7 64/3 64/7 64/24 65/2 65/19 66/5 66/25 67/2 67/6 67/25 68/5 68/18 68/20 72/22 73/7 73/18 73/22 74/14 74/17 98/22 103/23 104/5 104/8 110/18 116/24 118/23 120/8 120/20 120/24 121/5 121/11 121/20 122/6 122/11

**MS. PASCUCCI: [18]** 8/22 10/2 17/9 18/9 18/13 18/15 19/23 20/4 25/18 29/8 29/11 29/15 29/17 30/1 31/8 34/6 39/25 46/24

**THE COURT: [113]** 3/1 3/5 8/21 8/23 10/3 16/23 18/12 18/14 18/17 19/25 20/2 20/6 29/9 29/13 29/16 29/18 30/4 31/9 34/8 39/22 46/21 46/25 47/2 47/6 47/12 47/19 47/21 48/3 48/16 48/21 49/7 49/10 50/11 50/13 50/19 50/23 51/7 51/15 51/23 52/1 52/9 52/18 52/23 53/8 53/13 53/15 53/24 54/2 54/5 54/10 54/18 54/25 56/1 56/3 56/6 64/2 64/6

64/17 64/25 65/16 66/2 66/20 67/1 67/3 67/22 68/3 68/15 68/19 72/19 73/5 73/8 73/21 74/11 74/16 74/18 76/12 78/3 78/15 80/19 81/1 98/20 102/10 102/12 102/16 102/19 103/10 104/1 104/6 104/9 104/12 104/14 104/16 110/15 110/19 110/23 111/18 112/1 113/2 113/21 114/12 116/22 118/16 118/25 119/22 120/9 120/23 121/2 121/8 121/12 121/14 122/1 122/8 122/12

**THE WITNESS: [8]** 3/7 29/14 31/10 47/1 104/11 104/13 104/15 104/17

## $

**$.01 [1]** 41/16
**$.14 [1]** 41/14
**$.5 [2]** 62/25 63/5
**$.5 million [2]** 62/25 63/5
**$10,000 [3]** 14/12 97/8 98/18
**$114,000 [1]** 69/18
**$116,000 [2]** 91/6 98/8
**$116,859 [1]** 9/12
**$118 [7]** 66/22 66/24 73/10 73/24 75/2 88/1 88/2
**$127,000 [1]** 107/4
**$13 [1]** 76/18
**$13 million [1]** 76/18
**$13.2 [1]** 75/24
**$13.2 million [1]** 75/24
**$14 [1]** 69/24
**$14 million [1]** 69/24
**$140,000 [2]** 69/4 69/6
**$152,000 [2]** 91/6 97/22
**$152,237 [1]** 10/15
**$18 [4]** 67/5 67/8 67/11 67/18
**$2 [8]** 57/1 60/12 69/25 72/24 73/1 75/25 76/19 79/13
**$2 million [8]** 57/1 60/12 69/25 72/24 73/1 75/25 76/19 79/13
**$2,026,000 [1]** 55/20
**$2,027,890.17 [1]** 5/11
**$2200 [1]** 84/21
**$26 [3]** 71/16 72/9 95/8
**$26 million [3]** 71/16 72/9 95/8
**$26.3 [2]** 14/23 16/15
**$26.3 million [2]** 14/23 16/15
**$27,000 [1]** 106/5
**$4 [2]** 81/13 81/14
**$4 billion [2]** 81/13

81/14
**$400,000 [1]** 107/19
**$4000 [1]** 106/5
**$5.3 [1]** 70/25
**$5.3 million [1]** 70/25
**$5.37 [1]** 57/16
**$5.37 million [1]** 57/16
**$500,000 [2]** 63/1 103/3
**$51 [1]** 107/16
**$59 [1]** 74/1
**$6 [1]** 73/2
**$6 million [1]** 73/2
**$6.691 [1]** 55/15
**$6.691 million [1]** 55/15
**$600,000 [1]** 84/17
**$64,000 [1]** 50/2
**$640,000 [1]** 69/17
**$7600 [2]** 14/9 84/20
**$8000 [2]** 84/15 106/4
**$9 [4]** 74/2 74/2 74/10 74/10

## '

**'til [1]** 53/15

## -

**-and [4]** 2/5 2/12 2/15 2/18
**-v [1]** 1/5

## /

**/s/Stephen [1]** 124/18

## 1

**1.3 [1]** 79/13
**1.5 [1]** 71/17
**1.5 million [1]** 85/17
**1.58 million [3]** 24/25 25/6 27/20
**1.9 million [1]** 26/10
**10 [7]** 29/25 37/24 47/4 97/1 97/22 97/23 124/9
**10 percent [1]** 24/1
**10-cent [1]** 70/9
**10-K [2]** 71/25 72/5
**10-Ks [1]** 72/1
**10-Q [31]** 3/20 4/16 5/13 6/9 9/22 10/14 10/24 11/3 11/5 12/21 24/15 24/17 24/20 25/2 25/17 25/21 26/3 38/17 39/14 39/14 42/11 45/10 45/19 45/19 62/4 62/8 62/9 62/10 62/19 62/20 62/23
**10-Qs [2]** 15/19 45/3
**100 [1]** 105/16
**10019 [2]** 2/12 2/15
**102 [2]** 55/19 123/11
**103 [2]** 69/4 83/9
**10:11 [1]** 47/5
**10:43 [1]** 47/5
**10:53 [1]** 54/4
**11 [1]** 24/20
**11-80205-CR-KAM [1]** 1/2
**1100 [1]** 2/17
**111 [1]** 123/12

**113 [1]** 101/8
**114 [2]** 55/15 101/8
**118 [4]** 73/23 90/1 121/11 124/6
**11th [4]** 21/20 21/25 40/9 40/12
**12 [3]** 29/25 95/1 105/4
**12 percent [1]** 63/12 63/19 64/1
**121 [2]** 55/22 57/17
**122 [2]** 120/23 124/6
**12:30 [2]** 53/21 54/1
**12:32 [1]** 54/4
**13 [1]** 88/18
**13 million [1]** 103/6
**130 [1]** 88/4
**134 [1]** 81/6
**14 [1]** 43/3
**1400 [2]** 2/4 2/8
**141 [1]** 1/10
**14th [8]** 7/5 9/6 12/2 23/4 40/10 40/12 87/1 90/19
**15 [2]** 25/17 105/10
**15,220 [1]** 10/12
**15,223,705 [1]** 10/12
**15th [6]** 4/12 4/16 5/13 12/3 38/17 70/8
**16 [2]** 25/17 119/21
**168,500 [2]** 12/15 13/3
**17 [3]** 9/11 103/4 123/5
**17,000 [1]** 69/9
**17-cent [1]** 9/9
**18 [1]** 67/9
**18 percent [17]** 23/21 23/25 24/3 24/6 63/11 64/11 64/13 66/3 66/22 66/23 67/12 67/18 67/9 68/12 73/11 73/14 90/22

## 2

**2 million [1]** 10/17
**2,027,000 [1]** 5/16
**20 [6]** 1/8 24/13 37/24 52/8 112/23 124/4
**20,000 [1]** 106/2
**200 [6]** 29/7 29/10 30/3 30/6 105/16 124/5
**2000 [1]** 77/3
**2005 [3]** 33/17 33/19 94/4
**2006 [1]** 28/23
**2007 [12]** 5/12 15/16 33/9 34/3 61/4 66/15 94/6 104/25 107/9 108/10 114/21 114/24
**2007-2008 [1]** 95/6
**2008 [13]** 4/16 5/13 15/17 21/20 49/19 61/16 63/9 70/8 72/4 94/6 95/6 106/1 107/11
**2009 [1]** 108/11
**2010 [2]** 30/23 94/4
**2014 [1]** 110/8
**2015 [1]** 36/25
**2017 [1]** 38/22

**2018 [3]** 1/8 37/3 124/16
**204-month [1]** 57/23
**205 [1]** 31/7
**20530 [2]** 2/5 2/9
**206 [6]** 18/9 19/25 20/4 34/13 35/3 124/4
**207 [3]** 29/15 29/16 34/13
**208 [1]** 29/13
**20th [4]** 5/12 11/14 114/21 114/24
**21 million [1]** 72/5
**210 [4]** 49/16 49/18 50/3 50/12
**212 [3]** 49/17 50/12 50/14
**224 [1]** 81/6
**2246 [1]** 13/8
**23 [1]** 97/10
**2398 [1]** 81/6
**24 [1]** 94/25
**2415 [1]** 77/3
**25 [1]** 2/16
**250 [1]** 97/1
**25th [1]** 11/15
**26.3 million [1]** 16/22
**2nd [1]** 2/16

## 3

**3.3 million [1]** 26/10
**30 [1]** 124/5
**30 percent [4]** 24/13 40/19 42/4 108/20
**30th [1]** 124/16
**31 [1]** 98/10
**33 [1]** 97/24
**33131 [1]** 2/17
**33155 [1]** 2/19
**33401 [1]** 1/19
**336 [1]** 87/19
**34 [3]** 18/23 19/4 123/6
**3553 [3]** 102/16 103/22 111/24
**36 percent [1]** 15/23
**3768 [1]** 1/18
**39th [1]** 2/19

## 4

**40 [1]** 123/7
**40 percent [4]** 15/23 91/24 92/1 92/4
**401k [1]** 105/4
**417,000 [1]** 108/10
**478,000 [1]** 95/25
**48,000 [1]** 110/5
**485 [1]** 81/5

## 5

**5 million [4]** 55/22 26/8 26/15 26/16
**50 percent [1]** 92/22
**50,000 [1]** 98/5
**500,000 [1]** 89/10
**510 [1]** 114/2
**514-3768 [1]** 1/18
**525,000 [1]** 3/14
**530 [1]** 115/13

**5**

**533 [1]** 5/5
**544 [1]** 87/19
**55 [1]** 123/8
**561 [1]** 1/18
**564,000 [1]** 26/11
**570,000 [3]** 14/3 14/6
14/8

**6**

**60 percent [1]** 92/3
**63 [1]** 71/12
**6431 [1]** 2/19
**67 [1]** 13/8
**68 [3]** 17/8 21/18 33/1
**687 [1]** 9/11
**687,000 [1]** 9/6
**687,410 [1]** 9/7

**7**

**7 percent [1]** 24/20
**701 [1]** 1/19
**74 [3]** 10/5 123/9 124/9
**75 [2]** 8/25 124/8
**78 million [2]** 72/7 75/22
**78,000 [1]** 72/6

**8**

**8 percent [1]** 24/8
**80,000 [1]** 33/11
**825 [2]** 2/11 2/14

**9**

**90 percent [1]** 103/9
**93 [1]** 71/25
**95 percent [1]** 23/24
**98 [1]** 123/10

**A**

**a.m [3]** 47/5 47/5 54/4
**ability [2]** 109/24 115/9
116/2
**able [9]** 3/24 12/8 47/18
89/14 89/17 112/25
120/3 120/13 122/7
**above [1]** 124/15
**above-entitled [1]**
124/15
**absence [2]** 20/18 61/25
**absolutely [4]** 78/10
78/20 85/9 104/2
**abundance [1]** 98/11
**abuse [1]** 96/19
**academic [2]** 17/25
34/13
**accepted [1]** 109/25
**access [2]** 15/3 111/13
**accident [1]** 86/11
**according [1]** 76/19
**account [7]** 33/6 71/20
72/11 105/3 107/25
108/2 117/8
**accountable [1]** 57/5
**accounting [3]** 18/6
46/11 46/17
**accounts [5]** 15/5 15/7

15/11 69/6 75/15
**accurate [1]** 72/10
**accusations [1]** 117/5
**acknowledge [2]** 22/17
27/23
**acquired [1]** 32/23
**across [2]** 77/25 82/18
**action [9]** 106/9 106/11
106/18 107/1 107/2
107/3 107/4 107/6
121/10
**actions [2]** 106/13
106/14
**activity [2]** 16/14 96/8
**actual [17]** 21/11 34/22
40/25 41/21 41/25 42/23
57/23 59/15 65/16 65/22
66/19 67/13 69/24 72/11
75/14 100/11 102/3
**actually [47]** 7/17 7/20
11/2 20/14 26/25 31/25
37/13 40/15 45/25 49/1
49/3 51/20 56/22 58/5
59/13 61/3 65/9 65/23
67/11 69/20 72/2 72/6
72/7 76/8 76/22 77/13
77/18 79/16 79/23 80/16
84/13 85/2 85/13 86/25
87/3 88/7 88/16 89/11
95/21 98/2 100/12
101/25 106/11 109/20
114/2 115/11 116/4
**added [2]** 9/4 10/9
**adding [1]** 26/9
**addition [7]** 57/13 69/4
77/2 95/11 95/20 98/1
104/22
**additional [21]** 18/17
47/10 52/4 52/7 52/11
53/8 58/7 62/5 62/7 62/8
63/19 82/12 85/25 86/2
86/3 93/3 93/9 100/2
100/16 106/3 115/8
**address [7]** 54/17 77/18
84/8 103/2 104/21 111/1
119/23
**addressed [1]** 116/19
**adequately [1]** 106/19
**adjusted [2]** 78/23 89/22
**admission [1]** 49/5
**admit [4]** 19/25 30/3
121/2 121/9
**admitted [6]** 8/24 10/4
20/3 23/8 30/5 71/25
**admitting [1]** 120/23
**advice [1]** 106/25
**affect [3]** 76/24 111/23
111/24
**affidavit [4]** 115/12
115/22 119/11 119/14
**affirmed [5]** 50/4 50/17
55/10 101/5 117/22
**affirming [1]** 50/15
**after [35]** 5/20 5/23 6/10
7/22 11/3 11/14 16/5
18/17 31/22 31/23 40/16

41/4 41/22 42/11 43/17
47/5 52/6 53/7 54/4
54/17 54/24 62/16 62/23
63/11 64/22 66/24 83/23
83/24 86/21 88/21 89/15
89/17 103/16 106/1
106/8
**afternoon [3]** 53/19
104/11 104/12
**afterwards [1]** 16/11
**again [49]** 10/9 15/12
20/11 20/12 22/8 25/8
31/18 35/1 37/1 37/8
42/16 45/8 46/15 48/23
50/5 53/6 57/16 58/14
59/6 62/4 62/15 63/2
63/20 63/25 64/3 68/8
69/9 69/19 69/23 70/12
70/21 72/9 73/9 76/2
88/9 92/6 95/22 98/11
102/8 102/8 103/12
111/22 112/16 112/19
113/19 114/18 115/21
116/16 117/21
**aggregate [3]** 56/22 57/6
77/24
**ago [2]** 112/17 119/5
**agree [6]** 60/8 62/4
70/16 88/24 89/6 89/7
**agreed [1]** 63/17
**agreement [1]** 90/6
**agrees [1]** 60/10
**ahead [4]** 18/23 30/18
61/16 111/18
**Alex [1]** 2/13
**aligned [1]** 103/18
**allegation [1]** 96/22
**allegations [6]** 50/6 50/7
51/13 117/8 119/18 119/9
**alleged [4]** 16/16 49/23
55/8 94/4
**allocute [2]** 54/24
103/25
**allowed [1]** 47/23
**allowing [1]** 48/24
**alone [5]** 70/12 72/17
109/17 110/11 111/25
**already [7]** 42/16 48/13
72/21 101/4 102/5 102/9
118/13
**also [34]** 4/22 7/10 12/24
13/22 14/18 15/11 15/18
25/2 30/18 38/15 48/14
56/15 56/23 59/1 65/25
69/5 69/6 69/15 70/5
71/6 71/24 76/23 77/14
78/6 84/23 89/13 90/20
95/23 100/1 101/24
110/7 117/16 121/6
121/23
**alternative [5]** 70/19
83/6 83/7 94/17 94/19
**although [5]** 53/12
53/17 75/20 96/11
116/14
**amazing [2]** 105/11

109/21
**AMC [1]** 108/14
**amended [1]** 49/21
**AMERICA [1]** 1/3
**among [1]** 85/17
**amount [41]** 33/5 38/6
50/18 55/14 55/18 55/23
55/24 67/15 67/16 68/10
68/13 72/20 72/24 76/16
77/15 77/18 78/1 78/3
82/17 84/18 84/21 85/22
91/5 93/22 93/23 93/23
96/25 97/4 97/9 98/2
98/4 98/5 98/8 103/1
103/5 107/20 108/1
108/12 108/22 108/25
109/1
**analyses [1]** 20/24
**analysis [33]** 3/22 9/25
10/19 11/1 11/1 18/4
23/19 25/12 30/25 33/12
33/15 33/20 33/24 37/14
42/10 42/1 42/12 42/13
43/4 58/9 60/13 60/15
63/12 63/15 64/10 65/1
71/19 81/12 99/5 100/3
100/8 100/21 101/19
**analyst [1]** 81/17
**analysts [1]** 38/5
**analyzed [1]** 29/2
**Anand [6]** 58/15 93/25
93/25 95/22 95/23 95/24
**anew [1]** 101/6
**announced [1]** 40/9
**announcement [10]**
16/10 34/23 34/23 40/19
41/7 41/18 41/20 41/24
42/7 42/25
**announcements [2]** 31/1
42/18
**announces [1]** 22/5
**another [8]** 6/15 13/10
51/12 76/2 77/1 81/4
83/4 92/21
**answer [3]** 45/7 113/2
117/16
**answered [1]** 21/10
**answering [2]** 19/1
19/10
**anticipated [1]** 49/3
**anticipates [1]** 5/8
**anticipating [1]** 53/8
**any [64]** 7/4 8/22 10/21
15/22 20/1 22/24 33/4
33/7 34/24 34/25 39/24
45/14 45/14 45/23 45/25
46/23 47/12 47/16 47/20
52/4 52/7 52/11 52/22
53/10 57/19 57/21 57/21
71/4 72/8 72/11 72/14
72/19 73/12 75/5 79/5
80/12 82/14 83/23 83/25
84/14 86/1 86/3 86/3
86/14 92/2 96/13 97/14
98/22 100/11 101/16
101/18 107/7 107/14

107/14 109/17 111/5
112/20 113/1 114/23
115/9 117/15 118/16
119/14 121/3
**anybody [1]** 55/4
**anymore [1]** 115/18
**anyone [4]** 71/8 103/23
104/3 110/17
**anything [11]** 38/10
46/2 46/11 46/13 47/18
51/22 71/20 83/18 92/23
96/1 117/20
**aol.com [1]** 1/20
**apart [1]** 46/18
**apologies [5]** 18/14
18/16 19/24 26/2 29/18
**apologize [1]** 121/21
**apology [1]** 110/11
**appeals [2]** 102/5 114/25
**appear [1]** 6/3
**Appearances [2]** 1/15
2/1
**appears [4]** 29/25 31/15
40/18 41/17
**Apple [1]** 81/15
**apply [2]** 101/25 102/5
**applying [2]** 80/7 80/8
**apportion [1]** 45/11
**appreciate [2]** 96/12
110/10
**approach [10]** 5/19
13/22 18/12 20/5 29/9
31/9 89/12 90/17 97/12
97/15
**appropriate [33]** 55/25
56/8 56/22 57/4 57/7
57/11 57/12 57/20 57/22
58/20 60/3 62/2 66/20
70/2 70/20 70/23 72/14
72/15 72/19 73/3 73/5
74/3 78/1 97/12 97/13
97/16 97/17 99/18
101/13 102/10 107/5
111/8 114/16
**April [19]** 7/5 9/6 12/2
21/20 21/25 23/4 40/9
40/10 40/12 40/12 61/16
62/3 63/9 63/11 66/16
67/2 87/1 90/19 100/4
**April 11th [4]** 21/20
21/25 40/9 40/12
**April 14th [8]** 7/5 9/6
12/2 23/4 40/10 40/12
87/1 90/19
**April 2008 [2]** 61/16
63/9
**arbitrary [3]** 27/24
27/25 85/20
**area [1]** 40/5
**aren't [6]** 25/15 26/15
45/12 45/16 66/4 67/10
**argue [3]** 54/9 54/17
103/21
**arguendo [1]** 78/11
**argument [18]** 52/7 52/8
52/25 52/25 59/8 59/17

## A

**argument... [12]** 102/16
102/16 103/16 111/6
111/15 111/17 114/18
118/22 120/1 123/8
123/9 123/10

**arguments [3]** 58/1
117/10 117/11

**arisen [1]** 119/18

**around [7]** 28/23 30/23
69/18 76/18 106/5 106/5
109/18

**arrangement [1]** 93/19

**article [11]** 18/3 18/20
19/18 20/9 20/11 20/12
29/10 29/13 35/7 35/10
35/12

**articles [1]** 34/13

**ask [20]** 13/15 14/14
23/11 28/7 36/5 36/8
38/8 39/24 40/4 47/15
47/17 51/2 52/3 52/5
94/24 96/16 103/7
103/24 109/23 119/25

**asked [21]** 18/20 20/9
23/19 23/20 24/17 36/13
38/15 60/16 61/18 62/13
71/20 86/13 86/15 86/19
100/22 101/20 102/5
102/7 111/10 113/20
114/3

**asking [1]** 102/8

**assessing [1]** 63/8

**assessment [1]** 36/3

**asset [1]** 88/15

**assume [7]** 39/11 45/1
45/5 66/21 77/23 78/2
82/20

**assumed [4]** 64/10

**assumes [1]** 90/18

**assuming [5]** 50/20 63/7
78/9 78/10 78/11

**assumption [7]** 19/13
42/12 42/14 44/15 44/16
78/5 82/22

**assumptions [2]** 3/15
3/16

**attack [1]** 116/13

**attacking [1]** 49/12

**attempt [2]** 117/20
117/20

**attributable [8]** 25/10
40/12 44/10 63/18 66/5
66/7 67/5 67/7

**attribute [3]** 17/16
17/22 44/13

**attributed [4]** 12/25
63/2 64/16 107/23

**attributing [1]** 39/13

**August [10]** 4/12 4/16
5/13 12/3 38/17 38/17
62/3 70/8 100/5 107/10

**August 15th [5]** 4/12
4/16 5/13 38/17 70/8

**AUSA [1]** 116/14

**authority [2]** 5/10 88/9

**authorized [1]** 94/9

**automatic [2]** 108/5
108/6

**automatically [1]** 108/3

**availability [3]** 120/5
120/12 120/19

**available [2]** 8/19 115/2

**Avenue [5]** 2/4 2/8 2/11
2/14 2/16

**average [1]** 38/7

**award [1]** 72/21

**aware [8]** 5/3 33/16
33/18 54/15 54/23 97/2
101/16 110/19

**awareness [1]** 93/16

**away [1]** 114/20

**awhile [1]** 29/4

## B

**back [37]** 14/14 21/5
27/17 30/15 33/9 33/17
33/19 33/25 40/25 42/18
42/18 44/25 47/8 47/8
50/18 52/6 53/1 53/21
54/1 54/7 54/7 54/25
57/9 63/2 66/10 71/8
73/16 95/4 103/14
103/15 103/17 103/20
103/20 104/5 110/18
119/25 120/7

