11-cr-80205

DEFENDANT'S
EXHIBIT

**12**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE No. 11-80205-CR-MARRA

UNITED STATES OF AMERICA,

vs.

MITCHELL J. STEIN,

_____Defendant._____/

## EXPERT REPORT OF JAMES WES CHRISTIAN, JD AND ATTORNEY AT LAW

### I.   Introduction

#### A.   Summary of Conclusions

1.   During the Relevant Time Period (as hereinafter defined), there was large-scale "naked short selling"—an illegal form of market manipulation[1]—of the stock of Signalife ("SGN") which was a substantial cause of the drop in SGN's stock price.

2.   Evidence of manipulative naked short selling can be seen in the substantial number of "Fails to Deliver" reported of SGN's stock.[2] During the Relevant Time Period, the number of Fails to Deliver regularly averaged over 40% of the stock's entire trading volume; and in many cases, were a substantially higher percentage. Moreover, the high number of Fails to Deliver could not have been a result of normal short selling activity, as SGN routinely had reported Fails to Deliver far in excess of its reported short interest (Fails to Deliver reaching as high as 416% of

---

[1]   Long sales are sales where a seller delivers securities the seller actually owns to a buyer. Short sales are sales where the seller offers for sale a security which they do not own. The SEC requires short sellers to have a "locate" for the security (typically by borrowing the shares from their broker) so that the transaction will actually be completed on the closing date and the required securities will be delivered to the buyer. "Naked Short Selling" occurs when a person sells a security short without the required locate or borrow, and often with an intent to depress the market price of a security.

[2]   "Fails to Deliver" or "Fails" occur when the offeror of a security does not deliver promised securities to the buyer by the required closing date. Fails may occur for legitimate reasons in many markets, but significant amounts of long-extended Fails are evidence of a naked short selling scheme to manipulate the market by persons selling short with no intent to cover.

Since shares are traded electronically, when an offer to sell securities is accepted by a buyer, the buyer's account is typically credited with the shares automatically by their broker. However, the buyer's broker still has an outstanding obligation to retrieve the share from the offeror before the closing date. If the securities are not made available by the closing date, then the offeror "Fails to Deliver" the securities and the securities should be debited from the buyer's account. However, until the Fail is noticed, the buyer will be debited with shares which do not exist in reality—thus falsely increasing the number of trading shares available.

**Expert Report of J.W. Christian**                                                    **Page 1 of 18**

the short interest). Since reported short interest is a number calculated by the number of broker reported short-sales, the only means by which a company could have Fails to Deliver in excess of a properly recorded short interest is if broker dealers are misreporting short sales as long sales or otherwise creating the appearance that a "long" transaction closed which was in fact an illegal short. Even larger numbers of hidden Fails to Deliver were uncovered after SGN's 1-4,500 reverse share split, as discussed below.

3. The exceedingly high number of naked short sales put downward pressure on the price of SGN through: a) artificially increasing the number of shorts which would have otherwise occurred; and b) by artificially increasing the quantity of shares in circulation. Based on simple rules of supply and demand, an increase in the supply of the shares will also push down the price of a company's securities when such artificial shares are sold, exceeding demand. Dr. Robert Shapiro's regression analysis confirms this, as it shows a high statistical relevance between the amount of Fails to Deliver and a decrease in SGN's share price.

4. Mitchell Stein could not have foreseen the illegal activity of the manipulators because the manipulators took extensive steps to hide their illegal conduct from the public and regulators. It would be highly unreasonable to expect Mitchell Stein to have expected a large-scale manipulation attack of SGN's stock by a hidden group of manipulators using sophisticated financial techniques to disguise their conduct.

5. Finally, the injection of any information by SGN, positive or negative, would not necessarily have had a direct material impact on the price of the stock of SGN, as the short sale manipulators had a strong-hold on the company. This is substantiated by the prolonged period over which substantial fails persisted and the fails represented a large percentage of daily trading volume. As such, in my opinion, the market manipulation caused by naked short selling was the primary factor in the drop of the price of SGN stock during the Relevant Time Period rather than any market reaction to the alleged misstatements contained within the press releases Mitchell Stein was convicted for circulating.

**B.    Qualifications**

1    My name is James Wesley Christian. I have been engaged by the defendant Mitchell J. Stein to provide expert analysis and testimony regarding the adverse impact of certain market manipulation tactics which were used by persons other than Stein and which would have caused an adverse affect on the securities of Signalife/Heart Tronics ("SGN").

2    I received a Bachelor's degree in Science from West Texas State A&M University in 1975, and a Juris Doctorate degree from South Texas College of Law in 1978.

3       I am licensed to practice in approximately 14 federal courts across the country, including, most recently, the Northern District of California. I have been licensed by the State Bar of Texas since 1978 and the State Bar of New York since 2005.

4       I am the senior partner of the firm Christian Smith & Jewell, LLP ("CSJ"). CSJ provides a variety of legal services but one of its primary focuses for the last 17 years has been prosecuting (primarily for plaintiffs) issues related to the manipulation of securities of public companies by prime brokers, hedge funds, individual traders, analytic firms and other similar entities (participating as co-conspirators or otherwise). These cases have been prosecuted under both federal and state laws. A substantial majority of these cases dealt with a particular type of stock manipulation known as "naked short selling."[3] A copy of some of the naked short selling cases (the "Cases") we have filed on behalf of our clients is attached hereto as Exhibit "B".

5       I have personally worked alongside and coordinated with many expert witnesses (both liability and damages experts) in connection with these cases over the last 17 years, including Dr. Robert Shapiro ("Dr. Shapiro"). In connection with the Cases and developing the claims, I have become intimately familiar with: (a) applicable federal and state securities laws; (b) rules and regulations of the Securities and Exchange Commission (the "SEC"); (c) federal and state court cases; and (d) enforcement actions by FINRA or the SEC in connection with stock manipulation under Exchange Act Rule 10b-5[4] and/or similar federal statutes or corresponding state securities laws.

---

[3]     In a typical short sale, the short-seller must go out and find corresponding securities of like kind and quantity to the securities he/she wishes to short sale (the locate). This is typically accomplished by receiving a loan of securities from their broker. If, however, a short seller does not find a locate when he/she sells short or have a reasonable basis to believe he/she will be able to provide the securities on the closing date, then he/she is selling the short "naked" and is engaging in counterfeiting of securities.

[4]     17 C.F.R. § 240.10b-5.

**Expert Report of J.W. Christian**                                               **Page 3 of 18**

6 Further, I have performed due diligence (pre-litigation) on an additional 30 public companies to determine what manipulation, if any, occurred with respect to such issuer's security. If it did occur, I would further determine the viability of bringing a case, inclusive of the liability and damage facts associated with the same.

7 Myself, and some of my colleagues, have been in-part responsible for bringing awareness to the naked short selling issue and bringing about regulatory change to address naked short selling. For example:

a In 2003 and 2004, I (along with a consortium of lawyers) joined with the U.S. Chamber of Commerce, certain lobbyists we hired, and Attorney Generals from several states, to collectively make comments to (and confer with) the SEC on provisions within Regulation SHO ("Reg SHO")—the first major regulation covering short sale practices in over 65 years. This regulation was passed, in large part, due to market worries about manipulative short sale practices such as naked short selling.[5] While Reg SHO did not contain everything we thought would be necessary to eliminate naked short selling, it was an important start. Reg SHO became effective January of 2005.

b I co-authored the law review article *Naked Short Selling: How Exposed Are Investors?*, 43 Hous. L. Rev. 1033 (2006), with Dr. Shapiro.

c I have been interviewed, quoted or involved with numerous documentaries, articles, radio appearances and other media regarding the topic of naked short selling. The various groups include but are not limited to: the Economist, Bloomberg, Forbes, and numerous other journalists, radio appearances, and documentaries all surrounding the naked short selling/fail to deliver issues and related topics. A sampling of these appearances is set forth in my CV, attached as Exhibit "A."

8 I am being compensated at a rate of $650 per hour for my services subject to a cap of $100,000. My compensation in this case is in no way dependent upon the opinions that I render or the outcome of the case.

---

[5] Regulation SHO, Exchange Act Release No. 50,103, 69 Fed. Reg. 48,008, 48,008 (Aug. 6, 2004) (codified at 17 C.F.R. §242.200-.203); *See* Short Sales Concept Release, Exchange Act Release No. 42,037, 64 Fed. Reg. 57,996 (Oct. 28, 1999) (noting that when the SEC took comments on short selling reform, it received approximately 2,200 letters or comments from individual investors complaining of abusive short selling practices, including naked short selling).

### D.    Assignment

9      I was asked by Mitchell Stein to determine the impact, if any, on the price of the securities of SGN due to market manipulation from outside factors for a time period from September 1, 2007 through November 2008 (the "Relevant Time Period"). Specifically, I was asked to opine on what effect, if any, on the price of SGN's stock would have resulted from the substantial number of Fails to Deliver and naked short selling taking place during the Relevant Time Period.

10      Further, I was asked by Mr. Stein to look at the foreseeability of this illegal manipulative conduct in connection with the sales of the common stock of SGN.

11      In connection with my opinion, I conferred with Dr. Shapiro, who is extremely well versed in the area of manipulative short selling and the effect of such short sales on the market and on specific securities. Dr. Shapiro holds a Ph.D and M.A. degree from Harvard University and an M.Sc. From the London School of Economics, as well as an A.B. from the University of Chicago. Dr. Shapiro previously served as Under Secretary of Commerce for Economic Affairs in the Clinton Administration. Dr. Shapiro has worked with CSJ on numerous occasions to create market studies which establish the effect of certain manipulative acts on the price of a particular security. Dr. Shapiro has authored several publications concerning this topic which will be referenced in my report and/or his report which is attached hereto as Exhibit "C".

12      This report will summarize the testimony I intend to proffer at the re-sentencing hearing set for July 19 - 20, 2018 in this matter. Therefore, the observations, conclusions, and analysis set forth in this report may also materially change as additional data and information are made available and analyzed by myself and/or Dr. Shapiro. In addition, I reserve the right to prepare any other demonstrative exhibits using the data I relied upon as stated above in the preparation of this report. I reserve the right to offer additional related opinions and to prepare

demonstrative exhibits in support of those opinions. I may also prepare additional analyses in response to reports and testimony by the experts of the government.

### E.   Materials Relied Upon

13   The following is a list of the materials I relied upon in the preparation of this Expert Report:

i.   The following publicly available information was used in the analysis:

1.   Bloomberg data on stock prices, shares outstanding, and volume of stock traded per day for Signalife;

2.   Fails to Deliver published by the SEC bimonthly and found at www.sec.gov;

3.   "Threshold lists" published by the Amex Stock Exchange;

4.   Bi-monthly data from Compustat (regarding stock prices, volume and short interest); and

5.   Data from Yahoo Finance (regarding stock prices, volume and short interest).

ii.   Counsel for Defendant made the entire record available for my review. I reviewed the following material from that record in my analysis:

1.   Blue sheet data;

2.   Trial transcripts;

3.   Trial exhibits;

4.   Case pleadings; and

5.   Sentencing memoranda.

iii.   Report of Dr. Robert Shapiro in this case dated the 6th day of April, 2018 attached as Exhibit "C" and which is incorporated herein by reference.

iv.   Various rules and regulations of the SEC including, but not limited to, Reg SHO, as set forth in the report.

v.   Various case law concerning market manipulation and/or domination as set forth in the report.

vi.   Numerous FINRA and/or SEC enforcement actions discussed in this report.

      vii.    Various fines issued by FINRA and/or the SEC in connection with violations of Reg SHO as is set forth is this report.

     viii.    Articles published by economists, journalists, and others cited in this report.

      ix.    Reported short interest as published by the Amex Stock Exchange.

## II.    What was the Impact of Naked Short Selling/Fails To Deliver on the Stock Price of SGN During the Relevant Time Period?

### A.    Background on short sales/naked short sales.

14    What is a short sale? A short sale is the sale of the stock that a person does not own (which will have to be borrowed or purchased before the delivery date). Generally speaking, short sellers believe the price of the stock will fall, or seek to hedge against potential price volatility in securities that they own. If the price of the stock drops, short sellers buy the stock at the lower price and deliver these share to the buyer. If the short seller is correct, they make a profit between the high sale price and the lower, later cover price. If the short sellers are not correct and the stock rises, they will incur a loss when they are forced to cover at a higher price than their previous sale.

15    Typically when you sell short, your brokerage firm loans you the stock necessary to complete the transaction. The stock you borrow comes from either the firm's own inventory, the margin account of another brokerage firm's clients, or another lender. As you will be buying the stock on margin, your brokerage firm will charge you interest (sometimes referred to as a negative rebate on the loan). Although the vast majority of short sales are legal, manipulative short sales do occur and are illegal.

16    In a naked short sale, the seller does not borrow or arrange to borrow the securities in time to make delivery to the buyer within the standard three day settlement.[6] As a result, the seller Fails to Deliver the securities to the buyer when delivery is due. This is known as a "Failure

---

[6]    The T+3 settlement period was recently reduced to T+2.

to Deliver" or a "Fail". Simple rules of supply and demand dictate that if there is a constant supply of short sales without any corresponding limit on the supply (caused by traders short selling "naked" or without any corresponding locate or borrow of securities), then the apparent number of trading shares will increase and the price will drop.

17      Aside from the general prohibition on schemes to defraud found in SEC Rule 10b-5, Rule 10b-21 specifically provides that it is a manipulative act if a person submits an order to sell a security, if at such time the person is being deceitful about their intention or ability to deliver the security. 17 C.F.R. § 240.10b-21. Further, it is prohibited for any person to engage in a series of transactions in order to create actual or apparent active trading in the security or to depress the price of the security for the purposes of inducing the purchase or sale of the security by others. Exchange Act Section 9(a)(2) [15 U.S.C. § 78i].

**B.      About Reg SHO.**

18      Reg SHO (17 C.F.R. § 242.200, *et seq.*) was adopted and began on January 3, 2005 to update short sale regulation in light of numerous market developments including, but not limited to, market manipulation. In addition, it has been adopted to address concerns regarding persistent Fails to Deliver which may occur when the closing date for a securities transaction comes and goes with the securities never being delivered because the seller never found a locate for the short-sale. The SEC amended Reg SHO several times since 2005 to eliminate certain exceptions and strengthen certain requirements.

19      Reg SHO was initially adopted with a grandfather provision and certain market-maker provisions, both of which provided certain actors exemptions to many of Reg SHO's requirements—such as the requirement to locate securities before short selling. However, due to the continued concerns about Fails to Deliver, and the SEC continuing to observe certain securities with failure to deliver positions that were not being closed out under the then-existing

requirements, the SEC eliminated the grandfather provision in 2007 and eliminated the option market-maker exception in 2008, but retained the bona fide market maker exception. In addition, the SEC adopted temporary Rule 204T in 2008 and final Rule 204 in 2009 which further strengthened the closeout requirements of Reg SHO—applying closeout requirements to Fails to Deliver resulting from sales of all equity securities and reducing the time frame within which Fails to Deliver must be closed out.

20      Finally, in 2010, the SEC adopted Rule 201 of Reg SHO. Rule 201 restricts the price at which short sales may be sold when a stock is already experiencing significant downward pressure. As such, Rule 201 is designed to prevent short selling from rapidly driving down the price of a security that is already experienced a significant price decline.

## III.    Overview of the Basic Rules of Reg SHO Impacting the Opinions herein.

### A.    Rule 200

21      <u>Rule 200 requires that orders placed by broker dealers must be marked long, short or short exempt.</u> 17 C.F.R. § 242.200(g). To be marked long, the seller needs to have (as to all the securities being sold) the security in the physical possession of the seller, or reasonably be expected to have it within time to deliver. *Id.* Otherwise, the security must be marked short, or in the event the seller is entitled to rely on an exception from the short sales price test circuit breaker provision, and can be marked short exempt. *Id.*

### B.    Rule 203(b)(1)-(2)

22      <u>Rule 203(b)(1)-(2) is the locate requirement.</u> Reg SHO requires the broker dealer, before effecting a short sale order in any equity security, to have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due. 17 C.F.R. § 242.203(b)(1). This locate must be made and documented in writing prior to effecting the short sale. *Id.*

### C.     Rule 204

23      <u>The closeout requirement rule.</u> Rule 204 requires brokers and dealers that are participants of a registered clearing agency to take action to closeout failure to deliver positions. 17 C.F.R. § 242.204. Closing out requires the broker or dealer to purchase or borrow securities of like kind and quantity. The time period by which a broker must close-out the transaction depends on the specific facts of the transaction, but brokers must generally close-out within 4 days (T+4) or 6 days (T+6). Additionally, Rule 203(b)(3) of Reg SHO created the "threshold list" for securities of companies which were being aggressively sold short and which had long and persistent Fails to Deliver.[7] When a company is put onto the Threshold List, participants of a registered clearing agency must immediately purchase shares to close out the Fails to Deliver.

24      All of the above information can be found at: www.sec.gov/investor/pubs/regsho.htm under Key Points About Regulation SHO.

### D.     Illegal acts under Reg SHO

25      As a result of all the above, it is important to understand that any of the following activity is illegal under Reg SHO:

i.       Selling stock short without having located corresponding stock in like quantities and type for delivery at settlement, except and unless you are a bona fide market maker.

ii.      Selling stock short and failing to deliver shares at the time of settlement. This varies whether it is a long sale T+6 or a short sale T+4.

iii.     Selling stock short without having located stock for delivery at settlement and subsequently failing to deliver those shares at time of settlement.

iv.      Selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the securities price.

---

[7]      Defined as having an aggregate failure to deliver position for 5 consecutive settlement days at the National Securities Clearing Corporation (the "NSCC") totaling 10,000 shares or more and equal at least to .5% of the issuer's total shares outstanding. 17 C.F.R. § 242.203.

v. Misrepresenting that short sales are long sales in order to circumvent Rule 105 of Regulation M. *See* 17 C.F.R. § 242.105. (Regulation M prohibits certain short sellers from purchasing securities in a secondary or follow-on offering). Under Rule 200(g)(1) of Reg SHO an order to sell should be marked long only if the seller is deemed to own the security.

The above listed rules and regulations regarding short sales are routinely violated by certain bad actors and used as a tool to drive down the price of shares and profit from illegal shorts.

26 To further substantiate that all of the above violations occur commonly and on a massive scale, the undersigned has attached copies of several enforcement actions which have been brought against some of the largest brokers in this country, Exhibit "E". Additionally, attached as Exhibit "D" is a chart I prepared containing details concerning some of the actual enforcement actions brought against these brokers. While the undersigned did not review documents to reflect what brokerage firm(s) closed trades in Signalife during the Relevant Time Period, it is reasonable to assume several of the brokerage firms appearing in Exhibit "D" and "E" cleared many of the illegal naked short sales in SGN (documented herein) since Merrill Lynch, Goldman Sachs, Credit Suisse and J.P. Morgan clear approximately 50% of all common stock trades in the U.S. All the foregoing information is simply a sampling of what has been and is still continuing to take place in the securities marketplace and what the undersigned believes occurred to the stock of SGN. The foregoing enforcement actions, fines, and rules in Exhibit "D" and "E" are collectively called the "Violations". Among many other things, these Violations show that during the Relevant Time Period:

i. UBS Securities, LLC was fined $12,000,000 by FINRA for various Reg SHO violations. FINRA found that UBS' Reg SHO supervisory system regarding locates and the marking of sale orders was significantly flawed and resulted in a systemic supervisory failure that contributed to serious Reg SHO failures across its equities trading business. First, FINRA found that UBS placed millions of short sale orders to the market without locates, including in securities that were known to be hard to borrow. Second, FINRA found that UBS mismarked <u>millions</u> of sale orders in its trading systems. Many of these mismarked orders were short sales that were mismarked as "long," resulting in additional significant violations of Reg SHO's

locate requirement. Third, FINRA found that UBS had significant deficiencies related to its aggregation units that may have contributed to additional significant order-marking and locate violations. In summary, FINRA determined that based upon the foregoing, the firm violated Reg SHO during the time periods described above and that it **mismarked more than 10 million sale orders** including short sales mismarked as long that also violated Reg SHO's locate requirement. FINRA found that UBS' supervisory framework over its equities trading business was not reasonably designed to achieve compliance with the requirements of Reg SHO and other securities laws, rules and regulations until at least 2009.

ii.    Goldman Sachs was fined $15,000,000.00 by the SEC for allowing short sale locate requests to be handled by an automated model that either would unreasonably grant, in whole or in part, the locates on an automated basis. Goldman employees could (and 98% of the time did) simply by-pass the locate requirements of Reg SHO by simply hitting "F3" to autolocate the shares—even if they had no reasonable basis for believing the shares were actually located. The auto-locates reached more than 20,000 locates (not shares) per day. While the number of locates provided to customers which in reality did not exist (which would make their customers and/or their own short sales "naked") is not articulated in the SEC complaint, the undersigned believes it to be large based on the magnitude of locates provided by Goldman and the size of the fine levied against Goldman by the SEC.

iii.   Merrill Lynch unreasonably relied on "Easy-to-Borrow" lists as a reasonable basis for locating securities even when Merrill Lynch knew such lists were outdated or countervailing factors had changed whether the shares would be easy-to-borrow. As such, Merrill Lynch provided millions of locates for short sales without a reasonable basis for believing that the shares would be available for deliver. This, in effect, caused its customers' short sales (as well as Merrill Lynch's own proprietary trading) to be "naked." Merrill Lynch was fined $9 million, and was required to pay $1,566,245.67 in disgorgement and $334,564.65 in prejudgment interest.

iv.    Merrill Lynch Professional Clearing Corp. was fined $3.5 million for violating Reg SHO and Merrill Lynch, Pierce, Fenner & Smith was fined an additional $2.5 million for failing to establish, maintain and enforce supervisory systems and procedures related to Reg SHO. FINRA found that from September 2008 through July 2012, Merrill Lynch PRO did not take any action to close out certain fail-to-deliver positions, and did not have systems and procedures in place to address the close-out requirements of Regulation SHO for the majority of that period. FINRA also found that from September 2008 through March 2011, Merrill Lynch's supervisory systems and procedures were inadequate and improperly permitted the firm to allocate fail-to-deliver positions to the firm's broker-dealer clients based solely on each client's short position without regard to which clients caused or contributed to Merrill Lynch's fail-to-deliver position.

     v.      In June of 2014, FINRA fined Goldman Sachs, Merrill Lynch, and Barclays Capital $1,000,000.00 each for reporting short sales as long on their blue sheets and for other various reporting violations.

     vi.     Credit Suisse Securities, was fined $1.75 million by FINRA for violating Reg SHO by failing to supervise short sales and mis-marking sale orders. FINRA found that from June 2006 through December 2010, Credit Suisse's Reg SHO supervisory system regarding locates and the marking of sale orders was flawed and resulted in a systemic supervisory failure that contributed to significant Reg SHO failures across its equities trading business. During the time period, <u>Credit Suisse released millions of short sale orders to the market without locates</u>, including threshold and hard to borrow securities. The locate violations extended to numerous trading systems, aggregation units and strategies. In addition, <u>Credit Suisse mismarked tens of thousands of sale orders in its trading system</u>. The mismarked orders included short sales that were mismarked as "long," resulting in additional violations of Reg SHO's locate requirement.

     vii.     Deutsche Bank was fined $1,400,000 by FINRA for improperly relying on a "net" position of total shares which included shares supposedly held by international affiliates. This "net" aggregate position was then used to justify locates provided to customers and to its own brokers.

     viii.     J.P. Morgan was fined by FINRA for failing to properly mark 19,318,195 sell orders as short between October 19, 2011 to January 27, 2012 (approximately 3 months). This number illustrates the magnitude of the problem. Additionally, the firm on 21,217 occasions affected short sales on its own account without obtaining a locate. For these violations the firm was issued a fine of $350,000 in total.

## IV.    Analysis of the Stock Price of SGN and Various Potential Short Sale Indicators.

     27     After reviewing the failure to deliver data, sales volume, and short interest published by the SEC, the American Stock Exchange, Yahoo Finance and Compustat data, as well as the report of Dr. Shapiro, and other material stated above, in my expert opinion I have determined the following:

     i.     The Fails to Deliver in SGN from September 2007 to October 2008 were large when compared to the company's trading volume. Ironically, the reported short interest during that same period was not abnormal.

     ii.     In numerous instances during the Relevant Time Period, **the Fails to Deliver of SGN were more than 100% of the stock's reported short interest.** This simply should not happen in an unmanipulated market. Fails to Deliver are, and should be, a part of the reported short interest. There should never be an instance in which the Fails to Deliver exceed the short interest. However, **Fails to Deliver reached**

**125.5% of the short interest in the second half of January 2008 and as high as 416.2% of short interest in the first half of September 2008.** It is my opinion that the difference between the reported short interest and the Fails to Deliver were, in large part, a result of: a) trading tickets which were mismarked as long, but in reality were short; and/or b) other actions of broker dealers which created the appearance of the close of a transaction in long shares but which in reality, should have resulted in a fail to deliver.

iii.   The foregoing illegal activities injected false information into the marketplace. This initial falsehood was the broker calling a short sale a long sale. This further created a fiction in the marketplace by creating an artificial supply by showing the market there were more long shares actively trading than should have been in reality. The simple rules of supply and demand then dictate that such conduct would depress the price of SGN's stock as a result. When you increase supply without corresponding demand, the price will decrease. In the case of SGN, the Fails to Deliver increased both the shares offered for sale and shares sold. Therefore, the number of Fails to Deliver (due most likely to manipulative naked short selling) put significant downward pressure on the price of SGN stock and caused a substantial dip in the price thereof during the Relevant Time Period. This conclusion is supported by Dr. Shapiro's regression analysis which showed a highly relevant correlation between Fails to Deliver and SGN's stock price and led to Dr. Shapiro's conclusion that the Fails to Deliver of Signalife had a material adverse effect on its share price over the Relevant Time Period.

28   The undersigned's opinion is that SGN's Fails to Deliver were so substantial that the individuals behind these Fails effectively created a strong hold on the price of SGN such that they controlled the price of the security in a substantial way. As further evidence that SGN's substantial Fails to Deliver put downward pressure on the price of SGN stock, a sampling of the alarming number of Fails and other abnormalities shows:

i.   SGN averaged 679,563 Fails of its shares per day in the first 2 weeks of August 2008—350% of the total trading volume;

ii.   In seven of the 24 bi-monthly periods over the period of September 13, 2007 to September 12, 2008, Signalife's FTDs averaged more than 100% of the stock's reported short interest;

iii.   From September 13, 2007 to September 12, 2008, Fails to Deliver accounted for 42.9% of the average trading volume on a bimonthly basis; and

iv.   At one point in October of 2008, the **number of Fails accounted for 70% of the SGN's total <u>outstanding</u> shares.**

**Expert Report of J.W. Christian**                                      **Page 14 of 18**

29      By engaging in naked short selling of Signalife securities over a prolonged period of time, which regularly accounted for 40% of the daily trading volume of the stock (but often times higher), and were equal to as much as 70% of SGN's outstanding shares, the naked short sellers were in a position to continuously manipulate the price of the security. Legal authorities with which I am familiar suggest that such a degree of trading could have been sufficient to dominate the active trading market and thus manipulate (and effectively control) the market for securities.  *See generally U.S. v. Mulheren*, 938 F.2d 364, 371 (2d Cir. 1991) ("as a general proposition... market domination is a factor that supports a manipulation charge... The percent of domination must be viewed in light of the time period involved and other indicia of manipulation.); *United States v. Gilbert*, 668 F.2d 94, 95 (2d Cir. 1981); *see also* Lewis D. Lowenfels & Alan R. Bromberg, *Securities Market Manipulations: An Examination and Analysis of Domination and Control, Frontrunning, and Parking*, 55 Alb. L. Rev. 293, 299 (1991); *see also S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007).

30      In addition to the examples of high numbers of fails shown above, there are reasons to believe the actual number of Fails were even higher. Evidence of this is shown through the results of SGN's 1-for-4,500 share reverse split (reducing the total outstanding shares from 64,273,000 to 14,283) wherein the company required the return of previous shares before new shares would be issued. Upon the split occurring, when all of the shareholders sought to receive their new shares—with many of them being falsely marked long shares—there was a large spike in the number of Fails to Deliver: (a) On September 24, 2008 and September 25, 2008 (5 and 6 days respectively after the 1 for 4,500 share reverse split) there were still 936,232 and 936,242 shares, respectively, on the fails to deliver list despite only 14,283 shares being outstanding; (b) In the month after the reverse split, the Fails averaged 62.3% of SGN's outstanding shares and were

**Expert Report of J.W. Christian**                                                  **Page 15 of 18**

as high as 70% of SGN's issued and outstanding shares; and (c) On September 22, 2008, the 4,500-to-one reverse split reduced outstanding shares from 64,273,000 to 14,300, and the stock's price rose accordingly from $0.01 to $45.00 -and the following day, the stock's price fell to $1.10 on trading volume of 10,561 shares, representing 73.9% of all issued and outstanding shares. Items (a) through (c) are significant evidence of fictitious shares which were trading on the open market prior to the reverse split as if real shares, but which were exposed and became Fails upon SGN requiring all shares to be returned to the company and exchanged and by substantially shrinking the number of shares in the public float. In my experience, there are numerous ways in which Fails to Deliver can be hidden—all of which are made for the primary purpose of avoiding detection.

31     Based on my experience in the 20 cases I have handled to date, and the other approximately 30 cases upon which I performed due diligence services, the above stated activity in (a) through (c) indicates a large group of hidden Fails also consistent with the mismarking of tickets as long versus short that were not reported, and the use of various illegal techniques thereby making the number of Fails to Deliver even larger than the already substantial number reported by the SEC indicates SGN was in a manipulated market. These hidden fails, when added to the reported fails of SGN would have added to the decrease in the stock price of SGN.

**V.     Foreseeability by Mitchell Stein of the Above Stated Illegal Activity**

32     It is the opinion of the undersigned that none of the illegal activity constituting the Violations could have been foreseen by Mitchell Stein. When I take on a naked short selling case, usually hundreds of thousands of dollars are spent on due diligence before suit is even filed with the majority of that money going to pay for experts. Even after such due diligence is done, it is not until after trial is instituted (and hundreds of thousands more dollars are spent) before the discovery is brought forth which finally puts together all the pieces of the manipulation that occurred. The means by which short-sellers manipulate the market and find ways to circumvent Reg SHO are

always changing to avoid detection and are highly complex. It would be unreasonable to expect Mitchell Stein (who lacks any demonstrable expertise in this area) to have any knowledge as to the perpetrators of such a scheme or the manner such scheme was being perpetrated during the Relevant Time Period.

33      Further:

a      Mitchell Stein could not have anticipated the mismarking of tickets long when they were actually short sales by brokerage firms.

b      Mitchell Stein could not have foreseen nor predict that the number of Fails reported by the SEC were not accurate for various reasons, including but not limited to, broker dealers being untruthful on their blue sheets.

c      Mitchell Stein could not have foreseen that this level of large scale and fraudulent activities (i.e. counterfeiting of securities) could occur against the company of SGN.

d      Mitchell Stein could not have foreseen that the SEC and other regulatory bodies would fail to oversee and stop the large scale manipulation taking place against this company.

34      As such, it is my opinion that Mitchell Stein could not have foreseen any of the Violations that I believe are a substantial cause of the decrease in the price of SGN during the Relevant Time Period.

35      Finally, it is the undersigned's opinion that the injection of any information from the company, positive or negative, would not necessarily have a direct material impact on the price of the stock of SGN as the illegal short sale manipulators had a strong hold on the company as indicated above by the ratio of Fails to Deliver versus actual real investor trading in real SGN's shares.

**Expert Report of J.W. Christian**                                    **Page 17 of 18**

This report in the matter of *United States v. Stein* is respectfully submitted on April 6, 2018.

James Wesley Christian

## Exhibit List to the Expert Report of James "Wes" Christian

Exhibit A.    James "Wes" Christian Resume
Exhibit B.    List of naked short selling cases CSJ has handled
Exhibit C.    Expert Report of Dr. Robert Shapiro
Exhibit D.    List of Reg SHO Violations by Large Brokers
Exhibit E.    Sample of SEC Enforcement actions

# EXHIBIT A



2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

## James Wesley ("Wes") Christian

With over 15 years of experience in investigating manipulative trading practices, including naked short selling, and litigating numerous stock manipulation cases, e.g., *Overstock.com vs. Morgan Stanley & Co.*, Mr. Christian has provided substantial assistance to the US Securities and Exchange Commission and Department of Justice in the exposure and prosecution of several stock manipulators.



In addition to suing Wall Street for stock manipulation, Mr. Christian has focused on litigating against oil and gas companies for royalty fraud and banks for aiding and abetting Ponzi schemes across eight different states and two countries.

Mr. Christian has also handled many disputes involving breach of contract, fraud, wrongful death, intellectual property, breach of fiduciary duty and serious personal injuries or wrongful death actions.

### Education

- Keller High School, 1971
- Bachelor of Science, West Texas State A&M University, 1975
- Doctor of Jurisprudence, South Texas College of Law, 1978

### Work History

- 1978 - 1979  Associate, Morris McCann
- 1978 - 1988  Partner, Margraves Kennerly & Schueler
- 1988 - Present  Managing Partner, Christian Smith & Jewell/James W. Christian, P.C.

EXHIBIT A to the Expert Report of J. W. Christian

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

**Assistance to Securities and Exchange Commission and Department of Justice:**

- Collaborated with the U.S. Securities and Exchange Commission's Southern District of New York's office and the U.S. Department of Justice in the indictment and prosecution of Andreas and Thomas Badian in connection with Rhino Advisors;

- Collaborated with the U.S. Securities and Exchange Commission's Southern District of New York's office and the U.S. Department of Justice in connection with one or more defendants in the case of *Taser International, Inc., et al., v. Morgan Stanley & Co., Inc., et al.*; Superior Court of Georgia, Fulton County Case No. 2008-EV-004739-B.

**Stock Fraud Cases Litigated by Mr. Christian Include:**

- INTERNET LAW LIBRARY, INC. and Hunter M.A. Carr, Plaintiffs, v. SOUTHRIDGE CAPITAL MANAGEMENT, LLC, et al., Defendants./COOTES DRIVE, LLC., Defendant, Counterclaim–Plaintiff, v. INTERNET LAW LIBRARY, INC., Plaintiff, Counterclaim–Defendant./Jack TOMPKINS, Kerwin Drouet, et al., Plaintiffs, v. SOUTHRIDGE CAPITAL MANAGEMENT, et al., Defendants; United States District Court, S.D. New York;

- NANOPIERCE TECHNOLOGIES, INC., Plaintiff, v. SOUTHRIDGE CAPITAL MANAGEMENT LLC, Dan Pickett, Patricia E. Singer, Thomson Kernaghan & Co., Ltd., and Harvest Court LLC, Defendants./HARVEST COURT LLC, Counterclaim Plaintiff, v. NANOPIERCE TECHNOLOGIES, INC., Paul H. Metzinger, Christina Skousen, Barry Honig, Kristi Kampmann, Dr. Herbert Neuhaus, Gemini Investments, Ltd., Stanley Richards, Timothy Solomon, H. Glenn Bagwell, Dunlap Industries Limited, Turbo International Ltd., Peter Coker, Martin Christen, Robert Shaw, M. Albert Capote, Cayman National Trust Ltd., and Cayman National (Nominees) Ltd., Counterclaim Defendants; United States District Court, S.D. New York Case No. 02 Civ 0767(LBS);

2

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- ATSI COMMUNICATIONS, INC., Plaintiff, v. THE SHAAR FUND, LTD., et al., Defendants; United States District Court, S.D. New York Case No. 02 Civ. 8726(LAK);

- ENDOVASC LTD., INC., Plaintiff, v. J.P. TURNER & CO., LLC, et al., Defendants; United States District Court, S.D. New York Case No. 02 Civ. 7313(LAP);

- PET QUARTERS, INC., Plaintiff v. Thomas BADIAN, et al., Defendants; United States District Court, E.D. Arkansas Case No. 4:04-CV-697 (RSW);

- Joseph AVENIUS et al., Plaintiffs, v. BANC OF AMERICA SECURITIES LLC, et al., Defendants; Superior Court of California, San Francisco County Case No. CGC-06-453422;

- In re NOVASTAR FINANCIAL SECURITIES LITIGATION; United States District Court, W.D. Missouri, Western Division Case No. 04–0330–CV–W–ODS;

- OVERSTOCK.COM. INC., a Delaware corporation, et al., Plaintiffs, v. GRADIENT ANALYICS, INC., and Arizona corporation, et al., Defendants; Superior Court of the State of California, Marin County Case No. CV 053693;

- OVERSTOCK.COM, INC., A Delaware Corporation, et al., Plaintiffs, v. MORGAN STANLEY & CO., Incorporated, et al., Defendants; Superior Court of California, San Francisco County; Case No. CGC-07-460147;

- EAGLETECH COMMUNICATIONS INC., et al., Plaintiffs, v. CITIGROUP, INC., et al., Defendants; United States District Court, S.D. Florida Case No. 07-60668-CIV;

- EAGLETECH COMMUNICATIONS, INC., a Nevada Corporation authorized to do business in the State of Florida, Appellant, v. BRYN MAWR INVESTMENT GROUP, INC., et al., Defendants; United States District Court, S.D. Florida Case No. 4D09–3949

3

EXHIBIT A to the Expert Report of J. W. Christian

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- Greg MANNING, et al., Plaintiffs, v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., Defendants; United States District Court, D. New Jersey Case No. 12–4466 (JLL);

- HYPERDYNAMICS CORPORATION, Plaintiff, v. J.P. CAREY SECURITIES, INC., et al., Defendants; Superior Court of Georgia, Fulton County;

- SEDONA CORPORATION, Plaintiff, v. LADENBURG THALMANN & CO., INC., et al., Defendants; United States District Court, S.D. New York Case No. 03Civ.3120(LTS)(THK);

- FIRST EMPIRE CORPORATION (directly and derivatively in its capacity    as a shareholder of LecStar Corporation) and ALAN B. THOMAS, JR. (directly and derivatively in his capacity as a shareholder of LecStar Corporation), Plaintiffs, v. JOHN C. CANOUSE, et al., v. LECSTAR CORPORATION, as a Nominal Defendant; Superior Court of Georgia, Fulton County Case No. 1:04-CV-2596TWT;

- TASER INTERNATIONAL, INC., et al., Plaintiffs, v. MORGAN STANLEY & CO., INC., et al., Defendants; Superior Court of Georgia, Fulton County Case No. 2008-EV-004739-B

- RASER TECHNOLOGIES, INC., et al., Plaintiffs, v. MORGAN STANLEY & CO., LLC, et al., Defendants; Third Judicial District Court, Salt Lake County Case No. 150906718

- RASER TECHNOLOGIES, INC., et al., Plaintiffs, v. MORGAN STANLEY & CO., LLC, et al., Defendants; Superior Court of Fulton County, State of Georgia Case No. 2012-CV-214140

**Publications, Speeches & Law Review Articles**

- Energy Institute Seminar, Houston, Texas - February 16-17, 2006: Topic- "Alien Tort Claims and Other Ways to Obtain Jurisdiction Over Foreign Corporations Affiliated with U.S. Corporations"

4

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- Advanced Evidence and Discovery, Houston, Texas (April 26-27, 2006); Dallas, Texas (May 11-12, 2006); San Antonio, Texas (May 25-26, 2006): Topic – "Extra-Jurisdictional Domestic and International Civil Litigation: A Guide for Practitioners"

- Advanced Evidence and Discovery, Houston, Texas (April 19-20, 2006); Dallas, Texas (May 3-4, 2006); San Antonio, Texas (May 17-18, 2006):   Topic – "Internet Discovery and how to use it."

- University of Houston Law Review; Spring, 2007; *Naked Short Selling: How Exposed are Investors*

- Committee Member Jury Awareness State Bar of Texas, Houston, Texas, 2006-2007 Topic – "The Importance of Our Great American Jury System"

- Advanced Evidence and Discovery, Houston, Texas (April 19-20, 2007); Dallas, Texas (May 3-4, 2007); San Antonio, Texas (May 17-18, 2007):  Topic – "Daubert Challenges."

- Advanced Evidence and Discovery, Houston, Texas;  San Antonio, Texas (May 22-23, 2008):   Topic – "Expert Witnesses."

- 2009 Advanced Evidence and Discovery, Houston Texas:   Topic – "Musical Chairs: Apportioning Responsibility."

- Litigation Update, Dallas, Texas;  Houston, Texas (January 19-20, 2012): Topic - "Who We Are As Lawyers."

- Litigation Update, Austin, Texas;  (January, 2013): Topic – "Becoming a Texas Legal Legend."

- State Bar of Texas Annual Meeting, Dallas, Texas;  (June, 2013): Induction of Honorable Royal Furguson and Francis Scott Baldwin Sr.

- Litigation Update, Austin, Texas;  (January, 2014): Topic – "15 Keys to Winning a Jury Trial"

- State Bar of Texas Legends Committee, Lubbock, Texas;  (April, 2014): Induction of Forrest Bowers as a Texas Legal Legend.

5

EXHIBIT A to the Expert Report of J. W. Christian

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- State Bar of Texas Legends Committee, Austin, Texas; (June, 2014): Induction of Bob Black as a Texas Legal Legend.

- State Bar of Texas Legends Committee, Waco, Texas; (November, 2014): Induction of George Chandler as a Texas Legal Legend.

- 31st Annual Litigation Update Institute, San Antonio, Texas; (January 15-16, 2015): Topic – "How to Effectively Use Expert Witnesses."

- State Bar of Texas Legends Committee, Lubbock, Texas; (September 11, 2015): Induction of Mary Lou Robinson as a Texas Legend.

- State Bar of Texas Legends Committee, Houston, Texas; (November, 2015): Induction of Judge Ruby Kless Sondock as a Texas Legal Legend.

- University of Houston, Houston, Texas; (February 9, 2016): Importance of Lawyers in Society.

- Amarillo Bar Association, Amarillo, Texas; (April 28, 2016): Preparing, Presenting and Cross-Examination of Experts.

- Litigation Update Institute, San Antonio, Texas; (January 26-27, 2017).

- State Bar of Texas Legends Committee, (Dallas, Texas): January, 2017): Induction of Ron White as a Texas Legend.

- Litigation Council Spring Meeting, South Padre, Texas; (March 30-31, 2017).

- State Bar of Texas Legends Committee, Austin, Texas; (April, 2017): Inductions of Lloyd Lochridge and Pat Lochridge as a Texas Legend.

- State Bar of Texas Legends Committee, Lubbock, Texas; (April, 2017): Induction of Tom Morris as a Texas Legend.

- Litigation Council Fall Meeting, Ft. Davis, Texas; (October 6-7, 2017).

- Litigation Update, Austin, Texas; (January 11-12,2018).

6

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- State Bar of Texas Legends Committee, Dallas, Texas; (January, 2018): Induction of Harriet Miers as a Texas Legend.

**Law Firm News & Articles**

- Jennifer Hiller, Suits on Royalties Emerging in Shale, **SAN ANTONIO EXPRESS-NEWS**, Mar. 14, 2016

- Rebecca Davis O'Brien and Louise Radnofsky, Treatment of Elite Gymnasts Under Scrutiny, **THE WALL STREET JOURNAL**, Feb. 17, 2016

- Nancy Armour and Rachel Axon, Suit puts heat on Karolyis, **USA TODAY** , Feb. 17, 2017

- Jennifer Hiller, Suits on Royalties Emerging in Shale, **SAN ANTONIO EXPRESS-NEWS**, Mar. 14, 2016

- Liz Moyer, Signature Bank is Sued Over Ties to Ponzi Scheme, **NEW YORK TIMES**, Feb. 24, 2016

- Insolvency, Regulatory, The Enablers of the Fraudsters, Part 1, **ALLABOUTALPHA**, Sept. 1, 2015

- Helen Avery, JPMorgan's Trading Loss Proves Volcker Rule Won't Work, **EUROMONEY**, May 24, 2012

- Joe Meyers, "Naked Short Selling" Probed in New Documentary, **THE NEWS-TIMES**, Apr. 12, 2012

- BofA, Goldman, Others Settle Taser Short Selling Suit, **LAW 360**, Jun 20, 2011

- Helen Avery, Banking: Litigation Could Seriously Damage Banks' Health, **EUROMONEY**, Apr. 15, 2011

- Christopher Faille, But What if Compliance Officers Do Their Jobs, **HEDWORLD.com**, Apr. 15, 2011

- Michelle Massey, Marshall Lawyer Sue Beaumont Accounts After Losing $6M in Market Collapse, **THE SOUTHWEST TEXAS RECORD**, Oct. 12, 2010

7

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- Frank Geary, Police Union Paid Top Dollar for New Offices, **LAS VEGAS REVIEW-JOURNAL**, Aug. 2, 2009

- Christopher Faille, Christian Reflects on Mangan,Gryphon, **HEDGEWORLD.com**, Jan. 9, 2008

- John R. Emschwiller and Kara Scannell, Blame the 'Stock Vault'? Clearinghouse Faulted On Short-Selling Abuse; Finding the Naked Truth, **NY SUN**, Jul 5, 2007

- Judith Burns, SEC Economists Reject Claims On 'Naked' Short Sales, **DOW JONES NEWSWIRES**, Apr. 23, 2007

- CFO Staff, Naked Hunch: Overstock.com kicks its fight against short-sellers up a notch; the PCAOB debates the merits of mandatory fraud audits; state health-care reforms could cause headaches for Corporate America; and more, **CFO MAGAZINE**, Apr. 01, 2007

- Christopher Faille, Grassley Touts Regulation on Behalf of 'Average Joe', **LIPPER HEDGEWORLD**, Mar. 08, 2007

- Danny King and Gary Matsumoto, Overstock.com Sues Brokers for Stock Manipulation, **BLOOMBERG**, Feb. 2, 2007

- Liz Moyer, Naked Short Victim Strikes Back, **FORBES.com**, Feb. 2, 2007

- Joseph Sternberg, Naked Shorting, **NY SUN**, Aug 29, 2006

- Bob Drummond, Games Short Sellers Play, **BLOOMBERG**, Aug. 16, 2006

- Judith Burns, Legal Wrangling Continues In Case Vs. Ex-Refco Brokers, **DOW JONES NEWSWIRES**, Aug. 8, 2006

- Kara Scannell, 'Not MY Stock': The Latest Way to Fight Shorts, **THE WALL STREET JOURNAL**, Aug. 2, 2006

- Liz Moyer, Hedge Fund Hell, **FORBES**, Jul 28, 2006

- The Economist Staff, Betting on losers, **THE ECONOMIST**, Jun 22nd 2006

- Joseph Sternberg, Loaded for Bear, **NY SUN**, May 23, 2006

8

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- Dan Dorfman, Justice Department Eyes Overstock.com Fight, **NY SUN**, May 22, 2006

- Dan Dorfman, Overstock.com May Seek $1 Billion From Rocker Partners, **NY SUN**, May 12, 2006

- Todd Mason, SEC wants to know if backers made money by trying to kill it, **PHILADELPHIA INQUIRER**, Apr. 23, 2006

- Todd Mason, SEC says brokerages manipulated shares, **PHILADELPHIA INQUIRER**, Apr. 5, 2006

- Jane Sassen, The Secret Lives of Short Sellers: the Rise of Hedge Funds and Indie Research Raises New Questions About a Shadowy World, **BUSINESS WEEK**, Apr. 10, 2006

- Daniel Kadlec, Watch Out, They Bite!  How Hedge Funds Tied to Embattled Broker Refco Used "Naked Short Selling" to Plunder Small Companies, **TIME**, Nov. 14, 2005 (SPECIAL ISSUE: INSIDE BUSINESS, December 2005)

- Helen Avery & Peter Koh, The Curious Incident of the Shares that Didn't Exist, **EUROMONEY**, Vol. 36, No. 432, Apr. 2005

- Helen Avery, SEC Seeks to Curb Naked Ambition, **EUROMONEY**, Vol. 36, No. 432, Apr. 2005

- Peter Koh, Stung by the German Connection, **EUROMONEY**, Vol. 36, No. 432, Apr. 2005

- Rob Wherry, Wall Street's Next Nightmare? Flamboyant Litigator John O'Quinn is Gunning for Another Bonanza: The Entire Trading System in Penny Stocks, **FORBES**, Oct. 13, 2003

- Edward Robinson, The Outsiders, **BLOOMBERG MARKETS**, Jul. 2003

- Matthew McClearn, Predator or Prey?  Amid a Flurry of Lawsuits and Countersuits, the Murky world of Death-spiral Financings-Ones in Which Toronto Financier Mark Valentine Loomed Large-is Coming to Light, **CANADIAN BUSINESS**, Oct. 28, 2002

- Brandon Copple, Sinking Fund. Have Financiers Torpedoed Struggling Small Companies They Were Supposedly Helping?  Lawsuits Raise Some Ugly Accusations, **FORBES**, Jun. 10, 2002

9

EXHIBIT A to the Expert Report of J. W. Christian

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

**Radio Appearances**

- Tim Connolly's Winning Strategies – Re: Stock Fraud on Wall Street, April 29, 2011

- Tim Connolly's Winning Strategies – Re: Spiraling costs of litigation and how "David can still fight Goliath", Feb. 11, 2011

- Tim Connolly's Winning Strategies – Re: Insider Trading Issues, Dec. 3, 2010

- Tim Connolly's Winning Strategies – Re: Mortgage Fraud, Nov. 5, 2010

- Tim Connolly's Winning Strategies – Re: FIN REG, July 30, 2010

- Tim Connolly's Winning Strategies – Re: Naked Short-Selling, June 3, 2010

- Tim Connolly's Winning Strategies – Re: Flash Crash, May 7, 2010


**Documentaries**

- Brown Saddle Films, Wall Street Conspiracy

- Bloomberg T.V. Special, Phantom Shares

- Sandra Mohr, Mohr Productions - Stock Shock


**T.V. Appearances**

- Brown Saddle Films, Wall Street Conspiracy

**Professional Leadership Involvement**

- State Bar of Texas, 1978 - Present
- State Bar of New York, 2005 - Present
- American Association for Justice, 2003 - Present
- American Bar Association, 1978 - Present
- Houston Bar Association, 1978 - Present
- Member of Advanced Evidence & Discovery Committee - State Bar of Texas, 2006 - Present

10

EXHIBIT A to the Expert Report of J. W. Christian

2302 FANNIN, SUITE 500
HOUSTON, TEXAS 77002
PHONE: (713) 659-7617
FAX: (713) 659-7641
jchristian@csj-law.com

- Life Fellow of the Texas Bar Foundation
- Member of the Litigation Council (State Bar of Texas), 2006 - Present
- Energy Institute - Speaker, 2006
- Advanced Evidence & Discovery Committee - Member/Speaker, 2006 – Present
- "Who We Are As Lawyers" - Speaker, 2006 – Present
- Jury Awareness Committee, State Bar of Texas, 2006 – 2007
- Texas Legends Committee - Chairman, 2006 – 2010
- Texas Legends Committee - Co-Chairman, 2011 - 2014
- Annual Meeting, State Bar of Texas - Co-Chairman, 2011 – 2012
- Frequent speaker at SMU, South Texas College of Law, Texas Weslyan Law School and others on Role of a Lawyer in Our Society, 2007 – Present)
- Elected Secretary of Litigation Council of the State Bar of Texas, 2015 - 2016

**Professional Affiliations**

- United States Court of Appeals
- United States Court of Customs and Patent Appeals
- Fifth Circuit Court of Appeals
- United States Court of Claims
- United States Tax Court
- United States District Court, Northern District of Texas
- United States District Court, Southern District of Texas
- United States District Court, Eastern District of Texas
- United States District Court, Western District of Texas
- United States District Court, Western District of Colorado
- United States District Court, Delaware
- United States Bankruptcy Court, Delaware
- United States District Court, Southern District of New York

EXHIBIT A to the Expert Report of J. W. Christian

# EXHIBIT B

Stock Fraud List – Full Case Information

1. Internet Law Library
   o INTERNET LAW LIBRARY, INC. and Hunter M.A. Carr, Plaintiffs, v. SOUTHRIDGE CAPITAL MANAGEMENT, LLC, et al., Defendants./COOTES DRIVE, LLC., Defendant, Counterclaim–Plaintiff, v. INTERNET LAW LIBRARY, INC., Plaintiff, Counterclaim–Defendant./Jack TOMPKINS, Kerwin Drouet, et al., Plaintiffs, v. SOUTHRIDGE CAPITAL MANAGEMENT, et al., Defendants.
   o United States District Court, S.D. New York.
   o James W. Christian listed as counsel of record
2. Nanopierce
   o NANOPIERCE TECHNOLOGIES, INC., Plaintiff, v. SOUTHRIDGE CAPITAL MANAGEMENT LLC, et al., Defendants./HARVEST COURT LLC, Counterclaim Plaintiff, v.NANOPIERCE TECHNOLOGIES, INC., et al., Counterclaim Defendants.
   o United States District Court, S.D. New York.
   o No. 02 Civ 0767(LBS)
3. ATSI Communications, Inc.
   o ATSI COMMUNICATIONS, INC., Plaintiff, v. THE SHAAR FUND, LTD., et al., Defendants.
   o United States District Court, S.D. New York.
   o No. 02 Civ. 8726(LAK)
4. CVF Technologies Corp.
5. Endovasc
   o ENDOVASC LTD., INC., Plaintiff, v. J.P. TURNER & CO., LLC, et al.., Defendants.
   o United States District Court, S.D. New York.
   o No. 02 Civ. 7313(LAP)
6. Pet Quarters
   o PET QUARTERS, INC., Plaintiff v. Thomas BADIAN, et al., Defendants.
   o United States District Court, E.D. Arkansas
   o No. 4:04-CV-697 (RSW)
   o James W. Christian listed as counsel of record
7. NFI
   o Joseph AVENIUS et al., Plaintiffs, v. BANC OF AMERICA SECURITIES LLC, et al., Defendants.
   o No. CGC-06-453422
   o Superior Court of California, San Francisco County
   o James W. Christian listed as attorney of record
8. Novastar Financial, Inc.

EXHIBIT B to the Expert Report of J. W. Christian

- o In re NOVASTAR FINANCIAL SECURITIES LITIGATION
- o United States District Court, W.D. Missouri, Western Division
- o No. 04–0330–CV–W–ODS
9. Overstock – Marin County
  - o OVERSTOCK.COM. INC., a Delaware corporation, et al., Plaintiffs, v. GRADIENT ANALYICS, INC., and Arizona corporation, et al., Defendants.
  - o Superior Court of the State of California, Marin County
  - o No. CV 053693
10. Overstock – San Francisco County
  - o OVERSTOCK.COM, INC., A Delaware Corporation, et al., Plaintiffs, v. MORGAN STANLEY & CO., Incorporated, et al., Defendants.
  - o Superior Court of California, San Francisco County
  - o No. CGC-07-460147
11. Eagletech
  - o EAGLETECH COMMUNICATIONS INC., et al., Plaintiffs, v. CITIGROUP, INC., et al., Defendants.
    - ▪ United States District Court, S.D. Florida
    - ▪ No. 07-60668-CIV
  - o EAGLETECH COMMUNICATIONS, INC., a Nevada Corporation authorized to do business in the State of Florida, Appellant, v. BRYN MAWR INVESTMENT GROUP, INC., et al., Defendants.
    - ▪ United States District Court, S.D. Florida
    - ▪ No. 4D09–3949
12. Global Links
13. Greg Manning Auctions
  - o Greg MANNING, et al., Plaintiffs, v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., et al., Defendants.
  - o United States District Court, D. New Jersey
  - o No. 12–4466 (JLL)
14. Hyperdynamics
  - o HYPERDYNAMICS CORPORATION, Plaintiff, v. J.P. CAREY SECURITIES, INC., et al., Defendants
  - o Superior Court of Georgia, Fulton County
  - o James W. Christian listed as attorney of record
15. Sedona
  - o SEDONA CORPORATION, Plaintiff, v. LADENBURG THALMANN & CO., INC., et al., Defendants.
  - o No. 03Civ.3120(LTS)(THK)
  - o United States District Court, S.D. New York
  - o James W. Christian listed as attorney of record

16. Lecstar
   o FIRST EMPIRE CORPORATION (directly and derivatively in its capacity as a shareholder of LecStar Corporation) and ALAN B. THOMAS, JR. (directly and derivatively in his capacity as a shareholder of LecStar Corporation), Plaintiffs, v. JOHN C. CANOUSE, et al., v. LECSTAR CORPORATION, as a Nominal Defendant
   o Superior Court of Georgia, Fulton County
   o No. 1:04-CV-2596TWT
17. Taser
   o TASER INTERNATIONAL, INC., et al., Plaintiffs, v. MORGAN STANLEY & CO., INC., et al., Defendants
   o Superior Court of Georgia, Fulton County
   o No. 2008-EV-004739-B
   o James W. Christian listed as attorney of record
18. Raser – Utah
   o RASER TECHNOLOGIES, INC., et al.,. Plaintiffs, v. MORGAN STANLEY & CO., LLC, et al., Defendants.
   o Third Judicial District Court, Salt Lake County
   o No. 150906718
   o James W. Christian listed as attorney of record
19. Raser – Georgia
   o RASER TECHNOLOGIES, INC., et al.,. Plaintiffs, v. MORGAN STANLEY & CO., LLC, et al., Defendants.
   o Superior Court of Fulton County, State of Georgia
   o No. 2012-CV-214140
   o James W. Christian listed as attorney of record

# EXHIBIT C

**Examining the Impact of Naked Short Sales on the Share Price of Signalife**

**Robert J. Shapiro**

**April 6, 2018**

*Introduction*

At the request of James Christian, Esq., I have been asked to review certain aspects of the case involving Signalife (SGN) and Mitchell Stein. My review did not cover facts about Signalife or Mr. Stein's case, beyond the impact of certain specific factors on Signalife's share price. I focus on the economic significance and evidence regarding the fails-to-deliver (FTDs) of Signalife shares sold short, or "naked short sales," especially in 2007 and 2008, which Mr. Christian has advised me includes the period of public announcements by Signalife that provided a basis for charges against Mr. Stein. Research by the Securities and Exchange Commission (SEC), myself and others all have concluded that high levels of FTDs can depress a stock's share price. For this exercise, I examined the relationships and correlations between the FTDs of Signalife shares, the stock's total trading volume, and its price changes over several periods.

I have considerable background in this area. Regarding general credentials, I hold a Ph.D. and M.A. in political economy from Harvard University (1980), and I served as a Fellow of the National Bureau for Economic Research, Harvard University, the Brookings Institution and, currently, the McDonough School of Business at Georgetown University. I have advised senior government officials on aspects of equity markets and economic policy as principal economic adviser to then-Governor William Clinton in his 1991-1992 presidential campaign, advisor to President Clinton (1993-1997) and to Treasury Secretaries Robert Rubin and Lawrence Summers; as Under Secretary of Commerce for Economic Affairs (1997-2001); and as advisor to senior members of President Barack

1

Obama's administration, including two chairmen of the Council of Economic Advisers (CEA), Dr. Austan Goolsbee and Dr. Jason Furman, and Treasury Secretary Timothy Geithner. I have studied short sales for 15 years, including studies of the impact of naked short sales and FTDs. I served as a testifying expert in a prominent case involving naked short sales of Overstock.com shares by Merrill Lynch. I have also been a damages testifying or consulting expert on numerous other legal cases filed by James W. Christian and his legal consortium. I also advised senior SEC staff on the terms and subsequent amendments for Regulation SHO ("Reg SHO"), which governs short sales, and SEC Chair Mary Schapiro on the role of FTDs during the 2008 financial crisis.

I am being compensated at a flat fee of $25,000.00 for my services in this case. My compensation in this case is in no way dependent upon the opinions rendered or the outcome of the case; and based on my normal rate of $800 per-hour, I have contributed substantial hours at no compensation.

I obtained Signalife's daily trading data, including its trading volume and closing prices, its bimonthly (twice per-month) short interest data and its outstanding shares data from Compustat. I obtained Signalife's daily FTD data from the SEC's website. Until September 16, 2008, the SEC reported the FTDs of only those securities with total FTDs of at least 10,000 shares on a particular settlement date. Therefore, on those days prior to September 16, 2008, the SEC did not report FTDs for any stock with FTDs of zero to 9,999.

In brief, I found that the data show that Signalife's FTDs, measured as a share of its trading volume and a share of its short interest, were often abnormally large in 2007 and 2008, even as the stock's total reported levels of short interest as a percentage of its outstanding shares were not abnormal. At Mr. Christian's request, I focus here mainly on

2

the year from September 13, 2007 to Signalife's delisting from the American Stock Exchange ("AMEX") on September 12, 2008. I note that these analyses of the stock's outstanding FTDs as a share of its short interest and trading volume are based on average FTDs and trading volume on a twice-per-month basis, because the SEC reports short interest twice per-month. I also found certain anomalies in the data. In seven of the 24 bimonthly periods over the period of September 13, 2007 to September 12, 2008, or nearly 30 percent of that period, Signalife's FTDs averaged more than 100 percent of the stock's reported short interest. The SEC reports FTDs based on data from the Depository Trust and Clearing Corporation (DTCC), while broker dealers report short sales. Since a stock's FTDs are part of its short interest, on any day its FTDs should not exceed its short interest. Furthermore, given Signalife's low reported levels of short interest, broker dealers should have had little difficulty locating shares to borrow for short sales, which would leave the abnormal FTDs unexplained. One explanation for the apparent inconsistency between Signalife's FTD data and its reported short interest is that broker dealers mismarked significant numbers of their short sales of Signalife as long sales, perhaps to avoid the requirements of Reg SHO (explained below). In any case, these data focus our inquiry on Signalife's FTDs.

      I also observed that the high levels of Signalife FTDs were accompanied generally by a decline in the price of Signalife shares. From September 13, 2007 to September 12, 2008, the stock's price fell from $1.30 per-share to $0.06 per-share, or 95.4 percent. As I will describe in more detail below, a regression analysis found a statistically-significant correlation between increases in Signalife's FTDs and declines in its share prices. This correlation held not only for the period from September 13, 2007 to September 12, 2008,

3

but also for the longer periods of January 3, 2006 to September 12, 2008 and January 2, 2007 to September 12, 2008.

*The Significance of Naked Short Sales*

Short sales enable investors to profit when they believe that a stock's price will decline and that decline occurs. In a normal short sale, the short seller borrows stock from another investor's account and sells those borrowed shares to a third investor. At a later time, the short seller buys shares of that stock in the market to replace those that (s)he borrowed, "covering" or "closing out" the short sale. If the stock's share price declined from the time the short sale occurred to the time the short seller replaced the borrowed shares, the short seller profits. If the stock's share price rose over that period, the short seller takes a loss.

Legitimate short sales, like long sales, represent a contract in which a buyer pays a seller, and the seller delivers the shares which the buyer has purchased, but by borrowing them in the case of short sales. The requirement to borrow shares that a seller has sold short sustains the contract and the integrity of a company's capitalization by requiring that short sale transactions involve the actual exchange of shares registered with the SEC.

Naked short sales, which result in fails to deliver, violate these terms in the following ways. A buyer pays the short seller, but the short seller fails to borrow and deliver the shares the buyer has paid for. Such naked short sales can occur, because the SEC's Reg SHO allows a short seller to fail-to-deliver the borrowed shares for up to 18 days from the time of the original sale. On Day 3 of this period, or "T+3," the DTCC "settles" the short sale trade without the short seller providing the shares by tagging shares from another broker-dealer's account; and this procedure maintains a fiction that the short

4

sale is legitimate. Unless the stock has large, persistent FTDs that qualify it as a "threshold " security, this fiction can be maintained indefinitely; although under Reg SHO, the broker dealer cannot conduct subsequent short sales of the same stock without pre-borrowing the shares.[1] Security regulators in other nations are less accommodating; in Canada, for example, a short seller who fails to borrow shares that (s)he sold short is forced to buy-in after one day: After T+1, the regulators require that the broker-dealer for the naked short seller purchase the shares in the open market to cover the short-seller's position.

The Reg SHO rules are stricter for "threshold" or hard-to-borrow" stocks, defined by the SEC as any stock with outstanding FTDs equal to 0.5 percent of its outstanding shares and outstanding FTDs of at least of 10,000 shares that have persisted for five trading days. In such cases, Reg SHO directs the broker-dealer handling the short sale to demonstrate that it has "located" shares available for borrowing in the accounts of its own customers or customers of other broker-dealers before transacting a customer's short sale in that stock. However, enforcement of this locate requirement has been lax. Rule 203 (b)(3) of Reg SHO further requires that the broker dealer cover or close out a naked short sale in a threshold security once the FTDs have persisted for another 13 settlement days. Therefore, a naked short seller and the broker-dealer handling the trade have 18 trading days (5 + 13) to borrow the shares, or nearly one trading month. Moreover, sophisticated investors and broker-dealers have undertaken complex transactions that can obscure large, sustained naked short sales and so sidestep Reg SHO.

---

[1] SEC (2018). "Key Points About Regulation SHO."
https://www.sec.gov/investor/pubs/regsho.htm.

5

My review of SGN's data on FTDs and the stock's outstanding shares found that over the period from September 13, 2007 to September 12, 2008, SGN's FTDs exceeded the threshold of 10,000 shares on 160 trading days, covering 59.3 percent of the trading days over this one-year period. The FTDs of SGN met all of the criteria for threshold securities — FTDs of at least 10,000 shares and FTDs equal to 0.5 percent of outstanding shares, both for five consecutive days — from April 11, 2008 to April 15, 2008 and from August 4, 2008 to August 15, 2008.

It is my opinion that naked short sales and their associated FTDs violate the basic contract between seller and buyer, since the shares the buyer paid for are not delivered by the seller. Naked short sales and their associated FTDs also diminish an equity market's efficiency. In an efficient market, supply and demand for any stock determine its price, and the demand for a stock depends in part on accurate information about its current supply and existing demand. FTDs introduce false information about its supply and, if shares for short sales are expensive to borrow, false information about the demand.

For these and additional reasons, the rules promulgated by the SEC as Reg SHO and described above reflect the SEC's findings that naked short sales can have serious adverse effects on companies and markets. They distort the meaning of the company's public capitalization since no shares registered with the SEC are exchanged in a naked short sale transaction, and they can artificially depress a stock's price. Claims that FTDs often arise from human or mechanical errors or processing delays are unsubstantiated: The use of electronic shares and notations for more than 98 percent of all trades and the operations of the continuous net settlement system ensure that inadvertent FTDs represent a negligible share of all FTDs. Research and economic logic have established that

6

sustained, large-scale FTDs of hard-to-borrow stocks are typically a tactic to avoid the borrowing costs or "negative rebate" that other short sellers bear or, worse, part of an effort to manipulate a stock's price. In the first case, the naked short seller unilaterally claims an economic advantage over investors who respect the rules of the SEC and the stock exchanges. In the second case, naked short sellers can artificially drive down the value of a company's shares by flooding the market with sell orders for its shares, harming shareholders.[2]

In both cases, the SEC has noted that the naked short sellers' ability to avoid borrowing costs gives them more leverage than legitimate short sellers, and they can use this enhanced leverage to engage in large-scale trading that can manipulate share prices.[3] For these reasons, the SEC has long denounced the practice of naked short sales. In 2008, for example, the Commission wrote that "large and persistent fails to deliver" can be "indicative of manipulative naked short selling, which could be used as a tool to drive down a company's stock price" and "the perception of such manipulative conduct also may undermine the confidence of investors.[4]

These material adverse effects follow from two factors. Large-scale FTDs of hard-to-borrow stocks inject false information into the market. As noted, when a company's stock is hard to borrow, broker dealers charge a significant fee or negative rebate to lend

---

[2] Amendments to Regulation SHO, Release No. 34-58773, Securities and Exchange Commission, October 17, 2008.

[3] Security and Exchange Commission, "Short Sales, Proposed Rule," Release No. 34-48709, October 29, 2003.

[4] *Ibid.*, Federal Register, "Amendments to Reg SHO." July 21, 2006. https://www.federalregister.gov/documents/2006/07/21/06-6386/amendments-to-regulation-sho.

7

those shares. Therefore, naked short sales convey the false information that short sellers have absorbed these additional costs in order to short sell the company's shares, which other market participants interpret as signaling serious problems with the company. This false information encourages current shareholders to sell their shares and other market participants to short sell the company's shares.[5] While I did observe certain anomalies in the data on SGN's short interest and FTDs, as noted earlier, the low levels of Signalife's short interest, as reported, would suggest that this dynamic did not affect its share price.

The second material adverse effect from naked short sales is a "quantity effect." Naked short sales can depress a stock's share price under the basic economic principle that supply and demand determine prices. Fails to deliver increase the number of shares that are available in the market, and because shares are sold without being borrowed and delivered, they also increase the supply of shares in the market. Since supply and demand determine price, a change in one without a corresponding change in the other affects prices. In this case, the FTDs increased the supply of both the shares available in the markets and the shares sold, without affecting the demand. The expected economic result is a decline in the share price, relative to the price without the naked short sales. Signalife's substantial FTDs — for example, averaging 679,563 shares per day over the first two weeks of August 2008 — suggest that this dynamic affected its share price in this period.

---

[5] See, for example, Asquith, Paul, Parag Pathak and Jay Ritter (2005). "Short interest, institutional ownership, and stock returns." *Journal of Financial Economics* 78 2005) 243-276; Desai, Hemang and K. Ramesh, S. Ramu Thiagarajan and Bala V. Balachandran (200). "An Investigation of the Informational Role of Short Interest in the Nasdaq Market." *The Journal of Finance*. Vol. LVII, No. 6. October 2002; and Milunovich, George and Roselyne Joyeaux. "Market Efficiency and Price Discovery in the EU Carbon Futures Market." *Applied Financial Economics*, Vol. 20, No. 10, 2010. https://ssrn.com/abstract=989272.

*Examining the Largescale FTDs of Signalife Shares and Movements in Its Share Price*

First, the data show that the fails-to-deliver of Signalife share accounted for an abnormally large percentage of both its daily trading volume and the stock's short interest in the year leading up to its delisting (September 13, 2007 to September 12, 2008). (Complete data covering January 3, 2006 to September 12, 2008 are available from the SEC.) For this analysis, we used average FTDs and average trading volume over bimonthly periods (averaging day one to day 14, and day 15 to day 29, 30 or 31 of each month), again because the SEC issues its public data on short interest on a bimonthly basis.

- Over the year from September 13, 2007 to September 12, 2008, outstanding FTDs of Signalife shares averaged 42.9 percent of trading volume, based on the bimonthly averages of both variables.

- Over the same year, outstanding FTDs of Signalife shares, measured again on bimonthly basis, averaged 103.4 percent of short interest as reported on a bimonthly basis. This includes seven of 24 bimonthly periods when Signalife's average FTDs as a percentage of its short interest ranged from 125.5 percent (January 2008, second half) to 416.2 percent (September 2008, first half).

- Over that year, average outstanding FTDs of Signalife shares averaged 41.1 percent of average trading volume, again both measured on a bimonthly basis, ranging from 6.8 percent (October 2007, first half) to 350.0 percent. (August 2008, first half).

This suggests, as noted earlier, anomalies or flaws in the public data on Signalife's short interest. The high levels of Signalife FTDs even as the stock's reported short interest remained low may also suggest possible stock manipulation, in line with the SEC's views

9

of high levels of FTDs. Whatever the explanation for the FTDs' sustained large share of Signalife's average bimonthly short interest and trading volume, both developments were generally accompanied by a declining share price. To be sure, many factors affected SGN's price, including fluctuations in the overall economy and public knowledge about positive and negative events for the company, which at various times were certainly more important than the stock's FTDs. Nevertheless, in my experience, Signalife's high levels of FTDs, sustained over significant periods, are consistent with an attempt to manipulate a stock and depress its price.

- From the second half of September 2007 to the first half of January 2008, the share price of Signalife declined from $1.30 to $0.48, or 63.1 percent; and from the first half of January 2008 to the second half of September 2008, the share price decline from $0.48 to $0.06, or another 87.5 percent.

I also examined data provided by Mr. Christian on Signalife's daily FTDs in the months after the stock was delisted and underwent a 1-for-4,500 shares reverse split. In the second half of September 2008, before the reverse split, Signalife had 64,273,000 outstanding shares, which implies that the reverse split reduced the stock's outstanding shares to 14,283 shares. Based on the data of Signalife fails to deliver for each of the 22 trading days in October 2008 and the terms of the reverse split, those FTDs averaged 8,904 per trading day, or a daily average of 62.3 percent of the stock's outstanding shares. Signalife's daily FTDs in October 2008 were as high as 10,004 shares (October 2, 2008), or 70.0 percent of the stock's outstanding shares. I do not have the information to determine whether these data reflect stock manipulation; but based on my experience examining cases of sustained largescale FTDs, those data appear to suggest an attempt to

10

manipulate Signalife shares and depress their price. For example, a stock in which FTDs represent a substantial majority of its outstanding shares could reflect an effort by a manipulator to cover previous FTDs.

*Results of the Regression Analysis*

Finally, I performed a regression analysis using Signalife daily FTDs as the independent variable and Signalife's daily share prices as the dependent variable, to establish whether a significant correlation existed between the movements of those FTDs and the movements of those share prices. It is clear that Signalife's FTDs had been substantial since January 2006, and its share price had generally declined since that time. (Figure 1, below) Its share price fell from $2.70 per share on January 3, 2006 to $1.04 per share on January 2, 2007 (a 61.5 percent decline), from that level to $0.62 on January 2, 2008 (another 40.4 percent decline), and from that level to $0.04 on September 12, 2008 (a 93.5 percent decline) when SGN was delisted from the AMEX. In the year before its delisting, Signalife's share price fell from $1.76 on September 13, 2007 to $0.04 on September 12, 2008, or 97.7 percent. Its FTDs rose from daily averages of 48,130 shares in 2006, to 83,400 shares in 2007 and 217,523 per-day in 2008 until the delisting, peaking at 1,008,498 shares on March 24, 2008 or nearly 4.45 times its trading volume of 226,700 shares on the same day. A chart tracking SGN's daily share price and daily outstanding FTDs from January 3, 2006 to September 12, 2008 is provided in Figure 1, below.

**Figure 1: SGN's Daily Share Price and FTDs of SGN Stock, January 3, 2006 to September 12, 2008**



12

To perform the regression analysis, I used a dlog function in eViews (which measures percentage changes) to measure a possible correlation between percentage changes in Signalife's daily share price and its FTDs on the preceding day (that is, with a one-day lag). During the time period of this regression analysis, the SEC did not report the FTDs of securities with less than 10,000 FTDs. For those days in which there were zero FTDs by the SEC, I replaced 0 (zero) share with 1 share for technical reasons (while recognizing that the actual FTDs could be zero to 9,999). Had I not done so, the analysis could not have calculated the percentage changes in FTDs, since an integer cannot divide by zero. The alternative of eliminating from the regression those days that the SEC did not report FTDs would have skewed the regression results.

I used the following formula for the regressions:

$$\text{dlog (SGN Stock Price)} = a + b * \text{dlog (FTD(-1))}$$

I performed this regression analyses using three time periods:

- September 13, 2007 to September 12, 2008;

- January 3, 2006 to September 12, 2008; and

- January 3, 2007 to September 12, 2008.

These regression analyses confirm a statistically-significant negative relationship between percentage changes in Signalife's FTDs and percentage changes in its share price: As Signalife's FTDs increased, Signalife's share price declined.

13

**Table 1: Regression Results for SGN's Daily FTDs and Daily Share Price, Various Time Periods**

| Time Period | β Coefficient | T-Statistics | R-Squared |
|---|---|---|---|
| Sept. 13, 2007 - Sept 12, 2008 | -0.0033 | -1.90 * | 0.014 |
| Jan 3, 2006 - Sept 12, 2008 | -0.0017 | -1.94 * | 0.006 |
| Jan 3, 2007 - Sept 12, 2008 | -0.0027 | -2.03 ** | 0.010 |

(**) Statistically significant at 95.0% level; (*) Statistically significant at 90.0% level

Over the period from September 13, 2007 to September 12, 2008, when Signalife's share price fell from $1.76 to $0.04 or by 97.7 percent, the regression analysis shows a negative relationship between FTDs and SGN stock price. Without additional data and analysis, I cannot estimate the precise impact of the SGN FTDs on its share price. In my opinion, however, the above analyses suggest that the FTDs of Signalife had a material adverse effect on its share price over this period.

*Additional Observations*

I also reviewed data on SGN's share price, trading volume and outstanding shares over the period from September 12, 2008 to December 31, 2008, which followed the stock's delisting on September 12, 2008 and the company's 4,500-to-one reverse split on September 22, 2018. The data exhibit many anomalies. For example, the stock's FTDs jumped from 1,059 shares on September 23, 2008 to 936,232 shares on September 24, 2008, and then fell to 10 shares on September 25, 2008. Other data suggest possible stock manipulation. For example, on September 22, 2008, the 4,500-to-one reverse split reduced outstanding shares from 64,273,000 to 14,300, and the stock's price rose accordingly from $0.01 to $45.00; and the following day, the stock's price fell to $1.10 on trading volume of 10,561 shares, representing 73.9 percent of all outstanding shares.

Without additional information and analysis, I cannot establish or conclude that

14

SGN's share price was manipulated during this period; but once again, such anomalous developments are consistent with stock manipulation.

Finally, I reserve the right to offer additional opinions and to prepare additional charts and graphs as demonstrative exhibits.

Dated: April 6, 2018

Robert J. Shapiro

15

# EXHIBIT D

| Broker | Resolution Date | Disciplinary Entity | Sanction Amount | Violation |
|--------|-----------------|---------------------|-----------------|-----------|
| Goldman, Sachs & Co. | 5/19/2016 | FINRA | $50,000.00 | Acting as a program dealer in auction rate securities (ARS), submitted inaccurate information in certain respects regarding the result of an auction in approximately 1,000 instances to the municipal securities rulemaking board's (MSRB) short-term obligation rate transparency (short) System. The findings stated that the firm erroneously reported rate types for the ars indicating that the interest rates were "set by auction" (a), instead of the maximum (m) interest rates. The findings also stated that the firm's supervisory system did not provide for supervision reasonably designed to achieve compliance with respect to the applicable securities laws and regulations, and the msrb rules, relating to MSRB rule G-34 concerning short reporting of rate types. |
| Goldman, Sachs & Co. | 4/5/2016 | FINRA | $260,000.00 | It failed to submit special handling codes, accurate route (RT) prices, information for reportable events, accurate execution prices, and an accurate limit price to order audit trail system (OATS). The findings stated that the firm reported short sale transactions to the FINRA trade reporting facility (FNTRF) without the required short sale modifier. The findings also stated the firm's supervisory system did not provide for supervision reasonably designed to achieve compliance concerning the reporting of correct short sale modifiers to the FNTRF. |
| Goldman, Sachs & Co. | 4/4/2016 | FINRA | $260,000.00 | Failed to submit, or inaccurately submitted, certain information to the order audit trail system (oats), in alleged violation of FINRA rule 7450; (ii) during the period from May 17, 2011 through February 28, 2014, the firm reported certain short sale transactions to the FINRA trade reporting facility ("FTRF") without the required short sale modifier, in alleged violation of FINRA rule 6182; and (iii) the firm's supervisory system did not provide for supervision reasonably designed to achieve compliance with respect to FINRA rule 6182 concerning the reporting of correct short sale modifiers to the FTRF, in alleged violation of FINRA rule 2010 and NASD rule 3010. |

| Goldman, Sachs & Co. | 1/14/2016 | SEC | $15,000,000.00 | Arise out of practices engaged in by Goldman's securities lending demand team (the demand team), between November 2008 and mid-2013, in providing and documenting "locates" to enable its customers to execute short sales. In processing locate requests using the "F3" function, the demand team typically did not check alternative sources of securities or perform a meaningful further review. Instead, they relied on their general belief that Goldman's automated model was conservative and that the provision of additional locates would not result in failures to deliver the securities if and when due for settlement. The demand team did not document the basis for this general belief. Additionally, Goldman's documentation of its compliance with Reg SHO in its locate log was inaccurate in that Goldman failed to sufficiently differentiate between locates that were filled by its automated model and locates that were filled by the demand team using the "F3" function. In both cases, the locate log simply contained the term "autolocate" to refer to the start of-day inventory utilized by Goldman's automated model as the source of securities supporting the locate. As a result of the conduct described above, Goldman willfully violated section 17(a) of the Exchange Act and rules 203(b)(1)and 203(b)(1)(iii) of regulation SHO promulgated under the Exchange Act. |
| --- | --- | --- | --- | --- |
| Goldman, Sachs & Co. | 6/18/2015 | SEC | $500,000.00 | Violations of an antifraud provision of the federal securities laws in connection with respondent's underwriting of certain municipal securities offerings. Respondent, a registered broker-dealer, conducted inadequate due diligence in certain offerings and as a result, failed to form a reasonable basis for believing the truthfulness of certain material representations in official statements issued in connection with those offerings. This resulted in respondent offering and selling municipal securities on the basis of materially misleading disclosure documents. |

| | | | | |
|---|---|---|---|---|
| Goldman, Sachs & Co. | 10/28/2014 | FINRA | $55,000.00 | Failed to report apparent customer order events to the order audit trail system (OATS), failed to provide a record of order route reports submitted to oats, failed to accurately append the short sale indicator to FINRA/NASDAQ trade reporting facility (TRF) reports, failed to document "stopped stock" information on customer order memorandum, failed to provide complete and/or accurate customer order memorandum, and inaccurately marked sell transactions on its trading ledger. The findings stated that the firm incorrectly reported the number of shares executed at the market center as away executed shares in the firm's rule 605 of regulation NMS report and transmitted reports that contained inaccurate, incomplete, or improperly formatted data to OATS |
| Goldman, Sachs & Co. | 6/4/2014 | FINRA | $1,000,000.00 | The firm reported short sales as long sales on its blue sheets submissions when the trading desk used a particular middle office system, the desk's transactions were processed through a control account, and details about separate transactions were transmitted to the blue sheet reporting platform via the end of day batch process. The findings also stated that the firm failed to include certain street-side transactions executed for customers in its blue sheets submissions to FINRA causing them to be inaccurate. The firm's failure to submit accurate blue sheets had a negative impact on regulatory investigations into possible violations of securities laws. The findings also included that the firm did not have in place an adequate audit system providing for accountability of its blue sheet submissions. |
| Goldman, Sachs & Co. | 3/12/2013 | NASDAQ | $17,500.00 | Entered orders into the NASDAQ/single book system that failed to correctly indicate whether the orders were a buy, short sale, or long sale. The firm's supervisory system did not provide for supervision reasonably designed to achieve compliance with applicable securities laws, regulations and/or NASDAQ rules addressing quality of market topics. The firm's written supervisory procedures failed to provide for one or more of the minimum requirements for adequate written supervisory procedures in prevention of order entry/clearly erroneous transaction review request filings and books and records. |

| Goldman, Sachs & Co. | 9/20/2012 | International Securities Exchange | $1,074,788.00 | Improperly marked certain options orders on the exchange as "customer" through various proprietary order entry systems employed by the firm to send options orders to the exchange, in alleged violation of ISE rules 400, 712(a), and 1400(a), and section 17(a) of the securities exchange act of 1934 and rule 17a-3 promulgated thereunder and (ii) failed to have supervisory systems and controls in place, including a separate system of follow-up and review, reasonably designed to achieve compliance with the exchange's origin code requirements, in alleged violation of ISE rule 401. |
|---|---|---|---|---|
| Goldman, Sachs & Co. | 2/3/2012 | NYSE | $10,000.00 | On five occasions between November 14, 2008 and August 5, 2009, failed to timely submit the regulation and trading notice. |
| Goldman, Sachs & Co. | 1/9/2012 | NYSE ARCA | $40,000.00 | During the time period from October 2007 through August 2008 it, violated NYSE ARCA equities rule 6.18(b) by failing to establish and maintain an adequate supervisory system reasonably designed to ensure compliance with rule 105 of regulation M. |
| Goldman, Sachs & Co. | 6/4/2010 | FINRA | $22,500 | Violated FINRA Rules 2010, 8211, and 8213 and NASD Rule 3010 by failing to report accurate trading information by failing to include the ticker symbol for numerous electronic blue sheet records submissions and by failing to provide supervision reasonably designed to achieve compliance with respect to the applicable regulations and laws and FINRA rules concerning validation of data on blue sheet submissions. |

| | | | | |
|---|---|---|---|---|
| Goldman, Sachs & Co. | 5/27/2010 | FINRA | $120,000 | Violated SEC Rule 203(B)(1) of Regulation SHO, NASD Rules 2110, 3010, 3360 and 6130(B) by failing to report short interest positions for foreign securities and numerous shares; reporting short interest positions in securities totaling several million shares each time when the actual short interest positions in the securities were zero shares; inadvertently failed to remove its "excused withdrawal" status as a NASDAQ Market Maker in several securities and also accepted short sale orders or effected a short sale for its own account in mistaken reliance on the market maker exemption in SEC Rule 203(B)(2)(III) and thus without borrowing or entering into an arrangement to borrow the security or without having reasonable grounds to believe the security could be borrowed and timely delivered; and also failing to have the proper supervision procedures in place to ensure compliance with applicable laws, regulations and FINRA rules. |
| Goldman, Sachs & Co. | 3/20/2009 | NYSE Division of Enforcement, FINRA | $160,000 | Violated NYSE Rule 476(A)(10) by failing to accurately file reports with the NYSE of short interest positions in securities listed on the NYSE and violated NYSE Rule 342 by failing to provide proper procedures of supervision and control with respect to the submission of accurate reports of short interest positions in NYSE-listed securities. |
| Goldman, Sachs & Co. | 12/1/2008 | FINRA | $600,000 (for all violations in this report) | Violated SEC Rules 17A-3 and17A-4 and NASD Rules 2110, 3010(A), 3010(B), 3110, 5430(A), 6130(D)(6), 6420(A) and 6420(B) by failing to report to the NASDAQ Market Center the correct symbol indicating the transaction was a short sale for transactions in reportable securities and failing to notate a short sale indicator on the order ticket |
| Goldman, Sachs & Co. | 11/17/2008 | NYSE Division of Enforcement, FINRA | $600,000 (for all violations in this report) | Violated Section 10(A) of the Securities Exchange Act of 1934 by failing to mark tickets for sale orders as either long or short as required by Rule 10(A)-1(C) and erroneously executing sell orders on a minus tick for securities in which the firm held a short position in violation of Rule 10A-1(A). |
| Goldman, Sachs & Co. | 9/24/2008 | NASDAQ Stock Market, FINRA | $5,000 | Violated NASDAQ Rule 4755 by entering orders and failing to correctly indicate if the orders were a buy, short sale or long sale. |

| | | | | |
|---|---|---|---|---|
| Goldman, Sachs & Co. | 4/17/2008 | FINRA | $55,000 | Violated NASD Rules 2110, 6130, 6230(A), 6230(C)(6) and 6955 by failing to report short sale transactions they executed to the NASDAQ Market Center with a short sale modifier and failing to report to the NMC the correct symbol indicating whether the transactions were a buy, sell, sell short, sell short exempt or cross for transactions in reportable securities. |
| Goldman, Sachs & Co. | 2/16/2007 | Chicago Board Options Exchange (CBOE) | $5,000 | CBOE alleged on October 31, 2006 the firm controlled aggregate long call, short put positions in the Spy Option Class of 344,193 option contracts and after applying the firm's short underlying position of spy shares as a hedge, the firm still exceed the applicable position limit by 1,839 option contracts in violation of CBOE Rule 4.11. |
| Goldman, Sachs & Co. | 8/21/2006 | CBOE | $5,000 | CBOE alleged on July 18, 2006 the firm controlled aggregate long call, short put positions in the MVR Option Class of 36,190 option contracts which exceeded the applicable position limit by 4,690 option contracts in violation of CBOE Rule 4.11. |
| Goldman, Sachs & Co. | 7/20/2006 | NASD | $20,000 | Violated SEC Rule 200(G) and NASD Rules 6130 and 6955 by executing proprietary short sales and failing to properly mark the order tickets as short and incorrectly reported each transaction as a long sale. |
| Goldman, Sachs & Co. | 5/11/2006 | NASD | $20,000 | Violated NASD Rules 3370 and 6130(D)(6) with respect to customer short sale orders in a common stock and short sales in the common stock effected for the firm's proprietary account by failing to make an affirmative determination that the firm would receive delivery of the security or that the security could be borrowed in a timely manner; with respect to short sale transactions in the stock, the firm failed to report each transaction to NASDAQ Market Center with a short sale modifier and incorrectly reported short sale transactions in the stock to the NMC as short sale exempt. |

| | | | | |
|---|---|---|---|---|
| Goldman, Sachs & Co. | 2/17/2006 | NYSE Division of Enforcement | $150,000 | Violated Exchange Rule 410A by failing to submit accurate information via Blue Sheets; violated Exchange Rule 401 by failing to adhere to the principles of good business practice in the conduct of submitting inaccurate Blue Sheets; and violated Exchange Rule 342 by failing to establish and maintain appropriate supervision procedures to ensure compliance with regulations and laws concerning Blue Sheets. |
| Goldman, Sachs & Co. | 10/13/2005 | NASD | $15,000 | Violated NASD Rules 2110, 3010, 3370 and 6130 by effecting short sales in securities for the firm's proprietary accounts and failing to make a determination that the securities could be borrowed in a timely manner and also by failing to report short sale transactions to the NMC with a short sale modifier and incorrectly reporting long sale transactions to the NMC with a short sale modifier. |
| Goldman, Sachs & Co. | 7/19/2005 | NASD | $25,000 | Violated NASD Rules 2110, 3010, 3370, 4632, 6130, and 6955(A) by effecting short sales in securities for the firm's proprietary accounts and failing to make a determination that the securities could be borrowed in a timely manner; by failing to report executed short sale transactions to ACT with a short sale modifier and failing to report to ACT the correct symbol indicating whether the classification of the transaction; and by failing to establish and maintain appropriate supervision procedures to ensure compliance with regulations and laws concerning short sales. |
| Goldman, Sachs & Co. | 12/3/2002 | NASD | $20,000 | Violated NASD Rule 3360 by failing to fully report its short interest positions to NASD in 38 different securities. |
| Goldman, Sachs & Co. | 1/24/2000 | NASD | $1,000 | Violated NASD Rule 3360 by failing to fully report its short interest position of shares of stock. |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 12/8/2016 | Chicago Board Options Exchange | $35,000.00 | (I) improperly marking numerous orders as SSE when the subject orders did not satisfy the requirements of regulation SHO rule 201; (ii) failing to have adequate supervisory policies and procedures to identify SSE orders that were not eligible for such marking and failing to regularly surveil to ascertain the effectiveness of the policies and procedures required by regulation SHO rule 201 and take prompt action to remedy deficiencies in such policies and procedures; and (iii) failing to adequately supervise to assure compliance with the requirements of rules 200 and 201 of regulation SHO pertaining to the accurate marking of sale orders. (exchange rule 4.2 - adherence to law; section 17(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and rule 17a-3 - records to be made by certain exchange members, brokers and dealers thereunder; and regulation SHO rules 200 - definition of "short sale" and marking requirements and 201 - circuit breaker, promulgated under the exchange act). |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 9/20/2016 | Chicago Board Options Exchange | $50,000.00 | (I) improperly marking numerous orders as SSE when the subject orders did not satisfy the requirements of regulation SHO rule 201; (ii) failing to have adequate supervisory policies and procedures to identify SSE orders that were not eligible for such marking and failing to regularly surveil to ascertain the effectiveness of the policies and procedures required by regulation SHO rule 201 and take prompt action to remedy deficiencies in such policies and procedures; and (iii) failing to adequately supervise to assure compliance with the requirements of rules 200 and 201 of regulation SHO pertaining to the accurate marking of sale orders. (exchange rule 4.2 - adherence to law; section 17(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and rule 17a-3 - records to be made by certain exchange members, brokers and dealers thereunder; and regulation SHO rules 200 - definition of "short sale" and marking requirements and 201 - circuit breaker, promulgated under the Exchange Act). |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 6/23/2016 | SEC | $358,000,000.00 | Violations of the customer protection rule that began during the financial crisis and, in certain respects, continued until this year. The violations were two-fold. First, ML used cash belonging to its customers to fund its own business activities through a series of increasingly complex trades. Second, at the same time and continuing for years due to poor oversight and weak controls, MLPF&S allowed certain of its clearing banks to hold general liens over tens of billions of dollars of securities owned by its customers. As a result of the conduct, MLPF&S violated and willfully violated section 15(c)(3) of the exchange act and rule 15c3-3 thereunder. Also, MLPF&S willfully violated section 17(a)(1) of the exchange act and rules 17a-3(a)(10), 17a-5(a), and rules 17a-5(d)(3) (as it existed prior to amendments to rule 17a-5 in 2014), 17a-5(d)(2)(ii), 17a-5(d)(3), and 17a-11(e) thereunder. In addition, it willfully violated exchange act rule 21f-17. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 8/20/2015 | FINRA | $70,000.00 | That on five occasions, the firm accepted a short sale order in an equity security from another person, or effected a short sale in an equity security for its own account, without: borrowing the security, or entering into a bona fide arrangement to borrow the security; or having reasonable grounds to believe that the security could be borrowed so that it could be delivered on the date delivery is due; and documenting compliance with SEC rule 203(b)(1) of regulation SHO. The findings also stated that the firm transmitted 33 reports to the order audit trail system (OATS) that contained inaccurate, incomplete, or improperly formatted data. The findings also included that the firm failed to append the short sale indicator on 24 trade reports submitted to the FINRA/NASDAQ trade reporting facility for a short sale transaction in a reportable security and failed to timely report to the FINRA/NASDAQ trade reporting facility reporting by 8:00 p.m. eastern time 12 transactions that required a .RX modifier. FINRA found that for the month of April 2012, the firm made available a report on the covered orders in national market system securities that it received for execution from any person that included inaccurate information. |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 6/1/2015 | SEC | $9,000,000.00 | Violations of regulation SHO ("REG SHO") of the exchange act, in connection with its practices relating to its execution of short sales. The violations arose from two separate issues concerning Merrill's use of its "easy to borrow" lists. Merrill failed to comport with the sec guidance when executing transactions in reliance on easy to borrow ("ETB") lists in two separate but important ways.<br><br>In addition to the $9 million dollar fine, Merrill paid $1,566,245.67 in disgorgement, and $334,564.65 in prejudgment interest. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 5/27/2015 | NYSE ARCA | $300,000.00 | Consented to the sanctions and to the entry of findings that it violated NYSE ARCA equities rule 6.18 by failing to establish and maintain a system of supervision that was reasonably designed to ensure full compliance with rule 105 by its customers. The findings stated as a result the firm's retail customers effected short sales during rule 105's restricted period and bought shares of the same securities from the firm in follow-on offerings. The firm failed to take reasonable steps to prevent or identify the transactions. The findings also stated that the firm violated ARCA equities rule 6.18 with respect to its institutional customers' compliance with rule 105 in that it relied on a third-party vendor that, in some instances, provided inaccurate data, which the firm used to calculate the restricted period for surveillance purposes. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 10/27/2014 | FINRA | $2,500,000.00 | It failed to establish, maintain and enforce adequate supervisory systems and procedures, including in some instances written supervisory procedures, that were reasonably designed to ensure compliance with applicable securities laws and regulations including regulation SHO, emergency orders issued by the sec, customer reserve, and record retention requirements of the securities exchange act of 1934 and anti-money laundering requirements. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 6/4/2014 | FINRA | $1,000,000.00 | It submitted at least 5,323 inaccurate blue sheets to various securities regulators, including the SEC and FINRA. The findings stated that the inaccurate blue sheets failed to include customer names and addresses for trades made on the day the customer opened a firm account. |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 11/18/2013 | FINRA | $35,000.00 | Executed short sale transactions for which it failed to report each of these transactions to the FINRA/NASDAQ trade reporting facility (FNTRF) with the correct symbols indicating that the transactions were sell short. The firm executed long sale transactions for which it failed to report each of these transactions to the over-the-counter (OTC) reporting facility with the correct symbols indicating that the transactions were proprietary long sales. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 11/18/2013 | NASDAQ | $12,500.00 | Entered proprietary orders to sell short into the NASDAQ market center that incorrectly identified the orders as long. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 10/24/2013 | FINRA | $85,000.00 | The firm had fail-to-deliver positions at a registered clearing agency in an equity security that resulted from a long sale, and did not close the fail-to-deliver positions by purchasing securities of like kind and quantity within the time frame prescribed by sec rule 204(a)(1). The firm executed short sale orders and failed to properly mark the orders as short. The firm failed to contemporaneously or partially execute customer limit orders in a NASDAQ security after it traded each subject order for its own market-making account at a price that would have satisfied each customer's limit order. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 6/7/2013 | NASDQ | $10,000.00 | Entered orders into the NASDAQ market center that failed to correctly indicate whether the orders were a buy, short sale or long sale. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 12/12/2012 | FINRA | $265,000.00 | Executed cross transactions that were also short sales but reported these trades to the FNTRF without a short sale modifier. The firm failed to have adequate written supervisory procedures reasonably designed to ensure compliance with FINRA rules 6182, 7230a(d)(6) and NASD rule 6130(d)(6). |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 8/29/2012 | FINRA | $400,000.00 | Former broker of the firm recommended his customers engage in a pattern of unsuitable short-term closed-end funds (CEF) and unit investment trusts (UIT) trading. |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 4/25/2012 | American Stock Exchange | $50,000.00 | 1.Violated regulation SHO rule 203(b)(3) during the period of January 2006 through June 2008, by failing to close out 22 fail to deliver positions in four separate securities, that existed between 14 days to 50 days. 2. Violated AMEX rule 324, during the period of November 19, 2007 through December 27, 2007, by incorrectly booking a trade, which caused the firm to maintain inaccurate records and report inaccurate information to the national securities clearing corporation. 3. Violated AMEX rule 320 during the period of January 2006 through June 2008, by failing to implement and maintain adequate procedures of supervision and control |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 1/10/2011 | NASDAQ | $5,000.00 | Entered orders into the NASDAQ market center that failed to correctly indicate whether the orders were a short sale or long sale. |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 9/24/2008 | FINRA | $242,500 | Failed to Report to the NMC or FIRA/NASDAQ Trade Reporting facility the correct symbol indicating whether tractions were Buy, Sell , Sell Short, Sell Short Exempt or Cross for Transaction in reportable Securities. Violations of SEC Rules 10B-10, 17A-3, 17A-4, 200(G) of Regulation SHO, NASD Rules 2110, 2320, 3010, 3110, 4632, 4632(A), 6130, 6130(D), 6230(C)(6), 6230(E), 6620, 6620(F), 6955(A), |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 3/23/2006 | NASDAQ | $45,000 | Failed to report to act the correct symbol indicating whether transactions in eligible securities where a buy, sell, sell short, short Exempt or Cross for Transaction in reportable Securities. Violations of SEC Rules 10B-10, 11AC1-5, 17A-3, NASD Rules 2110, 3010, 3110, 4632, 6130(D), 6420(A), 6420(C)(3). |
| Merrill Lynch, Pierce, Fenner & Smith Inc. | 10/27/2004 | NASD | $97,000 | NASD Rules 2110, 2320, 3010, 3370, 4613(E), 4642, 6130, 6420, 6620 and SEC Rule 11AC 1-4 effectuated short sale transaction in certain securities and failed to make and affirmative determination prior to affecting such transaction and executed short sale transactions and failed to report these transactions to Act with a short sale modifier. |

| Merrill Lynch, Pierce, Fenner & Smith Inc. | 8/20/2004 | NASD | $9,000 | NASD Conduct Rule 3370 and NASD Marketplace Rule 6130(D) effectuated short sale transaction in certain securities and failed to make and affirmative determination prior to affecting such transaction. |
|---|---|---|---|---|
| Merrill Lynch Professional Clearing Corp. | 5/20/2015 | International Securities Exchange | $10,000 | The firm's automated market making desk incorrectly marked sell order executions as "long" rather than "short". The finding stated that the firm failed to have sufficient supervisory controls in place, including sufficient written supervisory procedures and an adequate supervisory system, and system of follow-up and review, designed to achieve compliance with SEC rule 200(G). This conduct violated rule 401. |
| Merrill Lynch Professional Clearing Corp. | 5/18/2015 | Box Options Exchange LLC | $55,000 | The firm's automated market making desk incorrectly marked sell order executions as "long" rather than "short". The finding stated that the firm failed to have sufficient supervisory controls in place, including sufficient written supervisory procedures and an adequate supervisory system, and system of follow-up and review, designed to achieve compliance with SEC rule 200(G). This conduct violated rule 401. |
| Merrill Lynch Professional Clearing Corp. | 6/8/2015 | NASDAQ OMX PHLX, INC. | $55,000 | The firm's position in a particular security had changed from "long" to "short" during the trading day. As a result of its review. A total of 30 sell order executions had been incorrectly marked as "long" rather than "short" by the firms automated market making desk. This conduct constitutes seperate and distinct violations of SEC rule 200(G). In addition, the firm failed to have sufficient supervisory controls in place, including sufficient written supervisory procedures and an adequate supervisory system, and system of follow-up and review, designed to achieve compliance with SEC rule 200(G). |
| Merrill Lynch Professional Clearing Corp. | 6/25/2015 | NASDAQ Stock Market | $55,000 | The firm's automated market making desk incorrectly marked sell order executions as "long" rather than "short". The finding stated that the firm failed to have sufficient supervisory controls in place, including sufficient written supervisory procedures and an adequate supervisory system, and system of follow-up and review, designed to achieve compliance with SEC rule 200(G). |

| Merrill Lynch Professional Clearing Corp. | 5/27/2015 | NYSE ARCA, INC. & NYSE MKT LLC | $10,000 | The firm violated rule 200(G) of regulation SHO, promulgated under the securities exchange act of 1934, by failing to properly mark sell orders as short, and violated NYSE ARCA options rule 11.18 by failing to establish and maintain adequate supervisory procedures and controls, including written supervisory procedures, reasonably designed to ensure that sell orders were properly marked. |
|---|---|---|---|---|
| Merrill Lynch Professional Clearing Corp. | 6/1/2015 | United States Securities and Exchange Commission | $9,000,000 | The firm violated regulation SHO of the exchange act, in connection with its practices relating to its execution of short sales. The violations arose from issues concerning Merrill's use of its "easy to borrow" lists. Merrill failed to comport with SEC guidance when executing transactions in reliance on easy to borrow lists in two separate but important ways. Merrill's execution platforms were designed to continue accepting short sale orders in reliance on its lending desk's easy to borrow list even when Merrill had determined, through placement of the stock on Merrill's watch list, that "countervailing factors" existed that rendered Merrill's reliance on the list as locate source unreasonable. The countervailing factors consisted of Merrill's knowledge of events that occurred throughout the day after the issuance of the easy to borrow list that had, or were deemed likely by Merrill to have, the potential to impact a particular stock's availability such that Merrill added the stock to its watch list. Even though Merrill's policy prevented the lending desk from granting locates in such circumstances soley on the basis of the easy to borrow list, Merrill allowed its execution platforms to continue to execute short sales soley in reliance on the easy to borrow list in such circumstances. This conduct violated rule 203(B) of regulation SHO in that Merrill purported to rely on easy to borrow list locates that could not provide the requisite reasonable grounds to believe the affected securities could be borrowed for delivery on the delivery date as required under the rule. |

| Merrill Lynch Professional Clearing Corp. | 10/27/2014 | FINRA | $5,000,000 | The firm failed to establish, maintain and enforce adequate supervisory systems and procedures, including in some instances written supervisory procedures that were reasonably designed to ensure compliance with applicable securities law and regulations including regulation SHO, the 2008 emergency orders issued by the SEC and anti-money laundering requirements. The findings stated that the firm failed to close out its fail-to-deliver positions reflected on its books and records, resulting from a failure in its intercompany settlement process to transfer its clearance and settlement obligations to its affiliated broker-dealer, by purchasing or borrowing securities of like kind and quantity as required by rule 204T(A) and 204(A) of regulation SHO. |
| --- | --- | --- | --- | --- |
| Merrill Lynch Professional Clearing Corp. | 20/27/2014 | FINRA | $3,500,000 | From September 2008 through July 2012 the firm did not take any action to close out certain fail-to-deliver positions, and did not have systems and procedures in place to address the close-out requirements of Regulation SHO for the majority of that period. |
| Merrill Lynch Professional Clearing Corp. | 10/27/2014 | NYSE ARCA, INC. | $1,500,000 | The firm failed to establish, maintain and enforce adequate supervisory systems and procedures, including in some instances written supervisory procedures for compliance with the clouse-out requirements of rules 204T(A) and 204(A) of regulation SHO. The firm failed to alter systems or procedures to ensure that its fail-to-deliver positions were investigated to determine whether each was caused by a short or long sale and, if so, to borrow or buy in securities when required. The firm violated NYSE ARCA equities rules 6.18(B) and (C). |
| Merrill Lynch Professional Clearing Corp. | 5/27/2010 | FINRA | $47,500 | NASD RULES 2110, 3360, 6955(A) NYSE Rule 421.10- submitted inaccurate short interest position reports in NASDQ Securities to NASD and submitted inaccurate short interest position reports in securities listed on the NYSE to the NYSE thereby the OATS system was unable to link the execution reports to the related trade report. |

| | | | | |
|---|---|---|---|---|
| Merrill Lynch Professional Clearing Corp. | 6/26/2007 | NASD | $12,500 | Violated SEC Rule 203(B)(3) and NASD Rules 2110 and 3010 by having a fail-to-deliver position in a threshold security for 13 consecutive settlement days and failing to timely allocate and close out its fail-to-deliver position. |
| Merrill Lynch Professional Clearing Corp. | 11/20/2001 | NASD | $20,000 | NASD Rule 3360- the firm failed to report its short interest positions in NASDQ SMALLCAP Securities to the NASD prior to April 199. The firm further submitted its short interest position report to the NASD and failed to report short interest shares of NASDAQ SAMALLCAP Securities. |
| Morgan Stanley & Co. | 11/21/2012 | NASD | $35,000.00 | Morgan Stanley & Co., LLC incorrectly entered orders with a principal capacity into the nasdaq singlebook system when it served as agent for a sponsered access client. The firm entered orders into the nasdaq market center that failed to correctly indicate whether the orders were a buy, short sale or long sale. The incorrect order designation resulted from a firm trading system problem that erroneously imputed certain principal orders into the firm's position calculation. The problem existed for approximately 21 months and affected other orders the firm sent to the nasdaq market center. |
| Morgan Stanley & Co. | 11/21/2012 | FINRA | $47,500.00 | Morgan Stanley & Co. LLC knew, or had reasonable grounds to believe, that the sale of an equity security was or would be effected pursuant to an order marked long, and failed to deliver the security on the date delivery was due. The firm had a fail-to-deliver position at a registered clearing agency in a threshold security, for 13 consecutive settlement days and failed to immediately thereafter close out the fail-to-deliver position by purchasing securities of like kind and quantity. |

| | | | | |
|---|---|---|---|---|
| Morgan Stanley & Co. | 6/5/2012 | CFTC | $5,000,000.00 | Executed, processed and reported numerous off-exchange futures trades to the Chicago mercantile exchange (CME) and Chicago board of trade (CBOT) as exchanges for related positions (hereinafter, EFRPS). Those trades, however, were not lawful EFRPS as they lacked the corresponding and related cash, over-the-counter (OTC) swap, OTC option, or other OTS derivative (collectively, cash or OTC derivative) position required to constitute a valid EFRP, pursuant to CME and CBOT rules. Because the futures trades were executed noncompetitively and not in accordance with the rules governing EFRPS, the trades constituted "fictitious sales" and resulted in non-bona fide prices being reported in violation of section 4c(a) of the commodity exchange act (the act) and commission regulation (regulation) 1.38(a). |
| Morgan Stanley & Co. | 12/13/2011 | FINRA | $65,000.00 | Series of formula errors captured non-overdrawn balances, resulting in credits being understated on the month-end computation by approximately $196 million. A mapping error in a spreadsheet used to analyze and adjust allocations for reserve formula purposes resulted in CNS fail to deliver/receive allocations being duplicated on the file. Resulted in credits being overstated by $36 million and debits being understated by $25 million. The firm did not exclude fail to deliver balances aged over 30 calendar days from the weekly and month-end computations. Violation of SEC Rule 15c3-3, SEA 15(c), NASD Rule 2110, and FINRA Rule 2010. |
| Morgan Stanley & Co. | 6/29/2011 | FINRA | $575,000.00 | The firm failed to establish and/or enforce written supervisory procedures and operational controls and failed to adequately supervise personnel and business operations in connection with certain total return swaps and off-shore stock loans in violation of NASD rules 3010 and 2110. |
| Morgan Stanley & Co. | 5/17/2011 | FINRA | $110,000 | Violated FINRA Rules 2010 and 6730, NASD Rules 2110, 3010, 3360, 6230(A) and (B) and (C)(5) and (C)(6), and MSRB Rules G-8 and G-14 by failing to report short interest positions in securities to FINRA and failing to provide adequate supervision designed to achieve compliance with the applicable securities laws, regulations and NASD rules concerning short interest position reporting. |

| Morgan Stanley & Co. | 8/25/2009 | FINRA | $20,000 | Violated NASD Rules 2110 and 3360 and NYSE Rule 421.10 by submitting inaccurate short interest position reports in NASDAQ securities to NASD and submitted inaccurate short interest position reports in NYSE-listed securities to the NYSE. |
|---|---|---|---|---|
| Morgan Stanley & Co. | 3/13/2007 | American Stock Exchange | $10,000 | Violated Article V, Section 4(H) of the Exchange Constitution by failing to comply with the affirmative determination requirements articulated in AMEX Information Circulars 90-25 and 98-1135 prior to effecting 10 short sales for the firm's proprietary or customer accounts and violated Exchange Rule 320 by failing to ensure that it developed and maintained reasonable supervisory procedures and policies regarding compliance with the requirement to make arrangements to either borrow the necessary stock or obtain other assurances that delivery can be timely made prior to effecting short sales. |
| Morgan Stanley & Co. | 8/21/2006 | NASD | $2,568,500 (for all violations in this report) | Violated SEC Rules 10A-10B-10, 11AC1-5, 17A-4 and NASD Rules 2110, 2320, 2860(B)(5), 3010, 3110, 3370, 4613(E)(1)(C), 4632, 6130(B) and (D), 6230(C)(8), 6420, 6420(C)(5), 6620(A) and (B) and 6955(A) by failing to report to the national market center the correct symbol indicating whether the transaction was a buy, sell, sell short, sell short exempt or cross for transactions in eligible securities; accepting short sales and failing to make/annotate affirmative determinations of delivery of the security; and causing short sales to be executed at or below the price at which the last sale was reported. |
| Morgan Stanley & Co. | 8/4/2006 | NYSE | $500,000 | Violated NYSE Rules 421 and 342(a) by submitting inaccurate short position reports and failing to supervise short interest position reporting. |
| Morgan Stanley & Co. | 1/7/2005 | NYSE Division of Enforcement | $13,000,000 (for all violations in this report) | Violated NYSE Rule 440B and Regulation 10(A)-1 promulgated under the Securities NYSE Act of 1934 by erroneously executing certain sell orders on a minus tick for securities in which the firm held a short position. |

| | | | | |
|---|---|---|---|---|
| Morgan Stanley & Co. | 12/13/2004 | NASD | $15,000 | Violated SEC Rule 10B-10 and NASD Marketplace Rule 6130(D) and NASD Conduct rule 3370 by failing to report to ACT the correct symbol indicating the classification of the transaction, accepting customer short sale orders and effectuating short sales for the firm's proprietary accounts while failing to make and annotate an affirmative determination that the security would be timely delivered or available to be borrowed by the settlement date. |
| Morgan Stanley & Co. | 4/8/2002 | NASD | $22,500 | Violated SEC Rule 11AC1-4 and NASD Marketplace Rule 6130 by executing short sale transactions and failing to report each of these transactions to ACT with a short sale modifier. |
| Morgan Stanley & Co. | 11/8/2000 | NASD | $200,000 | Violated NASD Rules 2110, 3010, and 3360 by misreporting its short interest positions to NASD, NYSE, and AMEX causing inaccurate information concerning such positions to be disseminated to the public and failed to timely report its discovery of such misreporting, failing to ensure that newly opened accounts were excluded from its mainframe computer's calculation of short interest positions and failed to establish and enforce supervisory procedures to achieve compliance with laws and regulations concerning short interest reporting. |
| Morgan Stanley & Co. | 11/7/2000 | AMEX | $200,000 | Violated Exchange Rule 30 during the period November 1996 through August 1998 by filing materially inaccurate reports of short interest positions with AMEX and failing to establish and enforce supervisory procedures to ensure compliance with such regulations and laws. |
| Morgan Stanley & Co. | 9/28/2000 | NYSE Division of Enforcement | $200,000 | Violated Exchange Rules 421, 351(A)(1), and 342 during the period November 1996 through August 1998 by filing materially inaccurate reports of short interest positions with the NYSE and failing to establish and enforce supervisory procedures to ensure compliance with such regulations and laws. |

| | | | | |
|---|---|---|---|---|
| Morgan Stanley Dean Witter | 10/10/2006 | AMEX | $500,000 | Violated Exchange Rule 30 by failing to report short interest positions or by submitting inaccurate short interest reports in preferred securities and affiliates' securities for a significant numbers of years until the problem was corrected in February 2006. Also violated Exchange Rule 320 for failing to establish a supervisory system and protocol that would detect such short interest reporting problems. |
| Morgan Stanley Dean Witter | 9/1/2006 | NYSE Division of Enforcement | $500,000 | Violated NYSE Rule 421 by submitting inaccurate reports of short positions in securities listed on the NYSE and violated NYSE Rules 342(A) and (B) by failing to establish and maintain appropriate procedures for supervision with respect to short interest position reporting. |
| Morgan Stanley Dean Witter | 8/24/2006 | NASD | $500,000 | Violated NASD Rules 2110, 3010 and 3360 by failing to provide indicator of its short interest positions for NASDAQ-listed securities traded on multiple exchanges in its reports to NASD, failing to report short positions in preferred securities held in accounts a the firm and for securities issued by affiliates, and failing to have a reasonable and proper supervision process to detect such violations. |
| Morgan Stanley Dean Witter | 3/18/2002 | NASD | $25,000 | Violated NASD Conduct Rules 2860(B)(5)(A), 3010 and 3360 by failing to report its short interest positions to the NASD for securities, submitting short interest position reports that included inaccurate short interest data and by failing to have a supervisory system in place to achieve compliance with the laws and regulations concerning short interest reporting. |
| Morgan Stanley Dean Witter | 8/21/2006 | NASD | $1,289,000 (for all violations in this report) | Violated SEC Rule 10B-10) and NASD Rule 3370 by accepting a customer short sale and effecting short sales for the firm's proprietary account while failing to make an affirmative determination that the firm would receive delivery or could borrow the security for delivery by the settlement date. |

| Morgan Stanley Dean Witter | 1/7/2005 | NYSE | $13,000,000 (for all violations in this report) | Violated NYSE Rule 440B and Regulation 10(A)-1 promulgated under the Securities Exchange Act of 1934 by erroneously executing certain sell orders on a minus tick for securities in which the firm held a short position. |
|---|---|---|---|---|
| UBS Financial Services Inc. | 2/26/2008 | FINRA | $110,000.00 | The firm executed short sale orders and failed to properly mark the order tickets as short for the orders and failed to make a determination that the firm could actually borrow such security on behalf of the customer for delivery. |
| UBS Financial Services Inc. | 10/14/2003 | NASD | $5,000.00 | Firms supervisory system did not provide for supervision reasonably designed to achieve compliance with respect to short sales transaction reported to act on its behalf. |
| UBS Securities, LLC | 2007-2008 | FINRA | $12,000,000.00 | UBS's Reg SHO supervisory system regarding locates and the marking of sale orders was significantly flawed and resulted in a systematic supervisory failure that contributed to serious Reg SHO failures across its equities trading business. First, FINRA found that USB placed millions of short sale orders tot eh market without locates, including in securities that were known to be hard to borrow. Second, FINRA found that UBS mismarked orders were short sales that were mismarked as "long," resulting in additional significant violations of Reg SHO's locate requirement. Third, FINRA found that UBS had significant deficiencies related to its aggregation unit that may have contributed to additional significant order-marking and locate violations. The firm violated Reg SHO and it has mismarked more than 10 million sale orders including short sales mismarked as lons that also violated Reg SHO locate requirement. UBS' supervisory framework over its equities trading business was not reasonably designed to achieve compliance with the requirements of Reg SHO and other securities laws, rules and regulations until at least 2009. |
| UBS Securities, LLC | 3/1/2007 | NASD | $65,000.00 | Submitted reports to OATS that contained inaccurate, incomplete or improperly formatted data, and erroneously submitted execution reports it routed away for handling and/or execution to OATS. |
| UBS Securities, LLC | 10/1/2004 | NASD | $10,000.00 | Submitting inaccurate and/or incomplete OATS data. |

| | | | | |
|---|---|---|---|---|
| UBS Services USA LLC | 1/20/2010 | FINRA | $60,000.00 | Failed to report FINRA/NASDA trade reporting facility the correct symbol indicating whether transactions were buy, sell, or sell short or cross for transactions in reportable securities. |
| UBS Services USA LLC | 1/20/2010 | NASDA stock market | $5,000.00 | Failed to correctly indicate whether orders were a buy, short sale or long sale. |
| UBS Services USA LLC | 6/26/2008 | FINRA | $116,000.00 | Accepted customer short sale orders in certain securities and for, each order failed to make an affirmative determination that the firm would receive delivery of the security on behalf of the customer or that the firm could borrow the security on behalf of the customerfor delivery by the settlement date. In addition, the firm affected short sale orders in cetain securities and for itself, and for each order failed to make an affirmative determination that the firm would receive delivery of the security or could borrow the security by the settlement date. |
| UBS Services USA LLC | 7/2/2003 | NASD | $2,000.00 | The firm executed short sale transactions and failed to report these transactions with a short sale modifier. Firm also incorectly labeled and reported long sale transactions as short sales. The firm also failed to report to ACT the correct symbol indicating whether the transactions were a buy, sell, sell short, sell short exempt, or cross for several transactions. |
| UBS Financial Services Inc. | 6/1/2012 | FINRA | $167,500.00 | The firm had a fail to deliver position at registered clearing agency in an equity security that resulted from a short sale, and failed to immediately thereafter close out the fail to deliver positions by purchasing securities of like kind and quantity no later than the begining of regular trading hours on the next consecutive settlement date following the settlement dates for the short sale transaction. The firm transmitted reports to the order audit trail system (OATS) that contained inaccurate buy/sell order designations. The firm failed to report to the over-the-counter (OTC) reporting facility the correct symbol indicating whether a transaction was a buy, sell, sell short, or cross for transaction in reportable securities. SEC rules 204T (A),204T (A)(1) of regulation SHO, NASD rules 6130(D)(6), 6955(A) were violated. |
| Barclays Capital | 6/1/2014 | FINRA | $1,000,000.00 | Reported short sales as long sales on their blue sheets and for other various reporting violations |

| | | | | |
|---|---|---|---|---|
| Credit Suisse Securities | 1/5/2017 | FINRA | $1,750,000.00 | Violated Reg SHO by failing to supervise short sale and mis-marking sale orders. From June 2006 through December 2010, the firm's Reg SHO supervisory system regarding locates and the marking of sale orders were flawed and resulted in a systematic supervisory failure that contributed to significant Reg SHO failures across its equities trading business. During that time period, the firm released millions of short sales orders to the market without locates, including threshold and hard to borrow securities. The locate violations extended to numerous trading sytems, aggregation units and strategies. In addition, the firm mismarked tens of thousands of sale orders in its trading system. The msmarked orders included short sales that were mismarked as "long," resulting in additional violations of Reg SGO's locate requirement. |
| Deutche Bank | 7/9/1905 | FINRA | $1,400,000.00 | The firm improperly relied on a "net" position of total shares which included shares supposedly held by international affiliates. This "net" aggregate position was then used to justify locates provided to customers and its own brokers. |

| J.P. Morgan | 7/9/1905 | FINRA | $350,000.00 | The firm failed to properly mark 19,318,195 sell orders as short between October 19, 2011 to January 27, 2012 (approximately 3 months). This number is symbolic of the magnitude of the problem. Additionally, the firm on 21,217 occasions affected short sales on its own account without obtaining a locate. |
|---|---|---|---|---|

# EXHIBIT E

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
## NO. 20080144512

TO:   Department of Enforcement ("Enforcement")
      Financial Industry Regulatory Authority ("FINRA")

RE:   Credit Suisse Securities (USA) LLC, Respondent
      CRD No. 816

> Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, the Respondent submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against the Respondent alleging violations based on the same factual findings described herein.

### I.

### ACCEPTANCE AND CONSENT

A.    The Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

Credit Suisse Securities (USA) LLC ("Credit Suisse" or the "Firm"), member New York Stock Exchange ("NYSE") and FINRA, is a registered broker-dealer with its principal office in New York, New York, and offers a wide range of investment products and functions across asset classes, for various investment styles, including private equity hedge funds, real assets, fixed income and equities.

### OVERVIEW

On July 28, 2004, the Securities and Exchange Commission (the "SEC") adopted 17 CFR Part 242 ("Reg SHO") under the Securities Exchange Act of 1934 ("Exchange Act"), effective September 7, 2004, with a compliance date of January 3, 2005. Reg SHO was, among other things, established to address potentially abusive naked short selling and other problems associated with failures to deliver while protecting and enhancing the operation, integrity and stability of the markets. As such, Reg SHO: (i) established a uniform "locate" requirement to reduce the number of potential failures to deliver; (ii) created uniform order marking requirements for sales of equity securities; and (iii) limited the time in which a broker-dealer can permit a failure to deliver to persist for

1

EXHIBIT E to the Expert Report of J. W. Christian    Page 1 of 119

securities on the various self-regulatory organization ("SRO") threshold security lists ("threshold securities").[1]

As set forth below, the Firm failed to fully comply with the locate and order marking requirements of Reg SHO, as well as FINRA Rules, NASD Rules and federal securities laws during the period covering, in whole or in part, June 1, 2006 through at least December 2010 (the "Relevant Period").

Credit Suisse's failure to comply with Reg SHO's locate and order marking requirements extended across multiple Firm aggregation units and trading systems, as well as the Firm's technology and supervisory systems and procedures. The Firm's Reg SHO violations occurred due to, among other things: (1) the failure to decrease available locate shares to account for short sale orders entered but unexecuted; (2) programming errors that resulted in trading systems failing to recognize the rejection of locate requests and/or using prior days' locate approvals; (3) misapplication of the bona-fide market maker exception to the locate requirement; (4) trading systems and traders mismarking sale orders; and (5) the failure to adequately supervise locates and order marking.

As a result of these failures, the Firm improperly entered proprietary short sale orders over at least a four and one-half-year period, without having reasonable grounds to believe that the securities being sold would be available for delivery. A number of these improper short sale orders were in hard-to-borrow and threshold securities. The Firm also mismarked sale orders, including short sales mismarked as long sales, resulting in additional violations of Reg SHO's locate requirement.

As a result of the mismarked sale orders, Credit Suisse also had reporting and recordkeeping violations. Credit Suisse's mismarked sale orders flowed through to the Firm's blue sheet submissions, causing it to make inaccurate submissions of trading data to FINRA. Moreover, these same mismarked sale orders caused the Firm to inaccurately report such orders to the Automated Confirmation Transaction Service ("ACT") and the Order Audit Trail System ("OATS"). Credit Suisse also failed to create and maintain an accurate record of its mismarked sale orders.

Credit Suisse's Reg SHO supervisory system was deficient and resulted in supervisory failures of multiple aggregation units and trading desks which executed both proprietary and customer orders. These supervisory deficiencies included, among other areas, (1) the failure to detect or prevent the entry of short sales without locates, (2) the failure to detect and prevent mismarked orders, and (3) the failure to prevent and detect trading system programming issues that contributed to the locate and order marking violations.

Credit Suisse's supervisory and compliance monitoring flaws included a failure to establish and maintain: (1) reasonable and adequate supervisory procedures for

---

[1]  Threshold securities are equity securities that have an aggregate fail to deliver position for: (i) five consecutive settlement days at a registered clearing agency [e.g., National Securities Clearing Corporation ("NSCC")]; (ii) totaling 10,000 shares or more; and (iii) equal to at least 0.5% of the issuer's total shares outstanding.

EXHIBIT E to the Expert Report of J. W. Christian   Page 2 of 119

compliance with the locate and order marking requirements of Reg SHO; (2) adequate Information Technology control procedures relating to Reg SHO; and (3) an adequate Reg SHO compliance program.

Due to the Firm's supervisory and compliance deficiencies with regard to Reg SHO, certain of the Firm's aforementioned violations were not detected or corrected until after Enforcement's investigation caused Credit Suisse to conduct a substantive review of its systems for Reg SHO compliance in April 2009.  In addition, Enforcement continued to identify Reg SHO violations occurring as the result of the deficiencies in the Firm's trading systems even after the Firm had completed its Reg SHO compliance review.  As problems were self-identified by the Firm or identified by FINRA to the Firm, the Firm implemented changes to its systems and procedures that were designed to prevent a recurrence of these violations.

## RELEVANT DISCIPLINARY HISTORY

### *Matter No. 2006005067802 (April 30, 2010)*

In April 2010, Credit Suisse was fined $5,000 for violation of NASDAQ Rule 4755 in that the Firm entered orders into the NASDAQ Market Center that failed to correctly indicate whether the orders were buy, short sale, or long sale.

### *Matter No. 20050024896-01 (July 18, 2008)*

In July 2008, Credit Suisse was fined $92,500 for violations of, among other things, SEC Rules 203(a)(1) and 203(b)(3) of Regulation SHO in that the Firm knew or had reasonable grounds to believe that the sale of an equity security was or would be effected pursuant to an order marked long and failed to deliver the security on the date delivery was due. The Firm had fail-to-deliver positions at a registered clearing agency in threshold securities for 13 consecutive settlement days and failed to immediately thereafter close out the fail-to-deliver positions by purchasing securities of like kind and quantity.

### *NYSE Hearing Board Decision 06-112 (June 28, 2006)*

In June 2006, the Firm was fined $250,000 for violations of Rule 203(b)(1) of Regulation SHO for accepting short sale orders and effecting those orders without having borrowed securities or entered into bona-fide arrangements to borrow them or without having reasonable grounds to believe securities could be borrowed so that they could be delivered on dates delivery was due, and Rule 203(a) by effecting sales marked long when it did not know or have reasonable grounds to believe that it would be able to deliver securities  on dates when the delivery was due or that customers were not representing short sales as long sales.

EXHIBIT E to the Expert Report of J. W. Christian    Page 3 of 119

*NYSE Hearing Board Decision 06-14 (Jan. 24, 2006)*

In January 2006, Credit Suisse (then known as Credit Suisse First Boston LLC) consented to findings that it violated NYSE Rule 410A, NYSE Rule 401, and NYSE Rule 342 in connection with its failure to submit accurate EBS data. In particular, a malfunction in the Firm's blue sheet system caused short sale transactions in broker DVP/RVP accounts to be erroneously identified as long sales. The problem persisted over 11 months and effected numerous submissions made to NYSE Regulation, Inc. and other regulators. The Firm was censured, fined $150,000, and required to conduct validation of all required blue sheet data elements. This validation was the same as the validation that all of the major firms completed under the Blue Sheet Street-Wide Initiative.

## FACTS AND VIOLATIVE CONDUCT

**I.    Credit Suisse's Locate Violations**

*Reg SHO's Locate Requirement*

Rule 203(b)(1) of Reg SHO states that, subject to certain exceptions, a "broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1)."

Reg SHO requires a broker-dealer to have reasonable grounds to believe the security can be borrowed so that it can be delivered in time for settlement before effecting a short sale in that security. Identifying a source from which to borrow such security is generally referred to as obtaining a "locate." Reg SHO requires that this "locate" must be made and documented prior to effecting the short sale.

*The Firm's Locate and Documentation Systems and Procedures*

The Exchange Traded Funds ("ETF") Desk of the Equity Derivatives Trading Desk Aggregation Unit, also known as the Derivatives aggregation unit[2], the Arbitrage Strategies Aggregation Unit ("Arb Strat")[3], Electronic Adaptive Trading Aggregation

---

[2]    During June 2006, the Equity Derivatives Trading Desk Aggregation Unit, also known as the Derivatives aggregation unit, consisted of 6 trading desks including the ETF Desk which consisted of four traders. The ETF Desk executed trades for Credit Suisse clients and provided liquidity not always available on the exchanges.

[3]    During June 2006, Arb Strat consisted of approximately 12 traders who executed proprietary trading programs that coordinated the purchase and sale of baskets of equities, thereby replicating an equity index and the simultaneous trading of future contracts.

4

EXHIBIT E to the Expert Report of J. W. Christian    Page 4 of 119

Unit ("EAT")[4], Quantitative Trading Aggregation Unit ("Quant")[5] and Electronic Market Making Aggregation Unit utilized an approval list process to obtain locates for short sales. Prior to the commencement of trading each trading day, each of these aggregation units submitted to Stock Loan a list of stocks together with a request for a locate of a specific number of shares of each stock. Stock Loan populated the list with the number of shares of each stock for which a locate was granted. In the event a locate request was rejected, Stock Loan noted "0" as the number of shares for which a locate was approved. The completed list (the "Approval List") was then made available for the aggregation unit to reference during the trading day. In addition to the Approval List, during the trading day these aggregation units could and did contact Stock Loan to request locates, including but not limited to, locates in stocks for which locates had earlier been granted or rejected through the Approval List process.

The Program Trading and Advanced Execution Services Aggregation Unit ("Program Trading")[6] entered hedge short sale orders daily for the Prime Services Swap Desk ("Prime Services"). Prime Services was supposed to obtain the locates for these short sales orders from Credit Suisse Stock Loan. For short sales other than those associated with the Prime Services hedge short sales the Program Trading desk was supposed to obtain locates directly from Credit Suisse's Stock Loan department.

Locates granted by Stock Loan were documented in the Firm's stock loan system, SSLocate, which recorded the details of the locate including the date and time the locate was granted and the number of shares for which the locate was granted.

*Overview of Firm's Locate Violations*

During the Relevant Period, the order entry systems used by traders who entered proprietary and customer orders permitted short sales to be entered without locates due to multiple causes. One significant cause of locate violations was the Firm's programming of order entry systems used by five aggregation units so that the entry of a short sale order did not reduce the remaining shares available from the locate that had been obtained until the order was executed. In addition, a programming error permitted traders in four aggregation units (including one aggregation unit that entered customer orders as well as proprietary trades) to enter short sale orders even though a locate request had been rejected entirely. Moreover, several of the order entry systems that the Firm

---

[4]    During June 2006, the EAT aggregation unit consisted of only one trader who engaged in statistical arbitrage strategies using internally developed algorithms to select stock baskets based on correlations between securities across different sectors or industry groups and their relationships to various market forces.

[5]    During June 2006, Quant consisted of approximately 19 traders on two desks who engaged mainly in statistical arbitrage strategies using internally developed algorithms to select stock baskets based on correlations between securities across different sectors or industry groups and their relationships to various market forces.

[6]    During June 2006, Program Trading consisted of approximately 13 traders on two desks who covered Program Trading clients and executed both agency and principal trades. Program Trading also engaged in proprietary trading strategies.

5

EXHIBIT E to the Expert Report of J. W. Christian    Page 5 of 119

permitted traders to use allowed traders to enter a short sale order without providing any locate information.

Due to the volume of trading data generated by affected aggregation units Enforcement reviewed short sales entered by five aggregation units on one sample trading day, June 30, 2006, for quantification (the "Sample Period"). Quantified violations from the Sample Period were extrapolated over the entire relevant period for each causation issue.

The Firm's failure to comply with the locate requirement also extended to other aggregation units and trading desks due to programming errors and the mismarking of short sale orders as "long" sales.

**A.** **The Firm Programmed Trading Systems Not to Reduce Available Locate Shares Upon Short Sale Order Entry**

During the period of at least June 2006 to August 2010, the Firm improperly programmed the trading systems used by Arb Strat, ETF, EAT, Quant and Program trading so that short sale orders could be entered for a number of shares in excess of the locate granted and so that located shares available were not decreased to account for short sale orders live in the market but unexecuted. Instead, these trading systems decreased the located shares available only by the number of shares executed as the result of short sale orders. The result of this programming was that each of these aggregation units entered and had open in the market short sale orders that, singularly or jointly, exceeded available located shares. As a result, short sales were executed without a valid locate. Only after Enforcement identified numerous unexplained short sale violations did the Firm correct this violative use of locates in August 2010.

On June 30, 2006, Arb Strat, EFT, EAT, Quant and Program trading entered a total of approximately 9,130 short sale orders without valid locates as the result of failure to decrease available locates. Extrapolation over the more than four year period when these aggregation units were improperly programmed not to decrease available locates upon entry of a short sale order reveals that approximately 9.7 million short sale orders were entered without valid locates.

**B.** **The Firm Entered Proprietary Short Sale Orders Without Locates Based on Rejected Locate Requests**

During the period of at least June 2006 through August 2007, the trading systems used by Arb Strat, ETF, EAT and Quant failed to recognize when a locate request had been rejected. Instead, these systems treated a rejected locate request as if a locate had been granted for the full number of shares requested because the system misread the entry in the approval field. As a result, Arb Strat, ETF, EAT and Quant had the ability to enter, and in numerous instances did enter, short sales based on a locate request that had been rejected.

6

EXHIBIT E to the Expert Report of J. W. Christian    Page 6 of 119

On June 30, 2006, these aggregation units entered approximately six short sale orders without locates in three stocks as the result of the trading systems failure to recognize a locate request as rejected.  Extrapolation over the approximately two and one-half year period when the trading systems used by Arb Strat, EFT, EAT and Quant failed to recognize a locate request as rejected reveals that more than 3,780 short sale orders were entered without locates.

**C.**    **The Firm's Arbitrage Strategies Aggregation Unit Entered Proprietary Short Sale Orders Without Locates Based On Prior Day's Locate Approvals**

Due to a delay in the availability of Arb Strat's Approval List for the current trading day, during the period of at least June 2006 through February 2007 on 16 trading days Arb Strat improperly used the prior day's Approval List as the basis for short sale locates.  As a result, on each day when Arb Strat utilized the prior day's Approval List it possibly entered short sales without locates in stocks that appeared on the prior but not the current day's Approval List, or for which a greater number of locate shares were approved in a particular stock on the prior trading day.

A comparison of the Arb Strat locate approval lists for June 29, 2006 and June 30, 2006 revealed 90 stocks that appeared on the June 29, 2006 approval list but not on the June 30, 2006 approval list.  On June 30, 2006, Arb Strat entered 1,749 short sale orders in 70 of these 90 stocks, including 195 short sale orders in eight threshold stocks without locates.[7]

Arb Strat used the prior trading day's Approval List on 16 trading days, including June 30, 2006, during the period June through August 2006.  Extrapolation over the nine month period for which this problem existed, reveals that the prior day's approval list was used on 48 trade dates; and that Arb Strat entered approximately 83,952 short sale orders, including short sales orders in threshold securities, without locates due to use of the prior days' locate Approval Lists.

**D.**    **The Firm's Trading Systems Did Not Have the Functionality to Prevent Short Sales Without Valid Locates and the Firm Failed to Have an Effective Post-Trade Locate Review System**

During the Relevant Period, order entry systems utilized by Arb Strat, ETF, EAT, Quant and Program trading did not have the functionality to automatically "block" or "stop" a short sale order from being released for execution in the event that a valid locate did not exist at the time of order entry.

In addition to the locate violations described above, on June 30, 2006, Arb Strat, ETF, Quant and Program trading entered a total of approximately 82 short sale

---

[7]    The same comparison revealed 86 stocks that appeared on the approval list for both dates, however, the number of shares for which a locate was granted was greater on June 29, 2006 than on June 30, 2006.

7

orders without locates in 73 stocks for which a locate had not even been requested. Extrapolation over the Relevant Period reveals that these aggregation units entered approximately 94,700 short sale orders without locates in stocks for which a locate had not even been requested.

Additional aggregation units and trading desks also utilized trading systems that permitted the entry of short sale orders without locates. During the period June 2009 through August 2009, the Firm permitted the Equity Cash Trading Aggregation Unit[8], ETF and Convertibles desks, and one trader on the options desk in the Derivatives aggregation unit to enter orders through a third-party trading system ("System 1"), which did not require the entry of locate information in connection with short sale orders. As the result of the use of this functionality, the Cash/Block and ETF desks entered approximately 376 short sales without locates. The Firm was aware at the time the trading system was installed that it included a functionality that permitted the entry of short sales without locates yet took no action to determine whether locates were obtained in connection with short sales entered through this system until September 2009.

While an automated "block" or "stop" function to prevent the release for execution of short sales without locates through a firm's order entry systems is not a requirement, the absence of such an automated function requires that a firm must have in place an effective post-trade review of short sales entered through its order entry systems to ensure that the required locates were in place prior to the release of such orders through the order entry systems. Credit Suisse failed to do either. Despite being aware that the order entry systems used by certain aggregation units were programmed in such a way as to permit the entry of short sales in excess of the number of shares for which a locate had been granted, for years after Reg SHO's effective date, the Firm failed to develop functional post-trade reports or any other review system for all of its customer and proprietary trading to identify short sales entered into its order entry systems without locates.

During the Relevant Period, the Firm failed to put in place reasonable and effective post-trade exception reports to review short sale orders entered by multiple aggregation units, trading desks and traders to determine whether a valid locate had been obtained. During the relevant period, the Firm had either 13 or 14 aggregation units, as few as five and as many as eight of which used the locate list process as their primary means of obtaining locates and/or their trading systems were intentionally programmed by the Firm not to reduce available locate shares to reflect short sale orders entered. Nonetheless, the Firm did not perform any review of short sales entered by these aggregation units until July 2008. The reviews initiated in July 2008 and that continued through the remainder of the

---

[8]     During June 2006, the Equity Cash Trading Aggregation Unit, also known as the Cash/Block Desk, consisted of approximately 45 traders who executed orders on behalf of the Firm's institutional client base, acting as agent and/or principal, using the Firm's capital to provide liquidity for its clients. The Cash/Block Desk also executed transactions in announced M&A arbitrage opportunities, and acquired proprietary positions to hedge or create additional liquidity for the Firm's clients.

EXHIBIT E to the Expert Report of J. W. Christian     Page 8 of 119

Relevant Period were inadequate to prevent and detect short sales from being accepted and/or entered without locates. As a result of the foregoing, the Firm lacked the reasonable grounds necessary to enter short sales through at least eight of its aggregation units.

**E.    The Firm Misused the Bona-Fide Market Maker Exception**

Reg SHO allows for certain categories of short sale orders to be treated as exceptions to the locate requirement[9]. The Firm misapplied an exception to the locate requirement by improperly treating short sales in certain securities as exceptions to the locate requirement.

During the period May 2009 through October 2009, the Firm incorrectly designated in its systems that it was a market maker in 98 securities, when it was not a market-maker in those securities. As a result, the Firm improperly treated proprietary orders in these 98 securities as exceptions to the locate requirements. During this six-month period, the Cash/Block desk entered approximately 199 short sale orders in one ETF without locates based on this misuse of the market maker exception.

**F.    The Firm Failed to Adequately Document Locates**

The Program Trading Unit/Desk entered short sale hedge orders for the Firm's Prime Services Client Desk without documentation of the number of shares for which a locate had been obtained or the time when the locate had been obtained. For example, on June 30, 2006, Program Trading entered 35 short sale hedge orders in 35 stocks without documented locates, including one threshold security.

Extrapolation over the Relevant Period reveals that Program Trading failed to adequately document locates for approximately 40,400 short sale orders.

**G.    Summary of Rule 203(b)(1) Violations**

Pursuant to Reg SHO, the Firm was required to reasonably ensure that its trading, including the function and review of its trading systems and its post-trade review systems and procedures, was in compliance with the "locate" requirement of Rule 203(b)(1). However, as noted above, the Firm violated the locate requirement on an ongoing basis across many of its trading systems, aggregation units and desks for an extended period of time.

Based upon the foregoing, the Firm violated Rule 203(b)(1) of Reg SHO by entering more than ten million short sale orders without locates during the

---

[9]    Short sales for which the SEC provided an exception to the locate requirement include broker-dealer to broker-dealer introduced short sales transactions, bona-fide market making activities, and certain short sales that are the result of a convertible security, option or warrant being tendered for conversion or exchange but the underlying security is not reasonably expected to be received in time for settlement.

EXHIBIT E to the Expert Report of J. W. Christian    Page 9 of 119

Relevant Period.  This further constituted a violation of NASD Rule 2110 and FINRA Rule 2010, which require that a firm, in the conduct of its business, observe high standards of commercial honor and just and equitable principles of trade.[10]

## II.  Credit Suisse's Order Marking Violations

As effected, Rule 200(g) of Reg SHO required that a broker or dealer mark all sell orders of any equity security as "long," "short" or "short exempt."  The accurate marking of sell orders is essential for locate, stock borrow, reporting, record-keeping and execution purposes.

### Overview of Order Marking Violations

During the Relevant Period, short sale orders entered by Firm traders through both proprietary and third-party order entry system were mismarked for multiple reasons. First, the proprietary trading systems utilized by Firm traders automatically marked sale orders as long or short based on reference to position servers. However, these systems allowed traders to override the automatic marking, and in some cases, referenced the incorrect position server and therefore incorrectly marked sale orders.  Second, with one notable exception, the third-party order entry systems that the Firm provided to traders could not access the Firm's position servers, so marking of those orders was entirely reliant on traders to mark sale orders in a compliant and accurate manner.  Third, in connection with at least one third-party order entry system the trader's failure to mark sale orders as long or short resulted in the default entry of all sale orders entered through this order entry system as long sales.  Fourth, the one third-party order entry system that was configured to access the Firm's position server for one aggregation unit failed to function properly, resulting in mismarked orders for at least seven proprietary traders. Accordingly, the Firm's failure to comply with the order marking requirements extended across multiple aggregation units, trading desks and strategies.

### A.  The Firm Mismarked Sell Orders Due to Numerous Programming Errors

#### Failure of Automatic Order Marking Through System 2 - Cash/Block

During the period of at least June 2006 to February 2009, the Firm permitted traders on the Cash/Block desk to use a third-party order entry system, System 2, to enter proprietary sale orders.  The Firm relied on System 2 to access the appropriate Firm position servers to automatically mark sale orders entered by the Cash/Block desk.

The Firm's 2007 TMMS revealed 145 sale orders that were mismarked as "long" in seven stocks on two exam trading days, entered by Cash/Block desk traders.  In

---

[10]     *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules including the change of NASD Rule 2110 to FINRA Rule 2010, effective December 15, 2008.

10

EXHIBIT E to the Expert Report of J. W. Christian    Page 10 of 119

determining the cause of these mismarked orders, the Firm learned that from at least June 2006 through January 2009, seven of the 45 traders on the Cash/Block desk had not been properly configured for automatic order marking through this order entry system. As a result, sale orders entered during this period by these seven traders using System 2 were all marked "long" regardless of the Cash/Block desks position in the stock.

From at least June 2006 until approximately January 2009, Credit Suisse was also unaware of two features of this order entry system that affected order marking and resulted in additional but unquantified mismarked sale orders on the Cash/Block desk.

Extrapolation over the more than two and one-half years when the programming error and the two order marking features existed in this order entry system reveals that more than 48,700 Cash/Block desk sale orders were mismarked as "long" through this order entry system.[11]

*Failure to Properly Mark Increased Sale Orders – Cash Block*

On May 29, 2009, the Firm implemented use of System 1, on its Cash/Block, ETF and Convertibles desks. This order entry system mismarked sell orders in that it failed to check the aggregation unit's position to determine the appropriate order marking when a trader cancelled and replaced the original order to increase its size.

As a result, during the period of at least June 2009 to mid-October 2009, the Cash/Block desk mismarked 26 short sales as long sales and four long sales as short sales.

*Failure to Properly Mark Sell Orders Due to Failure to Access Position Server - ETF*

In October 2009, the Firm learned that a trading system used by the ETF desk mismarked sale orders as "short" in certain circumstances. The trading system was supposed to mark the sale orders based on the desk's aggregation unit position as reflected in the Firm's position servers. When the trading system could not obtain the position data from the position server it automatically marked sell orders entered by certain users as short sale orders causing those orders which should have been marked long to be inaccurately marked.

---

[11]   The Cash/Block desk performed market-making functions therefore its bona-fide market making transactions were subject to an exception to the locate requirements. However any hedge transactions entered into by the Cash/Block desk would not qualify for an exception to the locate requirement. Therefore, any hedge short sale orders mismarked as long would also have resulted in locate violations.

EXHIBIT E to the Expert Report of J. W. Christian   Page 11 of 119

*Failure to Properly Mark Pair-Trade ETF Sale Orders - QuantHF*

Due to a programming error, during the period February 2010 to May 2010, the order entry system used by two traders in the Firm's QuantHF (High Frequency) Trading Desk Aggregation Unit[12] ("System 4") marked all sale orders in ETFs as "long" sale orders. The order entry system was used in conjunction with a strategy involving the paired buying and selling of ETFs and corresponding leveraged ETFs. As a result of the programming error, despite recognizing certain orders as "short" and checking for available locates in the ETFs to be shorted, this order entry system entered all the ETF sale orders as "long" sales. The Firm was unable to quantify the number of short sale orders mismarked as "long" as the result of this pairs-trading related programming error.

*Arb Strat Aggregation Unit*

During the one-week period of May 29 through June 5, 2009, an unanticipated result to a programming change caused 141 proprietary short sale orders of ETFs entered by Arb Strat to be mismarked as long sales. Arb Strat failed to obtain locates in connection with 62 of these mismarked short sale orders.

*Derivatives Aggregation Unit*

The Derivatives aggregation unit also used System 2, which required traders to manually sale mark orders as "long" or "short." Reviews initiated by the Firm in the third quarter of 2009 revealed that four of nine traders on the ETF desk, and one trader on each of the Derivatives and Convertibles desks, had marked a disproportionately small number of sale orders as short. It appears that these traders mismarked short sales as long sales. In addition, while conducting this review, Credit Suisse learned that some traders and supervisors in the Derivatives aggregation unit had also mismarked as short sales orders those that should have been marked long. Any short sales mismarked as long sales also resulted in locate violations.

*Cash/Block and Derivatives Aggregation Units*

During the period of at least June 2006 through December 2008, the Firm permitted traders in the Cash/Block and Derivatives aggregation units to use a third-party order entry system, System 3, designed primarily for trading in Pink Sheet stocks. This order entry system required traders to manually enter a code designating a short sale order as such otherwise the system defaulted to a long sale. Nonetheless, five traders using this system failed to enter the short sale order designation. Therefore, all sale orders entered through this system defaulted

---

[12]   The QuantHF (High Frequency) Trading Desk Aggregation Unit ("QuantHF") is a proprietary trading desk which consisted of two traders. QuantHF executes algorithm-based trading strategies using internally developed algorithms to select stock baskets based on correlations between securities across different sectors or industry groups and their relationships to various market forces to obtain a diversified portfolio.

EXHIBIT E to the Expert Report of J. W. Christian    Page 12 of 119

to entry as long sales. The Firm was unable to identify and/or quantify the short sale orders mismarked as long sales entered through this order entry system. Sale orders mismarked as long may also have resulted in required locates not being obtained and additional unquantified locate violations.

**B.**   **Summary of Rule 200(g) Violations**

Based upon the foregoing, the Firm violated Rule 200(g) during the time periods described above in that it mismarked at least 48,700 sale orders plus an unquantified number of sale orders mismarked due to various causes. Most of these mismarked orders consisted of actual short sales that were mismarked as "long" and also violated Reg SHO's locate requirement. This misconduct also constituted a violation of NASD Rule 2110, and FINRA Rule 2010.

**III.**   **Credit Suisse's Reporting Violations**

As noted earlier, during the Relevant Period, the Firm mismarked short sale orders as "long" and long sale orders as "short" due to its order marking issues.

Pursuant to its reporting obligations, the Firm was required to accurately report sell orders through its automated submissions of trading data ("blue sheets") for regulatory purposes. Further, the Firm was required to accurately report sell orders for public dissemination and regulatory purposes to a number of trade reporting, quotation display and collection facilities, including ACT and OATS, by indicating, among other things, whether each sell order was "long," "short," or "short exempt." As the result of the Firm's aforementioned order marking violations and the misuse of a reporting indicator for a limited type of order flow, the Firm inaccurately reported sell orders in violation of its reporting requirements.

*Blue Sheets*

NASD Rules 8211 and 8213 (and later FINRA Rules 8211 and 8213)[13] require that a firm submit transaction data in an automated format to regulators with certain designated information, including the indication of whether a transaction was a purchase, sale, or short sale. These "blue sheet" submissions are generated by firms at the request of regulators in connection with investigations of questionable trading. It is the responsibility of firms to reasonably ensure that the information submitted to regulators via blue sheets is accurate, and a firm's reliance on a third party vendor to assist with the preparation of the firm's blue sheets does not alter the firm's duty to comply.

---

[13]   *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 8211 and 8213 to FINRA Rules 8211 and 8213, respectively.

EXHIBIT E to the Expert Report of J. W. Christian   Page 13 of 119

The Firm mismarked sell orders that flowed through to the Firm's blue sheet submissions and caused to Firm to make inaccurate blue sheet submissions of trading data to FINRA.

Based upon the foregoing, the Firm violated NASD Rules 8211 and 8213 and FINRA Rules 8211 and 8213 in that it failed to accurately report at least 48,700 sell orders plus an unquantified number of mismarked sell orders due to various causes in its blue sheets. This misconduct also constituted a violation of NASD Rule 2110 and FINRA Rule 2010.

*Trade Reporting Rules Generally*

The NASD 4000, 5000, 6000, and 7000 Rule Series (and later FINRA 6000 and 7000 Rule Series)[14] require that firms report certain over-the-counter ("OTC") transactions in equity securities to transaction reporting, quotation display and collection facilities for public dissemination and regulatory purposes. Transactions must be reported to a FINRA Facility such as a Trade Reporting Facility ("TRF"), the Alternative Display Facility ("ADF"), or the OTC Reporting Facility ("ORF").[15] Firms are required to accurately report these transactions by indicating, among other things, whether a transaction was a "buy", "sell", or "sell short."

*ACT Reporting*

NASD Rule 6130 (and later FINRA Rules 7230A and 7330)[16] requires that firms report transactions to ACT for a number of regulatory purposes, including but not limited to indicating whether a transaction was a "buy", "sell", or "sell short."

As described above, the Firm mismarked short sale orders as long sales and long sale orders as short sales. These mismarkings were passed through to the data systems from which the Firm created its ACT reports, causing the inaccurate reporting of such sell orders.

---

[14]   *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the transfer of the NASD Marketplace Rules (the NASD Rule 4000 through 7000 Series) to the consolidated FINRA rulebook as the FINRA Rule 6000 through 7000 Series. *See also* FINRA Trade Reporting Frequently Asked Questions (FAQ), available at: http://www.finra.org/Industry/Regulation/Guidance/p038942.

[15]   The TRFs are facilities through which firms report transactions in National Market System stocks, as defined in SEC Rule 600(b)(47) of Regulation NMS, effected otherwise than on an exchange. FINRA has established the following TRFs (each in conjunction with the pertinent Exchange): the FINRA/NASDAQ TRF and the FINRA/NYSE TRF. The ADF is both a trade reporting and quotation display and collection facility for purposes of transactions in NMS stocks effected otherwise than on an exchange. The ORF is the facility through which members report OTC transactions in OTC Equity Securities and Restricted Equity Securities, as those terms are defined in FINRA Rule 6420.

[16]   *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, including the change of NASD Rule 6130 to FINRA Rules 7230A and 7330, effective December 15, 2008.

EXHIBIT E to the Expert Report of J. W. Christian   Page 14 of 119

Based upon the foregoing, the Firm violated NASD Rule 6130 and FINRA Rules 7230A and 7330 in that it failed to accurately report at least 48,700 sell orders plus an unquantified number of mismarked sell orders due to various causes to ACT. This misconduct also constituted a violation of NASD Rule 2110, and FINRA Rule 2010.

*OATS Reporting*

During the Relevant Period, the Firm was a "Reporting Member" within the definition set forth in NASD Rule 6951(n) (and later FINRA Rule 7410(n)). Pursuant to NASD Rule 6955(a) (and later FINRA Rule 7450(a)), the Firm was required to transmit to OATS the order information specified in NASD Rule 6954 (and later FINRA Rule 7440), including, among other things, the designation of an order as a "short sale order."[17]

As described above, the Firm mismarked short sale orders as long sales and long sale orders as short sales. These mismarkings were passed through to the data systems from which the Firm created its OATS reports, causing the inaccurate reporting of such sell orders.

Based upon the foregoing, the Firm violated NASD Rules 6951(n), 6954 and 6955(a) and FINRA Rules 7410(n), 7440 and 7450(a) in that it failed to accurately record and transmit at least 48,700 sell orders plus an unquantified number of mismarked sell orders due to various causes to OATS. This misconduct also constituted a violation of NASD Rule 2110 and FINRA Rule 2010.

## IV.    The Firm Failed to Create and Maintain Certain Accurate Books and Records

Under Section 17(a) of the Exchange Act and Rule 17a-3 thereunder, firms are required to make and keep current and accurate books and records relating to its business, including, but not limited to, daily records of all sales of securities, and a memorandum of each purchase and sale for every customer and account of the firm. NASD Rule 3110(a) requires that firms make and preserve books, accounts, records, memoranda, and correspondence in conformity with applicable laws, rules, regulations, and statements of policy promulgated thereunder, and with the Rules of the NASD, and as prescribed by Exchange Act Rule 17a-3.

As previously described, the Firm failed to maintain accurately marked sale orders from at least June 2006 to December 2009. In addition, due to a programming error, during the period August 2007 to January 2009, customer sale orders executed through riskless principal transactions were mismarked in the Firm's internal records. Rather than recording the customer sale as "long" or "short" based on the customer's designation of the order and/or position at the time of order entry, the Firm's internal records recorded

---

[17]    *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 6951(n), 6954 and 6955(a) to FINRA Rules 7410(n), 7440 and 7450(a), respectively.

EXHIBIT E to the Expert Report of J. W. Christian   Page 15 of 119

the order marking based on the position of the aggregation unit entering the riskless principal order.

Based upon the foregoing, the Firm violated Section 17(a) of Exchange Act and Rule 17a-3 thereunder and NASD Rule 3110(a) in that it failed to maintain accurate accurately marked sale orders. This also constituted a violation of NASD Rule 2110 and FINRA Rule 2010.

### V.   Systemic Supervisory Violations: The Firm's Reg SHO Supervision and Compliance Monitoring Program was Deficient

NASD Rule 3010 requires that firms establish and maintain a supervisory system, including written supervisory procedures, related to their business that is reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules.

*Overview of Supervisory Violations*

The Firm's written supervisory procedures ("WSPs") relating to Reg SHO were deficient in that, among other things, they failed to set forth adequate procedures to determine that: (i) locates were obtained for short sales, (ii) sale orders were properly marked, and (iii) that the trading systems were Reg SHO compliant. In addition to having inadequate WSPs, Credit Suisse failed to reasonably supervise its compliance with Reg SHO. Among other things, the Firm failed to: (i) prevent short sales from being entered without locates and perform adequate post-trade monitoring of short sales; (ii) prevent the mismarking of orders; and (iii) maintain Information Technology ("IT") protocols to supervise changes and additions to its trading systems and strategies.

### A.   The Firm Failed to Supervise to Prevent Short Sales from Being Entered Without Locates and Failed to Perform Adequate Post-trade Reviews

During the Relevant Period, the Firm failed to reasonably supervise its compliance with Reg SHO's locate requirement. As described, the Firm utilized multiple proprietary and third-party order entry systems to enter client and proprietary short sales. Several of these order entry systems allowed short sale orders to be entered without locates. The Firm failed to develop an adequate system for the post-trade review of short sales to identify short sales entered without locates. As a result, the Firm failed to detect that short sales were entered through its order entry systems without locates.

As described above, during the relevant period, the Firm had either 13 or 14 aggregation units, as few as five and as many as eight of which used the Approval List process as their primary means of obtaining locates and/or their trading systems were intentionally programmed by the Firm not to reduce available locate

16

shares to reflect short sale orders entered. Nonetheless, the Firm did not perform any review of short sales entered by these aggregation units until July 2008.

The reviews initiated in July 2008, which continued through August 2010, were inadequate to prevent and detect short sales from being accepted and/or entered without locates. For example, the post-trade reviews performed by the Firm did not reveal that four aggregation units had for at least four and one-half years entered short sale orders which, singularly or jointly, totaled a number of shares in excess of the available located shares. The Firm's review also failed to detect that each of these aggregation units entered short sales without locates as the result of this intentional programming. During the Relevant Period, the Firm had not implemented post-trade reviews adequate to detect the entry of short sales without locates through third-party trading systems it provides to its traders.

**B.**   **The Firm Failed to Supervise the Marking of Sale Orders**

During the Relevant Period, the Firm failed to have adequate supervisory policies and procedures and otherwise failed to reasonably supervise the marking of sale orders. As earlier described, the Firm mismarked a significant number of sale orders, including short sales mismarked as "long" that also violated Reg SHO's locate requirement.

The Firm's policies and procedures to supervise the marking of short sales were deficient. The quarterly review of short sales entered through proprietary trading systems, by only two trading units, and consisted of the review of trading in only two stocks on one randomly selected calendar day. This review was inadequate to detect and prevent the numerous order marking violations described above. For example, the Firm only became aware of that Cash/Block traders were not properly configured by one order entry system for order marking as the result of the 2007 TMMS exam which identified mismarked sale orders despite that aggregation unit having been reviewed multiple times.

Although Firm traders entered trades in Pink Sheet stocks using an order entry system that required the manual designation of short sale orders, the Firm's policies and procedures for supervision of order marking did not include supervision of order marking in Pink Sheet stocks and the Firm never conducted a review of order marking for Pink Sheet stocks during Relevant Period. Until August 2008, Credit Suisse did not have any policy or procedure to supervise and did not supervise the marking of sale orders entered through third-party order entry systems it permitted its traders to use.

In August and September 2008, the Firm created two supervisory/monitoring reports that reviewed order mark "trends" entered through third-party order entry systems (the "Reports") to identify aggregation units or trading desks with a statistically low percentage of short sale orders. These reviews enabled the Firm

to discover order marking discrepancies on multiple trading desks in multiple aggregation units. Despite these reviews the Firm did not become aware that another order entry system was mismarking ETF orders until late October 2009.

**C.**    **The Firm Failed to Supervise its Systems and Lacked Adequate IT Implementation and Change Protocols Affecting Reg SHO Compliance**

The Firm failed to have adequate policies and procedures to supervise and failed to adequately supervise its trading systems for Reg SHO compliance.

During the Relevant Period, the Firm failed to reasonably supervise the trading systems, both proprietary and third-party, which it made available to its traders, for compliance with Reg SHO. The Firm was not aware of the locate and order entry functions of certain third-party order entry systems that permitted the entry of short sale orders without locates and resulted in the mismarking of sale orders.

The Firm was also unaware of changes made to trading systems that negatively affected its compliance with the locate and order marking requirements of Reg SHO. In addition, the Firm failed to adequately anticipate and assess the potential regulatory impact of changes to its trading systems, including changes that impacted the Firm's compliance with the locate and order marking requirements of Reg SHO.

**D.**    **The Firm Failed to Supervise its Books and Records and Trade Data Submissions**

During the Relevant Period, as described above, the Firm failed to reasonably supervise to maintain and failed to maintain accurate books and records and submit accurate trade data on its blue sheets, ACT and OATS reports.

**E.**    **Summary of Supervisory Violations**

Based upon the foregoing, the Firm violated NASD Rule 3010 in that it failed to establish and maintain a supervisory system, including written supervisory procedures, reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules. This misconduct also constituted a violation of NASD Rule 2110 and FINRA Rule 2010.

**B.**    The Respondent also consents to the imposition of the following sanctions:

Censure; and

Fine in the amount of $1,750,000.

The Respondent agrees to pay the monetary sanction(s) upon notice that this AWC has

EXHIBIT E to the Expert Report of J. W. Christian    Page 18 of 119

been accepted and that such payment(s) are due and payable. The Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

The Respondent specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

The Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.  To have a Complaint issued specifying the allegations against the Respondent;

B.  To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.  To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.  To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, the Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

The Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

19

EXHIBIT E to the Expert Report of J. W. Christian    Page 19 of 119

## III.

## OTHER MATTERS

The Respondent understands that:

A.  Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.  If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the Respondent; and

C.  If accepted:

1.  This AWC will become part of the Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against the Respondent;

2.  This AWC will be made available through FINRA's public disclosure program in response to public inquiries about Respondent's disciplinary record;

3.  FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.  The Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. The Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects the Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.  The Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. The Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

The undersigned, on behalf of the Firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that he/she has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the Firm to submit it.

EXHIBIT E to the Expert Report of J. W. Christian   Page 20 of 119

12/13/11
_____
Date

Credit Suisse Securities (USA) LLC
_____

By: _____
    [Name] W Alen Rutledge
    [Title] Head of Trading

By: _____
    [Name]
    [Title]

Reviewed by:

Harry J. Weiss, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Tel: (202) 663-6993
Fax: (202) 663-6363
Harry.weiss@wilmerhale.com

21

Accepted by FINRA:


12/27/11
_____
Date

Signed on behalf of the
Director of ODA, by delegated authority


Susan Light
_____
Susan Light, SVP
Chief Counsel
FINRA Department of Enforcement
One World Financial Center
200 Liberty Street, 11th Floor
New York, New York 10281
Tel: (646) 315-7333
Fax: (202) 689-3411
Susan.light@finra.org

22

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER AND CONSENT**
**NO. 20100229712**

TO:    Department of Enforcement
       Financial Industry Regulatory Authority ("FINRA")

RE:    Merrill Lynch Professional Clearing Corp., CRD No. 16139, and
       Merrill Lynch, Pierce, Fenner & Smith Incorporated, CRD No. 7691, Respondents

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, Respondents submit this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondents alleging violations based on the same factual findings described herein.

**I.**

**ACCEPTANCE AND CONSENT**

A.    Merrill Lynch Professional Clearing Corp. ("MLPRO") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") hereby accept and consent, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

**BACKGROUND**

MLPRO, a Delaware corporation with its principal executive offices in New York City, has been registered as a broker-dealer with the Securities & Exchange Commission ("SEC") and FINRA since 1985. MLPRO also became registered as an Equities Trading Permit Holder with NYSE Arca, Inc. in 1977. MLPRO is also a fully guaranteed subsidiary of MLPFS. MLPRO provides prime brokerage, securities financing, and clearing and settlement services to broker-dealers, introducing broker-dealers and other prospective trading entities on a fully-disclosed basis. MLPRO is also a market maker on several U.S. listed options exchanges. MLPRO has approximately 210 employees including approximately 170 registered representatives.

MLPFS is a Delaware corporation with its principal executive offices in New York City. It has been a registered broker-dealer with the SEC since 1959 and FINRA since 1937. MLPFS is a wholly-owned subsidiary of NB Holdings Corporation and, since January 1, 2009, an indirect wholly-owned subsidiary of Bank of America Corporation. MLPFS is a global investment banking and multi-service brokerage firm that provides retail brokerage, corporate and investment banking services, wealth management, and

EXHIBIT E to the Expert Report of J. W. Christian     Page 23 of 119

commercial lending services. MLPFS has approximately 43,497 employees including approximately 31,784 registered representatives.

Because MLPRO and MLPFS are both FINRA registered broker dealers, FINRA has jurisdiction over each.

## RELEVANT DISCIPLINARY HISTORY

### MLPFS

In March 2012, MLPFS entered into a Stipulation of Facts and Consent to Penalty with NYSE Amex LLC in which it stipulated to findings that, among other things, it violated Regulation SHO ("Reg SHO") Rule 203(b)(3) by failing to close out 22 fail-to-deliver positions in 4 separate securities that existed between 14 days to 50 days, and violated Amex Rule 320 by failing to implement and maintain adequate procedures of supervision and control, including a separate system for follow-up and review, reasonably designed for compliance with Reg SHO Rule 203(b)(3). MLPFS consented to a sanction consisting of a censure and a $50,000 fine.

## OVERVIEW

Between approximately July 1, 2008 through July 2012, MLPRO failed to establish, maintain and enforce adequate supervisory systems and procedures, including in some instances written supervisory procedures, that were reasonably designed to ensure compliance with applicable securities laws and regulations including Regulation SHO, the 2008 Emergency Orders issued by the SEC and anti-money laundering requirements.

From the inception of Rule 204T of Regulation SHO in September 2008 through at least July 2012 ("FTD Relevant Period"), MLPRO failed to close out its fail-to-deliver ("FTD") positions, resulting from a failure in its Intercompany Settlement Process ("ISP") to transfer its clearance and settlement obligations to its affiliated broker-dealer, MLPFS, by purchasing or borrowing securities of like kind and quantity as required by Rule 204T(a) and 204(a) of Regulation SHO. During this period, MLPRO also failed to put in place supervisory systems or procedures, including written supervisory procedures that addressed the requirements of Rule 204 to timely close out FTD positions by purchasing or borrowing securities of like-kind and quantity or the requirement to notify its clients and refrain from effecting or accepting from its clients short sales in securities in which it had an aged FTD position.

Between approximately July 1, 2008 to December 31, 2008, MLPRO also failed to establish supervisory systems and procedures, including written supervisory procedures, that were reasonably designed to ensure compliance with applicable securities laws and rules by dozens of direct market access, sponsored access and naked access customers who traded on US Exchanges using a Firm provided market participant identifier ("MPID"). MLPRO's failure to establish adequate supervisory systems and procedures potentially facilitated these clients' ability to violate various rules and regulations across multiple exchanges.

2

From at least July 1, 2008 through August 2011, Merrill Lynch, Pierce, Fenner & Smith ("MLPFS") failed to establish, maintain and enforce adequate supervisory systems and procedures, including in some instances written supervisory procedures, that were reasonably designed to ensure compliance with applicable securities laws and regulations including Regulation SHO, Emergency Orders issued by the SEC, customer reserve, and record retention requirements of the Securities Exchange Act of 1934 ("Exchange Act") and anti-money laundering requirements.

From at least September 2008 through at least March 2011, MLPFS failed to establish, maintain and enforce adequate supervisory systems and procedures, including written supervisory procedures, that were reasonably designed to ensure compliance with the requirements of Rule 204 of Regulation SHO by allocating its Continuous Net Settlement ("CNS") FTD positions based on its broker-dealer clients' short positions and without also considering which clients contributed to those positions.

In addition, from September 2008 through August 2011 MLPFS failed to establish, maintain and enforce adequate supervisory systems and procedures, including written supervisory procedures, reasonably designed to ensure compliance with the requirements of Rules 204T(b) and (c) and 204(b) and (c) to notify its clients when it had an aged FTD position in a given security and to refrain from effecting or accepting from its clients short sales in securities in which it had an aged FTD position.

MLPRO and MLPFS also failed to establish, maintain and enforce adequate supervisory systems and procedures, including written supervisory procedures that were reasonably designed to surveil the activities of certain of its direct market access, naked access and sponsored access clients for the purpose of detecting and reporting, where appropriate, suspicious and/or manipulative trading.

MLPRO's failure to have in place adequate supervisory systems and procedures resulted in violations of certain provisions of Regulation SHO, the SEC-issued July and September 2008 Emergency Orders, the record keeping requirements of Section 17(a) of the Exchange Act, and the anti-money laundering requirements of NASD Rule 3011(a).

MLPFS failed to establish and implement adequate supervisory processes and procedures, including written supervisory procedures concerning the requirements of Rule 204T and Rule 204 of Regulation SHO. MLPFS also violated the SEC-issued July and September 2008 Emergency Orders, customer reserve and financial filing requirements of Sections 15a and 17a of the Exchange Act, and anti-money laundering requirements of NASD Rule 3011(a).

3

EXHIBIT E to the Expert Report of J. W. Christian   Page 25 of 119

## FACTS AND VIOLATIVE CONDUCT

**VIOLATIONS OF REGULATION SHO**

Effective September 7, 2004, the SEC adopted 17 CFR Part 42 ("Regulation SHO" or "Reg SHO") under the Exchange Act and designated January 3, 2005, as the commencement date for compliance. On September 17, 2008, the SEC issued an emergency order announcing the creation of new temporary rule 204T,[1] which imposed "enhanced delivery requirements on sales of all equity securities . . . ." In pertinent part, temporary Rule 204T required that a broker dealer deliver securities on long and short sales by settlement date; and that a broker dealer with a FTD resulting from a long or short sale, close out the FTD by no later than the beginning of regular trading hours on the settlement day following settlement date of the transaction.

Effective October 17, 2008, the SEC adopted Rule 204T of Regulation SHO on a temporary basis.[2] On July 31, 2009, Rule 204 of Regulation SHO made permanent Rule 204T, with some modifications.[3] Both Rule 204T and Rule 204 imposed various requirements, including, among other things, that broker dealers: (i) deliver securities on long and short sales by settlement date; (ii) close out FTD positions for short sales on the morning of T+4 by borrowing or purchasing securities of like kind and quantity; and (iii) close out FTD positions for long sales on the morning of T+6 by purchasing securities of like-kind and quantity. In addition, Rule 204 permitted the close out of FTD positions for long sales on the morning of T+6 by borrowing securities of like kind and quantity.

Rule 204T(d) and Rule 204(d) allow a participant of a registered clearing agency to allocate a portion of its FTD position to another registered broker-dealer for which it cleared or from which it received trades for settlement, based on such broker-dealer's short position. The SEC releases accompanying the issuance of Rules 204T and 204 clarified that allocations may be made to other broker-dealers "whose trading activities have caused the [FTD] position provided the allocation is reasonable."

NASD Rule 2110 (for conduct prior to December 15, 2008) and FINRA Rule 2010 (for conduct on or after December 15, 2008) required members, in the conduct of their business, to observe high standards of commercial honor and just and equitable principles of trade.

**<u>MLPRO failed to ensure that CNS FTD positions reflected on its books and records were closed out as required by Rules 204T(a) and 204(a) of Regulation SHO</u>**

Since the inception of Rule 204T and through at least July, 2012, in certain situations MLPRO took no action to purchase and/or borrow securities of like kind and quantity to close out FTD positions as required by Rule 204T and Rule 204.

---

[1] Exchange Act Release No. 58572 (September 17, 2008).
[2] Exchange Act Release No. 58773 (October 17, 2008).
[3] Exchange Act Release No. 60388 (July 31, 2009).

4

EXHIBIT E to the Expert Report of J. W. Christian   Page 26 of 119

During the FTD Relevant Period, MLPRO had in place with MLPFS an ISP through which MLPRO transferred its settlement and clearance obligations to MLPFS. This transfer, conducted through the Correspondent Clearing Service of the National Securities Clearing Corporation, is reflected as a new transaction between MLPRO and MLPFS.  The transfer of the positions from MLPRO to MLPFS was recorded on MLPRO's records as buy and sell transactions.  The ISP transfer was accompanied by movements of money in corresponding amounts.

The ISP was created as a settlement tool for MLPRO and was put in place prior to the establishment of Regulation SHO.  The ISP was not designed to address the close out requirements of Reg SHO and was never altered to ensure compliance with the close out requirements of any of the versions of Rule 204, once those requirements were established.

While the majority of MLPRO's clearance and settlement obligations transferred to MLPFS through the ISP without incident, MLPRO was aware during the FTD Relevant Period that sell transactions between MLPRO and MLPFS in which the corresponding positions did not successfully or properly transfer for clearance and settlement to MLPFS often resulted in FTDs on MLPRO's books and records and at the CNS level.

Nonetheless, during the FTD Relevant Period, MLPRO took no action to purchase and/or borrow securities of like kind and quantity to close out approximately 42,000 CNS FTD positions, representing millions of shares of securities, that were reflected on its books and records during that time as was required by Reg SHO Rule 204T(a) and Rule 204(a). Instead, all actions taken by MLPRO had the single purpose of transferring MLPRO's clearance and settlement obligation to MLPFS regardless of how long a FTD remained open on MLPRO's books.

Consequently, MLPRO violated Reg SHO Rule 204T(a) (from September 18, 2008 through July 30, 2009), Reg SHO Rule 204(a) (from July 31, 2009 and thereafter), NASD Rule 2110 (for conduct prior to December 15, 2008), and FINRA Rule 2010 (for conduct on or after December 15, 2008).

## SUPERVISORY VIOLATIONS RELATED TO REGULATION SHO

### MLPRO failed to have adequate supervisory systems and procedures for compliance with Reg SHO Rule 204T(a) and Rule 204(a).

NASD Rule 3010(a) requires firms to "establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD rules."

NASD Rule 3010(b) requires that each member shall "establish, maintain, and enforce written procedures to supervise the types of business in which it engages and to supervise the activities of registered representatives, registered principals, and other associated

5

EXHIBIT E to the Expert Report of J. W. Christian    Page 27 of 119

persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with the applicable Rules of NASD."

From September 2008 through at least January 2012, MLPRO failed to have in place systems and procedures, including written supervisory policies and procedures for compliance with the close-out requirements of Rules 204T(a) and 204(a) of Regulation SHO. The written supervisory procedures enacted by the Firm in January 2012 were deficient because they allowed FTD positions to be closed out or reduced by netting fail to receive positions or segregated excess positions in the same securities and failed to require MLPRO to close-out FTD positions exclusively by purchasing or borrowing securities of like kind and quantity.

During the FTD Relevant Period, despite the fact that the ISP processes generated certain FTD positions on its books and records, the Firm failed to alter the ISP process or implement systems and procedures reasonably designed to ensure compliance with Rules 204T(a) and 204(a), including systems or procedures to ensure that its FTD positions were investigated to determine whether each was caused by a short or long sale and, if so, to borrow or buy in securities when required.

By the foregoing conduct, from September 2008 through at least July 2012, MLPRO violated NASD Rules 3010(a) and (b) and 2110 (for conduct prior to December 15, 2008) and FINRA Rule 2010 (for conduct on or after December 15, 2008).

**MLPRO failed to establish adequate supervisory systems and procedures for compliance with the "notice" and "penalty box" provisions of Rules 204T(b) and (c) and 204 (b) and (c).**

Rule 204T(b), and Rule 204(b) of Regulation SHO imposed a penalty on broker-dealers who failed to close out FTD positions as required. Specifically, if the broker dealer had a FTD that was not timely closed pursuant to the provisions of Rule 204T(a) and Rule 204(a) respectively, then that broker-dealer and any client or broker or dealer from which it received trades for clearance and settlement, including any market maker, was prohibited from accepting a short sale order in the equity security from another person, or effecting a short sale in the equity security for its own account, without first borrowing the security or entering into a bona-fide arrangement to borrow the security. This requirement remains in effect until the FTD position is closed out by purchasing securities of like kind and quantity and that purchase has cleared and settled. These provisions are commonly referred to as the "penalty box" provisions.

Further, Reg SHO Rule 204T(c) and Rule 204(c) require that the participant notify any broker or dealer from which it receives trades for clearance and settlement, including any market maker that would otherwise be entitled to rely on the exception provided in §242.203(b)(2)(iii): (i) that the participant has a FTD position in an equity security at a registered clearing agency that has not been closed out in accordance with the requirements of paragraph (a) of this section; and (ii) when the purchase that the

6

participant has made to close out the FTD position has cleared and settled at a registered clearing agency.

From September 2008 through at least April 2011, MLPRO failed to notify any clients, including broker-dealer clients from which it received trades for clearance and settlement when it had a FTD position in an equity security associated with ISP failures that had not been closed out as required by Reg SHO Rule 204T(a) and Rule 204(a).  Moreover, MLPRO continued to accept short sale orders from its broker-dealer and other clients and to itself effect short sale orders in equity securities with respect to which it was in the "penalty box" without ensuring that the client had first borrowed the security or entered into a bona fide arrangement to borrow the security prior to accepting the short sale order.

For example, one of MLPRO's broker dealer sponsored access clients that traded through a service bureau provided by MLPRO entered approximately 1,351 short sale orders in at least eight securities on one day during the FTD Relevant Period, when MLPRO had an aged FTD position and with respect to which MLPRO was in the "penalty box," without first borrowing or arranging to borrow those securities.

In addition to the foregoing, MLPRO also failed to take any action to detect the entry of short sales without pre-borrows in equity securities in which it had an aged FTD due to ISP failures.

From September 2008 when Rule 204T took effect until July 2012, MLPRO's supervisory systems and procedures, including written supervisory procedures, did not provide for supervision reasonably designed to achieve compliance with Reg SHO Rules 204T(a) and 204(a), as well as compliance with the penalty box or notice requirements of Reg SHO Rules 204T(b) and (c) and 204(b) and (c).

By the foregoing conduct, from September 2008 through at least July 2012, MLPRO violated NASD Rules 3010(a) and (b) and 2110 (for conduct prior to December 15, 2008) and FINRA Rule 2010 (for conduct on or after December 15, 2008).

**MLPFS failed to  have adequate supervisory systems and procedures regarding its allocation methodology**



As noted above, under certain circumstances Rule 204T(d) and Rule 204(d) allow a clearing firm to allocate the obligation to close out FTDs to broker-dealers that clear or settle trades through the clearing firm.  From September 2008 through at least March 2011, MLPFS failed to establish and maintain systems and procedures reasonably designed to ensure compliance with Rules 204T(a) and (d) and Rules 204(a) and (d) of Regulation SHO.  During this time period, MLPFS' supervisory systems and procedures, including its written supervisory procedures regarding the allocation of FTDs considered its broker-dealer clients' short positions without also considering their trading activities as stated in the Rule 204T and Rule 204 adopting releases.  Specifically, during this period, MLPFS allocated its CNS FTD positions to its broker-dealer clients without 

7

ascertaining whether the allocated broker-dealers caused or contributed to those positions.

Specifically, during this period, MLPFS employed a two-tiered methodology to address all its CNS FTD positions. Tier I consisted of MLPFS' broker-dealer clients. Tier II consisted of MLPFS' non-broker dealer clients. Under its procedures, MLPFS first allocated its FTD position in a given security to its broker-dealer clients with a short position in that security on the stock record on the settlement date the FTD arose. Allocations were done on a pro rata basis relative to the cumulative short position of all its broker-dealer clients in the subject security.

If MLPFS' CNS FTD position in a security exceeded the number of shares that could be allocated to its broker-dealer clients under its procedures, then MLPFS closed-out all other clients and proprietary accounts with a short position in the subject security on a pro rata basis relative to the cumulative non-broker-dealer clients short position on the stock record on the settlement date the FTD arose. The costs associated with closing out the short positions of MLPFS' non-broker-dealer clients were passed to those clients. MLPFS' two-tiered methodology did not also consider whether its clients contributed to the FTD position in that security.

In addition, from September 2008 through at least March 2011, MLPFS' written procedures, including its written supervisory procedures were deficient in that they were consistent with the two-tiered methodology set forth above. The foregoing resulted in a significant number of improper allocations.

Further, MLPFS maintained trading accounts for four distinct but affiliated broker-dealer entities. Since at least 2005 through at least May 2012, the Firm consolidated these four legal entities' trading account positions into one "family account" and netted the positions of the four separate broker-dealer entities to determine the net position of the family account. The Firm improperly based its allocations on the net family account position instead of separately considering the positions of the four individual broker dealer entities. The Firm made only one allocation to the family account and sent only one allocation notice. Thus, the Firm did not consider the position of each legal broker-dealer entity when allocating its FTD positions.

By netting the short positions of the four related but separate and distinct broker dealer entities when allocating its FTD positions, MLPFS' processes failed to ensure that its allocations were made t o the specific entity that contributed to its FTD position as required.

Based on the foregoing, MLPFS' supervisory systems and procedures, including its written supervisory procedures regarding Rules 204T and 204 violated NASD Rules 3010(a), 3010(b) and 2110 (for conduct prior to December 15, 2008), and FINRA Rule 2010 (for conduct on or after December 15, 2008).

8

**MLPFS failed to have adequate supervisory systems and procedures for compliance with the "notice" and "penalty box" provisions of Rules 204T(b) and (c) and 204 (b) and (c)**

From at least September 2008 through at least August 2011, MLPFS did not have in place adequate systems and procedures, including written supervisory procedures, to ensure compliance with Rules 204T (b) and (c) and Rule 204 (b) and (c) of Regulation SHO. Specifically, during this time period, MLPFS' supervisory systems and procedures failed to ensure that its broker dealer clients were notified in certain situations when it had a FTD position in an equity security that had not been timely closed out pursuant to Rule 204T(a) and 204(a). In those situations, MLPFS also continued to accept short sale orders from its broker dealer and other clients and to itself effect short sale orders in equity securities with respect to which it was in the "penalty box" without ensuring that the client had first borrowed the security or entered into a bona fide arrangement to borrow the security prior to accepting the short sale order. During the referenced time period, MLPFS' supervisory systems and procedures were not reasonably designed to detect the entry of short sales without pre-borrows in equity securities in which it had an aged FTD.

Based on the foregoing, MLPFS violated NASD Rules 3010(a), 3010(b) and 2110 (for conduct prior to December 15, 2008), and FINRA Rule 2010 (for conduct on or after December 15, 2008).

## VIOLATIONS OF SECTION 12(k)(4) OF THE EXCHANGE ACT

**The Firms failed to comply with the July 2008 Emergency Order**

On July 15, 2008, the SEC issued an emergency order (the "July Emergency Order")[4]. The July Emergency Order provided, in pertinent part that no person could effect a short sale in the publicly traded securities of certain "Substantial Financial Firms" unless such person or its agent borrowed or arranged to borrow the security or otherwise had the security available to borrow in its inventory prior to effecting such short sale. An appendix to the July Emergency Order specifically identified 19 financial firms as "Substantial Financial Firms."

The July Emergency Order was effective on Monday, July 21, 2008 through Tuesday, July 29, 2008. On Tuesday, July 29, 2008, the SEC amended the July Emergency Order. The amendment extended the effective period of the order through Tuesday, August 12, 2008 (the "July Order Period").

MLPRO and MLPFS were the originating broker-dealers for short sale orders entered by its non-broker dealer direct market access and sponsored access customers.

---

[4] *See* Exchange Act Rel. No. 58166, as amended by Exchange Act Rel. No. 58190 (July 18, 2008) and Exchange Act Rel. No. 58248 (July 29, 2008).

EXHIBIT E to the Expert Report of J. W. Christian    Page 31 of 119

Consequently, during the July Order Period, MLPRO and MLPFS were responsible to determine that a required pre-borrow was obtained and documented for these clients' short sale orders in the Substantial Financial Firms.

## MLPRO

During the July Order Period, MLPRO effected through its internal systems for its non-broker-dealer direct market access clients hundreds of short sale orders in the common stock of six Substantial Financial Firms identified in the July Emergency Order without first having borrowed or arranged to borrow shares prior to effecting such short sales. The foregoing resulted in hundreds of thousands of executed shares violative of the July Emergency Order.

During the July Order Period, MLPRO effected for two non-broker dealer sponsored access clients, less than 20 short sale orders in the common stock of five Substantial Financial Firms identified in the July Emergency Order without first having borrowed or arranged to borrow shares. The foregoing resulted in tens of thousands of executed shares violative of the July Emergency Order.

## MLPFS

During the July Order Period, MLPFS released for execution or allowed to be entered for it and its non-broker dealer clients, including its sponsored access clients, hundreds of thousands of short sale orders in the securities of at least 17 Substantial Financial Firms identified in the July Emergency Order. The foregoing resulted in full or partial executions of millions of executed shares violative of the July Emergency Order.

### The Firms failed to comply with the September 2008 Emergency Order

On September 18, 2008,[5] the SEC issued another Emergency Order (the "September Emergency Order") which provided, among other things, that "all persons are prohibited from short selling any publicly traded securities of any "Included Financial Firm." An appendix to the September Emergency Order specifically identified 799 financial firms as "Included Financial Firms." The September Emergency Order was effective on September 19, 2008 through October 8, 2008 (the "September Order Period").

As the originating broker dealer for short sale orders entered by its non-broker dealer direct market access and sponsored access clients, MLPRO and MLPFS were also responsible during the September Order Period to prevent the entry of short sale orders in the Included Financial Firms and the Covered Securities by these clients.

---

[5] *See* Exchange Act Rel. No. 58592, as amended by Exchange Act Rel. No. 58611 (Sept 21, 2008); Exchange Act Rel. No. 58723 (Oct. 2, 2008).

EXHIBIT E to the Expert Report of J. W. Christian    Page 32 of 119

## MLPRO

During the September Order Period, MLPRO effected through its internal systems for its non-broker dealer direct market access clients hundreds of short sale orders in the securities of 30 Included Financial Firms and Covered Securities. The foregoing resulted in the full or partial executions of hundreds of thousands of shares in violation of the September Emergency Order.

During the September Order Period, MLPRO effected for three non-broker dealer sponsored access clients less than 20 violative short sale orders in the securities of 11 Included Financial Firms and Covered Securities identified in the September Emergency Order. Although these orders were entered, they resulted in no executions.

## MLPFS

During the September Order Period, MLPFS released for execution or allowed to be entered for it and its non-broker dealer clients, including direct market access and sponsored access clients, thousands of short sale orders in the securities of at least 326 Included Financial Firms identified in the September Emergency Order. The foregoing resulted in millions of executed shares in securities subject to the September Emergency Order.

By effecting short sales in the securities restricted by the July and September Emergency Orders MLPRO and MLPFS violated Section 12(k)(4) of the Exchange Act of 1934 and violated NASD Rule 2110.

### The Firm failed to have adequate supervisory systems and procedures for compliance with the July and September Emergency Orders

During the July and September Order Periods, MLPFS and MLPRO failed to have in place reasonable systems, procedures and, in some instances, written policies and procedures, including WSPs, to ensure compliance with July and September Emergency Orders by its' non-broker dealer direct market access and sponsored access clients.

#### Inadequate Pre-Execution Controls

Regulation SHO allows for broker-dealers to create and maintain a daily list of equity securities which it deems easy to borrow ("ETB Lists"). The inclusion of securities on a firm's ETB List indicates the firm's ability to easily supply shares of the identified securities, thereby providing the reasonable grounds for a locate necessary for effecting a short sale in those securities. Short sales entered in reliance upon a firm's ETB List do not require that a separate documented locate be otherwise obtained first.

During the July and September Order Periods, MLPRO and MLPFS used and distributed to certain of its sponsored access and naked access clients ETB Lists generated by MLPFS. During this period, MLPFS' order entry, acceptance and routing systems and

11

MLPRO's order router were programmed to permit the routing for execution of orders for any securities on the MLPFS ETB lists. As a means to prevent the entry of short sales in the Substantial Financial Firms and Included Financial Firms during the July and September Order Periods, MLPFS attempted to remove these securities from its ETB Lists. However, the ETB Lists generated by MLPFS were ineffective in preventing short sales in the Substantial Financial Firms and the Included Financial Firms during the July and September Order Periods because those securities were not timely removed from the ETB Lists. Moreover, during the September Order Period, additions and deletions of restricted securities made daily the list of Included Financial Firms were not contemporaneously added to and deleted from MLPFS' ETB List. The foregoing rendered the ETB Lists inaccurate.

A review of 350 ETB Lists created by MLPFS during the July Order Period revealed that one or more of the Substantial Financial Firms appeared on 41 of the 350 ETB Lists reviewed. Similarly, a review of 170 ETB Lists created by MLPFS during the September Order Period revealed that one or more of the Included Financial Firms and/or Covered Securities appeared on 110 of the 170 ETB Lists reviewed.

MLPFS' and MLPRO's use and distribution of the inaccurate ETB Lists during the July and September Order Periods allowed orders in the restricted securities to be automatically routed for execution in contravention of the July and September Emergency Orders.

In addition, during the September Order Period, MLPFS, on its own and on MLPRO's behalf, placed a technology block in its systems and MLPRO's order router to prevent short sale executions in the securities of Included Financial Firms and Covered Securities. However, the technology block was ineffective in blocking the execution of short sale orders in the Included Financial Firms and Covered Securities during that period.

Although MLPFS instructed its Securities Lending Desk -- used both by MLPRO and MLPFS -- not to grant locates in the Included Financial Firms and Covered Securities during the September Order Period, MLPFS' Securities Lending Desk in fact granted locates in these securities during the September Order Period. For example, on September 23, 2008 and September 29, 2008, MLPFS' Securities Lending Desk granted locates in 82 and 129 Included Financial Firms respectively.

Moreover, although, MLPRO's order router was programmed to reject short sale orders if the security was not on the MLPFS ETB List, the mere entry by the client of an affirmative locate/pre-borrow indicator, typically in the form of a "Y" for yes and "N" for no, prevented the order from being rejected. Moreover, because the MLPRO order router did not interact with any MLPFS locate/pre-borrow record to determine whether MLPFS had actually provided a locate/pre-borrow, customer entries were accepted at face value without requiring the client to identify the source of the third party locate/pre-borrow and with no check on whether such had actually been granted.

12

EXHIBIT E to the Expert Report of J. W. Christian    Page 34 of 119

Based on the foregoing, MLPFS and MLPRO lacked sufficient controls to prevent the release for execution of short sale orders violative of the July and September Emergency Orders including by its direct market access, naked access and sponsored access clients.

### Inadequate Post-Trade Reviews

MLPRO and MLPFS used End-of-Day Reports to conduct post trade reviews for compliance with the July Emergency Order. However, these reports did not encompass order data and/or records of short sale orders, executed or unexecuted. Because the End-of-Day Reports referenced only positions, not transactions, and included only those accounts that had an end of day increase in its overall short position in one of the securities subject to the July Emergency Order, they were insufficient to ensure compliance with the July Emergency Order.

MLPRO relied on MLPFS to conduct post-trade reviews on its behalf for compliance with the September Emergency Order. MLPFS, however, did not conduct any post trade reviews of the trading activity of MLPRO's direct market access clients whose trades passed through MLPRO's order router or MLPRO's sponsored access clients trading through certain service bureaus for compliance with the September Emergency Order. Thus, no post-trade review of these MLPRO clients' trading was conducted for compliance with the September Emergency Order.

MLPFS' post trade reviews of certain exception reports were likewise insufficient for adequate surveillance because they either excluded transactions that were released for execution but not actually executed in violation of the Emergency Orders or they excluded short sale transactions in securities on the Firm's ETB List and short sale orders in which locate information was provided.

### Lack of Written Policies and Procedures

During the September Order Period, MLPRO did not establish and maintain written policies and procedures, including written supervisory policies and procedures that addressed compliance with the September Emergency Order.

MLPFS' written policies and procedures regarding the July Emergency Order describe the above-referenced, inadequate End-of-Day Reports as the primary means to review for compliance with the July Emergency Order.

Based on the above-referenced shortcomings of the Firms' pre-execution controls, post-trade reviews and deficient policies and procedures, MLPFS and MLPRO lacked systems and procedures reasonably designed to ensure compliance with the July and September Emergency Orders. Accordingly, MLPRO and MLPFS each violated NASD Rules 3010(a) and (b) and 2110.

EXHIBIT E to the Expert Report of J. W. Christian    Page 35 of 119

## ANTI-MONEY LAUNDERING

NASD Rule 3011, in effect during from July 1, 2008 through December 31, 2008 (the AML Relevant Period),[6] required FINRA members to develop and implement a written AML program reasonably designed to achieve and monitor compliance with the requirements of the Bank Secrecy Act, 31 U.S.C. §5311, et seq., and the regulations promulgated thereunder. Section (a) of Rule 3011 directs member firms to establish and implement procedures reasonably designed to detect and cause the reporting of certain suspicious transactions. FINRA's predecessor NASD reminded firms in NTM 02-21 that a member firm's AMLCP must "fit its business models and needs" and "consider factors such as its size, location, business activities, the type of accounts it maintains, and the types of transactions in which its customers engage."

From July 1, 2008 through December 31, 2008 (the "AML Relevant Period"), suspicious activity monitoring for both MLPRO and MLPFS was primarily conducted through two surveillance reviews – the Mantas AML Platform and various Compliance Department reviews (the "Compliance Reviews") that served as a supplement to Mantas.

Information fed into the Mantas tool consisted of securities transactions that were executed by MLPRO or MLPFS respectively and/or cleared and settled by MLPRO or MLPFS. Thus, any client orders, including naked access and sponsored access client orders that were executed and cleared and settled away from the Firms were not subject to Mantas review.

Similarly, not all sponsored access and naked access client transactions executed away from the Firms were subject to the Compliance Reviews. In addition, during the AML Relevant Period, the trading of some MLPRO sponsored access clients was not captured at all by the Compliance Reviews, regardless of where those clients' trades were executed.

Thus, because MLPRO's and MLPFS' programs for suspicious activity monitoring failed to capture certain trading data necessary to monitor for suspicious activity, the firms failed to implement and establish procedures and internal controls reasonably designed to detect and cause the reporting of suspicious transactions in violation of NASD Rules 3011(a) and 2110 (for conduct prior to December 15, 2008) and FINRA Rule 2010 (for conduct on or after December 15, 2008).

## MLPRO BOOKS AND RECORDS VIOLATIONS

The Firm failed to maintain and/or preserve for a period of at least three years records of orders for trades placed by its naked access and sponsored access clients during at least the September Order Period.

Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4 thereunder, require broker dealers to preserve for a period of not less than three years a memorandum of each

---

[6] NASD Rule 3011 was superseded by FINRA Rule 3310 in January 2010.

14

EXHIBIT E to the Expert Report of J. W. Christian    Page 36 of 119

brokerage order, and of any instruction given or received for the purchase or sale of securities, whether executed or unexecuted. NASD Rule 3110(a) requires members to make, preserve and retain books and records in conformity with SEC Rules 17a-3 and 17a-4.

Prior to April 18, 2011, Enforcement requested that the Firm provide records of orders entered by its clients, including its naked access and sponsored access clients, in the Substantial Financial Firms and Covered Securities during the September Order Period. As of at least April 18, 2011, MLPRO was not in possession of order tickets for its sponsored access clients. Consequently, MLPRO did not provide order tickets or any other order information for orders placed in the securities of the Substantial Financial Firms and Covered Securities by certain of its naked access and sponsored access clients.

By the foregoing, MLPRO violated Section 17(a) of the Exchange Act and Rules 17a-3 and 17a-4 thereunder, NASD Rule 3110 (a) and FINRA Rule 2010.

## MLPRO'S INADEQUATE SUPERVISORY SYSTEMS AND PROCEDURES REGARDING ITS NAKED AND SPONSORED ACCESS CLIENTS

From July 1, 2008 through at least December 31, 2008, MLPRO did not have systems and procedures in place to ensure that the electronic trading of its naked access and sponsored access clients was properly reviewed and reasonably supervised.

During this period, MLPRO had an obligation to monitor all order flows it routed to a market center regardless of whether the Firm is the order entry firm. During this time period, electronic trading data of MLPRO's sponsored access and naked access clients was received by MLPFS' Electronic Trading Desk on MLPRO's behalf. Staff of the MLPFS Electronic Support Group was charged with performing reviews of MLPRO sponsored access and naked access client electronic order flow.

From July 1, 2008 through at least December 31, 2008, MLPFS's Electronic Trading Desk did not receive records of brokerage orders or executions for certain of MLPRO's naked access clients. Further, From July 1, 2008 through at least December 31, 2008, MLPFS' Electronic Trading Desk did not receive records of brokerage orders or executions for MLPRO's sponsored access clients that traded through certain service bureaus. Consequently, from July 1, 2008 through at least December 31, 2008, MLPRO failed to establish, maintain and enforce adequate supervisory systems and procedures, including written supervisory procedures, reasonably designed to monitor the electronic trading of MLPRO's referenced sponsored access and naked access clients in violation of NASD Rules 3010(a) and 2110 (for conduct prior to December 15, 2008) and FINRA Rule 2010 (for conduct on or after December 15, 2008).

EXHIBIT E to the Expert Report of J. W. Christian    Page 37 of 119

## MLPFS' INACCURATE RESERVE FORMULA COMPUTATIONS AND FOCUS REPORTS

Section 15(c) of the Exchange Act authorizes the SEC to promulgate Rules relating to the financial responsibility of broker-dealers. Rule 15c3-3, known as the "customer protection rule," includes a requirement that every broker-dealer perform a weekly computation (the "reserve formula") to determine what amount, if any, the broker dealer must deposit on behalf of customers in a bank account entitled Special Reserve Bank Account for the Exclusive Benefit of Customers (the "Reserve Bank Account").

In order for such deposits to be bona fide, they cannot create overdrafts or increase existing overdrafts in the accounts from which the funds are drawn; and the broker dealers' agreement on the account from which the funds are drawn must expressly state that overdrawn amounts are unsecured loans and that the bank agrees to look only to the overdrawn account for payment.

Pursuant to Section 17(a) of the Exchange Act and Rule 17a-5 promulgated thereunder, the Firm is required to file periodic reports of financial information known as FOCUS Reports. Such reports include reserve formula computations prepared as of the month-end reporting date.

During January 2009 and through December 2009, the Firm made 13 cash deposits to its Reserve Bank Account at one bank ("Bank A") drawn from an account it held at another bank ("Bank B") that were not bona fide because (1) they created or increased an overdraft in the bank account at Bank B from which the funds were drawn and (2) the Firm's written agreement concerning the account at Bank B failed to acknowledged that withdrawals were unsecured loans or contain certain other language regarding cross liens. The exclusion of these non bona fide deposits resulted in 13 hindsight deficiencies.

Six of the above referenced 13 hindsight deficiencies occurred in connection with a month-end reserve formula computation reported in a Firm FOCUS Report filing. Thus, the Firm submitted six inaccurate FOCUS Reports in that they contained inaccurate reserve formula computations.

By the foregoing, the Firm violated Section 15(c) of the Exchange Act and Rule 15c3-3(e) thereunder, Section 17(a) of the Exchange Act and Rule 17a-5 thereunder, and FINRA Rule 2010.

In addition, by failing to have systems and procedures in place reasonably designed to ensure compliance with Sections 15(c) and 17(a) of the Exchange Act as described above, MLPFS violated NASD Rules 3010(a) and FINRA Rule 2010.

EXHIBIT E to the Expert Report of J. W. Christian   Page 38 of 119

B.    MLPRO also consents to the imposition of the following sanctions:

    a.  A censure; and

    b.  A fine in the total amount of $5 million to be paid to FINRA and NYSE Arca, Inc., of which $3.5 million of that total amount shall be paid to FINRA.

MLPFS also consents to the imposition of the following sanctions:

    a.  A censure;

    b.  A fine of $2.5 million; and

    c.  An undertaking requiring MLPFS, within 120 days of the issuance of a Notice of Acceptance of this AWC, to adopt and implement supervisory systems and written procedures reasonably designed to achieve compliance with the current requirements of Rule 204 of Reg SHO.  MLPFS shall, within the time period specified, notify the Department of Enforcement in writing when it has adopted and implemented the supervisory systems and written procedures described above.  The Department of Enforcement may, upon showing of good cause and at its sole discretion, extend the time for compliance with this provision.

Respondents agree to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable.  Respondents have each submitted an Election of Payment form showing the method by which each proposes to pay the respective fines imposed.

Respondents specifically and voluntarily waive any right to claim that they are unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

Respondents specifically and voluntarily waive the following rights granted under FINRA's Code of Procedure:

    A.    To have a Complaint issued specifying the allegations against them;

    B.    To be notified of the Complaint and have the opportunity to answer the allegations in writing;

    C.    To defend against the allegations in a disciplinary hearing before a hearing panel,

EXHIBIT E to the Expert Report of J. W. Christian    Page 39 of 119

to have a written record of the hearing made and to have a written decision issued; and

D.     To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondents specifically and voluntarily waive any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

Respondents further specifically and voluntarily waive any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

Respondents understand that:

A.     Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.     If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondents; and

C.     If accepted:

1.     this AWC will become part of MLPRO's and MLPFS' permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against Respondents;

2.     this AWC will be made available through FINRA's public disclosure program in response to public inquiries about Respondents' disciplinary record;

3.     FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

18

EXHIBIT E to the Expert Report of J. W. Christian     Page 40 of 119

4.    Respondents may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis.  Respondents may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC.  Nothing in this provision affects Respondents': (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.    Respondents may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct.  Respondents understand that they may not deny the charges or make any statement that is inconsistent with the AWC in this Statement.  This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

The undersigned, on behalf of the MLPRO, certifies that a person duly authorized to act on MLPRO's behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that MLPRO has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce MLPRO to submit it.

10/21/2014
Date

Merrill Lynch Professional Clearing Corp.

By: _____ CEO

Reviewed by:

_____
Attorney Name
Counsel for Respondent

19

EXHIBIT E to the Expert Report of J. W. Christian    Page 41 of 119

The undersigned, on behalf of the MLPFS, certifies that a person duly authorized to act on MLPFS' behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that MLPFS has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce MLPFS to submit it.

October 20, 2014
Date

Merrill Lynch, Pierce, Fenner & Smith, Inc.
Merrill Lynch, Pierce, Fenner & Smith, Inc.

By: T. Daniel Montgomery
Associate General Counsel + Senior Vice President

Reviewed by:

Attorney Name
Counsel for Respondent

Accepted by FINRA:

October 27, 2014
Date

Signed on behalf of the
Director of ODA, by delegated authority

Richard Chin
Chief Counsel
FINRA Department of Enforcement
One World Financial Center
200 Liberty Street
New York, NY 10281
(646) 315-7322

20

EXHIBIT E to the Expert Report of J. W. Christian    Page 42 of 119

FINANCIAL INDUSTRY REGULATORY AUTHORITY
LETTER OF ACCEPTANCE, WAIVER AND CONSENT
NO. _2008015199 2 - 01_

TO:   Department of Market Regulation
      Financial Industry Regulatory Authority ("FINRA")

RE:   Morgan Stanley & Co. LLC[1]
      Broker-Dealer
      CRD No. 8209

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, Morgan Stanley & Co. LLC (the "firm") submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against the firm alleging violations based on the same factual findings described herein.

## I.

## ACCEPTANCE AND CONSENT

A.   The firm hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

The firm has been a member of FINRA since June 5, 1970, and its registration remains in effect.

### RELEVANT DISCIPLINARY HISTORY

On May 17, 2011, FINRA accepted an AWC in connection with 20070113472 in which the firm was fined $110,000, of which $30,000 was for short interest reporting violations that occurred from April 13, 2007 through October 15, 2007.

---

[1] Until April 16, 2008, the firm was registered as "Morgan Stanley & Co., Incorporated"; from April 17, 2008 to June 29, 2011 it was registered as "Morgan Stanley & Co. Incorporated"; from June 30, 2011 to the present it has been registered as "Morgan Stanley & Co. LLC."

STAR No. 20080151992 (includes 20100247285, 20110264768, 20130395613, and 20140428681) (CJC)

EXHIBIT E to the Expert Report of J. W. Christian    Page 43 of 119

## SUMMARY

In connection with 20080151992, the Short Interest staff of FINRA's Department of Market Regulation ("Market Regulation") reviewed the firm's short interest reporting during the period February 15, 2007 through October 30, 2009 ("Short Interest Review #1").[2]

In connection with 20100247285, the Short Interest staff of Market Regulation reviewed the firm's short interest reporting during the period December 31, 2009 through September 14, 2012 ("Short Interest Review #2").

In connection with 20130395613, the Short Interest staff of Market Regulation reviewed the firm's short interest reporting during the period May 15, 2012 through November 29, 2013 ("Short Interest Review #3").

In connection with 20140428681, the Short Interest staff of Market Regulation reviewed the firm's self-reported disclosure that it has not included in its short interest reporting the firm's short positions for securities that trade on a foreign exchange and for which a United States trading symbol exists ("Short Interest Review #4").

In connection with 20110264768, the Short Sales staff of Market Regulation reviewed the firm's compliance with short sale requirements during the period January 1, 2005 through December 31, 2011 ("Short Sale Aggregation Unit Review").

Based on the foregoing reviews, the staff determined that the firm violated FINRA Rule 4560, NASD Rule 3360, NYSE Rule 421, FINRA Rule 2010, NASD Rule 2110, NASD Rule 3010, and SEC Rule 200(f). Specifically, the staff determined the firm failed to submit accurate short interest reports during certain short interest reporting periods and failed to provide a supervisory system reasonably designed to achieve compliance with short interest reporting requirements. Additionally, the staff determined the firm improperly included positions of customer accounts in determining the net positions of its aggregation units, that the firm's written plan of authorization improperly permitted this inclusion, and that the firm failed to provide a supervisory system reasonably designed to achieve compliance with requirements relating to aggregation units and short sales.

---

[2] The short interest rules cited below require firms to maintain a record of short interest positions in all customer and proprietary firm accounts in all equity securities (with certain exceptions), and regularly report such positions to FINRA or other self-regulatory organization ("SRO") in the manner prescribed by FINRA or the appropriate SRO. For further information, see FINRA Notice to Members 12-38.

2

EXHIBIT E to the Expert Report of J. W. Christian     Page 44 of 119

## FACTS AND VIOLATIVE CONDUCT

20080151992 (Short Interest Review #1)

1.  For settlement dates from February 15, 2007 through November 30, 2008, the firm submitted to FINRA its short interest position reports. The firm over-reported positions by including 381 short interest positions for certain Nasdaq and OTC equity securities totaling 365,469,262 shares, when the firm should have reported 342 short interest positions totaling 365,280,102 shares for these securities. The conduct described in this paragraph constitutes separate and distinct violations of NASD Rule 3360 which, in part, required FINRA members to periodically report short interest positions held in OTC equity securities and securities listed on a national securities exchange to FINRA unless reported to another self-regulatory organization.

2.  For settlement dates from February 15, 2007 through November 30, 2008, the firm submitted to the New York Stock Exchange ("NYSE") its short interest position reports. The firm over-reported positions by including 4,042 short interest positions for certain NYSE, NYSE Amex, and NYSE Arca securities totaling 2,750,356,420 shares, when the firm should have reported 1,876 short interest positions totaling 2,745,856,053 shares for these securities. The conduct described in this paragraph constitutes separate and distinct violations of Incorporated NYSE Rule 421, which required NYSE members to periodically report short interest positions held in securities listed on the NYSE.

3.  For settlement dates December 15, 2008 through October 30, 2009, the firm submitted to FINRA its short interest position reports. The firm over-reported positions by including 3,235 short interest positions for certain Nasdaq, NYSE, NYSE Amex, NYSE Arca, and OTC equity securities totaling 1,789,997,798 shares, when the firm should have reported 1,461 short interest positions totaling 1,785,629,230 shares for these securities. The conduct described in this paragraph constitutes separate and distinct violations of FINRA Rule 4560, which incorporated and superseded NASD Rule 3360 and NYSE Rule 421 effective December 15, 2008.

EXHIBIT E to the Expert Report of J. W. Christian    Page 45 of 119

<u>20100247285 (Short Interest Review #2)</u>

4.    For 45 settlement dates from December 31, 2009 through September 14, 2012, the firm submitted to FINRA its short interest position reports. These reports included 50,789 short interest positions totaling 54,996,211,023 shares when the firm should have reported 50,786 positions totaling 58,994,913,505 shares; thus, the firm under-reported its short interest by approximately 4 billion shares, or 6.8 percent. The firm also failed to report 1,000 short interest positions totaling 18,423,118 shares. Specifically,

    a.    Certain short positions held for other broker-dealers were inadvertently coded as Proprietary Account of an Introducing Broker ("PAIB") and were incorrectly determined not to be reportable. As a result, during a 13-month sample period reviewed by the staff, the firm under-reported 741 short positions by approximately 165 million shares and failed to report 19 short interest positions totaling 681,895 shares.

    b.    The firm treated certain proprietary accounts of its foreign affiliates as not reportable. As a result, during a 13-month sample period reviewed by the staff, the firm under-reported 30,686 short interest positions by approximately 3.8 billion shares.

    c.    The firm inaccurately reported certain short interest positions accumulated in connection with syndicate offerings or covered by an overallotment option, as well as failed to report short interest positions that resulted from sales in excess of the overallotment. As a result, during a 14-month sample period reviewed by the staff, the firm over-reported five positions by approximately 5.8 million shares and failed to report four positions totaling approximately 219,000 shares.

    d.    The firm included sales of restricted stock (or "deemed to own") stock in its short interest reports that should have been excluded. As a result, for settlement dates April 15, 2011, April 29, 2011, and May 31, 2011, the firm over-reported three short interest positions totaling approximately 3 million shares.

    e.    The firm's short interest reporting was affected by two programs that updated overnight and thus caused reporting errors on settlement dates. One program, called the "MTJ" program segregated Type 2 positions in omnibus accounts from Type 3 short positions; the other program, called the "TSL" program, ran its own process that netted Type 2 and Type 3 positions in certain omnibus accounts. Moreover, certain omnibus accounts were excluded from the MTJ program or from some other part of the overnight adjustment process. As a result, during the 15-month sample period reviewed by the staff, the firm under-reported 19,354 short interest positions totaling approximately 90

4

EXHIBIT E to the Expert Report of J. W. Christian    Page 46 of 119

million shares, and failed to report 43 short interest positions totaling approximately 333,000 shares.

The conduct described in this paragraph constitutes separate and distinct violations of FINRA Rule 4560.

20130395613 (Short Interest Review #3)

5.  For 38 settlement dates from May 15, 2012 through November 29, 2013, the firm submitted to FINRA its short interest position reports. As a result of a coding error, the firm over-reported positions by including 492 short interest positions totaling 2,202,375,190 shares when the firm should have reported 69 short interest positions totaling 2,918,616 shares. The conduct described in this paragraph constitutes separate and distinct violations of FINRA Rule 4560.

20140428681 (Short Interest Review #4)

6.  During at least the periods under review herein, the firm failed to include in its short interest position reports certain short interest positions for securities that trade on a foreign exchange and for which a United States trading symbol also exists. As a result, the firm failed to report numerous short interest positions amounting to on average over a billion shares per reporting cycle. The conduct described in this paragraph constitutes separate and distinct violations of NASD Rule 3360 and NYSE Rule 421 (for conduct prior to December 15, 2008), and FINRA Rule 4560 (for conduct on or after December 15, 2008).

20100247285, 20130395613, and 20140428681 (Supervision of Short Interest Reporting)

7.  The firm's supervisory system, including the firm's written supervisory procedures ("WSPs"), did not provide for supervision reasonably designed to achieve compliance with applicable securities laws and regulations, and/or FINRA Rules, concerning short interest reporting. As a result, the firm failed to detect and prevent the short interest reporting violations described above. This constitutes a violation of NASD Rule 3010 and FINRA Rule 2010.

20110264768 (Short Sale Aggregation Unit Review)

8.  *Improper inclusion of non-broker-dealer affiliates' positions in AGUs.* Rule 200(f) of Regulation SHO provides that

> In order to determine its net position, a broker or dealer shall aggregate all of its positions in a security unless it qualifies for independent trading unit aggregation, in which case each independent trading unit shall aggregate all of its positions in a security to determine its net position. Independent trading unit aggregation is available only if: (1) the broker-dealer has a written plan of authorization that identifies each aggregation unit, specifies its trading objectives, and supports its

5

independent identity; (2) each aggregation unit within the firm determines, at the time of each sale, its net position for every security that it trades; (3) all traders in an aggregation unit pursue only the particular trading objective(s) or strategy(s) of that aggregation unit and do not coordinate that strategy with any other aggregation unit; and (4) individual traders are assigned to only one aggregation unit at any time.

Rule 200(f) does not permit the inclusion of the securities positions of a broker-dealer's non-broker-dealer affiliates in calculating the net securities positions of the independent trading units of a broker-dealer.

From January 1, 2005 through at least December 31, 2011 (the "Short Sale review period"), the firm's trading desks were organized into separate aggregation units ("AGUs") for purposes of compliance with SEC Rule 200(f) and pre-existing guidance concerning the proper use of AGUs. Each of the separate AGUs contained numerous trading books, for which securities positions were netted together to determine the total net position of that AGU and, accordingly, whether the AGU's orders should be marked long or short. In addition to the firm's proprietary positions, the AGUs also improperly included the trading positions of non-broker-dealer affiliates in determining the AGU's net positions.[3] As a result, the firm's AGUs failed to reflect the correct positions within the appropriate trading books, in violation of SEC Rule 200(f).

9. *Inadequate written plan of authorization.* During the Short Sale review period, the firm's written plan of organization for its AGUs failed to accurately provide for the overall net position of the securities that were traded and maintained by the firm's AGUs. More specifically, the firm's written plan of organization for its AGUs improperly permitted the inclusion of securities positions of non-broker-dealer affiliates in determining the net position of the firm's AGUs, in violation of SEC Rule 200(f).

10. *Inadequate WSPs.* The firm's supervisory system did not provide for supervision reasonably designed to achieve compliance with the applicable securities laws and regulations, including SEC and FINRA Rules, concerning aggregation of positions in a security to determine the net positions of the firm's AGUs. Specifically, the firm's WSPs improperly permitted the inclusion of non-broker-dealer affiliates' trading positions in determining the net positions of the firm's AGUs. The conduct described in this paragraph constitutes a violation of NASD Rules 2110 and 3010 (for conduct prior to December 15, 2008), and FINRA Rule 2010 and NASD Rule 3010 (for conduct on or after December 15, 2008).

---

[3] The non-broker-dealer affiliates' trading positions were incorporated into ten separate AGUs maintained by the firm during the relevant period.

EXHIBIT E to the Expert Report of J. W. Christian   Page 48 of 119

## OTHER FACTORS

The firm retained an independent consultant on three occasions during the time periods described above to review the firm's short interest reporting processes. The firm addressed the issues identified by the consultants that contributed to the short interest reporting violations described herein. In addition, in connection with these reviews, the firm identified and self-reported certain of the short interest reporting violations at issue in 20100247285 and all of the short interest reporting violations at issue in 20140428681. By self-reporting these violations and by providing extraordinary cooperation, the firm provided substantial assistance to FINRA's investigation. Accordingly, the sanction reflects significant consideration given to these actions taken by the firm.

B.   The firm also consents to the imposition of the following sanctions:

> • A censure;

> • A fine of $2,000,000 ($1,400,000 for the short interest reporting violations; $250,000 for the short interest supervision violations; $250,000 for the short sale violations; and $100,000 for the short sale supervision violations); and

> • An undertaking to revise the firm's WSPs, as warranted, with respect to the areas described in paragraphs A.7 and A.10 above. Within 120 days of acceptance of this AWC by the National Adjudicatory Council ("NAC"), an Executive Officer of the firm shall submit to the **COMPLIANCE ASSISTANT, LEGAL SECTION, MARKET REGULATION DEPARTMENT, 9509 KEY WEST AVENUE, ROCKVILLE, MD 20850**, a signed, dated letter, or an email from a work-related account of the Executive Officer to **MarketRegulationComp@finra.org**, providing the following information: (1) a reference to this matter; (2) a representation that the firm has addressed and corrected the deficiencies described in Section A above and a detailed description of all changes made to the firm's supervisory system and WSPs, as well as any changes the firm intends to make as a result of the issues identified above; and (3) the date the deficient procedures were addressed and corrected by the firm.

For good cause shown and upon receipt of a timely application from the firm, FINRA staff may extend the deadlines set forth in the undertakings described above.

The firm agrees to pay the monetary sanction(s) upon notice that this AWC has been accepted and that such payment(s) are due and payable. It has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

The firm specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

7

EXHIBIT E to the Expert Report of J. W. Christian     Page 49 of 119

## II.

### WAIVER OF PROCEDURAL RIGHTS

The firm specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.　　To have a Complaint issued specifying the allegations against the firm;

B.　　To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.　　To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.　　To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, the firm specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

The firm further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

8

## III.

## OTHER MATTERS

The firm understands that:

A.      Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.      If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the firm; and

C.      If accepted:

1.      this AWC will become part of the firm's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against the firm;

2.      this AWC will be made available through FINRA's public disclosure program in response to public inquiries about the firm's disciplinary record;

3.      FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.      The firm may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. The firm may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects the firm's (i) testimonial obligations, or (ii) right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.      The firm may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. The firm understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

EXHIBIT E to the Expert Report of J. W. Christian    Page 51 of 119

The undersigned, on behalf of the firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that it has agreed to the AWC's provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the firm to submit it.

April 6, 2015
Date

Respondent
Morgan Stanley & Co. LLC

By: _____

Name: _Scott Tucker_

Title: _Global Head of Litigation_

Reviewed by: _____

Counsel for Respondent
Susan L. Merrill

Accepted by FINRA:

5/13/15
Date

Signed on behalf of the
Director of ODA, by delegated authority

_____
Robert A. Marchman
Executive Vice President
Department of Market Regulation

10

EXHIBIT E to the Expert Report of J. W. Christian    Page 52 of 119

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## LETTER OF ACCEPTANCE, WAIVER AND CONSENT
### NO. 20080144511

TO:  Department of Enforcement ("Enforcement")
     Financial Industry Regulatory Authority ("FINRA")

RE:  UBS Securities LLC, Respondent
     CRD No. 7654

Pursuant to FINRA Rule 9216 of FINRA's Code of Procedure, the Respondent submits this Letter of Acceptance, Waiver and Consent ("AWC") for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against the Respondent alleging violations based on the same factual findings described herein.

### I.

### ACCEPTANCE AND CONSENT

A.  The Respondent hereby accepts and consents, without admitting or denying the findings, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, prior to a hearing and without an adjudication of any issue of law or fact, to the entry of the following findings by FINRA:

### BACKGROUND

UBS Securities LLC ("UBS" or the "Firm"), member NYSE and FINRA, is a registered broker-dealer with its principal office in Stamford, Connecticut and serves as the investment banking and securities arm of UBS AG in the United States. UBS provides investment banking, research, and sales and trading services, primarily to corporate and institutional clients.

### OVERVIEW

On July 28, 2004, the Securities and Exchange Commission (the "SEC") adopted 17 CFR Part 242 ("Reg SHO") under the Securities Exchange Act of 1934 ("Exchange Act"), effective September 7, 2004, with a compliance date of January 3, 2005. Reg SHO was, among other things, established to address potentially abusive naked short selling and other problems associated with failures to deliver while protecting and enhancing the operation, integrity and stability of the markets. As such, Reg SHO: (i) established a uniform "locate" requirement to reduce the number of potential failures to deliver; (ii) created uniform order

000348299 2011

marking requirements for sales of equity securities; and (iii) limited the time in which a broker-dealer can permit a failure to deliver to persist for securities on the various self-regulatory organization ("SRO") threshold security lists ("threshold securities").[1]

As set forth below, the Firm failed to comply with certain requirements of Reg SHO, FINRA Rules, NASD Rules and federal securities laws during the period covering, in whole or in part, January 3, 2005 through March 2010, with several violations continuing through December 31, 2010 (the "Relevant Period"). The Firm's violations existed for various periods of time throughout the Relevant Period and are summarized below.

UBS's Reg SHO supervisory and compliance system regarding locates and order marking of short sale orders was significantly flawed and resulted in a systemic supervisory failure that contributed to serious Reg SHO failures across the Firm's equities trading business. The Firm assigned supervisory responsibility for Reg SHO compliance to individual trading desks without providing them with sufficient policies, procedures, or supervisory tools. Further, the Firm failed to establish a reasonable system of oversight to monitor that the trading desks were, in fact, performing their designated supervisory duties. As a result, the Firm's locate and order marking practices on individual trading desks were not reasonably subjected to supervisory review to achieve compliance with Reg SHO. In addition, the Firm failed to detect or prevent the significant Reg SHO-related violations described in this AWC.

In particular, UBS's supervisory and compliance monitoring flaws included a failure to: (1) establish and maintain a supervisory structure that was sufficient to adequately supervise its compliance with Reg SHO, especially in light of the complexity of its equities trading activities; (2) establish, maintain and enforce written supervisory procedures for each of its trading desks that were reasonably designed to achieve compliance with Reg SHO; (3) develop and implement effective supervisory reports to monitor for compliance with Reg SHO; (4) establish adequate information technology implementation and change control procedures relating to Reg SHO; (5) adequately educate and train certain personnel with regard to compliance with Reg SHO; and (6) establish an adequate Reg SHO compliance monitoring program.

The Firm's failure to comply with Reg SHO's locate requirement extended to numerous Firm trading systems, desks, accounts and strategies, and also impacted the Firm's technology, operations, and supervisory systems and procedures. During the Relevant Period, the Firm's extensive locate violations occurred due to: (1) the misapplication of exceptions to Reg SHO's locate requirement by trading desks without adequate consultation and/or approval from any department

---

[1] Threshold securities are equity securities that have an aggregate fail to deliver position for: (i) five consecutive settlement days at a registered clearing agency [e.g., National Securities Clearing Corporation]; (ii) totaling 10,000 shares or more; and (iii) equal to at least 0.5% of the issuer's total shares outstanding.

EXHIBIT E to the Expert Report of J. W. Christian    Page 54 of 119

outside the trading desks; (2) the improper inclusion of certain threshold and hard-to-borrow securities on the Firm's easy-to-borrow list distributed to proprietary traders and clients; (3) the Firm permitting certain clients to bypass the locate requirement when entering short sales through the Firm's Direct Execution Services platform without implementing appropriate controls surrounding that process; and (4) the Firm failing to reasonably supervise that locates were obtained and/or documented for short sales entered through the Firm's Order Entry Systems.

As a result of these failures, the Firm improperly entered millions of proprietary and customer short sale orders at various times during the Relevant Period without having reasonable grounds to believe that the securities could be borrowed and available for delivery. A significant number of these short sale orders were in hard-to-borrow securities. Extrapolating from the quantified violations indicates that during the Relevant Period, the Firm likely entered tens of millions of proprietary and customer short sale orders without having reasonable grounds to believe that the securities could be borrowed and available for delivery. The duration, scope and volume of the trading created a potential for harm to the integrity of the market.

The Firm also failed to maintain the independence of its 21 aggregation units. Further, the Firm failed to maintain accurate written plans of organization for its aggregation units. In addition to inaccuracies in its written plans of organization, in certain instances, the Firm's risk management systems were inaccurate in that traders and accounts were included in either: (1) the wrong aggregation unit; (2) multiple aggregation units at the same time; or (3) in no aggregation unit at all. The Firm's aggregation unit deficiencies also may have resulted in order marking problems, including short sales mismarked as long that also potentially violated Reg SHO's locate requirement.

Additionally, the Firm mismarked millions of sale orders in its trading systems at various times during the Relevant Period. Extrapolating from the quantified violations indicates that the Firm likely mismarked tens of millions of sale orders during the Relevant Period. Many of these mismarked orders were short sales that were mismarked as "long," resulting in additional significant violations of Reg SHO's locate requirement.

Moreover, the Firm also had significant reporting and recordkeeping violations resulting from the foregoing. UBS's mismarked sale orders flowed through to the Firm's blue sheet submissions, causing it to make inaccurate submissions of trading data to FINRA. These same mismarked sale orders caused the Firm to inaccurately report such orders to the Automated Confirmation Transaction service and the Order Audit Trail System. The Firm also failed to create and maintain accurate books and records regarding its easy-to-borrow lists, aggregation units and mismarked orders.

3

Due to the aforementioned failures with respect to the Firm's Reg SHO supervisory and compliance program, many of the Firm's violations were not detected or corrected until after Enforcement's investigation caused UBS to conduct a substantive review of its systems and monitoring procedures for Reg SHO compliance.  It was not until at least 2009 that the Firm's supervisory framework over its equities trading business was reasonably designed to achieve compliance with the requirements of Reg SHO and the other securities laws, rules and regulations described herein.

## FACTS AND VIOLATIVE CONDUCT

I.     **The Firm's Extensive Locate Violations Since Reg SHO's Inception Date**

*Reg SHO's Locate Requirement*

Rule 203(b)(1) of Reg SHO states that, subject to certain exceptions, a "broker or dealer may not accept a short sale order in an equity security from another person, or effect a short sale in an equity security for its own account, unless the broker or dealer has: (i) Borrowed the security, or entered into a bona-fide arrangement to borrow the security; or (ii) Reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due; and (iii) Documented compliance with this paragraph (b)(1)."

Reg SHO requires a broker-dealer to have reasonable grounds to believe the security can be borrowed so that it can be delivered in time for settlement before effecting a short sale in that security.  Identifying a source from which to borrow such security is generally referred to as obtaining a "locate."  Reg SHO requires that the "locate" must be obtained and documented prior to effecting the short sale.

*Overview of Firm's Locate Violations*

As described below, the Firm effected or accepted millions of proprietary and customer short sale orders without locates at various times during the Relevant Period.  Extrapolating from the quantified violations indicates that during the Relevant Period, the Firm likely entered tens of millions of proprietary and customer short sale orders without valid locates.  Furthermore, due to the Firm's failures in certain other areas of Reg SHO compliance, the Firm effected an additional significant but unquantifiable number of short sales without valid locates during the Relevant Period.

4

EXHIBIT E to the Expert Report of J. W. Christian     Page 56 of 119

## A.    The Firm Misapplied Exceptions to Reg SHO's Locate Requirement

Reg SHO allows for certain categories of short sale orders to be treated as exceptions to the locate requirement.[2] However, the SEC specifically stated that Reg SHO only provided for certain "limited" exceptions to the locate requirement. As described below, the Firm misapplied exceptions to the locate requirement during the Relevant Period by improperly treating short sales in certain types of securities as exceptions to the locate requirement, resulting in significant violations of Reg SHO.

Enforcement tested short sales entered through more than a dozen of the Firm's Order Entry Systems ("OESs") during the three-month period June 1, 2006 to August 31, 2006 (the "Sample Period"). Enforcement's investigation uncovered approximately 700,000 short sales that were effected without locates during the Sample Period based upon improper applications of the exceptions to the locate requirement, as described below. Given that the Firm improperly applied these exceptions in some cases for several years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than ten million short sales in improper reliance on an exception to Reg SHO's locate requirement.

*The Firm Improperly Treated Short Sales in Exchange Traded Funds as Exceptions to the Locate Requirement*

The Firm incorrectly programmed a trading system so that two proprietary trading strategies treated all short sale orders in Exchange Traded Funds ("ETFs") as if they were exceptions to Reg SHO's locate requirement. As a result, one strategy improperly failed to obtain locates for short sales in two ETFs from January 2005 until on or about June 29, 2007. The other strategy improperly failed to obtain locates for short sales in eleven different ETFs from January 2005 until it ceased trading in all ETFs in the fall of 2007. The Firm also incorrectly programmed another trading system to allow short sale orders in ETFs to proceed without a locate during the period December 20, 2005 to November 11, 2008.

During the Sample Period, the Firm effected approximately 680,000 proprietary short sale orders in ETFs without locates through these two trading systems. Given that the Firm improperly treated ETFs as exceptions to Reg SHO's locate requirement for nearly three years, extrapolating from the number of violations quantified during the Sample Period indicates that the Firm likely effected more than 7.4 million short sales in ETFs without valid locates.

---

[2] Short sales for which the SEC provided an exception to the locate requirement include broker-dealer to broker-dealer introduced short sales transactions, bona-fide market making activities, and certain short sales that are the result of a convertible security, option or warrant being tendered for conversion or exchange but the underlying security is not reasonably expected to be received in time for settlement.

EXHIBIT E to the Expert Report of J. W. Christian    Page 57 of 119

*The Firm Improperly Treated Certain Short Sale Equity Hedge Transactions as Exceptions to the Locate Requirement*

During the period beginning January 3, 2005 until approximately April 3, 2008, the Firm also improperly treated certain equity hedge transactions effected by its market making unit as exceptions to Reg SHO's locate requirement.[3] Specifically, the Firm effected principal short sales in equity securities to hedge its risk in conjunction with positions it accumulated in connection with its market making activities. The Firm improperly treated these principal equity hedge short sales as exceptions to Reg SHO's locate requirement.

As a result, the Firm improperly released for execution a significant but unquantified number of principal equity hedge short sales without locates over a period of nearly three and a half years. These additional short sales were not quantified given the difficulty in identifying the exact nature and scope of the Firm's equity hedge short sales.

**B.     The Firm Improperly Included Threshold and Hard-to-Borrow Securities on its Easy-to-Borrow List**

Reg SHO allows broker-dealers to satisfy the locate requirement for short sales in certain securities by creating a daily list of equity securities which it deems "easy-to-borrow" ("ETB List"). The inclusion of a security on a firm's ETB List reflects the firm's determination, on the trade date for which the ETB List was created, that it has the ability to easily supply shares of the identified securities, thereby satisfying the reasonable grounds necessary for a broker-dealer to effect short sales in the included securities. Short sales entered in reliance upon a firm's ETB List are therefore considered to be in securities that are "easy-to-borrow" and do not require that a separate locate be otherwise obtained and/or documented.

The SROs release lists of threshold securities at approximately midnight each day. A security that is included on an SRO threshold list is generally not considered "easy-to-borrow." Stock loan departments at broker-dealers also typically make determinations concerning which securities are "hard-to-borrow" ("HTB"), thereby requiring that a separate locate determination be made and documented before releasing such orders for execution.

As described below, the Firm created and distributed ETB Lists that improperly included threshold and HTB securities to UBS's proprietary traders and clients, resulting in more than 900,000 short sale orders that were released for execution without valid locates.

---

[3] In adopting Reg SHO, the SEC did not incorporate an exception from the locate and delivery requirements of Reg SHO for short sales that result in bona-fide fully hedged or arbitraged positions, citing the difficulty of ascertaining the "bona-fide" nature of hedging and arbitrage.

6

EXHIBIT E to the Expert Report of J. W. Christian     Page 58 of 119

*The Firm's Easy-to-Borrow List Creation Process*

On a daily basis, the Firm's securities lending department, called Stock Borrow Loan ("SBL"), created ETB Lists for use by its proprietary trading desks and certain of its clients.  The inclusion of a security on the Firm's ETB List was intended to suffice as a locate in that security for that specified trade date only.  In order to create the ETB Lists, each morning at approximately 1:00 am, SBL first created a master list of securities included in certain indices and removed from this master list any securities that were on the threshold lists published by various SROs at or around midnight.  SBL was then supposed to back out the securities it deemed HTB.  Only after the threshold and HTB securities were removed from the master list was the ETB List supposed to be deemed finalized and made available or distributed to the Firm's proprietary desks and clients.

*The Firm Released ETB Lists to Proprietary Desks and Clients that Included HTB Securities*

Although the ETB Lists were only supposed to be released once finalized, the Firm failed to prevent proprietary trading desks from having access to the ETB Lists before HTB securities had been removed.  As a result, the ETB Lists utilized by these proprietary desks improperly included HTB securities.  These proprietary desks were able to and did release for execution a significant number of short sale orders in HTB securities without a valid locate in misplaced reliance on the securities' appearance on the ETB Lists.

The Firm also provided the unfinished ETB Lists which still included HTB securities to certain clients.  These clients were able to and did enter a significant number of short sale orders in HTB securities, to be executed at UBS, without a valid locate in misplaced reliance on the securities' appearance on the ETB Lists.  The clients that received the unfinished ETB Lists also had the ability to effect short sales in HTB securities away from the Firm.

*The Firm Released to Proprietary Desks and Clients the Prior Trading Days' ETB Lists*

In or about February 2007, the Firm changed the ETB List creation process so that SBL finalized its ETB List at approximately 4:30 pm daily for use the following trading day.  However, some systems continued to use the prior day's ETB List until mid-2008.  The proprietary desks and clients that received this stale ETB List had the ability to and did effect at the Firm a significant number of short sale orders in HTB securities without obtaining a locate.

*The Firm Used a Stale Threshold List to Create its ETB List*

From February 2007 until mid-2008, the Firm's ETB List creation process occurred mid-day for trading the next day.  Thus, the Firm's process excluded

7

securities added to the SRO threshold lists at approximately midnight each day for the next day's trading session. Proprietary desks and clients that received this stale ETB List had the ability to and may have effected at the Firm short sales in threshold securities added to the SRO threshold lists that night without obtaining a locate. Clients that received this stale ETB List also had the ability to effect short sales in threshold securities at locations away from the Firm.

As a result of these deficiencies in the Firm's ETB Lists, during the period January 2005 to August 2008, the Firm released more than 900,000 short sale orders for execution without locates in violation of Reg SHO. Many of these short sale orders were in HTB securities, and some may have been in threshold securities.

C.   **The Firm Permitted Certain Clients to Bypass the Locate Requirement When Entering Short Sales Through the Firm's Direct Execution Services ("DES") Platform**

During the period January 3, 2005 until approximately December 2009, the Firm programmed more than 270 clients ("DES Clients") with the ability to route short sale orders through the Firm's DES platform for execution without first requiring that the DES Clients obtain a locate from the Firm or demonstrate that a locate had been obtained from another recognized lending source.

The Firm's DES platform was normally designed to block short sale orders that did not contain an entry indicating that a locate had first been obtained. However, the Firm altered the programming for these 270 DES Clients to bypass this standard DES platform locate check.[4] As a result, the clients configured to bypass the locate check had the ability to route short sales directly to the market for execution without locates and the Firm did not have adequate controls around that process.

As a result of the aforementioned, during the period January 3, 2005 until in some cases as late as May 2009, 25 DES Clients entered approximately 200,000 short sale orders through the Firm's DES platform without locates. While the majority of these accounts were correctly re-programmed in May 2006, two additional accounts were not corrected until May 2009. Furthermore, as described below, due to the Firm's failure to establish and conduct a meaningful and effective review of its DES Clients' short sales until mid-2009, the Firm failed to detect the majority of these violations. Moreover, the Firm was unable to identify the total number of its DES Clients configured to bypass Reg SHO's locate requirement until in or around December 2009.

---

[4]  The Firm acknowledged that certain of the DES Clients were programmed to bypass the Reg SHO locate requirement, but stated it was unable to determine why those programming changes were made for all of those DES Clients.

8

EXHIBIT E to the Expert Report of J. W. Christian    Page 60 of 119

### D.   The Firm Accepted or Effected Proprietary and Customer Short Sale Orders Without Locates Through its Order Entry Systems

*The Firm's Locate and Documentation Systems and Procedures*

SBL utilized an automated stock lending system referred to as "ASAP" to provide and document locates and maintain the Firm's stock availability information. ASAP also functioned as a method of documenting locate requests the Firm received from proprietary traders and clients, and any subsequent locate requests SBL approved (including the amount of shares approved and the time of approval) or rejected.   Approved locate requests documented in ASAP automatically decremented the Firm's remaining availability in the security. ASAP assigned each approved locate a unique identification code ("ASAP ID") that documented the existence of the locate.

In addition to ASAP, SBL received locate requests via email, telephone and/or instant messaging/chat channels.  Emails, instant messages/chats and written logs of telephone conversations with SBL also served as alternate sources of documented evidence for locates.

*The Firm's Front-End Order Entry Systems Did Not Have the Functionality to Prevent Short Sales Without Valid Locates and the Firm Failed to Have an Effective Post-Trade Locate Review System*

During the Relevant Period, the Firm utilized more than a dozen OESs to enter proprietary and client short sales.  The Firm's OESs contained a dedicated locate field in the order entry screen into which the user was supposed to enter valid locate information when entering a short sale.  The majority of these OESs did not have in place the functionality to automatically "block" or "stop" a short sale order from being released for execution if the locate field was blank or contained an unrecognized or invalid locate source.  Several of the Firm's OESs accepted free-form text in the locate field.  As a result, the entry of any text, including a space or the entry of a meaningless combination of keystrokes which did not represent a valid locate or locate source would suffice for the OES to release the short sale order for execution.

Other OESs had a locate field with a drop-down menu containing standardized entries for identifying the source of a locate, such as "UBS," "SBL," or "Client." However, in the event the user selected either "UBS" or "SBL," thereby indicating that UBS had provided the locate, the OESs did not verify that the Firm had in fact provided the locate as represented.  Similarly, in the event the user selected "Client," the OES did not have the functionality to validate the client-provided locate source.  Therefore, the mere selection of one of these pre-programmed entries was sufficient for the OES to release the short sale order for execution.

9

EXHIBIT E to the Expert Report of J. W. Christian   Page 61 of 119

While a firm's OESs are not required to have an automated "block" or "stop" function or to validate a client-provided locate source, in the absence of such automated functions, a firm must have in place an effective post-trade review of short sales effected through its OESs to determine whether such short sales had valid locates. Despite being aware that its OESs did not have the ability to automatically prevent short sale orders from being released for execution without valid locates, the Firm failed to develop effective post-trade reports or any other review system for all of its customer and proprietary trading to identify short sales entered into its OESs without valid locates as described below.

With respect to customer short selling, the Firm failed to have effective post-trade exception reports for all customer short sales until mid-2006, with the exception of one report that was not put in place until mid-2009. Regarding proprietary short sales, prior to the Fall of 2008, the Firm failed to have effective post-trade exception reports for all of its proprietary short sales except for one report that had been developed for a single system.

Enforcement tested short sales entered through more than a dozen of the Firm's OESs during the Sample Period. Specifically, Enforcement identified numerous instances in which the locate field for proprietary and customer short sale orders was merely left blank or contained invalid locates. The Firm attributed these violations to the following: (1) traders that failed to properly comprehend the locate requirement; (2) a misunderstanding over whether short sales in certain securities such as American Depository Receipts ("ADRs") required locates; and (3) certain traders that wrongly believed a locate could be used over multiple trading days until exhausted.

Also, in numerous instances, a proprietary trader or client indicated that a locate had been obtained from the Firm by entering "UBS" or "SBL" or "ASAP" in the locate field. The purported locate did not exist in ASAP and its existence was not otherwise found in chats, emails or in any other Firm-approved method. Further, in multiple instances, proprietary traders and clients requested a locate from the Firm, the locate request was denied, but the short sale in the subject security was entered without a locate by the requestor. Additionally, in multiple instances, short sales were entered and/or executed for a number of shares in excess of the approved locate amount. Also, on multiple occasions, a short sale order was released for execution before a locate was approved.

In total, Enforcement identified approximately 45,000 short sales without valid locates during the Sample Period alone. Given that most of the OESs reviewed by Enforcement functioned in the same manner for more than four and one-half years (from January 3, 2005 until August 2009), extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely accepted or effected approximately 800,000 short sales in violation of Reg SHO's locate requirement.

10

EXHIBIT E to the Expert Report of J. W. Christian    Page 62 of 119

**E.      The Firm Incorrectly Programmed Certain Accounts and Strategies**

For the three-month Sample Period, Enforcement's investigation also uncovered more than 10,000 short sales that were improperly effected without locates based upon the Firm incorrectly programming accounts or strategies.   Extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely effected more than 100,000 short sales without locates.

**F.      Summary of Rule 203(b)(1) Violations**

Based upon the foregoing, the Firm violated Rule 203(b)(1) of Reg SHO by effecting tens of millions of short sale orders without locates at the times described herein during the Relevant Period.   This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008, both of which require that a firm, in the conduct of its business, observe high standards of commercial honor and just and equitable principles of trade.[5]

**II.      The Firm Failed to Maintain Independent Aggregation Units and to Accurately Document its Aggregation Units**

Rule 200(f) of Reg SHO states that:

> In order to determine its net position, a broker or dealer shall aggregate all of its positions in a security unless it qualifies for independent trading unit aggregation, in which case each independent trading unit shall aggregate all of its positions in a security to determine its net position. Independent trading unit aggregation is available only if: (1) the broker-dealer has a written plan of organization that identifies each aggregation unit, specifies its trading objective(s), and supports its independent identity; (2) each aggregation unit within the firm determines, at the time of each sale, its net position for every security that it trades; (3) all traders in an aggregation unit pursue only the particular trading objective(s) or strategy(s) of that aggregation unit and do not coordinate that strategy with any other aggregation unit; and (4) individual traders are assigned to only one aggregation unit at any time.

Rule 200(f) requires a broker-dealer to maintain independent aggregation units and demonstrate that each aggregation unit is engaged in separate trading strategies without regard to other units, and maintain written plans of organization as a means to demonstrate that each unit is independent.

---

[5] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules including the change of NASD Rule 2110 to FINRA Rule 2010, effective December 15, 2008.

11

EXHIBIT E to the Expert Report of J. W. Christian     Page 63 of 119

Further, in order to maintain the independence of the units, Rule 200(f) requires that a trader be assigned to only one aggregation unit at a time, and limits the trader to pursue only the trading strategies or objectives of that particular aggregation unit. Thus, if two or more traders or groups of traders (*i.e.*, desks) within the same firm coordinate their trading activities, those traders or desks must be in the same aggregation unit. Similarly, a trader assigned to one aggregation unit may not have access to information regarding the positions and/or transactions of any other aggregation unit, as such access in itself creates the ability for a trader to coordinate his trading with that of another aggregation unit.

*The Firm Failed to Maintain Independent Aggregation Units*

For trading purposes, the Firm's proprietary traders and accounts were assigned to different trading books within the Firm's risk management systems. The different trading books in the Firm's risk management systems were supposed to be in accordance with the Firm's aggregation unit assignments. However, in certain circumstances, the Firm's risk management systems failed to accurately reflect the correct traders and accounts in the appropriate trading books. As a result, the Firm's aggregation units, as they functioned through the Firm's risk management systems in calculating net positions, were deficient and inaccurate. In some cases, net positions resulting from the trading activity of traders and accounts assigned to a certain aggregation unit may have been improperly included in the calculation of the positions for other aggregation units. In other cases, trading activity for certain traders and accounts failed to be included in any position calculations for any aggregation units as these traders and accounts were not assigned to any trading group within the Firm's risk management systems. Further, traders assigned to certain aggregation units may have had access to other aggregation units' positions and transactions, and therefore, could have coordinated strategies. As a result of these problems, the Firm failed to maintain independent aggregation units.

The Firm's aggregation unit failures created the probability that sale orders which should have been marked as "short" were instead mismarked as "long," thereby resulting in unquantified violations of Reg SHO's locate requirement. These violations were not quantified given the difficulty in determining the Firm's proprietary net positions across 21 aggregation units.

*The Firm Failed to Maintain Adequate and Accurate Written Plans of Organization*

In addition, from January 2005 through at least the end of 2010, the Firm failed to maintain all required written plans of organization for each of its 21 aggregation units. The few versions of the written plans of organization the Firm did maintain contained inaccuracies in that certain traders and accounts reflected in the Firm's risk management systems were not on the plan, certain accounts were assigned to

12

the incorrect aggregation unit on the written plan, and the plans reflected certain accounts that were not included in the risk management systems.

*Summary of the Firm's Aggregation Unit Failures*

Based upon the foregoing, the Firm violated Rule 200(f) during the period January 3, 2005 through at least the end of 2010 in that it failed to maintain the independence of each of its 21 aggregation units and adequate and accurate written plans of organization for its aggregation units. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

**III.    The Firm's Significant Order Marking Violations**

As effected, Rule 200(g) of Reg SHO required that a broker or dealer mark all sale orders of any equity security as "long," "short" or "short exempt." The accurate marking of sale orders is essential for locate, stock borrow, reporting, record-keeping and execution purposes.

From approximately June 2006 until June 2008, a particular Firm proprietary trading strategy was incorrectly programmed to mark all sale orders in certain securities, such as ETFs, as "long." As a result, for the three-month Sample Period, this strategy mismarked nearly 1.6 million short sale orders as "long." Because locates were not obtained for any of these mismarked short sales, the orders also violated Reg SHO's locate requirement. Given that the mismarkings by this strategy persisted for two years, extrapolating from the number of violations uncovered during the Sample Period indicates that the Firm likely released more than 12 million short sale orders without required locates.

Further, for nearly three months in late 2009, another trading strategy consulted stale start of day position data when marking orders. As a result, more than 400,000 orders were mismarked as "long" or "short." Of these orders, more than 275,000 were actual short sales that were mismarked as "long" and the Firm therefore failed to obtain the required locates. In addition, at least one other system was incorrectly programmed to mark all sale orders as "long." However, these mismarkings did not result in locate violations as the orders were either exceptions to the locate requirement or the locates had been obtained by another system. Also, until at least March 2010, the Firm experienced additional issues that caused certain long sales to be mismarked as "short."

*Summary of the Firm's Order Marking Failures*

Based upon the foregoing, the Firm violated Rule 200(g) during the time periods described above in that it mismarked more than ten million sale orders, including short sales mismarked as "long" that also violated Reg SHO's locate requirement.

13

This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

## IV.    The Firm's Reporting Violations

Pursuant to its reporting obligations, the Firm was required to accurately report sale orders through its automated submissions of trading data ("blue sheets") for regulatory purposes.  Further, the Firm was required to accurately report sale orders for public dissemination and regulatory purposes to a number of trade reporting, quotation display and collection facilities, including the Automated Confirmation Transaction Service ("ACT") and the Order Audit Trail System ("OATS"), by indicating, among other things, whether each sale order was "long," "short" or "short exempt."   However, as the result of the Firm's aforementioned order marking and aggregation unit violations, the Firm inaccurately reported tens of millions of sale orders in violation of its reporting requirements.

*Blue Sheets*

NASD Rules 8211 and 8213 (and later FINRA Rules 8211 and 8213)[6] require that a firm submit transaction data in an automated format to regulators with certain designated information, including the indication of whether a transaction was a purchase, sale, or short sale.  These "blue sheet" submissions are generated by firms at the request of regulators in connection with investigations of questionable trading.  It is the responsibility of firms to reasonably ensure that the information submitted to regulators via blue sheets is accurate, and a firm's reliance on a third party vendor to assist with the preparation of the firm's blue sheets does not alter the firm's duty to comply.

The Firm mismarked sale orders that flowed through to the Firm's blue sheet submissions and caused the Firm to make inaccurate blue sheet submissions of trading data to FINRA.

Based upon the foregoing, the Firm violated NASD Rules 8211 and 8213 during the period January 3, 2005 to December 14, 2008, and FINRA Rules 8211 and 8213 for the period on or after December 15, 2008, in that it failed to accurately report sale orders in its blue sheets.  This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

---

[6] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 8211 and 8213 to FINRA Rules 8211 and 8213, respectively.

14

EXHIBIT E to the Expert Report of J. W. Christian    Page 66 of 119

*Trade Reporting Rules Generally*

The NASD 4000, 5000, 6000 and 7000 Rule Series (and later FINRA 6000 and 7000 Rule Series)[7] require that firms report certain over-the-counter ("OTC") transactions in equity securities to transaction reporting, quotation display and collection facilities for public dissemination and regulatory purposes. Transactions must be reported to a FINRA facility such as a Trade Reporting Facility ("TRF"), the Alternative Display Facility ("ADF"), or the OTC Reporting Facility ("ORF").[8] Firms are required to accurately report these transactions by indicating, among other things, whether a transaction was a "buy," "sell" or "sell short."

*ACT Reporting*

NASD Rule 6130 (and later FINRA Rules 7230A and 7330)[9] requires that firms report transactions to ACT for a number of regulatory purposes, including but not limited to indicating whether a transaction was a "buy," "sell" or "sell short."

The Firm mismarked sale orders that flowed through to the Firm's ACT reports and caused the inaccurate reporting of such sale orders.

Based upon the foregoing, the Firm violated NASD Rule 6130 during the period January 3, 2005 to December 14, 2008, and FINRA Rules 7230A and 7330 during the period on or after December 15, 2008, in that it failed to accurately report sale orders to ACT. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

*OATS Reporting*

During the Relevant Period, the Firm was a "Reporting Member" within the definition set forth in NASD Rule 6951(n) (and later FINRA Rule 7410(n)). Pursuant to NASD Rule 6955(a) (and later FINRA Rule 7450(a)), the Firm was required to transmit to OATS the order information specified in NASD Rule 6954

---

[7] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the transfer of the NASD Marketplace Rules (the NASD Rule 4000 through 7000 Series) to the consolidated FINRA rulebook as the FINRA Rule 6000 through 7000 Series. *See also* FINRA Trade Reporting Frequently Asked Questions (FAQ), available at: http://www.finra.org/Industry/Regulation/Guidance/p038942.

[8] The TRFs are facilities through which firms report transactions in NMS stocks, as defined in SEC Rule 600(b)(47) of Regulation NMS, effected otherwise than on an exchange. FINRA has established the following TRFs (each in conjunction with the pertinent Exchange): the FINRA/NASDAQ TRF and the FINRA/NYSE TRF. The ADF is both a trade reporting and quotation display and collection facility for purposes of transactions in NMS stocks effected otherwise than on an exchange. The ORF is the facility through which members report OTC transactions in OTC Equity Securities and Restricted Equity Securities, as those terms are defined in FINRA Rule 6420.

[9] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, including the change of NASD Rule 6130 to FINRA Rules 7230A and 7330, effective December 15, 2008.

15

EXHIBIT E to the Expert Report of J. W. Christian   Page 67 of 119

(and later FINRA Rule 7440), including, among other things, the designation of an order as a "short sale order."[10]

The Firm mismarked sale orders that flowed through to the Firm's OATS reports and caused the inaccurate transmittal of such sale orders.

Based upon the foregoing, the Firm violated NASD Rules 6954 and 6955(a) during the period January 3, 2005 to December 14, 2008, and FINRA Rules 7440 and 7450(a) during the period on or after December 15, 2008, in that it failed to accurately transmit sale orders to OATS. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

**V.     The Firm Failed to Create and Maintain Certain Accurate Books and Records**

Under Section 17(a) of the Exchange Act and Rule 17a-3 thereunder, firms are required to make and keep current and accurate books and records relating to its business, including, but not limited to, daily records of all sales of securities, and a memorandum of each purchase and sale for every customer and account of the firm. NASD Rule 3110(a) requires that firms make and preserve books, accounts, records, memoranda and correspondence in conformity with applicable laws, rules, regulations and statements of policy promulgated thereunder, and with the Rules of the NASD, and as prescribed by Exchange Act Rule 17a-3.

As previously described, the Firm failed to create and maintain accurate versions of its ETB Lists from January 2005 until August 2008. Further, the Firm failed to maintain accurate versions of its written plans of organization for its aggregation units from January 2005 until at least December 2010. Moreover, the Firm failed to maintain accurately marked sale orders from January 2005 until at least March 2010.

Based upon the foregoing, the Firm violated Section 17(a) of Exchange Act and Rule 17a-3 thereunder and NASD Rule 3110(a) during the period January 3, 2005 to approximately December 2010 in that it failed to maintain accurate books and records. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

---

[10] *See* FINRA Regulatory Notice 08-57, which describes certain changes to FINRA's rules, effective December 15, 2008, including the change of NASD Rules 6951(n), 6954 and 6955(a) to FINRA Rules 7410(n), 7440 and 7450(a), respectively.

16

EXHIBIT E to the Expert Report of J. W. Christian    Page 68 of 119

## VI.   Systemic Supervisory Violations: The Firm's Reg SHO Supervisory and Compliance Monitoring Program was Deficient

NASD Rule 3010 requires that firms establish and maintain a supervisory system, including written supervisory procedures related to their business, that is reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules.

As described below, it was not until at least 2009 that the Firm's supervisory framework over its equities trading business was reasonably designed to achieve compliance with the requirements of Reg SHO and other securities laws, rules and regulations described herein. The Firm failed to adequately supervise locates and order marking for short sale orders by its equities trading business. In particular, while the Firm designated its equities trading desks' heads ("Desk Heads") with the primary responsibility for Reg SHO supervision, it failed to provide for reasonable oversight to monitor whether and how the Reg SHO supervisory responsibilities were actually carried out. Among other problems, the Firm had substantial deficiencies in its Reg SHO-related: (1) supervisory structure in light of its complex equities trading activities; (2) written supervisory procedures; (3) supervisory reports; (4) supervision over the operation of its OESs; (5) information technology change control protocols; and (6) training for certain employees. Further, the Firm's Reg SHO compliance monitoring program was inadequate.

By designating the Desk Heads as the primary supervisors for compliance with Reg SHO, without providing adequate tools for their supervision or meaningful oversight, the Firm's aforementioned failures persisted for extended periods of time. As a result, the Firm failed to detect or prevent the substantial and persistent locate, aggregation unit, order marking, reporting, and books and records violations described in this AWC.

### A.   The Firm Failed to Establish and Maintain a Reasonable Supervisory System for Reg SHO Compliance

*The Firm Failed to Reasonably Supervise for Compliance with Reg SHO*

The Firm designated its Desk Heads with primary Reg SHO supervisory responsibility, including reviewing the activities of the traders on their respective desks. The Desk Heads were supported in their Reg SHO supervisory responsibilities by a Regulatory Control Group ("RCG"). With respect to Reg SHO compliance, RCG was responsible for: (1) creating written supervisory procedures with input from the Compliance Department; (2) working with UBS's Information Technology ("IT") group on various regulatory compliance systems and on developing supervisory reports for the review of trading activity; and (3) conducting reviews of trading activity.

EXHIBIT E to the Expert Report of J. W. Christian   Page 69 of 119

However, not all these responsibilities were fully carried out on every trading desk. On some trading desks, adequate written supervisory procedures were not created, IT changes were made which negatively affected regulatory compliance, and/or supervisory reports were not developed and/or reviewed.

The Desk Heads and RCG were required to utilize a centralized on-line supervisory tool created by the Firm to document that their Reg SHO-related supervisory reviews for each trading desk had occurred. However, this on-line tool did not always provide for a specific report or review for certain trading desks. Further, in some instances, Desk Heads or RCG indicated in the on-line supervisory tool that the supervisory reviews for certain trading desks had taken place when in fact no specific Reg SHO-related reviews had been performed.

*The Firm Failed to Perform Adequate Oversight of its Trading Desks for Reg SHO Supervision*

The Firm failed to develop an adequate system of oversight to monitor the performance of the Reg SHO-related responsibilities assigned to the Desk Heads and RCG. In addition, the Firm failed to establish adequate policies and procedures for the escalation of any potential Reg SHO-related issues or "red flags" to appropriate persons outside of the trading desks.

The Firm's assignment of primary Reg SHO supervisory responsibility to the Desk Heads, and its failure to implement adequate oversight of the trading desks to determine whether each Desk Head was actually carrying out its Reg SHO-related responsibilities, contributed to the Firm's failure to recognize the numerous issues that resulted in the significant violations described above.

**B.** **The Firm Failed to Reasonably Supervise and Establish, Maintain and Enforce Written Supervisory Procedures Reasonably Designed to Achieve Compliance with Reg SHO**

The Firm's written supervisory procedures ("WSPs") relating to Reg SHO were defective in several ways. Among other things: (1) the WSPs failed to clearly describe the reviews to be performed with respect to Reg SHO; (2) the WSPs did not adequately explain how supervisors should perform Reg SHO reviews; (3) some WSPs failed to include protocols for escalating issues noted by supervisors in the course of their responsibilities; and (4) the WSPs did not consistently include information on how supervisors were to document their Reg SHO reviews. As an example of these deficiencies, a number of WSPs simply made reference to the "affirmative determination" requirement of Reg SHO without providing further detail about any such review that should be performed to monitor for compliance with Reg SHO's locate requirement.

18

EXHIBIT E to the Expert Report of J. W. Christian    Page 70 of 119

### The Firm Failed to Prevent the Misapplication of Exceptions to the Locate Requirement

Until at least the end of 2008, the Firm failed to reasonably supervise and have adequate policies and procedures to supervise the application of exceptions to the locate requirement. As earlier described, certain of the Firm's trading desks misapplied exceptions to the locate requirement, without consultation with or approval from any supervisory department outside of the trading desks. Specifically, from January 3, 2005 through at least the end of 2008, the Firm did not have a formal mechanism in place, including maintaining records or documentation, to determine which trading desks or accounts were actually using exceptions to the locate requirement and whether those exceptions were being properly utilized.

### The Firm Failed to Properly Construct and Distribute ETB Lists

Until approximately August 2008, the Firm failed to reasonably supervise the compilation and distribution of its ETB Lists. As earlier described, the Firm improperly included certain threshold securities and HTB securities on ETB Lists disseminated to the Firm's proprietary traders and clients. As a result, the Firm and its clients effected a significant number of short sales in HTB securities and may have effected short sales in threshold securities without valid locates.

### The Firm Failed to Prevent Short Sales from Being Entered Without Locates through its OESs and Failed to Perform Adequate Post-trade Reviews

Until approximately 2009, the Firm failed to reasonably supervise its compliance with Reg SHO's locate requirement. As earlier described, the Firm utilized more than a dozen OESs to enter client and proprietary short sales. Certain of these OESs allowed short sale orders without valid locates to be released for execution. However, the Firm failed to develop an adequate system for the post-trade review of short sales to identify all short sales entered into its OESs without valid locates. As a result, for years the Firm failed to detect that short sales were effected through its OESs without locates.

### The Firm Failed to Maintain Independent Aggregation Units and Adequate Written Plans of Organization

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures to maintain independent aggregation units and adequate written plans of organization for its 21 aggregation units. As earlier described, some of the Firm's aggregation units were not independent in that in certain circumstances, the Firm's risk management systems failed to accurately reflect the correct traders and accounts in the appropriate trading books. Further, the Firm's written plans of organization were inaccurate in that certain traders and accounts reflected in the Firm's risk management systems were not on the plans,

19

EXHIBIT E to the Expert Report of J. W. Christian    Page 71 of 119

certain accounts were assigned to the incorrect aggregation unit on the written plans, and the plans reflected certain accounts that were not included in the risk management systems. The Firm failed to detect the deficiencies in its aggregation units and written plans of organization, and was, in some instances, unable to accurately determine its proprietary net positions and accurately mark its sale orders.

*The Firm Failed to Properly Mark Sale Orders*

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures to properly mark sale orders. As earlier described, the Firm mismarked a significant number of sale orders, including short sales mismarked as "long" that also violated Reg SHO's locate requirement.

*The Firm Failed to Maintain Accurate Books and Records and Submitted Inaccurate Trade Data on its Blue Sheets, ACT and OATS Reports*

During the Relevant Period, the Firm failed to reasonably supervise to maintain accurate books and records and submit accurate trade data on its blue sheets, ACT and OATS reports. As earlier described, the Firm failed to maintain certain accurate books and records and submitted a significant amount of inaccurate trade data on its blue sheets, ACT and OATS reports.

**C.     The Firm Failed to Supervise its Systems and Lacked Adequate IT Change Protocols Affecting Reg SHO Compliance**

During the Relevant Period, the Firm failed to reasonably supervise and have adequate policies and procedures in place to monitor or approve IT-related additions or changes to its systems. The Firm had no formal process in place for trading desks to obtain approval before initiating new trading strategies or making modifications to existing systems. As such, trading desks implemented and made unapproved changes to the Firm's systems without an adequate assessment of the potential regulatory impact of such changes, including changes that impacted the Firm's compliance with the locate and order marking requirements of Reg SHO. Further, because the Firm's IT implementation and change control processes were decentralized across its trading desks, and the Firm failed to keep pace with the growth, complexity and number of electronic trading systems used by UBS to trade equities, the Firm failed to develop established and consistent protocols for all trading desks to follow when making IT changes to the Firm's existing systems.

As a result, the Firm was unaware of certain changes made to its systems by its trading desks, including the implementation and use of a trading strategy or the coding of certain accounts and strategies, and the Firm failed to detect the violations caused by such changes to its systems. Further, certain DES Clients were programmed to bypass Reg SHO's locate requirement in the Firm's OESs.

EXHIBIT E to the Expert Report of J. W. Christian     Page 72 of 119

However, the Firm failed to have a supervisory process in place to monitor those DES Clients' trading for compliance with the locate requirement.

**D.     The Firm Failed to Adequately Educate and Train Its Personnel With Regard to Compliance with Reg SHO**

In response to Enforcement's inquiry regarding the causes of specific violations, the Firm stated that certain employees misunderstood Reg SHO's requirements, including mistaken beliefs that: (i) short sales of certain types of securities, including ADRs and ETFs, did not require locates; (ii) locates could be used over multiple days; and (iii) short sales were exceptions to the locate requirement based on the "tick test" pilot program and subsequent rule change. The Firm failed to adequately educate these personnel with regard to the requirements of Reg SHO.

**E.     The Firm's Reg SHO Compliance Monitoring Program was Inadequate**

In light of the highly decentralized way in which the Firm assigned supervisory responsibility for Reg SHO compliance to the Desk Heads, UBS failed to establish an adequate system to monitor and test whether such supervisory responsibilities were being adequately carried out by the trading desks until at least December 2009. The Firm also failed to review its order entry, order marking and locate protocols to confirm that they were functioning in compliance with Reg SHO. Specifically, until November 2006, the Firm lacked monitoring reports that focused on locates and order marking and did not otherwise reasonably surveil for these Reg SHO requirements.

Further, the Firm did not perform adequate oversight of its equities trading desks to determine whether adequate policies, procedures and systems for Reg SHO compliance had been established and/or reviews were occurring on such desks.

**F.     Summary of Supervisory Violations**

Based upon the foregoing, the Firm violated NASD Rule 3010 in that it failed to establish and maintain a supervisory system, including written supervisory procedures, that was reasonably designed to achieve compliance with the applicable securities laws, regulations and SRO rules. This violative conduct also constituted a violation of NASD Conduct Rule 2110 during the period January 3, 2005 to December 14, 2008, and FINRA Rule 2010 on or after December 15, 2008.

EXHIBIT E to the Expert Report of J. W. Christian    Page 73 of 119

## OTHER FACTORS

*The Firm's Corrective Actions during the Course of FINRA Enforcement's Investigation*

FINRA notes that as the system-related locate and order marking problems described above were identified during the course of FINRA Enforcement's investigation, the Firm implemented changes to its systems and procedures that were designed to prevent a recurrence of these violations.

*The Firm's Substantial Assistance to FINRA Enforcement's Investigation*

FINRA acknowledges that in 2010, the Firm undertook an internal review of its supervisory policies, procedures and systems relating to Reg SHO. The Firm reported the findings of its internal investigation to FINRA. The sanctions below reflect the credit that UBS has been given for conducting an investigation of these issues and providing the results to FINRA.

B.   The Respondent also consents to the imposition of the following sanctions:

Censure; and

Fine in the amount of $12,000,000.

The Respondent agrees to pay the monetary sanction(s) upon notice that this AWC has been accepted and that such payment(s) are due and payable. The Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

The Respondent specifically and voluntarily waives any right to claim that it is unable to pay, now or at any time hereafter, the monetary sanction(s) imposed in this matter.

The sanctions imposed herein shall be effective on a date set by FINRA staff.

## II.

## WAIVER OF PROCEDURAL RIGHTS

The Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.   To have a Complaint issued specifying the allegations against the Respondent;

22

B.   To be notified of the Complaint and have the opportunity to answer the allegations in writing;

C.   To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made and to have a written decision issued; and

D.   To appeal any such decision to the National Adjudicatory Council ("NAC") and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, the Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the General Counsel, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including acceptance or rejection of this AWC.

The Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

### III.

### OTHER MATTERS

The Respondent understands that:

A.   Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs ("ODA"), pursuant to FINRA Rule 9216;

B.   If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against the Respondent; and

C.   If accepted:

1.   This AWC will become part of the Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA or any other regulator against the Respondent;

23

EXHIBIT E to the Expert Report of J. W. Christian    Page 75 of 119

2.   This AWC will be made available through FINRA's public disclosure program in response to public inquiries about Respondent's disciplinary record;

3.   FINRA may make a public announcement concerning this agreement and the subject matter thereof in accordance with FINRA Rule 8313; and

4.   The Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression that the AWC is without factual basis. The Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects the Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party.

D.   The Respondent may attach a Corrective Action Statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. The Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this Statement. This Statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA or its staff.

The undersigned, on behalf of the Firm, certifies that a person duly authorized to act on its behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that Respondent has agreed to its provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth herein and the prospect of avoiding the issuance of a Complaint, has been made to induce the Firm to submit it.

10/14/2011
Date (mm/dd/yyyy)

UBS Securities LLC

By: _____
[Name]   Bryan M. Murtagh
[Title]   Managing Director

By: _____
[Name]   Abby Meiselman
[Title]   Managing Director

24

Reviewed by:

Ben A. Indek, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: (212) 309-6109
Fax: (212) 309-6001
bindek@morganlewis.com

25

Accepted by FINRA:

_____
Date    /6-2*-11

                              Signed on behalf of the
                              Director of ODA, by delegated authority

                              _____
                              Richard R. Best
                              Chief Counsel
                              FINRA Department of Enforcement
                              14 Wall Street, 14th Floor
                              New York, New York 10005
                              Tel: (646) 315-7308
                              Fax: (202) 689-3424
                              richard.best@finra.org

26

EXHIBIT E to the Expert Report of J. W. Christian    Page 78 of 119

# JPMorgan Asia Units Fined for Regulatory Breaches in Hong Kong

Cathy Kit Ching Chan
chan_cat

December 15, 2015 — 4:43 AM CST

▶ Fines total HK$30 million after firm cooperates with probe

▶ Breaches from 2010 to 2013 included naked short-selling

JPMorgan Chase & Co. units were fined HK$30 million ($3.9 million) in Hong Kong for regulatory breaches by the firm's institutional equities business between 2010 and 2013, including breaking a ban on so-called naked short-selling.

Failures connected with principal trading and dark liquidity pool trading also occurred, the Securities and Futures Commission said in a statement on Tuesday.

Between May 2010 and February 2013, mistakes in aggregating positions to determine whether they were net long or net short resulted in more than 41,000 uncovered short-sale trades being wrongly conducted as long-sale trades, the SFC said. In Hong Kong, "naked" or "uncovered" short selling, where investors short sell a security before borrowing it, is prohibited.

"We have fully co-operated with the SFC and are pleased to have resolved these legacy issues in relation to certain aspects of our systems and controls in the institutional equities business in Hong Kong," Marie Cheung, a JPMorgan spokeswoman, said in an e-mail. "The firm has strengthened its internal systems and controls to ensure compliance with the prevailing rules and regulations."

Among other deficiencies described by the SFC:

* A sample review revealed that 34 percent of short-selling orders in May 2012 from two JPMorgan units for principal trading lacked the appropriate "documentary assurance."

* Between January 2011 and December 2012, JPMorgan lacked adequate systems and controls to prevent

EXHIBIT E to the Expert Report of J. W. Christian    Page 79 of 119

client facilitation trades being executed without client consent.

* Agency orders were wrongly mixed with principal orders in dark liquidity pool operations.

The penalties took into account JPMorgan's cooperation and clean disciplinary record, the regulator said.

Before it's here, it's on the Bloomberg Terminal.

• Asia Finance • Markets • JPMorgan Chase & Co • Hong Kong • Asia

# Ex-Goldman Macro Trader Lim Reopens $1.1 Billion Hedge Fund

Bei Hu
BeiHu1

January 18, 2016 — 6:27 PM CST Updated on January 18, 2016 — 10:00 PM CST

▶ Leland Lim's Guard macro hedge fund returned 8.1% in 2015

▶ Guard hires former Asia head of Roubini Global Economics

Guard Capital Management, the Hong Kong-based firm led by former Goldman Sachs Group Inc. trader Leland Lim, reopened its macro hedge fund to new investors this month after outperforming peers in 2015, said a person with knowledge of the matter.

EXHIBIT E to the Expert Report of J. W. Christian    Page 80 of 119

The company also hired Don Hanna, who ran the Asia office of Roubini Global Economics, and Michael Stenske, a former Ernst & Young partner, said the person, who asked not to be identified as the information is private. Guard's fund returned 8.1 percent last year, said two people familiar with the firm. Since its inception in August 2014, investor inflows helped assets surge from $50 million to $1.1 billion, the people said.

Guard outperformed in a year when many funds seeking to profit from broad trends in the currency, stock, bond and commodity markets stumbled, including Brevan Howard Asset Management, whose main macro hedge fund lost money in 2015. Macro hedge funds on average gained 1.7 percent last year, according to preliminary data from Singapore-based Eurekahedge Pte.

## Concentrated Bets

Guard is known for concentrated bets on currencies and interest rates, making both long-term investments based on fundamental analysis and shorter-term tactical moves. It stopped taking money from new investors in July, while allowing existing investors to add deposits, after assets soared 18-fold in its first year.

Lim, a former co-head of Asia-Pacific macro trading at Goldman Sachs, co-founded Guard with Allan Bedwick, who led such trading for Singapore-listed commodity trader Noble Group Ltd. Lim didn't reply to an e-mail seeking comment.

As assets have grown, Guard hired Hanna for its research team, said one of the people. Hanna, who most recently worked at the research firm chaired by economist Nouriel Roubini, had previously been a managing director of New York-based alternative investment firm Fortress Investment Group LLC.

Guard hired Stenske as its chief financial officer, according to the person and Stenske's LinkedIn profile. The two, plus three other research and trading hires, will expand staff size to 15 by early next month, said the person. The other new hires include Fiona Lake, previously a global markets economist at Goldman Sachs, Wang Daili, an economist who worked with Hanna at Roubini Global Economics and Harry Carsch, a trader who joined from Civic Capital Advisors.

## Challenging Market

Widely anticipated trends such as the strengthening of the greenback against the euro, yen and emerging-markets currencies played out in 2015, Anthony Lawler, a money manager at GAM Holding, which invests in hedge funds, wrote in a Dec. 14 note. Yet "the volatility, choppiness and crowdedness along the way proved challenging, manifesting in some losses from risk-management trading and related trade timing," he added.

EXHIBIT E to the Expert Report of J. W. Christian    Page 81 of 119

Michael Platt's $8 billion BlueCrest Capital Management announced in December that it was returning all client money to focus on managing wealth of Platt and his employees after billions of dollars in withdrawals and poor returns. BlackRock Inc., the world's largest asset manager, Fortress Investment Group LLC and Bain Capital have also shut down macro hedge funds after losses and as redemptions eroded assets.

Before it's here, it's on the Bloomberg Terminal.

---

• Markets • Goldman Sachs Group Inc/The • Hedge Funds • Guard Capital

EXHIBIT E to the Expert Report of J. W. Christian   Page 82 of 119

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- x
U.S. SECURITIES AND EXCHANGE          :
COMMISSION,                           :
                                      :          11 Civ. 7387 (JSR)
            Plaintiff,                :
                                      :          OPINION AND ORDER
            -v-                       :
                                      :
CITIGROUP GLOBAL MARKETS INC.,        :
                                      :
            Defendant.                :
-------------------------------------- x

```
┌──────────────────────────────┐
│ USDC SDNY                     │
│ DOCUMENT                      │
│ ELECTRONICALLY FILED          │
│ DOC #:                        │
│ DATE FILED: 11/28/11          │
└──────────────────────────────┘
```

JED S. RAKOFF, U.S.D.J.

On October 19, 2011, the U.S. Securities and Exchange Commission

(the "S.E.C.") filed this lawsuit, accusing defendant Citigroup

Global Markets Inc. ("Citigroup") of a substantial securities fraud.

According to the S.E.C.'s Complaint, after Citigroup realized in

early 2007 that the market for mortgage-backed securities was

beginning to weaken, Citigroup created a billion-dollar Fund (known

as "Class V Funding III") that allowed it to dump some dubious assets

on misinformed investors.  This was accomplished by Citigroup's

misrepresenting that the Fund's assets were attractive investments

rigorously selected by an independent investment adviser, whereas in

fact Citigroup had arranged to include in the portfolio a substantial

percentage of negatively projected assets and had then taken a short

position in those very assets it had helped select. Complaint ¶¶ 1,

2, 58.  Having structured the Fund as a vehicle for unloading these

1

dubious assets on unwitting investors, id. ¶ 44, Citigroup realized

net profits of around $160 million, id. ¶ 63, whereas the investors,

as the S.E.C. later revealed, lost more than $700 million.  See

S.E.C.'s Memorandum of Law in Response to Questions Posed by the

Court Regarding Proposed Settlement ("SEC Mem.") at 17.

    In a parallel Complaint filed the same day against Citigroup

employee Brian Stoker, see U.S. Securities and Exchange Commission v.

Brian H. Stoker, 11 Civ. 7388 (JSR),[1] the S.E.C. alleged that

Citigroup knew in advance that it would be difficult to sell the Fund

if Citigroup disclosed its intention to use it as a vehicle to unload

its hand-picked set of negatively projected assets, see Stoker

Complaint ¶ 25. Specifically, paragraph 25 of the Stoker Complaint

alleges (in language some of which is notably missing from the

Citigroup Complaint) that:

> Citigroup knew it would be difficult to place the
> liabilities of [the Fund] if it disclosed to investors
> its intention to use the vehicle to short a hand-picked
> set of [poorly rated assets] .... By contrast,
> Citigroup knew that representing to investors that an
> experienced third-party investment adviser had selected
> the portfolio would facilitate the placement of the [Fund's]
> liabilities. (emphasis supplied)

    Although this would appear to be tantamount to an allegation of

knowing and fraudulent intent ("scienter," in the lingo of securities

law), the S.E.C., for reasons of its own, chose to charge Citigroup

---

[1] Nothing in this Opinion and Order has any bearing on the case against Stoker,
which is currently scheduled to commence trial on July 16, 2012.

2

EXHIBIT E to the Expert Report of J. W. Christian    Page 84 of 119

only with negligence, in violation of Sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2) and (3). Complaint ¶ 65.

Simultaneously with the filing of its Complaint against Citigroup, the S.E.C. presented to the Court for its signature a "Final Judgment As To Defendant Citigroup Global Markets Inc." (the "Consent Judgment"), together with a Consent of Defendant Citigroup Global Markets Inc. (the "Consent") that recited that Citigroup consented to the entry of the Consent Judgment "[w]ithout admitting or denying the allegations of the complaint ...." Consent ¶ 2. The Consent Judgment (I) "permanently restrained and enjoined" Citigroup and its agents, employees, etc., from future violations of Sections 17(a)(2) and (3) of the Securities Act, (II) required Citigroup to disgorge to the S.E.C. Citigroup's $160 million in profits, plus $30 million in interest thereon, and to pay to the S.E.C. a civil penalty in the amount of $95 million, and (III) required Citigroup to undertake for a period of three years, subject to enforcement by the Court, certain internal measures designed to prevent recurrences of the securities fraud here perpetrated.

Upon receipt of these submissions, the Court, by Order dated October 27, 2011, put some questions to the parties concerning the proposed Consent Judgment, to which the parties responded both in writing, see SEC Mem., supra, and Memorandum on Behalf of Citigroup Global Markets Inc. in Support of the Proposed Final Judgment and

3

EXHIBIT E to the Expert Report of J. W. Christian    Page 85 of 119

Consent ("Citigroup Mem."), and orally, see transcript of oral argument, 11/9/11 ("Tr."). Since then, the Court has spent long hours trying to determine whether, in view of the substantial deference due the S.E.C. in matters of this kind, the Court can somehow approve this problematic Consent Judgment. In the end, the Court concludes that it cannot approve it, because the Court has not been provided with any proven or admitted facts upon which to exercise even a modest degree of independent judgment.

The Court turns first to the standard of review. In its original Memorandum in support of the proposed Consent Judgment, filed before the case had been assigned to any judge, the S.E.C. expressly endorsed the standard of review set forth by this Court in its Bank of America decisions, i.e., "whether the proposed Consent Judgment ... is fair, reasonable, adequate, and in the public interest." Memorandum By Plaintiff Securities and Exchange Commission in Support of Proposed Settlement at 5 (quoting with approval SEC v. Bank of America Corp., 653 F. Supp. 2d 507, 508 (S.D.N.Y. 2009)("Bank of America I")); see also SEC v. Bank of America Corp., 2010 WL 624581, at *6 (S.D.N.Y. Feb. 22, 2010)("Bank of America II"). This was also the S.E.C.'s stated position in another, intervening proceeding before this Court, SEC v. Vitesse Semiconductor Corp., 771 F. Supp. 2d 304 (S.D.N.Y. 2010).

EXHIBIT E to the Expert Report of J. W. Christian    Page 86 of 119

In its most recent filing in this case, however, the S.E.C. partly reverses its previous position and asserts that, while the Consent Judgment must still be shown to be fair, adequate, and reasonable, "the public interest ... is not part of [the] applicable standard of judicial review." SEC Mem. at 4 n. 1.  This is erroneous. A large part of what the S.E.C. requests, in this and most other such consent judgments, is injunctive relief, both broadly, in the request for an injunction forbidding future violations, and more narrowly, in the request that the Court enforce future prophylactic measures (here, for a three-year period).  The Supreme Court has repeatedly made clear, however, that a court cannot grant the extraordinary remedy of injunctive relief without considering the public interest. See, e.g., eBay, Inc. v. MercExchange, 547 U.S. 388, 391 (2006)("According to well-established principles of equity, a plaintiff seeking a permanent injunction ... must demonstrate ... that the public interest would not be disserved by a permanent injunction.").  Indeed, the Court has held that "'In exercising their discretion, courts ... should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Similarly, the Second Circuit has repeatedly stated, most recently in Salinger v. Colting, 607 F.3d 68, 80 (2d Cir. 2010), that

EXHIBIT E to the Expert Report of J. W. Christian    Page 87 of 119

a court "must ensure that the public interests would not be disserved by the issuance" of an injunction. Id. at 80.

As a fall-back, the S.E.C. suggests that, if the public interest must be taken into account, the S.E.C. is the sole determiner of what is in the public interest in regard to Consent Judgments settling S.E.C. cases. See SEC Mem. at 4 n.1 (citing SEC v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984). That, again, is not the law.   Although in its somewhat delphic decision in Randolph the Ninth Circuit found that, on the facts of that case, there was no difference between the requirement of reasonableness and the requirement of being in the public interest, it was emphatic in upholding "the appropriateness of a requirement that the decree be in the public interest." Id. at 529. More pertinently, the D.C. Circuit, in United States v. Trucking Employers. Inc., 561 F.2d 313 (DC Cir. 1977), reaffirmed that "prior to approving a consent decree a court must satisfy itself of the settlement's 'overall fairness to beneficiaries and consistency with the public interest.'" Id. at 319   (quoting United States v. Allegheny Ludlum Industries, 517 F.2d 826, 850 (5th Cir. 1975)(emphasis supplied).  As these and similar authorities make plain, a court, while giving substantial deference to the views of an administrative body vested with authority over a particular area, must still exercise a modicum of independent judgment in determining whether the requested deployment of its injunctive powers will serve,

6

EXHIBIT E to the Expert Report of J. W. Christian    Page 88 of 119

or disserve, the public interest.  Anything less would not only violate the constitutional doctrine of separation of powers but would undermine the independence that is the indispensable attribute of the federal judiciary.

As a practical matter, moreover, and as Randolph implies, the requirement that a consent judgment be in the public interest is not meaningfully severable from the requirements, still acknowledged by the S.E.C., that the consent judgment be fair, reasonable, and adequate; for all these requirements inform each other.  For example, before the Court determines whether the proposed Consent Judgment is adequate, it must answer a preliminary question: adequate for what purpose?  The answer, at least in part, is that the settlement must be adequate to ensure that the public interest is protected.  See Randolph, 736 F.2d at 529 ("the SEC ought to always be required to serve the public interest").  The same analysis applies to the determination of the fairness of the settlement.  Before the Court determines whether the settlement is fair, it must ask a preliminary question: fair to whom?  As the holding of Trucking Employers quoted above makes plain, the answer is fair to the parties and to the public.

Without multiplying examples, it is clear that before a court may employ its injunctive and contempt powers in support of an administrative settlement, it is required, even after giving

7

EXHIBIT E to the Expert Report of J. W. Christian    Page 89 of 119

substantial deference to the views of the administrative agency, to be satisfied that it is not being used as a tool to enforce an agreement that is unfair, unreasonable, inadequate, or in contravention of the public interest.

Applying these standards to the case in hand, the Court concludes, regretfully, that the proposed Consent Judgment is neither fair, nor reasonable, nor adequate, nor in the public interest. Most fundamentally, this is because it does not provide the Court with a sufficient evidentiary basis to know whether the requested relief is justified under any of these standards. Purely private parties can settle a case without ever agreeing on the facts, for all that is required is that a plaintiff dismiss his complaint.[2] But when a public agency asks a court to become its partner in enforcement by imposing wide-ranging injunctive remedies on a defendant, enforced by the formidable judicial power of contempt,[3] the court, and the public, need some knowledge of what the underlying facts are: for otherwise, the court becomes a mere handmaiden to a settlement privately negotiated on the basis of unknown facts, while the public

---

[2] When the private parties go further and ask a court to retain jurisdiction to enforce the settlement, a court has total discretion whether or not to do so, see generally Kokkonen v. Guardian Life Insurance Co., 511 U.S. 375, 381 (1994), and many judges in this District routinely decline to approve a stipulation of the parties that so provides.

[3] The Second Circuit has described the contempt power as "among the most formidable weapons in the court's arsenal." United States v. Local 1804-1, Int'l Longshoremen's Ass'n, AFL-CIO, 44 F.3d 1091, 1095 (2d Cir. 1995).

8

EXHIBIT E to the Expert Report of J. W. Christian    Page 90 of 119

is deprived of ever knowing the truth in a matter of obvious public importance.

Here, the S.E.C.'s long-standing policy – hallowed by history, but not by reason – of allowing defendants to enter into Consent Judgments without admitting or denying the underlying allegations,[4] deprives the Court of even the most minimal assurance that the substantial injunctive relief it is being asked to impose has any basis in fact.  There is little real doubt that Citigroup contests the factual allegations of the Complaint.  In colloquy with the Court, counsel for Citigroup expressly reconfirmed that his client was not admitting the allegations of the Complaint, see tr. 13. He also noted, correctly, that he was free – notwithstanding the S.E.C.'s gag order precluding Citigroup from contesting the S.E.C.'s allegations in the media[5] – to fully contest the facts in any parallel litigation; and he strongly hinted that Citigroup would do just that. Tr. 26-27; see also Citibank Mem. at 7-8, 11.

The S.E.C., by contrast, took the position that, because Citigroup did not expressly deny the allegations, the Court, and the

---

[4] See Vitesse, 771 F. Supp. 2d at 308-10 (tracing the history of the policy).

[5] On its face, the SEC's no-denial policy raises a potential First Amendment problem.  See Vitesse, 771 F. Supp. 2d at 309 ("[H]ere an agency of the United States is saying, in effect, 'Although we claim that these defendants have done terrible things, they refuse to admit it and we do not propose to prove it, but will simply resort to gagging their right to deny it'"); see also Crosby v. Bradstreet Co., 312 F.2d 483, 485 (2d Cir. 1963) (reversing a consent settlement between two parties because the "injunction, enforceable through the contempt power, constitute[d] a prior restraint by the United States against the publication of facts which the community has a right to know").

9

EXHIBIT E to the Expert Report of J. W. Christian   Page 91 of 119

public, somehow knew the truth of the allegations. Tr. 12-13. This is wrong as a matter of law and unpersuasive as a matter of fact. As a matter of law, an allegation that is neither admitted nor denied is simply that, an allegation. It has no evidentiary value and no collateral estoppel effect. It is precisely for this reason that the Second Circuit held long ago, in Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976), that "a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues ... can not be used as evidence in subsequent litigation." Id. at 893. It follows that the allegations of the complaint that gives rise to the consent judgment are not evidence of anything either. Indeed the Lipsky court went so far as to hold that "neither [an S.E.C.] complaint nor reference to [such] a complaint which results in a consent judgment may properly be cited in the pleadings" in a parallel private action and must instead be stricken. Id.

    As for common experience, a consent judgment that does not involve any admissions and that results in only very modest penalties is just as frequently viewed, particularly in the business community, as a cost of doing business imposed by having to maintain a working relationship with a regulatory agency, rather than as any indication of where the real truth lies. This, indeed, is Citigroup's position in this very case. See Citigroup Mem. at 6-8.

10

Of course, the policy of accepting settlements without any admissions serves various narrow interests of the parties. In this case, for example, Citigroup was able, without admitting anything, to negotiate a settlement that (a) charges it only with negligence, (b) results in a very modest penalty, (c) imposes the kind of injunctive relief that Citigroup (a recidivist) knew that the S.E.C. had not sought to enforce against any financial institution for at least the last 10 years, see SEC Mem. at 23, and (d) imposes relatively inexpensive prophylactic measures for the next three years. In exchange, Citigroup not only settles what it states was a broad-ranging four-year investigation by the S.E.C. of Citigroup's mortgage-backed securities offerings, Tr. 27, but also avoids any investors' relying in any respect on the S.E.C. Consent Judgment in seeking return of their losses. If the allegations of the Complaint are true, this is a very good deal for Citigroup; and, even if they are untrue, it is a mild and modest cost of doing business.

It is harder to discern from the limited information before the Court what the S.E.C. is getting from this settlement other than a quick headline. By the S.E.C.'s own account, Citigroup is a recidivist, SEC Mem. at 21, and yet, in terms of deterrence, the $95 million civil penalty that the Consent Judgment proposes is pocket change to any entity as large as Citigroup.[6] While the S.E.C. claims

---

[6] Although the S.E.C. asserts that the fact that it is only charging negligence limits the amount of money it can recover from Citigroup, either by way of civil

11

that it is devoted, not just to the protection of investors but also to helping them recover their losses, the proposed Consent Judgment, in the form submitted to the Court, does not commit the S.E.C. to returning any of the total of $285 million obtained from Citigroup to the defrauded investors but only suggests that the S.E.C. "may" do so. Consent Judgment at 3. In any event, this still leaves the defrauded investors substantially short-changed. To be sure, at oral argument, the S.E.C. reaffirmed its long-standing purported support for private civil actions designed to recoup investors' losses. Tr. 10. But in actuality, the combination of charging Citigroup only with negligence and then permitting Citigroup to settle without either admitting or denying the allegations deals a double blow to any assistance the defrauded investors might seek to derive from the S.E.C. litigation in attempting to recoup their losses through private litigation, since private investors not only cannot bring securities claims based on negligence, see, e.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), but also cannot derive any collateral estoppel assistance from Citigroup's non-admission/non-denial of the S.E.C.'s allegations. Nor, as noted, does the public,

---

penalty or by way of disgorgement, see SEC Mem. at 17, it acknowledges in a footnote that the Second Circuit has assumed that "equitable restitution" is available in any government enforcement action. SEC Mem. at 17 n.6 (citing F.T.C. v. Verity Int'l, Ltd., 443 F.3d 48, 66 (2d Cir. 2006)).

EXHIBIT E to the Expert Report of J. W. Christian   Page 94 of 119

especially the business public, have any reason to credit those
allegations, which remain entirely unproven.[7]

The point, however, is not that certain narrow interests of the
parties might not be served by the Consent Judgment, but rather that
the parties' successful resolution of their competing interests
cannot be automatically equated with the public interest, especially
in the absence of a factual base on which to assess whether the
resolution was fair, adequate, and reasonable.  Even after giving the
fullest deference to the S.E.C.'s views - which have more than once

---

[7] The Court is also troubled when it compares the proposed Consent Judgment with the
consent judgment entered last year between the SEC and Goldman Sachs ("Goldman").
See SEC v. Goldman Sachs & Co. et al., No. 10 Civ. 3229 (BSJ), Dkt. 25 ("Goldman
Consent Judgment").  Goldman involved a similar but arguably less egregious factual
scenario in that Goldman was charged with not disclosing that an outside hedge
fund, Paulson & Co., had played a significant role in the portfolio selection
process and had maintained a short position in the assets it had selected. See SEC
v. Goldman Sachs & Co., supra, Dkt. 1 ("Goldman Complaint") ¶ 2.  Nonetheless, the
consent judgment in Goldman required Goldman to pay a $535 million penalty, even
though it made only $15 million in profits.  Goldman Consent Judgment ¶ 2.  Here,
as noted above, Citigroup made $160 million in profits and paid only a $95 million
fine.  The SEC argues that Goldman was charged with scienter-based violations, and
that those violations make possible a more significant sanction.  SEC Mem. at 19.
This logic is circular, however, because the SEC does not explain how Goldman's
actions were more culpable or scienter-based than Citigroup's actions here.
Furthermore, the consent judgment in Goldman contained several terms that are
notably missing from the proposed Consent Judgment here.  First, the consent
judgment included the following express admission from Goldman:
    "Goldman acknowledges that the marketing materials for the ABACUS 2007-
    ACI transaction contained incomplete information.  In particular, it was
    a mistake for the Goldman marketing materials to state that the
    reference portfolio was 'selected by' ACA Management LLC without
    disclosing the role of Paulson & Co. Inc. in the portfolio selection
    process and that Paulson's economic interests were adverse to
    [portfolio] investors. Goldman regrets that the marketing materials did
    not contain that disclosure."
(Goldman Consent Judgment ¶ 3.) Second, Goldman agreed to additional remedial
measures beyond those agreed to by Citigroup in the instant case.  Third, Goldman
agreed to cooperate with the SEC in a number of ways, such as making its employees
available for interviews by SEC staff and ordering its employees to testify "at
trial and other judicial proceedings when requested by Commission staff." Id. ¶ 17.
By contrast, Citigroup has not agreed to cooperate with the SEC in any cognizable
respect. SEC Mem. 21.

EXHIBIT E to the Expert Report of J. W. Christian     Page 95 of 119

persuaded this Court to approve an S.E.C. Consent Judgment it found dubious on the merits, see, e.g., Bank of America II, supra — the Court is forced to conclude that a proposed Consent Judgment that asks the Court to impose substantial injunctive relief, enforced by the Court's own contempt power, on the basis of allegations unsupported by any proven or acknowledged facts whatsoever, is neither reasonable, nor fair, nor adequate, nor in the public interest.

It is not reasonable, because how can it ever be reasonable to impose substantial relief on the basis of mere allegations?  It is not fair, because, despite Citigroup's nominal consent, the potential for abuse in imposing penalties on the basis of facts that are neither proven nor acknowledged is patent. It is not adequate, because, in the absence of any facts, the Court lacks a framework for determining adequacy. And, most obviously, the proposed Consent Judgment does not serve the public interest, because it asks the Court to employ its power and assert its authority when it does not know the facts.

An application of judicial power that does not rest on facts is worse than mindless, it is inherently dangerous.  The injunctive power of the judiciary is not a free-roving remedy to be invoked at the whim of a regulatory agency, even with the consent of the regulated.  If its deployment does not rest on facts — cold, hard,

14

EXHIBIT E to the Expert Report of J. W. Christian     Page 96 of 119

solid facts, established either by admissions or by trials - it serves no lawful or moral purpose and is simply an engine of oppression.

Finally, in any case like this that touches on the transparency of financial markets whose gyrations have so depressed our economy and debilitated our lives, there is an overriding public interest in knowing the truth. In much of the world, propaganda reigns, and truth is confined to secretive, fearful whispers. Even in our nation, apologists for suppressing or obscuring the truth may always be found. But the S.E.C., of all agencies, has a duty, inherent in its statutory mission, to see that the truth emerges; and if it fails to do so, this Court must not, in the name of deference or convenience, grant judicial enforcement to the agency's contrivances.

Accordingly, the Court refuses to approve the proposed Consent Judgment. Instead, the Court hereby consolidates this case with the Stoker action, adopts the Case Management Order in that action as equally applicable to the instant case, and directs the parties to be ready to try this case on July 16, 2012.

SO ORDERED.

Dated: New York, NY
November 28, 2011

JED S. RAKOFF, U.S.D.J.

15

EXHIBIT E to the Expert Report of J. W. Christian   Page 97 of 119

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 76899 / January 14, 2016**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-17053**

| | |
|---|---|
| In the Matter of<br><br>    Goldman, Sachs & Co.,<br><br>Respondent. | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Goldman, Sachs & Co.("Goldman" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Exchange Act, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Goldman's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Summary

1.      These proceedings arise out of practices engaged in by Goldman's Securities Lending Demand Team (the "Demand Team"), between November 2008 and mid-2013, in providing and documenting "locates" to enable its customers to execute short sales.

2.      Regulation SHO Rule 203(b)(1) ("Reg SHO") prohibits broker-dealers from accepting short sale orders in equity securities or effecting short sales in equity securities for its own account unless the broker or dealer has borrowed the security, entered into a bona fide arrangement to borrow the security, or has "reasonable grounds" to believe the security can be borrowed so that it can be delivered on the delivery date. This is generally referred to as the "locate" requirement. Reg SHO also requires the broker-dealer to document its compliance with the "locate" requirement. To document compliance with the obligations under Reg SHO, broker-dealers typically create and maintain a "locate log" that documents the basis for each locate provided.

3.      Between November 2008 and mid-2013, to comply with Reg SHO, Goldman employed a system where the vast majority of customer short sale locate requests were handled by an automated model that would either grant, in whole or in part (or "fill"), deny, or route (or "pend") the requests for further review to the Demand Team, a group of ten to twelve individuals who worked on Goldman's securities lending desk. The automated model would review and fill locate requests based on certain available inventory reported to Goldman by certain lending banks and brokerages that fed into Goldman's automated model at the start of each day after being reduced by Goldman based on their experience with various lenders (the "start-of-day inventory"). As the automated model processed locate requests, it reduced that start-of-day inventory on a 1:1 basis for all shares that were used to grant locate requests (regardless of whether the client actually used the locate). When the start-of-day inventory was depleted in that manner, the automated model would pend subsequent locate requests to the Demand Team for further review and processing.

4.      Over the course of the relevant period, the number of locate requests that pended to the Demand Team grew significantly, reaching more than 20,000 locate requests per day at its peak. The volume of locate requests became far more than the Demand Team could manually handle on a request-by-request basis. Thus, instead of manually identifying an alternative source of securities to satisfy these pended requests, the Demand Team processed approximately 98 percent of the pended requests by relying on a function of Goldman's order management system referred to as "fill from autolocate," which was activated by the "F3" key. This function enabled the Demand Team to cause Goldman's automated model to fill locate requests based on the amount of inventory that existed at the start of the day (i.e., the start-of-day inventory level before any locates were granted), even though Goldman's automated model had already treated the start-of-day inventory as depleted.

5.      In processing locate requests using the "F3" function, the Demand Team typically did not check alternative sources of securities or perform a meaningful further review. Instead, they relied on their general belief that Goldman's automated model was conservative and that the provision of additional locates would not result in failures to deliver the securities if and when due for settlement. The Demand Team did not document the basis for this general belief.

2

6.      Additionally, Goldman's documentation of its compliance with Reg SHO in its locate log was inaccurate in that Goldman failed to sufficiently differentiate between locates that were filled by its automated model and locates that were filled by the Demand Team using the "F3" function. In both cases, the locate log simply contained the term "autolocate" to refer to the start-of-day inventory utilized by Goldman's automated model as the source of securities supporting the locate.

## Respondent

7.      Goldman, headquartered in New York, New York, is dually-registered with the Commission as a broker-dealer and investment adviser. Goldman is a wholly-owned subsidiary of The Goldman Sachs Group, Inc., whose securities are registered with the Commission pursuant to Section 12(b) of the Exchange Act. The activity that is the subject of this Order pertains to the securities lending desk within the broker-dealer side of Goldman's business.

## Background

### Goldman's System for Complying with Reg SHO

8.      Between November 2008 and mid-2013, to comply with its Reg SHO locate requirements, Goldman employed a system where the vast majority of customer short sale locate requests were handled by an automated model. The automated model was designed to grant, in whole or in part, or deny locate requests that met certain criteria, and route to the Demand Team the remaining requests for further review and processing. The Demand Team also received and processed a small number of locate requests that were submitted directly to the Demand Team by clients via telephone or instant messaging that generally bypassed the automated model.

9.      Goldman used certain control lists and an automated model to process the vast majority of locate requests it received each day. Locate requests for securities on control lists, including an "easy-to-borrow" list, and more than a dozen lists of securities in which Goldman believed there could be a meaningful risk of delivery failure, were automatically filled or denied.

10.      Locate requests for securities not on a control list were processed through Goldman's automated model. The automated model would determine whether to fill a locate request in whole or in part or pend it to the Demand Team for further review and processing. This determination was made based on the amount of inventory the automated model recognized as available for borrowing. The inventory available for filling locate requests through the automated model was based on the amount of inventory reported to Goldman by certain lender banks and brokerages. This inventory was reported to Goldman, and other major brokerages that fill locate requests, once each day several hours before the markets opened. Upon receiving the report of available inventory, Goldman would generally apply a "haircut" to (or reduce) each lender's reported inventory. Goldman would then aggregate the remaining inventory and use it—the start-of-day inventory—as the exclusive source for its automated model to fill locate requests.

11.      As Goldman's automated model filled locate requests from the start-of-day inventory, it would simultaneously reduce that start-of-day inventory based upon the number of shares for which locates had been granted. Goldman referred to this reduction as the "utilization rate." Between November 2008 and mid-2013, Goldman applied a 100-percent utilization rate to

EXHIBIT E to the Expert Report of J. W. Christian    Page 100 of 119

the start-of-day inventory used by the automated model, even though Goldman's clients' actual utilization rate was substantially lower and understood by Goldman to be a small fraction of that. This meant that for each locate request granted, Goldman decreased the start-of-day inventory by the corresponding number of shares granted.

12.     Between November 2008 and mid-2013, using its control lists and the automated model, Goldman filled, in whole or in part, or denied the vast majority of the locate requests it received, which increased over time and peaked at approximately 250,000 locate requests per day.

**The Demand Team Routinely Sourced Locates to Inventory Treated as Depleted**

13.     When Goldman's automated model treated the start-of-day inventory for a particular security as depleted (based on the provision of locates equal to that start-of-day inventory amount), it was programmed to pend further locate requests in that security to the Demand Team for further review and processing.[2]  Over the course of the relevant period, the number of locate requests pended by the automated model to the Demand Team grew significantly, reaching more than 20,000 locate requests per day at its peak.[3]

14.     After Goldman's automated model treated the start-of-the-day inventory as depleted (based on the 1:1 utilization rate), the Demand Team's review should have consisted of conducting a further review of the requests and attempting to identify additional sources of inventory for the pended locate requests, such as loan returns, firm long positions, and customer margin, or contacting lenders to identify additional supply of the securities Goldman's customers sought to locate. The Demand Team, however, did not conduct such further review on approximately 98 percent of locate requests pended to it by Goldman's automated model.  Instead, before the markets opened, the Demand Team routinely processed thousands of pended locate requests by using the "fill from autolocate" function of Goldman's order management system, which was accessed via the "F3" key.

15.     The "fill from autolocate" function enabled Demand Team members to select as many of the locate requests routed to it from Goldman's automated model as desired (for certain customers, 3,000 to 4,000 locate requests were sometimes selected at one time) and hit the "F3" key to process the selected requests with one keystroke.  For example between 6:45 a.m. and 7:45 a.m. each day, on average, the Demand Team filled locate requests for several thousand unique CUSIPs.  Additionally, in one instance, a Demand Team member granted over 5,486 locates in a 35-minute period.

16.     After a Demand Team member selected "F3," the locate request would be filled by reference to the initial amount included in the start-of-day inventory for the security in question. Thus, each locate request filled using this function would cause the automated model to fill the selected locate requests based on inventory amounts that existed at the start of the day even though the automated model had treated that start-of-day inventory as depleted.  The Demand Team used

---

[2] Locate requests could pend for reasons other than the automated model treating start-of-day inventory as depleted, but such pends constituted a small minority of the daily pended locate requests.

[3] This significant increase in the number of pended locate requests was due, in part, to the increased use by Goldman's clients of bulk locate request lists that could contain many thousands of locate requests daily.

4

EXHIBIT E to the Expert Report of J. W. Christian    Page 101 of 119

the "F3" function as a means to compensate for the large volume of locate requests pended to them by Goldman's automated model.

17.     Before using the "F3" function, the Demand Team did not typically conduct additional review or identify other sources of inventory for the securities sought to be located, such as loan returns, firm long positions, or customer margin.  Instead, they relied on their general belief that Goldman's automated model was conservative and that the provision of additional locates would not result in failures to deliver the securities if and when due for settlement.  The Demand Team did not document the basis for this general belief.  Although no rationale was documented in Goldman's locate log or in any contemporaneous documentation, the Demand Team's belief that the model was conservative was based on their familiarity with their client's low utilization rates and that Goldman's rate of failures remained low and did not substantially change between November 2008 and mid-2013.[4]

18.     On numerous occasions, the start-of-day inventory supporting locate requests filled using the "F3" function had already been treated as depleted prior to the Demand Team filling the locate requests.  In some cases, the Demand Team continued to provide locates for millions of shares after the start-of-day inventory for such securities had been treated as depleted.  Further, in many instances, the Demand Team used the "F3" function to fill locate requests for securities that were included on a threshold securities[5] list, which signifies that such securities in which a substantial amount of fails to deliver have occurred and, as such, are considered generally hard to borrow.  Specifically, using the F3 function, the Demand Team filled approximately 488 locate requests in threshold securities each day.

19.     As a result, between November 2008 and mid-2013, certain short sales were executed by Goldman in reliance on locates provided by Goldman, without reasonable grounds to believe that the securities to be sold short could be borrowed to meet its delivery obligations.

**Goldman's Locate Logs Were Inaccurate as to the Source Supporting Certain Locates**

20.     Goldman's locate logs were inaccurate with respect to the source supporting the locate requests it filled using the "F3" function.  All locate requests were assigned a unique identifying number and were automatically logged in Goldman's locate log.  The locate log included the details of the locate request, such as the identity of the customer making the locate request, the security, the amount requested to be located, and the date and time of the request.  The locate log also included the details of the request's processing, such as who filled each locate

---

[4] During that time period and subsequently, Goldman was generally able to meet its settlement obligations. Securities in which Goldman experienced fails to deliver were added to control lists, and locate requests in those securities were denied by the automated model.

[5] Threshold securities, as defined in Rule 203(c)(6) of Regulation SHO, are equity securities of an issuer that is registered pursuant to Section 12 of the Exchange Act or for which the issuer is required to file reports pursuant to Section 15(d) of the Exchange Act that have an aggregate fail to deliver position for (i) five consecutive settlement days at a registered clearing agency (e.g., National Securities Clearing Corporation); (a) totaling 10,000 shares or more; and (b) equal to at least 0.5% of the issuer's total shares outstanding and (ii) that is included on a list disseminated to its members by a self-regulatory organization.  See http://www.sec.gov/investor/pubs/regsho.htm (last accessed November 23, 2015); see also Exchange Act Rel. No. 50103 (Jul. 28, 2004), 69 FR 48008, 48014 n. 62 (Aug. 6, 2004) ("Of course, securities that are 'threshold securities' pursuant to Rule 203(c) should generally not be included on 'Easy to Borrow' lists.")

EXHIBIT E to the Expert Report of J. W. Christian    Page 102 of 119

request, the amount of the security located, the source, date, and time the request was filled or denied.

21.     From November 2008 to mid-2013 Goldman's locate logs were inaccurate in that they failed to sufficiently differentiate between locates that were filled by its automated model versus locates that were filled as a result of the Demand Team's use of the "F3" function. In both cases, the locate log simply contained the term "autolocate" to refer to the aggregate inventory utilized by Goldman's automated model as the source of securities supporting the locate. The source of the security, however, was different for these different types of locates. When Goldman's automated model filled a locate request, the source of securities supporting the request was the start-of-day inventory. Conversely, when it was filled by the Demand Team using the "F3" function, the start-of-day inventory was treated as depleted and no alternative source of the security was identified.

**Goldman Identified the Need to Change Its Automated Model in 2011**

22.     Although the Demand Team's use of the "F3" function continued through at least mid-2013, Goldman first identified the need to change its automated model in early 2011. Specifically, in early 2011, Goldman learned that the logic of its legacy automated model was causing substantially more locate requests to pend for Demand Team review than the Demand Team could handle on a request-by-request basis. Starting in early 2011, Goldman began planning to enhance the automated model. Over the next two and a half years, Goldman developed, tested, and implemented a new automated model. During this time, however, Goldman did not modify the Demand Team's use of the "F3" function in granting locate requests.

**Goldman's Response to OCIE**

23.     In responding to an examination of its securities lending practices in 2013 by the Commission's Office of Compliance Inspections and Examinations ("OCIE"), Goldman provided responses to requests for information and findings made by OCIE examiners that were incomplete and unclear. In responding to a deficiency letter from OCIE, Goldman's response letter created the incorrect impression that the Demand Team conducted an individualized review for all locate requests pended to it from Goldman's automated model. Further, in the same letter, Goldman described the automated portion of its *current* system for filling locate requests in a manner that did not make clear the fact that it was Goldman's *legacy* automated model that was causing the high volume of locate requests to pend to the Demand Team.

24.     OCIE's examination was adversely affected and unnecessarily prolonged as a result of Goldman's responses to OCIE's requests. In determining the appropriate resolution to this matter, the Commission considered, in addition to the underlying conduct, these deficiencies in Goldman's responses to OCIE staff.

<u>**Goldman's Remedial Efforts**</u>

25.     In determining to accept the Offer, the Commission considered remedial acts undertaken by Goldman. By at least mid-2013, Goldman had phased out the use of its legacy automated model and implemented a new automated model with logic that substantially reduced the number of locate requests pended for Demand Team review. Additionally, Goldman implemented revised written policies and procedures governing the processing of locate requests

6

pended to the Demand Team. Shortly after the conclusion of the OCIE examination Goldman also discontinued the use of the autolocate functionality. Demand Team members are now required to locate a specific source of inventory for each locate request and to identify that source in the locate log.

## Violations

26.     As a result of the conduct described above, Goldman willfully[6] violated Rule 203(b)(1) of Regulation SHO promulgated under the Exchange Act, which provides, in relevant part, that before executing short sales, brokers or dealers must have "reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due."

27.     As a result of the conduct described above, Goldman willfully violated Section 17(a) of the Exchange Act and Rule 203(b)(1)(iii) of Regulation SHO promulgated thereunder. Section 17(a) of the Exchange Act requires brokers and dealers, among others, to make, keep, and furnish to the Commission such records as the Commission prescribes by rule. Rule 203(b)(1)(iii) of Regulation SHO requires that brokers or dealers document compliance with Rule 203(b)(1) of Regulation SHO. The document fulfilling this documentation requirement is commonly referred to as a "locate log." Inherent in the recordkeeping requirements of Section 17(a) of the Exchange Act and Rule 203(b)(1)(iii) of Regulation SHO is a requirement that the records be complete and accurate.

## IV.

In view of the foregoing, the Commission deems it appropriate, and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

A.     Respondent cease and desist from committing or causing any violations and any future violations of Rule 203(b)(1) of Regulation SHO promulgated under the Exchange Act, and any violations and any future violations of Section 17(a) of the Exchange Act and Rule 203(b)(1)(iii) thereunder relating to short sale locate records.

B.     Respondent is censured.

C.     Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $15,000,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717. Payment must be made in one of the following ways:

---

[6] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" Id. (quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 803 (D.C. Cir. 1965)).

7

EXHIBIT E to the Expert Report of J. W. Christian    Page 104 of 119

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Goldman as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Charles Riely, Assistant Regional Director, Division of Enforcement, Securities and Exchange Commission, 200 Vesey Street, Suite 400, New York, New York 10281.

By the Commission.

Brent J. Fields
Secretary

8

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 75083 / June 1, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16567

| | |
|---|---|
| In the Matter of<br><br>    Merrill Lynch, Pierce, Fenner &<br>    Smith Incorporated and Merrill<br>    Lynch Professional Clearing<br>    Corporation,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE<br>AND CEASE-AND-DESIST PROCEEDINGS,<br>PURSUANT TO SECTIONS 15(b) AND 21C<br>OF THE SECURITIES EXCHANGE ACT OF<br>1934, MAKING FINDINGS, AND IMPOSING<br>REMEDIAL SANCTIONS AND A CEASE-<br>AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch Professional Clearing Corporation ("Respondents" or "Merrill").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Merrill admits the findings set forth in Section III below, acknowledges that its conduct violated the federal securities laws, admits the Commission's jurisdiction over it and the subject matter of these proceedings, and consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:

### Summary

1.      These proceedings concern Merrill's violations of Regulation SHO (Reg SHO") of the Exchange Act, in connection with its practices relating to its execution of short sales. As described more fully below, the violations arose from two separate issues concerning Merrill's use of its "easy to borrow" lists.

### Respondents

2.      Respondent Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), headquartered in New York, New York, is dually-registered with the Commission as a broker-dealer and investment adviser.  It is a subsidiary of Bank of America Corporation.  The activity that is the subject of this recommendation pertains to the broker-dealer side of Merrill's business.

3.      Respondent Merrill Lynch Professional Clearing Corporation (MLPro), headquartered in New York, New York, is registered with the Commission as a broker-dealer. MLPro is a wholly-owned subsidiary of MLPF&S.

### Background

**A.     Reg SHO**

4.      Regulation SHO ("Reg SHO") of the Exchange Act governs short sales.  A short sale is any sale of a security which the seller does not own, or any sale which is consummated by the delivery of a security borrowed by, or for the account of, the seller.

5.      Rule 203(b) of Reg SHO prohibits a broker-dealer from accepting a short sale order in an equity security from another person or effecting a short sale in an equity security for its own account unless the broker-dealer has borrowed the security, entered into a bona-fide arrangement to borrow the security, or has "reasonable grounds" to believe that the security can be borrowed so that it can be delivered on the delivery date.  This is generally referred to as the "locate" requirement.  Rule 203(b) also requires the broker-dealer to document its compliance with the "locate" requirement.

6.      The Commission has articulated that, absent countervailing factors, easy to borrow ("ETB") lists may provide reasonable grounds to believe that the security sold short is available for borrowing as required in Rule 203(b) without having to contact the source of borrowed securities directly.  While broker-dealers with lending desks use their own criteria to determine whether or not a security should be included on its ETB list, the information used to

2

generate the ETB list must be less than 24 hours old, and securities on the list must be readily available such that it would be unlikely that a failure to deliver would occur.[1]

7.  Merrill failed to comport with this guidance when executing transactions in reliance on ETB lists in two separate but important ways.

8.  First, Merrill's execution platforms were designed to continue accepting short sale orders in reliance on its lending desk's ETB list even where Merrill had determined, through placement of the stock on Merrill's Watch List, that "countervailing factors" existed that rendered Merrill's reliance on the list as a locate source unreasonable. The countervailing factors consisted of Merrill's knowledge of events that occurred throughout the day after the issuance of the ETB list that had, or were deemed likely by Merrill to have, the potential to impact a particular stock's availability such that Merrill added the stock to its Watch List. In recognition of these countervailing factors, Merrill's practice (in accordance with an unwritten policy) was that its lending desk could not rely on the ETB list exclusively to grant "locates" under such circumstances. However, even though Merrill's policy prevented the lending desk from granting locates in such circumstances solely on the basis of the ETB list, Merrill allowed its execution platforms to continue to execute short sales solely in reliance on the ETB list in such circumstances. As a consequence, Merrill's conduct violated Rule 203(b) of Reg SHO in that Merrill purported to rely on ETB list locates that could not provide the requisite reasonable grounds to believe the affected securities could be borrowed for delivery on the delivery date as required under the Rule. Moreover, by recording the ETB list as the locate source with respect to short sale orders accepted and executed after Merrill had already determined to cut off ETB list locates for a security, Merrill further violated Rule 203(b) by failing to document an appropriate locate.

9.  Second, because of a flaw in Merrill's systems, in certain instances, Merrill used data that was more than 24 hours old for purposes of constructing its ETB lists. As a result, multiple securities were included on ETB lists on days when they should not have been, leading to Merrill accepting and executing short sale orders based on inappropriate reliance on defective ETB lists, such that Merrill did not have reasonable grounds to believe the security could be borrowed for delivery. Because in some circumstances the ETB list used older data, but Merrill did not institute and maintain procedures reasonably designed to detect the disparity in its own ETB list, Merrill's conduct violated the requirement under Rule 203(b) of Reg SHO. Had Merrill had the proper systems in place, it could have discovered its reliance on ETB lists containing information that was greater than 24 hours old.

## B.  Merrill's ETB Practice

10.  Merrill, as a broker-dealer, executes transactions, including short sales. As such, Merrill is subject to the requirements of Reg SHO.

---

[1]  *Short Sales,* Exchange Act Release No. 50103 (July 28, 2004), 69 Fed. Reg. 48008 at 48014.

EXHIBIT E to the Expert Report of J. W. Christian    Page 108 of 119

11. Merrill also operates a securities lending desk that provides locates for its customers. Merrill's lending desk routinely communicates with lenders, customers, and brokers in the course of each trading day, and monitors market developments that could impact the availability of securities for locates and settlement.

12. In the course of its duties, Merrill's lending desk determines before the start of each trading day, through application of a proprietary formula, whether a security is "Easy to Borrow." If a security satisfies the formula based on information then known, Merrill includes that security on an ETB list that it generates daily and disseminates to customers and to its own execution platforms early in the morning.

13. Once Merrill includes a security on an ETB list, both the lending desk (through either an automated or manual process) and its own execution platforms rely on the security's presence on the ETB list in order to satisfy Merrill's locate duty under Reg SHO to execute a short sale in that security.

14. As a general practice, Merrill did not redistribute its ETB list to its execution platforms following the original dissemination of the list first thing in the morning notwithstanding any subsequent developments in the marketplace that might impact availability of the stocks on the list.

15. However, on numerous occasions, through the course of the lending desk's ordinary business activity, the firm learned of developments that actually did, or had the potential to, restrict availability in particular stocks, including certain stocks that had been included on the daily ETB list earlier in the morning, prompting Merrill to add the stock to its "Watch List."

16. Merrill's lending desk practices required that if questions developed intraday about availability of a particular stock on the ETB list, the stock would be placed onto a separate list known as the "Watch List." As described in Merrill's "Business Requirements" document, an information technology staff document drafted in consultation with the securities lending desk in describing implementation of a new version of the Watch List in 2009 for the firm's Locates system, Watch List securities are "securities that have limited availability and should not be provided on the ETB's or automated locates as the inventory should be closely managed." Accordingly, for any stock added to the Watch List intraday, the lending desk was no longer permitted to rely on the ETB list for any new locate requests for that stock, but was instead required to find other, non-ETB list, sources for locate requests, such as by contacting a lending source directly. As a result, placing a security on the Watch List removed the security from the ETB list for locate purposes and meant that, in Merrill's estimation, reliance on the ETB list alone did not provide reasonable grounds to believe that the security in question could be borrowed so that it could be delivered on the delivery date.

17. The next day, securities placed on the Watch List during the prior day would not be included in that following day's new ETB list.

4

18.     From at least 2008 to present, however, when a stock was placed on the Watch List due to intraday market developments and, as a result, the lending desk ceased relying on the ETB list to source a locate for that stock, Merrill nevertheless continued to allow its execution platforms to execute short sales in purported reliance on the ETB List.

19.     At the times Merrill accepted short sale orders in a security for execution on the basis of the firm's ETB list while the same stock was on the Watch List, the ETB list did not provide the requisite reasonable grounds to believe that the security could be borrowed so that it could be delivered on delivery date because Merrill had information that led its securities lending desk to determine that the ETB list should not be relied on for locates in that security. In sourcing locates to the ETB list for Watch List securities, Merrill did not properly document its compliance with the locate requirement under Reg SHO.

20.     For example, on January 17, 2008, Merrill lending desk traders, having determined that a security could no longer reasonably be considered ETB, placed a stock on the Watch List. As the lending desk traders were seeking supply from individual lenders, the lenders were telling Merrill that they had no shares available, with messages such as "no good," "I am sorry, nothing available," and "short shares." With this knowledge, however, Merrill allowed its execution platforms to continue to execute short sales totaling 46,617 shares of the same security in reliance on the ETB list.

21.     Similarly, on September 8, 2008, during the heart of the financial crisis, Merrill lending desk traders determined that a security could no longer reasonably be considered ETB and placed the stock in question on the Watch List. Mid-day, Merrill traders recognized with respect to that security, "Up to this point banks and brokers still aren't willing to lend any stock." Nevertheless, Merrill's execution platforms executed short sales totaling 1,358,036 shares of the security, absent reasonable grounds to do so, in reliance on the ETB list.

22.     On May 22, 2012, Merrill's lending desk determined that a security could no longer be considered ETB and placed the stock in question on the Watch List, requiring a manual locate for all short sale orders other than those placed through the execution platforms. The stock was one in which Merrill saw that short-selling demand had "increased significantly" after a large plunge in the stock price; that the available borrow had "tightened throughout the day;" that borrow rates were "as deep as neg. 2%;" that short interest was more than 25% of the float; and that the "street is starting to experience recalls." Nonetheless, Merrill's execution platforms executed short sales totaling 840,080 shares of the security, absent reasonable grounds to do so, in reliance on the ETB list, which was the documented locate source.

23.     On January 14, 2014, Merrill's lending desk determined that a security could no longer be considered ETB and placed the stock in question on the Watch List, requiring a manual locate for all short sale orders other than those placed through the execution platforms. The stock was one in which Merrill saw that "[s]hort demand spiked;" borrow rates were "trending deeper," with shares for lending trading "in limited size; short interest was approximately 20% of the float; and recall activity "has increased." Nonetheless, Merrill's execution platforms executed short sales totaling 75,544 shares of the security, absent reasonable grounds to do so, in reliance on

5

the ETB list, which was the documented locate source.[2]

24.     Since approximately January 2010, Merrill lending desk traders who place securities on the Watch List must record a "Reason Code" indicating the circumstances underlying the decision for Watch List inclusion.  The list of possible Reason Codes includes situations such as "Bad Feeds Limited," "Corp Action," "Large Fails," "No Borrow," "Recalls," "Special Div," and "HTB" [Hard to Borrow].  Numerous Watch List securities since then have been recorded with those codes and others.  Merrill did not disclose this information to the staff of the Division of Enforcement (the "Staff") until the Staff learned about the codes from a witness during testimony.

25.     In April 2014, at a time when Merrill was aware of the ongoing Staff investigation into Merrill's lending desk practices and the Watch List, Merrill convened a meeting to discuss changing the Reason Codes, with discussion focusing on using a generic non-descriptive code to replace codes that explicitly identified borrowing difficulty as the grounds for Watch List placement.

26.     Following that discussion, lending desk traders were instructed to switch all current Reason Codes in their database to "Other" and to only use the "Other" code when placing any new securities on the Watch List.  Accordingly, although securities that were on the Watch List as of the end of April 2014 do not presently have specific Reason Codes associated with them, the complete audit trail reflects that those securities had been given a specific Reason Code when originally placed on the list.

27.     Merrill's acceptance of new short sale orders in purported reliance on the firm's ETB list after having learned of facts indicating that such reliance was no longer reasonable constituted a violation of Rule 203(b) of Reg SHO, because the orders were accepted without reasonable grounds to believe the security could be borrowed and those locates were inaccurately documented with an "ETB List" locate reference.

28.     Merrill has informed the Staff that it is implementing systems enhancements pursuant to which its lending desk will notify its execution platforms when a stock is added to the Watch List and its execution platforms will then stop relying on the Merrill ETB list as the locate source when accepting short sale orders for that stock.

---

[2]     These are but a few of the many examples from the documents produced to the Division that demonstrate that throughout the relevant period, Merrill was allowing its execution platforms to use an ETB List locate for short sales, even after securities had been placed on the Watch List by Merrill stock lending desk personnel because of concerns about diminishing availability of the stock for borrowing.

6

### C.   Merrill's "Stale Feed" Problems

29.   Merrill has regularly received electronic availability feeds and messages that it uses for determining whether a security should be included on the firm's ETB list.

30.   If a lender were to submit availability for a security one day, but then submit nothing the following day, the systems were designed to interpret the lack of a submission to mean that the particular lender had no availability.

31.   However, due to a flaw in Merrill's system, if a lender simply omitted a security from its list, rather than interpreting the omission to mean that the lender had no availability, under certain circumstances the system would look back to the last known number submitted from that lender and incorporate that value in its assessment of the overall availability of the security.

32.   Because of this flaw, Merrill's systems in certain instances inadvertently used data that was older than 24 hours old for purposes of constructing its ETB lists.  At times, the inclusion of the stale feed data resulted in securities being included on an ETB list when they otherwise should not have been.  Merrill, in turn, relied on its ETB list for executing short sales in certain of these securities, in violation of Reg SHO's locate requirement.

33.   Personnel at Merrill became aware of this problem in 2008 and attempted to fix it.  However, various iterations of the problem persisted and the firm did not completely eradicate "stale" availability data from its systems until 2012.

34.   Because Merrill could have discovered and prevented its reliance on ETB lists containing information greater than 24 hours old, but did not institute and maintain procedures reasonably designed to do so, its reliance on such ETB lists violated Rule 203(b) of Reg SHO.

### Violations

35.   As a result of the conduct described above, Merrill willfully[3] violated Rule 203(b) of Regulation SHO.

### Undertakings

36.   Respondents have undertaken to:

A.   Retain, at Respondents' expense and within thirty (30) days of the issuance of this Order, a qualified independent consultant (the "Consultant") not unacceptable to the Staff.

---

[3]   A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).  There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" *Id.* (quoting *Gearhart & Otis, Inc. v. SEC*, 348 F.2d 798, 803 (D.C. Cir. 1965)).

7

Respondents shall require the Consultant to conduct a comprehensive review of their policies, procedures and practices with respect to their acceptance of short sale orders for execution or effecting of short sales in reliance on Merrill's ETB list and Merrill's procedures to monitor compliance therewith, to satisfy its obligations under Rule 203(b) of Reg SHO to (i) accept short sale orders or effect short sales in equity securities only if it has borrowed the securities or entered into a bona fide arrangement to borrow the securities or has reasonable grounds to believe that securities can be borrowed for delivery when due; and (ii) document compliance with Rule 203(b)(1).

      B.      Cooperate fully with the Consultant, including providing the Consultant with access to its files, books, records, and personnel as reasonably requested for the review, obtaining the cooperation of employees or other persons under Merrill's control, and permitting the Consultant to engage such assistance (whether clerical, legal, technological, or of any other expert nature) as necessary to achieve the purposes of the retention.

      C.      Require the Consultant to complete its review and submit a written preliminary report ("Preliminary Report") to Merrill and Commission staff within ninety (90) days of the issuance of this Order. Merrill shall require that the Preliminary Report address the issue described in paragraph A above, include a description of the review performed, the conclusions reached, recommendations for any changes in or improvements to Merrill's policies and procedures, and a procedure for implementing such recommended changes.

      D.      Within ninety (90) days of receipt of the Preliminary Report, adopt and implement all recommendations contained in the Preliminary Report; provided, however, that as to any recommendation that Merrill considers to be, in whole or in part, unduly burdensome or impractical, Merrill may submit in writing to the Consultant and Commission staff, within thirty (30) days of receiving the Preliminary Report, an alternative policy, practice, or procedure designed to achieve the same objective or purpose. Within forty-five (45) days of receiving the Preliminary Report, Merrill and the Consultant shall attempt in good faith to reach an agreement relating to each recommendation that Merrill considers to be unduly burdensome or impractical. Within fifteen (15) days after the discussion and evaluation by Merrill and the Consultant, Merrill shall require that the Consultant inform Merrill and Commission staff of the Consultant's final determination concerning any recommendation that Merrill considers unduly burdensome or impractical, and Merrill shall abide by the determinations of the Consultant and adopt and implement all recommendations within the 90-day time period set forth in this paragraph.

      E.      Within fourteen (14) days of Merrill's adoption of all of the recommendations that the Consultant deems appropriate, certify in writing to the Consultant and Commission staff that Merrill has adopted and implemented all of the Consultant's recommendations and that Merrill has established policies, practices, and procedures consistent with its obligations under Rule 203(b).

      F.      Require that the Consultant review Merrill's revised policies, practices, and procedures for the six month period following implementation of the Consultant's recommendations, and require that the Consultant submit a written final report ("Final Report") to

Merrill and Commission staff within thirty (30) days after the one-year anniversary of the issuance of this Order. The Final Report shall (i) describe the review made of Merrill's revised policies, practices, and procedures; (ii) describe how Merrill is implementing, enforcing, and auditing compliance with the policies, practices, and procedures; and (iii) provide an opinion of the Consultant concerning whether Merrill is adequately implementing, enforcing, and auditing compliance with the policies, practices, and procedures.

G.     Require the Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Merrill, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity. The agreement will also provide that the Consultant will require that any firm with which the Consultant is affiliated or of which the Consultant is a member, and any person engaged to assist the Consultant in performance of the Consultant's duties under this Order shall not, without prior written consent of Commission staff in the New York Regional Office, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Merrill, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

H.     To ensure the independence of the Consultant, Merrill shall not have the authority to terminate the Consultant without prior written approval of Commission staff and shall compensate the Consultant and persons engaged to assist the Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

I.     Within fourteen (14) days after the one-year anniversary of the issuance of this Order, certify in writing to Commission staff that as of the one-year anniversary date Merrill has continued to implement and enforce all of the Consultant's recommendations and has continued to maintain policies, practices, and procedures consistent with its obligations under Rule 203(b).

J.     Certify, in writing, compliance with the undertaking(s) set forth above. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to Assistant Director Adam S. Grace, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

37.     For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

9

## IV.

In view of the foregoing, the Commission deems it appropriate, and in the public interest to impose the sanctions agreed to in Respondents' Offer.

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

A. Respondents cease and desist from committing or causing any violations and any future violations of Rule 203(b) of Regulation SHO.

B. Respondents are censured.

C. Respondents shall, within fifteen (15) days of the entry of this Order, pay disgorgement, which represents profits gained as a result of the conduct described herein, of $1,566,245.67 and prejudgment interest of $334,564.65 to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. Payment must be made in one of the following ways:

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;
(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or
(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

  Enterprise Services Center
  Accounts Receivable Branch
  HQ Bldg., Room 181, AMZ-341
  6500 South MacArthur Boulevard
  Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Merrill as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Andrew M. Calamari, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281.

D. Respondents shall, within fifteen (15) days of the entry of this Order, pay a civil money penalty in the amount of $9 million to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717. Payment must be made in one of the following ways:

EXHIBIT E to the Expert Report of J. W. Christian Page 115 of 119

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;
(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or
(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Merrill as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Andrew M. Calamari, Division of Enforcement, Securities and Exchange Commission, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281.

E.      Respondents shall comply with the undertakings enumerated in paragraph 36 above.


By the Commission.


                              Brent J. Fields
                              Secretary

EXHIBIT E to the Expert Report of J. W. Christian    Page 116 of 119



Holly Pappas <hpappas@csj-law.com>

---

# RE: SEC Mulls Schwab Unit's Naked Short-Sale Sanction Appeal

1 message

---

**Tim Connolly** <tim@texasgulfoil.com>                                      Tue, Jan 19, 2016 at 8:00 AM
To: "James W. Christian" <jwc@csj-law.com>

SEC Mulls Schwab Unit's Naked Short-Sale Sanction Appeal
Share us on:   By Ed Beeson
Law360, New York (January 15, 2016, 10:56 PM ET) -- A Charles Schwab Corp<http://www.law360.com/companies/charles-schwab-corporation>. subsidiary and a former customer told the U.S. Securities and Exchange Commission Friday<http://www.law360.com/agencies/securities-and-exchange-commission> that an agency judge overreached when she found them liable for an alleged naked short-selling scheme and ordered them to pay $8.2 million in sanctions.

OptionsXpress Inc. and Jonathan Feldman are challenging a June 2013 initial decision by Chief Administrative Law Judge Brenda Murray that found them liable for violations of the SEC's short-selling rules and on the hook for millions of dollars apiece in penalties and repayments.

But the pair argued that OptionsXpress and, in turn Feldman, had received tacit approval from their regulator, the Chicago Board Options Exchange, of the trading strategy deployed by Feldman and others.

An attorney for OptionsXpress, Stephen J. Senderowitz of Dentons LLP<http://www.law360.com/firms/dentons>, said the Chicago board had investigated the firm's use of instruments known as buy-rights to meet duties to close out short positions but determined there was no violation of Regulation SHO.

"This green flag from the CBOE<http://www.law360.com/companies/cboe-holdings-inc> defeats any finding that we acted with extreme recklessness," he said.

Feldman's attorney, Greg T. Lawrence of Conti Fenn & Lawrence LLP<http://www.law360.com/firms/conti-fenn>, said his client had relied on information he was given by OptionsXpress officials about what the regulators thought about his trading approach.

"He believed that the SEC had actually approved of his trading strategy," Lawrence said. "Was that true? For this fraud case, it doesn't matter. It doesn't matter at all. They said it. They never took it back."

The Chicago Board was fined $6 million by the SEC in 2013 for its oversight failures with respect to OptionsXpress and other matters. And at Friday's hearing, the SEC attorney denied the trading moves had a green flag.

Under SEC rules, traders can sell shares they don't own as long as they have either "borrowed" the shares from another investor or have a reasonable basis to believe they can borrow shares prior to the typical three-day window for closing out a transaction.

Abusive naked short selling occurs when a trader intentionally fails to deliver a stock within that period, either with an aim to manipulate a security or to avoid fees for borrowing the stock.

Feldman, who was a senior vice president at Maryland-based community bank at the time, had engaged in a complex sham trading scheme that involved buying and selling short billions of dollars of securities of Sears Holding Corp. and others, the SEC's enforcement division charged in 2012. The scheme allowed him to improperly avoid Regulation SHO's requirement to close out short positions and earned him more than $2.6 million in illicit profits over roughly a year-and-a-half period, according to Judge Murray's estimate.

Judge Murray had found that OptionsXpress aided and abetted Feldman's alleged fraud and that it also broke strict rules around closing out short positions within the requisite three days. The alleged misconduct took place before Schwab purchased OptionsXpress in 2011.

EXHIBIT E to the Expert Report of J. W. Christian    Page 117 of 119

The appeal comes at a time when the SEC is fighting fires over the use of its in-house court to try complex matters within hurried time frames and under rules that don't afford defendants many of the same rights they have in federal district court.

But Friday's hearing generated little discussion about the controversy over administrative tribunals. Instead, counsel for both OptionsXpress and Feldman pressed the point that Judge Murray went too far in finding they had broken the law.

The now three-member commission and the agency's Office of General Counsel will assess the legal soundness of Judge Murray's 105-page decision, which was based on a 17-day hearing that produced more than 5,000 pages of trial transcripts and about 320 exhibits.

An attorney for the enforcement division, Frederick L. Block, disputed defense arguments that they were operating under some form of regulatory approval.

"That's his testimony," Block said of Feldman's argument, before noting the trader did not corroborate the claim, which was relayed to him in an email and a subsequent phone call, or call anyone to testify to that point.

"What you need to consider is whether that belief is reasonable," Block told the commission.

Block also said OptionsXpress knew of several investigations into its short sale practices and that it had ignored regulatory guidance from the various exchanges. He asked the SEC to impose repayment of $7.2 million on the firm alone, or roughly $4.5 million more than the disgorgement order that Judge Murray imposed.

"At bottom, what we have here is there was not a single regulator telling them what they were doing complied with Rule 204 [of Reg SHO]," Block said. "What they want you to do is to say that it is the regulator's job to tell them to stop, but that's not the law. It's a regulated entity's job to make sure they are complying at all times with the securities laws."

OptionsXpress is represented by Stephen J. Senderowitz of Winston & Strawn LLP<http://www.law360.com/firms/winston-strawn>. Feldman is represented by Greg T. Lawrence of Conti Fenn & Lawrence LLP.

The SEC was represented by Frederick L. Block.

The case is In the matter of OptionsXpress Inc., file number 3-14848, before the U.S. Securities and Exchange Commission.


Tim Connolly
Chief Executive Officer
Corporate Strategies LLC
Merchant Bankers
123 N. Post Oak Lane, Suite 440
Houston, TX 77024
Office:  713-621 2737
Direct:  713-586-6677
Mobile: 713-824-9393
Fax:  713-586-6678


From: Tim Connolly
Sent: Tuesday, January 19, 2016 6:54 AM
To: James W. Christian
Subject: FW: SEC Mulls Schwab Unit's Naked Short-Sale Sanction Appeal


Tim Connolly
Chief Executive Officer
Corporate Strategies LLC

Exhibit 6 to Expert Report of J. W. Christian     Page 118 of 119

Merchant Bankers
123 N. Post Oak Lane, Suite 440
Houston, TX 77024

Office: 713-621 2737
Direct: 713-586-6677
Mobile: 713-824-9393
Fax: 713-586-6678

From: tim [mailto:service@law360.com]
Sent: Tuesday, January 19, 2016 6:54 AM
To: Tim Connolly
Subject: SEC Mulls Schwab Unit's Naked Short-Sale Sanction Appeal

--------------------------------

A Law360 reader sent you this article. Click on the link below to read the article. You must be registered to read the article. If you're not already registered, just fill in the form to get instant access to this article and thousands of other articles from Law360, the newswire for business lawyers.

SEC Mulls Schwab Unit's Naked Short-Sale Sanction Appeal
A Charles Schwab Corp. subsidiary and a former customer told the U.S. Securities and Exchange Commission Friday that an agency judge overreached when she found them liable for an alleged naked short-selling scheme and ordered them to pay $8.2 million in sanctions.

http://www.law360.com/securities/articles/744936<http://www.law360.com/securities/articles/744936?utm_source=shared-articles&utm_medium=email&utm_campaign=shared-articles>

**winmail.dat**
19K