UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No. 9:11-cr-80205-KAM

UNITED STATES OF AMERICA,

vs.

MITCHELL J. STEIN,

    Defendant.
_____/

# **DEFENDANT'S RESPONSE TO UNITED STATES' SUPPLEMENTAL CALCULATIONS**

    Defendant Mitchell J. Stein respectfully submits this response to the government's "Notice of Supplemental Loss Calculations," filed July 26, 2018 (DE 547).  The government's filing provides the Court with new loss calculation figures from Mr. Melley that were not presented at the evidentiary hearing this Court held on July 19-20, 2018.  The government's new calculations represent the third iteration of Mr. Melley's calculations that has been presented to this Court, none sponsored by an expert, and they continue to be an unreliable basis for this Court to estimate a loss amount.

    The stated motivation for the government's revised calculations is the Court's questions during the hearing (DE 547 at 1), but the new calculations should not assuage the Court's concerns.  Specifically, at the close of the hearing the Court asked the government why it was appropriate for Mr. Melley to include in his calculations losses that investors suffered on Signalife stock before the market learned of the fraud through an alleged corrective disclosure.[1]  As the Court suggested, an investor who sells his shares before the fraud is revealed may well suffer losses, but those losses

---

[1] *See, e.g.*, July 20, 2018 Tr. (DE 552) at 64:18-68:20, 73:6-74:11.

1

are not attributable to the fraud, as any price inflation the fraud may have caused would be present in both the purchase and sale prices.[2] The government's own expert, Dr. Becker, recognized that an investor does not lose money *due to the fraud* until the date on which the fraud is revealed.[3] Mr. Melley's calculations that were introduced at the hearing, which included all investors who purchased during the alleged fraud periods, even if they sold their shares before a corrective disclosure, thus overstated the amount of loss attributable specifically to the fraud.

The government's revision of its calculations implicitly concedes the point Dr. Becker acknowledged—that including investors' losses that occurred prior to a corrective disclosure overstates the amount of losses attributable to the fraud—but its new calculations fail to solve this problem for at least two reasons. *First*, although the government has now excluded investors who held *no* shares on the two alleged disclosure dates (DE 547 at 2),[4] it still includes investors who sold many of their shares prior to any disclosure of the fraud while still holding at least some shares on the disclosure date. If investors who sold all of their shares prior to the fraud's disclosure should be excluded from the calculation—as their losses could not be attributed to the fraud—it makes no sense to include the full losses of investors who sold some of their shares but held others.

---

[2] *See id.* at 65:17-19, 66:21-67:6.

[3] *See, e.g.*, July 19, 2018 Tr. (DE 551) at 112:17-20 (Becker) ("Q. In fact, [investors] don't lose money as a result of the fraud until the date that the fraud is revealed, correct? A. Until at least some portion of the news about the fraud is revealed."); *id.* at 113:8-24 ("Q. So in your view – I think you've said it, but just to be clear – people did not suffer a loss – investors in Signalife did not suffer a loss until April 14th? A. You mean did not suffer a loss due to the fraud? Q. That's correct. A. So based on a constant dollar approach, which I don't know if that's what Peter Melley did, but I think it is, yes, that would be right. Wait. It depends on the date on which they sold. So it's actually not – it's not that they didn't suffer a loss until April 14th; it's actually – it depends on the date on which they sold it if the date on which they sold it was after April 14th, then they may have suffered a loss due to the fraud. Q. And if the date they sold was before April 14th, they would not have suffered a loss due to the fraud? A. Yes.").

[4] Curiously, however, in its calculation based on investors who held shares on April 14, 2008, the government still includes investors who both purchased and sold their shares between April 14, 2008 and August 15, 2008. (DE 547 at 2 (referencing Exhibit C).)  Just as investors who sold all of their shares prior to April 14 could not have been affected by the fraud, investors who purchased after April 14 but sold all of their shares before the disclosure on August 15 could not have been affected by the fraud, because no other news about the fraud reached the market during that period. Their losses, if any, must be attributed to other factors and therefore should also have been excluded. This is an additional reason why the first of the two new calculations is unreliable.

As Dr. Becker conceded, any losses prior to the fraud's disclosure cannot be attributed to the fraud, and thus should be excluded. The government's calculation remains inflated at least because it includes the losses investors who held some shares on the disclosure dates experienced on shares that those same investors had previously sold.[5]

*Second*, more generally the new calculations fail to address the basic issue that prior to the fraud's disclosure, Signalife's stock price moved due to any number of factors, but as Dr. Becker admitted, an investor only suffered a loss due to the fraud when the fraud was revealed to the market.[6] The new calculations do not change that Mr. Melley included losses incurred throughout the fraud period due to price fluctuations that took place before any fraud was revealed to the market.[7] That is true both for investors who sold all of their shares prior to the fraud's disclosure and those who did not, but the government's new calculations—without any explanation—exclude only the former. The Melley calculations thus continue to charge the Defendant with investor losses that could not have been the result of his offense conduct.

---

[5] As an example, according to the blue sheet data, investor "FAO Mesa Capital Mgmt, LLC" purchased 107,200 shares during the "broad" period, and held 1,200 remaining shares according to Mr. Melley on August 15, 2008. Mr. Melley assigns a loss amount to this investor of $11,136.20, which presumably includes all of its losses on the 107,200 shares, and not simply the 1,200 it held at the disclosure. Similarly, an investor identified as "(TRDWRX)RE Lighthse Prtnrs LLC" purchased about 110,000 shares during the broad period and held 43 shares on August 15, 2008. Mr. Melley calculates this investor's loss amount as $2,290.99, which could not possibly be the losses suffered on only the 43 shares still held on the disclosure. Mr. Melley's loss amounts thus necessarily include losses on shares sold prior to August 15, 2008.