**bad [3]** 19/15 103/13
106/2

**balance [3]** 45/21 102/3
111/15

**bank [3]** 56/13 58/15
75/15

**bar [1]** 15/9

**barely [1]** 104/23

**barrage [1]** 112/7

**barred [1]** 117/14

**base [2]** 96/5 108/1

**based [17]** 5/10 22/13
24/24 30/8 31/3 38/12
43/14 46/10 46/23 55/16
57/17 60/15 63/15 64/10
70/21 83/7 105/1

**basic [5]** 80/7 80/24 81/3
81/5 99/17

**basically [5]** 8/11 9/20
55/23 58/16 59/19

**basis [11]** 15/19 49/22
50/5 79/5 90/8 93/5
94/23 97/14 98/14
101/10 114/11

**Beach [3]** 1/7 1/19 53/18

**beast [1]** 81/16

**because [55]** 4/15 15/18
34/24 41/12 43/8 44/2
45/24 47/18 48/11 60/18
61/17 61/18 64/11 65/11
65/15 66/8 67/14 68/9
68/11 73/11 73/14 73/17
74/4 74/4 74/7 74/21
76/12 79/6 79/15 86/14
89/7 89/14 90/2 90/5
90/10 90/17 90/21 90/21

**92/4** 91/4 92/23 92/25
95/6 95/9 96/22 97/6
98/3 102/2 107/7 107/22
108/11 109/6 111/21
114/17 115/4

**Becker [21]** 23/4 23/22
32/7 39/17 44/4 60/7
60/8 60/14 60/23 63/16
65/8 65/10 65/13 67/23
77/13 82/14 82/23 89/6
99/21 100/13 101/21

**Becker's [13]** 58/5 58/9
60/13 63/12 63/15 64/10
68/1 78/22 90/17 99/5
100/3 100/7 100/21

**becomes [1]** 34/24

**Beezer [1]** 37/18

**before [63]** 1/12 3/24
4/4 4/11 4/18 4/23 6/10
6/17 7/6 7/13 10/21
15/24 16/9 20/11 21/23
22/21 28/16 33/7 33/9
34/22 40/15 41/23 42/24
47/3 64/23 65/2 65/14
65/17 66/4 66/16 67/2
68/5 68/17 72/8 73/7
73/12 73/15 73/18 76/6
76/8 76/9 77/5 77/6
84/13 86/5 86/24 87/13
87/16 93/13 94/1 95/21
96/13 97/18 98/16
103/20 105/3 110/18
111/7 111/7 111/21
112/1 118/19 119/25

**begin [1]** 17/5 69/7
96/15

**beginning [8]** 7/23 11/13
15/13 16/19 33/3 33/21
33/22 69/24

**being [7]** 7/25 9/8 43/19
93/5 101/3 112/4 117/19

**belief [1]** 41/4

**believe [30]** 5/14 5/16
6/25 8/17 8/20 9/17 13/9
13/17 18/22 20/11 21/24
23/1 29/12 31/5 35/7
50/1 55/4 68/1 69/16
72/24 84/21 89/21
101/20 102/2 106/1
106/20 107/5 115/3

**believed [4]** 43/13 88/22
105/10 106/15

**believes [1]** 118/5

**below [2]** 57/23 95/25

**below-market [1]** 95/25

**benefited [1]** 70/12

**Benjamin [1]** 2/10

**Benscoter [1]** 87/9

**best [1]** 46/19

**better [1]** 28/2

**between [13]** 5/12 10/16
15/22 38/16 38/25 39/6
40/12 43/18 63/10 64/9
77/10 88/25 120/4

**beyond [1]** 115/7

**bid [1]** 38/8

**bid-ask [1]** 38/8

**big [2]** 46/1 46/9

**billion [2]** 81/13 81/14

**bit [2]** 23/16 81/20

**blame [1]** 58/8 84/6

**blaming [2]** 58/3 58/3

**blind [2]** 95/20 108/14

**blocks [1]** 83/22

**blow [1]** 22/8

**blue [4]** 15/3 15/14
32/24 86/14

**body [1]** 85/15

**book [1]** 26/14

**booked [3]** 26/24 27/7
38/20

**books [3]** 105/6 108/1
108/7

**boost [1]** 56/12

**Booth [1]** 19/21

**both [12]** 19/20 57/5
61/23 62/4 63/16 66/18
74/5 91/12 100/18
112/10 119/15 120/18

**bottom [4]** 9/2 9/3 9/4
10/7

**bought [11]** 5/20 7/22
10/20 32/23 43/21 76/10
83/22 87/7 88/1 88/13
95/9

**Brady [18]** 111/9 111/18
111/19 111/23 112/3
112/6 112/18 112/21
112/23 113/7 113/14
113/14 117/18 118/6
117/10 119/6 119/21
123/12

**break [2]** 18/17 53/1

**brief [10]** 34/8 34/15
34/15 53/7 91/15 91/16
92/18 94/25 94/25 95/1

**briefly [10]** 58/11 63/6
68/21 71/3 85/23 86/7
92/23 98/25 102/12
111/3

**briefs [1]** 58/12

**bring [3]** 76/17 103/14
103/20

**bringing [1]** 63/19

**broad [13]** 4/7 6/14 8/9
11/23 12/3 12/11 12/11
13/19 83/17 89/8 91/5
97/21 98/2

**broadcast [1]** 106/1

**broker [1]** 95/24

**brothers [6]** 104/22
106/3 106/4 107/22
109/24 110/11

**Bryan [1]** 69/15

**bucket [2]** 57/13 65/21

**burdensome [3]** 114/6
114/8 122/3

**Business [1]** 19/22

**buy [9]** 16/9 76/6 83/25
84/1 87/23 89/17 107/13
107/14 109/5

**buyer [1]** 16/6

**buyer's [4]** 89/13 89/14
89/16 89/19

**buyers [5]** 5/19 11/11
11/11

**buyers-only [2]** 5/19
11/11

**buying [5]** 16/7 32/16
109/6 109/8 109/14

**buys [5]** 66/21 73/23
73/24 73/24 89/25

## C

**Caitlin [1]** 2/6

**calculable [1]** 57/24

**calculate [9]** 8/14 11/20
11/22 28/6 67/24 69/22
77/9 77/20 97/19

**calculated [8]** 10/19
24/24 31/3 33/22 43/22
65/5 67/13 82/25

**calculating [4]** 15/15
38/12 70/2 102/3

**calculation [24]** 3/13 4/7
6/16 8/4 9/13 10/22
10/25 11/10 13/6 13/12
13/19 14/4 14/9 27/17
33/6 68/18 69/25 70/13
75/25 78/23 97/17 98/7
102/15 102/24

**calculations [23]** 4/3
4/10 5/15 6/2 55/19
56/24 57/22 57/25 63/10
63/14 63/15 65/6 65/6
66/10 70/7 72/14 75/13
77/13 77/17 83/17 89/2
89/19 103/23

**calendars [1]** 120/7

**California [3]** 21/1
106/13 110/5

**called [10]** 11/16 36/25
37/1 87/4 104/20 108/17
109/2 112/17 112/19
116/8

**calling [4]** 80/2 80/4
86/21 90/4

**calls [6]** 18/5 35/23 36/2
36/5 36/6 36/8

**came [12]** 10/17 38/17
41/1 42/4 42/18 75/3
76/2 76/23 79/1 82/6
107/9 112/12

**camera [1]** 122/10

**can't [16]** 16/2 25/24
28/6 37/22 38/3 44/10
77/23 78/14 78/15 79/14
80/10 82/14 82/18 85/16
86/20 105/19

**cannot [4]** 17/15 70/18
94/12 107/23

**cap [2]** 37/12 37/15

**capitalize [1]** 16/11

**caps [1]** 37/17

**capture [1]** 40/15

**captures [1]** 70/3

**Carolina [1]** 107/2

**Carpenter [6]** 54/25

**C**

**Carpenter... [5]** 83/13 84/4 86/23 104/10 104/14
**Carter [2]** 58/15 93/20
**case [76]** 1/2 5/5 7/10 10/24 13/23 20/15 21/1 23/1 23/3 23/6 23/14 28/4 28/20 28/22 28/25 29/5 30/19 31/14 31/17 32/16 33/13 33/16 36/25 37/1 37/12 38/13 43/23 55/4 56/19 57/9 58/10 59/24 61/23 63/4 70/17 71/4 71/17 77/21 79/1 79/2 79/18 80/16 80/18 80/20 80/25 80/25 81/2 81/5 81/5 81/6 81/8 83/4 87/17 87/19 91/12 91/15 94/1 94/21 96/3 96/18 97/14 98/4 98/16 98/17 98/19 99/3 101/7 101/16 101/21 103/10 112/4 112/6 112/15 115/4 118/15 119/16
**cases [15]** 37/20 37/20 37/24 71/9 78/25 80/22 81/1 81/10 95/1 95/3 99/7 99/7 99/8 101/14 101/14
**catch [1]** 53/5
**category [2]** 6/15 117/2
**cause [1]** 108/22
**caused [11]** 27/8 39/7 41/21 56/18 58/6 66/12 66/18 75/11 99/4 99/6 100/5
**causes [3]** 85/4 107/2 107/13
**caution [1]** 98/12
**ceiling [1]** 85/17
**ceilings [1]** 78/1
**cent [10]** 9/9 10/13 11/4 12/21 12/23 12/25 14/6 43/20 68/13 70/9
**center [1]** 18/24
**cents [8]** 9/11 12/23 12/24 13/3 13/8 14/8 24/21 43/3
**CEO [1]** 22/4
**cert [1]** 115/4
**certain [16]** 16/18 30/9 31/1 36/13 72/3 74/25 79/11 97/2 97/3 108/2 108/4 108/12 108/21 108/21 113/18 118/16
**certainly [19]** 21/10 28/3 37/23 48/9 48/10 70/15 80/18 84/6 85/24 86/17 92/1 92/9 101/15 111/23 114/10 116/17 118/10 119/2 119/20
**CERTIFICATE [1]** 124/11
**Certified [1]** 124/13
**certify [1]** 124/13

**certiorari [1]** 115/1
**challenging [1]** 75/5
**chance [3]** 3/21 48/14 120/7
**change [20]** 8/1 11/3 12/5 23/16 24/4 32/14 33/12 33/15 33/20 34/16 37/5 38/11 38/25 39/7 39/9 44/21 67/20 68/8 74/24 105/11
**changed [3]** 21/7 46/16 104/19
**changes [1]** 65/24
**charged [2]** 33/17 95/18
**chart [11]** 4/20 6/20 6/21 6/23 13/16 13/17 15/9 16/3 71/11 121/3 121/4
**charts [2]** 7/16 101/8
**chat [1]** 23/3
**check [4]** 43/10 45/8 115/14 116/4
**Chicago [1]** 19/20
**choices [1]** 18/4
**chose [1]** 118/6
**Christian [4]** 49/20 50/7 50/11 51/3
**circuit [30]** 50/4 50/14 50/17 51/18 57/9 74/21 79/22 79/22 80/18 81/22 82/11 83/1 85/23 86/6 95/2 98/16 99/2 99/10 99/14 100/22 101/25 102/1 102/7 114/22 115/1 115/3 117/11 117/22 119/4 119/17
**Circuit's [2]** 99/9 101/23
**circumstances [1]** 104/19
**circumstantial [5]** 80/3 80/12 80/13 99/13 100/20
**cite [3]** 81/4 81/5 87/19
**cited [7]** 71/9 79/2 79/3 87/17 91/14 95/1 101/14
**citing [1]** 99/8
**City [1]** 105/4
**civil [7]** 78/25 81/7 99/7 99/8 102/6 102/9 106/13
**claim [1]** 58/8
**clarification [3]** 64/18 64/19 93/13
**Clark [1]** 109/25
**class [12]** 77/25 106/9 106/10 106/13 106/14 106/16 106/17 106/19 106/21 107/1 107/6 107/10
**classic [1]** 16/14
**clear [17]** 13/3 24/3 25/8 26/25 36/18 38/20 39/10 50/17 62/9 63/22 65/21 70/5 80/18 80/19 84/3 95/17 102/25
**clearly [6]** 35/25 58/10 93/19 117/6 117/14

**119/7**
**Clematis [1]** 1/19
**close [1]** 91/3
**closer [1]** 109/9
**closing [1]** 52/25
**cloud [1]** 116/16
**coconspirators [3]** 56/17 56/25 59/13
**coffee [1]** 107/13
**collect [1]** 52/6
**collected [1]** 110/3
**collectively [1]** 41/2
**column [5]** 4/19 7/21 7/21 9/4 10/11
**combination [2]** 41/17 41/20
**combine [3]** 41/24 55/25 56/2
**combined [3]** 42/21 71/17 73/2
**comes [2]** 63/13 64/13
**comfortable [2]** 103/15 110/22
**common [4]** 21/11 31/16 32/2 107/14
**companies [5]** 36/2 37/23 37/23 38/1 105/18
**company [69]** 26/16 34/25 38/20 43/25 45/18 45/22 46/4 55/6 56/13 56/23 57/8 57/10 57/14 58/14 58/14 58/17 58/20 58/22 58/23 59/1 59/6 59/6 59/7 59/9 59/10 59/15 59/18 59/21 59/22 59/24 59/24 60/2 61/7 61/14 61/21 62/12 62/15 62/18 62/19 73/3 81/13 82/6 86/18 91/10 91/12 91/18 91/23 91/25 92/1 92/1 92/2 92/5 92/15 92/19 92/20 92/22 93/17 93/19 94/14 96/10 96/14 106/13 106/24 108/9 108/14 108/22 109/8 109/12 109/22
**company's [2]** 44/8 84/9
**company-specific [1]** 43/25
**compensated [1]** 110/3
**compensation [1]** 109/16
**complaint [4]** 49/21 49/23 49/24 50/6
**complete [7]** 40/17 105/15 106/10 106/15 118/19 119/16 122/9
**completely [1]** 60/2
**101/7 101/17**
**completeness [1]** 48/12
**complied [1]** 118/11
**component [8]** 66/12 67/10 67/14 67/17 69/14 74/2 74/3 74/11
**components [4]** 56/10 56/18 60/9 68/23

**concerning [1]** 14/18
**conclude [4]** 16/15 39/15 40/7 78/16
**concluded [2]** 30/8 122/15
**concludes [1]** 111/22
**conclusion [4]** 16/1 34/16 34/19 39/1
**conclusions [4]** 28/18 37/10 79/5 103/21
**concocted [1]** 105/15
**concurrence [4]** 80/14 99/9 99/10 99/15
**concurring [1]** 80/6
**condensed [1]** 32/9
**conditions [1]** 105/12
**conduct [4]** 33/25 44/14 72/8 72/12
**conducted [1]** 44/4
**conducting [2]** 28/16 44/18
**conference [5]** 18/5 35/23 36/2 36/5 36/6
**confidence [2]** 23/20 23/24
**confirmation [1]** 116/2
**confirmed [1]** 115/12
**confirming [1]** 52/14
**conflict [2]** 115/1 115/3
**confused [1]** 116/7
**conjunction [1]** 118/20
**connected [1]** 27/11
**connection [1]** 38/24
**conservative [11]** 12/22 14/7 57/1 63/8 64/1 69/1 69/7 69/12 70/2 70/6 89/12
**conservatively [1]** 69/21
**consider [4]** 3/21 33/8 96/17 103/8
**consideration [2]** 51/7 71/14
**considered [1]** 110/1
**considering [3]** 56/4 90/4 110/4
**considers [1]** 5/19
**consistent [4]** 13/22 15/25 16/13 74/8
**conspiracy [4]** 33/16 33/21 33/23 100/14
**constant [4]** 67/15 68/9 68/10 90/21
**constitute [3]** 17/15 34/17 34/20
**constitutes [1]** 23/2
**Cont.'d [2]** 3/10 123/4
**contact [2]** 120/4 120/11
**contain [2]** 20/18 121/24
**contained [3]** 25/2 34/4 62/10
**containing [2]** 35/19 121/25
**contains [1]** 117/4
**content [5]** 41/25 42/23
**contest [2]** 95/3 95/4
**contested [1]** 96/10

**contesting [3]** 96/5 96/7 96/16
**context [2]** 41/6 99/9
**continue [1]** 3/5
**continued [1]** 106/2
**continues [2]** 87/24 116/17
**contract [1]** 59/4
**contracts [5]** 22/6 22/25 105/17 107/9 109/18
**contrary [3]** 75/8 77/2 80/19
**control [1]** 15/12
**controlled [5]** 15/6 15/10 108/15 108/16 108/16
**conversation [1]** 116/6
**conversations [1]** 118/1
**convicted [1]** 101/3
**convicting [1]** 101/10
**conviction [1]** 101/5
**convictions [1]** 55/9
**convinced [1]** 110/12
**cooperating [1]** 93/20
**copies [1]** 18/10
**copy [6]** 18/17 18/20 20/9 29/21 31/13 49/17
**corporation [1]** 56/5
**correct [43]** 6/20 7/16 9/24 13/5 13/20 13/24 14/12 20/22 21/20 22/3 22/15 22/19 24/9 24/12 24/17 25/1 25/14 26/6 26/9 26/13 26/16 27/5 27/24 28/8 28/16 29/5 30/14 30/20 30/24 31/2 31/5 32/12 32/13 38/18 39/19 41/13 41/15 44/18 44/19 52/12 56/5 98/25 124/14
**corrected [3]** 10/25 11/21 42/5
**corrective [42]** 4/11 5/21 5/23 6/8 6/17 7/4 7/6 7/7 7/11 7/13 7/18 8/1 8/2 10/21 11/9 13/21 17/15 17/17 17/19 18/1 21/5 21/8 21/14 23/2 34/17 34/20 35/11 41/6 41/11 42/12 61/17 61/24 62/2 62/5 63/6 63/9 64/12 65/15 84/19 87/2 87/13 90/19
**correctly [3]** 85/8 93/8 97/25
**costs [1]** 50/2
**Cottingham [3]** 2/6 123/8 123/10
**couldn't [2]** 86/14 114/8
**counsel [9]** 4/4 17/5 18/11 49/17 54/8 96/20 99/1 100/8 117/6
**count [1]** 77/3
**counter [2]** 7/8 7/14
**counting [2]** 56/21 57/3
**counts [1]** 101/3

{WITNESSNAME} - Index couple..Dr.