[6] *See* July 19, 2018 Tr. (DE 551) at 113:25-115:7 (Becker). Dr. Becker acknowledged that she did not opine on what caused Signalife's stock price to drop during the alleged fraud period prior to any alleged disclosure. (*Id.* at 113:25-114:10.) Dr. Becker and certain of Defendant's experts (Dr. Hayter, Dr. Shapiro, and Mr. Christian) disagreed about whether the price drop during the fraud period resulted from naked short selling of Signalife stock, and on the proper way to measure the relationship between naked short selling and price movements. As explained in Defendant's experts' reports, Dr. Becker's opinion is focused too narrowly on the price impact of naked short selling immediately after it happens, and discounts the potential impact over longer periods. Ultimately, the Court need not resolve this dispute, as all of the experts who testified agreed that losses incurred prior to the revelation of the fraud cannot be attributed to the fraud, whatever else may have caused them.

[7] *See* July 20, 2018 Tr. (DE 552) at 3:21-7:15.

The correct method for this Court to calculate investor losses due to the offense conduct in this case remains the method outlined by defense counsel at the resentencing hearing.[8] Specifically, because the government has failed to make a showing of market-wide reliance,[9] the only investors whose losses can be included in the loss amount are those who provided direct testimony as to their reliance on the misrepresentations, Mr. Taylor and Dr. Harris.[10] Their losses due to the fraud should be measured based on the market's reaction on the date the fraud was revealed, August 15, 2008, and its impact on those investors' holdings on that date. Specifically, as Dr. O'Neal testified, Mr. Taylor and Dr. Harris's losses on the shares they held on August 15, 2008, totaled $2,246.67 and $7,600, respectively, for a total loss amount of $9,846.67.[11] Even if the government had presented proof of market-wide reliance, the total losses to investors due to the fraud (using the "buyers-only" method that the government endorsed) would be no greater than approximately $50,000 under Mr. Melley's "broad" period and $116,859 under his "narrow" period.[12]

---

[8] *See id.* at 84:16-21, 97:4-9.

[9] As Defendant explained at the hearing, the government put on no more of a case on reliance than it did for the first sentencing hearing, which the Eleventh Circuit found insufficient to show market-wide reliance, and failed to take up the concurrence's suggestion to attempt to establish the fraud-on-the-market presumption by proving market efficiency through expert testimony or otherwise. (*Id.* at 79:19-83:5.)

[10] Defendant does not concede that either individual relied upon the alleged fraud, but these are the only two investors the government called who gave any testimony concerning their reliance at all.

[11] *See* July 20, 2018 Tr. (DE 552) at 11:16-14:13 (Dr. O'Neal's testimony about these calculations). Dr. O'Neal calculated the impact of the four-cent stock price drop on August 15-18, 2008 on the remaining shares that Mr. Taylor and Dr. Harris held on August 15 (as determined by Mr. Melley), and divided the result by three reflecting (as Dr. O'Neal also testified) the confounded nature of the August 15, 2008 Signalife 10-Q, which contained two pieces of negative information unrelated to the fraud that would also have been important to investors. (*Id.*; *see also* July 19, 2018 Tr. (DE 551) at 246:25-251:2 (O'Neal).) The government did not include either Mr. Taylor or Dr. Harris in its loss calculations for the "narrow" period, which ended on April 14, 2008. (July 20, 2018 Tr. (DE 552) at 11:16-14:13 (O'Neal).)

[12] *See* July 20, 2018 Tr. (DE 552) at 7:16-11:15 (O'Neal), 97:21-98:6; DX 74 and 75 (DE 554-44 and 554-45) (exhibits showing Dr. O'Neal's calculations based on corrections to Mr. Melley's methodology). With respect to the broad period, Dr. O'Neal calculated the total impact of the $0.01 price drop on August 15, 2008, on all investors' remaining shares on that date (as determined by Mr. Melley) as $152,237. (July 20, 2018 Tr. (DE 552) at 7:16-11:15 (O'Neal), 97:21-98:6) That figure should then be divided by three for the reasons explained above. For the narrow period, Dr. O'Neal calculated the total impact of the $0.17 price drop on April 14, 2008, on all investors' remaining shares on

| | |
|---|---|
| August 2, 2018 | Respectfully Submitted, |
| | BENJAMIN GRUENSTEIN<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, New York 10019-7475<br>Phone: (212) 474-1080<br>Fax: (212) 474-3700<br>Email: bgruenstein@cravath.com |
| | By: _____/s/_____<br>    Benjamin Gruenstein, Esq.<br>    (Admitted *Pro Hac Vice*) |
| | RICHARD C. KLUGH |
| | Richard C. Klugh, P.A.<br>25 SE 2nd Ave Suite 1100<br>Miami, FL 33131-1674<br>United States<br>Phone: 305-536-1191<br>Fax: 305-536-2170<br>Email: rickklu@aol.com |
| | By: _____/s/_____<br>    Richard C. Klugh, Esq.<br>    Florida Bar No. 305294 |

---

that date (as determined by Mr. Melley).  (*Id.* at 7:16-9:17.)  For the reasons explained at the hearing and in Defendant's sentencing memorandum, only the August 15, 2008 10-Q should be seen as a "corrective disclosure" in this case.  While the Court asked questions of Dr. O'Neal concerning whether the April 14 webcast could have been a corrective disclosure of the company's April 11 press release (*see id.* at 40:7-42:9 (O'Neal)), the government has never alleged that the April 11 press release was fraudulent or that investors lost due to that press release.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 2, 2018, I electronically filed the foregoing documents with the Clerk of the Court and all counsel of record using CM/ECF.

By     /s/
        Richard C. Klugh, Esq.