# C

**couple [7]** 48/5 71/3 71/13 110/12 120/2 120/12 121/18
**course [16]** 14/22 22/11 43/2 56/23 59/10 60/25 81/14 81/15 89/6 91/7 93/20 95/5 100/9 101/24 117/7 120/14
**court [73]** 1/1 1/18 3/1 18/11 20/22 20/24 49/21 51/5 51/12 51/13 52/9 55/25 56/1 57/6 57/14 58/2 62/13 70/19 70/23 72/16 72/19 75/4 75/17 75/23 77/20 77/23 80/25 81/5 81/6 87/20 88/19 90/3 90/11 91/3 92/9 92/13 92/14 92/15 94/24 94/24 96/11 96/16 97/2 97/11 97/15 97/20 99/16 99/19 101/9 101/23 102/5 102/9 103/7 104/21 107/21 109/25 111/5 111/6 112/1 114/25 115/10 115/23 115/24 116/19 117/11 117/15 117/21 118/16 119/11 119/16 119/19 120/22 123/7
**Court's [2]** 74/6 118/13
**courtroom [4]** 83/14 86/23 120/3 120/11
**cover [2]** 38/5 72/21
**CPE [1]** 1/18
**CR [1]** 1/2
**Cravath [2]** 2/10 2/13
**create [1]** 41/10
**creates [1]** 116/16
**credentials [1]** 99/22
**credibility [3]** 49/5 49/12 50/10
**credit [3]** 25/12 70/8 70/9
**credited [1]** 66/9
**crime [1]** 74/25
**criminal [3]** 2/3 2/7 96/8
**cross [11]** 16/25 17/1 47/18 47/23 48/1 48/19 48/24 49/3 51/9 52/15 123/5
**cross-examination [4]** 16/25 17/1 48/1 48/24
**cross-examine [3]** 47/18 47/23 48/19
**cross-examined [1]** 51/9
**CRR [1]** 1/18 124/19
**crumble [1]** 88/15
**cup [1]** 107/13
**current [1]** 92/21

# D

**damage [1]** 43/12
**damages [1]** 107/5
**dark [2]** 19/1 19/9
**data [15]** 8/3 15/3 15/14

32/24 33/25 86/14 86/15 111/10 111/12 112/15 114/5 117/24 121/1 121/5 121/7
**database [1]** 113/19
**databases [1]** 113/1
**date [34]** 4/16 4/23 6/9 6/10 7/4 7/11 7/17 8/1 8/2 8/14 9/6 9/9 9/10 9/21 9/22 10/14 10/23 11/3 11/5 11/6 11/6 11/10 11/13 12/2 12/3 12/20 24/4 33/23 33/25 47/11 85/5 89/5 90/9 90/12
**Dated [1]** 124/16
**dates [4]** 4/5 12/1 12/4 42/8
**David [2]** 2/18 50/25
**days [8]** 24/19 41/23 42/19 60/6 74/24 75/3 89/12 112/17
**DC [2]** 2/5 2/9
**deal [5]** 118/17 118/18 120/15 120/16 120/18
**dealing [1]** 71/10
**debt [1]** 105/8
**debt-to-income [1]** 105/8
**decide [3]** 70/17 118/21 118/22
**decided [4]** 105/5 105/8 119/4 119/6
**decision [5]** 49/19 80/22 83/2 102/21 118/9
**decisions [4]** 105/24 112/10 118/21 120/13
**decline [11]** 9/9 10/13 12/20 25/9 40/24 42/5 46/1 46/9 99/4 99/6 102/1
**declined [1]** 40/24
**declines [1]** 100/5
**declining [1]** 44/9
**defendant [28]** 1/7 2/10 4/4 5/20 6/7 6/11 32/18 49/24 50/1 57/15 57/16 58/8 59/19 70/24 70/25 71/5 71/7 71/16 71/21 72/1 72/4 72/5 72/7 72/25 84/5 99/8 101/3 101/11
**defendant's [20]** 3/9 4/4 8/25 10/5 32/16 58/6 60/1 60/10 60/21 62/10 62/22 70/4 71/12 72/12 97/5 98/12 100/4 101/6 101/17 124/7
**defendants [1]** 101/14
**defense [23]** 8/21 10/2 17/8 18/11 21/17 32/25 49/17 49/20 51/1 52/10 52/21 58/1 59/17 60/8 63/16 71/9 71/11 99/1 100/8 101/20 102/8 117/24 120/25

**defense's [1]** 71/15
**defined [1]** 35/22
**defraud [1]** 75/10
**deliver [1]** 100/14
**Delnido [1]** 2/13
**delve [1]** 120/17
**demand [4]** 60/25 61/15 62/18 113/12
**dentist [1]** 69/16
**deny [1]** 116/15
**Department [2]** 2/4 2/8
**depending [1]** 75/17
**depressed [1]** 66/16
**deputy [2]** 120/4 120/11
**derived [1]** 89/3
**described [2]** 83/4 88/18
**describes [1]** 83/4
**describing [1]** 117/25
**description [1]** 51/14
**despite [1]** 75/4
**details [1]** 29/5
**determine [7]** 15/1 28/10 35/17 38/9 39/18 48/9 79/3
**determined [2]** 70/18 98/1
**didn't [44]** 16/13 23/5 32/22 40/23 40/24 41/1 45/14 51/11 53/2 58/18 59/9 59/14 59/18 61/21 64/19 67/24 73/16 73/17 73/19 76/20 78/4 78/7 81/12 83/25 84/14 87/2 87/6 88/11 89/15 93/9 95/9 99/23 100/9 100/10 103/1 108/17 109/13 111/5 112/20 112/20 115/9 116/7 116/8 116/15
**difference [9]** 11/7 11/8 43/18 43/20 74/2 74/3 76/13 76/16 77/10
**differences [1]** 11/4
**different [17]** 11/1 15/5 38/8 48/8 73/20 76/4 77/7 79/23 81/16 85/20 97/19 98/4 103/10 105/6 106/19 107/2 109/19
**differently [1]** 62/24
**difficult [4]** 17/16 17/21 28/10 34/24
**digest [1]** 102/18
**diluted [1]** 92/22
**direct [8]** 3/10 23/20 48/1 48/24 80/1 80/11 100/18 123/4
**directed [1]** 99/15
**direction [1]** 22/5
**directly [5]** 49/4 52/25 56/16 62/14 107/23
**disagree [1]** 99/21
**disagreement [3]** 62/7 88/25 90/11
**disappointed [1]** 107/21
**disclose [2]** 109/13 109/17

**disclosed [12]** 40/14 41/7 66/4 66/25 68/5 73/18 87/16 88/6 88/14 113/4 113/8 113/11
**disclosure [64]** 4/11 4/23 6/8 6/17 7/4 7/6 7/7 7/11 7/13 7/18 8/1 8/2 8/14 9/10 10/21 10/23 11/10 11/13 13/23 17/15 17/17 17/20 18/1 18/4 21/9 21/13 21/14 23/3 34/17 34/20 35/20 36/10 45/12 61/17 61/24 62/2 62/5 63/7 64/12 64/22 64/23 65/2 65/15 65/17 68/17 73/7 73/12 73/15 77/6 77/6 77/16 84/19 85/5 87/2 87/13 88/21 88/21 89/5 90/9 90/12 90/19 97/18 100/4 100/5
**disclosures [7]** 5/22 5/23 21/6 35/11 45/10 63/9 99/24
**discount [1]** 97/17
**discovered [3]** 105/7 105/12 115/21
**discovery [4]** 115/6 118/11 118/14 119/20
**discrepancy [1]** 10/16
**discuss [4]** 17/6 32/2 55/12 90/4
**discussed [10]** 4/25 6/14 11/21 40/10 40/11 40/20 75/12 77/4 84/17 95/16
**discusses [1]** 30/12
**discussing [2]** 26/4 68/7
**discussion [4]** 55/7 68/24 89/24 99/2
**discussions [1]** 23/3
**dismiss [3]** 114/15 115/6 123/12
**dismissal [1]** 119/19
**dispute [1]** 96/25
**disputes [2]** 117/7 117/8
**disputing [1]** 76/3
**disseminated [2]** 5/20 82/4
**district [7]** 1/1 1/1 1/13 28/22 30/22 49/19 79/1
**divide [1]** 13/4
**divided [7]** 12/25 14/8 25/6 25/10 27/20 85/17 98/2
**dividing [1]** 27/23
**Division [2]** 2/3 2/7
**docket [2]** 5/4 115/13
**Doctor [3]** 3/7 40/4 47/1
**document [9]** 5/4 5/17 19/12 93/11 114/1 115/13 115/24 116/1 122/9
**documents [2]** 32/22 115/2
**does [27]** 4/13 4/22 6/23 18/3 22/24 38/10 38/24 38/25 39/11 39/13 39/14

40/16 52/22 64/23 74/9 76/13 82/17 87/15 87/20 94/24 96/18 97/1 102/14 103/5 103/6 105/22 113/9
**doesn't [21]** 6/3 25/21 39/7 39/9 41/9 41/10 46/2 57/14 59/14 61/12 71/20 72/11 76/16 78/23 79/9 79/12 85/11 85/16 90/18 111/17 112/25
**doing [22]** 37/7 37/8 59/5 64/2 67/16 76/22 78/8 80/13 88/19 97/24 106/13 118/20
**DOJ [5]** 36/21 36/23 37/20 37/24 116/14
**dollar [5]** 33/5 67/15 68/10 68/13 74/8
**dollars [9]** 66/23 67/12 69/10 70/12 73/12 73/25 76/21 89/8 116/6
**don't [56]** 6/25 9/2 12/11 13/17 18/16 20/14 20/16 21/2 22/7 22/9 22/9 27/2 27/25 29/4 32/5 32/9 32/11 35/4 35/12 48/17 48/25 53/3 54/15 64/21 64/21 66/6 70/14 79/10 79/14 81/3 86/10 88/5 88/16 92/11 92/24 95/13 95/25 97/13 99/18 102/20 103/13 103/15 104/4 104/7 111/2 111/14 112/18 112/21 114/6 114/6 115/17 116/12 117/17 117/18 120/10 121/8
**done [17]** 9/13 33/24 34/1 36/12 43/3 43/7 43/8 69/11 80/9 82/7 89/19 93/10 97/19 98/15 105/23 106/24 116/14
**double [2]** 56/21 57/3
**doubt [2]** 20/16 22/9
**down [16]** 27/15 40/25 75/15 75/20 76/12 77/7 88/5 89/22 90/24 94/19 96/3 103/1 103/3 103/6 117/12
**downs [1]** 108/16
**downward [1]** 70/13
**Dr [1]** 85/19
**Dr. [73]** 3/12 3/21 11/16 14/1 17/3 17/14 18/3 19/18 20/21 23/4 23/22 25/15 27/10 27/17 28/14 30/12 32/7 32/11 33/15 34/2 34/12 39/17 44/4 58/5 58/9 60/7 60/8 60/8 60/10 60/13 60/14 60/23 63/12 63/15 63/16 64/10 65/8 65/10 65/13 67/23 68/1 71/19 76/4 77/13 78/4 78/22 79/8 81/10 81/24 82/9 82/14 82/23

{WITNESS NAME}                                                Index: D..fact

**D**

**Dr....** [21] 84/19 84/20
85/4 89/6 89/19 89/19
90/17 91/24 93/18 94/10
95/5 95/7 98/3 99/5
99/21 100/3 100/7
100/13 100/21 101/21
109/20

**Dr. Becker** [21] 23/4
23/22 32/7 39/17 44/4
60/7 60/8 60/14 60/23
63/16 65/8 65/10 65/13
67/23 77/13 82/14 82/23
89/6 99/21 100/13
101/21

**Dr. Becker's** [13] 58/5
58/9 60/13 63/12 63/15
64/10 68/1 78/22 90/17
99/5 100/3 100/7 100/21

**Dr. Harmison** [2] 93/18
94/10

**Dr. Harmison's** [1]
109/20

**Dr. Harris** [3] 14/1
81/24 82/9

**Dr. O'Neal** [32] 3/12
3/21 11/16 17/3 17/14
18/3 19/18 20/21 25/15
27/10 27/17 28/14 30/12
32/11 33/15 34/2 34/12
60/8 60/10 71/19 76/4
78/4 79/8 81/10 84/19
84/20 85/4 89/10 89/19
95/5 95/7 98/3

**Dr. O'Neal's** [1] 91/24

**dramatically** [1] 75/20

**draw** [5] 15/25 28/17
37/10 79/5 80/4

**drawn** [1] 15/12

**drop** [15] 11/4 12/25
45/13 45/15 45/15 76/1
85/5 89/13 90/2 90/8
90/14 90/16 90/20 96/13
108/23

**dropped** [3] 90/5 90/13
108/20

**dropping** [1] 84/10

**drops** [2] 79/13 90/1

**Drucker** [2] 28/20 29/22

**due** [20] 4/5 5/2 12/5
12/17 14/5 39/16 43/9
43/24 43/25 44/1 44/5
44/15 66/11 68/8 74/11
75/14 75/16 84/17 87/20
90/23

**dump** [7] 14/24 15/25
16/9 16/14 76/6 76/14
95/9

**Dura** [3] 87/17 101/21
101/25

**during** [43] 6/14 10/20
11/22 11/23 14/19 15/1
18/4 26/22 32/16 33/5
35/18 38/7 40/11 61/22
63/23 64/6 64/8 64/20
65/7 65/9 65/11 65/22

65/23 66/3 66/18 75/4
75/7 76/10 76/23 82/21
83/18 87/12 88/4 88/10
88/23 89/3 89/22 90/3
90/8 90/24 91/4 95/8
96/13

**DX74** [2] 9/18 10/2

**DX75** [2] 8/6 8/21

**E**

**E-mail** [1] 1/20

**e-MedSoft** [1] 106/24

**each** [10] 12/1 12/4 13/1
15/16 25/13 35/17 45/11
46/20 58/11 85/21

**earlier** [9] 6/14 21/10
35/25 37/1 39/11 53/20
72/4 94/3 95/20

**early** [2] 66/14 66/15

**earnings** [15] 13/2 27/8
27/11 35/23 35/24 35/25
36/4 38/25 41/19 46/1
46/1 46/4 46/5 46/9
85/10

**earnings-related** [1]
35/24

**Eastern** [1] 30/22

**easy** [1] 7/20

**economic** [2] 61/2 106/6

**economics** [1] 88/11

**Edward** [2] 3/9 123/3

**effect** [1] 118/5

**effectively** [1] 72/2

**effects** [1] 41/24

**efficiency** [23] 28/15
28/16 32/6 32/10 32/11
36/15 37/6 37/14 38/5
38/9 38/13 39/12 39/18
44/25 45/4 78/21 79/4
79/20 80/8 81/9 81/12
83/3 99/20

**efficient** [18] 3/17 28/19
30/13 37/10 37/17 38/2
39/1 45/1 78/7 78/12
78/14 78/16 79/5 79/7
79/11 79/15 80/21 81/15

**efficiently** [1] 38/2

**eight** [2] 31/19 98/9

**Eighth** [2] 2/11 2/14

**either** [12] 3/24 4/5 5/21
13/18 57/15 70/14 78/22
80/1 80/10 114/7 118/22
119/25

**elected** [1] 118/8

**elements** [3] 31/16 32/2
32/5

**Eleven** [1] 24/21

**Eleventh** [26] 57/9
74/21 79/22 79/22 80/18
81/22 82/11 83/1 85/23
86/6 95/2 98/16 99/2
99/9 99/9 99/14 100/22
101/23 101/24 102/1
102/7 114/22 117/11
117/22 119/4 119/16

**else** [3] 96/1 110/17

121/1
**embezzled** [2] 92/5 92/5
**emphasize** [1] 70/3
**emphasizes** [1] 69/10
**empirical** [1] 18/4
**end** [2] 15/16 43/19
**endangered** [1] 96/14
**endangerment** [1] 96/9
**ended** [3] 76/11 94/18
99/1

**enhancement** [5] 96/6
96/11 96/20 97/8 97/22
**enhancements** [1] 94/18
**enlightening** [1] 121/17
**enough** [4] 70/15 80/4
110/3 114/11
**enrolled** [1] 106/11
**entered** [7] 8/25 10/5
20/4 30/6 59/2 59/3
121/11
**entire** [11] 23/6 55/3
60/21 64/14 67/15 76/24
77/25 78/2 78/5 78/9
121/11
**entirely** [4] 56/14 74/6
117/18 118/14
**entitled** [1] 124/15
**entity** [1] 118/14
**equal** [2] 25/12 85/21
**equate** [1] 19/15
**equity** [7] 13/1 25/4
27/14 27/15 45/16 46/10
85/8
**equivalent** [1] 111/13
**error** [1] 24/5
**ESQ** [6] 2/2 2/6 2/10
2/13 2/16 2/18
**essentially** [7] 49/23
63/10 64/5 83/21 91/13
97/19 103/8
**establish** [1] 99/12
**established** [5] 55/9
72/18 81/21 99/5 114/7
**establishes** [2] 80/25
100/3
**estate** [2] 79/10 79/10
**estimate** [11] 14/7 24/3
24/4 25/6 25/8 28/7
28/11 46/20 69/7 69/12
82/23
**estimated** [2] 24/4 94/22
**estimation** [1] 25/9
**even** [25] 12/6 43/4 49/1
52/6 56/1 57/14 59/19
62/24 70/1 70/14 71/9
72/16 73/17 83/25 89/8
90/17 95/22 103/2 103/6
105/13 107/23 111/14
115/18 119/4 119/20
**evening** [2] 17/5 53/15
**event** [31] 28/16 28/18
30/19 31/17 31/22 32/3
37/7 37/10 38/12 39/16
42/17 43/2 44/4 44/14
44/18 44/20 58/5 60/9
60/14 65/5 78/4 78/8

78/13 78/15 78/17 78/21
78/22 79/6 80/10 99/23
114/24
**events** [2] 31/4 82/24
**ever** [5] 18/22 20/24
38/20 71/7 110/10
**every** [6] 11/8 53/18
81/7 90/22 92/21 112/5
**everybody** [2] 54/1
112/8
**everyone** [6] 3/2 47/7
54/6 70/3 70/7 112/5
**everything** [3] 75/4
105/14 105/15
**evidence** [42] 8/25 10/5
18/25 19/8 20/4 30/6
52/8 52/11 52/18 55/16
56/9 57/18 59/20 70/21
71/7 71/22 72/11 80/2
80/3 80/11 80/12 80/13
82/13 83/21 86/1 86/5
86/17 99/13 99/20
100/11 100/12 100/18
100/20 101/2 101/9
101/9 102/7 115/22
118/3 121/11 124/3
124/7
**Evidently** [1] 93/18
**Evie** [2] 58/25 93/15
**exact** [2] 21/2 25/25
**exactly** [8] 28/6 28/8
28/12 58/23 63/16 89/21
100/21 112/19
**examination** [8] 3/10
16/25 17/1 34/10 40/2
48/1 48/24 123/7
**examine** [3] 47/18 47/23
48/19
**examined** [1] 51/9
**example** [10] 37/13
66/14 68/24 68/25 73/10
74/10 93/15 112/19
113/17 114/18
**examples** [1] 69/19
**except** [2] 9/21 32/23
**excerpts** [1] 118/2
**excess** [1] 42/6
**exchange** [3] 58/18 59/5
72/3
**exclude** [1] 100/1
**excluded** [3] 58/7
100/13 100/16
**exculpated** [1] 113/4
**exculpatory** [1] 113/8
**excuse** [6] 40/5 59/3
67/18 72/6 74/5 99/25
**exhibit** [35] 8/25 10/5
17/8 18/9 19/25 20/4
21/18 21/22 22/20 25/18
29/7 30/3 30/6 31/7
31/20 33/1 49/16 49/17
49/18 50/3 55/15 55/19
55/22 57/17 69/4 71/12
71/25 83/9 91/20 121/11
124/4 124/5 124/6 124/8
124/9

78/13 78/15 78/17 78/21
78/22 79/6 80/10 99/23
114/24
**events** [2] 31/4 82/24
**ever** [5] 18/22 20/24
38/20 71/7 110/10
**every** [6] 11/8 53/18
81/7 90/22 92/21 112/5
**everybody** [2] 54/1
112/8
**everyone** [6] 3/2 47/7
54/6 70/3 70/7 112/5
**everything** [3] 75/4
105/14 105/15
**evidence** [42] 8/25 10/5

**exhibit 102** [1] 55/19
**exhibit 103** [2] 69/4 83/9
**exhibit 114** [1] 55/15
**exhibit 121** [2] 55/22
57/17
**exhibit 200** [2] 29/7 30/3
**exhibit 205** [1] 31/7
**exhibit 206** [2] 18/9
19/25
**exhibit 210** [3] 49/16
49/18 50/3
**exhibit 212** [1] 49/17
**exhibit 4** [1] 22/20
**exhibit 5** [1] 25/18
**exhibit 63** [1] 71/12
**exhibit 68** [3] 17/8 21/18
33/1
**exhibit 7** [1] 21/22
**exhibit 93** [1] 71/25
**exhibits** [15] 11/25 23/8
34/13 49/4 49/6 49/11
50/19 50/21 52/16 70/22
101/8 121/23 121/25
124/3 124/7
**exhibits 113** [1] 101/8
**exhibits 206** [1] 34/13
**exist** [1] 65/18
**exists** [1] 119/15
**expect** [1] 61/9
**expectation** [6] 40/13
41/2 42/2 61/4 61/6
62/17
**expectations** [3] 40/24
60/17 62/1
**expected** [2] 61/19 61/19
**expecting** [4] 26/14
40/22 40/23 60/23
**expert** [19] 3/25 20/21
28/25 36/13 36/24 37/5
47/15 48/12 48/14 49/20
50/11 52/14 60/8 60/10
63/16 77/12 88/11 88/12
99/13
**experts** [7] 47/10 62/4
62/10 62/22 70/16 75/12
88/25
**explain** [4] 6/4 10/7
31/16 77/17
**explained** [2] 91/15
92/17
**explaining** [1] 112/11
**explains** [2] 10/16 79/3
**explanation** [3] 51/14
83/7 115/23
**explicit** [1] 62/1
**explicitly** [1] 57/10
**extension** [2] 59/18 84/5
**extent** [7] 84/24 85/6
94/23 97/11 102/23
113/12 113/16
**extraneous** [1] 58/7

**F**

**fabricated** [1] 107/24
**face** [2] 71/18 99/18
**fact** [23] 7/3 10/18 12/17

**F**

**fact... [20]** 16/8 17/19 26/15 26/21 30/13 31/23 38/24 41/11 43/13 44/23 45/13 46/9 59/13 66/7 77/1 82/10 83/5 83/16 83/24 90/14
**fact-intensive [1]** 83/5
**factors [6]** 38/16 58/4 100/2 100/9 103/22 111/24
**facts [13]** 51/21 75/5 76/3 92/9 92/10 92/10 92/13 92/14 92/15 93/10 94/5 96/17 115/8
**factual [3]** 49/22 95/7 97/14
**factually [1]** 114/8
**failed [1]** 26/17
**fails [1]** 100/14
**fair [4]** 22/24 26/20 48/17 48/24
**fairness [1]** 103/8
**fall [2]** 61/4 119/21
**falls [1]** 65/21
**false [4]** 60/16 116/3 117/5 119/9
**falsity [2]** 62/6 107/7
**familiar [3]** 55/3 70/23 101/9
**family [1]** 28/20 69/5
**far [9]** 39/15 48/7 48/12 77/4 84/18 94/4 94/13 95/4 97/4
**Faust [1]** 87/5
**federal [2]** 20/22 119/11
**feel [5]** 103/13 103/15 110/3 111/6 114/9
**feels [3]** 48/25 110/10 112/11
**fell [1]** 24/20
**fella [1]** 13/11
**felt [4]** 41/13 88/7 93/22 104/21
**few [9]** 39/24 40/4 60/6 68/22 68/22 77/7 91/17 119/5 120/6
**Fidelity [3]** 105/16 105/16 105/16
**figure [11]** 11/25 55/16 55/20 57/2 59/1 60/4 62/25 63/1 64/15 71/1 72/24
**figured [1]** 15/7
**figures [4]** 56/1 57/21 70/15 102/8
**file [3]** 113/10 114/2 122/10
**filed [9]** 54/15 107/1 107/2 114/2 115/12 115/22 116/15 119/5 121/25
**files [2]** 114/3 117/21
**filing [3]** 49/21 93/1 119/11
**filings [4]** 81/19 105/8

107/8 109/4
**final [14]** 10/9 19/12 69/23 84/19 87/9 101/12 101/19 101/23 102/23 103/4 115/4 120/13 120/21 121/22
**finally [4]** 94/13 98/7 100/24 119/15
**financial [14]** 2/2 2/6 5/9 20/13 45/22 45/25 61/21 62/11 62/15 62/18 85/10 96/9 104/25 108/15
**finding [10]** 38/13 50/5 72/19 75/18 76/15 79/20 80/17 91/7 97/12 114/23
**findings [5]** 93/13 93/23 94/11 94/15 95/7
**finds [1]** 75/20
**fine [5]** 49/7 49/9 53/19 53/23 53/25
**finish [1]** 102/16
**finished [1]** 3/12
**first [38]** 5/12 7/2 7/3 11/22 13/15 18/22 20/16 20/17 26/10 34/19 55/14 56/9 56/11 58/13 64/8 71/2 71/4 71/15 75/21 77/6 77/22 80/15 81/8 83/13 86/8 90/19 91/23 95/21 98/16 99/1 100/25 106/9 106/12 106/24 107/11 117/17 118/7 119/2
**fit [1]** 9/25
**five [5]** 15/5 86/9 107/2 109/18 118/25
**FL [2]** 2/17 2/19
**flawed [1]** 20/24
**fleeting [2]** 21/20 22/2
**flights [3]** 53/5 53/12 53/14
**FLORIDA [3]** 1/1 1/7 1/19
**flow [1]** 54/16
**fluctuations [2]** 68/11 88/3
**focus [3]** 90/9 94/5 112/21
**focused [3]** 55/11 60/6 95/5
**focusing [1]** 8/8
**folks [2]** 107/10 107/12
**follow [3]** 6/1 6/23 101/25
**following [5]** 11/6 23/4 24/19 47/6 54/5
**foot [1]** 110/5
**footnote [1]** 101/23
**foregoing [1]** 124/13
**foremost [1]** 118/7
**foresee [1]** 21/12
**foreseeability [1]** 102/2
**forfeiture [1]** 110/22
**forgive [1]** 105/21
**forgot [1]** 121/22

**forthcoming [1]** 18/5
**forward [6]** 77/24 78/1 78/13 81/24 81/24 82/1 101/19 101/23 102/23 103/4 115/4 120/13 120/21 121/22
**found [15]** 20/24 23/22 24/19 49/21 71/2 75/6 75/23 91/8 92/13 95/7 97/11 98/17 98/19 114/22 118/13
**four [18]** 11/4 12/23 12/24 12/25 13/3 14/8 15/5 15/17 32/8 37/19 81/22 81/23 96/8 96/16 96/17 98/25 112/16 117/2
**four-cent [2]** 11/4 12/25
**fourth [1]** 82/4
**Franklin [4]** 1/18 124/12 124/18 124/19
**frankly [20]** 49/3 57/7 57/22 58/1 60/7 60/9 62/4 62/24 63/8 68/11 69/7 69/25 71/7 71/8 72/16 77/25 100/11 100/12 107/17 117/18
**fraud [120]** 2/2 2/3 2/6 2/7 5/1 5/2 5/3 7/12 7/23 10/19 10/20 11/4 12/5 12/17 14/5 14/22 15/8 15/14 16/4 16/16 16/19 16/20 33/4 33/5 33/7 33/10 33/14 39/8 39/16 43/9 43/16 43/24 44/3 44/5 44/6 44/10 44/12 44/13 44/15 44/22 55/8 55/9 58/6 62/21 65/2 65/13 65/15 86/9 107/2 65/23 66/4 66/5 66/11 66/12 66/13 66/17 67/6 67/6 67/8 68/3 68/5 73/11 73/13 73/14 73/15 73/18 74/22 75/14 75/16 76/8 76/9 76/23 76/24 78/25 81/1 81/8 82/21 83/2 83/19 84/1 84/9 84/18 84/21 85/12 85/13 87/12 87/16 87/20 87/23 87/25 88/6 88/6 88/10 88/14 89/2 89/3 89/17 89/23 90/3 90/8 90/15 90/17 90/21 90/24 91/2 91/5 92/8 95/6 95/8 96/13 99/4 99/5 100/4 101/4 101/4 101/6 106/10 107/1 110/8
**fraudulent [12]** 5/12 5/20 34/4 44/24 76/7 82/3 113/24 114/19 114/21 115/18 115/25 115/25
**fraudulently [3]** 16/11 56/11 66/25
**frequently [3]** 35/23 36/6 83/22
**friend [1]** 87/8
**front [2]** 31/25 35/7
**fulfilled [2]** 46/5 46/16

**full [4]** 19/5 19/6 78/18 79/25
**fully [1]** 118/11
**fundamental [1]** 116/19
**fundamentally [1]** 75/3
**funds [1]** 56/16
**further [7]** 16/23 39/21 47/12 52/18 62/21 118/22 120/18
**future [2]** 46/4 88/15

**G**

**gain [18]** 70/19 70/23 72/13 72/22 72/25 88/4 92/13 92/14 94/23 94/24 94/25 95/3 95/11 95/15 100/24 101/13 101/13 108/25
**gained [3]** 55/6 57/15 57/16
**gains [7]** 70/24 71/3 71/5 94/19 95/17 101/18 108/12
**gambling [1]** 108/7
**game [2]** 105/25 105/25
**gave [5]** 25/12 25/25 73/10 74/21 80/7
**general [3]** 68/12 112/22 119/8
**generally [6]** 42/22 45/1 60/20 82/5 82/25 101/8
**genuine [1]** 26/21
**get --I [1]** 79/9
**gets [4]** 69/23 71/5 79/7 79/8
**getting [2]** 40/15 112/7
**Giglio [1]** 19/20
**give [15]** 7/21 15/20 22/24 23/25 36/3 41/18 46/20 48/18 49/17 51/6 53/21 69/12 87/18 120/6 120/11
**given [15]** 4/4 15/22 33/23 38/7 49/2 49/25 62/1 65/24 77/8 84/25 90/6 90/11 96/12 96/19 115/15
**gives [1]** 82/23
**giving [1]** 115/19
**gloss [1]** 76/3
**goes [6]** 9/21 33/19 44/25 63/2 94/3 115/6
**going [54]** 18/8 19/23 26/18 28/12 31/6 33/9 33/17 33/25 40/9 40/10 40/13 40/20 41/18 41/25 42/3 42/7 42/19 42/22 47/10 47/11 47/16 51/6 51/9 51/18 52/4 52/7 55/10 61/6 61/7 61/9 61/13 61/20 62/17 79/17 83/11 83/14 86/9 86/21 87/5 89/6 102/20 103/15 103/17 103/23 105/5 105/11 108/21 109/22 110/8 112/17 120/17

121/5 122/3 122/5
**gone [2]** 27/15 114/20 116/11
**gonna [2]** 51/17 109/21
**good [19]** 3/2 3/4 3/7 3/8 3/12 17/3 17/4 40/13 40/22 44/9 87/3 87/4 104/11 104/12 105/1 105/9 108/20 109/7 111/25
**goods [2]** 59/12 59/14
**got [17]** 29/19 40/23 41/2 51/17 51/18 53/2 56/15 56/16 59/5 70/25 71/21 71/22 86/25 102/17 103/12 109/3 119/10
**gotten [1]** 89/20
**GOVERNMENT [91]** 1/4 2/2 5/8 5/18 8/20 9/14 11/16 11/25 18/8 19/25 29/6 30/2 30/3 31/7 34/12 34/12 38/11 48/25 49/16 49/16 49/18 50/2 51/3 52/5 52/17 52/22 53/23 54/22 55/15 55/21 55/25 56/20 63/7 69/11 75/8 75/21 75/24 76/19 76/25 77/8 78/11 78/12 79/21 80/19 81/21 82/7 82/18 83/6 83/9 84/4 85/3 85/25 86/13 86/19 88/9 88/17 88/24 90/18 91/10 91/14 91/20 92/2 94/3 94/18 95/3 97/3 98/13 98/14 99/3 99/11 103/2 111/11 112/13 112/16 112/23 113/17 113/23 114/7 114/17 114/20 114/22 114/25 115/8 115/10 115/17 115/23 116/5 116/17 117/7 118/6 118/11
**Government's [17]** 6/24 20/4 30/6 51/14 55/19 57/1 57/17 69/4 82/16 86/8 88/12 89/16 94/21 111/12 120/23 121/11 124/3
**Government's 122 [1]** 120/23
**grandmother [1]** 105/9
**granted [4]** 35/18 35/19 36/9 115/4
**graph [1]** 91/24
**greater [1]** 109/1
**greatest [1]** 115/19
**greatly [1]** 110/9
**ground [1]** 59/25
**Gruenstein [5]** 2/10 123/4 123/6 123/9 123/11
**guess [8]** 7/2 11/24 29/17 29/19 35/2 49/12 111/3 118/7

{WITNESSNAME}                                                                          Index: guidance..investors

**G**

**guidance [1]** 22/25
**guideline [4]** 103/21
103/22 118/21 120/15
**guidelines [16]** 54/24
57/22 57/24 71/6 74/23
94/23 96/3 96/4 96/24
97/10 102/4 102/15
102/23 103/4 103/7
104/8
**guy [1]** 105/14
**GX103 [1]** 84/11
**GX113 [1]** 95/13
**GX114 [1]** 91/19
**GX40 [1]** 4/6
**GX41 [1]** 6/19
**gym [1]** 87/8

**H**

**half [6]** 53/22 64/1 64/8
70/1 74/1 108/5
**Halliburton [2]** 81/4
81/6
**hallmark [1]** 76/5
**hand [1]** 81/5
**handed [1]** 81/10
**happen [2]** 41/9 112/10
**happened [5]** 51/5 90/2
101/1 116/6 117/8
**happy [5]** 53/13 75/2
97/20 104/4 117/15
**harm [2]** 68/14 88/7
**harmed [4]** 65/11 68/2
73/14 88/12
**Harmison [3]** 22/4
93/18 94/10
**Harmison's [1]** 109/20
**Harris [13]** 2/18 13/11
13/12 14/1 14/1 50/25
69/15 81/24 82/9 82/9
84/16 84/16 98/18
**hate [1]** 103/14
**haven't [8]** 30/16 30/16
35/12 43/3 48/11 80/12
106/7 111/4
**having [10]** 12/7 21/6
45/17 64/13 103/16
108/1 112/14 115/7
116/11 116/11
**he's [14]** 51/17 51/18
58/8 58/9 67/8 67/21
74/4 74/5 74/5 82/11
109/8 109/9 110/8
119/12
**heads [1]** 76/17
**health [3]** 61/21 62/15
62/18
**hear [7]** 86/9 100/10
100/11 102/15 105/20
107/21 111/5
**heard [20]** 55/18 60/23
61/1 61/11 61/11 69/20
70/16 75/4 80/11 80/12
86/10 99/19 99/22 99/22
100/12 103/16 104/18
117/11 117/12 118/2

**hearing [6]** 75/7 76/23
83/15 86/24 96/12
116/20
**heart [3]** 95/6 105/10
105/12
**hedging [2]** 108/17
109/2
**held [11]** 5/21 7/23 7/25
9/8 12/4 15/15 57/5 72/5
76/12 88/20 95/10
**help [1]** 73/21
**helpful [2]** 76/22 86/12
**helping [1]** 59/4
**here [64]** 7/3 9/19 9/24
11/1 15/9 17/10 18/23
20/13 21/23 22/4 22/22
23/17 27/24 36/7 41/11
47/17 49/22 53/13 54/1
54/23 55/3 55/8 55/8
55/12 56/1 56/8 57/7
57/11 57/20 60/3 60/11
62/5 62/7 68/9 69/22
70/3 70/15 70/20 70/25
72/12 72/18 73/3 73/5
74/4 74/20 75/5 75/13
75/20 86/17 90/2 91/8
92/6 94/7 99/18 101/1
101/13 101/22 102/10
102/16 103/25 104/3
104/19 110/17 118/12
**hidden [1]** 100/14
**high [7]** 16/12 21/20
22/2 24/13 58/13 60/7
76/10
**higher [7]** 24/5 24/11
41/23 46/6 57/7 57/11
103/7
**highlight [1]** 63/18
**highlights [1]** 68/25
**highly [2]** 96/14 96/15
**himself [5]** 56/16 56/16
56/25 69/3 92/5
**hired [1]** 93/16
**hit [1]** 40/15
**hold [6]** 6/7 7/4 26/25
70/10 88/13 106/3
**holding [7]** 6/12 7/7
11/9 11/12 16/18 88/15
109/2
**holdings [5]** 14/19 15/13
32/19 33/8 44/11
**holds [2]** 43/16 43/17
**Homes [1]** 37/19
**Honor [128]**
**Honor's [1]** 54/15
**HONORABLE [1]** 1/12
**hope [3]** 96/11 105/20
105/21
**hopefully [3]** 103/20
120/12 121/17
**hour [2]** 52/5 53/21
**house [2]** 79/13 110/4
**housekeeping [4]** 54/13
54/18 120/22 121/22
**houses [1]** 79/11
**However [1]** 97/14

**huh [4]** 46/18 50/24 64/7
67/3
**hundred [9]** 66/23 67/4
67/12 67/19 73/12 73/25
77/7 88/5 89/8
**hundreds [3]** 70/12
75/16 110/14
**Hygiene [1]** 37/18
**hypothetical [1]** 75/2

**I**

**I'd [4]** 47/17 71/24 75/1
104/4
**I'll [17]** 29/6 49/17
51/15 51/16 51/24 55/10
73/20 73/20 76/25 77/18
117/1 118/21 118/21
119/24 119/25 121/9
122/5
**I'm [39]** 6/12 10/12 18/8
19/5 19/23 22/7 23/15
24/2 29/23 30/16 31/6
32/1 33/18 43/23 44/12
46/12 48/6 52/13 52/14
55/10 73/20 79/17 94/18
97/20 97/24 101/15
102/20 104/7 105/19
105/19 105/21 107/7
107/10 107/21 110/19
112/3 112/22 113/6
**I've [8]** 18/22 20/11 21/6
21/24 92/7 102/17
110/14 112/7
**IBM [1]** 81/15
**idea [7]** 51/12 61/24
61/25 62/15 71/5 101/5
101/13
**identical [2]** 8/15 71/2
**identification [1]** 9/18
**identified [1]** 83/18
**identify [3]** 86/16 86/19
86/20
**ignorance [1]** 40/5
**image [2]** 113/16 113/16
**imagine [1]** 105/10
**immediately [4]** 11/6
31/23 45/3 92/25
**impact [15]** 60/20 61/2
81/25 82/1 82/10 82/12
85/22 85/24 85/25 86/2
100/19 104/23 114/12
118/1 121/23
**impacted [1]** 104/23
**important [22]** 20/19
23/12 36/1 45/20 51/6
60/18 61/13 62/12 71/13
85/11 87/15 90/13 90/14
91/1 91/22 92/23 104/21
112/8 116/11 116/16
117/9 119/14
**importantly [4]** 60/14
70/24 100/20 119/13
**imposed [1]** 57/23
**imposing [1]** 111/7
**imposition [2]** 50/4

**50/18**
**impounded [2]** 79/8
79/12
**impounding [1]** 45/2
**improper [1]** 51/22
**inappropriate [1]**
101/17
**inclined [1]** 57/6
**include [10]** 4/10 4/13
4/22 7/18 9/24 56/21
65/1 66/20 88/23 103/4
**included [13]** 8/13 10/22
45/23 46/1 46/13 57/1
59/1 65/14 66/1 68/17
87/14 107/22 110/13
**including [2]** 62/20
88/20
**income [2]** 45/21 105/8
**incomplete [2]** 35/19
36/10
**increase [3]** 42/6 43/8
108/5
**increased [1]** 43/3
**incredibly [1]** 72/10
**incurred [5]** 4/22 7/12
10/22 16/15 33/14
**indicate [1]** 16/13
**indicated [3]** 20/13
81/25 93/21
**indication [1]** 83/23
**indicators [1]** 38/4
**individual [11]** 59/2
69/10 70/16 82/14 82/19
83/8 84/11 86/7 86/16
87/16 115/14
**individuals [11]** 7/17
58/21 58/22 59/11 59/12
65/9 65/10 65/14 65/15
69/5 69/20
**indulgence [1]** 74/16
**Industry [1]** 5/9
**infer [1]** 79/14
**inference [1]** 80/5
**inflate [1]** 59/4
**inflated [14]** 63/24
65/12 65/18 66/9 66/22
66/23 67/17 67/19 68/3
73/11 73/16 87/24 87/24
88/13
**inflation [23]** 23/21
23/25 31/3 63/11 63/13
63/18 63/19 64/11 64/12
64/14 64/15 64/16 66/13
66/17 68/8 68/9 68/12
73/6 74/4 87/25 90/22
90/23 90/23
**inflationary [15]** 5/10
65/25 65/25 66/11 67/10
67/14 67/17 67/20 69/13
74/1 74/11 77/11 77/14
77/15 77/18
**inform [1]** 51/5
**information [64]** 3/19
3/20 5/20 8/15 15/18
20/19 21/11 23/11 25/3
25/10 34/4 34/25 35/17

**36/1 39/6 40/14 41/5
41/12 42/4 42/20 42/21
44/24 45/3 45/5 45/19
45/20 45/23 46/18 46/19
46/21 61/19 61/20 61/25
62/8 62/11 62/20 69/21
82/3 82/5 85/1 85/10
85/15 87/10 93/9 94/11
104/24 105/23 106/2
109/8 111/22 112/18
113/7 113/9 113/15
113/19 113/23 113/25
114/4 118/5 118/10
121/24 122/1 122/2
122/4
**inherent [1]** 59/9
**inquiries [2]** 111/10
113/20
**inquiry [1]** 83/5
**insecure [1]** 96/15
**insider [3]** 109/5 109/7
109/10
**instances [4]** 21/12
36/18 38/1 74/5
**Instead [1]** 82/8
**institutional [1]** 106/22
**instructed [2]** 15/4
32/21
**instruction [2]** 6/1 6/6
**instructions [2]** 6/23
7/14
**intend [1]** 102/14
**intensive [1]** 83/5
**interconnected [1]**
45/12
**interpret [1]** 19/14
**interrelated [2]** 62/11
62/14
**interrupt [1]** 54/16
**interval [1]** 23/21
**interview [3]** 86/25 87/6
117/25
**interviewed [1]** 86/24
**interviews [2]** 86/2
118/3
**intrinsic [2]** 66/19 73/24
**introduced [1]** 52/16
**invest [3]** 87/10 107/15
108/8
**invested [5]** 34/4 84/7
107/6 107/18 109/4
**investing [3]** 105/5
105/6 108/18
**investment [3]** 43/22
108/6 108/8
**investments [1]** 105/2
**investor [31]** 6/11 10/20
23/14 60/4 60/11 63/3
63/17 64/20 68/15 69/16
70/16 72/17 75/24 75/25
81/24 82/8 82/15 87/12
87/16 87/20 88/8 88/10
88/11 88/12 92/21 95/23
111/22 112/1 112/12
112/13 112/14
**investors [75]** 3/18 4/13

Index: investors... - market

**I**

investors... [73] 4/15
4/17 5/19 6/12 7/22 8/12
9/8 10/23 11/12 19/14
22/14 23/11 26/14 28/4
36/1 41/2 44/22 55/5
55/18 55/24 56/5 56/11
56/14 57/14 60/22 60/22
60/25 61/5 61/14 61/18
62/1 62/17 63/2 63/22
65/22 68/2 68/2 69/10
69/23 69/25 70/10 73/2
74/22 75/10 75/11 76/20
77/24 80/2 80/4 80/5
80/11 82/2 82/9 82/19
82/21 83/8 83/10 84/11
84/12 84/13 86/4 86/8
88/20 92/19 92/24 93/6
93/7 97/7 97/7 106/23
109/13 113/15 113/24
invitation [1] 102/1
involve [1] 97/1
involved [4] 94/10 110/7
116/14 116/15
involving [1] 101/14
irrational [1] 42/2
isn't [9] 20/22 21/20
21/25 22/15 27/13 30/13
30/19 32/12 102/10
isolate [1] 63/17
isolated [1] 69/13
isolating [1] 67/16
issuances [3] 92/17
92/18 95/21
issue [17] 14/18 37/12
37/20 54/12 54/13 55/11
80/15 82/15 87/15 91/11
92/20 94/1 96/18 110/22
112/6 116/19 117/17
issued [8] 22/18 34/3
58/22 93/1 93/3 93/5
94/9 95/22
issues [7] 79/16 79/18
87/15 96/24 112/4
120/15 120/16
issuing [1] 59/10
It'd [1] 14/6
it's [101] 5/5 5/6 7/9
7/20 11/2 17/16 17/21
18/22 19/4 21/10 22/11
24/4 25/8 26/4 26/7
26/25 27/4 28/10 28/11
29/4 29/25 31/20 31/25
34/21 35/2 37/8 46/17
48/17 51/6 51/15 51/20
51/21 55/16 55/19 55/25
56/21 56/21 57/3 57/4
61/4 61/7 62/12 62/25
62/25 63/1 63/4 66/8
66/22 66/23 67/7 67/16
67/18 70/2 70/17 70/23
70/25 71/1 71/13 72/6
72/10 72/10 73/4 74/10
79/15 80/23 81/3 82/22
85/16 85/19 87/19 87/21
87/22 88/7 89/7 89/16

91/6 91/22 94/21 97/16
99/17 99/18 101/4 101/7
102/5 104/25 108/17
109/2 109/21 109/21
110/12 114/5 114/8
115/13 116/7 116/14
117/1 117/14 117/19
117/22 122/3 122/5
items [2] 7/13 58/7
itself [3] 39/13 41/5
112/6

**J**

J-a-m-i-e [1] 104/15
Jamie [3] 54/25 86/23
104/14
job [1] 106/11
journal [3] 18/5 104/25
105/1
Jr [1] 2/16
judge [10] 1/13 50/1
51/17 79/2 80/6 80/14
80/21 83/1 99/10 121/20
July [2] 1/8 124/16
jumped [2] 40/19 42/3
jurisdiction [4] 119/15
119/16 119/19 119/20
jurisdictional [1] 51/21
jury [3] 101/10 114/23
115/19
just [112] 3/14 5/15 7/20
8/3 9/21 11/21 14/12
15/24 16/13 16/17 18/20
20/9 20/16 22/9 24/2
24/10 25/8 29/23 30/16
32/7 32/21 33/10 36/18
38/20 39/10 43/10 43/19
43/23 43/25 44/2 44/4
45/8 46/20 47/15 47/24
48/1 50/22 51/2 51/3
51/8 51/11 51/20 52/3
52/14 52/15 52/16 53/7
54/12 54/22 55/5 60/6
60/13 63/2 63/6 63/18
64/1 64/5 64/16 67/10
68/7 68/21 68/25 69/7
69/9 69/13 69/19 70/5
71/3 72/16 73/25 74/10
74/16 75/24 80/10 82/11
82/22 86/7 89/13 89/20
91/13 94/11 95/16 96/2
96/16 98/25 98/25 99/1
99/23 100/24 100/25
102/12 102/22 103/15
103/24 104/23 106/6
107/17 110/1 110/12
110/14 110/21 111/13
111/21 111/25 112/22
113/2 115/7 115/16
116/7 118/4 119/8
121/22
justice [4] 2/4 2/8 96/21
96/23
Justin [1] 87/9

**K**

K-l-i-n-e-k [1] 84/12

KAM [1] 1/2
Kaplan [1] 50/1
keep [2] 55/10 58/12
keeping [1] 103/9
Kelly [1] 19/20
KENNETH [1] 1/12
key [2] 77/1 79/17
kind [5] 27/23 35/21
76/21 106/19 111/13
kinda [2] 40/14 41/20
Kipp [1] 37/1
Klinek [1] 84/12
Klugh [5] 2/16 110/25
118/4 118/18 123/12
knew [3] 49/24 93/18
115/8
know [39] 4/14 27/2
28/12 28/18 31/21 35/7
35/10 35/12 39/5 42/10
43/4 48/7 48/10 48/25
53/3 53/3 58/12 79/14
81/4 85/21 86/23 89/1
90/7 90/16 90/20 92/11
95/25 103/22 105/20
106/6 107/8 108/23
109/7 110/15 110/25
111/2 111/5 112/18
117/6
knowingly [1] 119/11
knowledge [3] 4/3 4/13
119/9
known [7] 29/2 33/11
33/19 34/2 49/25 98/14
115/7
knows [3] 67/6 90/3
92/25
Ks [1] 72/1

**L**

lack [1] 34/23
laid [1] 79/23
language [2] 21/2 25/24
large [4] 13/2 25/3 37/12
37/23
larger [4] 37/15 37/21
37/24 85/15
last [14] 9/22 13/12
29/10 29/12 33/1 54/14
60/5 64/3 75/3 75/19
77/2 92/13 99/10 112/20
lastly [1] 32/14
late [1] 79/2
later [2] 64/16 105/13
Laughter [1] 83/10
law [8] 61/23 71/4 78/23
80/18 101/7 106/11
107/9 107/11
lawsuit [1] 107/1
lawyer [2] 116/14
116/15
lawyers [2] 116/13
116/13
lead [2] 101/25 106/22
leader [1] 96/7
leading [1] 16/3
learn [2] 105/5 108/17

learned [2] 106/14 107/6
least [11] 26/21 35/18
88/18 88/22 92/3 93/12
93/22 93/23 111/7 114/9
119/21
leave [3] 18/25 19/9
51/15
led [2] 87/10 101/2
left [3] 51/12 82/19 89/4
legal [11] 79/16 79/18
80/15 87/14 87/15 88/9
90/7 91/11 94/14 96/1
101/19
legally [2] 98/19 114/7
less [5] 33/11 63/1 70/1
75/17 77/4
let [15] 13/15 26/25
29/23 40/4 43/10 45/8
51/24 66/10 81/20 83/11
91/9 105/20 109/17
110/11 120/19
let's [17] 4/6 6/19 8/6
8/10 9/18 10/7 14/14
17/13 21/5 22/20 27/17
35/13 47/3 47/4 53/21
66/21 94/17
letting [1] 48/23
level [10] 23/25 58/13
60/7 96/5 97/24 97/24
98/5 98/8 98/10 102/25
Levinson [1] 81/3
lie [4] 56/11 56/14 60/21
105/15
lies [2] 95/18 107/24
light [2] 47/10 96/17
likely [1] 114/11
limb [1] 116/11
limited [4] 21/6 65/6
67/20 92/10
limiting [1] 65/5
line [1] 9/24
lines [1] 94/8
lines 4 [1] 94/8
list [2] 32/5 86/9
listen [1] 104/4
literature [4] 17/25
19/13 21/6 61/23
little [5] 23/16 26/7
49/15 81/20 84/25
LLP [2] 2/10 2/13
logic [3] 79/4 87/22
87/22
logical [1] 39/18
long [2] 33/24 120/16
looked [20] 9/21 9/22
11/2 15/6 16/12 30/15
31/19 32/21 35/12 36/15
42/19 42/20 42/24 83/20
86/18 89/12 99/23 105/9
107/16 109/20
looking [17] 4/19 8/15
9/19 11/11 15/9 16/2
19/3 20/14 22/7 26/3
32/18 33/10 34/22 44/12
90/12 93/4 103/17
looks [3] 26/18 30/1

36/6
loop [1] 91/3
lose [14] 76/20 84/8
87/16 87/20 88/5 88/6
88/11 88/14 92/22 92/24
92/24 93/1 109/2 119/11
loses [3] 59/6 59/6 67/11
losing [1] 76/11
loss [149]
losses [50] 4/22 5/1 5/2
7/10 7/12 7/18 8/14
10/19 16/16 33/6 33/20
33/22 43/9 44/10 44/12
56/22 56/23 57/14 58/6
60/4 65/5 65/16 65/24
65/25 66/4 66/7 66/19
67/10 67/20 69/13 69/17
69/22 69/24 71/12 74/22
75/11 75/14 75/24 85/6
85/7 88/23 92/2 93/7
106/5 106/6 106/19
106/20 107/3 108/12
108/24
lost [35] 10/23 14/23
16/19 16/21 44/2 44/7
55/18 55/24 63/24 67/5
67/5 67/8 67/21 69/3
69/4 69/10 71/16 71/17
83/18 84/7 84/15 84/17
84/18 84/19 84/21 87/12
87/25 88/10 89/22 95/8
95/9 97/7 106/4 106/5
107/18
lot [11] 45/19 55/7 68/24
84/7 88/25 90/2 95/9
102/17 107/25 110/8
119/10
low [3] 24/7 27/14 75/16
lower [2] 24/5 63/21
lunch [3] 52/6 53/7
53/20
Luxembourg [1] 94/7

**M**

ma'am [3] 104/11
104/17 110/16
mail [1] 1/20
main [1] 3/16
maintained [1] 19/13
majority [5] 34/22 79/25
99/15 108/14 109/11
makes [7] 40/17 75/17
77/10 89/16 103/11
103/19 115/11
making [2] 50/5 61/6
man [2] 107/23 110/5
managers [2] 18/25 19/9
manipulation [3] 49/23
49/25 50/8
manually [1] 35/14
March [1] 40/8
mark [4] 12/13 35/19
61/11 68/25
marked [4] 18/8 18/23
29/6 31/6
market [97] 3/13 3/17

# M

**market... [95]** 3/18 5/3 28/14 28/16 28/19 30/9 30/13 32/6 32/9 32/11 35/1 36/15 37/6 37/9 37/14 37/16 38/5 38/9 38/13 39/1 39/11 39/18 39/18 40/21 41/8 41/10 41/13 41/22 42/1 42/13 42/24 43/3 44/1 44/15 44/21 44/25 45/1 45/2 45/4 49/23 49/25 50/8 50/9 58/4 60/17 61/4 61/19 62/21 66/25 75/18 76/24 76/25 77/23 78/2 78/5 78/7 78/9 78/15 78/18 78/18 78/20 79/3 79/4 79/6 79/9 79/10 79/10 79/15 79/19 79/20 79/23 80/8 80/13 80/16 80/21 81/9 81/12 81/21 82/13 82/18 83/2 83/3 91/7 95/25 97/6 97/13 98/13 99/16 99/20 99/25 106/7 107/12 107/15 107/19 113/18
**market's [1]** 78/17
**market-wide [15]** 3/13 39/18 50/8 75/18 77/23 79/19 79/23 80/13 80/16 81/21 82/13 91/7 97/6 98/13 99/16
**markets [2]** 19/19 45/5
**MARRA [1]** 1/12
**massive [1]** 75/10
**match [3]** 40/24 41/1 51/14
**material [8]** 30/10 102/17 111/18 111/19 112/21 113/1 113/4 117/13
**materialize [2]** 26/18 26/19
**materialized [1]** 26/21
**materials [1]** 84/23
**math [2]** 73/21 97/24
**matter [13]** 30/22 56/24 61/12 64/20 68/12 79/4 87/22 88/11 111/24 116/17 120/22 121/22 124/15
**matters [7]** 93/10 112/3 116/21 116/21 119/17 119/18 120/18
**maybe [9]** 5/6 6/4 11/14 40/22 46/5 53/20 111/16 111/16 120/4
**McMahan [1]** 86/13
**me [49]** 6/3 6/6 13/15 16/12 22/8 25/24 26/25 26/25 29/23 30/1 31/18 36/7 40/4 41/17 43/10 45/8 48/25 51/17 51/19 59/3 66/10 67/18 72/6 73/21 74/5 81/20 83/11 91/9 99/25 103/19 104/4

105/6 105/20 106/15 107/22 109/13 110/10 110/14 110/17 112/5 112/8 116/9 118/18 120/3 120/5 120/11 120/17 120/19 122/10
**mean [20]** 6/11 8/19 24/2 30/16 31/18 37/15 38/3 38/8 42/10 44/8 45/16 47/22 51/16 73/17 82/17 85/11 85/16 99/11 104/3 105/14
**meaning [2]** 16/4 16/6
**means [7]** 6/4 6/6 45/2 79/6 82/17 96/6 108/25
**measure [7]** 43/20 57/10 58/20 64/21 66/20 70/23 74/3
**measured [1]** 68/9
**measures [1]** 55/13
**MedSoft [1]** 106/24
**meet [1]** 17/5
**Melley [24]** 3/22 5/9 6/1 6/5 8/12 8/16 9/13 10/17 11/21 55/17 65/4 65/4 70/22 77/5 77/16 77/24 82/16 83/17 89/2 89/6 89/21 91/3 93/8 97/15
**Melley's [24]** 4/7 6/20 7/16 10/19 10/25 11/10 55/19 63/15 65/1 66/10 68/22 68/23 69/1 69/8 69/17 69/23 70/7 78/22 82/20 84/14 89/8 89/15 97/11 98/7
**members [1]** 57/25
**memo [3]** 75/9 86/25 88/18
**memoranda [2]** 86/2 117/25
**memorandum [6]** 5/5 6/24 7/9 7/15 9/14 87/6
**mention [1]** 85/23
**mentioned [4]** 15/24 38/3 77/22 83/1
**merit [2]** 117/13 124/12
**method [13]** 11/11 11/20 12/22 12/24 64/2 70/2 72/14 72/15 75/23 89/14 89/14 89/16 89/20
**methodologies [2]** 55/22 69/1
**methodology [5]** 60/14 68/23 69/8 69/18 70/6
**metrics [2]** 57/15 57/19
**Miami [2]** 2/17 2/19
**Michelle [1]** 2/2
**might [5]** 10/21 41/11 51/8 111/25 112/24
**million [40]** 10/17 14/23 16/15 16/22 24/25 25/6 25/22 26/8 26/10 26/10 26/15 26/16 27/20 55/15 57/1 57/16 60/12 62/25 63/5 69/24 69/25 70/25 71/16 72/5 72/7 72/9

72/24 72/1 73/2 75/22 75/24 75/25 76/18 76/19 79/13 85/17 92/20 92/21 95/8 103/6
**millions [3]** 69/10 75/11 110/6
**Mills [1]** 110/5
**mind [2]** 93/4 95/13
**minimum [1]** 115/15
**minus [2]** 66/19 67/12 67/19
**minute [4]** 75/1 77/1 77/19 94/17
**minutes [4]** 47/4 48/5 48/20 52/8
**mischaracterization [1]** 65/8
**misleading [1]** 72/10
**misled [1]** 51/12
**misrepresentations [1]** 82/15
**missing [2]** 26/16 26/17
**MITCHELL [1]** 1/6
**mitigation [1]** 113/21
**mitigational [3]** 113/13 113/14 114/12
**model [1]** 84/14
**modified [1]** 75/22
**moment [6]** 25/19 26/1 48/2 50/23 52/13 96/2
**Monday [1]** 41/14
**money [22]** 16/19 16/21 44/7 55/14 55/18 55/23 55/24 59/20 61/7 69/3 76/11 84/7 84/8 87/12 87/16 87/20 88/4 88/5 88/10 94/13 107/18 107/20
**month [1]** 57/23
**months [1]** 119/5
**Moore [2]** 2/10 2/13
**moreover [1]** 118/10
**morning [14]** 3/2 3/4 3/7 3/8 3/12 17/3 17/4 21/7 38/10 60/17 61/18 62/14 71/11 120/25
**mortgage [1]** 110/8
**most [8]** 36/1 45/20 60/5 69/12 92/7 103/19 117/4 117/9
**mostly [1]** 111/10
**motion [16]** 111/9 113/10 114/10 114/14 114/15 115/5 115/16 115/21 117/3 117/4 117/13 119/2 119/3 119/6 123/12 123/12
**motions [10]** 54/15 54/18 111/1 111/3 111/3 111/4 114/15 117/2 118/18 119/15
**Motorola [1]** 81/14
**move [2]** 91/9 121/1
**moved [2]** 82/24 86/1
**movement [3]** 42/24 43/6 108/16

**movements [1]** 30/9
**moves [2]** 19/25 30/2
**moving [2]** 61/16 62/3
**Mr [6]** 68/22 123/4 123/6 123/9 123/11 123/12
**Mr. [104]** 3/22 4/7 5/9 6/1 6/5 6/20 7/16 8/12 8/16 9/13 10/17 10/19 10/25 11/10 11/17 11/21 12/6 14/1 14/18 14/23 15/6 15/10 15/13 15/21 16/4 32/23 33/2 33/6 33/13 43/12 44/11 49/20 50/7 50/11 51/3 54/7 54/15 55/6 55/14 55/17 55/19 55/23 56/10 56/25 57/5 58/14 58/15 58/15 61/1 63/15 65/1 65/4 65/4 66/10 68/23 69/1 69/3 69/8 69/17 69/23 70/7 70/22 76/6 76/21 77/5 77/16 77/24 77/25 78/22 82/3 82/16 82/20 84/20 84/22 89/6 89/8 89/15 89/21 91/3 91/23 93/8 94/20 95/8 95/23 95/23 95/24 96/7 96/19 96/23 97/11 101/24 105/20 106/23 108/13 109/11 109/25 110/4 110/10 110/25 113/5 117/4 117/5 118/4 118/18
**Mr. Anand [2]** 58/15 95/23
**Mr. Carter [1]** 58/15
**Mr. Christian [4]** 49/20 50/7 50/11 51/3
**Mr. Clark [1]** 109/25
**Mr. Harris [1]** 14/1
**Mr. Klugh [3]** 110/25 118/4 118/18
**Mr. Melley [20]** 3/22 6/1 6/5 8/12 8/16 9/13 10/17 11/21 55/17 65/4 65/4 70/22 77/5 77/16 77/24 82/16 89/6 89/21 91/3 93/8
**Mr. Melley's [21]** 4/7 6/20 7/16 10/19 10/25 11/10 55/19 63/15 65/1 66/10 68/23 69/1 69/8 69/17 69/23 70/7 78/22 82/20 89/8 89/15 97/11
**Mr. Nevdhal [1]** 95/23
**Mr. O'Neal [1]** 77/25
**Mr. Peter [1]** 5/9
**Mr. Stein [33]** 14/23 15/6 15/10 15/21 16/4 32/23 33/2 33/6 54/15 55/6 55/14 55/23 56/25 57/5 58/14 76/6 76/21 82/3 91/23 94/20 95/8 95/24 96/7 96/19 96/23 101/24 105/20 106/23

108/13 109/11 110/4 110/10 113/5
**Mr. Stein's [5]** 14/18 15/13 33/13 54/7 56/10
**Mr. Stiglitz [1]** 109/11
**Mr. Taylor [7]** 11/17 12/6 43/12 61/1 69/3 84/20 84/22
**Mr. Taylor's [1]** 44/11
**Mr. Tribou [1]** 117/4
**Ms [3]** 123/5 123/8 123/10
**Ms. [4]** 54/25 83/13 84/4 104/10
**Ms. Carpenter [3]** 83/13 84/4 104/10
**Ms. Jamie [1]** 54/25
**much [18]** 10/23 15/7 15/15 15/21 17/11 17/16 17/21 21/10 27/15 32/1 33/1 76/11 82/23 85/15 92/12 95/25 109/11 122/5
**multiple [3]** 20/21 101/3 116/3
**multiplied [2]** 9/9 10/13
**multiply [4]** 8/1 9/11 12/4 12/19
**Muscillo [2]** 58/25 93/15
**must [3]** 4/17 7/5 95/11
**myriad [2]** 44/7 71/22
**myself [2]** 84/5 114/2

# N

**naked [4]** 90/5 91/1 100/9 100/13
**name [5]** 12/8 13/11 13/12 104/13 104/14
**named [1]** 110/14
**names [1]** 84/12
**narrow [16]** 6/21 8/8 8/9 8/10 8/11 9/15 11/22 12/2 12/6 12/8 13/16 13/17 83/17 89/9 91/6 98/7
**narrowly [1]** 55/11
**NBTY [5]** 29/3 30/8 30/13 37/17 37/22
**near [1]** 107/3
**nearly [1]** 93/25
**necessarily [1]** 7/11
**necessary [1]** 37/9
**need [12]** 28/15 28/18 35/8 39/17 39/18 44/20 44/22 54/16 80/17 93/23 94/16 110/10
**needed [1]** 6/7
**needs [1]** 110/17
**negative [8]** 13/1 13/2 25/3 45/16 46/10 62/11 62/13 85/7
**negatively [1]** 19/14
**Neither [2]** 82/16 119/5
**net [8]** 16/4 16/6 16/21 85/7 94/25 95/3 101/13 101/13

**N**

**Nevdhal [1]** 95/23
**never [15]** 28/12 30/12 33/22 45/23 45/25 46/11 46/13 59/21 59/22 78/12 99/12 105/3 109/2 116/6 116/8
**new [13]** 2/4 2/8 2/12 2/15 22/25 28/22 30/22 49/20 113/10 115/6 115/21 119/7 120/14
**news [27]** 19/15 19/15 19/19 19/19 20/18 22/14 30/9 34/23 34/23 34/25 38/17 40/13 40/15 40/22 40/23 40/25 62/13 79/7 79/9 79/11 81/17 81/18 85/18 87/1 87/4 98/4 108/21
**next [15]** 5/18 14/16 24/15 28/14 40/25 47/4 91/9 93/1 110/18 120/2 120/4 120/6 120/11 120/12 121/18
**no [95]** 1/2 4/1 6/3 6/25 8/23 8/25 10/3 10/5 16/23 18/7 19/15 19/18 19/22 20/2 20/4 20/15 21/10 23/5 23/7 23/10 23/13 23/15 29/19 30/4 30/6 32/7 33/4 33/10 33/18 34/6 34/18 34/25 37/15 38/14 38/23 39/3 39/9 40/1 41/5 42/15 43/9 44/25 45/7 46/24 46/25 49/21 50/5 50/20 50/22 51/20 52/18 52/23 55/2 55/5 57/19 58/16 58/19 63/3 63/4 66/6 67/6 70/3 71/6 71/7 72/17 77/12 77/22 79/5 79/20 80/22 81/17 81/17 82/12 82/22 82/24 83/23 85/20 87/10 88/9 90/7 90/11 92/25 94/8 94/11 94/23 97/6 98/13 103/24 116/4 116/8 117/12 121/11 121/14 121/15 124/4
**Northwest [2]** 2/4 2/8
**note [5]** 54/22 56/23 62/12 96/11 103/12
**notes [2]** 43/10 52/6
**nothing [6]** 19/19 39/21 80/19 98/15 116/15 117/13
**notice [3]** 41/6 41/11 42/13
**notified [1]** 106/8
**number [36]** 4/15 5/16 7/2 7/22 7/24 7/25 9/7 9/12 9/15 10/16 12/16 12/19 15/10 15/11 16/18 17/13 20/25 21/17 25/25 31/24 32/22 38/5 38/8 45/23 60/9 63/21 69/1 69/8 72/2 77/4 77/6 85/20 97/9 98/24 100/2 115/17
**number 3 [1]** 115/17
**number 5 [1]** 17/13
**number 6 [1]** 21/17
**numbers [13]** 15/12 46/16 73/21 75/1 75/19 75/22 77/24 82/20 89/21 91/4 92/2 97/3 97/3
**numerous [1]** 84/1
**NY [2]** 2/12 2/15

**O**

**O'Neal [36]** 3/9 3/12 3/21 11/16 17/3 17/14 18/3 19/18 20/21 25/15 27/10 27/17 28/14 30/12 32/11 33/15 34/2 34/12 60/8 60/10 71/19 76/4 77/25 78/4 79/8 81/10 84/19 84/20 85/4 85/19 89/10 89/19 95/5 95/7 98/3 123/3
**O'Neal's [1]** 91/24
**object [1]** 121/8
**objection [16]** 8/22 8/23 8/24 10/3 10/4 20/1 20/2 20/3 30/4 30/5 39/24 40/1 47/20 50/21 53/10 121/3
**obligations [1]** 118/12
**obstructed [1]** 96/23
**obstruction [2]** 96/21 96/21
**obtain [1]** 114/23
**obvious [1]** 98/11
**obviously [10]** 7/2 7/8 37/15 38/2 40/18 48/8 49/2 56/25 96/5 112/19
**occur [1]** 5/2
**occurred [7]** 7/11 9/10 10/14 11/5 12/20 16/20 42/7
**occurs [1]** 44/6
**October [2]** 34/3 38/21
**off [2]** 4/11 120/17
**offense [9]** 95/12 95/15 95/17 96/5 97/1 98/5 98/8 98/9 102/25
**offered [2]** 80/19 83/6
**offering [1]** 99/12
**offers [2]** 8/21 10/2
**Official [1]** 1/18
**offset [5]** 71/5 72/9 74/8 92/3 101/17
**often [3]** 20/18 36/2 58/18
**Oh [4]** 29/14 43/12 53/16 120/24
**okay [48]** 5/18 6/11 6/14 8/4 8/11 8/18 9/24 12/9 12/13 16/23 19/5 19/7 23/18 24/16 27/19 29/8 29/14 31/8 31/21 31/24 32/17 35/3 40/6 43/7

43/10 47/18 49/11 51/25 52/14 53/16 53/25 54/19 55/1 56/4 56/7 60/24 67/23 68/20 73/22 74/12 102/19 102/22 103/2 104/9 110/20 114/13 121/25 122/12
**omission [12]** 17/14 17/17 17/22 21/8 21/12 21/14 34/16 34/20 35/22 41/5 41/11 42/17
**omissions [2]** 17/25 35/10
**once [5]** 5/3 32/14 36/25 42/4 103/22
**one [59]** 3/16 5/21 9/20 9/22 10/13 11/4 11/7 12/21 12/23 13/23 14/6 25/19 35/18 40/21 43/19 45/11 46/20 48/2 49/5 50/23 52/13 54/12 54/23 65/23 67/6 70/5 73/6 79/16 79/19 80/9 80/12 81/11 82/8 82/10 83/10 83/13 85/12 85/21 86/10 87/18 89/4 89/11 89/13 89/20 89/24 91/14 92/25 97/21 102/23 103/1 106/4 106/4 106/24 109/13 111/9 112/11 115/3 120/21 121/22
**one-third [2]** 45/11 46/20
**ones [1]** 89/17
**online [1]** 115/2
**only [44]** 5/19 5/19 7/16 7/19 11/5 11/11 11/12 13/19 13/23 52/8 56/14 58/5 62/7 65/21 65/23 71/9 80/11 80/20 81/18 81/18 82/5 82/19 85/12 86/10 88/7 88/19 89/4 89/13 89/14 89/16 89/20 90/12 93/1 97/5 97/23 98/17 98/18 99/23 100/12 101/13 105/15 108/13 113/14 120/14
**opening [1]** 94/25
**operating [1]** 85/7
**operations [1]** 45/18
**opinion [30]** 5/2 14/15 14/18 14/21 14/22 14/24 17/14 17/16 17/19 21/7 28/3 37/6 38/11 39/9 41/12 42/17 42/18 43/12 46/17 67/24 79/2 79/22 79/25 79/25 80/6 82/22 82/24 99/15 99/18 101/24
**opportunity [3]** 48/18 100/10 100/11
**opposed [1]** 43/19
**opposing [1]** 48/18
**opposite [2]** 41/9 76/9
**opposition [1]** 95/1
**opt [2]** 106/16 106/17

**opted [1]** 106/25
**option [1]** 108/25
**options [1]** 77/8
**order [7]** 3/1 6/7 28/17 115/12 115/14 116/1 116/3
**orders [21]** 3/20 22/6 22/14 22/25 25/23 26/4 26/20 38/21 41/19 45/17 45/24 46/3 46/5 46/13 46/15 46/19 51/16 51/24 61/8 61/20 66/24
**original [2]** 11/17 12/17
**originally [1]** 104/18
**others [2]** 42/3 38/2
**our [24]** 18/25 19/8 52/6 63/10 76/17 77/20 79/3 83/15 88/10 91/16 92/18 93/4 94/21 94/25 95/1 100/17 102/2 115/20 116/1 116/10 117/7 117/9 117/14 119/8
**outside [2]** 15/11 96/20
**outstanding [1]** 15/18
**over [31]** 14/22 15/8 15/15 16/16 17/10 25/22 26/7 26/15 33/7 33/14 43/1 43/2 43/6 43/8 44/9 54/14 60/5 63/5 68/13 74/23 77/3 83/25 84/17 86/18 103/8 105/18 107/19 119/16 119/19 119/20 120/12
**overall [2]** 15/21 42/1
**overpaid [9]** 65/12 66/8 67/9 67/9 73/13 73/17 74/4 74/5 74/5
**overpaying [2]** 67/22 68/2
**overpayment [1]** 68/14
**overreacted [1]** 40/22
**overstate [1]** 96/18
**overwhelming [2]** 55/16 56/9
**own [5]** 62/10 88/2 105/5 107/1 108/13
**owned [5]** 15/21 91/24 108/13 109/11 109/14
**owns [2]** 108/21 109/5

**P**

**P-a-c-k [1]** 84/13
**p.m [1]** 54/4
**Pack [2]** 84/12 84/12
**page [11]** 1/16 14/16 18/23 19/3 19/4 19/6 20/16 31/20 31/23 31/24 35/13
**page 3 [1]** 31/20
**page 34 [2]** 18/23 19/4
**page 4 [1]** 35/13
**pages [2]** 1/10 25/17
**pages 15 [1]** 25/17
**paid [6]** 33/2 33/11 71/8 77/15 93/18 93/22
**painting [1]** 76/22

**Palm [3]** 1/7 1/19 53/18
**panel [1]** 80/1
**paper [1]** 110/7
**papers [4]** 79/3 110/23 117/14 117/16
**paragraph [14]** 18/24 19/2 19/5 19/6 22/11 26/10 26/11 31/18 31/21 31/22 32/10 35/13 36/12 99/10
**paragraphs [1]** 26/4
**partial [1]** 63/6
**partially [3]** 61/17 61/24 64/12
**participants [2]** 19/1 19/9
**particular [9]** 16/2 44/13 60/19 61/19 82/24 99/24 113/12 113/16 114/5
**particularly [5]** 62/1 70/6 114/16 115/16 119/18
**parties [1]** 99/21
**Partners [1]** 100/15
**parts [2]** 57/4 57/5
**party [1]** 48/18
**Pascucci [2]** 2/2 123/5
**passage [2]** 7/9 20/18
**passing [1]** 100/8
**past [1]** 74/24
**patent [2]** 109/20 109/21
**pay [1]** 59/12
**paying [1]** 109/15
**payments [4]** 58/16 93/25 101/15 101/16
**pays [2]** 66/24 73/10
**pending [7]** 22/6 22/14 22/25 54/18 111/1 111/4 117/2
**people [23]** 4/10 4/22 6/15 6/16 40/24 53/3 65/2 68/17 75/14 77/5 84/6 89/17 89/22 90/2 97/18 103/12 103/14 105/23 105/24 109/15 109/16 110/11 110/12
**people's [2]** 75/15 108/24
**per [2]** 10/13 11/4
**perceived [1]** 21/8
**percent [38]** 15/23 15/23 23/21 23/24 23/25 24/1 24/3 24/6 24/8 24/13 24/20 40/19 42/4 63/11 63/12 63/19 64/1 64/11 64/13 66/13 66/22 66/23 67/12 67/18 67/19 68/9 68/12 73/11 73/14 90/22 91/24 92/1 92/3 92/4 92/22 103/9 108/4 108/20
**percentage [5]** 15/20 64/15 67/16 74/7 108/2
**perform [1]** 58/19
**performance [5]** 44/1

**P**

performance... [4] 44/8
45/22 84/10 85/9
performed [5] 3/22
23/20 30/19 30/25 36/14
perhaps [5] 54/17 75/17
84/5 86/17 99/13
period [87] 4/7 5/11
6/15 6/21 7/12 7/23 8/8
8/9 8/9 8/10 8/11 9/16
10/20 10/20 11/14 11/22
11/23 12/2 12/3 12/7
12/8 12/9 12/12 13/16
13/17 13/20 14/19 14/22
15/2 15/8 15/14 16/3
16/16 16/19 16/20 21/21
33/4 33/5 33/7 33/7
33/10 33/14 43/1 43/3
43/6 43/9 43/16 63/20
63/23 63/25 64/6 64/9
64/14 64/16 64/20 65/7
65/10 65/11 66/4 66/13
66/15 68/13 76/9 82/21
83/17 83/19 84/1 87/13
88/4 88/10 88/23 89/3
89/9 89/23 90/3 90/8
90/23 90/25 91/5 91/5
91/6 95/6 96/13 97/18
97/21 98/2 108/10
periods [2] 64/6 66/18
perjured [2] 114/23
115/7
persisting [1] 114/20
person [12] 64/24 73/10
73/13 73/14 73/15 73/16
77/15 89/25 108/21
109/6 115/11 119/10
personal [4] 56/13 58/14
121/24 122/4
personally [5] 34/2
105/9 107/22 110/15
116/12
pervasive [1] 50/8
Peter [1] 5/9
pick [1] 85/20
picked [1] 85/3
picture [1] 76/22
piece [1] 36/1
pieces [10] 25/10 38/16
39/6 45/20 46/21 56/21
62/11 62/13 85/18 98/4
piggy [2] 56/13 58/15
PII [1] 121/24
pinpoint [1] 39/8
place [1] 107/12
plaintiffs [2] 106/18
106/22
platform's [1] 108/11
Plaza [2] 2/11 2/14
please [4] 3/2 47/7 54/6
104/13
plenty [1] 70/10
plug [1] 113/2
plummeted [1] 70/10
point [40] 22/8 24/3
25/24 27/2 44/5 45/6

47/11 47/14 52/4 61/10
63/3 63/7 64/5 64/17
67/6 71/24 76/2 80/21
85/2 85/2 86/18 88/1
88/7 89/24 91/1 91/15
91/16 91/23 92/23 99/20
100/25 101/12 101/19
102/23 111/20 115/6
115/20 118/25 119/6
120/13
pointed [1] 88/17
points [9] 60/7 60/15
71/3 71/13 91/17 96/16
96/17 98/24 100/25
pool [3] 69/23 69/25
70/1
poor [1] 84/10
portion [7] 5/4 25/9
43/24 43/25 54/24 63/17
122/10
portions [1] 48/15
position [11] 63/8 64/21
68/6 71/16 71/18 73/13
97/4 97/5 98/12 98/12
100/17
positive [3] 40/13 45/14
87/1
possession [2] 113/23
114/4
possibility [1] 80/7
possible [12] 17/17 27/4
34/21 35/1 35/2 46/12
46/15 46/17 69/12
108/19 108/19 115/19
possibly [1] 17/18
potential [3] 38/15
90/19 91/9
potentially [2] 21/12
38/24
PowerPoint [1] 14/14
practice [1] 21/11
practices [1] 32/16
preceded [1] 40/8
precedent [1] 119/17
precisely [3] 61/17
87/21 87/22
precursor [3] 37/6 37/8
38/11
prefer [1] 122/3
preliminary [1] 80/17
premised [1] 78/5
prepared [6] 28/25
29/21 31/13 102/21
118/17 119/23
present [2] 54/7 116/3
presentations [1] 121/16
presented [7] 51/4 55/14
72/10 97/2 97/3 100/21
114/23
presenting [3] 5/8 52/11
88/22
press [55] 3/19 5/12
11/18 12/18 13/11 16/6
16/6 21/23 22/13 22/18

34/2 34/21 39/14 40/7
41/1 41/3 41/14 42/22
43/14 45/3 45/24 46/12
46/14 60/16 60/18 60/19
60/20 61/2 61/5 61/8
61/14 62/6 62/16 62/20
64/9 76/7 83/23 83/24
84/23 84/24 85/6 85/14
86/4 87/6 92/8 92/11
94/1 94/5 95/19 95/22
100/4 114/19 114/21
115/18 116/18
presumably [1] 85/21
presumes [1] 44/21
presumption [2] 83/3
99/17
pretty [2] 7/20 109/11
previous [3] 33/23 36/13
46/2
previously [3] 76/4
81/23 113/11
price [37] 8/2 9/10 11/2
12/5 12/20 16/10 16/12
21/20 22/2 22/17 24/4
25/9 40/11 40/18 41/13
41/15 42/4 44/6 45/4
56/12 59/4 60/23 64/24
65/24 66/16 66/18 70/9
76/7 79/8 79/12 79/13
87/24 88/13 99/5 99/6
100/1 107/13
prices [1] 95/25
primarily [1] 10/18
primary [1] 11/3
principle [1] 65/6
prior [1] 58/2
probably [9] 28/7 36/1
52/8 76/20 108/10
108/17 109/7 109/9
111/6
problem [3] 78/23
103/23 105/10
procedure [1] 106/14
proceeding [3] 75/21
113/17 116/18
proceedings [6] 1/11
47/6 49/22 54/5 122/15
124/14
proceeds [2] 59/23
67/13
process [1] 52/4
produce [2] 111/18
113/6
produced [2] 113/5
117/25
producing [1] 109/19
product [1] 105/14
production [1] 22/6
products [4] 60/24
62/19 105/17 109/19
professor [2] 106/12
107/9
professor's [1] 106/25
profit [1] 16/17
prominent [1] 91/11
promotion [1] 59/3

promotor [1] 93/17
proof [2] 77/22 82/22
proposition [1] 95/2
prosecutor [1] 118/8
prove [6] 78/11 78/14
80/16 82/18 90/18 101/6
proved [1] 95/18
proven [8] 76/25 81/8
96/22 97/6 98/13 99/3
99/4 100/22
provide [5] 22/5 58/18
59/14 97/20 114/8
provided [5] 11/25
36/14 59/12 102/6
120/25
Pryor [3] 80/6 80/14
99/11
Pryor's [1] 83/2
public [3] 31/1 82/2
92/20
publicly [2] 41/7 96/10
published [2] 20/12
20/15
pull [8] 13/14 17/8 21/22
22/20 26/1 32/25 35/4
55/21
pulled [2] 31/25 105/3
pump [9] 14/24 15/25
16/9 16/14 59/4 60/22
76/6 76/7 76/14
pump-and-dump [4]
14/24 16/14 76/6 76/14
punitive [1] 107/5
purchase [24] 3/19
25/22 26/4 26/20 38/21
41/19 45/17 45/24 46/3
46/4 46/13 46/15 46/19
61/8 61/20 66/14 66/24
106/2 110/12 115/12
115/14 115/25 116/1
116/2
purchased [14] 11/13
15/8 16/5 33/4 43/13
43/18 63/22 65/7 65/10
65/15 65/22 66/17 82/21
106/4
purchases [3] 67/18
74/6 83/24
purchasing [1] 63/24
purpose [2] 63/14
113/21
purposes [10] 25/12
29/2 63/10 74/23 75/6
76/14 76/15 111/25
113/25 118/14
pushed [1] 118/3
put [21] 5/6 8/6 45/25
58/1 69/6 70/21 75/25
77/24 77/25 78/12 81/23
81/24 82/1 82/1 83/9
108/25 112/23 112/24
120/17 121/5 121/6
puts [1] 115/11
putting [1] 122/4

**Q**

Qs [2] 15/19 45/3

qualified [3] 58/17
58/19 59/13
quantifiable [1] 70/18
quantified [1] 60/11
quantify [3] 62/23 68/4
68/7
quarter [10] 13/2 15/16
15/16 15/17 16/22 27/1
27/5 36/4 46/2 46/6
quarterly [2] 15/19 25/3
quarters [2] 15/17 45/14
queries [1] 113/7
question [125] 21/5 24/15
36/8 36/9 45/7 51/21
55/2 55/5 57/3 57/20
60/16 61/18 63/3 63/4
72/17 79/19 81/20 84/7
87/11 89/25 90/13 92/17
92/23 94/15 117/18
questioned [2] 85/8
101/21
questioning [2] 30/17
85/4
questions [18] 14/15
16/23 19/1 19/10 36/6
36/13 36/16 38/15 39/24
40/5 46/23 46/23 51/3
52/9 77/9 77/12 117/15
118/16
quick [2] 29/23 118/25
Quickly [1] 3/14
quit [1] 106/11
quite [4] 11/2 51/13 76/9
92/11
quote [3] 75/9 75/10
87/22
quoted [1] 83/4

**R**

R's [2] 15/20
raise [4] 16/10 71/3
93/16 121/22
raised [5] 87/12 87/23
91/10 112/4 113/13
Rand [1] 36/25
range [2] 57/24 75/22
rather [5] 52/24 64/13
67/15 68/10 122/4
ratio [1] 105/8
reaction [4] 31/1 41/8
41/10 44/15
read [19] 5/4 7/9 7/14
20/17 23/6 23/8 30/16
30/17 58/12 92/7 104/25
105/6 105/8 105/23
106/14 108/1 109/3
110/5 110/7
reading [2] 22/10 41/3
reads [1] 19/8
ready [3] 54/9 104/7
real [7] 55/13 60/24
60/25 61/7 61/14 79/10
79/10
reality [1] 70/9
realized [2] 26/15
106/10

**R**

**really [19]** 3/16 13/23 46/2 51/22 55/11 57/4 60/8 60/18 62/6 66/22 68/25 87/1 90/9 90/11 93/9 102/22 111/3 111/14 116/16
**Realtime [1]** 124/13
**reason [14]** 20/16 22/9 68/16 76/17 77/11 79/15 85/20 89/1 89/10 90/1 93/4 95/8 104/21 109/8
**reasonable [4]** 40/7 49/22 102/2 112/22
**reasonably [1]** 70/18
**reasons [10]** 17/22 20/25 44/7 56/9 89/11 90/25 95/16 98/3 98/14 115/3
**rebut [2]** 48/14 48/15
**rebuttal [3]** 52/22 98/22 123/10
**rebutted [1]** 119/14
**recalculate [1]** 50/18
**recall [4]** 11/18 18/2 36/15 37/22
**receive [1]** 85/24
**received [10]** 58/16 70/7 72/2 72/3 72/6 72/7 86/8 115/23 124/3 124/7
**recent [4]** 36/4 36/4 37/24 117/4
**recently [2]** 30/17 36/21
**recess [3]** 47/3 47/5 54/4
**recession [1]** 100/15
**recipients [1]** 93/11
**recognize [3]** 4/6 49/14 60/5
**recognized [9]** 25/22 26/5 26/8 26/22 27/1 27/2 27/14 61/9 61/13
**recommendation [1]** 87/8
**reconsider [1]** 122/6
**record [18]** 13/3 47/8 47/17 48/12 49/2 52/19 54/7 82/8 86/17 93/13 94/12 101/4 104/13 111/25 114/9 115/15 119/7 124/14
**records [3]** 83/20 111/11 114/3
**recoup [1]** 74/9
**recoups [1]** 74/7
**recover [1]** 107/3
**redact [4]** 122/2 122/4 122/6 122/7
**redacted [1]** 122/10
**redirect [3]** 34/8 34/10 123/6
**reduce [1]** 48/10
**reduced [4]** 67/11 69/9 69/18 92/4
**reducing [1]** 103/8
**reduction [1]** 77/17
**reference [2]** 5/15 100/8
**referenced [1]** 94/7

**referred [2]** 82/11 114/18
**reflects [1]** 56/24
**regard [7]** 111/11 111/23 112/9 115/11 115/17 115/24 119/17
**regarding [7]** 22/14 22/25 25/3 30/9 32/15 114/4 116/5
**regardless [2]** 59/23 63/24
**Registered [1]** 124/12
**regularly [2]** 18/25 19/9
**Regulatory [1]** 5/10
**rejected [4]** 102/6 102/10 117/12 117/22
**relate [4]** 85/9 85/10 95/19 113/20
**related [9]** 25/15 35/24 38/21 64/19 85/6 85/8 85/13 85/15 114/10
**relates [8]** 23/21 35/10 92/8 94/19 111/9 113/6 113/7 114/16
**relating [3]** 85/12 114/24 115/25
**relationship [1]** 39/6
**relationships [1]** 38/16
**release [16]** 5/13 16/6 21/23 22/13 22/18 34/25 40/8 41/1 41/3 41/14 42/22 60/19 64/9 95/22 114/21 116/18
**released [2]** 21/25 35/1
**releases [39]** 3/19 11/18 12/18 13/11 16/6 34/3 39/14 43/14 45/3 45/24 46/12 46/14 60/16 60/18 60/20 61/2 61/5 61/8 61/14 62/6 62/16 62/21 76/7 83/23 83/25 84/23 84/24 85/6 85/14 86/4 87/7 92/8 92/11 94/1 94/6 95/19 100/4 114/19 115/18
**relevant [8]** 14/19 49/22 64/6 65/7 65/9 65/11 90/22 90/24
**reliance [33]** 11/17 13/11 14/12 39/12 39/18 39/19 63/23 65/16 66/17 75/18 76/25 77/23 78/9 78/18 79/20 79/24 80/8 80/13 80/16 81/21 81/25 82/13 82/18 91/8 97/6 97/13 98/13 99/3 99/12 99/16 101/22 113/18 115/19
**relied [17]** 3/18 12/17 44/23 60/25 78/2 78/6 80/5 82/2 82/15 82/21 84/24 84/25 86/4 98/15 101/2 101/7 112/24
**relitigate [2]** 101/1 117/20
**rely [9]** 47/22 69/20 80/2

89/17 97/17 105/24 113/24 115/24 116/18
**relying [2]** 45/5 115/18
**remaining [13]** 4/16 7/21 9/5 9/7 10/10 10/11 10/12 12/1 12/3 12/14 12/19 14/1 96/24
**remains [1]** 115/3
**remarkably [1]** 103/5
**remember [7]** 21/2 25/24 29/5 38/4 59/2 60/21 87/6
**remembered [1]** 87/3
**remind [2]** 3/14 101/22
**reminds [1]** 112/5
**renewed [1]** 57/25
**Repeat [1]** 64/3
**repeated [1]** 101/22
**repeatedly [1]** 101/20
**reply [3]** 115/20 116/10 117/7
**report [14]** 28/25 29/2 29/21 30/1 30/8 30/12 30/25 31/13 32/12 47/25 48/18 48/23 51/9 53/18 **Reporter [4]** 1/18 1/18 124/12 124/13
**reports [18]** 3/25 4/5 20/18 36/14 37/5 47/15 47/23 48/10 48/15 49/2 49/6 52/15 52/19 81/17 89/15 103/17 107/8 109/17
**represent [1]** 106/18
**representation [1]** 116/5
**representations [1]** 115/10
**represented [2]** 106/20 116/6
**represents [2]** 68/12 68/14
**request [7]** 35/17 35/18 36/8 64/19 112/23 114/6 117/19
**requested [1]** 116/20
**require [3]** 38/13 93/13 97/12
**requirement [5]** 37/7 38/12 78/21 80/21 81/1
**requirements [1]** 74/21
**requires [1]** 83/3
**rescissory [1]** 75/23
**research [2]** 18/6 34/22
**resemble [1]** 14/24
**resentencing [4]** 1/11 52/20 55/8 112/4
**reserved [1]** 120/22
**resolution [1]** 115/16
**resolve [2]** 112/1 112/2
**resources [1]** 112/24
**respect [6]** 58/13 92/11 99/7 99/19 100/7 110/21
**respectfully [2]** 74/24 97/16
**respects [2]** 69/2 74/25
**respond [1]** 116/24

**response [5]** 57/25 111/12 111/14 116/15 117/10
**responsible [1]** 107/24
**rest [3]** 47/11 53/4 106/20
**rested [1]** 52/21
**resting [1]** 52/11
**restitution [7]** 71/8 72/20 72/23 73/1 73/3 74/23 110/2
**result [19]** 13/8 44/21 45/16 45/18 60/1 65/12 66/13 70/4 74/22 84/9 84/9 88/6 90/15 90/17 92/18 92/19 95/15 95/17 103/7
**resulted [2]** 5/1 96/13
**resulting [3]** 10/14 95/11 98/9
**results [2]** 63/20 110/13
**resumed [2]** 3/9 123/3
**retained [3]** 36/19 36/21 36/23
**retirement [1]** 105/3
**return [2]** 101/15 101/16
**revalue [1]** 45/6
**revalued [1]** 42/1
**revealed [6]** 44/6 62/6 76/8 87/21 87/25 96/14
**reveals [1]** 62/21
**revelation [1]** 12/5
**revenue [7]** 38/25 45/13 45/14 45/17 61/9 61/12 85/10
**revenues [9]** 25/22 26/5 26/8 26/16 26/22 26/24 27/7 38/20 46/5
**reverse [2]** 106/8 114/25
**review [6]** 20/12 21/23 23/2 23/3 84/22 93/11
**reviewed [4]** 18/3 19/18 22/21 35/14
**reviewing [2]** 84/23 103/16
**Richard [2]** 2/16 87/5
**ridiculous [3]** 71/18 101/6 117/5
**right [40]** 6/18 14/13 18/15 18/18 21/25 22/7 28/8 28/12 29/4 29/17 31/25 32/4 40/4 42/10 46/22 47/1 47/4 47/13 49/8 50/12 50/20 52/21 66/21 74/6 74/14 78/19 83/24 102/3 104/10 104/11 111/16 111/16 113/13 116/23 120/10 120/20 121/9 121/16 122/11 122/13
**rights [1]** 104/22
**rise [1]** 40/11
**RMR [2]** 1/18 124/19
**Ronald [1]** 86/13
**room [2]** 23/3 55/4

**roughly [8]** 10/17 62/16 84/21 85/21 89/7 89/7 97/8 98/5
**roundly [1]** 117/22
**row [1]** 43/4
**rule [4]** 111/7 118/22 119/21 119/25
**ruled [1]** 111/4
**rules [2]** 48/8 48/8
**ruling [3]** 70/19 103/15 104/8
**run [1]** 59/25
**Ryskamp [1]** 79/2
**Ryskamp's [1]** 80/21

**S**

**sale [6]** 64/22 67/5 67/8 67/13 73/7 109/16
**sales [4]** 26/14 26/15 27/10 38/25
**same [15]** 13/12 22/2 27/13 33/24 57/20 58/1 58/25 68/7 86/5 89/21 103/9 107/13 112/25 117/10 117/11
**sanction [3]** 50/1 51/11 51/22
**sanctioned [1]** 50/1
**sanctioning [1]** 49/20
**sanctions [2]** 50/5 51/4
**sat [1]** 55/3
**save [1]** 47/25
**saw [6]** 5/15 9/25 71/11 72/4 91/24 112/12
**say [34]** 17/21 20/15 22/24 26/17 26/20 27/25 28/11 36/9 48/16 53/20 53/21 55/10 64/3 67/9 73/23 73/24 73/25 74/2 76/20 78/4 78/7 80/22 84/3 85/2 88/10 92/2 93/5 97/21 99/21 111/16 116/8 116/8 117/17 118/18
**saying [11]** 22/8 22/9 36/7 59/19 59/21 59/22 60/24 67/23 112/23 112/25 113/9
**says [9]** 5/8 5/18 6/6 19/11 35/16 90/21 93/2 99/17 101/24
**schedules [3]** 53/4 120/2 120/5
**scheme [27]** 14/25 15/25 16/8 16/14 55/7 56/10 56/15 57/14 57/16 58/9 60/1 60/21 63/23 66/19 67/15 69/11 70/4 75/10 76/3 76/5 76/6 76/18 76/19 77/7 94/2 94/3 101/6
**school [3]** 19/21 106/12 107/11
**scientific [1]** 28/1
**screen [3]** 5/6 49/19 55/21

**S**

**seal [2]** 122/1 122/5
**search [1]** 114/3
**seated [3]** 3/3 47/7 54/6
**SEC [13]** 28/20 29/21 30/18 36/20 37/20 48/12 48/14 93/1 105/8 107/8 109/4 109/17 118/13
**SEC's [1]** 117/21
**second [30]** 3/18 6/20 15/17 19/2 19/5 19/6 19/8 22/11 26/11 31/22 35/16 46/6 50/4 50/14 50/17 51/18 56/12 60/4 60/19 63/20 64/1 64/9 71/19 75/8 84/11 87/15 100/7 106/23 108/18 117/1
**secondly [2]** 119/8 119/13
**seconds [1]** 118/25
**section [3]** 2/3 2/7 5/6
**securities [7]** 2/2 2/6 78/25 81/1 81/8 81/18 101/3
**security [1]** 96/9
**seem [3]** 7/14 19/14 111/17
**seemed [2]** 37/9 88/21
**seems [3]** 7/8 48/24 53/18
**seen [11]** 17/24 18/22 20/11 21/6 21/24 41/20 44/8 58/2 61/1 71/9 74/23
**sees [1]** 112/13
**segment [1]** 85/13
**sell [11]** 5/22 6/9 16/11 66/15 68/4 76/8 84/1 108/5 108/24 109/1 109/5
**seller [1]** 16/4
**selling [7]** 50/8 90/5 91/1 109/9 109/10 109/15 109/15
**sells [8]** 67/4 67/19 73/11 74/1 74/1 108/4 108/6 108/12
**semester [1]** 107/11
**sending [1]** 57/9
**sense [11]** 15/20 40/16 40/17 77/10 89/16 103/11 103/19 107/15 111/17 113/1 120/6
**sensitive [1]** 121/24
**sent [2]** 50/18 104/23
**sentence [13]** 5/18 18/24 19/2 19/8 19/12 20/17 35/16 57/20 57/23 75/9 103/9 111/7 111/21
**sentencing [25]** 5/5 6/24 7/9 7/15 9/14 19/25 21/22 22/20 25/18 48/8 54/16 58/3 71/2 75/9 75/19 77/2 88/18 102/4 112/6 113/25 114/10

**separate [7]** 45/10 46/18 56/15 56/18 80/6 91/14 118/14
**September [9]** 5/12 11/14 11/15 34/3 38/21 63/10 66/15 114/21 114/24
**September 2007 [1]** 66/15
**September 20th [3]** 5/12 114/21 114/24
**serve [1]** 113/21
**served [1]** 106/10
**services [6]** 58/16 58/18 58/19 59/12 59/14 96/1
**set [2]** 114/15 117/14
**setting [2]** 61/5 62/17
**seven [2]** 24/21 96/5
**several [4]** 56/9 77/8 96/4 119/5
**SFranklinUSDC [1]** 1/20
**Shannon [2]** 3/9 123/3
**share [11]** 10/13 11/4 56/12 66/22 73/10 73/12 75/2 92/17 92/18 107/14 107/16
**shareholder [7]** 6/9 11/9 25/4 27/13 27/15 45/16 85/7
**shareholders [7]** 7/3 7/5 7/10 73/4 91/13 91/14 110/14
**shares [101]** 4/11 4/16 4/17 5/21 5/23 6/8 6/9 6/12 6/16 7/4 7/6 7/17 7/21 7/22 7/23 7/24 7/25 9/5 9/7 9/7 9/8 9/11 10/10 10/11 10/13 11/9 11/12 12/1 12/4 12/14 12/15 12/19 14/2 15/10 15/11 15/18 16/5 16/7 16/9 16/18 16/18 32/19 32/22 33/2 33/3 33/4 33/12 44/6 56/15 56/24 58/17 58/21 58/22 58/23 58/24 59/5 59/7 59/7 59/8 59/11 59/11 59/15 59/25 68/17 70/11 71/21 71/22 72/2 72/5 72/7 88/20 92/20 92/21 92/25 93/3 93/5 93/12 93/18 93/25 94/9 94/10 95/21 95/22 106/3 106/3 108/10 108/14 108/22 108/24 109/5 109/5 109/5 109/6 109/9 109/10 109/12 109/14 109/14 109/15 109/15 109/16
**she's [5]** 48/15 54/24 59/1 83/18 86/23
**sheet [5]** 15/3 15/14 32/24 45/21 86/15

**shell [1]** 73/4
**ships [2]** 23/16 32/14
**short [5]** 21/21 47/3 50/8 90/5 91/1
**shorts [2]** 100/9 100/13
**should [22]** 47/23 48/13 49/24 53/20 66/23 72/21 74/24 77/20 82/25 87/13 90/12 93/22 95/4 98/2 102/16 111/6 112/2 113/8 113/10 116/19 120/3 122/7
**shouldn't [1]** 111/18
**show [18]** 12/6 12/9 13/15 17/9 18/8 19/23 29/6 31/6 31/18 72/1 75/13 78/6 78/13 108/1 113/10 113/14 114/11 116/2
**showed [10]** 5/17 12/11 13/17 21/7 32/22 34/12 50/10 59/20 83/21 84/11
**showing [2]** 7/10 83/3
**shown [5]** 37/5 38/10 57/17 58/5 90/25
**shows [7]** 4/15 8/12 9/5 45/22 58/10 72/5 113/24
**Shue [1]** 19/20
**sic [3]** 9/11 19/20 62/22
**signaled [1]** 22/13
**SignaLife [38]** 3/17 5/11 5/21 14/19 14/23 15/4 15/19 15/21 16/4 22/5 22/13 25/21 26/14 26/24 27/7 32/20 33/9 34/5 37/21 37/25 44/1 44/8 56/12 59/5 61/6 71/1 71/12 71/23 72/1 73/2 75/10 82/5 84/7 93/6 96/20 100/1 105/2 105/5
**SignaLife's [8]** 22/17 27/14 32/18 99/4 99/6 99/24 99/25 100/5
**signed [2]** 115/14 116/4
**significant [7]** 43/5 43/5 45/15 59/3 60/20 76/1 96/12
**significantly [2]** 37/21 103/1
**silence [2]** 18/3 19/14
**similar [9]** 9/20 11/2 32/7 50/6 63/1 70/25 71/1 95/14 95/16
**simple [1]** 113/19
**simply [13]** 9/5 10/9 10/22 16/12 16/17 28/6 36/11 41/23 59/24 63/4 84/9 94/11 111/24
**since [10]** 29/25 47/16 53/2 75/19 106/1 106/7 107/6 114/17 115/5 119/18
**single [4]** 23/14 81/24 81/25 90/22
**sir [1]** 119/1
**sit [2]** 94/18 96/3

**sitting [1]** 54/24
**situation [4]** 27/13 41/6 41/10 106/15
**situations [1]** 106/17
**six [1]** 98/6
**skewing [1]** 70/13
**skimming [1]** 34/15
**slide [5]** 17/9 17/13 21/17 33/1 72/4
**slightly [3]** 62/24 73/20 73/20
**small [2]** 37/17 83/16
**smaller [5]** 64/14 64/15 68/13 68/13 85/14
**sold [32]** 4/10 4/17 5/22 6/16 7/5 10/21 15/8 16/5 16/7 63/25 64/20 64/23 65/2 65/9 65/14 65/17 65/19 65/23 68/17 70/8 73/15 73/18 76/9 77/5 81/13 83/22 84/13 88/16 88/21 94/11 95/24 97/18
**solvency [1]** 96/9
**somebody [2]** 119/10 119/10
**somehow [4]** 51/12 59/9 71/5 99/14
**someone [5]** 36/7 64/23 66/21 79/12 83/18
**something [13]** 21/2 43/7 46/3 66/5 87/23 88/13 112/14 114/19 116/12 117/21 118/4 112/13 122/6
**somewhat [1]** 85/19
**soon [1]** 86/21
**sophisticated [1]** 96/6
**sorry [12]** 6/12 10/12 19/5 23/15 24/2 29/19 29/23 32/1 46/12 52/13 105/19 107/10
**sort [19]** 15/15 28/1 32/8 36/3 38/7 39/5 40/21 41/2 42/2 42/5 42/6 42/21 44/1 45/6 45/21 46/18 83/24 100/13 112/18
**sought [1]** 114/3
**sounds [3]** 29/5 30/24 84/25
**South [1]** 107/1
**Southeast [1]** 2/16
**SOUTHERN [3]** 1/1 28/22 49/19
**Southwest [1]** 2/19
**speak [4]** 18/4 23/14 51/24 110/17
**specific [6]** 43/25 74/21 82/15 87/10 99/13 111/10
**specifically [4]** 35/16 51/4 51/5 82/3
**specifics [2]** 37/22 51/13
**spend [1]** 96/2
**spends [1]** 105/22
**spike [1]** 40/11

**spiked [1]** 22/17
**split [1]** 106/8
**spoke [3]** 3/13 84/16 84/23
**spreads [1]** 34/16
**spreadsheet [8]** 8/3 8/7 8/12 8/13 8/19 9/2 9/20 10/10
**spreadsheets [1]** 89/15
**square [1]** 110/5
**Stanaford [1]** 79/2
**stand [3]** 3/9 47/25 48/23
**standard [3]** 81/7 102/6 102/9
**Starbucks [3]** 107/13 107/14 107/16
**start [2]** 8/10 83/11
**started [5]** 60/15 70/1 72/8 86/24 107/11
**starting [1]** 60/15
**starts [1]** 35/13
**state [3]** 25/21 86/4 98/11
**stated [4]** 17/22 42/16 82/2 117/6
**statement [8]** 45/21 64/19 68/1 81/25 82/10 82/12 104/24 109/25
**statements [10]** 46/1 46/11 82/1 82/2 85/24 85/25 86/2 100/19 118/2 121/23
**STATES [3]** 1/1 1/3 1/13
**statistical [3]** 23/19 28/1 61/2
**statistically [3]** 43/4 43/5 60/19
**statistics [1]** 24/10
**status [1]** 112/4
**stay [2]** 48/13 53/13
**STEIN [37]** 1/6 14/23 15/6 15/10 15/21 16/4 32/15 32/23 33/2 33/6 54/15 55/6 55/14 55/23 56/25 57/18 54/18 74/6 76/21 82/3 91/23 94/10 94/13 94/20 95/8 95/24 96/7 96/19 96/23 101/24 105/20 106/23 108/13 109/11 110/4 110/10 113/5
**Stein's [5]** 14/18 15/13 33/13 54/7 56/10
**step [1]** 37/9
**Stephanie [1]** 19/19
**Stephen [4]** 1/18 124/12 124/18 124/19
**steps [2]** 32/7 32/8
**Stiglitz [1]** 117/5
**still [20]** 6/8 7/23 9/8 39/17 57/23 65/18 66/9 66/9 66/16 66/20 67/16 67/21 68/14 70/10 73/4 74/11 97/23 103/4 106/3

**S**

**still... [1]** 113/17

**stock [109]** 3/17 5/11
5/22 8/2 9/9 11/2 12/20
14/23 15/4 15/5 15/21
16/10 16/12 22/17 24/20
29/2 30/9 30/13 31/1
31/3 37/10 37/12 37/13
38/6 38/6 40/18 41/13
41/15 41/22 42/1 42/4
42/6 43/16 45/4 45/6
59/3 59/5 60/22 63/11
63/13 64/11 64/13 64/20
65/12 65/12 65/19 65/24
66/8 66/12 66/24 67/22
68/3 68/12 69/6 70/9
73/25 76/6 76/7 76/10
76/11 76/12 78/12 78/14
79/8 79/12 81/15 81/16
82/24 83/22 83/25 84/10
85/5 87/4 87/7 88/1 88/2
88/3 88/4 88/16 90/1
90/2 90/4 90/13 90/14
90/16 90/20 92/21 93/17
95/9 95/24 96/1 96/12
99/4 99/6 99/25 100/1
100/6 106/7 106/7 106/8
107/7 107/12 107/15
107/18 108/4 108/5
108/15 108/20 108/22

**stockholder's [1]** 13/1

**stockholders' [1]** 46/10

**stocks [6]** 37/16 37/16
37/17 37/19 37/21 109/3

**stole [3]** 32/19 55/15
55/24

**stop [3]** 108/3 108/11
108/23

**strategy [1]** 118/9

**Street [2]** 1/19 2/19

**stricken [1]** 47/17

**strikes [1]** 102/2

**strong [1]** 19/12

**strongest [1]** 28/17

**studies [4]** 20/13 31/17
32/3 39/16

**study [28]** 28/16 28/18
30/19 31/22 36/12 37/7
37/11 38/12 42/17 43/2
44/4 44/14 44/18 44/20
58/5 60/9 60/14 65/5
78/5 78/8 78/13 78/15
78/17 78/21 78/22 79/6
80/10 99/23

**subject [4]** 46/14 52/15
52/17 96/25

**submit [14]** 47/24 48/1
48/17 49/4 49/4 49/12
50/10 56/20 57/11 70/1
80/17 97/16 117/16
122/9

**submits [1]** 55/25

**submitted [2]** 3/24
100/17

**submitting [1]** 110/22

**subpoenaed [1]** 104/19

**subscription [1]** 105/1

**subscription-based [1]**
105/1

**substantial [7]** 33/8
57/18 71/21 96/8 99/19
119/7 119/10

**substantially [3]** 50/6
62/25 111/24

**subtract [1]** 32/19

**successful [1]** 109/22

**such [2]** 38/5 101/16

**sued [1]** 107/4

**suffer [6]** 59/18 64/24
69/21 77/15 84/14 88/16

**suffered [10]** 7/19 12/7
65/16 65/23 66/3 67/21
70/4 75/15 83/16 88/23

**suggest [2]** 86/3 99/11

**suggested [2]** 80/14 84/4

**suggesting [1]** 113/3

**suggestion [3]** 52/24
53/11 99/14

**suggests [2]** 18/25 19/8

**Suite [1]** 2/17

**sum [1]** 7/21

**summarized [1]** 55/17

**summarizes [1]** 55/22

**summary [1]** 70/22

**summed [1]** 10/10

**supplement [3]** 82/7
115/13 119/3

**supplemented [1]** 115/5

**support [10]** 17/24
19/13 71/4 71/6 71/7
78/24 79/21 80/22 90/7
102/7

**supportable [1]** 98/19

**supported [1]** 111/14

**supporting [2]** 17/25
116/1

**supports [2]** 61/23 61/25

**Supreme [4]** 80/25 81/4
81/6 87/19

**sure [13]** 22/11 26/1
29/24 43/11 45/9 48/4
48/6 48/22 53/9 74/12
74/17 109/24 120/16

**Surrebuttal [1]** 123/11

**Swaine [2]** 2/10 2/13

**sway [1]** 86/3

**Swisher [1]** 37/18

**sworn [1]** 119/9

**Symbol [7]** 30/18 31/3
37/18 37/22 81/11 81/11
81/13

**Symbol's [1]** 31/1

**T**

**T-r-i-b-o-u [1]** 119/3

**t.hose [1]** 108/6

**Taipan [1]** 104/25

**take [26]** 7/24 12/3
12/19 13/3 23/25 26/1
29/23 47/3 47/4 52/5
53/1 53/20 59/17 71/13
71/20 72/11 72/16 77/5

86/18 89/1 89/3 91/4
97/15 109/9 117/1
120/17

**taken [4]** 47/5 54/4
59/23 63/8

**taking [4]** 15/14 63/25
89/22 97/17

**talk [12]** 32/9 32/11
32/14 42/22 48/5 75/2
75/18 76/25 81/20 94/17
104/3 112/6

**talked [1]** 84/22

**talking [14]** 31/24 39/10
56/4 75/22 79/17 83/11
87/18 91/22 91/25 93/7
96/2 111/19 111/22

**talks [1]** 112/8

**taught [1]** 105/6

**Taylor [14]** 11/17 12/6
12/13 43/12 61/1 61/11
68/25 69/3 82/9 82/10
84/16 84/20 84/22 98/18

**Taylor's [1]** 44/11

**teaches [1]** 108/8

**tease [1]** 43/23

**technical [2]** 111/15
111/17

**Technologies [5]** 30/18
37/18 81/11 81/12 81/13

**technology [2]** 72/3
105/11

**tell [9]** 44/23 51/17
51/19 82/14 102/14
103/20 109/4 120/3
120/5

**telling [1]** 109/18

**tells [1]** 105/1

**tend [1]** 37/5

**tens [1]** 76/20

**termed [1]** 11/11

**terms [3]** 37/22 45/12
112/11

**terrified [1]** 107/7

**test [4]** 28/15 80/8 80/8
102/2

**testified [30]** 13/10
14/11 17/24 18/2 20/21
21/19 23/24 24/7 25/2
27/20 28/15 34/21 46/7
48/11 48/13 58/15 62/23
69/3 69/16 76/5 77/13
77/14 84/20 93/8 93/9
93/16 93/20 95/23 95/24
97/7

**testify [7]** 11/17 36/23
60/23 61/1 61/12 99/22
112/20

**testifying [1]** 21/23

**testimony [31]** 5/9 17/6
22/22 27/10 28/9 32/15
35/25 43/13 47/11 47/16
48/1 48/19 48/24 66/5
70/16 72/17 82/5 82/8
86/12 93/21 94/8 94/14
99/13 100/18 100/19

103/16 103/18 114/23
115/7 116/3 123/3

**testing [2]** 32/5 100/16

**Thank [45]** 16/24 17/10
19/17 21/4 21/16 24/22
28/13 31/11 32/1 34/7
39/21 39/23 46/22 47/1
47/2 47/13 49/9 51/7
52/1 54/2 54/3 54/11
54/20 54/21 74/14 74/15
74/18 74/19 91/19 98/20
98/21 102/10 102/11
104/6 110/16 116/21
121/12 121/14 121/16
121/19 122/12 122/14
121/20

**Thanks [1]** 121/20

**that's [99]** 7/8 8/2 11/6
13/22 17/8 18/5 19/2
19/11 20/15 21/15 22/3
22/19 23/1 24/2 24/12
25/1 25/14 26/6 26/9
28/8 29/4 31/2 31/5
33/16 34/7 34/25 36/9
36/11 37/3 38/6 42/8
43/7 44/11 44/16 44/19
46/6 46/10 49/9 50/2
51/18 53/19 53/23 53/25
55/15 55/20 56/8 57/17
58/10 59/10 59/24 60/17
64/16 64/17 67/24 68/8
68/16 69/15 71/9 73/10
76/1 78/8 78/19 79/7
83/7 87/25 88/1 89/5
89/5 90/23 92/23 93/4
93/19 94/4 96/7 96/8
96/20 97/18 100/22
102/9 106/6 106/9
106/18 108/3 108/7
108/11 109/7 110/4
110/17 112/7 112/15
112/18 112/21 114/19
115/22 116/18 117/19
118/8 120/16 121/4

**the 15th [1]** 12/3

**the 20th [1]** 11/14

**the 25th [1]** 11/15

**themselves [1]** 51/25

**theoretical [1]** 70/8

**theory [4]** 49/24 94/17
94/19 113/18

**there's [73]** 13/10 33/16
34/24 41/8 41/9 45/13
45/13 45/15 45/15 50/20
52/7 54/23 55/2 55/4
55/7 55/23 55/24 57/13
57/19 59/8 60/24 61/9
62/17 63/3 63/4 63/4
63/11 64/22 65/8 66/17
68/24 70/15 71/4 71/6
71/6 72/17 72/18 73/12
77/22 78/9 79/1 79/5
79/20 81/17 83/22 88/25
90/7 90/7 93/1 93/2 93/2
93/12 94/23 96/6 96/21
96/21 97/6 97/14 98/13

**subscription** 101/21 105/13 106/17
108/2 108/5 108/12
108/23 109/4 109/8
113/16 115/1 117/2
117/12 118/5

**therefore [5]** 4/17 7/6
46/19 64/15 94/22

**they'd [1]** 22/14

**they're [20]** 26/17 26/18
36/7 56/25 59/11 59/18
59/21 59/22 60/24 61/5
66/9 69/13 70/11 71/10
82/19 83/11 88/15 109/1
111/16 115/15

**they've [7]** 11/11 66/16
72/9 98/15 98/15 102/6
109/1

**thing [7]** 61/13 64/3
81/18 82/4 103/1 112/25
117/9

**things [8]** 38/9 41/21
58/8 81/23 81/23 112/12
113/20 122/4

**think [100]** 15/22 21/1
21/10 24/2 26/9 26/9
28/1 28/17 29/4 32/8
34/21 35/24 37/15 38/3
40/8 40/21 42/19 43/20
46/6 48/7 48/10 48/12
48/13 48/17 48/23 49/3
51/4 51/6 53/2 53/7
54/14 54/16 56/8 56/17
57/7 60/2 60/17 61/14
62/4 62/6 62/12 63/2
65/8 66/6 66/7 68/8
68/23 68/25 69/5 69/9
69/15 70/15 71/11 71/13
71/18 72/3 72/4 72/6
72/13 72/14 72/21 75/3
76/3 76/21 79/9 79/10
79/17 80/15 85/16 86/4
86/10 86/11 88/24 91/11
91/22 93/12 97/13 97/16
99/2 99/18 102/20 103/4
103/11 103/12 103/19
104/7 105/22 110/8
110/9 111/14 113/22
114/6 114/16 115/17
116/12 116/18 117/1
117/2 117/9 118/4

**thinking [1]** 91/17

**thinks [1]** 74/24

**third [10]** 4/19 10/11
13/1 15/16 45/11 46/20
49/21 57/13 80/7 91/11

**thirds [1]** 12/25

**Thomas [1]** 119/3

**those [98]** 4/3 4/13 4/17
4/22 4/25 7/5 7/13 10/12
12/1 12/4 15/7 15/11
15/17 16/19 16/21 25/10
25/15 32/5 34/13 34/16
36/5 36/15 36/18 36/18
37/16 37/17 37/19 37/21
37/23 41/21 42/8 42/18
44/9 45/16 46/15 46/16

## T

**those... [62]** 46/20 47/15 49/6 50/4 50/18 50/21 52/14 52/16 52/17 54/17 52/1 56/1 56/17 56/20 57/5 58/7 58/21 58/21 60/18 60/20 61/2 62/13 65/7 65/15 66/4 66/7 67/9 69/12 69/19 70/10 70/11 77/12 77/13 78/1 78/2 78/2 85/12 85/12 86/11 90/10 91/7 92/15 92/18 92/24 95/3 95/21 97/7 100/10 100/16 101/8 101/8 108/6 108/7 108/7 109/14 110/13 113/20 116/21 117/7 118/2 118/3 119/24

**though [6]** 17/11 36/7 40/18 59/19 70/8 83/25

**thought [9]** 29/10 41/15 87/2 87/3 87/7 90/7 90/10 109/21 116/10

**thoughts [2]** 53/1 103/18

**thousand [1]** 89/8

**thousands [3]** 70/12 75/16 76/20

**three [41]** 4/20 7/3 7/3 13/4 14/8 52/7 25/10 25/11 25/15 27/21 27/23 31/16 32/2 32/5 32/9 38/16 38/16 39/6 45/10 55/13 60/15 60/16 60/18 60/20 61/5 62/11 79/16 79/23 80/9 85/4 85/18 87/14 97/19 98/2 98/3 107/19 110/14 111/3 114/18 116/21 117/2

**three starting [1]** 60/15

**through [21]** 9/21 9/22 37/13 51/9 55/3 56/16 56/17 58/4 58/11 60/13 68/22 70/22 70/22 80/1 80/3 91/21 100/18 100/21 108/14 109/12 109/16

**throughout [10]** 7/12 10/19 16/20 43/16 53/19 58/2 58/2 63/25 64/14 67/15

**THS [1]** 95/20

**thunderstorms [1]** 53/19

**Thursday [1]** 41/15

**times [7]** 13/3 14/6 14/8 20/22 37/24 84/1 112/23

**timing [1]** 27/3

**today [21]** 17/6 53/6 70/11 74/20 79/17 86/23 100/23 102/21 103/15 104/1 104/8 105/20 107/10 107/12 107/15 109/23 114/16 114/18 118/2 118/18 119/24

**together [7]** 41/21 42/9 53/1 82/1 85/1 97/8

**119/25**

**told [3]** 15/6 86/21 110/1

**too [3]** 24/11 122/3 122/5

**took [9]** 9/7 10/12 33/5 58/17 59/20 65/4 89/11 106/25 115/1

**topic [1]** 86/7

**topics [1]** 25/15

**total [13]** 7/24 7/25 9/5 10/11 10/14 12/16 12/25 14/11 15/18 16/21 77/3 97/10 98/9

**totals [1]** 9/4

**touting [1]** 105/2

**town [3]** 53/3 103/13 103/14

**trade [1]** 108/1

**traded [7]** 38/2 38/6 38/7 96/10 105/3 106/7 108/10

**trader [1]** 83/21

**trades [6]** 16/21 86/16 86/19 86/20 108/6 114/5

**trading [26]** 11/6 14/19 14/24 15/1 15/4 15/5 15/7 16/12 16/14 16/20 24/19 33/25 58/24 71/12 83/20 86/14 100/15 107/16 107/25 108/7 108/11 111/10 111/12 114/5 117/24 121/1

**transcript [6]** 1/11 22/21 23/6 92/7 92/8 124/14

**transfer [1]** 55/16

**transferred [5]** 56/15 56/16 56/24 58/21 59/16

**traveled [1]** 103/25

**trial [31]** 13/10 23/6 23/9 48/9 55/3 55/16 56/10 57/18 58/2 59/20 69/16 70/21 71/22 71/25 71/25 75/4 86/17 92/6 92/7 92/7 93/16 94/5 94/8 95/18 96/22 100/19 101/1 101/2 113/10 115/24 117/6

**Tribou [3]** 117/4 119/2 119/3

**tried [2]** 69/11 69/22

**trigger [1]** 108/24

**triggered [1]** 108/3

**triggering [1]** 108/23

**true [5]** 58/25 69/15 75/6 103/10 121/24

**trust [3]** 95/21 96/19 107/18

**trusts [4]** 56/17 94/7 108/14 109/12

**try [5]** 36/8 40/4 42/13 55/10 76/17

**trying [12]** 16/9 40/15 43/23 44/2 45/11 58/8 58/8 84/5 84/8 112/3 113/6 113/9

**turn [5]** 18/23 21/5 21/17 24/15 25/17 27/17 28/14

**turning [1]** 30/18

**Twenty [1]** 118/25

**Twenty-five [1]** 118/25

**two [64]** 3/16 5/22 7/2 7/13 11/3 12/1 14/11 24/19 26/4 34/13 37/17 37/20 37/20 37/24 41/21 41/23 42/8 42/18 42/18 43/1 43/6 45/20 47/9 47/15 48/20 49/4 49/6 50/19 52/6 53/8 54/14 56/1 56/20 56/21 57/4 57/7 57/12 60/5 64/5 65/24 69/19 74/24 75/3 75/7 82/9 82/19 89/11 89/12 96/7 96/21 96/24 97/7 97/8 98/15 100/25 104/22 105/6 105/13 106/17 109/24 111/2 111/3 112/17 116/21

**two-day [3]** 43/1 43/6 75/7

**types [1]** 99/12

**typical [1]** 16/8

## U

**U.S [7]** 2/4 2/8 5/5 36/25 37/1 81/6 87/19

**Uh [5]** 27/25 46/8 50/24 64/7 67/3

**Uh-huh [4]** 46/8 50/24 64/7 67/3

**ultimate [1]** 63/14

**ultimately [8]** 75/23 82/17 86/10 88/24 90/6 90/10 90/12 95/18

**Um [3]** 24/14 33/3 35/23

**uncertainty [1]** 93/12

**Uncle [1]** 100/15

**unclear [1]** 84/25

**under [14]** 14/12 57/19 57/20 62/24 69/8 69/9 69/17 84/15 94/22 102/3 119/16 119/21 122/1 122/5

**undercut [1]** 116/1

**underlying [7]** 44/16 51/21 93/10 121/1 121/1 121/5 121/7

**undermine [1]** 59/15

**Underreact [1]** 19/19

**understand [18]** 35/21 37/9 41/4 45/13 53/9 71/15 74/13 75/21 78/6 83/13 112/2 112/3 113/6 113/7 113/18 117/18 118/18 121/5

**understanding [7]** 4/9 4/9 15/13 36/11 76/21 80/24 83/16

**understood [2]** 52/10 83/14

**unfair [1]** 103/5

**unfortunate [1]** 110/4

**Unfortunately [1]** 77/11

**Unit [2]** 2/3 2/7

**UNITED [3]** 1/1 1/3 1/13

**University [1]** 19/20

**unless [1]** 118/16

**unlikely [1]** 110/2

**unorthodox [1]** 49/15

**unrelated [1]** 91/2

**unsupported [1]** 101/7

**until [10]** 64/22 77/16 87/21 88/1 88/6 88/16 89/15 108/17 119/5 120/18

**unusual [1]** 83/24

**upcoming [2]** 41/3 41/19

**upon [5]** 43/14 44/23 78/9 82/15 113/24

**ups [1]** 108/16

**upset [1]** 105/19

**upwards [1]** 42/1

**urge [1]** 70/19

**urged [1]** 101/24

**us [15]** 3/14 8/20 15/20 21/17 32/25 49/7 53/21 86/3 86/3 86/21 102/14 109/18 111/17 114/9 120/8

**used [7]** 11/4 11/8 11/10 56/12 56/13 58/14 101/10

**using [5]** 11/20 12/22 59/11 73/9 74/7

**utilized [1]** 5/18

## V

**valuable [1]** 59/7

**value [14]** 5/11 41/22 58/23 59/9 59/15 65/18 66/19 67/21 73/11 73/16 73/24 74/8 77/14 94/15

**valued [1]** 58/23

**values [1]** 77/11

**various [4]** 25/22 54/15 75/12 93/11

**vast [1]** 34/22

**verdict [2]** 101/10 115/19

**versus [3]** 36/25 37/1 43/24

**very [20]** 9/20 17/10 32/1 40/22 44/9 53/7 57/1 63/8 70/25 77/7 81/16 83/22 86/7 95/14 103/9 110/2 111/11 117/6 119/14 121/17

**viable [1]** 62/19

**Viard [1]** 37/2

**victim [22]** 54/23 58/3 58/9 59/22 59/23 81/25 82/1 82/10 82/11 84/6 85/24 85/25 86/2 100/18 100/19 100/19 103/25 104/22 109/25 118/1 118/1 121/23

**victims [14]** 56/5 71/17 72/17 77/3 77/3 77/4 77/6 97/2 97/9 97/23 101/15 107/22 110/3 120/13

**view [5]** 41/12 51/23 77/20 94/21 94/22

**virtually [3]** 59/25 70/11 71/1

**volume [3]** 1/10 38/6 38/7

**voluminous [1]** 111/11

## W

**walk [2]** 68/22 91/20

**walking [2]** 58/11 60/13

**want [40]** 5/4 17/8 21/17 21/22 23/16 24/15 25/17 28/14 32/14 32/25 47/22 47/24 47/24 48/5 49/6 49/11 51/11 52/25 60/6 62/8 63/18 63/22 65/21 70/3 70/5 71/3 73/9 85/2 87/11 89/24 96/2 98/25 98/25 100/25 101/12 101/22 103/12 109/9 112/21 113/25

**wanted [4]** 48/15 102/22 110/25 111/5

**wanting [1]** 113/5

**wants [4]** 104/3 116/24 118/5 118/18

**warranted [1]** 51/22

**Washington [2]** 2/5 2/9

**wasn't [8]** 75/20 77/19 113/4 113/5 113/11 116/12 118/17 119/23

**watch [1]** 109/6

**watching [1]** 87/3

**watermark [1]** 76/10

**ways [7]** 7/1 7/2 71/22 79/23 80/9 97/19 112/10

**we'd [2]** 117/16 121/1

**we'll [9]** 26/1 53/7 54/1 55/21 75/1 75/18 120/13 120/19 121/17

**we're [30]** 8/15 39/10 42/22 44/2 47/8 47/11 47/16 47/18 51/9 52/4 53/12 54/7 55/8 55/12 74/7 74/20 75/5 76/2 84/6 84/8 91/22 91/25 93/7 96/4 96/6 110/22 111/16 111/22 112/25 117/15

**we've [20]** 44/8 53/2 55/13 63/1 64/10 68/9 70/25 71/9 74/23 80/11 95/5 97/2 100/17 100/22 103/12 111/10 113/13 113/20 114/3 114/3

**weather [1]** 53/17

**web [1]** 106/1

**webcast [37]** 9/6 9/23 22/24 40/8 40/10 40/11 40/14 40/16 40/20 40/20

Case 9:11-cr-80205-KAM   Document 552   Entered on FLSD Docket 07/31/2018   Page 141 of 141
{WITNESSNAME} - Index: webcast...-zeros
141

# W

**webcast... [27]** 40/23 41/13 41/21 41/22 41/23 41/25 42/1 42/3 42/5 42/8 42/12 42/20 42/23 42/23 42/25 42/25 61/16 61/22 62/3 63/9 63/12 64/9 64/11 66/16 67/2 84/14 87/1

**week [2]** 120/4 120/11

**weeks [4]** 120/3 120/6 120/12 121/18

**weight [4]** 46/20 48/9 48/11 51/7

**welcome [4]** 24/23 47/8 52/2 54/6

**well [45]** 5/6 6/19 7/20 8/10 10/18 12/2 13/15 16/2 16/8 16/21 18/11 25/8 30/15 30/19 33/22 37/18 39/5 44/5 45/18 47/21 49/6 51/8 51/16 52/17 54/18 64/18 66/3 72/8 75/23 76/15 85/7 92/24 93/19 94/3 94/4 94/15 95/4 101/9 102/17 103/11 104/23 109/22 112/2 112/5 116/20

**went [7]** 9/22 62/14 75/15 76/10 76/12 100/1 105/7

**weren't [3]** 59/13 112/17 112/19

**West [3]** 1/7 1/19 53/18

**Westlaw [1]** 115/2

**what's [13]** 5/4 18/8 18/23 29/6 31/6 41/7 41/25 42/7 44/1 72/20 76/18 85/11 108/21

**whatever [6]** 41/19 52/9 66/10 74/8 90/1 103/3

**whatsoever [1]** 117/13

**wheelchair [1]** 105/10

**where [22]** 4/19 12/11 16/8 20/14 21/12 22/4 22/8 36/3 37/12 38/1 41/6 41/10 77/2 79/9 94/18 99/1 101/15 106/15 106/18 106/24 107/12 111/15

**wherever [1]** 103/6

**whether [23]** 4/10 21/8 30/12 34/16 34/19 35/10 35/17 36/14 37/6 37/9 38/11 39/15 75/17 76/14 82/14 86/13 86/15 86/15 94/9 94/10 94/10 111/5 118/21

**while [8]** 68/3 68/3 76/2 83/11 84/3 84/22 85/15 92/6

**who's [3]** 103/25 104/3 119/10

**whole [3]** 3/18 45/2 93/23

**why [40]** 4/2 9/2 10/8

12/11 15/25 16/15 35/4 39/4 41/4 43/17 43/20 44/11 59/10 68/16 76/11 77/10 77/17 77/19 79/14 87/12 89/25 90/4 90/13 90/14 91/16 93/4 95/16 109/10 111/17 111/19 112/3 112/11 112/13 112/13 112/18 115/3 115/24 118/6 118/8 120/10

**wide [15]** 3/13 39/18 50/8 75/18 77/23 79/19 79/23 80/13 80/16 81/21 82/13 91/7 97/6 98/13 99/16

**wife [2]** 108/15 109/12

**willing [1]** 105/21

**wire [1]** 101/4

**wisely [1]** 108/8

**without [8]** 8/24 10/4 20/3 30/5 79/20 103/15 115/16 121/9

**witness [27]** 3/9 11/16 13/10 18/12 20/5 36/24 47/4 49/12 50/11 61/11 82/12 82/16 83/15 83/15 86/8 86/20 86/22 87/4 87/5 87/9 93/21 104/19 112/20 112/20 116/4 118/3 118/9

**witnesses [19]** 14/11 47/12 47/16 48/11 49/5 49/13 52/5 53/8 75/13 86/9 86/11 87/18 90/4 90/10 98/15 112/16 116/3 118/1 118/7

**won't [4]** 28/7 86/20 92/22 110/18

**wonder [1]** 109/10

**words [2]** 28/9 79/7 113/15

**work [4]** 94/14 110/11 120/8 120/9

**worked [3]** 78/7 105/4 106/12

**works [1]** 24/10

**world [2]** 105/18 109/18

**Worldwide [2]** 2/11 2/14

**worth [2]** 43/19 88/2

**worthless [2]** 59/25 70/11

**wouldn't [9]** 26/17 26/20 27/7 27/25 41/4 43/17 43/20 65/18 107/18

**wound [1]** 43/18

**wrong [4]** 29/11 29/19 51/17 51/18

**wrote [1]** 29/25

# Y

**Yafa [2]** 93/15 93/15

**yeah [8]** 3/16 27/25 38/3 40/17 72/6 73/24 85/19

120/18

**year [6]** 36/4 37/1 62/16 83/25 106/12 108/18

**years [7]** 29/25 31/19 54/14 103/4 105/4 105/10 105/13

**yes [107]** 3/6 3/23 4/8 4/21 4/24 5/16 5/25 6/13 6/22 8/5 8/17 9/17 10/1 10/9 11/19 12/10 13/7 13/9 13/13 13/21 13/25 14/10 14/20 15/22 17/7 17/18 18/2 18/13 19/11 20/7 20/20 20/23 21/3 21/15 21/21 21/24 22/1 22/12 22/16 22/23 23/1 23/23 24/2 24/14 24/18 24/23 25/5 25/11 25/16 26/12 26/13 26/23 27/6 27/12 27/16 27/22 28/5 28/11 28/21 28/24 29/1 30/11 30/21 31/10 31/15 34/9 34/14 35/1 35/9 35/15 35/23 36/17 36/22 37/4 38/19 39/20 43/15 44/17 46/17 49/14 50/13 50/16 52/19 54/10 56/3 56/6 64/4 64/25 65/3 68/19 73/8 74/6 78/20 88/14 102/13 103/2 104/16 104/17 106/1 107/25 110/24 114/1 119/1 120/9 120/24 121/6 121/7

**yesterday [17]** 3/12 4/25 11/16 17/5 17/23 17/24 21/19 21/23 23/16 24/17 32/8 38/4 100/23 104/24 107/17 119/24 120/23

**yet [2]** 102/8 111/4

**yielded [1]** 10/11

**York [7]** 2/4 2/8 2/12 2/15 28/22 30/22 49/20

**you're [22]** 4/19 16/9 22/8 22/9 22/10 24/23 26/9 28/12 45/11 51/6 52/2 55/3 56/4 67/23 72/20 74/6 78/8 78/9 89/4 113/5 113/9 121/5

**you've [12]** 20/21 30/17 42/16 58/12 61/1 61/1 61/11 62/16 68/16 69/20 70/15 118/2

# Z

**zero [2]** 4/15 97/9

**zeros [1]** 4/20